TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Brian F. Moore

*Counsel for the Petitioning Creditors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re: | : | Chapter 7 |
|  | : |  |
| ELETSON HOLDINGS INC., et al.,[1] | : | Case No. 23-_____ |
|  | : |  |
|  | : | (Joint Administration Requested) |
| Debtors. | : |  |
|  | : |  |
------------------------------------------------------------x

**STATEMENT OF PETITIONING CREDITORS IN SUPPORT OF INVOLUNTARY CHAPTER 7 PETITIONS AGAINST ELETSON HOLDINGS INC., ELETSON FINANCE (US) LLC, AND AGATHONISSOS FINANCE LLC**

---

[1]    The Debtors in these chapter 7 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND .............................................................................................................. 5

    A. The Debtors ....................................................................................................... 5

    B. The Notes .......................................................................................................... 8

    C. Circumstances Leading to the Filing of the Involuntary Petitions .................. 11

        (1) The Debtors' Default Under the Indenture .................................................. 11

        (2) The First Failed RSA and Strict Foreclosure ................................................ 12

        (3) The Second Failed RSA ................................................................................ 15

        (4) The Debtors' Continuing Defaults under the Indenture
            and the SDNY Action ................................................................................... 17

JURISDICTION AND VENUE ........................................................................................ 18

ARGUMENT ................................................................................................................. 21

    A. The Petitioning Creditors Are Eligible Under Section 303(b) of the Bankruptcy
       Code to File the Involuntary Petitions ............................................................. 21

    B. The Petitioning Creditors Are Authorized to File the Involuntary Petition
       Under the Terms of the Indenture, the Notes, and the Trust Indenture Act . 22

    C. The Debtors Are Generally Not Paying Their Debts As They Come Due ..... 26

        (1) Number of Unpaid Claims .......................................................................... 27

        (2) Amount of Unpaid Claims .......................................................................... 28

        (3) Materiality of Non-payment ....................................................................... 29

        (4) Nature and Conduct of Debtor's Business .................................................. 29

CONCLUSION .............................................................................................................. 30

Pursuant to section 303 of title 11 of the United States Code (the "Bankruptcy Code"), Pach Shemen LLC, VR Global Partners, L.P., and ALPINE PARTNERS (BVI), L.P. (collectively, the "Petitioning Creditors") have filed involuntary petitions (the "Involuntary Petitions") under chapter 7 of the Bankruptcy Code against Eletson Holdings Inc. ("Eletson Holdings"), Eletson Finance (US) LLC ("Eletson Finance"), and Agathonissos Finance LLC ("Eletson MI" and, together with Eletson Holdings and Eletson Finance, the "Debtors"), the Debtors in the above-captioned cases (the "Bankruptcy Cases") because the Debtors have not paid more than approximately $354 million in principal and interest (plus continually accruing interest, fees, and other amounts) to holders of the Notes (as defined below), and are thus generally not paying their debts as they become due.  The Petitioning Creditors therefore respectfully request that this Court enter an order for relief against each of the Debtors pursuant to section 303(h)(1) of the Bankruptcy Code and Rule 1013 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").[2]

## PRELIMINARY STATEMENT[3]

1.      Following several Events of Default and multiple failed attempts at out-of-court restructurings (that resulted in the Strict Foreclosure and partial satisfaction of the Notes in 2019), the Debtors have not made any interest payments on the Notes since due in 2019 and have failed to pay the Notes on or after their maturity date.  Indeed, other than in connection with the Strict Foreclosure, the Debtors *have never made any cash payme nts on account of the Notes* since their issuance and have

---

[2]    Concurrently with the filing of the Involuntary Petitions, the Petitioning Creditors have filed a motion for joint administration of the Debtors' bankruptcy cases pursuant to Bankruptcy Rule 1015(b).

[3]    Capitalized terms used but not otherwise defined in this Preliminary Statement have the meanings ascribed to such terms below.

failed to provide basic financial and other reporting information as required under the Indenture—such as balance sheets and statements of cash flow, which should be readily available—despite repeated requests. Thus, the Petitioning Creditors have filed the Involuntary Petitions to ensure a transparent restructuring process for the Debtors and avoid transactions that diminish the Debtors' estates, and to obtain the aid of this Court in assuring that all parties will be dealt with fairly.[4]

2.      As required by section 303(b)(1) of the Bankruptcy Code, each of the Petitioning Creditors is the holder of a claim against each of the Debtors for principal and interest that is neither contingent as to liability nor the subject of a bona fide dispute as to liability or amount.[5] Such claims are, in the aggregate, at least $18,600 more than the value of any lien on property of the Debtors securing them. As beneficial holders of the Notes, each of the Petitioning Creditors has an absolute right under the Indenture, the Notes, and Section 316(b) of the Trust Indenture Act[6] to enforce its right to receive payment of principal and interest when due.

3.      The Debtors are generally not paying their debts as they become due and repeatedly failed to honor their monetary and nonmonetary contractual obligations under the Indenture and the Notes. Interest payments were due and were unpaid on April 15, 2019, and each subsequent interest payment date—each due on January 15, April 15, July 15, and October 15 of each calendar year—up to and including the Maturity Date. In the Forbearance Agreement and two RSAs, the Debtors

---

[4]   *See, e.g., In re CLE Corp.*, 59 B.R. 579, 584 (Bankr. N.D. Ga. 1986) ("[P]etitioners had a number of legitimate reasons for initiating this case:  to invoke the protection and supervision of the Court to protect themselves and other creditors; to investigate, account for, and protect the Debtor's assets, and to effect an orderly and effective reorganization of the Debtor under this Court's supervision.").

[5]   Concurrently with the filing of the Involuntary Petitions, the Petitioning Creditors have filed the requisite disclosures pursuant to Bankruptcy Rule 1003 (the "Supporting Affidavits").

[6]   15 U.S.C. §§ 77aaa-77bbbb.

acknowledged numerous monetary and non-monetary defaults (at least seven), and

that their obligations under the Indenture and the Notes were valid, binding, and

enforceable.  These payment defaults are just one of many Events of Default that

occurred shortly after the Debtors issued the Notes.  Furthermore, the Debtors failed to

pay the full outstanding amount due under the Notes when the Maturity Date occurred

on January 15, 2022.[7]  Without question, the Debtors are generally not paying their

debts as they come due under section 303(h) of the Bankruptcy Code.[8]  The number and

amount of overdue claims against the Debtors are very substantial—indeed, upon

information and belief the Debtors' outstanding and unpaid obligations under the

Notes constitute the largest claims against their estates.

       4.     The Petitioning Creditors believe that, in light of market

improvements in the shipping industry, there is potentially significant value at the

Debtors that can be available to satisfy creditors.  That said, the shipping industry is

very cyclical, and this value may be quickly lost depending upon market forces.  Given

the Debtors' failure to provide basic financial and other information required under the

Indenture, the Petitioning Creditors have serious concerns that, in light of the Debtors'

apparent financial condition, they are conducting insider and other affiliate transactions

that transfer their assets out of the reach of creditors and are "conducting [their]

---

[7]    As explained below, on January 11, 2023, the Trustee (as defined below) commenced the SDNY
Action to collect the outstanding amounts due under the Notes.

[8]    As several courts have held, filing an involuntary petition is among the remedies available to
noteholders following payment defaults such as those that have occurred here, even if the indenture
contains a "no-action clause" that conditions the exercise of remedies in different circumstances.  *See,
e.g., Envirodyne Indus., Inc. v. Conn. Mut. Life Co. (In re Envirodyne Indus., Inc.)*, 174 B.R. 986, 997 (Bankr.
N.D. Ill. 1994); *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361,
368 (Bankr. M.D. Ga. 2014); *GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re
Globo Comunicacoes E Participacoes S.A.)*, 317 B.R. 235, 248 (S.D.N.Y. 2004).

financial affairs in a manner not consistent with one operating in good faith and in the

regular course of business."[9]

5.     Because of these concerns and the Debtors' conduct to date in the

SDNY Action, the Petitioning Creditors come to this Court seeking a process that will

provide the Debtors' creditors with information regarding the Debtors' financial

condition and provides the disinfecting sunlight and transparency of a bankruptcy

proceeding.  In that regard, the Petitioning Creditors intend to file a motion shortly

pursuant to Bankruptcy Rule 2004 for an examination of the Debtors' financial

condition and related affairs (the "Rule 2004 Motion").

6.     Providing information is one of many critical pieces necessary to

engage with the Debtors in good faith on the terms of a consensual restructuring.

Although the Petitioning Creditors have filed involuntary chapter 7 petitions because

they believe that a trustee may be in the best interests of all creditors, the Petitioning

Creditors are ready, wiling and able to engage in good faith settlement discussions with

the Debtors.  Accordingly, the Petitioning Creditors are willing to work with the

Debtors regarding resolution of the Involuntary Petitions and their conversion of the

Bankruptcy Cases to voluntary chapter 11 proceedings so long as the Debtors agree to

honor and in fact fulfill their obligations as debtors in possession—despite failing to

honor their obligations repeatedly in the past—and likewise engage with their creditors

in good faith.

---

[9]   *In re Reed*, 11 B.R. 755, 760 (Bankr. S.D. W. Va. 1981).  For example, in addition to requesting basic
financial information, the Trustee has asked the Debtors to confirm whether in the last three years
Eletson Holdings or its subsidiaries have made transfers to insiders outside of the ordinary course of
business.  The Debtors have not responded to this request for nearly a month.

## BACKGROUND

7.      This section focuses upon the facts that are relevant to the request
of the Petitioning Creditors for entry of orders for relief.  Because the Debtors have not
responded to requests for financial and other information they are obligated to provide
under the Indenture, the description of facts concerning the Debtors and their
operations are largely based upon information and belief and will be supplemented as
necessary as facts are verified and/or additional facts become known.[10]

### A.      The Debtors

8.      The Debtors are part of a collection of companies that operate
under the name "Eletson."  Eletson is a family-owned international shipping company,
which touts itself as having "a global presence with headquarters in Piraeus, Greece as
well as offices in Stamford, Connecticut, and London."[11]  At one time, Eletson claimed
to "own[] and operate[] one of the world's largest fleets of medium and long-range
product tankers" and boasted a fleet consisting of "17 double hull tankers with a
combined capacity of 1,366,497 dwt, 5 LPG/NH3 carriers with a combined capacity of
174,730 cbm and 9 LEG carriers with capacity of 108,000 cbm."[12]  Upon information and
belief, Eletson conducts trading operations in the United States and the Debtors
regularly conduct business throughout the United States, including in the State of New
York.

9.      Eletson Holdings, a Liberian company, is Eletson's ultimate parent
company and is the direct parent and owner of 100% of the equity interests in the two

---

[10]   As noted above, concurrently with the filing of the Involuntary Petitions, the Petitioning Creditors
have filed a Rule 2004 Motion to examine the Debtors with respect to their financial condition and
other issues.

[11]   *See* https://www.eletson.com/index.php (last visited Mar. 1, 2023).

[12]   *Id.*

other Debtors in the Bankruptcy Cases, Eletson Finance and Eletson MI.  The Debtors

are the "Co-Issuers" under the Indenture.

10.     Upon information and belief, Eletson Holdings owns, directly or

indirectly, (a) 100% of the equity interests in other subsidiaries, including Eletson

Corporation, the Debtors' management company, and a portion of the equity interests

in Eletson Gas LLC ("Eletson Gas"), a joint venture,[13] (b) equity in special purpose

vehicles that have equity value in four product tankers, (c) a number of real estate

properties for commercial office space, and (d) cash in undisclosed amounts.[14]  Upon

information and belief, Eletson Holdings has other classes of outstanding secured and

unsecured debt, including potentially up to $30 million outstanding on account of

various credit facilities with Greek banks (some of which may have security against

certain real estate assets of Eletson).

11.     Eletson Finance is a Delaware limited liability company and was

formed for the purpose of issuing the Notes.  Under Section 4.14 of the Indenture,

Eletson Finance is prohibited from holding any material assets, becoming liable for any

material obligations, or engaging in any trade or business, or conducting any business

activity" other than the issuance of its stock to Eletson Holdings (or any wholly-owned

restricted subsidiaries thereof) and the issuance of the debt obligations on account of the

Notes (subject to certain limited exceptions contained in the "Limitations on Debt"

provisions of Section 4.09 of the Indenture).

---

[13]   An affiliate of one of the Petitioning Creditors owns the balance of the equity interests in the Eletson
Gas joint venture and, as of the petition date, was engaged in mandatory arbitration of certain
disputes between such holder and Eletson Holdings concerning the ownership of the equity interests
in Eletson Gas and certain related matters.

[14]   Eletson Holdings owns, directly or indirectly, equity interests in a subsidiary with an office in
Stamford, Connecticut, where the SDNY Action was served in accordance with the Indenture.
*See infra* ¶¶ 37 & 41.

12.     Eletson MI is a Marshall Islands limited liability company and previously served as the owner of 100% of the equity interests in the thirteen vessel-owning special purpose vehicles that guaranteed the Debtors' obligations under the Indenture and the Notes (the "<u>Guarantors</u>") and pledged certain of their assets relating to tanker vessels as collateral securing the Notes (the "<u>Collateral</u>").[15]  Since the Strict Foreclosure (as defined below), the Guarantors have been released from their obligations on account of the Notes and the Collateral has been released.

13.     From the limited public information available concerning Eletson, the Petitioning Creditors have serious concerns about the status of the Debtors' assets and an apparent pattern of behavior of not honoring their contractual obligations.  In addition to not paying the principal and interest on the Notes when they were due, the following is a summary of certain recent events that highlight these concerns:

- On or about November 25, 2021, a Greek court ordered the arrest of an oil tanker owned by Eletson in a "long running dispute" with Chinese lessor CISC Leasing that resulted in prior vessel arrests.[16]

- On or about May 28, 2021, the High Court of India ordered the arrest of *Anafi*, a gas tanker owned by Eletson Gas.  The arrest was to enforce $374,000 outstanding for fueling a crude oil tanker vessel (*MT Strofades*).  The vessel was released a week after the arrest.[17]

- On April 23, 2021, a lawsuit filed by Haotai International Ship Lease Co., Ltd., a Hong Kong-based tanker lessor, was voluntarily dismissed before a warrant for arrest was issued.  The lawsuit

---

[15]   The guarantors were Erikoussa SME, Alonissos SME, Agathonissos SME, Makronissos SME, Pelagos II SME, Angistri SME, Skopelos II SME, Megalonissos SME, Shinoussa Shipping Corporation, Sarakino Shipping Corporation, Venetiko Shipping Corporation, Skyros II Shipping Corporation, and Sikinos II Shipping Corporation.

[16]   Harry Papachristou, *Dispute Between Eletson and Chinese Lessor Escalates in Greece* (Nov. 25, 2021), https://www.tradewindsnews.com/tankers/dispute-between-eletson-and-chinese-lessor-escalates-in-greece/2-1-1104521 (last visited Mar. 2, 2023).

[17]   Bob Rust, *Eletson Corp. Creditor Arrests Eletson Gas Ship Over Unpaid Bunkers* (May 28, 2021), https://www.tradewindsnews.com/gas/eletson-corp-creditor-arrests-eletson-gas-ship-over-unpaid-bunkers/2-1-1017844 (last visited Mar. 2, 2023).

involved a dispute over payment of charter fees totaling nearly
$731,000 over three months.[18]

- On March 22, 2021, a crude oil tanker vessel (*MT Strofades*) owned
  by Eletson was arrested and held in Singapore in connection with
  disputes over payments for goods and services to CISC Leasing, the
  leasing arm of China Shipbuilding Industry Corp. The vessel was
  released in or around late April 2021.[19]

- On February 12, 2021, the U.S. District Court for the Eastern District
  of Louisiana entered an order authorizing and directing the seizure
  of an Eletson tanker vessel (*MT Argironissos*) in a lawsuit
  commenced by Haosheng International Ship Lease Co., a Chinese
  lessor, seeking outstanding charter hire payments totaling nearly
  $800,000. The case was voluntarily dismissed by the parties on
  April 22, 2021.[20]

- On February 5, 2021, Cosco Shipping Development, a Chinese
  lessor, arrested two "large modern tankers" owned by Eletson off
  of the coasts of Galveston, Texas, and England.[21]

**B.    The Notes**

14.    On or about July 2, 2018, the Debtors, as the Issuers and the

Guarantors, entered in the Indenture (together with all amendments, modifications,

supplements, and ancillary documents related thereto, the "Indenture")[22] with

Wilmington Savings Fund Society, FSB ("WSFS"), as Trustee and Collateral Agent (in

---

[18]    *Haotai International Ship Lease Co., Ltd. v. M/V SALAMINA, in rem, and Eletson Chartering Inc., Eletson
Holdings Inc. and Eletson Corp., in personam,* Case No. 21-cv-00221 (GCH) [Docket No. 11] (S.D. Tex.
Apr. 23, 2021).

[19]    Ship & Bunker News Team, *Panamax Tanker Arrested in Singapore* (Mar., 23, 2021),
https://shipandbunker.com/news/apac/561711-panamax-tanker-arrested-in-singapore (last visited
Mar. 2, 2023).

[20]    Matt Coyne, *Another Eletson Corp. Tanker Caught in Dispute with Chinese Lessors* (Feb. 18, 2021),
https://www.tradewindsnews.com/law/another-eletson-corp-tanker-caught-in-dispute-with-
chinese-lessors/2-1-965016 ("If the ship is arrested, it will be the fourth Eletson ship involved in the
ongoing legal fight") (last visited Mar. 2, 2023).

[21]    Harry Papchristou, *Cosco Leasing Unit Moves to Arrest Eletson Tanker Pair* (Feb. 5, 2021),
https://www.tradewindsnews.com/tankers/cosco-leasing-unit-moves-to-arrest-eletson-tanker-
pair/2-1-957424 (last visited Mar. 2, 2023).

[22]    A copy of the Indenture is attached hereto as **Exhibit A**.

such capacities, the "Trustee").[23]  Under the Indenture, the Debtors issued First

Preferred Ship Mortgage Notes due 2022 (the "Notes") in an aggregate principal

amount of $314,068,360.  Each Guarantor guaranteed the Debtors' obligations under the

Notes and the Indenture (individually, a "Guarantee").

15.    As set forth in the Indenture and the Form of Note attached to the

Indenture, interest on the Notes accrued at specified rates and in a specified manner

during three different time periods:  (a) from January 16, 2018 to July 15, 2018, interest

was payable semiannually, in arrears, at a rate of 12.00% per annum by increasing the

principal amount of the outstanding Notes or by issuing new Notes ("PIK Interest"),

(b) from July 16, 2018 to January 15, 2019, interest was payable semiannually, in arrears,

at a rate of 9.625% per annum, in cash ("Cash Interest"); and (c) from and after January

16, 2019, Cash Interest was payable quarterly, in arrears, at a rate per annum of

(i) 9.625% for any interest payment date for which the Trailing TCE (as defined in the

Indenture) was less than $20,000 or (ii) 10.625% plus 1.00% for each integral multiple of

$2,000 by which the Trailing TCE for such interest payment date exceeds $20,000 (up to

a maximum of 14.625% per annum), payable on each January 15, April 15, July 15, and

October 15 as Cash Interest.[24]  In addition, the Debtors agreed to pay interest on

overdue principal, interest, and premium, if any, at the rate of 1.00% per year in excess

of the then-applicable interest rate.[25]  The Indenture also required the Debtors to repay

the principal and any unpaid and accrued interest on the maturity date of January 15,

2022 (the "Maturity Date").[26]

---

[23]  WSFS is also the "Registrar" and "Paying Agent" under the Indenture and the "Custodian" with
respect to the Notes.  *See* Indenture § 2.03.

[24]  Indenture § 4.01 & Ex. A (Form of Note).

[25]  *Id.* § 4.01.

[26]  *Id.*, Ex. A (Form of Note).

16.    The Indenture specifies certain events of default (each, an "Event of Default").  Section 6.01 of the Indenture provides, in relevant part, that each of the following is an Event of Default:

(a) default for 30 days in the payment when due of any interest or any Additional Amounts on any Note;

(b) default in the payment of the principal of or premium, if any, on any Note at its Maturity (upon acceleration, optional or mandatory redemption, if any, required repurchase or otherwise);

…

(e) failure to comply with any covenant or agreement of an Issuer or of any Restricted Subsidiary that is contained in this Indenture, the Notes, any Guarantee or any Security Document (other than specified in clause (a), (b), (c), or (d) above) and such failure continues for a period of 30 consecutive days or more after notice has been given to the Company by the Trustee by Holders of at least 25% in aggregate principal amount of the Notes then outstanding specifying the default and demanding compliance . . . . [27]

17.    The Notes were previously secured by a first-priority lien in, and security interest on, certain Collateral pledged by the Debtors as security for all obligations and indebtedness owed by each Debtor to the Trustee and the holders of the Notes.  Specifically, the Debtors pledged the following assets as Collateral:  (a) all outstanding common shares or membership interests in Eletson Finance, Eletson MI, and the Guarantors (the "Pledged Equity"), (b) thirteen shipping vessels owned by the Guarantors (the "Mortgaged Vessels"), (c) the earnings arising from freights, hires and other earnings from the operation and use of or relating to each such Mortgaged Vessel, (d) all other cash and various accounts of Eletson MI and the Guarantors, and (e) all proceeds of any of the foregoing.  On or about July 2, 2018, the Debtors, the Trustee, and the Guarantors executed additional agreements and other documents evidencing the

---

[27]    *Id*. § 6.01(a), (b), (e).

creation of the liens and security interests on the Collateral and the granting of such

liens and security interests to the holders of the Notes and to the Trustee (the "<u>Security</u>

<u>Documents</u>").

18.    As explained in greater detail below, Section 13.11 of the Indenture

contains a New York choice of law and forum selection clause applicable to the

Indenture, the Notes, the Guarantees, and the Security Documents.[28]

C.    <u>Circumstances Leading to the Filing of the Involuntary Petitions</u>

(1)    <u>The Debtors' Defaults Under the Indenture and the Notes</u>

19.    Following the initial period of PIK Interest, on January 15, 2019, the

Debtors failed to make the first Cash Interest payment on the Notes in the amount of

approximately $12,172,111.86, which constituted an Event of Default as of February 14,

2019.[29]  On or about January 25, 2019, the Issuers, the Guarantors, and an ad hoc group

of holders of more than 90% of the Notes (the "<u>Ad Hoc Group</u>") entered into a

forbearance agreement (the "<u>Forbearance Agreement</u>").

20.    Under the Forbearance Agreement, the Debtors and the Guarantors

(a) ratified and affirmed the Notes and Security Documents and acknowledged that the

Notes and Security Documents constituted valid and binding obligations of the Debtors

and Guarantors, and (b) acknowledged that five (5) Events of Default had occurred and

were continuing, including, among other things, the Debtors' failure to make the

required Cash Interest payment on January 15, 2019 and breaches of various other

covenants.[30]  Also under the Forbearance Agreement, the Ad Hoc Group agreed to

---

[28]    Indenture § 13.11.

[29]    *Id.* § 6.01(a).

[30]    In addition to the payment default, the Debtors acknowledged Events of Default on account of (a) the
Debtors' failure to cause the disposal of certain vessels (*id.* §§ 4.29(a) & (b)), (b) Eletson MI's failure to
maintain certain liquidity levels (*id.* § 4.34), and (c) the Debtors' failure to dispose of certain

11

forbear from pursuing remedies available to them under the Indenture until the earlier of February 11, 2019 or the occurrence of a termination event under the Forbearance Agreement.

21.    On the same day that it executed the Forbearance Agreement, Eletson Holdings issued a press release stating:  "The Company is confident that it has sufficient liquidity in the near term to operate its business in the ordinary course while it works to implement its financial restructuring."[31]  Notwithstanding that statement, the Events of Default set forth in the Forbearance Agreement continued, and the Forbearance Agreement terminated on February 11, 2019.

(2)    <u>The First Failed RSA and Strict Foreclosure</u>

22.    Following the termination of the Forbearance Agreement, on April 8, 2019, the Trustee, at the direction of the Ad Hoc Group, sent a Notice of Events of Default to the Debtors and the Guarantors formally notifying them of Events of Default that had occurred and that were continuing under the Indenture and Security Documents, including the Debtors' failure to make the Cash Interest payment on January 15, 2019 and breaches of various other covenants.

23.    On or about June 24, 2019, the Debtors, the Guarantors, certain equity holders of Eletson Holdings, and the Ad Hoc Group entered into a Restructuring Support Agreement (the "<u>June 2019 RSA</u>") setting forth the terms of a restructuring of, among other things, the Debtors' obligations under the Notes and the Indenture

---

investments in the Piraeus Bank Group (as defined in the Indenture) that were directly or indirectly owned by the Debtors (*id.* § 4.37)).

[31]    *See* Eletson Announces Entry into a Forbearance Agreement and Grace Period (Jan. 25, 2019) (available at https://www.eletson.com/images/newfiles/Eletson_Press_Release_re_Forbearance_20190125_1800. pdf (last visited Mar. 1, 2023)).

(the "June Restructuring").  Under the June 2019 RSA, the Debtors and the Guarantors

acknowledged that seven (7) Events of Default had occurred and were continuing.[32]

24.     The June Restructuring contemplated that the parties would

effectuate a series of transactions through a joint prepackaged chapter 11 plan through a

chapter 11 case filed in the U.S. Bankruptcy Court for the Southern District of New York

(the "SDNY Bankruptcy Court"), including the issuance of new notes, convertible notes,

and new preferred stock of the Debtors in exchange for, among other things, partial

satisfaction of the existing Notes.  The effectiveness of the June 2019 RSA and the June

Restructuring transactions was conditioned on the Debtors meeting various milestones

as set forth in Exhibit C to the June 2019 RSA.  Those milestones included, among other

things, reaching agreement on the solicitation materials for the June Restructuring on or

before July 15, 2019, commencing solicitation with respect to the June Restructuring on

or before July 22, 2019 (subject to a one week extension under certain circumstances),

and reaching agreement on the remaining definitive documents on or before August 9,

2019.

25.     The June 2019 RSA also contemplated the execution and delivery of

a Strict Foreclosure Agreement by the Debtors, including Eletson MI (the "Strict

Foreclosure Agreement"), which was executed by the Debtors, the Guarantors, and the

Trustee on or about June 24, 2019.  Under the Strict Foreclosure Agreement, Eletson MI

transferred all rights to and equity interests in the Guarantors to non-party New

Agathonissos Finance LLC, a Marshall Islands limited liability company beneficially

---

[32]   In addition to the defaults set forth in the Forbearance Agreement, under the June 2019 RSA, the
Debtors and Guarantors acknowledged that the following additional Events of Default had occurred
and were continuing:  (a) the Debtors' failure to cause Collections (as defined in the Indenture) to be
deposited, transferred and used in accordance with the Indenture (Indenture §§ 4.31(a)-(d)), and
(b) the Debtors' failure to make payments in connection with the purchase or financing of a
Newbuilding Vessel (as defined in the Indenture) (*id.* § 4.31(e)).

owned by the holders of the Notes ("New Agathonissos").  The transfer of all equity interests in the Guarantors caused the automatic and unconditional release of each Guarantee under Section 11.05(a) of the Indenture.

26.    The Strict Foreclosure Agreement provided that, if the June Restructuring transactions contemplated by the June 2019 RSA were not consummated on or before the earlier of (a) December 24, 2019 or (b) the termination of the June 2019 RSA, so long as the Strict Foreclosure Agreement remained in full force and effect, the obligations owed to the Trustee and the holders of the Notes would be deemed partially satisfied in the amount of $130 million in exchange for the acceptance by the holders of the foreclosed interests in the Guarantors.

27.    On or about August 9, 2019, the Ad Hoc Group sent Eletson Holdings a Notice of Termination of the June 2019 RSA (the "June 2019 RSA Notice of Termination").  The June 2019 RSA Notice of Termination informed Eletson Holdings that a termination event had occurred due to the failure of Eletson Holdings to meet the milestones described above in the June 2019 RSA.  The June 2019 RSA Notice of Termination released the Ad Hoc Group and all other consenting holders of the Notes from all commitments, undertakings, and agreements related to the June 2019 RSA.

28.    Following direction letters sent by the Ad Hoc Group to the Trustee regarding various Events of Default that had occurred under the Indenture and the Security Documents, on April 8, 2019, the Trustee sent a Notice of Events of Default to the Debtors and the Guarantors formally notifying them of such events of default, including the Debtors' failure to make the Cash Interest payment on January 15, 2019.

29.    At the direction of the Ad Hoc Group, on or about October 16, 2019, the Trustee delivered a Consent Solicitation Statement to the holders of the Notes (the "Consent Solicitation Statement").  The Consent Solicitation Statement solicited the

consent of the holders of the Notes to amend the Indenture in certain respects and to

direct the Trustee to release all liens on the Collateral securing the Notes.  After

receiving the consent of holders representing two-thirds of the outstanding principal

amount of the Notes, the Debtors and the Trustee executed a Supplemental Indenture

on or about October 24, 2019 (the "Supplemental Indenture").

30.    On or about October 24, 2019, the Trustee effected the release of all

the liens on the Collateral securing the Notes.

(3)    The Second Failed RSA

31.    On October 29, 2019, the parties to the June 2019 RSA (other than

Eletson MI and the Guarantors) entered into a second Restructuring Support

Agreement (the "October 2019 RSA" and, together with the June 2019 RSA, the "RSAs")

again, setting forth the terms of a restructuring of, among other things, the Debtors'

obligations under the Notes and the Indenture (the "October Restructuring").  Under

the October 2019 RSA, the Debtors (other than Eletson MI) again acknowledged that the

seven (7) Events of Default set forth in the June 2019 RSA had occurred and were

continuing.

32.    In the October 2019 RSA, the Debtors agreed to allocate the vast

majority of their post-reorganization value to the holders of the Notes.  Specifically, the

October Restructuring contemplated that the parties would effectuate a series of

transactions, including the issuance of preferred equity exclusively to the holders of the

Notes (with an 8% annual dividend) and the issuance of new common equity split

between the holders of the Notes (70%) and Eletson Management Company (30%).  The

October Restructuring also provided for certain vessel sales, subject to obtaining

applicable consents, the proceeds of which would be distributed to creditors "mainly

bondholders."  Like the June 2019 RSA, the October 2019 RSA provided for various

15

transaction milestones related to the proposed out-of-court or, in the alternative, in-court restructuring transactions to be filed in the SDNY Bankruptcy Court.

33.   On February 2, 2023, counsel for the Ad Hoc Group sent a Notice of Termination of Restructuring Support Agreement stating that because the Debtors had failed to comply with the milestones and had been in breach of the October 2019 RSA since November 2019, for the avoidance of doubt, the October 2019 RSA was terminated by the Consenting Noteholders (as defined in the RSA).  On February 6, 2023, counsel for the Debtors responded with a letter generally contesting the Ad Hoc Group's termination of the October 2019 RSA.

34.   Putting aside these technical assertions about the October 2019 RSA, it is indisputable that the milestones thereunder were never satisfied and the October Restructuring transactions never occurred.  Section 28 of the October 2019 RSA makes clear that even if a Termination Event does not occur, "if the transactions contemplated by this Agreement or otherwise set forth in the Restructuring Term Sheet are not satisfied as provided herein, if (x) a Termination Event occurs, or (y) this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests."[33]  Thus, even if the Debtors could argue that the October 2019 RSA was never properly terminated by the Consenting Noteholders, the rights of the holders of the Notes thereunder are nevertheless preserved and, it goes without saying, that the rights of any holders of the Notes that are not subject to the October 2019 RSA are not bound by its terms.

---

[33]   "Termination Event" is defined to include, among other things, the occurrence of (without the requirement to provide notice) of (a) Debtors' breach of any representation, warranty, covenant, or obligation under the October 2019 RSA or (b) the Debtors' failure to meet any of the milestones set forth therein.

(4)     The Debtors' Continuing Defaults
            under the Indenture and the SDNY Action

35.     Since the delivery of the June 2019 RSA Notice of Termination, the

Debtors have failed to make any required payments of interest and principal on the

Notes.  On January 15, 2022, the Maturity Date of the Notes occurred, and all

outstanding principal and unpaid interest became immediately due and payable, which

the Debtors failed to pay when due (or at any time since then).

36.     On January 11, 2023, at the direction of the holders of a majority in

aggregate principal amount of the then-outstanding Notes, the Trustee filed a breach of

contract and indemnification complaint (the "SDNY Action") against the Debtors in the

U.S. District Court for the Southern District of New York (the "SDNY District Court").

The SDNY Action seeks monetary relief in the amount of all unpaid principal, and

accrued and unpaid interest, and indemnification for all losses incurred under the

Indenture and the Notes.  As of the date of the filing of the SDNY Action, such amounts

totaled approximately $354,159,101.92.

37.     By agreement of the parties following the Debtors' request, the

Debtors' response deadline to the SDNY Action has been extended to March 8, 2023,

and the SDNY District Court has scheduled the initial pre-trial conference on March 28,

2023.  Based on communications between the Trustee and the Debtors, the Petitioning

Creditors understand that the Debtors are refusing to accept service of the SDNY Action

and are contesting service despite having been served at the Debtors' office as set forth

in the Indenture for receipt of service of process.  In addition to these delay tactics, the

the Debtors continue to ignore repeated requests from the Trustee to provide basic

financial and other reporting information as required under the Indenture, which

should be readily available.

38.     The Debtors have provided no justification for their failure to pay the principal and interest under the Notes when due or provided any basis to claim that the Debtors' obligations under the Notes are not due and payable.  The Debtors have also not provided financial information requested by the Trustee.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction over these cases under 28 U.S.C. §§ 157 and 1334.  Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

40.     Each of the Debtors are eligible for relief under chapter 7 of the Bankruptcy Code.  Section 109(a) of the Bankruptcy Code provides, in pertinent part, that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  11 U.S.C. § 109(a).

41.     Section 13.11 of the Indenture provides that the "Indenture, the Notes, the Guarantees, and the Security Documents will be governed by and construed in accordance with the laws of the State of New York."[34]  In addition, Section 13.11 of the Indenture provides that the Issuers and Guarantors have irrevocably submitted to the jurisdiction of any New York state or federal court in the County of New York over "any suit, action or proceeding arising out of or relating to this Indenture, the Notes, the Guarantees or any Security Document."[35]  Furthermore, while the Notes remain outstanding, the Issuers and the Guarantors have consented and agreed to service of "any and all legal process, summons, notices and documents" at any business location maintained by the Issuers or Guarantors from time to time in the United States,

---

[34]   Indenture § 13.11.

[35]   *Id*.

including at offices located at 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.[36]  If at any time neither of the Issuers nor any Guarantors "maintain a bona fide business location in the United States," the Issuers and the Guarantors are required to "appoint an authorized agent . . . in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to th[e] Indenture, the Notes, the Guarantees or any Security Document."[37]

42.     The Debtors' contract rights under the Indenture and the Notes constitute intangible property in the United States that is sufficient to satisfy the requirements of section 109(a) of the Bankruptcy Code.[38]  As explained above, the Indenture and the Notes are governed by New York law, include a New York forum selection clause, and require that the Debtors maintain offices in the United States for service of process or, failing that, appoint an agent for service of process in New York. In addition, the Trustee, Registrar and Paying Agent is WSFS, a United States corporation, and the "Depositary" with respect to the Notes is The Depository Trust Company ("DTC"), located at 55 Water Street, New York, New York.[39]  Upon information and belief, certain of the Debtors conduct operations in the United States, including on account of trading activities, and likely funded an attorney retainer account in New York.

---

[36]   *Id.*

[37]   *Id.*

[38]   *See, e.g., In re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) (stating that New York law-governed debt containing a New York forum selection clause whether alone or together with other United States property provides a sufficient basis for jurisdiction and venue in New York); *In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015) (holding choice of law provision and contract rights under indenture sufficient to satisfy property requirement for eligibility to file chapter 15 recognition proceedings in the United States).  The eligibility requirements under section 109(a) of the Bankruptcy Code are the same for both chapter 11 cases and chapter 15 recognition proceedings.  11 U.S.C. § 109(a) (describing eligibility to be a debtor under title 11).

[39]   Indenture §§ 2.03 & 2.06(g).

43.     Finally, venue is proper in this District.  Section 1408 of title 28 of the United States Code provides that a case under title 11 may be commenced in the district court for the district—

> (1) in which the domicile, residence, principal place of business, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty-days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day-period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

> (2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.[40]

44.     Courts have found proper venue in this District where foreign corporations, like Eletson Holdings and Eletson MI, have New York-law governed debt instruments with New York forum selection clauses.[41]  It is also worth noting that the Debtors previously agreed to file for chapter 11 protection in the SDNY Bankruptcy Court under certain circumstances set forth in the RSAs.

45.     Accordingly, the Court has jurisdiction over the Bankruptcy Cases, the Debtors are eligible for relief under chapter 7 of the Bankruptcy Code, and venue of these proceedings in this District is proper.

---

[40]   28 U.S.C. § 1408.

[41]   *Berau*, 540 B.R. at 84 (finding venue in the Southern District of New York "likewise established" for purposes of chapter 15 proceeding because of contract rights and ties to New York under indenture); *see also In re Servicos de Petroleo Constellation S.A.*, 600 B.R. 237, 269 (Bankr. S.D.N.Y. 2019) (finding debtors eligible to file in the U.S. and venue proper in the Southern District of New York where "[a]ll of the principal documents setting forth [debtor's] prepetition debt obligations are governed by New York law and generally contemplate New York as a venue for disputes."); *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 700 (Bankr. S.D.N.Y. 2017) (holding venue satisfied by "debt instruments governed by New York law," despite the debtors having no substantial assets in the United States "other than the New York law governed debt.").

## **ARGUMENT**

46.     For the reasons set forth below, the Debtors' default on the principal and interest payments due to the holders of the Notes, together with the circumstances under which such defaults occurred, entitle the Petitioning Creditors to an order for relief against each of the Debtors under section 303 of the Bankruptcy Code.

**A.     The Petitioning Creditors Are Eligible Under Section 303(b) of the Bankruptcy Code to File the Involuntary Petitions**

47.     Section 303(b) of the Bankruptcy Code provides that "[a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title . . . by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such holder, if such noncontingent, undisputed claims aggregate at least $18,600 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims."[42]

48.     The Petitioning Creditors are holders of claims against each of the Debtors on account of the Notes that are not contingent as to liability or amount, nor the subject of a bona fide dispute as to liability or amount.  Those claims include, without limitation, payments of accrued interest that are overdue and unpaid principal which came due following the Maturity Date.  As set forth in the Involuntary Petitions and Supporting Affidavits, the Petitioning Creditors hold claims against each of the Debtors

---

[42]   11 U.S.C. § 303(b).

based upon their holdings of the Notes, and such claims aggregate at least $18,600 more

than the value of any lien on property of the Debtors securing such claims.

**B.    The Petitioning Creditors Are Authorized to
File the Involuntary Petition Under the Terms of
the Indenture, the Notes, and the Trust Indenture Act**

49.    Section 6.07 of the Indenture governs, and expressly preserves, the

right of holders of the Notes, such as the Petitioning Creditors, to enforce their right to

receive payment of principal and interest under the Notes.  Pursuant to Section 6.07:

> Notwithstanding any other provision of this Indenture, *the
> right of any Holder to receive payment of principal,
> premium, if any, and interest on the Note* . . . or *to bring suit
> for the enforcement of any such payment on or after such
> respective date, shall not be impaired or affected without
> the consent of such Holder* . . . .[43]

50.    The "respective due dates expressed in the Note" can be found in

the Form of Note attached as Exhibit A to the Indenture, which provides for interest

payable on January 15, April 15, July 15, and October 15 with respect to Cash Interest."[44]

Section 4.01 of the Indenture confirms that "[t]he Issuers will pay or cause to be paid the

principal of, premium, if any, and interest on, the Note on the dates and in the manner

provided in the Notes and this Indenture," and further describes the manner in which

principal and interest "will be considered paid on the date due . . . ."[45]  Section 6.01 of

the Indenture which sets forth various "Events of Default," includes both (a) "default

for 30 days in the payment when due of any interest or any Additional Amounts on any

Note," and, with no such 30-day grace period, (b) "default in the payment of the

principal of or premium, if any, on any Note at its Maturity (upon acceleration, optional

---

[43]    Indenture § 6.07 (emphasis added).

[44]    *See Id.*, Ex. A (Form of Note).

[45]    *Id.* § 4.01.

or mandatory redemption, if any, required repurchase or otherwise).["]46  There can be no dispute that the Issuers have not paid the outstanding principal and interest due under the Indenture and on account of the Notes when due.

51.    The "no-action clause" contained in Section 6.06 of the Indenture does not prevent the noteholders from filing and prosecuting the Involuntary Petitions. Section 6.06 provides:

> No holder of any of the Notes has any right to institute any proceedings with respect to this Indenture or any remedy thereunder unless the Holders of at least 25% in aggregate principal amount of the outstanding Notes have made a written request and offered an indemnity and/or security to the Trustee to institute such proceeding as Trustee under the Notes and this Indenture, and the Trustee has failed to institute such proceeding within 30 days after receipt of such notice and the Trustee within such 30-day period has not received directions inconsistent with such written request by Holders of a majority in aggregate principal amount of the outstanding Notes. ***Such limitations do not, however, apply to (i) a suit instituted by a Holder for the enforcement of the payment of the principal of, premium, if any, and Additional Amounts or interest on such Note on or after the respective due dates expressed in such Note . . . .***[47]

52.    As the final sentence of the foregoing paragraph of Section 6.06 makes clear, any restrictions that might otherwise exist under the no-action clause do not apply to pursuit of remedies in an effort to enforce the right to receive payment of principal or interest when due.[48]  In any event, any reliance on the no-action clause to

---

[46]  *Id.* § 6.01(1)(a)-(b).

[47]  *Id.* § 6.06 (emphasis added).

[48]  These provisions are consistent with Section 316(b) of the Trust Indenture Act, which prohibits modification by majority bondholder vote of an individual bondholder's right to receive payments of principal or interest on the due dates for such payments.  15 U.S.C. § 77ppp(b) ("Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.").  Courts have consistently held based on Section 316(b) that no-action clauses contained in an indenture that is qualified under the Trust Indenture Act do not bar suits by

bar the Petitioning Creditors' filing of the Involuntary Petitions is misplaced because holders of at least 25% of the aggregate principal amount of the outstanding Notes already directed the Trustee to institute a proceeding to recover on the Notes pursuant to the SDNY Action.

53.     Several courts have expressly held that the "principal and interest" exception allows the filing of an involuntary petition by noteholders.[49]  In this regard, courts have determined that an involuntary petition constitutes an action to enforce the payment of past due interest, and have rejected the argument that any distinction should be made between individual bondholder actions seeking a money judgment for overdue interest, and collective remedies such as an involuntary bankruptcy filing. This determination is based in part on the fact that Section 316(b) of the Trust Indenture Act "does not contain any limitations as to what remedies a bondholder may pursue when seeking payment of delinquent principal and interest."[50]  Section 303 of the Bankruptcy Code likewise contemplates that a small minority of creditors may place even the largest of corporations into involuntary bankruptcy where, as here, the statutory requirements are otherwise satisfied.  Thus, to the extent that the Debtors

---

individual noteholders to collect principal and interest when due.  *See, e.g., Newby v. Enron Corp. (In re Enron Corp. Secs. Derivative ERISA Litig.)*, Case No. MDL-1446, 2008 U.S. Dist. LEXIS 21560, at *47 (S.D. Tex. Mar. 19, 2008) ("A significant exception to a no-action clause is the bondholder's/noteholder's individual right to sue for payment of principal and interest on or after the due dates set out in his bond/note."); *Great Plains Trust Co. v. Union Pac. R.R. Co.*, 492 F.3d 986 (2d Cir. 1992) ("[D]ebenture holders could not bring suit 'upon or with respect to' the Indenture until either (a) there was an 'event of default' . . . *and* the debenture holders [complied with the requirements of the no-action clause], *or* (b) the issuer defaulted on payment of principal or interest.") (emphasis in original).

[49]    *See, e.g., Envirodyne Indus.*, 174 B.R. at 997 (noteholders' filing of an involuntary bankruptcy petition against the issuer was an action seeking the payment of past due interest and therefore not subject to the indenture's no-action clause); *FMB Bancshares*, 517 B.R. at 368 (same); *see also Globo Communicacoes*, 317 B.R. at 248 (reversing bankruptcy court's determination that no-action clause prohibited noteholders from filing involuntary petition against foreign issuer as a matter of law on grounds that clause "[did] not on its face purport to prohibit [noteholders] from filing an involuntary bankruptcy petition without the consent of the trustee of the notes.").

[50]    *Envirodyne Indus.*, 174 B.R. at 996.

24

would seek to limit noteholders' ability to file an involuntary petition as a means to enforce their rights to the payment of principal and interest when due, they cannot rely on the no-action clause to do so, and must instead "take [their] argument to Congress."[51]

54. Finally, the law is clear that beneficial holders of the Notes, such as the Petitioning Creditors, have the right to enforce payment of interest—and with it, the right to bring the Involuntary Petitions. Courts have held, based on Section 316(b) of the Trust Indenture Act, that beneficial holders of bonds have standing to sue the issuer for payment of principal and interest in their own right.[52] The basis for this conclusion is that the provisions of the Trust Indenture Act are controlling to the extent that they conflict with particular provisions contained in a qualified indenture,[53] and Section 316(b) of the Trust Indenture Act does not distinguish between beneficial and registered holders in protecting the right of "holders" to bring suit to enforce payment of principal and interest. In this regard, the Trust Indenture Act is consistent with bankruptcy law, which recognizes that each beneficial holder of debt securities is the holder of a claim under section 101(5) of the Bankruptcy Code.[54]

---

[51] *Id.*

[52] *See, e.g., In re Bd. of Directors of Multicanal S.A.*, 307 B.R. 384, 387 n.2 (Bankr. S.D.N.Y. 2004) (noting that Section 316(b) refers to "holders' without qualification," and that "the Federal courts have permitted beneficial holders to sue to vindicate [Trust Indenture Act] rights"); *accord Argo Fund Ltd. v. Bd. of Directors of Telecom Arg. (In re Bd. of Directors of Telecom Arg.)*, No. 06 Civ. 2352 (NRB), 2006 U.S. Dist. LEXIS 85274 (S.D.N.Y. Nov. 17, 2006); *see also Drachman v. Harvey*, 453 F.2d 722, 727 (2d Cir. 1971) (federal law confers standing on beneficial shareholders to sue under the Securities Exchange Act of 1934).

[53] 15 U.S.C. § 77rrr.

[54] *See, e.g., In re Pioneer Fin. Corp.*, 246 B.R. 626, 633 (Bankr. D. Nev. 2000) ("Plainly, it is the beneficial holder, not a holder of record, who has the 'claim' and the 'right to payment.'"); *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 691-92 (Bankr. D. Colo. 1995).

55.     Therefore, the Petitioning Creditors are authorized to file the Involuntary Petitions under the terms of the Indenture, the Notes, and applicable law, including the Trust Indenture Act.

### C.     The Debtors Are Generally Not Paying Their Debts As They Come Due

56.     Section 303(h) of the Bankruptcy Code provides that "[i]f the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed."[55]  If the petition is controverted by the debtor, section 303(h) requires the court to order relief against the debtor under the chapter under which the petition was filed, only if –

> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or
>
> (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.[56]

57.     As explained above, on April 15, 2019, and each subsequent interest payment date, each due on January 15, April 15, July 15, and October 15 of each calendar year up to and including the Maturity Date, and after the Maturity Date with respect to the principal amount of the Notes, the Debtors failed to pay principal and interest in the aggregate amount of more than $354 million due to what appears to be more than thirty (30) holders of the Notes (based on DTC report).  The Debtors'

---

[55]   11 U.S.C. § 303(h).

[56]   *Id.*

obligations to pay such principal and interest are not the subject of any bona fide dispute as to liability or amount.

58.     The "generally not paying standard" is not synonymous with the Bankruptcy Code's definition of insolvency contained in section 101(32) of the Bankruptcy Code; it is "not a balance-sheet insolvency test based on comparison of assets and liabilities."[57]  The standard also differs from the "equity insolvency" test, inasmuch as it considers whether the debtor is *actually* paying its debt when due, not whether it *can* pay its debts when due.[58]

59.     Courts consider the following four factors in making this determination:  (i) the number of claims that the debtor has not paid, (ii) the amounts of these unpaid claims, (iii) the materiality of the non-payments, and (iv) the debtor's overall financial condition and affairs.[59]  "No one factor is necessarily determinative of whether in fact the debtor is generally not paying debts as they become due," and thus "[a]n examination of the debtor's entire financial situation and debt structure may be necessary to make this determination."[60]  As explained below, each of these four factors supports a finding that the Debtors are not generally paying their debts as they come due.

(1)    Number of Unpaid Claims

60.     Here, the number of unpaid claims is at least equal to the number of beneficial holders of the Notes.  While the exact number of entities that hold the

---

[57]   Collier on Bankruptcy ¶ 303.31 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2014).

[58]   *Id.*; *see also B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1076 (2d Cir. 1983) (noting Congressional compromise in which the phrase "is generally not paying" was substituted for "is generally unable to pay").

[59]   *In re Paper I Partners, L.P.*, 283 B.R. 681, 677 (Bankr. S.D.N.Y. 2002); *Crown Heights Jewish Cmty. Council, Inv. v. Fischer (In re Fischer)*, 202 B.R. 341, 350 (E.D.N.Y. 1996) (citing cases).

[60]   *CLE Corp.*, 59 B.R. at 586.

Notes cannot be discerned from publicly available information, that number is likely substantial based upon the size of the issuance under the Indenture even after taking into account the partial paydown under the Strict Foreclosure.  Upon information and belief, the Debtors owe New Agathonissos millions of dollars on account of amounts due after the Strict Foreclosure.

61.    As noted above, each beneficial holder is treated as the holder of a claim under the Bankruptcy Code.[61]  Consistent with that premise, the claim of each beneficial holder who votes on a plan of reorganization is tabulated separately in order to determine whether a class of creditors has the requisite one-half of the number of votes required to accept the plan.[62]

(2)    Amount of Unpaid Claims

62.    The Debtors have failed to pay the requisite principal and interest under the Notes when due.  In light of the many actions taken by creditors and other parties against Eletson and its property (as described in paragraph 13 above), there may be additional debts that the Debtors are not paying, which would be the subject of discovery if the Debtors contest the Involuntary Petitions.  But even assuming that the missed principal and interest payments on the Notes were the only debts that were not being paid by the Debtors when due as of the petition date, such non-payments clearly

---

[61]  *Pioneer Fin.*, 246 B.R. at 633.

[62]  *See, e.g., In re Southland Corp.*, 124 B.R. 211, 219 (Bankr. N.D. Tex. 1991) (counting both number and amount of claims for each class of notes); *Colo. Springs*, 177 B.R. at 688 n.1, 692 n.3 (calculating both amount and number of votes of noteholders).  In *Colorado Springs*, the court concluded that the solicitation of votes from record holders rather than beneficial holders was inadequate.  In reaching that conclusion, the court commented that even though the total dollar amount of bonds for which no vote was cast was small (just 3%), "each beneficial bondholder has a separate and independent right to due process which is unrelated to the amount of their investment."  177 B.R. at 692.  Specifically, the court observed that only 28 votes were cast by the record owners, and that based on the size of ownership lots, "the number of non-voting beneficial holders could range from 5 to 67," meaning that "between 15 percent and 70 percent of the beneficial holders have failed to cast a vote on the Amended Plan."  *Id.* at 692 n.3.  These cases and others reflect the universally understood proposition that each separate beneficial holder of notes is regarded as holding a separate claim in bankruptcy.

represent a substantial percentage—likely a significant multiple—of the Debtors' likely total monthly operating expenses, a standard used by some courts to evaluate the amount of non-payment of debts.[63]

(3)     Materiality of Non-payment

63.     The third factor, materiality of non-payment, considers the duration of the non-payments and whether there is a reasonable basis for non-payment.[64]  Here, the Debtors' defaults have continued *for years*.  Courts have held much shorter periods to be sufficient, such as as little as just eight days.[65]

64.     Moreover, there is no reasonable basis for the Debtors' default and failure to make any cash payments on account of the Notes over the lifetime of the debt. Upon information and belief, the Petitioniong Creditors believe that the Debtors have access to assets and cash flows that can be used to pay creditors' claims—in full or in part—and are filing the Rule 2004 Motion to examine these issues since the Debtors have failed to provide more information in this regard.

(4)     Nature and Conduct of Debtor's Business

65.     The fourth factor of the "generally not paying" test requires an examination of the debtor's "overall contemporaneous handling of its affairs" in order to determine whether the debtor is "conducting [its] financial affairs in a manner not constituent with one operating in good faith and in the regular course of business."[66] For example, courts have considered in applying this factor whether the debtor "is

---

[63]  *Reed*, 11 B.R. at 760.

[64]  *Id.*

[65]  *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 779 F.2d 471, 475 (9th Cir. 1985) (where debtor had represented to the public that monies invested would be promptly returned on demand, failure to pay multiple depositors' demands totaling $830,000 over eight-day period supported summary judgment adjudication that debtor was generally not paying debts).

[66]  *Reed*, 11 B.R. at 760.

winding up his business or personal affairs, selling assets in a liquidating fashion,
paying only nondischargeable or co-obligor debts, kiting checks, or otherwise
conducting his financial affairs in a manner not consistent with one operating in good
faith and in the regular course of business."[67]

## CONCLUSION

66.    Based on the above, and such other evidence as may be adduced at
trial, the Petitioning Creditors respectfully request that the Court enter orders for relief
against each of the Debtors pursuant to section 303 of the Bankruptcy Code and grant
such other relief as may be just and proper.

DATED:  March 7, 2023         TOGUT, SEGAL & SEGAL LLP
        New York, New York       By:

                                           */s/Kyle J. Ortiz*
                                           KYLE J. ORTIZ
                                           BRYAN M. KOTLIAR
                                           BRIAN F. MOORE
                                           One Penn Plaza, Suite 3335
                                           New York, New York 10119
                                           (212) 594-5000

                                           *Counsel for the Petitioning Creditors*

---

[67]    *Id.*

# EXHIBIT "A"

**EXECUTION VERSION**

---

INDENTURE


Dated as of July 2, 2018


Among


ELETSON HOLDINGS INC.
ELETSON FINANCE (US) LLC
AGATHONISSOS FINANCE LLC
as Co-Issuers


THE GUARANTORS PARTY HERETO


and


WILMINGTON SAVINGS FUND SOCIETY, FSB
as Trustee and Collateral Agent


FIRST PREFERRED SHIP MORTGAGE NOTES DUE 2022

---

# TABLE OF CONTENTS

**Page**

### ARTICLE 1
### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01     Definitions ................................................................................................... 1
Section 1.02     Other Definitions ......................................................................................... 38
Section 1.03     Incorporation by Reference of TIA .............................................................. 39
Section 1.04     Rules of Construction ................................................................................. 40

### ARTICLE 2
### THE NOTES

Section 2.01     Form and Dating........................................................................................... 40
Section 2.02     Execution and Authentication ...................................................................... 42
Section 2.03     Registrar and Paying Agent.......................................................................... 43
Section 2.04     Paying Agent to Hold Money in Trust ......................................................... 43
Section 2.05     Holder Lists .................................................................................................. 43
Section 2.06     Transfer and Exchange.................................................................................. 44
Section 2.07     Replacement Notes ....................................................................................... 58
Section 2.08     Outstanding Notes ........................................................................................ 58
Section 2.09     Treasury Notes............................................................................................... 58
Section 2.10     Temporary Notes .......................................................................................... 59
Section 2.11     Cancellation .................................................................................................. 59
Section 2.12     Defaulted Interest ......................................................................................... 59
Section 2.13     CUSIP Numbers ........................................................................................... 60
Section 2.14     Issuance of Additional Notes........................................................................ 60

### ARTICLE 3
### REDEMPTION AND PREPAYMENT

Section 3.01     Notices to Trustee, Paying Agent and Registrar............................................ 61
Section 3.02     Selection of Notes to Be Redeemed or Purchased ......................................... 61
Section 3.03     Notice of Redemption or Purchase................................................................ 62
Section 3.04     Effect of Notice of Redemption.................................................................... 63
Section 3.05     Deposit of Redemption or Purchase Price..................................................... 63
Section 3.06     Notes Redeemed or Purchased in Part........................................................... 63
Section 3.07     Optional Redemption.................................................................................... 63
Section 3.08     Mandatory Redemption ................................................................................ 64
Section 3.09     Redemption Upon Changes in Withholding Taxes ........................................ 64
Section 3.10     Procedures for Offer to Purchase.................................................................. 65

### ARTICLE 4
### COVENANTS

Section 4.01     Payment of Notes........................................................................................... 69

i

Section 4.02     Maintenance of Office or Agency ............................................................... 69
Section 4.03     Reports ........................................................................................................ 70
Section 4.04     Compliance Certificate ................................................................................ 72
Section 4.05     Taxes............................................................................................................ 73
Section 4.06     Stay, Extension and Usury Laws ................................................................. 73
Section 4.07     Restricted Payments .................................................................................... 73
Section 4.08     Limitation on Dividends and Other Payment Restrictions Affecting
                 Restricted Subsidiaries................................................................................ 77
Section 4.09     Limitation on Debt........................................................................................ 79
Section 4.10     Asset Sales Not Involving Collateral ........................................................... 83
Section 4.11     Asset Sales Involving Collateral................................................................... 86
Section 4.12     Limitation on Transactions with Affiliates................................................... 89
Section 4.13     Limitation on Liens ...................................................................................... 91
Section 4.14     Limitation on Business Activities of Eletson Finance.................................... 92
Section 4.15     Corporate Existence ..................................................................................... 92
Section 4.16     Offer to Repurchase Upon Change of Control ............................................. 92
Section 4.17     Events of Loss .............................................................................................. 94
Section 4.18     Payments for Consent ................................................................................... 96
Section 4.19     Existing Trust Monies Offer........................................................................... 96
Section 4.20     Designation of Unrestricted and Restricted Subsidiaries ............................. 98
Section 4.21     Limitations on Guarantees of Debt by Restricted Subsidiaries.................... 100
Section 4.22     Sanctions...................................................................................................... 101
Section 4.23     Limitation on Issuances and Sales of Capital Stock of Restricted
                 Subsidiaries.................................................................................................. 101
Section 4.24     Limitations on Layering Debt........................................................................ 102
Section 4.25     Substitution of a Qualified Vessel or Qualified Collateral;
                 Designation as Mortgaged Vessel................................................................ 103
Section 4.26     Change of Flag............................................................................................. 103
Section 4.27     Additional Amounts ..................................................................................... 104
Section 4.28     Further Assurances ....................................................................................... 107
Section 4.29     Certain Newbuilding Vessels ....................................................................... 107
Section 4.30     Retention of Initial Advisor; Retention of Back-Up Manager ..................... 108
Section 4.31     Cash Segregation, Specified Accounts and Lock-Box Collection
                 Account ........................................................................................................ 109
Section 4.32     Excess Cash Flow Offer ............................................................................... 110
Section 4.33     Limitation on Business Activities of Eletson MI; Independent
                 Directors...................................................................................................... 111
Section 4.34     Minimum Aggregate Liquidity....................................................................... 112
Section 4.35     Ownership of Investments in Eletson Gas; Negative Pledge ........................ 112
Section 4.36     Limitation on Restricted Expenditures ......................................................... 112
Section 4.37     Liquidation of Piraeus Bank Common Stock ............................................... 112

ARTICLE 5
SUCCESSORS

Section 5.01     Merger, Consolidation or Sale of Assets ...................................................... 113

ii

## ARTICLE 6
## DEFAULTS AND REMEDIES

Section 6.01    Events of Default ....................................................................................... 115
Section 6.02    Acceleration ............................................................................................... 118
Section 6.03    Other Remedies .......................................................................................... 119
Section 6.04    Waiver of Past Defaults ............................................................................. 119
Section 6.05    Control by Majority .................................................................................... 119
Section 6.06    Limitation on Suits ..................................................................................... 120
Section 6.07    Rights of Holders to Receive Payment ...................................................... 120
Section 6.08    Collection Suit by Trustee .......................................................................... 120
Section 6.09    Trustee May File Proofs of Claim .............................................................. 121
Section 6.10    Priorities ..................................................................................................... 122
Section 6.11    Undertaking for Costs ................................................................................. 122
Section 6.12    Restoration of Rights and Remedies .......................................................... 122

## ARTICLE 7
## TRUSTEE

Section 7.01    Duties of Trustee ........................................................................................ 123
Section 7.02    Rights of Trustee ........................................................................................ 124
Section 7.03    Individual Rights of Trustee ....................................................................... 125
Section 7.04    Trustee's Disclaimer .................................................................................. 125
Section 7.05    Notice of Defaults ...................................................................................... 126
Section 7.06    Reports by Trustee to Holders ................................................................... 126
Section 7.07    Compensation and Indemnity ..................................................................... 126
Section 7.08    Replacement of Trustee .............................................................................. 127
Section 7.09    Successor Trustee by Merger, etc. ............................................................. 128
Section 7.10    Eligibility; Disqualification ....................................................................... 129
Section 7.11    Preferential Collection of Claims Against Issuers ..................................... 129
Section 7.12    Trustee in Other Capacities; Collateral Agent, Registrar and Paying
                Agent .......................................................................................................... 129

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance ...................... 130
Section 8.02    Legal Defeasance and Discharge ................................................................ 130
Section 8.03    Covenant Defeasance .................................................................................. 130
Section 8.04    Conditions to Legal or Covenant Defeasance ............................................ 131
Section 8.05    Deposited Money and U.S. Government Securities to be Held in
                Trust; Other Miscellaneous Provisions ...................................................... 133
Section 8.06    Repayment to the Issuers ............................................................................ 133
Section 8.07    Reinstatement ............................................................................................. 134

iii

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

| | | |
|---|---|---|
| Section 9.01 | Without Consent of Holders | 134 |
| Section 9.02 | With Consent of Holders | 135 |
| Section 9.03 | Compliance with TIA | 136 |
| Section 9.04 | Revocation and Effect of Consents | 137 |
| Section 9.05 | Notation on or Exchange of Notes | 137 |
| Section 9.06 | Trustee and Collateral Agent to Sign Amendments, etc. | 137 |

ARTICLE 10
COLLATERAL AND SECURITY

| | | |
|---|---|---|
| Section 10.01 | Grant of Security Interest | 138 |
| Section 10.02 | Recording and Opinions | 141 |
| Section 10.03 | Specified Releases and Disposition of Collateral | 142 |
| Section 10.04 | Release upon Satisfaction or Defeasance of all Outstanding Obligations | 145 |
| Section 10.05 | Form and Sufficiency of Release | 145 |
| Section 10.06 | Purchaser Protected | 146 |
| Section 10.07 | Authorization of Actions to be Taken by the Collateral Agent or Trustee Under the Security Documents | 146 |
| Section 10.08 | Authorization of Receipt of Funds by the Trustee Under the Security Documents | 146 |
| Section 10.09 | Action by the Collateral Agent | 147 |
| Section 10.10 | Compensation and Indemnity | 147 |
| Section 10.11 | Resignation; Successor Collateral Agent | 148 |
| Section 10.12 | Rights, Immunities, etc. under the Security Documents | 149 |
| Section 10.13 | Co-Collateral Agents | 149 |

ARTICLE 11
GUARANTEES

| | | |
|---|---|---|
| Section 11.01 | Guarantee | 150 |
| Section 11.02 | Limitation on Guarantor Liability | 151 |
| Section 11.03 | Execution and Delivery of Guarantee | 151 |
| Section 11.04 | Guarantors May Consolidate, etc., on Certain Terms. | 152 |
| Section 11.05 | Releases | 152 |

ARTICLE 12
SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| Section 12.01 | Satisfaction and Discharge. | 154 |
| Section 12.02 | Application of Trust Money | 155 |

Doc#: US1:12095985v22

## ARTICLE 13
### MISCELLANEOUS

Section 13.01    Parallel Debt ................................................................................. 156
Section 13.02    Notices ......................................................................................... 158
Section 13.03    Communication by Holders with Other Holders ......................... 159
Section 13.04    Certificate and Opinion as to Conditions Precedent................... 159
Section 13.05    Statements Required in Certificate or Opinion............................ 159
Section 13.06    Rules by Trustee and Agents ....................................................... 160
Section 13.07    No Personal Liability of Directors, Officers, Employees and
                 Stockholders............................................................................. 160
Section 13.08    No Immunity................................................................................. 160
Section 13.09    Judgment Currency...................................................................... 160
Section 13.10    Currency Indemnity..................................................................... 162
Section 13.11    Governing Law; Consent to Jurisdiction; Appointment of Process
                 Agent; Waiver of Immunity....................................................... 162
Section 13.12    No Adverse Interpretation of Other Agreements ........................ 163
Section 13.13    Successors.................................................................................... 163
Section 13.14    Severability................................................................................... 164
Section 13.15    Counterpart Originals .................................................................. 164
Section 13.16    Table of Contents, Headings, etc.................................................. 164
Section 13.17    English Language ......................................................................... 164
Section 13.18    USA PATRIOT Act....................................................................... 164

EXHIBITS

Exhibit A    FORM OF NOTE
Exhibit B    FORM OF CERTIFICATE OF TRANSFER
Exhibit C    FORM OF CERTIFICATE OF EXCHANGE
Exhibit D    FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL ACCREDITED
             INVESTOR
Exhibit E    FORM OF SUPPLEMENTAL INDENTURE

Doc#: US1:12095985v22

INDENTURE, dated as of July 2, 2018, among Eletson Holdings Inc., a Liberian corporation (the "Company"), Eletson Finance (US) LLC, a Delaware limited liability company ("Eletson Finance"), Agathonissos Finance LLC, a Marshall Islands corporation, ("Eletson MI" and, collectively with Eletson Finance and the Company, the "Issuers" and each, an "Issuer"), the Guarantors (as defined herein) and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as trustee (in such capacity, the "Trustee") and as Collateral Agent (as defined herein).

The Issuers, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined herein) of the First Preferred Ship Mortgage Notes due 2022 (the "Notes"):

## ARTICLE 1
## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions.

"144A Global Note" means a Global Note substantially in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"2013 Offering Memorandum" means the final offering memorandum, dated as of December 12, 2013, related to the offering and sale of the Existing Notes.

"Acceptable Broker" means any of (1) Fearnleys A.S., Oslo Shipbrokers A.S., (2) Clarkson Valuations Limited or (3) RS Platou ASA, ICAP Shipping Limited, ACM Ltd.; provided that, at the time any such firm is to be utilized, such firm would qualify as an Independent Appraiser.

"Account Pledge Agreement" means an agreement executed and delivered by a Guarantor, the Collateral Agent and an account bank (or acknowledged by such account bank), in form and substance acceptable to the Collateral Agent, whereby such Issuer or Guarantor establishes an Earnings Account, Specified Account or Collection Account, as applicable, and pledges it to the Collateral Agent.

"Acquired Debt" means Debt of a Person:

(1)    existing at the time such Person becomes a Restricted Subsidiary or is merged into or consolidated with the Company or any Restricted Subsidiary; or

(2)    assumed in connection with the acquisition of assets from any such Person,

in each case *provided* that such Debt was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary or such acquisition, as the case may be.

Acquired Debt will be deemed to be Incurred on the date the acquired Person becomes a Restricted Subsidiary (or is merged into or consolidated with the Company or any Restricted Subsidiary, as the case may be) or the date of the related acquisition of assets from any Person.

"Additional Notes" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with this Indenture, including Sections 2.02, 2.14, 4.09 and 4.13, as part of the same series as the Initial Notes.

"Affiliate" means, with respect to any specified Person

(1)      any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person;

(2)      any other Person that owns, directly or indirectly, 10% or more of such specified Person's Capital Stock or any officer or director of any such specified Person or other Person or, with respect to any natural Person, any Person having a relationship with such Person by blood, marriage or adoption not more remote than first cousin; or

(3)      any other Person 10% or more of the Voting Stock of which is beneficially owned or held, directly or indirectly by such specified Person.

For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agent" means any Collateral Agent, any co-Collateral Agent, Registrar, co-registrar, Escrow Agent, Paying Agent, Custodian, additional paying agent or any authenticating agent.

"Aggregate Available Days" means, with respect to a TCE Measurement Period, (x) the sum of the number of days each Mortgaged Vessel was owned by any Eletson MI Party during such TCE Measurement Period minus (y) the sum of the number of days each Mortgaged Vessel was off-hire for major repairs, dry-docking or special or intermediate surveys.

"Aggregate Liquidity" means, as of any Interest Payment Date, the amount of all cash and cash equivalents of the Eletson MI Parties shown on the consolidated balance sheet of the Company as of such Interest Payment Date that are held in the Collection Account (other than Trust Monies, Existing Trust Monies prior to the completion of the Existing Trust Monies Offer and amounts arising from a Charter Disposal or a disposition of other assets) and are available for the payment of interest on the Notes, after giving pro forma effect to all interest and other debt service payments that are required to have been made as of such Interest Payment Date.

"AI Global Note" means a Global Note substantially in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that will be issued in a

2

denomination equal to the outstanding principal amount of the Notes sold to Accredited Investors.

"Applicable PIK Notes Amount" means, as of any date, (x) the aggregate amount of PIK Interest paid on the Notes as of the date of the relevant Charter Disposal Proceeds Offer (which, for purposes of this definition, to the extent PIK Interest has not been paid, shall include the amount of any accrued and unpaid interest as of such date that will be paid as PIK Interest on July 15, 2018) plus (y) the aggregate amount of interest on the Existing Notes that was accrued and unpaid with respect to the interest period ended January 15, 2018 and capitalized as Notes pursuant to the Offer to Exchange as evidenced by an Officers' Certificate to such effect delivered to the Trustee on the Closing Date, minus (z) the aggregate amount of Charter Disposal Proceeds previously used to make Charter Disposal Proceeds Offers that have been completed.

"Applicable Procedures" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"Appraised Value" means the fair market sale value as of a specified date of a specified Vessel that would be obtained in an arm's-length transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined by an Independent Appraiser selected by the Company.

"Asset Sale" means any sale, issuance, conveyance, transfer, lease or other disposition (other than, in the case of Collateral, an Event of Loss) (including, without limitation, by way of merger, consolidation, amalgamation or other combination or sale and leaseback transaction) (collectively, a "transfer"), directly or indirectly, in one or a series of related transactions, of:

(1)    any Capital Stock of any Restricted Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Company or a Restricted Subsidiary);

(2)    all or substantially all of the properties and assets of any division or line of business of the Company or any Restricted Subsidiary; or

(3)    any other of the Company's or any Restricted Subsidiary's properties or assets.

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(i)    other than in the case of any Collateral or the Capital Stock of any parent or indirect parent of a Guarantor that is a Restricted Subsidiary of the Company, any single transaction or series of related transactions that involves assets or Capital Stock having a Fair Market Value of less than $5.0 million;

(ii)    any transfer or disposition of assets by the Company to any Restricted Subsidiary, or by any Restricted Subsidiary to the Company or any other Restricted Subsidiary and otherwise in accordance with the terms of this Indenture; *provided* that if such sale, lease,

3

conveyance, transfer or other disposition involves Collateral, such exemption shall only be available if such transaction is between or among the Company and/or one or more Guarantors and such assets shall continue to be subject to the first-priority perfected lien of this Indenture and the Security Documents;

(iii)    any transfer or disposition of obsolete or permanently retired equipment (other than Vessels) or facilities that are no longer useful in the conduct of the Company's and any Restricted Subsidiary's business and that are disposed of in the ordinary course of business;

(iv)    any transfer or disposition of assets that is governed by the provisions of this Indenture described under Sections 5.01 and 4.16;

(v)    a Restricted Payment that does not violate the covenant described in Section 4.07 or a Permitted Investment;

(vi)    the sale, lease, sublease, assignment or other disposition of any real or personal property or any equipment, inventory or other assets (other than Vessels or Related Assets) in the ordinary course of business;

(vii)    an issuance of Capital Stock by a Restricted Subsidiary to the Company or to another Restricted Subsidiary;

(viii)    any transfer, termination, unwinding or other disposition of Hedging Agreements in the ordinary course of business and not for speculative purposes;

(ix)    sales of assets received by the Company or any Restricted Subsidiary upon the foreclosure on a Lien granted in favor of the Company or any Restricted Subsidiary; or

(x)    the sale or other disposition of cash or Cash Equivalents.

"Assignment of Freights and Hires" means each assignment, between either an Issuer or a Guarantor, as applicable, and the Trustee, dated the Closing Date or a Vessel Tender Date, as the case may be, as amended from time to time in accordance with the terms of this Indenture and substantially in the form required by this Indenture, together with the documents contemplated thereby, pursuant to which an Issuer or such Guarantor, as applicable, assigns its right, title and interest in monies due and to become due under all charters, freights, hires and other earnings in respect of its Mortgaged Vessel.

"Assignment of Insurance" means each assignment, between either an Issuer or a Guarantor, as applicable, and the Trustee, dated the Closing Date or a Vessel Tender Date, as the case may be, as amended from time to time in accordance with the terms of this Indenture and substantially in the form required by this Indenture, together with the documents contemplated thereby, pursuant to which such Issuer or Guarantor, as applicable, assigns its right, title and interest in, to and under all policies and contracts of insurance in respect of its Mortgaged Vessel as well as any proceeds of such insurance.

"Authentication Order" means a written request or order on behalf of the Issuers signed by one Officer of each Issuer and delivered to the Trustee.

4

"Available Amount" means, in respect of any single Charter Disposal, $1.25 million.

"Average Life" means, as at the date of determination with respect to any Debt, the quotient obtained by dividing:

(a)    the sum of the products of:

(i)    the numbers of years from the date of determination to the date or dates of each successive scheduled principal payment of such Debt; multiplied by

(ii)    the amount of each such principal payment;

by

(b)    the sum of all such principal payments.

"Back-Up Manager" means a financial advisory firm of international reputation that is unrelated to the Company and its Affiliates and is retained to assist with interim management duties with respect to the Eletson MI Parties (provided that at the Closing Date the Back-Up Manager shall be AlixPartners UK LLP or an Affiliate thereof) or any successor thereto appointed in accordance with the provisions of Section 4.30.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Law" means the Bankruptcy Code and all other insolvency, bankruptcy, receivership, liquidation, conservatorship, assignment for the benefit of creditors, moratorium, rearrangement, reorganization, or similar legal requirements of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "beneficially owns," "beneficially owned" and "beneficial ownership" have a corresponding meaning.

"Board of Directors" means:

(1)    with respect to any corporation, the board of directors or managers of the corporation (which, in the case of any corporation having both a supervisory board and an executive or management board, shall be the executive or management board) or any duly authorized committee thereof;

5

(2)     with respect to any partnership, the board of directors of the general partner of the partnership or any duly authorized committee thereof;

(3)     with respect to a limited liability company, the managing member or members (or analogous governing body) or any controlling committee of managing members thereof; and

(4)     with respect to any other Person, the board or any duly authorized committee thereof or committee of such Person serving a similar function.

"<u>BoComm Agreements</u>" means, collectively, (1) the bareboat charter, dated December 30, 2016 between the BoComm Chartering Entity, as charterer and Hoasheng International Ship Lease Co., Limited, as owner, and (2) the bareboat charter, dated December 30, 2016 between the BoComm Chartering Entity, as charterer and Haotai International Ship Lease Co., Limited, as owner.

"<u>BoComm Charter Disposal</u>" means, with respect to a BoComm Vessel, (a) the disposition of such BoComm Vessel and its related BoComm Agreement to any Person other than the Company or an Affiliate of the Company, for consideration in the form of cash that is not less than the Fair Market Value of such BoComm Vessel and its related BoComm Agreement, with the broker for any such disposition being an Acceptable Broker; and (b) the release of the Issuers and their Restricted Subsidiaries from any and all obligations under the related BoComm Agreement.

"<u>BoComm Chartering Entity</u>" means Eletson Chartering Inc., a Liberian corporation.

"<u>BoComm Guarantee Subordination</u>" means the subordination of any and all guarantees of any and all obligations under the BoComm Agreements by the Issuers and their Restricted Subsidiaries (other than the BoComm Chartering Entities) to the obligations of the Issuers and their Restricted Subsidiaries under this Indenture, the Notes and the Guarantees thereof.

"<u>BoComm Vessels</u>" means, collectively, the newbuilding vessels, Salamina (Hull No. 1423) and Argironissos (Hull No. 1424), built by Shanghai Waigaoqiao Shipbuilding Company Limited.

"<u>Business Day</u>" means a day other than a Saturday, Sunday or other day on which banking institutions in Athens, Greece, London, England, New York, New York, Wilmington, Delaware or a place of payment under this Indenture are authorized or required by law to close.

"<u>Capital Stock</u>" means, with respect to any Person, any and all shares, interests, partnership interests (whether general or limited), participations, rights in or other equivalents (however designated) of such Person's equity, any other interest or participation that confers the right to receive a share of the profits and losses, or distributions of assets of, such Person and any rights (other than debt securities convertible into or exchangeable for Capital Stock), warrants or options exchangeable for, or convertible into, such Capital Stock, whether now outstanding or issued after the Closing Date.

6

"Capitalized Lease Obligation" means, with respect to any Person, any obligation of such Person under a lease of (or other agreement conveying the right to use) any property (whether real, personal or mixed), which obligation is required to be classified and accounted for as a capital lease obligation under U.S. GAAP, and, for purposes of this Indenture, the amount of such obligation at any date will be the capitalized amount thereof at such date, determined in accordance with U.S. GAAP and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"Cash Equivalents" means any of the following:

(1)    any evidence of Debt denominated in Euro, Sterling, U.S. dollars, Swiss francs or Japanese yen with a maturity of 180 days or less from the date of acquisition, issued or directly and fully guaranteed or insured by a member state (an "EU Member State") of the European Union whose sole lawful currency on the Closing Date is the Euro, the government of the United Kingdom of Great Britain and Northern Ireland, the United States of America, any state thereof or the District of Columbia, the government of the Swiss Confederation, the government of Japan, or any agency or instrumentality thereof;

(2)    time deposit accounts, certificates of deposit, money market deposits or bankers' acceptances denominated in Euro, Sterling, U.S. dollars, Swiss francs or Japanese yen with a maturity of 180 days or less from the date of acquisition issued by a bank or trust company organized in an EU Member State, the United Kingdom of Great Britain and Northern Ireland, the Swiss Confederation or Japan or any commercial banking institution that is a member of the U.S. Federal Reserve System, in each case having combined capital and surplus and undivided profits of not less than $500 million, whose long-term, unsecured, unsubordinated and unguaranteed debt has a rating, at the time any investment is made therein, of at least A or the equivalent thereof from S&P and at least A2 or the equivalent thereof from Moody's;

(3)    commercial paper with a maturity of 180 days or less from the date of acquisition issued by a corporation that is not the Company's or any Restricted Subsidiary's Affiliate and which is incorporated under the laws of an EU Member State, United Kingdom of Great Britain and Northern Ireland, the United States of America or any state thereof and, at the time of acquisition, having a short-term credit rating of at least A-1 or the equivalent thereof from S&P or at least P-1 or the equivalent thereof from Moody's;

(4)    time deposit accounts, certificates of deposit, money market deposits or bankers' acceptances denominated in Euro with a maturity of 180 days or less from the date of acquisition issued by a bank or trust company organized in the Hellenic Republic;

(5)    repurchase obligations with a term of not more than seven days for underlying securities of the type described in clause (1) above, entered into with a financial institution meeting the qualifications described in clause (2) above; and

(6)    Investments in money market mutual funds at least 95% of the assets of which constitute Cash Equivalents of the kind described in clauses (1) through (4) above.

"Change of Control" means the occurrence of any of the following events:

(1)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), other than a Permitted Holder or the Permitted Holders, is or becomes the "beneficial owner" (within the meaning of Rule 13d-3 under the Exchange Act), directly or indirectly, of Voting Stock representing more than 50% of the voting power of the Company's outstanding Voting Stock;

(2)     the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder;

(3)     during any consecutive two-year period following the Closing Date, individuals who at the beginning of such period constituted the Company's Board of Directors (together with any new members whose election to such Board of Directors, or whose nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the members of the Company's Board of Directors then still in office who were either members at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the members of the Company's Board of Directors then in office; or

(4)     Eletson MI or any Person owning a Mortgaged Vessel ceases to be a Wholly Owned Restricted Subsidiary of the Company.

Notwithstanding the foregoing, no actions taken pursuant to the Consulting Agreement shall constitute a Change of Control.

"Charter" means each time charter entered into with respect to a Mortgaged Vessel.

"Charter Disposal" means a BoComm Charter Disposal with respect to a BoComm Vessel or a Cosco Charter Disposal with respect to a Cosco Vessel.

"Charter Disposal Proceeds" means, in the aggregate, all Net Charter Disposal Proceeds Amounts for all completed Charter Disposals that have not previously been offered in a Charter Disposal Proceeds Offer.

"Clearstream" means Clearstream Banking, S.A., and its successors.

"Closing Date" means July 2, 2018.

"Co-Issuer" means an Issuer.

"Co-Issuers" means the Issuers.

"Collateral" means, collectively, all of the property and assets (including, without limitation, Trust Monies) that are from time to time subject to the Security Documents.

"Collateral Agent" means Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, in its

Doc#: US1:12095985v22

capacity as Collateral Agent under this Indenture and the Security Documents, together with its successors in such capacity.

"Collections" means all proceeds of Collateral, including, without limitation, earnings assigned pursuant to each Assignment of Freights and Hires and insurance proceeds relating to each Assignment of Insurance

"Commission" or "SEC" means the U.S. Securities and Exchange Commission.

"Company" has the meaning given in the preamble to this Indenture, or any successor thereto.

"Company Preferred Interests" means the shares of preferred stock, with liquidation preference equal to $ 1,000.00 per share, of the Company.

"Consolidated EBITDA" means the sum of (A) Consolidated Net Income *plus* (B) in each case to the extent deducted in computing Consolidated Net Income for such period:

(a)    Consolidated Net Interest Expense;

(b)    Consolidated Tax Expense;

(c)    Consolidated Non-cash Charges,

(d)    any net after-tax extraordinary losses; and

less

(C)    in each case to the extent increasing Consolidated Net Income for such period:

(a)    all non-cash items increasing Consolidated Net Income for such period;

(b)    all cash payments during such period relating to non-cash charges that were added back to Consolidated Net Income in determining the Consolidated Fixed Charge Coverage Ratio in any prior period;

(c)    any net after-tax extraordinary gains; and

(d)    any net after-tax gains attributable to sales of assets of the Company or any Restricted Subsidiary that are not sold in the ordinary course of business.

Notwithstanding the foregoing, Consolidated EBITDA shall not include any gains, losses, charges, credits or other amounts relating to the Exchange Offer or related transactions.

Doc#: US1:12095985v22

"Consolidated Fixed Charge Coverage Ratio" means, with respect to the Company and its Restricted Subsidiaries for any period, the ratio of (1) Consolidated EBITDA to (2) Consolidated Net Interest Expense; *provided* that:

(a)    if the Company or any Restricted Subsidiary has Incurred any Debt since the beginning of such period (except that in making such computation, the amount of Debt under any revolving credit facility outstanding on the date of such calculation will be computed based on (i) the average daily balance of such Debt during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Debt during the period from the date of creation of such facility to the date of such calculation) that remains outstanding or if the transaction giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio is an Incurrence of Debt or both, Consolidated Net Income and Consolidated Net Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Debt as if such Debt had been Incurred on the first day of such period and the discharge of any other Debt repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Debt as if such discharge had occurred on the first day of such period;

(b)    if, since the beginning of such period, the Company or any Restricted Subsidiary shall have made any asset sale, Consolidated Net Income for such period shall be reduced by an amount equal to the Consolidated Net Income (if positive) directly attributable to the assets which are the subject of such asset sale for such period, or increased by an amount equal to the Consolidated Net Income (if negative) directly attributable thereto, for such period and the Consolidated Net Interest Expense for such period shall be reduced by an amount equal to the Consolidated Net Interest Expense directly attributable to any Debt of the Company or of any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and the continuing Restricted Subsidiaries in connection with such asset sale for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Net Interest Expense for such period directly attributable to the Debt of such Restricted Subsidiary to the extent the Company and the continuing Restricted Subsidiaries are no longer liable for such Debt after such sale);

(c)    if, since the beginning of such period the Company or any Restricted Subsidiary (by merger, consolidation, amalgamation or other combination or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of an asset occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, Consolidated Net Income and Consolidated Net Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the Incurrence of any Debt) as if such Investment or acquisition occurred on the first day of such period;

(d)    if, since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) shall have made any asset sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (b) or (c) if made by the Company or a Restricted Subsidiary during such period, Consolidated Net Income

10

and Consolidated Net Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such asset sale or Investment or acquisition occurred on the first day of such period; and

(e)    if the Company or any Restricted Subsidiary shall have entered into an agreement to acquire a Vessel which at the time of calculation of the Consolidated Fixed Charge Coverage Ratio is being constructed on behalf of the Company or such Restricted Subsidiary (each such Vessel, a "Pending Vessel") and if such Pending Vessel is scheduled to be delivered no later than 24 months from the date of such calculation of the Consolidated Fixed Charge Coverage Ratio, *pro forma* effect will be given to the extent provided in the next paragraph below; *provided*, *however*, that such *pro forma* effect shall only be given in connection with Debt incurred pursuant to Section 4.09(a) for the purpose of financing the acquisition of such Pending Vessel.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition (including, without limitation, the charter-in of a Vessel) or construction of a Vessel or the acquisition of the Capital Stock of a Person that owns, or charters in, one or more Vessels, such Person may (i) subject in the case of a Pending Vessel to clause (iv) below, if a relevant Vessel is or is to be subject to a time charter-out with a remaining term of twelve months or longer, apply for the period for which the Consolidated Fixed Charge Coverage Ratio is being calculated *pro forma* net earnings (losses) for such Vessel with the revenue portion thereof based upon the actual terms and conditions of such charter-out, (ii) subject in the case of a Pending Vessel to clause (iv) below, if a relevant Vessel is or is to be subject to a time charter-out with a remaining term of between six and twelve months, apply for the period for which the Consolidated Fixed Charge Coverage Ratio is being calculated the annualized amount of *pro forma* net earnings (losses) for such Vessel with the revenue portion based upon the actual terms and conditions of such charter-out, (iii) subject in the case of a Pending Vessel to clause (iv) below, if a relevant Vessel is under time charter-out that is due to expire in six months or less, or is to be subject to charter on a voyage charter basis (whether or not any such charter is in place for such Vessel), in each case apply for the period for which the Consolidated Fixed Charge Coverage Ratio is being calculated *pro forma* net earnings (losses) for such Vessel with the revenue portion based upon the then applicable one-year time charter rate for comparable Vessels, as published in the most recent Clarksons Shipping Intelligence Weekly Report or any successor publication thereto (or, if such publication is no longer published, then based upon industry average earnings (losses) for comparable Vessels under time charter as determined in good faith by the chief financial officer of the Company) or (iv) if such Vessel is a Pending Vessel described in clause (e) of this definition then, include, to the extent that such Pending Vessel has not been delivered to the Company or a Restricted Subsidiary or if so delivered has not been deployed for the entire period for which the Consolidated Fixed Charge Coverage Ratio is being calculated, for such period (or the portion of such period during which such Pending Vessel was not deployed if such Pending Vessel has been deployed but not for the entire period) the Proportionate Amount of net earnings (losses) for such Pending Vessel with the revenue portion of such net earnings (losses) determined based upon the applicable provisions of clauses (i) through (iii) above (or the ratable amount of such Proportionate Amount of net earnings (losses) to the extent the Pending Vessel has been deployed but for less than the entire period (with the actual net earnings (losses) of such Pending Vessel being given effect to for the period deployed to the extent otherwise included in the calculation of Consolidated EBITDA)).  As used

11

herein, "<u>Proportionate Amount of earnings (losses)</u>" means the product of the net earnings (losses) referred to above and the percentage of the aggregate purchase price for such Vessel that has been paid as of the relevant date of the determination of the Consolidated Fixed Charge Coverage Ratio.

If any Debt bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Debt shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Debt for a period equal to the remaining term of such Interest Rate Agreement).

"<u>Consolidated Leverage Ratio</u>" means, with respect to the Company and the Restricted Subsidiaries, as of any date of determination, the ratio of (i) Total Debt on such date to (ii) the Consolidated EBITDA for the most recently ended four consecutive full fiscal quarters for which consolidated financial statements are available on or prior to such date of determination; *provided*, *however*, that Consolidated EBITDA will be calculated in the manner contemplated by, and subject to all adjustments provided in, the definition of Consolidated Fixed Charge Coverage Ratio.

"<u>Consolidated Net Income</u>" means, for any period, the Company's and the Restricted Subsidiaries' consolidated net income (or loss) for such period as determined in accordance with U.S. GAAP, adjusted by excluding (to the extent included in such consolidated net income or loss), without duplication:

(a)     the portion of net income (but not the loss) of any Person (other than the Company or a Restricted Subsidiary), including Unrestricted Subsidiaries, in which the Company or any Restricted Subsidiary has an equity ownership interest, except that the Company's or a Restricted Subsidiary's equity in the net income of such Person for such period shall be included in such Consolidated Net Income to the extent of the aggregate amount of dividends or other distributions actually paid to the Company or any Restricted Subsidiary in cash dividends or other distributions during such period;

(b)     solely for purpose of calculating the amount available for Restricted Payments under <u>Section 4.07(b)(3)(i)</u> the net income (but not the loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary is not at the date of determination permitted, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary or its shareholders;

(c)     net after-tax gains attributable to the termination of any employee pension benefit plan;

(d)     any restoration to net income of any contingency reserve, except to the extent provision for such reserve was made out of income accrued at any time following the Closing Date;

(e)    any net gain arising from the acquisition of any securities or extinguishment, under U.S. GAAP, of any Debt of such Person;

(f)    the net income attributable to discontinued operations (including, without limitation, operations disposed of during such period whether or not such operations were classified as discontinued);

(g)    any gains (but not losses) from currency exchange transactions not in the ordinary course of business; and

(h)    the cumulative effect of a change in accounting principles after the Closing Date.

Notwithstanding the foregoing, Consolidated Net Income shall not include any gains, losses, charges, credits or other amounts relating to the Exchange Offer or related transactions.

"Consolidated Net Interest Expense" means, with respect to the Company and the Restricted Subsidiaries, for any period, without duplication and in each case determined on a consolidated basis in accordance with U.S. GAAP, the sum of:

(a)    the Company's and the Restricted Subsidiaries' interest and finance expenses for such period, *plus*, to the extent not otherwise included in interest and finance expenses (whether or not paid in cash):

(i)    amortization of debt discount and original issue discount;

(ii)    the net costs of Hedging Agreements (including amortization of fees and discounts);

(iii)    commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and similar transactions; and

(iv)    the interest portion of any deferred payment obligation and amortization of debt issuance costs; *plus*

(b)    the interest component of the Company's and the Restricted Subsidiaries' Capitalized Lease Obligations accrued and/or scheduled to be paid or accrued during such period other than the interest component of Capitalized Lease Obligations between or among the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries; *plus*

(c)    the Company's and the Restricted Subsidiaries non-cash interest expenses and interest that was capitalized during such period; *plus*

(d)    the interest expense on Debt of another Person to the extent such Debt is guaranteed by the Company or any Restricted Subsidiary or secured by a Lien on the Company's or any Restricted Subsidiary's assets, but only to the extent that such interest is actually paid by the Company or such Restricted Subsidiary; *plus*

13

(e)    cash and non-cash dividends due (whether or not declared) on the Company's Redeemable Capital Stock and any Restricted Subsidiary's Preferred Stock (to any Person other than the Company and any Wholly Owned Restricted Subsidiary), in each case for such period;

*less* the Company's and the Restricted Subsidiaries' interest income for such period, determined on a consolidated basis in accordance with U.S. GAAP.

"Consolidated Non-cash Charges" means, for any period, the aggregate depreciation, amortization and other non-cash expenses of the Company and the Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with U.S. GAAP (excluding any such non-cash charge that requires an accrual of or reserve for cash charges for any future period).

"Consolidated Tax Expense" means, for any period with respect to any Relevant Taxing Jurisdiction, the provision for all national, local and foreign federal, state or other income taxes of the Company and the Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with U.S. GAAP.

"Consulting Agreement" means the agreement for the Provision of Consulting Services, dated as of the Closing Date, among AlixPartners, LLP, the Company and Eletson MI.

"continuing" means, with respect to any Default or Event of Default, that such Default or Event of Default has not been cured or waived.

"Corporate Trust Office" means the office of a Trustee designated by such Trustee at which at any particular time its corporate trust business shall be administered, which office on the date hereof is located at Wilmington Savings Fund Society, FSB, WSFS Bank Center, 500 Delaware Avenue, 11th Floor, Wilmington, Delaware 19801-7411, Attention: Global Capital Markets, Raye D. Goldsborough.

"Cosco Agreements" means, collectively, (1) the bareboat charter, dated November 1, 2017 between Folegrandros Shipping Corporation, as charterer and Oriental Fleet International Company Limited, as owner, and (2) the bareboat charter, dated November 1, 2017 between Kastelorizo Shipping Corporation, as charterer and Oriental Fleet International Company Limited, as owner.

"Cosco Charter Disposal" means, with respect to a Cosco Vessel, (a) the disposition of such Cosco Vessel and its related Cosco Agreement to any Person other than the Company or an Affiliate of the Company, for consideration in the form of cash that is not less than the Fair Market Value of such Cosco Vessel and its related Cosco Agreement, with the broker for any such disposition being an Acceptable Broker; and (b) the release of the Issuers and their Restricted Subsidiaries from any and all obligations under the related Cosco Agreement.

"Cosco Chartering Entities" means, collectively, (1) Folegrandros Shipping Corporation, a Liberian corporation and (2) Kastelorizo Shipping Corporation, a Liberian corporation.

14

"Cosco Vessel" means, collectively, the newbuilding vessels, Folegandros (Hull No. 1426) and Kastelorizo (Hull No. 1425), built by Shanghai Waigaoqiao Shipbuilding Company Limited.

"Credit Facility" or "Credit Facilities" means, one or more debt facilities (including, without limitation, the Existing Credit Facilities) or indentures, as the case may be, commercial paper facilities with banks, insurance companies or other institutional lenders providing for revolving credit loans, term loans, notes, letters of credit or other forms of guarantees and assurances or other credit facilities or extensions of credit, including overdrafts, in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"CSIC Charters" means each of (1) the bareboat charter dated August 24, 2017 respecting the ANTIKEROS and made between Azure Nova Spring Co., Limited as owner and Antikeros Special Maritime Enterprise as charterer ; (2) the bareboat charter dated August 24, 2017 respecting the DHONOUSSA and made between Azure Nova Summer Co., Limited as owner and Dhonoussa Special Maritime Enterprise as charterer; (3) the bareboat charter dated August 24, 2017 respecting the POLYAIGOS and made between Azure Nova Autumn Co., Limited as owner and  Polyaigos Special Maritime Enterprise as charterer; and (4) the bareboat charter dated August 24, 2017 respecting the STROFADES and made between Azure Nova Winter Co., Limited as owner and  Strofades Special Maritime Enterprise as charterer.

"Currency Agreements" means in respect of a Person any spot or forward foreign exchange agreements and currency swap, currency option or other similar financial agreements or arrangements designed to protect such Person against or manage exposure to fluctuations in foreign currency exchange rates.

"Custodian" means Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as custodian for the Depositary with respect to the Notes in global form, or any successor entity thereto.

"Debt" means, with respect to any Person, without duplication:

(a)     all liabilities of such Person for borrowed money (including overdrafts) or for the deferred purchase price of property or services, excluding any trade payables and other accrued current liabilities Incurred in the ordinary course of business;

(b)     all obligations of such Person evidenced by bonds, notes, debentures or other similar instruments;

(c)     all obligations, contingent or otherwise, of such Person in connection with any letters of credit, bankers' acceptances, receivables facilities or other similar facilities;

(d)     all debt of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), but excluding trade payables arising in the ordinary course of business;

Doc#: US1:12095985v22

(e)    all Capitalized Lease Obligations of such Person;

(f)    all obligations of such Person under or in respect of Hedging Agreements;

(g)    all Debt referred to in (but not excluded from) the preceding clauses (a) through (f) of other Persons and all dividends of other Persons, the payment of which is secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien upon or with respect to property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt (the amount of such obligation being deemed to be the lesser of the Fair Market Value of such property or asset and the amount of the obligation so secured);

(h)    all guarantees by such Person of Debt referred to in this definition of any other Person;

(i)    all Redeemable Capital Stock of such Person valued at the greater of its voluntary maximum fixed repurchase price and involuntary maximum fixed repurchase price plus accrued and unpaid dividends; and

(j)    Preferred Stock of any Restricted Subsidiary;

*provided* that the term "Debt" shall not include: (i) non-interest bearing installment obligations and accrued liabilities Incurred in the ordinary course of business that are not more than 90 days past due; (ii) anything accounted for as an operating lease in accordance with U.S. GAAP; and (iii) any pension obligations of such Person.

For purposes of this definition, the "maximum fixed repurchase price" of any Redeemable Capital Stock that does not have a fixed redemption, repayment or repurchase price will be calculated in accordance with the terms of such Redeemable Capital Stock as if such Redeemable Capital Stock were purchased on any date on which Debt will be required to be determined pursuant to this Indenture, and if such price is based upon, or measured by, the fair market value of such Redeemable Capital Stock, such fair market value will be determined in good faith by the Board of Directors of the issuer of such Redeemable Capital Stock; *provided*, that if such Redeemable Capital Stock is not then permitted to be redeemed, repaid or repurchased, the redemption, repayment or repurchase price shall be the book value of such Redeemable Capital Stock as reflected in the most recent financial statements of such Person.

"Default" means any event that is, or after the giving of notice or passage of time or both would be, an Event of Default.

"Definitive Note" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06, substantially in the form of Exhibit A except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"Depositary" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Section 2.03 as the Depositary with respect to the

16

Notes, and any and all successors thereto appointed as depositary hereunder and having become such pursuant to the applicable provisions of this Indenture.

"Designated Appraiser" means any of any of Fearnleys A.S., Oslo Shipbrokers A.S., Clarkson Valuations Limited, Simpson Spence & Young Shipbrokers Ltd., E.A. Gibson Shipbrokers Ltd., Jacq. Pierot Jr. & Sons, Allied Shipbroking, Greece, RS Platou ASA, ICAP Shipping Limited, ACM Ltd., London, Island Shipbrokers PTE LTD, Singapore, and Deloitte LLP, Ernst & Young LLP and KPMG LLP as determined by the Company; provided that, at the time any such firm is to be utilized, such firm would qualify as an Independent Appraiser.

"Disinterested Member" means, with respect to any transaction or series of related transactions, a member of the Company's Board of Directors who does not have any material direct or indirect financial interest in or with respect to such transaction or series of related transactions or is not an Affiliate, or an officer, director, member of a supervisory, executive or management board or employee of any Person (other than the Company) who has any direct or indirect financial interest in or with respect to such transaction or series of related transactions.

"Eletson MI Party" means each of Eletson MI and its Restricted Subsidiaries.

"Eletson MI Preferred Interests" means the units of limited liability company interests, with liquidation preference equal to $ 1,000.00 per unit, of Eletson MI.

"Eligible Jurisdiction" means any of the Republic of the Marshall Islands, the United States of America, any State of the United States or the District of Columbia, the Commonwealth of the Bahamas, the Republic of Liberia, the Republic of Panama, the Commonwealth of Bermuda, the British Virgin Islands, the Cayman Islands, the Isle of Man, Republic of Cyprus, Norway, the Hellenic Republic, the United Kingdom, Malta, any Member State of the European Union and any other jurisdiction generally acceptable to institutional lenders in the shipping industry, as determined in good faith by the Company.

"EMC" means EMC Investment Corporation, a wholly owned subsidiary of the Company.

"Equity Pledge Agreement" means the Pledge Agreement, dated as of the Closing Date, entered into between the Company and Eletson MI, as pledgors, and the Collateral Agent, as collateral agent for the Holders, and acknowledged by each Pledged Company (as defined therein), as the same may be amended, supplemented or otherwise modified from time to time.

"Escrow Agreement" means the Preferred Interests Escrow Agreement, dated of the Closing Date, among the Company, Eletson MI, the Trustee and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as escrow agent (the "Escrow Agent").

"Euro" or "€" means the lawful currency of the member states of the European Union that participate in the third stage of the European Economic and Monetary Union.

"Euroclear" means Euroclear Bank, S.A./N.V., and its successors, as operator of the Euroclear system.

Doc#: US1:12095985v22

"<u>Event of Loss</u>" means any of the following events: (a) the actual or constructive total loss of a Mortgaged Vessel or the agreed or compromised total loss of a Mortgaged Vessel, (b) the destruction of a Mortgaged Vessel, (c) damage to a Mortgaged Vessel to an extent, determined in good faith by the Company within 90 days after the occurrence of such damage (and evidenced by an Officers' Certificate to such effect delivered to the Trustee, within such 90-day period), as shall make repair thereof uneconomical or shall render such Mortgaged Vessel permanently unfit for normal use (other than obsolescence) or (d) the condemnation, confiscation, requisition for title, seizure, forfeiture or other taking of title to or use of a Mortgaged Vessel that shall not be revoked within six months.  An Event of Loss shall be deemed to have occurred: (i) in the event of the destruction or other actual total loss of a Mortgaged Vessel, on the date of such loss, or if such date is unknown, on the date such Mortgaged Vessel was last reported; (ii) in the event of a constructive, agreed or compromised total loss of a Mortgaged Vessel, on the date of determination of such total loss; (iii) in the case of any event referred to in clause (c) above, upon the delivery of the Company's Officers' Certificate to the Trustee; or (iv) in the case of any event referred to in clause (d) above, on the date that is six months after the occurrence of such event.

"<u>Event of Loss Proceeds</u>" means all compensation, damages and other payments (including insurance proceeds) received by the Company, any Guarantor or the Trustee, jointly or severally, from any Person, including any governmental authority, with respect to or in connection with an Event of Loss.

"<u>Excess Cash Flow Offer Amount</u>" means, with respect to any Excess Cash Flow Period, an amount that is equal to (x) 75% times (y) the amount which, if used to purchase Notes in the Excess Cash Flow Offer for such Excess Cash Flow Period, would cause Aggregate Liquidity to be $13.0 million, after giving pro forma effect to the application of the entire Excess Cash Flow Offer Amount to purchase Notes in the Excess Cash Flow Offer and the payment of the next installment of interest that is due on the Notes.

"<u>Exchange Act</u>" means the U.S. Securities Exchange Act of 1934, as amended, or any successor statute, and the rules and regulations promulgated by the Commission thereunder.

"<u>Exchange Offer</u>" means the offer to exchange the outstanding Existing Notes with the Initial Notes dated May 25, 2018.

"<u>Excluded Expenses</u>" means, collectively, professional fees and expenses (i) paid to the Initial Advisor and the Back-Up Manager in respect of their duties required to be performed under this Indenture, (ii) paid in connection with the Exchange Offer and related transactions or (iii) paid in connection with a BoComm Charter Disposal or a Cosco Charter Disposal.

"<u>Exercised Vessel Purchase Option Contract</u>" means any Vessel Purchase Option Contract which has been exercised by the Company or a Restricted Subsidiary, obligating the Company or such Restricted Subsidiary to purchase such Vessel and any Related Assets, subject only to customary conditions precedent.

"<u>Existing Credit Facilities</u>" means each of

(1)      The Revolving Credit Facility Agreement, dated July 29, 2002, between Piraeus Bank A.E., as Lender, Eletson Corporation, as Borrower and Eletson Holdings Inc., as Corporate Guarantor thereto, as supplemented by Addendum No. 1, dated May 6, 2004, Addendum No. 2, dated September 23, 2005, Addendum No. 3, dated April 4, 2012, Addendum No. 4, dated June 3, 2013, Addendum No. 5, dated July 29, 2013, Addendum No. 6, dated October 15, 2013, Addendum No. 7, dated February 6, 2015, Addendum No. 8, dated April 28, 2016, Addendum No. 9, dated June 29, 2016, Addendum No. 10, dated December 29, 2016, and Addendum No. 11, dated August 9, 2017;

(2)      the Guarantee Agreement, dated June 10, 2009, between Eletson Holdings Inc. and Emporiki Bank of Greece S.A., as Lender, relating to the Loan Agreement, dated June 10, 2009, between Kinaros Special Maritime Enterprise and Kithnos Shipping Corporation, as joint and several Borrowers, and Emporiki Bank of Greece S.A., as Lender., as amended and restated by the Supplemental Agreement, dated as of January 4, 2010, as further amended and restated by the Second Supplemental Agreement, dated July 7, 2011, as supplemented by the Third Supplemental Agreement, dated April 5, 2012, as supplemented by the Fourth Supplemental Agreement, dated September 7, 2017, as provided by Credit Agricole Corporate and Investment Bank (as assignee of Emporiki Bank of Greece S.A.);

(3)      the Guarantee Agreement, dated October 17, 2013, between Eletson Holdings Inc. as Guarantor, and DVB Bank SE, as Security Agent, relating to the Term Facility Agreement, dated October 17, 2013, between Fourni Special Maritime Enterprise and Kastos Special Maritime Enterprise, as Borrowers, and the Banks and Financial Institutions listed as Lenders in Schedule 1 thereto, DVB Bank SE, as Arranger, and DVB Bank SE, as Agent and Security Agent;

(4)      the Overdraft Facility Agreement, dated March 31, 2014, between Eletson Corporation, as Borrower, and Alpha Bank S.A., as Lender;

(5)      the Overdraft Facility Agreement, dated October 9, 2014, between Eletson Corporation, as Borrower, and Aegean Baltic Bank S.A., as Lender, as supplemented by Addendum No. 1, dated December 23, 2015, as amended by a Letter, dated February 16, 2017, and as further modified by a Letter, dated December 28, 2017;

(6)      the Facility Agreement, dated August 9, 2017, between Eletson Corporation, as Borrower, Eletson Holdings Inc., as Corporate Guarantor, and Piraeus Bank S.A., as Lender;

(7)      the Loan Facility, dated August 24, 2017, between Eletson Chartering III Inc., as Borrower, Eletson Holdings Inc., as Parent Guarantor, and CSIC Tankers Holding Co., Limited, as Original Lender, as modified by the Side Letter between EMC Investment Corporation and CSIC Tankers Holding Co., Limited, as Lender; and

(8)      the Loan Agreement, dated August 31, 2017, between Eletson Holdings Inc., the Banks and Financial Institutions listed as Lenders in Schedule 1 thereto, Citibank Europe plc, UK Branch, as Agent, and Citibank N.A., London Branch, as Security Trustee;

Doc#: US1:12095985v22

in each case, as amended, restated, modified, renewed, refunded, replaced or refinanced in whole or in part from time to time.

"Existing Notes" means the 9.625% First Preferred Ship Mortgage Notes due 2022 of Eletson Holdings Inc. and Eletson Finance Inc.

"Existing Trustee" means the Deutsche Bank Trust Company Americas.

"Existing Trust Monies" means the deposited Net Cash Proceeds relating to the sale of certain Mortgaged Vessels since the Original Issue Date, which as of the Closing Date are equal to $8,050,449.77.

"Fair Market Value" means, with respect to any asset or property, the sale value that would be obtained in an arm's-length free market transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Company's Board of Directors. Fair Market Value shall be determined in good faith by (i) if the value of such property or asset is less than $10.0 million, an Officer of the Company and evidenced by an Officers' Certificate delivered to the Trustee and (ii) if the value of such property or asset equals or exceeds $10.0 million, the Board of Directors of the Company; *provided*, *however*, that (x) if such determination is with respect to one or more Vessels, Fair Market Value shall be (I) based on the Appraised Value of such Vessel as of the date of such Fair Market Value determination and (II) shall be the greater of such Vessel's "charter-free" and "charter-adjusted" values and (y) if such determination relates to the determination by the Company of compliance with clause (r) of the definition of "Permitted Liens," such determination shall comply with clause (x) to the extent such determination relates to one or more Vessels and in all other cases to the extent of Related Assets that have not been included in the calculation of the Appraised Value of a Vessel which Related Assets have a value in excess of $10.0 million, such determination shall be based on the written opinion of an independent investment banking firm of international standing qualified to perform the task for which such firm has been engaged (as determined by the Company in good faith).

"Fuel Hedging Agreements" means any spot, forward or option fuel price protection agreements and other types of fuel hedging agreements designed to protect against or manage exposure to fluctuations in fuel prices.

"Global Note Legend" means the legend set forth in Section 2.06(g)(2), which is required to be placed on all Global Notes issued under this Indenture.

"Global Notes" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited with or on behalf of and registered in the name of the Depositary or its nominee, substantially in the form of Exhibit A and that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Section 2.01, 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(d)(3).

Doc#: US1:12095985v22

"guarantee" means, as applied to any obligation:

(a)      a guarantee (other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business), direct or indirect, in any manner, of any part or all of such obligation; and

(b)      an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of non-performance) of all or any part of such obligation, including, without limiting the foregoing, by the pledge of assets and the payment of amounts drawn down under letters of credit.

"Guarantee" means any guarantee of the Company's obligations under this Indenture and the Notes by any Restricted Subsidiary or any other Person in accordance with the provisions of this Indenture, including the Guarantees by the Guarantors dated as of the Closing Date.

"Guarantors" means

(1)      Erikoussa SME, Alonissos SME, Agathonissos SME, Makronissos SME, Pelagos II SME, Angistri SME, Skopelos II SME, Megalonissos SME, Shinoussa Shipping Corporation, Sarakino Shipping Corporation, Venetiko Shipping Corporation, Skyros II Shipping Corporation and Sikinos II Shipping Corporation; and

(2)      any other Person that executes a Guarantee in accordance with the provisions of this Indenture, including without limitation, Section 4.25; and

(3)      the respective successors and assigns of the Persons described in the foregoing clauses (1) and (2).

"Hedging Agreements" means Currency Agreements and Interest Rate Agreements.

"Holder" means the Person in whose name a Note is recorded on the Registrar's books.

"Holding Company" of a Person means any other Person (other than a natural person) of which the first Person is a Subsidiary.

"Indenture" means this Indenture, as amended, supplemented or otherwise modified from time to time.

"Independent Appraiser" means:

(1)      (a) a Designated Appraiser or (b) to the extent no Designated Appraiser meets the requirements of clause (2) below, a Person engaged in the business of appraising vessels similar to the Vessels who is generally acceptable to institutional lenders to the shipping industry and selected by the Company; and

21

(2)      who (a) is independent of the parties to the transaction in question and their Affiliates and (b) is not connected with the Company, any of the Restricted Subsidiaries or any of such Affiliates as an officer, director, employee, promoter, underwriter, trustee, partner or person performing similar functions.

"Independent Financial Advisor" means an investment banking firm, bank, accounting firm or third-party appraiser, in any such case, of international standing; *provided* that such firm is not an Affiliate of the Company.

"Initial Advisor" means a financial advisory firm of international reputation that is unrelated to the Company and its Affiliates and is retained to assist with financial and other reporting and cash management of the Eletson MI Parties (provided that at the Closing Date the Initial Advisor shall be AlixPartners UK LLP or an Affiliate thereof) or any successor thereto appointed in accordance with the provisions of Section 4.30.

"Initial Notes" means the $314,068,360 in aggregate principal amount of Notes issued under this Indenture on the Closing Date and any Notes issued in replacement or substitution therefor in accordance with the provisions of this Indenture.

"Institutional Accredited Investor" means an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, that is not also a QIB.

"Interest Rate Agreements" means in respect of a Person any interest rate protection agreements and other types of interest rate hedging agreements (including, without limitation, interest rate swaps, caps, floors, collars and similar agreements) designed to protect such Person against or manage exposure to fluctuations in interest rates.

"Investments" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including Guarantees or other similar obligations), advances or capital contributions (excluding commission, travel and similar advances to officers and employees made in the ordinary course of business), purchases or other acquisitions in consideration of Debt, Capital Stock or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in accordance with U.S. GAAP (for the sake of clarity, items classified as assets other than investments or as capital expenditures with respect to existing property, plant or equipment of the Company or a Restricted Subsidiary made in the ordinary course of business, in each case on a balance sheet prepared in accordance with U.S. GAAP, will not be Investments). If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Capital Stock of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Restricted Subsidiary that were not sold or disposed of in an amount determined as provided in the definition of Fair Market Value.  The acquisition by the Company or any Restricted Subsidiary of the Company of a Person that holds an Investment in a third Person will be deemed to be an Investment by Company or such Restricted Subsidiary in such third Person in an amount equal to the Fair Market Value of the Investments held by the acquired Person.  Except as otherwise

22

provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"Lien" means any mortgage or deed of trust, charge, pledge, lien (statutory or otherwise), privilege, security interest, hypothecation, assignment for or by way of security, claim, or preference or priority or other encumbrance upon or with respect to any property of any kind, real or personal, movable or immovable, now owned or hereafter acquired.  A Person will be deemed to own subject to a Lien any property which such Person has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement.

"Maturity" means, with respect to any Debt, the date on which any principal of such Debt becomes due and payable as therein or herein provided, whether at the Stated Maturity with respect to such principal or by declaration of acceleration, call for redemption or purchase or otherwise.

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgaged Vessels" means (i) the Vessels named Pelagos, Angistri, Erikoussa, Skopelos, Agathonissos, Makronissos, Alonissos, Megalonissos, Keros, Meganisi, Sikinos, Skyros, and Andimilos, and (ii) any other Vessels made or required to be made subject to the Lien of the Security Documents in favor of the Trustee for the benefit of the Holders pursuant to the provisions described under Section 4.25.

"Net Cash Proceeds" means:

(a)      with respect to any Asset Sale, the proceeds thereof in the form of cash or Cash Equivalents including payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed for, cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary), net of:

(i)      brokerage commissions and other fees and expenses (including, without limitation, fees and expenses of legal counsel, accountants, investment banks and other consultants) related to such Asset Sale;

(ii)      provisions for all taxes paid or payable, or required to be accrued as a liability under U.S. GAAP as a result of such Asset Sale;

(iii)      all distributions and other payments required to be made to any Person (other than the Company or any Restricted Subsidiary) owning a beneficial interest in the assets subject to the Asset Sale; and

(iv)      appropriate amounts required to be provided by the Company or any Restricted Subsidiary, as the case may be, as a reserve in accordance with U.S. GAAP against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary, as the case may be, after such Asset Sale,

23

including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an Officers' Certificate delivered to the Trustee; and

(b)    with respect to any capital contributions, issuance or sale of Capital Stock or options, warrants or rights to purchase Capital Stock, or debt securities or Capital Stock that have been converted into or exchanged for Capital Stock as referred to under Section 4.07, the proceeds of such issuance or sale in the form of cash or Cash Equivalents, payments in respect of deferred payment obligations when received in the form of, or stock or other assets when disposed of for, cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary), net of attorney's fees, accountant's fees and brokerage, consultation, underwriting and other fees and expenses actually Incurred in connection with such issuance or sale and net of taxes paid or payable as a result of thereof.

"Net Charter Disposal Proceeds Amount" means, with respect to any Charter Disposal, an amount (if positive) equal to (x) all net cash proceeds received by the Issuers or any of their Restricted Subsidiaries from such Charter Disposal, less (y) the Available Amount for such Charter Disposal.

"Net Voyage Revenues" means, with respect to a TCE Measurement Period, (x) aggregate voyage revenues for the Mortgaged Vessels during such TCE Measurement Period less (y) aggregate voyage expenses excluding commissions for the Mortgaged Vessels during such TCE Measurement Period.

"Newbuilding Vessel" means a Vessel under construction, recently completed, or that has not been engaged in commercial operations.

"Non-U.S. Person" means a Person who is not a U.S. Person.

"Notes" has the meaning assigned to it in the preamble to this Indenture.  The Initial Notes, PIK Notes and the Additional Notes, if any, shall be treated as a single class for all purposes under this Indenture, and unless otherwise stated or required by the context, all references to the Notes shall include the Initial Notes, any PIK Notes and any Additional Notes.

"Obligations" means shall mean any principal (including reimbursement obligations with respect to letters of credit whether or not drawn), interest (including in the case of the Notes, all interest accrued thereon after the commencement of any action or proceeding described under Section 6.01(1)(j) or (k), even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), fees, indemnifications, reimbursements, expenses, damages and other liabilities payable under the documentation governing any Debt.

"Offer to Exchange" means the offer to exchange, dated as of May 25, 2018, related to the offering of the Initial Notes in exchange for the outstanding Existing Notes.

"Officer" means, with respect to any Person, the chairman of the board, chief executive officer, chief financial officer, chief operating officer, president, any vice president, the treasurer, principal accounting officer, the secretary or duly authorized attorney-in-fact of such Person.

"Officers' Certificate" means a certificate signed by two Officers of the Company, a Guarantor or a Surviving Entity, as the case may be, and delivered to the Trustee.

"Opinion of Counsel" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requirements of Section 13.05. The counsel may be an employee of or counsel to the Company or any Subsidiary of the Company.

"Original Issue Date" means December 19, 2013.

"Pari Passu Debt" means (a) any Debt of the Company that ranks equally in right of payment with the Notes or (b) with respect to any Guarantee, any Debt that ranks equally in right of payment to such Guarantee.

"Participant" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"Permitted Flag Jurisdiction" means any of the Republic of the Marshall Islands, the Republic of Liberia, the Republic of Panama, the Hellenic Republic, Malta, the Republic of Cyprus, the Commonwealth of the Bahamas and the British Virgin Islands and any other jurisdiction generally acceptable to institutional lenders in the shipping industry, as determined in good faith by the Board of Directors.

"Permitted Holders" means (i) each of Niki N. Zilajkou and Vassiliki S. Andreoulaki, the heirs of John E. Karastamatis, Erric B. Kertsikoff and of Apostolos B. Hadjieleftheriadis, and their respective spouses and descendants, (ii) the respective beneficiaries of the several estates of each person described in clause (i) of this definition and (iii) any trust solely for the benefit of any person described in clauses (i) or (ii) of this definition.

"Permitted Investments" means any of the following:

(a)      Investments in cash or Cash Equivalents;

(b)      intercompany Debt to the extent permitted under clause (4) of the definition of "Permitted Debt";

(c)      Investments in: (i) the form of loans or advances to the Company or Eletson Finance by a Person other than an Eletson MI Party; (ii) the form of loans or advances to Eletson MI; (iii) a Guarantor; (iv) another Person if as a result of such Investment such other Person becomes a Guarantor or such other Person is merged or consolidated with or into, or transfers or conveys all or substantially all of its assets to Eletson MI or a Guarantor and (v) the Issuers or their Restricted Subsidiaries by a Restricted Subsidiary that is not an Eletson MI Party;

25

(d)     Investments made by the Company or any Restricted Subsidiary as a result of or retained in connection with an Asset Sale permitted under or made in compliance with Sections 4.10 and 4.11 to the extent such Investments are non-cash proceeds permitted thereunder;

(e)     expenses or advances to cover payroll, travel entertainment, moving, other relocation and similar matters that are expected at the time of such advances to be treated as expenses in accordance with U.S. GAAP;

(f)     Investments in the Notes;

(g)     Investments existing on the Original Issue Date;

(h)     Investments in Hedging Agreements permitted under Section 4.09(b)(8);

(i)     loans and advances (or guarantees to third party loans, but not any forgiveness of such loans or advances) to directors, officers or employees of the Company or any Restricted Subsidiary made in the ordinary course of business and consistent with the Company's past practices or past practices of the Restricted Subsidiaries, as the case may be, in an amount outstanding not to exceed at any one time $5.0 million;

(j)     Investments in a Person to the extent that the consideration therefor consists of the net proceeds of the substantially concurrent issue and sale (other than to any Subsidiary) of shares of the Company's Qualified Capital Stock; *provided* that the net proceeds of such sale have been excluded from, and shall not have been included in, the calculation of the amount determined under Section 4.07(b)(3)(ii);

(k)     (i) stock, obligations or securities received in satisfaction of judgments, foreclosure of liens or settlement of debts and (ii) any Investments received in compromise of obligations of such persons Incurred in the ordinary course of trade creditors or customers that were Incurred in the ordinary course of business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer;

(l)     other Investments (other than Investments made by an Eletson MI Party) in any Person other than an Affiliate of the Company having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause (l) that are at the time outstanding, not to exceed the greater of (i)$20.0 million and (ii) 2.5% of Total Tangible Assets; and

(m)     Investments in Fuel Hedging Agreements permitted under Section 4.09(b)(13).

Doc#: US1:12095985v22

"Permitted Liens" means the following types of Liens:

(a)        Liens securing Debt under Credit Facilities permitted to be Incurred pursuant to clause (1) of the definition of "Permitted Debt"; *provided* that no such Liens shall extend to any assets or property constituting Collateral;

(b)        Liens on any property or assets of a Restricted Subsidiary granted in favor of the Company or any Wholly Owned Restricted Subsidiary;

(c)        Liens on any of the Company's or any Restricted Subsidiary's property or assets securing (i) the Notes outstanding on the Closing Date, (ii) any PIK Notes issued as PIK Interest and (iii) any Guarantee of the Notes described in clause (i) or (ii);

(d)        any interest or title of a lessor under any Capitalized Lease Obligation (other than in respect of a Vessel) and Liens to secure Debt (including Capitalized Lease Obligations) permitted by clause (6) of the definition of "Permitted Debt" (other than Debt Incurred in respect of a Vessel) covering only the assets (other than assets of an Eletson MI Party) acquired with such Debt;

(e)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Company or any Restricted Subsidiary in the ordinary course of business in accordance with the Company's or such Restricted Subsidiary's past practices prior to the Closing Date;

(f)        statutory Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, employees, pension plan administrators or other like Liens arising in the ordinary course of the Company's or any Restricted Subsidiary's business and with respect to amounts not yet delinquent or being contested in good faith by appropriate proceedings and for which a reserve or other appropriate provision, if any, as shall be required in conformity with U.S. GAAP shall have been made or Liens arising solely by virtue of any statutory or common law provisions relating to attorney's liens or bankers' liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depositary institution;

(g)        Liens for taxes, assessments, government charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as shall be required in conformity with U.S. GAAP shall have been made;

(h)        Liens Incurred or deposits made to secure the performance of tenders, bids or trade or government contracts, or to secure leases, statutory or regulatory obligations, surety or appeal bonds, performance bonds or other obligations of a like nature Incurred in the ordinary course of business (other than obligations for the payment of money);

(i)        zoning restrictions, easements, licenses, reservations, title defects, rights of others for rights-of-way, utilities, sewers, electrical lines, telephone lines, telegraph wires, restrictions, encroachments and other similar charges, encumbrances or title defects incurred in the ordinary course of business that do not in the aggregate interfere in any material respect with

27

the ordinary conduct of the business of the Company and its Restricted Subsidiaries on the properties subject thereto, taken as a whole;

(j)        Liens arising by reason of any judgment, decree or order of any court so long as such Lien is adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment, decree or order shall not have been finally terminated or the period within which such proceedings may be initiated shall not have expired;

(k)        Liens on property of, or on shares of Capital Stock or Debt of, any Person other than a Guarantor existing at the time such Person is acquired by, merged with or into or consolidated with, the Company or any Restricted Subsidiary; *provided* that such Liens: (i) do not extend to or cover any property or assets of the Company or any Restricted Subsidiary other than the property or assets acquired or than those of the Person merged into or consolidated with the Company or Restricted Subsidiary; and (ii) were created prior to, and not in connection with or in contemplation of, such acquisition, merger, consolidation, amalgamation or other combination;

(l)        Liens securing the Company's or any Restricted Subsidiary's obligations under Hedging Agreements or Fuel Hedging Agreements permitted under Sections 4.09(b)(8) and (b)(13) or any collateral for the Debt to which such Hedging Agreements or Fuel Hedging Agreements relate; *provided*, *however*, that no such Liens shall extend to any assets or property constituting Collateral;

(m)        Liens Incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security or other insurance;

(n)        Liens Incurred in connection with any cash management program established in the ordinary course of business for the Company's benefit or that of any Restricted Subsidiary in favor of a bank or trust company of the type described in Section 4.21(a);

(o)        Liens securing Debt Incurred to refinance Debt that has been secured by a Lien permitted by this Indenture; *provided* that: (i) any such Lien shall not extend to or cover any assets not securing the Debt so refinanced; and (ii) the Debt so refinanced shall have been permitted to be Incurred pursuant to clause (1) of the definition of "Permitted Debt";

(p)        purchase money Liens to finance property or assets of the Company or any Restricted Subsidiary acquired in the ordinary course of business; *provided* that: (i) the related purchase money Debt shall not exceed the cost of such property or assets and shall not be secured by any property or assets of the Company or any Restricted Subsidiary other than the property and assets so acquired; and (ii) the Lien securing such Debt shall be created within 90 days of any such acquisitions;

(q)        Liens Incurred in the ordinary course of business of the Company or any Restricted Subsidiary with respect to obligations that do not exceed $20.0 million at any one time outstanding and that: (i) are not Incurred in connection with the borrowing of money or the obtaining of advances or credit (other than trade credit in the ordinary course of business), (ii) do not in the aggregate materially detract from the value of the property or materially impair the use

28

thereof in the operation of the Company's or such Restricted Subsidiary's business and (iii) do not extend to any assets or property of the Eletson MI Parties;

(r)     Liens on property or assets of any Restricted Subsidiary that is not an Eletson MI Party (X) securing Debt incurred in compliance with Section 4.09(a) or clause (14) of the definition of "Permitted Debt" with respect to any existing Vessel of such Person *provided however*, that the principal amount of Debt secured by such a Lien shall not exceed 75% of the Fair Market Value of such Vessel, determined based upon the average of written appraisals of three Independent Appraisers, and (Y) securing Debt incurred to finance the construction, purchase or lease of, or repairs, improvements or additions to, property of such Person, including a Vessel; *provided*, *however*, as to this clause (Y), in the case of a Vessel, (i) except as provided in clauses (ii), (iii) and (iv) below, the principal amount of Debt secured by such Lien does not exceed (x) with respect to Debt incurred to finance the construction of such Vessel, 75% of the sum of (1) the contract price pursuant to the Vessel Construction Contract for such Vessel and (2) any other Ready for Sea Cost for such Vessel, and (y) with respect to Debt incurred to finance the acquisition of such Vessel, 75% of the sum of (1) the contract price for the acquisition of such Vessel and (2) any other Ready for Sea Cost of such Vessel, (ii) in the case of Debt that matures within nine months after the Incurrence of such Debt (other than any Permitted Refinancing Debt of such Debt that matures within nine months or Debt that matures within one year prior to the Stated Maturity of the Notes), the principal amount of Debt secured by such a Lien shall not exceed 75% of the Fair Market Value of such Vessel at the time such Lien is incurred, (iii) in the case of a sale and leaseback transaction, the principal amount of Debt secured by such a Lien shall not exceed 75% of the Fair Market Value of such Vessel at the time such Lien is incurred and (iv) in the case of Debt representing Capitalized Lease Obligations relating to a Vessel, the principal amount of Debt secured by such a Lien shall not exceed 75% of the sum of (1) the Fair Market Value of such Vessel at the time such Lien is Incurred and (2) any Ready for Sea Cost for such Vessel; *provided further*, *however*, as to this clause (Y), that such Lien may not extend to any other property owned by such Person or any of its Subsidiaries at the time the Lien is incurred and the Debt (other than any interest thereon) secured by the Lien may not be incurred more than 180 days after the later of the acquisition, completion of construction, repair, improvement, addition or commencement of full operation of the property subject to the Lien; *provided further* that no such Liens shall extend to any assets or property constituting Collateral;

(s)     Liens Incurred in the ordinary course of business of the Company or any Restricted Subsidiary arising from Vessel operations, chartering, drydocking, maintenance, the furnishing of supplies and bunkers to Vessels, repairs and improvements to Vessels, crews' wages, salvage and any other maritime Liens that do not in the aggregate materially detract from the value of the property or materially impair the use thereof in the operation of the Company's or such Restricted Subsidiary's business; and

(t)     any extension, renewal or replacement, in whole or in part, of any Lien described in the foregoing clauses (b) through (s); *provided* that (i) any such extension, renewal or replacement shall be no more restrictive in any material respect than the Lien so extended, renewed or replaced and shall not extend in any material respect to any additional property or assets; and (ii) any such Liens on the Collateral shall have a priority, relative to the Liens on the

29

Collateral securing the Notes and the Guarantees, that is equal to or lower than the Liens on the Collateral securing the Debt so refinanced.

"Permitted Refinancing Debt" means any renewals, extensions, substitutions, defeasances, discharges, refinancings or replacements (each, for purposes of this definition and Section 4.09(b)(11), a "refinancing") of any Debt of the Company or a Restricted Subsidiary or pursuant to this definition, including any successive refinancings, as long as:

(a)     such Debt is in an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) not in excess of the sum of: (i) the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding of the Debt being refinanced; and (ii) an amount necessary to pay any fees and expenses, including premiums and defeasance costs, related to such refinancing;

(b)     the Average Life of such Debt is equal to or greater than the Average Life of the Debt being refinanced;

(c)     the Stated Maturity of such Debt is no earlier than the Stated Maturity of the Debt being refinanced;

(d)     if the Debt being renewed, extended, substituted, defeased, discharged, refinanced or replaced is subordinated in right of payment to the Notes or the Guarantees (as applicable), such Permitted Refinancing Debt is subordinated in right of payment to, the Notes or the Guarantees (as applicable) on terms at least as favorable to the Holders as those contained in the documentation governing the Debt being renewed, extended, substituted, defeased, discharged, refinanced or replaced;

(e)     the new Debt is not senior in right of payment or in Lien priority to the Debt that is being refinanced; and

(f)     such Debt is Incurred either by the Company or by the Restricted Subsidiary who is the obligor in relation to the Debt being renewed, extended, substituted, defeased, discharged, refinanced or replaced,

*provided* that Permitted Refinancing Debt will not include (i) Debt of a Subsidiary (other than a Guarantor) that refinances the Debt of any Guarantor, (ii) Debt of any Restricted Subsidiary that refinances Debt of an Unrestricted Subsidiary or (iii) Debt of an Eletson MI Party that refinances any Debt (other than the Notes and related Guarantees) of the Company, Eletson Finance or any Restricted Subsidiary that is not a Guarantor.

"Permitted Repairs" means, with respect to any newly acquired second-hand Vessel, repairs which, in the reasonable judgment of the Company (which judgment shall be deemed reasonable if any such repair is required by the classification society or by any Permitted Flag Jurisdiction or any port state), are required to be made to such Vessel upon acquisition and which are made within 120 days of the acquisition thereof.

Doc#: US1:12095985v22

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"PIK Interest" means the interest that accrues semiannually on the Notes, in arrears, for the interest period from January 16, 2018 to July 15, 2018, at a rate of 12.00% per annum, in each case, payable on July 15, 2018 to holders of record on the Closing Date, payable entirely by increasing the principal amount of the outstanding Notes or by issuing new Notes.

"PIK Notes" means any Notes issued pursuant to a PIK Payment.

"PIK Payment" means any payment made in consideration of PIK Interest.

"Preferred Stock" means, with respect to any Person, Capital Stock of any class or classes (however designated) of such Person that is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over the Capital Stock of any other class of such Person, whether now outstanding or issued after the Closing Date and including, without limitation, all classes and series of preferred or preference stock of such Person.

"Private Placement Legend" means the legend set forth in Section 2.06(g)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by the provisions of this Indenture.

"pro forma" means, with respect to any calculation made or required to be made pursuant to the terms of the Notes, a calculation in accordance with Article 11 of the Regulation S-X promulgated under the Securities Act (to the extent applicable), as interpreted in good faith by the Company's Board of Directors after consultation with the Company's external auditor, or otherwise a calculation made in good faith by the Company's chief financial officer after consultation with the Company's external auditor, as the case may be.

"QIB" means a "qualified institutional buyer" as defined in Rule 144A.

"Qualified Capital Stock" of any Person means any and all Capital Stock of such Person other than Redeemable Capital Stock.

"Qualified Collateral" means one or more Qualified Vessels and/or cash and Cash Equivalents, the aggregate Fair Market Value of which is at least equal to the Appraised Value of the Mortgaged Vessel or Mortgaged Vessels for which such Qualified Collateral is being substituted (such Appraised Value to be determined at the time of such substitution).

"Qualified Vessel" means, as of any date, a Vessel which (i) is not a Mortgaged Vessel as of such date and (ii) is to be owned by an Issuer or a Guarantor.

"Ready for Sea Cost" means with respect to a Vessel or Vessels to be acquired or leased (pursuant to a Capitalized Lease Obligation) by the Company or any Restricted Subsidiary, as determined in good faith by the Company, the aggregate amount of all expenditures incurred to acquire or construct and bring such Vessel or Vessels to the condition

31

and location necessary for its intended use, including any and all inspections, appraisals, repairs, modifications, additions, permits and licenses in connection with such acquisition or lease, which would be classified and accounted for as "property, plant and equipment" in accordance with U.S. GAAP.

"Redeemable Capital Stock" means any class or series of Capital Stock that, either by its terms, by the terms of any security into which it is convertible or exchangeable or by contract or otherwise, is, or upon the happening of an event or passage of time would be, required to be redeemed prior to the final Stated Maturity of the Notes or is redeemable at the option of the holder thereof at any time prior to such final Stated Maturity (other than upon a Change of Control of the Company in circumstances in which the Holders would have similar rights), or is convertible into or exchangeable for debt securities at any time prior to such final Stated Maturity; *provided* that any Capital Stock that would constitute Qualified Capital Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of any "asset sale" or "change of control" occurring prior to the Stated Maturity of the Notes will not constitute Redeemable Capital Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are no more favorable to the holders of such Capital Stock than the provisions contained in Sections 4.10, 4.11, 4.16, and 4.17 and such Capital Stock specifically provides that such Person will not repurchase or redeem any such stock pursuant to such provision prior to the Issuers' offer to repurchase such Notes as are required to be repurchased pursuant to Sections 4.10, 4.11, 4.16, and 4.17.

"Regulation S" means Regulation S promulgated under the Securities Act.

"Regulation S Global Note" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as applicable.

"Regulation S Permanent Global Note" means a permanent Global Note in the form of Exhibit A bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period.

"Regulation S Temporary Global Note" means a temporary Global Note in the form of Exhibit A bearing the Global Note Legend, the Private Placement Legend and the Regulation S Temporary Global Note Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903 of Regulation S.

"Regulation S Temporary Global Note Legend" means the legend set forth in Section 2.06(g)(3).

"Regulation S-X" means Regulation S-X promulgated under the Securities Act.

"Related Asset" means, with respect to a Vessel, (i) any insurance policies and contracts from time to time in force with respect to such Vessel, (ii) any requisition compensation payable in respect of any compulsory acquisition thereof, (iii) any earnings

32

derived from the use or operation thereof and/or any earnings account with respect to such earnings, including, without limitation, monies due and to become due under any charters, operating leases and related agreements entered into in respect of such Vessel and any security or guarantee in respect of the charterer's or lessee's obligations under such charter, lease or agreement and all claims for damages arising under any such charters, operating leases and related agreements or relating to each such Vessel, (iv) any cash collateral account established with respect to such Vessel pursuant to the financing arrangement with respect thereto, and (v) to the extent Trust Monies are used to finance such construction, any building contracts relating to such Vessel and any security or guarantee in respect of the builder's obligations under such contracts.

"Replacement Assets" means non-current properties and assets that replace the properties and assets that were the subject of an Asset Sale or non-current properties and assets that will be used in the Company's business or in that of the Restricted Subsidiaries or any and all businesses that in the good faith judgment of the Board of Directors of the Company are reasonably related.

"Responsible Officer" means, when used with respect to either Trustee, or the Collateral Agent, an officer or authorized representative of such Trustee or Collateral Agent, as applicable, in the Corporate Trust Office of the Trustee or the Collateral Agent, as applicable, having direct responsibility for the administration of this Indenture and/or Security Documents, and also, with respect to a particular corporate trust matter, any other officer of the Trustee or the Collateral Agent, as applicable, to whom such matter is referred because of such officer's knowledge of, and familiarity with, the particular subject.

"Requisite Holder Designee" means a representative agent for the Requisite Holders for the purposes of actions under this Indenture, as such designee may be changed from time to time by the Requisite Holders; initially, such Requisite Holder Designee shall be Beach Point Capital Management LP.

"Requisite Holders" means the holders of two thirds of the aggregate principal amount of Notes at any time outstanding.

"Restricted Definitive Note" means a Definitive Note bearing the Private Placement Legend.

"Restricted Global Note" means a Global Note bearing the Private Placement Legend.

"Restricted Period" means the 40-day distribution compliance period as defined in Regulation S.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"Rule 144" means Rule 144 promulgated under the Securities Act.

"Rule 144A" means Rule 144A promulgated under the Securities Act.

Doc#: US1:12095985v22

"Rule 903" means Rule 903 promulgated under the Securities Act.

"Rule 904" means Rule 904 promulgated under the Securities Act.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and its successors.

"Sanctioned Entity" means any Person, country or territory subject to Sanctions.

"Sanctions" means any U.S. sanctions or export controls administered by the Office of Foreign Assets Control of the U.S. Treasury Department, the U.S. Department of Commerce, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury, or any other relevant sanctions or export control authority.

"Securities Act" means the U.S. Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security Agreements" means (i) each Assignment of Freights and Hires and (ii) each Assignment of Insurance.

"Security Documents" means the Ship Mortgages, the Security Agreements, the Equity Pledge Agreement, the Escrow Agreement, any Account Pledge Agreement and any other security agreements, pledge agreements, mortgages, collateral assignments, control agreements and related agreements (including financing statements under the Uniform Commercial Code of the relevant states), if any, each as amended, supplemented, restated, renewed, replaced or otherwise modified from time to time, to secure any obligations under the Indenture or under which rights or remedies with respect to any such Lien are governed.

"Ship Mortgage" means either the first preferred ship mortgage or first priority statutory mortgage and related deed of covenants, in each case, on each of the Mortgaged Vessels granted by a Guarantor to the Trustee and dated on or before the Closing Date or a Vessel Tender Date, as the case may be, as amended from time to time in accordance with the terms of this Indenture and such Ship Mortgages.

"Significant Subsidiary" means any Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such Regulation is in effect on the Closing Date.

"Stated Maturity" means, when used with respect to any Note or any installment of interest thereon, the date specified in such Note as the fixed date on which the principal of such Note or such installment of interest, respectively, is due and payable, and, when used with respect to any other Debt, means the date specified in the instrument governing such Debt as the fixed date on which the principal of such Debt, or any installment of interest thereon, is due and payable.

"Sterling" means the lawful currency of the United Kingdom of Great Britain and Northern Ireland.

Doc#: US1:12095985v22

"Subordinated Debt" means Debt of the Issuers or any of the Guarantors that is (i) subordinated in right of payment to the Notes or the Guarantees of such Guarantors, as the case may be, (ii) secured by a Lien on the Collateral ranking junior to the Liens on the Collateral securing the Notes and the Guarantees of such Guarantors or (iii) that is unsecured.

"Subsidiary" means, with respect to any Person:

(a)     a corporation a majority of whose Voting Stock is at the time, directly or indirectly, owned by such Person, by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person; and

(b)     any other Person (other than a corporation), including, without limitation, a partnership, limited liability company, business trust or joint venture, in which such Person, one or more Subsidiaries of such Person or such Person and one or more Subsidiaries thereof, directly or indirectly, at the date of determination thereof, has at least majority ownership interest entitled to vote in the election of directors, managers or trustees thereof (or other Person performing similar functions).

"TCE-Based Interest Payment Date" means each of January 15, April 15, July 15 and October 15.

"TCE Measurement Period" means, with respect to a TCE-Based Interest Payment Date, the six most recently completed calendar months prior to such TCE-Based Interest Payment Date for which internal financial statements for the Eletson MI Parties are available.

"TIA" means the U.S. Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"Total Debt" means, as of any date of determination, the aggregate principal amount of all Debt of the Company and the Restricted Subsidiaries on such date (including after giving pro forma effect to any Debt to be Incurred on such date and the application of proceeds thereof), as determined on a consolidated basis in accordance with U.S. GAAP.

"Total Tangible Assets" means the total consolidated assets, less goodwill and intangibles, of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Company prepared in accordance with U.S. GAAP.

"Trailing TCE" means, with respect to any date, (x) Net Voyage Revenues for the TCE Measurement Period with respect to such date divided by (y) Aggregate Available Days for the Mortgaged Vessels for the TCE Measurement Period with respect to such date.

"Trust Monies" means all cash or Cash Equivalents received by the Trustee as or in respect of Collateral:  (a) upon the release of property from the Lien of any of the Security Documents; (b) as compensation for, or  proceeds of the sale of all or any part of the Collateral taken by eminent domain or purchased by, or sold pursuant to any order of, a governmental authority or otherwise disposed of; (c) in connection with an Event of Loss or Asset Sale with respect to Collateral; (d) pursuant to certain provisions of the Ship Mortgages; (e) as proceeds of

any other sale or other disposition of all or any part of the Collateral by or on behalf of the Trustee or any collection, recovery, receipt, appropriation or other realization of or from all or any part of the Collateral pursuant to the Security Documents or otherwise; (f) as part of Qualified Collateral; or (g) for application under this Indenture as provided in this Indenture or any Security Document, or whose disposition is not otherwise specifically provided for in this Indenture or in any Security Document; provided, however, that Trust Monies shall in no event include any property deposited with the Trustee for any Change of Control Offer, Asset Sale or optional redemption or defeasance of any Notes.

"UCC" means the Uniform Commercial Code as adopted in any applicable jurisdiction.

"Unrestricted Definitive Note" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"Unrestricted Global Note" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"Unrestricted Subsidiary" means (x) Eletson Gas LLC and each of its Subsidiaries (unless designated a Restricted Subsidiary after the Closing Date) and (y):

(a)    any Subsidiary of the Company that at the time of determination is an Unrestricted Subsidiary (as designated by the Company's Board of Directors pursuant to Section 4.20); and

(b)    any Subsidiary of an Unrestricted Subsidiary.

"U.S. dollar Equivalent" means with respect to any monetary amount in a currency other than U.S. dollars, at any time for the determination thereof, the amount of U.S. dollars obtained by converting such foreign currency involved in such computation into U.S. dollars at the spot rate for the purchase of U.S. dollars with the applicable foreign currency as published under "Currency Rates" in the section of *The Financial Times* entitled "*Currencies, Bonds & Interest Rates*" on the date two Business Days prior to such determination.

"U.S. dollars" means the lawful currency of the United States of America.

"U.S. GAAP" means Generally Accepted Accounting Principles in the United States in effect on the Closing Date.

"U.S. Government Securities" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States of America pledges its full faith and credit.

"U.S. Person" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

"Vessel" means one or more shipping vessels whose primary purpose is the maritime transportation of cargo and/or passengers or which are otherwise engaged, used or

36

useful in any business activities of the Company and its Restricted Subsidiaries and which are owned by and registered (or to be owned by and registered) in the name of the Company or any of its Restricted Subsidiaries or operated or to be operated by the Company or any of its Restricted Subsidiaries pursuant to a lease or other operating agreement constituting a Capitalized Lease Obligation, in each case together with all related spares, equipment and any additions or improvements.

"<u>Vessel Addition Expenses</u>" means expenses related to upgrades to Mortgaged Vessels that are not capitalized, which do not exceed $20,000 per item.

"<u>Vessel Construction Contract</u>" means any contract for the construction (or construction and acquisition) of a Vessel and any Related Assets entered into by the Company or any Restricted Subsidiary, including any amendments, supplements or modifications thereto or change orders in respect thereof.

"<u>Vessel Purchase Option Contract</u>" means any contract granting the Company or any Restricted Subsidiary the option to purchase one or more Vessels and any Related Assets, including any amendments, supplements or modifications thereto.

"<u>Voting Stock</u>" means any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors, managers or trustees (or Persons performing similar functions) of any Person (irrespective of whether or not, at the time, stock of any other class or classes shall have, or might have, voting power by reason of the happening of any contingency).

"<u>Wholly Owned Restricted Subsidiary</u>" means any Restricted Subsidiary, all of the outstanding Capital Stock (other than directors' qualifying shares or shares of Restricted Subsidiaries required to be owned by third parties pursuant to applicable law) of which are owned by the Company or by one or more other Wholly Owned Restricted Subsidiaries or by the Company and one or more other Wholly Owned Restricted Subsidiaries.

Doc#: US1:12095985v22

Section 1.02    <u>Other Definitions</u>.

| <u>Term</u> | Defined in Section |
|---|---|
| *"Action"* | 10.09 |
| *"Additional Amounts"* | 4.27 |
| *"Additional Notes"* | 1.01 |
| *"Automatic Exchange"* | 2.06 |
| *"Automatic Exchange Date"* | 2.06 |
| *"Automatic Exchange Notice"* | 2.06 |
| *"Automatic Exchange Notice Date"* | 2.06 |
| *"Base Currency"* | 13.09 |
| *"Budget"* | 4.03 |
| *"Change in Tax Law"* | 3.09 |
| *"Change of Control Offer"* | 4.16 |
| *"Change of Control Purchase Date"* | 4.16 |
| *"Change of Control Purchase Price"* | 4.16 |
| *"Charter Disposal Proceeds Offer"* | 4.29 |
| *"Code"* | 4.27 |
| *"Collateral Proceeds Reinvestment Termination Date"* | 4.11 |
| *"Collateral Sale Offer"* | 4.11 |
| *"Collection Account"* | 4.31 |
| *"Covenant Defeasance"* | 8.03 |
| *"Cure Amounts"* | 4.07 |
| *"DTC"* | 2.03 |
| *"Eletson Finance"* | Preamble |
| *"Eletson MI"* | Preamble |
| *"Eletson Gas Group"* | 4.35 |
| *"Escrow Agent"* | 1.01 |
| *"EU Member State"* | 1.01 |
| *"Event of Default"* | 6.01 |
| *"Event of Loss Offer"* | 4.17 |
| *"Excess Cash Flow Period"* | 4.32 |
| *"Excess Cash Flow Offer"* | 4.32 |
| *"Excess Cash Flow Offer Payment Date"* | 4.32 |
| *"Excess Collateral Proceeds"* | 4.11 |
| *"Excess Loss Proceeds"* | 4.17 |
| *"Excess Proceeds"* | 4.10 |
| *"Excess Proceeds Offer"* | 4.10 |
| *"Existing Trust Monies Offer"* | 4.19 |
| *"Incur", "Incurrence"* | 4.09 |
| *"Issuer"* | Preamble |
| *"judgment currency"* | 13.09 |
| *"Legal Defeasance"* | 8.02 |
| *"Loss Redemption Amount"* | 4.17 |
| *"Lost Mortgaged Vessel"* | 4.17 |

Doc#: US1:12095985v22

| Term | Defined in Section |
|------|------|
| "*Note Offer*" | 3.10 |
| "*Offer Amount*" | 3.10 |
| "*Offer Period*" | 3.10 |
| "*Operating Expenses*" | 4.31 |
| "*Other Connection Taxes*" | 4.27 |
| "*Overhead Expenses*" | 4.31 |
| "*Parallel Debt*" | 13.01 |
| "*Paying Agent*" | 2.03 |
| "*Pending Vessel*" | 1.01 |
| "*Permitted Debt*" | 4.09 |
| "*Piraeus Bank Group*" | 4.37 |
| "*Process Agent*" | 13.11 |
| "*Purchase Date*" | 3.10 |
| "*rate of exchange*" | 13.09 |
| "*refinancing*" | 1.01 |
| "*Registrar*" | 2.03 |
| "*Reinvestment Termination Date*" | 4.10 |
| "*Related Agreements*" | 4.11 |
| "*Relevant Payment Date*" | 4.27 |
| "*Relevant Taxing Jurisdiction*" | 4.27 |
| "*Restricted Payment*" | 4.07 |
| "*Restricted Payments*" | 4.07 |
| "*Sold Mortgaged Vessel*" | 4.11 |
| "*Specified Account*" | 4.31 |
| "*Specified BoComm Vessels*" | 4.29 |
| "*Successor Guarantor*" | 5.01 |
| "*Surviving Entity*" | 5.01 |
| "*Taxes*" | 4.27 |
| "*Tendered Vessel Owner*" | 4.25 |
| "*Total Loss*" | 4.09 |
| "*transfer*" | 1.01 |
| "*Trustee*" | Preamble |
| "*Vessel Tender Date*" | 4.25 |

**Section 1.03**   Incorporation by Reference of TIA.

Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Indenture.

The following TIA terms used in this Indenture have the following meanings:

"indenture securities" means the Notes;

"indenture security Holder" means a Holder;

"<u>indenture to be qualified</u>" means this Indenture;

"<u>indenture trustee</u>" or "<u>institutional trustee</u>" means the Trustee; and

"<u>obligor</u>" on the Notes and the Guarantees means the Issuers and the Guarantors, respectively, and any successor obligor upon the Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under the TIA have the meanings so assigned to them.

Section 1.04    <u>Rules of Construction</u>.

Unless the context otherwise requires:

(1)    a term has the meaning assigned to it;

(2)    an accounting term not otherwise defined has the meaning assigned to it in accordance with U.S. GAAP;

(3)    "or" is not exclusive;

(4)    words in the singular include the plural, and in the plural include the singular;

(5)    "will" shall be interpreted to express a command;

(6)    the term "including" is not limiting;

(7)    provisions apply to successive events and transactions;

(8)    references to sections of or rules under the Securities Act and Exchange Act will be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(9)    "herein," "hereof" and other words of similar import refer to this Indenture as a whole and not to any particular Article, Section or other subdivision; and

(10)    all references to Articles, Sections or subdivisions refer to Articles, Sections or subdivisions of this Indenture unless otherwise indicated.

## ARTICLE 2
## THE NOTES

Section 2.01    <u>Form and Dating</u>.

(a)    *General*.  The Notes and the Trustee's certificate of authentication will be substantially in the form of <u>Exhibit A</u>.  The Notes may have notations, legends or endorsements

Doc#: US1:12095985v22

required by law, stock exchange rule or usage.  Each Note will be dated the date of its authentication.  The Notes shall be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.  Any PIK Notes shall be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.  Notwithstanding any provision of this Indenture or the Notes (i) any *pro rata* redemptions or repurchases of the Notes by the Issuers pursuant to this Indenture shall be made in a manner that preserves the authorized denominations of the Notes, and (ii) in the case of Global Notes, the selection of Notes to be redeemed or repurchased will be in accordance with the procedures of the Depositary.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Issuers, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global and Definitive Notes*.  Notes issued in global form will be substantially in the form of Exhibit A (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Notes issued in definitive form will be substantially in the form of Exhibit A (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06.

(c)    *Temporary Global Notes*.  Notes offered and sold in reliance on Regulation S will be issued initially in the form of the Regulation S Temporary Global Note, which will be deposited by the Issuers on behalf of the purchasers of the Notes represented thereby with the Custodian, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of Participants holding on behalf of Euroclear or Clearstream, duly executed by the Issuers and authenticated by the Trustee as hereinafter provided.  The Restricted Period will be terminated prior to the expiration of the 40-day period upon the receipt by the Trustee of:

(1)    a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream, certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any Beneficial Owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who will take delivery of a Beneficial Ownership interest in a 144A Global Note or an AI Global Note bearing a Private Placement Legend, all as contemplated by Section 2.06(b)); and

41

(2)        an Officers' Certificate from the Issuers.

Following the termination of the Restricted Period, all beneficial interests in the Regulation S Temporary Global Note will be exchanged for beneficial interests in the Regulation S Permanent Global Note pursuant to the Applicable Procedures.  Simultaneously with the authentication of the Regulation S Permanent Global Note in accordance with Section 2.02, the Trustee will cancel the Regulation S Temporary Global Note.  The aggregate principal amount of the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Registrar and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

The Trustee shall have no duty to request the certificates described in subclauses (1) and (2) of this Section 2.01(c).

(d)        *Euroclear and Clearstream Procedures Applicable*.  The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream will be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Note that are held by Participants through Euroclear or Clearstream.

Section 2.02    Execution and Authentication.

At least one Officer of each Issuer shall execute the Notes on behalf of such Issuer by manual or facsimile signature.  If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee.  The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee will, upon receipt of an Authentication Order, authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes and the Regulation S Permanent Global Note.  Such Authentication Order shall specify the principal amount of the Notes to be authenticated, the date on which the issue of the Notes is to be authenticated, the number of separate Notes certificates to be authenticated, the registered Holder of each such Note and delivery instructions and, in the case of an issuance of Additional Notes after the Closing Date, shall certify that such issuance is in compliance with Sections 4.09 and 4.13.  The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Issuers pursuant to one or more Authentication Orders, except as provided in Section 2.07.

The Trustee may appoint an authenticating agent acceptable to the Issuers to authenticate Notes.  An authenticating agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuers.

Doc#: US1:12095985v22

Section 2.03    Registrar and Paying Agent.

The Issuers will maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("Registrar") and an office or agency where Notes may be presented for payment ("Paying Agent").  The Registrar will keep a register of the Notes and of their transfer and exchange.  The Issuers may appoint one or more co-registrars and one or more additional paying agents.  The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent.  The Issuers may change any Paying Agent or Registrar without notice to any Holder.  The Issuers will notify the Trustee in writing of the name and address of any Agent not a party to this Indenture.  If the Issuers fail to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such.  The Issuers or any of their respective Subsidiaries may act as Paying Agent or Registrar.

The Issuers initially appoint The Depository Trust Company ("DTC") to act as Depositary with respect to the Global Notes.

The Issuers appoint the Trustee to act as the Registrar and Paying Agent under this Indenture and as Custodian with respect to the Global Notes.

Section 2.04    Paying Agent to Hold Money in Trust.

The Issuers will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or interest on the Notes, and will notify the Trustee of any default by the Issuers in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Issuers at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee of all amounts that it is obligated to pay, the Paying Agent (if other than the Issuers or a Subsidiary of an Issuer) will have no further liability for the money.  If the Issuers or a Subsidiary of an Issuer act as Paying Agent, they will segregate and hold in a separate trust fund for the benefit of the Holders all money held by them as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Issuers, the Trustee will serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

The Registrar will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar or the Paying Agent, the Issuers will furnish to the Trustee at least five Business Days before each interest payment date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders and the Issuers shall otherwise comply with TIA § 312(a).

Doc#: US1:12095985v22

Section 2.06    Transfer and Exchange.

(a)    *Transfer and Exchange of Global Notes*.  A Global Note may not be transferred except as a whole by the Depositary to a nominee of the Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.  A Global Note is exchangeable for Definitive Notes if:

(1)    the Issuers deliver to the Trustee and the Registrar notice from the Depositary that it is unwilling or unable to continue to act as Depositary or that it has ceased to be a clearing agency registered under the Exchange Act and, in either case, the Issuers fail to appoint a successor Depositary within 90 days after the date of such notice from the Depositary;

(2)    the Issuers at their option, notify the Trustee and the Registrar in writing that they elect to cause the issuance of Definitive Notes; *provided* that in no event shall the Regulation S Temporary Global Note be exchanged by the Issuers for Definitive Notes prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act; or

(3)    there has occurred and is continuing a Default or Event of Default with respect to the Notes and the Depositary requests such exchange.

Upon the occurrence of any of the preceding events in (1), (2) or (3) above, Definitive Notes shall be issued in such names as the Depositary shall instruct the Trustee and the Registrar.  Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10, shall be authenticated and delivered in the form of, and shall be, a Global Note.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); *provided*, *however*, that beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b) or (c).

(b)    *Transfer and Exchange of Beneficial Interests in the Global Notes*.  The transfer and exchange of beneficial interests in the Global Notes will be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures. Beneficial interests in the Restricted Global Notes will be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act.  Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) of this Section 2.06(b), as applicable, as well as one or more of the other following subparagraphs, as applicable:

(1)    *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend;

44

*provided, however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than an initial purchaser of the Notes). Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(1).

(2)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes.* In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(1), the transferor of such beneficial interest must deliver to the Registrar either:

(i)    both: (x) a written order from a Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged; and (y) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(ii)    both: (x) a written order from a Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged; and (y) instructions given by the Depositary to the Registrar containing information satisfactory to the Registrar regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in Section 2.06(b)(1) above; *provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903 under the Securities Act.

Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Registrar shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(i).

(3)    *Transfer of Beneficial Interests to Another Restricted Global Note.* A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(i)    if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

45

(ii)    if the transferee will take delivery in the form of a beneficial interest in the Regulation S Temporary Global Note or the Regulation S Permanent Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

(iii)    if the transferee will take delivery in the form of a beneficial interest in the AI Global Note, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3)(d) thereof, if applicable.

(4)    *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note*. A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(i)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit C, including the certifications in item (1)(a) thereof; or

(ii)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, if the Issuers so request or if the Applicable Procedures so require, an Opinion of Counsel to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to this clause (4) at a time when an Unrestricted Global Note has not yet been issued, the Issuers shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to this clause (4).

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

46

(c)      *Transfer or Exchange of Beneficial Interests for Definitive Notes*.

(1)      *Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes*.  If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon receipt by the Registrar of the following documentation:

(i)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder in the form of Exhibit C, including the certifications in item (2)(a) thereof;

(ii)      if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(iii)      if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(iv)      if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(v)      if such beneficial interest is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (ii) through (iv) above, a certificate to the effect set forth in Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(vi)      if such beneficial interest is being transferred to the Issuers or any of their respective Subsidiaries, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

(vii)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(c) thereof,

the Registrar shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(i), and the Issuers shall execute and the Trustee shall authenticate and deliver to the Person designated in the instructions a Definitive Note in the appropriate principal amount.  Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or

47

names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant. The Trustee shall deliver such Definitive Notes to the Persons in whose names such Notes are so registered.  Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(1) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(2)    *Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes.*  Notwithstanding Sections 2.06(c)(1)(i) and (iii), a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(3)    *Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes.*  A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only if the Registrar receives the following:

(i)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit C, including the certifications in item (1)(b) thereof; or

(ii)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder in the form of Exhibit B, including the certifications in item (4) thereof;

and, if the Issuers so request or if the Applicable Procedures so require, an Opinion of Counsel to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(4)    *Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes.*  If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon satisfaction of the conditions set forth in Section 2.06(b)(2), the Registrar will cause the aggregate principal amount of the applicable Unrestricted Global Note to be reduced accordingly pursuant to Section 2.06(i), and the Issuers will execute and the Trustee will authenticate and deliver to the Person designated in the instructions a

48

Definitive Note in the appropriate principal amount.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(4) will be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest requests through instructions to the Registrar from or through the Depositary and the Participant.  The Trustee will deliver such Definitive Notes to the Persons in whose names such Notes are so registered.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(4) will not bear the Private Placement Legend.

(d)    *Transfer and Exchange of Definitive Notes for Beneficial Interests*.

(1)    *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.*  If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(i)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (2)(b) thereof;

(ii)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B, including the certifications in item (1) thereof;

(iii)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B, including the certifications in item (2) thereof;

(iv)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(a) thereof;

(v)    if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (ii) through (iv) above, a certificate to the effect set forth in Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable;

(vi)    if such Restricted Definitive Note is being transferred to the Issuers or any of their Subsidiaries, a certificate to the effect set forth in Exhibit B, including the certifications in item (3)(b) thereof; or

Doc#: US1:12095985v22

(vii)  if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate to the effect set forth in <u>Exhibit B</u>, including the certifications in item (3)(c) thereof,

the Registrar will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (i) above, the appropriate Restricted Global Note, in the case of clause (ii) above, the 144A Global Note, in the case of clause (iii) above, the Regulation S Global Note, and in all other cases, the AI Global Note.

(2)    *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.*  A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if the Registrar receives the following:

(i)    if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit C</u>, including the certifications in item (1)(c) thereof; or

(ii)    if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of <u>Exhibit B</u>, including the certifications in item (4) thereof;

and, in each such case set forth in this clause (2), if the Issuers so request or if the Applicable Procedures so require, an Opinion of Counsel to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this <u>Section 2.06(d)(2)</u>, the Registrar will cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3)    *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.*  A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time.  Upon receipt of a request for such an exchange or transfer, the Registrar will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to clause (2) above or this clause (3) at a time when an Unrestricted Global

50

Note has not yet been issued, the Issuers will issue and, upon receipt of an Authentication Order in accordance with Section 2.02, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)     *Transfer and Exchange of Definitive Notes for Definitive Notes.*  Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder must provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

(1)     *Restricted Definitive Notes to Restricted Definitive Notes.*  Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(i)     if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (1) thereof;

(ii)     if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications in item (2) thereof; and

(iii)     if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B, including the certifications, certificates and Opinion of Counsel required by item (3) thereof, if applicable.

(2)     *Restricted Definitive Notes to Unrestricted Definitive Notes.*  Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if the Registrar receives the following:

(i)     if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit C, including the certifications in item (1)(d) thereof; or

(ii)     if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B, including the certifications in item (4) thereof;

51

and, if the Issuers so request, an Opinion of Counsel to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(3)     *Unrestricted Definitive Notes to Unrestricted Definitive Notes.*  A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)     *[Reserved].*

(g)     *Legends.*  The following legends will appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)     *Private Placement Legend.*

(i)     Except as permitted by subparagraph (ii) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION.  NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATION.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF (1) REPRESENTS THAT (A) IT IS AN "ACCREDITED INVESTOR" (AS DEFINED IN RULE 501 OF REGULATION D UNDER THE SECURITIES ACT) OR (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN "OFFSHORE TRANSACTION" WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT ("REGULATION S") AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD WITH RESPECT TO RESTRICTED SECURITIES

SET FORTH IN RULE 144 UNDER THE SECURITIES ACT, ONLY (A) TO THE COMPANY OR ANY SUBSIDIARY THEREOF, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHICH NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS IN OFFSHORE TRANSACTIONS AND IN ACCORDANCE WITH THE LAWS APPLICABLE TO SUCH PURCHASER IN THE JURISDICTION IN WHICH SUCH PURCHASE IS MADE, (D) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a)(1), (2), (3), OR (7) UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FOR ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, (E) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUERS' AND THE TRUSTEE'S, OR REGISTRAR'S, AS APPLICABLE, RIGHT PRIOR TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (C), (D) OR (F) TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATIONS AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY IS COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR REGISTRAR.  THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE EXPIRATION OF THE APPLICABLE HOLDING PERIOD WITH RESPECT TO RESTRICTED SECURITIES SET FORTH IN RULE 144 UNDER THE SECURITIES ACT."

(ii)    Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(4), (c)(3), (c)(4), (d)(2), (d)(3), (e)(2) or (e)(3) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not bear the Private Placement Legend.

(2)    *Global Note Legend.*  Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUERS.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS GLOBAL NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC"), TO THE ISSUERS OR THEIR AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(3)    *Regulation S Temporary Global Note Legend.*  The Regulation S Temporary Global Note will bear a legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR DEFINITIVE

54

NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN).  NEITHER THE HOLDER NOR THE BENEFICIAL OWNERS OF THIS REGULATION S TEMPORARY GLOBAL NOTE SHALL BE ENTITLED TO RECEIVE PAYMENT OF INTEREST HEREON.”

(h)    *Procedures for Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.*

Upon the Issuers' satisfaction that the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act:

(1)    beneficial interests in a Restricted Global Note may be automatically exchanged for beneficial interests in an Unrestricted Global Note without any action required by or on behalf of the Holder of such Restricted Global Note (the "Automatic Exchange") at any time on or after the date that is the 366th calendar day after (a) with respect to the Notes issued on the Closing Date, the Closing Date or (b) with respect to Additional Notes, if any, the issue date of such Additional Notes, or, in each case, if such day is not a Business Day, on the next succeeding Business Day (the "Automatic Exchange Date"); and

(2)    the Issuers shall (a) provide written notice to DTC and the Trustee at least fifteen (15) calendar days prior to the Automatic Exchange Date, instructing DTC to exchange all of the outstanding beneficial interests in a particular Restricted Global Note for beneficial interests in an Unrestricted Global Note, which the Issuers shall have previously otherwise made eligible for exchange with the DTC; (b) provide prior written notice (the "Automatic Exchange Notice") to each Holder of such Restricted Global Note at such Holder's address appearing in the register of Holders at least fifteen (15) calendar days prior to the Automatic Exchange Date (the "Automatic Exchange Notice Date"), which notice must include (i) the Automatic Exchange Date, (ii) the section of this Indenture pursuant to which the Automatic Exchange shall occur, (iii) the "CUSIP" number of the Restricted Global Note from which such Holder's beneficial interests will be transferred and (iv) the "CUSIP" number of the Unrestricted Global Note into which such Holder's beneficial interests will be transferred; and (c) on or prior to the Automatic Exchange Date, deliver to the Trustee for authentication one or more Unrestricted Global Notes, duly executed by the Issuers, in an aggregate principal amount equal to the aggregate principal amount of each Restricted Global Note to be exchanged for one or more such Unrestricted Global Notes.

At the Issuers' written request on no less than five (5) calendar days' notice prior to the Automatic Exchange Notice Date, the Trustee shall deliver, in the Issuers' name and at their expense, the Automatic Exchange Notice to each Holder at such Holder's address appearing in the register of Holders; *provided* that the Issuers have delivered to the Trustee the information required to be included in such Automatic Exchange Notice.

Notwithstanding anything to the contrary in this Section 2.06(h), during the fifteen (15) calendar day period prior to the Automatic Exchange Date, no transfers or exchanges

55

other than pursuant to this Section 2.06(h) shall be permitted without the prior written consent of the Issuers.  As a condition to any Automatic Exchange, the Issuers shall provide, and the Trustee shall be entitled to conclusively rely upon, an Officers' Certificate and Opinion of Counsel to the Issuers to the effect that the Automatic Exchange shall be effected in compliance with the Securities Act, that the restrictions on transfer contained herein and in the Private Placement Legend shall no longer be required in order to maintain compliance with the Securities Act and that the aggregate principal amount of the particular Restricted Global Note is to be transferred to the particular Unrestricted Global Note by adjustment made on the records of the Trustee, as custodian for the Depositary, to reflect the Automatic Exchange.  Upon such exchange of beneficial interests pursuant to this Section 2.06(h), the aggregate principal amount of the Global Notes shall be increased or decreased by adjustments made on the records of the Trustee, as custodian for the Depositary, to reflect the relevant increase or decrease in the principal amount of such Global Note resulting from the applicable exchange.  The Restricted Global Note from which beneficial interests are transferred pursuant to an Automatic Exchange shall be cancelled following the Automatic Exchange.

(i)      *Cancellation and/or Adjustment of Global Notes.*  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on the "Schedule of Exchanges of Interests in the Global Note" of such Global Note by the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on the "Schedule of Exchanges of Interests in the Global Note" of such Global Note by the Trustee to reflect such increase.

(j)      *General Provisions Relating to Transfers and Exchanges.*

(1)      To permit registrations of transfers and exchanges, the Issuers will execute and the Trustee will authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2)      No service charge will be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuers or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.10, 3.06, 3.10, 4.10, 4.11, 4.16, 4.17, 4.29 and 9.05).

(3)      The Registrar will not be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)    All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes will be the valid obligations of the Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(5)    Neither the Registrar nor the Issuers will be required:

(i)    to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 and ending at the close of business on the day of selection;

(ii)    to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part; or

(iii)    to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date.

(6)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuers may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuers shall be affected by notice to the contrary.

(7)    The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02.

(8)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile or email, with originals thereof to be delivered to the Registrar thereafter in a timely manner.

(9)    Neither the Registrar, the Trustee nor any Agent shall have an obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by the terms of, this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

(10)    Neither the Trustee nor any Agent shall have any responsibility or liability for any action taken or not taken by the Depositary.

Doc#: US1:12095985v22

Section 2.07    Replacement Notes.

If any mutilated Note is surrendered to the Registrar, Trustee or the Issuers, or the Trustee and the Issuers receive evidence to their satisfaction of the destruction, loss or theft of any Note, the Issuers will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Trustee's and the Issuers' requirements are met.  An indemnity bond must be supplied by the Holder that is sufficient in the judgment of (i) the Trustee to protect the Trustee and (ii) the Issuers to protect the Issuers, the Trustee, any Agent and any authenticating agent from any loss or liability that any of them may suffer if a Note is replaced.  The Issuers may charge for their expenses in replacing a Note.

Every replacement Note is a contractual obligation of the Issuers and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08    Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Issuers or an Affiliate of the Issuers hold the Note; *however*, Notes held by the Issuers or a Subsidiary of an Issuer shall not be deemed to be outstanding for purposes of Section 3.07(a).

If a Note is replaced pursuant to Section 2.07 (other than a mutilated Note surrendered for replacement), it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuers, a Subsidiary of an Issuer or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09    Treasury Notes.

For purposes of determining whether the Holders of the required principal amount of Notes have concurred in any amendment, supplement, waiver, direction or consent, Notes owned by an Issuer, or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with any such Issuer, shall be disregarded (it being understood that a Holder shall not be deemed to be directly or indirectly controlling or controlled by or under direct or indirect common control with any Issuer for purposes of this provision solely by reason of the beneficial ownership of Eletson MI Preferred Interests or Company Preferred Interests or the provisions of the Consulting Agreement).

Doc#: US1:12095985v22

Section 2.10    Temporary Notes.

Until certificates representing Notes are ready for delivery, the Issuers may prepare and execute, and the Trustee, upon receipt of an Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Issuers consider appropriate for temporary Notes. Without unreasonable delay, the Issuers will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

After the preparation of the definitive Notes, the temporary Notes shall be exchanged for definitive Notes upon surrender of the temporary Notes at the office or agency of the Issuers, without charge to the Holder. Upon surrender for cancellation of one or more temporary Notes, the Issuers shall execute and the Trustee shall authenticate and deliver in exchange therefore a like principal amount of definitive Notes of authorized denominations.

Section 2.11    Cancellation.

The Issuers at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes in accordance with its customary procedures (subject to the record retention requirement of the Exchange Act and the Trustee). Certification of the destruction or cancellation of all canceled Notes will be delivered to the Issuers upon written request. The Issuers may not issue new Notes to replace Notes that they have paid or that have been delivered to the Trustee for cancellation. To the extent that any Notes are held in the form of Global Notes and less than all of such Global Notes are to be cancelled, the reduction of the principal amount of any such Global Note and the Registrar's notation of such cancellation on its books and records shall be deemed to satisfy any cancellation requirement, *provided* that certification of such cancellation shall be delivered to the Issuers upon written request.

Section 2.12    Defaulted Interest.

If the Issuers default in a payment of interest on the Notes, they will pay the defaulted interest in any lawful manner *plus*, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01. The Issuers will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuers will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Issuers (or, upon the written request of the Issuers, the Trustee in the name and at the expense of the Issuers) will send to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Doc#: US1:12095985v22

Section 2.13    CUSIP Numbers.

The Issuers in issuing the Notes may use CUSIP, ISIN or other such numbers (if then generally in use), and, if so, the Trustee shall use CUSIP, ISIN or other such numbers in notices of redemption as a convenience to Holders; *provided*, that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuers shall promptly notify the Trustee in writing of any change in the CUSIP, ISIN or other numbers.

Section 2.14    Issuance of Additional Notes.

The Issuers shall be entitled, from time to time, without consent of the Holders and (x) subject to compliance with Sections 4.09 and 4.13 and (y) *provided that*, on each date of issuance of Additional Notes, if any, and as a condition precedent to such issuance, the Company shall cause to be secured by the Lien of this Indenture and the Security Documents (subject only to Permitted Liens), (a) one or more Qualified Vessels (together with any Related Assets) that will become Mortgaged Vessels on the date of incurrence of such Additional Notes, (b) cash and/or (c) any combination of clauses (a) and (b), such that on each such date of issuance of Additional Notes the requirements of the proviso in clause (c) of the definition of "Permitted Liens" shall be satisfied, to issue Additional Notes under this Indenture with identical terms as the Initial Notes other than with respect to (i) the date of issuance, (ii) the issue price, (iii) the amount of interest payable on the first interest payment date and (iv) any adjustments in order to conform to and ensure compliance with the Securities Act (or other applicable securities laws) or to reflect differences with respect to original issue discount for U.S. federal income tax purposes. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, including those with respect to waivers, amendments, redemptions and offers to purchase; *provided* that if any Additional Notes are not fungible with the Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP number.

With respect to any Additional Notes, the Issuers shall set forth in an Officers' Certificate pursuant to a resolution of the Board of Directors of the Company, copies of which shall be delivered to the Trustee (with a copy to the Paying Agent and the Registrar), the following information:

> (i)    the aggregate principal amount of such Additional Notes to be authenticated and delivered pursuant to this Indenture; and

> (ii)    the issue price, the issue date and the CUSIP number of such Additional Notes and the date on which interest on such Additional Notes shall begin to accrue.

Doc#: US1:12095985v22

## ARTICLE 3
## REDEMPTION AND PREPAYMENT

Section 3.01   <u>Notices to Trustee, Paying Agent and Registrar</u>.

If the Issuers elect to redeem Notes pursuant to the optional redemption provisions of <u>Section 3.07</u>, they must furnish to the Trustee, at least 30 days but not more than 60 days before a redemption date, an Officers' Certificate setting forth:

(1)     the provision of this Indenture pursuant to which the redemption shall occur;

(2)     the redemption date;

(3)     the principal amount of Notes to be redeemed;

(4)     the redemption price; and

(5)     the CUSIP and ISIN number if any,

*provided* that, such Officers' Certificate may be furnished more than 60 days prior to a redemption date if issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to <u>Article 8</u> or <u>12</u>.

Section 3.02   <u>Selection of Notes to Be Redeemed or Purchased</u>.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee, subject to the Depositary's standard procedures, or the Depository, as applicable, will select Notes for redemption or purchase on a *pro rata* basis, by lot or by such other method as the Trustee in its sole discretion shall deem fair and appropriate, in each case, in accordance with the procedures of the Depositary, unless otherwise required by law or applicable securities exchange or depositary requirements.

In the event of partial redemption or purchase, the particular Notes to be redeemed or purchased will be selected, unless otherwise provided herein, not less than 30 but not more than 60 days prior to the redemption or purchase date by the Paying Agent or the Depository, as applicable,  from the outstanding Notes not previously called for redemption or purchase.

The Paying Agent or the Depository, as applicable, will promptly notify the Issuers in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected will be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof (or if a PIK Payment has occurred, such partial redemption will be in integral multiples of $1.00); except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not $1.00 or an integral multiple of $1.00 in excess thereof (or if a PIK Payment has occurred, such partial redemption will be in integral multiples of $1.00), shall be redeemed or purchased.

61

Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03    Notice of Redemption or Purchase.

Subject to the provisions of Section 3.04 and Section 3.10, at least 30 days but not more than 60 days before a redemption date, the Issuers will mail or cause to be mailed, by first class mail (or in the case of Global Notes, transmit in accordance with the procedures of the Depositary), a notice of redemption or purchase to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be delivered more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Article 8 or 12.

The notice will identify the Notes to be redeemed and will state:

(1)    the redemption date;

(2)    the redemption price;

(3)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, in the case of Definitive Notes, after the redemption date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion of the original Note will be issued in the name of the Holder upon cancellation of the original Note;

(4)    the name and address of the Paying Agent;

(5)    that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price and the CUSIP and ISIN numbers for such Notes;

(6)    that, unless the Issuers default in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the redemption date;

(7)    the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(8)    that no representation is made as to the correctness or accuracy of the CUSIP and ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuers' request, the Trustee will give the notice of redemption in the Issuers' name and at its expense; *provided*, *however*, that the Issuers have delivered to the Trustee (with a copy to the Registrar), at least five Business Days (or such shorter period as may be agreed to by the Trustee) before notice of redemption is required to be sent or caused to be sent to Holders pursuant to this Section 3.03, an Officers' Certificate requesting that the Trustee give such notice, which shall include a form of the notice setting forth the information to be stated in such notice as provided in the preceding paragraph.

Doc#: US1:12095985v22

Section 3.04   Effect of Notice of Redemption.

Once notice of redemption is mailed or transmitted, as the case may be, in accordance with Section 3.03, Notes called for redemption become irrevocably due and payable on the redemption date at the redemption price.  Notices of redemption may not be conditional.

Section 3.05   Deposit of Redemption or Purchase Price.

Prior to 10:00 a.m. (New York City time) on the redemption or purchase date, the Issuers will deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest on all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent will promptly return to the Issuers any money deposited with the Trustee or the Paying Agent by the Issuers in excess of the amounts necessary to pay the redemption or purchase price of, and accrued and unpaid interest on, all Notes to be redeemed or purchased.

If the Issuers comply with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after a regular record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date.  If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuers to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01.

Section 3.06   Notes Redeemed or Purchased in Part.

Upon surrender and cancellation of a Note that is redeemed or purchased in part, the Issuers will issue and, upon receipt of an Authentication Order, the Trustee will authenticate for the Holder at the expense of the Issuers a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered.  Notwithstanding anything in this Indenture to the contrary, only an Authentication Order and not an Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate such new Note.

Section 3.07   Optional Redemption.

(a)   At any time prior to maturity, upon not less than 30 nor more than 60 days' notice, the Issuers may redeem all or part of the Notes at the following redemption prices (expressed as percentages of their principal amount at maturity), plus accrued and unpaid interest, if any, to the redemption date, subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date, if redeemed during the twelve month period commencing on January 15 of the years set forth below.

Doc#: US1:12095985v22

| Year | Percentage |
|------|-----------|
| 2018 ...................................................................................... | 104.813% |
| 2019 ...................................................................................... | 102.406% |
| 2020 and thereafter ................................................................ | 100.000% |

(b)     Unless the Issuers default in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(c)     Any redemption pursuant to this <u>Section 3.07</u> shall be made pursuant to the provisions of <u>Sections 3.01</u> through <u>3.06</u>.

Section 3.08   <u>Mandatory Redemption</u>.

The Issuers are not required to make any mandatory redemption or sinking fund payments with respect to the Notes.  However, under certain circumstances, the Issuers may be required to offer to purchase the Notes as described in <u>Sections 4.10</u>, <u>4.11</u>, <u>4.16</u>, <u>4.17</u>, <u>4.19</u> or <u>4.32</u>.  The Issuers and the Restricted Subsidiaries may at any time and from time to time purchase Notes in the open market or otherwise.

Section 3.09   <u>Redemption Upon Changes in Withholding Taxes</u>.

The Company may, at its option, redeem the Notes, in whole but not in part, at any time upon giving not less than 30 nor more than 60 days' notice to the Holders, at a redemption price equal to 100% of the principal amount thereof, together with accrued and unpaid interest thereon, if any, to the redemption date and all Additional Amounts, if any, then due and which will become due on the date of redemption, subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date and Additional Amounts, if any, in respect thereof, as a result of the redemption or otherwise, if the Company determines in good faith that either Issuer is or, on the next date on which any amount would be payable in respect of the Notes, would be obliged to pay Additional Amounts, which such Issuer cannot avoid by the use of reasonable measures available to it (including making payment through a paying agent located in another jurisdiction) as a result of:

(a)     any change in, or amendment to, the laws or treaties (or any regulations or rulings promulgated thereunder) of any Relevant Taxing Jurisdiction which change or amendment occurs after the date of this Indenture or, if the Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction after the date of this Indenture, after such later date; or

(b)     any change in, or amendment to, an official position regarding the application, administration, or interpretation of the laws, treaties, regulations or rulings of any Relevant Taxing Jurisdiction (including by virtue of a holding, judgment or order by a court of competent jurisdiction), which change or amendment occurs after the date of this Indenture or, if the Relevant Taxing Jurisdiction becomes a Relevant Taxing Jurisdiction after the date of this Indenture, after such later date (each of the foregoing clauses (a) and (b), a "<u>Change in Tax Law</u>").

64

Notwithstanding the foregoing, no such notice of redemption will be given (a) earlier than 90 days prior to the earliest date on which the relevant Issuer would be obliged to pay Additional Amounts and (b) unless at the time such notice is given, the obligation to pay Additional Amounts remains in effect.

Prior to the publication through a prominent financial news wire service or, where relevant, mailing of any notice of redemption pursuant to the foregoing, the Company will deliver to the Trustee at least five days prior to the date when such notice of redemption is required to be sent to Holders or such later date as the Trustee shall agree:

(a)      an Officers' Certificate stating that the Company is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Company to so redeem have occurred (including that such obligation to pay such Additional Amounts cannot be avoided by the relevant Issuer taking reasonable measures available to it); and

(b)      an opinion of independent tax counsel of recognized standing, qualified under the laws of the Relevant Taxing Jurisdiction to the effect that the relevant Issuer is or would be obliged to pay such Additional Amounts as a result of a Change in Tax Law.

Such Officers' Certificate and opinion shall be sufficient evidence of the satisfaction of the conditions precedent as described above, in which event it will be conclusive and binding on the Holders.

The foregoing provisions will apply *mutatis mutandis* to any successor to the Company and to any jurisdiction in which any successor to the Company is organized or resident for tax purposes or from or through which such successor makes any payment on the Notes and, in each case, any political subdivision or taxing authority or agency thereof or therein.

Section 3.10   Procedures for Offer to Purchase.

(a)      In the event that, pursuant to Section 4.10, the Issuers are required to commence an Excess Proceeds Offer they will follow the procedures specified below.

The notice, which will govern the terms of the Excess Proceeds Offer, will state:

(1)      that the Excess Proceeds Offer is being made pursuant to this Section 3.10 and Section 4.10, and the length of time the Excess Proceeds Offer will remain open;

(2)      the Offer Amount, the purchase price and the Purchase Date;

(3)      that any Note or Pari Passu Debt not tendered or accepted for payment will continue to accrue interest;

(4)      that, unless the Issuers default in making such payment, all Notes and Pari Passu Debt accepted for payment pursuant to the Excess Proceeds Offer will cease to accrue interest after the Purchase Date;

Doc#: US1:12095985v22

(5)     that Holders electing to have a Note or Pari Passu Debt purchased pursuant to an Excess Proceeds Offer may elect to have Notes or Pari Passu Debt purchased in minimum amounts of $1.00 and integral multiples of $1.00 in excess thereof only, or if a PIK Payment has occurred, in a principal amount that is an integral multiple of $1.00;

(6)     that Holders electing to have any Notes purchased pursuant to any Excess Proceeds Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Purchase Date;

(7)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the expiration of the Offer Period, a facsimile transmission or letter setting forth the name of the holder, the principal amount of the Notes or Pari Passu Debt the Holder delivered for purchase and a statement that such Holder is withdrawing its election to have such Notes purchased;

(8)     that, if the aggregate principal amount of Notes and any such Pari Passu Debt validly tendered and not withdrawn by holders thereof exceeds the aggregate amount of Excess Proceeds, the Notes and any such Pari Passu Debt to be purchased will be selected by the Trustee on a *pro rata* basis (based upon the principal amount of Notes and the principal amount or accreted value of such Pari Passu Debt tendered by each holder) to the extent permitted by such Pari Passu Debt; and

(9)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer), which unpurchased portion must be equal to a minimum denomination of $1.00 in principal amount or an integral multiple of $1.00 in excess thereof.

(b)     In the event that, pursuant to <u>Section 4.11</u>, <u>Section 4.17</u> or <u>Section 4.29</u>, the Issuers are required to commence a Collateral Sale Offer or an Event of Loss Offer (collectively the "<u>Note Offers</u>" and each, a "<u>Note Offer</u>"), respectively, they will follow the procedures specified below.

The notice, which will govern the terms of the Note Offer, will state:

(1)     that the Note Offer is being made pursuant to this <u>Section 3.10</u> and <u>Section 4.11</u>, <u>Section 4.17</u> or <u>Section 4.29</u>, as applicable, and the length of time the Note Offer will remain open;

(2)     the Offer Amount, the purchase price and the Purchase Date;

(3)     that any Note not tendered or accepted for payment will continue to accrue interest;

Doc#: US1:12095985v22

(4)     that, unless the Issuers default in making such payment, all Notes accepted for payment pursuant to the Note Offer will cease to accrue interest after the Purchase Date;

(5)     that Holders electing to have a Note purchased pursuant to a Note Offer may elect to have Notes purchased in minimum amounts of $1.00 and integral multiples of $1.00 in excess thereof only;

(6)     that Holders electing to have any Notes purchased pursuant to any Note Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Purchase Date;

(7)     that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the expiration of the Offer Period, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Notes the Holder delivered for purchase and a statement that such Holder is withdrawing its election to have such Notes purchased;

(8)     that, if the aggregate principal amount of Notes surrendered by Holders thereof exceeds the Offer Amount, the Paying Agent will select the Notes to be purchased on a *pro rata* basis or by lot (or in the case of Global Notes, in accordance with the procedures of the Depositary) based on the principal amount of the Notes tendered (with such adjustments as may be deemed appropriate by the Paying Agent so that Notes are maintained in a minimum denomination of $1.00 and integral multiples of $1.00 in excess thereof); and

(9)     that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer), which unpurchased portion must be equal to a minimum denomination of $1.00 in principal amount or an integral multiple of $1.00 in excess thereof, or if a PIK Payment has occurred, in a principal amount that is an integral multiple of $1.00.

(c)     An offer made pursuant to the procedures set forth in this Section 3.10 will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "Offer Period").  No later than three Business Days after the termination of the Offer Period (the "Purchase Date"), the Issuers will apply all Excess Proceeds, Excess Collateral Proceeds or Event of Loss Proceeds, as the case may be, to the purchase of the aggregate principal amount of Notes required to be purchased pursuant to Section 4.10, Section 4.11, Section 4.17 or Section 4.29, as applicable (the "Offer Amount"), or, (x) if less than the Offer Amount of Notes or Pari Passu Debt, has been validly tendered in the Excess Proceeds Offer, all Notes or such Pari Passu Debt validly tendered in response to the Excess Proceeds Offer or (y) ) if less than the Offer Amount of Notes has been validly tendered in a Note Offer, all Notes validly tendered in

response to such Note Offer.  Payment for any Notes or Pari Passu Debt so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest up to but excluding the Purchase Date will be paid to the Person in whose name a Note or Pari Passu Debt, as applicable, is registered at the close of business on such interest record date, and no additional interest will be payable to Holders who tender Notes or holders of Pari Passu Debt pursuant to the Excess Proceeds Offer, Collateral Sale Offer or Event of Loss Offer, as applicable.

Upon the commencement of an Excess Proceeds Offer, Collateral Sale Offer or Event of Loss Offer, the Issuers will send, by first class mail (or in the case of Global Notes, transmit in accordance with the procedures of the Depositary), a notice to the Trustee, the Registrar and the Paying Agent and each of the Holders and in the case of an Excess Proceeds Offer, also to holders of any Pari Passu Debt to the extent required by the terms thereof.  The notice will contain all instructions and materials necessary to enable such Holders to tender Notes and Pari Passu Debt pursuant to the Excess Proceeds Offer and to tender Notes pursuant to the respective Note Offer.

On or before the Purchase Date, the Issuers will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of (x) Notes or Pari Passu Debt or portions thereof validly tendered and not properly withdrawn pursuant to an Excess Proceeds offer or (y) Notes or portions thereof validly tendered and not properly withdrawn pursuant to any Note Offer, or if less than the Offer Amount applicable to the Notes or Pari Passu Debt, as applicable, has been validly tendered, all Notes or any such Pari Passu Debt so tendered, in each case in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof; *provided* that if, following repurchase of a portion of a Note the remaining principal amount of such Note outstanding immediately after such repurchase would be less than $1.00, then the portion of such Note so repurchased shall be reduced so that the remaining principal amount of such Note outstanding immediately after such repurchase is $1.00.

The Issuers will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating that such Notes or portions thereof were accepted for payment by the Issuers in accordance with the terms of this Section 3.10.  The Paying Agent will promptly mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes and Pari Passu Debt, as applicable, validly tendered and not properly withdrawn by such Holder and accepted by the Issuers for purchase, and the Issuers will promptly issue a new Note, and the Trustee, upon receipt of an Authentication Order, will authenticate and mail or deliver (or cause to be transferred by book entry) such new Note to such Holder (it being understood that, notwithstanding anything in this Indenture to the contrary, no Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate and mail or deliver such Note), in a principal amount equal to any unpurchased portion of the Note surrendered; *provided* that each such new Note will be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof.  Any Note not so accepted shall be promptly mailed or delivered by the Issuers to the Holder thereof.  The Issuers will publicly announce the results of the Excess Proceeds Offer, Collateral Sale Offer or Event of Loss Offer on or as soon as practicable after the Purchase Date.

68

Notwithstanding the foregoing, no Additional Notes may be issued, directly or indirectly, for the purpose of waiving or directing the exercise of remedies with respect to, any Default or Event of Default that has occurred or arisen prior to the issuance of such Additional Notes (including by waiver, amendment, forbearance or otherwise).

Other than as specifically provided in this Section 3.10 and Section 4.10, Section 4.11, Section 4.17 or Section 4.29 any purchase pursuant to this Section 3.10 or Section 4.10, Section 4.11, Section 4.17 or Section 4.29 shall be made pursuant to the provisions of Sections 3.01 through 3.06.

## ARTICLE 4
## COVENANTS

Section 4.01   Payment of Notes.

The Issuers will pay or cause to be paid the principal of, premium, if any, and interest on, the Notes on the dates and in the manner provided in the Notes and this Indenture. Principal, premium, if any, and interest will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. New York City time on the due date money deposited by the Issuers in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest then due.  If a payment date is not a Business Day at a place of payment, payment may be made at that place on the next succeeding day that is a Business Day, and no interest shall accrue on such payment for the intervening period.

The Issuers will pay interest on overdue principal and premium, if any, at the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; the Issuers will pay interest on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

Section 4.02   Maintenance of Office or Agency.

The Issuers will maintain an office or agency (which may be an office of the Trustee or an Affiliate or agent of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices to the Issuers in respect of the Notes and this Indenture may be delivered.  The Issuers will give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuers fail to maintain any such required office or agency or fail to furnish the Trustee with the address thereof, such presentations and surrenders, notices may be made at the Corporate Trust Office.  Notwithstanding the foregoing, no service of legal process may be made on any Issuer at any office of the Trustee.

The Issuers may also from time to time designate one or more other offices or agencies where the Notes may be surrendered for any or all such purposes and may from time to time rescind such designation.  The Issuers will give prompt written notice to the Trustee of any

Doc#: US1:12095985v22

such designation or rescission and of any change in the location of any such other office or agency.

The Issuers hereby designate the Corporate Trust Office as one such office or agency of the Issuers in accordance with Section 2.03.

Section 4.03    Reports.

(a)    So long as any Notes are outstanding, the Company will furnish to the Trustee and to the Holders of the Notes:

(1)    within 120 days after the end of the Company's fiscal year beginning with the fiscal year ended December 31, 2018, annual reports containing: (i) information with a level of detail that is substantially comparable in all material respects to the sections in the 2013 Offering Memorandum entitled "Risk Factors," "Selected Consolidated Financial Information and Other Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," "Management," "Shareholders and Related Party Transactions" and "Description of Other Indebtedness"; (ii) the audited consolidated balance sheet of the Company as at the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Company for the most recent three fiscal years, including appropriate footnotes to such financial statements, for and as at the end of such fiscal years and the report of the independent auditors on the financial statements; (iii) Consolidated EBITDA of the Company for such periods substantially consistent with the presentation thereof in the 2013 Offering Memorandum and derived from such financial information; and (iv) summary unaudited consolidated financial information of the Eletson MI Parties for the periods presented in clause (ii);

(2)    within 60 days following the end of each of the first three fiscal quarters in each fiscal year of the Company, quarterly reports containing (i) the Company's unaudited condensed consolidated balance sheet as at the end of such quarter and unaudited condensed statements of income and cash flow for the most recent quarterly and year-to-date periods ending on the unaudited condensed balance sheet date and the comparable prior period, together with condensed footnote disclosure; (ii) summary unaudited consolidated financial information of the Eletson MI Parties for the periods presented in clause (i); and (iii) information with a level of detail that is substantially comparable in all material respects to the section in the 2013 Offering Memorandum entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations"; and

(3)    promptly after the occurrence of a material event, acquisition, disposition, restructuring, senior management changes at the Company or a change in auditors of the Company, a report containing a description of such event.

(b)    In addition, the Company shall furnish to the Holders, beneficial owners of the Notes, bona fide prospective investors, securities analysts and market makers, upon their

70

request, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(c)     All financial statements shall be prepared in accordance with U.S. GAAP.

(d)     At any time that any of the Company's subsidiaries are Unrestricted Subsidiaries and any such Unrestricted Subsidiary or a group of Unrestricted Subsidiaries, taken as a whole, constitutes a Significant Subsidiary of the Company, then the quarterly and annual financial information required by Section 4.03(a) will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries (including, without limitation, a calculation of Total Tangible Assets as at the last day of the applicable quarter or fiscal year, as the case may be) separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(e)     All reports and information provided pursuant to this Section 4.03 shall be made in the English language.  The Company will make available such information and such reports (as well as the details regarding the conference call described in clause (f) below) to the Trustee, any Holder and any beneficial owner of the Notes, in each case by posting such reports and information on a website or online data system no later than the date the Company is required to provide those reports and information, and the Company will maintain such postings for so long as any Notes remain outstanding.  If such website or online data system is password-protected, the Company will provide the password or otherwise make such reports and information readily available to the Trustee, any Holder, any beneficial owner of the Notes, any bona fide prospective investor, any securities analyst or any market maker in the Notes upon request and certification to the Company of its status, a confidentiality acknowledgment and certain other certifications relating to the compliance of such transaction with applicable securities laws.  It is understood that the Trustee shall have no responsibility to determine whether such postings have been made.

Delivery of such reports, information, and documents to the Trustee is for informational purposes only, and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Company's compliance with any of its covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

(f)     So long as Notes are outstanding, the Company will also within five (5) Business Days after furnishing to the Trustee the annual and quarterly reports required by Section 4.03(a)(1) and (a)(2), hold a conference call to discuss such reports and the results of operations for the relevant reporting period and provide to the Trustee for distribution to the Holders an announcement of the time and date of such conference call and including all information necessary to access the call.  The dial-in information for the conference call and information providing Holders, beneficial owners of the Notes, bona fide prospective investors, securities analysts and market makers to with access to the reports and information required by clause (e) above shall be set forth in such announcement.

(g)     The Company will furnish to the Trustee and to the Holders of the Notes:

(1)      (i) as soon as available, and in any event no later than 60 days after the end of each fiscal year of the Company commencing with the year ended December 31, 2018, detailed consolidated statements of projected cash flow and projected income for the following fiscal year (showing quarter-by-quarter break-downs) and a description of the underlying assumptions applicable thereto and (ii) as soon as available, significant revisions, if any, of any such projections with respect to such fiscal year (collectively, the "Budget"), which Budget shall in each case be accompanied by an Officers' Certificate stating that such Budget is based on reasonable estimates, information and assumptions and that such Officers have no reason to believe that such Budget is incorrect or misleading in any material respect;

(2)      within five (5) days after the same are sent, copies of all financial statements and reports that the Company sends to the holders of any class of its debt securities or public equity securities and not otherwise required to be furnished to Holders pursuant to Section 4.03.

(3)      promptly, such additional financial information as Holders through the Required Holder Designee may from time to time request; and

(4)      no later than five (5) days prior to the record date for each TCE-Based Interest Payment Date, the Company shall notify the Trustee in writing of (i) the Trailing TCE for each TCE-Based Interest Payment Date and (ii) the applicable interest rate for such TCE-Based Interest Payment Date. The Trustee, on behalf of the Issuers, shall provide such notice to the Holders no later than the record date for such TCE-Based Interest Payment Date. The Company will prepare the notice and the Trustee will then send such notice to the Holders.

(h)      Delivery of such reports, information and documents to the Trustee is for informational purposes only and the Trustee's receipt of such shall not constitute constructive notice of any information contained therein or determinable from information contained therein, including the Issuers' or the Guarantor's compliance with any of the provisions of this Indenture (as to which the Trustee is entitled to rely exclusively on an Officers' Certificate).

Section 4.04    Compliance Certificate.

The Issuers will deliver to the Trustee no later than the date on which the Company is required to deliver annual reports pursuant to the covenant described under Section 4.03, an Officers' Certificate stating that in the course of the performance by the relevant Officers of their respective duties as an Officer of the Company they would normally have knowledge of any Default and whether or not such Officers know of any Default that occurred during such period and, if any, specifying such Default, its status and what action the Company is taking or proposes to take with respect thereto.  For purposes of this Section 4.04, such compliance will be determined without regard to any period of grace or requirement of notice under this Indenture.

Doc#: US1:12095985v22

Section 4.05    Taxes.

The Company will pay or cause to be paid, and will cause each of its Subsidiaries to pay or cause to be paid, prior to delinquency, all material taxes, assessments, and governmental levies due and payable by the Company or such Subsidiary, as applicable, except such as are contested in good faith and by appropriate proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06    Stay, Extension and Usury Laws.

The Issuers and the Guarantors covenant (to the extent that they may lawfully do so) that they will not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuers and the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07    Restricted Payments.

(a)    The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, take any of the following actions (each of which is a "Restricted Payment" and which are collectively referred to as "Restricted Payments"):

(1)    declare or pay any dividend on or make any distribution (whether made in cash, securities or other property) with respect to any of the Company's or any Restricted Subsidiary's Capital Stock (including, without limitation, any payment in connection with any merger, consolidation, amalgamation or other combination involving the Company or any Restricted Subsidiary) (other than to the Company or any Wholly Owned Restricted Subsidiary) except for dividends or distributions payable solely in shares of the Company's Qualified Capital Stock or in options, warrants or other rights to acquire such shares of Qualified Capital Stock;

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger, consolidation, amalgamation or other combination), directly or indirectly, any shares of the Company's Capital Stock or any Capital Stock of any Affiliate of the Company held by persons other than the Company or a Restricted Subsidiary (other than Capital Stock of any Restricted Subsidiary or any entity that becomes a Restricted Subsidiary as a result thereof) or any options, warrants or other rights to acquire such shares of Capital Stock;

(3)    make any principal payment on, or repurchase, redeem, defease or otherwise acquire or retire for value, prior to any scheduled principal payment, sinking fund payment or Stated Maturity, any Subordinated Debt (other than intercompany Debt between the Company and any Guarantor or among Guarantors and other than the repurchase or other acquisition of Subordinated Debt purchased in anticipation of

73

satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of the repurchase or acquisition); or

(4)    make any Investment (other than any Permitted Investment) in any Person.

If any Restricted Payment described above is not made in cash, the amount of the proposed Restricted Payment will be the Fair Market Value of the asset to be transferred as at the date of transfer.

(b)    Notwithstanding Section 4.07(a), the Company or any Restricted Subsidiary may make a Restricted Payment (other than a Restricted Payment described in clause (1), (2) or (3) of the definition thereof) if, at the time of and after giving *pro forma* effect to such proposed Restricted Payment:

(1)    no Default or Event of Default has occurred and is continuing and such Restricted Payment will not be an event that is or, after the giving of notice of lapse of time or both, would be, an "event of default" under the terms of any Debt of the Company or of any Restricted Subsidiary;

(2)    the Consolidated Leverage Ratio would be less than 5.0 to 1.0; and

(3)    the aggregate amount of all Restricted Payments declared or made after the Original Issue Date (excluding Restricted Payments permitted by clauses (2) through (11) of Section 4.07(c), does not exceed the sum of:

(i)    50% of aggregate Consolidated Net Income on a cumulative basis during the period beginning on the first day of the fiscal quarter in which the Original Issue Date occurred and ending on the last day of the Company's last fiscal quarter ending prior to the date of such proposed Restricted Payment (or, if such aggregate cumulative Consolidated Net Income shall be a negative number, minus 100% of such negative amount); *plus*

(ii)    the aggregate Net Cash Proceeds received by the Company after the Original Issue Date as equity capital contributions or from the issuance or sale (other than to any Subsidiary) of shares of the Company's Qualified Capital Stock (including upon the exercise of options, warrants or rights) or warrants, options or rights to purchase shares of the Company's Qualified Capital Stock (except, in each case to the extent such proceeds are used to purchase, redeem or otherwise retire Capital Stock or Subordinated Debt as set forth in clause (4) or (5) of Section 4.07(c)) (excluding the Net Cash Proceeds from the issuance of the Company's Qualified Capital Stock financed, directly or indirectly, using funds borrowed from the Company or any Subsidiary until and to the extent such borrowing is repaid); *plus*

(iii)    (x) the amount by which the Company's Debt or Debt of any Restricted Subsidiary is reduced on the Company's consolidated balance sheet after the Original Issue Date upon the conversion or exchange (other than

by a Subsidiary) of such Debt into the Company's Qualified Capital Stock and (y) the aggregate Net Cash Proceeds received after the Original Issue Date by the Company from the issuance or sale (other than to any Subsidiary) of Redeemable Capital Stock that has been converted into or exchanged for the Company's Qualified Capital Stock, to the extent such Redeemable Capital Stock was originally sold for cash or Cash Equivalents, together with, in the case of both clauses (x) and (y), the aggregate Net Cash Proceeds received by the Company at the time of such conversion or exchange (excluding the Net Cash Proceeds from the issuance of the Company's Qualified Capital Stock financed, directly or indirectly, using funds borrowed from the Company or any Subsidiary until and to the extent such borrowing is repaid); *plus*

(iv)   (x) in the case of the disposition or repayment of any Investment constituting a Restricted Payment made after the Original Issue Date, an amount (to the extent not included in Consolidated Net Income) equal to the lesser of the return of capital with respect to such Investment and the initial amount of such Investment, in either case, less the cost of the disposition of such Investment and net of taxes and (y) in the case of the designation of an Unrestricted Subsidiary as a Restricted Subsidiary (as long as the designation of such Subsidiary as an Unrestricted Subsidiary was deemed a Restricted Payment), the Fair Market Value of the Company's interest in such Subsidiary; *provided* that such amount will not in any case exceed the amount of the Restricted Payment deemed made at the time that the Subsidiary was designated as an Unrestricted Subsidiary.  The designation of Eletson Gas LLC and its Subsidiaries as Unrestricted Subsidiaries effective as of the Closing Date as described in the Offer to Exchange shall not constitute a Restricted Payment hereunder.

The foregoing sum shall not include any amounts in respect of contributions to the Company or its Restricted Subsidiaries or any sales of equity interests in the Company or its Restricted Subsidiaries if such amounts were used to cure any failure to comply with the Section 4.31 or Section 4.34 ("*Cure Amounts*").

(c)   Notwithstanding Section 4.07(a) and (b) above, the Company and any Restricted Subsidiary may take the following actions so long as (with respect to clauses (3) through (11) below) no Default or Event of Default has occurred and is continuing:

(1)   [reserved];

(2)   cash payments in lieu of issuing fractional shares pursuant to the exchange or conversion of any exchangeable or convertible securities;

(3)   [reserved];

(4)   the repurchase, redemption or other acquisition or retirement for value of any shares of the Company's Capital Stock or options, warrants or other rights to

Doc#: US1:12095985v22

acquire such Capital Stock in exchange for (including any such exchange pursuant to the exercise of a conversion right or privilege in connection with which cash is paid in lieu of the issuance of fractional shares or scrip), or out of the Net Cash Proceeds of a substantially concurrent issuance and sale (other than to a Subsidiary) of, shares of the Company's Qualified Capital Stock or options, warrants or other rights to acquire such Capital Stock, in each case, other than Cure Amounts;

(5)     the repurchase, redemption, defeasance or other acquisition or retirement for value or payment of principal of any Subordinated Debt in exchange for, or out of the Net Cash Proceeds of a substantially concurrent issuance and sale (other than to a Subsidiary) of, shares of the Company's Qualified Capital Stock, other than  Cure Amounts;

(6)     the purchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Debt (other than Redeemable Capital Stock) in exchange for, or out of the Net Cash Proceeds of a substantially concurrent Incurrence (other than to a Subsidiary) of, Permitted Refinancing Debt;

(7)     the declaration or payment of any dividend to all holders of Capital Stock of a Restricted Subsidiary on a *pro rata* basis or on a basis that results in the receipt by the Company or a Restricted Subsidiary of dividends or distributions of greater value than the Company or such Restricted Subsidiary would receive on a *pro rata* basis;

(8)     the repurchase of Capital Stock deemed to occur upon the exercise of stock options with respect to which payment of the cash exercise price has been forgiven if the cumulative aggregate value of such deemed repurchases does not exceed the cumulative aggregate amount of the exercise price of such options received;

(9)     [reserved];

(10)    the payment by the Company of any dividends, fees, indemnities, compensation or bonuses or similar payments in an amount not to exceed the amount set forth in Section 4.12(b)(1); and

(11)    any other Restricted Payment (other than a Restricted Payment described in clause (1), (2) or (3) of the definition thereof) by the Company or a Restricted Subsidiary (other than an Eletson MI Party); *provided* that the total aggregate amount of Restricted Payments made under this clause (11) does not exceed $15.0 million; *provided*, *further*, that not more than $5.0 million of Restricted Payments may be made in any twelve-month period in reliance on this clause (11).

(d)     Notwithstanding the foregoing, (i) the Issuers and the Restricted Subsidiaries shall not, directly or indirectly (and shall cause their Subsidiaries not to, directly or indirectly), use Investments permitted by this covenant to make Restricted Payments of the type described in clause (1), (2) or (3) of the definition thereof, and (ii) no Eletson MI Party may make Restricted Payments to or Investments in, a Person that is not an Eletson MI Party, other than payments permitted to be made out of the Collection Account, as described under Section 4.31.

76

Section 4.08    Limitation on Dividends and Other Payment Restrictions Affecting Restricted Subsidiaries.

(a)    The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to:

(1)    pay dividends, in cash or otherwise, or make any other distributions on or in respect of its Capital Stock or any other interest or participation in, or measured by, its profits;

(2)    pay any Debt owed to the Company or any other Restricted Subsidiary;

(3)    make loans or advances to the Company or any other Restricted Subsidiary; or

(4)    sell, lease or transfer any of its properties or assets to the Company or any other Restricted Subsidiary.

(b)    The provisions of Section 4.08(a) will not apply to:

(1)    encumbrances and restrictions imposed by the Notes, this Indenture and the Guarantees;

(2)    encumbrances or restrictions imposed by Debt permitted to be Incurred under Section 4.09; *provided* that, such encumbrances or restrictions are not materially more restrictive taken as a whole to Holders than is customary in comparable financings (as determined in good faith by the Company) and the Company determines that at the time of the Incurrence of such Debt that such encumbrances or restrictions will not adversely affect, in any material respect, the Company's ability to make principal or interest payments on the Notes;

(3)    encumbrances or restrictions contained in any agreement in effect on the Closing Date (other than an agreement described in another clause of this paragraph (b));

(4)    with respect to restrictions or encumbrances referred to Section 4.08(a)(4), encumbrances and restrictions: (i) that restrict in a customary manner the subletting, assignment or transfer of any properties or assets that are subject to a lease, license, conveyance or other similar agreement to which the Company or any Restricted Subsidiary is a party; and (ii) contained in operating leases for real property and restricting only the transfer of such real property upon the occurrence and during the continuance of a default in the payment of rent;

(5)    encumbrances or restrictions contained in any agreement or other instrument of a Person acquired by the Company or any Restricted Subsidiary in effect at the time of such acquisition (but not created in contemplation thereof), which

77

encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets of the Person, so acquired;

(6)    encumbrances or restrictions contained in contracts for sales of Capital Stock or assets permitted by Section 4.10 or 4.11 with respect to the assets or Capital Stock to be sold pursuant to such contract or in customary merger or acquisition agreements (or any option to enter into such contract) for the purchase or acquisition of Capital Stock or assets or any of the Company's Subsidiaries by another Person;

(7)    encumbrances or restrictions imposed by applicable law or regulation or by governmental licenses, concessions, franchises or permits;

(8)    encumbrances or restrictions on cash or other deposits or net worth imposed by customers under contracts entered into the ordinary course of business;

(9)    customary limitations on the distribution or disposition of assets or property of a Restricted Subsidiary in joint venture agreements entered into the ordinary course of business and in good faith; *provided* that such encumbrance or restriction is applicable only to such Restricted Subsidiary and, *provided further*, that:

(i)    the encumbrance or restriction is not materially more disadvantageous to the Holders than is customary in comparable agreements (as determined in good faith by the Company); and

(ii)    the Company determines in good faith that any such encumbrance or restriction will not materially affect the ability of the Company or any Guarantor to make any principal or interest payments on the Notes;

(10)    in the case of Section 4.08(a)(4), customary encumbrances or restrictions in connection with purchase money obligations, mortgage financings and Capitalized Lease Obligations for property acquired in the ordinary course of business;

(11)    any encumbrance or restriction arising by reason of customary non-assignment provisions in agreements;

(12)    any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, extensions, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1), (3) and (5) and this clause (12) of Section 4.08(b); *provided* that such amendments, modifications, restatements, renewals, extension, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company's Board of Directors, no more restrictive (taken as a whole) with respect to such encumbrances or restrictions than those contained in the encumbrances or restrictions prior to such amendment, modification, restatement, renewal, extension, increase, supplement, refunding, replacement or refinancing;

(13)    restrictions contained in security agreements or mortgages securing Debt of a Restricted Subsidiary to the extent such restrictions restrict the transfer of the property subject to such security agreements or mortgages; or

(14)    customary provisions restricting the transfer of copyrighted or patented materials consistent with industry practice.

Section 4.09    Limitation on Debt.

(a)    The Company will not, and will not permit any Restricted Subsidiary to, create, issue, incur, assume, guarantee or in any manner become directly or indirectly liable with respect to or otherwise become responsible for, contingently or otherwise, the payment of (individually and collectively, to "Incur" or, as appropriate, an "Incurrence"), any Debt (including any Acquired Debt); *provided* that the Company and any Restricted Subsidiary will be permitted to Incur Debt (including Acquired Debt) if:

(1)    after giving effect to the Incurrence of such Debt and the application of the proceeds thereof, on a *pro forma* basis, no Default or Event of Default would occur or be continuing; and

(2)    at the time of such Incurrence and after giving effect to the Incurrence of such Debt and the application of the proceeds thereof, on a *pro forma* basis, the Consolidated Fixed Charge Coverage Ratio for the four full fiscal quarters for which financial statements are available immediately preceding the Incurrence of such Debt, taken as one period, would be greater than 2.0 to 1.0;

and *provided further* that, Restricted Subsidiaries that are not Guarantors may not incur Debt (including any Acquired Debt) except for an amount not to exceed $25.0 million at any one time outstanding that may be incurred by Restricted Subsidiaries that are not Guarantors or Eletson MI Parties; *provided further* that, notwithstanding the foregoing proviso, Eletson Finance may incur Debt in connection with serving as a co-obligor, co-issuer or guarantor of Debt incurred by the Company or any Restricted Subsidiary that is otherwise permitted by this Section 4.09(a).

(b)    Section 4.09(a) will not, however, prohibit the following (collectively, "Permitted Debt"):

(1)    the Incurrence by the Company or any Restricted Subsidiary (other than an Eletson MI Party) of Debt under Credit Facilities in an aggregate principal amount at any one time outstanding not to exceed $175.0 million less (without duplication) the aggregate amount of all Net Cash Proceeds of Asset Sales applied by the Company or any Restricted Subsidiary since the date of this Indenture to repay any term Debt under a Credit Facility or to repay any revolving credit Debt under a Credit Facility and effect a corresponding commitment reduction thereunder pursuant to the covenant described above under Sections 4.10 and 4.11;

(2)    the Incurrence by the Issuers of Debt pursuant to (i) the Notes issued on the Closing Date, (ii) PIK Notes issued in respect thereof (and PIK Notes

Doc#: US1:12095985v22

issued in respect of such PIK Notes) and the Incurrence by the Guarantors of Guarantees of the Notes described in the foregoing clauses (i) and (ii);

(3)     any Debt of the Company or any Restricted Subsidiary (other than Debt described in another clause of <u>Section 4.09(b)</u>) outstanding on the Closing Date;

(4)     the Incurrence by the Company or any Restricted Subsidiary of intercompany Debt between the Company and any Restricted Subsidiary or between or among Restricted Subsidiaries; *provided* that:

(i)     if the obligor of such Debt is the Company or a Guarantor, such Debt is (x) unsecured and (y) it is expressly subordinated in right of payment to the prior payment in full in cash (whether upon Stated Maturity, acceleration or otherwise) and the performance in full of its obligations under the Notes or its Guarantee, as the case may be;

(ii)     (x) any disposition, pledge or transfer of any such Debt to any Person (other than a disposition, pledge or transfer to the Company or a Restricted Subsidiary) and (y) any transaction pursuant to which any Restricted Subsidiary that has Debt owing to the Company or another Restricted Subsidiary ceases to be a Restricted Subsidiary, will, in each case, be deemed to be an Incurrence of such Debt not permitted by this clause (4); and

(iii)     no Debt may be incurred by any Person (other than an Eletson MI Party) pursuant to this clause (4) that is owed to the Company, Eletson Finance or any Restricted Subsidiary that is not a Guarantor.

(5)     the Incurrence by the Company or any Restricted Subsidiary of Debt arising under any appeal and reimbursement obligation entered into in respect of any judgment not constituting an Event of Default;

(6)     the Incurrence by the Company or any Restricted Subsidiary (other than an Eletson MI Party) of Debt represented by Capitalized Lease Obligations, mortgage financings, purchase money obligations or other Debt Incurred or assumed in connection with the acquisition or development of real or personal, movable or immovable, property or assets, in each case, Incurred for the purpose of financing all or any part of the purchase price, lease expense or cost of construction or improvement of property, plant or equipment used in the business of the Company or any such Restricted Subsidiary (including any reasonable related fees or expenses Incurred in connection with such acquisition or development) (and any Permitted Refinancing Debt with respect to such assets); *provided* that the principal amount of such Debt so Incurred at any time outstanding shall not in the aggregate exceed $102.0 million;

(7)     the Incurrence by the Company or any Restricted Subsidiary of Debt arising from agreements providing for guarantees, indemnities or obligations in respect of purchase price adjustments in connection with the acquisition or disposition of assets, including, without limitation, shares of Capital Stock, other than guarantees or similar credit support given by the Company or any Restricted Subsidiary of Debt

80

23-10322-jpm   Doc 3   Filed 03/07/23   Entered 03/07/23 10:34:32   Main Document
Pg 120 of 234

Incurred by any Person acquiring all or any portion of such assets for the purpose of financing such acquisition; *provided* that the maximum aggregate liability in respect of all such Debt permitted pursuant to this clause (g) will at no time exceed the net proceeds, including non-cash proceeds (the Fair Market Value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value), actually received from the sale of such assets;

(8)     the Incurrence by the Company or any Restricted Subsidiary of Debt under Hedging Agreements entered into in the ordinary course of business and not for speculative purposes;

(9)     the Incurrence by the Company or any Restricted Subsidiary of Debt in respect of workers' compensation and claims arising under similar legislation, or pursuant to self-insurance obligations and not in connection with the borrowing of money or the obtaining of advances or credit;

(10)     the Incurrence by the Company or any Restricted Subsidiary of Debt arising from (i) the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided* that such Debt is extinguished within 5 Business Days of Incurrence, (ii) bankers' acceptances, performance, surety, judgment, appeal or similar bonds, instruments or obligations and (iii) completion guarantees provided or letters of credit obtained by the Company or any Restricted Subsidiary in the ordinary course of business;

(11)     the Incurrence by the Company or any Restricted Subsidiary of Permitted Refinancing Debt in exchange for or the net proceeds of which are used to refund, replace or refinance Debt Incurred by it pursuant to, or described in, Section 4.09(a) or clauses (2), (3) or (11) of this Section 4.09(b), as the case may be;

(12)     customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business;

(13)     the Incurrence by the Company or any Restricted Subsidiary of Debt under Fuel Hedging Agreements entered into in the ordinary course of business and not for speculative purposes in order to hedge anticipated commodity price fluctuations;

(14)     the Incurrence by the Company or any Restricted Subsidiary (other than an Eletson MI Party) of Debt to finance the replacement (through construction or acquisition) of one or more Vessels, and any assets that shall become Related Assets (and any Permitted Refinancing Debt with respect to such Vessels or assets), upon a total loss, destruction, condemnation, confiscation, requisition, seizure, forfeiture or other taking of title to or use of such Vessel (*provided* that such loss, destruction, condemnation, confiscation, requisition, seizure, forfeiture or other taking of title to or use of such Vessel was covered by insurance or resulted in the actual payment of compensation, indemnification or similar payments to such Person (collectively, a "Total Loss")) in an

Doc#: US1:12095985v22

aggregate amount no greater than the Ready for Sea Cost for such replacement Vessel, in each case less all compensation, damages and other payments (including insurance proceeds other than in respect of business interruption insurance) actually received by the Company or any Restricted Subsidiary (other than an Eletson MI Party) from any Person in connection with the Total Loss in excess of amounts actually used to repay Debt secured by the Vessel subject to the Total Loss; and

(15)    the Incurrence by the Company or any Restricted Subsidiary of Debt (other than Debt for borrowed money) in relation to (i) regular maintenance required to maintain the classification of any of the Vessels owned, leased, time chartered or bareboat chartered to or by the Company or such Restricted Subsidiary (as the case may be); (ii) scheduled drydocking of any of the Vessels owned or leased by the Company or such Restricted Subsidiary for normal maintenance purposes; and (iii) any expenditures which will or may reasonably be expected to be recoverable from insurance on such Vessels (*provided, however,* that Debt Incurred in connection with such expenditures shall be repaid upon, and to the extent of, any recovery from such insurance).

(c)    For purposes of determining compliance with Section 4.09, in the event that an item of Debt meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (15) of Section 4.09(b), or is entitled to be Incurred pursuant to Section 4.09(a), the Company will be permitted to classify such item of Debt on the date of its Incurrence in any manner that complies with Section 4.09. Notwithstanding the next succeeding sentence, (A) Debt under Credit Facilities (including, without limitation, the Existing Credit Facilities) outstanding on the Closing Date and Debt under the CSIC Charters outstanding on the Closing Date will initially be deemed to have been Incurred on such date in reliance on the exception provided by Section 4.09(b)(1) and may not be later reclassified, and (B) Debt with respect to the BoComm Vessels (including under the BoComm Agreements) and the Cosco Vessels (including under the Cosco Agreements) shall be deemed to have been incurred pursuant to clause (6) of Section 4.09(b) and may not be later reclassified. In addition, any item of Debt initially classified as Incurred pursuant to one of the categories of Permitted Debt described in clauses (2) through (15) of Section 4.09(b), or is entitled to be Incurred pursuant to Section 4.09(a), may later be reclassified by the Company such that it will be deemed as having been Incurred pursuant to such new clause or Section 4.09(a) to the extent that such reclassified Debt could be Incurred pursuant to such new clause or Section 4.09(a) at the time of such reclassification. Notwithstanding the foregoing, no Debt of Persons other than Eletson MI Parties may be reclassified as Debt of any of the Eletson MI Parties.

(d)    For purposes of determining compliance with any restriction on the Incurrence of Debt in U.S. dollars where Debt is denominated in a different currency, the amount of such Debt will be the U.S. dollar Equivalent determined on the date of such determination; *provided* that if any such Debt denominated in a different currency is subject to a Currency Agreement (with respect to U.S. dollars) covering principal amounts payable on such Debt, the amount of such Debt expressed in U.S. dollars will be adjusted to take into account the effect of such agreement. The principal amount of any Permitted Refinancing Debt Incurred in the same currency as the Debt being refinanced will be the U.S. dollar Equivalent of the Debt being refinanced determined on the date such Debt being refinanced was initially Incurred.

Doc#: US1:12095985v22

Notwithstanding any other provision of this <u>Section 4.09</u>, for purposes of determining compliance with this <u>Section 4.09</u>, increases in Debt solely due to fluctuations in the exchange rates of currencies will not be deemed to exceed the maximum amount that the Company or a Guarantor may Incur under this <u>Section 4.09</u>.

(e)    For purposes of determining any particular amount of Debt under this <u>Section 4.09</u>:

(1)    obligations in the form of letters of credit, guarantees or Liens, in each case supporting Debt otherwise included in the determination of such particular amount, will not be treated as Debt for purposes of this covenant to the extent issued or granted (as the case may be) by the Company or a Restricted Subsidiary;

(2)    any Liens granted pursuant to the equal and ratable provisions referred to in <u>Section 4.13</u> will not be treated as Debt for purposes of this covenant (provided that any Debt secured by such Lien shall be treated as Debt); and

(3)    accrual of interest, accrual of dividends, the accretion or amortization of original issue discount or of accreted value, the obligation to pay commitment fees and the payment of interest or dividends in the form of additional Debt; *provided*, in each such case, that the amount of any such accrual, accretion or payment is included in the Consolidated Net Interest Expense as accrued, will not, in any case, be treated as Debt for purposes of this covenant.

(f)    The Company represents and warrants and agrees that, as of the Closing Date, the Company and its Restricted Subsidiaries have no instruments governing outstanding Debt with an aggregate principal amount exceeding $500,000, other than (i) the Notes issued on the Closing Date, (ii) any Existing Notes that have not been exchanged for Notes in the Exchange Offer, (iii) Debt under the Existing Credit Facilities, (iv) Debt incurred pursuant to the BoComm Agreements and (v) Debt incurred pursuant to the Cosco Agreements.

Section 4.10    <u>Asset Sales Not Involving Collateral</u>.

(a)    The Company will not, and will not permit any Restricted Subsidiary to, consummate any Asset Sale involving assets other than Collateral unless:

(1)    other than for an asset disposition connected with a Total Loss or foreclosure, the consideration the Company or such Restricted Subsidiary receives for such Asset Sale is not less than the Fair Market Value of the assets sold (in the case of any Asset Sale having a Fair Market Value greater than $2.0 million, as evidenced by a resolution of the Company's Board of Directors) (for the avoidance of doubt, Fair Market Value may be determined at the time a contract is entered into for such Asset Sale);

Doc#: US1:12095985v22

(2)      at least 75% of the consideration the Company or such Restricted Subsidiary receives in respect of such Asset Sale consists of:

(i)      cash (including any Net Cash Proceeds received from the conversion within 60 days of such Asset Sale of securities, notes or other obligations received in consideration of such Asset Sale);

(ii)      Cash Equivalents;

(iii)      the assumption by the purchaser of (x) the secured Debt of the Company or a Guarantor or, to the extent the asset was not owned by the Company or a Guarantor, Debt of a Restricted Subsidiary (in each case other than Debt that is subordinated in right of payment to the Notes or Guarantees) as a result of which neither the Company, the Guarantor nor any Restricted Subsidiary (as the case may be) remains obliged in respect of such Debt or (y) Debt of a Restricted Subsidiary that is no longer a Restricted Subsidiary as a result of such Asset Sale, if the Company and each other Restricted Subsidiary is released from any guarantee of such Debt as a result of such Asset Sale;

(iv)      Replacement Assets; or

(v)      a combination of the consideration specified in clauses (i) through (iv); and

(3)      the Company delivers an Officers' Certificate to the Trustee certifying and an Opinion of Counsel stating that such Asset Sale complies with the provisions described in the foregoing clauses (1) and (2).

(b)      If the Company or any Restricted Subsidiary consummates an Asset Sale involving assets other than Collateral, the Net Cash Proceeds of the Asset Sale, within 365 days of the consummation of such Asset Sale, may be used by the Company or such Restricted Subsidiary to:

(1)      permanently repay or prepay any then outstanding secured Debt of the Company or any Guarantor or, to the extent the asset was not owned by the Company or a Guarantor, any then outstanding Debt of a Restricted Subsidiary that is not a Guarantor (and to permanently reduce the corresponding commitment by an equal amount if such secured Debt is a revolving credit borrowing) owing to a Person other than the Company or a Restricted Subsidiary, as applicable;

(2)      invest in or acquire any Replacement Assets (it being understood and agreed that the use of all or any portion of such Net Cash Proceeds towards deposits or progress payments in respect of the construction of a newbuilding vessel to be acquired by the Company or a Restricted Subsidiary that is a Replacement Asset shall also be permitted under this clause (2));

(3)      make a capital expenditure; or

84

Doc#: US1:12095985v22

(4)     any combination of the foregoing.

The amount of such Net Cash Proceeds not so used as set forth in <u>Section 4.10(b)</u> constitutes "<u>Excess Proceeds</u>."

(c)     Pending the final application of any such Net Cash Proceeds, the Issuers may temporarily reduce revolving credit borrowings or otherwise invest such Net Cash Proceeds in any manner that is not prohibited by the terms of this Indenture.

(d)     (A) binding contract to apply Net Cash Proceeds in accordance with <u>Section 4.10(b)(2)</u> or <u>Section 4.10(b)(3)</u> above (or a combination thereof) will toll the 365-day period in respect of such Net Cash Proceeds or (B) determination by the Company to potentially apply all or a portion of such Net Cash Proceeds towards the exercise of an outstanding Vessel Purchase Option Contract or a Vessel Construction Contract will toll the 365-day period in respect of such Net Cash Proceeds, in each case, for a period not to exceed 365 days from the expiration of the aforementioned 365-day period, *provided* that such binding contract and such determination, in each case, shall be treated as a permitted application of Net Cash Proceeds from the date of such binding contract until and only until the earlier of (x) the date on which such acquisition or expenditure is consummated and (y) (i) in the case of any Vessel Construction Contract or any Exercised Vessel Purchase Option Contract (including any outstanding Vessel Purchase Option Contract exercised during the 365 day period referenced in clause (B) above), the date of expiration or termination of such Vessel Construction Contract or Exercised Vessel Purchase Option Contract and (ii) otherwise, the 365th day following the expiration of the aforementioned 365-day period (clause (i) or clause (ii) as applicable, the "<u>Reinvestment Termination Date</u>").  If such acquisition or expenditure is not consummated on or before the Reinvestment Termination Date and the Company (or the applicable Restricted Subsidiary, as the case may be) shall not have applied such Net Cash Proceeds pursuant to clauses (2)(a) through (d) above on or before the Reinvestment Termination Date, such binding contract shall be deemed not to have been a permitted application of the Net Cash Proceeds and such Net Cash Proceeds shall constitute Excess Proceeds.

(e)     When the aggregate amount of Excess Proceeds exceeds $15.0 million, the Issuers will, within 15 Business Days, make an offer to purchase (an "<u>Excess Proceeds Offer</u>") from all Holders and from the holders of any Pari Passu Debt, to the extent required by the terms thereof, on a *pro rata* basis, in accordance with the procedures set forth in this Indenture or the agreements governing any such Pari Passu Debt, the maximum principal amount (expressed as a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has occurred, expressed as an integral multiple of $1.00) of the Notes and any such Pari Passu Debt that may be purchased with the amount of the Excess Proceeds.  The offer price as to each Note and any such Pari Passu Debt will be payable in cash in an amount equal to (solely in the case of the Notes) 100% of the principal amount of such Note and (solely in the case of Pari Passu Debt) no greater than 100% of the principal amount (or accreted value, subject to the rights of Holders on the relevant record date to receive interest on the relevant payment date, as applicable) of such Pari Passu Debt, plus, in each case, accrued and unpaid interest, if any, to the date of purchase.

To the extent that the aggregate principal amount of Notes and any such Pari Passu Debt tendered pursuant to an Excess Proceeds Offer is less than the aggregate amount of Excess Proceeds, the Issuers may use the amount of such Excess Proceeds not used to purchase Notes and Pari Passu Debt for general corporate purposes that are not otherwise prohibited by this Indenture.  If the aggregate principal amount of Notes and any such Pari Passu Debt validly tendered and not withdrawn by holders thereof exceeds the aggregate amount of Excess Proceeds, the Notes and any such Pari Passu Debt to be purchased will be selected by the Trustee on a *pro rata* basis (based upon the principal amount of Notes and the principal amount or accreted value of such Pari Passu Debt tendered by each holder) to the extent permitted by such Pari Passu Debt.  Upon completion of each such Excess Proceeds Offer, the amount of Excess Proceeds will be reset to zero.

(f)     If the Issuers are obliged to make an Excess Proceeds Offer, the Issuers will offer to purchase the Notes in whole or in part in a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, in an integral multiple of $1.00, on a date that is not earlier than 30 days and not later than 60 days from the date the notice of the Excess Proceeds Offer is given to such holders, or such later date as may be required under the Exchange Act.  Pending the final application of any net proceeds, the Company may temporarily reduce revolving credit borrowings or otherwise invest the net proceeds in any manner that is not prohibited by the Indenture.

(g)     If the Issuers are required to make an Excess Proceeds Offer, the Issuers will comply with the applicable tender offer rules, including Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations, including the requirements of any applicable securities exchange on which Notes are then listed.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this <u>Section 4.10</u>, the Issuers will comply with such securities laws and regulations and will not be deemed to have breached its obligations described in this <u>Section 4.10</u> by virtue thereof.

Section 4.11    <u>Asset Sales Involving Collateral</u>.

(a)     The Company will not, and will not permit any Restricted Subsidiary to, consummate any Asset Sale involving Collateral unless:

(1)     the consideration the Company or such Restricted Subsidiary receives for such Asset Sale is not less than the Fair Market Value of the assets sold (in the case of any Asset Sale having a Fair Market Value greater than $2.0 million, as evidenced by a resolution of the Company's Board of Directors) (for the avoidance of doubt, Fair Market Value may be determined at the time a contract is entered into for such Asset Sale);

(2)     such Asset Sale is either of (i) the Company's or the relevant Restricted Subsidiary's entire interest in the applicable Mortgaged Vessel (the "<u>Sold Mortgaged Vessel</u>") together with the applicable Charters, freights and hires, insurance and related agreements (collectively, the "<u>Related Agreements</u>"); *provided* that the Company or a Guarantor may elect to sell only the Sold Mortgaged Vessel and retain all or any portion of the Related Agreements, *provided* that if any such Related Agreements

86

are transferred to a Subsidiary that is not a Guarantor, then the Company or such Guarantor shall receive either (x) Qualified Collateral having a Fair Market Value that is not less than the Fair Market Value of such Related Agreements or (y) cash in an amount equal to the Fair Market Value of such Related Agreement which it shall immediately deliver to the Trustee, which amounts shall constitute Trust Monies hereunder or (ii) all the Capital Stock of the Restricted Subsidiary that owns such Mortgaged Vessel and Related Assets or all of the Capital Stock of any parent or indirect parent of such Restricted Subsidiary;

(3)    the consideration received in the Asset Sale by the Company or such Restricted Subsidiary consists entirely of either (x) cash or Cash Equivalents or (y) Qualified Collateral having a Fair Market Value that is not less than the Fair Market Value of the Collateral that is the subject of such Asset Sale;

(4)    no Default or Event of Default shall have occurred and be continuing;

(5)    such Asset Sale is made in compliance with the provisions described under Section 10.03 and Section 12.02 below; and

(6)    the Company delivers an Officers' Certificate to the Trustee certifying and an Opinion of Counsel stating that such Asset Sale complies with the provisions described in the foregoing clauses (1) and (5).

(b)    If the Company or any Restricted Subsidiary consummates an Asset Sale involving Collateral, the Net Cash Proceeds of the Asset Sale, within 365 days of the consummation of such Asset Sale, may be used by the Company or such Restricted Subsidiary, together with the unused Net Cash Proceeds of any other Asset Sale(s) and any unused Excess Loss Proceeds, (*provided* that no Default or Event of Default shall have occurred and be continuing) to substitute one or more Qualified Vessels (and to make any Permitted Repairs with respect thereto) for such Sold Mortgaged Vessel and the Sold Mortgaged Vessel(s) that were the subject of any such other Asset Sale(s) or the Lost Mortgaged Vessel(s) in respect of which such Excess Loss Proceeds were received and make such Qualified Vessel(s) subject to the Lien of this Indenture and the applicable Security Agreements in accordance with the provisions thereof described under Section 10.03, Section 12.02 and Section 4.25(a). The amount of such Net Cash Proceeds not so used as set forth in this paragraph (b) constitutes "Excess Collateral Proceeds."

(c)    A (A) binding contract to apply Net Cash Proceeds in accordance with clause (2) above will toll the 365-day period in respect of such Net Cash Proceeds or (B) determination by the Company to potentially apply all or a portion of such Net Cash Proceeds towards the exercise of an outstanding Vessel Purchase Option Contract will toll the 365-day period in respect of such Net Cash Proceeds, in each case, for a period not to exceed 365 days from the expiration of the aforementioned 365-day period, *provided* that such binding contract and such determination, in each case, shall be treated as a permitted application of Net Cash Proceeds from the date of such binding contract until and only until the earlier of (x) the date on which such acquisition or expenditure is consummated and (y) (i) in the case of any Vessel Construction Contract or any Exercised Vessel Purchase Option Contract (including any

outstanding Vessel Purchase Option Contract exercised during the 365 day period referenced in clause (B) above), the date of expiration or termination of such Vessel Construction Contract or Exercised Vessel Purchase Option Contract and (ii) otherwise, the 365th day following the expiration of the aforementioned 365-day period (clause (i) or clause (ii) as applicable, the "Collateral Proceeds Reinvestment Termination Date").  If such acquisition or expenditure is not consummated on or before the Collateral Proceeds Reinvestment Termination Date and the Company (or the applicable Guarantor, as the case may be) shall not have applied such Net Cash Proceeds pursuant to clause (2) above on or before the Collateral Proceeds Reinvestment Termination Date, such binding contract shall be deemed not to have been a permitted application of the Net Cash Proceeds and such Net Cash Proceeds shall constitute Excess Collateral Proceeds.

(d)     When the aggregate amount of Excess Collateral Proceeds exceeds $15.0 million, the Issuers will, within 15 Business Days, make an offer to purchase (a "Collateral Sale Offer") from all Holders, on a *pro rata* basis, in accordance with the procedures set forth in this Indenture, the maximum principal amount (expressed as a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, a minimum amount that is an integral multiple of $1.00) of the Notes that may be purchased with the amount of the Excess Collateral Proceeds.  The offer price as to each Note will be payable in cash in an amount equal to 100% of the principal amount of such Note, plus accrued and unpaid interest, if any, to the date of purchase, subject to the rights of Holders on the relevant record date to receive interest on the relevant payment date.

To the extent that the aggregate principal amount of Notes tendered pursuant to a Collateral Sale Offer is less than the aggregate amount of Excess Collateral Proceeds, those Excess Collateral Proceeds shall be retained as Trust Monies.  If the aggregate principal amount of Notes validly tendered and not withdrawn by Holders thereof exceeds the aggregate amount of Excess Collateral Proceeds, the Notes to be purchased will be selected by the Trustee on a *pro rata* basis (based upon the principal amount of Notes tendered by each Holder) in accordance with the Depositary's standard procedures.  Upon completion of each such Collateral Sale Offer, the amount of Excess Collateral Proceeds will be reset to zero.

Whenever Net Cash Proceeds from any Asset Sale involving Collateral are received by the Issuers, such Net Cash Proceeds shall be retained by the Trustee as Trust Monies constituting Collateral subject to disposition as provided in this covenant or as provided under Section 10.03 and Section 12.02 provisions described above.  At the written direction of the Issuers, such Net Cash Proceeds may be invested by the Trustee in Cash Equivalents in which the Trustee can maintain a perfected first-priority security interest.

(e)     If the Issuers are obliged to make a Collateral Sale Offer, the Issuers will offer to purchase the Notes in whole or in part in a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, in an integral multiple of $1.00, on a date that is not earlier than 30 days and not later than 60 days from the date the notice of the Collateral Sale Offer is given to such holders, or such later date as may be required under the Exchange Act.

Doc#: US1:12095985v22

(f)    If the Issuers are required to make a Collateral Sale Offer, the Issuers will comply with the applicable tender offer rules, including Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations, including the requirements of any applicable securities exchange on which Notes are then listed.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this <u>Section 4.11</u>, the Issuers will comply with such securities laws and regulations and will not be deemed to have breached its obligations described in this <u>Section 4.11</u> by virtue thereof.

(g)    To the extent an Asset Sale relates to a Mortgaged Vessel,  (i) the Company and its Restricted Subsidiaries may not consummate such Asset Sale unless Holders representing a majority of the outstanding principal amount of Notes shall have consented to such Asset Sale; and (ii) the Company and its Restricted Subsidiaries may not apply the Net Cash Proceeds from such Asset Sale unless Holders representing a majority of the outstanding principal amount of Notes shall have consented to such application.

Section 4.12    <u>Limitation on Transactions with Affiliates</u>.

(a)    The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, make or amend, or suffer to exist any transaction or series of related transactions (including, without limitation, the payment, sale, purchase, exchange, lease or other disposal of assets or property or the rendering of any service), to, with, or for the benefit of, any Affiliate of the Company or any other Restricted Subsidiary, unless such transaction or series of transactions is entered into in good faith (and, in the case of such a transaction or series of transactions having a value greater than $1.0 million, in writing) and:

(1)    such transaction or series of transactions is on terms that, taken as a whole, are no less favorable to the Company or such Restricted Subsidiary, as the case may be, than those that could have been obtained in a comparable arm's-length transaction with third parties that are not Affiliates;

(2)    with respect to any such transaction or series of related transactions involving aggregate payments or the transfer of assets or the provision of services, in each case having a value or consideration greater than $5.0 million, the Company will deliver an Officers' Certificate to the Trustee certifying that such transaction or series of related transactions complies with clause (a) above;

(3)    with respect to any such transaction or series of related transactions involving aggregate payments or the transfer of assets or the provision of services, in each case having a value or consideration greater than $10.0 million, the Company will deliver a resolution of its Board of Directors (attached to an Officers' Certificate to the Trustee) resolving that such transaction complies with clause (a) above and that the fairness of such transaction has been approved by a majority of the Disinterested Members (or, in the event that there is only one Disinterested Member, by such Disinterested Member) of the Board of Directors; and

(4)    with respect to any such transaction or series of related transactions involving aggregate payments or the transfer of assets or the provision of services, in

each case having a value or consideration greater than $20.0 million, the Company will deliver to the Trustee a written opinion of an Independent Financial Advisor stating that the transaction or series of transactions is fair to the Company or such Restricted Subsidiary from a financial point of view.

(b)     Notwithstanding the foregoing, the restrictions set forth in this description will not apply to:

(1)     customary directors' fees, indemnities and similar arrangements (including the payment of directors' and officers' insurance premiums), consulting fees, employee compensation, employee and director bonuses, employment agreements and arrangements or employee benefit arrangements, including stock options or legal fees in an amount not to exceed $5.0 million in any fiscal year;

(2)     any Restricted Payment not prohibited by Section 4.07 other than a Restricted Payment made in accordance with clause Section 4.07(c)(10);

(3)     loans and advances (or guarantees to third party loans, but not any forgiveness of such loans or advances) to directors, officers or employees of the Company or any Restricted Subsidiary made in the ordinary course of business and consistent with the Company's past practices or past practices of the relevant Restricted Subsidiary, as the case may be, in an amount outstanding not to exceed at any one time $5.0 million;

(4)     agreements and arrangements existing on the Closing Date and disclosed in the Offer to Exchange and any amendment, modification or supplement thereto; *provided* that any such amendment, modification or supplement to the terms thereof is not more disadvantageous to the Holders and to the Company and the Restricted Subsidiaries, as applicable, in any material respect than the original agreement or arrangement as in effect on the Closing Date and *provided*, *further*, that such amendment or modification is: (x) on a basis substantially similar to that which would be conducted in an arm's-length transaction with third parties who are not Affiliates; and (y) in the case of any transaction having a Fair Market Value of greater than $5.0 million, approved by the Company's Board of Directors (including a majority of the Disinterested Members or, in the event that there is only one Disinterested Member, by such Disinterested Member);

(5)     the issuance of Qualified Capital Stock pursuant to, or for the purpose of the funding of, employment arrangements, stock options and stock ownership plans, as long as the terms thereof are or have been previously approved by the Company's Board of Directors;

(6)     the granting and performance of registration rights for the Company's securities;

(7)     (a) transactions between or among the Company and the Restricted Subsidiaries (other than Eletson MI Parties) or between or among Restricted Subsidiaries

90

(other than Eletson MI Parties) or (b) transactions with Naftilos Shipyards S.A. in the ordinary course of business in an amount not to exceed $1.0 million in any fiscal year;

(8)     any issuance of Capital Stock (other than Redeemable Capital Stock) of the Company;

(9)     the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement relating thereto) to which it is a party as at the Closing Date and any similar agreements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of, obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Closing Date shall only be permitted by this clause (ix) to the extent that the terms of any such amendment or new agreement are not otherwise disadvantageous to the Holders when taken as a whole; and

(10)     (a) any transaction between or among the Eletson MI Parties or (b) any transaction between (x) any of the Company or its Restricted Subsidiaries that are not Eletson MI Parties and (y) any of the Eletson MI Parties, if such transaction or series of transactions is on terms that, taken as a whole, are no less favorable to the Eletson MI Parties than those that could have been obtained in a comparable arm's-length transaction with third parties that are not Affiliates.

Section 4.13     Limitation on Liens.

(a)     The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien of any kind (except for Permitted Liens) or assign or otherwise convey any right to receive any income, profits or proceeds on or with respect to any of the Company's or any Restricted Subsidiary's property or assets, including any shares or stock or Debt of any Restricted Subsidiary, whether owned at or acquired after the Closing Date, or any income, profits or proceeds therefrom unless:

(1)     in the case of any Lien securing Subordinated Debt, the Issuers' obligations in respect of the Notes, the obligations of the Guarantors under the Guarantees and all other amounts due under this Indenture are directly secured by a Lien on such property, assets or proceeds that is senior in priority to the Lien securing the Subordinated Debt until such time as the Subordinated Debt is no longer secured by a Lien; and

(2)     in the case of any other Lien, the Company's obligations in respect of the Notes, the obligations of the Guarantors under the Guarantees and all other amounts due under this Indenture are equally and ratably secured with the obligation or liability secured by such Lien.

(b)     Notwithstanding the foregoing, the Issuers will not and will not permit any Guarantor to, create, incur, assume or suffer to exist any Lien (other than in favor of the Trustee for the benefit of the Holders) upon any of the Collateral other than Permitted Liens and, further,

the Company will not and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, assume or suffer to exist any Lien on any Capital Stock or intercompany Debt issued by any Guarantor other than in favor of the Trustee for the benefit of the Holders.

(c)     Any such Lien arising as a result of Section 4.13(a)(1) or Section4.13(a)(2) will be automatically and unconditionally released and discharged concurrently with the unconditional release of the Lien which gave rise to such Lien (other than as a consequence of an enforcement action with respect to the assets subject to such Lien).

Section 4.14     Limitation on Business Activities of Eletson Finance.

Eletson Finance shall not hold any material assets, become liable for any material obligations, engage in any trade or business, or conduct any business activity, other than (i) the issuance of its Capital Stock to the Company or any Wholly Owned Restricted Subsidiary and (ii) the incurrence of Debt as a co-obligor, co-issuer or guarantor of Debt incurred by the other Issuers or any Restricted Subsidiary, including the Notes, that is permitted to be incurred by the Company or any Restricted Subsidiary under Section 4.09 and (iii) activities incidental to any of the foregoing.  For so long as the Company or any successor obligor under the Notes is a Person that is not incorporated in the United States of America, any State of the United States or the District of Columbia there will be a co-issuer of the Notes that is a Wholly Owned Restricted Subsidiary of the Company and that is a limited liability company organized in the United States of America, any State of the United States or the District of Columbia.

Section 4.15     Corporate Existence.

Subject to Article 5, the Issuers shall do or cause to be done all things necessary to preserve and keep in full force and effect:

(1)     their corporate or limited liability company existence, as applicable, and the corporate, partnership, limited liability company or other existence of each Restricted Subsidiary of the Company, in accordance with the respective organizational documents (as the same may be amended from time to time) of the Issuers and the Restricted Subsidiaries; and

(2)     the rights (charter and statutory), licenses and franchises of the Company and its Restricted Subsidiaries; *provided*, *however*, that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Restricted Subsidiaries, if the Company determines in good faith that the preservation thereof is no longer desirable in the conduct of the business of the Company and its Restricted Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Holders of the Notes.

Section 4.16     Offer to Repurchase Upon Change of Control.

(a)     If a Change of Control occurs at any time, then the Issuers will make an offer (a "Change of Control Offer") to each Holder to repurchase such Holder's Notes, in whole or in part, at a purchase price (the "Change of Control Purchase Price") in cash equal to 101% of the principal amount thereof, plus accrued and unpaid interest, if any, to the date of purchase (the

"Change of Control Purchase Date"), subject to the rights of Holders on the relevant record date to receive interest due on the relevant interest payment date.

(b)        Within 30 days following any Change of Control, the Issuers will:

(1)        cause a notice of the Change of Control Offer to be published through the newswire service of Bloomberg, or if Bloomberg does not then operate, any similar agency; and

(2)        send notice of the Change of Control Offer by first-class mail, with a copy to the Trustee, to each Holder, which notice will state:

(i)        that a Change of Control has occurred and the date it occurred;

(ii)        the circumstances and relevant facts regarding the transaction or transactions that constitute such Change of Control;

(iii)        the Change of Control Purchase Price and the Change of Control Purchase Date, which will be a Business Day no earlier than 30 days nor later than 60 days after the date such notice is mailed, or such later date as is necessary to comply with any requirements under the Exchange Act and any other applicable securities laws or regulations;

(iv)        that any Note accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Purchase Date unless the Change of Control Purchase Price is not paid on such date;

(v)        that any Note or part thereof not tendered will continue to accrue interest;

(vi)        that Holders whose Notes are being repurchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer), which unpurchased portion must be equal to a minimum denomination of $1.00 in principal amount or integral multiples of $1.00 in excess thereof; and

(vii)        any other procedures that a Holder must follow to accept a Change of Control Offer or to withdraw such acceptance.

The Issuers will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.16, the Issuers will comply with the applicable securities laws and regulations and will not be deemed to have breached their obligations under this Section 4.16 by virtue of such compliance.

(c)      On the Change of Control Purchase Date, the Issuers will, to the extent lawful:

(1)      accept for payment all Notes or portions of Notes validly tendered and not properly withdrawn pursuant to the Change of Control Offer in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof; *provided* that if following repurchase of a portion of a Note, the remaining principal amount of such Note outstanding immediately after such repurchase would be less than $1.00, then the portion of the Note so repurchased shall be reduced so that the remaining principal amount of such Note outstanding immediately after such repurchase is $1.00;

(2)      deposit by 10:00 a.m. New York City time with the Paying Agent an amount equal to the Change of Control Purchase Price in respect of all Notes or portions of Notes validly tendered and not properly withdrawn; and

(3)      deliver or cause to be delivered to the Trustee the Notes accepted for payment together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuers.

(d)      The Trustee will promptly authenticate and deliver a new Note or Notes in a principal amount equal to any unpurchased portion of Notes surrendered, if any, to the Holder in global form or to each holder of certificated Notes; *provided* that each such new Note will be in a principal amount of $1.00 or in integral multiples of $1.00 in excess thereof, or if a PIK Payment has occurred, in a principal amount that is an integral multiple of $1.00. The Issuers will publicly announce the results of a Change of Control Offer on or as soon as practicable after the Change of Control Purchase Date.

(e)      The Issuers will not be required to make a Change of Control Offer following a Change of Control if (i) a third party has made, and not terminated, a tender offer for all of the Notes in the manner and at the times applicable to a Change of Control Offer, at a tender offer purchase price in cash equal to at least 101% of the principal amount thereof on the date of purchase, plus accrued and unpaid interest, if any, and such third party purchases all of the Notes validly tendered and not withdrawn under such tender offer or (ii) irrevocable notice of redemption for all outstanding Notes has been given pursuant to this Indenture as described above under Section 3.07, unless and until there is a default in payment of the applicable redemption price.

(f)      Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of the Change of Control, conditional upon the Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

Section 4.17   Events of Loss.

(a)      If an Event of Loss occurs at any time with respect to a Mortgaged Vessel (the Mortgaged Vessel suffering such Event of Loss being the "Lost Mortgaged Vessel"), the Company or the relevant Restricted Subsidiary shall deposit all Event of Loss Proceeds with respect to such Event of Loss with the Trustee as Trust Monies constituting Collateral subject to

94

disposition as provided in this covenant or as provided under the Section 10.03 and Section 12.02.  Such amount is hereinafter called the "Loss Redemption Amount." At the written direction of the Company, such Event of Loss Proceeds may be invested by the Trustee in Cash Equivalents in which the Trustee can maintain a perfected first-priority security interest.

(b)      Within 365 days (subject to extension as provided in Section 4.17(c)) after the receipt of any Event of Loss Proceeds, the Company or the applicable Restricted Subsidiary shall apply such Event of Loss Proceeds, together with any other unused Event of Loss Proceeds and any unused Net Cash Proceeds of any Asset Sale, (*provided* that no Default or Event of Default shall have occurred and be continuing) to substitute one or more Qualified Vessels (and to make any Permitted Repairs with respect thereto) for such Lost Mortgaged Vessel or the Lost Mortgaged Vessel(s) in respect of which such other Event of Loss Proceeds were received or the Sold Mortgaged Vessel(s) in respect of which such Net Cash Proceeds were received and make such Qualified Vessel(s) subject to the Lien of this Indenture and the applicable Security Documents in accordance with the provisions thereof described under Section 10.03, Section 12.02 and Section 4.25(a) as Mortgaged Vessel."  The Company and its Restricted Subsidiaries may not apply any Event of Loss Proceeds or Net Cash Proceeds of an Asset Sale pursuant to this clause (b) unless Holders representing a majority of the outstanding principal amount of Notes shall have consented to such application.  The amount of such Net Cash Proceeds not so used as set forth in this paragraph (b) constitutes "Excess Loss Proceeds."

(c)      When the aggregate amount of Excess Loss Proceeds exceeds $15.0 million, the Issuers will, within 15 Business Days, make an offer to purchase (an "Event of Loss Offer") from all Holders, on a *pro rata* basis, in accordance with the procedures set forth in this Indenture, the maximum principal amount (expressed as a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, expressed as an integral multiple of $1.00) of the Notes that may be purchased with the amount of the Excess Loss Proceeds.  The offer price as to each Note will be payable in cash in an amount equal to 100% of the principal amount of such Note, plus accrued and unpaid interest, if any, to the date of purchase, subject to the rights of Holders on the relevant record date to receive interest on the relevant payment date.

To the extent that the aggregate principal amount of Notes tendered pursuant to an Event of Loss Offer is less than the aggregate amount of Excess Loss Proceeds, those Excess Loss Proceeds shall be retained as Trust Monies.  If the aggregate principal amount of Notes validly tendered and not withdrawn by holders thereof exceeds the aggregate amount of Excess Loss Proceeds, the Notes to be purchased will be selected by the Trustee on a *pro rata* basis (based upon the principal amount of Notes tendered by each holder).  Upon completion of each such Event of Loss Offer, the amount of Excess Loss Proceeds will be reset to zero.

(d)      If the Issuers are obliged to make an Event of Loss Offer, the Issuers will offer to purchase the Notes in whole or in part in a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, in an integral multiple of $1.00, on a date that is not earlier than 30 days and not later than 60 days from the date the notice of the Event of Loss Offer is given to such holders, or such later date as may be required under the Exchange Act.

(e)        Whenever Net Cash Proceeds from any Event of Loss are received by the Issuers, such Net Cash Proceeds shall be retained by the Trustee as Trust Monies constituting Collateral subject to disposition as provided in this covenant or as provided under Section 10.03 and Section 12.02 provisions described below.  At the written direction of the Issuers, such Net Cash Proceeds may be invested by the Trustee in Cash Equivalents in which the Trustee can maintain a perfected first-priority security interest.

(f)        If the Issuers are required to make an Event of Loss Offer, the Issuers will comply with the applicable tender offer rules, including Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations, including the requirements of any applicable securities exchange on which Notes are then listed.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.17, the Issuers will comply with such securities laws and regulations and will not be deemed to have breached its obligations described in this Section 4.17 by virtue thereof.

Section 4.18    Payments for Consent.

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to be paid to all Holders and is paid ratably to all Holders that consent, waive or agree to amend in the time frame set forth in any documents distributed relating to such consent, waiver or agreement.

Section 4.19    Existing Trust Monies Offer.

(a)        On July 16, 2018, the Issuers shall commence an offer (the "Existing Trust Monies Offer") to use the Existing Trust Monies (together with cash on hand to pay accrued and unpaid interest on Notes that are purchased) to purchase Notes having an outstanding aggregate principal amount equal to the Existing Trust Monies at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, to, but not including, the purchase date. The Existing Trust Monies Offer shall remain open for not less than 20 Business Days and be otherwise made in accordance with the requirements of this Indenture and shall be consummated not later than the 30th Business Day after the Closing Date.

(b)        The Existing Trust Monies Offer shall be made to Holders of the Notes on a *pro rata* basis, in accordance with the procedures set forth in this Indenture or the agreements governing any such Pari Passu Debt, the maximum principal amount (expressed as a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has occurred, expressed as an integral multiple of $1.00) of the Notes and any such Pari Passu Debt that may be purchased with the amount of the Existing Trust Monies.  The offer price as to each Note and any such Pari Passu Debt will be payable in cash in an amount equal to (solely in the case of the Notes) 100% of the principal amount of such Note and (solely in the case of Pari Passu Debt) no greater than 100% of the principal amount (or accreted value, subject to the rights of Holders on the relevant record date to receive interest on the relevant payment date, as applicable) of such Pari Passu Debt, plus, in each case, accrued and unpaid interest, if any, to the date of purchase.

96

To the extent that the aggregate principal amount of Notes and any such Pari Passu Debt tendered pursuant to an Existing Trust Monies Offer is less than the aggregate amount of Existing Trust Monies, the Issuers may use the amount of such Existing Trust Monies not used to purchase Notes and Pari Passu Debt for general corporate purposes that are not otherwise prohibited by this Indenture.  If the aggregate principal amount of Notes and any such Pari Passu Debt validly tendered and not withdrawn by holders thereof exceeds the aggregate amount of Existing Trust Monies, the Notes and any such Pari Passu Debt to be purchased will be selected by the Trustee on a *pro rata* basis (based upon the principal amount of Notes and the principal amount or accreted value of such Pari Passu Debt tendered by each holder) to the extent permitted by such Pari Passu Debt.  Upon completion of each such Existing Trust Monies Offer, the amount of Existing Trust Monies will be reset to zero.

(c)      The Existing Trustee shall liquidate any Existing Trust Monies then held by it not later than the third Business Day prior to the consummation of the Existing Trust Monies Offer and release such Existing Trust Monies to the Paying Agent for the Notes for payment to Holders on the applicable purchase date.

(d)      The Issuers will grant the Trustee, for the benefit of the Holders and for the benefit of the Trustee, a first-priority security interest in the Existing Trust Monies and any accounts holding the Existing Trust Monies to secure the obligations under the Notes and this Indenture pending disbursement pursuant to the Existing Trust Monies Offer.

(e)      To the extent the Existing Trustee is unable or unwilling to continue to hold the Existing Trust Monies pending the completion of the Existing Trust Monies Offer, the Existing Trust Monies shall be transferred at or as promptly as practicable after the Closing Date to the Trustee to be held in the Collection Account for application pursuant to this Section 4.19(e).

(f)      Any Existing Trust Monies not applied to purchase Notes in the Existing Trust Monies Offer shall be pledged as Collateral and held by Eletson MI in the Collection Account pending future application in accordance with the terms of this Indenture.

(g)      When the Issuers are obliged to make an Existing Trust Monies Offer, the Issuers will offer to purchase the Notes in whole or in part in a minimum amount of $1.00 and integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, in an integral multiple of $1.00, on a date that is not earlier than 30 days and not later than 60 days from the date the notice of the Existing Trust Monies Offer is given to such holders, or such later date as may be required under the Exchange Act.

(h)      When the Issuers are required to make an Existing Trust Monies Offer, the Issuers will comply with the applicable tender offer rules, including Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations, including the requirements of any applicable securities exchange on which Notes are then listed.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.19, the Issuers will comply with such securities laws and regulations and will not be deemed to have breached its obligations described in this Section 4.19 by virtue thereof.

Section 4.20    Designation of Unrestricted and Restricted Subsidiaries.

(a)    The Company's Board of Directors may designate any Subsidiary (including newly acquired or newly established Subsidiaries) to be an Unrestricted Subsidiary (other than Eletson Finance or any other Subsidiary that is at such time a co-issuer of the Notes) only if:

(1)    no Default has occurred and is continuing at the time of or after giving effect to such designation;

(2)    the Company would be permitted to make an Investment (other than a Permitted Investment) at the time of designation (assuming the effectiveness of such designation) pursuant to Section 4.07(a) in an amount equal to the greater of (i) the net book value of the Company's interest in such Subsidiary calculated in accordance with U.S. GAAP and (ii) the Fair Market Value of the Company's interest in such Subsidiary;

(3)    the Company would be permitted under this Indenture to Incur at least $1.00 of additional Debt pursuant to the ratio set forth in Section 4.09(a) at the time of such designation (assuming the effectiveness of such designation);

(4)    neither the Company nor any Restricted Subsidiary has a contract, agreement, arrangement, understanding or obligation of any kind, whether written or oral, with such Subsidiary unless the terms of such contract, arrangement, understanding or obligation are no less favorable to the Company or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company or of any Restricted Subsidiary;

(5)    such Subsidiary does not own any Capital Stock, Redeemable Capital Stock or Debt of, or own or hold any Lien on any property or assets of, or have any Investment in, the Company or any other Restricted Subsidiary;

(6)    such Subsidiary is not liable, directly or indirectly, with respect to any Debt, Lien or other obligation that, if in default, would result (with the passage of time or giving of notice or otherwise) in a default on any of the Company's Debt or Debt of any Restricted Subsidiary;

(7)    such Subsidiary, either alone or in the aggregate with all other Unrestricted Subsidiaries, does not operate, directly or indirectly, all or substantially all of the businesses of the Company and its Subsidiaries;

(8)    such Subsidiary is a Person with respect to which neither the Company nor any Restricted Subsidiary has any direct or indirect obligation to:

(i)    subscribe for additional Capital Stock of such Person; or

(ii)    maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results;

98

(9)      such Subsidiary is not a pledgor under the EMC Pledge Agreement or any Account Pledge Agreement; and

(10)     Holders representing a majority of the outstanding principal amount of Notes shall have consented to such designation.

(b)      In the event of any such designation, the Company will be deemed to have made an Investment constituting a Restricted Payment pursuant to Section 4.07 for all purposes of this Indenture in an amount equal to the greater of (i) the net book value of the Company's interest in such Subsidiary calculated in accordance with U.S. GAAP and (ii) the Fair Market Value of the Company's interest in such Subsidiary.

(c)      Neither the Company nor any Restricted Subsidiary will at any time:

(1)      provide a guarantee of, or similar credit support to, any Debt of any Unrestricted Subsidiary (including of any undertaking, agreement or instrument evidencing such Debt); *provided* that the Company may pledge Capital Stock or Debt of any Unrestricted Subsidiary on a non-recourse basis as long as the pledgee has no claim whatsoever against the Company other than to obtain such pledged property, except to the extent permitted under Section 4.07 and Section 4.12;

(2)      be directly or indirectly liable for any Debt of any Unrestricted Subsidiary, except to the extent permitted under Section 4.07 and Section 4.12; or

(3)      be directly or indirectly liable for any other Debt that provides that the holder thereof may (upon giving notice, the lapse of time or both) declare a default thereof (or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity) upon the occurrence of a default with respect to any other Debt that is Debt of an Unrestricted Subsidiary (including any corresponding right to take enforcement action against such Unrestricted Subsidiary).

(d)      The Company's Board of Directors may designate any Unrestricted Subsidiary as a Restricted Subsidiary:

(1)      if no Default or Event of Default has occurred and is continuing at the time of, or will occur and be continuing after giving effect to, such designation; and

(2)      unless such designated Unrestricted Subsidiary shall not have any Debt outstanding (other than Debt that would be Permitted Debt), immediately before and after giving effect to such proposed designation, and after giving *pro forma* effect to the Incurrence of any such Debt of such designated Unrestricted Subsidiary as if such Debt was Incurred on the date of its designation as a Restricted Subsidiary, the Company could Incur at least $1.00 of additional Debt pursuant to the ratio set forth in Section 4.09(a).

(e)      Any such designation as an Unrestricted Subsidiary or Restricted Subsidiary by the Company's Board of Directors will be evidenced to the Trustee by filing a resolution of the Company's Board of Directors with the Trustee giving effect to such

99

designation and an Officers' Certificate certifying that such designation complies with the foregoing conditions, and giving the effective date of such designation. Any such filing with the Trustee must occur within 45 days after the end of the Company's fiscal quarter in which such designation is made (or, in the case of a designation made during the last fiscal quarter of the Company's fiscal year, within 90 days after the end of such fiscal year).

Section 4.21    <u>Limitations on Guarantees of Debt by Restricted Subsidiaries</u>.

(a)    The Company will not permit (i) any Restricted Subsidiary (other than Eletson Finance or any other Restricted Subsidiary that is at such time a co-issuer of the Notes) that is not a Guarantor, directly or indirectly, to guarantee, assume or in any other manner become liable for the payment of any Debt of the Company (other than the Notes) or any Guarantor (including, without limitation, by granting a Lien on any of its properties or assets) or (ii) Eletson MI to have, form, designate or acquire any Restricted Subsidiary, unless:

(1)    (i) such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture to this Indenture providing for a Guarantee of payment of the Notes by such Restricted Subsidiary on the same terms as the guarantee of such other Debt and, if such Restricted Subsidiary owns a Vessel required to become a Mortgaged Vessel, execute one or more Ship Mortgages and the other Security Documents in favor of the Trustee pursuant to which each such Vessel shall become a Mortgaged Vessel for all purposes under this Indenture in each case as provided for under <u>Section 4.25(a)</u>; and (ii) with respect to any guarantee of Subordinated Debt by such Restricted Subsidiary, any such guarantee shall be subordinated to such Restricted Subsidiary's Guarantee with respect to the Notes at least to the same extent as such Subordinated Debt is subordinated to the Notes; and

(2)    such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Company or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee.

(b)    <u>Section 4.21(a)</u> will not be applicable to any guarantee by any such Restricted Subsidiary (i) guaranteeing Debt existing on the Closing Date and disclosed in the Offer to Exchange; or (ii) that existed at the time such Person became a Restricted Subsidiary if the guarantee was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

100

(c)    Notwithstanding the foregoing, any Guarantee of the Notes created pursuant to the provisions described Section 4.21(a) may provide by its terms that it will be automatically and unconditionally released and discharged upon:

(1)    (with respect to any Guarantee created after the Closing Date) the release by the holders of the Company's or the Guarantor's Debt described in Section 4.21(a), of their guarantee by such Restricted Subsidiary (including any deemed release upon payment in full of all obligations under such Debt other than as a result of payment under such guarantee), at a time when:

(i)    no other Debt of the Company or any Guarantor has been guaranteed by such Restricted Subsidiary; or

(ii)    the holders of all such other Debt that is guaranteed by such Restricted Subsidiary also release their guarantee by such Restricted Subsidiary (including any deemed release upon payment in full of all obligations under such Debt other than as a result of payment under such guarantee); or

(2)    the release of the Guarantees on the terms and conditions and in the circumstances described under Section 11.05.

Section 4.22    Sanctions.

The Issuers will not, and will not permit any Guarantor to (i) cause itself or any of its Subsidiaries to be located, organized or resident in a country or territory that is the subject of comprehensive country-wide Sanctions if such activity would be a violation if undertaken by an Issuer, any Guarantor, the Trustee, a Holder or beneficial owner of the Notes or (ii) directly or indirectly, enter into any dealings or transactions, including, without limitation, a transaction with any Sanctioned Entity that at the time of the dealing or transaction is or was a Sanctioned Entity, that in any manner would reasonably be expected to result in the Trustee or any Holder or beneficiary owner of the Notes being in breach of any Sanctions or becoming a Sanctioned Entity.

Section 4.23    Limitation on Issuances and Sales of Capital Stock of Restricted Subsidiaries.

(a)    The Company will not sell or otherwise dispose of, and will not permit any Restricted Subsidiary (other than as permitted under Section 4.13), directly or indirectly, to issue or sell, any shares of Capital Stock of a Restricted Subsidiary (including options, warrants or other rights to purchase shares of such Capital Stock).

(b)    The foregoing clause (a), however, will not apply to:

(1)    any issuance or sale of shares of Capital Stock of a Restricted Subsidiary to the Company or a Wholly Owned Restricted Subsidiary;

Doc#: US1:12095985v22

(2)     any issuance or sale to directors of directors' qualifying shares or issuances or sales of shares of Capital Stock of a Restricted Subsidiary to be held by third parties, in each case to the extent required by applicable law;

(3)     any issuance or sale of shares of Capital Stock of a Restricted Subsidiary made in compliance with Section 4.10 and Section 4.11, as applicable; *provided* the net proceeds of any such issuance or sale of shares of Capital Stock are applied in accordance with Section 4.10 and Section 4.11, as applicable;

(4)     any issuance or sale of shares of Capital Stock of a Restricted Subsidiary if, immediately after giving effect to such issuance or sale, such Restricted Subsidiary would no longer constitute a Restricted Subsidiary and any remaining Investment in such Person would have been permitted to be made under Section 4.07 if made on the date of such issuance or sale; or

(5)     Capital Stock issued by a Person prior to the time:

(i)     such Person becomes a Restricted Subsidiary;

(ii)     such Person consolidates or merges with or into a Restricted Subsidiary; or

(iii)     a Restricted Subsidiary consolidates or merges with or into such Person;

but only if such Capital Stock was not issued or Incurred by such Person in anticipation of it becoming a Restricted Subsidiary.

Section 4.24   Limitations on Layering Debt.

The Company will not, and will not permit Eletson MI, Eletson Finance or any Guarantor to, directly or indirectly, incur any Debt that is or purports to be by its terms (or by the terms of any agreement governing such Debt) subordinated in right of payment to any other Debt of the Company, Eletson MI, Eletson Finance or of such Guarantor, as the case may be, unless such Debt is also by its terms (or by the terms of any agreement governing such Debt) made expressly subordinate in right of payment to the Notes or the Guarantee of such Guarantor, to the same extent and in the same manner as such Debt is subordinated to such other Debt of the Company, Eletson MI, Eletson Finance or such Guarantor, as the case may be.

For purposes of the foregoing, no Debt will be deemed to be subordinated in right of payment to any other Debt of the Company, Eletson Finance or any Guarantor solely by virtue of being unsecured or secured by a Permitted Lien or by virtue of the fact that the holders of such Debt have entered into intercreditor agreements or other arrangements giving one or more of such holders priority over the other holders in the collateral held by them or other payments among them.

Doc#: US1:12095985v22

Section 4.25    Substitution of a Qualified Vessel or Qualified Collateral; Designation as Mortgaged Vessel.

(a)    On the date on which a Vessel which is required to be designated as a "Mortgaged Vessel" is acquired by an Issuer or a Restricted Subsidiary (whether through the direct purchase of such Vessel or the equity interests of any person owning such Vessel) (such date, a "Vessel Tender Date"), if a Restricted Subsidiary of the Issuers is the owner of such Vessel (the "Tendered Vessel Owner"), it shall execute a Guarantee of the Notes and become a Guarantor under this Indenture and it (or an Issuer if such Issuer is the owner of such Vessel) shall deliver to the Trustee the documents and certificates required by this Indenture and the Security Documents, including, among other things: (i) a Ship Mortgage with respect to such Vessel dated the Vessel Tender Date (or as soon as practicable thereafter and in no event later than the 10th Business Day following the date on which the relevant Trust Monies were released to the Company or the applicable Guarantor) and substantially in the form attached as an exhibit to this Indenture or otherwise in a customary form for the relevant jurisdiction (such Ship Mortgage having been duly tendered for recording in the appropriate registry office); (ii) an Assignment of Freights and Hires and Assignment of Insurance with respect to such Vessel dated the Vessel Tender Date and substantially in the forms required by this Indenture; (iii) the certificate of an Independent Appraiser dated not more than 30 days prior to the Vessel Tender Date setting forth its determination of the Appraised Value of such Vessel as of the date of such certificate; (iv) a report of an insurance broker with respect to insurance policies maintained by the Tendered Vessel Owner with respect to such Vessel; (v) a current certificate from the American Bureau of Shipping, Det Norske Veritas or Lloyds Register of Shipping or other classification society of recognized international standing for such Vessel, which shall be free from any material recommendations; (vi) a certificate of ownership and encumbrances from the official registry of such Vessel; (vii) evidence to the effect that all Debt outstanding with respect to such Vessel has been repaid and that all security granted by, or covering assets or property of, such Issuer or any of the Restricted Subsidiaries with respect to such Debt shall have been released or that such Debt is permitted under Section 4.09; (viii) an Officers' Certificate; and (ix) Opinions of Counsel reasonably acceptable to the Trustee with respect to the enforceability of the documents executed and delivered and the grant and perfection of security interests in such Vessel or Qualified Collateral and Related Assets and general customary corporate matters.

(b)    The Issuers or any Guarantor may at its option, at any time and from time to time, substitute Qualified Collateral for a Mortgaged Vessel or Mortgaged Vessels (including without limitation in connection with any refinancing transaction); *provided* that (i) at the time of such substitution no Default or Event of Default shall have occurred and be continuing; (ii) such substitution shall comply with the provisions described under Section 4.25(a); and (iii) such substitution shall have been consented to by Holders of not less than a majority in aggregate principal amount of the Notes then outstanding.

Section 4.26    Change of Flag.

Neither the Issuers nor a Guarantor may transfer or change the flag of any of its Mortgaged Vessels other than to the flag of a Permitted Flag Jurisdiction and in connection therewith the Trustee shall release the existing Ship Mortgage and related Security Documents to which any Mortgaged Vessel is subject in connection with the transfer or change of the flag of

Doc#: US1:12095985v22

such Mortgaged Vessel to another Permitted Flag Jurisdiction if (i) the owner of the Mortgaged Vessel has executed (A) a new Ship Mortgage (granting the Trustee a first-priority security interest in such Mortgaged Vessel subject only to Permitted Liens) and (B) the related Security Documents with respect to such Mortgaged Vessel, dated the date such Mortgaged Vessel shall be released from the existing Ship Mortgage and related Security Documents to which it is subject, which Ship Mortgage and related Security Documents shall be in appropriate form for recording or registration in the appropriate governmental offices of the Permitted Flag Jurisdiction under which it is being reflagged and the appropriate governmental offices in the jurisdiction of incorporation and/or domicile of the applicable Issuer or Guarantor if required by applicable law in order to perfect the first-priority security interests therein created, as to which the Trustee will be entitled to rely on an Opinion of Counsel to the Company with respect thereto; and (ii) the Guarantor has made arrangements for recording the Ship Mortgage referred to in clause (i) above in the appropriate registry office of the Permitted Flag Jurisdiction under which the Mortgaged Vessel is being reflagged as soon as reasonably practicable and to make any other filing necessary to perfect the security therein.

Section 4.27   Additional Amounts.

(a)      All payments made by either Issuer under or with respect to the Notes or by any Guarantor under or with respect to a Guarantee will be made free and clear of and without withholding or deduction for or on account of any present or future taxes, duties, levies, imposts, assessments or governmental charges of whatever nature, and any interest, additions to tax, penalties and other liabilities with respect thereto (collectively, "Taxes") imposed or levied by any jurisdiction (i) in which such Issuer or Guarantor is organized or resident for tax purposes or (ii) from or through which such payments are made or, in each case, any political subdivision or authority thereof or therein having the power to tax (each, a "Relevant Taxing Jurisdiction") unless such Issuer or Guarantor (or a paying agent of such Issuer or Guarantor) is required to withhold or deduct such Taxes by law.  In the event that an Issuer or any Guarantor or a paying agent of an Issuer or any Guarantor is required by law to withhold or deduct any amount for or on account of any Taxes imposed by a Relevant Taxing Jurisdiction in respect of any payment made by such Issuer or Guarantor or such paying agent under or with respect to the Notes or any Guarantee, the Issuers or such Guarantor, as the case may be, will pay such additional amounts ("Additional Amounts") as may be necessary so that the net amount received by each Holder of the Notes after such withholding or deduction (including any withholding or deduction attributable to Additional Amounts) will be not less than the amount that such Holder would have received if such Taxes had not been required to be withheld or deducted.

(b)      Notwithstanding the foregoing, neither Issuer nor any Guarantor will have any obligation to pay Additional Amounts under or with respect to any Note or any Guarantee in respect or on account of:

(1)      any Taxes that are imposed or levied by a Relevant Taxing Jurisdiction by reason of the relevant Holder's or any beneficial owner's present or former connection with such Relevant Taxing Jurisdiction (including citizenship, nationality, residence, domicile, or existence of a business, a permanent establishment, a place of business or a place of management in the Relevant Taxing Jurisdiction), other than any connection arising solely from the acquisition or ownership of a Note, or the

104

receipt of any payment due under, or the enforcement of, the Notes or any Guarantee ("Other Connection Taxes");

(2)      any Taxes that are imposed or withheld by reason of the failure of the Holder or any beneficial owner of any Note, prior to the relevant date on which a payment under and with respect to the Notes is due and payable (the "Relevant Payment Date") to comply with the Issuers' written request addressed to the Holder at least 30 days prior to the Relevant Payment Date to provide accurate information with respect to any certification, identification, information or other reporting requirements concerning nationality, residence, identity or connection with the Relevant Taxing Jurisdiction which the Holder or such beneficial owner is legally required to satisfy, whether imposed by statute, treaty, regulation or administrative practice, in each such case by the Relevant Taxing Jurisdiction, as a precondition to exemption from, or reduction in the rate of deduction or withholding of, Taxes imposed by the Relevant Taxing Jurisdiction (including, without limitation, a certification that the Holder or beneficial owner is not resident in the Relevant Taxing Jurisdiction), but, in each case, only to the extent that the Holder or beneficial owner is legally eligible to provide such certification or other evidence or comply with any such reporting requirement;

(3)      any estate, inheritance, gift, sales, transfer or similar Taxes;

(4)      any Tax that is payable other than by deduction or withholding in respect of payments made by either Issuer or any Guarantor under or with respect to any Note or any Guarantee;

(5)      any Tax which would not have been so imposed but for the presentation (where presentation is permitted or required in order to receive payment) by the Holder of a Note for payment on a date more than 30 days after the date on which such payment becomes due and payable or the date on which payment thereof is duly provided for, whichever occurs later, except to the extent that the Holder would have been entitled to such Additional Amounts on presenting the same for payment on any day (including the last day) within such 30-day period;

(6)      any withholding or deduction in respect of any Taxes where such withholding or deduction is imposed in respect of a payment to a Holder or beneficial owner and is required to be made pursuant to the European Council Directive 2003/48/EC or any other directive implementing the conclusions of the ECOFIN Council meetings of 26 and 27 November 2000 or any law implementing or complying with, or introduced in order to conform to, any such directive;

(7)      any Tax that is imposed in respect of a Note presented for payment where such withholding or deduction could have been avoided by presenting a Note for a payment to, or otherwise requesting payment from, another Paying Agent in a Member State of the European Union; or

(8)      any United States federal Tax imposed or required to be deducted or withheld under or as a result of (i) Sections 1471 through 1474 of the U.S. Internal

Doc#: US1:12095985v22

Revenue Code of 1986, as amended from time to time (the "Code"), and any regulations or other official interpretations thereof, (ii) any agreements entered into pursuant to Section 1471(b)(1) of the Code, (iii) any intergovernmental agreement entered into by the United States and any other jurisdiction in connection with the implementation of Sections 1471 through 1474 of the Code and any treaty, law, regulation or other official interpretation or guidance ratified, enacted or promulgated in any other jurisdiction with respect to any such intergovernmental agreement or otherwise in connection with the implementation of Sections 1471 through 1474 of the Code, and (iv) any agreements entered into with any governmental authority or other tax authority pursuant to any authority described in clause (iii).

In addition, Additional Amounts will not be payable with respect to any Taxes that are imposed in respect of any combination of the above items.

(c)    The relevant Issuer or Guarantor will make or cause to be made any such withholding or deduction of Taxes required by law and will remit the full amount of Taxes so deducted or withheld to the relevant taxing authority in accordance with all applicable laws.  The Issuers will, upon request, make available to the Trustee, within 30 days after the date on which the payment of any Taxes so deducted or withheld is due pursuant to applicable law, certified copies of tax receipts evidencing such payment by the Issuers.  Such copies shall be made available to the Holders upon request.

(d)    At least 30 days prior to each date on which any payment under the Notes is due and payable, if the Issuers or a Guarantor will be obliged to pay Additional Amounts with respect to such payment (unless such obligation to pay Additional Amounts arises after the 30th day prior to the date on which payment under or with respect to the Notes is due and payable, in which case it will be promptly thereafter), the Issuers or such Guarantor will deliver to the Trustee an Officers' Certificate stating that such Additional Amounts will be payable and the amounts so payable and setting forth such other information as is necessary to enable such Trustee or paying agent to pay such Additional Amounts to the Holders on the payment date.

(e)    In addition, the Issuers or the Guarantors will pay any present or future stamp, issue, registration, transfer, documentation, court, excise or property Taxes or other similar Taxes (other than any Other Connection Taxes) that arise in any Relevant Taxing Jurisdiction from the execution, issuance, delivery, enforcement of, registration, redemption or retirement of, or receipt of payments by either Issuer or any Guarantor under or with respect to, the Notes, this Indenture or the Guarantees, and the Issuers agree to indemnify the Holders for any such Taxes paid by such Holders.

(f)    The foregoing provisions will survive any termination, defeasance or discharge of this Indenture and will apply *mutatis mutandis* to any jurisdiction in which any Surviving Entity or successor Person to an Issuer or a Guarantor is organized or resident for tax purposes or from or through which such successor makes any payment on the Notes or any Guarantee and, in each case, any political subdivision or taxing authority or agency thereof or therein.

Doc#: US1:12095985v22

Section 4.28    Further Assurances.

Each Issuer shall, and shall cause any Guarantor to, at its sole cost and expense:

(a)    execute and deliver all such agreements and instruments and take all further action as the Trustee shall reasonably request (A) to more fully or accurately describe the property intended to be Collateral or the obligations intended to be secured by this Indenture and the Security Documents and (B) to continue and maintain the Trustee's perfected security interest in the Collateral; and

(b)    file any such notice filings or other agreements or instruments as may be reasonably necessary or desirable under applicable law to perfect, continue and maintain the Liens created by this Indenture and the Security Documents.

Section 4.29    Certain Newbuilding Vessels.

(a)    The Company shall use all commercially reasonable efforts to cause the BoComm Guarantee Subordination to occur by June 30, 2018.  If the BoComm Guarantee Subordination has not occurred by June 30, 2018, holders of at least a majority in aggregate principal amount of the Notes may provide the Company with written notice, which notice may request that the Company monetize the charters with respect to one or both of the BoComm Vessels (the "Specified BoComm Vessels").  The Company shall, not later than the 105th day after receipt of such notice, cause a BoComm Charter Disposal to occur with respect to each Specified BoComm Vessel.

(b)    With respect to each Cosco Vessel, not later than the earlier to occur of (x) the delivery date of such Cosco Vessel and (y) November 15, 2018 (or such later date as may be approved by the Holders of a majority in principal amount of the outstanding Notes), the Company shall cause a Cosco Charter Disposal to occur with respect to such Cosco Vessel.

(c)    Not later than the fifth Business Day after the date the aggregate amount of Charter Disposal Proceeds exceeds $2.5 million, the Issuers shall make an offer to purchase (a "Charter Disposal Proceeds Offer") from all Holders, in accordance with the procedures set forth in this Indenture such amount of the Notes, up to the Applicable PIK Notes Amount, that may be purchased with the aggregate Charter Disposal Proceeds. The offer price as to each Note will be payable in cash in an amount equal to 100% of the principal amount of such Note plus accrued and unpaid interest, if any, to the date of purchase.  The Issuers may, at their option, use Charter Disposal Proceeds to make a Charter Disposal Proceeds Offer prior to the date such Charter Disposal Proceeds exceed $2.5 million.

(d)    Pending application in a Charter Disposal Proceeds Offer, the Issuers shall deposit in the Collection Account all Charter Disposal Proceeds from any Charter Disposal that in the aggregate do not exceed $2.5 million.

(e)    If the aggregate principal amount of Notes validly tendered and not withdrawn by Holders thereof exceeds the aggregate amount of such Charter Disposal Proceeds, the Notes to be purchased will be selected by the Trustee on a pro rata basis (based upon the principal amount of Notes tendered by each Holder). Upon completion of such Charter Disposal

107

Proceeds Offer, any remaining Charter Disposal Proceeds shall become Excess Proceeds for purposes of Section 4.10. The Available Amount with respect to any Charter Disposal may be used for general corporate purposes that are not otherwise prohibited by this Indenture and shall not constitute Excess Proceeds.

(f)     If the Issuers are obliged to make a Charter Disposal Proceeds Offer, the Issuers will offer to purchase the Notes in whole or in part in a minimum amount that is an integral multiple of $1.00, on a date that is not earlier than 30 days and not later than 60 days from the date the notice of the Charter Disposal Proceeds Offer is given to such holders, or such later date as may be required under the Exchange Act.

(g)     If the Issuers are required to make a Charter Disposal Proceeds Offer, the Issuers will comply with the applicable tender offer rules, including Rule 14e-1 under the Exchange Act and any other applicable securities laws and regulations, including the requirements of any applicable securities exchange on which Notes are then listed. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.29, the Issuers will comply with such securities laws and regulations and will not be deemed to have breached its obligations described in this Section 4.29 by virtue thereof.

Section 4.30    Retention of Initial Advisor; Retention of Back-Up Manager.

(a)     From and after the Closing Date, the Company and Eletson MI shall continuously retain an Initial Advisor, and the Company shall provide the Requisite Holder Designee and its representatives with reasonable opportunity to consult with such Initial Advisor. If an Initial Advisor ceases to be retained pursuant to this Section 4.30(a), the Company shall, as promptly as practicable (but not later than the fifth Business Day thereafter) retain a new financial advisory firm to act as Initial Advisor (which firm shall satisfy the qualifications set forth in the definition of "Initial Advisor"). The Initial Advisor will render certain monitoring and reporting services, including: (a) assisting the Company and the Eletson MI Parties in its monitoring of the cash and operating performance (including management fees and general and administrative expenses) of the Company and the Eletson MI Parties, (b) periodic reporting to the Holders, (c) reviewing the Company's and the Eletson MI Parties' short term cash flow forecast as provided by the Company including intra-month requirements, key assumptions and sensitivities around receivables, payables, potential creditor stretch and capital expenditure obligations, (d) providing high level comments around the Company and the Eletson MI Parties' cash flow forecasting accuracy and sensitivities, and forecast liquidity shortfall in the Company's and the Eletson MI Parties' short term cash flow forecast, (e) providing high level comments on intercompany transactions and cash flows within the Company and the Eletson MI Parties and their Affiliates, (f) providing high level review of the Company's and the Eletson MI Parties' trading projections, and (g) assisting management in preparation of required reporting pursuant to this Indenture and discussing reports with Holders as appropriate along with the Company.

(b)     From and after the Closing Date, the Company shall continuously retain a Back-Up Manager. Upon an Event of Default, the Back-Up Manager shall provide certain interim management duties to the Eletson MI Parties. If a Back-Up Manager ceases to be retained pursuant to Section 4.30(b), the Company or Eletson MI, as applicable, shall, as promptly as practicable (but not later than the fifth Business Day thereafter) retain a new

financial advisory firm to act as Back-Up Manager (which firm shall satisfy the qualifications set forth in the definition of "Back-Up Manager"). Upon an Event of Default under this Indenture, the Back-Up Manager shall take all instructions from the Holders and/or the Trustee (as directed by the Holders in writing) and shall not take any instructions from the Company. The duties of the Back-Up Manager shall be: (a) serving as interim management of the Eletson MI Parties, (b) running a process to outsource technical and commercial management of the Eletson MI Parties and their assets, (b) initiating, if instructed, the liquidation of any or all of the assets of the Eletson MI Group, and (c) any other services agreed with the Company's Board of Directors.

Section 4.31    Cash Segregation, Specified Accounts and Lock-Box Collection Account

(a)    Each Eletson MI Party will cause, as received, all Collections to be deposited in a deposit account of such Eletson MI Party in which the Trustee will have a first priority security interest (a "Specified Account").

(b)    The Company will establish and maintain a segregated trust account designated as the "Collection Account" for the benefit of the Holders under this Indenture. Any amounts held in a Specified Account shall be automatically transferred on a daily basis, at the end of each calendar day, to the Collection Account.

(c)    The Company may withdraw available amounts on deposit in the Collection Account to make the following payments and deposits:

(i)    on a daily basis, as necessary, to the extent of amounts deposited to the Collection Account that the Company determines were required to be deposited to another account or were deposited to the Collection Account in error;

(ii)    as necessary, to pay any agreed-upon allocation of corporate overhead (including, without limitation, amounts paid pursuant to Section 4.07(c)(10)) ("Overhead Expenses"), as approved by the Initial Advisor for each such period in its reasonable judgment that are due and payable; provided, that the amount paid in respect of such Overhead Expenses (other than Excluded Expenses) shall not exceed $1.75 million in any fiscal quarter, and any unused portion of such amount up to $1.0 million may be paid in the immediately subsequent fiscal quarter;

(iii)    as necessary, to pay any costs or expenses related to operation and maintenance of the Mortgaged Vessels ("Operating Expenses"), and dry-docking expenses, special survey expenses and Vessel Addition Expenses relating to the Mortgaged Vessels, each as approved by the Initial Advisor for each such period in its reasonable judgment that are due and payable; and

(iv)    to pay any installments of interest or principal on the Notes that are due and payable.

(d)    Notwithstanding anything to the contrary in this Indenture, while the Notes are outstanding, no cash shall be released from the Specified Accounts or the Collection Account except as provided above.

(e)      The Issuers will not, and will not permit their Restricted Subsidiaries to, directly or indirectly, make any payment made in connection with the purchase or financing of a Newbuilding Vessel (including by means of a bareboat charter or other arrangement).

Section 4.32    Excess Cash Flow Offer

(a)      Upon the availability of internal financial statements of the Company and its Restricted Subsidiaries for quarter ending at the end of each relevant period, (i) for the six month periods ended June 30, 2018 and December 31, 2018 and (ii) for each fiscal quarter ending on or after March 31, 2019 (each such period described in clauses (i) and (ii), an "Excess Cash Flow Period"), the Company shall determine the Excess Cash Flow Offer Amount for such Excess Cash Flow Period.

(b)      To the extent that the Excess Cash Flow Offer Amount for an Excess Cash Flow Period is positive, the Company shall, as promptly as practicable after the end of such Excess Cash Flow Period and not later than five Business Days after the availability of internal financial statements, make an offer (an "Excess Cash Flow Offer") to the Holders of the Notes to repurchase all or any part (equal to $1.00 or integral multiples of $1.00 in excess thereof, or if a PIK Payment has been made, equal to an integral multiple of $1.00) of each Holder's Notes at the purchase price described below; provided, that the maximum aggregate price payable in any Excess Cash Flow Offer will not exceed the applicable Excess Cash Flow Offer Amount.

(c)      If the Company is required to make an Excess Cash Flow Offer as provided in this Section 4.32, the Company will mail within five Business Days after the end of each Excess Cash Flow Period, an offer to each Holder, with a copy to the Trustee, which offer shall govern the terms of the Excess Cash Flow Offer. Such offer shall state, among other things, the repurchase date, which must be no earlier than 30 days nor later than 60 days from the date such offer is mailed, other than as may be required by law (the "Excess Cash Flow Offer Payment Date").

(d)      If only a portion of a Note is purchased pursuant to an Excess Cash Flow Offer, a new Note in a principal amount equal to the portion thereof not purchased will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made). Notes (or portions thereof) purchased pursuant to an Excess Cash Flow Offer will be cancelled and cannot be reissued.

(e)      In each Excess Cash Flow Offer, the Company will be required to repurchase Notes validly tendered and not withdrawn at a purchase price in cash equal to 100% of their principal amount, plus accrued and unpaid interest to, but not including, the Excess Cash Flow Offer Payment Date, subject to pro-ration in the event of oversubscription and to the right of Holders on the relevant regular record date to receive interest due on an interest payment date falling on or prior to the applicable date of repurchase.

(f)      On the Excess Cash Flow Offer Payment Date, the Company will, to the extent lawful:

(1)    accept for payment all Notes or portions of Notes properly tendered and not withdrawn pursuant to the Excess Cash Flow Offer;

(2)    deposit with the Paying Agent an amount equal to the aggregate purchase price to be paid in such Excess Cash Flow Offer in respect of Notes or portions of Notes properly tendered and not withdrawn; and

(3)    deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Company.

(g)    The Paying Agent will promptly mail or wire transfer to each holder of Notes or portions of Notes properly tendered and not withdrawn the purchase price payable with respect to such Notes or portions of Notes, and the Trustee will promptly authenticate and mail (or cause to be transferred by book-entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered. Any Note or portion of a Note accepted for payment pursuant to an Excess Cash Flow Offer will cease to accrue interest on and after the Excess Cash Flow Offer Payment Date. The Company will publicly announce the results of any Excess Cash Flow Offer on or as soon as practicable after the Excess Cash Flow Offer Payment Date.

(h)    The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws and regulations are applicable in connection with the repurchase of Notes pursuant to an Excess Cash Flow Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions this Section 4.32, the Company shall comply with the applicable securities laws and regulations and shall not be deemed to have breached their obligations under this Section 4.32 by virtue of such compliance.

Section 4.33    Limitation on Business Activities of Eletson MI; Independent Directors

(a)    Eletson MI shall not hold any material assets, become liable for any material obligations, engage in any trade or business, or conduct any business activity, other than (i) the issuance of its common interests to the Company, (ii) the issuance of the Eletson MI Preferred Interests, (iii) the incurrence of Debt in respect of the Notes that is permitted to be incurred by it under the covenant described under Section 4.09, (iv) entering into and carrying out the actions contemplated by the Consulting Agreement, (v) the ownership of the Guarantors and (vi) activities incidental to any of the foregoing.  Eletson MI (i) shall not dissolve or wind-up and shall at all times maintain its existence as a Marshall Islands Limited Liability Company, (ii) shall not reincorporate or redomicile in another jurisdiction, (iii) shall not merge or consolidate with or transfer all or substantially all of its assets to, any other Person and (iv) shall not incur any Debt other than in respect of Notes or issue any equity interests (other than common interests issued to the Company that are pledged as Collateral and Eletson MI Preferred Interests). Eletson MI shall at all times have at least two independent managers on its board of managers. The Company shall at all times have at least two independent directors on its board of directors.

111

(b)     Upon the occurrence of an acceleration of the Notes, the Holders of the Notes shall become entitled to receive, on a pro rata basis based on aggregate outstanding principal amount, the Eletson MI Preferred Interests and the Company Preferred Interests, and the Trustee shall distribute the Eletson MI Preferred Interests and the Company Preferred Interests to Holders of record of the Notes at such time. Upon the discharge of this Indenture due to the payment in full in cash of the Notes, the Eletson MI Preferred Interests and the Company Preferred Interests shall be transferred to the Company.

Section 4.34    <u>Minimum Aggregate Liquidity</u>

Eletson MI shall not permit its Aggregate Liquidity as of any Interest Payment Date to be less than (x) $1,000,000 times (y) the number of Mortgaged Vessels that as of such date have not suffered an Event of Loss, or any event or condition that given notice, the lapse of time, or both, would constitute an Event of Loss.

Section 4.35    <u>Ownership of Investments in Eletson Gas; Negative Pledge</u>

The Issuers shall not (and shall not permit any of their Subsidiaries to) own, directly or indirectly any Investments in Eletson Gas LLC or any of its Subsidiaries (collectively, the "<u>Eletson Gas Group</u>") other than Investments in the Eletson Gas Group that are owned by the Company, by Eletson MI. The Issuers will not, and will not permit any of their Subsidiaries to, create, incur, assume or otherwise cause or suffer to exist or become effective any Lien of any kind (other than Liens of the type described in clause (c) or (g) of the definition of "Permitted Liens") upon any Investment in the Eletson Gas Group that are now owned or hereafter acquired by them.

Section 4.36    <u>Limitation on Restricted Expenditures</u>

The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, pay or incur any general and administrative expenses (including any Overhead Expenses paid from the Collection Account and amounts paid pursuant <u>Section 4.07(c)(10)</u> but excluding any Excluded Expenses) in an amount exceeding $2.75 million in any fiscal quarter, and up to $1.0 million of any unused portion of such amount may be paid in the immediately subsequent fiscal quarter.

Section 4.37    <u>Liquidation of Piraeus Bank Common Stock</u>

Within 45 days after the Closing Date, the Issuers and their Restricted Subsidiaries (i) shall not, directly or indirectly, beneficially own any Investment in Piraeus Bank S.A. or its Affiliates (collectively, the "<u>Piraeus Bank Group</u>") and (ii) shall have sold all Investments in the Piraeus Bank Group that are directly or indirectly beneficially owned on or after the Closing Date by the Issuers or their Restricted Subsidiaries in one or more transactions otherwise permitted by this Indenture (including, without limitation, <u>Sections 4.10</u> and <u>4.11</u>). Following the Closing Date, the Issuers and their Restricted Subsidiaries shall not, directly or indirectly, make any additional Investments in the Piraeus Bank Group.

112

## ARTICLE 5
## SUCCESSORS

Section 5.01    <u>Merger, Consolidation or Sale of Assets</u>.

(a)    The Company will not, in a single transaction or through a series of transactions, merge, consolidate, amalgamate or otherwise combine with or into any other Person or sell, assign, convey, transfer, lease or otherwise dispose of, or take any action pursuant to any resolution passed by the Company's Board of Directors or shareholders with respect to a demerger or division pursuant to which the Company would dispose of, all or substantially all of the Company's properties and assets to any other Person or Persons, and the Company will not permit any Restricted Subsidiary to enter into any such transaction or series of transactions if such transaction or series of transactions, in the aggregate, would result in the sale, assignment, conveyance, transfer, lease or other disposition of all or substantially all of the properties and assets of the Company and the Restricted Subsidiaries on a consolidated basis to any other Person or Persons.  The previous sentence will not apply if at the time and immediately after giving effect to any such transaction or series of transactions:

(1)    either: (i) the Company will be the continuing corporation; or (ii) the Person (if other than the Company) formed by or surviving any such merger, consolidation, amalgamation or other combination or to which such sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company and the Restricted Subsidiaries on a consolidated basis has been made (the "<u>Surviving Entity</u>"):

(x)    (i) will be a corporation duly incorporated and validly existing under the laws of any Eligible Jurisdiction and (ii) will be, immediately after such merger, consolidation, amalgamation or other combination or sale, assignment, conveyance, transfer, lease or disposition, permitted to make all payments under or with respect to the Notes free and clear of, and without withholding or deduction for or on account of, any Taxes, imposed or levied by any Relevant Taxing Jurisdiction; and

(y)    will expressly assume, by a supplemental indenture or other agreements in forms satisfactory to the Trustee, the Company's obligations under the Notes, this Indenture and the Security Documents, and the Notes, this Indenture and the Security Documents will remain in full force and effect as so supplemented;

(2)    immediately after giving effect to such transaction or series of transactions on a *pro forma* basis (and treating any obligation of the Company or any Restricted Subsidiary Incurred in connection with or as a result of such transaction or series of transactions as having been Incurred by the Company or such Restricted Subsidiary at the time of such transaction), no Default or Event of Default will have occurred and be continuing;

(3)    immediately after giving effect to such transaction or series of transactions on a *pro forma* basis (on the assumption that the transaction or series of transactions occurred on the first day of the four-quarter fiscal period immediately prior

Doc#: US1:12095985v22

to the consummation of such transaction or series of transactions with the appropriate adjustments with respect to the transaction or series of transactions being included in such *pro forma* calculation), the Company (or the Surviving Entity if the Company is not the continuing obligor under this Indenture) could Incur at least $1.00 of additional Debt pursuant to the ratio set forth in Section 4.09(a);

(4)    any Guarantor, unless it is the other party to the transactions described above, has, by way of execution of a supplemental indenture, confirmed that its Guarantee will apply to such Person's obligations under this Indenture and the Notes;

(5)    if any of the Company's or any Restricted Subsidiary's property or assets will thereupon become subject to any Lien, the provisions of Section 4.13 are complied with; and

(6)    the Company or the Surviving Entity has delivered to the Trustee, in form and substance satisfactory to the Trustee, an Officers' Certificate (attaching the computations to demonstrate compliance with clause (3) above) and an Opinion of Counsel, each stating that such merger, consolidation, amalgamation or other combination or sale, assignment, conveyance, transfer, lease or other disposition, and if a supplemental indenture or other agreements are required in connection with such transaction, such supplemental indenture or other agreements, comply with the requirements of this Indenture and the Security Documents and that all conditions precedent in this Indenture and the Security Documents relating to such transaction have been satisfied and that this Indenture, the Notes and the Security Documents constitute legal, valid and binding obligations of the Company or the Surviving Entity, enforceable in accordance with their terms.

(b)    The Surviving Entity will succeed to, and be substituted for, and may exercise every right and power of, the Company under this Indenture but, in the case of a lease of all or substantially all of the Company's assets, the Company will not be released from the obligation to pay the principal of, premium, if any, and interest, on the Notes.

(c)    Subject to the provisions described under Section 11.05, no Guarantor will, in a single transaction or through a series of transactions, merge, consolidate, amalgamate or other combine with or into any other Person or sell, assign, convey, transfer, lease or otherwise dispose of, or take any action pursuant to any resolution passed by such Guarantor's Board of Directors or shareholders with respect to a demerger or division pursuant to which such Guarantor will dispose of, all or substantially all of such Guarantor's properties and assets to any other Person or Persons.  The previous sentence will not apply if at the time and immediately after giving effect to any such transaction or series of transactions:

(1)    such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation organized or existing under the laws of any Eligible Jurisdiction (such Guarantor or such Person, as the case may be, being herein called the "Successor Guarantor");

Doc#: US1:12095985v22

(2)      the Successor Guarantor (if other than such Guarantor) expressly assumes all the obligations of such Guarantor under its Guarantee, this Indenture and the Security Documents, pursuant to supplemental indentures and/or agreements in form reasonably satisfactory to the Trustee;

(3)      immediately after giving pro forma effect to such transaction, no Default or Event of Default exists and is continuing; and

(4)      the Guarantor or the Successor Guarantor has delivered to the Trustee, in form and substance satisfactory to the Trustee, an Officers' Certificate and an Opinion of Counsel, each stating that such merger, consolidation, amalgamation or other combination or sale, assignment, conveyance, transfer, lease or other disposition, and if a supplemental indenture or other agreements are required in connection with such transaction, such supplemental indenture or other agreements, comply with the requirements of this Indenture and the Security Documents and that all conditions precedent in this Indenture and the Security Documents relating to such transaction have been satisfied and that this Indenture, the Guarantee and the Security Documents constitute a legal, valid and binding obligation of the Guarantor or Successor Guarantor, enforceable in accordance with its terms.

(d)      The Successor Guarantor will succeed to, and be substituted for, and may exercise every right and power of, the relevant Guarantor under this Indenture, but, in the case of a lease of all or substantially all of the Guarantor's assets, the Guarantor will not be released from the obligation to pay the principal of, premium, if any, and interest, on the Guarantor.

(e)      Nothing in this Indenture will prevent: (i) any Restricted Subsidiary that is not a Guarantor from consolidating with, merging into or transferring all or substantially all of its properties and assets to the Company, a Guarantor or any other Restricted Subsidiary that is not a Guarantor; or (ii) any Guarantor from merging into or transferring all or part of its properties and assets to the Company or another Guarantor.

## ARTICLE 6
## DEFAULTS AND REMEDIES

Section 6.01    Events of Default.

(1)      Each of the following is an "Event of Default":

(a)      default for 30 days in the payment when due of any interest or any Additional Amounts on any Note;

(b)      default in the payment of the principal of or premium, if any, on any Note at its Maturity (upon acceleration, optional or mandatory redemption, if any, required repurchase or otherwise);

(c)      failure to comply with the provisions of Section 5.01;

115

(d)      (i) failure to make or consummate an Excess Proceeds Offer in accordance with the provisions of <u>Section 4.10</u>; (ii) failure to make or consummate a Collateral Sale Offer in accordance with the provisions of <u>Section 4.11</u>; (iii) failure to make or consummate an Event of Loss Offer in accordance with the provisions of <u>Section 4.17</u>; (iv) failure to make or consummate a Change of Control Offer in accordance with the provisions of <u>Section 4.16</u>; (v) failure to make or consummate an Excess Cash Flow Offer in accordance with the provisions <u>Section 4.32</u>; (vi) failure to comply with the provisions of <u>Section 4.31</u>;  (vii) failure to comply with <u>Section 4.34</u>; (viii) failure to comply with clause (f) of <u>Section 4.09</u>; (ix) failure to comply with <u>Section 4.33</u>; (x) failure to comply with the provisions of <u>Section 4.30</u>; (xi) failure to complete an Existing Trust Monies Offer in accordance with the provisions of <u>Section 4.19</u>; or (xii) failure to complete a Charter Disposal in the time frame allotted or failure to complete a Charter Disposal Proceeds Offer, in each case, in accordance with the provisions of <u>Section 4.29</u>; provided that, (A) an Event of Default under clause (vi) shall not occur until such failure to comply continues for five Business Days after the date of such failure to comply, and (B) an Event of Default under clause (vii) shall not occur until such failure to comply continues for ten Business Days after the date of such failure to comply;

(e)      failure to comply with any covenant or agreement of an Issuer or of any Restricted Subsidiary that is contained in this Indenture, the Notes, any Guarantee or any Security Document (other than specified in clause (a), (b), (c), or (d) above) and such failure continues for a period of 30 consecutive days or more after notice has been given to the Company by the Trustee or to the Company and a Responsible Officer of the Trustee by the Holders of at least 25% in aggregate principal amount of the Notes then outstanding specifying the default and demanding compliance;

(f)      default under the terms of any instrument evidencing or securing the Debt of the Company or any Restricted Subsidiary having an outstanding principal amount in excess of $10.0 million individually or in the aggregate, if that default:

(x)      results in the acceleration of the payment of such Debt; or

(y)      is caused by the failure to pay such Debt at final maturity thereof after giving effect to the expiration of any applicable grace periods (and other than by regularly scheduled required prepayment) and such failure to make any payment has not been waived or the final maturity of such Debt has not been extended;

(g)      any Guarantee ceases to be, or shall be asserted in writing by any Guarantor, or any Person acting on behalf of any Guarantor, not to be in full force and effect or enforceable in accordance with its terms (other than as provided for in this Indenture or any Guarantee);

(h)      one or more final judgments, orders or decrees (not subject to appeal and not covered by insurance issued by a solvent insurance carrier and to the extent such carrier has not disaffirmed liability) shall be rendered against the Company or any Restricted Subsidiary either individually or in an aggregate amount, in each case in excess of $10.0 million, and either a creditor shall have commenced an enforcement proceeding upon such judgment, order or decree or there shall have been a period of 30 consecutive days or more during which a stay of

116

enforcement of such judgment, order or decree was not (by reason of pending appeal or otherwise) in effect;

(i)     the occurrence of any "event of default" as defined under any Security Document or (x) any of the Security Documents ceases to be, or shall be asserted in writing by any Issuer or Guarantor, or any Person acting on behalf of any Issuer or Guarantor, not to be in full force and effect or (y) any of the security interests, the Liens, rights, powers and privileges created or purported to be created by the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby (other than by operation of the provisions of the Security Documents or this Indenture, by operation of law);

(j)     either Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(i)     commences a voluntary case,

(ii)     consents to the entry of an order for relief against it in an involuntary case,

(iii)     consents to the appointment of a custodian of it or for all or substantially all of its property,

(iv)     makes a general assignment for the benefit of its creditors, or

(v)     generally is not paying its debts as they become due; and

(k)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)     is for relief against either Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary in an involuntary case;

(ii)     appoints a custodian of either Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary or for all or substantially all of the property of either Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary; or

(iii)     orders the liquidation of either Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries of the Company that, taken together, would constitute a Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days; and

117

(l)      the Consulting Agreement ceases to be in full force and effect (other than a termination in accordance with the provisions of the Consulting Agreement).

Section 6.02    Acceleration.

(a)      If an Event of Default (other than as specified in clauses (j) or (k) of Section 6.01) occurs and is continuing, the Trustee or the Holders of not less than 25% in aggregate principal amount of the Notes then outstanding by written notice to the Issuers (and to the Trustee if such notice is given by the Holders) may, and the Trustee, upon the written request of such Holders, shall, declare the principal of, premium, if any, any Additional Amounts and accrued interest on all of the outstanding Notes immediately due and payable, and upon any such declaration all such amounts payable in respect of the Notes will become immediately due and payable.

(b)      If an Event of Default specified in clause (j) or (k) of Section 6.01(1) occurs and is continuing, then the principal of, premium, if any, Additional Amounts and accrued and unpaid interest on all of the outstanding Notes shall become and be immediately due and payable without any declaration or other act on the part of the Trustee or any holder of Notes.

(c)      At any time after a declaration of acceleration under this Indenture, but before a judgment or decree for payment of the money due has been obtained by the Trustee, the Holders of a majority in aggregate principal amount of the outstanding Notes, by written notice to the Issuers and the Trustee, may rescind such declaration and its consequences if:

(1)      the Issuers have paid or deposited with the Trustee a sum sufficient to pay:

(i)      all overdue interest and Additional Amounts on all of the Notes then outstanding;

(ii)      all unpaid principal of and premium, if any, on any outstanding Notes that has become due otherwise than by such declaration of acceleration and interest thereon at the rate borne by the Notes;

(iii)      to the extent that payment of such interest is lawful, interest upon overdue interest and overdue principal at the rate borne by the Notes; and

(iv)      all sums paid or advanced by the Trustee under this Indenture and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel;

Doc#: US1:12095985v22

(2)      the rescission would not conflict with any judgment or decree of a court of competent jurisdiction; and

(3)      all Events of Default, other than the non-payment of amounts of principal of, premium, if any, and any Additional Amounts and interest accrued on the Notes that have become due solely by such declaration of acceleration, have been cured or waived.

No such rescission shall affect any subsequent default or impair any right consequent thereon.

(d)      If an acceleration occurs, the principal amount of, premium, if any, and accrued interest on Notes that become due and payable shall equal the optional redemption price in effect on the date of such acceleration, as if such acceleration were an optional redemption of the Notes accelerated on such date of acceleration. The amounts described in the preceding sentence are intended to be liquidated damages and not unmatured interest or a penalty.

Section 6.03    Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.04    Waiver of Past Defaults.

Subject to 6.02(c), the Holders of not less than a majority in aggregate principal amount of the outstanding Notes may, on behalf of the Holders of all of the Notes, waive any past defaults under this Indenture, except a default (x) in the payment of the principal of, premium, if any, and Additional Amounts or interest on any Note; or (y) in respect of a covenant or provision which under this Indenture cannot be modified or amended without the consent of the holder of each Note outstanding, in which case, the consent of each affected holder of then outstanding Notes shall be required. Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    Control by Majority.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or Collateral Agent, as applicable, or exercising any trust or power conferred on it. However, the Trustee or Collateral Agent, as applicable, may refuse to follow

119

any direction that conflicts with law or this Indenture, or the Security Documents that the Trustee or Collateral Agent, as applicable, determines may be unduly prejudicial to the rights of other Holders or that may involve the Trustee or Collateral Agent, as applicable, in personal liability or if the Holders have failed to provide the indemnity or security required by Section 7.02(g). The Trustee and the Collateral Agent may take any other action deemed proper by the Trustee and Collateral Agent, as applicable, which is not inconsistent with such direction.

Section 6.06    Limitation on Suits.

No holder of any of the Notes has any right to institute any proceedings with respect to this Indenture or any remedy thereunder unless the Holders of at least 25% in aggregate principal amount of the outstanding Notes have made a written request and offered indemnity and/or security satisfactory to the Trustee to institute such proceeding as Trustee under the Notes and this Indenture, the Trustee has failed to institute such proceeding within 30 days after receipt of such notice and the Trustee within such 30-day period has not received directions inconsistent with such written request by Holders of a majority in aggregate principal amount of the outstanding Notes. Such limitations do not, however, apply to (i) a suit instituted by a Holder for the enforcement of the payment of the principal of, premium, if any, and Additional Amounts or interest on such Note on or after the respective due dates expressed in such Note or (ii) any actions taken (A) by the Back-Up Manager in accordance with the instructions of the Holders of the Notes or its stated duties under this Indenture or (B) by the Holders of the Notes with respect to the appointment and retention of, and the performance of duties by, a Back-Up Manager.

A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder (it being understood that the Trustee does not have an affirmative duty to ascertain whether or not such actions or forbearances are unduly prejudicial to such Holders).

Section 6.07    Rights of Holders to Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder to receive payment of principal, premium, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08    Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(1)(a) or (b) occurs and is continuing, the Issuers will pay to the Trustee, for the benefit of the Holders of such Notes, the whole amount then due and payable on such Notes for the principal of, premium, if any, and interest remaining unpaid on, the Notes and interest on overdue principal and premium and, to

the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

If the Issuers fail to pay such amount forthwith, the Trustee may institute a judicial proceeding for the collection of the sums so due and unpaid, and may prosecute such proceedings to the judgment or final decree, and may enforce the same against the Issuers or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out the property of the Issuers or any other obligor upon the Notes, wherever situated.

Section 6.09    <u>Trustee May File Proofs of Claim</u>.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuers (or any other obligor upon the Notes), their creditors or their property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee and Collateral Agent and its respective agents and counsel (or their respective agents and counsel if the Trustee and Collateral Agent are different Persons), and any other amounts due the Trustee under <u>Section 7.07</u> and the Collateral Agent under <u>Section 10.10</u>.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee and Collateral Agent, its agents and counsel (or their respective agents and counsel if the Trustee and Collateral Agent are different Persons), and any other amounts due the Trustee under <u>Section 7.07</u> or the Collateral Agent under <u>Section 10.10</u> out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Doc#: US1:12095985v22

Section 6.10    Priorities.

Any money or property collected by the Trustee pursuant to this Article 6 or by the Collateral Agent pursuant to the Security Documents, or any money or other property distributable in respect of the Issuers' or the Guarantors' Obligations under this Indenture after an Event of Default, shall be applied in the following order:

*First*:  to the Trustee, the Collateral Agent, the Agents and their respective agents and attorneys for amounts due under Section 7.07 and Section 10.10, including payment of all compensation, reasonable expenses and liabilities incurred, and all advances made, by the Trustee, the Agents and the Collateral Agent and the costs and expenses of collection;

*Second*:  to Holders for amounts due and unpaid on the Notes for principal, premium, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any and interest, respectively; and

*Third*:  any surplus remaining after the payment in full in cash of all the Obligations under the Notes shall be paid to the Issuers or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.10.

Section 6.11    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by its acceptance thereof shall be deemed to have agreed, in any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.11 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.07, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

Section 6.12    Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every case the Issuers, the Trustee and the Holder shall, subject to any determination in such proceeding, be restored severally and respectively to their former positions hereunder.

Doc#: US1:12095985v22

## ARTICLE 7
## TRUSTEE

Section 7.01   Duties of Trustee.

(a)     If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(1)     the duties of the Trustee will be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture. However, the Trustee will examine the certificates and opinions to determine whether or not they conform to the form requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this paragraph does not limit the effect of Section 7.01(b);

(2)     the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

(3)     the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05.

(d)     Whether or not therein expressly so provided, every provision of this Indenture and the Security Documents that in any way relates to the Trustee is subject to this Section 7.01.

(e)     No provision of this Indenture will require the Trustee to expend or risk its own funds or incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that indemnity satisfactory to the Trustee against such risk or liability is not reasonably assured to it.

123

(f)      The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuers.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)      The Trustee agrees to accept and act upon facsimile or electronic transmission (including portable document format) of documents hereunder, it being understood that originals of such documents shall be provided to the Trustee in a timely manner.

(h)      The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder.

Section 7.02    Rights of Trustee.

(a)      The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document, but the Trustee, in its reasonable discretion, may make such further inquiry or investigation into such facts or matters as it reasonably may see fit, and if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuers, personally or by agent or attorney, and shall have reasonable access to the premises of the Issuers during normal business hours in connection with such examination in a manner not to disrupt the normal business operations of the Issuers and shall incur no liability of any kind by reason of such inquiry or investigation.

(b)      Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both.  The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel, investment bankers, accountants and other professionals and the advice of such counsel, investment bankers, accountants and other professionals or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)      The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent appointed with due care.

(d)      The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)      Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuers will be sufficient if signed by an Officer of the Company.

124

(f)     In no event shall the Trustee be responsible or liable to any Person for special, indirect, punitive, incidental or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(g)     The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any Holders unless such Holders have offered to the Trustee indemnity or security satisfactory to the Trustee against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(h)     The Trustee shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Trustee (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank of New York wire or facsimile or other wire or communication facility).

(i)     The permissive right of the Trustee to do things enumerated in this Indenture or the Security Documents shall not be construed as a mandatory duty.

Section 7.03    Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuers or any Affiliate of an Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest (as defined in the TIA) it must eliminate such conflict within 90 days or resign.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11.

Section 7.04    Trustee's Disclaimer.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Notes or the Security Documents, it shall not be accountable for the Issuers' use of the proceeds from the Notes or any money paid to the Issuers or upon the Issuers' direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication, and it assumes no responsibility for their correctness.

The Trustee shall not be responsible for and makes no representation as to the existence, genuineness, value or protection of any Collateral (except for the safe custody of Collateral in its possession and the accounting for Trust Monies actually received), for the legality, effectiveness or sufficiency of any Security Document, or for the creation, perfection, priority, sufficiency or protection of any Lien.

Section 7.05     Notice of Defaults.

(a)     If a Default or an Event of Default occurs and is continuing and is known to a Responsible Officer of the Trustee, the Trustee will mail to each Holder notice of the Default or Event of Default within 15 Business Days after its occurrence.  Except in the case of a Default or an Event of Default in the payment of principal of, premium, if any, Additional Amounts or interest on any Notes, the Trustee may withhold the giving of such notice to the Holders of such Notes if it determines that withholding the giving of such notice is in the best interests of the Holders.

(b)     The Trustee shall not be deemed to have notice or be charged with knowledge of any Default or Event of Default (other than a Default or Event of Default in the payment of interest or premium, if any, on, or the principal of, the Notes) unless a Responsible Officer of the Trustee has actual knowledge thereof or shall have received written notice thereof at its address set forth in Section 13.02 from the Issuers or any Guarantor or Holders of at least 25% in aggregate principal amount of the then outstanding Notes specifying the occurrence and nature thereof and stating that such notice is a notice of default.

Section 7.06     Reports by Trustee to Holders.

Within 60 days after each January 1 beginning with January 1, 2019, and for so long as Notes remain outstanding, the Trustee will send to the Holders of the Notes a report dated as of such reporting date, in accordance with, and to the extent required by, §313 of the TIA.

Section 7.07     Compensation and Indemnity.

(a)     The Issuers shall pay to the Trustee and Agents from time to time reasonable compensation as shall be agreed to in writing by the Issuers and the Trustee and Agents for its acceptance of this Indenture, the Security Documents and services hereunder and thereunder (it being hereby agreed that the compensation set forth in any written fee agreement between the Issuers and the Trustee and Agents shall be deemed to be reasonable).  The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust.  The Issuers shall reimburse the Trustee and Agents promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses will include the reasonable compensation, disbursements and expenses of the Trustee's agents and counsel.

(b)     The Issuers and the Guarantors will, jointly and severally, indemnify the Trustee, the Agents and their respective officers, directors and agents against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture or the Security Documents, including the costs and expenses of enforcing this Indenture against the Issuers and the Guarantors (including this Section 7.07) and defending itself against any claim (whether asserted by the Issuers, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder and in connection with the exercise or performance of any of its powers or duties (if any) hereunder or under the Security Documents,

126

except to the extent any such loss, liability or expense may be attributable to its negligence, willful misconduct or bad faith.  The Trustee will notify the Issuers promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Issuers will not relieve the Issuers or any of the Guarantors of their obligations hereunder.  The Issuers or such Guarantor will defend the claim and the Trustee will cooperate in the defense.  The Trustee may have separate counsel and the Issuers will pay the reasonable fees and expenses of such counsel. Neither the Issuers nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)     The obligations of the Issuers and the Guarantors under this Section 7.07 will survive the satisfaction and discharge of this Indenture and the termination of the Security Documents.  The obligations of the Issuers and the Guarantors to the Trustee under this Section 7.07 shall survive the resignation, removal or replacement of the Trustee to the extent that the Trustee incurred fees, reimbursable expense or indemnifiable losses, liabilities or expenses while acting as trustee hereunder before such resignation, removal or replacement.

(d)     To secure the Issuers' and the Guarantors' payment obligations in this Section 7.07 and Section 10.10, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes.  Such Lien will survive the satisfaction and discharge of this Indenture and the resignation, removal or replacement of the Trustee or Collateral Agent.

(e)     When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(1)(j) or (1)(k) occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

Section 7.08   Replacement of Trustee.

(a)     A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08 and the Issuers' receipt of written notice from the successor Trustee of such appointment.

(b)     The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuers and the Holders with thirty (30) days written notice (which notice to the Holders may be given through the Depositary).  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuers in writing.  The Issuers may remove the Trustee with thirty (30) days written notice to the Trustee if:

(1)     the Trustee fails to comply with Section 7.10;

(2)     the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

127

(3)      a receiver of the Trustee or of its property shall have been appointed, or a custodian or public officer takes charge of the Trustee or its property or affairs for the purpose of rehabilitation, conservation or liquidation; or

(4)      the Trustee becomes incapable of acting.

(c)      If the Trustee resigns, is notified that it is to be removed or has notified the Issuer that it wishes to resign, in each case, in accordance with paragraph (b) above, or if a vacancy exists in the office of Trustee for any reason, the Issuers shall, as promptly as practicable, appoint a successor Trustee. Within one year after such notice is received by the recipients thereof (as the case may be), the Holders of a majority in aggregate principal amount of the then outstanding Notes may, by written notice to the then Trustee and the Issuers, appoint a successor Trustee to replace the retiring Trustee or any successor Trustee appointed by the Issuers or the relevant court pursuant to paragraph (d) below (as the case may be).

(d)      If a successor Trustee does not take office within 60 days after the retiring Trustee is notified that it is to be removed or has notified the Issuer that it wishes to resign, in each case, in accordance with paragraph (b) above, the retiring Trustee, the Issuers or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes, at the expense of the Issuers, may petition any court of competent jurisdiction for the appointment of a successor Trustee.

(e)      If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with <u>Section 7.10</u>, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)      A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuers. Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee, without any further act, deed, or conveyance, will have all the rights, powers, trusts and duties of the Trustee under this Indenture; but, on request of the Issuers or the successor Trustee, such retiring Trustee shall, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its Lien provided for in <u>Section 7.07</u>. The Issuers will give notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee to Holders of the Notes. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in <u>Section 7.07</u>. Notwithstanding replacement of the Trustee pursuant to this <u>Section 7.08</u>, the Issuers' obligations under <u>Section 7.07</u> will continue for the benefit of the retiring Trustee.

Section 7.09   <u>Successor Trustee by Merger, etc.</u>

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to

Doc#: US1:12095985v22

which the Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder, provided such entity shall be otherwise qualified and eligible under this Article, to the extent operative, without the execution or filing of any paper or further act on the part of any of the parties hereto. In the case any Notes shall have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 7.10    Eligibility; Disqualification.

(a)    There will at all times be a Trustee hereunder that is an entity organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trust power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $100.0 million as set forth in its most recent published annual report of condition.  If at any time the Trustee ceases to be eligible in accordance with the provisions of this Section 7.10, it shall resign immediately in the manner and with the effect specified in this Article.

(b)    This Indenture will always have a Trustee who satisfies the requirements of TIA § 310(a)(1), (2) and (5).  The Trustee shall comply with the terms of TIA § 310(b).

Section 7.11    Preferential Collection of Claims Against Issuers.

The Trustee is subject to TIA § 311, excluding any creditor relationship listed in TIA § 311(b).

Section 7.12    Trustee in Other Capacities; Collateral Agent, Registrar and Paying Agent.

References to the Trustee in Sections 7.01(b), (c), (d), (e), (f), (g), (h), Section 7.02, Section 7.03, Section 7.04, Section 7.07, Section 7.08 and Section 7.09 shall be understood to include the Trustee when acting in its other capacities under this Indenture, including as Paying Agent, Registrar and Collateral Agent or any Agent hereunder; provided that, notwithstanding anything herein to the contrary, (i) an Agent shall only be liable to the extent of its gross negligence or willful misconduct; and (ii) in and during an Event of Default, only the Trustee, and not any Agent, shall be subject to the prudent person standard.  Without limiting the foregoing, and for the avoidance of doubt, such Sections shall be read to apply to the Collateral Agent and the Security Documents, *mutatis mutandis*, in addition to this Indenture.  The privileges, rights, indemnities, immunities and exculpatory provisions contained in this Indenture shall apply to the Trustee, whether it is acting under this Indenture or the Security Documents.

Doc#: US1:12095985v22

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance.

The Issuers may at any time, at their option evidenced by a resolution of the Board of Directors of the Company set forth in an Officers' Certificate, elect to have either Section 8.02 or 8.03 be applied to all outstanding Notes and Guarantees upon compliance with the conditions set forth below in this Article 8.

Section 8.02    Legal Defeasance and Discharge.

Upon the Issuers' exercise under Section 8.01 of the option applicable to this Section 8.02, the Issuers and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "Legal Defeasance"). For this purpose, Legal Defeasance means that the Issuers and the Guarantors will be deemed to have paid and discharged the entire Debt represented by the outstanding Notes (including the Guarantees), which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 and the other sections of this Indenture referred to in clauses (1) and (2) of this Section 8.02, and to have satisfied all their other obligations under such Notes, the Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Issuers, shall execute such instruments as reasonably requested by the Issuers acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1)    the rights of Holders of outstanding Notes to receive payments in respect of the principal of, premium, if any, Additional Amounts and interest on such Notes when such payments are due;

(2)    the Issuers' obligations to issue temporary Notes, register, transfer or exchange any Notes, replace mutilated, destroyed, lost or stolen Notes, maintain an office or agency for payments in respect of the Notes and segregate and hold such payments on trust;

(3)    the rights, powers, trusts, duties and immunities of the Trustee and the obligations of the Issuers and the Guarantors in connection therewith; and

(4)    this Article 8.

Subject to compliance with this Article 8, the Issuers may exercise their option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03.

Section 8.03    Covenant Defeasance.

Upon the Issuers' exercise under Section 8.01 of the option applicable to this Section 8.03, the Issuers and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04, be released from each of their obligations under the

130

covenants contained in Sections 3.10, 4.03, 4.04(a), 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15(2), 4.16, 4.17, 4.18, 4.19, 4.20, 4.21, 4.22, 4.23, 4.24, 4.25, 4.26, 4.27, 4.28, 4.29, 4.30, 4.31, 4.32, 4.33, 4.34, 4.35, 4.36, 4.37 and 5.01 with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 are satisfied (hereinafter, "Covenant Defeasance"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Guarantees, the Issuers and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01, but, except as specified above, the remainder of this Indenture and such Notes and Guarantees will be unaffected thereby.  Upon the Issuers' exercise under Section 8.01 of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04, Sections 6.01(c) through 6.01(i) will no longer constitute Events of Default.

Section 8.04   Conditions to Legal or Covenant Defeasance.

(a)      In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03:

(1)      the Issuers must irrevocably deposit or cause to be deposited in trust with the Trustee, for the benefit of the Holders, cash in U.S. dollars, non-callable U.S. Government Securities or a combination thereof, in such amounts as will be sufficient, in the opinion of an internationally recognized firm of independent public accountants, to pay and discharge the principal of, premium, if any, Additional Amounts and interest, on the outstanding Notes on the Stated Maturity or on the applicable redemption date, as the case may be, and the Issuers must: (i) specify whether the Notes are being defeased to maturity or to a particular redemption date; and (ii) if applicable, have delivered to the Trustee an irrevocable notice to redeem all of the outstanding Notes;

(2)      in the case of Legal Defeasance, the Issuers must have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee stating that: (x) the Issuers has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or (y) since the Closing Date, there has been a change in applicable U.S. federal income tax law, in either case to the effect that (and based thereon such Opinion of Counsel shall confirm that) the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

131

(3)     in the case of Covenant Defeasance, the Issuers or the Guarantors must have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee to the effect that the Holders of the outstanding Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     the Issuers must have delivered to the Trustee Opinions of Counsel reasonably acceptable to the Trustee to the effect that the Holders of the outstanding Notes will not recognize income, gain or loss for Liberian income tax purposes as a result of such Legal Defeasance;

(5)     no Default or Event of Default will have occurred and be continuing (i) on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting Liens to secure such borrowing) or (ii) insofar as bankruptcy or insolvency events described in Section 6.01(1)(j) and (k) is concerned, at any time during the period ending on the 90th day after the date of such deposit;

(6)     such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting Liens to secure such borrowing), this Indenture or any material agreement or instrument to which any Issuer or any Restricted Subsidiary is a party or by which the Issuers or any Restricted Subsidiary is bound;

(7)     such Legal Defeasance or Covenant Defeasance will not result in the trust arising from such deposit constituting an investment company within the meaning of the U.S. Investment Company Act of 1940 unless such trust shall be registered under such act or be exempt from registration thereunder;

(8)     the Issuers must have delivered to the Trustee an Opinion of Counsel acceptable to the Trustee that the Trustee shall have a perfected first-priority security interest in such trust funds for the ratable benefit of the Holders;

(9)     the Issuers must have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuers with the intent of preferring the Holders over the other creditors of the Issuers with the intent of defeating, hindering, delaying or defrauding creditors of the Issuers or other creditors, or removing assets beyond the reach of the relevant creditors or increasing debts of the Issuers to the detriment of the relevant creditors;

(10)     no event or condition exists that would prevent the Issuers from making payments of the principal of, premium, if any, Additional Amounts and interest on the Notes on the date of such deposit or at any time ending on the 90th day after the date of such deposit; and

132

(11)    the Issuers must have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel acceptable to the Trustee, each stating that all conditions precedent provided for relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 8.05    Deposited Money and U.S. Government Securities to be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06, all money and non-callable U.S. Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including an Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, and interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuers will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or non-callable U.S. Government Securities deposited pursuant to Section 8.04 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.  If the funds deposited with the Trustee to effect Covenant Defeasance are insufficient to pay the principal of, premium, if any, Additional Amounts and interest on the Notes when due because of any acceleration occurring after an Event of Default, then the Issuers and the Guarantors will remain liable for such payments.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Issuers from time to time upon the request of the Issuers any money or non-callable U.S. Government Securities held by it as provided in Section 8.04 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(a)(1)), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06    Repayment to the Issuers.

Subject to applicable abandoned property laws, any money deposited with the Trustee or any Paying Agent, or then held by the Issuers, in trust for the payment of the principal of, premium, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium, if any, or interest has become due and payable shall be paid to the Issuers on their request or (if then held by the Issuers) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Issuers for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuers as trustee thereof, will thereupon cease; *provided*, *however*, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Issuers cause to be published once, in the New York Times or The Wall Street Journal (national

133

edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be less than 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Issuers.

Section 8.07   Reinstatement.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable U.S. Government Securities in accordance with Section 8.02 or Section 8.03, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuers' and the Guarantors' obligations under this Indenture and the Notes and the Guarantees will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or Section 8.03, as the case may be; *provided*, *however*, that, if the Issuers make any payment of principal of, premium, if any, or interest on, any Note following the reinstatement of its obligations, the Issuers will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01   Without Consent of Holders.

Notwithstanding Section 9.02, the Issuers, the Guarantors, the Trustee and the Collateral Agent, as applicable, may amend or supplement this Indenture, the Notes, the Guarantees or the Security Documents, without the consent of any Holder:

(1)     to evidence the succession of another Person to the Company and the assumption by any such successor of the covenants in this Indenture and in the Notes in accordance with Section 5.01;

(2)     to add to the Issuers' covenants and those of any Guarantor or any other obligor in respect of the Notes for the benefit of the Holders or to surrender any right or power conferred upon the Issuers or any Guarantor or any other obligor in respect of the Notes, as applicable, in this Indenture, the Notes or any Guarantee;

(3)     to cure any ambiguity, or to correct or supplement any provision in this Indenture, the Notes or any Guarantee that may be defective or inconsistent with any other provision in this Indenture, the Notes or any Guarantee or make any other provisions with respect to matters or questions arising under this Indenture, the Notes or any Guarantee; *provided* that, in each case, such provisions shall not adversely affect the interests of the Holders;

(4)     to conform the text of this Indenture, the Notes or any Guarantee to any provision of the "Description of the New Notes" section of the Offer to Exchange to the extent that such provision in the "Description of the New Notes" was intended to be a verbatim recitation of a provision of this Indenture, the Notes or any Guarantee, as set forth in an Officers' Certificate;

Doc#: US1:12095985v22

(5)      to release any Guarantor in accordance with (and if permitted by) the terms of this Indenture;

(6)      to add a Guarantor under this Indenture;

(7)      to evidence and provide the acceptance of the appointment of a successor Trustee under this Indenture;

(8)      to mortgage, pledge, hypothecate or grant a first-priority security interest in favor of the Trustee for the benefit of the Holders as additional security for the payment and performance of the Issuers' and any Guarantor's obligations under this Indenture, in any property, or assets, including any of which are required to be mortgaged, pledged or hypothecated, or in which a first-priority security interest is required to be granted to the Trustee pursuant to this Indenture or otherwise;

(9)      in the event that PIK Notes are issued in certificated form, to make appropriate amendments to reflect an appropriate minimum denomination of certificated PIK Notes and to establish minimum redemption amounts for certificated PIK Notes; or

(10)      to provide for the issuance of Additional Notes in accordance with and if permitted by the terms of an limitations set forth in this Indenture.

Section 9.02    <u>With Consent of Holders</u>.

Except as provided below in this <u>Section 9.02</u>, the Issuers, the Guarantors, the Trustee and the Collateral Agent, as applicable, may amend or supplement this Indenture, the Consulting Agreement, the Notes, the Guarantees and the Security Documents with the consent of the Holders of a majority in aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for, or purchase of, the Notes).

Subject to <u>Sections 6.04</u> and <u>6.07</u>, the Holders of a majority in aggregate principal amount of the Notes then outstanding may waive compliance in a particular instance by the Issuers or the Guarantors with any provision of this Indenture, the Consulting Agreement, the Notes, the Guarantees or the Security Documents.

However, without the consent of each Holder affected, an amendment, supplement or waiver under this <u>Section 9.02</u> may not (with respect to any Notes held by a non-consenting Holder):

(1)      change the Stated Maturity of the principal of, or any installment of or Additional Amounts or interest on, any Note (or change any Default or Event of Default related thereto);

(2)      reduce the principal amount of any Note (or Additional Amounts if any), reduce the premium payable upon the redemption of any Note or change the time at which any Note may be redeemed as described under <u>Section 3.07</u>, or reduce the rate of

135

or change the time for payment of interest on any Note (or change any Default or Event of Default related thereto);

(3)    change the coin or currency in which the principal of any Note or any premium or any Additional Amounts or the interest thereon is payable;

(4)    impair the right to institute suit for the enforcement of any payment of any Note in accordance with the provisions of such Note and this Indenture;

(5)    reduce the principal amount of Notes whose Holders must consent to any amendment, supplement or waiver of provisions of this Indenture;

(6)    modify any of the provisions relating to supplemental indentures requiring the consent of Holders or relating to the waiver of past defaults or relating to the waiver of certain covenants, except to increase the percentage of outstanding Notes required for such actions or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of each Holder affected thereby; or

(7)    release any Guarantee except in compliance with the terms of this Indenture.

Notwithstanding the foregoing, without the consent of Holders representing 66 2/3% of the outstanding principal amount of Notes, an amendment, supplement or waiver may not: (i) amend, change or modify in any material respect the obligation of the Issuers to make and consummate a Collateral Sale Offer, an Event of Loss Offer, an Excess Cash Flow Offer, an Existing Trust Monies Offer or a Charter Disposal Proceeds Offer, as the case may be, or modify the provisions or definitions with respect thereto; or (ii) release the Lien of the Trustee for the benefit of the Holders in any Collateral (other than by operation of the terms of this Indenture and the Security Documents).

It shall not be necessary for the consent of the Holders under this <u>Section 9.02</u> to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this <u>Section 9.02</u> becomes effective, the Issuers will send to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver.  Any failure of the Issuers to send such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amendment, supplement or waiver.

Section 9.03    <u>Compliance with TIA</u>.

Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture that complies with the TIA as then in effect.

Section 9.04    Revocation and Effect of Consents.

(a)    Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  Subject to Section 9.04(b), any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective.  An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

(b)    The Issuers may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to give their consent or take any other action required or permitted to be taken pursuant to this Indenture, other than the delivery of instructions by Holders to the Trustee or Collateral Agent.  If a record date is fixed, then notwithstanding clause (a) of this Section 9.04, those Persons who were Holders at such record date (or their duly designated proxies), and only those Persons, shall be entitled to give such consent or to revoke any consent previously given or to take any such action, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective more than 120 days after such record date.

Section 9.05    Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuers in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee and Collateral Agent to Sign Amendments, etc.

Upon the request of the Issuers accompanied by a resolution of the Board of Directors of the Company authorizing the execution of any such amendment or supplement and upon the filing with the Trustee and the Collateral Agent, if applicable, of evidence of the consent of the Holders if required pursuant to Section 9.02, the Trustee and the Collateral Agent, if applicable, will sign any amendment or supplement authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the Collateral Agent, as applicable.  In executing any amendment or supplement, the Trustee and the Collateral Agent, as applicable, will be entitled to receive and (subject to Section 7.01) will be fully protected in relying upon, in addition to the documents required by Section 13.04, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amendment or supplement is authorized or permitted by this Indenture or the Security Documents, as applicable and that such amendment or supplement is the legal, valid and binding obligation of the Issuers and Guarantors, enforceable against it in accordance with its terms.

## ARTICLE 10
## COLLATERAL AND SECURITY

Section 10.01  <u>Grant of Security Interest</u>.

(a)    To secure the due and punctual payment of the principal of, premium, if any, and interest on the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, purchase, repurchase, redemption or otherwise, and interest on the overdue principal of, premium, if any, and interest (to the extent permitted by law), if any, on the Notes and the performance of all other Indenture Obligations of the Issuers and the Guarantors, the Issuers and the Guarantors hereby covenant to cause the Security Documents to be executed and delivered concurrently with this Indenture, or in certain circumstances set forth in this Indenture and the Security Documents, subsequent to the Closing Date.  The Security Documents shall provide for the grant by the Issuers and the Guarantors party thereto to the Collateral Agent (and in the case of the Ship Mortgages (other than Greek Ship Mortgages) to the Trustee in its capacity as a trustee for the Holders) of security interests in the Collateral, subject to Permitted Liens.

(b)    Each of the Trustee and, by its acceptance of a Note, each Holder (i) appoints the Collateral Agent to act as its agent (and to hold any security interest created by the Security Documents for and on behalf of or in trust for it) under this Indenture and the Security Documents (and by its signature below, the Collateral Agent accepts such appointment) for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by either Issuer or any Guarantor to secure any of this Indenture Obligations, together with such powers and discretion as are reasonably incidental thereto, (ii) authorizes the Collateral Agent to enter into the Security Documents to which it is a party, to make any representations on behalf of the Holders as may be set forth in the Security Documents, to take such action on its behalf and in the Collateral Agent's designated capacity under the provisions of this Indenture and the Security Documents, and to perform its obligations and exercise its rights and powers expressly designated to it hereunder and thereunder in accordance herewith and therewith, and (iii) consents and agrees to the terms of each Security Document.  Each of the Trustee and each Holder agrees that any action taken by the Collateral Agent in accordance with the provisions of this Indenture and the Security Documents, and the exercise by the Collateral Agent of any rights or remedies set forth herein and therein, together with all other powers reasonably incidental thereto, shall be authorized and binding upon the Trustee and all Holders.  The duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have a trust relationship with the Trustee, any Holder, obligor or any other Person by reason of this Indenture or any of the Security Documents.  Notwithstanding the foregoing, no such consent or deemed consent shall be deemed or construed to represent an amendment or waiver, in whole or in part, of any provision of this Indenture or the Notes.  The foregoing will not limit the right of any Issuer or any Guarantor to amend, waive or otherwise modify the Security Documents in accordance with their terms.

(c)    The Collateral Agent shall not, nor shall the Trustee, have any duties or responsibilities except those expressly set forth in this Indenture and the Security Documents to which the Collateral Agent and/or the Trustee is a party, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture or the Security

138

Documents or otherwise exist on the part of either. The conferral upon the Collateral Agent or upon the Trustee of any right shall not imply a duty on the of either part to exercise such right. Any exercise of discretion on behalf of the Collateral Agent shall be exercised in accordance with the terms of this Indenture.

(d)    The Collateral Agent may, and the Trustee may, perform its duties under this Indenture and the Security Documents to which it is a party by or through receivers, agents, attorneys-in-fact and employees. Both the Collateral Agent and the Trustee may consult with and employ legal counsel, and shall be entitled to act upon, and shall be fully protected in taking action in reliance upon any advice or opinion given by legal counsel.

(e)    The Collateral Agent and the Trustee shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, consent, certificate, affidavit, letter, certification, statement, notice or other communication or document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person, and upon the advice and statements of legal counsel (including counsel to the Company or any obligor). Neither the Collateral Agent nor the Trustee shall be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture or other paper or document. Neither the Collateral Agent nor the Trustee shall have liability for failing or refusing to take any action under this Indenture or the Security Documents unless it shall first receive such advice, direction, instruction or concurrence as is required hereunder; and each of them shall have the right to seek instructions before acting or electing not to act under this Indenture, and/or the Security Documents. Neither the Collateral Agent nor the Trustee shall in any case have any liability in acting, or refraining from acting, under this Indenture and the Security Documents in accordance with a direction or instruction from the Issuers or the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes, as applicable, and such direction or instruction and any action taken or failure to act pursuant thereto shall be binding upon all the Holders. Notwithstanding anything herein to the contrary, the Collateral Agent shall have no responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created under this Indenture or any Security Document.

(f)    The Collateral Agent shall not be deemed to have knowledge of any Default or Event of Default unless a Responsible Officer of the Collateral Agent has received written notice from the Company, the Trustee or the Holders of at least 25% in aggregate principal amount of the then outstanding Notes specifying the occurrence and nature thereof and stating that such notice is a notice of default.

(g)    Neither the Collateral Agent nor the Trustee shall be liable for any action taken or omitted to be taken by it in connection with this Indenture or any Security Documents or instrument referred to or provided for herein or therein, except to the extent that any of the foregoing are found by a final, nonappealable decision of a court of competent jurisdiction to have resulted from its own gross negligence, willful misconduct or bad faith. Neither the Collateral Agent nor the Trustee assumes any responsibility for any failure or delay in performance or any breach by the Issuers or any obligor of any obligations under this Indenture and the Security Documents. Neither the Collateral Agent nor the Trustee shall be responsible to

139

the Holders or any other Person for any recitals, statements, information, representations or warranties contained in any Security Documents or in any certificate, report, statement, or other document referred to or provided for in, or received by either of them under or in connection with, this Indenture or any Security Document; the execution, validity, genuineness, effectiveness or enforceability of any Security Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Obligations under this Indenture and the Security Documents. Neither the Collateral Agent nor the Trustee shall have any obligation to any Holder or any other Person to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any obligor of any terms of this Indenture and the Security Documents, or the satisfaction of any conditions precedent contained in this Indenture and any Security Documents. The Collateral Agent shall not, nor shall the Trustee, be required to initiate or conduct any litigation or collection or other proceeding under this Indenture and the Security Documents unless expressly set forth hereunder or thereunder. The Collateral Agent shall, as shall the Trustee, have the right at any time to seek instructions from the Holders with respect to the administration of the Security Documents. In no event shall the Collateral Agent or the Trustee be liable to any Person under this Indenture or the Security Documents for special, punitive, indirect, consequential or incidental loss or damage of any kind whatsoever (including lost profits), even if the Collateral Agent or the Trustee, as the case may be, has been advised of the likelihood of such loss or damage.

(h)     No provision of this Indenture or the Security Documents shall require the Collateral Agent or the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers unless the Collateral Agent or the Trustee, as the case may be, shall have received security or indemnity satisfactory to it against potential costs and liabilities incurred by it relating thereto. Notwithstanding anything to the contrary contained in this Indenture or any of the Security Documents, in the event the Collateral Agent or the Trustee is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, neither the Collateral Agent nor the Trustee shall be required to commence any such action or exercise any such remedy or to inspect or conduct any studies of any property under the Ship Mortgages or take any such other action if it has determined that it may incur personal liability as the result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances unless the Collateral Agent, or the Trustee, as the case may be, has received security or indemnity from the Holders in an amount and in a form all satisfactory to it in its sole discretion, protecting it from all such liability. The Collateral Agent shall, as shall the Trustee, at any time be entitled to cease taking any action described above if it no longer reasonably deems any indemnity, security or undertaking from the Issuers or the Holders to be sufficient.

(i)     The parties hereto and the Holders hereby agree and acknowledge that neither the Collateral Agent nor the Trustee shall assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments,

140

expenses and costs (including any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture the Security Documents or any actions taken pursuant hereto or thereto.  Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture and the Security Documents, the Collateral Agent and the Trustee may each hold or obtain indicia of ownership primarily to protect its security interest in the Collateral, including the properties under the Ship Mortgages, and that any such actions taken by the Collateral Agent or the Trustee shall not be construed as or otherwise constitute any participation in the management of such Collateral, including the properties under the Ship Mortgages, as those terms are defined in Section 101(20)(E) of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended.

(j)     The Collateral Agent and the Trustee each and, by its acceptance of a Note, each Holder acknowledges that, as more fully set forth in the Security Documents, the Collateral as now or hereafter constituted shall be held by the Collateral Agent and/or the Trustee for the benefit of all the Holders, the Collateral Agent and the Trustee, and that the Liens granted by the Security Documents are subject to and qualified and limited in all respects by the Security Documents and actions that may be taken thereunder.

Section 10.02  <u>Recording and Opinions</u>.

(a)     The Company shall, and shall cause each of its Restricted Subsidiaries to, at its sole cost and expense, take or cause to be taken such actions as may be required by the Security Documents, to perfect, maintain (with the priority required under the Security Documents), preserve and protect the valid and enforceable, perfected (except as expressly provided herein or therein) security interests in and on all the Collateral granted by the Security Documents in favor of the Collateral Agent and/or the Trustee as security for the Obligations under this Indenture, the Notes, the Guarantees and the Security Documents, superior to and prior to the rights of all third Persons (other than to the extent permitted or not prohibited under this Indenture with respect to Permitted Liens), and subject to no other Liens (other than Permitted Liens), including the filing of financing statements, continuation statements, collateral assignments and any instruments of further assurance, in such manner and in such places as may be required by law to preserve and protect fully the rights of the Holders, the Collateral Agent, and the Trustee under this Indenture and the Security Documents to all property comprising the Collateral.  The Issuers shall from time to time promptly pay all financing and continuation statement recording and/or filing fees, charges and recording and similar taxes relating to this Indenture, the Security Documents and any amendments hereto or thereto and any other instruments of further assurance required pursuant hereto or thereto.

141

(b)      The Issuers will deliver to the Trustee and the Collateral Agent within 60 days after the end of each fiscal year, commencing with the fiscal year ending December 31, 2018, a written Opinion of Counsel reasonably satisfactory to the Trustee as to the continued perfection of the first-priority lien of this Indenture and the Security Documents on the Collateral:

(1)      (A) stating that, in the opinion of such counsel, all action has been taken with respect to the recording, registering, filing, re-recording, re-registering and re-filing of all supplemental indentures, financing statements, continuation statements, mortgages (including, without limitation, Ship Mortgages), assignments or other instruments or documents as is necessary to maintain the first-priority lien of this Indenture and Security Documents and reciting with respect to the security interests in the Collateral the details of such action or referring to prior opinions of counsel in which such details are given, and (B) stating that, in the opinion of such counsel, based on relevant laws as in effect on the date of such Opinion of Counsel, all such instruments or documents have been executed and filed, recorded or registered that are necessary as of such date and during the succeeding 12 months fully to preserve and protect, to the extent such protection and preservation are possible by filing, recording or registering, the rights of the Holders and the Trustee under this Indenture and Security Documents with respect to the security interests in the Collateral; or

(2)      stating that, in the opinion of such counsel, no such action is necessary to maintain such lien and assignment.

Section 10.03  Specified Releases and Disposition of Collateral.

(a)      The Issuers and each Guarantor will have the right to sell, exchange or otherwise dispose of any of the Collateral owned by it (other than (i) Trust Monies, which are subject to release from the Lien of this Indenture and the Security Documents as provided under Section 12.02 below and (ii) funds in the Collection Account or any Specified Account, which are subject to release as provided under Section 4.31), to the extent such sale, exchange or disposition is permitted by this Indenture and the Security Documents, upon compliance with the requirements and conditions of the provisions described below, and the Trustee shall release the same from the Lien of this Indenture or the Security Documents, as the case may be, upon receipt by the Trustee of a notice directing such release and describing the property to be so released, together with delivery of the following, among other matters:

(1)      if the property to be released has a Fair Market Value equal to or greater than $2.0 million, a resolution of the Board of Directors of the Issuers or the relevant Guarantor, as the case may be, directing such release and authorizing an application to the Trustee therefor;

(2)      an Officers' Certificate of the Company or the relevant Guarantor, as the case may be, dated not more than five Business Days prior to the date of the application for such release, in each case stating in substance as to certain matters, including the following:

(i)      that either (1) the Collateral to be released is not Net Cash Proceeds from an Asset Sale and is not being replaced by comparable property, has a book value of less than $1.0 million and is not necessary for the efficient operation of the Issuers' and the Restricted Subsidiaries' remaining property or in the conduct of the business of the Issuers and the Restricted Subsidiaries as conducted immediately prior thereto or (2) the Collateral to be released is being released in connection with an Asset Sale or an Event of Loss involving such Collateral and the Net Cash Proceeds from such Asset Sale or the Loss Redemption Amount with respect to such Event of Loss, as the case may be, are being or will be delivered to the Trustee to be held as Trust Monies and to be applied in accordance with the terms of this Indenture or (3) the Collateral to be released is Trust Monies representing (x) the Net Cash Proceeds from an Asset Sale involving Collateral which are to be applied to the purchase of one or more Qualified Vessels (whether through the direct purchase of such Qualified Vessel or the equity interests of any Person owning such Qualified Vessel that will become a Wholly Owned Restricted Subsidiary and a Guarantor) and Permitted Repairs thereon as provided under Section 4.11 or (y) a portion of the Loss Redemption Amount with respect to an Event of Loss which is to be applied to the purchase of one or more Qualified Vessels (whether through the direct purchase of such Qualified Vessel or the equity interests of any Person owning such Qualified Vessel that will become a Wholly Owned Restricted Subsidiary and a Guarantor) and Permitted Repairs thereon as provided under Section 4.17 or (4) the Collateral to be released constitutes Trust Monies that are being applied to the purchase of one or more Qualified Vessels (whether through the direct purchase of such Qualified Vessel or the equity interests of any Person owning such Qualified Vessel that will become a Wholly Owned Restricted Subsidiary and a Guarantor) and to make Permitted Repairs thereon in accordance with the provisions described under Section 4.25 or (5) the Collateral to be released is being released upon the receipt of Qualified Collateral (including without limitation in connection with any refinancing transaction) which is to be pledged to secure the Notes in accordance with the provisions described under Section 4.25;

(ii)      that no Default or Event of Default has occurred and is continuing;

(iii)      the Fair Market Value, in the opinion of the signers, of the property (other than Trust Monies) to be released at the date of such application for release; *provided* that it shall not be necessary under this clause (iii) to state the Fair Market Value of any property whose Fair Market Value is certified in a certificate of an Independent Appraiser under Section 10.03(c);

(iv)   that such sale, exchange or other disposition of Collateral is permitted by this Indenture and the Security Documents and all conditions precedent in this Indenture and the Security Documents relating to the release of the Collateral in question have been complied with;

(3)      if the property to be released is one or more Vessels, the certificate of an Independent Appraiser which reflects the Appraised Value of such Vessel or Vessels at the date of such application for release; and

(4)      one or more opinions of counsel which, when considered collectively, shall be substantially to the effect that such sale, exchange or other disposition of Collateral is permitted by this Indenture and the Security Documents and all conditions precedent provided in this Indenture and the Security Documents relating to the release of the Collateral have been complied with; and

(5)      if such sale, exchange or disposition is with respect to a Mortgaged Vessel, evidence of the consent of the Holders of not less than a majority in aggregate principal amount of the Notes then outstanding to such sale, exchange or disposition.

(b)      In connection with any release, the Issuers and the Guarantors shall (i) execute, deliver and record or file and obtain such instruments as may be required, including, without limitation, amendments to the Security Documents and (ii) deliver to the Trustee an Opinion of Counsel as to, and an Officers' Certificate certifying, the satisfaction of the applicable provisions of this Indenture and the Security Documents, as set forth in this Indenture and the Security Documents.

(c)      Notwithstanding the foregoing, the Issuers may obtain a release of (i) Net Cash Proceeds from an Asset Sale involving Collateral that are required to purchase Notes pursuant to a Collateral Sale Offer on the date of such purchase by directing the Trustee in writing to cause to be applied such Net Cash Proceeds to such purchase in accordance with the covenant described under Section 4.11, or (ii) all or any portion of a Loss Redemption Amount deposited with the Trustee in connection with an Event of Loss with respect to a Mortgaged Vessel that is required to purchase Notes pursuant to an Event of Loss Offer on the date of such purchase in accordance with the covenant described under Section 4.17 in the case of either (i) or (ii) above, by directing the Trustee in writing to cause to be applied such amount thereto in accordance with such covenants.

(d)      In case a Default or an Event of Default shall have occurred and be continuing, the Issuers, while in possession of the Collateral (other than cash and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture or under any Security Document) may do any of the things enumerated in Section 10.03 only if the Trustee, in its discretion, or the Holders of a majority in aggregate principal amount of the outstanding Notes shall consent to such action, in which event any certificate filed under this Section 10.03, shall omit the statement to the effect that no Default or Event of Default has occurred and is continuing.

144

(e)      All cash or Cash Equivalents received by the Trustee pursuant to this Section 10.03 will be held by the Trustee as Trust Monies under this Indenture subject to application as provided in this Section 10.03 or in Section 12.02.

Notwithstanding the provisions of this Section 10.03, so long as no Event of Default shall have occurred and be continuing, an Issuer or any Guarantor may, without any release or consent by the Trustee, do any number of ordinary course activities in respect of the Collateral, upon satisfaction of certain conditions, so long as such actions do not materially adversely affect the operations of the Mortgaged Vessel.

Section 10.04   Release upon Satisfaction or Defeasance of all Outstanding Obligations.

(a)      The Liens on all Collateral that secure the Notes and the Guarantees will be terminated and released:

(1)      if the Issuers exercise Legal Defeasance or Covenant Defeasance as described under Section 8.01;

(2)      upon satisfaction and discharge of this Indenture as described under Article 12; or

(3)      upon payment in full in immediately available funds of the principal of, premium, if any, and accrued and unpaid interest on the Notes and all other Obligations under this Indenture and the Security Documents that are then due and payable.

(b)      Upon the written request of the Company pursuant to an Officers' Certificate and Opinion of Counsel stating that all conditions precedent hereunder and under the Security Documents have been met, and upon receipt of any necessary or proper instruments of termination, satisfaction or release prepared by the Company or the Guarantors, as the case may be, the Collateral Agent, without the consent of any Holder or the Trustee and at the expense of the Company or the Guarantors, shall execute, deliver or acknowledge such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents.

Section 10.05   Form and Sufficiency of Release.

In the event that the Issuers or any Guarantor has sold, exchanged, or otherwise disposed of or proposes to sell, exchange or otherwise dispose of any portion of the Collateral that may be sold, exchanged or otherwise disposed of by the Issuers or such Guarantor to any Person other than the Issuers or a Guarantor, and the Issuers or such Guarantor requests in writing that the Trustee or Collateral Agent furnish a written disclaimer, release or quit-claim of any interest in such property under this Indenture and the Security Documents, the Trustee and the Collateral Agent, as applicable, shall execute, acknowledge and deliver to the Issuers or such Guarantor (in the form prepared by the Issuers at the Issuers' sole expense) such an instrument promptly after satisfaction of the conditions set forth herein for delivery of any such release. Notwithstanding the preceding sentence, all purchasers and grantees of any property or rights

145

purporting to be released herefrom shall be entitled to rely upon any release executed by the Collateral Agent hereunder as sufficient for the purpose of this Indenture and as constituting a good and valid release of the property therein described from the Lien of this Indenture or of the Security Documents.

Section 10.06  <u>Purchaser Protected</u>.

No purchaser or grantee of any property or rights purporting to be released herefrom shall be bound to ascertain the authority of the Collateral Agent to execute the release or to inquire as to the existence of any conditions herein prescribed for the exercise of such authority; nor shall any purchaser or grantee of any property or rights permitted by this Indenture to be sold or otherwise disposed of by the Issuers or the Guarantors be under any obligation to ascertain or inquire into the authority of the Issuers or the Guarantors to make such sale or other disposition.

Section 10.07  <u>Authorization of Actions to be Taken by the Collateral Agent or Trustee Under the Security Documents</u>.

(a)      The Trustee and, by its acceptance of a Note, each Holder agree that the Collateral Agent and/or the Trustee shall execute and deliver the Security Documents to which it is a party and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof.  For the avoidance of doubt, neither the Trustee nor the Collateral Agent shall have any discretion under this Indenture or the Security Documents and shall not be required to make or give any determination, consent, approval, request or direction without the written direction of the Holders of a majority in aggregate principal amount of the then outstanding Notes, the Trustee (in the case of the Collateral Agent), the Collateral Agent (in the case of the Trustee), or the Issuers, as applicable.

(b)      Prior to the occurrence of an Event of Default, the Issuers may direct the Collateral Agent in connection with any action required or permitted by this Indenture or the Security Documents.  After the occurrence of an Event of Default or as otherwise provided herein or under the Consulting Agreement, the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Collateral Agent in connection with any action required or permitted by this Indenture, the Consulting Agreement or the Security Documents.

Subject to the provisions of the Security Documents and the Consulting Agreement and unless otherwise expressly provided herein or therein, the Trustee may, at the direction of a majority of the Holders, direct the Collateral Agent and/or the Trustee to take all actions necessary or appropriate in order to (i) enforce any of the terms of the applicable Security Documents and (ii) collect and receive any and all amounts payable in respect of the Collateral in respect of the obligations of the Issuers and the Guarantors hereunder and thereunder.

Section 10.08  <u>Authorization of Receipt of Funds by the Trustee Under the Security Documents</u>.

The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents for turnover to the Trustee

146

to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of <u>Section 6.10</u> and the other provisions of this Indenture.

Section 10.09  <u>Action by the Collateral Agent</u>.

Subject to the provisions of the Security Documents, the Collateral Agent and/or the Trustee, as applicable, shall have the power to institute and to maintain such suits and proceedings in order to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Security Documents or this Indenture, and such suits and proceedings as are necessary to preserve or protect its interest and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest granted pursuant to any Security Document or be prejudicial to the interests of the Holders or the Trustee).

In each case that the Collateral Agent or the Trustee may or is required hereunder or under any Security Document to take any action (an "<u>Action</u>"), including to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under any Security Document, the Collateral Agent and/or the Trustee may seek direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes.  The Collateral Agent shall not, nor shall the Trustee, be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes.  If the Collateral Agent or the Trustee shall request direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with respect to any Action, the Collateral Agent shall be entitled to refrain from such Action unless and until the Collateral Agent shall have received direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with indemnity or security in accordance with <u>Section 7.02(g)</u>, and neither the Collateral Agent nor the Trustee shall incur liability to any Person by reason of so refraining.

Notwithstanding anything to the contrary in this Indenture or any Security Document, in no event shall the Collateral Agent or the Trustee be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture or the Security Documents (including the filing or continuation of any UCC financing or continuation statements or similar documents or instruments), nor shall the Collateral Agent or the Trustee be responsible for, and neither the Collateral Agent nor the Trustee makes any representation regarding, the validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

Section 10.10  <u>Compensation and Indemnity</u>.

(a)      The Issuers will pay to the Collateral Agent and/or the Trustee from time to time reasonable compensation as shall be agreed to in writing by the Issuers and the Collateral Agent and the Trustee for its acceptance of this Indenture, the Security Documents and services

147

hereunder.  The Issuers will reimburse each of the Collateral Agent and the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses will include the reasonable compensation, disbursements and expenses of the Collateral Agent's and the Trustee's agents and counsel.

(b)     The Issuers and the Guarantors will, jointly and severally, indemnify the Collateral Agent and the Trustee and their respective officers, directors and agents against any and all losses, liabilities or expenses incurred by it arising out of or in connection with the acceptance or administration of its duties under this Indenture and the Security Documents, including (i) any claim relating to the grant to the Collateral Agent or the Trustee of any Lien in any property or assets of the Issuers or the Guarantors and (ii) the costs and expenses of enforcing this Indenture and the Security Documents against the Issuers and the Guarantors (including this Section 10.10) and defending itself against any claim (whether asserted by the Issuers, the Guarantors, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder or thereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence, willful misconduct or bad faith.  The Collateral Agent will, as will the Trustee, notify the Issuers promptly of any claim for which it may seek indemnity.  Failure by the Collateral Agent or the Trustee as the case may be to so notify the Issuers will not relieve the Issuers or any of the Guarantors of their obligations hereunder.  The Issuers or such Guarantor will defend the claim and the Collateral Agent and the Trustee will each cooperate in the defense.  The Collateral Agent and the Trustee may have separate counsel and the Issuers will pay the reasonable fees and expenses of such counsel.  Neither the Issuers nor any Guarantor need pay for any settlement made without its consent, which consent will not be unreasonably withheld.

(c)     The obligations of the Issuers and the Guarantors under this Section 10.10 will survive the satisfaction and discharge of this Indenture and the resignation, removal or replacement of the Collateral Agent or the Trustee.

Section 10.11  Resignation; Successor Collateral Agent.

(a)     A resignation or removal of the Collateral Agent or the Trustee and appointment of a successor will become effective only upon the successor's acceptance of appointment as provided in this Section 10.11 and the Issuers' receipt of written notice from the successor Collateral Agent of such appointment.

(b)     The Collateral Agent may, as may the Trustee, resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuers and the Holders with thirty (30) days written notice (which notice to the Holders may be given through the Depositary).  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Collateral Agent and/or the Trustee by so notifying the Collateral Agent, the Trustee, and the Issuers in writing.

(c)     If the Collateral Agent or the Trustee resigns, is notified that it is to be removed or has notified the Issuer that it wishes to resign, in each case, in accordance with paragraph (b) above, or if a vacancy exists in the office of Collateral Agent or Trustee for any

148

reason, the Issuers shall, as promptly as practicable, appoint a successor Collateral Agent or Trustee, as the case may be.  Within one year after such notice is received by the recipients thereof (as the case may be), the Holders of a majority in aggregate principal amount of the then outstanding Notes may, by written notice to the then Collateral Agent and/or Trustee and the Issuers, appoint a successor replace the retiring Collateral Agent or Trustee or any successor Collateral Agent or Trustee appointed by the Issuers or the relevant court pursuant to paragraph (d) below (as the case may be).

(d)    If a successor Collateral Agent or Trustee does not take office within 60 days after the retiring Collateral Agent or Trustee, as the case may be, is notified that it is to be removed or has notified the Issuer that it wishes to resign, in each case, in accordance with paragraph (b) above, the retiring Collateral Agent, the Issuers or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes, at the expense of the Issuers, may petition any court of competent jurisdiction for the appointment of a successor Collateral Agent.

(e)    Upon acceptance by a successor Collateral Agent or Trustee of an appointment to serve as Collateral Agent or Trustee hereunder and under the Security Documents, such successor Collateral Agent shall thereupon succeed to and become vested with all the rights, powers, duties and obligations of the retiring Collateral Agent or Trustee without further act but the retiring Collateral Agent shall continue to have the benefits of the compensation, reimbursement and indemnification set forth in this Indenture and the Security Documents.

(f)    Notwithstanding any Collateral Agent's or Trustee's resignation, the provisions of this Article 10 shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while Collateral Agent or Trustee.

(g)    Any successor to the Collateral Agent or Trustee by merger or acquisition of stock or acquisition of the corporate trust business shall continue to be Collateral Agent or Trustee hereunder without further act on the part of the parties hereto, unless such successor resigns as provided above.

Section 10.12  Rights, Immunities, etc. under the Security Documents.

The provisions of this Indenture, including those provisions relating to the rights, duties, powers, privileges, protections and indemnification of the Collateral Agent and/or the Trustee shall apply with respect to any actions taken or not taken by the Collateral Agent or the Trustee, as the case may be, under any Security Documents.  Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under or pursuant to any Security Document, the Trustee and the Collateral Agent each shall have all of the rights, protections, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

Section 10.13  Co-Collateral Agents.

If at any time or times it shall be necessary or prudent in order to conform to any law of any jurisdiction in which any of the Collateral shall be located, or the applicable

149

Collateral Agent shall be advised by counsel, satisfactory to it, that it is reasonably necessary in the interest of the Holders, or the Trustee (at the written direction of the Holders not less than a majority in aggregate principal amount of then outstanding Notes) shall in writing so request the Collateral Agent, or the Collateral Agent shall deem it desirable for its own protection in the performance of its duties hereunder, the Collateral Agent shall, at the reasonable request of the Trustee, execute and deliver all instruments and agreements necessary or proper to constitute one or more persons approved by the Collateral Agent, either to act as co-Collateral Agent or co-Collateral Agents of all or any of the Collateral, jointly with the Collateral Agent originally named herein or any successor or successors, or to act as separate collateral agent or collateral agents any such property. The provisions of Section 10.11 that are applicable to a Collateral Agent shall also be applied to a Co-Collateral Agent appointed pursuant to this Section 10.13.

## ARTICLE 11
## GUARANTEES

Section 11.01  <u>Guarantee</u>.

(a)    Subject to this <u>Article 11</u>, each of the Guarantors hereby, jointly and severally, unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and Collateral Agent and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or  the Obligations of the Issuers hereunder or thereunder, that:

(1)    the principal of, premium, if any, and interest on, the Notes will be promptly paid in full when due, subject to the applicable grace periods, whether at Stated Maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other Obligations of the Issuers to the Holders, the Trustee or the Collateral Agent hereunder or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

(2)    in case of any extension of time of payment or renewal of any Notes or any of such other Obligations, that same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, subject to applicable grace periods, whether at Stated Maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately.  Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

(b)    The Guarantors hereby agree that their obligations hereunder are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuers, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of

Doc#: US1:12095985v22

insolvency or bankruptcy of the Issuers, any right to require a proceeding first against the Issuers, protest, notice and all demands whatsoever and covenant that this Guarantee will not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

(c)     If any Holder or the Trustee is required by any court or otherwise to return to the Issuers, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuers or the Guarantors, any amount paid either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(d)     Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Guarantee. The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 11.02   Limitation on Guarantor Liability.

Each Guarantor and, by its acceptance of Notes and the Guarantees, each Holder hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act of 1918, as amended, the Uniform Fraudulent Transfer Act of 1984, as amended, or any similar federal or state law to the extent applicable to any Guarantee. To effectuate the foregoing intention, the Trustee, the Collateral Agent, the Holders and the Guarantors hereby irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent transfer or conveyance.

Section 11.03   Execution and Delivery of Guarantee.

Each Guarantor hereby agrees that its execution and delivery of this Indenture or, if applicable, any supplemental indenture substantially in the form of Exhibit E pursuant to Section 4.20 and this Section 11.03 shall evidence its Guarantee set forth in Section 11.01 without the need for notation on the Notes. In the event that the Company or any of its Wholly-Owned Restricted Subsidiaries creates or acquires any Wholly-Owned Restricted Subsidiary

after the Closing Date, if required by Section 4.20, the Company will cause such Wholly-Owned Restricted Subsidiary to comply with the provisions of this Article 11, to the extent applicable.

Section 11.04  Guarantors May Consolidate, etc., on Certain Terms.

Except as otherwise provided in Section 11.05, no Guarantor (other than a Guarantor whose Guarantee is to be released in accordance with Section 11.05) may sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person) another Person unless:

(1)    immediately after giving effect to that transaction, no Default or Event of Default exists; and

(2)    either:

(i)    the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger (if other than the Guarantor) unconditionally assumes all the obligations of that Guarantor under its Guarantee, this Indenture and the Security Documents pursuant to a supplemental indenture and appropriate Security Documents; or

(ii)    the Net Cash Proceeds of such sale or other disposition are applied in accordance with Section 4.10 and 4.11.

In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by supplemental indenture substantially in the form of Exhibit E, executed and delivered to the Trustee, of the Guarantee and the due and punctual performance of all of the covenants and conditions of this Indenture to be performed by the Guarantor, such successor Person will succeed to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor.  All the Guarantees so evidenced will in all respects have the same legal rank and benefit under this Indenture as the Guarantees theretofore and thereafter executed in accordance with the terms of this Indenture as though all of such Guarantees had been executed at the Closing Date.

Except as set forth in Articles 4 and 5, and notwithstanding Section 11.04(2)(i) and 11.04(2)(ii), nothing contained in this Indenture or in any of the Notes will prevent any consolidation or merger of a Guarantor with or into an Issuer or another Guarantor, or will prevent any sale or conveyance of the property of a Guarantor as an entirety or substantially as an entirety to an Issuer or another Guarantor.

Section 11.05  Releases.

(a)    A Guarantee will be automatically and unconditionally released (and thereupon will terminate and be discharged and be of no further force and effect):

(1)    upon the voluntary sale or disposition (including through merger, consolidation, amalgamation or other combination) or conveyance, transfer or lease of

152

the Capital Stock of a Guarantor following which such Guarantor is no longer a Restricted Subsidiary;

     (2)    upon a Legal Defeasance, Covenant Defeasance or satisfaction and discharge of this Indenture that complies with the provisions under Article 8 or Article 12;

     (3)    upon the designation by the Company of the Guarantor as an Unrestricted Subsidiary in compliance with the terms of this Indenture; or

     (4)    upon payment in full of the aggregate principal amount of all Notes then outstanding and all other financial obligations under this Indenture and the Notes then due and owing.

     (b)    Upon any occurrence giving rise to a release of a Guarantee as specified above, and the delivery of an Officers' Certificate and Opinion of Counsel stating that the conditions precedent for the release of the Guarantee have been satisfied under the terms of this Indenture, the Trustee will execute any documents reasonably required in order to evidence or effect such release, discharge and termination in respect of such Guarantee.  Neither Issuer nor any Guarantor will be required to make a notation on the Notes to reflect any such Guarantee or any such release, termination or discharge.

     (c)    Any Guarantor not released from its obligations under its Guarantee with the consent of the Holders as provided in Section 9.02 or as provided in this Section 11.05 will remain liable for the full amount of principal of and interest and premium, if any, on the Notes and for the other Obligations of any Guarantor under this Indenture as provided in this Article 11.

Doc#: US1:12095985v22

## ARTICLE 12
## SATISFACTION AND DISCHARGE

Section 12.01  <u>Satisfaction and Discharge.</u>

(a)     This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1)     the Issuers have irrevocably deposited or caused to be deposited with the Trustee as funds on trust for such purpose an amount in U.S. dollars or non-callable U.S. Government Securities sufficient to pay and discharge the entire Debt on such Notes that have not, prior to such time, been delivered to the Trustee for cancellation, for principal of, premium, if any, and any Additional Amounts and accrued and unpaid interest on the Notes to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or redemption date, as the case may be, and the Issuers have delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of Notes at Stated Maturity or on the redemption date, as the case may be and either:

(i)     all of the Notes that have been authenticated and delivered (other than destroyed, lost or stolen Notes that have been replaced or paid and Notes for which payment money has been deposited on trust or segregated and held on trust by the Issuers and thereafter repaid to the Issuers or discharged from such trust as provided for in this Indenture) have been delivered to the Trustee for cancellation; or

(ii)     all Notes that have not been delivered to the Trustee for cancellation: (x) have become due and payable (by reason of the mailing of a notice of redemption or otherwise); (y) will become due and payable within one year of Stated Maturity; or (z) are to be called for redemption within one year of the proposed discharge date under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the Issuers' name and at the Issuers' expense;

(2)     the Issuers have paid or caused to be paid all sums payable by them under this Indenture; and

(3)     the Issuers have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that:

(i)     all conditions precedent provided in this Indenture relating to the satisfaction and discharge of this Indenture have been satisfied;

(ii)     no Default or Event of Default will have occurred and be continuing on the date of such deposit (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting Liens to secure such borrowing); and

Doc#: US1:12095985v22

(iii)   such satisfaction and discharge will not result in a breach or violation of, or constitute a default under (other than a Default or Event of Default resulting from the borrowing of funds to be applied to such deposit and the granting Liens to secure such borrowing), this Indenture or any other agreement or instrument to which any Issuer or any Restricted Subsidiary is a party or by which any Issuer or any Restricted Subsidiary is bound.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to subclause (ii) of clause (1) of this Section 12.01, the provisions of Sections 12.02 and 8.06 will survive.  In addition, nothing in this Section 12.01 will be deemed to discharge those provisions of Section 7.07 and 10.10, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 12.02  Application of Trust Money.

All Trust Monies shall be held by the Trustee as a part of the Collateral securing the Notes and, so long as no Event of Default shall have occurred and be continuing, may either (i) be released in accordance with Section 10.03 above and this Section 12.02 or (ii) at the written direction of the Issuers be applied by the Trustee from time to time to the payment of the principal of (together with any related interest payment) on any Notes at the final stated maturity of the Notes, upon redemption of any Notes or in connection with any defeasance or discharge of the Notes.  Trust Monies deposited with the Trustee shall be invested in certain specified Cash Equivalents pursuant to the written direction of the Issuers as long as the Trustee maintains a first priority perfected security interest therein.

If the Trustee or Paying Agent is unable to apply any money or U.S. Government Securities in accordance with Section 12.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuers' and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01; provided that if the Issuers have made any payment of principal of, premium, if any, or interest on, any Notes because of the reinstatement of their obligations, the Issuers shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Securities held by the Trustee or Paying Agent.

In connection with any release of Trust Monies by the Trustee to the Company in connection with any substitution of Collateral, upon delivery by the Company of an Officers' Certificate to the Trustee certifying (i) that a substitute Qualified Vessel will be acquired by an expected delivery date (whether such Qualified Vessel has been or will be acquired through the direct purchase of such Qualified Vessel or the equity interests of any Person owning such Qualified Vessel that will become a Wholly Owned Restricted Subsidiary and a Guarantor), (ii) that such Qualified Vessel is or will be registered in a Permitted Flag Jurisdiction, (iii) the purchase price of such Qualified Vessel and (iv) that no Default or Event of Default has occurred and is continuing, then Trust Monies in an amount equal to such purchase price for such Qualified Vessel may be released by the Trustee not more than five Business Days before such expected delivery date and held in a bank account in the name of the Company or a Guarantor on an unsecured basis for the sole purpose of paying such purchase price in connection with the

155

acquisition of such Qualified Vessel in accordance with the terms of the acquisition contract therefor and in a manner consistent with customary vessel acquisition practice; *provided*, *however*, that upon delivery by the Company of an Officers' Certificate to the Trustee certifying (A) the certifications set forth in clauses (i) – (iv) above and (B) that (1) such acquisition contract with respect to such Qualified Vessel requires that a portion of such purchase price be deposited or paid in advance of the delivery of such Qualified Vessel and (2) the amount of such deposit or advance payment to be released from escrow (which amount shall not exceed 10% of such purchase price), then Trust Monies in an amount equal to such deposit or advance payment may be released by the Trustee more than five Business Days in advance of such expected delivery date into a designated account on an unsecured basis for the sole purpose of making such deposit or advance payment, which deposit or advance payment is to be remitted to the seller (or as the seller may direct) upon or in advance of the delivery of such Qualified Vessel; *provided further*, that the aggregate amount of all Trust Monies so released by the Trustee with respect to the purchase of such Qualified Vessel shall not exceed its purchase price.  If the Company or the applicable Guarantor shall fail to deliver and file, record or register any Security Documents (including without limitation the Ship Mortgage) required by this Indenture and the Security Documents to perfect the first-priority security interest of the Trustee and the Holders in such Vessel and Related Assets on or prior to the 10th Business Day following the day on which the relevant Trust Monies were released to the Company or the applicable Guarantor as described above, then, on or before such 10th Business Day, then the Company shall return to the Trustee to be kept as Trust Monies an amount equal to the full amount of such Trust Monies that were released in connection with such proposed Vessel delivery and if the Company or the applicable Guarantor shall fail to deliver and file, record or register any of such Security Documents and perfect such security interests or fail to deliver such funds, then an Event of Default shall have occurred for all purposes under this Indenture; *provided* that if the Company or the Guarantors are engaged in litigating or arbitrating any dispute relating to the acquisition and the purchase of such Qualified Vessel has not been completed, then the time period for redelivery of such Trust Monies to the Trustee shall be tolled until the dispute has been settled or a final non-appealable judgment has been reached with respect to such dispute; *provided further*, that if the ultimate resolution thereof results in no such purchase of such Qualified Vessel, then an amount equal to all such released Trust Monies shall be returned promptly to the Trustee to be kept as Trust Monies.

## ARTICLE 13
## MISCELLANEOUS

Section 13.01  Parallel Debt.

(a)     Without prejudice to the provisions of this Indenture and the Security Documents and for the purpose of preserving the initial and continuing validity of the security rights granted and to be granted by the Issuers and each Guarantor to the Collateral Agent, an amount equal to and in the same currency of the obligations under the Notes and the Guarantees from time to time due by the Issuers or such Guarantor in accordance with the terms and conditions of the Notes and Guarantees, including for the avoidance of doubt, the limitations set out under Section 11.02, shall be owing as a separate and independent joint and several obligation of the Issuers and each Guarantor to the Collateral Agent (such payment undertaking and the obligations and liabilities which are the result thereof the "Parallel Debt").

(b)        The Issuers, each Guarantor and the Collateral Agent acknowledge that (i) for this purpose the Parallel Debt constitutes undertakings, joint and several obligations and liabilities of the Issuers and each Guarantor to the Collateral Agent under this Indenture and the Security Documents which are separate and independent from, and without prejudice to, the corresponding obligations under the Notes and Guarantees which the Issuers or such Guarantor have to the Holders and (ii) that the Parallel Debt represents the Collateral Agent's claims to receive payment of the Parallel Debt; *provided* that the total amount which may become due under the Parallel Debt shall not exceed the total amount which may become due under the Notes and Guarantees; *provided*, *further*, that the Collateral Agent shall exercise its rights with respect to the Parallel Debt solely in accordance with this Indenture and the Security Documents.

(c)        Every payment of monies made by the Issuers or a Guarantor to the Collateral Agent shall (conditionally upon such payment not subsequently being avoided or reduced by virtue of any provisions or enactments relating to bankruptcy, insolvency, liquidation or similar laws of general application) be in satisfaction *pro tanto* of the covenant by the Issuers or such Guarantor contained in Section 13.01(a); *provided* that if any such payment as is mentioned above is subsequently avoided or reduced by virtue of any provisions or enactments relating to bankruptcy, liquidation or similar laws of general application, the Collateral Agent shall be entitled to receive the amount of such payment from the Issuers or such Guarantor and the Issuers or such Guarantor shall remain liable to perform the relevant obligation and the relevant liability shall be deemed not to have been discharged.

(d)        Subject to the provisions of Section 13.01(c):

(1)        the total amount due and payable as Parallel Debt under this Section 13.01 shall be decreased to the extent that the Issuers or a Guarantor shall have paid any amounts to the Collateral Agent or to the Trustee on behalf of the Holders or any of them to reduce the outstanding principal amount of the Notes, or the Collateral Agent or the Trustee, on behalf of the Holders, otherwise receives any amount in payment of the Notes and the Guarantees; and

(2)        to the extent that the Issuers or a Guarantor shall have paid any amounts to the Trustee or to the Collateral Agent under the Parallel Debt or the Trustee or the Collateral Agent shall have otherwise received monies in payment of the Parallel Debt, the total amount due and payable under the Notes and the Guarantees shall be decreased as if said amounts were received directly in payment of the Notes and Guarantees.

157

Section 13.02  Notices.

Any notice or communication by the Issuers, any Guarantor, the Trustee or the Collateral Agent to the others is duly given if in writing and delivered in person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the others' address:

If to either Issuer and/or any Guarantor:

Eletson Corporation
118 Kolokotroni Street,
GR 185 35
Piraeus, Greece
Attention: Chief Financial Officer

with a copy to:

Holland & Knight LLP
31 West 52nd Street
New York, New York 10019
Attention: Jovi Tenev

If to the Trustee, Collateral Agent, Registrar and/or Paying Agent:

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801-7411
Attention:   Global Capital Markets, Raye D. Goldsborough

The Issuers, any Guarantor, the Trustee or the Collateral Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; when receipt acknowledged, if mailed or if transmitted by facsimile; and the Business Day of delivery to the recipient as confirmed by the courier, if sent by overnight air courier.

Any notice or communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar.  Any notice or communication will also be so mailed to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to send a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

If a notice or communication is given in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

Doc#: US1:12095985v22

If the Issuers send a notice or communication to Holders, they will send a copy to the Trustee, Collateral Agent and each Agent at the same time.

Notwithstanding any other provision of this Indenture or any Note, where this Indenture or any Note provides for notice of any event (including any notice of redemption or purchase) to a Holder of a Global Note (whether by mail or otherwise), such notice shall be sufficiently given if given to the Depositary for such Note (or its designee) pursuant to the standing instructions from such Depositary.

Section 13.03   Communication by Holders with Other Holders.

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuers, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

Section 13.04   Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuers or any Guarantor to the Trustee or Collateral Agent to take any action under this Indenture or the Security Documents, the Issuers or such Guarantor, as the case may be, shall furnish to the Trustee or Collateral Agent, as applicable:

(1)      an Officers' Certificate in form reasonably satisfactory to the Trustee or Collateral Agent, as applicable, (which must include the statements set forth in Section 13.05) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture or the Security Documents, as applicable, relating to the proposed action have been satisfied; and

(2)      an Opinion of Counsel in form reasonably satisfactory to the Trustee or Collateral Agent, as applicable, (which must include the statements set forth in Section 13.05) stating that, in the opinion of such counsel, all such conditions precedent and covenants, if any, have been satisfied.

Section 13.05   Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture (other than the Officers' Certificate required by Section 4.04) shall include:

(1)      a statement that each individual signing such certificate or opinion has read such covenant or condition;

(2)      a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)      a statement that, in the opinion of such individual, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4)      a statement as to whether or not, in the opinion of each such individual, such condition or covenant has been satisfied;

*provided*, that with respect to matters of fact, an Opinion of Counsel may rely on an Officers' Certificate or certificates of public officials.

Section 13.06   Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.07   No Personal Liability of Directors, Officers, Employees and Stockholders.

No director, officer, employee, incorporator or stockholder of an Issuer or any Guarantor, as such, will have any liability for any obligations of an Issuer or the Guarantors under the Notes, this Indenture, the Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  This waiver and release are part of the consideration for issuance of the Notes.

Section 13.08   No Immunity.

To the extent that either Issuer or any Guarantor may be entitled, in any jurisdiction in which judicial proceedings may at any time be commenced with respect to this Indenture or any Security Document, to claim for itself or its revenues, assets or properties any immunity from suit, the jurisdiction of any court, attachment prior to judgment, attachment in aid of execution of judgment, set-off, execution of a judgment or any other legal process, and to the extent that in any such jurisdiction there may be attributed to such Person such an immunity (whether or not claimed), each of the Issuers and the Guarantors hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the fullest extent permitted by the law of the applicable jurisdiction.

Section 13.09   Judgment Currency.

(a)      The Issuers and the Guarantors, jointly and severally, covenant and agree that the following provisions shall apply to conversion of currency in the case of the Notes, the Guarantees and this Indenture:

(1)      (A) if for the purpose of obtaining judgment in, or enforcing the judgment of, any court in any country, it becomes necessary to convert into a currency (the "Judgment Currency") an amount due in any other currency (the "Base Currency"), then the conversion shall be made at the rate of exchange prevailing on the Business Day

160

before the day on which the judgment is given or the order of enforcement is made, as the case may be (unless a court shall otherwise determine) and (B) if there is a change in the rate of exchange prevailing between the Business Day before the day on which the judgment is given or an order of enforcement is made, as the case may be (or such other date as a court shall determine), and the date of receipt of the amount due, the Issuers and the Guarantors shall pay such additional (or, as the case may be, such lesser) amount, if any, as may be necessary so that the amount paid in the Judgment Currency when converted at the rate of exchange prevailing on the date of receipt shall produce the amount in the Base Currency originally due.

(2)     In the event of the winding-up of either Issuer or any Guarantor at any time while any amount or damages owing under the Notes, the Guarantees and this Indenture, or any judgment or order rendered in respect thereof, shall remain outstanding, the Issuers and the Guarantors shall indemnify and hold the Holders and the Trustee harmless against any deficiency arising or resulting from any variation in rates of exchange between (i) the date as of which the U.S. dollar Equivalent of the amount due or contingently due under the Notes, the Guarantees and this Indenture (other than under this Section 13.09) is calculated for the purposes of such winding-up and (ii) the final date for the filing of proofs of claim in such winding-up.

For the purpose of this Section 13.09, the final date for the filing of proofs of claim in the winding-up of any Issuer or any Guarantor shall be the date fixed by the liquidator or otherwise in accordance with the relevant provisions of applicable law as being the latest practicable date as at which liabilities of such Issuer or such Guarantor may be ascertained for such winding-up prior to payment by the liquidator or otherwise in respect thereto.

(b)     The obligations contained in Section 13.10, and clauses (a)(1)(B) and (a)(2) of this Section 13.09 shall constitute separate and independent obligations from the other obligations of the Issuers and the Guarantors under this Indenture, shall give rise to separate and independent causes of action against the Issuers and the Guarantors, shall apply irrespective of any waiver or extension granted by any Holder or the Trustee or either of them from time to time and shall continue in full force and effect notwithstanding any judgment or order or the filing of any proof of claim in the winding-up of either Issuer or any Guarantor for a liquidated sum in respect of amounts due hereunder (other than under Section 13.09(a)(2)) or under any such judgment or order. Any such deficiency as aforesaid shall be deemed to constitute a loss suffered by the Holders or the Trustee, as the case may be, and no proof or evidence of any actual loss shall be required by either Issuer or any Guarantor or the liquidator or otherwise or any of them. In the case of Section 13.09(a)(2), the amount of such deficiency shall not be deemed to be reduced by any variation in rates of exchange occurring between the said final date and the date of any liquidating distribution.

(c)     The term "rate of exchange" shall mean the rate of exchange quoted by Reuters at 10:00 a.m. (New York time) for spot purchases of the Base Currency with the Judgment Currency other than the Base Currency referred to in subsections Section 13.01(a)(1) and (a)(2) and includes any premiums and costs of exchange payable.

Doc#: US1:12095985v22

Section 13.10  <u>Currency Indemnity</u>.

The U.S. dollar is the sole currency of account and payment for all sums payable under the Notes, the Guarantees and this Indenture.  Any amount received or recovered in respect of the Notes or the Guarantees in a currency other than U.S. dollar (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of either Issuer, any Restricted Subsidiary or otherwise) by a Holder in respect of any sum expressed to be due to such Holder from the Issuers or the Guarantors will constitute a discharge of their obligation only to the extent of the U.S. dollar amount which the recipient is able to purchase with the amount so received or recovered in such other currency on the date of that receipt or recovery (or, if it is not possible to purchase U.S. dollars on that date, on the first date on which it is possible to do so).  If the U.S. dollar amount that could be recovered following such a purchase is less than the U.S. dollar amount expressed to be due to the recipient under any Note, the Issuers and the Guarantors will jointly and severally indemnify the recipient against the cost of the recipient's making a further purchase of U.S. dollars in an amount equal to such difference.  For the purposes of this <u>Section 13.10</u>, it will be sufficient for the holder to certify that it would have suffered a loss had the actual purchase of U.S. dollars been made with the amount so received in that other currency on the date of receipt or recovery (or, if a purchase of U.S. dollars on that date had not been possible, on the first date on which it would have been possible).  These indemnities, to the extent permitted by law:

(a)     constitute a separate and independent obligation from the Issuers' and the Guarantors' other obligations;

(b)     give rise to a separate and independent cause of action;

(c)     apply irrespective of any waiver granted by any holder of a Note; and

(d)     will continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any Note or any other judgment or order.

Section 13.11  <u>Governing Law; Consent to Jurisdiction; Appointment of Process Agent; Waiver of Immunity</u>.

This Indenture, the Notes, the Guarantees and the Security Documents will be governed by and construed in accordance with the laws of the State of New York.  The Ship Mortgages will be governed by and construed in accordance with the laws of the flag of the relevant Mortgaged Vessel.  Certain Security Documents may also be governed by and construed in accordance with the laws of other applicable jurisdictions.

This Indenture and Security Documents governed by New York law will provide that each of the Issuers and the Guarantors will irrevocably submit to the jurisdiction of any New York State or United States Federal court sitting in the County of New York over any suit, action or proceeding arising out of or relating to this Indenture, the Notes, the Guarantees or any Security Document.  Each of the Issuers and the Guarantors will irrevocably waive, to the fullest extent permitted by applicable law, any objection which it may now or hereafter have to the laying of venue of any such suit, action or proceeding brought in such courts and any claim that

162

any such suit, action or proceeding brought in such courts, has been brought in an inconvenient forum and any right to which it may be entitled on account of place of residence or domicile. Each of the Issuers and the Guarantors will agree that final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding on them and may be enforced in any court to the jurisdiction of which each of them is subject by a suit upon such judgment, provided, that service of process is effected upon the Issuers or the Guarantors in the manner specified in the following paragraph or as otherwise permitted by applicable law.

As long as any of the Notes remain outstanding, the Issuers and the Guarantors will consent and agree to, the service of any and all legal process, summons, notices and documents by servicing a copy thereof upon any employee of any of the Issuers or any Guarantor at any business location that either Issuer or any Guarantor may maintain from time to time in the United States including, without limitation, at the offices of Eletson Maritime, Inc., located at 1 Landmark Square, Suite 424, Stamford Connecticut 06901. If at any time neither of the Issuers nor any Guarantor maintains a bona fide business location in the United States, the Issuers and Guarantors will appoint an authorized agent (together with any such employee referred to in the preceding sentence, the "Process Agent") in the City of New York, upon whom process may be served in any legal action or proceeding arising out of or relating to this Indenture, the Notes, the Guarantees or any Security Document. Service of process upon such agent and written notice of such service mailed or delivered to the Issuers or the relevant Guarantors shall to the extent permitted by applicable law be deemed in every respect effective service of process upon each of the Issuers and the Guarantors, as the case may be, in any such legal action or proceeding.

Each party irrevocably waives, to the fullest extent permitted by applicable law, all immunity (whether on the basis of sovereignty or otherwise) from jurisdiction, service of process, attachment (both before and after judgment) and execution to which it might otherwise be entitled in the Specified Courts, and with respect to any Related Judgment or Related Mortgaged Vessel Proceeding, each party waives any such immunity in the Specified Courts or any other court of competent jurisdiction, and will not raise or claim or cause to be pleaded any such immunity at or in respect of any such Related Proceeding or Related Judgment or any Related Mortgaged Vessel Proceeding, including, without limitation, any immunity pursuant to the United States Foreign Sovereign Immunities Act of 1976, as amended.

Section 13.12   No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.13   Successors.

All agreements of the Issuers in this Indenture and the Notes will bind their respective successors. All agreements of the Trustee and the Collateral Agent in this Indenture will bind their respective successors. All agreements of each Guarantor in this Indenture and the Guarantees will bind its successors, except as otherwise provided in Section 11.05.

163

Section 13.14  <u>Severability</u>.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 13.15  <u>Counterpart Originals</u>.

The parties may sign any number of copies or counterparts of this Indenture. Each signed copy or counterpart will be an original, but all of them together represent the same agreement.  The exchange of copies of this Indenture and of signature pages by facsimile or portable document format transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto and may be used in lieu of the original Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or portable document format shall be deemed to be their original signatures for all purposes.

Section 13.16  <u>Table of Contents, Headings, etc.</u>

The Table of Contents and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 13.17  <u>English Language</u>.

This Indenture and all Security Documents shall be in the English language, except as required by Greek or other applicable law (in which event certified English translations thereof shall be provided by the Company to the Trustee).  All documents, certificates, reports or notices to be delivered or communications to be given or made by any party thereto pursuant to the terms thereof or this Indenture or any Security Document shall be in the English language or, if originally written in another language, shall be accompanied by an accurate English translation upon which the parties hereto shall have the right to rely for all purposes of this Indenture and the Security Documents.

Section 13.18  <u>USA PATRIOT Act</u>.

The parties hereto acknowledge that in accordance with Section 326 of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, the Trustee and Collateral Agent, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account.  The parties hereto agree that they will provide the Trustee and Collateral Agent with such information as they may request in order to satisfy the requirements of the USA PATRIOT Act.

*(Signature pages follow)*

164

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be executed as of the date first written above.

**ISSUERS:**

ELETSON HOLDINGS INC.

By: _____
    Name:  Laskarina I. Karastamati
    Title:   President and Director

By: _____
    Name:  Vasileios A. Chadzieleftheriadis
    Title:   Vice-President, Treasurer and Director

ELETSON FINANCE (US) LLC

By: _____
    Name:  Laskarina I. Karastamati
    Title:   President and Director

By: _____
    Name:  Vasileios A. Chadzieleftheriadis
    Title:   Vice-President, Treasurer and Director

AGATHONISSOS FINANCE LLC

By: _____
    Name:  Laskarina I. Karastamati
    Title:   President and Director

By: _____
    Name:  Vasileios A. Chadzieleftheriadis
    Title:   Vice-President, Treasurer and Director

[Signature Page to the Indenture]

**GUARANTORS:**

ERIKOUSSA SPECIAL MARITIME ENTERPRISE
ALONISSOS SPECIAL MARITIME ENTERPRISE
AGATHONISSOS SPECIAL MARITIME
ENTERPRISE
MAKRONISSOS SPECIAL MARITIME
ENTERPRISE
PELAGOS II SPECIAL MARITIME ENTERPRISE
ANGISTRI SPECIAL MARITIME ENTERPRISE
SKOPELOS II SPECIAL MARITIME ENTERPRISE
MEGALONISSOS SPECIAL MARITIME
ENTERPRISE
SHINOUSSA SHIPPING CORPORATION
SARAKINO SHIPPING CORPORATION
VENETIKO SHIPPING CORPORATION
SKYROS II SHIPPING CORPORATION
SIKINOS II SHIPPING CORPORATION

By: _____
    Name:  Laskarina I. Karastamati
    Title:   Vice-President, Secretary and Director

By: _____
    Name:  Vasileios A. Chadzieleftheriadis
    Title:   Vice -President, Treasurer and Director

[Signature Page to the Indenture]

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Trustee and Collateral Agent

By:   _____

Name:  Raye Goldsborough
Title:  Assistant Vice President

EXHIBIT A

[Form of Face of Note]

[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Regulation S Temporary Global Note Legend, if applicable pursuant to the provisions of the Indenture]

CUSIP [   ][1]
ISIN [   ][1]

### ELETSON HOLDINGS INC.
### ELETSON FINANCE (US) LLC
### AGATHONISSOS FINANCE LLC

**First Preferred Ship Mortgage Notes due 2022**

No. [144A][Reg. S][AI]-[_____]                                      $[_____]

       Eletson Holdings Inc., a Liberian corporation, Eletson Finance (US) LLC, a Delaware limited liability company, and Agathonissos Finance LLC, a Marshall Islands corporation (collectively, the "Issuers," which term includes any successor entities), for value received promise to pay to _____ or its registered assigns, the principal sum of _____ (or such principal amount as may be set forth in the attached Schedule of Exchanges of Interests in the [Regulation S Temporary] Global Note) on January 15, 2022, and to pay interest thereon as hereinafter set forth.

       Interest Payment Dates: January 15 and July 15 (for the interest period from January 16, 2018 to January 15, 2019); January 15, April 15, July 15 and October 15 (for the interest period from and after January 16, 2019)

       Record Dates: the Closing Date (for the interest period from January 16, 2018 to July 15, 2018); January 1 (for the interest period from July 16, 2018 to January 15, 2019); January 1, April 1, July 1 and October 1 (for the interest period from and after January 16, 2019)

       Dated: [_____], 20[___]

       Reference is made to the further provisions of this Note contained on the reverse side of this Note, which will for all purposes have the same effect as if set forth at this place.

---

[1] AI CUSIP / ISIN:  28620E AB6 / US28620EAB65
Regulation S CUSIP / ISIN: V32257 AA1 / ISIN USV32257AA10
Rule 144A CUSIP / ISIN: 28620E AA8 / US28620EAA82

A-2

IN WITNESS WHEREOF, the Issuers have caused this instrument to be duly executed.

ELETSON HOLDINGS INC.

By: _____
     Name:
     Title:

ELETSON FINANCE (US) LLC

By: _____
     Name:
     Title:

AGATHONISSOS FINANCE LLC

By: _____
     Name:
     Title:

## TRUSTEE CERTIFICATE OF AUTHENTICATION

This Note is one of the First Preferred Ship Mortgage Notes due 2022 referred to in the within-mentioned Indenture.

Wilmington Savings Fund Society, FSB,
as Trustee

By: Wilmington Savings Fund Society, FSB

By: _____
Authorized Signatory

By: _____
Authorized Signatory

Dated: [_____], 20[____]

A-4

[Form of Back of Note]
**First Preferred Ship Mortgage Note due 2022**

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1)    *INTEREST.*  Eletson Holdings Inc., a Liberian corporation (the "Company"), Eletson Finance (US) LLC, a Delaware limited liability company ("Eletson Finance"), and Agathonissos Finance LLC, a Marshall Islands corporation (collectively with Eletson Finance and the Company, the "Issuers" and each, an "Issuer"), promise to pay interest on the principal amount of this Note at a variable rate per annum from [_____], 20[___] until maturity.  Interest on the Notes will accrue:

- Semiannually, in arrears, for the interest period from January 16, 2018 to July 15, 2018, at a rate of 12.00% per annum, payable on July 15, 2018 to holders of record on the Closing Date, payable entirely by increasing the principal amount of the outstanding Notes or by issuing new Notes ("PIK Interest");

- Semiannually, in arrears, for the interest period from July 16, 2018 to January 15, 2019, at a rate of 9.625% per annum, payable on January 15, 2019 in cash ("Cash Interest") to holders of record on January 1, 2019; and

- From and after January 16, 2019, quarterly, in arrears, at a rate per annum of (i) 9.625% for any interest payment date for which the Trailing TCE is less than $20,000 or (ii) 10.625% plus 1.00% for each integral multiple of $2,000 by which the Trailing TCE for such interest payment date exceeds $20,000 (up to a maximum of 14.625% per annum), payable on each January 15, April 15, July 15 and October 15 (each, a "TCE-Based Interest Payment Date") as Cash Interest to holders of record on the immediately preceding January 1, April 1, July 1 and October 1, respectively.  No later than five (5) days prior to the record date for each TCE-Based Interest Payment Date, the Company shall notify the Trustee in writing of (i) the Trailing TCE for each TCE-Based Interest Payment Date and (ii) the applicable interest rate for such TCE-Based Interest Payment Date. The Trustee, on behalf of the Issuers, shall provide such notice to the Holders no later than the record date for such TCE-Based Interest Payment Date. The Company will prepare the notice and the Trustee will then send such notice to the Holders.

Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; provided that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; provided further that the first Interest Payment Date shall be July 15, 2018.  The Issuers will pay interest on overdue principal and premium, if any, at a rate that is equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; they will pay interest on overdue installments of interest (without regard to any applicable grace period) at the same rate to the extent lawful.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

A-1

At all times, PIK Interest on the Notes will be payable (x) with respect to Notes represented by one or more global Notes registered in the name of, or held by, The Depository Trust Company ("**DTC**") or its nominee on the relevant record date, the Trustee will, at the written request of the Issuer, increase the principal amount of the outstanding global Note by an amount equal to the amount of PIK Interest for the applicable interest period (rounded down to the nearest whole dollar) and (y) with respect to Notes represented by certificated Notes, by issuing PIK Notes in certificated form in an aggregate principal amount equal to the amount of PIK Interest for the applicable interest period (rounded down to the nearest whole dollar), and the Trustee will, at the written request of the Issuers, authenticate and deliver such PIK Notes in certificated form for original issuance to the Holders on the relevant record date, as shown by the records of the register of Holders. Following an increase in the principal amount of any outstanding global Notes as a result of a PIK Payment, such global Note will bear interest on such increased principal amount from and after the date of such PIK Payment. Any PIK Notes issued in certificated form will be dated as of the applicable interest payment date and will bear interest from and after such date. All Notes issued pursuant to a PIK Payment will mature on the same date that the Notes with respect to which such PIK Payment was made will mature and will be governed by, and subject to the terms, provisions and conditions of, the Indenture and shall have the same rights and benefits as the Notes issued on the Closing Date. Any certificated PIK Notes will be issued with the description "PIK" on the face of such PIK Note, but shall be treated for all purposes under the Indenture with the same rights and obligations as the Notes.

(2)      *METHOD OF PAYMENT*.  The Issuers will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the applicable record dates specified in Section 1 above (whether or not a Business Day), next preceding the applicable Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, premium, if any, and interest at the office or agency of the Issuers maintained for such purpose or, at the option of the Issuers, payment of interest may be made by check mailed to the Holders at their addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required with respect to principal of and interest and premium, if any, on, all Global Notes and all other Notes the Holders of which will have provided wire transfer instructions to the Issuers or the Paying Agent.  Such payment will be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

(3)      *PAYING AGENT AND REGISTRAR*.  Initially, Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, will act as Paying Agent and Registrar.  The Issuers may change any Paying Agent or Registrar without notice to any Holder.  The Issuers or any of their Subsidiaries may act in any such capacity.

(4)      *INDENTURE*.  The Issuers issued the Notes under an Indenture dated as of July 2, 2018 (as it may be amended, supplemented or otherwise modified, the "Indenture") among the Issuers, the Guarantors, the Trustee and the Collateral Agent.  This Note is one of a duly authorized issue of notes of the Issuers designated as their First Preferred Ship Mortgage Notes due 2022.  The terms of the Notes include those stated in the Indenture and those made

A-2

part of the Indenture by reference to the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and the TIA for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

(5)    *OPTIONAL REDEMPTION.*

At any time prior to maturity, upon not less than 30 nor more than 60 days' notice, the Issuers may redeem all or part of the Notes at the following redemption prices (expressed as percentages of their principal amount at maturity), plus accrued and unpaid interest, if any, to the redemption date, subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date, if redeemed during the twelve month period commencing on January 15 of the years set forth below.

| <u>Year</u> | <u>Percentage</u> |
|---|---|
| 2018 | 104.813% |
| 2019 | 102.406% |
| 2020 and thereafter | 100.000% |

Unless the Issuers default in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

Any redemption pursuant to this <u>Section 5</u> shall be made pursuant to the provisions of <u>Sections 3.01</u> through <u>3.06</u> of the Indenture.

(6)    *MANDATORY REDEMPTION.*    The Issuers are not required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Issuers may be required to offer to purchase the Notes as described in the Indenture, including <u>Sections 4.10</u>, <u>4.11</u>, <u>4.16</u>, <u>4.17</u>, <u>4.19</u> and <u>4.32</u>. The Issuers and the Restricted Subsidiaries may at any time and from time to time purchase Notes in the open market or otherwise.

(7)    *REDEMPTION UPON CHANGES IN WITHHOLDING TAXES.*    The Notes may be subject to redemption under <u>Section 3.09</u> of the Indenture.

(8)    *REPURCHASE AT THE OPTION OF HOLDER.*    The Notes may be subject to repurchase at the Option of the Holder under the Indenture, including <u>Sections 4.10</u>, <u>4.11</u>, <u>4.16</u>, <u>4.17</u>, <u>4.19</u> and <u>4.32</u>.

(9)    *DENOMINATIONS, TRANSFER, EXCHANGE.*    The Notes are in registered form without coupons in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof. Any PIK Notes shall be in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuers may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuers and the Registrar need not exchange or register the transfer of any Note

A-3

or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuers and the Registrar need not exchange or register the transfer of any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption and ending at the close of business on the day of selection or during the period between a record date and the corresponding Interest Payment Date.

[This Regulation S Temporary Global Note is exchangeable in whole or in part for one or more Global Notes only (i) on or after the Restricted Period and (ii) upon presentation of certificates (accompanied by an Opinion of Counsel, if applicable) required by Article 2 of the Indenture. Upon exchange of this Regulation S Temporary Global Note for one or more Global Notes, the Trustee shall cancel this Regulation S Temporary Global Note.]

(10)    *PERSONS DEEMED OWNERS*.  The registered Holder of a Note will be treated as its owner for all purposes.

(11)    *UNCLAIMED MONEY*.  If any money deposited with the Trustee or any Paying Agent, or then held by the Issuers, in trust for the payment of the principal of, premium, if any, or interest on, any Note remains unclaimed for two years, the Trustee or Paying Agent will pay the money back to the Issuers or, if then held by the Issuers, will be discharged from such trust.  After any such payment, any Holder entitled to the money must look only to the Issuers and not the Trustee or Paying Agent for payment.

(12)    *DISCHARGE AND DEFEASANCE*.  Subject to the conditions set forth in the Indenture, the Issuers and the Guarantors at any time shall be entitled to terminate some or all of their obligations under the Indenture and the Notes or the Guarantees, as applicable, if the Issuers deposit with the Trustee cash in U.S. dollars or non-callable U.S. Government Securities for the payment of principal of, premium, if any, and accrued interest on the Notes to redemption or maturity, as the case may be.

(13)    *AMENDMENT, SUPPLEMENT AND WAIVER*.  The Notes may be subject to Amendment, Supplement and Waiver, as described in <u>Article 9</u> of the Indenture.

(14)    *DEFAULTS AND REMEDIES*.  The Indenture contains various Events of Default and provisions relating to remedies associated therewith, as described in <u>Article 6</u> of the Indenture.

(15)    *TRUSTEE DEALINGS WITH THE ISSUERS*.  The Trustee, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuers or an Affiliate of an Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest (as defined in the TIA) it must eliminate such conflict within 90 days or resign.

(16)    *NO RECOURSE AGAINST OTHERS*.  No director, officer, employee, incorporator or stockholder of an Issuer or any Guarantor, as such, will have any liability for any obligations of an Issuer or the Guarantors under the Notes, the Indenture, the Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each

Doc#: US1:12095985v22

Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

(17)    *AUTHENTICATION*.  This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent.

(18)    *ABBREVIATIONS*.  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(19)    *CUSIP NUMBERS*.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuers have caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders.  No representation is made as to the correctness or accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(20)    *GUARANTEES*.  The payment of the principal of, premium, if any, and interest on the Notes, is unconditionally guaranteed, jointly and severally, by the Guarantors to the extent set forth in and subject to the provisions of the Indenture.

(21)    *SECURITY*.  The Obligations of the Issuers and the Guarantors are secured by Liens on the Collateral pursuant to the terms of the Security Documents.  The actions of the Trustee, the Collateral Agent and the Holders and the application of proceeds from the enforcement of any remedies with respect to such Collateral are limited pursuant to the terms of the Security Documents.

(22)    *GOVERNING LAW*.  THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

The Issuers will furnish to any Holder upon written request and without charge a copy of the Indenture and the Security Documents.  Requests may be made to the Issuers at the following address:

Eletson Corporation
118 Kolokotroni Street,
GR 185 35
Piraeus, Greece
Attention: Chief Financial Officer

Doc#: US1:12095985v22

# ASSIGNMENT FORM

To assign this Note, fill in the form below:

I or we assign and transfer this Note to: _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Issuers.  The agent may substitute another to act for it.

Date: _____

Your Signature: _____

(*Sign exactly as your name appears on the face of this Note*)

Signature Guarantee*: _____

In connection with any transfer of this Note the undersigned confirms that it has not utilized any general solicitation or general advertising in connection with the transfer and that this Note is being transferred:

**[*Check One*]**

(1)  ☐  to the Company or a subsidiary thereof; or

(2)  ☐  pursuant to and in compliance with Rule 144A under the Securities Act; or

(3)  ☐  to an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act) that has furnished to the Trustee a signed letter containing certain representations and agreements (the form of which letter can be obtained from the Issuers); or

(4)  ☐  outside the United States to a person other than a "U.S. person" in compliance with Rule 904 of Regulation S under the Securities Act; or

A-6

(5)  ☐  pursuant to the exemption from registration provided by Rule 144 under the Securities Act.

Unless one of the boxes is checked, the Trustee will refuse to register any of the Notes evidenced by this certificate in the name of any person other than the registered Holder thereof; *provided* that if box (3), (4) or (5) is checked, the Issuers or the Trustee may require, prior to registering any such transfer of the Notes, in its sole discretion, such legal opinions, certifications (including an investment letter in the case of box (3) or (4)) and other information as the Trustee or the Issuers have reasonably requested to confirm that such transfer is being made pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Section 2.06 of the Indenture shall have been satisfied.

Dated: _____    Signed: _____
                                         (*Sign exactly as your name appears on the other side of this Note*)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## **TO BE COMPLETED BY PURCHASER IF (2) ABOVE IS CHECKED**

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuers as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____    _____
                                 NOTICE: To be executed by an executive officer

Doc#: US1:12095985v22

## **OPTION OF HOLDER TO ELECT PURCHASE**

If you want to elect to have this Note purchased by the Issuers pursuant to Section 4.10, 4.11, 4.16, 4.17, 4.19 or 4.32 of the Indenture, check the appropriate box below:

☐ **Section 4.10**   ☐ **Section 4.11**   ☐ **Section 4.16**   ☐ **Section 4.17**   ☐ **Section 4.19**   ☐ **Section 4.32**

If you want to elect to have only part of the Note purchased by the Issuers pursuant to Section 4.10, 4.11, 4.16, 4.17, 4.19 or 4.32 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

*       Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-8

SCHEDULE OF EXCHANGES OF INTERESTS
IN THE [REGULATION S TEMPORARY] GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____.
The following exchanges of a part of this [Regulation S Temporary] Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global Note or Definitive Note for an interest in this [Regulation S Temporary] Global Note, have been made:

| Date of Exchange | Amount of Decrease in Principal Amount of this Global Note | Amount of Increase in Principal Amount of this Global Note | Principal Amount of this Global Note Following such Decrease or Increase | Signature of Authorized Signatory of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

*      This schedule should be included only if the Note is issued in global form.

A-9

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

Eletson Corporation
118 Kolokotroni Street,
GR 185 35
Piraeus, Greece
Attention: Chief Financial Officer

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801-7411
Attention:      Global Capital Markets, Raye D. Goldsborough


Re:      First Preferred Ship Mortgage Notes due 2022

Reference is hereby made to the Indenture, dated as of July 2, 2018 (as amended, supplemented or otherwise modified, the "*Indenture*"), among Eletson Holdings Inc., a Liberian corporation, Eletson Finance (US) LLC, a Delaware limited liability company, and Agathonissos Finance LLC, a Marshall Islands corporation, as issuers (collectively, the "*Issuers*"), the Guarantors party thereto and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.      ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A**.  The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such

B-1

Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2.　　☐ **Check if Transferee will take delivery of a beneficial interest in the Regulation S Global Note or a Restricted Definitive Note pursuant to Regulation S**.  The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a Person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed Transfer is being made prior to the expiration of the Restricted Period, the Transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

3.　☐ **Check and complete if Transferee will take delivery of a beneficial interest in the AI Global Note or a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**.  The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)　　☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)　　☐ such Transfer is being effected to the Company or a subsidiary thereof; or

(c)　　☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Securities Act;

or

B-2

(d)      ☐ such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the registration requirements of the Securities Act other than Rule 144A, Rule 144, Rule 903 or Rule 904, and the Transferor hereby further certifies that it has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies with the transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requirements of the exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in the form of Exhibit D to the Indenture and (2) an Opinion of Counsel provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification), to the effect that such Transfer is in compliance with the Securities Act.  Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the AI Global Note and/or the Restricted Definitive Notes and in the Indenture and the Securities Act.

4.  ☐  **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a)      ☐  **Check if Transfer is pursuant to Rule 144**.  (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)      ☐  **Check if Transfer is Pursuant to Regulation S**.  (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)      ☐  **Check if Transfer is Pursuant to Other Exemption**.  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will not be subject to

B-3

the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

_____

[Insert Name of Transferor]

By: _____

Name:
Title:

Dated: _____

B-4

## ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)     ☐ a beneficial interest in the:

    (i)      ☐ 144A Global Note (CUSIP _____), or

    (ii)     ☐ Regulation S Global Note (CUSIP _____), or

    (iii)    ☐ AI Global Note (CUSIP _____); or

(b)     ☐ a Restricted Definitive Note.

2.      After the Transfer the Transferee will hold:

[CHECK ONE]

(a)     ☐ a beneficial interest in the:

    (i)      ☐ 144A Global Note (CUSIP _____), or

    (ii)     ☐ Regulation S Global Note (CUSIP _____), or

    (iii)    ☐ AI Global Note (CUSIP _____); or

    (iv)     ☐ Unrestricted Global Note (CUSIP _____); or

(b)     ☐ a Restricted Definitive Note; or

(c)     ☐ an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

Doc#: US1:12095985v22

EXHIBIT C

FORM OF CERTIFICATE OF EXCHANGE

Eletson Corporation
118 Kolokotroni Street,
GR 185 35
Piraeus, Greece
Attention: Chief Financial Officer

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801-7411
Attention:   Global Capital Markets, Raye D. Goldsborough

Re:   <u>First Preferred Ship Mortgage Notes due 2022</u>

Reference is hereby made to the Indenture, dated as of July 2, 2018 (as amended, supplemented or otherwise modified, the "*Indenture*"), among Eletson Holdings Inc., a Liberian corporation, Eletson Finance (US) LLC, a Delaware limited liability company, and Agathonissos Finance LLC, a Marshall Islands corporation, as issuers (collectively, the "*Issuers*"), the Guarantors party thereto and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*").  In connection with the Exchange, the Owner hereby certifies that:

1.   **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

(a)   ☐  **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and

C-1

(iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b)   ☐   **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c)   ☐   **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**.  In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(d)   ☐   **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**.  In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2.   **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a)   ☐   **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.**  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement

C-2

Legend printed on the Restricted Definitive Note and in the Indenture and under the Securities Act.

(b)      ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**.  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐  144A Global Note, ☐  Regulation S Global Note, ☐  AI Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

C-3

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

Doc#: US1:12095985v22

EXHIBIT D

## FORM OF CERTIFICATE FROM
## ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

Eletson Corporation
118 Kolokotroni Street,
GR 185 35
Piraeus, Greece
Attention: Chief Financial Officer

Wilmington Savings Fund Society, FSB
WSFS Bank Center
500 Delaware Avenue, 11th Floor
Wilmington, Delaware 19801-7411
Attention:     Global Capital Markets, Raye D. Goldsborough

Re:     First Preferred Ship Mortgage Notes due 2022

Reference is hereby made to the Indenture, dated as of July 2, 2018 (as amended, supplemented or otherwise modified, the "*Indenture*"), among Eletson Holdings Inc., a Liberian corporation, Eletson Finance (US) LLC, a Delaware limited liability company, and Agathonissos Finance LLC, a Marshall Islands corporation, as issuers (collectively, the "*Issuers*"), the Guarantors party thereto and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as trustee and collateral agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(a)     ☐  a beneficial interest in a Global Note, or

(b)     ☐  a Definitive Note,

we confirm that:

1.     We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the Securities Act of 1933, as amended (the "*Securities Act*") or any other applicable securities law.

2.     We understand that the offer and sale of the Notes have not been registered under the Securities Act or any applicable securities law, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence. We

D-1

agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (A) to the Company or any subsidiary thereof, (B) in accordance with Rule 144A under the Securities Act to a "qualified institutional buyer" (as defined therein), (C) to an institutional "accredited investor" (as defined below) that, prior to such transfer, furnishes (or has furnished on its behalf by a U.S. broker-dealer) to you and to the Company a signed letter substantially in the form of this letter and, an Opinion of Counsel in form reasonably acceptable to the Company to the effect that such transfer is in compliance with the Securities Act, (D) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act, (E) pursuant to the provisions of Rule 144 under the Securities Act or (F) pursuant to an effective registration statement under the Securities Act, and we further agree to provide to any Person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of clauses (A) through (E) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Issuers such certifications, legal opinions and other information as you and the Issuers may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion, in each case for investment only, and not with a view to, or for the offer or sale in connection with, any distribution thereof in violation of the Securities Act.

You and the Issuers are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

[Insert Name of Institutional Accredited Investor]

By: _____

Name:

Title:

D-2

EXHIBIT E

FORM OF SUPPLEMENTAL INDENTURE

[FIRST] SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*"), dated as of [＿＿＿＿＿＿＿＿＿＿＿], 20[＿], among [＿＿＿＿＿＿＿＿＿＿＿], a [JURISDICTION] [TYPE OF ENTITY] (the "*Additional Guarantor*"), Eletson Holdings Inc., a Liberian corporation, Eletson Finance (US) LLC, a Delaware limited liability company, and Agathonissos Finance LLC, a Marshall Islands corporation, as issuers (collectively, the "*Issuers*"), the Guarantors party to the Indenture (as defined below) and Wilmington Savings Fund Society, FSB, a federal savings bank duly organized and existing under the laws of the United States of America, as trustee and as collateral agent (collectively, the "*Trustee*").

W I T N E S S E T H

WHEREAS, the Issuers and the Guarantors have heretofore executed and delivered to the Trustee the Indenture, dated as of July 2, 2018, (as amended, supplemented or otherwise modified, the "*Indenture*"), governing the Issuers' First Preferred Ship Mortgage Notes due 2022 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances a Restricted Subsidiary of the Company shall execute and deliver to the Trustee a supplemental indenture pursuant to which such a Restricted Subsidiary shall unconditionally guarantee all of the Issuers' Obligations under the Notes and the Indenture as set forth herein (the "*Guarantee*"); and WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture without the consent of any Holder.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.     *Capitalized Terms*.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.     *Agreement to Guarantee*.  The Additional Guarantor hereby agrees to provide a full and unconditional Guarantee on the terms and subject to the conditions set forth in the Indenture including, but not limited to, Article 11 thereof.

3.     *No Recourse Against Others*.  No director, officer, employee, incorporator or stockholder of an Issuer or any Guarantor, as such, will have any liability for any obligations of an Issuer or the Guarantors under the Notes, the Indenture, the Guarantees or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder by accepting a Note waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.

4.     *NEW YORK LAW TO GOVERN*.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

E-1

5.    *Counterparts*.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy or counterpart will be an original, but all of them together represent the same agreement.  The exchange of copies of this Supplemental Indenture and of signature pages by facsimile or portable document format transmission shall constitute effective execution and delivery of this Supplemental Indenture as to the parties hereto and may be used in lieu of the original Supplemental Indenture for all purposes.  Signatures of the parties hereto transmitted by facsimile or portable document format shall be deemed to be their original signatures for all purposes.

6.    *Effect of Headings*.  The section headings herein are for convenience only and shall not affect the construction hereof.

7.    *Ratification of Indenture; Supplemental Indentures Part of Indenture*.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Indenture for all purposes, and each Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

8.    *Trustee*.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Additional Guarantor and the Issuers.

*9.*    *Notices*.  Notices to the Additional Guarantor shall be made in accordance with Section 13.02 of the Indenture at the address for the Issuers and the Guarantors set forth in such Section.

* * *

E-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

ELETSON HOLDINGS INC.

By: _____
     Name:
     Title:

ELETSON FINANCE (US) LLC

By: _____
     Name:
     Title:

AGATHONISSOS FINANCE LLC

By: _____
     Name:
     Title:

[GUARANTORS],
as Guarantors

By: _____
     Name:
     Title:

[ADDITIONAL GUARANTOR],
as a Guarantor

By: _____
     Name:
     Title:

E-3

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Trustee and Collateral Agent

By: Wilmington Savings Fund Society, FSB

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

E-4