UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In Re | Case No. 23-10322-JPM |
| ELETSON HOLDINGS INC, | (Involuntary Chapter 7) |
| Alleged Debtor. | MEMORANDUM IN SUPPORT OF MOTION |
| | <u>Hearing</u><br>Date:<br>Time:<br>Judge: Hon. John P. Mastando III |

Alleged Debtor Eletson Holdings Inc. (the "<u>Alleged Debtor</u>") submits this Memorandum in Support of its Motion for Relief from the Automatic Stay to Allow the Alleged Debtor to Proceed with, or to Confirm the Inapplicability of the Automatic Stay to, Prepetition Arbitration Proceedings about to go to trial.

## I.    INTRODUCTION

The above-captioned involuntary proceeding was commenced on March 7, 2023, or less than one week ago, by three petitioning creditors, at least one of which appears not to meet the minimum requirements to have joined in the involuntary petition.  That same creditor, Pach Shemen LLC ("<u>Pach Shemen</u>"), is an affiliate of an entity with which the Alleged Debtor has been engaged in a contentious arbitration proceeding since last year.

On March 6, 2023, the day prior to the commencement of this involuntary case, oral rulings (subsequently reduced to writing) were made in the arbitration including that Pach Shemen's affiliate, Levona Holdings Ltd ("<u>Levona</u>"), had waived the attorney-client privilege with respect to certain communications and was compelled to produce documents in the arbitration.  The arbitrator, Justice Ariel Belen, formerly an Associate Justice of the Supreme Court of New York,

1

Appellate Division, Second Department, also made other rulings that were contrary to Levona's positions, including the denial of a motion to strike filed by Levona and permission being granted to Claimants to file an expedited motion finding Levona in violation of a Status Quo Injunction entered in the arbitration. At the March 6, 2023 hearing, consistent with the parties' contractual agreement that the arbitration be concluded in not greater than 150 days after it was commenced, a final pretrial hearing was reaffirmed for April 17, 2023, with a three-week trial scheduled to commence on April 23, 2023.

The day after Justice Belen's rulings, Pach Shemen, together with two other petitioning creditors, filed the involuntary petition, and took the position that no further action could be taken in the arbitration – including the production of the ordered documents, finalization of expert reports, and the motion for violation of the Status Quo Injunction – because the proceeding was stayed. Levona's position before the Arbitration was that the stay is absolute, and all activities concerning all claims and counterclaims, discovery production, expert reports, briefing, and everything else related to the Arbitration must stop. This position was taken by Levona notwithstanding the fact that the Arbitration involves, in addition to the claims asserted by Levona against the Alleged Debtor: (i) affirmative claims asserted by the Alleged Debtor's affiliate Eletson Corporation ("Corp") against Levona, (ii) affirmative claims asserted by the Alleged Debtor against Levona, and (iii) claims asserted by Levona against non-debtor Corp. On Friday, March 10, 2023, an order was entered in the Arbitration confirming that it would be temporarily stayed, in its entirety, pending further guidance from this Court.

The unlawful commencement of this involuntary bankruptcy proceeding appears to be little more than a scheme to undermine the Alleged Debtor's business operations and gain a tactical advantage in the arbitration. By this motion, the Alleged Debtor seeks relief from stay to continue

2

with the arbitration, which involves affirmative claims filed by itself and its non-debtor affiliate, Corp against Levona, as well as defensive claims filed by Levona against the Alleged Debtor and Corp. Without relief from stay, critical disclosures and deadlines will be missed, and the parties will no longer be in a position to proceed with the trial scheduled to commence in April 2023. In light of the foregoing, and as set forth more fully below, cause exists under section 362(d)(1) for relief from stay to permit the arbitration to proceed.

## II. JURISDICTION AND VENUE

The United States Bankruptcy Court for the Southern District of New York (this "Court") has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in in the Southern District of New York pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are section 362(d) of the Bankruptcy Code, Bankruptcy Rule 4001, and Rule 4001-1 of the Local Bankruptcy Rules for the Southern District of New York.

## III. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A. Preliminary Details About the Alleged Debtor and This Involuntary Bankruptcy Proceeding

On March 7, 2023 (the "Involuntary Petition Date"), an involuntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") was filed against the Alleged Debtor and two of its affiliates. Prior to the Involuntary Petition Date, the Alleged Debtor was party to an arbitration proceeding (the "Arbitration") with its non-debtor affiliate, Corp, and adverse party Levona. The contentious Arbitration was initially commenced by the Alleged Debtor and Corp (collectively, the "Arbitration Claimants"), and is scheduled for trial starting in April 2023. The Honorable Ariel Belen, as arbitrator (the "Arbitrator"), each of the parties to the

Arbitration, their attorneys, fact witnesses, and expert witnesses have already reserved three consecutive weeks on their calendars to permit the Arbitration to proceed as scheduled. Given the number of participants and witnesses, many of whom are not United States citizens or residents, rescheduling the trial will significantly disrupt the business of the Alleged Debtor and its affiliates and could be catastrophic to their future operations. Furthermore, the parties to the Arbitration are bound by contractual agreements that require arbitrations of disputes thereunder to be concluded within 150 days. As such, time is of the essence.

The Arbitration was commenced by the Alleged Debtor and Corp against Levona for claims arising from Levona's purported purchase and alleged sale of certain preferred shares in the Arbitration Claimant's affiliate, Eletson Gas ("Gas"). Among other things, the Arbitration Claimants commenced the Arbitration seeking a declaration that Levona has no ownership interest in Gas. Levona, in turn, has filed counterclaims against the Arbitration Claimants seeking equitable relief, declaratory relief, and monetary damages, wherein it alleges, among other things, that it continues to own certain preferred shares of Gas, and also alleges that it has been injured by various actions and inactions of the Arbitration Claimants. If the claims related to ownership of the preferred shares is decided in Levona's favor, Levona will be owner of those shares in Gas. If it is decided in favor of the Arbitration Claimants, the shares will be returned to Gas or its nominee. Under no outcome will the preferred shares of Gas become property of the Alleged Debtor.

**B.** **The Unity of Interests Between Levona and Pach Shemen**

As detailed above, by this Motion, the Alleged Debtor seeks relief from this Court in order to proceed with the Arbitration involving Levona. It is important for this Court to consider the relationship of Levona and petitioning creditor Pach Shemen.

