UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 7 |
| AGATHONISSOS FINANCE LLC, | Case No.: 23-10321 (JPM) |
| Alleged Debtor. | |
| In re: | Chapter 7 |
| ELETSON HOLDINGS INC., | Case No.: 23-10322 (JPM) |
| Alleged Debtor. | |
| In re: | Chapter 7 |
| ELETSON FINANCE (US) LLC, | Case No.: 23-10323 (JPM) |
| Alleged Debtor. | |

**MEMORANDUM IN SUPPORT OF THE ALLEGED DEBTORS' MOTION TO
DISMISS THE CHAPTER 7 INVOLUNTARY PETITIONS FILED BY PACH SHEMEN
LLC, VR GLOBAL PARTNERS, L.P., AND ALPINE PARTNERS (BVI) L.P.**

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND AND PROCEDURAL POSTURE ................................................ 3

    A.      Preliminary Details ............................................................................................... 3

          1.     Indenture and Related Contracts: Provisions and Negotiations ................. 5

          2.     Indenture and Bondholder Litigation ......................................................... 9

          3.     Alleged Termination of Second RSA ....................................................... 10

    B.      Petition Papers: Claims and Revelations ........................................................... 11

          1.     Pach Shemen's Supporting Documents ................................................... 11

          2.     Other Petitioning Creditors' Supporting Affidavits and Ownership Statements ................................................................................................ 14

          3.     Petitioning Creditors' Statements in Support of Involuntary Petitions .................................................................................................. 15

    C.      Cases' Ongoing Effect on the Alleged Debtors' Operations ............................... 16

ARGUMENT ......................................................................................................................... 17

I.     Involuntary Petitions Must Be Rigorously Policed to Avoid Abuse. ............................. 17

II.    The Petitioning Creditors Were Ineligible To File Under Section 303(b) and (h). ......... 18

    A.      The Petitioning Creditors Alleged Claims Are Contingent. ............................... 22

    B.      The Petitioning Creditors Hold Claims That Are Subject To A Bona Fide Dispute. ............................................................................................................ 23

III.   The Petitions Were Filed In Bad Faith. ....................................................................... 24

IV.   Abstention Is Warranted Under Section 305(a)—And, Therefore, Dismissal. ............... 28

V.    The Alleged Debtors Should Be Awarded Fees, Costs, And Damages .......................... 29

RESERVATION OF RIGHTS ............................................................................................... 30

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 801 S. Wells St. Ltd P'ship*,
  192 B.R. 718 (Bankr. N.D. Ill. 1996) ...................................................................28

*In re Anmuth Holdings, LLC*,
  600 B.R. 168 (Bankr. E.D.N.Y. 2019)...................................................18, 25, 28

*In re Bayshore Wire Prods. Corp.*,
  209 F.3d 100, 105 (2d Cir. 2000).........................................................................25

*In re Brooklyn Res. Recovery*,
  216 B.R. 470 (Bankr. E.D.N.Y. 1997)............................................................18, 20

*In re Crescenzi*,
  53 B.R. 374 (Bankr. S.D.N.Y. 1985) ....................................................................22

*Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*,
  793 F.3d 228 (2d Cir. 2015)..........................................................23, 24, 25, 26

*In re Dino's, Inc.*,
  183 B.R. 779 (S.D. Ohio 1995) ............................................................................18

*In re Drexler*,
  56 B.R. 960 (Bankr. S.D.N.Y. 1986) ....................................................................18

*In re Duratech Indus.*,
  241 B.R. 291 (Bankr. E.D.N.Y. 1999)...................................................................28

*Envirodyne Indus. v. Conn. Mut. Life Co. (In re Envirodyne Indus.)*,
  174 B.R. 986 (Bankr. N.D. Ill. 1994) ...................................................................20

*FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*,
  517 B.R. 361 (Bankr. M.D. Ga. 2014)...................................................................20

*In re Forever Green Athletic Fields, Inc.*,
  804 F.3d 328 (3d Cir. 2015)............................................................................17, 24

*Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*,
  330 F.3d 111 (2d Cir. 2003) .................................................................................23

*In re Lough*,
  57 B.R. 993 (Bankr. E.D. Mich. 1986) .................................................................23

*In re Luxeyard, Inc.*,
556 B.R. 627 (Bankr. D. Del. 2016) ...............................................................25, 27

*In re Monitor Single Lift I, Ltd.*,
381 B.R. 455 (Bankr. S.D.N.Y. 2008) ...................................................................28

*In re Morris*,
115 B.R. 752 (Bankr. E.D.N.Y. 1990) ...................................................................18

*In re Mountain Dairies*,
372 B.R. 623 (Bankr. S.D.N.Y. 2007) ...................................................................29

*In re Murray*,
543 B.R. 484 (Bankr. S.D.N.Y. 2016) ...................................................................25

*In re Navient Sols., LLC*,
625 B.R. 801 (Bankr. S.D.N.Y. 2021) .............................................................28, 29

*In re Navient Sols., LLC*,
627 B.R. 588 (Bankr. S.D.N.Y. 2021) ...................................................................29

*In re Ransome Grp. Invs. I, LLP*,
424 B.R. 547 (Bankr. M.D. Fla. 2009) ..................................................................23

*In re Reid*,
773 F.2d 945 (7th Cir. 1985) ................................................................................17

*In re Reveley*,
148 B.R. 398 (Bankr. S.D.N.Y. 1992) ...................................................................26

*In re SBA Factors of Miami, Inc.*,
13 B.R. 99 (Bankr. S.D. Fla. 1981) .......................................................................18

*In re Taberna Preferred Funding IV, Ltd.*,
578 B.R. 244 (Bankr. S.D.N.Y. 2017) ...................................................................23

*Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*,
594 B.R. 576 (Bankr. S.D.N.Y. 2018) ..............................................................20, 21

*In re Taub*,
439 B.R. 261 (Bankr. E.D.N.Y. 2010) ...................................................................17

*In re TPG Troy, LLC*,
492 B.R. 150 (Bankr. S.D.N.Y. 2013) .............................................................23, 29

*In re TPG Troy, LLC*,
    Nos. 12-13965, 12-14966, 2013 Bankr. LEXIS 2899, 2013 WL 3789344
    (Bankr. S.D.N.Y. July 18, 2013).............................................................................18

*Wilk Auslander LLP v. Murray (In re Murray)*,
    565 B.R. 527 (S.D.N.Y. 2017),.............................................................................25

*Wilk Auslander LLP v. Murray (In re Murray)*,
    900 F.3d 53 (2d Cir. 2018).........................................................................17, 18, 24

**Statutes**

11 U.S.C. § 303(i) ...................................................................................................29

11 U.S.C. § 303(b) ..................................................................................................23

11 U.S.C. § 303(b)(1) .........................................................................................19, 23

11 U.S.C. § 303(h)(1) ..............................................................................................23

**Rules**

FED. R. BANKR. 1003(a)........................................................................................11, 21

FED. R. BANKR. 2004 ...............................................................................................26

Eletson Holdings, Inc. ("Holdings"), Agathonissos Finance LLC ("Eletson MI"), and Eletson Finance (US) LLC ("Eletson Finance," and together with Eletson and Eletson MI, collectively, the "Alleged Debtors"), the alleged debtors in the above-captioned involuntary cases (collectively, these "Cases") commenced pursuant to section 303 of title 11 of the U.S. Code (the "Bankruptcy Code"), hereby submit this memorandum of law in support of their joint motion to dismiss the involuntary chapter 7 petitions filed against Holdings by petitioning creditors Pach Shemen LLC ("Pach Shemen"); VR Global Partners, L.P. ("VR Global"); and ALPINE PARTNERS (BVI), L.P. ("Alpine," and together with Pach Shemen and VR Global, collectively, the "Petitioning Creditors"). In support thereof, the Alleged Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      These Cases are the invention of three petitioning creditors, one of whom, Pach Shemen LLC, is an affiliate of an entity with which Holdings has been engaged in a bitter arbitration proceeding for the better part of the last year. Only one day prior to the commencement of these Cases, oral rulings were made in the arbitration holding that Pach Shemen's affiliate, Levona Holdings Ltd ("Levona," and together with Pach Shemen, collectively, the "Levona Entities"), had waived attorney-client privilege with respect to certain communications and would be compelled to produce documents that could put it at a disadvantage. Several other adverse rulings were made against Levona, including that a firm, three-week trial was going forward six weeks later. At least one way to ensure delay, if only temporarily, remained. The next business day, Pach Shemen, together with the two other Petitioning Creditors, filed the Petitions. Within hours, Levona asserted to the Arbitrator that no further action could be taken in the Arbitration – including the production of those responsive documents – because of section 362(a) of the Bankruptcy Code.

