Stephen D. Zide
David A. Herman
Owen S. Haney
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
Email: stephen.zide@dechert.com
david.herman@dechert.com
owen.haney@dechert.com

*Proposed Counsel to the Official Committee of
Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ELETSON HOLDINGS INC., *et al.*, | : | Case No. 23-10322 (JPM) |
|  | : |  |
| Debtors.[1] | : | Jointly Administered |
|  | : |  |

------------------------------------------------------- X

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MODIFY THE COURT'S PRIOR ORDER GRANTING RELIEF FROM THE <u>AUTOMATIC STAY</u>

---

[1]      The Debtors in these chapter 11 cases are Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................. 6

    A.    Eletson Gas Is Formed as One of the Debtors' Main Operating
        Subsidiaries. ........................................................................................ 6

    B.    Eletson Gas Obtains the Option to Purchase the Preferred Shares ....................... 6

    C.    The Debtors Commence an Arbitration to Determine Ownership of the
        Preferred Shares. ................................................................................. 7

    D.    The Debtors Obtain Relief from the Automatic Stay to Pursue the
        Arbitration. ........................................................................................ 8

    E.    The Debtors Reveal That They Purportedly Already Transferred the
        Preferred Shares to "Nominees" Owned by Insiders. ...................................... 10

    F.    The Shareholders Allegedly Transferred the Preferred Shares at a "Family
        Meeting" Without Apparent Corporate Authority to Execute Such a
        Transfer. ........................................................................................... 11

    G.    The Arbitration Award Assesses Damages in Favor of Eletson Gas and the
        Cypriot Nominees, but Not In Favor of Eletson Holdings. ............................... 12

    H.    The Debtors Petition to Confirm the Arbitration Award, Including Its
        Findings that the Preferred Shares Were Transferred to the Nominees. .............. 13

    I.    The Debtors Convert these Cases to Voluntary Cases Under Chapter 11
        and Reveal that They Are Hopelessly Insolvent. ........................................... 13

    J.    The Debtors Refuse to Take Steps to Cure Conflicts of Interest and
        Preserve the Value of the Estates. ............................................................ 14

RELIEF REQUESTED ........................................................................................ 15

BASIS FOR RELIEF .......................................................................................... 16

    A.    The Court Has Inherent Authority to Modify the Stay Relief Order and Is
        Authorized to Do So by the Federal Rules. ................................................. 16

    B.    The Court Should Modify the Stay Relief Order to Preserve the Status
        Quo and Avoid Irreparable Harm to the Estates. ........................................... 18

CONCLUSION ................................................................................................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 710 Long Ridge Rd. Operating Co.*,
No. 13-13653 (DHS), 2014 WL 1648725 (Bankr. D.N.J. Apr. 24, 2014) .............................16

*In re AMR Corp.*,
730 F.3d 88 (2d Cir. 2013)...........................................................................................................18

*In re Anderson*,
884 F.3d 382 (2d Cir. 2018)..........................................................................................................21

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ....................................................................................................19

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998).........................................................................................................18

*CFTC v. Weintraub*,
471 U.S. 343 (1985)...............................................................................................................5, 21

*Claybrook v. Morris (In re Scott Acquisition Corp.)*,
344 B.R. 283 (Bankr. D. Del. 2006) ...........................................................................................18

*Deane v. Maginn*,
No. 2017-0346-LWW, 2022 WL 16557974 (Del. Ch. Nov. 1, 2022)...................................19

*In re DSI Renal Holdings, LLC*,
574 B.R. 446 (Bankr. D. Del. 2017) ...........................................................................................18

*In re Dunne*,
684 F. App'x 85 (2d Cir. 2017) .............................................................................................5, 20

*Fed. Land Bank of Springfield v. Hansen*,
113 F.2d 82 (2d Cir. 1940)......................................................................................................5, 16

*In re Kalikow*,
602 F.3d 82 (2d Cir. 2010).........................................................................................................21

*Klapprott v. United States*,
335 U.S. 601 (1949), ...................................................................................................................17

*In re New York Racing Ass'n Inc.*,
No. 06-12618 (JLG), 2016 WL 6081087 (Bankr. S.D.N.Y. Oct. 17, 2016) ......................5, 16

*In re Price*,
  577 B.R. 643 (Bank. E.D.N.C. 2017) ...................................................................17

*Rodriguez Camacho v. Doral Fin. Corp. (In re Rodriguez Camacho)*,
  361 B.R. 294 (1st Cir. BAP 2007) .......................................................................17

*State Bank of Southern Utah v. Gledhill (In re Gledhill)*,
  76 F.3d 1070 (10th Cir. 1996) .............................................................................17

*In re Texlon Corp.*,
  596 F.2d 1092 (2d Cir. 1979)...............................................................................16

*United Airlines, Inc. v. Brien*,
  588 F.3d 158 (2d Cir. 2009).................................................................................17

*Wayne United Gas Co. v. Owens-Illinois Glass Co.*,
  300 U.S. 131 (1937)..............................................................................................16

*Whitaker v. Baxter (In re Whitaker)*,
  341 B.R. 336 (Bankr. S.D. Ga. 2006) .............................................................16, 17

*In re Zahn Fams*
  206 B.R. 643 (B.A.P. 2d Cir. 1997)......................................................................17

## Statutes

11 U.S.C. § 105(a) ......................................................................................... *passim*

## Other Authorities

Fed. R. Bankr. P. 9024 ...................................................................................................6

Fed. R. Civ. P. 20(a) .....................................................................................................9

Fed. R. Civ. P. 20(b) ..................................................................................................9, 11

Fed. R. Civ. P. 60, 60(b), (b)(6) ...................................................................1, 6, 16, 17

H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977) ................................................18

S. Rep. No. 989, 95th Cong., 2d Sess. 54–55 (1978) .................................................18

The Official Committee of Unsecured Creditors (the "Committee") of Eletson Holdings, Inc. ("Eletson Holdings"), Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively, the "Debtors"), respectfully submits this motion under 11 U.S.C. § 105(a), Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 60(b) of the Federal Rules of Civil Procedure (the "Federal Rules"), to modify the Court's order dated April 17, 2023 (ECF 48), which granted certain relief from the automatic stay.

