## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Eletson Holdings Inc., *et al.*,[1] | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

---

## DISCLOSURE STATEMENT IN SUPPORT OF FIRST JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

---

**REED SMITH LLP**

Derek J. Baker
Derek Osei-Bonsu
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail:  dbaker@reedsmith.com
    dosei-bonsu@reedsmith.com

-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail:  abuck@reedsmith.com
    lsolomon@reedsmith.com

---

[1]     The Debtors in these chapter 11 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel for the Debtors*

THIS DISCLOSURE STATEMENT FOR THE FIRST JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED [_], THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, [_] UNLESS EXTENDED BY ORDER OF THE BANKRUPTCY COURT.**

**THE DEBTORS BELIEVE THAT THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' STAKEHOLDERS UNDER THE CIRCUMSTANCES OF THESE CHAPTER 11 CASES AND THAT, THEREFORE, CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS'**

**ESTATES. THE DEBTORS RECOMMEND THAT CREDITORS ENTITLED TO VOTE
TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS
DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT
CONTAIN ALL OF ITS TERMS AND PROVISIONS. ALL PARTIES WHO ARE ENTITLED
TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS
ENTIRETY BEFORE VOTING ON THE PLAN. TO THE EXTENT OF ANY
INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN SUPPLEMENT AND THE
DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN SUPPLEMENT
ARE CONTROLLING.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE
OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN)
WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN
SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY
BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE
DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE
TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF
CLAIMS OR INTERESTS. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT
CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY
LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER
SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX
ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE
PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE
HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS
CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE
FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN
BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.
THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR
CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED
IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE
HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN
THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE
SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE
FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF
TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT
OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN,
WHICH IS ANNEXED HERETO AS EXHIBIT 1.

**TABLE OF CONTENTS**

**Page**

I.    SUMMARY ................................................................................................. 1

    A.    Why You Are Receiving This Document ................................................ 1

    B.    Plan Overview ......................................................................................... 2

        1.    Purpose – Reorganization ............................................................ 2

        2.    Substantive Consolidation or Merger .......................................... 2

        3.    Plan Treatment ............................................................................. 3

    C.    Voting and Confirmation ........................................................................ 9

    D.    Risk Factors and Disclaimer .................................................................. 10

II.    VOTING ON AND CONFIRMATION OF THE PLAN ................................ 11

    A.    Deadline for Voting For or Against the Plan .......................................... 11

    B.    Confirmation Hearing for the Plan ......................................................... 12

    C.    Any Objections to Confirmation of the Plan .......................................... 13

    D.    Recommendations for Voting ................................................................. 14

III.    ORGANIZATION AND ACTIVITIES OF THE DEBTORS ......................... 14

    A.    The Debtors' Business ............................................................................ 14

    B.    Corporate History and Structure ............................................................ 14

    C.    Pre-Petition Capitalization ..................................................................... 15

        1.    Old Notes ..................................................................................... 15

        2.    Exchange Notes and Restructuring Support Agreements ............. 15

        3.    Eletson Holding Guaranty Obligations ........................................ 16

    D.    The OCM Guarantees ............................................................................. 16

    E.    The Azure Guarantees ............................................................................ 17

    F.    The Eletson Corp Guarantees ................................................................. 18

IV.    EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING ............ 18

    A.    Murchinson, Levona and Pach Shemen are Alter Egos for all Relevant
        Purposes ................................................................................................. 19

    B.    Levona Improperly Acquires the Preferred Shares of Eletson Gas ........ 20

    C.    The JAMS Arbitration ............................................................................ 21

    D.    Pach Shemen's Improper Acquisition of the Exchange Notes ............... 24

    E.    The Exchange Note Trustee is Forced to Initiate the Southern District
        Bondholder Litigation ............................................................................ 25

F.   The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases .............................................................................................. 25

G.   The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions ......................................................................................... 26

V.   THE CHAPTER 7 CASES ............................................................................................ 26

A.   The Involuntary Petitions and Joint Administration Motion ...................... 26

B.   The Alleged Joinders to the Involuntary Petitions ..................................... 27

C.   Motion for Relief from the Automatic Stay and the Stipulated Stay Order ........... 27

D.   The Motion to Dismiss and Associated Documents ................................... 28

E.   The Eletson State Court Action is Removed to the Bankruptcy Court ................... 29

F.   Mediation and the Conversion Stipulation ................................................. 29

VI.   THE CHAPTER 11 CASES .......................................................................................... 30

A.   Debtors' Filings ......................................................................................... 30

1.   Schedules and Statements of Financial Affairs .............................. 30

2.   Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports ........................................................................... 31

a.   2015.3 Disclosures .............................................................. 31

3.   Monthly Operating Reports ............................................................ 31

4.   Claims Bar Date and Review Process ............................................. 31

a.   Claims Bar Date .................................................................. 31

b.   Claims Review Process ........................................................ 32

5.   Application for the Retention of Debtors' Counsel ......................... 32

6.   Motion to Enforce .......................................................................... 33

7.   Establishment of Independent Committee ...................................... 33

B.   Appointment of the Committee and the Committee Filings ....................... 34

1.   Applications for appointment of Committee Professionals ............ 34

a.   Dechert Retention Application ............................................ 34

b.   FTI Retention Application ................................................... 34

2.   Motion to Modify Previous Order Granting Relief from the Automatic Stay ............................................................................... 35

3.   Interim Compensation Motion ........................................................ 36

VII.   ORDERLY DISTRIBUTION OF ASSETS ................................................................. 36

VIII.   THE PLAN .................................................................................................................... 37

A.   Overview of Chapter 11 .............................................................................. 37

B.   Purpose of the Plan ..................................................................................... 38

C.    Classification and Treatment of Claims ..................................................... 39
    1.    Classification and Treatment of Claims and Interests .................................. 39
        a.    Unclassified Claims .......................................................... 39
        b.    Classified Claims ........................................................... 40
D.    Acceptance and Rejection of the Plan ....................................................... 43
    1.    Voting Classes ............................................................................. 43
    2.    Classes Presumed to Accept the Plan ............................................... 43
    3.    Acceptance by Impaired Classes ...................................................... 43
    4.    Elimination of Vacant Classes; Acceptance by Non-Voting Classes ............ 43
    5.    Non-Consensual Confirmation ........................................................ 43
    6.    Controversy Concerning Impairment ................................................ 44
E.    Means for Implementation of the Plan ....................................................... 44
    1.    Implementation of the Plan and Sources of Consideration for Plan
          Distributions ............................................................................ 44
        a.    The Shareholder New Value Contribution ................................. 44
        b.    Distributable Cash ........................................................... 44
        c.    Litigation Trust Causes of Action .......................................... 44
    2.    Substantive Consolidation .............................................................. 45
        a.    Order Granting Plan Consolidation ........................................ 45
        b.    Plan Consolidation ........................................................... 45
    3.    Corporate Existence ..................................................................... 45
    4.    Vesting of Assets in the Reorganized Debtor ...................................... 46
    5.    Reorganized Debtor Organizational Documents ................................... 46
    6.    Appointment of Directors and Officers of the Reorganized Debtor ............. 46
    7.    Exemption for Certain Taxes and Fees .............................................. 46
    8.    Creation of Litigation Trust ............................................................ 47
    9.    Transfer of Assets and the Litigation Trust Causes of Action to the
          Litigation Trust ......................................................................... 48
    10.    Liabilities of the Litigation Trust .................................................... 49
    11.    Appointment of the Litigation Trust Trustee and Members of the
           Litigation Trust Oversight Committee .............................................. 49
    12.    Cooperation and Privilege .............................................................. 50
    13.    Duties of the Litigation Trust Trustee ............................................... 50
    14.    Post Confirmation Expenses ........................................................... 52
    15.    Liability; Indemnification .............................................................. 53

16.    Dissolution of the Committee ................................................ 53

17.    Litigation Trust Oversight Committee ................................... 54

18.    Good Faith ............................................................................. 55

19.    Saturday, Sunday or Legal Holiday ...................................... 55

20.    Issuance of Documents Necessary to Consummate the Plan ......... 55

21.    Final Decree .......................................................................... 55

F.    Retained Causes of Action ................................................................ 56

    1.    Maintenance of Causes of Action .......................................... 56

    2.    Preservation of Causes of Action ........................................... 56

    3.    Preservation of All Causes of Action Not Expressly Settled or Released .................................................................................. 57

G.    Treatment of Executory Contracts and Unexpired Leases ................ 57

    1.    Rejection of Executory Contracts or Unexpired Leases ......... 57

    2.    Rejection Damages Bar Date ................................................. 58

H.    Provisions Governing Distributions .................................................. 58

    1.    Disbursing Agent ................................................................... 58

        a.    Litigation Trust Trustee as Disbursing Agent for Class 5A Claims and Class 5B Claims ................................... 58

        b.    Alternative Disbursing Agent Qualifications ......................... 58

    2.    Time and Manner of Distributions ......................................... 58

    3.    Interest of Claims .................................................................. 59

    4.    Compliance with Tax Requirements/Allocations ................... 59

    5.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ......................................................................... 59

        a.    Delivery of Distributions in General ...................... 59

        b.    Undeliverable Distributions ................................... 59

    6.    Claims Administration Responsibility .................................... 60

        a.    Reservation of Rights to Object to Claims ............... 60

        b.    Objections to Class 5A Claims and Class 5B Claims ......... 60

        c.    Filing of Objections ............................................... 61

        d.    Determination of Claims ........................................ 61

    7.    Procedures for Treating and Resolving Disputed and Contingent Claims or Interests ............................................. 61

        a.    No Distributions Pending Allowance ...................... 61

        b.    Claim Estimation ................................................... 62

|  | 8. | Setoffs and Recoupment | 62 |
|  | 9. | Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code | 62 |
|  | 10. | Cancellation of Instruments and Agreements | 62 |
|  | 11. | Withholding Taxes | 62 |
|  | 12. | Reports | 63 |
|  | 13. | Distribution Record Date | 63 |
|  | 14. | Timing and Calculation of Amounts to be Distributed | 63 |
|  | 15. | Settlement of Claims and Controversies | 63 |
| I. | | Conditions Precedent to Confirmation and Occurrence of the Effective Date | 63 |
|  | 1. | Conditions Precedent to Confirmation | 63 |
|  | 2. | Conditions Precedent to Confirmation | 64 |
|  | 3. | Waiver of Conditions | 64 |
|  | 4. | Debtors' Right of Revocation or Withdrawal | 64 |
| J. | | Effect of Confirmation | 65 |
|  | 1. | Injunction | 65 |
|  | 2. | Term of Injunctions or Stays | 65 |
|  | 3. | Exculpation | 66 |
|  | 4. | Release of Liens | 66 |
| K. | | Retention of Jurisdiction | 67 |
| L. | | Miscellaneous Provisions | 68 |
|  | 1. | Effectuating Documents, Further Transactions and Corporation Action | 68 |
|  | 2. | Payment of Statutory Fees | 69 |
|  | 3. | Headings | 69 |
|  | 4. | Biding Effect of Plan | 69 |
|  | 5. | Final Order | 69 |
|  | 6. | Withholding and Reporting Requirements | 69 |
|  | 7. | Tax Exemption | 69 |
|  | 8. | Governing Law | 70 |
|  | 9. | Severability | 70 |
|  | 10. | Plan Controls | 70 |
|  | 11. | Amendments and Modifications | 70 |
|  | 12. | Notices | 71 |
|  | 13. | Filing of Additional Documents | 71 |
|  | 14. | Direction to a Party | 71 |

|       | 15. | Successors and Assigns | 72 |
|       | 16. | Reservation of Rights | 72 |
|       | 17. | Further Assurances | 72 |
|       | 18. | Entire Agreement | 72 |
|       | 19. | Filing of Additional Documents | 72 |
| IX.   |     | FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST | 72 |
|       | A.  | Feasibility of the Plan | 73 |
|       | B.  | Best Interest Test | 74 |
|       |     | 1. Generally | 74 |
|       | C.  | Best Interest of Creditors Test | 75 |
|       | D.  | Confirmation Without Acceptance by All Impaired Classes: the "Cramdown" Alternative | 75 |
| X.    |     | IMPORTANT CONSIDERATIONS AND RISK FACTORS | 76 |
|       | A.  | The Debtors have No Duty to Update | 76 |
|       | B.  | No Representations Outside the Disclosure Statement are Authorized | 76 |
|       | C.  | Information Presented is Based on the Debtors' Books and Records, and no Audit was Performed | 76 |
|       | D.  | All Information was Provided by Debtors and was Relied Upon by Professionals | 77 |
|       | E.  | Projections and Other Forward Looking Statements are Not Assured, and Actual Results will Vary | 77 |
|       | F.  | No Legal or Tax Advice is Provided to You by the Disclosure Statement | 77 |
|       | G.  | No Admissions Made | 77 |
|       | H.  | No Waiver of Rights Except as Expressly Set Forth in the Plan | 77 |
|       | I.  | Bankruptcy Law Risks and Considerations | 77 |
|       |     | 1. Confirmation of the Plan is Not Assured | 78 |
|       |     | 2. The Effective Date Might Be Delayed or Never Occur | 78 |
|       |     | 3. The Projected Value of Estate Assets Might Not be Realized | 78 |
|       |     | 4. Allowed Claims in the Various Classes May Exceed Projections | 78 |
| XI.   |     | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 78 |
|       | A.  | Federal Income Tax Consequences of the Plan | 78 |
|       |     | 1. Withholding Taxes | 79 |
|       |     | 2. Federal Income Tax Treatment of the Litigation Trust | 79 |
|       |     | 3. Litigation Trust Assets Treated As Owned by Holders of Allowed Class 5A and Class 5B Claims | 79 |
|       | B.  | Federal Income Tax Consequences of Payment of Allowed Claims | 79 |

    1.    Recognition of Gain or Loss ....................................................... 80

        a.    In General.................................................................... 80

        b.    Post-Effective Date Cash Distributions ................................. 80

        c.    Bad Debt and/or Worthless Securities Deduction ................... 80

    2.    Pending Payments..................................................................... 80

    3.    Payments Other than Pending Payments ....................................... 81

C.    Certain Other Tax Consequences for Holders of Claims.......................... 81

    1.    Receipt of Pre-Effective Date Interest .......................................... 81

    2.    Installment Method ................................................................... 81

D.    Importance of Obtaining Professional Tax Assistance ............................ 81

XII.    EFFECT OF CONFIRMATION ............................................................... 81

A.    Binding Effect of Confirmation ........................................................ 81

B.    Vesting of Assets Free and Clear of Liens, Claims and Interests................ 82

C.    Good Faith ................................................................................. 82

XIII.    ALTERNATIVES TO THE PLAN .......................................................... 82

A.    Liquidation Under Chapter 7 ........................................................... 82

B.    Dismissal................................................................................... 82

C.    Alternative Plan .......................................................................... 82

XIV.    CONCLUSION.................................................................................. 82

## TABLE OF EXHIBITS

Exhibit l        The Plan

Exhibit 2        Solicitation Order

Exhibit 3        Final Award

Exhibit 4        Schedule of Joining Creditors

Exhibit 5        Liquidation Analysis

## I.    SUMMARY

On March 7, 2023, the Debtors' bankruptcy cases were initiated through the filing of improper involuntary bankruptcy petitions by alleged creditors Pach Shemen LLC ("Pach Shemen"), VR Global Partners, L.P. and Alpine Partners (BVI) L.P (collectively, the "Petitioning Creditors").  By order of the Bankruptcy Court, on September 25, 2023, the Debtors' cases were converted to these Chapter 11 Cases.  The Plan described in this Disclosure Statement effects a resolution of the Debtors' outstanding obligations owed to its creditor constituencies and is created for the purposes, among others, of establishing a Litigation Trust to liquidate causes of action transferred from the Debtors to the Litigation Trust for the purpose of making distributions to certain Holders of Allowed Claims, distributing a new value contribution provided by the Debtors' shareholders and otherwise restructuring the outstanding obligations of the Estates, all as more fully set forth in this Disclosure Statement and the Plan.

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor.  A chapter 11 plan may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both.  The Plan is a reorganizing plan.

### A.    Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement."  The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning the plan.  In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be. ***This document, together with its attached exhibits, is the Disclosure Statement for the Plan.  The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.***

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.  The Disclosure Statement also discusses the events leading to the Debtors' Chapter 11 Cases, describes the main events that have occurred in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan.  The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and Holders of Claims and Interests, voting procedures and the confirmation process.

***All Creditors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan.  Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan.  Moreover, the Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.***

B.     Plan Overview

1.     Purpose – Reorganization

The purpose of the Plan is to reorganize the Debtors' outstanding liabilities and govern distributions to Creditors.  If the Plan is not confirmed, the Debtors believe that they will be forced either to liquidate under chapter 7 of the Bankruptcy Code or dismiss their Chapter 11 Cases.  In either event, the Debtors believe that the Debtors' Creditors would receive smaller distributions, or, in most cases, none at all, for their Claims.

