Stephen D. Zide
David A. Herman
Owen S. Haney
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
Email: stephen.zide@dechert.com
david.herman@dechert.com
owen.haney@dechert.com

*Counsel to the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
                        :

In re:                          :    Chapter 11
                          :

ELETSON HOLDINGS INC., *et al.*,    :    Case No. 23-10322 (JPM)
                          :

        Debtors.[1]          :    Jointly Administered
                          :

------------------------------------------------------- X

**NOTICE OF HEARING ON THE MOTION OF THE OFFICIAL**
**COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER**
**APPOINTING A CHAPTER 11 TRUSTEE**

---

[1] The Debtors in these chapter 11 cases are Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

**PLEASE TAKE NOTICE** that on March 7, 2023, three creditors commenced the above-captioned cases (the "Bankruptcy Cases") by filing involuntary petitions under section 303 of title 11 of the United States Code (the "Bankruptcy Code") against each of the above-captioned debtors (collectively, the "Debtors").[2]

**PLEASE TAKE FURTHER NOTICE** that on September 25, 2023, the Court entered an order converting these cases to voluntary cases under chapter 11 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that on February 6, 2024, the Official Committee of Unsecured Creditors (the "Committee") filed the *Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the Motion (the "Hearing") will be held **in person** before the Honorable John P. Mastando III, United States Bankruptcy Judge for the Southern District of New York, in the United States Bankruptcy Court for the Southern District of New York (the "Court"), in Courtroom No. 501, located at One Bowling Green, New York, New York 10004, on **February 21 at 9:00 a.m. (Prevailing Eastern Time)** (the "Hearing Date").

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be made in writing, stating in detail the reasons therefor, and must be filed with the Clerk of the Bankruptcy Court, so as to be actually received by the Honorable Judge Mastando III, with electronic copies emailed to Chambers at: JPM.chambers@nysb.uscourts.gov; and upon: (i) Reed Smith LLP, proposed counsel for the Debtors, 599 Lexington Avenue, New York, New York 10022, Attn: Andrew L. Buck (abuck@reedsmith.com); Louis M. Solomon (lsolomon@reedsmith.com); Anne E. Pille (apille@reedsmith.com); (ii) Dechert LLP, proposed

---

[2] Capitalized terms used but not defined herein shall have the meaning set forth in the Motion.

counsel for the Committee, 1095 Avenue of the Americas, New York, New York 100369, Attn: Stephen D. Zide, Esq. (stephen.zide@dechert.com); David A. Herman (david.herman@dechert.com); and Owen S. Haney (owen.haney@dechert.com); (iii) Togut, Segal & Segal LLP, counsel for the Petitioning Creditors, One Penn Plaza, Suite 3335, New York, New York 10119, Attn: Kyle J. Ortiz, Esq. (kortiz@teamtogut.com); and Jared C. Borriello, Esq. (jborriello@teamtogut.com); and (iv) the Office of the United States Trustee for Region 2, Attn: Daniel Rudewicz (Daniel.Rudewicz@usdoj.gov), One Bowling Green, Room 534, New York, New York 10004-1408, no later than **February 14, 2024 at 4:00 p.m. (Prevailing Eastern Time)** (the "Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that the Motion, as well as all other case related filings can be viewed and/or obtained by (i) accessing the Court's website for a fee, or (ii) by contacting the Office of the Clerk of the United States Bankruptcy Court, Southern District of New York. Please note that a PACER password is required to access documents on the Court's website.

Dated: New York, New York  
February 6, 2024

Respectfully submitted,

By: */s/ Stephen D. Zide*  
Stephen D. Zide  
David A. Herman  
Owen S. Haney  
DECHERT LLP  
1095 Avenue of the Americas  
New York, NY  10036-6797  
stephen.zide@dechert.com  
david.herman@dechert.com  
owen.haney@dechert.com  
Tel:  (212) 698-3500  
Fax: (212) 698-3599

*Counsel to the Official Committee of Unsecured Creditors*

Stephen D. Zide
David A. Herman
Owen S. Haney
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500
Facsimile: (212) 698-3599
Email: stephen.zide@dechert.com
david.herman@dechert.com
owen.haney@dechert.com

*Counsel to the Official Committee of*
*Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
In re:                                                       :        Chapter 11
                                                             :
ELETSON HOLDINGS INC., et al.,                               :        Case No. 23-10322 (JPM)
                                                             :
                                                             :        Jointly Administered
                              Debtors.[1]                    :
                                                             :
-------------------------------------------------------------x

# MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE

---

[1]      The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................... 1

JURISDICTION AND VENUE .................................................................................. 4

BACKGROUND ........................................................................................................ 4

    A.    The Debtors Operate a Fleet of Gas Tanker Ships Through a Network of Wholly Owned Subsidiaries. ..................................................................... 4

    B.    The Debtors Are Closely Held and Managed by Three Principal Families and Lack Any Independent Governance. .................................................... 5

    C.    The Debtors Have Been in Default on Their Debt Obligations for Years. ............ 7

    D.    After Years of Nonpayment, Creditors Instituted These Cases. ........................... 7

    E.    The Debtors Fail to Make Timely Disclosures Concerning Their Assets. ............ 8

    F.    The Debtors Refuse to Engage Cooperatively with their Creditors. ................... 10

    G.    The Debtors Seek to Transfer Value to Entities Controlled by the Families. ....... 11

    H.    The Debtors Propose a Plan that Would Return All the Equity in the Debtors to Their Insiders and Provide Creditors Almost No Recovery. ............. 14

ARGUMENT ........................................................................................................... 16

I.    The Court Should Appoint a Chapter 11 Trustee for Cause Under § 1104(a)(1). ........... 17

    A.    The Debtors' Purported Transfer of the Preferred Shares in Eletson Gas Constitutes Cause for Appointment of a Trustee. ................................................ 18

    B.    The Debtors' Conflicts of Interest Require Appointment of a Trustee. ............... 21

    C.    The Debtors Are Currently Working to Deplete the Estates to Enrich Their Insiders. .............................................................................................................. 23

    D.    The Debtors' Failure to Disclose Information to the Court and to their Creditors is Cause for a Trustee. ......................................................................... 25

    E.    The Debtors' Proposed Plan Demonstrates Their Inability to Discharge the Duties of a Trustee. ............................................................................................. 26

II.    The Court Should Appoint a Trustee in the Interest of Creditors Under § 1104(a)(2). ........................................................................................................... 27

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  342 B.R. 122 (S.D.N.Y. 2006)..................................................................27

*In re AG Serv. Centers, L.C.*,
  239 B.R. 545 (Bankr. W.D. Mo. 1999).........................................................26

*In re Ashley River Consulting, LLC*,
  No. 14-13406 (MG) 2015 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015) .................... *passim*

*Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 N. LaSalle Street Partnership*,
  526 U.S. 434 (1999).............................................................................3

*In re Bellevue Place Assocs.*,
  171 B.R. 615 (Bankr. N.D. Ill. 1994) ...................................................4, 30

*CFTC v. Weintraub*,
  471 U.S. 343 (1985)..........................................................................1, 16

*In re Colby Constr. Corp.*,
  51 B.R. 113 (Bankr. S.D.N.Y. 1985)............................................................21

*D.H. Blair & Co. v. Gottdiener*,
  462 F.3d 95 (2d Cir. 2006).....................................................................24

*In re Euro-American Lodging Corp.*,
  365 B.R. 421 (Bankr. S.D.N.Y. 2007)...........................................................28

*In re Eurospark Indus., Inc.*,
  424 B.R. 621 (Bankr. E.D.N.Y. 2010).....................................................4, 21, 29

*In re Futterman*,
  584 B.R. 609 (Bankr. S.D.N.Y. 2018)........................................................16, 30

*In re Grasso*,
  490 B.R. 500 (Bankr. E.D. Pa. 2013) ................................................... *passim*

*In re Ionosphere Clubs, Inc.*,
  113 B.R. 164 (Bankr. S.D.N.Y. 1990)....................................................16, 27, 30

*In re Klaynberg*,
  643 B.R. 309 (Bankr. S.D.N.Y. 2022).........................................................20

*In re McCorhill Pub., Inc.*,
    73 B.R. 1013 (Bankr. S.D.N.Y. 1987) .................................................................21

*Nationwide Mut. Ins. Co. v. Home Ins. Co.*,
    330 F.3d 843 (6th Cir. 2003) ......................................................................23, 24

*Orion Shipping & Trading Co.*,
    312 F.2d at 300 ............................................................................................24

*Petit v. New England Mortgage Services, Inc.* (*In re Petit*),
    182 B.R. 64 (D. Me. 1995) ..............................................................................29

