UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
In re:                                                      :    Chapter 11
                                                            :
ELETSON HOLDINGS INC., et al.,                              :    Case No. 23-10322 (JPM)
                                                            :
                                                            :    Jointly Administered
                                   Debtors.¹                :
                                                            :
------------------------------------------------------------x

**DECLARATION OF MICHAEL CORDASCO IN SUPPORT OF THE
MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE**

I, Michael Cordasco, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am a Senior Managing Director at FTI Consulting, Inc. (together with its wholly owned subsidiaries, "FTI"), a financial advisory services firm that provides, among other things, restructuring, crisis, and turnaround services. FTI is the financial advisor for the Official Committee of Unsecured Creditors (the "Committee") in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2. In my capacity as a Senior Managing Director, I am authorized to make and submit this declaration (the "Declaration") on behalf of FTI and in connection with the *Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee*.

3. Except as otherwise indicated herein, all facts set forth in this Declaration are

---

¹ The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

based upon (a) publicly available information, (b) information provided by the Debtors in connection with the Rule 2004 requests made during the involuntary proceedings, (c) FTI's analyses regarding such information, (d) discussions with certain other professionals at FTI and the professional advisors of the Committee and its members, (e) my review of the relevant documents, and (f) my more than 20 years of experience in providing restructuring, corporate finance, accounting and financial advisory services.

4.     I am not being compensated specifically for this testimony other than through payments received by FTI as the financial advisor for the Committee in these Chapter 11 Cases. If called upon to testify, I would testify to the facts and opinions set forth herein.

## Professional Background and Qualifications

5.     I am a Senior Managing Director at FTI, where I specialize in Corporate Finance and Restructuring, and more specifically, representing official committees of unsecured creditors. I have been employed by FTI for over 14 years, and during that time, in my estimation, I have represented over 35 official committees of unsecured creditors. Prior to joining FTI, I was a Manager at Goldin Associates and spent more than five years in Ernst & Young's Corporate Finance practice. I hold a B.S. in accounting from Fairfield University, and I am a certified insolvency and restructuring advisor, certified public accountant, and a certified turnaround professional. I am a member of the American Institute of Certified Public Accountants, the Association of Insolvency and Restructuring Advisors, and the Turnaround Management Association.

6.     I have more than 20 years of experience in restructuring and reorganization matters. I have significant experience advising official committees of unsecured creditors in a wide range of issues including, but not limited to, plan negotiations, the preparation and review

of business plans, cash flow forecasts, liquidation analyses and complex distribution waterfalls; the analysis of value and claims allocation methodologies; the evaluation and negotiation of 363 sale processes; the review of debtor-in-possession financing facilities and the analysis of creditors' claims and projected recoveries under various operating and restructuring scenarios.

**Debtors' Lack of Engagement with the Committee's Professionals is Atypical**

7. Since being selected to serve as financial advisor by the Committee on December 8, 2023, FTI has not had any meaningful direct communication with the Debtors or the Debtors' advisors. On December 13, 2023, shortly after FTI signed the "Joinder to Confidentiality Agreement and Protective Order", Dechert LLP ("Dechert"), in its capacity as counsel to the Committee, contacted Reed Smith LLP ("Reed Smith"), in its capacity as counsel to the Debtors, regarding establishing communication between FTI and those responsible for financial matters at the Debtors. To my knowledge, Reed Smith never responded to this outreach.

8. Based on my experience, it is very common for debtors who file for Chapter 11 with similarly sized liabilities to hire a financial advisor to assist with various aspects of a bankruptcy. To my knowledge, the Debtors have not engaged a financial advisor. In my 20 plus years as a restructuring advisor, during which I have represented over 35 official committees of unsecured creditors, this is the first official committee of unsecured creditors I have represented where the debtors did not employ a financial advisor.

9. Debtor Eletson Holdings Inc. is a holding company that owns 100% of common shares of at least 60 subsidiaries[2], with various assets of unknown value. In my experience, official creditors' committees routinely identify and investigate the assets of debtors' subsidiaries and value the Debtors' interest in them, as such assets could impact the value that

---

[2] Docket No. 340 at 9-10 (Amended Rider to Question 15 on Scheduled A/B).

3

could be distributed to unsecured creditors. Committees also routinely work to understand and evaluate the claims asserted against the Debtors by third-parties and insiders (including intercompany claims, which the Debtors have yet to disclose). To date, the Debtors have not disclosed sufficient information for the Committee to do that work. In addition, the Committee's ability to undertake these duties is practically impossible without the engagement and cooperation of the Debtors.

10. The Debtors filed a proposed Chapter 11 plan (the "Plan") on January 23, 2024, without engaging in any discussions with the Committee's advisors. The Debtors lack of communication is highly atypical.

### Debtors Have Failed to Disclose Material Information and Have Provided Little Transparency into the Material Assets

11. Debtor Eletson Holdings Inc. is a holding company that owns 100% of common shares of at least 60 subsidiaries.[3]

12. Among these subsidiaries are the non-Debtor subsidiaries: (i) Eletson Corporation; (ii) EMC Investment Corporation; (iii) Kastos Special Maritime Enterprise ("Kastos"); (iv) Fourni Special Maritime Enterprise ("Fourni"); (v) Kinaros Special Maritime Enterprise ("Kinaros"); (vi) Kimolos II Special Maritime Enterprise ("Kimolos") (iii through vi collectively, the "Charterer SMEs"); and (vii) Eletson Gas LLC ("Eletson Gas") (along with i through vi, the "Non-Debtor Subsidiaries").

13. Upon information and belief, each Charterer SME is a party to sale and leaseback arrangement with Oaktree Capital Management L.P. affiliated entities with respect to an eponymous vessel and operates the applicable vessel pursuant to the terms of a bareboat

---

[3] Docket No. 340 at 9-10 (Amended Rider to Question 15 on Scheduled A/B).

4

charter agreement.[4]

14. Eletson Gas's main assets are equity interests in 14 separate vessel chartering subsidiaries[5] as well as potential proceeds from an arbitration award,[6] the amount of which is contingent on various ongoing legal proceedings in the District Court.

15. The Debtors have provided minimal relevant information on these vessels which are operated by the Charter SMEs and Eletson Gas. The only information provided to date are high level summary balance sheets, income statements and cash flow statements for 9-months ending September 30, 2023,[7] which themselves have their own inadequacies as described herein.

16. These high-level financial summaries indicate that (i) the Charterer SMEs are generating positive cash flow from their operations[8], and (ii) there are significant intercompany disbursements reflected as cash outflows, potentially resulting in reduced cash flow from operations.[9]

17. Year-to-date through September 30, 2023, the Charterer SMEs generated a combined $18.4 million in cash flow from operations, when excluding the $7.7 million in

---

[4] Filed Proof of Claim Nos. 5-1, 6-1, 7-1, and 8-1.

[5] Bates No. EletsonBK085993.

[6] *Eletson Holdings, Inc., et al. v. Levona Holdings, LTD.*, Case No. 23-cv-07331-LJL (S.D.N.Y.), Docket No. 41, Exhibit 1 (Final Arbitration Award).

[7] Docket No. 341.

[8] Year to date through September 30, 2023, the Debtors reported operating cash flows for the Kastos, Fourni, Kinaros, and Kimolos of $2.9 million, $2.7 million, $2.4 million, and $2.7 million, respectively (Docket No. 341 at 130–133).

[9] Year to date through September 30, 2023, the Debtors reported intercompany disbursements for the Kastos, Fourni, Kinaros, and Kimolos of $0.1 million, $4.1 million, $3.3 million, and $0.2 million, respectively (Docket No. 341 at 130–133).

5

aggregate net intercompany disbursements, the nature of which are not detailed[10]. The balance sheets included in the second amended Rule 2015.3 Report did not provide further insight as intercompany balances are not included.[11] To that end, the second amended Rule 2015.3 Report (Docket No. 341) states that:

> Companies within a group often engage in intercompany transactions for cash flow purposes. These stand-alone balance sheets are clean from intercompany balances, given that the consolidated financial statements prepared by Eletson eliminate (net-off) these intercompany transactions. This netting-off procedure eliminates the possibility of duplicative inclusions, ensuring a more accurate depiction of external transactions.

18. Eletson Gas generated approximately $15 million in cash flow from operations year-to-date through September 30, 2023, but the balance sheet appears to be presented on a consolidated basis for all Eletson Gas subsidiaries, making it unclear to which specific entities that cash flow can be attributed to.[12]

19. To date, it is unknown to the Committee (i) whether profits are retained by Non-Debtor Subsidiaries or are distributed to other persons or entities outside the Debtors' corporate structure, (ii) how the cash generated by these vessels is handled, and (iii) whether these vessels are operating for the benefit of their ultimate equity holder, Eletson Holdings, or a third-party. Without this insight, the Committee cannot evaluate whether potential value leakage has occurred in connection with the Debtors' primary assets.

20. Based on my experience, these kinds of questions are addressed through a motion filed at the onset of a case, where a debtor seeks authority from the court to continue the

---

[10] Docket No. 341 at 130–133.

[11] Docket No. 341 at 12–15.

[12] Docket No. 341 at 138.

use of its existing cash management system (the "Cash Management Motion"), and by providing detail on intercompany balances in the Statement of Assets and Liabilities or the Rule 2015.3 Reports. However, the Debtors have neither filed a Cash Management Motion nor provided intercompany balances in the Statement of Assets and Liabilities or the Rule 2015.3 Reports.[13] This level of information is critical in order for the Committee to perform its typical duties.

21. Specifically, a Cash Management Motion typically provides the Committee with mechanisms to ensure value from the bankruptcy estate is not inappropriately leaking beyond creditors' reach. Information typically contained in a Cash Management Motion includes listings of cash accounts, the functions of the accounts, an overview of ordinary course intercompany transactions, and any intercompany financing arrangements. Further, the Committee is often critical in developing controls that are contained in the Cash Management Order, which can include, among others, periodic reporting on intercompany transactions, transactions between Debtors and non-Debtors, and reporting on cash balances by account.

22. Without any insight into the intercompany balances, it is not feasible to accurately determine the total claims pool at each Debtor entity, nor is it feasible to assess the value and collectability of any intercompany receivables.

**The Disclosures by the Debtors Do Not Appear to be GAAP Compliant**

23. Based on the limited information provided in the second amended 2015.3 Report filed on December 29, 2023, it does not appear that the financial statements are compliant with

---

[13] The second amended Rule 2015.3 Report states that: "Companies within a group often engage in intercompany transactions for cash flow purposes. These stand-alone balance sheets are clean from intercompany balances, given that the consolidated financial statements prepared by Eletson eliminate (net-off) these intercompany transactions. This netting-off procedure eliminates the possibility of duplicative inclusions, ensuring a more accurate depiction of external transactions." *See* Docket No. 341 at 10-67 (footnotes).

Generally Accepted Accounting Principles ("GAAP") despite the Debtors' claim to the contrary[14], based on the following:

    a) GAAP Financial Statements are required to contain footnote disclosures explaining the GAAP presentation rules and the methodologies behind certain account balances. These necessary disclosures are absent from the 2015.3 Financial Statements.

    b) While the Balance Sheet appears to be presented in correct GAAP "format and account structure," there are no intercompany balances shown on the entity-level Balance Sheets, even though there are intercompany transactions shown on the Statement of Cash Flows.

    c) Deferred Charges are included in noncurrent assets in the Balance Sheet, while also included in the operating section of the Statement of Cash Flows. The only assets and liabilities that should be included in this reconciliation from Net Income to Cash from Operating Activities are current assets and liabilities.

    d) The Income Statement includes Gain from sale of assets in the Operating Income section. These gains are typically included in Other Income or Nonoperating Income.

---

[14] The Debtors' second amended Rule 2015.3 Report notes: "The financial information contained herein for each entity subject to the reporting requirement (collectively the "Controlled Non-Debtor Entities") is presented on a preliminary and unaudited basis, remains subject to adjustments, and to the best of the Debtors' knowledge complies in all material respects with generally accepted accounting principles in the United States of America ("U.S. GAAP")." Docket No. 341 at 6 (Basis of Presentation).

8

Pursuant to 28 U.S.C. § 1746, I, the undersigned, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: February 6, 2024

/s/   Michael Cordasco
Michael Cordasco
Senior Managing Director
FTI Consulting, Inc.