**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

Eletson Holdings Inc., *et al.*,

               Debtors.

<u>FOR PUBLICATION</u>

Chapter 11

Case No. 23-10322 (JPM)
(Jointly Administered)

**MEMORANDUM OPINION AND ORDER**
**DENYING: (I) MOTION IN LIMINE; (II) MOTION TO**
**<u>EXCLUDE; AND (III) MOTIONS TO APPOINT A CHAPTER 11 TRUSTEE</u>**

*A P P E A R A N C E S:*

**REED SMITH LLP**
*Counsel for the Debtors*
599 Lexington Avenue
New York, NY 10022
By:    Louis M. Solomon, Esq.

**REED SMITH LLP**
*Counsel for the Debtors*
10 South Wacker Drive, 40th Floor
Chicago, IL 60606
By:    Anne E. Pille, Esq.

**REED SMITH LLP**
*Counsel for the Debtors*
1717 Arch Street
Philadelphia, PA 19103
By:    Derek J. Baker, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for the Shareholders*
787 Seventh Avenue
New York, NY 10019
By:    William E. Curtin, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for the Shareholders*
1000 Louisiana Street, Suite 5900
Houston, TX 77002
By:    Dustin K. McFaul, Esq.

**DECHERT LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1095 Avenue of the Americas
New York, NY 10036
By:    David A. Herman, Esq.
         Stephen D. Zide, Esq.

**TOGUT, SEGAL & SEGAL LLP**
*Counsel for the Petitioning Creditors*
1095 Avenue of the Americas
New York, NY 10036
By:    Kyle J. Ortiz, Esq.
         Brian F. Shaughnessy, Esq.

**PERKINS COIE LLP**
*Counsel for Wilmington Savings Fund Society, FSB, as Trustee*
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    Tina M. Moss, Esq.

**CHALOS & CO, P.C.**
*Counsel for Sunrise I NPL*
55 Hamilton Avenue
Oyster Bay, NY 11771
By:    Briton P. Sparkman, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee, Region 2*
One Bowling Green, Room 534
New York, NY 10004
By:    Daniel Rudewicz, Esq.

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    **INTRODUCTION**

Section 1104(a) of the Bankruptcy Code provides that a Court shall appoint a Chapter 11

Trustee for cause, or when such appointment is in the best interest of creditors. *See* 11 U.S.C. §

1104(a). Though the standard under Section 1104(a) permits the Court to analyze a wide array of

conduct in determining whether a Chapter 11 Trustee should be appointed, the appointment of a

Chapter 11 Trustee is considered an extraordinary remedy and parties seeking such an

appointment must prove by "'clear and convincing evidence' that the appointment of a trustee is

warranted." *In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009) (citing *In re Adelphia

Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006)).

These cases began when certain petitioning creditors commenced involuntary bankruptcy

proceedings against the Debtors. Though these cases have since been converted to voluntary

Chapter 11 proceedings, the adversarial spirit inherent in an involuntary bankruptcy case

remains, and has, most recently, resulted in the motions to appoint a Chapter 11 Trustee

presently pending before the Court. While the Court understands many of the movants' concerns,

the Court ultimately finds that the movants have not met the high burden necessary for such an

extraordinary remedy.

Pending before the Court are three motions to appoint a Chapter 11 Trustee: (i) the

Official Committee of Unsecured Creditors' (the "**Committee**") *Motion for an Order Appointing

a Chapter 11 Trustee* (the "**Committee Motion**") (Docket No. 394)[1]; (ii) the Office of the

---

[1] References to "Docket No. __" are to filings entered on the docket in *In re Eletson Holdings Inc. et al.*, No. 23-10322. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York. References to "FRCP __" are to the Federal Rules of Civil Procedure.

United States Trustee's (the "**UST**") *Motion to Appoint a Chapter 11 Trustee* (the "**UST Motion**") (Docket No. 424); and (iii) Pach Shemen LLC, VR Global Partners, L.P., Alpine Partners (BVI), L.P., Gene B. Goldstein, Gene B. Goldstein, In His Capacity as Trustee of the Gene B. Goldstein and Francine T. Goldstein Family Trust, Mark Millet, In His Capacity as Trustee of the Mark E. Millet Living Trust, Mark Millet, In His Capacity as Trustee of the Millet 2016 Irrevocable Trust, Robert Latter, Tracy Lee Gustafson, Jason Chamness, and Ron Pike's (collectively the "**Petitioning Creditors**," and collectively, with the Committee, the "**Creditors**") *Emergency Motion to Appoint a Trustee* (the "**PC Motion**," and together, with the Committee Motion and the UST Motion, the "**Trustee Motions**"). (Docket No. 468).

The Committee Motion is supported by the *Declaration of Michael Cordasco in Support of Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* (the "**Cordasco Declaration**"). (Docket No. 396).

The following joinders were filed to the Trustee Motions: (i) the Petitioning Creditors joined both the Committee Motion and the UST Motion (the "**PC Joinder**") (Docket No. 477); and (ii) Deutsche Bank Trust Company Americas in its Capacity as Indenture Trustee under the 2013 Notes Indenture ("**Deutsche Bank**"), Wilmington Savings Fund Society, FSB, as Trustee, ("**Wilmington**"), and Sunrise I NPL Finance ("**Sunrise**") joined the Committee Motion. (Docket Nos. 404, 420, and 476).

The PC Joinder is supported by the *Declaration of Jared C. Borriello in Support of Joinder of Motions for an Order Appointing Chapter 11 Trustee* (the "**Boriello Declaration**") (Docket No. 478).

In response to the Trustee Motions, Eletson Holdings Inc. ("**Eletson Holdings**"), Eletson Finance (US) LLC ("**Eletson Finance**") and Agathonissos Finance LLC ("**Agathonissos**

5

Finance," and collectively with Eletson Holdings and Eletson Finance, the "**Debtors**") filed an objection to the UST Motion (the "**Objection to the UST Motion**") (Docket No. 512) and an omnibus objection to the Committee Motion and the PC Motion (the "**Omnibus Objection**"). (Docket No. 513).

The Omnibus Objection is supported by the *Declaration of Louis M. Solomon in Support of Debtors' Omnibus Objection to (i) Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee and Joinder of Petitioning Creditors and (ii) Petitioning Creditors' Emergency Motion to Appoint a Trustee* (the "**Solomon Declaration**") (Docket No. 517).

Lassia Investment Company, Glafkos Trust Company, and Family Unity Trust Company, the majority shareholders of Eletson Holdings (together, the "**Shareholders**") also filed an *Omnibus Objection of the Majority Shareholders of Eletson Holdings Inc. to the Trustee Motions* (the "**Shareholder Objection**," and together with the Objection to the UST Motion and the Omnibus Objection, the "**Objections**") (Docket No. 518).

On April 2, 2024, the Court received the following replies to the Trustee Motions: (i) the *Reply of the United State Trustee in Support of The United States Trustee's Motion to Appoint a Chapter 11 Trustee* (the "**UST Reply**") (Docket No. 544); (ii) the *Petitioning Creditors' Reply In Support of Motions for Entry of an Order Appointing a Chapter 11 Trustee* (the "**PC Reply**") (Docket No. 547); and (iii) the *Reply of the Official Committee of Unsecured Creditors in Support of Its Motion for an Order Appointing a Chapter 11 Trustee* (the "**Committee Reply**," and together, with the UST Reply and the PC Reply, the "**Replies**") (Docket No. 549).

6

The PC Reply is supported by the *Declaration of Jared C. Borriello in Support of Petitioning Creditors' Reply in Support of Motions for Entry of an Order Appointing a Chapter 11 Trustee* (the "**Second Borriello Declaration**") (Docket No. 548).

The Court held evidentiary hearings on the Trustee Motions on April 9 (Docket No. 593, the "**April 9 Transcript**"), April 10 (Docket No. 601, the "**April 10 Transcript**"), and April 11, 2024 (Docket No. 602, the "**April 11 Transcript**") (collectively the "**Hearings**"). Consistent with the Court's scheduling order entered in connection with the Hearings, the parties submitted all direct testimony by declaration. (Docket No. 467 at ¶ 7). Accordingly, at the Hearings, the Court admitted the following direct testimony into the record for the Creditors: (i) the *Witness Declaration of Michael Cordasco in Support of the Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* (the "**Cordasco Witness Declaration**") (Docket No. 524); (ii) the *Declaration of Jeff Drake in Support of the Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* (the "**Drake Declaration**") (Docket No. 550); and (iii) the *Declaration of Cynthia Romano in Support of the Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* (the "**Romano Declaration**") (Docket No. 551).

The Court also admitted the following direct testimony for the Debtors: (i) the *Declaration of Vasilis Hadjieleftheriadis in Support of Debtors' Opposition to the Motion to Appoint a Trustee* (the "**Hadjieleftheriadis Declaration**") (Docket No. 514); (ii) the *Declaration of Vassilis Kertsikoff in Support of the Debtors' Omnibus Objection to (i) Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee and Joinder of Petitioning Creditors and (ii) Petitioning Creditors' Emergency Motion to Appoint a Trustee* (the "**Kertsikoff Declaration**") (Docket No. 516); (iii) the *Declaration of*

*Laskarina Karastamati in Support of Debtors' Opposition to the Motion to Appoint a Trustee* (the "**Karastamati Declaration**") (Docket No. 519); (iv) the *Witness Declaration of Nikolaos Veraros* (the "**Veraros Declaration**") (Docket No. 520); (v) the *Witness Declaration of Marina Orfanoudaki* (the "**Ofanoudaki Declaration**") (Docket No. 521); (vi) the and *Declaration of CLLR. T. Negbalee Warner* (the "**Warner Declaration**") (Docket No. 522).[2]

The UST, the Debtors, and the Creditors each submitted exhibit lists, and the exhibits contained within them were also admitted into the record. (Docket No. 554 ("**UST Ex.**"); Docket No. 560 ("**Debtor Ex.**"), Docket No. 569 ("**Creditor Ex.**"), respectively).[3] Finally, the Creditors and the Debtors each submitted deposition designations and counter designations, which the Court will also consider in connection with this ruling. (Docket Nos. 555 and 556, respectively).

Following the Hearings, the Court received post-trial briefs from the: (i) Committee (the "**Committee Brief**") (Docket No. 594); (ii) Debtors (the "**Debtor Brief**") (Docket No. 595); (iii) UST (the "**UST Brief**") (Docket No. 596); (iv) Shareholders (the "**Shareholder Brief**") (Docket No. 597); and (v) Petitioning Creditors (the "**PC Brief**") (Docket No. 598).[4]

The Court has reviewed and considered the Trustee Motions, the Objections, the Replies, the declarations, the testimony, the arguments of counsel, the briefs, and the record as a whole.

---

[2] Unredacted versions of the Hadjieleftheriadis Declaration, Kertsikoff Declaration, Karastamati Declaration, and Veraros Declaration were filed after the Hearings. (Docket Nos. 579, 580, 581, and 582, respectively).

[3] References to "UST Ex. __" are to exhibits submitted in the UST's Preliminary Exhibit List. (Docket No. 554). References to "Debtor Ex. __" are to exhibits submitted in the Debtors' Exhibit List. (Docket No. 560). References to "Creditor Ex. __" are to exhibits submitted in the Joint Amended Exhibit List submitted by the Committee and the Petitioning Creditors. (Docket No. 569).

[4] Also pending before the Court are two evidentiary motions. First, on the eve of the Hearings, the Petitioning Creditors filed the *Omnibus Motion in Limine to Exclude Evidence filed in Support of the Debtors' Trustee Motion Objections* (the "**PC Motion in Limine**") (Docket No. 568). Second, the Debtors raised oral motions to exclude the Drake Declaration and Romano Declaration at the Hearings (the "**Debtors' Motion to Exclude**") (April 10 Transcript 64:7–65:9; 103:23–104:7). The Debtors and the Committee responded to the evidentiary motions in their post-hearing briefs (Committee Brief at ¶¶ 24–27; Debtor Brief at ¶¶ 68–71). Accordingly, the Court will also address the PC Motion in Limine and the Debtors' Motion to Exclude herein.

## II.   <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).

## III.   <u>BACKGROUND</u>

### A.   <u>THE DEBTORS' ORGANIZATIONAL STRUCTURE</u>

Debtor Eletson Holdings is the ultimate parent of a collection of entities engaged in international gas shipping (the "**Eletson Enterprise**"). (Committee Motion at ¶ 11). The Eletson Enterprise owns and operates a fleet of medium and long-range gas tanker ships that carry a wide range of refined petroleum products, as well as crude oil. (*Id.*) The Eletson Enterprise "operates its fleet through wholly owned subsidiaries of Eletson Holdings, which own or charter the vessels." (*Id.* at ¶ 12). The fleet is managed by non-debtor Eletson Corporation ("**Eletson Corp.**"), another wholly owned subsidiary of Eletson Holdings. (*Id.*) The Eletson Enterprise currently includes 18 ships, 14 of which are operated by non-debtor Eletson Gas LLC ("**Eletson Gas**"). (*Id.*) Each of the Debtors are holding companies that do not maintain any operations or employees other than their officers and directors. (Kertsikoff Declaration at ¶ 13).

Eletson Holdings and its subsidiaries are closely held, controlled, and managed by the Kertsikoff, Hadjieleftheriadis, and Karastamati families (the "**Principal Families**"). (Committee Motion at ¶ 13). Each of the Principal Families owns approximately 30.7% of Eletson Holdings indirectly through Liberian trust companies. (*Id.*) The remaining equity is held by two other families, the Zilakos and Andreoulakis families (collectively, with the Principal Families, the "**Families**"). (*Id.*) All of the Families are themselves relatives of each other. (*Id.*)

Members of the Principal Families are also "directors and officers of Eletson Holdings and of its various subsidiaries, including Eletson Corp. and Eletson Gas." (*Id.* at ¶ 14). The

Families also own certain entities that are unaffiliated with the Eletson Enterprise (the "**Cypriot Nominees**"). (*Id.*)

### B. <u>THE NOTES</u>

In December 2013, Eletson Holdings and one of its affiliates issued the 9.625% First Preferred Ship Mortgage Notes due 2022 (the "**Old Notes**"). (Kertskoff Declaration at ¶ 19). The Old Notes had a face value of $300 million. (*Id.*) Deutsche Bank served as the trustee for the Old Notes. (*Id.*)

In May 2018, Eletson Finance and Eletson Holdings initiated an exchange for the Old Notes (the "**Note Exchange**"). (*Id.* at ¶ 20). "Approximately 2% of the holders of [the] Old Notes chose not to participate in the Note Exchange and retained their Old Notes." (*Id.*) In July 2018, the Debtors finalized the Note Exchange and issued the First Preferred Ship Mortgage Notes due 2022 (the "**Exchange Notes**"). (*Id.*) The Exchange Notes had a face value of $314,068,360. (*Id.*) Wilmington served as the trustee for the Exchange Notes. (*Id.* at ¶ 21).

In 2019, the Debtors entered into two restructuring support agreements with Wilmington and certain consenting noteholders: (i) the Restructuring Support Agreement dated June 24, 2019 (the "**First RSA**"), and (ii) the Restructuring Support Agreement dated October 29, 2019 (the "**Second RSA**" and, together with the First RSA, the "**RSA's**"). (*Id.* at ¶ 23).

### C. <u>ELETSON GAS, MURCHINSON, AND THE ARBITRATION</u>

In October 2013, Eletson Holdings and Blackstone Tactical Opportunities ("**Blackstone**") formed Eletson Gas, a $700 million liquefied petroleum gas shipping joint venture. (Kertsikoff Declaration at ¶ 84). As part of the joint venture, Eletson Holdings held the common shares of Eletson Gas (the "**Eletson Gas Common Shares**"), and Blackstone held the

preferred shares of Eletson Gas (the "**Eletson Gas Preferred Shares**"). (*Id.* at ¶ 85; Karastamati Declaration at ¶ 13).

In November 2021, Levona Ltd. ("**Levona**") acquired Blackstone's stake in Eletson Gas. (Kertsikoff Declaration at ¶ 89). Levona is a special purpose entity affiliated with Murchinson Inc. ("**Murchinson**"). (Karastamati Declaration at ¶ 11). Murchinson is also affiliated with another special purpose entity, Pach Shemen LLC ("**Pach Shemen**"), which is one of the Petitioning Creditors. (*Id.*) As part of Levona's acquisition, Levona became a party to Eletson Gas's Limited Liability Company Agreement (the "**LLCA**"). (*Id.* at ¶ 13).

On March 11, 2022, Eletson Holdings and Levona negotiated a Binding Offer Letter (Debtor Ex. 57, the "**BOL**") whereby Levona would sell its Preferred Shares to Eletson Gas or Eletson Gas' nominee for $23 million. (Karastamati Declaration at ¶ 17; BOL at § 2.1). Following execution of the BOL, a dispute arose over whether the purchase option contained in the BOL had been properly exercised. (Karastamati Declaration at ¶ 18). Accordingly, in July 2022, Eletson Holdings and Eletson Corp. initiated a JAMS arbitration (the "**Arbitration**") against Levona (and together with Eletson Holdings and Eletson Corp., the "**Arbitration Parties**") before the Honorable Ariel Belen (the "**Arbitrator**") pursuant to the LLCA seeking a determination of the ownership of the Eletson Gas Preferred Shares. (*Id.* at ¶¶ 4, 19).

Specifically, Eletson Holdings and Eletson Corp. asserted claims against Levona for breach of the LLCA and breach of the covenant of good faith and fair dealing. (See Creditor Ex. 76 at 9).[5] First, Eletson Holdings and Eletson Corp. asserted that Murchinson's acquisition of Blackstone's interests in Eletson Gas was void *ab initio* due to "deceitful and wrongful conduct," including: (i) bribing Eletson Corp.'s CFO, Peter Kanelos, causing him to disclose confidential

---

[5] Creditor Ex. 76 is the *Final Award* issued by the Arbitrator dated September 29, 2023 (the "**Final Award**"), as described below.

11

Eletson Gas information prior to Levona's purchase of the Preferred Shares (*id.* at 9–10); (ii) communicating directly with Eletson Gas' financiers and lenders in violation of an NDA (*id.* at 10); and (iii) engaging in industrial sabotage that led to the arrest of Eletson Gas vessels prior to Murchinson's acquisition of the Preferred Shares. (*Id.*)

Second, Eletson Holdings and Eletson Corp. claimed that Levona breached the LLCA and the Eletson Gas management agreements after acquiring Blackstone's shares by, *inter alia*: (i) attempting to fire Eletson Corp. as the manager of Eletson Gas and Eletson Gas' subsidiaries' vessels; (ii) failing to disclose pre-acquisition misuse and breaches of confidential information; (iii) continuing to conspire with Peter Kanelos to liquidate and harm Eletson Gas; and (iv) conspiring with Eletson Gas' corporate counsel, Watson Farley Williams, to take actions against Eletson Gas' interests. (*Id.*)

Third, Eletson Holdings and Eletson Corp. claimed that Levona, Murchinson, and Pach Shemen, violated an injunction entered in the Arbitration (the "**Status Quo Injunction**") by: (i) wrongfully declaring Eletson Gas in default of a loan made by Levona to Eletson Gas; (ii) trying to sell the Symi and Telendos (two of the vessels owned by subsidiaries of Eletson Gas); and (iii) "directing the purchase of a controlling position in debt securities of [Eletson] Holdings for the purpose of commencing litigation against [Eletson] Holdings and the involuntary [bankruptcy] . . . ." (*Id.*)

Finally, Eletson Holdings and Eletson Corp. asserted claims against Levona for failing to acknowledge Eletson Holdings and Eletson Corp.'s compliance with the BOL and other transaction documents by: (i) failing to transfer the Eletson Gas Preferred Shares; and (ii) continuing to act on behalf of Eletson Gas in a bad faith manner, including by entering into a contract with Unigas (the "**Unigas LOI**") without proper consent. (*Id.* at 11)

For these actions, Eletson Holdings and Eletson Corp. sought declaratory relief regarding the ownership of the Preferred Shares, as well as "compensatory damages of at least $71 million, punitive damages in the range of 3 to 9.63 times the compensatory damages, pre-judgment interest at ten percent per annum, costs, and attorney's fees." (*Id.*)

In response, Levona asserted counterclaims against Eletson Holdings and Eletson Corp., under the theory that Levona remained the holder of the Preferred Shares. (*Id.*) Accordingly, Levona sought declaratory relief regarding its rights under the LLCA. (*Id.*) Levona also sought monetary damages for failure to attend board meetings, which prevented Eletson Gas from refinancing certain debt and from engaging in due diligence in connection with the Unigas LOI. (*Id.*) Levona also asserted a claim for tortious interference in connection with the Unigas LOI and conversion for denying Levona the ability to sell the Symi and Telendos, two of the vessels owned by Eletson Gas. (*Id.*) As compensation for these claims, Levona sought compensatory damages of more than $3 million, plus additional amounts for any profit due to Levona from Eletson Gas as the holder of the Eletson Gas Preferred Shares, "and any decrease in net profit from the sale of the vessels as compared to the Unigas LOI." (*Id.*) Levona also sought $2 million in punitive damages, post-judgment interest, costs, and attorney's fees. (*Id.*)

### D.  THE INVOLUNTARY BANKRUPCY PROCEEDINGS

On March 7, 2023 (the "**Petition Date**"), certain of the Petitioning Creditors, (Pach Shemen, VR Global Partners, L.P., and Alpine Partners (BVI), L.P.) filed involuntary petitions against the Debtors under Chapter 7 of the Bankruptcy Code (the "**Involuntary Petitions**"). (Docket No. 1). They were later joined by the remaining 11 Petitioning Creditors. (Committee Motion at ¶ 19).

On March 13, 2023, the Debtors filed the *Motion for Relief from Stay to Proceed with, or to Confirm the Inapplicability of, the Automatic Stay to Prepetition Arbitration Proceedings* (the "**Stay Relief Motion**"). (Docket No. 5). The Debtors also moved to dismiss the Involuntary Petitions on April 14, 2023 (the "**Motion to Dismiss**"). (Docket No. 40).

On April 17, 2023, the Court so-ordered a stipulation between the parties regarding the Stay Relief Motion (the "**Stay Relief Stipulation**"). (Docket No. 48). As is relevant here, the Stay Relief Stipulation modified the automatic stay "solely to the extent necessary and for the sole purpose of permitting . . . a final determination or award to be made by the Arbitrator . . . with respect to the claims *currently* pending in the Arbitration." (*Id.* at ¶ 3) (emphasis added). Moreover, the Stay Relief Stipulation provided that:

> Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending further order of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award. For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court.

(*Id.* at ¶ 4).

### E.  THE FINAL AWARD AND THE CONFIRMATION PROCEEDINGS

Following entry of the Stay Relief Stipulation, Eletson Holdings and Eletson Corp. argued for the first time in the Arbitration that the Preferred Shares had been transferred to the Cypriot Nominees and were therefore not held by Eletson Gas. (*See* Creditor Ex. 3[6] at 20–21 (noting that an April 25, 2023, statement was the first time "Eletson asserted in the arbitration that the Preferred [Shares] were transferred to a nominee" and that previously "Eletson [Holdings and Eletson Corp.] claimed that . . . [they were] the sole unit holder of the company");

---

[6] Creditor Ex. 3 is the *Opinion and Order* dated February 9, 2024, issued by Judge Liman in the District Court (the "**Confirmation Ruling**"), as described below.

Creditor Ex. 19[7] at 153:2–24 (where the Debtors' counsel stated at a hearing in the Arbitration

that he urged his client to "just transfer [the Preferred Shares] to the nominees," and his clients

informed him that they "ha[d] already done it"); Final Award at 30 (noting that "[i]t is

undisputed that Eletson [Holdings and Eletson Corp.] raised this contingent transfer to Cypriot

[N]ominees for the first time in [their] Rule 20(b) submission on May 5, 2023")).[8]

On July 28, 2023, the Arbitrator issued an interim award in favor of Eletson Holdings and

Eletson Corp., which award was subsequently modified on August 15, 2023. (Kertsikoff

Declaration at ¶ 22). The interim award was made final by the Final Award, issued on September

29, 2023. (*Id.*)

In the Final Award, the Arbitrator found that Eletson Gas had exercised the option under

the BOL to acquire the Preferred Shares by transferring shares in two vessels owned by Eletson

Gas (the Symi and the Telendos) to Levona. (Final Award at 34–38). The Final Award also

concluded that the Preferred Shares had been transferred to the Cypriot Nominees as of March

11, 2022. (*Id.* at 96). Though not discussed in the Final Award, the Court notes that the transfer

of the Preferred Shares to the Cypriot Nominees apparently occurred at a "family meeting,"

(Debtor Ex. 585 (the "**Karastamati Deposition**") at 71–14–72:13) with the same individuals

standing on both sides of the transaction. (*Id.* at 15:17–19, 22:18–23:14, 35:11–13 (where

Karastamati states that she is a director and the president of Eletson Holdings, a director of

Eletson Gas, and an owner of one of the Cypriot Nominees); Karastamati Declaration at ¶ 1

(where Karastamati states that she is a secretary and director of Eletson Gas)).

---

[7] Creditor Ex. 19 is the transcript of the May 15, 2023, hearing in the Arbitration (the "**May 15 Arbitration Hearing**").

[8] The Court notes that the Arbitrator and the District Court each found different dates as to when Eletson Holdings and Eletson Corp. raised for the first time the transfer to the Cypriot Nominees. Nevertheless, both dates post-date the Stay Relief Stipulation.

Additionally, the Final Award assessed nearly $87 million in damages against Levona, plus fees, costs, and interest. (Final Award at 99–101). Notably, none of the damages awarded in the Final Award were awarded to Eletson Holdings. Instead, approximately half of the damages were awarded to Eletson Gas, and half were awarded to the Cypriot Nominees because the Arbitrator found that they were the ones directly harmed by Levona's conduct. (*Id.* at 64 (stating that "[t]he damages should be paid to the Preferred Nominees, as they flow directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interest"); *Id.* at 66–67 (describing damages that should be awarded to Eletson Gas for, *inter alia*, the leaking of Eletson Gas information, reputational harm to Eletson Gas, and lost business opportunities)).

On August 18, 2023, Eletson Holdings and Eletson Corp. filed a petition in the United States District Court for the Southern District of New York (the "**District Court**") to confirm the Final Award, including the portion finding that the Preferred Shares were transferred to the Cypriot Nominees and the portion awarding damages to Eletson Gas and the Cypriot Nominees. (Committee Motion at ¶ 43). The District Court issued the Confirmation Ruling on February 15, 2024, which confirmed the Final Award in part, but vacated certain portions of the damages and certain findings made by the Arbitrator relating to Levona, Pach Shemen, and Murchinson's liability under an alter ego theory.[9] (Confirmation Ruling at 81 (vacating "the portions of the Award that purport to find Murchinson and Pach Shemen liable, or that require them to pay damages"); *Id.* at 123–124)).

---

[9] The Court further notes that, following the Hearings in this matter, the District Court remanded the Final Award to the Arbitrator to clarify certain findings relating to the award of punitive damages. (Docket No. 696 at 21). Additionally, Levona filed a motion in the District Court seeking reconsideration of the Confirmation Ruling. (*Id.*) Upon filing of the reconsideration motion, the District Court stayed the remand to the Arbitrator pending resolution of the reconsideration motion. (*Id.* at 22).

### F.  **CONVERSION TO VOLUNTARY CHAPTER 11**

While the Arbitration was ongoing, the bankruptcy cases progressed. At a hearing before this Court on September 6, 2023, the parties stipulated to conversion of these cases to voluntary Chapter 11 proceedings (the "**Conversion Stipulation**"), which stipulation was later memorialized in the *Order Converting These Cases to Cases Under Chapter 11*. (Docket No. 215).

On October 10, 2023, the Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "**Schedules**"). (Committee Motion at ¶ 22 (citing Docket Nos. 216–221)). On October 13, 2023, the UST noticed a Section 341(a) meeting of creditors (the "**341 Meeting**") for November 7, 2023. (*Id.* at ¶ 23 (citing Docket No. 223)). Accordingly, by operation of Bankruptcy Rule 2015.3[10], the Debtors were to file reports regarding their interests in their subsidiaries (the "**2015.3 Reports**") by October 31, 2023, 7 days prior to the 341 Meeting. (*Id.*) However, the Debtors failed to file their 2015.3 reports on October 31, 2023. (*Id.*)

On October 20, 2023, the UST appointed the Committee. (Docket No. 233). The Committee's members are Aegean Baltic Bank S.A., Gene B. Goldstein, and Wilmington. (*Id.*) Deutsche Bank "serves as an ex-officio member of the Committee." (Committee Motion at ¶ 21).

On November 6, 2023, the 341 Meeting was adjourned because the Debtors' witness was unavailable. (*Id.* at ¶ 24). The 341 Meeting was rescheduled for November 14, 2023; however, the Debtors' witness was once again unavailable. (*Id.*)

---

[10] Bankruptcy Rule 2015.3(a) provides that Chapter 11 debtors "shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest . . . ." Rule 2015.3(a). Bankruptcy Rule 2015.3(b) further provides that "[t]he first report required by this rule shall be filed no later than seven days before the first date set for the meeting of creditors under §341 of the Code. Subsequent reports shall be filed no less frequently than every six months thereafter, until the effective date of a plan or the case is dismissed or converted." Rule 2015.3(b).

"On November 20, 2023, the Debtors filed 2015.3 Reports for ten of their 73 subsidiaries." (*Id.* at ¶ 25). However, the Debtors failed to produce a report for Eletson Gas on that date. (*Id.* at ¶ 26). On November 30, 2023, the Debtors filed an amended 2015.3 Report concerning Eletson Gas. (Committee Motion at ¶ 27 (citing Docket No. 298)).[11]

On December 11, 2023, the Debtors formed an independent committee (the "**Demand Review Committee**") in order to resolve certain objections from the U.S. Trustee to Reed Smith's retention as counsel for the Debtors in these cases. (Docket No. 330 at ¶¶ 18–20). The Demand Review Committee is empowered to investigate potential causes of action on behalf of the Debtors, including those against the Cypriot Nominees stemming from the transfer of the Preferred Shares. (Kertsikoff Declaration at ¶ 49 (citing Docket No. 329-2); Hadjieleftheriadis Declaration at ¶¶ 102–103). Importantly, the Demand Review Committee is only authorized to investigate claims upon receipt of a demand to do so. (*Id.*) As of March 22, 2024, no demand had been made of the Demand Review Committee. (Hadjieleftheriadis Declaration at ¶ 104).

On January 23, 2024, the Debtors filed their *First Joint Plan of Reorganization of Debtors under Chapter 11 of the United States Bankruptcy Code* (Creditor Ex. 54, the "**Debtors' First Plan**") on the day the 120-day exclusivity period ended. As is relevant here, under the Debtors' First Plan, the Debtors' shareholders would retain their equity interests in the reorganized Debtors in exchange for a $10 million cash contribution, despite every class of claims being impaired. (*Id.* at 18; see also *id.* at 13–14 (noting that all classes are impaired except for equity interests)). Additionally, the Debtors' First Plan contemplated that the Debtors would assign all claims and causes of action assertable by the Debtors to a litigation trust. (*Id.* at 15).

---

[11] The Committee also asserts that the 2015.3 Reports "were (and remain) deficient and did not disclose intercompany balances." (Committee Brief at ¶ 7 (citing Cordasco Declaration at ¶ 30); *see also* Committee Motion at ¶ 25).

Any proceeds stemming from successful litigation of any claims assigned to the trust would also be contributed to the plan. (*Id.*) At the time of filing, the plan was not market tested.[12] However, on March 26, 2024, the Petitioning Creditors filed their *Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**Petitioning Creditors' First Plan**") (Docket Nos. 531), and on May 14, 2024, the Petitioning Creditors filed their *Further Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**Petitioning Creditors' Amended Plan**"). (Docket No. 695).

On February 7, 2024, the Court entered an order establishing procedures for interim compensation and reimbursement of expenses of professionals in these cases (the "**Interim Compensation Order**"). (Docket. No. 398). The Interim Compensation Order provides that the Debtors "shall promptly pay" all unobjected-to fees following the expiration of the objection deadline each month. (*Id.* at ¶ (I)(g)).

Following entry of the Interim Compensation Order, the Committee and FTI Consulting ("**FTI**") filed monthly fee statements. (Docket Nos. 399–401). On February 22, 2024, the

---

[12] Following the Hearings, the Debtors filed their *Second Amended Joint Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code* (the "**Debtors' Second Amended Plan**"). (*See* Docket No. 671). The Debtors' Second Amended Plan increased the shareholder new value contribution to $30 million. (*Id.* at 13). Notably, however, under the Debtors' Second Amended Plan, the litigation trust trustee would be enjoined from pursuing any claims assigned to the trust relating to the transfer of the Preferred Shares to the Cypriot Nominees until the earlier of: "(i) a final, non-appealable, determination in favor of Levona . . . that the preferred shares of Eletson Gas were not transferred to [Eletson Holdings or the Cypriot Nominees]; (ii) a settlement or satisfaction of claims asserted by [Eletson Holdings, Eletson Corp. or the Cypriot Nominees] against Levona; or (iii) [Eletson Holdings, Eletson Corp. and the Cypriot Nominees] refuse to [contribute 75% of any recovery against Levona to the plan]." (*Id.*) In the event that clause (i) is satisfied, the Debtors' Second Amended Plan provides that the litigation trust trustee would have no right to pursue claims against Eletson Holdings, Eletson Corp., or the Cypriot Nominees. (*Id.*) In the event that Eletson Holdings or Eletson Corp. satisfy clause (ii) by settling with Levona, the Debtors' Second Amended Plan provides that the litigation trust trustee shall be required to settle and release all potential claims against Eletson Holdings, Eletson Corp., and the Cypriot Nominees in exchange for 75% of the cash recoveries against Levona. (*Id.*) The Debtors' Second Amended Plan provides that such payment shall "(i) be paid in full and final satisfaction of [all claims against Eletson Holdings, Eletson Corp., and the Cypriot Nominees], and (ii) constitute a redemption by Eletson Gas of the net enterprise value of the common shares of Eletson Gas as of the Effective Date." (*Id.*) However, if Eletson Holdings, Eletson Corp., and the Cypriot Nominees fail to comply with the settlement, the Second Amended Plan provides that the litigation trust trustee may commence litigation against them. (*Id.*)

Debtors filed objections to the interim fee statements. (Docket Nos. 431–432). However, the

Debtors failed to make any payment on the portion of the fees and expenses to which they did

not object as required by the Interim Compensation Order. (Creditor Ex. 26, 27 (where the

Debtors detail their inability to make such payments)). In letters to the Court, the Debtors

indicated that the reason they did not make the payments was because the Debtors had no

liquidity and needed to seek debtor-in-possession financing. (*Id.*)

Accordingly, on March 7, 2024, the Debtors filed the *Motion for Entry of Interim and*

*Final Orders (a) Authorizing the Debtors to Obtain Post-Petition Financing; (b) Granting Liens*

*and Providing Superpriority Administrative Expense Status; (c) Modifying the Automatic Stay;*

*(d) Scheduling a Final Hearing; and (e) Granting Related Relief* (the "**DIP Motion**"). (Docket

No. 458). The DIP Motion sought approval of a senior-secured loan facility in the amount of

$4,000,000 to be provided by one of the Debtors' subsidiaries, EMC Gas. (*Id.* at 1–2). In the DIP

Motion, the Debtors stated that the DIP Motion was necessary because "[t]he Debtors do not

believe they can force a dividend from their subsidiaries under applicable non-bankruptcy law

(including the organizational arrangements) and certain contractual obligations binding the

subsidiaries." (Creditor Ex. 126, the "**DIP Motion**" at ¶ 9).

However, following the filing of the DIP Motion, the Debtors paid the unobjected-to fees

through their subsidiaries, despite previously proclaiming that such payments could not be made.

(PC Brief at ¶ 13 (citing Creditor Ex. 26–27 (where the Debtors describe their inability to make

such payments in letters to the Court); (Creditor Ex. 29 (where the Debtors explain in an email

that "the Debtors have received sufficient funds from [a] subsidiary [] to pay the currently

outstanding payment obligations due as of today"))).

On March 26, 2024, the Debtors allowed their exclusivity periods to lapse without

seeking an extension. That same day, the Petitioning Creditors filed the Petitioning Creditors'

First Plan . (*See* Docket No. 531).

Finally, the Court notes that the parties have generally acted in an adversarial manner

throughout these proceedings. For instance, the Court has held numerous status and discovery

conferences, much of which is detailed in approximately 26 letters filed between February 9,

2024, and March 25, 2024. (*See* UST Reply (citing Docket Nos. 402; 403; 407; 414; 415; 416;

423; 437; 439; 441; 443; 446; 447; 448; 451; 452; 453; 460; 463; 466; 470; 471; 472; 483; 490;

528)).

## IV.  <u>LEGAL STANDARDS AND DISCUSSION</u>

### A.  <u>EVIDENTIARY DISPUTES</u>

Preliminarily, the Court must resolve certain unresolved evidentiary disputes. First, on

the eve of the Hearings, the Petitioning Creditors filed the PC Motion in Limine. (Docket No.

568). Second, the Debtors raised the Debtors' Motion to Exclude at the Hearings. (April 10

Transcript 64:7–65:9; 103:23–104:7). The Court will address these motions in turn.

#### 1.  <u>PC Motion in Limine</u>

In the PC Motion in Limine, the Petitioning Creditors first argue that the declarants'

attestations that are not based upon personal knowledge are improper and inadmissible. (PC

Motion in Limine at ¶¶ 4–6). Specifically, the Petitioning Creditors assert that none of the

Debtors' declarations "make clear that they are based upon the [d]eclarants' personal

knowledge" and instead state that they are either based in whole or in part on the declarants'

review of documents or do not reference the declarants' personal knowledge at all. (*Id.*) Second,

the Petitioning Creditors argue that certain attestations made by the declarants are inadmissible

because they represent the declarants' views about what the "documents mean[] and argue how

the Court should construe them." (*Id.* at ¶¶ 7–9). Next, the Petitioning Creditors argue that many

of the declarations provide the declarants' opinions regarding factual and legal determinations

that need to be made by the Court. (*Id.* at ¶¶ 10–12). Further, the Petitioning Creditors argue that

the declarations contain irrelevant subject matter that has "no bearing upon the resolution of the

Motions." (*Id.* at ¶¶ 13–18). Finally, the Petitioning Creditors argue that: (i) the declarants'

attestations regarding the Debtors' management expertise is inadmissible (*id.* at ¶¶ 19–22); (ii)

the declarations made by the Debtors' management, namely the Kertsikoff Declaration, the

Hadjieleftheriadis Declaration, and the Karastamati Declaration, are self-serving and should be

afforded little weight (*id.* at ¶ 23); (iii) the Veraros Declaration is inadmissible because the

declaration contains "factual and legal opinions that are not based upon Veraros' claimed

expertise and, as bald and admitted speculation, are neither based upon sufficient facts/data and

reliable principles/methods nor reflect the reliable application of such methods to such facts, and

cannot be helpful to the Court" (*id.* at ¶¶ 24–26); and (iv) most of the Debtors' exhibits and

deposition declarations are irrelevant and inadmissible (*id.* at ¶¶ 27–28).

In response, the Debtors argue that: (i) caselaw supports admissibility of evidence in a

bench trial (Debtor Brief at ¶ 68); (ii) declarants' may testify to business records they reviewed

in their official capacity (*id.* at ¶ 69); (iii) declarants may obtain personal knowledge from

reviewing documents (*id.* at ¶ 70); and (iv) the declarants' references to Murchinson, Levona,

and the Arbitration are relevant to these proceedings (*id.* at ¶ 70).

The Court agrees with the Debtors. Because these proceedings were conducted as a bench

trial, "the potential for prejudice is minimal." *Steinhilber v. Kirkpatrick, M.*, No.

18CIV1251VBJCM, 2020 WL 9074808, at *14 (S.D.N.Y. Aug. 21, 2020), *report and

recommendation adopted sub nom. Steinhilber v. Kirkpatrick*, No. 18 CV 1251 (VB), 2021 WL

22

1254554 (S.D.N.Y. Apr. 5, 2021). This is so because, in the context of a bench trial, "the factfinder knows the purpose for which evidence is admitted and is presumed to rest [their] verdict on the proper inferences to be drawn from such evidence." *United States v. Duran-Colon*, 252 F. App'x 420, 423 (2d Cir. 2007) (citations omitted). Indeed, "'the more prudent course in a bench trial [is] to admit into evidence doubtfully admissible records,' and to permit the parties to aim their arguments at the weight of the evidence." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 (PKL), 2003 WL 22764545, at *3 (S.D.N.Y. Nov. 21, 2003) (quoting *Van Alen v. Dominick & Dominick, Inc.,* 560 F.2d 547, 552 (2d Cir. 1977)). Accordingly, the Court finds that the Petitioning Creditors' arguments "are better directed toward the weight of the evidence, not the admissibility." *Id.* The Court will therefore deny the PC Motion in Limine and afford the Debtors' evidence the weight that the Court deems appropriate.

## 2. <u>Debtors' Motion to Exclude</u>

In the Debtors' Motion to Exclude, the Debtors argue that the expert testimony of Jeffrey Drake and Cynthia Romano should be excluded because both witnesses were not identified as experts in advance of the Hearings, and because the Debtors did not provide expert reports or a list of documents that the purported experts reviewed in connection with their testimony. (April 10 Transcript 64:7–65:9; 103:23–104:7).

In response, the Committee argues that it was not "required to submit formal 'reports,'" and that both experts' direct testimony was disclosed in advance of the Hearings but the Debtors chose not to depose them. (Committee Brief at ¶ 24). The Committee also asserts that both experts are qualified to offer the testimony they submitted to the Court. (*Id.* at ¶ 25).

The Court agrees with the Committee. Bankruptcy Rule 9014(c) makes clear that certain portions of Federal Rule of Civil Procedure 26 (dealing with expert disclosures) do not apply in

contested matters. Fed. R. Bankr. P. 9014(c) (noting that "[t]he following subdivisions of Fed. R. Civ. P. 26, as incorporated by Rule 7026, shall not apply in a contested matter unless the court directs otherwise: 26(a)(1) (mandatory disclosure), 26(a)(2) (disclosures regarding expert testimony) and 26(a)(3) (additional pre-trial disclosure), and 26(f) (mandatory meeting before scheduling conference/discovery plan)"). Here, the Court's scheduling order did not require any additional expert disclosures. (*See* Docket No. 467). In fact, as asserted by the Committee, the experts' "full direct testimony was disclosed by declaration and the Debtors had the option of deposing them ahead of the [H]earing[s] had they chosen to do so." (Committee Brief at ¶ 24 (citing Docket No 467 at ¶ 9).

Additionally, the Court is more than capable of assessing the qualifications of the experts presented by the Creditors. *Joseph S. v. Hogan*, No. 06 CIV. 1042 BMC SMG, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) (citing *BIC Corp. v. Far Eastern Source Corp.,* 23 F. App'x 36, 39 (2d Cir. 2001)) (noting that "the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology"). For these reasons, the Debtors' Motion to Exclude is denied.

**B.  <u>THE TRUSTEE MOTIONS</u>**

Chapter 11 of the Bankruptcy Code generally allows debtors to remain in control of their property. 11 U.S.C. § 1107. "While there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute." *In re Sillerman*, 605 B.R. 631, 640 (Bankr. S.D.N.Y. 2019) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990) (Lifland, C.J.); *In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015)).

Indeed, "a debtor-in-possession is obligated to perform all of the obligations of a trustee identified in Bankruptcy Code section 1106, *see* 11 U.S.C. § 1107, and owes fiduciary duties to his estate and creditors." *Id.* (citing *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005); *In re Centennial Textiles, Inc.,* 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)). Accordingly, "[t]he willingness to allow a Debtor to remain in possession of its assets is predicated upon the assumption that the Debtor will carryout its fiduciary obligations." *Id.* (citation omitted).

However, Section 1104 of the Bankruptcy Code provides that, upon request of a party in interest or the United States Trustee, the court shall order the appointment of a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104.

The appointment of a Chapter 11 Trustee is an "extraordinary remedy," and the party seeking the appointment of a Trustee "has the burden of showing by 'clear and convincing evidence' that the appointment of a trustee is warranted." *In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009) (citing *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006)).

Here, the Committee and the Petitioning Creditors assert that a Chapter 11 Trustee should be appointed for "cause" under Section 1104(a)(1), and the Committee, the Petitioning Creditors, and the UST assert that a Chapter 11 Trustee should be imposed because a Chapter 11 Trustee is

in the best interest of the creditors pursuant to Section 1104(a)(2). (*See* Docket Nos. 394, 424, 468). The Court will examine these arguments in turn.

### 1.  **For Cause Pursuant to Section 1104(a)(1)**

As stated above, the Creditors assert that a Chapter 11 Trustee should be appointed for cause pursuant to Section 1104(a)(1) of the Bankruptcy Code. (*See* Committee Motion; PC Motion). Section 1104(a)(1) of the Bankruptcy Code provides that, upon request of a party in interest or the United States Trustee, the court shall order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ." 11 U.S.C. § 1104(a)(1).

"The list of wrongs constituting 'cause' that warrants the appointment of a trustee [under Section 1104(a)(1)] is not exhaustive." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015). "Examples of non-enumerated misconduct found by courts to constitute cause include: (i) failure to comply with provisions of the Bankruptcy Code; (ii) failure to make required filings; (iii) failure to abide by Court Orders; (iv) failure to file tax returns; (v) conflicts of interest; and (vi) failure to discharge fiduciary duties." *In re Sillerman*, 605 B.R. 631, 641–42 (Bankr. S.D.N.Y. 2019) (internal citations omitted).

Importantly, "it is not necessary to delineate whether the cause consists of fraud, dishonesty, incompetence, gross mismanagement 'or similar cause.'" *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 527 (Bankr. E.D.N.Y. 1989). Indeed, any form of cause under "the penumbra of fiduciary neglect . . . mandates the appointment of a trustee." (*Id.*)

In the Committee Motion and the PC Motion, the Committee and the Petitioning

Creditors assert that all enumerated forms of cause are present in these cases, in addition to

certain forms of unenumerated cause. Specifically, the Committee and the Petitioning Creditors

argue, *inter alia*, that: (i) the Debtors transferred the preferred shares of Eletson Gas to place

them out of the reach of their creditors (Committee Motion at ¶¶ 58–65; PC Joinder at ¶¶ 27–29);

(ii) the Debtors are working to deplete the estates to enrich their insiders (Committee Motion at

¶¶ 70–73); (iii) the Debtors have been dishonest with the Court (PC Joinder at ¶¶ 40–42); (iv) the

Debtors are conflicted and have no independent governance (Committee Motion at ¶¶ 66–69; PC

Joinder at ¶¶ 30–35); (v) the Debtors have systematically failed to disclose information to the

Court and their creditors in these cases (Committee Motion at ¶¶ 74–76; PC Joinder at ¶¶ 4–10);

(vi) the Debtors have mismanaged these cases by proposing a patently unconfirmable plan and

seeking debtor-in-possession financing from an insider (Committee Motion at ¶ 77; PC Motion

at ¶ 14); and (vii) the Debtors have failed to abide by court orders. (PC Motion at ¶¶ 9–15; PC

Joinder at ¶¶ 36–39).

In the Omnibus Objection and the Shareholder Objection, the Debtors and the Majority

Shareholders assert the following arguments in response: (i) not pursuing the alleged fraudulent

transfers is not cause for the appointment of a Trustee (Omnibus Objection at ¶¶ 50–59;

Shareholder Objection at ¶¶ 27–31); (ii) the Debtors have no conflicts of interest (Omnibus

Objection at ¶¶ 60–61; Shareholder Objection at ¶¶ 32–36); (iii) the Debtors have not depleted

estate resources for insiders (Omnibus Objection at ¶¶ 62–65; Shareholder Objection at ¶¶ 37–

38); (iv) the Debtors are current on their financial disclosures and in compliance with all Court

orders (Omnibus Objection at ¶¶ 66–67; Shareholder Objection at ¶¶ 39–41); and (v) the Debtors

have filed a confirmable plan that is in the best interest of their creditors (Omnibus Objection at ¶¶ 68–70; Shareholder Objection at ¶ 42).

In the PC Reply, the Petitioning Creditors further argue that: (i) the Debtors do not contest the PC Trustee Motion on the merits and focus on irrelevant theories (PC Reply at ¶¶ 1–6); (ii) the Debtors are conflicted (*Id.* at ¶¶ 7–15); (iii) the Debtors have refused to cooperate with their creditors in these cases (*Id.* at ¶¶ 16–18; (iv) the Debtors' administration of these cases has been grossly inadequate (*Id.* at ¶¶ 19–25); (v) the Petitioning Creditors do not trust the Debtors (*Id.* at ¶¶ 26–29); and (vi) the Majority Shareholder Objection is meritless (*Id.* at ¶¶ 30–32).

Likewise, in the Committee Reply, the Committee argues that: (i) the Debtors have actively sought to transfer value out of the estates (Committee Reply at ¶¶ 7–12); (ii) the Debtors' management is conflicted, and such conflict cannot be cured by the Demand Review Committee that the Debtors created (*id.* at ¶¶ 13–15); (iii) the Debtors continue to fail to comply with their disclosure obligations under the Bankruptcy Code (*id.* at ¶¶ 16–23); and (iv) the Debtors have willfully violated Court orders, failed to fund administrative expenses, and proposed a DIP Motion that would authorize payments from insiders (*id.* at ¶¶ 24–32).

The Court notes that the Committee and Petitioning Creditors' Arguments generally pertain to: (i) events that occurred in conjunction with the purported transfer of the Preferred Shares and the Arbitration; or (ii) the manner in which the Debtors have conducted themselves in these bankruptcy proceedings. For simplicity, and because any form of "cause" under "the penumbra of fiduciary neglect . . . mandates the appointment of a trustee," the Court will address the Committee and the Petitioning Creditors' arguments in the context of these two broad

categories, as opposed to breaking them down by form of "cause." *See V. Savino Oil & Heating Co., Inc.*, 99 B.R. at 527.

### a.   The Debtors' Conduct Outside of These Bankruptcy Cases

Many of the Creditors' arguments for the appointment of a Chapter 11 Trustee pertain to the Debtors' conduct outside of the bankruptcy proceedings. In this regard, the parties present diametrically opposed versions of the facts.

As succinctly stated by the Committee, the BOL "grant[ed] to Eletson Gas the option" for "Eletson Gas or its nominee to purchase" the Preferred Shares (Committee Brief at ¶ 2 (citing BOL at § 2.1)). The Arbitrator found that Eletson Gas had exercised such purchase option under the BOL by giving to Levona "the shares of the Symi and the Telendos, [two of the vessels held by Eletson Holdings' subsidiaries,]" worth "in excess of the $23 million price set forth in the BOL." (*Id.* (citing Final Award at 35)). The Committee further notes that, in a document filed in the Arbitration on October 25, 2022, Eletson Holdings and Eletson Corp. asserted that, "by virtue of the transaction contemplated in the BOL, [Eletson] Holdings had become the sole unit holder of [Eletson] Gas." (*Id.* (citing Creditor Ex. 20 at ¶ 9; Confirmation Ruling at 20–21)). Consistent with this position, on March 13, 2023, the Debtors sought stay relief from this Court and asserted that "the Arbitration does not pose even a theoretical risk to 'property of the estate.'" (Committee Brief at ¶ 2 (citing Creditor Ex. 160 at 22)). However, the Creditors note (and the Arbitrator and the District Court found) that Eletson Holdings and Eletson Corp. first argued that the Preferred Shares had actually been transferred to the Cypriot Nominees after the Court granted stay relief. (*Id.*; *see also* Confirmation Ruling at 20–21 (noting that an April 25, 2023, statement was the first time "Eletson asserted in the arbitration that the Preferred [Shares] were transferred to a nominee" and that previously "Eletson claimed that . . . [it] was the sole unit holder of the

company"); May 15 Arbitration Hearing at 153:2–24 (where the Debtors' counsel stated in the

Arbitration that he urged his client to "just transfer [the Preferred Shares] to the nominees," and

his clients informed him that they "ha[d] already done it"); Final Award at 30 (noting that "[i]t is

undisputed that Eletson raised this contingent transfer to Cypriot [N]ominees for the first time in

its Rule 20(b) submission on May 5, 2023")).

Accordingly, the Committee argues:

> The economic effect of that transfer is undisputed. The Committee introduced
> unrebutted testimony of Michael Cordasco that, based on information supplied by
> the Debtors, the purported transfer had the effect of diverting from [Eletson]
> Holdings to the [Cypriot] Nominees at least $125 million, representing the equity
> value of [Eletson] Gas.

(Committee Brief at ¶ 3 (citing Cordasco Declaration at ¶¶ 26 –27; Creditor Ex. 1 at 113:7–13

(explaining the economic effect on Eletson Holdings); *see also* PC Brief at ¶ 7 (noting that the

debtors have focused on "pushing valuable property – the Preferred Shares and millions of

dollars in damages – away from the estates, while telling this Court that pursuing the Arbitration

is for the benefit of creditors")).

Additionally, the Creditors note that the transfer of the Preferred Shares to the Cypriot

Nominees occurred at a "family meeting" (Committee Brief at ¶ 4 (citing Karastamati

Deposition at 71:14–72:13)); with the same individuals standing on both sides of the transaction

(*Id.* where Karastamati states that she is a director and the president of Eletson Holdings, a

director of Eletson Gas, and an owner of one of the Cypriot Nominees); Karastamati Declaration

at ¶ 1 (where Karastamati states that she is a secretary and director of Eletson Gas)); and for a

purported purchase consideration of €3 million that was not negotiated and to date has never

been paid. (*Id.* (citing Karastamati Deposition at 62:23–63–7, 65:18–22 (where Karastamati

states that the transfer was not documented); *Id.* at 67:24–68:9, 67:4–11, 66:4–67:11 (where

Karastamati discusses how the purchase price was determined and states that it remains unpaid))).

The Creditors further argue that the Debtors and their principals have continued to diminish the estates during the pendency of the bankruptcy. (Committee Brief at ¶ 4; PC Brief at ¶ 7). Specifically, they assert that the Debtors have argued in the Arbitration that any damages awarded in their favor be paid to Eletson Gas and the Cypriot Nominees, not to Eletson Holdings or Eletson Corp. (Committee Brief at ¶ 5 (noting that the award is "worth as much as $89,406,326.32"); *see also* Confirmation Ruling at 71 (noting that "it was not until the pre-hearing brief, months after the [A]rbitration had commenced, that [Eletson Holdings & Eletson Corp.] asserted that the Preferred [Shares] should be transferred to the [Cypriot] Nominees and not until after the hearing and in its proposed order that [Eletson Holdings & Eletson Corp.] asked that damages be awarded to [Eletson] Gas and to the [Cypriot] Nominees and not to itself"); PC Brief at ¶ 7 (citing Confirmation Ruling at 24, 71)). The Creditors also note that, though the Arbitrator awarded attorney's fees and costs to the "claimants" (*i.e.*, both Eletson Holdings and Eletson Corp.) (Confirmation Ruling at 100), the Debtors have now requested that the District Court award those same fees—totaling nearly $10 million—solely to non-debtor Eletson Corp., even though Eletson Holdings is also a claimant. (Committee Brief at ¶ 5 (citing Creditor Ex. 123 at 22 (where Eletson Holdings and Eletson Corp. request in a proposed judgment sent to the District Court on February 23, 2024, that "Levona shall pay to Eletson Corp. . . . [a]ttorney's fees, costs, and expenses due in connection with the [A]rbitration in the amount of $9,590,222.99"))).

Finally, the Creditors argue that, though the Debtors have appointed the Demand Review Committee to investigate certain potential claims, the Demand Review Committee is not truly

independent and will not investigate claims unless a demand is made. (PC Brief at ¶¶ 15–16 (citing Creditor Ex 42 at 39; 30 at 3; 53 at 9–10)).

The Debtors have a different view. It is the Debtors' position that the Preferred Shares were never an asset of Eletson Holdings, and Eletson Holdings played no role in the nomination of the entities that received the Preferred Shares from Levona. (Debtor Brief at ¶ 29 (citing Kertsikoff Declaration at ¶ 132; Karastamati Declaration at ¶ 50). Further, the Debtors assert that the Preferred Shares "transferred directly from Levona to [the Cypriot Nominees]" rather than through Eletson Holdings. (*Id.* at ¶ 31 (citing Kertsikoff Declaration at ¶¶ 135–138; Karastamati Declaration at ¶¶ 45, 50; Hadjieleftheriadis Declaration at ¶¶ 78, 86)). The Debtors also argue that the €3 million purchase price for the Preferred Shares was reasonable. (*Id.* (citing Kertsikoff Declaration at ¶ 141; Karastamati Declaration at ¶¶ 57–58; Hadjieleftheriadis Declaration at ¶ 88); *see also* Final Award at 31 (noting that Eletson Holdings was never intended to directly or indirectly own the Preferred Shares); Confirmation Ruling at 28)). Finally, they assert that the Creditors and the Court knew that the Preferred Shares "may be transferred to a nominee," and that the Creditors had no objection to lifting the automatic stay. (*Id.* at ¶ 34 (citing Debtor Ex. 642 at 18:11–20)).

The Debtors also allege that the Creditors misunderstand the claims at issue in the Arbitration and "the nature of [the] monetary damages awarded and confirmed by the District Court." (*Id.* at ¶ 37). Specifically, the Debtors argue that the damages were expressly awarded to Eletson Gas and the Cypriot Nominees because they were the entities that were harmed by Levona's conduct. (*Id*; *see also* Final Award at 99; Confirmation Ruling at 70)). Further, they cite to the Confirmation Ruling for the proposition that "[Eletson] Holdings and [Eletson] Corp. have suffered a concrete injury in the breach of their right to have the dispute determined by the

32

arbitrator and have standing to vindicate their contractual right, even if the benefit of the award were to flow entirely to a third-party." (Debtor Brief at ¶ 37; *see also* Confirmation Ruling at 52)).

Finally, the Debtors argue that they have formed the Demand Review Committee to investigate potential claims arising from the transfer of the Preferred Shares to the Cypriot Nominees upon "receipt of any demand." (Kertsikoff Declaration at ¶ 49), and that, as of March 22, 2024, no demand has been made of the Demand Review Committee. (Hadjieleftheriadis Declaration at ¶ 104).

The Court finds that the Creditors have failed to establish that the Debtors' conduct outside of the bankruptcy proceedings constitutes cause under Section 1104(a)(1). First, the Court notes that the BOL expressly provided a purchase option in favor of "Eletson Gas or its nominee" to purchase the Preferred Shares from Levona. (BOL at § 2.1)). Additionally, the record indicates that the parties in these proceedings were aware of this language at the time that the Court approved the Stay Relief Stipulation at the April 17, 2023, hearing. (Debtor Ex. 642 at 18:11–20 (where counsel for the Committee states that the Stay Relief Stipulation "looks fine to us. I would say we were happy to see that there is a stay for enforcement of the judgment. We did have some concerns with transfers. There were some statements in the motion that was filed by the [Debtors] here that some of these assets may be transferred to a nominee.")).

The Court further notes that the issue before the Arbitrator and the District Court pertains to whether the purchase option contained within the BOL was properly exercised. (Final Award at 9 (noting that the question presented is whether "Eletson exercise[d] the purchase option pursuant to the [BOL]?")). However, the effect of the purported transfer of the Preferred Shares as it relates to these Debtors' estates (for instance, whether a potential preference, fraudulent

transfer, or other claim may exist) remains a live issue in these cases. (Confirmation Ruling at 89 (noting that "it is in [the Bankruptcy Court], in the first instance, that the Court can address the timing of the election by Eletson that the Preferred [Shares] should go to the [Cypriot Nominees] and whether the Preferred [Shares] should be considered to be property of the estate or should be clawed back or avoided"); *see also* Docket No. 348 (the "**Stay Relief Modification Opinion**") at 11 (where this Court noted in its January 4, 2024 Memorandum Opinion and Order that "if, as the Committee asserts, causes of action exist relating to findings made in the Arbitration, the Court is unaware of any impediment . . . to such causes of action being asserted in these proceedings by the appropriate party, at the appropriate time")).

Indeed, the Court notes that the Debtors established the Demand Review Committee for the express purpose of providing a means by which potential claims stemming from the transfer of the Preferred Shares to the Cypriot Nominees could be investigated. (Kertsikoff Declaration at ¶ 49). As of March 22, 2024, no demand had been made of the Demand Review Committee. (Hadjieleftheriadis Declaration at ¶ 104). Though the Creditors assert that the Demand Review Committee is not independent (PC Brief at ¶¶ 15–16 (citing Creditor Ex 42 at 39; 30 at 3; 53 at 9–10), such alleged lack of independence does not explain why the Creditors have failed to make a demand and/or to pursue these alleged claims by other means, such as by seeking derivative standing to assert them.

The Committee analogizes these cases to *Sillerman* and *Savino Oil*. (Committee Brief at ¶¶ 11–13). However, the Court finds both of those cases distinguishable. In *Savino Oil*, the debtor formed a new corporate entity and proceeded to transfer its most valuable assets to the newly formed entity before placing the original entity into bankruptcy. *In re Savino Oil and Heating Co., Inc.*, 99 B.R. 518, 523–24 (Bankr. E.D.N.Y 1989). Upon filing bankruptcy, the

owners did not disclose the existence of the new corporation or that the transfer had occurred. *Id.* at 526. The court found that such conduct "in and of itself" constitutes cause. *Id.*

As stated above, in these cases, it was well-known that the BOL contained a clause "grant[ing] to Eletson Gas the option" for "Eletson Gas *or its nominee* to purchase" the Preferred Shares. (BOL at § 2.1 (emphasis added)). Though the Court recognizes (as did the Arbitrator and the District Court) that the Debtors did not raise the fact that the transfer had occurred until after the Stay Relief Stipulation was granted, the Court notes that the Arbitrator found the Debtors' explanation credible. (Final Award at 30–32 (where the Arbitrator found that Eletson Holdings and Eletson Corp. credibly explained that they did not raise the transfer earlier because they did not think it was relevant to the Arbitration until Levona "made clear in the [Eletson] Holdings bankruptcy that they would attempt to use the bankruptcy proceedings as an end-run around any adverse award in this arbitration by claiming that the [P]referred [S]hares were part of the bankruptcy estate of [Eletson] Holdings"); Confirmation Ruling at 22–23 (noting that the Arbitrator "acknowledged that the lack of earlier written notice to Levona of the contingent transfer of the Preferred [Shares] to the [Cypriot] Nominees had initially 'raised concern,' but concluded that there was no 'bad faith or misconduct' in the failure to give notice.")). Thus, unlike *Savino*, it has not been established that the Debtors intentionally failed to disclose the transfer to the Cypriot Nominees.

The Court likewise finds *Sillerman* distinguishable. In *Sillerman*, the court found that a Chapter 11 Trustee should be appointed in part because the debtor had refused to pursue avoidance actions against family members. *In re Sillerman*, 605 B.R. 631, 646–47 (Bankr. S.D.N.Y. 2019). Critically, in *Sillerman*, the court found that the debtor had made numerous *post-petition* unauthorized transfers—including selling two golf memberships worth more than

$500,000 each—without disclosing what he did with the proceeds of such sales. *Id.* at 649 (emphasis added).

Here, as the Arbitrator found (and the District Court confirmed), the transfer of the Preferred Shares occurred on March 11, 2022, which was nearly a year before the involuntary cases were filed. (Final Award at 96; Confirmation Ruling at 31). Moreover, as discussed above, the BOL expressly provided the Debtors the ability to designate nominees, and the Creditors recognized this at the time that the Court entered the Stay Relief Stipulation. (BOL at § 2.1; Debtor Ex. 642 at 18:11–20).

To be clear, the Court notes that certain of the Debtors' conduct in the Arbitration is potentially problematic. Specifically, though Debtor Eletson Holdings is a party to the Arbitration, Eletson Holdings and Eletson Corp. argued—while represented by the same counsel who is representing the Debtors in these cases—that Eletson Holdings should not receive any portion of the damages or attorney's fees assessed against Levona. (Confirmation Ruling at 71 (noting that "it was not until . . . after the hearing and in its proposed order that [Eletson Holdings & Eletson Corp.] asked that damages be awarded to [Eletson] Gas and to the [Cypriot] Nominees and not to [themselves]"); Creditor Ex. 123 at 22 (requesting in a proposed judgment sent to the District Court that "Levona shall pay to Eletson Corp. . . . [a]ttorney's fees, costs, and expenses due in connection with the [A]rbitration in the amount of $9,590,222.99"))). However, as the District Court noted:

> The [A]rbitrator concluded that [Levona] wrongfully denied the [Cypriot] Nominees the Preferred [Shares] to which they were entitled and that, by depriving them of the Preferred [Shares] while retaining the two vessels, Levona was unjustly enriched at the [Cypriot] Nominees' expense. The [A]rbitrator reasoned that the damages "flow[ed] directly from Levona's refusal to relinquish the [P]referred [Shares], and the [Cypriot] Nominees hold all title and interest in the [P]referred [Shares]." Dkt. No. 47-5 at 64. The [A]rbitrator had the authority to hold that the Preferred [Shares] were transferred to the [Cypriot] Nominees and award the

36

> [Cypriot] Nominees damages. The Court need not agree with that reasoning to
> conclude that it was within the arbitrator's power to determine that Levona's breach
> of its obligations to [Eletson Holdings and Eletson Corp.] could be most readily
> and effectively redressed by giving the party most directly injured the benefit the
> [A]rbitrator found that [Levona] unjustly enjoyed. As to [Eletson Gas], the
> [A]rbitrator determined that they too were directly injured by the conduct that the
> [A]rbitrator found violated the LLCA—Levona caused the arrests of [Eletson Gas']
> vessels and committed other breaches of contract. If it was within the power of the
> [A]rbitrator to determine whether Levona breached the LLCA, it follows that it
> would be within the power of the [A]rbitrator to grant the relief that the [A]rbitrator
> believed was most effective to redress that breach.

(Confirmation Ruling at 70–71). The Court likewise notes that Eletson Holdings and Eletson

Corp. requested that the award of attorney's fees be paid solely to Eletson Corp. because Eletson

Corp. is the sole party paying for the Arbitration. (*See* Confirmation Ruling at 111 n.32 (noting

that "the arbitrator did not award fees and costs to third parties but rather to

Eletson '*to be paid to the entity or individuals who paid those costs and fees*'" (emphasis in

original)). Based on this reasoning, the Court finds *Sillerman* distinguishable.

In addition, the Court finds that any potential harm to the Debtors' estates is somewhat

ameliorated by the terms of the Stay Relief Stipulation, which requires the Arbitration Parties to

abstain from executing on the Final Award absent further order of this Court. (Docket No. 48 at ¶

4 ("Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed pending

further order of the Bankruptcy Court on a motion noticed following the issuance of the

Arbitration Award. For avoidance of doubt, no Arbitration Party shall transfer, dispose of,

transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any

asset or property related thereto absent a further order of this Court.")).

Indeed, at the Hearings in this matter, the Court asked counsel for the Debtors what will

happen to the judgment related to the Arbitration if it is paid by Levona. (April 11 Transcript at

81:6–7 ("So once the award is final, it will be brought back here before any payment is made to

anyone?"). In response, Counsel for the Debtors stated:

> [i]f Murchinson pays us the award, . . . [it's] going nowhere other than into an
> escrow account controlled by Your Honor. It is not going to be used for any
> purpose. There's going to be a lot of information before they ever do that. Your
> Honor is going to be kept [apprised], we're going to then be accused of writing too
> many letters, but we have been doing that, and we're going to continue to do that.
> And there cannot be the slightest doubt of that.

(*Id.* at 81:12–20). Finally, as stated above, the Court notes that the Creditors have made no

demand upon the Demand Review Committee, nor have they sought derivative standing to

pursue potential claims stemming from the alleged transfer of the Preferred Shares to the Cypriot

Nominess. (Hadjieleftheriadis Declaration at ¶ 104).

For these reasons, the Court finds that the Creditors have failed to establish cause by clear

and convincing evidence with respect to the Debtors' conduct outside these bankruptcy

proceedings.

### b.   **The Debtors' Conduct in These Bankruptcy Cases**

The Creditors also assert that certain of the Debtors' conduct in this bankruptcy case

warrants the appointment of a Chapter 11 Trustee for cause under Section 1104(a)(1) of the

Code. A primary argument raised by the Creditors is that the Debtors have not diligently carried

out their reporting obligations under the Bankruptcy Code. Specifically, the Creditors assert,

*inter alia*, that the Debtors: (i) failed to timely comply with their disclosure obligations under

Rule 2015.3 for their most valuable affiliate, Eletson Gas, and otherwise failed to disclose

intercompany balances in their other 2015.3 reports (Committee Brief at ¶ 7 (citing Creditor Ex.

91 (where the U.S. Trustee explains in a response to the Debtors' initial 2015.3 Reports that

there is no excuse not to file a 2015.3 Report for Eletson Gas); Cordasco Declaration at ¶ 30); PC

Brief at ¶ 20)); (ii) failed to appear at two 341 meetings and only appeared following the UST's

threat to appoint a Chapter 11 Trustee (Committee Brief at ¶ 7 (citing Creditor Ex. 86 at 3:13–16)); (iii) refused to produce any Rule 2004 discovery pursuant to the Committee's requests for more than a month because they asserted that they would not produce documents from any non-Debtor affiliates (Committee Brief at ¶ 7 (citing Creditor Ex. 17 at 33:17–20; Creditor Ex. 18 at 37:16–21; PC Brief at ¶ 21)); and (iv) only produced summary-level trial balances and not general ledgers (Committee Brief at ¶ 7 (citing Creditor Ex. 168 at 36:4–11; Creditor Ex. 66; Creditor Ex. 67; Cordasco Declaration at ¶ 12)).

The Creditors further argue that the Debtors' failure to fund these cases also warrants the appointment of a Chapter 11 Trustee. Specifically, the Creditors argue that the Debtors: (i) breached the Interim Compensation order by failing to pay unobjected-to fees for more than a month (Committee Brief at ¶ 9 (Creditor Ex. 26, 27, 29); PC Brief at ¶ 21 (citing Docket No. 458 at ¶ 7; Creditor Ex. 27 at 2)); (ii) sought approval of the DIP Motion, which would be insufficient to cover existing administrative expenses (Committee Brief at ¶ 9 (citing Cordasco Declaration at ¶¶ 16–17); PC Brief at ¶ 13 (citing Docket Nos. 265, 322, 324)); and (iii) asserted that the DIP Motion was necessary because the Debtors could not force their subsidiaries to make a dividend to the Debtors to pay administrative expenses, although the Debtors later compelled the exact dividends they previously claimed were impossible. (PC Brief at ¶ 13 (citing Creditor Ex. 26–29)).

The Creditors also state that the following additional conduct in these cases warrants a Chapter 11 Trustee: (i) the Debtors did not file any first day motions (PC Brief at ¶ 13); (ii) the Debtors failed to hire bankers or financial advisors to assist in obtaining financing or in making financial disclosures (*id.*); (iii) the Debtors generally have failed to engage with their creditors (*id.*); (iv) the Debtors filed a new value plan that was not market tested (*id.*); (v) the Debtors

allowed their exclusivity period to lapse (*id.*); (vi) the Debtors failed to pay quarterly UST fees (*id.* at ¶ 13 (citing Docket No. 508 at 15; Docket No. 509 at 15; Docket No. 510 at 15)); (vii) the Debtors made payments to their counsel post-petition before such counsel was retained (*id.* (citing Docket No. 385 at ¶¶ 4, 6; Docket No. 350)); (viii) the Debtors engaged professionals without Court approval (*id.*); and (ix) the Debtors have violated numerous Court orders. (*Id.*)

In response, the Debtors and the Shareholders assert that they proposed their plan in good faith. (Debtor Brief at ¶ 40 (citing Kertsikoff Declaration at ¶¶ 68–72; Debtor Ex. 667; Docket No. 570)). Further, they assert that the time entries in the Committee's fee statements indicated that the Committee never intended to take the Debtors' plan seriously, as the Creditors were already preparing their Chapter 11 Trustee Motion weeks before the Debtors even filed their plan. (Id. (citing Debtor Ex. 684 at 24–29)).

Regarding the Creditors' argument that the Debtors failed to fund these cases, the Debtors argue that they "actively explored all sources to obtain (and have obtained) funds to address administrative expenses, including attempting to secure funding from historical lenders." (*Id.* at ¶ 50 (citing Kertsikoff Declaration at ¶ 57)). The Debtors further assert that, when it became clear that they would be unable to secure outside financing, "they sought financing from an indirect subsidiary which proposed terms to obtain immediate financing" in the amount of $4.4 million. (*Id.* (citing Kertsikoff Declaration at ¶¶ 57–59; Debtor Ex. 671; Debtor Ex. 672; Debtor Ex. 684; Debtor Ex. 696)). Ultimately, the Debtors secured the consent of their lenders to permit certain of their subsidiaries to issue a dividend to Eletson Holdings to fund these cases. (*Id.* (citing Kertsikoff Declaration at ¶ 58; Debtor Ex. 756 at § 73(k))).

The Debtors also assert that they are currently taking actions to maximize distributions to creditors by seeking to reduce the administrative expenses in these cases (*Id.* at ¶ 51 (citing

40

Kertsikoff Declaration at ¶ 50), and also by exploring opportunities to monetize their assets by selling some of their subsidiaries. (*Id.* (citing Kertsikof Declaration at ¶¶ 60–67)).

Regarding the Debtors' reporting obligations, the Debtors assert that they timely filed their schedules and statements of financial affairs, provided additional information as requested, and are current on their monthly operating reports and Bankruptcy Rule 2015.3 Reports. (Debtor Brief at ¶ 52 (citing Karastamati Declaration at ¶¶ 27–31 (additional citations omitted)); Shareholder Brief at ¶ 17 (citing Karastamati Declaration at ¶ 31))). The Shareholders add that the Debtors have worked hard to comply with their reporting obligations despite the serious concerns they have about sharing confidential information due to the alleged past misuse of the information by the Murchinson entities (Shareholder Brief at ¶ 17 (citing Karastamati Declaration at ¶ 27)).

The Court finds that the Creditors have failed to establish cause by clear and convincing evidence warranting the appointment of a Chapter 11 Trustee with respect to the Debtors conduct in these cases. Preliminarily, with regard to the Debtors' purported lack of disclosure in these cases, the Court agrees with the Debtors that they timely filed their schedules and have generally complied with their mandatory reporting requirements under the Bankruptcy Code by filing operating reports and 2015.3 Reports. (*See* Debtor Brief at ¶ 52 (citing Karastamati Declaration at ¶¶ 27–31 (additional citations omitted))). Indeed, though the Debtors initially filed late and incomplete 2015.3 Reports (Committee Brief at ¶ 7 (citing Creditor Ex. 91; Cordasco Declaration at ¶ 30); PC Brief at ¶ 20)), the Court notes that the Debtors subsequently timely provided 2015.3 Reports for all their subsidiaries.

The Court is equally unpersuaded by the Creditors' arguments pertaining to the Debtors' disclosures in discovery. Though there have been a number of discovery disputes in these cases,

the Court is cognizant of the fact these cases began as hotly-contested involuntary Chapter 7

cases, which in part may explain the Debtors' initial hesitancy to exchange information.

(Shareholder Brief at ¶ 17 (citing Karastamati Declaration at ¶ 27)). In any event, the Court is not

aware of any case that stands for the proposition that a bankruptcy court should appoint a

Chapter 11 Trustee for cause because of standard, legitimate discovery disputes.

     The Court also does not believe that the Creditors have met their burden of establishing

cause by clear and convincing evidence regarding the Debtors' failure to timely fund these cases.

The Creditors seem to place a great emphasis on the fact that the Debtors should have known

that they would need DIP financing to timely comply with the Interim Compensation Order.

(Committee Brief at ¶ 9 (Creditor Ex. 26, 27, 29); PC Brief at ¶ 21 (citing Docket No. 458 at ¶ 7;

Creditor Ex. 27 at 2)). Though the Court agrees with the Creditors to some extent, the Court also

notes that the Debtors have subsequently made timely payments under the Interim Compensation

Order—which was entered on February 7, 2024—each month. (Debtor Brief at ¶ 50 (citing

Kertsikoff Declaration at ¶ 58). Accordingly, the Court finds that this argument is somewhat

moot. For similar reasons, the Court also finds that the Creditors' arguments pertaining to the

DIP Motion itself do not support a finding of cause by clear and convincing evidence. Indeed, as

the Creditors themselves point out, the Debtors ultimately began paying administrative expenses

in these cases without DIP financing. (PC Brief at ¶ 13 (citing Creditor Ex. 26–29)).

     Additionally, the Creditors' arguments pertaining to the Debtors' plan also do not support

the imposition of a Chapter 11 Trustee. For instance, the Creditors argue that the Debtors filed a

patently unconfirmable "new value plan" that was not market tested.[13] (PC Brief at ¶ 13).

---

[13] A "new value plan" is a Chapter 11 plan "under which the objection of an impaired senior class does not bar
junior claim holders from receiving or retaining property interests in the debtor after reorganization, if they
contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for

Simultaneously, the Creditors argue that cause exists to appoint a Chapter 11 Trustee because the

Debtors purposefully allowed the exclusivity period to lapse so that their plan could be market

tested through a competing plan process. (PC Brief at ¶ 13). However, as the Supreme Court has

held, one of the methods for potentially confirming a "new value plan" is through the competing

plan process. *203 N. LaSalle*, 526 U.S. at 454. The Court further notes that the Debtors' choice to

permit competing plans by allowing exclusivity to lapse has already yielded multiple amended

plans that invariably will increase creditor recovery in these cases. (*See e.g.* Docket Nos. 370,

531, 570, 663, 671, 695).

The Court also finds that the Creditors' remaining arguments pertaining to the lack of

first day motions and failure to hire their own bankers or financial advisors also do not constitute

cause. (*See* PC Brief at ¶ 13). The Court is unaware of any cases standing for the proposition that

cause exists to appoint a Chapter 11 Trustee for these failures, although they could present other

issues in these cases going forward.

Finally, in the PC Motion, the Petitioning Creditors analogize the Debtors' conduct in

these cases to other cases in which a Chapter 11 Trustee was appointed for cause for failure to

abide by Court orders. (*See* PC Motion at ¶ 13). However, the Court finds those cases

distinguishable. *See e.g. In re AG Serv. Centers, L.C.*, 239 B.R. 545, 551 (Bankr. W.D. Mo.

1999) (where, unlike here, the court found that the debtor's "failure to [comply with the cash

collateral order] can only be attributed to his deliberate choice to ignore the Court's orders and

proceed in any fashion he pleases, i.e., setting his own deadlines, repeatedly ignoring the budget

he proposed himself, and basically carrying on business as if he had never filed bankruptcy");

---

successful reorganization of the restructured enterprise." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship ("203 N. LaSalle")*, 526 U.S. 434, 434–35 (1999).

*Morningstar Marketplace, Ltd*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016) (where the court found that cause did not exist at all and appointed a trustee for entirely different reasons); *In re TP, Inc.*, 455 B.R. 455, 459 (Bankr. E.D.N.C. 2011) (where, among other things, the debtor directed its counsel to refuse to comply with an order to turnover funds required by a consent order); *In re Westbank Holdings, LLC*, No. 22-10082, 2022 WL 3052135, at *14 (Bankr. E.D. La. Aug. 1, 2022) (appointing trustee in part because the debtor "surreptitiously caused a total of $800,000 in insurance proceeds that were to be used to repair hurricane damage to properties held by the Debtors to vanish in the wind without one receipt, cancelled check, or other primary-source support to show that the proceeds were spent on repairs to the properties"); *In re Woodlawn Cmt'y Dev. Corp.*, 613 B.R. 671, 685 (N.D. Ill. 2020) (affirming appointment of a trustee and stating that "defying a court order—such as paying . . . a consulting fee that the bankruptcy judge explicitly forbade—is cause to appoint a trustee"); *In re NOA, LLC*, 578 B.R. 534, 540 (Bankr. E.D.N.C. 2017) (appointing a trustee where the debtor violated a stipulated order with its creditors that specifically restrained the debtor from shipping bulk clothing out of the United States until full payment for the goods was received)).

Having considered all of these arguments together, the Court finds that the Creditors have failed to establish that cause exists to appoint a Chapter 11 Trustee pursuant to Section 1104(a)(1) through clear and convincing evidence.

## 2. <u>Best Interest of the Creditors Pursuant to Section 1104(a)(2)</u>

As set forth above, the Movants also assert in their respective motions that a Chapter 11 Trustee should be appointed pursuant to Section 1104(a)(2) because such an appointment is in the best interest of creditors. Section 1104(a)(2) of the Bankruptcy Code provides that, upon request of a party in interest or the United States Trustee, the court shall order the appointment of

a trustee "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . ." 11 U.S.C. § 1104(a)(2).

Courts analyzing whether the appointment of a Chapter 11 Trustee is in the best interest of creditors have examined numerous factors, including: "(a) the trustworthiness of the debtor; (b) the debtor's past and present performance and prospects for rehabilitation; (c) the confidence—or lack thereof—of the business community and of creditors in present management; and (d) the benefits derived from the appointment of a trustee, balanced against the cost of the appointment." *In re Sillerman*, 605 B.R. 631, 652 (Bankr. S.D.N.Y. 2019).

Importantly, "Section 1104(a)(2) envisions a flexible standard and gives the district court discretion to appoint a trustee when doing so would serve the parties' and estate's interests." *In re The 1031 Tax Grp., LLC*, 374 B.R. 78, 90 (Bankr. S.D.N.Y. 2007) (internal quotations and citations omitted). Ultimately, "the decision to appoint a trustee rests in the [C]ourt's discretion," and the Court's discretion is broad. *In re China Fishery Grp. Ltd. (Cayman)*, No. 16-11895 (JLG), 2016 WL 6875903, at *14 (Bankr. S.D.N.Y. Oct. 28, 2016); *In re Wings Digital Corp.*, No. 05-12117 (ALG), 2005 WL 3789334, at *4 (Bankr. S.D.N.Y. May 16, 2005).

The Movants collectively make the following arguments regarding appointment of a Chapter 11 Trustee under Section 1104(a)(2): (i) the Debtors suffer from a lack of trustworthiness (Committee Motion at ¶ 79; UST Trustee Motion at 8–11; PC Joinder at ¶¶ 18–26); (ii) the Debtors lack any prospects of reorganization without a Trustee (Committee Motion at ¶ 80; UST Trustee Motion at 11; PC Brief at ¶¶ 24–25); (iii) the creditors have no confidence in the Debtors' ability to administer these estates and that acrimony has crippled progress (Committee Motion at ¶¶ 81–82; UST Trustee Motion at 11–12; PC Joinder at ¶¶ 1–3); and (iv)

45

the benefits of a Chapter 11 Trustee outweigh the costs (Committee Motion at ¶ 84; UST Trustee

Motion at 12; PC Brief at ¶¶ 29–36).

In the Omnibus Objection, the UST Objection, and the Shareholder Objection, the

Debtors and the Majority Shareholders assert in response that: (i) they are trustworthy and have

faithfully administered these estates (Omnibus Objection at ¶ 74; UST Objection at 12–13;

Shareholder Objection at ¶ 48); (ii) the Debtors have a realistic chance of reorganizing because

they have proposed a plan that is confirmable (Omnibus Objection at ¶ 75; UST Objection at 14–

16; Shareholder Objection at ¶¶ 49–51); (iii) the animosity in these cases has not risen to the

level sufficient to impose a Trustee and that they have the confidence of their other creditors

(Omnibus Objection at ¶¶ 76–79; UST Objection at 17–20); and (iv) appointment of a Chapter

11 Trustee would be bad for the Debtors' enterprise value (Omnibus Objection at ¶¶ 80–83; UST

Objection at 21–25; Shareholder Objection at ¶¶ 52–53).

In the Replies, the Movants assert that: (i) the creditors have no confidence in the Debtors

and the level of acrimony in these cases is atypical. (Committee Reply at ¶¶ 33, 35; UST Reply

at 3–8); (ii) these cases are not a two-party dispute between the Debtors and the Murchinson

affiliated entities (Committee Reply at ¶ 34); (iii) the creditors do not trust the Debtors (PC

Reply at ¶¶ 26–29); (iv) the Court should reject the Debtors' assertion that the estates would be

damaged by the appointment of a trustee (Committee Reply at ¶ 36); and (v) the impact to non-

debtor subsidiaries does not figure in the cost-benefit analysis regarding whether to appoint a

Trustee. (UST Reply at 8–11).

The Court will address these issues in turn.

### a.  **The Debtors' Trustworthiness**

The first factor courts consider in determining whether to appoint a Chapter 11 Trustee under Section 1104(a)(2) is the debtor's trustworthiness. Regarding this factor, the Petitioning Creditors generally reassert many of their arguments under Section 1104(a)(1), particularly:

> (1) the Debtors' abandonment of the Second RSA and failure to pay on the Notes, (2) their favoritism toward shareholders in their Plan and DIP, (3) their focus on pushing property away from creditors through the Arbitration, (4) their response to creditor concerns about the Cypriot Transfer by forming a Demand Review Committee represented by conflicted counsel and headed by a director who is not independent, (5) their refusal to engage with any creditors during the 120-day period, as well as (6) their lack of transparency regarding the financials of their subsidiaries . . . .

(PC Brief at ¶ 23; *see also* Committee Motion at ¶ 79 (asserting that the Debtors are untrustworthy because of their lack of independent governance, failure to make timely and accurate disclosures, and failure to provide information to the Committee and its advisors)).[14]

Though the Debtors and the Shareholders do not separately address this factor, the Court notes that many of these arguments were raised by the Creditors in the context of their arguments under Section 1104(a)(1) of the Bankruptcy Code and rejected by the Court. Specifically, those arguments relating to: (i) the Debtors' arguments in the Arbitration that the Preferred Shares were transferred to the Cypriot Nominees; (ii) the formation of the allegedly conflicted Demand Review Committee and the Debtors' lack of independent governance; and (iii) the Debtors' lack of financial transparency regarding their subsidiaries. (PC Brief at ¶ 23; Committee Motion at ¶ 79). Accordingly, the Court rejects these arguments for the same reasons set forth *infra*, section III.B.

---

[14] The UST Motion raises acrimony as an argument regarding the Debtors' trustworthiness.  (UST Motion at 8–11). However, the Court finds that this argument is relevant to the third factor, whether there is creditor confidence in the Debtors. Accordingly, the Court will address this argument *supra*, section III.B.2.c.

The Court is also unpersuaded by the Movants' remaining arguments. First, the Court disagrees that the Debtors' pre-petition default under the RSA and failure to pay the notes make the Debtors untrustworthy within the meaning of Section 1104(a)(2) of the Bankruptcy Code. Indeed, many bankruptcies are precipitated by some degree of such financial distress.

The Court also disagrees with the Movants that the Debtors' new value plan and DIP proposal makes the Debtors untrustworthy. First, with regard to the plan, the Court notes that "new value plans" can potentially be an acceptable means of reorganization so long as, for instance, they are market tested, as the Debtors propose here through the competing plan process. *203 N. LaSalle*, 526 U.S. at 454.

Likewise, with regard to the DIP proposal, though the DIP Motion sought approval of a senior-secured loan facility to be provided by one of the Debtors' subsidiaries, the Court finds that the Debtors' explanation for the proposal is credible. (DIP Motion at ¶ 9 (stating that "[t]he Debtors do not believe they can force a dividend from their subsidiaries under applicable nonbankruptcy law (including the organizational arrangements) and certain contractual obligations binding the subsidiaries")). In any event, the DIP Motion has so far proven to be unnecessary, as the Debtors' subsidiaries were able to obtain consent to make dividends to Eletson Holdings to fund these cases. (Creditor Ex. 26–29).

Finally, with regard to the argument that the Debtors have refused to engage with their creditors in these cases, the Court agrees with the Movants to a degree, but does not find that the Debtors' lack of engagement warrants the imposition of a Chapter 11 Trustee at this time. Indeed, the Court acknowledges that the Debtors have been reluctant at times to share information with the creditor body in these cases. For instance, the Debtors initially did not file timely 2015.3 Reports for any of their subsidiaries, and when they did file them, they excluded

48

Eletson Gas. (Committee Motion at ¶ 25–26). Additionally, as discussed above, the Court has regularly been required to resolve many discovery disputes throughout these cases, many of which are detailed in the letters filed on the docket. (Docket Nos. 402; 403; 407; 414; 415; 416; 423; 437; 439; 441; 443; 446; 447; 448; 451; 452; 453; 460; 463; 466; 470; 471; 472; 483; 490; 528).

Ultimately, however, the Court notes that the Debtors have largely complied with discovery requests in these cases after receiving direction from the Court and the Court is unaware of any required bankruptcy disclosures that remain outstanding. Moreover, the Court finds that, to a certain extent, the Debtors' initial reluctance to timely share information with their full creditor constituency is at least in part explained by certain findings made in the Arbitration. (*See e.g.*, Final Award at 50–52, 56, 62, 69 (where the Arbitrator found, *inter alia*: (i) that Murchinson bribed an officer of Eletson Corporation and Eletson Gas to act against Eletson Gas' interests; (ii) breached an NDA by communicating directly with Eletson Gas financiers and lenders; (iii) intentionally violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the arbitration; and (v) refused to produce relevant documents in the Arbitration)).

To be clear, bad behavior by the Debtors' creditors in other forums does not excuse the Debtors' compliance with the provisions of the Bankruptcy Code, or their obligations to comply with reasonable discovery requests in these proceedings. However, for the purposes of establishing the Debtors' lack of trustworthiness, the Court finds the Debtors' behavior does not establish cause by clear and convincing evidence for the appointment of a Chapter 11 Trustee. For all these reasons, the Court finds that this factor does not weigh in favor of the imposition of a Chapter 11 Trustee.

### b.  The Debtors' Past and Present Performance and Prospects for Rehabilitation

The second factor courts consider in determining whether to appoint a Chapter 11 Trustee under Section 1104(a)(2) is the Debtors' past and present performance and their prospects for rehabilitation. Regarding this factor, the Petitioning Creditors raise three facts: (i) the Debtors never made any payments on the Exchange Notes which allowed millions of dollars in interest to accrue (PC Brief at ¶ 24 (citing Creditor Ex. 36)); (ii) "they went from over 20 vessels to 4 vessels during the last five years due to their mismanagement" (PC Brief at ¶ 24 (citing Creditor Ex. 32 at 54; Docket no. 340 at 9–10); and (iii) the Families, who run Eletson Holdings, and who are also in charge of Eletson Gas have sought to push the Eletson Gas Preferred Shares out of the estate and are using estate resources to accomplish that goal. (PC Brief at ¶ 24 (citing Creditor Ex. 1 at 113:5–116:21; May 15 Arbitration Hearing at 153:2–13; Creditor Ex. 20 ¶ 9; Creditor Ex. 160 at 4)).

As for the Debtors' prospect for reorganization, the Petitioning Creditors state that the Debtors' plan "seek[s] to subordinate the entire creditor body to out-of-the-money shareholders in violation of the absolute priority rule. (PC Brief at ¶ 25; *see also* UST Motion at 11). Likewise, the Committee argues that reorganization seems unlikely because the Debtors breached both RSA's pre-bankruptcy and have not effectively progressed these cases. (Committee Motion at ¶ 80).

In response, the Debtors offered the testimony of Nikolaos Veraros as an expert in the shipping finance industry. (Debtor Brief at ¶ 12). Mr. Veraros analyzed the Debtors' operations, including charter and bareboat charter agreements, employment tables, industry information, and financial statements, and found that "current management is managing skillfully and successfully the relationships . . . with most of its creditors, [] to maximize the possibility for survival of the

assets to the ultimate benefit of all stakeholders." (Veraros Declaration at ¶¶ 15–37). Moreover,

the Debtors point out that they have historically been successful in preserving and monetizing the

value of their subsidiaries, including by successfully selling 13 of their vessels for the benefit of

their noteholders as part of the Second RSA. (Debtor Brief at ¶ 46 (citing Kertsikoff Declaration

at ¶ 25; Hadjieleftheriadis Declaration at ¶¶ 50–51)). The Debtors assert that these sales resulted

in more than $137 million of value being transferred to noteholders over a two-year period. (*Id.*

(citing Kertsikoff Declaration at ¶ 25; Hadjieleftheriadis Declaration at ¶¶ 50–51)). Finally, the

Debtors assert that they have proposed a confirmable plan in good faith. (Debtor Brief at ¶ 40

(citing Kertsikoff Declaration at ¶¶ 68–72; Debtor Ex. 667; Docket No. 570)).

Regarding this factor, the Court finds that the Movants have failed to meet their burden

that a Chapter 11 Trustee is warranted due to poor performance and lack of rehabilitation.

Indeed, when asked at the Hearings in this matter whether the underlying business was being run

poorly, counsel for the Committee stated that he believed it was a management issue, not an

issue at the subsidiary level. (*See* April 11 Hearing Transcript at 20:5–22). However, the record

does not support a finding at this time that the Debtors are poorly managing their business.

For instance, the Debtors produced uncontested testimony showing that the Debtors have

historically been successful at monetizing their enterprise for the benefit of creditors. (Debtor

Brief at ¶ 46 (citing Kertsikoff Declaration at ¶ 25; Hadjieleftheriadis Declaration at ¶¶ 50–51)).

Further, as Mr. Veraros testified (again, unopposed), "current management is managing skillfully

and successfully the relationships . . . with most of [their] creditors, [] to maximize the possibility

for survival of the assets to the ultimate benefit of all stakeholders." (Veraros Declaration at ¶¶

15–37).

The Court is equally unconvinced by the Creditors' arguments that pre-petition defaults constitute poor management sufficient to appoint a Chapter 11. (PC Brief at ¶ 24 (citing Creditor Ex. 36; Creditor Ex. 32 at 54; Docket No. 340 at 9–10)). Indeed, as stated above, many bankruptcies are precipitated by some degree of such financial distress. The Court likewise does not believe that the Debtors are being run poorly for many of the same reasons outlined extensively in the context of the Movants' 1104(a)(1) arguments. (*See supra*, section III.B).

Regarding the Debtors' prospect for reorganization, the Court further notes that the Debtors have attempted to prevent the loss of the Preferred Shares to Levona in the arbitration and have filed Chapter 11 plans. (*See* Debtors' First Plan; Debtors' Second Amended Plan). While the Movants point out that the Debtors' plans are new value plans that "seek to subordinate the entire creditor body to out-of-the-money shareholders in violation of the absolute priority rule," (PC Brief at ¶ 25; *see also* UST Motion at 11), the Court notes that new value plans can be an acceptable means of reorganization so long as, for instance, they are market tested, as is potentially contemplated here through the competing plan process. *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999).

For these reasons, the Court finds that the Debtors' past and present performance and their prospects for rehabilitation do not weigh in favor of appointing a Chapter 11 Trustee.

### c.  Creditor Confidence in Present Management

The third factor courts consider in determining whether to appoint a Chapter 11 Trustee under Section 1104(a)(2) is creditor confidence in present management. The Movants argue that this factor is met due to overwhelming creditor support of the Trustee Motions (PC Brief at ¶ 26 (citing Docket Nos. 404, 420, 476, 491); Committee Brief at ¶ 14 (citing Creditor Ex. 117, 119, 135; Debtor Ex. 691); UST Brief at 9)).

Further, all of the Movants argue that the acrimony in these cases constitutes cause to appoint a trustee. (PC Brief at ¶ 27 (citing Creditor Ex. 18 at 13:24–14:5 (where Debtors' counsel states that this is an "incredibly acrimonious case"); Docket No. 236 at ¶¶ 11, 13 (where the Debtors state that these cases is part of "improper collection litigations commenced by Murchinson and its alter egos")); Committee Brief at ¶ 14; UST Brief at 4–8)). The Petitioning Creditors also assert that the Debtors: (i) have objected to virtually every application submitted by the Committee in these cases (PC Brief at ¶ 27 (citing Docket Nos. 287, 356–57, 376–79, 380, 431–32, 464–65, 563-64)); and (ii) refuse to engage with their creditors in these cases and proposed a patently unconfirmable plan. (PC Brief at ¶ 27).

In response, the Debtors generally assert that these cases are essentially two-party disputes and that the "alleged acrimony and 'creditor' consensus in these cases are smokescreens" because in actuality "Murchinson is wearing multiple hats and parading around as a chorus of creditors." (Debtor Brief at ¶ 54). In support of this position, the Debtors cite to the Final Award, where the Arbitrator found that Murchinson by itself and through various affiliates attempted to take over the Eletson Enterprise "through bribes, conspiring with Eletson [Holdings]' outside counsel, interfering with financiers, and causing arrests of vessels." (*Id.* (citing Final Award at 50–52, 56, 62, 69)). The Debtors also argue that the acrimony alone in these cases does not rise to the level warranting the appointment as has been found in other cases. (*Id.* at ¶ 57). The Debtors further assert that, of the 26 letters the UST admitted into evidence in these proceedings to show acrimony, only 11 were submitted by the Debtors, certain others were requested by the Court, and several were simply requesting conferences with the Court in compliance with the Court's chambers rules. (*Id.* at ¶ 58) The Shareholders assert that the Debtors have acted "in good faith and have remained responsive to all reasonable requests of

creditors in these chapter 11 cases despite being compelled to fight a multi-front battle with the Murchinson [e]ntities before this Court, the District Court, and the Arbitration." (Shareholder Brief at ¶ 32 (citing Karastamati Declaration at ¶¶ 27–31)).

The Court finds that this factor is neutral, and ultimately does not support the appointment of a Chapter 11 Trustee on its own given the Court's other findings herein. Preliminarily, the Court acknowledges that virtually all of the Debtors' creditors who have appeared in these cases support the appointment of a Trustee. (PC Brief at ¶ 26 (citing Docket Nos. 404, 420, 476, 491); Committee Brief at ¶ 14 (citing Creditor Ex. 117, 119, 135; Debtor Ex. 691); UST Brief at 9)). However, the Court is also cognizant of the fact that these cases began as involuntary Chapter 7 proceedings and were later converted to voluntary Chapter 11 proceedings by stipulation. (*See* Docket No. 215). As often happens in involuntary bankruptcy proceedings, the Debtors may not be on the same page as their creditors. Were this factor sufficient on its own, Chapter 11 Trustees would likely be appointed in many more cases, and Section 1104 relief would no longer be an "extraordinary remedy." *See In re Bayou Grp., LLC*, 564 F.3d 541, 546 (2d Cir. 2009) (citing *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 655 (Bankr. S.D.N.Y.), *aff'd,* 342 B.R. 122 (S.D.N.Y. 2006)). For these reasons, the Court is unpersuaded by the argument that a Chapter 11 Trustee should be appointed simply because most creditors want one.

The Court also acknowledges that these cases are acrimonious, but likewise does not believe such acrimony warrants a trustee at this time. While some cases have held that acrimony alone is sufficient to appoint a Chapter 11 Trustee, the Court finds the level of such acrimony here distinguishable. *See e.g. In re Eurospark Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) (involving the unwillingness of one of the debtor's principal's to approve a settlement of the estate's last remaining asset—claims against certain insurance companies—even though

nearly all claims would have been paid by the settlement, all because the principal would receive

no recovery if the settlement were approved); *Marvel Entm't Group, Inc.*, 140 F.3d 463, 474 (3d

Cir.1998) (involving situation where a creditor-controlled debtor was at odds with the debtor's

lenders and the creditor controlled debtor would be placed in the "awkward position of

evaluating their own indenture and debt claims" against the lenders); *In re Eljamal*, 2018 WL

4735719, at *7 n.12 (S.D.N.Y. Sept. 28, 2018) (where the parties had filed "numerous adversary

actions against each other," had frequent discovery disputes, and could not resolve routine

motions); *Taub v. Adams*, No. 10-CV-02600 CBA, 2010 WL 8961434, at *3 (E.D.N.Y. Aug. 31,

2010) (where the debtor had *inter alia*, hired and fired 8 different lawyers over a 21-month

period)). Here, the Court notes that the parties have resolved numerous issues by stipulation (*See

e.g.,* Docket Nos. 23, 37, 48, 83, 625, 626), and even worked together to resolve a litany of

objections to the disclosure statements after the Hearings on the instant Trustee Motions. Stated

succinctly, the Court does not believe that the acrimony in these cases is an impediment to the

Debtors' ability to reorganize. *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010), *aff'd,* No.

08 BK 44210 ESS, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011) (noting that "Courts have

appointed trustees pursuant to Section 1104(a)(2) when there is '[a] high level of acrimony

between a debtor's management and its creditors, . . . *particularly if that acrimony is hampering

the prospects of rehabilitation*.'" (emphasis added)).

　　The Court is also unpersuaded by the cases cited by the Movants for the proposition that

excessive letter-writing warrants the imposition of a Chapter 11 Trustee. For instance, in *Taub*,

the court found that letters on the docket are indicative of the level of acrimony in a case. *In re

Taub*, 427 B.R. 208, 217 (Bankr. E.D.N.Y. 2010), *aff'd*, No. 08 BK 44210 ESS, 2011 WL

1322390 (E.D.N.Y. Mar. 31, 2011) (noting that "[n]umerous letters filed by the parties reflect the

acrimony between the parties and show that they have been unable to agree on how, when, or where to proceed with depositions and other discovery"). However, here, the Court agrees with the Debtors that certain of the letters identified by the UST, merely request status conferences, or were not filed by the Debtors. (Debtor Brief at ¶ 58). In any event, the Court does not believe that the letter-writing in this case, standing alone, is sufficient to warrant the appointment of a Chapter 11 Trustee under these circumstances.

For these reasons, the Court finds that this factor at most is neutral towards the appointment of a Chapter 11 Trustee.

### d.  Cost-Benefit Analysis

Finally, Courts determining whether to appoint a Chapter 11 Trustee under Section 1104(a)(2) of the Bankruptcy Code must weigh the costs against the benefits of such an appointment.

In support of this factor, the Petitioning Creditors argue that: (i) a neutral trustee would eliminate the acrimonious and costly litigation in these cases; (ii) overwhelming creditor support for the Trustee Motions shows that the creditors are willing to take on the cost of the appointment of the trustee; (iii) "if the Debtors are correct that there is no asset liquidation value for creditors to recover here (Docket No. 513 at ¶ 69), then appointment of a Trustee should pose no harm to the estates;" and (iv) there is no actual evidence that a trustee would adversely affect the Debtors' business. (PC Brief at ¶ 28; *see also* Committee Brief at ¶ 15 (noting that "[w]here creditors are 'willing to risk the costs, uncertainties and dislocations, occasioned by the appointment of a trustee' the Court should 'exercise its equitable powers to order that appointment'")).

56

In response, the Debtors assert that the appointing a Chapter 11 Trustee would be devastating to the Debtors and would not be in the Debtors' best interest. (Debtor Brief at ¶¶ 60–67; Shareholder Brief at ¶¶ 27–31). Specifically, they assert that the appointment of a Chapter 11 Trustee would be a default under the bareboat charters. (Debtor Brief at ¶ 63 (citing Kertsikoff Declaration at ¶ 74)). They further assert that a default under the bareboat charters would greatly harm their subsidiaries and reduce the Eletson Enterprise' value, which would be detrimental to all parties in interest. (Debtor Brief at ¶¶ 63–66). Finally, they argue that the international shipping industry requires a high level of expertise, which the current principles can uniquely provide. (Debtor Brief at ¶ 67 (citing Hadjieleftheriadis Declaration at ¶¶ 10, 69, 71; Karastamati Declaration at ¶ 34–44); *see also* Shareholder Brief at ¶ 27). Additionally, the Shareholders argue that a Chapter 11 Trustee would be needlessly expensive. (Shareholder Brief at ¶¶ 30–31). They further assert that "uprooting of the entirety of a debtor's existing and knowledgeable management is an ill-suited remedy to address a level of acrimony that exists in nearly all contested bankruptcy matters such as" these cases. (*Id.* at ¶ 34 (citing Shareholder Objection at ¶¶ 35–36; 53)).

Here, the Court once again finds that this factor does not weigh in favor of the appointment of a Chapter 11 Trustee. Indeed, as set forth in *WorldCom*, "[u]nder section 1104(a)(2), a creditor group, no matter how dominant, cannot justify the appointment of a trustee simply by alleging that it would be in its interests." *In re WorldCom, Inc.*, No. 02-13553 (AJG), 2003 Bankr. LEXIS 2192, at *19 (Bankr. S.D.N.Y. May 16, 2003) (citations omitted). The *WorldCom* court went on to say:

> It is important to remember that the "interests" standard requires a finding that appointment of a trustee would be in the interest of essentially all interested constituencies. . . . Use of the word "and" [in the text of section 1104(a)(2)] suggests that creditors cannot on their own obtain the appointment of a trustee under the

provision in order to disenfranchise equity security holders or other interests. Instead, appointment of a trustee must be in the interest of the estate generally in order to satisfy the statutory "interest" standard.

*Id.* (*quoting* 7 Alan N. Resnick & Frank J. Sommer, Collier on Bankruptcy § 1104.02 (15th ed. rev. 2003)).

Additionally, the Court finds that the potential costs of the appointment of a Chapter 11 Trustee do not warrant the benefits at this time. Principally, though these cases have often been acrimonious and involved discovery disputes of many kinds, they have been progressing. Indeed, since these cases were converted to Chapter 11, counsel have been retained for both the Debtors and the Committee, interim fees have been paid, and disclosure statements and competing plans have been filed. The appointment of a Chapter 11 Trustee at this stage could significantly delay the progress that has been made on the eve of potential solicitation of competing plans of reorganization.

Moreover, the potential costs are great. Not only are Chapter 11 Trustees potentially expensive (Shareholder Brief at ¶¶ 30–31), but the appointment of a Chapter 11 Trustee in these cases at this time could harm the Debtors' enterprise value, which is ultimately harmful to the very creditors who seek to appoint one. Accordingly, the Court finds that this factor does not weigh in favor of the appointment of a Chapter 11 Trustee.

V.     **CONCLUSION**

For the foregoing reasons, the Court finds that a Chapter 11 Trustee should not be

appointed at this time.[15] Accordingly, it is

OREDERED that the PC Motion in Limine and the Debtors' Motion to Exclude are

DENIED; and it is further

ORDERED that the Trustee Motions are DENIED.

**IT IS SO ORDERED.**


Dated: May 29, 2024
New York, New York

_/s/ John P. Mastando III_____
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE

---

[15] Finally, the Petitioning Creditors also argued in the PC Motion that a Chapter 11 Trustee should be appointed pursuant to Section 1112(b)(1) of the Bankruptcy Code due to failure to comply with an order of the Court and for substantial and continuing loss to the estate with an absence of reasonable likelihood of rehabilitation. (PC Trustee Motion at ¶¶ 16–19). Specifically, the Petitioning Creditors assert that the Debtors are in violation of the Interim Compensation Order and have no ability to finance these cases and that an independent estate fiduciary should continue to operate the estate as a going concern and pursue potential estate causes of action for the benefit of creditors. (*Id.*) The Court notes that the Petitioning Creditors did not address these arguments in the PC Reply or at the Hearings. However, the Court further notes that similar arguments were raised and rejected by the Court in connection with the Petitioning Creditors' arguments in support of a trustee appointment pursuant to Section 1104(a)(1). (*See infra*, section III.B). Accordingly, to the extent that the portion of the PC Motion seeking relief under Section 1112(b)(1) of the Bankruptcy Code is still being urged, that portion of the PC Motion is also denied.