UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ELETSON HOLDINGS INC., et al., | Case No.: 23-10322 (JPM) |
| Debtors.[1] | (Jointly Administered) |

**NOTICE OF FILING OF
FIRST AMENDED DISCLOSURE STATEMENT IN
SUPPORT OF SECOND AMENDED JOINT PLAN OF REORGANIZATION
OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on January 23, 2024, Eletson Holdings, Inc. and its debtors affiliates (collectively the "Debtors"), debtors-in-possession in the above-captioned chapter 11 cases, filed the Disclosure Statement in Support of First Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 371] (the "First Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that on April 26, 2024, the Debtors filed the Disclosure Statement in Support of First Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 621] (the "Amended Plan Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that on May 13, 2024, the Debtors filed the Disclosure Statement in Support of Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 672] (the "Second Amended Plan Disclosure Statement").

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the *First Amended Disclosure Statement in Support of Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code* attached hereto as **Exhibit A** (the "Disclosure Statement"), which supersedes the Second Amended Plan Disclosure Statement in all respects.

**PLEASE TAKE FURTHER NOTICE** that annexed hereto as **Exhibit B** is a redline comparing the Disclosure Statement against the Second Amended Plan Disclosure Statement.

**PLEASE TAKE FURTHER NOTICE** that copies of the First Disclosure Statement, First Amended Plan Disclosure Statement, Second Amended Plan Disclosure Statement, Disclosure Statement and other pleadings filed in the above-captioned chapter 11 case may be obtained from the Court's website, https://ecf.nysb.uscourts.gov, for a nominal fee.

DATED:  New York, New York
          May 31, 2024

**REED SMITH LLP**

/s/ Derek J. Baker
Derek J. Baker
Derek Osei-Bonsu
Reed Smith LLP
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail: dbaker@reedsmith.com
          dosei-bonsu@reedsmith.com

-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail: abuck@reedsmith.com
          lsolomon@reedsmith.com

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel to the Debtors*

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Eletson Holdings Inc., *et al.*,[1] | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**REED SMITH LLP**

Derek J. Baker
Derek Osei-Bonsu
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail:  dbaker@reedsmith.com
          dosei-bonsu@reedsmith.com

-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail:  abuck@reedsmith.com
          lsolomon@reedsmith.com

---

[1] The Debtors in these Chapter 11 Cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel for the Debtors*

THIS FIRST AMENDED DISCLOSURE STATEMENT (THE "<u>DISCLOSURE</u> <u>STATEMENT</u>") FOR THE SECOND JOINT AMENDED PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "<u>PLAN</u>"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED [_], THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE DEBTORS' PLAN. IN ADDITION TO THIS DISCLOSURE STATEMENT, YOU ARE RECEIVING AN ADDITIONAL DISCLOSURE STATEMENT AND RELATED PLAN THAT ARE NOT PRESENTED BY THE DEBTORS. PLEASE TAKE CARE TO ENSURE THAT YOU ARE EVALUATING THIS, THE DEBTORS' DISCLOSURE STATEMENT, IN RELATION TO THE DEBTORS' PLAN AND EVALUATE THE ADDITIONAL DISCLOSURE STATEMENT IN RELATION TO THE ADDITIONAL PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, [ ] UNLESS EXTENDED BY ORDER OF THE BANKRUPTCY COURT.**

**THE DEBTORS BELIEVE THAT THE PLAN PRESENTS THE MOST ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' STAKEHOLDERS UNDER THE CIRCUMSTANCES OF THESE CHAPTER 11 CASES AND THEREFORE CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS AND INTEREST HOLDERS. THE DEBTORS RECOMMEND THAT CREDITORS AND INTEREST HOLDERS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS.  ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.   TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN SUPPLEMENT AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN SUPPLEMENT ARE CONTROLLING.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.  HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.   CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE

SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT 1.

# TABLE OF CONTENTS

**Page**

I.  SUMMARY ........................................................................................................ 1

    A.  Why You Are Receiving This Document ................................................ 2

    B.  Plan Overview ........................................................................................ 2

        1.  Purpose – Reorganization ........................................................... 2

        2.  Substantive Consolidation or Merger ......................................... 2

        3.  Plan Treatment ........................................................................... 3

    C.  Voting and Confirmation ...................................................................... 10

    D.  Risk Factors and Disclaimer ................................................................ 11

II.  VOTING ON AND CONFIRMATION OF THE PLAN ................................. 12

    A.  Deadline for Voting For or Against the Plan ........................................ 12

    B.  Confirmation Hearing for the Plan ....................................................... 13

    C.  Any Objections to Confirmation of the Plan ........................................ 14

    D.  Recommendations for Voting ............................................................... 14

III.  ORGANIZATION AND ACTIVITIES OF THE DEBTORS ......................... 15

    A.  The Debtors' Business .......................................................................... 15

    B.  Corporate History and Structure .......................................................... 15

    C.  Pre-Petition Capitalization ................................................................... 15

        1.  Old Notes .................................................................................. 15

        2.  Exchange Notes and Restructuring Support Agreements ............. 16

    D.  Eletson Holdings Guaranty Obligations .............................................. 18

        1.  The OCM Guarantees ............................................................... 18

        2.  The Azure Guarantees ............................................................... 19

        3.  The Eletson Corp Guarantees ................................................... 19

IV.  EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING ........... 20

    A.  Murchinson Directly or Indirectly Created Levona and Pach Shemen, the Primary Actors in the Arbitration and Bankruptcy ................................ 20

    B.  Levona Improperly Acquires the Preferred Shares of Eletson Gas ........ 21

    C.  The JAMS Arbitration .......................................................................... 23

    D.  The District Court Order ....................................................................... 24

    E.  Pach Shemen's Improper Acquisition of the Exchange Notes ............... 26

    F.  The Exchange Note Trustee is Forced to Initiate the Southern District Bondholder Litigation ......................................................................... 27

G.  The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases ............................................................................................... 27

H.  The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions ................................................................................... 28

I.  Potential Claims Against the Debtors and their Principals related to the Preferred Shares .................................................................................. 28

V.  THE CHAPTER 7 CASES ......................................................................... 29

A.  The Involuntary Petitions and Joint Administration Motion ................... 29

B.  The Alleged Joinders to the Involuntary Petitions................................. 30

C.  Motion for Relief from the Automatic Stay and the Stipulated Stay Order ........... 30

D.  The Motion to Dismiss and Associated Documents ............................... 31

E.  The Eletson State Court Action is Removed to the Bankruptcy Court..... 31

F.  Mediation and the Conversion Stipulation ........................................... 32

VI.  THE CHAPTER 11 CASES ....................................................................... 33

A.  Debtors' Filings ................................................................................... 33

   1.  Schedules and Statements of Financial Affairs ........................... 33

   2.  Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports ..................................................................... 33

      a.  2015.3 Disclosures ............................................................ 34

   3.  Monthly Operating Reports ....................................................... 34

   4.  Claims Bar Date and Review Process ........................................ 34

      a.  Claims Bar Date ............................................................... 34

      b.  Claims Review Process ..................................................... 35

         i.  Original Petitioning Creditors Claim Objection ............... 35

         ii.  Levona Claim Objection ............................................... 36

         iii. Exchange Note Trustee Claim Objection ......................... 37

         iv.  New Agathonissos Finance LLC Claim Objection............ 39

         v.  Omnibus Claim Objections............................................ 39

   5.  Application for the Retention of Debtors' Counsel ....................... 39

   6.  Motion to Enforce ..................................................................... 39

   7.  Establishment of Independent Committee .................................... 40

   8.  Plans....................................................................................... 40

   9.  The Shareholder New Value Contribution .................................... 41

   10.  Motion to Compel Mediation...................................................... 43

   11.  Postpetition Financing and the DIP Motion ................................. 44

B.    Appointment of the Committee and the Committee Filings ....................................... 45

    1.    Applications for appointment of Committee Professionals ........................... 45

        a.    Dechert Retention Application ................................................. 45

        b.    FTI Retention Application ...................................................... 45

    2.    Motion to Modify Previous Order Granting Relief from the Automatic Stay ............................................................................................................... 46

    3.    Interim Compensation Motion ...................................................................... 46

C.    Trustee Motions, Mediation, Evidentiary Hearing and Exclusivity Motion ........... 47

    i.    The Trustee Motions ................................................................ 47

    ii.    The Mediation ......................................................................... 48

    iii.    The Evidentiary Hearing ......................................................... 48

    iv.    The Exclusivity Motion ........................................................... 49

D.    The Petitioning Creditor Plan and Disclosure Statement ......................................... 49

VII.    ORDERLY DISTRIBUTION OF ASSETS ......................................................................... 50

VIII.    THE PLAN .............................................................................................................................. 53

A.    Overview of Chapter 11 ............................................................................................ 53

B.    Purpose of the Plan ................................................................................................... 55

C.    Classification and Treatment of Claims ................................................................... 56

    1.    Classification and Treatment of Claims and Interests ................................. 56

        a.    Unclassified Claims ................................................................. 56

        i.    Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims)................................... 56

        ii.    Professional Fee Claims and Committee Professional Fee Claims .... 57

        iii.    DIP Claims................................................................................ 58

        iv.    Administrative Claim and Substantial Contribution Claim Filing Deadline .............................................................................. 58

        b.    Classified Claims .................................................................... 58

D.    Acceptance and Rejection of the Plan ...................................................................... 61

    1.    Voting Classes ............................................................................................. 61

    2.    Classes Presumed to Accept the Plan .......................................................... 61

    3.    Acceptance by Impaired Classes .................................................................. 61

    4.    Elimination of Vacant Classes; Acceptance by Non-Voting Classes............ 62

    5.    Non-Consensual Confirmation ..................................................................... 62

    6.    Controversy Concerning Impairment ........................................................... 62

E.    Means for Implementation of the Plan...................................................................... 62

1.    Implementation of the Plan and Sources of Consideration for Plan Distributions ............................................................................ 62

    a.    The Shareholder New Value Contribution ............................................ 62

    b.    Distributable Cash ................................................................................ 63

    c.    Excess SME Proceeds ........................................................................... 63

    d.    Litigation Trust Causes of Action ........................................................ 64

2.    Substantive Consolidation ............................................................................ 64

    a.    Order Granting Plan Consolidation ...................................................... 64

    b.    Plan Consolidation ............................................................................... 64

3.    Corporate Existence ..................................................................................... 65

4.    Vesting of Assets in the Reorganized Debtor .............................................. 65

5.    Dissolution of the Committee ...................................................................... 66

6.    Reorganized Debtor Organizational Documents .......................................... 66

7.    Appointment of Directors and Officers of the Reorganized Debtor ............. 66

8.    Creation of Litigation Trust ......................................................................... 67

9.    Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust ............................................................................................ 68

10.    Liabilities of the Litigation Trust ................................................................ 68

11.    Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee .......................................................... 69

12.    Cooperation and Privilege ............................................................................ 69

13.    Duties of the Litigation Trust Trustee .......................................................... 70

14.    Post Confirmation Expenses ........................................................................ 72

15.    Liability; Indemnification ............................................................................ 73

16.    Litigation Trust Oversight Committee .......................................................... 74

17.    Good Faith ................................................................................................... 75

18.    Saturday, Sunday or Legal Holiday .............................................................. 75

19.    Exemption from Certain Taxes and Fees ...................................................... 75

20.    Issuance of Documents Necessary to Consummate the Plan .......................... 75

21.    Final Decree ................................................................................................. 76

F.    Retained Causes of Action ....................................................................................... 76

1.    Maintenance of Causes of Action ................................................................ 76

2.    Preservation of Causes of Action ................................................................. 76

3.    Preservation of All Causes of Action Not Expressly Settled or Released ....................................................................................................... 77

4.  Retained Causes of Action and Retained Causes of Action
    Contribution ........................................................................... 77

G.  Treatment of Executory Contracts and Unexpired Leases ..................................... 78

    1.  Rejection of Executory Contracts or Unexpired Leases ................................ 78

    2.  Rejection Damages Bar Date ........................................................ 79

H.  Provisions Governing Distributions ......................................................... 79

    1.  Disbursing Agent .................................................................. 79

        a.  Litigation Trust Trustee as Disbursing Agent for Class 6A
            Claims and Class 6B Claims ................................................... 79

        b.  Alternative Disbursing Agent Qualifications ................................... 79

    2.  Time and Manner of Distributions .................................................. 79

    3.  Interest of Claims ................................................................ 80

    4.  Compliance with Tax Requirements/Allocations ...................................... 80

    5.  Delivery of Distributions and Undeliverable or Unclaimed
        Distributions ..................................................................... 80

        a.  Delivery of Distributions in General ......................................... 80

        b.  Undeliverable Distributions .................................................. 81

            i.   Holding of Undeliverable Distributions ................................... 81

            ii.  Failure to Claim Undeliverable Distributions ............................. 81

    6.  Claims Administration Responsibility .............................................. 81

        a.  Reservation of Rights to Object to Claims .................................... 81

        b.  Filing of Objections ......................................................... 81

        c.  Determination of Claims ...................................................... 82

    7.  Procedures for Treating and Resolving Disputed and Contingent
        Claims or Interests ............................................................... 82

        a.  No Distributions Pending Allowance ........................................... 82

        b.  Claim Estimation ............................................................. 83

    8.  Setoffs and Recoupment ............................................................ 83

    9.  Allowance and Disallowance of Claims Subject to Section 502 of the
        Bankruptcy Code ................................................................... 83

    10. Cancellation of Instruments and Agreements ........................................ 83

    11. Withholding Taxes ................................................................. 83

    12. Reports ........................................................................... 84

    13. Distribution Record Date .......................................................... 84

    14. Timing and Calculation of Amounts to be Distributed ............................... 84

    15. Settlement of Claims and Controversies ............................................ 84

I.  Conditions Precedent to Confirmation and Occurrence of the Effective Date ........ 84

    1.  Conditions Precedent to Confirmation............................................................. 84

    2.  Conditions Precedent to Confirmation............................................................. 85

        i.  the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and ............................................................. 85

        ii.  the provisions of the Confirmation Order are nonseverable and mutually dependent. ................................................................................... 85

    3.  Waiver of Conditions........................................................................................ 85

    4.  Debtors' Right of Revocation or Withdrawal ................................................... 85

J.  Effect of Confirmation ................................................................................................. 86

    1.  Injunction ......................................................................................................... 86

    2.  Term of Injunctions or Stays............................................................................ 86

    3.  Exculpation ...................................................................................................... 87

    4.  Release of Liens ............................................................................................... 87

K.  Retention of Jurisdiction .............................................................................................. 88

L.  Miscellaneous Provisions............................................................................................. 89

    1.  Effectuating Documents, Further Transactions and Corporation Action ....... 89

    2.  Payment of Statutory Fees ............................................................................... 90

    3.  Headings ........................................................................................................... 90

    4.  Biding Effect of Plan ....................................................................................... 90

    5.  Final Order ....................................................................................................... 90

    6.  Withholding and Reporting Requirements ...................................................... 90

    7.  Tax Exemption ................................................................................................. 90

    8.  Governing Law ................................................................................................. 91

    9.  Severability ...................................................................................................... 91

    10.  Plan Controls .................................................................................................... 91

    11.  Amendments and Modifications ...................................................................... 91

    12.  Notices ............................................................................................................. 92

    13.  Filing of Additional Documents ...................................................................... 92

    14.  Direction to a Party .......................................................................................... 92

    15.  Successors and Assigns..................................................................................... 93

    16.  Reservation of Rights ....................................................................................... 93

    17.  Further Assurances............................................................................................ 93

|  |  | 18. | Entire Agreement | 93 |
| IX. |  | FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST | 93 |
|  | A. | | Feasibility of the Plan | 94 |
|  | B. | | Best Interest Test | 94 |
|  |  | 1. | Generally | 94 |
|  |  | 2. | Best Interest of Creditors Test | 95 |
|  | C. | | Confirmation Without Acceptance by All Impaired Classes: the "Cramdown" Alternative | 96 |
| X. |  | IMPORTANT CONSIDERATIONS AND RISK FACTORS | 97 |
|  | A. | | The Debtors have No Duty to Update | 97 |
|  | B. | | No Representations Outside the Disclosure Statement are Authorized | 97 |
|  | C. | | Information Presented is Based on the Debtors' Books and Records, and no Audit was Performed | 97 |
|  | D. | | All Information was Provided by Debtors and was Relied Upon by Professionals | 97 |
|  | E. | | Projections and Other Forward Looking Statements are Not Assured, and Actual Results will Vary | 98 |
|  | F. | | No Legal or Tax Advice is Provided to You by the Disclosure Statement | 98 |
|  | G. | | No Admissions Made | 98 |
|  | H. | | No Waiver of Rights Except as Expressly Set Forth in the Plan | 98 |
|  | I. | | Bankruptcy Law Risks and Considerations | 98 |
|  |  | 1. | Confirmation of the Plan is Not Assured | 98 |
|  |  | 2. | The Effective Date Might Be Delayed or Never Occur | 99 |
|  |  | 3. | The Projected Value of Estate Assets Might Not be Realized | 99 |
|  |  | 4. | Allowed Claims in the Various Classes May Exceed Projections | 99 |
|  |  | 5. | The SME Revenue may fall short of Projections | 99 |
| XI. |  | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 99 |
|  | A. | | Federal Income Tax Consequences of the Plan | 99 |
|  |  | 1. | Withholding Taxes | 100 |
|  |  | 2. | Federal Income Tax Treatment of the Litigation Trust | 100 |
|  |  | 3. | Litigation Trust Assets Treated As Owned by Holders of Allowed Class 6A and Class 6B Claims | 100 |
|  | B. | | Federal Income Tax Consequences of Payment of Allowed Claims | 100 |
|  |  | 1. | Recognition of Gain or Loss | 101 |
|  |  |  | a.  In General | 101 |
|  |  |  | b.  Post-Effective Date Cash Distributions | 101 |

|  |  | c. | Bad Debt and/or Worthless Securities Deduction | 101 |
|  | 2. | | Pending Payments | 101 |
|  | 3. | | Payments Other than Pending Payments | 102 |
| C. | | | Certain Other Tax Consequences for Holders of Claims | 102 |
|  | 1. | | Receipt of Pre-Effective Date Interest | 102 |
|  | 2. | | Installment Method | 102 |
| D. | | | Importance of Obtaining Professional Tax Assistance | 102 |
| XII. | | | EFFECT OF CONFIRMATION | 102 |
| A. | | | Binding Effect of Confirmation | 102 |
| B. | | | Vesting of Assets Free and Clear of Liens, Claims and Interests | 102 |
| C. | | | Good Faith | 103 |
| XIII. | | | ALTERNATIVES TO THE PLAN | 103 |
| A. | | | Liquidation Under Chapter 7 | 103 |
| B. | | | Dismissal | 103 |
| C. | | | Alternative Plan | 103 |
| XIV. | | | CONCLUSION | 103 |

## TABLE OF EXHIBITS

Exhibit 1        The Plan

Exhibit 2        Solicitation Order

Exhibit 3        Final Award

Exhibit 4        District Court Order

Exhibit 5        Schedule of Petitioning Creditors

Exhibit 6        Litigation Trust Causes of Action

Exhibit 7        Liquidation Analysis

Exhibit 8        Valuation Analysis

Exhibit 9        Schedule of Subsidiaries

Exhibit 10       Commitment Letter

## I.    SUMMARY

On March 7, 2023, the Debtors' bankruptcy cases were initiated through the filing of involuntary bankruptcy petitions by alleged creditors Pach Shemen LLC ("Pach Shemen"), VR Global Partners, L.P. ("VR Global") and Alpine Partners (BVI) L.P ("Alpine Partners" and together with Pach Shemen and VR Global, the "Original Petitioning Creditors" and inclusive of those parties that filed joinders to the Original Petitioning Creditors, the "Petitioning Creditors").[2]  By order of the Bankruptcy Court, on September 25, 2023, the Debtors' voluntarily converted their bankruptcy cases from cases under Chapter 7 of the Bankruptcy Code to these Chapter 11 Cases.  The Plan described in this Disclosure Statement effects a resolution of the Debtors' outstanding obligations owed to its creditor constituencies through, among other things: (i) establishing a Litigation Trust to pursue and liquidate certain causes of action transferred from the Debtors which will, in turn make distributions to certain Holders of Allowed Claims and (ii) distributing a new value contribution provided by the Debtors' shareholders consisting of (a) Cash to satisfy the Debtors' administrative expense obligations and certain Claims and transferring the remaining Cash to the Litigation Trust for making distributions to certain Holders of Allowed Claims and/or the pursuit of the Litigation Trust Causes of Action; and (b) portions of the recoveries of parties entitled to recovery from Levona Ltd ("Levona") on Account of the Final Award and the District Court Order.  These contributions in addition to the other forms of Plan Consideration provided to the Litigation Trust will enhance distributions to certain Holders of Allowed Claims and/or the pursuit of the Litigation Trust Causes of Action.[3]  The Plan otherwise effectuates a restructuring of the outstanding obligations of the Estates, all as more fully set forth in this Disclosure Statement and the Plan.

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor.  A Chapter 11 plan may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both.  The Plan is a reorganizing plan.

On January 23, 2024, the Debtors filed their first plan of reorganization [Dkt. No. 370] (the "Original Plan").  On April 8, 2024, the Debtors filed the First Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 570] (the "First Amended Plan").  On May 13, 2024, the Debtors filed the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 671] which was subsequently modified on May 31, 2024 [Dkt. No. 725] (as amended, the "Plan").  The Original Plan and First Amended Plan are further amended and superseded by the Plan.  This Disclosure Statement pertains only to the Plan and does not pertain to the Original Plan or the First Amended Plan despite any overlap between the Plan, the Original Plan and First Amended Plan.  This Disclosure Statement amends and supersedes all previous Disclosure Statements filed by the Debtors in these Chapter 11 Cases.

---

2    Notwithstanding the voluntary conversion of the Debtors' cases under Chapter 7 of the Bankruptcy Code to these Chapter 11 Cases, the Debtors have reserved all rights against the Petitioning Creditors and their affiliates regarding the filing the involuntary petitions.

3    A schedule of the Causes of Action transferred to the Litigation Trust and constituting Litigation Trust Causes of Action is attached hereto as Exhibit 6.

A.     Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a Chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning said plan. In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be. ***This document, together with its attached exhibits, is the Disclosure Statement for the Plan. The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.***

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. The Disclosure Statement also discusses the events leading to the Debtors' Chapter 11 Cases, describes the main events that have occurred in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan. The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and Holders of Claims and Interests, voting procedures and the confirmation process.

***All Holders of Claims against the Debtors and Interests in the Debtors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan. Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan. Moreover, the provisions of the Plan, and Plan Supplement as applicable, will govern if there are any inconsistencies between the Plan and the Disclosure Statement.***

B.     Plan Overview

1.     Purpose – Reorganization

The purpose of the Plan is to reorganize the Debtors' outstanding liabilities and govern distributions to Creditors. If the Plan is not confirmed, the Debtors believe that they will be forced either to liquidate under Chapter 7 of the Bankruptcy Code or dismiss their Chapter 11 Cases. In either event, the Debtors believe that the Debtors' Creditors would receive smaller distributions, or, in most cases, none at all, for their Claims if the Plan or an alternative plan is not approved.

2.     Substantive Consolidation or Merger

The Consolidating Debtors are holding companies that were formed for the express purpose of issuing the Exchange Notes. Pursuant to the Exchange Notes Indenture, the Consolidating Debtors are prohibited from holding or maintaining any assets. As the Exchange Notes and the Claims related thereto will be discharged after the confirmation of these Chapter 11 Cases, the Debtors maintain there is no reason for the continued existence of the Consolidating Debtors. As such, the Consolidating Debtors will be consolidated into the Reorganized Debtor for the convenience of all parties, and with no impact to any operations, distributions, assets or rights of any party in interest or the Reorganized Debtor.

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into reorganized Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors

shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings, and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be a Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of Plan shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been affected.  This compromise and settlement are in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.    Plan Treatment

**UNCLASSIFIED AND UNIMPAIRED CLAIMS**

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims) | The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims, DIP Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim.  Notwithstanding anything herein to the | $[10,000] | 100% |

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
|  | contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Disbursing Agent. Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date. All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees. |  |  |
| Professional Fee Claims and Committee Professional Fee Claims | Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date. Prior to the Effective Date the Debtors may pay any Committee Professional Fees for all Committee Professional Fee Claims which are allowable or allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date. From and after the Effective Date, the Disbursing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the | Approx. $[13],000,000 | 100% |

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | payment of fees and expenses during the course of the Chapter 11 Case. | | |
| DIP Claims | Except to the extent that the holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, each such holder of an Allowed DIP Claim shall receive payment in full in Cash of such holders Allowed DIP Claim on the Effective Date. | Allowed DIP Claims: $[0] | 100% |

## CLASSIFIED CLAIMS

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| 1 | OCM Guaranty Claims | Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees. Holders of OCM Guaranty Claims will receive no cash distributions under the | Approx. $49,100,000 | 50% |

[4] The amounts set forth herein are estimates only. The actual amount of Allowed Claims for certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

[5] The percentages set forth herein are estimates only. The actual recoveries of certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | Plan on account of their OCM Guaranty Claims.<br><br>Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan. | | |
| 2 | Corp Guaranty Claims | The Corp Guaranty Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, (i) each Holder of an Allowed Corp Guaranty Claim shall receive its pro rata distribution of the Eletson Corporation Guaranty Recovery and (ii) each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.<br><br>Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. | Approx. $27,768,000 | 53.6% |
| 3 | Azure Guaranty Claims | Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, | Approx. $94,799,000 | .21% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | the Disbursing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.<br><br>Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. | | |
| 4 | Trade Creditor Claims | The Trade Creditor Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, each Holder of an Allowed Trade Creditor Claim shall receive, in exchange for such Allowed Trade Creditor Claim, Cash in an amount equal to 15% of the Face Amount of such Holder's Trade Creditor Claim from the Trade Creditor Reserve; *provided*, that in the event the aggregate distributions to Holders of Trade Creditor Claims exceeds the Trade Creditor Claim Cap, Holders of Trade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap.<br><br>Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. | Approx. $2,750,000 | 15% |
| 5 | Noteholder Election | The Noteholder Election Recovery Claims are Allowed Claims. Claims may only be | [_][6] | [_] |

---

6 The Noteholder Election Recovery Claims are only payable upon an affirmative election of certain Creditors to be treated in Class 5.  Given the inherent uncertainty in which Creditors will elect Class 5 treatment, no estimate can be provided at this time.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | Recovery Claims | treated as Noteholder Election Recovery Claims upon the affirmative and irrevocable election of a Holder of a Claim classified in Class 6A or 6B to have their Claim treated in Class 5. Except to the extent that a Holder of an Allowed Noteholder Election Recovery Claim agrees to less favorable treatment, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Noteholder Election Recovery Claims each Holder of an Allowed Noteholder Election Recovery Claim shall receive in full settlement, release, and satisfaction of such Noteholder Election Recovery Claim that is due and payable from the Noteholder Election Recovery Reserve, the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000. | | |
| 6A | Non-Petitioning Creditor Exchange Note Claims | Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6A Claim shall receive in full settlement, release, and satisfaction of, of such Allowed Class 6A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of the Plan. | $0-$337,000,000 | 4.6-17% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | Class 6A is Impaired and Holders of Class 6A Claims are entitled to vote to accept or reject the Plan. | | |
| 6B | Petitioning Creditor Exchange Note Claims | The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.  To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all claims in Class 6A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 6A Non-Petitioning Creditor Exchange Note Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6B Claim shall receive in full settlement, release, and satisfaction of, of such Allowed Class 6B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of the Plan. Notwithstanding the foregoing if the Bankruptcy Court determines it is unable to equitably subordinate the claims of Holders of Class 6B Claims through the Confirmation Order, Holders of Class 6B Claims will be deemed to hold claims under Class 6A and will be entitled to their Pro Rata portion of Litigation Trust Interests which shall be distributed to | $0-$337,000,000 | 0-.1% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|-------|-------|-------------------------|---------------------------|------------------------|
| | | Holders of Class 6 Claims in accordance with the terms of the Plan. Class 6B is Impaired and Holders of Class 6B Claims are entitled to vote to accept or reject the Plan. | | |
| 7 | Interests | On the Effective Date, all Interests shall be discharged, cancelled, released, and extinguished. In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of Reorganized Holdings in a pro rata amount equal to their portion of the Shareholder New Value Contribution made. Class 7 is Impaired, and Holders of Interests are entitled to vote to accept or reject the Plan. | Impaired | 100% |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL HOLDERS OF CLAIMS AND INTERESTS.**

      C.    <u>Voting and Confirmation</u>

Each Holder of a Claim in Classes 1, 2, 3, 4, 5 6A, 6B and Interests in Class 7 shall be entitled to vote either to accept or reject the Plan.  Classes 1, 2, 3, 4, 5, 6A, 6B and Interests in Class 7 shall have accepted the Plan if: (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims or Interests actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims or Interests actually voting in each such Class have voted to accept the Plan.  Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled to commence on **[_] at [_]:00 a.m. (Eastern)** before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots.  The Bankruptcy Court has established [_], 2024 (the "<u>Voting Record Date</u>") as the date for determining

which Holders of Claims and Interests are eligible to vote on the Plan. Ballots will be mailed to all registered Holders of Claims and Interests as of the Voting Record Date who are entitled to vote to accept or reject the Plan. An appropriate return envelope will be included with your Ballot, if necessary.

       D.      <u>Risk Factors and Disclaimer</u>

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim or Interest should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, to formulate an informed opinion as to the manner in which the Plan affects their Claim(s) against and Interests in the Debtors and to determine whether to vote to accept the Plan. Holders of Claims and Interests should particularly consider the risk factors described in Article X hereof.

Holders of Claims and Interests should also read the Plan carefully and in its entirety. The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records. The Debtors therefore represent that everything stated in this Disclosure Statement is true to the best of their knowledge. The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement. The liquidation analysis, valuation analysis, distribution projections and other information described herein are estimates only, and the timing and amounts of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys retained by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

The Debtors and their counsel also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending adversary proceedings and projected Causes of Action and objections to Claims.  However, no reliance should be placed on the fact that a particular adversary proceeding or projected Cause of Action or objection to a Claim is, or is not, identified in this Disclosure Statement or the Plan.  The Debtors or Litigation Trust Trustee, as applicable, may seek to investigate, file and prosecute claims and projected Causes of Action or Litigation Trust Causes of Action and objections to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action, Litigation Trust Causes of Action or objections to Claims.

## II.     VOTING ON AND CONFIRMATION OF THE PLAN

A.     Deadline for Voting For or Against the Plan

The Debtors have sent you one or more individual Ballots, with return envelopes for voting to accept or reject the Plan.  The Debtors urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) to the Counsel for the Debtors as follows:

**Reed Smith LLP**
**Three Logan Square**
**1717 Arch Street Suite 3100**
**Philadelphia, Pennsylvania 19146**
**Attn: Derek M. Osei-Bonsu**

**OR**

**ELECTRONICALLY AT**

**ELETSONBALLOTS@REEDSMITH.COM**

TO BE COUNTED, DEBTORS' COUNSEL MUST RECEIVE YOUR BALLOT (OR MASTER BALLOT OF YOUR NOMINEE HOLDER) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON [ ]** (THE "VOTING DEADLINE"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED.  ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS OR SUBCLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

Detailed voting instructions are printed on and/or accompany each Ballot.  Any Ballot or master Ballot sent by mail must be received by counsel to the Debtors at the appropriate address set forth above by no later than 5:00 p.m. Prevailing Eastern Time on the Voting Deadline.  Any

Ballot or master Ballot sent by any other means must be physically received by Debtors' counsel by 5:00 p.m. Prevailing Eastern Time on the Voting Deadline or it shall not be counted. Any unsigned Ballot or any Ballot that has no original signature, including any Ballot received by approved electronic means, shall not be counted. Any Ballot that is not clearly marked as voting for or against the Plan or marked as both voting for and against the Plan, shall not be counted. Any Ballot that is properly completed and timely received shall not be counted if such Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant voting Class as of the Voting Record Date. A Beneficial Holder (but not an entity voting, acting in a fiduciary capacity and on behalf of more than one Beneficial Holder, such as a nominee) that is voting more than one Claim or Interest in a voting Class must vote all of its Claims or Interests within a particular voting Class either to accept or to reject the Plan and may not split its vote in the same voting Class, and thus, any Ballot (or Ballots in the same voting Class) of a Beneficial Holder that partially rejects and partially accepts the Plan shall be deemed as accepting the Plan. Whenever a Holder of a Claim in a voting Class casts more than one Ballot voting the same Claim prior to the Voting Deadline, the last Ballot physically received by Debtors' counsel prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast Ballot(s), and any prior cast Ballot(s), shall not be counted. The Debtors, without notice, subject to contrary Order of the Bankruptcy Court, may waive any defect in any Ballot or master Ballot at any time, either before or after the close of voting. Such determinations will be disclosed in the voting report and any such determinations by the Debtors shall be subject to de-novo review by the Bankruptcy Court.

On January 23, 2024, the Debtors filed their *Motion of Debtors and Debtors in Possession for an Order: (I) Approving Their Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject their Plan of Reorganization, (III) Establishing the Confirmation Hearing and Related Deadlines, and (IV) Granting Related Relief* [Dkt. No. 372] (the "Solicitation Motion"). On May 31, 2024 the Debtors filed the Plan, which remains subject to the procedures set forth in the Solicitation Motion. On [_], 2024 the Bankruptcy Court entered its order granting the relief requested in the Solicitation Motion (the "Solicitation Order"), which, among other things, approved the voting procedures addressed herein [Dkt. No. _]. You should carefully read the Solicitation Order, which is annexed hereto as Exhibit 2. It establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is [_], 2024; (c) the applicable standards for tabulating Ballots; (d) the deadline for filing objections to Confirmation of the Plan; and the date and time of the Confirmation Hearing (also set forth below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein. If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

B.    Confirmation Hearing for the Plan

The Bankruptcy Court has set a hearing on the confirmation of the Plan (the "Confirmation Hearing") to consider objections to Confirmation, if any. The Confirmation Hearing shall commence at **[_], Prevailing Eastern Time on [_]**, in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be continued from time to time, without notice, other than

an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Bankruptcy Court's docket.

    C.      Any Objections to Confirmation of the Plan

        Any interested party may respond or object to Confirmation of the Plan. Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Bankruptcy Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors, counsel for the Committee and the Office of United States Trustee as well as all other parties who have requested notice in these Chapter 11 Cases **ON OR BEFORE [_], 2024 at 4:00 P.M., Prevailing Eastern Time**. Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

| | |
|---|---|
| Counsel for the Debtors | Counsel for the United States Trustee |
| Derek J. Baker | Office of The United States Trustee |
| Derek Osei-Bonsu | Alexander Hamilton Custom House |
| Reed Smith LLP | One Bowling Green, Suite 534 |
| Three Logan Square | New York, NY 10004 |
| 1717 Arch Street | Attn: Daniel Rudewicz |
| Philadelphia, PA 19103 | |
| Telephone: (215) 851-8100 | Counsel for the Committee |
| Facsimile: (215) 851-1420 | Dechert LLP |
| E-M ail: dbaker@reedsmith.com | Attn: Stephen Zide |
| dosei-bonsu@reedsmith.com | David Herman |
| -and- | Three Bryant Park, |
| Ann E. Pille (Admitted *Pro Hac Vice*) | 1095 Avenue of the Americas, |
| 10 S. Wacker Drive, Suite 4000 | New York, NY, 10036 |
| Chicago, IL 60606 | |
| Telephone: (312) 207-1000 | |
| Facsimile: (312) 207-6400 | |
| E-M ail: apille@reedsmith.com | |

    D.      Recommendations for Voting

        The Debtors strongly recommend that you vote in favor of the Plan. Rejection of the Plan may result in protracted delays, a Chapter 7 liquidation or the confirmation of another Chapter 11 plan such as the PS Plan (defined below) which the Debtors believe will result in a less favorable result for Creditors. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. The Debtors believe that Creditors will receive a greater and more certain distribution under the Plan than they would under the PS Plan or a Chapter 7 liquidation, as more fully discussed herein.

        **THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE. THE DEBTORS THEREFORE RECOMMEND THAT ALL PARTIES ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

### III.    ORGANIZATION AND ACTIVITIES OF THE DEBTORS

A.    The Debtors' Business

The Debtors in these cases are Eletson Holdings Inc. ("Eletson Holdings") and its wholly owned subsidiaries Eletson Finance (US) LLC ("Eletson Finance"), and Agathonissos Finance LLC.  No other subsidiaries of Eletson Holdings are subject to these Chapter 11 Cases.  Eletson Holdings and its corporate family (collectively "Eletson") are world leaders in international seaborne transportation specializing in the transport of refined petroleum products, liquified petroleum gas and ammonia. Eletson owns and operates a fleet of medium and long-range double hull product tankers, consisting of Handymax and Aframax size vessels which are capable of carrying a wide range of refined petroleum products, such as fuel oil and vacuum gas oil, gas oil, gasoline, jet fuel, kerosene and naphtha, as well as crude oil.  The scale and flexibility of Eletson's fleet, commercial expertise and long-standing industry relationships have allowed Eletson to sustain high utilization levels and maintain strong performance.

With offices around the globe Eletson charters its versatile, high-quality and modern fleet to customers including major international oil, LPG, and ammonia companies and traders.  Eletson maintains a large and diversified customer base including major international oil companies such as BP, Conoco Philips, Royal Dutch Shell and Chevron Corporation, state owned integrated oil companies such as Petrobras and Pemex, refined oil trades, LPG and ammonia producers, users, traders and importers.  For decades Eletson has been at the forefront of the shipping tanker sector and is an industry leader driving wide innovation and change.

B.    Corporate History and Structure

Eletson Holdings is the ultimate parent of the Eletson family.  Eletson Finance is a wholly owned subsidiary that does not itself have any subsidiaries.  Eletson's primary operations are undertaken by various non-Debtor subsidiaries who either (i) own title to the vessels comprising Eletson's fleet or (ii) charter the vessel of Eletson's fleet.  The Eletson fleet is managed by non-Debtor subsidiary Eletson Corporation ("Eletson Corp") subject to management agreements with the various entities in exchange for management fees.  In addition to Eletson Corp and the various entities that directly own or charter and operate the vessels in Eletson's fleet, there are several defunct corporate entities with no operations within the Eletson corporate structure.  Eletson Holdings serves as the guarantor for a number of its subsidiaries obligations as described in greater detail herein.[7]

Each of the Debtors are holding companies and do not maintain any ongoing operations or employ any employees outside of their officers and directors.

C.    Pre-Petition Capitalization

1.    Old Notes

In December 2013 Eletson Holdings and Eletson Finance issued those certain 9.625% First Preferred Ship Mortgage Notes due 2022 (the "Old Notes").  The Old Notes were issued in an

---

[7] A list of the Eletson entities is attached hereto as Exhibit 9.

original face value amount of $300 million dollars. Pursuant to the relevant indenture, Deutsche Bank Trust Company Americas served as the trustee for the Old Notes.

In May of 2018 Eletson Finance and Eletson Holdings initiated an exchange for the Old Notes (the "Note Exchange"). Approximately 2% of the holders of Old Notes chose not to participate in the Note Exchange and retained their Old Notes.

2. Exchange Notes and Restructuring Support Agreements[8]

In July of 2018 the Debtors finalized the Note Exchange and issued those certain First Preferred Ship Mortgage Notes due 2022 (the "Exchange Notes"). The Exchange Notes were issued in an original face value amount of $314,068,360. Pursuant to the relevant indenture (the "Exchange Notes Indenture"), Wilmington Savings Fund Society, FSB (the "Exchange Notes Trustee") served as trustee and collateral agent for the Exchange Notes. The Exchange Notes were secured by certain assets pledged as collateral (collectively, the "Collateral"), including, among other things: (i) all outstanding common shares or membership interests in Eletson Finance and certain guarantors under the Exchange Note Indenture; (ii) thirteen shipping vessels owned by guarantors under the Exchange Note Indenture (the "Exchange Note Vessels"); (iii) the earnings arising from freights, hires and other earnings from the operation and use of or relating to the Exchange Note Vessels, and (iv) all other cash and various accounts of Agathonissos Finance LLC and the guarantors set forth in the Exchange Notes Indenture.

Also in July of 2018, the Debtors initiated a tender offer seeking to purchase Exchange Notes from the holders of the Exchange Notes. Pursuant to the tender offer, the Debtors reduced the then outstanding obligations of the Exchange Notes by approximately $8 million.

In June of 2019, the Debtors, their guarantors, certain of Eletson Holding's shareholders and an ad hoc group of Exchange Noteholders entered into a Restructuring Support Agreement (the "Initial RSA"). Pursuant to the Initial RSA, a strict foreclosure agreement (the "Strict Foreclosure Agreement") was executed which provided for the reduction of the principal balance of the Exchange Notes by $130 million in exchange for the Collateral pledged as security for the Exchange Notes. In connection with the Initial RSA the Exchange Note Trustee in its capacity as collateral agent under the Exchange Note Indenture accepted title to 100% of the common shares of each of the thirteen special purpose entities that, themselves, owned the Exchange Note Vessels in partial satisfaction and discharge of $130 million of the principal obligations due and owing under the Exchange Notes. Thereafter, on October 24, 2019, the Exchange Note Indenture was amended to release all remaining Collateral securing the remaining Exchange Notes.

On October 29, 2019, a second restructuring support agreement was executed by the same parties (the "Second RSA"). The Second RSA contemplated a restructuring through either an out-of-court consent solicitation and exchange offer with the consent of all the Exchange Noteholders at the time, or a restructuring effected through a joint prepackaged Chapter 11 plan of reorganization, in accordance with certain milestones contained therein. The Debtors were

---

[8] The Committee does not agree with the Debtors' characterizations of the events leading up to the Petition Date and the characterization of the rights and obligations arising under the Fund Second RSA. Notwithstanding the Committee's disagreement, the Debtors believe the description of the Second RSA is a fair and accurate description of the rights and obligations arising thereunder.

required to segregate cash into certain accounts and prohibited the Debtors from seeking additional financing without the consent of the Exchange Noteholders. The Debtors were to use reasonable best efforts to effect the terms of the Second RSA and were prohibited from taking any actions contrary or inconsistent to the Second RSA and the transactions contemplated therein. The milestones included deadlines for the marketing and sale of one of the Debtors' vessels, as well as the solicitation for the regarding proceeding under an out of court transaction or a prepackaged chapter 11 bankruptcy, neither of which were met by the Debtors.

Pursuant to the Second RSA, Exchange Noteholders that were signatories to the Second RSA were restricted from selling, transferring, or assigning any interests they had in the Exchange Notes unless the transfer was to another Exchange Noteholder who agreed to be bound by the terms of the Second RSA. Further, the Second RSA provided that no action would be taken by Exchange Noteholders to enforce any defaults or events of default that were ongoing pursuant to the Exchange Note Indenture so long as the Second RSA was not terminated effectively creating a standstill period while the Debtors and Exchange Noteholders continued to negotiate the terms of a restructuring.

The Debtors assert that the Second RSA is and remains in force, and the actions of the Exchange Noteholders party to the Second RSA and the Petitioning Creditors who acquired rights therefrom in the sale of such Exchange Notes are in violation of the Second RSA and Eletson Holdings' rights thereunder as the Exchange Noteholders subject to the Second RSA were prohibited from transferring their interests to parties that were not signatories to the Second RSA. Further, pursuant to the standstill period of the Second RSA the Debtors were not obligated to make any payments on account of the Exchange Notes before the Debtors were placed into bankruptcy. As set forth in greater detail below, a letter purporting to terminate the Second RSA was sent to the Debtors after the Exchange Noteholders violated the terms of the Second RSA and after the Petition Date. The Debtors believe that this purported termination letter is meritless and did not impact the rights and remedies of the parties to the Second RSA.

In June 2020, well after the Second RSA was executed, the Debtors, more than seventy percent (70%) of the Exchange Noteholders, and others entered into a certain Stipulation Waiver and Release (the "OCM Financing Stipulation"), wherein a majority of the Exchange Noteholders acknowledged that they "[were] parties to that certain [Second RSA]…." *OCM Financing Stipulation* at p. 1. At no place in the OCM Financing Stipulation was it alleged that the Second RSA had been terminated or was no longer in effect. Like the Second RSA, the OCM Financing Stipulation included a restriction on the transfer of the Exchange Notes. Specifically it provided, "[e]ach Holder agrees…not to sell, assign, transfer, hypothecate or otherwise dispose of…any [Exchange Notes] to any third party that is not a[n] [Exchange Noteholder unless], as a condition precedent to any such transaction, the transferee of such [Exchange Notes] executed and delivers a joinder…to this Stipulation…to counsel to the Eletson Parties. *Id.*, at § 4(a). Any action taken in violation of the OCM Financing Stipulation, including the transfer of the Exchange Notes, is deemed void pursuant to the terms of the OCM Financing Stipulation.

Prior to the Petition Date, the Debtors did not make any payments on the Exchange Notes outside of an initial payment of PIK interest, the tender offer and the transfer of the vessel related to the Strict Foreclosure Agreement because the Debtors were operating pursuant to the standstill agreement set forth in the Second RSA. On the Petition Date, the outstanding balance of the

Exchange Notes and Old Notes were approximately $331,400,000 and $5,830,000 respectively, consisting of approximately $128,100,000 and $2,100,000 in accrued yet unpaid interest respectively and approximately $195,000,000 and $3,700,000 in unpaid principal respectively.

D.    Eletson Holdings Guaranty Obligations

In addition to the obligations under the Old Notes and Exchange Notes, Eletson Holdings guarantees the obligations of several of its non-Debtor affiliates.

1.    The OCM Guarantees

On June 24, 2020, OCM Maritime Rhine LLC ("OCM Rhine") entered into a bareboat charter agreement ("Kinaros Charter") with non-Debtor Kinaros Special Maritime Enterprise for the use of a vessel owned by OCM Rhine named the Kinaros. Pursuant to the Kinaros Charter, Kinaros Special Maritime Enterprise was obligated to make payments to OCM Rhine related to the charter of the Kinaros. The obligations were guaranteed by Eletson Holdings pursuant to that certain guarantee executed by Eletson Holdings in favor of OCM Rhine dated June 24, 2020 (the "Kinaros Guaranty"). Pursuant to the Kinaros Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kinaros Charter. The principal balance outstanding under the Kinaros Charter as of the Conversion Date is $11,750,000 with outstanding interest obligations of $217,417. As of the Conversion Date OCM Rhine has not declared any event of default under the Kinaros Charter, *however, the Chapter 11 Cases constitute a default under the Kinaros Guaranty*.

On June 24, 2020, OCM Maritime Yukon LLC ("OCM Yukon") entered into a bareboat charter agreement ("Kimolos Charter") with non-Debtor Kimolos II Special Maritime Enterprise for the use of a vessel owned by OCM Thames named the Kimolos. Pursuant to the Kimolos Charter, Kimolos II Special Maritime Enterprise was obligated to make payments to OCM Yukon related to the charter of the Kimolos. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Yukon dated June 24, 2020 (the "Kimolos Guaranty"). Pursuant to the Kimolos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kimolos Charter. The principal balance outstanding under the Kimolos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Yukon has not declared any event of default under the Kimolos Charter, *however, the Chapter 11 Cases constitute a default under the Kimolos Guaranty*.

On June 24, 2020, OCM Maritime Autumn LLC ("OCM Autumn") entered into a bareboat charter agreement ("Fourni Charter") with non-Debtor Fourni Special Maritime Enterprise for the use of a vessel owned by OCM Autumn named the Fourni. Pursuant to the Fourni Charter, Fourni Special Maritime Enterprise was obligated to make payments to OCM Autumn related to the charter of the Fourni. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Autumn dated June 24, 2020 (the "Fourni Guaranty"). Pursuant to the Fourni Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Fourni Charter. The principal balance outstanding under the Fourni Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of

the Conversion Date OCM Autumn has not declared any event of default under the Fourni Charter, *however, the Chapter 11 Cases constitute a default under the Fourni Guaranty*.

On June 24, 2020, OCM Maritime Thames LLC ("OCM Thames") entered into a bareboat charter agreement ("Kastos Charter") with non-Debtor Kastos Special Maritime Enterprise for the use of a vessel owned by OCM Thames named the Kastos.  Pursuant to the Kastos Charter,  Kastos Special Maritime Enterprise was obligated to make payments to OCM Thames related to the charter of the Kastos.  The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Thames dated June 24, 2020 (the "Kastos Guaranty").  Pursuant to the Kastos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kastos Charter.  The principal balance outstanding under the Kastos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239.  As of the Conversion Date OCM Thames has not declared any event of default under the Kastos Charter, *however, the Chapter 11 Cases constitute a default under the Kastos Guaranty*.

### 2.    The Azure Guarantees

On August 24, 2017, Azure Nova Spring Co., Azure Nova Summer Co., Azure Nova Autumn Co., and Azure Nova Winter Co. (collectively, "Azure") entered into  bareboat charter agreements (collectively, the "Charters") with non-Debtors Antikeros Special Maritime Enterprise, Dhonoussa Special Maritime Enterprise, Polyaigos Special Maritime Enterprise and Strofades Special Maritime Enterprise (collectively, the "Azure Charterers") respectively, for the use and operation of vessels owned by Azure named the Antikeros, Dhonoussa, Polyaigos and Strofades respectively (collectively, the "Azure Vessels").  Pursuant to the Charters, the Azure Charterers were obligated to make payments to Azure related to the charter of the Azure Vessels. The obligations were guaranteed by Eletson Holdings and Eletson Corp pursuant to those certain guarantees executed by Eletson Holdings and Eletson Corp in favor of each Azure entity dated August 24, 2017 (collectively, the "Azure Guarantees").  Pursuant to the Azure Guarantees Eletson Holdings guaranteed the full payment for all amounts due under the Charters.  As security for Eletson Holdings' obligations under the Azure Guarantees Eletson Holdings executed a share pledge agreement in favor of each Azure entity pursuant to which the equity of respective Azure Charterer was placed as collateral to secure the obligations under the applicable Charter.  In March of 2021 the Charters were terminated and the Azure Vessels were repossessed.  As a result of this termination and repossession, two arbitrations were commenced by Azure, one against the Charterers seeking a determination of any amounts owed to Azure because of the termination of the Charters and repossession of the Azure Vessels and a second against Eletson Holdings for any obligations arising from the Azure Guarantees which are asserted by Azure to be in an amount of no less than $94,799,702.  Eletson Holdings disputes that defaults have occurred, or obligations exist under the respective Azure Guaranties.

### 3.    The Eletson Corp Guarantees

Non-Debtor Eletson Corp is the operational and technical management entity for various Eletson entities (including various of Eletson Holdings' non-debtor subsidiaries).  As Eletson Corp's parent entity, Eletson Holdings guaranteed certain obligations of non-debtor Eletson Corp on a number of its unsecured obligations owed towards various banking entities in Greece, including Aegean Baltic Bank, Alpha Bank and Piraeus Bank.

The officers and directors of non-Debtor Eletson Corp have made clear that they intend to undertake a restructuring of the outstanding obligations of Eletson Corp.  The Debtors are fully in support of a restructuring of Eletson Corp's liabilities as this restructuring will lower the potential guaranty liability assumed by the Reorganized Debtor.

## IV.    EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING[9]

The Debtors' bankruptcy cases were initiated by the Original Petitioning Creditors, affiliates of Murchinson Inc. ("Murchinson") and its special purpose entity Levona (together with Murchinson, Pach Shemen and the other entities under Murchinson's direction and/or control the "Murchinson Entities") to hedge against Levona's potential loss in the Arbitration.[10]

Levona has been found to have unjustly pressured the Debtors and their shareholders into the sale or other disposition of the fleet assets of non-Debtor Eletson Gas LLC ("Eletson Gas") to enrich themselves at the expense of the Debtors and their affiliates.  A summary of the improper actions of the Murchinson Entities and the ensuing litigation history is provided below.[11]  For the avoidance of doubt, the Levona has been found by the Arbitrator to have (i) wrongfully commenced the Debtors' bankruptcy proceedings, and (ii) wrongfully perpetrated their scheme against the Debtors and various Eletson entities resulting in a final arbitration award (the "Final Award") has been entered against Levona in the amount of no less than $99,530,099.71.[12]  A copy of the Final Award is annexed hereto as Exhibit 3.

### A.    Murchinson Directly or Indirectly Created Levona and Pach Shemen, the Primary Actors in the Arbitration and Bankruptcy

Murchinson is a corporation organized under the laws of Canada with a principal place of business in Toronto, Canada.  Levona is special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire and hold the preferred shares of Eletson Gas (the "Preferred Shares").  Levona was created in 2021 and is owned by Nomis Bay Ltd. and BPY Limited.  Nomis Bay Ltd. and BPY Limited in turn are managed and controlled by Murchinson.  See *Final Award* at p. 19.  Levona does not have any employees, an email domain or bank accounts.  *Id.* at p. 20.

Pach Shemen (originally intended to be named Levona II) is another special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire

---

[9] The descriptions provided herein are for summary purposes only.  For a complete history of each of the various proceedings described herein, including the Arbitration, the Bondholder Litigation, the Confirmation Proceedings, the Chapter 7 Cases and the Chapter 11 Cases, please review the relevant docket.  A fuller history of the Arbitration can be found on the docket of the Confirmation Proceedings at Case No.: 1:23-cv-07331-LJL [Dkt. No. 68].

[10] The Committee has stated that it does not agree with the Debtors' characterizations of the events leading up to the Petition Date.  Notwithstanding the Committee's disagreement with the Debtors' recitation of events leading up to the Petition Date, the Debtors believe that the statements made in Article IV of the Disclosure Statement are accurate and truthful statements.

[11] A complete history of the Arbitration and Levona's actions can be found on the docket of the Confirmation Proceedings at Case No.: 1:23-cv-07331-LJL [Dkt. No. 66].

[12] Levona believes the District Court Remand Order may result in a reduction of the Final Award in an undetermined amount.  The Debtors disagree and expect that the Final Award will be adopted and reaffirmed by the Arbitrator upon consideration of the District Court Remand Order.

and hold interests in the outstanding Exchange Notes. *Id.* As set forth in Pach Shemen's corporate ownership statements filed with the Bankruptcy Court, Pach Shemen is also owned by Nomis Bay Ltd. and BPY Limited. *Corporation Ownership Statement of Pach Shemen, LLC* [Dkt. No. 1].

Thus, Murchinson directly or indirectly operates, directs, and/or controls both Levona and Pach Shemen,.

On February 9, 2024, the District Court entered the District Court Order (defined below) which confirmed in all substantive parts, the award issued against Levona, but vacated certain limited findings made in the Final Award related to Pach Shemen and Murchinson.[13] Notwithstanding the District Court Order, the Debtors believe that the determination of the Final Award regarding Levona and its affiliates are binding on the Debtors and Levona.

B.      Levona Improperly Acquires the Preferred Shares of Eletson Gas

In 2021 Levona acquired the Preferred Shares from Blackstone Tactical Opportunities' ("Blackstone") and was made party to the Eletson Gas' Limited Liability Company Agreement (the "LLCA"). As Levona was created for the express purpose of holding the Preferred Shares all correspondence regarding the purchase of the Preferred Shares were between Murchinson and Blackstone. As found by the Arbitrator, during these negotiations with Blackstone, Murchinson secretly bribed Peter Kanelos, the former CFO of Eletson Corp and a representative of Eletson Gas, as part of a scheme to lower the purchase price for the Preferred Shares then in Blackstone's possession.

Through Kanelos, Murchinson acquired confidential information about Eletson Gas, and communicated that information to Eletson Gas' financiers with the intention of causing these financiers to arrest certain ships in Eletson Gas' fleet. Murchinson then provided its proposal to restructure Eletson Gas' debt in an attempt to garner support for its eventual purchase of the Preferred Shares. *Final Award* at p. 22-25. Through these illicit conversations, Murchinson sought to lower the value of Eletson Gas, and therefore the Preferred Shares, which would entice Blackstone to sell the Preferred Shares at a lower price.

Murchinson recruited Kanelos into its scheme through bribery. Murchinson offered Kanelos compensation commensurate to the outcome of Murchinson's strategy in the form of 10% of its profit on the contemplated transactions. *Final Award* at p. 23. Kanelos was ultimately paid $100,000 by Murchinson/Levona upon Levona's acquisition of the Preferred Shares. *Id.* Recognizing the clear impropriety of these actions, Murchinson/Levona and Kanelos took several steps to conceal their clandestine activity such as only using Kanelos' personal email to remain undetected and refraining from discussing the purchase of the Preferred Shares with any other member of Eletson Gas or director or officer of the other Eletson entities. *Id.* Shockingly, after consummation of the sale of the Preferred Shares and upon signing onto the LLCA and becoming a member of Eletson Gas, representatives of Levona pretended as if they had never met or previously interacted with Kanelos. *Id.* Notably, it was found by the Arbitrator that Kanelos violated his fiduciary duties to Eletson Corp by taking part in Murchinson's schemes, and that

---

[13] A summary of the findings of the District Court Order are discussed in Section IV.D.

- 21 -

Murchinson knowingly incentivized Kanelos' breach of duties and created a conflict of interests through bribery. *Id.*

Pursuant to the LLCA Levona appointed several directors to the board of Eletson Gas. It became immediately clear to the other members of the Eletson Gas board that Levona's appointees were not acting in the best interests of Eletson Gas, but rather sought to enrich Levona through actions taken in clear violation of the terms of the LLCA. Levona's directors breached the LLCA by attempting to fire Eletson Corp as the manager of the vessels of Eletson Gas and its subsidiaries. Additionally, Levona's directors failed to disclose their pre-acquisition misuse of confidential information, bribery of Kanelos, and efforts to spur the arrests of Eletson Gas' ships. Levona also conspired with Eletson Gas' own counsel against the best interests of Eletson Gas.

The non-Levona members and directors of Eletson Gas rightfully determined that Levona and the directors appointed by Levona needed to be removed if Eletson Gas was to have any chance of survival. To that end, in February of 2022 the directors of Eletson Gas and Levona negotiated a Binding Offer Letter ("BOL") that would enable Eletson Gas or its nominee and Eletson Corp to buy out the Preferred Shares from Levona in exchange for consideration equal to "$US1 plus an amount equal to US$23,000,000 less the Net Value". BOL at 3.2. The BOL was executed on March 11, 2022. Pursuant to the BOL, a number of accompanying documents were executed including: (i) that certain Intra-Group Loan Agreement, pursuant to which Levona provided Eletson Gas a loan facility of up to $10 million for a term of up to two years; (ii) that certain Share Transfer Agreement, pursuant to which Eletson Gas transferred to Levona 100% of the shares of the Symi and Telendos, two vessels in Eletson Gas' fleet; (iii) that certain Assignment of Claims, pursuant to which Eletson Corp assigned to Levona all of its claims relating to the management fees and liquidity support owed to it by Eletson Gas, or its subsidiaries; (iv) that certain Deed of Waiver and Release; and (v) that certain Fundamental Action Letter. *Final Award* at p. 8-9.

The BOL provided that the Preferred Shares would be purchased by "Eletson Gas or its nominee" BOL at 2.1. The facts are – and the Arbitrator determined – as the Debtors have consistently confirmed throughout these bankruptcy proceedings, at all relevant times it was Eletson Gas' understanding and intention that upon the exercise of the purchase option, the Preferred Shares and/or the beneficial value of the Preferred Shares would be transferred to Eletson Gas' nominees (who could be the funding source for the exercise). At no time were the Preferred Shares owned by or nominated to Eletson Holdings.[14]

Given the foregoing, on March 11, 2022, Levona was divested of the Preferred Shares in exchange for the shares of the entities owning the Symi and Telendos, and from March 11, 2022, Levona had no membership interests in Eletson Gas.

---

14 The Committee does not agree with the Debtors' assertion that the relevant Eletson parties always intended for the Preferred Shares to be transferred to the Preferred Nominees and believes that this is a contested fact. Despite the Committee's disagreement, the Debtors maintain that it was always the intention of the Eletson Gas (with the consent of Holdings to benefit from the existence of the Preferred Shares to exist and remain as a liquidity source for Eletson Gas) to have the Preferred Shares transferred to the Preferred Nominees. This position is consistent with the Debtors' position in the Arbitration, these bankruptcy proceedings and the documentary evidence produced in both the Arbitration and these bankruptcy proceedings. Further, the District Court Order did not make any findings regarding the intent of the parties relating to the transfer of the Preferred Shares.

Notwithstanding the execution of the purchase option in the BOL and the divestiture of Preferred Shares, Levona continued to knowingly present itself as a member of Eletson Gas. This created confusion not only amongst Eletson Gas' employees, but also the market, harming Eletson Gas' businesses and ability to interact with third parties. But this was not the end of Levona's intentionally harmful actions. On July 15, 2022, more than four months after being divested of any interest in Eletson Gas, Levona purporting to act for Eletson Gas executed a non-binding letter of intent with Unigas, Eletson Gas' primary competitor, to sell nine of the vessels in Eletson Gas' fleet for $262 million. In addition to the proposed purchase price being significantly less than the actual value of the vessels, the proposed sale exposed Eletson Gas to significant risk of antitrust liability. Levona attempted to proceed with the sale process over the objection of Eletson Gas despite lacking a stake in Eletson Gas and threatened various officers and directors of the Eletson entities with litigation and other financial harm if they attempted to interfere with the sale.

C.     The JAMS Arbitration

In response to Levona's egregious and improper behavior, in July of 2022, Eletson Holdings and Eletson Corp (collectively the "Claimants") initiated a JAMS Arbitration Proceeding (Ref. No. 5425000511) (the "Arbitration") pursuant to the LLCA seeking a determination of the ownership of the Preferred Shares, as well as damages resulting from Levona's actions.

As part of the Arbitration, the presiding arbitrator (the "Arbitrator") issued a temporary restraining order ("TRO") which required the parties to the Arbitration to "maintain the status quo" and "among other things" refrain from: "(1) engage in the transfer or sale of any assets of [Eletson Gas] absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." *Final Award* at p. 14. On November 7, 2022, the Arbitrator clarified the parameters of the "status quo," stating that "[a]ny attempt to sell or otherwise transfer the Symi and Telendos vessels will be deemed to be in violation of the TRO." On January 12, 2023, the Arbitrator issued a preliminary injunction which extended the TRO's prohibition on actions upsetting the status quo until further notice. The preliminary injunction provided that the parties to the Arbitration "shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of [Eletson Gas], or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration" *Id.* The TRO, the November clarification, and the Preliminary Injunction collectively are referred to as the "Status Quo Injunction."

On March 6, 2023, Levona received several adverse orders in the Arbitration. First, Levona's motion to strike the Claimants' statements of claims was denied. Next the Arbitrator found that Levona had waived its attorney client privilege over a large tranche of emails and denied Levona's motion for sanctions. Finally, the Arbitrator stated that the scheduled trial would go forward in April of 2023 and confirmed the pre-trial deadlines.

On March 7, 2023, the day after these adverse rulings, in violation of the Arbitrator's Status Quo Injunction Pach Shemen and the other Original Petitioning Creditors initiated the Debtors'

- 23 -

Chapter 7 Cases by filing the improper Involuntary Petitions. Despite using the improperly commenced Chapter 7 Cases to derail the Arbitration, an order modifying the automatic stay was entered by the Bankruptcy Court on April 17, 2023, allowing the Arbitration to proceed.[15]

In May of 2023, a hearing was held before the Arbitrator regarding the merits of the Claimants' claims and Levona's counterclaims. On July 28, 2023, the Arbitrator issued an Interim Award, followed by a Corrected Interim Award on August 15, 2023, in favor of the Claimants. On September 29, 2023, the Arbitrator issued the Final Award noting that given the lack of distinction between Murchinson, Levona, and Pach Shemen, any award entered against Levona was an award entered against all three entities. *Final Award* at p. 21. Pursuant to the Final Award, the Arbitrator found, among other things: (i) the buyout option was exercised pursuant to the BOL; (ii) Eletson Gas exercised its rights under the BOL to nominate parties to receive the Preferred Shares that were purchased from Levona and the Preferred Shares were transferred to the Preferred Nominees effective as of March 11, 2022; (iii) as of March 11, 2022 Levona had no membership interest in Eletson Gas; and (iv) Levona breached the LLCA in multiple ways causing harm to Eletson Gas.

After the entry of the Final Award, the Claimants initiated the Confirmation Proceedings in the District Court.

D.    The District Court Order

On February 9, 2024, the District Court entered an order (the "District Court Order") granting in part and denying in part Claimants' petition to confirm the Final Award. Notably, the District Court confirmed the relief in the Final Award finding that the Preferred Shares were transferred from Levona to the Preferred Nominees, effective March 11, 2022.

The District Court Order suggests that the creditors of Eletson Holdings may be able to assert claims against the Preferred Nominees as a result of the Preferred Nominee's acquisition of the Preferred Shares from Levona rather than such Preferred Shares being delivered to Eletson Holdings. The Debtors note that this issue is an open question for the Bankruptcy Court to decide. As noted herein and in pleadings throughout these Chapter 11 Cases, the Debtors believe that any claims challenging the propriety of the election of the Preferred Nominees as the recipients of the Preferred Shares and Arbitration damages are legally and factually unsupportable, and that further pursuit of these claims would be a costly distraction and waste of estate resources for ultimately no benefit. As set forth in the Automatic Stay Order, any enforcement of the Final Award and collection of the damages awarded therein is subject to further review by the Bankruptcy Court.

The District Court further substantially confirmed the award of compensatory and punitive damages against Levona, vacating only the following limited findings of the Final Award:

- The finding that Murchinson and Pach Shemen are alter egos of Levona;

---

[15] The Debtors believe that the filing of the Involuntary Petitions by the Original Petitioning Creditors was a violation of the Arbitrator's Status Quo Injunction. The Debtors have reserved all rights to assert these claims against the Original Petitioning Creditors. The Committee has articulated that it does not agree with the Debtors' characterization of the Involuntary Petitions.

- The finding that the Status Quo Injunction remains in effect until confirmation of the Final Award by the Arbitrator;

- The finding that Levona caused or directed affiliates to purchase Exchange Notes for the purpose of wrongfully commencing and then actually causing the commencement of the Bondholder Litigation and the filing of the Involuntary Petitions against the Debtors;

- The finding that Levona wrongfully declared a default under the loan provided by Levona;

- The award of attorneys' fees, costs and expenses relating to the involuntary bankruptcy petition and Bondholder litigation in the amount of $3,007,266.20; and

- The award of monetary damages based upon violations of the Status Quo Injunction.

Due to ambiguity in the Final Award, on April 19, 2024, the District Court issued a Memorandum and Order (the "District Court Remand Order") remanding to the Arbitrator for clarification the issue of how the District Court's ruling might affect the amount of punitive damages awarded in the Final Award. Notably, the District Court ordered the Arbitrator to address two questions. First, whether the arbitrator would not have awarded punitive damages, but for the finding of a violation of the Status Quo Injunction, and second, whether the arbitrator would have applied a different multiple of the compensatory damages in his calculation of the punitive damages award in the absence of the finding of a violation of the Status Quo Injunction.

**Levona has requested that the following Statements be included (with which the Debtors disagree)**:

On February 9, 2024, the District Court entered an order (the "District Court Order") granting in part and denying in part Claimants' petition to confirm the Final Award and Levona's petition to vacate the award. The District Court vacated the Award as to (a) the arbitrator's determination that there had been Status Quo Injunction violations, (b) the arbitrator's declaration that Levona, Murchinson, and Pach Shemen are alter egos of each other; (c) the arbitrator's declaration that Levona violated the Status Quo Injunction by declaring Eletson Gas in default on a loan from Levona or based on Pach Shemen's role in these bankruptcy cases; (d) all awards of relief against Murchinson or Pach Shemen; (e) all awards of relief, including compensatory and punitive damages, based upon alleged violations of the Status Quo Injunction; and (f) all awards of attorneys' fees, costs, and expenses relating to the involuntary bankruptcy petition and the bondholder litigation in the amount of $3,007,266.20. *Eletson Holdings, Inc.*, 23-cv-07331 (S.D.N.Y. Feb. 9, 2024), ECF 83 at 123-24; *id.*, ECF 67-58 (Final Award), at 96-99. The District Court otherwise confirmed the relief in the Final Award, including the arbitrator's declaration that the Preferred Shares were transferred from Levona to the Preferred Nominees, effective March 11, 2022.

Following the District Court Order, Eletson and Levona submitted proposed judgments and supporting letter briefs. Levona's filing contended that the entire punitive damages award must be vacated because it was based in part on violations of the Status Quo Injunction (as the District Court had ruled, and the arbitrator provided no way to separate the punitive damages that were based on violations of the Status Quo Injunction from any that were not).

On April 19, 2024, the District Court issued a Memorandum and Order remanding to the arbitrator and specified that the arbitrator should "limit his clarification simply to the [following] questions": (1) Whether the arbitrator "would not have awarded punitive damages, but for the finding of a violation of the Status Quo Injunction," *Eletson Holdings, Inc.*, 23- cv-07331 (S.D.N.Y. Apr. 19, 2024), ECF 106 (the "Remand Order") at 7; and (2) Whether the arbitrator "would have applied a different multiple of the compensatory damages in his calculation of the punitive damages award in the absence of the finding of a violation of the Status Quo Injunction," Remand Order at 7-8. Consistent with this limited remand, the District Court "reserve[d] judgment on the question whether, in the event that the Arbitrator clarifies that he would not have awarded punitive damages but for the finding of a violation of the Status Quo Injunction, such clarification either permits or necessitates a vacatur of the punitive damages award in its entirety," an issue as to which the District Court permitted the parties file additional briefs as appropriate. Remand Order at 8 n.4. On May 3, 2024, Levona filed a motion for reconsideration of the District Court's remand order; that motion is scheduled to be fully briefed on May 15, 2024. On May 13, 2024, the District Court issued an order stating that "effect of the Court's remand to the Arbitrator, Dkt. No. 106, is STAYED pending the Court's resolution of the motion for reconsideration."

A copy of the District Court Order is annexed hereto as Exhibit 4.

E.    Pach Shemen's Improper Acquisition of the Exchange Notes[16]

On January 4, 2023, while the TRO in the Arbitration was in effect (which required the parties to "maintain the status quo") Pach Shemen, through Nomis Bay Ltd. and BPY Ltd., purchased approximately $183.8 million of the outstanding Exchange Notes (representing more than half of the aggregate balance of the outstanding Exchange Notes) for $2 million. *Final Award* at p. 60.

At the time of Pach Shemen's purchase and transfer of the Exchange Notes, the Exchange Notes were subject to the transfer restrictions set forth in the Second RSA. Pursuant to the Second RSA and the OCM Financing Stipulation (of which holders of approximately 80% of the aggregate balance of outstanding Exchange Notes were signatories) (i) no Exchange Noteholder was permitted to transfer, sell or assign its interests in the Exchange Notes unless such sale was to another Exchange Noteholder or a party who was to be bound by the Second RSA and (ii) no Exchange Noteholders could direct the Exchange Note Trustee to take any action to enforce any ongoing default or event of default under the Exchange Note Indenture. Any action in violation of the Second RSA is void pursuant to the terms thereof. Therefore, the Debtors believe that Pach Shemen is not a valid Exchange Noteholders and has no claims against the Debtors as the purchase and transfer of the Exchange Notes to Pach Shemen was void pursuant to the Second RSA and OCM Financing Stipulation.

---

[16] The Committee does not agree with the Debtors' assertions set forth in this Section IV.E. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances described in this section.

F.  The Exchange Note Trustee is Forced to Initiate the Southern District Bondholder Litigation[17]

The purchase of the Exchange Notes by Pach Shemen resulted in the Exchange Note Trustee bringing an enforcement action against the Debtors in direct contravention of the terms of the Second RSA.

Pursuant to the terms of the Second RSA, which was executed by holders of approximately 80% of the outstanding aggregate Exchange Notes, as of January 11, 2023, a standstill period was in place which prohibited Exchange Noteholders from directing the Exchange Note Trustee to initiate any action to enforce any default or event of default under the Exchange Note Indenture. Notwithstanding the foregoing, on January 11, 2023, the Debtors were sued by the Exchange Note Trustee in the District Court seeking repayment of the outstanding obligations under the Exchange Notes for various defaults and events of defaults (the "Bondholder Litigation").  In its complaint, the Exchange Note Trustee asserts that it was directed to file the complaint by the holders of a majority of the Exchange Notes, despite the fact that such a majority must include signatories to the Second RSA, and that such an action would be a direct violation of the terms of the Second RSA.  Notably, the complaint does not reference the Second RSA or the restrictions placed on the Exchange Noteholders pursuant thereto.

It was not until February 2, 2023, nearly three weeks after the Exchange Note Trustee initiated the Bondholder Litigation, that the Debtors received an alleged termination notice of the Second RSA.  However, the alleged termination notice suffered from material deficiencies that rendered it inoperative, and left questions regarding its authenticity.

Further the purported termination notice was facially invalid as a "Termination Event" as defined in the Second RSA occurs only upon written notice by "the [consenting Exchange Noteholders holding, in aggregate, at least two thirds in principal amount outstanding of the [Exchange Notes] held by the [consenting Exchange Noteholders]" and the termination notice did not provide that it was supported by the requisite number of Exchange Noteholders.  Given the ineffective and potentially fraudulent termination of the Second RSA, the Debtors believe the Bondholder Litigation was initiated in clear violation of the terms of the Second RSA and any Exchange Noteholder that directed the Exchange Note Trustee to initiate the Bondholder Litigation also knowingly violated the terms of the Second RSA.

As the Debtors would subsequently learn, the Exchange Noteholders that directed the Exchange Note Trustee to bring the action against the Debtors in the District Court were the Original Petitioning Creditors led by Pach Shemen.

G.  The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases

The second prong of the strategy underlying Pach Shemen's purchase of the Exchange Notes was to place the Debtors into bankruptcy to hedge Levona's position against the Claimants for the value of the Preferred Shares in the event of an adverse ruling in the Arbitration.  If the

---

17 The Committee does not agree with the Debtors' assertions set forth in this Section IV.F. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances described in this section.

Arbitrator ruled in favor of Levona, Murchinson could sell the Preferred Shares and/or the vessels owned by Eletson Gas. However, in the event of an adverse ruling, Levona believed that the value of the Preferred Shares and the Eletson Gas fleet would inure to the value of Eletson Holdings. By owning half of the value of the Exchanges Notes, which they purchased for a nominal cost, Levona and the Murchinson Entities could ensure that it would receive value from the Debtors who would be forced to make payments to creditors in the bankruptcy proceedings. Either the Murchinson Entities would win in the Arbitration and receive the Preferred Shares, or lose the Arbitration, then force the Debtors into bankruptcy and recoup the value of the Preferred Shares as the Debtors' largest creditors via distributions from the Debtors' estates.

However, Murchinson's hedging strategy was predicated on the incorrect assumption that if the Arbitrator found in favor of the Claimants, the value of the Preferred Shares would transfer to Eletson Holdings. The value of the Preferred Shares was always intended to transfer to the nominees of Eletson Gas and was never intended to inure to the benefit of Eletson Holdings. While the Committee alleges that Holdings should have received the benefit of the Preferred Shares, the Debtors note that it was always the intention of Eletson Gas to have the Preferred Shares transferred to the Preferred Nominees by Levona.

Notwithstanding Pach Shemen's invalid assumption, on March 7, 2023, the Original Petitioning Creditors filed the Involuntary Petitions against each of the Debtors initiating the Chapter 7 Cases.

     H.     The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions

On April 20, 2023, the Debtors filed a complaint against defendants Murchinson, Nomis Bay LTD., BPY Limited and certain John Does that sold their Exchange Notes to the Original Petitioning Creditors seeking redress from the scheme orchestrated by the Murchinson Entities to destroy the value of Eletson Gas and its affiliates through violation of the Second RSA, weaponizing the Exchange Note Trustee and initiating the Chapter 7 Cases (the "Eletson State Court Action").

In the Eletson State Court Action, the Debtors asserted claims for tortious interference of contract breach of contract and declaratory judgment. As stated below, the Eletson State Court Action was removed to the Chapter 7 Cases as a separate adversary proceeding that was ultimately dismissed without prejudice.

     I.     Potential Claims Against the Debtors and their Principals related to the Preferred Shares

The Committee and Petitioning Creditors believe that the nomination of the Preferred Nominees as the recipients of the Preferred Shares of Eletson Gas under the BOL, and the assignment of the damages of the Arbitration Award to the Preferred Nominees constituted fraudulent transfers. The Committee and Petitioning Creditors assert that the election of the Preferred Nominees, whose principals are also the Debtors' principals, as the recipients of the Preferred Shares was undertaken only after the initiation of the Debtors' bankruptcy proceedings to ensure the value of the Preferred Shares and the Arbitration Award damages were removed from

the Debtors' capital structure and thus out of reach of creditors.  Had Eletson Gas not elected for the Preferred Shares to be placed with the Preferred Nominees, the value of the Preferred Shares, which are valued at over $100 million, would have remained with Eletson Gas, and redounded to the ultimate benefit of Eletson Holdings, who is the owner of 100% of the common shares of Eletson Gas.  This value would then have been distributable to the Debtors' creditors. Instead, the transfer of the Preferred Shares to the Preferred Nominees removed this value from the Debtors' capital structure, at a time when the Debtors were purportedly insolvent.  Further, the Committee and Petitioning Creditors assert that the assignment of the Arbitration Award to the Preferred Nominees also constituted a fraudulent transfer as the Debtors assigned away the Arbitration Award at a time when the Debtors were insolvent.

These same parties assert that the Debtors either knowingly undertook these actions with the intent to deceive creditors or allowed these actions to be undertaken by Eletson Gas in a negligent manner.

The District Court Order found that the Preferred Shares were validly transferred to the Preferred Nominees by Eletson Gas upon the exercise of the purchase option in the BOL but stated that the allocation of the Arbitration Award and Preferred Shares may have given rise to claims by Eletson Holdings against Eletson Gas and/or the Preferred Nominees.  The Committee asserts that the Debtors are refusing to investigate and/or pursue these claims as the Debtors are controlled by the same parties that control the Preferred Nominees, and therefore will not investigate themselves.

Despite suggesting that claims exist related to the transfer of the Preferred Shares as found by the Arbitrator, no party (neither the Committee nor any Petitioning Creditor) has articulated a legal or factual basis for any such claims.  In fact, despite making the bare allegation that a "fraudulent transfer" occurred in pleadings, including the Trustee Motions (defined below), neither the Petitioning Creditors nor the Committee have articulated any factual or legal basis for any of such claims.  The District Court Order explicitly refrained from making any finding about the propriety of the nomination of the Preferred Nominees as the recipients of the Preferred Shares, instead noting that any determinations must be made by the Bankruptcy Court. The Debtors, as set forth below, have repeatedly articulated their position that any claims related to the Preferred Shares and Arbitration damages are both factually and legally unsupportable.  The Debtors have presented evidence to this effect on numerous occasions, and the validity of the transfer of the Preferred Shares from Levona to the Preferred Nominees as well as the award of damages by the Arbitrator have been heavily and repeatedly defended.  Despite multiple pleadings and numerous invitations from the Debtors, neither the Petitioning Creditors nor the Committee have (i) asserted any claims against the Preferred Nominees for any fraudulent transfers, (ii) presented the factual or legal basis for any claim to the Debtors or the Independent Committee or (iii) moved for standing to pursue any such claims.

For the avoidance of doubt, Debtors' counsel has only ever been directed by the Debtors' board of directors, and never by the Debtors' principals. Debtors' management and counsel have at all times acted in the best interest of the Debtors' estates and not in the interest of any individual or group of the Debtors' principals.

## V.    THE CHAPTER 7 CASES

A.    <u>The Involuntary Petitions and Joint Administration Motion</u>

On March 7, 2023, the Original Petitioning Creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against each of the Debtors (collectively the "Involuntary Petitions"). Attached as exhibits to the Involuntary Petitions are corporate ownership statements for each of the Petitioning Creditors as well as purported evidence of their purchase of outstanding Exchange Notes giving rise to their claims.

On the same day, the Original Petitioning Creditors filed a motion [Dkt. No. 2] for the joint administration of the Debtors' Chapter 7 Cases. The motion was approved by an order of the Bankruptcy Court [Dkt. No. 49] establishing Eletson Holdings, Inc. Case No. 23-10322 as the lead case.

B.    The Alleged Joinders to the Involuntary Petitions

The Chapter 7 Cases were initiated by the three Original Petitioning Creditors. However, eleven additional alleged creditors joined onto the Involuntary Petitions, including the Exchange Note Trustee allegedly pursuant to the alleged direction of holders of over 79% of the Exchange Noteholders. A complete list of the Petitioning Creditors is annexed hereto as Exhibit 5.

C.    Motion for Relief from the Automatic Stay and the Stipulated Stay Order

Upon the filing of the Involuntary Petitions the automatic stay was invoked pursuant to section 362 of the Bankruptcy Code staying all actions against the Debtors. Over the vehement protest of the Claimants, on March 10, 2023, the Arbitrator stayed the Arbitration pending further order or notice from the Bankruptcy Court.

On March 13, 2023, the Debtors filed the *Alleged Debtor's Motion for Relief from Stay to Proceed with, or to Confirm the Inapplicability of, the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 5] along with an accompanying memorandum of law and supporting declarations (collectively, the "Lift Stay Documents"). The Lift Stay Documents provided the Bankruptcy Court with the history of the Arbitration and the bad faith actions of Pach Shemen and the Petitioning Creditors in filing the Involuntary Petitions. Pursuant to the Lift Stay Documents, on March 17, 2023, the Debtors, Levona and the Petitioning Creditors entered into a stipulation [Dkt. No. 23] which laid out the discovery schedule related to the Lift Stay Documents, agreed that the Arbitration was stayed and provided that notwithstanding the staying of the Arbitration the Claimants and Levona would submit all outstanding discovery ordered by the Arbitrator no later than March 20, 2023.

On April 17, 2023, the Bankruptcy Court entered the *Stipulation and Order Granting Alleged Debtor's Motion for Relief From Stay to Proceed With, or to Confirm the Inapplicability of the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 48] (the "Stipulated Lift Stay Order"). The Stipulated Lift Stay Order provided that the automatic stay under section 362 of the Bankruptcy Code was modified "with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals with respect to the claims currently pending in the Arbitration..." *Stipulated Lift Stay Order* at ¶ 3. Further, the Stipulated Lift Stay Order provided that "Any Arbitration Award, whether in favor of any Arbitration Party, shall be

stayed pending further review of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award.  For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court." *Id.* at ¶ 4.  Based on the foregoing, the Stipulated Lift Stay Order also imposed an injunction against the disposition of assets subject to the Arbitration.

The Arbitration resumed on April 17, 2023, upon entry of the Stipulated Lift Stay Order.

D.    The Motion to Dismiss and Associated Documents[18]

The Debtors vehemently opposed the filing of the Involuntary Petitions by the Original Petitioning Creditors.  On April 14, 2023, the Debtors filed the *Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 40] (the "Motion to Dismiss"); *Memorandum of Law in Support of the Alleged Debtors' Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 41]; *Declaration of Louis M. Solomon in Support of the Alleged Debtors' Filed Motions* [Dkt. No. 44]; *Declaration of Vasilis Hadjieleftheriadis in Support of Alleged Filed Motion* [Doc. 42]; and several additional exhibits attached to, and incorporated by reference into, the foregoing (collectively, the "Motion to Dismiss Documents").

The Motion to Dismiss Documents asserted various legal and factual bases showing that the Involuntary Petitions were improperly brought. The Petitioning Creditors filed a number of responses to the Motion to Dismiss Documents.  Over the next months the Debtors and Petitioning Creditors engaged in discovery and related motion practice regarding evidentiary testimony pursuant to various scheduling orders and stipulations entered by the Bankruptcy Court. Ultimately no hearing on the Motion to Dismiss Documents was ever held prior to entry of the Conversion Stipulation (defined below).  The Motion to Dismiss was withdrawn pursuant to the Conversion Stipulation. Notwithstanding the withdrawal of the Motion to Dismiss, the Debtors reserved all rights in regards to the arguments contained in the Motion to dismiss including challenges to the propriety of the Involuntary Petitions.

E.    The Eletson State Court Action is Removed to the Bankruptcy Court

On June 16, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a notice of removal [Dkt. No. 85] removing the Eletson State Court Action from the Supreme Court of the State of New York to the Bankruptcy Court as an adversary proceeding (the "Chapter 7 Adversary Proceeding").

On July 21, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a motion to dismiss the Chapter 7 Adversary Proceeding and an accompanying memorandum of law.  Prior to any

---

[18] The Committee does not agree with the Debtors' assertions set forth in this Section V.D as the Motion to Dismiss was not adjudicated. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances surrounding the Motion to Dismiss. Further, despite not being adjudicated, the Debtors reserved all rights to all arguments made in the Motion to Dismiss and may assert these claims in these Chapter 11 Cases.

hearing on the merits, the Chapter 7 Adversary Proceeding was dismissed in accordance with the terms of the Conversion Stipulation.

      F.     Mediation and the Conversion Stipulation

Prior to the scheduled hearing on the Motion to Dismiss, on July 31, 2023, upon request of the Debtors, Exchange Note Trustee and the Petitioning Creditors, the Bankruptcy Court entered the *Order Appointing Hon. Allan L. Gropper (Ret.) as Mediator* [Dkt. No. 148] directing these parties towards a non-binding mediation (the "Chapter 7 Mediation"). The Chapter 7 Mediation was undertaken with respect to: (a) the issues raised in each of (i) the Involuntary Petitions, (ii) the Motion to Dismiss and (iii) each of the Petitioning Creditors and Exchange Note Trustee's objections to the Motion to Dismiss, and (b) such other matters as agreed to by the parties to the Mediation. The Chapter 7 Mediation was to last for four weeks unless a resolution was reached. On August 29, 2023, the Bankruptcy Court entered a stipulated order [Dkt. No. 185] extending the Chapter 7 Mediation to September 7, 2023, or such other date as agreed to by the parties to the Chapter 7 Mediation.

On September 6, 2023, the Debtors, Petitioning Creditors and the Exchange Note Trustee entered into a stipulation (the "Conversion Stipulation") which set forth the terms for the voluntary conversion of the Debtors' Chapter 7 Cases to the Chapter 11 Cases. The Conversion Stipulation was read into the record at a hearing before the Bankruptcy Court and set forth the following terms:

- Within seven days of the entry of the Conversion Stipulation the Debtors must withdraw the Motion to Dismiss without prejudice;

- The Petitioning Creditors will not object to the conversion of the Chapter 7 Cases to the Chapter 11 Cases;

- The Petitioning Creditors or people acting in concert with the Petitioning Creditors will not bring a motion to appoint an examiner, a trustee or to limit exclusivity during the first 120 days of the Chapter 11 Cases;

- The Debtors will withdraw the Chapter 7 Adversary Proceeding and agree not to reinitiate that action or the claims therein for the longer of four months or the end of Confirmation Proceedings and vacatur proceedings related to the Arbitration;

- Respective professionals for the Debtors, the Petitioning Creditors and those acting in concert with them agree not to object to the other professionals seeking retention as estate professionals in the capacity as Debtors' counsel or special counsel or Committee counsel respectively;

- The Debtors agree not to object to a substantial contribution motion on behalf of the Petitioning Creditors up to collectively $1.5 million dollars with the agreement that the Petitioning Creditors may seek additional amounts, and the Debtors and the Petitioning Creditors reserve all rights with regard to such later requests;

- The Petitioning Creditors will not object to or assert rights of recovery against the pre-petition fees of the Debtors' counsel up to a $2 million dollar cap, and all rights are reserved for any amounts about the $2 million dollar cap; and

- The Conversion Stipulation is without prejudice to all causes of action, claims, and defenses that the parties may assert, including without limitation the Debtors' ability to object to claims in the Chapter 11 Cases.

Pursuant to the Conversion Stipulation, on September 13, 2023, the Debtors filed the *Motion to Convert these Cases to Cases Under Chapter 11* [Dkt. No. 201]. On September 25, 2023 (the "Conversion Date") the Bankruptcy Court entered an order [Dkt. No. 215] converting the Chapter 7 Cases to the Chapter 11 Cases in accordance with the terms of the Conversion Stipulation.

## VI.    THE CHAPTER 11 CASES

Upon conversion of the Chapter 7 Cases to the Chapter 11 Cases, the Debtors have filed certain substantive motions to obtain relief necessary to allow the Debtors to effectively administer their Estates and maximize distributable value. Since the Conversion Date, in furtherance of the administration of their Estates, the Debtors have: (i) filed their schedules and statements of financial affairs; (ii) filed periodic disclosures pursuant to Bankruptcy Rule 2015.3 and debtor-in-possession monthly operating reports; (iii) filed motions to, (a) establish the Bar Date to determine the complete universe of the Debtors' obligations; (b) officially retain counsel to assist the Debtors in carrying out their duties under the Bankruptcy Code; and (c) enforce previous injunction orders of the Bankruptcy Court, the automatic stay and the Status Quo Injunction for the continued protection of the Debtors' Estates; (iv) established an Independent Committee to review potential causes of actions of and against the Debtors related to Eletson Gas, the Preferred Shares and the shareholders of Eletson Holdings; and (v) filed and prosecuted plans of reorganization returning value to valid stakeholders. Below are summaries of significant filing and developments in the Chapter 11 Cases. As each of the Debtors are non-operating entities, they do not employ any employees, do not maintain bank accounts or an active cash management system, do not pay taxes and do not otherwise have operations that would require the filing of typical "first day" motions for relief.

A.    Debtors' Filings

1.    Schedules and Statements of Financial Affairs

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on October 10, 2023 [Dkt. Nos. 216-221]. On December 29, 2023, Debtor Eletson Holdings filed an amended Schedule A/B [Dkt. No. 340]. The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the Southern District of New York or can be obtained free of charge from counsel to the Debtors.

2.    Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports

a.      2015.3 Disclosures

On November 20, 2023, the Debtors filed their periodic report pursuant to Bankruptcy Rule 2015.3 [Dkt. No 271] (the "2015 Disclosure").  On the same day the Debtors filed a statement regarding Eletson Holdings' interests in Eletson Gas for purposes of the 2015 Disclosure [Dkt. No. 272], noting that because of Levona's continued attempts to control the board of directors of Eletson Gas, the Debtors were unable to obtain the requisite financial information of Eletson Gas to include in the 2015 Disclosure.

In response to requests by the United States Trustee and after Levona filed a statement stating: "Levona has done nothing to prevent the Debtors from filing their Rule 2015.3 statement for Eletson Gas, and it certainly has never told the Debtors that they are prohibited from doing so [Dkt. No. 279 at 1]" on November 30, 2023, the Debtors filed an amended 2015 Disclosure [Dkt. No. 298] which included the consolidated financial information of Eletson Gas.

After filing the amended 2015 Disclosure, in response to further requests by the United States Trustee on December 29, 2023, the Debtors filed a second amended 2015 Disclosure [Dkt. No. 341] which included the financial information of additional non-operating subsidiaries of the Debtors which do not have any assets.  On February 12, 2024, the Debtors filed their Second Periodic Report Pursuant to Bankruptcy Rule 2015.3 [Dkt. No. 409].

3.      Monthly Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these Chapter 11 Cases, the Debtors have filed Monthly Operating Reports [Dkt. Nos. 268, 269, 270, 276, 277, 280 325, 326, 327, 361, 362, 363, 389, 427, 428, 429, 508, 509, 510, 603, 604, 605, 706, 707 and 708], and will continue to file such Monthly Operating Reports as required by the Guidelines.  Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes, and (e) statement regarding the status of accounts receivable reconciliation and aging.

4.      Claims Bar Date and Review Process

a.      Claims Bar Date

On October 18, 2023, the Debtors filed the *Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Dkt. No 227] (the "Bar Date Motion").  Pursuant to the Bar Date Motion, the Debtors sought to set December 18, 2023 at 4:00 p.m. Eastern Time as the date by which any entity or person other than those specified in the Bar Date Motion holding a prepetition claim against the Debtors, including a claim arising under sections 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) must file a proof of claim (the "Bar Date") and March 25, 2024 at 4:00 p.m. Eastern Time as the date by which any Governmental Entity as defined in the Bankruptcy Code must file a proof of claim (the "Governmental Bar Date").

On November 6, 2023, the Debtors filed an amended proposed order addressing concerns raised by the Committee. On November 9, 2023, the Bankruptcy Court entered an order approving the Bar Date Motion (the "Bar Date Order") establishing the Bar Date and Governmental Bar Date as the dates for all persons and entities (other than those excepted pursuant to the Bar Date Motion and Bar Date Order), including governmental units, to file Proofs of Claim for claims arising before the Conversion Date, including Claims arising under section 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code. The Bar Date Order further provides that, among other things, any person or entity that is required to file a Proof of Claim in these Chapter 11 Cases but fails to do so in a timely manner shall not be treated as a Creditor with respect to such Claim for purposes of voting and distribution in these Chapter 11 Cases, and such person or entity shall not be permitted to vote to accept or reject any Chapter 11 plan or participate in any distributions thereunder on account of such Claim.

b.    Claims Review Process[19]

The Debtors are continuing their evaluation of the numerous Claims filed in these Chapter 11 Cases to determine, among other things, whether it is necessary and appropriate to file objections seeking to disallow, reduce and/or reclassify such Claims. On January 28, 2024, the Debtors filed claim objections seeking disallowance, expunging, or in the alternative reduction of the claims of the Original Petitioning Creditors, the Exchange Note Trustee, Levona, New Agathonissos Finance LLC and Togut, Segal and Segal.

i.    Original Petitioning Creditors Claim Objection

The Debtors seek the disallowance and expungement of the entirety of the Original Petitioning Creditors' Claims as they, among other things: (i) lacked sufficient standing to file, and were contractually prohibited from filing, the involuntary petition pursuant to Sections 6.06 and 6.07 of the Exchange Note Indenture, (ii) neither Pach Shemen nor Alpine Partners held any claim against any Debtor because their purported acquisition of notes under the Indenture was void *ab initio* pursuant to the terms of the Second RSA and the OCM Stipulation, (iii) any claims of the original petitioning creditors were contingent in light of the standstill period set forth in the Second RSA, (iv) any purported claim of the original petitioning creditors was subject to a bona fide dispute, and (v) the original petitioning creditors acted in bad faith and for an improper purpose. The Original Petitioning Creditors filed administrative claims under section 507(a) for all fees incurred from early February 2023 through September 6, 2023. However, a cursory review of the Original Petitioning Creditors' supporting documentation indicates that they seek reimbursement for fees and costs grossly in excess of those required to file or adjudicate an involuntary petition, and they seek reimbursement for the substantial time opposing the Debtors' filings. Further the

---

[19] The Committee does not agree with the Debtors' assertions set forth in this Section VI.A.4.b. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of certain of the claims filed against the Debtors and the Debtors' objections thereto. Further, the Debtors are not seeking to litigate any pending claim objection in this Disclosure Statement. Instead, the Debtors are providing a summary of the material portions of the Debtors' Claim Objections as resolution of the Claim Objections will have a material impact on the distributable value of the Plan that will ultimately flow to creditors with Allowed Claims. For this reason, the Debtors believe that it is imperative that creditors entitled to vote on the Plan have a full understanding of the basis of the Debtors' Claim Objections. The Debtors reserve all rights to modify, amend or supplement any claim objection currently pending and to file new claim objections in accordance with the terms of the Bankruptcy Code.

supporting documentation for these claims indicates significant collusion between Pach Shemen and creditors it could direct as proxies including Watson Farley & Williams LLP, Paleokrassas & Partners Law Firm, New Agathonissos Finance LLC and the Exchange Notes Trustee. The Debtors believe that the Original Petitioning Creditors do not hold claims that are not contingent as to liability or subject to a bona fide dispute as to liability or amount, seek reimbursement of invalid amounts, and are otherwise subject to a number of other legal and equitable defenses by the Debtors.

ii.    Levona Claim Objection

The Debtors seek the disallowance and expungement of the entirety of Levona's Claims, which consist of a general unsecured claim in the amount of $262,500,000 and an administrative expense priority claim in an unliquidated amount pursuant to section 507(a)(3) of the Bankruptcy Code as they are predicated on incorrect and unsupportable assertions that: (i) Eletson Holdings violated the Stipulated Stay Relief Order, (ii) Eletson Holdings violated the automatic stay by purporting to transfer "whatever interest Eletson Holdings may have in the Eletson Gas Preferred Shares" to insiders, and (iii) to the extent any of those damages arose between the Petition Date and the Conversion Date in the ordinary course, an administrative priority claim. Levona's claims are nothing more than reassertions of the same claims they presented, and lost on, in the Arbitration. As detailed extensively in the Chapter 7 Cases and as set forth herein, Eletson Holdings never held any interest in the Preferred Shares and thus the basis of Levona's Claims are unsupportable. Further, as confirmed by the District Court Order, the Preferred Shares were transferred by Eletson Gas to the Preferred Nominees. Given the preclusive effect of the District Court Order, the Debtors believe that Levona is barred from asserting these claims against the Debtors, is not a legitimate creditor of the Debtors, has no valid claims against the Debtors and therefore is not entitled to any recovery.

**Levona has requested that the following statements be included (with which the Debtors disagree):**

In Levona's view, the assertion the Holdings did not hold an interest in the Preferred Shares fails to acknowledge that, prior to the commencement of these bankruptcy cases, Eletson Holdings repeatedly claimed that it was the "sole" shareholder of Eletson Gas as of March 11, 2022. *See Eletson Holdings, Inc. et al. v. Levona Holdings Ltd.*, 23-cv-07331 (S.D.N.Y. Feb. 9, 2024), ECF 83 at 20-21 (acknowledging that "in an October 25, 2022 affidavit submitted in the arbitration, Eletson [Holdings] claimed that Eletson [Holdings] had exercised the Purchase Option and was the sole unit holder of [Eletson Gas]," and that "Eletson [Holdings] made the same claim in memoranda of law submitted to the arbitrator on October 25, 2022, November 8, 2022, and November 18, 2022"); *Eletson Holdings, Inc.*, 23-cv-07331, ECF 67-20 (Aff. of Vassilis E. Kertsikoff dated Oct. 25, 2022) ¶ 9 ("Prior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes for convenience referred to as shares) of [Eletson Gas]. As of March 11, 2022, Eletson Holdings became the sole unit holder of [Eletson Gas] by reason of the transactions that [Levona] appears to be challenging ….").

Further, Levona states although the District Court Order confirmed that portion of the Final Award stating that the Preferred Shares were transferred by Eletson Gas to the Preferred Nominees, neither the Arbitrator nor the District Court were ever presented with, or ever decided, the question

of "whether [Eletson Gas] or Holdings improperly elected the [Cypriot] Nominees or whether the transfer to the [Cypriot] Nominees of [Eletson Gas's] right to the Preferred Interests effected a fraud on the creditors of Holdings." District Court Order at 87. As a result, according to the District Court Order, "the arbitrator's findings can have no collateral estoppel effect on those questions." *Id.* Levona's response to Debtors' objection to Levona's proof of claim, which is forthcoming, will explain Levona's position to the contrary. Indeed, Debtors produced certain documents in these bankruptcy cases that were improperly withheld by Eletson Holdings (and Eletson Corp.) during the Arbitration. These documents post-date Eletson Gas's purported exercise of the purchase option by at least four months and suggest that (i) Eletson Gas never exercised its option to purchase the preferred shares in Eletson Gas from Levona pursuant to the Binding Offer Letter and (ii) the Final Award was procured by fraud. *See* ECF 491 at 17 (citing ECF 478-1, Exs. 12-15); ECF 230 at 3, 6.

At minimum, Debtors have conceded, in their objection to Levona's proof of claim, that certain portions of the proof of claim are not precluded by the Final Award. *See* ECF 378 at 7-9 (acknowledging that Levona's proof of claim alleged three "new" claims: (i) Eletson Holdings violated this Court's stay relief order (ECF 48); (ii) Eletson Holdings violated the automatic stay; and (iii) an administrative priority claim). The question of whether the District Court Order or Final Award have any preclusive effect with respect to Levona's Proof of Claim has not yet been resolved by this Court.

### iii.    Exchange Note Trustee Claim Objection

The Debtors seek the disallowance and expungement, or in the alternative the reducing and reclassifying of the claims of the Exchange Note Trustee which consist of alleged secured claims of $366,011,815.96 on behalf of the Exchange Noteholders and (ii) administrative expense claims for the Exchange Note Trustee's fees costs and expenses, including cost of counsel pursuant to section 7.07 of the Exchange Note Indenture in the amount of $1,872,640.44. The objections assert, among other things: (i) the Original Petitioning Creditors lacked sufficient standing to file, and were contractually prohibited from filing, the involuntary petition pursuant to Sections 6.06 and 6.07 of the Exchange Note Indenture, (ii) neither Pach Shemen nor Alpine Partners held any claim against any Debtor because their purported acquisition of notes under the Indenture was void *ab initio* pursuant to the terms of the Second RSA and the OCM Stipulation, (iii) any claims of the original petitioning creditors were contingent in light of the standstill period set forth in the Second RSA, (iv) any purported claim of the original petitioning creditors was subject to a bona fide dispute, and (v) the original petitioning creditors acted in bad faith and for an improper purpose that the parties do not have valid claims against the Debtors, (vi) Exchange Note Trustee was aware of the void ab initio transfer of the Exchange Notes as well as the bad faith and improper purpose of the Original Petitioning Creditors, yet participated in the bad faith scheme by nonetheless filing suit against the Debtors under the Exchange Note Indenture at the direction of Pach Shemen, including, among other things, failing to withdraw the suit after it purportedly first learned that the transfer of the Exchange Notes to Pach Shemen was void ab initio –and (vii) the Exchange Note Trustee is not entitled to reimbursement for fees, costs and expenses incurred as a result of its negligence, willful misconduct or bad faith and because it did not hold, at the time it joined the involuntary petition, a claim that satisfied the requirements of 11 USC § 303(b)(1).

The Exchange Note Trustee initially asserted its approximately $366 million dollar claim

as a fully secured claim, despite the Strict Foreclosure Agreement releasing all Collateral for the Exchange Notes. On February 8, 2024, the Exchange Note Trustee filed an amended proof of claim classifying its claim as unsecured.

The Debtors also believe the Exchange Note Trustee's claims must be reduced to the extent the claim includes any recovery for entities that are not Exchange Noteholders. The Exchange Note Trustee's claims are asserted on behalf of the holders of the Exchange Notes, but no list of Exchange Noteholders is provided. Further, entities like Pach Shemen and Alpine Partners are not Exchange Noteholders as the transfer of Exchange Notes was void ab initio. The Exchange Note Trustee's claims are also in excess of the amount provided for in the Debtors' books and records which will require reconciliation and likely a reduction of the value of the claims asserted. Finally, the Exchange Note Trustee is not entitled to reimbursement of costs, fees and expenses incurred as a result of their negligence, willful misconduct and bad faith in participating in the Murchinson Entities' schemes. The Debtors further believe that the Exchange Note Trustee is not entitled to administrative expense status for the foregoing reasons.

Finally, the Debtors have objected to the allowance of the Exchange Note Trustee's claim until such time that all affirmative claims against the Exchange Note Trustee are resolved.

**The Exchange Note Trustee has requested that the following statement be included with and read in conjunction with the Debtors' position noted above. The Debtors disagree with the assertions noted below but are presenting them in the interest of fulsome disclosure.**

The Exchange Note Trustee disputes each of the Debtors' assertions set forth in Section VI.A.4.b.iii and filed a preliminary response to the Debtors' objection to its claims on May 7, 2024 [Dkt. No. 639]. The Exchange Note Trustee's preliminary response asserts, among other things, that: (i) the Debtors' contention that neither Pach Shemen nor Alpine held any claim against the Debtors is irrelevant to the claims filed by the Exchange Note Trustee because such claims were filed in the Exchange Note Trustee's representative capacity on behalf of *all* Exchange Noteholders (regardless of who such Exchange Noteholders may be) and not on behalf of Pach Shemen, Alpine, or any other specific Exchange Noteholder, (ii) because the pre-petition claims of the Exchange Note Trustee (the "Prepetition Exchange Note Trustee Claims") were filed in a representative capacity on behalf of *all* Exchange Noteholders, the Exchange Note Trustee need not identify the specific holders thereof; (iii) the identity of the beneficial holders of the Exchange Notes is not a valid basis for disallowance of the Exchange Note Trustee's claims under section 502(b) of the Bankruptcy Code; (iv) the Exchange Note Trustee has not acted in bad faith, nor participated in any bad faith scheme, and, indeed, at the time it filed suit against the Debtors under the Exchange Note Indenture, the Exchange Note Trustee was unaware of the existence of the Second RSA due to the Debtors' failure to notify it thereof (as the Exchange Note Indenture required); (v) the Trustee has not engaged in any negligent, willful, or bad faith misconduct and, to the contrary, properly filed the Prepetition Exchange Note Trustee Claims pursuant to its authority under Section 6.09 of the Exchange Note Indenture; (vi) the Prepetition Exchange Note Trustee Claims contain detailed calculations of the principal and interest due under the Exchange Notes and the Exchange Note Indenture, while the Debtors' objection thereto fails to identify any alternative basis for calculating the principal and interest due in a lesser amount; (vii) the Exchange Note Trustee's  fees, costs and expenses, including cost of counsel, related to the involuntary bankruptcy petition are properly reimbursable in the amount of no less than $1,872,640.44 and are

supported by detailed fee statements that will be provided in redacted form or for *in camera* review, as applicable, upon request of the Bankruptcy Court or a party; (viii) the Strict Foreclosure Agreement released only a portion of the collateral securing the Exchange Notes and the Prepetition Exchange Note Trustee Claims remained secured to the extent of the value (if any) of the remaining collateral; and (ix) the Debtors' contention that the Exchange Note Trustee improperly filed fully secured claims while serving on the Committee is false because the Prepetition Exchange Note Trustee Claims expressly stated that they were secured only to the extent of the value of their underlying collateral and stated unsecured claims for any deficiency.

### iv.   New Agathonissos Finance LLC Claim Objection

The Debtors seek the disallowance and expunging of the both the prepetition and administrative claims of New Agathonissos Finance LLC ("NAF") which are asserted in the amount of $5,155,522.00.  The Debtors objected to NAF's claims as NAF does not hold valid claims against the Debtors.  NAF asserts that the Debtors are obligated to pay NAF on behalf of reimbursement obligations arising from the Strict Foreclosure Agreement on account of payments as restitution, compensation for the Debtors' unjust enrichment, on a theory of equitable subrogation or any other similar theory. However even a cursory review of the Strict Foreclosure Agreement demonstrates that no such payment obligation exists.  Further, NAF has not provided the Debtors with receipts of the payments it purports to have made giving rise to the Debtors' reimbursement obligations.

### v.   Omnibus Claim Objections

The Debtors have also filed an omnibus claim objection to several Exchange Noteholder Claims duplicative of the claims asserted by the Exchange Note Trustee.  The Debtors also objected to the claim of Deutsche Bank to the extent such claim exceeds the obligations in the Debtors' books and records.

### 5.   Application for the Retention of Debtors' Counsel

On October 25, 2023, the Debtors filed the *Debtors' Application to Retain and Employ Reed Smith LLP as Counsel to the Debtors and Debtors-in-Possession, Nunc Pro Tunc as of the Conversion Date, Pursuant to 11 U.S.C. §327(a) and Federal Rule of Bankruptcy Procedure 2014* [Dkt. No. 235] (the "Reed Smith Application").  The Reed Smith Application was supported by the Declaration of Derek J. Baker, Esq. which was attached thereto (as supplemented from time to time the "Baker Affidavit").

On January 5, 2024, after the submission of supplemental Baker Affidavits, and after notice and hearing the Bankruptcy Court entered an order [Dkt. No. 350] approving the Reed Smith Application and authorized the retention of Reed Smith LLP as counsel to the Debtors pursuant to section 327(a) of the Bankruptcy Code.

### 6.   Motion to Enforce

Over the pendency of the Chapter 7 Cases and Chapter 11 Cases the Debtors have become aware of several actions taken by Levona that the Debtors believe constituted willful violations of orders of the Bankruptcy Court and the Arbitrator.  On November 27, 2023, the Debtors filed the *Debtors' Motion to Enforce Three Orders Protecting Debtors- the Automatic Stay, Stipulated Stay*

*Relief Order, and Status Quo Injunction – and for Sanctions against Levona Holdings Ltd.
Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Dkt No. 289] (the "Motion to
Enforce").  The Motion to Enforce sought redress for Levona's seemingly willful violations of the
Automatic Stay, Stipulated Lift Stay Order and the Status Quo Injunction.  On December 21, 2023,
Levona filed its opposition to the Motion to Enforce [Dkt. No. 332] pursuant to which Levona
asserts that it has not violated any order of the Arbitrator or the Bankruptcy Court.  On May 8,
2024, the Debtors withdrew the Motion to Enforce. In the Debtors' view, the Motion to Enforce
should be withdrawn without prejudice.  In Levona's view, the Motion to Enforce should be
withdrawn with prejudice.  The Court has not yet decided whether the Motion to Enforce is
withdrawn with or without prejudice.

7.    <u>Establishment of Independent Committee</u>

As stated herein, the Debtors are aware that there may exist claims against certain of the
Debtors' shareholders and/or certain of the Debtors' affiliates.  To ensure that the Debtors were
able to disinterestedly evaluate the propriety and strength of any potential cause of action against
an affiliate of the Debtors or other person or entity related to the Debtors and to resolve the
objection of the United States Trustee to the Reed Smith Application,  on December 11, 2023 the
Debtors appointed Panagiotis Konstantaras as a director of Eletson Holdings, and subsequently
created an independent committee (the "Independent Committee") comprised of Mr. Konstantaras
and filed a notice of the creation of the Independent Committee with the Bankruptcy Court [Dkt.
No. 329].  Pursuant to the corporate resolution establishing the Independent Committee, the board
of directors of Eletson Holdings authorized and delegated to the Independent Committee, among
other things, (i) the full and exclusive authority and power to investigate the matters raised in any
written demand on Eletson Holdings to investigate the shareholders of Eletson Holdings or the
preferred nominees of Eletson Gas (collectively, a "Demand"), (ii) the authority to determine what,
if any, action should be taken by Eletson Holdings in regards to any Demand, and (iii) the authority
to take appropriate action the Independent Committee deems necessary to give effect to the
foregoing powers.  The Independent Committee is represented by separate counsel which
previously served as potential conflicts counsel to the Debtors in the dismissed adversary
proceeding.  Counsel for the Independent Committee has not yet incurred time/costs in reviewing
claims identified by the Committee or others or any Demands.  As such as of the date hereof, no
formal retention application for counsel to the Independent Committee has been filed with the
Bankruptcy Court and no costs have been incurred.

Notably, the Bankruptcy Court stated that despite the assertions made by the Committee
and Petitioning Creditors that the Independent Committee is not independent, such asserted lack
of independence does not adequately explain why the Petitioning Creditors and Committee have
failed to make a Demand on the Independent Committee or pursue the transfer of the Preferred
Shares by other means such as pursuing standing.  As of the filing of this Disclosure Statement,
no Demand has been made on the Independent Committee.

8.    <u>Plans</u>

On January 23, 2024, the Debtors filed the Original Plan.  The Original Plan served as a good faith
proposal to begin the plan negotiation process and served as the Debtors' estimate of the value of
Reorganized Holdings (as defined therein). The Original Plan operates in the same manner as the

Plan and provides for the transfer of certain Causes of Action to a Litigation Trust for the pursuit and liquidation of those Litigation Trust Causes of Action for distribution of proceeds to certain of the Debtors' legitimate creditors. The Original Plan called for the subordination of the claims of the Petitioning Creditors, which meant that the Petitioning Creditors would not be paid until the Debtors' other creditors were paid in full.  The Debtors believed and continue to believe that the Original Plan was patently confirmable despite being a "new value" shareholder Plan, as the Eletson Members (as defined in the Original Plan) provided the Shareholder New Value Contribution (as defined in the Original Plan) which was the only source of plan funding that had been made available as of the date of the Original Plan.  Despite the Petitioning Creditors' assertions regarding the Debtors' use of the exclusivity period, the Petitioning Creditors made no outreach to the Debtors or otherwise indicated that they were willing or able to fund a plan of reorganization until the Debtors filed the Original Plan.  The PS Plan (defined below), as originally filed by the Petitioning Creditors, borrowed heavily from the Original Plan, including adopting and using the identical plan classifications and waterfall of funds from the Original Plan. Ultimately the Original Plan served its purpose and resulted in the Petitioning Creditors providing an estimate on their view of the enterprise value of the Reorganized Debtor, information that had not been shared with the Debtors despite the Debtors requesting said information many times.  On April 8, 2024, the Debtors filed the First Amended Plan.  The First Amended Plan was structurally similar to the Original Plan but increased the distributable value available to Creditors significantly.

On May 13, 2024, the Debtors filed a previous iteration of the Plan, which maintained the structure of the Original Plan and further increased the distributable value available to Creditors. In that iteration, the Debtors included a settlement negotiated by the Debtors on the one hand, and the Gas Ownership Defendants on the other hand, in the context of the Mediation. Such settlement would have resolved and settled any claims that Holdings would have against such the Gas Ownership Defendants in exchange for the Gas Ownership Defendants' agreement and satisfaction of the terms of the proposed settlement.

At a hearing before the Bankruptcy Court on May 15, 2024 (the "Initial Disclosure Statement Hearing") after objections were raised by certain parties in interest to the settlement included in the prior iteration of the Plan, the Debtors negotiated with the Eletson Members to increase their proposed Shareholder New Value Contribution and such Eletson Members agreed to cause the Gas Ownership Defendants to contribute the Collections Contribution as additional Shareholder New Value Contribution without the proposed settlement.

9.      The Shareholder New Value Contribution

The centerpiece of the Plan is the Plan Consideration, which is comprised in part of the Shareholder New Value Contribution.  The Shareholder New Value Contribution is (i) an aggregate $30 million contribution consisting of cash and cash equivalents and (ii) the Collections Contribution which is comprised of the assignment of seventy-five percent (75%) of the collections of the Gas Ownership Defendants against Levona on account of the Final Award and the District Court Order, net of costs of collection. The Shareholder New Value Contribution is being provided (or caused to be provided) by the Eletson Members.  For the avoidance of doubt, the Shareholder New Value Contribution represents new money cash contributions. The Eletson Members have provided the Debtors with proof of funding for the cash portion of the Shareholder New Value

Contribution on a redacted basis which has been shared with the Committee on an attorneys' eyes-only basis. The Eletson Members have also executed the Commitment Letter attached to the Disclosure Statement as Exhibit 10 which provides that the Eletson Members will provide the cash portion of the Shareholder New Value Contribution and are subject to the jurisdiction of the Bankruptcy Court for all claims related to the failure to provide the cash portion of the Shareholder New Value Contribution. These collective commitments and proof of funding have established the Eletson Members' financial wherewithal to fund the cash portion of the Shareholder New Value Contribution and the Eletson Members are prepared to transfer the cash portion of the Shareholder New Value Contribution promptly upon confirmation of the Plan.

The Shareholder New Value Contribution was the result of the Debtors' attempts to secure financing from their historical financiers to fund a potential exit from the Chapter 11 Cases. As with the Debtors' postpetition financing facility, the Debtors were unable to secure independent third-party financing for several reasons, including the very litigious nature of these Chapter 11 Cases. With no alternative funding sources available, the Debtors turned to the Eletson Members to determine what funding opportunities were available to pay the Debtors' administrative claims and otherwise provide an exit from the Chapter 11 Cases.

The Debtors and the authorized representatives of the Eletson Members negotiated the initial Shareholder New Value provided in the Original Plan over several months. At all times during these negotiations the Eletson Members were represented by their independent counsel, Sidley Austin LLP while the Debtors were represented by Reed Smith. Ultimately, the Debtors and Eletson Members agreed on a Shareholder New Value Contribution of $10 million dollars. This number was approved by the board of directors of Eletson Holdings as well as the appropriate parties of the Eletson Members. The initial value of $10 million was determined as a number which the Debtors and Eletson Members believed was a fair enterprise valuation, especially given the lack of financial interest from the Debtors' financiers. The number was also determined as a fair valuation that would entice potential financiers. At no time after filing the Original Plan were the Debtors approached by any party regarding alternative financing options or opportunities to purchase equity in the Reorganized Debtor.

Two months after the Original Plan was filed, the Petitioning Creditors filed the PS Plan, which provided for a proposed cash infusion of $27 million to be raised through a rights offering at an implied 50% discount of the Reorganized Debtor's equity value. Upon confirmation of the PS Plan, Pach Shemen as the purported holder of approximately 57% of the Exchange Notes, would exit the Chapter 11 Cases as the majority holder of the Reorganized Debtor, potentially owning over 80% of the equity of the Reorganized Debtor prior to dilution in the form of a Backstop Premium and Employee Incentive Plan. Notably at the time of filing the PS Plan did not include any valuation analysis of information supporting the Petitioning Creditors' valuation of the Reorganized Debtor. The Debtors likewise do not agree with the Petitioning Creditors' purported valuation of the Reorganized Debtor set forth in the PS Plan.

Given the market for the enterprise value of Reorganized Holdings established by the PS Plan, the Eletson Members informed the Debtors they were willing to increase the cash portion of the Shareholder New Value Contribution to $30 million, a number they were advised was more in line with the Reorganized Debtors' enterprise value. The increased value of the Shareholder New Value Contribution would be provided in the same pro rata proportions as the initial $10 million. The Debtors evaluated the proposal with counsel and accepted the offer of the Eletson Members. The Debtors then filed the First Amended Plan which included the increased Shareholder New

Value Contribution, but also included additional changes in classification of Exchange Noteholder that the Debtors believed would provide a greater return to the Debtors' legitimate Exchange Noteholders located in Class 6A, despite the lower enterprise valuation than the purported valuation of the Petitioning Creditors demonstrated in the PS Plan.

Following the Initial Disclosure Statement Hearing, the Debtors negotiated with the Eletson Members to increase their proposed Shareholder New Value Contribution and such Eletson Members agreed to cause the Gas Ownership Defendants to contribute the Collections Contribution as additional Shareholder New Value Contribution without the proposed settlement. During the negotiations of the Plan, the members of the Board of Directors of the Debtors (appointed by the Eletson Members) directed Reed Smith as counsel to the Debtors. The Board of Directors of the Debtors directed Reed Smith to engage with the Eletson Members on potential solutions to provide the Plan Consideration for the satisfaction of various creditor claims. While certain principals may sit as Directors of the Debtors and as principals of the Eletson Members, each respective role had separate legal counsel who engaged in and were active participants in the negotiations. Those negotiations were, at all times, to identify contribution scenarios which would inure to the benefit of the Debtors' stakeholders.

The Collections Contribution portion of the Shareholder New Value Contribution is predicated on the Gas Ownership Defendants' ability to collect the outstanding Arbitration Award from Levona and its alter egos, namely Pach Shemen and Murchinson. The Debtors believe that Levona, together with its alter egos, have sufficient collectible assets to satisfy the Arbitration Award. To collect against Pach Shemen and Murchinson, the Gas Ownership Defendants may need to establish that Pach Shemen and Murchinson are alter egos of Levona in a separate proceeding. However, the Debtors believe that the Arbitrators' findings that Levona, Pach Shemen and Murchinson are alter egos for all relevant purposes of the Arbitration Award and the harmful actions taken by Levona, was binding on all parties. To the extent persons argue that the District Court Order vacated the Arbitrator's findings as applied to Pach Shemen and Murchinson, the District Court Order exceeded the District Court's jurisdiction. Therefore, the Debtors reasonably believe that the Gas Ownership Defendants will be able to proceed against all of the Murchinson Entities and ultimately have the ability to collect the full amount of the Arbitration Award.

### 10.   Motion to Compel Mediation

As set forth in greater detail below on January 29, 2024, the Petitioning Creditors filed the Exclusivity Motion (as defined below) seeking to terminate the Debtors' exclusive period for soliciting the Original Plan and on February 7, 2024, the Committee filed the Committee Trustee Motion (defined below) seeking the appointment of a Chapter 11 trustee for the administration of the Debtors' estates. In response to these motions, on February 12, 2024, and February 13, 2024 the Debtors inquired with the Petitioning Creditors and the Committee on their willingness to enter into a consensual mediation for the purpose of negotiating a global settlement and resolution to these Chapter 11 Cases (the "Mediation"). On February 13, 2024, the Debtors filed the *Debtors' Motion to Compel Mediation Regarding Competing Plan and Plan Procedures* [Dkt. No. 412] (the "Mediation Motion"). The Petitioning Creditors and Committee filed letters [Dkt. Nos. 413-14] noting their reservations and concerns regarding the Mediation and the Mediation Motion but did not file formal objections to the Mediation Motion.

Despite all parties being in agreement that the Mediation represented a path to a potential consensual resolution of these Chapter 11 Cases, several open items remained unresolved, namely the selection of the mediator, the parties that would participate in the Mediation, the timing of the Mediation and the funding of the mediation. After several rounds of negotiations, on March 13, 2024, a consensual order [Dkt. No. 471] approving the Mediation was entered by the Bankruptcy Court (the "Mediation Order").

11.    Postpetition Financing and the DIP Motion

As the Debtors have no employees, operations or cash flows, the only significant administrative costs that are accruing in these Chapter 11 Cases are professional fees. After the Conversion Date, the Debtors planned to address outstanding administrative expenses as part of confirmation of a Chapter 11 plan of reorganization. Upon the filing of the Interim Compensation Motion, the Debtors began to take steps to secure postpetition financing to address the potential immediacy for liquidity. The Debtors undertook a two-prong approach. The Debtors first evaluated the possibility of forcing a dividend from the SMEs to address the Debtors' liquidity needs. The Bareboat Charters contain several restrictions that prevent the SMEs from sharing earnings and providing financial assistance to affiliated entities, thus any dividend that would be provided to the Debtors could only be issued with the consent of Oaktree, the financier of the SMEs. At the same time the Debtors were undertaking a search for a lender willing to provide the Debtors with a postpetition financing facility.

The Debtors were unable to secure postpetition financing by the time the Interim Compensation Order (defined below) was entered. On February 22, 2024 certain portions of Dechert LLP ("Dechert") and FTI Consulting Inc.'s ("FTI") fees and expenses for services provided to the Committee became due and were to be paid "promptly" pursuant to the Interim Compensation Order. Notably the term "promptly" is not defined. On March 5, 2024, the Debtors filed a letter with the Bankruptcy Court [Dkt. No. 451] informing the Bankruptcy Court of the Debtors' liquidity issues and the Debtors' efforts to secure postpetition financing.

Shortly thereafter the Debtors received a proposal from affiliate EMC Gas Corporation. EMC Gas Corporation offered the Debtors a financing facility consisting of a $4 million two draw term loan secured by all of the Debtors' assets (the "Original DIP Facility").

On March 7, 2024, the Debtors filed a motion [Dkt. No. 458] seeking court approval of the Original DIP Facility (the "DIP Motion"). On March 8, 2024, the Original Petitioning Creditors shared, for the first time, a competing postpetition financing facility with the Debtors (the "PC DIP Facility"). The PC DIP Facility provided for a $10 million term loan at a one percent (1%) interest rate and three percent (3%) default rate with no associated fees on an unsecured basis. The Debtors engaged in discussions with the Original Petitioning Creditors regarding the PC DIP Facility, including proof of funds given the Original Petitioning Creditors' status as assetless special purpose vehicles.

On March 14, 2024, EMC Gas Corporation provided the Debtors with an amended DIP facility proposal (the "Amended DIP Facility") on economically identical terms as the PC DIP Facility, save for the event of default in the event of the appointment of a Chapter 11 trustee over the Debtors' estates. As the Amended DIP Facility mirrored the economic terms of the best offer for postpetition financing received by the Debtors in the open market, the Debtors believe that the terms of the Amended DIP Facility, which were negotiated by principals of the Debtors and EMC

- 44 -

Gas Corporation in their corporate offices, are entirely fair. The Debtors have determined in their reasonable business judgment that they will enter into the Amended DIP Facility if the Debtors ultimately need postpetition financing.

The Debtors do not currently need to enter into the Amended DIP Facility. As the Debtors were negotiating the various postpetition financing facilities the Debtors received an email from Oaktree which the Debtors believe provided the Debtors with consent to force a dividend from the SMEs to fund the Debtors' liquidity needs. On March 17, 2024, the Debtors informed the Bankruptcy Court and Committee Professionals that they had secured the requisite funding to address outstanding administrative expenses in compliance with the Interim Compensation Order. On March 18, 2024, the Debtors caused outstanding professional fees to be paid by EMC Investment Corp., the treasury agent entity for the Eletson enterprise from SME funds on behalf of Eletson Holdings in accordance with the consent provided by Oaktree. Since March 18, 2024, the Debtors have remained in compliance with the terms of the Interim Compensation Order and have made all required payments of professional fees.

Notwithstanding the foregoing, the hearing for approval of the DIP Motion, which will be amended to reflect the terms of the Amended DIP Facility, is still pending and has been scheduled to be heard on June 18, 2024. As the Debtors' current liquidity is predicated on consent from third-party Oaktree, the Debtors must be prepared to continue to fund these Chapter 11 Cases in the event Oaktree's consent is withdrawn.

B.    Appointment of the Committee and the Committee Filings

On October 20, 2023, the Office of the United States Trustee appointed an The Official Committee of Unsecured Creditors (the "Committee") [Dkt. No. 233]. The following creditors were appointed to the Committee:

(a)    Gene B. Goldstein
(b)    Aegean Baltic Bank S.A.; and
(c)    Wilmington Savings Fund Society, FSB, as Exchange Note Trustee.

1.    Applications for appointment of Committee Professionals

a.    Dechert Retention Application

On November 20, 2023, the Committee filed the *Application of the Official Committee of Unsecured Creditors of Eletson Holdings Inc., Et Al. for an Order Authorizing the Employment and Retention of Dechert LLP as Counsel, Effective as of October 25, 2023* [Dkt. No. 273] seeking to retain Dechert as Committee counsel.

Given On January 5, 2024, the Bankruptcy Court entered an order [Dkt. No. 351] authorizing the retention of Dechert as counsel to the Committee over the outstanding objection of a creditor of the Debtors' estates.

b.    FTI Retention Application

On January 4, 2024, the Committee filed the *Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee*

*of Unsecured Creditors Effective as of December 8, 2023* [Dkt. No. 349] (the "FTI Application"). Pursuant to the FTI Application, FTI was to be retained by the Committee for the purpose of, among other things: (i) assisting the Committee in the review of the Schedules and SOFAs and Monthly Operating Reports, (ii) assistance with the assessment and monitoring of the Debtors' short term cash flow, liquidity and operating results, and (iii) assistance with the review of the Debtors' potential disposition or liquidation of both core and non-core assets. Notably, the FTI Application provided for no cap on spending and did not otherwise include any estimates as to the potential costs to the Debtors' Estates incurred during of FTI's retention.

On January 26, 2024, the Bankruptcy Court approved the retention of FTI as financial advisor to the Committee.

### 2.    Motion to Modify Previous Order Granting Relief from the Automatic Stay

On November 16, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors to Modify the Court's Prior Order Granting Relief from the Automatic Stay* [Dkt. No. 239] (the "Modification Motion") seeking to modify the Bankruptcy Court's previous Stipulated Lift Stay Order which permitted the Arbitration to proceed in light of the automatic stay imposed by the Chapter 7 Cases.

On November 27, 2023, the Debtors filed their opposition to the Modification Motion [Dkt. No. 286] challenging the propriety of the relief sought in the Modification Motion noting, among other things, d that limiting the scope of the Final Award would cause significant harm to the Debtors, their Estates and their creditors.

On December 1, 2023, the Committee filed a reply in support of the Modification Motion [Dkt. No. 302]. Notwithstanding the additional arguments raised, on January 4, 2024, the Bankruptcy Court issued a memorandum opinion and order [Dkt. No. 348] denying the Modification Motion.

### 3.    Interim Compensation Motion

On January 11, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 353] (the "Interim Compensation Motion") seeking modification of the compensation procedures set forth in the Bankruptcy Code.

On January 18, 2024, the Debtors filed the *Objection to Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 357] ("Interim Compensation Objection") requesting that the Bankruptcy Court reject the Committee's proposed interim compensation procedures as the Debtors believed it to be unnecessary in these Chapter 11 Cases and contrary to the explicit terms of the Bankruptcy Code.

On January 22, 2024, the Committee filed a reply to the Interim Compensation Objection [Dkt. No. 364] asserting the interim compensation procedures were necessary in the Chapter 11 Cases. On February 7, 2024, the Bankruptcy Court entered an order [Dkt. No. 398] approving the Interim Compensation Motion.

C.      Trustee Motions, Mediation, Evidentiary Hearing and Exclusivity Motion

i.      The Trustee Motions

On February 7, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* [Dkt. No. 394] (the "Committee Trustee Motion").  The Committee Trustee Motion sought the appointment of a Chapter 11 trustee over the Debtors' estates pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code.  Among other things, the Committee asserted that the Debtors were not acting as responsible fiduciaries for their estates and that the appointment of a trustee would be in the best interest of creditors. The Committee Trustee Motion was set to be heard on February 21, 2024. The Committee Trustee Motion was formally joined by Deutsche Bank Trust Company Americas as Trustee and Collateral Agent for holders of 9.265% First Preferred Ship Mortgage Notes due 2022 ("Deutsche Bank") [Dkt. No. 404], the Exchange Notes Trustee [Dkt. No. 420] and the Petitioning Creditors [Dkt. No. 491], and informally joined by Sunrise I NPL Finance DAC [Dkt. No. 476].

On February 9, 2024, the District Court entered the District Court Order confirming and vacating the Final Award in part.  Given the significant impact of the District Court Order to the Chapter 11 Cases, by letter dated the same day, the Debtors requested an adjournment of the pending hearing on the Exclusivity Motion and Committee Trustee Motion.  On February 12, 2024, the Bankruptcy Court ordered an adjournment of the February 21, 2024 hearing, with a status conference set for February 27, 2024 [Dkt. No. 405].

On February 13, 2024, the Debtors filed the Mediation Motion. On the same day the Petitioning Creditors and Committee filed letters asserting that the Debtors were attempting to use the Mediation as a delay tactic.

On February 16, 2024, the United States Trustee filed the *United States Trustee's Motion to Appoint a Chapter 11 Trustee* [Dkt. No. 424] (the "UST Trustee Motion") seeking appointment of a Chapter 11 trustee for the administration of the Debtors' estates.  The UST Trustee Motion did not seek appointment of a Chapter 11 trustee for cause or as a result of any action or omission taken by the Debtors. Instead, the UST Trustee Motion asserted that the acrimony between the Debtors and the Committee and Petitioning Creditors had reached a point warranting appointment of a trustee.  The UST Trustee Motion was not joined by any parties.

On February 27, 2024, the Bankruptcy Court held a status hearing (the "Status Hearing"), which among other things, set April 9, 2024, as the start of the evidentiary hearing on the relief sought in the Exclusivity Motion, Committee Trustee Motion and UST Trustee Motion.

On March 11, 2024, the Petitioning Creditors filed the *Petitioning Creditors' Emergency Motion to Appoint a Trustee* [Dkt. No. 468] (the "Emergency Trustee Motion" and together with the Committee Trustee Motion the "Trustee Motions") seeking appointment of a Chapter 11 trustee over the administration of the Debtors' estates pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code.  Among other things, the Petitioning Creditors asserted that the Debtors were not acting as responsible fiduciaries for their estates as a result of the insider postpetition financing facility sought in the DIP Motion, and that if the DIP Motion were not approved the Debtors would be administratively insolvent which would constitute sufficient cause for the appointment of a trustee and that the appointment of a trustee would be in the best interest of creditors.  The

Petitioning Creditors sought to have the Emergency Trustee Motion heard on an expedited basis, but such relief was denied by the Bankruptcy Court.

On March 22, 2024, the Debtors filed objections to the UST Trustee Motion [Dkt. No. 512] and the Trustee Motions (including those joinders filed thereto) [Dkt. No. 513]. Additionally, a majority of the Debtors' shareholders (the "Shareholders"), represented by separate counsel also filed objections to the Trustee Motions and the UST Trustee Motion [Dkt. No. 518].

On April 2, 2024, the United States Trustee, Petitioning Creditors and Committee each filed a reply in support of their motion for the appointment of a Chapter 11 trustee.

ii.    The Mediation

Prior to the Evidentiary Hearing the Mediation was held pursuant to the Mediation Order. Pursuant to the Mediation Order, the Mediation participants included: (a) the Debtors; (b) the Petitioning Creditors; (c) Committee; (d) the Shareholders; (e) Levona; (f) Exchange Note Trustee; (g) Eletson Corp.; and (h) Eletson Gas (collectively, the "Mediation Parties"). The Mediation was in respect to all claims, issues and disputes arising between the Mediation Parties related to the (i) Original Plan, Original Disclosure Statement and Solicitation Motion, (ii) the Trustee Motions, (iv) the UST Trustee Motion, (v) the Arbitration Award entered against Levona, (vi) the Debtors' objections to the Claims of the Original Petitioning Creditors and the claims of the Exchange Notes Trustee, and (vii) such other matters as so designated.

The Mediation was held on March 27 and continued thereafter. Pursuant to the Mediation, various settlement proposals were presented and evaluated by the Mediation Parties. Notably, the Mediator stated that the parties were in agreement on most issues. Notwithstanding this, ultimately the Mediation did not result in a global settlement and the Mediation Parties proceeded to the Evidentiary Hearing.

iii.    The Evidentiary Hearing

On April 9, 2024, the Evidentiary Hearing was held before the Bankruptcy Court on the Trustee Motions and the UST Trustee Motion. Direct witness testimony was submitted to the Bankruptcy Court by declaration. The Evidentiary Hearing lasted three days and concluded on April 11, 2024. The first day of the Evidentiary Hearing consisted of opening statements of the five parties participating in the evidentiary hearing: the Debtors, the Shareholders, the Committee, the Petitioning Creditors and the United States Trustee.

The second day consisted of cross examination of witnesses. The United States Trustee presented no witnesses. The Petitioning Creditors and Committee presented three witnesses: Michael Cordasco the principal of FTI for these Chapter 11 Cases, Jeff Drake a consultant hired by FTI and Cynthia Romano a senior managing director at FTI (collectively the "Movant Witnesses"). Each of the Movant Witnesses were cross examined by the Debtors and the Shareholders. Upon cross examination, the Debtors believe that the Movant Witnesses conceded they were not familiar with the Debtors' financial status, the Debtors' placement within the shipping industry, the Debtors' business history or needs or the Debtors' management history and successes. Further, on cross examination the Movant Witnesses stated that they had no evidence of (i) any value leakage from the Debtors, (ii) any business conduct that warranted replacement of the Debtors' current management, or (iii) any postpetition infirmities with the Debtors' business

operations. Further the Movant Witnesses confirmed that the Debtors had provided the Committee with a general ledger of all of the Debtors' transactions.

The Debtors presented five witnesses: Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Laskarina Karastamati, Marina Orfanoudaki and Nikolaos Veraros (collectively the "Debtor Witnesses"). Each of the Debtor Witnesses resides in Greece and traveled to New York to attend the Evidentiary Hearing.  Despite asserting the Debtor Witnesses had perpetrated a fraud on the Bankruptcy Court and notwithstanding the fact the Petitioning Creditors and the Committee demanded physical presence for the submission of witness declaration, the Petitioning Creditors and the Committee refused to cross examine the Debtor Witnesses.

The third day of the Evidentiary Hearing consisted of closing statements.  Following the conclusion of the Evidentiary Hearing, on April 18, 2024, each of the Debtors, Shareholders, Petitioning Creditors, Committee and United States Trustee submitted post-trial briefing in support of their positions. See Dkt. Nos. [594, 595, 596, 597, 598].

On May 29, 2024 the Bankruptcy Court entered an order [Dkt. No. 721] denying the relief sought in the Trustee Motions and finding that there was insufficient cause to appoint a chapter 11 trustee and that appointment of a chapter 11 trustee was not in the best interest of the Debtors' estates and the parties in interest in these Chapter 11 Cases, and that appointment of a trustee at this time would cause significant delay in and harm the Debtors' enterprise value and creditors by extension.

iv.    The Exclusivity Motion

On January 29, 2024, the Petitioning Creditors filed the *Motion of the Petitioning Creditors to Terminate the Debtors' Exclusivity Period* [Dkt. No. 384] (the "Exclusivity Motion") seeking to terminate the remainder of the Debtors' exclusive period to solicit the Original Plan, which period would end on March 25, 2024. Pursuant to the Exclusivity Motion, the Petitioning Creditors asserted that they "stand ready to immediately file and fund a value maximizing plan…" that purportedly provided for meaningfully higher recoveries. The Exclusivity Motion was set to be heard on February 21, 2024. The Exclusivity Motion was subsequently joined by the Exchange Note Trustee [Dkt No. 419] and supported by the Committee [Dkt. No. 473].  At the Status Conference the Bankruptcy Court provided that the Exclusivity Motion was to be heard at the Evidentiary Hearing.  However, the Debtors made the decision not to seek an extension of their exclusivity period (rendering the Exclusivity Motion moot) to allow the Petitioning Creditors to file their competing plan as a clear and efficient way to adequately market the Shareholder New Value Contribution in the Plan in accordance with Supreme Court precedent.  Allowing the competing plan represented a substantial cost saving to the Debtors' estates allowing the market to directly speak on value, rather than engaging a costly advisor to contrive a marketing process which would prevent other parties with an interest in the estate from actively participating.  The Bankruptcy Court noted that the expiration of exclusivity has facilitated a market testing of the Plan See [Dkt. No. 721] at pgs. 43;48;52.

D.    The Petitioning Creditor Plan and Disclosure Statement

On March 26, 2024, the Petitioning Creditors filed the *Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [Dkt. No. 531] (the "PS Plan") and *Disclosure Statement in Support of Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [Dkt. No. 532] (the "PS

Disclosure Statement"). The PS Plan mirrors the Original Plan in many material respects. Recoveries to parties under the PS Plan will be funded by a rights offering back stopped by Pach Shemen. Pursuant to PS Plan, General Unsecured Creditors and holders of Corp Guarantee Claims, (each as defined in the PS Plan) will be entitled to a selection of either pro rata cash from a $12,500,000 pool or pro rata distribution of equity of the Reorganized Debtor (each as defined in the PS Plan) as well as a right to participate in a rights offering for up to 68% of the remaining equity value of the Reorganized Debtor. Holders of Convenience Claims (as defined in the PS Plan) will receive payment equal to 10% of their claim up to an aggregate $1,000,000 between all Convenience Claims. Azure Guaranty Claims will receive a pro rata distribution of a $200,000 cash pool. Pach Shemen will be provided a Backstop Premium (as defined in the PS Plan) of 10% of the equity of the Reorganized Debtor effectively ensuring that it will control the Reorganized Debtor. The PS Disclosure Statement is riddled with factual inaccuracies regarding the Debtors' management of these cases and the prepetition period. As set forth in the Debtors' objections to the Trustee Motions, the Debtors' directors have at all times, both prior to and during the Chapter 7 Cases and Chapter 11 Cases, been responsible and prudent directors and have acted in the best interest of the Debtors and their legitimate creditors.

On May 10, 2024, the Petitioning Creditors filed the *Notice of Filing of (1) Anticipated Modifications to the Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and Its Affiliated Debtors and (2) Certain Appendices Related to the Petitioning Creditors' Disclosure Statement Related Thereto* [Dkt. No. 658] (the "PS DS Notice"). Pursuant to the PS DS Notice, the Petitioning Creditors amended the PS Plan to reduce the subscription rights of the rights offering and to increase payments to General Unsecured Creditors and Convenience Class creditors. The PS Plan as amended also modified the classification system used by the previous version of the PS Plan.

At the Initial Disclosure Statement Hearing the Bankruptcy Court indicated an intention to conditionally approve the PS Disclosure Statement as amended. Notwithstanding this intention the Bankruptcy Court did not authorize the solicitation of the PS Plan. Rather, the Bankruptcy Court directed the Debtors to modify the previous iteration of the Plan to address the comments provided on the record and file a new Plan, and directed the Debtors and Petitioning Creditors to discuss the procedures for the joint solicitation of the Plan and the PS Plan.

## VII. ORDERLY DISTRIBUTION OF ASSETS

The purpose of these Chapter 11 Cases is to effectuate an orderly disposition of the assets of the Debtors to holders of Allowed Claims. Accordingly, in consultation with their advisors and the Independent Committee, the Debtors formulated and implemented a strategy to identify and transfer certain potential and actual causes of action owned by the Debtors to a Litigation Trust for the pursuit and/or settlement and ultimate liquidation of said causes of action for distribution to the Debtors' noteholders. In addition to the transfer of causes of action, the members of Debtor Eletson Holdings will provide, or cause to be provided, a cash contribution in the amount of $30 million and rights to 75% of all net cash recoveries against Levona for payment of allowed administrative expenses, distributions to the Debtors' remaining creditors, and funding of the Litigation Trust created to pursue the causes of action transferred to the Litigation Trust. The results of such strategy are discussed below.

Eletson Holdings is a holding company.  The Debtors historically have not held cash or other liquid assets and their value has historically been derived from the equity interests of their subsidiaries. The Reorganized Debtor will remain a holding company after confirmation of the Plan and will not have future "operations" that require liquidity.  Cash from the Shareholder New Value Contribution is sufficient capitalization to satisfy all Chapter 11 related administrative claims and all pre-Effective Date claims treated through the Plan. Additional capitalization at the Reorganized Debtor is not required.

All distributions made pursuant to the Plan will be derived from the Plan Consideration. The Plan Consideration consists of four sources of consideration:

- The Shareholder New Value Contribution, which is comprised of a $30 million contribution of cash and cash equivalents, and the Collection Contributions, which consists of approximately seventy-five percent (75%) of the Gas Ownership Defendants' collections against Levona as a result of the Arbitration and the District Court Order net the costs of collection;

- The SME Revenue, which is comprised of any excess cash on hand of each of the SMEs existing as of the Effective Date after subtracting therefrom (i) any amounts, as necessary to satisfy the projected operating expenses of the SMEs not otherwise reasonably expected to be satisfied by anticipated revenues of the SMEs (on a consolidated basis) through the SME Revenue Period; and (ii) $250,000 (on a consolidated basis); and

- The Excess SME Proceeds which consist of future cash contributions of the Reorganized Debtor to the Litigation Trust during the Excess SME Proceeds Period of the aggregate of (i) 20% the consolidated excess cash flow (calculated on a semi-annual basis) of the consolidated operating revenues of the SMEs less the consolidated operating expenses and debt service for the previous six month period and (ii) 25% of the Excess SME Sale Proceeds, which are  the gross proceeds from the sale of any SME and/or SME Vessel less said SME's existing debt (including any unpaid obligations under the terms of the applicable bareboat charter and any trade obligations applicable to the operation of such SME Vessel which were incurred but not paid prior to the sale closing date); *provided however*, the aggregate Excess SME Proceeds shall not exceed $10 million.

- The Retained Causes of Action Contribution which consists of 75% of the net cash recoveries on account of Retained Causes of Action, where "net cash recoveries" means cash actually collected under any Retained Causes of Action net of costs of collection incurred by the Reorganized Debtor and net of any amounts setoff by the Reorganized Debtor for amounts owed to any defendant under a Retained Cause of Action.

The distributions a Creditor will receive pursuant to the Plan are dependent on the Class said Creditor is placed into.  The Plan groups substantially similar claims and was established to ensure that parties with similar claims were adequately represented.

The Debtors classified guaranty classes separately given the differences in the underlying obligations of the guaranty classes. The Debtors believe that this classification is reasonable given the nature of the different claims against different legal subsidiaries. Likewise, the Debtors believe that categorizing the OCM Guaranty Claims and the Corp Guaranty Claims separately – but nonetheless providing them the same treatment is not an impropriety.

While the Plan contemplates the reinstatement of these guaranty claims, the Debtors fully expect that the direct creditor subsidiaries have sufficient financial wherewithal to adequately address their direct obligations and do not foresee any significant liability to the Reorganized Debtor on account of such guaranty liability. Nonetheless, as set forth in the Valuation Analysis, the Debtors estimate the enterprise value of the Reorganized Debtor will be approximately $30 million. Given this enterprise value, the Reorganized Debtor will be able to sufficiently address any post-Effective Date guaranty liability.

Trade Creditors and Holders of Azure Guaranty Claims will receive payment on account of their Allowed Claims from the Shareholder New Value Contribution.

Trade Creditors are disclosed in the Debtors' Schedules of Assets and Liabilities (See Schedule E/F [Dkt. Nos. 216, 218, 220]) as those claims who are listed as not disputed or contingent. The Debtors created the Trade Creditor Class as a "convenience" class to ensure all creditors were adequately represented and provides a mechanism for other Creditors to receive an immediate cash payout rather than deal with Litigation Trust Interests. Notably, in the possibility that it is later determined that there are no Trade Creditors, the Plan provides for the elimination of Vacant Classes and the Trade Creditor Reserve will become Distributable Cash transferred to the Litigation Trust.

Class 6B consists solely of the Claims of Levona, Pach Shemen, Alpine Partners and VR Global. As stated herein in Article IV generally, and for the reasons asserted in the various claim objections provided in Article IV.A.4, the Debtors believe that the claims of members of Class 6B are illegitimate, and otherwise were procured in bad faith and therefore should be equitably subordinated. As a result, rather than dilute the distributions of legitimate creditors, the Debtors believed it was in the best interest of all parties to bifurcate the class. Further, in the event the Class 6B claims are Allowed and not subordinated, they will be treated identically with Class 6A claims.

Distributions to Class 6A and potentially Class 6B will be made through the Litigation Trust. The Litigation Trust will be funded by the (i) Distributable Cash, (ii) Collection Contributions, (iii) Excess SME Proceeds and (iv) Litigation Trust Causes of Action collectively.

The purpose of the Litigation Trust is to pursue the Litigation Trust Causes of Action and to make distributions to Holders of Allowed Class 6 Claims that elect to receive their pro rata share of Litigation Trust Interests in lieu of the Noteholder Election Recovery. The Litigation Trust will pursue the Litigation Trust Causes of Action for the recovery of value that will ultimately be distributed to Litigation Trust Beneficiaries. Notably, the Litigation Trust Trustee will control the decisions regarding the timing of distributions, as well as the determination of which portions of the Litigation Trust Assets will be used to pursue the Litigation Trust Causes of Action, and which portions will be used to make the distributions to applicable Class 6 Creditors.

The Debtors' Board of Directors undertook an evaluation of the potential Causes of Action known to exist during the Plan formulation period and evaluated which claims would be transferred to the Litigation Trust. In selecting the Causes of Action to be transferred, the Debtors selected Causes of Action that they believe closely align to the circumstances of these Chapter 11 Cases, as well as Causes of Action that parties of interest, namely the Committee and Petitioning Creditors, have asserted the Debtors should have pursued. The Debtors abided by the creditors' request in determining which Causes of Action would be transferred to the Litigation Trust and become Litigation Trust Causes of Action. The Debtors believe all the Litigation Trust Causes of Action transferred have meaningful value. In fact, the Debtors have even taken steps to negotiate and evidence a settlement of the claims against the Eletson Gas Defendants – which the Debtors believe are subject to substantial defenses and are meritless and have no value. Notably, the Litigation Trust Causes of Action are generally grouped by category and not individual claims thereby creating a broad class of Litigation Trust Causes of Action. The Debtors understand that the Unknown Causes of Action may exist and have created an affirmative duty under the Plan to notify the Litigation Trust upon the discovery of an Unknown Cause of Action. Further the Bankruptcy Court will retain jurisdiction to determine if any Unknown Cause of Action should be held by the Reorganized Debtor or the Litigation Trust, ensuring a neutral determination is made regarding the ownership of such Unknown Cause of Action.

The Litigation Trust will pursue the Litigation Trust Causes of Action in accordance with the terms of Litigation Trust Agreement. The Litigation Trust is subject to the Administrative Budget and will use the Administrative Fund to pursue the Litigation Trust Causes of Action. The Debtors believe in their reasonable business judgment that the proposed $100,000 Administrative Fund for the prosecution of Litigation Trust Causes of Action is sufficient to initiate litigation against the counterparties in the Litigation Trust Causes of Action. Further the Administrative Budget (which includes the Administrative Fund) is to be determined with the input of the Committee who will be appointing the Litigation Trust Trustee. Therefore, the Debtors believe that the Administrative Budget ultimately determined will be sufficient to ensure adequate operation of the Litigation Trust and provide funding additional funding of the Administrative Fund as necessary. As the Litigation Trust Causes of Action will be transferred with the Litigation Trust Privileges, the Debtors believe that a significant amount of the evaluation and work to bring the Litigation Trust Causes of Action has already been undertaken, and there will not be significant additional costs necessary in preparing the Litigation Trust Causes of Action to be pursued by the Litigation Trust.

## VIII.   THE PLAN

### A.   Overview of Chapter 11

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a Chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the

plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order satisfies any debt of the debtor that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan, to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL, TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.    Purpose of the Plan

The purpose of the Plan is to satisfy the Debtors' outstanding obligations through the distribution of (i) a new money contribution provided by the Eletson Holdings Members; (ii) a sharing of the excess cash flow and excess sale proceeds from the SMEs which will be owned by the Reorganized Debtor and (iii) the liquidation and distribution of the proceeds of valuable Causes of Action belonging to the Debtors. After payment of Administrative Expenses and funding of the reserves called for in the Plan, the Debtors' remaining creditors entitled to recovery under the Plan will receive their applicable distribution from the Plan Consideration as set forth above. One of the additional components of the Debtors' plan is the transfer of certain of the Debtors' causes of action to a Litigation Trust established in accordance with the Plan. The Litigation Trust will be managed by the Litigation Trust Trustee who will have two primary roles. First, the Litigation Trustee will ensure disbursement of cash accumulated or contributed to the Litigation Trust from the Distributable Cash (i.e., remaining cash from the Shareholder New Value Contribution (not otherwise spent in making reserves/effective date payments) and from excess cash on hand at the SMEs) and from future amounts contributed through the sharing of excess cash flows and sale proceeds related to the SMEs or the SME Vessels from the Reorganized Debtor. The Litigation Trust will also disburse the Collections Contribution from litigation against Levona. In addition, the Litigation Trust, subject to the oversight of the Litigation Trust Oversight Committee, may initiate, pursue, and otherwise liquidate the value of the Litigation Trust Causes of Action for the benefit of Holders of Claims in Class 6A who elect to receive Litigation Trust Interests.

The Debtors' Plan has a number of features which benefit the Holders of Class 6A Claims (i.e., certain Old Noteholders and Exchange Noteholders). First, the Plan contemplates the subordination of the Holders of Claims in Class 6B for their bad acts which damaged the Debtors and their affiliates. Second, the Plan permits holders of Class 6A to elect to be treated in Class 5 receive a "cash out option" through the "Noteholder Election Recovery" (which is a one-time payment, allowing creditors who are not interested in a longer collection period to receive an immediate distribution on the Effective Date).

For those Class 6A creditors electing to receive Litigation Trust Units, the Debtor's Plan provides a substantial, immediate cash recovery and the potential for substantial additional recoveries in the future. First, the Debtors anticipate approximately $8.2 million in Cash to be provided to the Litigation Trust on the Effective Date which will result in an immediate cash distribution. Second, because of the sharing of the Excess SME Proceeds on a bi-annual basis, additional recoveries from future operations of the SMEs is being provided to the holders of Class

- 55 -

6A Claims. The Debtors anticipate approximately $10 million in additional Cash to be provided to the Litigation Trust after Effective Date which will result in additional cash distributions. The Debtors have confidence in the expected contributions from the Excess SME Proceeds because, as the strong operational stewards of the SMEs, historical confidence they have from the customers and stakeholders, and the strength of their projections, the Excess SME Revenues pose a real and substantial additional recovery to Class 6A creditors. Third, the Debtors expect that a substantial sharing from Collections Contributions because the Debtors estimate the expected value of the Final Award to be in excess of approximately $90 million, which, if realized, and net of collection and awarded-legal expenses and required set-offs, could provide creditors in excess of an additional $50 million. Fourth, and finally, the Litigation Trust Trustee may pursue and collect on account of any of the Litigation Trust Causes of Action.

For purposes of this Disclosure Statement, the term Holder refers to the holder of a Claim or Interest in a particular Class under the Plan. If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect of certain Classes of Claims as provided in the Plan.

The cash portion of the Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims and the Committee Professional Fee Claims including the funding any reserves on account of the Professional Fee Claims required by the terms of the Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Trade Creditor Claim Reserve; and *fifth*, to fund the Noteholder Election Recovery Reserve. All remaining cash portions of the Shareholder New Value Contribution shall be deemed Distributable Cash.

C.    Classification and Treatment of Claims

1.    Classification and Treatment of Claims and Interests

a.    Unclassified Claims

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for the purposes of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article II.B of the Plan.

i.    Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims)

The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims, DIP Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Disbursing Agent. Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee

under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date. All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees.

ii.    Professional Fee Claims and Committee Professional Fee Claims

Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date. Prior to the Effective Date the Debtors may pay any Committee Professional Fees, which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date. From and after the Effective Date, the Disbursing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case.

On the Effective Date, any objections previously filed to any applications for payment of the Professional Fees shall be deemed withdrawn (with prejudice) on the Effective Date. Further, after the occurrence of the Effective Date, neither the Debtors, the Disbursing Agent, the Reorganized Debtor, the Litigation Trust, Litigation Trust Trustee nor the Litigation Trust Oversight Committee shall assert any objection to any Committee Professional Fee Claims.

Any final application for allowance of a Professional Fee Claims and Committee Professional Fee Claims for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, counsel for the Litigation Trust, the Litigation Trust Trustee and on the United States Trustee at the addresses listed in Article XI.L of the Plan so that it is received no later than forty-five (45) days after the Effective Date. In the event an application for allowance of a Professional Fee Claims and Committee Professional Fee Claims is not filed by the appropriate date, such Professional Fee Claims and Committee Professional Fee Claims shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trust Trustee and their successors, their assigns or their Assets. Allowed Professional Fee Claims and Committee Professional Fee Claims must be paid in full (subject to the limitation on the Committee Professional Fees in paragraph above) and Professional Fee Claims and Committee Professional Fee Claims pending allowance by the Bankruptcy Court must be reserved for in full prior to any payment to Holders of Allowed Claims in (a) Class 3 (Azure Guaranty Claims), (b) Class 4 (Trade Creditor Claims); (c) Class 5 (Noteholder Election Recovery Claims), (c) Class 6A (Non-Petitioning Creditor Exchange Note Claims); and (d) Class 6B (Petitioning Creditor Exchange Note Claims).

### iii.  DIP Claims

As of the Effective Date, the DIP Claims, if any, shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Documents, including principal, interest, fees and expenses.

Except to the extent that the Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, each such holder of an Allowed DIP Claim shall receive payment in full in Cash of such Holders Allowed DIP Claim on the Effective Date.

Immediately upon receipt of the payments set forth in this section, the DIP Documents shall be deemed cancelled.  The DIP Agent and DIP Lenders shall take all actions to effectuate and confirm such termination and discharge as reasonably requested by the Debtors or Reorganized Debtor as applicable.

### iv.  Administrative Claim and Substantial Contribution Claim Filing Deadline

Each Holder of an Administrative Claim (excluding Professional Fee Claims and Committee Professional Fee Claims that are not a substantial contribution claim) must file an Administrative Claim Request with the Bankruptcy Court prior to the Administrative Bar Date.

### b.  Classified Claims

*Class 1: OCM Guaranty Claims (Impaired)*

*Classification*: Class 1 consists of all Allowed OCM Guaranty Claims.

*Treatment*: The OCM Guaranty Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees.

*Voting*: Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

*Class 2: Corp Guarantee Claims (Impaired)*

*Classification*: Class 2 consists of all Corp Guaranty Claims.

*Treatment*: The Corp Guaranty Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, (i) each holder of an Allowed Corp Guaranty

Claim shall receive its pro rata distribution of the Eletson Corporation Guaranty Recovery and (ii) each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.

*Voting*: Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

*Class 3:  Azure Guaranty Claims (Impaired)*

*Classification*: Class 3 consists of the Azure Guaranty Claims.

*Treatment*: The Azure Guaranty Claims are Allowed Claims.  Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Disbursing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.

*Voting*: Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

*Class 4: Trade Creditor Claims (Impaired)*

*Classification*: Class 4 consists of the Trade Creditor Claims.

*Treatment:*  The Trade Creditor Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, each Holder of an Allowed Trade Creditor Claim shall receive, in exchange for such Allowed Trade Creditor Claim, Cash in an amount equal to 15% of the face amount of such Holder's Trade Creditor Claim from the Trade Creditor Reserve; *provided*, that in the event the aggregate distributions to Holders of Trade Creditor Claims exceeds the Trade Creditor Claim Cap, Holders of Trade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap.

*Voting*: Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

*Class 5: Noteholder Election Recovery Claims (Impaired)*

*Classification*: Class 5 consists of all Allowed Noteholder Election Recovery Claims.

*Treatment*: The Noteholder Election Recovery Claims are Allowed Claims. Claims may only be treated as Noteholder Election Recovery Claims upon the affirmative and irrevocable election of a Holder of a Claim classified in Class 6A or 6B to have their Claim treated in Class 5. Except to the extent that a Holder of an Allowed Noteholder Election Recovery Claim agrees to less favorable treatment, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Noteholder Election Recovery Claims each Holder of an Allowed Noteholder Election Recovery Claim shall receive in full settlement, release, and satisfaction of such Noteholder Election Recovery Claim that is due and payable from the Noteholder Election Recovery Reserve, the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000.

*Voting*: Class 5 is Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

*Class 6A: Non-Petitioning Creditor Note Claims (Impaired)*

*Classification*: Class 6A consists of all Allowed Non-Petitioning Creditor Exchange Note Claims and Old Note Claims.

*Treatment*: The Non-Petitioning Creditor Note Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6A Claim shall receive in full settlement, release, and satisfaction of such Allowed Class 6A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of the Plan.

*Voting*: Class 6A is Impaired and Holders of Class 6A Claims are entitled to vote to accept or reject the Plan.

*Class 6B: Petitioning Creditor Exchange Note Claims (Impaired)*

*Classification*: Class 6B consists of all Allowed Petitioning Creditor Exchange Note Claims.

*Treatment*: The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.  To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all Claims in Class 6A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 6A Non-Petitioning Creditor Exchange Note Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6B Claim shall receive in full settlement, release, and satisfaction of such Allowed Class 6B Claim

that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of the Plan.

Notwithstanding the foregoing if the Bankruptcy Court determines it is unable to equitably subordinate the claims of Holders of Class 6B Claims in the Confirmation Order, Holders of Class 6B Claims will be deemed to hold claims under Class 6A and will be entitled to their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of the Plan.

*Voting*: Class 6B is Impaired and Holders of Class 6B Claims are entitled to vote to accept or reject the Plan.

*Class 7: Interests (Impaired)*

*Classification*: Class 7 consists of all Interests.

*Treatment*: On the Effective Date, all Interests shall be discharged, cancelled, released, and extinguished. In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of Reorganized Holdings in a pro rata amount equal to their portion of the Shareholder New Value Contribution made.

*Voting*: Class 7 is Impaired, and Holders of Interests are entitled to vote to accept or reject the Plan.

    D.    <u>Acceptance and Rejection of the Plan</u>

    1.    <u>Voting Classes</u>

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on the Plan, Holders of Claims in Class 1 (OCM Guaranty Claims), Class 2 (Corp Guaranty Claims) Class 3 (Azure Guaranty Claims), Class 4 (Trade Creditor Claims), Class 5 (Noteholder Election Recovery Claims), Class 6A (Non-Petitioning Creditor Exchange Note Claims), Class 6B (Petitioning Creditor Exchange Note Claims) and Class 7 (Interests) shall be entitled to vote to accept or reject the Plan.

    2.    <u>Classes Presumed to Accept the Plan</u>

There are no Unimpaired Classes, and no class is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

    3.    <u>Acceptance by Impaired Classes</u>

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the

Bankruptcy Code) of more than one-half in number of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan.

4.    Elimination of Vacant Classes; Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

5.    Non-Consensual Confirmation

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code.  The Debtors reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XI.K of the Plan.

6.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.    Means for Implementation of the Plan

1.    Implementation of the Plan and Sources of Consideration for Plan Distributions

The Debtors and Reorganized Debtor as applicable will fund distributions and other sources and uses contemplated by the Plan with the Plan Consideration and the transfer and assignment of the Litigation Trust Assets to the Litigation Trust.

a.    The Shareholder New Value Contribution

The Debtors propose to implement and consummate the Plan on and after the Effective Date. Within ten (10) Business Days of entry of the Confirmation Order, the Eletson Holdings Members shall contribute, or cause to be contributed, to Eletson Holdings the full amount of the cash portion of the Shareholder New Value Contribution which shall be a contribution of Cash and cash equivalents in a total aggregate value of $30 million dollars.

The cash portion of the Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims (if any) and the Committee Professional Fee Claims including the funding any reserves on account of the Professional Fee Claims and Committee Professional Fee Claims required by the terms of the Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N of the Plan; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Eletson Corporation Guaranty Recovery, *fifth*, to fund the Trade Creditor Claim Reserve; and *sixth*, to fund the Noteholder Election Recovery Reserve.

The Collections Contribution constitutes an additional portion of the Shareholder New Value Contribution, and the Eletson Members shall cause the applicable Gas Ownership Defendant to direct the applicable portion of the Collections Contribution to the Litigation Trust within thirty (30) days of the receipt of a final, non-appealable, determination payment in satisfaction of the Arbitration Award.

### b.    Distributable Cash

Immediately upon the satisfaction of the payments provided for in Article IV A.1, the remaining cash portion of the Shareholder New Value Contribution shall become Distributable Cash along which shall be transferred to the Litigation Trust in accordance with the terms of the Plan and the Litigation Trust Agreement. Distributable Cash shall also include the SME Revenue and transferred to the Litigation Trust as set out in the Litigation Trust Agreement.

### c.    Excess SME Proceeds

Beginning on January 31, 2025, and on July 31 and January 31 of each subsequent calendar year during the SME Excess Proceeds Period, the Reorganized Debtor shall transfer any SME Excess Proceeds for the immediately preceding six-month period to the Litigation Trust in accordance with the instructions provided to the Reorganized Debtor by the Litigation Trust Trustee. On each payment date the SME Excess Proceeds paid, shall be accompanied with a reasonable accounting supporting the amounts of the Excess SME Proceeds transferred to the Litigation Trust.

Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the operation and/or management of the SMEs after the Effective Date, during the Excess SME Revenue Period or otherwise. The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee upon the execution of any letter of intent or other similar pre-sale documents entered into by the Reorganized Debtor and any potential purchaser of the SME and/or SME Vessels within ten (10) Business Days of execution of such document. In the event a sale is ultimately consummated, the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the consummation of such sale. The Litigation Trust shall have no right to direct, comment or impede any sale of any SME and/or SME Vessel by the Reorganized Debtor. The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of any contract of sale, and are provided with no additional rights and/or standing to object to the terms of any sale of any SME or SME Vessel pursuant to the terms of the Plan. For the avoidance of doubt the Reorganized Debtor is not required to consummate any sale of the SMEs or SME Vessels during the Excess SME Proceeds Period.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period.

Upon the earlier of (i) the expiration of the Excess SME Proceeds Period or (ii) the Litigation Trust having received Excess SME Cash Flow Proceeds of $5 million in the aggregate and Excess SME Sale Proceeds of $5 million in the aggregate, the obligations of the Reorganized Debtor related to the Excess SME Proceeds hereunder, and any reporting obligations to the Litigation Trust related thereto shall cease, and the Reorganized Debtor shall have no further obligations related to the Excess SME Proceeds, and the Litigation Trust shall have no right or claim to any further Excess SME Proceeds.  In the event the Excess SME Proceeds transferred to the Litigation Trust exceed (i) $5 million in the aggregate on account of the Excess SME Cash Flow Proceeds or (ii) $5 million in the aggregate on account of the Excess SME Sale Proceeds, the Litigation Trust shall within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, refund the Reorganized Debtor the portion of the actually paid Excess SME Proceeds exceeding the thresholds in clauses (i) and (ii) above in accordance with the instructions provided to the Litigation Trust by the Reorganized Debtor.

d.    Litigation Trust Causes of Action

On the Effective Date the Debtors shall fully and finally transfer and or assign each of the Litigation Trust Causes of Action and the applicable Litigation Trust Privileges to the Litigation Trust.

Litigation Trust Distributable Proceeds will be obtained from the Distributable Cash, the Litigation Trust Causes of Action, and Plan Consideration as applicable.  Unless otherwise specified herein, Cash payments to be made pursuant to the Plan will be made by the applicable Disbursing Agent.

2.    Substantive Consolidation

a.    Order Granting Plan Consolidation

Unless and to the extent previously approved by a prior order of the Bankruptcy Court, at the Confirmation Hearing, the Bankruptcy Court will consider approval under the Plan of the Plan Consolidation.

b.    Plan Consolidation

The Consolidating Debtors are holding companies that were formed for the express purpose of issuing the Exchange Notes. Pursuant to the Exchange Notes Indenture, the Consolidating Debtors are prohibited from holding or maintaining any assets.  As the Exchange Notes and the claims related thereto will be discharged after the confirmation of these Chapter 11 Cases, the Debtors maintain there is no reason for the continued existence of the Consolidating Debtors.  As such, the Consolidating Debtors will be consolidated into the Reorganized Debtor for the convenience of all parties, and with no impact to any operations, distributions, assets or rights of any party in interest or the Reorganized Debtor.

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be on Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of this section shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been affected.  This compromise and settlement are in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.      Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtor Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall be deemed to merge with and into the Reorganized Debtor, with the Reorganized Debtor being the sole surviving entity and the separate existence of the Consolidating Debtors shall cease and only the Reorganized Debtor shall continue to exist and as a separate corporation, with all the powers of a corporation pursuant to the applicable Liberian law and pursuant to the respective certificate of incorporation and bylaws in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

4.      Vesting of Assets in the Reorganized Debtor

Except for the Litigation Trust Causes of Action and Plan Consideration as applicable as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Litigation Trust Agreement), on the Effective Date, pursuant to the Plan all property in each Estate and any property acquired by any of the Debtors, including Intercompany Interests held by the Debtors in non-Debtor subsidiaries, shall revest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.      Dissolution of the Committee

Upon the Effective Date, the Committee shall dissolve automatically whereupon its members, Committee Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Committee Professional Fee Claims; and (iii) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order.  The Committee members and the Committee Professionals shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

6.      Reorganized Debtor Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtor will file such Reorganized Debtor Organizational Documents as are required to be filed with the applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor Organizational Documents will prohibit the issuance of non-voting equity securities.  After the Effective Date, the Reorganized Debtor may amend and restate the Reorganized Debtor Organizational Documents, and the Reorganized Debtor may file the certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the country of incorporation and the Reorganized Debtor Organizational Documents.

7.      Appointment of Directors and Officers of the Reorganized Debtor

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement the identity and any affiliations of any Person proposed to serve on as a Director or officer of the Reorganized Debtor, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an

- 66 -

"insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

### 8. Creation of Litigation Trust

The Plan contemplates the transfer of the Litigation Trust Assets into the Litigation Trust for distribution of the Litigation Trust Distributable Proceeds to Holders of Litigation Trust Interests.

Prior to the Effective Date, the Debtors and the Litigation Trust Trustee shall execute the Litigation Trust Agreement and the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, which shall be for the benefit of the Litigation Trust Beneficiaries. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to (a) Litigation Trust Interests and (b) the Litigation Trust Expenses as provided for in the Plan and the Litigation Trust Agreement. Also on the Effective Date, subject to, in all respects, the terms of the Litigation Trust Agreement, all Litigation Trust Privileges shall transfer to and vest exclusively in the Litigation Trust.

The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trust Trustee. The powers, rights, and responsibilities of the Litigation Trust Trustee shall be specified in the Litigation Trust Agreement. The Litigation Trust Trustee shall hold and distribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement. Other rights and duties of the Litigation Trust Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

After the Effective Date, the Debtors and the Reorganized Debtor shall have no interest in the Litigation Trust Assets except to the extent set forth in the Plan and the Litigation Trust Agreement. To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtor and the Litigation Trust Trustee or Litigation Trust as applicable shall be deemed to have been designated as a representative of the Reorganized Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtor for the benefit of the Litigation Trust Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed in accordance with the Plan.

The Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Litigation Trust Trustee and to ensure the treatment of the Litigation Trust as a liquidation trust for federal income tax purposes, all consistent with the Plan.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall have no obligation to provide any funds or financing to the Litigation Trust, other than the obligation to contribute the Litigation Trust Assets and the initial funding of the Administrative Fund, and under no circumstances will the expenses of the Litigation Trust be paid or reimbursed by the Debtors or the Reorganized Debtor, as applicable.

The Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that within a period of three (3) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest may extend the term of the Litigation Trust if it is necessary to facilitate or complete the distribution of the Litigation Trust Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Litigation Trust Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidation trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

9.    Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Litigation Trust Trustee will take this position on the Litigation Trust's tax return accordingly. The Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, and (b) a second-step transfer by Litigation Trust Beneficiaries. As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction, and the Debtors or Reorganized Debtor should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust Trustee shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors or Reorganized Debtor, Litigation Trust Trustee, and the Holders of Claims receiving Litigation Trust Interests shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

10.    Liabilities of the Litigation Trust

The liabilities transferred to the Litigation Trust shall include all Litigation Trust Interests and the Litigation Trust Expenses.

In accordance with Article IV.I of the Plan, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust to make the payments required to Litigation Trust Beneficiaries pursuant to the Plan and the Litigation Trust Agreement.

11.   <u>Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee</u>

The Committee shall appoint the Litigation Trust Trustee who shall have the power to administer the Litigation Trust and will be advised by the Litigation Trust Oversight Committee as specified in the Plan and the Litigation Trust Agreement. For the avoidance of doubt the members of the Litigation Trust Oversight Committee will be appointed by the Committee pursuant to the terms of the Litigation Trust Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement and with the consent and approval of the Committee the identity and any affiliations of the Litigation Trust Trustee and any Person proposed to serve on the Litigation Trust Oversight Committee, which appointments shall be confirmed in the Confirmation Order. To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

The Debtors and the Litigation Trust Trustee shall enter into a Litigation Trust Agreement in substantially the form which shall be filed with the Bankruptcy Court with the Plan Supplement. On the Effective Date, and upon the establishment of the Litigation Trust the Litigation Trust Trustee shall succeed in all respects to all of the rights, privileges and immunities of the Debtors in regard to the Litigation Trust Causes of Action and the Litigation Trust Privileges and shall be appointed as the sole party with standing to pursue Litigation Trust Causes of Action on behalf of the Debtors as of the Effective Date. The Litigation Trust Trustee, and his/her successors, shall serve until the earlier of (i) the later to occur of (a) the entry of the Final Decree, (b) the dissolution of the Litigation Trust, and (c) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan; or (ii) the expiration of the term of such Litigation Trust Trustee's employment agreement or such Litigation Trust Trustee's resignation, death, incapacity, removal or termination by the Litigation Trust Oversight Committee pursuant to the Litigation Trust Agreement or order of the Bankruptcy Court. Notwithstanding the foregoing, the Debtor Privileges will not transfer to the Litigation Trust and shall remain solely in the possession of the Debtors or Reorganized Debtor as applicable.

As set forth in the Plan, the pursuit and collection of the Litigation Trust Causes of Action and distribution of the proceeds thereof to the Litigation Trust Beneficiaries shall become the responsibility of the Litigation Trust Trustee who shall thereafter have responsibility for the management, control and operation thereof, and who may use, acquire and dispose of property of the Litigation Trust free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the terms of the Plan and the Litigation Trust Agreement.

Upon creation of the Litigation Trust, the Litigation Trust Trustee shall be the trustee of the Litigation Trust for all purposes and in all respects, with all necessary and appropriate power to act for, on behalf of and in the name of the Litigation Trust.

12.   <u>Cooperation and Privilege</u>

To effectively investigate, prosecute, compromise, and/or settle the Litigation Trust Causes of Action on behalf of the Litigation Trust, the Litigation Trust Trustee and its counsel and

representatives may require reasonable access to documents and information exclusively relating to the Litigation Trust Causes of Action in the possession of the Debtors, the Reorganized Debtor, and/or the Committee.   Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtor) and the Committee's records and information, each of which relating to the Litigation Trust Causes of Action, including electronic records or documents, as further detailed in, and subject in all respects to, the Litigation Trust Agreement.  The Litigation Trust Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Litigation Trust Agreement, the Litigation Trust Privileges, and privileges held by the Committee (if any) shall transfer to and vest exclusively in the Litigation Trust, and that the Reorganized Debtor shall preserve all of the Debtors' records and documents (including all electronic records or documents) exclusively related to the Litigation Trust Causes of Action and Litigation Trust Privileges for the later of a period of three (3) years after the Effective Date or until such later time as the Litigation Trust Trustee notifies the Reorganized Debtor in writing that such records are no longer required to be preserved.

13.    Duties of the Litigation Trust Trustee

In addition to the duties set forth in the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement, and herein, shall have the following duties.

a.    to manage, control and operate the Litigation Trust;

b.    to investigate and, if necessary and appropriate, to prosecute and enforce (or not prosecute or enforce), or to compromise, release or settle any Litigation Trust Causes of Action on behalf of the Estate and the Litigation Trust without further approval of or application to the Bankruptcy Court;

c.    to invest any Cash and the Litigation Trust Assets;

d.    to file any and all reports, pleadings, tax returns and other documents;

e.    to pay any and all distributions required or permitted to be made under the Plan;

f.    to pay out of the Litigation Trust any and all Claims, liabilities, losses, damages, costs and expenses incurred in connection therewith or as a result thereof, including all Post-Confirmation Expenses accruing from and after the Effective Date in accordance with the Administrative Budget;

g.    to employ, supervise and compensate any employees of the Litigation Trust;

h.    to make and file tax returns for the Litigation Trust;

i.    act as the Disbursing Agent to Holders of Class 6A Claims in accordance with the terms of the Plan, and in such capacity shall (i) disburse all Cash held by the Litigation Trust to the Holders of Class 6A Claims in any amount in excess of $1 million over the then current

budgeted needs of the Litigation Trust pursuant to the Administrative Budget within forty-five (45) days of the Effective Date and at least semi-annually thereafter, (ii) within ten (10) Business Days upon receipt of any Excess SME Proceeds disburse to Holders of Class 6A Claims one hundred percent of such Excess SME Proceeds, and (iii) within ten (10) Business Days upon receipt of any portion of the Collections Contribution disburse to Holders of Class 6A Claims one hundred percent of such Collections Contribution;

        j.     to commence and pursue dissolution or winding up of proceedings for the Litigation Trust;

        k.     to file, prosecute, compromise and settle objections to Claims after the Effective Date other than Administrative Claims or Claims seeking administrative allowance;

        l.     to prepare and deliver to the Litigation Trust Oversight Committee for approval the Administrative Budget of the Litigation Trust with respect to each six-month period following the initial Administrative Budget and any amendments or modifications thereto; and

        m.     to request the entry of a Final Decree.

In connection with the execution of his or her duties under the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement and herein, shall be authorized:

        a.     to execute such documents and to take such other actions as are necessary to effectuate the Plan and perform his or her duties as a trustee of the Litigation Trust, including to execute such documents and take such other action on behalf of the Litigation Trust;

        b.     to open, close and manage bank accounts, and to enter into business transactions within or without the ordinary course of business;

        c.     to retain and pay professionals (including the Professionals or the Committee Professionals) or other Persons to assist the Litigation Trust Trustee in the administration of the Litigation Trust, without prior Bankruptcy Court approval;

        d.     to incur any reasonable and necessary expenses (up to the amounts set forth in the Administrative Budget) in the performance of his or her duties as Litigation Trust Trustee;

        e.     to compromise, release or settle any Disputed Claim or Litigation Trust Cause of Action or to sell or dispose of any Litigation Trust Asset; and

        f.     to employ such other procedures, not inconsistent with the Plan, necessary for the Litigation Trust Trustee to perform his or her duties hereunder.

The Litigation Trust Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code (including, without limitation, commencing, prosecuting or settling Litigation Trust Causes of Action and asserting claims, defenses, offsets

and privileges arising from the Litigation Trust Privileges), to the extent not inconsistent with the Plan. In discharging the foregoing responsibilities, the Litigation Trust Trustee shall be entitled to exercise and rely upon his or her business judgment in consultation with the Litigation Trust Oversight Committee. The Litigation Trust Trustee shall not be obligated to take any action or to pursue any Litigation Trust Causes of Action unless justified in his or her reasonable determination by fact and law, nor shall the Litigation Trust Trustee be obligated to take any action that could reasonably cause him or her personal liability. Without limiting the generality of the foregoing, the Litigation Trust Trustee may consider the interests of Holders of Allowed Class 6A Claims and Class 6B Claims in receiving prompt distributions and such other factors as may be reasonable in the exercise of his or her business judgment. Such authorization and benefits shall also extend to any, each and every successor Litigation Trust Trustee, without reservation or limitation.

The Litigation Trust Trustee, at the direction of the Litigation Trust Oversight Committee, may expend the Cash of the Litigation Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during the administration thereof, (b) to pay the respective reasonable administrative expenses (including, but not limited to, any United States Trustee Quarterly Fees, Litigation Trust Trustee fees, professional fees, and taxes imposed on the Litigation Trust), and (c) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.

14.    <u>Post Confirmation Expenses</u>

Prior to the Effective Date, the Debtors shall approve the Administrative Budget for the six (6) month period beginning on the Effective Date for professional fees for services to be rendered to the Litigation Trust, which Administrative Budget may be altered from time to time by the Litigation Trust Trustee with the consent of the Litigation Trust Oversight Committee in accordance with the Litigation Trust Agreement provided that any fees and expenses of professionals retained by the Litigation Trust that have been incurred prior to the date of the modification of the Administrative Budget shall constitute budgeted amounts. The Litigation Trust Oversight Committee shall approve in advance the Litigation Trust Trustee's retention of professionals and their compensation arrangements.

On the Effective Date, the Litigation Trust Trustee shall establish the Administrative Fund. The initial amount of the Administrative Fund shall be based on the Litigation Trust Trustee's good faith estimate of the cost necessary to complete the Litigation Trust's obligations under the Plan and the Litigation Trust Agreement and will include the amount budgeted for the Litigation Trust's professionals provided however, the initial Administrative Fund shall not exceed the amount of $100,000 necessary to commence and/or pursue and Litigation Trust Causes of Action as of the Effective Date. The Litigation Trust shall pay all Litigation Trust Expenses related to carrying out its obligations under the Plan and the Litigation Trust Agreement from the Administrative Fund and, in the Litigation Trust Trustee's discretion, and with approval of the Litigation Trust Oversight Committee, may add additional amounts of Cash held by the Litigation Trust to the Administrative Fund to further the prosecution of the Litigation Trust Causes of Action or for administration and other miscellaneous needs of the Litigation Trust without further notice or motion in accordance with the terms of the Litigation Trust Agreement.

The reasonable and necessary fees and actual and necessary expenses of the Litigation Trust Trustee, the Litigation Trust Oversight Committee and the professionals retained by the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall be paid solely by the Litigation Trust Trustee in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

15.    Liability; Indemnification

Neither the Litigation Trust Trustee nor any member of the Litigation Trust Oversight Committee shall be liable for any act or omission taken or omitted to be taken in his or her capacity as Litigation Trust Trustee or as a member of the Litigation Trust Oversight Committee, as the case may be, other than acts or omissions resulting from the Litigation Trust Trustee's or Litigation Trust Oversight Committee member's willful misconduct, gross negligence or fraud.  The Litigation Trust Trustee and the Litigation Trust Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their respective attorneys, accountants, financial advisors and agents, and the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons other than acts or omissions resulting from the willful misconduct, gross negligence or fraud of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be.

Notwithstanding such authority, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be under any obligation to consult with their respective attorneys, accountants, financial advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, and their respective designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Litigation Trust shall indemnify and hold harmless the Litigation Trust Trustee, the Litigation Trust Oversight Committee and their respective designees and professionals, and all duly designated agents and representatives (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, but not limited to, attorneys' fees and costs) arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect to the performance of the duties of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, or the implementation or administration of the Plan; provided, however, that no such indemnification will be available to such Persons for such actions or

omissions if a court of competent jurisdiction has determined by Final Order that the challenged conduct occurred as a result of willful misconduct, gross negligence or fraud.

16.    Litigation Trust Oversight Committee

On the Effective Date, the Litigation Trust Oversight Committee shall have the duties set forth herein to maximize distributions to Litigation Trust Beneficiaries.  On the Effective Date, the Litigation Trust Oversight Committee shall be entitled to the rights, powers, immunities and privileges of the Committee.

The Litigation Trust Oversight Committee shall have the duty to take actions in accordance with the provisions of the Plan and in furtherance of the execution of the Plan.  Additionally, the Litigation Trust Oversight Committee shall have the following rights and duties:

a.    to approve any release or indemnity in favor of any third party granted or agreed to by the Litigation Trust Trustee;

b.    to authorize the Litigation Trust Trustee to commence any Litigation Trust Cause of Action;

c.    to approve the settlement of any Litigation Trust Cause of Action and to approve any application by the Litigation Trust Trustee for an order in connection with any such settlement;

d.    to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

e.    to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

g.    to monitor distributions to Holders of Litigation Trust Interests;

h.    to take such other actions as it deems necessary and appropriate with respect to the implementation of the Plan;

i.    to approve the Litigation Trust Trustee's retention of professionals;

j.    to remove the Litigation Trust Trustee in accordance with the procedures in the Litigation Trust Agreement; and

k.    to approve the Administrative Budget after the Effective Date.

The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the later to occur of (i) the entry of the Final Decree, (ii) the dissolution of the Litigation Trust,

and (iii) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan.

The Litigation Trust Oversight Committee shall have the right but shall not be required to retain counsel of its choice, and the reasonable and necessary fees and expenses of such counsel shall be paid by the Litigation Trust from the Administrative Fund.  The reasonable and necessary fees and expenses of counsel to the Litigation Trust Oversight Committee shall be paid in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

17.    Good Faith

Each of the Litigation Trust Trustee and Litigation Trust Oversight Committee shall act in good faith in carrying out its duties and responsibilities and use its best efforts to pursue or settle the Litigation Trust Causes of Action and maximize the value of the Litigation Trust Assets and minimize claims against the Litigation Trust.

18.    Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

19.    Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

20.    Issuance of Documents Necessary to Consummate the Plan

On or as soon as practicable after the Effective Date, the Debtors shall execute and deliver such other agreements, documents and instruments, as necessary to effectuate the Plan.

21.    Final Decree

Upon the Litigation Trust Trustee's determination that all Litigation Trust Causes of Action held by the Litigation Trust or the Litigation Trust Trustee, as applicable, have been finally resolved, transferred, or abandoned, the Litigation Trust shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code closing the Chapter 11 Cases.  The Litigation Trust may request the entry of the Final Decree notwithstanding the fact that not all Litigation Trust Assets have been monetized and distributed to Litigation Trust Beneficiaries.

F.    Retained Causes of Action

1.    Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf of the Debtors and the Estates to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all Litigation Trust Causes of Action transferred to the Litigation Trust.

Except as otherwise provided in the Plan, upon the Effective Date and subject to the terms of the Litigation Trust Agreement in accordance with section 1123(b)(3) of the Bankruptcy Code, the Litigation Trust Causes of Action shall vest in the Litigation Trust.  The Litigation Trust Trustee, on behalf of the Litigation Trust, shall retain and may exclusively enforce any and all or Litigation Trust Causes of Action, and commence, pursue and settle the Litigation Trust Causes of Action in accordance with the Plan and the Litigation Trust Agreement as applicable, subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee.  The Litigation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Litigation Trust Causes of Action without the consent or approval of any third party and without any further order of court subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee as required by the Litigation Trust Agreement.

2.    Preservation of Causes of Action

Except as otherwise expressly provided in the Plan, from and after the Effective Date, unless expressly designated as a Litigation Trust Cause of Action, the Reorganized Debtor shall maintain and may litigate or settle any Retained Causes of Action, including recovery or subordination actions under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 or 724 of the Bankruptcy Code or any other Causes of Action or rights to payments or claims that belong to the Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, no other Person may pursue any such Avoidance Actions, recovery or subordination actions or other Causes of Action that belong to the Debtors, Reorganized Debtor or the Litigation Trust as applicable, unless otherwise provided by order of the Bankruptcy Court.

To the extent any Claim or Cause of Action has not independently been reviewed by the Independent Committee and/or otherwise settled prior to the Effective Date, and such Claim or Cause of Action is designated a Litigation Trust Cause of Action, the Litigation Trust Trustee shall perform an independent investigation regarding whether such Litigation Trust Cause of Action, shall be investigated or pursued.  It is possible that there may be other Causes of Action which currently exist or may subsequently arise but relate to facts and circumstances arising prior to the Effective Date that are not set forth herein, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and, as a result, cannot be specifically referred to herein (collectively, the "Unknown Causes of Action").  Within twenty (20) days of the discovery of the facts and circumstances underlying an Unknown Cause of Action, the Independent Committee shall notify the Committee or Litigation Trust Trustee as applicable of the existence of said Unknown Cause of Action, and the Independent Committee and Committee or Litigation Trust Trustee as applicable shall confer and make a determination of whether such Unknown Cause of Action will be transferred to the Litigation Trust as a Litigation Trust Cause of Action. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction over any dispute between the Independent Committee and the Committee or Litigation Trust Trustee as applicable regarding the ownership of a discovered Unknown Cause of Action such that ownership of said discovered Unknown Cause of Action complies with the terms of the Plan.

3.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Cause of Action for later adjudication unless transferred to the Litigation Trust, (including, without limitation, Unknown Causes of Action), and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or other Final Order.  In addition, the Debtors, the Litigation Trust and any successor entities under the Plan as applicable expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from Debtors or a transfer of money or property from the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Litigation Trust, as applicable, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a Proof of Claim against the Debtors in these Bankruptcy Cases; (ii) such Creditor's Proof of Claim has been objected to; (iii) such Creditor's Claim was included in the Debtors' Schedules; or (iv) such Creditor's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

4.    Retained Causes of Action and Retained Causes of Action Contribution

On or before the expiration of any applicable statute of limitation, the Reorganized Debtor may initiate any Retained Causes of Action in any appropriate court of competent jurisdiction. Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the pursuit or settlement of the Retained Causes of Action. Beginning on the six-month anniversary of the Effective Date and every six months thereafter, the Reorganized Debtor shall provide the Litigation Trust and the Litigation Trust Trustee a report on the status of the pursuit of any Retained Causes of Action. The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of any proposed settlement of any Retained Cause of Action. In the event of a successful collection of any Retained Causes of Action the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the collection made thereon. The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of the proceeds of any Retained Causes of Action, and are provided with no additional rights and/or standing to object to the terms of any litigation strategy or proposed settlement of any Retained Causes of Action pursuant to the terms of the Plan. For the avoidance of doubt the Reorganized Debtor is not required to pursue or settle any Retained Causes of Action.

Within ten (10) Business Days of receipt of any Retained Causes of Action Contributions arising from the final, non-appealable prosecution of a Retained Cause of Action or the settlement of a Retained Cause of Action, the Reorganized Debtor shall transfer the applicable Retained Causes of Action Contributions to the Litigation Trust in accordance with the instructions provided by the Litigation Trust Trustee. Each payment of the Retained Causes of Action Contributions paid shall be accompanied with a reasonable accounting supporting the amounts of the Retained Causes of Action Contributions transferred to the Litigation Trust.

Upon the resolution of all Retained Causes of Action any reporting obligations of the Reorganized Debtor to the Litigation Trust regarding the prosecution and/or settlement of any Retained Causes of Action shall cease, and the Reorganized Debtor shall have no further obligations related to the Retained Causes of Action Contributions, and the Litigation Trust shall have no right or claim to any proceeds of any Causes of Action retained by the Debtors. In the event the any Retained Causes of Action Contribution transferred to the Litigation Trust exceed seventy-five percent (75%) of the net cash recoveries of the applicable Retained Cause of Action, within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, the Litigation Trust shall refund the Reorganized Debtor the portion of the actually paid Retained Cause of Action Contributions exceeding net cash recovery threshold set forth in the Plan.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Retained Causes of Actions Contributions, the accounting supporting the Retained Causes of Action Contributions, and the refund of any overpayments of Retained Causes of Action Contributions.

G.    Treatment of Executory Contracts and Unexpired Leases

1.    Rejection of Executory Contracts or Unexpired Leases

On the Effective Date, except for any executory contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, each executory contract that has not previously expired or terminated pursuant to its own terms shall be

deemed rejected pursuant to Bankruptcy Code §§ 365 and 1123, effective as of the Confirmation Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code §§ 365 and 1123 as of the Confirmation Date.

2.      Rejection Damages Bar Date

Except to the extent another Claims Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Bankruptcy Court, and a copy served on counsel for the Debtors and the Litigation Trust Trustee, within fifteen (15) days of the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Reorganized Debtor, the Litigation Trust, the Litigation Trust Trustee, their successors, their assigns or their Assets. Any timely filed Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class 4 (Trade Creditor Claims). Nothing in the Plan extends or modifies any previously applicable Claims Bar Date.

H.      Provisions Governing Distributions

1.      Disbursing Agent

a.      Litigation Trust Trustee as Disbursing Agent for Class 6A Claims and Class 6B Claims

The Reorganized Debtor shall be the Disbursing Agent for any payments made to parties other than creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to the Plan. The Litigation Trust Trustee shall be the Disbursing Agent for creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to Article IV.M.9 of the Plan.

b.      Alternative Disbursing Agent Qualifications

Other than as set forth in the Plan, after the Effective Date no Person other than the Litigation Trust Trustee (or the Reorganized Debtor to the extent any applicable disbursement to be made by the Reorganized Debtor as Disbursing Agent could not be effected on the Effective Date) shall be authorized by the Bankruptcy Court to serve as Disbursing Agent unless and until the Litigation Trust Oversight Committee consents in writing to that Person serving as Disbursing Agent, and that Person (i) executes and files a statement with the Bankruptcy Court agreeing to perform all of the duties of the Disbursing Agent under the Plan, and (ii) consents to the jurisdiction of the Bankruptcy Court in respect to all matters relating to the performance of his or her duties as the Disbursing Agent under the Plan or order of the Bankruptcy Court.

2.      Time and Manner of Distributions

The Disbursing Agent shall make Distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable after the Effective Date, except as otherwise agreed to by the Litigation Trust Oversight Committee or by order of the Bankruptcy Court. The Litigation Trust Trustee as Disbursing Agent shall have the power, subject to Litigation

Trust Oversight Committee consent, to make interim distributions to Litigation Trust Beneficiaries in accordance with the Plan if the Litigation Trust Trustee determines that such interim distributions are warranted and economical. If the Litigation Trust Trustee determines to make interim distributions to Litigation Trust Beneficiaries, the Litigation Trust Trustee will determine the amount to be distributed by taking into account such factors as ongoing expenses and costs, taxes and reserves necessary to provide for the resolution of Litigation Trust Causes of Action. Amounts withheld will be placed in an interest-bearing account approved by the Litigation Trust Oversight Committee, which shall fund ongoing expenses and costs relating to such reserves, including, without limitation, taxes in respect of Litigation Trust Causes of Action, if any.

At the option of the Disbursing Agent, except as otherwise provided in the Plan, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $50.00 will be considered de minimis, and Holders of Allowed Claims that are entitled to any distribution of less than $50.00 will not receive any distribution unless and until the aggregate of such distributions exceed $50.00. Such undistributed funds shall remain with and vest in the Litigation Trust for distribution to other Holders of Allowed Claims.

3.      Interest of Claims

Except as otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

4.      Compliance with Tax Requirements/Allocations

In connection with the Plan, to the extent applicable, the Litigation Trust and Litigation Trust Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

5.      Delivery of Distributions and Undeliverable or Unclaimed Distributions

a.      Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the addresses set forth on the Proof of Claim or Interest filed by such Holder (or at the last known address of such Holder if no motion requesting payment or Proof of Claim or Interest is filed or the Debtors and the Litigation Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Litigation Trust Trustee or the Debtors as applicable after the date of any related Proof of Claim or Interest, or (iii) at the addresses reflected in the Schedules if no

Proof of Claim or Interest has been filed and the Litigation Trust Trustee or the Debtors have not received a written notice of a change of address.

      b.   <u>Undeliverable Distributions</u>

      i.   <u>Holding of Undeliverable Distributions</u>

If any distribution to a Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until notification in writing of such Holder's then-current address is provided. Undeliverable distributions shall be returned and shall remain in the possession of the Litigation Trust until such time as a distribution becomes deliverable. Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Litigation Trust shall make all distributions that become deliverable.

      ii.   <u>Failure to Claim Undeliverable Distributions</u>

Any Holder of an Allowed Claim (irrespective of when a Claim became an Allowed Claim) that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within ninety (90) days after the distribution has been attempted to be made to the Holder of the Allowed Claim shall have its Claim related to such undeliverable distribution satisfied and shall be forever barred from asserting any such Claim against the Litigation Trust or be entitled to a further distribution. In such cases, any Cash held for distribution on account of such Claims shall be the property of the Litigation Trust free of any such Claim. Nothing contained herein shall require the Litigation Trust Trustee or any interested party to attempt to locate any Holder of an Allowed Claim.

      6.   <u>Claims Administration Responsibility</u>

      a.   <u>Reservation of Rights to Object to Claims</u>

Except as provided in Article II.B hereof, for the avoidance of doubt, nothing in this Section F shall affect the rights, if any, of any interested party to object to any Claim or Interest before the Effective Date. Unless a Claim or Interest is expressly described as an Allowed Claim or Interest pursuant to or under the Plan, or otherwise becomes an Allowed Claim or Interest prior to Effective Date, the Debtors reserve any and all objections to any and all Claims and Interests and motions or requests for the payment of Claims or Interests, whether administrative expense, priority, secured or unsecured, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' failure (as applicable) to object to any Claim or Interest in the Chapter 11 Cases shall be without prejudice to the Debtors' rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim or Interest is sought to be enforced by the Holder of such Claim or Interest prior to the Effective Date. .

      b.   <u>Filing of Objections</u>

After the Effective Date, the Reorganized Debtor shall have the sole authority to file objections and otherwise object to all Administrative Claims, and all claims seeking allowance as Administrative Claims, not paid on or prior to the Effective Date.

On the Effective Date, the Litigation Trust and the Litigation Trust Trustee as applicable shall assume the right and obligation to prosecute any Claim Objections (other than Administrative Claims or claims seeking allowance as Administrative Claims) which have not been previously adjudicated prior to the Effective Date. After the Effective Date, the Litigation Trust and Litigation Trust Trustee as applicable shall have the sole authority to file objections and otherwise object to all Claims (other than Administrative Claims or claims seeking allowance as Administrative Claims) which are paid on the Effective Date.

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if service is made by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases. Unless otherwise provided in the Plan or by order of the Bankruptcy Court, any objections to Claims must be filed and served not later than the Objection Deadline.

### c.    Determination of Claims

Any Claim as to which a Proof of Claim or Interests or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim or Interest, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim or Interest filed by the Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim or Interest. Any such Claim or Interest determined to be Allowed, shall be deemed to be an Allowed Claim for such liquidated amount (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) and shall be satisfied in accordance with the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim, right or Cause of Action that the Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. § 157.

### 7.    Procedures for Treating and Resolving Disputed and Contingent Claims or Interests

### a.    No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim or Interest; provided, however, that in the event that only a portion of such Claim or Interest is an Allowed Claim or Interest, the Disbursing Agent may make, in his or her discretion, a distribution

pursuant to the Plan on account of the portion of such Claim or Interest that becomes an Allowed Claim or Interest.

        b.    <u>Claim Estimation</u>

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee, as applicable, may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any.

        8.    <u>Setoffs and Recoupment</u>

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee as applicable may, pursuant to Section 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan any claims or Causes of Action of any nature whatsoever the Debtors, Reorganized Debtor or Litigation Trust, as applicable, may have against the Holder of such Claim; <u>provided</u>, <u>however</u>, that neither the failure to effect such setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, or Litigation Trust as applicable, of any setoff or recoupment the Debtors or Litigation Trust may have against the Holder of such Claim, nor of any other claim or Cause of Action.

        9.    <u>Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code</u>

Allowance and disallowance of Claims shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

        10.    <u>Cancellation of Instruments and Agreements</u>

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, or agreements evidencing, giving rise to or governing any Claim shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be satisfied and the Holders thereof shall have no rights against the Debtors, the Estates, the Reorganized Debtor, the Litigation Trust Trustee, the Litigation Trust Oversight Committee, and/or the Litigation Trust; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

        11.    <u>Withholding Taxes</u>

The Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan.  As a condition to making any distribution under the Plan,

the Disbursing Agent may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the Disbursing Agent may deem necessary to comply with applicable tax reporting and withholding laws.

12.    <u>Reports</u>

From the Effective Date, until a Final Decree is entered, the Litigation Trust Trustee shall submit quarterly reports to the United States Trustee and the Litigation Trust Oversight Committee setting forth all receipts and disbursements of the Litigation Trust as required by the United States Trustee guidelines.

13.    <u>Distribution Record Date</u>

As of the close of business on the applicable Distribution Record Date, the transfer register for all Claims maintained by the Debtors or their agents, shall be closed, and there shall be no further changes in the Record Holders of any such Claims.  Moreover, the Debtors, Reorganized Debtor, Litigation Trust, Litigation Trust Trustee or Litigation Trust Oversight Committee as applicable shall have no obligation to recognize the transfer of any such Claims occurring after the applicable Distribution Record Date and shall be entitled for all purposes herein to recognize and deal only with those Holders of record as of the close of business on the applicable Distribution Record Date.

14.    <u>Timing and Calculation of Amounts to be Distributed</u>

Except as otherwise provided herein, on the Effective Date each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class, provided however, the Litigation Trust shall maintain reserve accounts in trust for the payment or distribution on account of Litigation Trust Beneficiaries and shall make the appropriate adjustments in distributions to adequately take into consideration and fund such reserve accounts.  The Litigation Trust Trustee, as Disbursing Agent, shall be authorized to make interim distributions and any subsequent distributions necessary to distribute any Cash, or other consideration held in any reserve account to the appropriate Claim Holder as Claims are resolved and Allowed and reserves are reduced in accordance with the Plan.

15.    <u>Settlement of Claims and Controversies</u>

Pursuant to Fed. R. Bankr. P. 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of claims and/or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of any such Allowed Claim.

I.    <u>Conditions Precedent to Confirmation and Occurrence of the Effective Date</u>

1.    <u>Conditions Precedent to Confirmation</u>

It shall be a condition to Confirmation hereof that all provisions, terms and conditions of the Plan and the Disclosure Statement are approved in the Confirmation Order.

2.        Conditions Precedent to Confirmation

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions herein:

a.        Fourteen (14) days have passed since the entry of the Confirmation Order as a Final Order in form and substance satisfactory to the Debtors and the Committee in their absolute discretion. The Confirmation Order shall provide that, among other things:

i.        the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and

ii.        the provisions of the Confirmation Order are nonseverable and mutually dependent.

b.        The appointment of the Litigation Trust Trustee shall have been confirmed by the Confirmation Order or order of the Bankruptcy Court.

c.        All actions, documents and agreements necessary to implement the Plan, including, without limitation, creating the Litigation Trust and entering into the Litigation Trust Agreement, shall have been effected or executed.

d.        The Debtors shall have established a reserve for all then outstanding Professional Fee Claims and Committee Professional Fee Claims (as limited by the Plan) as estimated by the Debtors and the Committee on or prior to the Effective Date.

3.        Waiver of Conditions

Except as otherwise required by the tenets of the Plan, the Debtors may waive any of the conditions to Confirmation of the Plan and/or to occurrence of the Effective Date of the Plan set forth in this Article VIII, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

4.        Debtors' Right of Revocation or Withdrawal

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans.  If the Debtors revoke or withdraw the Plan, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document

or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

      J.     <u>Effect of Confirmation</u>

          1.     <u>Injunction</u>

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.**

          2.     <u>Term of Injunctions or Stays</u>

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until**

the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

3.     Exculpation

Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.  Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

4.     Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any holder of such security interest (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state,

**provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

      K.     <u>Retention of Jurisdiction</u>

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code.  Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

      a.     All matters relating to the assumption or rejection or the assumption and assignment of executory contracts, or Claims or disputes relating thereto;

      b.     All matters relating to the ownership of a Claim or Interest;

      c.     All matters relating to the distribution to Holders of Allowed Claims and Interests and to the determination of Claims and Interests;

      d.     Any and all matters involving the Litigation Trust Trustee and/or the Litigation Trust and/or the Litigation Trust Oversight Committee;

      e.     All matters relating to or arising in connection with the disallowance, Allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest;

      f.     To enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

      g.     All matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

      h.     All matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes involving the injunction and exculpation provisions of the Plan, and disputes arising under agreements, documents or instruments executed in connection with the Plan;

      i.     To consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

      j.     All applications for allowance of compensation and reimbursement of Professional Fee Claims under the Plan or under §§ 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

k.      To hear and determine all motions requesting allowance of an Administrative Claim;

l.      To determine requests for the payment of Claims entitled to priority under §507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

m.      All Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets of the Litigation Trust, as successor-in-interest to the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims and Interests, and all controversies and issues arising from or relating to any of the foregoing;

n.      All disputes between the Independent Committee and Committee or Litigation Trust Trustee as applicable regarding the ownership of any discovered Unknown Cause of Action;

o.      All disputes regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period;

p.      All matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

q.      Any other matter to the extent such jurisdiction is consistent with the Bankruptcy Code;

r.      To enter the Final Decree closing the Chapter 11 Case; and

s.      To enforce all orders previously entered by the Bankruptcy Court, including the Confirmation Order.

L.      <u>Miscellaneous Provisions</u>

1.      <u>Effectuating Documents, Further Transactions and Corporation Action</u>

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements of documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states where each of the Debtors are organized without any requirement of further action by the shareholders or directors of any Debtor.

2.      <u>Payment of Statutory Fees</u>

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid, prior to the Effective Date, out of the Assets of the Estate for each quarter (including any fraction thereof) and after the Effective Date by the Litigation Trust until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

3.      <u>Headings</u>

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

4.      <u>Biding Effect of Plan</u>

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, the Litigation Trust and their respective successors or assigns, whether or not the Claim or Interest of such Holders is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the Litigation Trust Trustee and any trustee appointed for the Debtors under Chapters 7 or 11 of the Bankruptcy Code).

5.      <u>Final Order</u>

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors in consultation with the Committee upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

6.      <u>Withholding and Reporting Requirements</u>

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, the Debtors, Litigation Trust and the Litigation Trust Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

7.      <u>Tax Exemption</u>

Pursuant to section 1146 of the Bankruptcy Code, any transfers from the Debtors, the Litigation Trust or the Litigation Trust  Trustee to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of the Debtors' or the Litigation Trust's personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to or by the Litigation

Trust Trustee of the Debtors' or the Litigation Trust's property in implementation of or as contemplated by the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 8.    Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors and the Litigation Trust, corporate governance matters shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles.

### 9.    Severability

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively. Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### 10.    Plan Controls

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement or the Plan Supplement, the provisions of the Plan shall control and take precedence.

### 11.    Amendments and Modifications

The Debtors may alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors in consultation with the Committee may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and pursue such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties-in-interest shall not be required.

12.    <u>Notices</u>

Any notices required under the Plan or any notices or requests of the Debtors or the Litigation Trust Trustee by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtors:

Reed Smith LLP
Attn:  Derek J. Baker, Esq. and Derek M. Osei-Bonsu, Esq.
Three Logan Square
1717 Arch Street Suite 3100
Philadelphia, PA 19146

-and-

Reed Smith LLP
Attn: Ann E. Pille
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606

To the Committee:

Dechert LLP
Attn:  Stephen Zide, Esq and David Herman Esq.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

To the Litigation Trust and the Litigation Trust Trustee:

_____

13.    <u>Filing of Additional Documents</u>

On or before substantial consummation of the Plan, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.    <u>Direction to a Party</u>

From and after the Effective Date, the Debtors, the Litigation Trust or the Litigation Trust Trustee may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to

perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

15.    Successors and Assigns

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

16.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

17.    Further Assurances

The Debtors, Litigation Trust Trustee, and all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

18.    Entire Agreement

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

## IX.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such

payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors, as Plan proponents, will disclose in the Plan Supplement the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as the Litigation Trust Trustee of the Litigation Trust or a member of the Litigation Trust Oversight Committee; and the appointment to such office of such individual is consistent with the interests of Creditors and with public policy; and the Debtors, as Plan proponents, will disclose in the Plan Supplement the identity of any Insider that will be employed or retained by the Litigation Trust or Litigation Trust Oversight Committee, and the nature of any compensation for such Insider.

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests will either have accepted the Plan or will not be Impaired under the Plan. However, the Plan may be confirmed without the approval of Classes 1, 2, 3, 4, 5, 6A, or 6B pursuant to section 1129(b) of the Bankruptcy Code because (1) the Plan does not discriminate unfairly and is fair and equitable; and (2) Holders of any Claim or Interest junior to will only receive or retain any property under the Plan on account of such junior Claim or Interest as a result of the new value provided.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date or prior to the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good faith.

A.     Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Plan is premised on cash payments to certain of the Debtors' creditors and the creation of the Litigation Trust for the pursuit and liquidation of Litigation Trust Causes of Action and the distribution of the Distributable Cash provided to the Litigation Trust to the Debtors' Old Noteholders and Exchange Noteholders. The Debtors believe that there will be sufficient Litigation Trust Assets available to enable the Litigation Trust Trustee to fully and timely perform all obligations described in the Plan and make distributions to creditors, therefore, that the Plan is feasible.

B.     Best Interest Test

1.     Generally

- 94 -

The Bankruptcy Code requires a bankruptcy court to determine that a plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court generally determines the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" consists primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors in these Chapter 11 Cases would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 Case and the Chapter 11 Case. A liquidation under Chapter 7 does not affect the priority of several holders of claims to be paid first. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 Case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself could trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

After estimating the recoveries in liquidation of priority claimants, the bankruptcy court next determines the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the "best interests" of creditors and equity security holders.

2.      Best Interest of Creditors Test

The Debtors believe that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors will be transferring the Litigation Trust Assets to the Litigation Trust for pursuit and distribution amongst the Litigation Trust Beneficiaries, while the Debtors' remaining creditors will receive a distribution derived from the Shareholder New Value Contribution.

The Debtors further believe that, in the event of conversion of the Chapter 11 Cases to cases under Chapter 7, distributions will be reduced by an extra layer of administrative expense created by conversion as well as significantly delayed. In Chapter 7 cases, the Chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee. The Chapter 7 trustee would be entitled to receive such commissions and such fees, even if the Chapter 7 trustee's only tasks are to distribute available Cash. The Debtors believe that it is in the best interests of the Creditors to avoid this additional and unnecessary layer of administrative expenses. It is also anticipated that Chapter 7 liquidations would result in delay in the distributions to Creditors. Among other things, Chapter 7 cases would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to Chapter 7. Fed. R. Bankr. P. 3002(c). Hence, Chapter 7 liquidations would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases. Further, in the event of a Chapter 7 liquidation, the Shareholder New Value Contribution would not be provided by the Eletson Members resulting in an immediate loss of distributable value to Creditors.

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors. The Debtors believe that, if the Plan is not confirmed or is not confirmable, the only likely alternative will be conversion of the Chapter 11 Cases to Chapter 7 liquidations. For the reasons set forth above, the Debtors believe that the Plan is more likely to yield economic benefits to Creditors than Chapter 7 liquidations. The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical Chapter 7 case.

C.    Confirmation Without Acceptance by All Impaired Classes: the "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. A bankruptcy court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

## X.    IMPORTANT CONSIDERATIONS AND RISK FACTORS

### A.    The Debtors have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### B.    No Representations Outside the Disclosure Statement are Authorized

Other than as set forth in this Disclosure Statement, no representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance of the Plan that are not in the Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report such unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

### C.    Information Presented is Based on the Debtors' Books and Records, and no Audit was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

### D.    All Information was Provided by Debtors and was Relied Upon by Professionals

Reed Smith LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Conversion Date as general bankruptcy counsel.  All counsel and other professionals for the Debtors have relied upon information provided by the Debtors in connection with preparation

of this Disclosure Statement.  Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein.

      E.      <u>Projections and Other Forward Looking Statements are Not Assured, and Actual Results will Vary</u>

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

      F.      <u>No Legal or Tax Advice is Provided to You by the Disclosure Statement</u>

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

      G.      <u>No Admissions Made</u>

Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

      H.      <u>No Waiver of Rights Except as Expressly Set Forth in the Plan</u>

A Creditor's vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate Assets, regardless of whether any Claims of the Debtors or their respective Estates are specifically or generally identified herein.

      I.      <u>Bankruptcy Law Risks and Considerations</u>

      1.      <u>Confirmation of the Plan is Not Assured</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate resolicitation of votes.

2.      The Effective Date Might Be Delayed or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order.  In that event, no distributions would be made, and the Holders of Claims and Interests would be restored to their previous position as of the moment before Confirmation, and the Debtors' obligations for Claims and Interests would remain unchanged.

3.      The Projected Value of Estate Assets Might Not be Realized

In conducting their feasibility and best interests test analyses, the Debtors projected the value of the Estates' Assets which would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan.  The Debtors have made certain assumptions, which may prove to be inaccurate.

4.      Allowed Claims in the Various Classes May Exceed Projections

The Debtors have also projected the allowed amount of Claims in each Class in conducting their feasibility and best interests test analyses.  Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

5.      The SME Revenue may fall short of Projections

Actual financial results for the SME Revenue may differ materially from anticipated results.  This may result in lower recoveries of holders of Litigation Trust Interests as there would be less Distributable Cash in the Litigation Trust.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.      Federal Income Tax Consequences of the Plan

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Holders of certain Claims and Interests.  This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof.  These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims or Interests. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers nor does it address tax consequences to Holders of Interests in the Debtors.  In addition, the description does not discuss state, local or non-U.S. tax consequences of the Plan.

1.     Withholding Taxes

The Disbursing Agent will withhold taxes from distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code.  Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding".  Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the Holder is not subject to backup withholding.  Your Ballot contains a place to indicate your TIN.

2.     Federal Income Tax Treatment of the Litigation Trust

For federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations and that such trust be owned by its beneficiaries (i.e., the Holders of Allowed Claims in Class 6A as applicable and Class 6B). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in the assets of the Litigation Trust and then contributed such interests to the Litigation Trust.

3.     Litigation Trust Assets Treated As Owned by Holders of Allowed Class 6A and Class 6B Claims

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trust Trustee, and the Holders of Allowed Claims and Interests) shall treat the transfer of Assets and liabilities to the Litigation Trust, in accordance with the terms of the Plan, as a transfer to Holders of Allowed Class 6A Claims as applicable and Class 6B Claims followed by a transfer by such Holders to the Litigation Trust, and the beneficiaries of the Litigation Trust shall be treated for federal income tax purposes as the grantors and owners thereof.  The beneficiaries of the Litigation Trust shall be Holders of Allowed Class 6A Claims as appliable and Class 6B Claims.

B.     Federal Income Tax Consequences of Payment of Allowed Claims

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's claim is allowed or disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

1.      Recognition of Gain or Loss

        a.      In General

In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, its deduction of the loss may be subject to limitation. The Holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the Holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

        b.      Post-Effective Date Cash Distributions

Because certain Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

        c.      Bad Debt and/or Worthless Securities Deduction

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.      Pending Payments

Cash and other Litigation Trust Assets that the Litigation Trust holds as a pending payment after the Effective Date should be deemed to have been paid to the Holder of the Claim entitled to receive such pending payment on the date that the Litigation Trust received it and to have been contributed by such Holder to the Litigation Trust as a grantor and beneficiary of the Litigation Trust. Thus, the Holder should recognize gain or loss based upon the amount deemed received and contributed to the Litigation Trust on the Effective Date, and any income subsequently realized by the Litigation Trust with respect to such pending payment will be reported by the Litigation Trust

Trustee as income of the grantor-beneficiary in the year realized, prior to the actual distribution of the pending payment to the Holder of the Allowed Claim. The actual receipt of the pending payments from the Litigation Trust will not be a taxable event.

### 3. Payments Other than Pending Payments

If any payment other than a pending payment is to be made out of the Litigation Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed. Any income realized by the prior to such time will be reported by the Litigation Trust Trustee as income of and taxable to the Litigation Trust.

### C. Certain Other Tax Consequences for Holders of Claims

### 1. Receipt of Pre-Effective Date Interest

In general, a Claim Holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest. A Claim Holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. Each Holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purpose

### 2. Installment Method

A Holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

### D. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.

## XII.    EFFECT OF CONFIRMATION

### A. Binding Effect of Confirmation

Confirmation will legally bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted the Plan.

### B. Vesting of Assets Free and Clear of Liens, Claims and Interests

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all Assets and property of the Debtors, and all property of the Estates, including, pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, other than the Litigation Trust Assets as transferred pursuant to the terms of the Plan and the Litigation Trust Agreement, will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests. Thereafter, the Reorganized Debtor will hold these assets without further jurisdiction, restriction or supervision of the Bankruptcy Court, except as may be provided in this Disclosure Statement or the Plan.

C.      Good Faith

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## XIII.   ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) the conversion to Chapter 7 cases; (b) dismissal of the Chapter 11 Cases; or (c) an alternative Chapter 11 plan.

A.      Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Assets of the Debtors for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide each Holder of a Claim entitled to receive a distribution under the Plan with a recovery that is expected to be more than or equal to what it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

B.      Dismissal

Dismissal of the Chapter 11 Cases would allow Creditors to exercise their state law rights. In a dismissal scenario, there will be no equality of distribution and many, if not most, unsecured creditors would not receive any Distribution.

C.      Alternative Plan

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims as proposed under the Debtors' Plan.

## XIV.   CONCLUSION

The Debtors believe that the Plan maximizes recoveries to all Creditors and, thus, is in their best interests. The Plan as structured, among other things, allows Creditors to participate in distributions in excess of those that would be available if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all Creditors.

**THE DEBTORS URGE CREDITORS TO <u>ACCEPT</u> THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS INSTRUCTED**

**ABOVE, BY COUNSEL TO THE DEBTORS BY 5:00 P.M., PREVAILING EASTERN TIME, ON [_].**

Respectfully Submitted,

Eletson Holdings, *et al.*, as Debtors and Debtors-in-Possession


By: /s/ Vasillis E. Kertsikoff
    Name: Vasillis E. Kertsikoff
    Title:  Vice President & Director

**Exhibit 1**

**Second Amended Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Eletson Holdings Inc., *et al.*,[1] | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

---

## SECOND AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

---

**REED SMITH LLP**

Derek J. Baker
Derek Osei-Bonsu
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail: dbaker@reedsmith.com
           dosei-bonsu@reedsmith.com

-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail: abuck@reedsmith.com
           lsolomon@reedsmith.com

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel for the Debtors*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, RESERVATION OF RIGHTS AND DEFINED TERMS ....................................................1

    A.    Rules of Interpretation, Computation of Time and Governing Law ........................1

    B.    Defined Terms ..........................................................................................................2

    C.    Exhibits ...................................................................................................................16

ARTICLE II. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS .........................................................................................................................16

    A.    Classification...........................................................................................................16

    B.    Unclassified Claims: Administrative Claims...........................................................17

            a.    Administrative Claims (other than Professional Fee Claims, DIP Claims or Committee Professional Fee Claims) ...................17

            b.    Professional Fee Claims and Committee Professional Fee Claims ..............................................................................................17

            c.    DIP Claims.............................................................................18

            d.    Administrative Claims and Substantial Contribution Claim Filing Deadline.......................................................................19

    C.    Treatment of Classified Claims ..............................................................................19

            1.    Class 1 — OCM Guaranty Claims...........................................................19

            2.    Class 2 — Corp Guaranty Claims............................................................19

            3.    Class 3 — Azure Guaranty Claims...........................................................20

            4.    Class 4 — Trade Creditor Claims ............................................................20

            5.    Class 5 — Noteholder Election Recovery Claims.....................................20

            6.    Class 6A — Non-Petitioning Creditor Note Claims..................................21

            7.    Class 6B — Petitioning Creditor Exchange Note Claims .........................21

            8.    Class 7 — Interests ..................................................................................22

ARTICLE III. ACCEPTANCE OR REJECTION OF THE PLAN ...............................................22

    A.    Voting Classes ........................................................................................................22

    B.    Classes Presumed to Accept this Plan ....................................................................22

    C.    Acceptance by Impaired Classes .............................................................................22

    D.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes....................................................................................................................23

    E.    Non-Consensual Confirmation ...............................................................................23

    F.    Controversy Concerning Impairment ......................................................................23

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN..........................................23

    A.    Implementation of the Plan and Sources of Consideration for Plan Distributions..........................................................................................................23

        1.    The Shareholder New Value Contribution ................................23

        2.    Distributable Cash......................................................................24

        3.    Excess SME Proceeds ................................................................24

        4.    Litigation Trust Causes of Action .............................................25

    B.    Substantive Consolidation. .......................................................................25

        1.    Order Granting Plan Consolidation ..........................................25

        2.    Plan Consolidation ....................................................................25

    C.    Corporate Existence....................................................................................26

    D.    Vesting of Assets in the Reorganized Debtor ...........................................27

    E.    Dissolution of the Committee.....................................................................27

    F.    Reorganized Debtor Organizational Documents .......................................27

    G.    Appointment of Directors and Officers of The Reorganized Debtor ...................28

    H.    Creation of the Litigation Trust .................................................................28

    I.    Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust ........................................................................................29

    J.    Liabilities of the Litigation Trust...............................................................30

    K.    Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee.....................................................30

    L.    Cooperation and Privilege..........................................................................31

    M.    Duties of the Litigation Trust Trustee........................................................31

    N.    Post Confirmation Expenses.......................................................................33

    O.    Liability; Indemnification ..........................................................................34

    P.    Litigation Trust Oversight Committee.......................................................35

    Q.    Good Faith .................................................................................................36

    R.    Saturday, Sunday or Legal Holiday...........................................................36

    S.    Exemption from Certain Taxes and Fees....................................................36

    T.    Issuance of Documents Necessary to Consummate the Plan.............................37

    U.    Final Decree ...............................................................................................37

ARTICLE V. RETAINED CAUSES OF ACTION ...........................................................37

    A.    Maintenance of Causes of Action ..............................................................37

    B.    Preservation of Causes of Action...............................................................38

- iv -

C.    Preservation of All Causes of Action Not Expressly Settled or Released ............38

D.    Retained Causes of Action and Retained Causes of Action Contribution ............39

ARTICLE VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES40

A.    Rejection of Executory Contracts or Unexpired Leases .......................................40

B.    Rejection Damages Bar Date ................................................................................40

ARTICLE VII. PROVISIONS GOVERNING DISTRIBUTIONS .............................................40

A.    Disbursing Agent ...................................................................................................40

        1.    Litigation Trust Trustee as Disbursing Agent for Class 6A Claims
              and Class 6B Claims ...................................................................................41

        2.    Alternative Disbursing Agent Qualification ...............................................41

B.    Time and Manner of Distributions .........................................................................41

C.    Interest on Claims ..................................................................................................42

D.    Compliance with Tax Requirements/Allocations ...................................................42

E.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........42

        1.    Delivery of Distributions in General ............................................................42

        2.    Undeliverable Distributions .........................................................................42

              a.    Holding of Undeliverable Distributions .............................................42

              b.    Failure to Claim Undeliverable Distributions ...................................42

F.    Claims Administration Responsibility ....................................................................43

        1.    Reservation of Rights to Object to Claims .................................................43

        2.    Filing of Objections ....................................................................................43

        3.    Determination of Claims .............................................................................44

G.    Procedures for Treating and Resolving Disputed and Contingent Claims or
        Interests ...................................................................................................................44

        1.    No Distributions Pending Allowance ..........................................................44

        2.    Claim Estimation ........................................................................................44

H.    Setoffs and Recoupment .......................................................................................44

I.    Allowance and Disallowance of Claims Subject to Section 502 of the
        Bankruptcy Code ....................................................................................................45

J.    Cancellation of Instruments and Agreements ........................................................45

K.    Withholding Taxes .................................................................................................45

L.    Reports ...................................................................................................................45

M.    Distribution Record Date .......................................................................................45

N.    Timing and Calculation of Amounts to be Distributed ..........................................46

O.      Settlement of Claims and Controversies ................................................46

ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND OCCURRENCE
OF THE EFFECTIVE DATE ..........................................................................................46

A.      Conditions Precedent to Confirmation ..................................................46

B.      Conditions Precedent to Occurrence of Effective Date .........................46

C.      Waiver of Conditions ..............................................................................47

D.      Debtors' Right of Revocation or Withdrawal ........................................47

ARTICLE IX. EFFECT OF CONFIRMATION .........................................................................47

A.      Injunction ................................................................................................47

B.      Term of Injunctions or Stays ..................................................................48

C.      Exculpation .............................................................................................48

D.      Release of Liens ......................................................................................49

ARTICLE X. RETENTION OF JURISDICTION .....................................................................49

ARTICLE XI. MISCELLANEOUS PROVISIONS ...................................................................51

A.      Effectuating Documents, Further Transactions and Corporation Action ..............51

B.      Payment of Statutory Fees ......................................................................51

C.      Headings ..................................................................................................51

D.      Binding Effect of Plan ............................................................................52

E.      Final Order ..............................................................................................52

F.      Withholding and Reporting Requirements .............................................52

G.      Tax Exemption ........................................................................................52

H.      Governing Law ........................................................................................53

I.      Severability .............................................................................................53

J.      Plan Controls ...........................................................................................53

K.      Amendments and Modifications .............................................................53

L.      Notices ....................................................................................................53

M.      Filing of Additional Documents .............................................................54

N.      Direction to a Party .................................................................................54

O.      Successors and Assigns ...........................................................................54

P.      Reservation of Rights ..............................................................................55

Q.      Further Assurances ..................................................................................55

R.      Entire Agreement ....................................................................................55

S.      Filing of Additional Documents .............................................................55

## SECOND AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, Eletson Holdings Inc., Eletson Finance (US) LLC and Agathonissos Finance LLC, debtors and debtors-in-possession (collectively and as defined below the "Debtors"), in the above-captioned and numbered case, hereby respectfully propose this Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code.

The Plan effects a restructuring of the Debtors' outstanding obligations owed to its creditor constituencies and is created for the purposes, among others, of making distributions to the Holders of Allowed Claims and Interests, and otherwise restructuring the outstanding obligations of the Estates, all as more fully set forth in this Plan.

### ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, RESERVATION OF RIGHTS AND DEFINED TERMS

A.     *Rules of Interpretation, Computation of Time and Governing Law*

1.     For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.     In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.     Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

Unless the context requires otherwise, the following terms shall have the following meanings when used in capitalized form herein:

1.    "Administrative Bar Date" means the date which is the 30th day after the Effective Date.

2.    "Administrative Budget" means (i) the initial budget for the six-month period following the Effective Date, setting forth in reasonable detail the anticipated Post-Confirmation Expenses of the Litigation Trust, together with any amendments or modifications thereto, as prepared by the Debtors pursuant to Article IV.N of this Plan which shall be determined by the Debtors with the consent of the Committee, which consent shall not be unreasonably withheld, in an amount no less than $[_] which shall be drawn from the Distributable Cash; and (ii) any budget for a subsequent six-month period, setting forth in reasonable detail the anticipated Post-Confirmation Expenses of the Litigation Trust, together with any amendments or modifications thereto, as prepared by the Litigation Trust Trustee and approved by the Litigation Trust Oversight Committee pursuant to Article IV.N of this Plan.

3.    "Administrative Claim" means a Claim for costs and expenses of administration under section 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise; and (c) all fees and charges assessed against the Estates under chapter 123 of Title 28 United States Code, 28 U.S.C. §§ 1911-1930.

4.    "Administrative Fund" means the reserve established for the Post-Confirmation Expenses in accordance with Article IV.N herein, which reserve may be augmented with Litigation Trust Assets by the Litigation Trust Trustee in consultation with and at the direction of the Litigation Trust Oversight Committee; provided, however, on the Effective Date, the initial Administrative Fund shall not exceed the amount of $100,000 necessary to monetize the Litigation Trust Causes of Action as of the Effective Date.

5.    "Allowed Claim" or "Allowed Interest" means, respectively, a Claim or Interest: (i) that has been Scheduled and (a) is not Scheduled as disputed, contingent or unliquidated and (b) as to which no Proof of Claim has been filed; (ii) as to which a timely Proof of Claim has been filed as of the relevant Claims Bar Date to which (x) no objection thereto, or motion to subordinate, disallow or otherwise limit recovery, has been made, and (y) the Litigation Trust Trustee has determined that no objection, or motion to subordinate, disallow or otherwise limit recovery, will be made to such Claim or Interest; (iii) as to which a timely Administrative Claim Request has been filed to which (x) no objection thereto, or application to equitably subordinate or otherwise limit recovery has been made, and (y) the Litigation Trust Trustee has determined that no objection, or application to equitably subordinate or otherwise limit recovery, will be made to such Administrative Claim Request; or (iv) that has been allowed by a Final Order or

pursuant to the terms of this Plan. An Allowed Claim shall not include interest on the amount of any Claim except with respect to an Allowed Secured Claim as permitted by section 506(b) of the Bankruptcy Code or as specifically provided in this Plan, or by Final Order of the Bankruptcy Court. If the Litigation Trust Trustee shall object to any Claim in accordance with section 502(d) of the Bankruptcy Code, such Claim shall not be an Allowed Claim until the avoidable transfer is returned, a Final Order has been entered that no avoidable transfer exists, or an agreement or settlement is reached that is approved by the Bankruptcy Court or pursuant to provisions in the Plan.

6.    "Allowed _____ Claim" or "Allowed _____ Interest" means an Allowed Claim or Allowed Interest, as the case may be, of a specified Class or an Allowed Claim that is an Administrative Claim, Priority Claim, Secured Claim, General Unsecured Claim or Interest, as the case may be.

7.    "Arbitration" means the JAMS Arbitration initiated by Eletson Holdings and Eletson Corp. against Levona Holdings Ltd.

8.    "Arbitration Award" means the award entered in favor of the Petitioners against Levona in the Arbitration.

9.    "Assets" means all assets of the Debtors, of any nature whatsoever, including, without limitation, all property of the Estates under and pursuant to Section 541 of the Bankruptcy Code; Cash; Causes of Action including Avoidance Actions; rights; interests; and property, real and personal, tangible and intangible.

10.    "Avoidance Actions" means those avoidance actions available in these Chapter 11 Cases pursuant to Chapter 5 of the Bankruptcy Code.

11.    "Azure" means collectively Azure Nova Spring Company, Ltd., Azure Nova Summer Company, Ltd., Azure Nova Autumn Company, Ltd. and Azure Nova Winter Company, Ltd.

12.    "Azure Guarantees" means those certain guarantees dated as of August 24, 2017, executed by Eletson Holdings in favor of the obligations of certain Eletson affiliates to Azure.

13.    "Azure Guaranty Claims" means any and all guaranty related Claims arising from the Azure Guarantees.

14.    "Azure Guaranty Recovery" means the lesser of (i) $200,000 and (ii) such other amount as determined by the Debtors and Azure in full and complete settlement, release and satisfaction of the Azure Guaranty Claims.

15.    "Ballots" means the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims and Interests in the Debtors entitled to vote shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

16.    "Bankruptcy Code" means Title 11 of the United States Code, and the applicable portions of Title 28 of the United States Code.

17.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

18.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, Local and Chambers Rules of the Bankruptcy Court.

19.    "Bar Date Order" means the *Order Establishing Deadlines for Filing Proofs of Claim and Claims Related to Gap Period and Approving Form and Manner of Notice Thereof* [D.I. 264].

20.    "Beneficial Holder" means the Person or Entity holding the beneficial interest in a Claim or Interest.

21.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) in New York, York.

22.    "Cash" means cash and cash equivalents in certified or immediately available funds, including, but not limited to, bank deposits, checks and similar items.

23.    "Cause of Action" means, but is not limited to the following: all claims as defined in section 101(5) of the Bankruptcy Code, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, all claims in any avoidance, recovery, inequitable conduct, subordination or other actions against Insiders and/or any other Persons under the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553) of the Debtors, the Debtors in Possession and/or the Estates against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown.

24.    "Chapter 11 Cases" means the chapter 11 bankruptcy cases of the Debtors initiated pursuant to that *Order Converting These Cases to Cases Under Chapter 11* [D.I. 215], jointly administered under the name Eletson Holdings Inc. Case No. 23-10322.

25.    "Claim" means any claim(s) against the Debtors as such term is defined in Bankruptcy Code § 101(5).

26.    "Claim Holder" means the Holder of a Claim.

27.    "Claims Bar Date" means (i) December 18, 2023, and (ii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including governmental units, asserting a Claim against the Debtors, must have filed a Proof of Claim or Administrative Claim Request or be forever barred from asserting such Claim.

28.    "Class" means a category of Claims or Interests as set forth in Article II herein.

29.    "Class 6 Claims" means the aggregate Claims of Class 6A and Class 6B.

30.    "Collections Contribution" means the Gas Ownership Defendants' agreement to contribute and deliver to the Litigation Trust Trustee a one time-cash payment equal to (i) 90% of the first $21 million of net cash recoveries under the Final Award (with the remaining 10% of net cash recoveries being collected by Eletson Corporation on account of amounts awarded to Eletson Corporation under the Final Award); plus (ii) 50% of the next $20 million of net cash recoveries under the Final Award (with the remaining 50% of such of cash recoveries of amounts awarded to Eletson Corporation under the Final Award); plus (iii) 75% of the net cash recoveries in excess of $41 million under the Final Award; provided, however, for purposes of the foregoing, "net cash recoveries" shall mean cash actually collected under the Final Award net of costs of collection incurred by Eletson Corporation and/or the Gas Ownership Defendants and net of any amounts setoff by any Gas Ownership Defendants for amounts owed to Levona).

31.    "Committee" means the Official Committee of Unsecured Creditors as constituted by the Office of United States Trustee in the Chapter 11 Cases.  [D.I. 233.]

32.    "Committee Professionals" means (a) Dechert LLP and (b) any other Person or Entity employed by the Committee pursuant to a Final Order in accordance with sections 327 and 1103 or 363 of the Bankruptcy Code and to be compensated for services rendered or incurred through the Effective Date pursuant to sections 327, 328, 329, 330 and 331 or 363 of the Bankruptcy Code or (c) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code by a Final Order.

33.    "Committee Professional Fees" means all fees and expenses (including, but not limited to, success fees, if any) for services rendered by all Committee Professionals in the Chapter 11 Cases through the Effective Date that the Bankruptcy Court has not denied by Final Order, regardless of whether a fee application has been filed for such fees.

34.    "Committee Professional Fee Claims" means all Committee Professional Fees which remain unpaid as of the Effective Date.

35.    "Confirmation" means the entry of the Confirmation Order.

36.    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rule 5003.

37.    "Confirmation Hearing" means that hearing before the Bankruptcy Court wherein the Debtors seek confirmation of the Plan as provided for in section 1128 of the Bankruptcy Code.

38.    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, and approving the transactions contemplated herein.

39.    "Consolidating Debtors" means collectively Eletson Finance (US) LLC and Agathonissos Finance LLC.

40.    "Conversion Date" means September 25, 2023.

41.     "Corp Guarantees" means an executed guaranty or similar security agreement other than the Azure Guarantees and the OCM Guarantees executed by Eletson Holdings guaranteeing the obligations of Eletson Corporation.

42.     "Corp Guaranty Claims" means any guaranty related Claims arising from the Corp Guarantees.

43.     "Creditor" shall have the meaning in section 101(10) of the Bankruptcy Code.

44.     "Debtors" means collectively Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

45.     "Debtor Privilege" means any attorney-client privilege, work product protection, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) held by the Debtors.

46.     "DIP Agent" means the administrative agent set forth in the DIP Documents.

47.     "DIP Claim" means any Claim in respect of the Debtors' obligations under the DIP Documents, including principal, interests and other fees and expenses owing pursuant to the DIP Documents and in accordance therewith held by or otherwise owed to the DIP Agent and/or DIP Lenders.

48.     "DIP Credit Agreement" means the credit agreement governing the terms and conditions of the postpetition financing facility entered into by the Debtors, DIP Agent and DIP Lenders and approved pursuant to order of the Bankruptcy Court.

49.     "DIP Documents" means the DIP Credit Agreement and related documents.

50.     "DIP Facility" means the postpetition financing facility approved by the Bankruptcy Court pursuant to the DIP Order.

51.     "DIP Lenders" means the lenders under the DIP Credit Agreement and any successors and permitted assigns.

52.     "DIP Order" means the interim or final order, as applicable, entered by the Bankruptcy Court approving the DIP Facility and authorizing the DIP Documents.

53.     "Disallowed Claim" means a Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) is Scheduled as zero or as contingent, disputed or unliquidated and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court, (iii) is not Scheduled and as to which no Proof of Claim or Administrative Claim Request has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (iv) has been withdrawn by agreement of the Debtors or the Litigation Trust Trustee  and the Holder thereof, or (v) has been withdrawn by the Holder thereof.

54.     "Disbursing Agent" means the Litigation Trust Trustee, Reorganized Debtor or third party as applicable in accordance with Article VII.A.

55.     "Disclosure Statement" means the First Amended Disclosure Statement in Support of the Second Amended Joint Plan of Reorganization of Debtors under Chapter 11 of the Bankruptcy Code, dated as of [_], and all exhibits thereto, as amended, supplemented, or modified from time to time, describing the Plan, that is prepared and distributed in accordance with the Bankruptcy Code and approved by the Bankruptcy Court.

56.     "Disclosure Statement Order" means the order approving the Disclosure Statement, which was entered by the Bankruptcy Court on [_], 2024 [D.I._].

57.     "Disputed" means, for purposes of this Plan, any Claim or Interest: (a) listed on the Schedules as unliquidated, disputed or contingent and for which a timely objection has been filed; or (b) as to which any Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules which has not been withdrawn or determined by a Final Order; provided, however, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.

58.     "Distributable Cash" means all remaining Cash or cash equivalents comprising of the Shareholder New Value Contribution after (i) payment of the Allowed Administrative Claims including Professional Fee Claims and Committee Fee Claims, (ii) funding of the Administrative Fund (iii) funding of the Azure Guaranty Recovery, (iv) funding the Eletson Corporation Guaranty Recovery (v) funding the Trade Creditor Claim Reserve, (vi) and funding the Noteholder Recovery Election Reserve.  Notwithstanding the foregoing, (i) any excess amounts remaining in the Trade Creditor Claim Reserve and Noteholder Election Recovery Reserve, if any, after final distributions on account of Allowed Trade Creditor Claims and Noteholder Election Recovery Claims, and (ii) the SME Revenue shall also be deemed Distributable Cash.

59.     "Distribution Record Date" means the Effective Date unless a different date is ordered by the Bankruptcy Court.

60.     "District Court Confirmation Proceedings" means those proceedings before the United States District Court for the Southern District of New York regarding the confirmation of the Arbitration Award issued in the Arbitration.

61.     "Effective Date" means the date selected by the Debtors on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII herein have been (i) satisfied or (ii) waived pursuant to the applicable provisions of this Plan.

62.     "Eletson Corporation" means non-Debtor Eletson Corporation.

63.     "Eletson Corporation Guaranty Recovery" means $1,000,000.00 to be paid Pro Rata to Holders of Corp Guaranty Claims.

64.     "Eletson Gas" means non-Debtor Eletson Gas LLC.

65.     "Eletson Holdings" means Eletson Holdings, Inc.

66.    "Eletson Holdings Members" means the holders of the common shares in Eletson Holdings.

67.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

68.    "Estate" means the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

69.    "Excess SME Cash Flow Proceeds" means the future cash contributions of the Reorganized Debtor to the Litigation Trust during the Excess SME Proceeds Period of 20% of the consolidated excess cash flow (calculated on a semi-annual basis) of the consolidated operating revenues of the SMEs less the consolidated operating expenses for the previous six month period, up to a maximum of $5 million in the aggregate.

70.    "Excess SME Proceeds" means the Excess SME Cash Flow Proceeds and the Excess SME Sale Proceeds.

71.    "Excess SME Proceeds Period" means the earlier of the four-year anniversary of the Effective Date or the date on which the sale of all of the SMEs and/or the SME Vessels has been consummated.

72.    "Excess SME Sale Proceeds" means 20% of the gross proceeds from the sale of any SME and/or SME Vessel less said SME's existing debt (including any unpaid obligations under the terms of the applicable bareboat charter and any trade obligations applicable to the operation of such SME Vessel which were incurred but not paid prior to the sale closing date) up to a maximum of $5 million in the aggregate.

73.    "Exchange Notes" means those certain 9.625% First Preferred Ship Mortgage Notes due 2022 in an original Face Amount of $300 million issued by the Debtors that were exchanged by noteholders pursuant to the that May 25, 2018 exchange offer.

74.    "Exchange Noteholder" means a Holder of the Exchanged Notes.

75.    "Exculpated Parties" means, collectively, the Debtors, the Debtors' officers and directors and the Debtors' Professionals retained under the Bankruptcy Code (each in their capacities as such) that served in such capacities at any time between the Petition Date and the Effective Date.

76.    "Face Amount" means (i) when used in reference to a Disputed or Disallowed Claim, the full stated liquidated amount claimed by the Holder of such Claim in any Proof of Claim timely filed with the Bankruptcy Court or otherwise deemed timely filed by any Final Order of the Bankruptcy Court or other applicable bankruptcy law, and (ii) when used in reference to an Allowed Claim, the allowed amount of such Claim.

77.    "File" or "Filed" means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

78.    "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

- 8 -

79.     "Final Order" means an order or judgment of the Bankruptcy Court as entered on the docket of the Chapter 11 Case that has not been reversed, stayed, modified or amended and as to which the time to appeal, petition for certiorari, or seek reargument or rehearing has run or as to which any right to appeal, reargue, petition for certiorari or seek rehearing has been waived in writing or, if an appeal, reargument, petition for certiorari or rehearing thereof has been pursued or granted then such an appeal, reargument, petition for certiorari or rehearing has been denied, and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.    Notwithstanding, and in lieu of the foregoing, insofar as the Confirmation Order confirming this Plan is concerned, Final Order means such order or judgment with respect to which no stay is in effect.

80.     "Gas Ownership Defendants" means Eletson Gas, the Preferred Owners and/or any officers or directors of the same.

81.     "General Unsecured Claim" means any Claim that is not an Administrative Claim, Priority Claim, a Secured Claim or an Interest.

82.     "Governmental Unit" has the meaning set forth in Section 101(27) of the Bankruptcy Code.

83.     "Holder" and collectively, "Holders" means a Person or Entity holding an Interest or Claim, and with respect to a vote on the Plan, means the Beneficial Holder as of the Distribution Record Date or any authorized signatory who has completed and executed a Ballot in accordance with the Voting Instructions.

84.     "Impaired" means with respect to any Class of Claims or Interests, any Claims or Interests that are impaired within the meaning of § 1124 of the Bankruptcy Code.

85.     "Impaired Claim" means a Claim classified in an Impaired Class of Claims.

86.     "Impaired Class" means each of the Classes that is not an Unimpaired Class.

87.     "Intercompany Interest" means any Interest of a Debtor or a Non-Debtor Affiliate that is held by another Debtors, including (a) all issued, unissued, authorized or outstanding shares or stock and (b) any interest, including but not limited to, any warrant, options, conversion privileges or contract rights to purchase or acquire any equity security or membership interest of any of the Debtors at any time.

88.     "Interest" means any common equity interest in Eletson Holdings, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock.

89.     "IRS" means the Internal Revenue Service.

90.     "Levona" means Levona Holdings Ltd. and/or its alter egos as determined in the Arbitration or necessary or appropriate to collect the Final Award.

91.     "Liberian Law" means the governing laws of the Republic of Liberia.

92.      "Liens" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

93.      "Litigation Trust" means the trust that will be created to pursue the Litigation Trust Causes of Action and effect distributions to applicable holders of Litigation Trust Interests following the Effective Date in accordance with the terms of this Plan and the Litigation Trust Agreement.

94.      "Litigation Trust Agreement" means the trust agreement described in Article IV of this Plan and substantially in the form to be filed with the Plan Supplement that, among other things, establishes the Litigation Trust, and describes the powers, duties and responsibilities of the agreement respecting the transfer of documents, information, and Litigation Trust Privileges and privileges of the Reorganized Debtor (solely in its capacity as successor to the Debtors) and solely related to the Litigation Trust Causes of Action to be entered into with the Litigation Trust Trustee; provided, however, that to the extent the terms of Article IV of this Plan conflict with the Litigation Trust Agreement, the terms of the Litigation Trust Agreement shall control.

95.      "Litigation Trust Assets" means the Litigation Trust Causes of Actions, the Excess SME Proceeds, Collections Contribution, Retained Causes of Action Contribution and the Distributable Cash; provided that neither the Debtors nor the Reorganized Debtor shall have any obligations to provide any funding to the Litigation Trust.

96.      "Litigation Trust Beneficiaries" means holders of the Litigation Trust Interests.

97.      "Litigation Trust Causes of Action" means any and all claims and Causes of Action of the Debtors arising under state or federal law, Liberian Law or Marshall Islands Law including all Pending Adversary Proceedings, Claim Objections and Avoidance Actions owned by, or asserted on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates listed on the Litigation Trust Causes of Action Schedule.

98.      "Litigation Trust Causes of Action Schedule" means the schedule attached to the Plan as Appendix A setting forth the Causes of Action that will be transferred to the Litigation Trust and constitute the Litigation Trust Causes of Action.

99.      Litigation Trust Distributable Proceeds" means all actual proceeds of (i) the Litigation Trust Causes of Action, net of any amounts (a) used to repay any funding for the Litigation Trust in accordance with the terms of such funding, (b) used to pay the Litigation Trust Expenses, and (c) as otherwise provided in accordance with the Litigation Trust Agreement (ii) the remaining Distributable Cash after satisfaction of the Litigation Trust Expenses, (iii) the Collections Contribution (v) the Retained Causes of Action Contributions and (vi) the cash provided by the Excess SME Proceeds.

100.     "Litigation Trust Expenses" means all reasonable fees, costs and expenses of and incurred by the Litigation Trust, including legal and other professional fees, costs and expenses, administrative fees and expenses, insurance fees, taxes and escrow expenses, which shall be paid in accordance with the Litigation Trust Agreement and the terms of this Plan; provided, however,

that neither the Debtors nor the Reorganized Debtor shall be required in any event to pay the Litigation Trust Expenses.

101.    "Litigation Trust Interests" means the interests in the Litigation Trust to be distributed on a Pro Rata basis to holders of Claims in Class 6 as set forth herein, which shall entitle such Holder to its Pro Rata portion (based on the percentage of Litigation Trust Interests held by such Holder) of Litigation Trust Distributable Proceeds.

102.    "Litigation Trust Oversight Committee" means the committee of up to five (5) members formed on the Effective Date and composed of members selected by the Committee. The initial members of the Litigation Trust Oversight Committee shall be identified in the Plan Supplement to be filed prior to the Confirmation Hearing or identified by the Litigation Trust Trustee pursuant to the terms of the Litigation Trust Agreement, as applicable.

103.    "Litigation Trust Privileges" means any attorney-client privilege, work product protection, joint interest privilege or other privilege or immunity attaching to any documents or communications (in any form, including, without limitation, written, electronic or oral) held by the Debtors related exclusively to Litigation Trust Causes of Action which shall be transferred to the Litigation Trust along with the Litigation Trust Causes of Action.

104.    "Litigation Trust Trustee" means the individual selected pursuant to Article IV of this Plan to act as trustee of the Litigation Trust in accordance with the provisions of this Plan and the Litigation Trust Agreement.

105.    "Marshall Islands Law" means the governing law of the Republic of the Marshall Islands.

106.    "NAF Claim" means the Claim asserted by New Agathonissos Finance LLC to the extent any portion of said Claim is deemed an Allowed Claim.

107.    "Non-Debtor Affiliate" means any person that is an affiliate of the Debtor within the meaning of section 101(2) of the Bankruptcy Code.

108.    "Non-Petitioning Creditors Exchange Note Claims" means claims asserted by Exchange Noteholders other than the Petitioning Creditors on account of the Exchange Notes.

109.    "Noteholder Election Recovery" means the recovery provided to Holders of Noteholder Election Recovery Claims paid from the Noteholder Election Recovery Reserve which for each individual Holder of a Noteholder Election Recovery Claim shall be the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000.

110.    "Noteholder Election Recovery Cap" means $7,000,000.

111.    "Noteholder Election Recovery Claims" means the Claims of any Holder of a Claim in Class 6A or 6B that affirmatively and irrevocably elects to have their Non-Petitioning Creditor Exchange Note Claim, Petitioning Creditor Exchange Note Claim or Old Note Claim, as

applicable, treated as a Claim under Class 5 with recovery drawn from the Noteholder Election Recovery Reserve.

112.    "Noteholder Election Recovery Reserve" means a reserve created in the amount of the Noteholder Election Recovery Claim Cap to fund recoveries for Noteholder Election Recovery Claims.

113.    "Objection Deadline" means that date which is one year after the Effective Date or such later date as the Court may allow upon request by the Litigation Trust Trustee, by which the Litigation Trust Trustee or any party in interest has to file an objection to any Claim not previously allowed.

114.    "OCM Entities" means collectively OCM Maritime Rhine LLC, OCM Maritime Yukon LLC, OCM Maritime Autumn LLC and OCM Maritime Thames LLC.

115.    "OCM Guarantees" means the guarantees executed by Eletson Holdings in favor of the obligations of the SMEs to the OCM Entities.

116.    "OCM Guaranty Claims" means Claims arising from the OCM Guarantees.

117.    "Old Noteholders" means the Holders of the Old Notes.

118.    "Old Notes" means those certain 9.625% First Preferred Ship Mortgage Notes due 2022 in an original Face Amount of $300 million issued by the Debtors that were not converted by holders of Old Notes pursuant to that May 25, 2018 exchange offer.

119.    "Old Notes Claim" means Claims arising from the Old Notes and the NAF Claim.

120.    "Pach Shemen" means Pach Shemen LLC.

121.    "Pending Adversary Proceedings" means all adversary proceedings commenced by the Debtors which are currently pending in the Bankruptcy Court.

122.    "Person" means any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof or other entity.

123.    "Petition Date" means March 7, 2023, the date on which certain of the Petitioning Creditors filed involuntary petitions for relief commencing the Bankruptcy Cases.

124.    "Petitioners" means the Debtors, Eletson Corporation and any other party benefiting from the Arbitration Award.

125.    "Petitioning Creditors" means Pach Shemen, VR Global Partners, L.P., and Alpine Partners (BVI) L.P. and (ii) Levona to the extent Levona is deemed to be a creditor of the Debtors by order of the Bankruptcy Court.

126. "Petitioning Creditors Exchange Note Claims" means any and all claims asserted by any Petitioning Creditor arising from said Petitioning Creditor's purporting to be the Beneficial Holder of any Exchange Notes.

127. "Plan" means this Second Amended Joint Plan of Reorganization of Debtors under Chapter 11 of the United States Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules.

128. "Plan Consideration" means the Shareholder New Value Contribution, the SME Revenue, Retained Causes of Action Contribution, and the Excess SME Proceeds.

129. "Plan Consolidation" means the consolidation of the Consolidating Debtors into Eletson Holdings as set forth in Article IV.B of this Plan.

130. "Plan Supplement" means a document supplementing the Plan to be submitted with the Court no later than ten (10) days prior to the Confirmation Hearing.

131. "Preferred Owners" means collectively Desimuso Trading Company, Apargo Limited, and Fentalon Limited.

132. "Preferred Shares" means the Preferred Shares of non-Debtor Eletson Gas LLC.

133. "Post-Confirmation Expense" means any fees, costs and expenses (including, without limitation, United States Trustee Quarterly Fees, Litigation Trust Expenses, attorneys' fees, the fees of other professionals, and any taxes imposed on the Litigation Trust or in respect of its Assets) necessary to complete the reorganization contemplated herein and the Litigation Trust after the Effective Date.

134. "Priority Claim" means a Claim entitled to priority pursuant to Bankruptcy Code § 507 that is not an Administrative Claim

135. "Professional" or, collectively, "Professionals" means a Person or Entity (a) employed by the Debtors pursuant to a Final Order in accordance with sections 327 or 363 of the Bankruptcy Code and to be compensated for services rendered or incurred through the Effective Date pursuant to sections 327, 328, 329, 330 and 331 or 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code by a Final Order.

136. "Professional Fees" means all fees and expenses (including, but not limited to, success fees, if any) for services rendered by all Professionals in the Chapter 11 Cases through the Effective Date that the Bankruptcy Court has not denied by Final Order, regardless of whether a fee application has been filed for such fees.

137. "Professional Fee Claims" means all Professionals Fees which remain unpaid as of the Effective Date.

138.    "Professional Claims Bar Date" means 5:00 p.m. (prevailing Eastern Time) on the date that is the first Business Day that is forty-five (45) days after the Effective Date.

139.    "Proof of Claim" means a Claim for which a proof of claim on Official Form 410 has been filed on or before the Claims Bar Date.

140.    "Pro Rata" means the proportion that the Face Amount of a Claim in a particular Class or Classes bears to the aggregate Face Amount of all Claims (including Disputed Claims but excluding Disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

141.    "Record Holder" means the Holder of a Claim or Interest on the Distribution Record Date.

142.    "Reorganized Debtor" means Eletson Holdings on and after the Effective Date.

143.    "Reorganized Debtor Organizational Documents" means the applicable bylaws, charter documents, articles of incorporation, certificates of incorporation, certificates of formation, limited liability company operating agreements, and related documents regarding the corporate existence and governance of the Reorganized Debtor.

144.    "Retained Causes of Action" means all Causes of Action existing as of the Effective Date not transferred to the Litigation Trust (including Unknown Causes of Action as applicable) and retained by the Reorganized Debtor which may be pursued by the Reorganized Debtor for the benefit of the Reorganized Debtor and Litigation Trust through the Retained Causes of Action Contribution.

145.    "Retained Causes of Action Contribution" means 75% of the net cash recoveries on account of Retained Causes of Action; provided, however, for purposes of the foregoing, "net cash recoveries" shall mean cash actually collected under any Retained Causes of Action net of costs of collection incurred by the Reorganized Debtor and net of any amounts setoff by the Reorganized Debtor for amounts owed to any defendant under a Retained Cause of Action.

146.    "Restructuring Transactions" means the transactions described in Article IV of this Plan.

147.    "Scheduled" with respect to any Claim, means listed on the Schedules.

148.    "Schedules" mean the schedules of assets and liabilities, schedules of executory contracts, and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they have been and may be amended and supplemented from time to time.

149.    "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code in each case as of the Petition Date, to the extent that the value of the Claim Holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

150.    "Shareholder New Value Contribution" means contribution provided by or caused to be provided by the Eletson Holdings Members (or affiliates thereof), consisting of (a) Cash and cash equivalents in an aggregate amount of $30 million and (b) the Collections Contribution.

151.    "SMEs" means each of Fourni Special Maritime Enterprises, Kastos Special Maritime Enterprises, Kimolos II Special Maritime Enterprise, and Kinaros Special Maritime Enterprise.

152.    "SME Revenue" means any excess cash on hand of each of the SMEs existing as of the Effective Date after subtracting therefrom (i) any amounts, as necessary to satisfy the projected operating expenses of the SMEs not otherwise reasonably expected to be satisfied by anticipated revenues of the SMEs (on a consolidated basis) through the SME Revenue Period; and (ii) $250,000 (on a consolidated basis).

153.    "SME Vessels" means each of and collectively, the vessels known as the Fourni, Kastos, Kimolos, and Kinaros as operated by the SMEs.

154.    "SME Revenue Period" means the period beginning on the first Business Day after the Effective Date and ending one hundred and eighty (180) days later.

155.    "Trade Creditor" means any creditor whose Claim has been Allowed and is not a creditor classified in Class 1, Class 2, Class 3, Class 5, Class 6A or Class 6B.

156.    "Trade Creditor Claim" means any Allowed General Unsecured Claim against the Debtors held by a Trade Creditor.

157.    "Trade Creditor Claim Cap" means $1,000,000.00.

158.    Trade Creditor Claim Reserve" means a reserve created in the amount of the Trade Creditor Claim Cap to fund recoveries for Trade Creditor Claims.

159.    "Unclassified Claims" means those Administrative and Priority Claims described in Article II herein.

160.    "Unimpaired Claims" means Claims in an Unimpaired Class.

161.    "Unimpaired Class" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

162.    "United States Trustee" means the Office of the United States Trustee for Region 2.

163.    "United States Trustee Quarterly Fee" means the quarterly fees payable to the United States Trustee accrued over the course of these Chapter 11 Cases pursuant to 28 U.S.C. § 1930(a)(6).

164.    "Voting Class" means any class of Claims and Interests entitled to vote on the Plan.

- 15 -

165.    "Voting Deadline" means the date, as stated in the Voting Instructions, of [_], 2024, at 5:00 p.m. prevailing Eastern Time for all Holders of Claims, which is the date and time by which all votes must be received in accordance with the procedures set forth in the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court by which all Ballots must be received.

166.    "Voting Instructions" mean the instructions for voting on the Plan contained in Article II of the Disclosure Statement entitled "Voting On and Confirmation of the Plan" and in the Ballots.

C.    *Exhibits*

All Exhibits to this Plan, if any, are incorporated by reference into and are made a part of this Plan as if set forth in full herein.

## ARTICLE II.

## CLASSIFICATION AND TREATMENT
## OF CLASSIFIED CLAIMS AND INTERESTS

A.    *Classification*

The classification of Claims (except for Administrative Claims) and Interests listed below is for all purposes, including, without limitation, voting, confirmation and distributions under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. Consistent with section 1122 of the Bankruptcy Code, a Claim or Interest shall be deemed classified by the Plan in a particular Class only to the extent such Claim or Interest satisfies the definition of such Class and shall be deemed classified in a different Class to the extent any remainder or other portion of such Claim or Interest satisfies the definition of such different Class.  NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CLAIM OR INTEREST IS CLASSIFIED IN A CERTAIN CLASS FOR VOTING PURPOSES.  A Claim is in a particular Class only to the extent such Claim is an Allowed Claim in such Class and has not been paid or otherwise settled before the Effective Date.  The classification of Claims and Interests pursuant to this Plan is as follows:

|  |  | *Class* | *Status* |  | *Voting Rights* |
|---|---|---|---|---|---|
| Class 1 | — | OCM Guaranty Claims | Impaired | — | Entitled to vote |
| Class 2 | — | Corp Guaranty Claims | Impaired | — | Entitled to vote |
| Class 3 | — | Azure Guaranty Claims | Impaired | — | Entitled to vote |
| Class 4 | — | Trade Creditor Claims | Impaired | — | Entitled to vote |
| Class 5 |  | Noteholder Election Recovery Claims | Impaired | — | Entitled to vote |

- 16 -

| Class 6A | — | Non-Petitioning Creditor Exchange Note Claims | Impaired | — | Entitled to vote |
| Class 6B | — | Petitioning Creditor Exchange Note Claims | Impaired | — | Entitled to vote |
| Class 7 | — | Interests | Impaired | — | Entitled to vote |

B.    *Unclassified Claims: Administrative Claims*

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for the purposes of voting or receiving distributions under this Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in this Article II.B.

a.    Administrative Claims (other than Professional Fee Claims, DIP Claims or Committee Professional Fee Claims)

The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims, DIP Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim.  Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Disbursing Agent.  Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date.  All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first.  Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees.

b.    Professional Fee Claims and Committee Professional Fee Claims

Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date.  Prior to the Effective Date the Debtors may pay any Committee Professional Fees for all Committee Professional Fee Claims which are allowable or allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date.  From and after the Effective Date, the Disbursing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the

Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Cases.

On the Effective Date, any objections previously filed to any applications for payment of the Professional Fees shall be deemed withdrawn (with prejudice) on the Effective Date. Further, after the occurrence of the Effective Date, neither the Disbursing Agent, the Reorganized Debtor, the Litigation Trust, Litigation Trust Trustee nor the Litigation Trust Oversight Committee shall assert any objection to any Committee Professional Fee Claims.

Any final application for allowance of a Professional Fee Claims and Committee Professional Fee Claims for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, counsel for the Litigation Trust, the Litigation Trust Trustee and on the United States Trustee at the addresses listed in Article XI.L of this Plan so that it is received no later than forty-five (45) days after the Effective Date. In the event an application for allowance of a Professional Fee Claims and Committee Professional Fee Claims is not filed by the appropriate date, such Professional Fee Claims and Committee Professional Fee Claims shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trust Trustee and their successors, their assigns or their Assets. Allowed Professional Fee Claims and Committee Professional Fee Claims must be paid in full (subject to the limitation on the Committee Professional Fees in paragraph above) and Professional Fee Claims and Committee Professional Fee Claims pending allowance by the Bankruptcy Court must be reserved for in full prior to any payment to Holders of Allowed Claims in (a) Class 3 (Azure Guaranty Claims), (b) Class 4 (Trade Creditor Claims); (c) Class 5 (Noteholder Election Recovery Claims); (d) Class 6A (Non-Petitioning Creditor Exchange Note Claims); (e) and Class 6B (Petitioning Creditor Exchange Note Claims).

c.     DIP Claims

As of the Effective Date, the DIP Claims, if any, shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Documents, including principal, interest, fees and expenses.

Except to the extent that the Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, each such Holder of an Allowed DIP Claim shall receive payment in full in Cash of such holders Allowed DIP Claim on the Effective Date.

Immediately upon receipt of the payments set forth in this section, the DIP Documents shall be deemed cancelled. The DIP Agent and DIP Lenders shall take all actions to effectuate and confirm such termination and discharge as reasonably requested by the Debtors or Reorganized Debtor as applicable.

      d.     Administrative Claims and Substantial Contribution Claim Filing Deadline

Each Holder of an Administrative Claim (excluding Professional Fee Claims and Committee Professional Fee Claims that are not a substantial contribution claim) must file an Administrative Claim Request with the Bankruptcy Court prior to the Administrative Bar Date.

C.     *Treatment of Classified Claims*

1.     **Class 1 — OCM Guaranty Claims**

    (a)     *Classification:* Class 1 consists of all OCM Guaranty Claims.

    (b)     *Treatment*: The OCM Guaranty Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided, however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees.

    (c)     *Voting*: Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

2.     **Class 2 — Corp Guaranty Claims**

    (a)     *Classification*: Class 2 consists of all Corp Guaranty Claims.

    (b)     *Treatment*: The Corp Guaranty Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, (i) each holder of an Allowed Corp Guaranty Claim shall receive its pro rata distribution of the Eletson Corporation Guaranty Recovery and (ii) each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided, however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.

    (c)     *Voting*: Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

3.      **Class 3 — Azure Guaranty Claims**

(a)      *Classification*: Class 3 consists of the Azure Guaranty Claims.

(b)      *Treatment*:  The Azure Guaranty Claims are Allowed Claims.  Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Disbursing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.

(c)      *Voting*: Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.      **Class 4 — Trade Creditor Claims**

(a)      *Classification*: Class 4 consists of the Trade Creditor Claims.

(b)      *Treatment*:  The Trade Creditor Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, each Holder of an Allowed Trade Creditor Claim shall receive, in exchange for such Allowed Trade Creditor Claim, Cash in an amount equal to 15% of the Face Amount of such Holder's Trade Creditor Claim from the Trade Creditor Claim Reserve; *provided*, that in the event the aggregate distributions to Holders of Trade Creditor Claims exceeds the Trade Creditor Claim Cap, Holders of Trade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap.

(c)      *Voting*: Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

5.      **Class 5 — Noteholder Election Recovery Claims**

(a)      *Classification*: Class 5 consists of all Allowed Noteholder Election Recovery Claims.

(b)      *Treatment*:  The Noteholder Election Recovery Claims are Allowed Claims. Claims may only be treated as Noteholder Election Recovery Claims upon the affirmative and irrevocable election of a Holder of a Claim classified in Class 6A or 6B to have their Claim treated in Class 5. Except to the extent that a Holder of an Allowed Noteholder Election Recovery Claim agrees to less favorable treatment, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Noteholder Election Recovery Claims each Holder of an Allowed Noteholder Election Recovery Claim shall receive in full settlement, release, and

satisfaction of such Noteholder Election Recovery Claim that is due and payable from the Noteholder Election Recovery Reserve, the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000.

(c)    *Voting:* Class 5 is Impaired and Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

6.    **Class 6A — Non-Petitioning Creditor Note Claims**

(a)    *Classification*: Class 6A consists of all Allowed Non-Petitioning Creditor Exchange Note Claims and Old Note Claims.

(b)    *Treatment*: The Non-Petitioning Creditor Note Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6A Claim shall receive in full settlement, release, and satisfaction of such Allowed Class 6A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of this Plan.

(c)    *Voting*: Class 6A is Impaired and Holders of Class 6A Claims are entitled to vote to accept or reject the Plan.

7.    **Class 6B — Petitioning Creditor Exchange Note Claims**

(a)    *Classification*: Class 6B consists of all Allowed Petitioning Creditor Exchange Note Claims.

(b)    *Treatment*: The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.  To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all Claims in Class 6A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 6A Non-Petitioning Creditor Exchange Note Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 6B Claim shall receive in full settlement, release, and satisfaction of such Allowed Class 6B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of this Plan.

Notwithstanding the foregoing if the Bankruptcy Court determines it is unable to equitably subordinate the claims of Holders of Class 6B Claims through the Confirmation Order, Holders of Class 6B Claims will be deemed to hold claims under Class 6A and

will be entitled to their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 6 Claims in accordance with the terms of this Plan.

(c)    *Voting*: Class 6B is Impaired and Holders of Class 6B Claims are entitled to vote to accept or reject the Plan.

8.    **Class 7 — Interests**

(a)    *Classification*: Class 7 consists of all Interests.

(b)    *Treatment*:   On the Effective Date, all Interests shall be discharged, cancelled, released, and extinguished. In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of Reorganized Holdings in a pro rata amount equal to their portion of the Shareholder New Value Contribution made.

(c)    *Voting*:   Class 7 is Impaired, and Holders of Interests are entitled to vote to accept or reject the Plan.

## ARTICLE III.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Voting Classes*

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on this Plan, Holders of Claims in Class 1 (OCM Guaranty Claims), Class 2 (Corp Guaranty Claims) Class 3 (Azure Guaranty Claims), Class 4 (Trade Creditor Claims), Class 5 (Noteholder Election Recovery Claims) Class 6A (Non-Petitioning Creditor Exchange Note Claims), Class 6B (Petitioning Creditor Exchange Note Claims) and Class 7 (Interests) shall be entitled to vote to accept or reject this Plan.

B.    *Classes Presumed to Accept this Plan*

There are no Unimpaired Classes and no class is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

C.    *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan.

D.    *Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

E.    *Non-Consensual Confirmation*

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code.  The Debtors reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XI.K hereof.

F.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Implementation of the Plan and Sources of Consideration for Plan Distributions*

The Debtors and Reorganized Debtor as applicable will fund distributions and other sources and uses contemplated by the Plan with the Plan Consideration and the transfer and assignment of the Litigation Trust Assets to the Litigation Trust.

1.    **The Shareholder New Value Contribution**

The Debtors propose to implement and consummate this Plan on and after the Effective Date. Within ten (10) Business Days of entry of the Confirmation Order, the Eletson Members shall contribute, or cause to be contributed, to Eletson Holdings the full amount of the cash portion of the Shareholder New Value Contribution which shall be a contribution of Cash and cash equivalents in a total aggregate value of $30 million dollars.

The cash portion of the Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims (if any) and the Committee Professional Fee Claims including the funding any reserves

on account of the Professional Fee Claims and Committee Professional Fee Claims required by the terms of this Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Eletson Corporation Guaranty Recovery, *fifth*, to fund the Trade Creditor Claim Reserve; and *sixth*, to fund the Noteholder Election Recovery Reserve.

The Collections Contribution constitutes an additional portion of the Shareholder New Value Contribution, and the Eletson Members shall cause the applicable Gas Ownership Defendant to direct the applicable portion of the Collections Contribution to the Litigation Trust within thirty (30) Business Days of the receipt of a final, non-appealable, determination payment in satisfaction of the Arbitration Award.

### 2.   **Distributable Cash**

Immediately upon the satisfaction of the payments provided for in Article IV A.1, the remaining cash portion of the Shareholder New Value Contribution shall become Distributable Cash which shall be transferred to the Litigation Trust in accordance with the terms of this Plan and the Litigation Trust Agreement. Distributable Cash shall also include the SME Revenue transferred to the Litigation Trust as set out in the Litigation Trust Agreement.

### 3.   **Excess SME Proceeds**

Beginning on January 31, 2025, and on July 31 and January 31 of each subsequent calendar year during the SME Excess Proceeds Period, the Reorganized Debtor shall transfer any SME Excess Proceeds for the immediately preceding six-month period to the Litigation Trust in accordance with the instructions provided to the Reorganized Debtor by the Litigation Trust Trustee. On each payment date the SME Excess Proceeds paid shall be accompanied with a reasonable accounting supporting the amounts of the Excess SME Proceeds transferred to the Litigation Trust.

Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the operation and/or management of the SMEs after the Effective Date, during the Excess SME Revenue Period or otherwise. The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee upon the execution of any letter of intent or other similar pre-sale documents entered into by the Reorganized Debtor and any potential purchaser of the SME and/or SME Vessels within ten (10) Business Days of execution of such document. In the event a sale is ultimately consummated, the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the consummation of such sale. The Litigation Trust shall have no right to direct, comment or impede any sale of any SME and/or SME Vessel by the Reorganized Debtor. The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of any contract of sale, and are provided with no additional rights and/or standing to object to the terms of any sale of any SME or SME Vessel pursuant to the terms of this Plan. For the avoidance of doubt the Reorganized Debtor is not required to consummate any sale of the SMEs or SME Vessels during the Excess SME Proceeds Period.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period.

Upon the earlier of (i) the expiration of the Excess SME Proceeds Period or (ii) the Litigation Trust having received Excess SME Cash Flow Proceeds of $5 million in the aggregate and Excess SME Sale Proceeds of $5 million in the aggregate, the obligations of the Reorganized Debtor related to the Excess SME Proceeds hereunder, and any reporting obligations to the Litigation Trust related thereto shall cease, and the Reorganized Debtor shall have no further obligations related to the Excess SME Proceeds, and the Litigation Trust shall have no right or claim to any further Excess SME Proceeds.  In the event the Excess SME Proceeds transferred to the Litigation Trust exceed (i) $5 million in the aggregate on account of the Excess SME Cash Flow Proceeds or (ii) $5 million in the aggregate on account of the Excess SME Sale Proceeds, the Litigation Trust shall within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, refund the Reorganized Debtor the portion of the actually paid Excess SME Proceeds exceeding the thresholds in clauses (i) and (ii) above in accordance with the instructions provided to the Litigation Trust by the Reorganized Debtor.

4.    **Litigation Trust Causes of Action**

On the Effective Date the Debtors shall fully and finally transfer and or assign each of the Litigation Trust Causes of Action and the applicable Litigation Trust Privileges to the Litigation Trust.

Litigation Trust Distributable Proceeds will be obtained from the Distributable Cash and the Litigation Trust Causes of Action, and Plan Consideration as applicable.  Unless otherwise specified herein, Cash payments to be made pursuant to the Plan will be made by the applicable Disbursing Agent.

B.    *Substantive Consolidation*

1.    **Order Granting Plan Consolidation**

Unless and to the extent previously approved by a prior order of the Bankruptcy Court, at the Confirmation Hearing, the Bankruptcy Court will consider approval under the Plan of the Plan Consolidation.

2.    **Plan Consolidation**

The Consolidating Debtors are holding companies that were formed for the express purpose of issuing the Exchange Notes. Pursuant to the Exchange Notes Indenture, the Consolidating Debtors are prohibited from holding or maintaining any assets.  As the Exchange Notes and the claims related thereto will be discharged after the confirmation of these Chapter 11 Cases, the Debtors maintain there is no reason for the continued existence of the Consolidating Debtors.  As such, the Consolidating Debtors will be consolidated into the Reorganized Debtor

for the convenience of all parties, and with no impact to any operations, distributions, assets or rights of any party in interest or the Reorganized Debtor.

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be on Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of this section shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been effected.  This compromise and settlement is in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

C.    *Corporate Existence*

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtor Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall be deemed to merge with and into the Reorganized Debtor, with the Reorganized Debtor being the sole surviving entity and the separate existence of the Consolidating Debtors shall cease and only the Reorganized Debtor shall continue to exist and as a separate corporation, with all the powers of a corporation pursuant to the applicable Liberian law and pursuant to the respective certificate of incorporation and bylaws in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and

- 26 -

require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

D.    *Vesting of Assets in the Reorganized Debtor*

Except for the Litigation Trust Causes of Action and Plan Consideration as applicable as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Litigation Trust Agreement), on the Effective Date, pursuant to the Plan all property in each Estate and any property acquired by any of the Debtors, including Intercompany Interests held by the Debtors in non-Debtor subsidiaries, shall revest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

E.    *Dissolution of the Committee*

Upon the Effective Date, the Committee shall dissolve automatically whereupon its members, Committee Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Committee Professional Fee Claims; and (iii) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation Order.  The Committee members and the Committee Professionals shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

F.    *Reorganized Debtor Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtor will file such Reorganized Debtor Organizational Documents as are required to be filed with the applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate the Reorganized Debtor Organizational Documents, and the Reorganized Debtor may file the certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the country of incorporation and the Reorganized Debtor Organizational Documents.

G.    *Appointment of Directors and Officers of The Reorganized Debtor*

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement the identity and any affiliations of any Person proposed to serve on as a Director or officer of the Reorganized Debtor, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

H.    *Creation of the Litigation Trust*

This Plan contemplates the transfer of the Litigation Trust Assets into the Litigation Trust for distribution of the Litigation Trust Distributable Proceeds to Holders of Litigation Trust Interests.

Prior to the Effective Date, the Debtors and the Litigation Trust Trustee shall execute the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, which shall be for the benefit of the Litigation Trust Beneficiaries. Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to (a) Litigation Trust Interests and (b) the Litigation Trust Expenses as provided for in this Plan and the Litigation Trust Agreement.  Also on the Effective Date, subject to, in all respects, the terms of the Litigation Trust Agreement, all Litigation Trust Privileges shall transfer to and vest exclusively in the Litigation Trust.

The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trust Trustee.  The powers, rights, and responsibilities of the Litigation Trust Trustee shall be specified in the Litigation Trust Agreement.  The Litigation Trust Trustee shall hold and distribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.  Other rights and duties of the Litigation Trust Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

After the Effective Date, the Debtors and the Reorganized Debtor shall have no interest in the Litigation Trust Assets except to the extent set forth in this Plan and the Litigation Trust Agreement.  To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtor and the Litigation Trust Trustee or Litigation Trust as applicable shall be deemed to have been designated as a representative of the Reorganized Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtor for the benefit of the Litigation Trust Beneficiaries. Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed in accordance with this Plan.

The Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Litigation Trust Trustee and to ensure the treatment of the Litigation Trust as a liquidation trust for federal income tax purposes, all consistent with this Plan.

Notwithstanding anything in this Plan to the contrary, the Reorganized Debtor shall have no obligation to provide any funds or financing to the Litigation Trust, other than the obligation to contribute the Litigation Trust Assets and the initial funding of the Administrative Fund, and under no circumstances will the expenses of the Litigation Trust be paid or reimbursed by the Debtors or the Reorganized Debtor, as applicable.

The Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that within a period of three (3) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest may extend the term of the Litigation Trust if it is necessary to facilitate or complete the distribution of the Litigation Trust Assets.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Litigation Trust Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidation trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

I.    *Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust*

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Litigation Trust Trustee will take this position on the Litigation Trust's tax return accordingly.  The Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets.  For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, and (b) a second-step transfer by Litigation Trust Beneficiaries.  As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction, and the Debtors or Reorganized Debtor should recognize gain or loss equal to the difference between the tax basis and fair value of such assets.  As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust Trustee shall make a good faith valuation of the Litigation Trust Assets.  This valuation will be made available from time to time, as relevant for tax reporting purposes.  Each of the Debtors or Reorganized Debtor, Litigation Trust Trustee, and the Holders of Claims receiving Litigation Trust Interests shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

J.      *Liabilities of the Litigation Trust*

The liabilities transferred to the Litigation Trust shall include all Litigation Trust Interests and the Litigation Trust Expenses.

In accordance with Article IV.I, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust to make the payments required to Litigation Trust Beneficiaries pursuant to the Plan and the Litigation Trust Agreement.

K.      *Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee*

The Committee shall appoint the Litigation Trust Trustee who shall have the power to administer the Litigation Trust and will be advised by the Litigation Trust Oversight Committee as specified in this Plan and the Litigation Trust Agreement.  For the avoidance of doubt the members of the Litigation Trust Oversight Committee will be appointed by the Committee pursuant to the terms of the Litigation Trust Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement, and with the consent and approval of the Committee, the identity and any affiliations of the Litigation Trust Trustee and any Person proposed to serve on the Litigation Trust Oversight Committee, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

The Debtors and the Litigation Trust Trustee shall enter into a Litigation Trust Agreement in substantially the form which shall be filed with the Bankruptcy Court with the Plan Supplement.  On the Effective Date, and upon the establishment of the Litigation Trust the Litigation Trust Trustee shall succeed in all respects to all of the rights, privileges and immunities of the Debtors in regard to the Litigation Trust Causes of Action and the Litigation Trust Privileges and shall be appointed as the sole party with standing to pursue Litigation Trust Causes of Action on behalf of the Debtors as of the Effective Date.  The Litigation Trust Trustee, and his/her successors, shall serve until the earlier of (i) the later to occur of (a) the entry of the Final Decree, (b) the dissolution of the Litigation Trust, and (c) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan; or (ii) the expiration of the term of such Litigation Trust Trustee's employment agreement or such Litigation Trust Trustee's resignation, death, incapacity, removal or termination by the Litigation Trust Oversight Committee pursuant to the Litigation Trust Agreement or order of the Bankruptcy Court. Notwithstanding the foregoing, the Debtor Privileges will not transfer to the Litigation Trust and shall remain solely in the possession of the Debtors or Reorganized Debtor as applicable.

As set forth herein, the pursuit and collection of the Litigation Trust Causes of Action and distribution of the proceeds thereof to the Litigation Trust Beneficiaries shall become the responsibility of the Litigation Trust Trustee who shall thereafter have responsibility for the management, control and operation thereof, and who may use, acquire and dispose of property of the Litigation Trust free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the terms of the Plan and the Litigation Trust Agreement.

Upon creation of the Litigation Trust, the Litigation Trust Trustee shall be the trustee of the Litigation Trust for all purposes and in all respects, with all necessary and appropriate power to act for, on behalf of and in the name of the Litigation Trust.

L.   *Cooperation and Privilege*

To effectively investigate, prosecute, compromise, and/or settle the Litigation Trust Causes of Action on behalf of the Litigation Trust, the Litigation Trust Trustee and its counsel and representatives may require reasonable access to documents and information exclusively relating to the Litigation Trust Causes of Action in the possession of the Debtors, the Reorganized Debtor, and/or the Committee. Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtor) and the Committee's records and information, each of which relating to the Litigation Trust Causes of Action, including electronic records or documents, as further detailed in, and subject in all respects to, the Litigation Trust Agreement. The Litigation Trust Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Litigation Trust Agreement, the Litigation Trust Privileges, and privileges held by the Committee (if any) shall transfer to and vest exclusively in the Litigation Trust, and that the Reorganized Debtor shall preserve all of the Debtors' records and documents (including all electronic records or documents) exclusively related to the Litigation Trust Causes of Action and Litigation Trust Privileges for the later of a period of three (3) years after the Effective Date or until such later time as the Litigation Trust Trustee notifies the Reorganized Debtor in writing that such records are no longer required to be preserved.

M.   *Duties of the Litigation Trust Trustee*

In addition to the duties set forth elsewhere in this Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement, and herein, shall have the following duties:

1.   to manage, control and operate the Litigation Trust;

2.   to investigate and, if necessary and appropriate, to prosecute and enforce (or not prosecute or enforce), or to compromise, release or settle any Litigation Trust Causes of Action on behalf of the Estate and the Litigation Trust without further approval of or application to the Bankruptcy Court;

3.   to invest any Cash and Litigation Trust Assets;

4.   to file any and all reports, pleadings, tax returns and other documents;

5.   to pay any and all distributions required or permitted to be made under this Plan;

6.   to pay out of the Litigation Trust any and all Claims, liabilities, losses, damages, costs and expenses incurred in connection therewith or as a result thereof, including all Post-Confirmation Expenses accruing from and after the Effective Date in accordance with the Administrative Budget;

7.    to employ, supervise and compensate any employees of the Litigation Trust;

8.    to make and file tax returns for the Litigation Trust;

9.    act as the Disbursing Agent to Holders of Class 6A Claims in accordance with the terms of this Plan, and in such capacity shall (i) disburse all Cash held by the Litigation Trust to the Holders of Class 6A Claims in any amount in excess of $1 million over the then current budgeted needs of the Litigation Trust pursuant to the Administrative Budget within forty-five (45) days of the Effective Date and at least semi-annually thereafter, (ii) within ten (10) days upon receipt of any Excess SME Proceeds disburse to Holders of Class 6A Claims one hundred percent of such Excess SME Proceeds, and (iii) within ten (10) days upon receipt of any portion of the Collections Contribution disburse to Holders of Class 6A Claims one hundred percent of such Collections Contribution;

10.    to commence and pursue dissolution or winding up of proceedings for the Litigation Trust;

11.    to file, prosecute, compromise and settle objections to Claims after the Effective Date other than Administrative Claims or Claims seeking administrative allowance;

12.    to prepare and deliver to the Litigation Trust Oversight Committee for approval the Administrative Budget of the Litigation Trust with respect to each six-month period following the initial Administrative Budget and any amendments or modifications thereto; and

13.    to request the entry of a Final Decree.

In connection with the execution of his or her duties under this Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement and herein, shall be authorized:

1.    to execute such documents and to take such other actions as are necessary to effectuate this Plan and perform his or her duties as a trustee of the Litigation Trust, including to execute such documents and take such other action on behalf of the Litigation Trust;

2.    to open, close and manage bank accounts, and to enter into business transactions within or without the ordinary course of business;

3.    to retain and pay professionals (including the Professionals or the Committee Professionals) or other Persons to assist the Litigation Trust Trustee in the administration of the Litigation Trust, without prior Bankruptcy Court approval;

4.    to incur any reasonable and necessary expenses (up to the amounts set forth in the Administrative Budget) in the performance of his or her duties as Litigation Trust Trustee;

5.    to compromise, release or settle any Disputed Claim or Litigation Trust Cause of Action or to sell or dispose of any Litigation Trust Asset; and

6.        to employ such other procedures, not inconsistent with this Plan, necessary for the Litigation Trust Trustee to perform his or her duties hereunder.

The Litigation Trust Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code (including, without limitation, commencing, prosecuting or settling Litigation Trust Causes of Action and asserting claims, defenses, offsets and privileges arising from the Litigation Trust Privileges), to the extent not inconsistent with this Plan.  In discharging the foregoing responsibilities, the Litigation Trust Trustee shall be entitled to exercise and rely upon his or her business judgment in consultation with the Litigation Trust Oversight Committee.  The Litigation Trust Trustee shall not be obligated to take any action or to pursue any Litigation Trust Causes of Action unless justified in his or her reasonable determination by fact and law, nor shall the Litigation Trust Trustee be obligated to take any action that could reasonably cause him or her personal liability.  Without limiting the generality of the foregoing, the Litigation Trust Trustee may consider the interests of Holders of Allowed Class 6A Claims and Class 6B Claims in receiving prompt distributions and such other factors as may be reasonable in the exercise of his or her business judgment.  Such authorization and benefits shall also extend to any, each and every successor Litigation Trust Trustee, without reservation or limitation.

The Litigation Trust Trustee, at the direction of the Litigation Trust Oversight Committee, may expend the Cash of the Litigation Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during the administration thereof, (b) to pay the respective reasonable administrative expenses (including, but not limited to, any United States Trustee Quarterly Fees, Litigation Trust Trustee fees, professional fees, and taxes imposed on the Litigation Trust), and (c) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.

N.    *Post Confirmation Expenses*

Prior to the Effective Date, the Debtors shall approve the Administrative Budget for the six (6) month period beginning on the Effective Date for professional fees for services to be rendered to the Litigation Trust, which Administrative Budget may be altered from time to time by the Litigation Trust Trustee with the consent of the Litigation Trust Oversight Committee in accordance with the Litigation Trust Agreement provided that any fees and expenses of professionals retained by the Litigation Trust that have been incurred prior to the date of the modification of the Administrative Budget shall constitute budgeted amounts.  The Litigation Trust Oversight Committee shall approve in advance the Litigation Trust Trustee's retention of professionals and their compensation arrangements.

On the Effective Date, the Litigation Trust Trustee shall establish the Administrative Fund.  The initial amount of the Administrative Fund shall be based on the Litigation Trust Trustee's good faith estimate of the cost necessary to complete the Litigation Trust's obligations under this Plan and the Litigation Trust Agreement and will include the amount budgeted for the Litigation Trust's professionals provided however, the initial Administrative Fund shall not

exceed the amount of $100,000 necessary to commence and/or pursue and Litigation Trust Causes of Action as of the Effective Date. The Litigation Trust shall pay all Litigation Trust Expenses related to carrying out its obligations under this Plan and the Litigation Trust Agreement from the Administrative Fund and, in the Litigation Trust Trustee's discretion, and with approval of the Litigation Trust Oversight Committee, may add additional amounts of Cash held by the Litigation Trust to the Administrative Fund to further the prosecution of the Litigation Trust Causes of Action or for administration and other miscellaneous needs of the Litigation Trust without further notice or motion in accordance with the terms of the Litigation Trust Agreement.

The reasonable and necessary fees and actual and necessary expenses of the Litigation Trust Trustee, the Litigation Trust Oversight Committee and the professionals retained by the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall be paid solely by the Litigation Trust Trustee in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing. The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

O.    *Liability; Indemnification*

Neither the Litigation Trust Trustee nor any member of the Litigation Trust Oversight Committee shall be liable for any act or omission taken or omitted to be taken in his or her capacity as Litigation Trust Trustee or as a member of the Litigation Trust Oversight Committee, as the case may be, other than acts or omissions resulting from the Litigation Trust Trustee's or Litigation Trust Oversight Committee member's willful misconduct, gross negligence or fraud. The Litigation Trust Trustee and the Litigation Trust Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their respective attorneys, accountants, financial advisors and agents, and the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons other than acts or omissions resulting from the willful misconduct, gross negligence or fraud of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be.

Notwithstanding such authority, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be under any obligation to consult with their respective attorneys, accountants, financial advisors or agents, and any determination not to do so shall not result in

the imposition of liability on the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, and their respective designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Litigation Trust shall indemnify and hold harmless the Litigation Trust Trustee, the Litigation Trust Oversight Committee and their respective designees and professionals, and all duly designated agents and representatives (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, but not limited to, attorneys' fees and costs) arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of the duties of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, or the implementation or administration of this Plan; provided, however, that no such indemnification will be available to such Persons for such actions or omissions if a court of competent jurisdiction has determined by Final Order that the challenged conduct occurred as a result of willful misconduct, gross negligence or fraud.

P.      *Litigation Trust Oversight Committee*

On the Effective Date, the Litigation Trust Oversight Committee shall have the duties set forth herein to maximize distributions to Litigation Trust Beneficiaries.  On the Effective Date, the Litigation Trust Oversight Committee shall be entitled to the rights, powers, immunities and privileges of the Committee.

The Litigation Trust Oversight Committee shall have the duty to take actions in accordance with the provisions of this Plan and in furtherance of the execution of this Plan. Additionally, the Litigation Trust Oversight Committee shall have the following rights and duties:

1.      to approve any release or indemnity in favor of any third party granted or agreed to by the Litigation Trust Trustee;

2.      to authorize the Litigation Trust Trustee to commence any Litigation Trust Cause of Action;

3.      to approve the settlement of any Litigation Trust Cause of Action and to approve any application by the Litigation Trust Trustee for an order in connection with any such settlement;

4.      to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

5.      to monitor distributions to Holders of Litigation Trust Interests;

6.      to take such other actions as it deems necessary and appropriate with respect to the implementation of the Plan;

7.      to approve the Litigation Trust Trustee's retention of professionals;

8.    to remove the Litigation Trust Trustee in accordance with the procedures in the Litigation Trust Agreement; and

9.    to approve the Administrative Budget after the Effective Date.

The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the later to occur of (i) the entry of the Final Decree, (ii) the dissolution of the Litigation Trust, and (iii) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to this Plan.

The Litigation Trust Oversight Committee shall have the right but shall not be required to retain counsel of its choice, and the reasonable and necessary fees and expenses of such counsel shall be paid by the Litigation Trust from the Administrative Fund. The reasonable and necessary fees and expenses of counsel to the Litigation Trust Oversight Committee shall be paid in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement. For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection. Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing. The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

Q.    *Good Faith*

Each of the Litigation Trust Trustee and Litigation Trust Oversight Committee shall act in good faith in carrying out its duties and responsibilities and use its best efforts to pursue or settle the Litigation Trust Causes of Action and maximize the value of the Litigation Trust Assets and minimize claims against the Litigation Trust.

R.    *Saturday, Sunday or Legal Holiday*

If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

S.    *Exemption from Certain Taxes and Fees*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and

upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

T.    *Issuance of Documents Necessary to Consummate the Plan*

On or as soon as practicable after the Effective Date, the Debtors shall execute and deliver such other agreements, documents and instruments, as necessary to effectuate the Plan.

U.    *Final Decree*

Upon the Litigation Trust Trustee's determination that all Litigation Trust Causes of Action held by the Litigation Trust or the Litigation Trust Trustee, as applicable, have been finally resolved, transferred, or abandoned, the Litigation Trust shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code closing the Chapter 11 Cases. The Litigation Trust may request the entry of the Final Decree notwithstanding the fact that not all Litigation Trust Assets have been monetized and distributed to Litigation Trust Beneficiaries.

## ARTICLE V.

## RETAINED CAUSES OF ACTION

A.    *Maintenance of Causes of Action*

Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf of the Debtors and the Estates to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all Litigation Trust Causes of Action transferred to the Litigation Trust. The Reorganized Debtor shall retain all rights to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all Retained Causes of Action.

Except as otherwise provided in the Plan, upon the Effective Date and subject to the terms of the Litigation Trust Agreement in accordance with section 1123(b)(3) of the Bankruptcy Code, the Litigation Trust Causes of Action shall vest in the Litigation Trust. The Litigation Trust Trustee, on behalf of the Litigation Trust, shall retain and may exclusively enforce any and all or Litigation Trust Causes of Action, and commence, pursue and settle the Litigation Trust Causes of Action in accordance with this Plan and the Litigation Trust Agreement as applicable, subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee. The Litigation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Litigation Trust Causes of Action without the consent or approval of any third party and without any further order of court subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee as required by the Litigation Trust Agreement.

B.     *Preservation of Causes of Action*

Except as otherwise expressly provided in this Plan, from and after the Effective Date, unless expressly designated as a Litigation Trust Cause of Action, the Reorganized Debtor shall maintain and may litigate or settle any Retained Causes of Action, including the recovery or subordination actions under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 or 724 of the Bankruptcy Code or any other Causes of Action or rights to payments or claims that belong to the Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, no other Person may pursue any such Avoidance Actions, recovery or subordination actions or other Causes of Action that belong to the Debtors, Reorganized Debtor or the Litigation Trust as applicable, unless otherwise provided by order of the Bankruptcy Court.

To the extent any Claim or Cause of Action has not independently been reviewed by the Independent Committee and/or otherwise settled prior to the Effective Date, and such Claim or Cause of Action is designated a Litigation Trust Cause of Action, the Litigation Trust Trustee shall perform an independent investigation regarding whether such Litigation Trust Cause of Action, shall be investigated or pursued.  It is possible that there may be other Causes of Action which currently exist or may subsequently arise but relate to facts and circumstances arising prior to the Effective Date that are not set forth herein, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and, as a result, cannot be specifically referred to herein (collectively, the "Unknown Causes of Action").  Within twenty (20) Business Days of the discovery of the facts and circumstances underlying an Unknown Cause of Action, the Independent Committee shall notify the Committee or Litigation Trust Trustee as applicable of the existence of said Unknown Cause of Action, and the Independent Committee and Committee or Litigation Trust Trustee as applicable shall confer and make a determination of whether such Unknown Cause of Action will be transferred to the Litigation Trust as a Litigation Trust Cause of Action. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction over any dispute between the Independent Committee and the Committee or Litigation Trust Trustee as applicable regarding the ownership of a discovered Unknown Cause of Action such that ownership of said discovered Unknown Cause of Action complies with the terms of this Plan.

C.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Cause of Action for later adjudication unless transferred to the Litigation Trust, (including, without limitation, Unknown Causes of Action), and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or other Final Order.  In addition, the Debtors, the Litigation Trust and any successor entities under the Plan as applicable expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit

- 38 -

in which the Debtors are defendants or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from Debtors or a transfer of money or property from the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Litigation Trust, as applicable, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such Entity has filed a Proof of Claim against the Debtors in these Bankruptcy Cases; (ii) such Creditor's Proof of Claim has been objected to; (iii) such Creditor's Claim was included in the Debtors' Schedules; or (iv) such Creditor's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

D.     *Retained Causes of Action and Retained Causes of Action Contribution*

On or before the expiration of any applicable statute of limitation, the Reorganized Debtor may initiate any Retained Causes of Action in any appropriate court of competent jurisdiction.  Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the pursuit or settlement of the Retained Causes of Action. Beginning on the six-month anniversary of the Effective Date and every six months thereafter, the Reorganized Debtor shall provide the Litigation Trust and the Litigation Trust Trustee a report on the status of the pursuit of any Retained Causes of Action.  The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of any proposed settlement of any Retained Cause of Action.  In the event of a successful collection of any Retained Causes of Action the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the collection made thereon.  The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of the proceeds of any Retained Causes of Action, and are provided with no additional rights and/or standing to object to the terms of any litigation strategy or proposed settlement of any Retained Causes of Action pursuant to the terms of this Plan.  For the avoidance of doubt the Reorganized Debtor is not required to pursue or settle any Retained Causes of Action.

Within ten (10) Business Days of receipt of any Retained Causes of Action Contributions arising from the final, non-appealable prosecution of a Retained Cause of Action or the settlement of a Retained Cause of Action, the Reorganized Debtor shall transfer the applicable Retained Causes of Action Contributions to the Litigation Trust in accordance with the instructions provided by the Litigation Trust Trustee. Each payment of the Retained Causes of Action Contributions paid shall be accompanied with a reasonable accounting supporting the amounts of the Retained Causes of Action Contributions transferred to the Litigation Trust.

Upon the resolution of all Retained Causes of Action any reporting obligations of the Reorganized Debtor to the Litigation Trust regarding the prosecution and/or settlement of any Retained Causes of Action shall cease, and the Reorganized Debtor shall have no further obligations related to the Retained Causes of Action Contributions, and the Litigation Trust shall have no right or claim to any proceeds of any Causes of Action retained by the Debtors.  In the event the any Retained Causes of Action Contribution transferred to the Litigation Trust exceed

seventy-five percent (75%) of the net cash recoveries of the applicable Retained Cause of Action, within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, the Litigation Trust shall refund the Reorganized Debtor the portion of the actually paid Retained Cause of Action Contributions exceeding net cash recovery threshold set forth in this Plan.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Retained Causes of Actions Contributions, the accounting supporting the Retained Causes of Action Contributions, and the refund of any overpayments of Retained Causes of Action Contributions.

## ARTICLE VI.

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.    *Rejection of Executory Contracts or Unexpired Leases*

On the Effective Date, except for any executory contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, each executory contract that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Bankruptcy Code §§ 365 and 1123, effective as of the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code §§ 365 and 1123 as of the Confirmation Date.

B.    *Rejection Damages Bar Date*

Except to the extent another Claims Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under this Plan must be filed with the Bankruptcy Court, and a copy served on counsel for the Debtors and the Litigation Trust Trustee, within fifteen (15) days of the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Reorganized Debtor, the Litigation Trust, the Litigation Trust Trustee, their successors, their assigns or their Assets.  Any timely filed Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class 4 (Trade Creditor Claims).  Nothing in this Plan extends or modifies any previously applicable Claims Bar Date.

## ARTICLE VII.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Disbursing Agent*

1.    **Litigation Trust Trustee as Disbursing Agent for Class 6A Claims and Class 6B Claims**

The Reorganized Debtor shall be the Disbursing Agent for any payments made to parties other than creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to this Plan. The Litigation Trust Trustee shall be the Disbursing Agent for creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to Article IV.M.9 of this Plan.

2.    **Alternative Disbursing Agent Qualification**

Other than as set forth in this Plan, after the Effective Date no Person other than the Litigation Trust Trustee (or the Reorganized Debtor to the extent any applicable disbursement to be made by the Reorganized Debtor as Disbursing Agent could not be effected on the Effective Date) shall be authorized by the Bankruptcy Court to serve as Disbursing Agent unless and until the Litigation Trust Oversight Committee consents in writing to that Person serving as Disbursing Agent, and that Person (i) executes and files a statement with the Bankruptcy Court agreeing to perform all of the duties of the Disbursing Agent under this Plan, and (ii) consents to the jurisdiction of the Bankruptcy Court in respect to all matters relating to the performance of his or her duties as the Disbursing Agent under this Plan or order of the Bankruptcy Court.

B.    *Time and Manner of Distributions*

The Disbursing Agent shall make Distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable after the Effective Date, except as otherwise agreed to by the Litigation Trust Oversight Committee or by order of the Bankruptcy Court. The Litigation Trust Trustee as Disbursing Agent shall have the power, subject to Litigation Trust Oversight Committee consent, to make interim distributions to Litigation Trust Beneficiaries in accordance with this Plan if the Litigation Trust Trustee determines that such interim distributions are warranted and economical. If the Litigation Trust Trustee determines to make interim distributions to Litigation Trust Beneficiaries, the Litigation Trust Trustee will determine the amount to be distributed by taking into account such factors as ongoing expenses and costs, taxes and reserves necessary to provide for the resolution of Litigation Trust Causes of Action. Amounts withheld will be placed in an interest-bearing account approved by the Litigation Trust Oversight Committee, which shall fund ongoing expenses and costs relating to such reserves, including, without limitation, taxes in respect of Litigation Trust Causes of Action, if any.

At the option of the Disbursing Agent, except as otherwise provided in this Plan, any distributions under this Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of this Plan to the contrary, no payment of fractional cents will be made under this Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $50.00 will be considered de minimis, and Holders of Allowed Claims that are entitled to any distribution of less than $50.00 will not receive any distribution unless and until the aggregate of such distributions exceed $50.00. Such

- 41 -

undistributed funds shall remain with and vest in the Litigation Trust for distribution to other Holders of Allowed Claims.

C.      *Interest on Claims*

Except as otherwise specifically provided for herein or in the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

D.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Litigation Trust and Litigation Trust Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      **Delivery of Distributions in General**

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the addresses set forth on the Proof of Claim or Interest filed by such Holder (or at the last known address of such Holder if no motion requesting payment or Proof of Claim or Interest is filed or the Debtors and the Litigation Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Litigation Trust Trustee or the Debtors as applicable after the date of any related Proof of Claim or Interest, or (iii) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been filed and the Litigation Trust Trustee or the Debtors have not received a written notice of a change of address.

2.      **Undeliverable Distributions**

a.      Holding of Undeliverable Distributions.

If any distribution to a Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until notification in writing of such Holder's then-current address is provided.  Undeliverable distributions shall be returned and shall remain in the possession of the Litigation Trust until such time as a distribution becomes deliverable.  Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind.  As soon as reasonably practicable, the Litigation Trust shall make all distributions that become deliverable.

b.      Failure to Claim Undeliverable Distributions.

Any Holder of an Allowed Claim (irrespective of when a Claim became an Allowed Claim) that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within ninety (90) days after the distribution has been attempted to be made to the Holder of the Allowed Claim shall have its Claim related to such undeliverable distribution satisfied and shall be forever barred from asserting any such Claim against the Litigation Trust or be entitled to a further distribution. In such cases, any Cash held for distribution on account of such Claims shall be the property of the Litigation Trust free of any such Claim. Nothing contained herein shall require the Litigation Trust Trustee or any interested party to attempt to locate any Holder of an Allowed Claim.

F.    *Claims Administration Responsibility*

1.    **Reservation of Rights to Object to Claims**

Except as provided in Article II.B hereof, for the avoidance of doubt, nothing in this Section F shall affect the rights, if any, of any interested party to object to any Claim or Interest before the Effective Date. Unless a Claim or Interest is expressly described as an Allowed Claim or Interest pursuant to or under this Plan, or otherwise becomes an Allowed Claim or Interest prior to Effective Date, the Debtors reserve any and all objections to any and all Claims and Interests and motions or requests for the payment of Claims or Interests, whether administrative expense, priority, secured or unsecured, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' failure (as applicable) to object to any Claim or Interest in the Chapter 11 Cases shall be without prejudice to the Debtors' rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim or Interest is sought to be enforced by the Holder of such Claim or Interest prior to the Effective Date.

2.    **Filing of Objections**

After the Effective Date, the Reorganized Debtor shall have the sole authority to file objections and otherwise object to all Administrative Claims, and all claims seeking allowance as Administrative Claims, not paid on or prior to the Effective Date.

On the Effective Date, the Litigation Trust and the Litigation Trust Trustee as applicable shall assume the right and obligation to prosecute any Claim Objections (other than Administrative Claims or claims seeking allowance as Administrative Claims) which have not been previously adjudicated prior to the Effective Date. After the Effective Date, the Litigation Trust and Litigation Trust Trustee as applicable shall have the sole authority to file objections and otherwise object to all Claims (other than Administrative Claims or claims seeking allowance as Administrative Claims) which are paid on the Effective Date.

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if service is made by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage

prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases. Unless otherwise provided in this Plan or by order of the Bankruptcy Court, any objections to Claims must be filed and served not later than the Objection Deadline.

3.    **Determination of Claims**

Any Claim as to which a Proof of Claim or Interests or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim or Interest, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim or Interest filed by the Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim or Interest. Any such Claim or Interest determined to be Allowed, shall be deemed to be an Allowed Claim for such liquidated amount (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) and shall be satisfied in accordance with this Plan. Nothing contained in this Plan shall constitute or be deemed a waiver of any Claim, right or Cause of Action that the Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. § 157.

G.    *Procedures for Treating and Resolving Disputed and Contingent Claims or Interests*

1.    **No Distributions Pending Allowance**

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim or Interest; provided, however, that in the event that only a portion of such Claim or Interest is an Allowed Claim or Interest, the Disbursing Agent may make, in his or her discretion, a distribution pursuant to the Plan on account of the portion of such Claim or Interest that becomes an Allowed Claim or Interest.

2.    **Claim Estimation**

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee, as applicable, may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any.

H.    *Setoffs and Recoupment*

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee as applicable may, pursuant to Section 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which

payments are to be made pursuant to this Plan any claims or Causes of Action of any nature whatsoever the Debtors, Reorganized Debtor or Litigation Trust, as applicable, may have against the Holder of such Claim; provided, however, that neither the failure to effect such setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, or Litigation Trust as applicable, of any setoff or recoupment the Debtors or Litigation Trust may have against the Holder of such Claim, nor of any other claim or Cause of Action.

I.    *Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code*

Allowance and disallowance of Claims shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

J.    *Cancellation of Instruments and Agreements*

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, or agreements evidencing, giving rise to or governing any Claim shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be satisfied and the Holders thereof shall have no rights against the Debtors, the Estates, the Reorganized Debtor, the Litigation Trust Trustee, the Litigation Trust Oversight Committee, and/or the Litigation Trust; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in this Plan.

K.    *Withholding Taxes*

The Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any payments under this Plan.  As a condition to making any distribution under this Plan, the Disbursing Agent may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the Disbursing Agent may deem necessary to comply with applicable tax reporting and withholding laws.

L.    *Reports*

From the Effective Date, until a Final Decree is entered, the Litigation Trust Trustee shall submit quarterly reports to the United States Trustee and the Litigation Trust Oversight Committee setting forth all receipts and disbursements of the Litigation Trust as required by the United States Trustee guidelines.

M.    *Distribution Record Date*

As of the close of business on the applicable Distribution Record Date, the transfer register for all Claims maintained by the Debtors or their agents, shall be closed, and there shall be no further changes in the Record Holders of any such Claims.  Moreover, the Debtors, Reorganized Debtor, Litigation Trust, Litigation Trust Trustee or Litigation Trust Oversight

Committee as applicable shall have no obligation to recognize the transfer of any such Claims occurring after the applicable Distribution Record Date and shall be entitled for all purposes herein to recognize and deal only with those Holders of record as of the close of business on the applicable Distribution Record Date.

N.      *Timing and Calculation of Amounts to be Distributed*

Except as otherwise provided herein, on the Effective Date each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class, provided however, the Litigation Trust shall maintain reserve accounts in trust for the payment or distribution on account of Litigation Trust Beneficiaries and shall make the appropriate adjustments in distributions to adequately take into consideration and fund such reserve accounts.  The Litigation Trust Trustee, as Disbursing Agent, shall be authorized to make interim distributions and any subsequent distributions necessary to distribute any Cash, or other consideration held in any reserve account to the appropriate Claim Holder as Claims are resolved and Allowed and reserves are reduced in accordance with this Plan.

O.      *Settlement of Claims and Controversies*

Pursuant to Fed. R. Bankr. P. 9019 and in consideration for the distributions and other benefits provided under this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of claims and/or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of any such Allowed Claim.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND OCCURRENCE OF THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions, terms and conditions of the Plan and the Disclosure Statement are approved in the Confirmation Order.

B.      *Conditions Precedent to Occurrence of Effective Date*

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions herein:

1.      Fourteen (14) days have passed since the entry of the Confirmation Order as a Final Order in form and substance satisfactory to the Debtors and the Committee in their absolute discretion.  The Confirmation Order shall provide that, among other things:

(i)      the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and

(ii)    the provisions of the Confirmation Order are nonseverable and mutually dependent.

2.    The appointment of the Litigation Trust Trustee shall have been confirmed by the Confirmation Order or order of the Bankruptcy Court.

3.    All actions, documents and agreements necessary to implement the Plan, including, without limitation, creating the Litigation Trust and entering into the Litigation Trust Agreement, shall have been effected or executed.

4.    The Debtors shall have established a reserve for all then outstanding Professional Fee Claims and Committee Professional Fee Claims (as limited by the Plan) as estimated by the Debtors and the Committee on or prior to the Effective Date.

C.    *Waiver of Conditions*

Except as otherwise required by the tenets of the Plan, the Debtors may waive any of the conditions to Confirmation of the Plan and/or to occurrence of the Effective Date of the Plan set forth in this Article VIII, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

D.    *Debtors' Right of Revocation or Withdrawal*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans.  If the Debtors revoke or withdraw the Plan, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

## ARTICLE IX.
## EFFECT OF CONFIRMATION

A.    *Injunction*

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any**

- 47 -

manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

B.      *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

C.      *Exculpation*

Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement

- 48 -

contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

D. *Release of Liens*

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such security interest (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

## ARTICLE X.

## RETENTION OF JURISDICTION

This Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and this Plan, including, without limitation, the following:

      1.     All matters relating to the assumption or rejection or the assumption and assignment of Executory Contracts, or Claims or disputes relating thereto;

      2.     All matters relating to the ownership of a Claim or Interest;

      3.     All matters relating to the distribution to Holders of Allowed Claims and Interests and to the determination of Claims and Interests;

4.      Any and all matters involving the Litigation Trust Trustee and/or the Litigation Trust and/or the Litigation Trust Oversight Committee;

5.      All matters relating to or arising in connection with the disallowance, Allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest;

6.      To enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

7.      All matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of this Plan;

8.      All matters relating to disputes arising in connection with the interpretation, implementation or enforcement of this Plan or the Confirmation Order, including disputes involving the injunction and exculpation provisions of this Plan, and disputes arising under agreements, documents or instruments executed in connection with this Plan;

9.      To consider any modifications of this Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

10.     All applications for allowance of compensation and reimbursement of Professional Fee Claims under this Plan or under §§ 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

11.     To hear and determine all motions requesting allowance of an Administrative Claim;

12.     To determine requests for the payment of Claims entitled to priority under § 507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

13.     All Causes of Action, Avoidance Actions and other suits and adversary proceedings, including proceedings to recover assets of the Litigation Trust, as successor-in-interest to the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or this Plan, proceedings to adjudicate the allowance of Disputed Claims and Interests, and all controversies and issues arising from or relating to any of the foregoing;

14.     All disputes between the Independent Committee and Committee or Litigation Trust Trustee as applicable regarding the ownership of any discovered Unknown Cause of Action;

15.     All disputes regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period;

16.     All matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

17.     Any other matter to the extent such jurisdiction is consistent with the Bankruptcy Code;

18.     To enter the Final Decree closing the Chapter 11 Case; and

19.     To enforce all orders previously entered by the Bankruptcy Court, including the Confirmation Order.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

A.     *Effectuating Documents, Further Transactions and Corporation Action*

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements of documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states where each of the Debtors are organized without any requirement of further action by the shareholders or directors of any Debtor.

B.     *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid, prior to the Effective Date, out of the Assets of the Estate for each quarter (including any fraction thereof) and after the Effective Date by the Litigation Trust until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

C.     *Headings*

The headings of the articles, paragraphs and sections of this Plan are inserted for convenience only and shall not affect the interpretation hereof.

D.    *Binding Effect of Plan*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of this Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, the Litigation Trust and their respective successors or assigns, whether or not the Claim or Interest of such Holders is Impaired under this Plan and whether or not such Holder has accepted this Plan.  The rights, benefits and obligations of any entity named or referred to in this Plan, whose actions may be required to effectuate the terms of this Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the Litigation Trust Trustee and any trustee appointed for the Debtors under chapters 7 or 11 of the Bankruptcy Code).

E.    *Final Order*

Except as otherwise expressly provided in this Plan, any requirement in this Plan for a Final Order may be waived by the Debtors in consultation with the Committee upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

F.    *Withholding and Reporting Requirements*

In connection with this Plan and all instruments issued in connection herewith and distributions hereunder, the Debtors, Litigation Trust and the Litigation Trust Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

G.    *Tax Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers from the Debtors, the Litigation Trust or the Litigation Trust  Trustee to any other Person or entity pursuant to this Plan, or any agreement regarding the transfer of title to or ownership of the Debtors' or the Litigation Trust's personal property, or the issuance, transfer or exchange of any security under this Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by this Plan, including, without limitation, any transfers to or by the Litigation Trust Trustee of the Debtors' or the Litigation Trust's property in implementation of or as contemplated by this Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

H.    *Governing Law*

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under this Plan, any agreements, documents and instruments executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors and the Litigation Trust, corporate governance matters shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles.

I.    *Severability*

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in this Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively.  Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

J.    *Plan Controls*

In the event and to the extent any provision of this Plan is inconsistent with any provision of the Disclosure Statement or the Plan Supplement, the provisions of this Plan shall control and take precedence.

K.    *Amendments and Modifications*

The Debtors may alter, amend or modify this Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing.  After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of this Plan, the Debtors in consultation with the Committee may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Disclosure Statement or the Confirmation Order, and pursue such matters as may be necessary to carry out the purposes and effects of this Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties-in-interest shall not be required.

L.    *Notices*

Any notices required under this Plan or any notices or requests of the Debtors or the Litigation Trust Trustee by parties in interest under or in connection with this Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtors:

Reed Smith LLP
Attn:  Derek J. Baker, Esq. and Derek M. Osei-Bonsu, Esq.
Three Logan Square
1717 Arch Street Suite 3100
Philadelphia, PA 19146

-and-

Reed Smith LLP
Attn: Ann E. Pille
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606

To the Committee:

Dechert LLP
Attn:  Stephen Zide, Esq and David Herman Esq.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

To the Litigation Trust and the Litigation Trust Trustee:

_____

M.    *Filing of Additional Documents*

On or before substantial consummation of this Plan, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

N.    *Direction to a Party*

From and after the Effective Date, the Debtors, the Litigation Trust or the Litigation Trust Trustee may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by this Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of this Plan.

O.    *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

- 54 -

P.  *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

Q.  *Further Assurances*

The Debtors, Litigation Trust Trustee, and all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

R.  *Entire Agreement*

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

S.  *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Respectfully Submitted,

Eletson Holdings, *et al.*, as Debtors and Debtors-in-Possession

By:    /s/ Vasillis E. Kertsikoff
       Name: Vasillis E. Kertsikoff
       Title:  Vice President & Director

**EXHIBIT 2**

**Solicitation Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,[1]** | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**ORDER (I) APPROVING THE DEBTORS' DISCLOSURE STATEMENT;
(II) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF
VOTES TO ACCEPT OR REJECT THEIR PLAN OF REORGANIZATION;
(III) ESTABLISHING THE CONFIRMATION HEARING AND RELATED
DEADLINES; AND (IV) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to sections 1125 and 1126 of the Bankruptcy Code,[2] Bankruptcy Rules 2002, 3016, 3017, and 3018 and Local Rules 3017-1(a) and 3017-1(b), for entry of an order (i) approving the Disclosure Statement; (ii) establishing procedures for solicitation and tabulation of votes to accept or reject the Plan; (iii) establishing the Confirmation Hearing and related deadlines; and (iv) granting related relief, all as set forth in the Motion; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. sections 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and notice of the Motion and the opportunity for a hearing on the Motion was appropriate under the particular circumstances; and the Court having reviewed the

---

[1] The Debtors in these chapter 11 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

[2] Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Motion and having considered the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED:**

1.      The Motion is granted as set forth herein.

2.      The Disclosure Statement is approved as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, and any objections to the adequacy of the information contained in the Disclosure Statement or in opposition to the approval of the Disclosure Statement and the relief requested in the Motion not otherwise consensually resolved are overruled.

3.      The following schedule in connection with confirmation of the Plan is hereby approved:

| Event | Proposed Deadline |
|---|---|
| Voting Record Date | Wednesday, May 15, 2024 |
| Rule 3018(a) Motion Deadline | Monday, June 3, 2024, at 4:00 p.m. (Eastern) |
| Solicitation Commencement Date | Three Business Days from the Entry of this Order |
| Voting Deadline | Monday, June 24, 2024 at 5:00 p.m. (Eastern) |
| Plan Supplement Filing Date | Ten days before Confirmation (June 24, 2024) |
| Voting Declaration Deadline | June 26, 2024 |
| Confirmation Objection Deadline | Monday, June 27, 2024 at 4:00 p.m. (Eastern) |
| Reply Deadline | July 1, 2024 at 4:00 p.m. (Eastern) |

| Confirmation Hearing | Wednesday, July 3, 2024 at [_] (Eastern) |

4.    No later than three (3) business days after entry of this Order, the Debtors shall mail or cause to be mailed to holders of Claims entitled to vote on the Plan, a solicitation package containing: (a) written notice (the "Confirmation Hearing Notice"), substantially in the form attached hereto as Exhibit 1, which Confirmation Hearing Notice is approved; (b) the Plan; (c) the Disclosure Statement, substantially in the form approved by the Court; (d) the appropriate ballots (substantially in the forms attached hereto as Exhibits 2 through 10) and a ballot return envelope, postage prepaid; and (e) such other information as the Court may direct or approve (collectively, the "Solicitation Package").  The Debtors shall send each impaired creditor entitled to vote on the Plan only one Solicitation Package even if such creditor has asserted Claims against multiple Debtors.  The Solicitation Package and the manner of service of the Solicitation Package satisfies the requirements of Bankruptcy Rule 3017(d).

5.    With respect to Solicitation Packages to be distributed to owners of a beneficial interest ("Beneficial Owners") in the Exchange Notes or Old Notes (collectively, the "Notes"), the Debtors shall distribute or cause to be distributed Solicitation Packages to (a) the record holders of such Notes as of the Voting Record Date, and (b) each broker, commercial bank, transfer agent, trust company, dealer, or other intermediary or nominee, or their mailing agent (each a "Nominee") identified by the Debtors as an entity through which Beneficial Owners indirectly hold positions in the Notes as of the Voting Record Date.  The Debtors shall send Solicitation Packages to the Nominees in paper format and/or via electronic transmission and each Nominee shall cooperate with each other to accomplish distribution of the Solicitation Packages to the respective Beneficial Owners.

- 3 -

6.     Each Nominee through which one or more Beneficial Owners holds positions in the Notes as of the Voting Record Date is hereby ordered to distribute the Solicitation Package to the Beneficial Owners for which they hold positions in the Notes within five (5) business days after receipt of such Solicitation Packages from the Debtors and obtain the vote of such Beneficial Owners consistent with customary practices for obtaining the votes of securities held in "street name", in one of the following two ways:

(a)     Master Ballots: A Nominee may obtain the votes of Beneficial Owners by forwarding to the Beneficial Owners the applicable unsigned Beneficial Holder Ballot, together with the Solicitation Package, a return envelope provided by, and addressed to, the Nominee, or other instructions specifying the procedure on how to return the Beneficial Holder Ballot or information requested therein to such Nominee, and other materials requested to be forwarded.  Each such Beneficial Owner may then indicate its vote on the Beneficial Holder Ballot, provide the information requested in the Beneficial Holder Ballot, review the certifications contained in the Beneficial Holder Ballot, and return the Beneficial Holder Ballot in sufficient time to be summarized by the Nominee on a Master Ballot in substantially the forms annexed hereto as **Exhibits 6** and **8**. The Nominee shall be responsible for summarizing the individual votes of its respective Beneficial Owners from their Beneficial Holder Ballots on the Master Ballot and returning the Master Ballot to Counsel to the Debtor so that it is received prior to the Voting Deadline. The Nominee shall retain copies of all Beneficial Holder Ballots received by such Nominee for inspection for a period of one year after the Effective Date of the Plan.

or

(b)     Pre-Validated Ballots: A Nominee may pre-validate a Beneficial Holder Ballot by, as applicable: (i) signing the applicable Beneficial Holder Ballot indicating the name of the Nominee and the Depository Trust Company (the "DTC") participation number; and (ii) indicating on the Beneficial Holder Ballot the account number of the applicable Beneficial Owner, and the outstanding principal amount of applicable Notes held by the Nominee for such Beneficial Owner; and shall forward such pre-validated Beneficial Holder Ballot together with the Solicitation Package and other materials requested to be forwarded to the Beneficial Owner for voting. The Beneficial Owner may then complete the information requested in such pre-validated Ballot, review the certifications contained in the Beneficial Holder Ballot, and return the Beneficial Ballot directly to Counsel to the Debtor as instructed so that it is received by Counsel to the Debtor before the Voting Deadline. A list of the Beneficial Owners to

- 4 -

whom pre-validated Beneficial Ballots were delivered will be maintained by each applicable Nominee for inspection for at least one year from the Voting Deadline. The Nominee shall maintain a list of the Beneficial Owners to whom pre-validated Beneficial Holder Ballots were delivered for inspection for a period of one year after the Effective Date of the Plan.

7.      **Wednesday, May 15, 2024** is established as the record date (the "Voting Record Date") for purposes of determining the creditors and interest holders entitled to receive the Solicitation Package or the Non-Voting Party Notice, as applicable.

8.      The Ballots, substantially in the forms attached hereto as Exhibits 2 through 10 are hereby approved.

9.      All Ballots must be properly executed, completed and delivered to counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) or electronically at Eletsonballots@reedsmith.com so that the Ballots are received on or before **Monday, June 24, 2024 at 5:00 p.m. (Eastern)** (the "Voting Deadline").

10.     For purposes of voting on the Plan, the amount of a claim held by a creditor shall be determined pursuant to the following guidelines:

(a)      The claim listed in a Debtor's schedule of liabilities, provided that (i) such claim is not scheduled as contingent, unliquidated, undetermined, or disputed, and (ii) no Proof of Claim has been timely filed (or otherwise deemed timely filed by the Court under applicable law).

(b)      The non-contingent and liquidated amount specified in a Proof of Claim timely filed with the Debtors (or otherwise deemed timely filed by the Court under applicable law) to the extent the Proof of Claim has not been superseded or amended by another Proof of Claim, and is not the subject of an objection, either generally to the applicable claim or solely for purposes of determining the amount of the applicable claim for voting purposes (or, if such claim has been resolved pursuant to a stipulation or order entered by the Court, or otherwise resolved by the Court, the amount set forth in such stipulation or order).

(c)      The amount temporarily allowed by the Court for voting purposes, pursuant to Bankruptcy Rule 3018(a), provided that a motion is brought,

notice is provided, and a hearing is held at or prior to the Confirmation Hearing, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

(d)     Except as otherwise provided in subsection (c) hereof, with respect to a ballot cast by an alleged creditor whose claim (i) is not listed on a Debtor's schedule of liabilities, or (ii) is listed as disputed, contingent, and/or unliquidated on a Debtor's schedule of liabilities, but who has timely filed a Proof of Claim in a wholly unliquidated, wholly contingent, or unknown amount that is not the subject of an objection, such ballot shall be counted as a vote in determining whether the numerosity requirement of section 1126(c) of the Bankruptcy Code has been met, but shall not be counted in determining whether the aggregate claim amount requirement has been met.

11.     If a creditor casts a ballot and has timely filed a Proof of Claim (or has otherwise had a Proof of Claim deemed timely filed by the Court under applicable law), but the creditor's claim is the subject of an objection (either generally to the applicable claim, or solely for purposes of determining the amount of the applicable claim for voting purposes), the creditor's ballot shall not be counted, unless such claim is temporarily allowed by the Court for voting purposes pursuant to Bankruptcy Rule 3018(a).  Creditors seeking to have a claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a) must file and serve a motion for such relief so as to be received by notice parties no later than **Monday, June 3, 2024, at 4:00 p.m. (Eastern)**, which motion shall be heard, at the Court's discretion, at or prior to the Confirmation Hearing.  Notwithstanding the foregoing, if an objector to a claim requests that such claim be reclassified and/or allowed in a fixed or reduced amount, such claimant's ballot shall, to the extent either (i) mutually acceptable to the claimant, objector and Debtors, or (ii) as ordered by the Bankruptcy Court after notice and hearing, be counted in such reduced amount and/or under the reclassified category.

12.     The following voting procedures and standard assumptions shall be used in tabulating the Ballots:

- 6 -

(a)     Ballots that indicate an acceptance or rejection of the Plan and which are otherwise properly executed and received prior to the Voting Deadline, *shall be counted* as votes to accept or reject the Plan.

(b)     Only ballots that are timely received prior to the Voting Deadline and that are properly executed will be counted.

(c)     Creditors must vote all of their claims within a particular class, even if electing to be treated in Class 4, either to accept or reject the Plan and may not split their vote.  Accordingly, a ballot that partially rejects and partially accepts the Plan *shall not be counted*.

(d)     Each creditor shall be deemed to have voted the full amount of its claim.

(e)     If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same claim, such ballots *shall not be counted*.

(f)     Ballots that are illegible or contain insufficient information to permit the identification of the creditor, *shall not be counted*.

(g)     Ballots that indicate both acceptance and rejection of the Plan *shall not be counted* as votes to accept or reject the Plan.

(h)     Ballots that fail to indicate an acceptance or rejection of the Plan *shall not be counted* as votes to accept or reject the Plan.

(i)     Unsigned ballots *shall not be counted*.

(j)     Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, *shall not be counted*.

(k)     Whenever a creditor casts more than one ballot voting the same claim prior to the Voting Deadline, the last dated ballot received prior to the Voting Deadline shall be deemed to reflect the voter's intent and supersede any prior ballots.

(l)     For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate claims held by a single creditor in a particular class will be aggregated and treated as if such creditor held one claim in such class, and the vote related to such claim will be treated as a single vote to accept or reject the Plan.

(m)     Votes cast by the Beneficial Owners in Class 5A and Class 5B on account of Notes held through Nominees will be applied to the applicable positions held by such Nominees as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from DTC.

- 7 -

(n)     Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date.

13.     The following procedures will be utilized in tabulating votes by Beneficial Holders of Notes:

(a)     Nominees are authorized to obtain the votes of beneficial holders of the Notes, as applicable, by forwarding the Solicitation Package to each beneficial holder of the Notes for whom it acts as a Nominee for voting so that the beneficial holder may return its vote directly to its Nominee. Each Nominee will distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices. If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the beneficial holders for the purpose of recording the beneficial holder's vote, the Nominee will be authorized to send the voting information form; provided, however, that the Nominee also distribute the appropriate Beneficial Holder Ballot approved by the Proposed Order; and

(b)     Nominees shall summarize the individual votes of their respective beneficial holders cast on their Beneficial Holder Ballots on a master Ballot which can be returned via email at Eletsonballots@reedsmith.com in substantially the forms of the Master Ballot attached to the Proposed Order as **Exhibits 6** and **8**, and then return the Master Ballot to Counsel to the Debtors.

14.     Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Debtors, which determination shall be final and binding.

15.     Any objection, comment, or response to confirmation of the Plan (including any supporting memoranda) must be in writing, served on the parties identified below, and filed with the Court, together with proof of service, such that the foregoing are received by such parties and the Court on or before **Monday, June 27, 2024 at 4:00 p.m. (Eastern)** (the "Confirmation Objection Deadline").  The Court shall consider only written objections that are timely filed and served by the Confirmation Objection Deadline.  Objections to confirmation of the Plan should provide proposed language to remedy such objections and shall be filed with the Court and served on the following parties:

- 8 -

**Counsel for the Debtors:** Reed Smith LLP, Three Logan Square 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Derek J. Baker, Esq. & Derek M. Osei-Bonsu, Esq.); Email: dbaker@reedsmith.com & dosei-bonsu@reedsmith.com

and

Reed Smith LLP, 10 S. Wacker Drive, Suite 4000, Chicago, IL 60606 (Attn: Ann E. Pille); Email: apille@reedsmith.com

and

Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022, (Attn: Andrew L. Buck and Louis M. Solomon); Email: abuck@reedsmith.com; lsolomon@reedsmith.com

**Counsel for the Official Committee of Unsecured Creditors:** Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York, NY 10036 (Attn: Stephen Zide, Esq. & David Herman); Email: stephen.zide@dechert.com; david.herman@dechert.com

and

**Office of the United States Trustee**: Alexander Hamilton Custom House, One Bowling Green, Suite 534, New York, NY 10004 (Attn: Daniel Rudewicz & Paul Schwartzberg); Email: Daniel.Rudewicz@usdoj.gov; Paul.Schwartzberg@usdoj.gov

16.     Any party supporting the Plan shall be afforded an opportunity to file a response to any objection to confirmation of the Plan, prior to the Confirmation Hearing.

17.     A hearing shall be held before this Court on **Wednesday, July 3, 2024 at [_] (Eastern)**, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green Courtroom 501, New York, NY 10004, or as soon thereafter as counsel can be heard, to consider confirmation of the Plan (the "Confirmation Hearing").

18.     The Confirmation Hearing may be adjourned from time to time without further notice to creditors and other parties in interest other than an announcement of the adjourned date at the Confirmation Hearing.

- 9 -

19.     Prior to the mailings described herein, the Debtors may fill in any missing dates and other information, correct any typographical errors, and make such other non-material, non-substantive changes as they deem appropriate.

20.     The Debtors are authorized, but not directed, to contact creditors who have submitted invalid Ballots to correct the defect in such creditor's Ballot.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

22.     The Court shall retain jurisdiction with respect to all matters arising under or relating to the implementation and enforcement of this Order.


Dated: _____, 2024
        New York, New York


        _____
        JOHN P. MASTANDO III
        UNITED STATES BANKRUPTCY JUDGE

## **Exhibit 1**

**Confirmation Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **Eletson Holdings Inc.,** *et al.,*[1] | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

### NOTICE OF (I) APPROVAL OF DISCLOSURE STATEMENT, (II) DEADLINE FOR VOTING ON PLAN, (III) HEARING TO CONSIDER CONFIRMATION OF PLAN, AND (IV) DEADLINE FOR FILING OBJECTIONS TO CONFIRMATION OF PLAN

**PLEASE TAKE NOTICE THAT:**

1. On May 13, 2024, the above-captioned debtors and debtors-in-possession (the "Debtors") filed the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code (as may be amended, modified or supplemented, the "Plan"; [Dkt. No. 671] and the Disclosure Statement in Support of the Plan (as may be amended, modified or supplemented, the "Disclosure Statement") [Dkt. No. 672].

2. By order dated _____, 2024 (the "Disclosure Statement Order") [Dkt. No. _], the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and authorized the Debtors to begin soliciting votes in respect of the Plan in accordance with the terms of the Disclosure Statement Order.

3. By the Disclosure Statement Order, the Bankruptcy Court established **[_], 2024 at 5:00 p.m. (Eastern)** (the "Voting Deadline") as the deadline by which ballots accepting or rejecting the Plan must be received. To be counted, your original ballot (which is enclosed herewith if you hold a claim within a class entitled to vote on the Plan) must actually be **received** on or before the Voting Deadline by counsel to the Debtors, Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) or submitted electronically at Eletsonballots@reedsmith.com.

4. On **[_], 2024 at 10:00 a.m. (Eastern)**, or as soon thereafter as counsel may be heard, a hearing (the "Confirmation Hearing") will be held before the Honorable John P. Mastando III in the Bankruptcy Court, One Bowling Green, Courtroom 501, New York, NY

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

10004 to consider confirmation of the Plan, as the same may be amended, modified or supplemented from time to time, and for such other and further relief as may be just and proper. The Confirmation Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by an announcement of such an adjournment in open court at the Confirmation Hearing or any adjournment thereof or an appropriate filing with the Bankruptcy Court. The Plan may be modified in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Plan and other applicable law, without further notice, prior to or as a result of the Confirmation Hearing.

5.    Objections, if any, to confirmation of the Plan, must be in writing, **filed on or before [_], 2024 at 4:00 p.m. (Eastern)** (the "Confirmation Objection Deadline") with the clerk of the Bankruptcy Court, and must (i) state with particularity the grounds therefor, (ii) be filed in accordance with the electronic filing procedures for the United States Bankruptcy Court for the Southern District of New York, with proof of service, with a courtesy copy delivered to the undersigned counsel and the Chambers of the Honorable John P. Mastando III, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, 10004; and (iii) be served upon (a) counsel to the Debtors, Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022, Attn: Andrew L. Buck and Louis M. Solomon, Reed Smith LLP, 10 South Wacker Drive, 40th Floor Chicago, IL 60606, Attn: Ann E. Pille and Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103, Attn: Derek J. Baker and Derek M. Osei-Bonsu; (b) counsel to William K. Harrington, the United States Trustee for Region 2, U.S. Department of Justice, Office of the U.S. Trustee, Alexander Hamilton U.S. Custom House, One Bowling Green, Room 534, New York, New York 10004, Attn: Paul Schwartzberg, Esq. and Daniel Rudewicz, Esq.; (c) counsel to the Official Committee of Unsecured Creditors, Dechert LLP, Three Bryant Park, 1095 Avenue of the Americas, New York NY 10036, Attn: Stephen Zide, Esq. & David Herman; and (d) and any other party in interest who files a Notice of Appearance and a request for service of documents, so as to be received by the Confirmation Objection Deadline.

6.    Claimants seeking to have a claim temporarily allowed for purposes of voting to accept or reject the Plan pursuant to Bankruptcy Rule 3018(a) must file and serve a motion for such relief so as to be received no later than **[_], 2024, at 4:00 p.m. (Eastern)** which motion shall be heard, at the Court's discretion, at or prior to the Confirmation Hearing.

7.    INJUNCTION AND RELATED PROVISIONS.[2]

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

*(a)  Injunction.*  **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are**

---

[2] Terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties: (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.* Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

(c) *Exculpation.* Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document

- 3 -

**created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.  Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.**

8.      You can review copies of the Plan and Disclosure Statement by (a) requesting copies of the Plan and Disclosure Statement from Debtors' counsel who will provide the copies free of charge, or (b) accessing the Bankruptcy Court's website: **www.nysb.uscourts.gov**, which requires a PACER password and login.

Dated: [_], 2024                          Respectfully submitted,
     New York, New York


**REED SMITH LLP**


/s/_____
Derek J. Baker
Derek M. Osei-Bonsu
Reed Smith LLP
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail: dbaker@reedsmith.com
     dosei-bonsu@reedsmith.com
-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail: abuck@reedsmith.com
     lsolomon@reedsmith.com
 -and-

Ann E. Pille
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

     *Counsel for the Debtors*

**<u>Exhibit 2</u>**

**Form of Ballot – Class 1 (OCM Guaranty Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,**[1] | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'**
**SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 1 Ballot: OCM Guaranty Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS**
**[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No.672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

This Ballot is being sent to holders of claims in Class 1 (OCM Guaranty Claims). The creditors of the Debtors whose claims are impaired under the Plan and who are not deemed to have rejected the Plan are afforded the opportunity to vote on the Plan, which may be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims in each class of claims voting on the Plan. In the event that the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b). To have your vote count, you must complete and return this Ballot.

You may make a voluntary and irrevocable election to have the entirety of your Class 1 Claim treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as described in further detail below and in the Plan). If your Claim is greater than $200,000, upon making the Trade Class Election, your Claim will be reduced to $200,000 for treatment in Class 4 (Trade Creditors).

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.  YOUR CLAIM HAS BEEN PLACED IN CLASS 1 UNDER THE PLAN.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.**

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF THE BALLOT CONTAINING YOUR VOTE IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE YOUR VOTE WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.  BALLOTS CAST BY FACSIMILE OR BY OTHER ELECTRONIC MEANS OTHER THAN AS SET FORTH ABOVE WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE DEBTORS IN WRITING.

## ACCEPTANCE OR REJECTION OF THE PLAN

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Ballots shall not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Ballot; (vi) any form of Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Ballot, facsimile Ballot or Ballot transmitted by electronic means without an original signature. If you hold claims in more than one Class, you will receive multiple Ballots.  You should vote each Ballot that you receive.

## IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

**(a) Injunction.  Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another**

- 2 -

proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.* Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

*(c) Exculpation.* Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of

any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

<u>Item 1. Vote on the Plan.</u>  (Please check one box only.)

> ☐  ACCEPTS (votes FOR) THE PLAN   ☐  REJECTS (votes AGAINST) THE PLAN
>
> *By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

This Ballot does <u>not</u> constitute and shall <u>not</u> be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.

<u>Item 2. **OPTIONAL** Trade Class Election for Class 1 Claims.</u>

By checking the box below, the undersigned *may irrevocably elect* to treatment of your Class 1 Claim as a Class 4 Claim (Trade Creditor). **By checking the box below, the undersigned irrevocably elects to** *reduce* your Class 1 Claim to an amount equal to $200,000 (to the extent your Allowed Class 1 Claim exceeds $200,000) and thereby receive payment in Cash in an amount equal to fifteen percent (15%) of your elected Class 4 Claim, in full satisfaction of such Claim; *provided that*, if the aggregate distributions to Holders of Allowed Class 4 Claims exceeds $1,000,000 (the "Trade Creditor Claim Cap"), then Holders of such Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap in Cash. By checking the box below and making the irrevocable Trade Class Election, the undersigned will be deemed to have accepted the Plan. If the undersigned fails to check the box below, the undersigned will be deemed to have rejected the Trade Class Election.

> ☐  The undersigned elects to **opt-in** to the Trade Class Election, and in the event its Class 1 Claim exceeds $200,000, to reduce its Class 1 Claim that is greater than $200,000 to a Claim of $200,000 to be treated as a Trade Claim pursuant to Section II(C)(4)(b) of the Plan.

<u>Item 3. Declarations.</u>

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Ballot and has full power and authority to vote to accept or reject the Plan; provided, however, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BALLOT.**
**PLEASE RETURN YOUR BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT.**

- 4 -

**IF YOU RECEIVED A DAMAGED BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Claim Number:                              Name of Voter:

Claim Amount:

| Signature: |
|---|

[Creditor Name and Address]

By: _____

Print or Type Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

Date: _____

SSN/TIN of Voter:_____

- 5 -

## **INSTRUCTIONS FOR COMPLETING THE BALLOT**

This Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  **Do not enclose notes or securities with your completed Ballot.**

This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  Please indicate your vote by marking an "X" in the appropriate box in <u>Item 1</u> of the Ballot.

If you are a Holder of a Class 1 Allowed Claim and you wish to make the optional Trade Class Election, please check the box in <u>Item 2</u>. Please note that failure to check the box in Item 2 will be deemed as having declined the Trade Class Election.

The amount of your Claim as set forth on this Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

After providing all remaining information requested in this Ballot, please sign and date this Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

Return this Ballot by mail, overnight courier or hand delivery to the Debtors' Counsel at the following address:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)


OR


Electronically at
Eletsonballots@reedsmith.com

**BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

You must vote all of your claims within a single class to either accept or reject the Plan.  A Ballot that partially rejects and partially accepts the Plan or Ballots that are voted inconsistently will not be counted.

This Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Ballot for such other classes.

## **Exhibit 3**

**Form of Ballot – Class 2 (Corp Guaranty Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,**[1] | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'
SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 2 Ballot: Corp Guaranty Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

This Ballot is being sent to holders of claims in Class 2 (Corp Guaranty Claims). The creditors of the Debtors whose claims are impaired under the Plan and who are not deemed to have rejected the Plan are afforded the opportunity to vote on the Plan, which may be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims in each class of claims voting on the Plan. In the event that the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b). To have your vote count, you must complete and return this Ballot.

You may make a voluntary and irrevocable election to have the entirety of your Class 2 Claim treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as described in further detail below and in the Plan). If your Class 2 Claim is greater than $200,000, upon making the Trade Class Election, your Claim will be reduced to $200,000 for treatment in Class 4 (Trade Creditors).

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.  YOUR CLAIM HAS BEEN PLACED IN CLASS 2 UNDER THE PLAN.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.**

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF THE BALLOT CONTAINING YOUR VOTE IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE, YOUR VOTE WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.  BALLOTS CAST BY FACSIMILE OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE DEBTORS IN WRITING.

<u>ACCEPTANCE OR REJECTION OF THE PLAN</u>

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Ballot; (vi) any form of Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Ballot, facsimile Ballot or Ballot transmitted by electronic means without an original signature. If you hold claims in more than one Class, you will receive multiple Ballots.  You should vote each Ballot that you receive.

<u>IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN</u>

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

***(a) Injunction.*  Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another**

proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.* Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

*(c) Exculpation.* Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of

- 3 -

any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

<u>Item 1.</u> **Vote on the Plan.  (Please check one box only.)**

---

☐   ACCEPTS (votes FOR) THE PLAN   ☐   REJECTS (votes AGAINST) THE PLAN

*By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

---

**This Ballot does <u>not</u> constitute and shall <u>not</u> be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.**

<u>Item 2.</u> **<u>OPTIONAL</u> Trade Class Election for Class 2 Claims.**

By checking the box below, the undersigned *may irrevocably elect* to treatment of your Class 2 Claim as a Class 4 Claim (Trade Creditor). **By checking the box below, the undersigned irrevocably elects to** *reduce* your Class 2 Claim to an amount equal to $200,000 (to the extent your Allowed Class 2 Claim exceeds $200,000) and thereby receive payment in Cash in an amount equal to fifteen percent (15%) of your elected Class 4 Claim, in full satisfaction of such Claim; *provided that*, if the aggregate distributions to Holders of Allowed Class 4 Claims exceeds $1,000,000 (the "<u>Trade Creditor Claim Cap</u>"), then Holders of such Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap in Cash. By checking the box below and making the irrevocable Trade Class Election, the undersigned will be deemed to have accepted the Plan. If the undersigned fails to check the box below, the undersigned will be deemed to have rejected the Trade Class Election.

---

☐   The undersigned elects to **<u>opt-in</u>** to the <u>Trade Class Election</u>, and in the event its Class 2 Claim exceeds $200,000, to reduce its Class 2 Claim that is greater than $200,000 to a Claim of $200,000 to be treated as a Trade Claim pursuant to Section II(C)(4)(b) of the Plan.

---

<u>Item 3. Declarations.</u>

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Ballot and has full power and authority to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BALLOT.
PLEASE RETURN YOUR BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT.**

**IF YOU RECEIVED A DAMAGED BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Claim Number:                              Name of Voter:

Claim Amount:

| Signature: |
| --- |

[Creditor Name and Address]

By: _____

Print or Type Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

Date: _____

SSN/TIN of Voter:_____

## **INSTRUCTIONS FOR COMPLETING THE BALLOT**

      **This Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Ballot.**

      This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  Please indicate your vote by marking an "X" in the appropriate box in <u>Item 1</u> of the Ballot.

      If you are a Holder of a Class 2 Allowed Claim and you wish to make the optional Trade Class Election, please check the box in <u>Item 2</u>. Please note that failure to check the box in Item 2 will be deemed as having declined the Trade Class Election.

      The amount of your Claim as set forth on this Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

      After providing all remaining information requested in this Ballot, please sign and date this Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

      Return this Ballot by mail, overnight courier or hand delivery to the Debtors' Counsel at the following address:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)


OR


Electronically at
Eletsonballots@reedsmith.com

      **BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

      You must vote all of your claims within a single class to either accept or reject the Plan.  A Ballot that partially rejects and partially accepts the Plan or Ballots that are voted inconsistently will not be counted.

      This Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Ballot for such other classes.

**<u>Exhibit 4</u>**

**Form of Ballot – Class 3 (Azure Guaranty Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,[1]** | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'
SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 3 Ballot: Azure Guaranty Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671].  The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot").  If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100.  **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

This Ballot is being sent to holders of claims in Class 3 (Azure Guaranty Claims).  The creditors of the Debtors whose claims are impaired under the Plan and who are not deemed to have rejected the Plan are afforded the opportunity to vote on the Plan, which may be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims in each class of claims voting on the Plan.  In the event that the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b).  To have your vote count, you must complete and return this Ballot.

You may make a voluntary and irrevocable election to have the entirety of your Class 3 Claim treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as described in further detail below and in the Plan).  If your Class 3 Claim is greater than $200,000, upon making the Trade Class Election, your Claim will be reduced to $200,000 for treatment in Class 4 (Trade Creditors).

---

[1] The Debtors in these chapter 11 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.  YOUR CLAIM HAS BEEN PLACED IN CLASS 3 UNDER THE PLAN.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.**

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF THE BALLOT CONTAINING YOUR VOTE IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE, YOUR VOTE WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.  BALLOTS CAST BY FACSIMILE OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE DEBTORS IN WRITING.

## ACCEPTANCE OR REJECTION OF THE PLAN

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Ballot; (vi) any form of Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Ballot, facsimile Ballot or Ballot transmitted by electronic means without an original signature. If you hold claims in more than one Class, you will receive multiple Ballots.  You should vote each Ballot that you receive.

## IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

***(a) Injunction.* Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another**

proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.*  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

*(c)  Exculpation.*  Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of

any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

**Item 1. Vote on the Plan.** (Please check one box only.)

☐  ACCEPTS (votes FOR) THE PLAN  ☐  REJECTS (votes AGAINST) THE PLAN

*By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

**This Ballot does not constitute and shall not be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.**

**Item 2. OPTIONAL Trade Class Election for Class 3 Claims.**

By checking the box below, the undersigned *may irrevocably elect* to treatment of your Class 3 Claim as a Class 4 Claim (Trade Creditor). **By checking the box below, the undersigned irrevocably elects to** *reduce* your Class 3 Claim to an amount equal to $200,000 (to the extent your Allowed Class 3 Claim exceeds $200,000) and thereby receive payment in Cash in an amount equal to fifteen percent (15%) of your elected Class 4 Claim, in full satisfaction of such Claim; *provided that*, if the aggregate distributions to Holders of Allowed Class 4 Claims exceeds $1,000,000 (the "Trade Creditor Claim Cap"), then Holders of such Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap in Cash. By checking the box below and making the irrevocable Trade Class Election, the undersigned will be deemed to have accepted the Plan. If the undersigned fails to check the box below, the undersigned will be deemed to have rejected the Trade Class Election.

☐  The undersigned elects to **opt-in** to the Trade Class Election, and in the event its Class 3 Claim exceeds $200,000 reduce its Class 3 Claim that is greater than $200,000 to a Claim of $200,000 to be treated as a Trade Claim pursuant to Section II(C)(4)(b) of the Plan.

**Item 3. Declarations.**

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Ballot and has full power and authority to vote to accept or reject the Plan; *provided*, *however*, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BALLOT.
PLEASE RETURN YOUR BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL NOT ACCEPT BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT.**

**IF YOU RECEIVED A DAMAGED BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY
QUESTIONS CONCERNING THIS BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Claim Number:                              Name of Voter:

Claim Amount:

| Signature: |
| --- |

By: _____

[Creditor Name and Address]     Print or Type Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

Date: _____

SSN/TIN of Voter:_____

**<u>INSTRUCTIONS FOR COMPLETING THE BALLOT</u>**

**This Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Ballot.**

This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  Please indicate your vote by marking an "X" in the appropriate box in <u>Item 1</u> of the Ballot.

If you are a Holder of a Class 3 Allowed Claim and you wish to make the optional Trade Class Election, please check the box in <u>Item 2</u>. Please note that failure to check the box in Item 2 will be deemed as having declined the Trade Class Election.

The amount of your Claim as set forth on this Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

After providing all remaining information requested in this Ballot, please sign and date this Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

Return this Ballot by mail, overnight courier or hand delivery to the Debtors' counsel at the following address:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)


OR


Electronically at
Eletsonballots@reedsmith.com

**BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

You must vote all of your claims within a single class to either accept or reject the Plan.  A Ballot that partially rejects and partially accepts the Plan or Ballots that are voted inconsistently will not be counted.

This Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Ballot for such other classes.

## __Exhibit 5__

**Form of Ballot – Class 4 (Trade Creditor Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,[8]** | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'**
**SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 4 Ballot: Trade Creditor Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS**
**[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

This Ballot is being sent to holders of claims in Class 4 (Trade Creditor Claims). The creditors of the Debtors whose claims are impaired under the Plan and who are not deemed to have rejected the Plan are afforded the opportunity to vote on the Plan, which may be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims in each class of claims voting on the Plan. In the event that the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b). To have your vote count, you must complete and return this Ballot.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE. YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN. YOUR CLAIM HAS BEEN PLACED IN CLASS 4 UNDER THE PLAN. IF YOU HOLD CLAIMS IN MORE THAN**

---

[8] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.**

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF THE BALLOT CONTAINING YOUR VOTE IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE, YOUR VOTE WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.  BALLOTS CAST BY FACSIMILE OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE DEBTORS IN WRITING.

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Ballot; (vi) any form of Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Ballot, facsimile Ballot or Ballot transmitted by electronic means without an original signature. If you hold claims in more than one Class, you will receive multiple Ballots.  You should vote each Ballot that you receive.

<u>**IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN**</u>

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

***(a) Injunction.*** **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or**

enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.* Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

*(c) Exculpation.* Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

**Item 1. Vote on the Plan.  (Please check one box only.)**

---

☐   ACCEPTS (votes FOR) THE PLAN   ☐   REJECTS (votes AGAINST) THE PLAN

*By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

---

**This Ballot does <u>not</u> constitute and shall <u>not</u> be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.**

**Item 2. Declarations.**

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Ballot and has full power and authority to vote to accept or reject the Plan; provided, however, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BALLOT.
PLEASE RETURN YOUR BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT .**

**IF YOU RECEIVED A DAMAGED BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Claim Number:                                      Name of Voter:

Claim Amount:                                      _____

                                                   **Signature:**

[Creditor Name and Address]                        By: _____

                                                   Print or Type Name: _____

                                                   Title: _____

                                                   Address: _____

                                                   _____

                                                   Telephone Number: _____

                                                   Date: _____

                                                   SSN/TIN of Voter:_____

## **INSTRUCTIONS FOR COMPLETING THE BALLOT**

**This Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Ballot.**

This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  Please indicate your vote by marking an "X" in the appropriate box in Item 1 of the Ballot.

The amount of your Claim as set forth on this Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

After providing all remaining information requested in this Ballot, please sign and date this Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

Return this Ballot by mail, overnight courier or hand delivery to the Debtors' Counsel at the following address:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)

OR

Electronically at
Eletsonballots@reedsmith.com

**BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

You must vote all of your claims within a single class to either accept or reject the Plan.  A Ballot that partially rejects and partially accepts the Plan or Ballots that are voted inconsistently will not be counted.

This Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Ballot for such other classes.

**<u>Exhibit 6</u>**

**Form of Master Ballot – Class 5A (Non-Petitioning Creditor Exchange Note Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,**[9] | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'
SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 5A Master Ballot: Non-Petitioning Creditors Exchange Note Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

You are receiving this Master Ballot because as of [ ], 2024 (the "Voting Record Date"), you may be a Nominee (i.e., a broker, dealer, commercial bank, trust company, or other agent or nominee) holding claims in Class 5A (Non-Petitioning Creditors Exchange Note Claims) on behalf of a Beneficial Owner(s) of the Old Notes and the Exchange Notes (as defined in the Plan) (collectively, the "Notes") entitled to vote on the Plan.

This Master Ballot is to be used by you as a Nominee to transmit only the votes you receive from the Beneficial Holder Ballots from Beneficial Owners who hold positions in the Notes through you as of the Voting Record Date. This Master Ballot is to be used by you only to transmit to Counsel to the Debtors the votes you receive on the Beneficial Holder Ballots from the Beneficial Owners of the Notes in which you have a position and for no other purpose.

Beneficial Holders of Class 5A Claims may make an irrevocable election to have their Class 5A Claim treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as

---

[9] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

described in further detail below and in the Plan).  If the Claim of a Beneficial Holder of a Class 5A Claim is in an amount greater than $200,000, choosing the Trade Creditor Election will reduce the Class 5A Claim to $200,000 for treatment in Class 4.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.**

**PLEASE COMPLETE, SIGN AND DATE THIS MASTER BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "<u>VOTING DEADLINE</u>").  IF THE MASTER BALLOT IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE THE VOTES TRANSMITTED HEREBY WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Master Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Master Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant(s); (iii) any Master Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Master Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Master Ballot; (vi) any form of Master Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Master Ballot, facsimile Master Ballot or Master Ballot transmitted by electronic means other than as provided for in this Master Ballot without an original signature.

<u>**Item 1. Certification of Authority to Vote.**</u>

The undersigned certifies that, as of the Voting Record Date, [ ], 2024, the undersigned (please check the applicable box):

☐    is a Nominee for the Beneficial Owner(s) of the aggregate principal amount of the Notes listed in Item 2 below;

☐    is acting under an unrevoked power of attorney and/or agency agreement (a copy of which will be provided upon request) granting the right to vote and executed by or on behalf of a Nominee for the Beneficial Owner(s) of the aggregate principal amount of the Notes listed in Item 2 below; or

☐    has been granted an unrevoked voting proxy (an original of which is attached hereto) from a Nominee for the Beneficial Owner(s) of the Notes or the Beneficial Owner itself of the aggregate principal amount of the Notes listed in Item 2 below; and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Owner(s) of the Notes described in Item 2 below.

**Item 2. Indication of CUSIP / ISIN.**

Please check ONE box below to indicate the CUSIP / ISIN to which this Master Ballot pertains:

| | NOTE DESCRIPTION | CUSIP / ISIN |
|---|---|---|
| ☐ | 9.625% First Preferred Ship Mortgage Notes Due 2022 | |
| ☐ | First Preferred Ship Mortgage Notes Due 2022 | |

**Item 3. Tabulation and Transmittal of the Votes of the Beneficial Owners of the Notes.**

The undersigned certifies that the Beneficial Owners listed in the table below (identified by their respective customer account numbers) (a) are Beneficial Owners of the Notes as of the Voting Record Date and (b) have delivered to the undersigned, as Nominee, duly completed, properly executed Beneficial Holder Ballots or appropriate instructions casting such votes.

| Your Customer Account Number for Each Beneficial Owner of the Notes | Principal Amount Held by Beneficial Owner as of the Voting Record Date | Item 2: Indicate the vote cast on Item 2 of the Beneficial Holder Ballot by Checking the appropriate box below | | | Item 3 / Item 4: Indicate the vote cast on Item 3 or Item 4 of the Beneficial Holder Ballot by Checking the appropriate box below | | |
|---|---|---|---|---|---|---|---|
| | | Accept the Plan | OR | Reject the Plan | Item 3(A): Opt-in to Exchange Note Election Recovery | Item 3(B): Opt-in to Litigation Trust Interests Election | Item 4: Opt-in to the Trade Class Election |
| 1. | $ | | | | | | |
| 2. | $ | | | | | | |
| 3. | $ | | | | | | |
| 4. | $ | | | | | | |
| 5. | $ | | | | | | |
| 6. | $ | | | | | | |
| 7. | $ | | | | | | |
| **TOTALS** | $ | | | | | | |

**Item 4. Certification Regarding Votes Cast on Other Ballots in Respect of Notes Under the Plan**

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Owners in Item 4 of their Beneficial Holders Ballots. Please attach additional sheets if necessary.

| YOUR Customer Account Number and/or Customer Name for each Beneficial Owner who completed Item 3 of the Beneficial Holder Ballot | Transcribe Information from Item 3 of the Beneficial Holder Ballot | | | | |
|---|---|---|---|---|---|
| | Customer Account Number at Other Nominee | Name of Other Registered Holder or Nominee (if applicable) | DTC Participant Number of Other Nominee | Aggregate Principle Amount of Other Claims Voted | CUISP / ISIN Number of Other Positions in the Notes Held and Voted by Beneficial Owner |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

**Item 5. Certifications.**

By signing this Master Ballot, the undersigned certifies to the Court and the Debtors that:

a)    the undersigned has received a copy of the Master Ballot, the Beneficial Holder Ballots and the remainder of the Solicitation Package and has delivered the same to the Beneficial Owners of the Notes listed in Item 2 of the Master Ballot above;

b)    the undersigned has received a completed and signed Beneficial Holder Ballot (or other accepted customary method of communicating a vote) from each Beneficial Owner listed in Item 2 above or from an intermediary nominee;

c)    the undersigned is the Nominee for the Beneficial Owner of Notes in Item 2 above being voted, or it has been authorized by each Beneficial Owner of the Notes listed in Item 2 above to vote on the Plan;

d)    the undersigned has properly disclosed:

- the number of Beneficial Owners of Notes who completed the Beneficial Holder Ballots;

- the respective amounts of the Notes owned, as the case may be, by each Beneficial Owner of Notes who completed a Beneficial Holder Ballot;

- each Beneficial Owner's respective vote concerning the Plan;

- each Beneficial Owner's certification as to other Class 5A Non-Petitioning Creditor Exchange Note Claims voted; and

- the customer name, account number, or other identification number for each Beneficial Owner;

e)    each Beneficial Owner of the Notes has certified to the undersigned (or to an intermediary nominee, as applicable), that it is eligible to vote on the Plan; and

f)    the undersigned will maintain copies of any Beneficial Holder Ballots and/or any alternate communication, correspondence, or other record of a conveyed vote returned by any Beneficial Owners of the Notes or by intermediary nominees (whether properly completed or defective) for at least one year after the Voting Deadline and disclose all such information to the Court or the Debtors, if so ordered.

**Item 6. Declarations.**

By signing this Ballot, the undersigned Nominee declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned Nominee declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is voting on behalf of the actual Beneficial Holders of the Claim(s), and the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned Nominee also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS MASTER BALLOT.**

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT MATER BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY ELECTRONIC MEANS OTHER THAN AS PROVIDED IN THE MASTER BALLOT.**

**IF YOU RECEIVED A DAMAGED MASTER BALLOT OR LOSE YOUR MASTER BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS MASTER BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Name of Nominee:

Participant Number:

Name of Proxy Holder or Agent for Nominee:

Social Security or Federal Tax Identification Number:

Signatory Name and Address:

**Signature:**

Print or Type Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

Date: _____

Date:

## <u>INSTRUCTIONS FOR COMPLETING THIS BALLOT</u>

**This Master Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with this completed Master Ballot.**

1.    The Debtors are soliciting the votes of Holders of Class 5A with respect to the Plan. Capitalized terms used in the Master Ballot or in these instructions (the "<u>Master Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order as applicable.

PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.

PLEASE ALLOW SUFFICIENT TIME TO CAREFULLY READ AND COMPLETE THE MASTER BALLOT.

2.    **Balloting Options**. You can elect one of the following two (2) balloting options with respect to voting the Class 5A – Non-Petitioning Creditor Exchange Note Claims of Beneficial Owners of the Notes:

a.    <u>Pre-Validate Ballots</u>. You may, at your option, elect to pre-validate the Beneficial Holder Ballot sent to you by Counsel to the Debtors. If you choose the pre-validation option, you must immediately pre-validate the individual Beneficial Holder Ballot and deliver to the Beneficial Owner a Solicitation Package containing, in addition to the materials already in the Solicitation Package sent by Counsel to the Debtors, (i) the pre-validated Ballot, (ii) a postage pre-paid return envelope addressed to the Counsel to the Debtors (address listed below), and (iii) clear instructions stating that such Beneficial Owner must return their pre-validated Beneficial Holder Ballot directly to the Counsel to the Debtors in such return envelope so that the Counsel to the Debtors actually receives the pre-validated Beneficial Holder Ballot prior to the Voting Deadline.  You must also maintain a list of the Beneficial Owners to whom pre-validated Beneficial Holder Ballot were delivered in your files for a period of one year after the Effective Date of the Plan (in the event you are required to produce such Ballots to the Counsel to the Debtors, Debtors, or the Court).

b.    <u>Non Pre-Validated Ballots</u>. If you do not elect to pre-validate the Beneficial Holder Ballot, you should immediately distribute Solicitation Packages, including the Beneficial Holder Ballots, to each Beneficial Owner that holds a position in the Notes through you (or intermediary nominees) or otherwise convey the information thereon through customary means and take any action required to ensure each such Beneficial Owner timely votes their positions in the Notes. To ensure that the vote cast by the Beneficial Owners of the Notes held through you are counted toward confirmation of the Plan, upon receipt of completed, executed Beneficial Holder Ballots, you must: (i) complete your Master Ballot in accordance with Paragraph 3 below; (ii) retain each completed Beneficial Holder Ballot (or alternative communication conveying the vote) received by you from each Beneficial Owner in your files for a period of one year after the Effective Date of the Plan (in the event you are required to produce such Ballots to the Counsel to the Debtors, Debtors, or the Court); and (iii) sign, date, and return your Master Ballot so that it is actually received by the Counsel to the Debtors, by mail, overnight courier or hand delivery, prior to the Voting Deadline at:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)

OR

Electronically at
Eletsonballots@reedsmith.com

3. **Complete Your Master Ballot**. You must properly complete the Master Ballot with respect to all Beneficial Holder Ballots returned to you by Beneficial Owners of the Notes as follows:

    a. **Item 1**: Check the appropriate box in Item 1 of the Master Ballot.

    b. **Item 2**: Check the appropriate box to denote the CUSIP / ISIN numbers for the Notes being voted through this Master Ballot.

    c. **Item 3**: Use the chart in <u>Item 3</u> of the Master Ballot to compile, validate, and indicate in each column the aggregate principal amount voted for each customer account number or other identification number assigned by you or an intermediary nominee to each such Beneficial Owner (remember that (i) each account of a Beneficial Owner must vote all such Beneficial Owner's positions in the Notes to accept or reject the Plan and may not split such vote and (ii) do not count any Beneficial Holder Ballot executed by the Beneficial Owner that does not indicate a vote to accept or reject the Plan or that indicates both a vote to accept or reject the Plan) and, if applicable, indicate any related elections made by each such Beneficial Owner..

    d. **Item 4**: Review and complete <u>Item 4</u> of the Master Ballot, if applicable.

    e. **Item 5**: Review and complete the certification in <u>Item 5</u> of the Master Ballot.

    f. **Item 6**: **Execute and date your Master Ballot**. You must: (a) sign and date your Master Ballot; (b) if applicable, indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Counsel to the Debtor, Debtor, or the Court, submit proper evidence to the requesting party to so act on behalf of such Beneficial Owner of the Notes; and (c) provide your name and mailing address, if different from the address on the attached mailing label or if no mailing label is attached to the Master Ballot.

4. **Master Ballots Not Counted**. Any Master Ballot (and votes transmitted thereon) received after the Voting Deadline will not be counted as a vote toward confirmation of the Plan. **The following Master Ballots also will NOT be counted**:

    • any Master Ballot (or group of Ballots with respect to Claims in a class received from a single creditor) that partially rejects and partially accepts the Plan;

- any Master Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline;

- Master Ballots sent by facsimile or any other electronic means, other than electronic email as provided herein;

- any Master Ballots sent to the Debtors, or the Debtors' agents (other than the Counsel to the Debtors);

- any Master Ballot that is properly completed, executed, and timely returned to the Counsel to the Debtors but does not indicate an acceptance or rejection of the Plan;

- any Master Ballot that is properly completed, executed, and timely returned to the Counsel to the Debtors but indicates both an acceptance and a rejection of the Plan;

- any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder;

- any Master Ballot not bearing an original signature on the line adjacent to the "Signature:" label in the certification section therein;

- any form of Master Ballot other than the official form sent by the Counsel to the Debtors or a copy of the official form; and

- Any vote included on any Master Ballot cast by an Entity that does not hold Notes.

5. **Delivery Methods**. The method of delivery of your Master Ballot to Counsel to the Debtors is at your own election and risk. Except as otherwise provided herein, such delivery will be deemed made only when Counsel to the Debtors actually receives the originally executed Master Ballot. Instead of effecting delivery by first-class mail, it is recommended, though not required, that you use electronic mail or an overnight or hand delivery service. In all cases, you should allow sufficient time to assure timely delivery.

6. **Master Ballot Limitations**. The Master Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan (including any applicable elections) and make certifications with respect thereto. At this time, holders of Claims should not surrender to you any certificates or instruments representing their positions in the Notes and you should not accept delivery of any such certificates or instruments surrendered together with any Beneficial Holder Ballot.

7. **Multiple Ballots**. If multiple Master Ballots are received from, or on behalf of, an individual Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the latest valid Master Ballot timely received will be deemed to reflect the intent of such Holder and to supersede and revoke any prior Master Ballot with respect to such Claim, provided that, if a Holder timely submits both a paper Master Ballot and a Master Ballot via email on account of the same Claim, the email Master Ballot shall supersede the paper Master Ballot

8. After the Voting Deadline, no Master Ballot may be withdrawn or modified without the prior written consent of the Debtors and approval of the Bankruptcy Court.

After providing all remaining information requested in this Master Ballot, please sign and date this Master Ballot. **Your signature is required in order for the votes contained within to be counted.**

**MASTER BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "<u>VOTING DEADLINE</u>"). IF A MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED. AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

## **Exhibit 7**

**Form of Beneficial Holder Ballot – Class 5A (Non-Petitioning Creditor Exchange Note Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>**Eletson Holdings Inc.,** *et al.,*[10]<br><br>**Debtors.** | **Chapter 11**<br><br>**Case No. 23-10322 (JPM)**<br>**(Jointly Administered)** |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT
DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 5A Beneficial Holder Ballot: Non-Petitioning Creditors Exchange Note Claims)**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY BEFORE
COMPLETING THIS BENEFICIAL HOLDER BALLOT

**THIS BENEFICIAL HOLDER BALLOT MUST BE COMPLETED, EXECUTED, AND
RETURNED IN ACCORDANCE WITH YOUR NOMINEE'S INSTRUCTIONS IN SUFFICIENT
TIME FOR THIS BENEFICIAL HOLDER BALLOT (OR THE MASTER BALLOT
REFLECTING THE VOTE CAST ON THIS BENEFICIAL HOLDER BALLOT) TO BE CAST
PRIOR TO THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN:**

**[_], 2024 AT 5:00 P.M. (EDT)**

> **You should return this Beneficial Holder Ballot to your Nominee in order to instruct your Nominee to cast your vote to accept or reject the Plan on your behalf. However, if it is your Nominee's customary practice to receive your instructions or have your vote cast by other means, such as by voting information form ("VIF"), phone, e-mail, internet, or fax, then you should follow your Nominee's voting procedures for casting your vote in lieu of returning this Beneficial Holder Ballot or the information requested herein to your Nominee.**

       The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at

---

[10] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

You are receiving this Beneficial Holder Ballot because as of [ ], 2024 (the "Voting Record Date"), you may be a Beneficial Holder of the Old Notes and the Exchange Notes (as defined in the Plan) (collectively, the "Notes") entitled to vote your respective portion of the Class 5A (Non-Petitioning Creditors Exchange Note Claims) under the Plan. Accordingly, if you continued to hold your position in the Notes as of the Voting Record Date, you will have a right to vote to accept or reject the Plan.

Each Beneficial Owner of the Notes should receive a single Beneficial Holder Ballot on account of its positions in the Notes held through a particular Nominee. The vote cast on the Beneficial Holder Ballot shall be counted and tabulated as a vote on account of such Beneficial Owner's positions in the Notes. A Beneficial Owner may not split its vote with respect to any of its positions in the Notes irrespective of whether such positions are held through the same or different Nominees. All positions of a Beneficial Owner in the Notes must be voted the same way.

You may make an irrevocable election to have your Class 5A Claim and treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as described in further detail below and in the Plan). If your Class 5A Claim is in an amount greater than $200,000, upon making the Trade Creditor Election, your claim will be reduced to $200,000.

As a Beneficial Holders of a Class 5A Claim you will be entitled to either (i) the Exchange Note Election Recovery or (ii) your Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan (as described in further detail below and in the Plan).

For the avoidance of doubt, you may **only select one** of either (i) the Trade Class Election, (ii) the Exchange Note Election Recovery, or (iii) the Litigation Trust Interests.

If you do not submit a Ballot or submit a Ballot but fail to affirmatively elect the Exchange Note Election Recovery, you will be deemed to have elected to receive Litigation Trust Interests. If you submit a Ballot electing both the Exchange Note Election and to receive Litigation Trust Interests, you will be deemed to have elected to receive Litigation Trust Interests.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE. YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN. YOUR CLAIM HAS BEEN PLACED IN CLASS 5A UNDER THE PLAN. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE. IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.**

To ensure that your vote is counted, you must: (a) complete this Beneficial Holder Ballot; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 below; and (c) sign and return this Beneficial Holder Ballot to the address set forth on the enclosed preaddressed envelope so that it is received by your Nominee in sufficient time for your Nominee to submit a master ballot prior to the Voting Deadline, which is **[ ] [ ].m. (prevailing Eastern Time) on [ ], 2024**. However, if it is your Nominee's customary practice to receive your instructions or have your vote cast by other means such as phone, e-mail, internet, or fax, then you should follow your Nominee's voting procedures for casting your vote in lieu of submitting this Beneficial Holder Ballot.

## ACCEPTANCE OR REJECTION OF THE PLAN

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

## IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

*(a) Injunction.*  **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.**

*(b) Term of Injunctions or Stays.*  **Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.**

**(c)  *Exculpation.* Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or**

**omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.**

**<u>Item 1. Principal Amount of Notes Held by Beneficial Owner.</u>**

The undersigned hereby certifies that as of the Voting Record Date, the undersigned Beneficial Owner held the following aggregate unpaid principal amount of the Notes (insert amount in box below):

| | |
|---|---|
| **Class:** | 5A |
| **Principal Amount of Notes:** | $ |
| **Debtor(s):** | ☐   Eletson Holdings Inc. |
| | ☐   Eletson Finance (US) LLC |
| | ☐   Agathonissos Finance LLC |

Please check ONE box below to indicate the CUSIP / ISIN to which this Master Ballot pertains:

| | **NOTE DESCRIPTION** | **CUSIP / ISIN** |
|---|---|---|
| ☐ | 9.625% First Preferred Ship Mortgage Notes Due 2022 | |
| ☐ | First Preferred Ship Mortgage Notes Due 2022 | |

**<u>Item 2. Vote On The Plan.</u>  (Please Check One Box Only.)**

> ☐  ACCEPTS (votes FOR) THE PLAN   ☐  REJECTS (votes AGAINST) THE PLAN
>
> ***By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.***

## Item 3. Treatment of Class 5A Claim

The Plan provides that Holders of Class 5A Claims have the option, at their election, to receive Litigation Trust Interests or cash under the Plan on account of such claim. Please read the following parts (A) and (B) below and select **ONLY ONE**.

### Item 3(A). Exchange Note Election Recovery.

Pursuant to Section II(C)(5)(b) of the Plan, Holders of Allowed Class 5A Claims may make the Exchange Note Election Recovery and receive the lesser of (i) the Face Amount of the Exchange Notes or the Old Notes held by a Creditor or (ii) $50,000 a in full and complete settlement, release and satisfaction of said Allowed Class 5A Claim. For the avoidance of doubt, if a Holder of an Allowed Class 5A Claim does not submit a Ballot, or submits a Ballot but fails to affirmatively elect the Exchange Note Election Recovery, or elects both the Exchange Note Election Recovery and the Litigation Trust Interests Election, such Holder shall be deemed to have selected to receive Litigation Trust Interests with respect to its Allowed Class 5A Claim.

By checking the box below , the undersigned may make the Exchange Note Election Recovery, thereby electing to receive the lesser of (i) the Face Amount of the Exchange Notes or the Old Notes held by the undersigned or (ii) $50,000 a in full and complete settlement, release and satisfaction of said Allowed Class 5A Claim.

> ☐　The undersigned elects to **opt-in** to the Exchange Note Election Recovery and to receive the lesser of (i) the Face Amount of the Exchange Notes or the Old Notes held by a Creditor or (ii) $50,000 a in full and complete settlement, release and satisfaction of said Allowed Class 5A Claim, pursuant to Section II(C)(5)(b) of the Plan.

### Item 3(B). Pro Rata portion of Litigation Trust Interests Election.

Pursuant to Section II(C)(5)(b) of the Plan, Holders of Allowed Class 5A Claims may elect receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan. For the avoidance of doubt, any Holder of an Allowed Class 5A Claim, shall automatically receive the Litigation Trust Interests specified in Section II(C)(5)(b) of the Plan (unless, pursuant to Section II(C)(4)(b) of the Plan, such Holder irrevocably elects the Trade Class Election); *provided, further*, if a Holder of an Allowed Class 5A Claim does not submit a Ballot, or submits a Ballot but fails to affirmatively elect the Exchange Note Election Recovery, or elects both the Exchange Note Election Recovery and the Litigation Trust Interests, such Holder shall be deemed to have elected to receive the Litigation Trust Interests with respect to its Allowed Class 5A Claim.

By checking the box below, if the undersigned is a Holder of a Class 5A Claim and chooses to accept the Plan, the undersigned may elect receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.

> ☐　The undersigned elects to **opt-in** to receive Litigation Trust Interest, and to receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of this Plan, pursuant to Section II(C)(5)(b) of the Plan.

## Item 4. OPTIONAL Trade Class Election for Class 5A Claims.

By checking the box below, the undersigned *may irrevocably elect* to treatment of your Class 5A Claim as a Class 4 Claim (Trade Creditor). **By checking the box below, the undersigned irrevocably elects to *reduce* your Class 5A Claim to an amount equal to $200,000 (to the extent your Allowed Class 5A Claim exceeds** $200,000) and thereby receive payment in Cash in an amount equal to fifteen percent (15%) of your elected Class 4

Claim, in full satisfaction of such Claim; *provided that*, if the aggregate distributions to Holders of Allowed Class 4 Claims exceeds $1,000,000 (the "Trade Creditor Claim Cap"), then Holders of such Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap in Cash. By checking the box below and making the irrevocable Trade Class Election, the undersigned will be deemed to have accepted the Plan. If the undersigned fails to check the box below, the undersigned will be deemed to have rejected the Trade Class Election.

☐   The undersigned elects to **opt-in** to the Trade Class Election, and in the event its Class 5A Claim exceeds $200,000, to reduce its Class 5A Claim that is greater than $200,000 to a Claim of $200,000 to be treated as a Trade Claim pursuant to Section II(C)(4)(b) of the Plan.

## Item 5. Certification Regarding Votes Cast on Other Beneficial Holder Ballots in Respect of the Notes.

If the Beneficial Owner on behalf of which this Beneficial Holder Ballot is being cast has cast other Beneficial Holder Ballots on account of other positions in the Notes held by it, the undersigned certifies that the requisite information regarding any other Beneficial Holder Ballots cast by it has been included in the table below (or on additional sheets attached hereto). Do not include in the following table information relating to your positions in the Notes being voted on this Beneficial Holder Ballot. *Only information relating to other Beneficial Holder Ballots cast by the Beneficial Owner on account of other positions it holds in the Notes should be identified in this Item 3.* Please attach additional sheets if necessary.

| Other Beneficial Holder Ballots Cast by Beneficial Owner in Respect of Additional Positions in the Notes | | | |
|---|---|---|---|
| | Customer Account Number at Other Nominee | Name of Other Registered Holder or Nominee (if applicable) | Aggregate Principal Amount of Other Class 5A Non-Petitioning Creditor Exchange Note Claims Voted | CUSIP / ISIN Number of Other Positions in the Notes Held and Voted by Beneficial Owner |
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |

To be counted, a Beneficial Owner must vote all of its positions in the Notes either to accept or reject the Plan. No split votes will be permitted.

## Item 6. Certifications.

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

a.   either: (i) the Entity is the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot, or (ii) the Entity is an authorized signatory for an Entity that is the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot;

b.   the Entity has received a copy of the Disclosure Statement and has received a copy of the Solicitation Package, and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.   either: (i) the Entity has cast the same vote with respect to all principal amounts of the Notes it holds, or (ii) the Entity for whom the undersigned is an authorized signatory of the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot has cast the same vote with respect to all principal amounts of the Notes such Beneficial Owner holds; and

d.  no other Beneficial Holder Ballots with respect to the principal amount of the Notes identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such principal amount, then any such earlier Beneficial Holder Ballots are hereby revoked.

**Item 7. Declarations.**

By signing this Beneficial Holder Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Beneficial Holder Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Beneficial Holder Ballot and has full power and authority to vote to accept or reject the Plan; provided, however, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request. The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

| | |
|---|---|
| **Name of Holder:** (print of type) | |
| **SSN/TIN of Voter:** | |
| **Date:** | |
| | **Signature:** |
| | **Name of Signatory**: |
| | (if other than Holder) |
| | **Title:** |
| | **Address:** |
| | |
| | |
| | **Telephone Number** |

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.**

**PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BENEFICIAL HOLDER BALLOT. PLEASE COMPLETE, SIGN, AND DATE THIS BENEFICIAL HOLDER BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED (OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS OF YOUR NOMINEE). PLEASE ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE THIS BENEFICIAL HOLDER BALLOT OR THE INFORMATION REQUESTED HEREIN AND CAST YOUR VOTE PRIOR TO THE VOTING DEADLINE AS INSTRUCTED BY YOUR NOMINEE.**

**IF YOU RECEIVED A DAMAGED BENEFICIAL HOLDER BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BENEFICIAL HOLDER BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

## <u>INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT</u>

**This Beneficial Holder Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Beneficial Holder Ballot.**

This Beneficial Holder Ballot is submitted to you to solicit your vote to accept or reject the Plan. Please indicate your vote by marking an "X" in the appropriate box in <u>Item 2</u> of the Beneficial Holder Ballot.

If you are a Holder of a Class 5A Allowed Claim and you wish to elect the Exchange Note Election Recovery, please check the box in <u>Item 3(A)</u>.  Please note that failure to check a box in Item 4 and Item 3(A) will be deemed as having elected Item 3(B).

If you are a Holder of a Class 5A Allowed Claim and you wish to elect the optional Pro Rata portion of Litigation Trust Interests, please check the box in <u>Item 3(B)</u>. Please note that failure to check a box in Item 3(A), Item 3(B), and Item 4 will be deemed as having elected Item 3(B).

If you are a Holder of an Allowed Class 5A Claim but do not submit a Ballot, or submit a Ballot but fail to affirmatively elect the Exchange Note Election Recovery, or elect both the Exchange Note Election Recovery and the Litigation Trust Interests, you will be deemed to have elected the Litigation Trust Interests with respect to your Allowed Class 5A Claim.

If you are a Holder of a Class 5A Allowed Claim and you wish to make the optional Trade Class Election, please check the box in <u>Item 4</u>. Please note that failure to check the box in Item 4 will be deemed as having declined the Trade Class Election. For the avoidance of doubt, a Holder electing Item 4 will be deemed as having declined Item 3(A) and Item Item 3(A).

**You may only select one** of the optional elections in Item 3(A), Item 3(B), and Item 4. If a Holder of an Allowed Class 5A Claim does not submit a Ballot or submits a Ballot but fails to affirmatively elect the Exchange Note Election Recovery, such Holder shall be deemed to have elected the Litigation Trust Interests with respect to its Allowed Class 5A Claim.

The amount of your Claim as set forth on this Beneficial Holder Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

**This Beneficial Holder Ballot does not constitute and shall not be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.**

After providing all remaining information requested in this Beneficial Holder Ballot, please sign and date this Beneficial Holder Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

To ensure that your vote is counted, you must: (a) complete the Beneficial Holder Ballot, including indicating the CUSIP / ISIN numbers for the Notes you are voting; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) sign and return the Beneficial Holder Ballot or the information requested therein in accordance with Nominee's instructions in sufficient time for your Beneficial Holder Ballot or for your Nominee to include your vote

on a Master Ballot, as applicable, that is actually received by the Voting Agent prior to the Voting Deadline on [_], 2024 at [ ] [ ].m (prevailing Eastern Time).

If a Beneficial Holder Ballot or the information requested therein is received after the Voting Deadline, it will not be counted unless otherwise determined by the Debtors and approved by the Court. Additionally, the following Beneficial Holder Ballots **will NOT be counted**:

- any Beneficial Holder Ballot (or group of Ballots with respect to Claims in a class received from a single creditor) that partially rejects and partially accepts the Plan;

- any Beneficial Holder Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline;

- any Beneficial Holder Ballot sent by facsimile, e-mail, or any other electronic means, except as instructed by the Debtors or your Nominee;

- any Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, or the Debtors' legal advisors;

- any Beneficial Holder Ballot that is properly completed, executed, and timely returned to its Nominee but does not indicate an acceptance or rejection of the Plan;

- any Beneficial Holder Ballot that is properly completed, executed, and timely returned to its Nominee but indicates both an acceptance and a rejection of the Plan;

- any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Beneficial Owner;

- any Beneficial Holder Ballot not bearing an original signature on the line adjacent to the "Signature:" label in the certification section therein other than a Beneficial Holder Ballot properly submitted in accordance with the Nominee's instructions;

- any form of a Beneficial Holder Ballot other than the official form sent by the Nominee or a copy of the official form;

- any vote included on any Beneficial Holder Ballot cast by an Entity that does not hold Notes; and

- any Beneficial Holder Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures.

You must vote all of your claims within a single class to either accept or reject the Plan. A Beneficial Holder Ballot that partially rejects and partially accepts the Plan or Beneficial Holder Ballots that are voted inconsistently will not be counted.

This Beneficial Holder Ballot has been prepared to reflect the class in which you are eligible to vote. If you have claims in more than one class, you may receive more than one Beneficial Holder Ballot for such other classes.

### Exhibit 8

**Form of Master Ballot – Class 5B Ballot (Petitioning Creditor Exchange Note Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc., *et al.*,[11]** | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'
SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 5B Master Ballot: Petitioning Creditors Exchange Note Claims)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS
[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

You are receiving this Master Ballot because as of [ ], 2024 (the "Voting Record Date"), you may be a Nominee (i.e., a broker, dealer, commercial bank, trust company, or other agent or nominee) holding claims in Class 5B (Petitioning Creditors Exchange Note Claims) on behalf of a Beneficial Owner(s) of the Old Notes and the Exchange Notes (as defined in the Plan) (collectively, the "Notes") entitled to vote on the Plan.

This Master Ballot is to be used by you as a Nominee to transmit only the votes you receive from the Beneficial Holder Ballots from Beneficial Owners who hold positions in the Notes through you as of the Voting Record Date. This Master Ballot is to be used by you only to transmit to Counsel to the Debtors the votes you receive on the Beneficial Holder Ballots from the Beneficial Owners of the Notes in which you have a position and for no other purpose.

Beneficial Holders of Class 5B Claims may make an irrevocable election to have their Class 5B Claim treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as

---

[11] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

described in further detail below and in the Plan).  If the Claim of a Beneficial Holder of a Class 5B Claim is in an amount greater than $200,000, choosing the Trade Creditor Election will reduce the Class 5B Claim to $200,000 for treatment in Class 4

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.**

**PLEASE COMPLETE, SIGN AND DATE THIS MASTER BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "<u>VOTING DEADLINE</u>").  IF THE MASTER BALLOT IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE, THE VOTES TRANSMITTED HEREBY WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Master Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Master Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Master Ballot that is illegible or contains insufficient information to permit the identification of the claimant(s); (iii) any Master Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Master Ballot cast by a person or entity that does not hold a claim in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Master Ballot; (vi) any form of Master Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Master Ballot, facsimile Master Ballot or Master Ballot transmitted by electronic means without an original signature.

<u>**Item 1. Certification of Authority to Vote.**</u>

The undersigned certifies that, as of the Voting Record Date, [ ], 2024, the undersigned (please check the applicable box):

☐ is a Nominee for the Beneficial Owner(s) of the aggregate principal amount of the Notes listed in Item 2 below;

☐ is acting under an unrevoked power of attorney and/or agency agreement (a copy of which will be provided upon request) granting the right to vote and executed by or on behalf of a Nominee for the Beneficial Owner(s) of the aggregate principal amount of the Notes listed in Item 2 below; or

☐ has been granted an unrevoked voting proxy (an original of which is attached hereto) from a Nominee for the Beneficial Owner(s) of the Notes or the Beneficial Owner itself of the aggregate principal amount of the Notes listed in Item 2 below; and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Owner(s) of the Notes described in Item 2 below.

<u>**Item 2. Tabulation and Transmittal of the Votes of the Beneficial Owners of the Notes.**</u>

The undersigned certifies that the Beneficial Owners listed in the table below (identified by their respective customer account numbers) (a) are Beneficial Owners of the Notes as of the Voting Record Date and (b)

have delivered to the undersigned, as Nominee, duly completed, properly executed Beneficial Holder Ballots or appropriate instructions casting such votes.

| Your Customer Account Number for Each Beneficial Owner of the Notes | Principal Amount Held by Beneficial Owner as of the Voting Record Date | Item 2: Indicate the vote cast on Item 2 of the Beneficial Holder Ballot by Checking the appropriate box below | | | Item 3 / Item 4: Indicate the vote cast on Item 3 or Item 4 of the Beneficial Holder Ballot by Checking the appropriate box below | |
|---|---|---|---|---|---|---|
| | | Accept the Plan | OR | Reject the Plan | Item 3: Opt-in to Litigation Trust Interests Election | Item 4: Opt-in to the Trade Class Election |
| 1. | $ | | | | | |
| 2. | $ | | | | | |
| 3. | $ | | | | | |
| 4. | $ | | | | | |
| 5. | $ | | | | | |
| 6. | $ | | | | | |
| 7. | $ | | | | | |
| **TOTALS** | $ | | | | | |

## Item 3. Indication of CUSIP / ISIN.

Please check ONE box below to indicate the CUSIP / ISIN to which this Master Ballot pertains:

| | NOTE DESCRIPTION | CUSIP / ISIN |
|---|---|---|
| ☐ | 9.625% First Preferred Ship Mortgage Notes Due 2022 | |
| ☐ | First Preferred Ship Mortgage Notes Due 2022 | |

## Item 4. Certification Regarding Votes Cast on Other Ballots in Respect of Notes Under the Plan

The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Owners in Item 3 of their Beneficial Holders Ballots.  Please attach additional sheets if necessary.

| YOUR Customer Account Number and/or Customer Name for each Beneficial Owner who completed Item 3 of the Beneficial Holder Ballot | Transcribe Information from Item 3 of the Beneficial Holder Ballot | | | | |
|---|---|---|---|---|---|
| | Customer Account Number at Other Nominee | Name of Other Registered Holder or Nominee (if applicable) | DTC Participant Number of Other Nominee | Aggregate Principle Amount of Other Claims Voted | CUISP / ISIN Number of Other Positions in the Notes Held and Voted by Beneficial Owner |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

**Item 5. Certifications.**

By signing this Master Ballot, the undersigned certifies to the Court and the Debtors that:

a)    the undersigned has received a copy of the Master Ballot, the Beneficial Holder Ballots and the remainder of the Solicitation Package and has delivered the same to the Beneficial Owners of the Notes listed in Item 2 of the Master Ballot above;

b)    the undersigned has received a completed and signed Beneficial Holder Ballot (or other accepted customary method of communicating a vote) from each Beneficial Owner listed in Item 2 above or from an intermediary nominee;

c)    the undersigned is the Nominee for the Beneficial Owner of Notes in Item 2 above being voted, or it has been authorized by each Beneficial Owner of the Notes listed in Item 2 above to vote on the Plan;

d)    the undersigned has properly disclosed:

- the number of Beneficial Owners of Notes who completed the Beneficial Holder Ballots;

- the respective amounts of the Notes owned, as the case may be, by each Beneficial Owner of Notes who completed a Beneficial Holder Ballot;

- each Beneficial Owner's respective vote concerning the Plan;

- each Beneficial Owner's certification as to other Class 5B Petitioning Creditor Exchange Note Claims voted; and

- the customer name, account number, or other identification number for each Beneficial Owner;

e)    each Beneficial Owner of the Notes has certified to the undersigned (or to an intermediary nominee, as applicable), that it is eligible to vote on the Plan; and

f)    the undersigned will maintain copies of any Beneficial Holder Ballots and/or any alternate communication, correspondence, or other record of a conveyed vote returned by any Beneficial Owners of the Notes or by intermediary nominees (whether properly completed or defective) for at least one year after the Voting Deadline and disclose all such information to the Court or the Debtors, if so ordered.

**Item 6. Declarations.**

By signing this Ballot, the undersigned Nominee declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned Nominee declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is voting on behalf of the actual Beneficial Holders of the Claim(s), and the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request. The undersigned Nominee also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024. PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS MASTER BALLOT.**

**PLEASE RETURN YOUR MASTER BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT MATER BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT.**

**IF YOU RECEIVED A DAMAGED MASTER BALLOT OR LOSE YOUR MASTER BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS MASTER BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Name of Nominee: _____

Participant Number: _____

Name of Proxy Holder or Agent for Nominee: _____

Social Security or Federal Tax Identification Number: _____

Signatory Name and Address:

| **Signature:** |
| --- |

Print or Type Name: _____

Title: _____

Address: _____

_____

Telephone Number: _____

Date: _____

Date: _____

## <u>INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT</u>

**This Master Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with this completed Master Ballot.**

9.      The Debtors are soliciting the votes of Holders of Class 5B with respect to the Plan. Capitalized terms used in the Master Ballot or in these instructions (the "<u>Master Ballot Instructions</u>") but not otherwise defined therein or herein shall have the meaning set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order as applicable.

PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.

PLEASE ALLOW SUFFICIENT TIME TO CAREFULLY READ AND COMPLETE THE MASTER BALLOT.

10.     **Balloting Options**. You can elect one of the following two (2) balloting options with respect to voting the Class 5B Ballot – Petitioning Creditor Exchange Note Claims of Beneficial Owners of the Notes:

   a.   <u>Pre-Validate Ballots</u>. You may, at your option, elect to pre-validate the Beneficial Holder Ballot sent to you by Counsel to the Debtors. If you choose the pre-validation option, you must immediately pre-validate the individual Beneficial Holder Ballot and deliver to the Beneficial Owner a Solicitation Package containing, in addition to the materials already in the Solicitation Package sent by Counsel to the Debtors, (i) the pre-validated Ballot, (ii) a postage pre-paid return envelope addressed to the Counsel to the Debtors (address listed below), and (iii) clear instructions stating that such Beneficial Owner must return their pre-validated Beneficial Holder Ballot directly to the Counsel to the Debtors in such return envelope so that the Counsel to the Debtors actually receives the pre-validated Beneficial Holder Ballot prior to the Voting Deadline.  You must also maintain a list of the Beneficial Owners to whom pre-validated Beneficial Holder Ballot were delivered in your files for a period of one year after the Effective Date of the Plan (in the event you are required to produce such Ballots to the Counsel to the Debtors, Debtors, or the Court).

   b.   <u>Non Pre-Validated Ballots</u>. If you do not elect to pre-validate the Beneficial Holder Ballot, you should immediately distribute Solicitation Packages, including the Beneficial Holder Ballots, to each Beneficial Owner that holds a position in the Notes through you (or intermediary nominees) or otherwise convey the information thereon through customary means and take any action required to ensure each such Beneficial Owner timely votes their positions in the Notes. To ensure that the vote cast by the Beneficial Owners of the Notes held through you are counted toward confirmation of the Plan, upon receipt of completed, executed Beneficial Holder Ballots, you must: (i) complete your Master Ballot in accordance with Paragraph 3 below; (ii) retain each completed Beneficial Holder Ballot (or alternative communication conveying the vote) received by you from each Beneficial Owner in your files for a period of one year after the Effective Date of the Plan (in the event you are required to produce such Ballots to the Counsel to the Debtors, Debtors, or the Court); and (iii) sign, date, and return your Master Ballot so that it is actually received by the Counsel to the Debtors, by mail, overnight courier or hand delivery, prior to the Voting Deadline at:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)

OR

Electronically at
Eletsonballots@reedsmith.com

11.    **Complete Your Master Ballot**. You must properly complete the Master Ballot with respect to all Beneficial Holder Ballots returned to you by Beneficial Owners of the Notes as follows:

   a.    **Item 1**: Check the appropriate box in Item 1 of the Master Ballot.

   b.    **Item 2**: Check the appropriate box to denote the CUSIP / ISIN numbers for the Notes being voted through this Master Ballot.

   c.    **Item 3**: Use the chart in <u>Item 3</u> of the Master Ballot to compile, validate, and indicate in each column the aggregate principal amount voted for each customer account number or other identification number assigned by you or an intermediary nominee to each such Beneficial Owner (remember that (i) each account of a Beneficial Owner must vote all such Beneficial Owner's positions in the Notes to accept or reject the Plan and may not split such vote and (ii) do not count any Beneficial Holder Ballot executed by the Beneficial Owner that does not indicate a vote to accept or reject the Plan or that indicates both a vote to accept or reject the Plan) and, if applicable, indicate any related elections made by each such Beneficial Owner..

   d.    **Item 4**: Review and complete <u>Item 4</u> of the Master Ballot, if applicable.

   e.    **Item 5**: Review and complete the certification in <u>Item 5</u> of the Master Ballot.

   f.    **Item 6**: **Execute and date your Master Ballot**. You must: (a) sign and date your Master Ballot; (b) if applicable, indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Counsel to the Debtor, Debtor, or the Court, submit proper evidence to the requesting party to so act on behalf of such Beneficial Owner of the Notes; and (c) provide your name and mailing address, if different from the address on the attached mailing label or if no mailing label is attached to the Master Ballot.

12.    **Master Ballots Not Counted**. Any Master Ballot (and votes transmitted thereon) received after the Voting Deadline will not be counted as a vote toward confirmation of the Plan. **The following Master Ballots also will NOT be counted**:

   •    any Master Ballot (or group of Ballots with respect to Claims in a class received from a single creditor) that partially rejects and partially accepts the Plan;

- any Master Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline (except as expressly provided herein);

- Master Ballots sent by facsimile or any other electronic means, other than electronic email;

- any Master Ballots sent to the Debtors, or the Debtors' agents (other than the Counsel to the Debtors);

- any Master Ballot that is properly completed, executed, and timely returned to the Counsel to the Debtors but does not indicate an acceptance or rejection of the Plan;

- any Master Ballot that is properly completed, executed, and timely returned to the Counsel to the Debtors but indicates both an acceptance and a rejection of the Plan;

- any Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder;

- any Master Ballot not bearing an original signature on the line adjacent to the "Signature:" label in the certification section therein;

- any form of Master Ballot other than the official form sent by the Counsel to the Debtors or a copy of the official form; and

- Any vote included on any Master Ballot cast by an Entity that does not hold Notes.

13. **Delivery Methods**. The method of delivery of your Master Ballot to Counsel to the Debtors is at your own election and risk. Except as otherwise provided herein, such delivery will be deemed made only when Counsel to the Debtors actually receives the originally executed Master Ballot. Instead of effecting delivery by first-class mail, it is recommended, though not required, that you use electronic mail or an overnight or hand delivery service. In all cases, you should allow sufficient time to assure timely delivery.

14. **Master Ballot Limitations**. The Master Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan (including any applicable elections) and make certifications with respect thereto. At this time, holders of Claims should not surrender to you any certificates or instruments representing their positions in the Notes and you should not accept delivery of any such certificates or instruments surrendered together with any Beneficial Holder Ballot.

15. **Multiple Ballots**. If multiple Master Ballots are received from, or on behalf of, an individual Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the latest valid Master Ballot timely received will be deemed to reflect the intent of such Holder and to supersede and revoke any prior Master Ballot with respect to such Claim, provided that, if a Holder timely submits both a paper Master Ballot and a Master Ballot via email on account of the same Claim, the email Master Ballot shall supersede the paper Master Ballot

- 8 -

16. After the Voting Deadline, no Master Ballot may be withdrawn or modified without the prior written consent of the Debtors and approval of the Bankruptcy Court.

After providing all remaining information requested in this Master Ballot, please sign and date this Master Ballot. **Your signature is required in order for the votes contained within to be counted.**

**MASTER BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "<u>VOTING DEADLINE</u>").  IF A MASTER BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

## **Exhibit 9**

**Form of Beneficial Holder Ballot – Class 5B (Petitioning Creditor Exchange Note Claims)**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **Eletson Holdings Inc.,** *et al.*,[12] | **Case No. 23-10322 (JPM)**<br>**(Jointly Administered)** |
| **Debtors.** | |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR REJECT
DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 5B Beneficial Holder Ballot: Petitioning Creditors Exchange Note Claims)**

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS CAREFULLY BEFORE
COMPLETING THIS BENEFICIAL HOLDER BALLOT

**THIS BENEFICIAL HOLDER BALLOT MUST BE COMPLETED, EXECUTED, AND
RETURNED IN ACCORDANCE WITH YOUR NOMINEE'S INSTRUCTIONS IN SUFFICIENT
TIME FOR THIS BENEFICIAL HOLDER BALLOT (OR THE MASTER BALLOT
REFLECTING THE VOTE CAST ON THIS BENEFICIAL HOLDER BALLOT) TO BE CAST
PRIOR TO THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN:**

**[_], 2024 AT 5:00 P.M. (EDT)**

> You should return this Beneficial Holder Ballot to your Nominee in order to instruct your Nominee to cast your vote to accept or reject the Plan on your behalf.  However, if it is your Nominee's customary practice to receive your instructions or have your vote cast by other means, such as by voting information form ("<u>VIF</u>"), phone, e-mail, internet, or fax, then you should follow your Nominee's voting procedures for casting your vote in lieu of returning this Beneficial Holder Ballot or the information requested herein to your Nominee.

The above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "<u>Plan</u>") [Dkt No. 671].  The United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") has approved the disclosure statement with respect to the Plan (the "<u>Disclosure Statement</u>") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "<u>Ballot</u>").  If you have any questions regarding this Ballot you may contact counsel to the Debtors at

---

[12] The Debtors in these chapter 11 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

You are receiving this Beneficial Holder Ballot because as of [ ], 2024 (the "Voting Record Date"), you may be a Beneficial Holder of the Old Notes and the Exchange Notes (as defined in the Plan) (collectively, the "Notes") entitled to vote your respective portion of the Class 5B (Petitioning Creditors Exchange Note Claims) under the Plan. Accordingly, if you continued to hold your position in the Notes as of the Voting Record Date, you will have a right to vote to accept or reject the Plan.

Each Beneficial Owner of the Notes should receive a single Beneficial Holder Ballot on account of its positions in the Notes held through a particular Nominee. The vote cast on the Beneficial Holder Ballot shall be counted and tabulated as a vote on account of such Beneficial Owner's positions in the Notes. A Beneficial Owner may not split its vote with respect to any of its positions in the Notes irrespective of whether such positions are held through the same or different Nominees. All positions of a Beneficial Owner in the Notes must be voted the same way.

You may make an irrevocable election to have your Class 5B Claim and treated as a Class 4 (Trade Creditor) Claim under the Plan (the "Trade Class Election") (as described in further detail below and in the Plan). If your Class 5B Claim is in an amount greater than $200,000, upon making the Trade Creditor Election, your claim will be reduced to $200,000.

As a Beneficial Holders of a Class 5B Claim you will be entitled to either (i) the Exchange Note Election Recovery or (ii) your Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan (as described in further detail below and in the Plan).

For the avoidance of doubt, you may **only select one** of either (i) the Trade Class Election, or (ii) the Litigation Trust Interests.

If you do not submit a Ballot or submit a Ballot but fail to affirmatively elect the Exchange Note Election Recovery, you will be deemed to have elected to receive  Litigation Trust Interests. If you submit a Ballot electing both the Exchange Note Election and to receive Litigation Trust Interests, you will be deemed to have elected to receive Litigation Trust Interests.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE.  YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN.  YOUR CLAIM HAS BEEN PLACED IN CLASS 5B UNDER THE PLAN.  IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.  IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.**

To ensure that your vote is counted, you must: (a) complete this Beneficial Holder Ballot; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 below; and (c) sign and return this Beneficial Holder Ballot to the address set forth on the enclosed preaddressed envelope so that it is received by your Nominee in sufficient time for your Nominee to submit a master ballot prior to the Voting Deadline, which is **[ ] [ ].m. (prevailing Eastern Time) on [ ], 2024**. However, if it is your Nominee's customary practice to receive your instructions or have your vote cast by other means such as phone, e-mail, internet, or fax, then you should follow your Nominee's voting procedures for casting your vote in lieu of submitting this Beneficial Holder Ballot.

- 2 -

## ACCEPTANCE OR REJECTION OF THE PLAN

Please note that you must vote the entire claim that you hold to accept or reject the Plan.  For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your claim in your vote.  You may not split your vote.

## IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

*(a)  Injunction.*  **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.**

*(b)  Term of Injunctions or Stays.*  **Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.**

**(c)  *Exculpation.*  Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or**

omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

## Item 1. Principal Amount of Notes Held by Beneficial Owner.

The undersigned hereby certifies that as of the Voting Record Date, the undersigned Beneficial Owner held the following aggregate unpaid principal amount of the Notes (insert amount in box below):

| Class: | 5B |
|---|---|
| **Principal Amount of Notes:** | $ |
| **Debtor(s):** | ☐ Eletson Holdings Inc. |
| | ☐ Eletson Finance (US) LLC |
| | ☐ Agathonissos Finance LLC |

Please check ONE box below to indicate the CUSIP / ISIN to which this Master Ballot pertains:

| | NOTE DESCRIPTION | CUSIP / ISIN |
|---|---|---|
| ☐ | 9.625% First Preferred Ship Mortgage Notes Due 2022 | |
| ☐ | First Preferred Ship Mortgage Notes Due 2022 | |

## Item 2. Vote On The Plan.  (Please Check One Box Only.)

☐ ACCEPTS (votes FOR) THE PLAN   ☐ REJECTS (votes AGAINST) THE PLAN

*By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

- 4 -

**Item 3. Treatment of Class 5B Claim: <u>Pro Rata portion of Litigation Trust Interests Election.</u>**

Pursuant to Section II(C)(6)(b) of the Plan, Holders of Allowed Class 5B Claims may elect receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.  For the avoidance of doubt, any Holder of an Allowed Class 5B Claim, shall automatically receive the Litigation Trust Interests specified in Section II(C)(6)(b) of the Plan (unless, pursuant to Section II(C)(4)(b) of the Plan, such Holder irrevocably elects the Trade Class Election); *provided, further*, if a Holder of an Allowed Class 5B Claim does not submit a Ballot, such Holder shall be deemed to have elected to receive the Litigation Trust Interests with respect to its Allowed Class 5B Claim.

By checking the box below, if the undersigned is a Holder of a Class 5B Claim and chooses to accept the Plan, the undersigned may elect receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of the Plan.

> ☐   The undersigned elects to **opt-in** to receive <u>Litigation Trust Interest</u>, and to receive their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5 Claims in accordance with the terms of this Plan, pursuant to Section II(C)(6)(b) of the Plan.

**Item 4. <u>OPTIONAL</u> Trade Class Election for Class 5B Claims.**

By checking the box below, the undersigned ***may irrevocably elect* to treatment of your Class 5B Claim as a Class 4 Claim (Trade Creditor).  By checking the box below, the undersigned irrevocably elects to** *reduce* your Class 5B Claim to an amount equal to $200,000 (to the extent your Allowed Class 5B Claim exceeds $200,000) and thereby receive payment in Cash in an amount equal to fifteen percent (15%) of your elected Class 4 Claim, in full satisfaction of such Claim; *provided that*, if the aggregate distributions to Holders of Allowed Class 4 Claims exceeds $1,000,000 (the "<u>Trade Creditor Claim Cap</u>"), then Holders of such Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap in Cash. By checking the box below and making the irrevocable Trade Class Election, the undersigned will be deemed to have accepted the Plan. If the undersigned fails to check the box below, the undersigned will be deemed to have rejected the Trade Class Election.

> ☐   The undersigned elects to **opt-in** to the <u>Trade Class Election</u>, and in the event its Class 5B Claim exceeds $200,000, to reduce its Class 5B Claim that is greater than $200,000 to a Claim of $200,000 to be treated as a Trade Claim pursuant to Section II(C)(4)(b) of the Plan.

*[Continued on the next page]*

**Item 5. Certification Regarding Votes Cast on Other Beneficial Holder Ballots in Respect of the Notes.**

If the Beneficial Owner on behalf of which this Beneficial Holder Ballot is being cast has cast other Beneficial Holder Ballots on account of other positions in the Notes held by it, the undersigned certifies that the requisite information regarding any other Beneficial Holder Ballots cast by it has been included in the table below (or on additional sheets attached hereto). Do not include in the following table information relating to your positions in the Notes being voted on this Beneficial Holder Ballot. *Only information relating to other Beneficial Holder Ballots cast by the Beneficial Owner on account of other positions it holds in the Notes should be identified in this Item 3*. Please attach additional sheets if necessary.

| Other Beneficial Holder Ballots Cast by Beneficial Owner in Respect of Additional Positions in the Notes | | | |
|---|---|---|---|
| | **Customer Account Number at Other Nominee** | **Name of Other Registered Holder or Nominee (if applicable)** | **Aggregate Principal Amount of Other Class 5B Petitioning Creditor Exchange Note Claims Voted** | **CUSIP / ISIN Number of Other Positions in the Notes Held and Voted by Beneficial Owner** |
| **1.** | | | | |
| **2.** | | | | |
| **3.** | | | | |
| **4.** | | | | |

To be counted, a Beneficial Owner must vote all of its positions in the Notes either to accept or reject the Plan. No split votes will be permitted.

**Item 6. Certifications.**

By signing this Ballot, the undersigned certifies to the Court and the Debtors that:

a.  either: (i) the Entity is the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot, or (ii) the Entity is an authorized signatory for an Entity that is the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot;

b.  the Entity has received a copy of the Disclosure Statement and has received a copy of the Solicitation Package, and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

c.  either: (i) the Entity has cast the same vote with respect to all principal amounts of the Notes it holds, or (ii) the Entity for whom the undersigned is an authorized signatory of the Beneficial Owner of the principal amount of the Notes being voted in this Beneficial Holder Ballot has cast the same vote with respect to all principal amounts of the Notes such Beneficial Owner holds; and

d.  no other Beneficial Holder Ballots with respect to the principal amount of the Notes identified in Item 1 have been cast or, if any other Beneficial Holder Ballots have been cast with respect to such principal amount, then any such earlier Beneficial Holder Ballots are hereby revoked.

*[Continued on the next page]*

**Item 7. Declarations**.

By signing this Beneficial Holder Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Beneficial Holder Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Beneficial Holder Ballot and has full power and authority to vote to accept or reject the Plan; provided, however, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request. The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

| | |
|---|---|
| **Name of Holder:** (print of type) | |
| **SSN/TIN of Voter:** | |
| **Date:** | |
| | **Signature:** |
| | **Name of Signatory**: |
| | (if other than Holder) |
| | **Title:** |
| | **Address:** |
| | |
| | |
| | **Telephone Number** |

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.**

**PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BENEFICIAL HOLDER BALLOT. PLEASE COMPLETE, SIGN, AND DATE THIS BENEFICIAL HOLDER BALLOT AND RETURN IT PROMPTLY IN THE ENVELOPE PROVIDED (OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS OF YOUR NOMINEE). PLEASE ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE THIS BENEFICIAL HOLDER BALLOT OR THE INFORMATION REQUESTED HEREIN AND CAST YOUR VOTE PRIOR TO THE VOTING DEADLINE AS INSTRUCTED BY YOUR NOMINEE.**

**IF YOU RECEIVED A DAMAGED BENEFICIAL HOLDER BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BENEFICIAL HOLDER BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

## <u>INSTRUCTIONS FOR COMPLETING THIS BENEFICIAL HOLDER BALLOT</u>

**This Beneficial Holder Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Beneficial Holder Ballot.**

This Beneficial Holder Ballot is submitted to you to solicit your vote to accept or reject the Plan. Please indicate your vote by marking an "X" in the appropriate box in <u>Item 2</u> of the Beneficial Holder Ballot.

If you are a Holder of a Class 5B Allowed Claim and you wish to elect the optional Pro Rata portion of Litigation Trust Interests Election, please check the box in <u>Item 3</u>. Please note that failure to check a box in Item 3 and Item 4 will be deemed as having elected Item 3.

If you are a Holder of an Allowed Class 5B Claim but do not submit a Ballot, or submit a Ballot but fail to affirmatively elect the Exchange Note Election Recovery, or elect both the Exchange Note Election Recovery and the Litigation Trust Interests Election, you will be deemed to have elected the Litigation Trust Interests Election with respect to your Allowed Class 5B Claim.

If you are a Holder of a Class 5B Allowed Claim that is greater than $200,000 and you wish to make the optional Trade Class Election, please check the box in <u>Item 4</u>. Please note that failure to check the box in Item 4 will be deemed as having declined the Trade Class Election.

**You may only select one** of the optional elections in Item 3 and Item 4. If a Holder of an Allowed Class 5B Claim does not submit a Ballot, such Holder shall be deemed to have elected the Litigation Trust Interests Election with respect to its Allowed Class 5B Claim.

The amount of your Claim as set forth on this Beneficial Holder Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Claim may be subject to further reconciliation, and an objection may be interposed.

**This Beneficial Holder Ballot does not constitute and shall not be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any claim.**

After providing all remaining information requested in this Beneficial Holder Ballot, please sign and date this Beneficial Holder Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

To ensure that your vote is counted, you must: (a) complete the Beneficial Holder Ballot, including indicating the CUSIP / ISIN numbers for the Notes you are voting; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Ballot; and (c) sign and return the Beneficial Holder Ballot or the information requested therein in accordance with Nominee's instructions in sufficient time for your Beneficial Holder Ballot or for your Nominee to include your vote on a Master Ballot, as applicable, that is actually received by the Voting Agent prior to the Voting Deadline on [_], 2024 at [ ] [ ].m (prevailing Eastern Time).

If a Beneficial Holder Ballot or the information requested therein is received after the Voting Deadline, it will not be counted unless otherwise determined by the Debtors and approved by the Court.

Additionally, the following Beneficial Holder Ballots **will NOT be counted**:

- any Beneficial Holder Ballot (or group of Ballots with respect to Claims in a class received from a single creditor) that partially rejects and partially accepts the Plan;

- any Beneficial Holder Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline;

- any Beneficial Holder Ballot sent by facsimile, e-mail, or any other electronic means, except as instructed by the Debtors or your Nominee;

- any Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, or the Debtors' legal advisors;

- any Beneficial Holder Ballot that is properly completed, executed, and timely returned to its Nominee but does not indicate an acceptance or rejection of the Plan;

- any Beneficial Holder Ballot that is properly completed, executed, and timely returned to its Nominee but indicates both an acceptance and a rejection of the Plan;

- any Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the Beneficial Owner;

- any Beneficial Holder Ballot not bearing an original signature on the line adjacent to the "Signature:" label in the certification section therein [other than a Beneficial Holder Ballot properly submitted in accordance with the Nominee's instructions;

- any form of a Beneficial Holder Ballot other than the official form sent by the Nominee or a copy of the official form;

- any vote included on any Beneficial Holder Ballot cast by an Entity that does not hold Notes; and

- any Beneficial Holder Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures.

You must vote all of your claims within a single class to either accept or reject the Plan.  A Beneficial Holder Ballot that partially rejects and partially accepts the Plan or Beneficial Holder Ballots that are voted inconsistently will not be counted.

This Beneficial Holder Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Beneficial Holder Ballot for such other classes.

## Exhibit 10

**Form of Ballot – Class 6 (Interests)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **Eletson Holdings Inc.,** *et al.*,[1] | **Case No. 23-10322 (JPM)** |
| **Debtors.** | **(Jointly Administered)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT DEBTORS'**
**SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER**
**CHAPTER 11 OF THE BANKRUPTCY CODE**

**(Class 6 Ballot: Interests)**

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS**
**[_], 2024 AT 5:00 P.M. (EDT)**

The above-captioned debtors and debtors-in-possession (the "Debtors") filed their Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on May 13, 2024 (the "Plan") [Dkt No. 671]. The United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has approved the disclosure statement with respect to the Plan (the "Disclosure Statement") [Dkt No. 672], which provides information to assist you in deciding how to vote your ballot (the "Ballot"). If you have any questions regarding this Ballot you may contact counsel to the Debtors at Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia PA 19103 (Attn: Derek M. Osei-Bonsu) (215) 241-8100. **Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.**

This Ballot is being sent to holders of interests in Class 6 (Interests). The holders of Interests in the Debtors who are not deemed to have rejected the Plan are afforded the opportunity to vote on the Plan, which may be confirmed by the Bankruptcy Court and thereby made binding on you if it is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of claims in each class of claims voting on the Plan. In the event that the requisite acceptances are not obtained, the Bankruptcy Court may nevertheless confirm the Plan if it finds that the Plan accords fair and equitable treatment to the class or classes rejecting it and otherwise satisfies the requirements of 11 U.S.C. § 1129(b). To have your vote count, you must complete and return this Ballot.

**YOU SHOULD REVIEW THE DISCLOSURE STATEMENT AND THE PLAN BEFORE YOU VOTE. YOU MAY WISH TO SEEK LEGAL ADVICE CONCERNING THE PLAN AND YOUR CLASSIFICATION AND TREATMENT UNDER THE PLAN. YOUR CLAIM HAS BEEN PLACED IN CLASS 6 UNDER THE PLAN. IF YOU HOLD CLAIMS IN MORE THAN**

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

**ONE CLASS, YOU WILL RECEIVE A BALLOT FOR EACH CLASS IN WHICH YOU ARE ENTITLED TO VOTE.**

**PLEASE COMPLETE, SIGN AND DATE THIS BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE SO THAT IT IS RECEIVED BY COUNSEL TO THE DEBTORS AT REED SMITH LLP, THREE LOGAN SQUARE, 1717 ARCH STREET, SUITE 3100, PHILADELPHIA PA 19103 (ATTN: DEREK M. OSEI-BONSU) OR ELECTRONICALLY AT ELETSONBALLOTS@REEDSMITH.COM BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF THE BALLOT CONTAINING YOUR VOTE IS NOT RECEIVED ON OR BEFORE THE VOTING DEADLINE, YOUR VOTE WILL NOT COUNT AS EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN.**

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT, IT WILL BE BINDING ON YOU WHETHER OR NOT YOU VOTE.  BALLOTS CAST BY FACSIMILE OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT WILL NOT BE COUNTED UNLESS APPROVED IN ADVANCE BY THE DEBTORS IN WRITING.

<u>**ACCEPTANCE OR REJECTION OF THE PLAN**</u>

Please note that you must vote the entirety of the Interests you hold to accept or reject the Plan. For purposes of tabulating the votes, you shall be deemed to have voted the full amount of your Interests in your vote.  You may not split your vote.

Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, the following Ballots shall <u>not</u> be counted or considered for any purpose in determining whether the Plan has been accepted or rejected: (i) any Ballot received after the Voting Deadline, even if postmarked before the Voting Deadline; (ii) any Ballot that is illegible or contains insufficient information to permit the identification of the claimant; (iii) any Ballot that indicates neither an acceptance nor a rejection, or indicates both acceptance and rejection, of the Plan; (iv) any Ballot cast by a person or entity that does not hold a claim or interest in a class that is entitled to vote to accept or reject the Plan; (v) any unsigned Ballot; (vi) any form of Ballot other than the official form sent by the Debtors' Counsel or a copy thereof; or (vii) any copy of a Ballot, facsimile Ballot or Ballot transmitted by electronic means without an original signature.  If you hold claims in more than one Class, you will receive multiple Ballots.  You should vote each Ballot that you receive.

<u>**IMPORTANT INFORMATION REGARDING PROVISIONS OF THE PLAN**</u>

THE PLAN CONTAINS THE FOLLOWING PROVISIONS:

*(a) Injunction.*  **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or**

enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

*(b) Term of Injunctions or Stays.*  Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, this Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

(c)  *Exculpation.*  Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit. Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

**Item 1. <u>Vote on the Plan</u>.  (Please check one box only.)**

---

   ☐  ACCEPTS (votes FOR) THE PLAN  ☐  REJECTS (votes AGAINST) THE PLAN

*By voting to accept the Plan, you are agreeing to the Injunction and Exculpation provisions as set forth above and as provided in Article IX of the Plan.*

---

**This Ballot does <u>not</u> constitute and shall <u>not</u> be deemed to constitute (a) a proof of claim or (b) an admission by the Debtors of the nature, validity or amount of any interests.**

**Item 2. <u>Declarations</u>.**

By signing this Ballot, the undersigned claimholder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has been provided with a copy of the Disclosure Statement relating to the Plan and all related tabulation materials.

By signing this Ballot, the undersigned Interest holder declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it is the holder of the claim set forth in the box on the first page of this Ballot and has full power and authority to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, that, to the extent that the undersigned is voting on behalf of the actual holder of the claim, the undersigned declares under penalty of perjury as provided for by 28 U.S.C. § 1746 that he/she/it has the requisite authority to do so and will submit evidence of same upon request.  The undersigned claimholder also acknowledges that the tabulation of votes is subject to all of the terms and conditions set forth in the Disclosure Statement relating to the Plan.

**THE VOTING DEADLINE IS 5:00 P.M. (EASTERN) ON [_], 2024.  PLEASE MAKE SURE THAT YOU HAVE PROVIDED ALL INFORMATION REQUESTED BY THIS BALLOT.
PLEASE RETURN YOUR BALLOT PROMPTLY.**

**DEBTORS' COUNSEL WILL <u>NOT</u> ACCEPT BALLOTS SUBMITTED BY FACSIMILE TRANSMISSION OR BY OTHER ELECTRONIC MEANS OTHER THAN THOSE PROVIDED IN THIS BALLOT .**

**IF YOU RECEIVED A DAMAGED BALLOT OR LOSE YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THIS BALLOT, PLEASE CALL THE DEBTORS' COUNSEL AT (215) 241-8100.**

Interest Number:              Name of Voter: _____

Interest Amount:

                               **Signature:**

[Interest Holder Name and Address]   By: _____

                               Print or Type Name: _____

                               Title: _____

                               Address: _____

                               _____

                               Telephone Number: _____

                               Date: _____

                               SSN/TIN of Voter:_____

- 4 -

**<u>INSTRUCTIONS FOR COMPLETING THE BALLOT</u>**

**This Ballot is <u>not</u> a letter of transmittal and may <u>not</u> be used for any other purpose than to cast votes to accept or reject the Plan.  Do not enclose notes or securities with your completed Ballot.**

This Ballot is submitted to you to solicit your vote to accept or reject the Plan.  Please indicate your vote by marking an "X" in the appropriate box in <u>Item 1</u> of the Ballot.

The amount of your Interests as set forth on this Ballot does not necessarily constitute an allowed claim under the Plan.  The amount of your Interests may be subject to further reconciliation, and an objection may be interposed.

After providing all remaining information requested in this Ballot, please sign and date this Ballot.  **Your signature is required in order for your vote to be counted.**  You are also required to provide your social security number or Tax Identification Number prior to receiving any distribution.  If you are signing in a representative capacity, also indicate your title after your signature.

Return this Ballot by mail, overnight courier or hand delivery to the Debtors' Counsel at the following address:

REED SMITH, LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(Attn: Derek M. Osei-Bonsu)


OR

Electronically at
Eletsonballots@reedsmith.com

**BALLOTS MUST BE RECEIVED BY 5:00 P.M. (EASTERN) ON [_], 2024 (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.  AN ENVELOPE ADDRESSED TO THE DEBTORS' COUNSEL IS ENCLOSED FOR YOUR CONVENIENCE.**

You must vote all of your claims within a single class to either accept or reject the Plan.  A Ballot that partially rejects and partially accepts the Plan or Ballots that are voted inconsistently will not be counted.

This Ballot has been prepared to reflect the class in which you are eligible to vote.  If you have claims in more than one class, you may receive more than one Ballot for such other classes.

**EXHIBIT 3**

**<u>Final Award</u>**

**JAMS ARBITRATION**
**NEW YORK, NEW YORK**

---

Eletson Holdings, Inc., et al.,

       **Claimants,**

    and                                                 JAMS Ref. No. 5425000511

Levona Holdings Ltd.,

       **Respondent.**

---

## FINAL AWARD

### I.    INTRODUCTION

1. <u>Parties and Counsel</u>:    The parties to this arbitration are identified in the caption and are represented as follows:

   <u>Counsel for Claimants:</u>

   Louis Solomon, Esq.
   Reed Smith LLP
   599 Lexington Avenue
   22nd Floor
   New York, New York 10022
   Tel: 212 521-5400
   Email: <u>lsolomon@reedsmith.com</u>

   Colin Underwood, Esq.
   Reed Smith LLP
   599 Lexington Avenue
   22nd Floor
   New York, New York 10022
   Tel: 212 521-5400
   Email: cunderwood@reedsmith.com

   Nancy Savitt, Esq.
   Reed Smith LLP
   599 Lexington Avenue
   22nd Floor
   New York, New York 10022
   Tel: 212 521-5400
   Email: <u>nsavitt@reedsmith.com</u>

Counsel for Respondents:

Mayer Klein, Esq.
Frankel, Rubin, Klein, et al.
231 South Bemiston Avenue
Suite 1111
Clayton, Missouri 63105
Tel: 314 725-8000
Fax: 314 726-5837
Email: mklein@frankelrubin.com

Reid Simpson, Esq.
Frankel, Rubin, Klein, et al.
231 South Bemiston Avenue
Suite 1111
Clayton, Missouri 63105
Tel: 314 725-8000
Fax: 314 726-5837
Email: rsimpson@frankelrubin.com

Mark McNeill
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7351
markmcneill@quinnemanuel.com

Odysseas Repousis
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7626
odysseasrepousis@quinnemanuel.com

Isaac Nesser
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7000
isaacnesser@quinnemanuel.com

William Adams
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7000
williamadams@quinnemanuel.com

2.  JAMS Arbitrator:

Hon. Ariel E. Belen (Ret.)
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.:  212 751-2700
Fax:  212 751-4099
Email: abelen@jamsadr.com

3.  JAMS Law Clerk:

Rachel Gupta, Esq.
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Email: rgupta@guptaresolutions.com

4.  JAMS ADR Consultant:

Burton King, Esq.
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.: 212 607-2758
Email: BKing@jamsadr.com

5.  The claims are set forth in a certain "Demand for Arbitration Form," dated July 29,
2022, and in a certain "Statement of Claims," dated July 29, 2022, with exhibits attached
thereto. Respondent submitted "Levona Holdings LTD's Response to Statement of Claims
and Statement of Counterclaims," with exhibits, dated August 19, 2022. Respondent also
submitted a Letter, dated September 5, 2022. Claimant then submitted a Letter, dated
September 5, 2022.

6.  This arbitration is brought pursuant to a certain "Eletson Gas, LLC, Third Amended
and Restated Limited Liability Company Agreement," dated July 29, 2022 ("LLCA"). The
arbitration provision is contained in subsection 12.14(a), page 69 of the LLCA. The parties

disagree as to the scope of this arbitration provision and the arbitrability before JAMS of some of the claims.

This Final Award is based upon a review of all the pleadings in this arbitration proceeding, as well as the submissions that follow that were considered by the undersigned arbitrator. The submissions and the exhibits attached thereto that were reviewed and considered are as follows: "Claimants' Pre-Hearing Statement of Position Pursuant to JAMS Rule 20(b) and Procedural Order No. 5 ¶ 8," dated May 5, 2023 ("Claimants' Rule 20(b) Statement"); "Respondent Levona's Rule 20(b) Statement of Counterclaims and Defenses to Eletson's Statement of Claims," dated May 5, 2023; "Claimants' Post-Hearing Submission," dated June 9, 2023 ("Claimants' Post Hearing Brief"); "Claimants' Proposed Order," dated June 9, 2023; "Respondent's Post Trial Brief and Statement of the Record," dated June 9, 2023 ("Respondent Post Trial Brief"); and "Respondent's Proposed Order," dated June 9, 2023. In addition, I heard and considered the testimony at an arbitration hearing that was held on May15, 16, 18, 19, 22, 23, and 24.

I also heard closing arguments on June 13, 2023. I reviewed and considered the transcripts of the arbitration hearing and closing arguments which contain the testimony of the witnesses and the colloquy and arguments of counsel on various substantive and procedural issues. I reviewed and considered the exhibits admitted with the post-hearing submissions and the exhibits admitted at the arbitration hearing. In addition, I reviewed Eletson's Affirmation Supporting Fees, Costs, Expenses and Interest, with supporting exhibits and client affidavit, filed on August 11, 2023 ("Opening Affirmation); Levona's Affirmation in Response to Claimants' Affirmation in Support of Its Motion for Fees, filed on August 25, 2023 ("Respondent's Affirmation"); and Eletson's Reply Affirmation in Further Support of Fees, Costs, Expenses and Interest, with supporting client affidavit, filed on September 1, 2023 ("Reply Affirmation").

On July 28, 2023, I issued an Interim Award in this arbitration. Subsequently, counsel for Levona requested corrections to the Interim Award pursuant to Rule 24(j) of the JAMS Comprehensive Rules and Procedures ("JAMS Rules") on August 15, 2023, I issued a Corrected Interim Award  ("Corrected Interim Award") clarifying that in Section VII.B.4 of the award:  "The entities referred to in B.1 and B.2 respectively shall also be awarded pre-judgment interest on the principal amount of the compensatory damages in paragraph B.1."

This Final Award adopts, incorporates, and republishes the Corrected Interim Award in its entirety amending the Corrected Interim Award only as necessary to make certain ministerial and stylistic edits, and to integrate the undersigned arbitrator's subsequent determinations regarding the Claimants' request for attorneys' fees, costs, expenses and interest. Section VII of the Corrected Interim Award entitled Conclusion and Corrected Interim Award is not reproduced here for the sake of brevity and clarity, although the findings and legal conclusions contained in that section are adopted here in their entirety in Section VIII of this Final Award entitled Conclusion and Final Award.

The Corrected Interim Award resolved all issues submitted for decision in this arbitration, except as expressly reserved therein, relating to the amount of Claimants' attorneys' fees, costs, expenses, and pre-judgment interest. The undersigned arbitrator in

this Final Award has considered and resolved all the issues and arguments raised relating to the merits of the claims, counterclaims, requests for attorneys' fees, costs, expenses, and pre-judgment interest. Any argument not addressed in this Final Award was found to be unavailing, without merit, academic, or unnecessary to reach.

The undersigned arbitrator recognizes and appreciates the high quality of the presentations by counsel for each party. The result of this decision is not a reflection on any difference in the quality of those presentations, but of the arbitrator's review of the record.

## II.    BACKGROUND OF THE DISPUTE AND SUMMARY OF CLAIMS AND COUNTERCLAIMS

### A. <u>Parties and Relevant Facts</u>

Claimant Eletson Holdings, Inc. ("Holdings") is a corporation formed under the laws of Liberia, which holds the common shares in Eletson Gas LLC (the "Company") (J-1.0005 and J-01.0084.) Claimant Eletson Corporation ("Eletson Corp") (together with Holdings, "Eletson") is formed under the laws of Liberia, and among other things, is a special member of the Company responsible for the provision of management services for the vessels owned directly or indirectly by the Company. Holdings is the parent company of Eletson Corp. (*See* C-1963, J-1.0085.) Eletson is owned by three principal families, which are the families of Laskarina Karastamati ("Karastamati"), Vassilis Kertsikoff ("Kertsikoff"), and Vasilis Hadjieleftheriadis ("Hadjieleftheriadis"), each of whom hold various officer positions in the Eletson entities.

On October 22, 2013, Holdings announced the creation of the Company, a $700 million liquefied petroleum gas shipping joint venture of Holdings and funds managed by Blackstone Tactical Opportunities ("Blackstone"). (C-1774, C-1964 ¶ 9; C-1963 ¶ 17.) Blackstone was the preferred shareholder of the Company. (J-1.0084.) Eletson contributed five medium-size gas carriers to the creation of the Company. (C-1774.) Additionally, in 2020, Eletson contributed approximately $5.5 million in liquidity support to the Company. (May 16, 2023 Transcript p.336:4-17.)

5

From 2013 to 2021, Blackstone was the preferred shareholder of the Company (May 16, 2023 Transcript pp. 23:20-24; 77:18-25.)  From 2013 to the present, Holdings was the common unit holder of the Company. (C-1964 ¶ 11; C-1963 ¶19.)

On August 16, 2019, Eletson and Blackstone entered into the Third Amended and Restated Limited Liability Company Agreement, dated August 16, 2019.  On April 16, 2020, Eletson and Blackstone entered into Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement. (J-2.) Collectively, the August 16, 2019 agreement and the April 16, 2020 Amendment are referred to as the "LLC Agreement" or "LLCA".  The LLCA regulates the relationship among the holders of membership interests in the Company. (*See* J-1.)

At the beginning of 2022, the Company owned, directly or indirectly, 14 liquefied petroleum gas carriers. (C-1963 ¶ 21; C-1964 ¶ 13.) The Eletson fleet is the second largest in the market—second only to Unigas, Eletson's primary competitor (C-1963 ¶ 21; C-1964 ¶ 13) ("Unigas is one of Eletson's key direct competitors").) The Company's revenues are primarily derived from the operation of the vessels (C-1963 ¶ 20; C-1964 ¶ 14.) Eletson Corp is responsible for the provision of management services for the vessels owned by the Company through subsidiaries. (C-1963 ¶ 9; May 18, 2023 Transcript pp. 52:14-17.) For its management services, Eletson Corp is paid management fees from the vessel subsidiaries. (May 16, 2023 Transcript pp. 243:3-18; 334:3-16.)  The management fees are an asset of Eletson Corp and a liability for the Company or the relevant subsidiaries incurring the expense. (May 16, 2023 Transcript pp. 334:19-25.) All throughout Eletson's partnership with Blackstone, Eletson managed the vessels (C-1963 ¶ 9.)

In early 2021, Blackstone sought to sell its interest in the Company.  Blackstone and Murchinson, an alternative management firm that manages funds on behalf of

6

institutional investors, signed a Confidentiality and Non-Disclosure Agreement on or around January 25, 2021 ("NDA".)  (J-36.) The NDA states that the parties "desire to exchange certain proprietary or confidential information for the purpose of exploring a possible negotiated direct investment opportunity . . . in connection with certain LPB Shipping assets owned or operated by Eletson Gas LLC." (*Id.*) The NDA provides further that the "Confidential Information will be used solely for the purpose of evaluating, financing and executing the Opportunity . . . and will not be disclosed by the Receiving Party or its Representatives except (i) as may be consented to by the Disclosing Party." (J-36.001.) Under the NDA, Murchinson agreed not to "directly or indirectly contact or communicate with any of Eletson's employees, lenders, lessors, customers, suppliers, or any other person with whom Eletson has a business relationship, or to seek any information in connection therewith from such person, without the express written consent of Blackstone." (J-36.0002.)

At some point in time, Murchsinson and Blackstone reached a deal, whereby Murchsinson would purchase 100% of Blackstone's interests in Eletson Gas for an initial investment of $3 million. (C-1782 p. 32:13-25.) Murchinson created a special purpose vehicle to hold these interests, Levona Holdings Ltd ("Levona")—the Respondent in this arbitration.  Levona is 60 percent owned by Nomis Bay and 40 percent owned by BPY— two hedge funds. (C-802, C-1053.)  Murchinson controls and manages Nomis Bay and BPY. On November 2, 2021, Blackstone assigned its interest in the Company to Levona and appointed the four representatives designated by Levona to the board of the Company. (J-12; C-033; C-051.)  These directors were: Eliyahu Hasset ("Hasset"), Joshua Fenttiman ("Fenttiman"), Mark Lichtenstein (Lichtenstein), and Adam Spears ("Spears").

For all meaningful purposes relevant to this Corrected Interim Award and the facts and circumstances giving rise to the claims at issue in these proceedings, Murchinson and Levona are one and the same. This will be discussed in more detail later in this Corrected Interim Award.   "Levona-related entities" refers to Levona, Murchinson and Pach Shemen—also a special purpose vehicle with identical ownership as Levona, managed and controlled by Murchinson.

Shortly after acquiring the Blackstone interests, Eletson officers and Levona's representative, Adam Spears, began discussing a deal that would enable Eletson to buyout Levona's interests.

The parties entered into a Binding Offer Letter ("BOL") on February 22, 2022.

Section 2.1 of the BOL provided that:

Subject to and in consideration of the Transfer occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to Eletson Gas the option exercisable by written notice to Levona by both of them (an "Option Notice"), for either Eletson Gas or its nominee to purchase all the membership interests held by Levona in Eletson Gas (the "Option Membership Interests") for a consideration equal to the Purchase Option Consideration payable in cash on completion of the transfer of the Membership Interests to such account as Levona may nominate in writing. (J-06 § 2.1.)

The Purchase Option Consideration "shall be an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value." (J-06 ¶ 3.2.) The Net Value "shall be based on a third party independent valuation of the [Symi and Teledos]." (J-06 ¶ 3.3(b).)

Following the execution of the BOL, on March 11, 2022, the parties entered into a series of agreements including the following: (i) the Intra-Group Loan Agreement, pursuant to which Levona provided the company a loan facility of up to $10 million for a term of up to two years (J-07); (ii) the Share Transfer Agreement, pursuant to which the Company transferred to Levona 100% of the shares of the Symi and Telendos (J-8); (iii) the

8

Assignment of Claims, pursuant to which Eletson Corporation assigned to Levona all of its claims relating to the management fees and liquidity support owed to it by the Company, or its subsidiaries (J-09); (iv) the Deed of Waiver and Release (C-0027); and (v) the Fundamental Action Letter (J-10) (collectively, the "Transaction Documents").

In April, the loan was amended to provide the Company with the ability to draw an additional $4 million. (C-24.)

On July 15, 2022, Levona entered into a Letter of Intent with Unigas, the main competitor of the Company, to sell the Company's fleet of vessels for $262 million ("Unigas LOI"). (J-019.)

### B.  Summary of Claims and Counterclaims

The resolution of the majority of the claims and counterclaims asserted in this arbitration rests upon the interpretation of the Transaction Documents. Did Eletson exercise the purchase option pursuant to the Transaction Documents?  If the answer is "yes," then at some point in time, Levona was no longer a member of the Company and did not have any rights under the LLCA to enter into the Unigas LOI, or otherwise act on behalf of the Company. Conversely, if Eletson did not fulfill the requirements under the Transaction Documents to exercise the purchase option, Levona's interests were not bought out and Eletson may have violated its obligations under the LLCA by refusing to, *inter alia*, engage in due diligence relating to the Unigas LOI.

Eletson has asserted claims against Levona for breach of the LLCA and breach of the covenant of good faith and fair dealing.  These claims can be grouped into four categories.  First, Eletson asserts claims that Murchinson engaged in deceitful and wrongful conduct that voids *ab initio* its acquisition of Blackstone's preferred interests.  Eletson claims that Murchinson bribed Eletson Corporation's CFO, Peter Kanelos, and caused him

to disclose confidential Company information before Murchinson's purchase of the preferred interests in the Company. Eletson also claims that Murchinson, in breach of the NDA with Blackstone, communicated directly with Company financiers and lenders, and engaged in industrial sabotage that led to the arrest of Company's vessels prior to Levona's acquisition of preferred interests. These claims will be referred to as the "Pre-Acquisition Claims." Eletson seeks damages, under a theory of rescissory damages, in connection with the harm it alleges it suffered as a result of these claims.[1]

Second, after acquiring Blackstone's interests, Eletson claims that Levona breached the LLCA in a number of ways. Immediately upon joining the Company, Eletson asserts that Levona breached the LLCA and the Company's management agreements by among other things, attempting to fire Eletson Corporation as the manager of the Company's or the Company's subsidiaries' vessels. In addition, Eletson claims that Levona failed to disclose its pre-acquisition misuse and breaches of confidential information, continued to conspire with Mr. Kanelos to liquidate and harm the Company, and conspired with the Company's counsel, Watson Farley Williams ("WFW") against the Company's interests. I will refer to these claims as the "Post-Acquisition/Pre-BOL Claims."

Eletson also alleges that the Levona-related entities violated the Status Quo Injunction (defined, *infra,*) on numerous occasions, including by wrongfully declaring the Company in default of the Loan made by Levona to the Company, trying to sell the Symi and Telendos, directing the purchase of a controlling position in debt securities of Holdings for the purpose of commencing litigation against Holdings and the involuntary bankrtupcy against Holdings ("Status Quo Injunction Claims").

---

[1] Eletson attempts to merge the Pre-Acquisition Claims into material breaches of the LLCA, but prior to November 2, 2021 when Blackstone sold its interests in the Company, neither Murchinson nor Levona were parties to the LLCA.

And finally, Eletson asserts claims for breach of the LLCA and breach of covenant of good faith and fair dealing against Levona for failing to acknowledge Eletson's compliance with the terms of the Transaction Documents, failing to transfer the preferred interests in the Company, and continuing to act on behalf of the Company in complete bad faith including by entering into the Unigas LOI.

In addition to declaratory relief, Eletson seeks compensatory damages of at least $71 million, punitive damages in the range of 3 to 9.63 times the compensatory damages, pre-judgment interest at ten percent per annum, costs, and attorney's fees.

Conversely, Levona asserts that through today, it remains the preferred interest holder.  Accordingly, it seeks various declarations with respect to the rights it is afforded by virtue of the LLCA and/or the Fundamental Action Letter.  It also seeks monetary damages allegedly arising from Eletson's failure to attend board meetings, which prevented the Company from refinancing certain debt and engage in due diligence in connection with the Unigas LOI.  Levona also asserts a claim for tortious interference in connection with the Unigas LOI and conversion for denying Levona the ability to sell the Symi and Telendos.  For all of its claims, Levona seeks compensatory damages of more than $3 million, plus an undefined amount that includes any profit it is due from the Company as preferred holder, and any decrease in net profit from the sale of the vessels as compared to the Unigas LOI.  Levona also seeks $2 million in punitive damages, post-judgment interest, costs, and attorney's fees.

### III.    HISTORY OF THE PROCEEDINGS

The following events and rulings are relevant to this Final Award.

Eletson filed the initial Statement of Claims on or about July 29, 2022.  Levona filed its Response to Statement of Claims and Statement of Counterclaims on August 19,

2022.  In that Response, and in a subsequently filed Motion to Strike Certain of Claimants'

Pleadings, Arguments, and Requests for Relief, dated, September 12, 2022 ("First Motion

to Strike"), Levona challenged the jurisdiction of JAMS. Levona conceded that JAMS had

jurisdiction to decide issues raised under the LLCA, including for example, issues related

to Levona's calling of board meetings and Eletson's failure to attend them, Eletson's refusal

to cooperate in due diligence for the Unigas sale, or Eletson's refusal to cooperate with

other rights Levona may have.   Levona, however, insisted that JAMS did not have

jurisdiction concerning the majority of Eletson's claims because determining those claims

required the arbitrator to enforce the parties' rights under the Transaction Documents,

which Levona claimed needed to be arbitrated in London. (*See, generally* First Motion to

Strike.)

On September 30, 2022, I ruled that JAMS has jurisdiction over the claims and

counterclaims pursuant to Section 12.14 of the LLCA, and by reason of the affirmative

claims Levona filed as counterclaims in this arbitration. (C-01813.)

The LLCA § 12.14(a) provides:

Any dispute, claim or controversy arising out of or relating to this
Agreement or the breach, termination, enforcement, interpretation or
validity thereof (including the determination of the scope or applicability of
this agreement to arbitrate) shall be determined by arbitration in New York
County in the State of New York or any other mutually agreeable location,
before a single arbitrator. The arbitrator shall be selected by agreement of
the parties. If the parties are unable to agree on an arbitrator within 15 days
after the demand for arbitration is made, JAMS shall designate the
arbitrator. The arbitration shall be administered by JAMS pursuant to its
Comprehensive Arbitration Rules and Procedures. The Federal Arbitration
Act shall govern the interpretation and enforcement of such arbitration
proceeding. The arbitrator shall apply the Law of the State of Delaware and
the Republic of the Marshall Islands, as the case may be, in accordance with
Section 12.13. (J-1.)

I ruled that "the arbitration provision in the LLC Agreement is broad, encompasses

the claims asserted, and the parties agree that this arbitration provision was not replaced or

superseded by the arbitration [provision] in the Transaction Documents." (C-1813 p. 12.) I further found that "by filing counterclaims, Respondent availed itself of this forum, submitted to JAMS, and waived its jurisdictional challenges." (C-1813 p. 12.)

I reiterate and emphasize the waiver ruling, as Levona continues to insist that JAMS does not have jurisdiction to enforce the Transaction Documents.

Specifically, in its Post Trial Brief, Levona argues:

The Option was not exercised. But, more importantly from a legal standpoint, an obligation to meet contract obligations external to the LLCA is not an obligation under the LLCA itself. As a result, not only is there no breach of contract but, the only way to find a breach of "good faith and fair dealing" is to look to the Transaction Documents—not the LLCA. *The Transaction documents are governed by English Law and are to be determined by either a British arbitration or court. Given that this Tribunal is not an expert in British Law, not seated in London, has heard no evidence or argument related to British Law, **and in fact does not have jurisdiction to enforce the Transaction Documents,** this argument is outside the scope of this matter from a simple legal perspective.*
(Respondent Post Trial Brief pp. 55-56.)

However, Levona has itself sought relief for its counterclaims that I can only award if I interpret, enforce, and provide relief for pursuant to the Transaction Documents. For example, in its Proposed Order, Levona specifically requests declarations interpreting the Transaction Documents (e.g., a through f), for example, seeking a finding that Levona holds the preferred shares, and Levona further seeks a ruling awarding damages as a result of Eletson's conversion of the Symi and Telendos (e.g., b and c)—relief that depends on my interpreting and enforcing the terms of the Transaction Documents. It also asserted a claim for tortious interference with the Unigas LOI—which is not a claim for a breach of the LLCA. Thus, Levona has waived any jurisdictional objection concerning the claims and counterclaims.

On October 10, 2022, I entered a Temporary Restraining Order, pending a decision on the parties' cross-motions for preliminary injunctive relief ("TRO"). The TRO

13

confirmed the oral Order rendered during the October 7, 2022 conference, and specifically provided that "during the pendency of this Temporary Restraining Order the parties hereto shall maintain the status quo and shall not, among other things: (1) engage in the transfer or sale of any assets of Eletson Gas LLC (the "Company") absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." (C-1816.)

On November 7, 2022, I clarified the parameters of the "status quo" (C-1838.) Levona argued that the TRO did not apply to "the sale of the Symi and Telendos" because "those vessels are not assets of … Eletson Gas." (C-1838.) I made clear that "Respondent's interpretation of the TRO is incorrect. By its terms, the TRO directed the parties to 'maintain the status quo.' Any attempt to sell or otherwise transfer the Symi and Telendos vessels will be deemed to be in violation of the TRO." (C-1838.)

On January 12, 2023, I then issued a decision on the parties' cross-motions for preliminary injunctions and entered a Preliminary Injunction, extending the TRO's prohibition on actions upsetting the status quo until further notice. (C-1887.)

The Preliminary Injunction stated:

The parties hereto shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of Eletson Gas LLC (the "Company"), or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration. (C-1887 p. 26.)

The Preliminary Injunction was to "stay in effect until amended by subsequent order of the undersigned arbitrator" (C-1887 p. 26.) The TRO, the November

14

clarification, and the Preliminary Injunction collectively are referred to herein as

the "Status Quo Injunction".

I also rendered various discovery rulings relating to Levona and Murchinson's

communications with its law firm, Watson Farley & Williams ("WFW"). On December 12,

2022, I found WFW represented both Eletson and Levona in connection with the

Transactions and that because of this dual representation, Levona was not permitted to

withhold documents on the basis of attorney-client privilege. (C-1880 pp. 9-10.)

On March 6, 2023, I held a status conference and oral argument to address

additional outstanding discovery disputes.  During that conference, I made certain oral

rulings ordering Respondent to produce various categories of documents.  These oral

rulings were subsequently memorialized in a March 10, 2023 email. With respect to WFW

communications, I held as follows:

> With respect to any documents or communications relating to WFW
> withheld on the basis of attorney-client privilege, the privilege has been
> waived due to Respondent's failure to comply with Procedural Order No. 4,
> which required that it produce a log including certain specific information
> "identifying any document required to be produced in response to any
> previously made document requests and demands that it is withholding from
> production on the basis of privilege." Respondent misconstrued Procedural
> Order No. 4 as the order did not state that the parties were to specifically
> identify only those documents this tribunal previously compelled or ordered
> to be produced.  Rather the plain meaning of the order read in its entirety
> demonstrates that any documents responsive to requests for production
> being withheld on the basis of privilege were to be identified specifically
> and those withheld on other bases could be logged categorically. Nor is there
> anything in prior rulings that would have placed a temporal limitation on
> my ruling finding that WFW jointly represented Levona and Eletson.  If
> Respondent wanted to raise these issues, it could have done so, but first, it
> needed to identify the documents and communications at issue by logging
> them pursuant to Procedural Order No. 4.

On March 7, 2023, Pach Shemen—a special-purpose vehicle owned and directed

by the same entities and representatives as Levona—was one of the petitioning creditors

who commenced an involuntary bankruptcy petition against Eletson Holdings. (C-749; C-

751; C-746.) As a result of this filing, Levona insisted that the Bankruptcy Court's automatic stay applied to these proceedings. Claimant emphatically disagreed, but on March 10, 2023, by an order issued by email, I stayed the instant arbitration proceedings "pending further order or notice from the Bankruptcy Court for the Southern District of New York." I did so despite Claimants' objections, in part, because Respondent insisted that continuing with the arbitration proceedings, and/or any compliance with orders of this tribunal, would violate federal law. In other words, they would not comply with any further rulings by me or appear at the evidentiary hearing, which at that time, was scheduled to commence on April 24, 2023, and continue for thirteen days.

In staying the proceedings, however, I reminded the parties that, "pursuant to the arbitration agreement requiring the parties to in good faith work towards an evidentiary hearing within 150 days, if the Bankruptcy Court shall find that this arbitration is not stayed, I will take the steps necessary to ensure timely completion of this arbitration and order the immediate completion of the pending and near term deadlines for document production and the exchange of expert reports. In the event the Bankruptcy Court denies a stay, any party that fails to comply with these deadlines may be subject to preclusion." (March 10, 2023 Email Order.)

On April 17, 2023, by stipulation and order of the court, the Bankruptcy Court lifted the Automatic Stay. (C-00781; LEV214.) I held a status conference that same day and this arbitration resumed. At this April 17th conference, the parties agreed to dates for the evidentiary hearing, which, at that time, was to commence on May 8, 2023, and continue for ten days.

On May 3, 2023, by email, the parties entered into a stipulation, pursuant to which they agreed, *inter alia*: to abbreviate the hearing schedule and split the hearing time equally

between them.  The parties futhte stipulated that  "the schedule is fair and reasonable and [they] waive any objection to the schedule ordered or otherwise determined by the Arbitrator.  The parties stipulate that each has no challenge or objection to the arbitration on fairness grounds or on the basis that it has not been granted enough time to prepare for or present its case." This stipulation was memorialized in Procedural Order No. 6, dated May 6, 2023.

On May 5, 2023, the parties served their JAMS Rule 20(b) submissions.  In their submission, Claimants stated that "The preferred interests at issue in this arbitration, from their issuance up until the execution of the BOL and even thereafter, were never owned or controlled, directly or indirectly, by Holdings, Eletson Corporation, the Company, or any other entity directly or indirectly affiliated with any of these entities.  (Claimants' Rule 20(b) Statement ¶ 100.) Rather, from "January 2022, at the latest, the families owning or controlling the Eletson holdings in the Company determined to nominate three entities independent of Holdings, Eletson Corporation, the Company, or any other entity directly or indirectly affiliated with any of these entities to hold the preferred interests." (Claimants' Rule 20(b) Statement ¶103.) The three entities are Cypriot entities by the names of Fentalon, Apargo, and Desimusco ("Preferred Nominees"). (*Id.*) Each of the three Preferred Nominees is related to one of the three principal Eletson families. In response to this claim, on May 10, 2023, Respondent filed its Motion to Strike Claimants' New Allegations of the Transfer of the Preferred Shares to the Preferred Nominees, or in the Alternative, to Dismiss Claimants' Claims in Chief ("May 10, 2023 Motion to Strike or Dismiss").

Also on May 5, 2023, in addition to their JAMS Rule 20(b) submissions, the parties filed motions in limine.  Eletson filed a motion in limine to bar Levona from using documents from Peter Kanelos as Eletson admissions.  Levona's motion sought to exclude:

(1) extrinsic evidence relating to the BOL and Transaction Documents; (2) evidence unrelated to claimed breaches of the LLCA, including allegations of misconduct before and after Levona acquired its interest in the Company; (3) evidence related to the actions of Pach Shemen; and (4) correspondence between Levona and WFW. The parties opposed each other's motions on May 10, 2023.[2]

On May 12, 2023, I issued Procedural Order No. 7 addressing additional motions to compel.  Relevant to this Corrected Interim Award I specifically ordered the following:

> Respondent has represented that it has produced all communications between Levona and WFW, but that it has not produced communications between Murchinson and WFW based in part on the grounds that Murchinson is a separate entity, with its own separate extension of the attorney-client privilege, and not under Respondent's or its counsel's control. However, throughout these proceedings, the information provided thus far gives the impression that Murchinson is substantially responsible for the creation of Levona. It has also been involved in this arbitration, including having the principal of Murchinson, Mr. Bistricer, attend depositions and potentially appear as a witness for Respondent at the evidentiary hearing. Moreover, in response to a prior ruling ordering the production of documents relating to Peter Kanelos, Respondent's counsel indicated that it was able to get Murchinson to voluntarily produce documents. Counsel is advised to make its best efforts to produce documents responsive to Claimants' request--specifically for relevant communications between Murchinson and WFW--or be prepared for the possibility of an adverse inference or other consequence, if circumstances shall warrant such action based on the evidence presented to me during the evidentiary hearing. (Procedural Order No. 7 p. 5.)

On May 12, 2023, three days before the commencement of the evidentiary hearing, Murchinson's separate counsel sent a letter regarding its production of communications with WFW, which it had still not provided.  Insisting that it was not a party to this arbitration, Murchinson was willing to produce documents *in camera*, but had not yet produced the documents in this arbitration because it did not want such production to be a

---

[2] As will be addressed throughout this Corrected Interim Award, Levona's motion is denied. Eletson's motion is largely mooted—as discussed, *infra*, I have given any documents drafted by Mr. Kanelos appropriate weight.

waiver of its claimed attorney-client privilege. It urged me to reconsider my ruling in Procedural Order No. 7. After additional correspondence, I declined to do so.

First, Murchinson could not have it both ways—on the one hand, insist it wasn't a party to these proceedings and that therefore I lacked jurisdiction over it, but on the other hand, cherry-pick which documents to provide Levona to produce, and have its representatives actively appear and participate in status conferences, depositions, and the evidentiary hearing in this arbitration. Second, I disagreed with Murchinson's claim that it had not waived its attorney-client privilege. Finally, Murchinson's proposal to produce the documents *in camera* was unreasonable and unfeasible given that the evidentiary hearing had already commenced. Thus, by email order, dated May 17, 2023, subject to certain protections upon production, I reiterated my ruling that "Murchinson and WFW communications shall be immediately produced, or Levona should be prepared for the possibility of an adverse inference or other consequence, if circumstances shall warrant such action based on the evidence presented to me during the evidentiary hearing."

The evidentiary hearing proceeded on May 15, 16, 18, 19, 22, 23 and 24, 2023.

## IV.    PRELIMINARY MATTERS

### A. <u>Levona/Murchinson/Pach Shemen</u>

In early 2021, Blackstone contacted Murchison about possibly acquiring its preferred interests. The evidence reflects that there is no correspondence between Blackstone and Levona relating to the acquisition of Blackstone's shares. All correspondence was between Murchinson and Blackstone, as Levona did not exist, and was created for the sole purpose of holding the acquired interests. Levona is owned by Nomis Bay and BPY, which in turn are managed and controlled by Murchinson. (C-802;

C-1053; May 22, 2023 Transcript p. 8:8-22; C-1782 (Deposition of Bistricer) pp. 19:22-20:19.)

It is undisputed that Levona does not have any employees. Similarly, it is undisputed that Levona does not have an email domain, its own bank accounts, or financial records of any kind that would reflect how it valued the preferred shares of the Symi and Telendos after the shares of those vessels were transferred to it. (May 22, 2023 Transcript pp 73:11-74:2.) Curiously, Murchinson's owner Mark Bistricer conceded that Murchinson kept financial records of Levona, but no financial records were exchanged in this arbitration or presented at the evidentiary hearing. Levona insisted throughout these proceedings that it does not have custody or control over Murchinson documents, and as a non-party to these proceedings, Murchinson did not have any obligation to produce documents. Yet, Murchinson did voluntarily produce some categories of documents.

Murchinson employees or agents, including its owner, Marc Bistricer ("Bistricer"), counsel, Mark Lichtenstein ("Lichtenstein"), and agent, Adam Spears ("Spears") also voluntarily appeared throughout these proceedings. It was presumably Bistricer/Murchinson who designated Hasset, Fenttiman, Lichtenstein, and Spears as Levona directors to sit on the Company's Board, as Levona has no employees. Bistricer, Spears and Lichtenstein all attended one or more depositions of Eletson witnesses in this arbitration. (*See, e.g.,* J-40 (Deposition of Lascarina Karastamati); J-41 (Deposition of Vassilis Kertsikoff).)  Indeed, at several Zoom status conferences and arguments, "Murchinson" was one of the remote participants.  Bistricer and Spears both voluntarily appeared for depositions in this arbitration. (C-1782; C-1783.)

Despite these facts, throughout these proceedings, Levona has insisted that Murchinson is a separate entity and not a party to these proceedings. The evidence

presented at the evidentiary hearing, however, demonstrates conclusively that although technically two separate corporate entities, Murchinson and Levona are not distinct for any purposes relevant to these proceedings. Levona, a shell entity, is controlled and directed by Murchinson. While Levona may be the named party, Murchinson is the real party in interest. Bistricer testified: "We bought from Blackstone their position in Eletson Gas . . . we bought everything.") (May 22, 2023 Transcript p. 7:20-8:3.) The documentary evidence further supports this. (*See, e.g.,* C-841 (Bistricer stating "Shareholders say Murchinson related entities. Levona Holdings is the SPV *we* made acquisition in.")(emphasis added); C-950 (discussing a loan of $2 million to the Company, Spears states, "this took a lot of work to get Marc [Bistricer] to agree to open his wallet."); C-1240 (Spears states "I have included . . . a background on Murchinson which is the firm behind the investment in Eletson Gas LLC.").) Murchinson's own counsel represented to third parties that Levona was owned and controlled by Murchinson. (C-1463 (email from WFW attorney, Saunders stating "Levona Holdings (an entity owned and controlled by Murchinson) . . .").)

Thus, any ruling I render in this arbitration extends to Murchinson. Any award in favor of Levona is really in favor of Murchinson, and similarly, any award finding liability and damages against Levona, is owed by Murchinson.

The same is true for Pach Shemen—another special purpose vehicle, with the identical ownership as Levona, directed by the same Murchinson representatives, including Spears and Lichtenstein, and seemingly created for the sole purpose of purchasing a controlling interest in the outstanding bond debt of Holdings so that three weeks later, it could direct the involuntary bankruptcy filing against Holdings. (C-751.)

Correspondence relating to the purchase of these bonds demonstrates how Pach Shemen is intertwined with, and indistinct from, Levona. In fact, "Levona II" was the

originally-contemplated name for the Pach Shemen entity.  In a December 8, 2022 email

from Spears to a selling bondholder, setting out the trade terms in connection with the

purchase of these bonds, Spears promises the following to the selling bondholder:

> 2. $500k *if the arbitration ends* to ***our*** satisfaction on Eletson Gas and ***we***
> can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or
> the Company (Eletson Gas) without legal interference. 3. 10% of the value
> received by Levona for its Preferred Shares in Eletson Gas . . . 4. 1/3 of the
> first $3 million profit ***realized by the entity buying these notes (Levona II)***
> . . . 5. Thereafter 25% of any profit realized by ***Levona II*** after the first $3
> million profit . . . . (C-0746.0008 (emphasis added.)

Notably, Spears is promising potential monetary benefits received in connection

with this arbitration, and any value relating to the preferred shares of the Company, as

compensation in connection with the purchase of the notes by Levona II, which when

subsequently created, was instead named Pach Shemen.  If truly separate entities, how

could Spears make such a promise? The answer is because the separateness is in name only.

Pach Shemen and Levona are not distinct for any meaningful purposes relevant to these

proceedings. They are alter egos of one another, with identical corporate ownership and

management.

Accordingly, Ideny Levona's motion in limine to exclude evidence relating to Pach

Shemen.

### B.  WFW and Peter Kanelos

#### i.  Peter Kanelos

Peter Kanelos was the CFO of Eletson Corporation and a representative of the

Company. The parties dispute whether he was also CFO of the Company.  The evidence

demonstrates that before it acquired the preferred interests from Blackstone, Murchinson

was secretly communicating with Kanelos about strategies for (a) lowering the purchase

price to acquire the Blackstone shares and (b) what to do with the assets of the Company

once  Levona became the preferred holder. (C-1599; C-1600; C-1615; C-1616; C-1617; C-1618; C-1623; C-1625; C-1635; C-1638; C-1640; C-1641; C-1642; C-1647; C-1648; C-1649; C-1664; C-1960; C-2018.) Murchinson used Kanelos to acquire the Company's confidential information and to communicate that information to the Company's financiers, along with Murchinson's proposals, to refinance the Company's debt. (*See*, *e.g.*, C-463; C-1600; C-1615; C-1616; C-1618; C-1623; C-1640; C-1641; C-1642; C-1647; C-1648; C-1649; C-1664.)

Unbelievably, Kanelos, a long-time employee and confidant of the principals of the Eletson entities was promised compensation commensurate with the ultimate strategy Murchinson employed. For example, in an email dated October 1, 2021, Bistricer writes to Kanelos: "You will get 10% of whatever profit we make on this transaction, should it go forward.  The 10% will be paid once we have received our capital back minus a reasonable return of capital." (C-1678.)

It is beyond cavil that Kanelos was acting contrary to his duties as an officer or representative of Eletson and the Company, and that he and Murchinson actively concealed their communications.  In all of the above-cited correspondence, Kanelos intentionally used his personal gmail account, not his Eletson email address.  In an October 31, 2021 email, Kanelos admitted that he was working on behalf of Murchinson's interest.  "After sourcing the deal for Murchinson I have worked very hard for a year in your team's interest (and continue to do so even if the plan is to ultimately liquidate the company. *While I am happy to align my interests with Murchinson . . . .*") (C-1679, emphasis added.)

Murchinson and Kanelos both took active steps to conceal their clandestine communications. For example, on November 1, 2021, Lichtenstein sent Kanelos a "Confidential Summary of Terms" summarizing the compensation to be paid to Kanelos.

(C-1680; C-1681.) Then just a few days later, on November 5, 2021, the day Levona became the preferred interest holder, Lichtenstein sent Kanelos an email to his Eletson address, attaching the notices of replacement of Blackstone directors, acting as if he had never met Kanelos. Addressing him formally, Lichtenstein writes: "Dear Mr. Kanelos, Nice to meet you. I have located your contact information on the Eletson website and am hoping you can be of assistance." (LEV025 p. 6.) There is also evidence that Kanelos would caution recipients of his emails not to disclose the communications or any negotiations to Eletson. (*See, e.g.*, C-1704.) As one example, on May 5, 2021, Kanelos sent an email from his gmail account, on behalf of Murchinson and stated that "[d]ue to the sensitivity of this deal ONLY use my Gmail to communicate to me." (C-567.)

After Levona became the preferred holder, Murchinson formalized its compensation arrangement with Kanelos in a certain Services Agreement, dated December 19, 2021. (C-1698; C-1699.) Levona/Murchinson followed through with its terms by wiring Kanelos $100,000 on December 21, 2021. (C-1700; C-1701.)

In an attempt to defend its secret communications with Kanelos both pre- and post-acquisition of Blackstone's interests, Levona has insisted that Kanelos was the CFO of the Company, not just Eletson Corporation, and that its communications with him were entirely proper as the preferred shareholder of the Company. Upon closer look, however, this argument quickly falls apart and only bolsters Eletson's assertions of impropriety. Even if he were the CFO of the Company, he was also the CFO of Eletson Corporation—he had duties to Eletson and his secret incentivization agreement with Murchinson was clearly a conflict of interest that was induced by Murchinson and never disclosed by anyone to Eletson. Moreover, the nature of the correspondence pre-November 2, 2021—before Murchinson/Levona had any claimed interest in the Company—makes it clear that Kanelos

24

was acting against the interests of the Company and was aligned with Murchinson. Accordingly, even if Kanelos was the CFO of the Company, this does not absolve Murchinson.

In fact, Levona's insistence that Kanelos was a representative of the Company, only serves to undermine its arguments that there was an attorney-client privilege between Murchinson and WFW.

*ii.  WFW*

Throughout these proceedings, there has been a lot of discussion concerning the representation of WFW.  Based on the evidence presented, separate offices of the firm represented both parties both pre- and post- Levona's acquisition of Blackstone's interests, including in connection with the Transaction Documents. The Athens Office represented Eletson and the London office represented Murchinson/Levona.  WFW partner, George Paleokrassas, testified that he believed an appropriate ethical wall was in place to protect the propriety of this dual representation, although no documents were provided in support of this claim. (May 19, 2023 Transcript pp. 243:22-244:8.)

In attempt to preserve its claimed "attorney-client privilege," Murchinson argues that it was told by WFW that there was no conflict.  While WFW represented that it would not have a conflict, WFW attorney Frank Dunne also stated that the firm had done work for Eletson Gas, knew the Company well, and that his "understanding [was] that [Murchinson was] looking at doing something at the shareholder level, which would not put my Firm on the other side of anything from you."  (C-1973 p. 7.)  This turned out not to be true, and Murchinson was well aware of this.

The main problem with any claim of attorney-client privilege between WFW and Murchinson is that Peter Kanelos climbed back and forth over this supposed ethical wall

numerous times and Murchinson/Levona knew this. Kanelos indicated in emails to Murchinson that he was working with WFW Athens in connection with pre-acquisition Murchinson strategies. (*See, e.g.,* C-1598; C-1614.) On May 26, 2021, attorney Karamacheras from WFW Athens sent Kanelos an email providing an analysis of the Company's restructuring of certain Company financing, pursuant to which WFW acted as the Company's counsel in 2020. Kanelos then forwarded this analysis to Murchinson and indicated that there was a "[n]eed to speak with Frank Dunne"—the attorney on Murchinson's side of the wall. (J-35.) Kanelos was also copied on communications from Dunne to Murchinson. For example, on June 13, 2021, Dunne sent an email to Murchinson, copying Kanelos at his gmail account providing an analysis to liquidate the Company. (C-465.)

Thus, Murchinson/Levona knew Kanelos was sharing Eletson "privileged" information with Murchinson and receiving Murchinson "privileged" information. Thus, Murchinson could not have reasonably had any expectation of privacy in its communications with WFW. Murchinson cannot on the one hand claim that Kanelos was the CFO of the Company, and on the other hand, claim attorney-client privilege with WFW-London when it is sharing communications with Kanelos. Thus, as per my prior rulings, any claim of attorney-client privilege has been waived by both Levona and Murchinson, based in part on the dual representation of the firm in connection with the Transactions, and Murchinson/Levona's inability to claim an expectation of privacy when it was knowingly providing WFW communications to Kanelos. (*See* Procedural Order Nos. 4, 7 and May 17, 2023 Email Order.) Thus, any communications between Murchsinon/Levona and WFW are admissible and Levona's motion in limine is denied.

Eletson asks me to go one step further and find that WFW conspired with Murchinson against the Company. However, WFW is not a party to these proceedings. What WFW knew or did not know, and what WFW may have done or not done, is outside my jurisdiction. I therefore decline to reach any conclusions with respect to the propriety of WFW's dual representation.

## C. The Preferred Nominees

Eletson claims that if they fulfilled the obligations under the Transaction Documents and bought out Levona, the preferred interests were transferred to the "Preferred Nominees." Eletson witnesses testified that from the outset of the time that the parties began discussing the buyout of Levona's interests, Eletson intended the preferred units to go to nominees of the Company, and that it told Levona of this intention. (C-1963 ¶101; C-1964 ¶ 193.)

The parties confirmed this language in the BOL, which expressly provides that "Levona hereby grants Eletson Gas the option . . . for either Eletson Gas or its nominee to purchase all of the membership interests held by Levona in Eletson Gas . . . ." (J-6 ¶ 2.1.) Indeed, this issue was acknowledged and agreed to by the parties in correspondence relating to the proposed buyout. For example, on February 21, 2022, Kertsikoff responded to a draft of the BOL sent by Spears and states that in regards to Clause 2.1, "we also need to delete references to Eletson Corporation in this clause and allow for Eletson Gas 'or its nominee' to be the buyer of the interests." (C-107.) (*See, also,* J-14 (reflecting that Levona knew about the Company's intention to transfer the interests to nominees in a January 10, 2022 email from Spears stating "We agree that upon closing . . . Levona shall transfer to the Company or, as the case may be, its nominated affiliate . . . all of the Membership Interests.").) Indeed, Spears stated that Murchinson did not object to the Company's

"constitutional documents being amended upon completion so that all membership interests in the Company become common units . . . although we do see this as technically a post closing matter than can be agreed between the new shareholders without Levona's involvement." (J-14.) *See, E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1990 Del. Super. LEXIS 351, *17-18 (Del. Super. Ct. Sept. 19, 1990) (even where the parol evidence rule applies, it only applies to prior or contemporaneous evidence "offered for the purpose of varying or contradicting the terms of an integrated contract and does not exclude evidence offered for the purpose of interpreting and giving a meaning to those terms."); *see also Fox v. Paine*, 2009 Del. Ch. LEXIS 10, *17-18 (Del. Ch. Jan. 22, 2009) (even for unambiguous contract, court may "consult extrinsic evidence secondarily to confirm the 'conclusion that the contract language is unambiguous, evidencing . . . the shared intent of the parties' at the time of they entered the contract. Situations exists where the court may 'consult undisputed background facts to place the contractual provision in its historical setting without violating' the principle that the court not consider extrinsic evidence when interpreting an unambiguous contract") (footnotes omitted), aff'd, 981 A.2d 1172 (Del. 2009).

The evidence presented in this arbitration demonstrates that the Eletson families agreed to the contingent transfer.  (*See* C-786; C-787; C-788; C-789; C-790.)  This agreement would take effect immediately upon Eletson's exercise of the option, *i.e.* the transfer of the Symi and Telendos and the assignment of the claims. (C-1964 ¶¶ 194, 198; C-1963 ¶ 104; C-1968 ¶¶ 105-109.)

The initial discussions are corroborated by a note drafted by Kertsikoff's sister on January 10, 2022. (C-789.) The note informed Kertsikoff's mother that "our Cypriot [company] is about to acquire a new asset," and further stated, in part, that "as soon as

[Murchinson/Levona] leave, their position needs to remain outside the group" (C-789; C-1964 ¶ 197.)    In early March 2022, Mr. Hadjieleftheriadis prepared a document memorializing the agreement to transfer the preferred shares, on a contingent and conditional basis, to the Cypriot companies, including the amount that was agreed to be paid. (C-1968 ¶ 105.) The document included the total estimate of the amount of the preferred shares and how those shares would be split among the three Cypriot companies. (C-787; C-1968 ¶ 105.) Mr. Hadjieleftheriadis also included information about the prospective sale of the assets that the three Cypriot companies own, and what percentage of the asset would be paid, which was €3 million. (C-787; C-1968 ¶ 105.)

Testimony and evidence reflect that on August 2, 2022, the three principal families owning or controlling the Eletson holdings in the Company had a meeting in Piraeus, Greece. (C-1968 ¶ 106.) During that meeting, the families discussed the contingent transfer of the preferred shares to the Preferred Nominees. (*Id.*) Mr. Andreoulakis, Eletson in-house counsel, took concurrent notes with this respect to this meeting. (C-786; May 16, 2023 Transcript p. 26:14-21.) The notes state, in relevant part, that Levona suddenly reneged on its exit obligations and maintained—albeit wrongly—that the preferred units remained under their control, even though Eletson had told Levona before the BOL was executed that the preferred units would go to nominees outside of the Company. Eletson did not tell them the names of the nominees but told them that it was not Eletson Holdings. (C-786; C-1963 ¶ 108.)

On October 11, 2022, the three principal families had another meeting. Again, the families discussed the agreement and that the Preferred Nominees would support the cost of the litigation as part of their obligations under the agreement. Mr. Andreoulakis took notes with respect to this meeting as well. (C-790; C-1963 ¶ 109; C-1968 ¶ 107.)

In October 2022, Mr. Hadjieleftheriadis forwarded to his brother and sister, through his secretary, the 2018 and 2019 financial statements of his Cypriot company, Desimusco (C-788.) The post-it note on the document stated: "Kostis/Helen please sign. I remind you that this company owns since March the 1/3 of the Blackstone share in Gas" (C-788; C-1968 ¶ 108.)

It is undisputed that Eletson raised this contingent transfer to Cypriot nominees for the first time in its Rule 20(b) submission on May 5, 2023. Accordingly, Levona then filed its May 10, 2023 Motion to Strike or Dismiss.  I reserved decision on this motion.

I now deny Respondent's Motion to Strike or Dismiss.

While Levona cites statements made by Eletson witnesses or counsel in various filings in this arbitration that purportedly contradict Eletson's current stance, I disagree with Levona's interpretation of these statements. For example, Levona cites to statements made by Kertsikoff and Eletson's counsel that post-March 11, 2022, "Eletson held itself out as the sole shareholders of the Company." (*See* May 2023 Motion to Strike or Dismiss, pp, 2-4.)  "Eletson" in this context, however, includes its affiliates. (*See, e.g.,* J-43 ¶ 1.) Both Karastamati and Kertsikoff testified at the hearing that the Preferred Nominees are affiliates of Eletson. (C-1963 ¶ 104; C-1964 ¶ 194.) In addition, at the evidentiary hearing, Karastamati testified "when we say Eletson we mean Eletson family, we mean Eletson affiliates, we mean Eletson family, Eletson Group . . . it is the common shares and the Eletson family." (May 16, 2023 Transcript pp. 150:15-151:2.)

While I acknowledge that the lack of earlier notice by Claimants to Levona of the contingent transfer of any preferred shares to the Preferred Nominees initially raised concern to me, the Eletson witnesses' testimony was both wholly credible and sincere. It is clear that even when Blackstone was the preferred holder, the Eletson witnesses viewed

the Company as a family company. In their day-to-day discussions, they may not have spoken in corporate formalities, however, there is nothing in the record supporting a determination that there was any bad faith or misconduct on their part. Moreover, representatives from each of the Preferred Nominees have testified that they are bound by any award in this arbitration.

In addition, Levona was not prejudiced by the late reference to the Preferred Nominees. Eletson produced to Levona the limited documents reflecting this transfer in April, a few weeks before the evidentiary hearing, giving it plenty of time to review the evidence. The parties subsequently entered into the May 3 joint stipulation agreeing to the fundamental fairness of this hearing. "The parties stipulate that each has no challenge or objection to the arbitration on fairness grounds on the basis that it has not been granted enough time to prepare for or present its case." (Procedural Order No. 6, ¶ 8(g).)

Moreover, Eletson's explanation for why the transfer to the nominees was not raised earlier in the proceedings is credible. Karastamati testified that the families "considered [it] to be an intrafamily matter, so [they] thought and believed it was not relevant to this arbitration." (May 16, 2023 Transcript pp. 108:5-11.) It was only after the Levona-related entities including its affiliate Pach Shemen made clear in the Holdings bankruptcy that they would attempt to use the bankruptcy proceedings as an end-run around against any adverse award in this arbitration by claiming that the preferred shares were part of the bankruptcy estate of Holdings, that Eletson felt compelled to set the record straight and make it clear that Eletson Holdings was never intended to directly or indirectly, as owner of the common shares of the Company, own the preferred shares.

Paradoxically, given the strenuous objection made by Levona in its motion to strike, Levona never sought additional discovery nor requested depositions on the issue of the

nominees before or during the arbitration hearing. At the arbitration hearing, Levona did not conduct any meaningful cross-examination of the three Eletson witnesses who testified about the contingent transfer to the Preferred Nominees or present any contradicting evidence. Levona also did not raise any credible reason why this transfer, at the time of the closing or post-closing of the Transactions, would be prohibited under the Transaction Documents.

Given the full history of these proceedings, the pleadings, and the evidentiary record in these proceedings, including the credibility of the Eletson witnesses, I deny Levona's May 2023 Motion to Strike or Dismiss.

## V.   ANALYSIS AND DECISION OF THE MERITS OF THE PARTIES' CLAIMS AND COUNTERCLAIMS

### A.  Eletson Exercised the Option Pursuant to the Terms of the BOL

Pursuant to the BOL, Levona granted the Company and Eletson Corporation a purchase option, whereby Levona agreed to be bought out of its stake in the Company.

Section 2.1 of the BOL provides:

Subject to and in consideration of the Transfer occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to Eletson Gas the option exercisable by written notice to Levona by both of them (an "Option Notice"), for either Eletson Gas or its nominee to purchase all the membership interests held by Levona in Eletson Gas (the "Option Membership Interests") for a consideration equal to the Purchase Option Consideration payable in cash on completion of the transfer of the Membership Interests to such account as Levona may nominate in writing. (J-06 § 2.1.)

Section 2.2 provides that an Option Notice may only be served after either:

(a) the Loan and any interest accrued thereon is fully repaid; or

(b) adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona). (J-06 § 2.2.)

Pursuant to Section 2.3, Eletson Gas had to exercise the option by sending the Option Notice within thirty days from the date of the BOL, unless the period was extended pursuant to Sections 2.4 or 2.5. (J-06.)

"Purchase Option Consideration" is defined as "an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value. If the Net Value is equal to US$23,000,000, the Purchase Option Consideration shall be US$1. If the Net Value exceeds US$23,000,000 the amount outstanding under the Loan shall be reduced by the amount of the difference." (J-06 § 3.2.)

Section 3.3 of the BOL specifies that "The Net Value shall be calculated as follows: . . . the Net Value shall be based on a third party independent valuation of the vessels owned by the Companies less the mutually agreed debts, costs, outgoings, expenses, trade debts and other liabilities of the Companies (including, if such vessels remain on finance lease, the purchase option price thereunder and the estimated fees and expenses of an eventual onward sale of the vessels) plus bunkers and lubs at the time of the transfer of the Companies to Levona." (J-06.)

Following the execution of the BOL, on March 11, 2022, the parties entered into a series of transactions and executed the Transaction Documents.

The language in the BOL is unambiguous, and neither party argues otherwise. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, No. N11C-12-022 PRW CCLD, 2017 Del. Super. LEXIS 279, at *16 (Super. Ct. June 8, 2017). Moreover, the BOL and Transaction Documents contain merger clauses. (*See e.g.,* J-06 ¶ 9.2.) It is well settled that "where a contract contains a merger clause, it will be enforced as written and cannot be added to, varied, or contradicted by

33

parol evidence." *Revolution Retail Sys., Ltd. Liab. Co. v. Sentinel Techs., Inc.*, No. 10605-VCP, 2015 Del. Ch. LEXIS 276, at \*57 (Del. Ch. Oct. 30, 2015) (citation removed); *see also Matthius v. Platinum Estates, Inc.*, 2010 NY Slip Op 4965, ¶ 2, 74 A.D.3d 908, 909, 903 N.Y.S.2d 477, 479 (App. Div. 2nd Dept.) ("The purpose of a merger clause is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary, or contradict the terms of a written agreement.")

It is undisputed that the Loan remains outstanding and has not been fully repaid pursuant to Section 2.2. Thus, Eletson could only have exercised the option to buyout Levona pursuant to the BOL if it paid Levona the Purchase Option Consideration and provided adequate security and/or collateral for the Loan. (J-06.) The record establishes that Eletson satisfied both of these conditions.

### i. *Purchase Option Consideration*

The evidence establishes that Levona received the Purchase Option Consideration. Pursuant to the Share Transfer Agreement, on March 11, 2022, the Company paid the Purchase Option Consideration by transferring the shares of the Symi and Telendos. (J-08.) The total transfer had and still has a value in excess of the $23 million price set forth in the BOL. (C-1900 ¶¶ 48-89; C-1897 ¶¶ 24-31.)

The record does not support Levona's contention that the transfer of the shares of the Symi and Telendos was the consideration for the option to buyout Levona, rather than the Purchase Option Consideration exercising that option. Section 2.1 expressly provides that "consideration equal to the Purchase Option Consideration" would be paid "on completion of the transfer of the Membership Interests." Meaning, the $23,000,000 (plus $1) would be paid at the same time the preferred interests were transferred, not for receiving an option to purchase the preferred interests.

34

In addition, transferring the shares in the Symi and Telendos without transferring Levona's interests in the Company would lead to a breach of the LLCA. Section 6.2 of the LLCA prohibits Members (which would include Levona as the preferred interest holder), from acquiring or owning any vessels such as the Symi and Telendos.

Section 6.2 provides, in relevant part, that:

> 6.2 Restrictions on Activities of the Members. Eletson and the Special Member agree that, except for activities engaged in through the Group Companies, none of Eletson or any of its Affiliates (including the Special Member) will directly or indirectly acquire, own, operate, charter or engage in the management of any LPG, ethylene, petrochemical gases and ammonia sectors. Each of BX, Blackstone Family and BTO SMD agrees that it shall not have a direct interest in the ownership of any vessels employed in the transport of LPG, ethylene, petrochemical gases or ammonia . . . . (J-01 § 6.2.)

This is essentially a non-compete clause—a concept also reflected in the LLCA's definition of "Ineligible Person." (J-01 p. 9.) Indeed, Levona should have been aware of this restriction as Blackstone flagged this issue for WFW, Murchinson's, counsel in October 2021—ensuring that Murchinson did not compete with the Company, otherwise it would be ineligible to purchase Blackstone's interests. (CM-2003.) Thus, the only reasonable interpretation of the BOL is for the transfer of the shares of the Symi and Telendos to constitute consideration for the buyout of Levona. Any other reading would be inconsistent with the parties' obligations under the LLCA.

Here, the parties' correspondence leading up to, and in connection with, the drafting of the BOL confirms this interpretation and the shared intent of the parties. *See, E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1990 Del. Super. LEXIS 351, *17-18 (Del. Super. Ct. Sept. 19, 1990) (even where the parole evidence rule applies, it only applies to prior or contemporaneous evidence "offered for the purpose of varying or contradicting the terms of an integrated contract and does not exclude evidence offered for the purpose of

interpreting and giving a meaning to those terms."); *see also Fox v. Paine*, 2009 Del. Ch. LEXIS 10, *17-18 (Del. Ch. Jan. 22, 2009) (even for an unambiguous contract, a court may "consult extrinsic evidence secondarily to confirm the 'conclusion that the contract language is unambiguous, evidencing . . . the shared intent of the parties' at the time of they entered the contract. Situations exists where the court may 'consult undisputed background facts to place the contractual provision in its historical setting without violating' the principle that the court not consider extrinsic evidence when interpreting an unambiguous contract") (footnotes omitted), *aff'd*, 981 A.2d 1172 (Del. 2009).

Early negotiations in January 2022 demonstrate that Murchinson sought $23 million in return for its preferred interests to be paid either in cash or by transferring the title in the Symi and Telendos.  (J-14, stating "Should the Closing not take place by 28 February 2022 (the 'Longstop Date'), the parties agree that the Company shall transfer title to two of its vessels to Murchinson Ltd. *as good and valuable consideration for the transfer of the Membership Interests* to the Company or, as the case may be, its nominated affiliate; the two vessels which shall be transferred should the Closing not take place by the Longstop Date are v. Symi and m.v. Tenendos [sic]" and "Immediately upon transfer of the Membership Interests, whether at the Closing simultaneously with payment of the Consideration *or in exchange for the transfer of title in the Vessels* . . . the Company's constitutional documents shall be amended so that all membership interests in the Company become common units….") (emphasis added).

While the scope of the buyout changed to include Levona's providing a loan to the Company, the negotiations concerning the ultimate consideration to be paid to Levona for its interests remained $23 million, not $23 million plus the value of the Symi and Telendos (which, not coincidentally, at the time of the negotiations of the BOL was valued at or

36

around $23 million). (*See, e.g.,* C-0107, email from Kertsikoff to Spears stating "as you are aware, we have been negotiating the sale of the Symi and Telendos for some time now and the latest price we have (as of yday [sic] is at (NAV equivalent) $22.7m.") For example, Spears confirmed the expected value for the transfer of Levona's interests on February 22, 2022: "our intention is not to try and get more than $23 million through this arrangement.") (C-1037.) Spears confirmed this at the hearing stating that Murchinson/Levona wanted "23 million . . . for the sale of the preferred [shares]." (May 22, 2023 Transcript pp. 198:22-199:10.)

In addition, the evidence demonstrates that the transfer of the Symi and Telendos was adequate consideration. Eletson's experts Peter Daniel and Nikolaos Veraros both calculated the Net Value of the Symi and Telendos, using independent valuations, as contemplated by the BOL. I find both of these calculations reasonable and credible.  Mr. Daniel calculated the Net Value as $24.2 million. (May 18, 2023 Transcript 190:3-12.) Mr. Veraros calculated the Net Value as of March 11, 2022 as $24,858,651, less a 1 percent broker commission. (C-1903 ¶¶ 26-31; C-1903.0017.)   Then, following the BOL, Mr. Veraros testified that he "adjusted for the rest of the assets and the liabilities of these two companies, as per the information from the company," and concluded that the Net Value was approximately $24.8 million (May 18, 2023 Transcript p. 276:14-23.) He further testified that he felt that a 1 percent broker commission would likely be standard for this transaction, and that approximately $665,000 should accordingly be deducted from his Net Value calculation. (May 18, 2023 Transcript pp. 276:18-278:12.)

Levona's expert, Kristoffer Slangsvold's valuation is not persuasive. Rather than rely on independent valuations, such as those by Arrow and Braemar, as Eletson's experts did, and as contemplated by the definition of Net Value in the BOL, Mr. Slangsvold

decided to conduct his own valuation of the Symi and Telendos. (J-47.) In addition, Mr. Slangsvold, prior to being retained as Levona's expert for the arbitration, had communications with Levona personnel about the potential sale of the Symi and Telendos. Notably, at the time of this outreach, the contemplated value for the two vessels was more than $23 million.  Accordingly, Mr. Slangsvold testimony does not carry as much weight as the valuations of Mr. Daniel and Veraros.  (May 24, 2023 Transcript p. 37:04-15.)

Moreover, as Dr. Furchtgott-Roth explained, the transfer of the Symi and Telendos without the reciprocal transfer of Levona's membership interests in the Company would be economically irrational, and that despite the references to the word "option" in the BOL, the BOL would more accurately be characterized as a "forward contract."  (C-1902 ¶ 29.) He states:

> I have not seen any explanation why, according to Levona, Eletson would have transferred assets worth $23 million but then never bothered to exercise the option that would then have cost it $1.00. An economist would not lightly assume any such economic irrationality. Although the BOL describes parts of the contract as an "option" and other parts without reference to an option, I find, from an economic perspective, that the BOL would more accurately be characterized as a "forward contract," in that both parties to the BOL agree to a future transaction at a price agreed upon in the BOL. (C-1902 ¶ 29) (footnotes omitted).

### ii.  Adequate Security and/or Collateral

The evidence also proves that Eletson provided adequate collateral for the Loan, which thereby should have triggered the exit of Murchinson/Levona from the Company. Pursuant to the Assignment of Claims executed on March 11, 2022, Eletson and EMC Gas, subsidiary of Eletson Gas, assigned Levona claims against the Company and the vessel subsidiaries for management fees and liquidity support. (J-9.)

Eletson's expert, Dr. Furchtgott-Roth testified that there is a clear distinction between security and collateral: "To me, in the context of BOL, collateral would be -- could

38

be a broad class of assets where a security probably means something that there's a direct party involved. . . . A security would be an asset where there is a marketable -- marketable -- it's an asset such as a bond, something that you can go into some market and trade it for a -- . . . . What I'm saying is, in this case, security in my mind is -- is narrower. And collateral would include security, but could include things that might not qualify as a security" (May 19, 2023 Transcript pp. 194:15-195:13.) Levona did not provide any persuasive contradicting evidence. Accordingly, I find that the assignment of claims constituted "collateral" not "security under the BOL.

While the terms of the BOL provided Levona sole discretion to approve "security," it did not have sole discretion to approve collateral, and nothing in the BOL precludes the management fees or liquidity support claims from constituting collateral (J-06 ¶ 2.2(b) ("adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona.").)  The evidence supports the conclusion that Eletson discussed the nature of the collateral it would provide and sent information to Levona relating to the value of these claims prior to the execution of the Assignment of Claims. (C-1004, providing that the management fees as of February 15, 2022 totaled $6,870,204, and the liquidity claims totaled $4,525,076; May 16, 2023 Transcript pp. 330:5-331:13;  336:2-339:8;  348:9-349:11.) Mr. Kertsikoff's testimony as to his conversations with Mr. Spears is credible. (May 16, 2023 Transcript pp. 330:5-331:13; 336:2-339:8; 348:9-349:11.)

Levona's contention that it required the Assignment of Claims not as collateral for the Loan, but as a separate protective measure to prevent Eletson Corporation from attempting to repay itself before repaying the Loan is unpersuasive. As of the date of the Assignment of Claims, the Company had already drawn down $5 million of the loan, on

February 23, 2022. Those funds had been paid to the Company's creditors, and Levona was fully aware of this. Thus, the Company had already received and spent a substantial portion of the loaned funds before any purported "protections" for the loan were put in place. (C-1964 ¶ 61.)

In addition, the assigned claims constituted adequate collateral under the BOL. Eletson provided extensive expert testimony concluding that the nominal and realizable value of the assigned claims, as of the time of assignment, exceeded $10 million.  Eletson expert, Mr. Leptos-Bourgi of PricewaterhouseCoopers S.A., reviewed and analyzed the Company's financial data to confirm the nominal value of the assignment of claims, and found that the Management Fees were worth $5,729,362.86, and that the Liquidity Support Claims were worth $4,646,069.07. (C-1901 p. 8.) Experts Daniel and Verraros then analyzed the extent to which the nominal value of these claims was realizable by Levona as of the date of the assignment of claims, and both experts found that the realizable collective value of those claims exceeded $10 million (C-1900 ¶¶ 15-47); C-1897 ¶¶ 9-18).)

Levona's attempt to argue that the claims were valued at less than $10 million fails. First, Levona's expert, Danniel Baer did not conduct the realizable value of these claims, but rather, testified as to how, in his opinion, the claims should have been reported on the financial statements in accordance with GAAP.  Mr. Baer did not consider, nor did he view it as relevant to his opinion, the legal ability of the holder of the assigned claims to enforce them (i.e., through the arrest of vessels or other rights such holders would have.) Despite this, he reached an opinion that the holder of the claims—regardless of who that may be—should take an impairment when reporting the value in their financial statements, and report the value of the assigned claims as zero.  (May 23, 2023 Transcript pp. 108:22-116:7.)

I do not find Baer's testimony convincing in light of other testimony heard throughout the proceeding, including from Eletson's experts. (*See, e.g.,* C-1897 ¶¶ 15-23.) (*See, e.g.,* C-1917.0002 (testimony of Mr. Daniel stating: "I note that Mr Baer looks to financial accounting standards, and US GAAP in particular, as determinative of the value of the management fees. While the standards Mr. Baer employs may be authoritative tools for financial reporting purposes, they involve the exercise of judgement and are not authoritative bases to determine the value of assets such as the management fees for any purpose other than the preparation of financial statements.").)

Moreover, Levona did not provide any contradicting evidence—it did not produce any financial records reflecting how it valued the assignment of claims (or the Symi and Telendos) on its books as of, or post-March 2022.  Murchinson has this information and as discussed, *supra*, did not produce any financial information despite Claimants' requests to do so.[3] (May 22, 2023 Transcript pp. 73:16-74:2.)

The documents and correspondence that have been provided undermine and disprove any notion that Levona did not attribute value to these claims or view the assignment as collateral and/or security. (*See* CM-1979 (email from Murchinson's WFW attorney emphasizing the significance of the management fees to any hostile takeover attempt); C-1951 (email from WFW to Murchinson dated February 20, 2022 suggesting as a condition that "ECorp assign[] all its claims against any group member to Levona as part of the security for any vent you pay in.").) On January 24, 2022, Spears emails Kertsikoff stating: "we allow you to replace some or all of the $4 million cash deposit with

---

[3] While I have sufficient basis to find that an adverse inference is warranted that Murchinson's records reflect that the value of the assigned claims is at least $10 million, and that the value of the Symi and Telendos is at least $23 million, the evidence presented to determine the adequacy of the consideration and collateral is sufficient without such an inference. (*See* JAMS Rule 29.)

consideration being the management fees that are accrued but unpaid from Eletson Gas (or the shipowning subsidiaries) to Eletson Corp . . . ." (J-15.) Most notably, on May 2022, after the BOL, Spears admits in an email that the assigned claims were worth $10,676,000. (C-1304.)[4]

As a result, the evidence supports the view that Levona knew these claims were worth more than $10 million and that these claims were provided as collateral.

###### iii.   Option Notice

Levona contends that the option was never exercised, and the lack of an express written Option Notice confirms this.  I agree with Levona that there does not seem to be a separate formal written notice provided to Levona by Eletson exercising the option. However, the evidence reflects that the parties acknowledged that Eletson was exercising the option.

The agenda for the March 10, 2022 Board Meeting—one day before the execution of the Transaction Documents—includes: "Update on Eletson's intention to exercise the purchase option." (J-04.)  Ms. Karastamati testified that "for us, the intention means the actual fact because if it is one way [sic] before, it's the intention, but one day after this is a fact so we believe, we strongly believe that we gave notice to Levona that we were

---

[4] Levona introduced evidence concerning a lawsuit filed in Greece by Eletson relating to the management claims on the vessels as proof that Eletson did not consider these claims collateral for the loan or assigned to Levona. Eletson offered evidence to the contrary establishing that: (1) the assigned claims included management claims on the Company's vessels that accrued as of March 11, 2022; there were claims that had accrued after March 2022 that were still owned by Eletson; and (2)  the purpose of that lawsuit was to obtain a TRO protecting the claims (both those assigned to Levona and those due to Eletson post-March 2022.  Specifically, Eletson sought "to secure our claims" against the Greek Vessels by prohibiting the bareboat charterers "from taking any action which would directly or indirectly have the purpose of transferring or encumbering" the Greek Vessels, which could have impaired or eliminated the ability to collect those claims. (J-38; see also May 22, 2023 Transcript pp. 278:16-287:20.)

exercising the option and gave this notice on March 10 and March 11, we exercised the option. (May 16, 2023 Transcript p. 87:4-13.)

Levona relies on the purported minutes of this March 10th meeting as evidence that Eletson did not exercise the option.  Specifically, Levona insists that the reference to "installment" in that document should be deemed to refer to the payment Eletson needed to pay pursuant to the BOL to extend the option period; in other words, proving that Eletson could not exercise the option on or about March 10th and needed an extension of time to do so.  However, this document (J-33), and Mr. Lichtenstein's testimony surrounding it, is not credible.  Eletson provided evidence about the metadata for this document that supports the inference that it was edited by Mr. Lichtenstein *after* this arbitration commenced. (C-2023.)  In addition, the reference to "installment" more credibly relates to the offset to the Loan that would occur if the Net Value exceeded $23 million.[5]

As additional support for the conclusion that the parties acknowledge that Eletson exercised the option, in the Unanimous Written Consent, Ms. Karastamati and Mr. Kertsikoff were appointed and "authorized to sign, execute (under hand or under seal) and deliver the [sic] on behalf of the Company . . . any and all notices to be issued . . . in

---

[5]  It is also worth noting that Mr. Lichtenstein's entire testimony lacked credibility. His witness statement (LEV255) consisted largely of hearsay and statements about events for which he had no personal knowledge, or opinions for which he had no expertise (i.e., rebuttals to expert reports). Prior to the hearing, Levona's counsel insisted Mr. Lichtenstein's presence at the entirety of the hearing was critical and it would be prejudiced if he was not able to attend the entirety of the hearing. Indeed, Levona insisted that Mr. Lichtenstein was a critical part of Levona's legal team, as he was purportedly Levona's General Counsel.  Pursuant to my email order, dated May 12, 2023, and to protect against contamination of his witness testimony, I permitted Mr. Lichtenstein to attend the evidentiary hearing, "only after his affidavit of direct testimony is provided to Claimants." Despite its earlier claim of prejudice, Levona waited to call him as their last witness, and submitted his witness statement after almost every other witness (fact and expert) had testified. Yet, his witness statement somehow managed to address every, or almost every, contested issue in the hearing. For the above reasons, his entire statement was given little evidentiary weight and I viewed his live testimony incredible.

connection with the Binding Letter Agreement and be authorized to execute and deliver any notices, acknowledgments or otherwise, to be entered into and done in connection therewith and with the arrangements contemplated thereby." (J-11.) All directors, including the Levona directors signed this, but only the Eletson directors were given this authorization. The fact that only Eletson personnel were so authorized supports the conclusion that Levona was no longer to act as the preferred member. (J-11.)

In addition, Eletson's conduct following March 11 was consistent with the buyout. For example, after the transfer of the Symi and Telendos to Levona, Eletson assisted Levona with the sale of the two vessels to other third parties. Eletson also made efforts to cooperate with Levona's efforts to reflag the vessels from Greece to Liberia and novate the underlying bareboat charters to Levona's interests (C-1968 ¶¶ 9-10.)

Additionally, both parties acted in a manner consistent with the fact that Levona had been bought out of the Company. For example, Eletson continued to manage the day to day affairs of the Company, board meetings essentially stopped, business dealings between Eletson and Levona concerning the Company then revolved around Eletson's repayment of its loan obligations to Levona, plus extensive efforts by Eletson to assist Levona in on-selling the Symi and Telendos, and Eletson held itself out, as the family at large, as the sole shareholder of the Company and sole beneficial owners of the Company's remaining 12 vessels. (C-1964 ¶ 71.)[6]

---

[6] Levona spent considerable energy and time focused on a July 13, 2022 email from Mr. Kanelos with attachment entitled "Murchinson Buyout Steps" (J-29) and subsequent email from Ms. Karastamati on July 19, 2022. (LEV218.) In Levona's view, the July 13th email is the "smoking gun" of the arbitration and makes clear that the option was not exercised. Levona also insists that additional emails surrounding this document that Eletson withheld as privileged demonstrate that the memo was sent on the advice of counsel and was not privileged. I already denied Levona's motion to compel after reviewing those emails *in camera*. The emails were privileged and do not support Levona's position. As for the substance of the July 13th document, I do not view this as the "smoking" gun Levona does. First, it was drafted by Mr. Kanelos who was being bribed by

Vassilis Kertsikoff repeatedly represented to potential investors that Levona was out of the Company. (C-399 ("Eletson Gas is seeking $30m from a financial/strategic partner to refinance working capital facility provided by its *previous* shareholders and to refinance part of its fleet."); J-26; C-579; C-580; C-581 (emphasis added).)

At best, the absence of a written notice and payment of $1 dollar are formalities that the parties failed to observe.

Levona argues that the fact that the stock registry was updated when Levona purchased Blackstone's interests but has not been updated to reflect Levona's exit is also reflective of the failure to exercise the option. I disagree. The express language of the BOL explains the absence of any update to the stock registry.

Section 3.4 of the BOL provides in pertinent part: "The parties agree to work in good faith to determine and agree the Net Value promptly and no later than 5 days after service of the Option Notice. In the event of any failure to agree the Net Value within the aforementioned period: (a) the Option Notice shall remain valid but the transfer of the Option Membership interests shall be suspended pending agreement or determination of the Net Value" (J-06 at § 3.4.) It is undisputed that the parties have not agreed on the Net Value. Thus, the formal transfer of the interests has been suspended. Levona, however, ceased being the beneficial owner of the preferred since March 11, 2022, and no longer had the right to vote those preferred shares. *Len v. Fuller,* 1997 Del. Ch. LEXIS 78, at*7, 10 (Del. Ch. May 30, 1997 (even where "there has been no determination of a price to be

---

Murchinson and had every incentive to muddy the waters. Second, as confirmed by the testimony of Eletson's witnesses, the Kanelos email created fury and confusion. (May 16, 2023 Transcript pp. 264:13-265:9; 265:24-266:17; C-1963 ¶¶ 77-78.) Ms. Karastamati's follow-up email can be viewed as an attempt to "move forward" with the original transaction after Levona refused to follow-through with the exercise of the BOL. (C-1963 ¶ 81.) I find that at most, this memo is an inaccurate checklist of items needed to complete Levona's exit from the Company pursuant to the terms of the BOL.

paid for [record-owner's] shares pursuant to a procedure set forth in the Shareholders Agreement, no cancellation of the certificates, and no change on the company's stock ledger," a court of equity "may enforce equitable rights in the stock (including an equitable right to control the exercise of the vote attached to the stock)"; finding beneficial owner controlled vote).

Levona argues that the BOL expressly references the word "option" 34 times. (*See, e.g.,* May 23, 2023 Transcript pp. 183-21-184:3 (Mr. De Quillacq testifying "I think it's important to see whether that contract is an option or forward. If you see the word option 36 times, it's likely to be an option.")) This is simply an example of elevating form over substance.  The substance of the BOL is more consistent with a forward contract, as explained by Dr. Furchtgott-Roth. (C-1902 ¶ 29.)

In addition to all the reasons already stated, and as Dr. Furchtgott-Roth testified, it would be economically irrational to find that Eletson never bothered to exercise the option that would have cost it $1 when the consequence of not doing so would be: Levona obtaining two liquified petroleum gas vessels valued at more than $23 million, more than $10 million in assigned claims, and a Fundamental Action Letter that gives Levona more rights to control the actions of the Company than those spelled out in the LLCA while Levona still retains the Company's preferred interests. (C-1902 ¶ 29.)

Accordingly, after weighing the evidence, I find that it is more likely than not that the conditions for the buyout were met.  As such, pursuant to the BOL, Levona's interests should have been transferred to Eletson Gas, or its nominee. As discussed, *supra*, Eletson has proven that Eletson Gas transferred these interests to the Preferred Nominees. Thus, as of March 11, 2022, Levona was no longer the preferred holder and ceased having any ownership in the Company.

46

Accordingly, it follows that Levona did not have the authority to enter into the Unigas LOI, direct the operations of the Company, or otherwise assert control over the assets of the Company.

### B.  Eletson's Pre-BOL Claims

Eletson asserts claims for breach of the LLCA and breach of the covenant of good faith and fair dealing.

Under Delaware law, the elements of a breach of contract claim are: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff."  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract.  "The implied covenant is a 'judicial convention designed to protect the spirit of the agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.'"  *Bakerman v. Sidney Frank Importing Co.*, 2006 Del. Ch. LEXIS 180, at *71-72 (Del. Ch. Oct. 10, 2006) (*quoting Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999)). "Courts will find a breach of an implied covenant when it is 'clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith had they thought to negotiate with respect to that matter.'" *Bakerman*, 2006 Del. Ch. LEXIS, at *72.

The terms "good faith" and "fair dealing" in the context of an implied covenant have a different meaning from the fiduciary duty concept of good faith and the duties of loyalty and care.  *Gerber v. Enter. Prods. Holdings*, 67 A.3d 400, 418 (Del. 2013),

*overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). The implied covenant imposes a duty "to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* at 419 (internal quotation marks omitted). And "'good faith' [means] faithfulness to the scope, purpose, and terms of the parties' contract." *Id.* (italics omitted). "Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (internal quotation marks and italics omitted).

Here, the members of the Company waived fiduciary duties. Under Delaware Law the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement may be expanded or restricted or eliminated by provisions in the LLC agreement. *Smith v. Scott*, 2021 Del. Ch. LEXIS 76, 2021 WL 1592463 at *23 (Del. Ch. Apr. 23, 2021). If the LLC's operating agreement plainly disclaims, restricts or limits the duties of its managers and members, the parties must look to the agreement's provisions for their rights and remedies. *Id.* at *24. Where traditional fiduciary duties "have been clearly supplanted or modified, those contractual choices will be respected." *Ross Holding & Mgmt. Co. v. Advance Realty Group, LLC*, 2014 Del. Ch. LEXIS 173, 2014 WL 4374261 at *41 (Del. Ch. Jan. 24, 2014).

An LLC agreement, however, "may not eliminate the implied contractual covenant of good faith and fair dealing." *Miller v. HCP & Co.*, 2018 WL 656378 at *22 (Del.Ch. Feb. 1, 2018) (*quoting* 6 Del. C. § 18-1101(b). However, the "implied covenant applies only if the contract is silent as to the subject issue." *Miller*, 2018 WL 656378 at *23. Because a claim for breach of the implied covenant is contractual, "the elements of an implied covenant claim are those of a breach of contract claim: 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage

to the plaintiff.'" *Miller*, 2018 WL 656378 at *22 (citation omitted). The implied covenant applies only when one party "proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Miller*, 2018 WL 65378 at *22 (*quoting Nemec v. Shrader,* 991 A.2d 1120, 1126 (Del. 2010)). The implied covenant does not "'establish a free-floating requirement that a party act in some morally commendable sense.' Instead, 'good faith' in the implied covenant context entails 'faithfulness to the scope, purpose, and terms of the parties' contract.'" *Miller*, 2018 WL 65378 *23 (citations omitted).

### i.   *Pre-Acquisition Conduct*

Prior to November 2, 2021, the Levona-related entities were not parties to the LLCA and therefore, could not have breached its terms or the covenant of good faith and fair dealing. To the extent Eletson seeks relief under any theory of liability for pre-November 2, 2021 actions, I do not have jurisdiction and deny such relief.

### ii.   *Levona's acquisition of the Blackstone's interests*

While the record provides sufficient evidence to conclude that Murchinson engaged in underhanded tactics and dishonest dealings in connection with its acquisition of the Blackstone's interest, I deny Eletson's claim seeking to void Levona's acquisition of Blackstone's interests *ab initio*.  Eletson has not met its burden in establishing how, even assuming Murchinson engaged in the nefarious actions Eletson alleges, that gives Eletson the right to void the transfer of Blackstone's shares.  Nor is the consequence of that clear— voiding that transfer would also void the BOL and the Transactions. Acknowledging this, Eletson seeks (1) rescissory damages relating to Levona's bad faith acquisition of its shares; (2) rescissory damages relating to the transfer of the Symi and Telendos to Levona, including that the proceeds of any sale of the Symi and Telendos and revenue related

thereto paid to Claimants/the Company. *See Creative Research Mfg. v. Advanced Bio-Delivery LLC*, No. 1211-N, 2007 Del. Ch. LEXIS 15, at *33 (Del. Ch. Jan. 30, 2007) (awarding rescissory damages). *Tam v. Spitzer*, 1995 Del. Ch. LEXIS 116, *27 (Del. Ch. Aug. 17, 1995) ("Where, as here, a party is fraudulently induced to enter into a contract, the defrauded party may elect either to affirm the contract and sue at law for money damages, or disaffirm the contract and seek rescission in equity.")

However, the sale of shares from Blackstone to Levona is not Eletson's contract to affirm or disaffirm—it is Blackstone's. Moreover, such a ruling would be incompatible with the basis for this arbitration's jurisdiction, as it would mean that Levona never had ownership in the Company, and therefore, was never bound by the LLCA. Finally, as I determined, *supra*, I am finding that Eletson exercised the BOL. Pursuant to the BOL, the shares of the Symi and Telendos were properly transferred to Levona. Also as discussed, *infra*, I am awarding Eletson damages for the amount Levona has been unjustly enriched by virtue of its holding the shares of the Symi and Telendos without simultaneously transferring the preferred interests to the Company or its nominee. To award rescissory damages tied to the Symi and Telendos under a theory of rescissory damages would be duplicative.

### iii.  Post-Acquisition/Pre-BOL Claims

Turning to the Post-Acquisition/Pre-BOL claims, the evidence presented at the hearing demonstrates that Murchinson bribed an Eletson officer and Company representative, breached the terms of its NDA with Blackstone, and disclosed Company confidential information. These actions, never disclosed to Eletson *after* Levona became a party to the LLCA, breached both the LLCA and/or the covenant of good faith and fair dealing.

### a. Bribing of Kanelos

As discussed, *supra,* the evidence establishes that Murchinson bribed Kanelos to act against the Company's interest. The clandestine relationship commenced prior to November 2, 2021, but continued after Levona/Murchinson became the preferred holder. Indeed, the illicit so-called "Services Agreement" was executed between Levona/Murchinson and Kanelos in December 2021 pursuant to which Murchinson wired $100,000 to Kanelos. (C-1699; C-1700; C-1701.)

Kanelos was clearly an officer of Eletson Corporation, and, according to Levona, of Eletson Gas.  The LLCA provides that "Each Officer shall have the fiduciary duties to the Group Companies as those of an officer to a corporation organized under the laws of Delaware"). (J-0 § 6.1(d).)  Pursuant to Schedule VII (m) (Fundamental Actions) Levona could not "enter into, amend or waive any term in an agreement between the Company and any Officer or member of senior management." (J-01 Schedule VII(m).) The so called Services Agreement induced a breach of those fiduciary duties and constituted a breach of the covenant of good faith and fair dealing.

### b. Violating confidentiality obligations and interfering with Company's contracts with its banks and financiers

The evidence also establishes that Murchinson breached its NDA with Blackstone by communicating directly with the Company's financiers and lenders.

The Blackstone NDA provided, in relevant part:

5. All inquiries and other communications are to be made directly to Blackstone or employees or representatives of Eletson specified by Blackstone. Accordingly, Receiving Party and its Representatives agree not to directly or indirectly contact or communicate with any of Eletson's employees, lenders, lessors, customers, suppliers, or any other person with whom Eletson has a business relationship, or to seek any information in connection therewith from such person, without the express written consent of Blackstone.

...

51

13. Neither this paragraph nor any other provision in this letter agreement can be waived, amended or assigned except with the written consent of each party hereto, which consent shall specifically refer to this paragraph (or such other provision) and explicitly make such waiver or amendment.

(C-1655, J-36.)

There is no evidence that Murchinson ever received written consent from Blackstone to reach out to anyone, especially the Company's financiers.

In addition, the LLCA contains several clauses governing and restricting the use of the Company's sensitive and confidential information. Under Section 12.3(a)-(b), a member may disclose the Company's confidential information "solely for the purposes of such Member monitoring and analyzing his investment in the Company or performing his duties as a Member, Director, Officer, employee, consultant or other service provider of the Company." (J-01 § 12.3(a).)  Each Member must "take all appropriate steps to safeguard such [Proprietary Information] and to protect it against disclosure, misuse, espionage, loss and theft." (J-01 § 12.3(a).)  Section 12.3(b) expressly provides that each Member will be responsible for a breach of Section 12.3 by its Representatives (J-01 § 12.3(b).)

In addition, Under Section 10.2(e)(ii), the Preferred Unit Exit provision, the Company and the Board are to be kept apprised of any attempts by the Preferred Member to disclose confidential information for purposes of selling the preferred units.

Section 10.2(e)(ii) provides:

Notwithstanding anything to the contrary set forth in this Agreement, during the Class B-2 Period prior to the consummation a Qualifying IPO, the restrictions on the Transfer of Units set forth in this Agreement shall not apply to the Preferred Members or the Preferred Units held by the Preferred Members, and such Preferred Members may Transfer to any Person that is not an Ineligible Person any Preferred Units; provided, however, that any transferee pursuant to this Section 10.2(e) shall be treated as a Permitted Transferee for purposes of Section 3.3(b). **The Company and the Board will use commercially reasonable efforts to provide support to the**

> **Preferred Members in connection with the marketing and Transfer to transferees and potential transferees, including, without limitation, and <u>subject to appropriate non-disclosure agreements, providing financial information, causing members of the Board and members of the Group Companies' management teams to be available (at reasonable times upon reasonable requests) to potential transferees</u> and coordinating inspections of the Vessels.** The restrictions, covenants and agreements of this Section 10.2(e) shall terminate upon the completion of a Qualifying IPO.

> (J-01 § 10.2(e)(ii) (emphasis added).)

It is undisputed that the Company and Eletson directors were not kept apprised of Murchinson's disclosure of confidential information in connection with its purchase of the preferred shares.

The evidence reflects that contrary to the NDA's express terms, Murchinson communicated directly with the Company's financiers and lenders and provided confidential Company information. For example, on February 12, 2021, Kanelos, on behalf of Murchinson, sent Libera a proposal to restructure Libera's loan facility. (C-463.) On May 10, 2021, an agent of Murchinson from Seafin sent a third-party financier a datapack for "Project Sage" containing Company information stating "the [Eletson] family is not aware about this transaction . . . we need to reiterate that this transaction needs to be dealt under a strict private and confidential basis." (C-453.)  Kanelos responded by disclosing the Company's financial statements and other confidential information. (C-453.) Indeed, the record is replete with examples of Murchinson's outreach to, and strategies regarding, Eletson's financiers and competitors, either by Bistricer directly or through Murchinson's agents, Kanelos and others. (*See, e.g.*, C-1621; C-1627; C-1628; C-1645; C-1651; C-1660; C-1661; C-1657; C-1667; C-1668; C-1672; C-1596; C-441; C-442; C-470.) Notably, Murchinson/Levona continued to disclose confidential information in breach of the LLCA,

53

without Eletson's and the Company's knowledge, and without NDAs, after Levona purported to join the Company. (C-998.)

The evidence also supports the finding that Levona breached the covenant of good faith and fair dealing by causing the Company's lenders to arrest five vessels and failing to disclose this conduct after it became a member of the Company. The documents presented at the hearing reflect that at some point in time, Murchinson, with its counsel, WFW, developed an aggressive strategy to take control over the company that included putting pressure on the Company's lenders, getting vessels arrested, firing and replacing the management companies for the vessels, and selling the fleet.  (CM-1999 ("Plan B" inviting "a consensual foreclosure of the SEB LEG Vessels," and "Libera to take their ships away also…with as much cooperation as [Murchinson could] offer," as well as "allow[ing SEB] to do what they keep threatening").)

On October 24 and 25, 2021, SEB arrested two of the Company's vessels (Dilos and Kithnos). (C-498; C-499.)   Eletson received "[n]o advance warning" "notice or indication that an arrest was coming." (C-498.) Then, after Levona's acquisition of Blackstone's interests in the Company, SEB proceeded to issue warrants of arrest for two more vessels, the Othoni and Paros, on November 11, 2021 and November 12, 2021, respectively.  (C-1964 ¶ 132.) Libera proceeded to issue a warrant of arrest for the Kithira on February 1, 2022. (C-1964 ¶ 132.)

As Kertsikoff attested, based on his long experience in the shipping industry and his relationships with the Company's financiers, he believes these arrests were the direct result of Levona's misconduct. (C-1964 ¶¶ 133-142.)  These arrests were extreme and unusual actions within the shipping industry, particularly as Eletson had a normal banking relationship with its lenders for years and was faithfully paying its debts prior to its

financial difficulties. (May 16, 2023 Transcript pp. 319:13-320:11; 323:3-326:14.)  At no time before the end of 2021 had SEB taken any action in terms of arresting the Company's vessels. (May 16, 2023 Transcript pp. 319:23-320:2.)  Moreover, as Mr. Hadjieleftheriadis testified: "we had given the syndicate, the banks, clear indications that first we would start paying down the debt interest and principal, but more importantly, though, we were prepared to refinance the facility. We had told them that we had a financier -- we had been in contact with a certain financier who would quickly finance the investments." (May 18, 2023 Transcript pp 112:9-17.)

As further evidence of Murchinson's corrupt intentions, on July 2021, Murchinson approached Eletson's broker, Thor Erik Lie from Grieg Shipbrokers, for information related to the Company's vessel values under the prospect of a "forced sale." (C-1659.)  A "forced sale" is the "worst possible" valuation level. (May 18, 2023 Transcript pp. 111:10-21.) As Kertsikoff testified: "The fact that Levona, through Murchinson, was asking one of the Company's key brokers to provide forced sale values shows its mal-intent. Never in my experience have we sought out a forced sale valuation. A forced sale means that the vessels will be auctioned off and sold at a below market price in order to liquidate the assets on an expedited basis. There is no reason that Murchinson should have been asking *our broker* to provide it with those values except to account for forced sales in anticipation of the arrests." (C-1964 ¶ 128.)

Murchinson/Levona insists that the record does not support the finding that they wanted to have the lenders arrest the vessels or that their actions caused the arrests of the vessels. (*See, e.g.,* CM-1992; C-465.)

I disagree.  First, I find the Eletson witnesses' testimony, combined with the record of communications between Murchinson and WFW reflecting Murchinson's intended

strategy, and between Murchinson and the banks and financiers, sufficient evidence to prove that Murchsinon's aggressive tactics more likely than not, contributed to the arrests of the ships, and that had Murchinson not interfered with the Company's relationships with its banks, the arrests would not have occurred. The emails Levona cites in its defense occurred before Murchinson turned to its "Plan B." (*Compare* CM-1992 and C-465 *with* CM-1999.)

Second, the record is incomplete, and we do not know what a full record would reflect.  Murchinson took the position throughout the entirety of these proceedings that it is not a party to this arbitration.  But as the evidence conclusively establishes, and as discussed, *supra*, Murchinson is the real party in interest in this arbitration. Despite this, Murchinson did not make a full production of documents and communications. It is only as a result of my orders directing Levona/Murchinson to produce its communications with Kanelos and WFW that we know about Murchinson's coordinated strategy (i.e., "Plan B") and the communications with the lenders. (CM-1999.)

For the avoidance of doubt, I do not believe that Levona's counsel in this arbitration was an active participant in its client's gamesmanship, but rather another pawn in its perpetual deceit.

Accordingly, I find that Murchinson's improper dealings with the Company's banks and financiers pre-acquisition of Blackstone's interests caused the arrests of the vessels and that its failure to disclose these actions to Eletson once it became a member in the Company was a breach of the covenant of good faith and fair dealing.

      *c. Breaching the LLCA by attempting to terminate management contracts*

Levona also breached the LLCA immediately upon joining the Company by attempting to terminate management contracts and replace the directors of the Company's subsidiaries. (C-818; C-837; C-838; C-1964 ¶¶ 20, 115-121.)

Section 3.2 of the LLCA, provides as follows:

> 3.2 <u>Fundamental Actions</u>.  Except for actions authorized to be taken by the Preferred Members pursuant to Section 3.6(c), the prior approval of at least four Directors (including at least one Eletson Director and at least one BX Director) shall be required in order for the Company to undertake, or permit or cause any Group Company to undertake, . . . (ii) during the Class B-2 Period, any of the actions set forth on Schedule VII (each a "Fundamental Action") (J-02 § 3.2.)

The parties agree that the carveout for Section 3.6(c) does not apply.

The Fundamental Action provision prohibits the Company from acting without an Eletson Director with respect to Schedule VII actions, a right made clear in the Amendment to the LLCA. (J-02 § 3.2.) Schedule VII enumerates 16 categories of actions that Levona cannot take without Eletson's approval (J-01, Schedule VII).

Those categories include the following:

> (b) other than the execution and delivery of the Management Agreements by the Shipcos and the Manager on the Initial Closing Date, enter into, or extend, amend, modify, renew or terminate any agreement or transaction, or waive performance under any such agreement, between a Group Company, on the one hand, and any member of the Group Company's management team, any Member, such Member's Affiliates or any other related party, on the other hand;
> . . .
> (h) approve the amendment, modification, termination, waiver or repeal of any provision of any Transaction Document (other than this Agreement), or provide any approval, consent to be provided to any Person on behalf of the Company or its Subsidiaries under the Transaction Documents (other than this Agreement), including without limitation, exercising any right of the Company or a Subsidiary to remove a manager under a Management Agreement;
> . . .

(j) amend or modify any provision of any charter, articles, organizational or other governing document of the Company's Subsidiaries that would have the effect of (i) creating any additional requirement of Eletson to make Capital Contributions to the Company, (ii) modifying any voting threshold or approval right held by Eletson, (iii) materially and adversely change the express rights of Eletson set forth therein, other than as a result of dilution due to the issuance of additional Equity Interests;

(k) other than in accordance with the terms of the Management Agreements, enter into any technical or commercial management agreement, any crewing arrangement or any other material vessel or maritime asset related agreement or any amendment thereto;
. . .
(p) enter into any agreement or commitment to effectuate any of the foregoing.

(J-01, Schedule VII.)

In the context of Schedule VII (h), "Transaction Documents" does not refer to the BOL, but rather, the LLCA defines the terms as "this Agreement, the Contribution Agreement, the Management Agreements and the Financial Services Agreements (as defined in the Contribution Agreement)." (J-01.)

The provisions in Schedule VII prohibited Levona from taking unilateral action concerning Eletson's Management Agreements, including without limitation, terminating them directly or indirectly. Murchinson's counsel specifically advised it of this. (CM-2002.) Nevertheless, on November 5, 2021, Levona, through Bistricer, authorized WFW to terminate the Company's management agreements with Eletson Corporation and replace the board of directors of the Company's subsidiaries with Levona representatives. WFW, on Levona's behalf, issued a Notice of Replacement and Appointment of Directors purporting to replace Eletson's Directors and to appoint Lichtenstein, Spears, Fenttiman, and Hassett as the directors of the Company's subsidiaries. (C-837.)

Levona also issued a notice terminating the Company's affiliates' Management Agreements with Eletson Corporation. (C-838.)

Levona then attempted to use these termination notices to cut Eletson Corporation off from any communication with SEB: Lichtenstein sent SEB a notice of the termination. (C-839; C-840; C-1958.) Levona never informed SEB that the termination notice was in violation of the LLCA—despite being advised as such by WFW—but rather stated: "[P]lease be advised that Eletson Corporation have today been served with a notice of termination in relation to the management of the Vessels and the authority they may have had to deal with you regarding the Facility Agreement or the Vessels has been revoked. As such, Eletson Corporation has no right to correspond or otherwise deal directly with you in relation to the Facility Agreement or any Vessel." (C-839; C-818 (WFW advises Murchinson that "[s]ervice of the Management Agreement termination notice without consent from an Eletson Corp Director will breach the [LLCA] which could possibly render the termination notice invalid".))

Thus, the record overwhelmingly demonstrates that Levona's attempted termination of the management agreements was a willful and intentional breach of the LLCA.

### C. Eletson's Status Quo Injunction Claims

Eletson asserts numerous allegations against the Levona-related entities for violations of the Status Quo Injunction. Some of those alleged claims, even if true and while harassing and menacing, did not cause quantifiable harm to the Company. For example, Levona's premature notice of default and acceleration of the Loan sent on October 25, 2022, and Levona's calling of board meetings. (C-404; C-405; C-086.)

As such, I will only specifically discuss those claims for which the violations caused quantifiable harm. The three actions are all related: Pach Shemen's purchase of a controlling interest in outstanding bonds issued by Holdings, Pach Shemen's directing of the trustee to commence litigation against Holdings, and Pach Shemen's directing of the commencement of the involuntary bankruptcy petition against Holdings.

On or about January 4, 2023, Pach Shemen purchased $183,851,546 in bonds of Holdings for $2 million. (C-746; May 22, 2023 Transcript p. 332:16-20.) Additionally, Mr. Spears, on behalf of the Levona-related entities, offered additional consideration to the bondholders contingent on the outcome of this arbitration stating that it would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the company." (C-746.0008.) The Holdings bonds were purchased by Pach Shemen from Nomis Bay and BPY via private trades and then transferred to Pach Shemen. (C-746.) Mr. Spears testified that he had bought the bonds from four funds which had previously owned them, named Beachpoint, Caspian, Redwood, and Knighthead. (May 23, 2023 Transcript pp. Tr. 326:20-327:2.)

On January 11, 2023, Pach Shemen then instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on these bonds ("Bondholder Litigation").[7] Then on March 7, 2023, Pach Shemen and two other creditors of Holdings, filed involuntary bankruptcy petitions against Holdings in the Southern District of New York. The involuntary bankruptcy petition and some of the documents included in the filing were signed by Mr. Lichtenstein and Mr. Spears. (C-749; C-751; C-746.) The timing of this

---

[7] Eletson argues that Pach Shemen's purchase of these bonds and directing the trustee to commence litigation violated a standstill agreement Eletson had in place with the original holders of the bonds. This claim, while likely true, is outside my jurisdiction.

filing is notable—it was three days after I orally issued certain discovery rulings adverse to Levona, including that it had waived any claim of attorney-client privilege with WFW, and ordering the production of Levona/Murchinson's communications with Kanelos.

Levona argues that none of the actions taken by Pach Shemen are violations of the Status Quo Injunction because Pach Shemen is not bound by those orders, and with respect to the trustee litigation and the bankruptcy, Pach Shemen is not the only creditor directing those litigations.

As discussed, *supra*, Pach Shemen is the alter ego of Levona. The separateness is in name only. Its representatives, including Spears and Lichtenstein, were bound by the Status Quo Injunction. Despite this, Pach Shemen a/k/a Levona II, (C-746.0008), entered into a trade to purchase the notes, offering as consideration value associated with the assets in dispute in this arbitration. The TRO and November 2022 clarification expressly ordered the parties to "maintain the status quo" and prohibited the "transfer or sale of, or attempt to sell or otherwise transfer, any assets of . . . Gas . . .," and the Status Quo Injunction entered in January 2023, further extended the prohibition to include "or assets in dispute in this arbitration." (C-1816; C-1887; C-1838.) While technically Pach Shemen was not transferring the assets of Gas or assets in dispute in this arbitration, the overall strategy was intended to disrupt the status quo and find another path to obtain the "assets of Gas . . . or assets in dispute in this arbitration."

In other words, the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration. They believed, at the time—although mistakenly—that if I ruled that Eletson had exercised the option and bought out Levona's interests, the preferred interests would pass to Holdings. Thus, by purchasing the bonds, it became a controlling creditor of Holdings with the ability

61

to put Holdings into bankruptcy.  In the first instance, the filing of the bankruptcy led to Levona's insistence that it could not arbitrate these claims due to the automatic bankruptcy stay. This was certainly not "maintain[ing] the status quo."  In the event the stay were to be lifted, and Levona lost in this arbitration, the Levona-related entities were then positioned to argue that, as creditor to Holdings, the value of the preferred shares passed to them.

Unfortunately for Levona, the strategy was misguided because the BOL expressly provided that in the event of a successful exercise of the option, the interests would transfer to "Eletson Gas or its nominee," (J-06 § 2.1), and as discussed, *supra*, Eletson Gas had transferred the interests to the Preferred Nominees.  Although the actions of Pach Shemen may have been for naught, their actions were intentional and direct violations of the Status Quo Injunction.

### D.  Levona's Counterclaims

In light of my finding that Eletson exercised the option to buyout Levona's membership interests as of March 11, 2022, Levona's abovementioned counterclaims fail and are dismissed. I find, however, that as part of the consideration paid in connection with the BOL, the shares of the subsidiaries which control the Symi and Telendos were transferred to Levona and Levona retains all rights associated with the ownership of the subsidiaries of those vessels since that time.

### VI.    DAMAGES

### A.  Compensatory Damages

Eletson's expert Dr. Furchtgott-Roth presented credible and convincing evidence as to the damages suffered as a result of the Levona-related entities' misconduct. Levona did not provide counter-calculations.  Dr. Furchtgott-Roth authored three expert reports in

this proceeding (C-1902, C-1918, and C-1934), and credibly testified in person at the hearing, where I determined he was qualified as an expert in economic analysis, options analysis, antitrust and competition, and damages. (May 19, 2023 Transcript pp. 108:22-109:3; see also C-1982 (hearing demonstrative).) He is a former Commissioner of the Federal Communications Commission and received a PhD in economics from Stanford University and an SB in economics from the Massachusetts Institute of Technology.

To calculate damages, Dr. Furchtgott-Roth reviewed extensive document discovery and company data listed in Exhibit B of his first report (C-1902.0105) and supplemented in subsequent reports. He explained that his "method for assessing economic damages begins with an assumption of Levona's liability as presented by Eletson," after which he would:  (i) calculate, where possible, the compensation necessary to restore the injured party, Eletson, to the economic position they would have enjoyed but for the wrongdoing of the other party, Levona; and (ii) where harms to Eletson are not reasonably amenable to quantification," he offered a description of Eletson's injuries. (C-1902.0108.)

Due to the character of several of these harms, Dr. Furchtgott-Roth was not readily able to ascertain a specific quantum of damages for several kinds of actionable misconduct. (C-1902.0109.)  As a result, he opined that his overall quantifications of damages are "necessarily a lower bound" of the full extent of harm Levona caused.  (C-1902.0109.) However, he was able to quantify several categories of damages.

> i.  *Damages Arising From Levona's Acquisition of the Symi and Telendos Without Reciprocal Transfer of the Preferred Interests*

Dr. Furchtgott-Roth calculated $19,677,743.71 in directly calculable losses for the lost services of the Symi and Telendos. Dr. Furchtgott-Roth testified at the hearing that this figure is an estimate of what the Company would have made from those two vessels had it not transferred them, which he claimed was an appropriate measure of unjust enrichment

because the vessels were transferred without the reciprocal transfer of the preferred interests. (May 19, 2023 Transcript pp. 143:23-145:8; see also C-1902, Ex. C.7.) The damages should be paid to the Preferred Nominees, as they flow directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interests. *See, e.g.*, *Urdan v. WR Capital Partners, Ltd. Liab. Co.*, 2019 Del. Ch. LEXIS 313, at *32 (Del. Ch. Aug. 19, 2019) ("when the shares are sold, the rights to assert and benefit from direct claims pass with the shares to the new owner").

> ii. *Damages Arising from the Levona-Related Entities' Other Misconduct*

Dr. Furchtgott-Roth calculated the directly calculable losses arising from Levona's conduct that led to the vessel arrests as $21,777,378.50. This includes: (a) approximately $17 million in lost time charter equivalent (TCE) revenues by comparing the projected time charter revenues for each arrested vessel against the actual revenues (i.e., zero), for time that each vessel was arrested; and (b) approximately $4.7 million in fixed costs incurred due to the arrests, such as legal expenses, hull cleaning, crew costs, and the like. (May 19, 2023 Transcript pp. 41:12-143:22; see also C-1902, Exs. C.1-C.5.) These damages shall be paid by the Levona-related entities to Eletson Gas as compensatory damages from the improper arrests of Eletson Gas vessels.

Eletson also seeks at least $10,000,000, to be determined by me in my discretion, for damages related to or arising out of Levona's other breaches of other contracts as to which Claimants were unable to specifically quantify damages, to be paid to Eletson Gas or the Preferred Nominees in my discretion. It argues that for each of those breaches, Eletson has proven that an injury in fact occurred. However, for several breaches, Dr. Furchtgott-Roth did not readily have facts available as of January 2023 sufficient to specifically quantify resultant damages. (*See, e.g.,* C-1902.0109 (noting that "due to the

character of certain of Eletson's injuries, various damages are difficult to quantify to a reasonable degree of certainty").)

Among these harms, are:

    a.  Risk of catastrophic loss of sensitive cargo or harm to vessels during the arrests;

    b.  As of result of the harmful acts of Levona and its affiliates, reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company;

    c.  Reputational harm to the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors;

    d.  Consequent to the reputational harm would be lost business opportunities, both with existing customers and with new customers;

    e.  The loss of access for the Claimants to both existing and new sources of capital as a result of the actions of Levona and its affiliates;

    f.  Management distraction to deal with the harmful acts of Levona and its affiliates; and

    g.  Permanent harm from the indelible record created by Levona and its affiliates.

I agree that the record supports the conclusion that the Levona-related entities' breaches caused the Company harm.  For example, Mr. Hadjieleftheriadis elaborated on several of these harms in his witness statement, testifying that several of these breaches independently cost the Company millions of dollars.  (C-1968 ¶ 91-101; ¶ 92 (asserting, among other claims that "Eletson would have paid millions of dollars to have avoided the breach of confidentiality and reputational damage that arose from" Kanelos' sharing of confidential information; ¶ 96 (claiming Levona's misconduct prevented the "refinancing of two of the facilities of the group—the Tufton facility and the Libera facility—which has resulted in lost financing opportunities and costs of several million dollars"); ¶ 99 ("Claimants have suffered tremendous harms due to Levona's conduct. Even if we were awarded the totality of the damages contemplated by Mr. Furchtgott-Roth's report, we still

would not be fully compensated, but Mr. Furchtgott-Roth's assessment of damages is a starting point.")

Delaware law is clear that, where a party has proven to a reasonable certainty that harm actually occurred, the trier of fact may use its discretion to determine the amount of damages that the plaintiff is entitled to. *Pers. Touch Holding Corp. v. Glaubach*, 2019 Del. Ch. LEXIS 66, at *48-49 (Del. Ch. Feb. 25, 2019) ("The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however. Each situation must be evaluated to know whether justice will permit an estimation of damages given the testimonial record or whether the record affords insufficient basis to fix an award." (citation omitted); *see also Raishevich v. Foster*, 9 F. Supp. 2d 415, 417 (S.D.N.Y. 1998) ("a fact finder has some latitude to make a just and reasonable estimate of damages based on relevant data." (citations omitted)).

JAMS Rule 24(c) is also instructive here and it reads as follows:

### Rule 24. Awards

(c) In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

Accordingly, and based upon my review of the totality of the evidentiary record, I award Claimants $2,000,000 to be paid to the Company for the following damages: (a) the reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company; (b) reputational harm to

the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors; (c) lost business opportunities, both with existing customers and with new customers, as a result of the reputational harm; (d) the loss of access for the Claimants to both existing and new sources of capital; and (e) permanent harm from the indelible record created by Levona and its affiliates.

### iii.  Damages Arising from the Violations of the Status Quo Order

Eletson is also entitled to damages for Levona's repeated violations of the Status Quo Injunction.  In its Proposed Order, Eletson seeks "an amount to be decided by the Tribunal in its discretion for damages relating to or arising out of Levona's violations of the Tribunal's Status Quo Injunction, to be paid to Eletson Gas or the Preferred Nominees in the Tribunal's discretion." (Proposed Order E(f).) In its post-hearing submission, Eletson requests that "[d]amages flowing from these violations should be included in the punitive damages assessed Levona." (Claimants' Post-Hearing Brief ¶ 799.)

Since I found that Pach Shemen's directing the trustee to commence litigation against Holdings and the commencement of the involuntary bankruptcy action both were intentional violations of the Status Quo Injunction, I award Eletson reimbursement of the attorney's fees and costs incurred in connection with those actions to be paid to the entity or individuals who paid those costs and fees. The LLCA provides that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party) (J-01, LLCA §12.14 (d); *See* JAMS Rule 24 (c).

### B.  <u>Punitive Damages</u>

Punitive damages in a contract action "can be awarded when conduct includes an element of ill will or an intent to cause injury or is malicious, willful or wanton." *Standard Distrib. Co. v. NKS Distribs.*, 1996 Del. Super. LEXIS 125, at *38 (Del. Super. Ct. Jan. 3,

1996) (finding punitive damages should be available for the deceit that accompanied the breach of contract in this case.") Punitive damages are permitted in breach of contract cases "[w]here the defendant's actions are similar in nature to that of a tort" or "it appears that the defendant has committed a 'willful wrong, in the nature of deceit.'" *Gillenardo v. Connor Broad. Del. Co.*, 2002 Del. Super. LEXIS 402, *36-37 (Del. Super. Ct. Apr. 30, 2002) (internal citations omitted). Dr. Furchtgott-Roth opined that if I determined that punitive damages were appropriate in this matter, a range of punitive damages measured at 3x to 9.6x compensatory damages would be appropriate. (C-1902 ¶ 94.)

Levona does not contest my ability to award punitive damages.  In fact, Levona requested that I award it punitive damages of $2,000,000 for what it referred to as Eletson's "intentional and bad faith acts." (Respondent's Proposed Order p. 3.)

If there was a case warranting punitive damages, I believe this is one. The evidence establishes that Murchinson, on its own, and through Levona and Pach Shemen, has engaged in an intentionally hostile, corrupt, wanton, and deceitful campaign to the great detriment of the Company.

Murchinson corrupted and bribed an Eletson officer.  The deceit continued with the intentional breach of the NDA with Blackstone. The deceit and backstabbing continued after Murchinson became the preferred holder and further continued after Eletson exercised the purchase option buying out Levona's preferred interests. It even continued during this arbitration as Murchinson disingenuously hid behind shell entities to avoid producing relevant documents and to repeatedly violate the Status Quo Injunction Order. To this day, I am convinced that all relevant documents have not been produced by Murchinson/Levona.

As discussed and cited throughout this Final Award, the record is replete with instances of Murchinson's agents engaging in deceitful and malicious behavior to further their own agenda: from Spears' secret dealings behind the Company's backs in which he bribed a Company officer and conspired with third-parties to the detriment of the Company (*see, e.g.,* C-1698, C-1699 ("Services Agreement"); C-1107 (Spears writing "I CANT STRESS ENOUGH – PLEASE DO NOT CONTACT THE VASSILIS X2 ABOUT THESE.")); to Murchinson/Levona's intentional breach of the LLCA's confidentiality obligations; to Murchinson/Levona's intentional interference with the Company's relationships with its lenders, causing the arrest of the Company's vessels, and their subsequent failure to disclose these violations to the Company; to Levona/Murchinson intentionally and knowingly breaching the LLCA by attempting to terminate management agreements and knowingly falsely telling the Company's lender that Eletson Corporation had "no right to correspond or otherwise deal with" its lenders (C-1958); to Lichtenstein's attempt to manipulate the evidentiary record by creating purported minutes of the March 10, 2022 board meeting after this arbitration was commenced (C-2023); to Levona and its agents knowingly violating—multiple times—the Status Quo Injunction Order (discussed, *supra*); to attempting to manipulate and deceive this tribunal by hiding behind shell entities while refusing to produce relevant documents, and misleading, if not outright lying, under oath.

It is clear to me that without some punitive deterrence, Murchinson's agents will continue to believe that they are not accountable for their actions.

Each of the Murchinson witnesses admitted that they actively concealed their activities, including their bribing of Kanelos, from the Company, without shame.

In addition to his attempt to perpetrate a fraud by creating a document after the commencement of this arbitration (C-2023), Mr. Lichtenstein, lied under oath, testifying that he was orally appointed "General Counsel" of Levona.  There is absolutely no support for this statement, nor is it credible.

When Mr. Lichtenstein testified at the hearing on May 24, 2023, he had been practicing law for three years. He graduated from law school in 2019, articled as a Canadian lawyer in 2020 which he described as akin to a residency after law school and then joined Murchinson in 2021. (May 24, 2023 Transcript pp. 109-110).

He represented in his witness statement that he was the "general counsel" of Levona but his testimony at the hearing under oath belies that assertion. He testified as follows:

> 18 Q. In Paragraph 4 of your witness statement,
> 19 you say that "as the general counsel of
> 20 Levona..."
> 21 So, are you selling this tribunal that you
> 22 are the general counsel of Levona?
> 23 I notice it has a capital "G" and a
> 24 capital "C," that looks like something formal.
> 25 A. Yes.
> Page 94
> 2 Q. Okay. You're the formal general counsel
> 3 of Levona?
> 4 A. I don't know what you mean by informal.
> 5 Q. You know what the word "formal" means?
> 6 A. Just as formal versus informal general
> 7 counsel, yeah, I don't understand it.
> 8 Q. Well, who appointed you to general counsel
> 9 of Levona?
> 10 A. Elliot Asa (phonetic).
> 11 Q. And what piece of paper did you do that
> 12 with?
> 13 A. It was orally.
> 14 Q. And when did he do that?
> 15 A. When he was the front desk director, I
> 16 spoke to him.
> 17 Q. You spoke to him, and he said you're the
> 18 general counsel. Do you have a business card, by
> 19 the way, that -- that identifies your general
> 20 counselship of Levona?

21 A. I don't have any business card of Levona.

(May 24, 2023 Transcript, pp. 93-94).

When pressed further by Claimant's counsel, he volunteered the following:

> Q. Okay. You said you didn't have a business
> 6 card, but do you have an e-mail address at
> 7 Levona?
> 8 A. No.
> 9 Q. Do you have an e-mail address at Poch
> 10 Shemen?
> 11 A. No.
> 12 Q. Does Poch Shemen have an e-mail address?
> 13 A. Not to my knowledge.
> 14 Q. Does Levona have an e-mail address?
> 15 A. No.
> Q. To communicate with you, you communicate
> 17 to Murchinson, correct?
> 18 A. Through my Murchinson e-mail address.
> 19 Q. Yes.
> 20 A.  Yes.

(May 24, 2023 Transcript, p. 106)

Before the start of the evidentiary hearing, Levona's counsel insisted that Mr. Lichtenstein was critical to Levona's legal team and his presence at the entirety of the hearing was necessary.  Despite my asking Levona to provide sufficient corporate records or anything in writing to substantiate its claim that Lichtenstein was an internal attorney for Levona, it provided nothing more than a certification by him where he called himself "(a Toronto based attorney for Levona and one of its board member representatives for Eletson Gas.)" (May 24, 2023 Transcript, p. 96.)

Despite that lack of support, and over the strenuous objection of Claimants' counsel, I gave Levona an opportunity for Lichtenstein to be present by permitting his attendance only after he provided his direct written witness statement to Eletson.  My purpose in this prerequisite to his attending the hearing before his actual testimony was to prevent any contamination of his witness testimony.  Apparently, however, that was

Lichtenstein's goal all along. He did not provide his witness statement until May 23, 2023—the penultimate day of testimony.  His entire written witness statement— purportedly as "General Counsel" of Levona (LEV255 ¶ 4)—is over 37 pages and 161 paragraphs in length and addresses almost every contested factual issue in the arbitration. It is also almost entirely hearsay and relates to events of which he has zero firsthand knowledge.  I give his written statement zero weight in these proceedings, as it is clear to me that he was either impermissibly listening into these proceedings remotely, or improperly speaking in depth with others who were in attendance during other witnesses' testimony so as to accomplish the very thing I intended to prevent—witness contamination.

Lichtenstein went so far as to actually manufacture evidence in this case.  He tried to argue that minutes of a March 10, 2022 Board meeting were created contemporaneously and proved that Eletson did not exercise the purchase option.  (J-33.) However, this document, and Mr. Lichtenstein's testimony surrounding it, is not credible.  As discussed above, Eletson credibly provided evidence about the metadata behind the document that supports the inference that it was edited by Mr. Lichtenstein *after* this arbitration commenced. (C-2023.)

It is clear from his testimony that this young lawyer does not understand the most basic ethical obligations of an attorney including to at all times avoid the appearance of an impropriety. This is glaringly illustrated in the following colloquy during his hearing testimony:

> Q. You willingly participated in this -- you,
> 7 as a lawyer, willingly participated in this
> 8 communication, correct?
> 9 A. I wrote this e-mail.
> 10 Q. And, in fact, I think is what you are
> 11 telling The Court is that you never, in fact,
> 12 objected to doing this.
> 13 A. Object to doing what?

14 Q. Objecting -- objected to making pretend
15 that you didn't know Mr. Kanelos when you did.
16 A. It was none of the other
17 directors' -- they didn't have a need to know
18 this.
19 Q. You were making pretend, right?
20 A. I don't know if the word is making
21 pretend. It's just a game. (May 24, 2023 Transcript, p. 164)

Murchinson/Levona continue through today to engage in gamesmanship both in connection with their refusal to honor their obligations under the BOL including their attempts to control the Company's assets as well their continuation of the multiple legal proceedings they have commenced—through Spears and Lichtenstein—in violation of the Status Quo Injunction Order.  This is none surprising since in the words of their own "General Counsel" this is all "just a game."

As a result of the bad-faith, deceitful, wanton and  corrupt manner in which Levona treated Claimants with an intent to injure them, bribed an Eletson officer, disregarded their obligations to Claimants and to the Company, intentionally and willfully breached the LLCA, committed associated torts against Claimant, and violated the orders of this arbitration, I find that punitive damages in the amount of $43,455,122.21, equal to the amount of compensatory damages, are warranted to be paid to the same entities that are to receive the underlying compensatory damages. *See, e.g., Standard Distrib. Co.*, 1996 Del. Super. LEXIS 125, at *38; *Barba v. Bos. Sci. Corp.*, 2015 Del. Super. LEXIS 537, at *31 (Del. Super. Ct. Oct. 9, 2015) (*citing State Farm Mut. Auto. Ins. Co. v. Campbell.* 538 U.S. 408 (2003)).

### **C. Interest, Costs and Fees**

Levona must pay pre-judgment interest on all non-punitive damages at 10 percent per annum. Eletson asserts that the appropriate pre-judgment rate of interest should be 10 percent, as established under the parties' agreements.  Specifically, Eletson refers to the

Intra-Group Loan, which provides for a rate of 10 percent per annum, for the loan that Levona provided the Company.  (*See* J-07 Section 6.2.)  Levona has not offered an alternative rate that it believes is more appropriate.  Thus, I conclude that it is reasonable to apply the rate previously negotiated by the parties in other transactions.

As indicated in Dr. Furchtgott-Roth's first report, all of the compensatory damages he quantified were adjusted for interest up through January 30, 2023.  Thus, Levona is obligated to pay additional prejudgment interest on those damages from January 30, 2023 up through the earlier of the date of payment of the awarded damages or the date of confirmation of this award by a court of competent jurisdiction.

Eletson also seeks the recovery of its costs and attorneys' fees for its prosecution and defense of this action pursuant to Section 12.14(d) of the LLCA, which provides that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party, which fees may be set by the arbitrator of such action or may be enforced in a separate action brought before an arbitrator for that purpose in accordance with this Section 12.14, and which fees shall be in addition to any other relief that may be awarded."

Since Claimants have prevailed in this arbitration, I grant Claimants' request for its costs and attorneys' fees pursuant to Section 12.14(d) of the LLCA and JAMS Rule 24(g) which read as follows:

**Rule 24. Awards**
(g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

## VII.  ELETSON'S APPLICATION FOR FEES, EXPENSES, COSTS AND INTEREST

In the Corrected Interim Award, I granted Claimants' request for the opportunity to produce evidence of their recoverable costs, fees, and interest, and set a briefing schedule, with which the parties have complied.

In its Opening Affirmation, Eletson seeks fees, expenses, and costs in the amount of $9,850,222.99 in connection with the arbitration, and $3,007,266.20 in connection with the Bankruptcy and Bondholder Litigation, for a total of $12,857,489.19.  This amount includes:

- $7,179,802.80 in legal and support staff fees incurred by Reed Smith in connection with the arbitration;

- $301,689.66 in disbursable costs and expenses incurred by Reed Smith in connection with the arbitration;

- $1,794,950.70 of a success fee owed to Reed Smith by Eletson under their engagement letter for the arbitration, which was triggered by the finding in the Corrected Interim Award that Eletson is the prevailing party in this arbitration;

- $344,691.99 in fees charged by Eletson's expert witnesses in connection with the arbitration, other than certain fees charged by one Eletson expert, Peter Daniel, whose expenses are primarily included as professional fees in Reed Smith's bills and included in the $7,179,802.80 referenced above;

- $50,986.27 in fees charged for trial support by Magna Legal Services and Transperfect Legal Solutions in connection with their trial support services in the arbitration;

- $251,878.47 in costs paid to JAMS for administrative, arbitrator and law clerk expenses in connection with the arbitration;

- $2,996,173.35 in legal and support staff fees incurred by Reed Smith in connection with the bankruptcy and Bondholder Litigation; and

- $107,082.35 in disbursable costs and expenses incurred by Reed Smith in connection with the bankruptcy and Bondholder Litigation.

Claimants note that Eletson is not seeking the reimbursement of attorney and non-attorney timekeeper fees if such attorney or timekeeper did not bill at least 15 hours to one of the two applicable Reed Smith client matter numbers. As a result, their total fee request of $12,857,489.20 has been discounted in the amount of $73,776.90 for the arbitration and $95,989.50 for the Bankruptcy and Bondholder Litigation. Second, Eletson is not seeking fees for its Greek counsel at the Timagenis Law Firm, who expended at least 700,000 euro in relation to the relevant matters. Third, in the engagement letter for the Bondholder and Bankruptcy Litigation, Reed Smith provided Eletson with a ten percent discount on all legal fees, which is reflected in the attached invoices and in the overall amount sought through this application.

The requested sum, however, does include fees that were expended in Eletson's preparation and filing of a New York state court complaint against Murchinson, which was folded into the bankruptcy. Eletson has indicated that to the extent I believe that such fees are outside the scope of those recoverable by Eletson, based on Eletson's review of the applicable invoices for the Bondholder Litigation contained in Exhibit 6 to their Opening Affirmation, approximately $260,000 worth of billing entries made some reference to work relating to Eletson's complaint against Murchinson.  (Opening Affirmation p. 16.). Eletson also acknowledges that their application includes *de minimis* fees, reflected in Eletson's invoices for the arbitration, in relation to two "nuisance litigations" that Eletson claims are part and parcel with the arbitration, that Levona filed, after the commencement of the arbitration, against persons associated with Eletson in Delaware Chancery Court, *Levona Holdings, Ltd. vs. Vassilis Kertsikoff, et al.*, 2022-0823-MTZ, and the United States District Court for the Southern District of Texas, *Levona Holdings, Ltd. vs. Vassilis Kertsikoff, et al.*, 4:22-cv-02988. (Opening Affirmation p. 16.)

76

Eletson argues that their billing rates and staffing were reasonable given that this arbitration was a "bet-the-company dispute seated in New York City" with lawyers "required to work on an expedited timeline . . . on many fronts in multiple proceedings that required different specialties."  (Opening Affirmation p. 4.)

Part of the requested fee amount includes a success fee in the amount of $1,794,950.70.  In December 2022, Reed Smith and Eletson reached an agreement that Eletson would withhold 25% of each invoice, retroactive to the commencement of the matter, and if they were successful in the arbitration, the client would pay Reed Smith two times the amount withheld. In other words, Reed Smith would receive an "upside" from this arrangement, in the event of success, of an additional 25% of its fees.

Eletson also seeks additional pre-judgment interest at the rate of 10 percent in the amount of $2,496,081.87, which is the amount of interest running from January 31, 2023 through August 31, 2023.  (Opening Affirmation p. 25.)

Finally, Eletson requests that "the Tribunal retain jurisdiction under Section 12.14(d) of the LLCA and/or JAMS Rules to enable Eletson efficiently to seek a subsequent and related award for additional fees and expenses that it has and will be required to spend since July 28, 2023," including to enforce the Corrected Interim Award and this Final Award. (*Id.*)

Levona opposes each of Eletson's requests.

As for Claimants' requests for fees, expenses and costs in the arbitration, Levona argues that Claimants' requests should be denied because they were neither the prevailing party nor the party responsible for the costs of the arbitration.

First, Levona argues that to be a prevailing party for attorney-fee purposes, one must "prevail on the central claims advanced, and receive substantial relief in consequence thereof." (Respondent's Affirmation p. 12, *citing Liberty Mut. Ins. Co. v. Brutus*, 2022 N.Y. Misc. Lexis 4154 (Sup. Ct. NY, Aug 16, 2022) (*quoting Sykes v. RFD Third Ave. I Assoc.,*

*LLC*, 39 AD3d 279, 833 N.Y.S.2d 76 (1ˢᵗ Dept. 2007); *see also Hensley v. Eckerhart*, 461

U.S. 424, 440 (1983) ("where the plaintiff achieved only limited success, the district court

should award only that amount of fees that is reasonable in relation to the results obtained."))

Here, Levona contends that Reed Smith represents Eletson Holdings and Eletson

Corporation, not Eletson Gas or the Preferred Nominees, the latter entities being non-parties

to whom the Corrected Interim Award awarded compensatory damages.  According to

Levona, Eletson, despite being the party advancing the claims in this arbitration, did not

receive substantial relief in consequence of those claims, and thus, Eletson is not the

prevailing party.

Levona also argues that Eletson was not the party responsible for paying the legal

fees and costs.  (Respondent Affirmation pp. 13-14.) Rather, Ms. Karastamati testified that

that the Greek families through the Preferred Nominees were responsible for supporting the

legal expenses and Reed Smith's affirmation does not address how the fees were paid, or who

was ultimately responsible for doing so.

As to specific objections to the amounts included in Eletson's fee request, Levona

argues that Reed Smith's bills are unreasonable.  First, Levona argues that curiously the total

amount of fees across all lawsuits is the exact amount due under the IntraGroup Loan.

In addition, Levona argues that Reed Smith improperly block-billed their time

entries, which makes Levona unable to discern what time may have been spent on unrelated

matters, for example, the Texas and Delaware lawsuits. (Respondent's Affirmation pp. 16-

17.)

Levona also contends that Reed Smith overstaffed the matter.  One example of the

alleged overstaffing was, according to Levona, the attendance and billing of ten attorneys at

the closing argument for the hearing.  (*Id.* p. 18.) Levona also points to the number of hours

Levona's primary counsel has billed for this matter, which, without providing any supporting documentation, Levona states was roughly half the total hours of Reed Smith. (*Id.*)

With respect to the success fee, Levona argues that Reed Smith has not provided any written evidence of the success fee, and therefore, has not satisfied its burden of proof. Moreover, Levona does not have responsibility to pay for Eletson's "bet" and if any award for attorneys' fees is awarded, it should be reduced to only the amount that Eletson has actually paid Reed Smith.

Levona objects to the inclusion of any fees for the Texas and Delaware lawsuits, as these suits are against officers of the Company, not parties to the arbitration, and the awarding of fees here would deny those "jurisdictions their application of the American rule." (Respondent's Affirmation pp. 14-15; *citing Mansfield Realty, I., LLC v. Mansfield LLC,* 2023 NY Slip Op 31419 (U), ¶; *see also Dreisbach v. Walton*, 2014 Del. Super. LEXIS 557, *10 (Del. Super. Ct. Oct. 27, 2014) ("The United States Supreme Court has held that attorney's fees should not be awarded for work related to claims distinct from the claim on which the party was successful.")

Levona argues that I lack "jurisdiction to make any ruling related to the appropriateness or validity of [the Bankruptcy or Bondholder Litigation], the entitled [sic] of any party to those actions to recover its incurred fees, or the reasonableness of any fees sought in respect of those actions." (Respondent's Affirmation p.6.) Rather, Levona asserts that only the Bankruptcy Court can award fees in a bankruptcy action and the awarding of fees in New York for a state action is prohibited unless it is authorized by statute. (*Id.*). It further argues that my awarding of fees here could result in inconsistent rulings if the other courts determine differently. Furthermore, Levona argues that I am not in a position to determine the reasonableness of the fees in the Bankruptcy or Bondholder Litigation, nor is Levona.

Finally, Levona argues that the debtor in the Bankrupty and the defendants in the Bondholder Litigation include, in addition to Eletson Holdings, third parties who are not present in this arbitration, and thus, a third-party may not claim the benefit of a fee shifting clause unless they are intended third-party beneficiaries, for which there is no evidence. (Respondent's Affirmation p. 7, *citing Hub Elec. Co. v. Gust. Constr. Co.,* 585 F.2d 183, 188-89 (6th Cir. 1978); *Redzepagic v. Hammer,* 2017 U.S. Dist. LEXIS 27984, at *22-23 (S.D.N.Y. Feb. 27, 2017) (party cannot benefit from attorney fee shifting provision because it was not the party that could recover under the agreement.)) According to Levona, Eletson has not met its burden in establishing how Eletson Holdings is entitled to full recovery of the fees incurred in connection with the Bankruptcy and Bondholder Litigation when the parties represented include non-parties to this arbitration.  (Respondent's Affirmation p. 8.)

Thus, Levona requests that I deny Eletson's fee request in its totality.

Alternatively, Levona argues that in the event I am to award Eletson attorneys' fees, I should, at most, award $3,130,160.80, which reflects: (1) a reduction in the amount of $1,794,950.70 for the fees Reed Smith did not expect its client to pay and another reduction of $1,794,950.70 for the subsequent "success fee"; and (2) a further reduction of the fees by 50% due to Reed Smith's inappropriate proof and unreasonable overstaffing, block billing, and lack of detail.  Levona argues that the 50% reduction is appropriate in light of the fact that Levona's counsel billed less than 50% of the time billed by Eletson's counsel. (Respondent's Affirmation p. 23.)

With respect to pre-judgment interest, Levona argues that because the Corrected Interim Award awards damages to Eletson Gas and the Preferred Nominees, Eletson is not entitled to seek additional prejudgment interest on their behalf.  Thus, the request for an additional award is inappropriate and should be denied.

Finally, Levona asserts that it is neither appropriate, nor legally permissible, for me to retain jurisdiction over the parties so that Eletson can make a future application for additional fees.  Rather, once I enter my determination on fees, this Tribunal becomes *functus officio*. (Respondent's Affirmation p. 9.) Moreover, this request by Eletson for continued arbitral jurisdiction was made for the first time in the Opening Affirmation and that alone is reason to deny it.  (*Id.* p. 10.)

### A.  Fees, Expenses, and Costs.

I find that Claimants' request for fees, expenses, and costs in this arbitration to be reasonable, with one exception, which I will address below.

Section 12.14(d) of the LLC Agreement grants this Tribunal the "discretion to award reasonable attorneys' fees . . . to the prevailing party," and JAMS Rule 24(g) allows the Tribunal to "allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law." Under applicable law, "when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987); *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (same); *Mahani v. EDIX Media Group, Inc.,* 935 A.2d 242, 245-46 (Del. 2007) (fees award was reasonable where it was "based on facts in the record, and was neither arbitrary or capricious").

In determining reasonableness, Delaware courts look at the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *See Mahani*, 935 A.2d at 246 (*citing in part,* Del. Lawyers' R. of Prof. Conduct 1.5(a)(1)).

These factors support Eletson's fee request. Reed Smith's hourly rates are within what courts in New York City have found reasonable. Reed Smith's lawyers' hourly rates ranged from $1610 for Mr. Solomon, Claimants' lead counsel, $1275 for Mr. Underwood, Claimants' second chair, and between $900-$425 per hour for other partners, counsel, associates, and paralegals.

Indeed, several Southern District courts have found that Reed Smith's current rates, when adjusted for inflation against the rates considered during the litigation at issue, were reasonable. *See, e.g. New York City. Vista Outdoor, Inc. v. Reeves Family Tr.*, 2018 U.S. Dist. LEXIS 102224, at *19 (S.D.N.Y. May 24, 2018) (hourly rates up to $1,260 in 2018 were "not excessive in the New York City 'big firm' market"); *Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, 2021 U.S. Dist. LEXIS 70271, at *6 (S.D.N.Y. Apr. 12, 2021) (partner rates of $1,175 and $1,350 per hour for partners at large law firm, "though on the higher end, [were] comparable to rates awarded in this jurisdiction"); *see also In re Relativity Fashion, LLC*, No. 15 Br. 11989 (Bankr. S.D.N.Y. June 10, 2016) (ECF No 1965) (awarding hourly rates of up to $1,225—in 2016—for Jones Day partners).

Moreover, as reflected in recent bankruptcy fee application filings submitted by New York City counsel at large firms, rates at even $2,000 an hour are common for lead

counsel. *See, e.g., In re SVB Financial Group*, Case No. 23-10367 (MG) (Bankr.
S.D.N.Y. 2023) (ECF No. 475) (fee application by large New York firm with rates over
$2,000 for partners, between $1,500 and $1,700 for counsel, and $775 to $1,475 for
associates).

Notably, Levona's counsel does not argue that the hourly rates of Reed Smith
were unreasonable or even high.  It is further worth noting in this connection that Levona
recently retained new counsel, Quinn Emanuel Urquhart & Sullivan, LLP, a firm that has
been reported to have hourly rates ranging for partners between $1,385-$2,130, as of
October 2022. (*See* Opening Affirmation, Exhibit 10.)

In addition, the amount of time billed by the Reed Smith attorneys in this
arbitration is reasonable in light of the extensive number of filings and the highly
contested nature of these proceedings.  I adjudicated numerous disputes, including
multiple challenges to JAMS' jurisdiction, several requests for injunctive and other
preliminary relief by both parties, successive motions to strike Eletson's pleadings, many
motions to compel discovery from both parties, and multiple motions *in limine*. Each of
these applications entailed substantial factual and legal research and development,
briefing, and often extensive oral argument. According to Claimant—and notably, not
disputed by Levona—over 200 litigation documents were filed in JAMS, over 10
hearings were conducted before me, even before the plenary hearing, 4 witnesses were
deposed, 15 expert reports were submitted, and approximately 26,000 documents totaling
over 160,000 pages were produced. (Opening Affirmation p. 6.)

In addition, the parties (i) submitted pre-hearing briefs that collectively exceeded
130 pages of legal argument, (ii) submitted proposed exhibit lists that collectively
exceeded 2,200 exhibits, (iii) participated in a pre-hearing  conference that lasted the

better part of a day, (iv) held an evidentiary hearing that lasted 7 full days, during which

several hundreds of exhibits were introduced and 14 witnesses were examined and/or

cross-examined, (v) submitted post-hearing briefing that collectively exceeded 320 pages

of legal argument and proposed findings of fact, and (vi) conducted a long and extensive

post-hearing oral argument lasting many hours. (Opening Affirmation p. 6.)

This said, I agree with Levona that an award of attorneys' fees should not include

the time incurred in connection with the state court action that Eletson commenced

against Murchinson. Eletson has estimated its fees for that action to be approximately

$260,000. Notably, Levona has not contested the amount estimated by Eletson, nor

proposed a different calculation.

I disagree with Levona's argument for the exclusion of fees incurred in this

arbitration that relate to the Texas and Delaware litigations, which Eletson claims to be

"de minimis". Levona does not challenge or dispute Eletson's claim that these costs are

"de minimis," and acknowledges that Reed Smith did not represent the individual Eletson

officers in connection with those suits. (*See* Respondent Affirmation p. 16.) Thus, it is

reasonable to conclude that the time entries referencing those actions are directly related

to this arbitration. Reed Smith needed to review the Texas and Delaware complaints and

stay apprised of those lawsuits in order to understand their connection and relevance to

the claims in this arbitration.

As for the non-attorney amounts requested, including disbursable expenses,

expert fees, trial support costs, and JAMS administrative and arbitrator costs, these costs

are shiftable to Respondent under the LLCA and JAMS Rule 24(f).  *See, e.g.*, *Themis*

*Capital v. Democratic Republic of Congo*, 2014 WL 4379100, at *9 (S.D.N.Y. Sept. 4,

2014) ("[C]ourts in this District routinely reimburse prevailing parties for the costs of

expert witnesses and consultants"); *Weiwei Gao v. Sidhu*, 2013 WL 2896995, at *6

(S.D.N.Y. June 13, 2013) (granting expert costs because they were "reasonable and

necessary" and because the "Fee Sharing Agreement provides for recovery of 'other costs

incurred"); *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.*, 2008

WL 4833025, at *9 (S.D.N.Y. Nov. 3, 2008) (because the contract "clearly—and

undisputedly—provide[d] for reasonable attorneys' fees 'and other costs'" and because

defendant did not use "duplicative or unnecessary expert witnesses," the Court declined

to "make any reductions in the costs related to [defendant's] use of these witnesses");

*Ambac Assur. Corp. v. Adelanto Pub. Util. Auth.*, 2013 WL 4615404, at *1, *7 (S.D.N.Y.

Aug. 29, 2013) (awarding expenses billed by e-discovery vendor pursuant to a fee-

shifting provision); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 2010 WL 1141145, at

*3, *6–7 (S.D.N.Y. Mar. 24, 2010) (awarding $408,071.34 for services related to

electronic data storage and hosting for e-discovery pursuant to a fee-shifting provision).

Indeed, Respondent does not even address these costs and expenses in its opposition to

Eletson's application.

I further award Eletson the "success fee" in the amount of $1,794,950.70.  In

circumstances such as this, the law is clear that the fee shifting provision in the parties'

agreement  obligates Levona to pay these contingent fees that Eletson now owes to Reed

Smith. *See IAC/InterActiveCorp v. O'Brien,* 26 A.3d 174, 179 (Del. 2011) (rejecting

argument that contingent legal fees were "not incurred because they do not represent

work done, but rather the success achieved"; finding "A premium or contingent fee is

payable for work done, if that work is successful. The fact that the amount of the fee is

not set until the result is obtained does not change the fact that the fee is incurred based

on hours or work performed for the client."); *Williams Cos. v. Energy Transfer LP*, 2022

Del. Ch. LEXIS 207, at *7-8 (Del. Ch. Ct. Aug. 25, 2022) ("There is nothing inherently unreasonable in enforcing a contractual fee-shifting arrangement to cover a contingent fee award"; awarding fee shifting on contingent fee arrangement); *S'holder Representative Servs. LLC v. Shire US Holdings, Inc.*, 2021 Del. Ch. LEXIS 81, at *2-3 (Del. Ch. Ct. April 27, 2021) (same; noting party opposing fee shifting could have negotiated for a contract that did not permit the shifting of contingent fees).

Accordingly, I award Claimants payment of their attorney's fees, expenses and costs for this arbitration in the total amount of $9,590,222.99.

For many of the same reasons, I also find Claimants' application for fees and costs for the Bankruptcy and Bondholder Litigations in the amount of $3,007,266.20 reasonable.

I note that Claimants submitted 10 supporting exhibits along with their Opening Affirmation that further substantiate the reasonableness of their application for fees, expenses, and costs in this arbitration, the Bankruptcy and the Bondholder Litigation:

- Exhibit 1 is the client Affidavit of Laskarina Karastimati attesting to the reasonableness of the fees and expenses paid and incurred by Eletson in connection with the matters as to which the Tribunal awarded fees and expenses;

- Exhibit 2 is the expert Affidavit of Dr. Harold Furtchgott-Roth calculating the additional interest the Tribunal awarded to Eletson in the Corrected Interim Award;

- Exhibit 3 is a set of summary charts of the totals set out herein;

- Exhibit 4 is a list of Reed Smith timekeepers by title, listing hours billed, rates, and value;

- Exhibit 5 is combined invoices related to this arbitration;

- Exhibit 6 is combined invoices related to the Bankruptcy and Bondholder Litigation;

- Exhibit 7 is combined expert invoices related to this arbitration;

- Exhibit 8 is combined trial support invoices related to this arbitration;

- Exhibit 9 is the biographies of Reed Smith attorneys that worked on this arbitration, the Bankruptcy, and/or the Bondholder Litigation; and

- Exhibit 10 is an article setting forth the rates of Quinn Emanuel Urquhart & Sullivan, LLP as of October 27, 2022.

Curiously, Levona did not submit any documentation to support their opposition to Claimant's application or support their argument that Reed Smith overstaffed or overbilled the matter. Indeed, I do not have any documentation to support Levona's assertion that Reed Smith billed more than double the hours of Frankel, Rubin, Klein, Payne & Pudlowski P.C. ("Frankel Rubin"). Levona did not attach, as is customary in responsive opposition submissions to fee applications, any supporting documentation demonstrating their own legal fees.

Levona's additional arguments in opposition to Claimants' application are unavailing.

Levona's argument that Eletson was not the prevailing party and that "the prevailing party was not a party to the Arbitration" is completely without merit. (Respondent's Affirmation p. 13.) In making this argument, Levona also implies that the propriety of the award to Eletson Gas and the Preferred Nominees, as purported non-parties, requires further adjudication. Putting aside that this is a merits issue that was already decided in the Corrected Interim Award, Levona's contention is simply untenable. The possibility that, if Eletson succeeded on its claims, relief would not be awarded to Eletson, but for example to Eletson Gas, has been known since the commencement of this arbitration.

From the start of this arbitration, the claims—*and Levona's counterclaims*—related to who held the preferred interests. A primary question to be answered in this arbitration was whether Eletson exercised the option under the BOL, thereby transferring the preferred interests pursuant to the terms of the BOL. The express terms of the BOL

made clear that, in the event the option was exercised, the preferred interests would

transfer to Eletson Gas or its nominee: "Levona hereby grants Eletson Gas the option . . .

for *either Eletson Gas or its nominee* to purchase all of the membership interests held by

Levona in Eletson Gas . . . ." (J-6 ¶ 2.1 (emphasis added); *see also*, Corrected Interim

Award pp. 26-31.)

Despite filing motions on numerous issues, including multiple motions to strike

claims and allegations, Levona never objected to Eletson having standing to enforce the

terms of the BOL, even though, if successful, relief would be awarded—as expressly set

forth in the BOL—to "Eletson Gas or its nominee."[8]

Indeed, given the disputed ownership of Eletson Gas, which was the catalyst to

the filing of this arbitration, the only entities who could bring this arbitration to dispute

the ownership of the preferred interests of Eletson Gas, would be Eletson and Levona, as

shareholders of Eletson Gas. In other words, Eletson Gas could not bring this claim on its

own given that Levona contended it continued to own the preferred interests of, and

therefore had a controlling interest in, Eletson Gas. It has also been clear throughout these

proceedings that Eletson would turn over any damages to Eletson Gas, depending upon

my ultimate determinations in this arbitration.  (*See* Third Amended Statement of Claims

at ¶ 64(p); *see also* Claimant's Post-Hearing Brief at ¶ 11.)[9]

Accordingly, it is Eletson that substantially prevailed on its claims in this

arbitration and any attempts by Levona to undermine previous findings in this arbitration

---

[8]    Levona objected only to Eletson's argument that the preferred interests had been
contingently transferred *from Eletson Gas* to the Preferred Nominees.
[9]    It is worth noting that had I found that Levona retained the preferred interests and
awarded Levona certain relief that it had requested, some of that relief would have in fact been
derivative relief.  While Levona sought damages under a theory of tortious interference in
connection with the Unigas offer letter, any damages suffered as a result of a decrease in sale
price, would have been to the Company, and only indirectly to Levona, as the preferring
shareholder.

based on new arguments that the relief was inappropriately granted to Eletson Gas, or a nominee of the Eletson Gas, are summarily rejected.

In addition, contrary to Levona's assertion, Reed Smith's use of block billing is not unreasonable, and a review of Reed Smith's invoices support a finding that sufficient detail was provided in the invoices to demonstrate that the time was billed productively. *See Gentel Wave Shipping S.A. v. Transfield Shipping, Inc.*, 2010 U.S. Dist. LEXIS 13210, *4 (S.D.N.Y. Feb. 11, 2010) (use of block billing "has been held to comply with Second Circuit standards and client expectations."). Courts will award attorneys' fees in connection with block billed entries where there is "enough detail and specificity so as to afford reasonable confidence that the time billed was productively spent, even if it is impossible to reconstruct the precise amounts of time allocable to each specific task listed in the block entry." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 54 (S.D.N.Y. 2015); *Aurora Comm. Corp. v. Approved Funding Corp.*, 2014 U.S. Dist. LEXIS 108949, *16 (S.D.N.Y. Aug. 6, 2014).

I also reject Levona's claim that Reed Smith overstaffed the matter. To use one of the examples Levona raised, the fact that ten attorneys attended and billed time at the closing argument does not lead to the conclusion that Reed Smith overstaffed the matter. In evaluating the reasonableness of staffing, it is not proper to isolate one event and evaluate it in a vacuum. This arbitration concerned the ownership of the preferred interests in Eletson Gas, a company with assets that were indisputably valued in the hundreds of millions of dollars, as well as a request for an award of compensatory damages in eight figures.

Moreover, the billing entries for the closing argument fees to which Levona cites as evidence of overstaffing reflect that time was spent not just attending the argument but

89

also on working on the closing argument presentation. (*See,* Opening Affirmation,

Exhibit 5 pp. 308-333.) Regardless, to determine that the time billed by attorneys was

reasonable, I need not reach a conclusion as to the value added by each timekeeper at

each event.  Rather, in determining fees, I look to "what a reasonable, paying client

would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood'Ass'n v. City of*

*Albany & Albany Cty. Bd. of Elections,* 552 F.3d 182, 194 (2d Cir. 2008).  Here, the fees

incurred by Reed Smith that have been already paid, or that the client has agreed to pay,

are reasonable and the reasonableness of those fees has been attested to in client

affirmations.

Importantly, it should not be forgotten this arbitration was a bet-the-company case

for Eletson, with a mandated expedited timeline for arbitration.  I agree with Eletson that,

even putting aside the lack of any evidentiary support for Levona's assertion that

Levona's counsel expended half as many hours as Reed Smith, the time expended by

Frankel Rubin is not an appropriate measure for comparison, given my repeated

suggestions at various times in this arbitration that Frankel Rubin should increase its

staffing to meet the expedited timelines of this arbitration.

Similarly, the arguments Levona raises in opposition to Claimants' requests for

fees in connection with the Bankruptcy and Bondholder Litigation fail. Levona's

invocation of the American rule is misplaced.  In the Corrected Interim Award and in this

Final Award , I ruled that Levona's alter ego, Pach Shemen repeatedly violated the Status

Quo Injunction Order. Since I ruled that Pach Shemen's directing of the commencement

of the Bondholder Litigation against Eletson Holdings, and the commencement of an

involuntary bankruptcy action against Eletson Holdings were both intentional violations

of the Status Quo Injunction, I awarded Eletson reimbursement of the attorney's fees and

90

costs incurred in connection with those actions to be paid to the entity or individuals who

paid those costs and fees. (*See* JAMS Rule 29 stating that the "Arbitrator may order

appropriate sanctions for failure of a Party to comply with its obligations under any of

these Rules or with an order of the Arbitrator. These sanctions may include, but are not

limited to, assessment of Arbitration fees and Arbitrator compensation and expenses,

assessment of any other costs occasioned by the actionable conduct, including reasonable

attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme

cases, determining an issue or issues submitted to Arbitration adversely to the Party that

has failed to comply.")

In other words, the award of attorneys' fees was as damages to compensate for the

intentional violations by Levona, through its alter ego, Pach Shemen, of the Status Quo

Injunction Order—not a finding of a prevailing party's entitlement to fees or a finding

under a fee-shifting provision. The court jurisdictions remain free to render any rulings

relating to fees in connection with the merits of those litigations. "Where an arbitration

clause is broad, arbitrators have the discretion to order such remedies as they deem

appropriate. This is because it is 'not the role of the courts to undermine the

comprehensive grant of authority to arbitrators by prohibiting' them from fashioning

awards or remedies to 'ensure [] a meaningful final award.'" *Reliastar Life Ins. Co. v.

EMC Nat'l Life Co.,* 564 F.3d 81, 86 & n.2 (2d Cir. 2009).

Moreover, the attorney affirmation, client affidavit, and invoices from the

Bankruptcy and Bondholder Litigation also provide me with sufficient basis to determine

the reasonableness of the fees requested. *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d

170, 174 (2d Cir. 2009) ("The presumptively reasonable fee boils down to what a

reasonable, paying client would be willing to pay, given that such a party wishes to spend

the minimum necessary to litigate the case effectively.") (citation omitted). Levona itself also had the ability to determine the reasonableness of Reed Smith's invoices. Even if Frankel Rubin may not be counsel of record in those lawsuits, Levona's agents, Spears and Lichtenstein, in particular, are involved in those proceedings, and subject to compliance with the confidentiality restrictions ordered in this arbitration, could have assisted Levona's counsel in connection with its opposition to Eletson's fee application.

Finally, Levona's argument that the Bondholder Litigation and Bankruptcy involve Eletson-related entities that are not parties to this arbitration, and therefore, Eletson is not entitled to the full recovery of the fees billed in those cases, is unavailing. The invoices reflect that the work done by Reed Smith that is included in the fee request was done solely on behalf of Eletson Holdings or jointly on behalf of Eletson Holdings and the other entities. The information provided in support of Eletson's application meets their burden of reasonableness. Levona has provided nothing to infer that the amount of fees incurred was greater simply because Reed Smith is representing multiple related entities in those litigations, as opposed to only Eletson Holdings.

### B. Additional Pre-Judgment Interest

The Corrected Interim Award provided for compensatory damages that included pre-judgment interest running up through January 30, 2023 at a rate of 10 percent, and also provided for the recovery of additional pre-judgment interest at the same rate running until such date that the award is paid or confirmed in a court proceeding. Claimants submitted, along with the Opening Affirmation, the Fourth Expert Report by Dr. Harold Furchtgott-Roth, which calculates the relevant amounts of additional pre-judgment interest owed by Levona. In accordance with Dr. Furchtgott-Roth's

calculations, the total amount of pre-judgment interest running up to August 31, 2023 is

$2,496,081.88. (Opening Affirmation p. 25.)

Thus, the pre-judgment interest running up to August 31, 2023 is awarded as

follows:

- To Eletson Gas: $1,319,163.14.

- To the Preferred Nominees: $1,176,918.74.

To the extent Levona did not satisfy the Corrected Interim Award by August 31,

2023, additional pre-judgment interest will continue to run in accordance with the terms

of the Corrected Interim Award. Dr. Furchtgott-Roth sets out how to calculate that

additional interest during that indefinite time period using the following formula:

{(Award amount as of August 31, 2023)*(1.008333)^[(number of whole
months since August 31, 2023) + ((number of days in partial month)/(total
number of days in partial month))] – (Award amount)}.

 (Opening Affirmation p. 26, citing Exhibits 2, 3.)

I agree with Claimants that pre-judgment interest at a rate of 10% running from

the date of this Final Award until the earlier of the date of payment of the amount due or

the date of confirmation of this award by a court of competent jurisdiction shall accrue on

the awarded amount of attorneys' fees, costs and expenses and the calculation of that

interest amount shall be done using the same formula above, except substituting the total

amount of attorneys' fees, costs, and expenses determined by the arbitrator for the

"Award amount".

Notably, Levona does not challenge the calculation of the interest amount Eletson

requests or the calculation proposed to calculate additional interest that may be due in the

future.  Nor does it respond to Eletson's request for interest on the fees, costs and

expenses, other than arguing that both attorneys' fees and interest should be denied outright.

With respect to pre-judgment interest, Levona argues that because the Corrected Interim Award awards damages to Eletson Gas and the Preferred Nominees, Eletson is not entitled to seek additional prejudgment interest on their behalf and therefore the request for an additional award is inappropriate and should be denied. This argument by Levona is both untimely and without merit.

### C.  Retention of Arbitral Jurisdiction

I deny Eletson's request to retain jurisdiction after this Final Award to enable Eletson to make future fee applications and agree with Levona that I made clear in the Corrected Interim Award, that "[u]pon receipt of all these papers, the matter shall be deemed submitted for a decision on the final award at that time." I also agree with that the arbitrator becomes *functus officio* after the issuance of a final award.

This said, both in the Corrected Interim Award and tin his Final Award I make clear that I have awarded Eletson fees, costs, and expenses in connection with this arbitration as well as the Bankruptcy and the Bondholder Litigation. Moreover, there is a continuing accrual of pre-judgment interest on any accrued and unpaid amounts running up until the earlier of the date of payment of the amounts due or the date of confirmation of this Final Award by a court of competent jurisdiction, as well as the formula that should be used to calculate any additional interest. Eletson has, among other options, the ability under Section 12.14(d) of the LLCA to seek additional relief in the event it needs to enforce payment of the amounts awarded.

### VIII.   CONCLUSION AND FINAL AWARD

This Final Award resolves all issues submitted for decision in this arbitration. The undersigned has considered and resolved all the issues and arguments raised relating to the merits of the claims, counterclaims, requests for attorney's fees, costs, expenses, and pre-judgement interest, including those not explicitly addressed herein. Any argument not addressed in this Final Award was found to be unavailing, without merit, academic, or unnecessary to reach.

This Final Award finds and orders as follows:

1.      Claimants have proven breaches of the LLCA and the covenant of good faith and fair dealing and established that Eletson exercised the purchase option pursuant to the BOL, and are therefore entitled to the declaratory relief, compensatory damages, punitive damages, prejudgment interest, and attorney's fees, as set forth below.

2.      Respondent has not proven any of its counterclaims and they are dismissed. Respondent is entitled to recover nothing from the Claimants.

## A.  **Declaratory Relief**

I hereby enter the following findings, determinations, and declarations:

1.      Eletson effectively exercised the buyout option granted in the Binding Offer Letter dated February 22, 2022 on and as of March 11, 2022, and any alleged precondition to the exercise of that option was either satisfied or waived.

2.      As of March 11, 2022, Respondent Levona had no membership interest in the Company, Eletson Gas.

3.      The Company exercised its rights under the BOL to nominate three entities—Fentalon, Apargo, and Desimusco, (the Preferred Nominees)—affiliated with the

principals of Claimants, as the parties to receive the preferred interests in the Company, previously held by Levona.

4.      The preferred interests in the Company were transferred to the Preferred Nominees, effective as of March 11, 2022, and the Preferred Nominees are permitted transferees under the LLCA. They have stipulated to be bound by this Award and any Judgment entered hereon.

5.      Eletson Holdings and Eletson Corporation never held any of the preferred interests in the Company.

6.      The shares of the subsidiaries which control the Symi and Telendos were transferred to Levona as of March 11, 2022 as the Purchase Option Consideration in connection with the BOL. Since March 11, 2022, Levona retains all rights associated with ownership of the subsidiaries of those vessels.

7.      The Status Quo Injunction shall stay in effect until the later of the final court judgment being entered on any Award or any further order of this Arbitrator.

8.      Levona, Murchinson, and Pach Shemen, are each alter egos of the other concerning every fact proven in this matter and every item of relief awarded herein. Any references to Levona herein are therefore to all the alter-egos and for the avoidance of doubt, any judgments against Levona are also against each alter-ego.

9.      Levona breached its LLCA and related obligations, including without limitation common law and contractual duties to Claimants and the Company, in at least the following ways:

i.      Bribing an Eletson Corporation employee, and Company representative, Peter Kanelos, and causing him to disclose the Company's confidential information;

ii.      Violating confidentiality obligations by disclosing the Company's confidential information to third parties, failing to take steps to recover such information, and then deceiving Claimants and the Company concerning said breaches after it became a member of the Company;

iii.      actively engaging in unlawful behavior by wrongfully influencing Company financiers to turn against the Company and Claimants, including without limitation by causing the arrest of five of the Company's vessels and not disclosing this misconduct to Eletson or the Company after it became a member of the Company;

iv.      Failing to acknowledge that Eletson fully complied with the terms of the BOL Purchase Option, and failing to act in good faith by remaining silent about its purported belief that the Company would or might fail to meet its BOL terms;

v.      Improperly purporting to act on behalf of the Company in its business dealings with third parties, including by attempting to sell the Company's assets to its primary competitor, Unigas, and concealing such misconduct from Claimants;

vi.      Improperly threatening Eletson and affiliated officers and directors, including by pursuing litigation against them;

vii.      Improperly purporting to seize control of the Company's board of directors post-March 11, 2022;

viii.    Improperly purporting to direct the day-to-day operations of the Company post-March 11, 2022;

ix.    Improperly purporting to assert control over the assets of the Company post March 11, 2022;

x.    Improperly purporting to call and hold meetings of the Board of the Company without following proper procedures and for unlawful and improper purposes of approving unlawful and improper conduct post March 11, 2022;

xi.    Breaching its obligations under the LLCA, including without limitation by purporting to terminate management agreements that Eletson Corporation has with the Company's subsidiaries, purporting to change management of the Company's subsidiaries, precluding Eletson Corporation from communicating with the Company's financiers, all of which Levona knew was unlawful and in breach of the LLCA; and

10.    Violating this arbitration's Status Quo Injunction by:

i.    Wrongfully declaring the Company in default of the loan from Levona and wrongfully purporting to accelerate payment of the principal;

ii.    Trying to sell vessels, including the Symi and Telendos, while the Status Quo Injunction was in effect; and

iii.    Directing and/or causing Levona's affiliates to purchase a controlling position in securities of Eletson Holdings in January 2023 for the purpose of wrongfully commencing and then actually causing the commencement of litigation

against Eletson Holdings and the filing an involuntary bankruptcy petition against Eletson Holdings.

### B. Compensatory Damages

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall pay $43,455,122.21 in compensatory damages as follows:

1.     $21,777,378.50, to be paid to Eletson Gas, as compensatory damages for the improper arrests of Eletson Gas vessels, which includes prejudgment interest at a rate of 10% from the date of the arrests (or approximate date the expenses were incurred) through January 2023;

2.     $19,677,743.71, to be paid to the Preferred Nominees, constituting the lost profits (EBITDA) due to Levona's unjust enrichment arising from available use of the Symi and Telendos since March 11, 2022, without the reciprocal transfer of the preferred interests, which includes pre-judgment interest through January 2023;

3.     $2,000,000 to be paid to Eletson Gas, as compensatory damages arising out of Levona's other breaches of contract, with prejudgment interest at 10% from the date of this Corrected Interim Award until the earlier of the payment of either this award or confirmation in a court of competent jurisdiction of this award.

4.     The entities referred to in B.1 and B.2 respectively shall also be awarded pre-judgment interest on the principal amount of the compensatory damages in paragraph B.1. above, (damages for improper arrests), and paragraph B.2. above (damages for lost profits due to Levona's unjust enrichment) at a rate of 10% running from January 30, 2023 through the earlier of either the payment of the award or confirmation of the award in a court of competent jurisdiction.

### C. **Punitive Damages**

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall

pay punitive damages in the total amount of $43,455,122.21, as follows:

1. $23,777,378.50, to be paid to Eletson Gas; and

2. $19,677,743.71 to be paid to the Preferred Nominees.

### D. **Attorney's Fees, Costs, Expenses and Additional Interest**

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall

pay:

1. Attorney's fees, costs, and expenses to Claimants incurred to date in

connection with this arbitration, the Bondholder Litigation, and the Bankruptcy pursuant

to the LLCA Section 12.14(d) and JAMS Rule 24(g), as follows:

    i. Attorneys' fees, costs, and expenses due in connection with this

arbitration in the amount of $9,590,222.99.

    ii. An additional amount of $22,366.10 representing additional JAMS

costs incurred in this arbitration since the filing of Eletson's Opening Affirmation,

and which Eletson has paid both its share and covered Respondent's share.

    iii. Attorneys' fees, costs and expenses due in connection with the

Bankruptcy and Bondholder Litigation in the amount of $3,007,266.20;

2. Additional pre-judgment interest on the compensatory damages as

awarded in the Corrected Interim Award through August 31, 2023, in the amount of

$2,496,081.88, to be paid as follows:

    i. To Eletson Gas: $1,319,163.14.

    ii. To the Preferred Nominees: $1,176,918.74.

3.    Additional prejudgment interest on compensatory damages running from August 31, 2023 until the earlier of the date of payment of the amount due or the date of confirmation of this Final Award by a court of competent jurisdiction calculated by using the formula set forth above in this Final Award; and

4.    Additional prejudgment interest on any fees, costs and expenses that have been awarded in this Final Award running from the date of this Final Award until the earlier of the date of payment of the amounts due or the date of confirmation of this Final Award by a court of competent jurisdiction calculated by using the formula set forth above in this Final Award.

The foregoing constitutes the Final Award in this arbitration.

Any other relief requested is hereby denied.

Dated: New York, NY
          September 29, 2023

_AEBelen_
Hon. Ariel E. Belen (Ret.)
JAMS Arbitrator

**Affirmation**

State of New York        )

                          :ss:

County of New York   )


I, Hon. Ariel E. Belen (Ret.), do hereby affirm upon my oath as arbitrator that I am the individual described in and who executed this instrument, which is my Final Award in this arbitration.


Dated: New York, New York
       September 29, 2023

     *AE Bele*

Hon. Ariel E. Belen (Ret.)
JAMS Arbitrator

**Exhibit 4**

**<u>District Court Order</u>**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

ELETSON HOLDINGS, INC. and ELETSON
CORPORATION,

                      Petitioners,

          -v-

LEVONA HOLDINGS LTD.,

                    Respondent.

--------------------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _02/09/2024__

23-cv-7331 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

       Petitioners Eletson Holdings Inc. ("Holdings") and Eletson Corporation ("Corp" and,
together with Holdings, "Eletson" or "Petitioners"), apply for an Order confirming a final
arbitration award (the "Award") issued by the Honorable Ariel Belen of the Judicial Arbitration
and Mediation Services, Inc. ("JAMS") on September 29, 2023. Dkt. No. 62. Respondent and
Cross-Petitioner Levona Holdings, Ltd. ("Levona" or "Respondent"), moves: (1) for an Order,
pursuant to Federal Rule of Civil Procedure 12(b)(1), dismissing the petition to confirm the
Award; (2) for an Order, pursuant to 9 U.S.C. § 10, vacating the corrected interim award dated
August 15, 2023 (the "Corrected Interim Award") and the Award; and (3) for an Order, pursuant
to 9 U.S.C. § 9, 9 U.S.C. § 207, and/or Article V of the New York Convention, denying the
petition to confirm the Award. Dkt. No. 49.

## BACKGROUND

       The following facts are drawn from the Amended and Supplemental Petition to
Recognize and Enforce the Arbitral Award ("Amended Petition"), Dkt. No. 62, the Award, Dkt.

No. 67-58, and the parties' statements of material fact pursuant to Federal Rule of Civil

Procedure 56.1, Dkt. Nos. 65, 66. The facts are undisputed except as otherwise stated.

## I.     The Relevant Parties

This dispute relates to corporate control over non-party Eletson Gas LLC ("Eletson Gas"

or the "Company"). Eletson Gas, formed in 2013 under the laws of the Republic of the Marshall

Islands, is a limited liability company that specializes in liquified petroleum gas ("LPG")

shipping. Dkt. No. 67-58 at 5; Dkt. No. 62 ¶ 2. The present dispute centers on whether

Respondent Levona violated its agreements with and obligations to Petitioners Holdings and

Corp, a question which turns in part on whether an option to purchase the preferred shares of

Eletson Gas was effectively exercised by Holdings.

Eletson—both Petitioners Holdings and Corp—is an international shipping group owned

by three principal families: the families of non-parties Laskarina Karastamati, Vassilis

Kertsikoff, and Vasilis Hadjieleftheriadis. Dkt. No. 67-58 at 5. Both Holdings, the parent

company, as well as its subsidiary, Corp, are corporations formed under the laws of Liberia.

Dkt. No. 62 ¶ 2. Holdings owns the common shares of the Company. *Id.* Corp provides

management services for vessels owned directly or indirectly by Eletson Gas in exchange for a

management fee.

Respondent Levona is a special purpose entity formed under the laws of the British

Virgin Islands on October 20, 2021. *Id.* ¶ 3. Levona is a subsidiary of two hedge funds, Nomis

Bay and BPY, that have both engaged the same alternative management company Murchinson

Ltd. ("Murchinson") to act as their investment sub-advisor. *Id.*; Dkt. No. 50 at 7 n.2.

## II.    The Joint Venture

As noted, this case arises from a dispute over the ownership of the preferred shares in the

Company, and thereby the control over the Company's decision making and assets. The

2

Company has historically owned a large fleet of medium and long-range product tankers and has been a leader in the transportation of oil products and gas cargoes. Dkt. No. 67-58 at 6. At the time that the events giving rise to this case occurred, the Company owned and operated fourteen LPG vessels, making its fleet the second largest on the market, second only to Unigas, the Company's primary competitor. *Id.*

The Company was formed in 2013 as a joint venture by Holdings and funds managed by Blackstone Tactical Opportunities ("Blackstone"). *Id.* at 5. At the outset of the joint venture, Holdings, which contributed equity interests in five medium-sized LPG vessels to the enterprise,[1] held (and still retains at present) the common stock in the Company, while the Blackstone funds, which contributed capital, held the preferred shares. *Id.*; Dkt. No. 67-50 ¶¶ 91–92. Over the following few years, the Company was plagued by financial problems, defaulting on several loans. Eventually, in November 2021, Blackstone sold its interest in the Company to Levona, making Levona the owner of the preferred shares previously held by Blackstone. Dkt. No. 67-58 at 7.

Several agreements are relevant to this dispute. The first is the Third Amended and Restated LLC Agreement ("LLCA"), which became effective August 16, 2019, and governs the relationship among the holders of membership interests in the Company and contains the arbitration provision that Eletson invoked in the arbitration at issue here. *Id.* at 6. The original parties to the LLCA were the Company, Holdings (the common shareholder of the Company), Corp (the manager of the fleet of the Company's ships), and Blackstone (which held the preferred shares in the Company through a number of different funds it managed, all of which

---

[1] The vessels were the Anafi, the Nisyros, the Symi II ("Symi"), the Telendos II ("Telendos"), and the Tilos. Dkt. No. 31-1 at 84. Eletson later contributed capital to the venture as well.

were parties to the LLCA). Dkt. No. 67-2 at 1–2. When Blackstone sold its interest in the preferred shares (the "Preferred Interests") to Levona in November 2021, Levona replaced Blackstone as party to the LLCA, and signed a Joinder Agreement to that effect, agreeing to be fully bound by and subject to the provisions of the LLCA. *See* Dkt. No. 67-4.

The LLCA confers on the parties certain rights and obligations. As relevant to this dispute, the LLCA gave the holder of the Preferred Interests the power to designate three of five members of the Company's Board of Directors. Dkt. No. 67-2 § 3.3. Because the Board of Directors had "the sole right to manage and control the business, operations and affairs of the Company and to do any and all acts on behalf of the Company that are necessary, advisable or convenient to the discharge of its duties," *id.* § 3.1, the LLCA affords the holder of the Preferred Interests managerial control over the Company. Even so, ownership of the Preferred Interests did not guarantee total control over the Company; the LLCA requires the approval of four Directors—one more Director than the holder of the Preferred Interests has the power to select— to undertake any "Fundamental Action," including the acquisition or disposition of any vessels or any assets worth more than $1,000,000. *Id.* § 3.2; *id.* Schedule VI. The LLCA also gives the holder of the Preferred Interests the right to the vast majority of the profits of the Company. When Levona purchased the preferred stock from Blackstone in November 2021, it inherited these rights.

The LLCA also contained a mandatory arbitration provision. Section 12.14(a) provides as follows:

> Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (including the determination of the scope or applicability of this agreement to arbitrate) shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator. The arbitrator shall be selected by agreement of the parties. If the parties are unable to agree on an

arbitrator within 15 days after the demand for arbitration is made, JAMS shall
designated the arbitrator.  The arbitration shall be administered by JAMS pursuant
to its Comprehensive Arbitration Rules and Procedures.  The Federal Arbitration
Act shall govern the interpretation and enforcement of such arbitration proceeding.
The arbitrator shall apply the Law of the State of Delaware and the Republic of the
Marshall Islands, as the case may be, in accordance with Section 12.13.[2]

Dkt. No. 67-2 § 12.14(a).  Arbitration was designated as the "exclusive and binding method" for

resolving any such dispute.  *Id.* § 12.14(b).  But the Company's financial problems continued

despite the LLCA and the Company's new management.  By early 2022, five of the Company's

ships—over a third of its fleet—had been arrested by various creditors for non-payment of the

Company's liabilities.  Dkt. No. 67-58 at 54.  Multiple arrested ships were scheduled to be sold

at auction to compensate creditors.

Three days before the auction was set to proceed, however, Holdings, Corp, the

Company, and a wholly-owned subsidiary of the Company, entered into the second agreement

with Levona that is relevant to this dispute—the Binding Offer Letter ("BOL")—on February 22,

2022, which, through a desperately-needed infusion of cash in the form of a loan from Levona,

enabled the Company to avoid losing most of its fleet.  Dkt. No. 67-10.  Pursuant to the BOL, the

Company agreed to transfer two of its ships to Levona, in exchange for Levona lending up to

$10,000,000 to the Company, and granting the Company a limited option to buy Levona out of

the Preferred Interests, which would have the effect of terminating Levona's ownership and

control of the Company.  *Id.*  Because it has some relevance to the dispute, the Court describes

the terms of the BOL in some detail.  The BOL sets forth the terms and conditions pursuant to

---

[2] Section 12.13 provides that "[t]o the fullest extent permitted under the laws of the Republic of
the Marshall Islands, [the LLCA] and the rights and obligations of the parties [t]hereunder shall
be governed and construed and enforced in accordance with the laws of the state of Delaware for
agreements made and to be performed wholly within that jurisdiction."  Dkt. No. 67-2 § 12.13.
To the extent that the laws of the Marshall Islands did not permit application of Delaware law,
Section 12.13 provides that the law of the Marshall Islands governs.  *Id.*

which Levona was "willing to (A) buy the shares and/or membership interests of" two of the

Company's vessels, the Symi and Telendos, "from [the Company] in consideration of advancing

a purchase option to [the Company] and Eletson Holdings . . . ; [and] (B) advance a

US$10,000,000 senior loan to [the Company] . . . ." *Id.* With respect to the purchase of the

Symi and the Telendos, the BOL states that "Levona shall buy all of the Shares in the Companies

held by [the Company] . . . in consideration of the grant to [the Company] and [Corp] of the

purchase option set out in Clause 2" of the BOL. *Id.* § 1.1.

The BOL then goes on to provide the terms and conditions of both the loan and the

option to purchase the Preferred Interests from Levona (the "Purchase Option"). Clause Four,

which addresses the loan and Assignment, provides that "[c]oncurrently with the Transfer [of the

Company's interests in the Symi and the Telendos to Levona], Levona shall enter into a loan

agreement . . . for the advance of a loan facility to [the Company] of an amount of

US$10,000,000" to be "used as mutually agreed upon between Levona and [the Company] for

various refinancing and sources and uses." *Id.* § 4.1. This loan, the BOL provided, was senior to

all liabilities of the Company "save for such secured debts of [the Company] as Levona may

agree in their sole discretion may remain senior to the loan." *Id.* And, concurrent with the

transfer of the interests in the vessels and entry into the loan agreement, the parties agreed that

Corp and the Company's subsidiary would assign any claims they had against the Company to

Levona until the full amount of the loan was paid back. *Id.* §§ 4.3, 4.4. The BOL further states

that the loan terms are to also include: (1) a maturity date of two years from the date of the first

drawdown; (2) an interest rate of 10% per annum compounded monthly; and (3) priority on any

excess cash flow. *Id.* § 4.2.

6

Clauses Two and Three of the BOL address the Purchase Option and the consideration for the Purchase Option ("Purchase Option Consideration"), respectively. Clause Two outlines the parameters under which the Company could buy out the Preferred Interests. It states that, "[s]ubject to and in consideration of the Transfer [of shares in the Symi and the Telendos] occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to [the Company] . . . the option, exercisable by written notice to Levona . . . , for either [the Company] or its nominee to purchase all of the membership interests held by Levona in [the Company] . . . for a consideration equal to the Purchase Option Consideration" detailed in Clause Three. *Id.* § 2.1. However, the BOL sets conditions upon how and when this Purchase Option could be exercised. Clause 2.2 states that the Company "shall only be entitled to serve an Option Notice after either: (a) the Loan and any Interest accrued thereon is fully repaid; or (b) adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona)." *Id.* § 2.2. Clause 2.3 limits the amount of time the relevant parties had to exercise the purchase option. "[A]n Option Notice may only be served within 30 days from the date of [the BOL] ('the Purchase Option Period')." *Id.* § 2.3. The Purchase Option Period could be extended, but only if the loan was at least partially repaid. *Id.* §§ 2.4, 2.5. Under Clause 2.3, "[i]f no Option Notice is validly served by the expiry of such Purchase Option Period, . . . the purchase option shall lapse." *Id.* § 2.3.

Clause Three of the BOL sets forth the formula and methodology for calculating the Purchase Option Consideration. The Purchase Option Consideration is stated to be an amount equal to "$1 plus an amount equal to US$23,000,000 less the Net Value," where the "Net Value" is equivalent to the value of the Symi and the Telendos as determined by an independent valuation. *Id.* §§ 3.2, 3.3. In essence, if the value of the two vessels is less than $23,000,000, the

7

Company—to exercise the option to buy out Levona's Preferred Interests—must true up the difference to Levona so that the total value of consideration paid to Levona (including the value of the vessels) equals $23,000,000. If the "Net Value" exceeds $23,000,000 (*i.e.*, if the value of the vessels is greater than $23,000,000), then the excess benefits the Company and is applied to reduce the amount outstanding on Levona's loan to the Company.

The BOL also conditioned the loan on an agreement from the Company, Corp, and Holdings that from the last date of the period during which the Purchase Option could be exercised, they would cooperate and vote in favor of any Fundamental Action proposed by Levona. *Id.* § 4.2(d).

Importantly, the BOL links the loan and the Purchase Option. The Company could only exercise the Purchase Option if Levona was repaid the loan and interest in full, or if Levona received, in its sole discretion, "adequate security and/or collateral . . . for the Loan." *Id.* § 2.2(b). If the Company repaid the loan and interest or provided such adequate security and/or collateral, it was entitled to exercise the Purchase Option and buy the Preferred Interests from Levona, subject only to truing up the value of the ships (the Symi and the Telendos) to $23,000,000. But if the Company could not repay the loan and interest or provide such adequate security, then it did not have the option of buying the Preferred Interests from Levona. In that situation, Levona, as consideration for the unexercised option, would retain the Preferred Interests and the attendant control over the Company, as well as its interests in the Symi and the Telendos.

Like the LLCA, the BOL contained a provision stipulating to the applicable law that would be used to adjudicate disputes, as well as a mandatory arbitration provision. But the law to be applied, as well as the terms of where and how any arbitration would occur, were different

8

from those set forth in the LLCA. Arbitration to resolve disputes arising from the BOL was to proceed as follows:

> This Letter and the negotiations between the parties in connection with the contents hereof, including but not limited to the proposed purchase of the Shares, grant of the Purchase Option and advance of the Loan and any disputes and claims arising out of or in connection with them and their formation (including non-contractual claims and disputes), shall be governed by and construed in accordance with English law and shall finally be resolved by arbitration in accordance with the rules of arbitration of the London International Centre for Arbitration applicable at the time of conclusion of this letter (the "Rules") by one arbitrator to be appointed in accordance with the Rules. The seat of the arbitration shall be London, United Kingdom. The language to be used in the arbitral proceedings shall be the English language.

*Id.* § 10. The mandatory arbitration provision in the BOL did not supersede the mandatory arbitration provision in the LLCA.

In short, the BOL provided that Levona would be provided $23,000,000 (partially in the form of the two ships), in exchange for a loan of $10,000,000 and, if that loan and any interest accrued on it was repaid, or if adequate security or collateral was provided to Levona, the Company could exercise an option to buy out Levona's stake in the Company by acquiring the Preferred Interests.

On March 11, 2022, Levona and the Company executed a series of contracts to give effect to the terms outlined in the BOL (the "Transaction Documents"). Pursuant to the agreement contemplated in the BOL to transfer two Company vessels to Levona, the parties executed the Share Transfer Agreement ("STA"). Dkt. No. 67-12. The STA provided that the Company would sell its interests in the Symi and the Telendos vessels and that "[t]he consideration for the sale and purchase of the Shares [in the vessels] shall be as set out in the [BOL]." *Id.* § 3.1. It contained an integration clause providing that the STA "together with the [BOL] constitutes the entire agreement between the Parties regarding the sale and purchase of the Shares [in the vessels] and related matters." *Id.* § 7.1.

9

The same day, the parties also executed several other agreements to effectuate the terms contemplated by the BOL. The parties entered into an Intra-Group Loan Agreement, pursuant to which Levona provided to the Company a loan facility of up to $10,000,000 for a term of up to two years. Dkt. No. 67-58 at 8. The parties agreed, through a Fundamental Action Letter, that while the loan was outstanding, Eletson would "[c]o-operate with any Fundamental Action . . . proposed by Levona." Dkt. No. 55-4 at 15. Before the parties entered into the Fundamental Action Letter, "Fundamental Actions" as defined in the LLCA—including the Company's acquisition and disposition of vessels and other assets worth more than $1,000,000— were the only acts over which Levona could not already exercise complete control as the holder of the Preferred Interests. By providing that Eletson would cooperate with "Fundamental Actions" that Levona wanted to take, the Fundamental Action Letter transferred virtually unfettered control over the Company's affairs to Levona. The parties also entered into an Assignment of Claims agreement, as contemplated by the BOL, pursuant to which Corp assigned to Levona all of its claims against the Company and any of its vessels. Dkt. No. 67-58 at 9. Relatedly, the parties entered into a Deed of Waiver and Release, pursuant to which specified outstanding claims against the Symi and Telendos were released by certain Eletson entities.

On the same day that the parties executed the Transaction Documents, March 11, 2022, the Board of Directors of the Company unanimously approved the STA, the Loan Agreement, and the Fundamental Action Letter in a written memorandum ("Written Consent"). Dkt. No. 67-13. The Written Consent summarized the terms of the BOL with respect to the sale of two of the Company's vessels to Levona "in consideration of the grant of a purchase option to the Company over the shares held by Levona in the Company," and with respect to the "fixed term unsecured loan facility advanced by Levona to the Company of []$10,000,000." *Id.* The Written Consent

10

ratified the BOL and all of the ancillary contracts, and authorized the Eletson Directors on the

board to sign, execute, and deliver the STA and the Loan Agreement on behalf of the Company.

*Id.* at 2.

      After signing the Transaction Documents, the Company and Levona continued to work in

concert to navigate the Company's financial challenges.  Dkt. No. 67-48 at 38.  A March 9, 2022

cash forecast prepared by the CFO of Corp, Peter Kanelos, projected that the Company would be

out of cash by April 7, 2022, and again by April 12, 2022.  *Id.*  In light of this projection, the

parties amended the loan to increase the amount available to the Company to $14,000,000.  Dkt.

No. 67-58 at 9.

      The parties dispute the effect of these agreements and specifically whether they constitute

an exercise of the Purchase Option, and thus whether the Company bought out Levona's

Preferred Interests in the Company.  Holdings and Corp contended in the arbitral proceedings

that these contracts satisfied the Purchase Option and effectuated the Company's purchase of the

Preferred Interest from Levona, and thus nullified Levona's membership interest in the

Company.  Dkt. No. 67-24 at 13–14.  Accordingly, Petitioners argued, Levona's later attempt to

sell some of the Company's assets was improper, because Levona, having allegedly sold off the

Preferred Interests, no longer had the authority to control the Company or its assets.  *Id.* at 14.  In

response, Levona contended that the transfer of the ownership shares of the vessels was

consideration for the Purchase Option, but did not itself constitute an exercise of the Purchase

Option.  Dkt. No. 67-17 at 8.  If the conditions for exercise of the Purchase Option were not

satisfied, Levona would retain the Preferred Interests *and* retain the ownership shares of the

vessels.  Pointing to the lack of a written notice to exercise the Purchase Option, and lack of

repayment of any portion of the Loan, Levona contended that the Company never exercised the

Purchase Option and thus that Levona properly retained managerial control over the Company.
*Id.*

About four months after the Transaction Documents were executed, on July 15, 2022, Levona—purporting to act on behalf of the Company—signed a non-binding Letter of Intent with Unigas (the "Unigas LOI")—the Company's primary competitor—to sell Unigas nine of the Company's twelve remaining vessels for $262,000,000. Dkt. No. 67-58 at 9. The two Eletson representatives on the Company's Board of Directors were not consulted before the Unigas LOI was signed, and were only informed of the agreement when a Levona representative sent the Unigas LOI to the Company's Board of Directors via email and directed them to accept its terms. Dkt. No. 67-24 at 16. Less than one week later, on July 21, 2022, one of the Levona representatives on the Board of Directors circulated notice for a Company Board Meeting to be held on July 26, 2022. *Id.* The Eletson representatives on the Board of Directors responded that the notice of the meeting was deficient for several reasons, such as the fact that the notice of the meeting did not specify the purpose of the meeting. *Id.* at 17. The Levona-appointed representative then circulated a new notice for a meeting of the Board of Directors of the Company to be held on July 28, 2022, and this time included a statement of the purpose of the meeting, which included certain actions to be taken in furtherance of the Unigas LOI. *Id.* After the Eletson Directors again responded that the notice was deficient and that they would not attend the meeting, the Levona directors stated that the meeting would nevertheless proceed, and ultimately held the meeting. *Id.*

## III. The Commencement of the Arbitration and Jurisdictional Issues

On July 29, 2022, Holdings and Corp submitted a statement of claims and demand for arbitration against Levona in New York pursuant to the mandatory arbitration provision of the LLCA. Dkt. No. 67-16; Dkt. No. 65 ¶ 40; Dkt. No. 66 ¶ 40. Petitioners alleged that Respondent

breached the LLCA "and its express and implied duties thereunder" by, *inter alia*, purporting to

act on behalf of the Company and in that capacity "actively trying to strip the Company of

substantially all of its assets for less . . . than fair market value and for [Respondent's] selfish and

personal gain." Dkt. No. 67-16 at 2. In particular, Petitioners alleged that Respondent granted

the Company and Corp the Purchase Option, *id.* ¶ 13, that the Company had exercised the

Purchase Option and effectuated the buy-out of the Preferred Interests, *id.,* that Respondent

accordingly had no power or authority to act on behalf of the Company, *id.*, and that

notwithstanding its absence of authority, and in violation of its duties under the LLCA,

Respondent had attempted to effect a sale of nine of the Company's twelve vessels at fire-sale

prices, *id.* ¶¶ 18–20. Eletson also included in its statement of claims its allegations that the

Eletson-appointed Directors on the Company's Board had refused to sign off on the sale of nine

of its twelve vessels, and that Respondent had improperly purported to call a meeting of the

Company's Board of Directors to circumvent the Eletson-appointed Directors. *Id.* ¶¶ 21–29.

Among other relief, Petitioners sought "[a] declaration that [Petitioners] have complied with all

obligations necessary to complete the buyout purchase option and that the option has been

executed," and injunctive relief against Respondent continuing to act on behalf of the Company.

*Id.* at 8. Petitioners also sought an award of "[c]ompensatory damages for all the harm caused to

the Company and/or Claimants by reason of Levona's misconduct," as well as punitive damages.

*Id.* at 8–9. On August 16, 2022, pursuant to the LLCA, JAMS appointed Justice Belen to act as

sole arbitrator of the dispute. Dkt. No. 62 ¶ 12.

On August 19, 2022, Levona filed its Response to the Statement of Claims and Statement

of Counterclaims. *Id.* ¶ 13; Dkt. No. 67-17. Levona contested the jurisdiction of the arbitrator

on the ground that the LLCA arbitration provision that Petitioners invoked—which provided for

arbitration in New York under the laws of the Marshall Islands and Delaware—could not control

the parties' dispute, which, Levona contended, arose from the BOL. Dkt. No. 67-17 ¶ 1. It

contended that the "crux" of the matter—the issue which underpinned all of Eletson's claims—

was whether the Company had exercised the Purchase Option as provided for in the BOL, and

thus that the dispute could only be resolved by an adjudication of the BOL in London under

English law pursuant to the BOL's arbitration provision. *Id.* ¶¶ 1, 2. Levona also asserted

counterclaims. It asserted that Eletson (both Holdings and Corp) had mismanaged the Company

and failed to take care of its needs in violation of its obligations under the LLCA, the BOL, and

the Loan Agreement. *Id.* ¶¶ 24–28. Specifically, Levona alleged that Eletson had breached the

provision of the BOL requiring it to agree to Fundamental Actions directed by Levona as long as

the loan remained outstanding. *Id.* ¶ 25. It alleged, as an example of Eletson's management

failures, that Eletson had prevented the financier responsible for the March 2022 refinancing of

selected LPG vessels from placing a mortgage on five of the vessels as desired, resulting in an

increase in the interest margin rate and higher interest payments. *Id.* ¶ 28. It also alleged that

Eletson had interfered with Levona's sale of the Symi and Telendos vessels, which Levona had

acquired pursuant to the STA. *Id.* ¶¶ 29–34. And finally, Levona alleged that, as the sole holder

of the Preferred Interests and pursuant to the LLCA and the Fundamental Action Letter, it had

the right to sign the Unigas LOI and that Eletson had interfered with Levona's efforts to make

the sale on behalf of the Company. *Id.* ¶¶ 35–41. Levona sought an order requiring Eletson

agents to vacate the Symi and Telendos, declaratory judgment that the Purchase Option was not

exercised, declaratory judgment that it retained the Preferred Interests, declaratory judgment that

it was authorized to execute the Unigas LOI, and "[c]ompensatory damages for all the harm

14

caused and continuing to be caused to the Company and Levona by way of [Petitioners']

mismanagement, breach of contracts, and tortious behavior." Dkt. No. 67-17 ¶ 48.

On September 12, 2022, Levona moved to strike Eletson's claims, asserting that the

claims were not within the jurisdiction of JAMS as it had in its initial response. Dkt. No. 67-18

at 3. On September 30, 2022, Justice Belen issued an order denying Levona's motion, holding

that "the arbitration provision in the [LLCA] is broad, encompasses the claims asserted, and the

parties agree that this arbitration provision was not replaced or superseded by the arbitration

[provision] in the Transaction Documents." *Id.* at 12. Justice Belen also found that Levona had

waived its jurisdictional challenges when it availed itself of the JAMS forum by filing

counterclaims. *Id.*

On October 10, 2022, Justice Belen issued a temporary restraining order ("TRO")

providing that, during its pendency, "the parties hereto shall maintain the status quo and shall

not, among other things: (1) engage in the transfer or sale of any assets of [the

Company] . . . absent the joint written consent of the parties"; or "(2) notice or conduct of any

board meetings for the purposes of proposing or considering transfer or sale of any assets of the

Company." Dkt. No. 67-58 at 13–14.[3] On November 7, 2022, Justice Belen issued an order

rejecting Levona's argument that the TRO did not apply to "the sale of the Symi and Telendos"

because those vessels were no longer assets of the Company, having been transferred to Levona

pursuant to the STA. The arbitrator held that "[a]ny attempt to sell or otherwise transfer the

Symi and Telendos vessels will be deemed to be in violation of the TRO." *Id.* at 14.

---

[3] The LLCA empowers the arbitrator to grant injunctive relief. It states, in relevant part, that
"[t]he parties agree that the arbitrator shall have authority to grant injunctive or other forms of
equitable relief (including, without limitation, a temporary restraining order or preliminary
injunction) to any party . . . to preserve such party's rights pending a final resolution on the
merits." Dkt. No. 67-2 § 12.14(c).

15

On October 25, 2022, Eletson moved for a preliminary injunction, extending the TRO

through the conclusion of the arbitration proceedings. Dkt. No. 31-20. In its application, it

complained that Levona was attempting to sell the Symi and Telendos and to continue its efforts

to sell the nine vessels to Unigas. *Id.* Levona cross-moved for injunctive relief, seeking an order

requiring Eletson to comply with any directive provided to Eletson by Levona related to the

Symi and Telendos and to cooperate in due diligence with respect to the sale of the nine vessels

to Unigas. On January 12, 2023, the arbitrator issued a decision on the parties' cross-motions for

preliminary injunctions and entered a preliminary injunction ("Status Quo Injunction") extending

the TRO's prohibition on actions altering the status quo until further notice. Dkt. No. 67-58 at

14. The preliminary injunction stated that:

> The parties hereto shall maintain the status quo and shall not, among other things:
> (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any
> assets of [the Company] . . . or assets in dispute in this arbitration, absent the joint
> written consent of the parties, which shall be sent to the undersigned Arbitrator, or
> (2) notice or conduct of any board meeting for the purpose of proposing or
> considering the transfer or sale of any assets of the Company or other assets in
> dispute in this arbitration.

*Id.*

On December 31, 2022, Eletson filed a Third Amended Statement of Claims and

Response to Counterclaims. Dkt. No. 67-24. In its claims, Eletson sought a determination that

Levona *never* had any lawful interests in the Company, that the assignment of the two entities

owning Company vessels to Levona was procured by coercion, fraud, illegal, and other

wrongdoing and is null and void, and that Levona not be considered an interest holder of the

Company, or, in the alternative, specific performance of the Company's buy-out of Levona's

Preferred Interests. *Id.* at 4. Eletson also sought compensatory and punitive damages and

attorneys' fees. *Id.*; *see also id.* at 22–24. In particular, Eletson sought "compensatory damages

16

for all the harm caused to the Company and/or Claimants by reason of Levona's misconduct."

*Id.* at 22.[4]

## IV.    The Debt Holder Litigation, Holdings' Bankruptcy and Related Arbitration Developments

On or about January 4, 2023, an affiliate under common ownership with Levona—Pach Shemen—purchased $183,851,546 in bonds of Holdings for $2,000,000, with an agreement that it would pay an additional $500,000 if the arbitration ended to Levona's satisfaction such that it was able to exercise its rights as holder of the Preferred Interests to sell the Company or its vessels.  Dkt. No. 67-58 at 60.  Thereafter, on January 11, 2023, Pach Shemen instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on the bonds.  *Id.*  Accordingly, that same day, a complaint was filed in this District by Wilmington Savings Fund Society, FSB against Holdings and two related entities (the "Bondholder Litigation"), alleging that the defendants had failed to make required quarterly interest payments on April 15, 2019 and each quarter thereafter, and had failed to repay principal and accrued interest on the maturity date of the bonds in violation of the terms of the notes and the indenture.  *Wilmington Sav. Fund Soc'y, FSB v. Eletson Holdings Inc.*, CM-ECF No. 23-cv-261, Dkt. No. 1.  On February 2, 2023, and again on March 8, 2023, the court in that case granted letter motions for an extension of time to answer.  *Id.* Dkt. Nos. 18, 23.  The case has since been stayed.  *Id.* Dkt. No. 23.

On March 7, 2023, while the arbitration was pending and after the Bondholder Litigation had been filed, Pach Shemen and two other creditors of Holdings filed involuntary petitions for relief under Section 303 of Title 11 of the Bankruptcy Code, commencing involuntary Chapter 7

---

[4] On January 27, 2023, Respondent filed a Second Amended Statement of Counterclaims.  Dkt. No. 67-25.

proceedings against Holdings and two of its affiliates in the Bankruptcy Court for the Southern

District of New York. Dkt. No. 67-30. Levona notified the arbitrator of the bankruptcy

proceedings that same day. *Id.* On March 8, Eletson submitted its own letter to the arbitrator,

asserting that the automatic stay generated as a result of the involuntary petition against Holdings

did not stay any of Eletson's affirmative claims or any of Levona's counterclaims against Corp,

and that Eletson intended to move the bankruptcy court to modify the automatic stay so as to

permit Levona's counterclaims against Holdings and the arbitration as a whole to move forward.

Dkt. No. 67-32. Eletson argued that the arbitration should move forward as scheduled for April

24, 2023. *Id.* It ended its letter to the arbitrator: "[w]e fully preserve all of Claimants' rights,

claims, and defenses. Levona's bad-faith bankruptcy filing, like its other bad-faith tactics, is

causing Claimants serious harm." *Id.* On March 10, 2023, Eletson sent a second letter to the

arbitrator in response to a suggestion by Levona that the arbitration and certain of Levona's

deadlines in connection with the arbitration be delayed. Dkt. No. 67-33. Eletson accused

Levona's affiliate, Pach Shemen, of procuring the involuntary bankruptcy to disrupt the

arbitration and of making false statements to the arbitrator. *Id.* It noted that Levona's affiliate

was the largest petitioning creditor in the bankruptcy proceeding, that Levona's designees on the

Company's Board had signed the involuntary petition, and that Pach Shemen had acknowledged

in the bankruptcy petition that one of its affiliates owned the balance of the equity interests in the

Company and was engaged in mandatory arbitration concerning the ownership of the equity

interests in the Company. *Id.* Eletson also asserted that Pach Shemen's purchase of the

Holdings bonds constituted a violation of the arbitrator's Status Quo Injunction. Referring to a

dispute the parties had with respect to documents, it stated: "Your Honor should insist on timely

production of documents and expert reports. If Levona does not honor Your Honor's orders,

Claimants reserve the right to seek the most severe sanctions." *Id.* at 1. The same day, the

arbitrator stayed the arbitration pending further order of the Bankruptcy Court. Dkt. No. 67-34.

In his order, the arbitrator stated: "[Petitioners] argue . . . [that] the filing of the involuntary

petition is *arguably* a violation of the status quo injunctive order." *Id.* at 2 (emphasis added).

On April 11, 2023, the petitioning creditors and the debtors in the bankruptcy case

submitted a stipulation, which was signed by the Bankruptcy Court on April 17, 2023, permitting

the existing claims then pending in the Arbitration to proceed (the "Lift Stay Order"). Dkt. No.

67-35. The relevant provisions are in paragraphs 3 and 4 of the Lift Stay Order:

> 3. The automatic stay under section 362(a) of the Bankruptcy Code is hereby
> modified with respect to the Arbitration solely to the extent necessary and for the
> sole purpose of permitting a trial, any related pre-trial proceedings (including any
> remaining discovery), any related post-trial proceedings or briefing, and a final
> determination or award to be made by the Arbitrator, including any appeals, with
> respect to the claims currently pending in the Arbitration . . . . The Arbitration
> Parties are authorized to provide a copy of this Stipulation and Order to the
> Arbitrator.
>
> 4. Any Arbitration Award, whether in favor of any Arbitration Party, shall be stayed
> pending further order of the Bankruptcy Court on a motion noticed following the
> issuance of the Arbitration Award. For avoidance of doubt, no Arbitration Party
> shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise
> use any such Arbitration Award or any asset or property related thereto absent a
> further order of this Court.

*Id.* at 3–4. The Lift Stay Order recited that the parties to the arbitration were Holdings, Corp,

and Levona and defined them as the "Arbitration Parties." *Id.* at 2.

On April 25, 2023, Eletson submitted to the arbitrator what it styled a "Supplemental

Notice of Additional Levona Status Quo Injunction Violations." Dkt. No. 67-36. Eletson

challenged (1) the filing in this court of the Bondholder Litigation, a claim for breach of contract

by the trustee of notes issued by Holdings and two non-party affiliates due to the nonpayment of

interest and principal and certain indemnified losses as a bad-faith filing "directed" by the

"Levona Parties"; (2) the service of a Notice by that trustee, Wilmington Savings Fund Society,

FSB, terminating a "Restructuring Support Agreement" among the consenting noteholders; and

(3) the filing by Pach Shemen and the two other creditors of the involuntary bankruptcy petitions

against Holdings and its two non-party affiliates. *Id.* Eletson claimed that the Bondholder

Litigation and the related purported termination of the Restructuring Support Agreement, as well

as the involuntary bankruptcy petition initiated by Pach Shemen, violated the Status Quo

Injunction and caused damages to Eletson generally and the Company specifically. *Id.* at 8–10.

Eletson further accused Levona of misleading the arbitrator when it filed a letter to the arbitrator

asserting that the arbitration was automatically stayed due to the bankruptcy petition, and that

Levona had misled the arbitrator by stating in the letter that "Levona is not responsible for the

bankruptcy nor does it own or control any party who filed the involuntary petition." *Id.* at 10.

Eletson submitted evidence that Pach Shemen's owners were identical to Levona's owners and

that Pach Shemen held itself out as "Levona II," as well as other evidence suggesting a close

relationship between the entities. *Id.* at 12. Eletson stated that it intended "to include these

violations and seek appropriate relief concerning them in the upcoming pre-hearing submissions

and to adduce proof concerning them at the upcoming hearing, seeking such other and further

relief as the Arbitrator deems fitting." *Id.* at 2. In the last numbered paragraph of the

submission, Eletson took issue with the claim in the bankruptcy proceeding that the Preferred

Interests were part of the bankruptcy estate. *Id.* at 16–17 ¶ 47. Eletson stated that:

> [A]s Levona knows, the preferred interests at issue here were, under the BOL, to
> be transferred to Gas or to a nominee, and, as Levona knows, the preferred interest
> was transferred at the time of the BOL and the subsequent March 2022 transactions
> to such nominees. Part of the relief Claimants seek here is confirmation that Levona
> has no interest in that preferred and that the nominees from Gas do.

*Id.* This statement was the first time that Eletson asserted in the arbitration that the Preferred

Interests were transferred to a nominee. Previously, in an October 25, 2022 affidavit submitted

in the arbitration, Eletson claimed that Eletson had exercised the Purchase Option and was the

sole unit holder of the Company.  Dkt. No. 67-20 ¶¶ 2, 9.  Eletson made the same claim in

memoranda of law submitted to the arbitrator on October 25, 2022, November 8, 2022, and

November 18, 2022.  Dkt. No. 67-21 at 10; Dkt. No. 67-22 at 6; Dkt. No. 67-23 at 11.  But

Eletson did not, until April 2023, state that the Company had transferred the Preferred Interests

to a nominee.

Ultimately, Holdings and the other debtors agreed to convert the bankruptcy case to a

voluntary Chapter 11 case, to withdraw a motion they had previously made in the bankruptcy

case that the involuntary bankruptcy case had been filed in bad faith, and agreed not to object to

the payment of attorneys' fees to the petitioning creditors from the bankruptcy estate in an

amount up to $1,500,000.  Dkt. No. 65 ¶¶ 132–134.  On September 25, 2023, the bankruptcy

court converted the involuntary bankruptcy proceeding to a Chapter 11 voluntary bankruptcy

case.  *Id.* ¶ 135.  On November 13, 2023, the bankruptcy court approved an award of $1,500,000

in attorneys' fees that the petitioning creditors, including Pach Shemen, had incurred in filing

and prosecuting the involuntary bankruptcy case.  *Id.* ¶ 174.

## V.    The Arbitration Hearing

The arbitration hearing commenced on May 15, 2023.  Dkt. No. 67-58 at 19.  On May 3,

2023, in advance of the hearing and before the submission of the parties' Pre-Hearing Briefs, the

parties stipulated that the schedule for the hearing was "fair and reasonable and waive[d] any

objection to the schedule ordered or otherwise determined by the arbitrator."  Dkt. No. 67-39 at

4.  The parties further stipulated "that each has no challenge or objection to the arbitration on

fairness grounds or on the basis that it has not been granted enough time to prepare for or present

its case."  *Id.*  Procedural Order Number 6 identified the parties to the arbitration as those stated

in the caption (*i.e.*, Holdings, Corp, and Levona), and the claims as those set forth in the Demand

for Arbitration and the Statement of Claims as well as those in Levona's Response to the Statement of Claims and Counterclaims. *Id.* at 1, 4.

In its Pre-Hearing Brief submitted on May 5, 2023, Eletson asserted that the Preferred Interests were not bought out by the Company but were transferred to nominees chosen by Eletson in March 2022. Dkt. No. 67-38. It stated: "[t]he preferred interests in this arbitration, from their issuance up until the execution of the BOL and even thereafter, were never owned or controlled, directly or indirectly" by Eletson, the Company or "any other entity directly or indirectly affiliated with any of those entities," *id.* ¶ 100, but that "[f]rom January 2022, at the latest," the owners of Eletson had determined to nominate three Cypriot entities (the "Nominees")—each related to the three families who own Eletson—to hold the Preferred Interests, *id.* ¶ 103. Eletson asked that the arbitrator confirm that the Nominees held the Preferred Interests in the Company. *Id.* ¶ 208(ii). Eletson also made a claim for "rescissory damages relating to the transfer of the Symi and Telendos to Levona, including that the proceeds of any sale of the Symi and Telendos and revenue related thereto paid to Claimants/the Company." *Id.* ¶ 50. Further, Eletson sought "punitive and other damages" for Levona's conduct that it alleged violated the Status Quo Injunction. *Id.* ¶ 51.

On May 10, 2023, Levona moved to strike Eletson's allegations that the Preferred Interests had been transferred to the Nominees, or in the alternative to dismiss Eletson's claims in chief. Dkt. No. 67-40. Levona argued that Eletson had improperly alleged that the Preferred Interests had been transferred to the Nominees for the first time on the eve of the hearing, with only specious evidence in support of the allegations, and in complete contradiction of Eletson's

prior assertions about the holders of the Preferred Interests.[5]  *Id.*  Levona suggested that Eletson

had contrived the allegation that the Preferred Interests had been transferred to the Nominees to

ensure that the Preferred Interests were not considered part of the bankruptcy estate in the

bankruptcy litigation and thereby "avoid the consequences of a negative decision in the

Bankruptcy Court." *Id.* at 4.  Put differently, on Levona's account, Eletson only suggested that

the Preferred Interests had been transferred to the Nominees at such a late stage because Eletson

did not have an incentive to make such an assertion until after the bankruptcy proceeding against

Holdings had been initiated.  *Id.*  Prior to the initiation of the bankruptcy proceeding, Holdings

could retain the Preferred Interests by winning the arbitration; after the initiation of the

bankruptcy proceedings, however, any arbitral award to Holdings would become an asset of the

bankruptcy estate, such that if the Preferred Interests were included in the arbitral award, the

Preferred Interests would be distributed to Holdings's creditors.  *Id.*  If the Preferred Interests

had been transferred to the Nominees, however, they would remain remote to the creditors in the

bankruptcy proceeding.  Levona also argued that, if the Cypriot entities were the Nominees, they

would be the real parties in interest and would be required to be made parties to the arbitration

and that Eletson would not have standing.  The arbitrator did not rule on Levona's motion until

after the hearing.  Dkt. No. 67-58 at 30.

During the eight-day hearing beginning on May 15, 2023, Eletson and Levona presented

the testimony of their representatives, expert witnesses, and others.  *Id.* ¶ 20.  In his opening

statement at the arbitration, counsel for Petitioners stated that he wished to address "how we

might structure relief here so that it's effective so that we don't wind up going through all this

---

[5] Levona specifically argued that it would be prejudicial to allow Eletson to introduce documents
regarding the transfer without allowing Levona any discovery.  Dkt. No. 67-40 at 5.

and your Honor will come to toil and struggle to come to a decision and then Levona and its affiliates will render it nugatory" and sought to prevent Levona from arguing that "even if [Petitioners] win in this proceeding, [the recovery] goes back into Holdings" because "the bankruptcy allows them to take it." Dkt. No. 67-42 at 4–5, 6.

The arbitration hearing continued on May 16, 18, 19, 22, 23, and 24, and the arbitrator heard closing arguments on June 13, 2023, at which point he deemed the record closed. Dkt. No. 65 ¶ 118; Dkt. No. 66 ¶ 118. At the hearing, representatives of the Nominees submitted written testimony in which they stated that Eletson had told Levona that it intended the Preferred Interests to go to the Nominees of the Company and that "[a]ny conclusion by the Tribunal in this Arbitration" would "bind" them. Dkt. No. 67-41 at ¶¶ 101, 103; Dkt. No. 67-43 ¶¶ 194, 196; Dkt. No. 67-45 ¶ 104. At the conclusion of the hearing, the parties consented to a fifteen-day extension of the thirty-day deadline under the JAMS Rules for issuance of an award. Dkt. No. 62 ¶ 21.

In early June 2023, both sides submitted to the arbitrator their post-hearing briefs, Dkt. No. 67-48; Dkt. No. 67-50; and their proposed arbitral award orders, Dkt. No. 67-47; Dkt. No. 67-49. In their proposed order, Petitioners requested an award of damages solely and directly to the Nominees and to the Company—non-parties to the arbitration—with no damages paid directly to either Petitioner. Dkt. No. 67-47. On July 11, 2023, while awaiting the arbitrator's decision, Levona applied to the arbitrator to order Eletson to produce what Levona claimed was material new information that had been produced by Holdings in the bankruptcy proceedings. Construing the request as one to reopen the hearing, the arbitrator denied that request as both procedurally and substantively flawed on July 18, 2023. Dkt. No. 67-52.

24

## VI.    The Interim Ruling and Final Award

On July 28, 2022, Justice Belen issued an "interim" ruling and award ("Interim Award") in Eletson's favor, and on August 15, 2023, Justice Belen issued the Corrected Interim Award. Dkt. No. 67-55.  On September 29, 2023, Justice Belen issued a Final Award.  Dkt. No. 67-58. The Interim Award and Corrected Interim Award resolved all issues submitted for decision in the arbitration, except those relating to the parties' requests for attorneys' fees, costs, expenses and pre-judgment interest.  Dkt. No. 62 ¶ 23.[6]  The Final Award adopted, incorporated, and republished the Corrected Interim Award in its entirety and integrated the arbitrator's subsequent determinations regarding the parties' requests for attorneys' fees, costs, expenses and interest. *Id.* ¶ 28.

The arbitrator grouped Eletson's claims that Levona breached the LLCA and the implied covenant of good faith and fair dealing into four categories: (1) claims that Murchinson engaged in deceitful and wrongful conducted that voided *ab initio* Levona's acquisition of Blackstone's Preferred Interests by bribing Corp's Chief Financial Officer to induce him to disclose confidential Company information, and by communicating directly with Company financiers and lenders, thus engaging in "industrial sabotage" prior to Levona's acquisition of the Preferred Interests, in violation of the NDA that Levona had entered into with Blackstone; (2) claims that Levona breached the LLCA after its acquisition of the Preferred Interests and before entering into the BOL by attempting to fire Corp as the manager of the Company's vessels and by failing

---

[6] On August 14, 2023, Justice Belen issued a ruling rejecting Levona's argument that the Interim Award was not an award subject to JAMS Rule 24, which governs finality, but granted Levona an extension under the JAMS rules to identify "any computational, typographical or other similar error in the Interim Award."  Dkt. No. 62 ¶¶ 24–25.  Justice Belen found "absolutely no merit to Respondent's argument that the Interim Award was not a final determination with respect to all the issues and arguments raised in this arbitration relating to the merits of the claims and counterclaims."  *Id.* ¶ 25.

to disclose its pre-acquisition misuse of confidential information; (3) claims that Levona and

"Levona-related entities"—Pach Shemen and Murchinson—violated the Status Quo Injunction

on numerous occasions, including by wrongfully declaring the Company in default of the loan

made by Levona to the Company, trying to sell the Symi and Telendos, directing the purchase of

a controlling position in debt securities of Holdings for the purpose of commencing litigation

against Holdings and the involuntary bankruptcy of Holdings; and (4) claims that Levona

breached the LLCA and the covenant of good faith and fair dealing by failing to transfer its

Preferred Interests in the Company in accordance with the BOL and continuing to act on behalf

of the Company in "complete bad faith" including by entering into a letter of intent with Unigas.

Dkt. No. 67-58 at 9–11.

Levona, on the other hand, sought a declaration that it remained the holder of the

Preferred Interests, and claimed that Eletson had breached the LLCA and Fundamental Action

Letter by failing to attend board meetings (thereby preventing the Company from refinancing

debt and engaging in due diligence in connection with the Unigas LOI), had tortiously interfered

with the Company's LOI with Unigas, and had engaged in conversion for denying Levona the

ability to sell the Symi and Telendos.  *Id.* at 11.

The arbitrator recognized that resolution of the majority of the claims and counterclaims

turned upon the interpretation of the Transaction Documents and whether the Company

exercised the Purchase Option to buy Levona out of the Preferred Interests.  *Id.* at 9.  If the

answer to that question was yes, then at some point Levona was no longer a member of the

Company and did not have rights under the LLCA to enter into the Unigas LOI or otherwise act

on behalf of the Company.  If the answer was no, then Levona would have remained a member

26

of the joint venture and Eletson may have violated its obligations under the LLCA by refusing to, *inter alia*, engage in due diligence relating to the Unigas LOI. *Id.*

As a preliminary matter, Justice Belen found that Murchinson and Pach Shemen were alter egos of Levona. He found that the evidence demonstrated "conclusively that although technically two separate corporate entities, Murchinson and Levona are not distinct for any purposes relevant to these proceedings," and that while Levona, which was a shell entity, might "be the named party, Murchinson is the real party in interest." *Id.* at 21. He thus concluded that "any ruling . . . in this arbitration extends to Murchinson. Any award in favor of Levona is really in favor of Murchinson, and similarly, any award finding liability and damages against Levona, is owed by Murchinson." *Id.* He reached the same conclusion as to Pach Shemen, which he found had the identical ownership of Levona and was "seemingly created for the sole purpose of purchasing a controlling interest in the outstanding bond debt of Holdings so that three weeks later, it could direct the involuntary bankruptcy filing against Holdings." *Id.*

The arbitrator also denied Levona's motion to strike Eletson's claims that the Purchase Option had been exercised and that the Preferred Interests had been transferred to the Nominees, or alternatively to dismiss the claims. *Id.* at 30. He acknowledged that the lack of earlier written notice to Levona of the contingent transfer of the Preferred Interests to the Nominees had initially "raised concern," but concluded that there was no "bad faith or misconduct" in the failure to give notice as "the Eletson witnesses viewed the Company as a family company," "representatives from each of the Preferred Nominees . . . testified that they are bound by any award in th[e] arbitration," and that "Levona was not prejudiced by the later reference to the

Preferred Nominees." *Id.* at 30–31.[7]  The arbitrator noted that "Eletson witnesses testified that

from the outset of the time that the parties began discussing the buyout of Levona's interests,

Eletson intended the preferred units to go to nominees of the Company, and that it told Levona of

this intention." *Id.* at 27.  The arbitrator stated that Eletson's explanation for why the transfer to

the Nominees was not mentioned earlier in the proceedings was credible: "It was only after the

Levona-related entities including . . . Pach Shemen made clear in the Holdings bankruptcy that

they would attempt to use the bankruptcy proceedings as an end-run around against any adverse

award in this arbitration by claiming that the preferred shares were part of the bankruptcy estate

of Holdings, that Eletson felt compelled to set the record straight and make clear

that . . . Holdings was never intended to directly or indirectly, as owner of the common shares of

the Company, own the preferred shares." *Id.* at 31.

Justice Belen next concluded that the Company properly exercised the Purchase Option

for the Preferred Interests because it had paid Levona the Purchase Option Consideration and had

provided adequate security and/or collateral for the Loan.[8]  *Id.* at 34–42.  He concluded that the

Company paid Levona the Purchase Option Consideration when, pursuant to the Share Transfer

Agreement, on March 11, 2022, it transferred the ownership shares of the Symi and Telendos to

Levona.  *Id.*  Levona had argued that the transfer of vessels was the consideration for the

Purchase Option itself, rather than the Purchase Option Consideration payable upon the exercise

of Purchase Option.  Justice Belen rejected that argument.  *Id.*  He reasoned that because Section

2.1 of the BOL provided that "consideration equal to the Purchase Option Consideration" would

---

[7] The arbitrator noted that "Levona never sought additional discovery nor requested depositions on the issue of the nominees before or during the arbitration hearing" and "did not conduct any meaningful cross-examination of the three Eletson witnesses who testified about the contingent transfer to the Preferred Nominees or present any contradicting evidence." *Id.* at 31–32.

[8] It was not disputed that the loan remained outstanding and had not been fully repaid. *Id.* at 34.

be paid "on completion of the transfer of the Membership Interests," the BOL contemplated that the Purchase Option Consideration would be paid in exchange for the Preferred Interests and not in exchange for the *option* to purchase the Preferred Interests. *Id.* In his view, that conclusion was consistent with the terms of the LLCA, which prohibits Members (including Levona as the holder of the Preferred Interests) from acquiring or owning any vessels such as the Symi and Telendos. *Id.* at 35. It was only if the Purchase Option was exercised and Levona was no longer a member of the Company that Levona could, consistent with the LLCA, acquire the two vessels.[9] Justice Belen further concluded that the transfer of the Symi and Telendos was adequate consideration because the Net Value of those ships was in excess of $23,000,000, and thus more than the Purchase Option Consideration amount contemplated in the BOL of $23,000,000 less the value of the two ships. *Id.* at 37.

Justice Belen also found that Eletson satisfied the additional conditions for exercising the Purchase Option. Although it was undisputed that Eletson had not repaid the loan to Levona, the arbitrator found that the Company had met the alternative basis outlined in the BOL for exercising the Purchase Option by providing "adequate security and/or collateral." *Id.* at 38–42. He rejected Levona's argument that the Purchase Option could not be exercised without Levona's determination that it had been afforded adequate security or collateral for the Loan, reading the relevant section of the BOL to provide only that the adequacy of the security, not the adequacy of the collateral, would be at Levona's sole discretion. Dkt. No. 67-58 at 39. Justice Belen read the word "adequate" to modify only "security" and not collateral. *Id.* And he concluded that Eletson had provided adequate collateral by assigning Corp's claims against the

---

[9] The arbitrator also pointed to parol evidence that the parties contemplated that the consideration to be paid to Levona for its interests in the Company was $23,000,000. *Id.* at 36–37.

29

Company to Levona, despite the fact that the BOL, independent of any collateral, required Eletson to transfer Corp's claims against the Company until the loan was paid off in full and that, in any event, Levona's rights under the loan were senior to the claims by Corp. *Id.* at 38. Justice Belen rejected Levona's contention that it required the assignment of claims not as collateral for the Loan, but as a separate protective measure to prevent Corp from attempting to repay itself before the Company repaid the Loan. *Id.* at 39. He also concluded that the assigned claims constituted adequate collateral because at the time of the assignment their value exceeded $10,000,000. *Id.* at 40.

Justice Belen further found that notice of intent to exercise the Purchase Option was properly provided. Although he found that Eletson did not provide separate formal written notice of exercising the Purchase Option to Levona as required by the BOL, he also found that Levona was on actual notice of the Purchase Option's exercise based on the minutes of a March 10, 2022 Company Board of Directors meeting which contained a reference to an "[u]pdate on Eletson's intention to exercise the purchase option." *Id.* at 42. Based on that language, and the testimony of an Eletson witness that for Eletson, "intention means the actual fact," the Company had, in practice, provided sufficient notice. *Id.* The arbitrator additionally concluded that Eletson had engaged in conduct after March 11, 2022, the date that the Transaction Documents were signed, that was consistent with a buyout by assisting Levona in the sale of the two vessels to third parties, reflagging the vessels from Greece to Liberia, and novating the underlying bareboat charters to Levona's interests. *Id.* at 44. The arbitrator also noted that after that date, Eletson held itself out to be the sole shareholder of the Company and the sole beneficial owner of its remaining twelve vessels, even though the Directors that Levona had named to the Company Board, pursuant to its authority as the holder of the Preferred Interests, remained on the Board

well past March 11.  *Id.*  He concluded that "[a]t best, the absence of a written notice and a payment of $1 dollar [required by the BOL] are formalities that the parties failed to observe."  *Id.* at 45.

Justice Belen concluded that since the conditions for the buyout were met, the Preferred Interests had been transferred to the Company or the Nominees and that, as of March 11, 2022, Levona no longer held the Preferred Interests and ceased to have any ownership interest in the Company.  *Id.* at 46.  The determination that the Purchase Option was properly exercised and that Levona ceased to have any ownership interest in the Company informed a number of the remainder of Justice Belen's conclusions.  Specifically, he concluded that Levona did not have the authority, once it ceased holding the Preferred Interests, to enter into the Unigas LOI, direct the operations of the Company, or otherwise assert control over the assets of the Company.  *Id.* at 47.

Having reached the determination that Eletson properly exercised the Purchase Option and that therefore Levona no longer held preferred interests in the Company, the arbitrator turned to the substantive claims.  With respect to Eletson's pre-BOL claims, Justice Belen concluded that: (1) he had no jurisdiction over any claims related to conduct before November 2, 2021, when Levona and the Levona-related entities were not parties to the LLCA, and that such entities also could not have breached the terms of the LLCA or the covenant of good faith and fair dealing implied in it for pre-November 2, 2021 conduct, *id.* at 49; and (2) although there was "sufficient evidence" that Murchinson engaged in underhanded tactics and dishonest dealings to acquire Blackstone's interests in the Company, Eletson was not entitled to have Levona's acquisition of those interests voided *ab initio, id.*  The arbitrator thus rejected Eletson's pre-BOL claims against Levona and the Levona-related entities.

31

Moving to Eletson's claims regarding Levona's conduct after becoming a signatory to the LLCA, but before entering into the BOL, Justice Belen ruled for Eletson. He found that in the time period after Levona acquired the Preferred Interests and became a member of the Company pursuant to the LLCA in November 2021, and before the BOL was entered into in February 2022, Murchinson bribed Peter Kanelos, the CFO of Corp and a representative of the Company, breached the terms of its NDA with Blackstone, and disclosed confidential Company information in violation of the LLCA and the covenant of good faith and fair dealing. *Id.* at 51. Levona and Murchinson had executed what was called a "Services Agreement" with Kanelos in December 2021 pursuant to which Murchinson wired $100,000 to Kanelos. *Id.* The arbitrator concluded that Kanelos was an officer of the Company, and not just Corp, and that, as a result, Levona and Murchinson's conduct violated a provision of the LLCA that barred Levona from entering into any agreement with an officer or member of senior management of the Company. *Id.* The arbitrator found that Kanelos had clandestine communications with Murchinson before and after Levona's acquisition of the Preferred Interests, contrary to his duties as an officer of Eletson and of the Company, and that he and Murchinson actively concealed their communications. *Id.* at 23–24. Justice Belen also found that Murchinson breached its NDA with Blackstone by communicating directly with the Company's financiers and lenders. *Id.* at 51. Justice Belen further found "Murchinson/Levona continued to disclose confidential information in breach of the LLCA, without Eletson's and the Company's knowledge, and without NDAs, after Levona purported to join the Company." *Id.* at 53–54. Justice Belen found that "Levona breached the covenant of good faith and fair dealing by causing the Company's lenders to arrest five vessels and failing to disclose this conduct after it became a member of the Company." *Id.* at 54. He determined: "Murchinson's improper dealings with the Company's banks and

32

financiers pre-acquisition of Blackstone's interests caused the arrests of the vessels and that its failure to disclose these actions to Eletson once it became a member in the Company was a breach of the covenant of good faith and fair dealing." *Id.* at 56. And, the arbitrator found that Levona breached the LLCA by attempting to terminate the Company's management agreement with Corp and by attempting to replace the boards of directors of the Company's subsidiaries with Levona's preferred representatives. *Id.* at 58.

Next, Justice Belen found that "Levona-related entities," namely Pach Shemen, had violated the Status Quo Injunction by purchasing a controlling interest in outstanding bonds issued by Holdings, directing the trustee to commence litigation against Holdings, and then directing the commencement of an involuntary bankruptcy petition against Holdings. *Id.* at 59–62. Justice Belen found that, in those ways, Pach Shemen intended to disrupt the status quo and ensure that it would retain the Preferred Interests and be able to use them to control and profit from the sale of the vessels; either the involuntary bankruptcy would strip the arbitrator of jurisdiction or, if not, it would operate as a hedge against a potential loss in the arbitration. *Id.* at 61. On the assumption (which Justice Belen elsewhere found to be faulty) that the Preferred Interests would pass to Holdings in the event of an arbitral ruling in its favor, Pach Shemen as a creditor of Holdings would nonetheless be able to use the bankruptcy proceeding to obtain the Preferred Interests. *Id.* at 61. Finally, Justice Belen rejected Levona's counterclaims based on his finding that Eletson exercised the Purchase Option and bought out the Preferred Interests as of March 11, 2022. *Id.* at 62.

Justice Belen awarded compensatory damages against Levona, and against Murchinson and Pach Shemen as Levona's alter egos, jointly and severally, to the Nominees in the amount of $19,677,743.71 and to the Company in the amount of $23,777,378.50. *Id.* at 100. The damages

included $19,677,743.71 for the loss of the two vessels that Levona caused to be improperly transferred. *Id.* at 63–64. The arbitrator concluded that those damages should be paid directly to the Nominees "as they flow directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interests." *Id.* at 64. He also awarded $21,777,378.50 to the Company for losses arising from Levona's conduct that led to the vessel arrests. *Id.* at 64. He awarded another $2,000,000 to the Company for the (1) reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company; (2) reputational harm to the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors; (3) lost business opportunities, both with existing customers and with new customers, as a result of the reputational harm; (4) Eletson's loss of access to both existing and new sources of capital; and (5) permanent harm from the "indelible record created by Levona and its affiliates." *Id.* at 65–67.[10] The arbitrator further awarded Eletson reimbursement of the attorney's fees and costs incurred in connection with the trustee litigation in the Southern District of New York and the involuntary bankruptcy proceeding in the amount of $3,007,266.20 "to be paid to the entity or individuals who paid those costs and fees." *Id.* at 67, 75. Justice Belen also awarded $43,455,122.21 in punitive damages to be paid to the same entities awarded the underlying compensatory damages. *Id.* at 73.

In addition to the compensatory and punitive damages, Justice Belen awarded Eletson attorneys' fees, expenses and costs for the arbitration of $9,590,222.99. *Id.* at 86. The attorneys' fees and costs awarded included fees and costs incurred in connection with the arbitration, a

---

[10] Justice Belen awarded the Petitioners prejudgment interest at a contractual rate of ten percent per annum. *Id.* at 73.

success fee owed by Eletson to counsel for Eletson, and fees and costs in connection with the

bankruptcy and bondholder litigation, but did not include costs incurred in connection with a

state court action that Eletson commenced against Murchinson. *Id.* at 75–76, 84. The arbitrator

rejected Levona's argument that Eletson was not the prevailing party because relief was payable

only to the Company and to the Nominees, on the theory that it had been clear "throughout the[]

proceedings that Eletson would turn over any damages" to the Company and that accordingly it

was "Eletson that substantially prevailed on its claims in this arbitration." *Id.* at 88. The

arbitrator also rejected Levona's argument that fees should not be awarded for the bankruptcy

and bondholder litigation based on JAMS Rule 29, which provides that the "Arbitrator may order

appropriate sanctions for failure of a Party to comply with its obligations under any of these

Rules or with an order of the Arbitrator." *Id.* at 91. "In other words, the award of attorneys' fees

was as damages to compensate for the intentional violations by Levona, through its alter ego,

Pach Shemen, of the Status Quo Injunction Order—not a finding of a prevailing party's

entitlement to fees or a finding under a fee-shifting provision." *Id.*

## PROCEDURAL HISTORY

On August 18, 2023, Petitioners filed the instant Petition, which was ordered unsealed on

September 13, 2023. Dkt. Nos. 1, 11, 14. On September 22, 2023, Respondent moved to

dismiss the Petition and cross-petitioned to vacate the Award. Dkt. Nos. 28–31.[11] About one

---

[11] On October 14, 2023, Respondent filed a statement of relatedness asking the Court to refer the
Petition to the Bankruptcy Court handling the bankruptcy litigation of Holdings. Dkt. No. 32.
Petitioners opposed that request. Dkt. No. 33. On October 6, 2023, Respondent filed a motion
to refer the matter to the Bankruptcy Court, Dkt. No. 34, and, on October 10, 2023, Petitioners
opposed that motion, Dkt. No. 35. The Court denied the motion to refer the Petition to the
Bankruptcy Court on October 10, 2023. Dkt. No. 36. The Court reasoned that, as the tribunal
with original jurisdiction of the Petition under the New York Convention and the Federal
Arbitration Act, it was the proper entity to decide whether to confirm or vacate the Award. *Id.*
Respondent asked the Court to reconsider that order, Dkt. No. 38, but the Court denied that

month later, on October 19, 2023, with leave from the Court, Petitioners filed their Supplemental Amended Petition. Dkt. Nos. 46–47. The Supplemental Amended Petition amended the Petition to reflect that the arbitrator had rendered a Final Award. *Id.* Respondent amended its response and moved to dismiss the Amended Petition on October 24. Dkt. Nos. 48–51. One week later, Petitioners filed their reply in support of the Amended Petition and further opposition to Respondent's cross-petition to vacate. Dkt. Nos. 54–55. Respondent filed its own reply in support of its motion to dismiss the Amended Petition on November 14, 2023. Dkt. Nos. 59–60.

On November 15, the Court held a conference, at which it instructed the parties to each submit statements of undisputed fact pursuant to Federal Rule of Civil Procedure 56.1. That same day, Petitioners filed a Corrected Amended and Supplemental Petition to Confirm the Arbitral Award, reflecting that Petitioners sought only confirmation and not enforcement of the Award. Dkt. No. 62. Petitioners and Respondent filed their respective statements and corresponding exhibits over the following forty-five days. Dkt. Nos. 65–68. On January 2, 2024, the Court held oral argument on the Petition.[12]

## DISCUSSION

Petitioners petition for an order confirming the Award and to have judgment entered thereon pursuant to Section 207 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 207. Dkt. No. 62. Respondent moves to dismiss the petition and cross-petitions the Court to vacate the

___

request, noting that confirmation was intended to be conducted on a summary and speedy basis and that it was prepared to consider the pending motions on the timetable submitted by the parties, Dkt. No. 39.

[12] The Court received supplemental letter briefs on January 5, 2024. Dkt. Nos. 73, 74. By letter motion on January 11, 2024, Respondent moved to amend its motion to vacate the Award and for discovery. Dkt. No. 75. After hearing oral argument, the Court denied that motion by memorandum and order dated January 23, 2024. Dkt. No. 80.

Award.[13]  Dkt. No. 49.  Petitioners brought this action under the New York Convention, more

formally known as the United Nations Convention on the Recognition and Enforcement of

Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38.  "Recognition and

enforcement seek to give effect to an arbitral award, while vacatur challenges the validity of the

award and seeks to have it declared null and void."  *Corporación AIC, SA v. Hidroeléctrica*

*Santa Rita S.A.*, 66 F.4th 876, 882 (11th Cir. 2023).  "The party opposing enforcement of an

arbitral award has the burden to prove that one of the . . . defenses under the New York

Convention applies."  *Encylopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d

85, 90 (2d Cir. 2005).

There is a "strong federal policy favoring arbitration, the enforcement of arbitration

agreements and the confirmation of arbitration awards."  *Pike v. Freeman*, 266 F.3d 78, 89 (2d

Cir. 2001).  "[T]he confirmation of an arbitration award is a summary proceeding that merely

makes what is already a final arbitration award a judgment of the court."  *Florasynth, Inc. v.*

*Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984).  As a summary proceeding, the decision of whether

to confirm an arbitral award "is not intended to involve complex factual determinations, other

than a determination of the limited statutory conditions for confirmation or grounds for refusal to

---

[13] The Court has jurisdiction over this matter.  Although review of domestic awards requires an "independent jurisdictional basis" apart from the FAA, confirmation or vacatur of nondomestic or international awards under the New York Convention does not.  *F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 324 (S.D.N.Y. 2010).  The FAA expressly provides federal courts with subject matter jurisdiction over an "action or proceeding falling under the [New York] Convention."  9 U.S.C. § 203.  The New York Convention applies to arbitral awards relating to commercial matters where either (1) at least one party is not a citizen of the United States; or (2) all parties are United States citizens but there is some reasonable relationship with one of more foreign states.  9 U.S.C. § 202; *see Dumitru v. Princess Cruise Lines, Ltd.*, 732 F. Supp. 2d 328, 335 (S.D.N.Y. 2010).  It is not disputed here that no party is domiciled or has its principal place of business in the United States, and that the Award concerns a commercial matter.

confirm." *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007). The review of arbitration awards is "very limited . . . in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993). Thus, although the FAA empowers a court to "confirm and/or vacate the award, either in whole or in part . . . a petition brought under the FAA is not an occasion for *de novo* review of an arbitral award," *Scandnavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012), nor an occasion for the court to conduct a "reassessment of the evidentiary record," *Wallace v. Buttar*, 378 F.3d 182, 193 (2d Cir. 2004).

The FAA provides several grounds upon which a court can refuse to confirm an arbitral award. At the outset, it states that a court must confirm an arbitral award falling under the New York Convention "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in said Convention."[14] 9 U.S.C. § 207. Article V of the New York Convention specifies seven grounds upon which courts may refuse to recognize an award. *Encyclopaedia Universalis*, 403 F.3d at 90. "[R]ecognition and enforcement of the award may be refused" only if the party against whom the award is invoked "furnishes . . . proof" that: (1) the parties to the arbitration agreement were "under some incapacity" or the agreement "is not valid" under the law designated by the parties, or, in the event they have not designated any, the law of the country where the award was made; (2) "the party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case;" (3) "[t]he award deals with a difference not

---

[14] Some courts in this District have found that, by its express terms, the New York Convention does not permit *vacatur* of arbitral award; it only permits a court to refuse to confirm. *See, e.g.*, *Kondot S.A. v. Duron LLC*, 586 F. Supp. 3d 246, 255 (S.D.N.Y. 2022).

contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration," although any "part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced;" (4) "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place;" or (5) "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made."  New York Convention, art. V.  Additionally, "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that" (6) "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of that country" or (7) "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."  *Id.*

In addition to the bases for refusing to confirm an arbitral award provided in the New York Convention, and recognized by reference in the FAA, the FAA itself contains several further statutory bases upon which an arbitral award may be vacated.  Such statutory bases are authorized by the New York Convention, which instructs "a court in the country under whose law the Arbitration was conducted to apply domestic arbitral law, in this case the FAA, to a motion to set aside or vacate that arbitral award."  *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 21 (2d Cir. 1997).  Thus, where an "[a]rbitration was entered into in the United States . . . the domestic provisions of the FAA also apply, as permitted by Articles V(1)(e) and (V)(2) of the New York Convention."  *Scandinavian Reinsurance Co.*, 668 F.3d at 71; *see also Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 589 (2d Cir. 2016) ("The

39

award in this case having been rendered in the United States, available grounds for vacatur include all the express grounds for vacating an award under the FAA."); *Temsa Ulasim Araclari Sanayi ve Ticaret A.S. v. CH Bus Sales, LLC*, 2022 WL 3974437 (S.D.N.Y. Sept. 1, 2022) (explaining that where "'the arbitration took place in the United States,' the award also is 'subject to the FAA provisions governing domestic arbitration awards.'" (quoting *Zeiler*, 500 F.3d at 164). Because the arbitration here was conducted in the United States, the Court also considers the grounds for vacatur outlined in the FAA. *See, e.g.*, *Branco Bradesco S.A. v. Steadfast Ins. Co.*, 2018 WL 4284315, at *10 (S.D.N.Y. Sept. 7, 2018).

Section 10(a) of the FAA provides four statutory bases upon which an arbitral award may be vacated:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; and

(4) where the arbitrators exceeded their powers, or so imperfectly executed them so that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a). Next, Section 11(b) of the FAA states that that the Court may *modify* the award under certain circumstances, including when "the arbitrators have awarded upon a matter not submitted to them." *Id.* § 11(b); *see also Nat'l Indem. Co. v. IRB Brasil Resseguros S.A.*, 164 F. Supp. 3d 457, 474 (S.D.N.Y. 2016). Still, courts have cabined the applicability of the FAA's statutory bases for vacating, modifying, or correcting an award: "[t]he statutory provisions [of the FAA], 9 U.S.C. §§ 10, 11, in expressly stating certain grounds for either vacating an award or modifying or correcting it, do not authorize its setting aside on the grounds of erroneous finding

40

of fact or of misinterpretation of law." *Amaicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir. 1960); *see also Squarepoint Ops LLC v. Sesum*, 2020 WL 996760, at *3 (S.D.N.Y. Mar. 2, 2020) ("Even a 'serious error' in the law or facts is alone insufficient to warrant vacatur." (quoting *KT Corp. v. ABS Holdings, Ltd.*, 784 F. App'x 21, 24 (2d Cir. 2019) (summary order))).

Finally, and in addition to the bases specified in the New York Convention and the FAA, the Second Circuit "has 'held that the court may set aside an arbitration award if it was rendered in manifest disregard of the law.'"[15] *Zurich Am. Ins. Co.*, 811 F.3d at 589 (quoting *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011)). Under these standards, "vacatur of arbitral awards is extremely rare." *Salus Cap. Partners, LLC v. Moser*, 289 F. Supp. 3d 468, 476 (S.D.N.Y. 2018) (quoting *Hamerslough v. Hipple*, 2012 WL 5290318, at *3 (S.D.N.Y. Oct. 25, 2012)).

Respondent argues that (1) the Petition should be dismissed at least in part because the Award was not in favor of Petitioners and Petitioners therefore lack standing, Dkt. No. 50 at 14–16; (2) the arbitrator exceeded his powers, *id.* at 16–31; and (3) the arbitrator manifestly disregarded the law, *id.* at 32–35. There is no argument that the award was procured by corruption, fraud, or undue means, that there was evident partiality or corruption in the arbitrator, or that the arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy.

The Court takes each argument in turn.

---

[15] The Second Circuit has expressly rejected the more permissive approach by other Circuits to vacatur of arbitral awards on other non-statutory bases, such as when the awards are "completely irrational," "arbitrary and capricious," or "contrary to an explicit public policy." *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007).

41

## I.  Petitioners Have Standing

"Article III of the Constitution limits federal courts to deciding 'Cases' and 'Controversies.'  For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must have standing to sue."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); *see also Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019).  "To have standing, a plaintiff must 'present an injury that is concrete, particularized and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "If a plaintiff fails to satisfy any of those elements, a federal court lacks subject-matter jurisdiction to hear the case and it must be dismissed."  *Fishon v. Peloton Interactive, Inc.*, 620 F. Supp. 3d 80, 89 (S.D.N.Y. 2022) (quoting *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015)).  "Article III's case-or-controversy requirement applies to actions governed by the FAA."  *Stafford v. Int'l Bus. Machines Corp.*, 78 F.4th 62, 68 (2d Cir. 2023); *Badgerow v. Walters*, 142 S. Ct. 1310, 1316 (2022).

Respondent argues that Petitioners lack Article III standing—specifically, injury in fact—to confirm the Award because the arbitrator did not award Petitioners any financial relief.  Dkt. No. 50 at 14–16; Dkt. No. 59 at 2-6.  Respondent notes that the compensatory damages awarded by the arbitrator are to be paid to persons other than Petitioners, including the Company, the Nominees, and those who advanced the fees and costs expended in the arbitration.  Dkt. No. 59 at 4.  Respondent also argues that the Award's declaratory relief was purely backward-looking.  *Id.*  Finally, Respondent argues that its vacatur petition cannot give Petitioners standing to confirm the award because standing addresses whether a party may bring suit in the first place.  *Id.* at 5.  Respondent bases its argument in large part on language from the Supreme Court's decision in *Town of Chester v. Laroe Estates*, 581 U.S. 433 (2017), that "a plaintiff must

42

demonstrate standing for each claim he seeks to press and for each form of relief that is sought."
*Id.* at 439 (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Relying on the
second clause of that sentence, Respondent asserts that the Court must examine each item of
relief awarded by the arbitrator to determine whether it provides a financial or other benefit to
Respondents and, if it does not, then the Court must refuse to confirm the arbitral award or at
least those portions of it that do not benefit Respondents.

Respondent's argument is built on a faulty foundation. Respondent reasons from *Town of
Chester* that because portions of the award do not provide financial relief directly to Petitioners,
Petitioners do not have a concrete interest in enforcement of those portions and the remedy
awarded by the arbitrator will not redress their grievances. Respondent's premise is mistaken. A
party to a contract need not have suffered direct financial loss to have a stake in its enforcement
or to have suffered a concrete injury when it is breached. "Intangible harms," in addition to
physical or monetary injuries, "can also be concrete." *TransUnion LLC v. Ramirez*, 594 U.S.
413, 425 (2021). "Chief among them are injuries with a close relationship to harms traditionally
recognized as providing a basis for lawsuits in American courts." *Id.* Rights arising from the
law of contracts are no less legal rights than those arising from the laws of property and tort. *See
Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137 (1939). A contract right itself is
a protectible interest, the breach of which gives rise to a concrete injury. *See Spokeo*, 578 U.S. at
344 (Thomas, J., concurring) (private rights that confer Article III standing include contract
rights); *Tech-Sonic, Inc. v. Sonics & Materials, Inc.*, 2015 WL 4715329, at *6 (D. Conn. Aug. 7,
2015).

A division has emerged among sister circuits regarding whether a breach of contract itself
constitutes a legally cognizable injury in fact, and thus satisfies the first element of the *Lujan* test

for standing. *See, e.g., Dinerstein v. Google, LLC*, 73 F.4th 502, 522 (7th Cir. 2023) ("A breach

of contract alone—without any actual harm—is purely an injury in law, not an injury in fact.

And it therefore falls short of the Article III requirements for a suit in federal court."); *Denning*

*v. Bond Pharmacy, Inc.*, 50 F.4th 445, 451 (5th Cir. 2022) ("[A] breach of contract is a sufficient

injury for standing purposes.").

In the Court's view, the Fifth Circuit has the better of the arguments. The Seventh

Circuit based its view that an alleged breach of contract did not create a cognizable injury giving

rise to standing in federal court on its reading of *Spokeo, Inc. v. Robins*, 578 U.S. 330,

*TransUnion LLV v. Ramirez*, 594 U.S. 413, and on a law review article. *Dinerstein*, 73 F.4th at

519. In *Spokeo*, the Supreme Court held that a plaintiff asserting a "bare procedural violation" of

the Fair Credit Reporting Act ("FCRA"), "divorced from any concrete harm," did not have

standing to sue in federal court. 578 U.S. at 341. Congress did not have the power to "authorize

that person to sue to vindicate that right." *Id.* In *TransUnion*, the Supreme Court held that the

courts lacked the power under Article III of the Constitution to adjudicate claims that a credit

reporting agency violated the FCRA by failing to use reasonable procedures to ensure the

accuracy of credit files in the absence of evidence that the misleading credit files were provide to

any potential creditors, concluding that the misleading information in the internal credit files did

not itself constitute a concrete harm. 594 U.S. at 433, 435. The Seventh Circuit, citing *Spokeo*

and *TransUnion*, reasoned that breach of a contract created a mere "legal infraction" and was

insufficient to create standing in the absence of some additional "factual harm suffered" to the

plaintiff as a result of the breach. *Dinerstein*, 73 F.4th at 519 (quoting F. Andrew Hessick,
*Standing and Contracts*, 89 Geo. Wash. L. Rev. 298, 313 (2021)).[16]

The holdings of *Spokeo* and *TransUnion* do not compel that result, and the decisions of
the Second Circuit do not support it. Both *Spokeo* and *TransUnion* involved alleged statutory
violations. At bottom, the question before the Court was whether Congress could expand the
power of the federal courts under Article III by "elevat[ing] to the status of legally cognizable
injuries, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341
(quoting *Lujan*, 504 U.S. at 578); *see TransUnion*, 594 U.S. at 425. Those cases did not involve,
as here, pre-existing common law rights historically enforceable in both federal and state court.
*See, e.g.*, *Ogden v. Saunders*, 25 U.S. 213, 259 (1827). The *TransUnion* Court held that
Congress "may not simply enact an injury into existence, using its lawmaking power to
transform something that is not remotely harmful into something that is." 594 U.S. at 426
(quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

The Court's methodology in *Spokeo* and *TransUnion* support the existence of Article III
standing here. The Supreme Court instructed courts to look to "constitutional text, history, and
precedent" to mark the limits of Congress's power to create an actionable legal injury sufficient
to support Article III standing. *Id.* at 428; *see also id.* at 424 ("[H]istory and tradition offer a
meaningful guide to the types of cases that Article III empowers federal courts to consider."
(quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 274 (2008))); *Spokeo*, 578

---

[16] Ironically, the Hessick article cited in *Dinerstein* recognizes that applying *Spokeo* to require a
showing of some additional concrete harm to the plaintiff before a breach of contract claim could
be brought in federal court "would significantly affect the enforceability of contracts in federal
courts" and would have "undesirable consequences," but argues that "the inability to square
*Spokeo* with contracts provides a compelling argument that *Spokeo* was wrongly decided."
F. Andrew Hessick, *Standing and Contracts*, 89 Geo. Wash. L. Rev. 298, 300–02 (2021). The
more logical and compelling inference is that *Spokeo* does not apply to contract claims.

U.S. at 340–41 (standing inquiry derives from case-or-controversy requirement which "is grounded in historical practice"). The Supreme Court did not hold that the plaintiff was required to show financial or physical injury to have Article III standing. Rather, it specifically embraced that "[v]arious intangible harms . . . can also be concrete." *TransUnion*, 594 U.S. at 425; *id.* at 427 (asking whether the plaintiff has alleged "any physical, monetary, or cognizable intangible harm,"); *Spokeo*, 578 U.S. at 340 ("[W]e have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete"). The Court also did not hold that the plaintiff personally need have suffered some additional factual harm in order to have standing. The *Spokeo* Court stated that in some circumstances, those similar to instances at common law, the violation of a legal right can give rise to standing without any showing of additional harm. 578 U.S. at 342; *see also* Erwin Chemerinsky, *Federal Jurisdiction* 74 (8th ed. 2020) ("Injury to rights recognized at common law—property, contracts, and torts, are sufficient for standing purposes."). The *TransUnion* Court then relied upon and cited favorably to *Sprint Communications*, in which (as discussed further *infra*) the Court recognized that a person did not have had to suffer harm individually in order to have standing to bring suit for harm caused to another. *Sprint Commc'ns Co.*, 554 U.S. at 287–88.

Eletson's standing here fits comfortably within constitutional text, history, and precedent. Eletson's injury is breach of a contractual right for Levona to honor the arbitral award. History and precedent support that a person whose contractual rights have been violated has standing to sue the breaching party, regardless of whether the non-breaching party has suffered additional harm. The right of a party to sue for breach of contract, regardless of harm done, has deep and roots in the law. *See* Restatement (First) of Contracts § 328 & cmt. a (1932) ("A breach of contract always creates a right of action; but a breach sometimes occurs without causing any

harm."); Lon L. Fuller & William R. Perdue, *The Reliance Interest in Contract Damages: 1*, 46

Yale L.J. 52, 59 (1936) ("In a society in which credit has become a significant and pervasive

institution, it is inevitable that the expectancy created by an enforceable promise should be

regarded as a kind of property, and breach of the promise as an injury to that property . . . . That

the promisee had not "used" the property which the promise represents (had not relied on the

promise) is as immaterial as the question whether the plaintiff in trespass *quare clausum fregit*

was using his property at the time it was encroached upon.").  For two centuries, courts have

recognized that a party who suffers only nominal damages from a material breach may still seek

relief in court against the breaching party.  *See Marzetti v. Williams*, 109 Eng. Rep. 842, 846

(K.B. 1830) ("[W]herever there is a breach of contract, or any injury to the right arising out of

that contract, nominal damages are recoverable."); *Wilcox v. Executors of Plummer*, 4 Pet. 172,

181–182 (1830) (holding that breach of "a contract to act diligently and skil[l]fully" provides a

"ground[] of action" in federal court); *see also Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G.*

*Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (reversing district court's grant of

dismissal of breach of contract claim for failure to adequately plead damages because plaintiff

"would have plausible claims for nominal damages").  Courts also have long recognized that a

promisee has the same right to enforce a contractual provision benefitting a third-party

beneficiary as a contractual provision benefitting the promissee itself.  *See* Restatement (First) of

Contracts § 345 & cmt. a (1932) ("This Section is an application of the general rules of damages

to contracts for the breach of which a beneficiary as well as the promisee can maintain suit.");

Restatement (Second) of Contracts § 305 (1981) ("The promisee of a promise for the benefit of a

beneficiary has the same right to performance as any other promise, whether the promise is

binding because part of a bargain, because of his reliance, or because of its formal

characteristics."); *see also* Restatement (Second) of Contracts § 305 ("A promise in a contract

creates a duty in the promisor to the promise to perform the promise even though he also has a

similar duty to an intended beneficiary."); 9 Corbin on Contracts § 46.2 (2023) ("Currently, there

is no longer any doubt that a promisee has the same right to performance in a contract for the

benefit of a third party as any other contract promise.").  It is sufficient that a plaintiff be "'in

privity of contract with the defendant *or* is a third party beneficiary of the contract.'"  *Tang Cap.*

*Partners, LP. v. BRC Inc.*, 2023 WL 2396635, at \*16–17 (S.D.N.Y. Mar. 8, 2023) (quoting

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 49 (2d Cir. 2014))).

The Court in *Spokeo* recognized that a plaintiff would have standing to bring a claim for

slander *per se*, notwithstanding that damages might be difficult to prove, 578 U.S. at 341–42, and

the Court in *TransUnion* recognized that harms such as "reputational harms, disclosure of private

information, and intrusion upon seclusion" could give rise to Article III standing, 594 U.S. at

425.  The tort of invasion of privacy, however, was recognized only late in our constitutional

history.  *See* Restatement (Second) of Torts § 652A & cmt. a ("Prior to 1890 no English or

American court had ever expressly recognized the existence of the right [to privacy] . . . .").

There is no reason to believe that the common law claim of breach of contract, which is of at

least equal if not greater historical provenance, should be accorded lesser recognition.

The recognition of standing is also supported by constitutional text.  While Respondent's

challenge to Petitioners' standing arises in the immediate and specific context of a motion to

confirm an arbitral award, Respondent's argument cannot be so limited.  If accepted, it would

deny any party to a contract the right to seek relief in federal court for a material breach in the

absence of a showing of some additional harm to itself.  But claims for breach of contract arise

routinely in both state and federal court, and—not infrequently in those actions—the non-

breaching party has not suffered additional harm separate from the breach itself.  It occasionally

will bargain for and seek to enforce benefits that will accrue to a third party.  The Constitution

itself recognizes that when such suits arise between citizens of different States the federal courts

are not deprived of power to hear them.  Article III of the Constitution provides that the judicial

power of the United States extends "to Controversies between two or more States."  U.S. Const.

Art. III sec. 2, cl. 1.  Indeed, the provenance of diversity jurisdiction dates back to the very first

Congress.  Judiciary Act of 1789, 1 Stat. 73.  If the non-breaching party has a claim against the

party in breach, the non-breaching party has the right to have that case adjudicated in federal

court (assuming that the statutory prerequisites for diversity jurisdiction are satisfied).  And if the

breaching party is sued in the courts of a foreign state by a citizen of that state, it has the right to

remove the matter to federal court (again, assuming the statutory prerequisites are satisfied). In

that manner, the Constitution itself guarantees all citizens a fair and impartial tribunal for the

adjudication of disputes.  *See, e.g.*, *Bank of United States v. Deveaux*, 5 Cranch 61, 87 (1809)

(Marshall, C.J.) ("The judicial department was introduced into the American constitution under

impressions, and with views, which are too apparent not to be perceived by all. However, true

the fact may be, that the tribunals of the states will administer justice as impartially as those of

the nation, to parties of every description, it is not less true that the constitution itself either

entertains apprehensions on this subject, or views with such indulgence the possible fears and

apprehensions of suitors, that it has established national tribunals for the decision of

controversies between aliens and a citizen, or between citizens of different states."), *overruled on

other grounds by Louisville, C. & C.R. Co. v. Letson*, 43 U.S. 497 (1844); The Federalist No. 80

(Alexander Hamilton) (stating that suits between citizens of different states "should be

committed to that tribunal which, having no local attachments, will be likely to be impartial

49

between the different States and their citizens, and which, owing its official existence to the Union, will never be likely to feel any bias inauspicious to the principles on which it is founded"). But the Seventh Circuit's view would have the effect of stripping the federal courts of power to hear certain of those cases in which, at the founding, the Framers and the First Congress thought the exercise of federal court power would be most important—where the presumed parochialism and prejudices of state courts would not give a foreigner a fair and independent tribunal. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 74 (1938) ("Diversity of citizenship jurisdiction was conferred in order to prevent apprehended discrimination in state courts against those not citizens of the state."). Under its view, an out-of-state plaintiff who contracted for a benefit to be provided to a third party and whose right to that performance was breached would be relegated in a suit for performance to the courts of the breaching party, except if the plaintiff could show some additional harm to itself. The court would have the general language of "case" or "controversy" negate the more specific language creating diversity jurisdiction in a vast swath of cases.

Finally, the Fifth Circuit's approach is closer to the Second Circuit's reading of *TransUnion*. In the aftermath of *TransUnion*, the Second Circuit has held that a person who was neither a party to a contract nor its third-party beneficiary but was a mere non-party lacked standing to enforce an agreement. *Ryansko v. N.Y. Univ.*, 63 F.4th 186, 193–94 (2d Cir. 2023). Implicit in *Rynasko* was the notion that if the plaintiff—the parent—was a party to the contract, she would have had standing. The Second Circuit has also held a property-based injury, even one rooted in federal statute, is sufficient to give rise to standing in the absence of any other additional harm. *Saba Cap. Cef Opportunities 1, Ltd. v. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 114 (2d Cir. 2023). If one's right to dominion and control over chattels is seriously

interfered with, she has standing to sue. *Id.* The Second Circuit has held, post-*TransUnion*, that a plaintiff whose private information has been disclosed to third parties has standing to sue regardless of whether the third parties used that information to cause additional harm. *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 285–86 (2d Cir. 2023). Indeed, the Second Circuit has never suggested that *TransUnion* or *Spokeo* denied a person who had standing to bring a common law contract, tort, or property claim in state court lacked the standing to bring the same claim in federal court.

The conclusion that Petitioners have standing to seek confirmation of the Award readily follows. Petitioners and Respondent are all parties to the LLCA. Dkt. No. 67-2 at 1–2; Dkt No. 67-4 at 2; *cf. Ryansko*, 63 F.4th at 193 (holding that a party lacked standing to bring breach of contract claim because she was "neither a party to the contract . . . nor an intended third-party beneficiary of that agreement, nor an assignee of [a party to the contract]'s claims"). The LLCA contains a mandatory arbitration provision, which states that "[a]ny dispute, claim, or controversy arising out of or relating to this Agreement . . . shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator." Dkt. No. 67-2 at 69. It also designated arbitration as the "exclusive and *binding* method" of resolving such disputes. *Id.* (emphasis added). It was pursuant to that provision of the LLCA that Holdings and Corp commenced an arbitration proceeding against Respondent in July 2022. Dkt. No. 65 ¶ 40; Dkt. No. 66 ¶ 40. Holdings and Corp bargained and gave consideration for the contractual right for all disputes regarding LLCA to be resolved through arbitration. Respondent agreed to be bound to that method of resolution. Yet, Respondent has not satisfied the award. It has denied that the arbitrator has the power to resolve its dispute with Petitioners and has refused to honor the arbitrator's determination of that dispute.

"An unconfirmed award is a contract right that may be used as the basis for a cause of action[,]" *Florasynth, Inc.*, 750 F.2d at 176, and contract rights are a type of private right recognized as conferring Article III standing. *See Spokeo*, 578 U.S. at 344 (Thomas, J., concurring); *see also Culwick v. Wood*, 384 F. Supp. 3d 328, 339 (E.D.N.Y. 2019). Holdings and Corp have suffered a concrete injury in the breach of their right to have the dispute determined by the arbitrator and have standing to vindicate their contractual right, even if the benefit of the award were to flow entirely to a third-party. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Cookson Am., Inc.*, 710 F.3d 470, 475 (2d Cir. 2013) (per curiam) (concluding that a union had Article III standing to enforce an agreement with an employer to provide benefits to retirees, because "[t]hat this benefit accrues to third parties . . . does not change the fact that the [plaintiff] has negotiated for the benefit and has incurred obligations in order to secure it"); *see also Frontier Commc'ns of N.Y., Inc. v. Int'l Bhd. of Elec. Workers*, 2008 WL 1991096, at *3 (S.D.N.Y. May 6, 2008) (Lynch, J.) ("It is 'axiomatic' that a party to an agreement has standing to sue a counter-party who breaches that agreement, even where some or all of the benefits of that contract accrue to a third party.").

It also is not fatal to the "redressability" element of the standing inquiry that the financial relief to be awarded by a court will be payable to a third-party and not to the plaintiff directly. "[F]ederal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit. Trustees bring suits to benefit their trusts; guardians ad litem bring suits to benefit their warder; receivers bring suit to benefit their receiverships' assignees in bankruptcy bring suit to benefit bankrupt estates; executors bring suits to benefit testator estates; and so forth." *Sprint Commc'ns Co.*, 554 U.S. at 287–88; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (holding that plaintiff had Article III

52

standing to assert claim for civil penalty to be paid to the Government). "[C]onfirmation arms
the winning party of an arbitration 'with a court order . . . [and] a variety of remedies available to
enforce the judgment.'" *Teamsters Loc. 177 v. United Parcel Serv.*, 966 F.3d 245, 253 (3d Cir.
2020) (quoting *Florasynth*, 750 F.2d at 176). If the behavior of the defendant giving rise to a
concrete injury is the failure to provide a benefit to a third-party as promised, then an order
requiring the provision of that benefit will redress the injury no less than the penalty paid to the
federal government redressed the injury of the private plaintiff in *Laidlaw*.

Thus, even though it is true that an arbitration award is divisible for purposes of
confirmation, *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104 (2d Cir. 2006) (court "can
confirm . . . the award either in whole or in part" in FAA case), the Court need not parse through
the arbitral award and determine whether Petitioners have standing to seek the Court's
confirmation of each element of the award. Instead, as long as the award remains unsatisfied in
any respect, Petitioners—as parties to the LLCA and parties to the arbitration—have standing to
seek redress. "A party, successful in arbitration, seeks confirmation by a court generally because
he fears the losing party will not abide by the award. Armed with a court order the winning party
has a variety of remedies available to enforce the judgment." *Florasynth*, *Inc.*, 750 F.2d at 176.
Petitioners bargained for, and gave consideration pursuant to, a contract—the LLCA—that
bound Petitioners and Respondent to resolve disputes relating to the contract through arbitration.
Respondent has failed to satisfy that award. Confirmation of the award would reduce the
arbitrator's contractually-enforceable order into a judicially-enforceable judgment, thus
providing redress for Petitioners' grievance that the award has not been satisfied. *Cf. Stafford*,
78 F.4th at 67 ("Confirmation is a 'mechanism[] for enforcing arbitration awards.'" (quoting
*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 582 (2008))); *D.H. Blair & Co.*, 462 F.3d at

104 ("The request [to confirm an arbitral award] simply [seeks] to give effect to the arbitration award."); *Footchrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 516 (2d Cir. 1975) ("The award itself is inchoate until enforced by judgment.").  Respondent has not demonstrated that anything more is necessary.

The few cases upon which Respondent relies are not to the contrary.  *Town of Chester* does not require a plaintiff—in order to have Article III standing—to show that the requested relief will benefit himself or herself financially.  The plaintiff need only show for each claim asserted and for each form of relief claimed, a concrete and particularized injury traceable to the defendant that can be redressed through judicial relief requested.  The plaintiff who has suffered damages in the past does not thereby have standing to assert a claim for injunctive relief, preventing the defendant from engaging in misconduct in the future; he also needs to allege a real and immediate risk of future injury.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *accord Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 47 (2d Cir. 2023) (en banc) (separately analyzing whether plaintiffs' injury was redressable "by monetary damages and by the specific injunctive relief sought").  Likewise, a plaintiff who has standing to complain about a municipal property tax exemption does not thereby have standing to challenge a state franchise tax credit.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  It does not follow from *Town of Chester* that a person who has suffered a concrete non-speculative harm is denied a federal forum simply because the relief that will redress that harm will also accrue to the benefit of a third party.

In *Stafford v. IBM*, 78 F.4th 62, the Second Circuit held that a motion to seek confirmation of an arbitral award was moot and thus the courts did not have Article III standing

54

to hear it.[17]  The court did not review the underlying relief awarded by the arbitrator or base its

decision on any issue regarding the persons whom that relief benefitted.  Rather, the court

concluded that the case was moot because respondent had satisfied its obligations under an

arbitration award "in full"; regardless of whom the award benefitted, there was nothing a

judgment could remedy.  The respondent did not owe the petitioner any further relief.  *Id.* at 65,

68.  There was "no longer any issue over payment or ongoing compliance with a prospective

award."  *Id.* at 68.  The petitioner's alleged injury had been fully redressed, and its contractual

right to resolution by arbitration had been fully vindicated.  In this case, by contrast, Petitioners

do not base standing solely on the "statutory right to seek confirmation under the FAA."  *Id.* at

69.  Respondent breached its contract with Petitioners and have yet to remedy that breach.[18]  The

Award provides relief intended to redress that breach.  The dispute is not moot.  A judgment is

necessary for Petitioners to obtain the relief that the arbitrator determined would redress the

contract rights of Petitioners that the arbitrator determined were violated.

Put differently, *Stafford* does not hold that a party to arbitration must have something

financial to gain from enforcement of the award, in order to have Article III standing to seek its

confirmation.  Further support for this conclusion can be found in the *Stafford* court's favorable

---

[17] The Court notes that other Circuits would hold that, even if an arbitral award is fully satisfied, that a party could still have standing to apply for the award's confirmation.  *See Teamsters Loc. 177*, 966 F.3d at 251–52 (holding that "[u]nder the FAA a party's injuries are only fully remedied by the entry of a confirmation order," and that "the dispute the parties went to arbitration to resolve is 'live' until the arbitration award is confirmed and the parties have an enforceable judgment in hand").

[18] Although the Court is dubious of the proposition that a pledge to comply with an arbitration award would defeat standing, it need not address that issue except to note that such a proposition, if accepted, could undermine the right conferred by the FAA and the New York Convention to confirmation of an award.  *See Teamsters Loc. 177*, 966 F.3d at 253 & n.3.  A respondent seeking to avoid payment under the award could simply pledge that it would satisfy the award, only to renege after the time period for confirmation had run.

mention of a Seventh Circuit case, *Unite Here Local 1 v. Hyatt Corp.*, in which that court found the petitioner had Article III standing to confirm an arbitral award. 862 F.3d 588 (7th Cir. 2017). In that case, the petitioner sought confirmation of two arbitral awards, one of which granted relief only in the form of an order for respondent to cease and desist certain conduct prohibited by the collective bargaining agreement between the parties, and the other of which granted monetary relief in the form of backpay, along with an order for respondent to cease and desist conduct prohibited by the collective bargaining agreement. *Id.* at 590–94. The court then found that there was "plainly a live dispute about whether [the respondent was] in fact acting in compliance with the awards," because "41 pending alleged violations of the award" created "an ongoing controversy." *Id.* at 598–99. Summarizing that and other cases, the *Stafford* court stated that a petitioner lacked standing to confirm an arbitral award "when there is no longer any issue over payment or ongoing compliance with a prospective award." 78 F.4th at 68. Finally, the court concluded its standing analysis by stating that "[t]he FAA's process for confirming an arbitration award still requires Article III injury, and § 9 of the FAA does not itself confer standing." *Id.* at 69.

*Compagnie Noga d'Importation et d'Exportation S.A. v. Russian Fed'n*, is also far afield. 2008 WL 3833257, at *6 (S.D.N.Y. Aug. 15, 2008), *aff'd*, 350 F. App'x 476 (2d Cir. 2009) (summary order). In that case, the court held that a party to an arbitration who had assigned its claim and the proceeds of an arbitration award to a syndicate of banks lacked standing to bring suit on that claim and to enforce the arbitral award. But Respondent's reliance on *Compagnie Noga* confuses an assignee with a third-party beneficiary. "An unequivocal and complete assignment extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112,

125 (2d Cir. 1984); *see Valdin Invs. Corp. v. Oxbridge Cap. Mgmt., LLC*, 651 Fed. App'x 5, 7

(2d Cir. 2016) (summary order) ("Valdin's assignment of its rights extinguished its claims

against Oxbridge and deprived it of any interest in this litigation. Valdin therefore lacks

standing."); *Wistron Neweb Corp. v. Genesis Networks Telecom Servs., LLC*, 2023 WL 4493542,

at *1 (S.D.N.Y. July 12, 2023) (same); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,

403 F. Supp. 3d 257, 260 (S.D.N.Y. 2019) ("Where a valid assignment has been executed, the

assignee is 'the real party in interest' and 'the right to sue is exclusively' the assignee's."

(quoting *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404, 409 n.6 (S.D.N.Y. 2018))).  By

contrast, both the parties to the contract and an intended third-party beneficiary have standing to

enforce a contract.  *Wistron Neweb Corp.*, 2023 WL 4493542, at *1.  The petitioner in

*Compagnie Noga* had assigned its interest in the claim in that case.  2008 WL 3833257, at *5.

Accordingly, the holding in *Compagnie Noga* that the petitioner no longer had standing was and

remains unexceptional.  Acceptance of Respondent's argument here, on the other hand, would be

unprecedented.

## II.    Respondent's Arguments that the Arbitrator Exceeded His Powers

Respondent next argues that the arbitrator exceeded his powers in violation of Section

10(a)(4) of the FAA by (1) adjudicating claims for conduct that falls outside the scope of the

arbitration agreement in the LLCA and that is expressly subject to a London-seated arbitral

tribunal; (2) adjudicating the rights and duties of non-parties to the arbitration proceedings and

non-signatories to the LLCA; (3) adjudicating claims barred by the bankruptcy; (4) awarding

fees incurred in the bankruptcy case and the bondholder litigation, in a manner that both violates

the bankruptcy court's exclusive jurisdiction and is outside the scope of the LLCA's arbitration

clause; and (5) awarding fees and costs to non-prevailing parties.

The FAA permits vacatur of an arbitral judgment "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). The Second Circuit has "consistently accorded the narrowest of readings to section 10(a)(4) permitting vacatur where the arbitrator has exceeded [his] powers." *Jock v. Sterling Jewelers Inc.*, 942 F.3d 617, 622 (2d Cir. 2019) (quoting *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009)). The focus of the inquiry is "whether the arbitrator had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrator correctly decided that issue." *Id.* (alterations omitted) (quoting *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011)); *see also Subway Int'l, B.V. v. Subway Russia Franchising Co., LLC*, 2021 WL 5830651, at *4 (S.D.N.Y. Dec. 8, 2021); *LTF Constr. Co., LLC v. Cento Sols. Inc.*, 2020 WL 7211236, at *3 (S.D.N.Y. Dec. 7, 2020). "[A]n arbitrator may exceed her authority by, first considering issues beyond those the parties have submitted for her consideration, or second, reaching issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 942 F.3d at 622. "This is an extremely deferential standard of review." *Id.* "It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielson S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010).

## A.    Adjudication of Claims Subject to a Different Arbitration Agreement

Respondent argues that the arbitrator exceeded his powers under the arbitration clause of the LLCA by improperly adjudicating claims stemming from an alleged breach of the BOL. Dkt. No. 50 at 23–25. In particular, Respondent asserts that the dispute about whether the Company exercised the Purchase Option should have been arbitrated in London before the London Court of International Arbitration ("LCIA") under English law pursuant to the terms of

58

the BOL, and not in New York pursuant to the terms of the LLCA. *Id.* at 25. Respondent points to portions of the Award in which the arbitrator "concluded that because 'the conditions for the buyout were met . . . pursuant to the BOL, Levona's interests should have been transferred to Eletson Gas, or its nominee[,]" *id.* at 24 (quoting Dkt. No. 67-58 at 47), to posit that the arbitrator acted outside his scope of "authority to decide only those issues 'arising out of or relating to' the LLCA[,]" *id.* (quoting Dkt. No. 67-2 § 12.14). Respondent argues that the arbitrator therefore improperly awarded unjust enrichment damages for events "not governed by the arbitration agreement." *Id.* at 24 (internal citation omitted).

Respondent's arguments mirror those that it made to the arbitrator. *See* Dkt. No. 31-8. Before the arbitrator, Respondent argued that, in the words of the arbitrator, "whether the Option was exercised, or whether performance under the Option or Loan was completed, must be decided by the LCIA, not JAMS." *Id.* at 5. It further asserted, again in the words of the arbitrator, that "the issue of who controls the preferred units is outside of JAMS' jurisdiction because it requires the arbitrator to interpret and enforce the Transaction Documents, which, according to Respondent, provide for arbitration in the London Court of International Arbitration." *Id.*

The arbitrator twice rejected those arguments. In his ruling on the motion to strike, the arbitrator first concluded that, by filing counterclaims, Respondent had availed itself of the arbitral forum, submitted to JAMS, and waived any objection to the arbitrator's assertion of jurisdiction. *Id.* at 12. In the alternative, and independently, the arbitrator rejected Respondent's argument on the merits because the language of the arbitration provision in the LLCA was broad, and "[t]o the extent that the Transaction Documents or events or actions that occurred in connection with those transactions 'relat[e] to [the LLC Agreement] or the breach, termination,

enforcement, interpretation or validity thereof" the broad arbitration provision of the LLC

Agreement governs." *Id.* at 13 (quoting Dkt. No. 67-2 § 12.14(a)) (alterations in original). The

arbitrator rejected Respondent's proposed construction of the two arbitration provisions which

would "require that the parties arbitrate their disputes in two steps: first, go to London to

adjudicate performance under the Transaction Documents and then second, come to JAMS to

determine breaches under the [LLCA]." *Id.* at 14. According to the arbitrator, such an

interpretation "would render impossible the intent of the arbitration provision in the [LLCA],

which contemplates that the parties use best efforts to arbitrate to completion disputes within 150

days from the selection of the arbitrator." *Id.* In the Award, the arbitrator reiterated that Levona

itself had sought relief for counterclaims that the arbitrator could only award if he interpreted,

enforced and provided relief pursuant to the Transaction Documents, and had thereby waived

any jurisdictional objections concerning the claims and counterclaims. Dkt. No. 67-58 at 13.

At the outset, the parties dispute whether Respondent waived its objection to the

arbitrator's jurisdiction to determine if the Purchase Option was exercised. It is for the Court to

determine whether Respondent waived its objection. *Cf. Opals on Ice Lingerie v. Bodylines,

Inc.*, 320 F.3d 362, 368 (2d Cir. 2003) ("[I]n this case, Bodylines objected repeatedly to

arbitration, beginning with the statement by its counsel in June 1999 which inspired Opals to file

the instant litigation. Correspondence between the parties throughout the period of the dispute

further supports Bodylines' assertion that it continuously objected to arbitration. These

objections prevent a finding of waiver."). Further, the question of whether a party has waived its

right to object to the arbitrability of an issue is governed by federal law. *See, e.g., Woodcrest

Nursing Home v. Loc. 144, Hotel, Hospital, Nursing Home and Allied Services Union*, 788 F.2d

894, 899 (2d Cir.1986) (per curiam). Even where a party participates in arbitral proceedings, it is

not deemed to have waived its objection to arbitrability of an issue if it "consistently and vigorously maintained its objection to the scope of arbitration." *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 9 n.10 (1st Cir. 2000). "[T]he fact that a party 'forcefully object[s]' to having an arbitrator decide a dispute . . . suggests an unwillingness to submit to arbitration." *Opals*, 320 F. 3d at 369 (quoting *First Options of Chi. v. Kaplan*, 514 U.S. 938, 946 (1995) (alteration added)). Here, Respondent did not waive its objection. The first argument presented by Respondent in its response to the Petitioners' statement of claims was that the arbitrator lacked jurisdiction to determine whether the Purchase Option was exercised, stating: "the question of this matter is simple: who holds the preferred shares of [the Company] . . . ? As will be shown, this can *only* be resolved by an adjudication on the [BOL] and various other documents signed at the nexus of the transaction in question, all of which demand arbitration in London and are governed by English Law." Dkt. No. 67-17 at 1. Respondent again reiterated its objection to the arbitrator's jurisdiction to resolve the Purchase Option issue in its amended statement of counterclaims, Dkt. No. 67-25 at 1, in its motion to strike Petitioners' allegations regarding the Preferred Interests, Dkt. No. 67-40 at 5, and its post-hearing brief, Dkt. No. 67-48 at 55. Petitioner thus did not waive its objection to the arbitrator's jurisdiction to determine the Purchase Option issue.

Even so, however, Respondent's argument underlying the objection—that the arbitrator exceeded his authority in awarding unjust enrichment damages and in addressing the question of Levona's ownership of the Preferred Interests—is without merit. The Supreme Court and the Second Circuit have repeatedly "held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019); *see also First Options of Chi.*, 514 U.S. at 944–45 ("In this manner the law treats silence or ambiguity about

the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'—for in respect to this latter question the law reverses the presumption.") (emphasis in original). Moreover, when "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delete such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 209 (2d Cir. 2005); *see Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 72302, at *8 (S.D.N.Y. Jan. 6, 2022); *Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *16 (S.D.N.Y. Sept. 16, 2020); *Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400 (E.D.N.Y. 2014).

The arbitration agreement in the LLCA is broad. It provides that "[a]ny dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof (including the scope or applicability of this agreement to arbitrate) shall be determined by arbitration in New York County in the State of New York or any other mutually agreeable location, before a single arbitrator." Dkt. No. 67-2 § 12.14(a). The mandatory arbitration provision does not just apply to disputes or controversies arising out of the LLCA but also to any disputes or controversies "relating to" the LLCA. *See Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir. 2001); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995). The provision also is not limited to claims or controversies relating to breaches of the LLCA but to any dispute, claim or controversy relating to the "termination, enforcement, interpretation, or validity" of the LLCA. *See, e.g.*, *Davitashvili v. Grubhub Inc.*, 2023 WL 2537777 (S.D.N.Y. Mar. 16, 2023); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 65 (2010).

Moreover, and importantly, the parties clearly and unmistakably delegated to the arbitrators the authority to decide the scope and application or the agreement to arbitrate. The breadth of the authority the parties delegated to the arbitrator is reinforced by their decision that the arbitration would be "administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures." LLCA at 69. Rule 11 of the JAMS Rules and Procedures which provides, in relevant part, that jurisdictional disputes, including disputes over the interpretation and scope of the agreement to arbitrate, will be submitted to the arbitrator:

> A. Once appointed, the Arbitrator shall resolve disputes about the interpretation and applicability of these Rules and conduct of the Arbitration Hearing. The resolution of the issue by the Arbitrator shall be final.
>
> B. Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are the proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.[19]

Dkt. No. 55-1 at 9.

"[I]f a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.*; *see also Beijing Shougang Mining Inv. Co., Ltd. v. Mongolia*, 11 F.4th 144 (2d Cir. 2021); *Jock*, 942 F.3d at 624 ("[W]hen parties to an agreement explicitly incorporate rules that empower an arbitrator to decide an issue, 'the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.'" (quoting *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 (2d Cir. 2018)); *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 522–23 (S.D.N.Y. 2017) (finding clear and unmistakable intent based on contract language that

---

[19] The language "as a preliminary matter" conveys that the arbitrator is to decide the scope of the arbitration before addressing the merits and not to limit the scope of the arbitrator's authority. *Cf. Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (summary order); *Parrella v. Orange Rabbit, Inc.*, 2021 WL 4462809, at *8–9 (S.D.N.Y. Sept. 29, 2021).

stated "disputes arising out of or relating to interpretation or application of this Arbitration

Provision shall be decided by an Arbitrator and not by a court or judge"); *Fraternity Fund Ltd. v.*

*Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 575–76 (S.D.N.Y. 2005) (finding clear and

unmistakable intent based on contract language that delegated to an arbitrator disputes involving

"meaning, construction, validity and/or enforceability"). "'[O]nce the parties have agreed that an

arbitrator may decide questions regarding the scope of arbitrable issues in the first instance,'

federal courts are indeed required to afford deference to the arbitral tribunal's decision as to that

scope." *Beijing Shougang*, 11 F.4th at 156 (quoting *Schneider v. Kingdom of Thailand*, 688 F.3d

68, 76 (2d Cir. 2012)). The Second Circuit has instructed that the Court may disturb the

arbitrator's ruling as to jurisdiction only if the ruling did not fall "within his interpretative

authority" and if the arbitrators reasoning did not draw "its essence from the agreement to

arbitrate" but instead effectively "dispensed its own brand of justice." *Beijing Shougang*, 11

F.4th at 161 (internal quotation marks and citations omitted).

Respondent has not satisfied its burden to show that the arbitrator exceeded his

interpretative authority in awarding unjust enrichment damages and in deciding issues regarding

Levona's ownership of the Preferred Interests. *See Smarter Tools Inc. v. Chongqing SENCI*

*Import & Export Trade Co., Ltd.*, 57 F.4th 372, 378 (2d Cir. 2023) (burden is on party seeking to

vacate the award to show that arbitrator exceeded his authority). The Third Amended Statement

of Claims and Response to Counterclaims submitted by Petitioners asserted that Levona had

engaged in "egregious and ongoing breaches" of the LLCA. Dkt. No. 31-35 ¶ 1. In the Award,

the arbitrator found that Levona breached its obligations arising out of the LLCA, including by

bribing an employee of Corp and causing him to disclose confidential information, violating

confidentiality obligations itself, influencing Gas's financiers to turn against Petitioners by

causing the arrest of Gas's vessels and doing so without notifying Petitioners, failing to

acknowledge that Eletson had fully complied with the terms of the BOL Purchase Option,

improperly purporting to act on behalf of the Company in its business dealings with third parties,

improperly threatening Eletson and its affiliated officers and directors, improperly purporting to

seize control of the Company's board of directors post-March 11, 2022, improperly purporting to

assert control over the assets of the Company post March 11, 2022, improperly purporting to call

and hold meetings of the Board of Directors post March 11, 2022, and breaching its obligations

under the LLCA.  Dkt. No. 67-58 at 96–98.  The arbitrator did not purport to award damages for

breach of the BOL.  He awarded damages of $19,677,743,71 for the lost services of the Symi

and Telendos without the reciprocal transfer of the Preferred Interests.  The damages were based

on an estimate of what the Company would have made from the two vessels had it not

transferred them and was awarded to the Nominees because they flowed from Levona's refusal

to relinquish the Preferred Interests and the Nominees hold all title and interest in the Preferred

Interests.  *Id.* at 64–65.  The arbitrator also awarded $21,777,378.50 as directly calculable losses

arising from Levona's conduct that led to the vessel arrests, including lost revenues and fixed

costs incurred due to the arrests, payable to the Company as compensatory damages.  *Id.* at 65.

Finally, the arbitrator awarded $2,000,000 to be paid to the Company from a number of other

wrongful acts of Levona including the loss of access to capital, management distraction, and

reputational harm.  *Id.* at 66.

The arbitrator based his conclusion that he had authority to make these determinations on

the language of the arbitration provision in the LLCA, and did not dispense his own brand of

industrial justice.  The Court need not conclude that it would have reached the same decision as

the arbitrator to conclude that he acted within the authority granted him by the parties to

determine his own jurisdiction. *See Beijing Shougang*, 11 F.4th at 158, 161. The dispute—and

the arbitrator's ultimate determination of wrongful conduct—arose out of the LLCA and the

relationship between the parties formed as a result of the LLCA, and related not just to breaches

of the LLCA but also to its termination, enforcement and interpretation. Levona is in error when

it asserts that the award of unjust enrichment damages related to events "not governed" by the

LLCA.[20] It is precisely as a result of Levona's conduct that the arbitrator determined that the

Company and the Nominees suffered the damages the arbitrator found that they had suffered.

With respect to the unjust enrichment damages in particular, the arbitrator concluded that it was

because Levona had taken unilateral acts—without authority to do so under the LLCA—that the

Company had suffered foregone profits.

Levona is mistaken in its argument that the arbitrator was required as a matter of law to

forego determination of Petitioners' claims because the arbitrator could not conclude whether

Levona had engaged in wrongful conduct arising out of or relating to the LLCA without first

making an antecedent determination as to whether Eletson had properly exercised the Purchase

Option. Eletson's claim for damages turned upon conduct engaged in by Levona both before and

after the exercise of the Purchase Option, and the arbitrator did not award damages for Levona's

failure to honor the Purchase Option. Thus, to a large extent, the question of whether Eletson

---

[20] Thus, Levona's reliance on the dictum from *Smarter Tools* that "vacatur was necessary where, for example, the arbitrators exceeded their powers [by awarding damages] for events not governed by the arbitration agreement," 57 F.4th at 382, is not availing. *Smarter Tools* cited *In re Arbitration Between Melun Indus., Inc. & Strange*, 898 F. Supp. 990, 994–95 (S.D.N.Y. 1990), but the distance between the facts of this case and those of *Melun Industries* demonstrate the weakness of Respondent's argument. In *Melun Industries*, the arbitration provision at issue limited the arbitrator to resolving disputes over a post-closing adjustment and thus the arbitrator exceeded his authority by resolving issues regarding the accuracy of an opening balance sheet. The case bears no resemblance to this one in which the arbitration clause is broad and delegates issues regarding arbitrability to the arbitrator.

had properly exercised the Purchase Option was in the nature of an affirmative defense or an "anticipatory repudiation"—if Eletson had not exercised the option and if Levona had maintained its Preferred Interests, then arguably Levona would not have breached the LLCA and its conduct would not have violated any implied covenant of good faith and fair dealing.

The antecedent determination that the arbitrator was required to make here bears similarity to the antecedent determinations that courts are required to make when analyzing a claim for tortious interference, which only lies if the plaintiff had a business relationship with a third party that the defendant injured, and which may be overcome by a showing by the defendant that interference arose through the exercise of its equal or superior right in the breaching party's business. *See, e.g.*, *Lesnik v. Lincoln Financial Advisors Corp.*, 2020 WL 3057456, at *3 (S.D.N.Y. June 9, 2020) ("Under New York law, a claim for tortious interference with prospective economic advantage comprises four elements: (a) business relations with a third party; (b) that defendant knew of the relationship and interfered with it; (c) defendant acted with the sole purpose of harming the plaintiff or solely out of malice or used wrongful means; and (d) injury to that business relationship."); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 791 (S.D.N.Y. 2019) ("It is imperative that, in bringing a tortious interference claim, a plaintiff identify the relevant terms of the contract that existed that were breached by defendant.") (internal quotation marks omitted); *Lesesne v. Brimecome*, 918 F. Supp. 2d 221, 227 (S.D.N.Y. 2013) (noting the requirement that a plaintiff "identify the potential customers at issue when asserting a cause of action for interference with prospective economic advantage"); *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 835 N.Y.S.2d 530, 532 (2007) ("In response to such a claim, a defendant may raise the economic interest defense—that it acted to protect its own legal or financial stake in the breaching party's business."). In other words,

67

judicial bodies are called upon to make antecedent determinations about rights and obligations arising out of contracts even where the judicial body would not have jurisdiction to decide a dispute arising out of those contracts.

Further, once the arbitrator had properly seized jurisdiction of the dispute, it was not outside the scope of his remedial authority to determine that the Preferred Interests should be transferred to the Nominees. As the arbitrator reasoned, because Eletson asserted breaches of the LLCA, the parties were not required to "arbitrate their disputes in two steps: first, go to London to adjudicate performance under the Transaction Documents and then second, come to JAMS to determine breaches under the [LLCA]." *Id.* at 14.

### B. Adjudication of the Rights and Duties of Non-Parties to the Arbitration and Non-Signatories to the Arbitration Agreement

Respondent argues that the arbitrator improperly adjudicated the rights and duties of non-parties to the arbitration proceedings and non-signatories to the LLCA. Dkt. No. 50 at 17–22. Specifically, Respondent complains that the arbitrator could not have awarded damages to the Company, as a non-party to the arbitration proceedings, or to the Nominees, as non-parties to the arbitration proceedings and non-signatories to the LLCA. *Id.* at 19. It also takes issue with the arbitrator's award of damages against Murchinson and Pach Shemen as Levona's alter egos because Murchison and Pach Shemen were not parties to the arbitration proceedings and are not signatories to the LLCA. *Id.* at 22–23.

### 1. The Award of Relief to Non-Signatories and Non-Parties

Respondent argues that the arbitrator erred and exceeded his powers under the arbitration agreement by adjudicating the rights and obligations of the Company and the Nominees. Dkt. No. 50 at 19–22; Dkt. No. 59 at 6. Respondent argues that the arbitrator was without power to award damages to the Nominees because they were neither signatories to the LLCA nor parties

to the arbitration proceedings, Dkt. No. 50 at 19, and that he lacked power to award damages to
Gas because, although it was a signatory to the LLCA, it was not a party to the arbitration, *id.* at
19–20. The argument is without merit.

The arbitration agreement in the LLCA is broad. It commits to the arbitrator the
resolution of "[a]ny dispute, claim or controversy arising out of or relating to th[e LLCA] or the
breach, termination, enforcement, interpretation or validity thereof (including the determination
of the scope or applicability of this agreement to arbitrate) . . . ." Dkt. No. 67-2 at 69; *see
Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 652 (S.D.N.Y. 2011) ("An arbitration clause
covering '[a]ny claim or controversy arising out of or relating to th[e] agreement,' is 'the
paradigm of a broad clause.'" (quoting *Collins & Aikman Prods. Co.*, 58 F.3d at 20)); *see also
Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 35–36 (2d Cir. 2002); *Genesco, Inc. v. T.
Kakiuchi & Co., Ltd.*, 815 F.2d 840, 845 (2d Cir. 1987). It also provides "[t]he arbitration shall
be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures."
Dkt. No. 67-2 at 69.

"Where an arbitration clause is broad, arbitrators have the discretion to order such
remedies as they deem appropriate." *ReliaStar Life Ins. Co. of N.Y.*, 564 F.3d at 86. "It is not
the role of the courts to undermine the comprehensive grant of authority to arbitrators by
prohibiting an arbitral security award that ensures a meaningful final award." *Banco de Seguros
del Estado v. Mut. Marine Off., Inc.*, 344 F.3d 255, 262 (2d Cir. 2003); *see also Forschner Grp.,
Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 406 (2d Cir. 1997). Indeed, "arbitrators are
generally afforded greater flexibility in fashioning remedies than are courts." *Benihana, Inc. v.
Benihana of Tokyo, LLC*, 784 F.3d 887, 902 (2d Cir. 2015); *see Shasha v. Malkin*, 2021 WL
11960275, at *7 (S.D.N.Y. Mar. 24, 2021) ("Arbitrators 'may grant equitable relief that a Court

69

could not.'" (quoting *Sperry Int'l Trade, Inc. v. Gov't of Israel*, 532 F. Supp. 901, 905 (S.D.N.Y.

1982), *aff'd*, 689 F.2d 301 (2d Cir. 1982))); *see also* 1 M. Domke, Domke on Commercial

Arbitration § 35:1 (3d ed. 2003) (hereinafter "Domke on Commercial Arbitration") ("Limited

only by the broad concepts of equity and justice, an arbitrator has a plethora of remedies, both

legal and equitable, to choose from in structuring a remedy."). "Additionally, the parties to the

arbitration agreement can broaden the remedies available to them under the arbitration agreement

by incorporating the rules of an arbitration administering agency." Domke on Commercial

Arbitration § 35:2. Here, JAMS Rule 24 provides: "The Arbitrator may grant any remedy or

relief that is just and equitable and within the scope of the Parties' Agreement, including, but not

limited to, specific performance of a contract or any other equitable or legal remedy." Dkt. No.

67-3.

      The award to the Nominees and the Company here fell within the broad authority the

parties delegated to the arbitrator. An arbitrator under a broad arbitration provision has even

greater power than a court to award relief in favor of Gas and/or the Nominees as third-party

beneficiaries of the LLCA. *Benihana, Inc.*, 784 F.3d at 902; *Sperry Int'l Trade*, 689 F.2d at 306

("Under New York law arbitrators have power to fashion relief that a court might not properly

grant."). The arbitrator concluded that Respondent wrongfully denied the Nominees the

Preferred Interests to which they were entitled and that, by depriving them of the Preferred

Interests while retaining the two vessels, Levona was unjustly enriched at the Nominees'

expense. The arbitrator reasoned that the damages "flow[ed] directly from Levona's refusal to

relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the

preferred interests." Dkt. No. 47-5 at 64. The arbitrator had the authority to hold that the

Preferred Interests were transferred to the Nominees and award the Nominees damages. The

Court need not agree with that reasoning to conclude that it was within the arbitrator's power to determine that Levona's breach of its obligations to Petitioners could be most readily and effectively redressed by giving the party most directly injured the benefit the arbitrator found that Respondent unjustly enjoyed. As to the Company, the arbitrator determined that they too were directly injured by the conduct that the arbitrator found violated the LLCA—Levona caused the arrests of the Company's vessels and committed other breaches of contract. If it was within the power of the arbitrator to determine whether Levona breached the LLCA, it follows that it would be within the power of the arbitrator to grant the relief that the arbitrator believed was most effective to redress that breach.

Respondent's arguments to the contrary are without merit. Respondent contends that a non-party to the arbitration agreement that did not participate in the arbitration is not bound by the award rendered in the arbitration. *See, e.g.*, *Ali A. Tamini v. M/V Jewon*, 808 F.2d 978, 981 (2d Cir. 1987); *Dist. Council No. 9 v. APC Painting, Inc.*, 272 F. Supp. 2d 229, 240 (S.D.N.Y. 2003). Respondent's point that the Nominees and the Company were non-parties and that they did not participate in the arbitration has force. Neither the Nominees nor the Company were named as parties. Although representatives of each testified, they did so in their capacity as witnesses, and not in their capacity as parties. The Court has reviewed the arbitration filings and agrees with Respondent that it was not until the pre-hearing brief, months after the arbitration had commenced, that Petitioners asserted that the Preferred Interests should be transferred to the Nominees and not until after the hearing and in its proposed order that Petitioners asked that damages be awarded to Gas and to the Nominees and not to itself.

But that point gets Respondent only so far. Unlike the arbitrator's decision to award relief as against non-parties to the arbitration discussed below, the arbitrator's decision to award

71

damages to non-parties did *not* "bind nonparties to the arbitration." *Soleimani v. Andonian*, 2022

WL 748246, at *5 (S.D.N.Y. Mar. 10, 2022). It bound Levona, a party to both the arbitration

and the underlying contract, to pay damages to non-parties. Accordingly, the award "do[es] not

bind the[] non-parties in the sense proscribed by decisional law." *Matter of Arb. Between Cole*

*Pub. Co., Inc. v. John Wiley & Sons, Inc.*, 1994 WL 532898, at *4 (S.D.N.Y. Sept. 29, 1994).

Nor does the award "unnecessarily determine the rights of non-parties," as in cases where

petitioners sought to confirm awards that benefitted nonparties *without resolving the parties'*

*dispute*. *See, e.g.*, *Techcapital Corp. v. Amoco Corp.*, 2001 WL 267010, at *16 (S.D.N.Y. Mar.

19, 2001).

Respondent also relies upon the Sixth Circuit decisions in *NCR Corp. v. Sac-Co, Inc.*, 43

F.3d 1076 (6th Cir. 1995), *Nationwide Mutual Insurance Co. v. Home Insurance Co.*, 330 F.3d

843, 849 (6th Cir. 2003), and *Armco Employees Independent Federation, Inc. v. AK Steel Corp.*,

149 F. App'x 347 (6th Cir. 2005). None is apposite. In *NCR Corp.*, all parties agreed that the

arbitrator exceeded his powers by awarding "class action type relief in a case that was not a class

action." 43 F.3d at 1080. One of NCR's authorized dealers asserted a claim in arbitration of

unfair competition; the arbitrator not only awarded that dealer punitive damages but also

awarded "punitive damages to all of NCR's United States nonservicing dealers even though only

one nonservicing dealer . . . was a party to the action before the arbitrator." *Id.* at 1078. In

*Nationwide*, the reviewing court had previously determined that the third-party eventually

awarded relief could not be a party to the arbitration given its contractual relationship with the

parties to the arbitration, and that the only relief available in the arbitration was to the parties

before the arbitrator. 330 F.3d at 847 ("In *Nationwide I*, we held that Nationwide could not bring

suit directly against CIGNA, or compel CIGNA to submit to arbitration, because of a third-party

72

disclaimer provision in the assumption contract between Home and CIGNA. We construed this disclaimer provision as a limitation on the obligations CIGNA undertook in its assumption contract with Home. Therefore, Nationwide's only recourse was against Home, and CIGNA and its affiliates were not parties to the arbitration."). The court concluded that the award was in manifest disregard of the law and the Circuit's prior opinion because it purported to adjudicate and create rights that were not the subject of the arbitration. *Id.* Put differently, the court in *Nationwide* held that relief could not be awarded to a third-party because the relevant contracts did not provide for it. *Id.* at 848 ("Thus, the arbitration award unambiguously exceeds the terms of the Nationwide-Home contractual dispute."). Notably, the court did not contest the proposition proffered by the appellee that, if the award was construed, simply to direct relief by which the appellant could discharge its legal obligations, it could be confirmed. *Id.* Finally, in *Armco*, the Sixth Circuit held that the labor arbitrator exceeded his powers by awarding relief in an arbitration brought by the defendant's apprentices who complied with the collective bargaining agreement's grievance procedures also to those apprentices who did not comply with those grievance procedures. *Armco*, 149 F. App'x at 350–52. The court concluded, "[l]imiting relief to those apprentices who properly complied with the group grievance procedure is consistent with the terms of the CBA" and that the arbitrator's award to all apprentices, including those who did not comply with the grievance procedure demonstrated a "clear infidelity" to the collective bargaining agreement because it conflicted not only with the terms of the collective bargaining agreement, but also with "the parties' intent in entering into an agreement that sets forth such detailed provisions for filing grievances." *Id.* at 351–52.

The cases offered by Respondent thus do not stand for the universal proposition that an arbitrator determining a dispute under a broad arbitration agreement lacks authority to grant

monetary relief directly to third parties. In those cases, the arbitrator's award either depended on the determination of the rights of persons who were not parties to the arbitration, or granted relief to parties that a court had previously held could not be awarded relief in the arbitration. In this case, by contrast, the Award did not rest upon a determination that a wrong was committed as against the Company or the Nominees independent of the wrongs committed to Petitioners. It rested upon a determination the rights of Corp and Holdings—including the right to exercise the Purchase Option—were violated and that the payment of monies to the third parties was the most effective means of providing relief. The Award does direct a remedy by which Respondent will "discharge its legal obligations" to Petitioners. *Nationwide*, 330 F.3d at 847. The Award thus cannot be disturbed on the basis that because relief was directed to persons other than the Petitioners the arbitrator exceeded his authority under the arbitration agreement.

### 2. The Award of Relief Against Non-Parties

Respondent next argues that because Murchinson and Pach Shemen were not parties to the arbitration, the arbitrator could not award relief against them and in favor of Petitioners. Dkt. No. 50 at 22-23; Dkt. No. 59 at 8. For their part, Petitioners assert that they seek *confirmation* of the award only as against Levona, and not against Murchinson or Pach Shemen. Dkt. No. 54 at 13. Petitioners argue that—with respect to the liability of Murchinson and Pach Shemen—the Court should merely confirm the *factual findings* of the arbitrator regarding the roles and actions of Murchison and Pach Shemen, as the issues of the relationship among Levona, Murchinson, and Pach Shemen were before the arbitrator and the arbitrator's findings cannot be revisited by a court on a petition to confirm an award. Dkt. No. 54 at 13. Specifically, the arbitrator based his award of relief against Murchison and Pach Shemen on his conclusion that "Levona, Murchinson, and Pach Shemen, are each alter egos of the other concerning every fact proven in

74

this matter and every item of relief awarded herein." Dkt. No. 67-58 at 96. As a result, "and for the avoidance of any doubt, any judgments against Levona are also against each alter ego." *Id.*

Respondent's argument has merit. "[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *see Schneider v. Kingdom of Thailand*, 688 F.3d 68, 71 (2d Cir. 2012) ("The question whether the parties have submitted a particular dispute to arbitration, i.e., the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." (quoting *Howsam*, 537 U.S. at 83)). "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chi.*, 514 U.S. at 943. Thus, "a decision whether parties other than those formally signatories to an arbitration clause may have their rights and obligations determined by an arbitrator when that issue has not been submitted to him is not within the province of the arbitrator himself but only of the court." *Orion Shipping & Trading Co. v. E. States Petroleum Corp. of Panama, S.A.*, 312 F.2d 299, 301 (2d Cir.), *cert. denied*, 373 U.S. 949 (1963). "[W]here the petitioners contend that they are not 'bound to [the] arbitration agreement, the issue of arbitrability is for the Court in the first instance.'" *Kwatin v. Mason*, 356 F. Supp. 3d 343, 348 (S.D.N.Y. 2018) (quoting *Boroditskiy v. European Specialties LLC*, 314 F. Supp. 3d 487, 493 (S.D.N.Y. 2018)); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 466 (S.D.N.Y. 2018) (stating that "whether [the non-signatory] is to be a party to the [arbitration agreement] is an issue for judicial determination first"); *Boroditskiy*, 314 F. Supp. 3d at 493 (noting that "in cases where a party disputes whether it is bound to an arbitration agreement, the issue of arbitrability is for the Court in the first instance" (quotation

marks omitted)); *Herman Miller, Inc. v. Worth Cap., Inc.*, 173 F.3d 844, (2d Cir. 1999)

(summary order) ("The question of 'whether a person is a party to [an] arbitration agreement' is

a threshold question to be determined by the court, and not by an arbitrator." (quoting *Interbras*

*Cayman Co. v. Orient Victory Shipping Co.*, 663 F.2d 4, 7 (2d Cir.1981) (per curiam))).

Although parties may delegate questions of arbitrability to the arbitrator "so long as the parties'

agreement does so by 'clear and unmistakeable' evidence," "before referring a dispute to an

arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein,*

*Inc.*, 139 S. Ct. at 530 (quoting *First Options of Chi.*, 514 U.S. at 944); *see Pacelli v. Augustus*

*Intel., Inc.*, 459 F. Supp. 3d 597, 605 (S.D.N.Y. 2020). These principles stem from the fact that

arbitration is "a creature of contract." *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir.

2019); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011). "[A]rbitration 'is a

matter of consent, not coercion.'" *Stolt-Nielsen*, 559 U.S. at 681 (quoting *Volt Info. Scis., Inc. v.*

*Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Accordingly, "the FAA

does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478

(quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)); *see*

*also Stolt-Nielsen*, 559 U.S. at 683 (holding that "parties may specify *with whom* they choose to

arbitrate their disputes").

There are limited circumstances in which a person who is not party to an arbitration

agreement will be bound by an arbitral award. A court upon motion may *compel* a non-signatory

to an arbitration agreement to participate in an arbitration. The Second Circuit has recognized

five theories for requiring non-signatories to arbitrate: "1) incorporation by reference; 2)

assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF, S.A. v. Am.*

*Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995); *see also Oriental Com. & Shipping Co. v. Rosseel,*

*N.V.*, 609 F. Supp. 75, 78 (S.D.N.Y. 1985) ("It is within the province of this Court to determine whether Oriental S.A., although not formally a party to the arbitration agreement, should be made a party to the arbitration proceeding in addition to Rosseel and Oriental U.K.").  District courts are instructed to "narrowly construe these five theories, each of which is governed by ordinary principles of contract and agency law." *Boroditskiy*, 314 F. Supp. 3d at 493.  As such, an "agreement to arbitrate does not bind an agent acting on behalf of a disclosed principal 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'" *Veera v. Janssen*, 2005 WL 1606054, at *3 (S.D.N.Y. July 5, 2005) (quoting *Lerner v. Amalgamated Clothing & Textile Workers Union*, 938 F.2d 2, 5 (2d Cir. 1991)).

In addition, a person who is not a party to an arbitration agreement may nonetheless become bound by the arbitrator's award if that person initiates the arbitration or participates, without objection, in the arbitration proceedings. *Cf. Cole Publishing Co.*, 1994 WL 532898, *4 ("[I]t has long been recognized that an arbitration award cannot be enforced against a non-party to the arbitration clause who did not participate in arbitration proceedings.").  Although "arbitrators do not have the power to bind a corporation which is not a party to the arbitration or a voluntary participant in the arbitration proceeding," *Am. Renaissance Lines, Inc. v. Saxis S.S. Co.*, 502 F.2d 674, 677 (2d Cir. 1974), they do have the authority to bind a voluntary participant in the arbitration proceeding, *see LGC Cap. Holdings, Inc. v. Julius Klein Diamonds, LLC*, 238 F. Supp. 3d 452, 473 (S.D.N.Y. 2017) (holding that individual non-signatories to an arbitration agreement "waived any right to object to the imposition of personal liability" by participating voluntarily in the proceeding, including by listing themselves in their personal capacity as respondents in the proceeding); *Halley Optical Corp. v. Jagar Int'l Mktg. Corp.*, 752 F. Supp.

77

638, 639–40 (S.D.N.Y. 1990) (finding waiver of objection to the imposition of personal liability where an individual participated in arbitration in order to ensure a party does not "participate in an arbitration, with the assurance that if it loses it may later challenge whether it had ever agreed to arbitration").

Finally, an alter ego to a participant in an arbitration or a party to an arbitration agreement can also be required to satisfy an arbitral award in the absence of an order compelling a party to arbitrate, or of actual participation in the arbitral proceedings. *See, e.g.*, *Blue Whale Corp. v. Grand China Shipping Dev. Co., Ltd.*, 722 F.3d 488 (2d Cir. 2013). However, in that circumstance, the proper vehicle is not an application under the FAA or the New York Convention to confirm the award issued in connection with a proceeding in which the third party did not participate and was not compelled to participate. An award against a person who is not a party to a arbitration agreement or who has not participated either voluntarily or by compulsion in an arbitration proceeding cannot be confirmed. The award may be confirmed only to the extent that it orders relief against a party or a participant. If the prevailing party seeks to hold the alter ego responsible for the relief awarded by the arbitrator, it must do so through a separate action in court to pierce the corporate veil. *See GE Transp. (Shenyang) Co. v. A-Power Energy Generation Sys., Ltd.*, 2016 WL 3525358, at *6 (S.D.N.Y. June 22, 2016); *APC Painting, Inc.*, 272 F. Supp. 2d at 240 ("[C]ase law is clear that in the commercial arbitration context the corporate veil cannot be pierced as part of a motion to confirm the arbitration award." (citing *Productos Mercantiles E Endustriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46–47 (2d Cir. 1994))); *see also Orion Shipping & Trading Co.*, 312 F.2d at 301 ("It may well be . . . that Eastern Panama is thoroughly dominated by Signal, and that Signal is properly accountable on an 'alter ego' theory. But we hold that an action for confirmation is not the proper time for a

78

District Court to 'pierce the corporate veil.'").  "[T]he question of whether a third party not named in an arbitral award may have that award enforced against it under a theory of alter-ego liability . . . is one left to the law of the enforcing jurisdiction, here the Southern District of New York, under the terms of Article III of the New York Convention," *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 74 (2d Cir.), *cert. denied*, 583 U.S. 1039 (2017), in which the Court applies the federal common law of veil piercing, *see, e.g.*, *Global Gaming Philippines, LLC v. Razon*, 2023 WL 5935640 (S.D.N.Y. Sept. 12, 2023).[21]

The arbitrator thus exceeded his authority when he ruled that Pach Shemen and Murchinson were required to pay damages to Levona.  *See Orion Shipping & Trading Co.*, 312 F.2d at 300 (concluding that the district court "held, properly we think, the arbitrator exceeded his powers in determining the obligations of a corporation which was clearly not a party to the arbitration proceeding, and that Signal's motion to vacate the award against it should be granted"); *Porzig*, 497 F.3d at 140–41 (vacating arbitral award of relief against a non-party to the arbitration after stating that "[t]he authority of the arbitral panel is established only through the contract between the parties who have subjected themselves to arbitration, and a panel may not exceed the power granted to it by the parties in the contract").  Here, only Levona—not Murchinson or Pach Shemen—was party to the LLCA, which contained the arbitration provision that Petitioners invoked.  There is no dispute that Murchinson and Pach Shemen did not agree to the LLCA, were not signatories to the LLCA, were not parties to the LLCA, and were not bound

---

[21] "An alter ego relationship is not easy to establish," and exists "only where the instrumentality is so extensively controlled that a relationship of principal and agent is created or where affording the entity separate juridical status would work fraud or injustice." *Esso Expl. & Prod'n Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 59 (2d Cir. 2022); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) (same).  Common ownership and control is not enough.  *See, e.g.*, *Thomson-CSF*, 64 F.3d at 788.

by the LLCA. Murchinson and Pach Shemen were thus also not bound by the arbitration

provision in the LLCA. There also is no evidence or argument that Levona had the authority to

bind Murchinson or Pach Shemen to the LLCA. The arbitrator had no authority to make

Murchinson or Pach Shemen parties to the arbitration and, even if he did, he did not exercise that

authority. Petitioners did not seek an order from a court compelling non-signatories Murchinson

or Pach Shemen to participate in the arbitration under the LLCA. Petitioners never claimed that

Murchinson or Pach Shemen were required to participate in the arbitration under a theory of

incorporation by reference, assumption, agency, veil-piercing, or estoppel. The JAMS

Comprehensive Arbitration Rules and Procedures, pursuant to which Eletson and Levona agreed

to arbitrate in the LLCA, Dkt. No. 67-2 § 12.14(a), requires each party to serve on the other a

Notice of Claims, "afford[ing] all other Parties reasonable and timely notice of its claims," Dkt.

No. 67-3 § 9. None of Eletson's Notice of Claims name Murchinson or Pach Shemen or seek

relief against Murchinson or Pach Shemen; Eletson does not claim here that it served

Murchinson or Pach Shemen with its Notice of Claims. Indeed, the Third Amended Statement

of Claims and Response to Counterclaims which was the basis of Eletson's claims in the

arbitration names only Levona; it does not name Pach Shemen or Murchinson, seek to compel

them to participate in the arbitration, or seek relief against them. Dkt. No. 31-35. Among other

things, Petitioners sought as relief "the damages that they have suffered because of Levona's

unlawful conduct together with punitive damages and attorneys' fees and costs." *Id.* ¶ 6(e).

Indeed, it was not until after the hearing had concluded that Petitioners asked the arbitrator to

award any relief against Pach Shemen and Murchinson and even then it did not do so by serving

Murchinson or Pach Shemen with papers or seeking to bring them in to the arbitration. Snuck

into the second page of Petitioners' post-hearing proposed order was the request that Murchinson

and Pach Shemen (along with hedge funds Nomis Bay and BPY) should be found to be alter

egos of Levona and responsible for "every item of relief awarded herein." Dkt. No. 67-47 at 2.

Tellingly, even then, the proposed order asked only that Levona pay damages.[22] *Id.* at 6–7. But,

by that point the hearing was over. Pach Shemen and Murchinson had no notice prior to the

hearing that they may ultimately be deemed liable in the proceedings, no opportunity to be heard,

and no opportunity to defend themselves. Their rights were adjudicated without affording them

any opportunity to be heard.

The Court therefore vacates the portions of the Award that purport to find Murchinson

and Pach Shemen liable, or that require them to pay damages to Petitioners, the Company, or the

Nominees. Section 11 of the FAA gives the court the power to modify or correct an award on

the ground that "the arbitrators have awarded upon a matter not submitted to them, unless it is a

matter not affecting the merits of the decision upon the matters submitted." 9 U.S.C. § 11. The

power is discretionary, and not mandatory. *See Sociedad Armadora Aristomenis Panama, S.A. v.

Tri-Coast S.S. Co.*, 184 F. Supp. 738, 741 (S.D.N.Y. 1960); *see also Cortez Byrd Chips, Inc. v.

Bill Harbert Constr. Co.*, 529 U.S. 193, 197–98 (2000). In the alternative, the FAA gives the

Court the power to vacate an award on the grounds that the arbitrator exceeded his power. 9

U.S.C. § 10(a)(4); *see Smarter Tools*, 57 F.4th at 381–82. In this case, it is an appropriate

exercise of discretion to modify the Award and not to vacate it in its entirety. The questions of

whether Levona was liable to Eletson and whether Levona could be held responsible under the

LLCA for the conduct of Murchinson and Pach Shemen were before the arbitrator. That the

arbitrator exceeded his powers in ordering relief directly against Murchinson and Pach

_____

[22] The Award, which recites that Levona, Murchinson, and Pach Shemen, pay compensatory and
punitive damages and attorney's fees, costs, expenses, and interest, as alter egos, jointly and
severally, Dkt. No. 67-58 at 99-100, exceed the relief requested by Eletson.

Shemen—because they were not signatories to the LLCA and were not parties to the arbitration—does not alone relieve Levona from liability for its role in the conduct of those entities.

Petitioners do not dispute that Pach Shemen and Murchinson cannot be bound as parties to the Award. They respond only that the Court should confirm "the factual findings involving the rules and actions of Murchinson and Pach Shemen, as these issues were arbitrated and submitted to Justice Belen for adjudication." Dkt. No. 54 at 13. That argument, however, is a non-sequitur. Under the New York Convention and the FAA, the Court does not confirm "factual findings." As Eletson itself emphasizes, the Court "cannot revisit or question the fact finding . . . that produced a challenged arbitration award." Dkt. No. 54 at 14 (citing *PDV Sweeny, Inc. v. Conocophillips Co.*, 670 F. App'x 23, 24 (2d Cir. 2016) (summary order)). It confirms an arbitral award. *Diapulse Corp. of Am. v. Carba, Ltd.*, 626 F.2d 1108, 1110 (2d Cir. 1980). A portion of the Award here, if confirmed in its entirety, would direct Murchinson and Pach Shemen to pay damages. And whether Pach Shemen and Murchinson are liable to pay damages was not a question submitted to Justice Belen for decision. Thus, it is no answer to say that Pach Shemen and Murchinson can raise their arguments in an action by Petitioners for enforcement. Petitioners have not demonstrated that they are entitled to an Award confirmed against Murchinson and Pach Shemen and Respondent has shown that that portion of the Award must be vacated. It may be that Petitioners could have obtained an order compelling Murchison and Pach Shemen to participate in the arbitration even though they were not signatories to the LLCA. Eletson may yet have the opportunity to seek to hold Murchinson and Pach Shemen responsible for Levona's obligations under the Award. But, not having sought to make Murchinson or Pach Shemen a party to the arbitration, they must do so through a separate action

82

for veil-piercing. They may not do so through findings and an award as to which Murchinson and Pach Shemen had no opportunity to be heard.

### C.     Arbitration of Claims Barred by the Bankruptcy Stay

Respondent argues that the arbitrator violated the Lift Stay Order and the bankruptcy stay by determining that the Preferred Interests had been assigned to the Nominees and by awarding damages based on the alleged bad faith bankruptcy filing. Dkt. No. 50 at 25–27. Petitioners respond that the arbitrator acted within his authority under the Lift Stay Order and that Respondent has waived any claim based on the arbitrator's failure to operate within the confines of that order by not raising any issue until after the arbitration record closed and then only with respect to the fee award. Petitioners suggest that the claim for violation of the Status Quo Injunction was pending before April 17, 2023 because the issue of the bankruptcy filing having been made in bad faith was the subject of correspondence and motion practice before the arbitrator in March 2023, and because the arbitrator himself stated that the filing of the involuntary petition may have been a violation of the Status Quo Injunction. Thus, Petitioners argue that the violation of the Status Quo Injunction was not a new claim but an issue relating to a preexisting order of the Tribunal. Dkt. No. 54 at 19.

The arbitrator's exercise of authority did not violate the automatic stay or the Lift Stay Order. The automatic stay itself did not prohibit Eletson from litigating its claims against Levona or from asking the arbitrator to find that the Preferred Interests had been transferred to the Nominees. "Section 362 of the Bankruptcy Code provides that the filing of a bankruptcy petition creates an automatic stay against 'the commencement or continuation . . . of a judicial, administrative, or other action or proceeding *against the debtor* that was or could have been commenced before the commencement of the case.'" *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994) (quoting 11 U.S.C. § 362(a)(1)). "The general purpose" underlying

the provision "is to grant complete, immediate, albeit temporary relief to the debtor from
creditors, and to prevent dissipation of the debtor's assets before orderly distribution to creditors
can be effected." *S.E.C. v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000) (quoting *Penn Terra Ltd. v.
Dep't of Envtl. Res.*, 733 F.3d 267, 271 (3d Cir. 1984)). For this reason, "any proceedings or
actions described in section 362(a)(1) are void and without vitality if they occur after the
automatic stay takes effect." *Rexnord Holdings*, 21 F.3d at 527. However, "the automatic stay is
inapplicable to suits *by* the bankrupt 'debtor,' as he is now called." *Martin-Trigona v. Champion
Fed. Sav. & Loan Ass'n*, 892 F.2d 575, 577 (7th Cir. 1989); *see also Koolik v. Markowitz*, 40
F.3d 567, 568 (2d Cir. 1994) (per curiam) ("[T]he automatic stay is applicable only to
proceedings 'against' the debtor."); *In re Berry Ests., Inc.*, 812 F.2d 67, 71 (2d Cir. 1987)
(holding that the automatic stay did not apply to state court actions brought by the debtor);
*Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)
("Section 362 by its terms only stays proceedings against the debtor."). Even if it would have an
adverse impact on the property of the bankruptcy estate, an action against a third party is not
subject to the automatic stay unless it is "legally certain[] to impact estate property." *Picard v.
Fairfield Greenwich Ltd.*, 762 F.3d 199, 208 (2d Cir. 2014). [23]

---

[23] The automatic stay does not "implicate mere ministerial acts performed by the clerk following
the completion of the judicial function," but does prevent the court from making any "judicial
decisions . . . after the filing of petitions in bankruptcy." *Rexnord Holdings,* 21 F.3d at 528; *see
In re Fogarty*, 39 F.4th 62, 77 (2d Cir. 2022) ("The 'ministerial act' exception represents an
exceedingly narrow category of actions that avoid the automatic stay."). Petitioner does not
argue that the act of confirmation under the New York Convention and the FAA is merely
ministerial.

Neither Eletson's claims nor the Award violated the automatic stay.[24]  Through the arbitration, Eletson sought a declaration and determination that it had complied with all of the obligations necessary to complete the option and that the option was exercised and completed on March 11, 2022, Dkt. No. 31-35 at 23, and that Levona be ordered to transfer any preferred shares it was found to have to Eletson, *id.* at 24.  Eletson did not assert claims against Holdings. Moreover, although Eletson's claims included "factual allegations" regarding the election of the Nominees that might overlap in any fraudulent conveyance action that the Trustee in the Holdings' bankruptcy case or another party would choose to bring in the future to recover assets of the estate, the "legal bases" for Eletson's claim in the arbitration is "independent" of any such claim and do not "depend in substance" on the question whether Eletson or Holdings may have wrongfully transferred its interest in the option to the Nominees.  *Picard*, 762 F.3d at 209.  Thus, Levona cannot use the automatic stay—a statutory safeguard "intended to protect the debtor and to assure equal distribution among creditors"—as "a weapon against the estate."  *Winters ex rel. McMahon v. George Mason Bank*, 94 F.3d 130, 135 (4th Cir. 1996) (quoting *In re Globe Inv. & Loan Co.*, 867 F.2d 556, 560 (9th Cir. 1989)); *see also Leeber Realty LLC v. Trustco Bank*, 2019 WL 498253, at *11 (S.D.N.Y. Feb. 8, 2019) ("Because the automatic stay's primary purpose is to preserve a bankrupt's estate for the benefit of all creditors, courts consistently hold that actions

---

[24] Eletson argues that Levona waived its rights to complain that the arbitrator exceeded his authority because it raised the issue about which it complains with the bankruptcy court in May 2023, but then did not file additional motions for relief.  Dkt. No. 54 at 20.  That argument is without merit.  Levona moved to strike Eletson's allegations that the Preferred Interests had been transferred to the Nominees or, in the alternative, to dismiss Eletson's claims.  Dkt. No. 31-37.

brought *by* a debtor are not subject to the automatic stay."), *aff'd*, 798 F. App'x 682 (2d Cir.

2019) (summary order).[25]

While Eletson sought an order compelling Levona to transfer to Eletson any preferred

shares it was found to have, Dkt. No. 67-24 at 23, that request is more accurately understood as a

demand that the arbitrator order Levona to turn over the Preferred Interests to the Company or

whomever, under the BOL, the Company elected as its nominees. As Eletson has argued, the

question regarding the identity of the recipient of the preferred shares would be a matter of

indifference to Levona in its capacities as contractual counterpart under the LLCA and the BOL.

If the Company did in fact exercise its option to buy Levona's preferred shares as the arbitrator

found, the Company had the sole authority, without any input by Levona, to determine who

should receive the preferred shares. Levona, which, pursuant to the arbitrator's findings, no

longer had control over the Company, had no interest in the matter.

For all of those reasons, Levona is mistaken in its argument that the arbitrator improperly

usurped the powers of the bankruptcy court by determining that Eletson had properly exercised

the option and that, as a result, the Nominees were entitled to the Preferred Interests. Nor will

this Court have violated the Automatic Stay by confirming the Award. The Award, by its terms,

only declares that "Eletson effectively exercised the buyout option granted in the Binding Offer

Letter," that "as of March 11, 2022, . . . Levona had no membership interest in" the Company,

that the Company "exercised its rights under *the BOL* to nominate three entities—Fentalon,

Apargo, and Desimusco, (the Preferred Nominees)—affiliated with the principals of Claimants,

---

[25] Levona's counterclaims against Eletson arguably did constitute an action against the debtor. *See Koolik*, 40 F.3d at 568 (holding that "a counterclaim against a plaintiff who becomes a bankruptcy debtor is an 'action or proceeding against the debtor' within the meaning of § 362(a)(1), notwithstanding the fact that the plaintiff initiated the lawsuit"). However, the bankruptcy court permitted those claims to go forward.

as the parties to receive the preferred interests in the Company," and that "[t]he preferred interests in the Company were transferred to the Preferred Nominees, effective as of March 11, 2022, and the Preferred Nominees are permitted transferees *under the LLCA*." Dkt. No. 47-5 at 96–97 (emphasis added). In short, the arbitrator adjudicated claims only as between Eletson and Levona and only under the BOL and LLCA. The arbitrator did not purport to address the questions—now raised by Levona—whether the Company or Holdings improperly elected the Nominees or whether the transfer to the Nominees of the Company's right to the Preferred Interests effected a fraud on the creditors of Holdings and the arbitrator's findings can have no collateral estoppel effect on those questions. *See* Restatement (Second) of Judgments § 84 cmt. c (1982) ("Giving claim preclusive effect to an arbitration award does not necessarily imply that such an award should also be given issue preclusive effects. It is coherent to treat an arbitration proceeding as wholly self-contained, conclusive as to the claims represented in the award but inoperative beyond them."). It therefore did not intrude on the authority of "the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re U.S. Lines, Inc.*, 197 F.3d 631, 640 (2d Cir. 1999), *cert. denied*, 529 U.S. 1038 (2000). The arbitrator's actions did not "dissipate estate assets or interfere with the trustee's orderly administration of the estate." *In re Fogarty*, 39 F.4th at 71 (quoting *Picard*, 762 F.3d at 207). The arbitrator did not "decide whether claims belonging to a debtor are property of the bankruptcy estate." Dkt. No. 38 at 2. The issues the bankruptcy court will have to decide were not before the arbitral proceedings nor was it necessary for the arbitrator to decide whether the election by Eletson that the Preferred Shares go to the Nominees rather than to the Company effected a fraud on the creditors of Holdings. Those issues therefore remain open for the bankruptcy court to decide.

87

*See Global Gaming Phillipines*, 2023 WL 5935640, at *3–4 (stating standards for application of issue preclusion to arbitral findings); *see also* Restatement (Second) of Judgments §§ 27, 84 (1982).

Thus, by confirming the arbitral award, the Court also will not intrude on the bankruptcy court's exclusive authority to decide what is property of the estate. *See Universal Well Servs., Inc. v. Avoco Nat. Gas Storage*, 222 B.R. 26, 30 (W.D.N.Y. 1998) ("[T]he decision as to what is and is not 'property of the estate' lies within the exclusive jurisdiction of the bankruptcy court."). As Eletson itself has emphasized, the Court's role on a petition to confirm an arbitral award is "very limited." Dkt. No. 54 at 5 (quoting *LiveWire Ergogenics, Inc. v. JS Barkats PLLC*, 645 F. Supp. 3d 290, 297 (S.D.N.Y. 2022)). The confirmation of an arbitration award "ordinarily is 'a summary proceedings that merely makes what is already a final arbitration award a judgment of the court.'" *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 132 (2d Cir. 2015) (quoting *D.H. Blair & Co.*, 462 F.3d at 110); Jay E. Grenig, Int'l Com. Arb. § 13:1 (Hilary Shroyer ed., 2023) ("Once a court has confirmed an award and reduced it to a judgment, a party may then seek a court in any Convention country with jurisdiction over the assets of the losing party that can be executed on to satisfy a money judgment. Finding such a court, the prevailing party may take the award that has been confirmed and reduced to a judgment, and petition the new court for recognition and enforcement."). The Court does not review the merits of the dispute and must "confirm an arbitration award unless it concludes that one of the enumerated grounds for refusing to enforce the award is present." *Citigroup*, 776 F.3d at 132 n.4 (internal citations and quotation marks omitted). Eletson has stated that it "intends to return to the Bankruptcy Court following this Court's ruling on confirmation and will prove then that the Arbitral Award does not even arguably involve property belonging to Holdings's estate." Dkt. No. 33 at 3; *see also*

Dkt. No. 35 at 3 ("Eletson intends to return to the Bankruptcy Court following this Court's confirmation ruling, to address enforcement issues.").  It is in that forum, in the first instance, that the Court can address the timing of the election by Eletson that the Preferred Interests should go to the Nominees and whether the Preferred Interests should be considered to be property of the estate or should be clawed back or avoided.[26]  *See Stone Container Corp. v. Tradeway Int'l Corp.*, 1994 WL 184661, at *3 (S.D.N.Y. May 12, 1994) ("[T]he issue of preferential transfers is properly an issue for the Bankruptcy Court to consider.  Therefore, the Court [will not] rule on the alleged transfers.").

For similar reasons, the prosecution of the violation of the Status Quo Injunction also did not violate the automatic stay.  That claim was leveled by Eletson against Levona.  *See Koch v. Preuss*, 2020 WL 1304084, at *3 (S.D.N.Y. Mar. 18, 2020).  It did not intrude upon the assets of the bankruptcy estate.  *See Martin-Trigona*, 892 F.2d at 577.  It could be argued that Eletson—by asking at the last minute that damages be paid to the Company and not to itself—transferred a claim that belonged to the estate or an entity owned by the estate to a non-debtor and that the damages awarded to the Company should instead be for the benefit of the creditors of Holdings, but the Court need not now address that issue (if it ever needs to be addressed).  The arbitrator had before him no issue with respect to the rights as between Holdings and the Company, and no order this Court will issue confirming the award thus could affect the rights as between Holdings and the Company.

---

[26] *Marquis Yachets v. Allied Marine Grp., Inc. (North)*, 2010 WL 1380137 (D. Minn. Mar. 31, 2010), upon which Levona relies, is distinguishable.  In that case, the court held that an arbitration panel exceeded its powers by deciding rather than staying claims in an arbitration brought against the debtor, not by the debtor, but nonetheless declined to modify the arbitration award because the panel was acting within its powers by continuing the arbitration award on claims to which the stay did not apply.

Finally, the Award of the Preferred Interests to the Nominees and damages to the

Company for violation of the Status Quo Injunction does not violate the Lift Stay Order or the

automatic stay. First, with respect to the Lift Stay Order, that order, by its terms, does not

purport to "expand the scope" of the automatic stay. *Picard*, 762 F.3d at 207. Its language is

permissive, not restrictive. The Bankruptcy Court stated:

> The automatic stay under section 362(a) of the Bankruptcy Code is hereby modified
> with respect to the Arbitration solely to the extent necessary and for the sole
> purpose of permitting a trial, any related pre-trial proceedings (including any
> remaining discovery), any related post-trial proceedings or briefing, and a final
> determination or award to be made by the arbitrator, including any appeals, with
> respect to the claims currently pending in the Arbitration.

Dkt. No. 67-35 at 4. The Lift Stay Order does not restrict Eletson from pursuing any action

beyond the ambit of the automatic stay. In any event, the word "claims" is capacious. It refers

to "[a] demand for money, property, or a legal remedy to which one asserts a right." *Claim*,

Black's Law Dictionary (10th ed. 2014); *see In re Bridge Const. Servs. of Fla., Inc.*, 140 F. Supp.

3d 324, 334 n.5 (S.D.N.Y. 2015) (same); *Am. Ins. Ass'n v. Del. Dep't of Ins.*, 2008 WL 44322, at

*4 (Del. Sup. Ct. Jan. 2, 2008) (same); *see also Goldstein v. N.J. Tr. Co.*, 39 F.R.D. 363, 366

(S.D.N.Y. 1966) (defining the word "claim" as it appears in Federal Rule of Civil Procedure

12(b)(6) to mean "the aggregate of operative facts which give rise to aa right enforceable in

courts").

In sum, neither the arbitration nor the present proceeding infringed upon the automatic

stay or Lift Stay Order.

### D. Award of Fees Incurred in the Bankruptcy Case and the Bondholder Litigation

Next, Respondent challenges the arbitrator's award of damages for violations of the

Status Quo Injunction. Dkt. No. 50 at 27–31. The arbitrator identified what he characterized as

three intentional violations of the Status Quo Injunction that collectively caused quantifiable

harm: (1) Pach Shemen's purchase of a controlling interest of the outstanding bonds issued by Holdings—amounting to $183,851,546 in face value—for $2,000,000 on January 4, 2023; (2) Pach Shemen's directing of the trustee to commence litigation against Holdings on January 11, 2023, after Pach Shemen purchased the bonds; and (3) Pach Shemen's directing of the commencement of the involuntary bankruptcy petition against Holdings on March 7, 2023, again after purchasing the bonds. Dkt. No. 67-58 at 60; *see also id.* at 98–99 (finding that Levona violated the Status Quo Injunction by "[d]irecting and/or causing Levona's affiliates to purchase a controlling position in securities of . . . Holdings in January 2023 for the purpose of wrongfully commencing and then actually causing the commencement of litigation against . . . Holdings and the filing an involuntary bankruptcy petition against . . . Holdings"). The arbitrator did not find that the acquisition of the bonds by Pach Shemen alone would have violated the Status Quo Injunction, nor is the basis for any such finding apparent from the record. Rather, the arbitrator concluded that through these actions together, "the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration." *Id.* at 61.[27] The arbitrator recognized that Pach Shemen's actions "technically" did not effect a transfer or attempted transfer or sale of the assets of the Company or of the assets in dispute in the arbitration, but he concluded that the "overall strategy was intended to disrupt the status quo and find another path to obtain the 'assets of [the Company] . . . or assets in dispute in this arbitration.'" *Id.* He also recognized that Pach Shemen was not bound by the Status Quo Injunction but he found that "Pach Shemen is the alter ego of Levona" and certain of the

---

[27] The arbitrator did not identify what would be wrongful about Levona hedging against a potential loss in the arbitration. Nor did the arbitrator award any compensatory damages arising out of the purchase of the bonds themselves—the compensatory award for breach of the Status Quo Injunction was based on fees and costs incurred during the bondholder litigation and the involuntary bankruptcy proceeding.

individuals who acted on behalf of Pach Shemen also were bound by the Status Quo Injunction. *Id.*

Consequently, the arbitrator awarded Petitioners $3,007,266.20 in fees and costs incurred by Petitioners in connection with the bondholder litigation against Holdings and the involuntary bankruptcy of Holdings that the arbitrator concluded Pach Shemen directed to be commenced in violation of the Status Quo Injunction, to be paid jointly and severally by Levona, Murchinson, and Pach Shemen to the entities or individuals who paid those costs and fees. Dkt. No. 67-58 at 91, 100. The arbitrator concluded that the attorneys' fees were damages "to compensate for the intentional violations by Levona, through its alter ego, Pach Shemen, of the Status Quo Injunction . . . ." *Id.* at 92. The arbitrator also based his award of punitive damages in the amount of $43,455,122.21, equal to the amount of compensatory damages, in part on what he concluded were violations of the Status Quo Injunction. *Id.* at 74.

The arbitrator lacked the power to enjoin Pach Shemen from filing the involuntary bankruptcy petition and the bondholder litigation or Levona from assisting in filing those actions and his award of damages for those actions thus exceeded his authority under the LLCA and under the law. *See Jock*, 942 F.3d at 622 (an arbitrator exceeds her authority by "considering issues beyond those the parties have submitted for her consideration [or] reaching issues clearly prohibited by law or by the terms of the parties' agreement"). The arbitration clause at issue, though broad, was not unlimited. It bound only the parties to the LLCA and applied only to disputes, claims or controversies "arising out of or relating to [the LLCA] or the breach, termination, enforcement, interpretation or validity thereof." Dkt. No. 67-2 § 12.14(b). It empowered the arbitrator to grant injunctive or other forms of equitable relief but only "(i) to preserve such party's rights pending a final resolution on the merits or (ii) that prevails in any

92

such arbitration." *Id.* § 12.14(c). Rule 24(e) of the JAMS Rules, to which the parties consented, gives the arbitrator the authority to grant "whatever interim measures are deemed necessary, including injunctive relief and measures for the protection or conservation of property and disposition of disposable goods." Dkt. No. 67-3 at 15. The JAMS Comprehensive Arbitration Rules and Procedures, in Rule 29, give the arbitrator the power to "order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator." *Id.* at 17.[28] As long as it is consistent with the arbitral agreement. an arbitrator has the authority to grant "interim relief in order to maintain the status quo." Domke on Commercial Arbitration § 35:4 (citing *Next Step Med. Co. v. Johnson & Johnson Int'l*, 619 F.3d 67 (1st Cir. 2010); *Charles Constr. Co. v. Derderian*, 586 N.E.2d 992 (Mass. 1992)). An arbitrator also "possesses the inherent authority to preserve the integrity of the arbitration process to which the parties have agreed." *On Time Staffing, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 784 F. Supp. 2d 450, 455 (S.D.N.Y. 2011).

The arbitrator's powers to issue injunctions, however, also are not unlimited. As a general matter, only under limited circumstances may even a court prevent a party from litigating a dispute in another court and thus intrude upon the second court's jurisdiction. "[T]he Supreme Court has recognized that '[t]he right of access to the courts is . . . one aspect of the right to petition' the government for a redress of grievances secured by the First Amendment to the Constitution." *Sherman v. Fivesky, LLC*, 2020 WL 5105164, at *5 (S.D.N.Y. Aug. 31, 2020) (quoting *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). Accordingly, federal courts themselves have circumscribed power to enjoin a party from availing

---

[28] Those sanctions may include assessment of any "costs occasioned by the actionable conduct, including reasonable attorneys' fees." Dkt. No. 67-3 at 17.

itself of its right to seek judicial relief. In particular, a federal court has the power to "protect its ability to carry out its constitutional functions against the threat of onerous, multiplicitious, and baseless litigation," by enjoining a litigant's right to file actions in federal court. *Abdullah v. Gatto*, 773 F.2d 487, 488 (2d Cir. 1985) (per curiam); *see In re Martin-Trigona*, 737 F.2d 1254, 1262–63 (2d Cir. 1984) (affirming injunction against filings in the District of Connecticut and requiring that Martin-Trigona inform other federal courts of the injunction and obtain leave of court but vacating injunction to the extent that it prevented Martin-Trigona from filing actions in state court). In addition, under the first-filed rule, "a district court 'may enjoin the suitor in [a] more recently commenced case from taking any further action in the prosecution of that case' if the claims presented in the second action should have been interposed as compulsory counterclaims to the claims in the suit pending before it." *Comput. Assocs. Int'l., Inc. v. Altai, Inc.*, 893 F.2d 26, 28–29 (2d Cir. 1990) (quoting *Nat'l Equip. Rental, Ltd. v. Fowler*, 287 F.2d 43, 45 (2d Cir. 1961)); *see Tropic Techs., Inc. v. Vendr, Inc.*, 2023 WL 2535215, at *5 (S.D.N.Y. Mar. 15, 2023).

But while courts do have the authority "to enjoin foreign suits by persons subject to their jurisdiction," that authority may only "be used sparingly and . . . only with care and great restraint." *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35–36 (2d Cir. 1987) (internal citations and quotation marks omitted). It may only be used when (1) the parties are the same in both matters, and (2) resolution of the case before the enjoining court is dispositive of the matter to be enjoined. *Id.*; *see LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 199 (2d Cir. 2004); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004). Even then, a court may not enjoin a party from seeking relief from another court without also weighing "(1) the threat to the enjoining court's jurisdiction posed by

94

the foreign action; (2) the potential frustration of strong public policies in the enjoining forum;
(3) the vexatiousness of the foreign litigation; (4) the possibility of delay, inconvenience,
expense, inconsistency, or a race to judgment; and (5) other equitable considerations." *Eastman
Kodak Co. v. Asia Optical Co., Inc.*, 118 F. Supp. 3d 581, 586 (S.D.N.Y. 2015); *see also China
Trade*, 837 F.2d at 35. If the foreign proceeding poses no threat to the enjoining court's
jurisdiction and will not frustrate the strong public policies of the enjoining forum or otherwise
undermine the integrity of proceeding before the enjoining forum, no injunction is appropriate.
"[O]ur legal system generally relies on principles of *stare decisis* and comity among courts to
mitigate the sometimes substantial costs of similar litigation" involving different parties. *Smith
v. Bayer Corp.*, 564 U.S. 299, 317 (2011).[29]

Of particular relevance here, a court has the authority to enjoin a party to an international
arbitration agreement from initiating or maintaining litigation before another court only if the
arbitration agreement is enforceable, the party being enjoined is bound by the arbitration
agreement, the claims to be enjoined are within the scope of the arbitration agreement, and
issuance of the injunction is appropriate upon consideration of a number of factors, including
which court has the greater interest in ruling on the enforceability of the arbitration agreement.
Restatement (Third) of the U.S. Law of Int'l Com. Arb. § 2.29 (Am. L. Inst., Tentative Draft No.
2, 2012); *cf. Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd*, 2010 WL 1050988 (S.D.N.Y. Mar. 23,
2010) (weighing *China Trade* factors to determine whether to award an anti-suit injunction
against litigation in India in favor of arbitration); *Paramedics Electromedicina Comercial, Ltda.*,
369 F.3d at 680–81 (weighing *China Trade* factors in reviewing district court's anti-suit

---

[29] *Smith v. Bayer* itself involved suits by different plaintiffs, each members of a putative (non-certified) class. The proposition it relied upon, however, is generally applicable to suits involving different parties or different sets of issues, and not just different plaintiffs.

injunction against litigation in Brazil in aid of arbitration); *T-Jat Sys. 2006 Ltd. v. Amdocs Software Sys. Ltd.*, 2013 WL 6409476, at *4 (S.D.N.Y. 2013) (weighing *China Trade* factors and enjoining respondents and their officers and representatives from bringing action in Israel that would interfere with New York arbitral proceedings); *Stolt Tankers BV v. Allianz Seguros, S.A.*, 2011 WL 2436662, at *5 (S.D.N.Y. June 16, 2011) (weighing *China Trade* factors and enjoining respondents from pursuing action in Brazil in light of agreement to arbitrate in New York). *But see Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp. 2d 332, 363–64 (S.D.N.Y. 2007) (Lynch, J.), *aff'd on other grounds*, 584 F.3d 396 (2d Cir. 2009) (holding that where an arbitral body itself enters an anti-suit injunction "the proper inquiry is whether the parties agreed to give the arbitrators the power to enter such an injunction" and that when the parties give broad authority to the arbitrator "the applicable test for arbitral jurisdiction is not whether the preconditions of *China Trade* are satisfied, but whether the arbitral award 'touch[es] matters' within the contract" (quoting *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 26–28 (2d Cir. 2002))).

Petitioners request, however, that this Court hold that they could obtain relief from a private arbitrator—in aid of the arbitration—would far exceed the limited relief that a court would be authorized to grant Petitioners. On Petitioners' argument, the arbitrator had the authority to enjoin the filing of lawsuits by persons who were not parties to the arbitration, to vindicate rights that were not subject to the arbitration, in proceedings that would not adjudicate issues presented in the arbitration, and that would in no way interfere with the integrity of the arbitration or prevent the arbitrator from issuing his award. The Court concludes that the arbitrator had no such authority.

Starting with the involuntary bankruptcy petition, the arbitrator's powers did not extend to enjoining the filing of an involuntary petition even by Levona, much less by Pach Shemen, a party who was not before the arbitral panel. Under the Bankruptcy Code, both the debtor and a creditor have a near absolute right to file a petition for relief. *United States v. Royal Bus. Funds Corp.*, 724 F.2d 12, 15 (2d Cir. 1983) (citing the general rule "that a debtor may not agree to waive the right to file a bankruptcy petition"); *In re Project Restore, LLC*, 2022 WL 6233552, at *6 (Bankr. M.D. Tenn. Oct. 7, 2022) ("From the Court's standpoint, a creditor cannot contract away its right as a petitioner in an involuntary case any more than a debtor can contract away its right to file a voluntary bankruptcy."). The reasons why a debtor cannot be understood, in a bilateral agreement, to have contracted away its right to file a voluntary bankruptcy petition are self-evident and readily understood. The right to file a bankruptcy petition exists not purely to protect the personal interests of the debtor but also to protect the interests of the community of all of the creditors and the economy generally against the destructive race to the courthouse that would ensue if a single forum were not permitted to adjudicate, all at once, the interests of all with a claim against the debtor. *See Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1203–04 (9th Cir. 2005) ("This is a unique contribution of the Bankruptcy Code that makes bankruptcy different from a collection of actions by individual creditors. In a world of individual actions, each creditor knows that if he waits too long, the debtor's assets will have been exhausted by the demands of the quicker creditors and he will recover nothing. The creditors race to the courthouse, all demanding immediate payment of their entire debt. Like piranhas, they make short work of the debtor, who might have survived to pay off more of his debts with a little bit of reorganization—or at least might have more equitably fed the slower piranhas."); *Israel-British Bank (London) v. Fed. Deposit Ins. Corp.*, 536 F.2d 509, 513 (2d Cir.), *cert.*

97

*denied*, 429 U.S. 978 (1976) ("The theme of the Bankruptcy Act is equality of distribution of

assets among creditors, and correlatively avoidance of preference to some. The road to equity is

not a race course for the swiftest." (internal citations omitted)). For those reasons, the Second

Circuit has held, as discussed further below, that the right to file a bankruptcy petition may be

waived only in limited circumstances, generally in those circumstances where—as in the case of

a receivership—an alternative forum exists that would "accomplish[] what a bankruptcy

would[:]" the settlement of all of the claims against a putative debtor. *See S.E.C. v. Byers*, 609

F.3d 87, 92 (2d Cir. 2010); *see also Royal Bus. Funds Corp.*, 724 F.2d at 12 (applying the same

rule in context of a consensual court-supervised federal receivership).

The same principles apply in the case of an involuntary petition. The Code gives every

creditor the right to file an involuntary bankruptcy petition under Chapter 7 or 11 so long as it is

the holder of a claim "that is not contingent as to liability or the subject of a bona fide dispute as

to liability or amount," and so long as it is either joined by two other creditors meeting the same

criteria and all together holding at least $18,600 in claims or, if there are fewer than twelve

creditors, so long as it holds more than $18,600 in claims. 11 U.S.C. § 303(b). The provision

ensures that creditors—as well as the debtor—can prevent the destructive race to the courthouse

and ensure the orderly disposition of the debtor's assets. "Involuntary bankruptcy petitions help

ensure the orderly and fair distribution of an estate by giving creditors an alternative to watching

nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the

courthouse." *In re Murray*, 900 F.3d 53, 59 (2d Cir. 2018); *see also In re Miles*, 294 B.R. 756,

760 (B.A.P. 9th Cir. 2003) ("A key justification for involuntary cases is as a creditors' remedy

that enables creditors who lack the muscle or the luck to extract preferences or unequal transfers

from distressed debtors to achieve equitable treatment by invoking the protections inherent in the

trustee's avoiding powers consistent with the principle of ratable recovery for creditors.").[30]

Although the Code recognizes that a vexatious creditor or a creditor unknowledgeable about the debtor's financial condition could interfere with the debtor's operations, it balances that risk against the risk that the debtor will not place itself into bankruptcy, creating such balance by permitting the debtor to operate until the court orders otherwise, by allowing the court to require the petitioner to file a bond to indemnify the debtor for costs should the petition be dismissed, and by providing for costs and damages in the event that the petition is dismissed. As Judge Lifland once put it, "[w]hile no doubt an improvidently filed involuntary petition (i.e.: by one without a valid claim) can wreak havoc on an innocent debtor, this potential harm must be juxtaposed with the need to ensure that earnest creditors promptly receive all of the rights and protections afforded by the bankruptcy laws, lest the assets of the estate be squandered and secreted away by a financially troubled or dishonest debtor." *Matter of B.D. Int'l Disc. Corp.*, 15 B.R. 755, 759 (Bankr. S.D.N.Y. 1981). Section 303(i) authorizes the court—if an involuntary petition is dismissed—to grant the debtor judgment against the petitioners for costs or a reasonable attorneys' fees and, if the petition has been filed in bad faith, for compensatory or punitive damages. 11 U.S.C. § 303(i); *see also In re TPG Troy, LLC*, 793 F.3d 228, 235 (2d Cir. 2015) ("When an involuntary petition is dismissed, 'there is a presumption that costs and attorney's fees will be awarded to the alleged debtor.'" (quoting *In re Mountain Diaries*, 372

---

[30] Originally, under United States law, only creditors, and not the debtor, could file a bankruptcy petition. *See In re Marshall*, 721 F.3d 1032, 1058–59 (9th Cir. 2013) ("Historically, bankruptcy laws have not been conceived in the United States or England for the protection of debtors, whether honest or dishonest. Bankruptcy laws were enacted principally for the benefit of trade and for the protection of creditors, to give them more powers acting in concert to collect debts than they possessed individually. . . . The 1841 Act was the first United States law to authorize a debtor to file a voluntary bankruptcy petition. Neither the 1800 Act nor the English predecessors permitted a voluntary bankruptcy filing.").

B.R. 623, 637 (Bankr. S.D.N.Y. 2007))). "[B]ad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)." *In re Bayshore Wire Prods. Corp.*, 209 F.3d 100, 105 (2d Cir.2000). The cost and damages provisions thus provide a potent deterrent against anyone who would file a possibly frivolous petition. *In re John Richards Homes Bldg. Co. L.L.C.*, 439 F.3d 248 (6th Cir. 2006) (affirming award of $4,100,000 in compensatory damages and $2,000,000 in punitive damages). But if a petition is not dismissed, the debtor has no right to relief under these provisions. The creditors are exercising a right given to them by Congress.

It follows that two parties cannot—by contract—agree to delegate to an arbitrator the power to decide whether either can file a bankruptcy petition, voluntary or involuntary. Although an arbitrator's powers are vast under the FAA and the New York Convention, they do have limits. "[T]he Arbitration Act's mandate may be overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *see also In re Belton v. GE Cap. Retail Bank*, 961 F.3d 612, 615 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 1513 (2021) ("The Arbitration Act requires courts to strictly enforce arbitration agreements. But like any statutory directive, that mandate may be overridden by contrary congressional intent."). The Second Circuit has recently reiterated that congressional intent to override the FAA's mandate to strictly enforce arbitration agreements "may be deduced from 'the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes.'" *In re Belton*, 961 F.3d at 615 (quoting *McMahon*, 482 U.S. at 227). "Disputes that involve both the Bankruptcy Code and the [FAA] often present conflicts of 'near polar extremes: bankruptcy policy exerts an inexorable pull towards centralization while arbitration policy advocates a decentralized approach toward dispute resolution.'" *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006) (quoting *In re U.S. Lines, Inc.*, 197 F.3d at 640). The Second Circuit has

stated that "[t]he Arbitration Act as interpreted by the Supreme Court dictates that an arbitration

clause should be enforced 'unless [doing so] would seriously jeopardize the objectives of the

Code.'" *In re U.S. Lines, Inc.*, 197 F.3d at 640 (quoting *Hays & Co. v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 885 F.2d 1149, 1161 (3d Cir. 1989)).  It follows that when enforcement of

an arbitration clause would seriously jeopardize the objectives of the Code an arbitration clause

should not be enforced.  "In order to determine whether enforcement of an arbitration agreement

would present an inherent conflict with the Bankruptcy Code, we must engage in a

> particularized inquiry into the nature of the claim and the facts of the specific
> bankruptcy. The objectives of the Bankruptcy Code relevant to this inquiry include
> the goal of centralized resolution of purely bankruptcy issues, the need to protect
> creditors and reorganizing debtors from piecemeal litigation, and the undisputed
> power of a bankruptcy court to enforce its own orders."

*In re Anderson*, 884 F.3d at 389 (quoting *MBNA Am. Bank, N.A.*, 436 F.3d at 108 (citation and

internal quotation marks omitted)).  "If a severe conflict is found, then the court can properly

conclude that, with respect to the particular Code provision involved, Congress intended to

override the [FAA's] general policy favoring the enforcement of arbitration agreements."  *MBNA*

*Am. Bank, N.A.*, 436 F.3d at 108; *see also In re Project Restore*, 2022 WL 6233552, at *4

(holding that arbitration clause is overridden when Congress intended the FAA to yield to a

contrary congressional command, "which may be deduced from (i) the text of the statute, (ii) the

statute's legislative history, or (iii) an inherent conflict between arbitration and the statute's

underlying purposes"); *In re Patriot Solar Grp., LLC*, 569 B.R. 451 (Bankr. W.D. Mich. 2017)

(denying motion for relief from the automatic stay so that a contractual counterparty could

pursue arbitral proceeding against debtor pursuant to arbitration provision in the parties'

contract).

       Courts have considered the preemptive force of Section 303 of the Bankruptcy Code in

two related contexts.  Neither is controlling but both are instructive.  In *Project Restore*, the

question was whether an agreement that the parties arbitrate a dispute as a prerequisite to an

involuntary petition could thwart the rights of a creditor to file a petition under Section 303. *In*

*re Project Restore*, 2022 WL 6233552, at \*1–2. The petitioning creditor had signed an

arbitration agreement that any dispute it had with the debtor would be resolved through

arbitration. *Id.* The debtor argued that the involuntary petition should be dismissed because, in

determining whether to allow an order for relief, the court would have to decide arbitrable issues.

*Id.* at \*1. As the court characterized it, the case involved the question whether the creditors'

rights to file a bankruptcy petition trumped its obligation under the arbitration agreement, as

made enforceable by the FAA, to present the dispute in the first instance to the arbitral tribunal.

*Id.* at \*4–5. The court held that there was "an inherent conflict between the underlying purposes

of the Bankruptcy Code and arbitration, at least to the extent that arbitration would preclude a

creditor's right to pursue an involuntary bankruptcy." *Id.* at \*4. Thus, in the court's view, the

issues presented by the petition were ones given exclusively to the bankruptcy courts by the

Bankruptcy Code and over which the arbitrator had no authority. *Id.* at \*5. The court

highlighted first that bankruptcy courts had "exclusive jurisdiction over bankruptcy cases,"

second that "the bankruptcy court [was] the sole court with which a petition, whether voluntary

or involuntary, [could] be filed to commence a bankruptcy proceeding" and "[a] bankruptcy case

could not be commenced by filing a petition for bankruptcy with an arbitrator," and third that

only the bankruptcy court and not the arbitrator could determine whether the petition satisfied the

requirements of Section 303 and enter an order for relief. *Id.* at \*4–5. The court also noted that

under the debtor's approach, "a petitioning creditor with a disputed claim subject to an

arbitration clause would have to have an arbitration award in order to qualify as a petitioning

creditor, regarding of whether the dispute was bona fide." *Id.* at \*5. The court concluded that "a

102

creditor cannot contract away its right as a petitioner in an involuntary case any more than a

debtor can contract away its right to file a voluntary bankruptcy." *Id.* at *6. In sum, that court

held that "creditors cannot prospectively delegate rights under the Bankruptcy Code to an

arbitrator." *Id.*

The question in *In re Miles* was whether state law tort causes of action for damages

predicated upon the filing of an involuntary bankruptcy petition were completely preempted by

the Bankruptcy Code and whether a claim for damages arising from the filing of such a petition

could be prosecuted other than through Section 303 of the Code. *In re Miles*, 430 F.3d 1083 (9th

Cir. 2005). The plaintiffs in that case were relatives of the debtors who alleged that several

involuntary bankruptcy petitions filed by the creditors-defendants, which were subsequently

dismissed, gave rise to causes of action under the state law torts of negligence, defamation, false

light, abuse of process, intentional and negligent infliction of emotional distress, and negligent

misrepresentation. *Id.* at 1086. The creditors-defendants removed the case which had been filed

in state court. *Id.* at 1087. The Bankruptcy Appellate Panel of the Ninth Circuit held that the

case was properly removed on grounds that the causes of action asserted by the plaintiffs were

completely preempted by the Bankruptcy Code, and that the plaintiffs' claims were without merit

because they did not satisfy Section 303. *Id.* at 1087. The Ninth Circuit affirmed. As relevant

here, the Ninth Circuit held that "Congress intended 11 U.S.C. § 303(i) to provide the exclusive

basis for awarding damages predicated upon the filing of an involuntary bankruptcy petition," *id.*

at 1089, and that "[p]ermitting state courts to decide whether the filing of an involuntary

bankruptcy petition was appropriate would subvert the exclusive jurisdiction of the federal courts

and undermine uniformity in bankruptcy law," *id.* at 1090. The court reasoned that "Congress

created involuntary bankruptcy proceedings to enable creditors who are unable to extract

103

preferences or unequal transfers from distressed debtors to achieve equitable treatment." *Id.*; *see also In re Miles*, 294 B.R. at 760. The court also noted that Section 303(i)'s remedial scheme was "comprehensive" and "addresse[d] the full range of remedies, from costs and attorneys' fees for dismissed involuntary petitions to compensatory and punitive damages for involuntary petitions filed in bad faith," and that Congress's authorization of certain sanctions for petitions filed in bad faith "suggest[ed] that Congress rejected other penalties." *In re Miles*, 430 F.3d at 1090. The court further noted that the Constitution itself recognized the importance of uniformity in the administration of the bankruptcy laws, providing that Congress had the power "to establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." *Id.* (quoting U.S. Const. Art. I, § 8, cl. 4). The court held, based on "[t]he 'highly complex' nature of the Bankruptcy Code and 'the unique, historical, and even constitutional need for uniformity in the administration of bankruptcy laws,'" that Section 303(i) provides the exclusive cause of action for damages predicated upon the filing of an involuntary bankruptcy petition and that state courts had no power to grant such relief. *Id.* at 1090–91 (quoting *MSR Expl., Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914–15 (9th Cir. 1996) (internal citations omitted)). "Allowing state court remedies for wrongful filings may well interfere with the filings of involuntary bankruptcy petitions by creditors and with other necessary actions that they, and others, must or might take within the confines of the bankruptcy process." *Id.* at 1090. The court concluded: "Permitting state courts to decide whether the filing of an involuntary bankruptcy petition was appropriate would subvert the exclusive jurisdiction of the federal courts and undermine uniformity in bankruptcy law by allowing state courts to create their own standards as to when a creditor may properly file an involuntary petition." *Id.*

Outside the arbitration context, the Second Circuit itself has limited the circumstances under which a court may issue an anti-litigation injunction barring bankruptcy filings as part of their broad equitable powers, cautioning that such power is "to be exercised cautiously." *Byers*, 609 F.3d at 91. In *Byers*, it approved such an injunction in the case of a Securities and Exchange Commission ("SEC") receivership only after concluding that the receivership would "accomplish[d] what a bankruptcy would."[31] *Id.* at 92. And, in *Royal Business Funds*, the Second Circuit affirmed an anti-suit injunction where the debtor was subject to a federal receivership (with the Small Business Administration ("SBA") serving as receiver pursuant to federal statute) to which it had consented and which had the authority to address the claims by all of the debtor's creditors. 724 F.2d at 16. No rights of creditors were impaired. In that instance, "[t]he bankruptcy petition, which was filed by the debtor rather than by third-party creditors, [would] disrupt the receiver's attempts to improve the company's fortunes." *Id.* The court concluded that "no public or private interest [wa]s served by allowing [the company] to repudiate the arrangements it made with the SBA." *Id.*

*In re Miles*, *Project Restore*, *Byers*, and *Royal Business Funds* strongly suggest that Eletson and Levona could not have—by private agreement to resolve disputes through arbitration—contracted away the rights of Levona, or an affiliate of Levona, to file an

---

[31] "A primary purpose of appointing a receiver is to conserve the existing estate." *Esbitt v. Dutch-Am. Mercantile Corp.*, 335 F.2d 141, 143 (2d Cir.1964). "Although neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 explicitly vests district courts with the power to appoint trustees or receivers, courts have consistently held that such power exists where necessary to prevent the dissipation of a defendant's assets pending further action by the court." *S.E.C. v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 436 (2d Cir. 1987), *cert. denied sub nom.*, 485 U.S. 938 (1988) (internal citation omitted). The Second Circuit has held that, where the SEC has alleged violations of the Securities Exchange Act, "the appointment of a trustee to help preserve the status quo while the various transactions were unraveled was necessary to obtain an accurate picture of what transpired." *Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir.1972), *abrogated on other grounds by Liu v. S.E.C.*, 140 S. Ct. 1936 (2020).

105

involuntary bankruptcy petition, and that the arbitral panel lacked the authority to enjoin Pach Shemen from filing such a petition. A "severe conflict" would be presented by any such provision. If, as the court held in *Project Restore*, a "petitioning creditor cannot contract away its right as a petitioner in an involuntary case" and cannot be forced to get an arbitrator's approval before filing an involuntary petition because "creditors cannot prospectively delegate rights under the Bankruptcy Code to an arbitrator," 2022 WL 6233552, at *16, it follows that an arbitrator in a case where the petitioning creditor has not contracted away its rights to file an involuntary petition cannot arrogate to himself the power to determine whether an involuntary petition may be filed or not. The assumption of such a power by the arbitrator would undermine a core proceeding committed to the exclusive jurisdiction of the bankruptcy court. And if, as the Ninth Circuit held in *Miles*, the exercise of jurisdiction by a state court to impose financial sanctions upon petitioning creditors based on "their own standards as to when a creditor may properly file an involuntary petition" would first, subvert the exclusive jurisdiction of the federal courts to determine whether a petition was properly filed or not, second, defeat the federal policy that "the potential costs of filing an involuntary bankruptcy petition should not be governed by state law," *In re Miles*, 430 F.3d at 1090, and third, undermine the uniformity of the Bankruptcy Code, so too here the exercise of jurisdiction by an arbitrator to determine *ex ante* whether a bankruptcy petition may be filed, and then to impose *ex post* financial sanctions when he has determined that the petition should not have been filed, would also conflict with the Bankruptcy Code, federal policy, and the uniformity intended to be achieved by the Constitution. In short, as the court stated in *Miles*, if Eletson felt aggrieved by the filing of the involuntary petition, it had "a comprehensive scheme of remedies available in the federal courts." *Id.* It had no right under the arbitration agreement and under the law to obtain relief from the arbitral tribunal.

106

The arrogation by the arbitrator of the power to determine whether a party could join in an involuntary petition clearly conflicts with the Code and its underlying purposes. Section 303 contains a carefully designed and balanced structure for the filing of an involuntary petition based on the number, type, and aggregate nominal significance of creditors joining in the petition. If there are fewer than twelve holders of claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount (excluding certain specified insiders), an involuntary petition can be filed by a single holder of at least $18,600 (originally "$10,000," adjusted effective April 1, 2022) of such claims. 11 U.S.C. § 303. If there are twelve or more such holders (excluding certain specified insiders), the petition must be filed by three or more of such entities. *Id.* The Code does so in order to permit creditors, as a class, to preserve their interests from the debtor's dissipation of its assets and to ensure that they have a forum in which the interests of all of the creditors are protected, while at the same time protecting against the risk of a premature or vexatious filing that would injure both the debtor and its creditors. The arbitrator's exercise of authority, if recognized by this Court, would disrupt that balance and undermine the purposes of Section 303. If accepted, a canny debtor—intent on defeating an involuntary petition—could undermine the rights of all of the creditors by agreeing with some of them that they would not under any circumstances join in an involuntary petition without first going through the arbitral hoop. A potential involuntary creditor, in those circumstances, might find no one who could join the petition—not because there were no qualified creditors and not because the debtor was not in distress, but because the other creditors had years earlier signed an arbitration agreement. In a world where arbitration agreements are prolific, it is not difficult to imagine a circumstance in which a putative debtor could virtually immunize itself from the risk of any involuntary bankruptcy by the mere expedient of signing arbitration agreements with all

107

or almost all of its creditors. Indeed, on Eletson's theory, an arbitrator presumably could even prevent a creditor—in either a voluntary or involuntary proceeding—from filing a notice of claim in a bankruptcy proceeding until the arbitration was concluded. If the filing was part of an "overall strategy . . . intended to disrupt the status quo and find another path to obtain the 'assets of [the Company] . . . or assets in dispute in th[e] arbitration,'" Dkt. No. 67-58 at 61, such an injunction would be within the arbitrator's prerogative. Such an order might provide an immediate benefit to a party in the arbitration. However, it would forestall the bankruptcy, delay the debtor's liquidation or emergence from bankruptcy, and thereby would undermine the rights of all of the other creditors, undercut the functioning of the Bankruptcy Code, and intrude on the exclusive jurisdiction of the bankruptcy courts.

The risk is not merely hypothetical. In this case, Pach Shemen joined a petition filed by just two of Holdings' creditors who sought the assistance of the bankruptcy court in order to protect against the risk of Holdings' dissipation of assets. As it turns out, their petition was well-founded. The involuntary bankruptcy was not dismissed. Holdings ultimately agreed to file a motion converting the bankruptcy proceeding to a voluntary case under Chapter 11 and the interests of the creditors are being protected. Dkt. No. 65 ¶ 134; Dkt. No. 66 ¶ 134. In the bankruptcy, Holdings agreed to pay the fees of the involuntary creditors. There was no finding, nor apparently could there have been one, by the bankruptcy court that the involuntary petitions did not qualify or that the petition was filed in bad faith. Had Pach Shemen not joined in the relief requested by the other creditors, the bankruptcy court might never have been in the position to accord such relief. The congressional purpose underlying Section 303 would have been thwarted. It thus cannot be that the arbitrator had the power to prevent Pach Shemen from

joining the petition or, once Pach Shemen had joined the petition, to impose on it damages not authorized by Section 303 for having done so.

Of course, here, the Court need not go so far as to hold that two parties could never agree to delegate to an arbitrator the power to determine whether either could file an involuntary bankruptcy petition. It is clear from the arbitration provision here that the parties did not agree to give that power to this arbitrator, and thus that the arbitrator exceeded his powers either by issuing the injunction he did as applied to the filing of the bankruptcy petition or by ordering damages for the violation of the injunction. The arbitrator had the power to protect the property and disposable goods that were the subject of the arbitration and to preserve the integrity of the proceedings before him. Instead, the Status Quo Injunction as interpreted and applied by the arbitrator granted relief of a different nature. The arbitrator interpreted and applied the Status Quo Injunction to prevent an entity that was not before the arbitral tribunal from availing itself of its rights to relief in judicial fora, pursuant to instruments that were not the subject of the arbitration, and pursuant to rights over which the arbitral tribunal had no jurisdiction. And it did so by preventing that third party from seeking the relief available to any person—debtor or creditor—available from the bankruptcy courts pursuant to the Bankruptcy Code. Permitting an arbitrator to enjoin an involuntary bankruptcy petition would fundamentally change the nature of arbitration, effectively forcing into the arbitral tribunal issues that affect the rights of third parties and that are committed by the Bankruptcy Code to the bankruptcy courts. In *Stolt-Nielsen S.A.*, 559 U.S. at 685, the Supreme Court refused to read an arbitration agreement as authorizing class arbitration where the agreement was silent regarding class arbitration. The Court recognized that "parties are 'generally free to structure their arbitration agreements as they see fit,'" *id.* at 683 (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995))), including by

selecting the "rules under which any arbitration will proceed," *id.*  Still, the Court refused to infer from silence agreement to a procedure that would fundamentally change the nature of arbitration. *Id.*  Here too, the LLCA's silence with respect to anti-bankruptcy cannot be read as a conferral of such authority of a fundamentally different nature.

The same conclusion follows with respect to the Bondholder Litigation.  Although the arbitrator stated that the proceedings were launched to "find another path to obtain the 'assets of [the Company] . . . or assets in dispute in this arbitration,'" Dkt. No. 67-58 at 61, the matters to be addressed in the arbitration proceeding and in the Bondholder Litigation just like those in the bankruptcy proceeding, respectively, were entirely different.  The former went to Eletson's rights under the LLCA and whether the Company or the Nominees were entitled to the Preferred Interests; the latter went to the rights of Pach Shemen under the bond indenture to the payment of interest and the repayment of principal for loans that had been extended to Holdings.  The arbitrator did not find that the Bondholder Litigation or the bankruptcy proceedings would resolve any of the legal or factual issues in the arbitration.  Because both sets of proceedings involved different issues, they could not have done so.  He also did not base his finding of a violation on any notion that the Bondholder Litigation interfered with or undermined the integrity of the arbitration.  Before it was stayed on March 8, 2023 following the filing of the bankruptcy petition, the only activity on the docket consisted of Holdings' agreement with the Trustee that Holdings would have additional time to respond to the complaint.  *Wilmington Sav. Fund Soc'y, FSB*, CM-ECF No. 23-cv-261, Dkt Nos. 17, 22.

As Respondent notes, an arbitration award is divisible for purposes of confirmation.  *See D.H. Blair & Co.*, 462 F.3d at 104 (holding that a court "can confirm . . . the award either in whole or in part" in FAA case); *Orion Shipping & Trading Co.*, 312 F.2d 299 (affirming district

court's partial confirmation in FAA case).  The Court chooses to do so here in light of the "strong federal policy favoring arbitration, the enforcement of arbitration agreements and the confirmation of arbitration awards."  *Pike*, 266 F.3d at 89; *cf. Smarter Tools Inc.*, 57 F.4th at 383 ("An award should be enforced, 'despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached.'" (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 339 (2d Cir. 2010))).  The portions of the award that found Levona, Pach Shemen, and Murchinson liable for violating the Status Quo Injunction and the damages ordered for those violations thus cannot stand.[32]

### E.       Fee Award to Corp and Holdings

Finally, Respondent argues that the arbitrator exceeded his authority in awarding fees and costs to Holdings and Corp.  Dkt. No. 50 at 31.  The arbitrator awarded Petitioners $9,590,222 in attorneys' fees, expenses, and costs for the arbitration, including a success fee in the amount of $1,794,950.70.  Dkt. No. 67-58 at 86–87.  Respondent argues that the award of attorneys' fees and costs to Petitioners exceeded the arbitrator's authority because the LLCA empowers the arbitrator to "award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party," Dkt. No. 67-2 § 12.14(d), and because Delaware law states that "'the defendant is the prevailing party' if a plaintiff receives 'zero dollars in damages,'" Dkt. No. 50 at 31 (quoting *Cooke v. Murphy*, 99 A.3d 226 (Del. 2014)).  As Holdings and Corp were not awarded damages by the arbitrator, Respondent argues that the arbitrator could not permissibly

---

[32] The Court therefore need not consider Respondent's argument that this portion of the Award should be vacated on the theory that the arbitrator was without power to award fees and costs incurred in the bankruptcy case to parties other than the bankrupt debtor—Holdings, Dkt. No. 50 at 28, except to note that the arbitrator did not award fees and costs to third parties but rather to Eletson "*to be paid to the entity or individuals who paid those costs and fees*."  Dkt. No. 67-58 at 67 (emphasis added). Whether Eletson would have had the power to further distribute the compensation to other parties is not before the Court.

111

interpret the LLCA in a manner that would deem Holdings and Corp prevailing parties eligible for fees. *Id.*

Petitioners respond that the arbitrator had the authority to determine that Holdings and Corp were prevailing parties and that he therefore also had the authority under the LLCA to award them attorneys' fees and costs. Dkt. No. 54 at 27–28. Petitioners dispute Respondents' assertion that Delaware law requires a party to be awarded nonzero dollar damages to be considered the prevailing party, and argue instead that "a prevailing party is one who 'predominated in the litigation.'" *Id.* at 28 (quoting *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 281 (Del. 2022)). Petitioners point to a case under Delaware law in which a court granted a party prevailing status and awarded it attorneys' fees and expenses even though its only relief in the underlying action was inspection of certain books and records. *Id.* (citing *Aloha Power Co., LLC v. Regenesis Power, LLC*, 2017 WL 6550429, at *5 (Del. Ch. Ct. Dec. 22, 2017)).

The arbitrator rejected Respondent's argument as "completely without merit." Dkt. No. 67-58 at 87. The arbitrator reasoned that, throughout the arbitration, it had been "clear that, in the event the option was exercised, the preferred interests would transfer to [the Company] or its nominee," *id.* at 88, and that "Eletson would turn over any damages" to the non-party Company, *id.* He thus ruled "it is Eletson that substantially prevailed on its claims in this arbitration." *Id.* at 88.

The fee award was well within the scope of the arbitrator's "contractually delegated authority." *Jock*, 942 F.3d at 622 (quoting *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013)). An arbitrator may award attorneys' fees and/or arbitration costs, to the extent they are permitted in the relevant arbitration provision or agreement. *See, e.g.*, *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996); *LiveWire Ergogenics*, 645 F. Supp. 3d at 299. The

112

LLCA delegated to the arbitrator the authority to interpret its terms and to determine any dispute, claim or controversy arising out of it. Dkt. No. 67-2 § 12.14(a). One of those terms is Section 12.14(d) which provides in pertinent part that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party, which fees may be set by the arbitrator of such action . . . and which fees shall be in addition to any other relief that may be awarded." *Id.* § 12.14(d). Thus, the arbitrator did not exceed his authority when he addressed the question of the prevailing party in the arbitration and determined that Petitioners were the prevailing party. *See, e.g.*, *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir.1997), *cert. denied*, 522 U.S. 1049 (1998); *MasTec N. Am., Inc. v. MSE Power Sys., Inc.*, 581 F. Supp. 2d 321, 330–31 (N.D.N.Y 2008); *Ferrand v. Mystique Brands LLC*, 2021 WL 119572, at *8 (S.D.N.Y. Jan. 13, 2021); *Ludgate Ins. Co., Ltd. v. Banco De Seguros Del Estado*, 2003 WL 443584, at *6–7 (S.D.N.Y. Jan. 6, 2003).

Respondent's argument is more properly understood as a challenge to the substance of the arbitrator's decision and whether he acted in manifest disregard of the law in determining that Petitioners were the prevailing party. So framed, however, the claim is no more successful. Respondent relies upon the Delaware Supreme Court's decision in *Cooke v. Murphy*, 99 A.3d 226, a motor vehicle accident case in which the court held that a plaintiff who proved the defendant's liability but failed to prove damages was not the prevailing party and was not entitled to an award of costs under Delaware Superior Court Civil Rule 54(d).[33] Following an earlier decision by a lower court, the Delaware Supreme Court reasoned "that where the

---

[33] Delaware Superior Court Civil Rule 54(d) states: "Except when express provision therefor is made either in a statute or in these Rules or in the Rules of the Supreme Court, costs shall be allowed as of course to the prevailing party upon application to the Court within ten (10) days of the entry of final judgment unless the Court directs otherwise." Del. Super. Ct. Civ. R. 54(d).

judgment reflects an award of zero dollars, 'it necessarily follows that Plaintiff has obtained no

judgment from Defendant and Defendant is indeed the prevailing party for purposes of Rule

54(d).'" *Id.* at *3 (quoting *Streetie v. Progressive Classic Ins. Co.*, 2011 WL 1259809, at *15

(Del. Super. Ct.) *aff'd*, 35 A.3d 419 (Del. 2011)).

 The arbitrator did not manifestly disregard any law in determining that Petitioners were

the prevailing parties under the LLCA and entitled to an award of fees. *Cooke* neither addressed

the question whether a party to a contract who succeeds in enforcing a provision specifically

benefitting third parties is a prevailing party, nor did it involve a contractual fee-shifting

provision. Here, where there was a contractual fee-shifting provision, the question whether

Petitioners were prevailing parties here is purely one of contractual interpretation. *See Bako

Pathology LP*, 288 A.3d at 280–81. The term "prevailing party" is a legal "term of art that the

parties bargained for in the contract[]." *Id.* at 281. It refers to the party which has

"predominated in the litigation" and "who has prevailed on most of [the] claims." *Id.* (internal

citations omitted). The prevailing party need not have personally received an award of money

damages. *See, e.g.*, *Aloha Power Co.*, 2017 WL 6550429, at *5 (concluding that party who

succeeded in books-and-records dispute was the prevailing party); *Mastrio v. Sebelius*, 768 F.3d

116, 120 (2d Cir. 2014) ("A plaintiff receiving . . . injunctive relief may be a prevailing party

where she prevailed on the merits." (internal quotation marks omitted)); *Tex. State Tchrs. Ass'n

v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989) ("Plaintiffs may be considered 'prevailing

parties' for attorneys' fee purposes if they succeed on any significant issue in litigation which

achieves some of the benefit the parties sought in bringing the suit."); *cf. Farrar v. Hobby*, 506

U.S. 103, 113 (1992) ("[T]he *degree* of the plaintiff's success does not affect eligibility for a fee

award." (alteration in original)).

114

The arbitrator acted within his discretion in determining that Petitioners were the prevailing parties and in awarding them fees. In its Third Amended Statement of Claims and Response to Counterclaims, Eletson sought a determination that Levona *never* had any lawful interests in the Company, that the assignment of the two entities owning Company vessels to Levona was procured by coercion, fraud, illegal, and other wrongdoing and is null and void, that Levona not be considered an interest holder of the Company, or, in the alternative, specific performance of the buy-out of Levona's preferred stock, and compensatory and punitive damages and attorneys' fees. Dkt. No. 31-35. In its Counterclaims, Levona sought an order requiring any agent of Eletson to vacate the two Company vessels, declaratory judgment that the loan was not repaid and the Purchase Option was not executed, a declaration that Levona remains in control of the preferred shares, a declaration that Levona is authorized to execute a deal with Unigas, and compensatory and punitive damages and attorneys' fees. Dkt. No. 31-11.

The arbitrator ruled for Petitioners. He concluded: "Claimants have proven breaches of the LLCA and the covenant of good faith and fair dealing and established that Eletson exercised the purchase option pursuant to the BOL, and are therefore entitled to the declaratory relief, compensatory damages, punitive damages, prejudgment interest, and attorney's fees," and that "Respondent has not proven any of its counterclaims and they are dismissed. Respondent is entitled to recover nothing from the Claimants." Dkt. No. 67-58 at 95. The arbitrator issued declaratory relief finding that Eletson exercised the buyout option in the BOL; that as of March 11, 2022, Levona had no membership interest in the Company; that the Preferred Interests were transferred to the Nominees; that Levona had breached the LLCA and violated the Status Quo Injunction; and that Levona, Murchinson, and Pach Shemen were obligated to pay damages to the Company and to the Nominees. *Id.* at 95–100. As a result of the Award, Eletson and the

115

Nominees will be the sole owners of the Company. It is irrelevant that the Preferred Interests will be transferred to the Nominees and not to Eletson itself. Under the BOL, the Preferred Interests would never have been transferred to Eletson—Eletson contracted for a buyout option for the Company or the Nominees to receive the Preferred Interests. But the fact that, as a result of Eletson prevailing on its contract claim, the Company or the Nominees will receive the direct monetary benefit does not make Eletson any less the prevailing party than it would any other contract party who succeeds in enforcing a contract provision that inures to the benefit of a third-party beneficiary. It does not prevent Eletson from being a prevailing party. *See, e.g.*, *Dattner v. Conagra Foods, Inc.*, 458 F.3d 98 (2d Cir. 2006); *Christopher P. by Norma P. v. Marcus*, 915 F.2d 794, 804–05 (2d Cir. 1990), *cert. denied*, 498 U.S. 1123 (1991). *Ferrand*, 2021 WL 119572, at *10 ("Even assuming *arguendo* that Ferrand's application here of the contractual term 'prevailing party' were the more persuasive, this case falls far short of being one of 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent but where none of the provisions of the FAA apply.'" (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003))).

## III.    Whether the Arbitrator Manifestly Disregarded the Law

Lastly, Respondent argues that the arbitrator grossly misinterpreted the BOL and manifestly disregarded the law. Dkt. No. 50 at 32. Specifically, Respondent contends that the arbitrator acted in manifest disregard of the law by relieving Eletson of the obligation under the BOL to have provided formal written notice of its intention to exercise the Purchase Option, *id.* at 33–34, and by failing to make any effort to interpret the BOL under English law, *id.* at 34–35. According to Respondent, these "deviation[s] from the plain contractual language and fundamental canons of contract interpretation [were] so far outside the range of permissible decisions as to warrant vacatur." *Id.* at 35.

116

Review of an arbitration award for manifest disregard of law is "severely limited." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002) (Sotomayor, J.) (quoting *Gov't of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir. 1989)). To vacate an arbitral award on grounds of manifest disregard, the court "must find 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" *Id.* (quoting *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir. 1967)). Vacatur under the manifest disregard standard is limited to "those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (quoting *T.Co Metals, LLC*, 592 F.3d at 339). "A court may vacate an arbitral award based on manifest disregard only upon a finding that '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.'" *Precision Castparts Corp. v. Schultz Holding GmbH & Co. KG*, 2020 WL 4003578, at *2 (S.D.N.Y. July 15, 2020) (quoting *Zurich Am. Ins. Co.*, 811 F.3d at 589). "The test has sometimes been described in three parts, as requiring a demonstration that (1) 'the law that was allegedly ignored was clear, and in fact explicitly applicable to the matter before the arbitrators'; (2) 'the law was in fact improperly applied, leading to an erroneous outcome;' and (3) 'the arbitrator must have known of [the law's] existence, and its applicability to the problem before him.'" *Id.* (quoting *T.Co Metals*, 592 F.3d at 339); *see also LiveWire Ergogenics*, 645 F. Supp. 3d at 296. "A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration panel made the wrong call on the law." *Wallace*, 378 F.3d at 190. Indeed, "[o]nly a barely colorable justification for the outcome reached by the arbitrators is necessary to confirm the award," *D.H. Blair & Co.*, 462 F.3d at 110, even if the "court[] disagree[s] with [the

117

arbitrator] on the merits," *Wallace*, 378 F.3d at 190.  "A 'barely colorable justification' exists so

long as the arbitrators had reasoning on which they 'could have justifiably rested their

decision.'"  *Smarter Tools*, 57 F.4th at 383 (quoting *Willemijn Houstermaatschappij, BV v.*

*Standard Microsystems Corp.*, 103 F.3d 9, 13–14 (2d Cir. 1997).

### A.      The Notice Requirement

Levona first contends that the arbitrator manifestly disregarded the law by holding that

Petitioners had satisfied the notice requirement of the BOL.  Dkt. No. 50 at 34.  The BOL

provides that the Purchase Option is "exercisable by written notice to Levona" by the Company

"for either [the Company] or its nominee to purchase all of the membership interests held by

Levona in [the Company]."  Dkt. No. 67-10 § 2.3.  It further provides that if an Option Notice is

not "validly served by the expiry of the Purchase Option Period," the Purchase Option will lapse.

*Id*. § 2.5.  The arbitrator found that "there does not seem to be a separate formal written notice

provided to Levona by Eletson exercising the option," but concluded that Levona received actual

notice and that the evidence established that "the parties acknowledged that Eletson was

exercising the option."  Dkt. No. 67-58 at 42.  The arbitrator supported that conclusion by the

content of the agenda for the March 10, 2022 Company Board of Directors meeting which

contained the language "[u]pdate on Eletson's intention to exercise the purchase option."  *Id.*  As

"additional support," he looked to the Unanimous Written Consent which was signed by all

directors including Levona directors, but gave only the Eletson directors authority to sign or

deliver on behalf of the company notices in connection with the BOL.  *Id.* at 43–44.  Finally, the

arbitrator concluded that "both parties acted in a manner consistent with the fact that Levona had

been bought out of the Company."  *Id.* at 44.  Thus, the arbitrator concluded "[a]t best, the

absence of a written notice and payment of $1 dollar are formalities that the parties failed to

118

observe." *Id.* The arbitrator did not cite English law or Delaware law in those portions of his

findings.[34]

Respondent supports its argument that the arbitrator's conclusion on notice satisfied the

first two prongs of the manifest disregard test—that the law allegedly ignored was clear and

explicitly applicable to the matter before the arbitrator, and that the arbitrator misapplied the

law—by citing the general axiom that a contract is to be interpreted to give meaning to its every

word, and the Delaware Supreme Court's 1986 decision in *Stoppi v. Wilmington Tr. Co.*, 518

A.2d 82, 86 (Del. 1986), regarding the notice required to be given by a secured party to a debtor

prior to the sale or disposition of collateral under the Uniform Commercial Code. Dkt. No. 50 at

34; *see also* Dkt. No. 59 at 13.[35] Respondent argues that the third prong of the test was

satisfied—that the arbitrator knew of the law's existence and its applicability to the problem

before him—because they directed the arbitrator's attention to the proposition that "a written

agreement that is complete, clear and unambiguous on its face must be enforced according to the

plain meaning of its terms." Dkt. No. 55-4 at 9 (quoting *Motors Liquidation Co. DIP Lenders*

*Tr. v. Allianz Ins. Co.*, 2017 Del. Super. LEXIS 279, at *16 (Del. Super. Ct. June 8, 2017)).

The argument that the arbitrator manifestly disregarded the law in excusing Petitioners from the

requirement of providing written notice is without merit. First, the general proposition of

---

[34] "[I]t is axiomatic that arbitrators need not disclose the rationale for their award." *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991). So long as the Court can infer a ground for the arbitrator's decision from the facts of the case, the Court must confirm the award. *Standard Microsystems Corp.*, 103 F.3d at 9.

[35] *Stoppi* interpreted the former Section 9-504(3) of the U.C.C. *Stoppi*, 518 A.2d at 84–86. Article 9 of the U.C.C. was recodified in 2001 and the former Section 9-504(3) is now Section 9-611. It requires a second party that disposes of collateral under Section 9-610 of the U.C.C. to "send" to the debtor and any secondary obligor a "reasonable authenticated notification of disposition." U.C.C. §§ 9-611(b), (c). The *Stoppi* court relied upon a definition of "send" to mean deposition in the mail or delivery for transmission to mean that the notification must be in writing.

119

contract law that a contract is interpreted according to its plain meaning and so as to give every

word meaning provides only limited support to Levona, in the face of the other general

proposition that, at least in some circumstances and in some states including Delaware, whether

viewed as a covenant or a condition precedent, "[n]otice provisions have generally been

interpreted to require substantial compliance," not literal compliance.  Richard A. Lord, 6

Williston on Contracts § 49:88 (4th ed. 2003); *Gower v. Trux, Inc.*, 2022 WL 534204, at *11

(Del. Ch. Ct. Feb. 23, 2022) ("When confronted with less than literal compliance with a notice

provision, courts have required that a party substantially comply with the notice provision."

(quoting *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *7 (Del. Ch. Ct. June 5, 2006)));

*Kelly v. Blum*, 2010 WL 629850, at *8 n.52 (Del. Ch. Ct. Feb. 24, 2010) (same); *cf. James

Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405 (Tex. 2022), *reh'g denied*

(Sept. 2, 2022); *Bantz v. Bongard*, 864 P.2d 618, 624 (Idaho 1993) ("This Court has long held

that only substantial compliance with a contractual notice provision is required."); *Putney Sch.,

Inc. v. Schaaf*, 599 A.2d 322, 327 (Vt. 1991) ("The rule in Vermont is that substantial

compliance with notice requirements will suffice.").  Nor do Respondent's citations to Delaware

case law.  The Delaware Superior Court's decision in *Motors Liquidation Co.* involved the

question whether insurance policies that were the assets of General Motors's predecessor had

been validly assigned to its successor trust, and in the quotations cited by Levona, the court

relied upon New York law.  2017 Del. Super. LEXIS 279, at *16 n. 61 (citing *Greenfield v.

Philles Recs., Inc.*, 780 N.E.2d 166 (N.Y. 2002)).  It has no apparent bearing on the notice issues

raised here.  *Stoppi v. Wilmington Trust Co.*, 518 A.2d at 86, the case Levona cites before this

Court, holds that written notification to the debtor prior to any sale or other disposition on

collateral is "the better rule" under the U.C.C, but also recognizes that "other jurisdictions have

split on the issue." It does not demonstrate that the law that was allegedly ignored was "clear, and in fact explicitly applicable to the matter before the arbitrators." *Precision Castparts Corp.*, 2020 WL 4003578, at *2.

Generally, Respondent misstates the law when it argues that it is sufficient that the arbitrator "knew the Delaware legal principles governing contract interpretation" and that those general principles should be interpreted to defeat Eletson's right to exercise the option in the absence of written notice. Dkt. No. 59 at 18. A party who agrees for an arbitrator to determine its disputes does not contract for those disputes to be determined in accordance with law, but only not in manifest disregard of the law. The Second Circuit has stated that "[a] party seeking vacatur bears the burden of proving that the arbitrators were fully aware of the existence of a clearly defined governing legal principle, but refused to apply it, in effect, ignoring it." *Duferco Int'l Steel Trading*, 333 F.3d at 389.[36] Moreover, in the absence of "an error that is so obvious that it would be instantly perceived as such by the average person qualified to serve as an arbitrator," the only duty of the arbitrator is to be aware of the "governing law identified by the parties to the arbitration." *Id.* Thus, the parties must have made the arbitrator aware not only of the law's existence, but also of "its applicability to the problem before him." *Precision Castparts Corp.*, 2020 WL 4003578, at *2 (quoting *T.Co Metals*, 592 F.3d at 339); *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002); *Aksman v. Greenwich Quantitative Rsch. LP*, 563 F. Supp. 3d 139, 150 (S.D.N.Y. 2021), *aff'd*, 2023 WL 6799770 (2d Cir. Oct. 16, 2023) (summary order). More specifically, although the Delaware Superior Court in 2018 required literal compliance with a notice provision preventing the release of funds from escrow

---

[36] The Third Circuit and the Delaware Supreme Court have both adopted this rule verbatim. *See, e.g.*, *Black Box Corp. v. Markham*, 127 F. App'x 22, 24 (3d Cir. 2005); *SPX Corp. v. Garda USA, Inc.*, 94 A.3d 745, 750 (Del. 2014).

121

where the contract at issue defined what constituted reasonable notice and required the release of

funds if such notice was not provided, *see, e.g.*, *PR Acquisitions, LLC v. Midland Funding LLC*,

2018 WL 2041521, at *6–7 (Del. Ch. Ct. Apr. 30, 2018) (granting summary judgment for

plaintiff where defendant contracting party "never directly gave notice to [the plaintiff] in any

form before the [contractually specified] date," and did not, in course of litigation, offer any

"reason other than its own error for its failure to comply with the notice provision it negotiated"),

and more recently stated "as a matter of law, where the contract specifies what constitutes notice

thereunder and dictates how to communicate that notice, strict compliance with the notice

provision is necessary," *Aluminum Source, LLC v. LLFlex, LLC*, 2023 WL 2547996, at *19 (Del.

Sup. Ct. Mar. 16, 2023), that rule appears not to be as uniformly applicable or oblivious to

context as Levona suggests.  Following *PR Acquisitions*, the Delaware Chancery Court has

explained that Delaware courts have "at times, accepted substantial compliance with notice

provisions in lieu of actual compliance, when the circumstances so justified." *Vintage Rodeo*

*Parent, LLC v. Rent-A-Center, Inc.*, 2019 WL 1223026, at *15 (Del. Ch. Ct. Mar. 14, 2019).  As

Chancellor Strine explained: "The requirement of substantial compliance is an attempt to avoid

'harsh results . . . where the purpose of these [notice] requirements has been met.' . . . Substantial

performance is 'that which, despite deviations from contract requirements, provides the

important and essential benefits of the contract.'" *Gildor*, 2006 WL 4782348, at *7 (internal

citations omitted).

     Critically, Levona did not cite any of these cases or any other cases that could possibly be

relied on to support its position to the arbitrator, and thus did not put him on notice of the

applicable law.  Levona's argument to the arbitrator regarding notice was limited to a single

sentence: "[n]o 'written option notice' was given—this is undisputed."  Dkt. No. 55-4 at 19.  It

cited no law to the effect that the failure to provide written notice would defeat the exercise of
the option when both parties actually knew of Eletson's exercise of the option within the
Purchase Option Period. It therefore cannot be said that the arbitrator "knew of a governing
legal principle yet refused to apply it or ignored it altogether." *DiRussa*, 121 F.3d at 824
(quoting *Folkways*, 989 F.2d at 112). Accordingly, its argument that the arbitrator manifestly
disregarded the law in finding that the notice requirement had been satisfied is unavailing.

### B. Interpretation Under Delaware Law

Levona's argument that the arbitrator manifestly disregarded the law by looking only to
Delaware law and not to English law is no more successful. The BOL has a choice-of-law clause
providing that it would be "governed by and construed in accordance with English law." Dkt.
No. 67-10 § 10. Levona did not cite to the arbitrator any English law but only to Delaware law
and to New York law. Dkt. No. 31-38 at 48–49, 52–55, 66–67. It can hardly complain that the
arbitrator manifestly disregarded a body of law to which it did not direct the arbitrator's
attention. *See, e.g.*, *Wallace*, 378 F.3d at 195; *Westerbeke*, 304 F.3d at 209; *DiRussa*, 121 F.3d at
823; *see also GMS Grp., LLC v. Benderson*, 326 F.3d 75, 77–78 (2d Cir. 2003); *Halligan v. Pipe
Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998), *cert. denied*, 526 U.S. 1034 (1999).

### CONCLUSION

The application to confirm is GRANTED IN PART and DENIED IN PART and the
motion to vacate is GRANTED IN PART and DENIED IN PART.

The Court confirms the Award as stated in Dkt. No. 67-58, beginning on page 95,
including the award of compensatory and punitive damages and the grant of attorneys' fees,
costs, expenses, and pre-judgment interest, with the following exceptions:

- Paragraphs A.7, A.8, A.10(i), and A.10(iii) are vacated.

- All awards of relief against Murchinson and Pach Shemen are vacated.

123

- All awards of relief, including compensatory and punitive damages, based upon violations of the Status Quo Injunction are vacated.

- All awards of attorneys' fees, costs, and expenses relating to the involuntary bankruptcy petition and Bondholder Litigation are vacated.

Parties are directed to each submit a proposed judgment in accordance with this Opinion and Order by February 23, 2024. The Clerk of Court is respectfully directed to close Dkt. Nos. 28, 49.

SO ORDERED.

Dated: February 9, 2024 _____
     New York, New York            LEWIS J. LIMAN
                         United States District Judge

**EXHIBIT 5**

**Schedule of Petitioning Creditors**

| Name |
| --- |
| Wilmington Savings Fund Society, FSB |
| New Agathonissos Finance LLC |
| Gene B. Goldstein, solely in his capacity as Trustee of the Gene B. Goldstein and Francine T. Goldstein Family Trust |
| Gene B. Goldstein |
| Tracy Lee Gustafson |
| Mark Millet, solely in his capacity as Trustee of the Mark E. Millet Living Trust |
| Robert H. Latter |
| Ron Pike |
| Mark Millet, solely in his capacity as Trustee of the Millet 2016 Irrevocable Trust |
| Jason Chamness |
| Farragut Square Global Master Fund, LP |

# EXHIBIT 6

## <u>Litigation Trust Causes of Action</u>

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Eletson Holdings Inc., *et al.*,[1] | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

This schedule of Causes of Action (the "Schedule") represents the most current list of the Causes of Action to be transferred to the Litigation Trust and deemed Litigation Trust Causes of Action in connection with the Debtors' Second Amended Joint Plan of Reorganization of Debtors under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 725] (the "Plan") [2] (subject to the terms thereof and hereof) and supplements.

In accordance with Section 1141(b)-(c) of the Bankruptcy Code, upon the Effective Date, the Causes of Action as described herein shall vest in the Litigation Trust, free and clear of all Claims, Liens, charges, and other encumbrances and interests except as set forth herein.

**Litigation Trust Causes of Action Which May Be Asserted By The Litigation Trust[3]**

- Any and all Causes of Action that Eletson Holdings may assert, directly or derivatively, against the Debtors' current or former directors, officers, shareholders, based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the Preferred Owners.

- Any and all Causes of Action of any kind whatsoever that Eletson Holdings may hold or may assert, directly or derivatively, against the Preferred Owners based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the Preferred Owners.

- Any and all Avoidance Actions against any party other than those specifically defined in the Retained Causes of Action section of this Schedule.

---

[1] The Debtors in these chapter 11 cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.

[2] Capitalized terms not defined herein shall have the meaning set forth in the Plan.

[3] The Litigation Trust Causes of Action are subject to the Retained Causes Of Action and Avoidance of Doubt Statements provided in this Schedule.

The above is in every respect subject to the following:

1.      Nothing herein shall be deemed a concession that a claim exists in favor of any Debtor, and any party subject to any claim brought by the Litigation Trust Trustee reserves and retains any and all rights to dispute that a claim existed in favor of a Debtor, including by asserting any and all defenses including defenses of jurisdiction; and further, nothing herein shall be deemed a concession or submission by any party to the jurisdiction of the Bankruptcy Court;

2.      Nothing in the foregoing in any way modifies the right of any party sued in connection with any Litigation Trust Cause of Action to assert that such claim is subject to, and exculpated under, the terms of the exculpation clause in the Plan and the Confirmation Order;

3.      Notwithstanding the identification of Claims and Causes of Action above, no Debtor is making or has made any representation about the existence of or validity of any Claims or Causes of Action which may be asserted, and the Debtors understand that substantial defenses and/or limitations on collectability may exist with respect to any asserted Claims or Causes of Action;

4.      The aforementioned specifically delineated list of Litigation Trust Causes of Action pertains only to the right of the Debtors to assert such claims or causes of action and such transfer shall not prejudice the right of any subsidiary, shareholder or other affiliate of a Debtor to independently assert such claims or causes of action, if it is entitled by applicable law to do so; and

5.      In the case of actual or claimed inconsistency or ambiguity, the scope of any Litigation Trust Causes of Action shall be strictly construed, and all ambiguities shall be resolved in favor of the Claim or Cause of Action being a Retained Cause of Action.

## Retained Causes of Action

For the avoidance of doubt, Retained Causes of Action include any and all claims which are not Litigation Trust Causes of Action, including but limited to:

- Any and all Claims and Causes of Action other than those explicitly transferred above.

- Any and all Claims or Causes of Action necessary, warranted, and/or appropriate to collect the entirety of the monetary value of the Final Award issued in the Arbitration.

- Any and all Claims or Causes of Action of the Debtors against Murchinson Ltd., Pach Shemen LLC, Levona Holdings Ltd., Nomis Bay Ltd., BPY Limited, and any other person or entity acting at the direction or in concert, cooperation, or participation with or representing any of the foregoing persons or entities.

- Any and all Claims and Causes of Action of the Debtors against the law firms that have represented the Debtors., Eletson Corporation, Eletson Gas, the Existing Shareholders and their respective affiliates concerning any and all Claims or Cause of Action, including without limitation based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the Cypriot Nominees, the Arbitration (including any appeals), and the District Court Confirmation Proceedings (including any appeals), other past or ongoing legal proceedings in foreign jurisdictions against Murchison, Levona, Pach Shemen and their affiliates

All collections on account of any Retained Causes of Action shall be subject to the Retained Causes of Action Contributions in the Plan.

**EXHIBIT 7**

## Liquidation Analysis

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ELETSON HOLDINGS INC., et al., | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

**LIQUIDATION ANALYSIS**

| Assets | Low End Value | High End Value |
|---|---|---|
| Holdings' Ownership of Corp | $0.00 (Corp has obligations in excess of all assets) | $0.00 (Corp has obligations in excess of all assets) |
| Holdings' Ownership of Fourni SME | $0.00[1] | $6.3 MM[2] |
| Holdings' Ownership of Kinaros SME | $0.00[3] | $5.9 MM[4] |
| Holdings' Ownership of Kimolos SME | $0.00[5] | $4.6 MM[6] |
| Holdings' Ownership of Kastos SME | $0.00[7] | $6.3 MM[8] |
| Holdings' Ownership and equity interests of all other subsidiaries (including the value of the common units of Eletson Gas, LLC by Holdings.) | $3.3MM[9] | $3.3MM |

---

[1] Assuming OCM Owner terminates the lease (bareboat charter) or refuses to permit exercise of purchase option, due to the outstanding events of default

[2] Based on broker vessel valuation as of May 13, 2024, and assuming OCM Owner permits the lease (bareboat charter) to continue, and also permits the SME to exercise the purchase option and sell the vessel (having subtracted outstanding lease liability and related accrued interest as of March 31, 2024). The net value assuming prior satisfaction of the trade debt of the SME (as of March 31, 2024) and Also assuming a 20% base case scenario liquidation discount and a 2.5% brokerage sale fee

[3] Same as footnote 1

[4] Same as footnote 2

[5] Same as footnote 1

[6] Same as footnote 2

[7] Same as footnote 1

[8] Same as footnote 2

[9] Taking into account cash position of EMC Investments as of May 13, 2024. The Debtors believe all the value of the remaining net equity value in the remaining subsidiaries

| Litigation Claims of the Debtors | Unknown | Unknown |
|---|---|---|
| **TOTALS** | **$3.3MM** | **$26.3 MM** |

| CLAIMS | Low End Asserted Value | High End Asserted Value |
|---|---|---|
| Chapter 7 Fees (including Trustee Fees) | $2MM | $5MM |
| Chapter 11 Administrative Claims (including Professional Fee Claims) | $12MM | $17MM |
| OCM Guaranty Claims | $0.00 | $49.1MM[10] |
| Corp Guaranty Claims | $0.00 | $37MM[11] |
| Azure Guaranty Claims | $0.00 | $95MM |
| Claims Under Deutsche Indenture | $5.8MM | $6MM |
| Claims Under WSFS Indenture | $167MM[12] | $366MM |
| NAF Claims | $3.9MM | $5.5MM |
| Miscellaneous Unsecured Claims | $2.7MM | $2.7MM |
| Levona Holdings Claim | $0.00 | $262MM |
| **TOTALS** | **$193.4MM** | **$840MM** |

---

[10] OCM Guarantee Claims will not be triggered because sale of each vessel is pre-conditioned on OCM Owner having received in full the remaining lease obligations

[11] Assumes that the Corp. creditors have been unable to recover any funds from Corp.

[12] Assumes proper equitable subordination of Pach Shemen, Alpine, VR Global and Levona affiliated entities who purchased in violation of Restructuring Support Agreement, OCM Stipulation and Status Quo Injunction.

**RANGE OF RECOVERY**

| CLAIMS | Low End Recovery Range (assumes "Low End Value" / "High End Asserted Value") | High End Recovery Range (assumes "High End Value" / "Low End Asserted Value") [13] |
|---|---|---|
| Chapter 7 Fees (including Trustee Fees) | 100% | 100% |
| Administrative Claims (including Professional Fee Claims) | 11% | 100% |
| OCM Guaranty Claims | 0% | 100% |
| Corp Guaranty Claims | 0% | 0% |
| Azure Guaranty Claims | 0% | 0% |
| Claims Under Deutsche Indenture | 0% | 1.4% |
| Claims Under WSFS Indenture | 0% | 1.4% |
| NAF Claims | 0% | 1.4% |
| Miscellaneous Unsecured Claims | 0% | 1,4% |
| Levona Holdings Claim | 0% | 0% |

---

[13] While the Debtors believe they have strong basis to oppose the claims asserted by certain creditors, the Debtors do not believe that this is a likely scenario as it would anticipate 100% litigation success on *all* affirmative claims and on *all* asserted claim objections.

**EXHIBIT 8**

**<u>Valuation Analysis</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ELETSON HOLDINGS INC., et al., | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

**VALUATION ANALYSIS**

**Notes to Valuation Methodology**

The valuation analysis of Reorganized Debtor[1] herein is based on a Discounted Cash Flow (DCF) methodology.

This methodology consists of projecting the future net cash flows through 2028 of the four (4) SMEs owned by Reorganized Debtor. The Debtors have then discounted such cash flow to present value for an estimation of Reorganized Debtor's enterprise value. Available Cash of the SMEs (who will remain subsidiaries of Reorganized Debtors (as of May 13, 2024)) and Shareholder New Value Contribution are then added to such net cash flow to arrive at enterprise value as of the Effective Date. Estimated Administrative Claims and projected payments to creditors/Litigation Trust under the Plan and the remaining Bareboat Charter obligations of the SMEs are subtracted to calculate the final equity value of the Reorganized Debtor.

Specifically the Debtors further note:

An estimation of future revenues of the SMEs through 2028 is performed based on existing time charter employment of the vessels operated by the SMEs and reasonable assumptions about freight rates to be realized after the expiration of the existing time charters. Such assumptions take into account the current market status as well as historical data.

It is assumed that, at the end of 2028, a sale of the vessels operated by the SMEs will occur for prices reflecting the age of such vessels as well as historical evolution of prices for similar type and age of vessels.[2]

The reader of this analysis should be warned that the inherent volatility of the shipping market may result in substantially different actual future freight rates and vessel values (higher or lower than projected).

---

[1] Capitalized terms shall have the meanings ascribed thereto in the Plan [Dkt. 671].

[2] Based on broker vessel valuation as of May 13, 2024, and assuming OCM Owner permits the lease (bareboat charter) to continue, and also permits the SME to exercise the purchase option and sell the vessel (having subtracted outstanding lease liability and related accrued interest as of March 31, 2024). The net value assuming prior satisfaction of the trade debt of the SME (as of March 31, 2024) and also assuming a 20% base case scenario liquidation discount and a 2.5% brokerage sale fee.

The Operating expenses for the vessels operated by the SMEs are projected utilizing the latest historical performance and assuming an inflation growth rate for future periods.

Management's estimations are used for dry-docking and other general administrative expenses of the SMEs.

The liabilities of the SMEs are based on 31 March 2024 financial data available to Holdings and include the amounts due the OCM Entities (along with accrued interest) and trade debt related to the operation of the vessels by the SMEs.

Cash amount included in the calculation as of 13 May 2024 as reported by the Treasury Agent for the SMEs. [3]

---

[3] Taking into account cash position of the SMEs maintained by EMC Investments as of May 13, 2024.

|  | May-24 | Jul-24 | Dec-24 | Dec-25 | Dec-26 | Dec-27 | Dec-28 |
|---|---|---|---|---|---|---|---|
| CALCULATION OF ENTERPRISE VALUE ($mn) | | | | | | | |
| Revenues | | 6.6 | 16.4 | 34.0 | 34.2 | 24.6 | 24.6 |
| Less: Operating Expenses | | -2.0 | -5.1 | -12.5 | -12.8 | -13.0 | -13.3 |
| Less: Dry-docking provisions | | -0.2 | -0.8 | -2.0 | -2.0 | -2.0 | -2.0 |
| Less: Admninistrative expenses | | -0.4 | -0.9 | -2.2 | -2.2 | -2.2 | -2.2 |
| EBITDA | | 4.0 | 9.5 | 17.3 | 17.2 | 7.4 | 7.1 |
| Proceeds from vessel sales | | | | | | | 46.1 |
| Free Cash Flow to Firm | | 4.0 | 9.5 | 17.3 | 17.2 | 7.4 | 53.2 |

| | |
|---|---|
| Enterprise Value | 84.3 |
| | |
| CALCULATION OF EQUITY VALUE ($mn) | |
| Enterprise Value | 84.3 |
| OCM leases | -48.1 |
| OCM acrued interest | -1.1 |
| Trade debt of 4 SME | -4.7 |
| Cash | 3.3 |
| New Cash contribution | 30.0 |
| Administrative expenses Ch 11 | -14.5 |
| Cash paid to Usecured Creditors | -18.8 |
| | |
| Equity Value | 30.3 |

# EXHIBIT 9

## Schedule of Subsidiaries

**In re Eletson Holdings, Inc.**

Fournoi Shipping Corporation (100%)
Arginusae Holdings, Inc. (100%)
Five Investment Inc. (100%)
Glaronissi Shipping Corporation (100%)
EMC Investment Corporation (100%)
Eletson Corporation (100%)
Agathonissos Finance LLC (100%)
Eletson Finance (US) LLC (100%)
Eletson Gas LLC (100% of common shares)
Kastos Special Maritime Enterprise (100%)
Fourni Special Maritime Enterprise (100%)
Kinaros Special Maritime Enterprise (100%)
Kimolos II Special Maritime Enterprise (100%)
Antikeros Special Maritime Enterprise (100%)
Dhonoussa Special Maritime Enterprise (100%)
Polyaigos Special Maritime Enterprise (100%)
Strofades Special Maritime Enterprise (100%)
Eletson Chartering Inc. (100%)
Kastelorizo Shipping Corporation (100%)
Folegandros Shipping Corporation (100%)
Eletson Chartering II Inc. (100%)
Eletson Chartering III Inc., Liberia (100%)
Argironissos Shipping Corporation (100%)
Salamina Shipping Corporation (100%)
Samothraki Shipping Corporation (100%)
Eletson Offshore Inc. (100%)
Eletson Chartering III Inc., Marshal Islands (100%)
Agathonissos Shipping Corporation (100%)
Alkyonis Shipping Corporation (100%)
Alonissos Shipping Corporation (100%)
Angistri Shipping Corporation (100%)
Dhokos Shipping Corporation (100%)
Erikoussa Shipping Corporation (100%)
Kandilousa Shipping Corporation (100%)
Karos II Shipping Corporation (100%)
Makronissos Shipping Corporation (100%)
Megalonissos Shipping Corporation (100%)
Parapola Shipping Corporation (100%)
Pelagos Shipping Corporation (100%)
Serifopoulo Shipping Corporation (100%)
Serifos Shipping Corporation (100%)
Skiropoula Shipping Corporation (100%)
Skopelos Shipping Corporation (100%)
Sporades Shipping Corporation (100%)
Stavronisi Shipping Corporation (100%)

Velopoula Shipping Corporation (100%)

Astipalea Shipping Corporation (100%)

Kithnos Shipping Corporation (100%)

Paros Shipping Corporation (100%)

Othoni Shipping Corporation (100%)

Mathraki Shipping Corporation (100%)

Limnos Shipping Corporation (100%)

Dilos Shipping Corporation (100%)

Despotico Shipping Corporation (100%)

Antimilos Shipping Corporation (100%)

Anafi Shipping Corporation (100%)

Thira Shipping Corporation (100%)

Karos Shipping Corporation (100%)

Dhonousa Shipping Corporation

Antikeros Shipping Corporation

**Exhibit 10**

**<u>Commitment Letter</u>**

[LETTERHEAD INSERT]

May [18], 2024

Eletson Holdings, Inc.

Re: **Commitment Letter for $30 Million Shareholder New Value Contribution by Eletson Members**

Ladies and Gentlemen

Reference is made to the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code (the "Plan")[1] filed by Debtors in the Chapter 11 Cases [Dkt No. 725]. This letter (the "Commitment Letter") is hereby issued by Lassia Investment Company, Glafkos Trust Company, and Family Unity Trust Company (the "Majority Eletson Members"). We, the Majority Eletson Members, constituting the majority of the Eletson Members, hereby commit to provide the Debtors with the Shareholder New Value Contribution for the purposes of effecting the consummation of the Plan following confirmation thereof by the Bankruptcy Court. Pursuant to this Commitment Letter, we, the Majority Eletson Members, hereby agree to provide the Shareholder New Value Contribution to Eletson Holdings, Inc. upon the Effective Date of the Plan, solely for purposes of consummating the Plan. Upon the delivery of the Shareholder New Value Contribution and the consummation of the Plan, the Majority Eletson Members understand they will receive the Interests in the Reorganized Debtor as provided for in the Plan. In the event a Confirmation Order with respect to the Plan is not entered or does not become a Final Order, or in the event the Effective Date of the Plan does not occur for any reason other than the failure of the Majority Eletson Members to make the Shareholder New Value Contribution, the Majority Eletson Members obligations hereunder shall immediately terminate without further notice or action by any party. In addition, the Majority Eletson Members' obligations hereunder shall terminate on September 30, 2024 without further notice or action by any party.

The Majority Eletson Members hereby confirm that the proceeds of the Shareholder New Value Contribution shall be made from funds procured by themselves and not from any funds to of any Debtor.

This Commitment Letter has been and is made solely for the benefit of the Eletson Holdings, Inc.and solely for purposes of effecting the Shareholder New Value Contribution under the Plan. Nothing in this Commitment Letter, expressed or implied, is intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements contained herein.

This Commitment Letter and the Plan embodies the entire agreement and understanding among the Majority Eletson Members, and the Debtors with respect to the Shareholder New Value Contribution, supersedes all prior agreements and understandings relating to the specific matters hereof and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. This Commitment Letter is not assignable by Eletson Holdings, Inc. intended to be solely for the benefit of Eletson Holdings, Inc.

---

[1] Capitalized terms used herein but undefined have the meaning provided in the Plan.

Each of the parties hereto agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to this Commitment Letter.  For the avoidance of doubt, each of the Majority Eletson Members irrevocability submits to the jurisdiction of the Bankruptcy Court solely for purpose (i) of enforcement of the terms of this Commitment Letter or (i) to compel the contribution of the Shareholder New Value Contribution by any Majority Eletson Member.

This Commitment Letter shall be governed by, and construed in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

This Commitment Letter may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter by telecopier, facsimile or other electronic transmission (including by .PDF file) shall be effective as delivery of a manually executed counterpart thereof.

LASSIA INVESTMENT COMPANY

By:_____
Name:_____
Title:_____

GLAFKOS TRUST COMPANY

By:_____
Name:_____
Title:_____

FAMILY UNITY TRUST COMPANY

By:_____
Name:_____
Title:_____

ACCEPTED AND AGREED TO
AS OF May [_], 2024


ELETSON HOLDINGS INC.


By:_____
Name:_____
Title:_____


ELETSON FINANCE (US), LLC.


By:_____
Name:_____
Title:_____


AGATHONISSOS FINANCE LLC.


By:_____
Name:_____
Title:_____

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Eletson Holdings Inc., *et al.*,[1] | Case No. 23-10322 (JPM) |
| Debtors. | (Jointly Administered) |

**FIRST AMENDED DISCLOSURE STATEMENT IN SUPPORT OF SECOND AMENDED JOINT PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**REED SMITH LLP**

Derek J. Baker
Derek Osei-Bonsu
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail:  dbaker@reedsmith.com
                dosei-bonsu@reedsmith.com

-and-

Andrew L. Buck
Louis M. Solomon
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 251-5400
Facsimile: (212) 521-5450
E-Mail:  abuck@reedsmith.com
                lsolomon@reedsmith.com

---

[1]   The Debtors in these Chapter 11 Cases are:  Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

-and-

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel for the Debtors*

THIS FIRST AMENDED DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") FOR THE SECOND JOINT AMENDED PLAN OF REORGANIZATION OF DEBTORS UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE (THE "PLAN"), THE ACCOMPANYING BALLOTS AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTORS TO KNOWN HOLDERS OF CLAIMS AND INTERESTS PURSUANT TO SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT THE PLAN PROPOSED BY THE DEBTORS.

BY ORDER DATED [ ], THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION TO PERMIT THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO MAKE REASONABLY INFORMED DECISIONS IN EXERCISING THEIR RIGHT TO VOTE ON THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE DEBTORS' PLAN. IN ADDITION TO THIS DISCLOSURE STATEMENT, YOU ARE RECEIVING AN ADDITIONAL DISCLOSURE STATEMENT AND RELATED PLAN THAT ARE NOT PRESENTED BY THE DEBTORS. PLEASE TAKE CARE TO ENSURE THAT YOU ARE EVALUATING THIS, THE DEBTORS' DISCLOSURE STATEMENT, IN RELATION TO THE DEBTORS' PLAN AND EVALUATE THE ADDITIONAL DISCLOSURE STATEMENT IN RELATION TO THE ADDITIONAL PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS <u>5:00 P.M.,
PREVAILING EASTERN TIME, [ ]</u> UNLESS EXTENDED BY ORDER OF THE
BANKRUPTCY COURT.**

**THE DEBTORS BELIEVE THAT THE PLAN PRESENTS THE MOST
ADVANTAGEOUS OUTCOME FOR ALL THE DEBTORS' STAKEHOLDERS UNDER
THE CIRCUMSTANCES OF THESE CHAPTER 11 CASES AND ~~THAT,~~ THEREFORE~~,~~
CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS'
ESTATES <u>AND THEIR CREDITORS AND INTEREST HOLDERS</u>. THE DEBTORS
RECOMMEND THAT CREDITORS <u>AND INTEREST HOLDERS</u> ENTITLED TO VOTE
TO ACCEPT OR REJECT THE PLAN VOTE TO ACCEPT THE PLAN.**

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS
DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT
CONTAIN ALL OF ITS TERMS AND PROVISIONS.  ALL PARTIES WHO ARE ENTITLED
TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS
ENTIRETY BEFORE VOTING ON THE PLAN.   TO THE EXTENT OF ANY
INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN SUPPLEMENT AND THE
DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN SUPPLEMENT
ARE CONTROLLING.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE
OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN)
WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN
SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY
BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE
DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE
TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF
CLAIMS OR INTERESTS.  HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT
CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY
LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER
SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX
ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE
PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE
HEREOF, UNLESS ANOTHER TIME IS SPECIFIED.   CERTAIN STATEMENTS
CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE
FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN
BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.
THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR
CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED
IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE
HEREOF.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN
THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE

SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT THAT ARE NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT 1.

## TABLE OF CONTENTS

**Page**

I.     SUMMARY ................................................................................................ 1

    A.   Why You Are Receiving This Document ................................................ ~~1~~2

    B.   Plan Overview ........................................................................................ 2

         1.   Purpose – Reorganization .......................................................... 2

         2.   Substantive Consolidation or Merger ........................................ 2

         3.   Plan Treatment .......................................................................... 3

    C.   Voting and Confirmation ...................................................................... 10

    D.   Risk Factors and Disclaimer ................................................................ ~~10~~11

II.    VOTING ON AND CONFIRMATION OF THE PLAN ............................. ~~11~~12

    A.   Deadline for Voting For or Against the Plan ....................................... ~~11~~12

    B.   Confirmation Hearing for the Plan ....................................................... 13

    C.   Any Objections to Confirmation of the Plan ....................................... ~~13~~14

    D.   Recommendations for Voting ............................................................... 14

III.   ORGANIZATION AND ACTIVITIES OF THE DEBTORS ..................... ~~14~~15

    A.   The Debtors' Business .......................................................................... ~~14~~15

    B.   Corporate History and Structure ........................................................... 15

    C.   Pre-Petition Capitalization ................................................................... ~~15~~16

         1.   Old Notes ................................................................................... ~~15~~16

         2.   Exchange Notes and Restructuring Support Agreements ........... ~~15~~16

   ~~3~~D.   Eletson ~~Holding~~Holdings Guaranty Obligations ................................. ~~17~~18

      ~~D~~1.   The OCM Guarantees ............................................................... ~~17~~18

      ~~E~~2.   The Azure Guarantees ............................................................... ~~18~~19

      ~~F~~3.   The Eletson Corp Guarantees ................................................... ~~19~~20

IV.   EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING ....... ~~19~~20

    A.   Murchinson Directly or Indirectly Created Levona and Pach Shemen, the Primary Actors in the Arbitration and Bankruptcy .............................. 20

    B.   Levona Improperly Acquires the Preferred Shares of Eletson Gas ..... ~~20~~21

    C.   The JAMS Arbitration ........................................................................... ~~22~~23

    D.   The District Court Order ....................................................................... ~~25~~24

    E.   Pach Shemen's Improper Acquisition of the Exchange Notes ............. 26

    F.   The Exchange Note Trustee is Forced to Initiate the Southern District Bondholder Litigation ........................................................................... 27

G.    The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases .................................................................................................................. ~~27~~28

H.    The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions ................................................................................................... 28

I.    Potential Claims Against the Debtors and their Principals related to the Preferred Shares .................................................................................................. 28

J.    [PLACEHOLDER FOR LEVONA INSERT] ................................................. 29

V.    THE CHAPTER 7 CASES ............................................................................................ ~~29~~30

A.    The Involuntary Petitions and Joint Administration Motion ............................. ~~29~~30

B.    The Alleged Joinders to the Involuntary Petitions ............................................ ~~29~~30

C.    Motion for Relief from the Automatic Stay and the Stipulated Stay Order ........ ~~29~~30

D.    The Motion to Dismiss and Associated Documents ........................................... ~~30~~31

E.    The Eletson State Court Action is Removed to the Bankruptcy Court ................. 31

F.    Mediation and the Conversion Stipulation ....................................................... 32

VI.    THE CHAPTER 11 CASES ......................................................................................... 33

A.    Debtors' Filings ............................................................................................... 33

1.    Schedules and Statements of Financial Affairs ..................................... 33

2.    Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports .............................................................................. ~~33~~34

a.    2015.3 Disclosures .................................................................. 34

3.    Monthly Operating Reports .................................................................. 34

4.    Claims Bar Date and Review Process .................................................... 34

a.    Claims Bar Date ...................................................................... 34

b.    Claims Review Process ............................................................ 35

i.    Original Petitioning Creditors Claim Objection ........... 35

ii.    Levona Claim Objection .............................................. 36

iii.    Exchange Note Trustee Claim Objection ..................... 37

iv.    New Agathonissos Finance LLC Claim Objection ........... 39

v.    Omnibus Claim Objections .......................................... 39

5.    Application for the Retention of Debtors' Counsel ................................ ~~38~~39

6.    Motion to Enforce ................................................................................. ~~38~~39

7.    Establishment of Independent Committee ............................................. ~~39~~40

8.    Plans .................................................................................................... ~~39~~40

9.    The Shareholder New Value Contribution ............................................ ~~40~~41

10.    Motion to Compel Mediation ............................................................... ~~41~~43

        11.    Postpetition Financing and the DIP Motion ............................................... 4244

    B.    Appointment of the Committee and the Committee Filings ................................ 4345

        1.    Applications for appointment of Committee Professionals ....................... 4345

            a.    Dechert Retention Application ................................................ 45

            b.    FTI Retention Application ...................................................... 45

        2.    Motion to Modify Previous Order Granting Relief from the Automatic Stay ...................................................................................... 4446

        3.    Interim Compensation Motion .................................................................. 4446

    C.    Trustee Motions, Mediation, Evidentiary Hearing and Exclusivity Motion ....... 4547

            i.    The Trustee Motions ............................................................. 47

            ii.    The Mediation ...................................................................... 48

            iii.    The Evidentiary Hearing ....................................................... 48

            iv.    The Exclusivity Motion ........................................................ 49

    D.    The Petitioning Creditor Plan and Disclosure Statement .................................. 4849

VII.    ORDERLY DISTRIBUTION OF ASSETS ................................................................ 4850

VIII.    THE PLAN .................................................................................................................. 5153

    A.    Overview of Chapter 11 ........................................................................................ 5153

    B.    Purpose of the Plan ............................................................................................... 5255

    C.    Classification and Treatment of Claims ............................................................... 5356

        1.    Classification and Treatment of Claims and Interests ............................... 5356

            a.    Unclassified Claims ............................................................... 56

                 i.    Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims) ....................................... 56

                ii.    Professional Fee Claims and Committee Professional Fee Claims .... 57

               iii.    DIP Claims ........................................................................... 58

               iv.    Administrative Claim and Substantial Contribution Claim Filing Deadline ............................................................................... 58

            b.    Classified Claims .................................................................. 58

    D.    Acceptance and Rejection of the Plan ................................................................... 5861

        1.    Voting Classes ........................................................................................... 5861

        2.    Classes Presumed to Accept the Plan ....................................................... 5861

        3.    Acceptance by Impaired Classes .............................................................. 5861

        4.    Elimination of Vacant Classes; Acceptance by Non-Voting Classes ......... 5862

        5.    Non-Consensual Confirmation ................................................................. 5862

        6.    Controversy Concerning Impairment ........................................................ 5962

E.    Means for Implementation of the Plan.................................................. 5962

    1.    Implementation of the Plan and Sources of Consideration for Plan
    Distributions .................................................................................. 5962

        a.    The Shareholder New Value Contribution ................................. 62

        b.    Distributable Cash ...................................................................... 63

        c.    Excess SME Proceeds ................................................................. 63

        d.    Litigation Trust Causes of Action .............................................. 64

    2.    Substantive Consolidation ............................................................. 6064

        a.    Order Granting Plan Consolidation ............................................ 64

        b.    Plan Consolidation ...................................................................... 64

    3.    Corporate Existence ....................................................................... 6165

    4.    Vesting of Assets in the Reorganized Debtor ............................... 6165

    5.    Dissolution of the Committee ........................................................ 6166

    6.    Reorganized Debtor Organizational Documents ........................... 6266

    7.    Appointment of Directors and Officers of the Reorganized Debtor .......... 6266

    8.    Creation of Litigation Trust .......................................................... 6267

    9.    Transfer of Assets and the Litigation Trust Causes of Action to the
    Litigation Trust ............................................................................. 6368

    10.    Gas Ownership Claims Settlement ................................................ 64

    1110.Liabilities of the Litigation Trust ................................................. 6568

    1211.Appointment of the Litigation Trust Trustee and Members of the
    Litigation Trust Oversight Committee .......................................... 6569

    1312.Cooperation and Privilege ............................................................ 6669

    1413.Duties of the Litigation Trust Trustee .......................................... 6670

    1514.Post Confirmation Expenses .......................................................... 6872

    1615.Liability; Indemnification ............................................................. 6973

    1716.Litigation Trust Oversight Committee .......................................... 7074

    1817.Good Faith .................................................................................... 7175

    1918.Saturday, Sunday or Legal Holiday............................................... 7175

    2019.Exemption from Certain Taxes and Fees....................................... 7275

    2120.Issuance of Documents Necessary to Consummate the Plan ........ 7275

    2221.Final Decree .................................................................................. 7276

F.    Retained Causes of Action ....................................................................... 7276

    1.    Maintenance of Causes of Action .................................................. 7276

    2.    Preservation of Causes of Action.................................................... 7376

3.  Preservation of All Causes of Action Not Expressly Settled or
    Released .................................................................................. 7377

4.  Retained Causes of Action and Retained Causes of Action
    Contribution ........................................................................... 77

G. Treatment of Executory Contracts and Unexpired Leases ................................. 7478

1.  Rejection of Executory Contracts or Unexpired Leases ........................... 7478

2.  Rejection Damages Bar Date ............................................................. 7479

H. Provisions Governing Distributions ............................................................ 7479

1.  Disbursing Agent .......................................................................... 7479

    a.  Litigation Trust Trustee as Disbursing Agent for Class 6A
        Claims and Class 6B Claims ....................................................... 79

    b.  Alternative Disbursing Agent Qualifications ................................... 79

2.  Time and Manner of Distributions ..................................................... 7579

3.  Interest of Claims ........................................................................ 7580

4.  Compliance with Tax Requirements/Allocations ..................................... 7680

5.  Delivery of Distributions and Undeliverable or Unclaimed
    Distributions .............................................................................. 7680

    a.  Delivery of Distributions in General ........................................... 80

    b.  Undeliverable Distributions ...................................................... 81

        i.  Holding of Undeliverable Distributions ................................. 81

        ii. Failure to Claim Undeliverable Distributions ......................... 81

6.  Claims Administration Responsibility ................................................. 7781

    a.  Reservation of Rights to Object to Claims .................................... 81

    b.  Filing of Objections .............................................................. 81

    c.  Determination of Claims ......................................................... 82

7.  Procedures for Treating and Resolving Disputed and Contingent
    Claims or Interests ...................................................................... 7882

    a.  No Distributions Pending Allowance ........................................... 82

    b.  Claim Estimation ................................................................. 83

8.  Setoffs and Recoupment ................................................................ 7883

9.  Allowance and Disallowance of Claims Subject to Section 502 of the
    Bankruptcy Code ......................................................................... 7883

10. Cancellation of Instruments and Agreements ....................................... 7883

11. Withholding Taxes ....................................................................... 7983

12. Reports ................................................................................... 7984

13. Distribution Record Date ............................................................... 7984

14. Timing and Calculation of Amounts to be Distributed............................. ~~79~~84

15. Settlement of Claims and Controversies................................................. ~~79~~84

I.   Conditions Precedent to Confirmation and Occurrence of the Effective Date .... ~~80~~84

1.   Conditions Precedent to Confirmation...................................................... ~~80~~84

2.   Conditions Precedent to Confirmation...................................................... ~~80~~85

    i.   the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and .................................................... 85

    ii.  the provisions of the Confirmation Order are nonseverable and mutually dependent. ............................................................................ 85

3.   Waiver of Conditions .............................................................................. ~~80~~85

4.   Debtors' Right of Revocation or Withdrawal........................................... ~~81~~85

J.   Effect of Confirmation ................................................................................ ~~81~~86

1.   Injunction ............................................................................................... ~~81~~86

2.   Term of Injunctions or Stays................................................................... ~~82~~86

3.   Exculpation ............................................................................................ ~~82~~87

4.   Release of Liens ..................................................................................... ~~82~~87

K.   Retention of Jurisdiction .............................................................................. ~~83~~88

L.   Miscellaneous Provisions.............................................................................. ~~84~~89

1.   Effectuating Documents, Further Transactions and Corporation Action ... ~~84~~89

2.   Payment of Statutory Fees ...................................................................... ~~85~~90

3.   Headings ................................................................................................ ~~85~~90

4.   Biding Effect of Plan .............................................................................. ~~85~~90

5.   Final Order ............................................................................................. ~~85~~90

6.   Withholding and Reporting Requirements ............................................... ~~85~~90

7.   Tax Exemption ....................................................................................... ~~86~~90

8.   Governing Law ....................................................................................... ~~86~~91

9.   Severability ............................................................................................ ~~86~~91

10.  Plan Controls .......................................................................................... ~~86~~91

11.  Amendments and Modifications .............................................................. ~~86~~91

12.  Notices ................................................................................................... ~~87~~92

13.  Filing of Additional Documents .............................................................. ~~87~~92

14.  Direction to a Party ................................................................................ ~~88~~92

15.  Successors and Assigns............................................................................ ~~88~~93

16.  Reservation of Rights..................................................................... ~~88~~93

17.  Further Assurances........................................................................ ~~88~~93

18.  Entire Agreement .......................................................................... ~~88~~93

IX.  FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST ..................... ~~88~~93

A.  Feasibility of the Plan ........................................................................ ~~89~~94

B.  Best Interest Test............................................................................... ~~90~~95

1.  Generally.................................................................................... ~~90~~95

2.  Best Interest of Creditors Test ................................................... ~~90~~95

C.  Confirmation Without Acceptance by All Impaired Classes: the
"Cramdown" Alternative .................................................................... ~~91~~96

X.  IMPORTANT CONSIDERATIONS AND RISK FACTORS................................... ~~92~~97

A.  The Debtors have No Duty to Update................................................. ~~92~~97

B.  No Representations Outside the Disclosure Statement are Authorized.............. ~~92~~97

C.  Information Presented is Based on the Debtors' Books and Records, and no
Audit was Performed .......................................................................... ~~92~~97

D.  All Information was Provided by Debtors and was Relied Upon by
Professionals ...................................................................................... ~~93~~98

E.  Projections and Other Forward Looking Statements are Not Assured, and
Actual Results will Vary...................................................................... ~~93~~98

F.  No Legal or Tax Advice is Provided to You by the Disclosure Statement ........ ~~93~~98

G.  No Admissions Made.......................................................................... ~~93~~98

H.  No Waiver of Rights Except as Expressly Set Forth in the Plan ....................... ~~93~~98

I.  Bankruptcy Law Risks and Considerations ....................................... ~~93~~98

1.  Confirmation of the Plan is Not Assured ................................... ~~93~~98

2.  The Effective Date Might Be Delayed or Never Occur............... ~~94~~99

3.  The Projected Value of Estate Assets Might Not be Realized.................. ~~94~~99

4.  Allowed Claims in the Various Classes May Exceed Projections.............. ~~94~~99

~~5.~~  ~~The Gas Ownership Claim Settlement Amount is Undetermined and
may fall short of Projections~~............................................................ ~~94~~

~~6~~5.  The SME Revenue may fall short of Projections........................................ ~~94~~99

XI.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES....................................... ~~94~~99

A.  Federal Income Tax Consequences of the Plan .................................. ~~94~~99

1.  Withholding Taxes..................................................................... ~~95~~100

2.  Federal Income Tax Treatment of the Litigation Trust ............... ~~95~~100

3.  Litigation Trust Assets Treated As Owned by Holders of Allowed
Class ~~5A~~6A and Class ~~5B~~6B Claims................................................. ~~95~~100

B.    Federal Income Tax Consequences of Payment of Allowed Claims................ 96100

   1.    Recognition of Gain or Loss ......................................................... 96101

        a.    In General................................................................... 101

        b.    Post-Effective Date Cash Distributions .............................. 101

        c.    Bad Debt and/or Worthless Securities Deduction ............................ 101

   2.    Pending Payments .................................................................... 97101

   3.    Payments Other than Pending Payments ................................... 97102

C.    Certain Other Tax Consequences for Holders of Claims.................. 97102

   1.    Receipt of Pre-Effective Date Interest ....................................... 97102

   2.    Installment Method .................................................................. 97102

D.    Importance of Obtaining Professional Tax Assistance....................... 97102

XII.    EFFECT OF CONFIRMATION ............................................................... 98102

A.    Binding Effect of Confirmation .................................................... 98103

B.    Vesting of Assets Free and Clear of Liens, Claims and Interests...................... 98103

C.    Good Faith ................................................................................ 98103

XIII.    ALTERNATIVES TO THE PLAN .......................................................... 98103

A.    Liquidation Under Chapter 7 ........................................................ 98103

B.    Dismissal.................................................................................. 98103

C.    Alternative Plan ......................................................................... 99103

XIV.    CONCLUSION.................................................................................. 99103

## TABLE OF EXHIBITS

Exhibit l        The Plan

Exhibit 2        Solicitation Order

Exhibit 3        Final Award

Exhibit 4        ~~Litigation Trust Causes of Action~~District Court Order

Exhibit 5        Schedule of Petitioning Creditors

Exhibit 6        ~~District Court Order~~Litigation Trust Causes of Action

Exhibit 7        Liquidation Analysis

Exhibit 8        Valuation Analysis

Exhibit 9        Schedule of Subsidiaries

Exhibit 10       Commitment Letter

## I.    SUMMARY

On March 7, 2023, the Debtors' bankruptcy cases were initiated through the filing of involuntary bankruptcy petitions by alleged creditors Pach Shemen LLC ("Pach Shemen"), VR Global Partners, L.P. ("VR Global") and Alpine Partners (BVI) L.P ("Alpine Partners" and together with Pach Shemen and VR Global, the "Original Petitioning Creditors" and inclusive of those parties that filed joinders to the Original Petitioning Creditors, the "Petitioning Creditors").[2]  By order of the Bankruptcy Court, on September 25, 2023, the Debtors' voluntarily converted their bankruptcy cases from cases under Chapter 7 of the Bankruptcy Code to these Chapter 11 Cases.  The Plan described in this Disclosure Statement effects a resolution of the Debtors' outstanding obligations owed to its creditor constituencies through, among other things: (i) ~~distributing a new value contribution provided by the Debtors' shareholders to satisfy the Debtors' administrative expense obligations and certain Claims and making distributions to certain Holders of Allowed Claims through a Litigation Trust; (ii)~~establishing a Litigation Trust to pursue and liquidate certain causes of action transferred from the Debtors ~~(which will, in turn make distributions to certain Holders of Allowed Claims);[3]~~ and ~~(iii)  proposing and evidence a settlement with the Eletson Gas Ownership Defendants which will enhance~~ii) distributing a new value contribution provided by the Debtors' shareholders consisting of (a) Cash to satisfy the Debtors' administrative expense obligations and certain Claims and transferring the remaining Cash to the Litigation Trust for making distributions to certain Holders of Allowed Claims and/or the pursuit of the Litigation Trust Causes of Action; and (b) portions of the recoveries of parties entitled to recovery from Levona Ltd ("Levona") on Account of the Final Award and the District Court Order.  These contributions in addition to the other forms of Plan Consideration provided to the Litigation  Trust will enhance distributions to certain Holders of Allowed Claims and/or the pursuit of the Litigation Trust Causes of Action.[3] The Plan otherwise effectuates a restructuring of the outstanding obligations of the Estates, all as more fully set forth in this Disclosure Statement and the Plan.

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan that proposes how to dispose of a debtor's assets and treat claims against, and interests in, such debtor.  A Chapter 11 plan may provide for a debtor-in-possession to reorganize by continuing to operate, to liquidate by selling assets of the estate or to implement a combination of both.  The Plan is a reorganizing plan.

On January 23, 2024, the Debtors filed their first plan of reorganization [Dkt. No. 370] (the "Original Plan").  On April 8, 2024, the Debtors filed the First Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 570] (the "First Amended Plan").  On May 13, 2024, the Debtors filed the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code [Dkt. No. 671] which was subsequently modified on May 31, 2024 [Dkt. No. 725] (as amended, the "Plan").  The Original Plan and First Amended Plan are further amended and superseded by the Plan.  This Disclosure Statement pertains only to the Plan and does not pertain to the Original Plan or the First Amended Plan despite any overlap between the Plan, the Original Plan, and First Amended Plan

---

2    Notwithstanding the voluntary conversion of the Debtors' cases under Chapter 7 of the Bankruptcy Code to these Chapter 11 Cases, the Debtors have reserved all rights against the Petitioning Creditors and their affiliates regarding the filing the involuntary petitions.

~~3    A schedule of the Causes of Action transferred to the Litigation Trust and constituting Litigation Trust Causes of Action is attached hereto as Exhibit 4.~~

3    A schedule of the Causes of Action transferred to the Litigation Trust and constituting Litigation Trust Causes of Action is attached hereto as Exhibit 6.

~~and the Plan~~. This Disclosure Statement amends and supersedes all previous Disclosure Statements filed by the Debtors in these Chapter 11 Cases.

A.    Why You Are Receiving This Document

The Bankruptcy Code requires that the party proposing a Chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement."  The Bankruptcy Code requires a disclosure statement to contain "adequate information" concerning said plan.  In other words, a disclosure statement must contain sufficient information to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be. **This document, together with its attached exhibits, is the Disclosure Statement for the Plan.  The Bankruptcy Court has reviewed this Disclosure Statement and has determined that it contains adequate information and may be sent to you to solicit your vote on the Plan.**

This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan.  The Disclosure Statement also discusses the events leading to the Debtors' Chapter 11 Cases, describes the main events that have occurred in the Debtors' Chapter 11 Cases, and, finally, summarizes and analyzes the Plan.  The Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtors and Holders of Claims and Interests, voting procedures and the confirmation process.

**All ~~Creditors~~Holders of Claims against the Debtors and Interests in the Debtors should carefully review both the Disclosure Statement and the Plan before voting to accept or reject the Plan.  Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan.  Moreover, the ~~Plan~~ provisions of the Plan, and Plan Supplement as applicable, will govern if there are any inconsistencies between the Plan and the Disclosure Statement.**

B.    Plan Overview

1.    Purpose – Reorganization

The purpose of the Plan is to reorganize the Debtors' outstanding liabilities and govern distributions to Creditors.  If the Plan is not confirmed, the Debtors believe that they will be forced either to liquidate under Chapter 7 of the Bankruptcy Code or dismiss their Chapter 11 Cases.  In either event, the Debtors believe that the Debtors' Creditors would receive smaller distributions, or, in most cases, none at all, for their Claims if the Plan or an alternative plan is not approved.

2.    Substantive Consolidation or Merger

The Consolidating Debtors are holding companies that were formed for the express purpose of issuing the Exchange Notes. Pursuant to the Exchange Notes Indenture, the Consolidating Debtors are prohibited from holding or maintaining any assets.  As the Exchange Notes and the Claims related thereto will be discharged after the confirmation of these Chapter 11 Cases, the Debtors maintain there is no reason for the continued existence of the Consolidating Debtors.  As such, the Consolidating Debtors will be consolidated into the Reorganized Debtor for

the convenience of all parties, and with no impact to any operations, distributions, assets or rights of any party in interest or the Reorganized Debtor.

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into reorganized Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings, and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be ~~on~~a Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor.  The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of Plan shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been affected.  This compromise and settlement are in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable.  Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.    Plan Treatment

**UNCLASSIFIED AND UNIMPAIRED CLAIMS**

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Administrative Claims (other than Professional Fee Claims or | The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims, DIP Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, | $[10,000] | 100% |

- 3 -

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Committee Professional Fee Claims) | without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim. Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Disbursing Agent. Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date. All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees. | | |
| Professional Fee Claims and Committee Professional Fee Claims | Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date. Prior to the Effective Date the Debtors may pay any Committee Professional Fees for all Committee Professional Fee Claims which are allowable or allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date. From and after the Effective Date, the Disbursing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective | Approx. $[13],000,000 | 100% |

| Unclassified Claims | Plan Treatment | Estimated Allowed Claims | Estimated Recovery |
|---|---|---|---|
| | Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case. | | |
| DIP Claims | Except to the extent that the holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, each such holder of an Allowed DIP Claim shall receive payment in full in Cash of such holders Allowed DIP Claim on the Effective Date. | Allowed DIP Claims: $[0] | 100% |

## CLASSIFIED CLAIMS

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| 1 | OCM Guaranty Claims | Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty | Approx. $49,100,000 | ~50% |

---

[4] The amounts set forth herein are estimates only. The actual amount of Allowed Claims for certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

[5] The percentages set forth herein are estimates only. The actual recoveries of certain Classes of Claims cannot be determined with certainty until the Claims reconciliation and objection process is complete.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | percent (50%) of the obligations of the SMEs subject to the OCM Guarantees. Holders of OCM Guaranty Claims will receive no cash distributions under the Plan on account of their OCM Guaranty Claims.

Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan. | | |
| 2 | Corp Guaranty Claims | The Corp Guaranty Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, (i) each Holder of an Allowed Corp Guaranty Claim shall receive its pro rata distribution of the Eletson Corporation Guaranty Recovery and (ii) each of the Corp Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees. ~~Holders of Corp Guaranty Claims will receive no cash distributions under the Plan on account of their Corp Guaranty Claims.~~

Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. | Approx. $27,768,000 | ~~50~~53.6% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|-------|-------|------------------------|---------------------------|------------------------|
| 3 | Azure Guaranty Claims | Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Disbursing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.<br><br>Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan. | Approx. $94,799,000 | ~.21% |
| 4 | Trade Creditor Claims | The Trade Creditor Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, each Holder of an Allowed Trade Creditor Claim shall receive, in exchange for such Allowed Trade Creditor Claim, Cash in an amount equal to [15]% of the ~~face amount~~Face Amount of such Holder's Trade Creditor Claim~~; provided, the aggregate distributions to Holders of Trade Creditor Claims shall not exceed~~ from the Trade Creditor ~~Claim Cap~~Reserve; | Approx. $[2,750,000][6] | [15]% |

[6] The estimated range of Trade Creditor Claims set forth herein includes amounts subject to Proofs of Claim for which the Claims reconciliation and objection process has not been completed. Further, additional Creditors may elect to have their Claims treated as Trade Claims. Due to the uncertainty and inherent risk involved, as well as the potential for creditors to elect to be treated under Class 4, the actual amount of Trade Creditor Claims cannot be determined with any degree of certainty until the Claims reconciliation and objection and vote tabulation process is completed.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | *provided,* ~~that any holder of an Allowed Claim may elect to be treated as a Trade Creditor under the Plan with a Trade Creditor Claim equal to the lesser of (i) the face value of such electing Creditors' Claim or (ii) the Trade Creditor Claim Threshold Amount;~~ *provided further*, that in the event the aggregate distributions to Holders of Trade Creditor Claims exceeds the Trade Creditor Claim Cap, Holders of ~~such~~ Trade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap. | | |
| | | Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. | | |
| 5 | Noteholder Election Recovery Claims | The Noteholder Election Recovery Claims are Allowed Claims. Claims may only be treated as Noteholder Election Recovery Claims upon the affirmative and irrevocable election of a Holder of a Claim classified in Class 6A or 6B to have their Claim treated in Class 5. Except to the extent that a Holder of an Allowed Noteholder Election Recovery Claim agrees to less favorable treatment, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Noteholder Election Recovery Claims each Holder of an Allowed Noteholder Election Recovery Claim shall receive in full settlement, release, and satisfaction of such Noteholder Election Recovery Claim that is due and payable from the Noteholder | [ _ ][6] | [ _ ] |

6 The Noteholder Election Recovery Claims are only payable upon an affirmative election of certain Creditors to be treated in Class 5. Given the inherent uncertainty in which Creditors will elect Class 5 treatment, no estimate can be provided at this time.

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | Election Recovery Reserve, the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000. | | |
| 5A6A | Non-Petitioning Creditor Exchange Note Claims | Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5A6A Claim shall elect to receive in full settlement, release, and satisfaction of, of such Allowed Class 5A6A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter: at the exclusive election of the Holder of an Allowed Class 5A Claim either (i) the Exchange Note Election Recovery or (ii) their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 56 Claims in accordance with the terms of thisthe Plan.<br><br>Class 5A6A is Impaired and Holders of Class 5A6A Claims are entitled to vote to accept or reject the Plan. | $0-$337,000,000 | 54.6-17% |
| 5B6B | Petitioning Creditor Exchange Note Claims | The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.  To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all claims in Class 5A6A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 5A6A Non-Petitioning Creditor Exchange Note | $0-$337,000,000 | 0-.1% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|---|---|---|---|---|
| | | Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class ~~5B~~6B Claim shall receive in full settlement, release, and satisfaction of, of such Allowed Class ~~5B~~6B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class ~~5~~6 Claims in accordance with the terms of the Plan.<br><br>Notwithstanding the foregoing if the Bankruptcy Court determines it is unable to equitably subordinate the claims of Holders of Class ~~5B~~6B Claims through the Confirmation Order, Holders of Class ~~5B~~6B Claims will be deemed to hold claims under Class ~~5A~~6A and will be entitled to ~~either  (i) the Exchange Note Election Recovery or (ii)~~ their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class ~~5~~6 Claims in accordance with the terms of ~~this~~the Plan.<br><br>Class ~~5B~~6B is Impaired and Holders of Class ~~5B~~6B Claims are entitled to vote to accept or reject the Plan. | | |
| ~~6~~7 | Interests | On the Effective Date, all Interests shall be discharged, cancelled, released, and extinguished.  In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of Reorganized Holdings in a pro rata amount equal to their portion of the Shareholder New Value Contribution made. | Impaired | 100% |

| Class | Claim | Plan Treatment of Class | Estimated Class Claims[4] | Estimated Recovery[5] |
|-------|-------|-------------------------|---------------------------|------------------------|
| | | Class 6~~7~~ is Impaired, and Holders of Interests are entitled to vote to accept or reject the Plan. | | |

**THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL HOLDERS OF CLAIMS AND INTERESTS.**

C.    Voting and Confirmation

Each Holder of a Claim in Classes 1, 2, 3, 4, ~~5A~~5 6A, ~~5B~~6B and ~~6~~Interests in Class 7 shall be entitled to vote either to accept or reject the Plan.  Classes 1, 2, 3, 4, ~~5A~~5, ~~5B~~6A, 6B and ~~6~~Interests in Class 7 shall have accepted the Plan if: (i) the Holders of at least two-thirds in dollar amount of the Allowed Claims or Interests actually voting in each such Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims or Interests actually voting in each such Class have voted to accept the Plan.  Assuming the requisite acceptances are obtained, the Debtors intend to seek confirmation of the Plan at the Confirmation Hearing scheduled to commence on **[_] at [_]:00 a.m. (Eastern)** before the Bankruptcy Court.

Article II of this Disclosure Statement specifies the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards for tabulating Ballots.  The Bankruptcy Court has established [  ], 2024 (the "Voting Record Date") as the date for determining which Holders of Claims and Interests are eligible to vote on the Plan.  Ballots will be mailed to all registered Holders of Claims and Interests as of the Voting Record Date who are entitled to vote to accept or reject the Plan.  An appropriate return envelope will be included with your Ballot, if necessary.

D.    Risk Factors and Disclaimer

Prior to deciding whether and how to vote on the Plan, each Holder of a Claim or Interest should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, to formulate an informed opinion as to the manner in which the Plan affects their Claim(s) against and Interests in the Debtors and to determine whether to vote to accept the Plan.  Holders of Claims and Interests should particularly consider the risk factors described in Article X hereof.

Holders of Claims and Interests should also read the Plan carefully and in its entirety.  The Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan, itself, supersede and control the summary.

In formulating the Plan, the Debtors relied on financial data derived from their books and records.  The Debtors therefore represent that everything stated in this Disclosure Statement is true

to the best of their knowledge.  The Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtors may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.  Any forward-looking statements are qualified in their entirety by reference to the factors discussed throughout this Disclosure Statement.  The liquidation analysis, valuation analysis, distribution projections and other information described herein are estimates only, and the timing and amounts of actual distributions to creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

**Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtors for purposes of any pending or future litigation matter or proceeding.**

**Although the attorneys retained by the Debtors have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtors, they have not independently verified such information and make no representations as to the accuracy thereof.  The attorneys employed by the Debtors shall have no liability for the information in this Disclosure Statement.**

**The Debtors and their counsel also have made a diligent effort to identify in this Disclosure Statement and in the Plan pending adversary proceedings and projected Causes of Action and objections to Claims.  However, no reliance should be placed on the fact that a particular adversary proceeding or projected Cause of Action or objection to a Claim is, or is not, identified in this Disclosure Statement or the Plan.  The Debtors or Litigation Trust Trustee, as applicable, may seek to investigate, file and prosecute claims and projected Causes of Action or Litigation Trust Causes of Action and objections to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action, Litigation Trust Causes of Action or objections to Claims.**

## II.   VOTING ON AND CONFIRMATION OF THE PLAN

A.   <u>Deadline for Voting For or Against the Plan</u>

~~If one or more of your Claims is in a voting Class, the~~The Debtors have sent you one or more individual Ballots, with return envelopes for voting to accept or reject the Plan.  The Debtors urge you to accept the Plan by completing, signing and returning the enclosed Ballot(s) in the return envelope(s) to the Counsel for the Debtors as follows:

- 12 -

**Reed Smith LLP**
**Three Logan Square**
**1717 Arch Street Suite 3100**
**Philadelphia, Pennsylvania 19146**
**Attn: Derek M. Osei-Bonsu**

**OR**

**ELECTRONICALLY AT**

**ELETSONBALLOTS@REEDSMITH.COM**

TO BE COUNTED, DEBTORS' COUNSEL MUST RECEIVE YOUR BALLOT (OR MASTER BALLOT OF YOUR NOMINEE HOLDER) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON [ ]** (THE "VOTING DEADLINE"), UNLESS THE BANKRUPTCY COURT EXTENDS OR WAIVES THE PERIOD DURING WHICH VOTES WILL BE ACCEPTED BY THE DEBTORS, IN WHICH CASE THE TERM "VOTING DEADLINE" FOR SUCH SOLICITATION SHALL MEAN THE LAST TIME AND DATE TO WHICH SUCH SOLICITATION IS EXTENDED. ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS OR SUBCLASS HELD BY THE SAME HOLDER THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN SHALL NOT BE COUNTED. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED.

Detailed voting instructions are printed on and/or accompany each Ballot. Any Ballot or master Ballot sent by mail must be received by counsel to the Debtors at the appropriate address set forth above by no later than 5:00 p.m. Prevailing Eastern Time on the Voting Deadline. Any Ballot or master Ballot sent by any other means must be physically received by Debtors' counsel by 5:00 p.m. Prevailing Eastern Time on the Voting Deadline or it shall not be counted. Any unsigned Ballot or any Ballot that has no original signature, including any Ballot received by ~~facsimile or other~~approved electronic means, ~~or any Ballot with only a photocopy of a signature~~ shall not be counted. Any Ballot that is not clearly marked as voting for or against the Plan or marked as both voting for and against the Plan, shall not be counted. Any Ballot that is properly completed and timely received shall <u>not</u> be counted if such Ballot was sent in error to, or by, the voting party, because the voting party did not have a Claim that was entitled to be voted in the relevant voting Class as of the Voting Record Date. A Beneficial Holder (but not an entity voting, acting in a fiduciary capacity and on behalf of more than one Beneficial Holder, such as a nominee) that is voting more than one Claim or Interest in a voting Class must vote all of its Claims or Interests within a particular voting Class either to accept or to reject the Plan and may not split its vote in the same voting Class, and thus, any Ballot (or Ballots in the same voting Class) of a Beneficial Holder that partially rejects and partially accepts the Plan shall be deemed as accepting the Plan. Whenever a Holder of a Claim in a voting Class casts more than one Ballot voting the same Claim prior to the Voting Deadline, the last Ballot physically <u>received</u> by Debtors' counsel prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast Ballot(s), and any prior cast Ballot(s), shall <u>not</u> be counted. The Debtors,

- 13 -

without notice, subject to contrary Order of the Bankruptcy Court, may waive any defect in any Ballot or master Ballot at any time, either before or after the close of voting.  Such determinations will be disclosed in the voting report and any such determinations by the Debtors shall be subject to de-novo review by the Bankruptcy Court.

On ~~January 23, 2024, the Debtors filed the Original Plan.  Also on~~ January 23, 2024, the Debtors filed their *Motion of Debtors and Debtors in Possession for an Order: (I) Approving Their Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject their Plan of Reorganization, (III) Establishing the Confirmation Hearing and Related Deadlines, and (IV) Granting Related Relief* [Dkt. No. 372] (the "Solicitation Motion"). On May ~~[  ]~~31, 2024 the Debtors filed the Plan, which remains subject to the procedures set forth in the Solicitation Motion. On [ _ ], 2024 the Bankruptcy Court entered its order granting the relief requested in the Solicitation Motion (the "Solicitation Order"), which, among other things, approved the voting procedures addressed herein [Dkt. No. _ ].  You should carefully read the Solicitation Order, which is annexed hereto as Exhibit 2.  It establishes, among other things: (a) the deadlines, procedures and instructions for voting to accept or reject the Plan; (b) the Voting Record Date, which is [ _ ], 2024; (c) the applicable standards for tabulating Ballots; (d) the deadline for filing objections to Confirmation of the Plan; and ~~I~~the date and time of the Confirmation Hearing (also set forth below).

The Solicitation Order should be referred to if you have any questions concerning the procedures described herein.  If there are any inconsistencies or ambiguities between this Disclosure Statement and the Solicitation Order, the Solicitation Order will control.

      B.     <u>Confirmation Hearing for the Plan</u>

The Bankruptcy Court has set a hearing on the confirmation of the Plan (the "<u>Confirmation Hearing</u>") to consider objections to Confirmation, if any.  The Confirmation Hearing shall commence at **[ _ ], Prevailing Eastern Time on [ _ ]**, in the United States Bankruptcy Court for the Southern District of New York, Courtroom 501, One Bowling Green, New York, New York 10004.  The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Bankruptcy Court's docket.

      C.     <u>Any Objections to Confirmation of the Plan</u>

Any interested party may respond or object to Confirmation of the Plan.  Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Bankruptcy Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtors, counsel for the Committee and the Office of United States Trustee as well as all other parties who have requested notice in these Chapter 11 Cases **ON OR BEFORE [ _ ]**~~[  ]~~**, 2024 at 4:00 P.M., Prevailing Eastern Time**.  Bankruptcy Rule 3020 governs the form of any such objection.

**Counsel on whom objections must be served are:**

<u>Counsel for the Debtors</u>             <u>Counsel for the United States Trustee</u>
Derek J. Baker                      <u>Office of The United States Trustee</u>

Derek Osei-Bonsu
Reed Smith LLP
Three Logan Square
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 851-8100
Facsimile: (215) 851-1420
E-Mail: dbaker@reedsmith.com
dosei-bonsu@reedsmith.com

Alexander Hamilton Custom House
One Bowling Green, Suite 534
New York, NY 10004
Attn: Daniel Rudewicz

Counsel for the Committee
Dechert LLP
Attn: Stephen Zide
David Herman

-and-

Three Bryant Park,

Ann E. Pille (Admitted *Pro Hac Vice*)
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

1095 Avenue of the Americas,
New York, NY, 10036

~~Counsel for the United States Trustee~~
~~Office of The United States Trustee~~
~~Alexander Hamilton Custom House~~
~~One Bowling Green, Suite 534~~
~~New York, NY 10004~~
~~Attn: Daniel Rudewicz~~

~~Counsel for the Committee~~
~~Dechert LLP~~
~~Attn: Stephen Zide~~
~~David Herman~~
~~Three Bryant Park,~~
~~1095 Avenue of the Americas,~~
~~New York, NY, 10036~~

D.    Recommendations for Voting

The Debtors strongly recommend that you vote in favor of the Plan. Rejection of the Plan may result in protracted delays, a Chapter 7 liquidation or the confirmation of another Chapter 11 plan such as the PS Plan (defined below) which the Debtors believe will result in a less favorable ~~return~~result for ~~creditors~~Creditors. These alternatives may not provide for distribution of as much value to Holders of Allowed Claims as does the Plan. The Debtors believe that ~~unsecured creditors~~Creditors will receive a greater and more certain distribution under the Plan than they would under the PS Plan or a Chapter 7 liquidation, as more fully discussed herein.

**THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF ALL OF THEIR CREDITORS AS A WHOLE. THE DEBTORS THEREFORE RECOMMEND THAT ALL PARTIES ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

III.    **ORGANIZATION AND ACTIVITIES OF THE DEBTORS**

A.    The Debtors' Business

- 15 -

The Debtors in these cases are Eletson Holdings Inc. ("Eletson Holdings") and its wholly owned subsidiaries Eletson Finance (US) LLC ("Eletson Finance"), and Agathonissos Finance LLC. No other subsidiaries of Eletson Holdings are subject to these Chapter 11 Cases. Eletson Holdings and its corporate family (collectively "Eletson") are world leaders in international seaborne transportation specializing in the transport of refined petroleum products, liquified petroleum gas and ammonia. Eletson owns and operates a fleet of medium and long-range double hull product tankers, consisting of Handymax and Aframax size vessels which are capable of carrying a wide range of refined petroleum products, such as fuel oil and vacuum gas oil and, gas oil, gasoline, jet fuel, kerosene and naphtha, as well as crude oil. The scale and flexibility of Eletson's fleet, commercial expertise and long-standing industry relationships have allowed Eletson to sustain high utilization levels and maintain strong performance.

With offices around the globe Eletson charters its versatile, high-quality and modern fleet to customers including major international oil, LPG, and ammonia companies and traders. Eletson maintains a large and diversified customer base including major international oil companies such as BP, Conoco Philips, Royal Dutch Shell and Chevron Corporation, state owned integrated oil companies such as Petrobras and Pemex, refined oil trades, LPG and ammonia producers, users, traders and importers. For decades Eletson has been at the forefront of the shipping tanker sector and is an industry leader driving wide innovation and change.

B.    Corporate History and Structure

Eletson Holdings is the ultimate parent of the Eletson family. Eletson Finance (US) is a wholly owned subsidiary that does not itself have any subsidiaries. Eletson's primary operations are undertaken by various non-Debtor subsidiaries who either (i) own title to the vessels comprising Eletson's fleet or (ii) charter the vessel of Eletson's fleet. The Eletson fleet is managed by non-Debtor subsidiary Eletson Corporation ("Eletson Corp") subject to management agreements with the various entities in exchange for management fees. In addition to Eletson Corp and the various entities that directly own or charter and operate the vessels in Eletson's fleet, there are several defunct corporate entities with no operations within the Eletson corporate structure. Eletson Holdings serves as the guarantor for a number of its subsidiaries obligations as described in greater detail herein.[7]

Each of the Debtors are holding companies and do not maintain any ongoing operations or employ any employees outside of their officers and directors.

C.    Pre-Petition Capitalization

1.    Old Notes

In December 2013 Eletson Holdings and Eletson Finance issued those certain 9.625% First Preferred Ship Mortgage Notes due 2022 (the "Old Notes"). The Old Notes were issued in an original face value amount of $300 million dollars. Pursuant to the relevant indenture, Deutsche Bank Trust Company Americas served as the trustee for the Old Notes.

---

[7] A list of the Eletson entities is attached hereto as Exhibit 9.

In May of 2018 Eletson Finance and Eletson Holdings initiated an exchange for the Old Notes (the "Note Exchange").  Approximately 2% of the holders of Old Notes chose not to participate in the Note Exchange and retained their Old Notes.

2.    Exchange Notes and Restructuring Support Agreements[78]

In July of 2018 the Debtors finalized the Note Exchange and issued those certain First Preferred Ship Mortgage Notes due 2022 (the "Exchange Notes").  The Exchange Notes were issued in an original face value amount of $314,068,360.  Pursuant to the relevant indenture (the "Exchange Notes Indenture"), Wilmington Savings Fund Society, FSB (the "Exchange Notes Trustee") served as trustee and collateral agent for the Exchange Notes.  The Exchange Notes were secured by certain assets pledged as collateral (collectively, the "Collateral"), including, among other things: (i) all outstanding common shares or membership interests in Eletson Finance and certain guarantors under the Exchange Note Indenture; (ii) thirteen shipping vessels owned by guarantors under the Exchange Note Indenture (the "Exchange Note Vessels"); (iii) the earnings arising from freights, hires and other earnings from the operation and use of or relating to the Exchange Note Vessels, and (iv) all other cash and various accounts of Agathonissos Finance LLC and the guarantors set forth in the Exchange Notes Indenture.

Also in July of 2018, the Debtors initiated a tender offer seeking to purchase Exchange Notes from the holders of the Exchange Notes.  Pursuant to the tender offer, the Debtors reduced the then outstanding obligations of the Exchange Notes by approximately $8 million.

In June of 2019, the Debtors, their guarantors, certain of Eletson Holding's shareholders and an ad hoc group of Exchange Noteholders entered into a Restructuring Support Agreement (the "Initial RSA").  Pursuant to the Initial RSA, a strict foreclosure agreement (the "Strict Foreclosure Agreement") was executed which provided for the reduction of the principal balance of the Exchange Notes by $130 million in exchange for the Collateral pledged as security for the Exchange Notes. In connection with the Initial RSA the Exchange Note Trustee in its capacity as collateral agent under the Exchange Note Indenture accepted title to 100% of the common shares of each of the thirteen special purpose entities that, themselves, owned the Exchange Note Vessels in partial satisfaction and discharge of $130 million of the principal obligations due and owing under the Exchange Notes.  Thereafter, on October 24, 2019, the Exchange Note Indenture was amended to release all remaining Collateral securing the remaining Exchange Notes.

On October 29, 2019, a second restructuring support agreement was executed by the same parties (the "Second RSA").  The Second RSA contemplated a restructuring through either an out-of-court consent solicitation and exchange offer with the consent of all the Exchange Noteholders at the time, or a restructuring effected through a joint prepackaged Chapter 11 plan of reorganization, in accordance with certain milestones contained therein.  The Debtors were required to segregate cash into certain accounts and prohibited the Debtors from seeking additional financing without the consent of the Exchange Noteholders.  The Debtors were to use reasonable best efforts to effect the terms of the Second RSA and were prohibited from taking any actions

---

[78] The Committee does not agree with the Debtors' characterizations of the events leading up to the Petition Date and the characterization of the rights and obligations arising under the Second RSA.  Notwithstanding the Committee's disagreement, the Debtors believe the description of the Second RSA is a fair and accurate description of the rights and obligations arising thereunder.

contrary or inconsistent to the Second RSA and the transactions contemplated therein. The milestones included deadlines for the marketing and sale of one of the Debtors' vessels, as well as the solicitation for the regarding proceeding under an out of court transaction or a prepackaged chapter 11 bankruptcy, neither of which were met by the Debtors.

Pursuant to the Second RSA, Exchange Noteholders that were signatories to the Second RSA were restricted from selling, transferring, or assigning any interests they had in the Exchange Notes unless the transfer was to another Exchange Noteholder who agreed to be bound by the terms of the Second RSA. Further, the Second RSA provided that no action would be taken by Exchange Noteholders to enforce any defaults or events of default that were ongoing pursuant to the Exchange Note Indenture so long as the Second RSA was not terminated effectively creating a standstill period while the Debtors and Exchange Noteholders continued to negotiate the terms of a restructuring.

The Debtors assert that the Second RSA is and remains in force, and the actions of the Exchange Noteholders party to the Second RSA and the Petitioning Creditors who acquired rights therefrom in the sale of such Exchange Notes are in violation of the Second RSA and Eletson Holdings' rights thereunder as the Exchange Noteholders subject to the Second RSA were prohibited from transferring their interests to parties that were not signatories to the Second RSA. Further, pursuant to the standstill period of the Second RSA the Debtors were not obligated to make any payments on account of the Exchange Notes before the Debtors were placed into bankruptcy. As set forth in greater detail below, a letter purporting to terminate the Second RSA was sent to the Debtors after the Exchange Noteholders violated the terms of the Second RSA and after the Petition Date. The Debtors believe that this purported termination letter is meritless and did not impact the rights and remedies of the parties to the Second RSA.

In June 2020, well after the Second RSA was executed, the Debtors, more than seventy percent (70%) of the Exchange Noteholders, and others entered into a certain Stipulation Waiver and Release (the "OCM Financing Stipulation"), wherein a majority of the Exchange Noteholders acknowledged that they "[were] parties to that certain [Second RSA]…." *OCM Financing Stipulation* at p. 1. At no place in the OCM Financing Stipulation was it alleged that the Second RSA had been terminated or was no longer in effect. Like the Second RSA, the OCM Financing Stipulation included a restriction on the transfer of the Exchange Notes. Specifically it provided, "[e]ach Holder agrees…not to sell, assign, transfer, hypothecate or otherwise dispose of…any [Exchange Notes] to any third party that is not a[n] [Exchange Noteholder unless], as a condition precedent to any such transaction, the transferee of such [Exchange Notes] executed and delivers a joinder…to this Stipulation…to counsel to the Eletson Parties. *Id.*, at § 4(a). Any action taken in violation of the OCM Financing Stipulation, including the transfer of the Exchange Notes, is deemed void pursuant to the terms of the OCM Financing Stipulation.

Prior to the Petition Date, the Debtors did not make any payments on the Exchange Notes outside of an initial payment of PIK interest, the tender offer and the transfer of the vessel related to the Strict Foreclosure Agreement because the Debtors were operating pursuant to the standstill agreement set forth in the Second RSA. On the Petition Date, the outstanding balance of the Exchange Notes and Old Notes were approximately $331,400,000 and $5,830,000 respectively, consisting of approximately $128,100,000 and $2,100,000 in accrued yet unpaid interest respectively and approximately $195,000,000 and $3,700,000 in unpaid principal respectively.

**D.** ~~3.~~ Eletson ~~Holding~~Holdings Guaranty Obligations

In addition to the obligations under the Old Notes and Exchange Notes, Eletson Holdings guarantees the obligations of several of its non-Debtor affiliates.

**1.** ~~D.~~ The OCM Guarantees

On June 24, 2020, OCM Maritime Rhine LLC ("OCM Rhine") entered into a bareboat charter agreement ("Kinaros Charter") with non-Debtor Kinaros Special Maritime Enterprise for the use of a vessel owned by OCM Rhine named the Kinaros. Pursuant to the Kinaros Charter, Kinaros Special Maritime Enterprise was obligated to make payments to OCM Rhine related to the charter of the Kinaros. The obligations were guaranteed by Eletson Holdings pursuant to that certain guarantee executed by Eletson Holdings in favor of OCM Rhine dated June 24, 2020 (the "Kinaros Guaranty"). Pursuant to the Kinaros Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kinaros Charter. The principal balance outstanding under the Kinaros Charter as of the Conversion Date is $11,750,000 with outstanding interest obligations of $217,417. As of the Conversion Date OCM Rhine has not declared any event of default under the Kinaros Charter, *however, the Chapter 11 Cases constitute a default under the Kinaros Guaranty*.

On June 24, 2020, OCM Maritime Yukon LLC ("OCM Yukon") entered into a bareboat charter agreement ("Kimolos Charter") with non-Debtor Kimolos II Special Maritime Enterprise for the use of a vessel owned by OCM Thames named the Kimolos. Pursuant to the Kimolos Charter, Kimolos II Special Maritime Enterprise was obligated to make payments to OCM Yukon related to the charter of the Kimolos. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Yukon dated June 24, 2020 (the "Kimolos Guaranty"). Pursuant to the Kimolos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kimolos Charter. The principal balance outstanding under the Kimolos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Yukon has not declared any event of default under the Kimolos Charter, *however, the Chapter 11 Cases constitute a default under the Kimolos Guaranty*.

On June 24, 2020, OCM Maritime Autumn LLC ("OCM Autumn") entered into a bareboat charter agreement ("Fourni Charter") with non-Debtor Fourni Special Maritime Enterprise for the use of a vessel owned by OCM Autumn named the Fourni. Pursuant to the Fourni Charter, Fourni Special Maritime Enterprise was obligated to make payments to OCM Autumn related to the charter of the Fourni. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Autumn dated June 24, 2020 (the "Fourni Guaranty"). Pursuant to the Fourni Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Fourni Charter. The principal balance outstanding under the Fourni Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Autumn has not declared any event of default under the Fourni Charter, *however, the Chapter 11 Cases constitute a default under the Fourni Guaranty*.

On June 24, 2020, OCM Maritime Thames LLC ("OCM Thames") entered into a bareboat charter agreement ("Kastos Charter") with non-Debtor Kastos Special Maritime Enterprise for the

use of a vessel owned by OCM Thames named the Kastos. Pursuant to the Kastos Charter, Kastos Special Maritime Enterprise was obligated to make payments to OCM Thames related to the charter of the Kastos. The obligations were guaranteed by Eletson Holdings pursuant to that certain guaranty executed by Eletson Holdings in favor of OCM Thames dated June 24, 2020 (the "Kastos Guaranty"). Pursuant to the Kastos Guaranty Eletson Holdings guaranteed the full payment for all amounts due under the Kastos Charter. The principal balance outstanding under the Kastos Charter as of the Conversion Date is $12,450,00 with outstanding interest obligations of $229,239. As of the Conversion Date OCM Thames has not declared any event of default under the Kastos Charter, *however, the Chapter 11 Cases constitute a default under the Kastos Guaranty*.

### 2.    ~~E.~~ The Azure Guarantees

On August 24, 2017, Azure Nova Spring Co., Azure Nova Summer Co., Azure Nova Autumn Co., and Azure Nova Winter Co. (collectively, "Azure") entered into bareboat charter agreements (collectively, the "Charters") with non-Debtors Antikeros Special Maritime Enterprise, Dhonoussa Special Maritime Enterprise, Polyaigos Special Maritime Enterprise and Strofades Special Maritime Enterprise (collectively, the "Azure Charterers") respectively, for the use and operation of vessels owned by Azure named the Antikeros, Dhonoussa, Polyaigos and Strofades respectively (collectively, the "Azure Vessels"). Pursuant to the Charters, the Azure Charterers were obligated to make payments to Azure related to the charter of the Azure Vessels. The obligations were guaranteed by Eletson Holdings and Eletson Corp pursuant to those certain guarantees executed by Eletson Holdings and Eletson Corp in favor of each Azure entity dated August 24, 2017 (collectively, the "Azure Guarantees"). Pursuant to the Azure Guarantees Eletson Holdings guaranteed the full payment for all amounts due under the Charters. As security for Eletson Holdings' obligations under the Azure Guarantees Eletson Holdings executed a share pledge agreement in favor of each Azure entity pursuant to which the equity of respective Azure Charterer was placed as collateral to secure the obligations under the applicable Charter. In March of 2021 the Charters were terminated and the Azure Vessels were repossessed. As a result of this termination and repossession, two arbitrations were commenced by Azure, one against the Charterers seeking a determination of any amounts owed to Azure because of the termination of the Charters and repossession of the Azure Vessels and a second against Eletson Holdings for any obligations arising from the Azure Guarantees which are asserted by Azure to be in an amount of no less than $94,799,702. Eletson Holdings disputes that defaults have occurred, or obligations exist under the respective Azure Guaranties.

### 3.    ~~F.~~ The Eletson Corp Guarantees

Non-Debtor Eletson Corp is the operational and technical management entity for various Eletson entities (including various of Eletson Holdings' non-debtor subsidiaries). As Eletson Corp's parent entity, Eletson Holdings guaranteed certain obligations of non-debtor Eletson Corp on a number of its unsecured obligations owed towards various banking entities in Greece, including Aegean Baltic Bank, Alpha Bank and Piraeus Bank.

The officers and directors of non-Debtor Eletson Corp have made clear that they intend to undertake a restructuring of the outstanding obligations of Eletson Corp. The Debtors are fully in support of a restructuring of Eletson Corp's liabilities as this restructuring will lower the potential guaranty liability assumed by the Reorganized Debtor.

## IV.    EVENTS LEADING TO THE DEBTORS' BANKRUPTCY FILING[8][9]

The Debtors' bankruptcy cases were initiated by the Original Petitioning Creditors, affiliates of Murchinson Inc. ("Murchinson") and its special purpose entity Levona ~~Ltd. ("Levona" and~~ (together with Murchinson, Pach Shemen and the other entities under Murchinson's direction and/or control the "Murchinson Entities") to hedge against Levona's potential loss in the Arbitration.[9][10]

Levona has been found to have unjustly pressured the Debtors and their shareholders into the sale or other disposition of the fleet assets of non-Debtor Eletson Gas LLC ("Eletson Gas") to enrich themselves at the expense of the Debtors and their affiliates.  A summary of the improper actions of the Murchinson Entities and the ensuing litigation history is provided below.[10][11]  For the avoidance of doubt, the Levona has been found by the Arbitrator to have (i) wrongfully commenced the Debtors' bankruptcy proceedings, and (ii) wrongfully perpetrated their scheme against the Debtors and various Eletson entities resulting in a final arbitration award (the "Final Award") has been entered against Levona in the amount of no less than $99,530,099.71.[11][12]  A copy of the Final Award is annexed hereto as Exhibit 3.

### A.    Murchinson Directly or Indirectly Created Levona and Pach Shemen, the Primary Actors in the Arbitration and Bankruptcy

Murchinson is a corporation organized under the laws of Canada with a principal place of business in Toronto, Canada.  Levona is special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire and hold the preferred shares of Eletson Gas (the "Preferred Shares").  Levona was created in 2021 and is owned by Nomis Bay Ltd. and BPY Limited.  Nomis Bay Ltd. and BPY Limited in turn are managed and controlled by Murchinson.  See *Final Award* at p. 19.  Levona does not have any employees, an email domain or bank accounts.  *Id.* at p. 20.

Pach Shemen (originally intended to be named Levona II) is another special purpose entity created by Murchinson or entities under Murchinson's control for a singular purpose: to acquire and hold interests in the outstanding Exchange Notes.  *Id.*  As set forth in Pach Shemen's corporate ownership statements filed with the Bankruptcy Court, Pach Shemen is also owned by Nomis Bay Ltd. and BPY Limited. *Corporation Ownership Statement of Pach Shemen, LLC* [Dkt. No. 1].

---

[8][9] The descriptions provided herein are for summary purposes only.  For a complete history of each of the various proceedings described herein, including the Arbitration, the Bondholder Litigation, the Confirmation Proceedings, the Chapter 7 Cases and the Chapter 11 Cases, please review the relevant docket. A fuller history of the Arbitration can be found on the docket of the Confirmation Proceedings at Case No.: 1:23-cv-07331-LJL [Dkt. No. 68].

[9][10] The Committee has stated that it does not agree with the Debtors' characterizations of the events leading up to the Petition Date.  Notwithstanding the Committee's disagreement with the Debtors' recitation of events leading up to the Petition Date, the Debtors believe that the statements made in Article IV of the Disclosure Statement are accurate and truthful statements.

[10][11] A complete history of the Arbitration and Levona's actions can be found on the docket of the Confirmation Proceedings at Case No.: 1:23-cv-07331-LJL [Dkt. No. 66].

[11][12] Levona believes the District Court Remand Order may result in a reduction of the Final Award in an undetermined amount.  The Debtors disagree and expect that the Final Award will be adopted and reaffirmed by the Arbitrator upon consideration of the District Court Remand Order.

Thus, Murchinson directly or indirectly operates, directs, and/or controls both Levona and Pach Shemen,.

On February 9, 2024, the District Court entered the District Court Order (defined below) which confirmed in all substantive parts, the award issued against Levona, but vacated certain limited findings made in the Final Award related to Pach Shemen and Murchinson.[12][13] Notwithstanding the District Court Order, the Debtors believe that the determination of the Final Award regarding Levona and its affiliates are binding on the Debtors and Levona.

### B.    Levona Improperly Acquires the Preferred Shares of Eletson Gas

In 2021 Levona acquired the Preferred Shares from Blackstone Tactical Opportunities' ("Blackstone") and was made party to the Eletson Gas' Limited Liability Company Agreement (the "LLCA").  As Levona was created for the express purpose of holding the Preferred Shares all correspondence regarding the purchase of the Preferred Shares were between Murchinson and Blackstone.  As found by the Arbitrator, during these negotiations with Blackstone, Murchinson secretly bribed Peter Kanelos, the former CFO of Eletson Corp and a representative of Eletson Gas, as part of a scheme to lower the purchase price for the Preferred Shares then in Blackstone's possession.

Through Kanelos, Murchinson acquired confidential information about Eletson Gas, and communicated that information to Eletson Gas' financiers with the intention of causing these financiers to arrest certain ships in Eletson Gas' fleet.  Murchinson then provided its proposal to restructure Eletson Gas' debt in an attempt to garner support for its eventual purchase of the Preferred Shares.  *Final Award* at p. 22-25.  Through these illicit conversations, Murchinson sought to lower the value of Eletson Gas, and therefore the Preferred Shares, which would entice Blackstone to sell the Preferred Shares at a lower price.

Murchinson recruited Kanelos into its scheme through bribery.  Murchinson offered Kanelos compensation commensurate to the outcome of Murchinson's strategy in the form of 10% of its profit on the contemplated transactions.  *Final Award* at p. 23.  Kanelos was ultimately paid $100,000 by Murchinson/Levona upon Levona's acquisition of the Preferred Shares.  *Id.* Recognizing the clear impropriety of these actions, Murchinson/Levona and Kanelos took several steps to conceal their clandestine activity such as only using Kanelos' personal email to remain undetected and refraining from discussing the purchase of the Preferred Shares with any other member of Eletson Gas or director or officer of the other Eletson entities.  *Id.* Shockingly, after consummation of the sale of the Preferred Shares and upon signing onto the LLCA and becoming a member of Eletson Gas, representatives of Levona pretended as if they had never met or previously interacted with Kanelos.  *Id.* Notably, it was found by the Arbitrator that Kanelos violated his fiduciary duties to Eletson Corp by taking part in Murchinson's schemes, and that Murchinson knowingly incentivized Kanelos' breach of duties and created a conflict of interests through bribery.  *Id.*

Pursuant to the LLCA Levona appointed several directors to the board of Eletson Gas.  It became immediately clear to the other members of the Eletson Gas board that Levona's appointees

---

[12][13] A summary of the findings of the District Court Order are discussed in Section IV.D.

- 22 -

were not acting in the best interests of Eletson Gas, but rather sought to enrich Levona through actions taken in clear violation of the terms of the LLCA. Levona's directors breached the LLCA by attempting to fire Eletson Corp as the manager of the vessels of Eletson Gas and its subsidiaries. Additionally, Levona's directors failed to disclose their pre-acquisition misuse of confidential information, bribery of Kanelos, and efforts to spur the arrests of Eletson Gas' ships. Levona also conspired with Eletson Gas' own counsel against the best interests of Eletson Gas.

The non-Levona members and directors of Eletson Gas rightfully determined that Levona and the directors appointed by Levona needed to be removed if Eletson Gas was to have any chance of survival. To that end, in February of 2022 the directors of Eletson Gas and Levona negotiated a Binding Offer Letter ("BOL") that would enable Eletson Gas or its nominee and Eletson Corp to buy out the Preferred Shares from Levona in exchange for consideration equal to "$US1 plus an amount equal to US$23,000,000 less the Net Value". BOL at 3.2. The BOL was executed on March 11, 2022. Pursuant to the BOL, a number of accompanying documents were executed including: (i) that certain Intra-Group Loan Agreement, pursuant to which Levona provided Eletson Gas a loan facility of up to $10 million for a term of up to two years; (ii) that certain Share Transfer Agreement, pursuant to which Eletson Gas transferred to Levona 100% of the shares of the Symi and Telendos, two vessels in Eletson Gas' fleet; (iii) that certain Assignment of Claims, pursuant to which Eletson Corp assigned to Levona all of its claims relating to the management fees and liquidity support owed to it by Eletson Gas, or its subsidiaries; (iv) that certain Deed of Waiver and Release; and (v) that certain Fundamental Action Letter. *Final Award* at p. 8-9.

The BOL provided that the Preferred Shares would be purchased by "Eletson Gas or its nominee" BOL at 2.1. The facts are – and the Arbitrator determined – as the Debtors have consistently confirmed throughout these bankruptcy proceedings, at all relevant times it was Eletson Gas' understanding and intention that upon the exercise of the purchase option, the Preferred Shares and/or the beneficial value of the Preferred Shares would be transferred to Eletson Gas' nominees (who could be the funding source for the exercise). At no time were the Preferred Shares owned by or nominated to Eletson Holdings.[13][14]

Given the foregoing, on March 11, 2022, Levona was divested of the Preferred Shares in exchange for the shares of the entities owning the Symi and Telendos, and from March 11, 2022, Levona had no membership interests in Eletson Gas.

Notwithstanding the execution of the purchase option in the BOL and the divestiture of Preferred Shares, Levona continued to knowingly present itself as a member of Eletson Gas. This created confusion not only amongst Eletson Gas' employees, but also the market, harming Eletson Gas' businesses and ability to interact with third parties. But this was not the end of Levona's intentionally harmful actions. On July 15, 2022, more than four months after being divested of

---

[13][14] The Committee does not agree with the Debtors' assertion that the relevant Eletson parties always intended for the Preferred Shares to be transferred to the Preferred Nominees and believes that this is a contested fact. Despite the Committee's disagreement, the Debtors maintain that it was always the intention of the Eletson Gas (with the consent of Holdings to benefit from the existence of the Preferred Shares to exist and remain as a liquidity source for Eletson Gas) to have the Preferred Shares transferred to the Preferred Nominees. This position is consistent with the Debtors' position in the Arbitration, these bankruptcy proceedings and the documentary evidence produced in both the Arbitration and these bankruptcy proceedings. Further, the District Court Order did not make any findings regarding the intent of the parties relating to the transfer of the Preferred Shares.

any interest in Eletson Gas, Levona purporting to act for Eletson Gas executed a non-binding letter of intent with Unigas, Eletson Gas' primary competitor, to sell nine of the vessels in Eletson Gas' fleet for $262 million. In addition to the proposed purchase price being significantly less than the actual value of the vessels, the proposed sale exposed Eletson Gas to significant risk of antitrust liability. Levona attempted to proceed with the sale process over the objection of Eletson Gas despite lacking a stake in Eletson Gas and threatened various officers and directors of the Eletson entities with litigation and other financial harm if they attempted to interfere with the sale.

C.    The JAMS Arbitration

In response to Levona's egregious and improper behavior, in July of 2022, Eletson Holdings and Eletson Corp (collectively the "Claimants") initiated a JAMS Arbitration Proceeding (Ref. No. 5425000511) (the "Arbitration") pursuant to the LLCA seeking a determination of the ownership of the Preferred Shares, as well as damages resulting from Levona's actions.

As part of the Arbitration, the presiding arbitrator (the "Arbitrator") issued a temporary restraining order ("TRO") which required the parties to the Arbitration to "maintain the status quo" and "among other things" refrain from: "(1) engage in the transfer or sale of any assets of [Eletson Gas] absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." *Final Award* at p. 14. On November 7, 2022, the Arbitrator clarified the parameters of the "status quo," stating that "[a]ny attempt to sell or otherwise transfer the Symi and Telendos vessels will be deemed to be in violation of the TRO." On January 12, 2023, the Arbitrator issued a preliminary injunction which extended the TRO's prohibition on actions upsetting the status quo until further notice. The preliminary injunction provided that the parties to the Arbitration "shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of [Eletson Gas], or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration" *Id.* The TRO, the November clarification, and the Preliminary Injunction collectively are referred to as the "Status Quo Injunction."

On March 6, 2023, Levona received several adverse orders in the Arbitration. First, Levona's motion to strike the Claimants' statements of claims was denied. Next the Arbitrator found that Levona had waived its attorney client privilege over a large tranche of emails and denied Levona's motion for sanctions. Finally, the Arbitrator stated that the scheduled trial would go forward in April of 2023 and confirmed the pre-trial deadlines.

On March 7, 2023, the day after these adverse rulings, in violation of the Arbitrator's Status Quo Injunction Pach Shemen and the other Original Petitioning Creditors initiated the Debtors' Chapter 7 Cases by filing the improper Involuntary Petitions. Despite using the improperly

- 24 -

commenced Chapter 7 Cases to derail the Arbitration, an order modifying the automatic stay was entered by the Bankruptcy Court on April 17, 2023, allowing the Arbitration to proceed.[14][15]

In May of 2023, a hearing was held before the Arbitrator regarding the merits of the Claimants' claims and Levona's counterclaims. On July 28, 2023, the Arbitrator issued an Interim Award, followed by a Corrected Interim Award on August 15, 2023, in favor of the Claimants. On September 29, 2023, the Arbitrator issued the Final Award noting that given the lack of distinction between Murchinson, Levona, and Pach Shemen, any award entered against Levona was an award entered against all three entities. *Final Award* at p. 21. Pursuant to the Final Award, the Arbitrator found, among other things: (i) the buyout option was exercised pursuant to the BOL; (ii) Eletson Gas exercised its rights under the BOL to nominate parties to receive the Preferred Shares that were purchased from Levona and the Preferred Shares were transferred to the Preferred Nominees effective as of March 11, 2022; (iii) as of March 11, 2022 Levona had no membership interest in Eletson Gas; and (iv) Levona breached the LLCA in multiple ways causing harm to Eletson Gas.

After the entry of the Final Award, the Claimants initiated the Confirmation Proceedings in the District Court.

D.    The District Court Order

On February 9, 2024, the District Court entered an order (the "District Court Order") granting in part and denying in part Claimants' petition to confirm the Final Award. Notably, the District Court confirmed the relief in the Final Award finding that the Preferred Shares were transferred from Levona to the Preferred Nominees, effective March 11, 2022.

The District Court Order suggests that the creditors of Eletson Holdings may be able to assert claims against the Preferred Nominees as a result of the Preferred Nominee's acquisition of the Preferred Shares from Levona rather than such Preferred Shares being delivered to Eletson Holdings. The Debtors note that this issue is an open question for the Bankruptcy Court to decide. As noted herein and in pleadings throughout these Chapter 11 Cases, the Debtors believe that any claims challenging the propriety of the election of the Preferred Nominees as the recipients of the Preferred Shares and Arbitration damages are legally and factually unsupportable, and that further pursuit of these claims would be a costly distraction and waste of estate resources for ultimately no benefit. As set forth in the Automatic Stay Order, any enforcement of the Final Award and collection of the damages awarded therein is subject to further review by the Bankruptcy Court.

The District Court further substantially confirmed the award of compensatory and punitive damages against Levona, vacating only the following limited findings of the Final Award:

- The finding that Murchinson and Pach Shemen are alter egos of Levona;

---

[14][15] The Debtors believe that the filing of the Involuntary Petitions by the Original Petitioning Creditors was a violation of the Arbitrator's Status Quo Injunction. The Debtors have reserved all rights to assert these claims against the Original Petitioning Creditors. The Committee has articulated that it does not agree with the Debtors' characterization of the Involuntary Petitions.

- 25 -

- The finding that the Status Quo Injunction remains in effect until confirmation of the Final Award by the Arbitrator;

- The finding that Levona caused or directed affiliates to purchase Exchange Notes for the purpose of wrongfully commencing and then actually causing the commencement of the Bondholder Litigation and the filing of the Involuntary Petitions against the Debtors;

- The finding that Levona wrongfully declared a default under the loan provided by Levona;

- The award of attorneys' fees, costs and expenses relating to the involuntary bankruptcy petition and Bondholder litigation in the amount of $3,007,266.20; and

- The award of monetary damages based upon violations of the Status Quo Injunction.

Due to ambiguity in the Final Award, on April 19, 2024, the District Court issued a Memorandum and Order (the "District Court Remand Order") remanding to the Arbitrator for clarification the issue of how the District Court's ruling might affect the amount of punitive damages awarded in the Final Award. Notably, the District Court ordered the Arbitrator to address two questions. First, whether the arbitrator would not have awarded punitive damages, but for the finding of a violation of the Status Quo Injunction, and second, whether the arbitrator would have applied a different multiple of the compensatory damages in his calculation of the punitive damages award in the absence of the finding of a violation of the Status Quo Injunction.

**Levona has requested that the following Statements be included (with which the Debtors disagree):**

On February 9, 2024, the District Court entered an order (the "District Court Order") granting in part and denying in part Claimants' petition to confirm the Final Award and Levona's petition to vacate the award. The District Court vacated the Award as to (a) the arbitrator's determination that there had been Status Quo Injunction violations, (b) the arbitrator's declaration that Levona, Murchinson, and Pach Shemen are alter egos of each other; (c) the arbitrator's declaration that Levona violated the Status Quo Injunction by declaring Eletson Gas in default on a loan from Levona or based on Pach Shemen's role in these bankruptcy cases; (d) all awards of relief against Murchinson or Pach Shemen; (e) all awards of relief, including compensatory and punitive damages, based upon alleged violations of the Status Quo Injunction; and (f) all awards of attorneys' fees, costs, and expenses relating to the involuntary bankruptcy petition and the bondholder litigation in the amount of $3,007,266.20. *Eletson Holdings, Inc.*, 23-cv-07331 (S.D.N.Y. Feb. 9, 2024), ECF 83 at 123-24; *id.*, ECF 67-58 (Final Award), at 96-99. The District Court otherwise confirmed the relief in the Final Award, including the arbitrator's declaration that the Preferred Shares were transferred from Levona to the Preferred Nominees, effective March 11, 2022.

Following the District Court Order, Eletson and Levona submitted proposed judgments and supporting letter briefs. Levona's filing contended that the entire punitive damages award must be vacated because it was based in part on violations of the Status Quo Injunction (as the District Court had ruled, and the arbitrator provided no way to separate the punitive damages that were based on violations of the Status Quo Injunction from any that were not.

On April 19, 2024, the District Court issued a Memorandum and Order remanding to the arbitrator and specified that the arbitrator should "limit his clarification simply to the [following] questions": (1) Whether the arbitrator "would not have awarded punitive damages, but for the finding of a violation of the Status Quo Injunction," *Eletson Holdings, Inc.*, 23-cv-07331 (S.D.N.Y. Apr. 19, 2024), ECF 106 (the "Remand Order") at 7; and (2) Whether the arbitrator "would have applied a different multiple of the compensatory damages in his calculation of the punitive damages award in the absence of the finding of a violation of the Status Quo Injunction," Remand Order at 7-8.  Consistent with this limited remand, the District Court "reserve[d] judgment on the question whether, in the event that the Arbitrator clarifies that he would not have awarded punitive damages but for the finding of a violation of the Status Quo Injunction, such clarification either permits or necessitates a vacatur of the punitive damages award in its entirety," an issue as to which the District Court permitted the parties file additional briefs as appropriate.  Remand Order at 8 n.4.  On May 3, 2024, Levona filed a motion for reconsideration of the District Court's remand order; that motion is scheduled to be fully briefed on May 15, 2024.  On May 13, 2024, the District Court issued an order stating that "effect of the Court's remand to the Arbitrator, Dkt. No. 106, is STAYED pending the Court's resolution of the motion for reconsideration."

A copy of the District Court Order is annexed hereto as Exhibit ~~6~~4.

E.      Pach Shemen's Improper Acquisition of the Exchange Notes[~~15~~16]

On January 4, 2023, while the TRO in the Arbitration was in effect (which required the parties to "maintain the status quo") Pach Shemen, through Nomis Bay Ltd. and BPY Ltd., purchased approximately $183.8 million of the outstanding Exchange Notes (representing more than half of the aggregate balance of the outstanding Exchange Notes) for $2 million. *Final Award* at p. 60.

At the time of Pach Shemen's purchase and transfer of the Exchange Notes, the Exchange Notes were subject to the transfer restrictions set forth in the Second RSA.  Pursuant to the Second RSA and the OCM Financing Stipulation (of which holders of approximately 80% of the aggregate balance of outstanding Exchange Notes were signatories) (i) no Exchange Noteholder was permitted to transfer, sell or assign its interests in the Exchange Notes unless such sale was to another Exchange Noteholder or a party who was to be bound by the Second RSA and (ii) no Exchange Noteholders could direct the Exchange Note Trustee to take any action to enforce any ongoing default or event of default under the Exchange Note Indenture.  Any action in violation of the Second RSA is void pursuant to the terms thereof.  Therefore, the Debtors believe that Pach Shemen is not a valid Exchange Noteholders and has no claims against the Debtors as the purchase and transfer of the Exchange Notes to Pach Shemen was void pursuant to the Second RSA and OCM Financing Stipulation.

---

[~~15~~16] The Committee does not agree with the Debtors' assertions set forth in this Section IV.E. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances described in this section.

F.   The Exchange Note Trustee is Forced to Initiate the Southern District Bondholder
     Litigation¹⁶¹⁷

The purchase of the Exchange Notes by Pach Shemen resulted in the ~~the~~ Exchange Note Trustee ~~to~~ bringing an enforcement action against the Debtors in direct contravention of the terms of the Second RSA.

Pursuant to the terms of the Second RSA, which was executed by holders of approximately 80% of the outstanding aggregate Exchange Notes, as of January 11, 2023, a standstill period was in place which prohibited Exchange Noteholders from directing the Exchange Note Trustee to initiate any action to enforce any default or event of default under the Exchange Note Indenture. Notwithstanding the foregoing, on January 11, 2023, the Debtors were sued by the Exchange Note Trustee in the District Court seeking repayment of the outstanding obligations under the Exchange Notes for various defaults and events of defaults (the "Bondholder Litigation").  In its complaint, the Exchange Note Trustee asserts that it was directed to file the complaint by the holders of a majority of the Exchange Notes, despite the fact that such a majority must include signatories to the Second RSA, and that such an action would be a direct violation of the terms of the Second RSA.  Notably, the complaint does not reference the Second RSA or the restrictions placed on the Exchange Noteholders pursuant thereto.

It was not until February 2, 2023, nearly three weeks after the Exchange Note Trustee initiated the Bondholder Litigation, that the Debtors received an alleged termination notice of the Second RSA.  However, the alleged termination notice suffered from material deficiencies that rendered it inoperative, and left questions regarding its authenticity.

Further the purported termination notice was facially invalid as a "Termination Event" as defined in the Second RSA occurs only upon written notice by "the [consenting Exchange Noteholders holding, in aggregate, at least two thirds in principal amount outstanding of the [Exchange Notes] held by the [consenting Exchange Noteholders]" and the termination notice did not provide that it was supported by the requisite number of Exchange Noteholders.  Given the ineffective and potentially fraudulent termination of the Second RSA, the Debtors believe the Bondholder Litigation was initiated in clear violation of the terms of the Second RSA and any Exchange Noteholder that directed the Exchange Note Trustee to initiate the Bondholder Litigation also knowingly violated the terms of the Second RSA.

As the Debtors would subsequently learn, the Exchange Noteholders that directed the Exchange Note Trustee to bring the action against the Debtors in the District Court were the Original Petitioning Creditors led by Pach Shemen.

G.   The Petitioning Creditors File Involuntary Petitions Leading to the Chapter 7 Cases

The second prong of the strategy underlying Pach Shemen's purchase of the Exchange Notes was to place the Debtors into bankruptcy to hedge Levona's position against the Claimants for the value of the Preferred Shares in the event of an adverse ruling in the Arbitration.  If the

---

¹⁶¹⁷ The Committee does not agree with the Debtors' assertions set forth in this Section IV.F. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances described in this section.

Arbitrator ruled in favor of Levona, Murchinson could sell the Preferred Shares and/or the vessels owned by Eletson Gas. However, in the event of an adverse ruling, Levona believed that the value of the Preferred Shares and the Eletson Gas fleet would inure to the value of Eletson Holdings. By owning half of the value of the Exchanges Notes, which they purchased for a nominal cost, Levona and the Murchinson Entities could ensure that it would receive value from the Debtors who would be forced to make payments to creditors in the bankruptcy proceedings. Either the Murchinson Entities would win in the Arbitration and receive the Preferred Shares, or lose the Arbitration, then force the Debtors into bankruptcy and recoup the value of the Preferred Shares as the Debtors' largest creditors via distributions from the Debtors' estates.

However, Murchinson's hedging strategy was predicated on the incorrect assumption that if the Arbitrator found in favor of the Claimants, the value of the Preferred Shares would transfer to Eletson Holdings. The value of the Preferred Shares was always intended to transfer to the nominees of Eletson Gas and was never intended to inure to the benefit of Eletson Holdings. While the Committee alleges that Holdings should have received the benefit of the Preferred Shares, the Debtors note that it was always the intention of Eletson Gas to have the Preferred Shares transferred to the Preferred Nominees by Levona.

Notwithstanding Pach Shemen's invalid assumption, on March 7, 2023, the Original Petitioning Creditors filed the Involuntary Petitions against each of the Debtors initiating the Chapter 7 Cases.

H.    The Debtors Initiate a State Court Action in Response to the Murchinson Entities' Actions

On April 20, 2023, the Debtors filed a complaint against defendants Murchinson, Nomis Bay LTD., BPY Limited and certain John Does that sold their Exchange Notes to the Original Petitioning Creditors seeking redress from the scheme orchestrated by the Murchinson Entities to destroy the value of Eletson Gas and its affiliates through violation of the Second RSA, weaponizing the Exchange Note Trustee and initiating the Chapter 7 Cases (the "Eletson State Court Action").

In the Eletson State Court Action, the Debtors asserted claims for tortious interference of contract breach of contract and declaratory judgment. As stated below, the Eletson State Court Action was removed to the Chapter 7 Cases as a separate adversary proceeding that was ultimately dismissed without prejudice.

I.    Potential Claims Against the Debtors and their Principals related to the Preferred Shares

The Committee and Petitioning Creditors believe that the nomination of the Preferred Nominees as the recipients of the Preferred Shares of Eletson Gas under the BOL, and the assignment of the damages of the Arbitration Award to the Preferred Nominees constituted fraudulent transfers. The Committee and Petitioning Creditors assert that the election of the Preferred Nominees, whose principals are also the Debtors' principals, as the recipients of the Preferred Shares was undertaken only after the initiation of the Debtors' bankruptcy proceedings to ensure the value of the Preferred Shares and the Arbitration Award damages were removed from

- 29 -

the Debtors' capital structure and thus out of reach of creditors.  Had Eletson Gas not elected for the Preferred Shares to be placed with the Preferred Nominees, the value of the Preferred Shares, which are valued at over $100 million, would have remained with Eletson Gas, and redounded to the ultimate benefit of Eletson Holdings, who is the owner of 100% of the common shares of Eletson Gas.  This value would then have been distributable to the Debtors' creditors. Instead, the transfer of the Preferred Shares to the Preferred Nominees removed this value from the Debtors' capital structure, at a time when the Debtors were purportedly insolvent.  Further, the Committee and Petitioning Creditors assert that the assignment of the Arbitration Award to the Preferred Nominees also constituted a fraudulent transfer as the Debtors assigned away the Arbitration Award at a time when the Debtors were insolvent.

These same parties assert that the Debtors either knowingly undertook these actions with the intent to deceive creditors or allowed these actions to be undertaken by Eletson Gas in a negligent manner.

The District Court Order found that the Preferred Shares were validly transferred to the Preferred Nominees by Eletson Gas upon the exercise of the purchase option in the BOL but stated that the allocation of the Arbitration Award and Preferred Shares may have given rise to claims by Eletson Holdings against Eletson Gas and/or the Preferred Nominees.  The Committee asserts that the Debtors are refusing to investigate and/or pursue these claims as the Debtors are controlled by the same parties that control the Preferred Nominees, and therefore will not investigate themselves.

Despite suggesting that claims exist related to the transfer of the Preferred Shares as found by the Arbitrator, no party (neither the Committee nor any Petitioning Creditor) has articulated a legal or factual basis for any such claims.  In fact, despite making the bare allegation that a "fraudulent transfer" occurred in pleadings, including the Trustee Motions (defined below), neither the Petitioning Creditors nor the Committee have articulated any factual or legal basis for any of such claims.  The District Court Order explicitly refrained from making any finding about the propriety of the nomination of the Preferred Nominees as the recipients of the Preferred Shares, instead noting that any determinations must be made by the Bankruptcy Court. The Debtors, as set forth below, have repeatedly articulated their position that any claims related to the Preferred Shares and Arbitration damages are both factually and legally unsupportable.  The Debtors have presented evidence to this effect on numerous occasions, and the validity of the transfer of the Preferred Shares from Levona to the Preferred Nominees as well as the award of damages by the Arbitrator have been heavily and repeatedly defended.  Despite multiple pleadings and numerous invitations from the Debtors, neither the Petitioning Creditors nor the Committee have (i) asserted any claims against the Preferred Nominees for any fraudulent transfers, (ii) presented the factual or legal basis for any claim to the Debtors or the Independent Committee or (iii) moved for standing to pursue any such claims.

For the avoidance of doubt, Debtors' counsel has only ever been directed by the Debtors' board of directors, and never by the Debtors' principals. Debtors' management and counsel have at all times acted in the best interest of the Debtors' estates and not in the interest of any individual or group of the Debtors' principals.

## V.    THE CHAPTER 7 CASES

### A.    The Involuntary Petitions and Joint Administration Motion

On March 7, 2023, the Original Petitioning Creditors filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against each of the Debtors (collectively the "Involuntary Petitions"). Attached as exhibits to the Involuntary Petitions are corporate ownership statements for each of the Petitioning Creditors as well as purported evidence of their purchase of outstanding Exchange Notes giving rise to their claims.

On the same day, the Original Petitioning Creditors filed a motion [Dkt. No. 2] for the joint administration of the Debtors' Chapter 7 Cases. The motion was approved by an order of the Bankruptcy Court [Dkt. No. 49] establishing Eletson Holdings, Inc. Case No. 23-10322 as the lead case.

B.     The Alleged Joinders to the Involuntary Petitions

The Chapter 7 Cases were initiated by the three Original Petitioning Creditors. However, eleven additional alleged creditors joined onto the Involuntary Petitions, including the Exchange Note Trustee allegedly pursuant to the alleged direction of holders of over 79% of the Exchange Noteholders. A complete list of the Petitioning Creditors is annexed hereto as Exhibit 5.

C.     Motion for Relief from the Automatic Stay and the Stipulated Stay Order

Upon the filing of the Involuntary Petitions the automatic stay was invoked pursuant to section 362 of the Bankruptcy Code staying all actions against the Debtors. Over the vehement protest of the Claimants, on March 10, 2023, the Arbitrator stayed the Arbitration pending further order or notice from the Bankruptcy Court.

On March 13, 2023, the Debtors filed the *Alleged Debtor's Motion for Relief from Stay to Proceed with, or to Confirm the Inapplicability of, the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 5] along with an accompanying memorandum of law and supporting declarations (collectively, the "Lift Stay Documents"). The Lift Stay Documents provided the Bankruptcy Court with the history of the Arbitration and the bad faith actions of Pach Shemen and the Petitioning Creditors in filing the Involuntary Petitions. Pursuant to the Lift Stay Documents, on March 17, 2023, the Debtors, Levona and the Petitioning Creditors entered into a stipulation [Dkt. No. 23] which laid out the discovery schedule related to the Lift Stay Documents, agreed that the Arbitration was stayed and provided that notwithstanding the staying of the Arbitration the Claimants and Levona would submit all outstanding discovery ordered by the Arbitrator no later than March 20, 2023.

On April 17, 2023, the Bankruptcy Court entered the *Stipulation and Order Granting Alleged Debtor's Motion for Relief From Stay to Proceed With, or to Confirm the Inapplicability of the Automatic Stay to Prepetition Arbitration Proceedings* [Dkt. No. 48] (the "Stipulated Lift Stay Order"). The Stipulated Lift Stay Order provided that the automatic stay under section 362 of the Bankruptcy Code was modified "with respect to the Arbitration solely to the extent necessary and for the sole purpose of permitting a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals with respect to the claims currently pending in the Arbitration…" *Stipulated Lift Stay Order* at ¶ 3. Further, the Stipulated Lift Stay Order provided that "Any Arbitration Award, whether in favor of any Arbitration Party, shall be

- 31 -

stayed pending further review of the Bankruptcy Court on a motion noticed following the issuance of the Arbitration Award.  For avoidance of doubt, no Arbitration Party shall transfer, dispose of, transact in, hypothecate, encumber, impair or otherwise use any such Arbitration Award or any asset or property related thereto absent a further order of this Court." *Id.* at ¶ 4.  Based on the foregoing, the Stipulated Lift Stay Order also imposed an injunction against the disposition of assets subject to the Arbitration.

The Arbitration resumed on April 17, 2023, upon entry of the Stipulated Lift Stay Order.

D.    The Motion to Dismiss and Associated Documents[17][18]

The Debtors vehemently opposed the filing of the Involuntary Petitions by the Original Petitioning Creditors.  On April 14, 2023, the Debtors filed the *Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 40] (the "Motion to Dismiss"); *Memorandum of Law in Support of the Alleged Debtors' Motion to Dismiss Chapter 7 Involuntary Petitions Filed by Pach Shemen LLC, VR Global Partners, L.P. and Alpine Partners (BVI) L.P.* [Dkt. No. 41]; *Declaration of Louis M. Solomon in Support of the Alleged Debtors' Filed Motions* [Dkt. No. 44]; *Declaration of Vasilis Hadjieleftheriadis in Support of Alleged Filed Motion* [Doc. 42]; and several additional exhibits attached to, and incorporated by reference into, the foregoing (collectively, the "Motion to Dismiss Documents").

The Motion to Dismiss Documents asserted various legal and factual bases showing that the Involuntary Petitions were improperly brought

.  The Petitioning Creditors filed a number of responses to the Motion to Dismiss Documents.  Over the next months the Debtors and Petitioning Creditors engaged in discovery and related motion practice regarding evidentiary testimony pursuant to various scheduling orders and stipulations entered by the Bankruptcy Court.  Ultimately no hearing on the Motion to Dismiss Documents was ever held prior to entry of the Conversion Stipulation (defined below).  The Motion to Dismiss was withdrawn pursuant to the Conversion Stipulation. Notwithstanding the withdrawal of the Motion to Dismiss, the Debtors reserved all rights in regards to the arguments contained in the Motion to dismiss including challenges to the propriety of the Involuntary Petitions.

E.    The Eletson State Court Action is Removed to the Bankruptcy Court

On June 16, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a notice of removal [Dkt. No. 85] removing the Eletson State Court Action from the Supreme Court of the State of New York to the Bankruptcy Court as an adversary proceeding (the "Chapter 7 Adversary Proceeding").

---

[17][18] The Committee does not agree with the Debtors' assertions set forth in this Section V.D as the Motion to Dismiss was not adjudicated. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of the circumstances surrounding the Motion to Dismiss. Further, despite not being adjudicated, the Debtors reserved all rights to all arguments made in the Motion to Dismiss and may assert these claims in these Chapter 11 Cases.

On July 21, 2023, Murchinson, Nomis Bay Ltd. and BPY Limited filed a motion to dismiss the Chapter 7 Adversary Proceeding and an accompanying memorandum of law.  Prior to any hearing on the merits, the Chapter 7 Adversary Proceeding was dismissed in accordance with the terms of the Conversion Stipulation.

F.    Mediation and the Conversion Stipulation

Prior to the scheduled hearing on the Motion to Dismiss, on July 31, 2023, upon request of the Debtors, Exchange Note Trustee and the Petitioning Creditors, the Bankruptcy Court entered the *Order Appointing Hon. Allan L. Gropper (Ret.) as Mediator* [Dkt. No. 148] directing these parties towards a non-binding mediation (the "Chapter 7 Mediation").  The Chapter 7 Mediation was undertaken with respect to: (a) the issues raised in each of (i) the Involuntary Petitions, (ii) the Motion to Dismiss and (iii) each of the Petitioning Creditors and Exchange Note Trustee's objections to the Motion to Dismiss, and (b) such other matters as agreed to by the parties to the Mediation.  The Chapter 7 Mediation was to last for four weeks unless a resolution was reached. On August 29, 2023, the Bankruptcy Court entered a stipulated order [Dkt. No. 185] extending the Chapter 7 Mediation to September 7, 2023, or such other date as agreed to by the parties to the Chapter 7 Mediation.

On September 6, 2023, the Debtors, Petitioning Creditors and the Exchange Note Trustee entered into a stipulation (the "Conversion Stipulation") which set forth the terms for the voluntary conversion of the Debtors' Chapter 7 Cases to the Chapter 11 Cases.  The Conversion Stipulation was read into the record at a hearing before the Bankruptcy Court and set forth the following terms:

- Within seven days of the entry of the Conversion Stipulation the Debtors must withdraw the Motion to Dismiss without prejudice;

- The Petitioning Creditors will not object to the conversion of the Chapter 7 Cases to the Chapter 11 Cases;

- The Petitioning Creditors or people acting in concert with the Petitioning Creditors will not bring a motion to appoint an examiner, a trustee or to limit exclusivity during the first 120 days of the Chapter 11 Cases;

- The Debtors will withdraw the Chapter 7 Adversary Proceeding and agree not to reinitiate that action or the claims therein for the longer of four months or the end of Confirmation Proceedings and vacatur proceedings related to the Arbitration;

- Respective professionals for the Debtors, the Petitioning Creditors and those acting in concert with them agree not to object to the other professionals seeking retention as estate professionals in the capacity as Debtors' counsel or special counsel or Committee counsel respectively;

- The Debtors agree not to object to a substantial contribution motion on behalf of the Petitioning Creditors up to collectively $1.5 million dollars with the agreement that the Petitioning Creditors may seek additional amounts, and the Debtors and the Petitioning Creditors reserve all rights with regard to such later requests;

- The Petitioning Creditors will not object to or assert rights of recovery against the pre-petition fees of the Debtors' counsel up to a $2 million dollar cap, and all rights are reserved for any amounts about the $2 million dollar cap; and

- The Conversion Stipulation is without prejudice to all causes of action, claims, and defenses that the parties may assert, including without limitation the Debtors' ability to object to claims in the Chapter 11 Cases.

Pursuant to the Conversion Stipulation, on September 13, 2023, the Debtors filed the *Motion to Convert these Cases to Cases Under Chapter 11* [Dkt. No. 201]. On September 25, 2023 (the "Conversion Date") the Bankruptcy Court entered an order [Dkt. No. 215] converting the Chapter 7 Cases to the Chapter 11 Cases in accordance with the terms of the Conversion Stipulation.

## VI.    THE CHAPTER 11 CASES

Upon conversion of the Chapter 7 Cases to the Chapter 11 Cases, the Debtors have filed certain substantive motions to obtain relief necessary to allow the Debtors to effectively administer their Estates and maximize distributable value. Since the Conversion Date, in furtherance of the administration of their Estates, the Debtors have: (i) filed their schedules and statements of financial affairs; (ii) filed periodic disclosures pursuant to Bankruptcy Rule 2015.3 and debtor-in-possession monthly operating reports; (iii) filed motions to, (a) establish the Bar Date to determine the complete universe of the Debtors' obligations; (b) officially retain counsel to assist the Debtors in carrying out their duties under the Bankruptcy Code; and (c) enforce previous injunction orders of the Bankruptcy Court, the automatic stay and the Status Quo Injunction for the continued protection of the Debtors' Estates; (iv) established an Independent Committee to review potential causes of actions of and against the Debtors related to Eletson Gas, the Preferred Shares and the shareholders of Eletson Holdings; and (v) filed and prosecuted plans of reorganization returning value to valid stakeholders. Below are summaries of significant filing and developments in the Chapter 11 Cases. As each of the Debtors are non-operating entities, they do not employ any employees, do not maintain bank accounts or an active cash management system, do not pay taxes and do not otherwise have operations that would require the filing of typical "first day" motions for relief.

A.    Debtors' Filings

1.    Schedules and Statements of Financial Affairs

The Debtors filed their respective schedules of assets and liabilities (the "Schedules") and statements of financial affairs (the "SOFAs") with the Bankruptcy Court on October 10, 2023 [Dkt. Nos. 216-221]. On December 29, 2023, Debtor Eletson Holdings filed an amended Schedule A/B [Dkt. No. 340]. The Schedules and SOFAs can be reviewed at the office of the Clerk of the Bankruptcy Court for the Southern District of New York or can be obtained free of charge from counsel to the Debtors.

2.    Bankruptcy Rule 2015.3 Disclosures and Debtor-in-Possession Operating Reports

- 34 -

a.    2015.3 Disclosures

On November 20, 2023, the Debtors filed their periodic report pursuant to Bankruptcy Rule 2015.3 [Dkt. No 271] (the "2015 Disclosure").  On the same day the Debtors filed a statement regarding Eletson Holdings' interests in Eletson Gas for purposes of the 2015 Disclosure [Dkt. No. 272], noting that because of Levona's continued attempts to control the board of directors of Eletson Gas, the Debtors were unable to obtain the requisite financial information of Eletson Gas to include in the 2015 Disclosure.

In response to requests by the United States Trustee and after Levona filed a statement from Levona, stating: "Levona has done nothing to prevent the Debtors from filing their Rule 2015.3 statement for Eletson Gas, and it certainly has never told the Debtors that they are prohibited from doing so [Dkt. No. 279 at 1]" on November 30, 2023, the Debtors filed an amended 2015 Disclosure [Dkt. No. 298] which included the consolidated financial information of Eletson Gas.

After filing the amended 2015 Disclosure, in response to further requests by the United States Trustee on December 29, 2023, the Debtors filed a second amended 2015 Disclosure [Dkt. No. 341] which included the financial information of additional non-operating subsidiaries of the Debtors which do not have any assets.  On February 12, 2024, the Debtors filed their Second Periodic Report Pursuant to Bankruptcy Rule 2015.3 [Dkt. No. 409].

3.    Monthly Operating Reports

Consistent with the operating guidelines and reporting requirements established by the United States Trustee (the "Guidelines") in these Chapter 11 Cases, the Debtors have filed Monthly Operating Reports [Dkt. Nos. 268, 269, 270, 276, 277, 280 325, 326, 327, 361, 362, 363, 389, 427, 428, 429, 508, 509, 510, 603, 604 and, 605, 706, 707 and 708], and will continue to file such Monthly Operating Reports as required by the Guidelines.  Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtors' post-petition taxes, aland (e) statement regarding the status of accounts receivable reconciliation and aging.

4.    Claims Bar Date and Review Process

a.    Claims Bar Date

On October 18, 2023, the Debtors filed the *Debtors' Motion for an Order Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [Dkt. No 227] (the "Bar Date Motion").  Pursuant to the Bar Date Motion, the Debtors sought to set December 18, 2023 at 4:00 p.m. Eastern Time as the date by which any entity or person other than those specified in the Bar Date Motion holding a prepetition claim against the Debtors, including a claim arising under sections 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) must file a proof of claim (the "Bar Date") and March 25, 2024 at 4:00 p.m. Eastern Time as the date by which any Governmental Entity as defined in the Bankruptcy Code must file a proof of claim (the "Governmental Bar Date").

- 35 -

On November 6, 2023, the Debtors filed an amended proposed order addressing concerns raised by the Committee. On November 9, 2023, the Bankruptcy Court entered an order approving the Bar Date Motion (the "Bar Date Order") establishing the Bar Date and Governmental Bar Date as the dates for all persons and entities (other than those excepted pursuant to the Bar Date Motion and Bar Date Order), including governmental units, to file Proofs of Claim for claims arising before the Conversion Date, including Claims arising under section 503(b)(9), 503(b)(3)(A), 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code. The Bar Date Order further provides that, among other things, any person or entity that is required to file a Proof of Claim in these Chapter 11 Cases but fails to do so in a timely manner shall not be treated as a Creditor with respect to such Claim for purposes of voting and distribution in these Chapter 11 Cases, and such person or entity shall not be permitted to vote to accept or reject any Chapter 11 plan or participate in any distributions thereunder on account of such Claim.

b.    Claims Review Process[18][19]

The Debtors are continuing their evaluation of the numerous Claims filed in these Chapter 11 Cases to determine, among other things, whether it is necessary and appropriate to file objections seeking to disallow, reduce and/or reclassify such Claims. On January 28, 2024, the Debtors filed claim objections seeking disallowance, expunging, or in the alternative reduction of the claims of the Original Petitioning Creditors, the Exchange Note Trustee, Levona, New Agathonissos Finance LLC and Togut, Segal and Segal.

i.    Original Petitioning Creditors Claim Objection

The Debtors seek the disallowance and expungement of the entirety of the Original Petitioning Creditors' Claims as they, among other things: (i) lacked sufficient standing to file, and were contractually prohibited from filing, the involuntary petition pursuant to Sections 6.06 and 6.07 of the Exchange Note Indenture, (ii) neither Pach Shemen nor Alpine Partners held any claim against any Debtor because their purported acquisition of notes under the Indenture was void *ab initio* pursuant to the terms of the Second RSA and the OCM Stipulation, (iii) any claims of the original petitioning creditors were contingent in light of the standstill period set forth in the Second RSA, (iv) any purported claim of the original petitioning creditors was subject to a bona fide dispute, and (v) the original petitioning creditors acted in bad faith and for an improper purpose. The Original Petitioning Creditors filed administrative claims under section 507(a) for all fees incurred from early February 2023 through September 6, 2023. However, a cursory review of the Original Petitioning Creditors' supporting documentation indicates that they seek reimbursement for fees and costs grossly in excess of those required to file or adjudicate an involuntary petition, and they seek reimbursement for the substantial time opposing the Debtors' filings. Further the

---

[18][19] The Committee does not agree with the Debtors' assertions set forth in this Section VI.A.4.b. Notwithstanding the Committee's disagreement, the Debtors maintain that this is an accurate representation of certain of the claims filed against the Debtors and the Debtors' objections thereto. Further, the Debtors are not seeking to litigate any pending claim objection in this Disclosure Statement. Instead, the Debtors are providing a summary of the material portions of the Debtors' Claim Objections as resolution of the Claim Objections will have a material impact on the distributable value of the Plan that will ultimately flow to creditors with Allowed Claims. For this reason, the Debtors believe that it is imperative that creditors entitled to vote on the Plan have a full understanding of the basis of the Debtors' Claim Objections. The Debtors reserve all rights to modify, amend or supplement any claim objection currently pending and to file new claim objections in accordance with the terms of the Bankruptcy Code.

supporting documentation for these claims indicates significant collusion between Pach Shemen and creditors it could direct as proxies including Watson Farley & Williams LLP, Paleokrassas & Partners Law Firm, New Agathonissos Finance LLC and the Exchange Notes Trustee. The Debtors believe that the Original Petitioning Creditors do not hold claims that are not contingent as to liability or subject to a bona fide dispute as to liability or amount, seek reimbursement of invalid amounts, and are otherwise subject to a number of other legal and equitable defenses by the Debtors.

ii.    Levona Claim Objection

The Debtors seek the disallowance and expungement of the entirety of Levona's Claims, which consist of a general unsecured claim in the amount of $262,500,000 and an administrative expense priority claim in an unliquidated amount pursuant to section 507(a)(3) of the Bankruptcy Code as they are predicated on incorrect and unsupportable assertions that: (i) Eletson Holdings violated the Stipulated Stay Relief Order, (ii) Eletson Holdings violated the automatic stay by purporting to transfer "whatever interest Eletson Holdings may have in the Eletson Gas Preferred Shares" to insiders, and (iii) to the extent any of those damages arose between the Petition Date and the Conversion Date in the ordinary course, an administrative priority claim. Levona's claims are nothing more than reassertions of the same claims they presented, and lost on, in the Arbitration.  As detailed extensively in the Chapter 7 Cases and as set forth herein, Eletson Holdings never held any interest in the Preferred Shares and thus the basis of Levona's Claims are unsupportable.  Further, as confirmed by the District Court Order, the Preferred Shares were transferred by Eletson Gas to the Preferred Nominees.  Given the preclusive effect of the District Court Order, the Debtors believe that Levona is barred from asserting these claims against the Debtors, is not a legitimate creditor of the Debtors, has no valid claims against the Debtors and therefore is not entitled to any recovery.

**Levona has requested that the following statements be included (with which the Debtors disagree):**

In Levona's view, the assertion the Holdings did not hold an interest in the Preferred Shares fails to acknowledge that, prior to the commencement of these bankruptcy cases, Eletson Holdings repeatedly claimed that it was the "sole" shareholder of Eletson Gas as of March 11, 2022. *See Eletson Holdings, Inc. et al. v. Levona Holdings Ltd.*, 23-cv-07331 (S.D.N.Y. Feb. 9, 2024), ECF 83 at 20-21 (acknowledging that "in an October 25, 2022 affidavit submitted in the arbitration, Eletson [Holdings] claimed that Eletson [Holdings] had exercised the Purchase Option and was the sole unit holder of [Eletson Gas]," and that "Eletson [Holdings] made the same claim in memoranda of law submitted to the arbitrator on October 25, 2022, November 8, 2022, and November 18, 2022"); *Eletson Holdings, Inc.*, 23-cv-07331, ECF 67-20 (Aff. of Vassilis E. Kertsikoff dated Oct. 25, 2022) ¶ 9 ("Prior to March 11, 2022, Eletson Holdings was a common unit holder (sometimes for convenience referred to as shares) of [Eletson Gas].  As of March 11, 2022, Eletson Holdings became the sole unit holder of [Eletson Gas] by reason of the transactions that [Levona] appears to be challenging ....").

Further, Levona states although the District Court Order confirmed that portion of the Final Award stating that the Preferred Shares were transferred by Eletson Gas to the Preferred Nominees, neither the Arbitrator nor the District Court were ever presented with, or ever decided, the question

- 37 -

of "whether [Eletson Gas] or Holdings improperly elected the [Cypriot] Nominees or whether the transfer to the [Cypriot] Nominees of [Eletson Gas's] right to the Preferred Interests effected a fraud on the creditors of Holdings." District Court Order at 87. As a result, according to the District Court Order, "the arbitrator's findings can have no collateral estoppel effect on those questions." *Id.* Levona's response to Debtors' objection to Levona's proof of claim, which is forthcoming, will explain Levona's position to the contrary. Indeed, Debtors produced certain documents in these bankruptcy cases that were improperly withheld by Eletson Holdings (and Eletson Corp.) during the Arbitration. These documents post-date Eletson Gas's purported exercise of the purchase option by at least four months and suggest that (i) Eletson Gas never exercised its option to purchase the preferred shares in Eletson Gas from Levona pursuant to the Binding Offer Letter and (ii) the Final Award was procured by fraud. *See* ECF 491 at 17 (citing ECF 478-1, Exs. 12-15); ECF 230 at 3, 6.

At minimum, Debtors have conceded, in their objection to Levona's proof of claim, that certain portions of the proof of claim are not precluded by the Final Award. *See* ECF 378 at 7-9 (acknowledging that Levona's proof of claim alleged three "new" claims: (i) Eletson Holdings violated this Court's stay relief order (ECF 48); (ii) Eletson Holdings violated the automatic stay; and (iii) an administrative priority claim). The question of whether the District Court Order or Final Award have any preclusive effect with respect to Levona's Proof of Claim has not yet been resolved by this Court.

### iii. Exchange Note Trustee Claim Objection

The Debtors seek the disallowance and expungement, or in the alternative the reducing and reclassifying of the claims of the Exchange Note Trustee which consist of alleged secured claims of $366,011,815.96 on behalf of the Exchange Noteholders and (ii) administrative expense claims for the Exchange Note Trustee's fees costs and expenses, including cost of counsel pursuant to section 7.07 of the Exchange Note Indenture in the amount of $1,872,640.44. The objections assert, among other things: (i) the Original Petitioning Creditors lacked sufficient standing to file, and were contractually prohibited from filing, the involuntary petition pursuant to Sections 6.06 and 6.07 of the Exchange Note Indenture, (ii) neither Pach Shemen nor Alpine Partners held any claim against any Debtor because their purported acquisition of notes under the Indenture was void *ab initio* pursuant to the terms of the Second RSA and the OCM Stipulation, (iii) any claims of the original petitioning creditors were contingent in light of the standstill period set forth in the Second RSA, (iv) any purported claim of the original petitioning creditors was subject to a bona fide dispute, and (v) the original petitioning creditors acted in bad faith and for an improper purpose that the parties do not have valid claims against the Debtors, (vi) Exchange Note Trustee was aware of the void ab initio transfer of the Exchange Notes as well as the bad faith and improper purpose of the Original Petitioning Creditors, yet participated in the bad faith scheme by nonetheless filing suit against the Debtors under the Exchange Note Indenture at the direction of Pach Shemen, including, among other things, failing to withdraw the suit after it purportedly first learned that the transfer of the Exchange Notes to Pach Shemen was void ab initio –and (vii) the Exchange Note Trustee is not entitled to reimbursement for fees, costs and expenses incurred as a result of its negligence, willful misconduct or bad faith and because it did not hold, at the time it joined the involuntary petition, a claim that satisfied the requirements of 11 USC § 303(b)(1).

The Exchange Note Trustee initially asserted its approximately $366 million dollar claim

as a fully secured claim, despite the Strict Foreclosure Agreement releasing all Collateral for the Exchange Notes.  On February 8, 2024, the Exchange Note Trustee filed an amended proof of claim classifying its claim as unsecured.

The Debtors also believe the Exchange Note Trustee's claims must be reduced to the extent the claim includes any recovery for entities that are not Exchange Noteholders.  The Exchange Note Trustee's claims are asserted on behalf of the holders of the Exchange Notes, but no list of Exchange Noteholders is provided.  Further, entities like Pach Shemen and Alpine Partners are not Exchange Noteholders as the transfer of Exchange Notes was void ab initio.  The Exchange Note Trustee's claims are also in excess of the amount provided for in the Debtors' books and records which will require reconciliation and likely a reduction of the value of the claims asserted. Finally, the Exchange Note Trustee is not entitled to reimbursement of costs, fees and expenses incurred as a result of their negligence, willful misconduct and bad faith in participating in the Murchinson Entities' schemes. The Debtors further believe that the Exchange Note Trustee is not entitled to administrative expense status for the foregoing reasons.

Finally, the Debtors have objected to the allowance of the Exchange Note Trustee's claim until such time that all affirmative claims against the Exchange Note Trustee are resolved.

iv. Statement from the Exchange Note Trustee

**The Exchange Note Trustee has requested that the following statement be included with and read in conjunction with the Debtors' position noted above.  The Debtors disagree with the assertions noted below but are presenting them in the interest of fulsome disclosure.**

The Exchange Note Trustee disputes each of the Debtors' assertions set forth in Section VI.A.4.b.iii and filed a preliminary response to the Debtors' objection to its claims on May 7, 2024 [Dkt. No. 639].  The Exchange Note Trustee's preliminary response asserts, among other things, that: (i) the Debtors' contention that neither Pach Shemen nor Alpine held any claim against the Debtors is irrelevant to the claims filed by the Exchange Note Trustee because such claims were filed in the Exchange Note Trustee's representative capacity on behalf of *all* Exchange Noteholders (regardless of who such Exchange Noteholders may be) and not on behalf of Pach Shemen, Alpine, or any other specific Exchange Noteholder, (ii) because the pre-petition claims of the Exchange Note Trustee (the "Prepetition Exchange Note Trustee Claims") were filed in a representative capacity on behalf of *all* Exchange Noteholders, the Exchange Note Trustee need not identify the specific holders thereof; (iii) the identity of the beneficial holders of the Exchange Notes is not a valid basis for disallowance of the Exchange Note Trustee's claims under section 502(b) of the Bankruptcy Code; (iv) the Exchange Note Trustee has not acted in bad faith, nor participated in any bad faith scheme, and, indeed, at the time it filed suit against the Debtors under the Exchange Note Indenture, the Exchange Note Trustee was unaware of the existence of the Second RSA due to the Debtors' failure to notify it thereof (as the Exchange Note Indenture required); (v) the Trustee has not engaged in any negligent, willful, or bad faith misconduct and, to the contrary, properly filed the Prepetition Exchange Note Trustee Claims pursuant to its authority under Section 6.09 of the Exchange Note Indenture; (vi) the Prepetition Exchange Note Trustee Claims contain detailed calculations of the principal and interest due under the Exchange Notes and the Exchange Note Indenture, while the Debtors' objection thereto fails to identify any alternative basis for calculating the principal and interest due in a lesser amount; (vii) the Exchange Note Trustee's  fees, costs and expenses, including cost of counsel, related to the involuntary

bankruptcy petition are properly reimbursable in the amount of no less than $1,872,640.44 and are supported by detailed fee statements that will be provided in redacted form or for *in camera* review, as applicable, upon request of the Bankruptcy Court or a party; (viii) the Strict Foreclosure Agreement released only a portion of the collateral securing the Exchange Notes and the Prepetition Exchange Note Trustee Claims remained secured to the extent of the value (if any) of the remaining collateral; and (ix) the Debtors' contention that the Exchange Note Trustee improperly filed fully secured claims while serving on the Committee is false because the Prepetition Exchange Note Trustee Claims expressly stated that they were secured only to the extent of the value of their underlying collateral and stated unsecured claims for any deficiency.

iv.        v. New Agathonissos Finance LLC Claim Objection

The Debtors seek the disallowance and expunging of the both the prepetition and administrative claims of New Agathonissos Finance LLC ("NAF") which are asserted in the amount of $5,155,522.00. The Debtors objected to NAF's claims as NAF does not hold valid claims against the Debtors. NAF asserts that the Debtors are obligated to pay NAF on behalf of reimbursement obligations arising from the Strict Foreclosure Agreement on account of payments as restitution, compensation for the Debtors' unjust enrichment, on a theory of equitable subrogation or any other similar theory. However even a cursory review of the Strict Foreclosure Agreement demonstrates that no such payment obligation exists. Further, NAF has not provided the Debtors with receipts of the payments it purports to have made giving rise to the Debtors' reimbursement obligations.

v.        vi. Omnibus Claim Objections

The Debtors have also filed an omnibus claim objection to several Exchange Noteholder Claims duplicative of the claims asserted by the Exchange Note Trustee. The Debtors also objected to the claim of Deutsche Bank to the extent such claim exceeds the obligations in the Debtors' books and records.

5.        Application for the Retention of Debtors' Counsel

On October 25, 2023, the Debtors filed the *Debtors' Application to Retain and Employ Reed Smith LLP as Counsel to the Debtors and Debtors-in-Possession, Nunc Pro Tunc as of the Conversion Date, Pursuant to 11 U.S.C. §327(a) and Federal Rule of Bankruptcy Procedure 2014* [Dkt. No. 235] (the "Reed Smith Application"). The Reed Smith Application was supported by the Declaration of Derek J. Baker, Esq. which was attached thereto (as supplemented from time to time the "Baker Affidavit").

On January 5, 2024, after the submission of supplemental Baker Affidavits, and after notice and hearing the Bankruptcy Court entered an order [Dkt. No. 350] approving the Reed Smith Application and authorized the retention of Reed Smith LLP as counsel to the Debtors pursuant to section 327(a) of the Bankruptcy Code.

6.        Motion to Enforce

Over the pendency of the Chapter 7 Cases and Chapter 11 Cases the Debtors have become aware of several actions taken by Levona that the Debtors believe constituted willful violations of orders of the Bankruptcy Court and the Arbitrator. On November 27, 2023, the Debtors filed the

- 40 -

*Debtors' Motion to Enforce Three Orders Protecting Debtors- the Automatic Stay, Stipulated Stay Relief Order, and Status Quo Injunction – and for Sanctions against Levona Holdings Ltd. Pursuant to Sections 105(a) and 362 of the Bankruptcy Code* [Dkt No. 289] (the "Motion to Enforce").  The Motion to Enforce sought redress for Levona's seemingly willful violations of the Automatic Stay, Stipulated Lift Stay Order and the Status Quo Injunction.  On December 21, 2023, Levona filed its opposition to the Motion to Enforce [Dkt. No. 332] pursuant to which Levona asserts that it has not violated any order of the Arbitrator or the Bankruptcy Court.  On May 8, 2024, the Debtors withdrew the Motion to Enforce. In the Debtors' view, the Motion to Enforce should be withdrawn without prejudice. In Levona's view, the Motion to Enforce should be withdrawn with prejudice.  The Court has not yet decided whether the Motion to Enforce is withdrawn with or without prejudice.

7.    Establishment of Independent Committee

As stated herein, the Debtors are aware that there may exist claims against certain of the Debtors' shareholders and/or certain of the Debtors' affiliates.  To ensure that the Debtors were able to disinterestedly evaluate the propriety and strength of any potential cause of action against an affiliate of the Debtors or other person or entity related to the Debtors and to resolve the objection of the United States Trustee to the Reed Smith Application,  on December 11, 2023 the Debtors appointed Panagiotis Konstantaras as a director of Eletson Holdings, and subsequently created an independent committee (the "Independent Committee") comprised of Mr. Konstantaras and filed a notice of the creation of the Independent Committee with the Bankruptcy Court [Dkt. No. 329].  Pursuant to the corporate resolution establishing the Independent Committee, the board of directors of Eletson Holdings authorized and delegated to the Independent Committee, among other things, (i) the full and exclusive authority and power to investigate the matters raised in any written demand on Eletson Holdings to investigate the shareholders of Eletson Holdings or the preferred nominees of Eletson Gas (collectively, a "Demand"), (ii) the authority to determine what, if any, action should be taken by Eletson Holdings in regards to any Demand, and (iii) the authority to take appropriate action the Independent Committee deems necessary to give effect to the foregoing powers.  The Independent Committee is represented by separate counsel which previously served as potential conflicts counsel to the Debtors in the dismissed adversary proceeding. Counsel for the Independent Committee has not yet incurred time/costs in reviewing claims identified by the Committee or others or any Demands.  As such as of the date hereof, no formal retention application for counsel to the Independent Committee has been filed with the Bankruptcy Court and no costs have been incurred.

Notably, the Bankruptcy Court stated that despite the assertions made by the Committee and Petitioning Creditors that the Independent Committee is not independent, such asserted lack of independence does not adequately explain why the Petitioning Creditors and Committee have failed to make a Demand on the Independent Committee or pursue the transfer of the Preferred Shares by other means such as pursuing standing.  As of the filing of this Disclosure Statement, no Demand has been made on the Independent Committee.

8.    Plans

On January 23, 2024, the Debtors filed the Original Plan.  The Original Plan served as a good faith proposal to begin the plan negotiation process and served as the Debtors' estimate of the value of

Reorganized Holdings (as defined therein). The Original Plan operates in the same manner as the Plan and provides for the transfer of certain Causes of Action to a Litigation Trust for the pursuit and liquidation of those Litigation Trust Causes of Action for distribution of proceeds to certain of the Debtors' legitimate creditors. The Original Plan called for the subordination of the claims of the Petitioning Creditors, which meant that the Petitioning Creditors would not be paid until the Debtors' other creditors were paid in full.  The Debtors believed and continue to believe that the Original Plan was patently confirmable despite being a "new value" shareholder Plan, as the Eletson Members (as defined in the Original Plan) provided the Shareholder New Value Contribution (as defined in the Original Plan) which was the only source of plan funding that had been made available as of the date of the Original Plan.  Despite the Petitioning Creditors' assertions regarding the Debtors' use of the exclusivity period, the Petitioning Creditors made no outreach to the Debtors or otherwise indicated that they were willing or able to fund a plan of reorganization until the Debtors filed the Original Plan.  The PS Plan (defined below), as originally filed by the Petitioning Creditors, borrowed heavily from the Original Plan, including adopting and using the identical plan classifications and waterfall of funds from the Original Plan. Ultimately the Original Plan served its purpose and resulted in the Petitioning Creditors providing an estimate on their view of the enterprise value of the Reorganized Debtor, information that had not been shared with the Debtors despite the Debtors requesting said information many times.  On April 8, 2024, the Debtors filed the First Amended Plan.  The First Amended Plan was structurally similar to the Original Plan but increased the distributable value available to Creditors significantly.

On May 13, 2024, the Debtors filed a previous iteration of the Plan, which maintained the structure of the Original Plan and further increased the distributable value available to Creditors. In that iteration, the Debtors included a settlement negotiated by the Debtors on the one hand, and the Gas Ownership Defendants on the other hand, in the context of the Mediation. Such settlement would have resolved and settled any claims that Holdings would have against such the Gas Ownership Defendants in exchange for the Gas Ownership Defendants' agreement and satisfaction of the terms of the proposed settlement.

At a hearing before the Bankruptcy Court on May 15, 2024 (the "Initial Disclosure Statement Hearing") after objections were raised by certain parties in interest to the settlement included in the prior iteration of the Plan, the Debtors negotiated with the Eletson Members to increase their proposed Shareholder New Value Contribution and such Eletson Members agreed to cause the Gas Ownership Defendants to contribute the Collections Contribution as additional Shareholder New Value Contribution without the proposed settlement.

9.    The Shareholder New Value Contribution

The centerpiece of the Plan and the previous iterations ofis the Plan isConsideration, which is comprised in part of the Shareholder New Value Contribution.  The Shareholder New Value Contribution is (i) an aggregate $30 million contribution consisting of cash and cash equivalents and (ii) the Collections Contribution which is comprised of the assignment of seventy-five percent (75%) of the collections of the Gas Ownership Defendants against Levona on account of the Final Award and the District Court Order, net of costs of collection. The Shareholder New Value Contribution is being provided (or caused to be provided) by the Eletson Members.  For the avoidance of doubt, the Shareholder New Value Contribution represents a new money cash

contribution that has not been generated or procured from the Debtors or their subsidiariescontributions. The Eletson Members have provided the Debtors with proof of funding sufficient to establishfor the cash portion of the Shareholder New Value Contribution on a redacted basis which has been shared with the Committee on an attorneys' eyes-only basis.  The Eletson Members have also executed the Commitment Letter attached to the Disclosure Statement as Exhibit 10 which provides that the Eletson Members will provide the cash portion of the Shareholder New Value Contribution and are subject to the jurisdiction of the Bankruptcy Court for all claims related to the failure to provide the cash portion of the Shareholder New Value Contribution.  These collective commitments and proof of funding have established the Eletson Members' financial wherewithal to fund the cash portion of the Shareholder New Value Contribution and the Eletson Members are prepared to transfer the cash portion of the Shareholder New Value Contribution promptly upon confirmation of the Plan.

The Shareholder New Value Contribution was the result of the Debtors' attempts to secure financing from their historical financiers to fund a potential exit from the Chapter 11 Cases.  As with the Debtors' postpetition financing facility, the Debtors were unable to secure independent third-party financing for several reasons, including the very litigious nature of these Chapter 11 Cases.  With no alternative funding sources available, the Debtors turned to the Eletson Members to determine what funding opportunities were available to pay the Debtors' administrative claims and otherwise provide an exit from the Chapter 11 Cases.

The Debtors and the authorized representatives of the Eletson Members negotiated the initial Shareholder New Value provided in the Original Plan over several months.  At all times during these negotiations the Eletson Members were represented by their independent counsel, Sidley Austin LLP while the Debtors were represented by Reed Smith.  Ultimately, the Debtors and Eletson Members agreed on a Shareholder New Value Contribution of $10 million dollars. This number was approved by the board of directors of Eletson Holdings as well as the appropriate parties of the Eletson Members.  The initial value of $10 million was determined as a number which the Debtors and Eletson Members believed was a fair enterprise valuation, especially given the lack of financial interest from the Debtors' financiers. The number was also determined as a fair valuation that would entice potential financiers. At no time after filing the Original Plan were the Debtors approached by any party regarding alternative financing options or opportunities to purchase equity in the Reorganized Debtor.

Two months after the Original Plan was filed, the Petitioning Creditors filed the PS Plan, which provided for a proposed cash infusion of $27 million to be raised through a rights offering at an implied 50% discount of the Reorganized Debtor's equity value.  Upon confirmation of the PS Plan, Pach Shemen as the purported holder of approximately 57% of the Exchange Notes, would exit the Chapter 11 Cases as the majority holder of the Reorganized Debtor, potentially owning over 80% of the equity of the Reorganized Debtor prior to dilution in the form of a Backstop Premium and Employee Incentive Plan. Notably at the time of filing the PS Plan did not include any valuation analysis of information supporting the Petitioning Creditors' valuation of the Reorganized Debtor.  The Debtors likewise do not agree with the Petitioning Creditors' purported valuation of the Reorganized Debtor set forth in the PS Plan.

Given the market for the enterprise value of Reorganized Holdings established by the PS Plan, the Eletson Members informed the Debtors they were willing to increase the cash portion of the Shareholder New Value Contribution to $30 million, a number they were advised was more in line with the Reorganized Debtors' enterprise value. The increased value of the Shareholder New

Value Contribution would be provided in the same pro rata proportions as the initial $10 million. The Debtors evaluated the proposal with counsel and accepted the offer of the Eletson Members. The Debtors then filed the First Amended Plan which included the increased Shareholder New Value Contribution, but also included additional changes in classification of Exchange Noteholder that the Debtors believed would provide a greater return to the Debtors' legitimate Exchange Noteholders located in Class 5A6A, despite the lower enterprise valuation than the purported valuation of the Petitioning Creditors demonstrated in the PS Plan.

Following the Initial Disclosure Statement Hearing, the Debtors negotiated with the Eletson Members to increase their proposed Shareholder New Value Contribution and such Eletson Members agreed to cause the Gas Ownership Defendants to contribute the Collections Contribution as additional Shareholder New Value Contribution without the proposed settlement. During the negotiations of the Plan, the members of the Board of Directors of the Debtors (appointed by the Eletson Members) directed Reed Smith as counsel to the Debtors. The Board of Directors of the Debtors directed Reed Smith to engage with the Eletson Members on potential solutions to provide the Plan Consideration for the satisfaction of various creditor claims. While certain principals may sit as Directors of the Debtors and as principals of the Eletson Members, each respective role had separate legal counsel who engaged in and were active participants in the negotiations. Those negotiations were, at all times, to identify contribution scenarios which would inure to the benefit of the Debtors' stakeholders.

The Collections Contribution portion of the Shareholder New Value Contribution is predicated on the Gas Ownership Defendants' ability to collect the outstanding Arbitration Award from Levona and its alter egos, namely Pach Shemen and Murchinson. The Debtors believe that Levona, together with its alter egos, have sufficient collectible assets to satisfy the Arbitration Award. To collect against Pach Shemen and Murchinson, the Gas Ownership Defendants may need to establish that Pach Shemen and Murchinson are alter egos of Levona in a separate proceeding. However, the Debtors believe that the Arbitrators' findings that Levona, Pach Shemen and Murchinson are alter egos for all relevant purposes of the Arbitration Award and the harmful actions taken by Levona, was binding on all parties. To the extent persons argue that the District Court Order vacated the Arbitrator's findings as applied to Pach Shemen and Murchinson, the District Court Order exceeded the District Court's jurisdiction. Therefore, the Debtors reasonably believe that the Gas Ownership Defendants will be able to proceed against all of the Murchinson Entities and ultimately have the ability to collect the full amount of the Arbitration Award.

10.   Motion to Compel Mediation

As set forth in greater detail below on January 29, 2024, the Petitioning Creditors filed the Exclusivity Motion (as defined below) seeking to terminate the Debtors' exclusive period for soliciting the Original Plan and on February 7, 2024, the Committee filed the Committee Trustee Motion (defined below) seeking the appointment of a Chapter 11 trustee for the administration of the Debtors' estates. In response to these motions, on February 12, 2024, and February 13, 2024 the Debtors inquired with the Petitioning Creditors and the Committee on their willingness to enter into a consensual mediation for the purpose of negotiating a global settlement and resolution to these Chapter 11 Cases (the "Mediation"). On February 13, 2024, the Debtors filed the *Debtors' Motion to Compel Mediation Regarding Competing Plan and Plan Procedures* [Dkt. No. 412] (the "Mediation Motion"). The Petitioning Creditors and Committee filed letters [Dkt. Nos. 413-14]

- 44 -

noting their reservations and concerns regarding the Mediation and the Mediation Motion but did not file formal objections to the Mediation Motion.

Despite all parties being in agreement that the Mediation represented a path to a potential consensual resolution of these Chapter 11 Cases, several open items remained unresolved, namely the selection of the mediator, the parties that would participate in the Mediation, the timing of the Mediation and the funding of the mediation. After several rounds of negotiations, on March 13, 2024, a consensual order [Dkt. No. 471] approving the Mediation was entered by the Bankruptcy Court (the "Mediation Order").

11.   Postpetition Financing and the DIP Motion

As the Debtors have no employees, operations or cash flows, the only significant administrative costs that are accruing in these Chapter 11 Cases are professional fees. After the Conversion Date, the Debtors planned to address outstanding administrative expenses as part of confirmation of a Chapter 11 plan of reorganization. Upon the filing of the Interim Compensation Motion, the Debtors began to take steps to secure postpetition financing to address the potential immediacy for liquidity. The Debtors undertook a two-prong approach. The Debtors first evaluated the possibility of forcing a dividend from the SMEs to address the Debtors' liquidity needs. The Bareboat Charters contain several restrictions that prevent the SMEs from sharing earnings and providing financial assistance to affiliated entities, thus any dividend that would be provided to the Debtors could only be issued with the consent of Oaktree, the financier of the SMEs. At the same time the Debtors were undertaking a search for a lender willing to provide the Debtors with a postpetition financing facility.

The Debtors were unable to secure postpetition financing by the time the Interim Compensation Order (defined below) was entered. On February 22, 2024 certain portions of Dechert LLP ("Dechert") and FTI Consulting Inc.'s ("FTI") fees and expenses for services provided to the Committee became due and were to be paid "promptly" pursuant to the Interim Compensation Order. Notably the term "promptly" is not defined. On March 5, 2024, the Debtors filed a letter with the Bankruptcy Court [Dkt. No. 451] informing the Bankruptcy Court of the Debtors' liquidity issues and the Debtors' efforts to secure postpetition financing.

Shortly thereafter the Debtors received a proposal from affiliate EMC Gas Corporation. EMC Gas Corporation offered the Debtors a financing facility consisting of a $4 million two draw term loan secured by all of the Debtors' assets (the "Original DIP Facility").

On March 7, 2024, the Debtors filed a motion [Dkt. No. 458] seeking court approval of the Original DIP Facility (the "DIP Motion"). On March 8, 2024, the Original Petitioning Creditors shared, for the first time, a competing postpetition financing facility with the Debtors (the "PC DIP Facility"). The PC DIP Facility provided for a $10 million term loan at a one percent (1%) interest rate and three percent (3%) default rate with no associated fees on an unsecured basis. The Debtors engaged in discussions with the Original Petitioning Creditors regarding the PC DIP Facility, including proof of funds given the Original Petitioning Creditors' status as assetless special purpose vehicles.

On March 14, 2024, EMC Gas Corporation provided the Debtors with an amended DIP facility proposal (the "Amended DIP Facility") on economically identical terms as the PC DIP Facility, save for the event of default in the event of the appointment of a Chapter 11 trustee over the Debtors' estates. As the Amended DIP Facility mirrored the economic terms of the best offer

- 45 -

for postpetition financing received by the Debtors in the open market, the Debtors believe that the terms of the Amended DIP Facility, which were negotiated by principals of the Debtors and EMC Gas Corporation in their corporate offices, are entirely fair.  The Debtors have determined in their reasonable business judgment that they will enter into the Amended DIP Facility if the Debtors ultimately need postpetition financing.

The Debtors do not currently need to enter into the Amended DIP Facility. As the Debtors were negotiating the various postpetition financing facilities the Debtors received an email from Oaktree which the Debtors believe provided the Debtors with consent to force a dividend from the SMEs to fund the Debtors' liquidity needs.  On March 17, 2024, the Debtors informed the Bankruptcy Court and Committee Professionals that they had secured the requisite funding to address outstanding administrative expenses in compliance with the Interim Compensation Order. On March 18, 2024, the Debtors caused outstanding professional fees to be paid by EMC Investment Corp., the treasury agent entity for the Eletson enterprise from SME funds on behalf of Eletson Holdings in accordance with the consent provided by Oaktree.  Since March 18, 2024, the Debtors have remained in compliance with the terms of the Interim Compensation Order and have made all required payments of professional fees.

Notwithstanding the foregoing, the hearing for approval of the DIP Motion, which will be amended to reflect the terms of the Amended DIP Facility, is still pending and has been scheduled to be heard on June 18, 2024.  As the Debtors' current liquidity is predicated on consent from third-party Oaktree, the Debtors must be prepared to continue to fund these Chapter 11 Cases in the event Oaktree's consent is withdrawn.

B.    Appointment of the Committee and the Committee Filings

On October 20, 2023, the Office of the United States Trustee appointed an The Official Committee of Unsecured Creditors (the "Committee") [Dkt. No. 233].  The following creditors were appointed to the Committee:

(a)    Gene B. Goldstein
(b)    Aegean Baltic Bank S.A.; and
(c)    Wilmington Savings Fund Society, FSB, as Exchange Note Trustee.

1.    Applications for appointment of Committee Professionals

a.    Dechert Retention Application

On November 20, 2023, the Committee filed the *Application of the Official Committee of Unsecured Creditors of Eletson Holdings Inc., Et Al. for an Order Authorizing the Employment and Retention of Dechert LLP as Counsel, Effective as of October 25, 2023* [Dkt. No. 273] seeking to retain Dechert as Committee counsel.

Given On January 5, 2024, the Bankruptcy Court entered an order [Dkt. No. 351] authorizing the retention of Dechert as counsel to the Committee over the outstanding objection of a creditor of the Debtors' estates.

b.    FTI Retention Application

- 46 -

On January 4, 2024, the Committee filed the *Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of December 8, 2023* [Dkt. No. 349] (the "FTI Application"). Pursuant to the FTI Application, FTI was to be retained by the Committee for the purpose of, among other things: (i) assisting the Committee in the review of the Schedules and SOFAs and Monthly Operating Reports, (ii) assistance with the assessment and monitoring of the Debtors' short term cash flow, liquidity and operating results, and (iii) assistance with the review of the Debtors' potential disposition or liquidation of both core and non-core assets. Notably, the FTI Application provided for no cap on spending and did not otherwise include any estimates as to the potential costs to the Debtors' Estates incurred during of FTI's retention.

On January 26, 2024, the Bankruptcy Court approved the retention of FTI as financial advisor to the Committee.

2.    Motion to Modify Previous Order Granting Relief from the Automatic Stay

On November 16, 2023, the Committee filed the *Motion of the Official Committee of Unsecured Creditors to Modify the Court's Prior Order Granting Relief from the Automatic Stay* [Dkt. No. 239] (the "Modification Motion") seeking to modify the Bankruptcy Court's previous Stipulated Lift Stay Order which permitted the Arbitration to proceed in light of the automatic stay imposed by the Chapter 7 Cases.

On November 27, 2023, the Debtors filed their opposition to the Modification Motion [Dkt. No. 286] challenging the propriety of the relief sought in the Modification Motion noting, among other things, d that limiting the scope of the Final Award would cause significant harm to the Debtors, their Estates and their creditors.

On December 1, 2023, the Committee filed a reply in support of the Modification Motion [Dkt. No. 302]. Notwithstanding the additional arguments raised, on January 4, 2024, the Bankruptcy Court issued a memorandum opinion and order [Dkt. No. 348] denying the Modification Motion.

3.    Interim Compensation Motion

On January 11, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 353] (the "Interim Compensation Motion") seeking modification of the compensation procedures set forth in the Bankruptcy Code.

On January 18, 2024, the Debtors filed the *Objection to Motion of the Official Committee of Unsecured Creditors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Dkt. No. 357] ("Interim Compensation Objection") requesting that the Bankruptcy Court reject the Committee's proposed interim compensation procedures as the Debtors believed it to be unnecessary in these Chapter 11 Cases and contrary to the explicit terms of the Bankruptcy Code.

On January 22, 2024, the Committee filed a reply to the Interim Compensation Objection [Dkt. No. 364] asserting the interim compensation procedures were necessary in the Chapter 11

Cases. On February 7, 2024, the Bankruptcy Court entered an order [Dkt. No. 398] approving the Interim Compensation Motion.

      C.      <u>Trustee Motions, Mediation, Evidentiary Hearing and Exclusivity Motion</u>

      i.      <u>The Trustee Motions</u>

On February 7, 2024, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Appointing a Chapter 11 Trustee* [Dkt. No. 394] (the "<u>Committee Trustee Motion</u>"). The Committee Trustee Motion sought the appointment of a Chapter 11 trustee over the Debtors' estates pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code. Among other things, the Committee asserted that the Debtors were not acting as responsible fiduciaries for their estates and that the appointment of a trustee would be in the best interest of creditors. The Committee Trustee Motion was set to be heard on February 21, 2024. The Committee Trustee Motion was formally joined by Deutsche Bank Trust Company Americas as Trustee and Collateral Agent for holders of 9.265% First Preferred Ship Mortgage Notes due 2022 ("<u>Deutsche Bank</u>") [Dkt. No. 404], the Exchange Notes Trustee [Dkt. No. 420] and the Petitioning Creditors [Dkt. No. 491], and informally joined by Sunrise I NPL Finance DAC [Dkt. No. 476].

On February 9, 2024, the District Court entered the District Court Order confirming and vacating the Final Award in part. Given the significant impact of the District Court Order to the Chapter 11 Cases, by letter dated the same day, the Debtors requested an adjournment of the pending hearing on the Exclusivity Motion and Committee Trustee Motion. On February 12, 2024, the Bankruptcy Court ordered an adjournment of the February 21, 2024 hearing, with a status conference set for February 27, 2024 [Dkt. No. 405].

On February 13, 2024, the Debtors filed the Mediation Motion. On the same day the Petitioning Creditors and Committee filed letters asserting that the Debtors were attempting to use the Mediation as a delay tactic.

On February 16, 2024, the United States Trustee filed the *United States Trustee's Motion to Appoint a Chapter 11 Trustee* [Dkt. No. 424] (the "<u>UST Trustee Motion</u>") seeking appointment of a Chapter 11 trustee for the administration of the Debtors' estates. The UST Trustee Motion did not seek appointment of a Chapter 11 trustee for cause or as a result of any action or omission taken by the Debtors. Instead, the UST Trustee Motion asserted that the acrimony between the Debtors and the Committee and Petitioning Creditors had reached a point warranting appointment of a trustee. The UST Trustee Motion was not joined by any parties.

On February 27, 2024, the Bankruptcy Court held a status hearing (the "<u>Status Hearing</u>"), which among other things, set April 9, 2024, as the start of the evidentiary hearing on the relief sought in the Exclusivity Motion, Committee Trustee Motion and UST Trustee Motion.

On March 11, 2024, the Petitioning Creditors filed the *Petitioning Creditors' Emergency Motion to Appoint a Trustee* [Dkt. No. 468] (the "<u>Emergency Trustee Motion</u>" and together with the Committee Trustee Motion the "<u>Trustee Motions</u>") seeking appointment of a Chapter 11 trustee over the administration of the Debtors' estates pursuant to sections 1104(a)(1) and (a)(2) of the Bankruptcy Code. Among other things, the Petitioning Creditors asserted that the Debtors were not acting as responsible fiduciaries for their estates as a result of the insider postpetition financing facility sought in the DIP Motion, and that if the DIP Motion were not approved the Debtors would

be administratively insolvent which would constitute sufficient cause for the appointment of a trustee and that the appointment of a trustee would be in the best interest of creditors. The Petitioning Creditors sought to have the Emergency Trustee Motion heard on an expedited basis, but such relief was denied by the Bankruptcy Court.

On March 22, 2024, the Debtors filed objections to the UST Trustee Motion [Dkt. No. 512] and the Trustee Motions (including those joinders filed thereto) [Dkt. No. 513]. Additionally, a majority of the Debtors' shareholders (the "Shareholders"), represented by separate counsel also filed objections to the Trustee Motions and the UST Trustee Motion [Dkt. No. 518].

On April 2, 2024, the United States Trustee, Petitioning Creditors and Committee each filed a reply in support of their motion for the appointment of a Chapter 11 trustee.

### ii.   The Mediation

Prior to the Evidentiary Hearing the Mediation was held pursuant to the Mediation Order. Pursuant to the Mediation Order, the Mediation participants included: (a) the Debtors; (b) the Petitioning Creditors; (c) Committee; (d) the Shareholders; (e) Levona; (f) Exchange Note Trustee; (g) Eletson Corp.; and (h) Eletson Gas (collectively, the "Mediation Parties"). The Mediation was in respect to all claims, issues and disputes arising between the Mediation Parties related to the (i) Original Plan, Original Disclosure Statement and Solicitation Motion, (ii) the Trustee Motions, (iv) the UST Trustee Motion, (v) the Arbitration Award entered against Levona, (vi) the Debtors' objections to the Claims of the Original Petitioning Creditors and the claims of the Exchange Notes Trustee, and (vii) such other matters as so designated.

The Mediation was held on March 27 and continued thereafter. Pursuant to the Mediation, various settlement proposals were presented and evaluated by the Mediation Parties. Notably, the Mediator stated that the parties were in agreement on most issues. Notwithstanding this, ultimately the Mediation did not result in a global settlement and the Mediation Parties proceeded to the Evidentiary Hearing.

### iii.   The Evidentiary Hearing

On April 9, 2024, the Evidentiary Hearing was held before the Bankruptcy Court on the Trustee Motions and the UST Trustee Motion. Direct witness testimony was submitted to the Bankruptcy Court by declaration. The Evidentiary Hearing lasted three days and concluded on April 11, 2024. The first day of the Evidentiary Hearing consisted of opening statements of the five parties participating in the evidentiary hearing: the Debtors, the Shareholders, the Committee, the Petitioning Creditors and the United States Trustee.

The second day consisted of cross examination of witnesses. The United States Trustee presented no witnesses. The Petitioning Creditors and Committee presented three witnesses: Michael Cordasco the principal of FTI for these Chapter 11 Cases, Jeff Drake a consultant hired by FTI and Cynthia Romano a senior managing director at FTI (collectively the "Movant Witnesses"). Each of the Movant Witnesses were cross examined by the Debtors and the Shareholders. Upon cross examination, the Debtors believe that the Movant Witnesses conceded they were not familiar with the Debtors' financial status, the Debtors' placement within the shipping industry, the Debtors' business history or needs or the Debtors' management history and successes. Further, on cross examination the Movant Witnesses stated that they had no evidence of (i) any value leakage from the Debtors, (ii) any business conduct that warranted replacement of

the Debtors' current management, or (iii) any postpetition infirmities with the Debtors' business operations. Further the Movant Witnesses confirmed that the Debtors had provided the Committee with a general ledger of all of the Debtors' transactions.

The Debtors presented five witnesses: Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Laskarina Karastamati, Marina Orfanoudaki and Nikolaos Veraros (collectively the "Debtor Witnesses"). Each of the Debtor Witnesses resides in Greece and traveled to New York to attend the Evidentiary Hearing. Despite asserting the Debtor Witnesses had perpetrated a fraud on the Bankruptcy Court and notwithstanding the fact the Petitioning Creditors and the Committee demanded physical presence for the submission of witness declaration, the Petitioning Creditors and the Committee refused to cross examine the Debtor Witnesses.

The third day of the Evidentiary Hearing consisted of closing statements. Following the conclusion of the Evidentiary Hearing, on April 18, 2024, each of the Debtors, Shareholders, Petitioning Creditors, Committee and United States Trustee submitted post-trial briefing in support of their positions. See Dkt. Nos. [594, 595, 596, 597, 598].

~~As of the date hereof, no ruling has been issued on the Trustee Motions or the UST Trustee Motion.~~

On May 29, 2024 the Bankruptcy Court entered an order [Dkt. No. 721] denying the relief sought in the Trustee Motions and finding that there was insufficient cause to appoint a chapter 11 trustee and that appointment of a chapter 11 trustee was not in the best interest of the Debtors' estates and the parties in interest in these Chapter 11 Cases, and that appointment of a trustee at this time would cause significant delay in and harm the Debtors' enterprise value and creditors by extension.

### iv.   The Exclusivity Motion

On January 29, 2024, the Petitioning Creditors filed the *Motion of the Petitioning Creditors to Terminate the Debtors' Exclusivity Period* [Dkt. No. 384] (the "Exclusivity Motion") seeking to terminate the remainder of the Debtors' exclusive period to solicit the Original Plan, which period would end on March 25, 2024. Pursuant to the Exclusivity Motion, the Petitioning Creditors asserted that they "stand ready to immediately file and fund a value maximizing plan…" that purportedly provided for meaningfully higher recoveries. The Exclusivity Motion was set to be heard on February 21, 2024. The Exclusivity Motion was subsequently joined by the Exchange Note Trustee [Dkt No. 419] and supported by the Committee [Dkt. No. 473]. At the Status Conference the Bankruptcy Court provided that the Exclusivity Motion was to be heard at the Evidentiary Hearing. However, the Debtors made the decision not to seek an extension of their exclusivity period (rendering the Exclusivity Motion moot) to allow the Petitioning Creditors to file their competing plan as a clear and efficient way to adequately market the Shareholder New Value Contribution in the Plan in accordance with Supreme Court precedent. Allowing the competing plan represented a substantial cost saving to the Debtors' estates allowing the market to directly speak on value, rather than engaging a costly advisor to contrive a marketing process which would prevent parties with an interest in the estate from actively participating. The Bankruptcy Court noted that the expiration of exclusivity has facilitated a market testing of the Plan See [Dkt. No. 721] at pgs. 43;48;52.

### D.   The Petitioning Creditor Plan and Disclosure Statement

On March 26, 2024, the Petitioning Creditors filed the *Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [Dkt. No. 531] (the "PS Plan") and *Disclosure Statement in Support of Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [Dkt. No. 532] (the "~~PC~~PS Disclosure Statement").   The PS Plan mirrors the Original Plan in many material respects. Recoveries to parties under the PS Plan will be funded by a rights offering back stopped by Pach Shemen.   Pursuant to PS Plan, General Unsecured Creditors and holders of Corp Guarantee Claims, (each as defined in the PS Plan) will be entitled to a selection of either pro rata cash from a $12,500,000 pool or pro rata distribution of equity of the Reorganized Debtor (each as defined in the PS Plan) as well as a right to participate in a rights offering for up to 68% of the remaining equity value of the Reorganized Debtor. Holders of Convenience Claims (as defined in the PS Plan) will receive payment equal to 10% of their claim up to an aggregate $1,000,000 between all Convenience Claims. Azure Guaranty Claims will receive a pro rata distribution of a $200,000 cash pool. Pach Shemen will be provided a Backstop Premium (as defined in the PS Plan) of 10% of the equity of the Reorganized Debtor effectively ensuring that it will control the Reorganized Debtor. The ~~PC~~PS Disclosure Statement is riddled with factual inaccuracies regarding the Debtors' management of these cases and the prepetition period.   As set forth in the Debtors' objections to the Trustee Motions, the Debtors' directors have at all times, both prior to and during the Chapter 7 Cases and Chapter 11 Cases, been responsible and prudent directors and have acted in the best interest of the Debtors and their legitimate creditors.

On May 10, 2024, the Petitioning Creditors filed the *Notice of Filing of (1) Anticipated Modifications to the Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and Its Affiliated Debtors and (2) Certain Appendices Related to the Petitioning Creditors' Disclosure Statement Related Thereto* [Dkt. No. 658] (the "~~PC~~PS DS Notice"). Pursuant to the ~~PC~~PS DS Notice, the Petitioning Creditors ~~suggest they anticipate amending~~amended the PS Plan to reduce the subscription rights of the rights offering and ~~purport~~ to increase payments to General Unsecured Creditors~~,~~ and Convenience Class creditors~~ and Holders of Corp. Guaranty Claims~~.  The PS Plan as amended also modified the classification system used by the previous version of the PS Plan.

At the Initial Disclosure Statement Hearing the Bankruptcy Court indicated an intention to conditionally approve the PS Disclosure Statement as amended.  Notwithstanding this intention the Bankruptcy Court did not authorize the solicitation of the PS Plan.  Rather, the Bankruptcy Court directed the Debtors to modify the previous iteration of the Plan to address the comments provided on the record and file a new Plan, and directed the Debtors and Petitioning Creditors to discuss the procedures for the joint solicitation of the Plan and the PS Plan.

## VII.   ORDERLY DISTRIBUTION OF ASSETS

The purpose of these Chapter 11 Cases is to effectuate an orderly disposition of the assets of the Debtors to holders of Allowed Claims.  Accordingly, in consultation with their advisors and the Independent Committee, the Debtors formulated and implemented a strategy to identify and transfer certain potential and actual causes of action owned by the Debtors to a Litigation Trust for the pursuit and/or settlement and ultimate liquidation of said causes of action for distribution to the Debtors' noteholders. In addition to the transfer of causes of action, the members of Debtor Eletson Holdings will provide, or cause to be provided, a cash contribution in the amount of $30 million and rights to 75% of all net cash recoveries against Levona for payment of allowed

administrative expenses, distributions to the Debtors' remaining creditors, and funding of the Litigation Trust created to pursue the causes of action transferred to the Litigation Trust.  The results of such strategy are discussed below.

Eletson Holdings is a holding company.  The Debtors historically have not held cash or other liquid assets and their value has historically been derived from the equity interests of their subsidiaries. The Reorganized Debtor will remain a holding company after confirmation of the Plan and will not have future "operations" that require liquidity.  Cash from the Shareholder New Value Contribution is sufficient capitalization to satisfy all Chapter 11 related administrative claims and all pre-Effective Date claims treated through the Plan. Additional capitalization at the Reorganized Debtor is not required.  ~~While the Plan does contemplate the reinstatement of certain guaranty claims, the treatment of the other pre-Effective Date liabilities through the Plan will allow the Reorganized Debtor to re-focus on the operations and management of the subsidiaries to ensure operational efficiencies separate from the historic Eletson Holdings company liabilities.  Such subsidiary level focus – without additional Eletson Holdings liabilities – will ensure Reorganized Debtors' management ability to strengthens those subsidiary operations for the subsidiary stakeholders and satisfy such subsidiary creditors without the need to resort to the collection of the Reorganized Debtors' guaranty obligations.  The reinstatement of these guaranty obligations is a means to assure the subsidiary's creditors of their subsidiaries' operational strength.~~

All distributions made pursuant to the Plan will be derived from the Plan Consideration. The Plan Consideration consists of four sources of consideration:

> • The Shareholder New Value Contribution, which is comprised of a $30 million contribution of cash and cash equivalents, and the Collection Contributions, which consists of approximately seventy-five percent (75%) of the Gas Ownership Defendants' collections against Levona as a result of the Arbitration and the District Court Order net the costs of collection;

> • The SME Revenue, which is comprised of any excess cash on hand of each of the SMEs existing as of the Effective Date after subtracting therefrom (i) any amounts, as necessary to satisfy the projected operating expenses of the SMEs not otherwise reasonably expected to be satisfied by anticipated revenues of the SMEs (on a consolidated basis) through the SME Revenue Period; and (ii) $250,000 (on a consolidated basis); and

> • The Excess SME Proceeds which consist of future cash contributions of the Reorganized Debtor to the Litigation Trust during the Excess SME Proceeds Period of the aggregate of (i) 20% the consolidated excess cash flow (calculated on a semi-annual basis) of the consolidated operating revenues of the SMEs less the consolidated operating expenses and debt service for the previous six month period and (ii) 25% of the Excess SME Sale Proceeds, which are the gross proceeds from the sale of any SME and/or SME Vessel less said SME's existing debt (including any unpaid obligations under the terms of the applicable bareboat charter and any trade obligations applicable to the operation of such SME Vessel which were

incurred but not paid prior to the sale closing date); *provided however*, the aggregate Excess SME Proceeds shall not exceed $10 million.

• The Retained Causes of Action Contribution which consists of 75% of the net cash recoveries on account of Retained Causes of Action, where "net cash recoveries" means cash actually collected under any Retained Causes of Action net of costs of collection incurred by the Reorganized Debtor and net of any amounts setoff by the Reorganized Debtor for amounts owed to any defendant under a Retained Cause of Action.

The distributions a Creditor will receive pursuant to the Plan are dependent on the Class said Creditor is placed into. The Plan groups substantially similar claims and was established to ensure that parties with similar claims were adequately represented. The Petitioning Creditors' classifications in the PS Plan closely mirror those of the Debtors.

The Debtors classified guaranty classes separately given the differences in the underlying obligations of the guaranty classes. The Debtors believe that this classification is reasonable given the nature of the different claims against different legal subsidiaries. Likewise, the Debtors believe that categorizing the OCM Guaranty Claims and the Corp Guaranty Claims separately – but nonetheless providing them the same treatment is not an impropriety.

While the Plan contemplates the reinstatement of these guaranty claims, the Debtors fully expect that the direct creditor subsidiaries have sufficient financial wherewithal to adequately address their direct obligations and do not foresee any significant liability to the Reorganized Debtor on account of such guaranty liability. Nonetheless, as set forth in the Valuation Analysis, the Debtors estimate the enterprise value of the Reorganized Debtor will be approximately $30 million. Given this enterprise value, the Reorganized Debtor will be able to sufficiently address any post-Effective Date guaranty liability.

Trade Creditors and Holders of Azure Guaranty Claims will receive payment on account of their Allowed Claims from the Shareholder New Value Contribution.

Trade Creditors are disclosed onin the Debtors' Schedules of Assets and Liabilities (See Schedule E/F [Dkt. Nos. 216, 218, 220]) as those claims who are listed as not disputed or contingent. The Debtors created the Trade Creditor Class as a "convenience" class to ensure all creditors were adequately represented and provides a mechanism for other Creditors to receive an immediate cash payout rather than deal with Litigation Trust Interests. Notably, in the possibility that it is later determined that there are no Trade Creditors, the Plan provides for the elimination of Vacant Classes and the Trade Creditor Reserve will become Distributable Cash transferred to the Litigation Trust.

The only significant difference in classifications between the Plan and the PS Plan is the separation of Class 5A (Non-Petitioning Creditor Exchange Note Claims) and 5B (Petitioning Creditor Exchange Note Claims). TheClass 6B consists solely of the Claims of Levona, Pach Shemen, Alpine Partners and VR Global. As stated herein in Article IV generally, and for the reasons asserted in the various claim objections provided in Article IV.A.4, the Debtors believe that the claims of members of Class 5B6B are illegitimate, and otherwise were procured in bad

faith and therefore should be equitably subordinated.  As a result, rather than dilute the distributions of legitimate creditors, the Debtors believed it was in the best interest of all parties to bifurcate the class.  Further, in the event the Class ~~5B~~6B claims are Allowed and not subordinated, they will be treated identically with Class ~~5A~~6A claims.

Distributions to Class ~~5A~~6A and potentially Class ~~5B~~6B will be made through the Litigation Trust.  The Litigation Trust will be funded by the (i) ~~the~~ Distributable Cash, (ii) ~~the~~Collection Contributions, (iii) Excess SME Proceeds and (iv) Litigation Trust Causes of Action ~~and (iii) the Gas Ownership Claim Settlement~~collectively.

The purpose of the Litigation Trust is to pursue the Litigation Trust Causes of Action and to make distributions to Holders of Allowed ~~Exchange Noteholder~~Class 6 Claims that elect to receive their pro rata share of Litigation Trust Interests in lieu of the ~~Exchange Note~~Noteholder Election Recovery.  The Litigation Trust will pursue the Litigation Trust Causes of Action for the recovery of value that will ultimately be distributed to Litigation Trust Beneficiaries.  Notably, the Litigation Trust Trustee will control the decisions regarding the timing of distributions, as well as the determination of which portions of the Litigation Trust Assets will be used to pursue the Litigation Trust Causes of Action, and which portions will be used to make the distributions to applicable Class 6 Creditors.

The Debtors' Board of Directors undertook an evaluation of the potential Causes of Action known to exist during the Plan formulation period and evaluated which claims would be transferred to the Litigation Trust. In selecting the Causes of Action to be transferred, the Debtors selected Causes of Action that they believe closely align to the circumstances of these Chapter 11 Cases, as well as Causes of Action that parties of interest, namely the Committee and Petitioning Creditors, have asserted the Debtors should have pursued.  The Debtors abided by the creditors' request in determining which Causes of Action would be transferred to the Litigation Trust and become Litigation Trust Causes of Action.  The Debtors believe all the Litigation Trust Causes of Action transferred have meaningful value.  In fact, the Debtors have even taken steps to negotiate and evidence a settlement of the claims against the Eletson Gas Defendants – which the Debtors believe are subject to substantial defenses and are meritless and have no value.  Notably, the Litigation Trust Causes of Action are generally grouped by category and not individual claims thereby creating a broad class of Litigation Trust Causes of Action.  The Debtors understand that the Unknown Causes of Action may exist and have created an affirmative duty under the Plan to notify the Litigation Trust upon the discovery of an Unknown Cause of Action.  Further the Bankruptcy Court will retain jurisdiction to determine if any Unknown Cause of Action should be held by the Reorganized Debtor or the Litigation Trust, ensuring a neutral determination is made regarding the ownership of such Unknown Cause of Action.

The Litigation Trust will pursue the Litigation Trust Causes of Action in accordance with the terms of Litigation Trust Agreement.  The Litigation Trust is subject to the Administrative Budget and will use the Administrative Fund to pursue the Litigation Trust Causes of Action. The Debtors believe in their reasonable business judgment that the proposed $100,000 Administrative Fund for the prosecution of Litigation Trust Causes of Action is sufficient to initiate litigation against the counterparties in the Litigation Trust Causes of Action. Further the Administrative Budget (which includes the Administrative Fund) is to be determined with the input of the Committee who will be appointing the Litigation Trust Trustee.  Therefore, the Debtors believe

that the Administrative Budget ultimately determined will be sufficient to ensure adequate operation of the Litigation Trust and provide funding additional funding of the Administrative Fund as necessary. As the Litigation Trust Causes of Action will be transferred with the Litigation Trust Privileges, the Debtors believe that a significant amount of the evaluation and work to bring the Litigation Trust Causes of Action has already been undertaken, and there will not be significant additional costs necessary in preparing the Litigation Trust Causes of Action to be pursued by the Litigation Trust.

## VIII.  THE PLAN

A.  <u>Overview of Chapter 11</u>

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan is the principal objective of a Chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order satisfies any debt of the debtor that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes. A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan shall classify the claims of a debtor's creditors and equity interest holders. In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class. The Debtors also are required under section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes. The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code, but it is possible that a Holder of a Claim or Interest may challenge the classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, the Debtors intend, to the extent permitted by the Bankruptcy Court and the Plan,

to make such reasonable modifications of the classifications under the Plan to permit Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the reconstituted Class or Classes of which the accepting Holder is ultimately deemed to be a member.  Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

THE REMAINDER OF THIS ARTICLE PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL, TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS, THE DEBTORS' ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

B.      Purpose of the Plan

The purpose of the Plan is to ~~reorganize~~satisfy the Debtors' outstanding obligations through the distribution of (i) a new money contribution provided by the Eletson Holdings Members; (ii) a sharing of the excess cash flow and excess sale proceeds from the SMEs which will be owned by the Reorganized Debtor and (iii) the liquidation and distribution of the proceeds of valuable Causes of Action belonging to the Debtors ~~and distributing a new money contribution provided by the Eletson Holdings Members. The Plan provides for transfer of certain of the Debtors' causes of action to a Litigation Trust that is established in accordance with the terms of the Plan and the Litigation Trust Agreement.  The Litigation Trust will be managed by the Litigation Trust Trustee who, subject to the oversight of the Litigation Trust Oversight Committee, will initiate, pursue, and otherwise liquidate the value of the Litigation Trust Causes of Action for the benefit of Holders of Claims in Class 5A who elect to receive Litigation Trust Interests in lieu of the Exchange Note Recovery and Holders of Claims in Class 5B~~.  After payment of Administrative Expenses and funding of the reserves called for in the Plan, the Debtors' remaining

creditors entitled to recovery under the Plan will receive their applicable distribution from the ~~Shareholder New Value Contribution, a $30 million contribution of Cash and cash equivalents provided by or caused to be provided by the Eletson Holdings Members, or~~Plan Consideration as set forth above.   One of the additional components of the Debtors' plan is the transfer of certain of the Debtors' causes of action to a Litigation Trust established in accordance with the Plan.  The Litigation Trust will be managed by the Litigation Trust ~~Assets which include~~Trustee who will have two primary roles. First, the Litigation Trustee will ensure disbursement of cash accumulated or contributed to the Litigation Trust from the Distributable Cash (i.e., remaining cash from the Shareholder New Value Contribution ~~as well as the SME Revenue for distribution to Creditors. These amounts are further supplemented by the proceeds from the Gas Claims Settlement which will provide additional cash to the Litigation Trust.   The Debtors believe that the Plan provides the best and most prompt possible recovery to Holders of Claims and will result in materially greater recoveries compared to the PS Plan.  The Debtors anticipate approximately $15 million in Distributable Cash being provided to the Litigation Trust.  The Litigation Trust Trustee may then use this Cash to effect distributions to Creditors, and/or in the pursuit~~(not otherwise spent in making reserves/effective date payments) and from excess cash on hand at the SMEs) and from future amounts contributed through the sharing of excess cash flows and sale proceeds related to the SMEs or the SME Vessels from the Reorganized Debtor.  The Litigation Trust will also disburse the Collections Contribution from litigation against Levona.  In addition, the Litigation Trust, subject to the oversight of the Litigation Trust Oversight Committee, may initiate, pursue, and otherwise liquidate the value of the Litigation Trust Causes of Action.~~  Such collections - together with the Gas Claims Settlement - likely result in additional Cash or assets being recovered by the~~ for the benefit of Holders of Claims in Class 6A who elect to receive Litigation Trust ~~for further distributions to Creditors.  The Debtors believe that the payments provided for under the Plan are in the best interest of the Debtors' creditors.  Even though a portion of the value distributed to creditors comes from Gas Claims Settlement and favorable collection of other Litigation Trust Causes of Action, such amounts are substantially more tangible than the speculative nature of future equity interests in a reorganized debtor under the PS Plan.  The Debtors believe that the Plan will ultimately provide a greater Cash Recovery to Creditors than the PS Plan.~~Interests.

The Debtors' Plan has a number of features which benefit the Holders of Class 6A Claims (i.e., certain Old Noteholders and Exchange Noteholders).  First, the Plan contemplates the subordination of the Holders of Claims in Class 6B for their bad acts which damaged the Debtors and their affiliates.  Second, the Plan permits holders of Class 6A to elect to be treated in Class 5 receive a "cash out option" through the "Noteholder Election Recovery" (which is a one-time payment, allowing creditors who are not interested in a longer collection period to receive an immediate distribution on the Effective Date).

For those Class 6A creditors electing to receive Litigation Trust Units, the Debtor's Plan provides a substantial, immediate cash recovery and the potential for substantial additional recoveries in the future.  First, the Debtors anticipate approximately $8.2 million in Cash to be provided to the Litigation Trust on the Effective Date which will result in an immediate cash distribution.  Second, because of the sharing of the Excess SME Proceeds on a bi-annual basis, additional recoveries from future operations of the SMEs is being provided to the holders of Class 6A Claims.  The Debtors anticipate approximately $10 million in additional Cash to be provided to the Litigation Trust after Effective Date which will result in additional cash distributions.  The Debtors have confidence in the expected contributions from the Excess SME Proceeds because, as

the strong operational stewards of the SMEs, historical confidence they have from the customers and stakeholders, and the strength of their projections, the Excess SME Revenues pose a real and substantial additional recovery to Class 6A creditors.  Third, the Debtors expect that a substantial sharing from Collections Contributions because the Debtors estimate the expected value of the Final Award to be in excess of approximately $90 million, which, if realized, and net of collection and awarded-legal expenses and required set-offs, could provide creditors in excess of an additional $50 million.  Fourth, and finally, the Litigation Trust Trustee may pursue and collect on account of any of the Litigation Trust Causes of Action.

For purposes of this Disclosure Statement, the term Holder refers to the holder of a Claim or Interest in a particular Class under the Plan.  If the Plan is confirmed by the Bankruptcy Court and consummated, on the Effective Date or as soon as practicable thereafter, the Debtors will make distributions in respect of certain Classes of Claims as provided in the Plan.

The cash portion of the Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims and the Committee Professional Fee Claims including the funding any reserves on account of the Professional Fee Claims required by the terms of ~~this~~the Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Trade Creditor Claim Reserve; and *fifth*, to fund the ~~Exchange Note~~Noteholder Election Recovery Reserve.  All remaining cash portions of the Shareholder New Value Contribution shall be deemed Distributable Cash.

C.    Classification and Treatment of Claims

1.    Classification and Treatment of Claims and Interests

a.    Unclassified Claims

As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for the purposes of voting or receiving distributions under the Plan.  Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article II.B of the Plan.

i.    Administrative Claims (other than Professional Fee Claims or Committee Professional Fee Claims)

The Disbursing Agent shall pay each Holder of an Allowed Administrative Claim (excluding Professional Fee Claims, DIP Claims and Committee Professional Fee Claims) the full amount of such Allowed Administrative Claim, without interest, in Cash, as soon as practicable after the later of: (i) the occurrence of the Effective Date, or (ii) the date such Administrative Claim becomes an Allowed Claim.  Notwithstanding anything herein to the contrary, a Holder of an Allowed Administrative Claim may be paid on such other date or dates and upon such other less favorable terms as may be agreed upon by such Holder and the Disbursing Agent.  Notwithstanding anything else herein, all United States Trustee Quarterly Fees payable to the United States Trustee under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 shall be paid in full on the Effective Date.  All fees that arise under 28 U.S.C. § 1930 and any interest that accrues thereon under 31 U.S.C. § 3717 after the Effective Date shall be paid in full when due

until the Chapter 11 Cases are closed, dismissed, or converted, whichever occurs first. Notwithstanding any other provision herein, the United States Trustee shall not be required to file a proof of claim or a request for payment of United States Trustee Quarterly Fees.

ii.   <u>Professional Fee Claims and Committee Professional Fee Claims</u>

Prior to the Effective Date, the Debtors may pay any Professional Fees (other than Committee Professional Fees) which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Petition Date through the Effective Date.  Prior to the Effective Date the Debtors may pay any Committee Professional Fees, which the Bankruptcy Court has allowed pursuant to sections 503(b)(2) - (b)(6) of the Bankruptcy Code from the Conversion Date through the Effective Date.  From and after the Effective Date, the Disbursing Agent shall pay Professionals and the Committee Professionals the respective Professional Fees and the Committee Professional Fees awarded by Final Order of the Bankruptcy Court, as soon as practicable after the later of (i) the Effective Date, and (ii) the date upon which any order awarding fees and expenses becomes a Final Order, in accordance with the terms of any order entered by the Bankruptcy Court governing the payment of fees and expenses during the course of the Chapter 11 Case.

On the Effective Date, any objections previously filed to any applications for payment of the Professional Fees shall be deemed withdrawn (with prejudice) on the Effective Date.  Further, after the occurrence of the Effective Date, neither the Debtors, the Disbursing Agent, the Reorganized Debtor, the Litigation Trust, Litigation Trust Trustee nor the Litigation Trust Oversight Committee shall assert any objection to any Committee Professional Fee Claims.

Any final application for allowance of a Professional Fee Claims and Committee Professional Fee Claims for services rendered and costs incurred through the Effective Date must be filed with the Bankruptcy Court and served on counsel for the Debtors, counsel for the Litigation Trust, the Litigation Trust Trustee and on the United States Trustee at the addresses listed in Article XI.L of the Plan so that it is received no later than forty-five (45) days after the Effective Date.  In the event an application for allowance of a Professional Fee Claims and Committee Professional Fee Claims is not filed by the appropriate date, such Professional Fee Claims and Committee Professional Fee Claims shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Litigation Trust, the Litigation Trust Trustee and their successors, their assigns or their Assets.  Allowed Professional Fee Claims and Committee Professional Fee Claims must be paid in full (subject to the limitation on the Committee Professional Fees in paragraph above) and Professional Fee Claims and Committee Professional Fee Claims pending allowance by the Bankruptcy Court must be reserved for in full prior to any payment to Holders of Allowed Claims in (a) Class 3 (Azure Guaranty Claims), (b) Class 4 (Trade Creditor Claims); (c) Class ~~5A~~5 (Noteholder Election Recovery Claims), (c) Class 6A (Non-Petitioning Creditor Exchange Note Claims); and (d) Class ~~5B~~6B (Petitioning Creditor Exchange Note Claims).

iii.   <u>DIP Claims</u>

- 59 -

As of the Effective Date, the DIP Claims, if any, shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Documents, including principal, interest, fees and expenses.

Except to the extent that the ~~holder~~Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim, each such holder of an Allowed DIP Claim shall receive payment in full in Cash of such ~~holders~~Holders Allowed DIP Claim on the Effective Date.

Immediately upon receipt of the payments set forth in this section, the DIP Documents shall be deemed cancelled. The DIP Agent and DIP Lenders shall take all actions to effectuate and confirm such termination and discharge as reasonably requested by the Debtors or Reorganized Debtor as applicable.

iv. Administrative Claim and Substantial Contribution Claim Filing Deadline

Each Holder of an Administrative Claim (excluding Professional Fee Claims and Committee Professional Fee Claims that are not a substantial contribution claim) must file an Administrative Claim Request with the Bankruptcy Court prior to the Administrative Bar Date.

b. Classified Claims

*Class 1: OCM Guaranty Claims (Impaired)*

*Classification*: Class 1 consists of all Allowed OCM Guaranty Claims.

*Treatment*: The OCM Guaranty Claims are Allowed Claims. Except to the extent that a Holder of an Allowed OCM Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each OCM Guaranty Claim, each of the OCM Guarantees shall be reinstated in full force and effect and made effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or OCM Entities, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of the SMEs subject to the OCM Guarantees.

*Voting*: Class 1 is Impaired and the Holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

*Class 2: Corp Guarantee Claims (Impaired)*

*Classification*: Class 2 consists of all Corp Guaranty Claims.

*Treatment*: The Corp Guaranty Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Corp Guaranty Claim agrees to less favorable treatment, upon the occurrence of the Effective Date, in full settlement, release, and satisfaction of, and in exchange for each Corp Guaranty Claim, (i) each holder of an Allowed Corp Guaranty Claim shall receive its pro rata distribution of the Eletson Corporation Guaranty Recovery and (ii) each of the Corp Guarantees shall be reinstated in full force and effect and made

- 60 -

effective as to the Reorganized Debtor unmodified in their terms without further action of the Debtors, Reorganized Debtor or Corp Guaranty counterparties, provided however, that the Reorganized Debtor shall only be obligated to guaranty fifty percent (50%) of the obligations of Eletson Corporation subject to the Corp Guarantees.

*Voting*: Class 2 is Impaired and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

## Class 3:  Azure Guaranty Claims (Impaired)

*Classification*: Class 3 consists of the Azure Guaranty Claims.

*Treatment*: The Azure Guaranty Claims are Allowed Claims.  Except to the extent that a holder of an Allowed Azure Guaranty Claim agrees to less favorable treatment, If not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Azure Guaranty Claims, the Disbursing Agent shall pay to the Holders of Azure Guaranty Claims, by wire transfer of immediately available funds, their Pro Rata portion of the Azure Guaranty Recovery.

*Voting*: Class 3 is Impaired and Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

## Class 4: Trade Creditor Claims (Impaired)

*Classification*: Class 4 consists of the Trade Creditor Claims.

*Treatment:*  The Trade Creditor Claims are Allowed Claims. Except to the extent that a Holder of an Allowed Trade Creditor Claim agrees to less favorable treatment, if not paid previously, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Trade Creditor Claims, each Holder of an Allowed Trade Creditor Claim shall receive, in exchange for such Allowed Trade Creditor Claim, Cash in an amount equal to [15]% of the face amount of such Holder's Trade Creditor Claim; provided, the aggregate distributions to Holders of Trade Creditor Claims shall not exceed from the Trade Creditor Claim CapReserve; provided, further, that in the event the aggregate distributions to Holders of Trade Creditor Claims exceeds the Trade Creditor Claim Cap, Holders of suchTrade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap; provided further, that any holder of an Allowed Claim may elect to be treated as a Trade Creditor under the Plan with a claim equal to the lesser of (i) the face value of such electing Creditors' Claim or (ii) the Trade Creditor Claim Threshold Amount..

*Voting*: Class 4 is Impaired and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

## Class 5: Noteholder Election Recovery Claims (Impaired)

*Classification*: Class 5 consists of all Allowed Noteholder Election Recovery Claims.

*Treatment*: The Noteholder Election Recovery Claims are Allowed Claims. Claims may only be treated as Noteholder Election Recovery Claims upon the affirmative and irrevocable election of a Holder of a Claim classified in Class 6A or 6B to have their Claim treated in Class 5. Except to the extent that a Holder of an Allowed Noteholder Election Recovery Claim agrees to less favorable treatment, on the Effective Date and prior to any transfer by the Debtors of any Assets to the Litigation Trust or to any Holder of any Claim or otherwise, in full and complete settlement, release and satisfaction of the Noteholder Election Recovery Claims each Holder of an Allowed Noteholder Election Recovery Claim shall receive in full settlement, release, and satisfaction of such Noteholder Election Recovery Claim that is due and payable from the Noteholder Election Recovery Reserve, the lesser of (i) the Face Amount of such Holder's Noteholder Election Recovery Claim, (ii) such Holder's Pro Rata portion of the Noteholder Election Recovery Cap, or (iii) $70,000.

*Voting*: Class 4̶5 is Impaired and Holders of Class 4̶5 Claims are entitled to vote to accept or reject the Plan.

### Class 5̶.̶4̶6A: Non-Petitioning Creditor Note Claims *(Impaired)*

*Classification*: Class 5̶6A consists of all Allowed Non-Petitioning Creditor Exchange Note Claims and Old Note Claims.

*Treatment*: The Non-Petitioning Creditor Note Claims are Allowed Claims.  Except to the extent that a Holder of an Allowed Non-Petitioning Creditor Note Claim agrees to less favorable treatment, each Holder of an Allowed Class 5A6A Claim shall ~~elect to~~ receive in full settlement, release, and satisfaction of~~, of~~ such Allowed Class 5A6A Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter~~: at the exclusive election of the Holder of an Allowed Class 5A Claim either  (i) the Exchange Note Election Recovery or (ii)~~ their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class 5̶6 Claims in accordance with the terms of the Plan.

*Voting*: Class 5A6A is Impaired and Holders of Class 5A6A Claims are entitled to vote to accept or reject the Plan.

### Class 5B6B: Petitioning Creditor Exchange Note Claims (Impaired)

*Classification*: Class 5B6B consists of all Allowed Petitioning Creditor Exchange Note Claims.

*Treatment*: The Petitioning Creditor Exchange Note Claims are Disputed Claims and may only become Allowed by Final Order of the Bankruptcy Court.   To the extent the Petitioning Creditor Exchange Note Claims are deemed Allowed Claims the Petitioning Creditor Exchange Note Claims are equitably subordinated pursuant to section 510(c) of the Bankruptcy Code and are only entitled to a recovery upon the satisfaction of all ~~claims~~Claims in Class 5A6A.  In the event Petitioning Creditor Exchange Note Claims are found to be Allowed Claims and all Class 5A6A Non-Petitioning Creditor Exchange Note

Claims are paid in full, and except to the extent that a Holder of an Allowed Petitioning Creditor Exchange Note Claim agrees to less favorable treatment, each Holder of an Allowed Class ~~5B~~6B Claim shall receive in full settlement, release, and satisfaction of~~, of~~ such Allowed Class ~~5B~~6B Claim that is due and payable, on the Effective Date, or as soon as practicable thereafter, their Pro Rata portion of the Litigation Trust Interests which shall be distributed to Holders of Class ~~5~~6 Claims in accordance with the terms of the Plan.

Notwithstanding the foregoing if the Bankruptcy Court determines it is unable to equitably subordinate the claims of Holders of Class ~~5B~~6B Claims in the Confirmation Order, Holders of Class ~~5B~~6B Claims will be deemed to hold claims under Class ~~5A~~6A and will be entitled to ~~either  (i) the Exchange Note Election Recovery or (ii)~~ their Pro Rata portion of Litigation Trust Interests which shall be distributed to Holders of Class ~~5~~6 Claims in accordance with the terms of ~~this~~the Plan.

*Voting*: Class ~~5B~~6B is Impaired and Holders of Class ~~5B~~6B Claims are entitled to vote to accept or reject the Plan.

*Class ~~6~~7:  Interests (Impaired)*

*Classification*: Class ~~6~~7 consists of all Interests.

*Treatment*: On the Effective Date, all Interests shall be discharged, cancelled, released, and extinguished.  In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of Reorganized Holdings in a pro rata amount equal to their portion of the Shareholder New Value Contribution made.

*Voting*: Class ~~6~~7 is Impaired, and Holders of Interests are entitled to vote to accept or reject the Plan.

D.    Acceptance and Rejection of the Plan

1.    Voting Classes

Except as otherwise provided in order(s) of the Bankruptcy Court pertaining to solicitation of votes on the Plan, Holders of Claims in Class 1 (OCM Guaranty Claims), Class 2 (Corp Guaranty Claims) Class 3 (Azure Guaranty Claims), Class 4 (Trade Creditor Claims), Class ~~5A~~5 (Noteholder Election Recovery Claims), Class 6A (Non-Petitioning Creditor Exchange Note Claims), Class ~~5B~~6B (Petitioning Creditor Exchange Note Claims) and Class ~~6~~7 (Interests) shall be entitled to vote to accept or reject the Plan. ~~If and to the extent any Class identified as being not Impaired is Impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), such Class shall be entitled to vote to accept or reject the Plan.~~

2.    Classes Presumed to Accept the Plan

There are no ~~unimpaired classes~~Unimpaired Classes, and no class is presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.      Acceptance by Impaired Classes

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan and (b) the ~~holders~~Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims and Interests actually voting in such Class have voted to accept the Plan.

4.      Elimination of Vacant Classes; Acceptance by Non-Voting Classes

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

5.      Non-Consensual Confirmation

The Debtors will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code.  The Debtors reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with Article XI.K of the Plan.

6.      Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

E.      Means for Implementation of the Plan

1.      Implementation of the Plan and Sources of Consideration for Plan Distributions

The Debtors and Reorganized Debtor as applicable will fund distributions and other sources and uses contemplated by the Plan with ~~(1)~~ the ~~Shareholder New Value Contribution,~~Plan Consideration and ~~(2)~~ the transfer and assignment of the Litigation Trust Assets~~, which include the Litigation Trust Causes of Action and Distributable Cash,~~ to the Litigation Trust.

a.      The Shareholder New Value Contribution

- 64 -

The Debtors propose to implement and consummate the Plan on and after the Effective Date. Within ten (10) Business Days of entry of the Confirmation Order, the Eletson Holdings Members shall contribute, or cause to be contributed, to Eletson Holdings the full amount of the cash portion of the Shareholder New Value Contribution which shall be a contribution of Cash and cash equivalents in a total aggregate value of $30 million dollars.

The cash portion of the Shareholder New Value Contribution will be utilized as follows: *first*, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims (if any) and the Committee Professional Fee Claims including the funding any reserves on account of the Professional Fee Claims and Committee Professional Fee Claims required by the terms of the Plan; *second*, to fund the Administrative Fund as set forth in Article IV.N of the Plan; *third* to fund the Azure Guaranty Recovery; *fourth*, to fund the Eletson Corporation Guaranty Recovery, *fifth*, to fund the Trade Creditor Claim Reserve; and ~~fifth~~*sixth*, to fund the ~~Exchange Note~~Noteholder Election Recovery Reserve.

The Collections Contribution constitutes an additional portion of the Shareholder New Value Contribution, and the Eletson Members shall cause the applicable Gas Ownership Defendant to direct the applicable portion of the Collections Contribution to the Litigation Trust within thirty (30) days of the receipt of a final, non-appealable, determination payment in satisfaction of the Arbitration Award.

b.   Distributable Cash

Immediately upon the satisfaction of the payments provided for in Article IV A.1, the remaining cash portion of the Shareholder New Value Contribution shall become Distributable Cash along which shall be transferred to the Litigation Trust in accordance with the terms of the Plan and the Litigation Trust Agreement. Distributable Cash shall also include the SME Revenue and transferred to the Litigation Trust as set out in the Litigation Trust Agreement.

c.   Excess SME Proceeds

Beginning on January 31, 2025, and on July 31 and January 31 of each subsequent calendar year during the SME Excess Proceeds Period, the Reorganized Debtor shall transfer any SME Excess Proceeds for the immediately preceding six-month period to the Litigation Trust in accordance with the instructions provided to the Reorganized Debtor by the Litigation Trust Trustee.  On each payment date the SME Excess Proceeds paid, shall be accompanied with a reasonable accounting supporting the amounts of the Excess SME Proceeds transferred to the Litigation Trust.

Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the operation and/or management of the SMEs after the Effective Date, during the Excess SME Revenue Period or otherwise.  The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee upon the execution of any letter of intent or other similar pre-sale documents entered into by the Reorganized Debtor and any potential purchaser of the SME and/or SME Vessels within ten (10) Business Days of execution of such document.  In the event a sale is ultimately consummated, the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the consummation of such sale.  The Litigation Trust shall have no right to direct, comment or impede any sale of any SME

and/or SME Vessel by the Reorganized Debtor.  The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of any contract of sale, and are provided with no additional rights and/or standing to object to the terms of any sale of any SME or SME Vessel pursuant to the terms of the Plan.  For the avoidance of doubt the Reorganized Debtor is not required to consummate any sale of the SMEs or SME Vessels during the Excess SME Proceeds Period.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period.

Upon the earlier of (i) the expiration of the Excess SME Proceeds Period or (ii) the Litigation Trust having received Excess SME Cash Flow Proceeds of $5 million in the aggregate and Excess SME Sale Proceeds of $5 million in the aggregate, the obligations of the Reorganized Debtor related to the Excess SME Proceeds hereunder, and any reporting obligations to the Litigation Trust related thereto shall cease, and the Reorganized Debtor shall have no further obligations related to the Excess SME Proceeds, and the Litigation Trust shall have no right or claim to any further Excess SME Proceeds.  In the event the Excess SME Proceeds transferred to the Litigation Trust exceed (i) $5 million in the aggregate on account of the Excess SME Cash Flow Proceeds or (ii) $5 million in the aggregate on account of the Excess SME Sale Proceeds, the Litigation Trust shall within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, refund the Reorganized Debtor the portion of the actually paid Excess SME Proceeds exceeding the thresholds in clauses (i) and (ii) above in accordance with the instructions provided to the Litigation Trust by the Reorganized Debtor.

d.        c. Litigation Trust Causes of Action

On the Effective Date, the Debtors, shall fully and finally transfer and or assign each of the Litigation Trust Causes of Action and the applicable Litigation Trust Privileges to the Litigation Trust.

Litigation Trust Distributable Proceeds will be obtained from the Distributable Cash, Gas Ownership Claims Settlement and the Litigation Trust Causes of Action, and Plan Consideration as applicable.  Unless otherwise specified herein, Cash payments to be made pursuant to the Plan will be made by the applicable Disbursing Agent.

2.        Substantive Consolidation

a.        Order Granting Plan Consolidation

Unless and to the extent previously approved by a prior order of the Bankruptcy Court, at the Confirmation Hearing, the Bankruptcy Court will consider approval under the Plan of the Plan Consolidation.

b.        Plan Consolidation

The Consolidating Debtors are holding companies that were formed for the express purpose of issuing the Exchange Notes. Pursuant to the Exchange Notes Indenture, the

Consolidating Debtors are prohibited from holding or maintaining any assets. As the Exchange Notes and the claims related thereto will be discharged after the confirmation of these Chapter 11 Cases, the Debtors maintain there is no reason for the continued existence of the Consolidating Debtors. As such, the Consolidating Debtors will be consolidated into the Reorganized Debtor for the convenience of all parties, and with no impact to any operations, distributions, assets or rights of any party in interest or the Reorganized Debtor.

Upon the Effective Date, the Consolidating Debtors shall be consolidated for all purposes into Eletson Holdings and (i) all assets and liabilities of the Consolidating Debtors shall be consolidated and merged into Eletson Holdings, (ii) all guarantees of any Consolidating Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Consolidating Debtor, any guaranty thereof executed by either of the Consolidating Debtors and any joint or several liability of either of the Consolidating Debtors shall be one obligation of Eletson Holdings and (iii) each and every Claim filed or to be filed in the Chapter 11 Cases against any Debtor shall be deemed filed against Eletson Holdings collectively and shall be on Claim against, and if to the extent allowed, shall become one obligation of Eletson Holdings; provided further, the consolidation shall also limit the rights of a creditor to assert that its Claim is secured by a right setoff under section 553 of the Bankruptcy Code, and the Debtors will be deemed, for purposes of any Claims or determining the availability of the right of set-off under section 553 of the Bankruptcy Code, to be one entity, such that, subject to other provisions of section 553 of the Bankruptcy Code, the debts due to any of the Consolidating Debtors shall be offset against Claims against another Debtor. The substantive consolidation provided for in this section shall not affect the obligations of each and every Debtor to pay fees to the United States Trustee that may have come due prior to the Effective Date.

Pursuant to Bankruptcy Rule 9019 and any applicable state law and as consideration for the distributions and other benefits provided under the Plan, the provisions of this section shall constitute a good faith compromise and settlement of any Causes of Action or disputes that could be brought by a Holder of a Claim or Interest asserting that such Claim or Interest would have received more favorable treatment had substantive consolidation not been affected. This compromise and settlement are in the best interests of Holders of Claims and Interests and is fair, equitable and reasonable. Upon Confirmation of the Plan, the Plan shall be approved as a settlement of all such Causes of Action and disputes. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of this settlement pursuant to Bankruptcy Rule 9019 and its finding that this is a good faith settlement pursuant to any applicable state laws, given and made after due notice and opportunity for hearing, and shall bar any such Cause of Action by any Holder of a Claim or Interest with respect to the matters described in this section.

3.    Corporate Existence

Except as otherwise provided in the Plan (including with respect to any Restructuring Transaction undertaken pursuant to the Plan), the Reorganized Debtor Organizational Documents, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Debtor shall be deemed to merge with and into the Reorganized Debtor, with the Reorganized Debtor being the sole surviving entity and the separate existence of the Consolidating Debtors shall cease and only the Reorganized Debtor shall continue to exist and as a separate corporation, with all the powers of a corporation pursuant to the

applicable Liberian law and pursuant to the respective certificate of incorporation and bylaws in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

4.    Vesting of Assets in the Reorganized Debtor

Except for the Litigation Trust Causes of Action and ~~Gas Ownership Claims Settlement~~Plan Consideration as applicable as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement (including the Litigation Trust Agreement), on the Effective Date, pursuant to the Plan all property in each Estate and any property acquired by any of the Debtors, including Intercompany Interests held by the Debtors in non-Debtor subsidiaries, shall revest in the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order. On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any claims or Interests without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.    Dissolution of the Committee

Upon the Effective Date, the Committee shall dissolve automatically whereupon its members, Committee Professionals and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to: (i) obligations arising under confidentiality agreements, joint interest agreements and protective orders entered during the Chapter 11 Cases which shall remain in full force and effect according to their terms; (ii) applications for Committee Professional Fee Claims; and (iii) any pending motions, or any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order. The Committee members and the Committee Professionals shall not be entitled to compensation and reimbursement of expenses for services rendered after the Effective Date, except for services rendered in connection with applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed after the Effective Date.

6.    Reorganized Debtor Organizational Documents

To the extent required under the Plan or applicable non-bankruptcy law, on the Effective Date, the Reorganized Debtor will file such Reorganized Debtor Organizational Documents as are required to be filed with the applicable authorities in the state, province, or country of incorporation in accordance with the corporate laws of the respective state, province, or country of incorporation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Debtor Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtor may amend and restate the Reorganized Debtor Organizational Documents, and the Reorganized Debtor may file the certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of the country of incorporation and the Reorganized Debtor Organizational Documents.

7.      Appointment of Directors and Officers of the Reorganized Debtor

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement the identity and any affiliations of any Person proposed to serve on as a Director or officer of the Reorganized Debtor, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

8.      Creation of Litigation Trust

The Plan contemplates the transfer of the Litigation Trust Assets into the Litigation Trust for distribution of the Litigation Trust Distributable Proceeds to Holders of Litigation Trust Interests.

Prior to the Effective Date, the Debtors and the Litigation Trust Trustee shall execute the Litigation Trust Agreement and the Litigation Trust Agreement and shall take all steps necessary to establish the Litigation Trust in accordance with the Plan, which shall be for the benefit of the Litigation Trust Beneficiaries.  Additionally, on the Effective Date the Debtors shall transfer and/or assign and shall be deemed to transfer and/or assign to the Litigation Trust all of their rights, title and interest in and to all of the Litigation Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Litigation Trust Assets shall automatically vest in the Litigation Trust free and clear of all Claims and Liens, subject only to (a) Litigation Trust Interests and (b) the Litigation Trust Expenses as provided for in the Plan and the Litigation Trust Agreement.  Also on the Effective Date, subject to, in all respects, the terms of the Litigation Trust Agreement, all Litigation Trust Privileges shall transfer to and vest exclusively in the Litigation Trust.

The Litigation Trust shall be governed by the Litigation Trust Agreement and administered by the Litigation Trust Trustee.  The powers, rights, and responsibilities of the Litigation Trust Trustee shall be specified in the Litigation Trust Agreement.  The Litigation Trust Trustee shall hold and distribute the Litigation Trust Assets in accordance with the Plan and the Litigation Trust Agreement.  Other rights and duties of the Litigation Trust Trustee and the Litigation Trust Beneficiaries shall be as set forth in the Litigation Trust Agreement.

After the Effective Date, the Debtors and the Reorganized Debtor shall have no interest in the Litigation Trust Assets except to the extent set forth in the Plan and the Litigation Trust Agreement.  To the extent that any Litigation Trust Assets cannot be transferred to the Litigation Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Litigation Trust Assets shall be deemed to have been retained by the Reorganized Debtor and the Litigation Trust Trustee or Litigation Trust as applicable shall be deemed to have been designated as a representative of the Reorganized Debtor pursuant to section 1123(b)(3)(B) of the Bankruptcy Code to enforce and pursue such Litigation Trust Assets on behalf of the Reorganized Debtor for the benefit of the Litigation Trust Beneficiaries.  Notwithstanding the foregoing, all net proceeds of such Litigation Trust Assets shall be transferred to the Litigation Trust to be distributed in accordance with the Plan.

The Litigation Trust Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to govern the rights, powers, obligations and appointment and removal of the Litigation Trust Trustee and to ensure the treatment of the Litigation Trust as a liquidation trust for federal income tax purposes, all consistent with the Plan.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtor shall have no obligation to provide any funds or financing to the Litigation Trust, other than the obligation to contribute the Litigation Trust Assets and the initial funding of the Administrative Fund, and under no circumstances will the expenses of the Litigation Trust be paid or reimbursed by the Debtors or the Reorganized Debtor, as applicable.

The Litigation Trust shall terminate no later than the fifth (5th) anniversary of the Effective Date; provided, however, that within a period of three (3) months prior to such termination date, the Bankruptcy Court, upon motion by a party in interest may extend the term of the Litigation Trust if it is necessary to facilitate or complete the distribution of the Litigation Trust Assets. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained within three (3) months prior to the expiration of each extended term; provided, however, that the aggregate of all such extensions shall not exceed three (3) years, unless the Litigation Trust Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Litigation Trust as a liquidation trust within the meaning of Treas. Reg. § 301.7701-4(d) for federal income tax purposes.

9.   Transfer of Assets and the Litigation Trust Causes of Action to the Litigation Trust

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Litigation Trust is intended to be treated as a "liquidating trust" for U.S. federal income tax purposes pursuant to Treasury Regulation section 301-7701-4(d), and the Litigation Trust Trustee will take this position on the Litigation Trust's tax return accordingly. The Litigation Trust Beneficiaries shall be treated as the grantors of the Litigation Trust and as the deemed owners of the Litigation Trust Assets. For U.S. federal income tax purposes, the transfer of assets to the Litigation Trust will be deemed to occur as (a) a first-step transfer of the Litigation Trust Assets to the Litigation Trust Beneficiaries, and (b) a second-step transfer by Litigation Trust Beneficiaries. As a result, the transfer of the Litigation Trust Assets to the Litigation Trust should be a taxable transaction, and the Debtors or Reorganized Debtor should recognize gain or loss equal to the difference between the tax basis and fair value of such assets. As soon as possible after the transfer of the Litigation Trust Assets to the Litigation Trust, the Litigation Trust Trustee shall make a good faith valuation of the Litigation Trust Assets. This valuation will be made available from time to time, as relevant for tax reporting purposes. Each of the Debtors or Reorganized Debtor, Litigation Trust Trustee, and the Holders of Claims receiving Litigation Trust Interests shall take consistent positions with respect to the valuation of the Litigation Trust Assets, and such valuations shall be utilized for all U.S. federal income tax purposes.

10. Gas Ownership Claims Settlement

~~The transfer of the Litigation Trust Causes of Action to the Litigation Trust shall include the Gas Ownership Claims against the Gas Ownership Defendants. All such Gas Ownership Defendants' defenses thereto are expressly preserved. The rights of the Petitioners issued against Levona, including without limitation, the Non-Transferred Claims, shall not be transferred to the Litigation Trust, provided, however, that the Levona Claim Objections, shall be a Litigation Trust Cause of Action, and further, provided, neither the adjudication of any rights, claims or actions of the Levona Claim Objections, nor any stipulation or findings with respect to facts in connection therewith, shall be binding in any capacity on the Debtors or any other Gas Ownership Defendants. The Petitioners and the Gas Ownership Defendants may, at their exclusive discretion, commence, continue, prosecute, settle or otherwise resolve any Non-Transferred Claims asserted or assertable by the Petitioners against Levona.~~

~~Notwithstanding the transfer of the Gas Ownership Claims against the Gas Ownership Defendants, the Litigation Trust Trustee shall not commence (and, if commenced prior to the transfer to the Litigation Trust, shall abate) the pursuit of any Gas Ownership Claims until the earlier of (i) a final, non-appealable, determination in favor of Levona by a court of competent jurisdiction presiding over litigation between Levona, on the one hand, and the Gas Ownership Defendants, on the other, that the preferred shares of Eletson Gas were not transferred to any one or more of the Gas Ownership Defendants; (ii) a settlement or satisfaction of claims asserted by any Petitioners or the Gas Ownership Defendants against Levona; or (iii) the Gas Ownership Defendants refuse to comply with the Gas Ownership Settlement. In the event there is a final, non-appealable determination by a court of competent jurisdiction determining clause (i) above, the Litigation Trust Trustee shall have no right to commence or pursue any Gas Ownership Claim against any Gas Ownership Defendant. In the event of the satisfaction of clause (ii) above, the Litigation Trust Trustee shall settle and release (in full) all the Gas Ownership Claims against the Gas Ownership Defendants in exchange for the Gas Ownership Defendants' agreement to contribute and deliver to the Litigation Trust Trustee a one-time cash payment of equal to 75% of the cash recoveries against Levona (net of costs of collection incurred by Corp. and/or the Gas Ownership Defendants against Levona and net of any amounts set-off by any Gas Ownership Defendants for amounts owed to Levona), which payment shall: (i) be paid in full and final satisfaction of the Gas Ownership Claims, and (ii) constitute a redemption by Eletson Gas of the net enterprise value of the common shares of Eletson Gas as of the Effective Date (the "Gas Ownership Settlement"). Each of the Gas Ownership Defendants stipulate and agree that any applicable statute of limitation on the Gas Ownership Claims shall be tolled until 30 days after notice by the Gas Ownership Defendants of the occurrence of (ii) or (iii) above.~~

~~In the event the Gas Ownership Defendants fail or refuse to comply with the Settlement, the Litigation Trust Trustee may, in its discretion, commence, prosecute, settle, and/or otherwise resolve any Gas Ownership Claims. In the event the Litigation Trust Trustee determines to commence a litigation against any Gas Ownership Defendants, Reed Smith shall, and the Gas Ownership Defendants' option, be entitled and authorized to represent any Gas Ownership Defendant, and the Litigation Trust Trustee is bound not to seek disqualification of Reed Smith in connection with its representation of any Gas Ownership Defendant, and shall expressly waive the right to assert or claim the existence of any conflict of interest would disqualify Reed Smith or impair its ability to represent any Gas Ownership Defendant or Petitioner.~~

10.    ~~11.~~ Liabilities of the Litigation Trust

The liabilities transferred to the Litigation Trust shall include all Litigation Trust Interests and the Litigation Trust Expenses.

In accordance with Article IV.I of the Plan, the Debtors will transfer the Litigation Trust Assets to the Litigation Trust to make the payments required to Litigation Trust Beneficiaries pursuant to the Plan and the Litigation Trust Agreement.

11.    12.  Appointment of the Litigation Trust Trustee and Members of the Litigation Trust Oversight Committee

The Committee shall appoint the Litigation Trust Trustee who shall have the power to administer the Litigation Trust and will be advised by the Litigation Trust Oversight Committee as specified in the Plan and the Litigation Trust Agreement. For the avoidance of doubt the members of the Litigation Trust Oversight Committee will be appointed by the Committee pursuant to the terms of the Litigation Trust Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, in the Plan Supplement and with the consent and approval of the Committee the identity and any affiliations of the Litigation Trust Trustee and any Person proposed to serve on the Litigation Trust Oversight Committee, which appointments shall be confirmed in the Confirmation Order.  To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

The Debtors and the Litigation Trust Trustee shall enter into a Litigation Trust Agreement in substantially the form which shall be filed with the Bankruptcy Court with the Plan Supplement. On the Effective Date, and upon the establishment of the Litigation Trust the Litigation Trust Trustee shall succeed in all respects to all of the rights, privileges and immunities of the Debtors in regard to the Litigation Trust Causes of Action and the Litigation Trust Privileges and shall be appointed as the sole party with standing to pursue Litigation Trust Causes of Action on behalf of the Debtors as of the Effective Date.  The Litigation Trust Trustee, and his/her successors, shall serve until the earlier of (i) the later to occur of (a) the entry of the Final Decree, (b) the dissolution of the Litigation Trust, and (c) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan; or (ii) the expiration of the term of such Litigation Trust Trustee's employment agreement or such Litigation Trust Trustee's resignation, death, incapacity, removal or termination by the Litigation Trust Oversight Committee pursuant to the Litigation Trust Agreement or order of the Bankruptcy Court.  Notwithstanding the foregoing, the Debtor Privileges will not transfer to the Litigation Trust and shall remain solely in the possession of the Debtors or Reorganized Debtor as applicable.

As set forth in the Plan, the pursuit and collection of the Litigation Trust Causes of Action and distribution of the proceeds thereof to the Litigation Trust Beneficiaries shall become the responsibility of the Litigation Trust Trustee who shall thereafter have responsibility for the management, control and operation thereof, and who may use, acquire and dispose of property of the Litigation Trust free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the terms of the Plan and the Litigation Trust Agreement.

Upon creation of the Litigation Trust, the Litigation Trust Trustee shall be the trustee of the Litigation Trust for all purposes and in all respects, with all necessary and appropriate power to act for, on behalf of and in the name of the Litigation Trust.

### 12.    ~~13.~~ Cooperation and Privilege

To effectively investigate, prosecute, compromise, and/or settle the Litigation Trust Causes of Action on behalf of the Litigation Trust, the Litigation Trust Trustee and its counsel and representatives may require reasonable access to documents and information exclusively relating to the Litigation Trust Causes of Action in the possession of the Debtors, the Reorganized Debtor, and/or the Committee. Accordingly, the Litigation Trust Agreement shall provide for the Litigation Trust Trustee's reasonable access to the Debtors' records and information (which shall be maintained by the Reorganized Debtor) and the Committee's records and information, each of which relating to the Litigation Trust Causes of Action, including electronic records or documents, as further detailed in, and subject in all respects to, the Litigation Trust Agreement. The Litigation Trust Agreement shall also provide that as of the Effective Date, and subject in all respects to the terms of the Litigation Trust Agreement, the Litigation Trust Privileges, and privileges held by the Committee (if any) shall transfer to and vest exclusively in the Litigation Trust, and that the Reorganized Debtor shall preserve all of the Debtors' records and documents (including all electronic records or documents) exclusively related to the Litigation Trust Causes of Action and Litigation Trust Privileges for the later of a period of three (3) years after the Effective Date or until such later time as the Litigation Trust Trustee notifies the Reorganized Debtor in writing that such records are no longer required to be preserved.

### 13.    ~~14.~~ Duties of the Litigation Trust Trustee

In addition to the duties set forth in the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement, and herein, shall have the following duties.

a.    to manage, control and operate the Litigation Trust;

b.    to investigate and, if necessary and appropriate, to prosecute and enforce (or not prosecute or enforce), or to compromise, release or settle any Litigation Trust Causes of Action on behalf of the Estate and the Litigation Trust without further approval of or application to the Bankruptcy Court;

c.    to invest any Cash and the Litigation Trust Assets;

d.    to file any and all reports, pleadings, tax returns and other documents;

e.    to pay any and all distributions required or permitted to be made under the Plan;

f.    to pay out of the Litigation Trust any and all Claims, liabilities, losses, damages, costs and expenses incurred in connection therewith or as a result thereof, including all Post-Confirmation Expenses accruing from and after the Effective Date in accordance with the Administrative Budget;

- 73 -

g.    to employ, supervise and compensate any employees of the Litigation Trust;

h.    to make and file tax returns for the Litigation Trust;

i.    act as the Disbursing Agent to Holders of Class 6A Claims in accordance with the terms of the Plan, and in such capacity shall (i) disburse all Cash held by the Litigation Trust to the Holders of Class 6A Claims in any amount in excess of $1 million over the then current budgeted needs of the Litigation Trust pursuant to the Administrative Budget within forty-five (45) days of the Effective Date and at least semi-annually thereafter, (ii) within ten (10) Business Days upon receipt of any Excess SME Proceeds disburse to Holders of Class 6A Claims one hundred percent of such Excess SME Proceeds, and (iii) within ten (10) Business Days upon receipt of any portion of the Collections Contribution disburse to Holders of Class 6A Claims one hundred percent of such Collections Contribution;

ij.    to commence and pursue dissolution or winding up of proceedings for the Litigation Trust;

jk.    to file, prosecute, compromise and settle objections to Claims after the Effective Date other than Administrative Claims or Claims seeking administrative allowance;

kl.    to prepare and deliver to the Litigation Trust Oversight Committee for approval the Administrative Budget of the Litigation Trust with respect to each six-month period following the initial Administrative Budget and any amendments or modifications thereto; and

lm.    to request the entry of a Final Decree.

In connection with the execution of his or her duties under the Plan, the Litigation Trust Trustee, at the direction of and in consultation with the Litigation Trust Oversight Committee as set forth more specifically in the Litigation Trust Agreement and herein, shall be authorized:

a.    to execute such documents and to take such other actions as are necessary to effectuate the Plan and perform his or her duties as a trustee of the Litigation Trust, including to execute such documents and take such other action on behalf of the Litigation Trust;

b.    to open, close and manage bank accounts, and to enter into business transactions within or without the ordinary course of business;

c.    to retain and pay professionals (including the Professionals or the Committee Professionals) or other Persons to assist the Litigation Trust Trustee in the administration of the Litigation Trust, without prior Bankruptcy Court approval;

d.    to incur any reasonable and necessary expenses (up to the amounts set forth in the Administrative Budget) in the performance of his or her duties as Litigation Trust Trustee;

e.    to compromise, release or settle any Disputed Claim or Litigation Trust Cause of Action or to sell or dispose of any Litigation Trust Asset; and

f.      to employ such other procedures, not inconsistent with the Plan, necessary for the Litigation Trust Trustee to perform his or her duties hereunder.

The Litigation Trust Trustee shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Litigation Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code (including, without limitation, commencing, prosecuting or settling Litigation Trust Causes of Action and asserting claims, defenses, offsets and privileges arising from the Litigation Trust Privileges), to the extent not inconsistent with the Plan. In discharging the foregoing responsibilities, the Litigation Trust Trustee shall be entitled to exercise and rely upon his or her business judgment in consultation with the Litigation Trust Oversight Committee. The Litigation Trust Trustee shall not be obligated to take any action or to pursue any Litigation Trust Causes of Action unless justified in his or her reasonable determination by fact and law, nor shall the Litigation Trust Trustee be obligated to take any action that could reasonably cause him or her personal liability. Without limiting the generality of the foregoing, the Litigation Trust Trustee may consider the interests of Holders of Allowed Class ~~5A~~6A Claims and Class ~~5B~~6B Claims in receiving prompt distributions and such other factors as may be reasonable in the exercise of his or her business judgment. Such authorization and benefits shall also extend to any, each and every successor Litigation Trust Trustee, without reservation or limitation.

The Litigation Trust Trustee, at the direction of the Litigation Trust Oversight Committee, may expend the Cash of the Litigation Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Litigation Trust Assets during the administration thereof, (b) to pay the respective reasonable administrative expenses (including, but not limited to, any United States Trustee Quarterly Fees, Litigation Trust Trustee fees, professional fees, and taxes imposed on the Litigation Trust), and (c) to satisfy other respective liabilities incurred by the Litigation Trust in accordance with the Plan or the Litigation Trust Agreement.

14.      ~~15.~~ Post Confirmation Expenses

Prior to the Effective Date, the Debtors shall approve the Administrative Budget for the six (6) month period beginning on the Effective Date for professional fees for services to be rendered to the Litigation Trust, which Administrative Budget may be altered from time to time by the Litigation Trust Trustee with the consent of the Litigation Trust Oversight Committee in accordance with the Litigation Trust Agreement provided that any fees and expenses of professionals retained by the Litigation Trust that have been incurred prior to the date of the modification of the Administrative Budget shall constitute budgeted amounts. The Litigation Trust Oversight Committee shall approve in advance the Litigation Trust Trustee's retention of professionals and their compensation arrangements.

On the Effective Date, the Litigation Trust Trustee shall establish the Administrative Fund. The initial amount of the Administrative Fund shall be based on the Litigation Trust Trustee's good faith estimate of the cost necessary to complete the Litigation Trust's obligations under the Plan and the Litigation Trust Agreement and will include the amount budgeted for the Litigation Trust's professionals provided however, the initial Administrative Fund shall not exceed the amount of $100,000 necessary to commence and/or pursue and Litigation Trust Causes of Action

as of the Effective Date.  The Litigation Trust shall pay all Litigation Trust Expenses related to carrying out its obligations under the Plan and the Litigation Trust Agreement from the Administrative Fund and, in the Litigation Trust Trustee's discretion, and with approval of the Litigation Trust Oversight Committee, may add additional amounts of Cash held by the Litigation Trust to the Administrative Fund to further the prosecution of the Litigation Trust Causes of Action or for administration and other miscellaneous needs of the Litigation Trust without further notice or motion in accordance with the terms of the Litigation Trust Agreement.

The reasonable and necessary fees and actual and necessary expenses of the Litigation Trust Trustee, the Litigation Trust Oversight Committee and the professionals retained by the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall be paid solely by the Litigation Trust Trustee in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

### 15.    16. Liability; Indemnification

Neither the Litigation Trust Trustee ~~or~~nor any member of the Litigation Trust Oversight Committee shall be liable for any act or omission taken or omitted to be taken in his or her capacity as Litigation Trust Trustee or as a member of the Litigation Trust Oversight Committee, as the case may be, other than acts or omissions resulting from the Litigation Trust Trustee's or Litigation Trust Oversight Committee member's willful misconduct, gross negligence or fraud.  The Litigation Trust Trustee and the Litigation Trust Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their respective attorneys, accountants, financial advisors and agents, and the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such Persons other than acts or omissions resulting from the willful misconduct, gross negligence or fraud of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be.

Notwithstanding such authority, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall not be under any obligation to consult with their respective attorneys, accountants, financial advisors or agents, and any determination not to do so shall not result in the imposition of liability on the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, and their respective designees, unless such determination is based on willful misconduct, gross negligence or fraud.  The Litigation Trust shall indemnify and hold harmless the Litigation Trust Trustee, the Litigation Trust Oversight Committee and their respective

designees and professionals, and all duly designated agents and representatives (in their capacity as such), from and against and in respect of all liabilities, losses, damages, claims, costs and expenses (including, but not limited to, attorneys' fees and costs) arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of the duties of the Litigation Trust Trustee or the Litigation Trust Oversight Committee, as the case may be, or the implementation or administration of the Plan; provided, however, that no such indemnification will be available to such Persons for such actions or omissions if a court of competent jurisdiction has determined by Final Order that the challenged conduct occurred as a result of willful misconduct, gross negligence or fraud.

16.        17. Litigation Trust Oversight Committee

On the Effective Date, the Litigation Trust Oversight Committee shall have the duties set forth herein to maximize distributions to Litigation Trust Beneficiaries.  On the Effective Date, the Litigation Trust Oversight Committee shall be entitled to the rights, powers, immunities and privileges of the Committee.

The Litigation Trust Oversight Committee shall have the duty to take actions in accordance with the provisions of the Plan and in furtherance of the execution of the Plan.  Additionally, the Litigation Trust Oversight Committee shall have the following rights and duties:

a.        to approve any release or indemnity in favor of any third party granted or agreed to by the Litigation Trust Trustee;

b.        to authorize the Litigation Trust Trustee to commence any Litigation Trust Cause of Action;

c.        to approve the settlement of any Litigation Trust Cause of Action and to approve any application by the Litigation Trust Trustee for an order in connection with any such settlement;

d.        to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

e.        to review all financial information relating to the Litigation Trust (including any quarterly reports required by the Office of the United States Trustee), which shall be promptly provided by the Litigation Trust Trustee upon request by the Litigation Trust Oversight Committee;

g.        to monitor distributions to Holders of Litigation Trust Interests;

h.        to take such other actions as it deems necessary and appropriate with respect to the implementation of the Plan;

i.        to approve the Litigation Trust Trustee's retention of professionals;

- 77 -

j.        to remove the Litigation Trust Trustee in accordance with the procedures in the Litigation Trust Agreement; and

k.        to approve the Administrative Budget after the Effective Date.

The duties and powers of the Litigation Trust Oversight Committee shall terminate upon the later to occur of (i) the entry of the Final Decree, (ii) the dissolution of the Litigation Trust, and (iii) the payment of the final distributions to Holders of Litigation Trust Interests pursuant to the Plan.

The Litigation Trust Oversight Committee shall have the right but shall not be required to retain counsel of its choice, and the reasonable and necessary fees and expenses of such counsel shall be paid by the Litigation Trust from the Administrative Fund.  The reasonable and necessary fees and expenses of counsel to the Litigation Trust Oversight Committee shall be paid in accordance with the following procedures or such other procedures as may be set by the Litigation Trust Trustee: upon the submission of a fee and/or expense statement to the Litigation Trust Trustee and the Litigation Trust Oversight Committee, the Litigation Trust Trustee and the Litigation Trust Oversight Committee shall have twenty (20) days from the delivery of a fee statement to give notice of an objection to the fee statement to the professional or Person seeking compensation or reimbursement.  For an objection to be valid, it shall be in writing and set forth in detail the specific fees objected to and the basis for the objection.  Any objection that remains unresolved fifteen (15) days after it is made shall be filed with the Bankruptcy Court by the objecting party, served upon the professional or Person seeking compensation or reimbursement, and heard by the Bankruptcy Court at the next regularly scheduled omnibus hearing.  The uncontested portion of each invoice shall be paid within twenty (20) days after its delivery to the Litigation Trust Trustee and the Litigation Trust Oversight Committee in accordance with the procedures set forth in the Litigation Trust Agreement.

### 17.        ~~18.~~ Good Faith

Each of the Litigation Trust Trustee and Litigation Trust Oversight Committee shall act in good faith in carrying out its duties and responsibilities and use its best efforts to pursue or settle the Litigation Trust Causes of Action and maximize the value of the Litigation Trust Assets and minimize claims against the Litigation Trust.

### 18.        ~~19.~~ Saturday, Sunday or Legal Holiday

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 19.        ~~20.~~ Exemption from Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon

entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

<u>20.</u>    <s>21.</s> Issuance of Documents Necessary to Consummate the Plan

On or as soon as practicable after the Effective Date, the Debtors shall execute and deliver such other agreements, documents and instruments, as necessary to effectuate the Plan.

<u>21.</u>    <s>22.</s> Final Decree

Upon the Litigation Trust Trustee's determination that all Litigation Trust Causes of Action held by the Litigation Trust or the Litigation Trust Trustee, as applicable, have been finally resolved, transferred, or abandoned, the Litigation Trust shall move for the entry of a Final Decree pursuant to section 350 of the Bankruptcy Code closing the Chapter 11 Cases.  The Litigation Trust may request the entry of the Final Decree notwithstanding the fact that not all Litigation Trust Assets have been monetized and distributed to Litigation Trust Beneficiaries.

F.    Retained Causes of Action

1.    Maintenance of Causes of Action

Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf Except as otherwise provided in the Plan, the Litigation Trust shall retain all rights on behalf of the Debtors and the Estates to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases, any and all Litigation Trust Causes of Action transferred to the Litigation Trust.

Except as otherwise provided in the Plan, upon the Effective Date and subject to the terms of the Litigation Trust Agreement in accordance with section 1123(b)(3) of the Bankruptcy Code, the Litigation Trust Causes of Action shall vest in the Litigation Trust.  The Litigation Trust Trustee, on behalf of the Litigation Trust, shall retain and may exclusively enforce any and all or Litigation Trust Causes of Action, and commence, pursue and settle the Litigation Trust Causes of Action in accordance with the Plan and the Litigation Trust Agreement as applicable, subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee.  The Litigation Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Litigation Trust Causes of Action without the consent or approval of any third party and without any further order of court subject to the advice of counsel and the consent of the Litigation Trust Oversight Committee as required by the Litigation Trust Agreement.

2.    Preservation of Causes of Action

Except as otherwise expressly provided in the Plan, from and after the Effective Date, unless expressly designated as a Litigation Trust Cause of Action, the Reorganized Debtor shall maintain and may litigate or settle any <s>Avoidance</s><u>Retained Causes of</u> Action, <u>including</u> recovery or subordination actions under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548,

549, 550, 551, 553 or 724 of the Bankruptcy Code or any other Causes of Action or rights to payments or claims that belong to the Debtors.  Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, no other Person may pursue any such Avoidance Actions, recovery or subordination actions or other Causes of Action that belong to the Debtors, Reorganized Debtor or the Litigation Trust as applicable, unless otherwise provided by order of the Bankruptcy Court.

To the extent any Claim or Cause of Action has not independently been reviewed by the Independent Committee and/or otherwise settled prior to the Effective Date, and such Claim or Cause of Action is designated a Litigation Trust Cause of Action, the Litigation Trust Trustee shall perform an independent investigation regarding whether such Litigation Trust Cause of Action, shall be investigated or pursued.  It is possible that there may be other Causes of Action which currently exist or may subsequently arise but relate to facts and circumstances arising prior to the Effective Date that are not set forth herein, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and, as a result, cannot be specifically referred to herein (collectively, the "Unknown Causes of Action").  Within [twenty (20)] days of the discovery of the facts and circumstances underlying an Unknown Cause of Action, the Independent Committee shall notify the Committee or Litigation Trust Trustee as applicable of the existence of said Unknown Cause of Action, and the Independent Committee and Committee or Litigation Trust Trustee as applicable shall confer and make a determination of whether such Unknown Cause of Action will be transferred to the Litigation Trust as a Litigation Trust Cause of Action. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction over any dispute between the Independent Committee and the Committee or Litigation Trust Trustee as applicable regarding the ownership of a discovered Unknown Cause of Action such that ownership of said discovered Unknown Cause of Action complies with the terms of ~~this~~the Plan.

3.     <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

Unless a Claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Cause of Action for later adjudication unless transferred to the Litigation Trust, (including, without limitation, Unknown Causes of Action), and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation Date or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or other Final Order.  In addition, the Debtors, the Litigation Trust and any successor entities under the Plan as applicable expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Any Person to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from Debtors or a transfer of money or property from the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Litigation Trust, as applicable, subsequent to the Effective Date and may, if appropriate, be the subject of an action after the Effective Date, whether or not

(i) such Entity has filed a Proof of Claim against the Debtors in these Bankruptcy Cases; (ii) such Creditor's Proof of Claim has been objected to; (iii) such Creditor's Claim was included in the Debtors' Schedules; or (iv) such Creditor's scheduled Claim has been objected to by the Debtors or has been identified by the Debtors as disputed, contingent, or unliquidated.

4.    Retained Causes of Action and Retained Causes of Action Contribution

On or before the expiration of any applicable statute of limitation, the Reorganized Debtor may initiate any Retained Causes of Action in any appropriate court of competent jurisdiction. Neither the Litigation Trust nor Litigation Trust Trustee shall have any rights to direct the Reorganized Debtor in the pursuit or settlement of the Retained Causes of Action. Beginning on the six-month anniversary of the Effective Date and every six months thereafter, the Reorganized Debtor shall provide the Litigation Trust and the Litigation Trust Trustee a report on the status of the pursuit of any Retained Causes of Action. The Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of any proposed settlement of any Retained Cause of Action. In the event of a successful collection of any Retained Causes of Action the Reorganized Debtor shall notify the Litigation Trust and Litigation Trust Trustee within ten (10) Business Days of the collection made thereon. The Litigation Trust and Litigation Trust Trustee as applicable are not, and are not intended to be, third party beneficiaries of the proceeds of any Retained Causes of Action, and are provided with no additional rights and/or standing to object to the terms of any litigation strategy or proposed settlement of any Retained Causes of Action pursuant to the terms of the Plan. For the avoidance of doubt the Reorganized Debtor is not required to pursue or settle any Retained Causes of Action.

Within ten (10) Business Days of receipt of any Retained Causes of Action Contributions arising from the final, non-appealable prosecution of a Retained Cause of Action or the settlement of a Retained Cause of Action, the Reorganized Debtor shall transfer the applicable Retained Causes of Action Contributions to the Litigation Trust in accordance with the instructions provided by the Litigation Trust Trustee. Each payment of the Retained Causes of Action Contributions paid shall be accompanied with a reasonable accounting supporting the amounts of the Retained Causes of Action Contributions transferred to the Litigation Trust.

Upon the resolution of all Retained Causes of Action any reporting obligations of the Reorganized Debtor to the Litigation Trust regarding the prosecution and/or settlement of any Retained Causes of Action shall cease, and the Reorganized Debtor shall have no further obligations related to the Retained Causes of Action Contributions, and the Litigation Trust shall have no right or claim to any proceeds of any Causes of Action retained by the Debtors. In the event the any Retained Causes of Action Contribution transferred to the Litigation Trust exceed seventy-five percent (75%) of the net cash recoveries of the applicable Retained Cause of Action, within ten (10) Business Days of written notice of such over payment by the Reorganized Debtor, the Litigation Trust shall refund the Reorganized Debtor the portion of the actually paid Retained Cause of Action Contributions exceeding net cash recovery threshold set forth in the Plan.

Unless the Reorganized Debtor and the Litigation Trust and Litigation Trust Trustee agree otherwise in writing, the Bankruptcy Court shall retain sole jurisdiction to resolve any dispute regarding the payment of the Retained Causes of Actions Contributions, the accounting supporting the Retained Causes of Action Contributions, and the refund of any overpayments of Retained Causes of Action Contributions.

G.    Treatment of Executory Contracts and Unexpired Leases

1.    Rejection of Executory Contracts or Unexpired Leases

On the Effective Date, except for any executory contract that was previously assumed or rejected by an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code, each executory contract that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Bankruptcy Code §§ 365 and 1123, effective as of the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection pursuant to Bankruptcy Code §§ 365 and 1123 as of the Confirmation Date.

2.    Rejection Damages Bar Date

Except to the extent another Claims Bar Date applies pursuant to an order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts under the Plan must be filed with the Bankruptcy Court, and a copy served on counsel for the Debtors and the Litigation Trust Trustee, within fifteen (15) days of the Effective Date, or such Claim shall be forever barred and shall not be entitled to a distribution or be enforceable against the Debtors, their Estates, the Reorganized Debtor, the Litigation Trust, the Litigation Trust Trustee, their successors, their assigns or their Assets.  Any timely filed Claim arising from the rejection of an Executory Contract shall be treated as a Claim in Class 4 (Trade Creditor Claims).  Nothing in the Plan extends or modifies any previously applicable Claims Bar Date.

H.    Provisions Governing Distributions

1.    Disbursing Agent

a.    Litigation Trust Trustee as Disbursing Agent for Class ~~5A~~6A Claims and Class ~~5B~~6B Claims

The Reorganized Debtor shall be the Disbursing Agent for any payments made to parties other than creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to the Plan.  The Litigation Trust Trustee shall be the Disbursing Agent for creditors that shall receive Litigation Trust Interests and shall make all required distributions to such creditors pursuant to Article IV.M.9 of the Plan.

b.    Alternative Disbursing Agent Qualifications

Other than as set forth in the Plan, after the Effective Date no Person other than the Litigation Trust Trustee (or the Reorganized Debtor to the extent any applicable disbursement to be made by the Reorganized Debtor as Disbursing Agent could not be effected on the Effective Date) shall be authorized by the Bankruptcy Court to serve as Disbursing Agent unless and until the Litigation Trust Oversight Committee consents in writing to that Person serving as Disbursing Agent, and that Person (i) executes and files a statement with the Bankruptcy Court agreeing to perform all of the duties of the Disbursing Agent under the Plan, and (ii) consents to the jurisdiction of the Bankruptcy Court in respect to all matters relating to the performance of his or her duties as the Disbursing Agent under the Plan or order of the Bankruptcy Court.

      2.       <u>Time and Manner of Distributions</u>

The Disbursing Agent shall make Distributions under the Plan on account of Claims Allowed on the Effective Date or as soon as practicable after the Effective Date, except as otherwise agreed to by the Litigation Trust Oversight Committee or by order of the Bankruptcy Court. The Litigation Trust Trustee as Disbursing Agent shall have the power, subject to Litigation Trust Oversight Committee consent, to make interim distributions to Litigation Trust Beneficiaries in accordance with the Plan if the Litigation Trust Trustee determines that such interim distributions are warranted and economical. If the Litigation Trust Trustee determines to make interim distributions to Litigation Trust Beneficiaries, the Litigation Trust Trustee will determine the amount to be distributed by taking into account such factors as ongoing expenses and costs, taxes and reserves necessary to provide for the resolution of Litigation Trust Causes of Action. Amounts withheld will be placed in an interest-bearing account approved by the Litigation Trust Oversight Committee, which shall fund ongoing expenses and costs relating to such reserves, including, without limitation, taxes in respect of Litigation Trust Causes of Action, if any.

At the option of the Disbursing Agent, except as otherwise provided in the Plan, any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank, by wire transfer or by ACH. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan. Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary). Any distribution of less than $50.00 will be considered de minimis, and Holders of Allowed Claims that are entitled to any distribution of less than $50.00 will not receive any distribution unless and until the aggregate of such distributions exceed $50.00. Such undistributed funds shall remain with and vest in the Litigation Trust for distribution to other Holders of Allowed Claims.

      3.       <u>Interest of Claims</u>

Except as otherwise specifically provided for in the Plan or in the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.

      4.       <u>Compliance with Tax Requirements/Allocations</u>

In connection with the Plan, to the extent applicable, the Litigation Trust and Litigation Trust Trustee shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of Allowed Claims with any excess allocated, if applicable, to unpaid interest that accrued on such Claims.

      5.       <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

            a.       <u>Delivery of Distributions in General</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (i) at the addresses set forth on the Proof of Claim or Interest filed by such Holder (or at the last known address of such Holder if no motion requesting payment or Proof of Claim or Interest is filed or the Debtors and the Litigation Trust have been notified in writing of a change of address), (ii) at the addresses set forth in any written notices of address changes delivered to the Litigation Trust Trustee or the Debtors as applicable after the date of any related Proof of Claim or Interest, or (iii) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been filed and the Litigation Trust Trustee or the Debtors have not received a written notice of a change of address.

b.    Undeliverable Distributions

i.    Holding of Undeliverable Distributions

If any distribution to a Holder of an Allowed Claim is returned as undeliverable, no further distributions shall be made to such Holder unless and until notification in writing of such Holder's then-current address is provided. Undeliverable distributions shall be returned and shall remain in the possession of the Litigation Trust until such time as a distribution becomes deliverable. Undeliverable distributions shall not be entitled to any interest, dividends or other accruals of any kind. As soon as reasonably practicable, the Litigation Trust shall make all distributions that become deliverable.

ii.    Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim (irrespective of when a Claim became an Allowed Claim) that does not assert a Claim pursuant hereto for an undeliverable distribution (regardless of when not deliverable) within ninety (90) days after the distribution has been attempted to be made to the Holder of the Allowed Claim shall have its Claim related to such undeliverable distribution satisfied and shall be forever barred from asserting any such Claim against the Litigation Trust or be entitled to a further distribution. In such cases, any Cash held for distribution on account of such Claims shall be the property of the Litigation Trust free of any such Claim. Nothing contained herein shall require the Litigation Trust Trustee or any interested party to attempt to locate any Holder of an Allowed Claim.

6.    Claims Administration Responsibility

a.    Reservation of Rights to Object to Claims

Except as provided in Article II.B hereof, for the avoidance of doubt, nothing in this Section F shall affect the rights, if any, of any interested party to object to any Claim or Interest before the Effective Date. Unless a Claim or Interest is expressly described as an Allowed Claim or Interest pursuant to or under the Plan, or otherwise becomes an Allowed Claim or Interest prior to Effective Date, the Debtors reserve any and all objections to any and all Claims and Interests and motions or requests for the payment of Claims or Interests, whether administrative expense, priority, secured or unsecured, Liens and security interests, whether under the Bankruptcy Code, other applicable law or contract. The Debtors' failure (as applicable) to object to any Claim or Interest in the Chapter 11 ~~Case~~Cases shall be without prejudice to the Debtors' rights to contest or otherwise defend against such Claim or Interest in the Bankruptcy Court when and if such Claim

or Interest is sought to be enforced by the Holder of such Claim or Interest prior to the Effective Date.~~.~~.

    b.    <u>Filing of Objections</u>

After the Effective Date, the Reorganized Debtor shall have the sole authority to file objections and otherwise object to all ~~Claims~~ Administrative Claims, and all claims seeking allowance as Administrative Claims, not paid on or prior to the Effective Date.

~~other than Claims included in Class 5A and Class 5B to which no pre-Effective Date objection has been filed.  The~~On the Effective Date, the Litigation Trust and the Litigation Trust Trustee as applicable shall assume the right and obligation to prosecute any Claim Objections (other than Administrative Claims or claims seeking allowance as Administrative Claims) which have not been previously adjudicated prior to the Effective Date.  After the Effective Date, the Litigation Trust and Litigation Trust Trustee as applicable shall have the sole authority to file objections and otherwise object to all Claims ~~included in Class 5A and Class 5B, notwithstanding any election to be treated as a Class 4 Trade Creditor, to which no pre-Effective Date objection has been filed.~~  (other than Administrative Claims or claims seeking allowance as Administrative Claims) which are paid on the Effective Date.

An objection to a Claim or Interest shall be deemed properly served on the Holder of such Claim or Interest if service is made by any of the following methods: (i) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for such Holder is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or Interest or other representative identified on the Proof of Claim or Interest or any attachment thereto; or (iii) by first class mail, postage prepaid, on any counsel that has appeared on the behalf of such Holder in the Chapter 11 Cases.  Unless otherwise provided in ~~this~~the Plan or by order of the Bankruptcy Court, any objections to Claims must be filed and served not later than the Objection Deadline.

    c.    <u>Determination of Claims</u>

Any Claim as to which a Proof of Claim or Interests or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated pursuant to (i) an order of the Bankruptcy Court, (ii) applicable bankruptcy law, (iii) agreement of the parties, (iv) applicable non-bankruptcy law, or (v) the lack of (a) an objection to such Claim or Interest, (b) an application to equitably subordinate such Claim, and (c) an application to otherwise limit recovery with respect to such Claim or Interest filed by the Debtors on or prior to any applicable deadline for filing such objection or application with respect to such Claim or Interest.  Any such Claim or Interest determined to be Allowed, shall be deemed to be an Allowed Claim for such liquidated amount (so long as such determination has not been stayed, reversed or amended and as to which determination (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending) and shall be satisfied in accordance with the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim, right or Cause of Action that the Debtors may have against any Person in connection with or arising out of any Claim or Claims, including, without limitation, any rights under 28 U.S.C. § 157.

7.      Procedures for Treating and Resolving Disputed and Contingent Claims or Interests

a.      No Distributions Pending Allowance

No payments or distributions will be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order, and the Disputed Claim has become an Allowed Claim or Interest; provided, however, that in the event that only a portion of such Claim or Interest is an Allowed Claim or Interest, the Disbursing Agent may make, in his or her discretion, a distribution pursuant to the Plan on account of the portion of such Claim or Interest that becomes an Allowed Claim or Interest.

b.      Claim Estimation

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee, as applicable, may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code; provided, however, that the Bankruptcy Court shall determine (i) whether such Disputed Claim is subject to estimation pursuant to section 502(c) of the Bankruptcy Code, and (ii) the timing and procedures for such estimation proceedings, if any.

8.      Setoffs and Recoupment

Prior to the Effective Date the Debtors, and after the Effective Date the Litigation Trust Trustee as applicable may, pursuant to Section 558 of the Bankruptcy Code or applicable non-bankruptcy law, but shall not be required to, setoff against or recoup from any Claim on which payments are to be made pursuant to the Plan any claims or Causes of Action of any nature whatsoever the Debtors, Reorganized Debtor or Litigation Trust, as applicable, may have against the Holder of such Claim; provided, however, that neither the failure to effect such setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtors, or Litigation Trust as applicable, of any setoff or recoupment the Debtors or Litigation Trust may have against the Holder of such Claim, nor of any other claim or Cause of Action.

9.      Allowance and Disallowance of Claims Subject to Section 502 of the Bankruptcy Code

Allowance and disallowance of Claims shall be in all respects subject to the provisions of Section 502 of the Bankruptcy Code, including, without limitation, subsections (b), (d), (e), (g), (h) and (i) thereof.

10.     Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided herein, all promissory notes, shares, certificates, instruments, indentures, or agreements evidencing, giving rise to or governing any Claim shall be deemed canceled and annulled without further act or action under any applicable agreement, law, regulation, order or rule; the obligations of the Debtors under such promissory notes, share certificates, instruments, indentures or agreements shall be satisfied

and the Holders thereof shall have no rights against the Debtors, the Estates, the Reorganized Debtor, the Litigation Trust Trustee, the Litigation Trust Oversight Committee, and/or the Litigation Trust; and such promissory notes, share certificates, instruments, indentures or agreements shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

11.    Withholding Taxes

The Disbursing Agent shall be entitled to deduct any federal, state or local withholding taxes from any payments under the Plan.  As a condition to making any distribution under the Plan, the Disbursing Agent may require that the Holder of an Allowed Claim provide such Holder's taxpayer identification number and such other information and certification as the Disbursing Agent may deem necessary to comply with applicable tax reporting and withholding laws.

12.    Reports

From the Effective Date, until a Final Decree is entered, the Litigation Trust Trustee shall submit quarterly reports to the United States Trustee and the Litigation Trust Oversight Committee setting forth all receipts and disbursements of the Litigation Trust as required by the United States Trustee guidelines.

13.    Distribution Record Date

As of the close of business on the applicable Distribution Record Date, the transfer register for all Claims maintained by the Debtors or their agents, shall be closed, and there shall be no further changes in the Record Holders of any such Claims.  Moreover, the Debtors, Reorganized Debtor, Litigation Trust, Litigation Trust Trustee or Litigation Trust Oversight Committee as applicable shall have no obligation to recognize the transfer of any such Claims occurring after the applicable Distribution Record Date and shall be entitled for all purposes herein to recognize and deal only with those Holders of record as of the close of business on the applicable Distribution Record Date.

14.    Timing and Calculation of Amounts to be Distributed

Except as otherwise provided herein, on the Effective Date each Holder of an Allowed Claim against the Debtors shall receive the distributions that the Plan provides for Allowed Claims in the applicable Class, provided however, the Litigation Trust shall maintain reserve accounts in trust for the payment or distribution on account of Litigation Trust Beneficiaries and shall make the appropriate adjustments in distributions to adequately take into consideration and fund such reserve accounts.  The Litigation Trust Trustee, as Disbursing Agent, shall be authorized to make interim distributions and any subsequent distributions necessary to distribute any Cash, or other consideration held in any reserve account to the appropriate Claim Holder as Claims are resolved and Allowed and reserves are reduced in accordance with the Plan.

15.    Settlement of Claims and Controversies

Pursuant to Fed. R. Bankr. P. 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith

compromise and settlement of claims and/or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of any such Allowed Claim.

    I.    <u>Conditions Precedent to Confirmation and Occurrence of the Effective Date</u>

    1.    <u>Conditions Precedent to Confirmation</u>

It shall be a condition to Confirmation hereof that all provisions, terms and conditions of the Plan and the Disclosure Statement are approved in the Confirmation Order.

    2.    <u>Conditions Precedent to Confirmation</u>

It shall be a condition to occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions herein:

    a.    Fourteen (14) days have passed since the entry of the Confirmation Order as a Final Order in form and substance satisfactory to the Debtors and the Committee in their absolute discretion. The Confirmation Order shall provide that, among other things:

    i.    the Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, and other agreements or documents created in connection with the Plan; and

    ii.    the provisions of the Confirmation Order are nonseverable and mutually dependent.

    b.    The appointment of the Litigation Trust Trustee shall have been confirmed by the Confirmation Order or order of the Bankruptcy Court.

    c.    All actions, documents and agreements necessary to implement the Plan, including, without limitation, creating the Litigation Trust and entering into the Litigation Trust Agreement, shall have been effected or executed.

    d.    The Debtors shall have established a reserve for all then outstanding Professional Fee Claims and Committee Professional Fee Claims (as limited by the Plan) as estimated by the Debtors and the Committee on or prior to the Effective Date.

    3.    <u>Waiver of Conditions</u>

Except as otherwise required by the tenets of the Plan, the Debtors may waive any of the conditions to Confirmation of the Plan and/or to occurrence of the Effective Date of the Plan set

forth in this Article VIII, at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to confirm and/or consummate the Plan.

### 4. Debtors' Right of Revocation or Withdrawal

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans. If the Debtors revoke or withdraw the Plan, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtors or any other Person (ii) prejudice in any manner the rights of such Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

### J. Effect of Confirmation

### 1. Injunction

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims that have been discharged pursuant to Article IX of the Plan or are subject to exculpation pursuant to Article IX of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtor, or the Exculpated Parties: (1) commencing or continuing in any manner any action or another proceeding of any kind on account of or in connection with or with respect to any such Claims or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the aforementioned entities or the property or the estates of the aforementioned entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the aforementioned entities or against the property of the aforementioned entities on account of or in connection with or with respect to any such Claims unless, such holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests r settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the**

implementation or consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX of the Plan.

2.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code §§ 105 or 362, ~~this~~the Plan or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the later of (i) the closing of the Chapter 11 Cases or (ii) the dissolution of the Litigation Trust.

3.    Exculpation

Effective as of the Effective Date, to the fullest extent permissible under 11 U.S.C. § 1125(e) and notwithstanding anything herein to the contrary, each Exculpated Party is hereby exculpated from any claim, obligation, Cause of Action, or liability for (a) any act or omission occurring between the Petition Date and the Effective Date in connection with, the representation of the Debtors, or (b) any act or omission occurring between the Petition Date and the Effective Date in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, administering, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the Reorganized Holdings Organizational Documents, the Reorganized Debtors Organizational Documents, the Restructuring Transactions, the Litigation Trust Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), in each case except for fraud, willful misconduct, gross negligence or claims for legal malpractice, release of which is prohibited by Rule 1.8(h) of the New York Rules of Professional Conduct (22 N.Y.C.R.R. § 1200), each solely to the extent as determined by a Final Order of a court of competent jurisdiction; provided, however, that, for the avoidance of doubt, such exculpation shall not act or be construed to exculpate, channel, release, enjoin, or otherwise affect any civil or criminal enforcement action by a Governmental Unit.  Notwithstanding the foregoing, the Exculpation shall not release any obligation or liability of any Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or impair the ability of any Entity under the Plan to object to any request for payment on account of Professional Fee Claims.

4.    Release of Liens

Except as otherwise provided in the Plan, the Plan Supplement, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan all mortgages, deeds of trust, Liens, pledges, or other security interests against any property

**of the Estates shall be fully released, settled, compromised, and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any holder of such security interest (and the applicable agents for such holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such holder (and the applicable agents for such holder), and to take such actions as may be reasonably requested by the Reorganized Debtor to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

K.    <u>Retention of Jurisdiction</u>

The Plan shall not in any way limit the Bankruptcy Court's post-confirmation jurisdiction as provided under the Bankruptcy Code. Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court shall retain and have exclusive jurisdiction (to the extent granted by applicable law, including any provisions permitting mandatory or discretionary withdrawal of such jurisdiction) over any matter arising out of or related to the Chapter 11 Cases and the Plan, including, without limitation, the following:

a.    All matters relating to the assumption or rejection or the assumption and assignment of executory contracts, or Claims or disputes relating thereto;

b.    All matters relating to the ownership of a Claim or Interest;

c.    All matters relating to the distribution to Holders of Allowed Claims and Interests and to the determination of Claims and Interests;

d.    Any and all matters involving the Litigation Trust Trustee and/or the Litigation Trust and/or the Litigation Trust Oversight Committee;

e.    All matters relating to or arising in connection with the disallowance, Allowance or estimation of Claims or Interests filed, both before and after the Confirmation Date, including any objections to the classification of any Claim or Interest;

f.    To enter and implement such orders as may be appropriate if the Confirmation Order is for any reason stayed, revoked, modified and/or vacated;

g.    All matters relating to the construction and implementation of the Plan and the provisions thereof, and to hear and determine all requests for orders in aid of execution, implementation or consummation of the Plan;

h.    All matters relating to disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes involving the injunction and exculpation provisions of the Plan, and disputes arising under agreements, documents or instruments executed in connection with the Plan;

i.      To consider any modifications of the Plan, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

j.      All applications for allowance of compensation and reimbursement of Professional Fee Claims under the Plan or under §§ 328, 330, 331, 503(b), 1103 and 1129(a)(4) of the Bankruptcy Code;

k.      To hear and determine all motions requesting allowance of an Administrative Claim;

l.      To determine requests for the payment of Claims entitled to priority under §507(a)(2) of the Bankruptcy Code, including compensation and reimbursement of expenses of parties entitled thereto;

m.      All Causes of Action, Avoidance Actions and other suits and adversary proceedings to recover assets of the Litigation Trust, as successor-in-interest to the Debtors and property of the Estates, wherever located, and to adjudicate any and all other Causes of Action, Avoidance Actions, suits, adversary proceedings, motions, applications and contested matters that may be commenced or maintained pursuant to the Chapter 11 Cases or the Plan, proceedings to adjudicate the allowance of Disputed Claims and Interests, and all controversies and issues arising from or relating to any of the foregoing;

n.      All disputes between the Independent Committee and Committee or Litigation Trust Trustee as applicable regarding the ownership of any discovered Unknown Cause of Action;

o.      All disputes regarding the payment of the Excess SME Proceeds, the accounting supporting the Excess SME Proceeds, the refund of any Excess SME Proceeds during the Excess SME Proceeds Period;

p.      o. All matters concerning state, local and federal taxes in accordance with §§ 346, 505 and 1146 of the Bankruptcy Code;

q.      p. Any other matter to the extent such jurisdiction is consistent with the Bankruptcy Code;

q. All disputes involving the existence, nature or scope of the Confirmation Order, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program;

r.      To enter the Final Decree closing the Chapter 11 Case; and

s.      To enforce all orders previously entered by the Bankruptcy Court, including the Confirmation Order.

L.      <u>Miscellaneous Provisions</u>

1.      <u>Effectuating Documents, Further Transactions and Corporation Action</u>

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements of documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable general corporation law of the states where each of the Debtors are organized without any requirement of further action by the shareholders or directors of any Debtor.

2.    <u>Payment of Statutory Fees</u>

All fees payable pursuant to section 1930(a) of Title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid, prior to the Effective Date, out of the Assets of the Estate for each quarter (including any fraction thereof) and after the Effective Date by the Litigation Trust until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

3.    <u>Headings</u>

The headings of the articles, paragraphs and sections of the Plan are inserted for convenience only and shall not affect the interpretation hereof.

4.    <u>Biding Effect of Plan</u>

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, the Estates, the Litigation Trust and their respective successors or assigns, whether or not the Claim or Interest of such Holders is Impaired under the Plan and whether or not such Holder has accepted the Plan.  The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan, shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor or assign of such entity (including, without limitation, the Litigation Trust Trustee and any trustee appointed for the Debtors under Chapters 7 or 11 of the Bankruptcy Code).

5.    <u>Final Order</u>

Except as otherwise expressly provided in the Plan, any requirement in the Plan for a Final Order may be waived by the Debtors in consultation with the Committee upon written notice to the Bankruptcy Court.  No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

6.    <u>Withholding and Reporting Requirements</u>

In connection with the Plan and all instruments issued in connection herewith and distributions hereunder, the Debtors, Litigation Trust and the Litigation Trust Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign

taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.

7.    Tax Exemption

Pursuant to section 1146 of the Bankruptcy Code, any transfers from the Debtors, the Litigation Trust or the Litigation Trust  Trustee to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of the Debtors' or the Litigation Trust's personal property, or the issuance, transfer or exchange of any security under the Plan, or the execution, delivery or recording of an instrument of transfer pursuant to, in implementation of or as contemplated by the Plan, including, without limitation, any transfers to or by the Litigation Trust Trustee of the Debtors' or the Litigation Trust's property in implementation of or as contemplated by the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

8.    Governing Law

Except to the extent a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless specifically stated, the rights, duties and obligations arising under the Plan, any agreements, documents and instruments executed in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control), and, with respect to the Debtors and the Litigation Trust, corporate governance matters shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles.

9.    Severability

After the Effective Date, should the Bankruptcy Court or any other court of competent jurisdiction determine that any provision in the Plan is either illegal on its face or illegal as applied to any Claim, such provisions shall be unenforceable either as to all Holders of Claims or as to the Holder of such Claim as to which the provision is illegal, respectively.  Such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

10.    Plan Controls

In the event and to the extent any provision of the Plan is inconsistent with any provision of the Disclosure Statement or the Plan Supplement, the provisions of the Plan shall control and take precedence.

11.    Amendments and Modifications

- 94 -

The Debtors may alter, amend or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Hearing. After the Confirmation Date and prior to "substantial consummation" (as such term is defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtors in consultation with the Committee may institute proceedings in the Bankruptcy Court pursuant to section 1127(b) of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, and pursue such matters as may be necessary to carry out the purposes and effects of the Plan, by the filing of a motion on notice to the Bankruptcy Rule 2002 service list only, and the solicitation of all Creditors and other parties-in-interest shall not be required.

12.    Notices

Any notices required under the Plan or any notices or requests of the Debtors or the Litigation Trust Trustee by parties in interest under or in connection with the Plan shall be in writing and served either by (i) certified mail, return receipt requested, postage prepaid, (ii) hand delivery, or (iii) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

To the Debtors:

Reed Smith LLP
Attn:  Derek J. Baker, Esq. and Derek M. Osei-Bonsu, Esq.
Three Logan Square
1717 Arch Street Suite 3100
Philadelphia, PA 19146

-and-

Reed Smith LLP
Attn: Ann E. Pille
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606

To the Committee:

Dechert LLP
Attn:  Stephen Zide, Esq and David Herman Esq.
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

To the Litigation Trust and the Litigation Trust Trustee:

_____

13.    Filing of Additional Documents

On or before substantial consummation of the Plan, the Debtors may file with the Bankruptcy Court such agreements or other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

14.    <u>Direction to a Party</u>

From and after the Effective Date, the Debtors, the Litigation Trust or the Litigation Trust Trustee may apply to the Bankruptcy Court for the entry of an order directing any Person to execute or deliver or to join in the execution or delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by the Plan, and to perform any other act (including the satisfaction of any lien or security interest) that is reasonably necessary or reasonably appropriate for the consummation of the Plan.

15.    <u>Successors and Assigns</u>

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

16.    <u>Reservation of Rights</u>

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

17.    <u>Further Assurances</u>

The Debtors, Litigation Trust Trustee, and all Holders of Claims receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

18.    <u>Entire Agreement</u>

The Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

## IX.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy Court will enter the Confirmation Order.  The Debtors believe that the Plan satisfies or will satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- 96 -

- The Debtors, as Plan proponents, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors, as Plan proponents, will disclose in the Plan Supplement the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as the Litigation Trust Trustee of the Litigation Trust or a member of the Litigation Trust Oversight Committee; and the appointment to such office of such individual is consistent with the interests of Creditors and with public policy; and the Debtors, as Plan proponents, will disclose in the Plan Supplement the identity of any Insider that will be employed or retained by the Litigation Trust or Litigation Trust Oversight Committee, and the nature of any compensation for such Insider.

- With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests, ~~other than Class 6~~ will either have accepted the Plan or will not be Impaired under the Plan.  However, the Plan may be confirmed without the approval of Classes 1, 2, 3, 4, ~~5A~~5, 6A, or ~~5B~~6B pursuant to section 1129(b) of the Bankruptcy Code because (1) the Plan does not discriminate unfairly and is fair and equitable; and (2) Holders of any Claim or Interest junior to will only receive or retain any property under the Plan on account of such junior Claim or Interest as a result of the new value provided.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date or prior to the Effective Date.

The Debtors believe that (a) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (b) they have complied, or will have complied, with all of the requirements of Chapter 11 and (c) the Plan has been proposed in good faith.

A.    Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors.  This requirement is imposed by section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  The Plan is premised on cash payments to certain of the Debtors' creditors and the creation of the Litigation Trust for the pursuit and liquidation of

Litigation Trust Causes of Action and the distribution of the Distributable Cash provided to the Litigation Trust to the Debtors' Old Noteholders and Exchange Noteholders. The Debtors believe that there will be sufficient Litigation Trust Assets available to enable the Litigation Trust Trustee to fully and timely perform all obligations described in the Plan and make distributions to creditors, therefore, that the Plan is feasible.

B.    Best Interest Test

1.    Generally

The Bankruptcy Code requires a bankruptcy court to determine that a plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court generally determines the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" consists primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors in these Chapter 11 Cases would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 Case and the Chapter 11 Case. A liquidation under Chapter 7 does not affect the priority of several holders of claims to be paid first. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 Case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself could trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation also would prompt the rejection of a large number of executory contracts and unexpired leases and thereby create a significantly higher number of unsecured claims.

After estimating the recoveries in liquidation of priority claimants, the bankruptcy court next determines the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the "best interests" of creditors and equity security holders.

2.    Best Interest of Creditors Test

The Debtors believe that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.  The Debtors will be transferring the Litigation Trust Assets to the Litigation Trust for pursuit and distribution amongst the Litigation Trust Beneficiaries, while the Debtors' remaining creditors will receive a distribution derived from the Shareholder New Value Contribution.

The Debtors further believe that, in the event of conversion of the Chapter 11 Cases to cases under Chapter 7, distributions will be reduced by an extra layer of administrative expense created by conversion as well as significantly delayed.  In Chapter 7 cases, the Chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee.  The Chapter 7 trustee would be entitled to receive such commissions and such fees, even if the Chapter 7 trustee's only tasks are to distribute available Cash.  The Debtors believe that it is in the best interests of the Creditors to avoid this additional and unnecessary layer of administrative expenses.  It is also anticipated that Chapter 7 liquidations would result in delay in the distributions to Creditors.  Among other things, Chapter 7 cases would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to Chapter 7. Fed. R. Bankr. P. 3002(c).  Hence, Chapter 7 liquidations would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the Chapter 11 Cases.  Further, in the event of a Chapter 7 liquidation, the Shareholder New Value Contribution would not be provided by the Eletson Members resulting in an immediate loss of distributable value to Creditors.

Based on the foregoing, the Plan provides an opportunity to bring the greatest return to Creditors.  The Debtors believe that, if the Plan is not confirmed or is not confirmable, the only likely alternative will be conversion of the Chapter 11 Cases to Chapter 7 liquidations. For the reasons set forth above, the Debtors believe that the Plan is more likely to yield economic benefits to Creditors than Chapter 7 liquidations.  The Debtors believe that the members of each Impaired Class will receive at least as much under the Plan as they would in a liquidation in a hypothetical Chapter 7 case.

C.    Confirmation Without Acceptance by All Impaired Classes: the "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan may be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it.  A bankruptcy court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by impaired classes as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the lien securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the

allowed amount of that claim of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

## X.    IMPORTANT CONSIDERATIONS AND RISK FACTORS

### A.    The Debtors have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### B.    No Representations Outside the Disclosure Statement are Authorized

Other than as set forth in this Disclosure Statement, no representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code.  Any representations or inducements made to secure your acceptance of the Plan that are not in the Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report such unauthorized representations or inducements to Debtors' counsel and the Office of the United States Trustee.

### C.    Information Presented is Based on the Debtors' Books and Records, and no Audit was Performed

While the Debtors have endeavored to present information fairly in this Disclosure Statement, because of Debtors' financial difficulties, as well as the complexity of Debtors' financial matters, the Debtors' books and records upon which this Disclosure Statement is based

might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

  D.  <u>All Information was Provided by Debtors and was Relied Upon by Professionals</u>

  Reed Smith LLP was approved by the Bankruptcy Court to represent the Debtors effective as of the Conversion Date as general bankruptcy counsel.  All counsel and other professionals for the Debtors have relied upon information provided by the Debtors in connection with preparation of this Disclosure Statement.  Although counsel for the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein.

  E.  <u>Projections and Other Forward Looking Statements are Not Assured, and Actual Results will Vary</u>

  Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

  F.  <u>No Legal or Tax Advice is Provided to You by the Disclosure Statement</u>

  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

  G.  <u>No Admissions Made</u>

  Nothing contained herein shall constitute an admission of any fact or liability by any party (including, without limitation, the Debtors) or to be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

  H.  <u>No Waiver of Rights Except as Expressly Set Forth in the Plan</u>

  A Creditor's vote for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors (or any party in interest, as the case may be) to object to that Creditor's Claim, or recover any preferential, fraudulent or other voidable transfer or Estate Assets, regardless of whether any Claims of the Debtors or their respective Estates are specifically or generally identified herein.

  I.  <u>Bankruptcy Law Risks and Considerations</u>

1.      Confirmation of the Plan is Not Assured

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  There can also be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate resolicitation of votes.

2.      The Effective Date Might Be Delayed or Never Occur

There can be no assurance as to the timing of the Effective Date or that it will occur.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or been waived, the Confirmation Order shall be vacated in accordance with the Plan and such Confirmation Order. In that event, no distributions would be made, and the Holders of Claims and Interests would be restored to their previous position as of the moment before Confirmation, and the Debtors' obligations for Claims and Interests would remain unchanged.

3.      The Projected Value of Estate Assets Might Not be Realized

In conducting their feasibility and best interests test analyses, the Debtors projected the value of the Estates' Assets which would be available for payment of expenses and distributions to Holders of Allowed Claims, as set forth in the Plan.   The Debtors have made certain assumptions, which may prove to be inaccurate.

4.      Allowed Claims in the Various Classes May Exceed Projections

The Debtors have also projected the allowed amount of Claims in each Class in conducting their feasibility and best interests test analyses.  Certain Classes, and the Classes below them in priority, could be significantly affected by the allowance of Claims in an amount that is greater than projected.

~~5.   The Gas Ownership Claim Settlement Amount is Undetermined and may fall short of Projections~~

~~The Gas Ownership Claim Settlement provides that certain litigation recoveries against Levona will be transferred to the Litigation Trust.  The amount of these recoveries may fall short of the projected amount set forth in this Disclosure Statement given the inherent uncertainty in the pursuit of any litigation claim.~~

5.      ~~6.~~ The SME Revenue may fall short of Projections

Actual financial results for the SME Revenue may differ materially from anticipated results.  This may result in lower recoveries of holders of Litigation Trust Interests as there would be less Distributable Cash in the Litigation Trust.

## XI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

A.      Federal Income Tax Consequences of the Plan

The following is a general summary of certain significant U.S. federal income tax consequences of the Plan to the Holders of certain Claims and Interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury Department regulations promulgated thereunder ("Treasury Regulations"), judicial decisions and current administrative rulings and practice as in effect on the date hereof. These authorities are all subject to change at any time by legislative, judicial or administrative action, and such change may be applied retroactively in a manner that could adversely affect Holders of Claims or Interests and the Debtors.

Due to a lack of definitive judicial or administrative authority or interpretation, the complexity of the application of the Tax Code and Treasury Regulations to the implementation of the Plan, the possibility of changes in the law, the differences in the nature of various Claims and Interests and the potential for disputes as to legal and factual matters, the tax consequences discussed below are subject to substantial uncertainties.

The description that follows does not cover all aspects of United States federal income taxation that may be relevant to the Debtors or Holders of Claims or Interests. For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and non-U.S. taxpayers nor does it address tax consequences to Holders of Interests in the Debtors. In addition, the description does not discuss state, local or non-U.S. tax consequences of the Plan.

1.      Withholding Taxes

The Disbursing Agent will withhold taxes from distributions provided under the Plan and required by law to be withheld and will comply with all applicable reporting requirements of the Tax Code. Under the Tax Code, interest, dividends and other "reportable payments" may under certain circumstances be subject to "backup withholding". Backup withholding generally applies if the Holder (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct TIN and the Holder is not subject to backup withholding. Your Ballot contains a place to indicate your TIN.

2.      Federal Income Tax Treatment of the Litigation Trust

For federal income tax purposes, it is intended that the Litigation Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations and that such trust be owned by its beneficiaries (i.e., the Holders of Allowed Claims in Class 5A6A as applicable and Class 5B6B). Accordingly, for federal income tax purposes, it is intended that the beneficiaries be treated as if they had received a distribution from the Debtors' Estates of an undivided interest in the assets of the Litigation Trust and then contributed such interests to the Litigation Trust.

3.      Litigation Trust Assets Treated As Owned by Holders of Allowed Class 5A6A and Class 5B6B Claims

For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Litigation Trust Trustee, and the Holders of Allowed Claims and Interests) shall treat the

- 103 -

transfer of Assets and liabilities to the Litigation Trust, in accordance with the terms of the Plan, as a transfer to Holders of Allowed Class ~~5A~~6A Claims as applicable and Class ~~5B~~6B Claims followed by a transfer by such Holders to the Litigation Trust, and the beneficiaries of the Litigation Trust shall be treated for federal income tax purposes as the grantors and owners thereof. The beneficiaries of the Litigation Trust shall be Holders of Allowed Class ~~5A~~6A Claims as appliable and Class ~~5B~~6B Claims.

B.    Federal Income Tax Consequences of Payment of Allowed Claims

The United States federal income tax consequences of Plan implementation to the Holders of Allowed Claims will depend on, among other things, the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder receives distributions under the Plan in more than one taxable year, whether the Holder's claim is allowed or disputed at the Effective Date, and whether the Holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

1.    Recognition of Gain or Loss

a.    In General

In general, a Holder of a Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount. If the Holder realizes a capital loss, its deduction of the loss may be subject to limitation. The Holder's aggregate tax basis for any property received under the Plan generally will equal the amount realized. The Holder's amount realized generally will equal the sum of the Cash and the fair market value of any other property received (or deemed received) by the Holder under the Plan on the Effective Date or subsequent distribution date, less the amount (if any) allocable to Claims for interest, as discussed below.

b.    Post-Effective Date Cash Distributions

Because certain Holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive Cash distributions subsequent to the Effective Date of the Plan, the imputed interest provisions of the Internal Revenue Code may apply to treat a portion of the subsequent distributions as imputed interest. Additionally, because Holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the Holder may be deferred. All Holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

c.    Bad Debt and/or Worthless Securities Deduction

A Holder who, under the Plan, receives in respect of a Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year)

to a bad debt deduction in some amount under § 166(a) of the Internal Revenue Code or a worthless securities deduction under § 165(g) of the Internal Revenue Code.  The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed.  Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 2.    Pending Payments

Cash and other Litigation Trust Assets that the Litigation Trust holds as a pending payment after the Effective Date should be deemed to have been paid to the Holder of the Claim entitled to receive such pending payment on the date that the Litigation Trust received it and to have been contributed by such Holder to the Litigation Trust as a grantor and beneficiary of the Litigation Trust. Thus, the Holder should recognize gain or loss based upon the amount deemed received and contributed to the Litigation Trust on the Effective Date, and any income subsequently realized by the Litigation Trust with respect to such pending payment will be reported by the Litigation Trust Trustee as income of the grantor-beneficiary in the year realized, prior to the actual distribution of the pending payment to the Holder of the Allowed Claim.  The actual receipt of the pending payments from the Litigation Trust will not be a taxable event.

### 3.    Payments Other than Pending Payments

If any payment other than a pending payment is to be made out of the Litigation Trust, such payment will not be deemed to have been made to any recipient until, and to the extent that, the amount to which the payee is entitled has been determined and distributed.  Any income realized by the prior to such time will be reported by the Litigation Trust Trustee as income of and taxable to the Litigation Trust.

### C.    Certain Other Tax Consequences for Holders of Claims

### 1.    Receipt of Pre-Effective Date Interest

In general, a Claim Holder that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be required to take such amount into income as taxable interest.  A Claim Holder that was previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan. Each Holder is urged to consult its tax advisor regarding the tax treatment of its distributions under the Plan and the deductibility of any accrued but unpaid interest for federal income tax purpose

### 2.    Installment Method

A Holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of § 453B of the Internal Revenue Code.

### D.    Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. Federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Holder's individual circumstances. Accordingly, Holders are urged to consult with their tax advisors about federal, state, local and non-U.S. tax consequences to the Plan.

## XII.    EFFECT OF CONFIRMATION

### A.    Binding Effect of Confirmation

Confirmation will legally bind the Debtors, all Creditors, Interest Holders and other parties in interest to the provisions of the Plan, whether or not the Claim or Interest Holder is impaired under the Plan, and whether or not such Creditor or Interest Holder has accepted the Plan.

### B.    Vesting of Assets Free and Clear of Liens, Claims and Interests

Except as otherwise provided in the Plan or in the Confirmation Order, upon the Effective Date, title to all Assets and property of the Debtors, and all property of the Estates, including, pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, other than the Litigation Trust Assets as transferred pursuant to the terms of the Plan and the Litigation Trust Agreement, will vest in the Reorganized Debtor free and clear of all Liens, Claims and Interests. Thereafter, the Reorganized Debtor will hold these assets without further jurisdiction, restriction or supervision of the Bankruptcy Court, except as may be provided in this Disclosure Statement or the Plan.

### C.    Good Faith

Confirmation of the Plan shall constitute a finding that the Plan has been proposed in good faith and in compliance with applicable provisions of the Bankruptcy Code.

## XIII.    ALTERNATIVES TO THE PLAN

The Debtors believe that if the Plan is not confirmed, or is not confirmable, the alternatives to the Plan include: (a) the conversion to Chapter 7 cases; (b) dismissal of the Chapter 11 Cases; or (c) an alternative Chapter 11 plan.

### A.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Assets of the Debtors for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. For the reasons previously discussed above, the Debtors believe that Confirmation of the Plan will provide each Holder of a Claim entitled to receive a distribution under the Plan with a recovery that is expected to be more than or equal to what it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

### B.    Dismissal

Dismissal of the Chapter 11 Cases would allow Creditors to exercise their state law rights. In a dismissal scenario, there will be no equality of distribution and many, if not most, unsecured creditors would not receive any Distribution.

      C.    <u>Alternative Plan</u>

The Debtors believe that any alternative plan would not result in as favorable of treatment of Claims as proposed under the Debtors' Plan.

**XIV.  CONCLUSION**

The Debtors believe that the Plan maximizes recoveries to all Creditors and, thus, is in their best interests. The Plan as structured, among other things, allows Creditors to participate in distributions in excess of those that would be available if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all Creditors.

**THE DEBTORS URGE CREDITORS TO <u>ACCEPT</u> THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS INSTRUCTED ABOVE, BY COUNSEL TO THE DEBTORS BY 5:00 P.M., PREVAILING EASTERN TIME, ON [_].**

                Respectfully Submitted,

                Eletson Holdings, *et al.*, as Debtors and
                Debtors-in-Possession

                By: <u>/s/ Vasillis E. Kertsikoff</u>
                    Name: Vasillis E. Kertsikoff
                    Title:  Vice President & Director