# TOGUT, SEGAL & SEGAL LLP

ONE PENN PLAZA
NEW YORK, NEW YORK 10119

——

WWW.TOGUTLAWFIRM.COM

——

(212) 594-5000

KYLE J. ORITZ

(212) 201-6582

KORTIZ@TEAMTOGUT.COM

August 23, 2024

**VIA EMAIL**

Honorable John P. Mastando III
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

Re:     *In re Eletson Holdings Inc.*, Case No. 23-10322 (JPM)

Dear Judge Mastando:

I write on behalf of the Petitioning Creditors concerning Reed Smith's letter to the Court yesterday, disputing that it did not sufficiently disclose its prior representation of certain Eletson entities and individuals, including Laskarina Karastamati, Vasillis Kertsikoff, and Vassilis Hadjielftheriadis. That letter does not alleviate the Petitioning Creditors' serious concerns.

Reed Smith's engagement letter in the Arbitration states that it covers ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Exhibit A at 1 (emphasis added). As the Arbitrator observed in his decision, "[b]oth Karastamati and Kertsikoff testified at the [Arbitration] hearing that the Preferred Nominees are affiliates of Eletson." Exhibit B (Arbitration Award) at 30. The Arbitration engagement letter also expressly lists ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. A at 1. Contrary to the Debtors' assertions in their letter yesterday, there is no carve out in the engagement letter subsequently nullifying any of these parties as clients.

Just two days ago, Lou Solomon, the Debtors' lead counsel in these proceedings, as well as in the Arbitration, told this Court that Reed Smith "never undertook any representation of those individuals," referring to Karastamati, Kertsikoff, and Hadjielftheriadis. *See* Exhibit C (Aug. 21, 2024 Hr'g Tr.) at 114:18-19. Even if Reed Smith's tortured reading of the Arbitration engagement letter is correct, Reed Smith's engagement letter for the District Court case that Wilmington commenced against the Debtors in January 2023 as the Indenture Trustee for the Notes at issue in these

proceedings, explicitly includes ███████████████████████████
███████████████ *See* <u>Exhibit D</u> at 1.

　　　　In short, Reed Smith's failure to properly disclose its connections to Eletson, as well as its penchant for making false and misleading statements to this Court, continue to plague these proceedings.

　　　　The Petitioning Creditors are available to discuss this at the Court's earliest convenience.

Respectfully submitted,

TOGUT, SEGAL & SEGAL LLP
By:

<u>*/s/ Kyle J. Ortiz*</u>

Kyle J. Ortiz
A Member of the Firm

# EXHIBIT "A"
## (Filed Under Seal)

# EXHIBIT "B"

**JAMS ARBITRATION**
**NEW YORK, NEW YORK**

---

Eletson Holdings, Inc., et al.,

        Claimants,

    and                                           JAMS Ref. No. 5425000511

Levona Holdings Ltd.,

        Respondent.

---

**FINAL AWARD**

## I.    INTRODUCTION

1. <u>Parties and Counsel</u>:    The parties to this arbitration are identified in the caption and are represented as follows:

        <u>Counsel for Claimants:</u>

        Louis Solomon, Esq.
        Reed Smith LLP
        599 Lexington Avenue
        22nd Floor
        New York, New York 10022
        Tel: 212 521-5400
        Email: lsolomon@reedsmith.com

        Colin Underwood, Esq.
        Reed Smith LLP
        599 Lexington Avenue
        22nd Floor
        New York, New York 10022
        Tel: 212 521-5400
        Email: cunderwood@reedsmith.com

        Nancy Savitt, Esq.
        Reed Smith LLP
        599 Lexington Avenue
        22nd Floor
        New York, New York 10022
        Tel: 212 521-5400
        Email: nsavitt@reedsmith.com

Counsel for Respondents:

Mayer Klein, Esq.
Frankel, Rubin, Klein, et al.
231 South Bemiston Avenue
Suite 1111
Clayton, Missouri 63105
Tel: 314 725-8000
Fax: 314 726-5837
Email: mklein@frankelrubin.com

Reid Simpson, Esq.
Frankel, Rubin, Klein, et al.
231 South Bemiston Avenue
Suite 1111
Clayton, Missouri 63105
Tel: 314 725-8000
Fax: 314 726-5837
Email: rsimpson@frankelrubin.com

Mark McNeill
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7351
markmcneill@quinnemanuel.com

Odysseas Repousis
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7626
odysseasrepousis@quinnemanuel.com

Isaac Nesser
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7000
isaacnesser@quinnemanuel.com

William Adams
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
22nd Floor
New York, New York, 10010
Tel: 212 849 7000
williamadams@quinnemanuel.com

2.  JAMS Arbitrator:

Hon. Ariel E. Belen (Ret.)
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.:  212 751-2700
Fax:  212 751-4099
Email: abelen@jamsadr.com

3.  JAMS Law Clerk:

Rachel Gupta, Esq.
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Email: rgupta@guptaresolutions.com

4.  JAMS ADR Consultant:

Burton King, Esq.
JAMS
620 Eighth Avenue
34th Floor
New York, New York 10018
Tel.: 212 607-2758
Email: BKing@jamsadr.com

5.  The claims are set forth in a certain "Demand for Arbitration Form," dated July 29,
2022, and in a certain "Statement of Claims," dated July 29, 2022, with exhibits attached
thereto. Respondent submitted "Levona Holdings LTD's Response to Statement of Claims
and Statement of Counterclaims," with exhibits, dated August 19, 2022. Respondent also
submitted a Letter, dated September 5, 2022. Claimant then submitted a Letter, dated
September 5, 2022.

6.  This arbitration is brought pursuant to a certain "Eletson Gas, LLC, Third Amended
and Restated Limited Liability Company Agreement," dated July 29, 2022 ("LLCA"). The
arbitration provision is contained in subsection 12.14(a), page 69 of the LLCA. The parties

3

disagree as to the scope of this arbitration provision and the arbitrability before JAMS of some of the claims.

This Final Award is based upon a review of all the pleadings in this arbitration proceeding, as well as the submissions that follow that were considered by the undersigned arbitrator. The submissions and the exhibits attached thereto that were reviewed and considered are as follows: "Claimants' Pre-Hearing Statement of Position Pursuant to JAMS Rule 20(b) and Procedural Order No. 5 ¶ 8," dated May 5, 2023 ("Claimants' Rule 20(b) Statement"); "Respondent Levona's Rule 20(b) Statement of Counterclaims and Defenses to Eletson's Statement of Claims," dated May 5, 2023; "Claimants' Post-Hearing Submission," dated June 9, 2023 ("Claimants' Post Hearing Brief"); "Claimants' Proposed Order," dated June 9, 2023; "Respondent's Post Trial Brief and Statement of the Record," dated June 9, 2023 ("Respondent Post Trial Brief"); and "Respondent's Proposed Order," dated June 9, 2023. In addition, I heard and considered the testimony at an arbitration hearing that was held on May 15, 16, 18, 19, 22, 23, and 24.

I also heard closing arguments on June 13, 2023. I reviewed and considered the transcripts of the arbitration hearing and closing arguments which contain the testimony of the witnesses and the colloquy and arguments of counsel on various substantive and procedural issues. I reviewed and considered the exhibits admitted with the post-hearing submissions and the exhibits admitted at the arbitration hearing. In addition, I reviewed Eletson's Affirmation Supporting Fees, Costs, Expenses and Interest, with supporting exhibits and client affidavit, filed on August 11, 2023 ("Opening Affirmation"); Levona's Affirmation in Response to Claimants' Affirmation in Support of Its Motion for Fees, filed on August 25, 2023 ("Respondent's Affirmation"); and Eletson's Reply Affirmation in Further Support of Fees, Costs, Expenses and Interest, with supporting client affidavit, filed on September 1, 2023 ("Reply Affirmation").

On July 28, 2023, I issued an Interim Award in this arbitration. Subsequently, counsel for Levona requested corrections to the Interim Award pursuant to Rule 24(j) of the JAMS Comprehensive Rules and Procedures ("JAMS Rules") and on August 15, 2023, I issued a Corrected Interim Award ("Corrected Interim Award") clarifying that in Section VII.B.4 of the award:  "The entities referred to in B.1 and B.2 respectively shall also be awarded pre-judgment interest on the principal amount of the compensatory damages in paragraph B.1."

This Final Award adopts, incorporates, and republishes the Corrected Interim Award in its entirety amending the Corrected Interim Award only as necessary to make certain ministerial and stylistic edits, and to integrate the undersigned arbitrator's subsequent determinations regarding the Claimants' request for attorneys' fees, costs, expenses and interest. Section VII of the Corrected Interim Award entitled Conclusion and Corrected Interim Award is not reproduced here for the sake of brevity and clarity, although the findings and legal conclusions contained in that section are adopted here in their entirety in Section VIII of this Final Award entitled Conclusion and Final Award.

The Corrected Interim Award resolved all issues submitted for decision in this arbitration, except as expressly reserved therein, relating to the amount of Claimants' attorneys' fees, costs, expenses, and pre-judgment interest. The undersigned arbitrator in

this Final Award has considered and resolved all the issues and arguments raised relating to the merits of the claims, counterclaims, requests for attorneys' fees, costs, expenses, and pre-judgment interest.  Any argument not addressed in this Final Award was found to be unavailing, without merit, academic, or unnecessary to reach.

The undersigned arbitrator recognizes and appreciates the high quality of the presentations by counsel for each party. The result of this decision is not a reflection on any difference in the quality of those presentations, but of the arbitrator's review of the record.

## II.   BACKGROUND OF THE DISPUTE AND SUMMARY OF CLAIMS AND COUNTERCLAIMS

### A.  <u>Parties and Relevant Facts</u>

Claimant Eletson Holdings, Inc. ("Holdings") is a corporation formed under the laws of Liberia, which holds the common shares in Eletson Gas LLC (the "Company") (J-1.0005 and J-01.0084.) Claimant Eletson Corporation ("Eletson Corp") (together with Holdings, "Eletson") is formed under the laws of Liberia, and among other things, is a special member of the Company responsible for the provision of management services for the vessels owned directly or indirectly by the Company.  Holdings is the parent company of Eletson Corp. (*See* C-1963, J-1.0085.)  Eletson is owned by three principal families, which are the families of Laskarina Karastamati ("Karastamati"), Vassilis Kertsikoff ("Kertsikoff"), and Vasilis Hadjieleftheriadis ("Hadjieleftheriadis"), each of whom hold various officer positions in the Eletson entities.

On October 22, 2013, Holdings announced the creation of the Company, a $700 million liquefied petroleum gas shipping joint venture of Holdings and funds managed by Blackstone Tactical Opportunities ("Blackstone"). (C-1774, C-1964 ¶ 9; C-1963 ¶ 17.) Blackstone was the preferred shareholder of the Company. (J-1.0084.)  Eletson contributed five medium-size gas carriers to the creation of the Company. (C-1774.)  Additionally, in 2020, Eletson contributed approximately $5.5 million in liquidity support to the Company. (May 16, 2023 Transcript p.336:4-17.)

From 2013 to 2021, Blackstone was the preferred shareholder of the Company (May 16, 2023 Transcript pp. 23:20-24; 77:18-25.)  From 2013 to the present, Holdings was the common unit holder of the Company. (C-1964 ¶ 11; C-1963 ¶19.)

On August 16, 2019, Eletson and Blackstone entered into the Third Amended and Restated Limited Liability Company Agreement, dated August 16, 2019.  On April 16, 2020, Eletson and Blackstone entered into Amendment No. 1 to the Third Amended and Restated Limited Liability Company Agreement. (J-2.) Collectively, the August 16, 2019 agreement and the April 16, 2020 Amendment are referred to as the "LLC Agreement" or "LLCA".  The LLCA regulates the relationship among the holders of membership interests in the Company. (*See* J-1.)

At the beginning of 2022, the Company owned, directly or indirectly, 14 liquefied petroleum gas carriers. (C-1963 ¶ 21; C-1964 ¶ 13.) The Eletson fleet is the second largest in the market—second only to Unigas, Eletson's primary competitor (C-1963 ¶ 21; C-1964 ¶ 13) ("Unigas is one of Eletson's key direct competitors").) The Company's revenues are primarily derived from the operation of the vessels (C-1963 ¶ 20; C-1964 ¶ 14.) Eletson Corp is responsible for the provision of management services for the vessels owned by the Company through subsidiaries. (C-1963 ¶ 9; May 18, 2023 Transcript pp. 52:14-17.) For its management services, Eletson Corp is paid management fees from the vessel subsidiaries. (May 16, 2023 Transcript pp. 243:3-18; 334:3-16.)  The management fees are an asset of Eletson Corp and a liability for the Company or the relevant subsidiaries incurring the expense. (May 16, 2023 Transcript pp. 334:19-25.) All throughout Eletson's partnership with Blackstone, Eletson managed the vessels (C-1963 ¶ 9.)

In early 2021, Blackstone sought to sell its interest in the Company.  Blackstone and Murchinson, an alternative management firm that manages funds on behalf of

6

institutional investors, signed a Confidentiality and Non-Disclosure Agreement on or around January 25, 2021 ("NDA".)  (J-36.) The NDA states that the parties "desire to exchange certain proprietary or confidential information for the purpose of exploring a possible negotiated direct investment opportunity . . . in connection with certain LPB Shipping assets owned or operated by Eletson Gas LLC." (*Id.*) The NDA provides further that the "Confidential Information will be used solely for the purpose of evaluating, financing and executing the Opportunity . . . and will not be disclosed by the Receiving Party or its Representatives except (i) as may be consented to by the Disclosing Party."  (J-36.001.) Under the NDA, Murchinson agreed not to "directly or indirectly contact or communicate with any of Eletson's employees, lenders, lessors, customers, suppliers, or any other person with whom Eletson has a business relationship, or to seek any information in connection therewith from such person, without the express written consent of Blackstone."  (J-36.0002.)

At some point in time, Murchsinson and Blackstone reached a deal, whereby Murchsinson would purchase 100% of Blackstone's interests in Eletson Gas for an initial investment of $3 million. (C-1782 p. 32:13-25.) Murchinson created a special purpose vehicle to hold these interests, Levona Holdings Ltd ("Levona")—the Respondent in this arbitration.  Levona is 60 percent owned by Nomis Bay and 40 percent owned by BPY— two hedge funds. (C-802, C-1053.)  Murchinson controls and manages Nomis Bay and BPY. On November 2, 2021, Blackstone assigned its interest in the Company to Levona and appointed the four representatives designated by Levona to the board of the Company. (J-12; C-033; C-051.)  These directors were: Eliyahu Hasset ("Hasset"), Joshua Fenttiman ("Fenttiman"), Mark Lichtenstein (Lichtenstein), and Adam Spears ("Spears").

For all meaningful purposes relevant to this Corrected Interim Award and the facts and circumstances giving rise to the claims at issue in these proceedings, Murchinson and Levona are one and the same. This will be discussed in more detail later in this Corrected Interim Award.  "Levona-related entities" refers to Levona, Murchinson and Pach Shemen—also a special purpose vehicle with identical ownership as Levona, managed and controlled by Murchinson.

Shortly after acquiring the Blackstone interests, Eletson officers and Levona's representative, Adam Spears, began discussing a deal that would enable Eletson to buyout Levona's interests.

The parties entered into a Binding Offer Letter ("BOL") on February 22, 2022.

Section 2.1 of the BOL provided that:

Subject to and in consideration of the Transfer occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to Eletson Gas the option exercisable by written notice to Levona by both of them (an "Option Notice"), for either Eletson Gas or its nominee to purchase all the membership interests held by Levona in Eletson Gas (the "Option Membership Interests") for a consideration equal to the Purchase Option Consideration payable in cash on completion of the transfer of the Membership Interests to such account as Levona may nominate in writing. (J-06 § 2.1.)

The Purchase Option Consideration "shall be an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value." (J-06 ¶ 3.2.) The Net Value "shall be based on a third party independent valuation of the [Symi and Teledos]." (J-06 ¶ 3.3(b).)

Following the execution of the BOL, on March 11, 2022, the parties entered into a series of agreements including the following: (i) the Intra-Group Loan Agreement, pursuant to which Levona provided the company a loan facility of up to $10 million for a term of up to two years (J-07); (ii) the Share Transfer Agreement, pursuant to which the Company transferred to Levona 100% of the shares of the Symi and Telendos (J-8); (iii) the

Assignment of Claims, pursuant to which Eletson Corporation assigned to Levona all of its claims relating to the management fees and liquidity support owed to it by the Company, or its subsidiaries (J-09); (iv) the Deed of Waiver and Release (C-0027); and (v) the Fundamental Action Letter (J-10) (collectively, the "Transaction Documents").

In April, the loan was amended to provide the Company with the ability to draw an additional $4 million. (C-24.)

On July 15, 2022, Levona entered into a Letter of Intent with Unigas, the main competitor of the Company, to sell the Company's fleet of vessels for $262 million ("Unigas LOI"). (J-019.)

### B. <u>Summary of Claims and Counterclaims</u>

The resolution of the majority of the claims and counterclaims asserted in this arbitration rests upon the interpretation of the Transaction Documents. Did Eletson exercise the purchase option pursuant to the Transaction Documents? If the answer is "yes," then at some point in time, Levona was no longer a member of the Company and did not have any rights under the LLCA to enter into the Unigas LOI, or otherwise act on behalf of the Company. Conversely, if Eletson did not fulfill the requirements under the Transaction Documents to exercise the purchase option, Levona's interests were not bought out and Eletson may have violated its obligations under the LLCA by refusing to, *inter alia*, engage in due diligence relating to the Unigas LOI.

Eletson has asserted claims against Levona for breach of the LLCA and breach of the covenant of good faith and fair dealing. These claims can be grouped into four categories. First, Eletson asserts claims that Murchinson engaged in deceitful and wrongful conduct that voids *ab initio* its acquisition of Blackstone's preferred interests. Eletson claims that Murchinson bribed Eletson Corporation's CFO, Peter Kanelos, and caused him

to disclose confidential Company information before Murchinson's purchase of the preferred interests in the Company. Eletson also claims that Murchinson, in breach of the NDA with Blackstone, communicated directly with Company financiers and lenders, and engaged in industrial sabotage that led to the arrest of Company's vessels prior to Levona's acquisition of preferred interests. These claims will be referred to as the "Pre-Acquisition Claims." Eletson seeks damages, under a theory of rescissory damages, in connection with the harm it alleges it suffered as a result of these claims.[1]

Second, after acquiring Blackstone's interests, Eletson claims that Levona breached the LLCA in a number of ways. Immediately upon joining the Company, Eletson asserts that Levona breached the LLCA and the Company's management agreements by among other things, attempting to fire Eletson Corporation as the manager of the Company's or the Company's subsidiaries' vessels. In addition, Eletson claims that Levona failed to disclose its pre-acquisition misuse and breaches of confidential information, continued to conspire with Mr. Kanelos to liquidate and harm the Company, and conspired with the Company's counsel, Watson Farley Williams ("WFW") against the Company's interests. I will refer to these claims as the "Post-Acquisition/Pre-BOL Claims."

Eletson also alleges that the Levona-related entities violated the Status Quo Injunction (defined, *infra,*) on numerous occasions, including by wrongfully declaring the Company in default of the Loan made by Levona to the Company, trying to sell the Symi and Telendos, directing the purchase of a controlling position in debt securities of Holdings for the purpose of commencing litigation against Holdings and the involuntary bankrtupcy against Holdings ("Status Quo Injunction Claims").

---

[1] Eletson attempts to merge the Pre-Acquisition Claims into material breaches of the LLCA, but prior to November 2, 2021 when Blackstone sold its interests in the Company, neither Murchinson nor Levona were parties to the LLCA.

And finally, Eletson asserts claims for breach of the LLCA and breach of covenant of good faith and fair dealing against Levona for failing to acknowledge Eletson's compliance with the terms of the Transaction Documents, failing to transfer the preferred interests in the Company, and continuing to act on behalf of the Company in complete bad faith including by entering into the Unigas LOI.

In addition to declaratory relief, Eletson seeks compensatory damages of at least $71 million, punitive damages in the range of 3 to 9.63 times the compensatory damages, pre-judgment interest at ten percent per annum, costs, and attorney's fees.

Conversely, Levona asserts that through today, it remains the preferred interest holder. Accordingly, it seeks various declarations with respect to the rights it is afforded by virtue of the LLCA and/or the Fundamental Action Letter. It also seeks monetary damages allegedly arising from Eletson's failure to attend board meetings, which prevented the Company from refinancing certain debt and engage in due diligence in connection with the Unigas LOI. Levona also asserts a claim for tortious interference in connection with the Unigas LOI and conversion for denying Levona the ability to sell the Symi and Telendos. For all of its claims, Levona seeks compensatory damages of more than $3 million, plus an undefined amount that includes any profit it is due from the Company as preferred holder, and any decrease in net profit from the sale of the vessels as compared to the Unigas LOI. Levona also seeks $2 million in punitive damages, post-judgment interest, costs, and attorney's fees.

### III.    HISTORY OF THE PROCEEDINGS

The following events and rulings are relevant to this Final Award.

Eletson filed the initial Statement of Claims on or about July 29, 2022. Levona filed its Response to Statement of Claims and Statement of Counterclaims on August 19,

2022.  In that Response, and in a subsequently filed Motion to Strike Certain of Claimants'

Pleadings, Arguments, and Requests for Relief, dated, September 12, 2022 ("First Motion

to Strike"), Levona challenged the jurisdiction of JAMS. Levona conceded that JAMS had

jurisdiction to decide issues raised under the LLCA, including for example, issues related

to Levona's calling of board meetings and Eletson's failure to attend them, Eletson's refusal

to cooperate in due diligence for the Unigas sale, or Eletson's refusal to cooperate with

other rights Levona may have.   Levona, however, insisted that JAMS did not have

jurisdiction concerning the majority of Eletson's claims because determining those claims

required the arbitrator to enforce the parties' rights under the Transaction Documents,

which Levona claimed needed to be arbitrated in London. (*See, generally* First Motion to

Strike.)

On September 30, 2022, I ruled that JAMS has jurisdiction over the claims and

counterclaims pursuant to Section 12.14 of the LLCA, and by reason of the affirmative

claims Levona filed as counterclaims in this arbitration. (C-01813.)

The LLCA § 12.14(a) provides:

Any dispute, claim or controversy arising out of or relating to this
Agreement or the breach, termination, enforcement, interpretation or
validity thereof (including the determination of the scope or applicability of
this agreement to arbitrate) shall be determined by arbitration in New York
County in the State of New York or any other mutually agreeable location,
before a single arbitrator. The arbitrator shall be selected by agreement of
the parties. If the parties are unable to agree on an arbitrator within 15 days
after the demand for arbitration is made, JAMS shall designate the
arbitrator. The arbitration shall be administered by JAMS pursuant to its
Comprehensive Arbitration Rules and Procedures. The Federal Arbitration
Act shall govern the interpretation and enforcement of such arbitration
proceeding. The arbitrator shall apply the Law of the State of Delaware and
the Republic of the Marshall Islands, as the case may be, in accordance with
Section 12.13. (J-1.)

I ruled that "the arbitration provision in the LLC Agreement is broad, encompasses

the claims asserted, and the parties agree that this arbitration provision was not replaced or

superseded by the arbitration [provision] in the Transaction Documents." (C-1813 p. 12.)

I further found that "by filing counterclaims, Respondent availed itself of this forum, submitted to JAMS, and waived its jurisdictional challenges." (C-1813 p. 12.)

I reiterate and emphasize the waiver ruling, as Levona continues to insist that JAMS does not have jurisdiction to enforce the Transaction Documents.

Specifically, in its Post Trial Brief, Levona argues:

The Option was not exercised. But, more importantly from a legal standpoint, an obligation to meet contract obligations external to the LLCA is not an obligation under the LLCA itself. As a result, not only is there no breach of contract but, the only way to find a breach of "good faith and fair dealing" is to look to the Transaction Documents—not the LLCA. *The Transaction documents are governed by English Law and are to be determined by either a British arbitration or court. Given that this Tribunal is not an expert in British Law, not seated in London, has heard no evidence or argument related to British Law, **and in fact does not have jurisdiction to enforce the Transaction Documents,**** this argument is outside the scope of this matter from a simple legal perspective.
(Respondent Post Trial Brief pp. 55-56.)

However, Levona has itself sought relief for its counterclaims that I can only award if I interpret, enforce, and provide relief for pursuant to the Transaction Documents. For example, in its Proposed Order, Levona specifically requests declarations interpreting the Transaction Documents (e.g., a through f), for example, seeking a finding that Levona holds the preferred shares, and Levona further seeks a ruling awarding damages as a result of Eletson's conversion of the Symi and Telendos (e.g., b and c)—relief that depends on my interpreting and enforcing the terms of the Transaction Documents. It also asserted a claim for tortious interference with the Unigas LOI—which is not a claim for a breach of the LLCA. Thus, Levona has waived any jurisdictional objection concerning the claims and counterclaims.

On October 10, 2022, I entered a Temporary Restraining Order, pending a decision on the parties' cross-motions for preliminary injunctive relief ("TRO"). The TRO

confirmed the oral Order rendered during the October 7, 2022 conference, and specifically provided that "during the pendency of this Temporary Restraining Order the parties hereto shall maintain the status quo and shall not, among other things: (1) engage in the transfer or sale of any assets of Eletson Gas LLC (the "Company") absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering transfer or sale of any assets of the Company." (C-1816.)

On November 7, 2022, I clarified the parameters of the "status quo" (C-1838.) Levona argued that the TRO did not apply to "the sale of the Symi and Telendos" because "those vessels are not assets of … Eletson Gas." (C-1838.)  I made clear that "Respondent's interpretation of the TRO is incorrect.  By its terms, the TRO directed the parties to 'maintain the status quo.' Any attempt to sell or otherwise transfer the Symi and Telendos vessels will be deemed to be in violation of the TRO." (C-1838.)

On January 12, 2023, I then issued a decision on the parties' cross-motions for preliminary injunctions and entered a Preliminary Injunction, extending the TRO's prohibition on actions upsetting the status quo until further notice. (C-1887.)

The Preliminary Injunction stated:

The parties hereto shall maintain the status quo and shall not, among other things: (a) engage in the transfer or sale of, or attempt to sell or otherwise transfer, any assets of Eletson Gas LLC (the "Company"), or assets in dispute in this arbitration, absent the joint written consent of the parties, which shall be sent to the undersigned Arbitrator; or (2) notice or conduct of any board meetings for the purposes of proposing or considering the transfer or sale of any assets of the Company or other assets in dispute in this arbitration.  (C-1887 p. 26.)

The Preliminary Injunction was to "stay in effect until amended by subsequent order of the undersigned arbitrator" (C-1887 p. 26.) The TRO, the November

clarification, and the Preliminary Injunction collectively are referred to herein as

the "Status Quo Injunction".

I also rendered various discovery rulings relating to Levona and Murchinson's

communications with its law firm, Watson Farley & Williams ("WFW"). On December 12,

2022, I found WFW represented both Eletson and Levona in connection with the

Transactions and that because of this dual representation, Levona was not permitted to

withhold documents on the basis of attorney-client privilege. (C-1880 pp. 9-10.)

On March 6, 2023, I held a status conference and oral argument to address

additional outstanding discovery disputes.  During that conference, I made certain oral

rulings ordering Respondent to produce various categories of documents.  These oral

rulings were subsequently memorialized in a March 10, 2023 email. With respect to WFW

communications, I held as follows:

> With respect to any documents or communications relating to WFW
> withheld on the basis of attorney-client privilege, the privilege has been
> waived due to Respondent's failure to comply with Procedural Order No. 4,
> which required that it produce a log including certain specific information
> "identifying any document required to be produced in response to any
> previously made document requests and demands that it is withholding from
> production on the basis of privilege." Respondent misconstrued Procedural
> Order No. 4 as the order did not state that the parties were to specifically
> identify only those documents this tribunal previously compelled or ordered
> to be produced.  Rather the plain meaning of the order read in its entirety
> demonstrates that any documents responsive to requests for production
> being withheld on the basis of privilege were to be identified specifically
> and those withheld on other bases could be logged categorically. Nor is there
> anything in prior rulings that would have placed a temporal limitation on
> my ruling finding that WFW jointly represented Levona and Eletson.  If
> Respondent wanted to raise these issues, it could have done so, but first, it
> needed to identify the documents and communications at issue by logging
> them pursuant to Procedural Order No. 4.

On March 7, 2023, Pach Shemen—a special-purpose vehicle owned and directed

by the same entities and representatives as Levona—was one of the petitioning creditors

who commenced an involuntary bankruptcy petition against Eletson Holdings. (C-749; C-

751; C-746.) As a result of this filing, Levona insisted that the Bankruptcy Court's automatic stay applied to these proceedings.  Claimant emphatically disagreed, but on March 10, 2023, by an order issued by email, I stayed the instant arbitration proceedings "pending further order or notice from the Bankruptcy Court for the Southern District of New York." I did so despite Claimants' objections, in part, because Respondent insisted that continuing with the arbitration proceedings, and/or any compliance with orders of this tribunal, would violate federal law. In other words, they would not comply with any further rulings by me or appear at the evidentiary hearing, which at that time, was scheduled to commence on April 24, 2023, and continue for thirteen days.

In staying the proceedings, however, I reminded the parties that, "pursuant to the arbitration agreement requiring the parties to in good faith work towards an evidentiary hearing within 150 days, if the Bankruptcy Court shall find that this arbitration is not stayed, I will take the steps necessary to ensure timely completion of this arbitration and order the immediate completion of the pending and near term deadlines for document production and the exchange of expert reports. In the event the Bankruptcy Court denies a stay, any party that fails to comply with these deadlines may be subject to preclusion." (March 10, 2023 Email Order.)

On April 17, 2023, by stipulation and order of the court, the Bankruptcy Court lifted the Automatic Stay. (C-00781; LEV214.)  I held a status conference that same day and this arbitration resumed.  At this April 17th conference, the parties agreed to dates for the evidentiary hearing, which, at that time, was to commence on May 8, 2023, and continue for ten days.

On May 3, 2023, by email, the parties entered into a stipulation, pursuant to which they agreed, *inter alia*: to abbreviate the hearing schedule and split the hearing time equally

between them.  The parties futhte stipulated that  "the schedule is fair and reasonable and [they] waive any objection to the schedule ordered or otherwise determined by the Arbitrator.  The parties stipulate that each has no challenge or objection to the arbitration on fairness grounds or on the basis that it has not been granted enough time to prepare for or present its case." This stipulation was memorialized in Procedural Order No. 6, dated May 6, 2023.

On May 5, 2023, the parties served their JAMS Rule 20(b) submissions.  In their submission, Claimants stated that "The preferred interests at issue in this arbitration, from their issuance up until the execution of the BOL and even thereafter, were never owned or controlled, directly or indirectly, by Holdings, Eletson Corporation, the Company, or any other entity directly or indirectly affiliated with any of these entities.  (Claimants' Rule 20(b) Statement ¶ 100.) Rather, from "January 2022, at the latest, the families owning or controlling the Eletson holdings in the Company determined to nominate three entities independent of Holdings, Eletson Corporation, the Company, or any other entity directly or indirectly affiliated with any of these entities to hold the preferred interests." (Claimants' Rule 20(b) Statement ¶103.) The three entities are Cypriot entities by the names of Fentalon, Apargo, and Desimusco ("Preferred Nominees"). (*Id.*) **Each of the three Preferred Nominees is related to one of the three principal Eletson families.** In response to this claim, on May 10, 2023, Respondent filed its Motion to Strike Claimants' New Allegations of the Transfer of the Preferred Shares to the Preferred Nominees, or in the Alternative, to Dismiss Claimants' Claims in Chief ("May 10, 2023 Motion to Strike or Dismiss").

Also on May 5, 2023, in addition to their JAMS Rule 20(b) submissions, the parties filed motions in limine.  Eletson filed a motion in limine to bar Levona from using documents from Peter Kanelos as Eletson admissions.  Levona's motion sought to exclude:

(1) extrinsic evidence relating to the BOL and Transaction Documents; (2) evidence unrelated to claimed breaches of the LLCA, including allegations of misconduct before and after Levona acquired its interest in the Company; (3) evidence related to the actions of Pach Shemen; and (4) correspondence between Levona and WFW. The parties opposed each other's motions on May 10, 2023.[2]

On May 12, 2023, I issued Procedural Order No. 7 addressing additional motions to compel.  Relevant to this Corrected Interim Award I specifically ordered the following:

> Respondent has represented that it has produced all communications between Levona and WFW, but that it has not produced communications between Murchinson and WFW based in part on the grounds that Murchinson is a separate entity, with its own separate extension of the attorney-client privilege, and not under Respondent's or its counsel's control. However, throughout these proceedings, the information provided thus far gives the impression that Murchinson is substantially responsible for the creation of Levona. It has also been involved in this arbitration, including having the principal of Murchinson, Mr. Bistricer, attend depositions and potentially appear as a witness for Respondent at the evidentiary hearing. Moreover, in response to a prior ruling ordering the production of documents relating to Peter Kanelos, Respondent's counsel indicated that it was able to get Murchinson to voluntarily produce documents. Counsel is advised to make its best efforts to produce documents responsive to Claimants' request--specifically for relevant communications between Murchinson and WFW--or be prepared for the possibility of an adverse inference or other consequence, if circumstances shall warrant such action based on the evidence presented to me during the evidentiary hearing. (Procedural Order No. 7 p. 5.)

On May 12, 2023, three days before the commencement of the evidentiary hearing, Murchinson's separate counsel sent a letter regarding its production of communications with WFW, which it had still not provided.  Insisting that it was not a party to this arbitration, Murchinson was willing to produce documents *in camera*, but had not yet produced the documents in this arbitration because it did not want such production to be a

---

[2] As will be addressed throughout this Corrected Interim Award, Levona's motion is denied. Eletson's motion is largely mooted—as discussed, *infra*, I have given any documents drafted by Mr. Kanelos appropriate weight.

waiver of its claimed attorney-client privilege. It urged me to reconsider my ruling in Procedural Order No. 7. After additional correspondence, I declined to do so.

First, Murchinson could not have it both ways—on the one hand, insist it wasn't a party to these proceedings and that therefore I lacked jurisdiction over it, but on the other hand, cherry-pick which documents to provide Levona to produce, and have its representatives actively appear and participate in status conferences, depositions, and the evidentiary hearing in this arbitration. Second, I disagreed with Murchinson's claim that it had not waived its attorney-client privilege. Finally, Murchinson's proposal to produce the documents *in camera* was unreasonable and unfeasible given that the evidentiary hearing had already commenced. Thus, by email order, dated May 17, 2023, subject to certain protections upon production, I reiterated my ruling that "Murchinson and WFW communications shall be immediately produced, or Levona should be prepared for the possibility of an adverse inference or other consequence, if circumstances shall warrant such action based on the evidence presented to me during the evidentiary hearing."

The evidentiary hearing proceeded on May 15, 16, 18, 19, 22, 23 and 24, 2023.

## IV.    PRELIMINARY MATTERS

### A.  <u>Levona/Murchinson/Pach Shemen</u>

In early 2021, Blackstone contacted Murchison about possibly acquiring its preferred interests. The evidence reflects that there is no correspondence between Blackstone and Levona relating to the acquisition of Blackstone's shares. All correspondence was between Murchinson and Blackstone, as Levona did not exist, and was created for the sole purpose of holding the acquired interests. Levona is owned by Nomis Bay and BPY, which in turn are managed and controlled by Murchinson. (C-802;

C-1053; May 22, 2023 Transcript p. 8:8-22; C-1782 (Deposition of Bistricer) pp. 19:22-20:19.)

It is undisputed that Levona does not have any employees. Similarly, it is undisputed that Levona does not have an email domain, its own bank accounts, or financial records of any kind that would reflect how it valued the preferred shares of the Symi and Telendos after the shares of those vessels were transferred to it. (May 22, 2023 Transcript pp 73:11-74:2.) Curiously, Murchinson's owner Mark Bistricer conceded that Murchinson kept financial records of Levona, but no financial records were exchanged in this arbitration or presented at the evidentiary hearing. Levona insisted throughout these proceedings that it does not have custody or control over Murchinson documents, and as a non-party to these proceedings, Murchinson did not have any obligation to produce documents. Yet, Murchinson did voluntarily produce some categories of documents.

Murchinson employees or agents, including its owner, Marc Bistricer ("Bistricer"), counsel, Mark Lichtenstein ("Lichtenstein"), and agent, Adam Spears ("Spears") also voluntarily appeared throughout these proceedings. It was presumably Bistricer/Murchinson who designated Hasset, Fenttiman, Lichtenstein, and Spears as Levona directors to sit on the Company's Board, as Levona has no employees. Bistricer, Spears and Lichtenstein all attended one or more depositions of Eletson witnesses in this arbitration. (*See, e.g.,* J-40 (Deposition of Lascarina Karastamati); J-41 (Deposition of Vassilis Kertsikoff).) Indeed, at several Zoom status conferences and arguments, "Murchinson" was one of the remote participants. Bistricer and Spears both voluntarily appeared for depositions in this arbitration. (C-1782; C-1783.)

Despite these facts, throughout these proceedings, Levona has insisted that Murchinson is a separate entity and not a party to these proceedings. The evidence

presented at the evidentiary hearing, however, demonstrates conclusively that although technically two separate corporate entities, Murchinson and Levona are not distinct for any purposes relevant to these proceedings. Levona, a shell entity, is controlled and directed by Murchinson. While Levona may be the named party, Murchinson is the real party in interest. Bistricer testified: "We bought from Blackstone their position in Eletson Gas . . . we bought everything.") (May 22, 2023 Transcript p. 7:20-8:3.) The documentary evidence further supports this. (*See, e.g.,* C-841 (Bistricer stating "Shareholders say Murchinson related entities. Levona Holdings is the SPV *we* made acquisition in.")(emphasis added); C-950 (discussing a loan of $2 million to the Company, Spears states, "this took a lot of work to get Marc [Bistricer] to agree to open his wallet."); C-1240 (Spears states "I have included . . . a background on Murchinson which is the firm behind the investment in Eletson Gas LLC.").) Murchinson's own counsel represented to third parties that Levona was owned and controlled by Murchinson. (C-1463 (email from WFW attorney, Saunders stating "Levona Holdings (an entity owned and controlled by Murchinson) . . .").)

Thus, any ruling I render in this arbitration extends to Murchinson. Any award in favor of Levona is really in favor of Murchinson, and similarly, any award finding liability and damages against Levona, is owed by Murchinson.

The same is true for Pach Shemen—another special purpose vehicle, with the identical ownership as Levona, directed by the same Murchinson representatives, including Spears and Lichtenstein, and seemingly created for the sole purpose of purchasing a controlling interest in the outstanding bond debt of Holdings so that three weeks later, it could direct the involuntary bankruptcy filing against Holdings. (C-751.)

Correspondence relating to the purchase of these bonds demonstrates how Pach Shemen is intertwined with, and indistinct from, Levona. In fact, "Levona II" was the

originally-contemplated name for the Pach Shemen entity.  In a December 8, 2022 email

from Spears to a selling bondholder, setting out the trade terms in connection with the

purchase of these bonds, Spears promises the following to the selling bondholder:

> 2. $500k *if the arbitration ends* to ***our*** satisfaction on Eletson Gas and ***we***
> can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or
> the Company (Eletson Gas) without legal interference. 3. 10% of the value
> received by Levona for its Preferred Shares in Eletson Gas . . . 4. 1/3 of the
> first $3 million profit ***realized by the entity buying these notes (Levona II)***
> . . . 5. Thereafter 25% of any profit realized by ***Levona II*** after the first $3
> million profit . . . . (C-0746.0008 (emphasis added.)

Notably, Spears is promising potential monetary benefits received in connection

with this arbitration, and any value relating to the preferred shares of the Company, as

compensation in connection with the purchase of the notes by Levona II, which when

subsequently created, was instead named Pach Shemen.  If truly separate entities, how

could Spears make such a promise? The answer is because the separateness is in name only.

Pach Shemen and Levona are not distinct for any meaningful purposes relevant to these

proceedings. They are alter egos of one another, with identical corporate ownership and

management.

Accordingly, Ideny Levona's motion in limine to exclude evidence relating to Pach

Shemen.

## B.  <u>WFW and Peter Kanelos</u>

### *i.  Peter Kanelos*

Peter Kanelos was the CFO of Eletson Corporation and a representative of the

Company. The parties dispute whether he was also CFO of the Company.  The evidence

demonstrates that before it acquired the preferred interests from Blackstone, Murchinson

was secretly communicating with Kanelos about strategies for (a) lowering the purchase

price to acquire the Blackstone shares and (b) what to do with the assets of the Company

once  Levona became the preferred holder. (C-1599; C-1600; C-1615; C-1616; C-1617; C-1618; C-1623; C-1625; C-1635; C-1638; C-1640; C-1641; C-1642; C-1647; C-1648; C-1649; C-1664; C-1960; C-2018.) Murchinson used Kanelos to acquire the Company's confidential information and to communicate that information to the Company's financiers, along with Murchinson's proposals, to refinance the Company's debt. (*See*, *e.g.*, C-463; C-1600; C-1615; C-1616; C-1618; C-1623; C-1640; C-1641; C-1642; C-1647; C-1648; C-1649; C-1664.)

Unbelievably, Kanelos, a long-time employee and confidant of the principals of the Eletson entities was promised compensation commensurate with the ultimate strategy Murchinson employed. For example, in an email dated October 1, 2021, Bistricer writes to Kanelos: "You will get 10% of whatever profit we make on this transaction, should it go forward.  The 10% will be paid once we have received our capital back minus a reasonable return of capital." (C-1678.)

It is beyond cavil that Kanelos was acting contrary to his duties as an officer or representative of Eletson and the Company, and that he and Murchinson actively concealed their communications.  In all of the above-cited correspondence, Kanelos intentionally used his personal gmail account, not his Eletson email address.  In an October 31, 2021 email, Kanelos admitted that he was working on behalf of Murchinson's interest.  "After sourcing the deal for Murchinson I have worked very hard for a year in your team's interest (and continue to do so even if the plan is to ultimately liquidate the company. *While I am happy to align my interests with Murchinson* . . . .") (C-1679, emphasis added.)

Murchinson and Kanelos both took active steps to conceal their clandestine communications. For example, on November 1, 2021, Lichtenstein sent Kanelos a "Confidential Summary of Terms" summarizing the compensation to be paid to Kanelos.

(C1680; C-1681.) Then just a few days later, on November 5, 2021, the day Levona became the preferred interest holder, Lichtenstein sent Kanelos an email to his Eletson address, attaching the notices of replacement of Blackstone directors, acting as if he had never met Kanelos. Addressing him formally, Lichtenstein writes: "Dear Mr. Kanelos, Nice to meet you. I have located your contact information on the Eletson website and am hoping you can be of assistance." (LEV025 p. 6.) There is also evidence that Kanelos would caution recipients of his emails not to disclose the communications or any negotiations to Eletson. (*See, e.g.*, C-1704.) As one example, on May 5, 2021, Kanelos sent an email from his gmail account, on behalf of Murchinson and stated that "[d]ue to the sensitivity of this deal ONLY use my Gmail to communicate to me." (C-567.)

After Levona became the preferred holder, Murchinson formalized its compensation arrangement with Kanelos in a certain Services Agreement, dated December 19, 2021. (C-1698; C-1699.) Levona/Murchinson followed through with its terms by wiring Kanelos $100,000 on December 21, 2021. (C-1700; C-1701.)

In an attempt to defend its secret communications with Kanelos both pre- and post-acquisition of Blackstone's interests, Levona has insisted that Kanelos was the CFO of the Company, not just Eletson Corporation, and that its communications with him were entirely proper as the preferred shareholder of the Company. Upon closer look, however, this argument quickly falls apart and only bolsters Eletson's assertions of impropriety. Even if he were the CFO of the Company, he was also the CFO of Eletson Corporation—he had duties to Eletson and his secret incentivization agreement with Murchinson was clearly a conflict of interest that was induced by Murchinson and never disclosed by anyone to Eletson. Moreover, the nature of the correspondence pre-November 2, 2021—before Murchinson/Levona had any claimed interest in the Company—makes it clear that Kanelos

was acting against the interests of the Company and was aligned with Murchinson. Accordingly, even if Kanelos was the CFO of the Company, this does not absolve Murchinson.

In fact, Levona's insistence that Kanelos was a representative of the Company, only serves to undermine its arguments that there was an attorney-client privilege between Murchinson and WFW.

> ii. WFW

Throughout these proceedings, there has been a lot of discussion concerning the representation of WFW.  Based on the evidence presented, separate offices of the firm represented both parties both pre- and post- Levona's acquisition of Blackstone's interests, including in connection with the Transaction Documents. The Athens Office represented Eletson and the London office represented Murchinson/Levona.  WFW partner, George Paleokrassas, testified that he believed an appropriate ethical wall was in place to protect the propriety of this dual representation, although no documents were provided in support of this claim. (May 19, 2023 Transcript pp. 243:22-244:8.)

In attempt to preserve its claimed "attorney-client privilege," Murchinson argues that it was told by WFW that there was no conflict.  While WFW represented that it would not have a conflict, WFW attorney Frank Dunne also stated that the firm had done work for Eletson Gas, knew the Company well, and that his "understanding [was] that [Murchinson was] looking at doing something at the shareholder level, which would not put my Firm on the other side of anything from you."  (C-1973 p. 7.)  This turned out not to be true, and Murchinson was well aware of this.

The main problem with any claim of attorney-client privilege between WFW and Murchinson is that Peter Kanelos climbed back and forth over this supposed ethical wall

numerous times and Murchinson/Levona knew this.  Kanelos indicated in emails to Murchinson that he was working with WFW Athens in connection with pre-acquisition Murchinson strategies. (*See, e.g.,* C-1598; C-1614.)   On May 26, 2021, attorney Karamacheras from WFW Athens sent Kanelos an email providing an analysis of the Company's restructuring of certain Company financing, pursuant to which WFW acted as the Company's counsel in 2020.  Kanelos then forwarded this analysis to Murchinson and indicated that there was a "[n]eed to speak with Frank Dunne"—the attorney on Murchinson's side of the wall.  (J-35.)  Kanelos was also copied on communications from Dunne to Murchinson.  For example, on June 13, 2021, Dunne sent an email to Murchinson, copying Kanelos at his gmail account providing an analysis to liquidate the Company.  (C-465.)

Thus, Murchinson/Levona knew Kanelos was sharing Eletson "privileged" information with Murchinson and receiving Murchinson "privileged" information.  Thus, Murchinson could not have reasonably had any expectation of privacy in its communications with WFW.  Murchinson cannot on the one hand claim that Kanelos was the CFO of the Company, and on the other hand, claim attorney-client privilege with WFW-London when it is sharing communications with Kanelos.  Thus, as per my prior rulings, any claim of attorney-client privilege has been waived by both Levona and Murchinson, based in part on the dual representation of the firm in connection with the Transactions, and Murchinson/Levona's inability to claim an expectation of privacy when it was knowingly providing WFW communications to Kanelos. (*See* Procedural Order Nos. 4, 7 and May 17, 2023  Email Order.) Thus, any communications between Murchsinon/Levona and WFW are admissible and Levona's motion in limine is denied.

Eletson asks me to go one step further and find that WFW conspired with Murchinson against the Company.  However, WFW is not a party to these proceedings. What WFW knew or did not know, and what WFW may have done or not done, is outside my jurisdiction.  I therefore decline to reach any conclusions with respect to the propriety of WFW's dual representation.

## C. <u>The Preferred Nominees</u>

Eletson claims that if they fulfilled the obligations under the Transaction Documents and bought out Levona, the preferred interests were transferred to the "Preferred Nominees." Eletson witnesses testified that from the outset of the time that the parties began discussing the buyout of Levona's interests, Eletson intended the preferred units to go to nominees of the Company, and that it told Levona of this intention. (C-1963 ¶101; C-1964 ¶ 193.)

The parties confirmed this language in the BOL, which expressly provides that "Levona hereby grants Eletson Gas the option . . . for either Eletson Gas or its nominee to purchase all of the membership interests held by Levona in Eletson Gas . . . ."   (J-6 ¶ 2.1.) Indeed, this issue was acknowledged and agreed to by the parties in correspondence relating to the proposed buyout.  For example, on February 21, 2022, Kertsikoff responded to a draft of the BOL sent by Spears and states that in regards to Clause 2.1, "we also need to delete references to Eletson Corporation in this clause and allow for Eletson Gas 'or its nominee' to be the buyer of the interests." (C-107.) (*See, also,* J-14 (reflecting that Levona knew about the Company's intention to transfer the interests to nominees in a January 10, 2022 email from Spears stating "We agree that upon closing . . . Levona shall transfer to the Company or, as the case may be, its nominated affiliate . . .  all of the Membership Interests.").) Indeed, Spears stated that Murchinson did not object to the Company's

"constitutional documents being amended upon completion so that all membership interests in the Company become common units . . . although we do see this as technically a post closing matter than can be agreed between the new shareholders without Levona's involvement." (J-14.) *See, E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1990 Del. Super. LEXIS 351, *17-18 (Del. Super. Ct. Sept. 19, 1990) (even where the parol evidence rule applies, it only applies to prior or contemporaneous evidence "offered for the purpose of varying or contradicting the terms of an integrated contract and does not exclude evidence offered for the purpose of interpreting and giving a meaning to those terms."); *see also Fox v. Paine*, 2009 Del. Ch. LEXIS 10, *17-18 (Del. Ch. Jan. 22, 2009) (even for unambiguous contract, court may "consult extrinsic evidence secondarily to confirm the 'conclusion that the contract language is unambiguous, evidencing . . . the shared intent of the parties' at the time of they entered the contract. Situations exists where the court may 'consult undisputed background facts to place the contractual provision in its historical setting without violating' the principle that the court not consider extrinsic evidence when interpreting an unambiguous contract") (footnotes omitted), aff'd, 981 A.2d 1172 (Del. 2009).

The evidence presented in this arbitration demonstrates that the Eletson families agreed to the contingent transfer.  (*See* C-786; C-787; C-788; C-789; C-790.)  This agreement would take effect immediately upon Eletson's exercise of the option, *i.e.* the transfer of the Symi and Telendos and the assignment of the claims. (C-1964 ¶¶ 194, 198; C-1963 ¶ 104; C-1968 ¶¶ 105-109.)

The initial discussions are corroborated by a note drafted by Kertsikoff's sister on January 10, 2022. (C-789.) The note informed Kertsikoff's mother that "our Cypriot [company] is about to acquire a new asset," and further stated, in part, that "as soon as

[Murchinson/Levona] leave, their position needs to remain outside the group" (C-789; C-1964 ¶ 197.)   In early March 2022, Mr. Hadjieleftheriadis prepared a document memorializing the agreement to transfer the preferred shares, on a contingent and conditional basis, to the Cypriot companies, including the amount that was agreed to be paid. (C-1968 ¶ 105.) The document included the total estimate of the amount of the preferred shares and how those shares would be split among the three Cypriot companies. (C-787; C-1968 ¶ 105.) Mr. Hadjieleftheriadis also included information about the prospective sale of the assets that the three Cypriot companies own, and what percentage of the asset would be paid, which was €3 million. (C-787; C-1968 ¶ 105.)

Testimony and evidence reflect that on August 2, 2022, the three principal families owning or controlling the Eletson holdings in the Company had a meeting in Piraeus, Greece. (C-1968 ¶ 106.) During that meeting, the families discussed the contingent transfer of the preferred shares to the Preferred Nominees. (*Id.*) Mr. Andreoulakis, Eletson in-house counsel, took concurrent notes with this respect to this meeting. (C-786; May 16, 2023 Transcript p. 26:14-21.) The notes state, in relevant part, that Levona suddenly reneged on its exit obligations and maintained—albeit wrongly—that the preferred units remained under their control, even though Eletson had told Levona before the BOL was executed that the preferred units would go to nominees outside of the Company. Eletson did not tell them the names of the nominees but told them that it was not Eletson Holdings. (C-786; C-1963 ¶ 108.)

On October 11, 2022, the three principal families had another meeting. Again, the families discussed the agreement and that the Preferred Nominees would support the cost of the litigation as part of their obligations under the agreement. Mr. Andreoulakis took notes with respect to this meeting as well. (C-790; C-1963 ¶ 109; C-1968 ¶ 107.)

In October 2022, Mr. Hadjieleftheriadis forwarded to his brother and sister, through his secretary, the 2018 and 2019 financial statements of his Cypriot company, Desimusco (C-788.) The post-it note on the document stated: "Kostis/Helen please sign. I remind you that this company owns since March the 1/3 of the Blackstone share in Gas" (C-788; C-1968 ¶ 108.)

It is undisputed that Eletson raised this contingent transfer to Cypriot nominees for the first time in its Rule 20(b) submission on May 5, 2023. Accordingly, Levona then filed its May 10, 2023 Motion to Strike or Dismiss.  I reserved decision on this motion.

I now deny Respondent's Motion to Strike or Dismiss.

While Levona cites statements made by Eletson witnesses or counsel in various filings in this arbitration that purportedly contradict Eletson's current stance, I disagree with Levona's interpretation of these statements. For example, Levona cites to statements made by Kertsikoff and Eletson's counsel that post-March 11, 2022, "Eletson held itself out as the sole shareholders of the Company." (*See* May 2023 Motion to Strike or Dismiss, pp, 2-4.)  "Eletson" in this context, however, includes its affiliates. (*See, e.g.,* J-43 ¶ 1.) Both Karastamati and Kertsikoff testified at the hearing that the Preferred Nominees are affiliates of Eletson. (C-1963 ¶ 104; C-1964 ¶ 194.) In addition, at the evidentiary hearing, Karastamati testified "when we say Eletson we mean Eletson family, we mean Eletson affiliates, we mean Eletson family, Eletson Group . . . it is the common shares and the Eletson family." (May 16, 2023 Transcript pp. 150:15-151:2.)

While I acknowledge that the lack of earlier notice by Claimants to Levona of the contingent transfer of any preferred shares to the Preferred Nominees initially raised concern to me, the Eletson witnesses' testimony was both wholly credible and sincere. It is clear that even when Blackstone was the preferred holder, the Eletson witnesses viewed

the Company as a family company. In their day-to-day discussions, they may not have spoken in corporate formalities, however, there is nothing in the record supporting a determination that there was any bad faith or misconduct on their part. Moreover, representatives from each of the Preferred Nominees have testified that they are bound by any award in this arbitration.

In addition, Levona was not prejudiced by the late reference to the Preferred Nominees. Eletson produced to Levona the limited documents reflecting this transfer in April, a few weeks before the evidentiary hearing, giving it plenty of time to review the evidence. The parties subsequently entered into the May 3 joint stipulation agreeing to the fundamental fairness of this hearing. "The parties stipulate that each has no challenge or objection to the arbitration on fairness grounds on the basis that it has not been granted enough time to prepare for or present its case." (Procedural Order No. 6, ¶ 8(g).)

Moreover, Eletson's explanation for why the transfer to the nominees was not raised earlier in the proceedings is credible. Karastamati testified that the families "considered [it] to be an intrafamily matter, so [they] thought and believed it was not relevant to this arbitration." (May 16, 2023 Transcript pp. 108:5-11.) It was only after the Levona-related entities including its affiliate Pach Shemen made clear in the Holdings bankruptcy that they would attempt to use the bankruptcy proceedings as an end-run around against any adverse award in this arbitration by claiming that the preferred shares were part of the bankruptcy estate of Holdings, that Eletson felt compelled to set the record straight and make it clear that Eletson Holdings was never intended to directly or indirectly, as owner of the common shares of the Company, own the preferred shares.

Paradoxically, given the strenuous objection made by Levona in its motion to strike, Levona never sought additional discovery nor requested depositions on the issue of the

nominees before or during the arbitration hearing. At the arbitration hearing, Levona did

not conduct any meaningful cross-examination of the three Eletson witnesses who testified

about the contingent transfer to the Preferred Nominees or present any contradicting

evidence. Levona also did not raise any credible reason why this transfer, at the time of the

closing or post-closing of the Transactions, would be prohibited under the Transaction

Documents.

Given the full history of these proceedings, the pleadings, and the evidentiary

record in these proceedings, including the credibility of the Eletson witnesses, I deny

Levona's May 2023 Motion to Strike or Dismiss.

## V.   ANALYSIS AND DECISION OF THE MERITS OF THE PARTIES' CLAIMS AND COUNTERCLAIMS

### A.  Eletson Exercised the Option Pursuant to the Terms of the BOL

Pursuant to the BOL, Levona granted the Company and Eletson Corporation a

purchase option, whereby Levona agreed to be bought out of its stake in the

Company.

Section 2.1 of the BOL provides:

Subject to and in consideration of the Transfer occurring and the conditions set out in Clause 2.2 and 2.3, Levona hereby grants to Eletson Gas the option exercisable by written notice to Levona by both of them (an "Option Notice"), for either Eletson Gas or its nominee to purchase all the membership interests held by Levona in Eletson Gas (the "Option Membership Interests") for a consideration equal to the Purchase Option Consideration payable in cash on completion of the transfer of the Membership Interests to such account as Levona may nominate in writing. (J-06 § 2.1.)

Section 2.2 provides that an Option Notice may only be served after either:

(a) the Loan and any interest accrued thereon is fully repaid; or

(b) adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona). (J-06 § 2.2.)

Pursuant to Section 2.3, Eletson Gas had to exercise the option by sending the Option Notice within thirty days from the date of the BOL, unless the period was extended pursuant to Sections 2.4 or 2.5. (J-06.)

"Purchase Option Consideration" is defined as "an amount equal to US$1 plus an amount equal to US$23,000,000 less the Net Value.  If the Net Value is equal to US$23,000,000, the Purchase Option Consideration shall be US$1.  If the Net Value exceeds US$23,000,000 the amount outstanding under the Loan shall be reduced by the amount of the difference." (J-06 § 3.2.)

Section 3.3 of the BOL specifies that "The Net Value shall be calculated as follows: . . . the Net Value shall be based on a third party independent valuation of the vessels owned by the Companies less the mutually agreed debts, costs, outgoings, expenses, trade debts and other liabilities of the Companies (including, if such vessels remain on finance lease, the purchase option price thereunder and the estimated fees and expenses of an eventual onward sale of the vessels) plus bunkers and lubs at the time of the transfer of the Companies to Levona." (J-06.)

Following the execution of the BOL, on March 11, 2022, the parties entered into a series of transactions and executed the Transaction Documents.

The language in the BOL is unambiguous, and neither party argues otherwise. "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, No. N11C-12-022 PRW CCLD, 2017 Del. Super. LEXIS 279, at *16 (Super. Ct. June 8, 2017). Moreover, the BOL and Transaction Documents contain merger clauses.  (*See e.g.,* J-06 ¶ 9.2.)  It is well settled that "where a contract contains a merger clause, it will be enforced as written and cannot be added to, varied, or contradicted by

parol evidence." *Revolution Retail Sys., Ltd. Liab. Co. v. Sentinel Techs., Inc.*, No. 10605-VCP, 2015 Del. Ch. LEXIS 276, at \*57 (Del. Ch. Oct. 30, 2015) (citation removed); *see also Matthius v. Platinum Estates, Inc.*, 2010 NY Slip Op 4965, ¶ 2, 74 A.D.3d 908, 909, 903 N.Y.S.2d 477, 479 (App. Div. 2nd Dept.) ("The purpose of a merger clause is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to alter, vary, or contradict the terms of a written agreement.")

It is undisputed that the Loan remains outstanding and has not been fully repaid pursuant to Section 2.2.  Thus, Eletson could only have exercised the option to buyout Levona pursuant to the BOL if it paid Levona the Purchase Option Consideration and provided adequate security and/or collateral for the Loan. (J-06.) The record establishes that Eletson satisfied both of these conditions.

### i.  *Purchase Option Consideration*

The evidence establishes that Levona received the Purchase Option Consideration. Pursuant to the Share Transfer Agreement, on March 11, 2022, the Company paid the Purchase Option Consideration by transferring the shares of the Symi and Telendos. (J-08.) The total transfer had and still has a value in excess of the $23 million price set forth in the BOL. (C-1900 ¶¶ 48-89; C-1897 ¶¶ 24-31.)

The record does not support Levona's contention that the transfer of the shares of the Symi and Telendos was the consideration for the option to buyout Levona, rather than the Purchase Option Consideration exercising that option.  Section 2.1 expressly provides that "consideration equal to the Purchase Option Consideration" would be paid "on completion of the transfer of the Membership Interests." Meaning, the $23,000,000 (plus $1) would be paid at the same time the preferred interests were transferred, not for receiving an option to purchase the preferred interests.

In addition, transferring the shares in the Symi and Telendos without transferring Levona's interests in the Company would lead to a breach of the LLCA.  Section 6.2 of the LLCA prohibits Members (which would include Levona as the preferred interest holder), from acquiring or owning any vessels such as the Symi and Telendos.

Section 6.2 provides, in relevant part, that:

> 6.2 Restrictions on Activities of the Members.  Eletson and the Special Member agree that, except for activities engaged in through the Group Companies, none of Eletson or any of its Affiliates (including the Special Member) will directly or indirectly acquire, own, operate, charter or engage in the management of any LPG, ethylene, petrochemical gases and ammonia sectors.  Each of BX, Blackstone Family and BTO SMD agrees that it shall not have a direct interest in the ownership of any vessels employed in the transport of LPG, ethylene, petrochemical gases or ammonia . . . . (J-01 § 6.2.)

This is essentially a non-compete clause—a concept also reflected in the LLCA's definition of "Ineligible Person." (J-01 p. 9.)  Indeed, Levona should have been aware of this restriction as Blackstone flagged this issue for WFW, Murchinson's, counsel in October 2021—ensuring that Murchinson did not compete with the Company, otherwise it would be ineligible to purchase Blackstone's interests. (CM-2003.) Thus, the only reasonable interpretation of the BOL is for the transfer of the shares of the Symi and Telendos to constitute consideration for the buyout of Levona. Any other reading would be inconsistent with the parties' obligations under the LLCA.

Here, the parties' correspondence leading up to, and in connection with, the drafting of the BOL confirms this interpretation and the shared intent of the parties.  *See, E. I. Du Pont de Nemours & Co. v. Admiral Ins. Co.*, 1990 Del. Super. LEXIS 351, *17-18 (Del. Super. Ct. Sept. 19, 1990) (even where the parole evidence rule applies, it only applies to prior or contemporaneous evidence "offered for the purpose of varying or contradicting the terms of an integrated contract and does not exclude evidence offered for the purpose of

interpreting and giving a meaning to those terms."); *see also Fox v. Paine*, 2009 Del. Ch. LEXIS 10, *17-18 (Del. Ch. Jan. 22, 2009) (even for an unambiguous contract, a court may "consult extrinsic evidence secondarily to confirm the 'conclusion that the contract language is unambiguous, evidencing . . . the shared intent of the parties' at the time of they entered the contract. Situations exists where the court may 'consult undisputed background facts to place the contractual provision in its historical setting without violating' the principle that the court not consider extrinsic evidence when interpreting an unambiguous contract") (footnotes omitted), *aff'd*, 981 A.2d 1172 (Del. 2009).

Early negotiations in January 2022 demonstrate that Murchinson sought $23 million in return for its preferred interests to be paid either in cash or by transferring the title in the Symi and Telendos.  (J-14, stating "Should the Closing not take place by 28 February 2022 (the 'Longstop Date'), the parties agree that the Company shall transfer title to two of its vessels to Murchinson Ltd. *as good and valuable consideration for the transfer of the Membership Interests* to the Company or, as the case may be, its nominated affiliate; the two vessels which shall be transferred should the Closing not take place by the Longstop Date are v. Symi and m.v. Tenendos [sic]" and "Immediately upon transfer of the Membership Interests, whether at the Closing simultaneously with payment of the Consideration *or in exchange for the transfer of title in the Vessels* . . . the Company's constitutional documents shall be amended so that all membership interests in the Company become common units….") (emphasis added).

While the scope of the buyout changed to include Levona's providing a loan to the Company, the negotiations concerning the ultimate consideration to be paid to Levona for its interests remained $23 million, not $23 million plus the value of the Symi and Telendos (which, not coincidentally, at the time of the negotiations of the BOL was valued at or

around $23 million).  (*See, e.g.,* C-0107, email from Kertsikoff to Spears stating "as you are aware, we have been negotiating the sale of the Symi and Telendos for some time now and the latest price we have (as of yday [sic] is at (NAV equivalent) $22.7m.") For example, Spears confirmed the expected value for the transfer of Levona's interests on February 22, 2022: "our intention is not to try and get more than $23 million through this arrangement.")  (C-1037.)  Spears confirmed this at the hearing stating that Murchinson/Levona wanted "23 million . . . for the sale of the preferred [shares]." (May 22, 2023 Transcript pp. 198:22-199:10.)

In addition, the evidence demonstrates that the transfer of the Symi and Telendos was adequate consideration. Eletson's experts Peter Daniel and Nikolaos Veraros both calculated the Net Value of the Symi and Telendos, using independent valuations, as contemplated by the BOL. I find both of these calculations reasonable and credible.  Mr. Daniel calculated the Net Value as $24.2 million. (May 18, 2023 Transcript 190:3-12.) Mr. Veraros calculated the Net Value as of March 11, 2022 as $24,858,651, less a 1 percent broker commission. (C-1903 ¶¶ 26-31; C-1903.0017.)   Then, following the BOL, Mr. Veraros testified that he "adjusted for the rest of the assets and the liabilities of these two companies, as per the information from the company," and concluded that the Net Value was approximately $24.8 million (May 18, 2023 Transcript p. 276:14-23.) He further testified that he felt that a 1 percent broker commission would likely be standard for this transaction, and that approximately $665,000 should accordingly be deducted from his Net Value calculation. (May 18, 2023 Transcript pp. 276:18-278:12.)

Levona's expert, Kristoffer Slangsvold's valuation is not persuasive. Rather than rely on independent valuations, such as those by Arrow and Braemar, as Eletson's experts did, and as contemplated by the definition of Net Value in the BOL, Mr. Slangsvold

decided to conduct his own valuation of the Symi and Telendos. (J-47.) In addition, Mr. Slangsvold, prior to being retained as Levona's expert for the arbitration, had communications with Levona personnel about the potential sale of the Symi and Telendos. Notably, at the time of this outreach, the contemplated value for the two vessels was more than $23 million.  Accordingly, Mr. Slangsvold testimony does not carry as much weight as the valuations of Mr. Daniel and Veraros.  (May 24, 2023 Transcript p. 37:04-15.)

Moreover, as Dr. Furchtgott-Roth explained, the transfer of the Symi and Telendos without the reciprocal transfer of Levona's membership interests in the Company would be economically irrational, and that despite the references to the word "option" in the BOL, the BOL would more accurately be characterized as a "forward contract."  (C-1902 ¶ 29.) He states:

> I have not seen any explanation why, according to Levona, Eletson would have transferred assets worth $23 million but then never bothered to exercise the option that would then have cost it $1.00. An economist would not lightly assume any such economic irrationality. Although the BOL describes parts of the contract as an "option" and other parts without reference to an option, I find, from an economic perspective, that the BOL would more accurately be characterized as a "forward contract," in that both parties to the BOL agree to a future transaction at a price agreed upon in the BOL. (C-1902 ¶ 29) (footnotes omitted).

### ii.   Adequate Security and/or Collateral

The evidence also proves that Eletson provided adequate collateral for the Loan, which thereby should have triggered the exit of Murchinson/Levona from the Company. Pursuant to the Assignment of Claims executed on March 11, 2022, Eletson and EMC Gas, subsidiary of Eletson Gas, assigned Levona claims against the Company and the vessel subsidiaries for management fees and liquidity support. (J-9.)

Eletson's expert, Dr. Furchtgott-Roth testified that there is a clear distinction between security and collateral: "To me, in the context of BOL, collateral would be -- could

be a broad class of assets where a security probably means something that there's a direct party involved. . . . A security would be an asset where there is a marketable -- marketable -- it's an asset such as a bond, something that you can go into some market and trade it for a -- . . . . What I'm saying is, in this case, security in my mind is -- is narrower. And collateral would include security, but could include things that might not qualify as a security" (May 19, 2023 Transcript pp. 194:15-195:13.) Levona did not provide any persuasive contradicting evidence. Accordingly, I find that the assignment of claims constituted "collateral" not "security under the BOL.

While the terms of the BOL provided Levona sole discretion to approve "security," it did not have sole discretion to approve collateral, and nothing in the BOL precludes the management fees or liquidity support claims from constituting collateral (J-06 ¶ 2.2(b) ("adequate security and/or collateral is provided for the Loan (the adequacy of such security being at the sole discretion of Levona.").)  The evidence supports the conclusion that Eletson discussed the nature of the collateral it would provide and sent information to Levona relating to the value of these claims prior to the execution of the Assignment of Claims. (C-1004, providing that the management fees as of February 15, 2022 totaled $6,870,204, and the liquidity claims totaled $4,525,076; May 16, 2023 Transcript pp. 330:5-331:13;  336:2-339:8;  348:9-349:11.) Mr. Kertsikoff's testimony as to his conversations with Mr. Spears is credible. (May 16, 2023 Transcript pp. 330:5-331:13; 336:2-339:8; 348:9-349:11.)

Levona's contention that it required the Assignment of Claims not as collateral for the Loan, but as a separate protective measure to prevent Eletson Corporation from attempting to repay itself before repaying the Loan is unpersuasive. As of the date of the Assignment of Claims, the Company had already drawn down $5 million of the loan, on

39

February 23, 2022. Those funds had been paid to the Company's creditors, and Levona was fully aware of this. Thus, the Company had already received and spent a substantial portion of the loaned funds before any purported "protections" for the loan were put in place. (C-1964 ¶ 61.)

In addition, the assigned claims constituted adequate collateral under the BOL. Eletson provided extensive expert testimony concluding that the nominal and realizable value of the assigned claims, as of the time of assignment, exceeded $10 million.  Eletson expert, Mr. Leptos-Bourgi of PricewaterhouseCoopers S.A., reviewed and analyzed the Company's financial data to confirm the nominal value of the assignment of claims, and found that the Management Fees were worth $5,729,362.86, and that the Liquidity Support Claims were worth $4,646,069.07. (C-1901 p. 8.) Experts Daniel and Verraros then analyzed the extent to which the nominal value of these claims was realizable by Levona as of the date of the assignment of claims, and both experts found that the realizable collective value of those claims exceeded $10 million (C-1900 ¶¶ 15-47); C-1897 ¶¶ 9-18).)

Levona's attempt to argue that the claims were valued at less than $10 million fails. First, Levona's expert, Danniel Baer did not conduct the realizable value of these claims, but rather, testified as to how, in his opinion, the claims should have been reported on the financial statements in accordance with GAAP.  Mr. Baer did not consider, nor did he view it as relevant to his opinion, the legal ability of the holder of the assigned claims to enforce them (i.e., through the arrest of vessels or other rights such holders would have.) Despite this, he reached an opinion that the holder of the claims—regardless of who that may be—should take an impairment when reporting the value in their financial statements, and report the value of the assigned claims as zero.  (May 23, 2023 Transcript pp. 108:22-116:7.)

I do not find Baer's testimony convincing in light of other testimony heard throughout the proceeding, including from Eletson's experts. (*See, e.g.,* C-1897 ¶¶ 15-23.) (*See, e.g.*, C-1917.0002 (testimony of Mr. Daniel stating: "I note that Mr Baer looks to financial accounting standards, and US GAAP in particular, as determinative of the value of the management fees. While the standards Mr. Baer employs may be authoritative tools for financial reporting purposes, they involve the exercise of judgement and are not authoritative bases to determine the value of assets such as the management fees for any purpose other than the preparation of financial statements.").)

Moreover, Levona did not provide any contradicting evidence—it did not produce any financial records reflecting how it valued the assignment of claims (or the Symi and Telendos) on its books as of, or post-March 2022.  Murchinson has this information and as discussed, *supra*, did not produce any financial information despite Claimants' requests to do so.[3] (May 22, 2023 Transcript pp. 73:16-74:2.)

The documents and correspondence that have been provided undermine and disprove any notion that Levona did not attribute value to these claims or view the assignment as collateral and/or security. (*See* CM-1979 (email from Murchinson's WFW attorney emphasizing the significance of the management fees to any hostile takeover attempt); C-1951 (email from WFW to Murchinson dated February 20, 2022 suggesting as a condition that "ECorp assign[] all its claims against any group member to Levona as part of the security for any vent you pay in.").) On January 24, 2022, Spears emails Kertsikoff stating: "we allow you to replace some or all of the $4 million cash deposit with

---

[3] While I have sufficient basis to find that an adverse inference is warranted that Murchinson's records reflect that the value of the assigned claims is at least $10 million, and that the value of the Symi and Telendos is at least $23 million, the evidence presented to determine the adequacy of the consideration and collateral is sufficient without such an inference. (*See* JAMS Rule 29.)

consideration being the management fees that are accrued but unpaid from Eletson Gas (or the shipowning subsidiaries) to Eletson Corp . . . ." (J-15.) Most notably, on May 2022, after the BOL, Spears admits in an email that the assigned claims were worth $10,676,000. (C-1304.)[4]

As a result, the evidence supports the view that Levona knew these claims were worth more than $10 million and that these claims were provided as collateral.

### iii.   Option Notice

Levona contends that the option was never exercised, and the lack of an express written Option Notice confirms this.  I agree with Levona that there does not seem to be a separate formal written notice provided to Levona by Eletson exercising the option. However, the evidence reflects that the parties acknowledged that Eletson was exercising the option.

The agenda for the March 10, 2022 Board Meeting—one day before the execution of the Transaction Documents—includes: "Update on Eletson's intention to exercise the purchase option." (J-04.)  Ms. Karastamati testified that "for us, the intention means the actual fact because if it is one way [sic] before, it's the intention, but one day after this is a fact so we believe, we strongly believe that we gave notice to Levona that we were

---

[4] Levona introduced evidence concerning a lawsuit filed in Greece by Eletson relating to the management claims on the vessels as proof that Eletson did not consider these claims collateral for the loan or assigned to Levona. Eletson offered evidence to the contrary establishing that: (1) the assigned claims included management claims on the Company's vessels that accrued as of March 11, 2022; there were claims that had accrued after March 2022 that were still owned by Eletson; and (2)  the purpose of that lawsuit was to obtain a TRO protecting the claims (both those assigned to Levona and those due to Eletson post-March 2022.  Specifically, Eletson sought "to secure our claims" against the Greek Vessels by prohibiting the bareboat charterers "from taking any action which would directly or indirectly have the purpose of transferring or encumbering" the Greek Vessels, which could have impaired or eliminated the ability to collect those claims. (J-38; see also May 22, 2023 Transcript pp. 278:16-287:20.)

exercising the option and gave this notice on March 10 and March 11, we exercised the option. (May 16, 2023 Transcript p. 87:4-13.)

Levona relies on the purported minutes of this March 10th meeting as evidence that Eletson did not exercise the option.  Specifically, Levona insists that the reference to "installment" in that document should be deemed to refer to the payment Eletson needed to pay pursuant to the BOL to extend the option period; in other words, proving that Eletson could not exercise the option on or about March 10th and needed an extension of time to do so.  However, this document (J-33), and Mr. Lichtenstein's testimony surrounding it, is not credible.  Eletson provided evidence about the metadata for this document that supports the inference that it was edited by Mr. Lichtenstein *after* this arbitration commenced. (C-2023.)  In addition, the reference to "installment" more credibly relates to the offset to the Loan that would occur if the Net Value exceeded $23 million.[5]

As additional support for the conclusion that the parties acknowledge that Eletson exercised the option, in the Unanimous Written Consent, Ms. Karastamati and Mr. Kertsikoff were appointed and "authorized to sign, execute (under hand or under seal) and deliver the [sic] on behalf of the Company . . . any and all notices to be issued . . . in

---

[5]  It is also worth noting that Mr. Lichtenstein's entire testimony lacked credibility. His witness statement (LEV255) consisted largely of hearsay and statements about events for which he had no personal knowledge, or opinions for which he had no expertise (i.e., rebuttals to expert reports). Prior to the hearing, Levona's counsel insisted Mr. Lichtenstein's presence at the entirety of the hearing was critical and it would be prejudiced if he was not able to attend the entirety of the hearing. Indeed, Levona insisted that Mr. Lichtenstein was a critical part of Levona's legal team, as he was purportedly Levona's General Counsel.  Pursuant to my email order, dated May 12, 2023, and to protect against contamination of his witness testimony, I permitted Mr. Lichtenstein to attend the evidentiary hearing, "only after his affidavit of direct testimony is provided to Claimants." Despite its earlier claim of prejudice, Levona waited to call him as their last witness, and submitted his witness statement after almost every other witness (fact and expert) had testified. Yet, his witness statement somehow managed to address every, or almost every, contested issue in the hearing. For the above reasons, his entire statement was given little evidentiary weight and I viewed his live testimony incredible.

connection with the Binding Letter Agreement and be authorized to execute and deliver any notices, acknowledgments or otherwise, to be entered into and done in connection therewith and with the arrangements contemplated thereby." (J-11.) All directors, including the Levona directors signed this, but only the Eletson directors were given this authorization. The fact that only Eletson personnel were so authorized supports the conclusion that Levona was no longer to act as the preferred member. (J-11.)

In addition, Eletson's conduct following March 11 was consistent with the buyout. For example, after the transfer of the Symi and Telendos to Levona, Eletson assisted Levona with the sale of the two vessels to other third parties. Eletson also made efforts to cooperate with Levona's efforts to reflag the vessels from Greece to Liberia and novate the underlying bareboat charters to Levona's interests (C-1968 ¶¶ 9-10.)

Additionally, both parties acted in a manner consistent with the fact that Levona had been bought out of the Company. For example, Eletson continued to manage the day to day affairs of the Company, board meetings essentially stopped, business dealings between Eletson and Levona concerning the Company then revolved around Eletson's repayment of its loan obligations to Levona, plus extensive efforts by Eletson to assist Levona in on-selling the Symi and Telendos, and Eletson held itself out, as the family at large, as the sole shareholder of the Company and sole beneficial owners of the Company's remaining 12 vessels. (C-1964 ¶ 71.)[6]

---

[6] Levona spent considerable energy and time focused on a July 13, 2022 email from Mr. Kanelos with attachment entitled "Murchinson Buyout Steps" (J-29) and subsequent email from Ms. Karastamati on July 19, 2022. (LEV218.) In Levona's view, the July 13th email is the "smoking gun" of the arbitration and makes clear that the option was not exercised. Levona also insists that additional emails surrounding this document that Eletson withheld as privileged demonstrate that the memo was sent on the advice of counsel and was not privileged. I already denied Levona's motion to compel after reviewing those emails *in camera*. The emails were privileged and do not support Levona's position. As for the substance of the July 13th document, I do not view this as the "smoking" gun Levona does. First, it was drafted by Mr. Kanelos who was being bribed by

Vassilis Kertsikoff repeatedly represented to potential investors that Levona was out of the Company. (C-399 ("Eletson Gas is seeking $30m from a financial/strategic partner to refinance working capital facility provided by its *previous* shareholders and to refinance part of its fleet."); J-26; C-579; C-580; C-581 (emphasis added).)

At best, the absence of a written notice and payment of $1 dollar are formalities that the parties failed to observe.

Levona argues that the fact that the stock registry was updated when Levona purchased Blackstone's interests but has not been updated to reflect Levona's exit is also reflective of the failure to exercise the option. I disagree. The express language of the BOL explains the absence of any update to the stock registry.

Section 3.4 of the BOL provides in pertinent part: "The parties agree to work in good faith to determine and agree the Net Value promptly and no later than 5 days after service of the Option Notice. In the event of any failure to agree the Net Value within the aforementioned period: (a) the Option Notice shall remain valid but the transfer of the Option Membership interests shall be suspended pending agreement or determination of the Net Value" (J-06 at § 3.4.) It is undisputed that the parties have not agreed on the Net Value. Thus, the formal transfer of the interests has been suspended. Levona, however, ceased being the beneficial owner of the preferred since March 11, 2022, and no longer had the right to vote those preferred shares. *Len v. Fuller,* 1997 Del. Ch. LEXIS 78, at*7, 10 (Del. Ch. May 30, 1997 (even where "there has been no determination of a price to be

---

Murchinson and had every incentive to muddy the waters. Second, as confirmed by the testimony of Eletson's witnesses, the Kanelos email created fury and confusion. (May 16, 2023 Transcript pp. 264:13-265:9; 265:24-266:17; C-1963 ¶¶ 77-78.) Ms. Karastamati's follow-up email can be viewed as an attempt to "move forward" with the original transaction after Levona refused to follow-through with the exercise of the BOL. (C-1963 ¶ 81.) I find that at most, this memo is an inaccurate checklist of items needed to complete Levona's exit from the Company pursuant to the terms of the BOL.

paid for [record-owner's] shares pursuant to a procedure set forth in the Shareholders Agreement, no cancellation of the certificates, and no change on the company's stock ledger," a court of equity "may enforce equitable rights in the stock (including an equitable right to control the exercise of the vote attached to the stock)"; finding beneficial owner controlled vote).

Levona argues that the BOL expressly references the word "option" 34 times. (*See, e.g.,* May 23, 2023 Transcript pp. 183-21-184:3 (Mr. De Quillacq testifying "I think it's important to see whether that contract is an option or forward. If you see the word option 36 times, it's likely to be an option.")) This is simply an example of elevating form over substance.  The substance of the BOL is more consistent with a forward contract, as explained by Dr. Furchtgott-Roth. (C-1902 ¶ 29.)

In addition to all the reasons already stated, and as Dr. Furchtgott-Roth testified, it would be economically irrational to find that Eletson never bothered to exercise the option that would have cost it $1 when the consequence of not doing so would be: Levona obtaining two liquified petroleum gas vessels valued at more than $23 million, more than $10 million in assigned claims, and a Fundamental Action Letter that gives Levona more rights to control the actions of the Company than those spelled out in the LLCA while Levona still retains the Company's preferred interests. (C-1902 ¶ 29.)

Accordingly, after weighing the evidence, I find that it is more likely than not that the conditions for the buyout were met.  As such, pursuant to the BOL, Levona's interests should have been transferred to Eletson Gas, or its nominee. As discussed, *supra*, Eletson has proven that Eletson Gas transferred these interests to the Preferred Nominees. Thus, as of March 11, 2022, Levona was no longer the preferred holder and ceased having any ownership in the Company.

Accordingly, it follows that Levona did not have the authority to enter into the Unigas LOI, direct the operations of the Company, or otherwise assert control over the assets of the Company.

### B. Eletson's Pre-BOL Claims

Eletson asserts claims for breach of the LLCA and breach of the covenant of good faith and fair dealing.

Under Delaware law, the elements of a breach of contract claim are: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract.  "The implied covenant is a 'judicial convention designed to protect the spirit of the agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain.'" *Bakerman v. Sidney Frank Importing Co.*, 2006 Del. Ch. LEXIS 180, at *71-72 (Del. Ch. Oct. 10, 2006) (*quoting Chamison v. Healthtrust, Inc.*, 735 A.2d 912, 920 (Del. Ch. 1999)). "Courts will find a breach of an implied covenant when it is 'clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith had they thought to negotiate with respect to that matter.'" *Bakerman*, 2006 Del. Ch. LEXIS, at *72.

The terms "good faith" and "fair dealing" in the context of an implied covenant have a different meaning from the fiduciary duty concept of good faith and the duties of loyalty and care.  *Gerber v. Enter. Prods. Holdings*, 67 A.3d 400, 418 (Del. 2013),

*overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013).  The implied covenant imposes a duty "to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose."  *Id.* at 419 (internal quotation marks omitted).  And "'good faith' [means] faithfulness to the scope, purpose, and terms of the parties' contract."  *Id.* (italics omitted). "Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally."  *Id.* (internal quotation marks and italics omitted).

Here, the members of the Company waived fiduciary duties. Under Delaware Law the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement may be expanded or restricted or eliminated by provisions in the LLC agreement. *Smith v. Scott*, 2021 Del. Ch. LEXIS 76, 2021 WL 1592463 at *23 (Del. Ch. Apr. 23, 2021). If the LLC's operating agreement plainly disclaims, restricts or limits the duties of its managers and members, the parties must look to the agreement's provisions for their rights and remedies. *Id.* at *24. Where traditional fiduciary duties "have been clearly supplanted or modified, those contractual choices will be respected." *Ross Holding & Mgmt. Co. v. Advance Realty Group, LLC*, 2014 Del. Ch. LEXIS 173, 2014 WL 4374261 at *41 (Del. Ch. Jan. 24, 2014).

An LLC agreement, however, "may not eliminate the implied contractual covenant of good faith and fair dealing." *Miller v. HCP & Co.*, 2018 WL 656378 at *22 (Del.Ch. Feb. 1, 2018) (*quoting* 6 Del. C. § 18-1101(b). However, the "implied covenant applies only if the contract is silent as to the subject issue." *Miller*, 2018 WL 656378 at *23. Because a claim for breach of the implied covenant is contractual, "the elements of an implied covenant claim are those of a breach of contract claim: 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage

to the plaintiff.'" *Miller*, 2018 WL 656378 at \*22 (citation omitted). The implied covenant applies only when one party "proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Miller*, 2018 WL 65378 at \*22 (*quoting Nemec v. Shrader,* 991 A.2d 1120, 1126 (Del. 2010))*.* The implied covenant does not "'establish a free-floating requirement that a party act in some morally commendable sense.' Instead, 'good faith' in the implied covenant context entails 'faithfulness to the scope, purpose, and terms of the parties' contract.'" *Miller*, 2018 WL 65378 \*23 (citations omitted).

### i.  *Pre-Acquisition Conduct*

Prior to November 2, 2021, the Levona-related entities were not parties to the LLCA and therefore, could not have breached its terms or the covenant of good faith and fair dealing. To the extent Eletson seeks relief under any theory of liability for pre-November 2, 2021 actions, I do not have jurisdiction and deny such relief.

### ii.  *Levona's acquisition of the Blackstone's interests*

While the record provides sufficient evidence to conclude that Murchinson engaged in underhanded tactics and dishonest dealings in connection with its acquisition of the Blackstone's interest, I deny Eletson's claim seeking to void Levona's acquisition of Blackstone's interests *ab initio*.  Eletson has not met its burden in establishing how, even assuming Murchinson engaged in the nefarious actions Eletson alleges, that gives Eletson the right to void the transfer of Blackstone's shares.  Nor is the consequence of that clear— voiding that transfer would also void the BOL and the Transactions. Acknowledging this, Eletson seeks (1) rescissory damages relating to Levona's bad faith acquisition of its shares; (2) rescissory damages relating to the transfer of the Symi and Telendos to Levona, including that the proceeds of any sale of the Symi and Telendos and revenue related

thereto paid to Claimants/the Company. *See Creative Research Mfg. v. Advanced Bio-Delivery LLC*, No. 1211-N, 2007 Del. Ch. LEXIS 15, at *33 (Del. Ch. Jan. 30, 2007) (awarding rescissory damages). *Tam v. Spitzer*, 1995 Del. Ch. LEXIS 116, *27 (Del. Ch. Aug. 17, 1995) ("Where, as here, a party is fraudulently induced to enter into a contract, the defrauded party may elect either to affirm the contract and sue at law for money damages, or disaffirm the contract and seek rescission in equity.")

However, the sale of shares from Blackstone to Levona is not Eletson's contract to affirm or disaffirm—it is Blackstone's. Moreover, such a ruling would be incompatible with the basis for this arbitration's jurisdiction, as it would mean that Levona never had ownership in the Company, and therefore, was never bound by the LLCA. Finally, as I determined, *supra*, I am finding that Eletson exercised the BOL. Pursuant to the BOL, the shares of the Symi and Telendos were properly transferred to Levona. Also as discussed, *infra*, I am awarding Eletson damages for the amount Levona has been unjustly enriched by virtue of its holding the shares of the Symi and Telendos without simultaneously transferring the preferred interests to the Company or its nominee.  To award rescissory damages tied to the Symi and Telendos under a theory of rescissory damages would be duplicative.

### iii.   Post-Acquisition/Pre-BOL Claims

Turning to the Post-Acquisition/Pre-BOL claims, the evidence presented at the hearing demonstrates that Murchinson bribed an Eletson officer and Company representative, breached the terms of its NDA with Blackstone, and disclosed Company confidential information.  These actions, never disclosed to Eletson *after* Levona became a party to the LLCA, breached both the LLCA and/or the covenant of good faith and fair dealing.

### a. Bribing of Kanelos

As discussed, *supra,* the evidence establishes that Murchinson bribed Kanelos to act against the Company's interest. The clandestine relationship commenced prior to November 2, 2021, but continued after Levona/Murchinson became the preferred holder. Indeed, the illicit so-called "Services Agreement" was executed between Levona/Murchinson and Kanelos in December 2021 pursuant to which Murchinson wired $100,000 to Kanelos. (C-1699; C-1700; C-1701.)

Kanelos was clearly an officer of Eletson Corporation, and, according to Levona, of Eletson Gas.  The LLCA provides that "Each Officer shall have the fiduciary duties to the Group Companies as those of an officer to a corporation organized under the laws of Delaware"). (J-0 § 6.1(d).)  Pursuant to Schedule VII (m) (Fundamental Actions) Levona could not "enter into, amend or waive any term in an agreement between the Company and any Officer or member of senior management." (J-01 Schedule VII(m).) The so called Services Agreement induced a breach of those fiduciary duties and constituted a breach of the covenant of good faith and fair dealing.

### b. Violating confidentiality obligations and interfering with Company's contracts with its banks and financiers

The evidence also establishes that Murchinson breached its NDA with Blackstone by communicating directly with the Company's financiers and lenders.

The Blackstone NDA provided, in relevant part:

5. All inquiries and other communications are to be made directly to Blackstone or employees or representatives of Eletson specified by Blackstone. Accordingly, Receiving Party and its Representatives agree not to directly or indirectly contact or communicate with any of Eletson's employees, lenders, lessors, customers, suppliers, or any other person with whom Eletson has a business relationship, or to seek any information in connection therewith from such person, without the express written consent of Blackstone.

> …

51

13. Neither this paragraph nor any other provision in this letter agreement can be waived, amended or assigned except with the written consent of each party hereto, which consent shall specifically refer to this paragraph (or such other provision) and explicitly make such waiver or amendment.

(C-1655, J-36.)

There is no evidence that Murchinson ever received written consent from Blackstone to reach out to anyone, especially the Company's financiers.

In addition, the LLCA contains several clauses governing and restricting the use of the Company's sensitive and confidential information. Under Section 12.3(a)-(b), a member may disclose the Company's confidential information "solely for the purposes of such Member monitoring and analyzing his investment in the Company or performing his duties as a Member, Director, Officer, employee, consultant or other service provider of the Company." (J-01 § 12.3(a).)  Each Member must "take all appropriate steps to safeguard such [Proprietary Information] and to protect it against disclosure, misuse, espionage, loss and theft." (J-01 § 12.3(a).)  Section 12.3(b) expressly provides that each Member will be responsible for a breach of Section 12.3 by its Representatives (J-01 § 12.3(b).)

In addition, Under Section 10.2(e)(ii), the Preferred Unit Exit provision, the Company and the Board are to be kept apprised of any attempts by the Preferred Member to disclose confidential information for purposes of selling the preferred units.

Section 10.2(e)(ii) provides:

Notwithstanding anything to the contrary set forth in this Agreement, during the Class B-2 Period prior to the consummation a Qualifying IPO, the restrictions on the Transfer of Units set forth in this Agreement shall not apply to the Preferred Members or the Preferred Units held by the Preferred Members, and such Preferred Members may Transfer to any Person that is not an Ineligible Person any Preferred Units; provided, however, that any transferee pursuant to this Section 10.2(e) shall be treated as a Permitted Transferee for purposes of Section 3.3(b). **The Company and the Board will use commercially reasonable efforts to provide support to the**

> **Preferred Members in connection with the marketing and Transfer to transferees and potential transferees, including, without limitation, and subject to appropriate non-disclosure agreements, providing financial information, causing members of the Board and members of the Group Companies' management teams to be available (at reasonable times upon reasonable requests) to potential transferees and coordinating inspections of the Vessels.** The restrictions, covenants and agreements of this Section 10.2(e) shall terminate upon the completion of a Qualifying IPO.
>
> (J-01 § 10.2(e)(ii) (emphasis added).)

It is undisputed that the Company and Eletson directors were not kept apprised of Murchinson's disclosure of confidential information in connection with its purchase of the preferred shares.

The evidence reflects that contrary to the NDA's express terms, Murchinson communicated directly with the Company's financiers and lenders and provided confidential Company information. For example, on February 12, 2021, Kanelos, on behalf of Murchinson, sent Libera a proposal to restructure Libera's loan facility. (C-463.) On May 10, 2021, an agent of Murchinson from Seafin sent a third-party financier a datapack for "Project Sage" containing Company information stating "the [Eletson] family is not aware about this transaction . . . we need to reiterate that this transaction needs to be dealt under a strict private and confidential basis." (C-453.)  Kanelos responded by disclosing the Company's financial statements and other confidential information. (C-453.) Indeed, the record is replete with examples of Murchinson's outreach to, and strategies regarding, Eletson's financiers and competitors, either by Bistricer directly or through Murchinson's agents, Kanelos and others. (*See, e.g.*, C-1621; C-1627; C-1628; C-1645; C-1651; C-1660; C-1661; C-1657; C-1667; C-1668; C-1672; C-1596; C-441; C-442; C-470.) Notably, Murchinson/Levona continued to disclose confidential information in breach of the LLCA,

without Eletson's and the Company's knowledge, and without NDAs, after Levona purported to join the Company. (C-998.)

The evidence also supports the finding that Levona breached the covenant of good faith and fair dealing by causing the Company's lenders to arrest five vessels and failing to disclose this conduct after it became a member of the Company. The documents presented at the hearing reflect that at some point in time, Murchinson, with its counsel, WFW, developed an aggressive strategy to take control over the company that included putting pressure on the Company's lenders, getting vessels arrested, firing and replacing the management companies for the vessels, and selling the fleet. (CM-1999 ("Plan B" inviting "a consensual foreclosure of the SEB LEG Vessels," and "Libera to take their ships away also…with as much cooperation as [Murchinson could] offer," as well as "allow[ing SEB] to do what they keep threatening").)

On October 24 and 25, 2021, SEB arrested two of the Company's vessels (Dilos and Kithnos). (C-498; C-499.)  Eletson received "[n]o advance warning" "notice or indication that an arrest was coming." (C-498.) Then, after Levona's acquisition of Blackstone's interests in the Company, SEB proceeded to issue warrants of arrest for two more vessels, the Othoni and Paros, on November 11, 2021 and November 12, 2021, respectively. (C-1964 ¶ 132.) Libera proceeded to issue a warrant of arrest for the Kithira on February 1, 2022. (C-1964 ¶ 132.)

As Kertsikoff attested, based on his long experience in the shipping industry and his relationships with the Company's financiers, he believes these arrests were the direct result of Levona's misconduct. (C-1964 ¶¶ 133-142.)  These arrests were extreme and unusual actions within the shipping industry, particularly as Eletson had a normal banking relationship with its lenders for years and was faithfully paying its debts prior to its

financial difficulties. (May 16, 2023 Transcript pp. 319:13-320:11; 323:3-326:14.)  At no time before the end of 2021 had SEB taken any action in terms of arresting the Company's vessels. (May 16, 2023 Transcript pp. 319:23-320:2.)  Moreover, as Mr. Hadjieleftheriadis testified: "we had given the syndicate, the banks, clear indications that first we would start paying down the debt interest and principal, but more importantly, though, we were prepared to refinance the facility. We had told them that we had a financier -- we had been in contact with a certain financier who would quickly finance the investments." (May 18, 2023 Transcript pp 112:9-17.)

As further evidence of Murchinson's corrupt intentions, on July 2021, Murchinson approached Eletson's broker, Thor Erik Lie from Grieg Shipbrokers, for information related to the Company's vessel values under the prospect of a "forced sale." (C-1659.)  A "forced sale" is the "worst possible" valuation level. (May 18, 2023 Transcript pp. 111:10-21.) As Kertsikoff testified: "The fact that Levona, through Murchinson, was asking one of the Company's key brokers to provide forced sale values shows its mal-intent. Never in my experience have we sought out a forced sale valuation. A forced sale means that the vessels will be auctioned off and sold at a below market price in order to liquidate the assets on an expedited basis. There is no reason that Murchinson should have been asking *our broker* to provide it with those values except to account for forced sales in anticipation of the arrests." (C-1964 ¶ 128.)

Murchinson/Levona insists that the record does not support the finding that they wanted to have the lenders arrest the vessels or that their actions caused the arrests of the vessels. (*See, e.g.,* CM-1992; C-465.)

I disagree.  First, I find the Eletson witnesses' testimony, combined with the record of communications between Murchinson and WFW reflecting Murchinson's intended

strategy, and between Murchinson and the banks and financiers, sufficient evidence to prove that Murchsinon's aggressive tactics more likely than not, contributed to the arrests of the ships, and that had Murchinson not interfered with the Company's relationships with its banks, the arrests would not have occurred. The emails Levona cites in its defense occurred before Murchinson turned to its "Plan B." (*Compare* CM-1992 and C-465 *with* CM-1999.)

Second, the record is incomplete, and we do not know what a full record would reflect. Murchinson took the position throughout the entirety of these proceedings that it is not a party to this arbitration. But as the evidence conclusively establishes, and as discussed, *supra*, Murchinson is the real party in interest in this arbitration. Despite this, Murchinson did not make a full production of documents and communications. It is only as a result of my orders directing Levona/Murchinson to produce its communications with Kanelos and WFW that we know about Murchinson's coordinated strategy (i.e., "Plan B") and the communications with the lenders. (CM-1999.)

For the avoidance of doubt, I do not believe that Levona's counsel in this arbitration was an active participant in its client's gamesmanship, but rather another pawn in its perpetual deceit.

Accordingly, I find that Murchinson's improper dealings with the Company's banks and financiers pre-acquisition of Blackstone's interests caused the arrests of the vessels and that its failure to disclose these actions to Eletson once it became a member in the Company was a breach of the covenant of good faith and fair dealing.

> ### c. *Breaching the LLCA by attempting to terminate management contracts*

Levona also breached the LLCA immediately upon joining the Company by attempting to terminate management contracts and replace the directors of the Company's subsidiaries. (C-818; C-837; C-838; C-1964 ¶¶ 20, 115-121.)

Section 3.2 of the LLCA, provides as follows:

> 3.2 <u>Fundamental Actions</u>.  Except for actions authorized to be taken by the Preferred Members pursuant to Section 3.6(c), the prior approval of at least four Directors (including at least one Eletson Director and at least one BX Director) shall be required in order for the Company to undertake, or permit or cause any Group Company to undertake, . . . (ii) during the Class B-2 Period, any of the actions set forth on Schedule VII (each a "Fundamental Action") (J-02 § 3.2.)

The parties agree that the carveout for Section 3.6(c) does not apply.

The Fundamental Action provision prohibits the Company from acting without an Eletson Director with respect to Schedule VII actions, a right made clear in the Amendment to the LLCA. (J-02 § 3.2.) Schedule VII enumerates 16 categories of actions that Levona cannot take without Eletson's approval (J-01, Schedule VII).

Those categories include the following:

> (b) other than the execution and delivery of the Management Agreements by the Shipcos and the Manager on the Initial Closing Date, enter into, or extend, amend, modify, renew or terminate any agreement or transaction, or waive performance under any such agreement, between a Group Company, on the one hand, and any member of the Group Company's management team, any Member, such Member's Affiliates or any other related party, on the other hand;
> . . .
> (h) approve the amendment, modification, termination, waiver or repeal of any provision of any Transaction Document (other than this Agreement), or provide any approval, consent to be provided to any Person on behalf of the Company or its Subsidiaries under the Transaction Documents (other than this Agreement), including without limitation, exercising any right of the Company or a Subsidiary to remove a manager under a Management Agreement;
>  . . .

(j) amend or modify any provision of any charter, articles, organizational or other governing document of the Company's Subsidiaries that would have the effect of (i) creating any additional requirement of Eletson to make Capital Contributions to the Company, (ii) modifying any voting threshold or approval right held by Eletson, (iii) materially and adversely change the express rights of Eletson set forth therein, other than as a result of dilution due to the issuance of additional Equity Interests;

(k) other than in accordance with the terms of the Management Agreements, enter into any technical or commercial management agreement, any crewing arrangement or any other material vessel or maritime asset related agreement or any amendment thereto;

. . .

(p) enter into any agreement or commitment to effectuate any of the foregoing.

(J-01, Schedule VII.)

In the context of Schedule VII (h), "Transaction Documents" does not refer to the BOL, but rather, the LLCA defines the terms as "this Agreement, the Contribution Agreement, the Management Agreements and the Financial Services Agreements (as defined in the Contribution Agreement)." (J-01.)

The provisions in Schedule VII prohibited Levona from taking unilateral action concerning Eletson's Management Agreements, including without limitation, terminating them directly or indirectly. Murchinson's counsel specifically advised it of this. (CM-2002.) Nevertheless, on November 5, 2021, Levona, through Bistricer, authorized WFW to terminate the Company's management agreements with Eletson Corporation and replace the board of directors of the Company's subsidiaries with Levona representatives. WFW, on Levona's behalf, issued a Notice of Replacement and Appointment of Directors purporting to replace Eletson's Directors and to appoint Lichtenstein, Spears, Fenttiman, and Hassett as the directors of the Company's subsidiaries. (C-837.)

Levona also issued a notice terminating the Company's affiliates' Management Agreements with Eletson Corporation. (C-838.)

Levona then attempted to use these termination notices to cut Eletson Corporation off from any communication with SEB:  Lichtenstein sent SEB a notice of the termination. (C-839; C-840; C-1958.)  Levona never informed SEB that the termination notice was in violation of the LLCA—despite being advised as such by WFW—but rather stated:  "[P]lease be advised that Eletson Corporation have today been served with a notice of termination in relation to the management of the Vessels and the authority they may have had to deal with you regarding the Facility Agreement or the Vessels has been revoked. As such, Eletson Corporation has no right to correspond or otherwise deal directly with you in relation to the Facility Agreement or any Vessel." (C-839; C-818 (WFW advises Murchinson that "[s]ervice of the Management Agreement termination notice without consent from an Eletson Corp Director will breach the [LLCA] which could possibly render the termination notice invalid".))

Thus, the record overwhelmingly demonstrates that Levona's attempted termination of the management agreements was a willful and intentional breach of the LLCA.

### C.  Eletson's Status Quo Injunction Claims

Eletson asserts numerous allegations against the Levona-related entities for violations of the Status Quo Injunction. Some of those alleged claims, even if true and while harassing and menacing, did not cause quantifiable harm to the Company. For example, Levona's premature notice of default and acceleration of the Loan sent on October 25, 2022, and Levona's calling of board meetings. (C-404; C-405; C-086.)

As such, I will only specifically discuss those claims for which the violations caused quantifiable harm. The three actions are all related: Pach Shemen's purchase of a controlling interest in outstanding bonds issued by Holdings, Pach Shemen's directing of the trustee to commence litigation against Holdings, and Pach Shemen's directing of the commencement of the involuntary bankruptcy petition against Holdings.

On or about January 4, 2023, Pach Shemen purchased $183,851,546 in bonds of Holdings for $2 million. (C-746; May 22, 2023 Transcript p. 332:16-20.) Additionally, Mr. Spears, on behalf of the Levona-related entities, offered additional consideration to the bondholders contingent on the outcome of this arbitration stating that it would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the company." (C-746.0008.) The Holdings bonds were purchased by Pach Shemen from Nomis Bay and BPY via private trades and then transferred to Pach Shemen. (C-746.) Mr. Spears testified that he had bought the bonds from four funds which had previously owned them, named Beachpoint, Caspian, Redwood, and Knighthead. (May 23, 2023 Transcript pp. Tr. 326:20-327:2.)

On January 11, 2023, Pach Shemen then instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on these bonds ("Bondholder Litigation").[7] Then on March 7, 2023, Pach Shemen and two other creditors of Holdings, filed involuntary bankruptcy petitions against Holdings in the Southern District of New York. The involuntary bankruptcy petition and some of the documents included in the filing were signed by Mr. Lichtenstein and Mr. Spears. (C-749; C-751; C-746.) The timing of this

---

[7] Eletson argues that Pach Shemen's purchase of these bonds and directing the trustee to commence litigation violated a standstill agreement Eletson had in place with the original holders of the bonds. This claim, while likely true, is outside my jurisdiction.

filing is notable—it was three days after I orally issued certain discovery rulings adverse to Levona, including that it had waived any claim of attorney-client privilege with WFW, and ordering the production of Levona/Murchinson's communications with Kanelos.

Levona argues that none of the actions taken by Pach Shemen are violations of the Status Quo Injunction because Pach Shemen is not bound by those orders, and with respect to the trustee litigation and the bankruptcy, Pach Shemen is not the only creditor directing those litigations.

As discussed, *supra*, Pach Shemen is the alter ego of Levona. The separateness is in name only. Its representatives, including Spears and Lichtenstein, were bound by the Status Quo Injunction. Despite this, Pach Shemen a/k/a Levona II, (C-746.0008), entered into a trade to purchase the notes, offering as consideration value associated with the assets in dispute in this arbitration. The TRO and November 2022 clarification expressly ordered the parties to "maintain the status quo" and prohibited the "transfer or sale of, or attempt to sell or otherwise transfer, any assets of . . . Gas . . .," and the Status Quo Injunction entered in January 2023, further extended the prohibition to include "or assets in dispute in this arbitration." (C-1816; C-1887; C-1838.) While technically Pach Shemen was not transferring the assets of Gas or assets in dispute in this arbitration, the overall strategy was intended to disrupt the status quo and find another path to obtain the "assets of Gas . . . or assets in dispute in this arbitration."

In other words, the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration. They believed, at the time—although mistakenly—that if I ruled that Eletson had exercised the option and bought out Levona's interests, the preferred interests would pass to Holdings. Thus, by purchasing the bonds, it became a controlling creditor of Holdings with the ability

to put Holdings into bankruptcy.  In the first instance, the filing of the bankruptcy led to Levona's insistence that it could not arbitrate these claims due to the automatic bankruptcy stay. This was certainly not "maintain[ing] the status quo."  In the event the stay were to be lifted, and Levona lost in this arbitration, the Levona-related entities were then positioned to argue that, as creditor to Holdings, the value of the preferred shares passed to them.

Unfortunately for Levona, the strategy was misguided because the BOL expressly provided that in the event of a successful exercise of the option, the interests would transfer to "Eletson Gas or its nominee," (J-06 § 2.1), and as discussed, *supra*, Eletson Gas had transferred the interests to the Preferred Nominees.  Although the actions of Pach Shemen may have been for naught, their actions were intentional and direct violations of the Status Quo Injunction.

### D.  Levona's Counterclaims

In light of my finding that Eletson exercised the option to buyout Levona's membership interests as of March 11, 2022, Levona's abovementioned counterclaims fail and are dismissed. I find, however, that as part of the consideration paid in connection with the BOL, the shares of the subsidiaries which control the Symi and Telendos were transferred to Levona and Levona retains all rights associated with the ownership of the subsidiaries of those vessels since that time.

## VI.    DAMAGES

### A.  Compensatory Damages

Eletson's expert Dr. Furchtgott-Roth presented credible and convincing evidence as to the damages suffered as a result of the Levona-related entities' misconduct. Levona did not provide counter-calculations.  Dr. Furchtgott-Roth authored three expert reports in

this proceeding (C-1902, C-1918, and C-1934), and credibly testified in person at the hearing, where I determined he was qualified as an expert in economic analysis, options analysis, antitrust and competition, and damages. (May 19, 2023 Transcript pp. 108:22–109:3; see also C-1982 (hearing demonstrative).) He is a former Commissioner of the Federal Communications Commission and received a PhD in economics from Stanford University and an SB in economics from the Massachusetts Institute of Technology.

To calculate damages, Dr. Furchtgott-Roth reviewed extensive document discovery and company data listed in Exhibit B of his first report (C-1902.0105) and supplemented in subsequent reports. He explained that his "method for assessing economic damages begins with an assumption of Levona's liability as presented by Eletson," after which he would:  (i) calculate, where possible, the compensation necessary to restore the injured party, Eletson, to the economic position they would have enjoyed but for the wrongdoing of the other party, Levona; and (ii) where harms to Eletson are not reasonably amenable to quantification," he offered a description of Eletson's injuries. (C-1902.0108.)

Due to the character of several of these harms, Dr. Furchtgott-Roth was not readily able to ascertain a specific quantum of damages for several kinds of actionable misconduct. (C-1902.0109.)  As a result, he opined that his overall quantifications of damages are "necessarily a lower bound" of the full extent of harm Levona caused.  (C-1902.0109.) However, he was able to quantify several categories of damages.

> i. *Damages Arising From Levona's Acquisition of the Symi and Telendos Without Reciprocal Transfer of the Preferred Interests*

Dr. Furchtgott-Roth calculated $19,677,743.71 in directly calculable losses for the lost services of the Symi and Telendos. Dr. Furchtgott-Roth testified at the hearing that this figure is an estimate of what the Company would have made from those two vessels had it not transferred them, which he claimed was an appropriate measure of unjust enrichment

because the vessels were transferred without the reciprocal transfer of the preferred interests. (May 19, 2023 Transcript pp. 143:23-145:8; see also C-1902, Ex. C.7.) The damages should be paid to the Preferred Nominees, as they flow directly from Levona's refusal to relinquish the preferred interests, and the Preferred Nominees hold all title and interest in the preferred interests. *See, e.g.*, *Urdan v. WR Capital Partners, Ltd. Liab. Co.*, 2019 Del. Ch. LEXIS 313, at *32 (Del. Ch. Aug. 19, 2019) ("when the shares are sold, the rights to assert and benefit from direct claims pass with the shares to the new owner").

> ii. *Damages Arising from the Levona-Related Entities' Other Misconduct*

Dr. Furchtgott-Roth calculated the directly calculable losses arising from Levona's conduct that led to the vessel arrests as $21,777,378.50. This includes: (a) approximately $17 million in lost time charter equivalent (TCE) revenues by comparing the projected time charter revenues for each arrested vessel against the actual revenues (i.e., zero), for time that each vessel was arrested; and (b) approximately $4.7 million in fixed costs incurred due to the arrests, such as legal expenses, hull cleaning, crew costs, and the like. (May 19, 2023 Transcript pp. 41:12-143:22; see also C-1902, Exs. C.1-C.5.) These damages shall be paid by the Levona-related entities to Eletson Gas as compensatory damages from the improper arrests of Eletson Gas vessels.

Eletson also seeks at least $10,000,000, to be determined by me in my discretion, for damages related to or arising out of Levona's other breaches of other contracts as to which Claimants were unable to specifically quantify damages, to be paid to Eletson Gas or the Preferred Nominees in my discretion. It argues that for each of those breaches, Eletson has proven that an injury in fact occurred. However, for several breaches, Dr. Furchtgott-Roth did not readily have facts available as of January 2023 sufficient to specifically quantify resultant damages. (*See, e.g.,* C-1902.0109 (noting that "due to the

character of certain of Eletson's injuries, various damages are difficult to quantify to a reasonable degree of certainty").)

Among these harms, are:

a. Risk of catastrophic loss of sensitive cargo or harm to vessels during the arrests;

b. As of result of the harmful acts of Levona and its affiliates, reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company;

c. Reputational harm to the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors;

d. Consequent to the reputational harm would be lost business opportunities, both with existing customers and with new customers;

e. The loss of access for the Claimants to both existing and new sources of capital as a result of the actions of Levona and its affiliates;

f. Management distraction to deal with the harmful acts of Levona and its affiliates; and

g. Permanent harm from the indelible record created by Levona and its affiliates.

I agree that the record supports the conclusion that the Levona-related entities' breaches caused the Company harm. For example, Mr. Hadjieleftheriadis elaborated on several of these harms in his witness statement, testifying that several of these breaches independently cost the Company millions of dollars. (C-1968 ¶ 91-101; ¶ 92 (asserting, among other claims that "Eletson would have paid millions of dollars to have avoided the breach of confidentiality and reputational damage that arose from" Kanelos' sharing of confidential information; ¶ 96 (claiming Levona's misconduct prevented the "refinancing of two of the facilities of the group—the Tufton facility and the Libera facility—which has resulted in lost financing opportunities and costs of several million dollars"); ¶ 99 ("Claimants have suffered tremendous harms due to Levona's conduct. Even if we were awarded the totality of the damages contemplated by Mr. Furchtgott-Roth's report, we still

would not be fully compensated, but Mr. Furchtgott-Roth's assessment of damages is a starting point.")

Delaware law is clear that, where a party has proven to a reasonable certainty that harm actually occurred, the trier of fact may use its discretion to determine the amount of damages that the plaintiff is entitled to. *Pers. Touch Holding Corp. v. Glaubach*, 2019 Del. Ch. LEXIS 66, at *48-49 (Del. Ch. Feb. 25, 2019) ("The law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages. Speculation is an insufficient basis, however. Each situation must be evaluated to know whether justice will permit an estimation of damages given the testimonial record or whether the record affords insufficient basis to fix an award." (citation omitted); *see also Raishevich v. Foster*, 9 F. Supp. 2d 415, 417 (S.D.N.Y. 1998) ("a fact finder has some latitude to make a just and reasonable estimate of damages based on relevant data." (citations omitted)).

JAMS Rule 24(c) is also instructive here and it reads as follows:

**Rule 24. Awards**

(c) In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' Agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

Accordingly, and based upon my review of the totality of the evidentiary record, I award Claimants $2,000,000 to be paid to the Company for the following damages:  (a) the reduced bargaining position of the Company with business-sensitive information available to other parties, including those negotiating with the Company; (b) reputational harm to

the Company and Eletson from the actions of Levona and its affiliates with financiers and banks but also with customers, employees, and vendors; (c) lost business opportunities, both with existing customers and with new customers, as a result of the reputational harm; (d) the loss of access for the Claimants to both existing and new sources of capital; and (e) permanent harm from the indelible record created by Levona and its affiliates.

*iii.   Damages Arising from the Violations of the Status Quo Order*

Eletson is also entitled to damages for Levona's repeated violations of the Status Quo Injunction.  In its Proposed Order, Eletson seeks "an amount to be decided by the Tribunal in its discretion for damages relating to or arising out of Levona's violations of the Tribunal's Status Quo Injunction, to be paid to Eletson Gas or the Preferred Nominees in the Tribunal's discretion." (Proposed Order E(f).) In its post-hearing submission, Eletson requests that "[d]amages flowing from these violations should be included in the punitive damages assessed Levona." (Claimants' Post-Hearing Brief ¶ 799.)

Since I found that Pach Shemen's directing the trustee to commence litigation against Holdings and the commencement of the involuntary bankruptcy action both were intentional violations of the Status Quo Injunction, I award Eletson reimbursement of the attorney's fees and costs incurred in connection with those actions to be paid to the entity or individuals who paid those costs and fees. The LLCA provides that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party) (J-01, LLCA §12.14 (d); *See* JAMS Rule 24 (c).

**B.  Punitive Damages**

Punitive damages in a contract action "can be awarded when conduct includes an element of ill will or an intent to cause injury or is malicious, willful or wanton." *Standard Distrib. Co. v. NKS Distribs.*, 1996 Del. Super. LEXIS 125, at *38 (Del. Super. Ct. Jan. 3,

1996) (finding punitive damages should be available for the deceit that accompanied the breach of contract in this case.") Punitive damages are permitted in breach of contract cases "[w]here the defendant's actions are similar in nature to that of a tort" or "it appears that the defendant has committed a 'willful wrong, in the nature of deceit.'" *Gillenardo v. Connor Broad. Del. Co.*, 2002 Del. Super. LEXIS 402, *36-37 (Del. Super. Ct. Apr. 30, 2002) (internal citations omitted). Dr. Furchtgott-Roth opined that if I determined that punitive damages were appropriate in this matter, a range of punitive damages measured at 3x to 9.6x compensatory damages would be appropriate. (C-1902 ¶ 94.)

Levona does not contest my ability to award punitive damages.  In fact, Levona requested that I award it punitive damages of $2,000,000 for what it referred to as Eletson's "intentional and bad faith acts." (Respondent's Proposed Order p. 3.)

If there was a case warranting punitive damages, I believe this is one. The evidence establishes that Murchinson, on its own, and through Levona and Pach Shemen, has engaged in an intentionally hostile, corrupt, wanton, and deceitful campaign to the great detriment of the Company.

Murchinson corrupted and bribed an Eletson officer.  The deceit continued with the intentional breach of the NDA with Blackstone. The deceit and backstabbing continued after Murchinson became the preferred holder and further continued after Eletson exercised the purchase option buying out Levona's preferred interests. It even continued during this arbitration as Murchinson disingenuously hid behind shell entities to avoid producing relevant documents and to repeatedly violate the Status Quo Injunction Order. To this day, I am convinced that all relevant documents have not been produced by Murchinson/Levona.

As discussed and cited throughout this Final Award, the record is replete with instances of Murchinson's agents engaging in deceitful and malicious behavior to further their own agenda: from Spears' secret dealings behind the Company's backs in which he bribed a Company officer and conspired with third-parties to the detriment of the Company (s*ee, e.g.,* C-1698, C-1699 ("Services Agreement"); C-1107 (Spears writing "I CANT STRESS ENOUGH – PLEASE DO NOT CONTACT THE VASSILIS X2 ABOUT THESE.")); to Murchinson/Levona's intentional breach of the LLCA's confidentiality obligations; to Murchinson/Levona's intentional interference with the Company's relationships with its lenders, causing the arrest of the Company's vessels, and their subsequent failure to disclose these violations to the Company; to Levona/Murchinson intentionally and knowingly breaching the LLCA by attempting to terminate management agreements and knowingly falsely telling the Company's lender that Eletson Corporation had "no right to correspond or otherwise deal with" its lenders (C-1958); to Lichtenstein's attempt to manipulate the evidentiary record by creating purported minutes of the March 10, 2022 board meeting after this arbitration was commenced (C-2023); to Levona and its agents knowingly violating—multiple times—the Status Quo Injunction Order (discussed, *supra*); to attempting to manipulate and deceive this tribunal by hiding behind shell entities while refusing to produce relevant documents, and misleading, if not outright lying, under oath.

It is clear to me that without some punitive deterrence, Murchinson's agents will continue to believe that they are not accountable for their actions.

Each of the Murchinson witnesses admitted that they actively concealed their activities, including their bribing of Kanelos, from the Company, without shame.

In addition to his attempt to perpetrate a fraud by creating a document after the commencement of this arbitration (C-2023), Mr. Lichtenstein, lied under oath, testifying that he was orally appointed "General Counsel" of Levona.  There is absolutely no support for this statement, nor is it credible.

When Mr. Lichtenstein testified at the hearing on May 24, 2023, he had been practicing law for three years. He graduated from law school in 2019, articled as a Canadian lawyer in 2020 which he described as akin to a residency after law school and then joined Murchinson in 2021. (May 24, 2023 Transcript pp. 109-110).

He represented in his witness statement that he was the "general counsel" of Levona but his testimony at the hearing under oath belies that assertion. He testified as follows:

> 18 Q. In Paragraph 4 of your witness statement,
> 19 you say that "as the general counsel of
> 20 Levona..."
> 21 So, are you selling this tribunal that you
> 22 are the general counsel of Levona?
> 23 I notice it has a capital "G" and a
> 24 capital "C," that looks like something formal.
> 25 A. Yes.
> Page 94
> 2 Q. Okay. You're the formal general counsel
> 3 of Levona?
> 4 A. I don't know what you mean by informal.
> 5 Q. You know what the word "formal" means?
> 6 A. Just as formal versus informal general
> 7 counsel, yeah, I don't understand it.
> 8 Q. Well, who appointed you to general counsel
> 9 of Levona?
> 10 A. Elliot Asa (phonetic).
> 11 Q. And what piece of paper did you do that
> 12 with?
> 13 A. It was orally.
> 14 Q. And when did he do that?
> 15 A. When he was the front desk director, I
> 16 spoke to him.
> 17 Q. You spoke to him, and he said you're the
> 18 general counsel. Do you have a business card, by
> 19 the way, that -- that identifies your general
> 20 counselship of Levona?

21 A. I don't have any business card of Levona.

(May 24, 2023 Transcript, pp. 93-94).

When pressed further by Claimant's counsel, he volunteered the following:

> Q. Okay. You said you didn't have a business
> 6 card, but do you have an e-mail address at
> 7 Levona?
> 8 A. No.
> 9 Q. Do you have an e-mail address at Poch
> 10 Shemen?
> 11 A. No.
> 12 Q. Does Poch Shemen have an e-mail address?
> 13 A. Not to my knowledge.
> 14 Q. Does Levona have an e-mail address?
> 15 A. No.
> Q. To communicate with you, you communicate
> 17 to Murchinson, correct?
> 18 A. Through my Murchinson e-mail address.
> 19 Q. Yes.
> 20 A.  Yes.

(May 24, 2023 Transcript, p. 106)

Before the start of the evidentiary hearing, Levona's counsel insisted that Mr. Lichtenstein was critical to Levona's legal team and his presence at the entirety of the hearing was necessary.  Despite my asking Levona to provide sufficient corporate records or anything in writing to substantiate its claim that Lichtenstein was an internal attorney for Levona, it provided nothing more than a certification by him where he called himself "(a Toronto based attorney for Levona and one of its board member representatives for Eletson Gas.)" (May 24, 2023 Transcript, p. 96.)

Despite that lack of support, and over the strenuous objection of Claimants' counsel, I gave Levona an opportunity for Lichtenstein to be present by permitting his attendance only after he provided his direct written witness statement to Eletson.  My purpose in this prerequisite to his attending the hearing before his actual testimony was to prevent any contamination of his witness testimony.  Apparently, however, that was

71

Lichtenstein's goal all along. He did not provide his witness statement until May 23, 2023—the penultimate day of testimony.   His entire written witness statement— purportedly as "General Counsel" of Levona (LEV255 ¶ 4)—is over 37 pages and 161 paragraphs in length and addresses almost every contested factual issue in the arbitration. It is also almost entirely hearsay and relates to events of which he has zero firsthand knowledge.  I give his written statement zero weight in these proceedings, as it is clear to me that he was either impermissibly listening into these proceedings remotely, or improperly speaking in depth with others who were in attendance during other witnesses' testimony so as to accomplish the very thing I intended to prevent—witness contamination.

Lichtenstein went so far as to actually manufacture evidence in this case.  He tried to argue that minutes of a March 10, 2022 Board meeting were created contemporaneously and proved that Eletson did not exercise the purchase option.   (J-33.) However, this document, and Mr. Lichtenstein's testimony surrounding it, is not credible.  As discussed above, Eletson credibly provided evidence about the metadata behind the document that supports the inference that it was edited by Mr. Lichtenstein *after* this arbitration commenced. (C-2023.)

It is clear from his testimony that this young lawyer does not understand the most basic ethical obligations of an attorney including to at all times avoid the appearance of an impropriety. This is glaringly illustrated in the following colloquy during his hearing testimony:

> Q. You willingly participated in this -- you,
> 7 as a lawyer, willingly participated in this
> 8 communication, correct?
> 9 A. I wrote this e-mail.
> 10 Q. And, in fact, I think is what you are
> 11 telling The Court is that you never, in fact,
> 12 objected to doing this.
> 13 A. Object to doing what?

14 Q. Objecting -- objected to making pretend
15 that you didn't know Mr. Kanelos when you did.
16 A. It was none of the other
17 directors' -- they didn't have a need to know
18 this.
19 Q. You were making pretend, right?
20 A. I don't know if the word is making
21 pretend. It's just a game. (May 24, 2023 Transcript, p. 164)

Murchinson/Levona continue through today to engage in gamesmanship both in connection with their refusal to honor their obligations under the BOL including their attempts to control the Company's assets as well their continuation of the multiple legal proceedings they have commenced—through Spears and Lichtenstein—in violation of the Status Quo Injunction Order.  This is none surprising since in the words of their own "General Counsel" this is all "just a game."

As a result of the bad-faith, deceitful, wanton and  corrupt manner in which Levona treated Claimants with an intent to injure them, bribed an Eletson officer, disregarded their obligations to Claimants and to the Company, intentionally and willfully breached the LLCA, committed associated torts against Claimant, and violated the orders of this arbitration, I find that punitive damages in the amount of $43,455,122.21, equal to the amount of compensatory damages, are warranted to be paid to the same entities that are to receive the underlying compensatory damages. *See, e.g., Standard Distrib. Co.*, 1996 Del. Super. LEXIS 125, at *38; *Barba v. Bos. Sci. Corp.*, 2015 Del. Super. LEXIS 537, at *31 (Del. Super. Ct. Oct. 9, 2015) (*citing State Farm Mut. Auto. Ins. Co. v. Campbell.* 538 U.S. 408 (2003)).

## C. Interest, Costs and Fees

Levona must pay pre-judgment interest on all non-punitive damages at 10 percent per annum. Eletson asserts that the appropriate pre-judgment rate of interest should be 10 percent, as established under the parties' agreements.  Specifically, Eletson refers to the

Intra-Group Loan, which provides for a rate of 10 percent per annum, for the loan that Levona provided the Company.  (*See* J-07 Section 6.2.)  Levona has not offered an alternative rate that it believes is more appropriate.  Thus, I conclude that it is reasonable to apply the rate previously negotiated by the parties in other transactions.

As indicated in Dr. Furchtgott-Roth's first report, all of the compensatory damages he quantified were adjusted for interest up through January 30, 2023.  Thus, Levona is obligated to pay additional prejudgment interest on those damages from January 30, 2023 up through the earlier of the date of payment of the awarded damages or the date of confirmation of this award by a court of competent jurisdiction.

Eletson also seeks the recovery of its costs and attorneys' fees for its prosecution and defense of this action pursuant to Section 12.14(d) of the LLCA, which provides that "the arbitrator shall have discretion to award reasonable attorneys' fees and reasonable travel expenses (excluding meals) to the prevailing party, which fees may be set by the arbitrator of such action or may be enforced in a separate action brought before an arbitrator for that purpose in accordance with this Section 12.14, and which fees shall be in addition to any other relief that may be awarded."

Since Claimants have prevailed in this arbitration, I grant Claimants' request for its costs and attorneys' fees pursuant to Section 12.14(d) of the LLCA and JAMS Rule 24(g) which read as follows:

> **Rule 24. Awards**
> (g) The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

## VII.   ELETSON'S APPLICATION FOR FEES, EXPENSES, COSTS AND INTEREST

In the Corrected Interim Award, I granted Claimants' request for the opportunity to produce evidence of their recoverable costs, fees, and interest, and set a briefing schedule, with which the parties have complied.

In its Opening Affirmation, Eletson seeks fees, expenses, and costs in the amount of $9,850,222.99 in connection with the arbitration, and $3,007,266.20 in connection with the Bankruptcy and Bondholder Litigation, for a total of $12,857,489.19.  This amount includes:

- $7,179,802.80 in legal and support staff fees incurred by Reed Smith in connection with the arbitration;

- $301,689.66 in disbursable costs and expenses incurred by Reed Smith in connection with the arbitration;

- $1,794,950.70 of a success fee owed to Reed Smith by Eletson under their engagement letter for the arbitration, which was triggered by the finding in the Corrected Interim Award that Eletson is the prevailing party in this arbitration;

- $344,691.99 in fees charged by Eletson's expert witnesses in connection with the arbitration, other than certain fees charged by one Eletson expert, Peter Daniel, whose expenses are primarily included as professional fees in Reed Smith's bills and included in the $7,179,802.80 referenced above;

- $50,986.27 in fees charged for trial support by Magna Legal Services and Transperfect Legal Solutions in connection with their trial support services in the arbitration;

- $251,878.47 in costs paid to JAMS for administrative, arbitrator and law clerk expenses in connection with the arbitration;

- $2,996,173.35 in legal and support staff fees incurred by Reed Smith in connection with the bankruptcy and Bondholder Litigation; and

- $107,082.35 in disbursable costs and expenses incurred by Reed Smith in connection with the bankruptcy and Bondholder Litigation.

Claimants note that Eletson is not seeking the reimbursement of attorney and non-attorney timekeeper fees if such attorney or timekeeper did not bill at least 15 hours to one of the two applicable Reed Smith client matter numbers. As a result, their total fee request of $12,857,489.20 has been discounted in the amount of $73,776.90 for the arbitration and $95,989.50 for the Bankruptcy and Bondholder Litigation. Second, Eletson is not seeking fees for its Greek counsel at the Timagenis Law Firm, who expended at least 700,000 euro in relation to the relevant matters. Third, in the engagement letter for the Bondholder and Bankruptcy Litigation, Reed Smith provided Eletson with a ten percent discount on all legal fees, which is reflected in the attached invoices and in the overall amount sought through this application.

The requested sum, however, does include fees that were expended in Eletson's preparation and filing of a New York state court complaint against Murchinson, which was folded into the bankruptcy. Eletson has indicated that to the extent I believe that such fees are outside the scope of those recoverable by Eletson, based on Eletson's review of the applicable invoices for the Bondholder Litigation contained in Exhibit 6 to their Opening Affirmation, approximately $260,000 worth of billing entries made some reference to work relating to Eletson's complaint against Murchinson.  (Opening Affirmation p. 16.). Eletson also acknowledges that their application includes *de minimis* fees, reflected in Eletson's invoices for the arbitration, in relation to two "nuisance litigations" that Eletson claims are part and parcel with the arbitration, that Levona filed, after the commencement of the arbitration, against persons associated with Eletson in Delaware Chancery Court, *Levona Holdings, Ltd. vs. Vassilis Kertsikoff, et al.*, 2022-0823-MTZ, and the United States District Court for the Southern District of Texas, *Levona Holdings, Ltd. vs. Vassilis Kertsikoff, et al.*, 4:22-cv-02988. (Opening Affirmation p. 16.)

Eletson argues that their billing rates and staffing were reasonable given that this arbitration was a "bet-the-company dispute seated in New York City" with lawyers "required to work on an expedited timeline . . . on many fronts in multiple proceedings that required different specialties." (Opening Affirmation p. 4.)

Part of the requested fee amount includes a success fee in the amount of $1,794,950.70. In December 2022, Reed Smith and Eletson reached an agreement that Eletson would withhold 25% of each invoice, retroactive to the commencement of the matter, and if they were successful in the arbitration, the client would pay Reed Smith two times the amount withheld. In other words, Reed Smith would receive an "upside" from this arrangement, in the event of success, of an additional 25% of its fees.

Eletson also seeks additional pre-judgment interest at the rate of 10 percent in the amount of $2,496,081.87, which is the amount of interest running from January 31, 2023 through August 31, 2023. (Opening Affirmation p. 25.)

Finally, Eletson requests that "the Tribunal retain jurisdiction under Section 12.14(d) of the LLCA and/or JAMS Rules to enable Eletson efficiently to seek a subsequent and related award for additional fees and expenses that it has and will be required to spend since July 28, 2023," including to enforce the Corrected Interim Award and this Final Award. (*Id.*)

Levona opposes each of Eletson's requests.

As for Claimants' requests for fees, expenses and costs in the arbitration, Levona argues that Claimants' requests should be denied because they were neither the prevailing party nor the party responsible for the costs of the arbitration.

First, Levona argues that to be a prevailing party for attorney-fee purposes, one must "prevail on the central claims advanced, and receive substantial relief in consequence thereof." (Respondent's Affirmation p. 12, *citing Liberty Mut. Ins. Co. v. Brutus*, 2022 N.Y. Misc. Lexis 4154 (Sup. Ct. NY, Aug 16, 2022) (*quoting Sykes v. RFD Third Ave. I Assoc.,*

*LLC*, 39 AD3d 279, 833 N.Y.S.2d 76 (1ˢᵗ Dept. 2007); *see also Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983) ("where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."))

Here, Levona contends that Reed Smith represents Eletson Holdings and Eletson Corporation, not Eletson Gas or the Preferred Nominees, the latter entities being non-parties to whom the Corrected Interim Award awarded compensatory damages. According to Levona, Eletson, despite being the party advancing the claims in this arbitration, did not receive substantial relief in consequence of those claims, and thus, Eletson is not the prevailing party.

Levona also argues that Eletson was not the party responsible for paying the legal fees and costs. (Respondent Affirmation pp. 13-14.) Rather, Ms. Karastamati testified that that the Greek families through the Preferred Nominees were responsible for supporting the legal expenses and Reed Smith's affirmation does not address how the fees were paid, or who was ultimately responsible for doing so.

As to specific objections to the amounts included in Eletson's fee request, Levona argues that Reed Smith's bills are unreasonable. First, Levona argues that curiously the total amount of fees across all lawsuits is the exact amount due under the IntraGroup Loan.

In addition, Levona argues that Reed Smith improperly block-billed their time entries, which makes Levona unable to discern what time may have been spent on unrelated matters, for example, the Texas and Delaware lawsuits. (Respondent's Affirmation pp. 16-17.)

Levona also contends that Reed Smith overstaffed the matter. One example of the alleged overstaffing was, according to Levona, the attendance and billing of ten attorneys at the closing argument for the hearing. (*Id.* p. 18.) Levona also points to the number of hours

Levona's primary counsel has billed for this matter, which, without providing any supporting documentation, Levona states was roughly half the total hours of Reed Smith. (*Id.*)

With respect to the success fee, Levona argues that Reed Smith has not provided any written evidence of the success fee, and therefore, has not satisfied its burden of proof. Moreover, Levona does not have responsibility to pay for Eletson's "bet" and if any award for attorneys' fees is awarded, it should be reduced to only the amount that Eletson has actually paid Reed Smith.

Levona objects to the inclusion of any fees for the Texas and Delaware lawsuits, as these suits are against officers of the Company, not parties to the arbitration, and the awarding of fees here would deny those "jurisdictions their application of the American rule." (Respondent's Affirmation pp. 14-15; *citing Mansfield Realty, I., LLC v. Mansfield LLC,* 2023 NY Slip Op 31419 (U), ¶; *see also Dreisbach v. Walton*, 2014 Del. Super. LEXIS 557, *10 (Del. Super. Ct. Oct. 27, 2014) ("The United States Supreme Court has held that attorney's fees should not be awarded for work related to claims distinct from the claim on which the party was successful.")

Levona argues that I lack "jurisdiction to make any ruling related to the appropriateness or validity of [the Bankruptcy or Bondholder Litigation], the entitled [sic] of any party to those actions to recover its incurred fees, or the reasonableness of any fees sought in respect of those actions." (Respondent's Affirmation p.6.) Rather, Levona asserts that only the Bankruptcy Court can award fees in a bankruptcy action and the awarding of fees in New York for a state action is prohibited unless it is authorized by statute.  (*Id.*).  It further argues that my awarding of fees here could result in inconsistent rulings if the other courts determine differently.  Furthermore, Levona argues that I am not in a position to determine the reasonableness of the fees in the Bankruptcy or Bondholder Litigation, nor is Levona.

Finally, Levona argues that the debtor in the Bankrupty and the defendants in the Bondholder Litigation include, in addition to Eletson Holdings, third parties who are not present in this arbitration, and thus, a third-party may not claim the benefit of a fee shifting clause unless they are intended third-party beneficiaries, for which there is no evidence. (Respondent's Affirmation p. 7, *citing Hub Elec. Co. v. Gust. Constr. Co.,* 585 F.2d 183, 188-89 (6th Cir. 1978); *Redzepagic v. Hammer,* 2017 U.S. Dist. LEXIS 27984, at *22-23 (S.D.N.Y. Feb. 27, 2017) (party cannot benefit from attorney fee shifting provision because it was not the party that could recover under the agreement.)) According to Levona, Eletson has not met its burden in establishing how Eletson Holdings is entitled to full recovery of the fees incurred in connection with the Bankruptcy and Bondholder Litigation when the parties represented include non-parties to this arbitration.  (Respondent's Affirmation p. 8.)

Thus, Levona requests that I deny Eletson's fee request in its totality.

Alternatively, Levona argues that in the event I am to award Eletson attorneys' fees, I should, at most, award $3,130,160.80, which reflects: (1) a reduction in the amount of $1,794,950.70 for the fees Reed Smith did not expect its client to pay and another reduction of $1,794,950.70 for the subsequent "success fee"; and (2) a further reduction of the fees by 50% due to Reed Smith's inappropriate proof and unreasonable overstaffing, block billing, and lack of detail.  Levona argues that the 50% reduction is appropriate in light of the fact that Levona's counsel billed less than 50% of the time billed by Eletson's counsel. (Respondent's Affirmation p. 23.)

With respect to pre-judgment interest, Levona argues that because the Corrected Interim Award awards damages to Eletson Gas and the Preferred Nominees, Eletson is not entitled to seek additional prejudgment interest on their behalf.  Thus, the request for an additional award is inappropriate and should be denied.

Finally, Levona asserts that it is neither appropriate, nor legally permissible, for me to retain jurisdiction over the parties so that Eletson can make a future application for additional fees.  Rather, once I enter my determination on fees, this Tribunal becomes *functus officio*. (Respondent's Affirmation p. 9.) Moreover, this request by Eletson for continued arbitral jurisdiction was made for the first time in the Opening Affirmation and that alone is reason to deny it.  (*Id.* p. 10.)

### A.  Fees, Expenses, and Costs.

I find that Claimants' request for fees, expenses, and costs in this arbitration to be reasonable, with one exception, which I will address below.

Section 12.14(d) of the LLC Agreement grants this Tribunal the "discretion to award reasonable attorneys' fees . . . to the prevailing party," and JAMS Rule 24(g) allows the Tribunal to "allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law." Under applicable law, "when a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay whatever amounts have been expended by the prevailing party, so long as those amounts are not unreasonable." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987); *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992) (same); *Mahani v. EDIX Media Group, Inc.,* 935 A.2d 242, 245-46 (Del. 2007) (fees award was reasonable where it was "based on facts in the record, and was neither arbitrary or capricious").

In determining reasonableness, Delaware courts look at the following factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *See Mahani*, 935 A.2d at 246 (*citing in part,* Del. Lawyers' R. of Prof. Conduct 1.5(a)(1)).

These factors support Eletson's fee request. Reed Smith's hourly rates are within what courts in New York City have found reasonable. Reed Smith's lawyers' hourly rates ranged from $1610 for Mr. Solomon, Claimants' lead counsel, $1275 for Mr. Underwood, Claimants' second chair, and between $900-$425 per hour for other partners, counsel, associates, and paralegals.

Indeed, several Southern District courts have found that Reed Smith's current rates, when adjusted for inflation against the rates considered during the litigation at issue, were reasonable. *See, e.g. New York City. Vista Outdoor, Inc. v. Reeves Family Tr.*, 2018 U.S. Dist. LEXIS 102224, at *19 (S.D.N.Y. May 24, 2018) (hourly rates up to $1,260 in 2018 were "not excessive in the New York City 'big firm' market"); *Angelo, Gordon & Co., L.P. v. MTE Holdings, LLC*, 2021 U.S. Dist. LEXIS 70271, at *6 (S.D.N.Y. Apr. 12, 2021) (partner rates of $1,175 and $1,350 per hour for partners at large law firm, "though on the higher end, [were] comparable to rates awarded in this jurisdiction"); *see also In re Relativity Fashion, LLC*, No. 15 Br. 11989 (Bankr. S.D.N.Y. June 10, 2016) (ECF No 1965) (awarding hourly rates of up to $1,225—in 2016—for Jones Day partners).

Moreover, as reflected in recent bankruptcy fee application filings submitted by New York City counsel at large firms, rates at even $2,000 an hour are common for lead

counsel. *See, e.g., In re SVB Financial Group*, Case No. 23-10367 (MG) (Bankr.

S.D.N.Y. 2023) (ECF No. 475) (fee application by large New York firm with rates over

$2,000 for partners, between $1,500 and $1,700 for counsel, and $775 to $1,475 for

associates).

Notably, Levona's counsel does not argue that the hourly rates of Reed Smith

were unreasonable or even high.  It is further worth noting in this connection that Levona

recently retained new counsel, Quinn Emanuel Urquhart & Sullivan, LLP, a firm that has

been reported to have hourly rates ranging for partners between $1,385-$2,130, as of

October 2022. (*See* Opening Affirmation, Exhibit 10.)

In addition, the amount of time billed by the Reed Smith attorneys in this

arbitration is reasonable in light of the extensive number of filings and the highly

contested nature of these proceedings.  I adjudicated numerous disputes, including

multiple challenges to JAMS' jurisdiction, several requests for injunctive and other

preliminary relief by both parties, successive motions to strike Eletson's pleadings, many

motions to compel discovery from both parties, and multiple motions *in limine*. Each of

these applications entailed substantial factual and legal research and development,

briefing, and often extensive oral argument. According to Claimant—and notably, not

disputed by Levona—over 200 litigation documents were filed in JAMS, over 10

hearings were conducted before me, even before the plenary hearing, 4 witnesses were

deposed, 15 expert reports were submitted, and approximately 26,000 documents totaling

over 160,000 pages were produced. (Opening Affirmation p. 6.)

In addition, the parties (i) submitted pre-hearing briefs that collectively exceeded

130 pages of legal argument, (ii) submitted proposed exhibit lists that collectively

exceeded 2,200 exhibits, (iii) participated in a pre-hearing  conference that lasted the

better part of a day, (iv) held an evidentiary hearing that lasted 7 full days, during which

several hundreds of exhibits were introduced and 14 witnesses were examined and/or

cross-examined, (v) submitted post-hearing briefing that collectively exceeded 320 pages

of legal argument and proposed findings of fact, and (vi) conducted a long and extensive

post-hearing oral argument lasting many hours. (Opening Affirmation p. 6.)

This said, I agree with Levona that an award of attorneys' fees should not include

the time incurred in connection with the state court action that Eletson commenced

against Murchinson. Eletson has estimated its fees for that action to be approximately

$260,000. Notably, Levona has not contested the amount estimated by Eletson, nor

proposed a different calculation.

I disagree with Levona's argument for the exclusion of fees incurred in this

arbitration that relate to the Texas and Delaware litigations, which Eletson claims to be

"de minimis". Levona does not challenge or dispute Eletson's claim that these costs are

"de minimis," and acknowledges that Reed Smith did not represent the individual Eletson

officers in connection with those suits. (*See* Respondent Affirmation p. 16.) Thus, it is

reasonable to conclude that the time entries referencing those actions are directly related

to this arbitration. Reed Smith needed to review the Texas and Delaware complaints and

stay apprised of those lawsuits in order to understand their connection and relevance to

the claims in this arbitration.

As for the non-attorney amounts requested, including disbursable expenses,

expert fees, trial support costs, and JAMS administrative and arbitrator costs, these costs

are shiftable to Respondent under the LLCA and JAMS Rule 24(f).  *See, e.g.*, *Themis*

*Capital v. Democratic Republic of Congo*, 2014 WL 4379100, at *9 (S.D.N.Y. Sept. 4,

2014) ("[C]ourts in this District routinely reimburse prevailing parties for the costs of

expert witnesses and consultants"); *Weiwei Gao v. Sidhu*, 2013 WL 2896995, at *6

(S.D.N.Y. June 13, 2013) (granting expert costs because they were "reasonable and

necessary" and because the "Fee Sharing Agreement provides for recovery of 'other costs

incurred'"); *Austrian Airlines Oesterreichische Luftverkehrs AG v. UT Fin. Corp.*, 2008

WL 4833025, at *9 (S.D.N.Y. Nov. 3, 2008) (because the contract "clearly—and

undisputedly—provide[d] for reasonable attorneys' fees 'and other costs'" and because

defendant did not use "duplicative or unnecessary expert witnesses," the Court declined

to "make any reductions in the costs related to [defendant's] use of these witnesses");

*Ambac Assur. Corp. v. Adelanto Pub. Util. Auth.*, 2013 WL 4615404, at *1, *7 (S.D.N.Y.

Aug. 29, 2013) (awarding expenses billed by e-discovery vendor pursuant to a fee-

shifting provision); *HSH Nordbank AG N.Y. Branch v. Swerdlow*, 2010 WL 1141145, at

*3, *6–7 (S.D.N.Y. Mar. 24, 2010) (awarding $408,071.34 for services related to

electronic data storage and hosting for e-discovery pursuant to a fee-shifting provision).

Indeed, Respondent does not even address these costs and expenses in its opposition to

Eletson's application.

    I further award Eletson the "success fee" in the amount of $1,794,950.70.  In

circumstances such as this, the law is clear that the fee shifting provision in the parties'

agreement  obligates Levona to pay these contingent fees that Eletson now owes to Reed

Smith. *See IAC/InterActiveCorp v. O'Brien,* 26 A.3d 174, 179 (Del. 2011) (rejecting

argument that contingent legal fees were "not incurred because they do not represent

work done, but rather the success achieved"; finding "A premium or contingent fee is

payable for work done, if that work is successful. The fact that the amount of the fee is

not set until the result is obtained does not change the fact that the fee is incurred based

on hours or work performed for the client."); *Williams Cos. v. Energy Transfer LP*, 2022

Del. Ch. LEXIS 207, at *7-8 (Del. Ch. Ct. Aug. 25, 2022) ("There is nothing inherently unreasonable in enforcing a contractual fee-shifting arrangement to cover a contingent fee award"; awarding fee shifting on contingent fee arrangement); *S'holder Representative Servs. LLC v. Shire US Holdings, Inc.*, 2021 Del. Ch. LEXIS 81, at *2-3 (Del. Ch. Ct. April 27, 2021) (same; noting party opposing fee shifting could have negotiated for a contract that did not permit the shifting of contingent fees).

Accordingly, I award Claimants payment of their attorney's fees, expenses and costs for this arbitration in the total amount of $9,590,222.99.

For many of the same reasons, I also find Claimants' application for fees and costs for the Bankruptcy and Bondholder Litigations in the amount of $3,007,266.20 reasonable.

I note that Claimants submitted 10 supporting exhibits along with their Opening Affirmation that further substantiate the reasonableness of their application for fees, expenses, and costs in this arbitration, the Bankruptcy and the Bondholder Litigation:

- Exhibit 1 is the client Affidavit of Laskarina Karastimati attesting to the reasonableness of the fees and expenses paid and incurred by Eletson in connection with the matters as to which the Tribunal awarded fees and expenses;

- Exhibit 2 is the expert Affidavit of Dr. Harold Furtchgott-Roth calculating the additional interest the Tribunal awarded to Eletson in the Corrected Interim Award;

- Exhibit 3 is a set of summary charts of the totals set out herein;

- Exhibit 4 is a list of Reed Smith timekeepers by title, listing hours billed, rates, and value;

- Exhibit 5 is combined invoices related to this arbitration;

- Exhibit 6 is combined invoices related to the Bankruptcy and Bondholder Litigation;

- Exhibit 7 is combined expert invoices related to this arbitration;

- Exhibit 8 is combined trial support invoices related to this arbitration;

- Exhibit 9 is the biographies of Reed Smith attorneys that worked on this arbitration, the Bankruptcy, and/or the Bondholder Litigation; and

- Exhibit 10 is an article setting forth the rates of Quinn Emanuel Urquhart & Sullivan, LLP as of October 27, 2022.

Curiously, Levona did not submit any documentation to support their opposition to Claimant's application or support their argument that Reed Smith overstaffed or overbilled the matter. Indeed, I do not have any documentation to support Levona's assertion that Reed Smith billed more than double the hours of Frankel, Rubin, Klein, Payne & Pudlowski P.C. ("Frankel Rubin"). Levona did not attach, as is customary in responsive opposition submissions to fee applications, any supporting documentation demonstrating their own legal fees.

Levona's additional arguments in opposition to Claimants' application are unavailing.

Levona's argument that Eletson was not the prevailing party and that "the prevailing party was not a party to the Arbitration" is completely without merit. (Respondent's Affirmation p. 13.) In making this argument, Levona also implies that the propriety of the award to Eletson Gas and the Preferred Nominees, as purported non-parties, requires further adjudication. Putting aside that this is a merits issue that was already decided in the Corrected Interim Award, Levona's contention is simply untenable. The possibility that, if Eletson succeeded on its claims, relief would not be awarded to Eletson, but for example to Eletson Gas, has been known since the commencement of this arbitration.

From the start of this arbitration, the claims—*and Levona's counterclaims*—related to who held the preferred interests. A primary question to be answered in this arbitration was whether Eletson exercised the option under the BOL, thereby transferring the preferred interests pursuant to the terms of the BOL. The express terms of the BOL

87

made clear that, in the event the option was exercised, the preferred interests would transfer to Eletson Gas or its nominee: "Levona hereby grants Eletson Gas the option . . . for ***either Eletson Gas or its nominee*** to purchase all of the membership interests held by Levona in Eletson Gas . . . ." (J-6 ¶ 2.1 (emphasis added); *see also*, Corrected Interim Award pp. 26-31.)

Despite filing motions on numerous issues, including multiple motions to strike claims and allegations, Levona never objected to Eletson having standing to enforce the terms of the BOL, even though, if successful, relief would be awarded—as expressly set forth in the BOL—to "Eletson Gas or its nominee."[8]

Indeed, given the disputed ownership of Eletson Gas, which was the catalyst to the filing of this arbitration, the only entities who could bring this arbitration to dispute the ownership of the preferred interests of Eletson Gas, would be Eletson and Levona, as shareholders of Eletson Gas. In other words, Eletson Gas could not bring this claim on its own given that Levona contended it continued to own the preferred interests of, and therefore had a controlling interest in, Eletson Gas. It has also been clear throughout these proceedings that Eletson would turn over any damages to Eletson Gas, depending upon my ultimate determinations in this arbitration.  (*See* Third Amended Statement of Claims at ¶ 64(p); *see also* Claimant's Post-Hearing Brief at ¶ 11.)[9]

Accordingly, it is Eletson that substantially prevailed on its claims in this arbitration and any attempts by Levona to undermine previous findings in this arbitration

---

[8]    Levona objected only to Eletson's argument that the preferred interests had been contingently transferred *from Eletson Gas* to the Preferred Nominees.

[9]    It is worth noting that had I found that Levona retained the preferred interests and awarded Levona certain relief that it had requested, some of that relief would have in fact been derivative relief.  While Levona sought damages under a theory of tortious interference in connection with the Unigas offer letter, any damages suffered as a result of a decrease in sale price, would have been to the Company, and only indirectly to Levona, as the preferring shareholder.

based on new arguments that the relief was inappropriately granted to Eletson Gas, or a nominee of the Eletson Gas, are summarily rejected.

In addition, contrary to Levona's assertion, Reed Smith's use of block billing is not unreasonable, and a review of Reed Smith's invoices support a finding that sufficient detail was provided in the invoices to demonstrate that the time was billed productively. *See Gentel Wave Shipping S.A. v. Transfield Shipping, Inc.*, 2010 U.S. Dist. LEXIS 13210, *4 (S.D.N.Y. Feb. 11, 2010) (use of block billing "has been held to comply with Second Circuit standards and client expectations."). Courts will award attorneys' fees in connection with block billed entries where there is "enough detail and specificity so as to afford reasonable confidence that the time billed was productively spent, even if it is impossible to reconstruct the precise amounts of time allocable to each specific task listed in the block entry." *Beastie Boys v. Monster Energy Co.*, 112 F. Supp. 3d 31, 54 (S.D.N.Y. 2015); *Aurora Comm. Corp. v. Approved Funding Corp.*, 2014 U.S. Dist. LEXIS 108949, *16 (S.D.N.Y. Aug. 6, 2014).

I also reject Levona's claim that Reed Smith overstaffed the matter.  To use one of the examples Levona raised, the fact that ten attorneys attended and billed time at the closing argument does not lead to the conclusion that Reed Smith overstaffed the matter. In evaluating the reasonableness of staffing, it is not proper to isolate one event and evaluate it in a vacuum.  This arbitration concerned the ownership of the preferred interests in Eletson Gas, a company with assets that were indisputably valued in the hundreds of millions of dollars, as well as a request for an award of compensatory damages in eight figures.

Moreover, the billing entries for the closing argument fees to which Levona cites as evidence of overstaffing reflect that time was spent not just attending the argument but

also on working on the closing argument presentation. (*See,* Opening Affirmation, Exhibit 5 pp. 308-333.) Regardless, to determine that the time billed by attorneys was reasonable, I need not reach a conclusion as to the value added by each timekeeper at each event.  Rather, in determining fees, I look to "what a reasonable, paying client would be willing to pay." *Arbor Hill Concerned Citizens Neighborhood'Ass'n v. City of Albany & Albany Cty. Bd. of Elections,* 552 F.3d 182, 194 (2d Cir. 2008).  Here, the fees incurred by Reed Smith that have been already paid, or that the client has agreed to pay, are reasonable and the reasonableness of those fees has been attested to in client affirmations.

Importantly, it should not be forgotten this arbitration was a bet-the-company case for Eletson, with a mandated expedited timeline for arbitration.  I agree with Eletson that, even putting aside the lack of any evidentiary support for Levona's assertion that Levona's counsel expended half as many hours as Reed Smith, the time expended by Frankel Rubin is not an appropriate measure for comparison, given my repeated suggestions at various times in this arbitration that Frankel Rubin should increase its staffing to meet the expedited timelines of this arbitration.

Similarly, the arguments Levona raises in opposition to Claimants' requests for fees in connection with the Bankruptcy and Bondholder Litigation fail. Levona's invocation of the American rule is misplaced.  In the Corrected Interim Award and in this Final Award , I ruled that Levona's alter ego, Pach Shemen repeatedly violated the Status Quo Injunction Order. Since I ruled that Pach Shemen's directing of the commencement of the Bondholder Litigation against Eletson Holdings, and the commencement of an involuntary bankruptcy action against Eletson Holdings were both intentional violations of the Status Quo Injunction, I awarded Eletson reimbursement of the attorney's fees and

costs incurred in connection with those actions to be paid to the entity or individuals who paid those costs and fees. (*See* JAMS Rule 29 stating that the "Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses, assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.")

In other words, the award of attorneys' fees was as damages to compensate for the intentional violations by Levona, through its alter ego, Pach Shemen, of the Status Quo Injunction Order—not a finding of a prevailing party's entitlement to fees or a finding under a fee-shifting provision.  The court jurisdictions remain free to render any rulings relating to fees in connection with the merits of those litigations.  "Where an arbitration clause is broad, arbitrators have the discretion to order such remedies as they deem appropriate.  This is because it is 'not the role of the courts to undermine the comprehensive grant of authority to arbitrators by prohibiting' them from fashioning awards or remedies to 'ensure [] a meaningful final award.'" *Reliastar Life Ins. Co. v. EMC Nat'l Life Co.,* 564 F.3d 81, 86 & n.2 (2d Cir. 2009).

Moreover, the attorney affirmation, client affidavit, and invoices from the Bankruptcy and Bondholder Litigation also provide me with sufficient basis to determine the reasonableness of the fees requested.  *See Simmons v. N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) ("The presumptively reasonable fee boils down to what a reasonable, paying client would be willing to pay, given that such a party wishes to spend

the minimum necessary to litigate the case effectively.") (citation omitted). Levona itself also had the ability to determine the reasonableness of Reed Smith's invoices. Even if Frankel Rubin may not be counsel of record in those lawsuits, Levona's agents, Spears and Lichtenstein, in particular, are involved in those proceedings, and subject to compliance with the confidentiality restrictions ordered in this arbitration, could have assisted Levona's counsel in connection with its opposition to Eletson's fee application.

Finally, Levona's argument that the Bondholder Litigation and Bankruptcy involve Eletson-related entities that are not parties to this arbitration, and therefore, Eletson is not entitled to the full recovery of the fees billed in those cases, is unavailing. The invoices reflect that the work done by Reed Smith that is included in the fee request was done solely on behalf of Eletson Holdings or jointly on behalf of Eletson Holdings and the other entities. The information provided in support of Eletson's application meets their burden of reasonableness.  Levona has provided nothing to infer that the amount of fees incurred was greater simply because Reed Smith is representing multiple related entities in those litigations, as opposed to only Eletson Holdings.

### B.  Additional Pre-Judgment Interest

The Corrected Interim Award provided for compensatory damages that included pre-judgment interest running up through January 30, 2023 at a rate of 10 percent, and also provided for the recovery of additional pre-judgment interest at the same rate running until such date that the award is paid or confirmed in a court proceeding. Claimants submitted, along with the Opening Affirmation, the Fourth Expert Report by Dr. Harold Furchtgott-Roth, which calculates the relevant amounts of additional pre-judgment interest owed by Levona. In accordance with Dr. Furchtgott-Roth's

calculations, the total amount of pre-judgment interest running up to August 31, 2023 is

$2,496,081.88. (Opening Affirmation p. 25.)

Thus, the pre-judgment interest running up to August 31, 2023 is awarded as

follows:

- To Eletson Gas: $1,319,163.14.

- To the Preferred Nominees: $1,176,918.74.

To the extent Levona did not satisfy the Corrected Interim Award by August 31,

2023, additional pre-judgment interest will continue to run in accordance with the terms

of the Corrected Interim Award. Dr. Furchtgott-Roth sets out how to calculate that

additional interest during that indefinite time period using the following formula:

{(Award amount as of August 31, 2023)*(1.008333)^[(number of whole
months since August 31, 2023) + ((number of days in partial month)/(total
number of days in partial month))] – (Award amount)}.

 (Opening Affirmation p. 26, citing Exhibits 2, 3.)

I agree with Claimants that pre-judgment interest at a rate of 10% running from

the date of this Final Award until the earlier of the date of payment of the amount due or

the date of confirmation of this award by a court of competent jurisdiction shall accrue on

the awarded amount of attorneys' fees, costs and expenses and the calculation of that

interest amount shall be done using the same formula above, except substituting the total

amount of attorneys' fees, costs, and expenses determined by the arbitrator for the

"Award amount".

Notably, Levona does not challenge the calculation of the interest amount Eletson

requests or the calculation proposed to calculate additional interest that may be due in the

future.  Nor does it respond to Eletson's request for interest on the fees, costs and

expenses, other than arguing that both attorneys' fees and interest should be denied outright.

With respect to pre-judgment interest, Levona argues that because the Corrected Interim Award awards damages to Eletson Gas and the Preferred Nominees, Eletson is not entitled to seek additional prejudgment interest on their behalf and therefore the request for an additional award is inappropriate and should be denied. This argument by Levona is both untimely and without merit.

### C. Retention of Arbitral Jurisdiction

I deny Eletson's request to retain jurisdiction after this Final Award to enable Eletson to make future fee applications and agree with Levona that I made clear in the Corrected Interim Award, that "[u]pon receipt of all these papers, the matter shall be deemed submitted for a decision on the final award at that time." I also agree with that the arbitrator becomes *functus officio* after the issuance of a final award.

This said, both in the Corrected Interim Award and tin his Final Award I make clear that I have awarded Eletson fees, costs, and expenses in connection with this arbitration as well as the Bankruptcy and the Bondholder Litigation. Moreover, there is a continuing accrual of pre-judgment interest on any accrued and unpaid amounts running up until the earlier of the date of payment of the amounts due or the date of confirmation of this Final Award by a court of competent jurisdiction, as well as the formula that should be used to calculate any additional interest. Eletson has, among other options, the ability under Section 12.14(d) of the LLCA to seek additional relief in the event it needs to enforce payment of the amounts awarded.

### VIII.   CONCLUSION AND FINAL AWARD

94

This Final Award resolves all issues submitted for decision in this arbitration. The undersigned has considered and resolved all the issues and arguments raised relating to the merits of the claims, counterclaims, requests for attorney's fees, costs, expenses, and pre-judgement interest, including those not explicitly addressed herein. Any argument not addressed in this Final Award was found to be unavailing, without merit, academic, or unnecessary to reach.

This Final Award finds and orders as follows:

1.      Claimants have proven breaches of the LLCA and the covenant of good faith and fair dealing and established that Eletson exercised the purchase option pursuant to the BOL, and are therefore entitled to the declaratory relief, compensatory damages, punitive damages, prejudgment interest, and attorney's fees, as set forth below.

2.      Respondent has not proven any of its counterclaims and they are dismissed. Respondent is entitled to recover nothing from the Claimants.

## A.  **Declaratory Relief**

I hereby enter the following findings, determinations, and declarations:

1.      Eletson effectively exercised the buyout option granted in the Binding Offer Letter dated February 22, 2022 on and as of March 11, 2022, and any alleged precondition to the exercise of that option was either satisfied or waived.

2.      As of March 11, 2022, Respondent Levona had no membership interest in the Company, Eletson Gas.

3.      The Company exercised its rights under the BOL to nominate three entities—Fentalon, Apargo, and Desimusco, (the Preferred Nominees)—affiliated with the

principals of Claimants, as the parties to receive the preferred interests in the Company, previously held by Levona.

4.      The preferred interests in the Company were transferred to the Preferred Nominees, effective as of March 11, 2022, and the Preferred Nominees are permitted transferees under the LLCA.  They have stipulated to be bound by this Award and any Judgment entered hereon.

5.      Eletson Holdings and Eletson Corporation never held any of the preferred interests in the Company.

6.      The shares of the subsidiaries which control the Symi and Telendos were transferred to Levona as of March 11, 2022 as the Purchase Option Consideration in connection with the BOL. Since March 11, 2022, Levona retains all rights associated with ownership of the subsidiaries of those vessels.

7.      The Status Quo Injunction shall stay in effect until the later of the final court judgment being entered on any Award or any further order of this Arbitrator.

8.      Levona, Murchinson, and Pach Shemen, are each alter egos of the other concerning every fact proven in this matter and every item of relief awarded herein. Any references to Levona herein are therefore to all the alter-egos and for the avoidance of doubt, any judgments against Levona are also against each alter-ego.

9.      Levona breached its LLCA and related obligations, including without limitation common law and contractual duties to Claimants and the Company, in at least the following ways:

i.       Bribing an Eletson Corporation employee, and Company representative, Peter Kanelos, and causing him to disclose the Company's confidential information;

ii.      Violating confidentiality obligations by disclosing the Company's confidential information to third parties, failing to take steps to recover such information, and then deceiving Claimants and the Company concerning said breaches after it became a member of the Company;

iii.     actively engaging in unlawful behavior by wrongfully influencing Company financiers to turn against the Company and Claimants, including without limitation by causing the arrest of five of the Company's vessels and not disclosing this misconduct to Eletson or the Company after it became a member of the Company;

iv.      Failing to acknowledge that Eletson fully complied with the terms of the BOL Purchase Option, and failing to act in good faith by remaining silent about its purported belief that the Company would or might fail to meet its BOL terms;

v.       Improperly purporting to act on behalf of the Company in its business dealings with third parties, including by attempting to sell the Company's assets to its primary competitor, Unigas, and concealing such misconduct from Claimants;

vi.      Improperly threatening Eletson and affiliated officers and directors, including by pursuing litigation against them;

vii.     Improperly purporting to seize control of the Company's board of directors post-March 11, 2022;

viii.    Improperly purporting to direct the day-to-day operations of the Company post-March 11, 2022;

ix.    Improperly purporting to assert control over the assets of the Company post March 11, 2022;

x.    Improperly purporting to call and hold meetings of the Board of the Company without following proper procedures and for unlawful and improper purposes of approving unlawful and improper conduct post March 11, 2022;

xi.    Breaching its obligations under the LLCA, including without limitation by purporting to terminate management agreements that Eletson Corporation has with the Company's subsidiaries, purporting to change management of the Company's subsidiaries, precluding Eletson Corporation from communicating with the Company's financiers, all of which Levona knew was unlawful and in breach of the LLCA; and

10.    Violating this arbitration's Status Quo Injunction by:

i.    Wrongfully declaring the Company in default of the loan from Levona and wrongfully purporting to accelerate payment of the principal;

ii.    Trying to sell vessels, including the Symi and Telendos, while the Status Quo Injunction was in effect; and

iii.    Directing and/or causing Levona's affiliates to purchase a controlling position in securities of Eletson Holdings in January 2023 for the purpose of wrongfully commencing and then actually causing the commencement of litigation

against Eletson Holdings and the filing an involuntary bankruptcy petition against Eletson Holdings.

### B. Compensatory Damages

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall pay $43,455,122.21 in compensatory damages as follows:

1. $21,777,378.50, to be paid to Eletson Gas, as compensatory damages for the improper arrests of Eletson Gas vessels, which includes prejudgment interest at a rate of 10% from the date of the arrests (or approximate date the expenses were incurred) through January 2023;

2. $19,677,743.71, to be paid to the Preferred Nominees, constituting the lost profits (EBITDA) due to Levona's unjust enrichment arising from available use of the Symi and Telendos since March 11, 2022, without the reciprocal transfer of the preferred interests, which includes pre-judgment interest through January 2023;

3. $2,000,000 to be paid to Eletson Gas, as compensatory damages arising out of Levona's other breaches of contract, with prejudgment interest at 10% from the date of this Corrected Interim Award until the earlier of the payment of either this award or confirmation in a court of competent jurisdiction of this award.

4. The entities referred to in B.1 and B.2 respectively shall also be awarded pre-judgment interest on the principal amount of the compensatory damages in paragraph B.1. above, (damages for improper arrests), and paragraph B.2. above (damages for lost profits due to Levona's unjust enrichment) at a rate of 10% running from January 30, 2023 through the earlier of either the payment of the award or confirmation of the award in a court of competent jurisdiction.

### C.  **Punitive Damages**

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall pay punitive damages in the total amount of $43,455,122.21, as follows:

1.  $23,777,378.50, to be paid to Eletson Gas; and

2.  $19,677,743.71 to be paid to the Preferred Nominees.

### D.  **Attorney's Fees, Costs, Expenses and Additional Interest**

Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, shall pay:

1.      Attorney's fees, costs, and expenses to Claimants incurred to date in connection with this arbitration, the Bondholder Litigation, and the Bankruptcy pursuant to the LLCA Section 12.14(d) and JAMS Rule 24(g), as follows:

    i.      Attorneys' fees, costs, and expenses due in connection with this arbitration in the amount of $9,590,222.99.

    ii.     An additional amount of $22,366.10 representing additional JAMS costs incurred in this arbitration since the filing of Eletson's Opening Affirmation, and which Eletson has paid both its share and covered Respondent's share.

    iii.    Attorneys' fees, costs and expenses due in connection with the Bankruptcy and Bondholder Litigation in the amount of $3,007,266.20;

2.      Additional pre-judgment interest on the compensatory damages as awarded in the Corrected Interim Award through August 31, 2023, in the amount of $2,496,081.88, to be paid as follows:

    i.      To Eletson Gas: $1,319,163.14.

    ii.     To the Preferred Nominees: $1,176,918.74.

3.      Additional prejudgment interest on compensatory damages running from

August 31, 2023 until the earlier of the date of payment of the amount due or the date of

confirmation of this Final Award by a court of competent jurisdiction calculated by using

the formula set forth above in this Final Award; and

4.      Additional prejudgment interest on any fees, costs and expenses that have

been awarded in this Final Award running from the date of this Final Award until the earlier

of the date of payment of the amounts due or the date of confirmation of this Final Award

by a court of competent jurisdiction calculated by using the formula set forth above in this

Final Award.

The foregoing constitutes the Final Award in this arbitration.

Any other relief requested is hereby denied.

Dated: New York, NY
        September 29, 2023

_____
Hon. Ariel E. Belen (Ret.)
JAMS Arbitrator

**Affirmation**

State of New York        )

                                          :ss:

County of New York    )


I, Hon. Ariel E. Belen (Ret.), do hereby affirm upon my oath as arbitrator that I am

the individual described in and who executed this instrument, which is my Final Award in

this arbitration.


Dated: New York, New York
             September 29, 2023

*AEBele*

Hon. Ariel E. Belen (Ret.)
JAMS Arbitrator

# EXHIBIT "C"

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - -x

5

6 In the Matter of:

7 ELETSON HOLDINGS, INC. et al.,          Main Case No.

8           Debtors.                      23-10322-jpm

9

10 - - - - - - - - - - - - - - - - - - - -x

11

12                 United States Bankruptcy Court

13                 One Bowling Green

14                 New York, New York

15

16                 August 21, 2024

17                 9:04 AM

18

19

20

21 B E F O R E:

22 HON. JOHN P. MASTADANO, III

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  MARIA

Motion to Shorten Time with Respect to Motion for Entry of
Order Temporarily Allowing the Notes Claims for Voting Purposes
949

Order signed on 8/15/2024 Pursuant to Fed. R. Bankr. P. 9006(c)
to Shorten Notice Period for Consideration of the Debtors
Retention Applications (Related Doc # 938). With hearing to be
held on 8/21/2024 at 09:00 AM at Videoconference (ZoomGov)
(JPM) (Rodriguez-Castillo, Maria)

Notice of Hearing /Notice of Plan Confirmation Status
Conference (related document(s)840, 848, 846)

Amended Notice of Agenda of Matters Scheduled for Hearing on
August 21, 2024 at 9:00 A.M. (Eastern) (related document(s)921,
764, 924, 574, 37, 372, 987, 936, 592, 937)

Motion to Approve Debtor in Possession Financing /Debtors
Motion for Entry of an Order (A) Authorizing the Debtors to
Obtain Postpetition Financing and (B) Granting Related Relief

Notice of Agenda of Matters Scheduled for Hearing on August 21,
2024 at 9:00 A.M

Transcribed by:  Michael Drake

eScribers, LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

```
 1
 2   A P P E A R A N C E S (All present by video or telephone):
 3   REED SMITH LLP
 4         Attorneys for Debtors
 5         599 Lexington Avenue
 6         New York, NY 10119
 7
 8   BY:   ANDREW BUCK, ESQ.
 9         CHRISTOPHER M. LAUKAMG, ESQ.
10         LOUIS SOLOMON, ESQ.
11
12
13   REED SMITH LLP
14         Attorneys for Debtors
15         10 South Wacker Drive
16         40th Floor
17         Chicago, IL 60606
18
19   BY:   MICHAEL B. GALIBOIS, ESQ.
20         ANN E. PILLE, ESQ.
21
22
23
24
25
```

1

2  REED SMITH LLP

3          Attorneys for Debtors

4          1717 Arch Street

5          Suite 3100

6          Philadelphia, PA 19103

7

8  BY:    DEREK J. BAKER, ESQ.

9          DEREK M. OSEI-BONSU, ESQ.

10         JOHSUA PELES, ESQ.

11

12

13  REED SMITH LLP

14         Attorneys for Debtors

15         1201 Market Street

16         Wilmington, DE 19801

17

18  BY:    KEVIN W. COCKERHAM, ESQ.

19

20

21

22

23

24

25

1

2    TOGUT SEGAL & SEGAL LLP

3          Attorneys for Petitioning Creditors

4          One Penn Plaza

5          Suite 3335

6          New York, NY  10119

7

8    BY:   JARED C. BORIELLO, ESQ.

9          LEILA EBRAHIMI, ESQ.

10          AMANDA C. GLAUBACH, ESQ.

11          BRYAN KOTLIAR, ESQ.

12          JEFFREY LEFKOWITZ, ESQ.

13          MARTHA MARTIR, ESQ.

14          JOHN MCCLAIN, ESQ.

15          KYLR J. ORTIZ, ESQ.

16          DAWN L. PERSON, ESQ.

17          BRIAN F. SHAUGHNESSY, ESQ.

18

19

20    SEWARD & KISSELL LLP

21          Attorneys for NAF

22          1 Battery Park Plaza

23          New York, NY 10004

24

25    BY:   ANDREW MATOTT, ESQ.

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3          Office of the United States Trustee

4          1 Bowling Green

5          New York, NY 10004

6

7   BY:   DANIEL RUDEWICZ, ESQ.

8          PAUL K. SCHWARTZBERG, ESQ.

9

10

11  SIDLEY AUSTIN LLP

12          Attorneys for Shareholders

13          787 Seventh Avenue

14          New York, NY 10019

15

16  BY:   WILLIAM E. CURTIN, ESQ.

17          MICHAEL A. SABINO, ESQ.

18

19

20

21

22

23

24

25

1

2  THOMPSON HINE LLP

3        Attorneys for Deutsche Bank, as trustee

4        300 Madison Avenue

5        27th Floor

6        New York, NY 10017

7

8  BY:   ALEXANDER ANDREWS, ESQ.

9

10

11  DECHERT LLP

12        Attorneys for the Official Committee of Unsecured

13        Creditors

14        1095 Avenue of the Americas

15        New York, NY 10036

16

17  BY:   OWEN HANEY, ESQ.

18        DAVID HERMAN, ESQ.

19        KARLI WADE, ESQ.

20        STEPHEN ZIDE, ESQ.

21

22

23

24

25

1

2  QUINN EMANUEL URQUART & SULLIVAN LLP

3       Attorneys for Levona Holdings Ltd.

4       51 Madison Avenue

5       22nd Floor

6       New York, NY 10010

7

8  BY:   ISAAC NESSER, ESQ.

9        MATTHEW R. SCHECK, ESQ.

10        JOHN SUPER, ESQ.

11

12

13  QUINN EMANUEL URQUART & SULLIVAN LLP

14       Attorneys for Levona Holdings Ltd.

15       300 West 5th Street

16       Austin, TX 78701

17

18  BY:   MATTHEW R. ROZNOVAK, ESQ.

19        MATTHEW R. SCHECK, ESQ.

20

21

22

23

24

25

PERKINS COIE LLP

    Attorneys for Wilmington Savings Fund Society FSB, as

    Trustee

    1155 Avenue of the Americas

    2nd Floor

    New York, NY 10036

BY TINA N. MOSS, ESQ.


INTERESTED PARTIES:

    MARK LICHTENSTEIN, ESQ. on behalf of Pach Sheman

    ADAM SPEARS, on behalf of Pach Shemen

ALSO PRESENT:

    ELENA EVENGELATOU, Aegean Baltic Bank

1    confirmation.  Reed Smith has obviously done a tremendous

2    amount of work.

3            But I did just want to state for the record that we

4    think this is a very serious matter that we expect will be

5    addressed with the Court now and going forward as necessary.

6            THE COURT:  Thank you, counsel.

7            Does anyone else wish to be heard before I turn to the

8    debtors?

9            Does the U.S. Trustee wish to be heard?

10            MR. SCHWARTZBERG:  Your Honor, Paul Schwartzberg For

11    the U.S. Trustee's Office.

12            We are looking at this matter.  And I just wanted to

13    say the individual is actually -- since this is off agenda,

14    whose I know it's being looked at is having surgery today.  I

15    don't want to make any misstatements and comment incorrectly.

16    But it is something in our office under review.

17            THE COURT:  Okay.  Thank you.  Hope all goes well with

18    the surgery.

19            Okay.  Anyone else?

20            MR. SCHWARTZBERG:  Thank you, Your Honor.

21            THE COURT:  Anyone else?  Before I turn to the

22    debtors?

23            Oka.  Would the debtors like to be heard?

24            MR. SOLOMON:  Your Honor, this is Lou Solomon.

25            This is one of the many -- really, I counted probably

1    ten or fifteen letters that are trying to distract us from

2    actually getting this case ready for trial that I actually

3    wanted to respond to.  We haven't had an opportunity to do

4    that, to respond in writing.  So I'll ask Your Honor to just

5    take this verbal response.  We in the fullness of time can get

6    a letter in to address this.

7            There's nothing problematic at all about it.  The only

8    thing that's problematic is that if Murchinson's agent,

9    Dechert, can find a way to distort the facts, they will.  And

10   then they'll hand it to Levona, and then they will.  And

11   they'll hand it to Pach Shemen, and then they will.

12           There's nothing inconsistent about anything that we

13   have submitted in the engagement letter and in the retention

14   applications.  And we are going to be happy to go through that

15   just so that Your Honor understands what the facts are.  And

16   Justice Belen knew this and actually their findings in his

17   award about this.

18           When Levona was improperly trying to take over

19   Eletson, it threatened individuals personally.  So Pac Shemen's

20   alter ego and its affiliate, people who are here and the people

21   who are controlling Dechert now, threatened the individuals.

22   When they came to Reed Smith, it was clear that we were going

23   to be representing the parties to the actual agreement.  And

24   though that is Holdings and Corp -- they were parties to the

25   actual agreement.  Nothing has been withheld about that.  The

1    fact that they were parties to the agreement and needed then to

2    be claimants has nothing to do with who was going to be paying

3    the fees ever.  It didn't have anything to do with paying the

4    fees.  And Your Honor actually has our schedules about who has

5    paid the fees.

6            But they did come to us -- and there was a moment in

7    time we weren't sure what Levona was going to be doing with

8    respect to those individuals -- and said, okay, we will look at

9    this, make sure that there is no conflict if we ever represent

10   you.  And that is what went forward.

11           Now, Levona Pach Shemen, Murchinson, the committee did

12   sue those individuals personally.  Justice Belen talks about

13   that.  Reed Smith was not involved.  Independent counsel was

14   involved.  As Justice Belen observed, we never represented the

15   individuals and still have not represented any of the

16   individuals.  And that's the -- those are the facts.  And so

17   our engagement letter says what it says, and we stand by it.

18   And now I've explained why it says what it said.  And we never

19   undertook any representation of those individuals and never

20   needed to get a conflict waiver because they got other counsel

21   when they were actually sued personally by that group of

22   entities in both Delaware and in Texas.

23           THE COURT:  Okay.  Thank you.  So you'll submit

24   something in writing, and then we'll go from there and

25   determine the --

1        MR. SOLOMON:  Thank you.  Of course, Your Honor.

2    Thank you.

3        THE COURT:  Yeah, thank you.  I appreciate that.

4        MR. SOLOMON:  I could have been quieted, Your Honor.

5    I'm sorry.  I should have asked first.  All right.  Thank you,

6    Your Honor.  Yes.  We'll --

7        THE COURT:  No, I appreciate that.  I appreciate that

8    response.  But I think also it makes sense to put it in writing

9    and then --

10        MR.SOLOMON:  very much so.

11        THE COURT:  -- the parties can see it.  And we'll

12    determine if anything further needs to be discussed.

13        MR. SOLOMON:  Thank you, Your Honor.

14        MR. ORTIZ:  Your Honor, very briefly if I may.  Kyle

15    Ortiz for the petitioning creditors.

16        They should certainly have an opportunity to put

17    things in writing.  But what Mr. Solomon may not appreciate is

18    everything he just said is irrelevant.  It was not disclosed.

19    He appears have no idea what the requirements under Rule 2014

20    are.  You disclose, and then you can explain.  But you can't

21    explain what you don't disclose.  The rule is very clear, and

22    it's very serious.  You must disclose these relationships.

23        I'm sure they'll have their chance.  People put in

24    whatever motions they have.  And you'll be able to determine

25    that.  But that's exactly kind of what Leslie Fay was, like,

**EXHIBIT "D"**
**(Filed Under Seal)**