**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

Eletson Holdings Inc., *et al.*,

                              Debtors.

<u>FOR PUBLICATION</u>

Chapter 11

Case No. 23-10322 (JPM)
(Jointly Administered)

**MEMORANDUM OPINION AND ORDER OVERULING IN PART**
**AND SUSTAINING IN PART DEBTORS' CLAIM OBJECTIONS**

*A P P E A R A N C E S:*

**REED SMITH LLP**
*Counsel for the Debtors*
599 Lexington Avenue
New York, NY 10022
By:    Louis M. Solomon, Esq.
       Alyssa F. Conn, Esq.
       Colin A. Underwood, Esq.

**REED SMITH LLP**
*Counsel for the Debtors*
1717 Arch Street
Philadelphia, PA 19103
By:    Derek J. Baker, Esq.
       Joshua M. Peles, Esq.

**TOGUT, SEGAL & SEGAL LLP**
*Counsel for the Petitioning Creditors, DIP Lender, & Proposed Plan Sponsor*
One Penn Plaza, Suite 3335
New York, NY 10119
By:    Kyle J. Ortiz, Esq.
       Brian F. Shaughnessy, Esq.
       Bryan M. Kotliar, Esq.
       John McClain, Esq.
       Jared C. Borriello, Esq.

**DECHERT LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1095 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    David A. Herman, Esq.
       Stephen D. Zide, Esq.
       Gary J. Mennitt, Esq.

**PERKINS COIE LLP**
*Counsel for Wilmington Savings Fund Society, FSB, as Trustee*
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    Tina M. Moss, Esq.
       Paul Japser, Esq.
       Martin E. Gilmore, Esq.
       Rachel S. Mechanic, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for the Shareholders*
787 Seventh Avenue New York, NY 10019
By:     William E. Curtin, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee, Region 2*
One Bowling Green, Room 534 New York, NY 10004
By:     Daniel Rudewicz, Esq.
        Shara Cornell, Esq.

I.    INTRODUCTION ............................................................................................... 3

   A. FIRST OMNIBUS OBJECTION TO CERTAIN CLAIMS ................................................ 4

   B. OBJECTION TO CLAIMS OF PACH SHEMEN LLC, VR GLOBAL PARTNERS, LP, AND ALPINE

   PARTNERS (BVI) L.P. ...................................................................................... 5

   C. OBJECTION TO CLAIMS OF WILMINGTON SAVINGS FUND SOCIETY, FSB ................. 6

II.   JURISDICTION ............................................................................................. 10

III.  BACKGROUND ............................................................................................. 10

   A. THE INDENTURE ............................................................................................ 10

   B. THE FIRST RSA AND THE STRICT FORECLOSURE ................................................ 13

   C. THE SECOND RSA ......................................................................................... 14

   D. DEFAULT UNDER THE SECOND RSA ................................................................. 16

   E. THE OCM STIPULATION ................................................................................ 17

   F. LEVONA, THE PREFERRED SHARES, THE ARBITRATION, & PACH SHEMEN ............. 18

   G. PACH SHEMEN'S ACQUISITION OF THE NOTES, THE JANUARY 10, 2023 DIRECTION LETTER &

   THE SDNY ACTION ........................................................................................ 20

   H. THE FEBRUARY 2023 TERMINATION LETTER ..................................................... 21

   I. THE BANKRUPTCY PROCEEDINGS ..................................................................... 22

IV.   LEGAL ANALYSIS ....................................................................................... 28

   A. THE CLAIMS ALLOWANCE PROCESS ................................................................ 28

   A. THE OBJECTION TO DUPLICATIVE CLAIMS ........................................................ 29

   B. THE OBJECTION TO WILMINGTON CLAIMS ....................................................... 30

      1.    The Wilmington Pre-Petition Claims Should Be Reclassified as General Unsecured

      Claims ........................................................................................................ 33

1

2.     *The Wilmington Pre-Petition Claims Should Not Be Reduced Because They Do Not Seek Recovery for any Entities or Persons That Are Not Noteholders* ................................ 34

    a)     The Wilmington Pre-Petition Claims Were Filed on Behalf of All Noteholders, Regardless of Identity ..................................................................................... 35

    b)     Pach Shemen & Alpine Validly Purchased the Notes and Their Purchases are not Void *Ab Initio* ........................................................................................... 38

3.     *The Debtors' Books and Records Objection Does Not Rebut the Debtors' Burden to Dispute Wilmington's Prima Facie Claim* ........................................................... 45

4.     *Wilmington Did Not Act in Bad Faith* ........................................................... 47

5.     *Wilmington's Fees Are Reasonable* ............................................................... 51

6.     *Setoff is Inapplicable* ................................................................................... 54

C. THE OBJECTION TO PC CLAIMS ......................................................................... 55

1.     *The Petitioning Creditors are Valid Creditors and Arguments Under Section 303(b) of the Bankruptcy Code are Irrelevant to Allowance of Post-Conversion Administrative Expense Claims* ......................................................................................... 57

2.     *The Petitioning Creditors' Fees Are Reasonable* ......................................... 60

3.     *Setoff is Inapplicable* ................................................................................... 63

**V.    CONCLUSION** .............................................................................................. 63

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.   <u>INTRODUCTION</u>

In 2018, the Debtors issued over $300,000,000 of notes pursuant to an indenture. (Holdings Claim No. 14-2).[1] Despite promising noteholders payments of principal and interest, the Debtors have largely failed to abide by their obligations to the noteholders, resulting in, *inter alia*: (i) two failed restructuring support agreements; (ii) a strict foreclosure of thirteen vessels held by the Debtors; (iii) bondholder litigation for breach of contract under the indenture; and (iv) involuntary bankruptcy proceedings that were converted into the instant cases. (*See generally* Hadjieleftheriadis Declaration). Today, the Debtors allegedly owe $360,011,815.96 in unpaid principal and interest under the notes and indenture. (Holdings Claim No. 14-2). Notwithstanding the various legal theories the Debtors have advanced to challenge the claims of certain individual unpaid noteholders, the Debtors cannot dispute that the underlying debt has gone unpaid for many years. For the reasons set forth below, the Court largely overrules the Debtors' claim objections.

Pending before the Court are several claim objections (the "**Objections**") filed by the Debtors. (Docket Nos. 376, 377, 380). The Claim Objections assert that certain claims should be disallowed, reduced, or reclassified under a variety of legal theories.

---

[1] The Debtors in these chapter 11 cases are Eletson Holdings Inc. ("**Holdings**," pending at *In re Eletson Holdings Inc. et al.*, No. 23-10322), Eletson Finance (US) LLC ("**Finance**," pending at *In re Eletson Finance (US) LLC*, No. 23-10323), and Agathonissos Finance LLC ("**Agathonissos**," pending at *In re Agathonissos Finance LLC*, No. 23-10321). The Debtors' cases are jointly administered under the Holdings docket, and accordingly, references to "Docket No. __" are to filings entered on the Holdings docket. (*See* Docket No. 49). However, each of the Debtors maintains separate claim registries. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York. References to "FRCP __" are to the Federal Rules of Civil Procedure.

## A.  **FIRST OMNIBUS OBJECTION TO CERTAIN CLAIMS**

The first objection pending before the Court is the Debtors' *First Omnibus Objection to Certain Claims* (the "**Omnibus Claim Objection**"). (Docket No. 376). The Omnibus Claim Objection seeks disallowance of certain claims filed against Holdings, including: (i) Claim No. 1 filed by Tracy Lee Gustafson (the "**Gustafson Claim**"); (ii) Claim No. 3 filed by TR I/XII/W, J Fleishmann/Dorette (the "**Fleishmann/Dorette Claim**"); and (iii) Claim No. 15 filed by Middle East Shipping Agencies Overseas Ltd. (the "**Middle East Claim**"), which claims the Debtors contend are duplicative of certain claims filed by trustees under applicable indentures. (*See generally* Omnibus Claim Objection). The Debtors also objected to Claim No. 2 in the Holdings case ("**Deutsche Bank**" and the "**Deutsche Bank Claim**"), which claim the Debtors assert is not supported by the Debtors' books and records. (*See generally* Omnibus Claim Objection). The Omnibus Claim Objection is supported by the *Declaration of Vassilis E. Kertsikoff in Support of Debtors' Objections to Proofs of Claim* (the "**First Kertsikoff Declaration**"). (Docket No. 381).[2]

On May 7, 2024, Deutsche Bank filed the *Response to Debtors' First Omnibus Objection to Certain Claims* (the "**Deutsche Bank Response**"). (Docket No. 637).

Subsequently, the Debtors withdrew the portion of the Omnibus Claim Objection dealing with the Deutsche Bank Claim. (Docket No. 964). Accordingly, in the Omnibus Claim Objection, only the Debtors' objections to duplicative claims remain.

---

[2] The First Kertsikoff Declaration was purportedly submitted in support of each of the Debtors' claim objections. (*See generally* First Kertsikoff Declaration).

**B.  OBJECTION TO CLAIMS OF PACH SHEMEN LLC, VR GLOBAL PARTNERS, LP, AND ALPINE PARTNERS (BVI) L.P.**

The second objection pending before the Court is the *Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**Objection to PC Claims**"). (Docket No. 377). The Objection to PC Claims is also supported by the First Kertsikoff Declaration. (*See generally* First Kertsikoff Declaration). The Objection to PC Claims seeks disallowance of the following administrative expense claims filed under Sections 503(b) and 507(a)(2) of the Bankruptcy Code: (i) Claim No. 17 in the Holdings case, Claim No. 4 in the Finance case, and Claim No. 4 in the Agathonissos case filed by Pach Shemen LLC ("**Pach Shemen**," and collectively, the "**Pach Shemen Claims**"); (ii) Claim No. 18 in the Holdings case, Claim No. 5 in the Finance case, and Claim No. 5 in the Agathonissos case filed by VR Global Partners LP ("**VR Global**," and collectively, the "**VR Global Claims**"); and (iii) Claim No. 19 in the Holdings case, Claim No. 6 in the Finance case, and Claim No. 6 in the Agathonissos case filed by Alpine Partners (BVI) L.P. ("**Alpine**," and collectively, the "**Alpine Claims**").[3] (Objection to PC Claims at ¶ 13).

In response, the Petitioning Creditors filed their *Preliminary Opposition to the Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**PC Preliminary Opposition**"). (Docket No. 643). On August 13, 2024, the Petitioning Creditors also filed their *Final Opposition to the Debtors' Claim Objections* (the "**PC Final Opposition**"). (Docket No. 933).[4] The PC Final Opposition is supported by the

---

[3] The Pach Shemen Claims, the VR Global Claims, and the Alpine Claims (collectively the "**PC Claims**," and the "**Petitioning Creditors**") are identical as to each Debtor.

[4] The PC Final Opposition was also submitted in opposition to the Debtors' Objection to Wilmington Claims (as defined below). (*See generally* PC Final Opposition).

*Declaration of Jared C. Borriello in Support of Petitioning Creditors' Final Opposition to the Debtors' Claim Objections* (the "**Borriello Declaration**"). (Docket No. 934).

On August 20, 2024, the Debtors filed their *Reply in Further Support of Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**Reply in Support of Objection to PC Claims**"). (Docket No. 982). The Reply in Support of Objection to PC Claims is supported by the: (i) *Declaration of Louis M. Solomon in Support of Reply in Further Support of Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**Solomon Declaration**") (Docket No. 984); (ii) *Declaration of Vasilis Hadjieleftheriadis in Support of Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**Hadjieleftheriadis Declaration**") (Docket No. 985); and (iii) *Declaration of Vassilis Kertsikoff in Support of the Debtors' Objections to Proof of Claims* (the "**Supplemental Kertsikoff Declaration**").[5] (Docket No. 986).

Finally, on September 2, 2024, the Petitioning Creditors filed their *Surreply in Opposition to Debtors' Objection to Claims of Pach Shemen LLC, VR Global Partners, LP, and Alpine Partners (BVI) L.P.* (the "**PC Surreply**") (Docket No. 1053).

### C. <u>OBJECTION TO CLAIMS OF WILMINGTON SAVINGS FUND SOCIETY, FSB</u>

The final objection pending before the Court is the Debtors' *Objection to Claims of Wilmington Savings Fund Society, FSB* (the "**Wilmington Claim Objection**," and together, with the Omnibus Objection, the Objection to PC Claims, the "**Objections**"). (Docket No. 380). The

---

[5] The Supplemental Kertsikoff Declaration was also submitted in support of the Objection to Wilmington Claims (as defined below). (*See generally* Supplemental Kertsikoff Declaration).

Wilmington Claim Objection is also supported by the First Kertsikoff Declaration. (*See generally* First Kertsikoff Declaration).

In the Wilmington Claim Objection, the Debtors object to certain proofs of claim filed by Wilmington Savings Fund Society, FSB Trustee and Collateral Agent ("**Wilmington**"), including:

i.   Three identical secured claims, each in the amount of $366,911,815.96 stemming from the Debtors' purported obligations under an indenture. (Objection at ¶¶ 19–20). The Wilmington prepetition claims can be found at: (i) Claim No. 14-2 in the Holdings case; (ii) Claim No. 2-2 in the Agathonissos case; and (iii) Claim No. 2-2 in the Finance case (the "**Wilmington Pre-Petition Claims**"); and

ii.  Three identical administrative claims filed under Section 507(a)(2) of the Bankruptcy Code in the amount of $1,843,156.14. The Wilmington administrative claims can be found at: (i) Claim No. 20-2 in the Holdings case; (ii) Claim No. 3-2 in the Agathonissos case; and (iii) Claim No. 3-2 in the Finance case (the "**Wilmington Administrative Claims**").

In response to the Objection to Wilmington Claims, Wilmington filed its *Preliminary Response to Debtors' Objection to Claims of Wilmington Savings Fund Society, FSB* (the "**Wilmington Preliminary Response**"). (Docket No. 639). The Wilmington Preliminary Response is supported by the *Declaration of Tina N. Moss in Support of Preliminary Response of Wilmington Savings Fund Society, FSB, as Trustee and Collateral Agent, to Debtors' Objection to Claims of Wilmington Savings Fund Society, FSB* (the "**Moss Declaration**"). (Docket No. 640).

Additionally, Petitioning Creditors filed their *Joinder to WSFS's Opposition to the Debtors' Objections to WSFS's Claims* (the "**PC Joinder in Support of Wilmington Claim**"). (Docket No. 645).

As set forth above, on August 13, 2024, the Petitioning Creditors also filed the PC Final Opposition. (*See generally* PC Final Opposition). The PC Final Opposition is supported by the Borriello Declaration. (*See generally* Borriello Declaration). On the same date, Wilmington filed

its *Final Response to Debtors' Objection to Claims of Wilmington Savings Fund Society, FSB and Joinder to Petitioning Creditors' Preliminary Opposition and Final Opposition to Debtors' Claim Objections* (the "**Wilmington Final Response**"). (Docket No. 935). The Final Response is supported by the *Declaration of Patrick J. Healy* (the "**Healy Declaration**"). (Docket No. 993).

On August 20, 2024, the Debtors filed their *Reply in Further Support of Debtors' Objection to Claims of Wilmington Savings Fund Society, FSB* (the "**Reply in Support of Wilmington Claim Objection**"). (Docket No. 983). The Reply in Support of Wilmington Claim Objection is supported by the Solomon Declaration, the Hadjieleftheriadis Declaration, and Supplemental Kertsikoff Declaration. (*See generally* Solomon Declaration; Hadjieleftheriadis Declaration; Supplemental Kertsikoff Declaration).

Finally, on September 2, 2024, Wilmington filed its *Surreply to Debtors' Objection to Claims of Wilmington Savings Fund Society, FSB* (the "**Wilmington Surreply**"). (Docket No. 1054).

The parties also submitted exhibit lists and deposition designations in accordance with the Court's scheduling orders entered in connection with the Objections. (Docket Nos. 735, 915). Specifically, the Debtors submitted the: (i) *Debtors' Second Amended Deposition Designations with Wilmington and Petitioning Creditors' Joint Counter Designations* (the "**Debtors' Deposition Designations**") (Docket No. 1128); and (ii) *Debtors' Fifth Amended Exhibit List* (the "**DX**") (Docket No. 1137). Additionally, Wilmington and the Petitioning Creditors jointly submitted the: (i) *Second Amended Joint Exhibit List of Wilmington Savings Fund Society, FSB, as Trustee and Collateral Agent and Petitioning Creditors for Hearing on Debtors' Objections to Certain Claims* (the "**CX**") (Docket No. 1117); and (ii) *Wilmington Savings Fund Society,*

*FSB, as Trustee and Collateral Agent and Petitioning Creditors' Joint Deposition Designations and Counter Designations of the Debtors in Connection with Debtors' Claim Objections* (the "**Creditors' Deposition Designations**") (Docket No. 1082).[6]

The Court held evidentiary hearings on the Objections on September 9 and 10, 2024 (the "**Hearings**," and the transcripts thereof the "**September 9 Transcript**" (Docket No. 1124), and the "**September 10 Transcript**" (Docket No. 1125), respectively) where it heard witness testimony, admitted evidence into the record, and heard arguments of counsel.

Following the Hearings, the Court received the following post-trial briefs: (i) the Petitioning Creditors' and Official Committee of Unsecured Creditors' *Joint-Post Trial Brief Regarding Confirmation of the Competing Plans* (the "**Creditor Brief**")[7] (Docket No. 1140); and (ii) the *Debtors' Post Confirmation Hearing Brief in Support of Debtors' Second Amended Joint Plan of Reorganization of Debtors under Chapter 11 of the Bankruptcy Code and Resolution of the Debtors' Objections to the Purported Claims of Alleged Creditors of the Debtors' Estates* (the "**Debtor Brief**")[8] (Docket No. 1141).

The Court has reviewed and considered the Objections; all responses, replies, and declarations filed thereto; the Post-Trial Briefs; the arguments of counsel; and the record as a whole.

---

[6] Pursuant to the *Stipulated Confidentiality Agreement and Protective Order* (Docket No. 37) and the *Amended and Restated Stipulated Confidentiality Agreement and Protective Order* (Docket No. 1018) entered in this case, portions of certain filings and supporting documents were filed under seal or provided on an attorneys' eyes only basis. At the Hearings, the Court gave the parties the opportunity to withdraw from the record any such material that the parties did not want to be cited, quoted, or otherwise referenced in this opinion. (September 13 Transcript, Docket No. 1161 at 94:18–22). No parties in this matter requested information withdrawn. The Court will nevertheless refrain from revealing bank account numbers, sensitive banking or personal information, or other similar material contained within sealed documents.

[7] Wilmington joined the Creditor Brief. (Docket No. 1145).

[8] Certain of the Debtors' shareholders joined the Debtor Brief. (Docket No. 1146).

## II.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B).

## III.   BACKGROUND

The Debtors are part of an international gas shipping enterprise (the "**Eletson Enterprise**"). (See *Memorandum Opinion and Order Denying: (i) Motion in Limine; (ii) Motion to Exclude; and (iii) Motions to Appoint a Chapter 11 Trustee* (the "**Trustee Opinion**"), Docket No. 721 at 9). The Eletson Enterprise collectively owns and operates a fleet of gas tanker ships engaged in the business of shipping refined petroleum products and crude oil. (*Id.*).  On October 22, 2013, Holdings partnered with Blackstone Tactical Opportunities ("**Blackstone**") to form Eletson Gas ("**Gas**"), "a $700 million liquefied petroleum gas shipping joint venture . . . ." (DX-002(O), the "**Final Award**") at 5). Upon formation of Gas, Blackstone held the preferred shares of Gas (the "**Gas Preferred Shares**"), and Holdings held the common shares of Gas. (*Id.* at 5–6).

### A.  THE INDENTURE

In December 2013, Debtors Holdings and Agathonissos issued those certain *9.625% First Preferred Ship Notes due 2022* (the "**Old Notes**") in the principal amount of $300,000,000. (Hadjieleftheriadis Declaration at ¶ 8). Deutsche Bank served as trustee under the indenture governing Old Notes. (*Id.*).

In May 2018, Holdings and Finance initiated an exchange for the Old Notes (the "**Note Exchange**"). (*Id.* at ¶ 9). Approximately 98% of the holders of the Old Notes participated in the Note Exchange, and in July 2018, the Debtors finalized the Note Exchange and issued those certain *First Preferred Ship Mortgage Notes due 2022* (the "**New Notes**"). (*Id.*). The New Notes

were issued in a principal amount of $314,068,360. (Prepetition Claims at Ex. A-1; Healy Declaration at ¶ 6).

The New Notes were governed by an indenture (the "**Indenture**"), pursuant to which Wilmington served as trustee and collateral agent. (*See* Prepetition Claims Ex. A; Healy Declaration at ¶ 6). "Under the terms of the [New] Notes and the Indenture, interest on the [New] Notes accrued in accordance with a formula set forth on page A-1 of the [New] Notes." (Healy Declaration at ¶ 8). The formula called for interest to accrue at specified rates and in a specified manner during three discrete time periods as follows:

i. Semiannually, in arrears, for the interest period from January 16, 2018 to July 15, 2018, at a rate of 12.00% per annum, payable on July 15, 2018 to holders of record on the Closing Date, payable entirely by increasing the principal amount of the outstanding Notes or by issuing new Notes ("**PIK Interest**");

ii. Semiannually, in arrears, for the interest period from July 16, 2018 to January 15, 2019, at a rate of 9.625% per annum, payable on January 15, 2019 in cash ("**Cash Interest**") to holders of record on January 1, 2019; and

iii. From and after January 16, 2019, quarterly, in arrears, at a rate per annum of (i) 9.625% for any interest payment date for which the Trailing TCE is less than $20,000 or (ii) 10.625% plus 1.00% for each integral multiple of $2,000 by which the Trailing TCE for such interest payment date exceeds $20,000 (up to a maximum of 14.625% per annum), payable on each January 15, April 15, July 15 and October 15 (each, a "**TCE-Based Interest Payment Date**") as Cash Interest to holders of record on the immediately preceding January 1, April 1, July 1, and October 1, respectively.

(Healy Declaration at ¶ 8 (citing Wilmington Pre-Petition Claim at 202)).[9] The New Notes also provide that the Debtors must pay interest on any overdue principal at a rate of "1% per annum in excess of the then applicable interest rate" (the "**Default Interest Rate**"). (*Id.* at ¶ 11).

---

[9] The Trailing TCE set forth above is a performance-based metric defined in the Indenture that was to be provided by the Debtors to Wilmington no later than five days before the TCE-Based Interest Payment Date. (Healy Declaration at ¶ 9 (citing Indenture at § 4.03(g))). According to Wilmington, the Debtors never provided the Trailing TCE. (Healy Declaration at ¶ 10). Thus, Wilmington applied the maximum interest rate of 14.625% for each quarter beginning on January 16, 2019. (*Id.*).

Additionally, the Indenture governing the New Notes: (i) specified certain events of default, including failure to pay interest within 30 days of the payment due date; and (ii) provided that the Debtors were to indemnify Wilmington against all losses, liabilities, and expenses arising out of Wilmington's administration of duties under the Indenture. (*See* Wilmington Pre-Petition Claim Ex. A §§ 6.01, 7.07(b), 10.10(b)).

The Indenture also set forth the scope of Wilmington's rights and responsibilities to act on behalf of noteholders under the Indenture. For instance, the Indenture: (i) authorizes Wilmington to exercise remedies against the Debtors in the case of default, including by instituting a judicial proceeding, with or without direction from the noteholders themselves (Indenture at §§ 6.03; 6.08)); (ii) provides that "[h]olders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to [Wilmington]" (*id.* at § 6.05); and (iii) provides that Wilmington "need not investigate any fact or matter stated in any . . . certificate [or] statement" and "may conclusively rely and shall be fully protected in acting or refraining from acting upon" any such documents if it does take direction from a noteholder (*id.* at §§ 7.02; 10.01(e)).

The Debtors also pledged certain assets as collateral for the New Notes under the Indenture (the "**Pledge Agreement**"), including:

> (i) all outstanding common shares or membership interests in Finance and certain guarantors under the Indenture (the "**Pledged Equity**"); (ii) thirteen shipping vessels owned by guarantors under the Indenture (the "**Vessels**"); (iii) the earnings arising from the freights, hires, and other earnings from the operation and use of or relating to the [V]essels; and (iv) all other cash and various accounts of [Agathonissos] and the guarantors.

(Hadjieleftheriadis Declaration at ¶ 10).

On August 13, 2018, the Debtors purchased some of the New Notes back from noteholders, resulting in a reduced principal amount of $324,862,074.60, and interest in the amount of $2,431,953.59 as of that date. (Healy Declaration at ¶ 16).

Shortly thereafter, on January 15, 2019, the Debtors defaulted under the Indenture by failing to make a payment required thereunder. (Healy Declaration at ¶ 18). As a result of the default, Wilmington applied interest for the period January 16, 2019, to February 15, 2019 (the "**Grace Period**") at a rate of 14.625%. (*Id.* at ¶ 20). After the Grace Period, Wilmington applied the Default Interest rate of 15.625%. (*Id.* at ¶ 21).[10]

### B.  THE FIRST RSA AND THE STRICT FORECLOSURE

On June 24, 2019, the Debtors, certain of the Debtors' equity holders and guarantors, and an ad hoc group of noteholders (the "**Ad Hoc Group**") entered into a Restructuring Support Agreement (the "**First RSA**") setting forth the terms of a restructuring of the Debtors' obligations under the New Notes and the Indenture. (*Id.* at ¶ 23–24). As part of the First RSA, and in accordance with the Pledge Agreement, the Debtors executed a Strict Foreclosure Agreement (the "**Strict Foreclosure Agreement**"). (*Id.* at ¶ 25). The Strict Foreclosure Agreement provided in part that:

> if the restructuring transactions contemplated by the [First] RSA were not consummated on or before the earlier of (i) December 24, 2019 or (ii) the termination of the [First] RSA, so long as the Strict Foreclosure [Agreement] remained in full force and effect, the obligations owed to [Wilmington] and to the Holders of the Notes would be deemed partially satisfied in the amount of $130 million in exchange for the acceptance by the Holders of the foreclosed Collateral.

(*Id.* at ¶ 25).

---

[10] According to Wilmington, as of the date that the instant cases were converted to voluntary proceedings under Chapter 11 of the Bankruptcy Code, the outstanding amount due under the indenture, inclusive of principal and interest, was $362,072,957.96. (*Id.* at ¶ 32).

13

The Ad Hoc Group terminated the First RSA on August 9, 2019, and accordingly, pursuant to the Strict Foreclosure Agreement, the "outstanding principal amount of the Notes was [] reduced . . . to $194,862,074.60 as of that date," and the collateral was liquidated. (Healy Declaration at ¶ 26).

## C. **THE SECOND RSA**

On October 29, 2019, the Debtors, certain holders of equity interests in Holdings, and certain holders of more than 80% of the New Notes (the "**Consenting Noteholders**"), entered into a second Restructuring Support Agreement (the "**Second RSA**") (Solomon Declaration at Exhibit 9). (Hadjieleftheriadis Declaration at ¶ 15).[11] The Second RSA contained numerous milestones, the first of which provided that:

> As soon as reasonably practicable, but in no event later than October 31, 2019, the Company shall have entered into a memorandum of agreement with respect to the sale of the Company's interest in the vessel Salamina, which shall be in form and substance acceptable to the Company and the Required Consenting Noteholders.

(Second RSA at Ex. C).[12] Additionally, Section 5(c) of the Second RSA required that:

> any proceeds from the sale [of the company's interest in the Salamina], after the payment of applicable professional fees, shall be paid pro rata to holders of (i) [New Notes], (ii) Old Notes [], and (iii) claims arising under the Working Capital Facility Agreements, it being understood and agreed that the pro rata portion payable will be applied to pay the New Holdings Preferred Stock as described in the Restructuring Term Sheet; provided, that, if the Debtors do not satisfy the Milestones with respect to the sale of vessel Salamina then, (i) the Debtors and Required Consenting Noteholders shall consult with each other concerning the sale

---

[11] Wilmington was not a party to the Second RSA. (September 9 Transcript at 165:5–11).

[12] Some of the other milestones set forth in the Second RSA include, *inter alia*: (i) agreement on the form and substance of an out of court restructuring of the Debtors' indebtedness to be reached within 15 days of the memorandum of agreement regarding the sale of the Salamina; (ii) commencement of solicitation of the out of court restructuring, or alternatively, a chapter 11 plan within 21 days from the memorandum of understanding for the sale of the Salamina; (iii) consummation of the out of court restructuring within 5 days of the termination of the solicitation period if the out of court restructuring received supermajority approval from the Consenting Noteholders; (iv) commencement of voluntary chapter 11 cases within 5 days of the termination of the solicitation period if the out of court restructuring does not receive supermajority approval by the Consenting Noteholders; and (v) certain additional milestones to be completed in the context of the potential bankruptcy filing, should the out of court restructuring not receive the required supermajority approval. (*Id.* at Ex. C). It does not appear that any of these milestones were met.

of the Salamina and/or an Alternative Vessel (as defined below) for a period of fourteen days and (ii) after such fourteen day period, at the direction of the Required Consenting Noteholders, a third-party, reasonably acceptable to the Required Consenting Noteholders and the Debtors (it being understood that Clarksons London is acceptable to the Debtors), will be engaged to sell the Debtors' interest in one or more vessels, as determined by the Required Consenting Noteholders (such vessel, the "Alternative Vessel"), on a timeframe to be reasonably acceptable to the Required Consenting Noteholders.

(Id. at § (6)(a)(ii)). Importantly, the Second RSA expressly provided that it could be terminated:

by the Consenting Noteholders holding, in aggregate, at least two thirds in principal amount outstanding of the Senior Notes Claims held by the Consenting Noteholders (each such group a "**Terminating Support Group**"), upon written notice to all other Parties, upon the occurrence of any of the following events (each a "**Termination Event**"):

. . .

(ii) the failure of the Debtors to meet any Milestone set forth on Exhibit C unless (i) such failure is the result of any act, omission, or delay on the part of any Consenting Noteholders whose Terminating Support Group is seeking termination under this Agreement or (ii) such Milestone is extended in accordance with Exhibit C.

 (Id. at § (6)(a)(ii)). Notably, notwithstanding the termination provision set forth above, the

Second RSA also included a reservation of rights which stated in relevant part:

This [Second RSA and related term sheet] are part of a proposed settlement of disputes among the Parties. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the [Second RSA] are not consummated as provided herein, if (x) a Termination Event occurs, or (y) this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests . . . .

(Id. at § (28)).[13]

---

[13] The term Termination Event as it is used in the preceding provision is defined in the Second RSA as having the meaning ascribed to it in paragraph (6)(c) of the Second RSA, which in turn states that such date is the date on which the Second RSA is terminated in accordance with Section 6 of the Second RSA. (Id. at §§ (1) (definition of "Termination Date"); (6)(c)).

Importantly, the term sheet provided that, *inter alia*, pursuant to the restructuring contemplated by the Second RSA: (i) Holdings would issue "[p]referred equity with $47.5MM liquidation preference and 8% annual dividend [] issued to bondholders;" and (ii) the provision of 70% of the common equity in Holdings to be issued to the Noteholders. (*Id.* at Ex. A (the "**Second RSA Term Sheet**")).

The Second RSA also included: (i) restrictions on the transfer of notes, stating that none of the Consenting Noteholders shall "sell, transfer, assign, hypothecate, pledge, grant a participation interest in, or otherwise dispose of" their interests in the New Notes without such transferee having executed a joinder to the Second RSA at least three days prior to the effectiveness of the transfer, or such transfer would be deemed "null and void and of no force or effect" (*id.* at § (7)(a)); (ii) a forbearance period (the "**Forbearance Period**") whereby the parties to the Second RSA agreed not to undertake certain collection activities under the Indenture while the Debtors moved toward consummation of the restructuring contemplated by the Second RSA (*id.* at § 36); and (iii) a prohibition on entry into new financing arrangements, including vessel leases, without obtaining approval from the noteholders. (*Id.* at § (5)(d)).

Moreover, the Second RSA contained a specific performance provision entitling a non-breaching party to "specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any [p]arty to comply promptly" with any of their obligations under the Second RSA. (*Id.* at § 26).

### D.  DEFAULT UNDER THE SECOND RSA

The Debtors apparently defaulted under the very first milestone under the Second RSA by failing to enter into a memorandum of agreement regarding the sale of the Salamina by

October 31, 2019.[14] (Hadjieleftheriadis Declaration at ¶¶ 21–22; Kertsikoff Declaration at ¶ 14).

Accordingly, on November 15, 2019, the Consenting Noteholders sent the Debtors the *Direction*

*Letter Pursuant to Section (5)(c) of the Restructuring Support Agreement* (the "**November 15**

**Direction Letter**," CX-101), directing the Debtors to retain Clarksons London to sell the

Salamina as contemplated by the Second RSA. (November 15 Direction Letter).

On January 16, 2020, Paul, Weiss, Rifkind, Wharton & Garrison ("**Paul Weiss**"),

purportedly acting as counsel for the Ad Hoc Group under the Indenture, sent a letter to

Holdings, noting that: (i) the Debtors had "failed to comply with the terms necessary to complete

every [term of the proposed restructuring];"[15] and (ii) the Ad Hoc Group had not received any

interest payments on account of their notes since 2018. (CX-223, the "**January 2020 Letter**").

Accordingly, the January 2020 Letter indicated that the Ad Hoc Group "continues to reserve its

rights to exercise all remedies and assert all claims available under the Indenture and under

applicable law, including . . . the right to commence an involuntary bankruptcy case against

Holdings . . . ." (*Id.*)

E.  **THE OCM STIPULATION**

As noted *supra*, Section (II)(C), the Second RSA prohibited refinancing of Vessel leases

without prior consent of a majority of the Consenting Noteholders. (Second RSA at § (5)(d)).

However, in June 2020, the Debtors obtained such consent and refinanced certain Vessel leases

in connection with OCM Maritime Thames LLC, OCM Maritime Autumn LLC, OCM Maritime

Rhine LLC, and OCM Maritime Yukon LLC (collectively, "**Oaktree**"). (DX-001(g), the "**OCM**

---

[14] The Salamina was apparently ultimately sold in April 2021, and the proceeds of the sale were used to pay down other debt. (Hadjieleftheriadis Declaration at ¶¶ 14, 21–22).

[15] The January 2020 Letter appears to reference another restructuring proposal sent to the Debtors on December 27, 2019, which contemplated termination or amendment of the Second RSA, entry into a new or revised RSA, and a voluntary chapter 11 bankruptcy filing pursuant to a pre-packaged plan that would vest 70% of the Debtors' equity in a group of noteholders. (CX-222; CX-223).

**Stipulation**"). As is relevant here, the OCM Stipulation: (i) includes a recital noting that "the Eletson Parties and the Holders are parties to that certain Restructuring Support Agreement dated as of October 29, 2019;" (ii) prohibits noteholders from selling, assigning, transferring, hypothecating, or otherwise disposing of their New Notes unless, "as a condition precedent to any such transaction, the transferee" executes a joinder to the OCM Stipulation; and (iii) provides that any disposition of the New Notes as set forth above is void *ab initio* if a joinder is not executed. (*Id.* at § (4)(a)–(b)).[16]

## F. LEVONA, THE PREFERRED SHARES, THE ARBITRATION, & PACH SHEMEN

On November 2, 2021, Blackstone sold the Gas Preferred Shares to Murchinson, "an alternative management firm that manages funds on behalf of institutional investors." (Final Award at 6–7). As part of this transaction, Murchinson formed Levona Holdings Ltd. ("**Levona**")—a special purpose entity—to hold the Gas Preferred Shares.[17] (*Id.* at 7)

After Levona acquired the Gas Preferred Shares, the Debtors and Levona began discussing the terms by which the Debtors could buy the Gas Preferred Shares back from Levona. (*Id.* at 8). Ultimately, the parties entered into a Binding Offer Letter (the "**BOL**") on February 22, 2022, whereby Levona granted the Debtors (or the Debtors' nominee) a purchase option (the "**Purchase Option**") to purchase the Gas Preferred Shares for an amount dependent in part upon the net asset value of two vessels owned by Gas, the Symi and Telendos. (*Id.*) Subsequently, a dispute arose regarding whether the Debtors had properly exercised the Purchase Option contained in the BOL. (*Id.* at 11). Accordingly, on July 29, 2022, Holdings and an affiliate, Eletson Corp., commenced a JAMS arbitration (the "**Arbitration**") against Levona

---

[16] Pach Shemen and Alpine signed joinders to the OCM Stipulation on April 28, 2023. (See CX-127–128).

[17] Levona is directly owned by two Murchinson owned funds, Nomis Bay and BPY. (*Id.*)

seeking, *inter alia*, a determination regarding the ownership of the Gas Preferred Shares. (*Id.* at 9–10).

While the Arbitration was pending, Murchinson and Levona sought an alternative means by which they could obtain control of the Gas assets should the Debtors prevail in the Arbitration. (*Id.* at 20–21). As part of these efforts, Murchinson and Levona negotiated with certain holders of the New Notes regarding the potential purchase of a majority of the then-outstanding New Notes. (DX-096 (the "**Note Purchase Emails**") (email chain discussing New Note purchase terms)). Murchinson's plan was to purchase a majority of the New Notes in order to embark on a potential "bankruptcy strategy" to exert control over the Debtors and prevail in the Arbitration. (DX-199 (the "**Bankruptcy Strategy Emails**") (discussing the need to move quickly because Murchinson already had "the lawyers in motion on the bankruptcy strategy")). Murchinson ultimately negotiated the purchase of a majority of the New Notes, totaling $183,851,546. (Final Award at 60). As consideration for its purchase of the New Notes, Murchinson agreed to pay to the selling noteholders: (i) $2,000,000 up front; (ii) an additional $500,000 if the Arbitration ended to Murchinson's satisfaction; (iii) 10% of the value received by Levona for its Gas Preferred Shares (excluding certain expenses), up to $1,000,000; (iv) one third of the first $3,000,000 profit realized by the entity holding the New Notes on Murchinson's behalf (excluding expenses); and (v) thereafter 25% of any profit realized by the entity holding the New Notes on Murchinson's behalf after $3,000,000 of profit is earned under (iv). (*See* Note Purchase Emails).

Murchinson formed another special purpose vehicle, Pach Shemen on December 12, 2022, to hold the New Notes, which were officially acquired by Pach Shemen on January 4, 2023. (CX-12 (the "**Pach Shemen LLC Agreement**"); Final Award at 60).[18]

## G. PACH SHEMEN'S ACQUISITION OF THE NOTES, THE JANUARY 10, 2023 DIRECTION LETTER & THE SDNY ACTION

Though Pach Shemen did not acquire the New Notes until January 4, 2023, the record indicates that Perkins Coie, as counsel for Wilmington, was in contact with Dechert LLP ("**Dechert**"), as counsel for Murchinson as early as December 23, 2022, regarding a direction letter to be issued to Wilmington under the Indenture. (CX-339 at 2).

On January 10, 2023, Pach Shemen issued to Wilmington the *Direction and Indemnity Agreement Under First Preferred Ship Mortgage Notes Indenture*. (CX-73, the "**January 10 Direction Letter**"). Pursuant to the January 10 Direction Letter, Pach Shemen as the holder of a majority in aggregate principal amount of the outstanding notes, directed Wilmington to retain Dechert as "special litigation and restructuring counsel" to assist Wilmington with its enforcement of Wilmington's rights and remedies under the Indenture. (*Id.* at 1–2). The noteholders further directed Wilmington to "commence and prosecute an action" against the Debtors in the United States District Court for the Southern District of New York (the "**SDNY Action**"), seeking damages "in an amount equal to all unpaid interest and principal on the Notes together with all other unpaid amounts that may be owed or owing under the Indenture and the Notes." (*Id.* at 2).

---

[18] Pach Shemen apparently acquired the notes from BP Holdings C LLC ("**BP**"), Caspian Select Credit Master Fund, Ltd. and certain of its affiliates ("**Caspian**"), Knighthead Master Fund LP and certain of its affiliates ("**Knighthead**"), and Redwood Master Fund Ltd. and certain of its affiliates ("**Redwood**," and collectively with BP, Caspian, and Knighthead, the "**Selling Noteholders**"). (CX-129 at 2).

On July 22, 2024, Pach Shemen and the Selling Noteholders also jointly signed a letter (the "**July 22, 2024 Sale Confirmation Letter**"), reiterating that, to the extent the prior sale was deemed invalid, the Selling Noteholders intended to sell their New Notes to Pach Shemen. (CX-13).

Prior to commencing the SDNY Action as requested in the January 10 Direction Letter, Wilmington confirmed that Pach Shemen did in fact hold a majority of the New Notes by: (i) receiving from Pach Shemen a certificate of interest that certified its holding of the New Notes (the "**Pach Shemen Certificate**")[19] (CX-74); (ii) obtaining reports from the Depository Trust Company, as of January 9, 2023, which "list the institutional custodians holding the [New] Notes, and the amounts of such holdings, as of the date of the reports" (Healy Declaration at ¶ 45(b); DTC Reports); and (iii) obtaining Pach Shemen's account statement from Curvature. (CX-76 (the "**Curvature Account Statements**").

Having satisfied itself that Pach Shemen did in fact hold a majority of the outstanding New Notes under the Indenture, Wilmington commenced the SDNY Action on January 11, 2023, asserting claims for breach of contract under the Indenture and seeking damages for unpaid principal and accrued interest in the amount of $354,159,101.92, as well as for indemnification for expenses and losses incurred in connection therewith. (CX-103).

### H.  THE FEBRUARY 2023 TERMINATION LETTER

On February 2, 2023, Paul Weiss sent the *Notice of Termination of Restructuring Support Agreement* (the "**February 2, 2023 Termination Letter**") to the Debtors on behalf of the consenting noteholders under the Second RSA. (DX-001(H)). The February 2, 2023 Termination Letter specifically: (i) reiterated that the Debtors had been in breach of the Second RSA since November 2019 when they breached the first milestone under the Second RSA; (ii) stated that the parties to the Second RSA had not operated pursuant to its terms since the breach in November 2019; and (iii) notified the Debtors that, for the avoidance of doubt, the February 2,

---

[19] As set forth *supra*, Section (III)(C), Wilmington was entitled to rely "conclusively" upon such certification pursuant to Section 7.02(a) of the Indenture.

2023 Termination Letter was to serve as an official termination notice pursuant to Section

6(a)(ii) of the Second RSA. (*Id.*) Though the February 2, 2023 Termination Letter purports to

have been sent on behalf of the Consenting Noteholders as that term is defined in the Second

RSA, the letter: (i) does not identify any individual noteholders on behalf of whom it is sent; (ii)

is not on Paul Weiss letterhead and does not have a wet ink signature; (iii) does not identify the

source of Paul Weiss' authority to send the February 2, 2023 Termination Letter; and (iv) does

not allege that the February 2, 2023 Termination Letter is supported by the requisite two-thirds in

principal amount outstanding of the New Notes held by the Consenting Noteholders in order to

effectively terminate the Second RSA under Section 6(a)(ii) of the Indenture. (Hadjieleftheriadis

Declaration at ¶¶ 28–30 (citing DX-001(H)).

## I.  <u>THE BANKRUPTCY PROCEEDINGS</u>

On March 8, 2023, the Petitioning Creditors filed involuntary chapter 7 bankruptcy

petitions against the Debtors. (*See* Docket No. 1). The Debtors filed a Motion to Dismiss the

involuntary Chapter 7 petitions on April 14, 2023. (Docket No. 40).

Shortly thereafter, on April 17, 2023, the parties stipulated to relief from the automatic

stay to permit "a trial, any related pre-trial proceedings (including any remaining discovery), any

related post-trial proceedings or briefing, and a final determination or award to be made by the

Arbitrator, including any appeals, with respect to the claims currently pending in the Arbitration .

. . ." (Docket No. 48 at 3).

On June 6, 2023, Wilmington received the *Direction and Indemnity Agreement under

First Preferred Ship Mortgage Notes Indenture, dates as of June 6, 2023*. (CX-78 (the "**June 6,

2023 Direction Letter**")). The June 6, 2023 Direction Letter was signed by two different groups:

(i) persons or entities who were existing holders and/or holders who purchased the New Notes

during the period of December 8, 2022, to January 4, 2023, directly or indirectly from holders in

Group II and continue to hold the New Notes ("**Group I**"); and (ii) persons or entities who were existing holders and/or former holders who divested themselves of all or substantially all of their holdings of the New Notes during the period of December 8, 2022 to January 4, 2023 ("**Group II**," and collectively, with Group I, the "**June 6 Directing Noteholders**"). (*See* June 6, 2023 Direction Letter ). The noteholders in Group I held a majority in aggregate principal amount of the New Notes as of the date of the June 6, 2023 Direction Letter, and the noteholders in Group II held a majority in aggregate principal amount of the New Notes prior to the disputed sale of the New Notes to holders in Group I. (*See* June 6, 2023 Direction Letter ; *see also* Healy Declaration at ¶ 54). Accordingly, the June 6 Directing Noteholders collectively held a majority in aggregate principal amount of the New Notes, "irrespective of whether their sales of the [New] Notes to each other were valid." (Healy Declaration at ¶ 54). The June 6 Directing Noteholders directed Wilmington to join the involuntary bankruptcy proceedings, which Wilmington did on July 5, 2023. (Docket No. 102; CX-78).

On June 8, 2023, Paul Weiss, on behalf of the Consenting Noteholders, and Togut, Segal & Segal ("**Togut**"), on behalf of Pach Shemen, VR Global, and Alpine, sent the Debtors another termination letter (the "**June 8, 2023 Termination Letter**") again purporting to terminate the Second RSA, to the extent it had not already been terminated. (CX-129). The June 8, 2023 Termination Letter reiterated that it was the noteholders' position that the Second RSA had been terminated when the Debtors missed the first milestone back in November 2019, or in the alternative, that the Second RSA was terminated pursuant to the February 2, 2023 Termination Letter. (*Id.* at 4–5). Given that the Debtors had asserted that the February 2, 2023 Termination Letter was invalid because it did not indicate on behalf of whom it was sent or contain any noteholders' wet ink signatures, the June 8, 2023 Termination Letter attempted to cure these

alleged infirmities by containing the signatures of the noteholders as well as VR Global,

"affirming that the February [2,] 2023 Letter was sent on their behalf, eliminating any doubt

about whether Paul Weiss had sufficient authority to send the same and to terminate the [Second

RSA]." (*Id.* at 5). Additionally, the June 8, 2023 Termination Letter indicates that Pach Shemen

and Alpine, as new noteholders, had agreed to be bound by the OCM Stipulation and had

executed joinders pursuant to Section 4(c) of the agreement. (*Id.* at 6).

On September 6, 2023, the Debtors stipulated to conversion of the involuntary Chapter 7

cases into voluntary Chapter 11 cases (the "**Conversion Stipulation**"). (Docket No. 204). The

Conversion Stipulation specified that, *inter alia*: (i) the Petitioning Creditors would not bring a

motion to appoint a Chapter 11 Trustee or motion to limit the Debtors' exclusivity period during

the first 120 days of the Chapter 11 Cases; (ii) the parties would not object to retention of each

other's professionals; (iii) the Debtors agreed not to object to a substantial contribution motion

on behalf of the Petitioning Creditors up to $1.5 million, with the Petitioning Creditors being

able to seek additional amounts subject to any objections filed by the Debtors; (iv) the

Petitioning Creditors agreed not to object to the pre-petition fees of Debtors' counsel up to $2

million; and (v) the parties reserved their rights with respect to "to all causes of action, claims,

and defenses that the parties may assert, including without limitation the Debtors' ability to

object to claims in the Chapter 11" cases. (*Id.* at 9:5–10:22). The Conversion Stipulation was

reflected in a written order on September 25, 2023 (the "**Conversion Order**"). (Docket No.

215).

While the bankruptcy cases progressed, the arbitrator issued the Final Award on

September 29, 2023. (*See generally* Final Award). In the Final Award, the arbitrator found that

the Debtors had properly exercised the option under the BOL to acquire the Gas Preferred Shares

24

by transferring shares of the Symi and the Telendos to Levona. (*Id.* at 34–38). Additionally, the arbitrator assessed nearly $87 million in damages against Levona, Pach Shemen, and Murchinson, because the arbitrator found that, *inter alia*, Murchinson and its proxies: (i) bribed an officer (the former CFO) of Eletson Corporation and Gas to act against Gas' interests; (ii) breached an NDA by communicating directly with Gas financiers and lenders; (iii) intentionally violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the Arbitration; and (v) refused to produce relevant documents in the Arbitration. (*Id.* at 50–52, 56, 62, 69, 99–101). The arbitrator also found that Murchinson, Pach Shemen, and Levona were all alter egos of each other, and that they had worked together to commit the above "intentional and bad faith acts.[20]" (*Id.* at 11, 22, 49–50, 61, 68, 90, 96). Thereafter, Holdings and Eletson Corp. filed a petition in the United States District Court for the Southern District of New York (the "**District Court**" and the "**Confirmation Proceedings**," pending at *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 23-cv-07331-LJL (S.D.N.Y)) to confirm the Final Award. (Confirmation Proceedings at Docket No. 1). Levona filed a cross motion to vacate same. (Confirmation Proceedings at Docket Nos. 28–31).

On October 20, 2023, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**"). (Docket No. 233). The Committee was comprised of Gene B. Goldstein, Aegean Baltic Bank S.A., and Wilmington. (*Id.*)

On November 9, 2023, the Court entered the *Order Establishing Deadlines for Filing Proofs of Claim and Claims Related to Gap Period and Approving Form and Manner of Notice Thereof* (the "**Bar Date Order**"). (Docket No. 264). As is relevant here, the Bar Date Order explicitly provided:

---

[20] As discussed below, these findings were subsequently vacated by the District Court. (*See generally* DX-002(X)).

[A]ny entity, other than an indenture trustee or agent (a "**Debt Instrument Agent**") under any credit agreement or bond or note issued by the Debtors pursuant to an indenture (a "**Debt Instrument**"), that has a claim (a "**Debt Claim**") exclusively relating to the repayment of, or guarantee of repayment of, principal, interest and/or other applicable fees and charges owed under a Debt Instrument; provided, however, that any person or entity that wishes to assert a claim arising out of or relating to a Debt Instrument other than a Debt Claim will be required to file a proof of claim, unless another exception herein applies.

(Bar Date Order at ¶ (6)(g)). The Bar Date Order also specified:

Nothing in paragraph 6(g) hereof shall be deemed to eliminate the requirement that a Debt Instrument Agent file a proof of claim with respect to a Debt Claim. A Debt Instrument Agent may file one proof of claim pursuant to section 501(a) of the Bankruptcy Code, on or before the General Bar Date on account of all Debt Claims arising in connection with a Debt Instrument, which single claim shall be deemed to be asserted by the Debt Instrument Agent on behalf of all holders of such Debt Claims under the said Debt Instrument; provided, that such claim sets forth in reasonable detail the basis and amount of the claim asserted against each Debtor; and provided further any proof of claim filed pursuant the foregoing shall be without prejudice to the rights of any Debtor and any party in interest to (a) object to all or any portion of such claim; or to (b) assert any claims or rights such party may have with respect to any particular holder of a Debt Claim asserted by the Debt Instrument Agent.

(*Id.* at ¶ (7)). As will be discussed at length herein, the Gustafson Claim, Fleishmann/Dorette Claim, Middle East Claim, Wilmington Pre-Petition Claims, Wilmington Administrative Claims, Pach Shemen Claims, VR Global Claims, and Alpine Claims were filed in compliance with the Bar Date Order.

On November 20, 2023, Dechert filed the *Application of the Official Committee of Unsecured Creditors of Eletson Holdings Inc., et al. for an Order Authorizing the Employment and Retention of Dechert LLP as Counsel, Effective as of October 25, 2023* (the "**Dechert Retention Application**"). (Docket No. 273). Attached to the Dechert Retention Application is the *Declaration of Stephen D. Zide in Support of the Application of the Official Committee of Unsecured Creditors of Eletson Holdings Inc., et al. for an Order Authorizing the Employment and Retention of Dechert LLP as Counsel, Effective as of October 25, 2023* (the "**First Zide**

**Declaration**"). (*Id.* at Ex. C). In the First Zide Declaration, Mr. Zide disclosed that Dechert had

previously represented Murchinson and Pach Shemen in connection with the SDNY Action. (*Id.*

at ¶ 26). Dechert claimed that (i) such representation ended on October 24, 2023, (*ie.*, one day

prior to seeking retention by the Committee); (ii) Pach Shemen and Murchinson had agreed to

waive all conflicts related to Dechert's representation of the Committee; and (iii) the waiver

permits Dechert to take positions adverse to Murchinson, Pach Shemen, and any affiliates. (*Id.* at

¶ 27). Likewise, the First Zide Declaration disclosed that Dechert had previously represented

Wilmington in the SDNY Action pursuant to the January 10, 2023 Direction Letter. (*Id.* at ¶ 28).

Dechert stated that such representation also ended on October 24, 2023. (*Id.*)

In a supplemental declaration filed by Dechert in support of the Dechert Retention

Application on December 1, 2023 (the "**Supplemental Zide Declaration**"), Dechert further

stated that it was not aware of the Second RSA at the time Wilmington initiated the SDNY

Action on January 11, 2023, and did not become aware of the Second RSA until January 23,

2023. (Docket No. 304 at ¶ 9).

The District Court issued an *Opinion and Order* on February 15, 2024 (the

"**Confirmation Ruling**"), which confirmed the Final Award in part, but vacated certain portions

of the damages and certain findings made by the arbitrator relating to the liability of Levona,

Pach Shemen, and Murchinson under an alter ego theory. (*See generally* DX-002(X)).

Thereafter, on July 3, 2024, Levona filed a motion for leave to amend its vacatur petition in order

to raise the possibility that the Debtors had withheld from the arbitrator key documents that

allegedly undermine the Debtors' position that the Debtors had exercised their option to purchase

the Gas Preferred Shares from Levona. (Confirmation Proceedings at Docket No. 123). On

September 6, 2024, the District Court granted Levona's motion to amend, stating:

> Crediting the inferences for which Levona argues, the newly-produced documents
> put the lie to Eletson's suggestion that these documents would be irrelevant. The
> documents are highly relevant both to the arbitration and to the proceedings before
> [the District Court]. They tend to show fraud in the arbitration proceeding.

(Docket No. 1084 Ex. A at 16). The District Court went on to state that "Levona has proffered

evidence that would suggest that the [allegedly withheld documents] may be just the tip of the

iceberg and that there may be other relevant documents that would support its claims that

extraordinary circumstances prevented it from filing earlier and that fraud was committed in the

arbitration." (*Id.* at 47). Accordingly, the District Court granted Levona discovery to determine

whether the Final Award "was procured by fraud or undue means." (*Id.*) The Court understands

that these proceedings remain ongoing, and that there is a schedule in place that contemplates the

completion of discovery by January 13, 2025, and the completion of briefing by February 25,

2025. (*See* Creditor Brief Ex. A (the "**District Court Case Management Order**")).

## IV.    LEGAL ANALYSIS

### A.    THE CLAIMS ALLOWANCE PROCESS

Section 502(a) of the Bankruptcy Code provides that any claim for which a timely proof

of claim has been filed is deemed allowed unless a party in interest objects. *See* 11 U.S.C. §

502(a). If an objection is filed to a proof of claim, the court, upon notice and a hearing, must

determine the validity and/or the proper amount of the asserted claim. *See* 11 U.S.C. § 502(b).

Bankruptcy Rule 3001(c)(1) further provides that when a claim is based on a writing, a copy of

the writing shall be filed with the claim. *See* Fed. R. Bankr. P. 3001(c)(1).

Properly filed proofs of claim are entitled to *prima facie* validity pursuant to Bankruptcy

Rule 3001(f). However, "[o]nce an objectant offers sufficient evidence to overcome the *prima*

*facie* validity of the claim, the claimant is required to meet the usual burden of proof to establish

the validity of the claim." *In re Rockefeller Ctr. Properties*, 272 B.R. 524, 539 (Bankr. S.D.N.Y.

2000) (citations omitted). Though properly filed proofs of claim are entitled to *prima facie*

validity, Section 502(b) of the Bankruptcy Code provides that a claim shall not be allowed to the

extent that "such claim is unenforceable against the debtor and property of the debtor, under any

agreement or applicable law for a reason other than because such claim is contingent or

unmatured." *See* 11 U.S.C. § 502(b)(1).

With regard to administrative claims, Section 503(b)(3)(A) of the Bankruptcy Code

permits compensation and reimbursement of expenses to be awarded to creditors that file

involuntary bankruptcy petitions under Section 330(a) of the Bankruptcy Code. *See* 11 U.S.C. §

503(b)(3)(A). Such compensation is limited to "reasonable compensation for professional

services rendered by an attorney . . . based on the time, the nature, the extent, and the value of

such services, and the cost of comparable services other than in a case under this title, and

reimbursement for actual, necessary expenses incurred by such attorney or accountant." 11

U.S.C. § 503(b)(4).

The Court will analyze each of the Objections in turn.

A.  **THE OBJECTION TO DUPLICATIVE CLAIMS**

In the Omnibus Claim Objection, the Debtors assert that the Gustafson Claim and the

Fleishmann/Dorette Claim are duplicative of the Wilmington Claim, and that the Middle East

Claim is duplicative of the Deutsche Bank Claim. (Omnibus Claim Objection at ¶ 15; *see also*

Schedule I attached to the Omnibus Claim Objection).

Pursuant to the Bar Date Order entered in this case, no proof of claim needed to be filed

by "any entity, other than an indenture trustee or agent . . . under any . . . note issued by the

Debtors pursuant to an indenture . . . that has a claim . . . exclusively relating to the repayment

of, or guarantee of repayment of, principal, interest and/or other applicable fees and charges

owed under a Debt Instrument . . . ." (Bar Date Order at ¶ 6(g)). The Bar Date Order further

provides that "[a] Debt Instrument Agent may file one proof of claim pursuant to section 501(a) of the Bankruptcy Code, on or before the General Bar Date on account of all Debt Claims arising in connection with a Debt Instrument, which single claim shall be deemed to be asserted by the Debt Instrument Agent on behalf of all holders of such Debt Claims under the said Debt Instrument." (*Id.* at ¶ 7).

Here, the Court notes that Deutsche Bank and Wilmington filed claims on behalf of all noteholders under the respective indentures as set forth in the above provisions. (*See* Wilmington Pre-Petition Claims; Deutsche Bank Claims). Accordingly, the Court agrees with the Debtors that the Gustafson Claim, Fleishmann/Dorette Claim, and Middle East Claim are duplicative. The Court also notes that no responses were received to the Omnibus Claim Objection. Accordingly, the Omnibus Claim Objection is SUSTAINED and Claim Nos. 1, 3, and 15 in the Holdings case are disallowed in their entirety.

## B.  <u>THE OBJECTION TO WILMINGTON CLAIMS</u>

The next objection pending before the Court is the Objection to Wilmington Claims. The Wilmington Claims fall into two categories. First, the Wilmington Pre-Petition Claims stem from the Debtors' purported obligations under the Indenture. (*See generally* Wilmington Pre-Petition Claims). The Wilmington Pre-Petition Claims are identical as to each Debtor and were filed as secured claims in the amount of $366,911,815.96. (*Id.*) The second category of claims filed by Wilmington is administrative claims filed under Section 507(a)(2) of the Bankruptcy Code, asserted in the amount of $1,872,764.44 against each Debtor. (*See generally* Wilmington Administrative Claims).

With regard to the Wilmington Claims, the Debtors generally assert in the Objection that: (i) the Wilmington Pre-Petition Claims are improperly asserted as fully secured claims (Objection to Wilmington Claims at ¶¶ 25–27); (ii) the Wilmington Pre-Petition Claims should

be reduced to the extent they seek recovery for any entities or persons that are not noteholders
(*id.* at ¶¶ 28–29); (iii) the Wilmington Pre-Petition Claims are inconsistent with the Debtors'
books and records (*id.* at ¶ 30); and (iv) Wilmington is not entitled to reimbursement for fees,
costs, and expenses as a result of Wilmington's negligence, willful misconduct, or bad faith. (*Id.*
at ¶¶ 31–34). Additionally, with regard to the Wilmington Administrative Claims, the Debtors
argue that Wilmington has not provided any basis for reimbursement of its fees or expenses as
required under the Bankruptcy Code. (*Id.* at ¶¶ 35–42). Finally, the Debtors generally object to
all of Wilmington's claims until all affirmative claims that the Debtors have against Wilmington
have been resolved. (*Id.* at ¶¶ 43–45).

In response, Wilmington asserts that: (i) the Objection to the secured status of the
Wilmington Pre-Petition Claims is either frivolous or moot (Wilmington Preliminary Response
at ¶ 44); (ii) the portion of the Objection that states that Wilmington cannot recover on behalf of
entities that allegedly improperly purchased the notes ignores the representative capacity in
which the Wilmington Pre-Petition Claims were filed on behalf of all noteholders (Wilmington
Preliminary Response at ¶¶ 45–61; Wilmington Final Response at ¶¶ 1–3); (iii) the portion of the
Objection stating that the Wilmington Pre-Petition Claims are inconsistent with the Debtors'
books and records should be overruled because the Debtors provide no explanation showing their
calculation (Wilmington Preliminary Response at ¶¶ 62–66; Wilmington Final Response at ¶¶ 4–
5); (iv) the portion of the Objection seeking disallowance of the Wilmington Pre-Petition Claims
based on bad acts and affirmative claims should be overruled because they are not cognizable
under the indenture and are unsupported by the evidence. (Wilmington Preliminary Response at
¶¶ 67–75; Wilmington Final Response at ¶¶ 6–16); and (v) the portion of the Objection to the
Wilmington Administrative Claims should be overruled because Wilmington spent substantial

time assisting with the involuntary cases and can provide timesheets to back up its time. (Wilmington Preliminary Response at ¶¶ 76–83; Wilmington Final Response at ¶¶ 17–21).

In the PC Joinder in Support of Wilmington Claim and the PC Final Opposition, the Petitioning Creditors further argue that: (i) the Wilmington Claims are allowable in full because the Indenture and Bar Date Order permit Wilmington to file a claim on behalf of all Noteholders (PC Joinder in Support of Wilmington Claim at ¶¶ 1–6); (ii) there is no basis in Section 502(b) of the Bankruptcy Code to object to a proof of claim on the basis of a creditor's identity and that a dispute regarding who validly owns the notes would be between noteholders, not between the Debtors and the noteholders (PC Joinder in Support of Wilmington Claim at ¶¶ 8–16; PC Final Opposition at ¶¶ 8–11); (iii) Section 303(b) does not provide a basis to object to a creditor's claim (PC Joinder in Support of Wilmington Claim at ¶¶ 17–26; PC Final Opposition at ¶¶ 1–7); (iv) the Petitioning Creditors validly hold the New Notes (PC Joinder in Support of Wilmington Claim at ¶¶ 27–28; PC Final Opposition at ¶¶ 12–39); and (v) neither Wilmington nor the Petitioning Creditors acted in bad faith (PC Final Opposition at ¶¶ 40–49).

In the Reply in Support of Wilmington Claim Objection, the Debtors assert that: (i) bad faith is a proper basis to object to Wilmington's claims because the Debtors reserved their rights to argue bad faith, and because bad faith is relevant to both the Wilmington Pre-Petition Claims and the Wilmington Administrative Claims (Reply in Support of Wilmington Claim Objection at ¶¶ 13–31); and (ii) Wilmington's claims must be reduced because Wilmington incorrectly calculated the amounts due under the notes, and Wilmington appears to seek compensation twice for its fees and expenses. (*Id.* at ¶¶ 32–45).

In the Wilmington Surreply, Wilmington asserts that: (i) it does not seek to be compensated twice for fees and expenses (Wilmington Surreply at ¶¶ 1–6); and (ii)

Wilmington's invoices support the amount sought in the Wilmington Pre-Petition Claims (*id.* at ¶¶ 7–9).

The Court will address these issues in turn.

### 1.  The Wilmington Pre-Petition Claims Should Be Reclassified as General Unsecured Claims

As set forth above, the Debtors' first argument is that the Wilmington Pre-Petition Claims are improperly asserted as fully secured claims. (Objection to Wilmington Claims at ¶¶ 25–27). The Debtors argue that each of the claims are unsecured claims because the holders of the obligations under the Indenture exercised rights under the Strict Foreclosure Agreement in June 2019, and accordingly, to the extent any collateral remains following the Strict Foreclosure Agreement, it has not been identified in the Wilmington Pre-Petition Claims. (*Id.*). The Debtors also note that Wilmington is a member of the Committee, indicating that Wilmington is an unsecured creditor, but that Wilmington did not file an unsecured claim. (*Id.* at ¶ 26). Accordingly, the Debtors assert that the Wilmington Pre-Petition Claims should not be allowed until a full investigation into Wilmington's conduct (in seeking to be a member of the Committee) is investigated, or at a minimum, that the Wilmington Pre-Petition Claims should be reclassified as general, unsecured claims. (*Id.* at ¶ 27).

In response, Wilmington points out that the Wilmington Pre-Petition Claims expressly state that such claims were filed as "secured claim[s] except to the extent that the [c]ollateral is insufficient to satisfy the amounts claim[ed]" and that the Wilmington Pre-Petition Claims were "also filed as a general unsecured claim as to any deficiency on the amounts claimed . . . ." (Wilmington Preliminary Response at ¶ 44 (citing Prepetition Claim Addendum at ¶¶ 48–49)). Moreover, Wilmington asserts that it made clear that it did not believe the remaining collateral has any value, and accordingly, that such claims are fully unsecured. (*Id.*). Accordingly,

Wilmington states in the Preliminary Response that it has no objection to the reclassification of the Wilmington Pre-Petition Claims to the extent the collateral has no value. (*Id.*).

Here, the Court agrees with the Debtors insofar as the Wilmington Prepetition Claims should be reclassified as general unsecured claims to the extent the collateral securing such claims has no value. As Wilmington does not appear to dispute that there is no collateral remaining to secure its claims, the Court sustains this portion of the Objection to Wilmington Claims and finds that the Wilmington Pre-Petition Claims should be reclassified as general unsecured claims.

### 2. The Wilmington Pre-Petition Claims Should Not Be Reduced Because They Do Not Seek Recovery for any Entities or Persons That Are Not Noteholders

Next, the Debtors argue that the Wilmington Pre-Petition Claims should be reduced because Wilmington seeks recovery on behalf of entities or persons that are not proper noteholders, and thus such claims are unenforceable against the Debtors pursuant to Section 502(b)(1) of the Bankruptcy Code. (Objection to Wilmington Claims at ¶¶ 28–29). Specifically, the Debtors assert that Pach Shemen and Alpine are not noteholders because their acquisition of notes issued under the Indenture was void *ab initio* pursuant to the Second RSA and the OCM Stipulation. (*Id.* at ¶ 28). Accordingly, the Debtors object to the Wilmington Pre-Petition Claims to the extent they seek recovery on behalf of entities that are not valid noteholders under the Indenture (namely, Pach Shemen and Alpine). (*Id.*). The Debtors also argue that Wilmington should be compelled to disclose a complete list of noteholders on behalf of whom it asserts the Wilmington Pre-Petition Claims. (*Id.* at ¶ 29).

In response, Wilmington argues that: (i) the Wilmington Pre-Petition Claims were filed on behalf of the class of noteholders under the Indenture, not on behalf of Pach Shemen or Alpine (Wilmington Preliminary Response at ¶ 46); (ii) the identity of the claimant is not one of

the enumerated bases for disallowance specified in Section 502(b) of the Bankruptcy Code

(Wilmington Preliminary Response at ¶¶ 46, 54–61; Wilmington Final Response at ¶ 1); and (iii)

Wilmington is not obligated (or even able) to determine the identity of specific noteholders of

the notes on behalf of whom Wilmington asserted a representative, collective claim under the

Bar Date Order. (Wilmington Preliminary Response at ¶¶ 47–53).

Additionally, the Petitioning Creditors argue that the Wilmington Pre-Petition Claims

should be allowed in full because: (i) the Bar Date Order and the Indenture permit Wilmington to

file the Wilmington Pre-Petition Claims on behalf of all noteholders (PC Joinder in Support of

Wilmington Claim at ¶¶ 1–6); (ii) the New Notes remain unpaid regardless of the identity of the

noteholders and Section 502(b) of the Bankruptcy Code does not permit objections to claims

based on the identity of the creditor (*id.* at ¶¶ 7–16); (iii) the Petitioning Creditors validly

purchased the New Notes because the Debtors incurably breached and abandoned the Second

RSA and the Second RSA was validly terminated pursuant to the February 2, 2023 Termination

Letter (PC Final Opposition at ¶¶ 20–33); and (iv) Pach Shemen and Alpine properly signed

joinders to the OCM Stipulation. (*Id.* at ¶¶ 34–35).

### a) The Wilmington Pre-Petition Claims Were Filed on Behalf of All Noteholders, Regardless of Identity

The Court agrees with Wilmington and the Petitioning Creditors. As a threshold matter,

the Court notes that the Wilmington Pre-Petition Claims expressly provided that they were filed

on behalf of Wilmington as trustee under the Indenture, in its representative capacity on behalf of

all holders of the New Notes. (Wilmington Pre-Petition Claim Addendum at ¶ 9). Wilmington

was authorized to file such a claim by both the express terms of the Indenture and also by the Bar

Date Order entered in this case. Indeed, Section 6.09 of the Indenture states:

> Trustee May File Proofs of Claim. The Trustee is authorized to file such proofs of
> claim and other papers or documents as may be necessary or advisable in order to

have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their respective agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuers (or any other obligor upon the Notes), their creditors or their property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee . . . .

(Amended Wilmington Pre-Petition Claims at 148).

Further, the Bar Date Order expressly provides that no proof of claim needed to be filed by "any entity, other than an indenture trustee or agent . . . under any . . . note issued by the Debtors pursuant to an indenture . . . that has a claim . . . exclusively relating to the repayment of, or guarantee of repayment of, principal, interest and/or other applicable fees and charges owed under a Debt Instrument . . . ." (Bar Date Order at ¶ 6(g)). The Bar Date Order further provides that "[a] Debt Instrument Agent may file one proof of claim pursuant to section 501(a) of the Bankruptcy Code, on or before the General Bar Date on account of all Debt Claims arising in connection with a Debt Instrument, which single claim shall be deemed to be asserted by the Debt Instrument Agent on behalf of all holders of such Debt Claims under the said Debt Instrument." (*Id.* at ¶ 7). Thus, the Court finds that Wilmington was authorized by both the Indenture and the Bar Date Order to file the Wilmington Pre-Petition Claims on behalf of the class of noteholders.

Additionally, as argued by Wilmington and the Petitioning Creditors, Section 502(b) of the Bankruptcy Code does not permit objections to validly filed claims based purely on the identity of a creditor. As set forth above, Section 502(b)(1) of the Bankruptcy Code—the only provision raised by the Debtors—provides that claims should not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement

or applicable law for a reason other than because such claim is contingent or unmatured." *See* 11 U.S.C. § 502(b)(1).

In *In re Roby*, the court addressed the issue of whether Section 502(b)(1) of the Bankruptcy Code permits a debtor to object to a proof of claim that had been assigned to another party. *See In re Roby*, No. 06-10668, 2008 WL 2357338 (Bankr. N.D. Cal. June 9, 2008). In that case, the debtor objected to a mortgage claim pursuant to Section 502(b)(1) on the basis that the claim had been assigned to another party, rendering the creditor "no longer a real party in interest." *Id.* at *1. In overruling the debtor's objection, the court first noted that "Section 502(b) of the Bankruptcy Code mandates that the court allow a claim unless one of nine enumerated grounds for disallowance is found." *Id.* The court went on to state that a "claim is not unenforceable merely because the wrong party may be asserting it" and that the debtor had "no standing to contest the assignment of the claim to" the third party. *Id.* at *2. The court further stated that the proper remedy for the debtor to address a purported dispute regarding ownership of a claim "is to interplead the funds and walk away, not object to the claim." *Id.*

Here, the Debtors do not, and cannot, dispute that the underlying debt owed pursuant to the Indenture and the New Notes remains unpaid. Accordingly, as in *Roby*, and as noted by Wilmington, "[e]ven if Pach Shemen and Alpine do not own their [n]otes" because their purchase was allegedly void *ab initio*, "someone does, and the identity of the beneficial owners is irrelevant to the validity of the Pre-Petition [] Claims." (Wilmington Preliminary Response at ¶ 58).

For these reasons, the Court declines to compel Wilmington to identify each noteholder on behalf of whom the Wilmington Pre-Petition Claims were filed. Such a production may be impossible in any event, because as Wilmington states, the mechanics for issuance and transfer

of the notes under the Indenture do not, and are not intended to, enable Wilmington to identify the noteholders at any time. (Wilmington Preliminary Response at ¶¶ 48–50 (noting that, under Section 2.06(b) of the Indenture, "the transfer and exchange of beneficial interests in the Global Notes are effected through a financial intermediary, the Depositary (DTC), in accordance with the provisions of the Indenture and the Applicable Procedures, and not through the Trustee")).

    **b)** <u>**Pach Shemen & Alpine Validly Purchased the Notes and Their Purchases are not Void *Ab Initio***</u>

Notwithstanding the above ruling, the Court also finds that Pach Shemen & Alpine validly purchased the New Notes, and that their purchase of the New Notes is not void *ab initio* for several reasons.

First, as argued by the Petitioning Creditors, it appears that the Second RSA was long ago abandoned by the parties. Under New York law, "[r]escission of a contract by abandonment requires the mutual assent of the parties." *Jones v. Hirschfeld*, 348 F. Supp. 2d 50, 59–60 (S.D.N.Y. 2004) (citations omitted). "A contract will be treated as abandoned when one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior." *Savitsky v. Sukenik*, 240 A.D.2d 557, 559 (1997) (citations omitted); *see also C3 Media & Mktg. Grp., LLC v. Firstgate Internet, Inc.*, 419 F. Supp. 2d 419, 433 (S.D.N.Y. 2005). Indeed, "the refusal of one party to perform his contract amounts to an abandonment of it, leaving the other party to his choice of remedies, but his assent to abandonment dissolves the contract so that he can neither sue for a breach nor compel specific performance." *Id.*

Importantly, such intention "need not be manifested expressly," and can "be inferred from attendant circumstances and conduct of the parties." *Jones v. Hirschfeld*, 348 F. Supp. 2d at 59–60 (citations omitted); *EMF Gen. Contracting Corp. v. Bisbee*, 6 A.D.3d 45, 49, 774 N.Y.S.2d 39, 43 (2004) (noting that "[a] contract will be treated as abandoned when one party

acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior"). However, when the conduct of the parties forms the basis of establishing abandonment, the parties' actions must be "positive, unequivocal and inconsistent with an intent to be further bound by the contract." *Jones v. Hirschfeld*, 348 F. Supp. 2d at 60 (citations omitted). "Generally, a finding of an abandonment will be based upon clear, affirmative conduct by at least one of the parties that is entirely at odds with the contract." *Id.* (citing *EMF Gen. Contracting Corp. v. Bisbee*, 6 A.D.3d at 50, 774 N.Y.S.2d at 43). Importantly, the party asserting abandonment has the burden of proving it, and abandonment will not be presumed. *In re Firestar Diamond, Inc.*, No. 18-10509 (SHL), 2020 WL 1907537, at *2 (Bankr. S.D.N.Y. Apr. 17, 2020). The "mere fact that a party breaches its agreement with another is insufficient to establish abandonment." *AEB & Assocs. Design Grp., Inc. v. Tonka Corp.*, 853 F. Supp. 724, 733 (S.D.N.Y. 1994)

Here, the Court finds that the Second RSA was abandoned by the parties. As set forth above, the Second RSA contained numerous milestones, the first of which provided that the Debtors were to enter into a memorandum of agreement with respect to the sale of the Salamina by October 31, 2019. (Second RSA at Ex. C). The Second RSA also provided that it could be terminated by noteholders holding at least two-thirds in principal amount outstanding of the New Notes, upon the occurrence of a Termination Event, which included the failure of the Debtors to meet any milestone in the Second RSA. (*Id.* at § (6)(a)(ii)).

The Debtors do not dispute that they failed to enter into a memorandum of understanding regarding the sale of the Salamina within the timeframes contemplated by the Second RSA. (Hadjieleftheriadis Declaration at ¶¶ 21–22; Kertsikoff Declaration at ¶ 14). Indeed, it does not

appear that a single milestone under the Second RSA was ever met by the Debtors. (*See* PC Final
Opposition at ¶¶ 21, 27).

Though the Consenting Noteholders initially sought performance from the Debtors by
sending the November 2019 Direction Letter, it does not appear that the Consenting Noteholders
otherwise made any effort to seek performance thereunder. (November 2019 Direction Letter;
PC Final Opposition at ¶ 29). In fact, as the Debtors themselves noted, when the Salamina was
ultimately sold in April 2021 (nearly one and a half years late), the proceeds of the sale were not
distributed in accordance with Section 5(c) of the Second RSA, and instead, were "allocated
either to pay down debt ($38,000,000) or to fund on-going operations ($3,500,000)."
(Hadjieleftheriadis Declaration at ¶ 14). This is important because the Debtors also state that
"information about the sale of the Salamina was readily available in the public domain and in
industry-specific publications and available reports" and that "[a]t no time did any of the
Consenting Noteholders object, declare a breach, or take action of any sort related to the sale of
any Debtor's interests in the Salamina . . . ." (*Id.* at ¶¶ 15–16).

The December 27, 2019 restructuring proposal and January 2020 Letter also appear
consistent with abandonment. Indeed, the December 27, 2019 restructuring proposal
contemplated termination or amendment of the Second RSA, entry into a new or revised RSA,
and a voluntary Chapter 11 bankruptcy filing pursuant to a pre-packaged plan that would vest
70% of the Debtors' equity in a group of noteholders. (CX-222; CX-223). The January 2020
Letter further specified that, because of the Debtors' breach of the Second RSA and failure to
consummate any proposed restructuring, the noteholders reserved their "rights to exercise all
remedies and assert all claims available under the Indenture and under applicable law, including .
. . the right to commence an involuntary bankruptcy case against Holdings," notwithstanding the

40

fact that an involuntary bankruptcy case would likely have been prohibited by the Second RSA.
(*Id.*)

The fact that the Consenting Noteholders did not seek to enforce the Second RSA by seeking specific performance or suing for breach of contract is consistent with other cases where courts have found abandonment. *Savitsky v. Sukenik*, 240 A.D.2d at 559 (finding abandonment where the plaintiff acquiesced to the defendant's breach when upon discovering the "impending sale of [a] property to a third party, she took no steps to enforce or preserve her rights under the contract . . . [but instead] merely demanded the return of her down payment . . . consistent with [an] earlier demand . . . and the record [did] not reveal that either party made a bona fide effort to either tender or demand the tender of performance"); *see also Jones v. Hirschfeld*, 348 F. Supp. 2d 50, 61 (S.D.N.Y. 2004) (finding abandonment under New York law where plaintiff did not attempt to enforce the contract until four years after the breach, during the course of litigation, and despite her "previous unequivocal manifestations of intent to abandon"); *Chowdhury v. Thomas*, 186 A.D.3d 794, 795 (2020) (finding abandonment where the plaintiff failed to enforce a contract for 20 years); *Dutch v. Basile*, 170 A.D.2d 966, 566 N.Y.S.2d 801 (1991) (finding abandonment where the plaintiff sought a new agreement upon discovering a default rather than seeking to enforce the prior agreement, and where the plaintiff never sought specific performance); *In re Schanzer's Est.*, 7 A.D.2d 275, 278, 182 N.Y.S.2d 475, 479 (1959), *aff'd sub nom. Matter of Schanzer's Est.*, 8 N.Y.2d 972, 169 N.E.2d 11 (1960) (finding abandonment of a prior agreement where the parties to the agreement negotiated a new agreement inconsistent with prior agreement without ever mentioning the prior agreement).

Indeed, the Chapter 11 plan that the Debtors proposed (*see* Docket No. 1111) is itself inconsistent with the Second RSA. (*See* September 9 Transcript at 73:16–74:18 (noting that

41

Section 22 of the Second RSA required specific performance, and that the Second RSA Term

Sheet contemplated, *inter alia*, the provision of 70% of the equity in Holdings to the

Noteholders*; see also* Second RSA at § 22; Second RSA Term Sheet)). No party has sought to

enforce these provisions here or elsewhere. For all these reasons, the Court finds that the Second

RSA was abandoned.

Even if the Second RSA had not been abandoned, it was terminated by the February 2,

2023 Termination Letter. As set forth above, the February 2, 2023 Termination Letter: (i)

reiterated that the Debtors had been in breach of the Second RSA since November 2019 (more

than three years earlier) when they breached the first milestone under the Second RSA; (ii) stated

that the parties to the Second RSA have not operated pursuant to its terms since the breach in

November 2019; and (iii) notified the Debtors that, for the avoidance of doubt, the February 2,

2023 Termination Letter was to serve as an official termination notice pursuant to Section

6(a)(ii) of the Second RSA. (DX-001(H)).

The Debtors assert that the February 2, 2023 Termination letter did not identify on behalf

of whom it was sent, and therefore it is ineffective because it was not sent on behalf of the

requisite Consenting Noteholders holding at least two-thirds in principal outstanding under the

New Notes. (Reply in Support of Wilmington Claim Objection at ¶ 42). However, this argument

fails for two reasons. First, the Debtors do not point to any provision of the Second RSA that

required a termination notice to identify with specificity on behalf of whom it is sent. Tellingly,

no Consenting Noteholder has come forward to argue that they did *not* in fact request

termination of the Second RSA.

Second, any doubt that the Consenting Noteholders had the requisite authority to

terminate the Second RSA (even assuming it had not been previously abandoned) through the

February 2, 2023 Termination Letter was resolved by the June 8, 2023 Termination Letter, which

contains the "signatures of the Selling Noteholders as well as VR Global affirming that the

February 2023 Letter was sent on their behalf, eliminating any doubt about whether Paul Weiss

had sufficient authority to send the same and to terminate the Restructuring Support Agreement."

(*See* June 8, 2023 Termination Letter). Indeed, the Court notes that the June 8, 2023 Termination

Letter is signed by holders of $218,454,802 of outstanding notes. (*Id.*) As the Debtors are aware,

the amount of New Notes held by the Consenting Noteholders totals $269,539,090, meaning that

the June 8, 2023 Termination Letter, and by extension the February 2, 2023 Termination Letter,

were executed by holders of 81% of the New Notes. (*See* Reply in Support of Wilmington Claim

Objection at ¶ 42 n.5). Such consent clearly exceeds the two-third threshold required to terminate

the Second RSA.

Assuming *arguendo*, that the Second RSA was not terminated until February 2, 2023

(even though the Court finds that it had been abandoned prior to that date), Pach Shemen and the

Selling Noteholders also executed the July 22, 2024 Sale Confirmation Letter, reiterating that the

Selling Noteholders intended to sell their New Notes to Pach Shemen in the event the initial sale

was deemed void *ab initio*. (CX-13). Such sale would necessarily have occurred after both the

February 2, 2023 Termination Letter, and June 8, 2023 Termination Letter.[21] Accordingly, Pach

Shemen and Alpine's acquisition of the New Notes was not void *ab initio* in any event.[22]

---

[21] The July 22, 2024 Sale Confirmation Letter also defeats the Debtors' arguments that the sale of the New Notes to
Pach Shemen and Alpine are void *ab initio* pursuant to the OCM Stipulation. The OCM Stipulation provided that
sales of New Notes are void *ab initio* unless the purchaser of the New Notes executes a joinder to the OCM
Stipulation as a condition precedent to the sale. (OCM Stipulation at § (4)(a)–(b)). Here Pach Shemen and Alpine
executed a joinder to the OCM Stipulation on April 28, 2023 (*see* CX-127–128), after they purportedly first acquired
the New Notes, but before the July 22, 2024 Sale Confirmation Letter. Accordingly, to the extent necessary, the
Court finds that the July 22, 2024 Sale Confirmation Letter renders Pach Shemen and Alpine's acquisition of the
New Notes effective under the OCM Stipulation.

[22] As set forth above, the Court principally finds that the Second RSA was abandoned well before Pach Shemen and
Alpine acquired the New Notes. However, whether the Debtors may hold claims against Pach Shemen and Alpine if

Finally, even if the Second RSA had not been abandoned or terminated, the Debtors

cannot enforce the covenant against transfer of the New Notes because the Debtors have failed to

comply with each milestone under the Second RSA. (*See* PC Final Opposition at ¶ 33). "Under

New York law, when a party to a contract materially breaches [a] contract, it cannot then enforce

that contract against a non-breaching party." *Nadeau v. Equity Residential Properties Mgmt.*

*Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) (citing *In re Lavigne*, 114 F.3d 379, 387 (2d

Cir. 1997). A breach is material when it "substantially defeats the purpose of that contract." *Id.*

(citing *Lavigne*, 114 F.3d at 387); *see also Barbagallo v. Marcum LLP*, 925 F. Supp. 2d 275, 287

(E.D.N.Y. 2013), *aff'd,* 552 F. App'x 102 (2d Cir. 2014) (citing Restatement (Second) of

Contracts § 241 (1981) (listing circumstances that are significant for determining materiality of a

breach, including "the extent to which the injured party will be deprived of the benefit which he

reasonably expected" and "the extent to which the behavior of the party failing to perform or to

offer to perform comports with standards of good faith and fair dealing")).

The purpose of the Second RSA was to negotiate a comprehensive restructuring of the

Debtors' obligations under the Indenture and the New Notes through an out of court transaction,

or alternatively, through a voluntary Chapter 11 bankruptcy filing. (*See generally* Second RSA).

The Second RSA included many milestones, setting forth the time and manner within which the

restructuring would be completed. (*Id.* at Exhibit C). The Debtors failed to comply with a single

milestone thereunder. In fact, the only reason these cases were filed in the first instance was

because of the very transfer of the New Notes to the Petitioning Creditors that the Debtors now

complain of. Accordingly, the Court finds that the Debtors cannot now enforce the covenant

---

the Second RSA had not been terminated until February 2, 2023 remains an open issue, even though Pach Shemen
and Alpine would still be valid noteholders under such scenario.

against transfer of the New Notes against the noteholders, as the Debtors have materially

breached the Second RSA.

For all these reasons, the Court finds that Pach Shemen and Alpine are valid noteholders.

### 3. The Debtors' Books and Records Objection Does Not Rebut the Debtors' Burden to Dispute Wilmington's *Prima Facie* Claim

Next, the Debtors argue that the Wilmington Pre-Petition Claims are inconsistent with the

Debtors' books and records. (Objection to Wilmington Claims at ¶ 30).

In response, Wilmington asserts that this portion of the Objection should be overruled

because the Debtors provide no explanation showing their calculation and how it differs from

Wilmington's calculation. (Wilmington Preliminary Response at ¶¶ 62–66; Wilmington Final

Response at ¶¶ 4–5).

In the Reply in Support of Wilmington Claim Objection, the Debtors assert that their

calculations: (i) are "accurately set forth in the Debtors' books and records, which were produced

in discovery subsequent to the filing of Wilmington's proof of claim;" and (ii) are consistent

with the parties' correspondence. (Reply in Support of Wilmington Claim Objection at ¶ 35

(additional citations omitted)). The Debtors also assert that Wilmington has not provided any

meaningful evidence to refute the Debtors' calculations. (*Id.*)

Here, the Court agrees with Wilmington: the Debtors have not provided evidence

sufficient to rebut the *prima facie* validity of the Wilmington Pre-Petition Claims.

As set forth above, Section 502(a) of the Bankruptcy Code provides that any claim for

which a timely proof of claim has been filed is deemed allowed unless a party in interest objects.

*See* 11 U.S.C. § 502(a). If an objection is filed to a proof of claim, the court, upon notice and a

hearing, must determine the validity and/or the proper amount of the asserted claim. *See* 11

U.S.C. § 502(b). Importantly, Courts in this district have held that boilerplate books and records

objections, without more, do not rebut the *prima facie* validity of a claim because they fail to rebut at least one essential element of the claim. *In re Residential Cap., LLC*, No. 12-12020 (MG), 2014 WL 1058921, at *5 (Bankr. S.D.N.Y. Mar. 17, 2014).

First, the Court notes that Wilmington provided a detailed mathematical computation showing how it calculated its claim, in addition to the narrative provided in the Healy Declaration explaining Wilmington's calculations. (*See* Amended Wilmington Pre-Petition Claims; Healy Declaration at ¶¶ 8–32). While the Debtors allege that they provided their computations to Wilmington during discovery, the Debtors have not offered those computations to the Court. Instead, the Kertsikoff Declaration attaches several email chains that the Debtors claim proves that their calculations "are consistent with the Indenture and the parties' correspondence." (Reply in Support of Wilmington Claim Objection at ¶ 35 (citing Kertsikoff Declaration at ¶ 23; *id.* at Ex. 1, Ex. 5)). However, none of these exhibits disclose how or why Wilmington's claim is incorrect. (*See* Kertsikoff Declaration at Ex. 1, email sent on 4/7/2020 at 14:25 from Marina Orfandoudaki at Eletson to Raye Goldsborough at Wilmington ("I am looking forward to your reply for the interest/accrued interest/outstanding amount of the bond")).

Additionally, in the Healy Declaration, Wilmington notes several errors in the Debtors' calculation of outstanding principal and interest under the New Notes, including that:

(i)      Debtors only included the Trailing TCE interest for part of the time that the debt was outstanding and at the wrong interest rate;

(ii)     Debtors did not calculate the Default Interest Rate of 1% on the principal amount, but rather on the existing interest due at any given interest period;

(iii)    Debtors contend that the $130 million principal reduction under the Strict Foreclosure Agreement occurred on or about August 9, 2019, rather than June 24, 2019, and Debtors do not explain how they arrived at that date;

(iv)     Debtors calculate the days during their payment periods incorrectly (per the Indenture, the calculations are 30 days/month and 360 days/year); and

(v)      Debtors cease interest accrual on January 1, 2022, rather than on the Conversion Date.

(Healy Declaration at ¶ 40). The Debtors have offered no evidence in response to these issues.

Accordingly, the Court finds that the Debtors have not rebutted the validity of the Wilmington

Pre-Petition Claims. *See In re Residential Cap., LLC*, 2014 WL 1058921, at *5.

### 4.   **Wilmington Did Not Act in Bad Faith**

Next, the Debtors argue that Wilmington is not entitled to reimbursement for fees, costs,

and expenses under Section 7.07 of the Indenture as a result of Wilmington's alleged negligence,

willful misconduct, or bad faith. (Objection to Wilmington Claims at ¶¶ 31–34). Specifically, the

Debtors assert that since "January 2023, Wilmington has improperly taken express direction

from Pach Shemen, as the purported holder of a majority of the notes issued under the Indenture"

even though Wilmington knew of the existence of the Second RSA and its prohibition on efforts

to collect on the indebtedness under the Indenture. (*Id.* at ¶ 32). Accordingly, the Debtors

"request that Wilmington be required to disclose further details to substantiate the costs, fees and

expenses for which it seeks reimbursement, and further requests that any costs, fees and expenses

incurred at the direction of Pach Shemen or with the assistance of Dechert [] be disallowed." (*Id.*

at ¶ 33).

In response, Wilmington first asserts that Wilmington is authorized and empowered as

Trustee under the Indenture to exercise remedies against the Debtors in the case of default,

including by instituting a judicial proceeding, and it may do so with or without direction from the

noteholders themselves. (Wilmington Preliminary Response at ¶ 70 (citing Wilmington Pre-

Petition Claims Ex. A, §§ 6.03 and 6.08)). Moreover, Wilmington notes that, pursuant to the

Indenture, if Wilmington takes direction from holders, it "need not investigate any fact or matter

stated in any . . . certificate [or] statement" and "may conclusively rely and shall be fully

protected in acting or refraining from acting upon" any such documents." (Wilmington

Preliminary Response at ¶ 70 (citing Wilmington Pre-Petition Claims at §§ 7.02, 10.01(e)).

Notwithstanding these provisions, Wilmington asserts that in this instance, it did in fact verify the information provided by Pach Shemen prior to filing the SDNY Action and confirmed that Pach Shemen was a noteholder through its brokerage statement and the DTC reporting system. (Wilmington Preliminary Response at ¶ 70).

Likewise, with regard to joining the involuntary bankruptcy proceedings, Wilmington notes that, in the Arbitration Confirmation Proceedings, the District Court has already found that creditors have a right to file for bankruptcy relief and further ruled that:

> As it turns out, [the Petitioning Creditors'] petition was well founded. The involuntary bankruptcy was not dismissed. Holdings ultimately agreed to file a motion converting the bankruptcy proceeding to a voluntary case under Chapter 11 and the interests of the creditors are being protected. In the bankruptcy, Holdings agreed to pay the fees of the involuntary creditors. There was no finding, nor apparently could there have been one, by the bankruptcy court that the involuntary petitions did not qualify or that the petition was filed in bad faith. Had Pach Shemen not joined in the relief requested by the other creditors, the bankruptcy court might never have been in the position to accord such relief. The congressional purpose underlying Section 303 would have been thwarted.

(Wilmington Preliminary Response at ¶¶ 72–73 (citing Confirmation Ruling at 97, 108-109); Wilmington Final Response at ¶ 11) (internal citations omitted)). Wilmington also notes that, in joining the involuntary petitions, Wilmington acted pursuant to the June 6 Direction Letter, which:

> was signed by 31 entities holding a majority in aggregate principal amount of the Notes, irrespective of whether the sale of Notes to one or more of the Original Petitioning Creditors was valid. The directing Noteholders included 18 holders of more than 77% of the Notes in the aggregate, as well as 13 holders who collectively held more than 58% of the Notes prior to the disputed sales.

(Wilmington Preliminary Response at ¶¶ 36, 74; Wilmington Final Response at ¶¶ 18).

Accordingly, Wilmington asserts that "regardless of whether the sale of Notes to the Original Petitioning Creditors was valid, [Wilmington] received direction from the requisite majority required for Noteholders to direct the 'time, method and place of conducting any proceeding for

exercising any remedy available to the Trustee' pursuant to Section 6.05 of the Indenture."
(Wilmington Preliminary Response at ¶ 36). In any event, Wilmington asserts that Debtors'
arguments that Wilmington acted in bad faith under Section 303 of the Bankruptcy Code in
bringing the involuntary petitions are moot because the Debtors voluntarily converted these cases
to Chapter 11. (Wilmington Final Response at ¶¶ 6–10).

In the Reply in Support of Wilmington Claim Objection, the Debtors further argue that
their right to seek disallowance of Wilmington's claim for bad faith is not moot because: (i) the
Debtors reserved their rights to argue bad faith when they voluntarily converted these cases to
Chapter 11 (Reply in Support of Wilmington Claim Objection at ¶¶ 14–18); (ii) Wilmington's
bad faith is relevant to its administrative claims because Section 503(b)(3)(A) allows for
payment of administrative expenses only for good faith creditors (*id.* at ¶¶ 19–22); and (iii)
Wilmington's bad faith is relevant to the Wilmington Pre-Petition Claims because the Indenture
expressly excludes recovery of fees, costs, and expenses to the extent "such loss, liability or
expense may be attributable to the negligence, willful misconduct or bad faith" of Wilmington.
(*Id.* at ¶ 24 (citing Indenture, § 7.07); *see also id.* § 7.01(c) ("The Trustee may not be relieved
from liabilities for its own negligent action, its own negligent failure to act, or its own willful
misconduct . . .").

Here, the Court agrees with Wilmington. Principally, the Court has already found that
Pach Shemen and Alpine validly acquired the notes, *supra*, Section (IV)(B)(2)(a)) because the
Second RSA had been abandoned prior to Pach Shemen's acquisition of same. Accordingly, the
Court finds that this argument is, to some extent, moot.

However, assuming *arguendo* that the Court agreed with the Debtors that Pach Shemen
and Alpine's acquisition of the New Notes were void *ab initio*, the Court nevertheless disagrees

with the Debtors on the issue of Wilmington's alleged bad faith for several reasons. First, the

Indenture: (i) authorizes Wilmington to exercise remedies against the Debtors in the case of

default, including by instituting a judicial proceeding, *with or without direction from the*

*noteholders themselves* (Indenture at §§ 6.03; 6.08) (emphasis added)); and (ii) requires the

Debtors to furnish Wilmington with reports after a "material event, acquisition, disposition,

restructuring, [or] senior management changes at the Company." (Wilmington Final Opposition

at ¶ 32 (quoting Section RSA at § 4.0)).

Critically, Wilmington was not a party to the Second RSA, did not participate in the

negotiation of the Second RSA, and apparently was not informed by the Debtors about the

Second RSA prior to the commencement of the SDNY Action. (Healy Declaration at ¶ 48).

Dechert, then acting as special counsel to Wilmington in the SDNY Action, apparently learned

of the existence of the Second RSA on January 23, 2023. (*Id.* at ¶ 51). The Court notes that the

Debtors claim that Wilmington was aware of the existence of the Second RSA because the

Debtors mentioned there being "two RSA Agreements" in passing in an email on April 7, 2020.

(Reply in Support of Objection to Wilmington Claims at ¶ 48; Kertsikoff Declaration at ¶ 12).

However, the email chain in question notably does not attach the Second RSA itself, nor does it

identify for Wilmington any key terms for which the Debtors now claim Wilmington had prior

knowledge. (DX-002(DD); DC-003(B)). Other than these emails, the Debtors have provided no

evidence showing that Wilmington was aware of the Second RSA at the time it filed the SDNY

Action.

Second, with regard to Wilmington's actions in filing the SDNY Action, the Court notes

that, prior to commencing the SDNY Action as requested in the January 10 Direction Letter,

Wilmington confirmed that Pach Shemen did in fact hold a majority of the New Notes by: (i)

receiving from Pach Shemen the Pach Shemen Certificate, which certified that Pach Shemen held the New Notes[23] (CX-74); (ii) obtaining DTC Reports as of January 9, 2023, which "list the institutional custodians holding the [New] Notes, and the amounts of such holdings, as of the date of the reports" (Healy Declaration at ¶ 45(b); CX-75); and (iii) obtaining Pach Shemen's account statement from Curvature. (*See* Curvature Account Statements). Only after confirming that Pach Shemen was in fact a holder of the New Notes, did Wilmington take any action against the Debtors.

Third, with regard to Wilmington's actions in connection with joining the involuntary bankruptcy proceedings, the Court notes that Wilmington acted pursuant to the June 6, 2023 Direction Letter as was permitted under the Indenture, at the direction of 13 holders who collectively held more than 58% of the New Notes prior to the disputed sales (i.e., excluding Pach Shemen and Alpine). (Wilmington Preliminary Response at ¶¶ 36, 74; Wilmington Final Response at ¶¶ 18; CX-78; Healy Declaration at ¶ 54). For these reasons, even if Wilmington took direction from Pach Shemen and Alpine at a time when their acquisition of the notes was void *ab initio*, Wilmington still acted pursuant to proper authority as provided by the Indenture.

Thus, the Court overrules this portion of the Debtors' Objection to Wilmington Claims and finds that Wilmington did not act in bad faith.

### 5.  Wilmington's Fees Are Reasonable

The Debtors' next argue that Wilmington cannot seek administrative expense priority for its fees in connection with the involuntary bankruptcy under Section 503 of the Bankruptcy Code without filing its time records. (Objection to Wilmington Claims at ¶¶ 35–42).

---

[23] As set forth *supra*, Section (III)(C), Wilmington was entitled to rely "conclusively" upon such certification pursuant to Section 7.02(a) of the Indenture.

In response, Wilmington asserts that the Wilmington Administrative Claims expressly provided that, although invoices were not attached to the proofs of claim due to their "being voluminous and containing privileged and confidential material, [Wilmington] would provide supporting invoices in redacted form or for *in camera* review, as applicable, upon request of the Court or a party." (Wilmington Preliminary Response at ¶ 83 (citing Wilmington Administrative Claims at n. 3)).

In the Reply in Support of Wilmington Claim Objection, the Debtors further assert that the invoices Wilmington provided to the Debtors in discovery show that Wilmington seeks to be compensated twice —through both its prepetition and administrative claims—for fees and expenses related to the filing of its joinder to the involuntary petitions and litigating the Debtors' motion to dismiss same. (Reply in Support of Wilmington Claim Objection at ¶¶ 36–41). Specifically, the Debtors note that Wilmington seeks $1,564,048 for fees and expenses of the "Trustee's General Counsel" and $2,015,442 in fees and expenses of "Trustee's Special Litigation and Restructuring Counsel," Dechert, through, September 25, 2023, which Wilmington asserts were incurred in connection with litigating the involuntary bankruptcy cases pursuant to the indenture. (*Id.* (citing Wilmington Pre-Petition Claim Addendum at ¶¶ 39–40)). However, the Debtors note that Wilmington also seeks administrative claims for the same period in the amount of $1,872,764.44. (Reply in Support of Wilmington Claim Objection at ¶ 39 (citing Wilmington Administrative Claims at ¶ 9)).

In the Wilmington Surreply, Wilmington further asserts that it does not seek to be compensated twice for the same services because, "as noted in the Wilmington Administrative Claims, [Wilmington] filed, *in the alternative*, both a pre-petition and administrative expense claim, for fees and expenses" because certain of Wilmington's fees are both assertable as

administrative expense claims under Section 503(b) for services rendered during the involuntary bankruptcy proceedings, and also assertable as Pre-Petition fees incurred under the indenture. (Wilmington Surreply at ¶¶ 2–6). Wilmington also reasserts that it provided the Debtors all copies of the invoices (redacted for privilege) supporting its fees in the Wilmington Pre-Petition Claims. (*Id.* at ¶¶ 7–9).

Finally, following the Hearings on this matter, the Court notes that Wilmington filed an amended motion to approve its administrative expenses in the reduced amount of $1,843,156.14. (Docket No. 1146 at ¶ 9).

Principally, the Court agrees with Wilmington that the Wilmington Administrative Claims are allowable administrative expenses. As set forth above, pursuant to Section 503(b)(3)(A), a creditor filing an involuntary petition under Section 303 of the Bankruptcy Code may file an administrative priority claim for "the actual, necessary expenses . . . incurred by a creditor that files a petition under section 303 of this title . . . ." 11 U.S.C. § 503(b)(3)(A).

Additionally, pursuant to Section 503(b)(4) of the Bankruptcy Code, reimbursement for attorneys' fees is available to petitioning creditors for reasonable "professional services rendered by an attorney or an accountant of an entity [Section 503(b)(3)(A)], based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement of actual necessary expenses incurred by such attorney or accountant . . . ." 11 U.S.C. § 503(b)(4).

Aside from the Debtors' arguments relating to bad faith above, which the Court has rejected, the Debtors do not otherwise argue that any time entries contained in Wilmington's claims are unreasonable within the meaning of Sections 503(b)(3)(A) or (b)(4) of the Bankruptcy Code. Though the Court notes that the Debtors initially objected to the Wilmington

53

Administrative Claims on the basis that Wilmington had not provided time records to substantiate such fees (Objection to Wilmington Claims at ¶¶ 35–42), the Court notes that Wilmington subsequently provided redacted time records supporting the fees sought (CX-327–CX-349), and provided unredacted time records for the Court's *in camera* review. (*See* Docket No. 1147). Following a review of Wilmington's time records, the Court finds that the Wilmington Administrative Claims are reasonable and necessary, and thus, the Debtors' objection to them is overruled.

The Debtors likewise do not raise any specific time entry objections to the Wilmington Pre-Petition fees asserted under the Indenture. However, as noted by the Debtors, and apparently agreed by Wilmington, some of the fees that Wilmington requests in the Wilmington Administrative Claims are also sought in the Wilmington Pre-Petition Claims. (Reply in Support of Wilmington Claim Objection at ¶¶ 36–41; Wilmington Surreply at ¶¶ 2–6). Accordingly, having found that the Wilmington Administrative Claims are reasonable, the Court correspondingly finds that the Wilmington Pre-Petition Claims should be reduced by $1,843,156.14, to $365,068,659.82, to account for fees awarded as an administrative expense. (Wilmington Surreply at ¶ 6; Docket No. 1146 at ¶ 9).[24]

### 6. Setoff is Inapplicable

Finally, the Debtors assert that they believe they hold affirmative claims against Wilmington, including, *inter alia*: "claims for negligence, tortious interference with contractual rights, and for abuse of the bankruptcy process in connection with the commencement of the Debtors' involuntary petitions in bad faith." (Objection to Wilmington Claims at ¶ 43).

---

[24] The Court notes that this result would be the same notwithstanding the Court's *in camera* review of the unredacted fee statements.

Accordingly, the Debtors assert that they have setoff rights pursuant to state law that should be preserved for the Debtors' estates pursuant to Section 558 of the Bankruptcy Code. (*Id.* at ¶ 43).

While Wilmington does not address this argument, the Court disagrees with the Debtors. Bankruptcy Code Section 558 preserves for a Debtor's estate "the benefit of any defense available to the debtor as against any entity other than the estate," including setoff rights. 11 U.S.C. § 558; *see also In re Westchester Structures, Inc.,* 181 B.R. 730, 739–40 (Bankr. S.D.N.Y. 1995). However, the availability of setoff rights is determined under state law. *See Westchester Structures, Inc.,* 181 B.R. at 739.

Under New York law, speculative claims are insufficient to act as a setoff to liquidated claims. *See Willett v. Lincolnshire Mgmt., Inc*., 302 A.D.2d 271, 271 (N.Y. App. Div. 2003) (noting that "there is no right to set off a possible, unliquidated liability against a liquidated claim that is due and payable"); *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.*, 524 F. Supp. 2d 412, 424 (S.D.N.Y. 2007).

The Debtors have not articulated a concrete claim against Wilmington sufficient to setoff Wilmington's liquidated claims under the Indenture or Wilmington's administrative expenses. Moreover, as set forth above, the Court has not found that Wilmington acted in bad faith as alleged. Accordingly, the Debtors' potential claims against Wilmington do not prevent allowance of Wilmington's claims.

## C.  <u>THE OBJECTION TO PC CLAIMS</u>

The final objection pending before the Court is the Debtors' Objection to PC Claims. The Objection to PC Claims seeks disallowance of the following administrative expense claims filed under Sections 503(b)(3)(A) and 503(b)(4) of the Bankruptcy Code by the Petitioning Creditors in connection with the pursuit of the involuntary bankruptcy proceedings: (i) Claim No. 17 in the Holdings case, Claim No. 4 in the Finance case, and Claim No. 4 in the Agathonissos case filed

55

by Pach Shemen; (ii) Claim No. 18 in the Holdings case, Claim No. 5 in the Finance case, and Claim No. 5 in the Agathonissos case filed by VR Global; and (iii) Claim No. 19 in the Holdings case, Claim No. 6 in the Finance case, and Claim No. 6 in the Agathonissos case filed by Alpine. (*See* Objection to PC Claims at ¶ 13; *see also* Docket No. 322, the *Second Application of the Petitioning Creditors, Pursuant to Section 503(b)(3)(A) and 502(b)(4) of the Bankruptcy Code, for Allowance of Professional Fees*)).

In the Objection to PC Claims, the Debtors argue that: (i) the PC Claims should be disallowed in their entirety because the Petitioning Creditors' claims are contingent as to liability and subject to a bona fide dispute as to liability or amount under Section 303 of the Bankruptcy Code (*Id.* at ¶¶ 23–25); (ii) the Petitioning Creditors' claims should be reduced because the Petitioning Creditors seek reimbursement for fees and costs in excess of what is permitted under Section 502(b) of the Bankruptcy Code (*id.* at ¶¶ 26–30); and (iii) the PC claims are subject to setoff due to affirmative claims the Debtors hold against the Petitioning Creditors. (*Id.* at ¶¶ 31–33).

In response, the Petitioning Creditors argue that: (i) the Debtors' arguments under Section 303(b) of the Bankruptcy Code—namely, that the Petitioning Creditors' claims are contingent as to liability or subject to a bona fide dispute as to liability or amount—are moot because the Debtors voluntarily converted these cases to Chapter 11 (*see* PC Preliminary Opposition at ¶¶ 19–24); (ii) all of the requested fees and expenses are allowable under Section 503(b)(3)(A) and 503(b)(4) of the Bankruptcy Code (*id.* at ¶¶ 25–35); and (iii) the PC Claims were filed by valid holders of notes issued under the Indenture and are not subject to setoff. (*Id.* at ¶¶ 36–42).

In the Reply in Support of Objection to PC Claims, the Debtors further argue that: (i) the

Petitioning Creditors are not creditors with a right to payment and did not incur the expenses for

which they now seek compensation (Reply in Support of Objection to PC Claims at ¶¶ 6–12); (ii)

the Debtors did not waive their rights to challenge whether the Petitioning Creditors are entitled

to administrative expense priority because the Debtors reserved their right to challenge the

Petitioning Creditors' status as creditors (*id.* at ¶¶ 13–29); (iii) the Petitioning Creditors failed to

meet the requirements under Section 303 of the Bankruptcy Code and are therefore not creditors

(*id.* at ¶¶ 30–44); and (iv) the Petitioning Creditors filed the involuntary bankruptcy petitions in

bad faith and for an improper purpose. (*Id.* at ¶¶ 45–61).

In the PC Surreply, the Petitioning Creditors also argue that: (i) Pach Shemen and Alpine

are creditors (PC Final Opposition at ¶¶ 1–6); and (ii) the Petitioning Creditors have incurred

allowable administrative expenses. (*Id.* at ¶¶ 7–12).

1. **The Petitioning Creditors are Valid Creditors and Arguments Under Section 303(b) of the Bankruptcy Code are Irrelevant to Allowance of Post-Conversion Administrative Expense Claims**

The first argument raised by the Debtors is that the PC Claims should be disallowed

because the Petitioning Creditors do not hold claims against the Debtors that are not contingent

as to liability or the subject of a bona fide dispute as to liability or amount pursuant to Section

303 of the Bankruptcy Code. (Objection to PC Claims at ¶¶ 23–25). Specifically, the Debtors

assert that the Petitioning Creditors' acquisition of the New Notes was void *ab initio* pursuant to

the Second RSA and the OCM Stipulation, and accordingly, they were not valid creditors as of

the petition date. (*Id.* at ¶ 24).

In response, the Petitioning Creditors argue: (i) that the legal standard for allowance of

administrative claims under Section 503(b)(3)(A) of the Bankruptcy Code does not permit

consideration of the Section 303 arguments. (PC Preliminary Opposition at ¶¶ 19–24; PC Final

Opposition at ¶¶ 2–3); (ii) that the Debtors' Section 303 arguments are moot, because the Debtors voluntarily converted these cases to Chapter 11 cases, and they were not dismissed. (PC Final Opposition at ¶¶ 4–7); (iii) even if permitted, the Debtors' Section 303 arguments are meritless because the Petitioning Creditors' acquisition of the New Notes was not void *ab initio*. (PC Preliminary Response at ¶¶ 36–39; PC Final Opposition at ¶¶ 12–49).

In the Reply in Support of Objection to PC Claims, the Debtors further argue that Pach Shemen and Alpine are not creditors with a right to payment because their acquisition of the New Notes was void *ab initio* (Reply in Support of Objection to PC Claims at ¶¶ 6–12, 30–44). Moreover, the Debtors assert that they did not waive their rights to challenge whether the Petitioning Creditors are entitled to administrative claims because: (i) the Debtors reserved their rights to contest the Petitioning Creditors' status as creditors (*id.* at ¶¶ 16–24); and (ii) the Court has not made any findings as to whether the Petitioning Creditors filed the involuntary petitions in bad faith. (*Id.* at ¶¶ 25–29). Finally, the Debtors again argue that the Petitioning Creditors filed the involuntary petitions in bad faith and for an improper purpose. (*Id.* at ¶¶ 45–61).

In the PC Surreply the Petitioning Creditors again argue that they are in fact creditors, and that in any event, this Court does not have authority to determine who holds the New Notes in the absence of a dispute between noteholders. (PC Surreply at ¶¶ 1–6).

Here, the Court agrees with the Petitioning Creditors. Principally, the Court has already found that the Petitioning Creditors are valid holders of the New Notes. (*See supra*, Section (iv)(b)(2)(A)). Accordingly, any argument related to whether the Petitioning Creditors are valid noteholders is overruled.

Second, as argued by the Petitioning Creditors, the Debtors waived their ability to argue that the involuntary bankruptcy petitions were filed in bad faith when they voluntarily converted

these cases to Chapter 11 proceedings. (*See* PC Final Opposition at ¶ 21 (*citing* Confirmation

Ruling) (stating that "if a petition is not dismissed, the debtor has no right to relief under [Section

303]"); *Speer v. Clipper Realty Trust (In re Speer)*, 771 F. App'x 25, 27 (2d Cir. 2019) (stating

that "voluntary conversion is 'an election of remedies that obviates the need for further litigation

of issues' based on the original [chapter 7] bankruptcy petition") (*quoting In re J.B. Lovell*

*Corp.*, 876 F.2d 96, 99 (11th Cir. 1989) (noting that "whether or not [a creditor's] claim against

[the debtor] in the Chapter 7 proceeding is a 'bona fide dispute' under § 303(h)(1) of the

Bankruptcy Code is irrelevant and [the debtor's] appeal is moot [because the Debtor] voluntarily

elected to pursue remedies under Chapter 11 rather than continue litigation in the original

Chapter 7 proceedings"); *In re Basil St. Partners, LLC*, 477 B.R. 856, 865 (Bankr. M.D. Fla.

2012) (stating that "[a]ll issues that were pending in the involuntary chapter 7 case pertaining to

the merits under § 303(h)(1) are now moot" following conversion); *see also* 6 Collier on

Bankruptcy ¶ 706.02[4] (2023) (stating that "if an involuntary chapter 7 case is converted by the

debtor before the court enters an order for relief, the issues in the involuntary case become

moot")).

The Debtors claim that these arguments are not moot because they expressly reserved

their rights to make these arguments when they converted these cases to voluntary Chapter 11,

but this argument is incorrect. Indeed, the Conversion Stipulation provided that the parties

reserved their rights with respect to "to all causes of action, claims, and defenses that the parties

may assert, including without limitation the Debtors' ability to object to claims in the Chapter

11" cases. (Conversion Stipulation at 9:5–10:22). However, while the Conversion Stipulation

permitted the Debtors to raise any arguments they had previously raised in the involuntary

bankruptcy without having them waived, such reservation of rights did not confer the Debtors

with the unfettered authority to make those arguments in any context that they wished. *See, e.g.,*
*In re 1031 Tax Grp., LLC*, 397 B.R. 670, 679 (Bankr. S.D.N.Y. 2008) (stating that the
"reservation of rights preserved claims; it did not create them where none exists"). Here, as set
forth above, Section 303 arguments are irrelevant to allowance of administrative claims.

In any event, for all the reasons stated herein, and for the avoidance of doubt, the Court
finds that the Petitioning Creditors did not act in bad faith in bringing the involuntary petitions
within the meaning of Section 303 of the Bankruptcy Code.[25]

### 2.    The Petitioning Creditors' Fees Are Reasonable

Next, the Debtors argue that the PC Claims are substantially in excess of the benefit
provided to the estates in filing the involuntary petitions. (Objection to PC Claims at ¶¶ 26–30).
Specifically, the Debtors argue that certain of the Petitioning Creditors' fees sought in the PC
Claims were actually for services rendered in pursuit of the Petitioning Creditors' own interests,
not to benefit the estates, including:

> the Original Petitioning Creditors pursuit of discovery to serve the interests of Pach
> Shemen and its alter egos in arbitration proceedings, the opposition filed by the
> Original Petitioning Creditors to oppose the Debtors' motion for relief from stay,
> the efforts on the part of the Original Petitioning Creditors to research and evaluate
> abuse of process claims, the fees and expenses incurred by the Original Petitioning
> Creditors to remove pending state court litigation filed against alter egos of Pach
> Shemen to this Court; and fees which appear to have been incorrectly billed by the
> Original Petitioning Creditors' counsel for services rendered in connection with
> unrelated bankruptcy cases.

(*Id.* at ¶ 29).

---

[25] The Debtors also argued that the Petitioning Creditors are not valid creditors because they did not file pre-petition
claims against the Debtors prior to the bar date. (Objection to PC Claims at ¶ 18). However, as set forth *supra*,
Section (IV)(b)(2), Wilmington filed the proof of claim on behalf of all holders of the New Notes as was permitted
under both the Bar Date Order and the Indenture (*See* Amended Wilmington Pre-Petition Claims at 148; Bar Date
Order at ¶ 6(g)). Accordingly, this argument is without merit.

In response, the Petitioning Creditors argue that all the requested fees and expenses are allowable administrative expenses pursuant to Sections 503((b)(3)(A) and 503(b)(4) of the Bankruptcy Code. (PC Preliminary Opposition at ¶¶ 25–35).

In the Reply in Support of Objection to PC Claims, the Debtors further argue that the Petitioning Creditors are not entitled to administrative expense reimbursement because they are not the entities who incurred an obligation to pay costs and expenses in connection with these cases. (Reply in Support of Objection to PC Claims ¶¶ 13–15). Specifically, the Debtors note that it was an affiliate of Pach Shemen who agreed to pay Togut's fees. (*Id.* at ¶ 14).

In the PC Surreply, the Petitioning Creditors assert that they have incurred expenses in connection with these cases even if another entity is paying them. (PC Surreply at ¶¶ 7–12).

With regard to the argument that the Petitioning Creditors' fees are too high relative to the benefit these cases conferred on the estates, the Court disagrees. Principally, the Court notes that "[t]he purpose of §§ 503(b)(3)(A) and 503(b)(4) is to reimburse petitioning creditors for the costs associated with successfully filing and prosecuting an involuntary petition—a valuable service that brings the debtor into court so that its assets can be equitably marshaled before they are squandered." *In re Key Auto Liquidation Ctr., Inc.*, 384 B.R. 599, 604 (Bankr. N.D. Fla. 2008). Here, as the District Court previously noted:

> As it turns out, [the Petitioning Creditors'] petition was well founded. The involuntary bankruptcy was not dismissed. Holdings ultimately agreed to file a motion converting the bankruptcy proceeding to a voluntary case under Chapter 11 and the interests of the creditors are being protected [citations omitted]. In the bankruptcy, Holdings agreed to pay the fees of the involuntary creditors. There was no finding, nor apparently could there have been one, by the bankruptcy court that the involuntary petitions did not qualify or that the petition was filed in bad faith. Had Pach Shemen not joined in the relief requested by the other creditors, the bankruptcy court might never have been in the position to accord such relief. The congressional purpose underlying Section 303 would have been thwarted.

(Confirmation Ruling at 108-109). The Court also notes that Pach Shemen has proposed a

competing plan and also provided debtor in possession funding to the Debtors in these cases. The

claim that the Petitioning Creditors did not bring value to these estates and their creditors strains

credulity. (*See* Docket Nos. 1052, 1132).

Finally, the Debtors argue that because a different entity than Pach Shemen is paying for

Togut's fees in connection with these cases, the PC Claims are not compensable and should be

disallowed. (Reply in Support of Objection to PC Claims ¶¶ 13–15). The Court once again

disagrees. First, as stated by the Petitioning Creditors, "Pach Shemen is obligated to repay the

entities that paid the Togut firm on Pach Shemen's behalf in connection with the involuntary

petitions." (PC Surreply at ¶ 8 (citing Ex. A)). The Court notes that at the Hearings, the Debtors

argued that such agreement is violative of the statute of frauds because it is an oral surety

contract. (September 9 Transcript at 146:19–147:15). However, the Court finds that the statute of

frauds does not apply here because the Petitioning Creditors are not offering the oral agreement

in an attempt to enforce it. *See Martin Roofing, Inc. v. Goldstein*, 60 N.Y.2d 262, 265, 457

N.E.2d 700, 701 (1983) (stating that "[w]hen a party promises to answer for the debt of another,

however, the benefit to the promisor is not apparent and so the promise, *if it is to be enforceable*

under the statute, must either be evidenced by writing") (emphasis added).

In any event, other courts have found that:

> The fact that a third party agrees to pay one's expenses does not mean that those
> expenses were unnecessary or never actually incurred. Here, the Trade Creditors
> actually incurred expenses that were reasonably necessary for preparing, filing, and
> prosecuting the involuntary petition. Accordingly, those expenses are compensable
> as administrative expenses under §§ 503(b)(3)(A) and 503(b)(4), the fact that Ciano
> essentially agreed to cover them notwithstanding.

*In re Key Auto Liquidation Ctr., Inc.*, 384 B.R. at 605. The Petitioning Creditors filed the involuntary bankruptcy petitions at potential great risk to themselves, and the Debtors agreed to voluntarily convert. The Court finds that such fees are reasonable.

### 3. Setoff is Inapplicable

The Debtors' last argument is that setoff applies to the PC Claims because the Debtors believe they hold affirmative claims against the Petitioning Creditors, including, *inter alia*: "claims for breach of the Second RSA and the OCM Stipulation, for tortious interference with contractual rights, [and] for abuse of the bankruptcy process in connection with the commencement of the Debtors' involuntary petitions in bad faith." (Objection to PC Claims at ¶ 31). Accordingly, the Debtors assert that they have setoff rights pursuant to state law that should be preserved for the Debtors' estates pursuant to Section 558 of the Bankruptcy Code. (*Id.* at ¶ 32).

As with Wilmington (see *supra*, Section (iv)(b)(6)), the Debtors have not articulated a concrete claim against the Petitioning Creditors sufficient to setoff the PC Claims. Moreover, the Court has not seen evidence that the Debtors have a colorable claim under any of the theories identified given the findings herein. Accordingly, the Debtors' Objection to PC Claims is overruled in this respect.

## V. CONCLUSION

For the foregoing reasons, the Court SUSTAINS the Objections in part, as follows:

i.    The Gustafson Claim, the Fleishmann/Dorette Claim, and the Middle East Claim are DISALLOWED in their entirety;

ii.   The Amended Wilmington Pre-Petition Claims are re-classified as general unsecured claims to the extent the collateral securing such claims has no value;

iii.   The Wilmington Administrative Claims are allowed in the amount of
$1,843,156.14;

iv.   The Wilmington Pre-Petition Claims are allowed and reduced by $1,843,156.14,
to $365,068,659.82, corresponding to the portion of the Wilmington
Administrative Claims that the Court deems allowed;

v.   The PC Claims are allowed in a total amount of $2,594,805.56, comprising: (i)
$2,234,807.36 for the Pach Shemen Claims; (ii) $357,567.10 for the VR Global
Claims; and (iii) $2,431.10 for the Alpine Claims.

All other arguments set forth in the Objections are OVERRULED, and the PC Claims
and the Wilmington Claims are ALLOWED except where expressly noted above. The parties are
directed to submit an order to the Court consistent with this opinion within 7 days of entry of this
Memorandum Opinion and Order.

**IT IS SO ORDERED.**

New York, New York
Dated: October 25, 2024

/s/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE