**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

In re:

Eletson Holdings Inc., *et al.*,

                         Debtors.

</td><td>

<u>FOR PUBLICATION</u>

Chapter 11

Case No. 23-10322 (JPM)
(Jointly Administered)

</td></tr>
</table>

**MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING**
**CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF**
**ELETSON HOLDINGS INC. AND ITS AFILLIATED DEBTORS, SUSTAINING**
**<u>OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE</u>**

*A P P E A R A N C E S:*

**REED SMITH LLP**
*Counsel for the Debtors*
599 Lexington Avenue
New York, NY 10022
By:    Louis M. Solomon, Esq.
       Alyssa F. Conn, Esq.
       Colin A. Underwood, Esq.

**REED SMITH LLP**
*Counsel for the Debtors*
1717 Arch Street
Philadelphia, PA 19103
By:    Derek J. Baker, Esq.
       Joshua M. Peles, Esq.

**TOGUT, SEGAL & SEGAL LLP**
*Counsel for the Petitioning Creditors, DIP Lender, & Proposed Plan Sponsor*
One Penn Plaza, Suite 3335
New York, NY 10119
By:    Kyle J. Ortiz, Esq.
       Brian F. Shaughnessy, Esq.
       Bryan M. Kotliar, Esq.
       John McClain, Esq.
       Jared C. Borriello, Esq.

**DECHERT LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1095 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    David A. Herman, Esq.
       Stephen D. Zide, Esq.
       Gary J. Mennitt, Esq.

**PERKINS COIE LLP**
*Counsel for Wilmington Savings Fund Society, FSB, as Trustee*
1155 Avenue of the Americas, 22nd Floor
New York, NY 10036
By:    Tina M. Moss, Esq.
       Paul Japser, Esq.
       Martin E. Gilmore, Esq.
       Rachel S. Mechanic, Esq.

**SIDLEY AUSTIN LLP**
*Counsel for the Shareholders*
787 Seventh Avenue New York, NY 10019
By:     William E. Curtin, Esq.

**WILLIAM K. HARRINGTON**
*United States Trustee, Region 2*
One Bowling Green, Room 534 New York, NY 10004
By:     Daniel Rudewicz, Esq.
        Shara Cornell, Esq.

I.   INTRODUCTION................................................................................................ 4

  A. The Plans and Motion in Limine ............................................................ 5

    1.   The Debtors' Plan .......................................................................... 5

    2.   The Petitioning Creditors' Plans .................................................. 7

    3.   The Petioning Creditors' Omnibus Motion in Limine to Exclude Certain of the

    Debtors' Evidence ................................................................................ 11

II.  JURISDICTION ............................................................................................. 12

III. BACKGROUND ............................................................................................. 12

  A. The Indenture................................................................................... 12

  B. The First RSA and the Strict Foreclosure .................................... 15

  C. The Second Rsa ............................................................................... 16

  D. Default Under the Second RSA ...................................................... 19

  E. The OCM Stipulation ...................................................................... 20

  F. Murchinson, Pach Shemen, & Levona ........................................... 20

  G. The Bankruptcy Proceedings ......................................................... 22

  H. The Plan Process and the DIP Loan .............................................. 26

  I. Summary of the Debtor Plan .......................................................... 27

    1.   The Litigation Trust ..................................................................... 27

    2.   The Shareholder New Value Contribution.................................. 30

    3.   SME Revenue & Excess SME Proceeds....................................... 32

    4.   Classification of Claims................................................................ 34

  J. Summary of the PC Alternative Plan ............................................ 38

  K. Summary of the PC Plan................................................................. 39

1.   The Rights Offering ............................................................................ 39

2.   Classification of Claims ..................................................................... 41

L. VOTING RESULTS ...................................................................................... 45

IV. LEGAL ANALYSIS ........................................................................... 48

A. THE PC MOTION IN LIMINE ..................................................................... 49

B. THE DEBTOR PLAN IS NOT CONFIRMABLE ............................................... 52

1.   The Debtor Plan Violates the Absolute Priority Rule of Section 1129(b)(2)(B)(ii) ..... 54

a)   Second Circuit Precedent: Coltex ............................................. 55

b)   Supreme Court Precedent: 203 N. LaSalle .............................. 59

c)   Under the Debtor Plan, Portions of the Shareholder New Value Contribution are not
"New," and Other Portions are not Money or Money's Worth ...................................... 61

d)   The Shareholder New Value Contribution is Not Substantial ................................. 67

e)   The Shareholder New Value Contribution is Not Reasonably Equivalent to the
Value of the Reorganized Debtors .................................................................. 69

f)   The Shareholder New Value Contribution is Not "Necessary" .............................. 72

2.   The Debtor Plan is Not Feasible Pursuant to Section 1129(a)(11) ............................. 79

3.   Other Issues with the Debtor Plan .............................................................. 85

C. THE PC ALTERNATIVE PLAN IS NOT CONFIRMABLE ................................... 92

D. THE PC PLAN IS CONFIRMABLE ............................................................... 93

1.   The PC Plan Does Not Violate Section 1129(a)(3) Because it Was Proposed in Good
Faith ................................................................................................... 95

2.   The PC Plan Does Not Violate the Best Interest of the Creditors Test Under Section
1129(a)(7) ............................................................................................ 96

3.     *The PC Plan Does Not Violate Section 1129(a)(1) Because it Does Not Violate Section*

*1122*.................................................................................................................... *98*

4.     *The PC Plan is Feasible Pursuant to Section 1129(a)(11)*........................................... *99*

E. SECTION 1129(C) ............................................................................................................ 101

**V.   CONCLUSION** ............................................................................................................... **102**

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.    INTRODUCTION

Pending before the Court are three competing plans of reorganization under Chapter 11

of the Bankruptcy Code. One plan has been proposed by the Debtors, and two plans have been

proposed by a group of holders of a portion of more than $300,000,000 of notes issued in 2018

pursuant to an indenture, which noteholders have never received a payment thereunder.

The Debtors have proposed a "new value plan" that, in its most basic terms,

contemplates the return of 100% of the equity of the reorganized Debtors to the Debtors' existing

shareholders in exchange for, *inter alia*: (i) $37 million in cash and cash equivalents; (ii)

distribution of revenues from certain of the Debtors' subsidiaries; (iii) contribution to the plan of

a portion of the potential recovery on a judgment stemming from an arbitration award; and (iv) a

guaranty by the Debtors' shareholders of up to $40 million of the arbitration award to be

escrowed at a rate of $1 million per month for the next 40 months. (*See* Docket Nos. 1111,

1139).[1] No class of claims under the Debtors' plan would be paid in full. (*Id.* at 19–23).

Pach Shemen LLC ("**Pach Shemen**"), VR Global Partners, L.P. ("**VR Global**"), Alpine

Partners (BVI) ("**Alpine**"), L.P., Mark Millet, In His Capacity as Trustee of the Mark E. Millet

Living Trust, Mark Millet, In His Capacity as Trustee of the Millet 2016 Irrevocable Trust,

Robert Latter, Tracy Lee Gustafson, Jason Chamness, and Ron Pike (collectively, the

---

[1] The Debtors in these chapter 11 cases are Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance. The Debtors' cases are jointly administered. References to "Docket No. __" are to filings entered on the *In re Eletson Holdings Inc. et al.*, No. 23-10322 docket. References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York. References to "FRCP __" are to the Federal Rules of Civil Procedure. References to "FRE" are to the Federal Rules of Evidence.

"**Petitioning Creditors**")[2] who are all holders of notes issued under the above-mentioned indenture, have proposed two competing plans of reorganization, one of which is modeled after the Debtors' plan but generally provides for a $41 million cash contribution, as opposed to the Debtors' $37 million cash contribution. (Docket No. 1131). The Petitioning Creditors' other plan provides for, *inter alia*, a $53.5 million cash contribution offered pursuant to a rights offering. (Docket No. 1132).

Principally, this case presents questions regarding the circumstances in which a "new value plan" can be confirmed in the face of a confirmable competing plan (or plans) proposed by a debtor's creditors under the United States Supreme Court's decision in *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999), the Second Circuit's decision in *In re Coltex Loop Cent. Three Partners, L.P.*, 138 F.3d 39 (2d Cir. 1998), and their progeny. Because the Court finds that: (i) the Debtors' plan does not satisfy, *inter alia*, the new value exception to the absolute priority rule as set forth in the relevant caselaw; (ii) the Petitioning Creditors' rights offering plan is confirmable; and (iii) the Petitioning Creditors' right offering plan is supported by the vast majority of creditors, the Court will confirm the Petitioning Creditors' rights offering plan. (*See* Docket Nos. 941, 1132).

A. <u>**THE PLANS AND MOTION IN LIMINE**</u>

1. <u>**The Debtors' Plan**</u>

The first plan pending before the Court is the *Debtors' Second Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (As Further Modified) (the "**Debtor Plan**," Docket No. 1111), as modified by that certain *Plan Supplement* (the "**Debtor Plan Supplement**," Docket No. 910), and the *Committee's Plan Supplement to the Second Amended*

---

[2] Gene B. Goldstein and Gene B. Goldstein, In His Capacity as Trustee of the Gene B. Goldstein and Francine T. Goldstein Family Trust are also Petitioning Creditors but are not plan proponents. (*See* Docket No. 1140 at n.2).

*Joint Plan of Reorganization of Debtors under Chapter 11 of the United States Bankruptcy Code and the Petitioning Creditors' Alternative Chapter 11 Plan of Eletson Holdings Inc. and its Affiliated Debtors* (the "**Committee Supplement**," Docket No. 911).

The Debtor Plan is supported by the: (i) *Declaration of Vassilis Kertsikoff in Support of the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code* (the "**Kertsikoff Declaration**," Docket No. 1020); and (ii) *Declaration of Vasilis Hadjieleftheriadis in Support of the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code* (the "**Hadjieleftheriadis Declaration**," Docket No. 1021). The Debtors also filed the *Second Supplemental Commitment Letter for Revised Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code* (the "**Shareholder Commitment Letter**") in support of the Debtor Plan. (Docket No. 1139).

Two objections were filed to the Debtor Plan, the first of which is the *Petitioning Creditors' Objection to Confirmation of the Debtors' Chapter 11 Plan* (the "**PC Objection to Debtor Plan**") (Docket No. 1027). The PC Objection to Debtor Plan is supported by the *Declaration of Jared C. Borriello in Support of Petitioning Creditors' Objection to Confirmation of the Debtors' Chapter 11 Plan* (the "**First Borriello Declaration**"). (Docket No. 1028).

The second objection to the Debtor Plan is the Official Committee of Unsecured Creditors' (the "**Committee**") *Objection to the Debtors' Second Amended Joint Plan of Reorganization and the Petitioning Creditors' Alternative Chapter 11 Plan and Statement in Support of the Petitioning Creditors' Plan* (the "**Committee Objection**"). (Docket No. 1030). Wilmington Savings Fund Society, FSB, as Indenture Trustee and Collateral Agent

("**Wilmington**") filed a joinder (and later, an amended joinder) to the Committee Objection. (Docket Nos. 1031, 1035).

Finally, on September 5, 2024, the Debtors filed their *Memorandum of Law in Support of Entry of an Order Confirming the Second Amended Joint Plan of Reorganization of Debtors Under Chapter 11 of the United States Bankruptcy Code and Response to the Confirmation Objections of the Official Committee of Unsecured Creditors and the Petitioning Creditors* (the "**Debtor Confirmation Memo**"). (Docket No. 1062).

### 2.  <u>The Petitioning Creditors' Plans</u>

The Petitioning Creditors proposed two competing plans in addition to the Debtor Plan. The first plan proposed by the Petitioning Creditors is the *Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**PC Plan**") (Docket No. 1132), as supplemented by that certain *Amended Plan Supplement to the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**PC Plan Supplement**"). (Docket No. 1134).

The Petitioning Creditors also submitted the *Petitioning Creditors' Revised Alternative Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**PC Alternative Plan**," and together with the PC Plan, the "**PC Plans**") (Docket No. 1131), as supplemented by that certain *Amended Plan Supplement to the Petitioning Creditors' Alternative Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "**PC Alternative Plan Supplement**"). (Docket No. 1133). The PC Alternative Plan is further supplemented by the Committee Supplement. (Committee Supplement).

The PC Plans are supported by the *Declaration of Adam Spears in Support of Confirmation of the Petitioning Creditors' Chapter 11 Plans* (the "**Spears Declaration**"). (Docket No. 1023). Additionally, the Petitioning Creditors filed the *Amended Commitment Letter*

Related to the Petitioning Creditors' Plan and the Petitioning Creditors' Alternative Plan (the

"**PC Commitment Letter**") in support of the PC Plans. (Docket No. 1109).

In response, the Debtors filed the *Omnibus Objection to (i) Confirmation of the*

*Petitioning Creditors' PS Plan and (ii) Confirmation of the Petitioning Creditors PS Alternative*

*Plan* (the "**Debtor Objection to PC Plans**"). (Docket No. 1029). Lassia Investment Company,

Glafkos Trust Company, and Family Unity Trust Company, the Debtors' majority shareholders,

(the "**Shareholders**") joined the Debtor Objection to PC Plans (the "**Shareholder Joinder**").

(Docket No. 1033). The Committee also objected to the PC Alternative Plan. (Committee

Objection). As set forth above, the Committee Objection was joined by Wilmington.

(Wilmington Joinder).

On September 5, 2024, the Petitioning Creditors filed their *Omnibus Reply to the*

*Debtors' and the Shareholders' Objections to Confirmation of the PC Plans* (the "**PC Reply**").

(Docket No. 1058). The PC Reply is supported by the *Declaration of Jared C. Borriello in*

*Support of Petitioning Creditors' Omnibus Reply to the Debtors' and the Shareholders'*

*Objections to Confirmation of the PC Plans* (the "**Second Borriello Declaration**"). (Docket No.

1059).

Additionally, the Petitioning Creditors filed their *Memorandum of Law in Support of*

*Confirmation of the Petitioning Creditors' Joint Chapter 11 Plan of Reorganization of Eletson*

*Holdings Inc. and its Affiliated Debtors* (the "**PC Confirmation Memo**"). (Docket No. 1066).

The Debtors and the Petitioning Creditors jointly solicited the plans pursuant to the *Order*

*(i) Approving Disclosure Statements, (ii) Approving Solicitation and Notice Procedures with*

*Respect to Confirmation of Competing Plans, (iii) Approving Forms of Various Ballots and*

*Notices in Connection Therewith (iv) Approving Scheduling of Certain Key Dates in Connection*

*with Confirmation, and (v) Granting Related Relief* (the "**Order Approving Disclosure Statements**"). (Docket No. 856). Pursuant to the Order Approving Disclosure Statements, the Debtors and the Petitioning Creditors jointly submitted the *Certification of James Lee with Respect to the Tabulation of Votes on the Competing Chapter 11 Plans of Reorganization for Eletson Holdings Inc. and its Affiliated Debtors* (the "**Lee Certification**"). (Docket No. 941).

The parties also submitted exhibit lists and deposition designations in accordance with the Court's scheduling orders entered in connection with the plans. Specifically, the Debtors submitted the: (i) *Debtors' Designation List with the Committee and Petitioning Creditors' Joint Counter Designations* (the "**Debtors' Deposition Designations**") (Docket No. 1097); and (ii) *Debtors' Fifth Amended Exhibit List* ("**DX**") (Docket No. 1137). Additionally, the Petitioning Creditors and the Committee jointly submitted the: (i) *Fourth Amended Joint Exhibit List of Petitioning Creditors and the Official Committee of Unsecured Creditors for Hearing on Debtors' Confirmation of the Competing Plans of Reorganization* ("**CRX**") (Docket No. 1142); and (ii) *Petitioning Creditors' and the Official Committee of Unsecured Creditors' Joint Deposition Designations and Counter Designations of the Debtors in Connection with Hearing on Confirmation of the Competing Plans of Reorganization* (the "**Creditors' Deposition Designations**") (Docket No. 1096).[3]

The Court held evidentiary hearings in connection with plan confirmation (and with certain claim objections) on September 9, 10, 11, 12, and 13, 2024 (the "**Hearings**," and the

---

[3] Pursuant to the *Stipulated Confidentiality Agreement and Protective Order* (Docket No. 37) and the *Amended and Restated Stipulated Confidentiality Agreement and Protective Order* (Docket No. 1018) entered in this case, portions of certain filings and supporting documents were filed under seal or provided on an attorneys' eyes only basis. At the Hearings, the Court gave the parties the opportunity to withdraw from the record any such material that the parties did not want to be cited, quoted, or otherwise referenced in this opinion. (September 13 Transcript, Docket No. 1161 at 94:18–22). No parties in this matter requested information withdrawn. The Court will nevertheless refrain from revealing bank account numbers, sensitive banking or personal information, or other similar material contained within sealed documents.

transcripts thereof the **September 9 Transcript**" (Docket No. 1124), the "**September 10 Transcript**" (Docket No. 1125), the "**September 11 Transcript**" (Docket No. 1130), the "**September 12 Transcript**" Docket No. 1160), the "**September 13 Transcript**" (Docket No. 1161), respectively) where the Court heard witness testimony, admitted evidence into the record, and heard arguments of counsel.

Following the Hearings, the Court received the following post-trial briefs: (i) the Petitioning Creditors' and Committee's *Joint-Post Trial Brief Regarding Confirmation of the Competing Plans* (the "**Creditor Brief**")[4] (Docket No. 1140); and (ii) the *Debtors' Post Confirmation Hearing Brief in Support of Debtors' Second Amended Joint Plan of Reorganization of Debtors under Chapter 11 of the Bankruptcy Code and Resolution of the Debtors' Objections to the Purported Claims of Alleged Creditors of the Debtors' Estates* (the "**Debtor Brief**").[5] (Docket No. 1141).

Additionally, at the direction of the Court, the parties filed the *Joint Submission of Expert Reports and Trial Presentations of the Debtors, the Official Committee of Unsecured Creditors, and the Petitioning Creditors in Connection with the Hearing on the Competing Plans of Reorganization of Eletson Holdings Inc.* (the "**Expert Reports**"). (Docket No. 1153).

The Expert Reports include the following reports filed on behalf of the Debtors: (i) *Expert Report of David Nolletti, dated August 26, 2024* (the "**Nolletti Report**") (*id.* at Ex. 2); (ii) *Expert Report of Nikolaos Veraros, dated August 26, 2024* (the "**Veraros Report**") (*id.* at Ex. 3); (iii) *Expert Report of Harold Furchtgott-Roth, dated August 26, 2024* (the "**Furchtgott-Roth Report**") (*id.* at Ex. 5); (iv) *Rebuttal Report of Harold Furchtgott-Roth, dated September 3, 2024*

---

[4] Wilmington joined the Creditor Brief. (Docket No. 1145).

[5] Certain of the Debtors' Shareholders joined the Debtor Brief. (Docket No. 1146).

("**Furchtgott-Roth Rebuttal Report**," and together with the Furchtgott-Roth Report, the "**Furchtgott-Roth Reports**") (*id.* at Ex. 7); (v) *Supplement to Expert Report of David Nolletti, dated September 3, 2024* ("**Nolletti Supplemental Report**") (*id.* at Ex. 8); (vi) *Second Expert Report of Nikolaos Veraros, dated September 3, 2024* ("**Second Veraros Report**") (*id.* at Ex. 9); and (vii) *Supplemental Rebuttal Report of Harold Furchtgott-Roth, dated September 10, 2024* ("**Furchtgott-Roth Supplemental Rebuttal Report**") (*id.* at Ex. 11).

The Expert Reports also contain the following reports filed on behalf of the Petitioning Creditors: (i) *Declaration of Alex Zyngier in Support of the Petitioning Creditors' Chapter 11 Plans dated August 26, 2024* (the "**Zyngier Declaration**") (*id.* at Ex. 4); and (ii) *Declaration of Alex Zyngier in Response to Expert Report of Nikolaos Veraros, dated September 3, 2024* (the "**Zyngier Rebuttal Declaration**") (*id.* at Ex. 10). Additionally, the Expert Reports contain the *Declaration and Expert Report of Michael Cordasco, dated August 26, 2024* (the "**Cordasco Report**") filed on behalf of the Committee. (*Id.* at Ex. 1).

### 3.   The Petioning Creditors' Omnibus Motion in Limine to Exclude Certain of the Debtors' Evidence

Finally, on September 8, 2024, the Petitioning Creditors filed their *Omnibus Motion in Limine to Exclude Certain of the Debtors' Evidence* (the "**PC Motion in Limine**"). (Docket No. 1088). The PC Motion in Limine was later joined by Wilmington. (Docket No. 1119). The Debtors filed their *Opposition to Petitioning Creditors' Omnibus Motion in Limine to Exclude Certain of the Debtors' Evidence* (the "**Debtor Opposition to PC Motion in Limine**") on September 10, 2024. (Docket No. 1105).

The Court has reviewed and considered the plans; all responses, replies, and declarations filed in connection therewith; the Post-Trial Briefs; the PC Motion in Limine; the arguments of counsel, and the record as a whole.

11

## II.   **JURISDICTION**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(L).

## III.   **BACKGROUND**[6]

The Debtors are part of an international gas shipping enterprise (the "**Eletson Enterprise**"). (See *Memorandum Opinion and Order Denying: (i) Motion in Limine; (ii) Motion to Exclude; and (iii) Motions to Appoint a Chapter 11 Trustee* (the "**Trustee Opinion**"), Docket No. 721 at 9). The Eletson Enterprise collectively owns and operates a fleet of gas tanker ships engaged in the business of shipping refined petroleum products and crude oil. (*Id.*).  On October 22, 2013, Holdings partnered with Blackstone Tactical Opportunities ("**Blackstone**") to form Eletson Gas ("**Gas**"), "a $700 million liquefied petroleum gas shipping joint venture . . . ." (DX-002(O), the "**Final Award**") at 5). Upon formation of Gas, Blackstone held the preferred shares of Gas (the "**Gas Preferred Shares**"), and Holdings held the common shares of Gas. (*Id.* at 5–6).

### A.   **THE INDENTURE**

In December 2013, Debtors Holdings and Agathonissos issued those certain *9.625% First Preferred Ship Notes due 2022* (the "**Old Notes**") in the principal amount of $300,000,000. (Docket No. 985 (the "**Hadjieleftheriadis Claim Objection Declaration**") at ¶ 8). Deutsche Bank served as trustee under the indenture governing the Old Notes. (*Id.*).

---

[6] This Memorandum Opinion and Order is being issued subsequent to the *Memorandum Opinion and Order Overruling in Part and Sustaining in Part Debtors' Claim Objections* (the "**Claim Objection Opinion**"), familiarity with which is assumed. (Docket No. 1211). The findings of fact and conclusions of law contained within the Claim Objection Opinion will be discussed herein as necessary.

In May 2018, Holdings and Finance initiated an exchange for the Old Notes (the "**Note Exchange**"). (*Id.* at ¶ 9). Approximately 98% of the holders of the Old Notes participated in the Note Exchange, and in July 2018, the Debtors finalized the Note Exchange and issued those certain *First Preferred Ship Mortgage Notes due 2022* (the "**New Notes**"). (*Id.*). The New Notes were issued in a principal amount of $314,068,360. (Claim No. 14-2 at Ex. A-1; Docket No. 993 (the "**Healy Declaration**") at ¶ 6).

The New Notes were governed by an indenture (the "**Indenture**"), pursuant to which Wilmington served as trustee and collateral agent. (*See* Claim No. 14-2 at Ex. A; Healy Declaration at ¶ 6). "Under the terms of the [New] Notes and the Indenture, interest on the [New] Notes accrued in accordance with a formula set forth on page A-1 of the [New] Notes." (Healy Declaration at ¶ 8). The formula called for interest to accrue at specified rates and in a specified manner during three discrete time periods as follows:

    i.    Semiannually, in arrears, for the interest period from January 16, 2018 to July 15, 2018, at a rate of 12.00% per annum, payable on July 15, 2018 to holders of record on the Closing Date, payable entirely by increasing the principal amount of the outstanding Notes or by issuing new Notes ("**PIK Interest**");

    ii.    Semiannually, in arrears, for the interest period from July 16, 2018 to January 15, 2019, at a rate of 9.625% per annum, payable on January 15, 2019 in cash ("**Cash Interest**") to holders of record on January 1, 2019; and

    iii.    From and after January 16, 2019, quarterly, in arrears, at a rate per annum of (i) 9.625% for any interest payment date for which the Trailing TCE is less than $20,000 or (ii) 10.625% plus 1.00% for each integral multiple of $2,000 by which the Trailing TCE for such interest payment date exceeds $20,000 (up to a maximum of 14.625% per annum), payable on each January 15, April 15, July 15 and October 15 (each, a "**TCE-Based Interest Payment Date**") as Cash Interest to holders of record on the immediately preceding January 1, April 1, July 1, and October 1, respectively.

(Healy Declaration at ¶ 8 (citing Claim No. 14-2 at 202)).[7] The New Notes also provide that the Debtors must pay interest on any overdue principal at a rate of "1% per annum in excess of the then applicable interest rate" (the "**Default Interest Rate**"). (*Id.* at ¶ 11).

Additionally, the Indenture governing the New Notes: (i) specified certain events of default, including failure to pay interest within 30 days of the payment due date; and (ii) provided that the Debtors were to indemnify Wilmington against all losses, liabilities, and expenses arising out of Wilmington's administration of duties under the Indenture. (*See* Claim No. 14-2 Ex. A at §§ 6.01, 7.07(b), 10.10(b)).

The Indenture also set forth the scope of Wilmington's rights and responsibilities to act on behalf of noteholders under the Indenture. For instance, the Indenture: (i) authorizes Wilmington to exercise remedies against the Debtors in the case of default, including by instituting a judicial proceeding, with or without direction from the noteholders themselves (Claim No. 14-2 Ex. A at §§ 6.03; 6.08)); (ii) provides that "[h]olders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to [Wilmington]" (*id.* at § 6.05); and (iii) provides that Wilmington "need not investigate any fact or matter stated in any . . . certificate [or] statement" and "may conclusively rely and shall be fully protected in acting or refraining from acting upon" any such documents" if it does take direction from a noteholder (*id.* at §§ 7.02; 10.01(e)).

---

[7] The Trailing TCE set forth above is a performance-based metric defined in the Indenture that was to be provided by the Debtors to Wilmington no later than five days before the TCE-Based Interest Payment Date. (Healy Declaration at ¶ 9 (citing Claim No. 14-2 Ex. A at § 4.03(g))). According to Wilmington, the Debtors never provided the Trailing TCE. (Healy Declaration at ¶ 10). Accordingly, Wilmington applied the maximum interest rate of 14.625% for each quarter beginning on January 16, 2019. (*Id.*).

14

The Debtors also pledged certain assets as collateral for the New Notes under the Indenture (the "**Pledge Agreement**"), including:

> (i) all outstanding common shares or membership interests in Finance and certain guarantors under the Indenture (the "**Pledged Equity**"); (ii) thirteen shipping vessels owned by guarantors under the Indenture (the "**Vessels**"); (iii) the earnings arising from the freights, hires, and other earnings from the operation and use of or relating to the [V]essels; and (iv) all other cash and various accounts of [Agathonissos] and the guarantors.

(Hadjieleftheriadis Claim Objection Declaration at ¶ 10).

On August 13, 2018, the Debtors purchased some of the New Notes back from noteholders, resulting in a reduced principal amount of $324,862,074.60, and interest in the amount of $2,431,953.59 as of that date. (Healy Declaration at ¶ 16).

Shortly thereafter, on January 15, 2019, the Debtors defaulted under the Indenture by failing to make a payment required thereunder. (Healy Declaration at ¶ 18). As a result of the default, Wilmington applied interest for the period January 16, 2019, to February 15, 2019 (the "**Grace Period**") at a rate of 14.625%. (*Id.* at ¶ 20). After the Grace Period, Wilmington applied the Default Interest rate of 15.625%. (*Id.* at ¶ 21).[8]

### B.  THE FIRST RSA AND THE STRICT FORECLOSURE

On June 24, 2019, the Debtors, certain of the Debtors' equity holders and guarantors, and an ad hoc group of noteholders (the "**Ad Hoc Group**") entered into a Restructuring Support Agreement (the "**First RSA**") setting forth the terms of a restructuring of the Debtors' obligations under the New Notes and the Indenture. (*Id.* at ¶ 23–24). As part of the First RSA, and in accordance with the Pledge Agreement, the Debtors executed a Strict Foreclosure

---

[8] According to Wilmington, as of the date that the instant cases were converted to voluntary proceedings under Chapter 11 of the Bankruptcy Code, the outstanding amount due under the indenture, inclusive of principal and interest, was $362,072,957.96. (*Id.* at ¶ 32).

15

Agreement (the "**Strict Foreclosure Agreement**"). (*Id.* at ¶ 25). The Strict Foreclosure

Agreement provided in part that:

> if the restructuring transactions contemplated by the [First] RSA were not consummated on or before the earlier of (i) December 24, 2019 or (ii) the termination of the [First] RSA, so long as the Strict Foreclosure [Agreement] remained in full force and effect, the obligations owed to [Wilmington] and to the Holders of the Notes would be deemed partially satisfied in the amount of $130 million in exchange for the acceptance by the Holders of the foreclosed Collateral.

(*Id.* at ¶ 25).

The Ad Hoc Group terminated the First RSA on August 9, 2019, and accordingly,

pursuant to the Strict Foreclosure Agreement, the "outstanding principal amount of the Notes

was [] reduced . . . to $194,862,074.60 as of that date," and the collateral was liquidated. (Healy

Declaration at ¶ 26).

## C.  THE SECOND RSA

On October 29, 2019, the Debtors, certain holders of equity interests in Holdings, and

certain holders of more than 80% of the New Notes (the "**Consenting Noteholders**"), entered

into a second Restructuring Support Agreement (the "**Second RSA**") (Docket No. 984 Ex. 9).

(Hadjieleftheriadis Claim Objection Declaration at ¶ 15).[9] The Second RSA contained numerous

milestones, the first of which provided that:

> As soon as reasonably practicable, but in no event later than October 31, 2019, the Company shall have entered into a memorandum of agreement with respect to the sale of the Company's interest in the vessel Salamina, which shall be in form and substance acceptable to the Company and the Required Consenting Noteholders.

(Second RSA at Ex. C).[10] Additionally, Section 5(c) of the Second RSA required that:

---

[9] Wilmington was not a party to the Second RSA. (September 9 Transcript at 165:5–11).

[10] Some of the other milestones set forth in the Second RSA include, *inter alia*: (i) agreement on the form and substance of an out of court restructuring of the Debtors' indebtedness to be reached within 15 days of the memorandum of agreement regarding the sale of the Salamina; (ii) commencement of solicitation of the out of court restructuring, or alternatively, a chapter 11 plan within 21 days from the memorandum of understanding for the sale

any proceeds from the sale, after the payment of applicable professional fees, shall be paid pro rata to holders of (i) [New Notes], (ii) Old Notes [], and (iii) claims arising under the Working Capital Facility Agreements, it being understood and agreed that the pro rata portion payable will be applied to pay the New Holdings Preferred Stock as described in the Restructuring Term Sheet; provided, that, if the Debtors do not satisfy the Milestones with respect to the sale of vessel Salamina then, (i) the Debtors and Required Consenting Noteholders shall consult with each other concerning the sale of the Salamina and/or an Alternative Vessel (as defined below) for a period of fourteen days and (ii) after such fourteen day period, at the direction of the Required Consenting Noteholders, a third-party, reasonably acceptable to the Required Consenting Noteholders and the Debtors (it being understood that Clarksons London is acceptable to the Debtors), will be engaged to sell the Debtors' interest in one or more vessels, as determined by the Required Consenting Noteholders (such vessel, the "Alternative Vessel"), on a timeframe to be reasonably acceptable to the Required Consenting Noteholders.

(*Id.* at § (6)(a)(ii). Importantly, the Second RSA expressly provided that it could be terminated:

by the Consenting Noteholders holding, in aggregate, at least two thirds in principal amount outstanding of the Senior Notes Claims held by the Consenting Noteholders (each such group a "**Terminating Support Group**"), upon written notice to all other Parties, upon the occurrence of any of the following events (each a "**Termination Event**"):

. . .

(ii) the failure of the Debtors to meet any Milestone set forth on Exhibit C unless (i) such failure is the result of any act, omission, or delay on the part of any Consenting Noteholders whose Terminating Support Group is seeking termination under this Agreement or (ii) such Milestone is extended in accordance with Exhibit C.

(*Id.* at § (6)(a)(ii). Notably, notwithstanding the termination provision set forth above, the

Second RSA also included a reservation of rights which stated in relevant part:

This [Second RSA and related term sheet] are part of a proposed settlement of disputes among the Parties. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the

---

of the Salamina; (iii) consummation of the out of court restructuring within 5 days of the termination of the solicitation period if the out of court restructuring received supermajority approval from the Consenting Noteholders; (iv) commencement of voluntary chapter 11 cases within 5 days of the termination of the solicitation period if the out of court restructuring does not receive supermajority approval by the Consenting Noteholders; and (v) certain additional milestones to be completed in the context of the potential bankruptcy filing, should the out of court restructuring not receive the required supermajority approval. (*Id.* at Ex. C). It does not appear that any of these milestones were met.

> [Second RSA] are not consummated as provided herein, if (x) a Termination Event occurs, or (y) this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests . . . .

(*Id.* at § (28)).[11]

Importantly, the term sheet provided *inter alia*, that pursuant to the restructuring contemplated by the Second RSA: (i) Holdings would issue "[p]referred equity with $47.5MM liquidation preference and 8% annual dividend [] issued to bondholders;" and (ii) the provision of 70% of the common equity in Holdings to be issued to the Noteholders. (*Id.* at Ex. A (the "**Second RSA Term Sheet**")).

The Second RSA also included: (i) restrictions on the transfer of notes, stating that none of the Consenting Noteholders shall "sell, transfer, assign, hypothecate, pledge, grant a participation interest in, or otherwise dispose of" their interests in the New Notes without such transferee having executed a joinder to the Second RSA at least three days prior to the effectiveness of the transfer, or such transfer would be deemed "null and void and of no force or effect" (*id.* at § (7)(a)); (ii) a forbearance period (the "**Forbearance Period**") whereby the parties to the Second RSA agreed not to undertake certain collection activities under the Indenture while the Debtors moved toward consummation of the restructuring contemplated by the Second RSA (*id.* at § 36); and (iii) a prohibition on entry into new financing arrangements, including vessel leases, without obtaining approval from the noteholders. (*Id.* at § (5)(d)).

Moreover, the Second RSA contained a specific performance provision entitling a non-breaching party to "specific performance and injunctive or other equitable relief as a remedy of

---

[11] The term Termination Event as it is used in the preceding provision is defined in the Second RSA as having the meaning ascribed to it in paragraph (6)(c) of the Second RSA, which in turn states that such date is the date on which the Second RSA is terminated in accordance with Section 6 of the Second RSA. (*Id.* at §§ (1) (definition of "Termination Date"); (6)(c)).

18

any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any [p]arty to comply promptly" with any of their obligations under the Second RSA. (*Id.* at § 26).

### D. **DEFAULT UNDER THE SECOND RSA**

The Debtors apparently defaulted under the very first milestone under the Second RSA by failing to enter into a memorandum of agreement regarding the sale of the Salamina by October 31, 2019.[12] (Hadjieleftheriadis Claim Objection Declaration at ¶¶ 21–22; Docket No. 381 at ¶ 14). Accordingly, on November 15, 2019, the Consenting Noteholders sent the Debtors the *Direction Letter Pursuant to Section (5)(c) of the Restructuring Support Agreement* (the "**November 15 Direction Letter**," CX-101[13]), directing the Debtors to retain Clarksons London to sell the Salamina as contemplated by the Second RSA. (November 15 Direction Letter).

On January 16, 2020, Paul, Weiss, Rifkind, Wharton & Garrison ("**Paul Weiss**"), purportedly acting as counsel for the Ad Hoc Group under the Indenture, sent a letter to Holdings (the "**January 2020 Letter**"), noting that: (i) the Debtors had "failed to comply with the terms necessary to complete every [term of the proposed restructuring];"[14] and (ii) the Ad Hoc Group had not received any interest payments on account of their notes since 2018. (CX-223). Accordingly, the January 2020 Letter indicated that the Ad Hoc Group "continues to reserve its rights to exercise all remedies and assert all claims available under the Indenture and under

---

[12] The Salamina was apparently ultimately sold in April 2021, and the proceeds of the sale were used to pay down other debt. (Hadjieleftheriadis Declaration at ¶¶ 14, 21–22).

[13] Wilmington and the Petitioning Creditors jointly submitted the *Second Amended Joint Exhibit List of Wilmington Savings Fund Society, FSB, as Trustee and Collateral Agent and Petitioning Creditors for Hearing on Debtors' Objections to Certain Claims* (the "**CX**") (Docket No. 1117) in connection with the claim objections.

[14] The January 2020 Letter appears to reference another restructuring proposal sent to the Debtors on December 27, 2019, which contemplated termination or amendment of the Second RSA, entry into a new or revised RSA, and a voluntary chapter 11 bankruptcy filing pursuant to a pre-packaged plan that would vest 70% of the Debtors' equity in a group of noteholders. (CX-222; CX-223).

applicable law, including . . . the right to commence an involuntary bankruptcy case against Holdings . . . ." (*Id.*)

### E.  THE OCM STIPULATION

As noted *supra*, Section (II)(C), the Second RSA prohibited refinancing of Vessel leases without prior consent of a majority of the Consenting Noteholders. (Second RSA at § (5)(d)). However, in June 2020, the Debtors obtained such consent and refinanced certain Vessel leases in connection with OCM Maritime Thames LLC, OCM Maritime Autumn LLC, OCM Maritime Rhine LLC, and OCM Maritime Yukon LLC (collectively, "**Oaktree**," and the agreement, the "**OCM Stipulation**"). (DX-001(g)). As is relevant here, the OCM Stipulation: (i) includes a recital noting that "the Eletson Parties and the Holders are parties to that certain Restructuring Support Agreement dated as of October 29, 2019;" (ii) prohibits noteholders from selling, assigning, transferring, hypothecating, or otherwise disposing of their New Notes unless, "as a condition precedent to any such transaction, the transferee" executes a joinder to the OCM Stipulation; and (iii) provides that any disposition of the New Notes as set forth above is void *ab initio* if a joinder is not executed. (*Id.* at § (4)(a)–(b)).[15]

### F.  MURCHINSON, PACH SHEMEN, & LEVONA

On November 2, 2021, Blackstone sold the Gas Preferred Shares to Murchinson, "an alternative management firm that manages funds on behalf of institutional investors." (Final Award at 6–7). As part of this transaction, Murchinson formed Levona Holdings Ltd. ("**Levona**")—a special purpose entity—to hold the Gas Preferred Shares.[16] (*Id.* at 7).

---

[15] Pach Shemen and Alpine signed joinders to the OCM Stipulation on April 28, 2023. (*See* CX-127–128).

[16] Levona is directly owned by two Murchinson owned funds, Nomis Bay and BPY. (*Id.*)

After Levona acquired the Gas Preferred Shares, the Debtors and Levona began discussing the terms by which the Debtors could potentially buy the Gas Preferred Shares back from Levona. (*Id.* at 8). Ultimately, the parties entered into a Binding Offer Letter (the "**BOL**") on February 22, 2022, whereby Levona granted the Debtors (or the Debtors' nominee) a purchase option (the "**Purchase Option**") to purchase the Gas Preferred Shares for an amount dependent in part upon the net asset value of two vessels owned by Gas—the Symi and Telendos. (*Id.*) Subsequently, a dispute arose regarding whether the Debtors had properly exercised the Purchase Option contained in the BOL. (*Id.* at 11). Accordingly, on July 29, 2022, Holdings and an affiliate, Eletson Corp., commenced a JAMS arbitration (the "**Arbitration**") against Levona seeking, *inter alia*, a determination regarding who owned the Gas Preferred Shares. (*Id.* at 9–10).

While the Arbitration was pending, Murchinson and Levona sought an alternative means by which they could obtain control of the Gas assets should the Arbitration result in an adverse outcome. (*Id.* at 20–21). As part of these efforts, Murchinson and Levona negotiated with certain holders of the New Notes regarding the potential purchase of a majority of the then-outstanding New Notes. (DX-096 (the "**Note Purchase Emails**") (email chain discussing New Note purchase terms)). Murchinson's plan was to purchase a majority of the New Notes in order to embark on a potential "bankruptcy strategy" to exert control over the Debtors and prevail in the Arbitration. (DX-199 (the "**Bankruptcy Strategy Emails**") (discussing the need to move quickly because Murchinson already had "the lawyers in motion on the bankruptcy strategy")). Murchinson ultimately negotiated the purchase of a majority of the New Notes, totaling $183,851,546. (Final Award at 60). As consideration for its purchase of the New Notes, Murchinson agreed to pay to the selling noteholders: (i) $2,000,000 up front; (ii) an additional

21

$500,000 if the Arbitration ended to Murchinson's satisfaction; (iii) 10% of the value received by Levona for its Gas Preferred Shares (excluding certain expenses), up to $1,000,000; (iv) one third of the first $3,000,000 profit realized by the entity holding the New Notes on Murchinson's behalf (excluding expenses); and (v) thereafter 25% of any profit realized by the entity holding the New Notes on Murchinson's behalf after $3,000,000 of profit is earned under (iv). (*See* Note Purchase Emails). Murchinson formed Pach Shemen—another special purpose vehicle—on December 12, 2022, to hold the New Notes, which were officially acquired on January 4, 2023. (Final Award at 60).[17]

### G. **THE BANKRUPTCY PROCEEDINGS**

On March 8, 2023, Pach Shemen, VR Global, and Alpine, filed involuntary chapter 7 bankruptcy petitions against the Debtors. (*See* Docket No. 1). The Debtors filed a Motion to Dismiss the involuntary Chapter 7 petitions on April 14, 2023. (Docket No. 40).

Shortly after the involuntary bankruptcy cases were filed, the parties stipulated to relief from the automatic stay to permit "a trial, any related pre-trial proceedings (including any remaining discovery), any related post-trial proceedings or briefing, and a final determination or award to be made by the Arbitrator, including any appeals, with respect to the claims currently pending in the Arbitration . . . ." (Docket No. 48 at 3).

On September 6, 2023, the Debtors stipulated to conversion of the involuntary Chapter 7 cases to voluntary Chapter 11 cases (the "**Conversion Stipulation**"). (Docket No. 204). The

---

[17] As addressed at length in the Claim Objection Opinion, the Debtors contend that Pach Shemen's acquisition of the New Notes is void *ab initio* pursuant to certain agreements governing the New Notes, and that Pach Shemen's claims should be disallowed because Pach Shemen acquired the New Notes in bad faith. (*See generally* Claim Objection Opinion). The Court rejected those arguments in the Claim Objection Opinion and found, *inter alia*, that Pach Shemen's acquisition of the New Notes is not void *ab initio*, that Pach Shemen is a valid holder of the New Notes, and that Pach Shemen did not acquire the New Notes in bad faith. (*Id.* at 38–45, 55–63).

Conversion Stipulation was memorialized as a written order on September 25, 2023 (the "**Conversion Order**"). (Docket No. 215).

On October 20, 2023, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "**Committee**"). (Docket No. 233). The Committee was comprised of Gene B. Goldstein, Aegean Baltic Bank S.A. ("**AB Bank**")[18], and Wilmington Savings Fund Society, FSB as Indenture Trustee. (*Id.*)

While the bankruptcy cases progressed, the arbitrator issued the Final Award on September 29, 2023. (*See generally* Final Award). In the Final Award, the Arbitrator found that the Debtors had exercised the option under the BOL to acquire the Gas Preferred Shares by transferring shares of the Symi and the Telendos to Levona. (*Id.* at 34–38). The Final Award also concluded that the Gas Preferred Shares had been transferred to affiliates of the Debtors' principles (the "**Cypriot Nominees**") as of March 11, 2022. (*Id.* at 96). Additionally, the arbitrator assessed nearly $87 million in damages against Levona, Pach Shemen, and Murchinson, because the arbitrator found that, *inter alia*, Murchinson and its proxies: (i) bribed an officer (the former CFO) of Eletson Corporation and Gas to act against Gas' interests; (ii) breached an NDA by communicating directly with Gas financiers and lenders; (iii) intentionally

---

[18] AB Bank resigned from the Committee on June 14, 2024, for undisclosed reasons. (Creditor Brief at ¶ 28 n.17). Shortly thereafter, the Debtors made statements "in open Court, in public filings, and elsewhere—including in response to questions from the Court—about reasons why AB Bank may have resigned." (*Id.* (citing CRX-29 at 34:2–35:6 (questioning whether AB Bank reviewed a declaration on plan feasibility prior to its resignation); Docket No. 862 at 1 (asserting that AB Bank "resigned when the Murchinson-controlled 'committee' appealed Your Honor's discretionary denial of the motion to appoint a trustee"); CRX-32 at 67:11-19 ("THE COURT: Why did it [AB Bank] leave the committee? . . . [Debtor's Counsel]: Your Honor, I don't know, but I do know . . . that the timing was proximate to when Your Honor ruled on the trustee motion. And then the committee decided to take an appeal from that. I don't have direct Information about that, Your Honor. I do know that . . . they're not there any longer.")). It was later disclosed at the Hearings on these matters that an officer and director of the Debtors had reached an agreement with AB Bank on June 5, 2024, whereby Corp.—one of the Debtors' wholly owned subsidiaries—agreed to pay $6 million to AB Bank over a period of six years to resolve AB Bank's claims. (Creditor Brief at ¶ 28 (citing CRX-123)). The Debtors did not seek Court approval of this agreement. Corp. made the first $1 million payment to AB Bank pursuant to the agreement on June 13, 2024, and AB Bank withdrew from the Committee the next day. (*Id.* (citing CRX-90)).

violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the

Arbitration; and (v) refused to produce relevant documents in the Arbitration. (*Id.* at 50–52, 56,

62, 69, 99–101). Notably, despite the fact that Debtor Holdings was a party to the Arbitration,

none of the damages awarded in the Final Award were awarded to Debtor Holdings. Instead,

approximately half of the damages were awarded to Gas, and half were awarded to the Cypriot

Nominees because the arbitrator found that they were the parties directly harmed by Levona's

conduct. (*Id.* at 64 (stating that "[t]he damages should be paid to the [Cypriot] Nominees, as they

flow directly from Levona's refusal to relinquish the preferred interests, and the [Cypriot]

Nominees hold all title and interest in the preferred interest"); *Id.* at 66–67 (describing damages

that should be awarded to Gas for, *inter alia*, the leaking of Gas information, reputational harm

to Gas, and lost business opportunities)).

Thereafter, Holdings and Eletson Corp. filed a petition in the United States District Court

for the Southern District of New York (the "**District Court**" and the "**Confirmation**

**Proceedings**," pending at *Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 23-cv-07331-LJL

(S.D.N.Y)) to confirm the Final Award. (Confirmation Proceedings at Docket No. 1). Levona

filed a cross motion to vacate same. (Confirmation Proceedings at Docket Nos. 28–31).

On February 15, 2024, the District Court issued an *Opinion and Order*, which confirmed

the Final Award in part (the "**Confirmation Ruling**," DX-002(X)) but vacated certain portions

of the damages and certain findings made by the arbitrator relating to Levona, Pach Shemen, and

Murchinson's liability under an alter ego theory. (*See generally* Confirmation Ruling). On July 3,

2024, Levona filed a motion for leave to amend its vacatur petition in order to raise the

possibility that the Debtors had withheld key documents from the arbitrator that allegedly

undermine the Debtors' position that the Debtors had exercised the option to purchase the Gas

24

Preferred Shares from Levona. (Confirmation Proceedings at Docket No. 123). On September 6,

2024, the District Court granted Levona's motion to amend, stating:

> Crediting the inferences for which Levona argues, the newly-produced documents
> put the lie to Eletson's suggestion that these documents would be irrelevant. The
> documents are highly relevant both to the arbitration and to the proceedings before
> [the District Court]. They tend to show fraud in the arbitration proceeding.

(Docket No. 1084 Ex. A at 16). The District Court went on to state that "Levona has proffered

evidence that would suggest that the [allegedly withheld documents] may be just the tip of the

iceberg and that there may be other relevant documents that would support its claims that

extraordinary circumstances prevented it from filing earlier and that fraud was committed in the

arbitration." (*Id.* at 47). Accordingly, the District Court granted Levona discovery to determine

whether the Final Award "was procured by fraud or undue means." (*Id.*) The Court understands

that these proceedings remain ongoing, and that there is a schedule in place that contemplates the

completion of discovery by January 13, 2025, and the completion of briefing by February 25,

2025. (*See* Creditor Brief Ex. A (the "**District Court Case Management Order**")).

Additionally, earlier in these proceedings, the Petitioning Creditors, the Committee, and

the United States Trustee each filed motions to appoint a Chapter 11 Trustee (Docket Nos. 394,

424, 468), which the Court denied on May 29, 2024, in its *Memorandum Opinion and Order

Denying: (i) Motion in Limine; (ii) Motion to Exclude; and (iii) Motions to Appoint a Chapter 11

Trustee* (the "**Trustee Opinion**"). (Docket No. 721).

Finally, the Court notes that Pach Shemen provided the Debtors with a debtor in

possession loan (the "**DIP Loan**") pursuant to the *Order (a) Authorizing the Debtors to Obtain

Postpetition Financing and (b) Granting Related Relief* (the "**DIP Order**") which the Court

entered on August 30, 2024. (Docket No. 1052). As is relevant here, the DIP Loan is an

"unsecured postpetition [loan] in the form of a multi-draw term loan facility . . . in the aggregate

25

principal amount of $10,000,000.00." (DIP Order at 1). The DIP Loan was provided at a .5%

interest rate per annum, payable in kind, with a default interest rate of 1.5% per annum. (*See*

Docket No. 921 at 9 (the *Motion for Entry of an Order (a) Authorizing the Debtors to Obtain*

*Postpetition Financing and (b) Granting Related Relief* (the "**DIP Motion**"))).

## H. THE PLAN PROCESS AND THE DIP LOAN

On January 23, 2024, the Debtors filed their *First Joint Plan of Reorganization of*

*Debtors under Chapter 11 of the United States Bankruptcy Code* (the "**Debtors' Original Plan**")

along with a disclosure statement on the day the 120-day exclusivity period pursuant to Section

1121(b) of the Bankruptcy Code. (Docket Nos. 370, 371); *see also* 11 U.S.C. § 1121(b). The

Debtors' Original Plan was not accepted within the next 60 days as required by Section

1121(c)(3) of the Bankruptcy Code, and accordingly, the Debtors' exclusivity period lapsed on

March 23, 2024.[19] *See* 11 U.S.C. § 1121(c)(3). On March 26, 2024, the Petitioning Creditors

filed their *Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated*

*Debtors* (the "**PC Original Plan**") along with a disclosure statement. (Docket Nos. 531, 532).

The Petitioning Creditors also filed their *Overbid Chapter 11 Plan for Eletson Holdings Inc. and*

*its Affiliated Debtors* (the "**PC Original Alternative Plan**") along with a disclosure statement on

June 11, 2024. (Docket Nos. 762, 763).

Each of the original plans and disclosure statements were amended multiple times, and

the final disclosure statements (Docket No. 839 (the "**Debtor Disclosure Statement**"), Docket

No. 847 (the "**PC Disclosure Statement**"), Docket No. 849 (the "**PC Alternative Disclosure**

---

[19] Prior to the expiration of the Debtors' exclusivity period, the Petitioning Creditors had filed the *Motion to Terminate the Debtors' Exclusivity Period*. (Docket No. 384). Wilmington and the Committee had also each filed joinders to the motion. (Docket Nos. 419, 473). However, prior to the hearing on that motion, the Debtors intentionally allowed exclusivity to lapse to permit competing plans, without seeking an extension of same. (*See* Trustee Opinion at 21).

**Statement**") were approved on July 10, 2024, following hearings held on May 15, 2024, May 31, 2024, June 7, 2024, and June 18, 2024. (Order Approving Disclosure Statements).

Thereafter, the parties commenced solicitation of the plans.

## I.   SUMMARY OF THE DEBTOR PLAN

Principally, the Debtor Plan is a "new value plan" that contemplates the return of 100% of the equity of the reorganized Debtor[20] to the Debtors' Shareholders. (Debtor Plan at 22–23). The Debtor Plan will be funded in several ways.

### 1.   The Litigation Trust

First, the Debtor Plan contemplates the establishment of a litigation trust (the "**Litigation Trust**"), which would pursue the Litigation Trust Causes of Action (the "**Litigation Trust Causes of Action**"). (*Id.* at 10). The Litigation Trust Causes of Action are defined in the plan to include:

> any and all claims and Causes of Action of the Debtors arising under state or federal law, Liberian Law or Marshall Islands Law including all Pending Adversary Proceedings, Claim Objections and Avoidance Actions owned by, or asserted on behalf of, or that may be asserted by or on behalf of, the Debtors or their Estates listed on the Litigation Trust Causes of Action Schedule.

(*Id.* at 10–11). As set forth in the Litigation Trust Causes of Action Schedule, the Litigation Trust Causes of Action specifically include:

> • Any and all Causes of Action that Eletson Holdings may assert, directly or derivatively, against the Debtors' current or former directors, officers, shareholders, based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the [Cypriot Nominees].
> • Any and all Causes of Action of any kind whatsoever that Eletson Holdings may hold or may assert, directly or derivatively, against the Preferred Owners based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the Preferred Owners.

---

[20] The Debtor Plan contemplates that the Debtors will be consolidated into Holdings (the "**Reorganized Debtor**") on the effective date of the Debtor Plan. (Debtor Plan at 26–27).

- Any and all Avoidance Actions against any party other than those specifically defined in the Retained Causes of Action section of this Schedule.

(Debtor Disclosure Statement Ex. 6 at 1 (the "**Litigation Trust Causes of Action Schedule**")).[21] The Litigation Trust would be funded initially by \$200,000, subject to a budget established by the trustee of the litigation trust (the "**Litigation Trust Trustee**").[22] (Debtor Plan at 2). The Debtor Plan contemplates that the Litigation Trust Trustee will be tasked with carrying out the duties of the Litigation Trust and will be chosen by the Committee. (Debtor Plan at 11). The Debtor Plan further contemplates that the Litigation Trust Trustee would be overseen by the Litigation Trust Oversight Committee (the "**Litigation Trust Oversight Committee**"), whose membership will be comprised of up to five individuals also chosen by the Committee. (*Id.*) In the Committee Supplement, the Committee disclosed that it had chosen Alan D. Halperin, Esq., to serve as the Litigation Trust Trustee, and Mark Lichtenstein, Adam Spears, and Leonard Hoskinson to serve as the initial members of the Litigation Trust Oversight Committee.[23] (Committee Supplement at 50).

The Debtor Plan also provides for certain retained causes of action (the "**Retained Causes of Action**"), which are defined in the plan as:

---

[21] The Litigation Trust Causes of Action Schedule further specifies that the above causes of action are "subject to the Retained Causes Of Action and Avoidance of Doubt Statements provided in this Schedule" as discussed below. (*Id.* at n.3).

[22] In addition to the \$200,000 startup fund, the Litigation Trust will also be funded by "Distributable Cash," which is defined in the plan as "all remaining Cash or cash equivalents comprising of the Shareholder New Value Contribution and SME Revenue after (i) payment of the Allowed Administrative Claims including Professional Fee Claims and Committee Fee Claims, (ii) funding of the [Litigation Trust in the amount of \$200,000], (iii) funding of the Azure Guaranty Recovery, (iv) funding the Eletson Corporation Guaranty Recovery, (v) funding the Trade Creditor Claim Reserve, and (vi) funding the Noteholder Recovery Election Reserve. Notwithstanding the foregoing, (i) any excess amounts remaining in the Trade Creditor Claim Reserve and Noteholder Election Recovery Reserve, if any, after final distributions on account of Allowed Trade Creditor Claims and Noteholder Election Recovery Claims, and (ii) any excess amounts remaining in the Administrative Fund." (*Id.* at 7, 10–11). These additional terms are discussed *infra*, Section (III)(D)(4).

[23] Messrs. Lichtenstein and Spears are each affiliated in various ways with Murchinson, Pach Shemen, and Levona. (September 13 Transcript at 100:12–18; 120:9–12; 220:15–21).

all Causes of Action existing as of the Effective Date not transferred to the
Litigation Trust (including Unknown Causes of Action as applicable) and retained
by the Reorganized Debtor which may be pursued by the Reorganized Debtor for
the benefit of the Reorganized Debtor and Litigation Trust through the Retained
Causes of Action Contribution.

(Debtor Plan at 15). In turn, the Litigation Trust Causes of Action Schedule identifies the

following Retained Causes of Action:

- Any and all Claims and Causes of Action other than those explicitly transferred above.
- Any and all Claims or Causes of Action necessary, warranted, and/or appropriate to collect the entirety of the monetary value of the Final Award issued in the Arbitration. [24]
- Any and all Claims or Causes of Action of the Debtors against Murchinson Ltd., Pach Shemen LLC, Levona Holdings Ltd., Nomis Bay Ltd., BPY Limited, and any other person or entity acting at the direction or in concert, cooperation, or participation with or representing any of the foregoing persons or entities.
- Any and all Claims and Causes of Action of the Debtors against the law firms that have represented the Debtors., Eletson Corporation, Eletson Gas, the Existing Shareholders and their respective affiliates concerning any and all Claims or Cause[s] of Action, including without limitation based on, relating to, or in any manner arising from, or in connection with, the transfer of the Preferred Shares of Eletson Gas to the Cypriot Nominees, the Arbitration (including any appeals), and the District Court Confirmation Proceedings (including any appeals), other past or ongoing legal proceedings in foreign jurisdictions against Murchison, Levona, Pach Shemen and their affiliates.

(Litigation Trust Causes of Action Schedule at 2–3). The Debtor Plan provides that 75% of the

net cash recoveries on account of the Retained Causes of Action shall be contributed to the

Litigation Trust, "net of costs of collection incurred by the Reorganized Debtor and net of any

---

[24] The Court notes that, in addition to the Debtors' commitment to pay 75% of any recovery from the Arbitration to the Litigation Trust as discussed herein, the Debtors' Shareholders have also pledged additional proceeds from the same Arbitration as part of the Shareholder New Value Contribution as discussed *infra*, Section (III)(D)(2). Though not directly explained, it appears that the difference between these two sources of funding is the fact that a portion of the Final Award entered in the Arbitration was awarded to the Cypriot Nominees, which are wholly owned by the Debtors' Shareholders, and the other half was awarded to Gas, whose common shares are owned by the Debtor. Accordingly, it appears that the Debtor Plan purports to pay 75% of the Final Award attributable to Gas to the Litigation Trust *vis a vis* the Retained Causes of Action, and the Debtors' Shareholders propose to contribute a portion of the Final Award attributable to the Cypriot Nominees *vis a vis* the Shareholder New Value Contribution as set forth *infra*, Section (III)(D)(2).

amounts setoff by the Reorganized Debtor for amounts owed to any defendant under a Retained

Cause of Action." (Debtor Plan at 15). Thus, under the Debtor Plan, the Litigation Trust would

collect and distribute 100% of the proceeds (net of expenses) of any recovery from the Litigation

Trust Causes of Action, and 75% of the proceeds (net of expenses) of any recovery from the

Retained Causes of Action.

### 2.    The Shareholder New Value Contribution

The second source of funding under the Debtor Plan is the Shareholder New Value

Contribution, which is defined as "(a) Cash and cash equivalents in an aggregate amount of $37

million and (b) the Collections Contribution." (Debtor Plan at 15). To substantiate the $37

million cash contribution, the Debtors submitted the Shareholder Commitment Letter. (*See*

Shareholder Commitment Letter). The Shareholder Commitment Letter provides that the

Shareholders shall:

i.    provide the Debtors with Cash and cash equivalents in an aggregate amount of $37 million;

ii.   cause each of the Gas Ownership Defendants to contribute and deliver to the Litigation Trust Trustee a cash payment equal to (i) 90% of the first $21 million of net cash recoveries under the Final Award; plus (ii) 50% of the next $20 million of net cash recoveries under the Final Award; plus (iii) 75% of the net cash recoveries in excess of $41 million under the Final Award (the "**Collections Contribution**");

iii.  cause each of the Gas Ownership Defendants to issue a guaranty guaranteeing up to $40 million of the Collections Contribution (the "**Guaranty**");

iv.   establish and cause to be funded by the Gas Ownership Defendants an escrow account (the "**Guaranty Escrow**"), which shall be funded by 40 monthly payments of $1 million each, beginning on the Effective Date;

v.    that in the event less than $15 million of the Collections Contribution has been paid to the Litigation Trust Trustee on such date that is fifteen (15) months from the Effective Date, to cause the difference between the amount of the Collections Contribution [already] provided to the Litigation Trust Trustee and $15 million to be paid to the Litigation Trust Trustee from the Guaranty (the "**First Guaranty Payment**");

vi.   in the event less than $30 million, in the aggregate, of a) the Collections Contribution and b) the First Guaranty Payment has been paid to the Litigation Trust Trustee on such date that is thirty (30) months from the

30

> Effective Date, to cause the difference between the aggregate of a) the Collections Contribution and b) the First Guaranty Payment [already] provided to the Litigation Trust Trustee and $30 million to be paid to the Litigation Trust Trustee from the Guaranty (the "**Second Guaranty Payment**"); and
>
> vii.    in the event less than $40 million, in the aggregate, of a) the Collections Contribution b) the First Guaranty Payment and c) the Second Guaranty Payment has been paid to the Litigation Trust Trustee on such date that is forty (40) months from the Effective Date, to cause the difference between the aggregate of a) the Collections Contribution, b) the First Guaranty Payment and (c) the Second Guaranty Payment previously provided to the Litigation Trust Trustee and $40 million to be paid to the Litigation Trust Trustee from the Guaranty [(the "**Third Guaranty Payment**")].

(*Id.* at 1–2.)[25] The Shareholder Commitment Letter is only enforceable by the Debtors. (Shareholder Commitment Letter at 3 (stating that "[t]his Commitment Letter has been and is made solely for the benefit of the Debtors and their estates and solely for purposes of effecting the Amended Shareholder New Value Contribution under the Plan [and that it is not] intended to confer or does confer on any other person or entity any rights or remedies under or by reason of this Commitment Letter or the agreements contained herein")).

The Debtors also provided certain documents to the Court and the creditors on an "attorney eyes only" basis, in an attempt to demonstrate that the Debtors' shareholders have access to sufficient funds to make the Shareholder New Value Contribution. (*See* DX-312(A)-(C)). Though these documents appear to be from various banking institutions and purport to show sufficient funds held by the shareholders, the Court notes that the first document indicates that the value represented is held in "cash, listed securities and derivatives linked to listed securities" held by two separate entities, one of which is not bound by the Shareholder Commitment Letter. (DX-312(A)). Additionally, the document provides no indication of how

---

[25] The Court notes that the Shareholder Commitment Letter as described above was filed on September 20, 2024, one week after the Hearings concluded on these matters. (*See* Shareholder Commitment Letter). Pro The $40 million escrow provisions described above were not present in earlier versions of the Shareholder Commitment Letter. (*See* Docket Nos. 829 at Ex. 10; Docket No. 1092).

much of the assets in the account are held in cash. (*Id.*) Likewise, the remaining documents describe sums held in the names of several companies, only some of which are bound by the Shareholder Commitment Letter. (*See* DX-312(B)-(C)).

In addition to the cash contribution, the second portion of the Shareholder New Value Contribution is the Collection Contribution, which is described above in both the Shareholder Commitment Letter and in the Debtor Plan. (*See* Shareholder Commitment Letter at 1; Debtor Plan at 4–5 (defining the Collection Contribution as "the Gas Ownership Defendants'[26] agreement to contribute and deliver to the Litigation Trust Trustee a one time-cash payment equal to (i) 90% of the first $21 million of net cash recoveries under the Final Award (with the remaining 10% of net cash recoveries being collected by Eletson Corporation on account of amounts awarded to Eletson Corporation under the Final Award); plus (ii) 50% of the next $20 million of net cash recoveries under the Final Award (with the remaining 50% of such of cash recoveries of amounts awarded to Eletson Corporation under the Final Award); plus (iii) 75% of the net cash recoveries in excess of $41 million under the Final Award; provided, however, for purposes of the foregoing, "net cash recoveries" shall mean cash actually collected under the Final Award net of costs of collection incurred following the date of the Final Award (i.e., September 29, 2023) by Eletson Corporation and/or the Gas Ownership Defendants and net of any amounts setoff by any Gas Ownership Defendants for amounts owed to Levona.")).

### 3. **SME Revenue & Excess SME Proceeds**

The third source of funding for the Debtor Plan is the contribution of cash on hand of certain non-Debtor subsidiaries (the "**SMEs**"). (Debtor Plan at 15). First, the Debtor Plan

---

[26] Gas Ownership Defendants is defined in the Debtor Plan as Gas, the Cypriot Nominees, and any officers or directors of same. (Debtor Plan at 9).

contemplates the contribution of SME revenues ("**SME Revenue**") to the Debtor Plan on the effective date, to the extent that such SMEs have excess cash on hand after subtracting "(i) any amounts, as necessary to satisfy the projected operating expenses of the SMEs not otherwise reasonably expected to be satisfied by anticipated revenues of the SMEs (on a consolidated basis) [for the 180 day period following the effective date]; and (ii) $250,000 (on a consolidated basis)." (*Id.*)

Second, the Debtor Plan contemplates the contribution to the Litigation Trust of certain future proceeds from the SMEs (the "**Excess SME Proceeds**"). (*Id.* at 8). The Excess SME Proceeds fall into two categories, excess SME cash flow proceeds (the "**Excess SME Cash Flow Proceeds**") and excess SME sale proceeds (the "**Excess SME Sale Proceeds**"). Excess SME Cash Flow Proceeds is defined in the plan as:

> future cash contributions of the Reorganized Debtor to the Litigation Trust [during the earlier of the four-year anniversary of the effective date of the plan, or the date on which the sale of all the SMEs has been consummated,] of 20% of the consolidated excess cash flow (calculated on a semi-annual basis) of the consolidated operating revenues of the SMEs less the consolidated operating expenses for the previous six month period, up to a maximum of $5 million in the aggregate.

(*Id.*) Likewise, Excess SME Sale Proceeds is defined as:

> 20% of the gross proceeds from the sale of any SME and/or SME Vessel less said SME's existing debt (including any unpaid obligations under the terms of the applicable bareboat charter and any trade obligations applicable to the operation of such SME Vessel which were incurred but not paid prior to the sale closing date) up to a maximum of $5 million in the aggregate.

(*Id.*)

### 4.  Classification of Claims

The Debtor Plan proposes the following classes of claims:

| Class | Description | Amount in Class[27] | Treatment[28] | Impairment[29] |
|---|---|---|---|---|
| Class 1 | OCM Guaranty Claims[30] | Approximately $49,100,000 | These claims will be reinstated in full as to the reorganized Debtor, provided, however, that the reorganized Debtor shall only be obligated to guarantee 50% of the obligations of the SMEs subject to the OCM Guarantees | Impaired, 50% estimated recovery |
| Class 2 | Corp Guaranty Claims[31] | Approximately $27,768,000 | These claimants will receive: (i) Pro rata distribution of the Eletson Corporation Guaranty Recovery[32] and (ii) each of the Corp Guarantees shall be reinstated as to the Reorganized Debtor, provided, however, that the Reorganized Debtor shall only be obligated to guaranty 50% of the obligations of Eletson Corporation subject to the Corp Guarantees | Impaired, 53.6% estimated recovery[33] |

---

[27] The amounts shown in this column are estimates from the Debtor Disclosure Statement. (See Debtor Disclosure Statement at 6–12).

[28] (See Debtor Plan at 19–23).

[29] Estimated recoveries (expressed as a percent of the dollar amount of the total claims in the class) are estimates from the Debtor Disclosure Statement. (See Debtor Disclosure Statement at 6–12).

[30] OCM Guaranty Claims are claims arising from guarantees executed by Holdings in favor of obligations the SMEs owed to OCM Maritime Rhine LLC, OCM Maritime Yukon LLC, OCM Maritime Autumn LLC and OCM Maritime Thames LLC. (Debtor Plan at 12).

[31] Corp. Guarantee Claims are claims arising from executed guarantees or similar security agreement other than the Azure Guarantees and the OCM Guarantees executed by Holdings guaranteeing the obligations of Eletson Corp. (See Debtor Plan at 6).

[32] Eletson Corporation Guarantee Recovery means "$1,000,000.00 to be paid Pro Rata to Holders of Corp Guaranty Claims." (Debtor Plan at 7).

[33] "The 53.6% recovery consists of (i) 50% for the reinstatement of the Corp Guaranty claims against the Reorganized Debtor, which is not a cash recovery, and (ii) 3.6% for the pro rata share of the $1 million Corp Guaranty Recovery." (Debtor Disclosure Statement at 7 n. 8).

| Class 3 | Azure Guaranty Claims[34] | Approximately $94,799,000 | These claimants will receive their Pro Rata portion of the Azure Guaranty Recovery[35], prior to any transfer by the Debtors of any assets to the Litigation Trust or to any holder of any claim or otherwise | Impaired, .21% estimated recovery |
| Class 4 | Trade Creditor Claims[36] | Approximately $2,750,000 | These claimants will receive cash in an amount equal to 15% such claimant's claim from the Trade Creditor Claim Reserve[37]; provided, that in the event the aggregate distributions to such claimants exceed the Trade Creditor Claim Cap, Holders of Trade Creditor Claims shall receive their Pro Rata Share of the Trade Creditor Claim Cap[38] | Impaired, 15% estimated recovery |
| Class 5 | Noteholder Election Recovery Claims[39] | Unknown | Claims may only be treated pursuant to this class upon the affirmative election by a Class 6A or 6B claimant to have their claim treated in Class 5. Each Class 5 claimant shall receive cash from the Noteholder Election Recovery Reserve[40] in an amount equal to the lesser of (i) the face amount of such claimant's Class 5 claim, (ii) such Class 5 claimant's pro rata | Impaired, 1-100% estimated recovery |

---

[34] Azure Guarantee Claims means claims arising from certain guarantees dated as of August 24, 2019, executed by Holdings in favor of obligations of certain Eletson affiliates to Azure Nova Spring Company, Ltd., Azure Nova Summer Company, Ltd., Azure Nova Autumn Company, Ltd. and Azure Nova Winter Company, Ltd. (Debtor Plan at 3).

[35] Azure Guarantee Recovery means "the lesser of (i) $200,000 and (ii) such other amount as determined by the Debtors and Azure in full and complete settlement, release and satisfaction of the Azure Guaranty Claims." (Debtor Plan at 3).

[36] Trade Creditor Claims are any claims held by creditors that are not classified in Class 1, Class 2, Class 3, Class 5, Class 6A or Class 6B. (Debtor Plan at 15).

[37] Trade Creditor Claim Reserve means a $1,000,000 reserve to fund recoveries for Trade Creditor Claims. (Debtor Plan at 16).

[38] The Trade Creditor Claim Cap means $1,000,000. (Debtor Plan at 15).

[39] Noteholder Election Recovery Claims means the claims of holders in Class 6A or Class 6B that affirmatively elect to have their claims treated under Class 5. (Debtor Plan at 12).

[40] The Noteholder Election Recovery Reserve is a $7,000,000 reserve created to fund recoveries for Class 5 claims. (Debtor Plan at 12).

| | | | portion of the Noteholder Election Recovery Cap[41], or (iii) $70,000. | |
|---|---|---|---|---|
| Class 6A | Non-Petitioning Creditor Exchange Note Claims[42] | $179,000,000-$380,000,000 | Class 6A claimants shall receive on the effective date their pro rata portion of Litigation Trust Interests[43], which shall be distributed to Class 6 claimants in accordance with the Debtor Plan. | Impaired, 4.6-17% estimated recovery |
| Class 6B | Petitioning Creditor Exchange Note Claims | $0-$337,000,000 | Class 6B claims are disputed claims that shall only be allowed by order of the Bankruptcy Court. To the extent Class 6B claims are deemed allowed, such claims are equitably subordinated pursuant to Section 510(c) of the Bankruptcy Code and are only entitled to recovery following payment in full of all Class 6A claims. Notwithstanding the foregoing, if the Bankruptcy Court determines that it is unable to equitably subordinate Class 6B claimants, such claimants will be deemed holders of Class 6A claims and will be paid in accordance with that class. | Impaired, 0-.1% estimated recovery |
| Class 7 | Interests | N/A | In exchange for the Shareholder New Value Contribution, the Holders making such Shareholder New Value Contribution shall receive their pro rata share of equity of the reorganized debtor in a pro rata amount equal to their | Impaired, 100% estimated recovery |

---

[41] The Noteholder Election Recovery Cap means $7,000,000. (Debtor Plan at 12).

[42] Non-Petitioning Creditor Exchange Note Claims means claims held by noteholders of "those certain 9.625% First Preferred Ship Mortgage Notes due 2022 in an original Face Amount of $300 million issued by the Debtors that were exchanged by noteholders pursuant to the that May 25, 2018 exchange offer" other than those held by the Petitioning Creditors. (Debtor Plan at 8, 12).

[43] Litigation Trust Interests means the interests in the Litigation Trust to be distributed on a pro rata basis to Class 6 claimants. (Debtor Plan at 11). Such claimants shall receive their pro rata share of the Litigation Trust Disposable Proceeds, which means "all actual proceeds of (i) the Litigation Trust Causes of Action, net of any amounts (a) used to repay any funding for the Litigation Trust in accordance with the terms of such funding, (b) used to pay the Litigation Trust Expenses, and (c) as otherwise provided in accordance with the Litigation Trust Agreement (ii) the remaining Distributable Cash after satisfaction of the Litigation Trust Expenses, (iii) the Collections Contribution (v) the Retained Causes of Action Contributions and (vi) the cash provided by the Excess SME Proceeds." (*Id.*)

| | | | portion of the Shareholder New Value Contribution made | |
|---|---|---|---|---|

Additionally, the Debtor Plan proposes payment in full on the effective date (subject to allowance by the Bankruptcy Court), of allowed administrative expenses, including professional fees, DIP claims, and substantial contribution claims. (*Id.* at 18–19).

The Debtor Plan thus contemplates distributions in several ways. First, within ten business days of confirmation of the Debtor Plan, the $37 million cash and cash equivalent portion of the Shareholder New Value Contribution shall be utilized as follows: "first, for the payment of Administrative Claims including the Professional Fee Claims, DIP Claims (if any) and the Committee Professional Fee Claims including the funding [sic] any reserves on account of the Professional Fee Claims and Committee Professional Fee Claims required by the terms of this Plan; second, to fund the [initial startup costs of the Litigation Trust]; third to fund the Azure Guaranty Recovery; fourth, to fund the Eletson Corporation Guaranty Recovery; fifth, to fund the Trade Creditor Claim Reserve; [and] sixth, to fund the Noteholder Election Recovery Reserve" with the remainder of the Shareholder New Value Contribution (i.e., the Collections Contribution), to be contributed to the Litigation Trust within thirty business days of the receipt of a final, non-appealable, payment in satisfaction of the Final Award. (Debtor Plan at 24–25).

Second, as set forth above, the Reorganized Debtor shall transfer any Excess SME Proceeds to the Litigation Trust during the Excess SME Proceeds Period (i.e., four years from the effective date of the plan) consistent with the formula discussed *supra*, Section (III)(D)(2). Upon resolution of the Litigation Trust Causes of Action, the Litigation Trust will pay any excess cash on hand to Class 6A claimants, following payment of certain Litigation Trust

37

expenses, consistent with certain procedures set forth in the Debtor Plan and the agreements

governing the Litigation Trust. (*Id.* at 26, 32–35).

### J.  SUMMARY OF THE PC ALTERNATIVE PLAN

As set forth above, the PC Alternative Plan is modeled after the Debtor Plan. However,

the PC Alternative Plan differs in several respects, including, *inter alia*: (i) the initial funding for

the Litigation Trust would be increased from $200,000 to $3,000,000 (PC Alternative Plan at 3);

(ii) Pach Shemen (or an affiliate) is defined as the "Plan Sponsor" (*id.* at 15); (iii) Pach Shemen

will contribute $41 million in exchange for the equity in the reorganized Debtor as opposed to

the Debtors' $37 million contribution (*id.* at 27); (iv) Pach Shemen will also contribute

"contingent value rights" to the Litigation Trust (the "**CVRs**"), which is Pach Shemen's

obligation to pay "a one time-cash payment equal to (i) 90% of the first $21 million of cash

recoveries under the Final Award; plus (ii) 50% of the next $20 million of cash recoveries under

the Final Award; plus (iii) 75% of cash recoveries in excess of $41 million under the Final

Award;"[44] (*Id.* at 5–6); (iv) Class 1 claims (OCM Guaranty Claims) are unimpaired (*id.* at 22);

(v) Class 2 claims (Corp. Guaranty Claims), are entitled to receive either: (a) their pro rata share

of $1,250,000 (as opposed to $1,000,000 as provided for in the Debtor Plan), plus reinstatement,

provided that the reorganized Debtor shall only be obligated to pay 50% of the obligations of

Eletson Corp. subject to the Corp. Guarantees; or (b) their pro rata share of $3,000,000 (*id.* at

23); (vi) Class 5 (Noteholder Election Recovery Claims) are entitled to receive the lesser of (a)

---

[44] For the purposes of the foregoing, "'cash recoveries' shall mean cash actually collected under the Final Award following the date of the Final Award (i.e., September 29, 2023) by Eletson Corporation and/or the Gas Ownership Defendants." (*Id.* at 5–6). However, "to the extent the Final Award is transferred from Eletson Gas and/or the Preferred Owners to Eletson Holdings or the Reorganized Debtor, as applicable, and/or otherwise paid to Eletson Holdings, then the Plan Sponsor shall not have an obligation to contribute and deliver the CVRs, in which case the proceeds of the foregoing shall be transferred to the Litigation Trust as Litigation Trust Distributable Proceeds." (*Id.* at 6).

the face amount of such claimant's Class 5 claim, (b) such Class 5 claimant's pro rata portion of

the Noteholder Election Recovery Cap[45], or (c) $100,000 (as opposed to $70,000 as provided for

in the Debtor Plan) (*id.* at 13); and (vii) the Arbitration and enforcement of the Final Award are

part of the Litigation Trust Causes of Action, and the Retained Causes of Action only include

future litigations "necessary, warranted, and/or appropriate to collect the entirety of the monetary

value of the Final Award issued in the Arbitration." (*Id.* at 12, 17).

Additionally, the Court notes that the Petitioning Creditors have escrowed $43.5 million

in cash in a bank account held by their counsel. (*See* PC Commitment Letter at Ex. A). In

addition to the escrow, the PC Commitment Letter provides, *inter alia*, that: (i) Pach Shemen has

agreed to backstop, "on a fully committed basis, up to $53.5 million (the "**Commitment**

**Amount**") in cash" in support of the PC Alternative Plan and the PC Plan. (*Id.* 1–2).

### K.  SUMMARY OF THE PC PLAN

The final plan pending before the Court is the PC Plan. Primarily, the PC Plan will be

funded pursuant to a $53.5 million (the "**Rights Offering Amount**") equity rights offering (the

"**Rights Offering**"). (PC Plan at 14).

#### 1.  The Rights Offering

As set forth in the PC Plan, the Rights Offering will provide holders of General

Unsecured Claims (excluding Convenience Claims[46]) with subscription rights (the "**Rights**

---

[45] The Noteholder Election Recovery Cap means $8,000,000, as opposed to $7,000,000 in the Debtor Plan. (PC Alternative Plan at 13).

[46] Convenience Claims are allowed general unsecured claims in an "amount that is greater than $0 but less than or equal to [$1,000,000]; provided, that [general unsecured claimants] (including, for the avoidance of doubt, 2022 Notes Claims and Old Notes Claims) exceeding [$1,000,000] may irrevocably elect on their [b]allot to have their [g]eneral [u]nsecured [c]laim reduced to [$1,000,000] and treated as Convenience Claims." (PC Plan at 5–6).

**Offering Subscription Rights**"[47]), to purchase up to 75% of the equity of the reorganized debtor

(subject to dilution on account of the Backstop Premium[48] and the EIP[49] at a price that represents

an implied 14% discount to the mid-point of the plan equity value of up to $62,058,088.00. (PC

Plan at 14).

The Rights Offering Amount is fully committed and backstopped by Pach Shemen

pursuant to a backstop commitment agreement (the "**Backstop Agreement**"). (PC Plan at 3, 10).

The Backstop Agreement provides for, *inter alia*, (i) the ability for certain General Unsecured

creditors to join the Backstop Agreement; and (ii) the backstop parties' commitment to purchase

any Rights Offering Subscription Rights that are not purchased by General Unsecured creditors

in connection with the Rights Offering. (PC Disclosure Statement at 3). In return, such parties

will receive a backstop commitment premium equal to 8% of the equity in the reorganized

Holdings (the "**Backstop Premium**"). (*Id.*) The Backstop Premium shall be divided among the

backstop parties in accordance with their commitment to the Backstop Agreement. (*Id.*)

Additionally, as set forth above in connection with the PC Alternative Plan, the Court

notes that the Petitioning Creditors have escrowed $43.5 million in cash in a bank account held

by their counsel. (*See* PC Commitment Letter at Ex. A). In addition to the escrow, the PC

Commitment Letter provides, *inter alia*, that: (i) Pach Shemen has agreed to backstop, "on a

---

[47] Rights Offering Subscription Rights means the subscription rights to purchase the equity in the reorganized Debtor offered to holders of general unsecured claims pursuant to the Rights Offering in accordance with procedures approved by the Bankruptcy Court. (PC Plan at 14)

[48] Backstop Premium means a backstop commitment premium equal to 8% of the equity of the reorganized debtor (subject to dilution on account of the EIP) issued and outstanding on the effective date. (PC Plan at 3).

[49] EIP means the employee incentive plan established by reorganized debtor's new board after the effective date, which shall provide for equity-based compensation in an amount not to exceed 5% of the equity in the reorganized debtor, to eligible employees of the reorganized debtor's direct and indirect subsidiaries that are not Eletson Insiders. (PC Plan at 8).

fully committed basis," the Commitment Amount, which is a payment of up to $53.5 million in

cash. (*Id.* 1–2).

Finally, pursuant to the PC Plan, the Debtors will be consolidated through Reorganized

Holdings. (PC Plan at 14).

## 2. Classification of Claims

The PC Plan contemplates the following classes:

| Class | Description | Amount in Class[50] | Treatment[51] | Impairment[52] |
|---|---|---|---|---|
| Class 1 | Other Priority Claims[53] | $0 | Class 1 claimants will receive cash equal to the amount of their claim | Unimpaired, 100% estimated recovery |
| Class 2 | Secured Claims[54] | Unknown | Class 2 claimants will receive either: (i) cash in an amount equal to their claim; (ii) reinstatement of such claim; (iii) the collateral securing their claim; or (iv) such other treatment rendering such claim unimpaired | Unimpaired, 100% estimated recovery |

---

[50] The amounts shown in this column are estimates from the PC Disclosure Statement. (*See* PC Disclosure Statement at 45–49).

[51] (PC Plan at 20–25).

[52] Estimated recoveries (expressed as a percent of the dollar amount of the total claims in the class) are estimates from the PC Disclosure Statement. (*See* PC Disclosure Statement at 45–49).

[53] "Other Priority Claim means any Claim against any Debtor accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim, DIP Claim, or Priority Tax Claim." (PC Plan at 12)

[54] "Secured Claim means a Claim against a Debtor (other than Administrative Claims, DIP Claims, Priority Tax Claims, Other Priority Claims, OCM Guaranty Claims, Subordinated Claims, or Intercompany Claims), that is secured by a [l]ien on property in which a Debtor's [e]state has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable [e]state's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) or 1129(b) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code." (PC Plan at 15).

| Class 3 | General Unsecured Claims[55] | $505,000,000 to $768,000,000 | Class 3 claimants will receive: (1) at the claimant's election: (a) Equity: its pro rata share of 25% of the equity of the reorganized debtor; or (b) Cash: its pro rata share of the GUC Cash Pool[56] (calculated based on the amount of all Class 3 claimants, regardless of choice between the cash and equity options; provided that if a Class 3 claimant does not submit a ballot or fails to affirmatively elect treatment, such claimant will be deemed to elect the cash option.<br><br>Class 3 Claimants will also receive their pro rata share of the Rights Offering Subscription Rights[57] (subject to dilution), to purchase equity in the reorganized debtor to be issued pursuant to the Rights Offering to the extent such Class 3 claimant elects to exercise its Rights Offering Subscription Rights | Impaired, 1.8-2.7% estimated recovery (cash out), 1.9-8.32% estimated recovery (equity, excluding rights exercise), 2.9-12.7% (equity, including rights exercise) |

---

[55] "General Unsecured Claim means any [c]laim against any Debtor, but excluding any Administrative Claims, DIP Claims, Professional Fee Claims, U.S. Trustee Fees, Priority Tax Claims, Other Priority Claims, Convenience Claims, OCM Guaranty Claims, Subordinated Claims, or Intercompany Claims, as of the Petition Date that is neither secured by collateral nor entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court." (PC Plan at 9).  "For the avoidance of doubt, any General Unsecured Claims (including, for the avoidance of doubt, [New Note] Claims and Old Notes Claims) that exceed [$1,000,000] is a 'General Unsecured Claim,' unless . . . such [h]older irrevocably elects to have its [claim] treated as a Convenience Claim on its Ballot." (*Id.*)

[56] "GUC Cash Pool means [c]ash in the amount of (a) $13,500,000.00 plus, (b) to the extent the aggregate amount of Professional Fee Claims and DIP Claims filed in the Chapter 11 Cases with the Bankruptcy Court (i) do not exceed $24,200,000.00, $3,000,000.00 or (b) exceed $24,200,000.00, but are less than $27,200,000.00, the difference between (A) $27,2000,000.00 and (B) the aggregate amount of Professional Fee Claims and DIP Claims filed in the Chapter 11 Cases with the Bankruptcy Court." (PC Plan at 10). "For the avoidance of doubt, distributions to [h]olders of Convenience Claims shall not be made from the GUC Cash Pool . . . ." (*Id.*)

[57] Rights Offering Subscription Rights means the subscription rights to purchase the Reorganized Equity offered to General Unsecured Claimholders pursuant to the Rights Offering in accordance with the Rights Offering Procedures. (PC Plan at 14).

| Class 4 | Convenience Claims[58] | Unknown | Class 4 claimants will receive cash equal to 15% of the face amount of such holder's claim, provided that distributions to Class 4 claimants shall not exceed the Convenience Claim Cap, provided further that in the event the distributions to Class 4 claimants exceeds the Convenience Claim Cap[59], such holders shall receive their pro rata share of the Convenience Claim Cap | Impaired, 15% estimated recovery |
| --- | --- | --- | --- | --- |
| Class 5 | OCM Guarantee Claims[60] | N/A | Class 5 claims shall be reinstated | Unimpaired, 100% estimated recovery |
| Class 6 | Subordinated Claims[61] | Unknown | Class 6 claims shall be cancelled, discharged, and released without distribution to holders | Impaired, 0% estimated recovery |
| Class 7 | Intercompany Claims[62] | N/A | Class 7 claims shall be either reinstated or discharged, canceled, released, and extinguished without distribution, as determined by the Plan Proponents or the reorganized debtor, as applicable | Impaired/Unimpaired |

[58] "Convenience Claim means any [a]llowed General Unsecured Claim against the Debtors in an amount that is greater than $0 but less than or equal to the Convenience Claim Threshold Amount; provided, that [h]olders of [a]llowed General Unsecured Claims (including, for the avoidance of doubt, [New] Notes Claims and Old Notes Claims) exceeding the Convenience Claim Threshold [a]mount may irrevocably elect on their [b]allot to have their General Unsecured Claim reduced to the Convenience Class Threshold Amount and treated as Convenience Claims." (PC Plan at 5–6).

[59] Convenience Claim Cap means $2,500,000.00. (PC Plan at 6).

[60] "OCM Guaranty Claim means any Claim arising from or related to the guarantees executed by Eletson Holdings in favor of the obligations of each of:  Fourni Special Maritime Enterprises; Kastos Special Maritime Enterprises; Kimolos II Special Maritime Enterprise; Kinaros Special Maritime Enterprise; OCM Maritime Rhine LLC; OCM Maritime Yukon LLC; OCM Maritime Autumn LLC; and OCM Maritime Thames LLC." (PC Plan at 11).

[61] Subordinated Claim means, collectively, Section 510(b) Claims and Eletson Insider Claims. (PC Plan at 15).

[62] Intercompany Claim means any and all claims of a Debtor against another Debtor or non-Debtor Affiliate. (PC Plan at 10).

| Class 8 | Intercompany Interests[63] | N/A | Class 8 claims shall be either reinstated or discharged, canceled, released, and extinguished without distribution, as determined by the Plan Proponents or the reorganized debtor, as applicable | Impaired/Unimpaired |
| Class 9 | Existing Equity Interests[64] | N/A | Class 9 claims shall be cancelled, discharged, and released without distribution to holders | Impaired, 0% |

The PC Plan also proposes payment in full on the effective date of allowed administrative expenses (subject to allowance by the Bankruptcy Court), including professional fees, DIP claims, and priority tax claims. (*Id.* at 17–19). Additionally, the PC Plan expressly provides that the proof of claim filed by Levona (Claim No. 21-1) is deemed disallowed and will remain disallowed until such claim has been settled or resolved by final order. (*Id.* at 40).[65]

The proceeds of the Rights Offering will be used to fund, *inter alia*: (i) the costs of consummation of the PC Plan, including plan payments, the payment of Administrative Claims, and the payment of priority Claims; (ii) funding of the GUC Cash Pool; and (iii) the costs and expenses of the reorganized debtor, including fees and expenses related to the pursuit of the Retained Causes of Action preserved under the PC Plan.

---

[63] Intercompany Interest means an interest in a Debtor held by another Debtor; provided, for the avoidance of doubt, Parent Equity Interests are not Intercompany Interests. (PC Plan at 10). Parent Equity Interest means any interest in Eletson Holdings. (PC Plan at 12).

[64] "Existing Equity Interests means all existing equity Interests (other than Intercompany Interests), including without limitation, (a) any and all Parent Equity Interest, and (b) all common and preferred stock and all rights to purchase common and preferred stock in each Debtor." (PC Plan at 9).

[65] Relatedly, the PC Plan provides that any decisions relating to claims and causes of action with Levona and its affiliates, including Pach Shemen, will be required to be made by an independent director, provided that the majority of the reorganized Debtor's shareholders (excluding Pach Shemen and affiliates) may settle claims against Levona or direct the actions of the independent director with respect to such claims. (PC Plan at 32). The PC Plan provides that the independent director will be selected by the Committee. (*Id.*)

Previous versions of the PC Plan also provided that an independent director of the reorganized Debtor would have authority over all causes of action relating to Levona (including the Arbitration and District Court proceedings). (PC Plan Ex 2 at 32 (redline of the PC Plan compared to prior version)). Under the old version of the PC Plan, if the other board members of the reorganized Debtor (other than the independent director) disagreed with any decisions made by the independent director with respect to the Levona claims, the reorganized Debtor's board had authority to refer the dispute to an arbitrator to resolve the dispute. (*Id.*) The PC Plan (both the prior version and the version presently pending before the Court) provide that the new board of the reorganized Debtor will be comprised of: (i) one board member selected by the Petitioning Creditors; (ii) one board member selected by the Petitioning Creditors, subject to consent of the Committee; and (iii) the independent director selected by the Committee. (PC Plan at 32). At the close of trial, the Petitioning Creditors agreed to remove from the PC Plan the arbitration provision. (*See* September 13 Transcript at 229:19–230:4). The PC Plan currently pending before the Court provides that only the independent director of the reorganized Debtor has the authority to settle such claims. (*See* PC Plan at 32). However, the PC Plan provides that a majority of the shareholders of the reorganized Debtor (excluding Pach Shemen and any affiliates of Pach Shemen) may settle the Levona claims or direct the actions of the independent director with respect to such claims. (*Id.*)

### L.  <u>VOTING RESULTS</u>

As set forth above, the Debtors and the Petitioning Creditors jointly solicited their plans, and the Lee Certification was submitted with respect to the tabulation of votes on all three of the plans. (*See generally* Lee Certification). At the time the votes were tabulated, there remained several pending objections to proofs of claim filed by various creditors. (*See* Docket Nos. 376–380). The Debtors apparently took the position that votes cast by creditors whose claims were

subject to pending claim objections should not be tallied, so the Lee Certification includes

summaries of votes calculated in two ways: (i) including all the votes; and (ii) excluding the

votes cast by disputed claimants. (*See generally* Lee Certification). The Court subsequently

overruled the Debtors' claim objections in the Claim Objection Opinion, except for the Debtors'

objection to certain claims that were duplicative (Docket No. 376).[66] (*See* Claim Objection

Opinion). Accordingly, the Court will utilize the data in the Lee Certification inclusive of all

votes consistent with the Claim Objection Opinion.

Importantly, creditors were entitled to vote in favor of more than one plan. If a creditor

voted on more than one plan, such creditor could (but was not required to) rank their preference

by so indicating on the ballot. (*See* Docket No. 852, Ex. 5 at 1). With respect to preferences, the

ballots specifically provided:

> You have the option to accept more than one of the Competing Plans. *If you have voted to accept more than one Competing Plan*, please indicate your preference among such Competing Plans by placing a check mark ( √ ) next to the Competing Plan that you prefer. You may only pick ONE plan.

(Docket No. 852, Ex. 7 (Class 2/Class 3 Ballot) at 4–5) (emphasis added).

As set forth above, under the Debtor Plan, Class 1, Class 2, Class 3, Class 4, Class 5,

Class 6A/6B, and Class 7 were all entitled to vote. (*See supra*, Section (III)(i)(4)). The voting

results for the Debtor Plan are as follows:

| Class | Members Voted | Members Accepted | % Members Accepted | Total $ Voted | $ Accepted | % $ Accepted | Plan Preference Vote Count |
|-------|---------------|------------------|--------------------|---------------|-----------|--------------|----------------------------|
| 1 | 4 | 4 | 100% | $4.00 | $4 | 100% | 0 |
| 2 | 3 | 3 | 100% | $27,040,368.42 | $27,040,368.42 | 100% | 3 |
| 3 | 4 | 4 | 100% | $94,799,702.40 | $94,799,702.40 | 100% | 4 |
| 4 | 3 | 1 | 33.33% | $2,703,564.00 | $298,144.00 | 11.03% | 1 |

---

[66] Sustaining the Objection to Duplicative Claims has no impact on the voting results in the Lee Certification because the Court merely found that those creditors' claims were part of claims filed by indenture trustees on behalf of all noteholders under such indentures. However, for plan voting purposes, individual noteholders voted on the plans, not the indenture trustees.

| 5 | 28 | 5 | 17.86% | $67,494,503.00 | $2,609,681.00 | 3.87% | 4 |
| 6A/6B | 20 | 5 | 25% | $199,736,948.00 | $2,745,499.00 | 1.37% | 2 |
| 7 | 5 | 5 | 100% | $0 | $0 | 100% | 5 |

(Lee Certification Ex. A). Accordingly, as discussed herein, Class 1, Class 2, Class 3, and Class

7 voted to accept the Debtor Plan within the meaning of Section 1126(c). *See* 11 U.S.C. §

1126(c) (providing that a class of claims accepts a Chapter 11 plan when holders of such claims

or interest holding at least two-thirds in amount and one-half in number cast a vote in favor of a

Chapter 11 plan).

Likewise, under the PC Alternative Plan, Class 2, Class 3, Class 4, Class 5, and Class

6A/6B were entitled to vote. (*See supra*, Section (III)(j)). Class 1 was not entitled to vote on the

PC Alternative Plan, as they were unimpaired under the PC Alternative Plan and therefore

deemed to accept. (*Id.*) Likewise, Class 7 was not entitled to vote on the PC Alternative Plan

despite being impaired because they were deemed to reject the PC Alternative Plan. (*Id.*) The

voting results for the PC Alternative Plan are as follows:

| **Class** | **Members Voted** | **Members Accepted** | **% Members Accepted** | **Total $ Voted** | **$ Accepted** | **% $ Accepted** | **Plan Preference Vote Count** |
|---|---|---|---|---|---|---|---|
| 2 | 3 | 0 | 0.00% | $27,040,368.42 | $0.00 | 0.00% | 0 |
| 3 | 4 | 0 | 0.00% | $94,799,702.40 | $0.00 | 0.00% | 0 |
| 4 | 3 | 2 | 66.67% | $2,703,564.00 | $2,405,420.00 | 88.97% | 0 |
| 5 | 29 | 17 | 58.62% | $67,522,112.00 | $10,842,818.00 | 16.06% | 10 |
| 6A/6B | 13 | 10 | 76.92% | $195,428,265.00 | $188,386,221.00 | 94.60% | 0 |

(*Id.*) Accordingly, as discussed herein, Class 4, Class 5, and Class 6A/6B voted to accept the PC

Alternative Plan within the meaning of Section 1126(c). *See* 11 U.S.C. § 1126(c).

Finally, under the PC Plan, only Class 3 and Class 4 were entitled to vote. (*See supra*,

Section (III)(k)(2)). Under the PC Plan, Class 1, Class 2, and Class 5 were unimpaired and

deemed to accept the PC Plan, and therefore were not entitled to vote on the PC Plan. (*Id.*)

Likewise, Class 6 and Class 9 were not entitled to vote on the PC Plan despite being impaired

because they were deemed to reject the PC Plan. (*Id.*) Finally, Class 7 and Class 8 were either

impaired or unimpaired, and deemed to either accept or reject, and were therefore not entitled to

vote on the PC Plan. (*Id.*) The voting results for the PC Plan are as follows:

| Class | Members Voted | Members Accepted | % Members Accepted | Total $ Voted | $ Accepted | % $ Accepted | Plan Preference Vote Count |
|-------|---------------|------------------|--------------------|---------------|------------|--------------|----------------------------|
| 3 | 51 | 40 | 78.43% | $418,497,169.82 | $295,470,422.00 | 70.60% | 6 |
| 4 | 25 | 25 | 96.15% | $9,962,526.00 | $9,664,382.00 | 97.01% | 11 |

(*Id.*) Accordingly Class 3 and Class 4 voted to accept the PC Plan within the meaning of Section

1126(c). *See* 11 U.S.C. § 1126(c).

## IV.   LEGAL ANALYSIS

Section 1129 of the Bankruptcy Code sets forth the requirements to confirm a bankruptcy

plan. *See* 11 U.S.C. § 1129. "The proponent of the confirmation of a plan must prove by a

preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a),

and if the plan is not fully consensual, 11 U.S.C. § 1129(b)." *In re Breitburn Energy Partners

LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). A Chapter 11 plan is fully consensual when each

class of claims under the plan has either voted to accept the plan or is unimpaired under the plan.

*See* 11 U.S.C. § 1129(a)(8). Section 1126(c) "explains how to tally acceptances within a class of

claims to arrive at the vote of the overall class." *In re DBSD N. Am., Inc.*, 634 F.3d 79, 105 (2d

Cir. 2011). That section provides:

> A class of claims has accepted a plan if such plan has been accepted by creditors,
> other than any entity [whose acceptance is procured in bad faith pursuant to Section
> 1126(e)], that hold at least two-thirds in amount and more than one-half in number
> of the allowed claims of such class held by creditors, other than any entity [whose
> acceptance is procured in bad faith pursuant to Section 1126(e)], that have accepted
> or rejected such plan.

11 U.S.C. §§ 1126(c), (e).[67] Alternatively, a class of claims is unimpaired under a plan where the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).

As set forth above, pursuant to Section 1129(b), a Chapter 11 plan can still be confirmed so long as such plan has at least one impaired accepting class, and so long as the plan does not "discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." *See* 11 U.S.C. §§ 1129(a)(8), (a)(10), (b)(1).

## A. THE PC MOTION IN LIMINE

Before turning to its analysis of the competing plans, the Court will first resolve the PC Motion in Limine filed on the eve of trial. In the PC Motion in Limine, the Petitioning Creditors primarily advance two arguments: (i) the Court should exclude the Furchtgott-Roth Reports or limit Mr. Furchtgott-Roth's testimony at the trial (PC Motion in Limine at ¶¶ 16–27); and (ii) the Court should exclude the Kertsikoff Declaration and the Hadjieleftheriadis Declaration or limit Messrs. Kertsikoff's and Hadjieleftheriadis' testimony at trial. (*Id.* at ¶¶ 28–38).

Regarding Dr. Furchtgott-Roth's testimony, the Petitioning Creditors specifically argue that: (i) the Furchtgott-Roth Reports are not based upon "sufficient facts and data" within the meaning of FRE 702(b) because Dr. Furchtgott-Roth's conclusions are based upon matters in which he is not an expert (*id.* at ¶¶ 17–18); (ii) the Furchtgott-Roth Reports are not based upon

---

[67] As the Second Circuit went on to explain in *DBSD*:

> For each class, then, the bankruptcy court must calculate two fractions based on the non-designated, allowed claims in the class. To arrive at the first fraction, the court divides the value of such claims that vote to accept the plan by the value of all claims that vote either way. For the second fraction, the court uses the number of claims rather than their value. If the first fraction equals two-thirds or more, and the second fraction more than one-half, then the class as a whole votes to accept the plan.

*DBSD N. Am., Inc.*, 634 F.3d at 106.

"reliable principles and methods" within the meaning of FRE 702(c) because the "economic standard of good faith" does not have a generally accepted definition and is not used in economic authorities cited by Dr. Furchtgott-Roth (*id.* at ¶ 19); (iii) Dr. Furchtgott-Roth's expertise in the field of economics and views about economic concepts cannot "help the trier of fact to understand the evidence or to determine a fact in issue" pursuant to FRE 702(a) (*id.* at ¶¶ 20–24); and (iv) Dr. Furchtgott-Roth's opinions regarding what the various parties intended or desired by taking or failing to take certain actions are improper. (*Id.* at ¶¶ 25–26); Accordingly, the Petitioning Creditors argue that Dr. Furchtgott-Roth should not be allowed to testify at trial because the Furchtgott-Roth Reports are inadmissible. (*Id.* at ¶ 27).

Regarding the Kertsikoff Declaration and the Hadjieleftheriadis Declaration, the Petitioning Creditors likewise argue that: (i) Messrs. Kertsikoff's and Hadjieleftheriadis's opinions about what the evidence shows are irrelevant and unhelpful to the Court (*id.* at ¶¶ 29–30); (ii) like Dr. Furchtgott-Roth, Messrs. Kertsikoff's and Hadjieleftheriadis's opinions about the legal issues in the case—including whether the Debtor Plan meets the confirmation requirements of Section 1129—lack foundation and are improper under FRE 701 (*id.* at ¶¶ 31–32); (iii) like Mr. Furchtgott-Roth, Messrs. Kertsikoff and Hadjieleftheriadis should not be permitted to opine on the state of mind of other parties (*id.* at ¶ 33); (iv) many of the opinions expressed within the Kertsikoff Declaration and the Hadjieleftheriadis Declaration are not based upon personal knowledge and constitute inadmissible hearsay (*id.* at ¶ 34); (v) the Kertsikoff Declaration and the Hadjieleftheriadis Declaration reference supporting documentation that is incomplete (*id.* at ¶ 35); and (vi) admitting the Kertsikoff Declaration and the Hadjieleftheriadis Declaration is unfairly prejudicial to the Petitioning Creditors within the meaning of FRE 403 given the declarants' personal interests in the outcome of these cases. (*Id.* ¶ 36).

50

In response, regarding Dr. Fuchtgott-Roth's testimony, the Debtors argue that: (i) the Fuchtgott-Roth Reports are based upon "sufficient facts and data" within the meaning of FRE 702(b) because the opinions contained therein are based upon conclusions drawn from the record, case law provided by counsel, economic literature, and professional experience (Debtor Opposition to PC Motion in Limine at ¶¶ 3–8); (ii) the Fuchtgott-Roth Reports apply reliable principles and methods because Dr. Furchtgott-Roth has evaluated "good faith" in the context of commercial contracts in professional settings from an economic perspective (*id.* at ¶¶ 9–12); (iii) Dr. Furchtgott-Roth's opinions are helpful to the trier of fact because they provide context to a concept central to confirmation (*id.* at ¶¶ 13–15); and (iv) Dr. Furchtgott-Roth's opinions do not usurp the role of the factfinder because Dr. Furchtgott-Roth based his opinions on the record, and he does not offer legal opinions. (*Id.* at ¶¶ 16–19).

Regarding the Kertsikoff Declaration and the Hadjieleftheriadis Declaration, the Debtors argue: (i) the Kertsikoff Declaration and the Hadjieleftheriadis Declaration are relevant because reliance upon personal knowledge obtained from a review of relevant documents is permissible (*id.* at ¶ 26); (ii) the Kertsikoff Declaration and the Hadjieleftheriadis Declaration do not rely upon impermissible opinion testimony regarding the state of mind of other parties (*id.* at ¶ 27); (iii) the actions of affiliates of the Petitioning Creditors are relevant to whether the PC Plans have been pursued in good faith (*id.* at ¶ 28); and (iv) the Kertsikoff Declaration and the Hadjieleftheriadis Declaration are not unfairly prejudicial even though the declarants have an interest in the outcome of these proceedings. (*Id.* at ¶ 29). The Debtors also argue generally regarding the Furchtgott-Roth Reports, the Kertsikoff Declaration, and the Hadjieleftheriadis Declaration that the evidence should not be excluded because the risk of prejudice in a bench trial is minimal. (*See generally id.*).

51

The Court agrees with the Debtors, at least insofar as the risk of prejudice is minimal because these proceedings were held in the context of a bench trial. Indeed, as this Court previously held in the Trustee Opinion:

> Because these proceedings were conducted as a bench trial, "the potential for prejudice is minimal." *Steinhilber v. Kirkpatrick, M.*, No. 18CIV1251VBJCM, 2020 WL 9074808, at *14 (S.D.N.Y. Aug. 21, 2020), *report and recommendation adopted sub nom. Steinhilber v. Kirkpatrick*, No. 18 CV 1251 (VB), 2021 WL 1254554 (S.D.N.Y. Apr. 5, 2021). This is so because, in the context of a bench trial, "the factfinder knows the purpose for which evidence is admitted and is presumed to rest [their] verdict on the proper inferences to be drawn from such evidence." *United States v. Duran-Colon*, 252 F. App'x 420, 423 (2d Cir. 2007) (citations omitted). Indeed, "'the more prudent course in a bench trial [is] to admit into evidence doubtfully admissible records,' and to permit the parties to aim their arguments at the weight of the evidence." *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 CIV. 8294 (PKL), 2003 WL 22764545, at *3 (S.D.N.Y. Nov. 21, 2003) (quoting *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977)).

(*Id.* at 22–23). Additionally, this "Court is more than capable of assessing the qualifications of the experts presented by the [Debtors]." (*Id.* at 24 (citing *Joseph S. v. Hogan*, No. 06 CIV. 1042 BMC SMG, 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011) (citing *BIC Corp. v. Far Eastern Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001)) (noting that "the Court can take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology")). For these reasons, the Court will deny the PC Motion in Limine and afford the Fuchtgott-Roth Reports, Kertsikoff Declaration, and the Hadjieleftheriadis Declaration the weight that it deems appropriate.

## B. **THE DEBTOR PLAN IS NOT CONFIRMABLE**

As set forth above, the Petitioning Creditors and the Committee filed objections to the Debtor Plan. In the PC Objection to Debtor Plan and the Committee Objection, the Petitioning Creditors and the Committee principally argue that the Debtor Plan cannot be crammed down on creditors pursuant to Section 1129(b) of the Bankruptcy Code because the Debtor Plan violates the absolute priority rule and because it discriminates unfairly. (PC Objection to Debtor Plan at

¶¶ 22–43; Committee Objection at ¶¶ 46–51, 64–66). Regarding the absolute priority rule (and the new value exception thereto), the Petitioning Creditors specifically argue that: (i) the Shareholder New Value Contribution is not necessary (PC Objection to Debtor Plan at ¶¶ 25–31); (ii) the Shareholder New Value Contribution is not new (*id.* at ¶ 32); (iii) the Shareholder New Value Contribution is not Substantial (*id.* at ¶¶ 33–34); (iv) the Shareholder New Value Contribution is not money or money's worth (*id.* at ¶¶ 35–36); and (v) the Shareholder New Value Contribution is not reasonably equivalent to the value of the reorganized Debtors (*id.* at ¶¶ 37–39). Additionally, the Petitioning Creditors argue that: (i) the Debtor Plan is not feasible as required by Section 1129(a)(11) (PC Objection to Debtor Plan at ¶¶ 44–47; Committee Objection at ¶¶ 52–60); (ii) the Debtor Plan does not provide equal treatment as required by Section 1123(a)(4) (PC Objection to Debtor Plan at ¶¶ 48–51); (iii) the Debtor Plan was not proposed in good faith (PC Objection to Debtor Plan at ¶¶ 52–62; Committee Objection at ¶¶ 61–63, 69–71); and (iv) the Debtor's inadequate disclosures regarding the development of the Debtor Plan and negotiation with the Shareholders violate Section 1129(a)(2) of the Bankruptcy Code. (Committee Objection at ¶¶ 67–68).

In response, the Debtors argue that the Debtor Plan: (i) does not violate Section 1123(a)(4) because it provides equal treatment to all creditors within a given class (Debtor Confirmation Memo at ¶¶ 44–46); (ii) was not filed in bad faith and provides more funding than all other plans (*id.* at ¶¶ 68–70); (iii) does not discriminate unfairly (*id.* at ¶¶ 103–106); and (iv) satisfies the new value exception to the absolute priority rule (*id.* at ¶¶ 113–135).

In the Creditor Brief, the Committee and the Petitioning Creditors further argue that the Debtor Plan: (i) cannot be crammed down on creditors because the Shareholder New Value Contribution is not necessary or new (Creditor Brief at ¶¶ 5–14); (ii) is not feasible because the

Debtors have not shown that $37 million is sufficient to fund the Debtor Plan, or that they have $37 million in cash to begin with (*id.* at ¶¶ 15–25); (iii) was not proposed in good faith (*id.* at ¶ 26); and (iv) favors their historical lenders and other guarantee creditors and involves secret deals and millions in unapproved side-payments to procure favorable votes (*id.* at ¶¶ 27–30).

Finally, in the Debtor Brief, the Debtors further argue that: (i) the Debtor Plan's classification system is permissible pursuant to Sections 1129(a)(1), 1122, and 1123 of the Bankruptcy Code (Debtor Brief at ¶¶ 7–9); (ii) the Debtor Plan satisfies Section 1129(a)(3) because it was proposed in good faith (*id.* at ¶¶ 10–12); (iii) the Debtor Plan satisfies Section 1129(a)(4) because the Debtors have not engaged in any settlements with creditors that have not been disclosed to the Court (*id.* at ¶ 13); (iv) the Debtor Plan satisfies Section 1129(a)(11) because it is sufficiently funded to ensure all plan payments can be made (*id.* at ¶¶ 14–21); and (v) the Debtor Plan satisfies Section 1129(b) because it satisfies the new value exception to the absolute priority rule, does not discriminate unfairly, and is fair and equitable. (*Id.* at ¶¶ 22–38).

### 1. The Debtor Plan Violates the Absolute Priority Rule of Section 1129(b)(2)(B)(ii)

The Petitioning Creditors and the Committee first argue that the Debtor Plan cannot be confirmed because the Shareholder New Value Contribution violates the absolute priority rule. (PC Objection to Debtor Plan at ¶¶ 22–43; Committee Objection at ¶¶ 46–51, 64–66; Creditor Brief at ¶¶ 5–14).

In response, the Debtors argue that the Debtor Plan satisfies the new value exception to the absolute priority rule (Debtor Confirmation Memo at ¶¶ 113–135; Debtor Brief at ¶¶ 22–38).

As stated *supra*, Section (IV), pursuant to Section 1129(b), a Chapter 11 plan that is not fully consensual can be confirmed so long as such plan has at least one impaired accepting class, and so long as the plan does not "discriminate unfairly, and is fair and equitable, with respect to

each class of claims or interests that is impaired under, and has not accepted, the plan." *See* 11 U.S.C. §§ 1129(a)(8), (a)(10), (b)(1). Further, Section 1129(b)(2)(B)(ii) provides that the condition that a Chapter 11 plan be fair and equitable with respect to a class includes, *inter alia*, the following requirement:

> **(B)** With respect to a class of unsecured claims—
>> **(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>> **(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . .

*See* 11 U.S.C. § 1129(b)(2)(B)(i)–(ii). This provision is often referred to as the "absolute priority rule." *Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship* ("*203 N. LaSalle*"), 526 U.S. 434, 442 (1999). However, as recognized by the United States Supreme Court and the Second Circuit, there may be circumstances in which a debtor's equity holders may retain their equity in the debtor, notwithstanding the fact that unsecured creditors are not paid in full. *See generally 203 N. LaSalle*, 526 U.S. 434 (1999); *BT/SAP Pool C Assocs. v. Coltex Loop Cent. Three Partners ("Coltex II")*, 203 B.R. 527, 532 (S.D.N.Y. 1996), *aff'd sub nom. In re Coltex Loop Cent. Three Partners, L.P. ("Coltex III")*, 138 F.3d 39 (2d Cir. 1998). This exception has sometimes been referred to as the "new value exception" or the "new value corollary" to the absolute priority rule. *203 N. LaSalle*, 526 U.S. at 442; *Coltex III*, 138 F.3d at 41.

The Court begins its analysis of this provision with a review of the seminal cases on this issue in the Second Circuit and the United States Supreme Court.

### a)  Second Circuit Precedent: Coltex

In *Coltex*, the debtor was a limited partnership whose primary asset was an office building in Houston, Texas. *Coltex II,* 203 B.R. at 529–30. During the debtor's exclusivity period, the debtor submitted a new value plan, pursuant to which the debtor's equity holders

proposed to pay $3,400,000 in exchange for retaining 100% of their equity interests, despite

unsecured creditors only receiving a cash payment worth 10% of their claims. *Id.* at 530. At the

confirmation hearing, one of the debtor's limited partners (who also served as vice president of

the debtor's general partner), testified that the debtor had only approached one of its lenders in

an effort to obtain equity or other financing for the property, and that such request was rejected.

*Id.* The bankruptcy court confirmed the plan over the dissenting class of unsecured claims and

the secured lender's objection. *Id.* at 531.

On appeal, the District Court began its review by tracing the origins of the absolute

priority rule back to United States Supreme Court precedent from the 1800's, long before it was

codified by Congress. *Id.* As the District Court noted:

> The absolute priority rule was developed by the Supreme Court in the late 1800's
> in response to problems encountered in railroad receivership actions. In these cases
> managers of the railroads would often "cut a deal" whereby partial payments were
> made on certain senior creditors' claims and the shareholders—who sometimes
> included these same managers—would retain their interests in the railroad provided
> they contributed some additional capital. In this way, senior creditors were able to
> conspire with shareholders to sell the bankrupt railroad back to the shareholders
> while wiping out the claims of junior creditors. To prevent this inequity and to
> protect junior creditors, the Supreme Court held that the shareholders of a debtor
> could not, under any circumstances, retain an interest in the debtor's property unless
> all creditors' claims were paid in full. This rule, which became known as the
> absolute priority rule, was based on contract law. Because contracts gave creditors
> priority over shareholders, the Court required a plan of reorganization to do the
> same. The Court, therefore, perceived the absolute priority rule as barring the
> retention of any interest by a shareholder if any layer of creditor did not receive full
> payment under a plan. In other words, creditors had absolute priority over equity
> holders.

*Id.* at 531–32 (internal citations omitted). The District Court went on to explain that the absolute

priority rule, as initially conceived, sometimes "provided harsh and unwanted results in certain

cases," often leading to liquidation when such a result was unwanted, even by creditors. *Id.* at

532.

In response to such harsh results, courts created the new value exception to the absolute

priority rule, providing that "as a last resort to liquidation, old equity could contribute funds and

retain control of the debtor so long as creditors were given this opportunity first and declined to

do so." *Id.* (citations omitted). The District Court in Coltex then explained the test that had been

developed by the United States Supreme Court:

> To satisfy the new value exception, a contribution had to be necessary to the success
> of the undertaking and old equity's participation had to be based on a substantial
> contribution in money or money's worth. In addition, the contribution had to be
> reasonably equivalent to the property received or retained by the equity holder.

*Id.* (citing *Case v. Los Angeles Lumber Prod. Co.*, 308 U.S. 106, 121–22 (1939)). The District

Court went on to note that the absolute priority rule was codified by Congress when it passed the

Bankruptcy Code in 1978. *Id.* However, as the District Court also noted, Congress "did *not*

explicitly codify the new value exception. *Id.* (emphasis in original). The District Court further

explained: "[t]hat decision, and its implications, has been the subject of great debate and courts

have been confronted with the question of whether the new value 'exception' remains viable

under the Code." *Id.* The court went on to discuss a variety of cases analyzing whether the new

value exception had survived the codification of the absolute priority rule, ultimately finding that

it did *(see id.* at 532–34) and reiterating that the five requirements for satisfying the new value

exception as set forth in cases within the Second Circuit were: "the capital contribution by old

equity must be (1) new, (2) substantial, (3) money or money's worth, (4) necessary for a

successful reorganization and (5) reasonably equivalent to the property that old equity is

retaining or receiving." *Id.* at 534 (citing *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754,

762 (Bankr. S.D.N.Y. 1995); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 707–08

(Bankr. S.D.N.Y. 1993), *aff'd,* 165 B.R. 773 (S.D.N.Y. 1994), *aff'd sub nom. In re One Times

Square Assocs.*, 41 F.3d 1502 (2d Cir. 1994) (additional citations omitted).

Applying this standard, the District Court in *Coltex* reversed the Bankruptcy Court on the "necessary" prong. *Id.* at 535. As the District Court held, "the debtor must show not only that it needs funds to reorganize but rather that it is necessary for *old equity* to contribute those funds." *Id.* (emphasis in original). "In other words, under the 'necessary' requirement of the new value exception, old equity must be willing to contribute more money than any other source or it must be the lender of 'last resort.'" *Id.* (citations omitted). The District Court further explained that "the market must be tested for other sources of funding and the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity." *Id.* However, as the District Court explained, it is not enough for a debtor to simply demonstrate that a plan was nonexclusive; a debtor seeking confirmation of a new value plan "must also [show] that the debtor undertook a diligent search for alternative sources of funding." *Id.* The District Court found that the debtor could not meet this standard and reversed the Bankruptcy Court. *Id.* at 536.

On appeal, the Second Circuit affirmed. *Coltex II*, 138 F.3d at 46. The Second Circuit stated in relevant part:

> Old equity must do more than demonstrate that new capital is necessary for a successful reorganization. The old owners must also show that the reorganized entity 'needs funds from the prior owner-managers because no other source of capital is available . . . . More importantly, . . . old equity participation [is] "necessary" only where the success of the reorganization hinged on "new money" from the old stockholders . . . . Here, the bankruptcy court applied the wrong legal standard in finding that the new equity infusion by old equity was essential to a successful reorganization. It should be remembered that [the debtor] is not a business enterprise which may be halted. It is an entity which holds title to a parcel of real estate. Failure to accept the Plan of the debtor does not mean that the business will fail in the normal sense of that concept. Under the conditions at hand any number of plans may be considered a "successful reorganization," not simply one which makes little change in ownership.

*Id.* at 45–47 (citations omitted). The court concluded by stating that "[e]ach [] plan must be examined to make sure that old equity does not retain or receive property of the debtor 'on account of' its prior subordinate position" and that only "[w]here no other party seeks to file a plan or where the market for the property is adequately tested," may old equity "be able to demonstrate that it can meet the requirements of 11 U.S.C. § 1129 . . . ." *Id.*

### b) Supreme Court Precedent: *203 N. LaSalle*

In *203 N. LaSalle*, the United States Supreme Court also examined the continued viability of the new value exception to the absolute priority rule. *203 N. LaSalle*, 526 U.S. 434 (1999). The debtor in that case was a real estate partnership in Chicago. *Id.* at 437–38. Bank of America loaned the debtor $93 million, secured by a mortgage on the debtor's principal asset, 15 floors of an office building in downtown Chicago. *Id.* at 438. The debtor's assets were pre-petition rents in the amount of $3.1 million and the 15 floors in the office building worth approximately $54.5 million. *Id.* at 439. The debtor's plan in *203 N. LaSalle* contained the following features:

> 1) The Bank's $54.5 million secured claim would be paid in full between 7 and 10 years after the original 1995 repayment date.
> (2) The Bank's $38.5 million unsecured deficiency claim would be discharged for an estimated 16% of its present value.
> (3) The remaining unsecured claims of $90,000, held by the outside trade creditors, would be paid in full, without interest, on the effective date of the plan.
> (4) Certain former partners of the Debtor would contribute $6.125 million in new capital over the course of five years (the contribution being worth some $4.1 million in present value), in exchange for the Partnership's entire ownership of the reorganized debtor.

*Id.* at 440. Only the debtor's equity holders would be permitted to contribute new capital under the plan. *Id.*

The Court expressly stated that it was not deciding whether the Bankruptcy Code permitted new value plans at all, and if it does, what test should apply to judge their sufficiency. *Id.* at 443. Ultimately, however, the Court found that, regardless of what test is employed to

determine the sufficiency of a potential new value plan, "plans providing junior interest holders

with exclusive opportunities *free from competition and without benefit of market valuation* fall

within the prohibition of § 1129(b)(2)(B)(ii)." *Id.* at 458 (emphasis added). Notably, however,

the Court cited to *Coltex* for the proposition that there may be other requirements—other than

market testing—necessary to confirm a new value plan. *Id.* at 453 n.26. The Court stated:

> Even when old equity would pay its top dollar and that figure was as high as anyone
> else would pay, the price might still be too low unless the old equity holders paid
> more than anyone else would pay, on the theory that the "necessity" required to
> justify old equity's participation in a new value plan is a necessity for the
> participation of old equity as such. On this interpretation, disproof of a bargain
> would not satisfy old equity's burden; it would need to show that no one else would
> pay as much. *See, e.g., In re Coltex Loop Central Three Partners, L.P.*, 138 F.3d
> 39, 45 (C.A.2 1998) ("[O]ld equity must be willing to contribute more money than
> any other source" (internal quotation marks and citation omitted)); Strub, 111
> Banking L.J., at 243 (old equity must show that the reorganized entity "needs funds
> from the prior owner-manager because no other source of capital is available"). No
> such issue is before us, and we emphasize that our holding here does not suggest
> an exhaustive list of the requirements of a proposed new value plan.

*Id.* The standard set forth in *Coltex* remains the law in the Second Circuit and is also cited as

persuasive authority elsewhere. *See e.g.*, *In re DBSD N. Am., Inc.*, 634 F.3d 79 (2d Cir. 2011); *In

re Latam Airlines Grp. S.A.*, 620 B.R. 722, 801-02 (Bankr. S.D.N.Y. 2020); *In re RAMZ Real

Est. Co., LLC*, 510 B.R. 712, 718-719 (Bankr. S.D.N.Y. 2014); *In re RYYZ, LLC*, 490 B.R. 29,

44 (Bankr. E.D.N.Y. 2013); *In re ECS Ref., Inc.*, 625 B.R. 425, 450 (Bankr. E.D. Cal. 2020); *In

re Trenton Ridge Invs., LLC*, 461 B.R. 440, 509 (Bankr. S.D. Ohio 2011).

c) **Under the Debtor Plan, Portions of the Shareholder New Value Contribution are not "New," and Other Portions are not Money or Money's Worth**

Under *Coltex*, the Shareholder New Value Contribution must be "new" and also must be "money or money's worth." *Coltex II,* 203 B.R. at 534.[68] The Petitioning Creditors argue that the Shareholder New Value Contribution is not "new" because the Debtors have not provided evidence that the funds exist, and if the funds do exist, the Debtors have not verified that the funds do not come from the Debtors or their subsidiaries, because new value contributions are supposed to come from outside the Debtors' business. (PC Objection to Debtor Plan at ¶ 32). Likewise, the Petitioning Creditors argue that the Shareholder New Value Contribution is not money or money's worth because it: (i) has never been demonstrated to be real; (ii) is "backed by an illusory [Shareholder Commitment Letter] with the same individuals standing on both sides;" (iii) the Collections Contribution is not money or money's worth because it is a promise to make a payment after the effective date; and (iv) continuation of the Debtor's existing management is not "new value." (*Id.* at ¶¶ 35–36).

In response, the Debtors first argue that the Shareholder New Value Contribution is new because $37 million of cash and cash equivalents is coming from the Debtors' Shareholders, which are entities "completely removed from the Debtors' corporate structure and are wholly independent from the Debtors' enterprises." (Debtor Confirmation Memo at ¶ 115). Further, the Debtors argue that the "Collections Contribution will be provided by Eletson Gas, the [Cypriot] Nominees, and their officers and directors," all of whom are likewise outside of the Debtors' corporate structure, and that enforcement of the Final Award which forms the basis of the

---

[68] Though the "new" prong and "money or money's worth" prong are separate elements under *Coltex*, the Court will discuss them together for the purposes of this opinion in analyzing various components of the Shareholder New Value Contribution.

Collections Contribution "unquestionably belongs to the [Cypriot] Nominees." (*Id.* at ¶¶ 116–17). Likewise, the Debtors also argue that the Shareholder New Value Contribution is money or money's worth because it includes $37 million provided on the effective date of the Debtor Plan, and because the Collections Contribution "is a directed form of payment through the foreclosure of fixed assets that have been valued in an amount of at least $60 million and may not be disposed of due to a binding global injunction (the "**Worldwide Freeze Order**") of a court of competent jurisdiction [in the British Virgin Islands]." (*Id.* at ¶ 122).

In the Creditor Brief, the Petitioning Creditors and the Committee further argue that Collections Contribution is not money or money's worth because it is a "contingent future payment that depends on what, if anything" may be collected from Levona under the Final Award, "less deductions for undisclosed costs and setoff." (Creditor Brief at ¶ 10). Additionally, the Committee and the Petitioning Creditors argue that there is no certainty regarding when, or if, the Final Award will ever be collected, particularly given the recent opinion issued in the District Court permitting Levona discovery on whether fraud was committed in the Arbitration. (*Id.* at ¶ 12). The Committee and the Petitioning Creditors also note that even if the Collections Contribution had some value, such value is, at least in part, not "new" because it comes in part from Gas, whose common stock is 100% owned by the Debtors, and is therefore from inside the Debtors' corporate structure. (*Id.* at ¶ 13). Finally, the Committee and the Petitioning Creditors argue that any use of the Final Award as part of the Collections Contribution violates the stipulated stay relief order entered in this case. (*Id.* at ¶ 14 (*citing* Docket No. 48).

In the Debtor Brief, the Debtors further argue that the Collections Contribution is money or money's worth, particularly because it is now backed by a $40 million guarantee as set forth in the Shareholder Commitment Letter. (Debtor Brief at ¶ 24). Additionally, the Debtors argue

that, though the Final Award has not been reduced to cash, it soon will be because: (i) the Worldwide Freeze Order and the lift stay order in this case ensure that Levona cannot dissipate its assets (allegedly worth $80 million) prior to payment of the Final Award; (ii) "Pach Shemen, as an alter-ego of Levona, should be estopped from arguing that the Collections Contribution is not money or money's worth, whereas Levona is responsible for interfering with collection[69];" and (iii) the commitment to escrow $40 million in the event the Final Award is not collected as set forth in the Shareholder Commitment Letter shows a guarantee of money or money's worth. (*Id.* at ¶ 24).

The Court agrees with the Petitioning Creditors and the Committee. Principally, contributions are only "new" under *Coltex* where they come from outside a debtor's business. *Latam Airlines Grp.*, 620 B.R. at 802 n.17 (citing *In re S.A.B.T.C. Townhouse Ass'n Inc.,* 152 B.R. 1005, 1010 (Bankr. M.D. Fla. 1993) (noting that existing equity holders "must contribute something to the debtor that does not already belong to the debtor or to which the debtor is not already entitled")); *see also In re Sea Garden Motel & Apartments*, 195 B.R. 294, 302 (D.N.J. 1996) (stating "[i]t is well established that the new value exception to the absolute priority rule will only apply where the infusion of capital comes from an outside source").

---

[69] Relatedly, the Debtors assert that:

> This case presents a unique set of facts that Debtors believe is a matter of first impression in th[e] bankruptcy context. The Arbitration Award is enforceable against Levona, an alter ego and affiliate of Pach Shemen. But for Levona's machinations, the Award would have already been turned into cash available to creditors. Pach Shemen, the affiliate who initiated these bankruptcy proceedings to assist Levona's efforts in the Arbitration, seeks to push through its Competing Plans for the benefit of Levona and Murchinson on the argument that the award against its affiliate is not valuable. This Court should reject that bad faith effort.

(*Id.* at ¶ 25). However, as set forth extensively in this Court's Claim Objection Opinion, the Court finds that Pach Shemen's actions were not taken in bad faith. (*See generally* Claim Objection Opinion). This argument will therefore not be further addressed here. In any event, for the other reasons set forth herein, the Collections Contribution does not constitute new value under *Coltex*, so this argument is, to some extent, irrelevant.

Likewise, a new value contribution is only considered money or money's worth when such new value is a "*present* contribution by the shareholders." *In re 8315 Fourth Ave. Corp.*, 172 B.R. 725, 738 (Bankr. E.D.N.Y. 1994) (emphasis in original). Courts have specifically held that promises of future services, and even promissory notes issued by an equity holder, do not constitute new value because they are not a present contribution. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204 (1988) (noting that promise of future labor "is intangible, inalienable, and in all likelihood, unenforceable" and that "[u]nlike 'money or money's worth', a promise of future services cannot be exchanged in any market for something of value to the creditors today"); *In re Yasparro,* 100 B.R. 91 (Bankr. M.D. Fla. 1989) (contribution of promissory notes is not new value because payments are made in the future); *In re Hendrix,* 131 B.R. 751 (Bankr. M.D. Fla. 1991) (promise to make monthly payments to fund plan is future contribution and does not constitute money or monies worth); *In re Sovereign Group 1985–27 Ltd.,* 142 B.R. 702 (E.D. Pa. 1992) (escrowing funds to secure guarantee of plan distributions held not to constitute new value); *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992) (stating that contributions must be "an up-front infusion of money or money's worth" to constitute new value); *In re Cleary Packaging, LLC*, 657 B.R. 780, 802 fn.57 (Bankr. D. Md. 2023) (stating that "new value must be a present contribution rather than a promise to pay in the future") (citations omitted); *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 78 (B.A.P. 9th Cir. 1994) (noting that "contributions through the cancellation of the alleged debt owed to the insiders is not up-front" and does not constitute new value); *In re Farwest Pump Co.*, 621 B.R. 871, 897 (Bankr. D. Ariz. 2019) (holding that shareholder contribution of "proceeds of sale of a piece or real property" are not money or money's worth because the shareholder did not "show that the anticipated sale closed or that [the] funds are available")).

64

Here, the only portion of the Shareholder New Value Contribution that potentially constitutes new value under *Coltex* is the $37 million cash contribution. As set forth above *supra*, Section (III)(D)(2), the Collections Contribution is defined in the Debtor Plan as Gas, the Cypriot Nominees, and their officers and directors' agreement to contribute a one time-cash payment equal to "(i) 90% of the first $21 million of net cash recoveries under the Final Award (with the remaining 10% of net cash recoveries being collected by Eletson Corporation on account of amounts awarded to Eletson Corporation under the Final Award); plus (ii) 50% of the next $20 million of net cash recoveries under the Final Award (with the remaining 50% of such of cash recoveries of amounts awarded to Eletson Corporation under the Final Award)." (*See* Shareholder Commitment Letter at 1; Debtor Plan at 4–5).

However, there are several problems with the Collections Contribution constituting new value under both the "new" prong and the "money or money's worth" prong of *Coltex*. First, to the extent such contribution is coming from Gas, the Court finds that such contribution is not "new," because Debtor Holdings owns 100% of the common shares of Gas, and therefore, such contribution would be coming from inside the Debtors' capital structure. (Final Award at 5–6).

Second, none of the Collections Contribution constitutes money or money's worth for several reasons. As noted by the Petitioning Creditors, whether the Final Award will ever be collected is unclear at best. For instance, the District Court recently permitted Levona discovery in connection with its vacatur petition to ascertain whether the Debtors committed fraud in procuring the Final Award. (Docket No. 1084 Ex. A at 47). Even if this were not the case, it appears likely to the Court that Levona would appeal any denial of its vacatur petition, meaning that creditors could be waiting years to receive payment on their claims based on the Collections Contribution. Further, as argued by the Petitioning Creditors, there is no way of knowing how

65

much (if any) money will be collected from Levona. (Creditor Brief at ¶ 11). Indeed, the

Debtors' own witnesses variously stated that the Collections Contribution may be worth $0, $30

million, $50 million, or $70 million. (Hadjieleftheriadis Declaration at ¶ 54 (testifying that the

Collections Contribution may be worth $50 million); Kertsikoff Declaration at ¶ 9 (same);

September 11 Transcript at 160:7–161:10 (where Mr. Hadjieleftheriadis testifies that the

Collections Contribution could be worth anywhere from $30 million to $77 million); *Id.* at

191:12–192:6 (where Mr. Hadjieleftheriadis testifies that the Debtors may collect nothing from

Levona, and that ultimately he does not know what the Collections Contribution is worth);

September 12 Transcript at 116:25–117:13 (where Dr. Furchtgott-Roth testified that it was

uncertain whether the Collections Contribution would ever be collected)). It is because of this

very uncertainty that such contribution cannot constitute new value as it is not a "*present*

contribution by the shareholders." *8315 Fourth Ave. Corp.*, 172 B.R. at 738 (emphasis in

original).

The Debtors also argue that the $40 million escrow detailed in the Shareholder

Commitment Letter constitutes new value under *Coltex*. (Debtor Brief at ¶ 24). However, courts

in other districts have held that the guarantees do not constitute new value because they are not

money or money's worth. *See Sovereign Group 1985–27 Ltd.,* 142 B.R. at 709. This is so

because "there is no assurance that the [guarantee] will ever be transformed into cash which will

aid in the reorganization of the [d]ebtor." *Id.* In this case, the Court agrees with the court in

*Sovereign Group* because the $40 million guarantee proposed here would be escrowed at a rate

of only $1 million per month for 40 months.(*See* Shareholder Commitment Letter at 1–2).

Though the Shareholders have allegedly committed to provide these funds, the Court does not

have adequate proof that such funds will be available over such a long-time horizon. For these

reasons, the Court finds that the $40 million guarantee likewise does not constitute new value because it is not money or money's worth.

Finally, though not argued by the Debtors, to the extent the Debtor Plan contemplates Excess SME Proceeds (*see* Debtor Plan at 8) being provided as new value, the Court disagrees because such proceeds would originate from within the Debtors' capital structure and are thus not new. For these reasons, only the $37 million cash contribution constitutes potential new value.[70]

### d)  <u>The Shareholder New Value Contribution is Not Substantial</u>

The Petitioning Creditors next argue that the Shareholder New Value Contribution is not substantial under *Coltex*. (PC Objection to Debtor Plan at ¶ 34). As the Petitioning Creditors pointed out, the substantiality requirement is measured in relation to the unpaid unsecured "claims being disposed of under the [p]lan. (*Id.* at ¶ 33 (citing *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 762 (Bankr. S.D.N.Y. 1995)). Here, the Petitioning Creditors argue that the Shareholder New Value Contribution would be paid pursuant to a waterfall under which general unsecured creditors would receive very small recoveries. (*Id.* at ¶ 34 (noting that some noteholder claimants would receive their pro rata share of $7 million dollars, which pro rata shares the Debtors' experts estimate to be approximately $700,000, and that creditors that elect to receive payments from the Litigation Trust will receive no cash on the effective date of the plan)). The Petitioning Creditors thus assert that the Debtor Plan proposes $37 million "in

---

[70] The Court notes that even the $37 million may not be money or money's worth. As set forth herein, the Debtors provided certain documents to the Court and the creditors on an "attorney eyes only" basis, in an attempt to demonstrate that the Debtors' shareholders have access to sufficient funds to make the Shareholder New Value Contribution. (*See* DX-312(A)-(C)). Though these documents appear to be from various banking institutions and purport to show sufficient funds held by the shareholders, such documents indicate that the holdings are in "cash, listed securities and derivatives linked to listed securities." (*Id.*) Depending on the nature of these holdings, such holdings may not be money or money's worth, and therefore may not constitute new value under *Coltex*.

funding against approximately $505 million in general unsecured claims in the low case (or

approximately 6%) or approximately $768 million in general unsecured claims in the high case

(or approximately 4%)." (*Id.* at ¶ 33).

In response, the Debtors acknowledge that for the purposes of determining whether a new

value contribution is substantial, "the new value must be weighed against the claims being

disposed by the plan of reorganization." (Debtor Confirmation Memo at ¶ 118 (citing *Fur

Creations,* 188 B.R. at 762)). The Debtors argue that a significant portion of the general

unsecured claims asserted against the Debtors have been objected to and will likely be

disallowed. (*Id.* at ¶ 119). Specifically, the Debtors argue:

> The Debtors estimate that the claims pool ranges from $197 million to $768 million
> depending on the ultimate allowance of claims. Kertsikoff Declaration at ¶78.
> Given the foregoing, the Shareholder New Value Contribution will range from
> approximately 10.4% of the claims being addressed under the Debtors' Plan to
> potentially 40.6% of claims being addressed under the Debtors' Plan. Clearly the
> Shareholder New Value Contribution is substantial in light of the contribution and
> the overall claims pool. See e.g., *In re Abeinsa Holding, Inc.*, 562 B.R. 265 (Bankr.
> D. Del. 2008) (finding that 8% contribution was substantial for new value plan).

(*Id.*) The Debtors dispute the Petitioning Creditors' estimation that the general unsecured claims

total $505 million, noting that many of these claims are subject to claim objections. (*Id.* at ¶

120). Finally, the Debtors argue that for the purpose of substantiality, the relevant inquiry should

be a comparison of the new value contribution to "funds used to assist in the reorganization

effort," and not "compared to the actual funds provided to creditors." (*Id.* at ¶ 121).

The Court agrees with the Petitioning Creditors. As the parties have noted, the new value

must be weighed against the claims being disposed of by the plan of reorganization. *Fur

Creations,* 188 B.R. at 762. Here, the Court has already denied the Debtors' claim objections in

the Claim Objection Opinion. (*See generally* Claim Objection Opinion). Accordingly, the

amount of general unsecured claims is at least $505 million. (Debtor Confirmation Memo at ¶¶

119–20) (noting that the total amount of unsecured claims outstanding is $768 million and that

Levona's claim is $262 million, meaning the amount of undisputed unsecured claims in this case

is $505 million); *see also* Zyngier Declaration at 6 (showing that there are $505,979,112 of

general unsecured claims on the low end, and $768,479,112 of general unsecured claims on the

high end, with a midpoint of $637,229,112 in general unsecured claims).[71]

Utilizing this ratio results in an estimated contribution of 7.3%, which the Court finds is

not substantial based on the facts of these cases under the relevant caselaw. *See, e.g.*, *Fur*

*Creations*, 188 B.R. at 762–63 (finding 2.3% not substantial); *In re Snyder*, 967 F.2d 1126, 1131

(7th Cir. 1992) (finding 1.3% not substantial); *In re Sovereign Grp.*, 142 B.R. 702, 710 (E.D. Pa.

1992) (finding 3.6% not substantial); *In re Wynnefield Manor Assocs., L.P.*, 163 B.R. 53, 57

(Bankr. E.D. Pa. 1993) (finding 7.5% not substantial); *In re Haskell Dawes, Inc.*, 199 B.R. 867,

876 (Bankr. E.D. Pa. 1996) (finding 5.1% not substantial); *but see In re Abeinsa Holding, Inc.*,

562 B.R. 265, 275 (Bankr. D. Del. 2016) (finding 15.9% substantial).[72] Given the sheer amount

of unpaid unsecured debt in this case, the Court finds that the Shareholder New Value

Contribution is not substantial under *Coltex*.

### e) The Shareholder New Value Contribution is Not Reasonably Equivalent to the Value of the Reorganized Debtors

The Petitioning Creditors next argue that the Shareholder New Value Contribution is not

reasonably equivalent to the value of the reorganized Debtors. (PC Objection to Debtor Plan at ¶

37). Principally, the Petitioning Creditors note that the Debtors did not market the Shareholder

New Value Contribution, such as by "contacting a wide range of potentially interested parties,

---

[71] The Committee, the Debtors, and the Petitioning Creditors all appear to exclude Levona from their analyses. (Debtor Confirmation Memo at ¶ 119 n.14; PC Objection to Debtor Plan at ¶ 33).

[72] The Court is aware that the Debtors argued that this case approved a new value plan with an 8% contribution, but that figure does not seem to appear in the case. (Debtor Confirmation Memo at ¶ 119).

making diligence information available to prospective bidders, executing non-disclosure agreements, or hiring an investment banker or other advisor." (*Id.* at ¶ 38). Indeed, the Petitioning Creditors argue that their valuation analysis provides that the "range of enterprise value for [the reorganized Debtors,] just considering the Debtors' four SMEs is 'between $103.9 million and $116.4 million . . . [and] [t]he midpoint of the enterprise valuation range is $110.2 million.'" (*Id.* at ¶ 39 (citing PC Disclosure Statement at Ex. E); *see also* Zyngier Declaration at Ex. F)). Despite these valuations, the Petitioning Creditors note that the Debtors have proposed that their shareholders will acquire 100% of the equity in the Reorganized Debtors for $37 million. (*Id.*) Alternatively, under the PC Plan, unsecured creditors had the option to purchase up to 75% of the equity of the reorganized debtor at a price that represents an implied 14% discount to the mid-point of the plan equity value of up to $62,058,088.00. [73] (*Id.*; *see also* PC Plan at 14). Though no unsecured creditors chose the equity option under the PC Plan, the Petitioning Creditors argue that this further demonstrates that [they are] paying "top dollar," as nobody was willing to contribute capital at the valuation that Pach Shemen is providing. (PC Objection to Debtor Plan at ¶ 39 n.19).

In response, the Debtors argue that the Shareholders "propose to provide $80 million towards the Debtors' reorganization, and that the Debtors' valuation of the enterprise value of the Reorganized Debtor is approximately $84.3 million dollars. (Debtor Confirmation Memo at ¶ 132 (citing Veraros Report)). They assert, therefore, that the Shareholders "seek to purchase the equity of the Debtors at an approximately 5% discount . . . ." (*Id.*) The Debtors further take issue with the valuation analysis contained within the PC Disclosure Statement, arguing that this

---

[73] The Petitioning Creditors' experts estimate the equity value of the reorganized Debtors to be worth "between approximately $55.8 million and $68.3 million, with a midpoint estimate of $62.1 million." (*See* Zyngier Declaration at Ex. F).

enterprise valuation is predicated on (i) "speculative market conditions;" (ii) "the continued operation of the shipping industry at unprecedentedly high value;" and (iii) ignorance of "the cyclical nature of the industry . . . ." (*Id.* at ¶ 133). For these reasons, the Debtors argue that the Shareholder New Value Contribution is more than reasonably equivalent to the value of the Reorganized Debtor. (*Id.*)

Preliminarily, the Court notes that both *Coltex II* and *203 N. LaSalle* "mandate that a debtor market-test a proposed transaction in order to demonstrate that the purported new value was necessary and reasonably equivalent; and was not merely an exclusive opportunity for old equity to gain advantages at the expense of creditors." *Latam Airlines Grp.*, 620 B.R. at 803; *see also 203 N. LaSalle*, 526 U.S. at 458; *Coltex II*, 203 B.R. at 535. Courts have found that the "reasonably equivalent" prong is "not satisfied where the new value contributed by the existing equity-holders is grossly disproportionate to the value of the debtor's equity or assets." *Latam Airlines Grp.*, 620 B.R. at 802 (citations omitted).

In this case, the Debtors did not market the Shareholder New Value Contribution by "contacting a wide range of potentially interested parties, making diligence information available to prospective bidders, executing non-disclosure agreements, or hiring an investment banker or other advisor." (PC Objection to Debtor Plan at ¶ 38). Instead, the Debtors relied on the termination of exclusivity and competing plan process to "market test" their plan. (Debtor Brief at ¶ 32). While this Court previously stated that "one of the methods for potentially confirming a 'new value plan' is through the competing plan process," the Court notes that the United States Supreme Court in *203 N. LaSalle* did not definitively decide whether competing plans were sufficient to satisfy this requirement. *See* 526 U.S. at 458 (noting that "[w]hether a market test would require an opportunity to offer competing plans or would be satisfied by a right to bid for

71

the same interest sought by old equity is a question we do not decide here); *see also In re Eletson Holdings Inc.*, 659 B.R. 426, 452 (Bankr. S.D.N.Y. 2024).

Assuming, *arguendo*, that competing plans constitute adequate market testing, the Court finds that, in this case, the market has spoken, and the Shareholder New Value Contribution provides insufficient value.[74] Through this competing plan process, the Petitioning Creditors proposed the PC Plan, which contemplates the purchase of the Debtors' equity at an implied valuation significantly higher than the Debtors. (*Compare* PC Objection to Debtor Plan at ¶ 39 (citing PC Disclosure Statement at Ex. E) *with* Debtor Confirmation Memo at ¶ 132 (citing Veraros Report)). The Debtors' only response essentially boils down to arguing that the Petitioning Creditors' valuation is too high, which the Court finds unpersuasive. (Debtor Brief at ¶ 133).

Additionally, as set forth above, the Shareholder New Value Contribution only consists of $37 million, not $80 million as the Debtors argue in the Debtor Brief. (*Id.* at ¶ 132). Thus, even using the Debtors' lower $84.3 million valuation (*see* Veraros Report), the Shareholder New Value Contribution constitutes a more than 50% discount compared to the value of the equity. The Court finds that such a discount cannot constitute reasonably equivalent value, particularly where other, higher contributions exist. *See Latam Airlines Grp.*, 620 B.R. at 802–03 (collecting cases).

### f)   The Shareholder New Value Contribution is Not "Necessary"

Finally, the Petitioning Creditors argue that the Shareholder New Value Contribution is not necessary within the meaning of *Coltex*. (PC Objection to Debtor Plan at ¶¶ 25–31; *see also* Committee Objection at ¶ 49). In support of this position, the Petitioning Creditors assert that,

---

[74] As set forth *infra*, Section (IV)(E), it appears the creditors agree based on the voting results.

under *Coltex*, and for the purposes of the absolute priority rule, the Debtors must establish that it

"it is necessary for old equity to contribute [the Shareholder New Value Contribution]" because

"no other source was willing to infuse the same amount of capital as old equity." (PC Objection

to Debtor Plan at ¶ 25). The Petitioning Creditors argue that the new value contribution is not

necessary here because in this case, the Petitioning Creditors have offered two plans, both of

which offer more outside funding than the Debtor Plan, and because terminating exclusivity is

not tantamount to a market test. (*Id.* at ¶¶ 29–30). Specifcially, the Petitioning Creditors claim

that, under *Coltex*, "the existence of a creditor plan dooms a debtor's new value plan[,] it is that

simple." (*Id.* at ¶¶ 30–31 (*citing In re Trikeenan Tileworks, Inc.*, No. 10-13725-JMD, 2011 WL

2898955, at *7-9 (Bankr. D.N.H. July 14, 2011) (confirming creditor plan with "many

similarities" to the debtor's new value plan but with greater creditor recovery); *c.f. In re Dwellco

I Ltd. P'Ship*, 219 B.R. 5, 7 (Bankr. D. Conn. 1998) (rejecting debtor's new value plan and

confirming creditor's liquidating plan); *see also* Committee Objection at ¶¶ 49–50 (arguing that

the Debtors cannot establish that the Shareholder New Value Contribution is necessary because

the Petitioning Creditors are willing to contribute more money than the Shareholders, and

because the Debtors made no effort to market test the new value contribution)).

In response, the Debtors appear to focus on the language in *Coltex* that states that "*old

equity must be willing to contribute more money* than any other source or it must be the lender of

'last resort,'" and that, when considering all components of funding in the Debtor Plan, the

Debtor Plan offers more. (Debtor Confirmation Memo at ¶¶ 123–124 (emphasis added) (arguing

that the Debtor Plan offers $80 million to the plan, compared to $41 million under the PC

Alternative Plan and $53.5 million under the PC Plan)). The Debtors also assert that the

Petitioning Creditors are incorrect that the mere existence of the PC Plan dooms the Debtor Plan.

(*Id.* at ¶ 126). Rather, the Debtors assert that various cases have confirmed new value plans over other competing plans. (*Id.* (citing *In re Walden Palms Condo. Ass'n*, 625 B.R. 543, 552 (Bankr. M.D. Fla. 2020)). The Debtors also argue that *Coltex*, *Trikeenan Tileworks*, and *Dwellco* do not support the Petitioning Creditors' position in this regard. (*Id.* (citations omitted)).

In the Creditor Brief, the Petitioning Creditors and the Committee further argue that both the PC Plan and the PC Alternative Plan prove that the Shareholder New Value Contribution is not "necessary" because the other plans offer more new money than under the Debtor Plan, and also provide greater recoveries than the Debtor Plan. (Creditor Brief at ¶¶ 6–8).

Finally, in the Debtor Brief, the Debtors argue that the Debtor Plan provides the greatest monetary investment "in terms of committed financing with a viable source of payment." (Debtor Brief at ¶¶ 32–33) (noting that the Shareholder Commitment Letter provides "the escrowed guarantee of the additional $40 million" and evidences that the Debtors have the funds necessary for the Debtor Plan, and that the PC Commitment Letter gives Pach Shemen the discretion to back out of the commitment letter if the confirmation order is not entered "in form and substance satisfactory to [Pach Shemen]" or if the rights offering has not closed by November 30)). Additionally, the Debtors argue that the relevant inquiry is how much money is going to creditors, not how much is being contributed to the relevant plans in a vacuum. (*Id.* at ¶ 34 (arguing that "[o]f the PS Plan's recent $10M increase, for example, less than $2 million is actually going to creditors")). In support of this position the Debtors provide a lengthy analysis of mathematical computations provided by the Debtors' experts that allegedly show that their plan would result in larger distributions to creditors. (*Id.* at ¶¶ 34–38).

The Debtors misconstrue the "necessary" standard under *Coltex*. The Second Circuit explained in *Coltex*:

74

> [T]he debtor must show not only that it needs funds to reorganize but rather that it is necessary for *old equity* to contribute those funds. In other words, under the "necessary" requirement of the new value exception, old equity must be willing to contribute more money than any other source or it must be the lender of "last resort." Before a debtor can claim that old equity's participation is "necessary," the market must be tested for other sources of funding and the debtor must be able to satisfy the bankruptcy court, with tangible proof, that the debtor would be unable to obtain funds from any other source or that no other source was willing to infuse the same amount of capital as old equity. Only upon this showing can it be found that the infusion of new capital by old equity was "necessary" and, therefore, that old equity is not receiving any property "on account of" its prior interests.

*Coltex II*, 203 B.R. at 535 (internal citations omitted). Accordingly, under *Coltex*, the relevant inquiry is the amount of money parties are willing to *contribute* to the plan. (*Id.*) The Court again reiterates that only the $37 million cash contribution constitutes new value for the purposes of the absolute priority rule. (*See supra*, Section (IV)(B)(1)(c). As previously stated, the PC Alternative Plan would provide $41 million in new funding, and the PC Plan would provide $53.5 million. (Debtor Confirmation Memo at ¶¶ 123–124). Under *Coltex*, the inquiry may end there. Moreover, to the extent the Debtors can be construed to be arguing that *a portion* of the SME revenues will be paid on the effective date and in the future under the Debtor Plan, the Court notes that *all* of the SME revenues will also be given to creditors under both the PC Plan and the PC Alternative Plan, because Pach Shemen itself is a creditor, and Pach Shemen will obtain the equity of the Debtors under either Petitioning Creditor plan. (Creditor Brief at ¶ 8). The same can be said of the Collections Contribution. (*See* PC Plan at 32 (where claims against Levona are retained by the reorganized Debtors and can only be resolved by the independent director)). Under the PC Plan, Pach Shemen will receive 100% of any value collected from Levona from the Final Award by virtue of its position as the equity holder of the reorganized Debtor, while the Debtor Plan contemplates contribution to the Debtor Plan of only a portion of

such collection via a waterfall set forth in the Collections Contribution and related provisions discussed above. (*Id.*)

Moreover, even if the Debtors' interpretation of the necessary requirement under *Coltex* is correct, the PC Plan still provides higher day 1 distributions to creditors than the Debtor Plan, rendering the Shareholder New Value Contribution unnecessary. The Debtors argue in the Debtor Brief that their plan would provide $8.1 million to creditors on day 1, while the PC Plan would provide only $5.1 million. (*See* Debtor Brief at ¶ 37). However, the Court notes that the Committee's expert, Mr. Cordasco, found that the Debtor Plan would be underfunded by $7.4 million, while the PC Alternative Plan would provide $6.7 million to creditors, and the PC Plan would provide $9.8 million to creditors. (*See* Cordasco Report at 7; September 12 Transcript at 292:10–293:16). Given that Mr. Cordasco was not retained by either of the plan proponents, the Court finds Mr. Cordasco's testimony credible (subject to certain adjustments and revisions described below).

For their part, the Debtors rely upon a chart prepared by Dr. Furchtgott-Roth in the Furchtgott-Roth Supplemental Rebuttal Report (as updated following the Hearings). (*Id.* (citing Furchtgott-Roth Supplemental Rebuttal Report at Ex. 2)). As is relevant here, that chart provided that, under the PC Plan, $5.1 million would be available on day one of the plan, while there would be $8.1 million available on day 1 under the Debtor Plan. (*Id.*) In arriving at the day 1 distribution amounts, the Debtors' analysis begins with the amount of money being put into the plans ($53.5 million under the PC Plan, and $37 million under the Debtor Plan), and then subtracts Dr. Furchtgott-Roth's projections regarding required payments needed to fund the plans, to arrive at the amount leftover to pay general unsecured creditors on day 1 stated above. (*See* Furchtgott-Roth Supplemental Rebuttal Report at Ex. 2). The Court understands that this

76

analysis was prepared using assumptions provided by counsel for the Debtors. September 12

Transcript at 107:2–117:23). However, the Court finds that there are at least three potential

issues with the Debtors' assumptions.

First, the Debtors' assumptions deducted "Disputed Claims" in the amount of $6.4

million under the PC Plan, and in the amount of $1.5 million under the Debtor Plan. (*See*

Furchtgott-Roth Supplemental Rebuttal Report at Ex. 2). However, the Disputed Claim amount

under both plans should be the same because the allowed claims under either plan would not

differ. In any event, the Court overruled the Debtors' claim objections. (*See generally* Claim

Objection Opinion). Accordingly, the Debtors' assumptions should include $6.4 million under

the "Disputed Claims" row under both plans. This change reduces the "Net Amount Available on

Day 1" under the Debtor Plan to $3.2 million, less than that under the PC Plan. This change

alone reduces the "Net Amount Available on Day 1" under the Debtor Plan to $3.2 million, less

than that under the PC Plan.

Second, the Court notes that the Debtors assumed $6.8 million in "Plan Proponent and

Prof. Backstop Fees" under the PC Plan, but in the amount of $0 under the Debtor Plan. (*See*

Furchtgott-Roth Supplemental Rebuttal Report at Ex. 2). However, the Petitioning Creditors

apparently informed the Debtors prior to the Hearings that they will be filing a substantial

contribution motion pursuant to Section 503(b)(3)(D) of the Bankruptcy Code seeking $6.8

million in the event the Debtor Plan is confirmed based on, *inter alia*, their willingness to pursue

competing plans in these cases. (September 13 Transcript at 187:9–12). While such a motion has

not been filed, the Court finds that at least some portion of such a motion should be accounted

for (and the Court believes 50% or $3.4 million is a reasonable assumption at this time), as the

Petitioning Creditors' actions in this case including, *inter alia*, providing the Debtors $10 million

77

in DIP financing and filing multiple competing plans has invariably increased creditor recovery, even if the Debtor Plan were ultimately confirmed. (*See* Docket Nos. 370, 531, 570, 663, 671, 695). Any substantial contribution claim would obviously further lower the day 1 distribution to creditors under the Debtor Plan.

Third, the Debtors assumed that only $200,000 would be necessary for "Litigation Trust Startup" costs under the Debtor Plan (as set forth above, the PC Plan does not contemplate a litigation trust, and therefore, the Debtors' analysis deducts $0 for Litigation Trust Startup costs). (*See* Furchtgott-Roth Supplemental Rebuttal Report at Ex. 2). However, Mr. Cordasco examined other recent cases with Litigation Trusts and found that at least $3 million would be necessary, as opposed to the $200,000 provided under the Debtor Plan. (*See* Cordasco Report at 22; September 12 Transcript at 327:16–329:19). The Court finds it likely that at a minimum $1.5 million would be necessary to fund the Litigation Trust under the Debtor Plan.

When the Disputed Claims, Plan Proponent and Prof. Backstop Fees, and Litigation Trust Startup costs are adjusted as set forth herein, the PC Plan still provides $5.1 million on day 1 of the plan, but the Debtor Plan is underfunded by $1.5 million in funding on day 1 of the plan (using the Debtors' analysis), further proving that the Shareholder New Value Contribution is unnecessary because the PC Plan provides more value.

Finally, the Debtors assert that courts have confirmed new value plans over other competing plans, meaning that the Shareholder New Value Contribution can still be necessary notwithstanding the existence of the PC Plan and PC Alternative Plan. (Debtor Confirmation Memo at ¶ 126 (citing *In re Walden Palms Condo. Ass'n*, 625 B.R. 543, 552 (Bankr. M.D. Fla. 2020)). However, the Debtors misconstrue these cases. In *Walden Palms*, the court confirmed the debtor's new value plan only after finding that the plan proposed by the creditor was

78

unconfirmable. *See Walden Palms Condo. Ass'n*, 625 B.R. at 548–50. The Court is unaware of

any case post-*LaSalle* where the court has confirmed a new value plan despite a *confirmable*

competing plan filed by the debtor's creditors, particularly where, as here, the creditors are

willing to contribute more new capital than the Debtors. Moreover, as set forth *infra*, Section

(IV)(E), the PC Plan has been accepted by an overwhelming majority of creditors entitled to vote

on the plans. For all these reasons, the Court finds that the Debtor Plan cannot satisfy the new

value exception to the absolute priority rule and cannot be confirmed.

### 2.    The Debtor Plan is Not Feasible Pursuant to Section 1129(a)(11)

The next issue raised by the Petitioning Creditors with respect to the Debtor Plan is that

the Debtor Plan is not feasible under Section 1129(a)(11) of the Bankruptcy Code. (PC Objection

to Debtor Plan at ¶¶ 44–47). In support of this position, the Petitioning Creditors argue first that

the Debtors have not demonstrated that the $37 million cash contribution to be provided by the

Shareholders is "real." (*Id.* at ¶ 45). Second, the Petitioning Creditors argue that the Shareholder

Commitment Letter is not sufficient because it is enforceable only by the Debtors. (*Id.* at ¶ 46).

Finally, the Petitioning Creditors argue that even if the $37 million cash contribution were real,

such amount is insufficient to fund the Debtor Plan's day one obligations. (*Id.* at ¶ 47).

Regarding the last point, the Committee further argues that: (i) the Debtors' plan has a $14.4

million funding shortfall (Committee Objection at ¶ 53 (citing Cordasco Report at 7); *see also*

September 12 Transcript at 292:10–23)); (ii) the Debtor Plan does not allocate enough money for

startup costs of the Litigation Trust (Committee Objection at ¶ 54 (citing Cordasco Report at 32;

*see also* September 12 Transcript at 303:12–306:5)); (iii) even if the Debtors succeed in all of

their objections to opposing counsel's fees, such objections do not save their plan because they

are speculative (Committee Objection at ¶ 55); and (iv) the Shareholder Commitment Letter does

not prove that the Debtors have the funds to close in cash on the effective date. (*Id.* at ¶¶ 56–58).

In response, the Debtors argue that: (i) the Shareholder Commitment Letter supports a finding of feasibility (Debtor Confirmation Memo at ¶ 90); (ii) the $37 million provides the Debtor Plan with sufficient liquidity to make all distributions under the plan (*id.* at ¶¶ 91–92); (iii) the Shareholder Commitment Letter demonstrates the existence of the $37 million and is an enforceable commitment (*id.* at ¶¶ 94–95); and (iv) the Litigation Trust is properly funded (*id.* at ¶ 96).

In the Creditor Brief, the Petitioning Creditors and the Committee further argue that the Debtors have not proven that the $37 million Shareholder New Value Contribution is sufficient to satisfy all the payment obligations under the plan. (Creditor Brief at ¶ 15). The Petitioning Creditors and Committee also argue that the Debtors have not proven that the Shareholders actually have $37 million in cash to fund the Debtor Plan, and accordingly, cannot establish a reasonable likelihood of success (*Id.* (citing *Kane v. John Manville Corp.*, 843 F.2d 636, 649 (2d. Cir. 1988) (under section 1129, a plan must have a "reasonable assurance of success")). In support of this position, the creditors rely on the Cordasco Report, where Mr. Cordasco performed an analysis and determined that the Debtor plan likely had up to a $7.4 million shortfall notwithstanding the $37 million Shareholder New Value Contribution. (*Id.* at ¶ 16 (citing Cordasco Report at 7, 11); *see also* September 12 Transcript at 292:10–23)). Moreover, the creditors argue that the Debtors' expert, Mr. Nolletti, "performed no independent analysis of the likely administrative claims required to be paid at emergence and relied solely on filed claims or assumptions given to him by counsel." (Creditor Brief at ¶ 16 (citing September 12 Transcript at 198:24–199:10; 201:4–14; 231:7–22; 234:14–235:22; 268:14–25; 274:11–19)). Further, the creditors argue that Mr. Nolletti did not perform any sensitivity analyses, assumed the Debtors

would emerge from bankruptcy in September 2024, and did not estimate any fees for October 2024. (*Id.* (citing September 12 Transcript at 199:14–18; 201:19–23; 204:2–14)).

Most critically, the Petitioning Creditors and the Committee point out that the Debtors' estimations of expenses in this case assumed that all of the Debtors' claim objections to the administrative expenses of the Petititioning Creditors', Wilmington Savings Fund Society, FSB as Indenture Trustee, and New Agathonissos Finance[75] would be sustained in their entirety and that such creditors' claims would be $0. (*Id.* at ¶ 17 (citing September 12 Transcript at 233:23–235:22). Additionally, the creditors assert that the Debtors' analysis did not include the possibility that a substantial contribution may be filed, or that the Debtors had already agreed not to object to such a motion pursuant to the terms of the DIP loan provided by Pach Shemen. (*Id.* at ¶ 17). As the creditors note, several factors increase the likelihood that a substantial contribution claim would likely be allowed in some amount. (*Id.* (citing Kertsikoff Declaration at ¶ 92 (noting that the shareholders increased their contribution in response to the Petitioning Creditors' plans); Hadjieleftheriadis Declaration at ¶ 50 (same); CRX-189 (where the rights offering and backstop approval order makes certain findings about the benefits to the creditors and the estate); CRX-186 (where the DIP loan term sheet provides that the Debtors will not object to DIP lender's substantial contribution claim); CRX-186 (where the order approving the DIP loan finds that the DIP is necessary to a successful reorganization)). As set forth *supra*, Section (IV)(1)(F), the Court believes it is fair to assume at this stage that at least $3.4 million

---

[75] This claim was settled on September 24, 2024 by virtue of the *Agreed Order Resolving Motion of New Agathonissos Finance LLC for Allowance of Administrative Expense Claim and Debtors' Objection to Claims of New Agathonissos Finance LLC* (the "**NAF Claim Order**"). (Docket No. 1158). The NAF Claim Order provides that NAF has an allowed general unsecured claim in the amount of $2,397,195 and allowed priority administrative claim in the amount of $225,000. (*Id.* at 2).

(representing 50% of the claimed $6.8 million (September 13 Transcript at 187:9–12)), would be allowed.

Further, the creditors argue that the Litigation Trust is not adequately funded under the Debtor Plan. (*Id.* at ¶ 18). In the Cordasco report, Mr. Cordsaco included a table of recent cases where litigation trusts were established and noted that all of them provided far more than $200,000 for a case of this size. (*Id.* (citing Cordasco Report at 22). Mr. Cordasco's report found that at least $3 million would be necessary (*Id.* (citing Cordasco Report at 22; September 12 Transcript at 327:16–329:19)). This Court has found that at least $1.5 million would be necessary. (*See supra*, Section (IV)(1)(F)).

Lastly, the creditors argue that the Debtors have not established that they actually have $37 million in cash on the effective date, and instead, the banking information provided by the Debtors shows "that the value represented is held in "cash, listed securities and derivatives linked to listed securities" and is otherwise held in accounts controlled at least in part by entities not bound by the Shareholder Commitment Letter. (Creditor Brief at ¶¶ 21–22 (citing DX-312(A)-(C)).

Finally, in response, the Debtors argue that the evidence shows that they have funded the plan sufficiently to ensure that they can make all payments on the effective date and that sufficient funds exist for the Litigation Trust. (Debtor Brief at ¶ 14). The Debtors also argue that the Litigation Trust will be further supplemented by future cash flows to be provided at a later date. (*Id.*) The Debtors also assert that their contribution is backed up by the Shareholder Commitment Letter, which is binding on the Shareholders. (*Id.* at ¶ 16). Additionally, the Debtors assert that even if the creditors prevail in opposing all of the Debtors' claim objections,

resulting in approximately $5 million in unaccounted for claims, the Debtor Plan will still have a surplus of $9-10 million. (*Id.* at ¶ 17).

The Debtors also assert that the plan provides only $200,000 for the Litigation Trust, and accordingly, the creditors' assertion "that $3 million is needed is meaningless, as that is not what is provided for in the Plan, and the Committee and FTI do not have the authority to modify the terms of the Plan." (*Id.* at ¶ 18). In any event, the Debtors argue that the Litigation Trust will be provided by additional cash flows later on. (*Id.*) The Debtors further argue that the Committee and the Petitioning Creditors have still not even shown they have claims they will use the Litigation Trust to pursue. (*Id.* at ¶ 19). Finally, the Debtors argue that the appropriate standard for satisfaction of Section 1129(a)(11) merely requires a reasonable likelihood of success, which the Debtors have me. (*Id.* at ¶ 21).

To satisfy Section 1129(a)(11), "[i]t is not necessary that success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success . . . ." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (citations and emphasis omitted). Rather, "the key element of feasibility is whether there exists the reasonable probability that the provisions of the Plan can be performed." *Id.*

Here, the Court finds that the Debtors have not established that the Debtor Plan is feasible. Principally, the Court is unpersuaded that the $37 million Shareholder New Value Contribution provides sufficient funding to make all required day 1 payments under the plan. As the Petitioning Creditors and the Committee point out, the Debtors' analysis assumed that all of the Debtors' claim objections to the administrative expenses of the Petititioning Creditors', Wilmington Savings Fund Society, FSB as Indenture Trustee, and New Agathonissos Finance

would be sustained in their entirety and that such creditors' claims would be $0. (*See* September

12 Transcript at 233:23–235:22). As set forth in the Claim Objection Opinion, these

administrative claims have been allowed in the approximate amount of $4.4 million, and the

New Agathonissos Finance claim has been settled for as an allowed general unsecured claim in

the amount of $2,397,195 and allowed priority administrative claim in the amount of $225,000.

(*See* Claim Objection Opinion; *see also* NAF Claim Order at 2). Moreover, the Debtors failed to

account for the fact that a substantial contribution motion may be filed, or that the Debtors had

already agreed not to object to such a motion pursuant to the terms of the DIP loan provided by

Pach Shemen. (Creditor Brief at ¶ 17; DIP Order; September 13 Transcript at 187:9–12).

That the Debtor Plan is not feasible is also further supported by the fact that the Litigation

Trust appears to be underfunded under the Debtor Plan. It does not appear that the Debtors

seriously challenge these opinions, other than to essentially state that the plan says what it says,

and that the Debtors will not offer more funding. (Debtor Brief at ¶ 18).[76]

Finally, though not the turning point of the Court's analysis, the Court finds that the

Shareholder Commitment Letter and the documents provided by the Debtors do not fully

substantiate that the Shareholders have sufficient funds to make the Shareholder New Value

Contribution. As stated above, the banking information provided by the Debtors shows that the

value represented is held in "cash, listed securities and derivatives linked to listed securities" and

is otherwise held in accounts controlled at least in part by entities not bound by the Shareholder

Commitment Letter. (Creditor Brief at ¶¶ 21–22 (citing DX-312(A)-(C)). Alternatively, the

---

[76] The Debtors also attack Mr. Cordasco's credibility and essentially argue that he is an agent of the Petitioning Creditors, but the Court notes that Mr. Cordasco also found that the PC Alternative Plan was unconfirmable in part because it was also not feasible. (Committee Objection at ¶ 59).

Court notes that the Petitioning Creditors have escrowed $43.5 million in cash in a bank account held by their counsel. (*See* PC Commitment Letter at Ex. A).

For all these reasons, the Court finds that the Debtor Plan is also not feasible under Section 1129(a)(11).

### 3. Other Issues with the Debtor Plan

The Petitioning Creditors and the Committee raise numerous other objections to the Debtor Plan. In the PC Objection to Debtor Plan, the Petitioning Creditors argue that the Debtor Plan discriminates unfairly. (PC Objection to Debtor Plan at ¶¶ 40–43). Specifically, the Petitioning Creditors point out that the Debtor Plan treats unsecured creditors differently by, for example, providing the OCM Guarantee Claims and Corp. Guaranty Claims recoveries of 50% and 53.5%, while other unsecured creditors will receive less than .1%. (*Id.* at ¶ 41). The Petitioning Creditors also argue that the equitable subordination of the Petitioning Creditors' claims is also unfair discrimination because the Court has not ruled that the Petitioning Creditors should be equitably subordinated under Section 510(c). (*Id.* at ¶ 42).

The Petitioning Creditors further argue that the Debtor Plan fails to provide equal treatment as required by Section 1123(a)(4). (*Id.* at ¶¶ 48–51). Specifically, the Petitioning Creditors argue that Class 5 of the Debtor Plan violates this provision because holders in this class will receive different recoveries. (*Id.* at ¶ 50). The Petitioning Creditors also argue that "[w]hile all Holders of Claims in Class 6A (Non-Petitioning Creditor Exchange Note Claims) and Class 6B (Petitioning Creditor Exchange Note Claims) get the option to elect into Class 5, the actual treatment of each Claim is different because a Holder of a Claim in the amount of $50,000, would likely recover 100% of its Claim, while a Holder of Claim in the amount of $10 million would likely receive $70,000, recovering only .7% of its Claim." (*Id.*) The Petitioning Creditors argue that the "savings clause," whereby holders of Class 5 claims would be treated as

members of Class 6A or 6B if the Court determines that Class 5 is impermissible, does not save the Debtor Plan because such creditors would receive no recovery on the effective date of the plan, and would be left with "nothing more than an interest in an underfunded litigation trust—an outcome which they rejected by making the very Noteholder Election Recovery Claim Election." (*Id.* at ¶ 51).

Finally, the Petitioning Creditors argue that the Debtor Plan was not filed in good faith as required by Section 1129(a)(3). (*Id.* at ¶¶ 52–61). Specifically, the Petitioning Creditors argue that the Debtors' plan process violates Section 1129(a)(3) because the Debtors, *inter alia*, formulated and prosecuted their plan with no input from creditors, and because the Shareholder New Value Contribution was negotiated by the same individuals standing on both sides of the transaction. (*Id.* at ¶ 55). The Petitioning Creditors also argue that the Debtor Plan was proposed in bad faith because it gerrymanders classes and needlessly impairs claims for many of the same reasons argued regarding unfair discrimination and unequal treatment. (*Id.* at ¶¶ 56–61).

The Committee raises many of the same arguments. First, the Committee argues that the Debtor Plan impermissibly gerrymanders an accepting class of creditors in violation of Section 1122(a). (Committee Objection at ¶¶ 61–63). Specifically, they argue that there is no reason to treat the guarantee claims separately while other unsecured creditors receive nothing. (*Id.*) The Committee also argues that the Debtor Plan discriminates unfairly between similarly situation creditors in violation of Section 1129(b)(1) because the Debtors cannot show that the favored treatment of their alleged "historical lenders" (the guarantee classes) is necessary for an effective reorganization. (*Id.* at ¶¶ 64–66). Finally, the Committee argues that the Debtor Plan violates Section 1129(a)(2) and 11229(a)(3) because the Debtors did not disclose the nature of their plan

negotiations with their Shareholders, and because the plan was proposed in bad faith since it does not maximize creditor recoveries. (*Id.* at ¶¶ 67–71).

In response, the Debtors first argue that there is a valid business purpose to separate Classes 1, 2, and 3 (the guarantee claims), because the "underlying guaranty obligations supporting each of these claims are based on different contractual relationships with separate and distinct entities and differing rights." (Debtor Confirmation Memo at ¶¶ 29–38). The Debtors further argue that the Debtor Plan provides the same treatment within each class because even if the Court finds that Class 5 is impermissible, creditors who chose Class 5 were aware of how they would be treated in such a scenario and elected to be treated as a member of Class 5 knowingly. (*Id.* at ¶¶ 43–46). The Debtors also argue that the Debtor Plan has been proposed in good faith. (*Id.* at ¶¶ 65–70). Specifically, the Debtors argue that their plan provides more money to creditors than the other plans, and that they were not required to get creditor input on their plan. (*Id.*) The Debtors argue that no unfair discrimination exists here because the Debtors have explained why they separately classified unsecured creditors. (*Id.* at ¶¶ 102–106). Finally, the Debtors argue that the Petitioning Creditors should be equitably subordinated pursuant to Section 510(c) given their misconduct and bad faith in these cases. (*Id.* at ¶¶ 136–154).

In the Creditor Brief, the Petitioning Creditors and the Committee further argue that the Debtor Plan was not proposed in good faith in violation of Section 1129(a)(3) for several reasons, including *inter alia*: (i) the Debtors negotiated the Shareholder New Value Contribution with the same people on both sides of the negotiation; (ii) the Debtors did not retain financial advisors to assist them in the development of their plan; (iii) the Debtors did not pursue alternate sources of funding for their plan; and (iv) the Debtors gave favorable treatment to certain creditors. (Creditor Brief at ¶ 26). Additionally, the Committee and the Petitioning Creditors note

87

that the Debtor Plan unfairly provides better treatment for their historical lenders (the guarantee claims), who would receive 53.6% recovery under the Debtor Plan. (*Id.* at ¶ 26). This disparate treatment is made further complicated by the fact that at the Hearings, it was alleged that the Debtors had made previously undisclosed, unapproved deals with these same creditors. (*Id.* at ¶ 28).

Finally, in the Debtor Brief, the Debtors argue that they proposed their plan in good faith because the Debtor Plan provides more money than any other plan., and that they were under no obligation to engage their creditors during the plan formulation process because all of the creditors have conducted them in bad faith in this case. (Debtor Brief at ¶¶ 10–12 (claiming further that "[t]he Committee, through its designee, admitted that it investigated no claims except those against the Debtors' insiders and did an arithmetic evaluation of what could be collected against Levona, took no action to support the Debtors' actions to prevent dissipation of estate assets by Levona, permitted Pach Shemen's counsel to attend Committee meetings despite asserting independence from Pach Shemen, is represented by Murchinson's former counsel, and incredibly permitted Dechert to be the deciding vote in the event of a split vote") (internal citations omitted)).

The Debtors also argue that their plan satisfies Section 1112(a)(4) because the Debtors have not "engaged in any settlements with any creditors that have not been disclosed to the Court." (*Id.* at ¶ 13). Specifically, the Debtors claim that:

> [N]on-Debtor Eletson Corporation ("Corp") has taken steps to reorganize its obligations, which benefits the Debtors by reducing the contingent liability of the Reorganized Debtor (*see* DX-267 at p. 22). Corp is not a debtor and is permitted to settle its obligations without oversight from the Bankruptcy Court. Further, settlements of claims and agreements to vote in favor of a plan of reorganization are not prohibited by the Bankruptcy Code. *In re GOL Linhas Aéreas Inteligentes S.A.*, 659 B.R. 641 (Bankr. S.D.N.Y. 2024) (explaining the common nature of plan support agreements); *see also In re CHC Grp. Ltd.*, 2017 Bankr. LEXIS 1016, *30-

33 (Bankr. N.D. Tex. Mar. 3, 2017). Nevertheless, as [Messrs. Kertkiskoff and Hadjieleftheriadis] made clear, none of the bank settlements involved Holdings ([September 11 Transcript] at 764:6-8), and none of was conditioned in any way on voting in favor of the Debtors' Plan ([September 11 Transcript] at 681:17-683:8; 764:9-15). Thus, the votes of Classes 2 and 3 are valid votes in support of the Plan. Further, the willingness to settle issues and maintain relations with the Eletson enterprise is clearly indicative of a valid preference towards the Plan as these parties were free to engage in negotiations for settlement with Pach Shemen as well, and in fact, they did so (DX-326; DX-327; DX-328; DX-329; DX-332).

(*Id.*)

Given that the Debtor Plan has not satisfied Section 1129(b)(2)(B)(ii) or Section 1129(a)(11), the Court will not address in lengthy detail the remaining objections raised by the Petitioning Creditors and the Committee. However, the Court takes note of several other potential issues with the Debtor Plan that could also impact whether the Debtor Plan is confirmable.

First, the Court notes that the Debtor Plan provides for the equitable subordination of the Petitioning Creditors due to the Petitioning Creditors' alleged bad faith. (Debtor Confirmation Memo at ¶¶ 136–154). However, as noted extensively in the Claim Objection Opinion, the Court finds that the Petitioning Creditors have not acted in bad faith, and therefore, the Court finds that no basis exists to equitably subordinate the Petitioning Creditors. (See Claim Objection Opinion).

Moreover, it appears that the Debtor Plan may discriminate unfairly, as it appears that certain classes may have been gerrymandered. Under Section 1129(b)(1), the Debtor Plan must not "discriminate unfairly" against the three classes of claims that voted to reject the Debtor Plan. 11 U.S.C. § 1129(b)(1). This prohibition is based on the principle that "a dissenting class [should] receive relative value equal to the value to all other similarly situated classes." *Matter of Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (citation omitted). In this

Circuit, courts have applied a four-factor test: "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without the discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale." *In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014) (citations omitted).

From the outset, the Court finds that the Debtors have not adequately explained why their "historical lenders" needed to be treated separately from the other classes of unsecured creditors under their plan. The Debtors' explanation that such classification was necessary because the "underlying guaranty obligations supporting each of these claims are based on different contractual relationships with separate and distinct entities and differing rights" is unpersuasive. (Debtor Confirmation Memo at ¶¶ 29–38). On the surface, this classification scheme may have been proposed to obtain an impaired accepting class in order to confirm the Debtor Plan. See 11 U.S.C. §§ 1122(a), 1123(a)(4), 1129(a)(8), (a)(10), (b)(1), (b)(2).

This classification scheme is also made problematic by the fact that, at the Hearings, it was disclosed that these same creditors may have been part of previously undisclosed, unapproved deals with the Debtors to procure votes in favor of the Debtor Plan. Indeed, the Court notes that the order approving solicitation of the plans in this case was entered on July 10, 2024. (Docket No. 856). Pursuant to that order, solicitation commenced on July 17, 2024, and the deadline for creditors to submit ballots was set as August 9, 2024. (*Id.*)

On July 31, 2024, Mr. Kertsikoff (who serves as an officer and director of the Debtors) sent an offer to one of the Debtors' creditors, Piraeus Bank/Sunrise serviced by Intrum S.A. ("**Sunrise**") an offer to acquire Sunrise' claims against Eletson Corp and its affiliates. (*See* Creditor Brief at ¶ 28 (citing CRX-121)). The offer provided that, "on the effective date of the Debtors [sic.] plan the reorganized Eletson Holdings Inc. and / or a legal entity to be nominated

by Eletson Corp will acquire the [] claims . . . for a one-time consideration of $8.2 million, . . . net[] of[] any recovery due to [Sunrise] in accordance with the Debtors [sic.] plan following confirmation." (See CRX-121). The subject line of the email containing the offer read "Eletson Holdings Ch.11_Sunrise." *Id.*

Additionally, on August 2, 2024, Mr. Kertsikoff sent a similar settlement email to Cepal Hellas, servicer for the Alpha Bank loan held by Hermes Acquisitions ("**Hermes**"). Creditor Brief at ¶ 28 (citing CRX-91)). This letter stated that it was "proposal for the final settlement of Eletson Corporation's debt . . . which is collateralized with Eletson Holdings' corporate guarantee and amounts to $4,302.198.44 (according to Chapter 11 data)." (*See* CRX-91 at 2). Moreover, the agreement provided that, "on the effective date of the Debtors' Plan, the reorganized Eletson Holdings Inc and/ or Eletson Corporation" would pay $750,000 in "full and final debt settlement" of Hermes' claims against Eletson Corp., which amount would "include[] the recovery that is projected to be paid according with the Debtor's Plan (class 2) following confirmation." *Id.* Hermes accepted this proposal that same day, "subject to a total payment of $750.000 on the effective date of the Debtor's Plan." (*Id.* at 1).

One day before the voting deadline, on August 8, 2024, Mr. Hadjieleftheriadis, another officer and director of the Debtors, signed a third settlement agreement with the holders of the Azure Guarantee Claims (collectively, "**Azure**"). (Creditor Brief at ¶ 28 (citing CRX-238)). Pursuant to the settlement, Azure agreed to "provide to Eletson evidence in writing that [Azure] has voted to accept the Debtors' Plan and reject the PC Plan and the Alternative PC Plan and has already sent the relevant ballot by email to the address stated in the relevant solicitation materials." (*See* CRX-238 at ¶ 1).

91

Moreover, as set forth above, while the plans were being solicited, Laskarina Karastamati (an officer and director of the Debtors) had reached an agreement with AB Bank on June 5, 2024, whereby Corp.—one of the Debtors' wholly owned subsidiaries—agreed to pay $6 million to AB Bank over a period of six years to resolve AB Bank's claims. (Creditor Brief at ¶ 28 (citing CRX-123)). Corp. made the first $1 million payment to AB Bank pursuant to the agreement on June 13, 2024, and AB Bank withdrew from the Committee the next day. (*Id.* (citing CRX-90)).

"Each of these creditors—the three holders of Corp Guaranty Claims and the holders of the Azure Guaranty Claims—voted to accept the Debtors' Plan . . . .". (*Id.* at ¶ 29). The Court makes no finding regarding whether such agreements are permissible because they were entered into by Corp. instead of the Debtors (*see* Debtor Brief at ¶ 13), but these agreements clearly reference Holdings, the plans, and votes in connection therewith. At a minimum, these undisclosed agreements add further context to the Debtors' classification scheme in the Debtor Plan, and make it appear more likely that the Debtor Plan was gerrymandered to procure impaired accepting classes.

For all these reasons, the Debtor Plan is not confirmable.

## C.  <u>THE PC ALTERNATIVE PLAN IS NOT CONFIRMABLE</u>

Having established that the Debtor Plan is not confirmable, the Court notes that it does not appear that the Petitioning Creditors are seriously pursuing the PC Alternative Plan. As counsel for the Petitioning Creditors stated at the Hearings:

> I'll just mention the PC alternative plan. We haven't talked about it much this week. There's a reason for that. It comes up really only in the context, if you're going to approve the debtors' plan, that plan provides more value. But I'm not going to stand here, Your Honor, and push a plan over the PC plan, primarily because we listen to creditors. The creditors chose. They chose the PC plan. Now, if it had flipped, and the creditors had chosen an alternative plan, I would be pushing that plan over the PC plan. The creditors made that decision, Your Honor, with three different

> disclosure statements providing all of the information about all the horrible, horrible things that Murchinson, which isn't even here, has done. And they voted.

(*See* September 13 Transcript at 179:1–14).

In any event, the Court notes that both the Debtors and the Committee assert that the PC Alternative Plan is unconfirmable for many of the same reasons as the Debtor Plan. (Debtor Objection to PC Plans at ¶ 20; Committee Objection at ¶ 59). Because the Court has found that the Debtor Plan is not confirmable and based on the voting results and the Petitioning Creditors' arguments related thereto, the Court need not determine whether the PC Plan is confirmable.

### D.  THE PC PLAN IS CONFIRMABLE

The final plan pending before the Court is the PC Plan. As set forth above, "[t]he proponent of the confirmation of a plan must prove by a preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a), and if the plan is not fully consensual, 11 U.S.C. § 1129(b)." *In re Breitburn Energy Partners LP*, 582 B.R. 321, 349 (Bankr. S.D.N.Y. 2018). A Chapter 11 plan is fully consensual when each class of claims under the plan has either voted to accept the plan or is unimpaired under the plan. *See* 11 U.S.C. § 1129(a)(8). Here, the plan is not fully consensual, as Classes 6 and 9 (and potentially Classes 7 and 8) are impaired and were deemed to reject the PC Plan. (*See generally* PC Plan at 20–21; Lee Certification). Accordingly, confirmation of the PC Plan is only possible pursuant to Section 1129(b). Importantly, the only objection filed to the PC Plan was the Debtor Objection, and the Debtors only object to the PC Plan on the basis of Section 1129(a)(1), Section 1129(a)(3), Section 1129(a)(7), and Section 1129(a)(11). (*See generally* Debtor Objection).

Regarding the remaining elements of confirmation, the Court finds that the PC Plan is confirmable under Section 1129. Indeed, the PC Plan, inter alia: (i) complies with applicable provisions of the Bankruptcy Code (*see* PC Plan at Arts. III, V, VII, X); (ii) has been proposed

by plan proponents who comply with applicable provisions of the Bankruptcy Code (*see generally* PC Plan; Lee Certification); (iii) provides that all administrative expenses in this case will be approved by the Bankruptcy Court (*see* PC Plan at Art. II.2.4); (v) discloses the identity of all new officers and directors of the reorganized Debtor (*see* PC Plan at Art. V.5.10); (vi) has been accepted by all classes of claims entitled to vote on the PC Plan (*see* Lee Certification); (vii) provides that all priority claims required to be paid on the effective date shall be paid on the effective date (see PC Plan at Arts. II.2.1, II.2.3, III); (viii) has an impaired accepting class (see Lee Certification); and (ix) provides for the payment of all statutory fees on the effective date (*see* PC Plan at Art. XII.12.1). (*See* PC Confirmation Memo (citing 11 U.S.C. §§ 1129(a)(1)–(a)(2), (a)(4)–(a)(6), (a)(8)–(a)(10)).[77] Additionally, the Court finds that the PC Plan satisfies Section 1129(b) of the Bankruptcy Code. (*See* PC Confirmation Memo at ¶¶ 70–76). To the extent not addressed herein, the Court finds that the PC Plan is otherwise confirmable, aside from the objections raised by the Debtors discussed below.

In the Debtor Objection, the Debtors first argue that the PC Plan: (i) violates Section 1129(a)(3) because it was proposed in bad faith (Debtor Objection at ¶¶ 41–49); (ii) is not in the best interests of the creditors as required by Section 1129(a)(7) (*id.* at ¶¶ 56–61); (iii) is not feasible pursuant to Section 1129(a)(11) (*id.* at ¶¶ 62–71); and (iv) violates Section 1129(a)(1) because it violates Section 1122 by lumping wholly unrelated claims together (*id.* at ¶¶ 72–76).

In response, the Petitioning Creditors argue that the PC Plan: (i) does not violate Section 1129(a)(3) because it was proposed in good faith (PC Reply at ¶¶ 4–10); (ii) does not violate

---

[77] Moreover, as set forth in the PC Confirmation Memo, Sections 1129(a)(13) through (a)(16) are inapplicable to the PC Plan. (*See* PC Confirmation Memo at ¶¶ 67–69).

Section 1129(a)(7) because it is in the best interest of the creditors (*id.* at ¶¶ 11–12); (iii) is

feasible (*id.* at ¶¶ 13–18); and (iv) appropriately classifies claims. (*Id.* at ¶¶ 19–21).

Finally, in the Debtor Brief, the Debtors once again argue that the PC Plan cannot be

confirmed because the Petitioning Creditors have acted in bad faith. (Debtor Brief at ¶¶ 43–51).

## 1. **The PC Plan Does Not Violate Section 1129(a)(3) Because it Was Proposed in Good Faith**

The principal argument advanced by the Debtors is that the PC Plan was not proposed in

good faith. (Debtor Objection at ¶¶ 41–49; Debtor Brief at ¶¶ 43–51). The Debtors specifically

argue that the Petitioning Creditors' conduct:

> can only be described as a years'-long attempt by the Murchinson Entities to complete a hostile takeover of the Debtors. Indeed, in the Arbitration, Levona was found to have wrongfully commenced the Debtors' bankruptcy proceedings, and wrongfully perpetrated its scheme against the Debtors and various Eletson entities, resulting in the Final Award against Levona of no less than $99,530,099.71. See Final Award at pp. 95-101. Because Murchinson and Pach Shemen could not accomplish these goals pre-petition, or through the involuntary bankruptcy filing, they have continued their onslaught in the Chapter 11 Cases through the machinations of the Petitioning Creditors.

> To that end, Pach Shemen and the Petitioning Creditors have abused the Bankruptcy Code and the Bankruptcy Court's procedures to continue their attacks on the Debtors and their professionals throughout the Chapter 11 Cases. Pach Shemen's bad faith is exemplified by, among numerous other things: (a) the filing of a baseless motion seeking the appointment of a chapter 11 trustee over the Debtors' estates, (b) filing objections to every single fee application filed by the Debtors' counsel, yet failing to file a single objection to the fees of Committee Professionals, (c) improperly directing the Exchange Notes Trustee throughout the Debtors' Chapter 11 Cases and (d) most recently seeking blatantly retaliatory requests for document productions for all parties that voted in favor of the Debtors' plan of reorganization and rejected the Competing Plans. These scorched earth tactics are nothing more than a continuation of Murchinson's concentrated campaign to undermine the Debtors' autonomy and impede the progress toward the Debtors' successful reorganization.

(Debtor Objection at ¶¶ 45–46).

In response, the Petitioning Creditors argue that PC Plan was proposed in good faith after

the Debtors let their exclusivity periods lapse, which the Debtors themselves have previously

stated was beneficial to the estate. (PC Reply at ¶ 4). The Petitioning Creditors further note that they have provided the Debtors $10 million DIP financing at a significantly below market interest rate (.5%); and have taken all the actions complained of by the Debtors in order to protect themselves and other creditors. (*Id.* at ¶¶ 5–10).

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  Good faith is not defined in the Bankruptcy Code, but Courts have found that good faith in this context means a "reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re Quigley Co.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010) (internal citation omitted); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (stating that "[t]he good-faith test means that the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected'"). "It must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan, […], including […] pre-filing conduct." *In re Quigley Co.*, 437 B.R. at 125 (internal citations omitted).

Principally, as stated numerous times throughout this opinion, the Court has already considered and rejected the Debtors arguments regarding the Petitioning Creditors' bad faith in the Claim Objection Opinion. (*See* Claim Objection Opinion). To the extent any remaining arguments remain, the Court expressly overrules them. For these reasons, the Court finds that the Petitioning Creditors have acted in good faith within the meaning of Section 1129(a)(3).

### 2. The PC Plan Does Not Violate the Best Interest of the Creditors Test Under Section 1129(a)(7)

The Debtors' next argument is that the PC Plan is not in the best interests of the creditors as required by Section 1129(a)(7). (Debtor Objection at ¶¶ 56–61). Specifically, the Debtors

argue that the PC Plan relies on "unsupported assumptions regarding the costs associated with winding down the Debtors' estates in a chapter 7 proceeding . . . and that [t]here is no evidence to support professional fees of between $4 million to $5 million in a simple sale proceeding." (*Id*. at ¶ 59). Additionally, the Debtors argue that the litigation analysis assumes that the Chapter 7 Trustee will investigate estate causes of action, but such investigation would be duplicative of work the Committee has already done in this case. (*Id*. at ¶ 60).

In response, the Petitioning Creditors argue that the PC Plan does not violate Section 1129(a)(7) of the Bankruptcy Code because the Petitioning Creditors' liquidation analysis provides the only such analysis conduced by any financial advisor in this case. (PC Reply at ¶ 11). Moreover, the Petitioning Creditors argue that the Debtors do not even have standing to raise these issues because no creditors have raised it and the Debtors have no pecuniary interest in the outcome of a potential Chapter 7 case given the amount of claims here. (*Id.*) Finally, the Petitioning Creditors argue that even if the Debtors are correct, the PC Plan provides more funding than would be required to meet Section 1129(a)(7) under the Debtors' own liquidation analysis that was prepared without a financial advisor. (*Id.* at ¶ 12).

The "best interests of creditors" test requires that, with respect to each impaired class, each holder of a claim or an equity interest in such class either: (i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtors liquidated under chapter 7 on such date.  See 11 U.S.C. § 1129(a)(7)(A)(i)-(ii).

Further, a plan's proponent bears the burden of proof to establish by a preponderance of the evidence that the plan is in the best interests of the creditors.  *In re Adelphia Communs.*

97

*Corp.*, 361 B.R. 337, 365 (S.D.N.Y. 2007) ("The bankruptcy court must find by a preponderance

of the evidence that the plan is in the best interests of the creditors").

Here, the Court agrees with the Petitioning Creditors. First, it is unlikely that the Debtors

have standing to raise this issue. (*See* PC Reply at ¶ 11) (citing *In re Gaston & Snow*, No. 93

Civ. 8517 (JGK), 1996 WL 694421, *7 (Bankr. S.D.N.Y. Dec. 4, 1996) ("[o]nly parties

adversely affected by provisions of a plan [in this case § 1129(a)(7)] may raise an objection to

confirmation based on such provisions."); *In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 497

(Bankr. S.D.N.Y. 2024) (a party in interest "cannot challenge portions of the plan that do not

affect its direct interests.") (*quoting In re Quigley Co., Inc.*, 391 B.R. 695, 703 (Bankr. S.D.N.Y.

2008))). In any event, the Court agrees with the Petitioning Creditors that the PC Plan provides

sufficient funding to satisfy the best interest of the creditors test under all of the liquidation

analyses pending before the Court. (*See, eg.,* Debtor Disclosure Statement, Ex. 7 (showing a

$26.3 million liquidation analysis on the high end); PC Plan at Appendix C) (showing a $26.1

million liquidation analysis on the high end)). For this reason, this argument is overruled.

### 3. **The PC Plan Does Not Violate Section 1129(a)(1) Because it Does Not Violate Section 1122**

The Debtors' next argument is that the PC Plan violates Section 1129(a)(1) since it lumps

wholly unrelated claims together (Debtor Objection at ¶¶ 72–76). Specifically, the Debtors argue

that the PC Plan proposes just two voting classes and lumps all general unsecured creditors

together (aside from claims under $1 million, which are in a convenience class), to effectively

control the votes in favor of the PC Plan. (*Id.* at ¶ 73). The Debtors further argue that:

> By ignoring the clear differences of the nature and basis of the claims within Class
> 3 General Unsecured Claims (i.e., noteholder claims, contingent guaranty claims,
> and trade creditor claims), the P[C] Plan aims to overwhelm by lumping them in
> with Pach Shemen's controlling stake in the Exchange Notes.  As evidenced by the
> voting results, non-noteholder claims overwhelmingly support the Debtors' Plan.
> By placing these dissenting voices into the same class as Pach Shemen who

98

purchased an outsized position in the Exchange Notes for pennies on the dollar, these dissenting creditors are effectively silenced, and the PS Plan would have a clear path towards confirmation without a cramdown.

(*Id.* at ¶ 74).

In response, the Petitioning Creditors argue that the PC Plan appropriately classifies claims. (PC Reply at ¶¶ 19–21). Specifically, the Petitioning Creditors argue that, under Section 1122(a), general unsecured claims are typically placed together regardless of specific type. (*Id.* at ¶ 20).

Under section 1122(a) of the Bankruptcy Code, a plan may place a claim in a particular class "only if such claim . . . is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). Under this provision, "unsecured claims will, generally speaking, comprise one class, whether trade, tort, publicly held debt or a deficiency of a secured creditor." *In re 266 Washington Assocs.*, 141 B.R. 275, 282 (Bankr. E.D.N.Y. 1992) (quoting *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 830 (Bankr. S.D.N.Y. 1982) (additional citations omitted).

As set forth above regarding the Debtor Plan, the Debtors have offered no reason to separately classify the claims they now complain of. Further, the Court notes that the Debtors did not cite a single case standing for the proposition that Section 1122(a) is violated by putting all unsecured claims together. For these reasons, this argument is overruled.

### 4.  **The PC Plan is Feasible Pursuant to Section 1129(a)(11)**

The final argument raised by the Debtors is that the PC Plan is not feasible pursuant to Section 1129(a)(11) (Debtor Objection at ¶¶ 62–66). Specifically, the Debtors argue that the PC Plan is not feasible because the Petitioning Creditors' enterprise values are unreasonable and unsubstantiated. (*Id.* at ¶ 66). In support of this position, the Debtors argue that the Petitioning Creditors' valuation of $62.1 million is based on an "artificially inflated enterprise value not aligned with the market value." (*Id.*)

99

In response, the Petitioning Creditors assert that the PC Plan is feasible. (PC Reply at ¶¶ 13–18). Specifically, they note that the Debtors do not dispute that the PC Plan is funded through consummation, and that the Petitioning Creditors have escrowed the funds needed to confirm the PC Plan pursuant to the PC Commitment Letter. (*Id.* at ¶ 14). The Petitioning Creditors asseert that:

> the Debtors make an incomprehensible argument that either (a) [the PC Plan] valuation from Batuta was too high and offered creditors "an artificially inflated enterprise value not aligned with the market value" (see Obj. ¶ 66) but also somehow (b) the "PS Disclosure Statement 'scared' all other creditors away from the equity election by painting a picture that creditors will be buying into a company that is certain to disappoint, resulting in significant lost equity value" (id. ¶ 66). The Debtors purport to have conducted a market process (see Docket No. 1021 ¶ 50), but then argued
> that Pach Shemen's valuation is too high where it was willing to pay "top dollar."

(*Id.* at ¶ 15). In any event, the Petitioning Creditors argue that the valuation analysis has nothing to do with the Debtors' feasibility. (*Id.* at ¶ 16).

Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that the Plan is feasible. *See* 11 U.S.C. § 1129(a)(11). "In making determinations as to feasibility . . . a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed, . . . [a]ll it needs to know is that the plan has a reasonable likelihood of success." *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 421–22 (Bankr. S.D.N.Y. 2003).

Here, the Court agrees with the Petitioning Creditors. The Debtors do not genuinely dispute the feasibility of the PC Plan, and instead raise arguments wholly irrelevant to the feasibility analysis under Section 1129(a)(11). To the extent required, the Court further finds that the PC Plan is feasible because it provides sufficient funding to meet all effective date obligations, and because the Petitioning Creditors have escrowed $43.5 in cash to fund the PC Plan. (*See* PC Reply at ¶¶ 13–18).

For all these reasons, the Court finds that the PC Plan is confirmable.

### E.  <u>SECTION 1129(C)</u>

Section 1129(c) of the Bankruptcy Code provides that where multiple plans meet the requirements for confirmation, the Court may confirm only one plan.  *See* 11 U.S.C. § 1129(c). Section 1129(c) further provides that if more than one plan meets the confirmation requirements of the Bankruptcy Code, the court should consider the preference of creditors and equity holders in determining which plan to confirm. *Id.*

Here, as set forth at length herein, the Court has found that only the PC Plan is confirmable. However, for the avoidance of doubt, the Court also notes that, even if the Debtor Plan were also confirmable, the PC Plan received an overwhelming majority of votes from impaired classes of claims. (*See* Lee Certification). While the Debtors somehow manage to argue that the Debtor Plan received the most votes, the Debtors' argument is based on faulty assumptions, including: (i) that the votes of creditors whose claims had been objected to would not be counted; and (ii) that creditor preferences (some of which appear to have been cast improperly) should be considered, as opposed to pure creditor votes/acceptances. (*See* Debtor Brief at ¶¶ 39–42).

As stated numerous times herein, the Court overruled the Debtors' claim objections, and therefore all of the votes count. (*See* Claim Objection Opinion). Moreover, under Section 1129(c), plan preferences only count to the extent multiple plans are confirmable.[78] *See* 11 U.S.C. §1129(c). There is only one such confirmable plan here, the PC Plan.

---

[78] The plan preference totals contained in the Lee Certification are unreliable in any event. It is clear from the voting results that certain creditors who only voted for the Debtor Plan nevertheless checked the plan preference box on the ballot, which was expressly contrary to the instructions contained therein. (Creditor Brief at ¶ 33 (noting that, if calculated in accordance with the instructions: "Of the 26 claimants that voted to accept more than one plan and indicated a preference, only two (2) holders marked a preference for the Debtors' Plan.  *See* CRX-131 (Plan Election

Indeed, 65 claims voted to accept the PC Plan, while just 29 claims voted to accept the

PC Alternative Plan, and 22 claims voted to accept the Debtors' Plan. (See Lee Certification at

Ex. A). When compared against the total amount of voting claims in the class, the 65 claims that

voted to accept the PC Plan represents 84.4% in number and 71.2% in amount of all claims

voting on the PC Plan. (*Id.*) By this same metric, the 29 claims that voted to accept the PC

Alternative Plan represents 55.8% in number and 52% in amount of all claims voting on the PC

Alternative Plan, and the 29 claims that voted to accept the Debtor Plan represents 35.5% in

number and 32.5% in amount of all claims voting on the Debtor Plan. (*Id.*)

For these reasons, the PC Plan is confirmable. Moreover, even if the PC Alternative Plan

and the Debtor Plan were confirmable (they are not, as set forth herein), the PC Plan clearly

received more votes and should be confirmed under Section 1129(c).

## V.    <u>CONCLUSION</u>

For the foregoing reasons, confirmation of the Debtor Plan and the PC Alternative Plan is

DENIED, and the PC Plan is CONFIRMED.

**IT IS SO ORDERED.**

New York, New York
Dated: October 25, 2024

/s/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE

---

Spreadsheet). By contrast, of those same 26 claimants, 14 (53%) marked a preference for the PC Plan and 10 holders
marked a preference for the PC Alternative Plan (over 38%).  *Id.*")).