TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Brian F. Shaughnessy
John N. McClain, III
Jared C. Borriello

*Counsel for Reorganized Holdings*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11
                                          :
ELETSON HOLDINGS INC., et al.,[1]         :        Case No. 23-10322 (JPM)
                                          :
                                          :        (Jointly Administered)
                     Debtors.             :
                                          :
------------------------------------------------------------x

**EMERGENCY MOTION OF REORGANIZED ELETSON HOLDINGS INC.
FOR AN ORDER IMPOSING SANCTIONS ON ELETSON HOLDINGS'
(A) EXISTING PERSON OF RECORD AND (B) FORMER SHAREHOLDERS,
OFFICERS, DIRECTORS, AND COUNSEL, INCLUDING REED SMITH LLP**

---

[1]   The Debtors in these chapter 11 cases are:  Eletson Holdings Inc. ("Holdings"), Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

Where applicable, the pre-Effective Date Debtors and Holdings are referred to as "Former Debtors" and "Former Holdings" to distinguish them from the post-Effective Date entity, Reorganized Holdings.  *See* Plan (as defined below) § 12.11.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................ 2

JURISDICTION AND VENUE .......................................................................................... 4

BACKGROUND ................................................................................................................. 5

    A.   The Plan Goes Effective ............................................................................................ 5

    B.   Reed Smith and the Other Violating Parties Refuse to Help
         Implement the Plan .................................................................................................... 6

    C.   Reed Smith and the Former Debtors Try to Obstruct the Plan ................................ 8

RELIEF REQUESTED ...................................................................................................... 14

BASIS FOR RELIEF REQUESTED ................................................................................ 16

    I.     The Violating Parties Must Comply with the Bankruptcy Code, the
         Confirmation Order, and the Plan ......................................................................... 16

    II.    The Violating Parties Refuse to Comply with Their Obligations ................... 20

    III.   The Court Should Order the Violating Parties to Remedy
         the LISCR Issue, Cease Their Obstructive Tactics, and Otherwise Help to
         Carry Out the Plan ................................................................................................ 22

    IV.   The Court Should Hold the Violating Parties in Contempt and
         Sanction Them ....................................................................................................... 24

RESERVATION OF RIGHTS .......................................................................................... 28

NOTICE ............................................................................................................................ 28

CONCLUSION ................................................................................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Badgley v. Santacroce,*
  800 F.2d 33 (2d Cir. 1986) ................................................................. 24

*Bartel v. Eastern Airlines,*
  133 F.3d 906, 1998 WL 2405 (2d Cir. 1998), *cert. denied,* 525 U.S. 867 (1998) ................. 27

*Chicago Truck Drivers v. Bhd. Lab. Leasing,*
  207 F.3d 500 (8th Cir. 2000) ........................................................ 25, 26

*Ex Parte Robinson,*
  86 U.S. 505 (1873) ........................................................................... 25

*Hart v. Blanchette,*
  Case No. 12-CV-6458-CJS, 2019 WL 1416632 (W.D.N.Y. Mar. 29, 2019) ....................... 18

*In re Bambi,*
  492 B.R. 183 (Bankr. S.D.N.Y. 2013) .................................................... 24

*In re Chateaugay Corp.,*
  201 B.R. 48 (Bankr. S.D.N.Y. 1996) .................................................... 23

*In re Chief Exec. Officers Clubs, Inc.,*
  359 B.R. 527 (Bankr. S.D.N.Y. 2007) .................................................. 26

*In re Covelli,*
  550 B.R. 256 (Bankr. S.D.N.Y. 2016) .................................................. 27

*In re Damon,*
  40 B.R. 367 (Bankr. S.D.N.Y. 1984) .................................................... 25

*In re Eppolito,*
  583 B.R. 822 (Bankr. S.D.N.Y. 2018) .................................................. 24

*In re J&B Haldeman Holdings, LLC,*
  517 B.R. 910 (Bankr. W.D. Wis. 2014) ................................................ 17

*In re Legend Radio Group, Inc.*
  248 B.R. 281 (W.D. Va. 1999) ........................................................... 23

*In re Markus,*
  78 F.4th 554 (2d Cir. 2023) ............................................................... 27

*In re Mega-C Power Corporation,*
  Case No. BK-N-04-50962-GWZ (Bankr. D. Nev. July 26, 2011) ........................ 23

*In re Patterson*,
111 B.R. 395 (Bankr. N.D.N.Y. 1989)..................................................................... 25

*In re Payne*,
707 F.3d 195 (2d Cir. 2013) .................................................................................. 18

*In re Riverside Nursing Home*,
137 B.R. 134 (Bankr. S.D.N.Y. 1992)..................................................................... 23

*In re Stockbridge Funding Corp.*,
145 B.R. 797 (Bankr. S.D.N.Y. 1992)............................................................... 25, 27

*In re Voyager Digital Holdings, Inc.*,
649 B.R. 111 (Bankr. S.D.N.Y. 2023) .................................................................... 17

*In re Worldcom, Inc.*,
361 B.R. 697 (Bankr. S.D.N.Y. 2007) .................................................................... 24

*In re WorldCom, Inc.*,
Case No. 02-13533, 2009 WL 2959457 (Bankr. S.D.N.Y. May 19, 2009) ........... 17

*Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*,
389 U.S. 64 (1967) ................................................................................................ 18

*Legend Radio Grp., Inc. v. Sutherland*,
211 F.3d 1265, 2000 WL 359740 (4th Cir. Apr. 7, 2000) ..................................... 23

*Maness v. Meyers*,
419 U.S. 449 (1975).............................................................................................. 16

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info., Inc.*,
369 F.3d 645 (2d Cir. 2004) .................................................................................. 26

*Solow v. Kalikow (In re Kalikow)*,
602 F.32 82 (2d Cir. 2010)..................................................................................... 24

*United States v. United Mine Workers*,
330 U.S. 258 (1947).............................................................................................. 25

*Wilson v. United States*,
221 U.S. 361 (1911).............................................................................................. 18

**Statutes**

11 U.S.C. § 105 ........................................................................................................ 4

11 U.S.C. § 105(a)............................................................................................... 23, 24

11 U.S.C. § 1141 ...................................................................................................... 4

11 U.S.C. § 1141(a)............................................................................................ 18, 19

11 U.S.C. § 1142 .................................................................................................... 4

11 U.S.C. § 1142(a)................................................................................ 10, 16, 19, 22

11 U.S.C. § 1142(b)................................................................................... 17, 23, 24

28 U.S.C. § 157 ...................................................................................................... 4

28 U.S.C. § 1334 .................................................................................................... 4

28 U.S.C. § 1408 .................................................................................................... 4

28 U.S.C. § 1409 .................................................................................................... 4

**Rules**

Fed. R. Bankr. P. 2002 ......................................................................................... 28

Fed. R. Bankr. P. 7008 ........................................................................................... 4

Fed. R. Civ. P. 65(d)(2)......................................................................................... 18

**Other Authorities**

8 Collier on Bankruptcy ¶ 1142.01-02 (16th ed. 2024)........................................ 17

Reorganized Eletson Holdings Inc. ("Reorganized Holdings"), by and through its undersigned counsel, hereby submits this emergency motion (the "Motion") pursuant to sections 105, 1141, and 1142 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), against Reorganized Holdings' (a) existing person of record at the address of record (the "AOR") currently on file with LISCR (defined below) and (b) former shareholders[2] (the "Former Shareholders"), officers and directors (together, the "Former D&Os"), and counsel for Former Debtors, including Reed Smith LLP ("Reed Smith"), as well as counsel for the Former D&Os at Daniolos Law Firm ("Former D&Os Counsel" and, together with the AOR, the Former Shareholders, the Former D&Os, and Reed Smith, the "Violating Parties"), holding the Violating Parties in civil contempt and imposing monetary sanctions upon the Violating Parties.[3]

In support of this Motion, Reorganized Holdings submits (a) the Declaration of James A. A. Pierre II attached hereto as **Exhibit B** (the "Pierre Declaration") and (b) the Declaration of Bryan M. Kotliar, Esq. attached hereto as **Exhibit C** (the "Kotliar Declaration" and, together with the Pierre Declaration, the "Declarations").[4]

---

[2]    The Former Shareholders are comprised of the following five entities:  (a) Family Unity Trust Company, (b) Glafkos Trust Company, (c) Lassia Investment Company, (d) Elafonissos Shipping Corporation, and (e) Keros Shipping Corporation.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan (as defined below).

[4]    Exhibits cited to herein as "Ex. __" are attached to the Kotliar Declaration.

## PRELIMINARY STATEMENT[5]

1.       After more than 18 months of a bankruptcy in which they voluntarily participated and caused the incurrence of over $30 million in professional fees being paid by the Plan Proponents, the Violating Parties are refusing to accept the final judgment of this Court, *i.e.*, the Petitioning Creditors' now-confirmed Plan. Instead, these parties are actively working to obstruct that Plan, in violation of the Confirmation Order and bedrock bankruptcy law. Harsh sanctions are warranted.

2.       Under each of the Confirmation Order, the Plan, and sections 1141 and 1142 of the Bankruptcy Code, the Violating Parties are required to implement the Plan. There is no discretion—just as the sky is undeniably blue, the Violating Parties are unequivocally obligated to cooperate. Yet, in blatant defiance of their legal duties, they continue to refuse. This willful noncompliance is both unacceptable and indefensible.

3.       For instance, the Violating Parties have refused to take steps to properly update LISCR, LLC—the Liberian International Ship & Corporate Registry—to reflect the change of ownership that occurred on the Plan's Effective Date (November 19, 2024), as required under Section 5.4 of the Plan "without further notice to or order of the Bankruptcy Court." The Violating Parties, who did not move for a stay pending their appeal of the Confirmation Decision, are seeking a stay through the back door by falsely claiming that the Confirmation Order and Plan must first be recognized in Liberia. All the Violating Parties have been asked to do is file a change of the AOR (address of record) or file Reorganized Holdings' new corporate documents

---

[5]    Capitalized Terms used but not otherwise defined in this Preliminary Statement shall have the meaning ascribed to such terms in the Motion.

with LISCR.  The Violating Parties have refused to even identify the current AOR or who is currently authorized to make filings with LISCR.  These are ministerial tasks.

4.    If permitted to continue, the Violating Parties' refusal to merely update a corporate registry will require an expensive and completely unnecessary recognition proceeding in front of a Liberian court.  It is a mockery of this Court and the Bankruptcy Code to which the Violating Parties voluntarily submitted.

5.    There is more.  On November 12, 2024, Reed Smith falsely told Judge Liman that the Plan is subject to Greek and Liberian law, and thus the "effective date of the transaction [the Plan] is going to itself be the subject of debate."  Ex. 1 (Nov. 12, 2024 S.D.N.Y. Hr'g Tr.) at 6:24-25.  On November 20, 2024, Reed Smith sent a letter to Judge Liman, again falsely arguing that "the purported new shareholders of Holdings" must take "the steps necessary under Liberian and Greek law to confirm their capacity to act on behalf of Holdings."  Ex. 2.  And on November 21, 2024, even though Reed Smith's retention by Former Holdings automatically terminated two days prior on the Effective Date pursuant to Section 2.5 of the Plan, Reed Smith had the audacity to file a Statement of Issues for appeal on behalf of Eletson Holdings, under the false notion that they were rehired by Eletson Holdings.  *See* Docket No. 1262 (Statement of Issues).

6.    Reed Smith, which is obligated to ensure that its clients follow court orders, has instead conspired with those clients—the Eletson family—to ignore this Court's authority.  The Violating Parties even orchestrated the resignation of half the board of Former Holdings mere days before the Effective Date for the express purpose of arguing that a provisional board, purportedly appointed by a Piraeus court, is unable to take any actions under the Plan until an application to approve the replacement board members is heard in February 2025.  *See* Ex. 3.  Yet, somehow that

3

provisional board had the authority to rehire Reed Smith in violation of the Plan that

terminated them and created a brand new board.

7.      The Violating Parties, including Reed Smith, are bent on ignoring

the authorities to which they are bound.  They should be compelled to comply with the

Confirmation Order and also punished accordingly for their misconduct, as set forth

below and in the Proposed Order.

## JURISDICTION AND VENUE

8.      This United States Bankruptcy Court for the Southern District of

New York (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012

(Preska, C.J.) (the "Amended Standing Order").  Reorganized Holdings confirms its

consent, pursuant to Bankruptcy Rule 7008, to the extent that it is later determined that

the Court, absent consent of the parties, cannot enter final orders or judgments in

connection herewith consistent with Article III of the United States Constitution.

9.      Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409.

10.     The statutory predicates for the relief requested herein are

sections 105, 1141, and 1142 of the Bankruptcy Code and Bankruptcy Rule 9020.

11.     Pursuant to Section 11.1 of the Plan and Paragraph WW of the

Confirmation Order, the Court retains exclusive jurisdiction over all matters arising out

of, and related to, the Chapter 11 Cases, including the matters set forth in Article XI of

the Plan and section 1142 of the Bankruptcy Code.  In particular, under Section 11.1(d)

of the Plan, the Court retains jurisdiction to "enter such orders as may be necessary or

appropriate to implement or consummate the provisions of this Plan . . . "  Plan

§ 11.1(d).

4

**BACKGROUND**

**A. The Plan Goes Effective**

12.     On October 25, 2024, after a week-long trial, the Court issued a

decision [Docket No. 1212] (the "Confirmation Decision") (a) confirming the Petitioning

Creditors' chapter 11 plan [Docket No. 1132, Ex. 1] (the "Plan") and overruling the

Former Debtors' objections thereto and (b) rejecting the Former Debtors' plan [Docket

No. 1111, Ex. A] and the Petitioning Creditors' alternative plan [Docket No. 1131, Ex. 1].

13.     On November 4, 2024, the Court entered an order confirming the

Plan [Docket No. 1223] (the "Confirmation Order").

14.     On November 7, 2024, the Former Debtors filed a notice of appeal

[Docket No. 1233] regarding the Confirmation Order, but never moved for a stay of the

Confirmation Order.

15.     Following the Confirmation Decision, the Petitioning Creditors and

their advisors (bankruptcy counsel, corporate counsel, Liberian counsel, and financial

advisors) worked tirelessly with the numerous parties, including the Old Notes Trustee,

the 2022 Notes Trustee, Verita, New Agathonissos Finance LLC ("NAF"), the new

directors for Reorganized Holdings, the Depository Trust Company, the Committee,

various noteholders, brokers, and other nominees to implement and consummate the

Plan.

16.     On November 19, 2024 (the "Effective Date"), the Plan Proponents

declared the Plan effective and notified the parties, including Reed Smith, by

email.  *See* Kotliar Decl. ¶ 8.  Also on that date, the Plan Proponents filed notice of

Effective Date [Docket No. 1258] (the "Notice of Effective Date"), which stated that all

conditions precedent to the Effective Date set forth in Section 9.1 of the Plan were

satisfied or waived pursuant to Section 9.2 of the Plan, and that the Plan was substantially consummated.  *See* Notice of Effective Date at 2.

17.    Among other things, the following occurred on the Effective Date pursuant to the Plan:  (a) all notes, stocks, and other documents giving rise to claims against and interests in the Former Debtors (including the Former Debtors' existing equity interests) were automatically cancelled without need of any further action (*see* Plan § 5.4); (b) Reorganized Holdings issued the Reorganized Equity to the new holders thereof (*see id.* § 5.8); (c) Reorganized Holdings entered into the Amended Bylaws and Shareholders Agreement without the necessity of any further actions under applicable nonbankruptcy law (*see id.* §§ 5.20, 9.1(i)); (d) the members of the boards of each Debtor prior to the Effective Date were deemed to have resigned and ceased to be a director or manager of the applicable Debtor in any respect (*see id.* § 5.10(c)); (e) Reorganized Holdings terminated the Former Debtors' professional retentions, including Reed Smith (*see id.* §§ 2.5(a) and 10.6); and (f) the $53.5 million amount of the Rights Offering (in escrow since November 6, 2024) was distributed to creditors or to accounts for the benefit of creditors, among other distributions (*see id.* §§ 2.1(a), 2.2(b), 2.6, 5.18, 9.1(g), 9.1(h), 9.1(i)).

18.    Additionally, on the Effective Date, Togut Segal & Segal LLP was retained as counsel to Reorganized Holdings and Eletson Corporation ("Eletson Corp.").  Ex. 4 (Engagement Letter)

**B.  Reed Smith and the Other Violating Parties
     Refuse to Help Implement the Plan**

19.    Unlike all other parties in this case, Reed Smith and the other Violating Parties have refused to cooperate in the Petitioning Creditors' efforts to implement the Plan.  Kotliar Decl. ¶¶ 3-7.  For example, on October 28, 2024, counsel for

the Petitioning Creditors emailed Reed Smith to begin closing discussions and requested standard closing-diligence information such as copies of corporate constituent documents, loan agreements, employment agreements, and an employee roster, among other things. *See* Ex. 5 (Oct. 28, 2024 Email from L. Ebrahimi to D. Baker at 9:04 a.m.). On October 30, 2024, counsel for the Petitioning Creditors also requested that Reed Smith put the Petitioning Creditors in touch with key personnel to begin discussions regarding the Employee Incentive Plan under the Plan. *See* Ex. 6 (Oct. 30, 2024 Email from B. Kotliar to D. Baker at 10:20 a.m.). On November 4, 2024, the Petitioning Creditors explicitly directed the Former Debtors to provide the requested information pursuant to paragraph 5(iii) of the Confirmation Order (as described in greater detail below). Ex. 7 (Nov. 4, 2024 Email from B. Kotliar to D. Baker at 5:35 p.m.). Still, Reed Smith and the Violating Parties continued their refusal to cooperate.

20.     In fact, Reed Smith did not join a single call with counsel for the Petitioning Creditors to assist in implementing the Plan until the final closing call on the Effective Date. Kotliar Decl. ¶¶ 4-6. On the regularly scheduled weekly DIP Lender calls with Reed Smith and representatives of the Former Debtors and their non-Debtor subsidiaries, Reed Smith and the foregoing representatives refused to answer any questions about "the Plan or transition" because they purportedly did not relate to the information and reporting rights provided by the DIP Credit Agreement. *Id.* ¶ 4.

21.     During this same period, Reed Smith also claimed that they and the Former Debtors were unable to provide information for the non-Debtor subsidiaries (where they claim all of the information resides) because such information "called for actions from parties other than the Debtor (which Reed Smith does not represent)." Ex. 8 (Oct. 28, 2024 Email from D. Baker to B. Kotliar at 5:39 p.m.). Reed Smith made this claim even though the Former Debtors, through Reed Smith, (a) filed Rule 2015.3

Reports for all subsidiaries [Docket Nos. 271, 298, 341, 409, 962] and (b) negotiated and

agreed to the DIP Credit Agreement, which includes weekly variance reporting for

"Budget Parties," including various non-Debtor subsidiaries like Eletson Corp.,

*see* Docket No. 1047 at 30.

22.    On November 6, 2024, the Petitioning Creditors filed a letter with

the Court detailing Reed Smith's lack of cooperation/responsiveness and requesting the

Court's assistance. *See* Docket No. 1227 at 1-4. On November 8, 2024, right before the

next scheduled status conference, Reed Smith finally responded with some basic

information—copies of governance documents, including charters, certificates of

incorporation, bylaws, and similar corporate documents for all entities, loan documents

for all entities, board minutes and resolutions that list the board members of each

entity—and referred the Petitioning Creditors to schedule 4(g) of the DIP for

information on pending litigations. *See* Ex. 9 (Nov. 8, 2024 Email from D. Baker to B.

Kotliar at 4:38 p.m.). Neither Reed Smith nor the Former Debtors provided any

additional information, despite frequent follow-up requests. Kotliar Decl. ¶ 3; Ex. 10

(Nov. 11, 2024 Email from D. Baker to B. Kotliar at 1:57 p.m.).

**C.  Reed Smith and the Former Debtors Try to Obstruct the Plan**

23.    Despite being bound by the Confirmation Order and the

Bankruptcy Code to implement the Plan, Reed Smith and the Former Debtors openly

expounded on their intention to obstruct implementation of the Plan. For example, on

November 12, 2024, Reed Smith informed Judge Liman that the Former Debtors

intended to contest the Plan's effectiveness, stating:

> We know that the plan says that shares of Holdings, old Holdings, might
> be extinguished, but even that is explicitly subject to applicable law, and
> that applicable law is not U.S. law, it's Liberian law. I'm not suggesting
> anything that I know; the only thing I know to represent to your Honor is

> that we asked the same Liberian counsel whom your Honor knows from
> the last time whether a U.S. bankruptcy order is automatically enforceable
> in Liberia.  It is not.

Ex. 1 (Nov. 12, 2024 S.D.N.Y. Tr.) at 7:13-21.  In a letter to this Court filed later that day

[Docket No. 1241] (the "Former Debtors' November 12 Letter"), Reed Smith argued that

"a recognition proceeding is needed in both Liberia and Greece to ensure the

Confirmation Order's enforceability."  Former Debtors' November 12 Letter at 1.  Reed

Smith advanced this position even though (a) the Confirmation Order and Plan provide

that the Court-ordered ownership change would take place automatically upon the

Effective Date (*see* Plan §§ 5.4, 5.8; Confirmation Order ¶ 1); and (b) Reed Smith has

never identified any party in Liberia against whom the Confirmation Order needs to be

enforced.

24.    Shortly before a November 13, 2024 hearing (the "November 13

Hearing"), Reed Smith filed another letter [Docket No. 1243] (the "Former Debtors'

November 13 Letter") attaching an email from Former D&Os Counsel stating, without

proof, that four of the eight board members of Former Holdings—Vassilis Kertsikoff,

Laskarina Karastamati, Eleni Karastamati, and Panagiotis Konstantaras—had resigned,[6]

and advised the Court that (a) provisional board members had been appointed by a

provisional order of a Greek court and (b) a hearing is set in Greece on February 4, 2025

to reconstitute the board, among other things.  *See* Former Debtors' November 13 Letter,

Ex. A.  Former Holdings sought this February 2025 hearing even though (a) Former

Holdings' board was set to be reconstituted automatically upon the occurrence of the

Effective Date pursuant to the terms of the Plan (*see* Plan §§ 5.4, 5.8); (b) the Former

---

[6]    Reed Smith told the Petitioning Creditors on November 12, 2024 that "the directors who resigned
from Holdings also resigned from their officer positions at Holdings."  Ex. 11 (Nov. 12, 2024 Email
from D. Baker to B. Kotliar at 5:51 p.m.).

Debtors were not seeking to stay the Confirmation Order; and (c) the Former Debtors and the Former D&Os were enjoined from taking "any actions inconsistent with the Plan or [the] Confirmation Order without the prior written consent of the Petitioning Creditors or further order of the Court" (Confirmation Order ¶ 5(iii)).

25.    At the November 13 Hearing, Reed Smith made similar false statements to this Court on this issue.  *See* Ex. 12 (Nov. 13, 2024 Bankr. Hr'g Tr.) at 13:5-6 ("Until they're in compliance with non-U.S. law, I don't see how there can be an effective transfer of this company.").  Reed Smith argued that complying with non-U.S. law is a "condition precedent" that the Petitioning Creditors "can't waive."  *Id.* at 12:21-13:4.  Reed Smith said this even though the Plan explicitly states that any such condition precedent is, in fact, waivable.  *See* Plan §§ 9.1, 9.2.  Reed Smith, the Former Debtors, and the Former Shareholders could have, but never did, raise this in their Plan objections.

26.    At that same November 13 Hearing, Reed Smith also claimed that they were advised that completing the LISCR Letter (described below) would violate Liberian law.  *See* Ex. 12 (Nov. 13, 2024 Bankr. Hr'g Tr.) at 34:4-13.  Reed Smith said this even though, again, any potential application of non-U.S. law is waivable (Plan §§ 9.1, 9.2) and, in any event, the Bankruptcy Code compels the Former Debtors to help implement the Plan "[n]otwithstanding any otherwise applicable nonbankruptcy law." 11 U.S.C. § 1142(a).  Moreover, none of these issues were raised by Reed Smith or the Former D&Os with the Petitioning Creditors at any point during their previous discussions concerning Plan implementation, which the Court had ordered Reed Smith and the Former Debtors to assist in good faith to facilitate.  *See* Confirmation Order ¶ 5(i).

27.     Reed Smith and the Former Debtors have also refused to update LISCR.  Prior to the Effective Date, the Petitioning Creditors and their advisors worked with Liberian counsel to prepare documents to reflect the change in ownership for Eletson Holdings Inc. that would take place (and has now taken place) pursuant to the Plan.  *See* Pierre Decl. ¶¶ 3, 15-20.  Specifically, Liberian counsel reviewed and commented on the Amended Certificate of Incorporation, Amended Bylaws, and Shareholders Agreement before these documents were submitted to the Court for approval as part of the Plan Supplement.  *See id.* ¶ 3.  In addition, after the Confirmation Decision, the Petitioning Creditors and their counsel worked with Liberian counsel on having these documents "pre-cleared" by LISCR so that LISCR would accurately reflect the change in ownership upon the Effective Date.  *See id.* ¶¶ 3, 7, 15-20.

28.     On November 11, 2024, LISCR informed Liberian counsel that LISCR only accepts instructions from the company's existing AOR.  *See id.* ¶ 18.  This means that the corporation's existing AOR controls whether and when a corporation can make any filings with LISCR.  *See id.* ¶ 10.  Absent a filing by the existing AOR that either replaces the existing AOR or makes the requisite corporate filings, the only other way to have the Amended Certificate of Incorporation accepted by LISCR is through a recognition proceeding brought in a Liberian court.  Thus, despite the Court-ordered transfer of share ownership that was to happen automatically under the Plan upon the Effective Date (which has now taken place), updating LISCR to utilize the Amended Certificate of Incorporation remains exclusively within the Violating Parties' control.[7]

---

[7]     Ultimately, the Petitioning Creditors were forced to go effective while continuing to operate under the current Certificate of Incorporation.  Thus, although able to go effective, Reorganized Holdings will not be able to register the Amended Certificate of Incorporation until they go through an entirely unnecessary recognition process for the sole purpose of updating the AOR.  No other corporate documents are filed with LISCR.  Thus, Reorganized Holdings was able to implement the Amended By-Laws and Shareholder Agreement notwithstanding the Former Debtors' lack of cooperation.

29.     On November 12, 2024, counsel for the Petitioning Creditors emailed Reed Smith, requesting (a) that Reed Smith and the Former Debtors identify the existing AOR for Eletson Holdings Inc.; and (b) that the existing AOR complete a form of letter, to be held in escrow and submitted on the Effective Date, instructing LISCR to update its AOR for Eletson Holdings Inc. to reflect Reorganized Holdings' new AOR and authorized personnel (the "LISCR Letter").  *See* Ex. 13 (Nov. 12, 2024 Email from B. Kotliar to D. Baker at 7:25 a.m.).  Reed Smith did not respond to these requests.  Kotliar Decl. ¶ 10.

30.     Instead, at the November 13 Hearing, Reed Smith claimed they were advised that providing the requested LISCR Letter would violate Liberian law. *See* Ex. 12 (Nov. 13, 2024 Bankr. Hr'g Tr.) at 34:4-10, 35:16-23, 37:7-13.  The Court directed the parties to meet and confer on the Liberian law issues.  *Id.* at 44:16-25.  At a meet and confer held on November 14, 2024, Reed Smith agreed to ask the Former Debtors to identify Former Holdings' AOR, to speak with Former D&Os Counsel and Liberian counsel, and to arrange for discussions with these parties.  Kotliar Decl. ¶ 9. To date, Reed Smith has not done any of these things. *Id.* ¶¶ 9, 10.

31.     On November 17, 2024, Reed Smith sent an email to the Petitioning Creditors confirming that they will not update LISCR.  *See* Ex. 14 (Nov. 17, 2024 Email from L. Solomon to B. Kotliar at 4:23 p.m.) (the "November 17 Email").

32.     On November 19, 2024, after the Plan became effective, Reorganized Holdings' new Chief Executive Officer Adam Spears wrote a letter (the "Restriction Letter") instructing Reed Smith to refrain from taking any action or making any decisions on behalf of Reorganized Holdings or any of its subsidiaries "without the express written approval or instructions from the new personnel

designated by" Reorganized Holdings, including Mr. Spears.  *See* Ex. 15 (Restriction

Letter).

33.    Despite this instruction, Reed Smith sent a letter to Judge Liman the

next day, purportedly on behalf of Eletson Corp., a wholly-owned subsidiary of

Reorganized Holdings, in connection with the Committee's pending appeal of its prior

motion to appoint a Chapter 11 trustee.  Ex. 2 (Nov. 20, 2024 L. Solomon Letter to Judge

Liman); *see also* Ex. 16 (Nov. 21, 2024 Letter from L. Solomon to Judge Liman).  In that

letter, Reed Smith again challenged the enforceability of the Plan and Confirmation

Order, stating:

- "Reed Smith's representation of Holdings was purportedly terminated as of
  yesterday, the date upon which the Plan was declared effective;"

- "On behalf of Corp (whom we still represent), we wish to apprise the Court that
  **the purported new shareholders of Holdings . . . have made no showing that
  they have taken the steps necessary under Liberian and Greek law to confirm
  their capacity to act on behalf of Holdings in this or any other forum**;" and

- "In addition, as of November 12, 2024, a court in Piraeus, Greece, issued an order
  constituting a provisional board of directors for Holdings, with responsibility to
  undertake corporate actions, including specifically the retention of outside
  counsel in this proceeding.  **We have not been informed that the provisional
  board has exercised its power to appoint Togut, or any law firm other than
  Reed Smith (which we understand has been directed to act), to represent
  Holdings in this matter**."

Ex. 2 at 1 (emphases added); *see also* Ex. 16 at 1 (same).  Eletson Corp. fired Reed Smith

the next day.  Ex. 17 (Nov. 21, 2024 Termination Letter).

34.    On November 21, 2024, even though Reed Smith acknowledged to

Judge Liman that its retention by Former Holdings automatically terminated on the

Effective Date under the Plan, Reed Smith filed a Statement of Issues for the

Confirmation Appeal in the Bankruptcy Court *on behalf of* Former Holdings.

*See* Docket No. 1262 (Statement of Issues).  According to Reed Smith, it has been rehired

by Former Holdings, *i.e.*, it is now acting "at the direction of the provisional board" (*id.* at 2), the same board that was automatically extinguished pursuant to the Plan on the Effective Date (Plan § 5.10(c)).  In doing so, Reed Smith has dropped all pretense that they are acting for the benefit of any party but the Eletson family.

35.    The Eletson family has even made a public proclamation that they will not comply with the Plan or the Confirmation Order.  As detailed in a recent *TradeWinds* article, "[t]he 'incumbent [Former Holdings] officers said in a statement sent to TradeWinds that any attempt by the 'purported new equity owners' of [Reorganized Holdings] to appoint management or directors at the Liberian company was 'premature and ineffective.'  This is due to a lack of recognition of their capacity and authority in the courts of Liberia and Greece, where the business is located, they claimed."  Ex. 18. Vasilis Hadjieleftheriadis, former president of Former Holdings who falsely and fraudulently claimed to still hold that title, is quoted as saying:  "'[w]hile we respect the US bankruptcy process, the recent decision is under appeal and we must also respect international law.'"  *Id.*

36.    In short, despite their statements to the contrary, Reed Smith and the Eletson family have no respect for, and no intention of complying with, this Court's orders or the Bankruptcy Code.

## **RELIEF REQUESTED**

37.    Reed Smith and the other Violating Parties seek to interfere with the application of this Court's orders at home and abroad by advancing the unprecedented and baseless argument that Reorganized Holdings must obtain foreign recognition of the Court's orders before Reorganized Holdings can take any action whatsoever.  If accepted, this argument creates a Catch-22 scenario in which Reorganized Holdings is without authority to make the decision to initiate proceedings

14

to obtain recognition of its own authority to make decisions.  This position is not only absurd; it is also wholly incompatible with the Bankruptcy Code, to which Reed Smith and the Eletson family are unequivocally bound.  Such a blatant and calculated attempt to undermine the authority of this Court and subvert the confirmed Plan is nothing short of a willful disregard of the law.

38.    Reed Smith told this Court back in May that the parties' competing plans should be subject to a vote and that the Eletson family would honor the preference of their creditors.  *See* Ex. 19 (May 15, 2024 Bankr. Hr'g Tr.) at 23:13-24:10, 27:5-20, 29:12-16.  That is, of course, until they lost.  And now the Eletson family is invoking nonexistent authority manufactured by Reed Smith to argue that the Confirmation Order has no force or effect upon the Former Debtors until a court in Liberia and/or Greece ratifies it.  This is the precise type of conduct that warrants a finding of contempt and the imposition of sanctions.

39.    Accordingly, Reorganized Holdings respectfully requests that the Court enter the Proposed Order:

- (a) finding that the Violating Parties have contravened the Bankruptcy Code, Confirmation Order, and Plan;

- (b) ordering the Violating Parties to fulfill their obligations under the Bankruptcy Code, Confirmation Order, and Plan, by carrying out the Plan, ceasing to interfere with the Plan, and helping implement the Plan, including by executing the LISCR Letter and ceasing and desisting from purporting to represent Reorganized Holdings or any of its subsidiaries in this or any other forum;

- (c) finding the Violating Parties in contempt of this Court; and

- (d) imposing monetary sanctions against the Violating Parties in order to coerce their compliance with this Court's orders and compensate Reorganized Holdings for fees and expenses incurred as a result of the Violating Parties' obstructionist conduct.

## BASIS FOR RELIEF REQUESTED

**I.    The Violating Parties Must Comply with the Bankruptcy Code,
the Confirmation Order, and the Plan**

40.    The Supreme Court has said:

> [It is a] basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.

*Maness v. Meyers*, 419 U.S. 449, 458–60 (1975).  Thus, "once the court has ruled, counsel and others involved in the action must abide by the ruling and comply with the court's orders." *Id.*

41.    Section 1141 of the Bankruptcy Code provides in relevant part:

> **[T]he provisions of a confirmed plan bind the debtor**, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C § 1141(a) (emphasis added).

42.    Section 1142(a) of the Bankruptcy Code, which governs the "[i]mplementation of [bankruptcy] plan[s,]" states that:

> **Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation** related to financial condition, **the debtor** and any entity organized or to be organized for the purpose of carrying out the plan **shall carry out the plan and shall comply with any orders of the court**.

11 U.S.C. § 1142(a) (emphasis added).  As one bankruptcy court in this District has stated:

> The approval of a plan of reorganization does not just give a debtor an option to proceed with what the plan provides[.]  **[Section 1142] imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do what the plan contemplates**.  In effect, the confirmation order acts as a court order that the plan be carried out.

16

*In re Voyager Digital Holdings, Inc.,* 649 B.R. 111, 134 (Bankr. S.D.N.Y. 2023) (emphasis added); *see* 8 Collier on Bankruptcy ¶ 1142.01-02 (16th ed. 2024) (section 1142 "eliminates the need for specific orders instructing the debtor to act to effectuate the plan, which can be particularly helpful in cases in which the debtor is not the plan proponent").

43.    Section 1142(a) applies until a plan is fully consummated.  *See In re J&B Haldeman Holdings, LLC,* 517 B.R. 910, 918 (Bankr. W.D. Wis. 2014) (rejecting debtors' argument that "a court loses section 1142(b) power if a confirmed plan has been substantially consummated" and stating that "[s]ection 1142(b) does not limit a court's authority to enter orders necessary to effect substantial consummation of the confirmed plan"); *In re WorldCom, Inc.*, Case No. 02-13533, 2009 WL 2959457, at *7 (Bankr. S.D.N.Y. May 19, 2009) ("Section 1142(b) empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan.") (internal citations omitted); *see infra* Section III (discussing Section 1142(b)).

44.    The Confirmation Order and Plan bind not only the Former Debtors, but all of the Violating Parties.  It has long been well-settled that court orders entered against a corporation bind the corporation's directors, officers, and shareholders.

> A command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs.  If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt. . . .  Although the command is in form to the board, it may be enforced against those through whom alone it can be obeyed. . . . While the board is proceeded against in its corporate capacity, the individual members are punished in their natural capacities for failure to do what the law requires of them as the representatives of the corporation.

17

*See Wilson v. United States*, 221 U.S. 361, 376-77 (1911); Fed. R. Civ. P. 65(d)(2) (court orders bind "the parties . . . the parties' officers, agents, servants, employees, and attorneys . . . and other persons who are in active concert or participation with" them); *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 75-76 (1967) (Fed. R. Civ. P. 65(d) applies broadly to any "equitable decree compelling obedience under the threat of contempt").  Court orders also bind a commanded party's attorneys, who are under an obligation to oversee their client's compliance with the order.  Fed. R. Civ. P. 65(d)(2); *Hart v. Blanchette*, Case No. 12-CV-6458-CJS, 2019 WL 1416632, at *22 (W.D.N.Y. Mar. 29, 2019) ("It is axiomatic that attorneys must comply with court orders and have a responsibility to oversee their clients' compliance.") (collecting cases); *In re Payne*, 707 F.3d 195, 206 (2d Cir. 2013) ("[I]t is an elementary fact and expectation of legal practice that an attorney who fails to abide by a court rule or order may be subject to sanctions or other adverse consequences." (citing *Maness*)).  Finally, the Court-ordered Plan expressly binds the Debtors and all of the Debtors' "Related Parties[,]"[8] meaning that the Plan and Confirmation Order bind, *inter alia*, Reed Smith, the Former D&Os, the Former D&Os Counsel, the Former Shareholders, and the Former Shareholders' attorneys—*i.e.*, each of the Violating Parties.  For a host of reasons, the Violating Parties are required to follow the Court's directions set forth within the Confirmation Order and to "carry out" all of the confirmed Plan's provisions in full. *See* Confirmation Order ¶ 1; 11 U.S.C. § 1141(a).

---

[8]    Under the Plan, "Related Parties" includes, *inter alia*, the Debtors; the Debtors' predecessors, successors, and assigns; the Debtors' parents, owners, subsidiaries and affiliates; current and former officers, directors, principals, direct and indirect equity holders, fiduciaries, employees, agents, attorneys, managers, representatives, and other professionals; and all of the foregoing's respective heirs, servants, and nominees. *See* Plan § 1.124.

45.    Consistent with the requirements set forth within sections 1141(a) and 1142(a), the Plan and Confirmation Order impose the following obligations upon the Violating Parties:

- "The Debtors and . . . their [] Related Parties are hereby directed to cooperate in good faith to implement and consummate the Plan," Confirmation Order ¶ 5(i);

- "[A]ll . . . parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan," *id.* ¶ 12; and

- Most importantly, "the Debtors are hereby authorized and directed to take or not take any and all actions as instructed by the Petitioning Creditors and shall not take any actions inconsistent with the Plan and this Confirmation Order without the prior written consent of the Petitioning Creditors or further order of the Court" in connection with "actions taken pursuant to this Paragraph 4 [sic][9] and all other actions required by the Plan and th[e] Confirmation Order," *id.* ¶ 5(iii).

46.    Additionally, Paragraph 5 of the Confirmation Order provides various authorizations that expressly contemplate what the Violating Parties are expected to do to fulfill their statutory and Court-mandated obligations "to cooperate in good faith to implement and consummate the Plan," including:

- "[T]he authority and right to carry out and implement all provisions of the Plan as provided in the Plan," *id.* ¶ 5(i); and

- The "authori[ty] and []power[] to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and ta[ke] such actions as are necessary or appropriate to consummate (including, in anticipation of consummation) the Plan and the transactions contemplated therein, including the issuance of any equity interests in connection with the Plan." *Id.*

The Confirmation Order also includes a blanket authorization of "[a]ll actions contemplated by the Plan, including actions taken in anticipation of the Effective Date,"

---

[9]    The reference to "this Paragraph 4" within Confirmation Order ¶ 5(iii) appears to be a typographical error.

which the Court "authorized and approved in all respects (subject to the provisions of the Plan and this Confirmation Order)." *Id.*

47.    The Plan itself, with which the Violating Parties are obligated to comply pursuant to the Bankruptcy Code and the Confirmation Order, contains many similar directions and authorizations concerning implementation of the Plan. *See* Plan, Art. V (entitled "Means for Implementation of this Plan"). As stated in Article V of the Plan:

- "Each of the matters provided for under this Plan involving the corporate structure of any Debtor or Reorganized Holdings or any corporate action to be taken by or required of any Debtor or Reorganized Holdings shall be deemed to have occurred and be effective as provided herein. . . . On or (as applicable) *before the Effective Date*, the appropriate officers of the Debtors or Reorganized Holdings, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by this Plan (or necessary or desirable to effectuate any transaction hereunder) in the name of and on behalf of the Debtors or Reorganized Holdings, as applicable. . . . The authorizations and approvals contemplated by this Section 5.11 shall be effective notwithstanding any requirements under nonbankruptcy law," Plan § 5.11 (emphasis added); and

- "The directors, officers, managers or any other appropriate officer of the Debtors, with the prior written consent of the Plan Proponents, or, after the Effective Date, Reorganized Holdings, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan," Plan § 5.12 (entitled "Effectuating Documents; Further Transactions").

## II.    The Violating Parties Refuse to Comply with Their Obligations

48.    On the Effective Date, the following, *inter alia*, automatically occurred under the Plan, regardless of the Violating Parties' false proclamations about the need to first satisfy Liberian or Greek law: (a) all equity interests in the Former Debtors were extinguished (*see* Plan §§ 5.4, 3.3(i)-(ii)); (b) Reorganized Holdings replaced Former Holdings (*see id.* §§ 5.2(c), 5.4, 5.8); (c) all equity interests in Reorganized Holdings were issued to the new holders thereof (*see id.* § 5.8); (d) the

20

members of the boards of each of the Former Debtors were deemed to have resigned and ceased to be a director or manager of the applicable Debtor in any respect (*see id.* § 5.10(c)); and (e) Former Holdings' retention of Reed Smith was terminated (*see id.* §§ 2.5(a), 10.6).

49.     The Violating Parties' refusal to acknowledge any of this is itself a violation of the Plan and Confirmation Order.  Their affirmative attempts to block or, at a minimum, delay the fruition of that which has already occurred, is a shameful and blatant disregard of the power vested in this Court, not to mention a case of willful amnesia.  Reed Smith and the Eletson family seem to have forgotten that it was they who voluntarily sought the assistance of this Court and the Bankruptcy Code, and are now under the delusion that none of that matters unless a court in Greece or Liberia agrees.

50.     There is no Eletson Holdings; there is only Reorganized Holdings.  The Eletson family has no remaining equity interest.  The "provisional board" does not exist.  Reed Smith is no longer counsel to Reorganized Holdings' or Eletson Corp.[10] Reorganized Holdings has new management, and none of them is a member of the Eletson family.

51.     Reed Smith's and the Violating Parties' refusal to identify Former Holdings' existing AOR and to have the existing AOR execute the LISCR Letter is a violation of the Plan and Confirmation Order.  *See* Plan § 5.2(b); Confirmation Order ¶¶ 5(i), 5(iii), 12.  So are Reed Smith's attempts to continue acting as counsel to

---

[10]    Reed Smith is now acting solely for the benefit of the Eletson family—whose directing individuals are clients of Reed Smith and are parties to the engagement letters that Reed Smith fought for months to conceal—against the interests of its former client, Reorganized Holdings.  This is the type of blatant conflict that law students study when learning the most basic rules of ethics.  *See* ABA Model Rule 1.9(a)-(b) (prohibition against representations adverse to former clients).

Reorganized Holdings and Eletson Corp. *See* Plan §§ 2.5, 10.6; Confirmation Order ¶ 12. So is Reed Smith's and the other Violating Parties' refusal to enable complete and unfettered access of new equity and management to Reorganized Holdings' information and assets. Plan § 5.11; Confirmation Order ¶¶ 5(i), 5(iii), 12. So is Reed Smith's and the Violating Parties' attempt to rely on a fake provisional board to cause delay and force the rightful owners of Reorganized Holdings to prosecute a costly and unnecessary foreign recognition proceeding to secure that which the Plan, Confirmation Order, and Bankruptcy Code have already conferred upon them. *See* Plan §§ 5.2(b), 5.10; Confirmation Order ¶¶ 5(i), 5(iii), 12.

52.     Reed Smith and the other Violating Parties simply refuse to accept that the Court ordered them to "cooperate in good faith" and take "any and all actions as instructed by the Petitioning Creditors" to help consummate the Plan. Confirmation Order ¶¶ 5(i), 5(iii). They have done the opposite.

53.     Congress has expressly directed that all debtors "shall carry out the plan and shall comply with any orders of the court" "notwithstanding any otherwise applicable" provisions of another law not found within the Bankruptcy Code itself. 11 U.S.C. § 1142(a). Thus, even if Greek or Liberian law were "otherwise applicable," as Reed Smith and the other Violating Parties wrongly contend, neither Greek nor Liberian law is capable of excusing the Violating Parties' obstructionism, which must be stopped immediately.

### III.    The Court Should Order the Violating Parties to Remedy the LISCR Issue, <u>Cease Their Obstructive Tactics, and Otherwise Help to Carry Out the Plan</u>

54.     Section 1142(b) of the Bankruptcy Code provides that:

The court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to

perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.

11 U.S.C. § 1142(b).  As one bankruptcy court in this District  has stated:

> After a Chapter 11 plan has been confirmed the debtor is required to carry out the provisions of the plan and the court is authorized to direct the debtor to perform any act necessary for the consummation of the plan, as stated in 11 U.S.C. § 1142.  Subsection (b) of § 1142 expressly authorizes the court to direct a recalcitrant debtor or other party to perform acts necessary to consummate the plan.

*In re Riverside Nursing Home,* 137 B.R. 134, 137-38 (Bankr. S.D.N.Y. 1992).  Another court

in this District has stated that "[t]he clear intent of Section 1142(b) of the Bankruptcy

Code is to assure that the terms and provisions of a confirmed chapter 11 plan are

carried out until the plan is completed and the final decree is entered closing the case."

*In re Chateaugay Corp.,* 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996).

     55.     Courts regularly invoke section 1142 in requiring debtors to execute

documents reflecting asset transfers or other transactions contemplated by a plan.

*See, e.g.*, *In re Mega-C Power Corporation*, Case No. BK-N-04-50962-GWZ (Bankr. D. Nev.

July 26, 2011), Docket No. 1875 at 2-3 (ordering shareholder trustee to transfer shares to

liquidating trustee in accordance with plan of liquidation); *In re Legend Radio Group, Inc.*

248 B.R. 281, 286 (W.D. Va. 1999) (directing debtor to execute and deliver "all necessary

documents relating to the sale of its assets to Bristol Broadcasting and filing the

appropriate documents with the Federal Communications Commission"); *aff'd sub nom.*

*Legend Radio Grp., Inc. v. Sutherland*, 211 F.3d 1265, 2000 WL 359740 (4th Cir. Apr. 7,

2000).

     56.     Further, this Court is statutorily empowered by 11 U.S.C. § 105(a)

to "issue any order, process, or judgment that is necessary or appropriate to carry out

the provisions of" the Bankruptcy Code, which statute bankruptcy courts have also

invoked when ordering debtors and other necessary parties to comply with court

orders. *See In re Eppolito,* 583 B.R. 822, 828-29 (Bankr. S.D.N.Y. 2018) (holding a party in

contempt under section 105(a) for violation of a discharge injunction); *see also Solow v.*

*Kalikow (In re Kalikow),* 602 F.32 82 (2d Cir. 2010) ("The statutory contempt powers given

to a bankruptcy court under § 105(a) complement the inherent powers of a federal court

to enforce its own orders.").

      57.    Finally, the Plan specifically provides that Reorganized Holdings is

entitled to petition the Court for assistance in securing consummation and

implementation of the Plan.  Plan § 5.17 ("The Plan Proponents . . . or, after the Effective

Date, Reorganized Holdings, shall be entitled to seek such orders, judgments,

injunctions, and rulings as they deem necessary to carry out the intentions and

purposes, and to give full effect to the provisions, of this Plan.").

      58.    For the reasons described above, the Court should, pursuant to

sections 1142(b) and 105(a), direct and order the Violating Parties to comply with the

Plan, Confirmation Order, and Bankruptcy Code by remedying the LISCR issue and

assisting Reorganized Holdings in implementing Plan, rather than improperly

challenging the Plan's validity and effect to secure the stay for which they failed to

move when they appealed the Confirmation Order.

## IV.   **The Court Should Hold the Violating Parties in Contempt and Sanction Them**

      59.    Congress has vested bankruptcy courts with the power to hold

parties in contempt in order to compel their compliance with court orders.  *See, e.g., In re*

*Bambi,* 492 B.R. 183, 191 (Bankr. S.D.N.Y. 2013) ("Courts may . . . use civil contempt

pursuant to § 105(a) and Federal Rule of Bankruptcy Procedure 9020 to 'to compel a

reluctant party to do what a court requires of him.'" (quoting *Badgley v. Santacroce,* 800

F.2d 33, 36 (2d Cir. 1986)); *In re Worldcom, Inc.,* 361 B.R. 697, 721 (Bankr. S.D.N.Y. 2007)

("The Court has the power, under 11 U.S.C. § 105 and Bankruptcy Rule 9020, to hear

and determine a request for contempt emanating from the violation of one of its orders in a core proceeding.") (citation omitted).  The contempt power is critical to ensure that judicial power is not disrespected:

> One of the overarching goals of a court's contempt power is to ensure that litigants do not anoint themselves with the power to adjudge the validity of orders to which they are subject.  The Supreme Court has observed that, without the contempt power, what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.

*Chicago Truck Drivers v. Bhd. Lab. Leasing*, 207 F.3d 500, 504-05 (8th Cir. 2000) (quoting *United States v. United Mine Workers*, 330 U.S. 258, 290 n.56 (1947)).

60.    Beyond the authority granted by Congress, all courts also have the inherent power to find parties in civil contempt when they refuse to comply with court orders.  The Supreme Court long ago stated:

> The power to punish for contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts; and consequently to the due administration of justice.  The moment the courts of the United States were called into existence, and invested with jurisdiction over any subject, they became possessed of this power.

*Ex Parte Robinson*, 86 U.S. 505, 506 (1873).  Bankruptcy Courts are no exception to this rule.  *In re Stockbridge Funding Corp.*, 145 B.R. 797, 803 (Bankr. S.D.N.Y. 1992) ("[A] bankruptcy court possesses the inherent power to enforce compliance with its lawful orders through civil contempt[.]"); *In re Damon,* 40 B.R. 367, 374 (Bankr. S.D.N.Y. 1984) ("The civil contempt power of [the Bankruptcy] Court is beyond cavil.").  "The ability to enforce orders and judgment through the contempt power is essential to the orderly administration of justice."  *In re Patterson,* 111 B.R. 395, 397 (Bankr. N.D.N.Y. 1989) (quotations and citations omitted).

61.    The Court's power to hold a person in civil contempt may be exercised "when (1) the order the party allegedly failed to comply with is clear and

unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the party

has not diligently attempted in a reasonable manner to comply." *In re Chief Exec.*

*Officers Clubs, Inc.*, 359 B.R. 527, 535 (Bankr. S.D.N.Y. 2007) (citations omitted);

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info., Inc.*, 369 F.3d 645, 657 (2d

Cir. 2004) (same). Notably here, "[i]t is well-settled that a court's contempt power

extends to nonparties who have notice of the court's order and the responsibility to

comply with it." *Chicago Truck*, 207 F.3d at 507; *see supra* ¶ 44 (discussing how

corporation's directors, officers, shareholders, and attorneys must comply with orders

entered against corporation).

62.     For the reasons described above, this Court should hold the

Violating Parties in contempt. They have acted as if the Confirmation Decision,

Confirmation Order, and Court-ordered Plan are not binding upon them. In fact, they

have told that to this Court as well as Judge Liman. Pursuant to the Confirmation

Order, the Violating Parties must: (1) "cooperate in good faith to implement and

consummate the Plan" (Confirmation Order ¶ 5 (i)); and (2) "take or not take any and

all actions as instructed by the Petitioning Creditors" and "not take any actions

inconsistent with the Plan and this Confirmation Order without the prior written

consent of the Petitioning Creditors or further order of the Court" (*id.* ¶ 5(iii)).

63.     What is surprising is not that the Violating Parties have ignored

this Court's orders—they have done that in the past. What is surprising is that the

Violating Parties are so open about it, *e.g.*, (1) refusing to file the requested LISCR Letter

or to identify the AOR; (2) telling this Court and the District Court that Reed Smith

continues to represent Reorganized Holdings after Reed Smith was terminated

automatically by the Plan; (3) telling this Court and the District Court that the

Confirmation Order has no effect ***even in the United States*** until a court in Greece

and/or Liberia says it has effect under foreign law irrelevant to section 1142; and
(4) predicating their brazen acts on a "provisional board" that does not exist.

64.     Where a court finds a party in contempt, it may impose sanctions
upon that party.  "[S]anctions in civil contempt proceedings may be employed for either
or both of two purposes: to coerce the defendant into compliance with the court's order,
and to compensate the complainant for losses sustained." *Bartel v. Eastern Airlines*, 133
F.3d 906, 1998 WL 2405, at *2 (2d Cir. 1998), *cert. denied*, 525 U.S. 867 (1998) (quotations
and citations omitted); *In re Markus*, 78 F.4th 554, 570 (2d Cir. 2023) ("A bankruptcy
court's inherent sanctioning authority includes the power to impose civil contempt
sanctions in non-nominal amounts to compensate an injured party and coerce future
compliance with the court's orders.").

65.     Second Circuit courts do not hesitate to impose daily monetary
sanctions in order to coerce parties to comply with their orders.  *See, e.g.*, *Stockbridge
Funding Corp.*, 145 B.R. at 806 (assessing sanctions against debtor's counsel of $10,000
per day until documents were turned over), *order aff'd in part, vacated in part*, 158 B.R.
914 (S.D.N.Y. 1993); *Markus*, 78 F.4th at 561 (affirming imposition of sanctions on
debtor's counsel of $1,000 per day for failure to comply with court orders).  Sanctions
are also imposed to compensate the complainant for expenses incurred in seeking and
obtaining compliance, including attorneys' fees, litigation costs, travel expenses, among
others.  *See In re Covelli,* 550 B.R. 256, 270 (Bankr. S.D.N.Y. 2016).

66.     Because of the Violating Parties' failures and refusal to comply with
this Court's orders, the Court should impose appropriate sanctions, including daily
monetary sanctions against the Violating Parties until they cease their obstructive
tactics.  Specifically, Reorganized Holdings respectfully submits that the Court should
impose, *inter alia*, sanctions upon the Violating Parties as follows:

- Coercive monetary sanctions of **$100,000** per day until the LISCR issue is remedied, a simple ministerial act that only the Violating Parties can effect;

- Compensatory monetary sanctions in a to-be-determined amount to pay for Reorganized Holdings' expenses incurred as a result of the Violating Parties' many failures to comply with their Court-ordered obligations;

- Compensatory monetary sanctions in a to-be-determined amount to pay for Reorganized Holdings' expenses arising out of any recognition proceedings in Greece or Liberia, because such proceedings would be altogether superfluous but for the Violating Parties' refusal to comply with their Court-ordered obligations;

- Additional coercive and compensatory monetary sanctions in to-be-determined amounts each time that the Violating Parties take any actions that interfere with the implementation and consummation of the Plan hereafter; and

- Any other sanctions that the Court deems just and proper.

## **RESERVATION OF RIGHTS**

67.     Reorganized Holdings reserves all rights in connection with the Motion, including the right to seek additional sanctions against the Violating Parties, or any additional parties, for any conduct, including conduct that occurred prior to the Effective Date or after the Effective Date, or for any other purposes.

## **NOTICE**

68.     Notice of this Motion will be given to the following parties or their counsel:  (a) the AOR and Former D&Os; (b) Reed Smith and Former D&Os Counsel; (c) LISCR; (d) the Former Shareholders; (e) the U.S. Trustee; (f) the Securities and Exchange Commission; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  Reorganized Holdings submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## CONCLUSION

**WHEREFORE**, Reorganized Holdings respectfully requests that the Court

(a) enter the Proposed Order, substantially in the form attached hereto as **Exhibit A**,

and (b) grant such other and further relief as the Court deems just and proper.

DATED:  November 25, 2024
        New York, New York

TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
KYLE J. ORTIZ
BRYAN M. KOTLIAR
BRIAN F. SHAUGHNESSY
JOHN N. McCLAIN, III
JARED C. BORRIELLO
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel for Reorganized Holdings*

**Exhibit A**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                      :
In re:                       :        Chapter 11
                      :
ELETSON HOLDINGS INC., et al.,[1]   :        Case No. 23-10322 (JPM)
                      :
                      :        (Jointly Administered)
              Debtors.    :
                      :
----------------------------------------------------------------x

## ORDER (I) HOLDING CERTAIN PERSONS IN CIVIL CONTEMPT, (II) IMPOSING SANCTIONS AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Emergency Motion")[2] of Reorganized Holdings for entry of an order (this "Order") against Reorganized Holdings' (a) existing person of record at the address of record (the "AOR") currently on file with the Liberian International Ship & Corporate Registry ("LISCR") and (b) former shareholders[3] (the "Former Shareholders"), officers and directors (together, the "Former D&Os"), and counsel, including Reed Smith LLP ("Reed Smith"), as well as counsel for the Former D&Os at Daniolos Law Firm ("Former D&Os Counsel" and, together with the AOR, the Former Shareholders, the Former D&Os, and Reed Smith, the "Violating Parties"), holding the Violating Parties in civil contempt, imposing monetary sanctions upon the Violating Parties, and granting related relief; and the Court having jurisdiction to consider the

---

[1]    The Debtors in these chapter 11 cases are:  Eletson Holdings Inc. ("Holdings"), Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Emergency Motion.

[3]    The Former Shareholders are comprised of the following five entities:  The Former Shareholders are comprised of the following five entities:  (a) Family Unity Trust Company, (b) Glafkos Trust Company, (c) Lassia Investment Company, (d) Elafonissos Shipping Corporation, and (e) Keros Shipping Corporation.

Emergency Motion and relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order, as well as Section 11.1 of the Plan and paragraph WW of the Confirmation Order; and consideration of the Emergency Motion and relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court having the authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Emergency Motion having been provided; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Former Debtors, their estates, their creditors, and all parties in interest and Reorganized Holdings; and the Court having reviewed the Emergency Motion and the Declarations and heard the statements of counsel at the hearing on the Emergency Motion (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Emergency Motion and at the record of the Hearing establish just cause for the relief granted herein; and all objections to the Emergency Motion, if any, having been withdrawn or overruled; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Court FINDS that the Violating Parties have violated, among other things, the Bankruptcy Code, the Plan, and the Confirmation Order, by failing to comply with their applicable obligations thereunder.

2.      The Court FINDS that the Violating Parties are in contempt of Court as a result of their violations of the Bankruptcy Code, the Plan, and the Confirmation Order.

3.      The Motion is GRANTED to the extent set forth herein.

4.      The Court hereby imposes the following sanctions on each of the Violating Parties on a joint and several basis:  (a) coercive monetary sanctions of $100,000 per day until LISCR is updated to reflect Reorganized Holdings's current Amended Certificate of Incorporation; (b) compensatory monetary sanctions in a to-be-determined amount to pay for Reorganized Holdings' expenses incurred as a result of the Violating Parties' many failures to comply with their Court-ordered obligations; and (c) compensatory monetary sanctions in a to-be-determined amount to pay for Reorganized Holdings' expenses arising out of any recognition proceedings in Greece or Liberia, because such proceedings would be altogether superfluous but for the Violating Parties' refusal to comply with their Court-ordered obligations.

5.      The Court will consider additional coercive and compensatory monetary sanctions in to-be-determined amounts each time that the Violating Parties take any actions that interfere with the implementation and consummation of the Plan hereafter.

6.      This Order shall be immediately effective and enforceable upon its entry.

7.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2024


_____
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

**Pierre Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                           :

In re:                          :        Chapter 11
                           :

ELETSON HOLDINGS INC., *et al.*,[1]  :        Case No. No. 23-10322 (JPM)
                           :

            Debtors.       :        (Jointly Administered)
                           :
                           :
-----------------------------------------------------------x

## DECLARATION OF JAMES PIERRE PURSUANT TO 28 U.S.C. § 1746

        I, James A. A. Pierre II, a Liberian citizen and Counsellor-at-Law at Pierre,

Tweh, and Associates, who is admitted to practice law in the Republic of Liberia, hereby

declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the

United States of America as follows:

        1.        I hold a law degree from Emory University School of Law awarded in

2005.  I am a senior associate at Pierre, Tweh & Associates (the "Firm"), a general

practice Liberian law firm.  I was a legal counsel at the Law Reform Commission of

Liberia from 2012-2013, law clerk for the Supreme Court of Liberia from 2013-2015, and

was a legal consultant for the Liberian Ministry of Justice from 2015-2016.  Furthermore,

the areas of law I practice in include corporate law, contractual law, commercial

transactions, corporate governance, and anti-fraud.

        2.        I was retained as an expert in Liberian law by counsel for Reorganized

Holdings Inc. ("Reorganized Holdings") in connection with the above-captioned

bankruptcy cases (the "Chapter 11 Cases") to submit this declaration (the

---

[1]       The Debtors in these chapter 11 cases are:  Eletson Holdings Inc. ("Holdings"), Eletson Finance
(US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118
Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime,
Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

"Declaration")[2]  By this Declaration: (a) I express my opinion regarding certain aspects of Liberian law, including matters regarding Liberian corporate governance and the recognition of foreign judgments by Liberian courts; and (b) I detail my ongoing efforts on Reorganized Holdings' behalf to implement the change in ownership and management (the "Transition") of Eletson Holdings Inc. ("Holdings") to Reorganized Holdings as set forth in the so-ordered Confirmation Decision confirming the chapter 11 plan proposed by the Petitioning Creditors [Docket No. 1132, Ex. 1] (the "Plan"), including: (i) my ongoing interactions with LISCR (defined below) on seeking pre-clearance for filing the Amended Articles of Incorporation, Amended Bylaws, and Shareholders Agreement for Reorganized Holdings (among other filings); and (ii) my preparation for the initiation of a proceeding to have the Court's Confirmation Decision recognized in Liberian court.

3.      Prior to my retention by Reorganized Holdings, I was retained during the Chapter 11 Cases by the Petitioning Creditors, as Plan Proponents of the Plan and PC Alternative Plan.  In that capacity, I worked with the Petitioning Creditors and their other advisors, including bankruptcy counsel and corporate counsel, in reviewing and commenting from a Liberian-law perspective on the forms of Amended of Incorporation, Amended Bylaws, and Shareholders Agreement of Reorganized Holdings, as well as on seeking pre-clearance for these documents with LISCR and making other filings.

4.      I reserve the right to supplement my opinions, including in response to questions raised by the Court or the parties, and to opine on other matters raised by the

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan (as defined below).

parties.

## A. Administration of Liberian Corporations

5.      Holdings is incorporated under the laws of Liberia as a "non-resident corporation." Liberian law recognizes two types of corporations: resident and non-resident. Resident Liberian corporations conduct business within Liberia and are subject to local taxation. Additionally, resident Liberian corporations are formed by filing the charter documents at the Liberia Business Registry in Liberia. Non-resident Liberian corporations are precluded from conducting business in Liberia, and as such, are not subject to any Liberian law intended to regulate the conduct of business in Liberia which, for instance, is why the Insolvency and Restructuring Act of Liberia expressly declares that it does not apply to non-resident Liberian corporations. I understand that, consistent with the requirements of being a non-resident Liberian corporation, Holdings has no operations or assets in Liberia and none of its shareholders (including prior to or after the Effective Date of the Plan) reside in Liberia.

6.      LISCR, LLC, the Liberian International Ship & Corporate Registry ("LISCR"), administers the Liberian Corporate Registry pursuant to an act of Liberian Law. Under Liberian law, LISCR is the deputy registrar where all non-resident Liberian corporations are required to file their official corporate-governance documents. LISCR maintains an office in the United States of America located at 22980 Indian Creek Drive, Suite 200, Dulles, Virginia 20166.

7.      In order for a non-resident Liberian corporation to amend its corporate-governance documents, such as Holdings is required to do under the Court-approved Plan, the amended documents must be filed by the corporation with LISCR. LISCR maintains a pre-clearance process that allows LISCR to review the draft of all corporate documents that are intended to be officially filed.

8.       A non-resident Liberian corporation filing of amended articles of incorporation with LISCR gives the document legal effect in Liberia.[3]  The Liberian government has granted LISCR the authority to register non-resident Liberian corporations.  As a result, the articles of incorporation of a non-resident Liberian corporation becomes effective in Liberia only when it is duly registered with LISCR.  Similarly, in order to amend an existing articles of incorporation, such amendment is also required to be duly registered with LISCR.  Therefore, until amended articles of incorporation of a non-resident Liberian corporation are registered and filed with LISCR, the document has no legal effect in Liberia, which leaves the previously filed articles of incorporation in place.

9.       I have read the Plan, the Confirmation Decision, and the Confirmation Order.  I understand that Article V of the Plan provides for the issuance of new equity in Reorganized Holdings and entry into the Amended Articles of Incorporation, Amended Bylaws, and Shareholders Agreement without the need for any further action, including further actions taken pursuant to applicable non-bankruptcy law such as Liberian law.  This means, pursuant to the Plan, the Amended Bylaws and Shareholders Agreement can take effect without any further action.  However, Liberian law requires the Amended Articles of Incorporation to be filed with LISCR in order to have legal effect in Liberia.  So, although the Amended Bylaws and Shareholders Agreement can take effect without any further action, until the Amended Articles of Incorporation become effective, the Amended Bylaws and Shareholders Agreement can only be implemented insofar as they do not conflict with Holdings' existing articles of incorporation.

---

[3]       I provide no opinion regarding the laws of any jurisdiction other than Liberia.

### B. Requirements for Implementing the Transition

10.     When a non-resident Liberian corporation is formed and files its corporate-governance documents with LISCR, the corporation is required to provide LISCR with an address of record ("AOR"), and this person is the only person to whom LISCR sends any notifications and from whom LISCR receives instructions pertaining to the corporation's registration.  So, the corporate-governance documents required to be filed with LISCR can only be filed from the non-resident Liberian corporation's existing AOR.  This means that the corporation's existing AOR controls whether and when a corporation can make a filing with LISCR.

11.     The AOR for a non-resident Liberian corporation is not public information and LISCR will not provide a non-resident Liberian corporation's AOR to the public because the AOR is considered an internal corporate record of the corporation.  As of the date hereof, I understand that the Petitioning Creditors and Reorganized Holdings have been unable to obtain Holdings' AOR from Reed Smith LLP, former counsel to Holdings, or from other efforts to contact the Debtors' former management.

12.     There are two ways to officially change a non-resident Liberian corporation's corporate-governance documents, including the corporation's articles of incorporation and bylaws, with LISCR: the submission of either (1) instructions directing the change submitted from the corporation's AOR to LISCR, or a person who has been granted authority by the current AOR through an authorization letter also submitted to LISCR; or (2) a Liberian court order directing LISCR to make the change. In other words, where an AOR for a corporation updates the corporation's corporate-governance documents with LISCR, there is no need for the corporation to obtain a Liberian court order directing LISCR to make the change.  Liberian corporations often update their corporate-governance documents with LISCR without obtaining a Liberian

court order for many reasons including, for example, where the corporation undergoes an ownership change as part of a merger or other transaction.

13.    Regarding the first avenue, in my experience, when a non-resident Liberian corporation undergoes a change in ownership or management, such as by way of a restructuring or merger, the corporation's existing AOR will make the necessary filings with LISCR, which usually includes the existing AOR notifying LISCR of an AOR change.  I understand that counsel for the Petitioning Creditors, as Plan Proponents, requested that Holdings provide its AOR, but Holdings has failed to provide the AOR and the existing AOR has failed to make the necessary filings.

14.    Regarding the second avenue, Liberian courts recognize foreign court orders in certain circumstances.  A party seeking to have a Liberian court recognize a foreign court order must commence an action in Liberian court asking the court to enforce the order.  Under Liberian law, an order obtained in a non-Liberian court is admissible in Liberian courts when they are duly authenticated.  The authentication of a foreign court order in Liberian court requires the party seeking recognition to prove that: (a) the party adversely affected by the court order appeared before the foreign court; and (b) the foreign court had jurisdiction to issue the order.  If the party seeking recognition makes this showing, the Liberian court will likely recognize the foreign court order.  However, the litigation process in Liberian courts usually progresses very slowly, especially if the lower court's ruling is appealed because under Liberian law an appeal operates as a stay, meaning that a recognition proceeding in Liberian court can take years to complete.

**C.      Efforts to Implement the Transition**

15.     Since the Confirmation Decision was rendered on October 25, 2024, I have worked with counsel to the Petitioning Creditors (and, after the Effective Date, counsel to Reorganized Holdings) to consummate the Plan.

16.     I have advised Reorganized Holdings' counsel regarding the process of modifying Holdings' existing corporate-governance documents to reflect the Transition to Reorganized Holdings.

17.     I have also advised Reorganized Holdings' counsel regarding how to file the Amended Articles of Incorporation and Amended Bylaws for Reorganized Holdings as part of implementing the change in ownership and management of Holdings to Reorganized Holdings as set forth in the Plan.  *See* Docket Nos. 913 and 1134.

18.     I have been working with LISCR personnel on pre-clearing Reorganized Holdings' Amended Articles of Incorporation and Amended Bylaws since November 7, 2024, and as of the date hereof, neither document has obtained pre-clearance.  On November 11, 2024, LISCR informed me that the draft Amended Articles of Incorporation could not be cleared because it did not comply with the required format. Moreover, LISCR stressed that although I can submit documents for pre-clearance, once the document has been cleared only Holdings' currently registered AOR or a person granted authority by the current AOR through an authorization letter submitted to LISCR has the authority to submit the Amended Articles of Incorporation for the official filing.  I promptly shared this information with Reorganized Holdings' counsel.  After revising the draft Amended Articles of Incorporation to be consistent with LISCR's required format, it was resubmitted for pre-clearance on November 13, 2024.  LISCR has yet to respond to this second submission.  The Amended Bylaws were also submitted

for pre-clearance on November 13, 2024 and LISCR responded that bylaws are an internal document so it or any amendments thereto are not required to be filed.

19.     Since November 12, 2024, Reorganized Holdings' counsel has sought Holdings' counsel cooperation in implementing the Transition.  Specifically, I am aware that on the morning of November 12, 2024, Reorganized Holdings' counsel emailed Holdings' counsel an instruction and direction to complete a form of letter (the "<u>LISCR Letter</u>"): (a) identifying the existing AOR and authorized personnel for Holdings; and (b) changing the AOR and authorizations for Holdings, as contemplated by the Plan, Amended Articles of Incorporation, and Amended Bylaws.

20.     My understanding is that Holdings' counsel has not cooperated with Reorganized Holdings' counsel's requests.  Specifically, Holdings' counsel has: (a) failed to provide Reorganized Holdings' counsel with the current AOR; and (b) claimed that changing the AOR and authorizations will violate non-bankruptcy law.

**D.      Conclusion**

21.     Unless and until Holdings' former counsel and former management cooperates with Reorganized Holdings' counsel in implementing the Transition by submitting the LISCR Letter or otherwise instructing LISCR through Holdings' existing AOR or a Holdings-authorized agent to modify Holdings' existing corporate-governance documents to reflect that the Transition has taken place, the only remaining avenue for implementing the Transition is to initiate and complete a recognition proceeding in Liberian court, which is costly (and in my view, unnecessary given that the existing AOR can and should make the requested filings), and could take weeks, months, or years to complete.  The Firm intends to imminently file the petition for the Liberian court to recognize and enforce the Confirmation Order.

8

I certify under penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States of America that the foregoing is true and correct.

Executed on  November 25, 2024 in Monrovia, Liberia.

/s/ James A. A. Pierre II
James A. A. Pierre II

**<u>Exhibit C</u>**

**Kotliar Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                :
In re:                 :        Chapter 11
                :
ELETSON HOLDINGS INC., et al.,    :        Case No. 23-10322 (JPM)
                :
                :        (Jointly Administered)
        Debtors. [1]     :
                :
---------------------------------------------------------------x

**DECLARATION OF BRYAN M. KOTLIAR, ESQ. IN
SUPPORT OF EMERGENCY MOTION FOR AN ORDER IMPOSING
SANCTIONS ON ELETSON HOLDINGS' (A) EXISTING PERSON OF RECORD
AND (B) FORMER SHAREHOLDERS, OFFICERS,  DIRECTORS, AND COUNSEL**

       I, Bryan M. Kotliar, Esq. hereby declare under penalty of perjury,

pursuant to section 1746 of Title 28 of the United States Code, as follows:

       1.     I am a partner at the law firm of Togut, Segal & Segal LLP

(the "Togut Firm"), counsel to Reorganized Holdings in the above-captioned chapter 11

cases.

       2.     I respectfully submit this Declaration in support of the *Emergency*

*Motion of Reorganized Eletson Holdings Inc. for an Order Imposing Sanctions on Eletson*

*Holdings' (A) Existing Person of Record and (B) Former Shareholders, Officers, Directors, and*

*Counsel, Including Reed Smith LLP* (the "Motion")[2] filed contemporaneously herewith.

---

[1]    The Debtors in these chapter 11 cases are:  Eletson Holdings Inc. ("Eletson Holdings"), Eletson
Finance (US) LLC ("Eletson Finance"), and Agathonissos Finance LLC ("Eletson MI" and, together
with Eletson Holdings and Eletson Finance, the "Debtors").  The address of the Debtors' corporate
headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is
c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

[2]    Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such
terms in the Motion.

**Basic Diligence Information**

3.        Since the issuance of the Confirmation Decision, counsel to the Plan

Proponents has made various requests to the Former Debtors.  After the issuance of the

Confirmation Order, pursuant to paragraph 5(iii) thereof, counsel to the Plan

Proponents expressly directed the Former Debtors to provide certain information

related to the Former Debtors' business.  Eventually, Reed Smith and the Former

Debtors provided some basic information—such as copies of governance documents,

including charters, certificates of incorporation, bylaws, and similar corporate

documents for all entities, loan documents for some subsidiaries, board minutes and

resolutions that list the board members of each entity—but have refused to provide

additional information, despite frequent, repeated follow-up requests.

4.        I participated in the regularly scheduled weekly calls with the DIP

Lender, Reed Smith, and representatives of the Former Debtors and their non-Debtor

subsidiaries.  At one of these calls held on October 31, 2024 (*i.e.*, after the Confirmation

Decision), Reed Smith and the foregoing representatives objected to questions about

"the Plan or transition" because they purportedly did not relate to the information and

reporting rights provided by the DIP Credit Agreement and generally refused to

answer questions on that basis.

**The Plan Effective Date**

5.        I participated in calls regarding closing of the confirmed Plan

(collectively, the "Closing Calls") on November 6, 2024 at 10:00 a.m. (prevailing Eastern

Time), November 8, 2024 at 10:00 a.m. (prevailing Eastern Time), and November 19,

2024 at 10:00 a.m. (prevailing Eastern Time) (the "November 19 Call").  Invitations to

the Closing Calls were provided to representatives and counsel for the Former Debtors,

the Plan Proponents, the Official Committee of Unsecured Creditors, the Old Notes

Trustee, the 2022 Notes Trustee, Verita, and New Agathonissos Finance LLC.

6.      Reed Smith was invited to the Closing Calls but failed to attend any

calls other than the November 19 Call where I announced that the Plan Proponents

would be moving forward with consummating the Plan.  Reed Smith did not object.

7.      Shortly after that call, I sent an email to all of the parties, including

Reed Smith, repeating such announcement and instructing Verita to begin transferring

the funds in connection with the payments to be made on the Effective Date of the Plan.

Reed Smith did not object.

8.      I declared the Effective Date by email on November 19, 2024.  Reed

Smith did not object.  In fact, since then, Reed Smith has been emailing with counsel to

the Plan Proponents about making various professional fee payments, including to

Reed Smith, premised on the occurrence of the Effective Date and funding from

Reorganized Holdings from accounts set up on the Effective Date with Plan funding.

## LISCR

9.      I participated in a call on November 14, 2024 in which Reed Smith

agreed to ask the Former Debtors to identify Eletson Holdings Inc.'s Liberian AOR,

speak with Former D&Os Counsel and Liberian counsel, and arrange for discussions

with these parties.  To date, Reed Smith has not done any of these things.

10.     Reed Smith and the Former Debtors have not responded to the Plan

Proponents' requests to (a) identify the existing AOR for Eletson Holdings Inc. and (b)

complete a form of letter, to be held in escrow and submitted on the Effective Date,

instructing LISCR to update its AOR for Eletson Holdings Inc. to reflect Reorganized

Holdings' new AOR and authorized personnel.

11.     Attached hereto are true and correct copies of the following

documents:

| Exhibit | Description |
|---------|-------------|
| 1. | *November 12, 2024 SDNY Hearing Transcript* |
| 2. | *November 20, 2024 Letter from L. Solomon to Judge Liman* |
| 3. | *November 12, 2024 Letter from L. Solomon to Judge Mastando* |
| 4. | *Reorganized Eletson Holdings Togut Retention Letter* |
| 5. | *October 28, 2024 Email from L. Ebrahimi to D. Baker at 9:04 a.m.* |
| 6. | *October 30, 2024 Email from B. Kotliar to D. Baker at 10:20 a.m.* |
| 7. | *November 5, 2024 Email from B. Kotliar to D. Baker at 5:34 p.m.* |
| 8. | *October 28, 2024 Email from D. Baker to B. Kotliar at 5:39 p.m.* |
| 9. | *November 8, 2024 Email from D. Baker to B. Kotliar at 4:38 p.m.* |
| 10. | *November 11, 2024 Email from D. Baker to B. Kotliar at 1:57 p.m.* |
| 11. | *November 12, 2024 Email from D. Baker to B. Kotliar at 5:51 p.m.* |
| 12. | *November 13, 2024 Hearing Transcript* |
| 13. | *November 12, 2024 Email from B. Kotliar to D. Baker at 7:25 a.m.* |
| 14. | *November 17, 2024 Email from L. Solomon to B. Kotliar at 4:23 p.m.* |
| 15. | *Restriction Letter* |
| 16. | *November 21, 2024 Letter from L. Solomon to Judge Liman* |
| 17. | *November 21, 2024 Termination Letter* |
| 18. | *TradeWinds Article* |
| 19. | *May 15, 2024 Hearing Transcript* |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true to the best of my knowledge.

Dated:  New York, New York
           November 25, 2024

/s/ *Bryan M. Kotliar*
Bryan M. Kotliar

**Exhibit 1**

OBC1ELEC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ELETSON HOLDINGS INC., *et al.*,

4                    Petitioners,

5          v.                            23 Civ. 7331 (LJL)

6    LEVONA HOLDINGS LTD.,

7                    Respondent.         Conference
     ------------------------------x

8                                        New York, N.Y.
                                         November 12, 2024
9                                        10:50 a.m.

10   Before:

11                    HON. LEWIS J. LIMAN,

12                                        District Judge

13                    APPEARANCES

14   REED SMITH LLP
          Attorneys for Petitioners
15   BY:  LOUIS M. SOLOMON, ESQ.
          COLIN A. UNDERWOOD, ESQ.
16
     QUINN EMANUEL URQUHART & SULLIVAN, LLP
17        Attorneys for Respondent
     BY:  ISAAC NESSER, ESQ.
18        WILLIAM B. ADAMS, ESQ.
          MICHAEL A. WITTMANN, ESQ.
19

20

21

22

23

24

25

OBC1ELEC

1       (Case called)

2           THE DEPUTY CLERK:  Starting with counsel for

3    plaintiffs, please state your appearance for the record.

4           MR. SOLOMON:  Good morning, your Honor.  Lou Solomon

5    and Colin Underwood for the petitioners.

6           THE COURT:  Good morning.

7           MR. NESSER:  Good morning, your Honor.  Isaac Nesser,

8    William Adams, and Michael Wittmann from Quinn Emanuel for

9    Levona.

10          THE COURT:  Good morning.  And I apologize that we're

11   getting started late.  It's always one of the happy occasions

12   to admit new members of the bar.

13          I guess, Mr. Nesser, you were the one who asked for a

14   stay and asked for a status conference, so why don't we get

15   started with you, and you can give me your view of the status

16   and why the short stay that I entered should be permitted to

17   continue, if in fact that is your position.

18          MR. NESSER:  Thank you, your Honor.

19          The status is as follows:  The bankruptcy court's

20   confirmation order has been appealed, but there's been no

21   motion for a stay.  As such, I understand from counsel to the

22   petitioning creditors that they're in the process of closing

23   certain transactions that are predicate to effectiveness, and

24   they expect the plan to go effective in the next couple of

25   business days.  I should say they're in the room here today if

OBC1ELEC

1    your Honor has any desire to hear from them.

2            In terms of, you know, where we go from there, the

3    process of appointing new management and board members and so

4    forth I assume will take some amount of time to deal with.

5    I'll note that under the plan——I think it was Section 2.5(a) of

6    the plan——any professionals engaged by the debtors are

7    automatically terminated on the effective date, and so there

8    would need to be, at least with respect to Eletson Holdings I

9    think, as I read the plan, at least as to Eletson Holdings,

10   there would need to be a new engagement with counsel.  Whether

11   that's Reed Smith or some other firm, I have no idea.  But

12   that's something that, as I understand it, will need to occur.

13           THE COURT:  And that's upon the effective date?

14           MR. NESSER:  Correct.

15           THE COURT:  And when is the effective date?

16           MR. NESSER:  As I understand it from counsel for

17   petitioning creditors, they expect the effective date to occur

18   within the next couple of business days.  And again, your

19   Honor, that's Section 2.5(a) of the plan.  That's ECF 1132.

20   It's pdf page 27.

21           So under the circumstances, our view is that it

22   probably makes sense to continue the stay in place for another

23   couple of weeks.  Two weeks from today would put us

24   November 26th, which is the Tuesday before Thanksgiving.  If

25   that makes sense to the Court, that would be sensible from our

1    perspective.  If you wanted to do the Monday after

2    Thanksgiving, that would be sensible as well.

3              And that's where we are.

4              THE COURT:  So Mr. Nesser, if I'm not mistaken, you

5    have not responded to the request for letters of request on the

6    various third-party discovery.  Is there any reason why I

7    shouldn't have you respond to those so that if the case

8    continues to go forward in something like its current posture,

9    either with Holdings or Corp., or with the folks who are the

10   beneficiaries of the arbitration order, it's not unduly

11   delayed?

12             MR. NESSER:  Your Honor, we have no objection to that,

13   provided that, you know, the third-party discovery we've been

14   pursuing would be permitted to proceed as well.

15             THE COURT:  So refresh me as to what that is.  I know

16   that Mr. Solomon and Mr. Underwood have filed motions to have

17   me approve letters of request to various foreign courts and

18   before anything happens, before anything is collected, I have

19   to authorize those.  Refresh me as to where things stand for

20   you.

21             MR. NESSER:  We have not filed any motions.  We don't

22   have anything that we filed here.  I don't believe we

23   anticipate filing any at this point in time.  But, you know, we

24   did serve a significant number of subpoenas, including

25   subpoenas abroad, and we have desisted from pursuing any of

1  those in light of the stay.  We've told the counterparties

2  that—to the extent we're in touch with them, we've told the

3  counterparties that everything is stayed.

4       THE COURT:  Well, I haven't heard from Mr. Solomon.

5  I'm not prejudging whatever he's going to say because I don't

6  know what he's going to say, but you've asked for a stay, and a

7  stay would mean that nobody collects discovery from anybody.

8  What I'm raising is whether, in the interim, there is the

9  filings before the Court so that if discovery goes forward, the

10 Court has issued whatever orders make sense.

11      MR. NESSER:  Again, I have no objection to that, your

12 Honor.  I suppose the only thing I would say is, again, there's

13 perhaps a question as to what new management might or might not

14 want to do with those motions, but from my perspective, I'm not

15 Eletson, I will not become Eletson, thank goodness; from my

16 perspective, I have no objection.

17      THE COURT:  Okay.  All right.  Mr. Solomon?

18 Mr. Underwood?

19      MR. SOLOMON:  Thank you, your Honor.

20      It seems unarguable, as your Honor observed in your

21 Honor's order, that some balancing here is needed.  It's

22 unquestionable at the same time that I think the Eletson

23 interests are being prejudiced, and so it is our view, for

24 reasons that I will explain, that the Court should lift the

25 stay, we should move forward, and then whatever comes before

OBC1ELEC

1    your Honor in some formal way, your Honor will then be able to

2    react to rather than trying to anticipate.  Two weeks ago they

3    thought they were going to close and this was going to happen

4    and that was going to happen, and it hasn't happened.  It was

5    supposed to happen last Friday and it didn't happen; for

6    whatever reason, it didn't happen.  And so rather than keep

7    sort of speculating about that, we would like this case to move

8    forward, and I believe we have a statutory right to do that,

9    fully recognizing that your Honor has discretion concerning the

10   issue of the stay.

11        The reason we think it should move forward is, at a

12   minimum, now that Levona has made assertion concerning

13   Holdings, there are parties whom we, Reed Smith, Holdings,

14   believes we may soon not be in a position to represent as we

15   have been——Gas and Preferred Nominees have been adequately

16   represented in this case until now.  To the extent that they're

17   going to try to bring a big hook and pull Holdings out, that's

18   an open question.  Counsel for those parties, which will

19   include Reed Smith but will not be exclusive to Reed Smith, are

20   here.  No one has moved to intervene.  At a minimum, it seems

21   to me that your Honor should see those papers to see what this

22   case should look like, irrespective of what happens in the

23   bankruptcy.  That's item No. 1.

24        Item No. 2 is, the effective date of the transaction

25   is going to itself be the subject of debate.  The petitioning

OBC1ELEC

1    creditors, in the plan that has been approved, they recognize

2    that Holdings is a Liberian corporation, and they explicitly

3    state that the effectiveness of a plan issued by a U.S. court

4    may be subject to Liberian law and they have to go through some

5    events in Liberia to confirm what the U.S. court did.  Now

6    whether or not we have anything to do with that—and we don't—

7    that has to be done.  Your Honor will remember almost a year

8    ago when Levona tried to say that this case couldn't go forward

9    because there was inadequate representation, right, it was

10   inadequate capacity and authorization for us to do that, your

11   Honor rejected that because it was untimely.  And this issue is

12   not I think untimely.  I think we don't have anything from the

13   people who are purporting to take over.  We know that the plan

14   says that the shares of Holdings, old Holdings, might be

15   extinguished, but even that is explicitly subject to applicable

16   law, and that applicable law is not U.S. law, it's Liberian

17   law.  I'm not suggesting anything that I know; the only thing I

18   know to represent to your Honor is that we asked the same

19   Liberian counsel whom your Honor knows from the last time

20   whether a U.S. bankruptcy order is automatically enforceable in

21   Liberia.  It is not.  There are steps that they have to take.

22   And let's assume for these purposes they're going to take them.

23   I don't know how long it takes to take them, I don't know what

24   they have to do to take them, I don't know what reaction a

25   Liberian court is going to have to this.  I think there's a

1    whole lot that we do not know, but I do know that the plan

2    itself says that even the cancellation of the shares is subject

3    to applicable——i.e., Liberian——law.  Even if the shares are

4    canceled, as your Honor knows——

5               THE COURT:  Give me one second, Mr. Solomon.  I'm just

6    checking one thing that may lead to a question.

7               MR. SOLOMON:  Yes, sure.

8               THE COURT:  Okay.  Go ahead.  I'm sorry.

9               MR. SOLOMON:  Let us suppose that the shares are

10   canceled, and we're advised that they will be canceled, if

11   appropriate under Liberian law.  They still are going to have

12   to replace the board, and the board is going to have to——the

13   new board is going to have to tell us what to do, and I'm

14   assuming it can all happen, if it happens, but it's not

15   happening yet, and they're going to need to show that they have

16   the capacity to take over the board and direct new counsel or

17   direct counsel or direct something before all of that happens.

18   So that is——

19              THE COURT:  Mr. Solomon, Mr. Nesser made reference to

20   a provision of the plan that stated that, as I understood it,

21   as of the effective date of the plan, the professional

22   engagements of Holdings would be terminated.  Do you have that

23   language?

24              MR. SOLOMON:  I do, your Honor, and we recognize it.

25              THE COURT:  Can you read it to me, please, and then I

1    may ask you to unpack it and ask Mr. Nesser about it.

2            MR. SOLOMON:  There actually is a bankruptcy lawyer

3    for the trust here to tell me.  Is it provision 205?

4            COUNSEL:  2.5(a).

5            THE COURT:  Yes, it's referenced as 2.5(a).

6            MR. SOLOMON:  I do not have that in my notes, your

7    Honor.

8            THE COURT:  Your colleague is passing it up to you.

9    Maybe your colleague can also tell you how the effective date

10   is defined.

11           MR. SOLOMON:  This is Kyle Ortiz from the Togut firm.

12   He's not my colleague, but he's an officer of the court.

13           On the effective date—and I have that someplace in my

14   notes—the retention, including all rights and duties arising

15   from or related to the Chapter 11 cases, of each of the

16   debtor's retained professionals shall terminate, provided,

17   however, that the debtor's retained professionals may file fee

18   applications in accordance with the plan and confirmation order

19   by the professional fee claims bar date.

20           So this is a reference to rights and duties arising

21   from or relating to the Chapter 11 cases—

22           MR. NESSER:  No.

23           MR. SOLOMON:  —of each of the debtor's retained

24   professionals shall terminate.  That's what I was just handed.

25           THE COURT:  That's as of the effective date.

OBC1ELEC

1           MR. SOLOMON:  It is, your Honor.

2           THE COURT:  How is the effective date defined?

3           MR. SOLOMON:  There needs to be——

4           THE COURT:  I'm going to ask Mr. Nesser if he can go

5   to the person in the gallery who it sounds like has a copy of

6   the plan, and maybe provide to the Court a copy of the plan.

7           MR. SOLOMON:  I may not be the right person to be

8   answering this.

9           THE COURT:  Hold on for a second, Mr. Solomon, while

10   we're getting a copy of the plan.

11           Maybe he doesn't have it.

12           MR. ORTIZ:  Your Honor, it has some notes and

13   highlighting.

14           THE COURT:  Do you have any problem——I'll try to

15   disregard your notes and highlighting.

16           MR. ORTIZ:  I can also remove some of the flags.

17           MR. SOLOMON:  We won't ask for it, your Honor.

18           THE COURT:  Okay.

19           (Discussion off the record)

20           THE COURT:  Thank you.  Give me one second.

21           Okay.  Go ahead, Mr. Solomon.

22           MR. SOLOMON:  Thank you, your Honor.

23           And so what I'm not saying is that this is not going

24   to ever happen; what I am saying is that in order for the plan

25   to be declared effective, the petitioning creditors, under the

 1    plan——because I do have and your Honor has it in front of you——

 2    have to have satisfied all of the conditions precedent.  I

 3    believe they are waivable, but in the conditions precedent,

 4    there are two that require them to obtain all governmental and

 5    third-party approvals.  That's Article IX, Section 9.1(f), and

 6    (l).  But they have to both obtain the requisite approvals and

 7    file with the government units in accordance with applicable

 8    law.  My only point is that this is going to require review by

 9    another court and another jurisdiction, and it is our view that

10    there is no reason to tether this case to that proceeding.  If,

11    as, and when Levona or somebody shows up with the proper

12    evidence to your Honor that this has all been done and that I'm

13    not here and that Holdings is not here, then I think your Honor

14    will be able to look at something concrete and answer the

15    question of capacity and who has the authority to speak, but as

16    of now, we do.  Our client is being quite prejudiced, and while

17    the stay is being asked for here, Levona is pressing forward in

18    the LCIA.  There's been a slight delay in that case also, but

19    they've not agreed here to stay that matter so they're

20    continuing to litigate and cost everything that they're

21    claiming they're trying to save here; they're continuing to

22    siphon——encumber funds from the assets that we are going to pay

23    the creditors with.  The number is up to now $17.5 million that

24    they're asking to encumber these funds.  And I believe we have

25    a right under the statute and under the New York Convention to

1    ask your Honor, as expeditiously as possible, to decide the

2    matter and give us a judgment and then we'll let the—then we

3    can either enforce it, go back to the bankruptcy court, they

4    can go to the circuit, the normal things that might have

5    happened in this case, but it's been exceedingly delayed.

6           THE COURT:  Tell me a little bit more about prejudice

7    and about the LCIA.

8           MR. SOLOMON:  Yes.  So the LCIA proceeding is the

9    exact claim that we won before Justice Belen.  It is a claim

10   that Levona has asserted against Gas.

11          THE COURT:  Right.

12          MR. SOLOMON:  The same claim.  So that they owned a

13   preferred—

14          THE COURT:  No, I recall that, but what's the status?

15          MR. SOLOMON:  Oh, so the status is that that is

16   marching forward in discovery that Levona is pressing for.

17   When your Honor declined to ask them to stay that proceeding a

18   couple of weeks ago, I'm informed that they voluntarily delayed

19   a hearing in that case by a couple of weeks but they've not

20   agreed to stay that proceeding, and so that proceeding is

21   causing—everything that they claim they're trying to avoid

22   here is still going to proceed there, and Gas, Holdings, Corp.

23   are all being prejudiced by the expenditure of funds there that

24   they're not going to be here.  We're all—we're trying to get

25   our judgment, they're trying to continue to delay getting that

OBC1ELEC

1    judgment.  That's the first item of prejudice with respect to

2    LCIA.

3            With respect to the worldwide freezing order, which is

4    still in effect, there is an exception to that that allows

5    Levona to seek to encumber the assets of the Symi and/or

6    Telendos, which are being——which will be——

7            THE COURT:  I know.

8            MR. SOLOMON:  Okay.  And they have just advised us

9    that they wish to pull $7.5 million more.  I was advised of

10   this last night.  They've already taken 10, and they want 7.5

11   more to take out of that, which is going to reduce the res, the

12   assets, that we have to satisfy the judgment of the award, that

13   the creditors have, because we have agreed to hand those assets

14   over, 75 percent of those assets over.  In your Honor's

15   opinion, the stay opinion of a couple weeks ago, your Honor

16   adopted a quote that Levona gave you, which had the bankruptcy

17   court stating that under the plan, Levona is going to pay

18   everything in the award over to Pach Shemen, but of course

19   that's not right.  As your Honor has already ruled, there are

20   other parties who have rights to that award, and that's Gas and

21   the Preferred Nominees.  And so that is plainly wrong.  I don't

22   think that's what Judge Mastando meant.  I don't think that——

23           THE COURT:  No.  I think, frankly, my sentence really

24   says, under the confirmation order, that the following is the

25   case.  I didn't intend to adjudicate whatever rights those

OBC1ELEC

1   third parties have, and I don't think Judge Mastando did.  So I

2   get that point.  By the same token, though, you shouldn't

3   understand me to be saying that Pach Shemen doesn't have

4   entitlement to a hundred percent of the value collected from

5   Levona.  That matter is an open issue, I think.  In other

6   words, there's no judgment that has been entered that

7   determines those rights.

8         MR. SOLOMON:  So that our position is clear, your

9   Honor, I believe that the award, the final award has the rights

10  that it has under New York convention.  I do not believe that

11  your Honor disturbed that.  I do not believe Judge Mastando was

12  intending to change——

13        THE COURT:  You and I aren't saying anything

14  different.  I'm saying there's been no judgment; you're saying

15  there's a contractual right that is conferred by the award.

16        MR. SOLOMON:  Well, I was saying more, your Honor.  I

17  was saying that Judge Mastando wasn't——I don't think we have a

18  contract clause——I don't think this is now raised to the

19  constitutional level of whether the bankruptcy court had the

20  right to take the contract rights away from the parties to whom

21  your Honor has said they have it.  I don't think——I just——

22        THE COURT:  I get the point.  I think I get the point.

23        MR. SOLOMON:  And so that is the prejudice, and I

24  believe every day that we are stayed, we are being prejudiced.

25  And I'm not suggesting that there may not come a time when

OBC1ELEC

1    someone is going to present your Honor with evidence——and it's

2    not that I have it and it's not that I'm——I think there are

3    some——

4          THE COURT:  So tell me, if I lift the stay, what that

5    means as a practical matter for the next couple of weeks.

6          MR. SOLOMON:  I think that we need to get whoever else

7    feels they have an interest in this case to apply to your

8    Honor, to see whether there are other parties that your Honor

9    will feel should properly be parties to this matter.

10         THE COURT:  I think that makes sense.  I'll turn to

11   Mr. Nesser, but if there are parties who want to move to

12   intervene, that my stay not prevent them from moving to

13   intervene.

14         MR. SOLOMON:  Second, we were in the process of

15   preparing our discovery, what passes for cooperation in these

16   matters actually was occurring, and we were narrowing lists of

17   key terms, of what was going to be produced.  I believe that

18   all should continue.  We have in front of your Honor motions to

19   compel and motions for third-party discovery, and we think that

20   that should continue.  I think discovery should continue.

21   That's where we were when your Honor entered the stay.

22         THE COURT:  One of my concerns with respect to the

23   motions for discovery is that there's an issue, as you know,

24   about compelling communications to and from lawyers, and in the

25   possession of lawyers, people from your firm.  The privilege

1    belongs to Holdings or to Holdings and Corp., as I now

2    understand it, and it would be within their prerogative to

3    either insist on the privilege or to waive the privilege.  That

4    doesn't dispose of the question as to whether there's an

5    exception to the privilege, but it may make it unnecessary for

6    me to decide that question, and in a case like this, where

7    equitable tolling is a question, why would you have me spend a

8    whole bunch of time addressing an issue that may not be a ripe

9    issue, or an issue I have to decide?

10             MR. SOLOMON:  I would like to say three things about

11   that, your Honor.

12             THE COURT:  Okay.

13             MR. SOLOMON:  The first is that we believe they have

14   placed their communications at issue, and so we also need your

15   Honor at some point to address the waiver question at the

16   Levona level.  First thing I'd like to say.

17             Second thing I'd like to say is that even if Holdings

18   has new owners, I believe, under the New York Court of Appeals

19   decision in *Tekni-Plex*, the particular issues that have been

20   litigated here do not get waived, and we will address that at

21   the appropriate time.

22             And the third thing I'd like to say is—

23             THE COURT:  Why not?  Just give me a preview.

24             MR. SOLOMON:  Oh, because what *Tekni-Plex* says is that

25   if you have privileged information that relates to the running

OBC1ELEC

1   of the business, okay, then the new owners should have access

2   to it.  And I do not believe that we're going to be taking a

3   contrary position.  I don't know what other counsel is going to

4   say.  I don't believe we're going to be taking a contrary

5   position.  Insofar as it doesn't relate to the running of the

6   business but it relates to the matter that brought you

7   together, in that case, as a merger, there was a dispute——

8           THE COURT:  I understand.

9           MR. SOLOMON:  What the Court of Appeals said is it

10   would chill attorney-client privilege manifestly and too much,

11   and they didn't require the waiver in those circumstances.

12           But the third thing I'd like to say is that it feels

13   like we have a whole wall to paint, and I'd like to paint it as

14   quickly as possible.  There's a lot of discovery that doesn't

15   involve that particular issue.  Why don't we set that issue

16   aside.  We can just set that issue aside.  Discovery isn't

17   going to all happen in one place.  Your Honor had given us a

18   couple of months to get it done.  I still would like to try to

19   maintain that schedule.  But why don't we put off the issue of

20   waiver so that your Honor can address it at an appropriate

21   time.  We're prepared to do that.

22           THE COURT:  Okay.  Anything else before I turn to

23   Mr. Nesser?

24           MR. SOLOMON:  Thank you, your Honor.

25           THE COURT:  Mr. Nesser, anything?

OBC1ELEC

1         One thing I'm focused on is that under the plan, the

2    plan doesn't become effective until the conditions precedent

3    are satisfied, and there's a lengthy list of conditions

4    precedent.

5         MR. NESSER:  Your Honor, I direct you to paragraph 9.2

6    in that same section of conditions precedent, which specifies

7    that each of the conditions precedent are waivable.  And again,

8    as I indicated earlier, my understanding from Togut, who are

9    representatives of the plan proponents, is that the plan, as

10   they understand it, will be going effective in the next couple

11   of days.

12        THE COURT:  Okay.  All right.  Here's what I think

13   makes sense.  And I'll ask each of you to ask for any kind of

14   clarification.

15        I'm prepared to modify the stay to the following

16   extent: to permit the filings of motions to intervene by Gas

17   and by the other people who are beneficiaries of the award.

18   I'm also prepared to lift the stay to require responses to the

19   motions by Mr. Solomon and his client to third-party discovery.

20   And we can talk about the timetable for those.  And then I

21   would keep the stay of discovery in effect in all other

22   respects.  And I think we should have another conference

23   probably at the beginning of December to see where things

24   stand.  It may be that after I get the motions to intervene,

25   depending on what happens with the motions to intervene, it

OBC1ELEC

1    would make sense to put that conference off for a little bit,

2    but I think I should know, and everybody would benefit from

3    knowing who's at the table before we go forward with a whole

4    lot of paper discovery and depositions.

5         MR. NESSER:  Your Honor, one point, just on

6    sequencing.  It's not quite clear to me how there could be a

7    motion to intervene that would satisfy the standard before the

8    effective date occurs.  In other words, the entire premise of

9    these motions to intervene is that, our interests aren't

10   represented because Holdings is no longer Holdings, and so, you

11   know, if what Mr. Solomon is saying is correct, which I don't

12   concede and don't believe is correct, but assuming that they

13   are in fact going to take this position that something in

14   Liberia is going to interfere with the changeover and so forth

15   and so on, that I think has pretty significant implications for

16   when the intervention would and could be addressed.

17        THE COURT:  Mr. Solomon, can the motions be filed

18   before the plan is declared effective?

19        MR. SOLOMON:  They can, your Honor, yes.  The matter

20   before your Honor, as your Honor has actually observed, isn't

21   controlled by the bankruptcy, isn't controlled by what's going

22   on in the bankruptcy.  Levona has filed a letter, and they have

23   said this is what they intend to do.  They intend to take out

24   Holdings, they intend to get rid of us, they intend to——

25        THE COURT:  So you don't need to argue the point now,

OBC1ELEC

 1    but it's sufficient to me that you, as somebody who represents,

 2    along with others, those entities, are taking the position that

 3    a motion could be filed.

 4            I'll listen to Mr. Nesser then about whether the

 5    standards are satisfied.  Isn't that right, Mr. Nesser?

 6            MR. NESSER:  I'm sorry, your Honor.  Number one, I

 7    don't understand in what world Reed Smith could be representing

 8    any of those entities.

 9            THE COURT:  Okay.  I mean, you can then make that

10    argument at the time.  You can say that there's a conflict.

11            MR. NESSER:  No, no, of course.  I just mean for

12    purposes of the statements that are being made today, I don't

13    know on whose behalf they're being made.  He's saying things

14    about what some other party might do.

15            THE COURT:  But all I'm permitting is the motion to be

16    made.

17            MR. NESSER:  I understand.  I just wanted to be clear

18    that insofar as your Honor is making that ruling in reliance on

19    representations that counsel to Eletson is making, all I'm

20    saying—and it may be irrelevant, but all I'm saying is it's

21    clear to me that counsel sitting here has no authority to speak

22    on behalf of those other entities in terms of when they might

23    want to file.

24            THE COURT:  I don't understand that point, and in

25    fact, I think in my previous order I made that clear.

OBC1ELEC

1          MR. NESSER:  Yes.

2          THE COURT:  And it may in fact be the case that those

3    entities do not want to file a motion to intervene until after

4    the plan is declared effective, if the plan is declared

5    effective.  All I am saying is that my stay is not going to

6    prevent a filing of a motion to intervene, and that we're going

7    to have a conference at some date in probably early December

8    where we may have a better sense as to who's at the table.

9          MR. NESSER:  That's perfectly well understood, your

10   Honor.  It's just the point your Honor was making, as I

11   understood it, was, let's come back at the beginning of

12   December, understand who's at the table.  But, again, it just

13   seems to me as if—what Mr. Solomon said in his letter when he

14   addressed these intervention issues is, until now, Gas and the

15   nominees were represented by the parties in the case—that's

16   what he said—and therefore, there was no need for those

17   entities to intervene, but when and if the effective date

18   occurs, those entities will no longer be represented in the

19   case and therefore there will be grounds to intervene, and so

20   having said that—and again, I suppose it's fair—if the answer

21   is that, well, I'm just Reed Smith and I don't represent those

22   other entities, and maybe that's the answer, but it just seems

23   to me that if the entire premise of the intervention motion is

24   that there's been a change in management or ownership of

25   Eletson Holdings, how can there be an intervention motion

OBC1ELEC

1  before there's been a change in management of Holdings?  But I

2  heard your Honor saying you're not requiring any filing, you're

3  just permitting a filing, so I'm happy to—

4          THE COURT:  So how soon can you file your responses to

5  the motions for letters of request?

6          MR. NESSER:  Is a week acceptable?

7          THE COURT:  That's fine with me.  So that would be

8  November 19th.

9          And Mr. Solomon, why don't you, if there's a need for

10  a reply, respond on November 26th.

11         MR. SOLOMON:  Thank you, your Honor.

12         MR. NESSER:  And your Honor, we would expect to file

13  one consolidated response to all of those motions.

14         THE COURT:  Mr. Solomon, any reason why you can't file

15  a consolidated reply to all of those?

16         MR. SOLOMON:  No objection.

17         THE COURT:  It will reduce the paperwork for me.

18         MR. SOLOMON:  No objection.

19         THE COURT:  Okay.  And then let me give you a date for

20  a conference in early December.

21         Somebody can take back the copy of the plan.  Thank

22  you.

23         MR. ORTIZ:  Thank you, your Honor.

24         MR. SOLOMON:  Your Honor, since the 1st is a Sunday,

25  could we see if the Court has any availability on the 2nd?

OBC1ELEC

```
 1              THE COURT:  December 5th at 3:00.  Does that work for
 2   you, Mr. Solomon?
 3              MR. SOLOMON:  It does, your Honor.  Thank you.
 4              THE COURT:  And Mr. Nesser?
 5              MR. NESSER:  Your Honor, unfortunately, it does not.
 6   That would be in person, yes?
 7              THE COURT:  I think so, yes.
 8              MR. NESSER:  Unfortunately that date doesn't work for
 9   me.
10              THE COURT:  Does December 6th at 2:30 work for you,
11   Mr. Solomon?
12              MR. SOLOMON:  It does, your Honor.  If we go long, I'm
13   going to have to excuse myself, but——
14              THE COURT:  Let me see if we can schedule it a little
15   bit earlier.
16              Is 12 noon better for you?
17              MR. SOLOMON:  Yes, very much so, but only if it's
18   convenient for the Court.
19              THE COURT:  I wouldn't have suggested it otherwise.
20              And Mr. Nesser, December 6th at 12 noon?
21              MR. NESSER:  Yes, your Honor.
22              THE COURT:  Okay.  All right.  We're adjourned.
23                              o0o
24
25
```

**Exhibit 2**



**Louis M. Solomon**
Direct Phone: +1 212 549 0400
Email: lsolomon@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

November 20, 2024

**Via ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street, Room 1620
New York, NY 10007

*Re: In re Eletson Holdings, Inc., et. al.,* Civil No. 1:24-cv-05096-LJL

Dear Judge Liman:

We write as counsel for Eletson Corporation ("Corp") in connection with the Notice of Appearance filed yesterday by the law firm Togut, Segal & Segal LLP ("Togut") purporting to appear on behalf of Eletson Holdings, Inc. ("Holdings") (ECF No. 210). We note that, pursuant to Section 2.5(a) of the *Petitioning Creditors' Revised Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliates Debtors* (the "Plan") (Bankr. ECF No. 1132), Reed Smith's representation of Holdings was purportedly terminated as of yesterday, the date upon which the Plan was declared effective (*see* Bankr. ECF No. 1258).

On behalf of Corp (whom we still represent), we wish to apprise the Court that the purported new shareholders of Holdings (a Liberian corporation with its principal place of business and center of main interests in Greece) have made no showing that they have taken the steps necessary under Liberian and Greek law to confirm their capacity to act on behalf of Holdings in this or any other forum. In addition, as of November 12, 2024, a court in Piraeus, Greece, issued an order constituting a provisional board of directors for Holdings, with responsibility to undertake corporate actions, including specifically the retention of outside counsel in this proceeding. We have not been informed that the provisional board has exercised its power to appoint Togut, or any law firm other than Reed Smith (which we understand has been directed to act), to represent Holdings in this matter.

We request that the Court refrain from accepting Togut's capacity to speak for Holdings until the issues surrounding who has the capacity to speak for Holdings can be sorted out.

Respectfully,

Louis M. Solomon

cc:     Counsel of Record (via ECF)

**Exhibit 3**

# ReedSmith

**Driving progress**
*through partnership*

**Louis M. Solomon**
Direct Phone: +1 212 549 0400
Email: lsolomon@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

November 12, 2024

**Via ECF**

Honorable John P. Mastando
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, New York 10004

**Re: *In re Eletson Holdings, Inc., et al.*, Bankr. S.D.N.Y. 1:23-bk-10322 (JPM)**

Dear Judge Mastando:

As counsel for Debtors, we write in response to the letter submitted by the Petitioning Creditors on November 6, 2024 [ECF 1227].

At no point has any Debtor or Reed Smith failed to cooperate in any way with the Petitioning Creditors in connection with the consummation of the *Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [ECF 1132, Ex. 1] (the "Plan").[1] The transaction contemplated under their Plan is the reconstitution of Eletson Holdings, Inc. ("Eletson Holdings"), in accordance with applicable non-bankruptcy law. Those documents evidencing that implementation are contained within their Plan Supplement. There has been no information request provided whatsoever – nor has any information been withheld – that relate to that documentation.

Instead, the information requests made by the Petitioning Creditors related to operations and information that is maintained by "lower level" subsidiaries of the Debtor. They do not deal with implementation of the Plan. Except for the representations previously disclosed, none of those entities is a client of Reed Smith, and Reed Smith does not represent them. Nevertheless, the information requests made by the Petitioning Creditors have been provided to the officers of the Debtors who, we are advised, are taking legal advice under applicable non-bankruptcy law (not from Reed Smith) as to their ability to respond. In that regard, in an effort to cooperate with the Petitioning Creditors, the board of Eletson Holdings (the "Board") sought advice regarding the enforceability of the Confirmation Order in Liberia and Greece. As noted in the email communication attached as Exhibit A to this letter, a recognition proceeding is needed in both Liberia and Greece to ensure the Confirmation Order's enforceability. It is for this reason that certain information pertaining to the Debtors' non-debtor foreign subsidiaries has yet to be remitted to the Petitioning Creditors. Further, even though it is not required, Reed Smith cooperated with Counsel to the Petitioning Creditors by providing them specific identification of materials that have been previously produced to them which were in Reed Smith's possession. See the attached e-mail correspondence as Exhibit B to this letter.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

ABU DHABI ♦ ASTANA ♦ ATHENS ♦ AUSTIN ♦ BEIJING ♦ BRUSSELS ♦ CENTURY CITY ♦ CHICAGO ♦ DALLAS ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG
HOUSTON ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH ♦ NEW YORK ♦ ORANGE COUNTY ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH
PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

Honorable John P. Mastando
November 12, 2024
Page 2



The Petitioning Creditors' protestations around the implementation of their own Plan does not take cognizance of applicable non-bankruptcy corporate formalities that must be undertaken in order to obtain the information they request.  Indeed, their own Plan suggests that certain actions, pursuant to applicable non-US law, may need to be undertaken for implementation of the Plan. *See* Plan, §§ 5.2 & 9.1. The Petitioning Creditors' apparent lack of appreciation of the intricacies of non-US corporate formalities to be undertaken is not a failure of Reed Smith to cooperate; it is a misapprehension by the Petitioning Creditors of the implementation of their own Plan.

Reed Smith has not prevented implementation of the confirmed Plan.  Upon the lawful Effective Date and the proper reconstitution of Eletson Holdings under applicable non-bankruptcy law, the Petitioning Creditors owning the reissued equity will be entitled to exercise whatever rights they are entitled to under applicable non-bankruptcy law as provided for in the Plan and that applicable law.  Reed Smith has done nothing to interfere or obstruct those rights.

Finally, we would like to inform the Bankruptcy Court that Reed Smith was recently advised that four members of the Board have resigned and that there are currently ongoing court proceedings to fill those vacancies.

Respectfully submitted,

Louis M. Solomon

Counsel of record

# EXHIBIT A

**From:**      DANIOLOS John Markianos <j.markianos@daniolos.gr>
**Sent:**      Tuesday, November 12, 2024 2:43 PM
**To:**        Solomon, Louis M.; Underwood, Colin A.; V. Hadjieleftheriadis; Manolis Andreoulakis (Eletson)
**Subject:**   Eletson Holdings

External E-Mail - FROM DANIOLOS John Markianos <j.markianos@daniolos.gr>

Dear Mr. Solomon,

I represent the members of the Board of Directors of Eletson Holdings Inc.

We have seen the request of the law firm Togut, Segal & Segal LLP for a notification to be sent to the Liberian International Ship & Corporate Registry (LISCR) regarding a change of the so called "Address of Record", which we are considering.

However, as preliminary remarks, it is important to note the following:

1. As per clear legal advice of Liberian counsel, the effects/enforceability of a New York judgment cannot be automatically recognized in Liberia and needs to be confirmed by a Liberian Court, before any such corporate action may be taken.

2. The principal place of business and centre of main interests of Eletson Holdings Inc. is Greece and therefore any relevant New York judgment would also need to be recognized in Greece, in accordance with applicable Greek law and the European Insolvency Regulation.

3. Last but not least, four out of the eight Board members of Eletson Holdings Inc. have resigned which rendered necessary the judicial appointment of substitute Board members by the competent Greek court. Until the new board is properly constituted an appropriate course of action cannot be decided.

We shall revert with further developments.

Yours Sincerely,
John Markianos-Daniolos

Στάλθηκε από [Outlook για Android](https://outlook.com)

# EXHIBIT B

| From: | Baker, Derek J. |
|---|---|
| Sent: | Friday, November 8, 2024 4:38 PM |
| To: | Bryan Kotliar; Solomon, Louis M. |
| Cc: | Leila Ebrahimi; Osei-Bonsu, Derek M.; Kyle Ortiz; Amanda Glaubach; Martha Martir; Eletson Bankruptcy Team (S) |
| Subject: | RE: Eletson - Closing Matters |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Flagged |

Bryan:

In response to your request that ReedSmith provide information WE have in response to your request that ReedSmith provide you information that ReedSmith has in response to your information requests, our responses are in **Bold**:

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all entities –
    - **EletsonBK093425-094686; EletsonBK097123-97308; EletsonBK093258-093291; 093448-93559; 094249-94300; 094409-94482; 097025-097108.**
- Copies of all loan documents for all entities:
    - **Piraeus - EletsonBK025683-25809.**
    - **ABB - EletsonBK017075-17084; EletsonBK024299 - 24401.**
    - **Alpha Bank - EletsonBK016657-58; EletsonBK16673-79;  EletsonBK024426.**
    - **CitiBank EletsonBK024746 - 24790.**
- List of all board members and officers for all entities
    - **There are no lists that have been produced. However, the board members are listed on the minutes discussed in the Board Minutes and Resolutions EletsonBK093258-093291; 093448-93559; 094249-94300; 094409-94482; 097030-097108)**
- List of all legal, financial and other professionals retained / employed by each entity and outstanding amounts due to each
    - **We presume you have the various fee statements for ReedSmith and the various debtor professionals for Holdings and ReedSmith for Corp. as identified in the filed documents**
- List of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities
    - **See DIP Schedule 4(g)**

**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100

F: +1 215 851 1420
**reedsmith.com**

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, November 7, 2024 9:11 AM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>
**Cc:** Baker, Derek J. <DBaker@ReedSmith.com>; Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

Following up on m email below.  Please provide as much of the requested information as possible on a rolling basis as soon as possible.  That includes any information in Reed Smith's possession or control.

Best regards,

Bryan

———

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

TOGUT SEGAL & SEGAL LLP

On Nov 6, 2024, at 12:01 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Thank you Lou.  You can send us whatever documents you have on a rolling basis and let us know the timing for receiving the balance.

There were also other items in my email such as identification of key employees and a transition team as well as a question about your cooperation with us per the Confirmation Order.  We'd appreciate your response to the entire email.

Best regards,

Bryan

———

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

2

**Exhibit 4**

# TOGUT, SEGAL & SEGAL LLP

**ONE PENN PLAZA**
**NEW YORK, NEW YORK 10119**
———
**WWW.TOGUTLAWFIRM.COM**
———
**(212) 201-5000**

As of November 19, 2024

**PRIVILEGED AND CONFIDENTIAL**

**Via E-mail**

Reorganized Eletson Holdings, Inc. and certain of its subsidiaries and affiliates
Attn: Adam Spears, CEO & President
(adam.spears@eletsonholdings.com)

      Re:     Representation of Reorganized Eletson Holdings, Inc.

Dear Adam:

      Thank you for selecting Togut, Segal & Segal LLP (the "<u>Togut Firm</u>") as counsel to Reorganized Eletson Holdings Inc. and certain of its subsidiaries and affiliates (together, "<u>Eletson Holdings</u>" or the "<u>Client</u>"), as reorganized pursuant to that certain *Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* [Docket No. 1132, Ex. 1] (the "<u>Plan</u>"), which went effective on November 19, 2024 (the "<u>Plan Effective Date</u>").  As you know, we represented Pach Shemen LLC ("<u>Pach Shemen</u>") and certain other petitioning creditors during Eletson Holdings' chapter 11 cases.

      As we have discussed, the Togut Firm will serve as counsel for Eletson Holdings in carrying out the Plan and closing its chapter 11 case, including, but not limited to, prosecuting and resolving pending and potential objections to claims, prosecuting and resolving any claims and causes of action belonging to Eletson Holdings such as the Retained Causes of Action (as defined in the Plan), and such other matters on which we may agree (collectively, the "<u>Matter</u>").

      As part of our firm's routine in opening new files, we provide a retention and fee letter to all clients.  The purpose of this letter is to generally set forth our understanding of the legal services to be performed and the basis on which our firm will be paid for those services.  Accordingly, this letter confirms our willingness to represent you in connection with the Matter.

      Our firm is a specialty "boutique," and our practice is strictly limited to corporate restructurings and bankruptcy matters, particularly under chapter 11.  To the

Togut, Segal & Segal llp

Eletson Holdings, Inc.
As of November 19, 2024
Page 2

extent that the Client requests or desires other services, including non-bankruptcy-related legal advice or legal services (*e.g.*, regulatory, tax and other non-bankruptcy-related matters), we presume that other counsel will perform such services.  We will of course work closely with you and your other professionals during our engagement.

As to our firm's charges, the beginning point for determining our fees is actual time spent.  For that reason, we have established bookkeeping rates for each of our lawyers and legal assistants.  Work performed by members of the firm that we anticipate being staffed on the Matter range from $1,060 to $1,175 an hour.  The current hourly rates of our associates and counsel range from $445 to $1,195 an hour and are reviewed on, and subject to adjustment, on an annual basis each January.  In addition to fees for legal services rendered, you will be expected to reimburse us for our expenses, including travel, photocopies, postage, fax transmissions, telephone, computer-assisted legal research, overtime for secretarial staff, late meals, outside technical/computer support, etc.

We are not aware of any conflict of interest that would prevent us from acting for you in respect of the Matter that is the subject of this letter.  Our firm represents many other companies and individuals, and it is possible that during the time that we are representing you, some of our present or future clients will have transactions or disputes with them.  You acknowledge that the firm is a bankruptcy boutique with a regular practice of representing companies in connection with out-of-court restructurings and in-court proceedings, including under Chapter 11 of the Bankruptcy Code.  In connection with representing debtors in bankruptcy proceedings, you acknowledge that we may be required to disclose our representation of you in connection with the Matter.  You also acknowledge that we currently represent, and may in the future represent, other creditors and other parties in connection with the Matter, and you will not seek to disqualify the firm or assert any actual or potential conflicts of interest with respect to such other matters.  You further acknowledge and agree that, to the extent that the firm undertakes any future representation that would create a conflict of interest with you as it relates to such future matter, the firm may terminate its engagement with you, and you will not seek to disqualify or oppose the firm on such other matter.

You agree that we may continue to represent or may undertake in the future to represent existing or new clients in any matter that is not related to the work for you in the Matter ("Unrelated Matters"), and that you will not oppose or seek to oppose or disqualify the firm from representing any debtors in connection with any bankruptcy proceedings so long as such representation of such debtors is not substantially related to the Matter.  We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence with respect to Unrelated Matters shall not apply in any instance where, because of our representation of you, we have obtained proprietary or other confidential information of a non-public nature, that if

TOGUT, SEGAL & SEGAL LLP

Eletson Holdings, Inc.
As of November 19, 2024
Page 3

known to such other client, could be used in any such other matter by such client to your material disadvantage.

We are under a strict duty of confidentiality to you in respect to the Matter. We shall keep strictly confidential all confidential or proprietary information obtained from the Client or from any representatives, affiliates, financing sources, or agents during the performance of our services hereunder ("Confidential Information"), and we, our personnel, and anyone else working on our behalf will not disclose or use any Confidential Information other than in the ordinary course of providing services to the Client pursuant to this engagement. "Confidential Information" includes, without limitation, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the client or any of its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors or consultants, or otherwise related to the engagement. Upon completion of the services, and at your request, we will promptly return or destroy all Confidential Information (without retaining any copies). For the avoidance of doubt, "Confidential Information" shall not include information which (i) is or becomes publicly available other than as a result of a disclosure by us in violation of this agreement, (ii) is or becomes available to us on a non-confidential basis from a source (other than you or your affiliates) which is not prohibited from disclosing such information to us by a legal contractual or fiduciary obligation with respect to such information, or (iii) is independently developed by us without the use of Confidential Information.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, us from disclosure required by applicable law or legal, administrative, or judicial process, but we shall not encourage, suggest, invite, or request, or assist in securing, any such disclosure. We will immediately inform you in advance (unless prohibited by law), of any such disclosure, will only disclose that portion of the Confidential Information permitted by law to be disclosed, and will use its best efforts to ensure confidential treatment is afforded to such Confidential Information.

Togut, Segal & Segal llp

Eletson Holdings, Inc.
As of November 19, 2024
Page 4


You may telephone me upon your receipt of this letter if you have any questions.  We look forward to working with you on this Matter.

Very truly yours,

TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*

Kyle J. Ortiz
A Member of the Firm

**CONSENTED TO AND AGREED BY:**

Reorganized Eletson Holdings, Inc. and certain of its subsidiaries and affiliates


By:   Adam Spears
Chief Executive Officer & President

Togut, Segal & Segal LLP

Eletson Holdings, Inc.
As of November 19, 2024
Page 4

You may telephone me upon your receipt of this letter if you have any questions.  We look forward to working with you on this Matter.

Very truly yours,

TOGUT, SEGAL & SEGAL LLP
By:

_____
Kyle J. Ortiz
A Member of the Firm

**CONSENTED TO AND AGREED BY:**

Reorganized Eletson Holdings, Inc. and certain of its subsidiaries and affiliates

*Adam Spears*
_____
By:   Adam Spears
        Chief Executive Officer & President

**Exhibit 5**

**From:** **Leila Ebrahimi** lebrahimi@teamtogut.com
**Subject:** Eletson - Closing Matters
**Date:** October 28, 2024 at 9:04 AM
**To:** Baker, Derek J. DBaker@reedsmith.com, Osei-Bonsu, Derek M. DOsei-Bonsu@reedsmith.com
**Cc:** Bryan Kotliar bkotliar@teamtogut.com, EXT Kyle Ortiz kortiz@teamtogut.com, Amanda Glaubach aglaubach@teamtogut.com, Martha Martir mmartir@teamtogut.com

Reed Smith Team,

We'd like to begin the process of working with you, the Debtors, and the other parties on consummating the PC Plan in accordance with the Court's decision from Friday.  <u>**Please let us know when you are available today / tomorrow for a call with us.**</u>

Attached is an initial draft of a closing checklist that we've prepared.  You'll see we are starting to work through various items with the parties this week, and will be emailing all of the parties (including you) regarding scheduling all hands closing calls.  We will circulate updated versions throughout the coming weeks.

As for the Debtors and their subsidiaries, you will see there various items that we need from the Debtors and their subsidiaries.  In particular, there are a few high priority diligence items (see Part A, Row 2) that we'd like to receive by no later than this Wednesday, October 30.  We've excerpted this below for your convenience.

In addition, as for various third party transition matters, we'd like for you to coordinate scheduling calls with Oaktree and the Company's other historical lenders.

Let us know if you have any questions regarding the above, thank you.

Best Regards,
Leila

### <u>HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30</u>

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all entities
- Copies of all loan documents for all entities
- List of board members and officers for all entities
- List of all legal, financial, and other professionals retained / employed by each entity and outstanding amounts due to each
- List of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities

—
**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5583 | Mobile: +1 201 961 3262
lebrahimi@teamtogut.com | togutlawfirm.com

**Eletson - PC Plan Closing Checklist.docx** 

**Exhibit 6**

**From:** **Bryan Kotliar** bkotliar@teamtogut.com
**Subject:** Re: Eletson - Closing Matters
**Date:** October 30, 2024 at 10:20 AM
**To:** Baker, Derek J.  DBaker@ReedSmith.com
**Cc:** Leila Ebrahimi lebrahimi@teamtogut.com, Osei-Bonsu, Derek M.  DOsei-Bonsu@reedsmith.com, Kyle Ortiz kortiz@teamtogut.com
, Amanda Glaubach aglaubach@teamtogut.com, Martha Martir mmartir@teamtogut.com, Eletson Bankruptcy Team (S)
EletsonBankruptcyTeam@reedsmith.com

Good morning Derek,

Following up again on the below emails and requests.

In addition and in particular - as it relates to employees - as you know, the Court-confirmed PC Plan provides for the establishment of an employee incentive plan.  Please identify and put us in touch with key personnel (again, in addition to the employee-related requests for information in my email below).

Best regards,

Bryan


**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**Togut Segal & Segal LLP**

> On Oct 29, 2024, at 4:55 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Derek,
>
> Following up on my emails below.  Please let us know what information we can expect to receive and when.  Let us know if you'd like to have a call to discuss.
>
> Best regards,
>
> Bryan
>
>
> **Bryan M. Kotliar | Partner**
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335 | New York, NY 10119
> Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
> bkotliar@teamtogut.com | togutlawfirm.com
>
> <597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>
>
>> On Oct 28, 2024, at 7:23 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>>
>> Derek,
>>
>> As you know, the Court confirmed the PC Plan.  Thus, we have every right to work to effectuate that plan promptly.  This is particularly so considering the current liquidity situation with the DIP being nearly fully drawn.
>>
>> In light of these circumstances, we are working with all of the parties to implement the plan as quickly as possible and save these estates needless administrative expenses.  It is also critical to ensuring a smooth transition of the Debtors' and their non-debtor subsidiaries' operations, which is in their best interests.
>>
>> You, the Debtors, and their current shareholders have no basis to refuse to cooperate with us and the other parties in effectuating the Court's order.  We are asking you for the information that you have or that you have access to (such as, by way of Eletson Holdings' ownership of its subsidiaries to which they owe fiduciary duties).  There are obviously instances where you do not have information, but we are asking for your assistance in obtaining it.
>>
>> Thus, please let us know what information that you have that you will provide, by when, and what you do

not have that you will assist us with obtaining.  As for Reed Smith's fees related to this work, to the extent that you are assisting in a productive and good faith manner, we will not object to such fees.

Best regards,

Bryan

—

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 28, 2024, at 5:38 PM, Baker, Derek J. <DBaker@ReedSmith.com> wrote:

All – we are in receipt of your email; however, it is likely a bit premature at this point.  The Debtors – under the direction of the Shareholders and in the exercise of their fiduciary duties – are reviewing the Decision.   An initial review of the attached appears to call for actions from parties other than the Debtor (which ReedSmith does not represent) and from persons that a shareholder of the Debtor does not have any right to direct under applicable non-bankruptcy law.

We also want to understand the requests being made and want confirmation that any actions requested to be undertaken and undertaken by ReedSmith (as well as any costs incurred in responding to any objections to fee statements submitted) will be compensated and will not be otherwise subject to any objection by Pach Shemen or anyone affiliated with it (including Levona, the Indenture Trustee(s), the Committee or any other person acting upon information provided or directed by PS).  Please confirm.

**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

**From:** Leila Ebrahimi <lebrahimi@teamtogut.com>
**Sent:** Monday, October 28, 2024 9:05 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>
**Cc:** Bryan Kotliar <bkotliar@teamtogut.com>; EXT Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>
**Subject:** Eletson - Closing Matters

**External E-Mail - FROM lebrahimi@teamtogut.com <lebrahimi@teamtogut.com>**

Reed Smith Team,

We'd like to begin the process of working with you, the Debtors, and the other parties on consummating the PC Plan in accordance with the Court's decision from Friday.  **Please let us know when you are available today / tomorrow for a call with us.**

Attached is an initial draft of a closing checklist that we've prepared.  You'll see we are starting to work through various items with the parties this week, and will be emailing all of the parties (including you) regarding scheduling all hands closing calls.  We will circulate updated versions throughout the coming weeks.

As for the Debtors and their subsidiaries, you will see there various items that we need from the Debtors and their subsidiaries.  In particular, there are a few high priority diligence items (see Part A, Row 2) that we'd like to receive by no later than this Wednesday, October 30.  We've excerpted this below for your convenience.

In addition, as for various third party transition matters, we'd like for you to coordinate scheduling calls with Oaktree and the Company's other historical lenders.

Let us know if you have any questions regarding the above, thank you.

Best Regards,
Leila

**HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30**

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all entities
- Copies of all loan documents for all entities
- List of board members and officers for all entities
- List of all legal, financial, and other professionals retained / employed by each entity and outstanding amounts due to each
- List of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities

—
**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5583 | Mobile: +1 201 961 3262
lebrahimi@teamtogut.com | togutlawfirm.com

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021

<Eletson - PC Plan Closing Checklist.docx>

**Exhibit 7**

**From:** **Bryan Kotliar** bkotliar@teamtogut.com ▪
**Subject:** Re: Eletson - Closing All Hands
**Date:** November 4, 2024 at 5:35 PM
**To:** Baker, Derek J.  DBaker@ReedSmith.com
**Cc:** Leila Ebrahimi  lebrahimi@teamtogut.com, Osei-Bonsu, Derek M.  DOsei-Bonsu@reedsmith.com, Catherine LoTempio lotempio@sewkis.com, gayda@sewkis.com, Mehak Rashid  Mehak@legalscale.com, neil@legalscale.com, Herman, David David.Herman@dechert.com, Zide, Stephen  Stephen.Zide@dechert.com, Haney, Owen Sargent  Owen.Haney@dechert.com, Michael.Cordasco@fticonsulting.com, Joseph.Sternberg@fticonsulting.com, Marshall.Eisler@fticonsulting.com, Moss, Tina N. (Perkins Coie)  TMoss@perkinscoie.com, kim.havlin@whitecase.com, philip.abelson@whitecase.com, Bae, John John.Bae@thompsonhine.com, James Lee  james.lee@veritaglobal.com, Leanne Rehder Scott  lscott@veritaglobal.com, bsparkman@chaloslaw.com, Kyle Ortiz  kortiz@teamtogut.com, Martha Martir  mmartir@teamtogut.com, Amanda Glaubach aglaubach@teamtogut.com, Jasper, Paul S. (Perkins Coie)  PJasper@perkinscoie.com

Derek,

Pursuant to the Confirmation Order [ECF 1223], including, without limitation, paragraphs 5(i) and 5(iii) thereof, the Petitioning Creditors hereby instruct the Debtors to, and to cause their non-Debtor subsidiaries (the "Subsidiaries") to, do and provide the following:

- (1) Provide an employee roster for all Subsidiaries, identify key personnel, and facilitate and schedule / coordinate discussions with the Petitioning Creditors' representatives and employees; identify payroll provider and personnel involved in coordinating payroll

- (2) Provide copies of all employment-related agreements with Subsidiaries, including, without limitation, any agreements regarding employment, services, separation, retention, severance, incentive, bonus, consulting, contractor or related agreements or arrangements

- (3) Provide copies of any employee benefit plans and retirement plans at the Subsidiaries

- (4) Provide copies of (or otherwise access to) all books and records of the Debtors and the Subsidiaries, including all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all Subsidiaries

- (5) Provide copies of loan agreements, liens, indemnification agreements, and agreements for indebtedness for all Subsidiaries; if any of the foregoing does not exist in a written agreement, provide a description of all such agreements

- (6) Provide a list of all members of the board (or other similar governing body) and officers for all Subsidiaries, including contact information and KYC/AML information for each; identify whether any counsel (in house or otherwise) representing any officers or directors in any legal actions

- (7) Provide a list of all legal, financial, and other professionals retained / employed by the Debtors and all Subsidiaries, outstanding amounts due to each, and points of contact

- (8) Provide a list (or other description) of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by the Debtors and all Subsidiaries

- (9) Provide copies of all insurance policies, including, without limitation, D&O insurance (including any tail coverage) to which Eletson Holdings is listed as an additional insured and information related to any insurance benefits, including claims, rights, and proceeds, arising therefrom.

- (10) Provide a list of material contracts and material suppliers for all Subsidiaries

- (11) Provide a list of all bank accounts and authorized signatories for all Subsidiaries, along with approved users, account information, and points of contact at each bank

- (12) Identify personnel responsible for IT and related services and provide access to Eletson's email platform and website

- (13) Identify employee(s) responsible for assisting the Petitioning Creditors and their counsel with consummating the Plan and transitioning the ownership and management of the company, including providing available days and times this week to discuss closing matters

Finally, paragraph 5(i) of the Confirmation Order directs the Debtors to cooperate with the Petitioning Creditors in good faith to implement and consummate the Plan.  You have still not responded to my question below to that effect, which has been pending for nearly a week.  Please let us know if the Debtors will be cooperating in good faith, and if so, how you plan to do that.

Best regards,

Bryan

---

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**Togut Segal & Segal LLP**

> On Nov 4, 2024, at 6:19 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Derek,

I hope you had a nice weekend. Following up again on the questions in my below emails. When will you be providing responses?

On scheduling the all hands closing calls, please let us know today your availability for days and times this week for those calls. If we do not hear from you today, we will move forward with the following schedule: Tuesday, Thursday, Friday this week at 10am ET.

Best regards,

Bryan

—

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**TOGUT SEGAL & SEGAL LLP**

On Nov 1, 2024, at 10:59 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Good morning Derek,

I hope you had a nice Halloween with the family.

Following up again on my emails below.

(1) Will the Debtors and Reed Smith be cooperating with our requests for information and assisting with closing the PC Plan? In addition to the information requested below, please provide us with contact information and introduce us to the IT people at the company so that we can get the new officers and directors working with the company on having company email addresses / access to emails.

(2) What days and times work for you for the all hands closing calls through tomorrow and next week? You asked for the courtesy of checking with you, so we are working with your availability. Please let us know what that is.

On yesterday's DIP lender call, you indicated along the lines of that you would not be responding on that to call to information about the plan transition as (in your view, which we disagree with) that did not relate to the information and reporting rights under the DIP Credit Agreement. And that you would respond in "due course." We are still waiting for your response. It is imperative that you respond and cooperate so that we can timely close.

Thank you,

Bryan

—

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 31, 2024, at 8:44 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Good morning Derek — Following up again —

(1) Will the Debtors and Reed Smith be cooperating with our requests for information and assisting with closing the PC Plan?

(2) What days and times work for you for the all hands closing calls through tomorrow and next week? You asked for the courtesy of checking with you, so we are working with your availability. Please let us know what that is.

For the rest of the group, this morning's 10am is adjourned until further notice.

Best regards,

Bryan

—

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 30, 2024, at 6:13 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Derek,

The requests are for information from the Debtors and their non-Debtor subsidiaries that they control.

As you know, the Debtors routinely provide information about various subsidiaries. For example, under the DIP Credit Agreement, the Debtors provide ongoing reporting information and variance / budgets with respect to various subsidiaries like the "Budget Parties" that include the SMEs and Eletson Corp. The notion that you cannot provide any information from any entities other than the Debtors is uncooperative and untrue. Also, Reed Smith represents various other subsidiaries from which we are requesting information.

Also, throughout these chapter 11 cases, the Debtors have taken the position that the Debtors, as holding companies, rely on the interdependent relationship with their subsidiaries from which their value is derived. And that the Debtors depend on the ability of their subsidiaries to navigate challenges in real time to distribute sufficient funds to satisfy financial and other obligations. The Debtors have argued before that changes in Holdings management will lead to dislocation within the Eletson enterprise to the detriment of the creditors. Avoiding those issues is in the Debtors', their estates', and their creditors' best interests.

Finally, you have not answered my question. Will the Debtors and Reed Smith be cooperating with our requests for information and assisting with closing the PC Plan? What is the answer to that question?

Best regards,

Bryan

---

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

> On Oct 30, 2024, at 3:48 PM, Baker, Derek J. <DBaker@ReedSmith.com> wrote:
>
> We read most of the information requested to be of entities that are not a Debtor. If you can identify what information you want is "from a debtor" we are happy to review it.
>
> **Derek J. Baker**
>
> dbaker@reedsmith.com
> D: +1 215-851-8148
> M: +1 215-285-1600
>
> **Reed Smith**
> Three Logan Square
> Suite 3100
> 1717 Arch Street
> Philadelphia, PA 19103
> T: +1 215 851 8100
> F: +1 215 851 1420
> **reedsmith.com**

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Wednesday, October 30, 2024 3:43 PM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Catherine LoTempio <lotempio@sewkis.com>; gayda@sewkis.com; Mehak Rashid <Mehak@legalscale.com>; neil@legalscale.com; Herman, David <David.Herman@dechert.com>; Zide, Stephen <Stephen.Zide@dechert.com>; Haney, Owen Sargent <Owen.Haney@dechert.com>; Michael.Cordasco@fticonsulting.com; Joseph.Sternberg@fticonsulting.com; Marshall.Eisler@fticonsulting.com; Moss, Tina N. (Perkins Coie) <TMoss@perkinscoie.com>; kim.havlin@whitecase.com;

Ma. 4 ( CINULU Culu)      wieee@puwmuec.ei.com; nummamm@wmecaee.com;
philip.abelson@whitecase.com; Bae, John <John.Bae@thompsonhine.com>;
James Lee <james.lee@veritaglobal.com>; Leanne Rehder Scott
<lscott@veritaglobal.com>; bsparkman@chaloslaw.com; Kyle Ortiz
<kortiz@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>; Amanda
Glaubach <aglaubach@teamtogut.com>
**Subject:** Re: Eletson - Closing All Hands

**External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>**

Derek -

Will the Debtors and Reed Smith be cooperating with our requests for information
and assisting with closing the PC Plan?

We have outstanding requests to you by separate emails, to which we have not
received any information.  And now you will not answer my question of when you
are available for closing calls with the other parties.

We intend to schedule all hands closing calls - one for later this week and then
daily next week.  If there are days and times that work better for you than others,
please let us know.

Best regards,

Bryan

―――

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

> On Oct 30, 2024, at 3:04 PM, Baker, Derek J.
> <DBaker@ReedSmith.com> wrote:
>
> I don't know that we have anything to report at this time.  I don't want to
> waste anyone's time getting on a call to simply report that.
>
> **Derek J. Baker**
>
> dbaker@reedsmith.com
> D: +1 215-851-8148
> M: +1 215-285-1600
>
> **Reed Smith**
> Three Logan Square
> Suite 3100
> 1717 Arch Street
> Philadelphia, PA 19103
> T: +1 215 851 8100

T: +1 215 851 8100
F: +1 215 851 1420
reedsmith.com

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Wednesday, October 30, 2024 10:21 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Catherine LoTempio <lotempio@sewkis.com>; gayda@sewkis.com; Mehak Rashid <Mehak@legalscale.com>; neil@legalscale.com; Herman, David <David.Herman@dechert.com>; Zide, Stephen <Stephen.Zide@dechert.com>; Haney, Owen Sargent <Owen.Haney@dechert.com>; Michael.Cordasco@fticonsulting.com; Joseph.Sternberg@fticonsulting.com; Marshall.Eisler@fticonsulting.com; Moss, Tina N. (Perkins Coie) <TMoss@perkinscoie.com>; kim.havlin@whitecase.com; philip.abelson@whitecase.com; Bae, John <John.Bae@thompsonhine.com>; James Lee <james.lee@veritaglobal.com>; Leanne Rehder Scott <lscott@veritaglobal.com>; bsparkman@chaloslaw.com; Kyle Ortiz <kortiz@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>
**Subject:** Re: Eletson - Closing All Hands

External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

Good morning Derek - following up again on scheduling the closing calls.  Please let us know what days and times work this week for you.

Thank you,

Bryan

———

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

> On Oct 29, 2024, at 4:55 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Derek,

Following up on scheduling the closing calls.  Please let us know what days and times work this week for you.

Thank you,

Bryan

———

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 29, 2024, at 8:40 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Derek -

Thanks for letting us know.  Please let us know what days and times this week work for your participation in these calls (on which no one was consulted but no one raised any issues either) and we will coordinate with the group on scheduling.  On the call we'll also coordinate with you and the group on next week's availability.

For the rest of the group, today's call is adjourned until further notice.  We will update the calendar.

Looking forward to working with you.

Best regards,

Bryan

—

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

On Oct 29, 2024, at 8:32 AM, Baker, Derek J. <DBaker@reedsmith.com> wrote:

We are not available today for the requested initial kick off call at 10:00 a.m. due to other

10:00 a.m. due to other commitments.

We were not consulted about schedule when these calls were set. If you would like us to participate, please give the courtesy of some available times (on more than 24 hours' notice) and we can coordinate availability.

**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
reedsmith.com

---

**From:** Leila Ebrahimi <lebrahimi@teamtogut.com>
**Sent:** Monday, October 28, 2024 10:29 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Catherine LoTempio <lotempio@sewkis.com>; gayda@sewkis.com; Mehak Rashid <mehak@legalscale.com>; Neil@legalscale.com; Herman, David <David.Herman@dechert.com>; Zide, Stephen <Stephen.Zide@dechert.com>; Haney, Owen Sargent <Owen.Haney@dechert.com>; Michael.Cordasco@fticonsulting.com; Joseph.Sternberg@fticonsulting.com; Marshall.Eisler@fticonsulting.com; Moss, Tina N. (Perkins

Coie)
<TMoss@perkinscoie.com>;
kim.havlin@whitecase.com;Phi
lip.abelson@whitecase.com;
Bae, John
<John.Bae@thompsonhine.co
m>; James Lee
<james.lee@veritaglobal.com>;
Leanne Rehder Scott
<lscott@veritaglobal.com>;
bsparkman@chaloslaw.com
**Cc:** Bryan Kotliar
<bkotliar@teamtogut.com>;
EXT Kyle Ortiz
<kortiz@teamtogut.com>;
Martha Martir
<mmartir@teamtogut.com>;
Amanda Glaubach
<aglaubach@teamtogut.com>
**Subject:** Eletson - Closing All
Hands

**External E-Mail - FROM
lebrahimi@teamtogut.com
<lebrahimi@teamtogut.com>**

All,

As you may know, the Court
confirmed the PC Plan this past
Friday, October 25.  We'd like to
begin the process of working
with all parties on
consummating the PC Plan.
Attached is an initial draft of a
closing checklist that we've
prepared.  We will circulate
updated versions throughout
the coming weeks.

**We would like to schedule an
initial kick off call for
tomorrow October 29th at 10
AM (Eastern) and again on
Thursday October 31st at 10
AM (Eastern) for a follow up
call**.  After the initial kick off
calls, going forward we would
like to schedule daily closing
calls at 10 AM (Eastern)
through closing.  We will be
sending a link to the zoom calls
to everyone on this email chain

to everyone on this email chain,
please let us know if anyone
else from your side should be
included.

Best Regards,
Leila
—
**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 |
New York, NY 10119
Direct: +1 212 201 5583 |
Mobile: +1 201 961 3262
lebrahimi@teamtogut.com |
 togutlawfirm.com

This E-mail, along with any
attachments, is considered
confidential and may well be legally
privileged. If you have received it in
error, you are on notice of its
status. Please notify us
immediately by reply e-mail and
then delete this message from your
system. Please do not copy it or
use it for any purposes, or disclose
its contents to any other person.
Thank you for your cooperation.

RSUSv12021

**Exhibit 8**

**From:** Baker, Derek J. dbaker@reedsmith.com 
**Subject:** RE: Eletson - Closing Matters
**Date:** October 28, 2024 at 5:39 PM
**To:** Leila Ebrahimi lebrahimi@teamtogut.com, Osei-Bonsu, Derek M. DOsei-Bonsu@reedsmith.com
**Cc:** Bryan Kotliar bkotliar@teamtogut.com, EXT Kyle Ortiz kortiz@teamtogut.com, Amanda Glaubach aglaubach@teamtogut.com,
Martha Martir mmartir@teamtogut.com, Eletson Bankruptcy Team (S) EletsonBankruptcyTeam@reedsmith.com

All – we are in receipt of your email; however, it is likely a bit premature at this point. The Debtors – under the direction of the Shareholders and in the exercise of their fiduciary duties – are reviewing the Decision. An initial review of the attached appears to call for actions from parties other than the Debtor (which ReedSmith does not represent) and from persons that a shareholder of the Debtor does not have any right to direct under applicable non-bankruptcy law.

We also want to understand the requests being made and want confirmation that any actions requested to be undertaken and undertaken by ReedSmith (as well as any costs incurred in responding to any objections to fee statements submitted) will be compensated and will not be otherwise subject to any objection by Pach Shemen or anyone affiliated with it (including Levona, the Indenture Trustee(s), the Committee or any other person acting upon information provided or directed by PS). Please confirm.


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
reedsmith.com

---

**From:** Leila Ebrahimi <lebrahimi@teamtogut.com>
**Sent:** Monday, October 28, 2024 9:05 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>
**Cc:** Bryan Kotliar <bkotliar@teamtogut.com>; EXT Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>
**Subject:** Eletson - Closing Matters


**External E-Mail - FROM lebrahimi@teamtogut.com <lebrahimi@teamtogut.com>**

Reed Smith Team,

We'd like to begin the process of working with you, the Debtors, and the other parties on consummating the PC Plan in accordance with the Court's decision from Friday. **Please let us know when you are available today / tomorrow for a call with us.**

Attached is an initial draft of a closing checklist that we've prepared. You'll see we are

starting to work through various items with the parties this week, and will be emailing all of the parties (including you) regarding scheduling all hands closing calls.  We will circulate updated versions throughout the coming weeks.

As for the Debtors and their subsidiaries, you will see there various items that we need from the Debtors and their subsidiaries.  In particular, there are a few high priority diligence items (see Part A, Row 2) that we'd like to receive by no later than this Wednesday, October 30.  We've excerpted this below for your convenience.

In addition, as for various third party transition matters, we'd like for you to coordinate scheduling calls with Oaktree and the Company's other historical lenders.

Let us know if you have any questions regarding the above, thank you.

Best Regards,
Leila

## HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all entities
- Copies of all loan documents for all entities
- List of board members and officers for all entities
- List of all legal, financial, and other professionals retained / employed by each entity and outstanding amounts due to each
- List of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities

—
**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 l New York, NY 10119
Direct: +1 212 201 5583 l Mobile: +1 201 961 3262
lebrahimi@teamtogut.com l togutlawfirm.com

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021



Eletson – PC Plan Closing
Checklist.docx

**Exhibit 9**

**From:** Baker, Derek J.  dbaker@reedsmith.com
**Subject:** RE: Eletson - Closing Matters
**Date:** November 8, 2024 at 4:38 PM
**To:** Bryan Kotliar  bkotliar@teamtogut.com,  Solomon, Louis M.  LSolomon@reedsmith.com
**Cc:** Leila Ebrahimi  lebrahimi@teamtogut.com,  Osei-Bonsu, Derek M.  DOsei-Bonsu@reedsmith.com,  Kyle Ortiz  kortiz@teamtogut.com
, Amanda Glaubach  aglaubach@teamtogut.com,  Martha Martir  mmartir@teamtogut.com,  Eletson Bankruptcy Team (S)
EletsonBankruptcyTeam@reedsmith.com

Bryan:

In response to your request that ReedSmith provide information WE have in response to your
request that ReedSmith provide you information that ReedSmith has in response to your
information requests, our responses are in **Bold**:

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate
  constituent documents for all entities –
    - **EletsonBK093425-094686; EletsonBK097123-97308; EletsonBK093258-093291; 093448-93559; 094249-94300; 094409-94482; 097025-097108.**
- Copies of all loan documents for all entities:
    - **Piraeus - EletsonBK025683-25809.**
    - **ABB - EletsonBK017075-17084; EletsonBK024299 - 24401.**
    - **Alpha Bank - EletsonBK016657-58; EletsonBK16673-79; EletsonBK024426.**
    - **CitiBank EletsonBK024746 - 24790.**
- List of all board members and officers for all entities
    - **There are no lists that have been produced. However, the board members are listed on the minutes discussed in the Board Minutes and Resolutions EletsonBK093258-093291; 093448-93559; 094249-94300; 094409-94482; 097030-097108)**
- List of all legal, financial and other professionals retained / employed by each entity
  and outstanding amounts due to each
    - **We presume you have the various fee statements for ReedSmith and the various debtor professionals for Holdings and ReedSmith for Corp. as identified in the filed documents**
- List of all pending, outstanding, and/or threatened or otherwise potentially known
  litigations (threatened, actual, or otherwise) against or instituted by all entities
    - **See DIP Schedule 4(g)**


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, November 7, 2024 9:11 AM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>
**Cc:** Baker, Derek J. <DBaker@ReedSmith.com>; Leila Ebrahimi
<lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>;
Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>;
Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S)
<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

External E-Mail - FROM **bkotliar@teamtogut.com** <bkotliar@teamtogut.com>

Following up on m email below.  Please provide as much of the requested information as
possible on a rolling basis as soon as possible.  That includes any information in Reed
Smith's possession or control.

Best regards,

Bryan

─────

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

TOGUT SEGAL & SEGAL LLP

> On Nov 6, 2024, at 12:01 PM, Bryan Kotliar <bkotliar@teamtogut.com>
> wrote:
>
> Thank you Lou.  You can send us whatever documents you have on a rolling
> basis and let us know the timing for receiving the balance.
>
> There were also other items in my email such as identification of key
> employees and a transition team as well as a question about your
> cooperation with us per the Confirmation Order.  We'd appreciate your
> response to the entire email.
>
> Best regards,
>
> Bryan
>
>
> ─────
>
> **Bryan M. Kotliar | Partner**
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335 | New York, NY 10119
> Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
> bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Nov 6, 2024, at 9:53 AM, Solomon, Louis M.
<LSolomon@reedsmith.com> wrote:

Bryan,

We are in receipt of your document requests and
are working with our clients to compile this
information.  We note that you have scheduled a
call for this morning, notwithstanding the fact that
the Debtors are unable to attend at that time.  We
are still in the process of collecting documents and
do not have any pertinent updates for today's on
hands call.  We believe our time would be better
spent continuing to compile documents in
response to Pach Shemen's requests.

I also think I saw an email from you about vessels
not being in service.  Was that from you?  We did
check, and we were told that the report you
received was inaccurate.  Do you have any more
information?

Thank you.


**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Wednesday, October 30, 2024 10:20 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu,
Derek M. <DOsei-Bonsu@reedsmith.com>; Kyle Ortiz
<kortiz@teamtogut.com>; Amanda Glaubach
<aglaubach@teamtogut.com>; Martha Martir
<mmartir@teamtogut.com>; Eletson Bankruptcy Team (S)

<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

**External E-Mail -
FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>**

Good morning Derek,

Following up again on the below emails and requests.

In addition and in particular - as it relates to employees - as you know, the Court-confirmed PC Plan provides for the establishment of an employee incentive plan.  Please identify and put us in touch with key personnel (again, in addition to the employee-related requests for information in my email below).

Best regards,

Bryan

———

**Bryan M. Kotliar** | Partner
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>


On Oct 29, 2024, at 4:55 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Derek,

Following up on my emails below.  Please let us know what information we can expect to receive and when.  Let us know if you'd like to have a call to discuss.

Best regards,

Bryan

———

**Bryan M. Kotliar** | Partner
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-
DA0D1DE7FE3A.png>

On Oct 28, 2024, at 7:23 PM, Bryan
Kotliar <bkotliar@teamtogut.com>
wrote:

Derek,

As you know, the Court confirmed the PC Plan.
 Thus, we have every right to work to effectuate
that plan promptly.  This is particularly so
considering the current liquidity situation with the
DIP being nearly fully drawn.

In light of these circumstances, we are working
with all of the parties to implement the plan as
quickly as possible and save these estates
needless administrative expenses.  It is also
critical to ensuring a smooth transition of the
Debtors' and their non-debtor subsidiaries'
operations, which is in their best interests.

You, the Debtors, and their current shareholders
have no basis to refuse to cooperate with us and
the other parties in effectuating the Court's
order.  We are asking you for the information
that you have or that you have access to (such
as, by way of Eletson Holdings' ownership of its
subsidiaries to which they owe fiduciary duties).
 There are obviously instances where you do not
have information, but we are asking for your
assistance in obtaining it.

Thus, please let us know what information that
you have that you will provide, by when, and
what you do not have that you will assist us with
obtaining.  As for Reed Smith's fees related to
this work, to the extent that you are assisting in
a productive and good faith manner, we will not
object to such fees.

Best regards,

Bryan

───────

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-
DA0D1DE7FE3A.png>

On Oct 28, 2024, at 5:38 PM,
Baker, Derek J.
<DBaker@ReedSmith.com>
wrote:

All – we are in receipt of
your email; however, it is
likely a bit premature at this
point.  The Debtors – under
the direction of the
Shareholders and in the
exercise of their fiduciary
duties – are reviewing the
Decision.   An initial review
of the attached appears to
call for actions from parties
other than the Debtor
(which ReedSmith does
not represent) and from
persons that a shareholder
of the Debtor does not
have any right to direct
under applicable non-
bankruptcy law.

We also want to
understand the requests
being made and want
confirmation that any
actions requested to be
undertaken and
undertaken by ReedSmith
(as well as any costs
incurred in responding to
any objections to fee
statements submitted) will
be compensated and will
not be otherwise subject to
any objection by Pach
Shemen or anyone
affiliated with it (including
Levona, the Indenture
Trustee(s), the Committee
or any other person acting
upon information provided
or directed by PS).  Please
confirm.

**Derek J. Baker**

[dbaker@reedsmith.com](mailto:dbaker@reedsmith.com)
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

---

**From:** Leila Ebrahimi
<[lebrahimi@teamtogut.co](mailto:lebrahimi@teamtogut.com)
[m](mailto:lebrahimi@teamtogut.com)>
**Sent:** Monday, October 28,
2024 9:05 AM
**To:** Baker, Derek J.
<[DBaker@ReedSmith.com](mailto:DBaker@ReedSmith.com)
>; Osei-Bonsu, Derek M.
<[DOsei-](mailto:DOsei-Bonsu@reedsmith.com)
[Bonsu@reedsmith.com](mailto:DOsei-Bonsu@reedsmith.com)>
**Cc:** Bryan Kotliar
<[bkotliar@teamtogut.com](mailto:bkotliar@teamtogut.com)>
; EXT Kyle Ortiz
<[kortiz@teamtogut.com](mailto:kortiz@teamtogut.com)>;
Amanda Glaubach
<[aglaubach@teamtogut.co](mailto:aglaubach@teamtogut.com)
[m](mailto:aglaubach@teamtogut.com)>; Martha Martir
<[mmartir@teamtogut.com](mailto:mmartir@teamtogut.com)>
**Subject:** Eletson - Closing
Matters

==**External E-Mail -
FROM lebrahimi@teamto
gut.com <lebrahimi@team
togut.com>**==

---

Reed Smith Team,

We'd like to begin the
process of working with
you, the Debtors, and the
other parties on
consummating the PC Plan
in accordance with the
Court's decision from
Friday. **Please let us**

Friday.  **Please let us know when you are available today / tomorrow for a call with us.**

Attached is an initial draft of a closing checklist that we've prepared.  You'll see we are starting to work through various items with the parties this week, and will be emailing all of the parties (including you) regarding scheduling all hands closing calls.  We will circulate updated versions throughout the coming weeks.

As for the Debtors and their subsidiaries, you will see there various items that we need from the Debtors and their subsidiaries.  In particular, there are a few high priority diligence items (see Part A, Row 2) that we'd like to receive by no later than this Wednesday, October 30.  We've excerpted this below for your convenience.

In addition, as for various third party transition matters, we'd like for you to coordinate scheduling calls with Oaktree and the Company's other historical lenders.

Let us know if you have any questions regarding the above, thank you.

Best Regards,
Leila

**HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30**

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all entities
- Copies of all loan documents for all entities
- List of board members and officers for all entities
- List of all legal, financial, and other professionals retained / employed by each entity and outstanding amounts due to each
- List of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities

—

**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 l New York, NY 10119
Direct: +1 212 201 5583 l Mobile: +1 201 961 3262
lebrahimi@teamtogut.com l togutlawfirm.com

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it

for any purposes, or disclose
its contents to any other
person. Thank you for your
cooperation.

RSUSv12021

<Eletson - PC Plan Closing
Checklist.docx>

**Exhibit 10**

**From:** **Baker, Derek J.** dbaker@reedsmith.com
**Subject:** RE: Eletson - Closing Matters
**Date:** November 11, 2024 at 1:57 PM
**To:** Bryan Kotliar bkotliar@teamtogut.com
**Cc:** Solomon, Louis M. LSolomon@reedsmith.com, Leila Ebrahimi lebrahimi@teamtogut.com, Osei-Bonsu, Derek M.
   DOsei-Bonsu@reedsmith.com, Kyle Ortiz kortiz@teamtogut.com, Amanda Glaubach aglaubach@teamtogut.com, Martha Martir
   mmartir@teamtogut.com, Eletson Bankruptcy Team (S) EletsonBankruptcyTeam@reedsmith.com

Bryan:

The below information is the information we (Reed Smith) have.  We (Reed Smith) do not have
the other information.

We have asked the officers of Holdings to determine whether Holdings has the other materials
and, if not, inquire as to which entities do have the information.


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
reedsmith.com

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Monday, November 11, 2024 9:51 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Solomon, Louis M. <LSolomon@reedsmith.com>; Leila Ebrahimi
<lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>;
Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>;
Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S)
<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

Thanks Derek.  What is the status of the balance of the requests?

---

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

TOGUT SEGAL & SEGAL LLP

On Nov 8, 2024, at 4:38 PM, Baker, Derek J. <DBaker@ReedSmith.com>
wrote:

Bryan:

In response to your request that ReedSmith provide information WE have in
response to your request that ReedSmith provide you information that ReedSmith
has in response to your information requests, our responses are in **Bold**:

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of incorporation, by laws, and similar
  corporate constituent documents for all entities –
    - **EletsonBK093425-094686; EletsonBK097123-97308;
      EletsonBK093258-093291; 093448-93559; 094249-94300;
      094409-94482; 097025-097108.**
- Copies of all loan documents for all entities:
    - **Piraeus - EletsonBK025683-25809.**
    - **ABB - EletsonBK017075-17084; EletsonBK024299 - 24401.**
    - **Alpha Bank - EletsonBK016657-58; EletsonBK16673-79;
      EletsonBK024426.**
    - **CitiBank EletsonBK024746 - 24790.**
- List of all board members and officers for all entities
    - **There are no lists that have been produced. However, the board
      members are listed on the minutes discussed in the Board
      Minutes and Resolutions EletsonBK093258-093291; 093448-
      93559; 094249-94300; 094409-94482; 097030-097108)**
- List of all legal, financial and other professionals retained / employed
  by each entity and outstanding amounts due to each
    - **We presume you have the various fee statements for
      ReedSmith and the various debtor professionals for
      Holdings and ReedSmith for Corp. as identified in the filed
      documents**
- List of all pending, outstanding, and/or threatened or otherwise
  potentially known litigations (threatened, actual, or otherwise) against
  or instituted by all entities
    - **See DIP Schedule 4(g)**


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
reedsmith.com

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, November 7, 2024 9:11 AM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>
**Cc:** Baker, Derek J. <DBaker@ReedSmith.com>; Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

==External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>==

Following up on m email below.  Please provide as much of the requested information as possible on a rolling basis as soon as possible.  That includes any information in Reed Smith's possession or control.

Best regards,

Bryan

---

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

> On Nov 6, 2024, at 12:01 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Thank you Lou.  You can send us whatever documents you have on a rolling basis and let us know the timing for receiving the balance.
>
> There were also other items in my email such as identification of key employees and a transition team as well as a question about your cooperation with us per the Confirmation Order.  We'd appreciate your response to the entire email.
>
> Best regards,
>
> Bryan
>
> ---
>
> **Bryan M. Kotliar | Partner**

Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Nov 6, 2024, at 9:53 AM, Solomon, Louis M. <LSolomon@reedsmith.com> wrote:

Bryan,

We are in receipt of your document requests and are working with our clients to compile this information.  We note that you have scheduled a call for this morning, notwithstanding the fact that the Debtors are unable to attend at that time.  We are still in the process of collecting documents and do not have any pertinent updates for today's on hands call.  We believe our time would be better spent continuing to compile documents in response to Pach Shemen's requests.

I also think I saw an email from you about vessels not being in service.  Was that from you?  We did check, and we were told that the report you received was inaccurate.  Do you have any more information?

Thank you.

**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue

New York, New York 10022

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Wednesday, October 30, 2024 10:20 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Leila Ebrahimi <lebrahimi@teamtogut.com>;
Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Kyle Ortiz
<kortiz@teamtogut.com>; Amanda Glaubach
<aglaubach@teamtogut.com>; Martha Martir
<mmartir@teamtogut.com>; Eletson Bankruptcy
Team (S)
<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

External E-Mail -
FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

Good morning Derek,

Following up again on the below emails and requests.

In addition and in particular - as it relates to employees - as you know, the Court-confirmed PC Plan provides for the establishment of an employee incentive plan.  Please identify and put us in touch with key personnel (again, in addition to the employee-related requests for information in my email below).

Best regards,

Bryan

———

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

On Oct 29, 2024, at 4:55 PM, Bryan
Kotliar <bkotliar@teamtogut.com>
wrote:

Derek

Derek,

Following up on my emails below.
 Please let us know what information
we can expect to receive and when.
 Let us know if you'd like to have a call
to discuss.

Best regards,

Bryan

———

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 28, 2024, at
7:23 PM, Bryan Kotliar
<bkotliar@teamtogut.com>
wrote:

Derek,

As you know, the Court
confirmed the PC Plan.  Thus, we
have every right to work to
effectuate that plan promptly.
 This is particularly so
considering the current liquidity
situation with the DIP being
nearly fully drawn.

In light of these circumstances,
we are working with all of the
parties to implement the plan as
quickly as possible and save
these estates needless
administrative expenses.  It is
also critical to ensuring a smooth
transition of the Debtors' and
their non-debtor subsidiaries'
operations, which is in their best
interests.

You, the Debtors, and their
current shareholders have no
basis to refuse to cooperate with

us and the other parties in effectuating the Court's order. We are asking you for the information that you have or that you have access to (such as, by way of Eletson Holdings' ownership of its subsidiaries to which they owe fiduciary duties). There are obviously instances where you do not have information, but we are asking for your assistance in obtaining it.

Thus, please let us know what information that you have that you will provide, by when, and what you do not have that you will assist us with obtaining. As for Reed Smith's fees related to this work, to the extent that you are assisting in a productive and good faith manner, we will not object to such fees.

Best regards,

Bryan

---

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 28, 2024, at 5:38 PM, Baker, Derek J. <DBaker@ReedSmith.com> wrote:

All – we are in receipt of your email;

however, it is likely a bit premature at this point.  The Debtors – under the direction of the Shareholders and in the exercise of their fiduciary duties – are reviewing the Decision.   An initial review of the attached appears to call for actions from parties other than the Debtor (which ReedSmith does not represent) and from persons that a shareholder of the Debtor does not have any right to direct under applicable non-bankruptcy law.

We also want to understand the requests being made and want confirmation that any actions requested to be undertaken and undertaken by ReedSmith (as well as any costs incurred in responding to any

objections to fee statements submitted) will be compensated and will not be otherwise subject to any objection by Pach Shemen or anyone affiliated with it (including Levona, the Indenture Trustee(s), the Committee or any other person acting upon information provided or directed by PS). Please confirm.

**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

_____

**From:** Leila

Ebrahimi
<[lebrahimi@te](mailto:lebrahimi@teamtogut.com)
[amtogut.com](mailto:lebrahimi@teamtogut.com)>
**Sent:** Monday,
October 28,
2024 9:05 AM
**To:** Baker,
Derek J.
<[DBaker@Re](mailto:DBaker@ReedSmith.com)
[edSmith.com](mailto:DBaker@ReedSmith.com)>;
Osei-Bonsu,
Derek M.
<[DOsei-](mailto:DOsei-Bonsu@reedsmith.com)
[Bonsu@reeds](mailto:DOsei-Bonsu@reedsmith.com)
[mith.com](mailto:DOsei-Bonsu@reedsmith.com)>
**Cc:** Bryan
Kotliar
<[bkotliar@tea](mailto:bkotliar@teamtogut.com)
[mtogut.com](mailto:bkotliar@teamtogut.com)>;
EXT Kyle Ortiz
<[kortiz@teamt](mailto:kortiz@teamtogut.com)
[ogut.com](mailto:kortiz@teamtogut.com)>;
Amanda
Glaubach
<[aglaubach@t](mailto:aglaubach@teamtogut.com)
[eamtogut.com](mailto:aglaubach@teamtogut.com)
>; Martha
Martir
<[mmartir@tea](mailto:mmartir@teamtogut.com)
[mtogut.com](mailto:mmartir@teamtogut.com)>
**Subject:** Elets
on - Closing
Matters

==**External E-**==
==**Mail -**==
==**FROM** [lebrahi](mailto:lebrahimi@teamtogut.com)==
==[mi@teamtogu](mailto:lebrahimi@teamtogut.com)==
==[t.com](mailto:lebrahimi@teamtogut.com) <[lebrahi](mailto:lebrahimi@teamtogut.com)==
==[mi@teamtogut](mailto:lebrahimi@teamtogut.com)==
==[.com](mailto:lebrahimi@teamtogut.com)>==
————————————
Reed Smith
Team,

We'd like to
begin the
process of
working with
you, the
Debtors, and
the other
parties on

consummating the PC Plan in accordance with the Court's decision from Friday.  **Please let us know when you are available today / tomorrow for a call with us.**

Attached is an initial draft of a closing checklist that we've prepared.  You'll see we are starting to work through various items with the parties this week, and will be emailing all of the parties (including you) regarding scheduling all hands closing calls.  We will circulate updated versions throughout the coming weeks.

As for the Debtors and their subsidiaries, you will see there various items that we need from the Debtors and their subsidiaries.  In particular,

there are a few high priority diligence items (see Part A, Row 2) that we'd like to receive by no later than this Wednesday, October 30. We've excerpted this below for your convenience.

In addition, as for various third party transition matters, we'd like for you to coordinate scheduling calls with Oaktree and the Company's other historical lenders.

Let us know if you have any questions regarding the above, thank you.

Best Regards,
Leila

**HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30**

- Employee roster for all entities
- Copies of all employment agreeme

agreeme
nts
- Copies
of all
charters,
certificat
es of
incorpor
ation, by
laws,
and
similar
corporat
e
constitue
nt
docume
nts for
all
entities
- Copies
of all
loan
docume
nts for
all
entities
- List of
board
member
s and
officers
for all
entities
- List of all
legal,
financial,
and
other
professi
onals
retained
/
employe
d by
each
entity
and
outstand
ing
amounts
due to
each
- List of all

pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by all entities

—

**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 l New York, NY 10119
Direct: +1 212 201 5583 l Mobile: +1 201 961 3262
lebrahimi@teamtogut.com l togutlawfirm.com

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please

notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021

<Eletson - PC Plan Closing Checklist.docx>

**Exhibit 11**

**From: Baker, Derek J.** dbaker@reedsmith.com
**Subject:** RE: Eletson - Closing Matters
**Date:** November 12, 2024 at 5:51 PM
**To:** Bryan Kotliar  bkotliar@teamtogut.com
**Cc:** Solomon, Louis M.  LSolomon@reedsmith.com,  Leila Ebrahimi  lebrahimi@teamtogut.com,  Osei-Bonsu, Derek M.
DOsei-Bonsu@reedsmith.com,  Kyle Ortiz  kortiz@teamtogut.com,  Amanda Glaubach  aglaubach@teamtogut.com,  Martha Martir
mmartir@teamtogut.com,  Eletson Bankruptcy Team (S)  EletsonBankruptcyTeam@reedsmith.com,  Solow, Richard C.
RSolow@reedsmith.com

DB

Bryan – there is no provision in the Plan or the Confirmation Order allowing the Plan Proponents
to "direct" the Debtor prior to the Effective Date.

We are advised – and therefore report – that the directors who resigned from Holdings also
resigned their officer positions at Holdings.

**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Tuesday, November 12, 2024 4:14 PM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Solomon, Louis M. <LSolomon@reedsmith.com>; Leila Ebrahimi
<lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>;
Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>;
Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S)
<EletsonBankruptcyTeam@reedsmith.com>; Solow, Richard C.
<RSolow@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

**External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>**

Derek,

What is your response to the LISCR letter request I sent this morning?  What is your
response on the MAC question in my email below?

As to your email, we disagree with nearly all of your email and your gross
misinterpretation of the Plan and the Confirmation Order, and we reserve all rights.  To
one of your points, you say that "there is no evidence or confirmation that such
compliance" with "applicable non-bankruptcy law" has occurred.  There is no such
requirement in the Plan, and the provisions you cite are discretionary protections for the
Plan Proponents (and the conditions precedent are waivable by the Plan Proponents).
The Debtors, however, are required to take such actions directed by the Plan
Proponents to assist in effectuating the Plan.

Proponents to assist in effectuating the Plan.

What applicable non-bankruptcy law are you aware of that has not been complied with? To the extent that the Debtors are receiving counsel on that issue, you are directed to put us in touch with that counsel immediately to discuss any of these alleged issues.

As to the balance of your email, what is the status of the officers of Eletson Holdings (including those officers like LK and VK who were also directors that you say have resigned) and the directors and officers of Eletson's subsidiaries? Have there been any changes / resignations? And are there any other changes that we should be aware of (including on account of any other MACs)?

Best regards,

Bryan

---

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**TOGUT SEGAL & SEGAL LLP**

> On Nov 12, 2024, at 3:12 PM, Baker, Derek J. <DBaker@ReedSmith.com> wrote:
>
> Bryan:
>
> We disagree with the tenor and statements in your email. The confirmation order in no way requires anyone to participate in "closing calls".
>
> The Confirmation Order only requires cooperation to implement and consummate the plan. (See Order ¶ 5). YOUR Plan makes clear that the only implementation needed for the consummation of YOUR Plan is for the execution and implementation of the Definitive Documents which you have stated are part of your plan supplement. Plan § 5.2(b). None of the "information" requests relate to any implementation called for on YOUR Plan. Neither ReedSmith nor any Debtor has in any way obstructed YOUR plan – i.e., the reconstitution of Eletson Holdings, Inc., under applicable non-bankruptcy law under the terms of YOUR Definitive Documents under YOUR Plan. Moreover, as YOUR Plan requires compliance with applicable non-bankruptcy law (§ 5.2(b)(i) & (x)), there is no evidence or confirmation that such compliance has occurred.
>
> Nevertheless, as it relates to "information" requests made to ReedSmith – we (ReedSmith) have ABSOLUTELY cooperated in

responding to your information requests made of ReedSmith. Those information requests were duplicative and unnecessary but we nevertheless for you the information that YOU ALREADY HAD.  (We are re-attaching the response we provided last week).

Finally, today at 11:18 a.m. ET, ReedSmtith was advised "that four members of the board of Eletson Holdings have resigned, namely Lascarina and her sister Eleni , Vassili kerstikoff and Takis Costantaras. There are ongoing proceedings for filing in the vacancies and reinstating eight members at the board of Eletson Holdings."  That is all the information we know at this time.


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Tuesday, November 12, 2024 8:48 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Solomon, Louis M. <LSolomon@reedsmith.com>; Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Kyle Ortiz <kortiz@teamtogut.com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha Martir <mmartir@teamtogut.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters

---

External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

---

Derek,

The Confirmation Order [Docket No. 1223] requires the Debtors and their agents to cooperate with the Petitioning Creditors and assist in consummating the Plan, including participate in closing calls, which you have repeatedly failed to do.


The majority of our information requests remain outstanding.  The requests

are repeated below, but we again note that as counsel to EHI and pursuant to your duty to the creditors and the Court, any additional information which Reed Smith or the Debtors possess or have access to, should also be provided to assist in the consummation of the Court-approved Plan which was found to be in the best interests of the Debtors, their estates, and their creditors.  For example, we have sought the employee roster for all entities and copies of all employment agreements, which have not been provided.

We request you promptly provide us with the documents or information requested and a detailed status update of the requests you have not responded to so far, despite our repeated requests since October 28, 2024.

To the extent your response is that this is not information of the Debtors' or Reed Smith's possession, custody, or control, a position on which we reserve all rights and do not agree as set forth in the letter we filed with the Court on November 6, 2024 [Docket No. 1227], the Debtors control their subsidiaries and have access to the requested information, we request you promptly identify the specific entities, people, and processes that you are undertaking to obtain the information.  We request you schedule calls for as soon as possible for us to speak to the appropriate personnel at the company as well as any third-party advisors, including counsel, assisting with this process that would make obtaining the information more efficient. As you know, we plan to finish closing by November 14, 2024, so any delay in this information may be obstructing our closing.

Finally, as provided by section 9.1(k) of the Plan, we request that the Debtors confirm that "since the Conversion Date", there have not been and are not contemplated any "material adverse changes in the operations, assets, revenue, financial condition, profits, or prospects of the Debtors or their non-Debtor subsidiaries and/or Affiliates (other than virtue of the Chapter 11 Cases)", including, but not limited to, changes in the ordinary course operations, management, or governance of Eletson Corporation and changes in the chartering, operations or management of any vessels beneficially owned or operated, directly or indirectly, by the Debtors or their subsidiaries.

*****

**Information Requests**

- (1) Provide an employee roster for all Subsidiaries, identify key personnel, and facilitate and schedule / coordinate discussions with the Petitioning Creditors' representatives and employees; identify payroll provider and personnel involved in coordinating payroll

- (2) Provide copies of all employment-related agreements with Subsidiaries, including, without limitation, any agreements regarding employment, services, separation, retention, severance, incentive, bonus, consulting, contractor or related agreements or arrangements

- (3) Provide copies of any employee benefit plans and retirement plans at

the Subsidiaries

- (4) Provide copies of (or otherwise access to) all books and records of the Debtors and the Subsidiaries, including all charters, certificates of incorporation, by laws, and similar corporate constituent documents for all Subsidiaries

- (5) Provide copies of loan agreements, liens, indemnification agreements, and agreements for indebtedness for all Subsidiaries; if any of the foregoing does not exist in a written agreement, provide a description of all such agreements

- (6) Provide a list of all members of the board (or other similar governing body) and officers for all Subsidiaries, including contact information and KYC/AML information for each; identify whether any counsel (in house or otherwise) representing any officers or directors in any legal actions

- (7) Provide a list of all legal, financial, and other professionals retained / employed by the Debtors and all Subsidiaries, outstanding amounts due to each, and points of contact

- (8) Provide a list (or other description) of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by the Debtors and all Subsidiaries

- (9) Provide copies of all insurance policies, including, without limitation, D&O insurance (including any tail coverage) to which Eletson Holdings is listed as an additional insured and information related to any insurance benefits, including claims, rights, and proceeds, arising therefrom.

- (10) Provide a list of material contracts and material suppliers for all Subsidiaries

- (11) Provide a list of all bank accounts and authorized signatories for all Subsidiaries, along with approved users, account information, and points of contact at each bank

- (12) Identify personnel responsible for IT and related services and provide access to Eletson's email platform and website

- (13) Identify employee(s) responsible for assisting the Petitioning Creditors and their counsel with consummating the Plan and transitioning the ownership and management of the company, including providing available days and times this week to discuss closing matters

---

**Bryan M. Kotliar ǀ Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 ǀ New York, NY 10119
Direct: +1 212 201 5582 ǀ Mobile: +1 516 410 1361
bkotliar@teamtogut.com ǀ togutlawfirm.com

On Nov 11, 2024, at 1:56 PM, Baker, Derek J.
<DBaker@ReedSmith.com> wrote:

Bryan:

The below information is the information we (Reed Smith) have.
We (Reed Smith) do not have the other information.

We have asked the officers of Holdings to determine whether
Holdings has the other materials and, if not, inquire as to which
entities do have the information.


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Monday, November 11, 2024 9:51 AM
**To:** Baker, Derek J. <DBaker@ReedSmith.com>
**Cc:** Solomon, Louis M. <LSolomon@reedsmith.com>; Leila
Ebrahimi <lebrahimi@teamtogut.com>; Osei-Bonsu, Derek M.
<DOsei-Bonsu@reedsmith.com>; Kyle Ortiz
<kortiz@teamtogut.com>; Amanda Glaubach
<aglaubach@teamtogut.com>; Martha Martir
<mmartir@teamtogut.com>; Eletson Bankruptcy Team (S)
<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters


External E-Mail -
FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

---

Thanks Derek. What is the status of the balance of the
requests?

---

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP

One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

On Nov 8, 2024, at 4:38 PM, Baker, Derek J.
<DBaker@ReedSmith.com> wrote:

Bryan:

In response to your request that ReedSmith provide
information WE have in response to your request
that ReedSmith provide you information that
ReedSmith has in response to your information
requests, our responses are in **Bold**:

- Employee roster for all entities
- Copies of all employment agreements
- Copies of all charters, certificates of
  incorporation, by laws, and similar corporate
  constituent documents for all entities –
  - **EletsonBK093425-094686;
    EletsonBK097123-97308;
    EletsonBK093258-093291; 093448-
    93559; 094249-94300; 094409-94482;
    097025-097108.**
- Copies of all loan documents for all entities:
  - **Piraeus - EletsonBK025683-25809.**
  - **ABB - EletsonBK017075-17084;
    EletsonBK024299 - 24401.**
  - **Alpha Bank - EletsonBK016657-58;
    EletsonBK16673-79;
    EletsonBK024426.**
  - **CitiBank EletsonBK024746 - 24790.**
- List of all board members and officers for all
  entities
  - **There are no lists that have been
    produced. However, the board members
    are listed on the minutes discussed in
    the Board Minutes and
    Resolutions EletsonBK093258-
    093291; 093448-93559; 094249-
    94300; 094409-94482; 097030-
    097108)**
- List of all legal, financial and other
  professionals retained / employed by each
  entity and outstanding amounts due to each
  - **We presume you have the various
    fee statements for ReedSmith and
    the various debtor professionals for**

**the various debtor professionals for
Holdings and ReedSmith for Corp.
as identified in the filed documents**
- List of all pending, outstanding, and/or
  threatened or otherwise potentially known
  litigations (threatened, actual, or otherwise)
  against or instituted by all entities
  - **See DIP Schedule 4(g)**


**Derek J. Baker**

dbaker@reedsmith.com
D: +1 215-851-8148
M: +1 215-285-1600

**Reed Smith**
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
T: +1 215 851 8100
F: +1 215 851 1420
**reedsmith.com**

---

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, November 7, 2024 9:11 AM
**To:** Solomon, Louis M.
<LSolomon@reedsmith.com>
**Cc:** Baker, Derek J. <DBaker@ReedSmith.com>;
Leila Ebrahimi <lebrahimi@teamtogut.com>; Osei-
Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>;
Kyle Ortiz <kortiz@teamtogut.com>; Amanda
Glaubach <aglaubach@teamtogut.com>; Martha
Martir <mmartir@teamtogut.com>; Eletson
Bankruptcy Team (S)
<EletsonBankruptcyTeam@reedsmith.com>
**Subject:** Re: Eletson - Closing Matters


==External E-Mail -
FROM bkotliar@teamtogut.com<bkotliar@teamtogut.com>==

Following up on m email below.  Please provide as
much of the requested information as possible on a
rolling basis as soon as possible.  That includes any
information in Reed Smith's possession or control.

Best regards,

Bryan

----

**Bryan M. Kotliar ǀ Partner**
Togut, Segal & Segal LLP

One Penn Plaza, Suite 3335 I New York, NY 10119
Direct: +1 212 201 5582 I Mobile: +1 516 410 1361
bkotliar@teamtogut.com I togutlawfirm.com

<image001.png>

On Nov 6, 2024, at 12:01 PM, Bryan
Kotliar <bkotliar@teamtogut.com>
wrote:

Thank you Lou.  You can send us
whatever documents you have on a
rolling basis and let us know the timing
for receiving the balance.

There were also other items in my
email such as identification of key
employees and a transition team as
well as a question about your
cooperation with us per the
Confirmation Order.  We'd appreciate
your response to the entire email.

Best regards,

Bryan

---

**Bryan M. Kotliar** I Partner
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 I New York, NY 10119
Direct: +1 212 201 5582 I Mobile: +1 516 410 1361
bkotliar@teamtogut.com I togutlawfirm.com

<597CF39D-802E-4454-B1AD-
DA0D1DE7FE3A.png>

On Nov 6, 2024, at
9:53 AM, Solomon, Louis
M.
<LSolomon@reedsmith.co
m> wrote:

Bryan,

We are in receipt of your document requests and are working with our clients to compile this information.  We note that you have scheduled a call for this morning, notwithstanding the fact that the Debtors are unable to attend at that time.  We are still in the process of collecting documents and do not have any pertinent updates for today's on hands call.  We believe our time would be better spent continuing to compile documents in response to Pach Shemen's requests.

I also think I saw an email from you about vessels not being in service.  Was that from you?  We did check, and we were told that the report you received was inaccurate.  Do you have any more information?

Thank you.

**Louis M. Solomon** ([bio](bio))
E-Mail: [Lsolomon@reedsmith.com](mailto:Lsolomon@reedsmith.com)
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

---

**From:** Bryan Kotliar <[bkotliar@teamtogut.com](mailto:bkotliar@teamtogut.com)>

**Sent:** Wednesday, October 30, 2024 10:20 AM
**To:** Baker, Derek J. <[DBaker@ReedSmith.com](mailto:DBaker@ReedSmith.com)>
**Cc:** Leila Ebrahimi <[lebrahimi@teamtogut.com](mailto:lebrahimi@teamtogut.com)>; Osei-Bonsu, Derek M. <[DOsei-Bonsu@reedsmith.com](mailto:DOsei-Bonsu@reedsmith.com)>; Kyle Ortiz <[kortiz@teamtogut.com](mailto:kortiz@teamtogut.com)>; Amanda Glaubach <[aglaubach@teamtogut.com](mailto:aglaubach@teamtogut.com)>; Martha Martir <[mmartir@teamtogut.com](mailto:mmartir@teamtogut.com)>; Eletson Bankruptcy Team (S) <[EletsonBankruptcyTeam@reedsmith.com](mailto:EletsonBankruptcyTeam@reedsmith.com)>
**Subject:** Re: Eletson - Closing Matters

==External E-Mail - FROM [bkotliar@teamtogut.com](mailto:bkotliar@teamtogut.com) <[bkotliar@teamtogut.com](mailto:bkotliar@teamtogut.com)>==

---

Good morning Derek,

Following up again on the below emails and requests.

In addition and in particular - as it relates to employees - as you know, the Court-confirmed PC Plan

provides for the
establishment of an
employee incentive plan.
 Please identify and put us
in touch with key personnel
(again, in addition to the
employee-related requests
for information in my email
below).

Best regards,

Bryan

———

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New
York, NY 10119
Direct: +1 212 201 5582 | Mobile:
+1 516 410 1361
bkotliar@teamtogut.com | togutlawf
irm.com

<image001.png>

On Oct 29,
2024, at
4:55 PM,
Bryan Kotliar
<bkotliar@tea
mtogut.com>
wrote:

Derek,

Following up
on my emails
below.  Please
let us know
what
information we
can expect to
receive and
when.  Let us
know if you'd
like to have a
call to discuss.

Best regards,

Bryan

——

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Oct 28, 2024, at 7:23 PM, Bryan Kotliar <bko

[tliar@teamtogut.com](mailto:tliar@teamtogut.com) wrote:

Derek,

As you know, the Court confirmed the PC Plan. Thus, we have every right to work to effectuate that plan promptly. Th

is is particularly so considering the current liquidity situation with the DIP being nearly fully drawn.

In light of these circumstances, we are working with all of the parties to im

plement the plan as quickly as possible and save these estates needless administrative expenses. It is also critical to ensuring a smooth transition of the Debtors' and their

non-debtor subsidiaries' operations, which is in their best interests.

You, the Debtors, and their current shareholders have no basis to refuse to cooperate with us

and the other parties in effectuating the Court's order. We are asking you for the information that you have or that you have access to (such as, by way of Eletson Holdings'

ownership of its subsidiaries to which they owe fiduciary duties). There are obviously instances where you do not have information, but we are asking for your assistance in obt

aining it.

Thus, please let us know what information that you have that you will provide, by when, and what you do not have that you will assist us with obtaining. As

As for Reed Smith's fees related to this work, to the extent that you are assisting in a productive and good faith manner, we will not object to such fees.

Best regards,

Bry

an

---

**Bryan M. Kotliar** | **Partner**

Togut, Segal & Segal LLP

One Penn Plaza, Suite 3335 | New York, NY 10119

Direct: +1 212 201 5582 | Mobile: +1 516 410 1361

bkotliar@teamtogut.

[co
m](#) l
[tog
utla
wfir
m.c
om](#)

<597
CF3
9D
-
80
2E
-
44
54
-
B1
A
D-
D
A0
D1
D
E7
FE
3A
.p
ng
>

O
n
O
c
t
2
8
,
2
0
2
4
,

at 5:38 PM, Baker, Derek J. <[DBaker@ReedSmith.com](mailto:DBaker@ReedSmith.com)> wrote:

All-wea

reinreceipt of your email; however, it is likely a bit premature

e
a
t
t
h
i
s
p
o
i
n
t
.

T
h
e
D
e
b
t
o
r
s
—
u
n
d
e
r
t
h
e
d
i
r
e
c
t
i
o
n
o
f
t
h
e
S
h
a
r
e
h
o

lders and in the exercise of their fiduciary duties — are review

ing the Decision.

An initial review of the attached appears to

call for actions from parties other than the Debtor (which Reed

Smith doesnot represent) and from persons that a shareholder o

r
t
h
e
D
e
b
t
o
r
d
o
e
s
n
o
t
h
a
v
e
a
n
y
r
i
g
h
t
t
o
d
i
r
e
c
t
u
n
d
e
r
a
p
p
l
i
c
a
b
l
e
n
o

n-bankruptcy law.

We also want to understand the requests b

eingmadeandwantconfirmationthatanyactionsrequestedtob

e
u
n
d
e
r
t
a
k
e
n
a
n
d
u
n
d
e
r
t
a
k
e
n
b
y
R
e
e
d
S
m
i
t
h
(
a
s
w
e
l
l
a
s
a
n
y
c
o
s
t
s
i
n

curredinrespondingtoanyobjectionstofeestatementssubmi

tted) will be compensated and will not be otherwise subject to an

" objection by Pach Shemenor anyone affiliated with it (includ

ing Levona, the Indenture Trustee(s), the Committee or any oth

er person acting upon information provided or directed by PS).

Please confirm.

**Derek J. Baker**

[dbaker@reedsmith.com](mailto:dbaker@reedsmith.com)
D: +1

215-851-8148 M: +1 215-285-1600

**Reed Smith** Three Logan Squar

e Suite 3100 1717 Arch Street Philadelphia, PA 19103 T: +1215851

8100

F: +12158511420

reedsmith.com

**From:**

Leila Ebrahimi <l

[.ebrahimimi@teamtogout.com](mailto:.ebrahimimi@teamtogout.com)>

**Sent:** Monday, October 28, 2024 9:

05 AM **To:** Baker, Derek J. <DBaker@ReedSmith.com>; Osei-Bons"

u
;
D
e
r
e
k
M
.
<
[D
O
s
e
i
-
B
o
n
s
u
@
r
e
e
d
s
m
i
t
h
.
c
o
m](mailto:DOsei-Bonsu@reedsmith.com)
>
**C
c
:**

B
r
y
a
n
K
o
t
l
i
a
r
<
b

[kotliar@teamtogut.com](mailto:kotliar@teamtogut.com)>; EXT Kyle Ortiz <[kortiz@teamtogut.](mailto:kortiz@teamtogut.)

com>; Amanda Glaubach <aglaubach@teamtogut.com>; Martha aMar

.tir<[mmartir@teamtogout.com](mailto:mmartir@teamtogout.com)>**Subject:** Eletson-Closing Mat

ters

**External E-Mail - FROM lebrahimi@teamtogut.com <le**

brahimi@teamtogut.com>. Reed Smith Team, We'd like to begin t

he process of working with you, the Debtors, and the other parti

esonconsummating the PCPlaninaccordancewiththeCourt,sdec

sion from Friday.

**Please let us know when you are available to o**

**day/tomorrow for a call with us.**

-- Attached is an initial draft

of a closing checklist that we've prepared. You'll see we are st

.arting to work through various items with the parties this week

, and will be emailing all of the parties (including you) regard;

ngscheduling all hands closing calls. We will circulate upda

ted versions throughout the coming weeks.

As for the Debtors a

nd their subsidiaries, you will see there various items that we n

"eed from the Debtors and their subsidiaries. In particular, t

here are a few high priority diligence items (see Part A, Row 2) t

natwe,'d like to receive by no later than this Wednesday, October

.30.

We've excerpted this below for your convenience.

In add

ition, as for various third party transition matters, we'd like

e f o r y o u t o c o o r d i n a t e s c h e d u l i n g c a l l s w i t h O a k t r e e a n d t h e C o m

pany, s other historical lenders.

Let us know if you have any q

uestions regarding the above, thank you.

Best Regards, Leila

## HIGH PRIORITY ITEMS TO BE PROVIDED BY 10/30

- Employee roster

for all entities

- Copies of all employment agreements

- Copies

of all charters, certificates of incorporation, by laws, and si

. milar corporate constituent documents for all entities

- Copi

es of all loan documents for all entities

- List of board members

and officers for all entities

- List of all legal, financial, and

other professionals retained/employed by each entity and out

standing amounts due to each

- List of all pending, outstanding

, and/or threatened or otherwise potentially known litigation

s (threatened, actual, or otherwise) against or instituted by

all entities

— **Leila Ebrahimi** Togut, Segal & Segal LLP One Penn Pl

.aza, Suite 3335 l New York, NY 10119 Direct: +1 212 201 5583 l M

obile: +1 201 961 3262 lebrahimi@teamtogut.com | togutlaw

[wfirm.com](#)

This E-mail, along with any attachments, is considered

confidential and may well be legally privileged. If you have receiv

edit in error, you are on notice of its status. Please notif yu s immed

iately by reply e-mail and then delete this message from your system

.... Please do not copy it or use it for any purposes, or disclose its cont

`ents to any other person. Thank you for your cooperation.

RSUSv12021

<Eletson - PC Plan Closing Checklist.docx>

<Mail Attachment.eml>

## Exhibit 12

1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  ELETSON HOLDINGS INC., ET AL.,            Main Case No.

8          Debtors.                          23-10322-jpm

9

10 - - - - - - - - - - - - - - - - - - - -x

11

12              United States Bankruptcy Court

13              One Bowling Green

14              New York, New York

15

16              November 13, 2024

17              10:08 AM

18

19

20

21 B E F O R E:

22 HON. JOHN P. MASTANDO, III

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  MARIA

2

1

2  Case Status Conference /Letter to the Honorable John P.

3  Mastando III re: Request for Status Conference on November 7,

4  2024 (Attachments: Exs. A-H) (related document(s)1212, 1223,

5  1132)

6

7  Notice of Hearing /(Status Conference: 11/13/2024 at 10:00 AM)

8  Notice of Status Conference

9

10  Letter /Letter to the Honorable John P. Mastando III re: Status

11  Conference on November 13, 2024 (Attachments: Exhibits A-E)

12  (related document(s)1241, 1227, 1132)

13

14

15

16

17

18

19

20  Transcribed by:  River Wolfe

21  eScribers, LLC

22  7227 North 16th Street, Suite #207

23  Phoenix, AZ 85020

24  (800) 257-0885

25  operations@escribers.net

3

1

2    A P P E A R A N C E S (All present by video or telephone):

3    REED SMITH LLP

4          Attorneys for Debtors

5          10 South Wacker Drive

6          40th Floor

7          Chicago, IL 60606

8

9    BY:   MICHAEL B. GALIBOIS, ESQ.

10

11

12    REED SMITH LLP

13          Attorneys for Debtors

14          1717 Arch Street

15          Suite 3100

16          Philadelphia, PA 19103

17

18    BY:   DEREK J. BAKER, ESQ.

19          DEREK M. OSEI-BONSU, ESQ.

20          JOSHUA M. PELES, ESQ.

21

22

23

24

25

4

1

2   REED SMITH LLP

3        Attorneys for Debtors

4        599 Lexington Avenue

5        New York, NY 10022

6

7   BY:   ANDREW L. BUCK, ESQ.

8        CHRISTOPHER M. LAUKAMG, ESQ.

9        LOUIS M. SOLOMON, ESQ.

10        RICHARD SOLOW, ESQ.

11

12

13   REED SMITH LLP

14        Attorneys for Debtors

15        1201 Market Street

16        Wilmington, DE 19801

17

18   BY:   KEVIN W. COCKERHAM, ESQ.

19

20

21

22

23

24

25

5

TOGUT, SEGAL & SEGAL LLP

     Attorneys for Petitioning creditors, proposed DIP lender,

       and proposed plan sponsor

     One Penn Plaza

     Suite 3335

     New York, NY 10119

BY:   JARED C. BORRIELLO, ESQ.

     LEILA EBRAHIMI, ESQ.

     JOHN C. GALLEGO, ESQ.

     AMANDA C. GLAUBACH, ESQ.

     BRYAN M. KOTLIAR, ESQ.

     JEFFREY LEFKOWITZ, ESQ.

     MARTHA E. MARTIR, ESQ.

     JOHN MCCLAIN, ESQ.

     KYLE J. ORTIZ, ESQ.

     BRIAN F. SHAUGHNESSY, ESQ.

6

1

2  DECHERT LLP

3       Attorneys for Official Committee of Unsecured Creditors

4       1095 Avenue of the Americas

5       New York, NY 10036

6

7  BY:   OWEN HANEY, ESQ.

8       DAVID A. HERMAN, ESQ.

9       KARLI K. WADE, ESQ.

10       STEPHEN D. ZIDE, ESQ.

11

12

13  PERKINS COIE LLP

14       Attorneys for Wilmington Savings Fund Society, FSB

15       505 Howard Street

16       Suite 1000

17       San Francisco, CA 94105

18

19  BY:   PAUL JASPER, ESQ.

20

21

22

23

24

25

7

1

2   PERKINS COIE LLP

3         Attorneys for Wilmington Savings Fund Society, FSB

4         1155 Avenue of the Americas

5         22nd Floor

6         New York, NY 10036

7

8   BY:   TINA N. MOSS, ESQ.

9

10

11  UNITED STATES DEPARTMENT OF JUSTICE

12        Attorneys for Office of the United States Trustee

13        One Bowling Green

14        Suite 534

15        New York, NY 10707

16

17  BY:   DANIEL RUDEWICZ, ESQ.

18

19

20

21

22

23

24

25

8

ALSO PRESENT:

       CLARA E. GEOGHEGAN, Law360

       UDAY GORREPATI, ABI Project

       TAYLOR HARRISON, ION Group

       MARK LICHTENSTEIN, ESQ., Murchinson Ltd.

       DAWN L. PERSON, Togut, Segal & Segal LLP

       ADAM SPEARS, ace148 Inc.

       BLANKA WOLFE, Reorg

**ELETSON HOLDINGS INC., ET AL.**

9

1              P R O C E E D I N G S

2         THE COURT:  Good morning, everyone.  We're here on

3    case number 23-10322, Eletson Holdings.

4         Can I have appearances for the record, please?

5         MR. SOLOMON:  Good morning, Your Honor.  Lou Solomon,

6    and with me is a new colleague, Rich Solow and Derek Osei-

7    Bonsu.  Mr. Baker is still assisting in the case, but pursuant

8    to a request by the Administrative Office of the U.S. Courts,

9    he will not be appearing.  But we wanted both Your Honor to

10   know that he's not left the case, but he won't be appearing

11   before Your Honor at this time.

12        THE COURT:  Thank you, Counsel.

13        MR. ORTIZ:  Your Honor, Kyle Ortiz of Togut, Segal &

14   Segal for the plan proponents, petitioning creditors, and DIP

15   lender, joined on the phone by my colleagues Bryan Kotliar and

16   Brian Shaughnessy.

17        THE COURT:  Good morning.

18        MR. ORTIZ:  Good morning.

19        MR. HERMAN:  Good morning, Your Honor.  David Herman

20   from Dechert on behalf of the official committee of unsecured

21   creditors.

22        THE COURT:  Good morning.

23        MR. HERMAN:  Good morning.

24        MR. RUDEWICZ:  Good morning, Your Honor.  Daniel

25   Rudewicz on behalf of the United States Trustee.

**ELETSON HOLDINGS INC., ET AL.**

10

1          THE COURT:  Good morning.

2          MR. JASPER:  Good morning.  Paul Jasper of Perkins

3    Coie on behalf of Wilmington Savings Fund Society, FSB, and

4    joining me also is Tina Moss.

5          THE COURT:  Good morning.

6          Okay.  Mr. Solomon, would you like to begin?

7          MR. SOLOMON:  We'd be happy to, Your Honor.  We

8    understood it the purpose of the conference was I think as of

9    yesterday a letter that had been sent on November 6th by

10   counsel for the petitioning creditors.  We did try to respond

11   to that letter, insofar as we have been asked to cooperate

12   before the effective date.  We have done all that we can.

13         Much of the information that is being sought, I think,

14   is premature, both because it's before the effective date and

15   there's no basis to ask for it, but we've set that aside and

16   tried to find the information.  We have gone back to the

17   directors of Holdings and asked the questions of where they

18   thought they could get additional information.  They have

19   sought counsel on their own.  They've done that in part because

20   they've been, I think, sort of threatened by the Pach Shemen

21   principals to go get counsel on their own.  And that counsel

22   has responded that they are considering the request.

23         We don't control it.  We have done all we can.  I'm

24   not sure what more can be asked of us.  That was as of -- that

25   was, I think, as of yesterday.  And then later yesterday,

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
Pg 243 of 448
**ELETSON HOLDINGS INC., ET AL.**

11

1    another letter came in to Your Honor about updating the

2    Liberian registry.  There, again, what we did was we sent that

3    letter off to our client, and our client has then sent it to

4    counsel for the directors at Holdings.  They have written back.

5    All the communications we're having, we're sending at this

6    point, by the way, both to Your Honor and to counsel.  And got

7    the letter back that we already -- we submitted just a couple

8    of minutes ago, just after I received it, detailing what

9    consideration they are giving to it.

10          I did want to say, Your Honor, that in the plan, as I

11    read it, from the get-go, the petitioning creditors have

12    understood that there are non-U.S. aspects of this bankruptcy.

13    Their plan says that whether the stock gets canceled is not

14    just an issue of U.S. law.  It has to comply with all

15    applicable law.  I think I've read four or five other times in

16    the plan where they recognize that there are non-U.S. aspects

17    of this.  We do not represent the debtor in any of those -- in

18    any of those aspects.

19          And so I think the short answer is we have done what

20    we can.  And I don't know what else is being asked of us in a

21    conference setting.  If there's a motion that they wish to

22    make, then perhaps they should make it.  But that's, I think,

23    our opening position.

24          THE COURT:  Okay.  Thank you, Counsel.  Now, I think I

25    saw a notice of appeal was filed, correct?

**ELETSON HOLDINGS INC., ET AL.**

12

1          MR. SOLOMON:  We did, Your Honor.  Yes.  Well,

2    Holdings did, Your Honor.

3          THE COURT:  Yes.  And what is the impact, if any, of

4    that?

5          MR. SOLOMON:  Well, I think, in due course, I can

6    describe -- I can describe that.  We believe that there are a

7    couple of respects that are quite meaningful to the outcome of

8    Your Honor's rulings, where I think Your Honor felt bound by

9    law in a way that we think that the --

10          THE COURT:  No, I don't mean what the basis for the

11    appeal is.  I just mean, what is the impact here of the filing

12    of a notice of appeal, if any.  Is there any impact on these

13    proceedings?

14          MR. SOLOMON:  While someone else is talking, I can

15    give that some more thought, but I don't think so, Your Honor.

16    I don't think Your Honor is ousted of any jurisdiction on the

17    matters that are being raised by the petitioning creditors.  If

18    that was the question, I don't think so.

19          THE COURT:  Okay.  And has any appeal -- is any stay

20    being sought?

21          MR. SOLOMON:  Well, we did not seek a stay because I

22    don't think they can go effective with their plan until they

23    comply with the non-U.S. law that they -- there are two

24    different parts of -- they have conditions precedent to their

25    closing that they maintain they can waive.  These same parties

1    were before Judge Liman yesterday, and I heard them explain to

2    Judge Liman that they feel that they can waive those.  But

3    there are aspects of the plan that they can't wave, and that is

4    they have to be in compliance with non-U.S. law.

5           Until they're in compliance with non-U.S. law, I don't

6    see how there can be an effective transfer of this company.

7    And so I think that's going to take them a little time.  At

8    least what I keep asking them for is some evidence that they

9    have done it, that these various things have occurred.  And so

10   I hope that answers Your Honor's question.

11          THE COURT:  It does.  So I assume you have a different

12   view as to the effective date; is that what you're saying?

13   Well, different from their view.

14          MR. SOLOMON:  So I read the definition of "effective

15   date", and I believe that we may be on the same page that in

16   order for them to claim effective date, they do have authority

17   that they've arrogated to themselves to waive some conditions,

18   precedent.  But what they don't have is the authority to render

19   moot our appeal until they've actually proceeded through

20   consummating the plan.  And that, I do not think they can do

21   without complying with various aspects of non-U.S. law.

22          THE COURT:  Okay.  Thank you, Counsel.

23          Would anyone else like to be heard?

24          MR. ORTIZ:  Your Honor, Kyle Ortiz of Togut, Segal &

25   Segal for the plan proponents.  Look, I don't think anything

1    that was just said is even remotely accurate about how

2    bankruptcy law works and how plans go effective, but we'll get

3    into that.  We asked for this conference.  We appreciate that

4    Your Honor gave us the time to talk about this.  What you just

5    saw is the exact obstruction that we're going to get into,

6    which is the just coming up with, which I think we just

7    admitted, an effort to obtain a stay without asking for a stay

8    by just not complying with the law.

9            So look, we originally thought we were just going to

10   have a quick status conference.  Give you some update on our

11   progress towards the effective date.  And we're really focused

12   on some things that were going to be an issue post-effective

13   date with their noncooperation in kind of effectuating

14   downstream corporate control.  But things have kind of

15   dramatically escalated in the past twenty-four hours as the

16   debtors, through comments they made in the district court --

17   and I was in the galley.  I didn't say anything in that

18   hearing.  So there was no comments made by us to a district

19   court.  We're not in front of them yet.

20           And then the letter that they filed yesterday, I

21   think, made it very clear that they plan to actively obstruct

22   efforts to close.  So I will still give Your Honor an update

23   with regard to where we are.

24           THE COURT:  Well, I think they're saying that they --

25   I think they're saying that they think there are issues of

**ELETSON HOLDINGS INC., ET AL.**

15

1   foreign law, et cetera, other things that need to be dealt

2   with, or at least that's part of what they're saying.

3        MR. ORTIZ:  Yes, Your Honor, but that's just

4   completely inaccurate.  So they don't get to relitigate

5   confirmation today.  They didn't raise any of these issues.

6        We have the -- we have to come up with what we need to

7   do to effectuate our plan.  We have the foreign law that we

8   think we need to do, and we do that.  And then that's up to us.

9   We declare an effective date.  And if they think they can

10  challenge that, they can go challenge that.

11       The debtors are not the Court.  The debtors don't get

12  to decide what we have to do.  And I'm going to go through,

13  Your Honor.  Your Honor has already issued what they're

14  supposed to do at this point.  And what they are supposed to do

15  is cooperate with the plan and do what we ask.

16       And all that we've asked and all that we need, and

17  I'll get into this, Your Honor, is for them to fill out a

18  letter that we sent to them so that we can send that to the

19  Liberian registry.  This is amazing.  We did a year and a half

20  and a week-long trial, and he's trying to get a do-over right

21  now.

22       So let's just like -- I just want to back up, Your

23  Honor.  I'm going to go through what applies to this and just

24  give you some context.  I want to note that everybody else has

25  been working towards confirmation.  We have the full 53.5

**ELETSON HOLDINGS INC., ET AL.**

16

1  million at an account with Verita, the distribution agent.

2  Verita has spent the last two days verifying account numbers

3  and wire amounts.  And we're ready to fund and make plan

4  payments, including funding the reorganized Holdings.

5       Now, where the issue comes up is, as Your Honor is

6  aware, the plan also provides that there's a number of

7  corporate actions contemplated to be made to effectuate the

8  confirmed plan that the debtors are bound by, Your Honor, under

9  Section 1141 of the Code and obligated to implement under

10 Section 1142 of the Code.  These corporate actions essentially

11 boil down to canceling the old shares and then issuing the new

12 shares to change the ownership of Holdings.

13      For instance, Your Honor, section 5.4 of the plan

14 provides in part for the stock of the current equity to be

15 terminated, Your Honor, "without further notice to or under the

16 Bankruptcy Code act or action under applicable law, regulation,

17 order, or rule, or any requirement or further action, vote, or

18 other approval of authorization by any person, the plan cancels

19 the old shares."

20      Section 5.8 then calls for the issuance of new equity

21 in the plan supplement, including the amended bylaws and

22 articles of incorporation, to effectuate all that.  On the

23 effective date, the new shares are issued.  To do all this

24 requires, Your Honor, updating the Liberian registry to reflect

25 the new ownership.

**ELETSON HOLDINGS INC., ET AL.**

17

1          And to be clear, Your Honor, I don't know what their

2    letter is referring to.  There's no court involved.  Liberian

3    law is a carbon copy of Delaware law.  This is just updating

4    the corporate registry to reflect what the confirmed plan,

5    which the debtors are bound by, provides for.  This is simply

6    updating of the corporate registry.

7          Your Honor, and this is where things have gone off the

8    rails in the last twenty-four hours, we have been working for

9    the last many months and particularly in the last two-and-a-

10   half weeks with our Liberian counsel on making the necessary

11   filings to the Liberian registry, such as filing the amended

12   certificate of incorporation and amended bylaws for reorganized

13   Holdings, which were approved by this Court, to implement the

14   ownership and management change at Holdings that are

15   contemplated by the confirmed plan that the debtors are bound

16   by under Section 1141 of the Code and obligated to carry out

17   under Section 1142 of the Code.

18         Liberian counsel, Your Honor, was going through what

19   is called a preclearance process.  With the Liberian

20   registry -- when the Liberian registry -- which, by the way,

21   Your Honor, is itself actually a U.S. LLC headquartered in

22   Virginia, which may be bound by this Court itself -- informed

23   us that the Liberian registry only accepts instructions from a

24   company's current address of record or a person granted

25   authority by the current address of record through an

1   authorization letter submitted to the Liberian registry.  So

2   our Liberian lawyer prepared this authorization order, and we

3   sent it to the debtors to populate and execute, consistent with

4   their obligations under the plan and the Bankruptcy Code.

5         And I should back up real quick.  There are actually

6   two ways to do this.  One is through the authorization letter

7   submitted as just noted or to demonstrate we already have

8   authority, regardless of the debtor's cooperation, by first

9   getting our confirmation order recognized in Liberia, which

10  would allow us to file the registry even without the debtors'

11  executing an authorization letter.

12        But we don't have to do that, Your Honor, because the

13  debtors are here and subject to the jurisdiction of this Court.

14  So I think it's important to note here, really, the purpose of

15  recognition and cross-border insolvencies.  And my practice is

16  almost exclusively cross-border restrictions.  Done Japanese

17  companies, UK companies, Chilean companies, Brazilian

18  companies, German companies, Italian companies, Philippine

19  companies, and two Greek shipping companies in the past.  And

20  sometimes, I have sought recognition.  More often, I have not.

21  It depends on the situation and what you need and who you are

22  seeking to bind.

23        The purpose of recognition is if you have a foreign

24  entity that is not subject to the jurisdiction of the U.S.

25  court, that you need to enforce certain things on in a foreign

**ELETSON HOLDINGS INC., ET AL.**

19

1    jurisdiction, you go to that country, get recognition, and

2    enforce.  But here, Your Honor, the only entity we need to do

3    anything related to Liberia is the debtors themselves.  And

4    they are unquestionably subject to the jurisdiction of this

5    court.  There's no need for them to reconstitute a board,

6    decide an appropriate course of action with mysterious counsel

7    that apparently advises them when Reed Smith doesn't, that they

8    claim in their letter.

9          They invoked this Court's jurisdiction when they

10   voluntarily converted, and this Court confirmed a plan which is

11   binding on them and they are obligated by law to enforce.  They

12   don't get to choose whether to do that or dictate what we need

13   to do or whether we need to get recognition.  And this isn't

14   about, Your Honor, the intricacies of non-U.S. corporate

15   formalities that counsels' letters suggesting we don't

16   apprehend.  The plan, like nearly all plans, including the ones

17   that they drafted, is explicit that it is effectuated "without

18   any requirement or further action by shareholders, directors,

19   or managers of the debtors."  The plan itself provides all

20   necessary authorizations.

21         The only party refusing to do something is the

22   debtors.  And they are here, Your Honor, right now and subject

23   to this court.  Not only are they subject to this court,

24   they're subject to the Bankruptcy Code, the plan, and the

25   confirmation order.  And all three of those things, Your Honor,

23-10322-jpm   Doc 1268   Filed 11/25/24   Entered 11/25/24 09:06:22   Main Document
Pg 252 of 448
**ELETSON HOLDINGS INC., ET AL.**

20

1  require the debtors to cooperate and take this one small action

2  that they've been directed to take and implement the plan that

3  they are bound by under 1141 of the Code and obligated to carry

4  out under Section 1142 of the Code.

5          And specifically, Your Honor, Section 1142 provides

6  that, 1142(a), "notwithstanding any other applicable

7  nonbankruptcy law, rule, or regulation related to financial

8  condition, the debtor shall carry out the plan and shall comply

9  with any orders of the court."  And then at (b), it says, "The

10  court may direct the debtor and any other necessary party to

11  execute or deliver or to join in the execution or delivery of

12  any instrument required to effect the transfer of property

13  dealt with by a confirmed plan and to perform any other act,

14  including the satisfaction of any lien, that is necessary for

15  the consummation of the plan."

16          Your Honor, Colliers is instructive on the purpose of

17  this section when it says, "Section 1142(a) directs the debtor

18  to carry out the terms of the confirmed plan.  While these

19  provisions are arguably superfluous in light of the statement

20  in Section 1141(a), that the plan binds the debtor, Section

21  1142(a) makes clear the legal obligation of the debtor to carry

22  out the terms of the confirmed plan and obviates the need for

23  the court to specifically direct the debtors to do so.  And

24  this is the most important part.  This clear statement of the

25  debtor's obligation is particularly helpful in those cases

1 | where the debtor was not the plan proponent."

2 | And it's worth highlighting for Your Honor that when

3 | Section 1142(b) says the court may direct the debtor to

4 | execute, deliver, or to join in delivery of any instrument

5 | necessary for the consummation of the plan, Your Honor has

6 | already done that through the confirmation order and the

7 | confirmation of the language in the plan itself.  The

8 | confirmation order, Your Honor, provides both an obligation to

9 | cooperate and an injunction from interference.

10 | That obligation to cooperate arises under paragraph 5,

11 | which provides at 5-1 that the debtor, the petitioning

12 | creditors, and each of their respective related parties, which,

13 | by the way, Your Honor, is a term that includes owners,

14 | subsidiaries, and affiliates, among others, are hereby directed

15 | to cooperate in good faith to implement and consummate the

16 | plan.

17 | Paragraph 5-3 then provides that in connection with

18 | any actions taken pursuant to this paragraph and all other

19 | actions required by the plan and this confirmation order, to

20 | effectuate, implement, or consummate the plan and the

21 | transactions contemplated therein, the debtors are hereby

22 | authorized and directed to take or not take any and all actions

23 | as instructed by the petitioning creditors and shall not take

24 | any actions inconsistent with the plan.

25 | On the injunctive side, Your Honor, paragraph 12

**ELETSON HOLDINGS INC., ET AL.**

22

1   provides, among other things, upon entry of the confirmation

2   order, by the way, not the effective date, upon entry of the

3   confirmation order, all holders of claims or interest and other

4   parties-in-interest, along with the respective present or

5   former employees, agents, officers, directors, principals,

6   shall be enjoined from taking any actions to interfere with the

7   implementation or consummation of the plan.

8           Then, Your Honor -- and I'm sorry.  I'm just going

9   through this because these are very explicit language that are

10  in the plan and the confirmation order.  The plan itself

11  describes the means for implementation and what is required of

12  the debtors in article 5.  And again, under the Bankruptcy

13  Code, Your Honor, the plan is binding on the debtors, and they

14  are obligated to effectuate it.

15          Specifically, section 5.2 provides for the debtors to,

16  among other things, participate in a whole host of actions

17  which are instructed by the plan proponents, including, among

18  many, many others, filing of appropriate certificates of

19  articles of incorporation, reincorporation, merger,

20  consolidation and conversion.  Such other transactions that are

21  required to effectuate the plan.  The issuance of reorganized

22  entity.  All other actions that the applicable entities

23  determined to be necessary, including making filing or

24  recordings that may be necessary by applicable law in

25  connection with this plan, and such action and documents are

**ELETSON HOLDINGS INC., ET AL.**

23

1   deemed to require no further action or approval.

2          Section 5-11, Your Honor, relating to corporate

3   action.  And this is the issue that we're talking about today.

4   "Each of the matters" -- this is a quote.  "Each of the matters

5   provided for under this plan involving the corporate structure

6   of any debtor or reorganized Holdings or any corporate action

7   to be taken by or required of any debtor or reorganized

8   Holdings shall be deemed to have occurred and be effective as

9   provided herein and shall be authorized, approved, and to the

10   extent taken prior to the effective date ratified in all

11   respects, without any requirement of further action by

12   shareholders, members, creditors, directors, or managers of the

13   debtor as applicable.

14          Goes on to say, "On or as applicable before the

15   effective date, the appropriate officers of the debtors or

16   reorganized Holdings, as applicable, shall be authorized and as

17   applicable, directed to issue, execute, and deliver the

18   agreements, documents, securities, and instruments contemplated

19   by this plan in the name of and on behalf of the debtor

20   organized holdings as applicable, including the shareholder

21   agreement and any other agreements.  The authorizations and

22   approvals contemplated by this Section 5-11 shall be effective

23   notwithstanding any requirements under nonbankruptcy law."

24          So Your Honor, notwithstanding this clear dictate in

25   the plan, which again Section 1141 binds upon the debtors, to

**ELETSON HOLDINGS INC., ET AL.**

24

1   cooperate in these corporate actions, the debtors wrote the

2   Court a letter last night that claims the debtors have not

3   failed to cooperate and then details all the ways the debtors

4   not only plan not to cooperate, but to actively obstruct the

5   petitioning creditors efforts to consummate the plan.  The

6   debtors will say, you've heard it already, that their

7   shareholders are evaluating the appropriate course of action in

8   light of certain resignations and other events or working with

9   some mysterious counsel that isn't Reed Smith to determine what

10   they can do under nonbankruptcy law.

11        Nonsense.  There is nothing to evaluate.  They're

12   subject to this Court, and Your Honor has ordered their

13   cooperation.  The plan binds them, and they're obligated to

14   effectuate the plan.  And again, Your Honor, Section 5-11 says

15   the authorizations and approvals contemplated by it shall be

16   effective notwithstanding any requirement under nonbankruptcy

17   law.

18        So if counsel is going to instruct the debtors not to

19   comply with court orders, then both the debtors and their

20   counsel should be sanctioned.  What has actually just

21   transpired in the last twenty-four hours, Your Honor, is we

22   asked the debtors to execute an authorization letter.  We

23   drafted a form.  It's simply fill in the blanks.

24        Following receipt of this very simple request that's

25   consistent with the plan, that's consistent with the law, half

1   the board resigned from the board and apparently also their

2   officer positions.  And of course, we're looking into the

3   consequences of what that means from an authority perspective.

4   But their articles on their face call for only three board

5   members, and I think the email that Mr. Solomon just filed

6   provides that there are new board members provisionally.  So

7   there are definitely people who can do what they are ordered to

8   do under the plan and under the confirmation order.  And

9   they've just simply refused to take the simple act because it

10  would mean that there's an effective date.

11          Instead, they sent the Court this copy of a self-

12  serving email from a Greek lawyer opining on Liberian law.  The

13  debtors, Your Honor, do not get to decide what we need to do to

14  effectuate our plan.  It's up to us to effectuate our plan.

15  They are required to do as directed in furtherance of the plan,

16  consistent with Sections 1141 and 1142 of the Code, the plan,

17  and the confirmation order.

18          We asked them for a letter.  Whether that is

19  sufficient in Liberia is our problem, not theirs.  They have no

20  discretion.  They don't get to evaluate and decide whether to

21  honor This Court's orders.  We're asking for something.  The

22  stuff that was in the earlier letter is things that would be

23  helpful post-effective date.  They should be doing those, but

24  they're not critical.

25          But the thing that came up last night with regard to

1    this instruction in Liberia, that is critical, and they need to

2    do that.  We are asking for something that is very simple.

3    This recognition nonsense is just that, Your Honor.  It's

4    nonsense.  They're the only party refusing to do things.

5    They're the ones that came to this court.  This is, I think,

6    Your Honor, as transparently as can possibly be, an effort at

7    delay and obstruction.  We've already drafted the letter we

8    need.  They just have to fill it out.

9         The Court has already ordered -- so Mr. Solomon talked

10   about a motion.  No, you've already ordered that they're

11   required to do so.  And Congress long ago mandated they're

12   required to do so by enacting Sections 1141 and 1142 of the

13   Bankruptcy Code, as Collier said, particularly an important

14   protection when the debtor is not the plan proponent.

15        So what we are asking of Your Honor today is to,

16   again, direct them to comply with the plan, the order, and the

17   Bankruptcy Code and just populate this letter.  And if they

18   refuse to do that, you need to impose some penalty on the

19   debtors, their shareholders, and their counsel each day until

20   they do because they will be choosing to remain in contempt of

21   Your Honor's orders.  And if we have to go seek recognition of

22   the confirmation order in Liberia to accomplish what they are

23   flatly refusing to do in violation of the plan, the Bankruptcy

24   Code, and the order, they should have to pay for that.  And I

25   can't imagine they're seriously going to say that they're going

**ELETSON HOLDINGS INC., ET AL.**

27

1  to oppose recognition of a plan they are bound by in Liberia.

2  It's absurd.

3           I want to, like, acknowledge the stakes here, Your

4  Honor.  My client has had 53.5 million tied up for the past two

5  months.  43.5 million tied up for the last nearly six months.

6  Nearly thirty million of that, Your Honor, is for payments to

7  professionals for in a year-and-a-half-plus-long process that

8  they are just flatly refusing to cooperate with because they

9  don't like the outcome.

10          This plan, Your Honor, is ready to go effective but

11  for the debtors' refusal to provide this one little letter

12  that's just a fill in the blank.  We have conditions precedent.

13  We have satisfied them all.  The only thing we need is this

14  letter, and we will declare our effective date, which is our

15  right, as plan proponents, to declare our effective date

16  consistent with the conditions precedent that we drafted for

17  our own protections.

18          The time is up, Your Honor.  The DIP is fully drawn.

19  This case is thirty million of pro fees in.  This is nothing

20  but obstruction.  If they want to stay, they need to file a

21  motion and satisfy the standard.  They don't get to play games

22  in other places and say that they need proof of things.  I

23  don't have to give proof to the debtors.  It's my job to make

24  this plan, satisfy the conditions, which we determine if we

25  satisfy them, and file the effective date.

**ELETSON HOLDINGS INC., ET AL.**

28

1          They want to challenge that, go nuts.  But this is

2     obstruction.  And if they are allowed to do this, Your Honor,

3     we've seen this pattern this entire case, they will take it as

4     permission.  They will continue to do additional things.  They

5     need to be directed or penalized, or we will continue to be

6     talking about this in February of next year.  At the very

7     least, they're not willing to just fill out this one letter,

8     they should be penalized for the millions a month the delay

9     this is causing.  Thank you, Your Honor.

10          THE COURT:  Thank you, Counsel.

11          Did anyone else wish to be heard before I turn it back

12     to Mr. Solomon?

13          MR. HERMAN:  Your Honor, David Herman for the

14     committee.  Could I be heard?

15          THE COURT:  Please.

16          MR. HERMAN:  Thank you, Your Honor.  So I think Mr.

17     Ortiz covered all the points pretty well.  I just wanted to

18     highlight a few things because I actually think this is quite

19     simple.  We have a confirmed plan.  Your Honor has confirmed

20     it.  There's a confirmation order.  As Your Honor pointed out

21     in the colloquy with Mr. Solomon, there's been no stay.  There

22     has been an appeal.  But as Your Honor knows, an appeal does

23     not stay a confirmation order.  So as Mr. Solomon acknowledged,

24     this Court retains jurisdiction to act.

25          And so what is required of the parties?  And you start

23-10322-jpm   Doc 1268   Filed 11/25/24   Entered 11/25/24 09:06:22   Main Document
Pg 261 of 448
**ELETSON HOLDINGS INC., ET AL.**

29

```
 1   with 1142.  1142(a) does not just provide that the debtor has
 2   to cooperate.  It provides that, notwithstanding any otherwise
 3   applicable nonbankruptcy law, rule, or regulation and so forth,
 4   the debtor shall carry out the plan and shall comply with any
 5   orders of the Court.  So the appropriate question for Mr.
 6   Solomon and the place that one ought to expect debtor's counsel
 7   to begin two weeks after the plan has been confirmed, is with
 8   an explanation of what the debtors are doing to carry out the
 9   plan.
10        Now, what the petitioning creditors have said is all
11   they need from the debtors is to sign an instrument that
12   provides for the transfer of in the stock registry as required
13   under applicable law.  And 1142 also explains how that's
14   supposed to happen.  The debtor should be doing it anyway
15   because under 1142(a), as I explained, the debtor shall carry
16   out the plan.
17        But 1142(b) provides this court with the authority and
18   with instructions as to what to do in the event that the debtor
19   or any other necessary party doesn't do that, which is the
20   following.  "The court may direct the debtor and any other
21   necessary party to execute or deliver or to join in the
22   execution or delivery of any instrument required to effect a
23   transfer of property dealt with by a confirmed plan."  So this
24   is a provision of the Bankruptcy Code that specifically
25   contemplates this situation, where you have a confirmed plan
```

1   that needs to be implemented, and somebody needs to execute

2   some sort of instrument, which is this letter that the

3   petitioning creditors have prepared.

4         All of this is also required under the confirmation

5   order.  The confirmation order under paragraph 5(i) provides

6   the debtors and the petitioning creditors and each of their

7   respective related parties are hereby directed to cooperate in

8   good faith to implement and consummate the plan.  That mirrors

9   the requirements of Section 1142(a).

10        And then in paragraph 5(iii) of the plan provides, as

11  Mr. Ortiz mentioned, that the debtors are hereby authorized and

12  directed to take or not take any and all actions as instructed

13  by the petitioning creditors and shall not take any actions

14  inconsistent with the plan or this confirmation order without

15  the petitioning creditors' prior consent.  So you have a

16  requirement in the Bankruptcy Code and in the confirmation

17  order that the debtors not just cooperate, but that they

18  affirmatively carry out the plan and that they listen to the

19  petitioning creditors.

20        To the extent the debtors hide behind the stay that's

21  imposed by Bankruptcy Rule 3020(e) that provides an order

22  confirming the plan is stayed until the expiration of fourteen

23  days, the Court has the ability to shorten that, and we would

24  urge the Court to do so.  The purpose of the stay under the

25  Rule is not to provide incumbent management and owners with a

1   window of opportunity to try to thwart the plan until the stay

2   is up.

3          So that's the legal framework and the framework under

4   this Court's orders.  As far as all the excuses that we're

5   hearing, these are all things that have been concocted in the

6   last two weeks.  Foreign recognition is not necessary.  Greece

7   is a signatory to the model law on cross-border insolvency.

8   See it's the same as our Chapter 15.  As Mr. Ortiz well knows,

9   he and I have been on opposite sides of cross-border cases, the

10  purpose of those provisions is to be able to apply for

11  assistance to local courts, if necessary, to implement a plan.

12  That's not necessary here.  All the debtors have to do is sign

13  the letter and it goes effective.

14         All of this is also inconsistent with a number of

15  things.  It's inconsistent with the debtor's sworn testimony on

16  feasibility that they could go effective with a plan in short

17  order.  There was no testimony at trial that there would need

18  to be some unknown period of time that the debtor would have to

19  stay in bankruptcy to initiate foreign proceedings and things

20  like that.  There's nothing in the debtors' disclosure

21  statement about the need to institute foreign proceedings.

22  There's nothing in the objections raised.  The debtors

23  consented to entry of the confirmation order following the

24  Court's ruling, which says that they shall do all these things

25  notwithstanding any nonbankruptcy law.  So all of these things

**ELETSON HOLDINGS INC., ET AL.**

32

1  are just excuses that have been concocted since the plan has

2  been confirmed.

3        So what should the Court do about this?  From the

4  committee's perspective, our main concern here is that this is

5  a very thin estate.  Your Honor found rightly in the

6  confirmation ruling that the debtors' plan was underfunded.

7  There wasn't enough funds for that one to go effective.  The

8  petitioning creditors' plan is also on the razor's edge.  They

9  have a commitment letter.  At some point, that commitment

10 letter will expire.  The DIP is fully drawn.  The debtors are

11 not paying professional fees currently.  There objected to fees

12 that are outstanding and have not been paid for some time, and

13 they have no money to do so.  If this keeps going on, the

14 estates are simply going to run out of money, notwithstanding

15 the fact that we have a confirmed plan.

16       So our view is we would really urge the Court to act

17 decisively here.  The Bankruptcy Code and the rules and the

18 confirmation order supply all the guidance for what the Court

19 needs to do.  Your Honor should direct the debtors and their

20 principals and their officers and directors to execute whatever

21 instruments the petitioning creditors believe they need.  And

22 to the extent they don't do so, the debtors and their counsel

23 and their management should be held in contempt.  And to the

24 extent that they're hiding behind a stay of the confirmation

25 order, the Court should shorten it.  Thank you, Your Honor.

**ELETSON HOLDINGS INC., ET AL.**

33

1              THE COURT:  Thank you, Counsel.

2              Does anyone else wish to be heard?

3              MR. SOLOMON:  Your Honor, I would.

4              THE COURT:  Counsel.

5              MR. SOLOMON:  Lou Solomon for the debtors.  I guess

6    I'm used to being threatened by --

7              THE COURT:  Counsel, can you first update me on what

8    happened yesterday in the district court?

9              MR. SOLOMON:  Yes.  Yes, Your Honor.  We went down at

10   the same time.  I was getting, apparently, this letter that I

11   was required to respond to in six hours, at the same time I was

12   doing that, I was going down to Judge Liman.  It was an in-

13   person.  What the judge did was he lifted the stay so that

14   motions to intervene could be made.  He lifted the stay so that

15   Levona could respond to our requests for third-party discovery.

16   So all of that is done.  He maintained the stay for everything

17   else for the rest of discovery.  That's all that's before him

18   is the rest of discovery.  And we're to appear before him on

19   December 6th again.  And --

20             THE COURT:  So what's going forward is the discovery

21   related to the motion to vacate?

22             MR. SOLOMON:  Yes, Your Honor.  That's the only thing

23   that -- yes.  Correct.  Correct, Your Honor.  That, and motions

24   to intervene because Levona has said that they plan to throw us

25   out, and so Gas and the and the nominees have advised us that

**ELETSON HOLDINGS INC., ET AL.**

34

1   they intend to move to intervene, which he's allowed those

2   motions to be made.

3        THE COURT:  Got it.

4        MR. SOLOMON:  And what we explained to him as well,

5   because of the communications that we received, is that

6   apparently what we're being asked to do, apparently, in the

7   eyes of Liberian counsel, is to violate Liberian law.  And the

8   question presented to Your Honor is whether the Bankruptcy Code

9   or their plan requires the debtor to violate non-U.S. law.  The

10   Bankruptcy Code --

11        THE COURT:  And you're referring to specifically the

12   letter that they're seeking to --

13        MR. SOLOMON:  Yes, Your Honor.

14        THE COURT:  -- or are you referring more broadly?  Is

15   it just --

16        MR. SOLOMON:  No, no.  I'm actually referring to

17   that -- I'm referring to that letter.  That letter says that

18   what we have to say is that Adam Spears is the CEO of Holdings.

19   Adam Spears is not the CEO of Holdings.  Adam Spears cannot be

20   the CEO of Holdings until they have this bankruptcy recognized

21   in Liberia.  Now, I am speaking as a layman when it comes to

22   that.  I have been given information, all of which I've

23   communicated both to Your Honor and to the other side, about

24   what Liberian law requires.  But it is not a surprise that when

25   they sent me this letter on my way down to Judge Liman and

23-10322-jpm   Doc 1268   Filed 11/25/24   Entered 11/25/24 09:06:22   Main Document
Pg 267 of 448
**ELETSON HOLDINGS INC., ET AL.**

35

1   wanted an answer in six hours and didn't give us a chance to

2   actually get anybody, who, in fact, then responded and said

3   they are looking into it, to answer any further than that, any

4   more fully than that when they sent this to me yesterday.

5        But I do know that their very plan says that what the

6   plan has to do is satisfy the applicable requirements of

7   applicable law.  That's section 5.2 under restructuring

8   transactions.  Now, why Mr. Ortiz threatens me for a half hour

9   or forty minutes and why Mr. Herman me-toos, again, as

10  essentially counsel for Pach Shemen, counsel for Murchinson,

11  why they go through all of this and not once identify to Your

12  Honor the five or six times where in the plan they recognize,

13  they acknowledge, that they have to satisfy non-U.S. law.  That

14  is a mystery to me, but I am going to call it to Your Honor's

15  attention.

16       5.2 says what I just read.  5.4 says cancellation of

17  existing securities.  On the effective date, all notes, stock,

18  where permitted by applicable law, are going to be canceled.

19  Okay.  I don't know what applicable law requires.  I have asked

20  them for some evidence that they are satisfying applicable law

21  because on the one question that they asked, and that is make

22  pretend that Adam Spears is the CEO, that violates applicable

23  law.  So I've asked simply for that.

24       Now, Your Honor, my view is if they can waive this and

25  they think it's a condition precedent and they want to go

**ELETSON HOLDINGS INC., ET AL.**

36

1    effective, then they can do that.  And they don't need me for

2    it.  But if they do need the debtors for it, then the debtors

3    have to go and did go and get counsel in Liberia and in Greece.

4    And those counsel have said this cannot be done in the way they

5    are doing it.  They are ignoring applicable law.

6          And so I don't believe Your Honor should require the

7    debtor to do that.  I don't believe Your Honor should sanction

8    debtor for not violating foreign law.  The idea that Reed Smith

9    now somehow is going to be sanctioned because our client wants

10   to follow non-U.S. law is an absurdity.  I don't have to speak

11   to that further.  And there are more places in the plan where

12   over and over again they acknowledge they have said in their

13   risk factors to everybody, including this Court, that the

14   debtors are incorporated in Liberia and some of their interests

15   are governed by the laws of foreign jurisdictions other than

16   the United States.

17         Although the plan proponents will make every effort to

18   ensure that the confirmation order entered by the bankruptcy

19   court and the steps taken pursuant to the confirmation order to

20   implement are recognized and are effective in all applicable

21   jurisdictions, it is possible that if a creditor or stakeholder

22   were to challenge the plan, a foreign court may refuse to

23   recognize the effect of the confirmation order.  So not only do

24   they recognize the risk, but they also have in their plan that

25   they have to comply with non-U.S. law.

**ELETSON HOLDINGS INC., ET AL.**

37

1              So they came to me less than twenty-four hours ago and

2     said, here, this is what we need.  And I then sent it off.  And

3     counsel in Liberia has said this is unlawful.  This cannot be

4     done.  We're not going to be able to recognize Adam Spears as

5     CEO until such time as they comply with non-U.S. law.  And that

6     is what I told them.

7              And in come they and say that we're violating this and

8     we're violating this and why can't we cooperate.  We will

9     cooperate.  We are cooperating with everything that we have

10    control over.  Asking us to violate non U.S. law is not

11    something that we have control over.  And that's really what

12    we're talking about here.  Not talking about other -- well, so

13    far as I know, we're not talking about other big issues.

14             Let me just look at my notes and make just sure that

15    there's nothing else I wanted to say, Your Honor.

16             Thank you, Your Honor.

17             THE COURT:  Thank you, Counsel.

18             Does anyone else wish to be heard?

19             MR. ORTIZ:  Your Honor, Kyle Ortiz of Togut, Segal &

20    Segel for the plan proponents.  Look, that was remarkable.  We

21    violate a law.  That's the first time we've heard him say this.

22    But that's a plan objection.  The plan says what the plan says.

23    If you are going to say that you can't do things under Liberian

24    law, you should have raised that as part of your plan

25    objection.  He is selectively reading little words here and

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
Pg 270 of 448
**ELETSON HOLDINGS INC., ET AL.**

38

1    there and ignoring other words here and there that say things

2    like the authorizations and approvals contemplated by section

3    5-11 shall be effective, notwithstanding any requirement under

4    nonbankruptcy law.

5          This is not -- it is remarkable to me that somebody

6    will just suddenly say to do anything they can to stop this

7    from happening -- what is it -- we're in November 13th, so two

8    months after the confirmation hearing, that there are things

9    that violate the law about our plan.  Okay.  This is just not

10   the case.  All we've asked, and it's attached to our -- it's

11   attached to our letter.  I'm sure Your Honor has read it

12   because you read everything.  You've seen this letter.  The

13   requirement is that you need to have this change of address so

14   that we can file what we need to file.

15         What they're saying is, no, go to Liberia and get

16   recognition to do the same thing that they're going to then

17   challenge.  Are they telling you they're going to challenge

18   recognition in Liberia?  Because if they're not, then they're

19   just clearly telling you that this is an obstruction and the

20   delay so that they can do something else so that they can move

21   assets out of Corp.  I don't know.  I'm not going to speculate.

22   That's their thing, speculating.

23         What I do know is that we have a confirmed plan and

24   that they are debtors in a U.S. bankruptcy court, and they are

25   obligated to implement it.  To say that they -- it says Adam

1   Spears will be the CEO. He will be the person of record

2   following the filing, which is all we need so that we can make

3   the filing. This person is authorized to make that filing

4   consistent with the bankruptcy court order. I don't know how

5   to say it. They're making things up on the fly to try to

6   accomplish a stay that you need to actually bring emotion and

7   do something about.

8         And this is what we're talking about when we're

9   talking about sanctionable conduct. There's a plan. Again,

10   year and a half. Thirty-million dollars. Week-long trial.

11   This never came up. This is a thing that they are literally

12   making up today in order to stop a plan that's been confirmed

13   by Your Honor and took up your clerk's time and your time and

14   everybody's time.

15         I've never been like this in court before. I just, I

16   don't even know what to say to what they're trying to do.

17   They're making stuff up to stop something because they don't

18   like the result. You need to just enforce the plan. And if

19   they're not willing to do that, they should be sanctioned.

20   There should be serious consequences for just thumbing their

21   noses at the bankruptcy system. Thank you, Your Honor.

22         THE COURT: Thank you, Counsel.

23         Did anyone else wish to be heard before I --

24         MR. SOLOMON: I do, Your Honor.

25         THE COURT: Hold on, Mr. Solomon. Just let me see if

**ELETSON HOLDINGS INC., ET AL.**

40

1   anyone else wishes to be heard.

2        MR. KOTLIAR:  I just, Your Honor, just very briefly, I

3   wanted to clarify what we're asking for.  This is Bryan Kotliar

4   of Togut, Segal & Segal, counsel for the plan proponents.

5        I think it was said differently by different people.

6   And I think Mr. Solomon probably said it in the most inaccurate

7   way.  Holdings is a Liberian company.  It has no assets or

8   operations in Liberia.  It actually can't.  It's what's called

9   a nonresident corporation.  It's not allowed to operate in

10  Liberia.  In connection with its Liberian existence on a shelf,

11  which is managed by the Liberian registry, it actually has a

12  registered office in Virginia.

13       I think, as Mr. Ortiz said, Holdings has an address of

14  record with the Liberian registry that has a person of record

15  with the Liberian registry.  To change that address of record,

16  to change the person of record, the Liberian registry needs a

17  letter from the existing address of record.  Changing the

18  address of record is how you -- is how Holdings submits the

19  bylaws, the shareholder agreement, the corporate governance

20  documents to the Liberian registry to update their paperwork.

21       The plan, the confirmation order, and the otherwise

22  requirements that Mr. Ortiz mentioned, that issues the new

23  equity.  It replaces the governance.  It replaces the corporate

24  documents that Your Honor has already approved and directed the

25  debtors to implement.  That all happens on the effective date,

1    and the conditions pertinent to the effective date we control.

2    We just need them to submit a letter to update some paperwork

3    to effectuate the confirmed and soon-to-be-consummated plan.

4    Thank you.

5            THE COURT:  Thank you, Counsel.

6            MR. HERMAN:  Your Honor, David Herman for the

7    committee.  Very briefly, I just want to reinforce that

8    everything that Mr. Solomon is arguing is foreclosed by Section

9    1142(a), which says, "notwithstanding any otherwise applicable

10   nonbankruptcy law, the debtor shall carry out the plan and

11   comply with orders of the court."

12           THE COURT:  So you're saying even if that violates

13   some foreign law?

14           MR. HERMAN:  Yes.  If there are violations of foreign

15   law, I guess that'll get taken care of in those countries.  But

16   for purposes of this Court implementing its plan for this

17   debtor that's under the custody of this Court as a debtor in

18   Chapter 11, it has to comply with the Bankruptcy Code.

19           And just to be clear, what's being asked of the debtor

20   is a ministerial act.  They have to sign a letter to give to

21   the registrar to have the stock registry changed.  And 1142(b)

22   contemplates this exact situation and provides that the court

23   may direct the debtor or any other necessary party to deliver

24   an instrument required to do that.

25           There's no evidence in front of Your Honor that

**ELETSON HOLDINGS INC., ET AL.**

42

1   there's a violation of foreign law.  This is Mr. Solomon's say

2   so.  And frankly, it defies belief.  We've never heard about

3   any of this before.  There's nothing in their disclosure

4   statement about it.  There's nothing in their objections about

5   it.  This is all just something that they've made up to try to

6   get in the way of the plan going effective.

7         THE COURT:  Thank you, Counsel.

8         MR. SOLOMON:  Your Honor, Lou Solomon for the debtors.

9   We're obstructing nothing.  We are making up nothing.  We are,

10  as accused, acting on the fly because I got something yesterday

11  which was not part of what we were to be before Your Honor on.

12  I am having to respond to it now.  We've done the best we can

13  to get answers to the questions from the other jurisdictions.

14  For counsel to say there's no evidence, there's no evidence

15  from them.  Before yesterday, they never came to us and asked

16  us for this.

17        We don't know anything about this, so we sent it off

18  to the right people.  We were told that there is a legal

19  inhibition, non-U.S., to do it.  And now, Your Honor is being

20  told that it doesn't matter if we violate non-U.S. law.  I

21  would like to brief that issue.  I'm not trying to delay

22  anything.  It's an extraordinary statement.  Okay.  And I think

23  there's no basis in law to allow that.

24        But yes, we're doing it on the fly, and it's not our

25  fault.  And we're doing the best we can.  And to try to

**ELETSON HOLDINGS INC., ET AL.**

43

1  railroad Your Honor into sanctioning us or threatening us to do

2  something that we are advised violates the law of another

3  jurisdiction is improper.  Thank you, Your Honor.

4        THE COURT:  Thank you, Counsel.

5        MR. ORTIZ:  Your Honor, I'm sorry.  Just very briefly,

6  Kyle Ortiz for the petitioning creditors.

7        So when I talked about other cases we've done in

8  recognition, again, what he's doing right now is there should

9  definitely not be briefing.  That's exactly what he wants.

10  That's a stay.  It is relitigating the plan.  And I want to

11  just clarify, like, I have -- again, here's two examples of

12  when I sought recognition.

13        Pacific Drilling, which was a Luxembourg entity,

14  Luxembourg law does not allow you to extinguish shares.  In

15  LATAM Airlines, we sought recognition in Chile because Chilean

16  law does not allow you to terminate shares.  We didn't seek

17  recognition in Brazil or Peru or certain of the other

18  jurisdictions because we didn't need that.  Those are things

19  that you raise at plan confirmation.  Say there's a feasibility

20  issue that you need to get around in order to make this plan

21  work, and those are raised at confirmation.

22        So this is a collateral attack that they're coming up

23  with now.  Again, this is all stuff that everybody knew about,

24  exactly how this plan was going to be effectuated and exactly

25  what was going to be required, and it's in the plan fifteen

**ELETSON HOLDINGS INC., ET AL.**

44

1   different places that there's going to potentially be

2   instruments or things that we need from the debtors and that

3   they are directed to do so.  We can't start over and start

4   briefing on things that have always been known.  If they

5   thought that there was a issue with Liberian law that needed to

6   be part of the plan discussion, like it was in those other

7   cases I mentioned where we did need to get recognition, these

8   are things that we always evaluate and decide whether we need

9   recognition or we don't need recognition.

10          Do we need recognition in Liberia?  Yes, only if the

11  debtors don't fill out this letter.  And they're a party who's

12  in front of this Court, and we don't need to go somewhere else

13  to get them and enforce on them.  They're right here.  Thank

14  you, Your Honor.

15          THE COURT:  Thank you, Counsel.

16          Okay.  I understand the issues that have been raised.

17  Obviously, these are complicated issues that have been raised,

18  both in the numerous letters that have been submitted and here

19  at the status conference.  And this was set as a status

20  conference.  The Court is not prepared or able to rule on these

21  issues being raised in this context.  So I would encourage the

22  parties to continue discussing and seeing if they can resolve

23  these issues.  And if not, I think a motion will need to be

24  brought to brief these things that have been raised.  There

25  have been a lot of issues raised here today.

**ELETSON HOLDINGS INC., ET AL.**

45

1          MR. SOLOMON:  Thank you, Your Honor.

2          THE COURT:  Anything else for today?

3          MR. SOLOMON:  Nothing from the -- nothing from the

4    debtors, Your Honor.  Thank you.

5          MR. ORTIZ:  Yeah.  Nothing further, Your Honor, but

6    we'll be bringing those motions.  We'll try to talk to them

7    today, but we have been directed to meet and confer with them

8    throughout this case, and they've never once taken that

9    seriously.  So you'll be seeing motions quickly, and they'll be

10   on shortened notice because they have just gotten a stay

11   without doing what they're required to do.  So we'll bring

12   those motions, we'll get things in front of you, and they will

13   likely include things like contempt and sanctions.  Thank you,

14   Your Honor.

15         THE COURT:  Thank you, Counsel.

16         Okay.  We're adjourned.  Thank you, everyone.  Have a

17   great day.

18      (Whereupon these proceedings were concluded at 11:00 AM)

19

20

21

22

23

24

25

46

1

2                         C E R T I F I C A T I O N

3

4    I, River Wolfe, certify that the foregoing transcript is a true

5    and accurate record of the proceedings.

6

7

8

9    _____

10   River Wolfe (CDLT-265)

11   TTA-Certified Digital Legal Transcriber

12

13   eScribers

14   7227 North 16th Street, Suite #207

15   Phoenix, AZ 85020

16

17   Date:  November 14, 2024

18

19

20

21

22

23

24

25

## A

**ABI (1)**
8:4
**ability (1)**
30:23
**able (3)**
31:10;37:4;44:20
**absurd (1)**
27:2
**absurdity (1)**
36:10
**accepts (1)**
17:23
**accomplish (2)**
26:22;39:6
**account (2)**
16:1,2
**accurate (1)**
14:1
**accused (1)**
42:10
**ace148 (1)**
8:8
**acknowledge (3)**
27:3;35:13;36:12
**acknowledged (1)**
28:23
**act (6)**
16:16;20:13;25:9;
28:24;32:16;41:20
**acting (1)**
42:10
**action (11)**
16:16,17;19:6,18;
20:1;22:25;23:1,3,6,
11;24:7
**actions (12)**
16:7,10;21:18,19,
22,24;22:6,16,22;
24:1;30:12,13
**actively (2)**
14:21;24:4
**actually (10)**
13:19;17:21;18:5;
24:20;28:18;34:16;
35:2;39:6;40:8,11
**ADAM (7)**
8:8;34:18,19,19;
35:22;37:4;38:25
**additional (2)**
10:18;28:4
**address (7)**
17:24,25;38:13;
40:13,15,17,18
**adjourned (1)**
45:16
**Administrative (1)**
9:8
**admitted (1)**
14:7
**advised (2)**

33:25;43:2
**advises (1)**
19:7
**affiliates (1)**
21:14
**affirmatively (1)**
30:18
**again (12)**
11:2;22:12;23:25;
24:14;26:16;33:19;
35:9;36:12;39:9;43:8,
11,23
**agent (1)**
16:1
**agents (1)**
22:5
**ago (3)**
11:8;26:11;37:1
**agreement (2)**
23:21;40:19
**agreements (2)**
23:18,21
**Airlines (1)**
43:15
**allow (4)**
18:10;42:23;43:14,
16
**allowed (3)**
28:2;34:1;40:9
**almost (1)**
18:16
**along (1)**
22:4
**Although (1)**
36:17
**always (2)**
44:4,8
**AMANDA (1)**
5:12
**amazing (1)**
15:19
**amended (3)**
16:21;17:11,12
**Americas (2)**
6:4;7:4
**among (3)**
21:14;22:1,16,17
**amounts (1)**
16:3
**ANDREW (1)**
4:7
**apparently (5)**
19:7;25:1;33:10;
34:6,6
**appeal (7)**
11:25;12:11,12,19;
13:19;28:22,22
**appear (1)**
33:18
**appearances (1)**
9:4
**appearing (2)**
9:9,10

**applicable (21)**
11:15;16:16;20:6;
22:22,24;23:13,14,16,
17,20;29:3,13;35:6,7,
18,19,20,22;36:5,20;
41:9
**applies (1)**
15:23
**apply (1)**
31:10
**appreciate (1)**
14:3
**apprehend (1)**
19:16
**appropriate (5)**
19:6;22:18;23:15;
24:7;29:5
**approval (2)**
16:18;23:1
**approvals (3)**
23:22;24:15;38:2
**approved (3)**
17:13;23:9;40:24
**arguably (1)**
20:19
**arguing (1)**
41:8
**arises (1)**
21:10
**around (1)**
43:20
**arrogated (1)**
13:17
**article (1)**
22:12
**articles (3)**
16:22;22:19;25:4
**aside (1)**
10:15
**aspects (5)**
11:12,16,18;13:3,
21
**assets (2)**
38:21;40:7
**assistance (1)**
31:11
**assisting (1)**
9:7
**assume (1)**
13:11
**attached (2)**
38:10,11
**attack (1)**
43:22
**attention (1)**
35:15
**Attorneys (7)**
4:3,14;5:3;6:3,14;
7:3,12
**authority (6)**
13:16,18;17:25;
18:8;25:3;29:17
**authorization (6)**

16:18;18:1,2,6,11;
24:22
**authorizations (4)**
19:20;23:21;24:15;
38:2
**authorized (5)**
21:22;23:9,16;
30:11;39:3
**Avenue (3)**
4:4;6:4;7:4
**aware (1)**
16:6

## B

**back (6)**
10:16;11:4,7;15:22;
18:5;28:11
**Baker (1)**
9:7
**bankruptcy (22)**
11:12;14:2;16:16;
18:4;19:24;22:12;
26:13,17,23;29:24;
30:16,21;31:19;
32:17;34:8,10,20;
36:18;38:24;39:4,21;
41:18
**basis (3)**
10:15;12:10;42:23
**begin (2)**
10:6;29:7
**behalf (4)**
9:20,25;10:3;23:19
**behind (2)**
30:20;32:24
**belief (1)**
42:2
**best (2)**
42:12,25
**big (1)**
37:13
**bind (1)**
18:22
**binding (2)**
19:11;22:13
**binds (3)**
20:20;23:25;24:13
**blank (1)**
27:12
**BLANKA (1)**
8:9
**blanks (1)**
24:23
**board (5)**
19:5;25:1,1,4,6
**boil (1)**
16:11
**Bonsu (1)**
9:7
**BORRIELLO (1)**
5:9
**both (7)**

16:18;18:1,2,6,11;
21:8;24:19;34:23;
44:18
**bound (7)**
12:8;16:8;17:5,15,
22;20:3;27:1
**Bowling (1)**
7:13
**Brazil (1)**
43:17
**Brazilian (1)**
18:17
**BRIAN (2)**
5:18;9:16
**brief (2)**
42:21;44:24
**briefing (2)**
43:9;44:4
**briefly (5)**
40:2;41:7;43:5
**bring (2)**
39:6;45:11
**bringing (1)**
45:6
**broadly (1)**
34:14
**brought (1)**
44:24
**BRYAN (3)**
5:13;9:15;40:3
**BUCK (1)**
4:7
**bylaws (3)**
16:21;17:12;40:19

## C

**CA (1)**
6:17
**call (2)**
25:4;35:14
**called (2)**
17:19;40:8
**calls (1)**
16:20
**came (3)**
11:1;25:25;26:5;
37:1;39:11;42:15
**Can (30)**
9:4;10:12,23,24;
11:20;12:5,6,14,22,
25;13:2,6,20;15:9,10,
18;24:10;25:7;26:6;
33:7;35:24;36:1;38:6,
14,20,20;39:2;42:12,
25;44:22
**canceled (2)**
11:13;35:18
**canceling (1)**
16:11
**cancellation (1)**
35:16
**cancels (1)**

16:18
**carbon (1)**
17:3
**care (1)**
41:15
**carry (10)**
17:16;20:3,8,18,21;
29:4,8,15;30:18;
41:10
**case (7)**
9:3,7,10;27:19;
28:3;38:10;45:8
**cases (4)**
20:25;31:9;43:7;
44:7
**causing (1)**
28:9
**CEO (6)**
34:18,19,20;35:22;
37:5;39:1
**certain (3)**
18:25;24:8;43:17
**certificate (1)**
17:12
**certificates (1)**
22:18
**cetera (1)**
15:1
**challenge (6)**
15:10,10;28:1;
36:22;38:17,17
**chance (1)**
35:1
**change (5)**
16:12;17:14;38:13;
40:15,16
**changed (1)**
41:21
**Changing (1)**
40:17
**Chapter (2)**
31:8;41:18
**Chile (1)**
43:15
**Chilean (2)**
18:17;43:15
**choose (1)**
19:12
**choosing (1)**
26:20
**CHRISTOPHER (1)**
4:8
**claim (2)**
13:16;19:8
**claims (2)**
22:3;24:2
**CLARA (1)**
8:3
**clarify (2)**
40:3;43:11
**clear (6)**
14:21;17:1;20:21,
24;23;24;41:19

**clearly (1)**
38:19
**clerk's (1)**
39:13
**client (4)**
11:3,3;27:4;36:9
**close (1)**
14:22
**closing (1)**
12:25
**COCKERHAM (1)**
4:18
**Code (20)**
16:9,10,16;17:16,
17;18:4;19:24;20:3,4;
22:13;25:16;26:13,
17,24;29:24;30:16;
32:17;34:8,10;41:18
**COIE (3)**
6:13;7:2;10:3
**collateral (1)**
43:22
**colleague (1)**
9:6
**colleagues (1)**
9:15
**Collier (1)**
26:13
**Colliers (1)**
20:16
**colloquy (1)**
28:21
**coming (2)**
14:6;43:22
**comments (2)**
14:16,18
**commitment (2)**
32:9,9
**Committee (4)**
6:3;9:20;28:14;
41:7
**committee's (1)**
32:4
**communicated (1)**
34:23
**communications (2)**
11:5;34:5
**companies (8)**
18:17,17,17,18,18,
18,19,19
**company (2)**
13:6;40:7
**company's (1)**
17:24
**completely (1)**
15:4
**compliance (2)**
13:4,5
**complicated (1)**
44:17
**comply (10)**
11:14;12:23;20:8;
24:19;26:16;29:4;

36:25;37:5;41:11,18
**complying (2)**
13:21;14:8
**concern (1)**
32:4
**concluded (1)**
45:18
**concocted (2)**
31:5;32:1
**condition (2)**
20:8;35:25
**conditions (6)**
12:24;13:17;27:12,
16,24;41:1
**conduct (1)**
39:9
**confer (1)**
45:7
**conference (6)**
10:8;11:21;14:3,10;
44:19,20
**confirmation (31)**
15:5,25;18:9;19:25;
21:6,7,8,19;22:1,3,10;
25:8,17;26:22;28:20,
23;30:4,5,14,16;
31:23;32:6,18,24;
36:18,19,23;38:8;
40:21;43:19,21
**confirmed (17)**
16:8;17:4,15;19:10;
20:13,18,22;28:19,19;
29:7,23,25;32:2,15;
38:23;39:12;41:3
**confirming (1)**
30:22
**Congress (1)**
26:11
**connection (3)**
21:17;22:25;40:10
**consent (1)**
30:15
**consented (1)**
31:23
**consequences (2)**
25:3;39:20
**consideration (1)**
11:9
**considering (1)**
10:22
**consistent (6)**
18:3;24:25,25;
25:16;27:16;39:4
**consolidation (1)**
22:20
**consummate (4)**
21:15,20;24:5;30:8
**consummating (1)**
13:20
**consummation (3)**
20:15;21:5;22:7
**contemplated (7)**
16:7;17:15;21:21;

23:18,22;24:15;38:2
**contemplates (2)**
29:25;41:22
**contempt (3)**
26:20;32:23;45:13
**context (2)**
15:24;44:21
**continue (3)**
28:4,5;44:22
**control (5)**
10:23;14:14;37:10,
11;41:1
**conversion (1)**
22:20
**converted (1)**
19:10
**cooperate (15)**
10:11;15:15;20:1;
21:9,10,15;24:1,3,4;
27:8;29:2;30:7,17;
37:8,9
**cooperating (1)**
37:9
**cooperation (2)**
18:8;24:13
**copy (2)**
17:3;25:11
**Corp (1)**
38:21
**corporate (12)**
14:14;16:7,10;17:4,
6;19:14;23:2,5,6;
24:1;40:19,23
**corporation (1)**
40:9
**Counsel (37)**
9:12;10:10,19,21,
21;11:4,6,24;13:22;
17:10,18;19:6;24:9,
18,20;26:19;28:10;
29:6;32:22;33:1,4,7;
34:7;35:10,10;36:3,4;
37:3,17;39:22;40:4;
41:5;42:7,14;43:4;
44:15;45:15
**counsels' (1)**
19:15
**countries (1)**
41:15
**country (1)**
19:1
**couple (2)**
11:7;12:7
**course (4)**
12:5;19:6;24:7;
25:2
**COURT (77)**
9:2,12,17,22;10:1,
5;11:24;12:3,10,19;
13:11,22;14:16,19,24;
15:11;17:2,13,22;
18:13,25;19:5,10,23,
23;20:9,10,23;21:3;

24:2,12,19;25:11;
26:5,9;28:10,15,24;
29:5,17,20;30:23,24;
32:3,16,18,25;33:1,4,
7,8,20;34:3,11,14;
36:13,19,22;37:17;
38:24;39:4,15,22,25;
41:5,11,12,16,17,22;
42:7;43:4;44:12,15,
20;45:2,15
**Courts (2)**
9:8;31:11
**Court's (4)**
19:9;25:21;31:4,24
**covered (1)**
28:17
**creditor (1)**
36:21
**creditors (18)**
5:3;6:3;9:14,21;
10:10;11:11;12:17;
21:12,23;23:12;24:5;
29:10;30:3,6,13,19;
32:21;43:6
**creditors' (2)**
30:15;32:8
**critical (2)**
25:24;26:1
**cross-border (4)**
18:15,16;31:7,9
**current (3)**
16:14;17:24,25
**currently (1)**
32:11
**custody (1)**
41:17

**D**

**DANIEL (2)**
7:17;9:24
**date (20)**
10:12,14;13:12,15,
16;14:11,13;15:9;
16:23;22:2;23:10,15;
25:10,23;27:14,15,25;
35:17;40:25;41:1
**DAVID (4)**
6:8;9:19;28:13;
41:6
**DAWN (1)**
8:7
**day (2)**
26:19;45:17
**days (2)**
16:2;30:23
**DE (1)**
4:16
**dealt (3)**
15:1;20:13;29:23
**debtor (29)**
11:17;20:8,10,17,
20,21;21:1,3,11;23:6,

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.            Pg 281 of 448

November 13, 2024

7,13,19;26:14;29:1,4,
14,15,18,20;31:18;
34:9;36:7,8;41:10,17,
17,19,23
**Debtors (52)**
4:3,14;14:16;15:11,
11;16:8;17:5,15;18:3,
13;19:3,19,22;20:1,
23;21:21;22:12,13,
15;23:15,25;24:1,2,3,
6,18,19,22;25:13;
26:19;27:23;29:8,11;
30:6,11,17,20;31:12,
22;32:10,19,22;33:5;
36:2,14;38:24;
40:25;42:8;44:2,11;
45:4
**debtors' (4)**
18:10;27:11;31:20;
32:6
**debtor's (4)**
18:8;20:25;29:6;
31:15
**December (1)**
33:19
**DECHERT (2)**
6:2;9:20
**decide (5)**
15:12;19:6;25:13,
20;44:8
**decisively (1)**
32:17
**declare (3)**
15:9;27:14,15
**deemed (2)**
23:1,8
**defies (1)**
42:2
**definitely (2)**
25:7;43:9
**definition (1)**
13:14
**Delaware (1)**
17:3
**delay (4)**
26:7;28:8;38:20;
42:21
**deliver (5)**
20:11;21:4;23:17;
29:21;41:23
**delivery (3)**
20:11;21:4;29:22
**demonstrate (1)**
18:7
**DEPARTMENT (1)**
7:11
**depends (1)**
18:21
**Derek (1)**
9:6
**describe (2)**
12:6,6
**describes (1)**

22:11
**detailing (1)**
11:8
**details (1)**
24:3
**determine (2)**
24:9;27:24
**determined (1)**
22:23
**dictate (2)**
19:12;23:24
**different (5)**
12:24;13:11,13;
40:5;44:1
**differently (1)**
40:5
**DIP (4)**
5:3;9:14;27:18;
32:10
**direct (7)**
20:10,23;21:3;
26:16;29:20;32:19;
41:23
**directed (11)**
20:2;21:14,22;
23:17;25:15;28:5;
30:7,12;40:24;44:3;
45:7
**directors (6)**
10:17;11:4;19:18;
22:5;23:12;32:20
**directs (1)**
20:17
**disclosure (2)**
31:20;42:3
**discovery (4)**
33:15,17,18,20
**discretion (1)**
25:20
**discussing (1)**
44:22
**discussion (1)**
44:6
**distribution (1)**
16:1
**district (3)**
14:16,18;33:8
**documents (4)**
22:25;23:18;40:20,
24
**dollars (1)**
39:10
**done (12)**
10:12,19,23;11:19;
13:9;18:16;21:6;
33:16;36:4;37:4;
42:12;43:7
**do-over (1)**
15:20
**down (4)**
16:11;33:9,12;
34:25
**downstream (1)**

14:14
**drafted (4)**
19:17;24:23;26:7;
27:16
**dramatically (1)**
14:15
**drawn (2)**
27:18;32:10
**Drilling (1)**
43:13
**due (1)**
12:5

## E

**earlier (1)**
25:22
**EBRAHIMI (1)**
5:10
**edge (1)**
32:8
**effect (3)**
20:12;29:22;36:23
**effective (32)**
10:12,14;12:22;
13:6,12,14,16;14:2,
11;15:9;16:23;22:2;
23:8,10,15,22;24:16;
25:10;27:10,14,15,25;
31:13,16;32:7;35:17;
36:1,20;38:3;40:25;
41:1;42:6
**effectuate (10)**
15:7;16:7,22;21:20;
22:14,21;24:14;
25:14,14;41:3
**effectuated (2)**
19:17;43:24
**effectuating (1)**
14:13
**effort (3)**
14:7;26:6;36:17
**efforts (2)**
14:22;24:5
**Eletson (1)**
9:3
**else (14)**
11:20;12:14;13:23;
15:24;28:11;33:2,17;
37:15,18;38:20;
39:23;40:1;44:12;
45:2
**email (2)**
25:5,12
**emotion (1)**
39:6
**employees (1)**
22:5
**enacting (1)**
26:12
**encourage (1)**
44:21
**enforce (5)**

18:25;19:2,11;
39:18;44:13
**enjoined (1)**
22:6
**enough (1)**
32:7
**ensure (1)**
36:18
**entered (1)**
36:18
**entire (1)**
28:3
**entities (1)**
22:22
**entity (4)**
18:24;19:2;22:22;
43:13
**entry (3)**
22:1,2;31:23
**equity (3)**
16:14,20;40:23
**escalated (1)**
14:15
**ESQ (23)**
4:7,8,9,10,18;5:9,
10,11,12,13,14,15,16,
17,18;6:7,8,9,10,19;
7:8,17;8:6
**essentially (2)**
16:10;35:10
**estate (1)**
32:5
**estates (1)**
32:14
**et (1)**
15:1
**evaluate (3)**
24:11;25:20;44:8
**evaluating (1)**
24:7
**even (4)**
14:1;18:10;39:16;
41:12
**event (1)**
29:18
**events (1)**
24:8
**everybody (1)**
15:24;36:13;43:23
**everybody's (1)**
39:14
**everyone (2)**
9:2;45:16
**evidence (5)**
13:8;35:20;41:25;
42:14,14
**exact (2)**
14:5;41:22
**exactly (3)**
43:9,24,24
**examples (1)**
43:11
**exclusively (1)**

18:16
**excuses (2)**
31:4;32:1
**execute (8)**
18:3;20:11;21:4;
23:17;24:22;29:21;
30:1;32:20
**executing (1)**
18:11
**execution (2)**
20:11;29:22
**existence (1)**
40:10
**existing (2)**
35:17;40:17
**expect (1)**
29:6
**expiration (1)**
30:22
**expire (1)**
32:10
**explain (1)**
13:1
**explained (2)**
29:15;34:4
**explains (1)**
29:13
**explanation (1)**
29:8
**explicit (2)**
19:17;22:9
**extent (4)**
23:10;30:20;32:22,
24
**extinguish (1)**
43:14
**extraordinary (1)**
42:22
**eyes (1)**
34:7

## F

**face (1)**
25:4
**fact (2)**
32:15;35:2
**factors (1)**
36:13
**failed (1)**
24:3
**faith (1)**
21:15;30:8
**far (2)**
31:4;37:13
**fault (1)**
42:25
**feasibility (2)**
31:16;43:19
**February (1)**
28:6
**feel (1)**
13:2

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.    Pg 282 of 448

November 13, 2024

**fees (3)**
27:19;32:11,11
**felt (1)**
12:8
**few (1)**
28:18
**fifteen (1)**
43:25
**file (5)**
18:10;27:20,25;
38:14,14
**filed (3)**
11:25;14:20;25:5
**filing (7)**
12:11;17:11;22:18,
23;39:2,3,3
**filings (1)**
17:11
**fill (6)**
15:17;24:23;26:8;
27:12;28:7;44:11
**financial (1)**
20:7
**find (1)**
10:16
**first (3)**
18:8;33:7;37:21
**five (2)**
11:15;35:12
**flatly (2)**
26:23;27:8
**Floor (1)**
7:5
**fly (3)**
39:5;42:10,24
**focused (1)**
14:11
**follow (1)**
36:10
**Following (4)**
24:24;29:20;31:23;
39:2
**foreclosed (1)**
41:8
**foreign (13)**
15:1,7;18:23,25;
31:6,19,21;36:8,15,
22;41:13,14;42:1
**form (1)**
24:23
**formalities (1)**
19:15
**former (1)**
22:5
**forth (1)**
29:3
**forty (1)**
35:9
**forward (1)**
33:20
**found (1)**
32:5
**four (1)**

**11:15**
**fourteen (1)**
30:22
**framework (2)**
31:3,3
**Francisco (1)**
6:17
**frankly (1)**
42:2
**front (4)**
14:19;41:25;44:12;
45:12
**FSB (3)**
6:14;7:3;10:3
**full (1)**
15:25
**fully (3)**
27:18;32:10;35:4
**Fund (4)**
6:14;7:3;10:3;16:3
**funding (1)**
16:4
**funds (1)**
32:7
**further (8)**
16:15,17;19:18;
23:1,11;35:3;36:11;
45:5
**furtherance (1)**
25:15

## G

**GALLEGO (1)**
5:11
**galley (1)**
14:17
**games (1)**
27:21
**Gas (1)**
33:25
**gave (1)**
14:4
**GEOGHEGAN (1)**
8:3
**German (1)**
18:18
**get-go (1)**
11:11
**gets (1)**
11:13
**given (1)**
34:22
**giving (1)**
11:9
**GLAUBACH (1)**
5:12
**Goes (2)**
23:14;31:13
**Good (13)**
9:2,5,17,18,19,22,
23,24;10:1,2,5;21:15;
30:8

**GORREPATI (1)**
8:4
**governance (2)**
40:19,23
**governed (1)**
36:15
**granted (1)**
17:24
**great (1)**
45:17
**Greece (2)**
31:6;36:3
**Greek (2)**
18:19;25:12
**Green (1)**
7:13
**Group (1)**
8:5
**guess (2)**
33:5;41:15
**guidance (1)**
32:18

## H

**half (5)**
15:19;17:10;24:25;
35:8;39:10
**HANEY (1)**
6:7
**happen (1)**
29:14
**happened (1)**
33:8
**happening (1)**
38:7
**happens (1)**
40:25
**happy (1)**
10:7
**HARRISON (1)**
8:5
**headquartered (1)**
17:21
**heard (11)**
13:1,23;24:6;28:11,
14;33:2;37:18,21;
39:23;40:1;42:2
**hearing (3)**
14:18;31:5;38:8
**held (1)**
32:23
**helpful (2)**
20:25;25:23
**hereby (4)**
21:14,21;30:7,11
**herein (1)**
23:9
**here's (1)**
43:11
**HERMAN (11)**
6:8;9:19,19,23;
28:13,13,16;35:9;

**41:6,6,14**
**hide (1)**
30:20
**hiding (1)**
32:24
**highlight (1)**
28:18
**highlighting (1)**
21:2
**Hold (1)**
39:25
**holders (1)**
22:3
**Holdings (18)**
9:3;10:17;11:4;
12:2;16:4,12;17:13,
14;23:6,8,16,20;
34:18,19,20;40:7,13,
18
**Honor (103)**
9:5,9,11,13,19,24;
10:7;11:1,6,10;12:1,2,
8,15,16;13:24;14:4,
22;15:3,13,13,17,23;
16:5,8,13,15,24;17:1,
7,18,21;18:12;19:2,
14,22,25;20:5,16;
21:2,5,8,13,25;22:8,
13;23:2,24;24:12,14,
21;25:13,21;26:3,6,
15;27:4,6,10,18;28:2,
9,13,16,19,20,22;
32:5,19,25;33:3,9,22,
23;34:8,13,23;35:12,
24;36:6,7;37:15,16,
19;38:11;39:13,21,
24;40:2,24;41:6,25;
42:8,11,19;43:1,3,5;
44:14;45:1,4,5,14
**Honor's (4)**
12:8;13:10;26:21;
35:14
**hope (1)**
13:10
**host (1)**
22:16
**hour (1)**
35:8
**hours (6)**
14:15;17:8;24:21;
33:11;35:1;37:1
**Howard (1)**
6:15

## I

**idea (1)**
36:8
**identify (1)**
35:11
**ignoring (2)**
36:5;38:1
**imagine (1)**

**26:25**
**impact (3)**
12:3,11,12
**implement (10)**
16:9;17:13;20:2;
21:15,20;30:8;31:11;
36:20;38:25;40:25
**implementation (2)**
22:7,11
**implemented (1)**
30:1
**implementing (1)**
41:16
**important (3)**
18:14;20:24;26:13
**impose (1)**
26:18
**imposed (1)**
30:21
**improper (1)**
43:3
**in- (1)**
33:12
**inaccurate (2)**
15:4;40:6
**Inc (1)**
8:8
**include (1)**
45:13
**includes (1)**
21:13
**including (8)**
16:4,21;19:16;
20:14;22:17,23;
23:20;36:13
**inconsistent (4)**
21:24;30:14;31:14,
15
**incorporated (1)**
36:14
**incorporation (3)**
16:22;17:12;22:19
**incumbent (1)**
30:25
**information (4)**
10:13,16,18;34:22
**informed (1)**
17:22
**inhibition (1)**
42:19
**initiate (1)**
31:19
**injunction (1)**
21:9
**injunctive (1)**
21:25
**insofar (1)**
10:11
**insolvencies (1)**
18:15
**insolvency (1)**
31:7
**instance (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.    Pg 283 of 448

November 13, 2024

16:13
**Instead (1)**
25:11
**institute (1)**
31:21
**instruct (1)**
24:18
**instructed (3)**
21:23;22:17;30:12
**instruction (1)**
26:1
**instructions (2)**
17:23;29:18
**instructive (1)**
20:16
**instrument (6)**
20:12;21:4;29:11,
22;30:2;41:24
**instruments (3)**
23:18;32:21;44:2
**intend (1)**
34:1
**interest (1)**
22:3
**interests (1)**
36:14
**interfere (1)**
22:6
**interference (1)**
21:9
**intervene (3)**
33:14,24;34:1
**into (6)**
14:3,5;15:17;25:2;
35:3;43:1
**intricacies (1)**
19:14
**invoked (1)**
19:9
**involved (1)**
17:2
**involving (1)**
23:5
**ION (1)**
8:5
**issuance (2)**
16:20;22:21
**issue (8)**
11:14;14:12;16:5;
23:3,17;42:21;43:20;
44:5
**issued (2)**
15:13;16:23
**issues (9)**
14:25;15:5;37:13;
40:22;44:16,17,21,23,
25
**issuing (1)**
16:11
**Italian (1)**
18:18

## J

**Japanese (1)**
18:16
**JARED (1)**
5:9
**JASPER (3)**
6:19;10:2,2
**JEFFREY (1)**
5:14
**job (1)**
27:23
**JOHN (2)**
5:11,16
**join (3)**
20:11;21:4;29:21
**joined (1)**
9:15
**joining (1)**
10:4
**Judge (5)**
13:1,2;33:12,13;
34:25
**jurisdiction (8)**
12:16;18:13,24;
19:1,4,9;28:24;43:3
**jurisdictions (4)**
36:15,21;42:13;
43:18
**JUSTICE (1)**
7:11

## K

**KARLI (1)**
6:9
**keep (1)**
13:8
**keeps (1)**
32:13
**KEVIN (1)**
4:18
**kind (2)**
14:13,14
**knew (1)**
43:23
**known (1)**
44:4
**knows (2)**
28:22;31:8
**KOTLIAR (4)**
5:13;9:15;40:2,3
**KYLE (5)**
5:17;9:13;13:24;
37:19;43:6

## L

**language (2)**
21:7;22:9
**last (9)**
16:2;17:8,9,9;24:2,

21;25:25;27:5;31:6
**LATAM (1)**
43:15
**later (1)**
10:25
**LAUKAMG (1)**
4:8
**law (55)**
11:14,15;12:9,23;
13:4,5,21;14:2,8;15:1,
7;16:16;17:3,3;19:11;
20:7;22:24;23:23;
24:10,17,25;25:12;
29:3,13;31:7,25;34:7,
9,24;35:7,13,18,19,
20,23;36:5,8,10,25;
37:5,10,21,24;38:4,9;
41:10,13,15;42:1,20,
23;43:2,14,16;44:5
**Law360 (1)**
8:3
**laws (1)**
36:15
**lawyer (2)**
18:2;25:12
**layman (1)**
34:21
**least (3)**
13:8;15:2;28:7
**LEFKOWITZ (1)**
5:14
**left (1)**
9:10
**legal (3)**
20:21;31:3;42:18
**LEILA (1)**
5:10
**lender (2)**
5:3;9:15
**less (1)**
37:1
**letter (36)**
10:9,11;11:1,3,7;
14:20;15:18;17:2;
18:1,6,11;19:8;24:2,
22;25:18,22;26:7,17;
27:11,14;28:7;30:2;
31:13;32:9,10;33:10;
34:12,17,17,25;38:11,
12;40:17;41:2,20;
44:11
**letters (2)**
19:15;44:18
**Levona (2)**
33:15,24
**Lexington (1)**
4:4
**Liberia (15)**
18:9;19:3;25:19;
26:1,22;27:1;34:21;
36:3,14;37:3;38:15,
18;40:8,10;44:10
**Liberian (25)**

11:2;15:19;16:24;
17:2,10,11,18,19,20,
23;18:1,2;25:12;34:7,
7,24;37:23;40:7,10,
11,14,15,16,20;44:5
**LICHTENSTEIN (1)**
8:6
**lien (1)**
20:14
**lifted (2)**
33:13,14
**light (2)**
20:19;24:8
**likely (1)**
45:13
**Liman (4)**
13:1,2;33:12;34:25
**listen (1)**
30:18
**literally (1)**
39:11
**little (3)**
13:7;27:11;37:25
**LLC (1)**
17:21
**LLP (7)**
4:2,13;5:2;6:2,13;
7:2;8:7
**local (1)**
31:11
**long (1)**
26:11
**Look (4)**
13:25;14:9;37:14,
20
**looking (2)**
25:2;35:3
**lot (1)**
44:25
**Lou (3)**
9:5;33:5;42:8
**LOUIS (1)**
4:9
**Ltd (1)**
8:6
**Luxembourg (2)**
43:13,14

## M

**main (1)**
32:4
**maintain (1)**
12:25
**maintained (1)**
33:16
**makes (1)**
20:21
**making (6)**
17:10;22:23;39:5,
12,17;42:9
**managed (1)**
40:11

**management (3)**
17:14;30:25;32:23
**managers (2)**
19:19;23:12
**mandated (1)**
26:11
**many (3)**
17:9;22:18,18
**MARK (1)**
8:6
**Market (1)**
4:15
**MARTHA (1)**
5:15
**MARTIR (1)**
5:15
**matter (1)**
42:20
**matters (3)**
12:17;23:4,4
**may (8)**
13:15;17:22;20:10;
21:3;22:24;29:20;
36:22;41:23
**MCCLAIN (1)**
5:16
**mean (3)**
12:10,11;25:10
**meaningful (1)**
12:7
**means (2)**
22:11;25:3
**meet (1)**
45:7
**members (3)**
23:12;25:5,6
**mentioned (3)**
30:11;40:22;44:7
**merger (1)**
22:19
**me-toos (1)**
35:9
**million (3)**
16:1;27:4,5,6,19
**millions (1)**
28:8
**ministerial (1)**
41:20
**minutes (2)**
11:8;35:9
**mirrors (1)**
30:8
**model (1)**
31:7
**money (2)**
32:13,14
**month (1)**
28:8
**months (4)**
17:9;27:5,5,5;38:8
**moot (1)**
13:19
**more (6)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.        Pg 284 of 448

November 13, 2024

10:24;12:15;18:20;
34:14;35:4;36:11
**morning (11)**
9:2,5,17,18,19,22,
23,24;10:1,2,5
**MOSS (2)**
7:8;10:4
**most (2)**
20:24;40:6
**motion (5)**
11:21;26:10;27:21;
33:21;44:23
**motions (6)**
33:14,23;34:2;45:6,
9,12
**move (2)**
34:1;38:20
**Much (1)**
10:13
**Murchinson (2)**
8:6;35:10
**mysterious (2)**
19:6;24:9
**mystery (1)**
35:14

## N

**name (1)**
23:19
**nearly (3)**
19:16;27:5,6
**necessary (13)**
17:10;19:20;20:10,
14;21:5;22:23,24;
29:19,21;31:6,11,12;
41:23
**need (41)**
15:1,6,8,16;18:21,
25;19:2,5,12,13;
20:22;25:13;26:1,8,
18;27:13,20,22;28:5;
29:11;31:17,21;
32:21;36:1,2;37:2;
38:13,14;39:2,6,18;
41:2;43:18,20;44:2,7,
8,9,10,12,23
**needed (1)**
44:5
**needs (4)**
30:1,1;32:19;40:16
**New (12)**
4:5;5:7;6:5;7:6,15;
9:6;16:11,20,23,25;
25:6;40:22
**next (1)**
28:6
**night (2)**
24:2;25:25
**nominees (1)**
33:25
**non (1)**
37:10

**nonbankruptcy (8)**
20:7;23:23;24:10,
16;29:3;31:25;38:4;
41:10
**noncooperation (1)**
14:13
**nonresident (1)**
40:9
**Nonsense (3)**
24:11;26:3,4
**non-US (14)**
11:12,16;12:23;
13:4,5,21;19:14;34:9;
35:13;36:10,25;37:5;
42:19,20
**noses (1)**
39:21
**note (2)**
15:24;18:14
**noted (1)**
18:7
**notes (2)**
35:17;37:14
**notice (4)**
11:25;12:12;16:15;
45:10
**notwithstanding (9)**
20:6;23:23,24;
24:16;29:2;31:25;
32:14;38:3;41:9
**November (2)**
10:9;38:7
**number (3)**
9:3;16:6;31:14
**numbers (1)**
16:2
**numerous (1)**
44:18
**nuts (1)**
28:1
**NY (5)**
4:5;5:7;6:5;7:6,15

## O

**objected (1)**
32:11
**objection (2)**
37:22,25
**objections (2)**
31:22;42:4
**obligated (7)**
16:9;17:16;19:11;
20:3;22:14;24:13;
38:25
**obligation (4)**
20:21,25;21:8,10
**obligations (1)**
18:4
**obstruct (2)**
14:21;24:4
**obstructing (1)**
42:9

**obstruction (5)**
14:5;26:7;27:20;
28:2;38:19
**obtain (1)**
14:7
**obviates (1)**
20:22
**Obviously (1)**
44:17
**occurred (2)**
13:9;23:8
**off (4)**
11:3;17:7;37:2;
42:17
**Office (3)**
7:12;9:8;40:12
**officer (1)**
25:2
**officers (3)**
22:5;23:15;32:20
**Official (2)**
6:3;9:20
**often (1)**
18:20
**old (2)**
16:11,19
**once (2)**
35:11;45:8
**One (9)**
5:5;7:13;18:6;20:1;
27:11;28:7;29:6;32:7;
35:21
**ones (2)**
19:16;26:5
**only (11)**
17:23;19:2,21,23;
24:4;25:4;26:4;27:13;
33:22;36:23;44:10
**opening (1)**
11:23
**operate (1)**
40:9
**operations (1)**
40:8
**opining (1)**
25:12
**opportunity (1)**
31:1
**oppose (1)**
27:1
**opposite (1)**
31:9
**order (34)**
13:16;16:17;18:2,9;
19:25;21:6,8,19;22:2,
3,10;25:8,17;26:16,
22,24;28:20,23;30:5,
5,14,17,21;31:17,23;
32:18,25;36:18,19,23;
39:4,12;40:21;43:20
**ordered (4)**
24:12;25:7;26:9,10
**orders (7)**

20:9;24:19;25:21;
26:21;29:5;31:4;
41:11
**organized (1)**
23:20
**originally (1)**
14:9
**ORTIZ (18)**
5:17;9:13,13,18;
13:24,24;15:3;28:17;
30:11;31:8;35:8;
37:19,19;40:13,22;
43:5,6;45:5
**Osei- (1)**
9:6
**others (2)**
21:14;22:18
**otherwise (3)**
29:2;40:21;41:9
**ought (1)**
29:6
**ousted (1)**
12:16
**out (18)**
15:17;17:16;20:4,8,
18,22;26:8;28:7,20;
29:4,8,16;30:18;
32:14;33:25;38:21;
41:10;44:11
**outcome (2)**
12:7;27:9
**outstanding (1)**
32:12
**over (5)**
36:12,12;37:10,11;
44:3
**OWEN (1)**
6:7
**own (3)**
10:19,21;27:17
**owners (2)**
21:13;30:25
**ownership (3)**
16:12,25;17:14

## P

**Pach (2)**
10:20;35:10
**Pacific (1)**
43:13
**page (1)**
13:15
**paid (1)**
32:12
**paperwork (2)**
40:20;41:2
**paragraph (6)**
21:10,17,18,25;
30:5,10
**part (7)**
10:19;15:2;16:14;
20:24;37:24;42:11;

44:6
**participate (1)**
22:16
**particularly (3)**
17:9;20:25;26:13
**parties (5)**
12:25;21:12;28:25;
30:7;44:22
**parties-in-interest (1)**
22:4
**parts (1)**
12:24
**party (3)**
19:21;20:10;26:4;
29:19,21;41:23;44:11
**past (3)**
14:15;18:19;27:4
**pattern (1)**
28:3
**PAUL (2)**
6:19;10:2
**pay (1)**
26:24
**paying (1)**
32:11
**payments (2)**
16:4;27:6
**penalized (2)**
28:5,8
**penalty (1)**
26:18
**Penn (1)**
5:5
**people (3)**
25:7;40:5;42:18
**perform (1)**
20:13
**perhaps (1)**
11:22
**period (1)**
31:18
**PERKINS (3)**
6:13;7:2;10:2
**permission (1)**
28:4
**permitted (1)**
35:18
**PERSON (8)**
8:7;16:18;17:24;
33:13;39:1,3;40:14,
16
**perspective (2)**
25:3;32:4
**pertinent (1)**
41:1
**Peru (1)**
43:17
**Petitioning (17)**
5:3;9:14;10:10;
11:11;12:17;21:11,
23;24:5;29:10;30:3,6,
13,15,19;32:8,21;43:6
**Philippine (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.          Pg 285 of 448

November 13, 2024

18:18
**phone (1)**
9:15
**place (1)**
29:6
**places (3)**
27:22;36:11;44:1
**plan (116)**
5:4;9:14;11:10,13,
16;12:22;13:3,20,25;
14:21;15:7,15;16:3,6,
8,13,18,21;17:4,15;
18:4;19:10,16,19,24;
20:2,8,13,15,18,20,
22;21:1,5,7,16,19,20,
24;22:7,10,10,13,17,
21,25;23:5,19,25;
24:4,5,13,14,25;25:8,
14,14,15,16;26:14,16,
23;27:1,10,15,24;
28:19;29:4,7,9,16,23,
25;30:8,10,14,18,22;
31:1,11,16;32:1,6,8,
15;33:24;34:9;35:5,6,
12;36:11,17,22,24;
37:20,22,22,22,22,24;
38:9,23;39:9,12,18;
40:4,21;41:3,10,16;
42:6;43:10,19,20,24,
25;44:6
**plans (2)**
14:2;19:16
**play (1)**
27:21
**Plaza (1)**
5:5
**please (2)**
9:4;28:15
**point (3)**
11:6;15:14;32:9
**pointed (1)**
28:20
**points (1)**
28:17
**populate (2)**
18:3;26:17
**position (1)**
11:23
**positions (1)**
25:2
**possible (1)**
36:21
**possibly (1)**
26:6
**post-effective (2)**
14:12;25:23
**potentially (1)**
44:1
**practice (1)**
18:15
**precedent (5)**
12:24;13:18;27:12,
16;35:25

**preclearance (1)**
17:19
**premature (1)**
10:14
**prepared (3)**
18:2;30:3;44:20
**PRESENT (2)**
8:2;22:4
**presented (1)**
34:8
**pretend (1)**
35:22
**pretty (1)**
28:17
**principals (3)**
10:21;22:5;32:20
**prior (2)**
23:10;30:15
**pro (1)**
27:19
**probably (1)**
40:6
**problem (1)**
25:19
**proceeded (1)**
13:19
**proceedings (4)**
12:13;31:19,21;
45:18
**process (2)**
17:19;27:7
**professional (1)**
32:11
**professionals (1)**
27:7
**progress (1)**
14:11
**Project (1)**
8:4
**proof (2)**
27:22,23
**property (2)**
20:12;29:23
**proponent (2)**
21:1;26:14
**proponents (7)**
9:14;13:25;22:17;
27:15;36:17;37:20;
40:4
**proposed (2)**
5:3,4
**protection (1)**
26:14
**protections (1)**
27:17
**provide (3)**
27:11;29:1;30:25
**provided (2)**
23:5,9
**provides (18)**
16:6,14;17:5;19:19;
20:5;21:8,11,17;22:1,
15;25:6;29:2,12,17;

30:5,10,21;41:22
**provision (1)**
29:24
**provisionally (1)**
25:6
**provisions (2)**
20:19;31:10
**purpose (6)**
10:8;18:14,23;
20:16;30:24;31:10
**purposes (1)**
41:16
**pursuant (3)**
9:7;21:18;36:19

**Q**

**quick (2)**
14:10;18:5
**quickly (1)**
45:9
**quite (2)**
12:7;28:18
**quote (1)**
23:4

**R**

**railroad (1)**
43:1
**rails (1)**
17:8
**raise (2)**
15:5;43:19
**raised (9)**
12:17;31:22;37:24;
43:21;44:16,17,21,24,
25
**ratified (1)**
23:10
**razor's (1)**
32:8
**read (6)**
11:11,15;13:14;
35:16;38:11,12
**reading (1)**
37:25
**ready (2)**
16:3;27:10
**real (1)**
18:5
**really (4)**
14:11;18:14;32:16;
37:11
**receipt (1)**
24:24
**received (2)**
11:8;34:5
**recognition (19)**
18:15,20,23;19:1,
13;26:3,21;27:1;31:6;
38:16,18;43:8,12,15,
17;44:7,9,9,10

**recognize (5)**
11:16;35:12;36:23,
24;37:4
**recognized (3)**
18:9;34:20;36:20
**reconstitute (1)**
19:5
**record (10)**
9:4;17:24,25;39:1;
40:14,14,15,16,17,18
**recordings (1)**
22:24
**REED (5)**
4:2,13;19:7;24:9;
36:8
**referring (5)**
17:2;34:11,14,16,
17
**reflect (2)**
16:24;17:4
**refusal (1)**
27:11
**refuse (2)**
26:18;36:22
**refused (1)**
25:9
**refusing (4)**
19:21;26:4,23;27:8
**regard (2)**
14:23;25:25
**regardless (1)**
18:8
**registered (1)**
40:12
**registrar (1)**
41:21
**registry (18)**
11:2;15:19;16:24;
17:4,6,11,20,20,23;
18:1,10;29:12;40:11,
14,15,16,20;41:21
**regulation (3)**
16:16;20:7;29:3
**reincorporation (1)**
22:19
**reinforce (1)**
41:7
**related (5)**
19:3;20:7;21:12;
30:7;33:21
**relating (1)**
23:2
**relitigate (1)**
15:4
**relitigating (1)**
43:10
**remain (1)**
26:20
**remarkable (2)**
37:20;38:5
**remotely (1)**
14:1
**render (1)**

13:18
**Reorg (1)**
8:9
**reorganized (6)**
16:4;17:12;22:21;
23:6,7,16
**replaces (2)**
40:23,23
**represent (1)**
11:17
**request (3)**
9:8;10:22;24:24
**requests (1)**
33:15
**require (3)**
20:1;23:1;36:6
**required (16)**
20:12;21:19;22:11,
21;23:7;25:15;26:11,
12;28:25;29:12,22;
30:4;33:11;41:24;
43:25;45:11
**requirement (7)**
16:17;19:18;23:11;
24:16;30:16;38:3,13
**requirements (4)**
23:23;30:9;35:6;
40:22
**requires (4)**
16:24;34:9,24;
35:19
**resignations (1)**
24:8
**resigned (1)**
25:1
**resolve (1)**
44:22
**respective (3)**
21:12;22:4;30:7
**respects (2)**
12:7;23:11
**respond (4)**
10:10;33:11,15;
42:12
**responded (2)**
10:22;35:2
**rest (2)**
33:17,18
**restrictions (1)**
18:16
**restructuring (1)**
35:7
**result (1)**
39:18
**retains (1)**
28:24
**Rich (1)**
9:6
**RICHARD (1)**
4:10
**right (6)**
15:20;19:22;27:15;
42:18;43:8;44:13

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.         Pg 286 of 448

November 13, 2024

**rightly (1)**
32:5
**risk (2)**
36:13,24
**RUDEWICZ (3)**
7:17;9:24,25
**rule (6)**
16:17;20:7;29:3;
30:21,25;44:20
**rules (1)**
32:17
**ruling (2)**
31:24;32:6
**rulings (1)**
12:8
**run (1)**
32:14

## S

**same (6)**
12:25;13:15;31:8;
33:10,11;38:16
**San (1)**
6:17
**sanction (1)**
36:7
**sanctionable (1)**
39:9
**sanctioned (3)**
24:20;36:9;39:19
**sanctioning (1)**
43:1
**sanctions (1)**
45:13
**satisfaction (1)**
20:14
**satisfied (1)**
27:13
**satisfy (5)**
27:21,24,25;35:6,
13
**satisfying (1)**
35:20
**Savings (3)**
6:14;7:3;10:3
**saw (2)**
11:25;14:5
**saying (6)**
13:12;14:24,25;
15:2;38:15;41:12
**Section (22)**
16:9,10,13,20;
17:16,17;20:4,5,17,
17,20,20;21:3;22:15;
23:2,22,25;24:14;
30:9;35:7;38:2;41:8
**Sections (2)**
25:16;26:12
**securities (2)**
23:18;35:17
**seeing (2)**
44:22;45:9

**seek (3)**
12:21;26:21;43:16
**seeking (2)**
18:22;34:12
**SEGAL (11)**
5:2,2;8:7,7;9:13,14;
13:24,25;37:19;40:4,
4
**Segel (1)**
37:20
**selectively (1)**
37:25
**self- (1)**
25:11
**send (1)**
15:18
**sending (1)**
11:5
**sent (10)**
10:9;11:2,3;15:18;
18:3;25:11;34:25;
35:4;37:2;42:17
**serious (1)**
39:20
**seriously (2)**
26:25;45:9
**serving (1)**
25:12
**set (2)**
10:15;44:19
**setting (1)**
11:21
**shall (16)**
20:8,8;21:23;22:6;
23:8,9,16,22;24:15;
29:4,4,15;30:13;
31:24;38:3;41:10
**shareholder (2)**
23:20;40:19
**shareholders (4)**
19:18;23:12;24:7;
26:19
**shares (6)**
16:11,12,19,23;
43:14,16
**SHAUGHNESSY (2)**
5:18;9:16
**shelf (1)**
40:10
**Shemen (2)**
10:20;35:10
**shipping (1)**
18:19
**short (2)**
11:19;31:16
**shorten (2)**
30:23;32:25
**shortened (1)**
45:10
**side (2)**
21:25;34:23
**sides (1)**
31:9

**sign (3)**
29:11;31:12;41:20
**signatory (1)**
31:7
**simple (4)**
24:24;25:9;26:2;
28:19
**simply (5)**
17:5;24:23;25:9;
32:14;35:23
**situation (3)**
18:21;29:25;41:22
**six (4)**
27:5;33:11;35:1,12
**small (1)**
20:1
**SMITH (5)**
4:2,13;19:7;24:9;
36:8
**Society (3)**
6:14;7:3;10:3
**SOLOMON (32)**
4:9;9:5,5;10:6,7;
12:1,5,14,21;13:14;
25:5;26:9;28:12,21,
23;29:6;33:3,5,5,9,22;
34:4,13,16;39:24,25;
40:6;41:8;42:8,8;
45:1,3
**Solomon's (1)**
42:1
**SOLOW (2)**
4:10;9:6
**somebody (2)**
30:1;38:5
**somehow (1)**
36:9
**someone (1)**
12:14
**sometimes (1)**
18:20
**somewhere (1)**
44:12
**soon-to-be-consummated (1)**
41:3
**sorry (2)**
22:8;43:5
**sort (2)**
10:20;30:2
**sought (6)**
10:13,19;12:20;
18:20;43:12,15
**speak (1)**
36:10
**speaking (1)**
34:21
**SPEARS (7)**
8:8;34:18,19,19;
35:22;37:4;39:1
**specifically (5)**
20:5,23;22:15;
29:24;34:11
**speculate (1)**

38:21
**speculating (1)**
38:22
**spent (1)**
16:2
**sponsor (1)**
5:4
**stakeholder (1)**
36:21
**stakes (1)**
27:3
**standard (1)**
27:21
**start (3)**
28:25;44:3,3
**statement (5)**
20:19,24;31:21;
42:4,22
**STATES (4)**
7:11,12;9:25;36:16
**status (3)**
14:10;44:19,19
**stay (18)**
12:19,21;14:7,7;
27:20;28:21,23;
30:20,24;31:1,19;
32:24;33:13,14,16;
39:6;43:10;45:10
**stayed (1)**
30:22
**STEPHEN (1)**
6:10
**steps (1)**
36:19
**still (2)**
9:7;14:22
**stock (5)**
11:13;16:14;29:12;
35:17;41:21
**stop (3)**
38:6;39:12,17
**Street (2)**
4:15;6:15
**structure (1)**
23:5
**stuff (3)**
25:22;39:17;43:23
**subject (7)**
18:13,24;19:4,22,
23,24;24:12
**submit (1)**
41:2
**submits (1)**
40:18
**submitted (4)**
11:7;18:1,7;44:18
**subsidiaries (1)**
21:14
**suddenly (1)**
38:6
**sufficient (1)**
25:19
**suggesting (1)**

19:15
**Suite (3)**
5:6;6:16;7:14
**superfluous (1)**
20:19
**supplement (1)**
16:21
**supply (1)**
32:18
**supposed (3)**
15:14,14;29:14
**sure (3)**
10:24;37:14;38:11
**surprise (1)**
34:24
**sworn (1)**
31:15
**system (1)**
39:21

## T

**talk (2)**
14:4;45:6
**talked (2)**
26:9;43:7
**talking (8)**
12:14;23:3;28:6;
37:12,12,13;39:8,9
**TAYLOR (1)**
8:5
**telling (2)**
38:17,19
**term (1)**
21:13
**terminate (1)**
43:16
**terminated (1)**
16:15
**terms (2)**
20:18,22
**testimony (2)**
31:15,17
**that'll (1)**
41:15
**theirs (1)**
25:19
**therein (1)**
21:21
**thin (1)**
32:5
**third-party (1)**
33:15
**thirty (2)**
27:6,19
**Thirty-million (1)**
39:10
**thought (4)**
10:18;12:15;14:9;
44:5
**threatened (2)**
10:20;33:6
**threatening (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: Eletson Holdings, Inc.    Pg 287 of 448

November 13, 2024

43:1
**threatens (1)**
35:8
**three (2)**
19:25;25:4
**throughout (1)**
45:8
**throw (1)**
33:24
**thumbing (1)**
39:20
**thwart (1)**
31:1
**tied (2)**
27:4,5
**times (2)**
11:15;35:12
**TINA (2)**
7:8;10:4
**today (7)**
15:5;23:3;26:15;
39:12;44:25;45:2,7
**TOGUT (6)**
5:2;8:7;9:13;13:24;
37:19;40:4
**told (3)**
37:6;42:18,20
**took (1)**
39:13
**towards (2)**
14:11;15:25
**transactions (3)**
21:21;22:20;35:8
**transfer (4)**
13:6;20:12;29:12,
23
**transparently (1)**
26:6
**transpired (1)**
24:21
**trial (3)**
15:20;31:17;39:10
**tried (1)**
10:16
**Trustee (2)**
7:12;9:25
**try (6)**
10:10;31:1;39:5;
42:5,25;45:6
**trying (3)**
15:20;39:16;42:21
**turn (1)**
28:11
**twenty-four (4)**
14:15;17:8;24:21;
37:1
**two (9)**
12:23;16:2;18:6,19;
27:4;29:7;31:6;38:7;
43:11
**two-and-a- (1)**
17:9

**U**

**UDAY (1)**
8:4
**UK (1)**
18:17
**under (27)**
16:8,9,15,16;17:16,
17;18:4;20:3,4;21:10;
22:12;23:5,23;24:10,
16;25:8,8;29:13,15;
30:4,5,24;31:3;35:7;
37:23;38:3;41:17
**underfunded (1)**
32:6
**understood (2)**
10:8;11:12
**UNITED (4)**
7:11,12;9:25;36:16
**unknown (1)**
31:18
**unlawful (1)**
37:3
**unquestionably (1)**
19:4
**Unsecured (2)**
6:3;9:20
**up (20)**
14:6;15:6,8,22;
16:5;18:5;25:14,25;
27:4,5,18;31:2;39:5,
11,12,13,17;42:5,9;
43:22
**update (5)**
14:10,22;33:7;
40:20;41:2
**updating (4)**
11:1;16:24;17:3,6
**upon (3)**
22:1,2;23:25
**urge (2)**
30:24;32:16
**used (1)**
33:6

**V**

**vacate (1)**
33:21
**various (2)**
13:9,21
**verifying (1)**
16:2
**Verita (2)**
16:1,2
**view (4)**
13:12,13;32:16;
35:24
**violate (6)**
34:7,9;37:10,21;
38:9;42:20
**violates (3)**

35:22;41:12;43:2
**violating (3)**
36:8;37:7,8
**violation (2)**
26:23;42:1
**violations (1)**
41:14
**Virginia (2)**
17:22;40:12
**voluntarily (1)**
19:10
**vote (1)**
16:17

**W**

**WADE (1)**
6:9
**waive (4)**
12:25;13:2,17;
35:24
**wants (2)**
36:9;43:9
**wave (1)**
13:3
**way (9)**
11:6;12:9;17:20;
21:13;22:2;34:25;
36:4;40:7;42:6
**ways (2)**
18:6;24:3
**week-long (2)**
15:20;39:10
**weeks (3)**
17:10;29:7;31:6
**what's (2)**
33:20;40:8;41:19
**Whereupon (1)**
45:18
**whole (1)**
22:16
**who's (1)**
44:11
**willing (2)**
28:7;39:19
**Wilmington (4)**
4:16;6:14;7:3;10:3
**window (1)**
31:1
**wire (1)**
16:3
**wish (5)**
11:21;28:11;33:2;
37:18;39:23
**wishes (1)**
40:1
**without (8)**
13:21;14:7;16:15;
18:10;19:17;23:11;
30:14;45:11
**WOLFE (1)**
8:9
**words (2)**

37:25;38:1
**work (1)**
43:21
**working (3)**
15:25;17:8;24:8
**works (1)**
14:2
**worth (1)**
21:2
**written (1)**
11:4
**wrote (1)**
24:1

**Y**

**year (3)**
15:19;28:6;39:10
year-and-a-half-plus-long (1)
27:7
**yesterday (7)**
10:9,25,25;13:1;
14:20;33:8;35:4;
42:10,15
**York (5)**
4:5;5:7;6:5;7:6,15

**Z**

**ZIDE (1)**
6:10

**1**

**1000 (1)**
6:16
**10022 (1)**
4:5
**10036 (2)**
6:5;7:6
**10119 (1)**
5:7
**10707 (1)**
7:15
**1095 (1)**
6:4
**11 (1)**
41:18
**11:00 (1)**
45:18
**1141 (6)**
16:9;17:16;20:3;
23:25;25:16;26:12
**1141a (1)**
20:20
**1142 (8)**
16:10;17:17;20:4,5;
25:16;26:12;29:1,13
**1142a (7)**
20:6,17,21;29:1,15;
30:9;41:9
**1142b (3)**
21:3;29:17;41:21

**1155 (1)**
7:4
**12 (1)**
21:25
**1201 (1)**
4:15
**13th (1)**
38:7
**15 (1)**
31:8
**19801 (1)**
4:16

**2**

**22nd (1)**
7:5
**23-10322 (1)**
9:3

**3**

**3020e (1)**
30:21
**3335 (1)**
5:6

**4**

**43.5 (1)**
27:5

**5**

**5 (2)**
21:10;22:12
**5.2 (3)**
22:15;35:7,16
**5.4 (2)**
16:13;35:16
**5.8 (1)**
16:20
**505 (1)**
6:15
**5-1 (1)**
21:11
**5-11 (4)**
23:2,22;24:14;38:3
**5-3 (1)**
21:17
**53.5 (2)**
15:25;27:4
**534 (1)**
7:14
**599 (1)**
4:4
**5i (1)**
30:5
**5iii (1)**
30:10

**6**

November 13, 2024

**6th (2)**
10:9;33:19

**9**

**94105 (1)**
6:17

**Exhibit 13**

**From: Bryan Kotliar** bkotliar@teamtogut.com ▉

**Subject:** Eletson - LISCR Letter [Urgent - Response Required]

**Date:** November 12, 2024 at 7:25 AM

**To:** Baker, Derek J. dbaker@reedsmith.com, Eletson Bankruptcy Team (S) EletsonBankruptcyTeam@reedsmith.com

**Cc:** Kyle Ortiz kortiz@teamtogut.com, Martha E. Martir mmartir@teamtogut.com, Amanda Glaubach aglaubach@teamtogut.com, Leila Ebrahimi lebrahimi@teamtogut.com

Derek,

We understand from our Liberian counsel that the Liberian Registry (LISCR) only accepts instructions from a company's current address of record or a person who has been granted authority by the current address of record through an authorization letter submitted to LISCR. The amended and restated articles of incorporation and amended by laws for Reorganized Holdings that have been authorized by the Court as part of the Plan must be submitted by the address of record or another duly authorized person.

We have prepared the attached letter from Eletson Holdings Inc. instructing LISCR to update the Address of Record for Eletson Holdings Inc. The Debtors are instructed and directed to complete the letter and return it to us by no later than 4:00 p.m. (ET) today, Tuesday, November 12. On the Plan Effective Date, when we submit the amended and restated articles of incorporation and amended by laws, we will include this letter identifying our authority to do so. Until then, it will be held in escrow.

If you have any questions, please call me as soon as possible so we can address them.

Best regards,

Bryan

Eletson - Letter to LISCR.docx
20 KB

---

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**TOGUT SEGAL & SEGAL LLP**

**Exhibit 14**

From: **Solomon, Louis M.** LSolomon@reedsmith.com ▮
Subject: RE: Eletson
Date: November 17, 2024 at 4:24 PM
To: Bryan Kotliar bkotliar@teamtogut.com
Cc: Osei-Bonsu, Derek M. DOsei-Bonsu@reedsmith.com, Eletson Bankruptcy Team (S) EletsonBankruptcyTeam@reedsmith.com, Zide, Stephen stephen.zide@dechert.com, Herman, David David.Herman@dechert.com, Kyle Ortiz kortiz@teamtogut.com, Brian Shaughnessy bshaughnessy@teamtogut.com, John McClain jmcclain@teamtogut.com, Jared Borriello jborriello@teamtogut.com

Bryan,

We heard back from Greek counsel to the Directors of Holdings. Without waiving any applicable privilege or immunity, we can report that we are advised that that counsel has advised the Directors to refrain from taking any action at this stage regarding a change to the Address of Record for Holdings, including the three alternatives proposed in your email of November 13.

As we previously disclosed to the Court last week, following the resignation of four of the Directors of Holdings, the Piraeus First Instance Court appointed provisional board members with limited authority to take certain corporate actions until the hearing of the respective application on February 4, 2025. It is our understanding that a change in the Address of Record may constitute a material change in Holdings' representation and corporate structure, and for this reason, the provisional Directors could be held in contempt of the Piraeus First Instance Court's order should they proceed with a change of the Address of Record at this time.

The Directors' Greek counsel has also advised us that the US bankruptcy orders will need to be recognized and enforced in both Greece and Liberia. It is our understanding that a change to the Address of Record cannot supersede the requirements to obtain judicial recognition under Greek and Liberian law. Further, under Greek law, the provisional Directors may be subject to liability by Holdings' shareholders and subsidiaries should they proceed to change the Address of Record without a Greek order enforcing the US bankruptcy judgment.

Regards.


**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile: +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

**From:** Solomon, Louis M.
**Sent:** Friday, November 15, 2024 12:40 PM
**To:** Bryan Kotliar <bkotliar@teamtogut.com>
**Cc:** Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>; Zide, Stephen <stephen.zide@dechert.com>; Herman, David <David.Herman@dechert.com>; Kyle Ortiz <kortiz@teamtogut.com>; Brian Shaughnessy <bshaughnessy@teamtogut.com>; John McClain <jmcclain@teamtogut.com>; Jared Borriello <jborriello@teamtogut.com>
**Subject:** RE: Eletson

Bryan, we have not heard back from counsel on the issues raised on our call yesterday.  I did have one suggestion, which no one has authorized us to suggest but do so in the spirit of trying to move things along.  Would Petitioning Creditors stipulate to going and seeking confirmation of the Plan Order in Liberia and Greece in exchange for a stipulation by the directors of Holdings that they will file the letter once the confirmation is accomplished?  I ask because as I read the Plan it was always the plan to get that confirmation until just recently.

When we hear back from counsel, we will advise.

Regards.

**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, November 14, 2024 6:17 PM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>
**Cc:** Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>; Zide, Stephen <stephen.zide@dechert.com>; Herman, David <David.Herman@dechert.com>; Kyle Ortiz <kortiz@teamtogut.com>; Brian Shaughnessy <bshaughnessy@teamtogut.com>; John McClain <jmcclain@teamtogut.com>; Jared Borriello <jborriello@teamtogut.com>
**Subject:** Re: Eletson

External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>

Reed Smith team,

As a follow up on today's call, please get back to us with the name of the address of record and person of record for Eletson Holdings Inc. with LISCR.  Please also put us in touch with Greek counsel for the directors and Liberian counsel to discuss today's

issues.

Please also let us know what other feedback you receive from whoever you speak to about the Liberian issues we discussed.

Best regards,

Bryan

———

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

**TOGUT SEGAL & SEGAL LLP**

On Nov 13, 2024, at 3:24 PM, Solomon, Louis M. <LSolomon@reedsmith.com> wrote:

We used them earlier in the case: HPA.

Best.

**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

_____

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Wednesday, November 13, 2024 3:22 PM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>
**Cc:** Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>; Zide, Stephen <stephen.zide@dechert.com>; Herman, David <David.Herman@dechert.com>; Kyle Ortiz <kortiz@teamtogut.com>; Brian Shaughnessy <bshaughnessy@teamtogut.com>; John McClain <jmcclain@teamtogut.com>; Jared Borriello <jborriello@teamtogut.com>
**Subject:** Re: Eletson

==**External E-Mail - FROM bkotliar@teamtogut.com <bkotliar@teamtogut.com>**==

Tomorrow at 10am ET works for us - I will send a calendar and Zoom link shortly.

We are working with Pierre Tweh as our Liberian counsel.

We are working with Pierre Twen as our Liberian counsel.

What is the name of your Liberian counsel?  Looking forward to you setting up that introduction.

—————

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

> On Nov 13, 2024, at 2:24 PM, Solomon, Louis M. <LSolomon@reedsmith.com> wrote:
>
> Bryan, Derek and I can't make it today.  And Kyle made clear to the Court how constructive you all want to be.  Passing that, can you do 930a or 10a tomorrow?
>
> You know who our Liberian counsel is, and yes will can try to make an introduction.  Who have you been using?
>
> Regards.
>
> **Louis M. Solomon** (bio)
> E-Mail: Lsolomon@reedsmith.com
> Direct Tel.: +1.212.549.0400
> Mobile:  +1.917.292.2484
> Reed Smith LLP
> 599 Lexington Avenue
> New York, New York 10022
>
> ————————————————————
> **From:** Bryan Kotliar <bkotliar@teamtogut.com>
> **Sent:** Wednesday, November 13, 2024 1:50 PM
> **To:** Solomon, Louis M. <LSolomon@reedsmith.com>; Osei-Bonsu, Derek M. <DOsei-Bonsu@reedsmith.com>; Eletson Bankruptcy Team (S) <EletsonBankruptcyTeam@reedsmith.com>
> **Cc:** Zide, Stephen <stephen.zide@dechert.com>; Herman, David <David.Herman@dechert.com>; Kyle Ortiz <kortiz@teamtogut.com>; Brian Shaughnessy <bshaughnessy@teamtogut.com>; John McClain <jmcclain@teamtogut.com>; Jared Borriello <jborriello@teamtogut.com>

**Subject:** Eletson

**External E-Mail -
FROM bkotliar@teamtogut.com<bkotliar@teamtogut.com>**

Reed Smith team,

Consistent with the Court's direction at today's status conference, please let us know when you are available to meet and confer today regarding the issues with the Liberian registry. I propose 3:30 p.m. (ET) - let us know if that does not work for you.

In the meantime, while we disagree with your explanation that what we are asking for violates Liberian law, we have the following proposed alternatives that we'd like to discuss with you and whichever Liberian counsel you mentioned today. If you have other ideas, please let us know - we are looking to be constructive. In that regard, working constructively toward an Effective Date, kindly introduce us to your Liberian counsel and share with us any laws and requirements you are informed are required to be satisfied to effectuate the Plan.

Finally, to allow for these discussions to continue and for your and your Liberian counsel's time to review, we will adjourn our target effective date to Tuesday, November 19.

**(1) Change AOR to Reorganized Holdings Representatives**

You work with us, our Liberian counsel, and your Liberian counsel on reviewing and revising the draft AOR letter change we sent you on Tuesday and filed with the Court to have the existing AOR designate one of Reorganized Holdings representatives (we picked Adam Spears, we can change his title for purposes of this if that was the issue) which will be submitted on the plan effective date.

**(2) Change AOR to Reed Smith**

Same as item (1) above but instead of a Reorganized Holdings representative, the new AOR can be someone at Reed Smith, Holdings current counsel. Raising this in case there are other issues that you have about the appropriate Reorganized Holdings representative.

**(3) Existing AOR Makes the Filings**

Subject to further discussion with our Liberian counsel, we would likely be willing to have the existing AOR (and please let us know who that is) make the appropriate filings of the amended and restated certificate of incorporation, amended by laws, and shareholders agreement with the Liberian registry after the Effective Date.

after the Effective Date.

*****

Best regards,

Bryan

———

**Bryan M. Kotliar** ⏐ **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 ⏐ New York, NY 10119
Direct: +1 212 201 5582 ⏐ Mobile: +1 516 410 1361
bkotliar@teamtogut.com ⏐ togutlawfirm.com

<image001.png>

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

RSUSv12021

**Exhibit 15**

# Eletson Holdings Inc.

c/o Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119

November 19, 2024

Reed Smith LLP (**"*Reed Smith*"**)

599 Lexington Avenue
New York, NY 10022
Attention:

     Louis M. Solomon, Esq.
     Alyssa F. Conn, Esq.
     Colin A. Underwood, Esq.

355 S Grand Ave Ste 2900,
Los Angeles, CA 90071
Attention:

     Peter J. Kennedy, Esq.

To whom it may concern:

On behalf of Eletson Holdings Inc. and its subsidiaries (collectively, "***Eletson***"), I am writing to provide Reed Smith specific instructions regarding the ongoing legal matters involving Eletson. Reed Smith is hereby instructed as follows:

1. **Engagement Personnel**. Please identify the personnel at Reed Smith who are responsible for managing all matters related to Eletson (the "***Relevant Personnel***"). Please provide their full names, roles, and contact information.

2. **Access to Personnel**. We request that Reed Smith make all Relevant Personnel available for a meeting with our team to discuss their prior and ongoing representation of any Eletson entities. To facilitate this, please provide available dates and times for each Relevant Personnel for a meeting to be scheduled within three (3) days from the date hereof (or such later date as we request).

3. **Retention and Preservation of Files**. We request that you immediately take all necessary steps to preserve and retain all files, documents, and communications relevant to the matters for which Reed Smith has provided counsel to Eletson. This includes electronic files, physical documents and any other materials that may be pertinent.

4. **Transmittal of Files and Access to Systems**. To ensure a complete and seamless transition, please promptly provide all documents and communications related to Eletson files. This includes, but is not limited to:

   a) All executed contracts, drafts, amendments, and related documentation;

   b) Emails, letters, internal memos, and any other written or electronic communications;

   c) Research, legal opinions, pleadings, motions, filings, memoranda, and any drafts and final documents prepared during representation;

   d) Full access to all platforms and tools used for Eletson-related matters, such as Gravity Stack Slackspace and similar systems. This includes any login credentials, permissions, and associated user documentation;

   e) Any digital records, including databases, spreadsheets, presentations, or other electronically stored information (ESI);

   f) Hard copies of files, records, or other materials housed at your office or in storage. Please provide a detailed inventory of such documents; and

   g) Any additional items, including case notes, timelines, or strategies, that may aid in the continuity of handling Eletson matters.

   For e-discovery and electronic records, please ensure data integrity by providing native file formats where applicable, along with any metadata or audit trails. If there are specific technical requirements or processes involved, promptly let me know.

   Should you require any further authorizations, details, or clarification to process this request, do not hesitate to contact me. Your timely and thorough response to this request is expected and appreciated.

5. **Restriction on Actions**. Effective immediately, no action should be taken, nor any filings or decisions made, on behalf of Eletson in any jurisdiction without the express written approval or instructions from the new personnel designated by our organization. Such designated personnel shall include myself and Mark Lichtenstein. Please ensure that no steps are taken without prior authorization.

6. **Outstanding Proceedings**. Please provide a comprehensive list of all outstanding proceedings to which Eletson is currently a party, including matters in which Reed Smith is not acting as counsel. Please identify any ongoing or threatened litigation, arbitration, regulatory matters, or similar proceedings involving Eletson.

7. **Work Streams and Client Codes**. Please provide a detailed breakdown of all outstanding work streams, client codes, or similar records associated with your current or past work with Eletson. This information will assist us in maintaining a clear understanding of all matters in which you are currently or in the past have been engaged.

Docusign Envelope ID: B1664BA7-8F6F-4B44-8B83-4F985EF3CA83

8. **Other Counsel Representing Eletson**. Please provide the names of all law firms, attorneys, or other legal representatives known to Reed Smith who are representing Eletson in any actual, potential, or threatened litigation, dispute or other legal matters. This includes any matters not directly handled by Reed Smith.

9. **Co-Counsel and Opposing Counsel**. In connection with all open matters involving Eletson, we request that you provide the names of all co-counsel, opposing counsel, and any other parties involved in these proceedings. This will help us ensure that all legal resources are properly coordinated and that all relevant parties are accounted for.

10. **Reed Smith Fees**. Please identify (i) all outstanding amounts owed to Reed Smith by Eletson and (ii) which Eletson entities are party to the applicable engagement letters with Reed Smith for any and all outstanding amounts owed to Reed Smith.

Please also identify whether any of Reed Smith's fees for work done on behalf of Eletson have been paid by any third parties. Please identify those third parties and how much they have paid in the past and have agreed to pay in the future. Please provide copies of all related agreements with such third parties.

We appreciate your immediate attention to these matters. If you require any clarification or further instructions, please do not hesitate to reach out to me directly at adam.spears@eletsonholdings.com.

Thank you for your prompt assistance.

Sincerely,

**Eletson Holdings Inc.**


**By:** _Adam Spears_____
Name: Adam Spears
Title: Chief Executive Officer
adam.spears@eletsonholdings.com

CC: bkotliar@teamtogut.com; kortiz@teamtogut.com

**Exhibit 16**

**ReedSmith**

Driving progress
*through partnership*

**Louis M. Solomon**
Direct Phone: +1 212 549 0400
Email: lsolomon@reedsmith.com

Reed Smith LLP
599 Lexington Avenue
New York, NY 10022-7650
+1 212 521 5400
Fax +1 212 521 5450
reedsmith.com

November 21, 2024

**Via ECF**

The Honorable Lewis J. Liman
United States District Court
Southern District of New York
500 Pearl Street, Room 1620
New York, NY 10007

*Re: Eletson Holdings, Inc., et al. v. Levona Holdings Ltd.,* Civil No. 23-cv-7331 (LJL)

Dear Judge Liman:

We write as counsel for Eletson Corporation ("Corp") in connection with the Notice of Appearance filed on Tuesday by the law firm Togut, Segal & Segal LLP ("Togut") purporting to appear on behalf of Eletson Holdings, Inc. ("Holdings") (ECF No. 210). We note that, pursuant to Section 2.5(a) of the *Petitioning Creditors' Revised Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliates Debtors* (the "Plan") (Bankr. ECF No. 1132), Reed Smith's representation of Holdings was purportedly terminated as of Tuesday, the date upon which the Plan was declared effective (*see* Bankr. ECF No. 1258).

On behalf of Corp (whom we still represent), we wish to apprise the Court that the purported new shareholders of Holdings (a Liberian corporation with its principal place of business and center of main interests in Greece) have made no showing that they have taken the steps necessary under Liberian and Greek law to confirm their capacity to act on behalf of Holdings in this or any other forum. In addition, as of November 12, 2024, a court in Piraeus, Greece, issued an order constituting a provisional board of directors for Holdings, with responsibility to undertake corporate actions, including specifically the retention of outside counsel in this proceeding. We have not been informed that the provisional board has exercised its power to appoint Togut, or any law firm other than Reed Smith (which we understand has been directed to act), to represent Holdings in this matter.

We request that the Court refrain from accepting Togut's capacity to speak for Holdings until the issues surrounding who has the capacity to speak for Holdings can be sorted out.

Respectfully,

*Louis M. Solomon*

Louis M. Solomon

cc: Counsel of Record (via ECF)

**Exhibit 17**

**Eletson Holdings Inc.**

c/o Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, NY 10119

November 21, 2024

Reed Smith LLP (**"*Reed Smith*"**)

599 Lexington Avenue
New York, NY 10022
Attention:
> Louis M. Solomon, Esq.
> Alyssa F. Conn, Esq.
> Colin A. Underwood, Esq.

355 S Grand Ave Ste 2900,
Los Angeles, CA 90071
Attention:
> Peter J. Kennedy, Esq.

To whom it may concern:

You are hereby notified that Eletson Holdings Inc. and its subsidiaries (collectively, the "Company") have terminated all of Reed Smith's engagements with the Company for all matters as of November 20, 2024 (the "Termination Date"). As a reminder, Eletson Holdings Inc.'s engagement of Reed Smith terminated on November 19, 2024 by operation of its Court-approved chapter 11 plan.

On November 20, 2024, Reed Smith attorney Louis Solomon filed a letter with the U.S. District Court for the Southern District of New York purportedly on behalf of certain Company entities advancing positions against the Company's interests. This filing was not authorized by any Company personnel, including those identified in the instructions previously sent to Reed Smith in prior letters dated November 19, 2024.

You are also hereby notified that the Company has not agreed to and is not obligated to pay any of Reed Smith's fees and/or expenses incurred after the Termination Date. The Company is undertaking a rigorous review of all outstanding fees and/or expenses purportedly owed to Reed Smith by the Company. You are directed to provide copies of invoices for all fees and expenses purportedly owed to Reed Smith by the Company through the Termination Date **by no later than December 5, 2024**.

In addition to all of the requests in the Company's November 19, 2024 letters to Reed Smith, as well as all of Reed Smith's obligations to the Company under, among other things, applicable Professional Rules of Responsibility and rules governing attorney conduct, you are instructed to preserve and return to the Company all client materials.

You must coordinate with the Company's counsel at Legal Scale LLP (Attn: Neil O'Donnell, Esq. (neil@legalscale.com) and Bryan Judd, Esq. (bryan@legalscale.com)) regarding the submission of invoices and the return of client materials. In addition, should you have any questions, you may reach me by email at adam.spears@eletsonholdings.com.

All rights reserved.

Sincerely,

**Eletson Holdings Inc.**

By: _Adam Spears_
Name: Adam Spears
Title: Chief Executive Officer
adam.spears@eletsonholdings.com

CC: bkotliar@teamtogut.com; kortiz@teamtogut.com

**Exhibit 18**

# Eletson leaders jostle for control after conflicting US and Greek court rulings

Tanker owner's incumbent officers claim US process lacks Greek and Liberian court authority

A conflict has emerged at shipowner Eletson between existing management and a new leadership team installed by a New York bankruptcy court.

Tanker owner Eletson Holdings (EHI) emerged from bankruptcy protection in New York this week with a restructuring plan backstopped by a Canadian hedge fund and with a new chief executive named as Adam Spears.

Today existing managers at tanker owner Eletson have hit back, claiming new executives installed after a US bankruptcy court restructuring have no validity.

The "incumbent officers" said in a statement sent to TradeWinds that any attempt by the "purported new equity owners" of EHI to appoint management or directors at the Liberian company was "premature and ineffective".

This is due to a lack of recognition of their capacity and authority in the courts of Liberia and Greece, where the business is located, they claimed.

TradeWinds understands that EHI is the Liberian-registered parent, while the tanker fleet is run by the Greek operation.

This raises the possibility of new owners affiliated with Canadian hedge fund Murchinson controlling EHI, while the existing team runs the Greek company.

It is not clear how this would work in practice.

The Eletson officers noted that a Greek court had appointed a provisional board of directors with the authority to run the company, pending a hearing scheduled for February 2025, "at which time the management of the company will be addressed".

Vasilis Hadjieleftheriadis, EHI president, said: "While we respect the US bankruptcy process, the recent decision is under appeal and we must also respect international law.

"In the meantime, we assure our various stakeholders that we continue to exercise our utmost diligence and care to ensure the smooth operation of the business."

Vassilis Kertsikoff, chairman and chief executive of Eletson Gas, added: "The operation and control of Eletson Gas, a separate legal entity, is not affected."

Officers at Eletson declined to comment further.

## 'New leadership'

On Wednesday, Eletson Holdings emerged from bankruptcy protection in New York with a restructuring plan backstopped by an affiliate of

Murchinson.

The restructured company said it exited the Chapter 11 bankruptcy process with "new leadership, new financial resources and no debt".

The announcement came more than 20 months after creditors pushed Eletson, an owner of MR product tankers, into a Chapter 7 liquidation case. A federal judge later converted it into a Chapter 11 reorganisation.

Eletson said one of those creditors, Murchinson-backed Pach Shemen, proposed and backstopped the reorganisation plan that allowed it to exit the US Bankruptcy Court for the Southern District of New York.

Murchinson is a Toronto hedge fund backed by Marc Bistricer that, in shipping, has been known to be a provider of rescue financing.

The plan garnered the support of the majority of Eletson's creditors and was approved by the court in October.

Spears, a new name to many in shipping, was appointed the shipowner's new chief executive.

"Today marks an important milestone for Eletson and its subsidiaries," he said.

"After completing the Chapter 11 process, the company is now in a strengthened financial position and debt-free. We look forward to being able to focus on the next phase of Eletson's evolution by enhancing operations and driving growth."

The new Eletson comprises Spears and independent directors Leonard Hoskinson and Timothy Matthews.

Eletson was founded in 1966 by Hadjieleftheriadis with his two sons and two sons-in-law. (Copyright)

**Exhibit 19**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

ELETSON HOLDINGS INC., et al.,           Main Case No.

      Debtors.                           23-10322-jpm

- - - - - - - - - - - - - - - - - - - -x

           United States Bankruptcy Court

           One Bowling Green

           New York, New York

           May 15, 2024

           9:46 AM

B E F O R E:

HON. JOHN P. MASTANDO, III

U.S. BANKRUPTCY JUDGE

ECRO:  K. HARRIS

2

1

2  Motion to Approve /(Hearing Date: May 8, 2024 at 10:00 a.m.,

3  Objection Deadline: May I, 2024 at 4:00 p.m.) Notice of Hearing

4  and Petitioning Creditors Motion for Entry of an Order (I)

5  Approving (A) The Rights Offering and Related Procedures and

6  Materials and (B) The Backstop Agreement, and (II) Granting

7  Related Relief (Attachment(s): Ex. A: Proposed Order, Ex. 1:

8  Rights Offering Procedures, Ex. 2: GUC Subscription Form, Ex.

9  3: Corp. Guaranty Subscription Form, Ex. 4: Backstop Agreement)

10 (related document(s)532, 531)

11

12 Motion to Approve /Petitioning Creditors Motion for Entry of an

13 Order (I) Approving Certain Key Dates Relating to Confirmation

14 of the Petitioning Creditors Plan, Including Scheduling A

15 Hearing to Consider Approval of Petitioning Creditors Plan;

16 (II) Approving the Form and Manner of the Confirmation Hearing

17 Notice; (III) Approving Petitioning Creditors Disclosure

18 Statement and Notice Thereof; (IV) Approving (A) Procedures for

19 Solicitation, (B) Forms of Ballots, (C) Procedures for

20 Tabulation of Votes, and (D) Procedures for Objections; and (V)

21 Establishing Notice and Objection Procedures for the

22 Confirmation of the Plan (Attachments: Ex: Proposed Order, Ex.

23 I: Confirmation Hearing Notice, Ex. 2: Class 3 GUC Ballot, Ex.

24 2A: Class 3 Master Ballot, Ex.: 2B Class 3 Beneficial Holder

25 Ballot, Ex. 3: Class 4 Conv. Claims, Ex. 4: Class 5 Azure

3

1

2 Claims, Ex. 5: Class 6 Guaranty Claims, Ex. 6: DS Hearing

3 Notice) (related document(s)532, 531)

4

5 Notice of Proposed Order /Notice of Filing of Revised Proposed

6 Order (I) Approving Certain Key Dates Relating to Confirmation

7 of the Petitioning Creditors Plan, Including Scheduling A

8 Hearing to Consider Approval of Petitioning Creditors Plan;

9 (II) Approving the Form and Manner of the Confirmation Hearing

10 Notice; (III) Approving Petitioning Creditors Disclosure

11 Statement and Notice Thereof; (IV) Approving (A) Procedures for

12 Solicitation, (B) Forms of Ballots, (C) Procedures for

13 Tabulation of Votes, and (D) Procedures for Objections; and (V)

14 Establishing Notice and Objection Procedures for the

15 Confirmation of the Plan (Attachments: Exhibit A: Revised

16 Proposed Order with Exhibits, Exhibit B: Redline of Revised

17 Proposed Order to Original Proposed Order) (related

18 document(s)663, 532, 574,665,664,531)

19

20 Amended Notice of Hearing /(Hearing Date: 5/15/2024 at 9:30 AM)

21 Notice of Change of Time for Hearing on Petitioning Creditors:

22 (1) Motion for Entry of an Order {I) Approving Certain Key

23 Dates Relating to Confirmation of the Petitioning Creditors

24 Plan, Including Scheduling a Hearing to Consider Approval of

25 Petitioning Creditors Plan; (II) Approving the Form and Manner

4

of the Confirmation Hearing Notice; (III) Approving Petitioning

Creditors Disclosure Statement and Notice thereof; (IV)

Approving (A) Procedures for Solicitation, (B) Forms of

Ballots, (C) Procedures for Tabulation of Votes, and (D)

Procedures for Objections; and (V) Establishing Notice And

Objection Procedures for the Confirmation of the Plan; and (2)

Motion for Entry of an Order (I) Approving (A) The Rights

Offering and Related Procedures and Materials and (B) The

Backstop Agreement, and (II) Granting Related Relief (Hybrid

Hearing: "In Person" and "Zoom for Government")(related

document(s)574, 632, 592)


Notice of Adjournment of Hearing /(Adjourned Hearing Date:

5/15/2024 at 11 :00 AM, Objections Due: 5/9/2024 at 4:00 PM)

Notice of Adjournment of Hearing on Petitioning Creditors: ( 1

)Motion for Entry of an Order (I) Approving Certain Key Dates

Relating to Confirmation of the Petitioning Creditors Plan,

Including Scheduling a Hearing to Consider Approval of

Petitioning Creditors Plan; (II) Approving the Form and Manner

of the Confirmation Hearing Notice; {III) Approving Petitioning

Creditors Disclosure Statement and Notice thereof; (IV)

Approving (A) Procedures for Solicitation, (B) Forms of

Ballots, (C) Procedures for Tabulation of Votes, and (D)

Procedures for Objections; and (V) Establishing Notice And

5

1

2  Objection Procedures for the Confirmation of the Plan; and (2)

3  Motion for Entry of an Order {I) Approving (A) The Rights

4  Offering and Related Procedures and Materials and (B) The

5  Backstop Agreement, and (II) Granting Related Relief (Hybrid

6  Hearing: "In Person" and "Zoom for Government") (related

7  document(s)574, 592)

8

9  Statement /Notice of Filing of (1) Anticipated Modifications to

10  the Petitioning Creditors Joint Chapter 11 Plan of

11  Reorganization of Eletson Holdings Inc. and Its Affiliated

12  Debtors and (2) Certain Appendices Related to the

13  Petitioning Creditors Disclosure Statement Related Thereto

14  (Attachments: Appendix C - Liquidation Analysis, Appendix D -

15  Financial Projections, Appendix E - Valuation Analysis,

16  Appendix F - Backstop Party Financial Wherewithal) (related

17  document(s)532, 531)

18

19  Response /Petitioning Creditors Omnibus Reply to the Debtors

20  Objections to the Disclosure Statement and Rights Offering

21  Motions (related document(s)663, 652, 532, 653, 570, 574, 665,

22  664, 666, 531)

23

24  Amended Plan /Notice of Filing of Petitioning Creditors Amended

25  Joint Chapter 11 Plan of Reorganization of Eletson Holdings

6

1

2  Inc. and Its Affiliated Debtors (Attachments: Exhibit 1:

3  Petitioning Creditors Amended Joint Chapter 11 Plan of

4  Reorganization, Exhibit 2: Redline of Amended Plan to

5  Initial Plan) (related document(s )532, 531)

6

7  Amended Disclosure Statement /Notice of Filing of Amended

8  Disclosure Statement In Support of Petitioning Creditors

9  Amended Joint Chapter 11 Plan of Reorganization ofEietson

10  Holdings Inc. and Its Affiliated Debtors (Attachments: Exhibit

11  1: Amended Disclosure Statement along with Appendix A - filed

12  separately; and Appendix B-F), Exhibit 2: Redline of Amended

13  Disclosure Statement to Initial Disclosure Statement) (related

14  document(s)663, 532, 658, 531)

15

16  Notice of Proposed Order /Notice of Filing of Revised Proposed

17  Order (I) Approving (A) The Rights Offering and Related

18  Procedures and Materials and (B) The Backstop Agreement, and

19  (11) Granting Related Relief (Attachments: Exhibit 1: Revised

20  Proposed Order, Exhibit 2: Redline to Original Proposed Order)

21  (related document(s)663, 532, 592, 664, 531)

22

23  Letter /Letter to the Honorable John P. Mastando, III Regarding

24  Objection Deadline Extension for the Official Committee of

25  Unsecured Creditors and the United States Trustee (related

7

1

2  document(s)532, 574, 592, 531)

3

4  Letter to the Honorable Judge John P. Mastando III Regarding

5  Objection Deadline Extension for the Official Committee of

6  Unsecured Creditors (related document(s)621, 570, 372)

7

8  Amended Notice of Hearing (related document(s)376, 377, 372,

9  379, 380)

10

11  Notice of Agenda of Matters Scheduled for Hearing on May 15,

12  2024 at 9:30 A.M. (Eastern) (related document(s)376, 377, 574,

13  372, 379, 592, 380)

14

15  Objection to the Petitioning Creditors Motion for Entry of an

16  Order (I) Approving (A) Rights Offering and Related Procedures

17  and Materials and (B) the Backstop Agreement, and (II) Granting

18  Related Relief (related document(s)592)

19

20  Objection /Debtors Limited Objection and Reservation of Rights

21  to the Petitioning Creditors Disclosure Statement Motion

22  (related document(s)574)

23

24

25

8

19   Transcribed by:  Michael Drake

20   eScribers, LLC

21   7227 North 16th Street, Suite #207

22   Phoenix, AZ 85020

23   (800) 257-0885

24   operations@escribers.net

25

9

1

2    A P P E A R A N C E S:

3    REED SMITH LLP

4          Attorneys for Debtors

5          10 South Wacker Drive

6          40th Floor

7          Chicago, IL 60606

8

9    BY:   ANN E. PILLE, ESQ.

10

11

12   REED SMITH LLP

13         Attorneys for Debtors

14         1717 Arch Street

15         Suite 3100

16         Philadelphia, PA 19103

17

18   BY:   DEREK J. BAKER, ESQ.

19

20

21

22

23

24

25

10

1

2   REED SMITH LLP

3        Attorneys for Debtors

4        599 Lexington Avenue

5        New York, NY 10022

6

7   BY:   LOUIS M. SOLMON, ESQ.

8

9

10  DECHERT LLP

11       Attorneys for Official Committee of Unsecured Creditors

12       1095 Avenue of the Americas

13       New York, NY 10036

14

15  BY:   STEPHEN D. ZIDE, ESQ.

16       DAVID A. HERMAN, ESQ.

17

18

19  UNITED STATES DEPARTMENT OF JUSTICE

20       Office of the United States Trustee

21       One Bowling Green

22       Suite 534

23       New York, NY 10707

24

25  BY:   DANIEL RUDEWICZ, ESQ.

11

1

2    SIDLEY AUSTIN LLP

3         Attorneys for Laceon Investment Company

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:   WILLIAM E. CURTIN, ESQ.

8

9

10   QUINN EMANUEL URQUIHART & SULLIVAN LLP

11        Attorneys for Levona Holdings Ltd.

12        51 Madison Avenue

13        22nd Floor

14        New York, NY 10010

15

16   BY:   JOHN SUPER, ESQ.

17        ISAAC NESSER, ESQ.

18

19

20

21

22

23

24

25

12

1

2  PERKINS COIE LLP

3        Attorneys for Wilmington Savings Fund Society, FSB

4        1155 Avenue of the Americas

5        22nd Floor

6        New York, NY 10036

7

8  BY:   TINA N. MOSS, ESQ.

9

10

11  SEWARD & KISSELL LLP

12        Attorneys for New Agathonissos Finance LLC

13        One Battery Park Plaza

14        New York, NY 10004

15

16  BY:   CATHERINE V. LOTEMPIO, ESQ.

17        ANDREW MATOTT, ESQ.

18

19

20

21

22

23

24

25

13

```
 1

 2   THOMPSON HINE LLP

 3        Attorneys for Deutsche Bank

 4        300 Madison Avenue

 5        27th Floor

 6        New York, NY 10017

 7

 8   BY:   ALEXANDER J. ANDREWS, ESQ.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**ELETSON HOLDINGS INC.**

14

1                    P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.  We're here on

3    Case Number 23-10322, Eletson Holdings Inc.

4          Can have appearances for the record, please?

5          MR. BAKER:  Good morning, Your Honor.  Derek Baker,

6    Lou Solomon and Ann Pille, on behalf of the debtors, Eletson

7    Holdings Inc. and their affiliates.

8          THE COURT:  Good morning.

9          MR. BAKER:  Good morning.

10         MR. ZIDE:  Good morning, Your Honor.  Stephen Zide

11   from Dechert, on behalf of the official committee of unsecured

12   creditors, I'm here with my colleague, David Herman.

13         THE COURT:  Good morning.

14         MR. RUDEWICZ:  Good morning, Your Honor.  Daniel

15   Rudzewicz, on behalf of the United States Trustee.

16         THE COURT:  Good morning.

17         MR. ORTIZ:  Good morning, Your Honor.  Kyla Ortiz of

18   Togut, Segal & Segal on behalf of the petitioning creditors.

19   I'm joined by my partners Brian Kotliar and Brian Shaughnessy.

20         THE COURT:  Good morning.

21         MR. CURTIN:  Good morning.  William Curtin of Sidley

22   Austin for Laceon Investment Company, Glafcos Trust Company,

23   and Family Unity Trust Company, the majority shareholders of

24   Eletson Holdings Inc.

25         THE COURT:  Good morning.

**ELETSON HOLDINGS INC.**

15

1      MR. SUPER:  Good morning, Your Honor.  John Super from

2  Quinn Emanuel on behalf of Levona Holdings Limited.  And I'm

3  joined by my colleague, Isaac Nesser.

4      THE COURT:  Good morning.

5      MS. MOSS:  Good morning, Your Honor.  Tina Moss of

6  Perkins Coie on behalf of Wilmington Savings Fund Society, FSB

7  as indenture trustee.

8      THE COURT:  Good morning.

9      MS. LOTEMPIO:  Good morning, Your Honor.  Catherine

10  Lotempio of Seward & Kissell on behalf of New Agathonissos

11  Finance LLC.  And I'm joined in the courtroom by my colleague

12  Andrew Matott.

13      THE COURT:  Good morning.

14      MR. ANDREWS:  Good morning, Your Honor.  Alex Andrews,

15  Thompson Hine, on behalf of Deutsche Bank, 2013 Notes Trustee.

16      THE COURT:  Good Morning.

17      Counsel?

18      MR. BAKER:  Good morning again, Your Honor.  Derek

19  Baker from Reed Smith on behalf of the debtors.

20      Your Honor, my proposal would be to simply proceed

21  through the agenda that was filed, the amended agenda, docket

22  Number 692.  Unless, Your Honor has a different preference.

23      THE COURT:  No, that sounds good.  Thank you.

24      MR. BAKER:  Thank you, Your Honor.

25      Your Honor, I'm going to start with some potential

**ELETSON HOLDINGS INC.**

16

1    resolutions of certain of the issues that are identified on

2    docket number 1, which is the debtor's motion for solicitation

3    order and approval of the debtors' disclosure statement.

4           Your Honor, one of the objections that was filed was

5    of an objection of Levona.  It was identified at docket number

6    648.  And the debtor filed a reply at 670.

7           Your Honor, I'm pleased to report that after

8    discussions with Levona that the parties have agreed to insert

9    additional language in the debtor's disclosure statement.  That

10   language -- I'm not going to bore the Court with reading it

11   into the record but to simply state that it was identified in

12   an email exchange between me and Mr. Super who previously

13   identified himself yesterday, May 14th at 1:57 p.m. And the

14   debtors would intend to make those additional changes to its

15   disclosure statement, which would resolve the objection.

16          Oh, and excuse me, and would also add that on May

17   8th -- this I will read into the record.  On May 8th, 2024, the

18   debtors withdrew the motion to enforce.  In the debtors' view,

19   the motion to enforce should be withdrawn without prejudice.

20   In Levona's view, the motion to enforce should be withdrawn

21   with prejudice.  The Court has not yet decided whether the

22   motion to enforce is withdrawn with or without prejudice.  That

23   will be added to the disclosure statement.

24          THE COURT:  Okay.

25          MR. BAKER:  And I believe with those additions, that

**ELETSON HOLDINGS INC.**

17

1   resolves the Levona objection.  But I'll let Mr. Super confirm

2   that.

3              THE COURT:  You can come to the --

4              MR. SUPER:  John Super for Levona, Your Honor.

5        I agree with what Mr. Baker just said.  And that will

6   resolve the issues raised in Levona's limited objection at

7   docket 648.

8              THE COURT:  Thank you, counsel.

9              MR. BAKER:  Your Honor, so then that leaves two

10  additional objections that remain.  First is the objection of

11  the committee.  And the second is the objection of Pach Shemen.

12  And the debtor filed replies to both of them.

13       Your Honor, there have been ongoing discussions with

14  the parties.  And in addition to some additional disclosure

15  related requests from the committee, the debtor is prepared to

16  make some additional changes to its disclosure statement to

17  address certain of the requests of the committee.  It is not

18  entirely clear that these will fully resolve the committee

19  objection.  I'm simply stating that for the record.  I am

20  hopeful that it does and reserves confirmation issues for

21  confirmation where, frankly, we think they belong.  But we're

22  prepared to argue the issues in the event that these do not

23  resolve the request by the committee.

24       We understand that -- as Your Honor may have seen --

25  and I apologize, Your Honor.  I know there were a flurry of

**ELETSON HOLDINGS INC.**

18

1    filings at the end of the day yesterday.  But as you can

2    appreciate, there were significant ongoing discussions among

3    the parties.  And we did file at docket number 687 evaluation

4    analysis, which we understand satisfies the committee's request

5    that the debtors prepare a valuation analysis and provide

6    projections in accordance with its -- or together with its

7    disclosure statement.

8          We have also been requested to make two additional

9    representations.  One is the nature of how the settlement that

10   is proposed as part of the litigation trust assignment, how

11   that was arrived at.  And we are intending to make some

12   additional disclosure around that, stating simply that it was

13   arrived between arm's length negotiations between the Board of

14   Holdings with their respective counsel, Reed Smith, and the

15   principals of the preferred nominees through their separate

16   counsel, Sidley Austin.  And the negotiations took place in the

17   context of the global mediation that was the subject of the

18   Court's order.  And that is the rationale for the settlement

19   that is articulated in the debtors' plan.

20         The committee has also requested, and we have agreed

21   to request, that the shareholders that would be making the

22   shareholder new value contribution signed a commitment letter

23   that would be effective upon the confirmation of the debtors'

24   plan that would obligate the shareholders to make the

25   shareholder new value contribution in the event of a

**ELETSON HOLDINGS INC.**

19

1  confirmation of the debtors' plan.  I believe that is something

2  that is acceptable to all the parties.  And we would have that

3  prepared and circulated in addition to the debtors' disclosure

4  statement.

5       And there has been a request that the preferred -- or

6  that the primary shareholders disclose proof of funds to make

7  the shareholder new value contribution.

8       And what we have been authorized to do is to provide

9  the committee on an attorneys'-eyes-only basis or

10  professionals'-eyes-only basis, as articulated in the

11  protective order, a redacted copy of the proof of funds of the

12  three primary shareholders, the ones represented by Mr. Curtin

13  disclosing the amount of approximately thirty million dollars

14  to make the shareholder new value contribution.  The redactions

15  that the debtors would intend to make would redact all bank

16  information and identifying information of the parties as to

17  who has what, but it will show the amounts that are at issue.

18  And the representation that we would be making as counsel is

19  that those are the primary shareholders.

20       I don't believe that that last part satisfies the

21  committee, but there are some very substantial concerns about

22  leakage of information and disclosure of information and use of

23  information and improper context.  And we can certainly get

24  into that later this -- or later this morning.  But that's the

25  very real reason why we understand that the shareholders are

**ELETSON HOLDINGS INC.**

20

1  not inclined to make all of that information publicly available

2  nor to disclose it beyond a very limited group that would

3  confirm that they have the wherewithal to close under the terms

4  that we have proposed in our plan.  We're also prepared to show

5  that information, to Your Honor.

6          I don't know how Your Honor would -- if you would like

7  me to just continue then to proceed through my presentation, or

8  if you'd like to hear from the parties about whether that

9  changes where we are in terms of the presentations today.

10          THE COURT:  Why don't you proceed through your

11  presentation?  then I'll hear from the parties.

12          MR. BAKER:  Thank you, Your Honor.

13          MR. BAKER:  Thank you.

14          Your Honor, today is an important milestone in the

15  debtors' cases.  Approval of the disclosure statement will

16  begin a process to facilitate the debtors' goal of resolving

17  and facilitating claims and facilitating payment of claims to

18  legitimate creditors.  Approval of the -- we request that the

19  Court approve the disclosure statement, overrule the objections

20  as to disclosure, and allow for solicitation of the debtors'

21  plan.

22          I wanted to highlight a couple of things for Your

23  Honor, in terms of timeline.  January 23rd, 2024, the debtors

24  filed their plan.  And Your Honor may recall during a hearing

25  the debtor offered to engage with creditors.  The committee

**ELETSON HOLDINGS INC.**

21

1   refused.  Togut for its purposes agreed.  And there were

2   several preliminary conversations between the debtors and

3   counsel for Pach Shemen.   Counsel for Pach Shemen pressed

4   forward on a request to terminate exclusivity which the debtor

5   ultimately conceded and allowed.  And so Pach Shemen proposed

6   an alternative plan.  That alternative plan mirrored the

7   debtors' classification of claims in its plan.  All the while,

8   the committee refused to engage.

9        The committee waited three months to engage with the

10  debtors, despite numerous requests and overtures in the

11  interim.  Even when the committee started to engage and it only

12  did so by email, the committee did not even get on the phone to

13  discuss the plan.  There were calls that began in early May,

14  and there has been substantial activity since then, as Your

15  Honor can see, because there has been a second amended

16  disclosure statement that was filed at docket number 672.

17       The debtor repeatedly served drafts with comments only

18  to receive halfhearted and uninterested engagement.  The

19  committee provided the debtors with comments, and the debtors

20  incorporated most, if not all, of the substantive comments

21  requested by the committee.

22       The debtors disagree with the committee's

23  characterization that the information and the disclosure

24  statement is lacking, nor that the plan should not be pursued

25  on a competing basis.

**ELETSON HOLDINGS INC.**

22

1        The debtors believe that the facts presented are

2   necessary for a fulsome understanding of the debtors' position,

3   the basis for the claims asserted by the debtors against

4   various parties, and the articulation of the claims objections

5   which benefit many creditors.  And we have outlined for Your

6   Honor the tables that we have made substantial changes to our

7   plan -- to our disclosure statement at docket number 670 and

8   686, in addition to the ones I articulated today.

9        Your Honor, it's curious.  The committee position over

10  the last several months is that the debtor has not provided

11  information.  Every time the debtor provides information, the

12  committee's refrain is more.  In the disclosure statement, the

13  debtor provided detailed factual bases for the facts

14  underlining its plan.  The debtor provided a liquidation

15  analysis at docket number 672 and a valuation analysis at

16  docket number 687.

17       Now that a substantial amount of information has

18  provided, the committee says I want more.  And what is it that

19  they want?  Well, Your Honor, what they want is, in our view,

20  premature.

21       Nevertheless, Your Honor, it is now the committee that

22  is preventing creditors from getting information and given an

23  opportunity to vote on a plan.  So why would the committee

24  whose alleged goal is to maximize value and opportunities for

25  creditors insist on preventing the debtors plan from being

1  solicited and actively supporting Pach Shemen?  Is it because

2  Pach Shemen controls the Trustee who controls Dechert who

3  controls the committee?  What is really going on here is the

4  debtors' plan and the Pach Shemen plan give creditors a

5  fundamental choice.  The debtors' plan provides creditors with

6  cash and a guaranteed settlement of a costly and risky

7  litigation which is provided to proper creditors.  The Pach

8  Shemen plan, on the other hand, requires creditors to ride with

9  them on a risky business venture, including with substantial

10  litigation risk.  Creditors are forced to partner with a

11  merchants and fund who slash-and-burn business model has

12  wreaked havoc on the debtors' estates to date.

13       Creditors should be able to see the differing

14  recoveries and choose which plan better suits their needs and

15  identifies their preferred recovery method.  The debtors are

16  willing to offer that choice.  The committee and Pach Shemen

17  are not.  Why?  Is Pach Shemen worried that creditors will not

18  want to ride along with the Pach Shemen plan?  Is Pach Shemen

19  worried that creditors will prefer the debtors safer and more

20  achievable option.

21       The Court should not allow the committee and Pach

22  Shemen to prevent creditors from making the choice.  The Court

23  should give creditors the opportunity to evaluate those claims

24  and evaluate their risk profile.

25       Your Honor, much has been spilled about the objections

**ELETSON HOLDINGS INC.**

24

1   to confirmation of the debtors' plan that the committee and

2   Pach Shemen intend to press today.  We suggest, as we have,

3   that they reserve those for the right time which is

4   confirmation.

5          The committee's reliance on patent unconfirmability

6   standards is frankly, misplaced.  Your Honor, the patent

7   unconfirmability standard that is relied upon by Pach Shemen

8   and the committee is an entirely discretionary standard for the

9   Court.  They are asking this Court to use its discretion to

10  prevent creditors from having an opportunity to vote.  Even the

11  Pach Shemen reply makes clear that the patent uncomfirmability

12  standard is simply a cost-saving tool that the Court implies.

13  But in this case, the cost of solicitation are relatively low

14  because of the small universe of creditors and the small

15  solicitation costs.

16         Your Honor, the debtors believe that the Court is not

17  required to make any confirmation determinations now.  Those

18  should be reserved for a full evidentiary hearing at

19  confirmation on the plans that meet the confirmation standards.

20         Your Honor, I would be happy to go through each and

21  every one of the cases that are articulated related to the

22  patent unconfirmability standard, but I think I'll highlight

23  three of them.  The first is the American Capital Equipment

24  case out of the Third Circuit, 688 F.3d 145.  In there the

25  court really formulated the patent unconfirmability standard by

1    saying it must be determined upon a conclusion that there is no

2    dispute of any material fact, essentially a summary judgment

3    standard, that cannot be cured by a creditor vote.  Your Honor,

4    neither the committee nor Pach Shemen have identified that.  In

5    fact, every one of the issues that are identified in their

6    arguments as to why the plan is unconfirmable are issues that

7    require an evidentiary determination.

8          Your Honor, the Quigley decision out of 2007 where

9    they specifically highlight the patent unconfirmability

10   standard I think is really important.  There the court did not

11   refuse to approve the disclosure statement.

12         Your Honor, the one issue that I think really is

13   raised by Pach Shemen Pokémon in their argument about patent --

14   about confirmability is the fact that there is a separate class

15   created for creditors that the debtors believe should be

16   equitably subordinated.  Your Honor, I think it's important

17   that Quigley even notes that it is proper to separately

18   classify creditors when you have a legitimate reason.

19         The debtors' separate classification is proper because

20   equitable subordination can be accomplished through the plan at

21   the confirmation hearing with the evidence that is presented as

22   to why that is a proper classification.  That's the appropriate

23   time to have that.  There are sufficient, more than sufficient

24   reasons, articulated in the debtors disclosure statement as to

25   why the proper delineation is there.  And I think it's also

**ELETSON HOLDINGS INC.**

26

1    important that Your Honor note that under the debtors' plan,

2    there is a savings clause that provides that even if after the

3    confirmation hearing the Court concludes that it does not have

4    a sufficient basis for equitable subordination, that those

5    proposed equitably subordinated creditors would nonetheless be

6    part of class 5A under the debtors' plan.

7        Your Honor, the other two cases that I think are cited

8    pretty heavily in the papers are the Quigley decision, 437 B.R.

9    102 at 210 -- or 2010.  There, there is a substantial argument

10   about whether or not the plan was proposed in good faith.  And

11   there the court made that determination after a fifteen-day

12   evidentiary trial at confirmation.  Now, Your Honor, I'm not

13   suggesting in any way that we're going to need fifteen days of

14   trial to do a confirmation hearing.  But I think it's very

15   important that the Court recognize that even there, the good-

16   faith determination that the Pach Shemen and the committee try

17   to have this Court make on a summary judgment basis, there it

18   was done after a substantial evidentiary hearing.

19       And Your Honor, the Laytham (ph.) case, I'll simply

20   note there's a lot of 1129 analyzes that are thrown around in

21   that case.  But those 1129 analyzes are not in connection with

22   a plan.  In fact, they were relating to whether or not the DIP

23   lenders making a DIP loan in that case would be entitled to

24   364(e) good-faith determinations, not whether or not the

25   plan -- whether or not there was a plan that would satisfy the

27

1   new value corollary or violate the absolute priority rule.  So,

2   Your Honor, the biggest argument that is raised is the debtors'

3   plan as a new value plan, and that violates the absolute

4   priority rule and violation of LaSalle.

5        Your Honor, essentially what the arguments are raised

6   now is that Pach Shemen and the committee want to stop the very

7   market test that has already brought substantial value to this

8   estate.  The market test has produced substantial results.  The

9   debtor substantially improved its original plan.  Pach Shemen

10  alleges that it's substantially improved its plan.  Pach Shemen

11  properly called back its overbearing rights offering to prevent

12  risk to the estate.  In the event that the Pokémon plan is not

13  confirmed.

14       All of those go to why there is a market process here

15  that is working, and the Court should let that market process

16  continue.  If the market process continues, improvements can

17  continue.  Let creditors decide and reserve confirmation issues

18  for where they belong at the confirmation hearing where the

19  Court can decide all the confirmation issues after the creditor

20  vote.

21       Your Honor, in terms of the allegations related to

22  shareholder value, the shareholder new value contribution, as I

23  think I've already articulated for Your Honor about the

24  information that we've been provided  and our willingness to

25  share certain of it, we think that more than adequately

1    satisfies the five prong test.  It is new.  It is not assets of

2    the debtors.  It's assets of the shareholders, contributors to

3    the debtors.  It is substantial.  Thirty million dollars is a

4    substantial sum.  It is money or money's worth.  It's not sweat

5    equity.  It's necessary for the plan.  And I think everyone

6    would agree with that because the debtors do not have cash in

7    order to satisfy administrative claims and other creditor

8    claims.  That's why even under the Pach Shemen plan, there

9    needs to be a backstop to provide for funding of equity.

10          And, Your Honor, the information that was provided in

11   the valuation analysis we believe sufficiently confirms that

12   it's reasonably equivalent to the value that the shareholders

13   are receiving.  All of that is in addition detailed in the

14   amended disclosure statement at page 45 of the red line, docket

15   number 672, pages 468.  I'm sorry, 467 and -- excuse me, Your

16   Honor.  I've got the wrong page here.  470 and 471.

17          So, Your Honor, now we're left with the competing

18   plans being a proper market test.  Your Honor, everyone starts

19   with LaSalle, so that's where I'll start.  Your Honor, when you

20   read LaSalle, Justice Souter was very clear about the fact that

21   the lack of marketing, the fact that the court extended

22   exclusivity while a creditor wanted to assert a competing plan,

23   was part of the problem.  That was at page 438 of the court's

24   decision.

25          The court rejected that there is a per se bar to

**ELETSON HOLDINGS INC.**

29

1    shareholders making a contribution and receiving new equity.

2    That's at pages 451 and 452.

3        The court said that the debtors' plan was not

4    confirmable because it did not extend the opportunity to anyone

5    else to compete for equity or propose a competing plan.  That

6    was at page 453.  And importantly, that was because the plan

7    was approved before anyone could propose an alternative because

8    exclusivity was maintained at page 455.

9        And I think this is the most telling language from the

10   court's decision.  Courts should shy away from decisions that

11   are based on untested -- that are untested by competitive

12   choice.  That's a page number 458.  That's why we think the

13   competing plans make the most sense and allow creditors with

14   the opportunity to fully engage in the process which is what

15   bankruptcy is all about and allow creditors to then decide

16   which is their preferred recovery method.

17       Your Honor, that's the Coltex case I think that was

18   cited out of the Second Circuit.  That was actually a pre-

19   LaSalle case.  But that also rejected the plan because there

20   was no competing process.  And here there is a competing

21   process.

22       And in the Excel Maritime Carriers case, while - that

23   that was cited in our papers,  213 Bankr. LEXIS 3920, Judge

24   drain and his bench decision, while he preserved exclusivity,

25   he made it very clear he was giving everyone full knowledge of

1   the fact that one way you could address the existence of a

2   shareholder new value plan or confirm a new shareholder new

3   value plan would be through termination of exclusivity.  And

4   while the court there, Judge Drain there, kept exclusivity in

5   place, the court gave a stern warning about the viability of

6   the plan without terminating the exclusivity.  That's obviously

7   not the case here because exclusivity has allowed for competing

8   plans to be presented, and the debtors are prepared to proceed

9   on that basis.

10       Your Honor, the Amerifax Engineering decision, 2018

11  Bankr. LEXIS 2267, out of the District of Oregon, the new value

12  can be tested through a competing plan if the competing plan is

13  readily considered.  Here that's exactly what the debtors are

14  proposing.

15       And, Your Honor, the Walden Palms Condo case, the

16  creditor who was alleging to control a class just like Pach

17  Shemen is here, filed a competing plan, that was a sufficient

18  marketing for confirmation of the debtors' new value plan.

19       So, Your Honor, we believe that there is more than

20  ample basis on today's record for the Court to decline to

21  exercise the discretion that the committee and Pach Shemen

22  asking this Court to do on an on an anti-competitive basis.  To

23  direct the parties to make the necessary changes that I

24  articulated in my presentation earlier today and to proceed on

25  a joint solicitation of both plans and allow creditors with the

1 opportunity to voice their position.

2 　　　　Your Honor, unless you have further questions, I'll

3 cede the podium.

4 　　　　THE COURT:  One question is, can you explain the

5 settlement to me?

6 　　　　MR. BAKER:  Yes, Your Honor.  In accordance with the

7 terms of the -- in accordance with the terms of the litigation

8 trust, the claims that are alleged -- and Your Honor,

9 probably -- I see you trying to find a document.  So I'm going

10 to try and help you out and get you to the right page.

11 　　　　THE COURT:  Well, I'm looking at docket page 671, page

12 97 of the PDF of the filing.

13 　　　　MR. BAKER:  Correct.  Thank you, Your Honor.

14 　　　　So the way the settlement would work is that the.

15 claims against the -- what are called the gas ownership

16 defendants, that would be the preferred nominees, Eletson Gas,

17 any of the directors of Eletson Gas, all of the claims that

18 have been -- I don't even want to say assertive because they

19 haven't been asserted but alleged around whatever those issues

20 are because no one has ever really crystallized them for the

21 debtors or for the independent -- or independent committee, all

22 of the claims related to that are transferred to the litigation

23 trust.  The litigation trust trustee then has the full control

24 over that.  But what the settlement provides is that so long as

25 the defendants tender to the litigation trust seventy-five

1  percent of the net cash value of the recoveries from Levona on

2  account of the arbitration award --

3       THE COURT:  All right.  So this is the second -- the

4  notwithstanding paragraph.

5       MR. BAKER:  Correct.

6       THE COURT:  So take me through that paragraph.

7       MR. BAKER:  Sure.

8       THE COURT:  It's kind of  confusing.

9       MR. BAKER:  Understood, Your Honor.  And I can

10  appreciate that.

11       So the way it worked, the first sentence provides that

12  upon the assignment, the trustee would have the claims, but the

13  trustee would not actually start a lawsuit.  And the reason the

14  trustee wouldn't start the lawsuit is because there is ongoing

15  litigation in another court.  We believe in violation of the

16  preclusive effect of the final award, but nonetheless going on

17  in another court.

18       The sentence then continues that that abatement would

19  end upon the earliest of a determination in favor of Levona,

20  right, which would mean that if Levona is successful --

21       THE COURT:  You're talking about the District court?

22       MR. BAKER:  No, Your Honor, I'm actually talking about

23  the improper litigation that was commenced by Levona.

24       THE COURT:  Well, that was going to be my next

25  question.  Are you talking about the motions pending in the

**ELETSON HOLDINGS INC.**

33

1  District Court as to the confirmation of the arbitration award

2  and/or other litigations that I've heard about, but I don't

3  know that much about?

4       MR. BAKER:  Correct, Your Honor.

5       THE COURT:  You're talking about both?

6       MR. BAKER:  Both, both.

7       THE COURT:  Okay.

8       MR. BAKER:  But I think I think it's important to note

9  that the that the likelihood -- yes, both.

10      THE COURT:  Okay.  So if this were to occur sub one --

11      MR. BAKER:  Then the preferred shares that the that

12  were the subject of the original arbitration are in the hands

13  of Levona.

14      THE COURT:  Right.  So what would the trustee be

15  commencing at that point?

16      MR. BAKER:  The trustee wouldn't be commencing

17  anything because the preferred shares never were in the hands

18  of anybody else.  They were always in the hands of Levona if

19  they were successful in their ultimate claim.

20      THE COURT:  Okay.  But the provision says that the

21  trustee shall not commence the action until that happens.

22      MR. BAKER:  Until the earlier -- right.  So that's the

23  first clause, right.  The second clause would be, right --

24      THE COURT:  But what I'm saying is if that happens,

25  you're saying there's nothing for the Trustee to pursue.

**ELETSON HOLDINGS INC.**

34

1          MR. BAKER:  Correct.  Because the defendants wouldn't

2     have any -- the defendants would never have received property.

3          THE COURT:  Okay.

4          MR. BAKER:  In other words, Your Honor, the way that

5     it has been at least articulated my understanding of it -- And

6     again, it's been very weakly articulated.  But my understanding

7     is that there is a claim or cause of action against the

8     preferred nominees because there was a fraudulent transfer of

9     the preferred shares away from holdings.

10         THE COURT:  No, I understand that.  but what I'm

11    saying is, if that happens, I'm confused as to what this

12    provision is saying would then happen.

13         MR. BAKER:  So what that would --

14         THE COURT:  It seems to be implying the litigation

15    trustee would have an action to pursue at that point.

16         MR. BAKER:  No, the litigation Trustee would not have

17    an action.

18         THE COURT:  But it says the trustee shall not commence

19    the pursuit of any action until this happens.

20         MR. BAKER:  Correct.  And then if you go further down,

21    the only time that the trustee can commence an action is if the

22    gas ownership defendants fail to comply with clauses 2 and 3.

23         THE COURT:  Okay.  So then continue on to 2 and 3.

24         MR. BAKER:  Sure.  So 2 would be the litigation

25    Trustee would not commence a lawsuit until the gas ownership

1  defendants refused to comply with the settlement.  It's

2  articulated.

3          THE COURT:  Well, meaning --

4          MR. BAKER:  Transferring seventy-five percent of the

5  net cash value.

6          THE COURT:  It's gets a little circular.  But okay.

7  So this is saying  -- 2 is saying if there's a settlement or

8  satisfaction of the claim.  So for instance, if you settle or

9  if Levona satisfies the claims and pays a certain amount --

10          MR. BAKER:  Tor the gas ownership -- to the gas

11  defendants.

12          THE COURT:  The gas defendants.

13          MR. BAKER:  The gas defendants takes that money and

14  seventy-five percent of the net proceeds and gives it to the

15  litigation trust.

16          THE COURT:  Unless 3 happens.

17          MR. BAKER:  No, Your Honor.

18          THE COURT:  Well, sub 3 says the gas ownership

19  defendants refused to comply.

20          MR. BAKER:  Correct.  No, 2 says -- yeah, yeah, the

21  gas ownership refused to comply.  So if for some reason the gas

22  ownership defendants, right, do not actually tender the

23  seventy-five percent, then the gas ownership defendants are

24  subject to a lawsuit by the litigation trustee.

25          So the only time in which there is a settlement of the

1    litigation is if the gas defendants receive the money from

2    Livonia in exchange for their -- you know, as either settlement

3    or successful recovery and then give that money to the trustee.

4    If they give that money to the trustee, then they can settle.

5    But if they don't give that money to the trustee, then the

6    trustee has the right to sue them.

7            THE COURT:  Okay.  So seventy-five percent of anything

8    that comes from Levona would go to the trustee?

9            MR. BAKER:  Net cash proceeds.  Right.  Cash over

10   collections -- or cash over cost of collections.  l

11           THE COURT:  Okay.

12           MR. BAKER:  So that's the way that the settlement was

13   constructed.

14           THE COURT:  Okay.

15           MR. BAKER:  But again, Your Honor, in terms of whether

16   or not that would even be a -- I mean, we don't believe that

17   that would require necessarily 9019 approval.  But to the

18   extent it would, that would be a 9019 approval.  That would be

19   done in context of the confirmation hearing.

20           THE COURT:  Right.  Okay.  Has there been any

21   discussion -- if you get to a point where both disclosure

22   statements are approved, assuming you get there, if you get

23   there, has there been any discussion as to what the parties

24   intend to do at that point and how they plan to proceed?

25           MR. BAKER:  Very, very high level.  I think there's

1  been -- lots of people have SAT have stood at this podium and

2  said, in every case I've done, this happens; in every case I've

3  done, that happens.  The discussions that I've had with several

4  parties is that they do not have a lot of experience on

5  competing plans.  I'm not trying to suggest I have the most

6  experience, but in the competing plans that I have done, we've

7  done it one of two ways which is either do a master ballot

8  where you can choose, check yes or no on plan A, check yes or

9  no on plan B, and identify a preference for plan A or plan B,

10  one master ballot.  Or you can send out two separate ballots

11  with a notice that says you get to elect your ballot a your for

12  the Pach Shemen plan, your ballot for the debtor plan, and then

13  you send in a separate ballot for your preference.

14          THE COURT:  Okay.  Yeah.  I was just wondering if the

15  parties had discussed it at all.

16          MR. BAKER:  We've discussed it at a very, very high

17  level, but it is a mechanic that I think is easily worked

18  through.

19          THE COURT:  Okay.

20          MR. BAKER:  Your Honor, for those reasons we would

21  request that the Court approve the disclosure statement,

22  allow -- approve -- enter the solicitation order and allow the

23  debtors' plan to be solicited.  And I'll reserve the balance of

24  any comments for rebuttal.

25          THE COURT:  Thank you, counsel.

1          MR. CURTIN:  Your Honor, William Curtin from Sidley

2    Austin for the shareholders, majority shareholders.  Can I be

3    heard briefly?

4          THE COURT:  Yes, please.

5          MR. CURTIN:  Thank you, Your Honor.

6          Just a few weeks ago, when we were here, we talked

7    about the Chapter eleven process playing out and the benefits

8    that can come from that process.  I would submit to Your Honor

9    that you're seeing that happen.  Your Honor has before you two

10   vastly improved plans and disclosure statements that we did at

11   that point.  So those Chapter 11 benefits are already

12   happening, Your Honor.  There is a competitive process here.

13   There are two plans.  And that is what the debtors seek to

14   continue here and what it seems that the petitioning creditors

15   and the committee seem bent on stopping.

16         So if you just look at the distinctions between the

17   two arguments, you're hearing from the debtors let's solicit

18   both plans and let's allow creditors to vote, the entire

19   purpose of Chapter 11.  Ad you're hearing from the committee

20   and the petitioning creditors that only their plan, only the

21   petitioner creditors' plan should be solicited and that the

22   debtors' plan should be shut down within the confines of this

23   courtroom.

24         I would just simply ask Your Honor not to do that, not

25   to decide this matter in the courtroom based on the arguments

1  of counsel but to allow for the Chapter 11 process to play out

2  as it's expected to play out.  Now, granted, this is a

3  competing plan scenario, so a little bit different, but

4  certainly not unprecedented and certainly not unheard of.  And

5  as Mr. Baker just addressed, there are mechanisms to allow for

6  creditors to vote on both plans.  And that's what the

7  shareholders would respectfully submit should happen here.

8        Your Honor, the hallmarks -- some of the hallmarks of

9  Chapter eleven are publicity, allowing things to happen in

10  public, shining a spotlight on everything, and creating

11  engagement and a competitive process.  And that's what's

12  happened here and what can continue to happen.

13        So for those reasons, Your Honor, we would ask that

14  the Court approve the debtors' disclosure statement to allow

15  for both plans to be solicited.  And I would just confirm for

16  the record that the shareholders agree with Mr. Baker's

17  description of two things: one, of the settlement; and two, of

18  the things that we're willing to do to resolve some of the

19  committee's objections that Mr. Baker addressed at the

20  beginning of this argument with regard to the letter of

21  commitment and the redacted proof of funds.

22        THE COURT:  Thank you, counsel.

23        Would anyone else like to be heard?

24        MR. SUPER:  If I may, Your Honor.  Just briefly.  I'm

25  John Super for Levona.

**ELETSON HOLDINGS INC.**

40

1          I just wanted to follow up on Your Honor's questions

2     about the settlement and the litigation trust.  Levona was

3     equally confused by this provision, which we had not seen

4     before.  Mostly it's not clear to us what it means to put the

5     claim objection into a trust.  And from our perspective, it's a

6     liability to the estate, and it's not clear how it adds value.

7          At most, it seems to sort of insulate potential

8     findings with respect to the resolution of the claim objection

9     and the bonus proof of claim.  And as written, it's not clear

10    to us how it's compatible with the June 18th evidentiary

11    hearing on that issue.  Though I'll note here that debtors did

12    represent yesterday that they don't anticipate that it should

13    cause any delay as a result.

14         And we just raise this now, Your Honor, for disclosure

15    purposes as we think that creditors should better understand

16    what this means and how it will affect you know, what they're

17    giving up in exchange.  Thank you.

18         THE COURT:  Thank you, counsel.

19         MR. BAKER:  Your Honor, Derek Baker from Reed Smith.

20    On behalf of the debtors.  I just want to address the comment

21    of Mr. Super.

22         We did have a discussion with counsel for Levona, and

23    we're happy to make additional clarifying comments as needed.

24    This was not one of the ones that was raised until late last

25    night, but we're happy to make additional clarifying comments

**ELETSON HOLDINGS INC.**

41

1   to the extent it's necessary.

2          The plan does contemplate transfer of any unresolved

3   claim objections to the litigation trust for ultimate

4   prosecution in the event that -- upon confirmation.  But to the

5   extent that a claim objection is resolved prior to

6   confirmation, it wouldn't get transferred.  It's not necessary

7   to be transferred at that point.  So that's the clarification.

8          THE COURT:  You're saying it's a matter of necessity

9   at that point?

10         MR. BAKER:  Well, at that point, the debtors would not

11  be pursuing the claim objections because the proceeds of the

12  remaining distributable cash and the litigation trust all fall

13  to the benefit of the beneficiaries of the litigation trust.

14  And so we thought it was appropriate to give the

15  beneficiaries -- the litigation Trustee the right to control

16  right, how to prosecute those claim objections if they are

17  unresolved as of the confirmation date.

18         THE COURT:  Okay.

19         MR. BAKER:  Does that make sense, Your Honor?

20         THE COURT:  Yes.

21         MR. BAKER:  Okay.  Thank you.

22         THE COURT:  I'm not saying I agree with it.

23         MR. BAKER:  No, I --

24         THE COURT:  I'm just -- I understand.  Yeah, I'm

25  not --

**ELETSON HOLDINGS INC.**

42

1          MR. BAKER:  Derek Baker for the record, Your Honor.

2          THE COURT:  I'm not saying I disagree.

3          MR. BAKER:  I understand.  I understand.  I just

4    wanted to make sure I was being clear.

5          THE COURT:  Yes.  No, I appreciate that.  Thank you.

6          Would anyone else like to be heard?

7          MR. ORTIZ:  Good morning, Your Honor.  Kyle Ortiz of

8    Togut, Segal & Segal for the petitioning creditors.

9          THE COURT:  Good morning.

10         MR. ORTIZ:  Good morning.

11         Your Honor, despite making certain changes, in our

12   view, the debtor's disclosure statement remains woefully

13   inadequate and should not be approved.  And while we

14   acknowledge, Your Honor, that the debtors have made certain

15   positive changes to address certain issues, they also made

16   concerning value destructive changes that both raised new

17   disclosure issues and highlight the bad faith that permeates

18   the debtors plan and disclosure statement process.

19         This is not trivial, Your Honor, because courts in

20   this district have stated that the good faith requirement in

21   Section 1129(a)(3) of the Code, speaks more to the process of

22   plan development than the contents of the plan.  And even the

23   positive changes, Your Honor, accentuates the debtors' cat-and-

24   mouse approach to the plan process in these cases where they

25   start from a place of self-interest and only shift tactics when

1  called out.  Such tactics, Your Honor, are obviously

2  inconsistent with their fiduciary duties.

3       But this latest amended disclosure statement takes it

4  to another level.  And you were just started to go through

5  this, Your Honor, because, as I will discuss shortly, while

6  they did make some positive changes, through this gas claim

7  settlement they also added language to that sneaks the most

8  significant asset in the debtors' view through this settlement

9  out the back door yet again.  To be very clear, in our view,

10  this current version of the plan is materially worse than their

11  previous version because of this change exasperating their new

12  value failure, making their plan doomed, Your Honor.  It is

13  clearly bad faith to try to eliminate the claim that has been

14  the focal point of much discussion in this case, Your Honor.

15       Furthermore, Your Honor, the few things they did

16  address do not absolve the glaring informational deficiencies

17  that remain.  For instance, the debtors' plan is again premised

18  on a thirty-million-dollar shareholder new value contribution

19  that the only disclosure regarding its existence to date has

20  been to say, essentially, trust us.  And that's what you've

21  been hearing so far today.

22       Like many issues before the Court, Your Honor, the law

23  provides Your Honor with an option, a menu of options to choose

24  from to deny the debtors' disclosure statement.  And these

25  options fall into two broad buckets that require the hearing,

1    this hearing, to be the last stop for this plan and this

2    disclosure statement.

3         First, Your Honor, the disclosure statement relates to

4    a plan that for at least six independent reasons, including new

5    value of prohibition, is unconfirmable.  It was seven, Your

6    Honor.  It's now six.  But even the one fix relating to

7    removing the cap on committee fees just highlights the bad-

8    faith approach with which they began.

9         And second, Your Honor, confirmability aside, the

10   debtors' disclosure statement does not provide the required

11   adequate information under Section 1125 of the Bankruptcy Code

12   for a reasonable creditor to be able to make an intelligent

13   determination concerning the debtors' proposed plan.

14        And I'll start with the lack of information, Your

15   Honor.  For disclosure statement to be approved, the average

16   creditor must be able to discern from the information in the

17   disclosure statement what it's going to get and when and what

18   contingencies exist.  The average creditor also needs to know

19   the source of the information.  The debtors provide no

20   information on how they came up with the numbers they do

21   provide.  They don't disclose who develops their liquidation

22   analysis or the valuation analysis that was filed last night.

23   There is no information, Your Honor, on the process that went

24   into the conclusions that are made in the disclosure statement,

25   which is highly problematic when the decision-makers at the

1  debtors are the same parties that stand to benefit from the new

2  value plan.  Unlike the creditors, the debtors have no

3  independent financial advisor assisting them with the materials

4  they've created or the conclusions they have reached.

5          As Judge Glenn recently noted in Avianca, "A

6  disclosure statement is intended to be a source of factual

7  information based upon which one can make an informed judgment

8  about a reorganization plan and not an advertisement or a sales

9  brochure.  Accordingly, disclosure statements must contain

10 factual support for any opinions contained therein since

11 opinions alone do not provide the parties voting on the plan

12 with sufficient information upon which to formulate decisions."

13         Your Honor, most of what is in the disclosure

14 statement is simply what the debtors, quote, believe.  The word

15 "believe" appears over sixty times in their disclosure

16 statement.  A plan premised on an insider transaction requires

17 more disclosure than what the insiders who will benefit

18 believe.

19         And let's start at the beginning with the most

20 foundational information, Your Honor.  The disclosure statement

21 says the shareholder new value contribution is the centerpiece

22 of their plan.  But there is absolutely no legitimate

23 information, certainly no factual support, on where the alleged

24 thirty million is coming from, whether any contingencies exist

25 as to its availability, the timing of its availability, and

1  most basically, Your Honor, to date whether it exists.  The

2  disclosure statement merely sets, "The Eletson members have

3  provided the debtors with proof of funding sufficient to

4  establish the Eletson members' financial wherewithal to fund

5  the shareholder new value contribution."

6          Your Honor, that's not a disclosure.  Disclosure would

7  be providing the proof, AKA factual support.  It's a disclosure

8  statement.  Mr. Curtin just talked about this process being

9  publicity and disclosure, and they're still only talking about

10  providing an attorneys' eyes only.  Obviously, nobody's seen it

11  to date.  But it is not in this disclosure statement.  Having

12  the debtors, who are the same people as the Eletson members,

13  provide proof to themselves and satisfying themselves certainly

14  doesn't tell creditors anything, Your Honor.  Insider

15  transactions, I remind Your Honor, are held to heightened

16  scrutiny, and for good reason.  We've already seen this play

17  out in this case, Your Honor.

18          Going back to the DIP process, when the debtors

19  proposed an inadequate amount of capital, four million, on

20  terms overly favorable to insiders on a senior secured basis,

21  the creditors then had the proposed a superior DIP on better

22  terms and for ten million.  The debtors' insider lender then

23  allegedly matched this ten million.  But in his deposition,

24  again, wearing the wrong hat, Your Honor, Mr. Kertsikoff

25  admitted that the insider DIP lender didn't actually presently

1   have ten million.  Mr. Herman submitted the definition.  "Last

2   you checked, EMC gas has approximately seven to eight million.

3   Is that right?"

4        He answered, "Something like that, yeah."

5        So here we are faced with a remarkably similar

6   scenario, Your Honor, highlighting the need for information

7   here.  And there is no actual disclosure on these topics within

8   the disclosure statement.  Again, this is why insider

9   transactions are subject to heightened scrutiny.  The debtors

10  started out saying ten million was adequate with insiders as

11  their lender of first resort.  The obvious inadequacy of ten

12  million was exposed by the creditors with our plan and then the

13  debtors claim to have come up to thirty million, a number they

14  were apparently advised by who, left unsaid, was more in line

15  with enterprise value than the ten million they previously

16  believed was a fair valuation.

17       Putting aside the thirty million for a hundred percent

18  of the company is nowhere close to apples to apples, with

19  twenty-seven million for fifty percent, with the other fifty

20  percent going to creditors on account of their claims, there

21  just isn't any disclosure, Your Honor, outside of unsupported,

22  self-serving statements on this thirty million dollars.  Among

23  many other things, we just don't know if it's new as is

24  required.  They say it is.  They say it won't come from the

25  debtors or their subsidiaries.  But they play with words, Your

**ELETSON HOLDINGS INC.**

48

1    Honor.  Multiple times they've argued that Gas is not a

2    subsidiary.  So we really need to see the information of where

3    exactly this is coming from.  We need factual support, not

4    statements.  We don't know who it's coming from.  That, again,

5    is left vague.  I think that was partially clarified today, but

6    we'll have to see the actual documents.  And creditors need to

7    see that document in a disclosure statement.  We don't know

8    what contingencies to the availability or the timing exist.  It

9    sounded like the commitment letter would still be contingent on

10   the effective date occurring, so I don't know how much power

11   that actually has.  And they say that they will transfer the

12   funds promptly on the effective date.  But we all know that

13   debtors' view on the word promptly, Your Honor, and its

14   apparent infinite malleability.

15         The biggest issue, of course, is to date, there is no

16   concrete information.  And there's been representations made,

17   so maybe it will be eventually, but there's been no concrete

18   information on just simply whether this money exists, Your

19   Honor, or if, like the ten billion of the DIP, it's purely

20   illusory.  There is no information on this piece.  We don't

21   even get out of the gate on this most basic informational

22   centerpiece.

23         Compare that to twenty-seven million in cash in an

24   account ready to go today at Appendix F to our disclosure

25   statement.  It highlights the lack of adequate information.

49

1   And it highlights the bad faith they put forth a number that

2   they still haven't supported, and based on what they've said

3   today, they don't ever plan to put in a disclosure statement.

4   They plan they provided is attorneys' eyes only.  And again,

5   it's something we haven't seen.  So until we see it, I don't

6   know how much weight that has.

7          Turning next to feasibility, Your Honor, feasibility,

8   the debtors, unlike the creditors, provide no feasibility

9   analysis.  Instead, they just stated at article 7, that they

10  believe that they will be able to make payments from the

11  subsidiary levels now that they will be unburdened by

12  historical Eletson Holding liabilities.  Beliefs are not

13  disclosures, Your Honor.  First of all, they have not addressed

14  their Eletson Holding liabilities for over six years.  So that

15  argument makes no sense.  Nonexistent expenditures at Holdings

16  have not prevented the primary obligations of the guaranteed

17  claims from making the payments for the past six years.

18          There is nothing to suggest, Your Honor, that they'll

19  be able to make the payments now once the debtors are relieved

20  of debts that they were ignoring.

21          But more fundamentally, you needed an analysis with

22  support, not just self-serving beliefs.  There is no

23  information to back up the debtors' belief that they'll be able

24  to satisfy guarantee claims from the applicable subsidiaries.

25  Again, compare this to the creditor disclosure statement that

**ELETSON HOLDINGS INC.**

50

1   has a feasibility analysis developed with the assistance of a

2   financial advisor, as is prudent and advisable.

3          While the debtors have provided a liquidation

4   analysis, Your Honor, and a valuation five months after filing

5   the plan and only because the creditors highlighted these

6   deficiencies by engaging with the financial advisor and

7   providing comprehensive materials in this game of cat and

8   mouse, they provide no disclosure on how these documents were

9   prepared and who they were prepared by.

10         Generally, adequate disclosure includes, among other

11  things, the name of the advisors responsible for such

12  information and extensive notes and assumptions and disclaimers

13  that help creditors evaluate such reports.  For instance, Your

14  Honor, the debtors' valuation, there's no explanation for why

15  the debtors limited their valuation to DCF, and unlike the

16  creditors, didn't also consider an EV or comparables.  It

17  appears to be because DCF creates the most favorable numbers

18  for them, Your Honor.

19         There are no projections on the valuation of the Gas

20  ownership claim settlement, which I'm going to talk about in

21  depth in a minute, or the SME revenue.  There's no explanation

22  for why they believe they can have guarantee claims without

23  providing any consideration in return.  I do appreciate that

24  they updated the disclosure statement to clarify that there's

25  no consideration to those claimants.

1       There's no explanation for why they've articulated --

2   why they've artificially impaired the OCM claims that everybody

3   agrees are wildly oversecured, and under their own liquidation

4   analysis, would result in a worse outcome than liquidation in

5   violation of the best interest test for the OCM claims.

6       Their disclosure statement reply, Your Honor, claims

7   that they provided sufficient disclosure on the impairment of

8   classes 1 and 2, that's the OCM and Corp guarantee claims, and

9   points to article 7.  But there's no discussion or disclosure

10   of the impairment in that article.  The only logical

11   explanation, Your Honor, is to gerrymander as many cases as

12   possible in the hopes of obtaining an impaired accepting class.

13       The debtors claim to have addressed their

14   gerrymandering by providing sufficient disclosure regarding

15   their plan classification, but they still don't provide any

16   basis outside of the fact they did it and that they believe it

17   is appropriate.  Creditors need to understand what they're

18   going to get.  They did add ranges of recoveries, Your Honor,

19   at article 1B3, but they provide no analysis for how they came

20   up with those numbers without a financial advisor with a risk

21   to that range, particularly with regard to class 5A, Your

22   Honor.  The class 5A recoveries pivot almost exclusively on the

23   debtors belief that they can subordinate class 5B, but the

24   debtors provide no information on the subordination other than

25   that "the debtors believe the claims of 5B are illegitimate and

1  otherwise procured in bad faith and therefore should be

2  equitably subordinated."

3       They don't detail the grounds upon which they plan to

4  do that or disclose that bad faith is not a basis upon which to

5  subordinate, even if bad faith was found.  There's no

6  discussion concerning how or when this massive contingency will

7  be resolved.  It sounds like from today they've planned to do

8  that at confirmation, but there's a lot that goes into that.

9       Then there's the litigation trust, Your Honor.  There

10 is no clear information.  I think this is very critical because

11 it's clearly not clear if Your Honor has to be asking for

12 clarifications on it to explain that although Gas ownership

13 claims are transferred to the litigation Trust, the litigation

14 trust has no control over those claims, Your Honor.  And the

15 exclusive right to settle them is left with the reorganized

16 debtors and the Gas ownership defendants themselves.  Nor is

17 there any information on the process that went into the

18 development of the Gas ownership claim settlements.

19 Representations by counsel on the record today are vague and

20 certainly aren't in the disclosure statement.  They apparently

21 have settled what creditors believe, Your Honor, is the

22 debtors' most valuable claim for seventy-five percent of what

23 the debtors recovered from Levona.  The opportunity to pursue

24 the avoidance actions has been removed.  It's been settled.

25 It's mind-boggling, Your Honor.  Who settled with who and what

1   was the process?  Judge Garrity in Vitech (ph.), Judge Lane in

2   Miami Metals refused to approve settlements that invocate the

3   rights of parties not present in the settlement.

4        And even if that settlement had some legitimacy,

5   there's no information for parties to understand what that

6   seventy-five percent might be.  There's no discussion of the

7   value of what is being released in connection with this gas

8   ownership claim settlement that appears to have been agreed in

9   a vacuum among obviously conflicted parties.  And I'll walk

10  Your Honor through the settlement in a minute in detail,

11  because I think it's important.

12       But simply, Your Honor, creditors do not currently

13  have sufficient information to know what they will get.  They

14  don't know if there's a source of funding.  They don't have

15  information to understand what recoveries may be.  And they

16  don't have information on how all the determinations

17  underpinning the debtors' beliefs were made among related

18  parties.  That's not adequate information under Section 1125,

19  Your Honor.

20       So turning to the unconfirmable nature of the plan,

21  case law is clear.  The estate should not be subjected to the

22  time and expense of soliciting a plan that is unconformable on

23  its face.  Your Honor, this situation, it's somewhat unique.

24  This is not the normal situation as in Quigley, where the

25  debtors have proposed a plan with an exclusivity and in moving

54

1  the case along in good faith and there are a few potential plan

2  issues that can be put off until the plan stage.

3          Here, the cost will be borne by someone else because

4  there's a perfectly viable plan alternative.  The estate and

5  ultimately the creditor should not have to pay for this latest

6  bad faith attempt to pursue a plan designed to enrich insiders

7  and punish the very folks they have a fiduciary duty to because

8  they have the audacity to ask the debtors to answer for their

9  debts.

10          In the first instance, Your Honor, as I noted earlier,

11  there is a good-faith requirement in the Code.  And as Judge

12  Bernstein noted in Quigley, Section 1129(a)(3) speaks more to

13  the process of plan development than the contents of the plan.

14  Mr. Baker spoke of, and the debtors lead in the reply of

15  American Capital Equipment from the Third Circuit for the

16  proposition that, "A plan is patently unconformable where

17  conformation defects cannot be overcome by creditor voting

18  results and two of those defects concerned matters upon which

19  all material facts are not in dispute or have been fully

20  developed in the case."

21          In that case, the Third Circuit upheld, Your Honor, a

22  Bankruptcy Court denial of disclosure statement after the

23  disclosure statement stage in support of a plan that was not

24  proposed in good faith and was not feasible, both elements that

25  are present here.

1            The debtors also cite cases saying good faith is

2    lacking where plan is not proposed with honesty and good

3    intentions but rather with an ulterior motive.  Your Honor,

4    despite repeatedly telling Your Honor that litigation trust

5    will get the avoidance actions related to the transfer of Gas,

6    that transfer has been made completely illusory by the Gas

7    ownership claims.

8            And Your Honor has asked about this many times.  If

9    you go back to the testimony in connection with the trustee,

10   you asked Mr. Solomon, where are those claims going to get

11   litigated, the avoidance actions?  And he responded, well, I

12   don't know where they want to bring them, Your Honor.  But if

13   Your Honor wants us to bring them to glory judgment, I think we

14   want to preserve all our defenses, but we're happy to bring

15   them.  Both parties -- this is not actually accurate -- their

16   plan and our plan has these moved to a litigation trust and

17   then the litigation trustee can do them.

18           And you responded, no, I was just asking you because

19   if the Chapter 11 trustee doesn't pursue them and if the

20   committee can't pursue them, how are they going to be pursued,

21   any avoidance type claims related to the transfers of the

22   preferred shares?  You're saying it would be in the litigation

23   trust?

24           In response, it would be in the litigation trust.

25           But, Your Honor, the litigation trust only gets those

56

1   in names.  If you look at the schedule, it says that these Gas

2   ownership claims are going to litigation trust.  But if you

3   look at the language that you were just looking at, and I had

4   documents I could carry up to Your Honor, but it sounds like

5   you already have that paragraph, what's actually happening is

6   two things.  I mean, we've talked about really two big causes

7   of action:  the hundred million dollars that Livonia owes and

8   the actual preferred shares, which we think is in the

9   neighborhood of 125 million to 186 million.  Both of those go

10  away here.

11         I think it's important -- we'll start with the

12  paragraph that Your Honor was focused on.  Notwithstanding the

13  transfer of the gas ownership claims -- so they say they're

14  transferring these claims to the trust.  But notwithstanding

15  that transfer, the Gas ownership defendants' litigation trustee

16  shall not commence, which Your Honor, I think, pointed out, the

17  pursuit of any gas ownership claims.  And there's little in the

18  whole 1, it talks about if Levona wins.  And then there's

19  little in the whole 2, which is a settlement or satisfaction.

20  So a settlement or a satisfaction of the claims, which would

21  mean that the Gas ownership defendants prevail, asserted by any

22  petitioners of Gas ownership defendants against Levona.  And

23  then there's the provision that if they refuse to comply with

24  the Gas ownership settlement, which, for reasons I'm about to

25  go through, I don't think they ever would.

**ELETSON HOLDINGS INC.**

57

1        So if you -- they talk about what happens in the event

2    of little in the whole 1, which is that there'd be nothing

3    going to the to litigation trust.  And then they talk in a

4    sentence that starts in the event of satisfaction of clause 2

5    above, the litigation trust trustee shall settle and release in

6    full all of the Gas ownership claims against the Gas ownership

7    defendants in exchange for the Gas ownership defendants

8    agreement to contribute and deliver to litigation trust a one-

9    time cash payment of equal to seventy-five percent of the cash

10   recoveries against Levona, net of cost of collection, net of

11   any amount set off by Gas ownership defendants for amounts owed

12   to Levona which payment shall, 1, be paid in full and final

13   satisfaction for the gas ownership claims, which, by the way,

14   Your Honor, includes the transfer of the preferred shares and

15   constitute a redemption by Eletson Gas of net enterprise value

16   of the common shares of Eletson Gas.  As for the effective date

17   that appears just to be to put Humpty Dumpty back together and

18   get the common as well as the preferred.

19       So what they've done here is they've taken a claim

20   that the debtors believe they obtained through a fraudulent

21   transfer, the Lavona piece, giving part of that value that they

22   succeed in to pay and get settlement for the main claim that

23   we've been talking about since day one of this case, Your

24   Honor.  And there's really -- if you look at this, there's no

25   scenario where the litigation trust ever has anything to do.

58

1   It's only if they get this settlement that gets them out of

2   dodge, that gets them to preferred, and they still don't give

3   the seventy-five percent to the litigation trust that the

4   litigation trust ever can do anything.  It's remarkable, Your

5   Honor.  They could settle on the effective date for four

6   dollars, give three to the litigation trust, and walk away with

7   the preferred shares.

8           The debtors' plan, Your Honor, is being put forth at

9   the last minute with the ulterior motive of eliminating

10  litigation regarding the preferred shares and finalizing and

11  crystallizing the fraudulent transfer of the preferred shares

12  away from the debtors and their creditors once and for all.

13  And it would take an informed and careful reader to appreciate

14  that, Your Honor.  It is not obvious to a creditor in the first

15  instance.  There's nothing in this disclosure statement that

16  says the preferred shares actions are, for all intents and

17  purposes, been settled by the very people that they are going

18  to be asserted against.  That's not in here.  It misleadingly

19  says this is a claim that's going to the litigation trust.  But

20  if you read this document, that's illusory.

21          Bad faith cannot be overcome by a vote because it

22  looks to the process and whether the process was bad faith.

23  Does it make sense when the process is efficient to follow the

24  Third Circuit in American Capital and halt the plan at the

25  disclosure statement?  Everything about the debtors' process

59

1   here has been bad faith.  They started from the ten million in

2   the initial plan, Your Honor, the gerrymandering of classes,

3   the artificial impairment of classes, the unsupported

4   subordination, to this latest version of the plan that at the

5   very last minute, after telling Your Honor multiple times this

6   is coming to the litigation trust, essentially stripping out

7   the main cause of action of the plan while pretending it's

8   going to the litigation trust.

9         And the plan, the thirty million dollars, again, bad

10  faith, Your Honor, covers all elements.  There are many

11  confirmability issues.  The debtors originally had seven.  They

12  now have six.  But again, they only really have six if they

13  have the thirty million dollars and can pay it.  But we'll

14  briefly go through some of the other elements that are --

15  create an unconfirmability issue.

16        Feasibility, Your Honor, the debtors provide nothing

17  to demonstrate that Holdings would have the ability to pay the

18  guarantee claims if the primary obligors cannot.  Indeed, they

19  admit that Holdings won't be able to satisfy the arbitrarily

20  have guaranteed claims because they say they expect them to be

21  paid by the primary obligors.  But if that does not happen.

22  They have not demonstrated an ability to pay these claims from

23  the debtors.  So really, in essence, they're just eliminating

24  those guarantees in exchange for what they admit in the

25  disclosure statement, Your Honor.  There's no value.

1

2          So turning to the absolute priority rule, which we

3    think is still a very glaring issue, this is a -- and it's a

4    gating issue, Your Honor.  Their plan first has to be better.

5    You can't -- the Code starts from the proposition that there's

6    an absolute priority rule and that each bucket has to be filled

7    in full before the next bucket gets its first dollar.  And

8    there is an exception which makes sense.  Well, if nobody's

9    going to show up and only the people at the very bottom are

10   going to put in new money, that's better for creditors because

11   they'll get something.  But it has to be because there's no

12   other alternative.

13         Using their valuation numbers that they filed last

14   night, our plan provides twice as much value from an equity

15   standpoint.  But even if they were the only alternative, Your

16   Honor, they still have to satisfy the standard, which is new,

17   substantial money or money's worth needed and reasonably

18   equivalent.  And they haven't demonstrated there's nothing in

19   the disclosure statement, Your Honor, to show creditors who are

20   looking at this whether or not this is new.  They've not

21   provided any disclosure.  They've alluded to disclosures, but

22   that's not a disclosure statement.  It is not substantial, Your

23   Honor.  The debtors cutely claimed that thirty million is by

24   definition substantial.  Thirty million is not by definition

25   substantial.  Substantial will always be in relation to

1    something.

2              As the case they cite on this point, Your Honor, In re

3    Schneider says, "There is no mathematical formula.  It will

4    depend on the individual case."   And the court goes on and

5    says, "Where that disparity between the contribution and the

6    unsecured debt is so extreme, we agree with the courts below

7    that there's no need to proceed further and that the proposed

8    contribution is not substantial."

9              Here we're talking about thirty million dollars, Your

10   Honor, on half a billion in claims.  So a mere six percent.  We

11   could walk out to Bowling Green right now together, ask one

12   hundred people if six percent is a substantial portion of

13   something, and we'd probably get one hundred noes.  Well,

14   probably more like ninety-three.  People are silly.

15             But money or money's worth is the next requirement.

16   They say it's money.  But again, Your Honor, there's no

17   disclosure on that.  They've not proved that.  They're just

18   saying it and beliefs.  And as Judge Glenn said, you have to

19   provide information, not just what you believe or what you're

20   saying.  Maybe they'll be able to accomplish that at some

21   point, but it's not a disclosure statement that's up for today.

22             They say they needed -- there's a necessity because

23   they needed to start with a new value plan claiming that no

24   other alternative existed, claiming this will come as a shock

25   to Your Honor, Pach Shemen, and describing a previously

62

1    undisclosed, pre-planned process that led to this exclusion.

2            By the way, Your Honor, the debtor trying to maximize

3    value would attempt to create some sort of bidding process

4    instead of just saying someone else is here, process done.  And

5    it has to be equal.  The absolute priority rule isn't just if

6    somebody else comes up with the plan, the debtors can propose

7    any plan.  It has to be a superior plan economically, not going

8    out on a vote that is intended to send two disclosure

9    statements, create mass confusion with misleading information

10   in a disclosure statement, and  hope that they get votes and

11   that they can come back here and have a contested dueling

12   confirmation.  And who's paying for all of that, Your Honor?

13   At the end of the day, paying for all that is the creditors

14   who, by the way, have paid for this entire process and

15   ultimately will pay all of the admins at the end in a process

16   that took eleven million dollars to get to day 1, when they

17   finally shifted and admitted reality and is taken through a

18   trustee motion and through these motions -- there's two million

19   dollars a month coming from the debtors, however many million a

20   month coming from the committee.  And then, of course, the

21   creditors have to fund their own costs.  So this is not just a

22   well, let's go see what happens when the debtors are starting

23   from a place that is prohibited by the law.

24           And even if you believe this revisionist backfilled

25   process they claim to have run before the initial plan was

1    filed, the case law, Your Honor, is clear that such a process

2    is insufficient.  Both to H.G. Robot case and the SW Boston

3    Hotel case they cite require there to be an actual bidding

4    process for that first, starting with the lender of last

5    resort, as opposed to the lender of first resort.  And of

6    course, that's the rule because you have to prove -- that it's

7    the only option if you're going to take the Bankruptcy Code and

8    flip its priority scheme.  And our plan, Your Honor, does not

9    solve the new value issue for them because there is an

10   alternative on better terms that makes their plan not

11   necessary.  So their plan should go no further.

12        As the Second Circuit stated in Coltex, it must be

13   necessary for old equity to contribute those funds because no

14   other source was willing to infuse the same capital as old

15   equity.

16        They also say this issue is only an issue if they

17   don't get unanimous approval.  So let's dispense with any

18   suspense, Your Honor.  We aren't voting for their value grab

19   insider enriching plan.  Whether we're in class 5A most likely

20   or 5B, if we've gotten to a place where just pointing and

21   yelling as the law.  So they need to satisfy the standard.

22        Now on reasonable equivalency, the debtors point to

23   their own valuation.  But again, their valuation is not

24   supported by third-party financial advisor, and it's not

25   reasonably equivalent under our valuation, which was prepared

**ELETSON HOLDINGS INC.**

64

1    with the assistance of a financial advisor.  And even if they

2    can show reasonable equivalent value, Your Honor, which we

3    don't think they can, they have to satisfy each requirement.

4    It's a very high standard for a reason.  Again, it would

5    require the Code to be flipped on its head.

6         Some other issues, Your Honor, they gerrymander

7    classes improperly.  One of the cases they cite to where the

8    disclosure statement was denied, again, Your Honor, the

9    disclosure statement stage, not the plan stage, In re 18 RBC,

10   LLC, the court agreed, "The existing law in the Second Circuit

11   requires the debtor to present the court with credible proof of

12   any legitimate reason for separate classification."  And thus

13   they deny the disclosure statement because it lacked credible

14   proof.

15        Here, the debtors' proof is their belief.  That is

16   a -- that is both confirmability and disclosure issues.

17        We talked about their impermissible disguised

18   releases.  And really those were insignificant compared to what

19   we now have and what they've added, Your Honor, which is a

20   release of the fraudulent transfer claim through the gas

21   ownership settlement using some of the value that they obtained

22   through that very fraudulent transfer that they've apparently

23   settled with themselves.

24        Finally, Your Honor, just to head off somewhat

25   whataboutism, yes, we also made plans to our plan and

**ELETSON HOLDINGS INC.**

65

1    disclosure statement -- changes, not plans.  But the big

2    difference is they add 120 days, which really ended up being

3    180 days, to work with parties.  They didn't use it.  They

4    claimed to have reached out to people after they started with

5    the lender of first resort being the person who's supposed to

6    be last resort.

7          And we were -- we filed our plan on the first day

8    after exclusivity, and we couldn't have talked to anybody

9    before then because we were, of course, Your Honor, forbidden

10   from talking to anybody.  But we filed the cover note that

11   said, this is a start, we  will talk to anybody.  And we've

12   done that and we've engaged.  And there's a very big

13   difference.  This is not the competing plan process because

14   from the starting point, even when they move the thirty

15   million, there was no competition.  What we've been doing is

16   talking to the committee and other parties about resolving

17   their issues, really comparing against liquidation, not the

18   debtor's plan.  They're coming up to thirty million had nothing

19   to do with any of the changes we made.  That was conversations

20   we had with the committee and other parties to improve

21   economics for creditors.

22         As the party who's actually taking this process

23   responsibly and not just trying to -- again, at the end of the

24   day, this has always been about avoiding their debts.  And

25   that's basically what they'll end up doing if the plan is

**ELETSON HOLDINGS INC.**

66

1  approved, if they're able to create enough confusion.  And I

2  think it's important, Your Honor, these disclosure

3  statements -- and as Your Honor is certainly aware because we

4  had a whole bunch of them filed in the last day, they're a lot

5  of paper.  And for the average person to understand what

6  they're getting when they're getting two different disclosure

7  statements and what is happening, it's just -- it's designed to

8  create some confusion.  It's designed in a process that is

9  going to need what it looks like most of the creditors in the

10  case to file 3018 because they filed a claim objection to

11  Wilmington, they filed a claim of objection to the petitioning

12  creditors, they filed a claim of objection to NAF, I think they

13  have a claim objection to Deutsche Bank.  So there is a lot of

14  expense of going down this path that has no chance of success

15  when we have to then file a whole bunch of 3018 motions, go

16  through all this contested nonsense.

17      It's not the Bankruptcy Code working.  They come up --

18  they're not apples to apples.  Their plan is wildly inferior.

19  But again, that's not an easy thing for an individual creditor

20  to look at through competing disclosure statements that, as we

21  went through with this settlement, there's a lot of things that

22  aren't clear.  There's a lot of things that are hard for people

23  to understand.

24      And, Your Honor, I've sent out a lot of plans in my

25  life, a lot.  And every once in a while you're like, how are we

67

1    going to do here.  I will tell you almost every single time --
2    and this is this is the problem with the process and the
3    Bankruptcy Code.  But every single time I am shocked we get
4    almost unanimous acceptance.  They all come back voting because
5    people don't understand it.  They look at a disclosure
6    statement.  They're like I think if I check this, I get paid.
7    And then you're going to get two of these and try to understand
8    like what that means.  And they're hoping that somewhere in
9    that chaos, it creates an opening for, again, them to hold on
10    to their company for as little as possible, which is very clear
11    from this process.  It's this game of cat and mouse for as
12    little as possible while also providing creditors as little as
13    possible.  Y

14         Yeah, I think it's important, Your Honor.  The cost is
15    not solicitation as Mr. Baker says.  The cost is really the
16    dueling plans, all the 3018 motions, having two different
17    contested confirmations if they somehow both be voted on,
18    trying to figure out which of two confirmed plans might be
19    going forward.  And that's all at the end of the day expenses
20    that we would have to cover.

21         They point to Quigley, but that was not a dueling
22    plan.  I think they also -- they pointed to Walden, which I
23    think is an interesting case, because essentially the debtors
24    there were offering a one hundred cents.  So it's very
25    different.

1        And Mr. Curtin spoke of the benefits and that they're

2   the one trying to benefit.  But Your Honor, you can go back two

3   years before the petition date.  They've always been focused on

4   benefiting themselves.  That's not their fiduciary duty.  They

5   benefit themselves and they will move when forced to.  But

6   they're not looking at this through the lens of creditors.  If

7   they were, they'd be supporting the plan that the petitioning

8   creditors filed.

9        So, Your Honor, respectfully, we don't think the

10  disclosure statement has sufficient information.  We think it's

11  in support of a plan that is not confirmable and that this

12  should be its lasts top.  Thank you, Your Honor.

13        THE COURT:  Thank you, counsel.

14        MR. ZIDE:  Good afternoon, Your Honor.  Stephen Zide

15  from Dechert on behalf of the official committee of unsecured

16  creditors.

17        So what I'd like to do is just zoom out a little bit.

18  There's two disclosure statements for the Court today.  There's

19  the debtors' disclosure statement.  There's the petitioning

20  creditors' disclosure statement.  I like to explain what the

21  committee has been doing with respect to both disclosure

22  statements over the last several months and where the committee

23  is today and the committee's position today.

24        So in the first instance, the committee has been

25  reaching out to both parties, trying very actively to both

**ELETSON HOLDINGS INC.**

69

1    improve the economic terms of both plans and also to get

2    significantly more disclosure in both disclosure statements.

3    To that end, the committee has had numerous conversations with

4    both petitioning creditors and the debtors on their plan and

5    disclosure statements in an effort to try to get both

6    improvements, like I said, to the plan for the benefit of

7    unsecured creditors and also to increase the disclosures in

8    both of them.

9             I could tell you with respect to the petitioning

10   creditors' plan, they've made very substantial improvements

11   from what was filed originally.  Those were after very

12   extensive arm's length negotiations with the committee.  Just

13   to point them out, and we filed a statement on this yesterday,

14   Your Honor, they increased the straight equity that goes to

15   unsecured creditors on their plan from approximately thirty

16   percent to fifty percent.  They increased the cash pool under

17   their plan that creditors are entitled to get under their plan

18   if they want to opt out, the equity from 12.5 million to 13.5

19   million.  They've reduced the backstop premium that the

20   petitioning creditors were getting for backstopping the plan

21   from ten percent to eight percent.  That is something that is,

22   based on our financial advisor's advice, in line with the

23   market for backstop premiums.  And they've also agreed that any

24   creditor who wants to participate in that backstop could

25   participate in that backstop and get the benefits of that

**ELETSON HOLDINGS INC.**

70

1   backstop if they would like to do so.

2          They've also increased the convenience class.  These

3   are for smaller creditors.  They bumped up the recovery in cash

4   for convenience class creditors from ten to fifteen percent.

5   They've increased the amount in the convenience class from one

6   million to two and a half million.  And they've also increased

7   the threshold for a creditor in the convenience class from

8   200,000 to one million.

9          There was also very extensive negotiations with the

10  petitioning creditors on the reorganized company's board and

11  governance.  We came to an agreement with them on that.  It's

12  going to be a three-person board under their plan.  Petitioning

13  creditors get to appoint one of those board members.  They get

14  to appoint a second one with the reasonable consent of the

15  committee.  And the third board member will be an independent

16  director that the committee will appoint.  So we'll have no

17  affiliation with Pach Shemen, Murchinson, or any of the

18  petitioning creditors.

19         We've also got them to agree that under the corporate

20  governance of the petitioning creditors' plan, all litigation

21  claims, issues with respect to Murchinson, Levona, Pach Shemen

22  would fall under the decisional authority of the independent

23  director.  Okay.  There are some exceptions.  The majority of

24  unaffiliated shareholders could overrule the independent

25  director, but essentially the independent director would have

**ELETSON HOLDINGS INC.**

71

1   full authority with respect to any issues from Pach Shemen

2   which we thought was a very significant improvement under their

3   plan.

4         Now, with respect to the debtors' plan, just a little

5   clarification of the record because Mr. Baker said we refused

6   to engage with them, I just want to put that in context.  The

7   debtors filed their plan in January.  The debtors never

8   previewed their plan with the committee.  The initial plan that

9   the debtors filed was flat out unconfirmable.  It was

10   insufficient in funds.  There was caps on administrative

11   claims.  It was a new-value plan.  There was no contemplation

12   of marketing as required by the Supreme Court.  The committee

13   took this position very clearly and very early that that plan

14   was just a patently unconfirmable plan.  It was not worth it to

15   engage on that plan.

16         Subsequent to that, exclusivity terminated in late

17   March.  The petitioning creditors filed their alternative plan,

18   which under North LaSalle, could open up the opportunity for a

19   new-value plan, which is what gave the committee the

20   opportunity to start negotiating.  If you recall, right before

21   the trial and the trustee in early April, the debtors filed a

22   new plan.  At that time, they said they were going to file a

23   revised disclosure statement.  So once that happened, the

24   committee was going to take the approach that we would start

25   engaging with the debtors on their plan now that there are two

**ELETSON HOLDINGS INC.**

72

1   competing plans, which makes sense, which is, frankly, what

2   North LaSalle says should be done.  They never filed their

3   revised disclosure statement that week like they said they

4   would do at that time.  We reached out to them a week or so

5   later saying when are you guys going to do this, start the

6   negotiation process.  And then we did have a negotiation

7   process with the debtors on their plan and the disclosure

8   statement.

9         I could tell you we gave very extensive issues lists

10  to both parties.  We gave things that we thought the committee

11  needed in both plans and disclosure statements to both parties.

12  I could tell you, based on the negotiation with the debtors, to

13  their credit, there were some improvements to the plan that the

14  debtors did agree to.  They removed the artificial cap on the

15  committee's professional fees.  They agreed that the committee

16  gets to appoint the litigation trustee that they were putting

17  in place under their plan.  They also came up with this concept

18  that if there's excess cash at the SMEs, that will go to the

19  litigation trust.  Frankly, we have no idea what that is, how

20  much money that's going to be.  But there may be something

21  there.

22        They also added in a safety valve to the plan, which

23  is that if they're unable to subordinate the petitioning

24  creditors' claim, the petitioning creditors' claim get treated

25  just like all other creditors.  So from the committee's

1  perspective, these were improvements to the plan.

2          I could tell you also that just very recently,

3  unfortunately, they made a very significant material negative

4  to their plan and a very -- which is the settlement that we're

5  all talking about right now.  Up until I think, you know, this

6  weekend, the contemplation was that the claims against the

7  nominees would be going into the trust.  They had sent us a

8  list of causes of action that were going to the trust.  It had

9  that in there.  Frankly, we had major issues with that list

10 regardless, but it did have those claims going into the trust.

11 Then we had just learned very recently, as everyone learned

12 that they came up with this settlement in the plan, frankly, as

13 you've been hearing today, we think that settlement is not

14 valuable at all.  Essentially what it does is it doesn't allow

15 the trust to pursue the claims, like you like you heard today.

16 What it does is it puts the trust's claims on hold.  They get

17 to continue litigating with Levona.  If they lose against

18 Levona, then the trust has no claims.  There could be a lot of

19 claims that the trust has against the nominees, against the

20 debtors' officers and directors for everything that's

21 transpired over the last two years.  Those are all gone.

22 Nothing is gone if they're not successful against Levona.

23          Like Mr. Ortiz pointed out it essentially waives any

24 rights to the preferred shares which is the most valuable asset

25 here.  And all -- what it does is it says if they're successful

**ELETSON HOLDINGS INC.**

74

1    in getting a judgment or getting cash through a settlement from
2    the from Levona, the trust gets seventy-five percent of that
3    after costs.  We don't really have very little faith in that.
4    They control that litigation.  Like Mr. Ortiz said, they could
5    settle that for four dollars, we get three dollars.  The cost
6    there are very extensive.  They all get paid first.  So from
7    our perspective, that was a very detrimental change to the
8    plan.  And it's something we did not view positively at all.

9         So where does that leave us today?  and also, Your
10   Honor, there was very little disclosure on how that settlement
11   came about, who negotiated that settlement, why it makes sense.
12   We've expressed that to the debtors.  We think that absolutely
13   there needs to be more disclosure in the disclosure statement
14   with respect to that settlement.  Mr. Baker did say they do
15   intend to do that or they would be willing to do that, which is
16   a good thing.  That's obviously something we haven't seen yet.
17   And this is something that's come very quickly.  And so we're
18   still assessing that Your Honor.

19        Between the two plans, where we stand today, the
20   petitioning creditors' plan from our perspective is
21   overwhelmingly superior to the debtors' plan.  I often try to
22   remind myself of something Judge Lipton told me when I was a
23   very young associate.  He used the phrase KISS:  keep it
24   simple, stupid.  And the way I think about it is under the
25   debtors' plan, they're putting thirty million dollars and

**ELETSON HOLDINGS INC.**

75

1  getting a hundred percent of the equity of this company.  And

2  there are some litigation trusts which has some claims which

3  are essentially neutered.  Under the petitioning creditors'

4  plan, they're putting twenty-seven million in for fifty percent

5  of the company.  And fifty percent is going straight to the

6  shareholders.  So one plan gives the creditors fifty percent,

7  it has a rights offering for them to participate in the rest,

8  and it fully preserves those claims.  The other the other, the

9  other plan thirty million is going in.  It's largely paying

10  administrative expenses, no equity going to the creditors at

11  all.

12         So from our perspective, this is not even a close

13  call.  Again, like I said under the petition --

14         THE COURT:  Well, there is an award against Levona

15  though, right?  The arbitration.

16         MR. ZIDE:  Yes, there is.

17         THE COURT:  And how much is that for?

18         MR. ZIDE:  I believe there's a dispute right now

19  whether the punitive damages stands, but I think it's between

20  fifty and a hundred million.  And we obviously support the full

21  award against Levona.

22         THE COURT:  Right.  So fi it was 100 million dollars,

23  seventy-five million would go into --

24         MR. ZIDE:  Wo what it is is --

25         THE COURT:  Net of the costs?

1          MR. ZIDE:  Yeah.  Correct.  So there's a couple of

2    things.  Number 1, how much is Levona worth, okay?  It's a

3    special-purpose entity.  It's got two ships.  That's open to

4    debate.  Right?  I mean, obviously if Levona is worth very

5    substantial value, then that's more valuable claim.  If Levona

6    is not worth a hundred million dollars, then potentially it's

7    not worth a hundred-million-dollar claim, right?

8          And then like you said, you also have the litigation

9    costs against that which are very substantial.  If you look at

10   just the litigation costs prior to the arbitration, I believe

11   they were ten million dollars.  Those litigation costs are just

12   continuing to go up and go up and go up and go up.  And

13   essentially what it does is it gives them full discretion to

14   resolve that claim in any way they want.  And so if they want

15   to settle with Levona under that settlement, they could come to

16   an agreement with Levona that the nominees get the preferred

17   shares, which we think is the most valuable asset here, 125 to,

18   you know, over 125 million dollars.  And they'll settle the

19   claim against Levona for four dollars or four dollars over the

20   litigation costs.  And then the trust gets three dollars.  And

21   there's nothing we could do, and everything's waived.  And we

22   have no faith in that, Your Honor.  And just that's the

23   reality.

24          Look, we're at the disclosure statement phase, right?

25   I mean, creditors will get to vote.  They'll get to decide.  I

**ELETSON HOLDINGS INC.**

1   can just tell you, this is the committee's perspective right

2   now.

3        THE COURT:  No, I understand.  I understand.

4        MR. ZIDE:  It's almost worthless to unsecured

5   creditors from our perspective.

6        And by the way, just taking these two things into

7   account, this is why we put our statement in support yesterday,

8   why we support the petitioning creditors' plan.

9        Now ,with respect to the disclosure statements,

10   because I was talking about the merits of the plans and the

11   economic benefits of the plans, like I said, we conveyed the

12   same message to both parties.  We gave very extensive issues

13   lists to both parties of things they needed to improve with

14   respect to their disclosure statements.  We've told both

15   parties that their disclosure statements lack valuations, lack

16   projections, lacked analysis of feasibility, lack of

17   liquidation analysis.  We also told both parties that the way

18   that they had described the historical disclosures here were

19   just unnecessarily, inflammatory.  They should be more neutral

20   and that that those issues should be rectified within the

21   disclosure statements.  And like I said, we sent details issues

22   list to both parties with respect to the disclosure statement.

23        I could tell you everything we asked of the petition

24   creditors they did.  To their credit -- they're not the debtors

25   here.  They have a lot less information than the debtors.  But

**ELETSON HOLDINGS INC.**

78

1 they did hire a financial advisor.  They told us early on they

2 were going to be fixing all the issues that we raised with

3 them.  They provided go-forward business projections.  They

4 provide a liquidation analysis.  They provided proof of funding

5 very importantly.  They filed that on the docket that they had

6 the twenty-seven million dollars to fund.  There's a backstop

7 agreement which commits them to fund under their plan.  They've

8 also made further disclosures with respect to the rights

9 offering and what it takes to be an eligible holder and

10 whatnot.  And from our perspective, they fixed all the

11 disclosure issues they have.  And we are we're fully

12 comfortable, I can tell you now ,with their plan going out for

13 a vote.  And we obviously at this point support their plan.

14       To their credit, after a lot of back-and-0forth, the

15 debtors have also made a lot of improvements to their

16 disclosure-related issues.  They did file a liquidation

17 analysis.  They did file a valuation yesterday which we got for

18 the first time.  Frankly, they had told us they were not going

19 to be doing that until this weekend.  And so that was a

20 pleasant surprise that they've done that.  We're still going

21 through that.  But that was significant improvement.

22       But most importantly, Your Honor they have not showed

23 us the financial wherewithal that they're -- that the that they

24 have the ability to fund this.  There's no commitment agreement

25 in their plan.  From our perspective, and we've told this to

1    the debtors numerous times, we think it's just unnecessarily

2    burdensome to the estates for their plan to go out.

3            Is someone talking?

4            THE COURT:  Could someone on the on the Zoom mute your

5    line, please?  Sorry.

6            MR. ZIDE:  Okay.  Thank you, Your Honor.

7            And so we've told them we have no confidence on the

8    equity holders' ability to fund.  We've told them it's

9    absolutely critical that we see proof of funds and it's

10   absolutely critical that there be a commitment that they fund

11   if this plan is confirmed, if their plan is confirmed so it's

12   not just a free option for them.  To their credit, for the

13   first time this morning, Mr. Baker is now saying that they

14   think they could try to satisfy those requirements.  He's told

15   us -- again, this is hearing this for the first time, that they

16   will show us on a professional-eyes-only basis proof of funds.

17           He also said that they're willing to sign a commitment

18   letter.  We haven't seen any of this yet.  We don't know what

19   they're signing.  We don't know what we're going to see.  We

20   think that's a positive development, Your Honor.  We think it's

21   critical that any commitment letter that they sign has it that

22   they're subject to the jurisdiction of this Court.  We also

23   want to make sure that any commitment letter that they sign

24   doesn't have unnecessary, you know, outs, conditions, things

25   like that for that commitment.  But we haven't seen anything

**ELETSON HOLDINGS INC.**

80

1   yet.  I don't think anything has been prepared.  I think he's

2   just said for the record that they're willing to do that.  So

3   if they're willing to do that, we're willing to look at that

4   and entertain that and see if that satisfies that issue, Your

5   Honor.

6            So where we stand today, Your Honor, like I said,

7   we're fully comfortable with the petitioning creditors' plan

8   going out.  There are still significant issues with the

9   debtors' plan.  They're making representations to the Court

10  today that they're going to try to rectify them.  Like I said,

11  there needs to be -- we think there needs to be significant

12  more disclosure on the proposed settlement they put in there.

13  We think that there needs to be evidence, proof of funds,

14  commitment, whatnot.  There have been other issues that have

15  been raised at the hearing.

16           I think what the committee would like to do is -- and

17  this is normal in a Chapter 11 case, we'd like to put a letter

18  out there with the disclosure statement putting the committee's

19  position.  We frankly have not finalized a letter yet because

20  we're not really sure how this is going to go forward.  Your

21  Honor was asking is there going to be dueling plans, whatever,

22  dueling disclosure statements.  So we would like to do that.

23  If Your Honor permits the petitioning creditors' plan to go

24  out, we'd like a letter to go out with that.  If there's going

25  to be dueling plans, we'd like the letter to go out -- a letter

**ELETSON HOLDINGS INC.**

81

1   to go out with the dueling plans for the committee's position.

2   and that is something we'd like to do.  That's something we

3   could do relatively quickly in the next day or so.

4        So from the from the committee's perspective, if the

5   debtors are willing to make substantial changes to their

6   disclosure statement, rectify some of these issues, we are okay

7   if this goes for another couple of days, a week to give them

8   that time to do that.  We're not saying  from our position that

9   has their plan has to go out today without their plan.  We

10  obviously reserve all rights.  We don't know what they're going

11  to do.  We'd also encourage them if they are going to -- if

12  they will represent that, they're going to try to fix these

13  disclosure=related issues, to improve their plan and to improve

14  the economics of their plan, the terms of their plan.  Like we

15  said, we don't think it's even a close call, that the

16  petitioning creditors' plan is more superior.  But we will see

17  what they do.  And we will take that to the committee, Your

18  Honor.

19        THE COURT:  If you do get to a point where both

20  plans -- both disclosure statements and plans are going out,

21  you wouldn't anticipate doing them separately, would you?

22        MR. ZIDE:  I think it makes sense to do them at the

23  same time.  And I think it makes sense to have one ballot

24  because I think it just be really confusing if you have two

25  disclosure statements with two ballots, people are getting it

1   that I fill this out, do I need to fill this out.  So I think

2   it would be -- it would make sense for the parties to agree on

3   one ballot where they get to choose which plan they support.

4         I've never done competing plans before.  Mr. Baker

5   has, so he may have a little bit more experience than me on

6   this type of thing.  And I also think them going out at the

7   same time with one ballot gives the committee the opportunity

8   to put a letter in there saying you have two plans, this is the

9   one we recommend, this is the one we support.

10         THE COURT:  Thank you, counsel.

11         MR. ZIDE:  Thank you, Your Honor.

12         THE COURT:  Would anyone else like to be heard?

13         MS. LOTEMPIO:  Good morning, Your Honor.  Catherine

14   LoTempio on behalf of NAF.

15         THE COURT:  Good morning.

16         MS. LOTEMPIO:  Just briefly, Your Honor.  We just

17   wanted to rise to note that the debtors' plan does not appear

18   to classify claims of creditors like NAF that do not fall into

19   either the trade creditor class or the noteholder class.  And

20   while the NAF class -- or excuse me, claim has been objected to

21   by the debtors and the debtors take the position that we

22   wouldn't be entitled to vote on the plan at this time, we just

23   respectfully submit that there needs to be some disclosure as

24   to what class NAF would be in if it were entitled to vote or

25   its claim were allowed prior to the solicitation process.  And

1    I just based on your discussion right now raise the point that

2    if there were one ballot and claims that were objected to by

3    the debtors, would they be entitled to vote on the petitioning

4    creditors' plan versus the debtors' plan?  I just -- some

5    confusing things that I believe would need to be worked out in

6    the event that we are entitled to vote on the plan.  Thank you,

7    Your Honor.

8            THE COURT:  Thank you, counsel.

9            MR. BAKER:  Your Honor, Derek Baker from Reed Smith on

10   behalf of the debtors.

11           Would you be willing to accommodate a comfort break?

12           THE COURT:  Of course.

13           MR. BAKER:  Thank you, Your Honor.

14           MR. BAKER:  Before I reply.

15           THE COURT:  We'll take a ten-minute break.

16           MR. BAKER:  Thank you, Your Honor.

17           THE COURT:  Thank you.

18       (Recess from 11:22 a.m., until 11:40 a.m.)

19           THE COURT:  Please be seated.

20           Counsel?

21           MR. BAKER:  Good morning again, Your Honor.  Derek

22   Baker from Reed Smith on behalf of the debtors.

23           Your Honor, I'd like to, if I can reply to some of the

24   comments that were made by my friends on the other side.

25           Let me deal with what I think are the easy one -- or

**ELETSON HOLDINGS INC.**

84

1   is an easy one.  Counsel for NAF raised a question about where

2   NAF is under the debtors' plan.  Under the definition of NAF

3   claim, which is number 103 in the debtors' plan, and I'm

4   referring to docket 671, that's the definition of NAF claim.

5   NAF claim is also comprised within the definition of old notes

6   claim which is paragraph 113.  And then the old notes are

7   included within the treatment of class 5A which is on page 89.

8   So I think they're addressed, but I'm happy to include any

9   additional clarifying information in the disclosure statement

10   to the extent necessary.

11          Your Honor, with respect to the committee's -- I'll

12   start with the committee's comments.  Your Honor, while I will

13   acknowledge that the committee had been requesting proof of

14   funds and we have been having discussions with them about the

15   nature of the proof of funds and our representation concerning

16   the proof of funds that have been made available to us, the

17   first time that we were asked for a commitment letter was this

18   morning, and we indicated that we were willing to work through

19   that document.  I don't think that that's a heavy lift, and I

20   think that that's easily accomplishable.

21          I also think -- just for the record, I think a

22   commitment letter is -- while I understand the committee's

23   request for it, I think the fact of the matter is, is we only

24   put forward the plan because we have the support of the

25   shareholders, so we don't really view a separate commitment

**ELETSON HOLDINGS INC.**

85

1  letter as doing anything more than confirming the support that

2  we have of the shareholders to make the new -- the shareholder

3  new value contribution that's contemplated in the plan.  But if

4  the committee wants us to add an additional letter, we're happy

5  to work through that.

6        Your Honor, one of the points that my friend on the

7  other side highlighted was that the claim -- and by the claim,

8  I think he refers to the claims that would be asserted against

9  the preferred nominees and related to the preferred shares of

10 Eletson Gas, was the focal point of this case.  I think that

11 was the language he used, the focal point of this case.  If

12 it's the focal point of this case, how come no one has been

13 able to articulate what the claim is or even present it to the

14 debtors for analysis presented to the independent committee, or

15 even seek standing to do it?

16       But that all being said, we did agree and have always

17 agreed, and my partner stated it very plainly at prior

18 hearings, that it was always intended that that claim, whatever

19 it was, was going to be assigned to the litigation trust under

20 the debtors' plan.  And what we think we actually did was lock

21 in value associated with that plan, right, or that claim

22 because it's never been articulated what it is and how it can

23 result in value.  So what we did in the proposed language of

24 the plan is lock in value associated with that claim by saying,

25 okay, you think that you have a claim there, we don't know what

86

```
 1   it is, we don't -- it's never been articulated for us.  But in
 2   the context of a settlement that would be approved in
 3   connection with this plan, the preferred nominees and the
 4   defendants that would be the subject of that claim would agree
 5   to turn over a very significant portion of a collection.
 6           Now, I think Your Honor asked a very important
 7   question of my friend, Mr. Zide.  And it was, well, there's an
 8   award that's been confirmed, right?  That's real claim.  And it
 9   is.  And Your Honor will recall that one of the things that my
10   partner said to Your Honor was we were going to come back for
11   enforcement of that claim until we started finding out that
12   Levona took the position that certain assets are not subject to
13   this -- to your jurisdiction.  And so we advised Your Honor
14   that parties had gone and obtained a restraint against the
15   disposition of those vessels that are owned by Levona.  That is
16   a very, very substantial claim and a valuable claim.
17           THE COURT:  Which clam are you talking about?
18           MR. BAKER:  The claim that the parties have to collect
19   from Levona.
20           THE COURT:  The collection --
21           MR. BAKER:  And the assets --
22           THE COURT:  What is the status of hat injunction?
23           MR. BAKER:  And the assets of that of have been locked
24   up.  Excuse me.  I'm sorry.
25           THE COURT:  What are the what is the status of that
```

 1    injunction?

 2            MR. BAKER:  if I may defer to my colleague.  He's

 3    certainly closer to it.

 4            MR. SOLOMON:  Thank you.  Your Honor, Levona tried to

 5    open that injunction and have it vacated in the British Virgin

 6    Islands.  The claimants there -- we don't represent the gas

 7    entity, they're opposed.  And that restraint remains in place.

 8            THE COURT:  Thank you.

 9            MR. SOLOMON:  We didn't get any help from the

10    committee on that.

11            THE COURT:  Thank you, counsel.

12            MR. BAKER:  So, Your Honor --

13            THE COURT:  Well, that makes two things.

14            MR. BAKER:  Excuse me.

15            THE COURT:  They say, what if you settle it for a

16    thousand dollars and/or if Levona can't pay it?

17            MR. BAKER:  So let's deal with the Levona can't pay it

18    part because I think we've really locked in whether Levona can

19    pay it because we now have very substantial assets that are

20    going to be available to pay.  So that part's easy.

21            The what if the parties that would receive the benefit

22    of that award would settle it for some nominal amount and

23    somehow sort of engage in gamesmanship with the Holdings estate

24    I think sort of turns the process completely on its head.  We

25    are the only ones that have been actively pursuing the

**ELETSON HOLDINGS INC.**

88

1   collection of that and told Your Honor that we'd be bringing

2   those issues -- that we understood those issues would be coming

3   back to Your Honor for ultimate disposition because Murchinson

4   had originally obtained -- Murchinson using --

5         THE COURT:  Can everyone on Zoom please mute your

6   lines?  Thank you.  Sorry.

7         MR. BAKER:  That's quite all right, Your Honor.

8         Murchinson using Lavona as their one entity, now using

9   Pach Shemen as the second entity, now using their influence

10   over Deckert and the committee, right, that they have less

11   incentive to settle with Levona on the collection of that claim

12   and the monetization of that claim than the parties that

13   actually obtained it in the first place.  And so I don't think

14   that there's really any likelihood that that would ultimately

15   happen.  I think we're the only ones that have -- the debtors

16   and the parties that benefit from the award are the only ones

17   that have the incentive to actively secure those funds.

18         I also want to point out, Your Honor, that -- and my

19   partner is whispering in my ear, although probably not terribly

20   quietly right into the microphone, that we're going to come

21   back to Your Honor for ultimate settlement in advance of that.

22         But I want to address the rationale behind the

23   assignment of the claim to the trust and the proposed

24   settlement which was really to lock in value associated with

25   that claim which no one's really been able to articulate a

**ELETSON HOLDINGS INC.**

89

1    valuable basis for and who knows who they would pursue and how

2    they would pursue it and the like.  But if the committee would

3    prefer that that claim just be assigned to the trust and that

4    there be no lock-in of value associated with that, my

5    understanding -- and counsel for the majority shareholders and

6    counsel for the nominees can confirm .  My understanding is

7    they would be they would be happy to take the take the

8    assignment out of the -- the assignment of the litigation, the

9    proceeds of the litigation, out of the litigation trust and

10   make that an additional contribution that would be part of the

11   debtor's overall distributable value.

12          So in other words, the claim associated with the

13   debtor's rights against the preferred nominees, related to the

14   preferred shares that claim, whatever it is, however it's

15   articulated, that would get assigned to the litigation trust.

16   And the preferred nominees and Eletson Gas would agree to

17   contribute in addition to the shareholder new value

18   contribution the seventy-five percent of additional cash value

19   as additional proceeds that would come in on top of the -- at

20   the top of the debtors' plan.

21          Your Honor, it was always envisioned that those funds

22   would have more than sufficient value to be more than whatever

23   the enterprise value is that Pach Shemen is creating by simply

24   doing a series of projections and doing a DCF analysis.  So

25   from that perspective, we always do believe that our plan is

**ELETSON HOLDINGS INC.**

90

1    more -- provides more value to creditors.  But if that's the

2    nature of the structure, the debtors are prepared to -- and my

3    understanding is the primary shareholders and the preferred

4    nominees are willing to agree to do it that way.  And that can

5    be, I guess, in Mr. Zide's view --

6            THE COURT:  Yeah, I'm sorry.  Can you explain it

7    again?

8            MR. BAKER:  Sure.

9            THE COURT:  You're saying the claim would remain in

10   the trust?

11           MR. BAKER:  The claim against the preferred

12   nominees --

13           THE COURT:  Call it what you will.

14           MR. BAKER:  Call it whatever --

15           THE COURT:  Transfer, whatever it is, that would

16   remain in litigation trust?

17           MR. BAKER:  Correct.

18           THE COURT:  And then the seventy-five percent would be

19   contributed on top?

20           MR. BAKER:  Correct.

21           THE COURT:  Okay.

22           MR. BAKER:  As additional value.  We'd have to make

23   some definitional changes.

24           THE COURT:  Understood.

25           MR. BAKER:  But it would be additional value.

**ELETSON HOLDINGS INC.**

91

1          Now, Your Honor, let's go to what I think some other

2    sort of comments were.  Mr. Ortiz made a lot in his argument

3    about good faith, bad faith related to the plan.  That's all

4    argument of counsel.  There is not a single piece of evidence

5    that's been presented to Your Honor upon which you could decide

6    that as a motion for summary judgment today that we think that

7    Your Honor should exercise discretion and allow the plan to

8    otherwise be solicited.

9          Mr. Ortiz said that a shareholder new value plan is

10   really where there's no other alternative.  But that's actually

11   completely inconsistent with all the case law that we cited to

12   Your Honor, where there are, in fact, competing plans that

13   justify the confirmation of a shareholder new value plan.  So

14   that, by definition, means that there are competitive issues

15   associated with that.

16         Mr. Ortiz talked about the fact that he wanted to

17   understand the legitimate proof around the separate

18   classification.  Your Honor, I think I articulated that during

19   my presentation.  I think it's detailed in detail in our

20   disclosure statement that we believe that there is -- that it

21   is entirely proper to equitably subordinate those creditors

22   that were found by Justice Balint who have acted improperly.

23   And those determinations, we believe, are more than sufficient

24   basis, legitimate basis for the separate classification and

25   would ultimately allow equitable subordination in accordance

**ELETSON HOLDINGS INC.**

1    with the terms of the confirmation hearing.

2            But again, Your Honor, there is a provision in the

3    plan that allows the plan to be confirmed even without those

4    ultimate determinations because -- and that was an issue that

5    we negotiated with the committee late, but we negotiated with

6    the committee.

7            Your Honor, I think the 00 what I'll end with is this.

8    Mr. Ortiz says an average creditor should understand what it's

9    going to get, when, and how.  Your Honor, the disclosure

10   statement and the plan that the debtors are putting forward

11   does all of that.  It provides that the creditors are going to

12   get cash and they're going to get litigation trust units and

13   what litigation is going into the trust.  And they have the

14   control over how to pursue those claims when they're assigned.

15           Now, Your Honor, I think the most important critical

16   piece was Pach Shemen's statement that really the reason why

17   they don't want competing plans is because they're worried that

18   creditors will vote for the debtors' plan.  And, Your Honor,

19   that statement in and of itself is the exact reason why we

20   think that Your Honor should exercise Your Honor's discretion

21   and provide for the joint solicitation of plans.  And I'm happy

22   to otherwise answer any questions that you have.

23           THE COURT:  Thank you, counsel.

24           MR. BAKER:  Thank you, Your Honor.

25           THE COURT:  Did anyone else wish to be heard before we

1   proceed?

2           MR. ORTIZ:  Your Honor, if I may just very briefly.

3           THE COURT:  Please.

4           MR. ORTIZ:  Kyle Ortiz of Togut, Segal & Segal for the

5   petitioning creditors.  I don't want to turn this into back-

6   and-forth, back-and-forth.

7           But just very quickly, on the shareholder value, they

8   remarkably claim has never been articulated despite -- I think

9   we all sat through quite a lot of Mr. Herman going through it

10  in incredible detail on April 9th or April 7th or whatever the

11  first day of the trial was.  I just don't know how they can say

12  that.

13          They also apparently haven't looked at our disclosure

14  statement where we were very clear in certain matters related

15  to reorganize debtors, that such retained causes of action

16  include, among other things, A, claims against Levona Holdings

17  arising from the arbitration as defined below or otherwise, and

18  B,  claim seeking to recover the preferred shares of Eletson

19  Gas as defined below or the value thereof from the nominees is

20  defined below and claims related thereto such as breach of

21  fiduciary duty against the officers and directors that

22  authorize the transfer to such shares.  As of the date hereof,

23  the preferred shares are estimated to have a total amount of

24  outstanding obligations of approximately 333 million, including

25  principal and accrued and unpaid dividends.

**ELETSON HOLDINGS INC.**

94

1          So let's just not accurate.  And I find that the

2    statement that they were trying to do the creditors a favor and

3    lock in value by releasing these claims against themselves,

4    that's just a bad-faith statement, Your Honor.  That's proving

5    the point.  This is a bad-faith plan.  The plan leaves the

6    opportunity -- by the way, our plan leaves the opportunity to

7    pursue all of the Levona claim and all of the preferred shares.

8    That's what I just read to Your Honor.  And by the way, we have

9    a governance provision in there to make sure that that isn't

10   controlled by anybody who's related to those entities, unlike

11   the related things that they've just pulled off.  Frankly, it's

12   insulting to this Court that they're trying to do this at the

13   last minute.  They were trying to get a release.

14         I'm not -- I'm going be honest.  I didn't fully follow

15   what Mr. Baker was saying about whether they're going to put

16   that back in.  But even if that's the case, it's just -- again,

17   it's the cat and mouse.  They just got caught.

18         They're not -- the problem with this new value concept

19   is they're not competitive plans.  They're not even close.  And

20   they really kind of highlight that.  To the extent that there's

21   any world where these both go out, it should be very clear in

22   the debtors' disclosure statement that if there's was to

23   prevail, that the petitioning creditors are willing to overbid

24   that because that would be us being able to get a hundred

25   percent of the equity for what we're paying almost the same

1    amount for forty-one percent of the equity.  So it would be

2    remarkable deal.  But we're actually trying to do something

3    that is beneficial for creditors.  And we're going to have to

4    go through this process where we put out a plan that just isn't

5    even remotely competitive.  And again, if it does go out, it

6    needs to be clear, other than providing the release, that it's

7    not clear if it's coming in or out for the preferred shares, we

8    would just overbid that plan.  And they could have a

9    competitive process on that, on something that's half as

10   valuable for creditors.

11        I just want to note on the equitable subordination

12   point, I have to mention, he points to them saying Justice

13   Balint found that.  How many times do we have to go through

14   this?  That was vacated.  And that's just not a basis to point

15   to, to say we're going to be able to subordinate these claims.

16        That's all I have, Your Honor.  Thank you.

17        THE COURT:  Thank you, counsel.

18        Did anyone else wish to be heard?  Okay.

19        THE COURT:  Let's proceed to agenda item 2.  I want to

20   consider everything together.

21        MR. BAKER:  Your Honor, for the record, Derek Baker

22   from Reed Smith on behalf of the debtors.  I will cede the

23   podium to my friend Mr. Kotliar, who I understand is going to

24   present his two motions.

25        I would note that it is the debtor's position with

1   respect to the disclosure statement that the issues related to

2   confirmation on those, that the debtors are reserving their

3   rights with respect to confirmation but otherwise would be

4   agreeable to the solicitation of the petitioning creditors --

5   or the Pach Shemen plan together with the debtors' plan.

6          THE COURT:  So you're not objecting to theirs going

7   out or their disclosure statement?

8          MR. BAKER:  We're not objecting to theirs going out.

9   We do request that it go out simultaneously.

10         THE COURT:  Agreed.  And you're reserving everything

11  as to confirmation.

12         MR. BAKER:  And we're reserving our rights as to

13  confirmation.  Yes, Your Honor.

14         MR. KOTLIAR:  Good morning, Your Honor.  For the

15  record, Brian Kotliar, Togut, Segal & Segal, counsel for the

16  petitioning creditors.  Mr. Baker stole my thunder.  I wanted

17  to say that we've been able to resolve the debtors' objections,

18  and we're proceeding today on uncontested basis.

19         I'll be presenting two motions today.  They're

20  related, so I'll do them together.  One is for approval of the

21  petitioning creditors' disclosure statement and related

22  solicitation procedures and notices.  That motion is at docket

23  number 574.

24         The other motion is for approval of the rights

25  offering procedures and related things.  That's at docket

1    number 592.

2          The motion seek purely procedural relief related to

3    soliciting our plan.  And as I'll explain in a moment, none of

4    the relief that we're seeking today binds the debtors or their

5    estates to any not yet confirmed plan or incur any expenses or

6    administrative claims or other obligations.

7          We filed our initial plan and disclosure statement on

8    March 26th.  Those are at docket numbers 531 and 532.  Because

9    the debtors' exclusivity period had just expired the day

10   before, we filed those documents basically without talking to

11   any of the parties in the case about their terms.  But since

12   then, we've been talking to a lot of parties and continuing to

13   do a lot of work.

14         The only party that filed any objections were the

15   debtors, and that was the two that they filed at docket number

16   652 and 653.  We filed the reply at docket number 667.  But as

17   we just said, we think that we've resolved their objections

18   pursuant to the modifications we've made in documents filed

19   this week.  And I'll take the Court through that in a moment.

20         The committee filed a statement in support.  That's at

21   docket number 689.

22         So with that ,I'm happy to make a record on our two

23   motions, if Your Honor would like me to do so unless --

24         THE COURT:  Please.

25         MR. KOTLIAR:  -- Your Honor is reaching to sign the

**ELETSON HOLDINGS INC.**

98

1    orders.  Then I won't get in the way of that.

2         THE COURT:  No, please proceed.

3         MR. KOTLIAR:  Okay.  So what have we filed with

4    respect to these motions?  On Monday, we filed four documents:

5    first, an amended plan, that's at docket number 663; second, an

6    amended disclosure statement, that's at docket number 664.

7    That disclosure statement included some exhibits we filed the

8    Friday before at docket number 658.  That that Friday filing

9    consisted of the liquidation analysis, the valuation report,

10   and projections prepared by our financial advisor, Batuta

11   Capital Advisors.  That Friday filing also included financial

12   wherewithal for the backstop party, Pach Shemen, showing the

13   availability of the full $27 million.

14        Also on Monday, we filed number 3, a revised order

15   approving the rights offering motion.  That's at docket number

16   665.  And fourth, we filed a revised order approving the

17   disclosure statement motion.  That's at docket number 666.

18        All of those documents reflect extensive good-faith

19   discussions with various parties, including the creditors'

20   committee and its advisors, the two note trustees, Deutsche

21   Bank and Wilmington, and the U.S. Trustee.

22        In particular, Your Honor, there are extensive

23   negotiations with the committee that resulted in significant

24   changes to our plan and material improvement for creditors

25   recoveries.  Mr. Zide took the Court through that earlier, but

1    just to reiterate, those changes included 1, decreasing the

2    backstop premium from ten percent to eight percent; 2,

3    increasing the goosey cash flow from twelve and a half million

4    dollars to thirteen and a half million dollars.  That's the

5    cash for creditors that want cash instead of equity.  3,

6    increasing the ceiling on the convenience claim amounts from

7    200,000 dollars to a million dollars, increasing the

8    convenience claim recovery from ten percent to fifteen percent,

9    and increasing the total cash flow for convenience claims from

10   one million dollars to two and a half million dollars, and

11   last, establishing the composition of the new board, including

12   an independent director selected by the committee and

13   governance matters related to the Levona claims.

14          Our amended plan and disclosure statement and

15   solicitation and rights offering materials also reflect

16   extensive input from our other advisors.  That's the Batuta

17   financial advisor that I mentioned earlier, as well as KCC, who

18   we've retained as the solicitation agent.  KCC is a world-class

19   claims and noticing agent that I'm sure Your Honor is familiar

20   with in large Chapter 11 cases.  We retain them for their

21   expertise in soliciting the notes which are publicly traded

22   securities held through various intermediaries like nominees,

23   brokers, and others.  It's a complicated network that requires

24   an expert like KCC to do it well and give the proper notice.

25   Altogether, we think we are well positioned, with Your Honor's

1    approval to solicit our plan.

2          So what does that solicitation look like?  We're just

3    soliciting two classes of claims.  It's really just one class.

4    It's general unsecured creditors that also happens to have a

5    convenience class component.  Those are classes 3 and 4 under

6    our plan.  No one else is voting on our plan.

7          In addition to voting, general unsecured creditors can

8    make various elections first on their ballots for their claim

9    treatment, unsecured creditors can elect to receive cash or

10   equity.  They all have the same option.

11         Second, on their rights offering materials, they all

12   have the same option, the same option as Pach Shemen and the

13   other petitioning creditors to participate in the rights

14   offering or not at the same 17.8 percent discount to plan

15   equity value.

16         And third, we've added an option now for unsecured

17   creditors to join in the backstop pro rata based on their

18   claims.  That right to provide the backstop is now open to

19   everyone.  Subsequent backstop parties, people that commit

20   capital after Pach Shemen has and take on far less risk given

21   the time frame, can backstop pro rata on exactly the same

22   terms.

23         Another change reflected in Monday's filings that

24   resolved the debtors' objections are that the backstop premium

25   and fees and expenses are clearly and expressly only payable in

**ELETSON HOLDINGS INC.**

101

1    connection with consummation of our plan.  That's in paragraph

2    11 of the revised rights offering order which Reed Smith has

3    confirmed resolves their objection on this point subject to

4    some tweaks in the documents we filed last night.

5         If our plan is not confirmed -- if our plan is not

6    consummated, the backstop parties don't get the premium or the

7    fees and expenses.  That's pretty unique and different than any

8    backstop fees in any other case that I've ever seen.

9         In terms of the timeline, we're asking for the

10   following, which we think is very achievable.  We'd like to

11   finish the solicitation mailings within three business days

12   from the entry of the order.  We think that's early next week,

13   depending on if and when your order enters the order by June

14   3rd, we'll file the plan supplement.  June 24th is the voting

15   deadline.  June 26th will file the voting declaration.  June

16   27th is the deadline for objections to our plan, July 1st for

17   replies in support of our plan, and then July 3rd at TBD,

18   subject to Your Honor's availability for the confirmation

19   hearing.  Obviously, we'll do whatever the Court has available,

20   but we'd like that to be as soon as possible in early July.

21        We worked with KCC on the schedule, particularly given

22   their familiarity with the notes.  And we think this is

23   reasonable and provide sufficient notice.

24        So with that, I'll stop and see if Your Honor has any

25   questions.  And with that, we ask that you enter the orders in

**ELETSON HOLDINGS INC.**

1    the forms filed last night at dockets number 697 and 698.

2              THE COURT:  Thank you, counsel.

3              Would anyone else like to be heard?

4              MR. ZIDE:  Stephen Zide from Deckert on behalf of the

5    official committee of unsecured creditors.  Very briefly, Your

6    Honor.

7              I already expressed to committee view.  We just want

8    to reiterate that we did negotiate extensively with the

9    petitioning creditors on their plan.  They did make very

10   substantial improvements to their plan.  We think their plan is

11   ready to go, ready to solicit.  But like I said earlier, if the

12   debtors are willing to spend the next couple of days a week to

13   fix the disclosure issues in their plan, we could entertain

14   that, if that makes sense to do that.  But at this point, we're

15   fully supportive of their plan going forward.

16             THE COURT:  Thank you, counsel.

17             Did anyone else wish to be heard?

18             MR. BAKER:  Your Honor, Derek Baker from Reed Smith on

19   behalf of the debtors.

20             Your Honor, in response to the first comment of Mr.

21   Kotliar regarding the resolution of the language and the rights

22   offering order we did comment on that.  Mr. Kotliar did reflect

23   additional language that was reflected in the filing that was

24   last night, because it does limit the risk to the estate in the

25   event that the Pokémon claim Pokémon plan is not confirmed.  We

1    are okay with the entry of that order.

2         With respect to the solicitation order, the debtor

3    solicitation order mirrors the dates that were articulated by

4    Mr. Kotliar.  Obviously we understand -- excuse me, we

5    understand the committee's suggestion about taking some time in

6    very short order to provide the additional comments that I

7    articulated, I would be making to the plan and disclosure

8    statement.  And we're agreeable to doing that, which would we

9    think might slight, might delay those dates by a week at most.

10   If we could otherwise have the time to have those additions

11   made so that we could solicit jointly.

12        THE COURT:  Thank you, counsel.

13        MR. BAKER:  Thank you, Your Honor.

14        THE COURT:  Did anyone else wish to be heard?

15        MR. ZIDE:  Just very briefly.  Again, Stephen Zide on

16   behalf of the committee.

17        I just want to make it clear, even with those changes,

18   the committee has not signed off on the approach.  We have to

19   see what they'll do.

20        And number 2, I really would encourage the debtors to

21   do whatever they can to improve the economic terms of the plan

22   and the business terms of their plan to make them more

23   beneficial to unsecured creditors if they're going to take some

24   time over the next couple of days to go back and try to fix

25   their plan and disclosure statement.

**ELETSON HOLDINGS INC.**

104

1          THE COURT:  Thank you, counsel.

2          Does anyone else wish to be heard?  Okay.

3          As to the petitioning creditors' disclosure statement

4   motion, which is found at docket number 574, and there's a lot

5   of filings that go along with that, and the rights offering

6   motion which is found in docket 592 -- and again, there are a

7   number of filings that go along with that -- and noting that

8   there was no objection, I will grant the motions.  But I will

9   not yet enter the order subject the filing by the debtors of

10  the amendments and revisions that have been discussed here

11  today the commitment letter, the proposed committee letter, et

12  cetera, the other changes that have been referenced.

13         And I will continue this hearing as to the debtors'

14  motion until everyone has a chance to review those and the

15  Court does as well.  I will continue it to a time to be

16  determined based on when the submissions are made.  Next week

17  I'm in a jury trial in the District Court, so we may actually

18  meet at 500 Pearl if needed.  But we'll see what's submitted

19  and when.  And then we'll determine how to proceed.

20         But also, in the meantime, I would -- without

21  prejudging anything, I would like the parties to discuss if

22  both plans were to go out, how that would be done jointly,

23  again, without prejudging anything, but if that were to happen,

24  the parties should discuss how they would envision that and if

25  they can agree on procedure.

**ELETSON HOLDINGS INC.**

1          MR. KOTLIAR:  Okay.  Your Honor, for the record, Brian

2     Kotliar, Togut, Segal & Segal, counsel for the position of

3     creditors,

4          I think in connection with discussing those other

5     changes and what the timeline might look like, it comes back to

6     the one open issue on our order which is the date and time for

7     the confirmation hearing.  And I don't think we need that right

8     now, but I think having --

9          THE COURT:  Well, I don't think I can answer that for

10    that very reason.

11         MR. KOTLIAR:  Yeah.  I think getting those dates from

12    Your Honor chambers, which we're happy to do separately after

13    this hearing, I think will inform how we set the schedule

14    because we want to give people as much notice as possible but

15    also work towards a date that's going to be --

16         THE COURT:  I'm not sure what you mean.

17         MR. KOTLIAR:  So when you have the confirmation

18    hearing and you're working backwards., It's a lot easier than

19    moving forwards and saying we're going to give people this much

20    time to vote  And then it turns out there's four weeks.

21         THE COURT:  Oh, no, no.  I understand, but all I mean

22    is I don't know when we'll have that date because I don't know

23    when people are going to submit things, when there will be

24    agreement or disagreement, if there's a continuing discussion.

25         MR. KOTLIAR:  Understood.

**ELETSON HOLDINGS INC.**

106

1          THE COURT:  So once everything is resolved, we'll be

2    able to set that date.  And then you can work backwards from

3    that, if that's what you mean.

4          MR. KOTLIAR:  Yes.  Understood.  Thank you.

5          THE COURT:  Yes, absolutely.  Thank you, counsel.

6          MR. BAKER:  Thank you, Your Honor.  That was going to

7    be my -- I was going to Derek Baker from Reed Smith on behalf

8    of the debtor.

9          I was going to make a similar request to understand

10   what end dates would be.  But we can work with your chambers to

11   get some availability.

12         THE COURT:  Yes.  And again, the end dates will partly

13   be determined by what's submitted and when and if there's

14   agreement and if we need a further hearing and things like

15   that.

16         MR. BAKER:  Understood, Your Honor.  Thank you.

17         MR. ZIDE:  If I may, Your Honor.

18         THE COURT:  Please.

19         MR. ZIDE:  Stephen Zide from Dechert on behalf of the

20   committee.

21         From our perspective, we think it's important that

22   this does not go indefinitely.  This case isn't going on a long

23   time.  We do have a plan and disclosure statement which we

24   think is ready to go.  So what I would suggest is we put a

25   deadline here for the filing of new submissions maybe a week

**ELETSON HOLDINGS INC.**

107

1   from today, just so people's feet are to the fire and this is

2   just not going on indefinitely because it's just burning

3   administrative costs.

4        THE COURT:  I think that sounds reasonable.  Any

5   objection, Mr. Baker?

6        MR. BAKER:  I don't have an objection to setting a

7   date.  My only request is if I can get back to you, Your Honor,

8   it will not be more than a week.  But I only say that because

9   my team has been working sort of around the clock for the

10  last --

11       THE COURT:  Understood.

12       MR. BAKER:  -- ten days.  And I'd like to.  I'd like

13  to --

14       THE COURT:  Understood.  I think everyone's on the

15  same page.

16       MR. BAKER:  But we're not --

17       THE COURT:  We're moving it along.

18       MR. BAKER:  We're not dragging this out.

19       THE COURT:  Understood.  I think everyone is on the

20  same page, just moving it along as quickly as we can.  If we do

21  get to a point with competing plans, I don't know if it will be

22  July 3rd.  We'll have to figure out what the dates would be

23  based on when we reach that point.  As I said, I'll be at 500

24  Pearl for most of next week, but we'll make it work.  We'll get

25  done whatever we need to get done.

**ELETSON HOLDINGS INC.**

1          MR. BAKER:  Thank you, Your Honor.

2          THE COURT:  Thank you, counsel.

3          MR. BAKER:  Your Honor, then I would turn the podium

4    over to my partner Ms. Pille, to handle the status conferences.

5          THE COURT:  Thank you.

6          Good morning.

7          MS. PILLE:  Good morning, Your Honor.  Anne Pille from

8    Reed Smith, on behalf of the debtors here on items 4 through 7

9    of the agenda which are the pending claims objections.  We are

10   up on status for those today, Your Honor.

11         Last time we were before Your Honor, you set a

12   deadline for responses.  Those were filed on May 7th.  And so

13   we have had an opportunity to review those.  We have also

14   engaged with those parties that have filed responses with

15   respect to a potential scheduling order that I think in theory

16   would look very similar to the scheduling orders that we had

17   previously submitted on the other contested matters that we've

18   handled before Your Honor.

19         We have reached out to try to identify potential

20   hearing dates for any evidentiary hearing that may be necessary

21   with respect to those.  And I think the consensus amongst the

22   debtors and the creditors that have filed responses is to set

23   those matters over for status for the June 18th date just to

24   come in and -- to the extent that we need another date.

25         But then we'd like the Court to entertain having an

**ELETSON HOLDINGS INC.**

109

1    evidentiary hearing on those claims objections, all four of the

2    claims objections that are identified on the agenda items 4

3    through 7 either the week of July 22nd or the week of August

4    5th.  That seems -- those seem to be dates that work the best

5    for the parties, Your Honor.

6           THE COURT:  Okay.  And so you're not including the

7    Levona claim in this?

8           MS. PILLE:  That's correct, Your Honor.  Levona is

9    already scheduled for hearing on --

10          THE COURT:  For the June 18th -- well, I wasn't sure

11    what the status of that is.

12          MS. PILLE:  Yes, correct.  So the --

13          THE COURT:  Although I don't think they filed the

14    response yet --

15          MS. PILLE:  That's correct, Your Honor.

16          THE COURT:  -- to the claim objection.

17          MS. PILLE:  That's correct.  But we have engaged in

18    discovery with them.  I mean, we've been in communications with

19    Levona, especially because some of those issues relate to the

20    motion to enforce kind of consistently.

21          THE COURT:  Right, understood.

22          MS. PILLE:  So yes, this is only with respect to the

23    four items on the agenda, Your Honor, which is the omnibus

24    objection to the duplicative claims.

25          I will note that the response to that was only filed

1  by Deutsche Bank.  There were three individual note holders

2  that were identified in that claim objections.  And no

3  responses were filed by those.  The objection toe the original

4  petition creditors claims, which was at docket number 377 and

5  response was at docket number 643, the objection to the NAF

6  claim which as filed at 379 with the response filed at 644, and

7  the objection to the Wilmington claim which was filed at 380

8  and Wilmington's response was filed at 639.  And the

9  petitioning creditors represented by Togut also filed a

10  statement in support of the Wilmington or joinder in support of

11  the Wilmington response at 645.  So only with respect to those

12  four, we're looking for those -- the evidentiary hearing date,

13  Your Honor.

14          THE COURT:  Okay.  So The proposal is as to agenda

15  items 4, 5, 6, and 7, that we schedule a status conference with

16  the June 18th date that's currently on the calendar.  So we

17  will do that.  We'll grant that.  And then an evidentiary

18  hearing the week of --

19          MS. PILLE:  We had asked for either July 23rd and

20  24th, Your Honor, or something the week of August 5th.

21          Your Honor, my apologies.  I did not understand that

22  Wilmington may not be available the week of August 5th.  So if

23  the Court can entertain us on July 23rd and 24th, that would be

24  preferable.

25          THE COURT:  Okay.  Why don't we -- yes.  Let's

1  schedule it for July 23rd and 24th.  And if you would file a

2  notice with all these dates, that would be great.

3        MS. PILLE:  I will do that, Your Honor.  And the

4  parties have been reviewing a proposed scheduling order.  So we

5  will also propose dates for deadlines for discovery

6  depositions, things of that nature in that order.

7        THE COURT:  Great.  Thank you, counsel.

8        Would anyone else like to be heard on these matters?

9        MR. ORTIZ:  Good afternoon, Your Honor.  Kyle Ortiz at

10 Togut, Segal & Segal, petitioning creditors.

11       I do want to note, Ms. Pille, that with regards to the

12 duplicative claims, only Deutsche Bank responded, one of our

13 clients, Tracy Gustafson, was one of the parties who filed a

14 claim that was objected to as duplicative.  We resolved that

15 with the debtors by just an acknowledgment that his claim is

16 included within the Wilmington claim, which we appreciate that

17 they're -- so that  part of that one is resolved.

18       THE COURT:  Okay.  Thank you, counsel.

19       MS. PILLE:  That's correct, Your Honor.  Anne Pille on

20 behalf of the debtor.

21       That's correct.  Mr. Gustafson's claim is included

22 within --

23       THE COURT:  Thank you, counsel.

24       What else for today?

25       MR. BAKER:  Your Honor, Derek Baker from Reed Smith,

112

1  on behalf of the debtors.

2          That concludes the agenda.  The debtors have nothing

3  else to present to Your Honor unless Your Honor has any further

4  questions.

5          THE COURT:  No.  I think we're adjourned.  So I'll

6  look for those filings from the parties, and then we'll

7  schedule accordingly.

8          MR. BAKER:  Thank you, Your Honor.

9          THE COURT:  Thank you.  We're adjourned.  Have a great

10  day, everyone.

11      (Whereupon these proceedings were concluded at 12:17 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113

I N D E X

| RULINGS: | PAGE | LINE |
| --- | --- | --- |
| Disclosure statement motion and rights offering motion are granted. | 104 | 8 |

114

C E R T I F I C A T I O N

I, Michael Drake, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

Michael Drake (CER-513, CET-513)

AAERT Certified Electronic Transcriber


eScribers

7227 North 16th Street, Suite #207

Phoenix, AZ 85020


Date:  May 16, 2024

**#**

**#207 (1)**
8:21

**$**

**$27 (1)**
98:13

**/**

**/Adjourned (1)**
4:14
**/Debtors (1)**
7:20
**/Hearing (2)**
2:2;3:20
**/Letter (1)**
6:23
**/Notice (5)**
3:5;5:9,24;6:7,16
**/Petitioning (2)**
2:12;5:19

**{**

**{I (2)**
3:22;5:3
**{III (1)**
4:21

**A**

**abatement (1)**
32:18
**ability (4)**
59:17,22;78:24;
79:8
**able (15)**
23:13;44:12,16;
49:10,19,23;59:19;
61:20;66:1;85:13;
88:25;94:24;95:15;
96:17;106:2
**above (1)**
57:5
**absolute (5)**
27:1,3;60:2,6;62:5
**absolutely (5)**
45:22;74:12;79:9,
10;106:5
**absolve (1)**
43:16
**accentuates (1)**
42:23
**acceptable (1)**
19:2
**acceptance (1)**
67:4
**accepting (1)**
51:12

**accommodate (1)**
83:11
**accomplish (1)**
61:20
**accomplishable (1)**
84:20
**accomplished (1)**
25:20
**accordance (4)**
18:6;31:6,7;91:25
**Accordingly (2)**
45:9;112:7
**account (4)**
32:2;47:20;48:24;
77:7
**accrued (1)**
93:25
**accurate (2)**
55:15;94:1
**achievable (2)**
23:20;101:10
**acknowledge (2)**
42:14;84:13
**acknowledgment (1)**
111:15
**acted (1)**
91:22
**action (10)**
33:21;34:7,15,17,
19,21;56:7;59:7;73:8;
93:15
**actions (4)**
52:24;55:5,11;
58:16
**actively (4)**
23:1;68:25;87:25;
88:17
**activity (1)**
21:14
**actual (4)**
47:7;48:6;56:8;
63:3
**actually (14)**
29:18;32:13,22;
35:22;46:25;48:11;
55:15;56:5;65:22;
85:20;88:13;91:10;
95:2;104:17
**Ad (1)**
38:19
**add (4)**
16:16;51:18;65:2;
85:4
**added (5)**
16:23;43:7;64:19;
72:22;100:16
**addition (6)**
17:14;19:3;22:8;
28:13;89:17;100:7
**additional (18)**
16:9,14;17:10,14,
16;18:8,12;40:23,25;
84:9;85:4;89:10,18,

19;90:22,25;102:23;
103:6
**additions (2)**
16:25;103:10
**address (6)**
17:17;30:1;40:20;
42:15;43:16;88:22
**addressed (5)**
39:5,19;49:13;
51:13;84:8
**adds (1)**
40:6
**adequate (5)**
44:11;47:10;48:25;
50:10;53:18
**adequately (1)**
27:25
**adjourned (2)**
112:5,9
**Adjournment (2)**
4:14,16
**administrative (5)**
28:7;71:10;75:10;
97:6;107:3
**admins (1)**
62:15
**admit (2)**
59:19,24
**admitted (2)**
46:25;62:17
**advance (1)**
88:21
**advertisement (1)**
45:8
**advice (1)**
69:22
**advisable (1)**
50:2
**advised (2)**
47:14;86:13
**advisor (9)**
45:3;50:2,6;51:20;
63:24;64:1;78:1;
98:10;99:17
**advisors (4)**
50:11;98:11,20;
99:16
**advisor's (1)**
69:22
**affect (1)**
40:16
**Affiliated (3)**
5:11;6:2,10
**affiliates (1)**
14:7
**affiliation (1)**
70:17
**afternoon (2)**
68:14;111:9
**again (30)**
15:18;34:6;36:15;
43:9,17;46:24;47:8;
48:4;49:4,25;59:9,12;

19;90:22,25;102:23;
61:16;63:23;64:4,8;
65:23;66:19;67:9;
75:13;79:15;83:21;
90:7;92:2;94:16;95:5;
103:15;104:6,23;
106:12
**against (24)**
22:3;31:15;34:7;
56:22;57:6,10;58:18;
65:17;73:6,17,19,19,
22;75:14,21;76:9,19;
85:8;86:14;89:13;
90:11;93:16,21;94:3
**Agathonissos (2)**
12:12;15:10
**Agenda (9)**
7:11;15:21,21;
95:19;108:9;109:2,
23;110:14;112:2
**agent (2)**
99:18,19
**ago (1)**
38:6
**agree (13)**
17:5;28:6;39:16;
41:22;61:6;70:19;
72:14;82:2;85:16;
86:4;89:16;90:4;
104:25
**agreeable (2)**
96:4;103:8
**agreed (9)**
16:8;18:20;21:1;
53:8;64:10;69:23;
72:15;85:17;96:10
**Agreement (13)**
2:6,9;4:10;5:5;
6:18;7:17;57:8;70:11;
76:16;78:7,24;
105:24;106:14
**agrees (1)**
51:3
**AKA (1)**
46:7
**Alex (1)**
15:14
**ALEXANDER (1)**
13:8
**allegations (1)**
27:21
**alleged (4)**
22:24;31:8,19;
45:23
**allegedly (1)**
46:23
**alleges (1)**
27:10
**alleging (1)**
30:16
**allow (14)**
20:20;23:21;29:13,
15;30:25;37:22,22;
38:18;39:1,5,14;

73:14;91:7,25
**allowed (3)**
21:5;30:7;82:25
**allowing (1)**
39:9
**allows (1)**
92:3
**alluded (1)**
60:21
**almost (5)**
51:22;67:1,4;77:4;
94:25
**alone (1)**
45:11
**along (7)**
6:11;23:18;54:1;
104:5,7;107:17,20
**alternative (10)**
21:6,6;29:7;54:4;
60:12,15;61:24;
63:10;71:17;91:10
**although (3)**
52:12;88:19;109:13
**Altogether (1)**
99:25
**always (8)**
33:18;60:25;65:24;
68:3;85:16,18;89:21,
25
**Amended (18)**
3:20;5:24,24;6:3,4,
7,7,9,11,12;7:8;15:21;
21:15;28:14;43:3;
98:5,6;99:14
**amendments (1)**
104:10
**American (3)**
24:23;54:15;58:24
**Americas (2)**
10:12;12:4
**Amerifax (1)**
30:10
**among (6)**
18:2;47:22;50:10;
53:9,17;93:16
**amongst (1)**
108:21
**amount (9)**
19:13;22:17;35:9;
46:19;57:11;70:5;
87:22;93:23;95:1
**amounts (1)**
19:17;57:11;99:6
**ample (1)**
30:20
**Analysis (22)**
5:14,15;18:4,5;
22:15,15;28:11;
44:22,22;49:9,21;
50:1,4;51:4,19;77:16,
17;78:4,17;85:14;
89:24;98:9
**analyzes (2)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 429 of 448

May 15, 2024

26:20,21
**and/or (2)**
33:2;87:16
**and-forth (1)**
93:6
**ANDREW (2)**
12:17;15:12
**ANDREWS (3)**
13:8;15:14,14
**Ann (1)**
14:6
**Anne (2)**
108:7;111:19
**answered (1)**
47:4
**anticipate (2)**
40:12;81:21
**Anticipated (1)**
5:9
**anti-competitive (1)**
30:22
**apologies (1)**
110:21
**apologize (1)**
17:25
**apparent (1)**
48:14
**apparently (4)**
47:14;52:20;64:22;
93:13
**appear (1)**
82:17
**appearances (1)**
14:4
**appears (4)**
45:15;50:17;53:8;
57:17
**Appendices (1)**
5:12
**Appendix (7)**
5:14,14,15,16;6:11,
12;48:24
**apples (4)**
47:18,18;66:18,18
**applicable (1)**
49:24
**appoint (4)**
70:13,14,16;72:16
**appreciate (6)**
18:2;32:10;42:5;
50:23;58:13;111:16
**approach (4)**
42:24;44:8;71:24;
103:18
**appropriate (3)**
25:22;41:14;51:17
**Approval (13)**
2:15;3:8,24;4:19;
16:3;20:15,18;36:17,
18;63:17;96:20,24;
100:1
**Approve (8)**
2:2,12;20:19;25:11;

37:21,22;39:14;53:2
**approved (6)**
29:7;36:22;42:13;
44:15;66:1;86:2
**Approving (23)**
2:5,13,16,17,18;3:6,
9,10,11,22,25;4:2,4,8,
17,20,21,23;5:3;6:17;
7:16;98:15,16
**approximately (4)**
19:13;47:2;69:15;
93:24
**April (3)**
71:21;93:10,10
**arbitrarily (1)**
59:19
**arbitration (6)**
32:2;33:1,12;75:15;
76:10;93:17
**argue (1)**
17:22
**argued (1)**
48:1
**argument (7)**
25:13;26:9;27:2;
39:20;49:15;91:2,4
**arguments (4)**
25:6;27:5;38:17,25
**arising (1)**
93:17
**arm's (2)**
18:13;69:12
**around (5)**
18:12;26:20;31:19;
91:17;107:9
**arrived (2)**
18:11,13
**article (4)**
49:9;51:9,10,19
**articulate (2)**
85:13;88:25
**articulated (18)**
18:19;19:10;22:8;
24:21;25:24;27:23;
30:24;34:5,6;35:2;
51:1;85:22;86:1;
89:15;91:18;93:8;
103:3,7
**articulation (1)**
22:4
**artificial (2)**
59:3;72:14
**artificially (1)**
51:2
**aside (2)**
44:9;47:17
**assert (1)**
28:22
**asserted (5)**
22:3;31:19;56:21;
58:18;85:8
**assertive (1)**
31:18

**assessing (1)**
74:18
**asset (3)**
43:8;73:24;76:17
**assets (6)**
28:1,2;86:12,21,23;
87:19
**assigned (4)**
85:19;89:3,15;
92:14
**assignment (5)**
18:10;32:12;88:23;
89:8,8
**assistance (2)**
50:1;64:1
**assisting (1)**
45:3
**associate (1)**
74:23
**associated (6)**
85:21,24;88:24;
89:4,12;91:15
**assuming (1)**
36:22
**assumptions (1)**
50:12
**Attachments (7)**
2:7,22;3:15;5:14;
6:2,10,19
**attempt (2)**
54:6;62:3
**Attorneys (7)**
10:3,11;11:3,11;
12:3,12;13:3
**attorneys' (2)**
46:10;49:4
**attorneys'-eyes-only (1)**
19:9
**audacity (1)**
54:8
**August (3)**
109:3;110:20,22
**AUSTIN (4)**
11:2;14:22;18:16;
38:2
**authority (2)**
70:22;71:1
**authorize (1)**
93:22
**authorized (1)**
19:8
**availability (6)**
45:25,25;48:8;
98:13;101:18;106:11
**available (5)**
20:1;84:16;87:20;
101:19;110:22
**Avenue (6)**
10:4,12;11:4,12;
12:4;13:4
**average (4)**
44:15,18;66:5;92:8
**Avianca (1)**

45:5
**avoidance (4)**
52:24;55:5,11,21
**avoiding (1)**
65:24
**award (8)**
32:2,16;33:1;75:14,
21;86:8;87:22;88:16
**aware (1)**
66:3
**away (5)**
29:10;34:9;56:10;
58:6,12
**AZ (1)**
8:22
**Azure (1)**
2:25

# B

**back (16)**
27:11;43:9;46:18;
49:23;55:9;57:17;
62:11;67:4;68:2;
86:10;88:3,21;94:16;
103:24;105:5;107:7
**back- (1)**
93:5
**back-and-0forth (1)**
78:14
**back-and-forth (1)**
93:6
**backfilled (1)**
62:24
**Backstop (23)**
2:6,9;4:10;5:5,16;
6:18;7:17;28:9;69:19,
23,24,25;70:1;78:6;
98:12;99:2;100:17,
18,19,21,24;101:6,8
**backstopping (1)**
69:20
**backwards (2)**
105:18;106:2
**bad (12)**
42:17;43:13;49:1;
52:1,4,5;54:6;58:21,
22;59:1,9;91:3
**bad- (1)**
44:7
**bad-faith (2)**
94:4,5
**BAKER (102)**
14:5,5,9;15:18,19,
24;16:25;17:5,9;
20:12,13;31:6,13;
32:5,7,9,22;33:4,6,8,
11,16,22;34:1,4,13,
16,20,24;35:4,10,13,
17,20;36:9,12,15,25;
37:16,20;39:5,19;
40:19;41:10,19,21,
23;42:1,1,3;54:14;

67:15;71:5;74:14;
79:13;82:4;83:9,9,13,
14,16,21,22;86:18,21,
23;87:2,12,14,17;
88:7;90:8,11,14,17,
20,22,25;92:24;
94:15;95:21,21;96:8,
12,16;102:18,18;
103:13;106:6,7,16;
107:5,6,12,16,18;
108:1,3;111:25,25;
112:8
**Baker's (1)**
39:16
**balance (1)**
37:23
**Balint (2)**
91:22;95:13
**Ballot (2)**
2:23,24,25;37:7,10,
11,12,13;81:23;82:3,
7;83:2
**Ballots (2)**
2:19;3:12;4:5,24;
37:10;81:25;100:8
**Bank (7)**
13:3;15:15;19:15;
66:13;98:21;110:1;
111:12
**Bankr (2)**
29:23;30:11
**bankruptcy (6)**
29:15;44:11;54:22;
63:7;66:17;67:3
**bar (1)**
28:25
**based (10)**
29:11;38:25;45:7;
49:2;69:22;72:12;
83:1;100:17;104:16;
107:23
**bases (1)**
22:13
**basic (1)**
48:21
**basically (3)**
46:1;65:25;97:10
**basis (18)**
19:9,10;21:25;22:3;
26:4,17;30:9,20,22;
46:20;51:16;52:4;
79:16;89:1;91:24,24;
95:14;96:18
**Battery (1)**
12:13
**Batuta (2)**
98:10;99:16
**began (2)**
21:13;44:8
**begin (1)**
20:16
**beginning (2)**
39:20;45:19

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC    Pg 430 of 448

May 15, 2024

**behalf (23)**
14:6,11,15,18;15:2,
6,10,15,19;40:20;
68:15;82:14;83:10,
22;95:22;102:4,19;
103:16;106:7,19;
108:8;111:20;112:1
**behind (1)**
88:22
**belief (3)**
49:23;51:23;64:15
**Beliefs (4)**
49:12,22;53:17;
61:18
**belong (2)**
17:21;27:18
**below (4)**
61:6;93:17,19,20
**bench (1)**
29:24
**Beneficial (3)**
2:24;95:3;103:23
**beneficiaries (2)**
41:13,15
**benefit (9)**
22:5;41:13;45:1,17;
68:2,5;69:6;87:21;
88:16
**benefiting (1)**
68:4
**benefits (5)**
38:7,11;68:1;69:25;
77:11
**bent (1)**
38:15
**Bernstein (1)**
54:12
**best (2)**
51:5;109:4
**better (6)**
23:14;40:15;46:21;
60:4,10;63:10
**beyond (1)**
20:2
**B-F (1)**
6:12
**bidding (2)**
62:3;63:3
**big (3)**
56:6;65:1,12
**biggest (2)**
27:2;48:15
**billion (2)**
48:19;61:10
**binds (1)**
97:4
**bit (3)**
39:3;68:17;82:5
**Board (6)**
18:13;70:10,12,13,
15;99:11
**bonus (1)**
40:9

**bore (1)**
16:10
**borne (1)**
54:3
**Boston (1)**
63:2
**both (37)**
17:12;30:25;33:5,6,
6,9;36:21;38:18;39:6,
15;42:16;54:24;
55:15;56:9;63:2;
64:16;67:17;68:21,
25,25;69:1,2,4,5,8;
72:10,11,11;77:12,13,
14,17,22;81:19,20;
94:21;104:22
**bottom (1)**
60:9
**Bowling (2)**
10:21;61:11
**BR (1)**
26:8
**breach (1)**
93:20
**break (2)**
83:11,15
**Brian (4)**
14:19,19;96:15;
105:1
**briefly (7)**
38:3;39:24;59:14;
82:16;93:2;102:5;
103:15
**bring (3)**
55:12,13,14
**bringing (1)**
88:1
**British (1)**
87:5
**broad (1)**
43:25
**brochure (1)**
45:9
**brokers (1)**
99:23
**brought (1)**
27:7
**bucket (2)**
60:6,7
**buckets (1)**
43:25
**bumped (1)**
70:3
**bunch (2)**
66:4,15
**burdensome (1)**
79:2
**burning (1)**
107:2
**business (5)**
23:9,11;78:3;
101:11;103:22

**C**

**calendar (1)**
110:16
**call (4)**
75:13;81:15;90:13,
14
**called (3)**
27:11;31:15;43:1
**calls (1)**
21:13
**came (6)**
44:20;51:19;70:11;
72:17;73:12;74:11
**Can (51)**
14:4;17:3;18:1;
19:23;21:15;25:20;
27:16,19;30:12;31:4;
32:9;34:21;36:4;37:8,
10;38:2,8;39:12;45:7;
50:22;51:23;54:2;
55:17;58:4;59:13;
62:6,11;64:2,3;68:2;
77:1;78:12;83:23;
85:22;87:18;88:5;
89:6;90:4,6;93:11;
100:7,9,21;103:21;
104:25;105:9;106:2,
10;107:7,20;110:23
**cap (2)**
44:7;72:14
**Capital (7)**
24:23;46:19;54:15;
58:24;63:14;98:11;
100:20
**caps (1)**
71:10
**careful (1)**
58:13
**Carriers (1)**
29:22
**carry (1)**
56:4
**Case (36)**
14:3;24:13,24;
26:19,21,23;29:17,19,
22;30:7,15;37:2,2;
43:14;46:17;53:21;
54:1,20,21;57:23;
61:2,4;63:1,2,3;
66:10;67:23;80:17;
85:10,11,12;91:11;
94:16;97:11;101:8;
106:22
**cases (8)**
20:15;24:21;26:7;
42:24;51:11;55:1;
64:7;99:20
**cash (22)**
23:6;28:6;32:1;
35:5;36:9,9,10;41:12;
48:23;57:9,9;69:16;

70:3;72:18;74:1;
89:18;92:12;99:3,5,5,
9;100:9
**cat (3)**
50:7;67:11;94:17
**cat-and- (1)**
42:23
**CATHERINE (3)**
12:16;15:9;82:13
**caught (1)**
94:17
**cause (3)**
34:7;40:13;59:7
**causes (3)**
56:6;73:8;93:15
**cede (2)**
31:3;95:22
**ceiling (1)**
99:6
**centerpiece (2)**
45:21;48:22
**cents (1)**
67:24
**Certain (14)**
2:13;3:6,22;4:17;
5:12;16:1;17:17;
27:25;35:9;42:11,14,
15;86:12;93:14
**certainly (8)**
19:23;39:4,4;45:23;
46:13;52:20;66:3;
87:3
**cetera (1)**
104:12
**chambers (2)**
105:12;106:10
**chance (2)**
66:14;104:14
**Change (4)**
3:21;43:11;74:7;
100:23
**changes (19)**
16:14;17:16;20:9;
22:6;30:23;42:11,15,
16,23;43:6;65:1,19;
81:5;90:23;98:24;
99:1;103:17;104:12;
105:5
**chaos (1)**
67:9
**Chapter (12)**
5:10,25;6:3,9;38:7,
11,19;39:1,9;55:19;
80:17;99:20
**characterization (1)**
21:23
**check (3)**
37:8,8;67:6
**checked (1)**
47:2
**choice (4)**
23:5,16,22;29:12
**choose (4)**

70:3;72:18;74:1;
83:9;18:9;92:12;99:3,5,5,
9;100:9

**23:14;37:8;43:23;**
82:3
**Circuit (7)**
24:24;29:18;54:15,
21;58:24;63:12;64:10
**circular (1)**
35:6
**circulated (1)**
19:3
**cite (4)**
55:1;61:2;63:3;
64:7
**cited (4)**
26:7;29:18,23;
91:11
**claim (77)**
33:19;34:7;35:8;
40:5,8,9;41:3,5,11,16;
43:6,13;47:13;50:20;
51:13;52:18,22;53:8;
57:19,22;58:19;
62:25;64:20;66:10,
11,12,13;72:24,24;
76:5,7,14,19;82:20,
25;84:3,4,5,6;85:7,7,
13,18,21,24,25;86:4,
8,11,16,16,18;88:11,
12,23,25;89:3,12,14;
90:9,11;93:8,18;94:7;
99:6,8;100:8;102:25;
109:7,16;110:2,6,7;
111:14,15,16,21
**claimants (2)**
50:25;87:6
**claimed (2)**
60:23;65:4
**claiming (2)**
61:23,24
**Claims (72)**
2:25;3:2,2;20:17,
17;21:7;22:3,4;23:23;
28:7,8;31:8,15,17,22;
32:12;35:9;47:20;
49:17,24;50:22;51:2,
5,6,8,25;52:3,13,14,
55:7,10,21;56:2,13,
14,17,20;57:6,13;
59:18,20,22;61:10;
70:21;71:11;73:6,10,
15,16,18,19;75:2,8;
82:18;83:2;85:8;
92:14;93:16,20;94:3;
95:15;97:6;99:9,13,
19;100:3,18;108:9;
109:1,2,24;110:4;
111:12
**clam (1)**
86:17
**clarification (2)**
41:7;71:5
**clarifications (1)**
52:12
**clarified (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC    Pg 431 of 448

May 15, 2024

48:5
**clarify (1)**
50:24
**clarifying (3)**
40:23,25;84:9
**Class (25)**
2:23,24,24,25,25;
3:2;25:14;26:6;30:16;
51:12,21,22,23;63:19;
70:2,4,5,7;82:19,19,
20,24;84:7;100:3,5
**classes (6)**
51:8;59:2,3;64:7;
100:3,5
**classification (7)**
21:7;25:19,22;
51:15;64:12;91:18,24
**classify (2)**
25:18;82:18
**clause (4)**
26:2;33:23,23;57:4
**clauses (1)**
34:22
**clear (20)**
17:18;24:11;28:20;
29:25;40:4,6,9;42:4;
43:9;52:10,11;53:21;
63:1;66:22;67:10;
93:14;94:21;95:6,7;
103:17
**clearly (4)**
43:13;52:11;71:13;
100:25
**clients (1)**
111:13
**clock (1)**
107:9
**close (5)**
20:3;47:18;75:12;
81:15;94:19
**closer (1)**
87:3
**Code (8)**
42:21;44:11;54:11;
60:5;63:7;64:5;66:17;
67:3
**COIE (2)**
12:2;15:6
**colleague (4)**
14:12;15:3,11;87:2
**collect (1)**
86:18
**collection (5)**
57:10;86:5,20;88:1,
11
**collections (2)**
36:10,10
**Coltex (2)**
29:17;63:12
**comfort (1)**
83:11
**comfortable (2)**
78:12;80:7

**coming (9)**
45:24;48:3,4;59:6;
62:19,20;65:18;88:2;
95:7
**commence (5)**
33:21;34:18,21,25;
56:16
**commenced (1)**
32:23
**commencing (2)**
33:15,16
**comment (3)**
40:20;102:20,22
**comments (10)**
21:17,19,20;37:24;
40:23,25;83:24;
84:12;91:2;103:6
**commit (1)**
100:19
**commitment (14)**
18:22;39:21;48:9;
78:24;79:10,17,21,23,
25;80:14;84:17,22,
25;104:11
**commits (1)**
78:7
**Committee (75)**
6:24;7:5;10:11;
14:11;17:11,15,17,18,
23;18:20;19:9,21;
20:25;21:8,9,11,12,
19,21;22:9,18,21,23;
23:3,16,21;24:1,8;
25:4;26:16;27:6;
30:21;31:21;38:15,
19;44:7;55:20;62:20;
65:16,20;68:15,21,22,
24;69:3,12;70:15,16;
71:8,12,19,24;72:10,
15;80:16;81:17;82:7;
84:13;85:4,14;87:10;
88:10;89:2;92:5,6;
97:20;98:20,23;
99:12;102:5,7;
103:16,18;104:11;
106:20
**committee's (16)**
18:4;21:22;22:12;
24:5;39:19;68:23;
72:15,25;77:1;80:18;
81:1,4;84:11,12,22;
103:5
**common (2)**
57:16,18
**communications (1)**
109:18
**Company (8)**
11:3;14:22,22,23;
47:18;67:10;75:1,5
**company's (1)**
70:10
**comparables (1)**
50:16

**Compare (2)**
48:23;49:25
**compared (1)**
64:18
**comparing (1)**
65:17
**compatible (1)**
40:10
**compete (1)**
29:5
**competing (21)**
21:25;28:17,22;
29:5,13,20,20;30:7,
12,12,17;37:5,6;39:3;
65:13;66:20;72:1;
82:4;91:12;92:17;
107:21
**competition (1)**
65:15
**competitive (7)**
29:11;38:12;39:11;
91:14;94:19;95:5,9
**completely (3)**
55:6;87:24;91:11
**complicated (1)**
99:23
**comply (5)**
34:22;35:1,19,21;
56:23
**component (1)**
100:5
**composition (1)**
99:11
**comprehensive (1)**
50:7
**comprised (1)**
84:5
**conceded (1)**
21:5
**concept (2)**
72:17;94:18
**concerned (1)**
54:18
**concerning (4)**
42:16;44:13;52:6;
84:15
**concerns (1)**
19:21
**concluded (1)**
112:11
**concludes (2)**
26:3;112:2
**conclusion (1)**
25:1
**conclusions (2)**
44:24;45:4
**concrete (2)**
48:16,17
**conditions (1)**
79:24
**Condo (1)**
30:15
**conference (1)**

110:15
**conferences (1)**
108:4
**confidence (1)**
79:7
**confines (1)**
38:22
**confirm (5)**
17:1;20:3;30:2;
39:15;89:6
**confirmability (4)**
25:14;44:9;59:11;
64:16
**confirmable (2)**
29:4;68:11
**Confirmation (46)**
2:13,16,22,23;3:6,9,
15,23;4:2,7,18,21;5:2;
17:20,21;18:23;19:1;
24:1,4,17,19,19;
25:21;26:3,12,14;
27:17,18,19;30:18;
33:1;36:19;41:4,6,17;
52:8;62:12;91:13;
92:1;96:2,3,11,13;
101:18;105:7,17
**confirmations (1)**
67:17
**confirmed (10)**
27:13;67:18;79:11,
11;86:8;92:3;97:5;
101:3,5;102:25
**confirming (1)**
85:1
**confirms (1)**
28:11
**conflicted (1)**
53:9
**conformation (1)**
54:17
**confused (2)**
34:11;40:3
**confusing (3)**
32:8;81:24;83:5
**confusion (3)**
62:9;66:1,8
**connection (6)**
26:21;53:7;55:9;
86:3;101:1;105:4
**consensus (1)**
108:21
**consent (1)**
70:14
**Consider (6)**
2:15;3:8,24;4:19;
50:16;95:20
**consideration (2)**
50:23,25
**considered (1)**
30:13
**consisted (1)**
98:9
**consistently (1)**

109:20
**constitute (1)**
57:15
**constructed (1)**
36:13
**consummated (1)**
101:6
**consummation (1)**
101:1
**contain (1)**
45:9
**contained (1)**
45:10
**contemplate (1)**
41:2
**contemplated (1)**
85:3
**contemplation (2)**
71:11;73:6
**contents (2)**
42:22;54:13
**contested (4)**
62:11;66:16;67:17;
108:17
**context (5)**
18:17;19:23;36:19;
71:6;86:2
**contingencies (3)**
44:18;45:24;48:8
**contingency (1)**
52:6
**contingent (1)**
48:9
**continue (9)**
20:7;27:16,17;
34:23;38:14;39:12;
73:17;104:13,15
**continues (2)**
27:16;32:18
**continuing (3)**
76:12;97:12;105:24
**contribute (3)**
57:8;63:13;89:17
**contributed (1)**
90:19
**contribution (14)**
18:22,25;19:7,14;
27:22;29:1;43:18;
45:21;46:5;61:5,8;
85:3;89:10,18
**contributors (1)**
28:2
**control (6)**
30:16;31:23;41:15;
52:14;74:4;92:14
**controlled (1)**
94:10
**controls (3)**
23:2,2,3
**Conv (1)**
2:25
**convenience (8)**
70:2,4,5,7;99:6,8,9;

23-10322-jpm Doc 1268 Filed 11/25/24 Entered 11/25/24 09:06:22 Main Document
In the Matter of: ELETSON HOLDINGS INC Pg 432 of 448

May 15, 2024

100:5
**conversations (3)**
21:2;65:19;69:3
**conveyed (1)**
77:11
**copy (1)**
19:11
**corollary (1)**
27:1
**Corp (2)**
2:9;51:8
**corporate (1)**
70:19
**cost (7)**
24:13;36:10;54:3;
57:10;67:14,15;74:5
**costly (1)**
23:6
**costs (9)**
24:15;62:21;74:3;
75:25;76:9,10,11,20;
107:3
**cost-saving (1)**
24:12
**Counsel (35)**
15:17;17:8;18:14,
16;19:18;21:3,3;
37:25;39:1,22;40:18,
22;52:19;68:13;
82:10;83:8,20;84:1;
87:11;89:5,6;91:4;
92:23;95:17;96:15;
102:2,16;103:12;
104:1;105:2;106:5;
108:2;111:7,18,23
**couple (5)**
20:22;76:1;81:7;
102:12;103:24
**course (5)**
48:15;62:20;63:6;
65:9;83:12
**COURT (175)**
14:2,8,13,16,20,25;
15:4,8,13,16,23;
16:10,21,24;17:3,8;
20:10,19;23:21,22;
24:9,9,12,16,25;
25:10;26:3,11,15,17;
27:15,19;28:21,25;
29:3;30:4,5,20,22;
31:4,11;32:3,6,8,15,
17,21,21,24;33:1,5,7,
10,14,20,24;34:3,10,
14,18,23;35:3,6,12,
16,18;36:7,11,14,20;
37:14,19,21,25;38:4;
39:14,22;40:18;41:8,
18,20,22,24;42:2,5,9;
43:22;54:22;61:4;
64:10,11;68:13,18;
71:12;75:14,17,22,25;
77:3;79:4,22;80:9;
81:19;82:10,12,15;

83:8,12,15,17,19;
86:17,20,22,25;87:8,
11,13,15,18;90:6,9,
13,15,18,21,24;92:23,
25;93:3;94:12;95:17,
19;96:6,10;97:19,24;
98:2,25;101:19;
102:2,16;103:12,14;
104:1,15,17;105:9,16,
21;106:1,5,12,18;
107:4,11,14,17,19;
108:2,5,25;109:6,10,
13,16,21;110:14,23,
25;111:7,18,23;112:5,
9
**courtroom (3)**
15:11;38:23,25
**Courts (3)**
29:10;42:19;61:6
**Court's (3)**
18:18;28:23;29:10
**cover (2)**
65:10;67:20
**covers (1)**
59:10
**create (5)**
59:15;62:3,9;66:1,8
**created (2)**
25:15;45:4
**creates (2)**
50:17;67:9
**creating (2)**
39:10;89:23
**credible (2)**
64:11,13
**credit (4)**
72:13;77:24;78:14;
79:12
**creditor (17)**
25:3;27:19;28:7,22;
30:16;44:12,16,18;
49:25;54:5,17;58:14;
66:19;69:24;70:7;
82:19;92:8
**Creditors (128)**
2:4,12,14,15,17;3:7,
8,10,21,23,25;4:3,16,
18,20,22;5:10,13,19,
24;6:3,8,25;7:6,15,21;
10:11;14:12,18;
20:18,25;22:5,22,25;
23:4,5,7,8,10,13,17,
19,22,23;24:10,14;
25:15,18,26;5;27:17;
29:13,15;30:25;
38:14,18,20;39:6;
40:15;42:8;45:2;
46:14,21;47:12,20;
48:6;49:8;50:5,13,16;
51:17;52:21;53:12;
58:12;60:10,19;
62:13,21;65:21;66:9,
12;67:12;68:6,8,16;

69:4,7,15,17,20;70:3,
4,10,13,18;71:17;
72:25;75:6,10;76:25;
77:5,24;82:18;90:1;
91:21;92:11,18;93:5;
94:2,23;95:3,10;96:4,
16;98:24;99:5;100:4,
7,9,13,17;102:5,9;
103:23;105:3;108:22;
110:4,9;111:10
**creditors' (16)**
38:21;68:20;69:10;
70:20;72:24,24;
74:20;75:3;77:8;80:7,
23;81:16;83:4;96:21;
98:19;104:3
**critical (5)**
52:10;79:9,10,21;
92:15
**crystallized (1)**
31:20
**crystallizing (1)**
58:11
**cured (1)**
25:3
**curious (1)**
22:9
**current (1)**
43:10
**currently (2)**
53:12;110:16
**CURTIN (9)**
11:7;14:21,21;
19:12;38:1,1,5;46:8;
68:1
**cutely (1)**
60:23

## D

**damages (1)**
75:19
**DANIEL (2)**
10:25;14:14
**Date (24)**
2:2;3:20;4:14;
23:12;41:17;43:19;
46:1,11;48:10,12,15;
57:16;58:5;68:3;
93:22;105:6,15,22;
106:2;107:7;108:23,
24;110:12,16
**Dates (14)**
2:13;3:6,23;4:17;
103:3,9;105:11;
106:10,12;107:22;
108:20;109:4;111:2,5
**DAVID (2)**
10:16;14:12
**day (12)**
18:1;57:23;62:13,
16;65:7,24;66:4;
67:19;81:3;93:11;

97:9;112:10
**days (8)**
26:13;65:2,3;81:7;
101:11;102:12;
103:24;107:12
**DCF (3)**
50:15,17;89:24
**Deadline (7)**
2:3;6:24;7:5;
101:15,16;106:25;
108:12
**deadlines (1)**
111:5
**deal (3)**
83:25;87:17;95:2
**debate (1)**
76:4
**debt (1)**
61:6
**debtor (17)**
16:6;17:12,15;
20:25;21:4,17;22:10,
11,13,14;27:9;37:12;
62:2;64:11;103:2;
106:8;111:20
**Debtors (111)**
5:12,19;6:2,10;
10:3;14:6,15:19;
16:14,18;18:5;19:15;
20:23;21:2,10,19,19,
22;22:1,3,25;23:15,
19;24:16;25:15,24;
28:2,3,6;30:8,13;
31:21;38:13,17;
40:11,20;41:10;
42:14,18;44:19;45:1,
2,14;46:3,12,18;47:9,
13,25;49:8,19;50:3,
15;51:13,23,24,25;
52:16,23;53:25;54:8,
14;55:1;57:20;58:12;
59:11,16,23;60:23;
62:6,19,22;63:22;
67:23;69:4;71:7,7,9,
21,25;72:7,12,14;
74:12;77:24,25;
78:15;79:1;81:5;
82:21,21;83:3,10,22;
85:14;88:15;90:2;
92:10;93:15;95:22;
96:2;97:4,15;102:12,
19;103:20;104:9;
108:8,22;111:15;
112:1,2
**debtors' (58)**
16:3,18;18:19,23;
19:1,3;20:15,16,20;
21:7;22:2;23:4,5,12;
24:1;25:19;26:1,6;
27:2;29:3;30:18;
37:23;38:22;39:14;
42:23;43:8,17,24;
44:10,13;46:22;

97:9;112:10
**delineation (1)**

48:13;49:23;50:14;
52:22;53:17;58:8,25;
64:15;68:19;71:4;
73:20;74:21,25;80:9;
82:17;83:4;84:2,3;
85:20;89:20;92:18;
94:22;96:5,17;97:9;
100:24;104:13
**debtor's (7)**
16:2,9;42:12;65:18;
89:11,13;95:25
**debts (3)**
49:20;54:9;65:24
**DECHERT (5)**
10:10;14:11;23:2;
68:15;106:19
**decide (6)**
27:17,19;29:15;
38:25;76:25;91:5
**decided (1)**
16:21
**decision (6)**
25:8;26:8;28:24;
29:10,24;30:10
**decisional (1)**
70:22
**decision-makers (1)**
44:25
**decisions (2)**
29:10;45:12
**Deckert (2)**
88:10;102:4
**declaration (1)**
101:15
**decline (1)**
30:20
**decreasing (1)**
99:1
**defects (2)**
54:17,18
**defendants (20)**
31:16,25;34:1,2,22;
35:1,11,12,13,19,22,
23;36:1;52:16;56:21,
22;57:7,7,11;86:4
**defendants' (1)**
56:15
**defenses (1)**
55:14
**defer (1)**
87:2
**deficiencies (2)**
43:16;50:6
**defined (3)**
93:17,19,20
**definition (7)**
47:1;60:24,24;84:2,
4,5;91:14
**definitional (1)**
90:23
**delay (2)**
40:13;103:9
**delineation (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 433 of 448

May 15, 2024

25:25
**deliver (1)**
57:8
**demonstrate (1)**
59:17
**demonstrated (2)**
59:22;60:18
**denial (1)**
54:22
**denied (1)**
64:8
**deny (2)**
43:24;64:13
**DEPARTMENT (1)**
10:19
**depend (1)**
61:4
**depending (1)**
101:13
**deposition (1)**
46:23
**depositions (1)**
111:6
**depth (1)**
50:21
**Derek (10)**
14:5;15:18;40:19;
42:1;83:9,21;95:21;
102:18;106:7;111:25
**described (1)**
77:18
**describing (1)**
61:25
**description (1)**
39:17
**designed (1)**
54:6;66:7,8
**despite (4)**
21:10;42:11;55:4;
93:8
**destructive (1)**
42:16
**detail (4)**
52:3;53:10;91:19;
93:10
**detailed (3)**
22:13;28:13;91:19
**details (1)**
77:21
**determination (5)**
25:7;26:11,16;
32:19;44:13
**determinations (5)**
24:17;26:24;53:16;
91:23;92:4
**determine (1)**
104:19
**determined (3)**
25:1;104:16;106:13
**detrimental (1)**
74:7
**Deutsche (6)**
13:3;15:15;66:13;

98:20;110:1;111:12
**developed (2)**
50:1;54:20
**development (4)**
42:22;52:18;54:13;
79:20
**develops (1)**
44:21
**difference (2)**
65:2,13
**different (6)**
15:22;39:3;66:6;
67:16,25;101:7
**differing (1)**
23:13
**DIP (6)**
26:22,23;46:18,21,
25;48:19
**direct (1)**
30:23
**director (5)**
70:16,23,25,25;
99:12
**directors (3)**
31:17;73:20;93:21
**disagree (2)**
21:22;42:2
**disagreement (1)**
105:24
**discern (1)**
44:16
**disclaimers (1)**
50:12
**disclose (4)**
19:6;20:2;44:21;
52:4
**disclosing (1)**
19:13
**Disclosure (144)**
2:17;3:10;4:3,22;
5:13,20;6:7,8,11,13,
13;7:21;16:3,9,15,23;
17:14,16;18:7,12;
19:3,22;20:15,19,20;
21:16,23;22:7,12;
25:11,24;28:14;
36:21;37:21;38:10;
39:14;40:14;42:12,
17,18;43:3,19,24;
44:2,3,10,15,17,24;
45:6,9,13,15,17,20;
46:2,6,6,7,9,11;47:7,
8,21;48:7,24;49:3,25;
50:8,10,24;51:6,7,9,
14;52:20;54:22,23;
58:15,25;59:25;
60:19,21,22;61:17,21;
62:8,10;64:8,9,13,16;
65:1;66:2,6,20;67:5;
68:10,18,19,20,21;
69:2,2,5;71:23;72:3,7,
11;74:10,13,13;
76:24;77:9,14,15,21,

22;78:11;80:12,18,
22;81:6,20,25;82:23;
84:9;91:20;92:9;
93:13;94:22;96:1,7,
21;97:7;98:6,7,17;
99:14;102:13;103:7,
25;104:3;106:23
**disclosure=related (1)**
81:13
**disclosure-related (1)**
78:16
**disclosures (5)**
49:13;60:21;69:7;
77:18;78:8
**discount (1)**
100:14
**discovery (2)**
109:18;111:5
**discretion (5)**
24:9;30:21;76:13;
91:7;92:20
**discretionary (1)**
24:8
**discuss (4)**
21:13;43:5;104:21,
24
**discussed (3)**
37:15,16;104:10
**discussing (1)**
105:4
**discussion (9)**
36:21,23;40:22;
43:14;51:9;52:6;53:6;
83:1;105:24
**discussions (6)**
16:8;17:13;18:2;
37:3;84:14;98:19
**disguised (1)**
64:17
**disparity (1)**
61:5
**dispense (1)**
63:17
**disposition (2)**
86:15;88:3
**dispute (3)**
25:2;54:19;75:18
**distinctions (1)**
38:16
**distributable (2)**
41:12;89:11
**District (5)**
30:11;32:21;33:1;
42:20;104:17
**dividends (1)**
93:25
**docket (28)**
15:21;16:2,5;17:7;
18:3;21:16;22:7,15,
16;28:14;31:11;78:5;
84:4;96:22,25;97:8,
15,16,21;98:5,6,8,15,
17;104:4,6;110:4,5

dockets (1)
102:1
**document (4)**
31:9;48:7;58:20;
84:19
**documents (9)**
6:5;48:6;50:8;56:4;
97:10,18;98:4,18;
101:4
**documents376 (2)**
7:8,12
**documents532 (4)**
2:10;3:3;5:17;7:2
**documents574 (3)**
4:12;5:7;7:22
**documents592 (1)**
7:18
**documents621 (1)**
7:6
**documents663 (4)**
3:18;5:21;6:14,21
**dodge (1)**
58:2
**dollar (1)**
60:7
**dollars (28)**
19:13;28:3;47:22;
56:7;58:6;59:9,13;
61:9;62:16,19;74:5,5,
25;75:22;76:6,11,18,
19,19,20;78:6;87:16;
99:4,4,7,7,10,10
**done (15)**
26:18;36:19;37:2,3,
6,7;57:19;62:4;65:12;
72:2;78:20;82:4;
104:22;107:25,25
**doomed (1)**
43:12
**door (1)**
43:9
**down (3)**
34:20;38:22;66:14
**drafts (1)**
21:17
**dragging (1)**
107:18
**drain (1)**
29:24;30:4
**Drake (1)**
8:19
**DS (1)**
3:2
**Due (1)**
4:15
**dueling (7)**
62:11;67:16,21;
80:21,22,25;81:1
**Dumpty (1)**
57:17
**duplicative (3)**
109:24;111:12,14
**during (2)**

20:24;91:18
**duties (1)**
43:2
**duty (3)**
54:7;68:4;93:21

**E**

**ear (1)**
88:19
**earlier (6)**
30:24;33:22;54:10;
98:25;99:17;102:11
**earliest (1)**
32:19
**early (6)**
21:13;71:13,21;
78:1;101:12,20
**easier (1)**
105:18
**easily (2)**
37:17;84:20
**Eastern (1)**
7:12
**easy (4)**
66:19;83:25;84:1;
87:20
**economic (3)**
69:1;77:11;103:21
**economically (1)**
62:7
**economics (2)**
65:21;81:14
**effect (1)**
32:16
**effective (5)**
18:23;48:10,12;
57:16;58:5
**efficient (1)**
58:23
**effort (1)**
69:5
**eight (3)**
47:2;69:21;99:2
**either (5)**
36:2;37:7;82:19;
109:3;110:19
**elect (2)**
37:11;100:9
**elections (1)**
100:8
**elements (3)**
54:24;59:10,14
**Eletson (17)**
5:11,25;14:3,6,24;
31:16,17;46:2,4,12;
49:12,14;57:15,16;
85:10;89:16;93:18
**eleven (3)**
38:7;39:9;62:16
**eligible (1)**
78:9
**eliminate (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC.    Pg 434 of 448

May 15, 2024

43:13
**eliminating (2)**
58:9;59:23
**else (18)**
29:5;33:18;39:23;
42:6;54:3;62:4,6;
82:12;92:25;95:18;
100:6;102:3,17;
103:14;104:2;111:8,
24;112:3
**email (2)**
16:12;21:12
**EMANUEL (2)**
11:10;15:2
**EMC (1)**
47:2
**encourage (2)**
81:11;103:20
**end (11)**
18:1;32:19;62:13,
15;65:23,25;67:19;
69:3;92:7;106:10,12
**ended (1)**
65:2
**enforce (5)**
16:18,19,20,22;
109:20
**enforcement (1)**
86:11
**engage (8)**
20:25;21:8,9,11;
29:14;71:6,15;87:23
**engaged (3)**
65:12;108:14;
109:17
**engagement (2)**
21:18;39:11
**engaging (2)**
50:6;71:25
**Engineering (1)**
30:10
**enough (1)**
66:1
**enrich (1)**
54:6
**enriching (1)**
63:19
**enter (3)**
37:22;101:25;104:9
**enterprise (3)**
47:15;57:15;89:23
**enters (1)**
101:13
**entertain (4)**
80:4;102:13;
108:25;110:23
**entire (2)**
38:18;62:14
**entirely (3)**
17:18;24:8;91:21
**entities (1)**
94:10
**entitled (6)**

26:23;69:17;82:22,
24;83:3,6
**entity (4)**
76:3;87:7;88:8,9
**Entry (9)**
2:4,12;3:22;4:8,17;
5:3;7:15;101:12;
103:1
**envision (1)**
104:24
**envisioned (1)**
89:21
**equal (2)**
57:9;62:5
**equally (1)**
40:3
**Equipment (2)**
24:23;54:15
**equitable (4)**
25:20;26:4;91:25;
95:11
**equitably (4)**
25:16;26:5;52:2;
91:21
**equity (17)**
28:5;9;29:1,5;
60:14;63:13,15;
69:14,18;75:1,10;
79:8;94:25;95:1;99:5;
100:10,15
**equivalency (1)**
63:22
**equivalent (4)**
28:12;60:18;63:25;
64:2
**eScribers (1)**
8:20
**especially (1)**
109:19
**ESQ (11)**
10:7,15,16,25;11:7,
16,17;12:8,16,17;13:8
**essence (1)**
59:23
**essentially (10)**
25:2;27:5;43:20;
59:6;67:23;70:25;
73:14,23;75:3;76:13
**establish (1)**
46:4
**Establishing (5)**
2:21;3:14;4:6,25;
99:11
**estate (7)**
27:8,12;40:6;53:21;
54:4;87:23;102:24
**estates (3)**
23:12;79:2;97:5
**estimated (1)**
93:23
**et (1)**
104:11
**EV (1)**

50:16
**evaluate (3)**
23:23,24;50:13
**evaluation (1)**
18:3
**Even (27)**
21:11,12;24:10;
25:17;26:2,15;28:8;
31:18;36:16;42:22;
44:6;48:21;52:5;53:4;
60:15;62:24;64:1;
65:14;75:12;81:15;
85:13,15;92:3;94:16,
19;95:5;103:17
**event (8)**
17:22;18:25;27:12;
41:4;57:1,4;83:6;
102:25
**eventually (1)**
48:17
**everybody (1)**
51:2
**everyone (10)**
14:2;28:5,18;29:25;
73:11;88:5;100:19;
104:14;107:19;
112:10
**everyone's (1)**
107:14
**everything's (1)**
76:21
**evidence (3)**
25:21;80:13;91:4
**evidentiary (9)**
24:18;25:7;26:12,
18;40:10;108:20;
109:1;110:12,17
**Ex (14)**
2:7,7,8,8,9,22,22,
23,23,24,25,25;3:2,2
**exact (1)**
92:19
**exactly (3)**
30:13;48:3;100:21
**exasperating (1)**
43:11
**Excel (1)**
29:22
**exception (1)**
60:8
**exceptions (1)**
70:23
**excess (1)**
72:18
**exchange (5)**
16:12;36:2;40:17;
57:7;59:24
**exclusion (1)**
62:1
**exclusive (1)**
52:15
**exclusively (1)**
51:22

**exclusivity (12)**
21:4;28:22;29:8,24;
30:3,4,6,7;53:25;
65:8;71:16;97:9
**excuse (6)**
16:16;28:15;82:20;
86:24;87:14;103:4
**exercise (3)**
30:21;91:7;92:20
**Exhibit (8)**
3:15,16;6:2,4,10,12,
19,20
**Exhibits (2)**
3:16;98:7
**exist (3)**
44:18;45:24;48:8
**existed (1)**
61:24
**existence (2)**
30:1;43:19
**existing (1)**
64:10
**exists (2)**
46:1;48:18
**expect (1)**
59:20
**expected (1)**
39:2
**expenditures (1)**
49:15
**expense (2)**
53:22;66:14
**expenses (5)**
67:19;75:10;97:5;
100:25;101:7
**experience (3)**
37:4,6;82:5
**expert (1)**
99:24
**expertise (1)**
99:21
**expired (1)**
97:9
**explain (5)**
31:4;52:12;68:20;
90:6;97:3
**explanation (4)**
50:14,21;51:1,11
**exposed (1)**
47:12
**expressed (2)**
74:12;102:7
**expressly (1)**
100:25
**extend (1)**
29:4
**extended (1)**
28:21
**Extension (2)**
6:24;7:5
**extensive (9)**
50:12;69:12;70:9;
72:9;74:6;77:12;

98:18,22;99:16
**extensively (1)**
102:8
**extent (6)**
36:18;41:1,5;84:10;
94:20;108:24
**extreme (1)**
61:6
**eyes (2)**
46:10;49:4

## F

**F3d (1)**
24:24
**face (1)**
53:23
**faced (1)**
47:5
**facilitate (1)**
20:16
**facilitating (2)**
20:17,17
**fact (11)**
25:2,5,14;26:22;
28:20,21;30:1;51:16;
84:23;91:12,16
**facts (3)**
22:1,13;54:19
**factual (6)**
22:13;45:6,10,23;
46:7;48:3
**fail (1)**
34:22
**failure (1)**
43:12
**fair (1)**
47:16
**faith (22)**
26:10,16;42:17,20;
43:13;44:8;49:1;52:1,
4,5;54:1,6,24;55:1;
58:21,22;59:1,10;
74:3;76:22;91:3,3
**fall (4)**
41:12;43:25;70:22;
82:18
**familiar (1)**
99:19
**familiarity (1)**
101:22
**Family (1)**
14:23
**far (2)**
43:21;100:20
**favor (2)**
32:19;94:2
**favorable (2)**
46:20;50:17
**feasibility (6)**
49:7,7,8;50:1;
59:16;77:16
**feasible (1)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC    Pg 435 of 448

May 15, 2024

54:24

**fees (5)**
44:7;72:15;100:25;
101:7,8

**feet (1)**
107:1

**few (3)**
38:6;43:15;54:1

**fi (1)**
75:22

**fiduciary (4)**
43:2;54:7;68:4;
93:21

**fifteen (3)**
26:13;70:4;99:8

**fifteen-day (1)**
26:11

**fifty (7)**
47:19,19;69:16;
75:4,5,6,20

**figure (2)**
67:18;107:22

**file (9)**
18:3;66:10,15;
71:22;78:16,17;
101:14,15;111:1

**filed (52)**
6:11;15:21;16:4,6;
17:12;20:24;21:16;
30:17;44:22;60:13;
63:1;65:7,10;66:4,10,
11,12;68:8;69:11,13;
71:7,9,17,21;72:2;
78:5;97:7,10,14,15,
16,18,20;98:3,4,7,14,
16;101:4;102:1;
108:12,14,22;109:13,
25;110:3,6,6,7,8,9;
111:13

**Filing (12)**
3:5;5:9,24;6:7,16;
31:12;50:4;98:8,11;
102:23;104:9;106:25

**filings (5)**
18:1;100:23;104:5,
7;112:6

**fill (2)**
82:1,1

**filled (1)**
60:6

**final (2)**
32:16;57:12

**finalized (1)**
80:19

**finalizing (1)**
58:10

**finally (2)**
62:17;64:24

**Finance (2)**
12:12;15:11

**Financial (15)**
5:15,16;45:3;46:4;
50:2,6;51:20;63:24;

64:1;69:22;78:1,23;
98:10,11;99:17

**find (2)**
31:9;94:1

**finding (1)**
86:11

**findings (1)**
40:8

**finish (1)**
101:11

**fire (1)**
107:1

**First (26)**
17:10;24:23;32:11;
33:23;44:3;47:11;
49:13;54:10;58:14;
60:4,7;63:4,5;65:5,7;
68:24;74:6;78:18;
79:13,15;84:17;
88:13;93:11;98:5;
100:8;102:20

**five (2)**
28:1;50:4

**fix (4)**
44:6;81:12;102:13;
103:24

**fixed (1)**
78:10

**fixing (1)**
78:2

**flat (1)**
71:9

**flip (1)**
63:8

**flipped (1)**
64:5

**Floor (3)**
11:13;12:5;13:5

**flow (2)**
99:3,9

**flurry (1)**
17:25

**focal (4)**
43:14;85:10,11,12

**focused (2)**
56:12;68:3

**folks (1)**
54:7

**follow (3)**
40:1;58:23;94:14

**following (1)**
101:10

**forbidden (1)**
65:9

**forced (2)**
23:10;68:5

**Form (6)**
2:8,9,16;3:9,25;
4:20

**Forms (5)**
2:19;3:12;4:4,23;
102:1

**formula (1)**

61:3

**formulate (1)**
45:12

**formulated (1)**
24:25

**forth (2)**
49:1;58:8

**forty-one (1)**
95:1

**forward (6)**
21:4;67:19;80:20;
84:24;92:10;102:15

**forwards (1)**
105:19

**found (5)**
52:5;91:22;95:13;
104:4,6

**foundational (1)**
45:20

**four (10)**
46:19;58:5;74:5;
76:19,19;98:4;
105:20;109:1,23;
110:12

**fourth (1)**
98:16

**frame (1)**
100:21

**frankly (9)**
17:21;24:6;72:1,19;
73:9,12;78:18;80:19;
94:11

**fraudulent (5)**
34:8;57:20;58:11;
64:20,22

**free (1)**
79:12

**Friday (3)**
98:8,8,11

**friend (3)**
85:6;86:7;95:23

**friends (1)**
83:24

**FSB (2)**
12:3;15:6

**full (10)**
24:18;29:25;31:23;
57:6,12;60:7;71:1;
75:20;76:13;98:13

**fully (8)**
17:18;29:14;54:19;
75:8;78:11;80:7;
94:14;102:15

**fulsome (1)**
22:2

**Fund (10)**
12:3;15:6;23:11;
46:4;62:21;78:6,7,24;
79:8,10

**fundamental (1)**
23:5

**fundamentally (1)**
49:21

**funding (4)**
28:9;46:3;53:14;
78:4

**funds (14)**
19:6,11;39:21;
48:12;63:13;71:10;
79:9,16;80:13;84:14,
15,16;88:17;89:21

**further (7)**
31:2;34:20;61:7;
63:11;78:8;106:14;
112:3

**Furthermore (1)**
43:15

## G

**game (2)**
50:7;67:11

**gamesmanship (1)**
87:23

**Garrity (1)**
53:1

**gas (43)**
31:15,16,17;34:22,
25;35:10,10,12,13,18,
21,21,23;36:1;43:6;
47:2;48:1;50:19;
52:12,16,18;53:7;
55:5,6;56:1,13,15,17,
21,22,24;57:6,6,7,11,
13,15,16;64:20;
85:10;87:6;89:16;
93:19

**gate (1)**
48:21

**gating (1)**
60:4

**gave (5)**
30:5;71:19;72:9,10;
77:12

**general (2)**
100:4,7

**Generally (1)**
50:10

**gerrymander (2)**
51:11;64:6

**gerrymandering (2)**
51:14;59:2

**gets (8)**
35:6;55:25;58:1,2;
60:7;72:16;74:2;
76:20

**given (3)**
22:22;100:20;
101:21

**gives (4)**
35:14;75:6;76:13;
82:7

**giving (3)**
29:25;40:17;57:21

**Glafcos (1)**
14:22

**glaring (2)**
43:16;60:3

**Glenn (2)**
45:5;61:18

**global (1)**
18:17

**glory (1)**
55:13

**goal (2)**
20:16;22:24

**goes (4)**
52:8;61:4;69:14;
81:7

**go-forward (1)**
78:3

**Good (42)**
14:2,5,8,9,10,13,14,
16,17,20,21,25;15:1,
4,5,8,9,13,14,16,18,
23;26:10;42:7,9,10,
20;46:16;54:1,24;
55:1,2;68:14;74:16;
82:13,15;83:21;91:3;
96:14;108:6,7;111:9

**good- (1)**
26:15

**good-faith (3)**
26:24;54:11;98:18

**goosey (1)**
99:3

**governance (4)**
70:11,20;94:9;
99:13

**Government (1)**
5:6

**Governmentrelated (1)**
4:11

**grab (1)**
63:18

**grant (2)**
104:8;110:17

**granted (1)**
39:2

**Granting (5)**
2:6;4:10;5:5;6:19;
7:17

**great (3)**
111:2,7;112:9

**Green (2)**
10:21;61:11

**grounds (1)**
52:3

**group (1)**
20:2

**guarantee (4)**
49:24;50:22;51:8;
59:18

**guaranteed (3)**
23:6;49:16;59:20

**guarantees (1)**
59:24

**Guaranty (2)**
2:9;3:2

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC.    Pg 436 of 448

May 15, 2024

**GUC (2)**
2:8,23
**guess (1)**
90:5
**Gustafson (1)**
111:13
**Gustafson's (1)**
111:21
**guys (1)**
72:5

## H

**half (6)**
61:10;70:6;95:9;
99:3,4,10
**halfhearted (1)**
21:18
**hallmarks (2)**
39:8,8
**halt (1)**
58:24
**hand (1)**
23:8
**handle (1)**
108:4
**handled (1)**
108:18
**hands (3)**
33:12,17,18
**happen (8)**
34:12;38:9;39:7,9,
12;59:21;88:15;
104:23
**happened (2)**
39:12;71:23
**happening (3)**
38:12;56:5;66:7
**happens (10)**
33:21,24;34:11,19;
35:16;37:2,3;57:1;
62:22;100:4
**happy (10)**
24:20;40:23,25;
55:14;84:8;85:4;89:7;
92:21;97:22;105:12
**hard (1)**
66:22
**hat (2)**
46:24;86:22
**havoc (1)**
23:12
**head (3)**
64:5,24;87:24
**hear (2)**
20:8,11
**heard (13)**
33:2;38:3;39:23;
42:6;73:15;82:12;
92:25;95:18;102:3,
17;103:14;104:2;
111:8
**Hearing (50)**

2:3,15,16,23;3:2,8,
9,20,21,24;4:2,11,14,
14,16,19,21;5:6;7:8,
11;20:24;24:18;
25:21;26:3,14,18;
27:18;36:19;38:17,
19;40:11;43:21,25;
44:1;73:13;79:15;
80:15;92:1;101:19;
104:13;105:7,13,18;
106:14;108:20,20;
109:1,9;110:12,18
**hearings (1)**
85:18
**heavily (1)**
26:8
**heavy (1)**
84:19
**heightened (2)**
46:15;47:9
**held (2)**
46:15;99:22
**help (3)**
31:10;50:13;87:9
**hereof (1)**
93:22
**HERMAN (4)**
10:16;14:12;47:1;
93:9
**HG (1)**
63:2
**high (3)**
36:25;37:16;64:4
**highlight (5)**
20:22;24:22;25:9;
42:17;94:20
**highlighted (2)**
50:5;85:7
**highlighting (1)**
47:6
**highlights (3)**
44:7;48:25;49:1
**highly (1)**
44:25
**himself (1)**
16:13
**HINE (2)**
13:2;15:15
**hire (1)**
78:1
**historical (2)**
49:12;77:18
**hold (2)**
67:9;73:16
**Holder (2)**
2:24;78:9
**holders (1)**
110:1
**holders' (1)**
79:8
**Holding (2)**
49:12,14
**Holdings (15)**

5:11;25;6:10;11:11;
14:3,7,24;15:2;18:14;
34:9;49:15;59:17,19;
87:23;93:16
**honest (1)**
94:14
**honesty (1)**
55:2
**Honor (267)**
14:5,10,14,17;15:1,
5,9,14,18,20,22,24,25;
16:4,7;17:4,9,13,24,
25;20:5,6,12,14,23,
24;21:15;22:6,9,19,
21;23:25;24:6,16,20;
25:3,8,12,16;26:1,7,
12,19;27:2,5,21,23;
28:10,16,17,18,19;
29:17;30:10,15,19;
31:2,6,8,13;32:9,22;
33:4;34:4;35:17;
36:15;37:20;38:1,5,8,
9,12,24;39:8,13,24;
40:14,19;41:19;42:1,
7,11,14,19,23;43:1,5,
6,9,15,23;45:13,20;
46:1,6,14,15,17,24;
47:6,21;48:1,13,19;
49:7,13,18;50:4,14,
18;51:6,11,18,22;
52:9,11,14,21,25;
53:10,12,19,23;54:10,
21;55:3,4,8,12,13,25;
56:4,12,16;57:14,24;
58:5,8,14;59:2,5,10,
16,25;60:4,16,19,23;
61:2,10,16,25;62:2,
12;63:1,8,18;64:2,6,8,
19,24;65:9;66:2,3,24;
67:14;68:2,9,12,14;
69:14;74:10,18;
76:22;78:22;79:6,20;
80:5,6,21,23;81:18;
82:11,13,16;83:7,9,
13,16,21,23;84:11,12;
85:6;86:6,9,10,13;
87:4,12;88:1,3,7,18,
21;89:21;91:1,5,7,12,
18;92:2,7,9,15,18,20,
24;93:2;94:4,8;95:16,
21;96:13,14;97:23,
25;98:22;99:19;
101:24;102:6,18,20;
103:13;105:1,12;
106:6,16,17;107:7;
108:1,3,7,10,11,18;
109:5,8,15,23;110:13,
20,21;111:3,9,19,25;
112:3,3,8
**Honorable (2)**
6:23;7:4
**Honor's (4)**

40:1;92:20;99:25;
101:18
**hope (1)**
62:10
**hopeful (1)**
17:20
**hopes (1)**
51:12
**hoping (1)**
67:8
**Hotel (1)**
63:3
**Humpty (1)**
57:17
**hundred (9)**
47:17;56:7;61:12,
13;67:24;75:1,20;
76:6;94:24
**hundred-million-dollar (1)**
76:7
**Hybrid (2)**
4:10;5:5

## I

**idea (1)**
72:19
**identified (8)**
16:1,5,11,13;25:4,
5;109:2;110:2
**identifies (1)**
23:15
**identify (2)**
37:9;108:19
**identifying (1)**
19:16
**ignoring (1)**
49:20
**II (8)**
2:6,16;3:9,25;4:10,
20;5:5;7:17
**III (5)**
2:17;3:10;4:2;6:23;
7:4
**illegitimate (1)**
51:25
**illusory (3)**
48:20;55:6;58:20
**impaired (2)**
51:2,12
**impairment (3)**
51:7,10;59:3
**impermissible (1)**
64:17
**implies (1)**
24:12
**implying (1)**
34:14
**important (13)**
20:14;25:10,16;
26:1,15;33:8;53:11;
56:11;66:2;67:14;
86:6;92:15;106:21

**importantly (3)**
29:6;78:5,22
**improper (2)**
19:23;32:23
**improperly (2)**
64:7;91:22
**improve (6)**
65:20;69:1;77:13;
81:13,13;103:21
**improved (3)**
27:9,10;38:10
**improvement (3)**
71:2;78:21;98:24
**improvements (7)**
27:16;69:6,10;
72:13;73:1;78:15;
102:10
**inadequacy (1)**
47:11
**inadequate (2)**
42:13;46:19
**Inc (6)**
5:11;6:2,10;14:3,7,
24
**incentive (2)**
88:11,17
**inclined (1)**
20:1
**include (2)**
84:8;93:16
**included (6)**
84:7;98:7,11;99:1;
111:16,21
**includes (2)**
50:10;57:14
**Including (10)**
2:14;3:7,24;4:19;
23:9;44:4;93:24;
98:19;99:11;109:6
**inconsistent (2)**
43:2;91:11
**incorporated (1)**
21:20
**increase (1)**
69:7
**increased (5)**
69:14,16;70:2,5,6
**increasing (4)**
99:3,6,7,9
**incredible (1)**
93:10
**incur (1)**
97:5
**Indeed (1)**
59:18
**indefinitely (2)**
106:22;107:2
**indenture (1)**
15:7
**independent (10)**
31:21,21;44:4;45:3;
70:15,22,24,25;85:14;
99:12

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 437 of 448

May 15, 2024

**indicated (1)**
84:18
**individual (3)**
61:4;66:19;110:1
**inferior (1)**
66:18
**infinite (1)**
48:14
**inflammatory (1)**
77:19
**influence (1)**
88:9
**inform (1)**
105:13
**information (45)**
19:16,16,22,22,23;
20:1,5;21:23;22:11,
11,17,22;27:24;
28:10;44:11,14,16,19,
20,23;45:7,12,20,23;
47:6;48:2,16,18,20,
25;49:23;50:12;
51:24;52:10,17;53:5,
13,15,16,18;61:19;
62:9;68:10;77:25;
84:9
**informational (2)**
43:16;48:21
**informed (2)**
45:7;58:13
**infuse (1)**
63:14
**Initial (6)**
6:5,13;59:2;62:25;
71:8;97:7
**injunction (3)**
86:22;87:1,5
**input (1)**
99:16
**insert (1)**
16:8
**insider (6)**
45:16;46:14,22,25;
47:8;63:19
**insiders (4)**
45:17;46:20;47:10;
54:6
**insignificant (1)**
64:18
**insist (1)**
22:25
**instance (6)**
35:8;43:17;50:13;
54:10;58:15;68:24
**Instead (3)**
49:9;62:4;99:5
**insufficient (2)**
63:2;71:10
**insulate (1)**
40:7
**insulting (1)**
94:12
**intelligent (1)**

44:12
**intend (5)**
16:14;19:15;24:2;
36:24;74:15
**intended (3)**
45:6;62:8;85:18
**intending (1)**
18:11
**intentions (1)**
55:3
**intents (1)**
58:16
**interest (1)**
51:5
**interesting (1)**
67:23
**interim (1)**
21:11
**intermediaries (1)**
99:22
**into (16)**
16:11,17;19:24;
40:5;43:25;44:24;
52:8,17;73:7,10;
75:23;77:6;82:18;
88:20;92:13;93:5
**Investment (2)**
11:3;14:22
**invocate (1)**
53:2
**ISAAC (2)**
11:17;15:3
**Islands (1)**
87:6
**issue (13)**
19:17;25:12;40:11;
48:15;59:15;60:3,4;
63:9,16,16;80:4;92:4;
105:6
**issues (37)**
16:1;17:6,20,22;
25:5,6;27:17,19;
31:19;42:15,17;
43:22;54:2;59:11;
64:6,16;65:17;70:21;
71:1;72:9;73:9;77:12,
20,21;78:2,11,16;
80:8,14;81:6,13;88:2,
2;91:14;96:1;102:13;
109:19
**item (1)**
95:19
**items (4)**
108:8;109:2,23;
110:15
**IV (4)**
2:18;3:11;4:3,22

**J**

**January (2)**
20:23;71:7
**John (6)**

6:23;7:4;11:16;
15:1;17:4;39:25
**join (1)**
100:17
**joinder (1)**
110:10
**joined (3)**
14:19;15:3,11
**Joint (6)**
5:10,25;6:3,9;
30:25;92:21
**jointly (2)**
103:11;104:22
**Judge (9)**
7:4;29:23;30:4;
45:5;53:1,1;54:11;
61:18;74:22
**judgment (6)**
25:2;26:17;45:7;
55:13;74:1;91:6
**July (8)**
101:16,17,20;
107:22;109:3;110:19,
23;111:1
**June (8)**
40:10;101:13,14,
15,15;108:23;109:10;
110:16
**jurisdiction (2)**
79:22;86:13
**jury (1)**
104:17
**JUSTICE (4)**
10:19;28:20;91:22;
95:12
**justify (1)**
91:13

**K**

**KCC (4)**
99:17,18,24;101:21
**keep (1)**
74:23
**kept (1)**
30:4
**Kertsikoff (1)**
46:24
**Key (4)**
2:13;3:6,22;4:17
**kind (3)**
32:8;94:20;109:20
**KISS (1)**
74:23
**KISSELL (2)**
12:11;15:10
**knowledge (1)**
29:25
**knows (1)**
89:1
**Kotliar (15)**
14:19;95:23;96:14,
15;97:25;98:3;

102:21,22;103:4;
105:1,2,11,17,25;
106:4
**Kyla (1)**
14:17
**Kyle (3)**
42:7;93:4;111:9

**L**

**Laceon (2)**
11:3;14:22
**lack (6)**
28:21;44:14;48:25;
77:15,15,16
**lacked (2)**
64:13;77:16
**lacking (1)**
21:24;55:2
**Lane (1)**
53:1
**language (9)**
16:9,10;29:9;43:7;
56:3;85:11,23;
102:21,23
**large (1)**
99:20
**largely (1)**
75:9
**LaSalle (6)**
27:4;28:19,20;
29:19;71:18;72:2
**last (21)**
19:20;22:10;40:24;
44:1,22;47:1;58:9;
59:5;60:13;63:4;65:6;
66:4;68:22;73:21;
94:13;99:11;101:4;
102:1,24;107:10;
108:11
**lasts (1)**
68:12
**late (3)**
40:24;71:16;92:5
**later (3)**
19:24,24;72:5
**latest (3)**
43:3;54:5;59:4
**Lavona (2)**
57:21;88:8
**law (7)**
43:22;53:21;62:23;
63:1,21;64:10;91:11
**lawsuit (4)**
32:13,14;34:25;
35:24
**Laytham (1)**
26:19
**lead (1)**
54:14
**leakage (1)**
19:22
**learned (2)**

73:11,11
**least (2)**
34:5;44:4
**leave (1)**
74:9
**leaves (3)**
17:9;94:5,6
**led (1)**
62:1
**left (4)**
28:17;47:14;48:5;
52:15
**legitimacy (1)**
53:4
**legitimate (6)**
20:18;25:18;45:22;
64:12;91:17,24
**lender (6)**
46:22,25;47:11;
63:4,5;65:5
**lenders (1)**
26:23
**length (2)**
18:13;69:12
**lens (1)**
68:6
**less (3)**
77:25;88:10;100:20
**Letter (20)**
6:23;7:4;18:22;
39:20;48:9;79:18,21,
23;80:17,19,24,25,25;
82:8;84:17,22;85:1,4;
104:11,11
**level (3)**
36:25;37:17;43:4
**levels (1)**
49:11
**Levona (49)**
11:11;15:2;16:5,8;
17:1,4;32:1,19,20,23;
33:13,18;35:9;36:8;
39:25;40:2,22;52:23;
56:18,22;57:10,12;
70:21;73:17,18,22;
74:2;75:14,21;76:2,4,
5,15,16,19;86:12,15,
19;87:4,16,17,18;
88:11;93:16;94:7;
99:13;109:7,8,19
**Levona's (2)**
16:20;17:6
**Lexington (1)**
10:4
**LEXIS (2)**
29:23;30:11
**liabilities (2)**
49:12,14
**liability (1)**
40:6
**life (1)**
66:25
**lift (1)**

23-10322-jpm   Doc 1268   Filed 11/25/24   Entered 11/25/24 09:06:22   Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 438 of 448

May 15, 2024

84:19
**likelihood (2)**
33:9;88:14
**likely (1)**
63:19
**limit (1)**
102:24
**Limited (5)**
7:20;15:2;17:6;
20:2;50:15
**line (4)**
28:14;47:14;69:22;
79:5
**lines (1)**
88:6
**Lipton (1)**
74:22
**Liquidation (11)**
5:14;22:14;44:21;
50:3;51:3,4;65:17;
77:17;78:4,16;98:9
**list (3)**
73:8,9;77:22
**lists (2)**
72:9;77:13
**litigated (1)**
55:11
**litigating (1)**
73:17
**litigation (59)**
18:10;23:7,10;31:7,
22,23,25;32:15,23;
34:14,16,24;35:15,24;
36:1;40:2;41:3,12,13,
15;52:9,13,13;55:4,
16,17,22,24,25;56:2,
15;57:3,5,8,25;58:3,4,
6,10,19;59:6,8;70:20;
72:16,19;74:4;75:2;
76:8,10,11,20;85:19;
89:8,9,9,15;90:16;
92:12,13
**litigations (1)**
33:2
**little (13)**
35:6;39:3;56:17,19;
57:2;67:10,12,12;
68:17;71:4;74:3,10;
82:5
**Livonia (2)**
36:2;56:7
**LLC (4)**
8:20;12:12;15:11;
64:10
**LLP (7)**
10:2,10;11:2,10;
12:2,11;13:2
**loan (1)**
26:23
**lock (4)**
85:20,24;88:24;
94:3
**locked (2)**

86:23;87:18
**lock-in (1)**
89:4
**logical (1)**
51:10
**long (2)**
31:24;106:22
**look (13)**
38:16;56:1,3;57:24;
66:20;67:5;76:9,24;
80:3;100:2;105:5;
108:16;112:6
**looked (1)**
93:13
**looking (5)**
31:11;56:3;60:20;
68:6;110:12
**looks (2)**
58:22;66:9
**lose (1)**
73:17
**lot (19)**
26:20;37:4;52:8;
66:4,13,21,22,24,25;
73:18;77:25;78:14,
15;91:2;93:9;97:12,
13;104:4;105:18
**LOTEMPIO (6)**
12:16;15:9,10;
82:13,14,16
**lots (1)**
37:1
**Lou (1)**
14:6
**LOUIS (1)**
10:7
**low (1)**
24:13
**Ltd (1)**
11:11

## M

**Madison (2)**
11:12;13:4
**mailings (1)**
101:11
**main (2)**
57:22;59:7
**maintained (1)**
29:8
**major (1)**
73:9
**majority (4)**
14:23;38:2;70:23;
89:5
**makes (10)**
24:11;49:15;60:8;
63:10;72:1;74:11;
81:22,23;87:13;
102:14
**making (10)**
18:21;19:18;23:22;

26:23;29:1;42:11;
43:12;49:17;80:9;
103:7
**malleability (1)**
48:14
**Manner (4)**
2:16;3:9,25;4:20
**many (8)**
22:5;43:22;47:23;
51:11;55:8;59:10;
62:19;95:13
**March (2)**
71:17;97:8
**Maritime (1)**
29:22
**market (7)**
27:7,8,14,15,16;
28:18;69:23
**marketing (1)**
28:21;30:18;71:12
**mass (1)**
62:9
**massive (1)**
52:6
**Mastando (2)**
6:23;7:4
**Master (3)**
2:24;37:7,10
**matched (1)**
46:23
**material (4)**
25:2;54:19;73:3;
98:24
**materially (1)**
43:10
**Materials (9)**
2:6;4:9;5:4;6:18;
7:17;45:3;50:7;99:15;
100:11
**mathematical (1)**
61:3
**MATOTT (2)**
12:17;15:12
**matter (3)**
38:25;41:8;84:23
**Matters (7)**
7:11;54:18;93:14;
99:13;108:17,23;
111:8
**maximize (2)**
22:24;62:2
**May (20)**
2:2,3;7:11;16:13,
16,17;17:24;20:24;
21:13;39:24;53:15;
72:20;82:5;87:2;93:2;
104:17;106:17;
108:12,20;110:22
**maybe (3)**
48:17;61:20;106:25
**mean (10)**
32:20;36:16;56:6,
21;76:4,25;105:16,

21;106:3;109:18
**meaning (1)**
35:3
**means (4)**
40:4,16;67:8;91:14
**meantime (1)**
104:20
**mechanic (1)**
37:17
**mechanisms (1)**
39:5
**mediation (1)**
18:17
**meet (2)**
24:19;104:18
**member (1)**
70:15
**members (3)**
46:2,12;70:13
**members' (1)**
46:4
**mention (1)**
95:12
**mentioned (1)**
99:17
**menu (1)**
43:23
**merchants (1)**
23:11
**mere (1)**
61:10
**merely (1)**
46:2
**merits (1)**
77:10
**message (1)**
77:12
**Metals (1)**
53:2
**method (2)**
23:15;29:16
**Miami (1)**
53:2
**Michael (1)**
8:19
**microphone (1)**
88:20
**might (5)**
53:6;67:18;103:9,9;
105:5
**milestone (1)**
20:14
**million (52)**
19:13;28:3;45:24;
46:19,22,23;47:1,2,
10,12,13,15,17,19,22;
48:23;56:7,9,9;59:1,9,
13;60:23,24;61:9;
62:16,18,19;65:15,18;
69:18,19;70:6,6,8;
74:25;75:4,9,20,22,
23;76:6,11,18;78:6;
93:24;98:13;99:3,4,7,

21;106:3;109:18
10,10
**mind-boggling (1)**
52:25
**minute (5)**
50:21;53:10;58:9;
59:5;94:13
**mirrored (1)**
21:6
**mirrors (1)**
103:3
**misleading (1)**
62:9
**misleadingly (1)**
58:18
**misplaced (1)**
24:6
**model (1)**
23:11
**Modifications (2)**
5:9;97:18
**moment (2)**
97:3,19
**Monday (2)**
98:4,14
**Monday's (1)**
100:23
**monetization (1)**
88:12
**money (12)**
28:4;35:13;36:1,3,
4,5;48:18;60:10,17;
61:15,16;72:20
**money's (3)**
28:4;60:17;61:15
**month (2)**
62:19,20
**months (4)**
21:9;22:10;50:4;
68:22
**more (27)**
22:12,18;23:19;
25:23;27:25;30:19;
42:21;45:17;47:14;
49:21;54:12;61:14;
69:2;74:13;76:5;
77:19;80:12;81:16;
82:5;85:1;89:22,22;
90:1,1;91:23;103:22;
107:8
**morning (33)**
14:2,5,8,9,10,13,14,
16,17,20,21,25;15:1,
4,5,8,9,13,14,16,18;
19:24;42:7,9,10;
79:13;82:13,15;
83:21;84:18;96:14;
108:6,7
**MOSS (3)**
12:8;15:5,5
**most (20)**
21:20;29:9,13;37:5;
40:7;43:7;45:13,19;
46:1;48:21;50:17;

52:22;63:19;66:9;
73:24;76:17;78:22;
92:15;103:9;107:24

**Mostly (1)**
40:4

**Motion (26)**
2:2,4,12,12;3:22;
4:8,17;5:3;7:15,21;
16:2,18,19,20,22;
62:18;91:6;96:22,24;
97:2;98:15,17;104:4,
6,14;109:20

**Motions (10)**
5:21;32:25;62:18;
66:15;67:16;95:24;
96:19;97:23;98:4;
104:8

**motive (2)**
55:3;58:9

**mouse (4)**
42:24;50:8;67:11;
94:17

**move (2)**
65:14;68:5

**moved (1)**
55:16

**moving (4)**
53:25;105:19;
107:17,20

**much (11)**
23:25;33:3;43:14;
48:10;49:6;60:14;
72:20;75:17;76:2;
105:14,19

**Multiple (2)**
48:1;59:5

**Murchinson (5)**
70:17,21;88:3,4,8

**must (4)**
25:1;44:16;45:9;
63:12

**mute (2)**
79:4;88:5

**myself (1)**
74:22

## N

**NAF (11)**
66:12;82:14,18,20,
24;84:1,2,2,4,5;110:5

**name (1)**
50:11

**names (1)**
56:1

**nature (5)**
18:9;53:20;84:15;
90:2;111:6

**necessarily (1)**
36:17

**necessary (9)**
22:2;28:5;30:23;
41:1,6;63:11,13;

84:10;108:20

**necessity (2)**
41:8;61:22

**need (15)**
26:13;47:6;48:2,3,
6;51:17;61:7;63:21;
66:9;82:1;83:5;105:7;
106:14;107:25;
108:24

**needed (8)**
40:23;49:21;60:17;
61:22,23;72:11;
77:13;104:18

**needs (9)**
23:14;28:9;44:18;
74:13;80:11,11,13;
82:23;95:6

**negative (1)**
73:3

**negotiate (1)**
102:8

**negotiated (3)**
74:11;92:5,5

**negotiating (1)**
71:20

**negotiation (3)**
72:6,6,12

**negotiations (5)**
18:13,16;69:12;
70:9;98:23

**neighborhood (1)**
56:9

**neither (1)**
25:4

**NESSER (2)**
11:17;15:3

**net (8)**
32:1;35:5,14;36:9;
57:10,10,15;75:25

**network (1)**
99:23

**neutered (1)**
75:3

**neutral (1)**
77:19

**Nevertheless (1)**
22:21

**New (46)**
10:5,13,23;11:5,14;
12:6,12,14;13:6;
15:10;18:22,25;19:7,
14;27:1,3,22;28:1;
29:1;30:2,2,2,11,18;
42:16;43:11,18;44:4;
45:1,21;46:5;47:23;
60:10,16,20;61:23;
63:9;71:22;85:2,3;
89:17;91:9,13;94:18;
99:11;106:25

**new-value (2)**
71:11,19

**next (10)**
32:24;49:7;60:7;

61:15;81:3;101:12;
102:12;103:24;
104:16;107:24

**night (6)**
40:25;44:22;60:14;
101:4;102:1,24

**ninety-three (1)**
61:14

**nobody's (2)**
46:10;60:8

**noes (1)**
61:13

**nominal (1)**
87:22

**nominees (15)**
18:15;31:16;34:8;
73:7,19;76:16;85:9;
86:3;89:6,13,16;90:4,
12;93:19;99:22

**none (1)**
97:3

**nonetheless (2)**
26:5;32:16

**Nonexistent (1)**
49:15

**nonsense (1)**
66:16

**nor (4)**
20:2;21:24;25:4;
52:16

**normal (2)**
53:24;80:17

**North (3)**
8:21;71:18;72:2

**note (12)**
26:1,20;33:8;40:11;
65:10;82:17;95:11,
25;98:20;109:25;
110:1;111:11

**noted (3)**
45:5;54:10,12

**noteholder (1)**
82:19

**Notes (7)**
15:15;25:17;50:12;
84:5,6;99:21;101:22

**Notice (28)**
2:3,17,18,21,23;3:3,
5,10,11,14,20,21;4:2,
3,6,14,16,21,22,25;
6:16;7:8,11;37:11;
99:24;101:23;105:14;
111:2

**notices (1)**
96:22

**noticing (1)**
99:19

**noting (1)**
104:7

**notwithstanding (3)**
32:4;56:12,14

**nowhere (1)**
47:18

**Number (32)**
14:3;15:22;16:2,5;
18:3;21:16;22:7,15,
16;28:15;29:12;
47:13;49:1;76:2;84:3;
96:23;97:1,15,16,21;
98:5,6,8,14,15,17;
102:1;103:20;104:4,
7;110:4,5

**numbers (5)**
44:20;50:17;51:20;
60:13;97:8

**numerous (3)**
21:10;69:3;79:1

**NY (8)**
10:5,13,23;11:5,14;
12:6,14;13:6

## O

**objected (3)**
82:20;83:2;111:14

**objecting (2)**
96:6,8

**Objection (33)**
2:3,21;3:14;4:7;
5:2;6:24;7:5,15,20,
20;16:5,15;17:1,6,10,
11,19;40:5,8;41:5;
66:10,11,12,13;101:3;
104:8;107:5,6;
109:16,24;110:3,5,7

**Objections (24)**
2:20;3:13;4:6,15,
25;5:20;16:4;17:10;
20:19;22:4,23;25;
39:19;41:3,11,16;
96:17;97:14,17;
100:24;101:16;108:9;
109:1,2;110:2

**obligate (1)**
18:24

**obligations (3)**
49:16;93:24;97:6

**obligors (2)**
59:18,21

**obtained (5)**
57:20;64:21;86:14;
88:4,13

**obtaining (1)**
51:12

**obvious (2)**
47:11;58:14

**obviously (11)**
30:6;43:1;46:10;
53:9;74:16;75:20;
76:4;78:13;81:10;
101:19;103:4

**occur (1)**
33:10

**occurring (1)**
48:10

**OCM (3)**

51:2,5,8

**ofEietson (1)**
6:9

**off (5)**
54:2;57:11;64:24;
94:11;103:18

**offer (1)**
23:16

**offered (1)**
20:25

**Offering (19)**
2:5,8;4:9;5:4,20;
6:17;7:16;27:11;
67:24;75:7;78:9;
96:25;98:15;99:15;
100:11,14;101:2;
102:22;104:5

**Office (1)**
10:20

**officers (2)**
73:20;93:21

**Official (6)**
6:24;7:5;10:11;
14:11;68:15;102:5

**often (1)**
74:21

**old (4)**
63:13,14;84:5,6

**Omnibus (2)**
5:19;109:23

**once (5)**
49:19;58:12;66:25;
71:23;106:1

**One (48)**
10:21;12:13;16:4;
18:9;24:21;25:5,12;
30:1;31:4,20;33:10;
37:7,10;39:17;40:24;
44:6;45:7;57:23;
61:11,13;64:7;67:24;
68:2;70:5,8,13,14;
75:6;81:23;82:3,7,9,
9;83:2,25;84:1;85:6,
12;86:9;88:8;96:20;
99:10;100:3,6;105:6;
111:12,13,17

**one- (1)**
57:8

**ones (6)**
19:12;22:8;40:24;
87:25;88:15,16

**one's (1)**
88:25

**ongoing (3)**
17:13;18:2;32:14

**only (32)**
21:11,17;34:21;
35:25;38:20,20;
42:25;43:19;46:9,10;
49:4;50:5;51:10;
55:25;58:1;59:12;
60:9,15;63:7,16;
84:23;87:25;88:15,

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC Pg 440 of 448

May 15, 2024

16;97:14;100:25;
107:7,8;109:22,25;
110:11;111:12
**open (5)**
71:18;76:3;87:5;
100:18;105:6
**opening (1)**
67:9
**operations@escribersnet (1)**
8:24
**opinions (2)**
45:10,11
**opportunities (1)**
22:24
**opportunity (13)**
22:23;23:23;24:10;
29:4,14;31:1;52:23;
71:18,20;82:7;94:6,6;
108:13
**opposed (2)**
63:5;87:7
**opt (1)**
69:18
**option (8)**
23:20;43:23;63:7;
79:12;100:10,12,12,
16
**options (2)**
43:23,25
**Order (39)**
2:4,7,13,22;3:5,6,
16,17,17,22;4:8,17;
5:3;6:16,17,20,20;
7:16;16:3;18:18;
19:11;28:7;37:22;
98:14,16;101:2,12,13,
13;102:22;103:1,2,3,
6;104:9;105:6;
108:15;111:4,6
**orders (3)**
98:1;101:25;108:16
**Oregon (1)**
30:11
**Original (5)**
3:17;6:20;27:9;
33:12;110:3
**originally (3)**
59:11;69:11;88:4
**Ortiz (16)**
14:17,17;42:7,7,10;
73:23;74:4;91:2,9,16;
92:8;93:2,4,4;111:9,9
**others (1)**
99:23
**otherwise (6)**
52:1;91:8;92:22;
93:17;96:3;103:10
**out (59)**
24:24;25:8;29:18;
30:11;31:10;37:10;
38:7;39:1,2;43:1,9;
46:17;47:10;48:21;
56:16;58:1;59:6;

61:11;62:8;65:4;
66:24;67:18;68:17,
25;69:13,18;71:9;
72:4;73:23;78:12;
79:2;80:8,18,24,24,
25;81:1,9,20;82:1,1,6;
83:5;86:11;88:18;
89:8,9;94:21;95:4,5,
7;96:7,8,9;104:22;
105:20;107:18,22;
108:19
**outcome (1)**
51:4
**outlined (1)**
22:5
**outs (1)**
79:24
**outside (2)**
47:21;51:16
**outstanding (1)**
93:24
**over (17)**
22:9;31:24;36:9,10;
45:15;49:14;52:14;
68:22;73:21;76:18,
19;86:5;88:10;92:14;
103:24;108:4,23
**overall (1)**
89:11
**overbearing (1)**
27:11
**overbid (2)**
94:23;95:8
**overcome (2)**
54:17;58:21
**overly (1)**
46:20
**overrule (2)**
20:19;70:24
**oversecured (1)**
51:3
**overtures (1)**
21:10
**overwhelmingly (1)**
74:21
**owed (1)**
57:11
**owes (1)**
56:7
**own (3)**
51:3;62:21;63:23
**owned (1)**
86:15
**ownership (27)**
31:15;34:22,25;
35:10,18,21,22,23;
50:20;52:12,16,18;
53:8;55:7;56:2,13,15,
17,21,22,24;57:6,6,7,
11,13;64:21

**P**

**Pach (37)**
17:11;21:3,3,5;
23:1,2,4,7,16,17,18,
18,21;24:2,7,11;25:4,
13;26:16;27:6,9,10;
28:8;30:16,21;37:12;
61:25;70:17,21;71:1;
88:9;89:23;92:16;
96:5;98:12;100:12,20
**page (12)**
28:14,16,23;29:6,8,
12;31:10,11,11;84:7;
107:15,20
**pages (2)**
28:15;29:2
**paid (5)**
57:12;59:21;62:14;
67:6;74:6
**Palms (1)**
30:15
**paper (1)**
66:5
**papers (2)**
26:8;29:23
**paragraph (6)**
32:4,6;56:5,12;
84:6;101:1
**Park (1)**
12:13
**part (8)**
18:10;19:20;26:6;
28:23;57:21;87:18;
89:10;111:17
**partially (1)**
48:5
**participate (4)**
69:24,25;75:7;
100:13
**particular (1)**
98:22
**particularly (2)**
51:21;101:21
**parties (48)**
16:8;17:14;18:3;
19:2,16;20:8,11;22:4;
30:23;36:23;37:4,15;
45:1,11;53:3,5,9,18;
55:15;65:3,16,20;
68:25;72:10,11;
77:12,13,15,17,22;
82:2;86:14,18;87:21;
88:12,16;97:11,12;
98:19;100:19;101:6;
104:21,24;108:14;
109:5;111:4,13;112:6
**partly (1)**
106:12
**partner (5)**
23:10;85:17;86:10;
88:19;108:4
**partners (1)**
14:19
**part's (1)**

87:20
**Party (4)**
5:16;65:22;97:14;
98:12
**past (1)**
49:17
**patent (7)**
24:5,6,11,22,25;
25:9,13
**patently (2)**
54:16;71:14
**path (1)**
66:14
**pay (10)**
54:5;57:22;59:13,
17,22;62:15;87:16,17,
19,20
**payable (1)**
100:25
**paying (4)**
62:12,13;75:9;
94:25
**payment (3)**
20:17;57:9,12
**payments (3)**
49:10,17,19
**pays (1)**
35:9
**PDF (1)**
31:12
**Pearl (2)**
104:18;107:24
**pending (2)**
32:25;108:9
**people (14)**
37:1;46:12;58:17;
60:9;61:12,14;65:4;
66:22;67:5;81:25;
100:19;105:14,19,23
**people's (1)**
107:1
**per (1)**
28:25
**percent (33)**
32:1;35:4,14,23;
36:7;47:17,19,20;
52:22;53:6;57:9;58:3;
61:10,12;69:16,16,21,
21;70:4;74:2;75:1,4,
5,6;89:18;90:18;
94:25;95:1;99:2,2,8,
8;100:14
**perfectly (1)**
54:4
**period (1)**
97:9
**PERKINS (2)**
12:2;15:6
**permeates (1)**
42:17
**permits (1)**
80:23
**Person (4)**

4:11;5:6;65:5;66:5
**perspective (12)**
40:5;73:1;74:7,20;
75:12;77:1,5;78:10,
25;81:4;89:25;106:21
**petition (2)**
68:3;75:13;77:23;
110:4
**petitioner (1)**
38:21
**petitioners (1)**
56:22
**Petitioning (56)**
2:4,14,15,17;3:7,8,
10,21,23,25;4:2,16,
18,20,21;5:10,13,24;
6:3,8;7:15,21;14:18;
38:14,20;42:8;66:11;
68:7,19;69:4,9,20;
70:10,12,18,20;71:17;
72:23,24;74:20;75:3;
77:8;80:7,23;81:16;
83:3;93:5;94:23;96:4,
16,21;100:13;102:9;
104:3;110:9;111:10
**ph (2)**
26:19;53:1
**phase (1)**
76:24
**Phoenix (1)**
8:22
**phone (1)**
21:12
**phrase (1)**
74:23
**piece (4)**
48:20;57:21;91:4;
92:16
**Pille (14)**
14:6;108:4,7,7;
109:8,12,15,17,22;
110:19;111:3,11,19,
19
**pivot (1)**
51:22
**place (8)**
18:16;30:5;42:25;
62:23;63:20;72:17;
87:7;88:13
**plainly (1)**
85:17
**Plan (254)**
2:14,15,22;3:7,8,15,
24,25;4:7,18,20;5:2,
10,24,25;6:3,4,5,9;
18:19,24;19:1;20:4,
21,24;21:6,6,7,13,24;
22:7,14,23,25;23:4,4,
5,8,14,18;24:1;25:6,
20;26:1,6,10,22,25;
25;27:3,3,9,10,12;
28:5,8,22;29:3,5,6,19;
30:2,3,6,12,12,17,18;

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC Pg 441 of 448

May 15, 2024

36:24;37:8,9,9,9,12,
12,23;38:20,21,22;
39:3;41:2;42:18,22,
22,24;43:10,12,17;
44:1,4,13;45:2,8,11,
16,22;47:12;49:3,4;
50:5;51:15;52:3;
53:20,22,25;54:1,2,4,
6,13,13,16,23;55:2,
16,16;58:8,24;59:2,4,
7,9;60:4,14;61:23;
62:6,7,7,25;63:8,10,
11,19;64:9,25;65:7,
13,18,25;66:18;
67:22;68:7,11;69:4,6,
10,15,17,17,20;70:12,
20;71:3,4,7,8,8,11,13,
14,15,17,19,22,25;
72:7,13,17,22;73:1,4,
12;74:8,20,21,25;
75:4,6,9;77:8;78:7,12,
13,25;79:2,11,11;
80:7,9,23;81:9,9,13,
14,14,16;82:3,17,22;
83:4,4,6;84:2,3,24;
85:3,20,21,24;86:3;
89:20,25;91:3,7,9,13;
92:3,3,10,18;94:5,5,6;
95:4,8;96:5,5;97:3,5,
7;98:5,24;99:14;
100:1,6,6,14;101:1,5,
5,14,16,17;102:9,10,
10,13,15,25;103:7,21,
22,25;106:23

**planned (1)**
52:7
**plans (36)**
24:19;28:18;29:13;
30:8,25;37:5,6;38:10,
13,18;39:6,15;64:25;
65:1;66:24;67:16,18;
69:1;72:1,11;74:19;
77:10,11;80:21,25;
81:1,20,20;82:4,8;
91:12;92:17,21;
94:19;104:22;107:21
**play (4)**
39:1,2;46:16;47:25
**playing (1)**
38:7
**Plaza (1)**
12:13
**pleasant (1)**
78:20
**please (9)**
14:4;38:4;79:5;
83:19;88:5;93:3;
97:24;98:2;106:18
**pleased (1)**
16:7
**pm (4)**
2:3;4:15;16:13;
112:11

**podium (4)**
31:3;37:1;95:23;
108:3
**point (29)**
33:15;34:15;36:21,
24;38:11;41:7,9,10;
43:14;61:2,21;63:22;
65:14;67:21;69:13;
78:13;81:19;83:1;
85:10,11,12;88:18;
94:5;95:12,14;101:3;
102:14;107:21,23
**pointed (3)**
56:16;67:22;73:23
**pointing (1)**
63:20
**points (3)**
51:9;85:6;95:12
**Pokémon (4)**
25:13;27:12;
102:25,25
**pool (1)**
69:16
**portion (2)**
61:12;86:5
**position (12)**
22:2,9;31:1;68:23;
71:13;80:19;81:1,8;
82:21;86:12;95:25;
105:2
**positioned (1)**
99:25
**positive (4)**
42:15,23;43:6;
79:20
**positively (1)**
74:8
**possible (6)**
51:12;67:10,12,13;
101:20;105:14
**potential (5)**
15:25;40:7;54:1;
108:15,19
**potentially (1)**
76:6
**power (1)**
48:10
**pre- (1)**
29:18
**preclusive (1)**
32:16
**prefer (2)**
23:19;89:3
**preferable (1)**
110:24
**preference (3)**
15:22;37:9,13
**preferred (32)**
18:15;19:5;23:15;
29:16;31:16;33:11,
17;34:8,9;55:22;56:8;
57:14,18;58:2,7,10,
11,16;73:24;76:16;

85:9,9;86:3;89:13,14,
16;90:3,11;93:18,23;
94:7;95:7
**prejudging (2)**
104:21,23
**prejudice (3)**
16:19,21,22
**preliminary (1)**
21:2
**premature (1)**
22:20
**premised (2)**
43:17;45:16
**premium (4)**
69:19;99:2;100:24;
101:6
**premiums (1)**
69:23
**prepare (1)**
18:5
**prepared (11)**
17:15,22;19:3;20:4;
30:8;50:9,9;63:25;
80:1;90:2;98:10
**pre-planned (1)**
62:1
**present (6)**
53:3;54:25;64:11;
85:13;95:24;112:3
**presentation (4)**
20:7,11;30:24;
91:19
**presentations (1)**
20:9
**presented (5)**
22:1;25:21;30:8;
85:14;91:5
**presenting (1)**
96:19
**presently (1)**
46:25
**preserve (1)**
55:14
**preserved (1)**
29:24
**preserves (1)**
75:8
**press (1)**
24:2
**pressed (1)**
21:3
**pretending (1)**
59:7
**pretty (2)**
26:8;101:7
**prevail (2)**
56:21;94:23
**prevent (3)**
23:22;24:10;27:11
**prevented (1)**
49:16
**preventing (2)**
22:22,25

**previewed (1)**
71:8
**previous (1)**
43:11
**previously (4)**
16:12;47:15;61:25;
108:17
**primary (7)**
19:6,12,19;49:16;
59:18,21;90:3
**principal (1)**
93:25
**principals (1)**
18:15
**prior (4)**
41:5;76:10;82:25;
85:17
**priority (6)**
27:1,4;60:2,6;62:5;
63:8
**pro (2)**
100:17,21
**probably (4)**
31:9;61:13,14;
88:19
**problem (3)**
28:23;67:2;94:18
**problematic (1)**
44:25
**procedural (1)**
97:2
**procedure (1)**
104:25
**Procedures (24)**
2:5,8,18,19,20,21;
3:11,12,13,14;4:4,5,6,
7,9,23,24,25;5:2,4;
6:18;7:16;96:22,25
**proceed (11)**
15:20;20:7,10;30:8,
24;36:24;61:7;93:1;
95:19;98:2;104:19
**proceeding (1)**
96:18
**proceedings (1)**
112:11
**proceeds (5)**
35:14;36:9;41:11;
89:9,19
**process (44)**
20:16;27:14,15,16;
29:14,20,21;38:7,8,
12;39:1,11;42:18,21,
24;44:23;46:8,18;
52:17;53:1;54:13;
58:22,22,23,25;62:1,
3,4,14,15,25;63:1,4;
65:13,22;66:8;67:2,
11;72:6,7;82:25;
87:24;95:4,9
**procured (1)**
52:1
**produced (1)**

27:8
**professional (1)**
72:15
**professional-eyes-only (1)**
79:16
**professionals'-eyes-only (1)**
19:10
**profile (1)**
23:24
**prohibited (1)**
62:23
**prohibition (1)**
44:5
**Projections (7)**
5:15;18:6;50:19;
77:16;78:3;89:24;
98:10
**promptly (2)**
48:12,13
**prong (1)**
28:1
**proof (18)**
19:6,11;39:21;40:9;
46:3,7,13;64:11,14,
15;78:4;79:9,16;
80:13;84:13,15,16;
91:17
**proper (8)**
23:7;25:17,19,22,
25;28:18;91:21;99:24
**properly (1)**
27:11
**property (1)**
34:2
**proposal (2)**
15:20;110:14
**propose (4)**
29:5,7;62:6;111:5
**Proposed (28)**
2:7,22;3:5,5,16,17,
17;6:16,16,20,20;
18:10;20:4;21:5;26:5,
10;44:13;46:19,21;
53:25;54:24;55:2;
61:7;80:12;85:23;
88:23;104:11;111:4
**proposing (1)**
30:14
**proposition (2)**
54:16;60:5
**prosecute (1)**
41:16
**prosecution (1)**
41:4
**protective (1)**
19:11
**prove (1)**
63:6
**proved (1)**
61:17
**provide (20)**
18:5;19:8;28:9;
44:10,19,21;45:11;

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC.  Pg 442 of 448

May 15, 2024

46:13;49:8;50:8;
51:15,19,24;59:16;
61:19;78:4;92:21;
100:18;101:23;103:6
**provided (15)**
21:19;22:10,13,14,
18;23:7;27:24;28:10;
46:3;49:4;50:3;51:7;
60:21;78:3,4
**provides (9)**
22:11;23:5;26:2;
31:24;32:11;43:23;
60:14;90:1;92:11
**providing (7)**
46:7,10;50:7,23;
51:14;67:12;95:6
**proving (1)**
94:4
**provision (6)**
33:20;34:12;40:3;
56:23;92:2;94:9
**prudent (1)**
50:2
**public (1)**
39:10
**publicity (2)**
39:9;46:9
**publicly (2)**
20:1;99:21
**pulled (1)**
94:11
**punish (1)**
54:7
**punitive (1)**
75:19
**purely (2)**
48:19;97:2
**purpose (1)**
38:19
**purposes (3)**
21:1;40:15;58:17
**pursuant (1)**
97:18
**pursue (11)**
33:25;34:15;52:23;
54:6;55:19,20;73:15;
89:1,2;92:14;94:7
**pursued (2)**
21:24;55:20
**pursuing (2)**
41:11;87:25
**pursuit (2)**
34:19;56:17
**put (16)**
40:4;49:1,3;54:2;
57:17;58:8;60:10;
71:6;77:7;80:12,17;
82:8;84:24;94:15;
95:4;106:24
**puts (1)**
73:16
**Putting (6)**
47:17;72:16;74:25;

75:4;80:18;92:10

## Q

**quickly (4)**
74:17;81:3;93:7;
107:20
**quietly (1)**
88:20
**Quigley (6)**
25:8,17;26:8;53:24;
54:12;67:21
**QUINN (2)**
11:10;15:2
**quite (2)**
88:7;93:9
**quote (1)**
45:14

## R

**raise (2)**
40:14;83:1
**raised (9)**
17:6;25:13;27:2,5;
40:24;42:16;78:2;
80:15;84:1
**range (1)**
51:21
**ranges (1)**
51:18
**rata (2)**
100:17,21
**rather (1)**
55:3
**rationale (2)**
18:18;88:22
**RBC (1)**
64:9
**re (2)**
61:2;64:9
**reach (1)**
107:23
**reached (4)**
45:4;65:4;72:4;
108:19
**reaching (2)**
68:25;97:25
**read (4)**
16:17;28:20;58:20;
94:8
**reader (1)**
58:13
**readily (1)**
30:13
**reading (1)**
16:10
**ready (4)**
48:24;102:11,11;
106:24
**real (2)**
19:25;86:8
**reality (2)**

62:17;76:23
**really (27)**
23:3;24:25;25:10,
12;31:20;48:2;56:6;
57:24;59:12,23;
64:18;65:2,17;67:15;
74:3;80:20;81:24;
84:25;87:18;88:14,
24,25;91:10;92:16;
94:20;100:3;103:20
**reason (10)**
19:25;25:18;32:13;
35:21;46:16;64:4,12;
92:16,19;105:10
**reasonable (6)**
44:12;63:22;64:2;
70:14;101:23;107:4
**reasonably (3)**
28:12;60:17;63:25
**reasons (5)**
25:24;37:20;39:13;
44:4;56:24
**rebuttal (1)**
37:24
**recall (3)**
20:24;71:20;86:9
**receive (4)**
21:18;36:1;87:21;
100:9
**received (1)**
34:2
**receiving (2)**
28:13;29:1
**recently (3)**
45:5;73:2,11
**Recess (1)**
83:18
**recognize (1)**
26:15
**recommend (1)**
82:9
**record (15)**
14:4;16:11,17;
17:19;30:20;39:16;
42:1;52:19;71:5;80:2;
84:21;95:21;96:15;
97:22;105:1
**recover (1)**
93:18
**recovered (1)**
52:23
**recoveries (7)**
23:14;32:1;51:18,
22;53:15;57:10;98:25
**recovery (5)**
23:15;29:16;36:3;
70:3;99:8
**rectified (1)**
77:20
**rectify (2)**
80:10;81:6
**red (1)**
28:14

**redact (1)**
19:15
**redacted (2)**
19:11;39:21
**redactions (1)**
19:14
**redemption (1)**
57:15
**Redline (4)**
3:16;6:4,12,20
**reduced (1)**
69:19
**REED (12)**
10:2;15:19;18:14;
40:19;83:9,22;95:22;
101:2;102:18;106:7;
108:8;111:25
**referenced (1)**
104:12
**referring (1)**
84:4
**refers (1)**
85:8
**reflect (3)**
98:18;99:15;102:22
**reflected (2)**
100:23;102:23
**refrain (1)**
22:12
**refuse (2)**
25:11;56:23
**refused (7)**
21:1,8;35:1,19,21;
53:2;71:5
**regard (2)**
39:20;51:21
**Regarding (6)**
6:23;7:4;43:19;
51:14;58:10;102:21
**regardless (1)**
73:10
**regards (1)**
111:11
**reiterate (2)**
99:1;102:8
**rejected (2)**
28:25;29:19
**relate (1)**
109:19
**Related (47)**
2:5,7,10;3:3,17;4:9,
10;5:4,5,6,12,13,16,
21;6:5,13,17,19,21,
25;7:6,8,12,16,18,18,
22;17:15;24:21;
27:21;31:22;53:17;
55:5,21;85:9;89:13;
91:3;93:14,20;94:10,
11;96:1,20,21,25;
97:2;99:13
**relates (1)**
44:3
**Relating (6)**

2:13;3:6,23;4:18;
26:22;44:6
**relation (1)**
60:25
**relatively (2)**
24:13;81:3
**release (4)**
57:5;64:20;94:13;
95:6
**released (1)**
53:7
**releases (1)**
64:18
**releasing (1)**
94:3
**reliance (1)**
24:5
**relied (1)**
24:7
**Relief (7)**
2:7;4:10;5:5;6:19;
7:18;97:2,4
**relieved (1)**
49:19
**remain (4)**
17:10;43:17;90:9,
16
**remaining (1)**
41:12
**remains (2)**
42:12;87:7
**remarkable (2)**
58:4;95:2
**remarkably (2)**
47:5;93:8
**remind (2)**
46:15;74:22
**remotely (1)**
95:5
**removed (2)**
52:24;72:14
**removing (1)**
44:7
**Reorganization (5)**
5:11,25;6:4,9;45:8
**reorganize (1)**
93:15
**reorganized (2)**
52:15;70:10
**repeatedly (2)**
21:17;55:4
**replies (2)**
17:12;101:17
**Reply (8)**
5:19;16:6;24:11;
51:6;54:14;83:14,23;
97:16
**report (2)**
16:7;98:9
**reports (1)**
50:13
**represent (3)**
40:12;81:12;87:6

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 443 of 448

May 15, 2024

**representation (2)**
19:18;84:15

**representations (4)**
18:9;48:16;52:19;
80:9

**represented (2)**
19:12;110:9

**request (11)**
17:23;18:4,21;19:5;
20:18;21:4;37:21;
84:23;96:9;106:9;
107:7

**requested (2)**
18:8,20;21:21

**requesting (1)**
84:13

**requests (3)**
17:15,17;21:10

**require (5)**
25:7;36:17;43:25;
63:3;64:5

**required (4)**
24:17;44:10;47:24;
71:12

**requirement (4)**
42:20;54:11;61:15;
64:3

**requirements (1)**
79:14

**requires (4)**
23:8;45:16;64:11;
99:23

**Reservation (1)**
7:20

**reserve (4)**
24:3;27:17;37:23;
81:10

**reserved (1)**
24:18

**reserves (1)**
17:20

**reserving (3)**
96:2,10,12

**resolution (2)**
40:8;102:21

**resolutions (1)**
16:1

**resolve (7)**
16:15;17:6,18,23;
39:18;76:14;96:17

**resolved (7)**
41:5;52:7;97:17;
100:24;106:1;111:14,
17

**resolves (2)**
17:1;101:3

**resolving (2)**
20:16;65:16

**resort (5)**
47:11;63:5,5;65:5,6

**respect (20)**
40:8;68:21;69:9;
70:21;71:1,4;74:14;

77:9,14,22;78:8;
84:11;96:1,3;98:4;
103:2;108:15,21;
109:22;110:11

**respectfully (3)**
39:7;68:9;82:23

**respective (1)**
18:14

**responded (3)**
55:11,18;111:12

**Response (9)**
5:19;55:24;102:20;
109:14,25;110:5,6,8,
11

**responses (4)**
108:12,14,22;110:3

**responsible (1)**
50:11

**responsibly (1)**
65:23

**rest (1)**
75:7

**restraint (2)**
86:14;87:7

**result (3)**
40:13;51:4;85:23

**resulted (1)**
98:23

**results (2)**
27:8;54:18

**retain (1)**
99:20

**retained (2)**
93:15;99:18

**return (1)**
50:23

**revenue (1)**
50:21

**review (2)**
104:14;108:13

**reviewing (1)**
111:4

**Revised (10)**
3:5,15,16;6:16,19;
71:23;72:3;98:14,16;
101:2

**revisionist (1)**
62:24

**revisions (1)**
104:10

**ride (2)**
23:8,18

**right (35)**
24:3;31:10;32:3,20;
33:14,22,23,23;35:22;
36:6,9,20;41:15,16;
47:3;52:15;61:11;
71:20;73:5;75:15,18,
22;76:4,7,24;77:1;
83:1;85:21;86:8;88:7,
10,20;100:18;105:7;
109:21

**Rights (25)**

2:5,8;4:8;5:3,20;
6:17;7:16,20;27:11;
53:3;73:24;75:7;78:8;
81:10;89:13;96:3,12,
24;98:15;99:15;
100:11,13;101:2;
102:21;104:5

**rise (1)**
82:17

**risk (6)**
23:10,24;27:12;
51:20;100:20;102:24

**risky (2)**
23:6,9

**Robot (1)**
63:2

**RUDEWICZ (2)**
10:25;14:14

**Rudzewicz (1)**
14:15

**rule (6)**
27:1,4;60:2,6;62:5;
63:6

**run (1)**
62:25

# S

**safer (1)**
23:19

**safety (1)**
72:22

**sales (1)**
45:8

**same (14)**
45:1;46:12;63:14;
77:12;81:23;82:7;
94:25;100:10,12,12,
14,21;107:15,20

**SAT (2)**
37:1;93:9

**satisfaction (5)**
35:8;56:19,20;57:4,
13

**satisfies (5)**
18:4;19:20;28:1;
35:9;80:4

**satisfy (8)**
26:25;28:7;49:24;
59:19;60:16;63:21;
64:3;79:14

**satisfying (1)**
46:13

**Savings (3)**
12:3;15:6;26:2

**saying (25)**
25:1;33:24,25;
34:11,12;35:7,7;41:8,
22;42:2;47:10;55:1,
22;61:18,20;62:4;
72:5;79:13;81:8;82:8;
85:24;90:9;94:15;
95:12;105:19

**scenario (3)**
39:3;47:6;57:25

**schedule (6)**
56:1;101:21;
105:13;110:15;111:1;
112:7

**Scheduled (2)**
7:11;109:9

**Scheduling (7)**
2:14;3:7,24;4:19;
108:15,16;111:4

**scheme (1)**
63:8

**Schneider (1)**
61:3

**scrutiny (2)**
46:16;47:9

**se (1)**
28:25

**seated (1)**
83:19

**second (12)**
17:11;21:15;29:18;
32:3;33:23;44:9;
63:12;64:10;70:14;
88:9;98:5;100:11

**Section (4)**
42:21;44:11;53:18;
54:12

**secure (1)**
88:17

**secured (1)**
46:20

**securities (1)**
99:22

**seeing (1)**
38:9

**seek (3)**
38:13;85:15;97:2

**seeking (2)**
93:18;97:4

**seem (2)**
38:15;109:4

**seems (4)**
34:14;38:14;40:7;
109:4

**Segal (12)**
14:18,18;42:8,8;
93:4,4;96:15,15;
105:2,2;111:10,10

**selected (1)**
99:12

**self-interest (1)**
42:25

**self-serving (2)**
47:22;49:22

**send (3)**
37:10,13;62:8

**senior (1)**
46:20

**sense (11)**
29:13;41:19;49:15;
58:23;60:8;72:1;

74:11;81:22,23;82:2;
102:14

**sent (3)**
66:24;73:7;77:21

**sentence (3)**
32:11,18;57:4

**separate (9)**
18:15;25:14,19;
37:10,13;64:12;
84:25;91:17,24

**separately (4)**
6:12;25:17;81:21;
105:12

**series (1)**
89:24

**served (1)**
21:17

**set (5)**
57:11;105:13;
106:2;108:11,22

**sets (1)**
46:2

**setting (1)**
107:6

**settle (11)**
35:8;36:4;52:15;
57:5;58:5;74:5;76:15,
18;87:15,22;88:11

**settled (5)**
52:21,24,25;58:17;
64:23

**settlement (39)**
18:9,18;23:6;31:5,
14,24;35:1,7,25;36:2,
12;39:17;40:2;43:7,8;
50:20;53:3,4,8,10;
56:19,20,24;57:22;
58:1;64:21;66:21;
73:4,12,13;74:1,10,
11,14;76:15;80:12;
86:2;88:21,24

**settlements (2)**
52:18;53:2

**seven (3)**
44:5;47:2;59:11

**Seventh (1)**
11:4

**seventy-five (13)**
31:25;35:4,14,23;
36:7;52:22;53:6;57:9;
58:3;74:2;75:23;
89:18;90:18

**several (4)**
21:2;22:10;37:3;
68:22

**SEWARD (2)**
12:11;15:10

**shall (5)**
33:21;34:18;56:16;
57:5,12

**share (1)**
27:25

**shareholder (16)**

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 444 of 448

May 15, 2024

18:22,25;19:7,14;
27:22,22;30:2,2;
43:18;45:21;46:5;
85:2;89:17;91:9,13;
93:7
**shareholders (20)**
14:23;18:21,24;
19:6,12,19,25;28:2,
12;29:1;38:2,2;39:7,
16;70:24;75:6;84:25;
85:2;89:5;90:3
**shares (20)**
33:11,17;34:9;
55:22;56:8;57:14,16;
58:7,10,11,16;73:24;
76:17;85:9;89:14;
93:18,22,23;94:7;
95:7
**Shaughnessy (1)**
14:19
**Shemen (36)**
17:11;21:3,3,5;
23:1,2,4,8,16,17,18,
18,22;24:2,7,11;25:4,
13;26:16;27:6,9,10;
28:8;30:17,21;37:12;
61:25;70:17,21;71:1;
88:9;89:23;96:5;
98:12;100:12,20
**Shemen's (1)**
92:16
**shift (1)**
42:25
**shifted (1)**
62:17
**shining (1)**
39:10
**ships (1)**
76:3
**shock (1)**
61:24
**shocked (1)**
67:3
**short (1)**
103:6
**shortly (1)**
43:5
**show (6)**
19:17;20:4;60:9,19;
64:2;79:16
**showed (1)**
78:22
**showing (1)**
98:12
**shut (1)**
38:22
**shy (1)**
29:10
**side (2)**
83:24;85:7
**SIDLEY (4)**
11:2;14:21;18:16;
38:1

**sign (4)**
79:17,21,23;97:25
**signed (2)**
18:22;103:18
**significant (9)**
18:2;43:8;71:2;
73:3;78:21;80:8,11;
86:5;98:23
**significantly (1)**
69:2
**signing (1)**
79:19
**silly (1)**
61:14
**similar (3)**
47:5;106:9;108:16
**simple (1)**
74:24
**simply (11)**
15:20;16:11;17:19;
18:12;24:12;26:19;
38:24;45:14;48:18;
53:12;89:23
**simultaneously (1)**
96:9
**single (3)**
67:1,3;91:4
**situation (2)**
53:23,24
**six (8)**
44:4,6;49:14,17;
59:12,12;61:10,12
**sixty (1)**
45:15
**slash-and-burn (1)**
23:11
**slight (1)**
103:9
**small (2)**
24:14,14
**smaller (1)**
70:3
**SME (1)**
50:21
**SMEs (1)**
72:18
**SMITH (12)**
10:2;15:19;18:14;
40:19;83:9,22;95:22;
101:2;102:18;106:7;
108:8;111:25
**sneaks (1)**
43:7
**Society (2)**
12:3;15:6
**solicit (4)**
38:17;100:1;
102:11;103:11
**Solicitation (21)**
2:19;3:12;4:4,23;
16:2;20:20;24:13,15;
30:25;37:22;67:15;
82:25;92:21;96:4,22;

99:15,18;100:2;
101:11;103:2,3
**solicited (5)**
23:1;37:23;38:21;
39:15;91:8
**soliciting (4)**
53:22;97:3;99:21;
100:3
**SOLMON (1)**
10:7
**Solomon (4)**
14:6;55:10;87:4,9
**solve (1)**
63:9
**somebody (1)**
62:6
**somehow (2)**
67:17;87:23
**someone (4)**
54:3;62:4;79:3,4
**somewhat (2)**
53:23;64:24
**somewhere (1)**
67:8
**soon (1)**
101:20
**sorry (5)**
28:15;79:5;86:24;
88:6;90:6
**sort (6)**
40:7;62:3;87:23,24;
91:2;107:9
**sounded (1)**
48:9
**sounds (4)**
15:23;52:7;56:4;
107:4
**source (4)**
44:19;45:6;53:14;
63:14
**Souter (1)**
28:20
**speaks (2)**
42:21;54:12
**special-purpose (1)**
76:3
**specifically (1)**
25:9
**spend (1)**
102:12
**spilled (1)**
23:25
**spoke (2)**
54:14;68:1
**spotlight (1)**
39:10
**stage (4)**
54:2,23;64:9,9
**stand (3)**
45:1;74:19;80:6
**standard (10)**
24:7,8,12,22,25;
25:3,10;60:16;63:21;

64:4
**standards (2)**
24:6,19
**standing (1)**
85:15
**standpoint (1)**
60:15
**stands (1)**
75:19
**start (14)**
15:25;28:19;32:13,
14;42:25;44:14;
45:19;56:11;61:23;
65:11;71:20,24;72:5;
84:12
**started (6)**
21:11;43:4;47:10;
59:1;65:4;86:11
**starting (3)**
62:22;63:4;65:14
**starts (3)**
28:18;57:4;60:5
**state (1)**
16:11
**stated (4)**
42:20;49:9;63:12;
85:17
**Statement (106)**
2:18;3:11;4:3,22;
5:9,13,20;6:7,8,11,13,
13;7:21;16:3,9,15,23;
17:16;18:7;19:4;
20:15,19;21:16,24;
22:7,12;25:11,24;
28:14;37:21;39:14;
42:12,18;43:3,24;
44:2,3,10,15,17,24;
45:6,14,16,20;46:2,8,
11;47:8;48:7,25;49:3,
25;50:24;51:6;52:20;
54:22,23;58:15,25;
59:25;60:19,22;
61:21;62:10;64:8,9,
13;65:1;67:6;68:10,
19,20;69:13;71:23;
72:3,8;74:13;76:24;
77:7,22;80:18;81:6;
84:9;91:20;92:10,16,
19;93:14;94:2,4,22;
96:1,7,21;97:7,20;
98:6,7,17;99:14;
103:8,25;104:3;
106:23;110:10
**statements (21)**
36:22;38:10;45:9;
47:22;48:4;62:9;66:3,
7,20;68:18,22;69:2,5;
72:11;77:9,14,15,21;
80:22;81:20,25
**States (4)**
6:25;10:19,20;
14:15
**stating (2)**

17:19;18:12
**status (7)**
86:22,25;108:4,10,
23;109:11;110:15
**STEPHEN (6)**
10:15;14:10;68:14;
102:4;103:15;106:19
**stern (1)**
30:5
**still (10)**
46:9;48:9;49:2;
51:15;58:2;60:3,16;
74:18;78:20;80:8
**stole (1)**
96:16
**stood (1)**
37:1
**stop (3)**
27:6;44:1;101:24
**stopping (1)**
38:15
**straight (2)**
69:14;75:5
**Street (1)**
8:21
**stripping (1)**
59:6
**structure (1)**
90:2
**stupid (1)**
74:24
**sub (2)**
33:10;35:18
**subject (10)**
18:17;33:12;35:24;
47:9;79:22;86:4,12;
101:3,18;104:9
**subjected (1)**
53:21
**submissions (2)**
104:16;106:25
**submit (4)**
38:8;39:7;82:23;
105:23
**submitted (4)**
47:1;104:18;
106:13;108:17
**subordinate (5)**
51:23;52:5;72:23;
91:21;95:15
**subordinated (3)**
25:16;26:5;52:2
**subordination (6)**
25:20;26:4;51:24;
59:4;91:25;95:11
**Subscription (2)**
2:8,9
**Subsequent (2)**
71:16;100:19
**subsidiaries (2)**
47:25;49:24
**subsidiary (2)**
48:2;49:11

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC Pg 445 of 448

May 15, 2024

**substantial (25)**
19:21;21:14;22:6,
17;23:9;26:9,18;27:7,
8;28:3,4;60:17,22,24,
25,25;61:8,12;69:10;
76:5,9;81:5;86:16;
87:19;102:10
**substantially (2)**
27:9,10
**substantive (1)**
21:20
**succeed (1)**
57:22
**success (1)**
66:14
**successful (5)**
32:20;33:19;36:3;
73:22,25
**sue (1)**
36:6
**sufficient (13)**
25:23,23;26:4;
30:17;45:12;46:3;
51:7,14;53:13;68:10;
89:22;91:23;101:23
**sufficiently (1)**
28:11
**suggest (4)**
24:2;37:5;49:18;
106:24
**suggesting (1)**
26:13
**suggestion (1)**
103:5
**Suite (2)**
8:21;10:22
**suits (1)**
23:14
**SULLIVAN (1)**
11:10
**sum (1)**
28:4
**summary (3)**
25:2;26:17;91:6
**SUPER (10)**
11:16;15:1,1;16:12;
17:1,4,4;39:24,25;
40:21
**superior (4)**
46:21;62:7;74:21;
81:16
**supplement (1)**
101:14
**Support (20)**
6:8;45:10,23;46:7;
48:3;49:22;54:23;
68:11;75:20;77:7,8;
78:13;82:3,9;84:24;
85:1;97:20;101:17;
110:10,10
**supported (2)**
49:2;63:24
**supporting (2)**

23:1;68:7
**supportive (1)**
102:15
**supposed (1)**
65:5
**Supreme (1)**
71:12
**Sure (10)**
32:7;34:24;42:4;
79:23;80:20;90:8;
94:9;99:19;105:16;
109:10
**surprise (1)**
78:20
**suspense (1)**
63:18
**SW (1)**
63:2
**sweat (1)**
28:4

**T**

**tables (1)**
22:6
**Tabulation (4)**
2:20;3:13;4:5,24
**tactics (2)**
42:25;43:1
**talk (4)**
50:20;57:1,3;65:11
**talked (6)**
38:6;46:8;56:6;
64:17;65:8;91:16
**talking (15)**
32:21,22,25;33:5;
46:9;57:23;61:9;
65:10,16;73:5;77:10;
79:3;86:17;97:10,12
**talks (1)**
56:18
**TBD (1)**
101:17
**team (1)**
107:9
**telling (3)**
29:9;55:4;59:5
**ten (14)**
46:22,23;47:1,10,
11,15;48:19;59:1;
69:21;70:4;76:11;
99:2,8;107:12
**tender (2)**
31:25;35:22
**ten-minute (1)**
83:15
**terminate (1)**
21:4
**terminated (1)**
71:16
**terminating (1)**
30:6
**termination (1)**

30:3
**terms (18)**
20:3,9,23;27:21;
31:7,7;36:15;46:20,
22;63:10;69:1;81:14;
92:1;97:11;100:22;
101:9;103:21,22
**terribly (1)**
88:19
**test (5)**
27:7,8;28:1,18;51:5
**tested (1)**
30:12
**testimony (1)**
55:9
**theirs (2)**
96:6,8
**theory (1)**
108:15
**there'd (1)**
57:2
**therefore (1)**
52:1
**therein (1)**
45:10
**Thereof (5)**
2:18;3:11;4:3,22;
93:19
**Thereto (2)**
5:13;93:20
**Third (6)**
24:24;54:15,21;
58:24;70:15;100:16
**third-party (1)**
63:24
**thirteen (1)**
99:4
**thirty (16)**
19:13;28:3;45:24;
47:13,17,22;59:9,13;
60:23,24;61:9;65:14,
18;69:15;74:25;75:9
**thirty-million-dollar (1)**
43:18
**THOMPSON (2)**
13:2;15:15
**Though (2)**
40:11;75:15
**thought (3)**
41:14;71:2;72:10
**thousand (1)**
87:16
**three (8)**
19:12;21:9;24:23;
58:6;74:5;76:20;
101:11;110:1
**three-person (1)**
70:12
**threshold (1)**
70:7
**thrown (1)**
26:20
**thunder (1)**

96:16
**thus (1)**
64:12
**timeline (3)**
20:23;101:9;105:5
**times (6)**
45:15;48:1;55:8;
59:5;79:1;95:13
**timing (2)**
45:25;48:8
**TINA (2)**
12:8;15:5
**today (30)**
20:9,14;22:8;24:2;
30:24;43:21;48:5,24;
49:3;52:7,19;61:21;
68:18,23,23;73:13,15;
74:9,19;80:6,10;81:9;
91:6;96:18,19;97:4;
104:11;107:1;108:10;
111:24
**today's (1)**
30:20
**toe (1)**
110:3
**together (6)**
18:6;57:17;61:11;
95:20;96:5,20
**Togut (8)**
14:18;21:1;42:8;
93:4;96:15;105:2;
110:9;111:10
**told (10)**
74:22;77:14,17;
78:1,18,25;79:7,8,14;
88:1
**took (5)**
18:16;62:16;71:13;
86:12;98:25
**tool (1)**
24:12
**top (4)**
68:12;89:19,20;
90:19
**topics (1)**
47:7
**Tor (1)**
35:10
**total (2)**
93:23;99:9
**towards (1)**
105:15
**Tracy (1)**
111:13
**trade (1)**
82:19
**traded (1)**
99:21
**transaction (1)**
45:16
**transactions (2)**
46:15;47:9
**Transcribed (1)**

8:19
**transfer (14)**
34:8;41:2;48:11;
55:5,6;56:13,15;
57:14,21;58:11;
64:20,22;90:15;93:22
**transferred (4)**
31:22;41:6,7;52:13
**Transferring (2)**
35:4;56:14
**transfers (1)**
55:21
**transpired (1)**
73:21
**treated (1)**
72:24
**treatment (2)**
84:7;100:9
**trial (5)**
26:12,14;71:21;
93:11;104:17
**tried (1)**
87:4
**trivial (1)**
42:19
**Trust (52)**
14:22,23;18:10;
31:8,23,23,25;35:15;
40:2,5;41:3,12,13;
43:20;52:9,13,14;
55:4,16,23,24,25;
56:2,14;57:3,5,8,25;
58:3,4,6,19;59:6,8;
59:12,19;73:7,8,10,15,
18,19;74:2;76:20;
85:19;88:23;89:3,9,
15;90:10,16;92:12,13
**Trustee (35)**
6:25;10:20;14:15;
15:7,15;23:2;31:23;
32:12,13,14;33:14,16,
21,25;34:15,16,18,21,
25;35:24;36:3,4,5,6,8;
41:15;55:9,17,19;
56:15;57:5;62:18;
71:21;72:16;98:21
**trustees (1)**
98:20
**trusts (1)**
75:2
**trust's (1)**
73:16
**try (11)**
26:16;31:10;43:13;
67:7;69:5;74:21;
79:14;80:10;81:12;
103:24;108:19
**trying (11)**
31:9;37:5;62:2;
65:23;67:18;68:2,25;
94:2,12,13;95:2
**turn (3)**
86:5;93:5;108:3

**Turning (3)**
49:7;53:20;60:2
**turns (2)**
87:24;105:20
**tweaks (1)**
101:4
**twelve (1)**
99:3
**twenty-seven (4)**
47:19;48:23;75:4;
78:6
**twice (1)**
60:14
**two (39)**
17:9;18:8;26:7;
37:7,10;38:9,13,17;
39:17,17;43:25;
54:18;56:6,6;62:8,18;
66:6;67:7,16,18;68:2,
18;70:6;71:25;73:21;
74:19;76:3;77:6;
81:24,25;82:8;87:13;
95:24;96:19;97:15,
22;98:20;99:10;100:3
**type (2)**
55:21;82:6

**U**

**ulterior (2)**
55:3;58:9
**ultimate (5)**
33:19;41:3;88:3,21;
92:4
**ultimately (5)**
21:5;54:5;62:15;
88:14;91:25
**unable (1)**
72:23
**unaffiliated (1)**
70:24
**unanimous (2)**
63:17;67:4
**unburdened (1)**
49:11
**uncomfirmability (1)**
24:11
**unconfirmability (6)**
24:5,7,22,25;25:9;
59:15
**unconfirmable (5)**
25:6;44:5;53:20;
71:9,14
**unconformable (2)**
53:22;54:16
**uncontested (1)**
96:18
**under (25)**
20:3;26:1,6;28:8;
44:11;51:3;53:18;
63:25;69:16,17;
70:12,19,22;71:2,18;
72:17;74:24;75:3,13;

76:15;78:7;84:2,2;
85:19;100:5
**underlining (1)**
22:14
**underpinning (1)**
53:17
**Understood (10)**
32:9;88:2;90:24;
105:25;106:4,16;
107:11,14,19;109:21
**undisclosed (1)**
62:1
**unfortunately (1)**
73:3
**unheard (1)**
39:4
**uninterested (1)**
21:18
**unique (2)**
53:23;101:7
**United (1)**
6:25;10:19,20;
14:15
**units (1)**
92:12
**Unity (1)**
14:23
**universe (1)**
24:14
**Unless (5)**
15:22;31:2;35:16;
97:23;112:3
**Unlike (4)**
45:2;49:8;50:15;
94:10
**unnecessarily (2)**
77:19;79:1
**unnecessary (1)**
79:24
**unpaid (1)**
93:25
**unprecedented (1)**
39:4
**unresolved (2)**
41:2,17
**unsaid (1)**
47:14
**Unsecured (15)**
6:25;7:6;10:11;
14:11;61:6;68:15;
69:7,15;77:4;100:4,7,
9,16;102:5;103:23
**unsupported (2)**
47:21;59:3
**untested (2)**
29:11,11
**up (25)**
40:1,17;44:20;
47:13;49:23;51:20;
56:4;60:9;61:21;62:6;
65:2,18,25;66:17;
70:3;71:18;72:17;
73:5,12;76:12,12,12,

12;86:24;108:10
**updated (1)**
50:24
**upheld (1)**
54:21
**upon (12)**
18:23;24:7;25:1;
32:12,19;41:4;45:7,
12;52:3,4;54:18;91:5
**URQUIHART (1)**
11:10
**use (3)**
19:22;24:9;65:3
**used (2)**
74:23;85:11
**Using (6)**
60:13;64:21;88:4,8,
8,9

**V**

**vacated (2)**
87:5;95:14
**vacuum (1)**
53:9
**vague (2)**
48:5;52:19
**valuable (8)**
52:22;73:14,24;
76:5,17;86:16;89:1;
95:10
**Valuation (16)**
5:15;18:5;22:15;
28:11;44:22;47:16;
50:4,14,15,19;60:13;
63:23,23,25;78:17;
98:9
**valuations (1)**
77:15
**value (59)**
18:22,25;19:7,14;
22:24;27:1,3,7,22,22;
28:12;30:2,3,11,18;
32:1;35:5;40:6;42:16;
43:12,18;44:5;45:2,
21;46:5;47:15;53:7;
57:15,21;59:25;
60:14;61:23;62:3;
63:9,18;64:2,21;76:5;
85:3,21,23,24;88:24;
89:4,11,17,18,22,23;
90:1,22,25;91:9,13;
93:7,19;94:3,18;
100:15
**valve (1)**
72:22
**various (4)**
22:4;98:19;99:22;
100:8
**vastly (1)**
38:10
**venture (1)**
23:9

**version (3)**
43:10,11;59:4
**versus (1)**
83:4
**vessels (1)**
86:15
**viability (1)**
30:5
**viable (1)**
54:4
**view (11)**
16:18,20;22:19;
42:12;43:8,9;48:13;
74:8;84:25;90:5;
102:7
**violate (1)**
27:1
**violates (1)**
27:3
**violation (3)**
27:4;32:15;51:5
**Virgin (1)**
87:5
**Vitech (1)**
53:1
**voice (1)**
31:1
**vote (16)**
22:23;24:10;25:3;
27:20;38:18;39:6;
58:21;62:8;76:25;
78:13;82:22,24;83:3,
6;92:18;105:20
**voted (1)**
67:17
**Votes (5)**
2:20;3:13;4:5,24;
62:10
**voting (8)**
45:11;54:17;63:18;
67:4;100:6,7;101:14,
15

**W**

**waited (1)**
21:9
**waived (1)**
76:21
**waives (1)**
73:23
**Walden (2)**
30:15;67:22
**walk (3)**
53:9;58:6;61:11
**wants (3)**
55:13;69:24;85:4
**warning (1)**
30:5
**way (17)**
26:13;30:1;31:14;
32:11;34:4;36:12;
57:13;62:2,14;74:24;

76:14;77:6,17;90:4;
94:6,8;98:1
**ways (1)**
37:7
**weakly (1)**
34:6
**wearing (1)**
46:24
**week (16)**
72:3,4;81:7;97:19;
101:12;102:12;103:9;
104:16;106:25;107:8,
24;109:3,3;110:18,20,
22
**weekend (2)**
73:6;78:19
**weeks (2)**
38:6;105:20
**weight (1)**
49:6
**whataboutism (1)**
64:25
**whatnot (2)**
78:10;80:14
**what's (4)**
39:11;56:5;104:18;
106:13
**Whereupon (1)**
112:11
**Wherewithal (5)**
5:16;20:3;46:4;
78:23;98:12
**whispering (1)**
88:19
**whole (5)**
56:18,19;57:2;66:4,
15
**who's (4)**
62:12;65:5,22;
94:10
**whose (1)**
22:24
**wildly (2)**
51:3;66:18
**WILLIAM (3)**
11:7;14:21;38:1
**willing (14)**
23:16;39:18;63:14;
74:15;79:17;80:2,3,3;
81:5;83:11;84:18;
90:4;94:23;102:12
**willingness (1)**
27:24
**Wilmington (9)**
12:3;15:6;66:11;
98:21;110:7,10,11,22;
111:16
**Wilmington's (1)**
110:8
**wins (1)**
56:18
**wish (5)**
92:25;95:18;

23-10322-jpm    Doc 1268    Filed 11/25/24    Entered 11/25/24 09:06:22    Main Document
In the Matter of: ELETSON HOLDINGS INC. Pg 447 of 448

May 15, 2024

102:17;103:14;104:2
**withdrawn (3)**
16:19,20,22
**withdrew (1)**
16:18
**within (8)**
38:22;47:7;77:20;
84:5,7;101:11;
111:16,22
**without (10)**
16:19,22;30:6;
50:22;51:20;81:9;
92:3;97:10;104:20,23
**Wo (1)**
75:24
**woefully (1)**
42:12
**wondering (1)**
37:14
**word (2)**
45:14;48:13
**words (3)**
34:4;47:25;89:12
**work (10)**
31:14;65:3;84:18;
85:5;97:13;105:15;
106:2,10;107:24;
109:4
**worked (4)**
32:11;37:17;83:5;
101:21
**working (4)**
27:15;66:17;
105:18;107:9
**world (1)**
94:21
**world-class (1)**
99:18
**worried (3)**
23:17,19;92:17
**worse (2)**
43:10;51:4
**worth (8)**
28:4;60:17;61:15;
71:14;76:2,4,6,7
**worthless (1)**
77:4
**wreaked (1)**
23:12
**written (1)**
40:9
**wrong (2)**
28:16;46:24

**Y**

**years (4)**
49:14,17;68:3;
73:21
**yelling (1)**
63:21
**yesterday (6)**
16:13;18:1;40:12;

69:13;77:7;78:17
**York (8)**
10:5,13,23;11:5,14;
12:6,14;13:6
**young (1)**
74:23

**Z**

**ZIDE (22)**
10:15;14:10,10;
68:14,14;75:16,18,24;
76:1;77:4;79:6;81:22;
82:11;86:7;98:25;
102:4,4;103:15,15;
106:17,19,19
**Zide's (1)**
90:5
**Zoom (5)**
4:11;5:6;68:17;
79:4;88:5

**0**

**00 (2)**
4:15;92:7

**1**

**1 (15)**
2:7;3:22;4:16;5:9;
6:2,11,19;16:2;51:8;
56:18;57:2,12;62:16;
76:2;99:1
**1:57 (1)**
16:13
**10:00 (1)**
2:2
**100 (1)**
75:22
**10004 (1)**
12:14
**10010 (1)**
11:14
**10017 (1)**
13:6
**10019 (1)**
11:5
**10022 (1)**
10:5
**10036 (2)**
10:13;12:6
**102 (1)**
26:9
**103 (1)**
84:3
**10707 (1)**
10:23
**1095 (1)**
10:12
**11 (13)**
4:15;5:10,25;6:3,9,
19;38:11,19;39:1;

55:19;80:17;99:20;
101:2
**11:22 (1)**
83:18
**11:40 (1)**
83:18
**1125 (2)**
44:11;53:18
**1129 (2)**
26:20,21
**1129a3 (2)**
42:21;54:12
**113 (1)**
84:6
**1155 (1)**
12:4
**12.5 (1)**
69:18
**12:17 (1)**
112:11
**120 (1)**
65:2
**125 (3)**
56:9;76:17,18
**13.5 (1)**
69:18
**145 (1)**
24:24
**14th (1)**
16:13
**15 (1)**
7:11
**16th (1)**
8:21
**17.8 (1)**
100:14
**18 (1)**
64:9
**180 (1)**
65:3
**186 (1)**
56:9
**18th (4)**
40:10;108:23;
109:10;110:16
**1B3 (1)**
51:19
**1st (1)**
101:16

**2**

**2 (19)**
2:8,23;4:7;5:2,12;
6:4,12,20;34:22,23,
24;35:7,20;51:8;
56:19;57:4;95:19;
99:2;103:20
**200,000 (2)**
70:8;99:7
**2007 (1)**
25:8
**2010 (1)**

26:9
**2013 (1)**
15:15
**2018 (1)**
30:10
**2024 (5)**
2:2,3;7:12;16:17;
20:23
**210 (1)**
26:9
**213 (1)**
29:23
**2267 (1)**
30:11
**22nd (3)**
11:13;12:5;109:3
**23-10322 (1)**
14:3
**23rd (4)**
20:23;110:19,23;
111:1
**24th (4)**
101:14;110:20,23;
111:1
**257-0885 (1)**
8:23
**26th (2)**
97:8;101:15
**27th (2)**
13:5;101:16
**2A (1)**
2:24
**2B (1)**
2:24

**3**

**3 (12)**
2:9,23,24,24,25;
34:22,23;35:16,18;
98:14;99:5;100:5
**300 (1)**
13:4
**3018 (3)**
66:10,15;67:16
**333 (1)**
93:24
**364e (1)**
26:24
**372 (3)**
7:6,8,13
**377 (3)**
7:8,12;110:4
**379 (3)**
7:9,13;110:6
**380 (3)**
7:9,13;110:7
**3920 (1)**
29:23
**3rd (3)**
101:14,17;107:22

26:9

**4**

**4 (7)**
2:9,25,25;100:5;
108:8;109:2;110:15
**4:00 (2)**
2:3;4:15
**437 (1)**
26:8
**438 (1)**
28:23
**45 (1)**
28:14
**451 (1)**
29:2
**452 (1)**
29:2
**453 (1)**
29:6
**455 (1)**
29:8
**458 (1)**
29:12
**467 (1)**
28:15
**468 (1)**
28:15
**470 (1)**
28:16
**471 (1)**
28:16

**5**

**5 (3)**
2:25;3:2;110:15
**5/15/2024 (2)**
3:20;4:15
**5/9/2024 (1)**
4:15
**500 (2)**
104:18;107:23
**51 (1)**
11:12
**531 (9)**
2:10;3:3;5:17,22;
6:5,14,21;7:2;97:8
**532 (6)**
3:18;5:21;6:5,14,
21;97:8
**534 (1)**
10:22
**570 (2)**
5:21;7:6
**574 (5)**
5:21;7:2,12;96:23;
104:4
**574,665,664,531 (1)**
3:18
**592 (7)**
4:12;5:7;6:21;7:2,
13;97:1;104:6

**In the Matter of: ELETSON HOLDINGS INC.**

May 15, 2024

**599 (1)**
  10:4
**5A (5)**
  26:6;51:21,22;
  63:19;84:7
**5B (3)**
  51:23,25;63:20
**5th (3)**
  109:4;110:20,22

---

**6**

**6 (3)**
  3:2,2;110:15
**632 (1)**
  4:12
**639 (1)**
  110:8
**643 (1)**
  110:5
**644 (1)**
  110:6
**645 (1)**
  110:11
**648 (2)**
  16:6;17:7
**652 (2)**
  5:21;97:16
**653 (2)**
  5:21;97:16
**658 (2)**
  6:14;98:8
**663 (1)**
  98:5
**664 (3)**
  5:22;6:21;98:6
**665 (2)**
  5:21;98:16
**666 (2)**
  5:22;98:17
**667 (1)**
  97:16
**670 (2)**
  16:6;22:7
**671 (2)**
  31:11;84:4
**672 (3)**
  21:16;22:15;28:15
**686 (1)**
  22:8
**687 (2)**
  18:3;22:16
**688 (1)**
  24:24
**689 (1)**
  97:21
**692 (1)**
  15:22
**697 (1)**
  102:1
**698 (1)**
  102:1

---

**7**

**7 (5)**
  49:9;51:9;108:8;
  109:3;110:15
**7227 (1)**
  8:21
**787 (1)**
  11:4
**7th (2)**
  93:10;108:12

---

**8**

**8 (1)**
  2:2
**800 (1)**
  8:23
**85020 (1)**
  8:22
**89 (1)**
  84:7
**8th (2)**
  16:17,17

---

**9**

**9:30 (2)**
  3:20;7:12
**9019 (2)**
  36:17,18
**97 (1)**
  31:12
**9th (1)**
  93:10