TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Brian F. Shaughnessy
Amanda C. Glaubach

*Counsel for Reorganized Holdings*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                         :

In re:                               :         Chapter 11
                                           :

ELETSON HOLDINGS INC., et al.,        :         Case No. 23-10322 (JPM)
                                         :
                                         :         (Jointly Administered)

                        Debtors.[1]     :

-------------------------------------------------------------x

## REORGANIZED HOLDINGS' (A) PRELIMINARY OBJECTION TO REED SMITH'S FOURTH INTERIM AND FINAL FEE APPLICATION AND (B) REQUEST FOR DISGORGEMENT OF ALL REED SMITH'S FEES

---

[1]    The Debtors in these cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

sk

## TABLE OF CONTENTS

<strong>Page</strong>

RELEVANT FACTUAL BACKGROUND ................................................................................1

   I.  Reed Smith's Retention and Employment in the Chapter 11 Cases.........................1

      A.  Reed Smith's Retention Application........................................................................1

      B.  Reed Smith's Inadequate Disclosures.....................................................................2

      C.  Reed Smith's Conduct During the Chapter 11 Cases.............................................7

   II.  Reed Smith's Conduct After Entry of the Confirmation Order................................9

      A.  Reed Smith Ignored the Confirmation Order and Refused to Help Implement the PC Plan ..........................................................................................................9

      B.  Reed Smith Works to Obstruct the PC Plan and  Subvert the Confirmation Order....................................................................................................................10

OBJECTION....................................................................................................................15

   I.  Reed Smith's Misconduct Requires Disgorgement of their Fees...........................15

   II.  Reed Smith is Not Disinterested............................................................................20

   III.  Reed Smith's Services Did Not Benefit the Estate ...............................................22

      A.  Reed Smith's Work on the "Plan and Disclosure Statement" ............................25

      B.  Reed Smith's Work on "Claims Administration and Objections" ....................27

      C.  Reed Smith's Work on "Financing and Cash Collateral" ..................................27

   IV.  Additional Issues with Reed Smith's Fee Applications .........................................28

   V.  The Court Should Defer Ruling on the Fourth and Final Fee Application Until After the Estate's Claims Against Reed Smith Are Resolved ................................28

RESERVATION OF RIGHTS .........................................................................................29

CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AASI Creditor Liquidating Trust v. Raymond James & Assocs., Inc.*
   *(In re All Am. Semiconductor, Inc.)*, 427 B.R. 559 (Bankr. S.D. Fla. 2010) .........................29

*Buckley v. TransAmerica Inv. Corp. (In re Southern Kitchens),*
   216 B.R. 819 (Bankr. D. Minn. 1998) ...................................................................................17

*In re Ahead Commc'ns Sys., Inc.,*
   395 B.R. 512 (D. Conn. 2008)................................................................................................27

*In re Alcon,*
   Case No. 09-41608 TK, 2010 WL 144408 (Bankr. N.D. Cal. Jan. 8, 2010).........................16

*In re All Island Truck Leasing Corp.,*
   546 B.R. 522 (Bankr. N.D. Ill. 2016).....................................................................................24

*In re Ames Dep't Stores, Inc.,*
   76 F.3d 66 (2d Cir. 1996).......................................................................................................27

*In re Angelika Films 57th, Inc.,*
   227 B.R. 29 (Bankr. S.D.N.Y. 1998)................................................................................21, 22

*In re Bennet Funding Grp, Inc.,*
   213 B.R. 234 (Bankr. N.D.N.Y. 1997) ..................................................................................25

*In re Big Mac Marine, Inc.,*
   326 B.R. 150 (B.A.P. 8th Cir. 2005) ......................................................................................22

*In re Boy Scouts of America,*
   35 F.4th 149 (3d Cir. 2022)....................................................................................................20

*In re Byington,*
   454 B.R. 648 (Bankr. W.D. Va. 2011) ...................................................................................18

In re Coastal Equities, Inc.,
   39 B.R. 304 (Bankr. S.D. Cal. 1984)......................................................................................18

*In re Codesco, Inc.,*
   18 B.R. 997 (Bankr. S.D.N.Y. 1992).....................................................................................21

*In re Dickson Properties, LLC,*
   Case No. 11-18617 (BFK), 2012 WL 2026760 (Bankr. E.D. Va. June 5, 2012).................15

*In re EBW Laser Inc.,*
   333 B.R. 351 (Bankr. M.D.N.C. 2005)..................................................................................17

**Pages**

*In re Engel,*
190 B.R. 206 (Bankr. D.N.J. 1995) ........................................................................23

*In re Envirodyne Indus. Inc.,*
150 B.R. 1008 (Bankr. N.D. Ill. 1993) ...................................................................21

*In re Food Mgmt. Grp., LLC,*
380 B.R. 677 (Bankr. S.D.N.Y. 2008) ....................................................................19

*In re Granite Partners LP,*
219 B.R. 22 (Bankr. S.D.N.Y. 1998) ..................................................15, 16, 17, 21

*In re Haimil Realty Corp.,*
579 B.R. 19 (Bankr. S.D.N.Y. 2017) ....................................................................23

*In re Hunt,*
124 B.R. 263 (Bankr. S.D. Ohio 1990) ..................................................................25

*In re Image Innovations Holdings, Inc.,*
391 B.R. 255 (Bankr. S.D.N.Y. 2008) ...................................................................29

*In re Independent Eng'g Co.,*
232 B.R. 529 (B.A.P. 1st Cir. 1999) ......................................................................18

*In re JMK Constr. Grp.,*
441 B.R. 222 (Bankr. S.D.N.Y. 2010) ...................................................................21

*In re Keene Corp.,*
205 B.R. 690 (Bankr. S.D.N.Y. 1997) ...................................................................23

*In re Kohl,*
421 B.R. 115 (Bankr. S.D.N.Y. 2009) ...................................................................24

*In re Leslie Fay Companies, Inc.,*
175 B.R. 525 (Bankr. S.D.N.Y. 1994) ..............................................................16, 17

*In re Lewis Road, LLC,*
Case No. 09-37672, 2011 WL 6140747 (Bankr. E.D. Va. Dec. 9, 2011) ..............16

*In re Martin,*
817 F.2d 175 (1st Cir. 1987) ..................................................................................21

*In re Matco Elec. Group, Inc.,*
383 B.R. 848 (Bankr. N.D.N.Y. 2008) .............................................................16, 17

*In re Maui 14K, Ltd.,*
133 B.R. 657 (Bankr. D. Haw. 1991) .....................................................................18

**Page(s)**

*In re Midway Indus. Contractors, Inc.*,
   272 B.R. 651 (Bankr. N.D. Ill. 2001) ......................................................................18

*In re Miners Oil Co.*,
   502 B.R. 285 (Bankr. W.D. Va. 2013) .....................................................................17

*In re Molten Metal Technology, Inc.*,
   289 B.R. 505 (Bankr. D. Mass. 2003) ......................................................................18

*In re Mudd*,
   663 B.R. 364 (Bankr. W.D. Okla. 2024) ...................................................................16

*In re Office Products of Am., Inc.*,
   136 B.R. 964 (Bankr. W.D. Tex. 1992) ....................................................................25

*In re Park-Helena Corp.*,
   63 F.3d 877 (9th Cir. 1995) ......................................................................................18

*In re Project Orange Assocs. LLC*,
   431 B.R. 363 (Bankr. S.D.N.Y. 2010) ....................................................................20

*In re Quigley Co.*,
   500 B.R. 347 (Bankr. S.D.N.Y. 2013) ....................................................................24

*In re Spanjer Bros., Inc.*,
   203 B.R. 85 (Bankr. N.D. Ill. 1996) ........................................................................24

*In re Toys, Inc.*,
   331 B.R 176 (Bankr. D. Del. 2005) .........................................................................15

*In re Universal Factoring Co.*,
   329 B.R. 62 (Bankr. W.D. Okla. 2005) ...................................................................25

*Kravit, Gass & Weber, S.C. v. Michel (In re Crivello)*,
   134 F.3d 831 (7th Cir. 1998) ..........................................................................16, 18, 20

*Rome v. Braunstein*,
   19 F.3d 54 (1st Cir. 1994) ...................................................................................18, 21

*Rubner & Kutner, P.C. v. U.S. Tr. (In re Lederman Enters., Inc.)*,
   997 F.2d 1321 (10th Cir.1993) .................................................................................25

*United States v. Gellene*,
   182 F.3d 578 (7th Cir. 1999) ....................................................................................18

**Page(s)**

**Statutes**

11 U.S.C. § 327(a) ...................................................................................................20

11 U.S.C. § 330(a)(1)...........................................................................................22, 24

11 U.S.C. § 330(a)(2)................................................................................................22

11 U.S.C. § 330(a)(3)................................................................................................22

11 U.S.C. § 330(a)(4)................................................................................................23

11 U.S.C. § 330(a)(4)(A)..........................................................................................23

18 U.S.C. § 152 ....................................................................................................18, 19

**Other Authorities**

3 Collier on Bankruptcy ¶ 327.04[2] (16th ed. rev. 2012) ......................................20

**Rules**

Fed. R. Bankr. P. 2014(a) .........................................................................................15

Reorganized Eletson Holdings Inc. ("Reorganized Holdings") hereby submits this preliminary objection (the "Preliminary Objection") to the *Fourth Interim and Final Fee Application of Reed Smith LLP, Counsel to the Debtors and Debtors in Possession, for Compensation and Reimbursement of Expenses for the Period September 25, 2023 to November 19, 2024* [Dkt. 1325] (the "Fourth and Final Fee Application") requesting (a) denial of all of Reed Smith's fees and expenses and (b) disgorgement of all fees and expenses previously paid to Reed Smith in these cases and the Arbitration.  In support of this Preliminary Objection, Reorganized Holdings submits the Declaration of Jared C. Borriello (the "Borriello Declaration") and respectfully states:[2]

## RELEVANT FACTUAL BACKGROUND

**I.**     **Reed Smith's Retention and Employment in the Chapter 11 Cases**

      **A. Reed Smith's Retention Application**

1.     On October 25, 2023, the Debtors filed an application to retain Reed Smith in the Chapter 11 Cases [Dkt. 235] (the "Retention Application"), accompanied by the Declaration of Derek J. Baker of Reed Smith (the "Original Declaration").  *See* Ex. 1 (Original Decl.).

2.     The Committee and the U.S. Trustee filed objections to the Retention Application on November 1, 2023.  *See* Dkt. 245, 247.  The Committee and the U.S. Trustee questioned, among Reed Smith's other woefully inadequate disclosures, the firm's statement that "additional parties other than the Debtors agreed to support [Eletson] Corp. and satisfy any outstanding obligations owed to Reed Smith in

---

[2]     Exhibits cited to herein as "Ex. __" are attached to the Borriello Declaration.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the PC Preliminary Objection or the PC Plan (each as defined below).

connection with pre-conversion date litigations," given that Reed Smith did not provide the identity of these "additional parties."  Retention App. ¶ 20.

3.      In response, Reed Smith filed supplemental declarations by Mr. Baker on November 7, 2023 [Dkt. 261], November 30, 2023 [Dkt. 297], December 21, 2023 [Dkt. 330], and January 30, 2024 [Dkt. 385, 386] (collectively, the "Baker Declarations"). The Baker Declarations revealed that the Debtors' shareholders "had provided a comfort letter to Reed Smith in the event [Eletson] Corp. was unable to pay" the obligations remaining to Reed Smith for work done from the Petition Date through the Conversion Date.  *See* Dkt. 330 ¶ 8.  In addition, the Cypriot Nominees agreed to pay Reed Smith's fees in the Arbitration concerning the Eletson Gas preferred shares, and in the proceeding in the Southern District of New York (the "District Court Action") to confirm the Arbitration Award if Eletson Corp. was unable to pay.  *See* Dkt. 330 ¶ 13; *see also* Dkt. 261 ¶ 13.  While Reed Smith agreed to waive its claims against the shareholders and Cypriot Nominees for unpaid amounts, Reed Smith's inappropriate relationship with Eletson's insiders was confirmed.

4.      On January 5, 2024, the Court authorized the Debtors to retain Reed Smith as of September 25, 2023 (the "Conversion Date") [Dkt. 350] (the "Retention Order").

### B.  Reed Smith's Inadequate Disclosures

5.      As set forth in detail in the Petitioning Creditors' numerous objections to Reed Smith's fees in the Chapter 11 Cases, Reed Smith failed to adequately disclose who it represents in the Chapter 11 Cases.  In fact, Reed Smith deliberately concealed its representation of Eletson's Former Principals (as defined below).  *See Preliminary Objection of Petitioning Creditors to the First Interim Fee Application of Reed Smith* [Dkt. 484] (the "PC Preliminary Objection") ¶¶ 6-19; Subsequent Obj. ¶ 7; Third Obj. ¶¶ 11-12;

Fourth Obj. ¶ 8; Seventh Obj. ¶¶ 14-19; Eighth Obj. ¶¶ 15-22; Ninth Obj. ¶¶ 18-27; Tenth
Obj. ¶¶ 23-32.

6.      The Retention Application and Original Declaration state that Reed Smith
ran conflicts checks on "Shareholders and Officers of Eletson Holdings, Inc.," including
Laskarina Karastamati, Vasillis Kertsikoff, and Vassilis Hadjielftheriadis (collectively,
the "Former Principals").  Retention App., Ex. B, Sch. 1.[3]  These three individuals were
(a) officers and directors of the Debtors, (b) officers and directors of certain non-Debtor
subsidiaries, such as Eletson Corporation ("Eletson Corp.") and Eletson Gas LLC
("Eletson Gas"), and (c) part of the three families that are the ultimate beneficial owners
of the Debtors' former majority shareholders, Lassia Investment Co., Glafkos Trust Co.,
and Family Unity Trust Co. (collectively, the "Former Majority Shareholders") and
authorized representatives and signatories for these entities that actively negotiated the
Debtors' Plan (as defined below).  See Dkt. 1021 ¶¶ 14-24.  They are also the beneficial
owners of the three Cypriot entities, Fentalon Limited, Desimusco Trading Limited, and
Apargo Limited (collectively, the "Cypriot Nominees"), that they contend received the
Eletson Gas preferred shares.

7.      Nowhere in the Retention Application and related filings did Reed Smith
disclose that it represented the Former Principals.  For example, Schedule 2 to the
Original Declaration contains Reed Smith's conflicts disclosures, but **does not** include
the Debtors' Former Principals.  Retention App., Ex. B, Sch. 2.  Reed Smith instead

---

[3]    Schedule 1 of the Original Declaration, attached as Exhibit B to the Retention Application lists the
following as "Shareholders and Officers of Eletson Holdings, Inc.": "Lassia Investment Co., Glafkos
Trust Co., Family Unity Trust Co., Elafonissos Shipping Corp., Keros Shipping Corp., Laskarina
Karastamati, Vasileios Chatzieleftheriadis, Vassilis E. Kertsikoff, Konstantinos Chatzieleftheriadis,
Eleni Karastamati, Emmanouil Andreoulakis, Eleni Vandorou."  Retention App., Ex. B, Sch. 1.

affirmatively stated that it does not, and has not, represented the Former Principals.
*See, e.g.*, Suppl. Decl. [Dkt. 261] ¶ 7 ("Reed Smith is representing Debtor Holdings and
non-debtor, Corp – **and only those entities** – in the Arbitration and Confirmation
Proceedings."); Ex. 2 (6/18/24 Hr'g Tr.) at 266:21, 286:1-2 (stating that "we don't
represent the shareholders" and "we do not represent the families").

8.      Nor did Reed Smith disclose its engagement letter(s) with the Debtors (or
any Former Principals or affiliated entities)—as is customary in every chapter 11 case.
Reed Smith instead fought for months to conceal its engagement letters from discovery.
*See id.* (6/18/24 Hr'g Tr.) at 284:17-19. (THE COURT:  "[A]re you saying [the
engagement letters] should be produced or not produced?" SOLOMON:  "I think we
should not produce them."*); see also id*. at 283:22-23.

9.      After being compelled to do so by the Court, the Debtors finally produced
the requested engagement letters, including a Reed Smith engagement letter related to
the Arbitration (the "<u>Arbitration Engagement Letter</u>").  *See* Ex. 3. The letter confirmed
that Reed Smith did, in fact, represent the Former Principals.  *See id.*  It states that Reed
Smith represents "Eletson Holdings Inc. and Eletson Corporation (and their respective
affiliates)," as well as "***Lascarina Karastamati, Vasillis Kertsikoff, and Vassilis***
***Hadjieltheriadis (together, the 'Eletson Interests')*.**"  *Id.* at 1 (emphasis added).
The Arbitration Engagement Letter is signed by the Former Principals ***in their***
***individual capacities***.  *See id.* at 5.

10.     The fact that Reed Smith represents the Former Principals is reinforced by
letters in which Reed Smith has explicitly called them clients:  (1) a letter to third-party
Unigas, where Reed Smith stated "[w]e represent Eletson Holdings, Inc., Eletson
Corporation, and other related parties, including the ***Eletson Directors of Eletson Gas***
***LLC***," [Dkt. 1064, Ex. B (emphasis added)]; (2) a letter to Levona's arbitration counsel,

where Reed Smith stated "[a]s you know, we represent Eletson Holdings, Inc., Eletson Corporation, and other related parties including the manager and the ***Eletson Directors of Eletson Gas LLC***," and also that "the Eletson Directors do not waive [certain] notice and will not appear in response to the improper second notice," *id*., Ex. C (emphasis added); and (3) a letter to Levona's arbitration counsel where Reed Smith stated "we represent Eletson Holdings, Inc., Eletson Corporation, and other related parties including the manager and the ***Eletson Directors of Eletson Gas LLC***," *id*., Ex. D (emphasis added).

11.     After both the Petitioning Creditors and the U.S. Trustee raised concerns about Reed Smith's disclosure issues (*see* Dkt. 957, 968), the Court directed the Debtors to submit a written explanation (Ex. 4 *(8/21/24 Hr'g Tr.)* at 115:7-9), which Reed Smith did on August 22, 2024 [Dkt. 1013] (the "August 22 Letter").  In that letter, Reed Smith again falsely stated that it "has never represented … the Debtors' principals" and that its "disclosures regarding its relationship to the Debtors' principals, Laskarina Karastamati, Vassilis Kertsikoff, and Vasilis Hadjieleftheriadis have been accurate." August 22 Letter at 1-2.[4]

12.     On September 27, 2024, the U.S. Trustee moved to disgorge all of Reed Smith's fees and expenses in these cases [Dkt. 1166] (the "Disgorgement Motion"), for failing to disclose Reed Smith's connections with the Former Principals in violation of Bankruptcy Rule 2014.  *See* Disgorgement Mot. at 7-10.

13.     On October 30, 2024, with no prior notice to the Petitioning Creditors, Reed Smith filed a stipulation that it had entered into with the U.S. Trustee [Dkt. 1228]

---

[4]     On September 5, 2024, Levona Holdings Ltd. ("Levona") also filed a letter [Dkt. 1064] concerning Reed Smith's inconsistent disclosures, among other issues, to which Reed Smith has never responded.

(the "Stipulation") and a related declaration [Dkt. 1215] (the "Solomon Declaration"),

which purported to resolve the Disgorgement Motion. As part of the Stipulation, Reed

Smith agreed to, *inter alia*, (a) reduce the holdbacks sought in its Fourth and Final Fee

Application by $200,000 and (b) reduce the fees and expenses sought in its Third

Interim Fee Application by a total of $150,000.[5] The Solomon Declaration also states

that "Reed Smith confirms it never represented Lascarina Karastamati, Vassilis

Kertsikoff, and/or Vasilis Hadjieleftheriadis" and "never undertook any representation

of (Lascarina Karastamati, Vassilis Kertsikoff, and/or Vasilis Hadjieleftheriadis)."

Solomon Decl. ¶¶ 4, 6. Of course, that statement is contradicted by Reed Smith's own

engagement letters, and other documentary evidence. *See* Ex. 3 (Arbitration

Engagement Letter), Ex. 5 (Bondholder Litigation Engagement Letter); *see also* Dkt. 1064

at 2-3 & Exs. B-E.

14. On the same day that Reed Smith filed the Stipulation and Solomon

Declaration in this Court, the Debtors filed a contradictory letter in the District Court

Action [Dkt. 1219, Ex. A]. In that letter, Reed Smith sought to protect the rights of

Eletson Gas and the Cypriot Nominees by requesting that they be allowed to intervene

in the District Court Action. *Id.* at 2. Mr. Solomon stated: "[W]e, as counsel to Eletson

Gas . . . are authorized to state that Gas and the Preferred Nominees intend to seek

intervention." *Id.* This Court might recall that Reed Smith explicitly denied

representing Eletson Gas during a February 2024 hearing. *See* Ex. 6 (2/27/24 Hr'g Tr.)

at 63:13-18.

---

[5] Both the Petitioning Creditors and the Committee filed reservations of rights to the Stipulation, which
does not release or resolve the claims of any parties other than the U.S. Trustee. *See* Dkt. 1222, 1224.

C.    **Reed Smith's Conduct During the Chapter 11 Cases**

15.    Reed Smith's behavior throughout the Chapter 11 Cases actively harmed the Debtors' creditors, failed to maximize—and, indeed, destroyed—value and sought to benefit the Former Principals and Former Majority Shareholders who Reed Smith actually represented.

(1)    <u>The Plan Process</u>

16.    Reed Smith's conduct detrimental to these cases is best illustrated by its bad faith plan process, as described in detail in the Prior Objections, which are all incorporated herein by reference.  *See* PC Preliminary Obj. ¶¶ 24, 43-45; Ninth Obj. ¶ 30.

(2)    <u>DIP Financing</u>

17.    Reed Smith's misconduct is also illustrated by the Debtors' process in obtaining debtor in possession financing.  Despite the fact that it was clear at the outset that the Debtors could not fund these cases, they only sought approval of a debtor in possession financing loan [Dkt. 458] (the "<u>DIP Motion</u>") after they failed to meet their obligations under the Court's Interim Comp Order.  And the DIP Motion was for an insider loan that was highly prejudicial to the estates for a number of reasons, including that it would grant liens on all of the Debtors' assets for a grossly inadequate $2 million in liquidity.[6]  The Debtors refused to negotiate an alternative DIP loan by the Petitioning Creditors, which offered much better terms for the estates.

_____

[6]    Further highlighting the Debtors' and Reed Smith's bad faith and conflicted administration of these cases, the Debtors' declarant on the DIP Motion, Mr. Kertsikoff, actively disclaimed at his deposition that he represented the Debtors in the DIP financing negotiations and instead "changed hat[s]" to represent the DIP Lender.  Ex. 7 (3/15/24 VK Dep) at 32:10-25, 52:19-53:12.  The Debtors and Reed Smith also lied to the Court when Mr. Kertiskoff testified in his declaration 2 times that the DIP financing was negotiated on an "arms-length" basis (Dkt. 458, Ex. 2 (VK Decl.) ¶¶ 3, 8), a statement that Mr. Solomon would later state was untrue.  *See* Ex. 8 (4/11/24 Hr'g Tr.) at 99:15-25.

18.     After costing these estates and their creditors hundreds of thousands of dollars in professional fees, the Debtors adjourned the DIP Motion because they were able to obtain the liquidity from their SMEs that they previously – and falsely – insisted was not available, which Reed Smith knew.[7] *Compare* Dkt. 443 (Feb. 29, 2024 Reed Smith Letter) and Dkt. 470 (Mar. 11, 2024 Reed Smith Letter) *with* Dkt. 548, Ex. B (Mar. 17, 2024 Reed Smith Email to Chambers).

### (3) <u>Claims Objections</u>

19.     As set forth in detail in the Fourth Objection (as defined below), Reed Smith spent a significant amount of time billing fees to the "Claims Administration and Objections" matter, related to the Debtors' objections to Proof of Claims [Dkt. 376-380] (the "<u>Claims Objections</u>"), and the various replies and sur-replies to the Claims Objections.  The Claims Objections were meritless and demonstrated a willful ignorance of the Bankruptcy Code, controlling caselaw, and the Order Establishing Deadlines for Filing Proofs of Claim [Dkt. 264].  The Court issued a decision denying the Claims Objections and rejecting nearly all of the Debtors' arguments [Dkt. 1211] (the "<u>Claims Objection Decision</u>").

### (4) <u>The Arbitration</u>

20.     Reed Smith billed millions in fees to Eletson Holdings and Eletson Corp. in the Arbitration, a proceeding in which Reed Smith helped its true clients, the Former Principals, argue that Eletson Gas and the Cypriot Nominees transferred valuable property ***away from the estates*** – the Eletson Gas Preferred Shares.  Reed Smith confirmed this for the Arbitrator:

---

[7]     Ultimately the Court authorized Pach Shemen to provide DIP financing to the Debtors.  *See* Dkt. 1052.

> As soon as they said, even if they win–even if we win in this
> proceeding, they're going to take that asset and they are–it
> goes back into Holdings and so, lo and behold, the
> bankruptcy allows them to take it.  So your Honor has wasted
> a year, your Honor has given us a standstill for nothing, your
> Honor went through all this evidence and that's when we
> said, well, wait a minute, I went back to my client and it says
> these nominees, why don't we just transfer it to the nominees
> and they said, we don't have to, we have already done it.

Ex. 9 (5/15/23 JAMS Tr.) at 153:2-16.  As this Court is aware, Judge Liman issued a

decision on September 6, 2024, allowing Levona to amend its motion to vacate the

Arbitration Award and conduct discovery into whether Reed Smith's clients procured

the award by fraud.  *See Eletson Holdings Inc. v. Levona Holdings, Ltd.*, Case No. 23-cv-

07331 (LJL), Dkt. 162 at 1, 47.  Reed Smith's work in the Arbitration was designed to

hurt the estates, not benefit them.

## II.    Reed Smith's Conduct After Entry of the Confirmation Order

### A.    Reed Smith Ignored the Confirmation Order and Refused to Help Implement the PC Plan

21.    On October 25, 2024, the Court issued a decision [Dkt. 1212]

(the "Confirmation Decision") (a) confirming the Petitioning Creditors' chapter 11 plan

[Dkt. 1132, Ex. 1] (the "PC Plan") and overruling the Debtors' objections thereto and

(b) rejecting the Debtors' Plan, and the PC Alternative Plan.

22.    On November 4, 2024, the Court entered an order confirming the PC Plan

[Dkt. 1223] (the "Confirmation Order").  On November 7, 2024, the Debtors filed a

notice of appeal [Dkt. 1233] regarding the Confirmation Order, but never moved for a

stay of the Confirmation Order.

23.    As set forth within the Petitioning Creditors' letters filed with the Court

on November 6, 2024 [Dkt. 1227] (the "November 6 Letter") and on November 12, 2024

[Dkt. 1242] (the "November 12 Letter"), Reed Smith refused to cooperate with the

Petitioning Creditors' efforts to implement and consummate the PC Plan.  Before the

Effective Date, Reed Smith refused to cooperate with implementation of the PC Plan by:

- Failing to join calls with counsel for the Petitioning Creditors to assist in implementing the PC Plan, with the exception of the final closing call on the Effective Date, and stating that they would not join the calls because they had nothing to report.  *See* Ex. 10 (Oct. 30, 2024 Email from D. Baker to B. Kotliar at 3:04 p.m.).

- Refusing to answer any questions about "plan transition issues" because they purportedly did not relate to the information and reporting rights under the DIP Credit Agreement.  *See, e.g.* Ex. 11 (Nov. 14, 2024 Email from D. Baker to M. Martir at 9:31 a.m.).

- Claiming that they and the Debtors were unable to provide information for the non-Debtor subsidiaries (where they claim all of the information resides) because such information "called for actions from parties other than the Debtor (which Reed Smith does not represent)."  Ex. 12 (Oct. 28, 2024 Email from D. Baker to L. Ebrahimi at 5:39 p.m.).[8]

### B. Reed Smith Works to Obstruct the PC Plan and Subvert the Confirmation Order

24.     Even worse than failing to cooperate with implementing the PC Plan,

Reed Smith has consistently worked to interfere with and obstruct the PC Plan.

For example, Reed Smith has made statements to this Court and the District Court

challenging the Confirmation Order's enforceability and the PC Plan's effectiveness.

At a hearing on November 12, 2024, Reed Smith informed Judge Liman that the Debtors

intended to contest the PC Plan's effectiveness, stating:  "[w]e know that the plan says

that shares of Holdings, old Holdings, might be extinguished, but even that is explicitly

subject to applicable law, and that applicable law is not U.S. Law, it's Liberian law."

Ex. 13 (11/12/24 S.D.N.Y. Hr'g Tr.) at 7:13-17.

---

[8]    This claim was inconsistent with Reed Smith's actions earlier in these Chapter 11 Cases, including (a) filing Rule 2015.3 Reports for all subsidiaries [Dkt. 271, 298, 341, 409, 962], and (b) negotiating and agreeing to the DIP Credit Agreement, which includes weekly variance reporting for "Budget Parties," including various non-Debtor subsidiaries like Eletson Corp.  *See* Dkt. 1047 at 30.

25.    In a letter to this Court filed later that same day [Dkt. 1241], Reed Smith argued that "a recognition proceeding is needed in both Liberia and Greece to ensure the Confirmation Order's enforceability."  Dkt. 1241 at 1.  At a hearing before this Court on November 13, 2024, Reed Smith stated that absent recognition proceedings, "I don't see how there can be an effective transfer of this company."  Ex. 14 (11/13/24 Hr'g Tr.) at 13:5-6.  At the same hearing, Reed Smith also argued that seeking foreign recognition of the Confirmation Order is a "condition precedent" that the Petitioning Creditors are incapable of waiving, *id*. at 12:21-13:4, even though no such condition precedent exists and, even if it did, the PC Plan explicitly states that any such condition precedent is waivable.  *See* PC Plan §§  9.1, 9.2.

26.    During the same time period, on November 13, 2024, Reed Smith filed a letter with the Court [Dkt. 1243], attaching an email from the Daniolos Law Firm, counsel to the officers and directors of the Debtors, claiming without substantiating evidence, that (a) four of the eight board members of Former Holdings had resigned, (b) provisional board members had been appointed by a provisional order of a Greek court, and (c) a hearing is set in Greece on February 4, 2025 to, among other things, reconstitute the board.  *See* Dkt. 1243, Ex. A.  Reed Smith took the aforementioned action even though (a) Former Holdings' board was set to be reconstituted automatically upon the occurrence of the Effective Date under the PC Plan (*see* PC Plan §§ 5.4, 5.8), (b) the Debtors were not seeking to stay the Confirmation Order, and (c) the Confirmation Order enjoined the Debtors from taking "any actions inconsistent with the Plan or [the] Confirmation Order without the prior written consent of the Petitioning Creditors or further order of the Court" (Confirmation Order ¶ 5(iii)).

27.    Reed Smith (and the clients) have also refused to assist with updating the Liberian International Ship & Corporate Registry ("LISCR") to reflect Reorganized

Holdings' updated corporate documents, even after being instructed by Reorganized Holdings to take all steps necessary to do so.  On November 12, 2024, counsel for the Petitioning Creditors emailed Reed Smith, requesting (a) that Reed Smith and the Debtors identify the existing person of record at the address of record (the "AOR") for Eletson Holdings Inc.; and (b) that the existing AOR complete a form of letter, to be held in escrow and submitted on the Effective Date, instructing LISCR to update its AOR for Eletson Holdings Inc. to reflect Reorganized Holdings' new AOR and authorized personnel (the "LISCR Letter").  *See* Ex. 15 (Nov. 12, 2024 Email from B. Kotliar to D. Baker at 7:25 a.m.).  Instead of responding to the LISCR Letter, at a hearing on November 13, 2024 Reed Smith claimed that they were advised that providing the requested LISCR Letter would violate Liberian law.  *See* Ex. 14 (11/13/24 Hr'g Tr.) at 34:4-10, 35:16-23, 37:7-13.  On November 17, 2024, Reed Smith sent an email to the Petitioning Creditors stating that they will not update LISCR.  *See* Ex. 16 (Nov. 17, 2024 Email from L. Solomon to B. Kotliar at 4:24 p.m.).

28.    On November 19, 2024, the effective date of the PC Plan (the "Effective Date") occurred, and the following occurred, among other things, pursuant to the PC Plan:  (a) all notes, stocks, and other documents giving rise to claims against and interests in the Debtors (including the Debtors' existing equity interests) were automatically cancelled without need of any further action (*see* Plan § 5.4); (b) Reorganized Holdings issued the Reorganized Equity to the new holders thereof (*see id.* § 5.8); (c) Reorganized Holdings entered into the Amended Bylaws and Shareholders Agreement without the necessity of any further actions under applicable nonbankruptcy law (*see id.* §§ 5.20, 9.1(i)); (d) the members of the boards of each Debtor prior to the Effective Date were deemed to have resigned and ceased to be a director or manager of the applicable Debtor in any respect (*see id.* § 5.10(c)); (e) Reorganized

Holdings terminated the Debtors' professional retentions, including Reed Smith (*see id.* §§ 2.5(a) and 10.6); and (f) the $53.5 million amount of the Rights Offering (in escrow since November 6, 2024) was distributed to creditors or to accounts for the benefit of creditors, among other distributions (*see id.* §§ 2.1(a), 2.2(b), 2.6, 5.18, 9.1(g), 9.1(h), 9.1(i)).

29.     Additionally, on the Effective Date: (a) Togut Segal & Segal LLP was retained as counsel to Reorganized Holdings and Eletson Corp., *see* Ex. 17 (Togut Engagement Letter); and (b) Reorganized Holdings' new Chief Executive Officer, Adam Spears, wrote a letter (the "Restriction Letter") instructing Reed Smith to refrain from taking any action or making any decisions on behalf of Reorganized Holdings or any of its subsidiaries "without the express written approval or instructions from the new personnel designated by" Reorganized Holdings, including Mr. Spears.  Ex. 18 (Restriction Letter).

30.     While not included in the Fourth and Final Fee Application, Reed Smith's post-Effective Date actions further evidence a continuing pattern of behavior intended to obstruct the PC Plan in furtherance of its representation of a party or parties that are adverse to Reorganized Holdings and these estates.

31.     First, despite the clear instructions in the Restriction Letter, Reed Smith sent a letter to Judge Liman the next day, purportedly on behalf of Eletson Corp., a wholly owned subsidiary of Reorganized Holdings, in connection with the Committee's pending appeal of its prior motion to appoint a Chapter 11 trustee.  Ex. 19 (Nov. 20, 2024 Solomon Letter); *see also* Ex. 20 (Nov. 21, 2024 Solomon Letter).  In that letter, Reed Smith again challenged the enforceability of the Confirmation Order and PC Plan, stating:

13

- "Reed Smith's representation of Holdings was purportedly terminated as of yesterday, the date upon which the Plan was declared effective;"

- "On behalf of Corp (whom we still represent), we wish to apprise the Court that **the purported new shareholders of Holdings . . . have made no showing that they have taken the steps necessary under Liberian and Greek law to confirm their capacity to act on behalf of Holdings in this or any other forum**;" and

- "In addition, as of November 12, 2024, a court in Piraeus, Greece, issued an order constituting a provisional board of directors for Holdings, with responsibility to undertake corporate actions, including specifically the retention of outside counsel in this proceeding.  **We have not been informed that the provisional board has exercised its power to appoint Togut, or any law firm other than Reed Smith (which we understand has been directed to act), to represent Holdings in this matter**."

Ex. 19 at 1 (emphases added); *see also* Ex. 20 at 1 (same).  Eletson Corp. unequivocally fired Reed Smith the next day.  Ex. 21 (Nov. 21, 2024 Termination Letter).

32.    On November 21, 2024, even though Reed Smith acknowledged to Judge Liman that its retention by Former Holdings automatically terminated on the Effective Date under the PC Plan, Reed Smith filed a Statement of Issues for the Confirmation Appeal in the Bankruptcy Court *on behalf of* Former Holdings.  *See* Dkt. 1262 (Statement of Issues).  According to Reed Smith, it had been rehired by Former Holdings, *i.e.*, is now acting "at the direction of the provisional board" (*id.* at 2), the same board that was automatically extinguished pursuant to the PC Plan on the Effective Date (PC Plan § 5.10(c)).  This is despite Reed Smith's conduct acknowledging that the Effective Date occurred and that they are no longer acting for Eletson Holdings.  For example, after the Court entered the interim compensation order on December 12, 2024 approving the payment by Reorganized Holdings of various fees and expenses [Dkt. 1297], Reed Smith emailed Reorganized Holdings' counsel asking Reorganized Holdings to pay the millions in fees and expenses awarded to Reed Smith on an interim basis.  Ex. 22 (Dec. 12, 2024 Email from D. Baker to B. Kotliar at 2:31 p.m.).  In doing so,

Reed Smith dropped all pretense that they seek to act for the benefit of anyone other than the Former Principals and Former Majority Shareholders.

## OBJECTION

### I.    Reed Smith's Misconduct Requires Disgorgement of their Fees

33.    Reed Smith's failure to disclose their representation of the Former Principals, alone, warrants disallowance and disgorgement of all of their fees. Bankruptcy Rule 2014(a) could not be clearer:

> The application shall state . . . to the best of the applicant's knowledge, ***all of the person's connections*** with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. . . . The application must be accompanied by a verified statement of the person to be employed ***setting forth the person's connections***[.]

Fed. R. Bankr. P. 2014(a) (emphasis added).

34.    The disclosures required of professionals "go[] to the heart of the integrity of the bankruptcy system . . . Bankruptcy Rule 2014 disclosure ***is not optional; it's mandatory***." *In re Dickson Properties, LLC*, Case No. 11-18617 (BFK), 2012 WL 2026760, at *8 (Bankr. E.D. Va. June 5, 2012) (emphasis added); *see also In re Granite Partners LP*, 219 B.R. 22, 44 (Bankr. S.D.N.Y. 1998) ("The trustee broke the cardinal principle of Rule 2014(a). He arrogated to himself a disclosure decision that the court must make."). As one court has stated: "the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interests of the estate." *In re Toys, Inc.*, 331 B.R 176, 189 (Bankr. D. Del. 2005).

15

35.     As this Court has stated, Bankruptcy Rule 2014 requires that "*all*
connections 'that are not so remote as to be *de minimis* must be disclosed.'"  *In re Leslie
Fay Companies, Inc.*, 175 B.R. 525, 536 (Bankr. S.D.N.Y. 1994) (emphasis added).[9]
The burden to adequately disclose rests on the professional seeking employment, not
the Court, creditors, or parties in interest.  *See Kravit, Gass & Weber, S.C. v. Michel (In re
Crivello)*, 134 F.3d 831, 839 (7th Cir. 1998).  And Bankruptcy Rule 2014 disclosures must
be sufficiently explicit for a court and other parties to determine whether a professional
is disinterested or holds or represents an adverse interest.  *In re Lewis Road, LLC*, Case
No. 09-37672, 2011 WL 6140747, at *8 (Bankr. E.D. Va. Dec. 9, 2011).

36.     The requirement to disclose all connections is not subjective, "whereby the
professional discloses only those 'connections' that he/she/it concludes are relevant."
*In re Matco Elec. Group, Inc.*, 383 B.R. 848, 853 (Bankr. N.D.N.Y. 2008).  Said differently,
"the existence of a conflict of interest is not the *quid pro quo* for whether or not disclosure
must be made."  *Id.*; *see also Granite Partners*, 219 B.R. at 35 (courts should not have to
"rummage through files or conduct independent fact finding investigations" to
determine whether a professional should be disqualified).  "'***Disclosure, disclosure,
disclosure***,' should be every debtor's counsel's mantra, whether relating to the debtor's
schedules and statement of financial affairs or to the attorney's own disclosures."  *In re
Mudd*, 663 B.R. 364, 368 (Bankr. W.D. Okla. 2024) (emphasis added); *see also In re Alcon*,
Case No. 09-41608 TK, 2010 WL 144408, at *2 (Bankr. N.D. Cal. Jan. 8, 2010) ("one of the

---

[9]    This duty to disclose under Bankruptcy Rule 2014 is ongoing, continues throughout the case, and
"requires 'spontaneous, timely, and complete disclosure."  *In re The Harris Agency*, 462 B.R. 514, 524
(Bankr. E.D. Pa. 2011) (citations omitted).

fundamental principles in representing debtors in bankruptcy cases: i.e., disclosure, disclosure, disclosure.").

37.    "All facts that *may* have any bearing on the disinterestedness of a professional *must* be disclosed." *Leslie Fay*, 175 B.R at 533 (emphasis added).  A debtor violates "the cardinal principle of Rule 2014(a)" where it makes a "disclosure decision that the court must make." *Granite Partners*, 219 B.R. at 44.  Furthermore, Bankruptcy Rule 2014 "is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties, and the burden shifts to those entities to make inquiry in an effort to expand the disclosure."  *Matco*, 383 B.R. at 853-54.

38.    Professionals must "be meticulous in disclosing 'all connections' with the debtor and other parties in interest, the failure to do so justifying a court's taking significant punitive or corrective action."  *In re Miners Oil Co.*, 502 B.R. 285, 301-02 (Bankr. W.D. Va. 2013); *see In re EBW Laser Inc.*, 333 B.R. 351, 359 (Bankr. M.D.N.C. 2005) (quotation marks committed) ("The Bankruptcy Court may, in its discretion, disqualify counsel, or deny compensation, as a sanction for failure to make the disclosure required.") (quoting *Buckley v. TransAmerica Inv. Corp. (In re Southern Kitchens)*, 216 B.R. 819, 830 (Bankr. D. Minn. 1998)).

39.    Thus, a lack of disclosure is independent grounds to order disqualification or disgorgement even absent prejudice to the estate.

> This argument [about no prejudice] ignores the objective of requiring disclosure.  The objective of requiring disclosure is not so much to protect against prejudice to the estate, but to ensure undivided loyalty and untainted advice from professionals.  That is why lack of disclosure in and of itself is sufficient to warrant disqualification, even if in the end there was no prejudice.

*In re Midway Indus. Contractors, Inc.*, 272 B.R. 651, 664 (Bankr. N.D. Ill. 2001) (citing

*Crivello*, 134 F.3d at 836); *accord In re Byington*, 454 B.R. 648, 657 (Bankr. W.D. Va. 2011).

Thus, the Court need not find intent.  *See, e.g., In re Independent Eng'g Co.*, 232 B.R. 529,

532 (B.A.P. 1st Cir. 1999).  Indeed, even a negligent or inadvertent failure to disclose

fully relevant information may result in a denial of all requested fees.  *In re Park-Helena*

*Corp.*, 63 F.3d 877, 882 (9th Cir. 1995) (ordering complete denial of fees requested by

debtors' counsel for failure to disclose firm's connection to related party and source of

retainer) (citing *In re Maui 14K, Ltd.*, 133 B.R. 657, 660 (Bankr. D. Haw. 1991); *In re Coastal*

*Equities, Inc.*, 39 B.R. 304, 308 (Bankr. S.D. Cal. 1984).

   40.  Where an attorney employed to represent the estate holds an undisclosed

interest adverse to the estate, courts do not hesitate to deny all compensation.  *See, e.g.,*

*Rome v. Braunstein*, 19 F.3d 54, 62 (1st Cir. 1994) (holding that compensation was

properly denied to counsel under section 328(c) of the Bankruptcy Code and that

counsel could be retroactively disqualified as counsel under 327(a) due to undisclosed

representation of a chapter 11 debtor's principals); *In re Molten Metal Technology, Inc.*,

289 B.R. 505, 513-14 (Bankr. D. Mass. 2003) (denying and disgorging all fees of special

counsel when special counsel failed to disclose a joint defense agreement between the

debtor, the debtor's officers and directors, and a law firm whereby the law firm agreed

to handle the debtor and the debtors' officer and directors joint defense).

   41.  However, where intent is found, a lawyer can also be convicted of

knowingly and fraudulently making a false material declaration in a bankruptcy case.

*See, e.g., United States v. Gellene*, 182 F.3d 578, 581 (7th Cir. 1999) (upholding conviction

of law firm partner who was found guilty of knowingly and fraudulently making a

false material declaration in a bankruptcy case, in violation of 18 U.S.C. § 152, where the

law firm partner failed to disclose a prior representation of a secured creditor in his

Bankruptcy Rule 2014 declaration).[10]  In addition, Reed Smith's fraud and

misrepresentations may provide a separate and independent basis to award damages in

addition to the disqualification and disgorgement of their fees and expenses.  *See In re

Food Mgmt. Grp., LLC,* 380 B.R. 677, 701 (Bankr. S.D.N.Y. 2008) ("Under New York law, a

fraudulent concealment claim requires that the plaintiff show the following elements: (i)

the concealment of a material fact that the defendant had a duty by relationship to

disclose, (ii) knowledge of the material fact by the party with the duty to disclose, (iii)

non-disclosure of the material fact, (iv) scienter, (v) justifiable reliance by the claiming

party, and (vi) damages.").

      42.    Reed Smith has also violated its duties to this Court, including the duty of

Candor, and its duties to the Debtors and their estates, including the duty of loyalty.  *Id.*

at 708 ("While counsel's duty to the estate may not rise to the level of a policeman for

the debtor's post-petition conduct, an attorney for the debtor in possession has fiduciary

obligations to the estate stemming from his fiduciary obligations to the debtor in

possession and his responsibilities as an officer of the court").  Finally, Reed Smith's

conduct violates the Rules of Professional Conduct, including for actions taken after the

Effective Date (as described in greater detail below) when it took actions against

Reorganized Holdings, its former client.  *See* ABA Model Rule 1.9(a)-(b) (prohibition

against representations adverse to former clients).

      43.    Here, Reed Smith did not just fail to disclose its connections to the Former

Principals, it tried to conceal it, and then made false statements denying such after the

truth came out.  In doing so, Reed Smith violated bedrock disclosure requirements,

---

[10]    In addition to 18 U.S.C. § 152, Reed Smith's materially false disclosures implicate 18 U.S.C. § 157 ("Bankruptcy Fraud") and 18 U.S.C. § 1623 ("False declarations before grand jury or court").

their duties to the estates and this Court, and basic rules of professional responsibility,

and committed fraud (or at the minimum, misrepresentations).  Disclosure issues aside,

Reed Smith acted for the benefit of the Former Principals, both here and in the

Arbitration, at the expense of the estates.  Accordingly, the Court should deny Reed

Smith's fees and disgorge all amounts previously paid here and in the Arbitration.

## II.    <u>Reed Smith is Not Disinterested</u>

44.    Section 327(a) of the Bankruptcy Code authorizes the debtor to employ

professionals, including counsel, if they (1) "do not hold or represent an interest

adverse to the estate" and are (2) "disinterested persons."  11 U.S.C.

§ 327(a).  The Bankruptcy Code defines "disinterested person," as a person that:

> does not have an interest materially adverse to the interest of the estate or
> of any class of creditors or equity security holders, by reason of any direct
> or indirect relationship to, connection with, or interest in, the debtor, or
> for any other reason.

11 U.S.C. § 101(14)(C).

45.    While the two prongs are formally distinct, courts have recognized "they

effectively collapse into a single test."  *See In re Boy Scouts of America*, 35 F.4th 149, 157

(3d Cir. 2022) (citations omitted); *In re Project Orange Assocs. LLC*, 431 B.R. 363, 370

(Bankr. S.D.N.Y. 2010) (section 101(14) "overlaps with the adverse-interest requirement

of section 327(a), creating a single test for courts to employ when examining conflicts of

interest"); *see also* 3 Collier on Bankruptcy ¶ 327.04[2] (16th ed. rev. 2012).

46.    A professional person holds an adverse interest if it represents a client in a

proceeding with an "***economic interest that would tend to lessen the value of the***

***bankruptcy estate***," an interest that "***create[s] an actual or potential dispute in which***

***the estate is a rival claimant***," or an interest that presents a "***predisposition of bias***

***against the estate***."  *See Crivello*, 134 F.3d at 835.  It generally includes where a

professional person has a "meaningful incentive" to not act in the best interests of the estate and includes circumstances where there would be a "reasonable perception" of an incentive to act in a manner inconsistent with the best interests of the estate.  *Granite Partners*, 219 B.R. at 33 (internal quotation marks and citation omitted).

47.    Courts generally agree that the inquiry is focused on even the appearance of impropriety.  *See In re JMK Constr. Grp.*, 441 B.R. 222, 229 (Bankr. S.D.N.Y. 2010); *see also In re Martin*, 817 F.2d 175, 180-81 (1st Cir. 1987) (section 327(a)'s retention requirements are intended to prevent "the appearance of impropriety as much as its substance, to remove the temptation and opportunity to do less than duty demands") (internal citations and quotations omitted); *In re Envirodyne Indus. Inc.*, 150 B.R. 1008, 1019 (Bankr. N.D. Ill. 1993) (the analysis looks to "whether the firm's interest in maintaining the client relationship with [in that case, the debtor's controlling shareholder], a substantial party in interest, could impair the firm's ability to act with impartiality, even unconscious impartiality"); *In re Codesco, Inc.*, 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1992) ("There is no question that the purpose of the incorporation of the disinterest requirement of 11 U.S.C. § 327 was to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration."). The duty to avoid conflicts is "ongoing" and "[t]he need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment."  *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 39 (Bankr. S.D.N.Y. 1998) (quoting *Braunstein*, 19 F.3d at 57-58).

48.    "[W]here an attorney represents the interests of the debtor's principals to the exclusion of other constituents, the court may conclude that he not only failed to remain disinterested, he also failed to perform services which were reasonably likely to benefit the debtor's estate under § 330 of the Bankruptcy Code."  *Id.* at 40 (internal

citations and quotations omitted).  The test is objective, focusing on "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *Id.* at 42.  The court has broad discretion to deny all or part of the fee request, including before and after the point at which counsel became disinterested.  *Id.* (collecting cases).

49.     For the reasons discussed above, Reed Smith is not a disinterested person under section 327(a) because it cannot adequately represent both the interests of the Debtors and the Former Principals, whom had a significant stake in the outcome of these cases.  *See In re Big Mac Marine, Inc.,* 326 B.R. 150 (B.A.P. 8th Cir. 2005) (denying application for retention, as well as fees and expenses, where debtors' counsel had previously represented the debtors' biggest creditors in their own chapter 11 case and thus was not disinterested); *see also Angelika Films,* 227 B.R. at 38-45 (disallowing all fees and expenses of debtor's counsel because of counsel's concurrent representation of the debtor's principal and counsel favored the principal over the debtor and creditors).

### III.     <u>Reed Smith's Services Did Not Benefit the Estate</u>

50.     Section 330 of the Bankruptcy Code provides that a court may award "reasonable compensation for actual, necessary services rendered" by the professionals for the estate.  11 U.S.C. § 330(a)(1).[11]  Section 330(a)(3), in turn, provides that "[i]n determining the amount of reasonable compensation to be awarded" for professional services rendered, courts must "***consider the nature, the extent, and the value of such services, taking into account all relevant factors***[,]" and includes a non-exhaustive list of such factors: (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were necessary to the administration of, or beneficial

---

[11]    Such amount may be less than (or none of) the amount of compensation that is requested.  11 U.S.C. § 330(a)(2).

at the time at which the service was rendered toward the completion of, a case under

this title; (D) whether the services were performed within a reasonable amount of time

commensurate with the complexity, importance, and nature of the problem, issue, or

task addressed; (E) with respect to a professional person, whether the person is board

certified or otherwise has demonstrated skill and experience in the bankruptcy field;

and (F) whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3) (emphasis added).

      51.    Section 330(a)(4) of the Bankruptcy Code further provides that "the court

***shall not allow compensation*** for – (i) unnecessary duplication of services; or

(ii) services that were not – (I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case."  11 U.S.C. § 330(a)(4)(A) (emphasis

added).  A service is "necessary" and compensable when it is "reasonably likely to

benefit the debtor's estate" or "necessary to the administration of this case" (and it is

not unnecessarily duplicated). 11 U.S.C. § 330(a)(4)(A).  Most courts "hold that a service

is necessary if it benefits the estate."  *In re Keene Corp.,* 205 B.R. 690, 696 (Bankr. S.D.N.Y.

1997); *In re Engel,* 190 B.R. 206, 209 (Bankr. D.N.J. 1995) (citing cases).  Thus, the court

"shall not allow compensation for unnecessary duplication of service, for services that

were not reasonably likely to benefit the debtor's estate, or for services that were not

necessary to the administration of the case."  *In re Haimil Realty Corp.,* 579 B.R. 19, 27

(Bankr. S.D.N.Y. 2017) (citations omitted).

      52.    The "reasonably likely to benefit the debtor's estate" inquiry is objective

and requires the court to determine whether a reasonable professional operating under

the same circumstances as the professional whose service is under review would have

performed the service after conducting a cost-benefit analysis regarding the reasonable

probability of a net benefit resulting to the debtor's estate.  *In re Kohl*, 421 B.R. 115, 125

(Bankr. S.D.N.Y. 2009) (considering "the services that a reasonable lawyer would have

performed in the same circumstances"); *In re All Island Truck Leasing Corp.,* 546 B.R. 522,

534 (Bankr. N.D. Ill. 2016) ("the test is objective, considering the services that a

reasonable [officer] would have performed in the same circumstances") (internal

citations omitted).

53.    Courts should consider other factors besides the "economic impact" in the

"benefit to the estate" analysis including, "whether the services rendered promoted the

bankruptcy process or administration of the estate in accordance with the practice and

procedures provided under the Bankruptcy Code and Rules for the orderly and prompt

disposition of bankruptcy cases and related adversary proceedings."  *In re Spanjer Bros.,*

*Inc.,* 203 B.R. 85, 90 (Bankr. N.D. Ill. 1996).  Additionally, the "estate" for purposes of

this inquiry means unsecured creditors, and services that only provide benefits to

others, including secured creditors or the debtor's directors, officers, or shareholders,

are not compensable.  *See All Island Truck,* 546 B.R. at 534 ("Services are, therefore, not

compensable unless they were reasonably likely to provide a benefit to unsecured

creditors.").

54.    The fee applicant bears the burden of proving that the services for which

compensation is sought were "actual, necessary services" within the meaning of section

330(a)(1) of the Bankruptcy Code and that the amount of the fee award sought was

reasonable.  *See In re Quigley Co.,* 500 B.R. 347, 356 (Bankr. S.D.N.Y. 2013) ("The fee

applicant bears the burden of proof on its claim for compensation . . . . The fee applicant

carries its burden of going forward by submitting contemporaneous time records that,

*inter alia,* provide sufficient detail to enable the Court to determine that the services

were reasonable and necessary."); *In re Bennet Funding Grp.,* 213 B.R. 234, 245 (Bankr.

N.D.N.Y. 1997) ("[T]he burden of proof to show that services rendered were necessary, appropriate, and reasonable is on the applicant.").

55.     As set forth above and below, Reed Smith has not satisfied its burden.

**A.     Reed Smith's Work on the "Plan and Disclosure Statement"**

56.     As set forth in the Fourth and Final Fee Application, Reed Smith billed $3,701,986.95 to the "Plan and Disclosure Statement" project code.  *See* Fourth and Final Fee App., Ex. C.  For the reasons set forth within the Prior Objections, as well as those set forth below, such fees should not be awarded to Reed Smith because the Debtors' Plan only sought to benefit the Debtors' shareholders and insiders and had no realistic hope of confirmation.  *See* First Obj. §§ II.B.2 - B.3; Second Obj. ¶ 5; Third Obj. ¶ 8; Fourth Obj. ¶ 9; Fifth Obj. ¶ 9; Sixth Obj. ¶ 20; Eighth Obj. ¶ 24; Ninth Obj. ¶ 29; Tenth Obj.¶ 33; *see also Rubner & Kutner, P.C. v. U.S. Tr. (In re Lederman Enters., Inc.)*, 997 F.2d 1321, 1323-24 (10th Cir.1993) ("[T]he debtor's inability to successfully develop and complete a plan should have been apparent to counsel from commencement of the case. Therefore, any work performed . . . was not necessary, and the bankruptcy court did not abuse its discretion in refusing to compensate the law firm for such services."); *In re Universal Factoring Co.*, 329 B.R. 62, 79 (Bankr. W.D. Okla. 2005) ("Counsel for . . . debtor in possession will not be compensated for time spent in preparation of a plan which has no realistic hope of confirmation."); *In re Hunt*, 124 B.R. 263, 267 (Bankr. S.D. Ohio 1990) ("An attorney should not expect to be fully compensated for such unrealistic effort," where feasibility of plan "was nonexistent at the time the plan was offered."); *In re Office Products of Am., Inc.*, 136 B.R. 964, 975 (Bankr. W.D. Tex. 1992) (the "services relat[ed] to researching and determining individual tax liability worked solely to protect the

individual interests of the debtor's directors, officers, or shareholders . . . and so are not

compensable.").

       *57.*     Reed Smith knew that the Debtors' Plan was unconfirmable on its face.

As explained in the Confirmation Decision:

- the $37 million cash contribution constituted a new value proposal under binding case law (*see* Confirmation Decision at 65);

- the proposed Collections Contribution (as defined in the Confirmation Decision) was: (a) not "new" value because the contribution would come from inside the Debtors' capital structure (*id.*) and (b) was not "money or money's worth" for a number of reasons, including that "there is no way of knowing how much (if any) money will be collected from Levona" (*id.* at 65-66);

- the proposed shareholder new value contribution (a) was not substantial (*id.* at 69), (b) did not provide reasonably equivalent value (*id.* at 70-71), and (c) was not necessary,  (*id.* at 72-79);

- the Debtors did not conduct a market test for the Shareholder New Value Contribution, as mandated in binding case law (*id.* at 74); and

- the Debtors' Plan was not feasible because it (a) failed to provide sufficient funding to make payments required on day 1, (b) incorrectly assumed that the Claims Objections would be sustained entirely, and (c) failed to account for the potential success of a substantial-contribution motion, to which the Debtors had agreed not to object (*id.* at 83-84).

       58.     Reed Smith also knew that the Debtors' Plan was unconfirmable based on

the voting results, which revealed, among other things, that the creditors

overwhelmingly preferred the PC Plan.  *See* Dkt. 941, Ex. A.  Given the clear voting

results, and the fact that there were other plans available to the Debtors, reasonable

counsel acting in good faith would not have continued to prosecute the Debtors' Plan.

But Reed Smith was irretrievably conflicted and sought to benefit the Debtors'

shareholders and insiders at the expense of the estates.  Reed Smith thus doubled down,

by: (a) hiring experts to defend the Debtors' Plan (for the first time in the plan process),

(b) seeking to disenfranchise noteholders by discounting over $300 million in votes cast

by noteholders, and (c) withholding documents relevant to certain parties' voting. *See* Dkt. 924, 936, 937, 941; *see also* Dkt. 1140 ¶¶ 28-30.

59.    Accordingly, Reed Smith should not be paid for any work related to the Plan or Disclosure Statement.  *See In re Ahead Commc'ns Sys., Inc.,* 395 B.R. 512, 517-18 (D. Conn. 2008) (disallowing plan related fees to law firm where it "should have known that the Debtors' Plan could not be confirmed"); *see also In re Ames Dep't Stores, Inc.,* 76 F.3d 66, 72 (2d Cir. 1996) (reasonableness under section 330 is determined by considering *"what services a reasonable lawyer or legal firm would have performed in the same circumstances.")* (emphasis added).

**B.    Reed Smith's Work on "Claims Administration and Objections"**

60.    As set forth in the Fourth and Final Fee Application, Reed Smith billed $2,789,955.75 to "Claims Administration and Objections," which should not be compensable for the same reasons set forth in the Prior Objections, namely that Reed Smith's work did not benefit the Debtors' estates.  *See* Fourth and Final Obj., Ex. C; *see also* Fourth Obj. ¶ 11; Fifth Obj.¶ 10; Sixth Obj. ¶ 14; Seventh Obj. ¶ 21; Eighth Obj. ¶ 25; Ninth Obj. ¶31; Tenth Obj. ¶ 35.  Additionally, the Claims Objection Decision that overruled the Debtors' Claims Objections further demonstrates that Reed Smith's time billed to the "Claims Administration and Objections" project code did not benefit the Debtors' estates.

**C.    Reed Smith's Work on "Financing and Cash Collateral"**

61.    As set forth in the Fourth and Final Fee Application, Reed Smith billed $229,110.50 to "Financing and Cash Collateral," which should not be compensable for the reasons set forth in the Third Objection and for the reasons set forth above.

IV.     **Additional Issues with Reed Smith's Fee Applications**

62.     As set forth in all of the Prior Objections, the Fourth and Final Fee

Objection seeks payment and approval of fees charged at rates that exceed the amounts

permitted by the Retention Order and Reed Smith's subsequent disclosures.  In Reed

Smith's January 30, 2024 declaration in support of its retention [Dkt. 386] (the "Fifth

Supplemental Declaration"), Reed Smith disclosed the increased hourly rate for

partners, associates, and other personnel who may work on the Chapter 11 Cases.  *See*

Fifth Suppl. Decl. ¶ 4.  The Fifth Supplemental Declaration provides that the range for

partners is "$820 - $1,470" per hour.  *Id.*  Mr. Solomon, who billed $2,579,908.80 in

connection with the Fourth and Final Fee Application Fee Statement, is billed at three

different rates $1,449, $1,610, and $1,715, two of which exceed the highest possible

partner rate set forth in the Fifth Supplemental Declaration.[12]  While no fees should be

allowed to Reed Smith, in no event should the Debtors be charged any rates above the

$1,470 disclosed in the Fifth Supplemental Declaration.

V.      **The Court Should Defer Ruling on the Fourth and Final Fee Application Until After the Estate's Claims Against Reed Smith Are Resolved**

63.     At a minimum, the Court should not allow any fees and expenses

requested in the Fourth and Final Fee Application until Reorganized Holdings is

provided a full opportunity to investigate and explore any and all claims and causes of

action that may belong to Reorganized Holdings, including claims against the Debtors'

officers, directors, insiders, and professionals, including Reed Smith.  Otherwise,

Reorganized Holdings and other parties in interest could be prejudiced by entry of an

---

[12]   The Fourth and Final Fee Application does not explain why Reed Smith is billing Mr. Solomon at a higher rate in the Chapter 11 Cases than in the Arbitration.

award approving the fees requested in the Fourth and Final Fee Application.  *See, e.g., In re Image Innovations Holdings, Inc.*, 391 B.R. 255, 261 (Bankr. S.D.N.Y. 2008) (fee award "left open no room for an independent malpractice action"); *AASI Creditor Liquidating Trust v. Raymond James & Assocs., Inc. (In re All Am. Semiconductor, Inc.)*, 427 B.R. 559, 572 (Bankr. S.D. Fla. 2010) (dismissing adversary proceeding because complaint "challeng[ed] the reasonableness of the pre-petition fees including the quality of the services for which these fees were paid").

64.    If the Court approves any of Reed Smith's fees and expenses, it should do so subject to an express reservation of rights that such allowance is without prejudice to a subsequent award of sanctions or damages against Reed Smith.

## RESERVATION OF RIGHTS

65.    Reorganized Holdings reserves all rights with respect to this Preliminary Objection, including, without limitation, to supplement this filing following discovery in advance of any evidentiary hearing(s) scheduled with respect to the Fourth and Final Fee Application.[13]

---

[13]    In particular, Reorganized Holdings reserves the right to refer Reed Smith to applicable disciplinary authorities and the Department of Justice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should disallow the Fourth and Final Fee Application and disgorge all of Reed Smith's fees paid in these cases and the Arbitration.

Respectfully submitted,

DATED:  January 9, 2025
New York, New York

TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Brian F. Shaughnessy*
KYLE J. ORTIZ
BRYAN M. KOTLIAR
BRIAN F. SHAUGHNESSY
AMANDA C. GLAUBACH
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000

*Counsel for Reorganized Holdings*