At issue in the Arbitration is whether Levona continues to own preferred shares in Gas. Levona's appointed directors to Gas – and thus persons fully aware of the Arbitration proceedings including the Status Quo Injunction entered in that case – include Mark Lichtenstein and Adam Spears. Mr. Lichtenstein attended the March 6 hearing held in the Arbitration discussed below, in which the Arbitrator ordered Levona to disclose documents as to which it had waived privilege. Not coincidentally, both Messrs. Lichtenstein and Spears appeared before this Court the next day, submitting supporting documentation on behalf of Pach Sheman in the involuntary case, in an effort to stay the Arbitration and forestall Levona's production of the ordered documents and compliance with other directives. *See, e.g., Involuntary Petition* [Dkt No. 1] (including an electronic signature of Mark Lichtenstein on behalf of Pach Shemen, as petitioning creditor); *Corporate Ownership Statement of Pach Shemen LLC* [Dkt No. 1] (including an electronic signature of Mark Lichtenstein); *Affidavit of Adam Spears on Behalf of Pach Shemen LLC Pursuant to Federal Rules of Bankruptcy Procedure Rule 1003(a)* [Dkt No. 1].

In its Corporation Ownership Statement filed in the above-captioned proceeding, Mr. Lichtenstein attested that Pach Shemen is owned by Levona's owners in the exact same proportion as they own Levona: Nomis Bay Ltd. owns 60% of the equity interests of Pach Shemen, and BPY Limited owns 40% of the equity interest of Pach Shemen. *Compare Corporation Ownership Statement of Pach Shemen, LLC* [Dkt No. 1] *with* Solomon Decl., ¶ 6 (3/1/23 Organization chart submitted in Arbitration by Levona (showing same ownership)). Were this not conclusive, the involuntary petition papers expressly admit the affiliation between Levona and Pach Shemen:

> ***An affiliate of one of the Petitioning Creditors owns the balance of the equity interests in the Eletson Gas joint venture and, as of the petition date, was engaged in mandatory arbitration of certain disputes between such holder and Eletson Holdings concerning the ownership of the equity interests in Eletson Gas and certain related matters***.

*Statement of Petitioning Creditors in Support of Involuntary Chapter 7 Petitions* [Dkt. No. 3], ¶ 10 n.13 (emphasis added). The "affiliate" is Levona, and the referenced Petitioning Creditor is Pach Shemen.

As for Adam Spears, who has submitted many affidavits in the Arbitration, he submitted an affidavit for Pach Shemen, the exhibits to which reveal that Pach Shemen was once called Levona II. *See Affidavit of Adam Spears on Behalf of Pach Shemen LLC Pursuant to Federal Rules of Bankruptcy Procedure 1003(a)* [Dkt No. 1] (attaching a copy of a December 8, 2022 email referencing the "entity buying these notes (*Levona II*)") (emphasis added). Mr. Spears' affidavit also disclosed that "the Notes were transferred to [Pach Shemen] from Nomis Bay Ltd. and BPY Limited on January 4, 2023" – during the pendency of a Status Quo Injunction in place in the Arbitration, discussed below.

Accordingly, this motion will refer to Levona and Pach Shemen collectively as the "Levona Entities."

### C.     The Arbitration

The Alleged Debtor and Corp commenced the Arbitration against Levona on July 29, 2022 with its first Statement of Claims. *Solomon Decl.* ¶ 8. Eletson later filed an Amended Statement of Claims on September 13, 2022, a Second Amended Statement of Claims on October 19, 2022, and a Third Amended Statement of Claims on January 3, 2023 ("TASC"), which is the Arbitration Claimants' operative pleading. *Id.* The Arbitration Claimants allege that Levona's preferred interest in Gas was bought out in March 2022, but that Levona has wrongfully claimed that such transaction did not occur and has since attempted to strip Gas of substantially all of its assets for less than fair market value for Levona's personal gain, including by engaging in a bad-faith,

6

fraudulent, and orchestrated campaign to take over and dismantle Gas and drive the Arbitration Claimants —the managers of Gas's assets—out of business. *Id.* ¶ 9.

Claimant's TASC alleges, among other things, that Levona solicited and importuned (and then aided and abetted) criminal breaches of duty of one or more senior Corp employees, engaged in industrial sabotage by causing Gas's financiers to turn against Gas and arrest its vessels, misused Gas's confidential information, interfered with and induced third parties to breach lawful and valuable contracts with Alleged Debtor, Corp, and Gas (including Gas's financiers), conspired with joint legal counsel to hurt Gas, and coerced and defrauded Alleged Debtor, Corp, and Gas to sell two vessels and weaken Gas so that Levona could attempt to take it over and fire-sell its assets for Levona's personal gain. *Id.* at ¶ 10.

Levona filed its Response and Statement of Counterclaims on August 19, 2022, filed an Amended Counterclaim on October 19, 2022, and a Second Amended Counterclaim on January 27, 2023 ("SAC"), which is Levona's operative pleading. *Id.* at ¶ 11. Levona has no unique claims against the Alleged Debtor; rather, all of its claims are group pled against both of the Arbitration Claimants. In addition, as noted, Levona has alleged no interest in Alleged Debtor; it claims an interest in Gas, which is disputed by Eletson and which is one of the issues to be tried in April 2023. *Id.* at ¶ 12.

To act as the sole arbitrator of the dispute, the parties agreed upon The Honorable Ariel Belen, who is a former Associate Justice of the Appellate Division, Second Department, and a former Justice of the New York Supreme Court for Kings County, including in the Commercial Part. *Id.* at ¶ 13. Pursuant to the parties' agreement, JAMS appointed Justice Belen as arbitrator on August 16, 2022. *Id.* Per Section 12.14 of the LLC Agreement for Gas, Justice Belen has plenary authority concerning all disputes between members of Gas concerning matters that relate

to the LLC Agreement, and the parties have waived any ability to have any such claims adjudicated in a court proceeding. *Id.*

The Arbitration has been hotly contested, and the arbitrator has adjudicated numerous disputes, including a challenge to the tribunal's jurisdiction, several requests for injunctive and other preliminary relief by both parties, and numerous motions to strike the Arbitration Claimants' pleadings and, by both parties, to compel discovery. *Id.* at ¶ 14. By way of example, the parties have filed over 120 litigation documents with JAMS, conducted 8 hearings before Justice Belen, deposed several witnesses, produced a combined 11 expert reports (with several addition forthcoming), and collectively produced over 15,000 documents totaling almost 90,000 pages. *Id.*

Importantly, on October 10, 2022, Justice Belen issued a temporary restraining order (the "Status Quo Injunction") that required the parties to "maintain the status quo" and not "engage in the transfer or sale of any assets of Eletson Gas LLC (the 'Company') absent the joint written consent of the parties" and not "notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." *Id.* at ¶ 15. On November 7, 2022, Justice Belen made clear that "status quo" extended beyond the examples in the order, and ordered Levona not to attempt to sell or otherwise transfer two vessels Levona claimed were no longer owned by Gas. *Id.* On January 12, 2023, Justice Belen granted an injunction requiring the status quo injunction, including as to "assets in dispute in this arbitration," to remain in place pending the outcome of the Arbitration. *Id.* at ¶ 16.

Further, at a hearing on March 6, Levona received several adverse orders, including a denial of a motion to strike the Arbitration Claimants' TASC, a finding that Levona waived attorney client privilege over a large tranche of emails, the granting of the Arbitration Claimants' motion to compel other documents, and the denial of Levona's motion for sanctions. *Id.* at ¶ 17.

Justice Belen also reaffirmed that the trial would begin April 24, and confirmed the pre-trial deadlines. *Id.* at ¶ 18. Finally, Justice Belen set an expedited schedule for Alleged Debtor's and Corp's motion to confirm Levona's violation of the Status Quo Injunction by dint of the unlawful Southern District Bondholder litigation, discussed below, which the Alleged Debtor has only just learned that Levona's affiliate has masterminded. *Id.*

The involuntary Chapter 7 filing occurred the next day, March 7, 2023. The first-named petitioning creditor behind this involuntary petition is an affiliate of Levona. *Id.* at ¶ 19.

###### D.    Levona's Alleged Equity Position in Non-Debtor Eletson Gas LLC

In or around November 2021, Levona, an entity directly or indirectly controlled by Murchinson Ltd. ("Murchinson"), negotiated to purchase an equity position in Gas from an unaffiliated non-debtor party. By its own admission, Murchinson "was not willing to limit its option to only waiting and hoping that [Gas] would become profitable through operating profits." *Levona Holdings Ltd's Second Amended Statement of Counterclaim*, ¶ 35. As such, Murchinson arranged for Levona to purchase an equity position in Gas at a tiny fraction of its face value "for the purpose of exercising the preferred rights of [Gas]." *Id.,* ¶¶ 36, 37. Thereafter, displeased with the business recommendations being made by Levona with respect to the operations of Gas, the Arbitration Claimants and Levona negotiated a buy-out of Levona from Gas. A dispute exists with respect to whether the buy-out occurred. What followed was a contentious battle for control of Gas, which has culminated in the acrimonious Arbitration, the rulings by Justice Belen, and the impending trial date. Other harms the Arbitration Claimants have incurred at the hand of Levona will be tried as well.

### E. The Indenture and the Bondholder Litigation

After the Arbitration was commenced, Levona, and/or other entities under common control of Murchinson, have strategized and schemed to identify additional ways to obtain a tactical advantage against the Arbitration Claimants in the Arbitration. Despite being bound by the terms of the Status Quo Injunction entered in the Arbitration requiring the parties to maintain the "status quo," the Levona Entities, Murchinson, and certain of their affiliates have directly or indirectly sought to disrupt the Arbitration Claimants' business operations and tarnish their reputations. Among these schemes was the recent alleged acquisition by Pach Shemen of an interest in certain notes issued by the Alleged Debtor, Eletson Finance (US) LLC ("Eletson Finance"), and Agathonissos Finance LLC ("Eletson (MI)" and, together with the Alleged Debtor and Eletson Finance, the "Issuers") pursuant to an Indenture dated July 2, 2018 (the "Indenture").

Pursuant to the Indenture, the Issuers issued notes in the original principal amount of $314,068,360 (collectively, the "Notes"), which were used to fund the business operations of the Alleged Debtor. While certain Events of Default occurred under the Indenture, the Issuers continued to work with Wilmington Savings Fund Society, FSB, in its capacity as trustee under the Indenture (the "Trustee"), and holders of the majority of the Notes to pursue a consensual resolution.

To that end, on October 29, 2019, the Issuers, certain holders of equity interests in the Alleged Debtor, and certain holders of more than eighty percent (80%) of the aggregate outstanding Notes issued under the Indenture (collectively, the "Consenting Noteholders" and, together with the Issuers and the Consenting Common Equity Holders, the "Second RSA Signatories") entered into that certain Restructuring Support Agreement (the "Second RSA").

Pursuant to the Second RSA, each of the Consenting Noteholders agreed that they would "forbear from exercising, or from giving instructions to the [Trustee] to exercise, the rights and remedies available to [them] under the [Indenture] or applicable law or equity…" until the "Termination Date." *Second RSA,* § 36(a). The Termination Date, as defined in the Second RSA, means the "date on which [the Second RSA] is terminated in accordance with…Section 6…." *Id.,* § 6(c).

Notably, occurrence of the Termination Date under the Second RSA is not automatic. Instead, pursuant to Section 6(a) of the Second RSA, the Second RSA "may be terminated by the Consenting Noteholders holding, in the aggregate, at least two thirds in principal amount outstanding of the Senior Note Claims held by Consenting Noteholders…*upon written notice to all other Parties….*" *Id.,* § 6(a) (emphasis added).

Pursuant to the express terms of the Second RSA, the Second RSA Signatories agreed that each Consenting Noteholder would not sell, transfer, or assign its interests in any Notes unless that transfer was to another Consenting Noteholder, or to any other entity that first agreed, in writing, to be bound by the terms of the Second RSA. *Id.,* § 7(a). They further agreed that, "[a]ny Transfer made in violation of [Section 7 of the Second RSA] shall be deemed null and void and of no force or effect." *Id.*

Alleged Debtor placed reasonable, heavy, and material reliance on the Second RSA as well as on the first Restructuring Support Agreement (the "First RSA"), executed on June 24, 2019, that preceded it. Under a Pledge Agreement executed in connection with the Indenture, the Issuers pledged the certain assets as collateral under the Notes (collectively, the "Collateral"), including, but not limited to: (i) all outstanding common shares or membership interests in Finance and certain guarantors under the Indenture (the "Pledged Equity"); (ii) thirteen shipping vessels owned

by guarantors under the Indenture (the "Vessels"); (iii) the earnings arising from freights, hires and other earnings from the operation and use of or relating to the Vessels, (iv) all other cash and various accounts of Eletson MI and the guarantors.

On or about June 24, 2019, holders of greater than fifty percent (50%) of the aggregate principal amount of the Notes outstanding under the Indenture and the Trustee, in its capacity as collateral agent under the Indenture, accepted title to the Pledged Equity related to each of thirteen special purpose entities that, themselves, owned the thirteen Vessels, in partial satisfaction and discharge of the obligations due and owing under the Notes. Pursuant to the agreements executed between the Trustee and the Issuers, the obligations due under the Indenture were deemed partially satisfied in the amount of $130,000,000. *Notification of Proposal of Strict Foreclosure in Partial Satisfaction of Obligations Under the Notes Documents,* pp. 1-2. The foreclosure was conditioned upon the parties' entry into the first RSA. Thereafter, on October 24, 2019, five days before the execution of the Second RSA, the Indenture was amended to release all remaining collateral, thereby releasing any liens the Trustee, as collateral agent, may have asserted against the proceeds of the Vessels.

Based on the Issuers and Alleged Debtor's compliance with and of the bargain underlying the two RSAs, approximately $114 million in pre-RSA interest and other cash contributions was transferred to Noteholders; an additional $5.5 million in value was transferred to Noteholders in the form of value of the Vessels; and more than $137 million in value that was transferred to Noteholders in the form of proceeds of the Vessels sales and revenue received by those creditors in connection with the transferred vessels. These amount total to more than $257 million in payments to Noteholders under the Indenture.

As evidence of the continuing existence of the Standstill Period, in June 2020, the Alleged Debtor, a majority of the Consenting Noteholders, and others entered into that certain Stipulation Waiver and Release (the "OCM Financing Stipulation"), pursuant to which the majority of the Consenting Noteholders acknowledged that they "[were] parties to that certain Restructuring Support Agreement dated as of October 29, 2019…." *OCM Financing Stipulation*, p. 1. At no place in the OCM Financing Stipulation did any party allege that the Second RSA had been terminated or was no longer in effect.

Furthermore, similar to their binding agreement not to transfer their interests in the Notes under the Second RSA, the OCM Financing Stipulation also includes a restriction on transfer of the Notes. Specifically, it provides that "[e]ach Holder agrees…not to sell, assign, transfer, hypothecate or otherwise dispose of…any [Notes] to any third party that is not a Holder unless, as a condition precedent to any such transaction, the transferee of such [Notes] executed and delivers a joinder…to this Stipulation…to counsel to the Eletson Parties…." *OCM Financing Stipulation,* § 4(a). The OCM Financing Stipulation further provides that "[a]ny sale, assignment, transfer, hypothecation or other disposition…of any [Notes] that does not comply with [the referenced procedures] shall be deemed void *ab initio*." *Id.,* § 4(b). Upon information and belief, more than seventy percent (70%) of the holders of Notes under the Indenture joined as signatories to the OCM Financing Stipulation. Since the OCM Financing Stipulation was executed, the Alleged Debtor has not received any joinder to the OCM Financing Stipulation, which would have been required had any of the Notes held by signatories thereto been transferred or assigned.

From the execution of the Second RSA through early January 2023, the Alleged Debtor understood that it was still operating under the terms of the Second RSA, including the forbearance expressly set forth thereunder (the "Standstill Period"). It was not required to and therefore made

no payments under the Indenture and was not required to and therefore made no financial disclosures pursuant to the terms thereof. Instead, it was wholly focused – as were the Consenting Noteholders – on reaching an amicable and cooperative resolution. In turn, neither the Trustee nor the Noteholders ever made a demand on the Alleged Debtor or any of the other Issuers for payment, disclosure of financial information, or any other document under the Indenture. Indeed, from the execution of the Second RSA through January 11, 2023, the Alleged Debtor had <u>never received</u> any written notice that it was in default under its obligations under the Indenture or the Second RSA, nor did it ever receive notice that the Second RSA or the Standstill Period was being terminated. To the contrary, pursuant to the express terms of the OCM Financing Stipulation, holders of more than two thirds of the principal amount outstanding under the Notes had affirmed that the Second RSA was still in place.

On January 11, 2023, prior to the delivery of any written notice of termination of the Second RSA or its related Standstill Period, the Issuers were sued by the Trustee under the Indenture, pursuant to a Complaint (the "<u>Trustee Complaint</u>") filed in the United States District Court for the Southern District of New York (the "<u>District Court</u>"), which case was docketed as *Wilmington Savings Fund Society, FSB v. Eletson Holdings Inc., et al.,* Case No. 1:23-cv-261 (the "<u>Trustee Litigation</u>"). In the Trustee Complaint, the Trustee asserts that "[o]n or about January 10, 2023, holders of a majority in aggregate principal amount of the then-outstanding Notes delivered a letter to the Trustee" wherein they directed the Trustee to "prepare a complaint filed in [the District Court] for breach of contract due to the nonpayment of interest and principal and certain indemnified losses." *Trustee Complaint,* ¶ 49. The Trustee "accepted the directions" given to it by these alleged noteholders, and commenced the Trustee Litigation the following day. *Id.*

Despite detailing a long history of consensual negotiations and forbearance agreements between the Issuers, the Trustee and the Noteholders, the Trustee Complaint makes no mention of the Second RSA, which by its terms expressly prohibited all Consenting Noteholders from directing the Trustee to file suit. Neither did the Trustee attach to the Trustee Complaint any written documentation evidencing the alleged direction it received on January 10, 2023, directing it to file the Trustee Litigation, or otherwise identify any alleged Noteholders that the Trustee contends directed it to act. In fact, the Trustee Complaint does not disclose or attempt to explain why, after years of no apparent action, remedies were pursued in January 2023. The difference, as the Alleged Debtor now knows, is that shortly before the Trustee was directed to file suit, the Levona Entities purport to have acquired the interest in the Notes they now allege are held by Pach Shemen.

### F. The Alleged Termination of the Second RSA

It wasn't until more than three weeks after the Trustee Litigation was filed, on February 2, 2023, that the Alleged Debtor was served with an alleged "Notice of Termination of Restructuring Support Agreement" (the "Alleged RSA Termination") which purported to advise the Issuers that "the [Second RSA was] terminated with respect to the Consenting Noteholders pursuant to Section 6(a)(ii) of the [Second RSA]." *Alleged RSA Termination,* p. 1. The Alleged RSA Termination is not signed by any Consenting Noteholder, nor is any Consenting Noteholder identified by name therein. *Id.* Instead, it purports to be sent on behalf of Andrew Rosenberg of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss").

Strangely, the Alleged RSA Termination was not sent on Paul Weiss letterhead nor even signed by an "ink" signature. *Id.* While the electronic copy originally delivered to the Issuers was titled "draft," Mr. Rosenberg subsequently confirmed that the "draft" label was included in error.

The Alleged RSA Termination does not identify a single client Mr. Rosenberg or Paul Weiss represents, nor does it identify Mr. Rosenberg's or the firm's alleged authority for terminating the Second RSA. Mr. Rosenberg fails to even allege that he or Paul Weiss represents the requisite two thirds in principal amount outstanding of the Senior Note Claims held by Consenting Noteholders necessary to effectively terminate the Second RSA. *See, Alleged RSA Termination,* p. 1; *Second RSA,* § 6(a). This omission is critical to the validity of the alleged termination. Indeed, as has been disclosed in this bankruptcy proceeding, Pach Shemen contends it purchased more than $183 million in outstanding notes during the first week of January 2023. Yet, by the terms of the Second RSA, that transaction was void. As such, unless and until it can be verified that the alleged majority of the Noteholders – which does not and cannot include Pach Shemen – authorized the termination of the Second RSA, the alleged termination is invalid. Notwithstanding this discrepancy, however, Mr. Rosenberg has steadfastly refused to identify the Noteholders at whose direction he is alleged to have acted.

In short, the Alleged RSA Termination is deficient and does not comply with the clear requirements of the Second RSA regarding termination of the same. Since receiving the Alleged RSA Termination, none of the Issuers has received any other notice of termination that complies with the requirements of Section 6(a) of the Second RSA. As a result, the Issuers are informed and believe that no Termination Date has yet occurred under the Second RSA and that the Standstill Period remains in effect.

### G.     The Deficient and Unlawful Involuntary Bankruptcy Petitions

On March 7, 2023, little more than a month after delivery of the Alleged RSA Termination, Pach Shemen LLC ("Pach Shemen"), VR Global Partners, L.P ("VR Global"), and Alpine Partners

(BVI), L.P. ("Alpine") filed involuntary petitions (each, "Involuntary Petition" and, collectively, the "Involuntary Petitions") for relief under chapter 7 against each of the Issuers.

In the papers submitted with the Involuntary Petition for the Alleged Debtor, Pach Shemen asserts that Nomis Bay Ltd. owns 60% of its equity interests, and BPY Limited owns 40% of its equity interests. *Corporation Ownership Statement of Pach Shemen, LLC* [Dkt No. 1]. Importantly, as detailed above, the equity holders of Pach Shemen are identical to the equity holders of Levona – the respondent in the Arbitration -- and their ownership percentages in Pach Shemen are identical to their ownership percentages in Levona. This is almost assuredly why Pach Shemen appears to refer to itself as "Levona II" in the email correspondence detailing its offer to purchase the Notes.

In the papers filed in support of the Involuntary Petition, Pach Shemen asserts that its interests in the Notes under the Indenture "were transferred to it from Nobis Bay Ltd. ("Nobis Bay") and BPY Limited ("BPY") on January 4, 2023." *Affidavit of Adam Spears on Behalf of Pach Shemen LLC Pursuant to Federal Rules of Bankruptcy Procedure 1003(a),* ¶ 3. Without question, this alleged transfer was invalid, occurring while the Second RSA was still in effect. Furthermore, because of the face value of the Notes Pach Shemen alleges it holds – "at least $183,851,546 (plus applicable interest, fees and other charges)" – equals roughly half of the outstanding Notes due under the Indenture, there can be no legitimate dispute that some or all of the Notes alleged to have been transferred to Pach Shemen were transferred by Consenting Noteholders bound by the express terms of the Second RSA.

The negotiated terms of the Second RSA under this factual scenario are unequivocal. Any Consenting Noteholder was expressly prohibited from selling its interests in any Notes to Nobis Bay, BPY, and/or Pach Shemen, unless such transfer was "to another Consenting Noteholder, or

any other entity that first agreed in writing to be bound by the terms of the Second RSA." *Second RSA,* § 7(a). "Any Transfer made in violation of [Section 7 of the Second RSA] shall be deemed *null and void* and of no force or effect." *Id.* (emphasis added).

Less than a week after Pach Shemen asserts it acquired its interests in the Notes, the Trustee asserts it received the direction letter from "holders of a majority in aggregate principal amount of the then-outstanding Notes…directing the Trustee to take certain actions" under the Indenture. *Trustee Complaint,* ¶ 49. By the following day, the Trustee had filed the Trustee Complaint. Yet, if Pach Shemen, and its void acquisition of more than $183 million in Notes, was amongst the alleged holders credited as holding "a majority in aggregate principal amount of the then-outstanding Notes" accounted for by the Trustee in accepting the direction provided to it under the Indenture, that direction letter was unauthorized and unlawful.

On March 7, 2023, Pach Shemen, VP Global and Alpine filed the Involuntary Petition against the Alleged Debtor. As set forth above, while both Pach Shemen and Alpine submitted affidavits to the Bankruptcy Court contending that they "acquired [their] claims for investment purposes and not for the purpose of commencing the[] [above-captioned Bankruptcy Case]", Pach Shemen and Alpine both contend that their alleged purchase of the Notes occurred less than ninety days before they joined as petitioning creditors in the Involuntary Petition. The timing of Pach Shemen's acquisition, in addition to being highly suspicious as an investment, renders that acquisition void. Similarly, Alpine alleges that it acquired its interest in the Notes in December 2022, and its acquisition may too be void.

In their Statement of Petitioning Creditors in Support of Involuntary Chapter 7 Petitions Against Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC [Dkt No. 3] (the "Statement In Support of Involuntary Petition"), the Petitioning Creditors acknowledge

18

that the first notice of any termination of the Second RSA was sent on February 2, 2023, and further acknowledge that the Issuers have contested its validity. *Statement in Support of Involuntary Petition,* ¶ 33. The Petitioning Creditors, however, entirely ignore the prohibitions of transfer under the Second RSA and the impact of the same on the validity of the involuntary petition.

Under the circumstances, the Alleged Debtor is not aware of any claim owed by it to Pach Shemen or Alpine beyond alleged purchase of the Notes, which appear to be void *ab initio*. Indeed, in the face of the null and void note purchase, the Alleged Debtor is informed and believes that Pach Shemen, and perhaps Alpine as well, is not a creditor of the Alleged Debtor's and does not hold any claim against the Alleged Debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount. Thus, it appears that grounds exist for dismissal of the involuntary petition filed against the Alleged Debtor.

## IV.  ARGUMENT

### A.  Application of the Automatic Stay to this Involuntary Proceeding During the "Gap Period."

Section 303(b) provides that "[a]n involuntary case against a person is commenced" whenever certain statutorily defined persons "fil[e] with the bankruptcy court of a petition under chapter 7 or 11 …." 11 U.S.C. § 303(b) (emphasis added); *see also id.* § 303(b)(1)–(2) (specifying certain prerequisites in number and aggregate claim amount that creditors must meet). In between the filing of the involuntary petition and entry of the order for relief, a window of time known as the "gap period," Section 303(f) exists. *Id.* § 303(f). Under this subsection, "[n]otwithstanding [S]ection 363 …, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property *as if an involuntary case concerning the debtor had not been*

*commenced*," unless "the [bankruptcy] court orders otherwise." *Id.* (emphasis added).  Section 363

governs the use, sale, or lease of property of a debtor and/or its estate.  *Id.* § 363.

Yet, even during this "gap period," the Bankruptcy Code confers certain protections upon

an alleged debtor.  Among other things, Section 362(a) imposes an automatic stay, "applicable to

all entities," of certain types of actions, including "the commencement or continuation … of a

judicial, administrative, or other action or proceeding *against the debtor* …," and "any act to obtain

possession of property of the estate or of property *from the estate* or to exercise control over

property *of the estate*," *Id.* §§ 362(a)(1), 362(a)(3) (emphasis added).  ).  In general, the automatic

stay has two complementary purposes.  It is "one of the fundamental debtor protections provided

by the bankruptcy laws," giving "the debtor a breathing spell" from "the collection process" and

"reliev[ing] 'the financial pressures that drove … [the debtor] into bankruptcy.'" *Eastern*

*Refractories Co. v. Forty Eight Insulations*, 157 F.3d 169, 172 (2d Cir. 1998) (quoting H.R. REP.

NO. 95-595, at 340 (1977)); *accord In re Taub,* 438 B.R. 39, 44 (Bankr. E.D.N.Y. 2010).  The

automatic stay, however, also "provides creditor protection" by ensuring "all creditors are treated

equally" and no one creditor (or group of creditors) is able to "obtain payment of the[ir] claims in

preference to and detriment of other creditors" simply by being the first to pursue their remedies

in a non-bankruptcy court.  H.R. REP. NO. 95-595, at 340; *see also* "  *In re Taub,* 438 B.R. at 44

(stressing that the automatic stay is also "designed to promote equal treatment among creditors").

### B.     The Automatic Stay Does Not Apply To Significant Portions of the Arbitration.

As a threshold matter, the automatic stay does not apply to significant claims pending in

the Arbitration based on the relationship among Sections 541, 362, and 303(f).  To begin with,

Levona and the petitioning creditors lie outside the protective ambit of Section 362(a)(1).

Generally speaking, as already noted, the automatic stay exists to prevent piecemeal dismemberment and allow the debtor the time to order their financial affairs. Offensive litigation activity by the debtor does not implicate these interests, and Section 362(a)(1) generally has not been understood to prohibit a defendant in an action brought by a plaintiff-debtor from defending itself in that action. Such are the facts here. It was the Alleged Debtor, together with its non-debtor affiliate, Corp, that initiated the Arbitration. It is the Alleged Debtor, together with Corp, that is seeking affirmative relief from Levona. Yet it is Pach Shemen, a disputed creditor of the Alleged Debtor, rather than the Alleged Debtor itself, which has sought to use the Bankruptcy Code's foremost debtor protection device to avoid complying with one or more orders issued by the Arbitrator. To a defendant like Levona, which has pled the claims it has pled, Section 362(a)(1) has no relevance.

The analysis is no different under Section 362(a)(3). Section 362(a)(3) bars actions that seek "property of the estate," or "property from the estate." 11 U.S.C. § 362(a)(3). But the Bankruptcy Code says more. Specifically, Section 303(f) empowers the Alleged Debtor to sell, dispose, and use "property" that would otherwise qualify as "property of the estate" under the terms of Section 541(a) "as if" no case had been commenced and no estate created per Sections 303(b) and 541(a), respectively. *Id.* § 303(b); *In re Alpine Lumber & Nursery*, 13 B.R. 977, 979 (Bankr. S.D. Cal. 1981) ("This involuntary case does not become a case under Chapter 7 or Chapter 11 until the order for relief is entered. … [U]ntil an order for relief is entered in the case, the debtor may continue to use, acquire or dispose of property as if the involuntary case had not been commenced."), *cited in Kreidle v. IRS (In re Kreidle)*, 146 B.R. 464 (Bankr. D. Colo. 1991). Based on this explicit language, there exists no "property of the estate" that the Alleged Debtor may not use during the gap period in the absence of a court order to the contrary. *See Mann v. Marine Bank*

21

*W. (In re Omni Graphics, Inc.)*, 119 B.R. 641, 643 (Bankr. E.D. Wis. 1990) (concluding that §
303(f) "is intended to enable the debtor involved in an involuntary petition to continue doing
business during the so-called 'gap period'" and "not … as a shelter for the [b]ank"), *cited in, e.g.,*
*Rothenberg v. Ralph D. Kaiser Co. (In re Rothenberg)*, 173 B.R. 4, 13 14 (Bankr. D.D.C. 1994);
*see also Consolidated Partners Inv. Co. v. Lake*, 152 B.R. 485, 490–91 (Bankr. N.D. Ohio 1993)
("The whole rationale for allowing the debtor to operate during the involuntary gap period is that
prior to the entry of an order for relief, the subject of an involuntary petition should not be
adversely affected by the case.").   To construe Section 303(f) differently would be to ignore its
plain meaning.

 In fact, the Arbitration does not pose even a theoretical risk to "property of the estate."
This is not only because the Arbitration could never result in the Alleged Debtor's loss of property.
It is also because such the only other possibility—that the Alleged Debtor would prevail on one or
more of its affirmative monetary claims —could only inure to the benefit of any such conjectured
estate if an order for relief is ever entered.   Simply put, there is no threat property to which an
estate would be entitled and that the Alleged Debtor may not utilize at this time, and therefore no
statutory predicate for the application of Section 362(a)(3).

 Unsurprisingly, this approach accords with how the foregoing provisions have been
analyzed.   As multiple courts have averred, given the fact that a petition "filed" under Section 303
triggers the stay per Section 362(a)(1), the "only correct conclusion … is that section 362 applies
during the gap period" to "prevent[] prepetition *creditors* from collecting from the debtor."   *In re*
*Flores*, 291 B.R. 44, 56 (Bankr. S.D.N.Y. 2003) (emphasis added) (surveying precedent); *see also*
*Musso v. Ostashko (In re Ostashko)*, 333 B.R. 625, 629 n.5 (E.D.N.Y. 2005) (quoting *In re Flores*,
291 B.R. at 56); *In re DiLorenzo*, 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993) (stressing that "the

alleged debtor benefits from the protection of the automatic stay" upon an involuntary petition's filing).   In other words, the debtor gets to "operate[] as if there were no bankruptcy, although creditors may be unwilling to deal with the debtor on this basis since they are subject to the stay." 2 COLLIER ON BANKRUPTCY ¶ 303.23[1].  This result may appear "anomalous," for "all acts of all creditors are totally stayed whilst the debtor is free to wander …." *In re Oxford Dev.*, 115 B.R. 216, 218 (Bankr. W.D. Mo. 1990).   Yet, it alone conforms with one of the most inviolable interpretive rules: "every part of a statute must be construed in connection with the whole, so as to make all the parts harmonize, if possible, and give meaning to each." *Mkt. Co. v. Hoffmann*, 101 U.S. 112, 116 (1879); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("[C]ourts are not at liberty to pick and choose among congressional enactments"; "absent a clearly expressed congressional intention to the contrary," they must "give effect to both [enactments] if possible[.]").

In the instant case, the automatic stay does not apply to either affirmative claims or defensive claims involving Corp, nor does it apply to the Alleged Debtor's affirmative claims against Levona.   Instead, even a conservative review of Section 362 and 363 suggests that the automatic stay is in effect only with respect to the affirmative claims alleged by Levona against the Alleged Debtor.   Nevertheless, in an abundance of caution, the Alleged Debtor seeks a ruling from this Court finding that no stay is in effect with respect to any part of the Arbitration other than the defensive claims alleged against the Alleged Debtor.   Those defensive claims are addressed separately, below.

## C.      Relief from the Automatic Stay May be Granted "For Cause"

To the extent that the automatic stay does apply here, its imposition, while automatic, is not absolute.  Instead, the Bankruptcy Code provides a mechanism for parties in interests to seek

relief from the automatic stay on certain enumerated bases. Among those, Section 362(d)(1) permits relief from the automatic stay "for cause…." 11 U.S.C. § 362(d)(1).

The Second Circuit has observed that "[n]either the statute nor the legislative history defines the term 'for cause.'" *Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.),* 907 F.2d 1280, 1286 (2d Cir. 1990). Instead, "the decision of whether to lift the stay [is committed] to the discretion of the bankruptcy judge." *Id.* (internal quotation marks omitted) (citing *Holtkamp v. Littlefield (In re Holtkamp),* 669 F.2d 505, 507 (7th Cir. 1982)).

The Second Circuit, and courts within the Second Circuit, have created at least two multifactor tests in deciding whether cause exists to lift the automatic stay to allow litigation to proceed in another forum. The one that is applicable here is the one where the proceeding at issue is an arbitration.

Where the parties in interest have agreed to arbitrate the dispute, Second Circuit courts usually undertake a four-part inquiry: (i) whether the parties agreed to arbitrate, (ii) whether the dispute falls within the arbitration clause, (iii) if federal statutory claims are raised, whether Congress intended those claims to be arbitrable, and (iv) if the court concludes some but not all of the claims are aribtrable whether it should stay the non-arbitrable claims pending the conclusion of the arbitration. *In re Salander-O'Reilly Galleries, LLC,* 475 B.R. 9, 21 (S.D.N.Y. 2012); *see also Kittay v. Landegger (In re Hagerstown Fiber Ltd. P'ship)*, 277 B.R. 181, 204 (Bankr. S.D.N.Y. 2002), *cited in, e.g.*, *Cardali v. Gentile (In re Cardali)*, No. 10-3531, 2010 Bankr. LEXIS 4113, at *13, 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010); *cf. Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (holding this four-factor test to be applicable when a court has been asked to stay proceedings pending arbitration).

In the instant case, there can be no dispute that the parties agreed to arbitrate their dispute.

Indeed, the Arbitration has been pending since July 2022, and the parties have already expended significant resources in furtherance of preparing pleadings, motion practice, discovery, factual and expert witness preparation, and trial preparation. Trial is scheduled to start in April 2023, and in these last weeks, every day is critical. On March 9, 2023, even after the above-captioned involuntary proceeding was filed, Levona advised the Arbitrator, the Honorable Ariel Belen, that it "is eager to see this matter go to hearing." As such, all parties to the Arbitration – including the Alleged Debtor, Corp, and Levona – are poised to allow it to continue. In this same way, there can be no dispute that the claims in the Arbitration are arbitrable. Finally, there are no federal statutory claims at issue in the Arbitration, and, thus, no need to bifurcate the claims into arbitrable and non-arbitrable proceedings.

In light of the foregoing, each of the four *Kraken* factors weigh in favor of permitting the Arbitration to proceed, *cf. Robbins v. Robbins (In re Robbins)*, 964 F.2d 342, 345 (4th Cir. 1992) (explaining that "cause" may exist to permit litigation where (i) only issues of state law involved, (ii) judicial economy will be promoted, (iii) the litigation will not interfere with a preexisting bankruptcy case, and (iv) the estate can be protected by requiring that any judgment obtained be enforced only through the bankruptcy court), as the relevant legislative history underscores, S. REP. NO. 95-989, at 50 (1978). In fact, on the basis of judicial economy alone, bankruptcy courts have repeatedly granted relief from stay for cause to allow private arbitration proceedings to continue and conclude in other forum. *See, e.g.*, *In re The Consolidated FGH Liquidating Tr.*, 419 B.R. 636 (Bankr. S.D. Miss. 2009) (lifting the stay to allow a contractually-agreed-upon arbitration to proceed); *In re Edgerton*, 98 B.R. 392 (Bankr. N.D. Ill. 1989) (modifying stay for cause to allow arbitration to go forward based on a balancing of competing interests).

Significant factors beyond those identified in *Kraken* also weigh in favor of this Court's

determination that "cause" exists to lift the stay, and must or should be taken into account by this Court. Not the least of those factors is that the above-captioned case was commenced by the filing of an involuntary petition, and was not the result of any voluntary action on the part of the Alleged Debtor. Here, the Alleged Debtor never requested any "'breathing spell'" as a result of the commencement of this case, nor does it think a stay of the Arbitration is in the best interests of its creditors or its business operations. Instead, the stay that arose following the commencement of this proceeding has already resulted in missed discovery deadlines and has provided a basis for Levona to avoid producing documents that could be critical to the Arbitration Claimants' success in the Arbitration. Indeed, as the factual background above makes clear, this involuntary case was commenced by *an affiliate of Levona* the day after a significant ruling was made in the Arbitration finding that Levona had waived an attorney-client privilege and must produce responsive documents to the Alleged Debtor and Corp. Put simply, this timing is not a mere coincidence, but is, instead, a tactical move on the part of affiliates Levona and Pach Shemen. Bankruptcy, however, "is intended to be used as a shield and not as a sword," *In re Hisrschhorn,* 156 B.R. 379, 389 (Bankr. E.D.N.Y. 1993), and bankruptcy courts were not meant to become "'rented battlefield[s],'" *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 63 (2d Cir. 2018). The overlap among the Alleged Debtor's opponents, the sudden intrusion of another Murchinson entity into the proceedings, and the fact that the petition was filed to delay if not wholly frustrate compliance with due orders of Justice Belen—these demonstrable factors justify relief from any extant stay.

In addition, as detailed above, cause exists to grant stay relief in light of the significant deficiencies in the involuntary petition, itself, including material disputes regarding whether or not Pach Shemen and/or Alpine are even creditors of the Alleged Debtors. 11 U.S.C. § 303(a) (an

26

involuntary may be commenced "by three or more entities, each of which is… a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount…."); *cf. In re Pac. Rim Invs., LLP*, 243 B.R. 768, 771 (D. Colo. 2000) (deeming cause to dismiss as constituting cause for relief from the automatic stay under § 362(d)(1)).  In light of the information included in the affidavits each submitted pursuant to Federal Rule of Bankruptcy Procedure Rule 1003(a), both Pach Shemen and Alpine acquired their alleged interests in the Notes within the past few months, and both purport to have acquired those interests while the Second RSA was indisputably in effect.  Since no notice was given of any transfer of interests under the Notes, and neither Pach Shemen nor Alpine contend that they had agreed, in writing, to be bound by the terms of the Second RSA, those transfers are "null and void and of no force or effect."  *Second RSA,* § 7(a).   This deficiencies in the involuntary petition, itself, must not be ignored by this Court, and constitute an additional basis for cause to grant stay relief to permit the Arbitration to proceed.

Pursuant to Section 303 of the Bankruptcy Code, if an alleged debtor has more than three creditors, an involuntary petition may only be commenced by "three or more entities, each of which is a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount…."  *11 U.S.C. §303(b)(1).*   If an involuntary petition fails to meet the statutory requirements, it is subject to dismissal.  In addition, pursuant to section 303(i), a bankruptcy court can award the debtor costs, attorney's fees, and – if it determines the petition as filed in bad faith – "any damages proximately caused by such filing; or…punitive damages."  *11 U.S.C. §303(i)(1)-(2).*   While "bad faith" is not defined in the Bankruptcy Code, some courts have used an 'improper use' test, which "finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for

itself, rather than to protect against other creditors obtaining a disproportionate advantage, particularly when the creditor could have advanced its own interests in a different forum." *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.,* 209 F.3d 100, 105 (2nd Cir. 2000). Here, in light of the bad faith and improper actions of the Levona Entities, which conspired to commence this involuntary petition for the improper purpose of delaying and hindering the Arbitration, cause exists to grant relief from stay to permit the Arbitration to continue. While the Alleged Debtor fully intends to pursue all rights and remedies available to it under Section 303 or otherwise, it fears that such relief, even if expeditiously considered and granted, will still throw off the Arbitration proceedings that the parties by contract committed to have. The consequences to the Alleged Debtor and to Gas could be catastrophic.

## V. RESERVATION OF RIGHTS TO CONTEST THE INVOLUNTARY PETITION

The Alleged Debtor has every intention of disputing the involuntary petition by the deadline to do set forth in Rule 1011(b) of the Federal Rules of Bankruptcy Procedure, and reserves all rights to seek damages in connection therewith. At the same time, the upcoming trial in the Arbitration, and the importance of meeting all discovery and disclosure deadlines associated therewith, necessitates cause for immediate relief from stay.

## VI. CONCLUSION

Based on the foregoing, Eletson Holdings Inc.'s motion for relief from the automatic stay should be granted, and it should be allowed to proceed with the Arbitration. In addition, under the circumstances, the fourteen day stay imposed by Fed. R. Bankr. P. 4001(a)(3) should be found not to apply, such that any Order granting this Motion will be enforceable immediately upon its entry.

Dated: March 13, 2023

REED SMITH LLP

*/s/ Andrew L. Buck*
Andrew L. Buck
Louis M. Solomon
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
abuck@reedsmith.com
lsolomon@reedsmith.com
-and-

Ann E. Pille (*Pro Hac Vice* Application
Pending)
Reed Smith LLP
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
apille@reedsmith.com

*Counsel for Alleged Debtor Eletson Holdings
Inc.*