1

2.     The damage to the Alleged Debtors, and the business operations of the Alleged

Debtors and their affiliates was done.  Despite the fact that the Petitions are deficient under section

303 of the Bankruptcy Code, news of these Cases spread in the press and became public

knowledge.  The Alleged Debtors' business operations suffered in order to allow Levona a

temporary reprieve in the arbitration.  But bankruptcy is not where the Alleged Debtors belong,

and material deficiencies in the Petitions necessitate dismissal.

3.     These Cases were unlawfully commenced as little more than one collective scheme

to undermine the Alleged Debtors' business operations and gain a tactical advantage in the

Arbitration.  Dismissal must follow.  Specifically, the Motion should be granted because the entry

of an order for relief in these Cases would be inconsistent with the language and purposes of the

Bankruptcy Code in at least the following respects:

   a.    The Petitioning Creditors are unable to demonstrate that: (i) they hold claims that
         are not (a) contingent as to liability, or (b) the subject of a bona fide dispute as to
         liability or amount, or (ii) the Alleged Debtors have generally failed to pay debts
         that are not subject to a bona fide dispute as they became due;

   b.    The Petitions were filed in bad faith because, in addition to failing to satisfy the
         eligibility criteria, one or more of the Petitioning Creditors: (i) seek to utilize this
         Court's jurisdiction as a way to obtain a disproportionate advantage for themselves
         or their affiliates; (ii) seek to gain leverage over one or more of the Alleged Debtors
         in a way that places their business operations and relationships with other vendors
         and creditors at potentially fatal risk; (iii) seek to enjoy a tactical advantage in at
         least one pending action; (iv) were animated by the a desire to embarrass, harass,
         or spite the Alleged Debtors; and (v) filed suspiciously-timed petitions with
         apparently little preparatory inquiry; and

   c.    Dismissal under section 305(a) would be in the overall best interests of the creditor
         body and the Alleged Debtors because, among other reasons: (i) other forums are
         available to protect the interests of all parties, and actions are already proceeding
         in those forum; (ii) bankruptcy proceedings are not necessary to reach a just and
         equitable solution considering the nature of the assets at issue in the Arbitration and
         the existence of a prepetition action by the Trustee, as defined below; (iii) it will be
         needlessly costly and time consuming to start afresh with the federal bankruptcy
         process; and (iv) as already noted, the Petitions were not filed in good faith.

4.      Any one of the foregoing factors, alone, justifies dismissal of the Petitions.  When considered as a collective whole, the justification for dismissal is overwhelming.  For these and other reasons, as more fully set forth herein, this Court should: (a) dismiss the Petitions and (b) award actual and punitive damages to the Alleged Debtors, and against the Petitioning Creditors.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A.    Preliminary Details

5.      Prior to March 7, 2023 (collectively, the "Petition Date"), Holdings was a party to an arbitration proceeding (the "Arbitration") with its non-debtor affiliate, Eletson Corporation ("Corp.," and together with Holdings, collectively, the "Arbitration Claimants"), and adverse party Levona (together with the Arbitration Claimants, collectively, the "Arbitration Parties"), over claims arising from Levona's alleged ownership of certain preferred shares in Eletson Gas LLC ("Gas"), a non-party affiliate of Holdings.

6.      In or around November 2021, Levona, an entity directly or indirectly controlled by Murchinson Ltd. ("Murchinson"), negotiated to purchase an equity position in Gas.  *Second Amended Statement of Counterclaim, L. Solomon Dec.*, Ex. 4, ¶¶ 35–37.

7.      Because, by its own admission, Murchinson ████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.*, ¶¶ 35–37.

8.      ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████

3

█████████████████████████████    *Third Amended Statement of Claims*, *L. Solomon Dec.*, Ex. 3, ¶¶ 37-41.

9.      On July 29, 2022, the Arbitration Claimants commenced the Arbitration seeking redress for claims related to Levona's purchase and alleged sale of certain preferred shares in Gas from Blackstone.  *L. Solomon Dec.*, ¶¶ 8-10, 15.

10.     Thereafter, Levona filed counterclaims against the Arbitration Claimants seeking equitable relief, declaratory relief, and monetary damages, wherein it alleges, among other things, that it continues to own certain preferred shares of Gas, and also alleges that it has been injured by various actions and inactions of the Arbitration Claimants. *Id.* ¶¶ 11, 15, Ex. 4.  Two men have regularly appeared as representatives of Levona throughout the Arbitration:  Adam Spears ("Spears") and Mark Lichtenstein ("Lichtenstein").  *See infra*, ¶¶ 36–42.

11.     On October 10, 2022, less than two weeks after the Arbitrator denied Levona's motion to strike, the Arbitrator issued a temporary restraining order (the "Status Quo Injunction") that requires the Arbitration Parties to "maintain the status quo" and in addition not "engage in the transfer or sale of any assets of [Gas] absent the joint written consent of the parties" and not "notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of [Gas]." *L. Solomon Dec.*, ¶ 16, Ex. 5.  On November 7, 2022, the Arbitrator made clear that "status quo" extended beyond the examples in the order, and ordered Levona not to attempt to sell or otherwise transfer two vessels Levona claimed were no longer owned by Gas. *Id.*, ¶ 16.

12.     On January 3, 2023, the Arbitration Claimants filed a Third Amended Statement of Claims ("TASC"), which was their operative pleading as of the Petition Date. *Id.*, ¶ [*]

13.    ████████████████████████████████████████████

████████████████████████████████████████████████████████    *Id.*, ¶ 8, Ex. 3.

Eight days later, the Arbitrator further ordered the Status Quo Injunction to remain in place pending

the outcome of the Arbitration.  *Id.*, ¶ 17, Ex. 6.

14.    On March 6, 2023, the day before Petitioning Creditors commenced these Cases,

the Arbitrator orally (a) denied Levona's motion to strike the TASC; (b) found that Levona had

waived attorney client privilege over a large tranche of emails; (c) granted the Arbitration

Claimants' motion to compel the production of other documents from Levona; (d) denied Levona's

motion for sanctions, filed on February 13, 2023; (e) reaffirmed that the Arbitration trial would

begin April 24, 2023; (f) confirmed previously established pre-trial deadlines; and (g) set an

expedited schedule for Arbitration Claimants' motion to confirm Levona's violation of the Status

Quo Injunction by dint of certain bondholder litigation.  *Id.*, ¶¶ 18-19.  As of the Petition Date, the

Arbitration was still scheduled for trial starting on April 24, 2023.  *Id.*, ¶ 19.

15.    Regardless of which of the Arbitration Parties prevails following the Arbitration,

no Alleged Debtor will gain possession of the primary assets at issue:  Gas shares.

**1.    Indenture and Related Contracts: Provisions and Negotiations**

16.    Since the Arbitration began in July 2022, Levona, and/or other entities under

common control of Murchison, have strategized and schemed to identify additional ways to obtain

a tactical advantage against the Arbitration Claimants.  Despite being bound by the Arbitration's

Status Quo Injunction, the Levona Entities, Murchinson and certain of their affiliates have directly

or indirectly sought to disrupt the Arbitration Claimants' business operations and tarnish their

reputations.  Among these schemes was the creation of Pach Shemen and its recent alleged

acquisition of an interest in certain notes issued by the Alleged Debtors pursuant to an Indenture dated July 2, 2018 (the "Indenture").  *Indenture*, *V. Hadjieleftheriadis Dec.*, Ex. 1.

17.    Pursuant to the Indenture, the Alleged Debtors issued notes in the original principal amount of $314,068,360 (collectively, the "Notes"), the proceeds of which were used to fund the business operations of the Alleged Debtors.  *Id.*; *see also First Preferred Ship Mortg. Notes*, *V. Hadjieleftheriadis Dec.*, Ex. 2.  While certain Events of Default occurred under the Indenture, the Alleged Debtors continued to work with Wilmington Savings Fund Society, FSB, in its capacity as trustee and collateral agent under the Indenture (the "Trustee"), and holders of the majority of the Notes to pursue a consensual resolution.  *See generally V. Hadjieleftheriadis Dec.*, ¶¶ 7–26.

18.    To that end, on October 29, 2019, the Alleged Debtors, certain holders of equity interests in the Alleged Debtors, and certain holders of more than eighty percent (80%) of the aggregate outstanding Notes issued under the Indenture (collectively, the "Consenting Noteholders" and, together with the Alleged Debtors and certain holders of equity interests in Holdings, the "Second RSA Signatories") entered into a Restructuring Support Agreement (the "Second RSA").  *Second RSA*, *V. Hadjieleftheriadis Dec.*, Ex. 3.

19.    Pursuant to the express terms of the Second RSA, each of the Consenting Noteholders agreed that they would "forbear from exercising, or from giving instructions to the [Trustee] to exercise, the rights and remedies available to [them] under the [Indenture] or applicable law or equity" until the "Termination Date" (the "Standstill Period").  *Id.*, § 36(a).  The Termination Date, as defined in the Second RSA, means the "date on which [the Second RSA] is terminated in accordance with…Section 6…."  *Id.,* § 6(c).

20.    Occurrence of the Termination Date under the Second RSA is not automatic. Instead, pursuant to section 6(a) of the Second RSA, the Second RSA "may be terminated by the

Consenting Noteholders holding, in the aggregate, at least two thirds in principal amount outstanding of the Senior Note Claims held by Consenting Noteholders … *upon written notice to all other Parties….*" *Id.,* § 6(a) (emphasis added).

21.     Also pursuant to the express terms of the Second RSA, the Second RSA Signatories agreed that each Consenting Noteholder would not sell, transfer, or assign its interests in any Notes "unless such Transfer is to another Consenting Noteholder or any other entity that first agreed, in writing, to be bound by the terms of the [Second RSA] by executing and delivering to [Eletson Holdings and Eletson Finance], and counsel for the Consenting Noteholders, at least three (3) Business days prior to effectiveness of the relevant Transfer, a Transferee Joinder substantially in the form attached [to the Second RSA] as Exhibit B (the Transferee Joinder)." *Id.,* § 7(a).  They further agreed that, "[a]ny Transfer made in violation of [Section 7 of the Second RSA] shall be deemed null and void and of no force or effect." *Id.*

22.     The Alleged Debtors placed reasonable, heavy, and material reliance on the Second RSA as well as on an earlier Restructuring Support Agreement (the "First RSA"), executed on June 24, 2019, that preceded it. *First RSA*, *V. Hadjieleftheriadis Dec.*, Ex. 5.  Under a Pledge Agreement executed in connection with the Indenture, the Alleged Debtors pledged certain assets as collateral under the Notes (collectively, the "Collateral"), including, but not limited to: (a) all outstanding common shares or membership interests in Finance and certain guarantors under the Indenture (the "Pledged Equity"); (b) thirteen shipping vessels owned by guarantors under the Indenture (the "Vessels"); (c) the earnings arising from freights, hires and other earnings from the operation and use of or relating to the Vessels; and (d) all other cash and various accounts of Eletson MI and the guarantors. *Pledge Agreement*, § 2, pp 2–3, *V. Hadjieleftheriadis Dec.*, Ex. 5.

23.     On or about June 24, 2019, holders of a majority of the Notes outstanding under the Indenture and the Trustee accepted title to the Pledged Equity related to thirteen special purpose entities that owned the Vessels, in partial satisfaction and discharge of the obligations due and owing under the Notes. *Notification of Proposal of Strict Foreclosure,* pp. 1–2, *V. Hadjieleftheriadis Dec.*, Ex. 7. Pursuant to those transactions, the Indenture obligations were deemed partially satisfied in the amount of $130,000,000. *Id.*

24.     In addition to the foregoing, and based on the bargain underlying the First RSA and the Second RSA, approximately $114 million in pre-RSA interest and other cash contributions were transferred to Noteholders. *V. Hadjieleftheriadis Dec.*, ¶ 18. An additional $5 million in value was transferred to Noteholders in the form of value of the Vessels. *Id.* Finally, more than $137 million in value that was transferred to Noteholders in the form of proceeds of the Vessels sales and revenue received by those creditors in connection with the transferred vessels. *Id.* In total, Noteholders thereby received more than $257 million in payments under the Indenture. *Id.*

25.     In June 2020, well after the Second RSA was executed, the Alleged Debtors, more than seventy percent (70%) of the holders of Notes, and others entered into a certain Stipulation Waiver and Release (the "OCM Financing Stipulation"), wherein a majority of the Consenting Noteholders acknowledged that they "[were] parties to that certain Restructuring Support Agreement dated as of October 29, 2019 …." *OCM Financing Stipulation*, p. 1, *V. Hadjieleftheriadis Dec.*, Ex. 4. At no place in the OCM Financing Stipulation was it alleged that the Second RSA had been terminated or was no longer in effect. *See id.*

26.     Similar to the Second RSA, the OCM Financing Stipulation also includes a restriction on transfer of the Notes. Specifically, it provides that "[e]ach Holder agrees…not to sell, assign, transfer, hypothecate or otherwise dispose of…any [Notes] to any third party that is

not a Holder unless, as a condition precedent to any such transaction, the transferee of such [Notes] executed and delivers a joinder…to this Stipulation…to counsel to the Eletson Parties….” *Id.,* § 4(a).  The OCM Financing Stipulation further provides that “[a]ny sale, assignment, transfer, hypothecation or other disposition … of any [Notes] that does not comply with [the referenced procedures] shall be deemed void *ab initio*.” *Id.,* § 4(b).  Notably, since the OCM Financing Stipulation was executed, the Alleged Debtors have not received any joinder to the OCM Financing Stipulation, which joinder is a condition precedent to the transfer or assignment of any Notes impacted by the OCM Financing Stipulation.  *V. Hadjieleftheriadis Dec.*, ¶ 12.

### 2.    Indenture and Bondholder Litigation

27.    On January 11, 2023, prior to any termination of the Second RSA, the Trustee filed a Complaint (the “Trustee Complaint”) against the Alleged Debtors (the “Trustee Litigation”) in the United States District Court for the Southern District of New York (the “District Court”).

28.    In the Trustee Complaint, the Trustee asserts that “[o]n or about January 10, 2023, holders of a majority in aggregate principal amount of the then-outstanding Notes” directed the Trustee to “prepare a complaint filed in [the District Court] for breach of contract due to the nonpayment of interest and principal and certain indemnified losses.”  *Tr. Compl.,* ¶ 49, *V. Hadjieleftheriadis Dec.*, Ex. 9.  The Trustee “accepted the directions” received from these alleged noteholders, and commenced the Trustee Litigation the next day.  *Id.*

29.    Despite detailing a long history of consensual negotiations and forbearance agreements between the Issuers, the Trustee and the Noteholders, the Trustee Complaint does not mention the Second RSA, which by its terms expressly prohibited all Consenting Noteholders from directing the Trustee to file suit.  *See id.*; *see also Second RSA*, *Hadjieleftheriadis Dec.*, Ex. 3.  Neither did the Trustee Complaint include a copy of any written documentation evidencing the

alleged direction the Trustee received on January 10, 2023, directing it to file the Trustee

Litigation, or otherwise identify any alleged Noteholders that the Trustee contends directed it to

act. *See generally Tr. Compl., V. Hadjieleftheriadis Dec.*, Ex. 9. In fact, the Trustee Complaint

does explain why, after years of no apparent action, remedies were pursued in January 2023. *Id.*

The difference, as the Alleged Debtors now know, is that shortly before the Trustee was directed

to file suit, the Levona Entities, through Pach Shemen, purport to have acquired the interest in the

Notes.

### 3.    Alleged Termination of Second RSA

30.    It wasn't until more than three weeks after the Trustee Litigation was filed, on

February 2, 2023, that the Alleged Debtors were served with a purported "Notice of Termination

of Restructuring Support Agreement" (the "<u>Alleged RSA Termination</u>"). The document purported

to advise the Alleged Debtors that "the [Second RSA was] terminated with respect to the

Consenting Noteholders pursuant to Section 6(a)(ii) of the [Second RSA]." *Alleged RSA*

*Termination,* p. 1, *V. Hadjieleftheriadis Dec.*, Ex. 10. The Alleged RSA Termination is not signed

by any Consenting Noteholder, nor is any Consenting Noteholder identified in it. *Id.* It purports

to be sent on behalf of Andrew Rosenberg of Paul, Weiss, Rifkind, Wharton & Garrison. *Id.*

31.    The Alleged RSA Termination is deficient in multiple in ways. First, it was not

sent on Paul Weiss letterhead nor does it include an "ink" signature. *Id.* The electronic copy

originally delivered to the Issuers was titled "draft," although Mr. Rosenberg subsequently stated

that the "draft" label was included in error. *Id.* More significantly, the Alleged RSA Termination

is laden with omissions. It neglects to identify a single client Mr. Rosenberg represents, nor does

it identify Mr. Rosenberg's alleged authority for terminating the Second RSA. *See id.* Mr.

Rosenberg even failed to allege that he represents the requisite two thirds in principal amount

outstanding of the note claims held by Consenting Noteholders necessary to effectively terminate the Second RSA. *See id.*, p. 1; *see also Second RSA,* § 6(a), *V. Hadjieleftheriadis Dec.*, Ex. 3.

32.    These omissions are critical to the validity of the alleged termination.  Indeed, as has been disclosed in this bankruptcy proceeding, Pach Shemen contends it purchased more than $183 million in outstanding notes during the first week of January 2023.  Yet, pursuant to the unequivocal terms of the Second RSA, that transaction was void.  As such, unless and until it can be verified that the alleged majority of the Noteholders – which does not and cannot include Pach Shemen – authorized the termination of the Second RSA, the alleged termination is invalid.  Notwithstanding this discrepancy, however, Mr. Rosenberg has steadfastly refused to identify the Noteholders at whose direction he purports to have acted.

33.    In short, the Alleged RSA Termination fails to comply with the plain language of the Second RSA's termination provisions.  Further, since receiving the Alleged RSA Termination, none of the Alleged Debtors have received any other notice of termination purporting to terminate the Second RSA.  As a result, the Alleged Debtors are informed and believe that no Termination Date has yet occurred under the Second RSA and that the Standstill Period remains in effect.

**B.    Petition Papers: Claims and Revelations**

34.    On the Petition Date, little more than a month after delivery of the Alleged RSA Termination, the Petitioning Creditors filed the Petitions and several supporting documents that contain noteworthy admissions.

**1.    Pach Shemen's Supporting Documents**

35.    According to the Bankruptcy Rule 1003(a) affidavit sworn by Spears on behalf of Pach Shemen [Dkt. No. 1] (the "Pach Shemen Affidavit"), Pach Shemen "acquired its claims for investment purposes and not for the purpose of commencing these Bankruptcy cases" and asserts

11

a claim against each of the Alleged Debtors in the alleged total amount of "$183,851,546 (plus applicable interest, fees, and other charges)" arising from its alleged purchase of certain Notes. *Pach Shemen Aff.*, ¶¶ 3–4.

36. Spears, while styling himself as "an Authorized Representative of Pach Shemen," *id.*, ¶ 2, is well known to the Alleged Debtors: he has appeared as a lay advocate and representative of *Levona* throughout the Arbitration. *See L. Solomon Dec.*, ¶¶ 31, 34-36, Exs. 14, 17-19.

37. Pach Shemen's authorized signatory to its corporate ownership statement, Lichtenstein, is equally familiar to the Alleged Debtors. Like Spears, Lichtenstein, a board member of Gas, has enmeshed himself in the work of Levona and Murchison and the Arbitration. *See L. Solomon Dec.*, ¶¶ 31, 37-38, Exs. 20-24.

38. In the papers submitted with each Petition, Pach Shemen asserts that Nobis Bay Ltd. ("Nobis Bay") owns 60% of its equity interests, and BPY Limited ("BPY") owns 40% of its equity interests. *Pach Shemen Corp. Ownership Stmt.*, p. 1. Importantly, the equity holders of Pach Shemen are identical to the equity holders of Levona – the defendant in the Arbitration – and their ownership percentages in Pach Shemen are identical to their ownership percentages in Levona. *See L. Solomon Dec.*, ¶¶ 28, 30, 32-33. This is almost assuredly why Pach Shemen appears to refer to itself as "Levona II" in the email detailing its offer to purchase the Notes. *See* Affidavit of Adam Spears on Behalf of Pach Shemen LLC (Dkt. No. 1) at 13.

39. In these same documents, Pach Shemen asserts that its interests in the Notes under the Indenture "were transferred to it from … Nobis Bay and BPY … on January 4, 2023," shortly before the Petition Date. *Pach Shemen Aff.*, ¶ 3. This alleged transfer occurred while the Second RSA was still in effect. *V. Hadjieleftheriadis Dec.*, ¶¶ 10–25. Furthermore, because the face value of the Notes Pach Shemen alleges it holds – "at least $183,851,546…" – equals roughly half the

outstanding Notes due under the Indenture, there can be no legitimate dispute that some or all of the Notes alleged to have been transferred to Pach Shemen were transferred by Consenting Noteholders bound by the Second RSA. *Pach Shemen Aff.*, ¶ 3.

40.    The terms of the Second RSA under this factual scenario are unequivocal.  All Consenting Noteholders were expressly prohibited from selling interests in any Notes – including to Nobis Bay, BPY, and/or Pach Shemen – "unless such Transfer is to another Consenting Noteholder or any other entity that first agreed, in writing, to be bound by the terms of the [Second RSA] by executing and delivering to [Eletson Holdings and Eletson Finance], and counsel for the Consenting Noteholders, at least three (3) Business days prior to effectiveness of the relevant Transfer, a Transferee Joinder substantially in the form attached [to the Second RSA] as Exhibit B (the Transferee Joinder)." *Second RSA,* § 7(a), *V. Hadjieleftheriadis Dec.*, Ex. 3.  "Any Transfer made in violation of [Section 7 of the Second RSA] shall be deemed *null and void* and of no force or effect." *Id.* (emphasis added).

41.    The Alleged Debtors never received notice in any form—either written or verbal—identifying any Transfer or delivering any Transferee Joinder executed by Nomis Bay, BPY Limited, and/or Pach Shemen. *V. Hadjieleftheriadis Dec.*, ¶¶ 12, 19.

42.    Less than a week after Pach Shemen asserts it acquired its interests in the Notes, the Trustee contends it received a direction letter from "holders of a majority in aggregate principal amount of the then-outstanding Notes … directing the Trustee to take certain actions" under the Indenture. *Tr. Compl.,* ¶ 49, *V. Hadjieleftheriadis Dec.*, Ex. 9.  By the following day, the Trustee had filed the Trustee Complaint.  Yet, were Pach Shemen among those holding "a majority in aggregate principal amount of the then-outstanding Notes", which the Trustee relied upon to pursue remedies under Indenture, that direction was unlawful and unauthorized.

13

####    2.    Other Petitioning Creditors' Supporting Affidavits and Ownership Statements

43.    In the affidavits of Joshua Nemser and Amy Tarlowe on behalf of VR Global and Alpine, respectively, filed in support of each Petition ("VR Global Affidavit" and "Alpine Affidavit," respectively, and together with the Spears Pach Shemen Affidavit, collectively, the "Petitioning Creditors' Supporting Affidavits"), VR Global and Alpine each claim to have "acquired its claims on the open market." *VR Global Aff.*, ¶ 4; *Alpine Aff.*, ¶ 4.

44.    VR Global asserts it is a partnership, but discloses neither its partners nor its parents. *VR Global Partners, L.P., Corp. Ownership Stmt.,* p. 1.    According to the VR Global Affidavit, VR Global's Claim against the Alleged Debtors, and thus its authority to act as a "petitioning creditor," arises from its ownership of Notes in the aggregate amount of "$29,416,076 (plus applicable interest, fees, and other charges)." *VR Global Aff.*, ¶ 4.    VR Global acquired this position over several months in 2018 and 2019.  *See id.*   Not disclosed to the Bankruptcy Court is the fact that VR Global was a signatory to the Second RSA.  *Compare id.*, *with Second RSA*, *V. Hadjieleftheriadis Dec.*, Ex. 3.

45.    Alpine is owned by WBI, LP, Alps Investment Partners, LP, and CMK Investments, LLC. *Alpine Partners (BVI), L.P., Corp. Ownership Stmt.,* p. 1.   Alpine acquired its share of the Notes on December 8, 2022, and asserts its standing to act as a petitioning creditor arises from Notes valued at "at least $200,000 (plus applicable interest, fees, and other charges)." *Alpine Aff.*, ¶¶ 3–4.   Alpine's papers do not disclose the entity from which it alleges it purchased its Notes.

46.    As set forth above, while both Pach Shemen and Alpine allege that they "acquired [their] claims for investment purposes and not for the purpose of commencing the[] [above-captioned Bankruptcy Case]," those alleged purchases of the Notes occurred less than ninety days before they joined as the Petitioning Creditors in the Petitions. *Pach Shemen Aff.*, ¶ 4; *Alpine Aff.*,

14

¶ 4.   The timing of Pach Shemen's acquisition, in addition to being highly suspicious as an "investment," renders that acquisition void.  Similarly, Alpine's acquisition may too be void, depending upon whether the Notes it acquired were previously held by a Consenting Noteholder.

### 3.    Petitioning Creditors' Statements in Support of Involuntary Petitions

47.    In their Statement of Petitioning Creditors in Support of Involuntary Chapter 7 Petitions Against Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC [Dkt No. 3] (the "Statement In Support of Involuntary Petition"), the Petitioning Creditors make several representations.  First, as to the Second RSA, they acknowledge that the first notice of any termination of the Second RSA was sent on February 2, 2023, and further acknowledge that the Alleged Debtors, *i.e.* the "Issuers," have contested its validity.  *Stmt. Sup. Invol. Pet.*, ¶ 33, Dkt. 1.

48.    Second, Petitioning Creditors assert they are eligible creditors under sections 303(b) and (h) of the Bankruptcy Code because of the Alleged Debtors' purported "failure to pay … under the Notes" and "provid[e] financial information requested by the Trustee." *Id.*, ¶ 38.  The Petitioning Creditors insist that two sections of the Indenture empower them to file the Petitions: (i) section 6.07, which expressly authorizes the "any Holder" to "bring suit for the enforcement of any … payment" of principal, premium if any, and interest on one or more Notes, and (ii) section 6.06, which the Petitioning Creditors contend "does not prevent the Noteholders from filing and prosecuting the Involuntary Petitions." *Id.*, ¶¶ 49–53.

49.    In relying on the Trustee Litigation and the existence of the RSAs as evidence of the Alleged Debtors' current financial incapacity, however, the Petitioning Creditors disregard facts about the binding Second RSA.  Among other things, the Petitioning Creditors: (i) ignore the prohibitions of transfer under the Second RSA and the impact of the same on the validity of the

Petitions, (ii) neglect to advise the Court that the direction given to the Trustee to commence the

Trustee Litigation was unauthorized, and (iii) fail to advise this Court of the Standstill Period still

in effect as of the Petition Date.

**C.**      **Cases' Ongoing Effect on the Alleged Debtors' Operations**

50.      As set forth in the attached *Declaration of Vasilis Hadjieleftheriadis in Support of

Alleged Debtors' Filed Motions* (the "Hadjieleftheriadis Declaration"), the Petitions have

negatively impacted the Alleged Debtors' operation.  Now, the Alleged Debtors must expend even

more resources to defend themselves against the unlawful collateral attack commenced by the

Petitions.  *See Hadjieleftheriadis Dec.*, ¶¶ 28–30.  Already battling reputational issues related to

its dispute with Levona, the Petitions have exponentially amplified these harmful rumors.  *See id.*,

¶¶ 31–34.  As a result, Holdings has now been forced to expend monies and manpower to regain

what was once a strong, even leading, position in its major markets.  *See id.*

51.      This process has only been made harder by the global shipping industry's historic

susceptibility to sharp fluctuations, currently higher-than-normal charter, freight, demurrage and

detention rates, and persistent logistical and tracking issues.  *Id.*, ¶ 31.  Holdings' ability to attract

and retain valuable agreements and terms both ashore and at sea have suffered.  *Id.*  It has struggled

to retain senior executives, including a Chief Executive Officer and a Chief Financial Officer.  *Id.*,

¶ 35.  At lower managerial levels, numerous employees continue to leave due to this uncertain

environment.  *Id.*  Finally, Holdings has encountered more resistance to its proposed refinancing

of select loans on certain assets and difficulties in attracting new investors than it had before the

Petitioning Creditors sprang their March surprise.  *See id.*, ¶¶ 32, 34.

**ARGUMENT**

52.     Spawned by the filing of three barebones chapter 7 petitions by three purported "creditors," two of whom purport to have acquired their interests within ninety days of the Petition Date, these Cases represent a bald attempt to exploit the Bankruptcy Code.  A bankruptcy system is primarily intended to relieve the burdens on voluntary debtors and protect the interests of all legitimate unsecured creditors.  Yet, here, the wasteful exercise serves the overriding interests of only one supposed "creditor": Levona.  In these Cases, the Petitioning Creditors have, without question, improperly deployed the Bankruptcy Code's involuntary provisions as a weapon for partisan ends, which bankruptcy law condemns.  If even one of the Petitioning Creditors is found to lack good faith or eligibility, these Cases' dismissal is mandated.  Here, there are at least two.

## I.     Involuntary Petitions Must Be Rigorously Policed to Avoid Abuse.

53.     An involuntary bankruptcy is an extraordinary remedy with often irreversible consequences for a purported debtor.  *See, e.g.*, *Wilk Auslander LLP v. Murray (In re Murray)*, 900 F.3d 53, 60 (2d Cir. 2018) (explaining that "the unusual nature of involuntary petitions," along with their risks, led Congress to "provide[] bankruptcy courts with a variety of tools with which to police their use"); *In re Taub*, 439 B.R. 261, 269–70 (Bankr. E.D.N.Y. 2010) (stressing the consequences of a petition's filing in the absence of an order for relief).  Bankruptcy courts repeatedly express concern about the perils posed by an involuntary bankruptcy petition.  *In re Murray*, 900 F.3d at 59.  A debtor hauled into bankruptcy involuntarily risks "loss of credit standing, inability to transfer [assets] and carry on business affairs, and public embarrassment." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015) (quoting *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985)), *quoted in In re Murray*, 900 F.3d at 59; *see also In re Anmuth Holdings, LLC*, 600 B.R. 168, 175–76 (Bankr. E.D.N.Y. 2019) (quoting *In re Murray*, 900 F.3d at

17

59).  The mere "allegation of bankruptcy is a charge that ought not be made lightly," for "[i]t usually chills the alleged debtor's credit and his source of supply[,] … can scare away customers[, and] … leaves a permanent scar even if promptly dismissed."  *In re Dino's, Inc.*, 183 B.R. 179, 783 (S.D. Ohio 1995) (citing *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 101 (Bankr. S.D. Fla. 1981)); *see also In re Morris*, 115 B.R. 752, 757 (Bankr. E.D.N.Y. 1990) (citing to a portion of the foregoing quote from *In re SBA Factors of Miami, Inc.,* 13 B.R. at 101).

54.    Involuntary petitions carry with them baneful possibilities.  Thus, bankruptcy courts carefully scrutinize actions of petitioning creditors to ensure that an order for relief is only entered only where truly appropriate.  Such rigor aligns with the design of section 303 specifically, and the Bankruptcy Code, more generally.  Congress "intended the Bankruptcy Code as a shield for debtors, not a sword for creditors," *In re Drexler*, 56 B.R. 960, 971 (Bankr. S.D.N.Y. 1986).  Hence, bankruptcy courts "'should be wary of creditors who may find alluring the retributive quality' of thrusting a debtor into bankruptcy.'"  *In re Anmuth Holdings LLC*, 600 B.R. at 194.

55.    The Petitioning Creditors bear the burden of proof as to their eligibility under section 303.  *In re Brooklyn Res. Recovery*, 216 B.R. 470, 478 (Bankr. E.D.N.Y. 1997).  As the objecting parties, the Alleged Debtors must demonstrate the Petitioning Creditors' bad faith.  *See In re TPG Troy, LLC*, Nos. 12-13965, 12-14966, 2013 Bankr. LEXIS 2899, at *16, 2013 WL 3789344 (Bankr. S.D.N.Y. July 18, 2013).

## II.    The Petitioning Creditors Were Ineligible To File Under Section 303(b) and (h).

56.    In relevant part, section 303(b) provides:

An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 … by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder….

18

11 U.S.C. § 303(b)(1).

57.     Section 303(h) provides in relevant part:

[A]fter trial, the court shall order relief against the debtor in an involuntary case
under the chapter under which the petition was filed, *only if* … the debtor is
generally not paying such debtor's debts as such debts become due *unless* such
debts are the subject of a bona fide dispute as to liability or amount ….

*Id.* (emphasis added).

58.     Here, Pach Shemen and, potentially, Alpine, have failed to establish that they are

holders of eligible claims against the Alleged Debtors, and their standing to act as petitioning

creditors is, at best, doubtful for at least three reasons.  First, neither can show they are a legitimate

"holder" of a claim by a preponderance of the evidence.  The Alleged Debtors never received

notice in any form of any Transfer or Transferee Joinder under the Second RSA identifying Pach

Schemen or Alpine as an assignee of any Notes. Pursuant to the Second RSA, any interest acquired

from a Consenting Noteholder after the Second RSA was executed without the requisite notice

and written joinder are "null and void and of no force or effect."

59.     Second, even assuming *arguendo* that each of the Petitioning Creditors are

"holders," the Petitioning Creditors cannot sufficiently demonstrate they hold valid "claims."  As

noted above, their purported status as "creditors" relies on the nullification of material provisions

of the Indenture.  Pointing to sections 6.06 and 6.07 of the Indenture to support their authority as

direct creditors of the Alleged Debtors, the Petitioning Creditors contend that these provisions,

which authorize a holder to "bring suit for the enforcement of any … payment" of principal,

premium if any, and interest on the Note, also entitle any Noteholder to institute involuntary

bankruptcy proceedings against the Alleged Debtors.  This interpretation of the Indenture,

however, presents a host of problems.  To begin with, it relies on two non-Second Circuit cases:

*Envirodyne Industries, Inc. v. Connecticut Mutual Life Co. (In re Envirodyne Industries, Inc.)*, 174

19

B.R. 986 (Bankr. N.D. Ill. 1994), and *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361 (Bankr. M.D. Ga. 2014).   Yet *Envirodyne Industries, Inc.*, pointedly concedes that a clause permitting payment of past due interest does not "expressly permit[]" the filing of an involuntary petition.  *In re Envirodyne Indus.*, 174 B.R. at 997.

60.    More significantly, the Petitioning Creditors construe sections 6.06 and 6.07 far more expansively than the actual text of the Indenture permits.   Under these two provisions, a Noteholder may advance direct claims made for principal and interest payments.   However, bankruptcy is a collective proceeding, and an involuntary petition, like any petition, aims to ensure equitable treatment of all unsecured creditors and a debtor's financial rehabilitation.  *Cf. In re Brooklyn Res. Recovery, Inc.*, 216 B.R. at 486 ("Involuntary bankruptcy … exists as an avenue of relief for the benefit of the overall creditor body of troubled businesses.").   Logically, therefore, a petition's filing is not the same as one creditor's suit for outstanding principal and interest payments.  *Cf. Taberna Preferred Funding IV, Ltd. v. Opportunities II Ltd. (In re Taberna Preferred Funding IV, Ltd.)*, 594 B.R. 576, 601 (Bankr. S.D.N.Y. 2018) (advising that "an involuntary petition that seeks to achieve objectives that benefit all creditors is consistent with the Bankruptcy Code's goal to 'secure equal distribution among creditors'").

61.    The express language of section 6.07 underscores the precariousness of the Petitioning Creditors' position.  Section 6.07 of the Indenture provides that power of "any Holder" to independently pursue principal and interest may not be "impaired or affected" without their "consent." Yet, section 6.08 of the Indenture provides that express consent.  Among other things, section 6.08 of the Indenture provides that the Alleged Debtors "will pay *to the Trustee,* for the benefit of the [Noteholders], the whole amount…due and payable on [the] Notes," and further provides that "[i]f the [Alleged Debtors] fail to pay such amounts]…, the *Trustee* may institute a

judicial proceeding for the collection of the sums so due and unpaid." *Id.,* § 6.08 (emphasis added).

Tellingly, the Indenture provides that "[t]he *Trustee* is authorized to file…proofs of claim and

other papers or documents as may be necessary or advisable in order to have the claims of the

Trustee…and the Holders…allowed in any judicial proceedings relative to the [Alleged Debtors]."

*Id.*    Thus, the express terms of the Indenture nominate the Trustee, and not the individual

Noteholders, to pursue claims against the Alleged Debtors.

62.    Put simply, the Petitioning Creditors have not been forthcoming or transparent with

this Court.    The blatant omissions on basic factual details pertaining to the acquisition of their

disputed claims, the unity of ownership and control between Levona and Pach Schemen, and the

failure to acknowledge the Standstill Period in the Second RSA, taint the Petitioning Creditors'

standing as Petitioning Creditors.    Indeed, while the Alleged Debtors' investigations are in their

infancy, the circumstances surrounding the Petitions invite no less than two *more* questions about

the Petitioning Creditors' status as "creditors" which may invalidate their eligibility at this stage,

including: whether (a) one or more of the Petitioning Creditors are sufficiently interrelated to

effectively constitute a single party-in-interest; and (b) given proximity between the alleged

acquisition of the "claims" of Pach Shemen and Alpine, and the filing of the Petitions, either of

those creditors acquired its alleged interest for the purpose of commencing an involuntary case,

Fed. R. Bankr. 1003(a), *see supra*, ¶¶ 36–50.

63.    While the Petitioning Creditors bear the burden of proof in establishing their

eligibility, an affirmative response to either of these questions would also invalidate the Petitions.

As such, the Alleged Debtors intend to explore these issues, as well as this Court's jurisdiction

over the Alleged Debtors pursuant to section 109 of the Bankruptcy Code, in the context of this

contested motion to dismiss if this Court feels it necessary.  Even without further discovery, however, the nature and purpose of these Cases is already in doubt.  *See infra*, ¶¶ 65–78.

        **A.**    **The Petitioning Creditors Alleged Claims Are Contingent.**

64.     "Claims are contingent as to liability when the debtor's duty to pay arises only upon the occurrence of a future event that was contemplated by the parties at the time of the contract's execution.'" *In re Crescenzi*, 53 B.R. 374, 380 (Bankr. S.D.N.Y. 1985).  In these Cases, the alleged claims of VR Global and Pach Shemen, and potentially of Alpine, are contingent because the alleged creditors do not possess a right to payment until the occurrence of several conditions that have yet to come to pass.  *First*, as of the Petition Date, the Alleged Debtors were still operating under the terms of the Second RSA, including the Standstill Period expressly established thereunder.  While the Alleged Debtors admit that they made no direct payments under the Indenture, those payments were withheld in accordance with the express terms of the Second RSA.  Thus, the Alleged Debtors have not, as the Petitioning Creditors claim, "failed to make any *required* payments of interest and principal on the Notes."

65.     *Second*, even if the alleged termination of the Second RSA is ultimately determined to be valid, the validity was sufficiently in doubt to make the Petitioning Creditors' purported "claims" contingent as of the Petition Date for purposes of section 303(b).   Indeed, as has been disclosed in these Cases, Pach Shemen contends it purchased more than $183 million in outstanding notes during the first week of January 2023.  Yet, by the terms of the Second RSA, that transaction was void.  As such, unless and until it can be verified that the alleged majority of the Noteholders – which does not and cannot include Pach Shemen – authorized the termination of the Second RSA, the alleged termination is invalid.  As detailed above, the Alleged RSA Termination does not comply with the clear requirements of the Second RSA regarding

termination of the same.  Since receiving the Alleged RSA Termination, none of the Alleged

Debtors has received any other notice of termination under the Second RSA.  As a result, the

Alleged Debtors are informed and believe that no Termination Date has yet occurred under the

Second RSA and that the Standstill Period remains in effect.

      **B.**    **The Petitioning Creditors Hold Claims That Are Subject To A Bona Fide Dispute.**

      66.    A petitioning creditor does not have standing to commence an involuntary petition

if its debt is subject to a bona fide dispute.  *See* 11 U.S.C. § 303(b), (h)(1); *In re Taberna Preferred*

*Funding IV, Ltd.*, 578 B.R. 244, 248 (Bankr. S.D.N.Y. 2017).  A bona fide dispute exists where

"there is an objective basis for either a factual or a legal dispute as to the validity of the debt."  *Key*

*Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117 (2d Cir. 2003), *abrogated on*

*other grounds by In re Zarnel*, 619 F.3d 156 (2d Cir. 2010).  A court need not resolve the merits

or evaluate the potential outcome of a dispute, but merely determine whether one exists.  "[T]he

legislative history makes it clear that Congress intended to disqualify a creditor whenever there is

any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal."  *Crest*

*One Spa v. TPG Troy, LLC (In re TPG Troy, LLC),* 793 F.3d 228, 234 (2d Cir. 2015).

      67.    Analytically, if there is either a genuine issue of material fact that bears upon the

debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then

the petition must be dismissed.  In *re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986); *see also*

*In re BDC 56* LLC, 330 F.3d at 117 (adopting version of *Lough* test).  In making this assessment,

courts heed "the primary purpose" of section 303(b)(1): "'to prevent … creditors from using

involuntary petitions as a club to coerce the debtor to satisfy judgments when substantial questions

may remain concerning the debtor's liability.'"  *In re Ransome Grp. Invs. I, LLP*, 424 B.R. 547,

551 (Bankr. M.D. Fla. 2009); *see also In re TPG Troy, LLC*, 492 B.R. 150, 159 (Bankr. S.D.N.Y.

2013) ("Pending litigation over a claim strongly suggests … the existence of a bona fide dispute for purposes of … [section] 303(b)"; "[i]n particular, 'the existence of affirmative defenses may suggest that a bona fide dispute exists.'").

68.     Here, each of the "claims" held by the Petitioning Creditors is disputed.   Two of the three Petitioning Creditors purport to have acquired their claims during a time period when such acquisitions were void *ab initio* absent the satisfaction of certain conditions precedent that have not occurred.  The third Petitioning Creditor, VR Global, was a signatory to the Second RSA and knew or should have known about these deficiencies in the transfer, and was also aware of the Standstill Period under the Second RSA.   Indeed, the Second RSA was disclosed in the papers filed in support of the Petition, suggesting each of the Petitioning Creditors had access to and an ability to review the same.  This material dispute, alone, renders the Petitions invalid.  In such a circumstance, the "job of the court…is to ascertain whether a dispute that is bona fide exists; the court is not to actually resolve the dispute."  *In re TPG Troy, LLC,* 793 F.3d at 235.   Upon determining that a claim is subject to a bona fide dispute, dismissal of the involuntary petitions is appropriate.

## III.    The Petitions Were Filed In Bad Faith.

69.     In addition to the technical deficiencies of the Petitions, these Cases must be dismissed because they were filed by the Petitioning Creditors in bad faith and for an improper purpose.  *E.g.*, *In re Murray*, 900 F.3d at 60; *see also In re Forever Green Athletic Fields, Inc.*, 804 F.3d at 334–35 (an involuntary bankruptcy petition filed in bad faith is subject to dismissal), *cited in In re Murray*, 900 F.3d at 59.  The term "bad faith" is not defined in the Bankruptcy Code, and legislative history does not address the intended meaning of this language.  For these reasons, federal courts have used different approaches to determine whether an involuntary petition was

filed in bad faith, many of which overlap, *see In re Bayshore Wire Prods. Corp.*, 209 F.3d 100,

105 (2d Cir. 2000); *In re Luxeyard, Inc.*, 556 B.R. 627, 641 (Bankr. D. Del. 2016).

70.    Within the Second Circuit, courts have focused on four general areas of inquiry:

"(1) the merits of the involuntary petition; (2) the role of any improper conduct on the part of the

alleged debtor; (3) the reasonableness of the actions taken by the petitioning creditors; and (4) the

motivation and the objectives behind the filing of the petition." *In re Anmuth Holdings LLC*, 600

B.R. at 168 (citing *In re TPG Troy, LLC,* 793 F.3d at 228).    In looking to these four broad

categories, oft-cited factors found sufficient to prompt dismissal include, but are not limited to,

whether: (1) the bankruptcy court was the most recent battlefield in a long-running, two-party

dispute; (2) the creditor brought the case solely to enforce a judgment; (3) there were no competing

creditors; (4) there was no need for *pari passu* distribution; (5) assuming there were fraudulent

transfers to be avoided, the creditor could do so in another forum; (6) the creditor had adequate

remedies to enforce its judgment under non-bankruptcy law; (7) the creditor invoked the

bankruptcy laws solely to secure a benefit that it did not have under non-bankruptcy law and

without a creditor community to protect; (8) no assets would be lost or dissipated in the event that

the bankruptcy case did not continue; and (9) the debtor did not want or need a bankruptcy

discharge. *In re Murray*, 900 F.3d at 57–58 (affirming use of those factors in *Wilk Auslander LLP*

*v. Murray (In re Murray)*, 565 B.R. 527 (S.D.N.Y. 2017), which dismissed an involuntary chapter

7 petition for bad faith)).    Of course, "a bankruptcy court has discretion to determine what

additional circumstances, not enumerated in the statute, may constitute cause.'" *In re Murray*, 543

B.R. 484, 492 (Bankr. S.D.N.Y. 2016).

71.    In these Cases, regardless of the rubric used, evidence of bad faith is manifest.  First,

as detailed above, substantial deficiencies exist with respect to the Petitions and the Petitioning

Creditors' status as holders of non-contingent, undisputed and liquidated claims.  The scope of these failures suggests a facially insufficient pre-filing investigation, itself an adequate indicia of bad faith.  *In re Reveley*, 148 B.R. 398, 408 (Bankr. S.D.N.Y. 1992) ("[B]ad faith has been found where petitioners disregard facts which have an impact on the validity of their petition.") (collecting cases).

72.     In reality the fact that the Petitioning Creditors' investigation was deficient is revealed by at least two other themes that appear consistently in the papers filed in support of the Petitions: (i) the Petitioning Creditors' fail to provide any concrete facts in support of the alleged improper business practices of the Alleged Debtors, instead relying on "serious concerns," and conjecture about "the Debtors' apparent financial condition," and (ii) the Petitioning Creditors' plan to use Bankruptcy Rule 2004 as a fishing expedition to identify possible bases for these Cases when none were readily known prior to the Petition Date. *See Stmt. Sup. Invol. Pet.*, ¶¶ 4, 63–64.

73.     Third, by their own account, this trio relies on the Alleged Debtors' purported violation of the Indenture as a basis for commencing these Cases.  However, as set forth above, the Alleged Debtors' refusal is predicated on a reasonable construction of this agreements.  While the Alleged Debtors know their interpretation is correct, even if the Petitioning Creditors disagree, the Alleged Debtors have not engaged in any improper act due to their reasonable assertion of their contractual rights.  *Cf. In re TPG Troy, LLC*, 793 F.3d at 234 ("An involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt.").

74.     Fourth, the actions taken by the Petitioning Creditors in commencing these Cases were inherently unreasonable.  As alleged Noteholders, each of the Petitioning Creditors' claims were already being addressed by the Trustee Litigation filed prior to the Petition Date, which qualifies as an adequate forum to address those alleged claims.   In fact, upon information and

belief, the Trustee only commenced the Trustee Litigation *after* being directed to do so by one or more of the Petitioning Creditors.   Instead of permitting that litigation to proceed, the Petitioning Creditors instead opted to file the deficient Petitions, without the requisite authority to do so under the Indenture, significantly disrupting the Alleged Debtors' business operations in the process.   In doing so, they succeeded in bringing the Arbitration to a halt and also jumped on their opportunity to serve onerous and broad 2004 exam subpoenas on the Alleged Debtors as well as three of their non-debtor affiliates, pursuant to which they seek information which Levona had sought to discover as part of the Arbitration, but was denied.   In this way, these Cases were commenced to create a tactical advantage for the Levona Entities, and not for any legitimate bankruptcy purpose.

75.    Finally—and most importantly—the Petitions appear to have been instigated by the Levona Entities in an attempt to derail the upcoming trial on the Arbitration.  *See In re Luxeyard, Inc.,* 556 B.R. at 640 ("It is not a proper purpose to file an involuntary petition to frustrate proceedings in other courts or to force a company out of business.").  Indeed, it appears the primary motivations in commencing these Cases were to disrupt the Alleged Debtors' business operations, to trigger a change of corporate control for the Alleged Debtors, and to use the cases as a tool for obtaining financial information that Levona had requested, and been denied, as part of the Arbitration.  *Id.* at 641 ("[I]t is an improper use of the bankruptcy system to file an involuntary petition to obtain a disproportionate advantage for the petitioner's own position. Examples…include filing…in order to change corporate control….").  Considering where matters stood on the Petition Date, especially on the heels of the acute losses that Levona had endured in the Arbitration (for which Spears and Lichtenstein had a front row seat), the  timing of the Petitions demonstrates both the egregious bad faith and an improper use of the bankruptcy system necessary

to compel dismissal. *In re Anumth Holdings, LLC*, 600 B.R. at 192–93 (collecting cases on this point). In light of the Petitioning Creditors' bad faith, the Cases should be dismissed.

## IV.    Abstention Is Warranted Under Section 305(a)—And, Therefore, Dismissal.

76.    Section 305(a)(1) affords yet another justification for the dismissal of these Cases. Pursuant to this provision, a bankruptcy court may dismiss or suspend a case if such action would be in the best interest of creditors and the debtor. Factors supporting abstention where an involuntary petition is filed include: (i) pending court proceedings where creditors' interests can be protected; (ii) the existence of a pending resolution of creditor claims; and (iii) bankruptcy jurisdiction has been sought for an improper purpose. *See, e.g.*, *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 464–65 (Bankr. S.D.N.Y. 2008); *In re Duratech Indus.*, 241 B.R. 291, 300 (Bankr. E.D.N.Y. 1999). Though other factors have been cited, "[t]he 'purpose for which the involuntary petition was filed' has been regarded as 'the most important factor although not dispositive.'" *In re Navient Sols., LLC*, 625 B.R. 801, 820 (Bankr. S.D.N.Y. 2021).

77.    Here, the case for abstention is especially compelling for at least three reasons. First, it would be costly and inefficient to commence a full-scale bankruptcy proceeding in this Court. Second, as to the underlying claims, there are other forums available to protect the interest of any relevant parties: either the Arbitration, which will determine Levona's rights vis-à-vis the Arbitration Claimants, or the District Court, where the Trustee Litigation was filed. Bringing the underlying substantive issues before yet another federal forum is an unnecessary step that would result in additional costs and unwarranted delays. Third, as this memorandum has shown, the Petitioning Creditors did not file the Petition to achieve greater "creditor democracy" or some other laudable end. *In re 801 S. Wells St. Ltd P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996). Instead, they appear to have sought to attain leverage on the Alleged Debtors in a way that

needlessly places their business operations and their relationships with other vendors/creditors at catastrophic danger. Controlling authority makes clear that abstention under section 305 is warranted when involuntary petitions are filed to give the petitioning creditors an unfair advantage, such is what must happen here. *See In re Navient Sols., LLC*, 625 B.R. 801, 820 (Bankr. S.D.N.Y. 2021) ("In fact, section 305 mainly functions to rid the bankruptcy courts of retaliatory, involuntary case."); *see also* 2 COLLIER ON BANKRUPTCY ¶ 305.02[2][a] (16th ed. 2021) (stating that "the prototypical fact pattern under section 305(a)(1)" noted by Congress involves out-of-court workouts and efforts by recalcitrant creditors to initiate an involuntary case to gain leverage).

## V.    The Alleged Debtors Should Be Awarded Fees, Costs, And Damages

78.    In light of the Petitioning Creditors' exploitation of the Bankruptcy Code, as shown above, the Alleged Debtors deserve compensation for the damage the Petitioning Creditors' hastiness has inflicted. Section 303(i) specifies only two prerequisites for an award of fees, costs, or damages: (i) the court must have dismissed the petition other than by consent, and (ii) the debtor did not waive its right to recovery under section 303(i). *See* 11 U.S.C. § 303(i). There is a presumption that costs and attorneys' fees will be awarded to a putative debtor where an involuntary petition is dismissed. *E.g.*, *In re Navient Sols., LLC*, 627 B.R. at 588; *In re TPG Troy, LLC*, 492 B.R. at 162. Moreover, the petitioning creditors bear the burden of proof on justifying a denial of costs and fees. *In re Mountain Dairies*, 372 B.R. 623, 637 (Bankr. S.D.N.Y. 2007).

79.    In this Case, Alleged Debtors have not waived their right to recovery under section 303(i) and any dismissal would not be by consent of the parties given the contested nature of this proceeding. Thus, the Alleged Debtors should be awarded appropriate fees and costs pursuant to section 303(i)(1). In addition, because the Alleged Creditors have demonstrated the Petitioning

Creditors' bad faith, the Alleged Debtors merit punitive damages and further compensation for the harms the Petitions have caused pursuant to section 303(i)(2).

## **RESERVATION OF RIGHTS**

80.    The Alleged Debtors are continuing to review the Petitions and conduct relevant discovery, and reserve the right to raise additional objections to said Petitions, or to seek that Petitioning Creditors post a bond pursuant to section 303(e) of the Bankruptcy Code, at the appropriate time.

Dated:  April 14, 2023
      New York, New York

Respectfully submitted,

REED SMITH LLP

*/s/ Andrew L. Buck*
Andrew L. Buck
Louis M. Solomon
Reed Smith LLP
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
abuck@reedsmith.com

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
Reed Smith LLP
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
apille@reedsmith.com

*Counsel for Alleged Debtors Eletson Holdings Inc., Agathonissos Finance LLC, and Eletson Finance (US) LLC*