## PRELIMINARY STATEMENT

1.　　On April 17, 2023, this Court entered a stipulation and order modifying the automatic stay to permit debtor Eletson Holdings and its subsidiary, Eletson Corporation, to pursue an arbitration to determine the ownership of preferred shares in Eletson Gas. In seeking that relief, the Debtors represented that a successful outcome in the arbitration could "only inure to the benefit" of the Debtors and their "conjectured estate." (ECF 6 at 21.) The stay relief order modified the automatic stay to permit the arbitration to proceed "with respect to the claims currently pending in the Arbitration." (ECF 48 at ¶ 3.) All parties consented to that order.

2.　　After the Court issued its stay relief order, however, the Debtors commenced an effort to ensure that the Preferred Shares were transferred outside the reach of their creditors.[2] Their counsel unabashedly explained this effort to the Arbitrator as follows:

> "As soon as they said, even if they win–even if we win in this proceeding, they're going to take that asset and they are–it goes back into Holdings and so, lo and behold, the bankruptcy allows them to take it. So your Honor has wasted a year, your Honor has given us a standstill for nothing, your Honor went through all this evidence and that's when we said, well, wait a minute, *I went back to my client and it says these nominees, why don't we just transfer it to the nominees and they said, we don't have to, we have already done it.*"

---

[2] Undefined capitalized terms shall have the meaning set forth elsewhere in this motion.

(Ex. C at 153:2-24 (emphasis added).) In other words, the Debtors' counsel claimed that the Debtors' insiders had purported to cause all recoveries from the Arbitration to be transferred for the benefit of themselves, and that the Debtors' creditors would see nothing from any recoveries.

3. The Debtors then requested that the Arbitrator "structure the relief" in any award he issued to ensure that the assets remained outside the reach of their creditors and in the pockets of Cypriot entities, dubbed the "Nominees," that are owned by the Debtors' out-of-the-money shareholders. (*Id.* at 6:19-7:6.) As the Arbitrator found, the Debtors presented this contention for the first time on May 5, 2023, after this Court entered its stay relief order, which had limited the modification of the automatic stay to "claims currently pending in the Arbitration[.]" (ECF 48 at ¶ 3.) Because the Arbitration proceedings were confidential, the Debtors did not disclose that they had taken that position to their creditors or this Court until weeks later.

4. The story, even as told by the Debtors' insiders, describes *at best* a textbook fraudulent transfer. According to the Debtors, the three families who control and manage the Debtors purport to have transferred the Preferred Shares to Cypriot entities controlled by those same insiders without any meaningful consideration in return. The transfer—if it actually occurred at all—was supposedly authorized at a "family meeting," was not memorialized in any documentation, and was not approved by the boards of either Eletson Gas or Eletson Holdings.

5. On July 27, the Arbitrator entered an interim Award in favor of the Debtors.[3] The Arbitrator concluded that Eletson Gas had exercised the option to purchase the Preferred Shares by "transferring the shares of the Symi and Telendos," which the award found had "a value in excess of the $23 million." (Ex. D at 33, 75.) But even though Eletson Gas had supplied the

---

[3] On August 15, the Arbitrator entered a corrected interim Award, which is attached hereto as Exhibit D.

consideration to purchase the Preferred Shares—and Eletson Holdings and Eletson Corp. were the only two petitioners in the Arbitration—the Arbitrator accepted the Debtors' position that Eletson Gas had transferred the Preferred Shares outside the Debtors' capital structure to third-party "Nominees." In addition, the Arbitrator awarded compensatory and punitive damages, but no part of those damages was awarded to Eletson Holdings or Eletson Corp. Instead, the Arbitrator awarded half of the damages to the Nominees and the other half to Eletson Gas, neither of which was a party to the Arbitration. The Debtors subsequently commenced proceedings in the District Court to confirm the Arbitration Award as to Levona.

6. Critically, no one is representing the interests of the Debtors' bankruptcy estates and their creditors in connection with the Arbitration. The Debtors are seeking to confirm the Arbitrator's award, but in so doing are continuing to advocate that the Debtors and their creditors will receive nothing from the Award, which instead will go to non-debtor insiders.

7. To be clear, the Committee is not objecting to the Arbitrator's ruling that Eletson Gas exercised its option to purchase the Preferred Shares. Such a ruling, on its own, may indeed "inure to the benefit" of the Debtors, because if the Preferred Shares were repurchased by Eletson Gas (which all parties acknowledge supplied the consideration for the purchase), such repurchase would have the effect of increasing the value of the common shares of Eletson Gas, which are held by debtor Eletson Holdings. In contrast, a ruling that the Preferred Shares were transferred outside the Debtors' capital structure to Cypriot Nominees has the effect of significantly depleting the value of Eletson Holdings by eliminating the value of its interests in Eletson Gas. Yet that is the ruling that Eletson Holdings is now seeking in the District Court, to its own detriment.

8. Meanwhile, Eletson Holdings is now a debtor-in-possession under the supervision of this Court. These bankruptcy cases are in their early stages, having converted from involuntary

Chapter 7 cases to voluntary Chapter 11 cases as of September 25, about a month ago. The Debtors filed an application to retain counsel two days ago and the creditors' committee was just appointed on October 20. On October 10, the Debtors filed schedules of assets and liabilities (ECF 216, 218, 220), which represent that the Debtors have no income, no cash, and no other material assets.

9.     Although the Debtors are deeply insolvent and claim to have no assets, counsel purporting to represent the Debtors is engaged in contested proceedings in the District Court to confirm the Arbitration Award. There has been no disclosure as to who is paying that counsel in the District Court proceedings, although the Debtors revealed two days ago that unspecified "additional parties other than the Debtors" agreed to pay that counsel's fees "in connection with pre-convers[]ion date litigations." (ECF 235-2 ¶ 18.) Most importantly, counsel purporting to represent the Debtors is taking the position in those proceedings that the Nominees, and not Eletson Gas, properly own the Preferred Shares—a position that, if accepted, would have the effect of damaging Eletson Holdings and its estate, potentially rendering worthless the common interests in Eletson Gas, which otherwise may be the estates' most valuable asset. Put simply, counsel purporting to represent the Debtors is apparently being directed by the Debtors' insiders to defend a purported transfer to those same insiders, which, if true, would certainly be a fraudulent transfer, under circumstances where there is no independent fiduciary managing the Debtors.

10.     This Court should not permit that. As fiduciaries for their estates and their creditors, the Debtors should not be using estate resources and assets, or directing (unretained) estate professionals, to take positions in the District Court, in this Court, or anywhere else that the Preferred Shares properly belong to the Nominees. Nor should debtors-in-possession under this Court's supervision be permitting third parties to direct or pay their counsel, causing counsel to take positions for the benefit of those third-parties that could potentially have a preclusive effect

on the Debtors or other fiduciaries for the estates who may later seek to recover the purportedly transferred assets. Rather, consistent with their fiduciary duties and their responsibilities as debtors-in-possession under the Bankruptcy Code, the Debtors and their counsel should be pursuing all avenues to preserve and pursue the recovery of the disputed assets for the benefit of their estates and their creditors. *CFTC v. Weintraub*, 471 U.S. 343, 352 (1985) (a debtor-in-possession "has the duty to maximize the value of the estate").

11.     The automatic stay exists to protect debtors' estates from being dissipated before distributions can be made to creditors. *In re Dunne*, 684 F. App'x 85, 87 (2d Cir. 2017) ("The principal purpose of an automatic stay is to protect the debtor and to preserve the property of the debtor's estate for the benefit of all the creditors.") (citation omitted). That purpose urgently needs to be served here. To protect the assets of these estates from being dissipated, potentially irreparably, the Court should modify its prior stay relief order to make clear that further proceedings concerning the Arbitration are stayed until further order of this Court. Those proceedings should not go forward until such time as the Debtors' conflicts are resolved and it is ascertained who is going to be managing the Debtors, who their retained counsel will be under Section 327(a) of the Bankruptcy Code, and who properly may direct such counsel.

12.     The Court has authority to do so under Section 105(a) of the Bankruptcy Code. As courts have recognized, the bankruptcy court has inherent authority to modify its prior orders. *See Fed. Land Bank of Springfield v. Hansen*, 113 F.2d 82, 84 (2d Cir. 1940); *In re New York Racing Ass'n Inc.*, No. 06-12618 (JLG), 2016 WL 6081087, at *8 (Bankr. S.D.N.Y. Oct. 17, 2016). In addition, under Federal Rule 60(b)(6), made applicable by Bankruptcy Rule 9024, the Court has broad discretion to modify or set aside its prior orders for "any reason that justifies relief." Those standards are amply met here. Moreover, no party would be prejudiced by a temporary stay of

5

proceedings until critical issues in the Debtors' bankruptcy cases are resolved. If it is in the estates' interest to seek confirmation of the Award, or any part of it, there will be ample time for an estate fiduciary to do so.

## BACKGROUND

**A.** **Eletson Gas Is Formed as One of the Debtors' Main Operating Subsidiaries.**

13.     Eletson Gas ("Eletson Gas" or "Gas") is a gas shipping company that was formed in 2013 as a joint venture between Eletson Holdings and funds managed by Blackstone Tactical Opportunities ("Blackstone"). ████████████████████████████████████████████████

████████████████████████████[4]████████████████████████████████████████

████████████████████████████████████████████████████████████

14.     Eletson Gas is organized as a limited liability company with common and preferred membership interests. (*See* Ex. G at 064). ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

**B.** **Eletson Gas Obtains the Option to Purchase the Preferred Shares.**

15.     Blackstone initially held the Preferred Shares. (*See* Ex. D at 4.) In 2021, however, Levona Holdings Ltd. ("Levona") acquired the Preferred Shares from Blackstone. (*See* Ex. D at 6.) Thereafter, on February 22, 2022, Levona entered into a "binding offer letter" with Gas (Ex. H, the "BOL"), which vested in Gas the option for it or its nominee to purchase the Preferred Shares for "an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value." (the "Option"). (*See* Ex. H at § 2.1, 3.2.) Section 2.1 of the BOL provides:

---

[4] Page numbers cited herein refer to the last three characters of the page's Bates number.

> Subject to and in consideration of the Transfer occurring and the conditions set out in Clause 2.2 and 2.3, ***Levona hereby grants to Eletson Gas the option*** exercisable by written notice to Levona by both of them (an "Option Notice"), ***for either Eletson Gas or its nominee to purchase*** all the membership interests held by Levona in Eletson Gas (the "Option Membership Interests") ***for a consideration equal to the Purchase Option Consideration*** payable in cash on completion of the transfer of the Membership Interests to such account as Levona may nominate in writing.

(*Id.* H at 422 (emphasis added).)  Section 3.2 of the BOL, in turn, provides that "The Purchase Option Consideration shall be an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value."  (Ex. H at 422.)  The BOL thus vested in Gas (and only in Gas) the option for it or its nominee to purchase the Preferred Shares for the specified consideration (the "Option").

### C. The Debtors Commence an Arbitration to Determine Ownership of the Preferred Shares.

16. A dispute arose as to whether Eletson Gas had exercised that Option.  On July 29, 2022, Eletson Holdings and one of its subsidiaries, Eletson Corporation ("Eletson Corp."), commenced an arbitration proceeding against Levona (the "Arbitration").  The Arbitration was referred to Justice Ariel Belen (the "Arbitrator").  The Arbitration chiefly concerned whether Eletson Gas had exercised its Option to purchase the Preferred Shares.

17. On October 10, 2022, the Arbitrator issued a temporary restraining order (the "Status Quo Injunction") concerning the assets of Eletson Gas.  (ECF 7-2.)  The order required the parties to "maintain the status quo" and not to "engage in the transfer or sale of any assets of Eletson Gas LLC (the 'Company') absent the joint written consent of the parties."  (*Id.* at 2.)  The Status Quo Injunction further enjoined the "notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company."  (*Id.* at 2.)  On January 12, 2023, the Arbitrator issued a preliminary injunction ordering the Status Quo Injunction to remain in place pending the outcome of the Arbitration.  (ECF 7-3.)

**D.** **The Debtors Obtain Relief from the Automatic Stay to Pursue the Arbitration.**

18. On March 7, 2023 (the "<u>Petition Date</u>"), three holders of Notes filed involuntary chapter 7 petitions against the Debtors (the "<u>Petitions</u>"). (ECF 1.) The Petitions were later joined by 10 additional petitioning creditors. (*See* ECF 80, 92, 103, 104, 110, 113, 114, 115, 116, 117, 147.) The petitioning creditors include institutions as well as individual retail investors who collectively are owed hundreds of millions of dollars on account of the Notes.

19. On March 13, 2023, the Debtors filed a motion for relief from the automatic stay, seeking leave to proceed with the Arbitration (the "<u>Stay Relief Motion</u>"). (*See* ECF 5, 6.) The Debtors represented that "the Arbitration could never result in the Alleged Debtor's loss of property" and therefore "does not pose even a theoretical risk to 'property of the estate.'" (ECF 6 at 22.) Indeed, the Debtors contended that, "if the Debtors prevail on one or more of its affirmative monetary claims," the Arbitration "could only inure to the benefit of any such conjectured estate." (*Id*.) The Debtors asserted that, if they prevailed in the arbitration, the Preferred Shares would "be returned to Gas or its nominee." (*Id.* at 4.) The Debtors did not contend in making this motion that the Preferred Shares already had been transferred to "nominees" affiliated with their insiders, and indeed their submission made no mention of any Cypriot entities. To the contrary, the Debtors contended in their stay relief papers that Eletson Holdings and Eletson Corp. acquired the Preferred Shares. (ECF 7 ¶ 9 ("*Eletson* alleges that *it* bought out Levona's preferred interest in Gas in March 2022") (emphasis added)); *see also id.* ¶¶ 1-2 (defining "Eletson" as Eletson Holdings and Eletson Corp.); ECF 19 at ¶ 9 ("*Eletson* alleges that *it* bought Levona's preferred interest in Gas") (emphasis added).)

20. On March 17, 2023, this Court entered a stipulation and order to, among other things, facilitate the "orderly adjudication of the Stay Motion and to maintain the status quo in the Arbitration." (ECF 23.) The Court ordered that, except for the exchange of certain discovery,

"[p]ending the Stay Motion Hearing, the Arbitration will be stayed." (*Id.* ¶ 11.) The Court further ordered that: "[a]ll other matters relating to the arbitration are to remain stayed, including pre-trial conference and trial dates, the submission of pre-trial briefing and pre-trial motions, the exchange of witness/exhibit lists, and all other items covered by JAMS Rules 20(a) and (b), pending an order of the Court following the Stay Motion Hearing." (*Id.* ¶ 12.) Finally, the Court ordered that "[n]othing in this Stipulation and Order affects to any extent the Status Quo Injunction entered by the Arbitrator, which shall remain in effect." (*Id.* ¶ 14.)

21.     On April 17, 2023, the Court entered a further stipulation and order modifying the automatic stay with respect to the Arbitration. (ECF 48, the "Stay Relief Order".) The Stay Relief Order provided, in relevant part:

> 3.      The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals, with respect to the claims currently pending in the Arbitration (the "Arbitration Award") . . . .
>
> 4.      Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further order of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award. For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court.

(*Id.* ¶¶ 3-4.) The order further provided that this Court retains "jurisdiction with respect to any matters, claims, rights or disputes arising under this Stipulation and Order or any other actions to implement, interpret or enforce the terms and provisions of this Stipulation and Order." (*Id.* ¶ 9.)

**E.** **The Debtors Reveal That They Purportedly Already Transferred the Preferred Shares to "Nominees" Owned by Insiders.**

22.      After this Court issued the Stay Relief Order, the Debtors for the first time began taking the position that the Preferred Shares *already* had been transferred to three entities organized in Cyprus that are wholly owned by the three families who control the Debtors (the "Nominees"). The Debtors' counsel in the Arbitration explained that the purpose of this strategy was to prevent creditors of Eletson Holdings from obtaining the value of the Preferred Shares:

> "As soon as they said, even if they win–even if we win in this proceeding, they're going to take that asset and they are–it goes back into Holdings and so, lo and behold, the bankruptcy allows them to take it.  So your Honor has wasted a year, your Honor has given us a standstill for nothing, your Honor went through all this evidence and that's when we said, well, wait a minute, *I went back to my client and it says these nominees, why don't we just transfer it to the nominees and they said, we don't have to, we have already done it.*"[5]

23.      As the Arbitrator later found, "Eletson raised this contingent transfer to Cypriot nominees for the first time in its Rule 20(b) submission on May 5, 2023"—less than three weeks after this Court entered the Stay Relief Order, which had linked stay relief to "claims currently pending" at the time of that order.  (*See* Ex. D at 29; ECF 48 at ¶ 3.)  The Arbitration proceedings, however, were confidential and not open to the public, including other creditors.  There were no disclosures to this Court until May 15, 2023, when Levona brought the matter to this Court's attention.  The Debtors asserted at a hearing shortly thereafter for the first time that "eighteen months ago" there had been a "conditional, contingent transfer" of the Preferred Shares to the Cypriot Nominees controlled by the insiders.  (May 17 Hr'g Tr. at 17:6.)

---

[5] *Eletson Holdings, Inc. v. Levona Holdings, LTD.*, Case No. 23-cv-07331 (LJL), ECF 31-33 at 153:2-24.

**F.   The Shareholders Allegedly Transferred the Preferred Shares at a "Family Meeting" Without Apparent Corporate Authority to Execute Such a Transfer.**

24.   According to the one of those insiders, Lascarina Karastamati, the transfer of the Preferred Shares was not authorized at a board meeting of Gas, Holdings, or any other Eletson entity.  (*See* Ex. I at 70:20-71:22.)  Instead, it was purportedly authorized at a "family meeting" among the Kertsikoff, Hadjieleftheriadis, and Karastamati families—the families that collectively control the Debtors and whose members serve as officers and directors of both Holdings and Gas. (*See id.*; *see also id.* at 50:15-51:3 (decision "was between, you know, Eletson members of the family."))  The meeting supposedly took place in January 2022, before the BOL itself was even signed (*id.* at 74:8-13), and the alleged transfer was not reflected in any documentation.[6]  (*Id.* at 62:23-63:7, 65:18-22.)

25.   Importantly, the "family meeting" apparently did not include a majority of Gas's board of directors.  ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

Accordingly, the transfer of the Preferred Shares from Gas to the Nominees does not appear to have been approved by Gas's board of directors, even on an informal basis.  (*See* Ex. I at 71:14-19, 72:15-74:7.)  Karastamati testified that she was involved in negotiating the transfer, but not in her capacity as president and director of Holdings or as a director and officer of Gas—rather, she was involved "mostly as a shareholder of Fentalon," one of the Nominees, and also "[i]n [her] capacity as member of the Eletson family, of the Eletson group."  (*Id.* at 48:22-49:20.)  When asked to explain "which Eletson company transferred the preferred shares to the preferred nominees," Karastamati responded that "[t]his really didn't matter to us," because she and the

---

[6] January 2022 was also the month the Debtors' First Preferred Ship Mortgage Notes (the "Notes") matured.  (ECF 1, Ex. A.)

other families who control the Debtors simply view the Eletson companies collectively as a family business.  (*Id.* at 49:21-50:7; *see also id.* at 52:2-18, 53:20-54:8.)

26.     The families allegedly decided that the Nominees would pay Eletson Gas three million euros in return for the shares.  Karastamati admitted, however, that the three million euros had not yet been paid, such that to date Eletson Gas has not received any value in return for the shares.  (*Id.* at 70:3-9, 78:24-79:5.)

27.     Finally, Karastamati testified that the fees and expenses of Reed Smith, as counsel to the Debtors in the Arbitration, had been paid by EMC Investment Corporation ("EMC"), a wholly owned subsidiary of Eletson Holdings.  (*Id.* at 96:12-18.)  Karastamati also testified that Fentalon, the Nominee she controls, had assisted in paying Reed Smith's fees.  (*Id.* at 96:4-15.)

G.     **The Arbitration Award Assesses Damages in Favor of Eletson Gas and the Cypriot Nominees, but Not in Favor of Eletson Holdings.**

28.     On July 27, 2023, the Arbitrator entered an interim award (the "Award").  The Award found that "Eletson effectively exercised the buyout option granted in the Binding Offer Letter dated February 22, 2022 on and as of March 11, 2022."  (Ex. D at 74.)  Specifically, "on March 11, 2022, the Company [*i.e.*, Eletson Gas] paid the Purchase Option Consideration by transferring the shares of the Symi and Telendos," which the Award found had "a value in excess of the $23 million price set forth in the BOL."  (*Id.* at 33.)  The Award also concluded that the Preferred Shares were transferred by Eletson Gas to the Nominees "effective as of March 11, 2022."  (*Id.* at 75, 78-79.)

29.     The Award also assessed damages against Levona and its affiliates.  But none of those damages was awarded to Eletson Holdings.  Instead, half of the damages was awarded to the Nominees, and the other half was awarded to Eletson Gas, the Preferred Shares of which are allegedly held by those same Nominees.  (*Id.* at 75.)

## H. The Debtors Petition to Confirm the Arbitration Award, Including Its Findings that the Preferred Shares Were Transferred to the Nominees.

30. On August 18, 2023, Eletson Holdings and Eletson Corp. filed a petition in the United States District Court for the Southern District of New York (the "District Court") to confirm the Award. (Exs. K-M.) Among the findings they asked the District Court to confirm were that "[t]he preferred interests in the Company were transferred to the Preferred Nominees." (Ex. L at 9.) The Debtors also requested that the District Court approve the Arbitrator's award of compensatory and punitive damages in favor of Eletson Gas and the Nominees. (*Id.* at 11-12.)

## I. The Debtors Convert these Cases to Voluntary Cases Under Chapter 11 and Reveal that They Are Hopelessly Insolvent.

31. On September 6, 2023, after months of litigation, the Debtors and the Petitioning Creditors reached a settlement that resolved the Debtors' motion to dismiss the involuntary Chapter 7 proceedings. The Debtors agreed to withdraw their motion to dismiss and to convert the bankruptcy cases to voluntary cases under Chapter 11. (*See* Ex. N at 9:5-9.) On September 25, 2023, this Court issued an order formally converting the cases. (*See* ECF 215.)

32. On October 10, 2023, the Debtors filed their schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs"). (*See* ECF 216-221.) In their Schedules, the Debtors disclose unsecured claims against Eletson Holdings of nearly $400 million in the aggregate, although they list almost all of the claims as "Disputed." (*See* ECF 216 at 16-19.) The Debtors assert, however, that they have no cash on hand and no assets of any value. According to its SOFA, Eletson Holdings has not received any revenue for the last three years. (*See* ECF 217 at 1.) In addition, Eletson Holdings contends that its equity interests in 71 wholly-owned subsidiaries, including Eletson Gas, have no value. (*See* ECF 216 at 10-11.)

33. These cases remain in their early stages. The Debtors filed an application to retain counsel, as well as their "first day declaration," only two days ago. Nevertheless, the Debtors

continue to seek confirmation of the Arbitration Award, including its findings that the Preferred Shares were transferred out of the reach of their creditors.

34. The Committee was formed on Friday, October 20. Its members are Aegean Baltic Bank S.A., Gene B. Goldstein, and Wilmington Savings Fund Society, FSB, as Indenture Trustee (the "<u>Trustee</u>"). On October 25, the Committee selected Dechert LLP as its proposed counsel.

**J.      The Debtors Refuse to Take Steps to Cure Conflicts of Interest and Preserve the Value of the Estates.**

35. On October 13, 2023, the Trustee sent a letter to the Debtor's proposed counsel expressing concern regarding "the apparent use of estate resources to pursue a strategy of transferring assets to third parties that instead should be made available for distribution to creditors of the Debtors' estates." (Ex. O at 1.) The Trustee noted that,

> [b]ased on [deposition] testimony, it appears [that] . . . a subsidiary of the Debtors, is paying the Debtors' attorneys to pursue a strategy of transferring assets out of the estates for the benefit of the Debtors' insiders and that the Nominees are paying the Debtors' legal fees, while the Debtors are taking positions in these bankruptcy cases concerning the merit and value of claims against those same Nominees.

(*Id.* at 2.) The Trustee explained that "[i]t is untenable for the Debtors and their counsel to proceed in this matter, particularly where the Debtors are deeply insolvent and are under the supervision of the Bankruptcy Court." (*Id.*) The Trustee requested that the Debtors advise "what steps the Debtors intend to take, and when, to cure these obvious conflicts." (*Id.*)

36. On October 17, the Debtors responded by letter, denying that there was anything improper about their conduct and accusing the Trustee of various "lies and half-truths." (*See* Ex. P.) The Debtors also rejected the Trustee's demand that they take steps to cure their counsel's apparent conflicts. Accordingly, the Committee, of which the Trustee is a member, is compelled to file this motion.

## RELIEF REQUESTED

37.     The Committee respectfully requests that the Court modify the Stay Relief Order to provide that, until further order of this Court, (a) the Arbitration and related confirmation proceedings are stayed; and (b) the Debtors shall not take any steps to transfer, or seek a ruling as to the transfer of, any assets of the Debtors or their subsidiaries, including Eletson Gas.  A proposed order setting forth the relief requested herein is attached hereto as <u>Exhibit A</u> and a redline reflecting the proposed changes to the prior order is attached hereto as <u>Exhibit B</u>.  Specifically, the Committee requests that the Court modify the two operative paragraphs of the Stay Relief Order as follows:

> 2.     The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing **before the Arbitrator,** and a final determination or award to be made by the Arbitrator, ~~including any appeals,~~ with respect to the claims currently pending in the Arbitration (the "Arbitration Award").   The Arbitration Parties are authorized to provide a copy of this Stipulation and Order to the Arbitrator.

> 3.     Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further order of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award.  **Any proceedings to confirm or appeal from such an Arbitration Award shall also be stayed pending further order of this Court.**  For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court.  **The Debtors shall not take any steps to transfer, or seek a ruling approving or recognizing the transfer of, any assets of the Debtors or their subsidiaries, including Eletson Gas, absent further of this Court.**

**BASIS FOR RELIEF**

A.     **The Court Has Inherent Authority to Modify the Stay Relief Order and Is Authorized to Do So by the Federal Rules.**

38.     Under Section 105(a) of the Bankruptcy Code, this Court has the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As the Supreme Court and the Second Circuit have both recognized, a "bankruptcy court has continuous power to modify its own orders, if no intervening rights are disturbed." *Fed. Land Bank of Springfield v. Hansen*, 113 F. 2d 82, 84 (2d Cir. 1940) (citing *Wayne United Gas Co. v. Owens-Illinois Glass Co.*, 300 U.S. 131, 136-37 (1937)); *see also In re New York Racing Ass'n Inc.,* No. 06-12618 (JLG), 2016 WL 6081087, at *8 (Bankr. S.D.N.Y. Oct. 17, 2016) ("it is well settled that the Court has inherent power to reconsider a prior decision at any time before judgment"); *Whitaker v. Baxter (In re Whitaker)*, 341 B.R. 336, 346 (Bankr. S.D. Ga. 2006) (reimposing automatic stay pursuant to "the equitable powers conferred by § 105(a)").

39.     In addition, under Federal Rule 60(b)(6), on a "motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding for . . . any . . . reason that justifies relief." Fed. R. Civ. P. 60(b)(6); *see also* Fed. R. Bankr. P. 9024 ("Rule 60 F.R.Civ.P. applies in cases under the Code"). Rule 60(b) is consistent with this Court's inherent authority to modify its own orders. *See In re Texlon Corp.*, 596 F.2d 1092, 1100 (2d Cir. 1979) (Rule 60 did not "diminish the force" of the Supreme Court's holding in *Wayne United*); *accord N.Y. Racing*, 2016 WL 6081087, at *8 ("although FRCP 60(b) refers to relief from final orders, it does not restrict the bankruptcy court's power to reconsider any of its previous orders when equity so requires").[7]

---

[7] The Court has authority under Rule 60(b)(6) both to modify and to clarify its prior orders. *See, e.g.*, *In re 710 Long Ridge Rd. Operating Co.*, II, LLC, No. 13-13653 (DHS), 2014 WL 1648725, at *1 (Bankr. D.N.J. Apr. 24, 2014).

Under Rule 60(b), the Court has broad discretion to set aside its prior orders whenever justice so requires. *See Klapprott v. United States*, 335 U.S. 601, 615 (1949) (the "other reason clause . . . vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice."), *modified on other grounds*, 336 U.S. 942 (1949); *United Airlines, Inc. v. Brien*, 588 F.3d 158, 176 (2d Cir. 2009) ("Rule 60(b)(6) 'confers broad discretion on the trial court to grant relief when appropriate to accomplish justice.'") (quoting *Matarese v. LeFevre*, 801 F.2d 98, 106 (2d Cir.1986)).

40.     Courts have held that both Section 105(a) and Rule 60(b) supply a basis for the Bankruptcy Court to reimpose the automatic stay once it has been lifted or modified. *See State Bank of Southern Utah v. Gledhill (In re Gledhill)*, 76 F.3d 1070 (10th Cir. 1996) (affirming bankruptcy court order granting trustee's Rule 60(b) motion for relief from prior stay relief order); *Rodriguez Camacho v. Doral Fin. Corp. (In re Rodriguez Camacho),* 361 B.R. 294, 300 (1st Cir. BAP 2007) (holding that a party may seek relief from an order lifting the automatic stay under Rule 60(b)); *In re Price*, 577 B.R. 643, 655 (Bankr. E.D.N.C. 2017) ("A court may reconsider its own order granting relief from the automatic stay pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure.") *Whitaker*, 341 B.R. at 346 (reimposing automatic stay under § 105(a)).[8]

---

[8] In *In re Zahn Fams*, the Second Circuit Bankruptcy Appellate Panel stated in dicta that a request to "reinstate the [automatic] stay is, in fact, a request for an injunction and should meet the standards therefor . . . . and requires an Adversary Proceeding." 206 B.R. 643, 645, n.1 (B.A.P. 2d Cir. 1997). In that case, however, the Court was considering a motion for a stay pending appeal and did not need to address the procedural requirements of a motion to modify relief from the automatic stay. In addition, the Committee here is requesting only that the Court modify its own prior order which it has inherent authority to do. If the Court determines that an adversary proceeding is required, the Committee respectfully requests that this motion be treated as an adversary complaint.

**B.** **The Court Should Modify the Stay Relief Order to Preserve the Status Quo and Avoid Irreparable Harm to the Estates.**

41. Here, the circumstances give ample reason for this Court to modify its prior Stay Relief Order to ensure that estate assets are not dissipated at the early stages of these Chapter 11 cases. The purpose of the automatic stay, codified in Section 362 of the Banrkuptcy Code, is to give the debtor a "breathing spell" and "preserve the property of the debtor's estate for the benefit of all the creditors." *In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir. 2013); H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54–55 (1978).

42. There is a significant risk that such dissipation of estate assets may occur here. The estates have strong arguments that the purported transfer of the Preferred Shares never occurred, including because the individuals who contend they transferred the assets at a "family meeting," with no corporate formalities or documentation, had no apparent corporate authority to make such a transfer. The Arbitrator's ruling to the contrary is not binding on the Committee or on creditors of Eletson Holdings, because none of those parties was present in the Arbitration with an opportunity to be heard. *See Boguslavsky v. Kaplan,* 159 F.3d 715, 720–21 (2d Cir. 1998) (declining to apply collateral estoppel where "the defendants were not parties to the arbitration"). And even if the transfer did occur, the Debtors' estates have valuable causes of action arising from that transfer, including claims to avoid the transfer as a fraudulent conveyance and claims against the individuals involved for, among other things, breach of fiduciary duty, corporate waste, and usurpation of corporate opportunity. *See In re DSI Renal Holdings, LLC,* 574 B.R. 446 (Bankr. D. Del. 2017) (corporate waste, fraudulent transfer, and breach of fiduciary duty claims against officers and directors that stripped debtors of substantially all of valuable assets for little consideration); *Claybrook v. Morris (In re Scott Acquisition Corp.),* 344 B.R. 283 (Bankr. D. Del. 2006) (breach of fiduciary claims against directors of debtors' subsidiary for engaging in insider

transactions and receiving less than market consideration in return); *Deane v. Maginn*, No. 2017-0346-LWW, 2022 WL 16557974, at \*18 (Del. Ch. Nov. 1, 2022) (usurpation of corporate opportunity); *ASARCO LLC v. Americas Mining Corp.,* 396 B.R. 278, 410 (S.D. Tex. 2008) (directors of a wholly-owned subsidiary owe fiduciary duties to parent company).[9]

43.     In the face of all that, counsel purporting to represent the Debtors are currently engaged in contested litigation in which they seek a ruling by the District Court that the Preferred Shares were transferred to the Debtors' out-of-the-money shareholders and outside the reach of their creditors.  The parties who would be harmed by such a ruling are the Debtors themselves. But counsel purporting to represent the Debtors is pursuing such a ruling anyway, apparently being directed to defend a fraudulent transfer to the Debtors' insiders, under circumstances where there is no independent fiduciary managing the Debtors.  And counsel has been purporting to represent the Debtors for more than a month and half before filing an application for employment with this Court, and without having made any of the requisite disclosures of conflicts and connections, including with the insiders who may be paying counsel's fees.

44.     These concerns are accentuated by the fact that the Debtors have now disclosed, after months of costly litigation with their creditors, that they have no assets of any value and are deeply insolvent.  The Debtors contend that they have no cash on hand, that Eletson Holdings has not received any revenue in the last three years, and that the value of Eletson Holdings' interests in its subsidiaries, including Eletson Gas, is zero.  *See* ECF 216-21.  If those disclosures are accurate, the estates' ability to challenge the purported transfer of the Preferred Shares—or the estates' causes of action in connection with such transfer if it is found to have occurred—may be

---

[9] Even if the Award were vacated, the estate may have causes of action against the Debtors' insiders for attempting to defraud the estate.

the estates' most valuable asset. If the District Court action is allowed to continue, however, the Debtors may continue to take positions in that action that are contrary to their estates' interest and could have a preclusive effect on the Debtors, on their estates, or on estate fiduciaries in the future. The Court should preserve the status quo to ensure that does not happen until these important issues are resolved. *See In re Dunne*, 684 F. App'x 85, 87 (2d Cir. 2017) ("[t]he principal purpose of an automatic stay is to protect the debtor and 'to preserve the property of the debtor's estate for the benefit of all the creditors.'") (quoting *In re AMR Corp.*, 730 F.3d 88, 112 (2d Cir. 2013).

45. Moreover, there has been no disclosure of who is paying or directing the Debtors' counsel in the District Court proceedings. The Debtors' Schedules reflect that they have no cash or other assets from which such fees may be paid. At her deposition, Karastamati testified that the fees and expenses of counsel in the Arbitration were paid by EMC, a wholly owned subsidiary of Eletson Holdings, and that the Cypriot Nominee she controlled also had assisted in paying that counsel's fees. *See* Ex. I at 96:12-18, 97:4-24, 167:3-11. If Karastamati's testimony is accurate, it appears that a subsidiary of the Debtors is paying the Debtors' attorneys, with undisclosed cash, to pursue a strategy of transferring assets out of the reach of the Debtors' creditors. In addition, it appears that the Cypriot Nominees controlled by the Debtors' out-of-the-money shareholders are paying the Debtors' legal fees (and apparently directing the Debtors' counsel), while the Debtors are taking positions in the District Court and in these bankruptcy cases concerning the merit and value of claims against those same Nominees. Indeed, in their recently filed retention application the Debtors reveal that "[Eletson] Corp. (not Holdings) paid and agreed to satisfy amounts owed to Reed Smith in connection with those litigations"—i.e., the Arbitration and pre-petition litigation initiated by the Trustee—and that "additional parties other than the Debtors agreed to support Corp. and satisfy any outstanding obligations owed to Reed Smith in connection with pre-

conversation date litigations." ECF 235-2 ¶ 18. Those arrangements are rife with conflicts of interest and are contrary to the Debtors' obligations, as fiduciaries for their creditors, to preserve and maximize the value of their estates. *Weintraub*, 471 U.S. at 352 (a debtor-in-possession "has the duty to maximize the value of the estate"). There should be full disclosure of these arrangements to this Court and the Debtors' creditors before such conduct can be permitted to continue.

46.     Finally, the Arbitration ruling that the Preferred Shares were transferred to the Nominees was itself obtained in violation of this Court's Stay Relief Order. That order modified the automatic stay only with respect to "claims currently pending in the Arbitration." ECF 48 ¶3. The Debtors violated that order by raising new claims that Preferred Shares belonged not to the Debtors, but to insiders. Indeed, the Award itself makes clear that these claims were raised for the first time in a supplemental pleading only *after* this Court issued the Stay Relief Order. *See* Ex. D at 29. That violation of this Court's prior order supplies additional grounds for relief. *See In re Kalikow,* 602 F.3d 82, 96 (2d Cir. 2010) ("The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders."); *In re Anderson*, 884 F.3d 382, 390 (2d Cir. 2018) ("the equitable powers of the bankruptcy court to enforce its own injunctions are central to the structure of the Code.").

47.     No party would be prejudiced by the proposed modification of the Stay Relief Order. The Arbitrator has issued the Award, and proceedings before the Arbitrator apparently have reached their conclusion. If it is in the interests of Eletson Holdings, as a debtor-in-possession under the supervision of this Court, to seek confirmation of that Award or any part of it, there will be ample time for it to do so. As noted above, the Committee is not objecting to that portion of the Award that found that Eletson Gas successfully exercised its option to purchase the Preferred

Shares, and an independent fiduciary for the estates may later determine that it is in the estates' interest to seek confirmation of only that portion of the award. But no such independence exists at the Debtors today, and there is no urgency associated with these proceedings reaching their conclusion, at least until such time as it is determined who will be managing these insolvent debtors going forward, what counsel they may retain under Section 327 of the Bankruptcy Code, who is directing such counsel, and what funds will be used to pay such counsel.

## **CONCLUSION**

48. For the foregoing reasons, the Committee respectfully requests that the Court modify the Stay Relief Order to provide that, until further order of this Court, (a) the Arbitration and related confirmation proceedings are stayed; and (b) the Debtors and their insiders shall not take any steps to transfer, or seek a ruling as to the transfer of, any assets of the Debtors or their subsidiaries, including Eletson Gas.

Dated: New York, New York
      October 27, 2023

Respectfully submitted,

By: */s/ Stephen D. Zide*
Stephen D. Zide
David A. Herman
Owen S. Haney
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
stephen.zide@dechert.com
david.herman@dechert.com
owen.haney@dechert.com
Tel: (212) 698-3500
Fax: (212) 698-3599

*Proposed Counsel to the Official Committee of Unsecured Creditors*