2.     Substantive Consolidation or Merger

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be on Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of Plan shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been effected.  This compromise and settlement is in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.    Plan Treatment

**UNCLASSIFIED AND UNIMPAIRED CLAIMS**

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims) | The Distributing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Distributing Agent. Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date. All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees. | $[_] | 100% |
| Professional Fee Claims and Committee Professional Fee Claims | Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date. Prior to the Effective Date the Debtors may pay any Committee Professional Fees, which the Bankruptcy Court has allowed, up to a maximum | Professional Fee Claims Approx. $[_] | 100% |

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | amount of $1,500,000 in the aggregate for all Committee Professional Fee Claims which are allowable or allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date. From and after the Effective Date, the Distributing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case; provided however, in no event shall the payments of Committee Professional Fees since the Conversion Date exceed $1,500,000 in the aggregate.<br><br>On the Effective Date, any objections previously filed to any applications for payment of the Professional Fees shall be deemed withdrawn (with prejudice) on the Effective Date. Further, after the occurrence of the Effective Date, so long as of the aggregate Committee Professional Fees do not exceed $1,500,000, neither the Debtors, the Distributing Agent, the Reorganized Debtor, the Litigation Trust, Litigation Trust Trustee nor the Litigation Trust Oversight Committee shall assert any objection to any Committee Professional Fee Claims.<br><br>Any final application for allowance of a Professional Fee Claims and Committee Professional Fee Claims for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, counsel for the Litigation Trust, the Litigation Trust Trustee and | Committee Professional Fee Claims: Approx.<br><br>$1,500,000 | |

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | on the United States Trustee at the addresses listed in Article XI.L of this Plan so that it is received no later than forty-five (45) days after the Effective Date. In the event an application for allowance of a Professional Fee Claims and Committee Professional Fee Claims is not filed by the appropriate date, such Professional Fee Claims and Committee Professional Fee Claims shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trust Trustee and their successors, their assigns or their Assets. Allowed Professional Fee Claims and Committee Professional Fee Claims must be paid in full (subject to the limitation on the Committee Professional Fees in paragraph above) and Professional Fee Claims and Committee Professional Fee Claims pending allowance by the Bankruptcy Court must be reserved for in full prior to any payment to Holders of Allowed Claims in (a) Class 3 (Azure Guaranty Claims), (b) Class 4 (Trade Creditor Claims); (c) Class 5A (Non-Petitioning Creditor Exchange Note Claims); and (d) Class 5B (Petitioning Creditor Exchange Note Claims). | | |

### CLASSIFIED CLAIMS

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[2] | Estimated Recovery[3] |
|---|---|---|---|---|
| 1 | OCM Guaranty Claims | Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and | Approx. $49,100,000 | ~50% |

---

[2] The amounts set forth herein are estimates only. The actual amount of Allowed Claims for certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

[3] The percentages set forth herein are estimates only. The actual recoveries of certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[2] | Estimated Recovery[3] |
|---|---|---|---|---|
| | | in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCMs, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees.<br><br>Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan. | | |
| 2 | Corp Guaranty Claims | Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty Counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.<br><br>Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. | Approx. $27,768,000 | ~50% |
| 3 | Azure Guaranty Claims | Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any | Approx. $94,799,000 | ~.1% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[2] | Estimated Recovery[3] |
|---|---|---|---|---|
| | | Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Distributing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery<br><br>Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. | | |
| 4 | Trade Creditor Claims | Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, the Distributing Agent shall pay to the Trade Creditors, by wire transfer of immediately available funds, their Pro Rata portion of the Trade Creditor Recovery.<br><br>Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. | Approx. $5,000,000[4] | ~1% |
| 5A | Non-Petitioning Creditor Exchange Note Claims | Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5A Claim shall elect to receive in full | Approx. $5,953,000 | 0.8%-- Unknown |

---

[4] The estimated range of Trade Creditor Claims set forth herein includes amounts subject to Proofs of Claim for which the Claims reconciliation and objection process has not been completed. Due to the uncertainty and inherent risk involved, the actual amount of Trade Creditor Claims cannot be determined with any degree of certainty until the Claims reconciliation and objection process is completed.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[2] | Estimated Recovery[3] |
|-------|-------|------------------------|--------------------------|----------------------|
|  |  | settlement, release, and satisfaction of, of such Allowed Class 5A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter: at the exclusive election of the Holder of an Allowed Class 5A Claim either (i) their Pro Rata portion of the Exchange Note Election Recovery or (ii) their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.<br><br>Class 5A is Impaired and Holders of Class 5A Claims are entitled to vote to accept or reject the Plan. |  |  |
| 5B | Petitioning Creditor Exchange Note Claims | The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.  To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all claims in Class 5A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 5A Non-Petitioning Creditor Exchange Note Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5B Claim shall receive in full settlement, release, and satisfaction of, of such Allowed Class 5B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be | $0 – Approx. $320,195,000 | Unknown |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[2] | Estimated Recovery[3] |
|---|---|---|---|---|
| | | distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.<br><br>        Class 5B is Impaired and Holders of Class 5B Claims are entitled to vote to accept or reject the Plan. | | |
| 6 | Interests |        On the Effective Date, and in exchange for the Shareholder New Value Contribution, all Interests and Intercompany Interests shall be deemed reinstated and otherwise in full effect and force as on the Petition Date provided that the Holder of the Interests and Intercompany Interests to be reinstated has provided Cash and/or assets to the aggregate value of the Shareholder New Value Contribution.<br><br>        Class 6 is Unimpaired, and Holders of Interests are presumed to have accepted the Plan pursuant to 1126(f) of the Bankruptcy Code. | Reinstated | 100% |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL HOLDERS OF CLAIMS AND INTERESTS.**

        C.        Voting and Confirmation

        Each Holder of a Claim in Classes 1, 2, 3, 4, 5A and 5B shall be entitled to vote either to accept or reject the Plan. Classes 1, 2, 3, 4, 5A and 5B shall have accepted the Plan if: (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan. Class 6 is unimpaired and presumed to accept the Plan. Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled to commence on [_] at [_]:00 a.m. (Eastern) before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots. The Bankruptcy Court has established [_] (the "Voting Record Date") as the date for determining which Holders of Claims are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your Ballot, if necessary.

     D.    <u>Risk Factors and Disclaimer</u>

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, in order to formulate an informed opinion as to the manner in which the Plan affects their Claim(s) against the Debtors and to determine whether to vote to accept the Plan. Holders of Claims should particularly consider the risk factors described in Article X hereof.

Holders of Claims should also read the Plan carefully and in its entirety. The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records. The Debtors therefore represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement. The liquidation analyses, distribution projections and other information described herein are estimates only, and the timing and amounts of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys and other professionals employed by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, accountants, advisors and other**

**professionals employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

**The Debtors and their professionals also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending adversary proceedings and projected Causes of Action and objections to Claims. However, no reliance should be placed on the fact that a particular adversary proceeding or projected Cause of Action or objection to a Claim is, or is not, identified in this Disclosure Statement or the Plan. The Debtors or Litigation Trust Trustee, as applicable, may seek to investigate, file and prosecute claims and projected Causes of Action and objections to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims.**

**II.    VOTING ON AND CONFIRMATION OF THE PLAN**

      A.    <u>Deadline for Voting For or Against the Plan</u>

If one or more of your Claims is in a voting Class, the Debtors have sent you one or more individual Ballots, with return envelopes for voting to accept or reject the Plan. The Debtors urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) to the Counsel for the Debtors as follows:

**Reed Smith LLP**
**Three Logan Square**
**1717 Arch Street Suite 3100**
**Philadelphia, Pennsylvania 19146**
**Attn: Derek M. Osei-Bonsu**

TO BE COUNTED, DEBTORS' COUNSEL MUST RECEIVE YOUR BALLOT (OR MASTER BALLOT OF YOUR NOMINEE HOLDER) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON [ ]** (THE "<u>VOTING DEADLINE</u>"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED. ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS OR SUBCLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED AT THE DISCRETION OF THE DEBTORS.

Detailed voting instructions are printed on and/or accompany each Ballot. Any Ballot or master Ballot sent by mail must be received by counsel to the Debtors at the appropriate address set forth above by no later than 5:00 p.m. Prevailing Eastern Time on the Voting Deadline. Any Ballot or master Ballot sent by any other means must be physically received by Debtors' counsel

by 5:00 p.m. Prevailing Eastern Time on the Voting Deadline or it shall not be counted. Any unsigned Ballot or any Ballot that has no original signature, including any Ballot received by facsimile or other electronic means, or any Ballot with only a photocopy of a signature shall not be counted. Any Ballot that is not clearly marked as voting for or against the Plan or marked as both voting for and against the Plan, shall not be counted. Any Ballot that is properly completed and timely received shall not be counted if such Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant voting Class as of the Voting Record Date. A Beneficial Holder (but not an entity voting acting in a fiduciary capacity and on behalf of more than one Beneficial Holder, such as a Nominee) that is voting more than one Claim or Interest in a voting Class must vote all of its Claims or Interests within a particular voting Class either to accept or to reject the Plan and may not split its vote in the same voting Class, and thus, any Ballot (or Ballots in the same voting Class) of a Beneficial Holder that partially rejects and partially accepts the Plan shall be deemed as accepting the Plan. Whenever a Holder of a Claim in a voting Class casts more than one Ballot voting the same Claim prior to the Voting Deadline, the last Ballot physically received by Debtors' counsel prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast Ballot(s), and any prior cast Ballot(s), shall not be counted. The Debtors, without notice, subject to contrary Order of the Bankruptcy Court, may waive any defect in any Ballot or master Ballot at any time, either before or after the close of voting. Such determinations will be disclosed in the voting report and any such determinations by the Debtors shall be subject to de-novo review by the Bankruptcy Court.

On January 23, 2024, the Debtors filed the Plan [Dkt. No. 370]. Also on January 23, 2024 the Debtors filed their *Motion of Debtors and Debtors in Possession for an Order: (I) Approving Their Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject their Plan of Reorganization, (III) Establishing the Confirmation Hearing and Related Deadlines, and (IV) Granting Related Relief* [Dkt. No. _] (the "Solicitation Motion"). On [_], the Bankruptcy Court entered its order granting the relief requested in the Solicitation Motion (the "Solicitation Order"), which, among other things, approved the voting procedures addressed herein [Dkt. No. _]. You should carefully read the Solicitation Order, which is annexed hereto as Exhibit 2. It establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is [_], 2024 (c) the applicable standards for tabulating Ballots; (d) the deadline for filing objections to Confirmation of the Plan; and (e) the date and time of the Confirmation Hearing (also set forth below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

B.      Confirmation Hearing for the Plan

The Bankruptcy Court has set a hearing on the confirmation of the Plan (the "Confirmation Hearing") to consider objections to Confirmation, if any. The Confirmation Hearing shall commence at **[_], Prevailing Eastern Time on [_]**, in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be continued from time to time, without notice, other than

an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

      C.      <u>Any Objections to Confirmation of the Plan</u>

      Any interested party may respond or object to Confirmation of the Plan. Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors, counsel for the Committee and the Office of United States Trustee as well as all other parties who have requested notice in these Chapter 11 Cases **ON OR BEFORE [_] [_] at 4:00 P.M., Prevailing Eastern Time**. Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

<u>Counsel for the Debtors</u>
Derek J. Baker
Derek Osei-Bonsu
Reed Smith LLP
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail: dbaker@reedsmith.com
dosei-bonsu@reedsmith.com

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

| <u>Counsel for the United States Trustee</u> | <u>Counsel for the Committee</u> |
| --- | --- |
| Office of The United States Trustee | Dechert LLP |
| Alexander Hamilton Custom House | Attn: Stephen Zide |
| One Bowling Green, Suite 534 | David Herman |
| New York, NY 10004 | Three Bryant Park, |
| Attn: Daniel Rudewicz | 1095 Avenue of the Americas, |
| | New York, NY, 10036 |

D.    Recommendations for Voting

The Debtors strongly recommend that you vote in favor of the Plan.  Rejection of the Plan may result in protracted delays, a Chapter 7 liquidation or the confirmation of another less favorable Chapter 11 plan.  These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan.  The Debtors believe that unsecured creditors will receive a greater distribution under the Plan than they would in a Chapter 7 liquidation, no more fully discussed herein.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE.    THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS SUBMIT BALLOTS TO ACCEPT THE PLAN. THE DEBTORS RECOMMEND THAT PARTIES ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTE IN FAVOR OF THE PLAN.**

III.    **ORGANIZATION AND ACTIVITIES OF THE DEBTORS**

A.    The Debtors' Business

The Debtors in these cases are Eletson Holdings Inc. ("Eletson Holdings") and its wholly owned subsidiaries Eletson Finance (US) LLC, and Agathonissos Finance LLC.  No other subsidiaries of Eletson Holdings are subject to these Chapter 11 Cases.  Eletson Holdings and its corporate family (collectively "Eletson") are world leaders in international seaborne transportation specializing in the transport of refined petroleum products, liquified petroleum gas and ammonia. Eletson owns and operates a fleet of medium and long-range double hull product tankers, consisting of Handymax and Aframax size vessels which are capable of carrying a wide range of refined petroleum products, such as fuel oil and vacuum gas oil and gas oil, gasoline, jet fuel, kerosene and naphtha, as well as crude oil.  The scale and flexibility of Eletson's fleet, commercial expertise and long-standing industry relationships have allowed Eletson to sustain high utilization levels and maintain strong performance.

With offices around the globe Eletson charters its versatile, high-quality and modern fleet to customers including major international oil, LPG and ammonia companies and traders.  Eletson maintains a large and diversified customer base including major international oil companies such as BP, Conoco Philips, Royal Dutch Shell and Chevron Corporation, state owned integrated oil companies such as Petrobras and Pemex, refined oil trades, LPG and ammonia producers, users, traders and importers.  For decades Eletson has been at the forefront of the shipping tanker sector and is an industry leader driving wide innovation and change.

B.    Corporate History and Structure

Eletson Holdings is the ultimate parent of the Eletson family.  Eletson Finance (US) is a wholly owned subsidiary that does not itself have any subsidiaries.  Eletson's primary operations are undertaken by various non-Debtor subsidiaries who either (i) own title to the vessels comprising Eletson's fleet or (ii) charter the vessel of Eletson's fleet.  The Eletson fleet is managed by non-Debtor subsidiary Eletson Corporation ("Eletson Corp") subject to management agreements with the various entities in exchange for management fees.  In addition to Eletson Corp and the various entities that directly own or charter and operate the vessels in Eletson's fleet, there

- 14 -

are several defunct corporate entities with no operations within the Eletson corporate structure. Eletson Holdings serves as the guarantor for a number of its subsidiaries obligations as described in greater detail herein.

Each of the Debtors are holding companies and do not maintain any ongoing operations or employ any employees outside of their officers and directors.

C.    Pre-Petition Capitalization

    1.    Old Notes

In December 2013 Eletson Holdings and Eletson Finance issued those certain 9.625% First Preferred Ship Mortgage Notes due 2022 (the "Old Notes"). The Old Notes were issued in an original face value amount of $300 million dollars. Pursuant to the relevant indenture, Deutsche Bank Trust Company Americas served as the trustee for the Old Notes.

In May of 2018 Eletson Finance and Eletson Holdings initiated an exchange for the Old Notes (the "Note Exchange"). Approximately 2% of the holders of Old Notes chose not to participate in the Note Exchange and retained their Old Notes.

    2.    Exchange Notes and Restructuring Support Agreements

In July of 2018 the Debtors finalized the Note Exchange and issued those certain First Preferred Ship Mortgage Notes due 2022 (the "Exchange Notes"). The Exchange Notes were issued in an original face value amount of $314,068,360. Pursuant to the relevant indenture (the "Exchange Notes Indenture"), Wilmington Savings Fund Society, FSB (the "Exchange Notes Trustee") served as trustee and collateral agent for the Exchange Notes. The Exchange Notes were secured by certain assets pledged as collateral (collectively, the "Collateral"), including, among other things: (i) all outstanding common shares or membership interests in Eletson Finance and certain guarantors under the Exchange Note Indenture; (ii) thirteen shipping vessels owned by guarantors under the Exchange Note Indenture (the "Exchange Note Vessels"); (iii) the earnings arising from freights, hires and other earnings from the operation and use of or relating to the Exchange Note Vessels, and (iv) all other cash and various accounts of Agathonissos Finance LLC and the guarantors set forth in the Exchange Notes Indenture.

Also in July of 2018, the Debtors initiated a tender offer seeking to purchase Exchange Notes from the holders of the Exchange Notes. Pursuant to the tender offer, the Debtors reduced the then outstanding obligations of the Exchange Notes by approximately $8 million.

In June of 2019, the Debtors, their guarantors certain of Eletson Holding's shareholders and an ad hoc group of Exchange Noteholders entered into a Restructuring Support Agreement (the "Initial RSA"). Pursuant to the Initial RSA, a strict foreclosure agreement was executed which provided for the reduction of the principal balance of the Exchange Notes by $130 million in exchange for the Collateral pledged as security for the Exchange Notes. In connection with the Initial RSA the Exchange Note Trustee in its capacity as collateral agent under the Exchange Note Indenture accepted title to 100% of the common shares of each of the thirteen special purpose entities that, themselves, owned the Exchange Note Vessels in partial satisfaction and discharge of $130 million of the principal obligations due and owing under the Exchange Notes. Thereafter,

- 15 -

on October 24, 2019, the Exchange Note Indenture was amended to release all remaining Collateral securing the remaining Exchange Notes.

On October 29, 2019, a second restructuring support agreement was executed by the same parties (the "Second RSA").  Pursuant to the Second RSA, Exchange Noteholders that were signatories to the Second RSA were restricted from selling, transferring or assigning any interests they had in the Exchange Notes unless the transfer was to another Exchange Noteholder who agreed to be bound by the terms of the Second RSA.  Further, the Second RSA provided that no action would be taken by Exchange Noteholders to enforce any defaults or events of default that were ongoing pursuant to the Exchange Note Indenture so long as the Second RSA was not terminated effectively creating a standstill period while the Debtors and Exchange Noteholders continued to negotiate the terms of a restructuring.

The Debtors assert that the Second RSA is and remains in force, and the actions of the Exchange Noteholders party to the Second RSA and the Petitioning Creditors who acquired rights therefrom in the sale of such Exchange Notes are in violation of the Second RSA and Holdings' rights thereunder as the Exchange Noteholders subject to the Second RSA were prohibited from transferring their interests to parties that were not signatories to the Second RSA.  Further, pursuant to the standstill period of the Second RSA the Debtors were not obligated to may any payments on account of the Exchange Notes when the Debtors were placed into bankruptcy.

In June 2020, well after the Second RSA was executed, the Debtors, more than seventy percent (70%) of the Exchange Noteholders, and others entered into a certain Stipulation Waiver and Release (the "OCM Financing Stipulation"), wherein a majority of the Exchange Noteholders acknowledged that they "[were] parties to that certain [Second RSA]…."   *OCM Financing Stipulation* at p. 1.  At no place in the OCM Financing Stipulation was it alleged that the Second RSA had been terminated or was no longer in effect.  Like the Second RSA, the OCM Financing Stipulation included a restriction on the transfer of the Exchange Notes. Specifically it provided, "[e]ach Holder agrees…not to sell, assign, transfer, hypothecate or otherwise dispose of…any [Exchange Notes] to any third party that is not a[n] [Exchange Noteholder unless], as a condition precedent to any such transaction, the transferee of such [Exchange Notes] executed and delivers a joinder…to this Stipulation…to counsel to the Eletson Parties.  *Id.*, at § 4(a).  Any action taken in violation of the OCM Financing Stipulation, including the transfer of the Exchange Notes, is deemed void pursuant to the terms of the OCM Financing Stipulation.

### 3.   Eletson Holding Guaranty Obligations

In addition to the obligations under the Old Notes and Exchange Notes, Eletson Holdings guarantees the obligations of several of its non-Debtor affiliates.

### D.   The OCM Guarantees

On June 24, 2020, OCM Maritime Rhine LLC ("OCM Rhine") entered into a bareboat charter agreement ("Kinaros Charter") with non-Debtor Kinaros Special Maritime Enterprise for the use of a vessel owned by OCM Rhine named the Kinaros.  Pursuant to the Kinaros Charter, Kinaros Special Maritime Enterprise was obligated to make payments to OCM Rhine related to the charter of the Kinaros.  The obligations were guaranteed by Eletson Holdings pursuant to that

- 16 -

certain guarantee executed by Eletson Holdings in favor of OCM Rhine dated June 24, 2020 (the "Kinaros Guaranty"). Pursuant to the Kinaros Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kinaros Charter. The principal balance outstanding under the Kinaros Charter as of the Conversion Date is $11,750,000 with outstanding interest obligations of $217,417. As of the Conversion Date OCM Rhine has not declared any event of default under the Kinaros Charter, *however, the Chapter 11 Cases constitute a default under the Kinaros Guaranty*.

On June 24, 2020, OCM Maritime Yukon LLC ("OCM Yukon") entered into a bareboat charter agreement ("Kimolos Charter") with non-Debtor Kimolos II Special Maritime Enterprise for the use of a vessel owned by OCM Thames named the Kimolos. Pursuant to the Kimolos Charter, Kimolos II Special Maritime Enterprise was obligated to make payments to OCM Yukon related to the charter of the Kimolos. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Yukon dated June 24, 2020 (the "Kimolos Guaranty"). Pursuant to the Kimolos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kimolos Charter. The principal balance outstanding under the Kimolos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Yukon has not declared any event of default under the Kimolos Charter, *however, the Chapter 11 Cases constitute a default under the Kimolos Guaranty*.

On June 24, 2020, OCM Maritime Autumn LLC ("OCM Autumn") entered into a bareboat charter agreement ("Fourni Charter") with non-Debtor Fourni Special Maritime Enterprise for the use of a vessel owned by OCM Autumn named the Fourni. Pursuant to the Fourni Charter, Fourni Special Maritime Enterprise was obligated to make payments to OCM Autumn related to the charter of the Fourni. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Autumn dated June 24, 2020 (the "Fourni Guaranty"). Pursuant to the Fourni Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Fourni Charter. The principal balance outstanding under the Fourni Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Autumn has not declared any event of default under the Fourni Charter, *however, the Chapter 11 Cases constitute a default under the Fourni Guaranty*.

On June 24, 2020, OCM Maritime Thames LLC ("OCM Thames") entered into a bareboat charter agreement ("Kastos Charter") with non-Debtor Kastos Special Maritime Enterprise for the use of a vessel owned by OCM Thames named the Kastos. Pursuant to the Kastos Charter, Kastos Special Maritime Enterprise was obligated to make payments to OCM Thames related to the charter of the Kastos. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Thames dated June 24, 2020 (the "Kastos Guaranty"). Pursuant to the Kastos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kastos Charter. The principal balance outstanding under the Kastos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Thames has not declared any event of default under the Kastos Charter, *however, the Chapter 11 Cases constitute a default under the Kastos Guaranty*.

E.    The Azure Guarantees

On August 24, 2017, Azure Nova Spring Co., Azure Nova Summer Co., Azure Nova Autumn Co., and Azure Nova Winter Co. (collectively, "Azure") entered into  bareboat charter agreements (collectively, the "Charters") with non-Debtors Antikeros Special Maritime Enterprise, Dhonoussa Special Maritime Enterprise, Polyaigos Special Maritime Enterprise and Strofades Special Maritime Enterprise (collectively, the "Azure Charterers") respectively, for the use and operation of vessels owned by Azure named the Antikeros, Dhonoussa, Polyaigos and Strofades respectively (collectively, the "Azure Vessels").  Pursuant to the Charters, the Azure Charterers were obligated to make payments to Azure related to the charter of the Azure Vessels. The obligations were guaranteed by Eletson Holdings and Eletson Corp pursuant to those certain guarantees executed by Eletson Holdings and Eletson Corp in favor of each Azure entity dated August 24, 2017 (collectively, the "Azure Guarantees").  Pursuant to the Azure Guarantees Eletson Holdings guaranteed the full payment for all amounts due under the Charters.  As security for Eletson Holdings' obligations under the Azure Guarantees Eletson Holdings executed a share pledge agreement in favor of each Azure entity pursuant to which the equity of respective Azure Charterer was placed as collateral to secure the obligations under the applicable Charter.  In March of 2021 the Charters were terminated and the Azure Vessels were repossessed.  As a result of this termination and repossession, two arbitrations were commenced by Azure, one against the Charterers seeking a determination of any amounts owed to Azure because of the termination of the Charters and repossession of the Azure Vessels and a second against Eletson Holdings for any obligations arising from the Azure Guarantees which are asserted by Azure to be in an amount of no less than $94,799,702.  Eletson Holdings disputes that defaults have occurred, or obligations exist under the respective Azure Guaranties.

F.    The Eletson Corp Guarantees

Non-Debtor Eletson Corp is the operational and technical management entity for various Eletson entities (including various of Eletson Holdings' non-debtor subsidiaries).  As Eletson Corp's parent entity, Eletson Holdings guaranteed certain obligations of non-debtor Eletson Corp on a number of its unsecured obligations owed towards various banking entities in Greece, including Aegean Baltic Bank, Alpha Bank and Piraeus Bank.

## IV.    EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING[5]

The Debtors' bankruptcy cases were initiated by the Petitioning Creditors as part of scorched earth campaign orchestrated by Murchinson Inc. ("Murchinson") and its special purpose entity Levona Ltd. ("Levona" and together with Murchinson, Pach Shemen and the other entities under Murchinson's direction and/or control the "Murchinson Entities") as a litigation tactic to gain an advantage in the Arbitration (defined below) initiated by Eletson Holdings and Eletson Corp against Levona in an attempt to hedge against Levona's potential loss in the Arbitration.

The Murchinson Entities have undertaken a brutal and illegal scheme to unjustly pressure the Debtors and their shareholders into the sale or other disposition of the fleet assets of non-Debtor Eletson Gas LLC ("Eletson Gas") to enrich themselves at the expense of the Debtors and

---

[5] The descriptions provided herein are for summary purposes only.  For a complete history of each of the various proceedings described herein, including the Arbitration, the Bondholder Litigation, the Confirmation Proceedings, the chapter 7 cases and the Chapter 11 Cases, please review the relevant docket.

their affiliates, and in furtherance of this illicit scheme the Murchinson Entities have resorted to bribery, fraud, threats, and forgery. A summary of the improper actions of the Murchinson Entities and the ensuing litigation history is provided below.[6] For the avoidance of doubt, the Murchinson Entities have been found by the Arbitrator to have (i) wrongfully commenced the Debtors' bankruptcy proceedings, and (ii) wrongfully perpetrated their scheme against the Debtors and various Eletson entities resulting in a final arbitration award (the "Final Award") has been entered against the Murchinson Entities in the amount of no less than $99,530,099.71. As set forth in greater detail below, proceedings regarding confirmation of the Final Award (the "Confirmation Proceedings") are currently pending before the United States District Court for the Southern District of New York. A copy of the Final Award is annexed hereto as Exhibit 3.

A.    Murchinson, Levona and Pach Shemen are Alter Egos for all Relevant Purposes

Murchinson's multipronged attack against the Debtors was undertaken by the various Murchinson Entities as well as the counsel that Murchinson retained to undertake a number of these actions, including Dechert LLP ("Dechert"). As described in greater detail herein, Dechert previously served as counsel to Murchinson, Pach Shemen and the Exchange Note Trustee working at the direction of the Murchinson Entities for matters related to Eletson Holdings and Eletson Gas prior to the conversion to the Chapter 11 Cases and only terminated its representation of Murchinson, Pach Shemen and the Exchange Note Trustee the day before Dechert was retained by the Committee.

Murchinson is a corporation organized under the laws of Canada with a principal place of business in Toronto, Canada. Levona is special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire and hold the preferred shares of Eletson Gas (the "Preferred Shares"). Levona was created in 2021 and is owned by Nomis Bay Ltd. and BPY Limited. Nomis Bay Ltd. and BPY Limited in turn are managed and controlled by Murchinson. See *Final Award* at p. 19. Levona does not have any employees, an email domain or bank accounts. *Id.* at p. 20. Levona has insisted that it operates separately from Murchinson, but the Arbitrator has found that for purposes of the Arbitration, and by extension the chapter 7 cases discussed below and these Chapter 11 Cases, Levona and Murchinson were not separate and distinct parties. *Id.* at p. 21. Thus, an action taken by Levona was an action taken by Murchinson and vice versa.

Pach Shemen is another special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire and hold interests in the outstanding Exchange Notes in violation of the Second RSA and the Status Quo Injunction (defined below) for the direction of the Bondholder Litigation and the improper Involuntary Petitions. *Id.* As set forth in Pach Shemen's corporate ownership statements filed with the Bankruptcy Court, Pach Shemen is also owned by Nomis Bay Ltd. and BPY Limited. *Corporation Ownership Statement of Pach Shemen, LLC* [Dkt. No. 1]. Like Levona, the Arbitrator found that for purposes of the

---

[6] A complete history of the Arbitration and Murchinson's actions can be found on the docket of the Confirmation Proceedings at Case No.: 1:23-cv-07331-LJL [Dkt. No. 66].

Arbitration, Pach Shemen is not a distinct entity from Levona, and thus not distinct from Murchinson. *Final Award* at p. 21.

Thus, Murchinson directly or indirectly operates, directs, and controls both Levona and Pach Shemen, two entities created for the sole purpose of acquiring and exploiting interests in a non-Debtor Affiliate and claims against the Debtors respectively, and which entities are either subject to the Arbitration or are a Petitioning Creditor.

B.    Levona Improperly Acquires the Preferred Shares of Eletson Gas

In 2021 Levona acquired the Preferred Shares from Blackstone Tactical Opportunities' ("Blackstone") and was made party to the Eletson Gas' Limited Liability Company Agreement (the "LLCA"). As Levona was created for the express purpose of holding the Preferred Shares all correspondence regarding the purchase of the Preferred Shares were between Murchinson and Blackstone. As found by the Arbitrator, during these negotiations with Blackstone, Murchinson secretly bribed Peter Kanelos, the former CFO of Eletson Corp and a representative of Eletson Gas, as part of a scheme to lower the purchase price for the Preferred Shares then in Blackstone's possession.

Through Kanelos, Murchinson acquired confidential information about Eletson Gas, and communicated that information to Eletson Gas' financiers with the intention of causing these financiers to arrest certain ships in Eletson Gas' fleet. Murchinson then provided its proposal to restructure Eletson Gas' debt in an attempt to garner support for its eventual purchase of the Preferred Shares. *Final Award* at p. 22-25. Through these illicit conversations, Murchinson sought to lower the value of Eletson Gas, and therefore the Preferred Shares, which would entice Blackstone to sell the Preferred Shares at a lower price.

Murchinson recruited Kanelos into its scheme through bribery. Murchinson offered Kanelos compensation commensurate to the outcome of Murchinson's strategy in the form of 10% of its profit on the contemplated transactions. *Final Award* at p. 23. Kanelos was ultimately paid $100,000 by Murchinson/Levona upon Levona's acquisition of the Preferred Shares. *Id.* Recognizing the clear impropriety of these actions, Murchinson/Levona and Kanelos took several steps to conceal their clandestine activity such as only using Kanelos' personal email to remain undetected and refraining from discussing the purchase of the Preferred Shares with any other member of Eletson Gas or director or officer of the other Eletson entities. *Id.* Shockingly, after consummation of the sale of the Preferred Shares and upon signing onto the LLCA and becoming a member of Eletson Gas, representatives of Levona pretended as if they had never met or previously interacted with Kanelos. *Id.* Notably, it was found by the Arbitrator that Kanelos violated his fiduciary duties to Eletson Corp by taking part in Murchinson's schemes, and that Murchinson knowingly incentivized Kanelos' breach of duties and created a conflict of interests through bribery. *Id.*

Pursuant to the LLCA Levona appointed several directors to the board of Eletson Gas. It became immediately clear to the other members of the Eletson Gas board that Levona's appointees were not acting in the best interests of Eletson Gas, but rather sought to enrich Levona and the Murchinson Entities through actions taken in clear violation of the terms of the LLCA. Levona's directors breached the LLCA by attempting to fire Eletson Corp as the manager of the vessels of

Eletson Gas and its subsidiaries. Additionally, Levona's directors failed to disclose their pre-acquisition misuse of confidential information, bribery of Kanelos, and efforts to spur the arrests of Eletson Gas' ships. Levona also conspired with Eletson Gas' own counsel against the best interests of Eletson Gas.

The non-Levona members and directors of Eletson Gas rightfully determined that Levona and the directors appointed by Levona needed to be removed if Eletson Gas was to have any chance of survival. To that end, in February of 2022 the directors of Eletson Gas and Levona negotiated a Binding Offer Letter ("BOL") that would enable Eletson Gas to buyout the Preferred Shares from Levona for consideration of $23 million. The BOL was executed on March 11, 2022. Pursuant to the BOL, a number of accompanying documents were executed including: (i) that certain Intra-Group Loan Agreement, pursuant to which Levona provided Eletson Gas a loan facility of up to $10 million for a term of up to two years; (ii) that certain Share Transfer Agreement, pursuant to which Eletson Gas transferred to Levona 100% of the shares of the Symi and Telendos, two vessels in Eletson Gas' fleet; (iii) that certain Assignment of Claims, pursuant to which Eletson Corp assigned to Levona all of its claims relating to the management fees and liquidity support owed to it by Eletson Gas, or its subsidiaries; (iv) that certain Deed of Waiver and Release; and (v) that certain Fundamental Action Letter. *Final Award* at p. 8-9.

The BOL provided that the Preferred Shares would be purchased by Eletson Gas for the benefit of Eletson Gas or its nominee. At all relevant times, it was Eletson Gas' understanding and intention that upon the exercise of the purchase option, the Preferred Shares and/or the beneficial value of the Preferred Shares would be transferred to Eletson Gas' nominees (who could be the funding source for the exercise). At no time were the Preferred Shares owned by or nominated to Eletson Holdings.

Given the foregoing, on March 11, 2022, Levona was divested of the Preferred Shares in exchange for the shares of the entities owning the Symi and Telendos, and from March 11, 2022, Levona had no membership interests in Eletson Gas.

Notwithstanding the execution of the purchase option in the BOL and the divestiture of Preferred Shares, Levona continued to knowingly present itself as a member of Eletson Gas. This created confusion not only amongst Eletson Gas' employees, but also the market, harming Eletson Gas' businesses and ability to interact with third parties. But this was not the end of Levona's intentionally harmful actions. On July 15, 2022, more than four months after being divested of any interest in Eletson Gas, Levona purporting to act for Eletson Gas executed a non-binding letter of intent with Unigas, Eletson Gas' primary competitor, to sell nine of the vessels in Eletson Gas' fleet for $262 million. In addition to the proposed purchase price being significantly less than the actual value of the vessels, the proposed sale exposed Eletson Gas to significant risk of antitrust liability. Levona attempted to proceed with the sale process over the objection of Eletson Gas despite lacking a stake in Eletson Gas and threatened various officers and directors of the Eletson entities with litigation and other financial harm if they attempted to interfere with the sale.

C.    The JAMS Arbitration

In response to Levona's egregious and improper behavior, in July of 2022, Eletson Holdings and Eletson Corp (collectively the "Claimants") initiated a JAMS Arbitration Proceeding

(Ref. No. 5425000511) (the "Arbitration") pursuant to the LLCA seeking a determination of the ownership of the Preferred Shares, as well as damages resulting from Levona's actions.

As part of the Arbitration, the presiding arbitrator (the "Arbitrator") issued a temporary restraining order ("TRO") which required the parties to the Arbitration to "maintain the status quo" and "among other things" refrain from: "(1) engage in the transfer or sale of any assets of [Eletson Gas] absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." *Final Award* at p. 14. On November 7, 2022, the Arbitrator clarified the parameters of the "status quo," stating that "[a]ny attempt to sell or otherwise transfer the Symi and Telendos vessels will be deemed to be in violation of the TRO." On January 12, 2023, the Arbitrator issued a preliminary injunction which extended the TRO's prohibition on actions upsetting the status quo until further notice. The preliminary injunction provided that the parties to the Arbitration "shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of [Eletson Gas], or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration" *Id.* The TRO, the November clarification, and the Preliminary Injunction collectively are referred to as the "Status Quo Injunction."

On March 6, 2023, Levona received several adverse orders in the Arbitration. First, Levona's motion to strike the Claimants' statements of claims was denied. Next the Arbitrator found that Levona had waived its attorney client privilege over a large tranche of emails and denied Levona's motion for sanctions. Finally, the Arbitrator stated that the scheduled trial would go forward in April of 2023 and confirmed the pre-trial deadlines.

On March 7, 2023, - the day after these adverse rulings, and in violation of the Arbitrator's Status Quo Injunction, Levona's alter ego Pach Shemen and the remaining Petitioning Creditors initiated the Debtors' chapter 7 cases by filing the Involuntary Petitions. Despite using the improperly commenced chapter 7 cases to derail the Arbitration, an order modifying the automatic stay was entered by the Bankruptcy Court on April 17, 2023, allowing the Arbitration to proceed.

In May of 2023, a hearing was held before the Arbitrator regarding the merits of the Claimants' claims and Levona's counterclaims. On July 28, 2023, an interim award was issued by the Arbitrator in favor of the Claimants, and subsequently modified on August 15, 2023 adding additional damages against Levona. On September 29, 2023, the Arbitrator issued the Final Award noting that given the lack of distinction between Murchinson, Levona, and Pach Shemen, any award entered against Levona was an award entered against all three entities. *Final Award* at p. 21. Pursuant to the Final Award, the Arbitrator found, among other things:

- The buyout option was exercised pursuant to the BOL;

- Eletson Gas exercised its rights under the BOL to nominate parties to receive the Preferred Shares that were purchased from Levona and the Preferred Shares were transferred to these nominees effective as of March 11, 2022;

- As of March 11, 2022 Levona had no membership interest in Eletson Gas;

- Neither of the Claimants ever held any preferred interest in Eletson Gas;

- Levona owns all shares of the entities which control the Symi and Telendos pursuant to the exercise of the purchase option;

- The Status Quo Injunction remains in effect until confirmation of the Final Award entered by the Arbitrator;

- Murchinson, Levona and Pach Shemen are alter egos of each other concerning every fact proven in the Arbitration;

- Levona breached the LLCA in multiple ways including:

  o Bribing Peter Kanelos an Eletson Corp employee and causing him to disclose Eletson Gas's confidential information;

  o Violating confidentiality obligations by disclosing Eletson Gas' confidential information to third parties, failing to take steps to recover such information, and then deceiving the Claimants and Eletson Gas concerning said breaches after becoming a member of Eletson Gas;

  o Actively engaging in unlawful behavior by wrongfully influencing Eletson Gas' financiers to turn against Eletson Gas and the Claimants by causing the arrent of certain of Eletson Gas' vessels and not disclosing this misconduct upon becoming a member of Eletson Gas;

  o Failing to acknowledge that Eletson entities had fully complied with the terms of the purchase option in the BOL and failing to act in good faith;

  o Improperly purporting to act on behalf of Eletson Gas in Levona's business dealings with third parties including the attempted sale of Eletson Gas assets to its primary competitor Unigas;

  o Improperly threatening officers and directors of Eletson entities including threats of the pursuit of litigation against them;

  o Improperly purporting to seize control of Eletson Gas' board of directors after March 11, 2022;

  o Improperly purporting to direct the day-to-day operations of Eletson Gas after March 11, 2022;

  o Improperly purporting to assert control over the assets of Eletson Gas after March 11, 2022;

- 23 -

      o  Breaching obligations under the LLCA while a member of Eletson Gas by purporting to terminate management agreements with Eletson Corp; and

- Violating the Arbitration's Status Quo Injunction by:

      o  Wrongfully declaring a default under the loan provided by Levona;

      o  Trying to sell the Symi and Telendos while the Status Quo Injunction was in effect; and

      o  Directing and/or causing Levona affiliates to purchase Exchange Notes for the purpose of wrongfully commencing and then actually causing the commencement of the Bondholder Litigation and the filing of the involuntary bankruptcy petitions against the Debtors.

After the entry of the Final Award, the Claimants initiated the Confirmation Proceedings in the District Court. As of the date hereof, briefing has concluded in the Confirmation Proceeding and the District Court heard oral argument on January 2, 2024.

      D.  <u>Pach Shemen's Improper Acquisition of the Exchange Notes</u>

While the Arbitration was pending and the parties to the Arbitration were subject to the terms of the Status Quo Injunction, Levona and Murchinson took actions designed to drastically alter the status quo and improperly pressure the Claimants.

On January 4, 2023, Pach Shemen, through Nomis Bay Ltd. and BPY Ltd., and in violation of the Arbitrator's TRO requiring the parties to "maintain the status quo," purchased approximately $183.8 million of the outstanding Exchange Notes (representing more than half of the aggregate balance of the outstanding Exchange Notes) for $2 million. *Final Award* at p. 60. The purchase of the Exchange Notes was undertaken explicitly as a litigation tactic designed to further the Murchinson Entities' goals in the Arbitration and harm the Claimants. On December 8, 2022, while negotiating the purchase of the Exchange Notes Mr. Adam Spears a representative of Pach Shemen and Levona, offered additional consideration to the bondholders contingent on the outcome of the Arbitration stating that the purchaser would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the Company." *Id.*

Further, at the time of the Murchinson Entities' purchase and transfer of the Exchange Notes, the Exchange Notes were subject to the transfer restrictions set forth in the Second RSA. Pursuant to the Second RSA and the OCM Financing Stipulation (of which holders of approximately 80% of the aggregate balance of outstanding Exchange Notes were signatories) (i) no Exchange Noteholder was permitted to transfer, sell or assign its interests in the Exchange Notes unless such sale was to another Exchange Noteholder or a party who was to be bound by the Second RSA and (ii) no Exchange Noteholders could direct the Exchange Note Trustee to take any action to enforce any ongoing default or event of default under the Exchange Note Indenture. Any action in violation of the Second RSA is void pursuant to the terms thereof. Therefore, Pach Shemen is not a valid Exchange Noteholders and has no claims against the Debtors as the purchase

and transfer of the Exchange Notes to Pach Shemen was void pursuant to the Second RSA and OCM Financing Stipulation.

    E.    <u>The Exchange Note Trustee is Forced to Initiate the Southern District Bondholder Litigation</u>

The improper purchase of the Exchange Notes by Pach Shemen was the precursor to a two-pronged strategy designed to further pressure the Claimants in the Arbitration. The first prong involved weaponizing the Exchange Note Trustee to bring an enforcement action against the Debtors in direct contravention of the terms of the Second RSA.

Pursuant to the terms of the Second RSA, which was executed by holders of approximately 80% of the outstanding aggregate Exchange Notes, as of January 11, 2023, a standstill period was in place which prohibited Exchange Noteholders from directing the Exchange Note Trustee to initiate any action to enforce any default or event of default under the Exchange Note Indenture. Notwithstanding the foregoing, on January 11, 2023, the Debtors were sued by the Exchange Note Trustee in the District Court seeking repayment of the outstanding obligations under the Exchange Notes for various defaults and events of defaults (the "Bondholder Litigation"). In its complaint, the Exchange Note Trustee asserts that it was directed to file the complaint by the holders of a majority of the Exchange Notes, despite the fact that such a majority must include signatories to the Second RSA, and that such an action would be a direct violation of the terms of the Second RSA. Notably, the complaint does not reference the Second RSA or the restrictions placed on the Exchange Noteholders pursuant thereto. It was not until February 2, 2023, nearly three weeks after the Exchange Note Trustee initiated the Bondholder Litigation, that the Debtors received an alleged termination notice of the Second RSA. However, the alleged termination notice suffered from material deficiencies that rendered it inoperative, and left questions regarding its authenticity. The termination notice was purported to be sent on behalf of the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"). But the termination notice was not sent on Paul Weiss letterhead, nor even signed with an "ink" signature and the alleged termination notice was not signed by any parties to the Second RSA. Further the purported termination notice was facially invalid as a "Termination Event" as defined in the Second RSA occurs only upon written notice by "the [consenting Exchange Noteholders holding, in aggregate, at least two thirds in principal amount outstanding of the [Exchange Notes] held by the [consenting Exchange Noteholders]" and the termination notice did not provide that Paul Weiss represented the requisite number of Exchange Noteholders. Given the ineffective and potentially fraudulent termination of the Second RSA, the Bondholder Litigation was initiated in clear violation of the terms of the Second RSA and any Exchange Noteholder that directed the Exchange Note Trustee to initiate the Bondholder Litigation also knowingly violated the terms of the Second RSA.

As the Debtors would subsequently learn, the Exchange Noteholders that directed the Exchange Note Trustee to bring the action against the Debtors in the District Court were the Petitioning Creditors led by Pach Shemen.

    F.    <u>The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases</u>

The second prong of the strategy underlying Pach Shemen's purchase of the Exchange Notes was to place the Debtors into bankruptcy to hedge Levona's position against the Claimants

for the value of the Preferred Shares in the event of an adverse ruling in the Arbitration. If the Arbitrator ruled in favor of Levona, Murchinson could sell the Preferred Shares and/or the vessels owned by Eletson Gas. However, in the event of an adverse ruling, Levona believed that the value of the Preferred Shares and the Eletson Gas fleet would inure to the value of Eletson Holdings. By owning half of the value of the Exchanges Notes, which they purchased for a nominal cost, Levona and the Murchinson Entities could ensure that it would receive value from the Debtors who would be forced to make payments to creditors in the bankruptcy proceedings. Either the Murchinson Entities would win in the Arbitration and receive the Preferred Shares, or lose the Arbitration, then force the Debtors into bankruptcy and recoup the value of the Preferred Shares as the Debtors' largest creditors via distributions from the Debtors' estates.

However, Murchinson's hedging strategy was predicated on the incorrect assumption that if the Arbitrator found in favor of the Claimants, the value of the Preferred Shares would transfer to Eletson Holdings. Instead, as found by the Arbitrator, the value of the Preferred Shares was always intended to transfer to the nominees of Eletson Gas and was never intended to inure to the benefit of Eletson Holdings.

Notwithstanding this invalid assumption, on March 7, 2023, the Petitioning Creditors filed the Involuntary Petitions against each of the Debtors initiating the chapter 7 cases.

G.   The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions

On April 20, 2023, the Debtors filed a complaint against defendants Murchinson, Nomis Bay LTD., BPY Limited and certain John Does that sold their Exchange Notes to Nomis Bay, BPY Limited, Pach Shemen, and Alpine Partners (BVI), L.P., seeking redress from the scheme orchestrated by the Murchinson Entities to destroy the value of Eletson Gas and its affiliates through violation of the Second RSA, weaponizing the Exchange Note Trustee and initiating the Chapter 7 Cases (the "Eletson State Court Action").

In the Eletson State Court Action, the Debtors asserted claims for tortious interference of contract breach of contract and declaratory judgment. As stated below, the Eletson State Court Action was removed to the Chapter 7 Cases as a separate adversary proceeding that was ultimately dismissed without prejudice.

## V.   THE CHAPTER 7 CASES

A.   The Involuntary Petitions and Joint Administration Motion

On March 7, 2023, the Petitioning Creditors filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against each of the Debtors (collectively the "Involuntary Petitions"). Attached as exhibits to the Involuntary Petitions are corporate ownership statements for each of the Petitioning Creditors as well as purported evidence of their purchase of outstanding Exchange Notes giving rise to their claims.

On the same day, the Petitioning Creditors filed a motion [Dkt. No. 2] for the joint administration of the Debtors' chapter 7 cases. The motion was approved by an order of the

Bankruptcy Court [Dkt. No. 49] establishing Eletson Holdings, Inc. Case No. 23-10322 as the lead case.

      B.      <u>The Alleged Joinders to the Involuntary Petitions</u>

The chapter 7 cases were initiated by the three Petitioning Creditors. However, eleven additional alleged creditors joined onto the Involuntary Petitions, including the Exchange Note Trustee allegedly pursuant to the alleged direction of holders of over 79% of the Exchange Noteholders. A complete list of the Petitioning Creditors and those who have joined onto the Involuntary Petitions filed by the Petitioning Creditors is annexed hereto as Exhibit 4.

      C.      <u>Motion for Relief from the Automatic Stay and the Stipulated Stay Order</u>

Upon the filing of the Involuntary Petitions the automatic stay was invoked pursuant to section 362 of the Bankruptcy Code staying all actions against the Debtors. As desired by the Murchinson Entities over the vehement protest of the Claimants, on March 10, 2023, the Arbitrator stayed the Arbitration pending further order or notice from the Bankruptcy Court.

On March 13, 2023, the Debtors filed the *Alleged Debtor's Motion for Relief from Stay to Proceed with, or to Confirm the Inapplicability of, the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 5] along with an accompanying memorandum of law and supporting declarations (collectively, the "Lift Stay Documents"). The Lift Stay Documents provided the Bankruptcy Court with the history of the Arbitration and the bad faith actions of Pach Shemen and the Petitioning Creditors who were ultimately working on Murchinson's behalf. Pursuant to the Lift Stay Documents, on March 17, 2023, the Debtors, Levona and the Petitioning Creditors entered into a stipulation [Dkt. No. 23] which laid out the discovery schedule related to the Lift Stay Documents, agreed that the Arbitration was stayed and provided that notwithstanding the staying of the Arbitration the Claimants and Levona would submit all outstanding discovery ordered by the Arbitrator no later than March 20, 2023.

On April 17, 2023, the Bankruptcy Court entered the *Stipulation and Order Granting Alleged Debtor's Motion for Relief From Stay to Proceed With, or to Confirm the Inapplicability of the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 48] (the "Stipulated Lift Stay Order"). The Stipulated Lift Stay Order provided that the automatic stay under section 362 of the Bankruptcy Code was modified "with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals with respect to the claims currently pending in the Arbitration..." *Stipulated Lift Stay Order* at ¶ 3. Further, the Stipulated Lift Stay Order provided that "Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further review of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award. For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court." *Id.* at ¶ 4. Based on the foregoing, the Stipulated Lift Stay Order also imposed an injunction against the disposition of assets subject to the Arbitration.

The Arbitration resumed on April 17, 2023, upon entry of the Stipulated Lift Stay Order.

D.    The Motion to Dismiss and Associated Documents

The Debtors vehemently opposed the filing of the Involuntary Petitions by the Petitioning Creditors.  On April 14, 2023, the Debtors filed the *Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 40] (the "MTD"); *Memorandum of Law in Support of the Alleged Debtors' Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 41]; *Declaration of Louis M. Solomon in Support of the Alleged Debtors' Filed Motions* [Dkt. No. 44]; *Declaration of Vasilis Hadjieleftheriadis in Support of Alleged Filed Motion* [Doc. 42]; and several additional exhibits attached to, and incorporated by reference into, the foregoing (collectively, the "MTD Documents").

The MTD Documents provided the Bankruptcy Court with the various legal and factual bases showing that the Involuntary Petitions were improperly brought by the Petitioning Creditors. As set forth in greater detail in the MTD Documents, the Involuntary Petitions were invalid as:

- The Petitioning Creditors were unable to demonstrate that: (i) they hold claims that are not (a) contingent as to liability, or (b) the subject of a bona fide dispute as to liability or amount, or (ii) the Debtors have generally failed to pay debts that are not subject to a bona fide dispute as they became due;

- The Involuntary Petitions were filed in bad faith because, in addition to failing to satisfy the eligibility criteria, one or more of the Petitioning Creditors: (i) sought to utilize the Bankruptcy Court's jurisdiction as a way to obtain a disproportionate advantage for themselves or their affiliates; (ii) sought to gain leverage over one or more of the Debtors in a way that places their business operations and relationships with other vendors and creditors at potentially fatal risk; (iii) sought to enjoy a tactical advantage in at least one pending action; (iv) were animated by the a desire to embarrass, harass, or spite the Debtors; and (v) filed suspiciously-timed petitions with apparently little preparatory inquiry; and

- Dismissal under section 305(a) was in the overall best interests of the creditor body and the Debtors because, among other reasons: (i) other forums were available to protect the interests of all parties, and actions are already proceeding in those forum; (ii) bankruptcy proceedings were not necessary to reach a just and equitable solution considering the nature of the assets at issue in the Arbitration and the existence of a prepetition action by the Exchange Note Trustee; (iii) it will be needlessly costly and time consuming to start afresh with the federal bankruptcy process; and (iv) the Involuntary Petitions were not filed in good faith.

The Petitioning Creditors as well as joining creditors filed a number of responses to the MTD Documents.  Over the next months the Debtors, Petitioning Creditors and joining parties engaged in discovery and related motion practice regarding evidentiary testimony pursuant to various scheduling orders and stipulations entered by the Bankruptcy Court.  Ultimately no hearing on the MTD Documents was ever held prior to entry of the Conversion Stipulation (defined below).

E.    The Eletson State Court Action is Removed to the Bankruptcy Court

On June 16, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a notice of removal [Dkt. No. 85] removing the Eletson State Court Action from the Supreme Court of the State of New York to the Bankruptcy Court as an adversary proceeding (the "Chapter 7 Adversary Proceeding").

On July 21, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a motion to dismiss the Chapter 7 Adversary Proceeding and accompanying memorandum of law.  Prior to any hearing on the merits, the Chapter 7 Adversary Proceeding was dismissed in accordance with the terms of the Conversion Stipulation.

F.    Mediation and the Conversion Stipulation

Prior to the scheduled hearing on the MTD, on July 31, 2023, upon request of the Debtors, Exchange Note Trustee and the Petitioning Creditors, the Bankruptcy Court entered the *Order Appointing Hon. Allan L. Gropper (Ret.) as Mediator* [Dkt. No. 148] directing these parties towards a non-binding mediation (the "Mediation").  The Mediation was undertaken with respect to: (a) the issues raised in each of (i) the Involuntary Petitions, (ii) the MTD and (iii) each of the Petitioning Creditors and Exchange Note Trustee's objections to the MTD, and (b) such other matters as agreed to by the parties to the Mediation.  The Mediation was to last for four weeks unless a resolution was reached.  On August 29, 2023, the Bankruptcy Court entered a stipulated order [Dkt. No. 185] extending the Mediation to September 7, 2023, or such other date as agreed to by the parties to the Mediation.

As a result of the Mediation, on September 6, 2023, the Debtors, Petitioning Creditors and those creditors who joined the involuntary petitions along with the Exchange Note Trustee entered into a stipulation (the "Conversion Stipulation") which set forth the terms for the voluntary conversion of the Debtors' chapter 7 cases to the Chapter 11 Cases.  The Conversion Stipulation was read into the record at a hearing before the Bankruptcy Court and set forth the following terms:

- Within seven days of the entry of the Conversion Stipulation the Debtors must withdraw the MTD without prejudice;

- The Petitioning Creditors will not object to the conversion of the chapter 7 cases to the Chapter 11 Cases;

- The Petitioning Creditors or people acting in concert with the Petitioning Creditors will not bring a motion to appoint an examiner, a trustee or to limit exclusivity during the first 120 days of the Chapter 11 Cases;

- The Debtors will withdraw the Chapter 7 Adversary Proceeding and agree not to reinitiate that action or the claims therein for the longer of four months or the end of Confirmation Proceedings and vacatur proceedings related to the Arbitration;

- Respective professionals for the Debtors, the Petitioning Creditors and those acting in concert with them agree not to object to the other professionals seeking retention as estate

professionals in the capacity as Debtors' counsel or special counsel or Committee counsel respectively;

- The Debtors agree not to object to a substantial contribution motion on behalf of the Petitioning Creditors up to collectively $1.5 million dollars with the agreement that the Petitioning Creditors may seek additional amounts, and the Debtors and the Petitioning Creditors reserve all rights with regard to such later requests;

- The Petitioning Creditors will not object to or assert rights of recovery against the pre-petition fees of the Debtors' counsel up to a $2 million dollar cap, and all rights are reserved for any amounts about the $2 million dollar cap; and

- The Conversion Stipulation is without prejudice to all causes of action, claims, and defenses that the parties may assert, including without limitation the Debtors' ability to object to claims in the Chapter 11 Cases.

Pursuant to the Conversion Stipulation, on September 13, 2023, the Debtors filed the *Motion to Convert these Cases to Cases Under Chapter 11* [Dkt. No. 201]. On September 25, 2023 (the "Conversion Date") the Bankruptcy Court entered an order [Dkt. No. 215] converting the chapter 7 cases to the Chapter 11 Cases in accordance with the terms of the Conversion Stipulation.

## VI.    THE CHAPTER 11 CASES

Upon conversion of the chapter 7 cases to the Chapter 11 Cases, the Debtors have filed certain substantive motions to obtain relief necessary to allow the Debtors to effectively administer their Estates and maximize distributable value. Since the Conversion Date, in furtherance of the administration of their Estates, the Debtors have: (i) filed their schedules and statements of financial affairs; (ii) filed periodic disclosures pursuant to Bankruptcy Rule 2015.3 and debtor-in-possession monthly operating reports; (iii) filed motions to, (a) establish the Bar Date to determine the complete universe of the Debtors' obligations; (b) officially retain counsel to assist the Debtors in carrying out their duties under the Bankruptcy Code; and (c) enforce previous injunction orders of the Bankruptcy Court, the automatic stay and the Status Quo Injunction for the continued protection of the Debtors' Estates; and (iv) established an Independent Committee to review potential causes of actions of and against the Debtors related to Eletson Gas, the Preferred Shares and the shareholders of Eletson Holdings. Below are summaries of significant filing and developments in the Chapter 11 Cases. As the each of the Debtors are non-operating entities, they do not employ any employees, do not maintain bank accounts or an active cash management system, do not pay taxes and do not otherwise have operations that would require the filing of typical "first day" motions for relief.

A.    <u>Debtors' Filings</u>

1.    <u>Schedules and Statements of Financial Affairs</u>

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on October 10, 2023

[Dkt. Nos. 216-221]. On December 29, 2023, Debtor Eletson Holdings filed an amended Schedule A/B [Dkt. No. 340]. The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the Southern District of New York or can be obtained free of charge from counsel to the Debtors.

2.    Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports

a.    2015.3 Disclosures

On November 20, 2023, the Debtors filed their periodic report pursuant to Bankruptcy Rule 2015.3 [Dkt. No 271] (the "2015 Disclosure"). On the same day the Debtors filed a statement regarding Eletson Holdings' interests in Eletson Gas for purposes of the 2015 Disclosure [Dkt. No. 272], noting that because of Levona's continued attempts to control the board of directors of Eletson Gas, the Debtors were unable to obtain the requisite financial information of Eletson Gas to include in the 2015 Disclosure.

In response to requests by the United States Trustee and a statement from Levona, on November 30, 2023, the Debtors filed an amended 2015 Disclosure [Dkt. No. 298] which included the consolidated financial information of Eletson Gas.

After filing the amended 2015 Disclosure, in response to further requests by the United States Trustee on December 29, 2023, the Debtors filed a second amended 2015 Disclosure [Dkt. No. 341] which included the financial information of additional non-operating subsidiaries of the Debtors which do not have any assets.

3.    Monthly Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these Chapter 11 cases, the Debtors have filed Monthly Operating Reports [Dkt. Nos. 268, 269, 270, 276, 277, 280 325, 326 and 327], and will continue to file such Monthly Operating Reports as required by the Guidelines. Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes, and (e) statement regarding the status of accounts receivable reconciliation and aging.

4.    Claims Bar Date and Review Process

a.    Claims Bar Date

On October 18, 2023, the Debtors filed the *Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Dkt. No 227] (the "Bar Date Motion"). Pursuant to the Bar Date Motion, the Debtors sought to set December 18, 2023 at 4:00 p.m. Eastern Time as the date by which any entity or person other than those specified in the Bar Date Motion holding a prepetition claim against the Debtors, including a claim arising under sections 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) must file a

proof of claim (the "Bar Date") and March 25, 2024 at 4:00 p.m. Eastern Time as the date by which any Governmental Entity as defined in the Bankruptcy Code must file a proof of claim (the "Governmental Bar Date").

On November 6, 2023, the Debtors filed an amended proposed order addressing concerns raised by the Committee.  On November 9, 2023, the Bankruptcy Court entered an order approving the Bar Date Motion (the "Bar Date Order") establishing the Bar Date and Governmental Bar Date as the dates for all persons and entities (other than those excepted pursuant to the Bar Date Motion and Bar Date Order), including governmental units, to file Proofs of Claim for claims arising before the Conversion Date, including Claims arising under section 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  The Bar Date Order further provides that, among other things, any person or entity that is required to file a Proof of Claim in these Chapter 11 Cases but fails to do so in a timely manner shall not be treated as a Creditor with respect to such Claim for purposes of voting and distribution in these Chapter 11 Cases, and such person or entity shall not be permitted to vote to accept or reject any Chapter 11 plan or participate in any distributions thereunder on account of such Claim.

> b.    Claims Review Process

The Debtors are in the early stages of evaluating the numerous Claims filed in these Chapter 11 Cases to determine, among other things, whether it is necessary and appropriate to file objections seeking to disallow, reduce and/or reclassify such Claims.  The Debtors expect to reconcile the Claims against their Schedules in an effort to (a) eliminate duplicative or erroneous Claims and (b) ensure that the Bankruptcy Court allows only valid Claims.

As provided in Article VIII of the Plan, upon the Effective Date, the Litigation Trust and the Litigation Trust Trustee shall have exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims on behalf of the Debtors in respect to Claims in Class 5A and Class 5B.  If the Debtors, the Litigation Trust or the Litigation Trust Trustee, as applicable, objects to a Claim, a hearing regarding such objection will be held and notice of such objection and notice of the related hearing will be provided to affected Claim Holders as well as to other parties entitled to receive notice.  To the extent necessary, the Bankruptcy Court will rule on the objection and ultimately determine whether, and in what amount and priority, to allow the applicable Claim.  If the Debtors, the Litigation Trust or the Litigation Trust Trustee, as applicable, do not object to a Claim by the Objection Deadline, such Claim will be deemed Allowed and will receive the treatment accorded such Claim under the Plan.  As appropriate, the Debtors, the Litigation Trust or the Litigation Trust Trustee, as applicable, may seek to negotiate and/or settle disputes regarding a Claim or Claims as an alternative to filing objections to the allowance or treatment of such Claims.

> 5.    Application for the Retention of Debtors' Counsel

On October 25, 2023, the Debtors filed the *Debtors' Application to Retain and Employ Reed Smith LLP as Counsel to the Debtors and Debtors-in-Possession, Nunc Pro Tunc as of the Conversion Date, Pursuant to 11 U.S.C. §327(a) and Federal Rule of Bankruptcy Procedure 2014* [Dkt. No. 235] (the "Reed Smith Application").  The Reed Smith Application was supported by

the Declaration of Derek J. Baker, Esq. which was attached thereto (as supplemented from time to time the "Baker Affidavit").

On January 5, 2024, after the submission of supplemental Baker Affidavits, and after notice and hearing the Bankruptcy Court entered an order [Dkt. No. 350] approving the Reed Smith Application and authorized the retention of Reed Smith LLP as counsel to the Debtors pursuant to section 327(a) of the Bankruptcy Code.

6.    Motion to Enforce

Over the pendency of the chapter 7 cases and Chapter 11 Cases the Debtors have become aware of several actions taken by Levona and the Murchinson Entities that constituted willful violations of orders of the Bankruptcy Court and the Arbitrator.  On November 27, 2023, the Debtors filed the *Debtors' Motion to Enforce Three Orders Protecting Debtors- the Automatic Stay, Stipulated Stay Relief Order, and Status Quo Injunction – and for Sanctions against Levona Holdings Ltd. Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Dkt No. 289] (the "Motion to Enforce").  The Motion to Enforce seeks redress for the willful violations of the Automatic Stay, Stipulated Lift Stay Order and the Status Quo Injunction.  As set forth in greater detail in the Motion to Enforce, among other actions, Levona has willfully violated the orders of both the Bankruptcy Court and the Arbitrator by, among other things:

- Marketing actively and transacting in the sale of the Telendos vessel, an asset in dispute in the Arbitration and subject to the Final Award;

- Directing unilaterally and without authority one or more of the Eletson entities to undertake fundamental actions "with an eye toward terminating" Eletson Corporation's management of Eletson Gas' vessels and "[c]hang[ing] the method of appointing directors such that Levona is able to appoint them unilaterally and increase the number of directors" which would drastically alter the status quo in violation of the Status Quo Injunction;

- Demanding the financial manager of the Telendos to make substantial and unsubstantiated payments from the Telendos' bank account to a wholly owned subsidiary of Levona;

- Attempting to change the composition of the board of directors of entity that charters the Symi vessel, an asset in dispute in the Arbitration; and

- Commencing two bad faith arbitrations in the London Court of International Arbitration against Eletson Gas.

Given the callous disregard to the automatic stay protecting the Debtor's estates as well as the Stipulated Stay Relief Order and the Status Quo Injunction, the Motion to Enforce appropriately seeks a finding of contempt and an award of sanctions Against Levona.

On December 21, 2023, Levona filed its opposition to the Motion to Enforce [Dkt. No. 332] pursuant to which Levona asserts that it has not violated any order of the Arbitrator or the Bankruptcy Court.  As of the date hereof the Motion to Enforce remains pending.

7.    Establishment of Independent Committee

The Debtors are aware that there may exist claims against certain of the Debtors' shareholders and/or certain of the Debtors affiliates. To ensure that the Debtors were able to disinterestedly evaluate the propriety and strength of any potential cause of action against an affiliate of the Debtors or other person or entity related to the Debtors, on December 11, 2023 the Debtors appointed Panagiotis Konstantaras as a director of Eletson Holdings, and subsequently created an independent committee (the "Independent Committee") comprised of Mr. Konstantaras and filed a notice of the creation of the Independent Committee with the Bankruptcy Court [Dkt. No. 329]. Pursuant to the corporate resolution establishing the Independent Committee, the board of directors of Eletson Holdings authorized and delegated to the Independent Committee, among other things, (i) the full and exclusive authority and power to investigate the matters raised in any written demand on Eletson Holdings to investigate the shareholders of Eletson Holdings or the preferred nominees of Eletson Gas (collectively, a "Demand"), (ii) the authority to determine what, if any, action should be taken by Eletson Holdings in regards to any Demand, and (iii) the authority to take appropriate action the Independent Committee deems necessary to give effect to the foregoing powers. The Independent Committee is represented by separate counsel since its formation has engaged in substantive outreach to the Committee and the nominees of Eletson Gas regarding the existence of potential causes of action.

B.     Appointment of the Committee and the Committee Filings

On October 20, 2023, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee") [Dkt. No. 233]. The following creditors were appointed to the Committee:

(a)     Gene B. Goldstein
(b)     Aegean Baltic Bank S.A.; and
(c)     Wilmington Savings Fund Society, FSB, as Exchange Note Trustee.

1.     Applications for appointment of Committee Professionals

a.     Dechert Retention Application

On November 20, 2023, the Committee filed the *Application of the Official Committee of Unsecured Creditors of Eletson Holdings Inc., Et Al. for an Order Authorizing the Employment and Retention of Dechert LLP as Counsel, Effective as of October 25, 2023* [Dkt. No. 273] (the "Dechert Retention Application"). On January 5, 2024, the Bankruptcy Court entered an order [Dkt. No. 351] authorizing the retention of Dechert as counsel to the Committee over the outstanding objection of a creditor of the Debtors' Estates.

b.     FTI Retention Application

On January 4, 2024, the Committee filed the *Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of December 8, 2023* [Dkt. No. 349] (the "FTI Application"). Pursuant to the FTI Application, FTI Consulting Inc. ("FTI") was to be retained by the Committee for the purpose of, among other things: (i) assisting the Committee in the review of the Schedules and SOFAs and Monthly Operating Reports, (ii) assistance with the assessment and monitoring of

the Debtors' short term cash flow, liquidity and operating results, and (iii) assistance with the review of the Debtors' potential disposition or liquidation of both core and non-core assets.

The FTI Application provided that FTI would be compensated for work performed for the Committee on an hourly basis, with rates ranging from $1,495 an hour to $340 an hour based on the level of seniority and title of the applicable FTI professional. The FTI Application provided for no cap on spending and did not otherwise include any estimates as to the potential costs to the Debtors' Estates incurred during of FTI's retention.

On January 18, 2024, the Debtors filed the *Debtors' Objection to the Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of December 8, 2023* [Dkt. No. 356] (the "FTI Objection"). As set forth in greater detail in the FTI Objection the Debtors believe that the services of FTI as set forth in the FTI Application are unnecessary as the Debtors have no operations, are an excessive burden on the Debtors' Estates given the rates FTI proposes to charge for these Chapter 11 Cases without any upward spending cap, and will do nothing more than increase the administrative burn of the Debtors' Estates to the detriment of all of the Debtors' stakeholders, but most notably to holders of general unsecured claims, the constituency the Committee is charged with representing.

On January 22, 2024 the Committee filed a reply to the FTI Objection [Dkt. No. 365] asserting the retention of FTI was necessary in the Chapter 11 Cases.

As of the date hereof, the Bankruptcy Court has not entered an order approving the FTI Application.

2.    Motion to Modify Previous Order Granting Relief from the Automatic Stay

On November 16, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors to Modify the Court's Prior Order Granting Relief from the Automatic Stay* [Dkt. No 239] (the "Modification Motion") seeking to modify the Bankruptcy Court's previous Stipulated Lift Stay Order which permitted the Arbitration to proceed in light of the automatic stay imposed by the Chapter 7 Cases. As a result of the Stipulated Lift Stay Order and in accordance with the terms thereof, the Final Award had been entered by the Arbitrator and the Confirmation Proceeding was ongoing before the District Court. Notwithstanding the ongoing Confirmation Proceedings, the Committee sought to delay the Debtors' attempts to confirm the Final Award. The Committee wrongly asserted that the Stipulated Lift Stay Order was entered on the premise that the Final Award would inure to the benefit of the Debtors and their Estates. However, as it had become clear that the Final Award would inure to the benefit of the nominees of Eletson Gas, the Committee asserted that the Lift Stay Order must be modified to prevent the fraudulent transfer of the Preferred Shares to Eletson Gas' nominees through (a) staying the Arbitration and Confirmation Proceedings before the District Court and (b) preventing the Debtors from taking any steps to transfer or seek a ruling to transfer any assets of the Debtors including the Preferred Shares.

On November 27, 2023, the Debtors filed their opposition to the Modification Motion [Dkt. No. 286]. As stated therein, the Debtors challenged the propriety of the relief sought in the

Modification Motion noting, among other things, the procedural impropriety of attempting to us the Bankruptcy Court to limit the jurisdiction of the District Court, the failure to seek the relief sought in the Modification Motion in an adversary proceeding, the factual misrepresentations plaguing the Modification Motion and that limiting the scope of the Final Award would cause significant harm to the Debtors, their Estates and their creditors.

On December 1, 2023, the Committee filed a reply in support of the Modification Motion [Dkt. No. 302]. Notwithstanding the additional arguments raised, on January 4, 2024, the Bankruptcy Court issued a memorandum opinion and order [Dkt. No. 348] denying the Modification Motion.

### 3. Interim Compensation Motion

On January 11, 2024 the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 353] (the "Interim Compensation Motion") seeking modification of the compensation procedures set forth in the Bankruptcy Code.

The relief sought in the Interim Compensation Motion is unnecessary given the circumstances of the Chapter 11 Cases, and compliance with the proposed interim compensation procedures would be a costly and unnecessary distraction to the Debtors' reorganization efforts.

On January 18, 2024 the Debtors filed the *Objection to Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 357] ("Interim Compensation Objection") requesting that the court reject the Committee's proposed interim compensation procedures as they are unnecessary in these Chapter 11 Cases and contrary to the explicit terms of the Bankruptcy Code.

On January 22, 2024 the Committee filed a reply to the Interim Compensation Objection [Dkt. No. 364] asserting the interim compensation procedures were necessary in the Chapter 11 Cases.

As of the date hereof, the Bankruptcy Court has not entered an order approving the Interim Compensation Motion.

## VII. ORDERLY DISTRIBUTION OF ASSETS

The purpose of these Chapter 11 Cases is to effectuate an orderly disposition of the assets of the Debtors to holders of Allowed Claims. Accordingly, in consultation with their advisors and the Independent Committee, the Debtors formulated and implemented a strategy to identify and transfer all potential and actual causes of action owned by the Debtors to a Litigation Trust for the pursuit and/or settlement and ultimate liquidation of said causes of action for distribution to the Debtors' noteholders In addition to the transfer of causes of action, the members of Debtor Eletson Holdings will provide, or cause to be provided, a cash contribution in the amount of $10 million for payment of allowed administrative expenses, distributions to the Debtors' remaining creditors, and funding of the Litigation Trust created to pursue the causes of action transferred to the Litigation Trust. The results of such strategy are discussed below.

## VIII.    THE PLAN

    A.    <u>Overview of Chapter 11</u>

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order satisfies any debt of the debtor that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  The Debtors also are required under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes.  The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL, TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.    <u>Purpose of the Plan</u>

The purpose of the Plan is to reorganize the Debtors' outstanding obligations through the liquidation and distribution of the proceeds of valuable Causes of Action belonging to the Debtors and distributing a new money contribution provided by the Eletson Holdings Members. The Plan provides for transfer of the Debtors' causes of action to a Litigation Trust that is established in accordance with the terms of the Plan and the Litigation Trust Agreement. The Litigation Trust will be managed by the Litigation Trust Trustee who, subject to the oversight of the Litigation Trust Oversight Committee, will initiate, pursue, and otherwise liquidate the value of the Litigation Trust Causes of Action for the benefit of Holders of Claims in Class 5A who elect to receive Litigation Trust Interests in lieu of the Exchange Note Recovery and Holders of Claims in Class 5B. After payment of Administrative Expenses and funding of the reserves called for in the Plan, the Debtors' remaining creditors entitled to recovery under the Plan will receive their applicable distribution from the Shareholder New Value Contribution, a $10 million contribution of Cash and/or assets provided by or caused to be provided by the Eletson Holdings Members. The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims. For purposes of this Disclosure Statement, the term Holder refers to the holder of a Claim or Interest in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect of certain Classes of Claims as provided in the Plan.

C.      Classification and Treatment of Claims

       1.      Classification and Treatment of Claims and Interests

           a.      Unclassified Claims

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims.

              i.      Administrative Claims

Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims)

The Distributing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Distributing Agent. Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date. All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees. Holders of Allowed Administrative Claims are required to file a request for Administrative Claims prior to the Administrative Bar Date.

              ii.      Professional Fee Claims and Committee Professional Fee Claims

Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date. Prior to the Effective Date the Debtors may pay any Committee Professional Fees, which the Bankruptcy Court has allowed, up to a maximum amount of $1,500,000 in the aggregate for all Committee Professional Fee Claims which are allowable or allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date. From and after the Effective Date, the Distributing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case; provided however, in no

event shall the payments of Committee Professional Fees since the Conversion Date exceed $1,500,000 in the aggregate.

On the Effective Date, any objections previously filed to any applications for payment of the Professional Fees shall be deemed withdrawn (with prejudice) on the Effective Date. Further, after the occurrence of the Effective Date, so long as of the aggregate Committee Professional Fees do not exceed $1,500,000, neither the Debtors, the Distributing Agent, the Reorganized Debtor, the Litigation Trust, Litigation Trust Trustee nor the Litigation Trust Oversight Committee shall assert any objection to any Committee Professional Fee Claims.

Any final application for allowance of a Professional Fee Claims and Committee Professional Fee Claims for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, counsel for the Litigation Trust, the Litigation Trust Trustee and on the United States Trustee at the addresses listed in Article XI.L of this Plan so that it is received no later than forty-five (45) days after the Effective Date. In the event an application for allowance of a Professional Fee Claims and Committee Professional Fee Claims is not filed by the appropriate date, such Professional Fee Claims and Committee Professional Fee Claims shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trust Trustee and their successors, their assigns or their Assets. Allowed Professional Fee Claims and Committee Professional Fee Claims must be paid in full (subject to the limitation on the Committee Professional Fees in paragraph above) and Professional Fee Claims and Committee Professional Fee Claims pending allowance by the Bankruptcy Court must be reserved for in full prior to any payment to Holders of Allowed Claims in (a) Class 3 (Azure Guaranty Claims), (b) Class 4 (Trade Creditor Claims); (c) Class 5A (Non-Petitioning Creditor Exchange Note Claims); and (d) Class 5B (Petitioning Creditor Exchange Note Claims).

b.    Classified Claims

*Class 1: OCM Guaranty Claims (Impaired)*

*Classification*: Class 1 consists of all Allowed OCM Guaranty Claims.

*Treatment*: Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees.

*Voting*: Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

*Class 2: Corp Guarantee Claims (Impaired)*

*Classification*: Class 2 consists of all Corp Guaranty Claims.

*Treatment*: Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.

*Voting*: Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

### Class 3:  Azure Guaranty Claims (Impaired)

*Classification*: Class 3 consists of the Azure Guaranty Claims.

*Treatment*: Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Distributing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.

*Voting*: Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

### Class 4: Trade Creditor Claims (Impaired)

*Classification*: Class 4 consists of the Trade Creditor Claims.

*Treatment:*  Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, the Distributing Agent shall pay to the Trade Creditors, by wire transfer of immediately available funds, their Pro Rata portion of the Trade Creditor Recovery.

*Voting*: Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

### Class 5A:  Non-Petitioning Creditor Note Claims

*Classification*: Class 5 consists of all Allowed Non-Petitioning Creditor Exchange Note Claims and Old Note Claims.

*Treatment*: Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5A Claim shall elect to receive in full settlement, release, and satisfaction of, of such Allowed Class 5A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter: at the exclusive election of the Holder of an Allowed Class 5A Claim either  (i) their Pro Rata portion of the Exchange Note Election Recovery or (ii) their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan

*Voting*: Class 5A is Impaired and Holders of Class 5A Claims are entitled to vote to accept or reject the Plan.

## Class 5B: Petitioning Creditor Exchange Note Claims

*Classification*: Class 5B consists of all Allowed Petitioning Creditor Exchange Note Claims.

*Treatment*: The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.   To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all claims in Class 5A.   In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 5A Non-Petitioning Creditor Exchange Note Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5B Claim shall receive in full settlement, release, and satisfaction of, of such Allowed Class 5B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.

*Voting*: Class 5B is Impaired and Holders of Class 5B Claims are entitled to vote to accept or reject the Plan

## Class 6:  Interests (Unimpaired)

*Classification*: Class 6 consists of all Interests.

*Treatment*: On the Effective Date, and in exchange for the Shareholder New Value Contribution, all Interests and Intercompany Interests shall be deemed reinstated and otherwise in full effect and force as on the Petition Date, provided that the Holder of the Interests and Intercompany Interests to be reinstated has provided Cash and/or assets to the aggregate value of the Shareholder New Value Contribution.

*Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Interests are presumed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code.   Therefore, the Holders of Class 6 Interests are not entitled to vote to accept or reject the Plan.

D.    Acceptance and Rejection of the Plan

1.    Voting Classes

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on the Plan, Holders of Claims in Class 1 (OCM Guaranty Claims), Class 2 (Corp Guaranty Claims) Class 3 (Azure Guaranty Claims), Class 4 (Trade Creditor Claims), Class 5A (Non-Petitioning Creditor Exchange Note Claims) and Class 5B (Petitioning Creditor Exchange Note Claims) shall be entitled to vote to accept or reject the Plan.  If and to the extent any Class identified as being not Impaired is Impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), such Class shall be entitled to vote to accept or reject the Plan.

2.    Classes Presumed to Accept the Plan

Class 6 (Interests) are unimpaired by the Plan.  Pursuant to Bankruptcy Code § 1126(f), Class 6 is conclusively presumed to have accepted the Plan, and the votes of Holders of Interests in Class 6 will therefore not be solicited.

3.    Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

4.    Elimination of Vacant Classes; Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan

5.    Non-Consensual Confirmation

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code.  The Debtors reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XI.K of the Plan.

6.  Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.  Means for Implementation of the Plan

1.  Implementation of the Plan and Sources of Consideration for Plan Distributions

The Debtors and Reorganized Debtor as applicable will fund distributions and other sources and uses contemplated by the Plan with (1) the Shareholder New Value Contribution, and (2) the transfer and assignment of the Litigation Trust Assets, which include the Litigation Trust Causes of Action and Distributable Cash, to the Litigation Trust.

a.  The Shareholder New Value Contribution

The Debtors propose to implement and consummate the Plan on and after the Effective Date. Within ten (10) Business Days of entry of the Confirmation Order, the Eletson Holdings Members shall contribute, or cause to be contributed, to Eletson Holdings the full amount of the Shareholder New Value Contribution which shall be a contribution of Cash and/or assets in an aggregate value of $10 million dollars.

The Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims and the Committee Professional Fee Claims including the funding any reserves on account of the Professional Fee Claims required by the terms of this Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Trade Creditor Recovery; and *fifth*, to fund the Exchange Note Election Recovery.

b.  Distributable Cash

Immediately upon the satisfaction of the payments provided for in Article IV.A.1 of the Plan, the remaining Shareholder New Value Contribution shall become the Distributable Cash which shall be transferred to the Litigation Trust in accordance with the terms of the Plan and the Litigation Trust Transfer Agreement.

c.  Litigation Trust Causes of Action

On the Effective Date, the Debtors, shall fully and finally transfer and or assign each of their respective Litigation Trust Causes of Action to the Litigation Trust which shall become the Litigation Trust Causes of Action.

Litigation Trust Distributable Proceeds will be obtained from the Distributable Cash and the Litigation Trust Causes of Action.  Unless otherwise specified herein, Cash payments to be made pursuant to the Plan will be made by the Disbursing Agent.

2.        Substantive Consolidation

a.        Order Granting Plan Consolidation

The Plan contemplates entry of the Confirmation Order effectuating the Plan Consolidation. Unless and to the extent previously approved by a prior order of the Bankruptcy Court, at the Confirmation Hearing, the Court will consider approval under the Plan of the Plan Consolidation.

b.        Plan Consolidation

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be on Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of this section shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been effected.  This compromise and settlement is in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.        Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtor Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement,

on and after the Effective Date, each Debtor shall be deemed to merge with and into the Reorganized Debtor, with the Reorganized Debtor being the sole surviving entity and the separate existence of the Consolidating Debtors shall cease and only the Reorganized Debtor shall continue to exist and as a separate corporation, with all the powers of a corporation pursuant to the applicable Liberian law and pursuant to the respective certificate of incorporation and bylaws in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### 4.    Vesting of Assets in the Reorganized Debtor

Except for the Litigation Trust Causes of Action as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Litigation Trust Agreement), on the Effective Date, pursuant to the Plan all property in each Estate, and any property acquired by any of the Debtors, including Intercompany Interests held by the Debtors in non-Debtor subsidiaries, shall revest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 5.    Reorganized Debtor Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtor will file such Reorganized Debtor Organizational Documents as are required to be filed with the applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtor may amend and restate the Reorganized Debtor Organizational Documents, and the Reorganized Debtor may file the certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the country of incorporation and the Reorganized Debtor Organizational Documents.

### 6.    Appointment of Directors and Officers of the Reorganized Debtor

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement the identity and any affiliations of any Person proposed to serve on as a Director or officer of the Reorganized Debtor, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

### 7.    Exemption for Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

8.    <u>Creation of Litigation Trust</u>

The Plan contemplates the transfer of the Litigation Trust Assets into the Litigation Trust for distribution of the Litigation Trust Distributable Proceeds to Holders of Litigation Trust Interests.

On the Effective Date, the Reorganized Debtor (solely in its capacity as successors to the Debtors) and the Litigation Trust Trustee shall execute the Litigation Trust Agreement and the Litigation Trust Transfer Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, which shall be for the benefit of the Litigation Trust Beneficiaries. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to (a) Litigation Trust Interests and (b) the Litigation Trust Expenses as provided for in the Plan and the Litigation Trust Agreement. Also on the Effective Date, subject to, in all respects, the terms of the Litigation Trust Transfer Agreement, all Debtor Privileges shall transfer to and vest exclusively in the Litigation Trust.

The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trust Trustee. The powers, rights, and responsibilities of the Litigation Trust Trustee shall be specified in the Litigation Trust Agreement. The Litigation Trust Trustee shall hold and distribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trust Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement and the Litigation Trust Transfer Agreement.

After the Effective Date, the Debtors and the Reorganized Debtor shall have no interest in the Litigation Trust Assets except to the extent set forth in the Litigation Trust Agreement. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtor and the Litigation Trust Trustee or Litigation Trust as applicable shall be deemed to have been designated as a representative of the Reorganized Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtor for the benefit of the Litigation Trust Beneficiaries. Notwithstanding the foregoing, all net

proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed in accordance with the Plan.

The Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Litigation Trust Trustee and to ensure the treatment of the Litigation Trust as a liquidation trust for federal income tax purposes, all consistent with the Plan.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall have no obligation to provide any funds or financing to the Litigation Trust, other than the obligation to contribute the Litigation Trust Assets and the initial funding of the Administrative Fund, and under no circumstances will the expenses of the Litigation Trust be paid or reimbursed by the Debtors or the Reorganized Debtor, as applicable.

The Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that within a period of three (3) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest may extend the term of the Litigation Trust if it is necessary to facilitate or complete the distribution of the Litigation Trust Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Litigation Trust Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidation trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

9.    Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Litigation Trust Trustee will take this position on the Litigation Trust's tax return accordingly. The Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, and (b) a second-step transfer by Litigation Trust Beneficiaries. As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction, and the Debtors should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust Trustee shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors, Litigation Trust Trustee, and the Holders of Claims receiving Litigation Trust Interests shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

10.    Liabilities of the Litigation Trust

The liabilities transferred to the Litigation Trust shall include all Litigation Trust Interests and the Litigation Trust Expenses.

In accordance with Article IV.I, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust to make the payments required to Litigation Trust Beneficiaries pursuant to the Plan and the Litigation Trust Agreement.

11.    Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee

The Debtors shall appoint the Litigation Trust Trustee who shall have the power to administer the Litigation Trust and will be advised by the Litigation Trust Oversight Committee as specified in the Plan and the Litigation Trust Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement the identity and any affiliations of the Litigation Trust Trustee and any Person proposed to serve on the Litigation Trust Oversight Committee, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

The Debtors and the Litigation Trust Trustee shall enter into a Litigation Trust Agreement in substantially the form which shall be filed with the Bankruptcy Court with the Plan Supplement. On the Effective Date, and upon the establishment of the Litigation Trust the Litigation Trust Trustee shall succeed in all respects to all of the rights, privileges and immunities of the Debtors in regard to the Litigation Trust Causes of Action and the Debtor Privileges and shall be appointed as the sole party with standing to pursue Litigation Trust Causes of Action on behalf of the Debtors as of the Effective Date.  The Litigation Trust Trustee, and his/her successors, shall serve until the earlier of (i) the later to occur of (a) the entry of the Final Decree, (b) the dissolution of the Litigation Trust, and (c) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan; or (ii) the expiration of the term of such Litigation Trust Trustee's employment agreement or such Litigation Trust Trustee's resignation, death, incapacity, removal or termination by the Litigation Trust Oversight Committee pursuant to the Litigation Trust Agreement or order of the Bankruptcy Court.

As set forth in the Plan, the pursuit and collection of the Litigation Trust Causes of Action and distribution of the proceeds thereof to the Litigation Trust Beneficiaries shall become the responsibility of the Litigation Trust Trustee who shall thereafter have responsibility for the management, control and operation thereof, and who may use, acquire and dispose of property of the Litigation Trust free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the terms of the Plan and the Litigation Trust Agreement.

Upon creation of the Litigation Trust, the Litigation Trust Trustee shall be the trustee of the Litigation Trust for all purposes and in all respects, with all necessary and appropriate power to act for, on behalf of and in the name of the Litigation Trust.

12.    Cooperation and Privilege

To effectively investigate, prosecute, compromise, and/or settle the Litigation Trust Causes of Action on behalf of the Litigation Trust, the Litigation Trust Trustee and its counsel and representatives may require reasonable access to documents and information exclusively relating to the Litigation Trust Causes of Action in the possession of the Debtors, the Reorganized Debtor, and/or the Committee.  Accordingly, the Litigation Trust Transfer Agreement shall provide for the Litigation Trust Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtor) and the Committee's records and information relating to the Litigation Trust Causes of Action, including electronic records or documents, as further detailed in, and subject in all respects to, the Litigation Trust Transfer Agreement.  The Litigation Trust Transfer Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Litigation Trust Transfer Agreement, the Debtor Privileges, and privileges held by the Committee (if any) shall transfer to and vest exclusively in the Litigation Trust, and that the Reorganized Debtor shall preserve all of the Debtors' records and documents (including all electronic records or documents) exclusively related to the Litigation Trust Causes of Action for the later of a period of three (3) years after the Effective Date or until such later time as the Litigation Trust Trustee notifies the Reorganized Debtor in writing that such records are no longer required to be preserved.

13.    Duties of the Litigation Trust Trustee

In addition to the duties set forth elsewhere in the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement, and herein, shall have the following duties.

a.    to manage, control and operate the Litigation Trust;

b.    to investigate and, if necessary and appropriate, to prosecute and enforce (or not prosecute or enforce), or to compromise, release or settle any Litigation Trust Causes of Action on behalf of the Estate and the Litigation Trust without further approval of or application to the Bankruptcy Court;

c.    to invest any Cash and the Litigation Trust Assets;

d.    to file any and all reports, pleadings, tax returns and other documents;

e.    to pay any and all distributions required or permitted to be made under the Plan;

f.    to pay out of the Litigation Trust any and all Claims, liabilities, losses, damages, costs and expenses incurred in connection therewith or as a result thereof, including all Post-Confirmation Expenses accruing from and after the Effective Date in accordance with the Administrative Budget;

g.    to employ, supervise and compensate any employees of the Litigation Trust;

h.    to make and file tax returns for the Litigation Trust;

i.      to commence and pursue dissolution or winding up of proceedings for the Litigation Trust;

j.      to file, prosecute, compromise and settle objections to Claims without further approval of or application to the Bankruptcy Court, except as otherwise provided herein;

k.      to prepare and deliver to the Litigation Trust Oversight Committee for approval the Administrative Budget of the Litigation Trust with respect to each six-month period following the initial Administrative Budget and any amendments or modifications thereto; and

l.      to request the entry of a Final Decree.

In connection with the execution of his or her duties under the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement and herein, shall be authorized:

a.      to execute such documents and to take such other actions as are necessary to effectuate the Plan and perform his or her duties as a trustee of the Litigation Trust, including to execute such documents and take such other action on behalf of the Litigation Trust;

b.      to open, close and manage bank accounts, and to enter into business transactions within or without the ordinary course of business;

c.      to retain and pay professionals (including the Professionals or the Committee Professionals) or other Persons to assist the Litigation Trust Trustee in the administration of the Litigation Trust, without prior Bankruptcy Court approval;

d.      to incur any reasonable and necessary expenses (up to the amounts set forth in the Administrative Budget) in the performance of his or her duties as Litigation Trust Trustee;

e.      to compromise, release or settle any Disputed Claim or Litigation Trust Cause of Action or to sell or dispose of any Litigation Trust Asset; and

f.      to employ such other procedures, not inconsistent with the Plan, necessary for the Litigation Trust Trustee to perform his or her duties hereunder.

The Litigation Trust Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code (including, without limitation, commencing, prosecuting or settling Litigation Trust Causes of Action and asserting claims, defenses, offsets and privileges), to the extent not inconsistent with the Plan.  In discharging the foregoing responsibilities, the Litigation Trust Trustee shall be entitled to exercise and rely upon his or her business judgment in consultation with the Litigation Trust Oversight Committee.  The Litigation Trust Trustee shall not be obligated to take any action or to pursue any Litigation Trust Causes of Action unless justified in his or her reasonable determination by fact and law, nor shall the Litigation Trust Trustee be obligated to take any action that could reasonably cause him or her personal liability.  Without limiting the generality of the foregoing, the Litigation Trust Trustee

may consider the interests of Holders of Litigation Trust Interests in receiving prompt distributions and such other factors as may be reasonable in the exercise of his or her business judgment.  Such authorization and benefits shall also extend to any, each and every successor Litigation Trust Trustee, without reservation or limitation.

The Litigation Trust Trustee, at the direction of the Litigation Trust Oversight Committee, may expend the Cash of the Litigation Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during the administration thereof, (b) to pay the respective reasonable administrative expenses (including, but not limited to, any United States Trustee Quarterly Fees, Litigation Trust Trustee fees, professional fees, and taxes imposed on the Litigation Trust), and (c) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.

14.    Post Confirmation Expenses

Prior to the Effective Date, the Debtors shall approve the Administrative Budget for the six (6) month period beginning on the Effective Date for professional fees for services to be rendered to the Litigation Trust, which Administrative Budget may be altered from time to time by the Litigation Trust Trustee with the consent of the Litigation Trust Oversight Committee in accordance with the Litigation Trust Agreement provided that any fees and expenses of professionals retained by the Litigation Trust that have been incurred prior to the date of the modification of the Administrative Budget shall constitute budgeted amounts.  The Litigation Trust Oversight Committee shall approve in advance the Litigation Trustee's retention of professionals and their compensation arrangements.

On the Effective Date, the Litigation Trust Trustee shall establish the Administrative Fund. The initial amount of the Administrative Fund shall be based on the Litigation Trust Trustee's good faith estimate of the cost necessary to complete the Litigation Trust's obligations under this Plan and the Litigation Trust Agreement and will include the amount budgeted for the Litigation Trust's professionals provided however, the initial Administrative Fund shall not exceed the amount of $20,000 necessary to commence and/or pursue and Litigation Trust Causes of Action as of the Effective Date.  The Litigation Trust shall pay all Litigation Trust Expenses related to carrying out its obligations under this Plan and the Litigation Trust Agreement from the Administrative Fund and, in the Litigation Trust Trustee's discretion, and with approval of the Litigation Trust Oversight Committee, may add additional amounts of Cash held by the Litigation Trust to the Administrative Fund to further the prosecution of the Litigation Trust Causes of Action or for administration and other miscellaneous needs of the Litigation Trust without further notice or motion in accordance with the terms of the Litigation Trust Agreement.

The reasonable and necessary fees and actual and necessary expenses of the Litigation Trust Trustee, the Litigation Trust Oversight Committee and the professionals retained by the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall be paid solely by the Litigation Trust Trustee in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or

Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

15.    <u>Liability; Indemnification</u>

Neither the Litigation Trust Trustee nor any member of the Litigation Trust Oversight Committee shall be liable for any act or omission taken or omitted to be taken in his or her capacity as Litigation Trust Trustee or as a member of the Litigation Trust Oversight Committee, as the case may be, other than acts or omissions resulting from the Litigation Trust Trustee's or Litigation Trust Oversight Committee member's willful misconduct, gross negligence or fraud.  The Litigation Trust Trustee and the Litigation Trust Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their respective attorneys, accountants, financial advisors and agents, and the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons other than acts or omissions resulting from the willful misconduct, gross negligence or fraud of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be.

Notwithstanding such authority, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be under any obligation to consult with their respective attorneys, accountants, financial advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, and their respective designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Litigation Trust shall indemnify and hold harmless the Litigation Trust Trustee, the Litigation Trust Oversight Committee and their respective designees and professionals, and all duly designated agents and representatives (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, but not limited to, attorneys' fees and costs) arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of the duties of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, or the implementation or administration of the Plan; <u>provided</u>, <u>however</u>, that no such indemnification will be available to such Persons for such actions or omissions if a court of competent jurisdiction has determined by Final Order that the challenged conduct occurred as a result of willful misconduct, gross negligence or fraud.

16.    <u>Dissolution of the Committee</u>

Upon the Effective Date, the Committee shall dissolve automatically whereupon its members, Committee Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective

orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Committee Professional Fee Claims; and (iii) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Committee members and the Committee Professionals shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

17. <u>Litigation Trust Oversight Committee</u>

On the Effective Date, the Litigation Trust Oversight Committee shall have the duties set forth herein to maximize distributions to Litigation Trust Beneficiaries. On the Effective Date, the Litigation Trust Oversight Committee shall be entitled to the rights, powers, immunities and privileges of the Committee.

The Litigation Trust Oversight Committee shall have the duty to take actions in accordance with the provisions of the Plan and in furtherance of the execution of the Plan. Additionally, the Litigation Trust Oversight Committee shall have the following rights and duties:

a. to approve any release or indemnity in favor of any third party granted or agreed to by the Litigation Trust Trustee;

b. to authorize the Litigation Trust Trustee to commence any Litigation Trust Cause of Action;

c. to approve the settlement of any Litigation Trust Cause of Action and to approve any application by the Litigation Trust Trustee for an order in connection with any such settlement;

d. to approve the allowance of any Disputed Claim;

e. to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

f. to review and assert objections to motions filed or Claims asserted by Holders of Class 5A Claims and Class 5B Claims;

g. to monitor distributions to Holders of Litigation Trust Interests;

h. to take such other actions as it deems necessary and appropriate with respect to the implementation of the Plan;

i. to approve the Litigation Trust Trustee's retention of professionals;

j.        to remove the Litigation Trust Trustee in accordance with the procedures in the Litigation Trust Agreement; and

k.        to approve the Administrative Budget after the Effective Date.

The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the later to occur of (i) the entry of the Final Decree, (ii) the dissolution of the Litigation Trust, and (iii) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan

The Litigation Trust Oversight Committee shall have the right but shall not be required to retain counsel of its choice, and the reasonable and necessary fees and expenses of such counsel shall be paid by the Litigation Trust from the Administrative Fund.  The reasonable and necessary fees and expenses of counsel to the Litigation Trust Oversight Committee shall be paid in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

18.        Good Faith

Each of the Litigation Trust Trustee and Litigation Trust Oversight Committee shall act in good faith in carrying out its duties and responsibilities and use its best efforts to pursue or settle the Litigation Trust Causes of Action and maximize the value of the Litigation Trust Assets and minimize claims against the Litigation Trust.

19.        Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

20.        Issuance of Documents Necessary to Consummate the Plan

On or as soon as practicable after the Effective Date, the Debtors shall execute and deliver such other agreements, documents and instruments, as necessary to effectuate the Plan.

21.        Final Decree

Upon the Litigation Trust Trustee's determination that all applicable Class 5A Claims and all Class 5B Claims have been Allowed, Disallowed, expunged or withdrawn, and that all Litigation Trust Causes of Action held by the Litigation Trust or the Litigation Trust Trustee, as applicable, have been finally resolved, transferred, or abandoned, the Litigation Trust shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code closing the Chapter 11 Cases.  The Litigation Trust may request the entry of the Final Decree notwithstanding the fact that not all Litigation Trust Assets have been monetized and distributed to the Holders of applicable Allowed Class 5A Claims and Class 5B Claims.

F.    Retained Causes of Action

1.    Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf of the Debtors and the Estates to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all Causes of Action transferred to the Litigation Trust, whether such Causes of Action accrued before or after the Petition Date.

Except as otherwise provided in the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the respective Debtors, and the Litigation Trust may hold against any Person shall vest in the Litigation Trust.  Upon the Effective Date and subject to the terms of the Litigation Trust Transfer Agreement the Causes of Action shall become the Litigation Trust Causes of Action.  The Litigation Trust Trustee, on behalf of the Litigation Trust, shall retain and may exclusively enforce any and all such Claims, rights or Litigation Trust Causes of Action, and commence, pursue and settle the Litigation Trust Causes of Action in accordance with the Plan and the Litigation Trust Agreement as applicable, subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee.  The Litigation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Litigation Trust Causes of Action without the consent or approval of any third party and without any further order of court subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee as required by the Litigation Trust Agreement.

2.    Preservation of Causes of Action

Except as otherwise expressly provided in the Plan, from and after the Effective Date, the Litigation Trust and the Litigation Trust Trustee, subject to any approval of the Litigation Trust Oversight Committee as set forth in Article IV.Q of the Plan, may litigate or settle any Avoidance Action, recovery or subordination actions under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 or 724 of the Bankruptcy Code or any other Causes of Action or rights to payments or claims that belong to the Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, no other Person may pursue any such Avoidance Actions, recovery or subordination actions or other Causes of Action that belong to the Debtors or the Litigation Trust Causes of Action unless otherwise provided by order of the Bankruptcy Court.

To the extent any such Claim has not independently been reviewed by the Independent Committee and/or otherwise settled prior to the Effective Date, the Litigation Trust Trustee shall perform an independent investigation regarding whether any potential Litigation Trust Causes of Action, shall be investigated or pursued.  It is possible that there may be other Causes of Action which currently exist or may subsequently arise that are not set forth herein, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and, as a result, cannot be specifically referred to herein (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Causes of Action herein is not intended to limit the rights of the Litigation Trust to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors or the Litigation Trust Trustee.

3.      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Cause of Action for later adjudication by the Litigation Trust, (including, without limitation, Unknown Causes of Action), and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or other Final Order. In addition, the Debtors, the Litigation Trust and any successor entities under the Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from Debtors or a transfer of money or property from the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Litigation Trust, as applicable, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a Proof of Claim against the Debtors in these Bankruptcy Cases; (ii) such Creditor's Proof of Claim has been objected to; (iii) such Creditor's Claim was included in the Debtors' Schedules; or (iv) such Creditor's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

G.      Treatment of Executory Contracts and Unexpired Leases

1.      Rejection of Executory Contracts or Unexpired Leases

On the Effective Date, except for any executory contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, each executory contract that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Bankruptcy Code §§ 365 and 1123, effective as of the Confirmation

Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code §§ 365 and 1123 as of the Confirmation Date.

  2.  <u>Rejection Damages Bar Date</u>

Except to the extent another Claims Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of executory contracts under the Plan must be filed with the Court, and a copy served on counsel for the Debtors and the Litigation Trust Trustee, within fifteen (15) days of the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Reorganized Debtor, the Litigation Trust, the Litigation Trust Trustee, their successors, their assigns or their Assets.  Any timely filed Claim arising from the rejection of an executory contract shall be treated as a Claim in Class 4 (Trade Creditor Claims).  Nothing in the Plan extends or modifies any previously applicable Claims Bar Date.

  H.  <u>Provisions Governing Distributions</u>

  1.  <u>Disbursing Agent</u>

    a.  <u>Litigation Trust Trustee as Disbursing Agent for Class 5A Claims and Class 5B Claims</u>

The Reorganized Debtor shall be the Disbursing Agent for any payments made to parties other than Litigation Trust Beneficiaries.  The Litigation Trust Trustee shall be the Disbursing Agent, and the Disbursing Agent shall make all distributions to all Litigation Trust Beneficiaries under the Plan after the Effective Date.

    b.  <u>Alternative Disbursing Agent Qualifications</u>

Other than as set forth in the Plan, after the Effective Date no Person other than the Litigation Trust Trustee shall be authorized by the Bankruptcy Court to serve as Disbursing Agent unless and until the Litigation Trust Oversight Committee consents in writing to that Person serving as Disbursing Agent, and that Person (i) executes and files a statement with the Bankruptcy Court agreeing to perform all of the duties of the Disbursing Agent under the Plan, and (ii) consents to the jurisdiction of the Bankruptcy Court in respect to all matters relating to the performance of his or her duties as the Disbursing Agent under the Plan or order of the Bankruptcy Court.

  2.  <u>Time and Manner of Distributions</u>

The Disbursing Agent shall make Distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable after the Effective Date, except as otherwise agreed to by the Litigation Trust Oversight Committee or by order of the Bankruptcy Court.  The Litigation Trust Trustee as Disbursing Agent shall have the power, subject to Litigation Trust Oversight Committee consent, to make interim distributions to Litigation Trust Beneficiaries in accordance with the Plan if the Litigation Trust Trustee determines that such interim distributions are warranted and economical.  If the Litigation Trust Trustee determines to make interim distributions to Litigation Trust Beneficiaries, the Litigation Trust Trustee will determine the amount to be distributed by taking into account such factors as ongoing expenses and costs,

taxes and reserves necessary to provide for the resolution of Disputed Claims. Amounts withheld will be placed in an interest-bearing account approved by the Litigation Trust Oversight Committee, which shall fund ongoing expenses and costs relating to such reserves, including, without limitation, taxes in respect of Disputed Claims, if any.

At the option of the Disbursing Agent, except as otherwise provided in the Plan, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $50.00 will be considered de minimis, and Holders of Allowed Claims that are entitled to any distribution of less than $50.00 will not receive any distribution unless and until the aggregate of such distributions exceed $50.00. Such undistributed funds shall remain with and vest in the Litigation Trust for distribution to other Holders of Allowed Claims.

3.     Interest of Claims

Except as otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

4.     Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Litigation Trust and Litigation Trust Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

5.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

a.     Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the addresses set forth on the Proof of Claim or Interest filed by such Holder (or at the last known address of such Holder if no motion requesting payment or Proof of Claim or Interest is filed or the Debtors and the Litigation Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Litigation Trust Trustee or the Debtors as applicable after the date of any related Proof of Claim or Interest, or (iii) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been filed and the Litigation Trust Trustee or the Debtors have not received a written notice of a change of address.

b.     Undeliverable Distributions

i.  <u>Holding of Undeliverable Distributions</u>

If any distribution to a Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until notification in writing of such Holder's then-current address is provided. Undeliverable distributions shall be returned and shall remain in the possession of the Litigation Trust until such time as a distribution becomes deliverable. Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Litigation Trust shall make all distributions that become deliverable.

ii.  <u>Failure to Claim Undeliverable Distributions</u>

Any Holder of an Allowed Claim (irrespective of when a Claim became an Allowed Claim) that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within ninety (90) days after the distribution has been attempted to be made to the Holder of the Allowed Claim shall have its Claim related to such undeliverable distribution satisfied and shall be forever barred from asserting any such Claim against the Litigation Trust or be entitled to a further distribution. In such cases, any Cash held for distribution on account of such Claims shall be the property of the Litigation Trust free of any such Claim. Nothing contained herein shall require the Litigation Trust Trustee or any interested party to attempt to locate any Holder of an Allowed Claim.

6.  <u>Claims Administration Responsibility</u>

a.  <u>Reservation of Rights to Object to Claims</u>

Except as provided in Article II.B of the Plan, for the avoidance of doubt, nothing in Article VII.F of the Plan shall affect the rights, if any, of any interested party to object to any Claim or Interest before the Effective Date. Unless a Claim or Interest is expressly described as an Allowed Claim or Interest pursuant to or under this Plan, or otherwise becomes an Allowed Claim or Interest prior to Effective Date, the Debtors reserve any and all objections to any and all Claims and Interests and motions or requests for the payment of Claims or Interests, whether administrative expense, priority, secured or unsecured, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' failure (as applicable) to object to any Claim or Interest in the Chapter 11 Case shall be without prejudice to the Debtors' rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim or Interest is sought to be enforced by the Holder of such Claim or Interest prior to the Effective Date. After the Effective Date, the Litigation Trust through the Litigation Trust Trustee reserves any and all objections to applicable Class 5A Claims whose Holders elect to receive Pro Rata distribution of Litigation Trust Interests and Class 5B Claims. The Litigation Trust's failure to object to any Class 5A Claim or Class 5B Claim shall be without prejudice to Litigation Trust's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the Holder of such Claim.

b.  <u>Objections to Class 5A Claims and Class 5B Claims</u>

After the Effective Date the Litigation Trust Trustee shall be responsible for administering, disputing, objecting to, compromising or otherwise resolving and making distributions, if any,

with respect to applicable Class 5A Claims whose Holders elect to receive Pro Rata distribution of Litigation Trust Interests and Class 5B Claims.  Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to applicable Class 5A Claims and Class 5B Claims will be filed and served not later than the Objection Deadline.  In addition, the Litigation Trust Trustee may request (and the Bankruptcy Court may grant) an extension of such deadline by filing an ex parte motion with the Bankruptcy Court, based upon a reasonable exercise of his or her business judgment.  A motion seeking to extend the deadline to object to applicable Class 5A Claims and Class 5B Claims shall not be deemed an amendment to the Plan.

> c.     Filing of Objections

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if service is made by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.

> d.     Determination of Claims

Any Claim as to which a Proof of Claim or Interests or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim or Interest, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim or Interest filed by the Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim or Interest.  Any such Claim or Interest determined to be Allowed, shall be deemed to be an Allowed Claim for such liquidated amount (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) and shall be satisfied in accordance with the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim, right or Cause of Action that the Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. § 157.

> 7.     Procedures for Treating and Resolving Disputed and Contingent Claims or
> Interests

> a.     No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim or Interest; provided, however, that in the event that only a portion of such Claim or Interest is an Allowed Claim or Interest, the Disbursing Agent may make, in his or her discretion, a distribution

pursuant to the Plan on account of the portion of such Claim or Interest that becomes an Allowed Claim or Interest.

### b.    Claim Estimation

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee, as applicable, may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any.

### 8.    Setoffs and Recoupment

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee as applicable may, pursuant to Section 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan any claims or Causes of Action of any nature whatsoever the Debtors or Litigation Trust, as applicable, may have against the Holder of such Claim; provided, however, that neither the failure to effect such setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors or Litigation Trust, as applicable, of any setoff or recoupment the Debtors or Litigation Trust may have against the Holder of such Claim, nor of any other claim or Cause of Action.

### 9.    Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code

Allowance and disallowance of Claims shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

### 10.    Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, or agreements evidencing, giving rise to or governing any Claim shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be satisfied and the Holders thereof shall have no rights against the Debtors, the Estates, the Reorganized Debtor, the Litigation Trust Trustee, the Litigation Trust Oversight Committee, and/or the Litigation Trust; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

### 11.    Withholding Taxes

The Distributing Agent shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan.  As a condition to making any distribution under the Plan,

the Distributing Agent may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the Distributing Agent may deem necessary to comply with applicable tax reporting and withholding laws.

12.    Reports

From the Effective Date, until a Final Decree is entered, the Litigation Trust Trustee shall submit quarterly reports to the United States Trustee and the Litigation Trust Oversight Committee setting forth all receipts and disbursements of the Litigation Trust as required by the United States Trustee guidelines.

13.    Distribution Record Date

As of the close of business on the applicable Distribution Record Date, the transfer register for all Claims maintained by the Debtors or their agents, shall be closed, and there shall be no further changes in the Record Holders of any such Claims.  Moreover, the Debtors, Reorganized Debtor, Litigation Trust, Litigation Trust Trustee or Litigation Trust Oversight Committee as applicable shall have no obligation to recognize the transfer of any such Claims occurring after the applicable Distribution Record Date and shall be entitled for all purposes herein to recognize and deal only with those Holders of record as of the close of business on the applicable Distribution Record Date.

14.    Timing and Calculation of Amounts to be Distributed

Except as otherwise provided in the Plan, on the Effective Date each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class, provided however, the Litigation Trust shall maintain reserve accounts in trust for the payment or distribution on account of Litigation Trust Beneficiaries and shall make the appropriate adjustments in distributions to adequately take into consideration and fund such reserve accounts.  The Litigation Trust Trustee, as Distribution Agent, shall be authorized to make interim distributions and any subsequent distributions necessary to distribute any Cash, or other consideration held in any reserve account to the appropriate Claim Holder as Claims are resolved and Allowed and reserves are reduced in accordance with the Plan.

15.    Settlement of Claims and Controversies

Pursuant to Fed. R. Bankr. P. 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of claims and/or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of any such Allowed Claim.

I.    Conditions Precedent to Confirmation and Occurrence of the Effective Date

1.    Conditions Precedent to Confirmation

It shall be a condition to Confirmation hereof that all provisions, terms and conditions of the Plan and the Disclosure Statement are approved in the Confirmation Order.

2.      <u>Conditions Precedent to Confirmation</u>

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions herein:

a.      Fourteen (14) days have passed since the entry of the Confirmation Order as a Final Order in form and substance satisfactory to the Debtors and the Committee in their absolute discretion. The Confirmation Order shall provide that, among other things:

i.      the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and

ii.     the provisions of the Confirmation Order are nonseverable and mutually dependent.

b.      The appointment of the Litigation Trust Trustee shall have been confirmed by the Confirmation Order or order of the Bankruptcy Court.

c.      All actions, documents and agreements necessary to implement the Plan, including, without limitation, creating the Litigation Trust and entering into the Litigation Trust Agreement, shall have been effected or executed.

d.      The Debtors shall have established a reserve for all then outstanding Professional Fee Claims and Committee Professional Fee Claims (as limited by the Plan) as estimated by the Debtors and the Committee on or prior to the Effective Date.

3.      <u>Waiver of Conditions</u>

Except as otherwise required by the tenets of the Plan, the Debtors may waive any of the conditions to Confirmation of the Plan and/or to occurrence of the Effective Date of the Plan set forth in Article VIII of the Plan, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

4.      <u>Debtors' Right of Revocation or Withdrawal</u>

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans.  If the Debtors revoke or withdraw the Plan, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts affected by the Plan, and any document

or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

    J.    <u>Effect of Confirmation</u>

    1.    <u>Injunction</u>

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.**

    2.    <u>Term of Injunctions or Stays</u>

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code §§ 105 or 362, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until**

**the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.**

        3.    <u>Exculpation</u>

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and notwithstanding anything herein to the contrary, each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for (a) any prepetition action taken or omitted to be taken in connection with, the representation of the Debtors, or (b) any postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, in each case except for actual fraud, willful misconduct, or gross negligence in connection with the Plan or the Chapter 11 Cases, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel and financial advisors with respect to their duties and responsibilities pursuant to the Plan. Each Exculpated Party has, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, is not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.**

        4.    <u>Release of Liens</u>

**Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or**

**other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such security interest (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

      K.    <u>Retention of Jurisdiction</u>

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

      a.    All matters relating to the assumption or rejection or the assumption and assignment of executory contracts, or Claims or disputes relating thereto;

      b.    All matters relating to the ownership of a Claim or Interest;

      c.    All matters relating to the distribution to Holders of Allowed Claims and Interests and to the determination of Claims and Interests;

      d.    Any and all matters involving the Litigation Trust Trustee and/or the Litigation Trust and/or the Litigation Trust Oversight Committee;

      e.    All matters relating to or arising in connection with the disallowance, Allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest;

      f.    To enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

      g.    All matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

      h.    All matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes involving the injunction and exculpation provisions of the Plan, and disputes arising under agreements, documents or instruments executed in connection with the Plan;

i.      To consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

j.      All applications for allowance of compensation and reimbursement of Professional Fee Claims under the Plan or under §§ 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

k.      To hear and determine all motions requesting allowance of an Administrative Claim;

l.      To determine requests for the payment of Claims entitled to priority under § 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

m.      All Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets of the Litigation Trust, as successor-in-interest to the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims and Interests, and all controversies and issues arising from or relating to any of the foregoing;

n.      All matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

o.      Any other matter to the extent such jurisdiction is consistent with the Bankruptcy Code;

p.      All disputes involving the existence, nature or scope of the Confirmation Order, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program;

q.      To enter the Final Decree closing the Chapter 11 Case; and

r.      To enforce all orders previously entered by the Bankruptcy Court, including the Confirmation Order.

L.      <u>Miscellaneous Provisions</u>

1.      <u>Effectuating Documents, Further Transactions and Corporation Action</u>

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements of documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be

deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states where each of the Debtors are organized without any requirement of further action by the shareholders or directors of any Debtor.

    2.      Payment of Statutory Fees

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid, prior to the Effective Date, out of the Assets of the Estate for each quarter (including any fraction thereof) and after the Effective Date by the Litigation Trust until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

    3.      Headings

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

    4.      Biding Effect of Plan

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, the Litigation Trust and their respective successors or assigns, whether or not the Claim or Interest of such Holders is Impaired under the Plan and whether or not such Holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the Litigation Trust Trustee and any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

    5.      Final Order

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors in consultation with the Committee upon written notice to the Bankruptcy Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

    6.      Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, the Debtors, Litigation Trust and the Litigation Trust Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

    7.      Tax Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers from the Debtors, the Litigation Trust or the Litigation Trust Trustee to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of the Debtors' or the Litigation Trust's personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to or by the Litigation Trust Trustee of the Debtors' or the Litigation Trust's property in implementation of or as contemplated by the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

8.    Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors and the Litigation Trust, corporate governance matters shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles.

9.    Severability

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively. Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

10.    Plan Controls

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement or the Plan Supplement, the provisions of the Plan shall control and take precedence.

11.    Amendments and Modifications

The Debtors may alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors in consultation with the Committee may institute proceedings in the

Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and pursue such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties-in-interest shall not be required.

12.    Notices

Any notices required under the Plan or any notices or requests of the Debtors or the Litigation Trust Trustee by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtors:

Reed Smith LLP
Attn:  Derek J. Baker, Esq. and Derek M. Osei-Bonsu, Esq.
Three Logan Square
1717 Arch Street Suite 3100
Philadelphia, PA 19146

-and-

Reed Smith LLP
Attn: Ann E. Pille
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606

To the Committee:

Dechert LLP
Attn:  Stephen Zide, Esq and David Herman Esq.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

To the Litigation Trust and the Litigation Trust Trustee:

_____

13.    Filing of Additional Documents

On or before substantial consummation of the Plan, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.    Direction to a Party

From and after the Effective Date, the Debtors, the Litigation Trust or the Litigation Trust Trustee may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

15.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

16.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date

17.    Further Assurances

The Debtors, Litigation Trust Trustee, and all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

18.    Entire Agreement

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

19.    Filing of Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## IX.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Court have been satisfied. If so, the Bankruptcy Court will enter the Confirmation Order. The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors, as Plan proponents, will disclose in the Plan Supplement the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as the Litigation Trust Trustee of the Litigation Trust or a member of the Litigation Trust Oversight Committee; and the appointment to such office of such individual is consistent with the interests of Creditors and with public policy; and the Debtors, as Plan proponents, will disclose in the Plan Supplement the identity of any Insider that will be employed or retained by the Litigation Trust or Litigation Trust Oversight Committee, and the nature of any compensation for such Insider.

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests, other than Class 6 will either have accepted the Plan or will not be Impaired under the Plan.  However, the Plan may be confirmed without the approval of Classes 1, 2, 3, 4, 5A, or 5B pursuant to section 1129(b) of the Bankruptcy Code because (1) the Plan does not discriminate unfairly and is fair and equitable; and (2) Holders of any Claim or Interest junior to will only receive or retain any property under the Plan on account of such junior Claim or Interest as a result of the new value provided.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good faith.

A.    <u>Feasibility of the Plan</u>

To confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  The Plan is premised on cash payments to certain of the Debtors' creditors and the creation of the Litigation Trust for the pursuit and liquidation of

Litigation Trust Causes of Action and the distribution of the Distributable Cash provided to the Litigation Trust to the Debtors' Old Noteholders and Exchange Noteholders. The Debtors believe that there will be sufficient Litigation Trust Assets available to enable the Litigation Trust Trustee to fully and timely perform all obligations described in the Plan and make distributions to creditors, therefore, that the Plan is feasible.

B.   Best Interest Test

1.   Generally

The Bankruptcy Code requires a bankruptcy court to determine that a plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court generally determines the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" consists primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors in these Chapter 11 Cases would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. A liquidation under Chapter 7 does not affect the priority of several holders of claims to be paid first. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself could trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

After estimating the recoveries in liquidation of priority claimants, the bankruptcy court next determines the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the "best interests" of creditors and equity security holders.

C.    Best Interest of Creditors Test

The Debtors believe that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  The Debtors will be transferring the Litigation Trust Assets to the Litigation Trust for pursuit and distribution amongst the Litigation Trust Beneficiaries, while the Debtors' remaining creditors will receive a distribution derived from the Shareholder New Value Contribution.

The Debtors further believe that, in the event of conversion of the Chapter 11 Cases to cases under Chapter 7, distributions will be reduced by an extra layer of administrative expense created by conversion as well as significantly delayed.  In Chapter 7 cases, the Chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee.  The Chapter 7 trustee would be entitled to receive such commissions and such fees, even if the Chapter 7 trustee's only tasks are to distribute available Cash.  The Debtors believe that it is in the best interests of the Creditors to avoid this additional and unnecessary layer of administrative expenses.  It is also anticipated that Chapter 7 liquidations would result in delay in the distributions to Creditors.  Among other things, Chapter 7 cases would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to Chapter 7. Fed. R. Bankr. P. 3002(c).  Hence, Chapter 7 liquidations would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases.  Further, in the event of a Chapter 7 liquidation, the Shareholder New Value Contribution would not be provided by the Eletson Members resulting in an immediate loss of distributable value to Creditors.

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.  The Debtors believe that, if the Plan is not confirmed or is not confirmable, the only likely alternative will be conversion of the Chapter 11 Cases to Chapter 7 liquidations. For the reasons set forth above, the Debtors believe that the Plan is more likely to yield economic benefits to Creditors than Chapter 7 liquidations.  The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical Chapter 7 case.

D.    Confirmation Without Acceptance by All Impaired Classes: the "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the

- 75 -

allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

## X.    IMPORTANT CONSIDERATIONS AND RISK FACTORS

### A.    The Debtors have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

### B.    No Representations Outside the Disclosure Statement are Authorized

Other than as set forth in this Disclosure Statement, no representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance of the Plan that are not in the Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report such unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

### C.    Information Presented is Based on the Debtors' Books and Records, and no Audit was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based

might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

D.      All Information was Provided by Debtors and was Relied Upon by Professionals

Reed Smith LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Conversion Date as general bankruptcy counsel.  All counsel and other professionals for the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement.  Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein.

E.      Projections and Other Forward Looking Statements are Not Assured, and Actual Results will Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

F.      No Legal or Tax Advice is Provided to You by the Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

G.      No Admissions Made

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

H.      No Waiver of Rights Except as Expressly Set Forth in the Plan

A Creditor's vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate Assets, regardless of whether any Claims of the Debtors or their respective Estates are specifically or generally identified herein.

I.      Bankruptcy Law Risks and Considerations

1.    <u>Confirmation of the Plan is Not Assured</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate resolicitation of votes.

2.    <u>The Effective Date Might Be Delayed or Never Occur</u>

There can be no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order.  In that event, no distributions would be made, and the Holders of Claims and Interests would be restored to their previous position as of the moment before Confirmation, and the Debtors' obligations for Claims and Interests would remain unchanged.

3.    <u>The Projected Value of Estate Assets Might Not be Realized</u>

In conducting their feasibility and best interests test analyses, the Debtors projected the value of the Estates' Assets which would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan.  The Debtors have made certain assumptions, which may prove to be inaccurate.

4.    <u>Allowed Claims in the Various Classes May Exceed Projections</u>

The Debtors have also projected the allowed amount of Claims in each Class in conducting their feasibility and best interests test analyses.  Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.    <u>Federal Income Tax Consequences of the Plan</u>

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Holders of certain Claims and Interests.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof.  These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and

Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims or Interests. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers nor does it address tax consequences to Holders of Interests in the Debtors.  In addition, the description does not discuss state, local or non-U.S. tax consequences of the Plan.

          1.       <u>Withholding Taxes</u>

The Disbursing Agent will withhold taxes from distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code.  Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding".  Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the Holder is not subject to backup withholding.  Your Ballot contains a place to indicate your TIN.

          2.       <u>Federal Income Tax Treatment of the Litigation Trust</u>

For federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations and that such trust be owned by its beneficiaries (i.e., the Holders of Allowed Claims in Class 5A as applicable and Class 5B). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in the assets of the Litigation Trust and then contributed such interests to the Litigation Trust.

          3.       <u>Litigation Trust Assets Treated As Owned by Holders of Allowed Class 5A and Class 5B Claims</u>

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trust Trustee, and the Holders of Allowed Claims and Interests) shall treat the transfer of Assets and liabilities to the Litigation Trust, in accordance with the terms of the Plan, as a transfer to Holders of Allowed Class 5A Claims as applicable and Class 5B Claims followed by a transfer by such Holders to the Litigation Trust, and the beneficiaries of the Litigation Trust shall be treated for federal income tax purposes as the grantors and owners thereof.  The beneficiaries of the Litigation Trust shall be Holders of Allowed Class 5A Claims as appliable and Class 5B Claims.

          B.       <u>Federal Income Tax Consequences of Payment of Allowed Claims</u>

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder

receives distributions under the Plan in more than one taxable year, whether the Holder's claim is allowed or disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

1.    <u>Recognition of Gain or Loss</u>

a.    <u>In General</u>

In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's basis in the Claim.  Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount.  If the Holder realizes a capital loss, its deduction of the loss may be subject to limitation.  The Holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized.  The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the Holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

b.    <u>Post-Effective Date Cash Distributions</u>

Because certain Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest.  Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred.  All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

c.    <u>Bad Debt and/or Worthless Securities Deduction</u>

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.    <u>Pending Payments</u>

Cash and other Litigation Trust Assets that the Litigation Trust holds as a pending payment after the Effective Date should be deemed to have been paid to the Holder of the Claim entitled to receive such pending payment on the date that the Litigation Trust received it and to have been

contributed by such Holder to the Litigation Trust as a grantor and beneficiary of the Litigation Trust. Thus, the Holder should recognize gain or loss based upon the amount deemed received and contributed to the Litigation Trust on the Effective Date, and any income subsequently realized by the Litigation Trust with respect to such pending payment will be reported by the Litigation Trust Trustee as income of the grantor-beneficiary in the year realized, prior to the actual distribution of the pending payment to the Holder of the Allowed Claim.  The actual receipt of the pending payments from the Litigation Trust will not be a taxable event.

3.    <u>Payments Other than Pending Payments</u>

If any payment other than a pending payment is to be made out of the Litigation Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed.  Any income realized by the prior to such time will be reported by the Litigation Trust Trustee as income of and taxable to the Litigation Trust.

C.    <u>Certain Other Tax Consequences for Holders of Claims</u>

1.    <u>Receipt of Pre-Effective Date Interest</u>

In general, a Claim Holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest.  A Claim Holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. Each Holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purpose

2.    <u>Installment Method</u>

A Holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

D.    <u>Importance of Obtaining Professional Tax Assistance</u>

The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan, and is not a substitute for careful tax planning with a tax professional. The above discussion is for information purposes only and is not tax advice.  The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.

## XII.    EFFECT OF CONFIRMATION

A.    <u>Binding Effect of Confirmation</u>

- 81 -

Confirmation will legally bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted the Plan.

  B.  <u>Vesting of Assets Free and Clear of Liens, Claims and Interests</u>

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all Assets and property of the Estates, and all property of the Estates, including, pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, other than the Litigation Trust Assets as transferred pursuant to the terms of this Plan and the Litigation Trust Transfer Agreement, will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests. Thereafter, the Reorganized Debtor will hold these assets without further jurisdiction, restriction or supervision of the Bankruptcy Court, except as may be provided in this Disclosure Statement or the Plan.

  C.  <u>Good Faith</u>

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## XIII. ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) the conversion to Chapter 7 cases; (b) dismissal of the Chapter 11 Cases; or (c) an alternative chapter 11 plan.

  A.  <u>Liquidation Under Chapter 7</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Assets of the Debtors for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide each Holder of a Claim entitled to receive a distribution under the Plan with a recovery that is expected to be more than or equal to what it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

  B.  <u>Dismissal</u>

Dismissal of the Chapter 11 Cases would allow Creditors to exercise their state law rights. In a dismissal scenario, there will be no equality of distribution and many, if not most, unsecured creditors would not receive any Distribution.

  C.  <u>Alternative Plan</u>

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims as proposed under the Debtors' Plan.

## XIV. CONCLUSION

The Debtors believe that the Plan maximizes recoveries to all Creditors and, thus, is in their best interests. The Plan as structured, among other things, allows Creditors to participate in

distributions in excess of those that would be available if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all Creditors.

**THE DEBTORS URGE CREDITORS TO <u>ACCEPT</u> THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS INSTRUCTED ABOVE, BY COUNSEL TO THE DEBTORS BY 5:00 P.M., PREVAILING EASTERN TIME, ON [_].**

Respectfully Submitted,

Eletson Holdings, *et al.*, as Debtors and Debtors-in-Possession


By: <u>/s/ Vasillis E. Kertsikoff</u>
    Name: Vasillis E. Kertsikoff
    Title:  Vice President & Director