*In re PRS Ins. Grp., Inc.*,
    274 B.R. 381 (Bankr. D. Del. 2001) ..................................................................20

*In re Ridgemour Meyer Properties, LLC*,
    413 BR 101 (Bankr. S.D.N.Y. 2008) ........................................................2, 21, 22

*In re Sillerman*,
    605 B.R. 631 (Bankr. S.D.N.Y. 2019) ......................................................... *passim*

*In re Smart World Techs. LLC*,
    423 F. 3d 166 (2d Cir. 2005) .................................................................16, 18, 23

*In re Soundview Elite, Ltd.*,
    503 B.R. 571 (Bankr. S.D.N.Y. 2014) ................................................................22

*In re Taub*,
    427 B.R. 208 (Bankr. E.D.N.Y. 2010) ...............................................................29

*In re V. Savino Oil & Heating Co., Inc.*,
    99 B.R. 518 (Bankr. E.D.N.Y. 1989) ........................................................... *passim*

**Statutes**

11 U.S.C. § 1104 ................................................................................1, 17, 18

11 U.S.C. § 1107 ......................................................................................1, 16

11 U.S.C. § 1112 ............................................................................................4

11 U.S.C. § 1129 ......................................................................................22, 27

28 U.S.C. § 157 ...............................................................................................4

28 U.S.C. § 1334 ..............................................................................................4

28 U.S.C. § 1408 ..............................................................................................4

28 U.S.C. § 1409 ...................................................................................................................4

**Other Authorities**

Fed. R. Bankr. P. 2015.3 ..................................................................................................2, 8, 9

The Official Committee of Unsecured Creditors (the "Committee") of Eletson Holdings Inc. ("Eletson Holdings" or "Holdings"), Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively the "Debtors"), respectfully submits this motion for entry of an order, substantially in the form attached as **Exhibit 1**, appointing a chapter 11 trustee under 11 U.S.C. § 1104(a). In support of this Motion, the Committee submits the accompanying Declaration of Michael Cordasco ("Cordasco Declaration").

## PRELIMINARY STATEMENT

1.    The willingness of Congress "to leave a debtor in possession" of its business and properties "is premised on an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985); *see* 11 U.S.C. § 1107(a). A debtor's duty is to maximize the value of its estate and distribute that value in accordance with the Bankruptcy Code—first to creditors and then, if any value remains, to owners. In carrying out those duties, a debtor-in-possession must act as a fiduciary for its creditors and place those creditors' interests ahead of any personal interests.

2.    When a debtor-in-possession is incapable of discharging the fiduciary duties of a trustee, the Bankruptcy Code "commands that the stewardship of the reorganization effort must be turned over to an independent trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). Under § 1104(a)(1), "the court shall order the appointment of a trustee" for "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor . . . or similar cause." Examples of "cause" include "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; . . . fraud or dishonesty; and lack of credibility and creditor confidence." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG) 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015).

3.      If there ever were a case for the appointment of an independent trustee, it is this

one.  Rather than seeking to maximize the value of their estates, the families that own and manage

the Debtors have been working relentlessly to transfer their most valuable assets to entities they

own in the hopes of placing them outside the reach of creditors.  According to the Debtors, the

families purportedly transferred the preferred shares in Eletson Gas, worth about $187 million, to

entities they control in return for an alleged (unfulfilled) promise to pay €3 million, less than 2%

of what those interests are worth.  They supposedly did so at a "family meeting," with no apparent

corporate authority, with no documentation, and at a time that Eletson Holdings was deeply

insolvent and in default on its bond debt.

4.      A fiduciary's responsibility under these circumstances is to do whatever it can to

secure those assets and preserve them for creditors.  *See In re Sillerman*, 605 B.R. 631, 648 (Bankr.

S.D.N.Y. 2019) ("Taken alone, the Debtor's failure to investigate avoidance actions [is] sufficient

to justify a finding of 'cause' under 1104(a)(1).").  Instead, at the direction of the very individuals

who seek to loot the estate, the Debtors have spent millions of dollars that should be preserved for

creditors—without Court approval—to not only defend the purported transfer but to insulate it

from avoidance or challenge by creditors.   As courts have recognized, a "debtor and its managers

. . . cannot be counted on to conduct independent investigations of questionable transfers in which

they were involved," requiring the appointment of "[a]n independent trustee."  *In re Ridgemour*

*Meyer Properties, LLC*, 413 BR 101, 113 (Bankr. S.D.N.Y. 2008).

5.      At the same time, the Debtors have barely participated in these chapter 11 cases.

The Debtors filed no first day motions.  They filed schedules that listed the value of their assets as

"$0," only amending them months later to reflect what is on their books.  They failed to file timely

statements concerning their subsidiaries under Rule 2015.3, and they filed a statement for Eletson

2

Gas, their most valuable subsidiary, only after the U.S. Trustee sought relief from this Court. The Debtors twice failed to appear at Section 341 meetings of creditors, appearing only after the U.S. Trustee threatened to move for appointment of a trustee. And, although the Debtors caused a subsidiary to pay their professionals millions of dollars since these cases converted—all in support of the Debtors' efforts to transfer assets to their insiders—the Debtors have not paid modest U.S. Trustee fees, and they insist they have no access to cash to pay other administrative expenses.

6.      The Debtors also have refused to cooperate with the Committee or make disclosures concerning the Debtors' assets. As courts have recognized, "[o]ne of the most fundamental and crucial duties of a debtor-in-possession . . . is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization." *Savino Oil*, 99 B.R. at 526. In the three months since the Committee was formed, the Debtors have not provided one page of information to the Committee on a voluntary basis, and as recently as last Friday have refused to provide the Committee with any information concerning the subsidiaries that operate their business and from which creditor recoveries, if any, are likely to be drawn. This "[f]ailure by a debtor-in-possession to disclose material and relevant information to the Court and creditors or make required filings supports a finding of cause." *Sillerman*, 605 B.R. at 654.

7.      Moreover, the Court should appoint a trustee under § 1104(a)(2), which commands that the Court "shall" appoint a trustee "if [it] is in the interests of creditors." All of the factors courts assess under § 1104(a)(2) are present here. The Debtors have no reasonable prospects for reorganization. They filed a plan that would give substantially all the value of their enterprise to insiders and their own lawyers, leaving almost nothing for creditors, in violation of Supreme Court precedent, and without conducting any negotiations with their creditors. *See Bank of Am. Nat'l Trust & Savs. Assoc. v. 203 N. LaSalle Street Partnership*, 526 U.S. 434, 458 (1999).

3

8.      Finally, these cases are paralyzed by intense "acrimony between the creditors and the debtor's management," which, "standing alone, has been found to be a basis to appoint a chapter 11 trustee under § 1104(a)(2)." *In re Eurospark Indus., Inc.*, 424 B.R. 621, 630-31 (Bankr. E.D.N.Y. 2010). Creditors have no confidence in the Debtors' willingness or ability to steer these cases to a successful conclusion, and the Debtors in turn have threatened to sue their creditors and even their creditors' lawyers. Routine applications, like the retention of financial advisors and the establishment of compensation procedures, have resulted in wasteful litigation. A neutral and independent trustee is needed to "insulate the reorganization process from paralytic conflict," reduce the estate's administrative expenses, and finally "foster the negotiations between interested parties which generally occurs in bankruptcy cases." *In re Bellevue Place Assocs.*, 171 B.R. 615, 625 (Bankr. N.D. Ill. 1994); *Savino Oil*, 99 B.R. at 527 n.11.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein are sections 1104 and 1112 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2007.1, and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## BACKGROUND

**A.      The Debtors Operate a Fleet of Gas Tanker Ships Through a Network of Wholly Owned Subsidiaries.**

11.     Eletson Holdings is "the ultimate parent of the Eletson family" of companies (collectively, "Eletson"). (ECF 371 at 26.) Eletson is an international gas shipping company,

which "owns and operates a fleet of medium and long-range" gas tanker ships that carry "a wide range of refined petroleum products . . . as well as crude oil." (*Id.*)

12.    Eletson operates that fleet through wholly owned subsidiaries of Holdings, which own or charter the vessels. The fleet is managed by Eletson Corporation ("Eletson Corp." or "Corp."), another wholly owned subsidiary of Holdings. The Eletson fleet currently includes 18 vessels, 14 of which are operated by Eletson Gas LLC ("Eletson Gas" or "Gas"). (*See* Cordasco Decl. ¶¶ 12-14.)

**B.    The Debtors Are Closely Held and Managed by Three Principal Families and Lack Any Independent Governance.**

13.    Eletson is closely held, controlled, and managed by three families: the Kertsikoff, Hadjieleftheriadis, and Karastamati families (the "Principal Families"). Each of those families beneficially holds approximately 30.7% of the equity in Eletson Holdings through separate Liberian trust companies. (Ex. A at 62.) The remaining equity is beneficially held by two other families: the Zilakos and Andreoulakis families (the "Minority Families"). The three Principal Families and two Minority Families (collectively, the "Families") are all relatives of each other. (*Id.* at 61 (describing sibling and cousin relationships).)

14.    In addition to beneficially owning Holdings, members of the Families are also the directors and officers of Holdings and of its various subsidiaries, including Eletson Corp. and Eletson Gas. (*See* ECF 384-24.) The Principal Families also own the Cypriot Nominees (defined below). Based on discovery to date, the relationships among the various affiliates are as follows:[2]

---

[2] Sources: ECF 217 at 42 (Holdings' Statement of Financial Affairs); Ex. S at 15:17-18:2, 21:7-23:7, 35:11-13, 39:13-15; Ex. BB at 17:11-17, 44:10-45:3, 53:19-54:9; Ex. CC at 268:6-22; ECF 249-4 at 30 (Final Arbitration Award); Ex. DD at 36:3-20, 48:20-49:5, 62:10-64:10; Ex. EE; Ex. FF; Ex. HH; ECF 42-3 at 35, 36 (Second RSA Signature Page); *but see* ECF 217 at 42 (not listing Zilakos as a director).

| Holdings Directors | Holdings Officers | Owner of Holdings | Owner of Nominee | Board of Eletson Gas | Board of Eletson Corp. |
|---|---|---|---|---|---|
| **Principal Families** | | | | | |
| Lascarina J. Karastamati | ✓ President | ✓ Lassia Investment Co. | ✓ Fentalon Limited | ✓ ■■■■ | ✓ President |
| Vasilis A. Hadjeleftheriadis | ✓ Vice President & Treasurer | ✓ Glafkos Trust Co. | ✓ Desimusco Trading Co. | | ✓ Vice President & Treasurer |
| Vassilis E. Kertsikoff | ✓ Vice President | ✓ Family Unity Trust Co. | ✓ Apargo Limited | ✓ President | ✓ Vice President & Secretary |
| Eleni Karastamati | | | ✓ Fentalon Limited | | |
| Konstantinos Hadjieleftheriadis | | ✓ Glafkos Trust Company | ✓ Desimusco Trading Co. | | |
| **Minority Families** | | | | | |
| Emmanouil S. Andreoulakis | ✓ Secretary | ✓ Keros Shipping Corporation | | | |
| Ioannis Zilakos | | ✓ Elafonissos Shipping Corp. | | | |

15.     Under its Restated Articles of Incorporation (the "Charter"), Eletson Holdings is required to have at least two Independent Directors (as defined in the Charter). (Ex. B at Art VI.) Among other things, such Independent Directors must not be members of the Families. (*Id*.) The Independent Directors also may not be removed or replaced except under limited circumstances, and only subject to certain notice requirements for the benefit of creditors. (*Id*.) In identifying its board members in filings with this Court, however, Eletson Holdings lists only members of the Families and does not list any Independent Directors. (*See* ECF 217 at 42.)

16.     On December 13, the Debtors purported to appoint an Independent Director to the Board of Holdings. (*See* ECF 329-2.) The Charter provides, however, that an Independent Director must never have been a "director, officer, or employee" of Holdings, and the director the Debtors purported to appoint to their Board had been a director of Eletson Holdings from 2011 to 2019. (*See* Ex. B at VI; ECF 384, Ex. 27 (filed under seal).)

C.    **The Debtors Have Been in Default on Their Debt Obligations for Years.**

17.    The Debtors are deeply insolvent, owing their creditors at least $450 million.  Those debts include more than $320 million on account of First Preferred Ship Mortgage Notes due January 15, 2022 (the "Notes").  (*See* ECF 220 at 1; ECF 381 at ¶ 9.)  As set forth at length in prior pleadings, the Debtors never made a single cash payment over the entire life of the Notes and failed to repay the Notes at maturity.[3]  (*See* ECF 80 at ¶ 10; ECF 134 at ¶ 12; ECF 134-1 at ¶¶ 12, 14.)

18.    Beginning in 2019, the Debtors and an ad hoc group of noteholders made several unsuccessful attempts to restructure the Notes, but the Debtors failed to comply with the terms of their restructuring agreements.  (*See* ECF 134 at ¶ 12-16; ECF 134-1 at ¶ 12-16.) ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

D.    **After Years of Nonpayment, Creditors Instituted These Cases.**

19.    On March 7, 2023 (the "Petition Date"), certain petitioning creditors filed involuntary petitions against the Debtors under Chapter 7 (the "Petitions").  They were later joined by 11 additional petitioning creditors (collectively, the "Petitioning Creditors"), including the indenture trustee for the Notes.  Collectively, the Petitioning Creditors were owed hundreds of millions of dollars, largely on account of Notes that had remained in default and unpaid for years.

20.    On April 14, the Debtors moved to dismiss the Petitions.  There ensued months of litigation between the Debtors and their creditors, resulting in millions of dollars in administrative

---

[3] The Notes were issued under an indenture with Wilmington Savings Fund Society, FSB ("WSFS"), as indenture trustee, following an exchange offer for notes previously issued under an indenture, with Deutsche Bank Trust Company Americas ("Deutsche Bank") as the trustee (the "Old Notes").  Some of the Old Notes remain outstanding.

expenses.  (*See, e.g.*, ECF 322-324.)  On the eve of trial, the Debtors agreed to convert these cases

to voluntary cases under Chapter 11.  (*See* Ex. D at 9:5-10.)  The Petitioning Creditors agreed,

among other things, not to seek the appointment of a trustee for 120 days after conversion.  (*Id.* at

9-11.)  On September 25, 2023, the Court entered an order converting these cases.  (ECF 215.)

21.    On October 20, 2023, the office of the United States Trustee (the "U.S. Trustee")

appointed the Committee.  (ECF 233.)  The Committee's members are Aegean Baltic Bank S.A.

("AB Bank"), Gene B. Goldstein, and Wilmington Savings Fund Society, FSB, in its capacity as

indenture trustee for the Notes.  Deutsche Bank Trust Company Americas, in its capacity as

indenture trustee for the Old Notes, serves as an ex-officio member of the Committee.

**E.    The Debtors Fail to Make Timely Disclosures Concerning Their Assets.**

22.    On October 10, 2023, the Debtors filed their schedules of assets and liabilities and

statements of financial affairs (collectively, the "Schedules").  (ECF 216-221).  The Debtors

disclosed that they have no cash and that their only assets are equity interests in subsidiaries and

certain litigation claims.  (ECF 217 at 1, 3-4, 11-27.)  The Schedules listed the value of the equity

in each of the Debtors' subsidiaries as "$0."  (ECF 216 at 10-11.)

23.    On October 13, 2023, the U.S. Trustee noticed a section 341(a) meeting of creditors

("341 Meeting") for November 7.  (ECF 223.)  That notice triggered the Debtors' obligation under

Bankruptcy Rule 2015.3 to file, by October 31, reports regarding their interests in their subsidiaries

(the "2015.3 Reports").  On October 31, however, the Debtors failed to file 2015.3 Reports.

24.    A day before the 341 meeting, on November 6, the meeting was adjourned because

the Debtors' witness was unavailable.  (*See* ECF 223; Ex. E at 2:23-3:9.)  At a rescheduled 341

Meeting on November 14, the Debtors again failed to produce a witness.  The U.S. Trustee

explained that the Debtors are "required to appear to be examined under oath regarding the

bankruptcy case" and that if the Debtors' "representative cannot attend these meetings or timely

file reports, such as those required by Rule 2015.3, we will consider whether it is advisable to appoint a Chapter 11 Trustee." (Ex. E at 2:14-15, 3:13-16.)

25.    On November 20, the Debtors filed 2015.3 Reports for ten of their 73 subsidiaries. The 2015.3 Reports showed positive equity value at those subsidiaries. (*See* ECF 271 at 6-15, 39-48.) At the second rescheduled 341 Meeting on November 21, Vassilis Kertsikoff testified that the Schedules reflect "market value" of the Debtors' subsidiaries, whereas the 2015.3 Reports reflect "book value." (Ex. F at 40:11-24.) The 2015.3 Reports do not appear to comply with Generally Accepted Accounting Principles. (*See* Cordasco Decl. ¶ 23.)

26.    When they filed their 2015.3 reports on November 20, the Debtors did not include a report for Eletson Gas. The Debtors asserted that Levona (defined below) had prevented them from doing so (*see* ECF 272 at 1), which Levona denied (*see* ECF 279 at 1). The Committee asked the Debtors twice in writing to explain what Levona had done to prevent the Debtors from making these disclosures, but the Debtors did not respond. (*See* Ex. G.) On November 27, the U.S. Trustee filed a response, explaining that Levona "presents no bar" to the Debtors' compliance with Rule 2015.3 and requested that the Debtors immediately furnish the information. (ECF 284 at 3.)

27.    On November 30, the Debtors filed an "amended" 2015.3 Report with financial information concerning Eletson Gas. (ECF 298.) The amended report listed the "[t]otal stockholders' equity" of Eletson Gas at a deficit of $87,915,000 as of September 30, 2023.

28.    On December 29, the Debtors filed Amended Schedules, disclosing an aggregate equity value of the Debtors' subsidiaries of $52.5 million. (*See* ECF 340 at 9-11.) The Amended Schedules state that the $52.5 million valuation is based on "market value." (*Id.* at 2.) At a 341 meeting on January 5, 2024, however, Kertsikoff represented that it is "book value" and that the actual value remains "unknown." (*See* Ex. H at 26:25-27:4.)

**F.**     **The Debtors Refuse to Engage Cooperatively with their Creditors.**

29.     At a hearing on November 8, 2023, the Committee stated that it had not received any information on how the Debtors planned to fund these cases.  (Ex. I at 59:9-17.)  The Court directed the Debtors to have "discussions with the committee" on that subject.  (*Id.* at 60:10-12.)

30.     On November 15, the Committee asked for a call with Debtors' counsel regarding the Debtors' plan to fund these cases.  (Ex. J at 11.)  The Debtors initially questioned the need to discuss that subject (*id.* at 9-10) but, after follow-up, agreed to hold a call.  On the call on November 20, the Debtors informed the Committee's counsel that the Debtors would not provide further information concerning their assets or plans to address administrative expenses.  (*Id.* at 3.)

31.     On November 20, the Committee inquired of Debtors' counsel as to why the Debtors had not filed a 2015.3 Report for Eletson Gas.  (Ex. G at 1.)  The Committee followed up on that inquiry on November 27.  (*Id.*)  The Debtors did not respond.

32.     On December 12, the Committee sent a letter requesting information concerning the Debtors' Independent Directors.  (*See* Ex. K.)  The Debtors did not respond.

33.     On December 13, the Committee sought to introduce the Debtors to the Committee's financial advisors at FTI Consulting, Inc. ("FTI").  (Ex. L.)  The Committee asked for "a point of contact at the company with whom FTI can be in touch with diligence questions." (*Id.*)  The Debtors did not respond to the Committee's request.

34.     On December 28, the Committee sent a letter to the Debtors requesting confirmation that neither the Debtors nor their insiders had taken any action regarding the preferred shares of Eletson Gas (the "Preferred Shares") and would not do so without first seeking relief from this Court.  (Ex. M.)  The Debtors did not respond to the Committee's letter.

35.     On December 26, the Committee sought approval to conduct examinations under Bankruptcy Rule 2004.  (ECF 335.)  The Debtors initially opposed the application, arguing (among

other things) that it was "nothing more than an attempt to distract and burden the Debtor." (ECF 337 ¶ 8.) On January 18, however, the Debtors consented to entry of an order approving the Rule 2004 examinations, which the Court entered the same day. (Ex. N at 11:13-19; ECF 359.)

36.    After the hearing on January 18, the Committee requested to meet and confer with the Debtors concerning "the Debtors' ability to produce documents from and pertaining to its subsidiaries." (Ex. O at 4.) The Committee followed up on that request on January 19 and 22. (*Id.* at 2-4.) Later, on January 22, the Debtors responded that they were unwilling to meet and confer with the Committee at that time. (*Id.*) At a hearing on January 25, the Debtors declined to answer the Court's question as to whether they have "possession, custody, or control" over documents from their subsidiaries. (Ex. P at 22:20-22.) Finally, on February 2, the Debtors served formal responses and objections to the Committee's document requests, stating that they "will not produce any documents, and will not direct Eletson Corporation to produce, any documents from non-Debtor Subsidiaries or Affiliates." (*See generally* Ex. Q.)

37.    Since the Committee was formed in October 2023, the Debtors have not provided the Committee with even one page of information beyond their public filings.

**G.    The Debtors Seek to Transfer Value to Entities Controlled by the Families.**

38.    At the same time, the Debtors have spent millions of dollars of creditor money in an effort to transfer value from the estates to their insiders.

**1.    The Families Purportedly Transferred the Preferred Shares to Cypriot Entities They Control with No Apparent Corporate Authority to Do So.**

39.    As detailed at length in prior pleadings (ECF 181, 239), which are incorporated herein by reference, Eletson Holdings and Eletson Corporation initiated an arbitration in July 2022 seeking a ruling that Eletson Gas had exercised its option to purchase Preferred Shares in Eletson Gas from Levona Ltd. ("Levona"). After these bankruptcy cases were commenced, however, the

Debtors for the first time asserted that the Preferred Shares had been transferred to Cypriot Nominees (the "Nominees") that are owned by the Principal Families.  The Debtors' counsel explained that the purpose of asserting this claim was to prevent creditors of Eletson Holdings from obtaining the value of the Preferred Shares:

> "As soon as they said, . . . if we win in this proceeding, they're going to take that asset and they are–it goes back into Holdings and so, lo and behold, the bankruptcy allows them to take it . . . and that's when we said, well, wait a minute, *I went back to my client and it says these nominees, why don't we just transfer it to the nominees and they said, we don't have to, we have already done it.*"

(Ex. R at 153:2-16.)  The Debtors requested that the arbitrator "structure the relief" in any award he issued to ensure that the assets remained outside the reach of their creditors.  (*Id.* at 6:19-7:6.)

40.    According to the Debtors, the Preferred Shares were transferred to the Nominees in return for a promise to pay €3 million—about 13% of the $23 million that Gas paid to purchase the shares from Levona at or around that same time, or 1.6% of the $187 million the Debtors claim those shares are worth today—and they concede that the €3 million was not ever paid.  (*See* Ex. S at 66:4-67:11; Ex. CC at 269:21-270:25.)  The purported transfer was supposedly authorized at a "family meeting," was not memorialized in any formal documentation, and was not approved by the boards of either Eletson Gas or Eletson Holdings.  (*See* Ex. S at 62:23-63:7; 70:20-71:22.)

41.    On July 27, 2023, the Arbitrator entered an interim award, which was superseded by a final award (the "Award") on September 29, 2023.  The Award found that Eletson Gas "exercised the buyout option" to acquire the Preferred Shares by transferring shares in two vessels owned by Eletson Gas to Levona.  The Award further concluded that the Preferred Shares were transferred to the Nominees "effective as of March 11, 2022." (Ex. Y at 95-96.)

42.    The Award also assessed almost $87 million in damages against Levona, plus fees, costs, and interest.  (*Id.* at 99-100.)  Consistent with the Debtors' request to "structure the relief"

so as not to benefit the Debtors' creditors, however, none of those damages was awarded to Eletson

Holdings.  Instead, about half was awarded to the Nominees.  If the Debtors are correct that the

Preferred Shares were transferred to the Nominees, all the benefits of the damages awarded to Gas

would go for the benefit of the Nominees. (*Id.*)  In addition, the Award granted attorneys' fees to

the "Claimants," which the Debtors contend will be paid to Eletson Corp.  (*See id.*)

> **2.**     **The Debtors Pursue Confirmation of the Arbitration Award While Contending that they Receive No Monetary Benefit from the Award.**

43.     On August 18, 2023, Eletson Holdings and Eletson Corp. filed a petition in the

United States District Court for the Southern District of New York to confirm the Award.  (Exs.

K-M.)  Among the findings they asked the District Court to confirm are that "[t]he preferred

interests in the Company were transferred to the Preferred Nominees."  (*Id.* at 7.)  The Debtors

also requested that the District Court approve the Arbitrator's award of compensatory and punitive

damages in favor of Eletson Gas and the Nominees.  (*Id.* at 10-12.)

44.     The Debtors concede that they would receive no monetary value from confirmation

of the Award.  (*See* ECF 286 ¶¶ 40-41.)  Indeed, at the conclusion of oral argument, the District

Court ordered supplemental briefing on whether Eletson Holdings even has standing to pursue

confirmation, inquiring "whether the vindication of a contractual right" that benefits only a "third-

party beneficiary"—i.e., the Nominees—is "a concrete interest that is redressable in a court

proceeding sufficient to give rise to standing."  (Ex. U at 140:7-11.)  In supplemental briefing, the

Debtors made no assertion that Holdings has a financial interest in the proceedings; rather, they

contended Holdings has standing "on behalf of the intended beneficiaries, as Gas and the

Nominees explicitly were."  (Ex. V at 3.)  At the same time, the Debtors contend that the

arbitrator's findings are "binding" on this Court and their creditors.  (*See* Ex. W at 85:15-17

("nothing that can be done about it now"); *id.* at 85:15-21 ("it is binding on them").)

### 3. The Debtors Use Creditor Money, Without Court Approval, to Fund Their Efforts to Transfer Value from their Estates to the Families.

45.     Although the Debtors contend that they and their creditors would receive no monetary value from confirmation of the arbitration award, they have spent millions of dollars of creditor money[4] seeking to have it confirmed.  Just last week, on January 30, the Debtors' counsel at Reed Smith disclosed that, since the Conversion Date, the Debtors (through Eletson Corp.) have paid them more than $2.6 million in fees for work related to "the Arbitration and Confirmation Proceedings."  (ECF 385 at 2-3.)  Notably, all of those fees were paid in 2023, before this Court approved Reed Smith's retention.[5]  (*See* ECF 350 (retention order dated January 5, 2024).)

46.     The Debtors have not sought Court approval of those fees.  Instead, they have simply paid their counsel's fees using money from Eletson Corp.  At the same time, the Debtors contend that they have no cash available to fund other administrative expenses.  On February 1, 2024, this Court rejected that contention, explaining that "if the debtors themselves lack cash to pay professional fees, it appears that they can cause their subsidiaries to make a payment in the same way they have done for their own counsel."  (Ex. X at 13:2-5.)

### H. <u>The Debtors Propose a Plan that Would Return All the Equity in the Debtors to Their Insiders and Provide Creditors Almost No Recovery.</u>

47.     On January 23, 2024, the Debtors filed a plan and disclosure statement.  They did so without having conducted any plan discussions with their creditors or the Committee.  (*See* Ex. H at 20:19-23.)  Under the plan, the Debtors' shareholders would retain their equity interests in

---

[4] For the avoidance of doubt, assets at Eletson Corp. would go first to satisfy creditors of Eletson Corp. (including intercompany claims, if any), with any excess distributed to its equity holder, Eletson Holdings, for the benefit of creditors of Eletson Holdings.  Shareholders of Eletson Holdings would recover from the assets of Eletson Corp. only after creditors of both Eletson Corp. and Eletson Holdings are paid in full.

[5] Reed Smith previously reported that Eletson Corp. had paid them approximately $3.7 million for work related to "the Arbitration and Confirmation Proceedings" from August 2022 until June 2023.  (ECF 297 at 7.)

Eletson Holdings.  (ECF 370 Art. IV.A.1, II.C.7.)  The shareholders would contribute $10 million, most (if not all) of which would be used to pay the Debtors' counsel and other professional fees.[6] The Debtors did not market this "investment" opportunity to third-parties.   In addition, the Debtors' officers, directors and professionals would receive releases from any "claim, obligation, Cause of Action, or liability" labeled an "exculpation" provision, for both prepetition and postpetition conduct taken in connection with representation of the Debtors.  (ECF 370 Art. IX.C.)

48.    The Plan would yield creditors almost no recovery.  According to the disclosure statement, claims in class 3 would receive 0.1% recoveries, and trade creditors in class 4 would receive 1%.  (ECF 371 at 6-7.)  Guarantee claims would be "reinstated," but the Debtors would discharge 50% of their guarantees in return for no consideration.  (ECF 370 Art. II.C.1-2.)

49.    The plan divides Noteholders into two classes.   Noteholders who were not Petitioning Creditors (Class 5A), would receive either $50,000 divided pro-rata or interests in a litigation trust that would be formed to sue other Noteholders.  (*Id.* at Art II.C.5.b.)  The Petitioning Creditors (Class 5B) would be equitably subordinated and receive no recoveries.  (*Id.* Art. II.C.6.)

50.    In addition, the Plan would create a litigation trust to pursue claims against the Petitioning Creditors (*Id.* Art. IV).  The litigation trustee would be selected by the Debtors, and the trust would be funded with $20,000 to pursue claims.  (*Id.* Art. IV.K, N.)  At a hearing on January 25, the Debtors asserted that "the value that is returned to these creditors [under the plan] is the very litigation that they so greatly want against themselves."  (Ex. P at 20:3-5.)

---

[6] The Plan limits the fees for all Committee professionals at $1.5 million, while leaving the fees of Debtors' counsel unlimited.  (ECF 370 Art. II.B.1.).

**ARGUMENT**

51.    "The point of bankruptcy is to marshal assets in a way that maximizes their value for the benefit, primarily, of creditors, and then once creditors are paid, for owners."  *In re Futterman*, 584 B.R. 609, 618 (Bankr. S.D.N.Y. 2018).  A debtor's duty is to maximize the value of its estate and to distribute the estate's property in a manner that is consistent with the Bankruptcy Code's priorities.  *See In re Smart World Techs. LLC*, 423 F. 3d 166, 175 (2d Cir. 2005).

52.    "The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee."  *Savino Oil*, 99 B.R. at 526; *see also* 11 U.S.C. § 1107(a) ("a debtor in possession . . . shall perform all the functions and duties . . . of a trustee"); *Weintraub*, 471 U.S. at 352.  Accordingly, "[w]hen a debtor remains in possession of his businesses and properties in a chapter 11 case, he does so as a fiduciary for those creditors."  *Futterman*, 584 B.R. at 618-19.

53.    A debtor's essential fiduciary duty is to maximize the value of the estate for the benefit of its creditors.  That duty includes the obligations to

> "a) protect and conserve estate property for the benefit of creditors (including a duty to avoid self-dealing and to investigate and prosecute warranted avoidance actions); b) avoid damaging the estate; and c) refrain from acting in a manner that could hinder a successful reorganization."

*In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019) (citations omitted).

54.    When a debtor-in-possession is incapable of carrying out the fiduciary duties of a trustee, the Bankruptcy Code "commands that the stewardship of the reorganization effort must be turned over to an independent trustee."  *Savino Oil,* 99 B.R. at 526; *see In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) ("When a debtor-in-possession is incapable of performing [fiduciary] duties, a Chapter 11 trustee may be appointed.")

55.     Section 1104(a) of the Bankruptcy Code thus provides for the appointment of an

independent trustee for either of two reasons.   Under § 1104(a)(1), "the court *shall* order the

appointment of a trustee . . . for cause."   Under § 1104(a)(2), even in the absence of "cause," the

court "shall" appoint a trustee "if such appointment is in the interests of creditors."   As set forth

below, appointment of a trustee is required under both of those grounds.

## I.     The Court Should Appoint a Chapter 11 Trustee for Cause Under § 1104(a)(1).

56.     Section 1104(a) provides that "the court shall order the appointment of a trustee –

> for cause, including fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management,
> either before or after the commencement of the case, or similar
> cause, but not including the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor

11 U.S.C. § 1104(a).   As courts have explained, "[t]he list of wrongs constituting 'cause' that

warrants the appointment of a trustee is not exhaustive."   *Ashley River*, 2015 WL 1540941, at *9.

> [F]actors relevant to the appointment of a trustee under § 1104(A)(1)
> include: conflicts of interest, including inappropriate relations
> between corporate parents and the subsidiaries; misuse of assets and
> funds; inadequate record keeping and reporting; various instances of
> conduct found to establish fraud or dishonesty; and lack of
> credibility or and creditor confidence.

*Id.*; *see also Sillerman*, 605 B.R. at 641-42 (listing factors including "failure to comply with . . .

the Bankruptcy Code," "failure to make required filings," "conflicts of interest," and "failure to

discharge fiduciary duties").   As one court explained, "it is not necessary to delineate whether the

cause consists of fraud, dishonesty, incompetence, gross mismanagement 'or similar cause'."

*Savino Oil*, 99 B.R. at 527.   Rather, "any one of these causes within the penumbra of fiduciary

neglect, as defined, mandates appointment of a trustee."   *Id.*   In addition, "[a] court may consider

both the pre- and post-petition misconduct."   *Ashley River,* 2015 WL 1540941, at *10.

57.    Upon a showing of "cause" as under § 1104(a), appointment of a trustee is mandatory.  *See* 11 U.S.C. § 1104(a) ("the court *shall* order the appointment of a trustee . . .") (emphasis added); *Sillerman*, 605 B.R. at 642.

**A.    The Debtors' Purported Transfer of the Preferred Shares in Eletson Gas Constitutes Cause for Appointment of a Trustee.**

58.    The purported transfer of the Preferred Shares in Eletson Gas, and the Debtors' continuing and relentless efforts to ensure that the value of those shares remains outside the reach of creditors, requires appointment of a trustee.  A debtor's fiduciary duties require it to "protect and conserve estate property for the benefit of creditors," to "avoid self-dealing," and to "manage the estate's legal claims . . . in a way that maximizes the estate's value."  *Smart World*, 423 F.3d at 175; *Sillerman,* 605 B.R. at 648. The Debtors have failed to carry out those duties.

59.    It is undisputed that the Preferred Shares were purchased using assets of Eletson Gas.  According to the Debtors (and the arbitrator), Eletson Gas exercised its option to purchase the Preferred Shares by transferring to Levona vessels worth $23 million.  *See* Ex. Y at 95-96; ECF 371 at 21-24.  Those vessels belonged to Eletson Gas, not to the Nominees.

60.    At the time the transfer to the Nominees supposedly occurred in February 2022, Eletson Holdings was deeply insolvent.  The Notes had matured in January 2022, and hundreds of millions of dollars in principal and interest remained outstanding.  ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

61.    The purported transfer of the Preferred Shares is a textbook fraudulent conveyance. There is ample evidence that the purported transfer, if it occurred at all, was done with actual intent to defraud creditors of Holdings.  As Debtors' counsel explained:

> "As soon as they said, . . . if we win in this proceeding, they're going
> to take that asset and they are–it goes back into Holdings and so, lo

and behold, the bankruptcy allows them to take it . . . and that's when we said, well, wait a minute, ***I went back to my client and it says these nominees, why don't we just transfer it to the nominees and they said, we don't have to, we have already done it.***"

Ex. R at 153:2-24 (emphasis added).  Moreover, Eletson Gas did not receive any value, let alone reasonably equivalent value.  At the time of the purported transfer of the Preferred Shares, Gas had purchased them from Levona for $23 million.  According to the Debtors, the Preferred Shares are currently worth more than $180 million.  Ex. GG at 12:23-18. In contrast, the Debtors contend the shares were transferred in return for a future promise to pay €3 million, or about 1.6% of what the shares are now worth. ECF 286 ¶ 34.)  They also concede that, to date, the Nominees have not paid the €3 million they supposedly promised, *see* ECF 286 ¶ 34; Ex. S at 70:3-9.

62.    Accordingly, the Court should reject any efforts the by Debtors to excuse this fraudulent transfer on the grounds that Eletson Gas supposedly needed cash.  As recently as January 2, 2024, the Debtors tried to justify the transfer to the District Court as follows:

> The company needed money.  The nominees were willing to put up money.  Gas couldn't put up money because Gas was being strangled.  Gas couldn't pay even its legal fees.  Gas had to go outside of Gas in order to get its own legal fees . . . .

But when confronted with their counsel's statement at a 341 Meeting three days later, the Debtors admitted that the Nominees never "put up money" or assisted Gas with its legal fees.  According to Kertsikoff, the Nominees have never paid any legal fees of Holdings, Gas, or Corp., and "have not provided any money whatsoever to the debtors or their subsidiaries."  Ex. H at 22:16-24:24.

63.    It is also no answer for the Debtors to contend that the Preferred Shares "never belonged to Holdings."  *See* Ex. W at 89:2-3; Ex. U at 128:19-23.  Eletson Holdings owns 100% of the *Common Shares* of Eletson Gas, and the transfer of the Preferred Shares rendered those Common Shares worthless.  Judge Liman properly explained this as follows:

> If the preferred go back to Gas rather than to the nominees . . . that's going to increase the value of the common interest, effectively what's happening is that Gas is retiring its senior level of equity, increasing the value of the common; . . . it's taking back the preferred leaving the common as the only equity . . . .

(Ex. U at 113:7-13.)  Indeed, that is the position the Debtors themselves took in sworn affidavits before these bankruptcy cases commenced.

> Prior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes for convenience referred to as shares) of the Company [*i.e.*, Eletson Gas].  As of March 11, 2022, ***Eletson Holdings became the sole unit holder of the Company*** by reason of the transactions [at issue in the Arbitration].

(Ex. II at ¶ 9) (emphasis added); *see also id.* at ¶ 13 (referring to Preferred Shares as "units").)  It was only after creditors forced the Debtors into bankruptcy proceedings that the Debtors, directed by the Principal Families, began insisting that the Preferred Shares had already been transferred to entities they own that are outside the Debtors' capital structure.

64.    It is not necessary for the Court to conclude at this stage that the purported transfer constituted a fraudulent conveyance (although that is obvious) or that the Debtors' insiders had fraudulent intent.  Rather, courts have recognized that the diversion of funds to related parties—or even colorable claims that such transfers occurred—is cause for appointment of a trustee, whether that conduct is labeled "fraud," "mismanagement," "dishonesty," "incompetence," or an inability to manage conflicts of interest.  *See, e.g.*, *In re Klaynberg*, 643 B.R. 309, 321 (Bankr. S.D.N.Y. 2022) ("[E]ven setting aside Debtor's intent in . . . making the challenged transfers . . . [a]t a minimum, this reflects, 'incompetence, or gross mismanagement' and a 'misuse of assets and funds' that is unacceptable now that the Debtor has the obligations of a debtor in possession."); *In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001) ("Diversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee . . . ."); *In re Colby Constr. Corp.*, 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (shareholder's use "of

corporate assets to acquire another company in his own name indicates . . . fraud . . . or at least the dishonesty contemplated by [§ 1104(a)(1)]"); *see also Sillerman*, 605 B.R. at 647 (appointing trustee based on "evidence of unauthorized transactions between the Debtor and non-debtor affiliated entities which evinces a conflict of interest"); *In re McCorhill Pub., Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) ("[W]here there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed . . . .").

65.    Among other reasons, a trustee is required in those circumstances because a debtor's management cannot be expected to investigate and pursue causes of actions, for the benefit of creditors, in which they themselves are potentially implicated.  *See In re Ridgemour*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) ("An independent trustee should be appointed" because the "debtor and its managers . . . cannot be counted on to conduct independent investigations of questionable transfers in which they were involved."); *In re Grasso*, 490 B.R. 500, 517-18 (Bankr. E.D. Pa. 2013) (explaining that "[w]hile the basis for the estate's claims remains to be determined . . . [t]he existence of the estate's potential claims against the Debtor's wife evidenced a conflict of interest and . . . such conflict constituted cause for appointment of a Chapter 11 Trustee.").

## B.    The Debtors' Conflicts of Interest Require Appointment of a Trustee.

66.    More broadly, a trustee must be appointed due to the Debtors' conflicts of interest. *See Ashley River*, 2015 WL 1540941, at *9 ("Factors relevant to the appointment of a trustee under 1104(a)(1) include [] conflicts of interest . . ."); *Eurospark*, 424 B.R. at 629 ("It is well established that courts may appoint a chapter 11 trustee where a debtor-in-possession's management has a conflict of interest that interferes with its ability to fulfill its fiduciary duties to the estate.")

67.    The Debtors have no independent governance or management to ensure that they carry out their fiduciary duties.  Rather, the Families that own the Debtors are also simultaneously

the directors and officers of Holdings, Eletson Gas, and Eletson Corp., as well as the owners of

the Nominees against which the Debtors have claims.  *See* Ex. F at 33:1-11 (Kertsikoff testifying

that the entire Eletson "construct" is run by the "same people"); Ex. S at 52:9-13 (Karastamati

testifying that "for us it is one thing, it is Eletson Family.  It is—I mean, we didn't care, I mean,

who—if it was Eletson Gas or Eletson company or Eletson Family.").   Indeed, Karastamati

asserted that when she participated in the "family meeting" at which the Preferred Shares

supposedly were transferred, she was involved "mostly as a shareholder of Fentalon," one of the

Nominees, and also "[i]n [her] capacity as member of the Eletson family, of the Eletson group."

*Id.* at 48:22-49:20.

68.    This lack of independence requires the appointment of a trustee.  The Families

cannot be expected to "conduct independent investigations of questionable transactions in which

they were involved."  *Ridgemour*, 413 B.R. at 113; *see also In re Soundview Elite, Ltd.*, 503 B.R.

571, 582 (Bankr. S.D.N.Y. 2014) (Debtors "cannot be counted on to conduct independent

investigations of questionable transactions in which they were involved," necessitating "an

independent fiduciary in whom the stakeholders and [the court] can have confidence, and who is

not subject to the conflicts of interest that otherwise would so plainly exist").  In addition, the

Debtors are obligated to maximize recoveries to creditors, and shareholders are not entitled to

receive any value unless creditors consent or are paid in full.  *See* 11 U.S.C. § 1129(b)(2)(B)(ii);

*(In re Lehman Bros. Holdings Inc.)*, 855 F.3d 459, 470 (2d Cir. 2017) (absolute priority rule is a

"bedrock principle of bankruptcy law").  Because the Debtors are deeply insolvent, the Families

who control the Debtors here can receive value only if they succeed in transferring it out of the

estate or confirm a plan—like the one they have proposed—that improperly diverts value to them

at the expense of their creditors.  *See Eurospark*, 424 B.R. at 629 (appointing trustee where debtor's

"duty of pursuing or settling" claims "in the best interests of the estate and its creditors" conflicted

with the debtor's personal financial interests).

69.     Although the Debtors' governing documents require that they have independent

directors, those directors either are no longer on the board or, worse, *are* still on the board but have

no *de facto* role at the company.  (*See* ECF 217 at 42 (listing no independent directors); Ex. AA

at 3 (Debtors' counsel speculating that independent directors would "assumedly still be on the

Board" because they were never formally removed); Ex. GG at 22:17-18 ("What does it mean,

independent director?").  Whichever of those may be the case, it is apparent that there is no

independent fiduciary managing the Debtors or directing their professionals.  Accordingly, the

Court must appoint an independent trustee to cure the Debtors' conflicts of interest.

### C.    **The Debtors Are Currently Working to Deplete the Estates to Enrich Their Insiders.**

70.     The Debtors' conflicts of interest are not merely an abstract concern.  Rather, the

Debtors are actively taking steps to transfer value from the estates to entities they control, in

violation of their duties to preserve estate property and "to wisely manage the estate's legal claims"

for the benefit of creditors.  *Smart World*, 423 F.3d at 175.

71.     Instead of maximizing the value of the Debtors' estates, the Debtors have been

spending millions of dollars of creditor money to divert both the Preferred Shares and the damages

awarded in the arbitration to their insiders rather than to the estate.  Eletson Holdings and its wholly

owned subsidiary, Eletson Corp., were the only two petitioners in the Arbitration.  As fiduciaries,

the Debtors should be taking the position in the District Court that the arbitrator had no authority

to award damages and the Preferred Shares to non-parties and instead should have awarded any

monetary or other relief to the petitioners, Eletson Holdings and Eletson Corp.  *See Nationwide*

*Mut. Ins. Co. v. Home Ins. Co.*, 330 F.3d 843, 847 (6th Cir. 2003) (holding that "arbitration award

exceeds the panel's authority" by awarding damages to "non-parties to the arbitration").

72.    There has been ample opportunity for the Debtors to do since the start of these

cases. *See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (courts may confirm

or vacate arbitration award "in whole or in part.").   Indeed, the issue of whether the arbitrator

exceeded his authority by awarding recoveries to non-parties was the subject of extensive

argument before the District Court.   Contrary to their duties, the Debtors vigorously defended the

award of damages and the Preferred Shares to the Nominees and Gas rather than to Holdings or

Corp.  *See* Ex. U at 109:2-16 (disputing that the arbitrator "exceeded his powers in . . . awarding

damages to [the Nominees] and to Gas"), 111:22-112:16 (arguing that "Eletson intended the

preferred units to go to the nominees"), 115:6-116:5 (arguing that Gas "sold [the Preferred Shares]

for good value" and that the Debtors "have every right to have that enforced now") 116:7-120:16

(defending Debtors' ), 122:13-23 ("THE COURT:  What really is the justification for the money

going to the nominees? . . . "MR. SOLOMON:  What Justice Belen finds—and those findings I

believe are entitled to deference—is that the preferred nominees bought the right, title, and interest

to the preferred interests."), 128:19-129:8 (arguing that the Preferred Shares are "not part of the

estate, they were never part of the estate").   What's more, the Debtors have urged both this Court

and the District Court to find that the arbitrator's ruling that the preferred shares were transferred

to the Nominees is "conclusive" and "binding" on their creditors.  *See* Ex. W at 85:19.[7]

---

[7] As the District Court observed, the arbitrator's findings are not binding on creditors or the Committee because they were not parties to the Arbitration.  *See Nationwide*, 330 F.3d at 847; *Orion Shipping & Trading Co.*, 312 F.2d at 300; *see also* Ex. U at 110:3-10 (District Court explaining that "[a]t most, all you're going to get from me is that the preferred – that the nominees were transferees under the BOL, but not that what Eletson Gas did wasn't fraudulent or that it shouldn't all be clawed back."); *id.* at 71:17-72:8 (District Court explaining that if the Arbitrator's findings are "not entitled to estoppel because the[re are] persons who are not parties to the arbitration, then they're not worth the piece of paper they're written on"); *see also id.* at 76:7-9 ("The findings are never going to be collateral estoppel.")

73.     In short, rather than seeking to maximize the value of the estates, the Debtors are actively working to keep hundreds of millions of dollars in assets out of their creditors' reach, and they are paying professionals to do so using creditor money.  Those efforts to diminish the estates and enrich their insiders constitute cause for the appointment of a trustee.  *See Sillerman*, 605 B.R. at 649 (debtor "has a fiduciary duty to refrain from actions that could damage the estate").

### D.     The Debtors' Failure to Disclose Information to the Court and to their Creditors is Cause for a Trustee.

74.     The Debtors' failure to make timely disclosures in these cases also constitutes "cause" for the appointment of a trustee.  As one court explained:

> One of the most fundamental and crucial duties of a debtor-in-possession upon the filing of a Chapter 11 petition is to keep the Court and creditors informed about the nature, status and condition of the business undergoing reorganization . . . .  Open, honest and straightforward disclosure to the Court and creditors is intrinsic to the entire reorganization process . . . .

*Savino Oil*, 99 B.R. at 526.  Thus, when a debtor fails to disclose "material and relevant information to the Court and creditors, a Chapter 11 trustee is required."  *Grasso,* 490 B.R. at 522-23.

75.     Here, the Debtors have consistently failed to make required disclosures except when forced to do so by the Committee or the U.S. Trustee.  As set forth above, the Debtors filed schedules that listed the value of their assets as "$0," only amending them months later to reflect what is on their books.  *Compare* ECF 216 at 10-11 (original schedules) *with* ECF 340 at 9-11 (amended schedules).  The Debtors filed 2015.3 Reports three weeks late and failed to file a report for their most valuable subsidiary, Eletson Gas, until the U.S. Trustee sought relief from the Court.  *See* ECF 284.  The Debtors twice failed to appear at Section 341 meetings of creditors, appearing only after the U.S. Trustee threatened to move for the appointment of a trustee.  *See* Ex. E at 2:14-15, 3:13-16.  In addition, the Debtors' 2015.3 Reports and monthly operating reports fail to disclose intercompany balances, which obscure where cash is flowing from wholly-owned

operating entities. *See* Cordasco Decl. ¶¶ 11-22 (discussing risk of "value leakage" from lack of cash management motion or reporting on intercompany balances). This pattern of late and insufficient disclosure is cause for the appointment of a trustee. *See, e.g.*, *Sillerman*, 605 B.R. at 643-44 (failure to file 2015.3 report); *Ashley River*, 2015 WL 1540941, at *10 ("failed to timely file monthly operating reports or pay UST fees until compelled to do so by the UST"); *Grasso*, 490 B.R. at 520 (failure to file 2015.3 reports); *In re AG Serv. Centers, L.C.*, 239 B.R. 545, 551 (Bankr. W.D. Mo. 1999) (same).

76.     Similarly, the Debtors refuse to disclose information to the Committee. In the three months since the Committee was formed, the Debtors have not provided one page of information to the Committee voluntarily, and as recently as last Friday have refused to provide the Committee with any information concerning the subsidiaries that operate their business. As Mr. Cordasco explains, such inquiries by official committees are routine. *See* Cordasco Decl. ¶ 9. The Committee's effort to introduce the Debtors to their financial advisor to commence an ordinary diligence process did not elicit even the courtesy of a response. Indeed, the Debtors have refused even to discuss with the Committee their ability to fund administrative expenses. *See* Ex. J at 11; *see also Grasso*, 490 B.R. at 525 (finding that "appointment of a Chapter 11 Trustee was warranted due to the animosity held by the Debtor for his creditors['] legitimate attempts to evaluate whether sufficient assets are available to satisfy their claims.").

### E.     The Debtors' Proposed Plan Demonstrates Their Inability to Discharge the Duties of a Trustee.

77.     The Debtors' submission of a patently unconfirmable plan likewise constitutes cause for the appointment of a trustee. *Sillerman*, 605 B.R. at 650. To take but three of the most obvious defects, the Debtors' plan would give their shareholders the exclusive right to invest "new value" and retain their interests, without any market test, before creditors are paid in full, which

violates the absolute priority rule and the Supreme Court's ruling in *203 North Lasalle*. 526 U.S. at 457-58 ("[P]lans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)."). In addition, the plan violates the best interest of creditors test because, in a chapter 7 liquidation, creditors would receive the proceeds of a liquidation—including the value of the Debtors' operating subsidiaries—before shareholders would recover anything. In contrast, under the Debtors' Plan, creditors would receive almost no recoveries while shareholders receive almost all of the reorganized Debtors' value. *See, e.g.*, 11 U.S.C. § 1129(a)(7)(A)(ii); 7 Collier on Bankruptcy ¶ 1129.02[7] ("It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation."). As of this filing, the Debtors have not provided a liquidation analysis to show that the best interest test is satisfied. Finally, the plan would provide the Debtors' directors and officers with broad release for both prepetition and postpetition conduct, even though the Committee has identified material claims against the directors and officers. *See* ECF 370 Art. IX.C. Put simply, the Debtors have "made virtually no progress in moving the case to conclusion by way of a viable plan." *Sillerman*, 605 B.R. at 651.

## II.     The Court Should Appoint a Trustee in the Interest of Creditors Under § 1104(a)(2).

78.     Section 1104(a)(2) directs that courts "shall" appoint a trustee when doing so would be "in the interests of the estate or its creditors[.]" *In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 130 (S.D.N.Y. 2006). Section 1104(a)(2) is a "flexible standard and allows the appointment of a trustee even when no 'cause' exists." *Ionosphere Clubs*, 113 B.R. at 168. Factors include: (i) "the trustworthiness of the debtor"; (ii) the debtor's prospects for rehabilitation; (iii) creditors' lack of confidence in the debtor; and (iv) "the benefits derived from the appointment of a trustee, balanced

against the costs of the appointment.  *See Sillerman*, 605 B.R. at 651-52; Ashley River, 2015 WL 1540941, at *11.  All of those factors weigh in favor of appointing a trustee.

79.     First, the Debtors suffer from a lack of trustworthiness.  As set forth above, the Debtors lack any independent governance, and the individuals who are directing their affairs stand on both sides of challenged transactions.  *See In re Euro-American Lodging Corp.,* 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (trustee should be appointed under § 1104(a)(2) where the debtors' managers "suffer from material conflicts of interest").  In addition, the Debtors' failure to make timely and accurate public disclosures and refusal to provide information to the Committee and its advisors "casts doubt on the Debtor's trustworthiness." *Sillerman*, 605 B.R. at 652-53 (failure to file 2015.3 Reports supports trustee appointment under § 1104(a)(2)).

80.     Second, the Debtors lack any prospects of reorganizing successfully without an independent trustee.  For years, the Debtors breached every restructuring agreement they entered into with their creditors.  Now in bankruptcy, the Debtors have done little to progress these cases: they filed no first day motions, have not demonstrated an ability to fund administrative expenses, and have filed a plan that is patently unconfirmable and provides creditors almost no recoveries. *See Sillerman*, 605 B.R. at 655 (finding that "the prospects for rehabilitation do not appear to be favorable" where "[t]here is no concrete or reliable plan put forth by the Debtor for how to provide maximum recovery for estate creditors"); *Ashley River*, 2015 WL 1540941, at *11 (appointing trustee where "the Debtors have not done much of anything . . . other than file their schedules (which had to be amended . . .), applications to approve the retention of their attorneys, and respond to the motions of other parties . . . who seek relief to move these cases along").

81.     Third, creditors have no confidence in the Debtors' ability to effectively administer the estate.  *See Sillerman*, 605 B.R. at 655 ("A trustee can be appointed based solely on the

creditor's lack of confidence in the Debtor's ability to effectively administer the estate.");

*Eurospark*, 424 B.R. at 630 (appointing trustee where there was "the lack of trust in [the debtor's

shareholder] by the parties with the greatest economic stake" and a "loss of confidence in [his]

ability to administer the estate's . . . claims against [third-parties] in the best interests of the

estate"). Indeed, 11 creditors collectively holding a majority of the outstanding Notes have moved

to terminate the Debtors' exclusive periods to file a plan, contending that the Debtors "have no

intention of advancing these cases to a good faith resolution." *See* ECF 384 at 1.

82.     As courts have explained, "acrimony between the creditors and the debtor's

management, standing alone, has been found to be a basis to appoint a chapter 11 trustee

under § 1104(a)(2)." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (citation omitted);

*Eurospark Indus.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) (same). Here, the Debtors have

threatened to sue numerous of their creditors, as well as Committee counsel, and have turned even

routine applications, such as interim compensation procedures and applications to retain

professionals, into acrimonious litigation. *See Petit v. New England Mortgage Services, Inc.* (*In

re Petit*), 182 B.R. 64, 70 (D. Me. 1995) ("deep-seeded conflict and animosity between a debtor

and its creditors provides a basis for the appointment of a trustee" under Section 1104(a)(2)). The

Debtors continue to describe these cases as "bad faith," have refused to provide information to the

Committee, conducted no negotiations with creditors or the Committee before filing a plan, and

have touted their proposed plan as enabling creditors to bring "litigation . . . against themselves."

(*See* Ex. U at 73:18-20; Ex. P at 20:3-5; *see also Grasso*, 490 B.R. at 525 (citing "the animosity

held by the Debtor for his creditors['] legitimate attempts to evaluate whether sufficient assets are

available to satisfy their claims"). A neutral trustee is "needed to take charge of the many disputes

between [the debtor] and his creditors over their claims and hopefully to resolve those claims."
*Futterman*, 584 B.R. at 619.

83.     Fourth, the benefits of a trustee far outweigh the costs.  The estates have already

lost millions of dollars to conflict between the Debtors and their creditors, and with the Debtors

filing a patently unconfirmable plan and largely refusing to disclose information to creditors there

is no end in sight.  The "appointment of a Chapter 11 Trustee would likely reduce the estate's

administrative expenses as it would avoid much of the contentious litigation precipitated by the

Debtor's general intransigence."  *Grasso*, 490 B.R. at 525-26; *see also Ionosphere*, 113 B.R. at

170 (appointing trustee where creditors "are willing to risk the costs, uncertainties and dislocations,

occasioned by the appointment of a trustee"); *Savino Oil*, 99 B.R. at 526 n.11 (appointment of

trustee needed to "insulate the reorganization process from paralytic conflict"); *Bellevue*, 171 B.R.

at 625 ("[A] trustee is necessary to unfreeze this bankruptcy case and to permit and foster the

negotiations between interested parties which generally occurs in bankruptcy cases.").

## CONCLUSION

84.     For the reasons stated herein, the Committee respectfully requests that this Court

enter an Order in the form attached hereto as **Exhibit 1** appointing a chapter 11 trustee.

Dated: February 6, 2024
      New York, New York

Respectfully submitted,

By: */s/ David A. Herman*
Stephen D. Zide
David A. Herman
Owen S. Haney
DECHERT LLP
1095 Avenue of the Americas
New York, NY  10036-6797
stephen.zide@dechert.com
david.herman@dechert.com
owen.haney@dechert.com
Tel: (212) 698-3500
Fax: (212) 698-3599

*Counsel to the Official Committee of
Unsecured Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all ECF recipients in the above-captioned matter.


Dated: February 6, 2024                     Respectfully submitted,
      New York, New York

                                                      By: */s/ David A. Herman*
                                                      Stephen D. Zide
                                                      David A. Herman
  Owen S. Haney
  DECHERT LLP
  1095 Avenue of the Americas
  New York, NY  10036-6797
  stephen.zide@dechert.com
  david.herman@dechert.com
  owen.haney@dechert.com
  Tel: (212) 698-3500
  Fax: (212) 698-3599

  *Counsel to the Official Committee of*
  *Unsecured Creditors*

Exhibit 1

Proposed Order

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ELETSON HOLDINGS INC., et al., | : | Case No. 23-10322 (JPM) |
|  | : |  |
|  | : | Jointly Administered |
| Debtors.[1] | : |  |
|  | : |  |

---------------------------------------------------------------x

### <u>ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE</u>

Upon the motion (the "<u>Motion</u>")[2] of the Official Committee of Unsecured Creditors (the "<u>Committee</u>") of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), for entry of an order (this "<u>Order</u>"), as more fully described in the Motion, appointing a chapter 11 trustee; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order; and the Court having determined that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the Motion having been given as provided in the Motion, and such notice having been adequate and appropriate under the circumstances; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court on February 21, 2024 (the "<u>Hearing</u>"); and the Court having determined that the legal and factual basis set forth

---

[1]    The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

in the Motion and on the record of the Hearing established just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

It is **HEREBY ORDERED**, pursuant to 11 U.S.C. § 1104(a) and 11 U.S.C. § 1112(b), that the U.S. Trustee shall, as soon as practicable, appoint a chapter 11 trustee.

New York, New York
Dated: _____, 2024

_____
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE