TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Kyle J. Ortiz
Bryan M. Kotliar
Brian F. Shaughnessy
John N. McClain, III
Jared C. Borriello

*Counsel for Eletson Holdings Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ELETSON HOLDINGS INC., et al.,[1] | : | Case No. 23-10322 (JPM) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |

-------------------------------------------------------------x

### EMERGENCY MOTION OF ELETSON HOLDINGS INC. FOR ENTRY OF A FURTHER ORDER IN SUPPORT OF CONFIRMATION AND CONSUMMATION OF THE COURT-APPROVED PLAN OF REORGANIZATION

Eletson Holdings Inc. ("Holdings"), by and through its undersigned counsel, hereby submits this emergency motion (the "Motion"), pursuant to sections 105, 1141, and 1142 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), compelling the Ordered Parties[2] to withdraw their oppositions

---

[1] The Debtors in these chapter 11 cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901. References to the "Debtors" with respect to conduct that occurred prior to the Effective Date of the plan are references to the pre-Effective Date Debtors.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Sanctions Motion and Consummation Order (each as defined below).

to the judicial recognition of the Confirmation Order before the Liberian and Greek courts, and imposing sanctions and other costs until they do so.[3]

In support of this Motion, Holdings submits the Declaration of Jared C. Borriello, Esq. attached hereto as **Exhibit B** (the "Borriello Declaration"),[4] and respectfully states:

<u>**PRELIMINARY STATEMENT**</u>

1.      The Ordered Parties continue to ignore their obligations under the Plan, the Confirmation Order, the Consummation Order, and Sections 1141 and 1142 of the Bankruptcy Code to aid in implementing the Plan.  Additionally, they continue to take actions in violation of the Court's explicit injunction against interference with the Plan in paragraph 12 of the Confirmation Order by actively opposing judicial-recognition proceedings by Holdings in Liberia and Greece—proceedings that were only necessary because of the Ordered Parties' refusal to comply with the Confirmation Order.  The Ordered Parties are transparently violating the Confirmation Order and the Consummation Order.

2.      Under the *Navigator Gas* precedent in this District, this Court is expressly empowered to hold the Ordered Parties in contempt and to impose sanctions on them until they withdraw their oppositions.  There is real urgency to do so in short order considering that there are hearings scheduled in Greece for mid-March that, if not withdrawn, could lead to conflicting rulings, as well as a hearing scheduled for February 21, 2025 in Liberia.  The Court should accordingly: (a) find the Ordered Parties in contempt of Court, (b) compel them to withdraw their oppositions to the judicial

---

[3]      By separate motion filed contemporaneously herewith, Holdings is requesting that, pursuant to the Consummation Order, the Court schedule the hearing with respect to this Motion as soon as possible.

[4]      Exhibits cited to herein as "Ex. __" are attached to the Borriello Declaration.

recognition of the Confirmation Order in Liberian and Greek courts, (c) impose coercive monetary sanctions against each of the Ordered Parties at $50,000 per day until they withdraw the Liberian and Greek oppositions, and (d) require the Ordered Parties on a joint-and-several basis to pay Holdings' fees and expenses in connection with this Motion, the Sanctions Motion, the Liberian proceedings, and the Greek proceedings.[5]

## JURISDICTION AND VENUE

3.     This United States Bankruptcy Court for the Southern District of New York (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.) (the "Amended Standing Order").  Pursuant to Bankruptcy Rule 7008, Holdings confirms its consent to the Court's exercise of jurisdiction to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.     Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     Pursuant to Section 11.1 of the Plan and Paragraph WW of the Confirmation Order, the Court retains exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases, including the matters set forth in Article XI of the Plan and Section 1142 of the Bankruptcy Code.  In particular, under Section 11.1(d) of the Plan, the Court retains jurisdiction to "enter such orders as may be necessary or

---

[5]     Holdings reserves the right to return to this Court for other additional orders in aid of effectuating the Plan.

appropriate to implement or consummate the provisions of this Plan . . . ."  Plan § 11.1(d).

<strong><u>BACKGROUND</u></strong>

**I.**     **<u>The Ordered Parties Are Obliged To Fully Consummate the Plan</u>**

6.     On September 25, 2023, the Debtors voluntarily converted the involuntary chapter 7 cases to voluntary chapter 11 cases, submitting themselves to and invoking the jurisdiction of this Court to oversee the restructuring of the Company.

7.     On October 25, 2024, the Court issued a decision [Docket No. 1212] (the "<u>Confirmation Decision</u>") confirming the Petitioning Creditors' chapter 11 plan [Docket No. 1132, Ex. 1] (the "<u>Plan</u>") and overruling the Debtors' and Former Majority Shareholders' objections thereto [Docket Nos. 1029, 1033], among other things.

8.     On November 4, 2024, the Court entered the order confirming the Plan [Docket No. 1223] (the "<u>Confirmation Order</u>").  Through the Confirmation Order, the Court ordered the Debtors and all of their Related Parties[6]—including the Ordered Parties—to work in good faith to facilitate the Plan's consummation in full, to refrain from actions inconsistent with full consummation of the Plan, and to take directions from the Petitioning Creditors in connection with Plan implementation, stating:

- "The Debtors and . . . their [] Related Parties are hereby directed to cooperate in good faith to implement and consummate the Plan," Confirmation Order ¶ 5(i); and

- "[A]ll . . . parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined

---

[6]     Under the Plan, "Related Parties" includes, *inter alia*, the Debtors; the Debtors' predecessors, successors, and assigns; the Debtors' parents, owners, subsidiaries and affiliates; current and former officers, directors, principals, direct and indirect equity holders, fiduciaries, employees, agents, attorneys, managers, representatives, and other professionals; and all of the foregoing's respective heirs, servants, and nominees.  *See* Plan § 1.124.

4

from taking any actions to interfere with the implementation or consummation of the Plan," *id.* ¶ 12.

Notably, these provisions became effective on the date that the Confirmation Order was entered, November 4, 2024, as opposed to the later Effective Date.

9. On November 11, 2024, in violation of paragraph 12 of the Confirmation Order, Elafonissos Shipping Corporation and Keros Shipping Company (together, the "Former Minority Shareholders") filed a petition (the "Former Minority Shareholders' Greek Petition") with the First Instance Court of Piraeus in Greece (the "Greek Court"), seeking the appointment of a provisional board of directors of Holdings, despite the fact that, pursuant to the Confirmation Order and the Plan, the board of Holdings would be replaced on the Effective Date approximately one week later. Ex. 1 (Former Minority Shareholders' Greek Petition). The Former Minority Shareholders' Greek Petition collaterally attacked this Court's orders, including the claims-objection decision [Docket No. 1211] (the "Claims Decision"), the Confirmation Decision, and the Confirmation Order, seeking to relitigate these rulings by the Court as if they never happened. *Id.* at 19-27 (describing the "in bad faith method" of the bankruptcy petition and the "totally questionable nature of" the Petitioning Creditors' claims previously heard and adjudicated by this Court). The Former Minority Shareholders not only argued that the Confirmation Decision, Confirmation Order, and Plan must be recognized abroad before they can be effective, but the Former Minority Shareholders also made clear that they would actively seek to overturn all three. *Id.* at 35, 38, 41-42, 46. For example, the Former Minority Shareholders asked the Greek Court to authorize the provisional board of directors to "turn against" the Confirmation Decision and Confirmation Order and "to oppose" the Confirmation Order's validity, "as an impediment to the recognition of the [Confirmation] Decision in Greece . . . ." *Id.*

10.     On November 12, 2024, the Greek Court issued an *ex parte* interim order (the "Greek Order") appointing the following persons to replace (i) Laskarina Karastamati, (ii) Vassilis Kertsikoff, (iii) Eleni Karastamati, and (iv) Panagiotis Konstantaras (collectively, the "Resigning Directors"): (a) Adrianos Psomadakis-Karastamatis, (b) Panos Paxinos, (c) Eleni Giannakopoulou, and (d) Niki Zilakos (collectively, the "Provisional Appointees").  The Greek Court thereby purported to appoint a provisional board of directors of Holdings (the "Provisional Board") comprised of: (i) Vasileios Hadjieleftheriadis, (ii) Konstantinos Hatzieleftheriadis, (iii) Ioannis Zilakos, and (iv) Emmanuel Andreoulakis (collectively, the "Remaining Directors") plus (v) the Provisional Appointees.

11.     The Greek Court appointed the Provisional Board for "temporary management" of Holdings and authorized the Provisional Board to, among other things:

> Obtain judicial protection . . . before the **Greek Courts,** in order to challenge the [Confirmation Decision] in which it was filed by the U.S. Bankruptcy Court for reason of lack of international jurisdiction of that latter."
>
> . . .
>
> In addition, in the event that the Creditors apply for the acknowledgement and execution of the [Confirmation Decision] in Greece, where Eletson Holdings is based in fact, the latter to appear and be represented before the competent Greek Courts *in order to oppose*, otherwise and as an ***impediment to the recognition of the [Confirmation Decision] in Greece***, due to the inadequacy of the issuing party's international jurisdiction in the [Confirmation Decision], that is, the foreign Bankruptcy court of the U.S., and for their other claims in their favor.

Ex. 2 (Greek Order) at 34-35.

12.     On November 19, 2024 (the "Effective Date"), the Plan went effective.  *See* Docket No. 1258 (Notice of Effective Date) at 2.  On the Effective Date, all of Holdings' existing officers and directors, including the Remaining Directors and the Provisional Appointees, were "deemed to have resigned or shall otherwise cease to be a

director or manager of the applicable Debtor . . . ."  Plan § 5.10(c); *see also* Consummation Decision (defined below) at 26:5-26:10;  Ex. 17 (Feb. 14, 2025 SDNY Hr'g Tr.) at 108:11-13.

13.     On November 25, 2024, Holdings filed the *Emergency Motion of Reorganized Eletson Holdings Inc. for an Order Imposing Sanctions on Eletson Holdings' (A) Existing Person of Record and (B) Former Shareholders, Officers, Directors, and Counsel, Including Reed Smith LLP* [Docket No. 1268] (the "Sanctions Motion").  On December 10, 2024, respectively, Reed Smith, the Danialos Law Firm, and the Former Majority Shareholders (through Sidley Austin) filed objections to the Sanctions Motion [Docket Nos. 1285, 1287, 1291], which Holdings responded to on December 13, 2024 [Docket No. 1299] (the "Sanctions Reply").  On December 13, 2024, the Creditors' Committee filed a statement in support of the Sanctions Motion [Docket No. 1301].

14.     The Court held a trial on the Sanctions Motion on January 6, 2025, and thereafter the parties submitted post-trial proposed findings of fact and conclusions of law [Docket Nos. 1355, 1356] and post-trial briefs [Docket Nos. 1371, 1372] on January 13 and 17, 2025, respectively.

15.     On January 24, 2025, the Court issued an oral decision (the "Consummation Decision") granting the Sanctions Motion, as modified, which was followed on January 29, 2025 by an accompanying order [Docket No. 1402] (the "Consummation Order").[7]  In the Consummation Decision, the Court found that:[8]

---

[7]     A copy of the transcript of the Consummation Decision is attached as Exhibit A to the Consummation Order and Exhibit 22 to the Borriello Declaration.

[8]     Despite Reed Smith's mistaken assertion previously that the Court made no findings during its hour long oral ruling, the Court clearly states "[b]ased on the above and considering the evidence submitted in support and in opposition of the motion, the Court *finds* as follows."  Consummation Decision at 19:5-7 (emphasis added).

- "The new members of the board of directors [of Holdings] are Adam Spears, Leonard Hoskinson, and Timothy Matthews." Consummation Decision at 24:14-16.

- On the Effective Date, "the board members of the former debtor, certain of whom are now members of the provisional board, were automatically deemed to have resigned or otherwise ceased to be a director manager of Eletson Holdings Inc." *Id.* at 26:5-26:10 (internal quotation marks omitted).

- "Reorganized Eletson Holdings Inc., the same corporate entity as the former debtor, Eletson Holdings, but with the new owners, board, and management as approved by this court in the confirmation order, is the only Eletson Holdings Inc." *Id.* at 26:17-20 (internal quotation marks omitted).

- The unstayed Confirmation Order "recognizes the [authority of the] new board of Eletson and gives the new board of Eletson under section 5.2 of the plan the ability to act on behalf of Eletson . . . ." *Id.* at 26:12-27:2 (internal quotation marks and citations omitted).

- "[T]he confirmation order and Chapter 11 plan are binding on Reorganized Eletson Holdings Inc.'s former shareholder[s], officers, directors, counsel, nominees and others as defined in section 1.124 of the plan pursuant to Section 1141 and 1142 of the Bankruptcy Code." *Id.* at 43:11-15.

16.     In the Consummation Order, the Court ordered the same things *already* required by the Confirmation Order, *see supra* ¶ 8, *i.e.*, the Court required the Ordered Parties to work in good faith to facilitate the Plan's consummation in full, stating:

> Pursuant to section 1142 of the Bankruptcy Code, the Debtors and their Related Parties, including without limitation, the Ordered Parties, are authorized, required, and directed to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof[.]

Consummation Order ¶ 1.

## II.     Continued Misconduct by the Ordered Parties Since the Decision

### A. Initial Liberian Proceeding

17.     Since before the Effective Date, the Ordered Parties have wrongfully asserted that the Confirmation Order must be recognized in Liberia for the Plan to effectuate a change in the ownership and management of Holdings and refused

to update Holdings' "address of record" ("AOR") and corporate-governance documents on file with LISCR, LLC, the Liberian International Ship & Corporate Registry ("LISCR"). As a result, on November 26, 2024, Pach Shemen, LLC ("Pach Shemen"), a Petitioning Creditor, Plan Proponent, and shareholder of Holdings commenced a proceeding (the "Initial Liberian Proceeding") against Holdings in Liberia seeking, among other things, recognition of the Confirmation Order and an order instructing LISCR to change the AOR to a person designated by Pach Shemen. *See* Ex. 3 (Initial Liberian Recognition Proceeding Petition).

18.    On December 16, 2024, Liberian law firm Lex Group Liberia LLC, purportedly on behalf of Holdings with authorization by the Provisional Board, filed: (a) an Initial Response to Liberian Recognition Proceeding (the "Initial Response"), which argued that recognition of the Confirmation Order should not be granted based upon arguments already rejected by this Court, Ex. 4 (Initial Response); and (b) an Initial Motion to Dismiss Liberian Recognition Proceeding Petition (the "Initial MTD"), which sought to dismiss the Initial Liberian Proceeding for jurisdictional reasons, including the pendency of the Confirmation Order Appeal in the District Court, Ex. 5 (Initial MTD).

19.    On December 23, 2024, Pach Shemen dismissed the Liberian Petition without prejudice. *See* Ex. 6 (Notice of Voluntary Discontinuance of Liberian Recognition Proceeding Petition).

**B. The Foreign Representative Order**

20.    On November 25, 2024, Holdings filed a motion seeking entry of an order authorizing Adam Spears to act as the "foreign representative" for reorganized Holdings to the extent necessary to seek and obtain recognition of this Court's orders in

jurisdictions outside of the United States [Docket No. 1269] (the "Foreign Representative Motion").

21. Following discussions with Sidley and Reed Smith on the form of the proposed order granting Mr. Spears the authority to represent reorganized Holdings in Liberia and Greece, counsel for Holdings submitted an agreed-upon form of proposed order to this Court with Sidley and Reed Smith both copied, noting that "both parties have agreed to the attached Revised Proposed Order."  Ex. 8 (Dec. 18, 2024 Email from L. Ebrahimi to Chambers at 4:10 p.m.).  Neither Sidley nor Reed Smith made any objections in response.

22. On December 20, 2024, the Court entered the order submitted by the parties.  [Docket No. 1326] (the "Foreign Representative Order").  The Foreign Representative Order authorizes Adam Spears "to act as the sole 'foreign representative' solely on behalf of Holdings in Liberia and Greece and solely for the purpose of seeking (or supporting applications seeking) recognition of the Confirmation Order entered in this Chapter 11 Case in Liberia and Greece."  Foreign Rep. Order ¶ 3.

23. The Foreign Representative Order was neither appealed nor sought to be stayed and is a final order of this Court.

**C. The Subsequent Liberian Proceeding**

24. On January 7, 2025, after the District Court dismissed the Confirmation Order Appeal and this Court entered the Foreign Representative Order, Pach Shemen commenced another proceeding in Liberia (the "Subsequent Liberian Proceeding" and, together with the Initial Liberian Proceeding, the "Liberian Proceedings") against Reorganized Holdings "represented by Adam Spears, its Foreign Representative in Liberia, by and through his Attorney-in-Fact, Counsellor Kunkunyo W. Teh, of the City of Monrovia."  *See* Ex. 9 (Subsequent Liberian Recognition Petition).

Like the Initial Liberian Proceeding, the Subsequent Liberian Proceeding seeks, among other things, recognition of the Confirmation Order and an order instructing LISCR to change the AOR to a person designated by Pach Shemen. *See id.*

25. On January 9, 2025, Holdings "represented by Adam Spears," filed its returns in the Subsequent Liberian Proceeding supporting the application by Pach Shemen and consenting to the entry of a recognition order. Ex. 10 (Eletson Holdings' Returns in Subsequent Liberian Recognition Proceeding).

26. Also on January 9, 2025, both the Provisional Board (which alone opposed recognition in the Initial Liberian Proceeding) *and the Former Shareholders*—including both the Former Majority Shareholders and the Former Minority Shareholders—filed: (a) a response to the Subsequent Liberian Recognition Petition that was substantially similar to the Initial Response (the "Subsequent Response"); (b) a motion to dismiss that was substantially similar to the Initial MTD (the "Subsequent MTD"); (c) a motion to intervene that sought permission to appear and be heard in the Subsequent Liberian Proceeding (the "Motion to Intervene"); and (d) a motion to strike that challenged Mr. Spears' authority to represent reorganized Holdings in the Subsequent Liberian Proceeding (the "Motion to Strike" and, together with the Subsequent Response, the Subsequent MTD, and the Motion to Intervene, the "Subsequent Liberian Pleadings" in the "Liberian Proceedings"). *See* Exs. 11-14. Notably, within the Motion to Strike, the Provisional Board and Former Shareholders argue that Mr. Spears has not been authorized to act as "the foreign representative in Liberia" by "*any . . . competent authority*." Ex. 14 (Motion to Strike) ¶ 3 (emphasis added).

27. On January 10, 2025, counsel to Holdings emailed counsel to the Former Majority Shareholders and directed the Former Majority Shareholders to

withdraw the Subsequent Liberian Pleadings, among other things. *See* Ex. 15 (Jan. 10, 2025 Email from B. Kotliar to W. Curtin at 4:53 p.m.). This direction was ignored.

28. On January 26, 2025, counsel for Holdings emailed certain of the Ordered Parties—including Reed Smith, the Daniolos Law Firm, Sidley, Rimon P.C. (purported counsel to "Provisional Holdings"), and certain of the Former D&Os (Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, and Lascarina Karastamati)—a list of requests pursuant to the Plan, the Confirmation Order, the Consummation Decision, and the Consummation Order, including a request that the Ordered Parties "[w]ithdraw all pleadings filed in opposition to the recognition proceeding currently pending in Liberia." *See* Docket No. 1416 Ex. 1 (Email from B. Kotliar to Ordered Parties on Jan. 26, 2025).

29. On January 28, 2025, Reed Smith responded, stating that they do not "possess the capacity or authority to comply" with the January 26, 2025 requests, and that they had "passed along the request" to the other Ordered Parties. *See* Docket No. 1416 Ex. 2 (Letter from L. Solomon to B. Kotliar dated Jan. 28, 2025).

30. On February 12, 2025, the Liberian Court assigned a hearing on the Motion to Intervene for February 17, 2025. This hearing was subsequently reassigned and is now scheduled for February 21, 2025.

### D. Greek Proceedings

31. As noted above, the Greek Court appointed the Provisional Board for "temporary management" of Holdings and authorized the Provisional Board to, among other things, "oppose" and "challenge" the Confirmation Order's recognition by the Greek courts. *See supra* ¶¶ 9-11; Ex. 2 (Greek Order) at 34-37. The Greek Court initially set a hearing general shareholders' meeting for February 4, 2025 to elect a new board of directors of Holdings. Ex. 2 (Greek Order) at 40.

32. On February 3, 2025, Holdings filed an application in the Greek Court seeking recognition of the Confirmation Order, citing the Foreign Representative Order. Ex. 16 ("Holdings' Greek Petition"). Holdings also sought on February 4, 2025 to intervene in the pre-existing proceedings initiated by the Former Minority Shareholders' Greek Petition. Ex. 17 (Holdings' Greek Intervention Application).

33. On February 4, 2025, the Daniolos Law Firm moved to dismiss Holdings' Greek Petition on behalf of the Provisional Board. Ex. 18 (the "Daniolos Opposition"). The Daniolos Opposition argued, *inter alia*, that Greek judicial recognition of the Confirmation Order is a necessary prerequisite to the Confirmation Order having legal effect at all anywhere without qualification:

> Until the disputed bankruptcy decision is recognized by a court in Greece (but also in Liberia where the statutory seat of the company is located), it does not produce any legal effects and therefore the lawyer who appears to represent our company does not have any relevant mandate.

Daniolos Opposition at 2. Also on February 4, 2025, the Provisional Board and Former Minority Shareholders, through separate Greek counsel, the Calavros Law Firm, sought to intervene in the proceedings concerning Holdings' Greek Petition, making the same arguments made in the Former Minority Shareholders' Greek Petition that the Confirmation Order should not be recognized in Greece, *e.g.*, because the Court lacked jurisdiction over Holdings. Ex. 19 ("Former Minority Shareholders' Greek Intervention Application") at 3, 52-5, 59.

34. On February 4, 2025, the Greek Court adjourned the planned shareholders' hearing, and set a hearing on April 1, 2025 to consider the various filings in the proceedings in the Greek Court concerning Holdings (collectively, the "Greek Proceedings"). *Id.* at 61.

### E. Additional Developments

35.     On February 4, 2025, Reed Smith sent a letter to this Court making clear that neither it nor its clients will comply with the Consummation Order, nor will its clients. *See* Docket No. 1407 at 1.  Reed Smith argued that because of Holdings' Greek Petition, a stay of the Confirmation Order is necessary to provide "clarity" as to the very issues addressed by this Court in the Confirmation Decision and Confirmation Order. *See id*. at 2, 3.  The Provisional Board and Reed Smith's subsequent motion to stay enforcement of the Consummation Order [Docket No. 1412] is set to be argued in this Court on February 20, 2025.

36.     On February 14, 2025, Judge Liman held a hearing concerning the appeal from the Confirmation Order (the "<u>Confirmation Appeal</u>") that Reed Smith seeks to continue to prosecute on behalf of the Provisional Board. *See In re Eletson Holdings Inc.,* 24-cv-08672 (LJL) (S.D.N.Y. 2025) [Docket No. 66].[9]  After more than an hour of criticizing Reed Smith and its clients during argument for their obstructive tactics, Judge Liman issued an extensive bench ruling that: (1) rejected Reed Smith's arguments that foreign recognition of the Confirmation Order is necessary before the Confirmation Order is effective, pointing out the "inherent absurdity" of Reed Smith's arguments, Ex. 21 (Feb. 14, 2025 SDNY Hr'g Tr.) at 99:2-4; (2) held that the Provisional Board and Reed Smith are not entitled to speak for Holdings in the United States District Court for the Southern District of New York, and that post-Effective Date actions purportedly taken by the Provisional Board's counsel on behalf of Holdings were "plainly unauthorized," likening counsel to "interloper[s]" and striking the

---

[9]     Judge Liman's February 14, 2025 order was entered "[f]or the reasons stated on the record during" the hearing.  Ex. 20 (Feb. 14, 2025 SDNY Order) at 1.

notices of appearance and notices of appeal that the Provisional Board's counsel purported to file on Holdings' behalf, *id.* at 92:15-93:3, 95:8-22, 105:17-106:24; and (3) issued an indicative ruling that Holdings' decision to dismiss the Confirmation Appeal should be recognized and that the Second Circuit should dismiss the Confirmation Appeal, *id.* at 92:15-93:3. Before Judge Liman issued this ruling, he emphasized during argument that Reed Smith's and its clients' failure to do everything they reasonably could to help implement the Plan, was itself a violation of the Confirmation Order. *Id.* at 56:18-22 (THE COURT: "[T]he question…is whether, under your argument, your client is the one as Eletson Holdings, you say it is, is obligated to do all of those things [under the Plan] and , therefore, should be sanctioned for failing to do it[.]"); 62:11-16 (THE COURT: "But it does strike me as odd that those same individuals who asked the U.S. court to reorganize their entity could then purport to represent the reorganized entity, the entity that they said U.S. court would reorganize, and then, purporting to represent them, take a position opposite to the plan."). In fact, Judge Liman said the following after hearing Reed Smith emphasize that it still represents Holdings, and that the Greek order appointing the Provisional Board should control:

> Don't you find something a little bit odd with Eletson Holdings taking the position that Eletson Holdings hasn't done something. . . . You're arguing on behalf of Eletson Holdings that Eletson Holdings hasn't done something that Eletson Holdings should do. That seems to me to say, all right, you have now confessed. . . . You have asked me to refer to you as Eletson Holdings. That's who you said you represent. If in fact you represent Eletson Holdings, haven't you just confessed to your own wrongdoing?

*Id.* at 54:15-55:10.

37.     As of the date of this Motion, the Ordered Parties continue to press their arguments that the Confirmation Order should not be judicially recognized in

both Liberian and Greek proceedings and have not withdrawn their oppositions in either forum.

## RELIEF REQUESTED

38.     Paragraph 12 of the Confirmation Order provides that "upon entry of the Confirmation Order" the Ordered Parties are "enjoined from taking any actions to interfere with the implementation or consummation of the Plan," and paragraph 1 of the Consummation Order reiterates that the Ordered Parties are required "to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof" and "to take all steps reasonably necessary as requested by Holdings to unconditionally support the effectuation, implementation, and consummation of the Plan."

39.     As of the date of this Motion, despite the clear directives from the Court, the Ordered Parties have failed to comply with their obligations and continue to act in violation of the Plan, the Confirmation Decision, the Confirmation Order, the Consummation Decision, and the Consummation Order, including, without limitation, by failing to withdraw their oppositions to the judicial recognition of the Confirmation Order by Liberian and Greek courts, which the Ordered Parties are clearly using to try to frustrate this Court's direct orders and the full implementation of the Court-ordered Plan.

40.     As set forth in paragraphs 65 to 66 of the Sanctions Motion and paragraph 21 of the Sanctions Reply, which are incorporated herein by reference, the Court can order coercive monetary sanctions and other relief to compel compliance with its orders.

41.     In *In re Navigator Gas Transport PLC*, Case No. 03-10471 (Bankr. S.D.N.Y. Apr. 15, 2004) a debtor sought to evade a plan through a foreign proceeding in

the Isle of Man, as the Ordered Parties seek to do here through the Liberian and Greek oppositions. Upon the motion of the creditors' committee, Judge Blackshear issued an order: (a) directing the debtors as well as their directors, shareholder, and counsel (i) to unconditionally support the plan and (ii) to oppose any effort to undermine the confirmation order; and (b) directing the directors and the shareholder to pay sanctions of $10,000 for each day that they failed to follow the court's directions, plus the legal fees and costs incurred by the committee. *See* Docket No. 1328, Ex. 1C (*Navigator*, Docket No. 319) at 15-17.

42. Both the parties in *Navigator Gas* and the Ordered Parties here have filed pleadings in a foreign court seeking to "obstruct consummation of [a] plan." *E.g.*, Ex. 1 (Former Majority Shareholders' Greek Petition); Ex. 4 (Initial Response to Liberian Recognition Proceeding). And as this Court held based on *Navigator Gas*:

> [T]he Court finds that [*Navigator Gas*] is instructive because it highlights that the Court is empowered by section 1142 to implement the terms of the confirmation order on Chapter 11 plan even where such plan contemplates a reorganization of the corporate entity which may operate in a foreign jurisdiction. Both the sanctions order in *Navigator* and the confirmation order in this case direct former debtors and their personnel to cooperate to implement the terms of the terms of the Chapter 11 plan.

Consummation Decision at 33:9-17.

43. Holdings seeks similar relief here to that sought in *Navigator Gas*, and like Judge Blackshear did, the Court should grant relief. Holdings requests that the Court (a) find the Ordered Parties in contempt of Court, (b) compel them to withdraw their oppositions to the judicial recognition of the Confirmation Order in Liberian and Greek courts, (c) impose coercive monetary sanctions against each of the Ordered Parties at $50,000 per day until they withdraw the Liberian and Greek oppositions, and (d) require the Ordered Parties on a joint and several basis to pay Holdings' fees and

expenses in connection with this Motion, the Sanctions Motion, the Liberian proceedings, and the Greek proceedings.

44.     With hearings scheduled for March 19, 2025 in Greece, the Court can and should impose significant sanctions to bring the Ordered Parties into compliance with the Plan and to bring to a halt the Ordered Parties' ongoing value-destroying efforts to impede the implementation of the Court's long-ago-confirmed Plan.

## RESERVATION OF RIGHTS

45.     Holdings reserves all rights, including the right to seek additional sanctions and damages against the Ordered Parties, or any additional parties, for any conduct, including conduct that occurred prior to or after the Effective Date, or for any other purposes.

## NOTICE

46.     Notice of this Motion will be given to the following parties or their counsel:  (a) the Ordered Parties; (b) the U.S. Trustee; and (c) any party that has requested notice pursuant to Bankruptcy Rule 2002 (the "Notice Parties").  Holdings submits that, in light of the nature of the relief requested, no other or further notice need be provided.

47.     After the Court schedules the hearing with respect to this Motion, Holdings will file a notice of hearing and serve such notice on the Notice Parties.

## CONCLUSION

**WHEREFORE**, Holdings respectfully requests that the Court (a) enter the Proposed Order and (b) grant such other and further relief as the Court deems just and proper.

DATED: February 19, 2025  
New York, New York

TOGUT, SEGAL & SEGAL LLP  
By:

*/s/ Kyle J. Ortiz*_____  
KYLE J. ORTIZ  
BRYAN M. KOTLIAR  
BRIAN F. SHAUGHNESSY  
JOHN N. McCLAIN, III  
JARED C. BORRIELLO  
One Penn Plaza, Suite 3335  
New York, New York 10119  
(212) 594-5000

*Counsel for Eletson Holdings Inc.*

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                  :

In re:                                :       Chapter 11

                                         :

ELETSON HOLDINGS INC., et al.,[1]      :       Case No. 23-10322 (JPM)

                                       :

                                       :       (Jointly Administered)

                           Debtors.     :

                                       :
----------------------------------------------------------------x

## ORDER IN FURTHER SUPPORT OF CONFIRMATION AND CONSUMMATION OF THE COURT-APPROVED PLAN OF REORGANIZATION

Upon the motion (the "Motion")[2] of Eletson Holdings Inc. ("Holdings"), pursuant to sections 105, 1141, and 1142 of title 11 of the United States Code, and Bankruptcy Rule 9020, for entry of an order (this "Order") against the Ordered Parties: (a) finding the Ordered Parties in contempt of Court; (b) compelling the Ordered Parties to withdraw their oppositions to the judicial recognition of the Confirmation Order in Liberian and Greek courts; (c) imposing coercive monetary sanctions against each of the Ordered Parties at $50,000 per day until they withdraw their Liberian and Greek oppositions; and (d) requiring the Ordered Parties on a joint-and-several basis to pay Holdings' fees and expenses in connection with this Motion, the Sanctions Motion, the Liberian Proceedings, and the Greek Proceedings, and granting related relief; and the Court having jurisdiction to consider the Motion and relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order, 11 U.S.C. §§ 105 and

---

[1]    The Debtors in these chapter 11 cases are:  Eletson Holdings Inc. ("Holdings"), Eletson Finance (US) LLC, and Agathonissos Finance LLC.  The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185 35 Piraeus, Greece.  The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square, Suite 424, Stamford, Connecticut 06901.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

1142, and the Court's inherent jurisdiction to interpret and enforce its own orders (including the Confirmation Order ordering that the Plan be implemented and the Consummation Order enforcing the Confirmation Order); and consideration of the Motion and relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court having the authority to enter a final order consistent with Article III of the United States Constitution; and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been provided; and it appearing that no other or further notice need be provided; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, all parties in interest, and Holdings; and the Court having reviewed the Motion and the declaration annexed thereto; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and all objections to the Motion, if any, having been withdrawn or overruled; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

       1.     The Court FINDS that the Ordered Parties are in contempt of Court for ongoing violations of the Confirmation Order and the Consummation Order.

       2.     The Ordered Parties are authorized, required, and directed to withdraw any and all filings that oppose or undermine in any way the judicial recognition of the Confirmation Order, including, without limitation, filings in the Liberian Proceedings and the Greek Proceedings, by no later than seven (7) days from the date of service of this Order in accordance with applicable law (the "Compliance Deadline"), and are enjoined from making any filings in any court seeking to oppose or undermine in any way the judicial recognition of the Confirmation Order, including,

without limitation, by initiating or prosecuting any legal actions that seek to oppose or undermine the Confirmation Order.

3.     As a result of the Ordered Parties' violations of this Court's orders and this Court's finding of contempt, the Court (a) compels the Ordered Parties to withdraw their oppositions to the judicial recognition of the Confirmation Order in Liberian and Greek courts, (b) imposes coercive monetary sanctions against each of the Ordered Parties at $50,000 per day until they withdraw the Liberian and Greek oppositions, and (c) requires the Ordered Parties on a joint-and-several basis to pay Holdings' fees and expenses in connection with this Motion, the Sanctions Motion, the Liberian Proceedings, and the Greek Proceedings.

4.     Holdings shall serve a copy of this Order on all parties in interest consistent with applicable law.

5.     The Clerk of Court is directed to send copies of the Confirmation Order, Consummation Order, and this Order to the Liberian International Ship & Corporate Registry at 22980 Indian Creek Drive, Suite 200, Dulles, Virginia 20166.

6.     This Order is without prejudice to Holdings' rights to seek additional coercive and/or compensatory monetary sanctions.  The Court will consider additional coercive and/or compensatory monetary sanctions in to-be-determined amounts each time that the Ordered Parties take any actions that interfere with the implementation and consummation of the Plan hereafter.

7.     This Order shall be immediately effective and enforceable upon its entry.

8. The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

Dated: _____, 2025

_____
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE

**Borriello Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
: 
In re:                                                           :          Chapter 11
                                                                 :
ELETSON HOLDINGS INC., et al.,                                   :          Case No. 23-10322 (JPM)
                                                                 :
                                                                 :          (Jointly Administered)
                Debtors. [1]                                     :
                                                                 :
------------------------------------------------------------------x

**DECLARATION OF JARED C. BORRIELLO, ESQ. IN SUPPORT
OF EMERGENCY MOTION OF ELETSON HOLDINGS INC. FOR
ENTRY OF A FURTHER ORDER IN SUPPORT OF CONFIRMATION AND
CONSUMMATION OF THE COURT-APPROVED PLAN OF REORGANIZATION**

         I, Jared C. Borriello, Esq. hereby declare under penalty of perjury,

pursuant to section 1746 of Title 28 of the United States Code, as follows:

         1.       I am counsel at the law firm of Togut, Segal & Segal LLP, counsel to

Eletson Holdings in the above-captioned chapter 11 cases.

         2.       I respectfully submit this Declaration in support of the *Emergency*

*Motion of Eletson Holdings Inc. for Entry of a Further Order in Support of Confirmation and*

*Consummation of the Court-Approved Plan of Reorganization* (the "Motion")[2] filed

contemporaneously herewith.

         3.       Attached hereto are true and correct copies of the following

documents:

---

[1]    The Debtors in these cases are: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos
       Finance LLC. The address of the Debtors' corporate headquarters is 118 Kolokotroni Street, GR 185
       35 Piraeus, Greece. The Debtors' mailing address is c/o Eletson Maritime, Inc., 1 Landmark Square,
       Suite 424, Stamford, Connecticut 06901. References to the "Debtors" with respect to conduct that
       occurred prior to the effective date of the plan are to the pre-effective date Debtors.

[2]    Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such
       terms in the Motion.

| Exhibit | Description |
|---|---|
| 1. | Greek Petition (certified English Translation) |
| 2. | Greek Order, dated November 12, 2024 |
| 3. | Initial Liberian Recognition Proceeding Petition |
| 4. | Initial Response to Liberian Recognition Proceeding |
| 5. | Initial Motion to Dismiss Liberian Recognition Proceeding Petition |
| 6. | Notice of Voluntary Discontinuance of Liberian Recognition Proceeding Petition |
| 7. | December 16, 2024 Hearing Transcript |
| 8. | Dec. 18, 2024 Email from L. Ebrahimi to Chambers at 4:10 p.m. |
| 9. | Subsequent Liberian Recognition Petition |
| 10. | Eletson Holdings' Returns in Subsequent Liberian Recognition Proceeding |
| 11. | Subsequent Response to Liberian Recognition Proceeding |
| 12. | Motion to Dismiss Subsequent Liberian Recognition Proceeding |
| 13. | Motion to Intervene in Subsequent Liberian Recognition Proceeding |
| 14. | Motion to Strike in Subsequent Liberian Recognition Proceeding |
| 15. | Jan. 10, 2025 Email from B. Kotliar to W. Curtin at 4:53 p.m. |
| 16. | Holdings' Greek Petition |
| 17. | Holdings' Greek Intervention Application |
| 18. | Daniolos Opposition to Holdings' Greek Petition |
| 19. | Former Minority Shareholders' Greek Intervention Application |
| 20. | February 14, 2025 SDNY Order |
| 21. | February 14, 2025 SDNY Hearing Transcript |
| 22. | Consummation Decision (January 24, 2024 Hearing Transcript) |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true to the best of my knowledge.

Dated: New York, New York
February 19, 2025

/s/ *Jared C. Borriello*
Jared C. Borriello

EXHIBIT "1"

Niles, Illinois

## TRANSLATOR AFFIDAVIT

I, Eleftherios Kritikakis of Niles, Illinois, am a qualified, Berlitz-certified legal translator and
interpreter for the Greek and English languages. I am a member of the American Translators
Association (ATA) and the Association of Judiciary Interpreters and Translators (NAJIT).
I hereby certify that the attached translation of the "Application of Elafonissos Shipping
Corporation and Keros Shipping Corporation, dated November 11, 2024, filed with the Court
of First Instance of Piraeus, Greece" is, to the best of my knowledge and belief, a true and
accurate translation from Greek into English.

12|7|24
ELEFTHERIOS
KRITIKAKIS

Signature

-------------------------------------------------------------------------------------------------------------------------

**State of Illinois**
**County of Cook**

**Signed and attested before me on December 7, 2024, by Eleftherios Kritikakis**

> OFFICIAL SEAL
> LAILA HASAN
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES: 04/02/2026

**Seal**

**Signature of Notary**

TX-31

[hw:] *by Single Member Court docket E.M. - Navy*

[logo]

[hw:] *(Temporary Management Appointment) Admiralty* [illegible] *by temporary Order*

[stamp:] Dematerialized stamps

[hw:] *4*

## K. F. KALAVROS LAW FIRM
Ch. P. FILIOS • Th. Th. KLOUKINAS

[stamp:] Temporary Order Hearing [hw:] *11/12/2024* at time [hw:] *11:15* notice [hw:] Until *11/12/2024* [illegible] Piraeus [hw:] *11/11/2024* [illegible]

[stamp:] Elias D. Delazanos Presiding Judge of First Instance [signature]

[hw:] *7823 2/4/2025*

[hw:] *notice fifteen (15) days earlier for members of the last legally published Board of Directors of the Company*

*ELETSON HOLDINGS INC*

*Piraeus, 11/11/2024*

[signature]

E. ICOPINA to

### BEFORE THE SINGLE-MEMBER FIRST-INSTANCE COURT OF PIRAEUS

*(Voluntary Jurisdiction)*
[hw:] [illegible]
[signature]

### APPLICATION

**For the temporary Management of a Foreign Shipping Company, and Appointment of new members thereof.**

**(article 69 of the Civil Code)**

[hw:] *AS* [illegible] *[illegible] 1234 Maria Hahali Athens Bar Association 30492*

**a)** Of the foreign shipping company **"ELAFONISSOS SHIPPING CORPORATION",** which is based at its registered office in Liberia, in fact in Greece, at 118 Kolokotroni Street in Piraeus, legally represented by its shareholder and representative **Ioannis ZILAKOS, son of Nikolaos**, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Registration Number 065443172,

**b)** The foreign shipping company **"KEROS SHIPPING CORPORATION",** which is based at its registered office in Liberia, in fact in Greece, at 118 Kolokotroni St. in Piraeus, legally represented by its shareholder and representative **Stylianos ANDREOULAKIS, son of Emmanuel**, resident of Glyfada of Attica, 34 Tyrteou St., with Tax Registration Number 013241122,

both in the capacity of shareholders of the foreign shipping company **"ELETSON HOLDINGS INC.",** which is based at its registered office in Liberia, in fact in Greece, at 118 Kolokotroni Street in Piraeus.

*** O ***

**K. F. KALAVROS**
**UNIVERSITY PROFESSOR**

**M. K. KALAVROU, D.E.A.**
**Ch. K. KALAVROU, LL.M.**
**Th. Th KLOUKINAS**
**A. G. KARALEKAS**
**A. G. TSILIKA**

**Ch. P. FILIOS**
**UNIVERSITY PROFESSOR**

**I. V. VERGETI, LL.M.**
**P. A. KIOUSI, LL.M.**

**M. Ch. ASIMINAKI**
**X. N. DIAMANTI, M.A.**
**E. E. ZIAKAS, Ph.D.**
**Mr. SP. IGLEZIS**
**P. N. KALODIKIS**
**A. D. KAFETZI, LL.M.**
**A. A. KELESIDOU, LL.M.**
**E. Th. KLOUKINA, LL.M.**

**I. G. DOLAPTSI, LL.M.**
**A. N. PAPASTATHOPOULOS, LL.M.**
**A. K. ROUSSAKI, LL.M.**
**N. A. TSEMPERA, LL.M.**
**B. G. TSOURRA, LL.M.**
**K. G. FILIPPOUPOLITIS, LL.M.**
**M. P. HAHAMI**

**19 VRANA**
**115 25 ATHENS**
**210 3698700**
**CALAVROS@CALAVROS.GR**

**5 PAVLOU MELA**
**546 21 THESSALONIKI**
**2310 500770**
**THESSALONIKI@CALAVROS.GR**

**65 DONATOU DIMOULITSA**
**491 00 CORFU**
**26610 49736**
**CORFU@CALAVROS.GR**

**WWW.CALAVROS.GR**

[logo]

## A. PROCEDURAL HISTORY

### A.1. The multifamily shipping company "ELETSON". - Its parent company "ELETSON HOLDINGS INC." and its subsidiary "ELETSON CORPORATION".

Before any further elaboration, it should be noted that **ELETSON HOLDINGS INC.** is the "parent" company of the maritime multi-family business, known in maritime events on a global scale by the name "ELETSON". The latter was founded in Piraeus in 1966, by Vasilis Hatzieleftheriadis, a common ancestor of the members of the Board of Directors of ELETSON HOLDINGS and their grandparents, who, with his sons, daughters and sons-in-law as partners, founded ELETSON and afterwards achieved, both himself and his descendants, to draw a highly successful maritime course that spans over 50 years.

The company **ELETSON HOLDINGS INC.** (hereinafter ***"the Company" or "ELETSON HOLDINGS"***) is a Societe Anonyme (corporation), which is, as mentioned above, the "parent" company of the Eletson Family House, was established as early as 12/04/1985 under the laws of Liberia, having its **real place of business in Greece where it maintains offices, at the address 118 Kolokotroni in Piraeus**, as it is managed by an eight-member board of directors, that meets at its aforementioned facilities, all members of which are Greeks and residents of Greece, all decisions for its business activities and the fulfillment of its statutory objective are taken at its offices which it maintains at the above address, given that the Company is a holding company of shipping companies, performs all its activities in Piraeus through its 100% subsidiary Eletson Corporation, which maintains, in Piraeus, a legally established office in accordance with the provisions of article 25 of Law 27/1975, where it employs approximately 50 employees, that is paid, is insured and employed by Eletson Corporation, in accordance with the provisions of Greek law.

As mentioned above, the Company is a holding company, and among other things, holds in full the shares of four Greek Special Maritime Enterprises (**ENE**), which control the ships MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, under Greek Flag, which are tankers, and in particular of the Greek companies "KASTOS SPECIAL MARITIME ENTERPRISE", "KINAROS SPECIAL MARITIME ENTERPRISE", "KIMOLOS II SPECIAL MARITIME ENTERPRISE" and "FOURNI SPECIAL MARITIME ENTERPRISE", respectively.

[logo]

The ships are financed through loan agreements with reverse leasing (sale and lease back agreements). This means that the ships, which belonged to the above **ENEs**, were sold to companies which are subsidiaries or affiliated with the funder, and then re-leased under bareboat charterparty to the previous owners. The amount of funding is the purchase price as the case may be. The former shipowner companies (i.e. the ENEs), which are currently charterers of each ship by bareboat charterparty, pay the rent and through the rent they have been repaying financing and interest. When the loan is repaid (or leasing reaches its maturity), each ship is returned to the respective ENE (through the exercise of an option by the first shipowner ENE for the repurchase of the ship – purchase option).

The owners of the above ships (who are currently registered as owners in the Registry) are subsidiaries and/or affiliates of Oaktree Capital Management ("Oaktree") which is the funding company. The ENEs are the charterers by bareboat charterparty which own the ships, the crews of which, as well as the captain, are appointed by said companies. The ships are then chartered by time-charterparties to third-party charterers, usually with long-term contracts.

The above ships are managed by the Liberian company Eletson Corporation *(hereinafter: "ELETSON CORPORATION"),* which is also a 100% subsidiary of ELETSON HOLDINGS, as mentioned above, and maintains a lawful establishment, in accordance with the provisions of Article 25 of Law 27/1975 and Law 89/67, in Greece at 118 Kolokotroni Street, Piraeus, with Tax Registration Number, 098035979/ Public Tax Service of Ships of Piraeus.

**A.2. ELETSON HOLDINGS share capital structure.**

According to the recent Statement of the Directors, Nominated Employees and Shareholders of the company ELETSON HOLDINGS, dated 09/26/2024, the share capital amounts to 10,000 class A nominal shares, with no par value.

**Shareholders** of **ELETSON HOLDINGS** are the following foreign shipping companies, which belong to **Greek families, namely:**

**a.**    The foreign shipping company "**LASSIA INVESTMENT COMPANY**" of the family of Askarina Karastamati ("Karastamati"), holder of 3,072 shares, representing **30.72% of the** share capital of the Company;

3

[logo]

**b.**     The foreign shipping company "**FAMILY UNITY TRUST COMPANY**" of the family of Vasilis Kertsikoff ("Kertsikoff"), holder of 3,072 shares, representing **30.72% of the** share capital of the Company;

**c.**     The foreign shipping company "**GLAFKOS TRUST COMPANY**" of the family of Vasilis Hatzieleftheriadis ("Hatzieleftheriadis") holder of 3,072 shares, which represent **30.72% of the** share capital of the Company;

**d.**     The company "**ELAFONISSOS SHIPPING CORPORATION" of the family of Nikos Zilakos ("Zilakos"),** applicant herein, holder of 392 shares representing **3.92% of the** share capital of the Company, and finally,

**e.**     The foreign shipping company "**KEROS SHIPPING CORPORATION**" of the family of **Vasiliki Androulaki ("Androulaki"**), applicant herein, holder of 392 shares, which represent **3.92% of the** share capital of the Company.

ELETSON HOLDINGS, therefore, belongs to foreign companies also belonging to Greek ultimate beneficiaries, which has been incorporated under the laws of Liberia and has the center of its main interests in Greece, specifically in Piraeus of Attica, at 118 Kolokotroni Street.

## A.3. Eletson Gas LLC, a company incorporated by ELETSON HOLDINGS and Blackstone Tactical Opportunities.

In early 2013, **ELETSON HOLDINGS** entered into a commercial arrangement with the foreign investment fund **Blackstone Tactical Opportunities _(hereinafter Blackstone)_**, which manages alternative investments to establish a joint venture, focusing on the **liquid propane gas** (LPG) market.

Indeed, in fulfilling the above objective, the new company Eletson Gas LLC (**_hereinafter referred to as "Eletson Gas"_**) was established by Eletson Holdings and by Blackstone[1]'s investment fund, which was incorporated as a limited liability company (LLC) under the laws of the Marshall Islands, which provide for the establishment of a limited liability company (LLC) by an **agreement to establish a limited liability company (LLC Agreement** dated April 12th 2013, which was amended

---

[1] In fact, Blackstone participated in Eletson Gas LLC through its controlled legal entities, namely: (i) Blackstone Family Tactical Opportunities Investment Partnership (CAYMAN) ESC L.P., (ii) Blackstone Tactical Opportunities Investment Partnership (CAYMAN) SMD L.P. and (iii) BTO Eletson Holdings L.P.

[logo]

and was codified on August 16, 2019 – Amended and Restated LLC Agreement – to which an additional amendment was made on April 16, 2020). Shareholders of Eletson Gas were, on the *one hand*, ELETSON HOLDINGS, holding the common shares/units, and in particular 13,000,000 common shares which were and are the sum (100%) of the common shares, and *on the other hand* the investment fund Blackstone, holder of the preferred shares/units, i.e. having priority over the distribution of dividends and, under conditions, decisive power over the company, in particular 8,811,080 preferred shares which were the sum (100%) of the preferred shares. ELETSON CORPORATION also became a shareholder in Eletson Gas, being the managing company of the ships, by issuing to them certain "special membership units".

At **Eletson Gas**, **ELETSON HOLDINGS** contributed in-kind **five (5) new pre-existing LPG** ships, all under Greek flag, and in particular the ships ANAFI, NISYROS, TILOS, TELENDOS and SYMI, and held all common shares (stock shares), and **Blackstone** contributed significant capital to build/purchase **another nine (9) state-of-the-art liquid gas ships, with the capacity to carry ethylene products** as well, and held all **preferred shares** which, however, in accordance with the "LLC Agreement" *(hereinafter: "LLCA")* had increased rights and **controlled Eletson Gas LLC,** that is, they could make important corporate decisions and appointed the majority of the BoD members.

Accordingly, in early 2022, **Eletson Gas** owned, directly or indirectly, **fourteen (14) liquefied gas transport ships**, thereby making its fleet the second largest on the market - the first largest is Unigas' fleet, a major and direct competitor of ELETSON. **Eletson Gas'** revenues derive primarily from the exploitation of said ships. **ELETSON CORPORATION** (a subsidiary of ELETSON HOLDINGS) together with **EMC GAS Corporation** (as mentioned below) are responsible for providing management services to ships directly or indirectly owned by **Eletson Gas'** subsidiaries. For the management services, **ELETSON CORPORATION** receives management fees from its own subsidiary ship-owning companies. **Management fees are an asset of ELETSON CORPORATION and an obligation for Eletson Gas or their respective subsidiaries incurring the relevant cost.** Throughout Eletson's corporate relationship with Blackstone, ELETSON (HOLDINGS and CORPORATION) was managing said ships. In particular, the co-management of the above Eletson Gas' fleet was undertaken, on the one hand, by **ELETSON CORPORATION** (technical management), and on the other hand (commercial representation – monitoring-financial management) by **EMC GAS Corporation** which was established as a subsidiary of Eletson Gas, with statutory registered offices in the Marshall Islands, and was established as a shipping company under the legal framework of article 25 of Law 27/1975 and Law 89/67 (as a subsidiary of the above non-registered Eletson Gas).

TX-31

5

[logo]

Today, out of these original fourteen (14) liquefied gas transport ships, **Eietson Gas currently controls and operates twelve (12)** (i.e. except the ships "SYMI" and "TELENDOS"), the exploitation of said ships is done either directly by Eletson Gas or through its subsidiaries, charterers of said bareboat charterparties. These Eletson Gas subsidiaries are not owners of the aforementioned ships only formally, since these ships have been transferred to Eletson Gas' lenders under the obtained loan by sale and lease-back financing as it was described above (see **paragraph A.1**). In fact, they act as owners in everything, and after the repayment of the loan received and interest through the payment of rents, according to the bareboat charterparties of said ships, they will also become formal owners of the ships.

**A.4. The purchase of Blackstone's share by Levona, and Levona's agreement to withdraw (by transferring its (Levona's) shares in Eietson Gas or to companies it would recommend).**

In November 2021, another investment fund (hedge fund), **Murchison Ltd** *(hereafter Murchison),* purchased its share from Blackstone (for a consideration later revealed to be just US$3 million), thereby becoming a partner (shareholder) in Eietson Gas, in the place of Blackstone. The purchase was made through an affiliate of Murchinson, which was a special purpose vehicle, Levona Holdings Ltd *(hereinafter "Levona"),* incorporated under the laws of the British Virgin Islands.

**Murchinson** and **Levona** immediately stated from the outset that they did not intend to be long-term investors but wanted to withdraw soon with a significant profit above their investment. That's why negotiations started, which took place mainly in January and February 2022 and resulted in the conclusion of a Binding Offer Letter (*hereinafter "BOL"*) between **Eletson Holdings**, **Eletson Corporation**, **Eletson Gas** and **Levona**, dated **February 22, 2022**, according to which **Eletson Gas** would pay **Levona** twenty-three million US$ ($23,000,000) (or give Levona two ships of equivalent value, and in fact the stocks of the bareboat charterers, that is, SYMI II ENE and TELENDOS II ENE) and in return Levona would transfer the shares (preferential shares) it held to **Eletson Gas**, or to entities that the latter would indicate. Meanwhile, under the same agreement, Levona would initially make a US$10 million loan, which was increased to US$14 million (of which US$12.8 million was ultimately used) so that Eletson Gas would pay its short-term obligations to lenders. This loan would be repaid in one lump sum in two years.

Indeed, on **March 11, 2022**, both the **transfer of the shares of the two companies, shipowners (ENE) of MT SYMI and MT TELENDOS** were signed, as well as other documents according to the definitions of BOL, and the beneficial shareholders of **Eletson Gas** became **Fentafon Limited, Apargo**

[logo]

**Limited** and **Desimusco Trading Limited (*the "New Preferred Shareholders"*)** which were designated, according to the above, by **ELETSON GAS**.

In fact, Eletson Holdings and in particular Eletson Corporation, without having a legal obligation to do so, offered to assist Levona in further reselling these ships to third parties, i.e. liquidating them, obtaining the relevant benefit. In this way, Levona's investment of three million US dollars ($3,000,000) in November 2021 had an extra-multiplying return, that is, an amount of US$23 million just a few months later.

### A.5. Levona's allegations that it had not transferred the Eletson Gas shares.

However, while communications and procedures between Eletson and Levona continued about changing the flag of the two ships and resell them to third parties; Levona (about mid-July 2022) suddenly started claiming that (while indeed the shares of ENE SYMI and TELENDOS had been transferred to them as early as March 2022) they had not transferred, to Eletson Gas, their preferential shares in Eletson Gas, and this was because according to the BOL, Eletson Gas should have followed some formal procedures for exercising an option to acquire such preferential shares, something that, according to Levona's allegations, had not been exercised / followed. Therefore, Levona began claiming at that point that both of their ships had been transferred AND that they had not transferred the preferred shares they held in Eletson Gas. In fact, Levona's conduct, in bad faith, unconventional and criminally punishable had become apparent when they attempted to sell the other twelve ships of the Eletson Gas management fleet to Eletson's major competitor, Unigas. In particular, by a Letter of Intent (LOT) purportedly signed on July 15, 2022, between the company Unigas (which is a key competitor of Eletson Gas, as already mentioned) and Eletson Gas, which was allegedly signed by a representative of Levona (who, however, was not entitled to sign in the name and on behalf of Eletson Gas) it is assumed that the sale and transfer of the other twelve (12) ships to Unigas had been agreed.

[logo]

Levona's unconventional conduct, contrary to good faith and morality, had basically an underlying cause, that is, **the values of the 12 LPG ships that remained under the control of Eletson Gas had begun to rise significantly** between the time the BOL was signed (that is, February 22, 2022) until Levona dramatically changed its stance (mid July 2022). The reason for the increase was the (particularly critical for the gas market) geopolitical **event of Russia's invasion of Ukrainian territories** (which completely incidentally began in late February 2022, and escalated in the months that followed). The Western world's effort to find alternatives to mining and primarily liquid gas transport (i.e. not through Russian pipelines, but through ships) **dramatically increased demand for LPG transport ships, resulting in the skyrocketing commercial value of these types of ships**. Levona, as a hedge fund with the sole pursuit of high profits, rather than simply satisfying the already increasing value of SYMI and TELENDOS it controlled since March 11, 2022, **illegally attempted to reap benefits from the rest of the Eletson Gas fleet (i.e. the 12 ships) as well**. In other words, it was not enough for Levona to have just invested $3 million and would have generated on the basis of the contractual documents at least $23 million (!) from both ships, but upon discovering the new market prospects, they tried to multiply their profits (by tens of additional millions) claiming that they still owned the preferential shares and therefore had "to gain" as a preferential shareholder from the attempt to sell the remaining 12 ships as well (!!!).

[logo]

**A.6. The initiated arbitration in New York.**

**_A.6.1. The Arbitration Award issued in New York dated 09/29/2023 by the Arbitral Tribunal, consisting of Judge-Arbitrator Ariel E. BELEN (hereinafter referred to as "the Arbitration Award dated 09/29/2023")._**

Immediately following the aforementioned incident of the attempted transfer of the twelve (12) ships of Eletson Gas from Levona to the competitor company Unigas, **Eletson Holdings** and its subsidiary, **Eletson Corporation** appealed, **on 07/29/2022** to arbitration in New York pursuant to the arbitration clause contained in and entered into in the "LLC Agreement", in order to resolve the dispute between them and **"Levona"** as to whether the shares/units had been transferred to Eletson Gas or to companies they would indicate, and in particular their preferred shares (shares/units) held by Levona in Eletson Gas as well as related corporate disputes arising from the "LLC Agreement" (LLCA).

During the arbitration, **serious illegal acts and violations of morality by Levona/Murchinson** were revealed, which occurred before they had even acquired the shares (units) of Blackstone in Eletson Gas, after the acquisition and during the course of arbitration, such as, among other things, that Levona/Murchinson fraudulently: **a)** bribed a high-ranking official of Eletson (the Chief Financial Officer) to act against the interests of the latter, **b**) breached the confidentiality obligations of LLCA, **c)** interfered with the relationships of Eletson Gas with its lenders, causing the seizure of ships of Eletson Gas, **d)** falsified evidence by creating purported meeting minutes of the Board of Directors dated March 10, 2022, after the commencement of the arbitration, e) conspired with the lawyers of Eletson Gas (Watson Farley & Williams, hereinafter "WFW") against the interests of the latter.

In fact, the disclosure, during the Arbitration, that Peter Kanelos, a senior official of Eletson, had been bribed by Murchinson/Levona, led Eletson Holdings and Eletson Corporation to **file a complaint** against Peter Kanelos before the **Piraeus Misdemeanor Prosecutor. Following this, a _criminal prosecution was brought against Peter Kanelos (former Eletson's financial director) in July 2024 for the offenses of a) repetitive breach of professional confidentiality with consequential damages, b) repetitive breach of professional confidentiality, and c) repetitive receipt of bribes in the private sector. The criminal proceedings are still in progress._**

TX-31

9

[logo]

Finally, on **September 29, 2023**, the critical arbitration award was issued, according to which **Judge-Arbitrator Ariel E. BELEN** <u>acknowledged the conduct, in bad faith and contrary to morality, of the side of Murchinson/Levona and the violation by LLCA on behalf of them in various ways, and vindicated the side of Eletson (HOLDINGS and CORPORATION), in the sense that Levona had indeed transferred its (privileged) shares it held in Eletson Gas to Eletson Holdings or to third party companies designated by the latter (nominees), that is, to the New Preferential Shareholders, who, as already mentioned, were the Cypriot companies Fentalon, Apargo and Desimusco.</u>

In particular, as discussed in **CHAPTER "*VIII. CONCLUSION AND FINAL ARBITRATION AWARD*"** of the Arbitration Award dated 09/29/2023, Judge-Arbitrator Ariel E. BELEN ruled positively on the complaint of **ELETSON HOLDING** and **ELETSON CORPORATION** and issued his aforementioned award, acknowledging that[2]:

"***A. Acknowledging award***

*The following are hereby acknowledged:*

*1. Eletson effectively exercised the redemption option granted through the BOL dated February 22, 2022 on March 11, 2022, and any purported condition for exercising that right was either satisfied or waived.*

***2. As of March 11, 2022, Defendant Levona had no right of participation in the company Eletson Gas.***

*3. The Company exercised its rights under the BOL to appoint three entities – Fentalon, Apargo and Desimusco (the Preferential Shareholders) – associated with the principals of the Plaintiffs as the parties who would receive the preferred shares of the Company which were previously held by Levona.*

*4. The preferred shares in the Company were transferred to the Preferred Shareholders, effective as of March 11, 2022, and the Preferred Shareholders are permitted assignees under the LLCA. They*

---

[2] It is noted that in the Arbitration Award dated 09/29/2023, where **"ELETSON" or "Plaintiffs"** is mentioned, it means **"ELETSON HOLDINGS"** and **"ELETSON CORPORATION",** a subsidiary of the first, which happen to be also the Complainants (Plaintiffs) and where **"Company"** is mentioned, it means **"Eletson Gas".**

TX-31

[logo]

*have agreed to be bound by this award and by each award issued thereon.*

*5. Eletson Holdings and Eletson Corporation never owned any of the company's preferred shares.*

**6. The shares of the subsidiaries controlling the ships Symi and Telendos were transferred to Levona on March 11, 2022, as consideration for the Call Option in relation to the BOL.** *As of Mach 11, 2022, Levona reserves all rights relating to the ownership of the subsidiaries of those ships,*

*7. The Injunction Decision shall remain in effect until a final judgment is issued on any Arbitral Award or any other award of said arbitrator.*

*8. Levona, Murchinson and Pach Shemen, are each alter ego of the other with respect to each event proven in the present case, and any kind of compensation granted hereunder. Any reference to Levona herein therefore concerns all alter egos, and for the avoidance of doubt, any decisions against Levona also concern any alter ego thereof.*

*9. **Levona breached the LLCA and its related obligations**, including, without limitation, common law obligations and contractual obligations to Plaintiffs and the Company, in at least **the following ways**:*

> ***i.** Bribing an employee of Eletson Corporation and a representative of the Company, Peter Kanelos, so that he would disclose confidential information of the Company,*
> ***ii.** Breaching confidentiality obligations by disclosing confidential Company information to third parties, while failing to take steps to retrieve such information, and then deceiving the Plaintiffs and the Company about said breaches after becoming a shareholder in the Company,*
> ***iii.** Actively engaging in illegal conduct, which led the Company's funders to turn against the Company and the Plaintiffs, including but not limited to, by causing the seizure of five ships of the Company and not disclosing such infringing conduct to Eletson or the Company after becoming a shareholder in the Company;*

TX-31

11

[logo]

*iv. By not recognizing that Eletson has fully complied with the terms of the BOL Call Option and by not acting in good faith, silencing its purported belief that the Company could or may not meet the terms of the BOL;*

*v. Claiming to act on the Company's behalf in its business dealings with third parties, including, among other things, by attempting to sell the Company's assets to its main competitor, Unigas, and concealing such breach from the Plaintiffs;*

*vi. By unfairly threatening Eletson and its associated officers and directors, including, among other things, by suing them;*

*vii. By improperly claiming to have taken control of the board of directors of the Company after March 11, 2022;*

*viii. By improperly asserted that they were directing the Company's day-to-day operations after March 11, 2022;*

*ix. By improperly claiming that they are pursuing control of the Company's assets after March 11, 2022;*

*x. By improperly alleging that they convened and held meetings of the Company's Board of Directors without following appropriate procedures, and for unlawful and improper purposes of approving illegal and improper conduct after March 11, 2022;*

*xi. By breaching their obligations under the LLCA, including without limitation, by claiming to terminate the management agreements Eletson Corporation has with the Company's subsidiaries, that they are modifying the management of the Company's subsidiaries, **excluding Eletson Corporation from communications with the Company's funders (violations) that Levona knew were anti–contractual and violated the LLCA. [...]"***

**Subsequently, the same Arbitration Award dated 09/29/2023 as above, of Judge-Arbitrator Ariel E. BELEN awarded the amounts mentioned to them as: a) compensation for direct damages; and b) punitive damages, in addition to attorneys' fees, costs, expenses and additional interest, and specifically acknowledged that:**

[logo]

**"B. Compensation for direct damages**

*Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, will pay $43,455,122.21 in compensation as follows:*

1.  *$21,777,378.50 to be paid to Eletson Gas as compensation for direct damages for improper seizure of the Eletson Gas' ships, which includes default interest at 10% from the date of the seizures (or the approximate date the costs incurred) up to January 2023;*

2.  *$19,677,743.71 which must be paid to the Preferred Shareholders, which consist of lost profits (EBITDA) due to Levona's unjust enrichment arising from the exploitation of the Symi and Telendos ships from March 11, 2022, without the concurrent transfer of the preferred shares, which include pre-trial interest until January 2023;*

3.  *$2,000,000 to be paid to Eletson Gas as compensation for direct damages arising from the other breaches of the contract by Levona, with a preliminary interest of 10% from the date of this Interim Arbitration Award until the repayment of the compensation awarded by this award or the confirmation of this award by a competent court, depending on which day is earliest.*

4.  *The entities referred to above under B.1 and B.2 respectively are also awarded default interest on the principal amount of the compensation referred to in paragraph B.1. above (compensation for unlawful seizures) and paragraph B.2. above (compensation for lost profits due to unjust enrichment of Levona) at a rate of 10% from 30 January 2023 until the earlier of either the payment of the compensation or the confirmation of the (present) award by a competent court.*

**C.  *Punitive damages***

*Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, are liable to pay punitive damages in the total amount of $43,455,122.21, as follows:*

[logo]

1.  *$23,777,378.50 to be paid to Eletson Gas; and*

2.  *$19,677,743.71 to be paid to the Preferred Shareholders.*

**D.  <u>Attorneys' Fees, Costs, Expenses and Additional Interest</u>**

*Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, will pay:*

1.  *Solicitors' fees, costs and expenses incurred to date in connection with this arbitration, the Bondholders' Complaint and the Bankruptcy pursuant to Article 12.14(8) of the LLCA and Rule 24(5) of the JAMS, as follows:*

    i.   *Attorneys' fees, costs and expenses due in connection with this arbitration amounting to $9,590,222.99.*

    ii.  *An additional amount of $22,366.10, which represents additional costs of JAMS incurred in connection with this arbitration from the time Eletson filed the Initial Acknowledgment, and with respect of which Eletson paid both the share corresponding to them too the same as well as the share corresponding to the Defendant.*

    iii. *Attorneys' fees, costs and expenses due in connection with the Bankruptcy and the Bondholders' Claims of $3,007,266.20;*

2.  *Additional default interest on the principal amount of the compensation as awarded by the Corrected Interim Arbitration Award by 31 August 2023, amounting to $2,496,081.88, which shall be paid as follows:*

    i.   *To Eletson Gas: $1,319,163.14.*

    ii.  *To the Preferred Shareholders: $1,176,918.74.*

3.  *Additional default interest on the principal amount of the compensation from August 31, 2023 until the date of payment of the amount due or the date of confirmation of this Final Arbitration Award, as enforceable by a court of competent jurisdiction, whichever date is earlier, and calculated using the formula set forth above in this Final Arbitration Award; and*

14

[logo]

4.   *Additional default interest on fees, costs and expenses awarded by this Final Arbitration Award; from the time of publication of this Final Arbitration Award until the date of payment of the amounts due or the date of confirmation of this Final Arbitration Award as enforceable by a competent court, whichever date is earlier, and calculated using the formula set out above in this Final Arbitration Award."*

**A.6.2. The Judgment issued in New York dated 04/19/2024 by the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, amending the Arbitration Award dated 09/29/2023. – The decision of the same Judge Lewis J. LIMAN on the suspension of the confirmation of the Arbitration Award dated 09/29/2023 until 11/12/2024[3].**

Subsequently, on 19.10.2023 the aforementioned Appellants, ELETSON HOLDINGS and ELETSON CORPORATION, appealed to the U.S. District Court – Southern District of New York, to the application for **confirmation of the aforementioned Arbitration Award dated 29.09.2023 pursuant to article 207 of the Federal Arbitration Act (Federal Arbitration Act) encoded as 9 U.S.C. §§ 1-16.**

**The above article 207 of 9 U.S.C. §§ 1-16 specifically states the following:**

*"§207. Award of arbitrators; confirmation; jurisdiction; proceeding*

*Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention»* and faithfully translated:

---

[3] Prior to the issuance of the final arbitration award, an interim arbitration award has also been issued, which was then corrected. The arbitration award confirmation was initiated on the basis of the interim corrected arbitration award. See below: page 18

[logo]

*"§207. Award of arbitrators; confirmation; jurisdiction; proceeding*

*Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter **for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.**"*

Although the arbitration award confirmation procedure is, in accordance with the New York Convention, to which the above article refers, for the confirmation of arbitration awards, a formal and speedy procedure, nevertheless, Levona attempted to delay the proceedings in every possible way by testifying – inter alia – before Judge LIMAN,

 a. That there is a relevance (Related Case Statement) of the disputed award confirmation process and the proceedings before the bankruptcy court for the bankruptcy of ELETSON HOLDINGS, which it had in the meantime commenced against them with fraudulent acts, and we will refer in the immediately next chapter, as well as

 b. That the case of the confirmation of the arbitration award should be referred (referral) to the above Bankruptcy due to its relevance.

The above allegations and claims of Levona were dismissed by Judge LIMAN, however, in view of the number of legal documents filed by the other party, Judge LIMAN ordered the parties to file further briefs, in which to account for the undisputed material facts, and subsequently directed a hearing to take place on January 2, 2024.

Thereafter, on **02/09/2024**, Judge LIMAN issued a decision pursuant to which **the above Arbitration Award dated 09/29/2023, by the Arbitration Court, consisting of Judge-Arbitrator Ariel E. BELEN, canceling only some of its provisions, <u>but without amending the above amounts awarded and their beneficiaries. In particular, considered the following in the aforementioned decision</u>:**

*"The Court affirms the judgment as referred to in Dkt No. 67-58, commencing on page 95, including awarding damages and punitive damages and awarding pre-trial attorneys' fees, costs, expenses and interest, with the following exceptions:*

[logo]

- *Paragraphs A.7, A.8, A.10(i) and A.10(iii) are voided.*

- *All damages awarded against Murchinson and Pach Shemen are voided.*

- *All damages awarded, including compensation and punitive damages, based on violations of the order to uphold the status quo, are voided.*

- *All attorneys' fees, costs and expenses awarded in connection with the non-voluntary bankruptcy petition and the bondholder trial are voided."*

At the same time, Judge LIMAN asked the parties to file a proposed form of judgment (**Proposed Judgment**). In view of the fact that Judge LIMAN in his judgment dated February 9, 2024 voided all "*compensation, including punitive damages, based on Status Quo Injunction violations,*" Levona filed a proposed judgment and suggested that all the amount awarded as punitive damages be voided (i.e., the amount of US$43,455,122.21), while on the contrary, the side of Eletson (HOLDINGS and CORPORATION) claimed that the punitive damages should remain in their entirety, because Judge-Arbitrator Ariel E. BELEN had numerous other reasons to award this amount of punitive damages, and in any case the issue of the percentage of punitive damages that should be ratified was an issue that only the Arbitrator himself had the power to adjudicate.

Following this, Judge LIMAN issued a decision on **April 19, 2024**, by which he referred to Judge-Arbitrator Ariel E. BELEN the relevant matter, requesting clarification as to whether part of the amount awarded as punitive damages concerns the violations of Status Quo Injunction, and in the event of a positive response, what amount corresponds to these violations.

On **August 9, 2024**, an award was issued by Judge-Arbitrator Ariel E. BELEN in regard to the matter of referral, in which **he accepted that the entire amount of the punitive damages ($43,455,122.21 USD) must be ratified**, as he held that no part of the amount that had been awarded as punitive damages corresponded to violations of Status Quo Injunction, and this is because there were many other factors that had led him to determine that he had to award such high punitive damages against Levona.

TX-31                                                                                              17

[logo]

Following the relevant instructions of Judge LIMAN, the parties filed further documents and letters upon Levona's application for an amendment opposing the application for confirmation of the arbitration award and the counter-claim to annul the arbitration award.

On **September 6, 2024**, LIMAN J. issued a judgment **permitting Levona to amend their opposition** to the application for confirmation of the arbitration award. At the same time, Judge LIMAN allowed the production of documents (discovery) again in order to investigate the matter of alleged fraud in the context of the Arbitration.

A case management plan was then set up, which determined what actions they would take and within which deadlines.

Furthermore and more recently, on **October 25, 2024**, two **final judgments** were issued by the U.S. Bankruptcy Court - Southern District of New York on the open-ended proceedings against the Corporation (see in detail below, __under A.7.),__ which dismissed the debtors' oppositions to the claims of certain creditors and **approved the reorganization plan proposed by the Creditors in connection with the ELETSON HOLDINGS Bankruptcy.**

**In view of these two judgments of the Bankruptcy Court, and given that __the management of__ __ELETSON HOLDINGS, as well as its subsidiary, ELETSON CORPORATION__, of the two companies, that is, that were part of the Arbitration and the arbitration award validation process; __is__ __expected to pass to the Creditors (i.e. Pach Shemen, Levona, Murchinson), if these (awards) are__ __recognized - implemented; Levona__ submitted a letter before Liman requesting the __suspension of the__ __confirmation procedure of the Arbitration Award dated 29.09.2023.__**

Although Eletson's side responded to the above letter with convincing arguments, on 30 October 2024, LIMAN J. issued a decision on **31 October 2024 __suspending the arbitration award confirmation__ __process until 12 November 2024, a day on which a Status Conference will take place__**.

**It is clearly concluded from the above that ELETSON HOLDINGS, has a direct legitimate interest in attending the (Status Conference) hearing held on __12.11.2024__ in the U.S. District Court - Southern District of New York; consisting of Judge Lewis J. LIMAAN, in order to counter objections, allegations and impediments brought by the Respondent Levona in the confirmation procedure of the Arbitration Award issued in New York dated 29.09.2023 of the Arbitral Tribunal, consisting of the EETT Judge-Arbitrator Ariel E. BELEN and hereinafter to request the declaration of its enforceability, to take further action against Levona.**

[logo]

In addition, ELETSON HOLDINGS, as well as its subsidiary, ELETSON CORPORATION, have a direct legitimate interest in requesting the recognition of the above issued in New York from 29.09.2023 of the Arbitration Award of the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", to all the provisions of her Order, as well as the declaration of its enforceability under the provisions of the New York Convention, on the territory of another state than the one issued, including in Greece, where Levona holds property.

**A.7. The in bad faith method of the bankruptcy petition of ELETSON HOLDINGS by its opposing party to the Arbitration, Levona and its other affiliated companies.**

Murchinson and Levona (consisting of one and the same), when it was realized that they were increasingly defeated in the arbitration, which was established as above by the Arbitration Award dated 29.09.2023, put in place a plan to prevent the **issuance** of the above Arbitration Award by filing an application for the declaration of ELETSON HOLDINGS **involuntary bankruptcy**. In particular, Levona, acting through another affiliate (in fact, absolutely the same interests) of its own special purpose (special purpose vehicle), of **Pach Shemen LLC** (which in some correspondence arose from discovery, they were called Levona II), purchased old bonds issued by ELETSON HOLDINGS and had been repaid in large part by selling all the ships securing these bonds and then filed an **petition for involuntary bankruptcy of ELETSON HOLDINGS (pursuant to chapter 7 (chapter 7) of the American Bankruptcy Code).** Given that a prerequisite for the filing **of an involuntary bankruptcy petition** before the American Bankruptcy Court is for it to be filed by three creditors, co-applicants with **Pach Shemen** were two other companies, namely **VR Global** and **Alpine Partners**, who had also purchased, bonds issued by ELETSON HOLDINGS. It is notable that Pach Shemen appeared as ELETSON HOLDINGS bondholder by making an illegal agreement to purchase from the old bondholders approximately US$ denomination. US$183 million for the embarrassing price of approximately US$2 million (plus some additional returns were it to emerge winner of the Arbitration). **That is, Levona through the alter ego of Pach Shemen LLC spent just US$2 million but sought repayment of US$183 million and filed for bankruptcy against her opposing party in the then pending ELETSON HOLDINGS Arbitration (!).**

[logo]

The submission of said petition, results, under US (federal) bankruptcy law, in the automatic stay of all proceedings and arbitrations (individual prosecutions), and that is why **the aforementioned arbitration was stopped**. However, following the intense reaction of ELETSON HOLDINGS, which sought to continue the arbitration, the Pach Shemen /Levona /Murchinson side was forced to come to an agreement that was converted into a court order (stipulation), and thus the U.S. Bankruptcy Court issued a decision on 03/17/2023 and allowed said arbitration to continue. The Arbitration proceedings lasted for about two weeks in May 2023, by examining a series of witnesses on both sides, and then the Arbitration Award dated 09/29/2023 \was issued in New York by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN, as detailed above **under A.6.1.**

Subsequently, LEVONA constantly causes stifles and invokes impediments to the **confirmation** of the award dated 09/29/2023, the most recent being the suspension of its confirmation procedure by Judge LIMAN until 11/12/2024, as mentioned in detail above **under par. A.6.2.**

In more detail:

TX-31

20

[logo]

***A.7.1. The Judgment of Voluntary Bankruptcy (Chapter 11) of ELETSON HOLDINGS and the other companies, issued in New York on*** 10/25/2024 by the single-member U.S. Bankruptcy Court - South District of New York, consisting of Judge John P. MASTANDO.

While ELETSON HOLDINGS and ELETSON CORPORATION had already appealed, as of **07/29/2022** to arbitration against Levona (see above **under par. A.6.1.**), on **March 7, 2023**, petitions of involuntary (forced) bankruptcy (chapter 7 of the US Bankruptcy Code) were filed before the Bankruptcy Court of the Southern District of New York *(hereinafter the **"Bankruptcy Court")** by three purported creditors of them, and in particular Pach Shemen LLC, VR Global Partners and L.P., Alpine Partners L.P. *(hereinafter the **"creditors")** against ELETSON HOLDINGS, as well as against its co-debtors, Agathonisos Finance LLC and Eletson Finance (US) LLC *(hereinafter the **"purported Debtors")**

On March 8, 2023, Levona sent a letter to Judge-Arbitrator Ariel E. BELEN, informing him of the filing of involuntary bankruptcy petitions against ELETSON HOLDINGS which have resulted, under U.S. bankruptcy law, in all proceedings concerning Eletson Holdings and its subsidiaries (such as Eletson Corporation) being automatically stayed. Indeed, on March 10, 2023, Judge-Arbitrator Ariel E. BELEN stayed the aforementioned arbitration pending further judgment or notice by the Bankruptcy Court.

On **April 17, 2023**, upon agreement of the parties ratified by the Bankruptcy Court, the latter lifted the automatic suspension for the limited purpose of continuing arbitration under the terms of the related agreement (stipulation) between the parties.

In the meantime, on April 14, 2023, the alleged Debtors filed an application for dismissal of the above involuntary bankruptcy petitions.

Finally, the arbitration continued, as mentioned above, with an extensive hearing on 29 July 2023, the Interim Arbitration Award (**Interim Award**) was issued by Judge - Arbitrator Ariel E. BELEN, and on August 15, 2023, the Corrected Interim Arbitration Award (**Corrected Interim Award**) was issued, by which certain non-substantial corrections were made to the Interim Award.

TX-31

21

[logo]

At the same time, however, the above involuntary bankruptcy proceedings of "ELETSON HOLDINGS" and the remaining two (2) companies of its interests continued before the Bankruptcy Court. Given the then conditions, the ongoing pressures they received from the opposing side (Levona), which by continuous tricks hindered the progress of the Arbitration and in order for ELETSON HOLDINGS to have control of its property, at least until the issuance of the expected arbitration award, on September 9, 2023, upon agreement of the parties ratified by the Bankruptcy Court, the **involuntary** bankruptcy proceedings (based on capital (chapter) 7 of the American Bankruptcy Code) were amended to **voluntary** bankruptcy proceedings (based on capital (chapter) 11 of the American Bankruptcy Code).

Subsequently, and upon manipulations, in bad faith, of Levona and its affiliated companies, Murchinson/Pach Shemen, two decisions were issued on **10/25/2024** by the Bankruptcy Court of New York, consisting of John P. MASTANDO J, with which the oppositions of the alleged debtors were dismissed (ELETSON HOLDINGS, Agathonisos Finance LLC and Eletson Finance (US) LLC) against the claims of certain creditors (by Pach Shemen LLC; VR Global Partners L.P., Alpine Partners L.P.) and the reorganization plan proposed by the Creditors was approved.

_**A.7.2. The Order of the Bankruptcy Court of the U.S. - Southern District of New York, comprised of Judge John P. MASTANDO, which was**_ issued in New York on 11/04/2024 confirming the Voluntary Bankruptcy Decision (Chapter 11) dated 10/25/2024 for ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan.

On **11/04/2024**, the **Order** of the New York Bankruptcy Court, consisting of Judge John P. MASTANDO, was issued, confirming the above voluntary bankruptcy decision (Chapter 11) of ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan (FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS).

**Paragraph 25** of the above Order explicitly states:

[logo]

*"**Final Order**. This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon entry of the Confirmation Decision.»* and in faithful translation:

*"Final order. This Confirmation Order is a final order **and the period in which an appeal must be filed shall commence upon entry of the Confirmation Decision.**»*

That is, in accordance with the provisions of the U.S. Bankruptcy Code, the deadline for ELETSON HOLDINGS and the other debtor companies to file appeal is **14 days from the issuance of the decision and begins from the issuance of the decision (article 8002 Federal Rules of Bankruptcy Procedure**), and therefore it had to be filed by **11/08/2024**, since the above decision of the Bankruptcy Court was issued on 10/25/2024, and was made, after the relevant introductory appeal application was filed before the competent Court on 11/07/2024.

### *A.7.3. Conclusions. - Levona/Murchinson/Pach Shemen's bad faith conduct in the manipulation of the bankruptcy of ELETSON HOLDINGS. – Its reasons.*

From a number of documents, and as already adjudicated by Judge-Arbitrator Ariel E. BELEN in his final arbitration decision award dated 09/29/2023, the conduct of Levona, as well as its affiliates Murchinson and Pach Shemen, for which, indeed, the aforementioned Arbitrator mentions characteristically that ***"each is an alter ego of the other",*** **against ELETSON HOLDINGS, is entirely illegal, unconventional, unethical and totally in bad faith** [see in detail above **under A.6.1.**].

Their bad faith conduct led to the bankruptcy of ELETSON HOLDINGS, fully manipulated by them, which, although it was vindicated in the Arbitration Award dated 29.09.2023, was brought to a state of purportedly voluntary bankruptcy by actions of Levona/Murchinson/Pach Shemen and the other companies of its interests.

The manipulation, in bad faith, of the bankruptcy of the Company by Levona/Murchinson/Pach Shemen is proven by the following:

TX-31

23

[logo]

### *a. Lack of active legalization to file an involuntary bankruptcy petition.*

Creditors Pach Shemen LLC, VR Global Partners L.P., Alpine Partners L.P. failed to investigate whether they themselves were eligible for active legalization to file a petition for involuntary bankruptcy of the Company under the American bankruptcy code.

In particular, Murchinson/Pach Shemen and Alpine Partners, the two of the three companies that jointly filed a petition for involuntary bankruptcy, were aware, at the time they filed their petitions for the involuntary bankruptcy of ELETSON HOLDINGS, of the existence of the Second **Restructuring Support Agreement (the "Second RSA")**[4] and its contents. This agreement was intended to maintain Eletson Holdings' stability and orderly operation and for this reason it included important binding clauses, such as clauses prohibiting the manipulation of insolvency proceedings and clauses restricting the transfer of bonds.

Furthermore, the third of the companies jointly seeking the involuntary bankruptcy of ELETSON HOLDINGS, VR Global, as a signatory to the OCM Agreement (**the "OCM Stipulation Agreement"**),[5] was also aware of additional restrictions which prohibited the transfer of bonds to parties that had not signed accession to the OCM Agreement itself.

---

[4] **Note:** The Second RSA is an agreement signed on October 29, 2019, between the Debtors, certain shareholders of Eletson Holdings and certain holders of more than 80% of New Bonds ("Consenting Bondholders"). The Second RSA included restrictions on the transfer of bonds, indicating that none of the Consenting Bondholders will be able to sell, transfer, assign, mortgage, pledge, confer participation rights or otherwise dispose of their interests in the New Bonds; without the transferee having signed a Second RSA inclusion at least three days prior to the transfer, otherwise the transfer would be deemed void and without any force or effect. In addition, the Second RSA contained an enforcement clause, which granted a right to a non-infringing party to demand "specific execution and interference or other equitable relief as remedy for any such breach, including, but not limited to, an order by the Bankruptcy Court or other competent court requiring each party to immediately comply" with any of their obligations under the Second RSA.

Also, prior to the Second RSA, the First Restructuring Support Agreement (the "First RSA") was signed on June 24, 2019, between the Debtors, certain of the Debtors' shareholders and guarantors, and an ad hoc group of bondholders, which defined the terms for the restructuring of the Debtors' obligations under the New Bonds and which was terminated on August 9, 2019, by the ad hoc group of bondholders.

[5] **Note:** The OCM Agreement is an agreement by which the Debtors obtained the consent of the majority of Bondholders, which consent was required by the Second RSA for the refinancing of the ships' charterparties. With this consent they then proceeded to refinance certain ship charterparties in cooperation with OCM Maritime Thames LLC, OCM Maritime Autumn LLC, OCM Maritime Rhine LLC and OCM Maritime Yukon LLC.

OCM companies are affiliated companies with the investment fund Oaktree Capital Management.

In addition, the OCM Agreement: (i) includes a preamble stating that "Ellison Parties and Holders are parties to the particular Restructuring Support Agreement dated October 29, 2019," (ii) prohibits bondholders from selling, assigning, transferring, mortgaging or otherwise disposing of their New Bonds unless, "as a condition of any such transaction, the recipient" signs their inclusion in the OCM Agreement; and (iii) provides that any disposition of New Bonds, as mentioned above, is void from the outset if no enrollment is signed.

[logo]

Therefore, the filing of a petition for the involuntary bankruptcy of ELETSON HOLDINGS by the above creditors, without investigation and without ascertaining the legality of their claims, constitutes a fundamental contradiction to morality.

### *b. Bankruptcy manipulation scheme to gain advantage in a pending Arbitration.*

Furthermore, another reason that makes the Company's bankruptcy manipulated and contrary to morality are the true causes and purpose for which involuntary bankruptcy petitions were filed.

In particular, the above involuntary bankruptcy petitions were not filed for the purpose of financially restructuring Eletson Holdings, **but were intended to gain a strategic advantage in the arbitration proceedings that had already been commenced between Eletson Holdings and Eletson Corporation on the one hand as plaintiffs, and Levona (an affiliate of Murchinson), on the other hand as defendant.**

During all stages of the bankruptcy proceedings, from negotiating with the previous holders of the bonds issued by Eletson Holdings and the filing of petitions for involuntary bankruptcy, through the issuance of the final judgment of the Bankruptcy Court in the context of the voluntary bankruptcy proceedings (under chapter 11 of the American Bankruptcy Code), Pach Shemen (i.e. still an affiliate of Murchinson) played a pivotal role. Pach Shemen, by offering financial incentives and providing legal and financial support to the rest of the participants in the bankruptcy process, created a matrix of control and influence that allowed them to control the progress of the process, with the sole purpose of serving their own interests (i.e., the interests of Murchinson). For example, Murchinson/Pach Shemen, during the negotiation stage with bondholders, informed the latter that Murchinson (through its affiliate, Levona) *was "already in a dispute with Eletson" and "searched for any potential pressure point to improve the situation in the Gas arm"*. In fact, the final agreement that arose between Murchinson/Pach Shemen and the bond sellers provided that "*an additional $500,000 would be paid to bond sellers if the arbitration were terminated in our interest in respect of Eletson Gas and we would be able to exercise our rights as Preferred Shareholders to sell the Eletson Gas and/or the company (Eletson Gas) ships without legal intervention.*"

[logo]

Therefore, the acquisition of the Bonds never involved possible financial returns of that investment. Rather, Murchinson/Levona/Pach Shemen's common goal was to manipulate the bankruptcy proceedings for their benefit in arbitration and gain control of Eletson Holdings and through them, the control of Eletson Gas. In fact, Murchinson/Pach Shemen/Levona attempted to use information obtained through the bankruptcy proceedings before the U.S. Bankruptcy Court for their benefit in Arbitration.

### c. Initiation of bankruptcy proceedings based on disputed claims.

Finally, another reason that makes the bankruptcy of ELETSON HOLDINGS one in bad faith and manipulated, is that it was caused on the basis of disputed claims.

The filing of an involuntary bankruptcy petition of an obligor before a U.S. Bankruptcy Court must be based on **actual and undisputed claims.**

However, in this case, the above (purported) **Creditors were aware, at the time of filing the involuntary bankruptcy petitions, of the validly contested nature of their claims.**

In fact, the same creditors included in their proposals, in support of their petitions on involuntary bankruptcy of the Company, unfounded defamatory allegations about the purported Debtors, in order to humiliate the latter, disrupt their business relationships, and damage their reputation. Among other things, the creditors unfoundedly argued that the alleged Debtors engaged in intra-group transactions and in acts contrary to morality and good faith. These allegations remained unproven throughout the bankruptcy proceedings, as expected, since they lacked any crestal of truth.

In view of the above, the knowledge of the (purported) creditors of the totally questionable nature of their claims, in combination with the unfounded defamatory allegations against the purported debtors, demonstrates their conduct in bad faith and the undeniably and unambiguously manipulated bankruptcy procedure of ELETSON HOLDINGS, instigated on behalf of Levona/Murchinson/Pach Shemen.

TX-31

[logo]

It is clearly concluded from the above that ELETSON HOLDINGS is entitled to and has a direct legitimate interest to receive judicial protection, and in particular to support the appeal against the above Bankruptcy Decision of the U.S. - Southern District of New York comprising Judge John P. MASTANDO, which is already filed, which confirms the Decision of Voluntary Bankruptcy (Chapter 11) of ELETSON HOLDINGS and its other companies of interest dated 10/25/2024, as well as the amended plan of reorganization of the Creditors before the New York Bankruptcy Court, since the relevant deadline for the exercise of this (of the appeal) was to expire, as per the immediately above noted, on 11/08/2024, on the other hand to turn, with the corresponding legal remedies provided before the Greek Courts, in order to appeal the judgment of the Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) to which it was subjected by the U.S. Bankruptcy Court, among other reasons also due to lack of international jurisdiction of the latter, in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council. In addition, in the event that the (purported as) Creditors apply for the acknowledgment and enforcement of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter is entitled to and has a direct legitimate interest in appearing and being represented before the competent Greek Courts and protests, otherwise and as an impediment to the acknowledgment of the above Bankruptcy Decision in Greece, the lack of international jurisdiction of the US **Foreign Bankruptcy Court which issued** the Bankruptcy decision.

## B. THE RESIGNATION OF THE DIRECTORS OF ELETSON HOLDINGS. – THE LACK OF MANAGEMENT AND LEGAL REPRESENTATION OF THE COMPANY.

As mentioned above **under par. A.1**. **"ELETSON HOLDINGS INC."** is a Societe Anonyme (corporation) and has been incorporated under the laws of Liberia, as of 12/04/1985.

Pursuant to **Article III, Section 11. Powers** *(Section 11. Powers)* of the Company's Bylaws, the Company is governed by a Board of Directors, consisting of **eight (8) members**, in accordance with **Article III, Section 2.** Eligibility *(Section 2. Eligibility)* of the above Bylaws of the Company and at any rate **not less than three (3)** in accordance with **article 1.** Members of the same Bylaws *(Section 1. Number of BY-LAWS)* Pursuant to **article 5. Directors [VI. DIRECTORS] of the Amended and Codified Articles of Association of the Company** dated **06/29/2018**, which is registered with company's registration number

[logo]

C-40191 with the Ministry of Foreign Affairs of the Republic of Liberia, the Company is governed by a Board of Directors, consisting of **three (3) members**.

Until recently (i.e. until 11/08/2024) the Company was governed by **an eight-member Board of Directors**, as it appears from the **resolution, dated 12/11/2023, of** the Joint Assembly of the Members of the Board of Directors as well as the Shareholders of ELETSON HOLDINGS, and consisted of the following members:

**a)**   Laskarina Karastamati, Chair and BoD Member,

**b)**   Vasileios Hatzieleftheriadis, Vice President, Treasurer and BoD Member,

**c)**   Vasileios Kertsikoff, Vice President and BoD Member,

**d)**   Konstantinos Hatzieleftheriadis, BoD Member,

**e)**   Ioannis Zilakos, BoD Member,

**f)**   Eleni Karastamati, BoD Member,

**g)**   Panagiotis Konstantaras, BoD Member.

**h)**   Emmanuel Androulakis, as Secretary and BoD member,

While Eleni Vandorou was appointed as Assistant Secretary.

In the above Minutes, there is no provision for the Company's commitment, however, its Bylaws in **Article III, Section 5. Quorum (Section 5. Quorum of BY LAWS) provide that in order for there to be a legal formation and quorum at the meetings of the Company's Board of Directors, a majority is required, namely:**

" *Article III*

*BOARD OF DIRECTORS*

*Section 5. Quorum.*

*At any Meeting of the Board of Directors a **majority** of the Directors shall constitute a **quorum** for the transaction of business, but if at any Meeting of the Board there shall be less than a quorum present, a majority of those present may adjourn the Meeting from time to time until a quorum shall have been obtained.*

And in faithful translation:

[logo]

*"Article III,*

**Board of Directors**

**Section 5 - Quorum**

*At any Meeting of the Board of Directors a **majority** of the Directors shall constitute a **quorum** for the transaction of business, but if at any Meeting of the Board there shall be less than a quorum present, a majority of those present may adjourn the Meeting from time to time until a quorum shall have been obtained."*

In addition, pursuant to the Statement of Directors dated 09/26/2024, Officers and Shareholders of the Company (entered in the registration of the Company with number C-40191 with the Ministry of Foreign Affairs of the Republic of Liberia), the above Directors were published, while three (3) of them were appointed first, that is**, (a)** Laskarina Karastamati, as President, **(b)** Vasileios Hatzieleftheriadis, as Vice President and Treasurer, and **(c)** Vasilios Kertsikoff as Vice President, as **designated employees/managing officers of the Company (Officers),** to whom the power of attorney has been granted to sign on behalf of and to bind the Company.

The Designated Officers of the Company **shall be elected by the Board of Directors**, shall have an annual term of office, unless removed by the Board of Directors, as expressly provided in the Bylaws of ELETSON HOLDINGS in Article IV, Section 1. Designated Officers and Agents **(Section 1. Officers and Agents)** and Section 2. Term of Office **(Section 2. Term of Office)**. In addition, in the same Article IV, Section 3 above. Powers and Duties **(Section 3. Powers and Duties), it is explicitly provided that the Designated Officers of the Company are subject to the control of the Board of Directors, that is:**

*" Article IV*

**OFFICERS**

**Section 1. Officers and Agents.**

*[...] The Board of Directors may also appoint from time to time one or more Vice Presidents, Assistant Secretaries , Assistant Treasurers and other agents, officers, representatives and employees as may be deemed necessary. [...]"*

TX-31

29

[logo]

And in faithful translation:

*"Article IV,*
*Designated Officers*
*Section 1 - Officers and Agents*
*The **Board of Directors may also appoint** from time to time one or more Vice Presidents, Assistant Secretaries , Assistant Treasurers and other agents, officers, representatives and employees as may be deemed necessary."*

*Section 2. Term of Office.*
*The term of office of all officers shall be one year or until their respective successors are chosen and qualify; Provided however that any officer elected or appointed by the Board of Directors may be removed, with or without cause, at any time by the affirmative vote of a majority of the members of the Board then in office.*

And in faithful translation:

*"Section 2. Term of Office.*
*The term of office of all officers shall be one year or until their respective successors are chosen and qualify;* Provided however that **any officer elected or appointed by the Board of Directors may be removed, with or without cause**, at any time by the affirmative vote of a majority of the members of the Board then in office.

*Section 3. Powers and Duties.*
*The officers, agents, representatives and employees of the Corporation shall each have such powers and duties in the management of the property and affairs of the Corporation, subject to the control of the Board of Directors and approval of the Shareholders entitled to vote thereon, as generally pertain to their respective offices, as well as such powers and duties as from time to time may be prescribed by the Board of Directors and the Shareholders entitled to vote thereon.*
   *The Board of Directors may require any such officer, agent, representative or employee to give security for the faithful performance of his duties.*

TX-31

30

[logo]

And in faithful translation:

***Section 3. Powers and Duties.***

*The **officers**, agents, representatives and employees of the Corporation shall each have such powers and duties in the management of the property and affairs of the Corporation, **subject to the control of the Board of Directors** and approval of the Shareholders entitled to vote thereon, as generally pertain to their respective offices, as well as such powers and duties as from time to time may be prescribed by the Board of Directors and the Shareholders entitled to vote thereon. The Board of Directors may require any such officer, agent, representative or employee to give security for the faithful performance of his duties."*

**On 11/08/2024, by written letter from:**

a.  Laskarina Karastamati, Chair and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

b.  Vasileios Kertsikoff, Vice President and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

c.  Eleni Karastamati, Board Member and

d.  Panagiotis Konstantaras, Board Member,

**resigned** from the then eight-member ELETSON HOLDINGS' Board of Directors and the above capacities they held therein, while it was not possible to replace them, given that the Articles of Association of the Company did not provide for this and therefore no substitute members had been elected.

**Following the above resignations, the <u>eight-member</u> Board of Directors of the Company has now been converted into a <u>four-member</u> Board, consisting of:**

a)  Vasileios Hatzieleftheriadis, Vice President, Treasurer and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

b)  Konstantinos Hatzieleftheriadis, Board Member,

c)  Ioannis Zilakos, Board Member,

d)  Emmanuel Androulakis, Secretary and Board member.

**In addition to the total of three (3) designated employees/management officers of the Company, only one, Mr Vasileios Hatzieleftheriadis, remained.**

[logo]

Given, however, as immediately mentioned above, that a quorum at the meetings of the Company's directors is required, in accordance with the statutory provision pursuant to article III, Section 5 – A quorum (Section 5. Quorum of the Bylaws) a **majority**, **in combination with the fact that** until recently the Company was governed by an **eight-member Board of Directors**, as shown by the resolution dated 12/11/2023 of the Joint Meeting of the Members of the Board of Directors and the Shareholders of ELETSON HOLDINGS, the latter, as of today, 11/08/2024, is deprived of management, unable to convene a General Assembly of Shareholders and to make decisions, and to represent and bind the Company.

In addition, due to the absence of the Board of Directors, no designated employees/management officers of the Company could be appointed, while the one who remained, Mr. Vasileios Hatzieleftheriadis, similarly cannot make decisions, represent and bind the Company, since there is no Board of Directors to review and approve his decisions, in accordance with Section 3, of article IV above. Power and Duties **(Section 3. Powers and Duties of the Bylaws).**

Therefore, **today, the Company lacks Management and legal representation.**

## C. THE RELATIONSHIP OF THE APPLICANT FOREIGN SHIPPING COMPANIES WITH "ELETSON HOLDINGS". – THE SHARE COMPOSITION OF THE COMPANY.

According to the Statement dated 09/26/2024 of the Directors, Designated Employees and Shareholders of the ELETSON HOLDINGS Company, the share capital of the company amounts to 10,000 class A nominal shares of no par value.

The applicants herein, **ELAFONISSOS SHIPPING CORPORATION and KEROS SHIPPING CORPORATION, are holders of 392 shares (shareholders) each**, representing **3.92% of the share capital** for each of them.

In addition to the above applicant companies, shareholders of the company since its inception are also the following foreign shipping companies, which belong to **three Greek families with the highest corporate percentage, namely:**

a.    The foreign shipping company **"LASSIA INVESTMENT COMPANY"** of the family of Laskarina Karastamati ("Karastamati"),

TX-31

32

[logo]

**b.**    The foreign shipping company **"FAMILY UNITY TRUST COMPANY"** of the family of Vasilis Kertsikoff ("Kertsikoff"), and

**c.**    The foreign shipping company **"GLAFKOS TRUST COMPANY"** of the family of Vasilis Hatzieleftheriadis ("Hatzieleftheriadis"),

and which are holders of 3,072 shares each and each of them participates in the share capital of ELETSON HOLDINGS by **30.72%.**

**ELETSON HOLDINGS, therefore, belongs to foreign companies also belonging to Greek ultimate beneficiaries, is incorporated under the laws of Liberia and the base of its main interests is Piraeus, at 118 Kolokotroni Street.**

## D. EMERGENCY CASE – PERSISTENT RISK

*In this case*, due to the lack of management of the Company as detailed above **under B.** after the subsequent resignations of the four (4) members by then (8) eight-member Board of Directors of the Company, the remaining four members do not fill in the number of members required for the Board to be fully composed, there is an urgent case and an imminent risk that justifies the appointment of provisional management of the company during the injunctions proceedings to protect its rights.

In particular, there is an urgent case that your Court should regulate and appoint a temporary management of the Company in order to **manage** the Company and to **convene an extraordinary General Assembly for the election of a new Board of Directors:**

**(a)** To address current and urgent matters, such as acts for the management of the property of ELETSON HOLDINGS and any kind of transactions with financial institutions, charterers, suppliers, other trading partners and public bodies in Greece and abroad.

[logo]

**(b)** for the management of the four Special Maritime Enterprises controlled by the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and the other subsidiaries of ELETSON HOLDINGS, which, due to their maritime nature, have lasting and urgent needs for making decisions and actions,

**(c)** for the representation of their maritime subsidiaries and maintaining smooth and continuous communication with the funding partners of the above ships, which are financed through sale and lease back agreements, and

**(d)** To make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies and aids provided by law (Greek or foreign) for the name and on behalf of the above company, **in order to safeguard its property and its interests**, and in particular for the Company:

- **To appear and be represented at the hearing (Status Conference) of <u>11/12/2024</u> before the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments brought by the Respondent Levona in the procedure to confirm the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.**

- **To represent itself and its subsidiary, ELETSON CORPORATION, and to request the acknowledgment of the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", with all the provisions of its operative part, as well as the declaration of its enforceability under the provisions of the New York Convention, in the territory of another State than the one issued, inter alia, in Greece, where Levona holds property.**

- **Obtain judicial protection and be represented; so that, on the one hand, can support the appeal against the above Bankruptcy Decision, which is already issued, of the U.S. Bankruptcy Court - Southern District of New York comprising of Judge John P. MASTANDO which confirms the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS and its other companies of interest, as well as the amended plan for the reorganization of the Creditors <u>before the New York Bankruptcy Court</u>, as the relevant deadline for its exercise (of the appeal) would expire, as per the immediately above stated, on 11/08/2024, *on the other hand* to appeal, with the respective statutory legal remedies and means, <u>before the Greek Courts</u>, in order to challenge the Decision of Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) in which it was filed by the U.S. Bankruptcy Court for reasons**

[logo]

of lack of international jurisdiction of the latter in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.

- In addition, in the event that the Creditors apply for the acknowledgment and execution of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter to appear and be represented before the competent Greek Courts in order to oppose, otherwise and as an impediment to the recognition of the above Bankruptcy Decision in Greece, due to the inadequacy of the issuing party's international jurisdiction in the Bankruptcy Decision, that is, the foreign Bankruptcy Court of the U.S., and for their other claims in their favor.

- To appoint proxy lawyers in Greece or abroad to be represented before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required, in order to protect their interests, by filing legal remedies, using legal means, oppositions, etc.

### E. LEGAL SUBSUMPTION

According to the provision of article 69 of the Civil Code (which, according to its generality, applies to any kind of legal entity, therefore also to a Societe Anonyme - see ref. No. 619/1987 D 19, 283, Appeal 1750/1992, Arm MI.38), provisional management to a legal person may be appointed by the Court, upon request of anyone with a legitimate interest, only **if the persons required for the management are missing** or if their interests conflict with that of the legal person.

TX-31

35

[logo]

By the provision of **article 69 of the Civil Code**, which is of an exceptional nature and is strictly limited by the constitutional principle of proportionality (article 25 par. 1 subpar. c of the Constitution) and the principles of temporality, economy and subsidiarity deriving from the latter (Supreme Court 1392/2014, Private Law Chronicles 2015/98, Thessaloniki Appellate Court 1106/2013, Commercial Law Review 2013/711), the protection of interests of the legal entity and third parties (partners, creditors) related thereto is sought, but also of the wider whole, in view of the importance of legal entities, and in particular commercial companies, as a means of conducting economic activity. The above lack of management, to allow the appointment of a temporary management, can be: **a)** fictitious, when, among other things, due to dystrophy, malpractice or disagreements of board members, their refusal or indifference to the exercise of the necessary management acts (Supreme Court 1392/2014; Private Law Chronicles 2015/98, Thessaloniki Appellate Court 1106/2013, Commercial Law Review 2013/711; Thessaloniki First Instance Court 6890/2016, Legal Databank NOMOS), **b)** actual, especially in cases of death, severe illness, long-term absence (Supreme Court 395/2002, Private Law Chronicles 2003/407, Thessaloniki Appellate Court 2326/2004, CJEU 2004/912, Thessaloniki First Instance Court 6890/2016, Legal Databank NOMOS), and c) legal, as it happens, among other things, in cases of resignation, even silent, of a member of the board of directors (Supreme Court Plenary 1601/2002, Private Law Chronicles 2003/118), annulment of a resolution of the general assembly (Supreme Court 1601/2002; Private Law Chronicles 2003/118), expiration of the board of directors' term (Supreme Court Plenary 5/2004, Private Law Chronicles 2004/553, Thessaloniki First Instance Court 6890/2016, Legal Databank NOMOS).

Lack of management of a Societe Anonyme exists in the case of inability to exercise the responsibilities of the board as a collective body and when only some of its members are missing and the remaining, together with the legally declared and existing deputies, do not complete the total number of members required by the articles of association. The possibility alone of the formation of a quorum by the non-resigned members does not cover the lack of management, if it is not otherwise specified in the articles of association, because this requires full assembly of the board, in order to have the full composition provided by the articles of association (Supreme Court 1392/2014 Private Law Chronicles 2015.98, Supreme Court 1408/2010, Private Law Chronicles 2011,528, Supreme Court 1430/1987, EEN 1988, 768), while, similarly, lack of management of the Societe Anonyme, justifying the appointment of a new [whole] board of directors, also exists in the event that certain board members refuse to carry out their duties or interfere with their work and the remaining members are not sufficient under the articles of association of the company for quorum formation (see Supreme Court 854/1998, Hellenic Justice 1999.79, 119, Nomiko

[logo]

Vima 2000.44, Athens Appellate Court 2424/1991, as above, Thessaloniki First Instance Court 1882/2011, Private Law Chronicles 2011.612). **It is therefore necessary and appropriate to appoint a temporary board of directors, fully formulated, that is, by a number of members equal to the one provided by the company's articles of association for ordinary management, and not only by what is required for the completion of the impeded ordinary management members, so there would be a "mixed" temporary management, that is, made up of both electives, as well as by appointed members (Supreme Court 1392/2014, Supreme Court 854/1998, Athens Appellate Court 4238/2010, Athens Appellate Court** 2326/2004, Single Member **Athens Appellate Court** 1829/2012, Legal Databank NOMOS, <u>also comprised of some of the ordinary members of management, deemed appropriate to fulfill the powers which are the subject of the temporary management, because in this case it is not a mixed temporary management, after these members have already permanently dismissed their status as an ordinary – elected member of management and are appointed because they were deemed suitable as members of the temporary management</u> (Single Member Athens Appellate Court 1829/2012, CJEU 2012.1157, Patras Appellate Court 455/1994, Commercial Law Review 1994.582, Athens Appellate Court. 2424/1991, Hellenic Justice 34,617, Beis, Civil Law - Voluntary Jurisdiction; article 786 p. 547-548 – opposing Supreme Court 1430/87, EED 46,865, Athens Appellate Court 4282/1998, Hellenic Justice 1999,421, Piraeus Appellate Court 285/1997, Hellenic Justice 1997.1664, Athens Appellate Court 9651/1992, Hellenic Justice 1995,211, Thessaloniki Appellate Court 3570/1990, Hellenic Justice 32,1310, Thessaloniki Appellate Court 855/2007, Private Law Chronicles 2008,159, Commercial Law Review 2007.871, Asprogerakas - Grivas, Lack of Legal Person Management, par. 20, A. Kritikos Law of Unions and Workers' Unions, 1982, p. 384 et seq, 390, 391, I. Karakatsanis, Interpretation of Civil Code, article 92 No. 33). This (management) will actively assume the corporate affairs of the company, which concern urgent corporate matters, such as the fulfillment of obligations and the collection of claims for the success of its statutory purposes, the exercise and support of legal aids and means, for the fulfillment of the aforementioned purposes, including the decision to exercise corporate action, pursuant to articles 102 et seq. of Law 4548/2018. <u>The term of the provisional management must be set annually, for a period of time reasonable to avoid a disproportionate intervention in the constitutionally protected interest of the self-management of the legal person, since the management of all corporate affairs and in particular the management decisions of large financial and business interest cannot be made by a provisional management, which is deprived of the legalization of an elected management.</u>

[logo]

The appointment of the provisional management is made in accordance with article 786 par. 1 of the Code of Civil Procedure, under the procedure of voluntary jurisdiction, by the Single-Member Court of First Instance of the region where the Societe Anonyme is headquartered.

**Furthermore, according to article 786 par. 1 of the Code of Civil Procedure, in conjunction with article 69 and 778 of the Civil Code, it is concluded that the appointment of a temporary management or liquidators of a legal person is mandated if there is a lack of management** of the legal person, which occurs in cases where there is a real or legal inability of the managers or liquidators to perform their duties. Instead, according to article 786 par. 3 of the Code of Civil Procedure, the Single-Member Court of First Instance of the region where the company is headquartered, replaces temporary management or temporary liquidators, **if a material reason exists.** The meaning of the provision of a "material reason" for the replacement of a liquidator is any event which makes it impossible or very difficult to carry out the purpose of the liquidation or from which it is concluded that retaining the liquidator or liquidators does not ensure the smooth and uninterrupted conduct of the liquidation and creates fears of serious damages to the interests of the company and the partners or from which it is concluded that the continuation of the administrative power of the liquidator is rendered intolerable, in good transactional faith and morality on behalf of the partners (Patras Single Member First Instance Court 428/2021).

According to the prevailing case law opinion, in the case of a suspected risk or an urgent case, it is possible to determine a temporary management of a legal person or to replace its members during the procedure of injunctive measures as well, under the assistance of the other conditions for obtaining them.

## F. THE REQUESTED JUDICIAL PROTECTION

**Whereas** the applicants, foreign shipping companies, **"ELAFONISSOS SHIPPING CORPORATION"** and **"KEROS SHIPPING CORPORATION",** we have a direct legitimate interest under the capacity of shareholder, of 3,9% of each of us from the total shares of the company **"ELETSON HOLDINGS INC."** to appoint a temporary Board of Directors to the shipping company **"ELETSON HOLDINGS INC.",** in order to **administer** the Company and to **convene an extraordinary General Assembly for the election of a new Board of Directors,** in order **(a)** to address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other transactional and public bodies in Greece and abroad; and **(b)** to make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies and aids (Greek or foreign) in the name and on behalf of the aforementioned company in

[logo]

**order to safeguard its property and interests, on the one hand** from the Arbitration Decision issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN, on the other hand, to turn against the Voluntary Bankruptcy Decision of the Bankruptcy Court of the USA - South District of New York for ELETSON HOLDINGS (Chapter 11) which was issued in New York City on 10/25/2024 by this court which comprised of John P. MASTANDO, as well as the Order of the same U.S. Bankruptcy Court - Southern District of New York dated 11/04/2024, which court comprised of Judge John P. MASTANDO, which confirmed the Decision of Voluntary Bankruptcy (Chapter 11) of ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan dated 10/25/2024.

**Whereas the four (4) of the eight (8) members of the Board of Directors of the Company, namely** a) Laskarina Karastamati, b) Vasileios Kertsikoff, c) Eleni Karastamati, and d) Panagiotis Konstantaras pursuant to their written representations to the Company dated 11/08/2024, **expressly and in writing RESIGNED** from the Board of Directors of the foreign shipping company "**ELETSON HOLDINGS INC.**"

**Whereas a quorum at the meetings of the Board of Directors of the Company requires, according to the statutory provision of Section III above - (Section) 5 of the Bylaws of the 26th of June 2007), a simple majority, in combination, however, with the fact that** until recently the Company was governed by **an eight-member Board of Directors**, which was elected pursuant to the resolution dated 12/11/2023 of the Joint Meeting of the Members of the Board of Directors and of the Shareholders of ELETSON HOLDINGS, the last one as of today, 11/08/2024, lacks management, is not able to convene a general Assembly of Shareholders and make decisions and represent and bind the Company.

**Whereas** the foreign shipping company "**ELETSON HOLDINGS INC.**" lacks management and representation and has no protections against the voluntary bankruptcy proceedings initiated and redirected by its Creditors in New York against its property, it is certain that it will lose all of it and indeed permanently, if it does not oppose them in a timely manner.

**Whereas** following the aforementioned resignations, the company "**ELETSON HOLDINGS INC.**" does not have any body performing duties or management such as a director, manager, administrator or its representative, and thus is unable to exercise its legal rights and to address immediate and urgent current issues of its daily operation.

**Whereas** the applicants have a direct legitimate interest with the capacity of shareholders, 3.92% of each of us of the total shares of the company "**ELETSON HOLDINGS INC.**", to request the appointment of temporary management of the foreign shipping company "**ELETSON HOLDINGS INC.**"

[logo]

**Whereas** for all the above, a temporary management of eight-member composition of the foreign shipping company **"ELETSON HOLDINGS INC."** must be appointed with an annual term of office **consisting of the following members, namely:**

**The remaining directors of the Company:**

**1)**    Vasileios Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 8 Tinou Street, with Tax Registration Number 052767445

**2)**    Konstantinos Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 57, Plastira Street, with Tax Reg. No. 052767405

**3)**    Ioannis Zilakos, son of Nikolaos, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Registration Number 065443172,

**4)**    Emmanuel Andreoulakis, son of Stylianos, resident of Piraeus, Attica, at 62 Iroon Polytechneiou, with Tax Registration Number 050222446,

**As well as the following persons as new BoD Members of the Company:**

**5)**    Adrianos Psomadakis - Karastamatis, son of Michael, resident of Piraeus, Attica, 98-100 Karpathou Street, with Tax Registration Number 164642953,

**6)**    Panos PAXINOS, son of Ioannis, resident of Chalandri of Attica, 58 Kefalinias Street, with Tax Reg. No. 030723274,

**7)**    Eleni Giannakopoulou, daughter of Konstantinos, resident of Ymittos, Attica, 43 M. Tsaliki Street, with Tax Reg. No. 052036400 and

**8)**    Niki, spouse of Nikolaos Zilakos, resident of Glyfada, Attica, 34 Tyrtaiou Street, with Tax Reg. No. 064165981

TX-31                                                                                              40

[logo]

to **administer** the Company: **(a)** to address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, and **(b)** to manage the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, and its other subsidiaries; which, due to their maritime nature, have lasting and urgent needs for making decisions and proceeding to actions, **(c)** for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the sponsors of the above ships, funded through loan agreements with sale and lease back agreements, and **(d)** In order to make a decision to appoint attorneys and to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies (Greek or foreign) and aids in the name and on behalf of the aforementioned company, in **order to safeguard its property and interests, on the one hand** by the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal, consisting of Judge-Arbitrator Ariel E. BELEN, on the other hand, to turn against the Voluntary Bankruptcy Decision of ELETSON HOLDINGS (Chapter 11) issued on 10/25/2024 in New York by the U.S. Bankruptcy Court - Southern District of New York comprising of John P. MASTANDO, as well as the Order of the same U.S. Bankruptcy Court - Southern District of New York dated 11/04/2024, which court consisted of Judge John P. MASTANDO, confirming the Decision of Voluntary Bankruptcy (Chapter 11), dated 10/25/2024, of ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan **and to convene an extraordinary General Assembly for the election of a new Board of Directors**

Whereas, the above persons are the most suitable for the temporary management of the Company, as the first four of them are the remaining four (4) directors of the Company, after the resignation of the other four, as a result of the above, and for a number of years members of the Board of Directors, while the remaining four (new members) are also traders with their own companies, have a lot of experience in the corporate matters of shipping companies.

Whereas there is an immediate risk that the Company will **permanently** lose the management of its property, since, as mentioned above, voluntary bankruptcy proceedings have commenced against it by its Creditors in New York at the expense of its property, to which it has already opposed by filing the aforementioned appeal on 11/07/2024, as the relevant deadline expired on 11/08/2024, during the discussion of which it should appear and be represented to support what is involved, as well as it should be represented at the hearing (Status Conference) to be held on **11/12/2024** before the U.S. District Court - Southern District of New York comprising of Lewis J. LIMAN J. in order to counter objections, allegations

[logo]

and impediments brought by Respondent Levona in the confirmation procedure for the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal, consisting of Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.

**Whereas** there is an urgent case and an imminent risk that justifies the appointment of temporary management of the Company by proceeding to injunctive relief.

**Whereas** Your Court is competent and locally competent.

**Whereas** there is **an urgent need,** relating to the occurrence of immediate property damage to the Company and the final loss of such management as per the foregoing, which otherwise with certainty will occur, we request **an interim order** until the hearing of this application, on the condition that this will be discussed before your Court at the scheduled hearing on the scheduled trial date, by which the following are appointed as members of the temporary management of the foreign shipping company **"ELETSON HOLDINGS INC."**:

**1)** Vasileios Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 8 Tinou Street, with Tax Reg. No. 052767445

**2)** Konstantinos Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 57, Plastira Street, with Tax Reg. No. 052767405

**3)** Ioannis Zilakos, son of Nikolaos, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Reg. No. 065443172,

**4)** Emmanuel Andreoulakis, son of Stylianos, resident of Piraeus, Attica, Iroon Polytechneiou No. 62, with Tax Reg. No. 050222446,

**5)** Adrianos Psomadakis – Karastamatis, son of Michael, resident of Piraeus, Attica, 98-100 Karpathou Street, with Tax Reg. No. 164642953,

**6)** Panos PAXINOS, son of Ioannis, resident of Chalandri, Attica, 58 Kefalinias Street, with Tax Reg. No. 030723274,

**7)** Eleni Giannakopoulou, daughter of Konstantinos, resident of Ymittos, Attica, 43 M. Tsaliki Street, with Tax Reg. No. 052036400 and

[logo]

8) Niki, spouse of Nikolaos Zilakos, resident of Glyfada, Attica, 34 Tyrtaiou Street, with Tax Reg. No. 064165981,

**with the power to administer the Company: (a) to address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, and (b) to manage the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, and its other subsidiaries; which, due to their maritime nature, have lasting and urgent needs for making decisions and proceeding to actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the sponsors of the above ships, funded through loan agreements with sale and lease back agreements, and (d) In order to make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies (Greek or foreign) and aids provided by law (Greek or foreign) in the name and on behalf of the aforementioned company, in order to safeguard its property and interests, and in particular for the Company:**

- **To appear and be represented at the hearing (Status Conference) of <u>11/12/.2024</u> before the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments brought by the Respondent Levona in the procedure to confirm the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.**

- **To represent itself and its subsidiary, ELETSON CORPORATION, and to request the acknowledgment of the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", with all the provisions of its operative part, as well as the declaration of its enforceability under the provisions of the New York Convention, in the territory of another State than the one issued, inter alia, in Greece, where Levona holds property.**

TX-31

43

[logo]

- **Obtain judicial protection and on the one hand, to support the appeal against the above Bankruptcy Decision, which is already issued, of the U.S. Bankruptcy Court - Southern District of New York comprising of Judge John P. MASTANDO which confirms the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS and its other companies of interest, as well as the amended plan for the reorganization of the Creditors <u>before the New York Bankruptcy Court</u>, as the relevant deadline for its exercise (of the appeal) would expire, as per the immediately above stated, on 11/08/2024, on the other hand to appeal, with the respective statutory legal remedies and means, <u>before the Greek Courts</u>, in order to challenge the Decision of Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) in which it was filed by the U.S. Bankruptcy Court for reasons of lack of international jurisdiction of the latter in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.**

- **In addition, in the event that the Creditors apply for the acknowledgment and execution of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter to appear and be represented before the competent Greek Courts in order to oppose, otherwise and as an impediment to the recognition of the above Bankruptcy Decision in Greece, due to the inadequacy of the issuing party's international jurisdiction in the Bankruptcy Decision, that is, the foreign Bankruptcy Court of the U.S., and for their other claims in their favor.**

- **To appoint proxy lawyers in Greece or abroad to be represented before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required, in order to protect their interests, by filing legal remedies, using legal means, oppositions, etc.**

- **To convene an extraordinary General Assembly for the election of a new Board of Directors.**

**Whereas** this application is legal, valid and true, it must be accepted by Your Court.

[logo]

**Whereas** the legal fee of my proxy attorneys for the filing of this document has been paid, as shown in the advance payment receipts of the Athens Bar Association Nos… ..........................................................................

## FOR THESE REASONS

All with our legal rights reserved

### WE HEREBY REQUEST

- That this application be accepted.

- To **temporarily adjust the status**, in particular:

- A **temporary Board of Directors of eight-member composition must be appointed with an annual term in order to manage the** foreign shipping company **"ELETSON HOLDINGS INC."**, which is based at its registered office in Liberia, in fact in Greece, at 118 Kolokotroni Street in Piraeus, where it maintains a legally established office in accordance with the provisions of article 25 of Law 27/1975, and the following members must be appointed as members of the aforementioned temporary management:

**The remaining BoD Members of the Company:**

**1)** Vasileios Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 8 Tinou Street, with Tax Reg. No. 052767445

**2)** Konstantinos Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 57, Plastira Street, with Tax Reg. No. 052767405

**3)** Ioannis Zilakos, son of Nikolaos, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Reg. No. 065443172,

**4)** Emmanuel Andreoulakis, son of Stylianos, resident of Piraeus, Attica, at 62 Iroon Polytechneiou, with Tax Reg. No. 050222446,

**As well as the following persons as new BoD Members of the Company:**

**5)** Adrianos Psomadakis – Karastamatis, son of Michael, resident of Piraeus, Attica, 98-100 Karpathou Street, with Tax Reg. No. 164642953,

**6)** Panos PAXINOS, son of Ioannis, resident of Chalandri, Attica, 58 Kefalinias Street, with Tax Reg. No. 030723274,

TX-31

45

[logo]

**7)** Eleni Giannakopoulou, daughter of Konstantinos, resident of Ymittos, Attica, 43 M. Tsaliki Street, with Tax Reg. No. 052036400 and

**8)** Niki, spouse of Nikolaos Zilakos, resident of Glyfada, Attica, 34 Tyrtaiou Street, with Tax Reg. No. 064165981,

who will have the power and authority to: (**a**) **manage** the Company to address current and urgent matters, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, (**b**) for the management of the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and its other subsidiaries, which, due to their maritime nature, have lasting and urgent needs for making decisions and taking actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the funders of the above ships, funded through loan agreements with sale and lease back agreements, and (d) to render a decision to exercise, on behalf of the Company "ELETSON HOLDINGS INC.", all legal remedies and aids provided by law (Greek or foreign) in the name and on behalf of the above company in **order to safeguard its property and its interests**, on *the one hand* by the Arbitration Award of the Arbitral Tribunal issued in New York on 09/29/2023, which tribunal consisted of Judge-Arbitrator Ariel E. BELEN, ***on the other hand***, to turn against the Voluntary Bankruptcy Decision of ELETSON HOLDINGS (Chapter 11) issued on 10/25/2024 in New York by the U.S. Bankruptcy Court - Southern District of New York comprising of John P. MASTANDO, as well as the Order of the same U.S. Bankruptcy Court - Southern District of New York dated 11/04/2024, which court consisted of Judge John P. MASTANDO, confirming the Decision of Voluntary Bankruptcy (Chapter 11), dated 10/25/2024, of ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan and (c) **to convene an extraordinary General Assembly for the election of a new Board of Directors.**

To issue an **interim order**, **appointing them temporarily** until the discussion of this application, and subject to the discussion hereof before Your Court at the appointed hearing, as members of the temporary management of the foreign shipping company **"ELETSON HOLDINGS INC.,"** the following:

[logo]

**1)**    Vasileios Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 8 Tinou Street, with Tax Reg. No. 052767445

**2)**    Konstantinos Hatzieleftheriadis, son of Apostolos, resident of Voula, Attica, 57, Plastira Street, with Tax Reg. No. 052767405

**3)**    Ioannis Zilakos, son of Nikolaos, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Reg. No. 065443172,

**4)**    Emmanuel Andreoulakis, son of Stylianos, resident of Piraeus, Attica, Iroon Polytechneiou No. 62, with Tax Reg. No. 050222446,

**5)**    Adrianos Psomadakis – Karastamatis, son of Michael, resident of Piraeus, Attica, 98-100 Karpathou Street, with Tax Reg. No. 164642953,

**6)**    Panos PAXINOS, son of Ioannis, resident of Chalandri, Attica, 58 Kefalinias Street, with Tax Reg. No. 030723274,

**7)**    Eleni Giannakopoulou, daughter of Konstantinos, resident of Ymittos, Attica, 43 M. Tsaliki Street, with Tax Reg. No. 052036400 and

**8)**    Niki, spouse of Nikolaos Zilakos, resident of Glyfada, Attica, 34 Tyrtaiou Street, with Tax Reg. No. 064165981,

**with the power to call for an extraordinary General Assembly for the election of a new Board of Directions, so that they administer the Company until then, in order to: (a) address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, and (b) to manage the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, and its other subsidiaries; which, due to their maritime nature, have lasting and urgent needs for making decisions and proceeding to actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the sponsors of the above ships, funded through loan agreements with sale and lease back agreements, and (d) In order to make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies (Greek or foreign) and aids provided by law (Greek or foreign) in the name and on behalf of the aforementioned company, in order to safeguard its property and interests, and in particular for the Company:**

[logo]

- **To appear and be represented at the hearing (Status Conference) of <u>11/12/.2024</u> before the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments brought by the Respondent Levona in the procedure to confirm the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.**

- **To represent itself and its subsidiary, ELETSON CORPORATION, and to request the acknowledgment of the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", with all the provisions of its operative part, as well as the declaration of its enforceability under the provisions of the New York Convention, in the territory of another State than the one issued, inter alia, in Greece, where Levona holds property.**

- **Obtain judicial protection and on the one hand, to support the appeal against the above Bankruptcy Decision, which is already issued, of the U.S. Bankruptcy Court - Southern District of New York comprising of Judge John P. MASTANDO which confirms the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS and its other companies of interest, as well as the amended plan for the reorganization of the Creditors before the <u>New York Bankruptcy Court</u>, as the relevant deadline for its exercise (of the appeal) would expire, as per the immediately above stated, on 11/08/2024, on the other hand to appeal, with the respective statutory legal remedies and means, before the <u>Greek Courts</u>, in order to challenge the Decision of Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) in which it was filed by the U.S. Bankruptcy Court for reasons of lack of international jurisdiction of the latter in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.**

TX-31

48

[logo]

- **In addition, in the event that the Creditors apply for the acknowledgment and execution of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter to appear and be represented before the competent Greek Courts in order to oppose, otherwise and as an impediment to the recognition of the above Bankruptcy Decision in Greece, due to the inadequacy of the issuing party's international jurisdiction in the Bankruptcy Decision, that is, the foreign Bankruptcy Court of the U.S., and for their other claims in their favor.**

- **To appoint proxy lawyers in Greece or abroad to be represented before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required, in order to protect their interests, by filing legal remedies, using legal means, oppositions, etc.**

For your Court to issue a note, with similar content as above, until the day of the hearing of the temporary order.

To **impose** the court costs against the corporate property.

Athens, November 11, 2024

The Proxy Attorneys

| [signature] | [signature] |
|---|---|
| [stamp:] Mr. F. KALAVROS LAW COMPANY | [stamp:] Mr. F. KALAVROS LAW COMPANY |
| Ch. P. FILIOS • Th. Th. KLOUKINAS | Ch. P. FILIOS • Th. Th. KLOUKINAS |
| 19 VRANA - ATHENS 115 25 | 19 VRANA - ATHENS 115 25 |
| T. 2103698700 F. 2103698750 | T. 2103698700 F. 2103698750 |
| THEMOSTOKLIS TH. KLOUKINAS, ATTORNEY AT LAW | MARIA P. HAHAMI, ATTORNEY AT LAW |
| E: kloukinas@calavros.gr | E: chachami@calav.os.gr |

[stamp:] LEGAL DOCUMENT FILING REPORT
This legal document was filed
by the undersigned attorney at law.
Piraeus [hw:] *11/11/2024*
Filed by   The Secretary
[signature]

[hw:] *1) THEMISTOKLIS KLOUKINAS*

*Athens Bar Association #12348* [signature]

*2) MARIA HACHANI (Athens Bar Assoc. 30482)* [signature]

TX-31

[logo]

No: P5371062
Date: 11//08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 53.20 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

**LAW FIRM K.F. KALAVROS - Ch. P. FILIOS - Th.** KLOUKINAS, with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FIFTY-THREE EUROS AND TWENTY CENTS** for the lawyer **MARIA HAHAMI, daughter of PANAGIOTIS** with Reg. No. **030482** and Tax Reg. No. **131220580** concerning an APPLICATION, APPEARANCE before the PIRAEUS SINGLE-MEMBER FIRST INSTANCE COURT – VOLUNTARY JURISDICTION in the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

### ITEMIZED (*)
### REFERENCE [illegible] (Par. I of Law 4194/2013) €204.00

| | | | |
|---|---|---|---|
| Athens Bar Association | €8.00 | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | €40.80 | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | €30.60 | | |
| **TOTAL WITHHOLDINGS** | €49.20 | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €83.80 | | |

*VAT 24% = €48.96 is calculated on the amount of €204.00. (Total amount of [illegible] and VAT: €252.96)

[QR code]

By order of   Athens Bar Association

---

[logo]

No: P5371031
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 53.20 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

**LAW FIRM K.F. KALAVROS - Ch. P. FILIOS - Th.** KLOUKINAS with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FIFTY-THREE EUROS AND TWENTY CENTS** for the attorney at law **KLOUKINAS THEMOSTOKLIS, son of THEODOROS** with Reg. No. **012348** and Tax Reg. No. **040315330** concerning an APPLICATION, APPEARANCE BEFORE THE PIRAUS SINGLE MEMBERS FIRST INSTANCE COURT for the case of her principal **ELAFONISSOS SHIPPING CORPORATION, etc.**

### ITEMIZED (*)
### REFERENCE [illegible] (Par. I of Law 4194/2013) €204.00

| | | | |
|---|---|---|---|
| Athens Bar Association | €8.00 | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | €40.80 | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | €30.60 | | |
| **TOTAL WITHHOLDINGS** | €49.20 | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €83.80 | | |

*VAT 24% = €48.96 is calculated on the amount of €204.00. (Total amount of reference and VAT:€252.96)

[qr code]

By order of   Athens Bar Association

TX-31

[logo]

No: P5371062
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 53.20 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

**LAW FIRM K.F. KALAVROS - Ch. P. FILIOS - Th.** KLOUKINAS, with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FIFTY-THREE EUROS AND TWENTY CENTS** for the lawyer **MARIA HAHAMI, daughter of PANAGIOTIS** with Reg. No. **030482** and Tax Reg. No. **131220580** concerning an APPLICATION, APPEARANCE before the PIRAEUS SINGLE-MEMBER FIRST INSTANCE COURT – VOLUNTARY JURISDICTION in the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

### ITEMIZED (*)
### REFERENCE [illegible] (Par. I of Law 4194/2013) €204.00

| | | | |
|---|---|---|---|
| Athens Bar Association | €8.00 | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | €40.80 | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | €30.60 | | |
| **TOTAL WITHHOLDINGS** | €49.20 | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €83.80 | | |

*VAT 24% = €48.96 is calculated on the amount of €204.00. (Total amount of reference and VAT:€252.96)

[QR code]

By order of   Athens Bar Association

---

[logo]

No: P5371031
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 53.20 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

**LAW FIRM K.F. KALAVROS - Ch. P. FILIOS - Th.** KLOUKINAS with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FIFTY-THREE EUROS AND TWENTY CENTS** for the attorney at law **KLOUKINAS THEMOSTOKLIS, son of THEODOROS** with Reg. No. **012348** and Tax Reg. No. **040315330** concerning an APPLICATION, APPEARANCE BEFORE THE PIRAUS SINGLE MEMBERS FIRST INSTANCE COURT for the case of her principal **ELAFONISSOS SHIPPING CORPORATION, etc.**

### ITEMIZED (*)
### REFERENCE [illegible] (Par. I of Law 4194/2013) €204.00

| | | | |
|---|---|---|---|
| Athens Bar Association | €8.00 | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | €40.80 | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | €30.60 | | |
| **TOTAL WITHHOLDINGS** | €49.20 | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €83.80 | | |

*VAT 24% = €48.96 is calculated on the amount of €204.00. (Total amount of reference and VAT:€252.96)

[qr code]

By order of   Athens Bar Association

TX-31

[logo]

No: P5371076
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

### FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 48.60 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09‑27–2013)

LAW FIRM **K. F. KALAVROS - Ch. P. FILIOS - Th. KLOUKINAS** with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FORTY‑EIGHT EUROS AND SIXTY‑CENTS** for the attorney at law **THEMOSTOKLIS KLOUKINAS, son of THEODOROS** with Reg. No. **012348** and Tax Reg. No. **040315330**, which concerns the APPLICATION TEMPORARY ORDER - APPEARANCE before the PIRAEUS SINGLE‑MEMBER FIRST INSTANCE COURT - INJUNCTION MEASURES (of ANY TYPE) for the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

**ITEMIZED (*)**
**REFERENCE [illegible] (Par. I of Law 4194/2013) €186.00**

| | | | |
|---|---|---|---|
| Athens Bar Association | 7,00 € | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | 37,20 € | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | 27,90 € | | |
| **TOTAL WITHHOLDINGS** | 44,60 € | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €76.50 | | |

*VAT 24% = €44.64 is calculated on the amount of €186.00. (Total amount of reference and VAT:€230.64)

[QR code]

By order of   Athens Bar Association

---

[logo]

No: P5371065
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

### FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 48.60 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09‑27‑2013)

**LAW FIRM K. F. KALAPROS - Ch. P. FILIOS - TH. KLOUKINAS** with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FORTY‑EIGHT EUROS AND SIXTY CENTS** for the attorney at law **MARIA HAHAMI, daughter of PANAGIOTIS** with Reg. No. **030482** and Tax Reg. No. **131220580**, which concerns the APPLICATION TEMPORARY ORDER - APPEARANCE before the PIRAEUS SINGLE‑MEMBER FIRST INSTANCE COURT for INJUNCTION MEASURES (of ANY TYPE) for the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

**ITEMIZED (*)**
**REFERENCE [illegible] (Par. I of Law 4194/2013) €186.00**

| | | | |
|---|---|---|---|
| Athens Bar Association | 7,00 € | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | 37,20 € | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | 27,90 € | | |
| **TOTAL WITHHOLDINGS** | 44,60 € | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €76.50 | | |

*VAT 24% = €44.64 is calculated on the amount of €186.00. (Total amount of reference and VAT:€230.64)

[qr code]

By order of   Athens Bar Association

TX-31

[logo]

No: P5371076
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 53.20 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

LAW FIRM **K. F. KALAVROS - Ch. P. FILIOS - Th. KLOUKINAS** with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FORTY-EIGHT EUROS AND SIXTY-CENTS** for the attorney at law **THEMOSTOKLIS KLOUKINAS, son of THEODOROS** with Reg. No. **012348** and Tax Reg. No. **040315330**, which concerns the APPLICATION TEMPORARY ORDER - APPEARANCE before the PIRAEUS SINGLE-MEMBER FIRST INSTANCE COURT - INJUNCTION MEASURES (of ANY TYPE) for the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

**ITEMIZED (*)**
**REFERENCE [illegible] (Par. I of Law 4194/2013) €186.00**

| | | | |
|---|---|---|---|
| Athens Bar Association | 7,00 € | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | 37,20 € | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | 27,90 € | | |
| **TOTAL WITHHOLDINGS** | 44,60 € | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €76.50 | | |

*VAT 24% = €44.64 is calculated on the amount of €186.00. (Total amount of reference and VAT:€230.64)

[qr code]

By order of   Athens Bar
Association

[logo]

No: P5371065
Date: 11/08/2024

## ATHENS BAR ASSOCIATION

## FEES AND STAMPS ADVANCE PAYMENT RECEIPT, 48.60 EURO
### Annex I & III, Law 4194/2013 (Government Gazette A 208 / 09-27-2013)

**LAW FIRM K. F. KALAPROS - Ch. P. FILIOS - TH. KLOUKINAS** with Reg. No. **080011** and Tax Reg. No. **099634359** paid the amount of **FORTY-EIGHT EUROS AND SIXTY CENTS** for the attorney at law **MARIA HAHAMI, daughter of PANAGIOTIS** with Reg. No. **030482** and Tax Reg. No. **131220580**, which concerns the APPLICATION, TEMPORARY ORDER - APPEARANCE before the PIRAEUS SINGLE-MEMBER FIRST INSTANCE COURT for INJUNCTION MEASURES (of ANY TYPE) for the case of her principal **ELAFONISSOS SHIPPING CORPORATION etc.**

**ITEMIZED (*)**
**REFERENCE [illegible] (Par. I of Law 4194/2013) €186.00**

| | | | |
|---|---|---|---|
| Athens Bar Association | 7,00 € | TAXDIK FILING STAMP | €4.00 |
| E.F.K.A. | 37,20 € | TAXDIK STAMP FOR COPIES | €0.00 |
| Withholding per Article 29 of Law 4596/2019 | €0.40 | | |
| TAX | 27,90 € | | |
| **TOTAL WITHHOLDINGS** | 44,60 € | **TOTAL FOR STAMPS** | €4.00 |
| REPAYMENT | €76.50 | | |

*VAT 24% = €44.64 is calculated on the amount of €186.00. (Total amount of reference and VAT:€230.64)

[QR code]

By order of   Athens Bar
Association

[logo]  **General Secretariat for
Information Systems &
Digital Governance**

# e-FeeReceipt

[logo]  **HELLENIC REPUBLIC**
Ministry of Digital Governance

[qr code] [barcode]

## For use by the Public Service

| Fee Receipt Code | 734608631955 0512 0016 | | |
|---|---|---|---|
| Service | Justice | | |
| Fee Receipt Category | TA.X.DI.K. Stamp Duty ("Megarosimo") | | |
| Place of Fee | [ 2389 ] TA.X.DI.K. Stamp Duty ("Megarosimo") 6 euros | | |
| Amount (€) | EUR 6.00 | | |
| T.R.N. | 131220580 | Mother's last name | |
| Last name/Company name | HAHAMI | Date of Birth | |
| Name/Address | MARIA | Additional details | CERTIFICATION OF COPIES |
| Father's Name | PANAGIOTIS | | |
| | | email | |

## For Official Use

| Administrative Fee Code | 734608631955 0512 0016 | | |
|---|---|---|---|
| Public Authority | Justice | | |
| Administrative Fee Category | Ta.X.DI.K. Stamp Duty ("Megarosimo") | | |
| Administrative Fee Type | [ 2389 ] TA.X.DI.K. Stamp Duty ("Megarosimo") 6 euros | | |
| Amount (€) | Euro 6.00 | | |
| Tax Reg. Number | 131220580 | Mother's Name | |
| Last Name/Company | HAHAMI | Date of Birth | |
| First Name/Address | MARIA | Additional Info | CERTIFICATION OF COPIES |
| Father's Name | PANAGIOTIS | | |
| | | email | |

TX-31

**[logo]** **General Secretariat for Information Systems & Digital Governance** **e-FeeReceipt** [logo] **HELLENIC REPUBLIC** Ministry of Digital Governance

## For use by the Citizen

| Fee Receipt Code | 734608631955 0512 0016 | | |
|---|---|---|---|
| Service | Justice | | |
| Fee Receipt Category | TA.X.DI.K. Stamp Duty ("Megarosimo") | | |
| Place of Fee | [ 2389 ] TA.X.DI.K. Stamp Duty ("Megarosimo") 6 euros | | |
| Amount (€) | EUR 6.00 | | |
| T.R.N. | 131220580 | Mother's last name | |
| Last name/Company name | HAHAMI | Date of Birth | |
| Name/Address | MARIA | Additional details | CERTIFICATION OF COPIES |
| Father's Name | PANAGIOTIS | | |
| Bank | | email | |
| IBAN account (In case of refund) | | | |

## For Citizens Use

| Administrative Fee Code | 734608631955 0512 0016 | | |
|---|---|---|---|
| Public Authority | Justice | | |
| Administrative Fee Category | TA.X.DI.K. Stamp Duty ("Megarosimo") | | |
| Administrative Fee Type | [ 2389 ] TA.X.DI.K. Stamp Duty ("Megarosimo") 6 euros | | |
| Amount (€) | Euro 6.00 | | |
| Tax Reg. Number | 131220580 | Mother's Name | |
| Last Name/Company | HAHAMI | Date of Birth | |
| First Name/Address | MARIA | Additional Info | CERTIFICATION OF COPIES |
| Father's Name | PANAGIOTIS | | |
| Bank Name | | email | |
| Bank Account - IBAN (In case of refund) | | | |

| e-FeeReceipt | | | | *copy for the Bank* |
|---|---|---|---|---|
| Payment Code | RF34 9051 0200 9500 7346 0863 1 | | Amount | €6.00 |
| Service | Justice | | | |
| Fee Receipt Category | TA.X.DI.K. Stamp Duty ("Megarosimo") | | | |
| Fee Receipt Type | [ 2389 ] TA.X.DI.K. Stamp Duty ("Megarosimo") 6 euros | | | |

[qr code]        [barcode]

TX-31

# [logo:] Piraeus

[logo:] fee

Payment of e-Receipt

---

✓ **Your transaction has been successfully executed with the following details:**

---

Transaction Code **PX243164438553**

Bank Account: GR83 0172 1040 0051 0408 4899 966

Name - Company Name: MARIA HAHAMI

Payment Code: RF34905102009500734608631

Amount: EUR 6.00

**Execution details**

Execution On 11/11/2024

Date of Update: **11/11/2024 12:17:32**

Should you wish to contact us, please call us on +30 210 3288000.

TX-31

TX-31

[logo]

**HELLENIC REPUBLIC**

PIRAEUS FIRST INSTANCE COURT

## LEGAL DOCUMENT FILING REPORT

Type of Legal Document: APPLICATION WITH TEMPORARY ORDER

General Filing Number: 16655/2024

Special Filing Number: 7823/2024

Exception Request Number: 0

Before the PIRAEUS FIRST INSTANCE COURT today, 11-11-2024 Monday at 13:20 a.m., the attorney at law KLOUKINAS THEMOSTOKLIS with Reg. No.: 012348 of the Bar Association of ATHENS with Tax Reg. No. 040315330, MARIA HAHAMI with Reg. No.: 030482 of the Bar Association of ATHENS with Tax Reg.. No. 131220580, and filed the above legal document.

For this act, this report was drafted and lawfully signed.        L

Filed by                                                                              The Secretary
                                                                                              [signature]

KLOUKINAS THEMISTOKLIS                                          GIZA OURANIA

## HEARING SCHEDULING ACT

Proceedings: VOLUNTARY, of the SINGLE MEMBER COURT

Docket: VOLUNTARY, SINGLE-MEMBER ADMIRALTY COURT

with Docket Number: 1

We hereby schedule the discussion on 02/04/2025, Tuesday at 09:00 at the COURT OF FIRST INSTANCE of PIRAEUS at 3-5 Skouze, Second Floor, Room 218

with the condition that this legal document will be notified FIFTEEN (15) days before the hearing to the MEMBERS OF THE LAST LEGALLY PUBLISHED BoD OF ELETSON HOLDINGS INC.

Service will be performed at the responsibility of the applicant.

PIRAEUS, 11/11/2024
The Judge
[signature]

KOFINA EFTHYMIA

**TRUE COPY**
PIRAEUS, 11/11/2024
The Secretary
[signature]
GIZA OURANIA

TX-31

TX-31

**TEMPORARY ORDER**

The Judge of this court DELAZANOS ELIAS, appointed by the Presiding Judge of the Three-Member Council.

**SCHEDULES**

A date for the hearing of the application for the provision of a Temporary Order on 11/12/2024, Tuesday at 11.15, at the office of the President of the Service (5th floor, office 515).

Notification UNTIL 11/12/2024 AT TIME 10.00 AM

PIRAEUS, 11/11/2024

The Judge

[signature]

DELAZANOS ELIAS

**TRUE COPY**

PIRAEUS, 11/11/2024

The Secretary

[signature]

GIZA OURANIA

[hw:] [illegible]

*11/12/2024*

[stamp:] [illegible]

Presiding Judge of First Instance

[signature]

[hw:] - *Accepts application to grant a temporary order*

*Appoints temporary management of a shipping company*

*KELETSON HOLDINGS INC, consisting of the following persons*

*Vasileios Hatzieleftheriadis son of Apostolos, 2) Konstantinos Hatzieleftheriadis, son of Apostolos, 3) Ioannis Zilakos, son of Nikolaos, 4) Emmanuel Androulakis, son of Stylianos, 5) Andrianos Psomadakis-Karastamatis, son of Michael, 6) [illegible] son of Ioannis, 7) Eleni Giannopoulou [illegible], and 8) Niki, spouse of Nikolaos Zilakos, for their appearance and legal representation (appointment of attorney) before the US Courts of New York for its corporate affairs, temporarily until the discussion of the case on the scheduled hearing date and the time of discussion [illegible] on said hearing date.*

[hw:] *Piraeus, 11/12/2024*

*The President of the Service*

[stamp:] Antonia Megouli

Presiding Judge of First

Instance

[signature]

TX-31

TX-31

EXHIBIT "2"

*[handwritten annotations across top of page]*

**Κ. Φ. ΚΑΛΑΒΡΟΣ** ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ

Χ. Π. ΦΙΛΙΟΣ • Θ. Θ. ΚΛΟΥΚΙΝΑΣ

**ΕΝΩΠΙΟΝ ΤΟΥ ΜΟΝΟΜΕΛΟΥΣ ΠΡΩΤΟΔΙΚΕΙΟΥ ΠΕΙΡΑΙΑ**

*(Εκουσία Δικαιοδοσία)*

**Α Ι Τ Η Σ Η**

**Ηλία Δ. Δρυμιώτη,** Προσωρινής Διοίκησης αλλοδαπής Ναυτιλιακής Εταιρείας και
Ορισμού νέων μελών αυτής.

**(άρθρο 69 ΑΚ)**

α) Της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία **«ELAFONISSOS SHIPPING
CORPORATION»**, η οποία εδρεύει κατά την καταστατική της έδρα στη Λιβερία, εν τοις πράγμασι δε
στην Ελλάδα, επί της οδού Κολοκοτρώνη αρ. 118 στον Πειραιά, νομίμως εκπροσωπούμενη από τον
μέτοχο και εκπρόσωπο αυτής, **Ιωάννη ΖΗΛΑΚΟ του Νικολάου**, κάτοικο Π. Ψυχικού Αττικής, οδός
Πάρνηθος αριθ. 13, με Α.Φ.Μ. 065443172,

β) Της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία **«KEROS SHIPPING
CORPORATION»**, η οποία εδρεύει κατά την καταστατική της έδρα στη Λιβερία, εν τοις πράγμασι δε
στην Ελλάδα, επί της οδού Κολοκοτρώνη αρ. 118 στον Πειραιά, νομίμως εκπροσωπούμενη από τον
μέτοχο και εκπρόσωπο αυτής, **Στυλιανό ΑΝΔΡΕΟΥΛΑΚΗ του Εμμανουήλ**, κάτοικο Γλυφάδας
Αττικής, οδός Τυρταίου αριθ. 34, με ΑΦΜ 013241122,

αμφοτέρων με την ιδιότητα των μετόχων της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία
**«ELETSON HOLDINGS INC.»**, η οποία εδρεύει κατά την καταστατική της έδρα στη Λιβερία, εν τοις
πράγμασι δε στην Ελλάδα, επί της οδού Κολοκοτρώνη αρ. 118 στον Πειραιά.

**\*\*\* Ο \*\*\***

Κ. Φ. ΚΑΛΑΒΡΟΣ
ΚΑΘΗΓΗΤΗΣ ΠΑΝΕΠΙΣΤΗΜΙΟΥ

Μ. Κ. ΚΑΛΑΒΡΟΥ, D.E.A.
Χ. Κ. ΚΑΛΑΒΡΟΥ, LL.M.
Θ. Θ. ΚΛΟΥΚΙΝΑΣ
Α. Γ. ΚΑΡΑΛΕΚΑΣ
Λ. Γ. ΤΣΙΛΗΚΑ

Χ. Π. ΦΙΛΙΟΣ
ΚΑΘΗΓΗΤΗΣ ΠΑΝΕΠΙΣΤΗΜΙΟΥ

Ι. Ν. ΒΕΡΓΕΤΗ, LL.M.
Π. Α. ΚΙΟΥΣΗ, LL.M.

Μ. Χ. ΑΣΗΜΙΝΑΚΗ
Ξ. Ν. ΔΙΑΜΑΝΤΗ, Μ.Α.
Ε. Η. ΖΙΑΚΑΣ, Ph.D.
Κ. ΣΠ. ΙΓΓΛΕΖΗΣ
Π. Ν. ΚΑΛΟΔΙΚΗΣ
Α. Δ. ΚΑΦΕΤΖΗ, LL.M.
Α. Α. ΚΕΛΕΣΙΔΟΥ, LL.M.
Ε. Θ. ΚΛΟΥΚΙΝΑ, LL.M.

Ι. Γ. ΝΤΟΛΑΠΤΣΗ, LL.M.
Α. Ν. ΠΑΠΑΣΤΑΘΟΠΟΥΛΟΣ, LL.M
Α. Κ. ΡΟΥΣΑΚΗ, LL.M.
Ν. Α. ΤΣΕΜΠΕΡΑ, LL.M.
Β. Γ. ΤΣΟΥΡΑ, LL.M.
Κ. Γ. ΦΙΛΙΠΠΟΥΠΟΛΙΤΗΣ, LL.M.
Μ. Π. ΧΑΧΑΜΗ

BPANA 19
115 25 ΑΘΗΝΑ
210 3698700
CALAVROS@CALAVROS.GR

ΠΑΥΛΟΥ ΜΕΛΑ 5
546 21 ΘΕΣΣΑΛΟΝΙΚΗ
2310 500770
THESSALONIKI@CALAVROS.GR

ΔΟΝΑΤΟΥ ΔΗΜΟΥΛΙΤΣΑ 65
491 00 ΚΕΡΚΥΡΑ
26610 49736
CORFU@CALAVROS.GR

WWW.CALAVROS.GR

TX-81



Προσέτι, κατά το άρθρο 786 παρ. 1 ΚΠολΔ σε συνδυασμό με το άρθρο 69 και 778 ΑΚ προκύπτει ότι ο διορισμός προσωρινής διοίκησης ή εκκαθαριστών νομικού προσώπου **επιβάλλεται αν υπάρχει έλλειψη διοίκησης του νομικού προσώπου**, η οποία υφίσταται σε περιπτώσεις όπου διαπιστώνεται πραγματική ή νομική αδυναμία των διαχειριστών ή εκκαθαριστών να ασκήσουν τα καθήκοντά τους. Αντίθετα, κατά το άρθρο 786 παρ. 3 ΚΠολΔ, το Μονομελές Πρωτοδικείο της περιφέρειας όπου έχει την έδρα της η εταιρεία προβαίνει σε αντικατάσταση προσωρινής διοίκησης ή προσωρινών εκκαθαριστών, **εφόσον υφίσταται σπουδαίος λόγος**. Την έννοια της διάταξης «σπουδαίο λόγο» για την αντικατάσταση εκκαθαριστή αποτελεί κάθε γεγονός το οποίο καθιστά αδύνατη ή πολύ δυσχερή την πραγματοποίηση του σκοπού της εκκαθάρισης ή εκ του οποίου προκύπτει ότι η διατήρηση του εκκαθαριστή ή των εκκαθαριστών δεν εξασφαλίζει την ομαλή και απρόσκοπτη διεξαγωγή της εκκαθάρισης και δημιουργεί φόβους σοβαρών ζημιών στα συμφέροντα της εταιρίας και των εταίρων ή εκ του οποίου προκύπτει ότι η εξακολούθηση της διαχειριστικής εξουσίας του εκκαθαριστή αποβαίνει μη ανεκτή, κατά την καλή συναλλακτική πίστη και τα χρηστά ήθη εκ μέρους των εταίρων (ΜονΠρΠατρ 428/2021).

Κατά την κυρίαρχη στη νομολογία άποψη, σε περίπτωση πιθανολογούμενου κινδύνου ή επείγουσας περίπτωσης, είναι δυνατός ο προσδιορισμός προσωρινής διοίκησης νομικού προσώπου ή η αντικατάσταση μελών αυτής και κατά τη διαδικασία των ασφαλιστικών μέτρων, υπό τη συνδρομή και των λοιπών προϋποθέσεων λήψης αυτών.

### ΣΤ. Η ΑΙΤΟΥΜΕΝΗ ΔΙΚΑΣΤΙΚΗ ΠΡΟΣΤΑΣΙΑ

**Επειδή** οι αιτούσες, αλλοδαπές ναυτιλιακές εταιρείες, «**ELAFONISSOS SHIPPING CORPORATION**» και «**KEROS SHIPPING CORPORATION**», έχουμε άμεσο έννομο συμφέρον με την ιδιότητα της μετόχου, του 3,9% εκάστη εξ ημών του συνόλου των μετοχών της εταιρίας «**ELETSON HOLDINGS INC.**» να διορισθεί προσωρινό Διοικητικό Συμβούλιο στη ναυτιλιακή εταιρία με την επωνυμία «**ELETSON HOLDINGS INC.**», προκειμένου να **διοικήσει** την Εταιρεία και να **συγκαλέσει έκτακτη Γενική συνέλευση για την εκλογή νέου Διοικητικού Συμβουλίου, (α)** για την αντιμετώπιση τρεχόντων και επειγόντων θεμάτων, όπως πράξεις για τη διαχείριση της περιουσίας της ELETSON HOLDINGS και πάσης φύσεως συναλλαγές με χρηματοπιστωτικά ιδρύματα, ναυλωτές, προμηθευτές, άλλους συναλλασσόμενους και δημόσιους φορείς στην Ελλάδα και το εξωτερικό και **(β)** Για να λάβει απόφαση όπως ασκήσει για λογαριασμό της Εταιρείας «**ELETSON HOLDINGS INC.**» όλα τα προβλεπόμενα από το νόμο (ελληνικό ή αλλοδαπό) ένδικα μέσα και βοηθήματα στο όνομα και για

38

TX-81





λογαριασμό της ως άνω εταιρείας **προκειμένου να διαφυλάξει την περιουσία της και τα συμφέροντά της** *αφενός* από την εκδοθείσα στη Νέα Υόρκη από 29.09.2023 Διαιτητική Απόφαση του Διαιτητικού Δικαστηρίου αποτελούμενο από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN *αφετέρου* να στραφεί κατά της εκδοθείσας στη Νέα Υόρκη από 25.10.2024 Απόφασης Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών, του Πτωχευτικού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO, καθώς της από 04.11.2024 Διάταξης του ίδιου ως άνω Πτωχευτικού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO που επικυρώνει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών και το τροποποιημένο σχέδιο αναδιοργάνωσης των Πιστωτών.

Επειδή **τα τέσσερα (4) από τα οκτώ (8) μέλη του Διοικητικού Συμβουλίου της Εταιρείας και συγκεκριμένα** οι α) Λασκαρίνα Καρασταμάτη, β) Βασίλειος Κέρτσικωφ, γ) Ελένη Καρασταμάτη και δ) Παναγιώτης Κωνσταντάρας δυνάμει των από 08.11.2024 γραπτών δηλώσεών τους *προς την Εταιρεία* **ΠΑΡΑΙΤΗΘΗΚΑΝ** ρητά και εγγράφως από το Δ.Σ. της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία «**ELETSON HOLDINGS INC.**»,

Επειδή **για την ύπαρξη απαρτίας στις συνεδριάσεις του Δ.Σ. της Εταιρείας απαιτείται, σύμφωνα με καταστατική πρόβλεψη** Id. ανωτέρω **άρθρο ΙΙΙ- Τμήμα -(Section) 5 των ΒΥ-LAWS της 26ης Ιουνίου 2007**), **απλή μεν πλειοψηφία**, σε συνδυασμό, ωστόσο με το γεγονός ότι μέχρι προσφάτως η Εταιρεία διοικείτο από **οκταμελές Διοικητικό Συμβούλιο**, το οποίο εξελέγη δυνάμει της από 11.12.2023 απόφασης της Κοινής Συνεδρίασης των Μελών του Διοικητικού Συμβουλίου καθώς και των Μετόχων της ELETSON HOLDINGS, η τελευταία από σήμερα, 08.11.2024, στερείται διοικήσεως, μη μπορώντας να συγκαλέσει γενική Συνέλευση των μετόχων και να λάβει αποφάσεις και να εκπροσωπήσει και δεσμεύσει την Εταιρεία.

Επειδή η αλλοδαπή ναυτιλιακή εταιρία με την επωνυμία «**ELETSON HOLDINGS INC.**» στερείται διοικήσεως και εκπροσωπήσεως και δεν έχει καμία προστασία έναντι των διαδικασιών εκούσιας πτώχευσης που έχουν εκκινήσει και μεθοδεύσει οι Πιστωτές της στη Νέα Υόρκη εις βάρος της περιουσίας της, είναι βέβαιο δε ότι θα απωλέσει το σύνολο αυτής και μάλιστα οριστικά, εάν δεν εναντιωθεί εγκαίρως κατά αυτών.

Επειδή κατόπιν των άνω παραιτήσεων η εταιρία «**ELETSON HOLDINGS INC.**» δεν διαθέτει κανένα όργανο που να ασκεί καθήκοντα, διοίκησης όπως διευθύνοντος ή εντεταλμένου συμβούλου,

διοικητή, διαχειριστή ή εκπροσώπου αυτής και έτσι αδυνατεί να ασκήσει τα νόμιμα δικαιώματά της και να αντιμετωπίσει άμεσα και επείγοντα τρέχοντα ζητήματα της καθημερινής λειτουργίας της.

**Επειδή** οι αιτούσες έχουμε άμεσο έννομο συμφέρον με την ιδιότητα της μετόχου, του 3,92% εκάστη εξ ημών του συνόλου των μετοχών της εταιρίας **«ELETSON HOLDINGS INC.»**, να ζητήσουμε το διορισμό προσωρινής διοίκησης της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία **«ELETSON HOLDINGS INC.»**.

**Επειδή** για όλα τα παραπάνω πρέπει να οριστεί προσωρινή διοίκηση οκταμελούς σύνθεσης  της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία **«ELETSON HOLDINGS INC.»** με ετήσια θητεία, **απαρτιζόμενη από τα παρακάτω μέλη, ήτοι από:**

**Τα εναπομείναντα μέλη του Δ.Σ. της Εταιρείας:**

**1)** Βασίλειο Χατζηελευθεριάδη του Αποστόλου, κάτοικο Βούλας Αττικής, οδός Τήνου αριθ. 8, με ΑΦΜ 052767445

**2)** Κωνσταντίνο Χατζηελευθεριάδη του Αποστόλου, κάτοικο Βούλας Αττικής, οδός Πλαστήρα αριθ. 57, με ΑΦΜ 052767405

**3)** Ιωάννη Ζηλάκο του Νικολάου, κάτοικο Π. Ψυχικού Αττικής, οδός Πάρνηθος αριθ. 13, με ΑΦΜ 065443172,

**4)** Εμμανουήλ Ανδρεουλάκη του Στυλιανού, κάτοικο Πειραιάς Αττικής, οδός Ηρώων Πολυτεχνείου αριθ. 62 με ΑΦΜ 050222446,

**Καθώς και τα ακόλουθα πρόσωπα ως νέα μέλη του Δ.Σ. της Εταιρείας:**

**5)** Αδριανό Ψωμαδάκη – Καρασταμάτη του Μιχαήλ, κάτοικο Πειραιά Αττικής, οδός Καρπάθου αριθ. 98- 100, με ΑΦΜ 164642953,

**6)** Πάνο ΠΑΞΙΝΟ του Ιωάννη, κάτοικο Χαλανδρίου Αττικής, οδός Κεφαλληνίας αριθ. 58, με ΑΦΜ 030723274,

**7)** Ελένη Γιαννακοπούλου του Κωνσταντίνου, κάτοικο Υμηττού Αττικής, οδός Μ. Τσαλίκη αριθ. 43, με ΑΦΜ 052036400 και

**8)** Νίκη συζ. Νικολάου Ζηλάκου, κάτοικο Γλυφάδας Αττικής, οδός Τυρταίου αριθ. 34, με ΑΦΜ 064165981

TX-81

 

να **διοικήσουν** την Εταιρία: **(α)** για την αντιμετώπιση τρεχόντων και επειγόντων θεμάτων, όπως πράξεις για τη διαχείριση της περιουσίας της ELETSON HOLDINGS και πάσης φύσεως συναλλαγές με χρηματοπιστωτικά ιδρύματα, ναυλωτές, προμηθευτές, άλλους συναλλασσόμενους και δημόσιους φορείς στην Ελλάδα και το εξωτερικό και **(β)** για την διοίκηση των τεσσάρων Ειδικών Ναυτικών Επιχειρήσεων που ελέγχουν τα δεξαμενόπλοια MT Kastos, MT Kinaros, MT Kimolos και MT Fourni και των λοιπών θυγατρικών εταιρειών της, οι οποίες λόγω του ναυτιλιακού χαρακτήρα τους έχουν διαρκείς και επείγουσες ανάγκες λήψεως αποφάσεων και ενεργειών, **(γ)** για την εκπροσώπηση των ναυτιλιακών θυγατρικών τους και τη διατήρηση ομαλής και διαρκούς επικοινωνίας με τους χρηματοδότες των ανωτέρω πλοίων, τα οποία χρηματοδοτούνται μέσω συμφωνιών δανειοδότησης με ανάστροφη χρηματοδοτική μίσθωση (sale and lease back agreements), και **(δ)** Για να λάβει απόφαση όπως διορίσει πληρεξουσίους δικηγόρους και ασκήσει για λογαριασμό της Εταιρείας «ELETSON HOLDINGS INC.» όλα τα προβλεπόμενα από το νόμο (ελληνικό ή αλλοδαπό) ένδικα μέσα και βοηθήματα στο όνομα και για λογαριασμό της ως άνω εταιρείας **προκειμένου να διαφυλάξει την περιουσία της και τα συμφέροντά της** *αφενός* από την εκδοθείσα στη Νέα Υόρκη από 29.09.2023 Διαιτητική Απόφαση του Διαιτητικού Δικαστηρίου αποτελούμενο από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN *αφετέρου* να στραφεί κατά της εκδοθείσας στη Νέα Υόρκη από 25.10.2024 Απόφασης Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών, του Πτωχευτικού Δικαστηρίου των ΗΠΑ – Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO, καθώς της από 04.11.2024 Διάταξης του ίδιου ως άνω Πτωχευτικού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO που επικυρώνει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών και το τροποποιημένο σχέδιο αναδιοργάνωσης των Πιστωτών **και να συγκαλέσουν έκτακτη Γενική συνέλευση για την εκλογή νέου Διοικητικού Συμβουλίου**

**Επειδή** τα ανωτέρω πρόσωπα είναι τα πλέον κατάλληλα για την προσωρινή διοίκηση της Εταιρείας, καθόσον οι τέσσερεις πρώτοι εξ αυτών τυγχάνουν τα εναπομείναντα τέσσερα (4) μέλη του Δ.Σ. της Εταιρείας, μετά την παραίτηση των λοιπών τεσσάρων, ως προελέχθη ανωτέρω, και επί σειράς ετών μέλος ΔΣαυτής ενώ οι υπόλοιποι τέσσερεις (νέα μέλη) τυγχάνουν έμποροι και με δικές τους εταιρείες, έχουν μεγάλη εμπειρία στα εταιρικά θέματα ναυτιλιακών εταιρειών.

**Επειδή** επίκειται άμεσος κίνδυνος η Εταιρεία να απωλέσει **οριστικά** την διαχείριση της περιουσίας της, καθώς ως προελέχθη, έχουν εκκινήσει διαδικασίες εκούσιας πτώχευσης εναντίον της οι Πιστωτές της στη Νέα Υόρκη εις βάρος της περιουσίας της, στις οποίες έχει ήδη εναντιωθεί δια της καταθέσεως

41

TX-81

της προβλεπόμενης εφέσεως στις 7.11.2024, καθώς η σχετική προθεσμία εξέπνεε στις 8.11.2024, κατά τη συζήτηση της οποίας θα πρέπει να παραστεί και να εκπροσωπηθεί για να υποστηρίξει τα διαλαμβανόμενα σ` αυτήν, καθώς επίσης θα πρέπει να εκπροσωπηθεί κατά την ακρόαση (Status Conference) της **12.11.2024** ενώπιον του Περιφερειακού Δικαστηρίου των ΗΠΑ – Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή Lewis J. LIMAN, προκειμένου να αντικρούσει τις ενστάσεις, ισχυρισμούς και κωλύματα που φέρει η καθ'ης η Προσφυγή Levona στην διαδικασία επικύρωσης της εκδοθείσας στη Νέα Υόρκη από 29.09.2023 Διαιτητικής Απόφασης του Διαιτητικού Δικαστηρίου αποτελούμενου από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN και εντεύθεν όπως αιτηθεί την κήρυξη της εκτελεστότητας αυτής προκειμένου να στραφεί κατά της Levona.

**Επειδή** συντρέχει επείγουσα περίπτωση και επικείμενος κίνδυνος που δικαιολογούν τα διορισμό προσωρινής διοίκησης της Εταιρείας με τη λήψη ασφαλιστικών μέτρων.

**Επειδή** το Δικαστήριο Σας είναι καθ' ύλην και κατά τόπο αρμόδιο.

**Επειδή** υπάρχει **κατεπείγουσα ανάγκη**, που αφορά την επέλευση άμεσης περιουσιακής βλάβης της Εταιρείας και της οριστικής απώλειας της διαχείρισης αυτής κατά τ' ανωτέρω διαλαμβανόμενα, η οποία άλλως μετά βεβαιότητας θα συμβεί, ζητούμε την **έκδοση προσωρινής διαταγής** μέχρι την συζήτηση της παρούσας αίτησης, και υπό τον όρο συζήτησης αυτής της παρούσας ενώπιον του Δικαστηρίου σας κατά την ορισθείσα δικάσιμο, δια της οποίας **να ορίζονται** ως μέλη της προσωρινής διοίκησης της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία **«ELETSON HOLDINGS INC.»** οι:

**1)**    Βασίλειος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Τήνου αριθ. 8, με ΑΦΜ 052767445

**2)**    Κωνσταντίνος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Πλαστήρα αριθ. 57, με ΑΦΜ 052767405

**3)**    Ιωάννης Ζηλάκος του Νικολάου, κάτοικος Π. Ψυχικού Αττικής, οδός Πάρνηθος αριθ. 13, με ΑΦΜ 065443172,

**4)**    Εμμανουήλ Ανδρεουλάκης του Στυλιανού, κάτοικος Πειραιάς Αττικής, οδός Ηρώων Πολυτεχνείου αριθ. 62 με ΑΦΜ 050222446,

**5)**    Αδριανός Ψωμαδάκης – Καρασταμάτης του Μιχαήλ, κάτοικος Πειραιά Αττικής, οδός Καρπάθου αριθ. 98- 100, με ΑΦΜ 164642953,

**6)**    Πάνος ΠΑΞΙΝΟΣ του Ιωάννη, κάτοικος Χαλανδρίου Αττικής, οδός Κεφαλληνίας αριθ. 58, με ΑΦΜ 030723274,

**7)**    Ελένη Γιαννακοπούλου του Κωνσταντίνου, κάτοικος Υμηττού Αττικής, οδός Μ. Τσαλίκη

TX-81





αριθ. 43, με ΑΦΜ 052036400 και

8)    Νίκη συζ. Νικολάου Ζηλάκου, κάτοικος Γλυφάδας Αττικής, οδός Τυρταίου αριθ. 34, με ΑΦΜ 064165981,

με την εξουσία να διοικήσουν την Εταιρία: (α) για την αντιμετώπιση τρεχόντων και επειγόντων θεμάτων, όπως πράξεις για τη διαχείριση της περιουσίας της ELETSON HOLDINGS και πάσης φύσεως συναλλαγές με χρηματοπιστωτικά ιδρύματα, ναυλωτές, προμηθευτές, άλλους συναλλασσόμενους και δημόσιους φορείς στην Ελλάδα και το εξωτερικό (β) για την διοίκηση των τεσσάρων Ειδικών Ναυτικών Επιχειρήσεων που ελέγχουν τα δεξαμενόπλοια MT Kastos, MT Kinaros, MT Kimolos και MT Fourni και των λοιπών θυγατρικών εταιρειών της, οι οποίες λόγω του ναυτιλιακού χαρακτήρα τους έχουν διαρκείς και επείγουσες ανάγκες λήψεως αποφάσεων και ενεργειών, (γ) για την εκπροσώπηση των ναυτιλιακών θυγατρικών τους και τη διατήρηση ομαλής και διαρκούς επικοινωνίας με τους χρηματοδότες των ανωτέρω πλοίων, τα οποία χρηματοδοτούνται μέσω συμφωνιών δανειοδότησης με ανάστροφη χρηματοδοτική μίσθωση (sale and lease back agreements), και (δ) για να λάβει απόφαση όπως ασκήσει για λογαριασμό της Εταιρείας «ELETSON HOLDINGS INC.» όλα τα προβλεπόμενα από το νόμο (ελληνικό ή αλλοδαπό) ένδικα μέσα και βοηθήματα στο όνομα και για λογαριασμό της ως άνω εταιρείας προκειμένου να διαφυλάξει την περιουσία της και τα συμφέροντά της και ιδίως η Εταιρεία:

- Να παραστεί και εκπροσωπηθεί κατά την ακρόαση (Status Conference) της 12.11.2024 ενώπιον του Περιφερειακού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή Lewis J. LIMAN, προκειμένου να αντικρούσει τις ενστάσεις, ισχυρισμούς και κωλύματα που φέρει η καθ'ης η Προσφυγή Levona στην διαδικασία επικύρωσης της εκδοθείσας στη Νέα Υόρκη από 29.09.2023 Διαιτητικής Απόφασης του Διαιτητικού Δικαστηρίου αποτελούμενου από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN και εντεύθεν όπως αιτηθεί την κήρυξη της εκτελεστότητας αυτής προκειμένου να στραφεί κατά της Levona.

- Να εκπροσωπηθεί η ίδια και η θυγατρική αυτής, ELETSON CORPORATION και να αιτηθεί την αναγνώριση της εκδοθείσας στη Νέα Υόρκη από 29.09.2023 Διαιτητικής Απόφασης του Διαιτητικού Δικαστηρίου αποτελούμενου από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN και τη συμμόρφωση της καθ' ης αυτής, «Levona», προς όλες τις διατάξεις του Διατακτικού της, καθώς και την κήρυξη της εκτελεστότητας αυτής σύμφωνα με τις διατάξεις της Σύμβασης

TX-81





της Νέα Υόρκης, στο έδαφος άλλου κράτους από αυτό που εκδόθηκε, μεταξύ άλλων και στην Ελλάδα, όπου η Levona διατηρεί περιουσία.

- Να λάβει δικαστική προστασία και δη, *αφενός μεν να υποστηρίξει την ήδη ασκηθείσα έφεση* κατά της ανωτέρω Πτωχευτικής Απόφασης του Πτωχευτικού Δικαστηρίου των ΗΠΑ - *Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO* που επικυρώνει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών συμφερόντων της, καθώς και το τροποποιημένο σχέδιο αναδιοργάνωσης των Πιστωτών <u>ενώπιον του Πτωχευτικού Δικαστηρίου της Νέας Υόρκης</u> καθώς η σχετική προθεσμία για την άσκηση αυτής (της εφέσεως) εξέπνεε, κατά τα αμέσως ανωτέρω διαλαμβανόμενα, στις 8.11.2024, *αφετέρου να* στραφεί, με τα αντίστοιχα εκ του νόμου προβλεπόμενα ένδικα βοηθήματα και μέσα, <u>ενώπιον των Ελληνικών Δικαστηρίων</u>, προκειμένου να προσβάλει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) στην οποία ετέθη από το Πτωχευτικό Δικαστήριο των Η.Π.Α. για λόγους έλλειψης διεθνούς δικαιοδοσίας του τελευταίου σύμφωνα με τις διατάξεις του Κανονισμού 2015/848 του Ευρωπαϊκού Κοινοβουλίου και Συμβουλίου.

- Επιπλέον, στην περίπτωση που οι Πιστωτές αιτηθούν όπως αναγνωριστεί και εκτελεστεί η ανωτέρω απόφαση εκούσιας πτώχευσης στην Ελλάδα, όπου εν τοις πράγμασι εδρεύει η ELETSON HOLDINGS, η τελευταία να παρασταθεί και εκπροσωπηθεί ενώπιον των αρμόδιων Ελληνικών Δικαστηρίων προκειμένου να προβάλει κατ' ένσταση, άλλως και ως κώλυμα αναγνώρισης της ανωτέρω Πτωχευτικής Απόφασης στην Ελλάδα, ένεκα της ελλείψεως της διεθνούς δικαιοδοσίας του εκδώσαντος την Πτωχευτική απόφαση, αλλοδαπού Πτωχευτικό Δικαστήριο των Η.Π.Α. και των λοιπών προς όφελός της ισχυρισμών.

- Να διορίζει πληρεξούσιους δικηγόρους στην Ελλάδα ή στο εξωτερικό, προκειμένου να εκπροσωπηθεί ενώπιον ημεδαπών ή αλλοδαπών Δικαστηρίων, Διαιτητών, Ανακριτών και οποιαδήποτε άλλη Αρχή απαιτηθεί, για την προάσπιση των συμφερόντων της, καταθέτοντας ένδικα βοηθήματα, μέσα, ενστάσεις, κλπ.

- Να συγκαλέσει έκτακτη Γενική συνέλευση για την εκλογή νέου Διοικητικού Συμβουλίου.


Επειδή η παρούσα αίτηση τυγχάνει νόμιμη, βάσιμη και αληθής, πρέπει να γίνει δεκτή από το Δικαστήριό Σας.

44



**Επειδή** έχει καταβληθεί η νόμιμη αμοιβή των πληρεξουσίων δικηγόρων μου για την κατάθεση της παρούσας ως εμφαίνεται στα υπ' αριθ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . γραμμάτια προείσπραξης ΔΣΑ.

### ΓΙΑ ΤΟΥΣ ΛΟΓΟΥΣ ΑΥΤΟΥΣ

Με την επιφύλαξη παντός νομίμου δικαιώματός μας

### ΑΙΤΟΥΜΑΣΤΕ

-Να γίνει **δεκτή** η παρούσα αίτηση.

-Να **ρυθμιστεί προσωρινά η κατάσταση** και συγκεκριμένα:

-Να **οριστεί προσωρινό Διοικητικό Συμβούλιο οκταμελούς σύνθεσης με ετήσια θητεία προκειμένου να διοικήσει την** αλλοδαπή ναυτιλιακή εταιρία με την επωνυμία «**ELETSON HOLDINGS INC.**», η οποία εδρεύει κατά την καταστατική της έδρα στη Λιβερία, εν τοις πράγμασι δε στην Ελλάδα, επί της οδού Κολοκοτρώνη αρ. 118 στον Πειραιά, όπου και διατηρεί νόμιμα εγκατεστημένο γραφείο κατά τις διατάξεις του άρθρου 25 του Ν. 27/1975, και να οριστούν μέλη της ως άνω προσωρινής διοίκησης τα εξής μέλη:

**Τα εναπομείναντα μέλη του Δ.Σ. της Εταιρείας:**

**1)** Βασίλειος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Τήνου αριθ. 8, με ΑΦΜ 052767445

**2)** Κωνσταντίνος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Πλαστήρα αριθ. 57, με ΑΦΜ 052767405

**3)** Ιωάννης Ζηλάκος του Νικολάου, κάτοικος Π. Ψυχικού Αττικής, οδός Πάρνηθος αριθ. 13, με ΑΦΜ 065443172,

**4)** Εμμανουήλ Ανδρεουλάκη του Στυλιανού, κάτοικος Πειραιάς Αττικής, οδός Ηρώων Πολυτεχνείου αριθ. 62 με ΑΦΜ 050222446,

**Καθώς και τα ακόλουθα πρόσωπα ως νέα μέλη του Δ.Σ. της Εταιρείας:**

**5)** Αδριανός Ψωμαδάκης – Καραστ αμάτης του Μιχαήλ, κάτοικος Πειραιά Αττικής, οδός Καρπάθου αριθ. 98- 100, με ΑΦΜ 164642953,

**6)** Πάνος ΠΑΞΙΝΟΣ του Ιωάννη, κάτοικος Χαλανδρίου Αττικής, οδός Κεφαλληνίας αριθ. 58, με ΑΦΜ 030723274,

45

TX-81



**7)**   Ελένη Γιαννακοπούλου του Κωνσταντίνου, κάτοικος Υμηττού Αττικής, οδός Μ. Τσαλίκη αριθ. 43, με ΑΦΜ 052036400 και

**8)**   Νίκη συζ. Νικολάου Ζηλάκου, κάτοικος Γλυφάδας Αττικής, οδός Τυρταίου αριθ. 34, με ΑΦΜ 064165981,

οι οποίοι θα έχουν την εξουσία και αρμοδιότητα: **(α)** να **διοικήσουν** την Εταιρεία για την αντιμετώπιση τρεχόντων και επειγόντων θεμάτων, όπως πράξεις για τη διαχείριση της περιουσίας της ELETSON HOLDINGS και πάσης φύσεως συναλλαγές με χρηματοπιστωτικά ιδρύματα, ναυλωτές, προμηθευτές, άλλους συναλλασσόμενους και δημόσιους φορείς στην Ελλάδα και το εξωτερικό, **(β)** για την διοίκηση των τεσσάρων Ειδικών Ναυτικών Επιχειρήσεων που ελέγχουν τα δεξαμενόπλοια MT Kastos, MT Kinaros, MT Kimolos και MT Fourni και των λοιπών θυγατρικών εταιρειών της, οι οποίες λόγω του ναυτιλιακού χαρακτήρα τους έχουν διαρκείς και επείγουσες ανάγκες λήψεως αποφάσεων και ενεργειών, **(γ)** για την εκπροσώπηση των ναυτιλιακών θυγατρικών τους και τη διατήρηση ομαλής και διαρκούς επικοινωνίας με τους χρηματοδότες των ανωτέρω πλοίων, τα οποία χρηματοδοτούνται μέσω συμφωνιών δανειοδότησης με ανάστροφη χρηματοδοτική μίσθωση (sale and lease back agreements), και **(δ)** να λάβουν απόφαση όπως ασκήσουν για λογαριασμό της Εταιρείας «ELETSON HOLDINGS INC.» όλα τα προβλεπόμενα από το νόμο (ελληνικό ή αλλοδαπό) ένδικα μέσα και βοηθήματα στο όνομα και για λογαριασμό της ως άνω εταιρείας **προκειμένου να διαφυλάξει την περιουσία της και τα συμφέροντά της** *αφενός* από την εκδοθείσα στη Νέα Υόρκη από 29.09.2023 Διαιτητική Απόφαση του Διαιτητικού Δικαστηρίου αποτελούμενο από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN *αφετέρου* να στραφεί κατά της εκδοθείσας στη Νέα Υόρκη από 25.10.2024 Απόφασης Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών, του Πτωχευτικού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO, καθώς της από 04.11.2024 Διάταξης του ίδιους ως άνω Πτωχευτικού Δικαστηρίου των ΗΠΑ – Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO που επικυρώνει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών και το τροποποιημένο σχέδιο αναδιοργάνωσης των Πιστωτών και **(γ)** και να **συγκαλέσουν έκτακτη Γενική συνέλευση για την εκλογή νέου Διοικητικού Συμβουλίου.**

Να εκδοθεί **προσωρινή διαταγή**, με την οποία να **ορίζονται προσωρινά** μέχρι την συζήτηση της παρούσας αίτησης, και υπό τον όρο συζήτησης της παρούσας ενώπιον του Δικαστηρίου Σας κατά την

46



ορισθείσα δικάσιμο, ως μέλη της προσωρινής διοίκησης της αλλοδαπής ναυτιλιακής εταιρίας με την επωνυμία «**ELETSON HOLDINGS INC.**», οι:

**1)**    Βασίλειος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Τήνου αριθ. 8, με ΑΦΜ 052767445

**2)**    Κωνσταντίνος Χατζηελευθεριάδης του Αποστόλου, κάτοικος Βούλας Αττικής, οδός Πλαστήρα αριθ. 57, με ΑΦΜ 052767405

**3)**    Ιωάννης Ζηλάκος του Νικολάου, κάτοικος Π. Ψυχικού Αττικής, οδός Πάρνηθος αριθ. 13, με ΑΦΜ 065443172,

**4)**    Εμμανουήλ Ανδρεουλάκης του Στυλιανού, κάτοικος Πειραιάς Αττικής, οδός Ηρώων Πολυτεχνείου αριθ. 62 με ΑΦΜ 050222446,

**5)**    Αδριανός Ψωμαδάκης – Καραστάμάτης του Μιχαήλ, κάτοικος Πειραιά Αττικής, οδός Καρπάθου αριθ. 98- 100, με ΑΦΜ 164642953,

**6)**    Πάνος ΠΑΞΙΝΟΣ του Ιωάννη, κάτοικος Χαλανδρίου Αττικής, οδός Κεφαλληνίας αριθ. 58, με ΑΦΜ 030723274,

**7)**    Ελένη Γιαννακοπούλου του Κωνσταντίνου, κάτοικος Υμηττού Αττικής, οδός Μ. Τσαλίκη αριθ. 43, με ΑΦΜ 052036400 και

**8)**    Νίκη συζ. Νικολάου Ζηλάκου, κάτοικος Γλυφάδας Αττικής, οδός Τυρταίου αριθ. 34, με ΑΦΜ 064165981,

**με την εξουσία όπως συγκαλέσουν έκτακτη Γενική συνέλευση για την εκλογή νέου Διοικητικού Συμβουλίου και όπως, ως τότε, διοικήσουν την Εταιρία (α) για την αντιμετώπιση τρεχόντων και επειγόντων θεμάτων, όπως πράξεις για τη διαχείριση της περιουσίας της ELETSON HOLDINGS και πάσης φύσεως συναλλαγές με χρηματοπιστωτικά ιδρύματα, ναυλωτές, προμηθευτές, άλλους συναλλασσόμενους και δημόσιους φορείς στην Ελλάδα και το εξωτερικό (β) για την διοίκηση των τεσσάρων Ειδικών Ναυτικών Επιχειρήσεων που ελέγχουν τα δεξαμενόπλοια MT Kastos, MT Kinaros, MT Kimolos και MT Fourni και των λοιπών θυγατρικών εταιρειών της, οι οποίες λόγω του ναυτιλιακού χαρακτήρα τους έχουν διαρκείς και επείγουσες ανάγκες λήψεως αποφάσεων και ενεργειών, (γ) για την εκπροσώπηση των ναυτιλιακών θυγατρικών τους και τη διατήρηση ομαλής και διαρκούς επικοινωνίας με τους χρηματοδότες των ανωτέρω πλοίων, τα οποία χρηματοδοτούνται μέσω συμφωνιών δανειοδότησης με ανάστροφη χρηματοδοτική μίσθωση (sale and lease back agreements), και (δ) για να λάβει απόφαση όπως ασκήσει για λογαριασμό της**

47



Εταιρείας «ELETSON HOLDINGS INC.» όλα τα προβλεπόμενα από το νόμο (ελληνικό ή αλλοδαπό) ένδικα μέσα και βοηθήματα στο όνομα και για λογαριασμό της ως άνω εταιρείας προκειμένου να διαφυλάξει την περιουσία της και τα συμφέροντά της και ιδίως η Εταιρεία:

• Να παρασταθεί και εκπροσωπηθεί κατά την ακρόαση (Status Conference) της <u>12.11.2024</u> ενώπιον του Περιφερειακού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή Lewis J. LIMAN, προκειμένου να αντικρούσει τις ενστάσεις, ισχυρισμούς και κωλύματα που φέρει η καθ'ης η Προσφυγή Levona στην διαδικασία επικύρωσης της εκδοθείσας στη Νέα Υόρκη από 29.09.2023 Διαιτητικής Απόφασης του Διαιτητικού Δικαστηρίου αποτελούμενο από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN και εντεύθεν όπως αιτηθεί την κήρυξη της εκτελεστότητας αυτής προκειμένου να στραφεί κατά της Levona.

• Να εκπροσωπηθεί η ίδια και η θυγατρική αυτής, ELETSON CORPORATION και αιτηθεί την αναγνώριση της εκδοθείσας στη Νέα Υόρκη από 29.09.2023 Διαιτητικής Απόφασης του Διαιτητικού Δικαστηρίου αποτελούμενο από τον ε.τ. Δικαστή-Διαιτητή Ariel E. BELEN και τη συμμόρφωση της καθ' ης αυτής, «Levona», προς όλες τις διατάξεις του Διατακτικού της, καθώς και την κήρυξη της εκτελεστότητας αυτής σύμφωνα με τις διατάξεις της Σύμβασης της Νέα Υόρκης, στο έδαφος άλλου κράτους από αυτό που εκδόθηκε, μεταξύ άλλων και στην Ελλάδα, όπου η Levona διατηρεί περιουσία.

• Να λάβει δικαστική προστασία και δη, *αφενός μεν να υποστηρίξει την ήδη ασκηθείσα έφεση* κατά της ανωτέρω Πτωχευτικής Απόφασης του Πτωχευτικού Δικαστηρίου των ΗΠΑ - Νότιας Περιφέρειας της Νέα Υόρκης αποτελούμενο από τον Δικαστή John P. MASTANDO που επικυρώνει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) της ELETSON HOLDINGS και των λοιπών εταιρειών συμφερόντων της, καθώς και το τροποποιημένο σχέδιο αναδιοργάνωσης των Πιστωτών <u>ενώπιον του Πτωχευτικού Δικαστηρίου της Νέας Υόρκης</u> καθώς η σχετική προθεσμία για την άσκηση αυτής (της εφέσεως) εξέπνεε, κατά τα αμέσως ανωτέρω διαλαμβανόμενα, στις 8.11.2024, *αφετέρου να* στραφεί, με τα αντίστοιχα εκ του νόμου προβλεπόμενα ένδικα βοηθήματα και μέσα, <u>ενώπιον των Ελληνικών Δικαστηρίων</u>, προκειμένου να προσβάλει την από 25.10.2024 Απόφαση Εκούσιας Πτώχευσης (Chapter 11) στην οποία ετέθη από το Πτωχευτικό Δικαστήριο των Η.Π.Α. για λόγους έλλειψης διεθνούς δικαιοδοσίας του τελευταίου σύμφωνα με τις διατάξεις του Κανονισμού 2015/848 του Ευρωπαϊκού Κοινοβουλίου και Συμβουλίου.

48



- **Επιπλέον, στην περίπτωση που οι Πιστωτές αιτηθούν όπως αναγνωριστεί και εκτελεστεί η ανωτέρω απόφαση εκούσιας πτώχευσης στην Ελλάδα, όπου εν τοις πράγμασι εδρεύει η ELETSON HOLDINGS, η τελευταία να παρασταθεί και εκπροσωπηθεί ενώπιον των αρμοδίων Ελληνικών Δικαστηρίων προκειμένου να προβάλει κατ' ένσταση, άλλως και ως κώλυμα αναγνώρισης της ανωτέρω Πτωχευτικής Απόφασης στην Ελλάδα, ένεκα της ελλείψεως της διεθνούς δικαιοδοσίας του εκδώσαντος την Πτωχευτική απόφαση, αλλοδαπού Πτωχευτικό Δικαστήριο των Η.Π.Α. και των λοιπών προς όφελός της ισχυρισμών.**

- **Να διορίζει πληρεξούσιους δικηγόρους στην Ελλάδα ή στο εξωτερικό, προκειμένου να εκπροσωπηθεί ενώπιον ημεδαπών ή αλλοδαπών Δικαστηρίων, Διαιτητών, Ανακριτών και οποιαδήποτε άλλη Αρχή απαιτηθεί, για την προάσπιση των συμφερόντων της, καταθέτοντας ένδικα βοηθήματα, μέσα, ενστάσεις, κλπ.**

Να χορηγηθεί από το Δικαστήριό Σας σημείωμα, με όμοιο ως άνω περιεχόμενο, έως τη ημέρα συζήτησης της προσωρινής διαταγής.

Να **επιβληθεί** η δικαστική δαπάνη σε βάρος της εταιρικής περιουσίας.

Αθήνα, 11 Νοεμβρίου 2024

Οι πληρεξούσιοι δικηγόροι

Κ. Φ. ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΕΙΑ
Χ. Π. ΦΙΛΙΟΣ - Θ. Θ. ΚΛΟΥΚΙΝΑΣ
ΒΡΑΝΑ 19 - ΑΘΗΝΑ 115 25
Τ. 2103698700  Φ. 2103698750
ΘΕΜΙΣΤΟΚΛΗΣ Θ. ΚΛΟΥΚΙΝΑΣ, ΔΙΚΗΓΟΡΟΣ
E: kloukinas@calavros.gr

Κ. Φ. ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΕΙΑ
Χ. Π. ΦΙΛΙΟΣ - Θ. Θ. ΚΛΟΥΚΙΝΑΣ
ΒΡΑΝΑ 19 - ΑΘΗΝΑ 115 25
Τ. 2103698700  Φ. 2103698750
ΜΑΡΙΑ Π. ΧΑΧΑΜΗ, ΔΙΚΗΓΟΡΟΣ
E: chachami@calavros.gr

1) ΘΕΜΙΣΤΟΚΛΗΣ ΚΛΟΥΚΙΝΑΣ
ΔΣΑ 12348

2) ΜΑΡΙΑ ΧΑΧΑΜΗ (ΔΣΑ 30482)

49

TX-81





TX-81

No: Π5371062
Ημερομηνία: 08/11/2024

### Δ.Σ. ΑΘΗΝΩΝ

## ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ53,20 ΕΥΡΩ
### Παράρτημα I & III, N. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ 080011 και ΑΦΜ 099634359 κατέβαλε το ποσό των **ΠΕΝΗΝΤΑ ΤΡΙΑ ΕΥΡΩ ΚΑΙ ΕΙΚΟΣΙ ΛΕΠΤΩΝ**της δικηγόρου **ΧΑΧΑΜΗ ΜΑΡΙΑ του ΠΑΝΑΓΙΩΤΗ** με ΑΜ 030482 και ΑΦΜ **131220580** που αφορά σε ΑΙΤΗΣΗ, ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΕΚΟΥΣΙΑ ΔΙΚΑΙΟΔΟΣΙΑ για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

#### ΑΝΑΛΥΣΗ (*)
##### ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I N. 4194/2013)204,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 8,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 40,80 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 30,60 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 49,20 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 83,80 € | | |

*Επί του ποσού των204,00 € υπολογίζεται ΦΠΑ24% =48,96 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:252,96 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

---

No: Π5371031
Ημερομηνία: 08/11/2024



### Δ.Σ. ΑΘΗΝΩΝ

## ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ53,20 ΕΥΡΩ
### Παράρτημα I & III, N. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ 080011 και ΑΦΜ 099634359 κατέβαλε το ποσό των **ΠΕΝΗΝΤΑ ΤΡΙΑ ΕΥΡΩ ΚΑΙ ΕΙΚΟΣΙ ΛΕΠΤΩΝ**του δικηγόρου **ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ του ΘΕΟΔΩΡΟΥ** με ΑΜ 012348 και ΑΦΜ **040315330** που αφορά σε ΑΙΤΗΣΗ, ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΕΚΟΥΣΙΑ ΔΙΚΑΙΟΔΟΣΙΑ για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

#### ΑΝΑΛΥΣΗ (*)
##### ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I N. 4194/2013)204,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 8,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 40,80 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 30,60 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 49,20 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 83,80 € | | |

*Επί του ποσού των204,00 € υπολογίζεται ΦΠΑ24% =48,96 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:252,96 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

TX-81



No: Π5371062
Ημερομηνία: 08/11/2024

### Δ.Σ. ΑΘΗΝΩΝ

## ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ53,20 ΕΥΡΩ
### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με AM 080011 και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΠΕΝΗΝΤΑ ΤΡΙΑ ΕΥΡΩ ΚΑΙ ΕΙΚΟΣΙ ΛΕΠΤΩΝ**της δικηγόρου **ΧΑΧΑΜΗ ΜΑΡΙΑ του ΠΑΝΑΓΙΩΤΗ** με AM **030482** και ΑΦΜ **131220580** που αφορά σε ΑΙΤΗΣΗ, ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΕΚΟΥΣΙΑ ΔΙΚΑΙΟΔΟΣΙΑ για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION** κλπ.

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013)204,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 8,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 40,80 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 30,60 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 49,20 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 83,80 € | | |

*Επί του ποσού των204,00 € υπολογίζεται ΦΠΑ24% =48,96 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:252,96 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

---



No: Π5371031
Ημερομηνία: 08/11/2024

### Δ.Σ. ΑΘΗΝΩΝ

## ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ53,20 ΕΥΡΩ
### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με AM 080011 και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΠΕΝΗΝΤΑ ΤΡΙΑ ΕΥΡΩ ΚΑΙ ΕΙΚΟΣΙ ΛΕΠΤΩΝ**του δικηγόρου **ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ του ΘΕΟΔΩΡΟΥ** με AM **012348** και ΑΦΜ **040315330** που αφορά σε ΑΙΤΗΣΗ, ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΕΚΟΥΣΙΑ ΔΙΚΑΙΟΔΟΣΙΑ για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION** κλπ.

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013)204,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 8,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 40,80 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 30,60 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 49,20 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 83,80 € | | |

*Επί του ποσού των204,00 € υπολογίζεται ΦΠΑ24% =48,96 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:252,96 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

TX-81



No: Π5371076
Ημερομηνία: 08/11/2024



## Δ.Σ. ΑΘΗΝΩΝ

### ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ48,60 ΕΥΡΩ
#### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ **080011** και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΣΑΡΑΝΤΑ ΟΚΤΩ ΕΥΡΩ ΚΑΙ ΕΞΗΝΤΑ ΛΕΠΤΩΝ**του δικηγόρου **ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ του ΘΕΟΔΩΡΟΥ** με ΑΜ **012348** και ΑΦΜ **040315330** που αφορά σε ΑΙΤΗΣΗ, ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ-ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΑΣΦΑΛΙΣΤΙΚΑ ΜΕΤΡΑ (ΚΑΘΕ ΕΙΔΟΥΣ) για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013)186,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 7,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 37,20 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 27,90 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 44,60 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 76,50 € | | |

*Επί του ποσού των186,00 € υπολογίζεται ΦΠΑ24% =44,64 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:230,64 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

---

No: Π5371065
Ημερομηνία: 08/11/2024



## Δ.Σ. ΑΘΗΝΩΝ

### ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ48,60 ΕΥΡΩ
#### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ **080011** και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΣΑΡΑΝΤΑ ΟΚΤΩ ΕΥΡΩ ΚΑΙ ΕΞΗΝΤΑ ΛΕΠΤΩΝ**της δικηγόρου **ΧΑΧΑΜΗ ΜΑΡΙΑ του ΠΑΝΑΓΙΩΤΗ** με ΑΜ **030482** και ΑΦΜ **131220580** που αφορά σε ΑΙΤΗΣΗ, ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ-ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΑΣΦΑΛΙΣΤΙΚΑ ΜΕΤΡΑ (ΚΑΘΕ ΕΙΔΟΥΣ) για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013)186,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 7,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 37,20 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 27,90 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 44,60 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 76,50 € | | |

*Επί του ποσού των186,00 € υπολογίζεται ΦΠΑ24% =44,64 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:230,64 €)



Με εντολήΔ.Σ. ΑΘΗΝΩΝ

TX-81



No: Π5371076
Ημερομηνία: 08/11/2024

## Δ.Σ. ΑΘΗΝΩΝ

### ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ 48,60 ΕΥΡΩ
#### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ **080011** και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΣΑΡΑΝΤΑ ΟΚΤΩ ΕΥΡΩ ΚΑΙ ΕΞΗΝΤΑ ΛΕΠΤΩΝ** του δικηγόρου **ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ του ΘΕΟΔΩΡΟΥ** με ΑΜ **012348** και ΑΦΜ **040315330** που αφορά σε ΑΙΤΗΣΗ, ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ-ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΑΣΦΑΛΙΣΤΙΚΑ ΜΕΤΡΑ (ΚΑΘΕ ΕΙΔΟΥΣ) για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013) 186,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 7,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 37,20 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 27,90 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 44,60 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 76,50 € | | |

*Επί του ποσού των186,00 € υπολογίζεται ΦΠΑ24% =44,64 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:230.64 €)

Με εντολήΔ.Σ. ΑΘΗΝΩΝ





No: Π5371065
Ημερομηνία: 08/11/2024

## Δ.Σ. ΑΘΗΝΩΝ

### ΓΡΑΜΜΑΤΙΟ ΠΡΟΚΑΤΑΒΟΛΗΣ ΕΙΣΦΟΡΩΝ & ΕΝΣΗΜΩΝ 48,60 ΕΥΡΩ
#### Παράρτημα I & III, Ν. 4194/2013 (ΦΕΚ Α' 208 / 27-9-2013)

Η ΔΕ **Κ.Φ.ΚΑΛΑΒΡΟΣ ΔΙΚΗΓΟΡΙΚΗ ΕΤΑΙΡΙΑ Χ.Π. ΦΙΛΙΟΣ - Θ.Θ. ΚΛΟΥΚΙΝΑΣ** με ΑΜ **080011** και ΑΦΜ **099634359** κατέβαλε το ποσό των **ΣΑΡΑΝΤΑ ΟΚΤΩ ΕΥΡΩ ΚΑΙ ΕΞΗΝΤΑ ΛΕΠΤΩΝ** της δικηγόρου **ΧΑΧΑΜΗ ΜΑΡΙΑ του ΠΑΝΑΓΙΩΤΗ** με ΑΜ **030482** και ΑΦΜ **131220580** που αφορά σε ΑΙΤΗΣΗ, ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ-ΠΑΡΑΣΤΑΣΗ στοΜΟΝΟΜΕΛΕΣ ΠΡΩΤΟΔΙΚΕΙΟΠΕΙΡΑΙΑ -ΑΣΦΑΛΙΣΤΙΚΑ ΜΕΤΡΑ (ΚΑΘΕ ΕΙΔΟΥΣ) για υπόθεση του εντολέα της **ELAFONISSOS SHIPPING CORPORATION κλπ.**

ΑΝΑΛΥΣΗ (*)
ΠΟΣΟ ΑΝΑΦΟΡΑΣ (Παρ. I Ν. 4194/2013) 186,00 €

| | | | |
|---|---|---|---|
| ΔΣΑ | 7,00 € | ΤΑΧΔΙΚ ΚΑΤΑΘΕΣΗΣ | 4,00 € |
| Ε.Φ.Κ.Α. | 37,20 € | ΤΑΧΔΙΚ ΑΝΤΙΓΡΑΦΩΝ | 0,00 € |
| Κράτηση του Άρθρ. 29 ν.4596/2019 | 0,40 € | | |
| ΦΟΡΟΣ | 27,90 € | | |
| **ΣΥΝΟΛΟ ΚΡΑΤΗΣΕΩΝ** | 44,60 € | **ΣΥΝΟΛΟ ΕΝΣΗΜΩΝ** | 4,00 € |
| ΕΞΟΦΛΗΣΗ | 76,50 € | | |

*Επί του ποσού των186,00 € υπολογίζεται ΦΠΑ24% =44,64 €. (Σύνολο ποσού αναφοράς και ΦΠΑ:230.64 €)

Με εντολήΔ.Σ. ΑΘΗΝΩΝ



TX-81



# e-Παράβολο





## Για χρήση από το Φορέα

| | |
|---|---|
| **Κωδικός Παραβόλου** | 734608631955  0512  0016 |
| **Φορέας** | Δικαιοσύνης |
| **Κατηγορία Παραβόλου** | Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) |
| **Τύπος Παραβόλου** | [ 2389 ]  Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) 6 ευρώ |
| **Ποσό (€)** | 6,00 Ευρώ |
| **Α.Φ.Μ.** | 131220580 |
| **Επώνυμο/Επωνυμία** | ΧΑΧΑΜΗ |
| **Όνομα/Διεύθυνση** | ΜΑΡΙΑ |
| **Πατρώνυμο** | ΠΑΝΑΓΙΩΤΗΣ |

| | |
|---|---|
| **Μητρώνυμο** | |
| **Ημ.Γέννησης** | |
| **Πρόσθετα Στοιχεία** | ΕΠΙΚΥΡΩΣΗ ΑΝΤΙΓΡΑΦΩΝ |
| **email** | |

## For Official Use

| | |
|---|---|
| **Administrative Fee Code** | 734608631955  0512  0016 |
| **Public Authority** | Δικαιοσύνης |
| **Administrative Fee Category** | Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) |
| **Administrative Fee Type** | [ 2389 ]  Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) 6 ευρώ |
| **Amount (€)** | 6,00 Euro |
| **Tax Reg. Number** | 131220580 |
| **Last Name/Company** | ΧΑΧΑΜΗ |
| **First Name/Address** | ΜΑΡΙΑ |
| **Father's Name** | ΠΑΝΑΓΙΩΤΗΣ |

| | |
|---|---|
| **Moth. Name** | |
| **Date of Birth** | |
| **Additional Info** | ΕΠΙΚΥΡΩΣΗ ΑΝΤΙΓΡΑΦΩΝ |
| **email** | |

TX-81



## e-Παράβολο



### Για χρήση από τον Πολίτη

| | |
|---|---|
| **Κωδικός Παραβόλου** | 734608631955  0512  0016 |
| **Φορέας** | Δικαιοσύνης |
| **Κατηγορία Παραβόλου** | Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) |
| **Τύπος Παραβόλου** | [ 2389 ] Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) 6 ευρώ |
| **Ποσό (€)** | 6,00 Ευρώ |
| **Α.Φ.Μ.** | 131220580 |
| **Επώνυμο/Επωνυμία** | ΧΑΧΑΜΗ |
| **Όνομα/Διεύθυνση** | ΜΑΡΙΑ |
| **Πατρώνυμο** | ΠΑΝΑΓΙΩΤΗΣ |
| **Τράπεζα** | |

**Μητρώνυμο**

**Ημ.Γέννησης**

**Πρόσθετα Στοιχεία**  ΕΠΙΚΥΡΩΣΗ ΑΝΤΙΓΡΑΦΩΝ

**email**

**Λογαριασμός IBAN** *(Σε περίπτωση επιστροφής)*

### For Citizens Use

| | |
|---|---|
| **Administrative Fee Code** | 734608631955  0512  0016 |
| **Public Authority** | Δικαιοσύνης |
| **Administrative Fee Category** | Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) |
| **Administrative Fee Type** | [ 2389 ] Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) 6 ευρώ |
| **Amount (€)** | 6,00 Euro |
| **Tax Reg. Number** | 131220580 |
| **Last Name/Company** | ΧΑΧΑΜΗ |
| **First Name/Address** | ΜΑΡΙΑ |
| **Father's Name** | ΠΑΝΑΓΙΩΤΗΣ |
| **Bank Name** | |

**Moth. Name**

**Date of Birth**

**Additional Info**  ΕΠΙΚΥΡΩΣΗ ΑΝΤΙΓΡΑΦΩΝ

**email**

**Bank Account - IBAN** *(In case of refund)*

---

|  | **e-Παράβολο** | | απόκομμα για την *Τράπεζα* |
|---|---|---|---|
| **Κωδικός Πληρωμής** | RF34  9051  0200  9500  7346  0863  1 | **Ποσό** | 6,00 € |
| **Φορέας** | Δικαιοσύνης | | |
| **Κατηγορία Παραβόλου** | Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) | | |
| **Τύπος Παραβόλου** | [ 2389 ] Ένσημο ΤΑ.Χ.ΔΙ.Κ. (Μεγαρόσημο) 6 ευρώ | | |

TX-81



Εξόφληση e-Παραβόλου

Η συναλλαγή σας εκτελέστηκε επιτυχώς με τα παρακάτω στοιχεία:

Κωδικός Συναλλαγής   **PX243164438553**

Τραπεζικός Λογαριασμός:   GR83 0172 1040 0051 0408 4899 966

Ονοματεπώνυμο - Επωνυμία:   ΜΑΡΙΑ ΧΑΧΑΜΗ

Κωδικός Πληρωμής:   RF34905102009500734608631

Ποσό:   6,00 EUR

**Στοιχεία Εκτέλεσης**

Εκτέλεση   Στις 11/11/2024

Ημερομηνία Ενημέρωσης: **11/11/2024 12:17:32**

Σε περίπτωση που επιθυμείτε να επικοινωνήσετε μαζί μας, καλέστε μας στο +30 210 3288000.





**ΕΛΛΗΝΙΚΗ ΔΗΜΟΚΡΑΤΙΑ**
ΠΡΩΤΟΔΙΚΕΙΟ ΠΕΙΡΑΙΑ

### ΕΚΘΕΣΗ ΚΑΤΑΘΕΣΗΣ ΔΙΚΟΓΡΑΦΟΥ

Είδος Δικογράφου: ΑΙΤΗΣΗ ΜΕ ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ
Γενικός Αριθμός Κατάθεσης: 16655/2024
Ειδικός Αριθμός Κατάθεσης: 7823/2024
Αριθμός Αίτησης Εξαίρεσης: 0

Στο ΠΡΩΤΟΔΙΚΕΙΟ ΠΕΙΡΑΙΑ σήμερα την 11-11-2024 ημέρα Δευτέρα και ώρα 13:20 εμφανίσθηκε στη Γραμματεία
ο/η/οι δικηγόρος/οι ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ με ΑΜ: 012348 του Δ.Σ. ΑΘΗΝΩΝ με Α.Φ.Μ. 040315330,
ΧΑΧΑΜΗ ΜΑΡΙΑ με ΑΜ: 030482 του Δ.Σ. ΑΘΗΝΩΝ με Α.Φ.Μ. 131220580 και κατέθεσε/αν το παραπάνω
δικόγραφο.

Για την πράξη αυτή συντάχθηκε η έκθεση αυτή που υπογράφεται νόμιμα.

Ο/Η Καταθέσας                                              Ο/Η Γραμματέας


ΚΛΟΥΚΙΝΑΣ ΘΕΜΙΣΤΟΚΛΗΣ                              ΓΚΙΖΑ ΟΥΡΑΝΙΑ

### ΠΡΑΞΗ ΟΡΙΣΜΟΥ ΣΥΖΗΤΗΣΗΣ

Διαδικασία: ΕΚΟΥΣΙΑ ΜΟΝΟΜΕΛΟΥΣ
Πινάκιο: ΕΚΟΥΣΙΑ ΜΟΝΟΜΕΛΟΥΣ ΝΑΥΤΙΚΟ
με Αριθμό Πινακίου: 1

Ορίζουμε ως χρόνο συζήτησης την 04-02-2025, ημέρα Τρίτη και ώρα 09:00 στο ακροατήριο του ΠΡΩΤΟΔΙΚΕΙΟΥ
ΠΕΙΡΑΙΑ στον/ην οδ. Σκουζέ 3-5, Β΄ όροφος, Αίθουσα 218

με τον όρο να κοινοποιηθεί το δικόγραφο αυτό ΔΕΚΑ ΠΕΝΤΕ (15) ημέρες πριν από τη δικάσιμο, ΣΤΑ ΜΕΛΗ ΤΟΥ
ΤΕΛΕΥΤΑΙΟΥ ΝΟΜΙΜΩΣ ΔΗΜΟΣΙΕΥΜΕΝΟΥ ΔΣ ΤΗΣ ΕΤΑΙΡΕΙΑΣ ELETSON HOLDINGS INC
Η επίδοση θα γίνει με ευθύνη του αιτούντος.

ΠΕΙΡΑΙΑΣ, 11-11-2024
Ο/Η Δικαστής


ΚΟΦΙΝΑ ΕΥΘΥΜΙΑ


**ΑΚΡΙΒΕΣ ΑΝΤΙΓΡΑΦΟ**
ΠΕΙΡΑΙΑΣ, 11/11/2024
Ο/Η Γραμματέας


ΓΚΙΖΑ ΟΥΡΑΝΙΑ

TX-81



**ΠΡΟΣΩΡΙΝΗ ΔΙΑΤΑΓΗ**

Ο Δικαστής του δικαστηρίου τούτου ΔΕΛΑΖΑΝΟΣ ΗΛΙΑΣ που ορίσθηκε από τον Πρόεδρο του Τριμελούς Συμβουλίου.

**Ο Ρ Ι Ζ Ε Ι**

Ημερομηνία για συζήτηση αιτήσεως χορηγήσεως της Προσωρινής Διαταγής την 12-11-2024 ημέρα ΤΡΙΤΗ και ώρα 11.15, στο γραφείο του Προέδρου Υπηρεσίας (5ος όροφος, γραφείο 515).

Κοινοποίηση ΕΩΣ 12-11-2024 ΚΑΙ ΩΡΑ 10.00 π.μ.

ΠΕΙΡΑΙΑΣ, 11-11-2024

Ο/Η Δικαστής

ΔΕΛΑΖΑΝΟΣ ΗΛΙΑΣ

**ΑΚΡΙΒΕΣ ΑΝΤΙΓΡΑΦΟ**

ΠΕΙΡΑΙΑΣ, 11/11/2024

Ο/Η Γραμμάτέας

ΓΚΙΖΑ ΟΥΡΑΝΙΑ

Πρόεδρος Πρωτοδικών

Αντωνία Μάγγουλη
Πρόεδρος Πρωτοδικών

**ΑΚΡΙΒΕΣ ΑΝΤΙΓΡΑΦΟ**
το οποίο θεωρήθηκε για
τη νόμιμη σήμανση
Πειραιάς, 13/11/2024
Ο Γραμμάτέας

**Γεώργιος Γεωργίου**

TX-81

**BEFORE THE SINGLE-MEMBER COURT OF FIRST INSTANCE OF PIRAEUS**

(*Non-contentious Jurisdiction*)

**APPLICATION**

**For the appointment of a Temporary Administration of a foreign shipping company and designation of new members for it.**

**(Article 69 of the Civil Code)**

a) Of the foreign shipping company under the name of "**ELAFONISSOS SHIPPING CORPORATION**", which has, according to its Articles of Incorporation, its registered seat in Liberia and its real seat in Greece, at 118 Kolokotroni Street, Piraeus, lawfully represented by its shareholder and representative, **Ioannis ZILAKOS of Nikolaos** (fathers name), resident of P. Psychiko, Attica, 13 Parnithos Street, with TIN 065443172,

b) Of the foreign shipping company under the name of "**KEROS SHIPPING CORPORATION**", which has, according to its Articles of Incorporation, its registered seat in Liberia and its real seat in Greece, at 118 Kolokotroni Street, Piraeus, lawfully represented by its shareholder and representative, **Stylianos ANDREOU of Emmanuel** (fathers name), resident of Glyfada, Attica, 34 Tyrtaiou Street, with TIN 013241122,

both acting as shareholders of the foreign shipping company under the name of "**ELETSON HOLDINGS INC.**", which has, according to its Articles of Incorporation, its registered seat in Liberia and its real seat in Greece, at 118 Kolokotroni Street, Piraeus.

## A. PROCEDURAL BACKGROUND

**A.1. The family shipping enterprise of "ELETSON" – The parent company "ELETSON HOLDINGS INC." and its subsidiary "ELETSON CORPORATION".**

It should be noted from the outset that **ELETSON HOLDINGS INC.** is the "parent" company of the family shipping enterprise, globally known in the shipping industry as "ELETSON". This entity was founded in Piraeus in 1966 by Vasilis Hatzieleftheriadis, the common ancestor of the members of the Board of Directors of Eletson Holdings and their grandfather, who, together with his sons, daughters, and sons-in-law, established ELETSON and subsequently achieved—along with their descendants—a highly successful trajectory in shipping for over 50 years.

The company **ELETSON HOLDINGS INC.** (hereinafter "**the Company**" or "**ELETSON HOLDINGS**") is a corporation, which is, as previously mentioned, the "parent" company of the Eletson Family Shipping Enterprise. It was established on December 4, 1985, in accordance with the laws of Liberia, **having its real seat in Greece, where it maintains offices at 118 Kolokotroni Street, Piraeus**. The company is governed by an eight-member board of directors, all of whom are Greek citizens and residents of Greece, and it conducts all its business activities from this location, fulfilling its corporate

1

## F. THE JUDICIAL PROTECTION SOUGHT

**Whereas** the petitioners, foreign shipping companies, **"ELAFONISSOS SHIPPING CORPORATION"** and **"KEROS SHIPPING CORPORATION"**, have a direct legal interest in the capacity of shareholder of 3.9% each of the total shares of **"ELETSON HOLDINGS INC."** to appoint an temporary Board of Directors in the shipping company named **"ELETSON HOLDINGS INC."** in order to **manage** the Company and to **convene an extraordinary General Meeting for the election of a new Board of Directors, (a)** to deal with current and urgent matters, such as transactions for the management of the assets of ELETSON HOLDINGS and all kinds of transactions with financial institutions, shippers, suppliers, other traders and public entities in Greece and abroad; and **(b)** To take a decision to exercise on behalf of "ELETSON HOLDINGS INC." to pursue all legal remedies and remedies provided for by law (Greek or foreign) in the name and on behalf of the aforementioned company **in order to safeguard its property and its interests** from the Arbitral Award issued in New York from 29.09.2023 by the Arbitral Tribunal composed of the Retired Judge-Arbitrator Ariel E. BELEN *on the one hand*, and to challenge the Arbitral Award issued in New York from 25.10.2023 by the Retired Judge-Arbitrator Ariel E. BELEN *on the other hand*. 2024 Chapter 11 Bankruptcy Judgment of ELETSON HOLDINGS and the other companies, of the United States Bankruptcy Court for the Southern District of New York, composed of John P. MASTANDO, Judge, and the Chapter 11 Bankruptcy Judgment of 04.11.2024 Order of the same aforementioned Bankruptcy Court of the United States - Southern District of New York, consisting of Judge John P. MASTANDO, confirming the Chapter 11 Voluntary Bankruptcy Judgment of 25.10.2024 of ELETSON HOLDINGS and other companies and the amended Creditors' Plan of Reorganization.

**Whereas four (4) of the eight (8) members of the Board of Directors of the Company, namely** a) Laskarina Karastamatis, b) Vasilios Kertsikov, c) Eleni Karastamatis and d) Panagiotis Konstantaras, by virtue of the resolutions of 08.11.2024 were expressly **RESIGNED** in writing by the Board of Directors of the foreign shipping company **"ELETSON HOLDINGS INC."**,

**Whereas a quorum for the meetings of the Board of Directors of the Company is required, according to the statutory provision (see above above Article III- Section -(Section) 5 of the BY-LAWS of June 26, 2007), a simple majority, however, in conjunction with the fact that** until recently the Company was governed by an **eight-member Board of Directors**, elected by virtue of the 11.12.2023 by the decision of the Joint Meeting of the Members of the Board of Directors as well as the Shareholders of ELETSON HOLDINGS, the latter as of today, 08.11.2024, lacks governance, unable to convene a General Meeting of Shareholders and to take decisions and to represent and bind the Company.

TX-81

**Whereas** following the above resignations the company **"ELETSON HOLDINGS INC."** does not have any body exercising administrative functions, such as managing director or delegated advisor, administrator, manager or representative of the company and is thus unable to exercise its legal rights and to deal with immediate and urgent current issues of its daily operation.

**Whereas** the applicants have a direct legal interest in the capacity of shareholder, each of us holding 3.92% of the total shares of the company **"ELETSON HOLDINGS INC."**, we request the appointment of an interim administration of the foreign shipping company named **"ELETSON HOLDINGS INC."**.

**Whereas** for all of the above reasons, an interim administration of eight members of the foreign shipping company **"ELETSON HOLDINGS INC."** should be appointed with a one-year term of office, **consisting of the following members, namely**:

**The remaining members of the Board of Directors of the Company:**

**1)** Vassilios Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 8 Tinos Street, with VAT number 052767445

**2)** Konstantinos Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 57 Plastira Street, with Tax Identification Number 052767405

**3)** Ioannis Zilakos son of Nikolaos, resident of P. Psychiko, Attica, 13 Parnithos Street, with VAT number 065443172,

**4)** Emmanuel Andreoulakis son of Stylianos, resident of Piraeus, Attica, 62 Iroon Polytechniou Street, with VAT number 050222446,


**As well as the following persons as new members of the Board of Directors of the Company:**

**5)** Adrianos Psomadakis - Karastamatis son of Michael, resident of Piraeus, Attica, 98-100 Karpathos Street, with Tax ID 164642953,

**6)** Panos PAXINOS son of Ioannis, resident of Halandri, Attica, 58 Kefallinia Street, Attica, with VAT number 030723274,

**7)** Eleni Giannakopoulou daughter of Konstantinos, resident of Ymittos, 43 M. Tsaliki Street, Attica, with VAT number 052036400 and

**8)** Niki wife of Nikolaos Zilakou, resident of Glyfada, Attica, 34, Tirtaiou Street, with VAT number 064165981 to **manage** the Company: **(a)** to deal with current and urgent matters, such as operations for the management of the assets of ELETSON HOLDINGS and all kinds of transactions with financial institutions, shippers, suppliers, other traders and public entities in Greece and abroad and **(b)** for the management of the four Special Naval Enterprises that own the tankers MT Kastos, MT Kinaros, MT Kimolos and MT

30

TX-81

Fourni and its other subsidiaries, which, due to their shipping nature, have a permanent and urgent need to take decisions and actions; **(c)** to represent their shipping subsidiaries and to maintain smooth and continuous communication with the financiers of the above vessels, which are financed through sale and lease back agreements; and **(d)** To make a resolution to appoint attorneys to act on behalf of "ELETSON HOLDINGS INC." all legal remedies and remedies provided by law (Greek or foreign) in the name and on behalf of the aforementioned **company in order to safeguard its property and interests** *on the one hand* from the Arbitral Award issued in New York on 29.09.2023 by the Arbitral Tribunal composed of the Retired Judge-Arbitrator Ariel E. BELEN, *on the other hand* to challenge the judgment issued in New York on 25.10.2024 by the Bankruptcy Court of the United States of America - Southern District of New York, composed of Judge John P. MASTANDO, as well as the Order of 04.11.2024 of the same Bankruptcy Court of the United States of America - Southern District of New York, composed of Judge John P. MASTANDO, confirming the Chapter 11 Voluntary Bankruptcy Judgment of 25.10.2024 of ELETSON HOLDINGS and other companies and the amended Creditors' Plan of Reorganization, **and to convene an Extraordinary General Meeting for the election of a new Board of Directors**

**Whereas** the above persons are the most suitable for the interim management of the Company, since the first four of them are the remaining four (4) members of the Board of Directors of the Company, after the resignation of the other four, as mentioned above, and for many years a member of the Board of Directors, while the remaining four (new members) are traders with their own companies and have extensive experience in corporate matters of shipping companies.

**Whereas** there is an imminent risk that the Company will **permanently** lose the management of its assets, since, as stated above, voluntary bankruptcy proceedings have been initiated against it by its Creditors in New York against its assets, which it has already opposed by filing the foreseen appeal on 7.11.2024, as the relevant deadline expired on 8.11.2024, at the hearing of which it will have to be present and represented in support of the claims made therein, and will also have to be represented at the hearing (Status Conference) of **12. 11.2024** before the United States District Court - Southern District of New York, composed of Judge Lewis J. LIMAN, in order to rebut the objections, allegations and impediments raised by the Levona Action in the proceeding for the confirmation of the New York Arbitral Award of 29.09.2023 of the Arbitral Tribunal composed of the Honorable Ariel E. BELEN, Retired Judge-Arbitrator, and thereafter to apply for a declaration of enforceability thereof in order to proceed against Levona.

**Whereas** there is urgency and imminent danger which justify the appointment of an interim administration of the Company by means of interim measures.

**Whereas** the Court has jurisdiction in law and in fact.

**Whereas** there is an **urgent need**, concerning the occurrence of immediate financial damage to the Company and the permanent loss of its management as aforesaid,

TX-81

which will otherwise certainly occur, we request that an **interim injunction** be granted pending the hearing of this application, and subject to the condition that this application be heard by Your Court on the appointed date, appointing as members of the interim management of the foreign shipping company named **"ELETSON HOLDINGS INC."** the following:

**1)** Vassilios Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 8 Tinos Street, with VAT number 052767445

**2)** Konstantinos Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 57 Plastira Street, with Tax Identification Number 052767405

**3)** Ioannis Zilakos son of Nikolaos, resident of P. Psychiko, Attica, 13 Parnithos Street, with VAT number 065443172,

**4)** Emmanuel Andreoulakis son of Stylianos, resident of Piraeus, Attica, 62 Iroon Polytechniou Street, with VAT number 050222446,

**5)** Adrianos Psomadakis - Karastamatis son of Michael, resident of Piraeus, Attica, 98-100 Karpathos Street, with Tax ID 164642953,

**6)** Panos PAXINOS son of Ioannis, resident of Halandri, Attica, 58 Kefallinia Street, Attica, with VAT number 030723274,

**7)** Eleni Giannakopoulou daughter of Konstantinos, resident of Ymittos, 43 M. Tsaliki Street, Attica, with VAT number 052036400 and

**8)** Niki wife of Nikolaos Zilakou, resident of Glyfada, Attica, 34, Tirtaiou Street, with VAT number 064165981

**with the power to manage the Company: (a) to deal with current and urgent matters, such as operations for the management of the assets of ELETSON HOLDINGS and all kinds of transactions with financial institutions, shippers, suppliers, other parties to the transaction and public entities in Greece and abroad (b) to manage the four Special Shipping Companies that own the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and its other subsidiaries, which, due to their maritime nature, have a permanent and urgent need to take decisions and actions, (c) to represent their shipping subsidiaries and to maintain smooth and permanent communication with the financiers of the above mentioned vessels, which are financed through sale and lease back agreements, and (d) to take a decision to exercise on behalf of ELETSON HOLDINGS INC. " all remedies and reliefs provided by law (Greek or foreign) in the name and on behalf of the aforementioned company in order to safeguard its property and interests, in particular the Company:**

- **To attend and be represented at the hearing (Status Conference) of <u>12.11.2024</u> before the United States District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments raised by the defendant Levona in**

the proceedings for the confirmation of the New York Arbitral Award of 29. 09.2023 of the Arbitral Tribunal composed of the Honorable Ariel E. BELEN, Retired Judge-Arbitrator, and thereafter to apply for a declaration of enforceability thereof in order to proceed against Levona.

- Represent itself and its subsidiary, ELETSON CORPORATION, and apply for recognition of the Arbitral Award issued in New York on 29.09.2023 by the Arbitral Tribunal composed of the Retired Judge-Arbitrator Ariel E. BELENEN, acting as its representative, and request that the Arbitral Tribunal, composed of the Retired Judge-Arbitrator Ariel E. BELEN, acting as its representative, be granted the right to apply for recognition of the Arbitral Award issued in New York on 29.09.2023. BELEN and the compliance of the defendant, "Levona", with all the provisions of its Arbitral Award, as well as the declaration of its enforceability in accordance with the provisions of the New York Convention, in the territory of a State other than the one in which it was issued, including Greece, where Levona maintains property.

- To obtain judicial protection, namely, *on the one hand* to support the appeal already filed against the above Bankruptcy Judgment of the United States Bankruptcy Court for the Southern District of New York consisting of Judge John P. MASTANDO confirming the 25.10.2024 Chapter 11 Voluntary Bankruptcy Judgment of ELETSON HOLDINGS and its other interest companies, and the Creditors' Amended Plan of Reorganization before the Bankruptcy Court of New York as the relevant deadline for filing the same (the appeal) expired, as stated immediately above, on 8. 11.2024, *on the other hand*, to appear, with the respective remedies and means provided by law, before the Greek Courts, in order to challenge the Chapter 11 Judgment of Voluntary Bankruptcy of 25.10.2024 to which the Bankruptcy Court of the United States of America was referred for lack of jurisdiction in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.

- Furthermore, in the event that the Creditors request that the above voluntary bankruptcy decision be recognized and enforced in Greece, where ELETSON HOLDINGS is actually domiciled, the latter shall be represented before the competent Greek Courts in order to raise an objection, otherwise and as an obstacle to the recognition of the aforementioned Bankruptcy Judgment in Greece, due to the lack of jurisdiction of the foreign Bankruptcy Court of the United States of America which issued the Bankruptcy Judgment and the other allegations in its favour.

- To appoint attorneys in Greece or abroad to represent it before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required to defend its interests, filing remedies, instruments, objections, etc.

TX-81

- **To convene an extraordinary General Meeting for the election of a new Board of Directors.**

**Whereas** this application is legal, valid and true, it must be granted by Your Court.

**Whereas** the legal fees of my attorneys have been paid for the filing of this application as shown on the legal contribution cash receipt vouchers' no. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... . . . .. . . . . . .. . . . . . . ... Athens Bar Association .


## FOR THESE REASONS

Without prejudice to any of our legal rights

## WE REQUEST

-That the present application **is granted**.

-That **the situation be temporarily settled**, in particular:

-To **appoint an interim Board of Directors of eight members with a one-year term of office to manage the** foreign shipping company **"ELETSON HOLDINGS INC."**, having its registered office in Liberia, and in fact in Greece, at Kolokotroni Street, no. 118, Piraeus, where it maintains a legally established office in accordance with the provisions of Article 25 of Law 27/1975, and to appoint the following members of the above-mentioned provisional administration:

**The remaining members of the Board of Directors of the Company:**

**1)** Vassilios Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 8 Tinos Street, with VAT number 052767445

**2)** Konstantinos Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 57 Plastira Street, with Tax Identification Number 052767405

**3)** Ioannis Zilakos son of Nikolaos, resident of P. Psychiko, Attica, 13 Parnithos Street, with VAT number 065443172,

**4)** Emmanuel Andreoulakis son of Stylianos, resident of Piraeus, Attica, 62 Iroon Polytechniou Street, with VAT number 050222446,

**As well as the following persons as new members of the Board of Directors of the Company:**

**5)** Adrianos Psomadakis - Karastamatis son of Michael, resident of Piraeus, Attica, 98-100 Karpathos Street, with Tax ID 164642953,

**6)** Panos PAXINOS son of Ioannis, resident of Halandri, Attica, 58 Kefallinia Street, Attica, with VAT number 030723274,

34

**7)** Eleni Giannakopoulou daughter of Konstantinos, resident of Ymittos, 43 M. Tsaliki Street, Attica, with VAT number 052036400 and

**8)** Niki wife of Nikolaos Zilakou, resident of Glyfada, Attica, 34, Tirtaiou Street, with VAT number 064165981,

Who will have the power and authority to: (a) to **manage** the Company to deal with current and urgent matters, such as operations for the management of the assets of ELETSON HOLDINGS and all kinds of transactions with financial institutions, shippers, suppliers, other traders and public entities in Greece and abroad and **(b)** for the management of the four Special Naval Enterprises that own the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and its other subsidiaries, which, due to their shipping nature, have a permanent and urgent need to take decisions and actions; **(c)** to represent their shipping subsidiaries and to maintain smooth and continuous communication with the financiers of the above vessels, which are financed through sale and lease back agreements; and **(d)** to make a resolution to appoint attorneys to act on behalf of "ELETSON HOLDINGS INC." all legal remedies and remedies provided by law (Greek or foreign) in the name and on behalf of the aforementioned **company in order to safeguard its property and interests** *on the one hand* from the Arbitral Award issued in New York on 29.09.2023 by the Arbitral Tribunal composed of the Retired Judge-Arbitrator Ariel E. BELEN, *on the other hand* to challenge the judgment issued in New York on 25.10.2024 by the Bankruptcy Court of the United States of America - Southern District of New York, composed of Judge John P. MASTANDO, as well as the Order of 04.11.2024 of the same Bankruptcy Court of the United States of America - Southern District of New York, composed of Judge John P. MASTANDO, confirming the Chapter 11 Voluntary Bankruptcy Judgment of 25.10.2024 of ELETSON HOLDINGS and other companies and the amended Creditors' Plan of Reorganization, and (e) **to convene an Extraordinary General Meeting for the election of a new Board of Directors**

That an **interim order** be made appointing, on an **interim basis** pending the hearing of this application, and subject to the hearing of this application before Your Court at the appointed hearing, as members of the interim management of the foreign shipping company named **"ELETSON HOLDINGS INC."**, the following:

**1)** Vassilios Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 8 Tinos Street, with VAT number 052767445

**2)** Konstantinos Hadjieleftheriadis son of Apostolos, resident of Voula, Attica, 57 Plastira Street, with Tax Identification Number 052767405

**3)** Ioannis Zilakos son of Nikolaos, resident of P. Psychiko, Attica, 13 Parnithos Street, with VAT number 065443172,

**4)** Emmanuel Andreoulakis son of Stylianos, resident of Piraeus, Attica, 62 Iroon Polytechniou Street, with VAT number 050222446,

TX-81

As well as the following persons as new members of the Board of Directors of the Company:

**5)** Adrianos Psomadakis - Karastamatis son of Michael, resident of Piraeus, Attica, 98-100 Karpathos Street, with Tax ID 164642953,

**6)** Panos PAXINOS son of Ioannis, resident of Halandri, Attica, 58 Kefallinia Street, Attica, with VAT number 030723274,

**7)** Eleni Giannakopoulou daughter of Konstantinos, resident of Ymittos, 43 M. Tsaliki Street, Attica, with VAT number 052036400 and

**8)** Niki wife of Nikolaos Zilakou, resident of Glyfada, Attica, 34, Tirtaiou Street, with VAT number 064165981,

**with the power to convene an extraordinary General Meeting for the election of a new Board of Directors: (a) to deal with current and urgent matters, such as operations for the management of the assets of ELETSON HOLDINGS and all kinds of transactions with financial institutions, shippers, suppliers, other parties to the transaction and public entities in Greece and abroad (b) to manage the four Special Shipping Companies that own the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and its other subsidiaries, which, due to their maritime nature, have a permanent and urgent need to take decisions and actions, (c) to represent their shipping subsidiaries and to maintain smooth and permanent communication with the financiers of the above mentioned vessels, which are financed through sale and lease back agreements, and (d) to take a decision to exercise on behalf of ELETSON HOLDINGS INC. " all remedies and reliefs provided by law (Greek or foreign) in the name and on behalf of the aforementioned company in order to safeguard its property and interests, in particular the Company:**

- **To attend and be represented at the hearing (Status Conference) of 12.11.2024 before the United States District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments raised by the defendant Levona in the proceedings for the confirmation of the New York Arbitral Award of 29. 09.2023 of the Arbitral Tribunal composed of the Honorable Ariel E. BELEN, Retired Judge-Arbitrator, and thereafter to apply for a declaration of enforceability thereof in order to proceed against Levona.**
- **Represent itself and its subsidiary, ELETSON CORPORATION, and apply for recognition of the Arbitral Award issued in New York on 29.09.2023 by the Arbitral Tribunal composed of the Retired Judge-Arbitrator Ariel E. BELEN, acting as its representative, and request that the Arbitral Tribunal, composed of the Retired Judge-Arbitrator Ariel E. BELEN, acting as its representative, be granted the right to apply for recognition of the Arbitral Award issued in New York on 29.09.2023. BELEN and the compliance of the defendant, "Levona", with all the**

36

provisions of its Arbitral Award, as well as the declaration of its enforceability in accordance with the provisions of the New York Convention, in the territory of a State other than the one in which it was issued, including Greece, where Levona maintains property.

- To obtain judicial protection, namely, *on the one hand* to support the appeal already filed against the above Bankruptcy Judgment of the United States Bankruptcy Court for the Southern District of New York consisting of Judge John P. MASTANDO confirming the 25.10.2024 Chapter 11 Voluntary Bankruptcy Judgment of ELETSON HOLDINGS and its other interest companies, and the Creditors' Amended Plan of Reorganization <u>before the Bankruptcy Court of New York</u> as the relevant deadline for filing the same (the appeal) expired, as stated immediately above, on 8. 11.2024, *on the other hand*, to appear, with the respective remedies and means provided by law, <u>before the Greek Courts,</u> in order to challenge the Chapter 11 Judgment of Voluntary Bankruptcy of 25.10.2024 to which the Bankruptcy Court of the United States of America was referred for lack of jurisdiction in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.

- Furthermore, in the event that the Creditors request that the above voluntary bankruptcy decision be recognized and enforced in Greece, where ELETSON HOLDINGS is actually domiciled, the latter shall be represented before the competent Greek Courts in order to raise an objection, otherwise and as an obstacle to the recognition of the aforementioned Bankruptcy Judgment in Greece, due to the lack of jurisdiction of the foreign Bankruptcy Court of the United States of America which issued the Bankruptcy Judgment and the other allegations in its favour.

- To appoint attorneys in Greece or abroad to represent it before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required to defend its interests, filing remedies, instruments, objections, etc.

That a note with the same content as above be issued by the Court until the day of the hearing of the interim order.

**Order** the costs of the proceedings to be borne by the company's assets.

Athens, 11 November 2024

The lawyers authorised to act for the Company

[Signature]                                    [Signature]
[Seal of K.F.CALAVROS          [Seal of K.F.CALAVROS
LAW FIRM]                                  LAW FIRM]

37

TX-81

Writ filing report

This writ was filed by the signing attorney.

Piraeus, 11/11/2024

The filing party

THEMISTOKLIS KLOUKINAS
ATHENS BAR ASSOCIATION
REGISTRATION NUMBER: 030482

[**Signature**]

MARIA CHACHLAMI
ATHENS BAR ASSOCIATION
REGISTRATION NUMBER: 30482

[**Signature**]

The Court Clerk

[**Signature**]

38

TX-81

[…]

TX-81



## HELLENIC REPUBLIC
## PIRAEUS COURT OF FIRST
## INSTANCE

### WRIT FILING REPORT

| | |
|---|---|
| Type of Writ: | APPLICATION WITH PROVISIONAL ORDER |
| General Folio Number: | 16655/2024 |
| Specific Folio Number: | 7823/2024 |
| Exemption Application Number: | 0 |

At the PIRAEUS COURT OF FIRST INSTANCE today on Monday 11-11-2024 and at 13:20 am, the attorneys-at-law Mr. KLOUKINAS THEMISTOKLIS with ATHENS BAR ASSOCIATION REGISTRATION NUMBER: 012348 and TIN: 040315330, Mrs. CHACHLAMI MARIA with ATHENS BAR ASSOCIATION REGISTRATION NUMBER: 030482 and TIN: 131220580 appeared before the Court Clerk and filed the hereinabove Writ. This Report that has been lawfully signed has been drawn up for that dealing.

The Filing Party                                     The Court Clerk

Mr. KLOUKINAS THEMISTOKLIS                    Mrs. GKIZA OURANIA

### DEED FOR FIXING OF HEARING

| | |
|---|---|
| Proceedings: | SINGLE-MEMBER NON-CONTENTIOUS PROCEEDINGS |
| Docket: | SINGLE-MEMBER NON-CONTENTIOUS PROCEEDINGS –MARITIME DIVISION |

With Docket Number: 1

We hereby fix Tuesday, 04-02-2025 and 09:00 am as the time for hearing in the Court room at Chamber 218 on the 2nd floor, of the PIRAEUS COURT OF FIRST INSTANCE
with the pre-requisite that this writ will be served FIFTEEN (15) days prior to the hearing date TO THE MEMBERS OF THE LAST PUBLISHED BOARD OF DIRECTORS OF THE COMPANY ELETSON HOLDINGS INC
The service shall be the responsibility of the applicant

PIRAEUS, 11-11-2024
The Judge
Mrs. KOFINA EFTHIMIA
[*Signature*]

**TRUE COPY**
PIRAEUS, 11-11-2024

The Court Clerk
Mrs. GKIZA OURANIA
[*Signature*]

[*Signature & Seal of the Hellenic Republic – Piraeus Court of First Instance*]

[…]

40

TX-81

**PROVISIONAL ORDER**

The Judge of this court Mr. DELAZANOS ILIAS which was appointed by the President of the Three-Member Council

**FIXES**

TUESDAY, 12-11-2024 and 11:15am as the date for the hearing of the application for the granting of the Provisional Order, in the office of the Presiding Judge (5th floor, Chamber 515)

Service UNTIL 12-11-2024 AND 10:00 am

PIRAEUS, 11-11-2024
The Judge
Mr. DELAZANOS ILIAS
[*Signature*]

**TRUE COPY**
PIRAEUS, 11-11-2024

The Court Clerk
Mrs. GKIZA OURANIA
[*Signature*]

- Accepts the request for the issuance of a provisional order

- Appoints as a provisional management for the shipping company 'ELETSON HOLDINGS INC' consisting of the following individuals: **1)**Vasileios Chatzieleftheriadis of Apostolos, **2)**Konstantinos Chatzieleftheriadis of Apostolos, **3)**Ioannis Zilakos of Nikolaos, **4)**Emmanouil Andreoulakis of Stylianos, **5)**Adrianos Psomadakis-Karastamatis of Michail, **6)**Panos Paksinos of Ioannis, **7)**Eleni Giannakopoulou of Konstantinos, **8)**Niki, wife of Nikolaos Zilakos, in order to take care of all the urgent matters of the said company and in particular to take care of its legal representation (appointment of lawyers) before the Courts of New York for its pending cases, temporarily until the hearing of the application at the scheduled hearing date and under the condition that the case will be heard  at the said hearing date.

| | | |
|---|---|---|
| [*Seal of the Hellenic Republic – Piraeus Court of First Instance*]<br><br>True copy certified for legal stamping,<br><br>Piraeus, 13/11/2024<br><br>The Court Clerk<br><br>[*Signature of Georgios Georgiou*] | | Piraeus, 12-11-2024<br><br>The President of the Office<br><br>[*Signature of Antonia Meggouli*]<br><br>Antonia Meggouli<br><br>President of the Court of First Instance |

41

TX-81

EXHIBIT "3"

REPUBLIC OF LIBERIA) IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY) CIRCUIT, MONTSERRADO COUNTY, SITTING IN
ITS DECEMBER TERM, A.D. 2024

HIS HONOUR J. KENNEDY PEABODY . . . . . . RESIDENT CIRCUIT JUDGE

Pach Shemen, LLC, by and thru its           )
Manager, Mark Lichtenstein                   )
. . . . . . . . . . . . . . . Petitioner     )
                                             )
              Versus                         )     PETITION FOR THE
                                             )     ENFORCEMENT OF A
                                             )     FOREIGN JUDGMENT
Eletson Holdings Inc., a nonresident         )
Liberian corporation, c/o its Registered)
Agent, The LISCR Trust Company,              )
80 Broad Street, Monrovia, Liberia           )
. . . . . . . . . . . . . . . Respondent     )

*FILED BY: VICTOR G. GAILOR, CLERK OF COURT, 26TH DAY OF Nov, 20 24 AT 3:30PM*

## PETITIONER'S PETITION

The above-named Petitioner submits this Petition
respectfully requesting Your Honour to enforce the judgment duly
entered into by the United States Bankruptcy Court for the
Southern District of New York for the following legal and
factual reasons, to wit:

1. The Petitioner is a limited liability company validly
organized and existing under the laws of the State of Delaware,
U.S.A. Attached hereto and marked **Exhibit "P/1"** is a copy of the
Petitioner's Certificate of Incorporation.

2. The Petitioner has authorized Pierre, Tweh, & Associates
Inc., a Liberian law firm in good standing, to institute these
proceedings on behalf of the Petitioner. Attached hereto and
marked **Exhibit "P/2"** is a copy of the Resolution of the
Petitioner's Manager authorizing the institution of these
proceedings

3 Petitioner says as a result of the Respondent's
insolvency, the Respondent agreed to commence voluntary Chapter
11 bankruptcy proceedings under the jurisdiction of the United
States Bankruptcy Court for the Southern District of New York.
Attached hereto and marked in bulk **Exhibit "P/3"** are copies of
the Respondent's September 6, 2023 Stipulation for the
commencement of the voluntary Chapter 11 bankruptcy proceedings
and the corresponding September 25, 2023 written order from the
Bankruptcy Court. The Respondent's bankruptcy case is identified
as **In re: Eletson Holdings Inc., et al., Case No. 23-10322**.

4. The Petitioner says as part of the Respondent's
bankruptcy proceedings, the Petitioner, jointly with other of
the Respondent's creditors, filed two (2) separate bankruptcy
plans and the Respondent also filed its own bankruptcy plan with
the Bankruptcy Court. The creditors' plans detailed their
respective strategies for the reorganization and restructuring
of the Respondent and certain of the Respondent's affiliated
entities and the Respondent's plan independently also detailed
the Respondent's proposed reorganization and restructuring plan.

5. Further to Count 4 above, the Petitioner says after
reviewing the assessing the merits of the competing bankruptcy
plans that were submitted to the Bankruptcy Court for the
reorganization and restructuring of the Respondent, on October
25, 2024, Honorable John P. Mastando III, the United States
Bankruptcy Court Judge, accepted and confirmed one of the
bankruptcy plans that was filed by the Petitioner and denied

both the Petitioner's alternative plan and the Respondent's plan. Attached hereto are copies of the following:

   i). The Petitioner's September 19, 2024 bankruptcy plan (the "Plan), approved by the Bankruptcy Court on October 25, 2024, hereto attached and marked **Exhibit "P/4"**;

   ii). Judge Mastando's Confirmation Opinion (the "Opinion"), hereto attached and marked **Exhibit "P/5"**; and,

   iii) The Bankruptcy Court's November 4, 2024 Confirmation Order (the "Bankruptcy Order"), hereto attached and marked **Exhibit "P/6"**.

6. The Petitioner says the Plan calls for the complete reorganization and restructuring of the Respondent and include, inter alia, that the Respondent be subject to new governance documents, including Amended Articles of Incorporation. For reference: See Article V of the Plan. (**Exhibit "P/4"**).

7. Further to Count 6 above, Petitioner says the Respondent is a Non-Resident Liberian corporation, so amendments to the Respondent's Articles of Incorporation must be filed and registered with the Liberian International Ship & Corporate Registry (LISCR). Petitioner says LISCR LLC is the official appointed and designated exclusive agent for all Non-Resident Liberian Corporation with the authority granted by the Liberian Government to administer the Liberian corporate registry. Under the Liberian Business Corporations Act, all Non-Resident Liberian corporations are required to file their Articles of Incorporations and any amendments thereto with LISCR.

8. Still further to the said Counts 6 and 7 above, Petitioner says after filing the Articles of Incorporation with LISCR, a Non-Resident Liberian corporation is required to provide LISCR with an official Address of Record "(AOR"). The AOR is the only person or entity with whom LISCR will interact, and receive notifications and instructions pertaining to the registration and status of the company. Therefore any amendment to a Non-Resident Liberian corporation's Articles of Incorporation can only be made on instructions of the AOR.

9. Further to Counts 6 through 8 above, although the Plan has been approved by the Bankruptcy Court for immediate implementation, Petitioner however submits that LISCR will not accept the amendment of the Respondent's Articles of Incorporation for filing as because it requires instructions from the Respondent's current AOR which the current AOR is refusing to do.

10. Section 25.12 of the Liberian Civil Procedure Law provides that a foreign judgment is admissible against a party if any person appeared in the foreign court on behalf of such party. The Petitioner says the records of the bankruptcy proceedings confirm that the Respondent was represented by the Reed Smith LLP Law Firm who appeared and participated in the proceedings on behalf of the Respondent. For reference: See Page 2 of the Opinion (**Exhibit "P/5"**). The Respondent's participation in the proceeding is further evidenced by the Stipulation to commence voluntary Chapter 11 bankruptcy proceedings which was entered on the records of the Bankruptcy Court and the Respondent's filing its bankruptcy plan. See **Exhibit "P/3"** and Section III(H) and (I) of the Opinion (**Exhibit "P/5"**).

11. Section 25.13 of the Civil Procedure Law additionally requires the court to have jurisdiction to render the decision that is sought to be enforced in Liberia. As affirmed in Section II of the Opinion (**Exhibit "P/5"**), the United States Bankruptcy Court for the Southern District of New York has jurisdiction over the proceedings pursuant to Title 28 of the United States Code at Section 157(a).

Section 157(a) provides that:

*"Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district").*

Section 157(b(1) provides that:

*"Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments").*

Section 157(b(2)(L) provides that:

*"Core proceedings include, but are not limited to ... confirmations of plans".*

12. Petitioner says the Bankruptcy Court's jurisdiction is also supported by the Amended Standing Order of Reference, dated January 31, 2012, issued by the Chief Judge of the United States District Court for the Southern Jurisdiction of New York which provides as follows:

*"Pursuant to 28 U.S.C. Section 157(a) any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 are referred to the bankruptcy judges for this district.".*

Attached hereto and marked in bulk as **Exhibit "P/7"** are the respective sections of the United States Code cited above and the Amended Standing Order.

13. Petitioner submits that it has met and complied with the required statutory requirements for the granting of the Petition to have the judgment issued by the United States Bankruptcy Court for the Southern District of New York enforced against the Respondent in Liberia.

WHEREFORE, and in view of the foregoing, the Petitioner most respectfully prays Your Honour as follows:

a. Issue an interim order that prohibiting LISCR from complying with any instructions from the Respondent's currently registered AOR pending the hearing and final determination of the Petitioner's Petition.

b. Order that the Opinion and Bankruptcy Order that confirm the Plan be enforced in Liberia.

c. Order LISCR to accept from the Petitioner the amendments to the Respondent's governing documents as required by the Plan, namely the Amended Articles of Incorporation, the Amended By-Laws and any other applicable material governance and/or organizational documents of Respondent that need to be modified in order to fully implement the Plan.

d. Instruct LISCR to change the Respondent's AOR to a person designated by the Petitioner.

e. Grant unto the Petitioner any and all such further relief deemed by Your Honour to be just, legal, and equitable as in keeping with law.

Respectfully Submitted:
The above named Petitioner,
By and thru its Legal Counsel
Pierre, Tweh, & Associates Inc.,
3rd Floor - Blue Plaza Building,
Benson Street, Monrovia, Liberia

_____
James E. Pierre
COUNSELLOR-AT-LAW

Dated this 26th day of
November, A.D.,2024

EXHIBIT "4"

P/C

REPUBLIC OF LIBERIA     )     IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERADDO COUNTY)           CIRCUIT, MONTSERADDO COUNTY, SITTING
                              IN ITS DECEMBER TERM, A.D. 2014

## BEFORE HIS HONOUR: J. KENNEDY PEABODY....... RESIDENT CIRCUIT JUDGE

Pach Shemen LLC by and thru its          )
Manager, Mark Lichtenstein....... Petitioner )
                                          )
              Versus                      )     PETITION FOR THE
                                          )     ENFORCEMENT OF
Eletson Holdings Inc., a nonresident      )     FOREIGN JUDGMENT
Liberian Corporation, c/o its Registered  )
Agent, the LISCR Trust Company, 80 Broad)
Street, Monrovia, Liberia......... Respondent)

## RESPONDENT'S RETURNS

Respondent in the above-entitled cause of action prays Your Honour and this Honourable Court to deny and dismiss Petitioner's Petition and for following legal and factual reasons.

### I.     Legal Premise

1.1     That as to the entire Petition, Respondent says that it should be denied and dismissed because the judgment sought to be enforced is the subject of an appeal that has not been determined. Attached hereto and marked as Respondent's **Exhibit R/1** is the Notice of Appeal (docket 1233) and the Statement of Grounds of Appeal (docket 1264) both before the United States Bankruptcy Court for the Southern District of New York, evidencing the pendency of the appeal.

1.2.     That the Respondent's current Board of Directors have authorized Lex Group Liberia to file these returns challenging the enforcement of the judgment, because this court is at liberty to give or to refuse to give effect to the foreign judgment, which is sought to be enforced, if this court finds that to do so would be unjust and inequitable. The Supreme Court of Liberia in the case **Turner V. Burnette, 24 LLR 212 (1975),** held that "The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied]. In the instant case, Respondent says that it would be unjust and inequitable to give effect to the foreign judgment sought to be enforced for the following factual and legal reasons.

1.3     That having made findings concerning the bad faith actions of Murchinson and its affiliates , the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this court is not so constrained and should refuse the enforcement of the bankruptcy judgment in Liberia, because it was obtained by the misuse of laws and with such bad faith on the part of the Petitioner. This court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was unjust and inequitable, and hence, a judgment obtained by such means should not be enforced in Liberia.

### II.     Factual background

2.1     The Respondent is a corporation, which was incorporated on December 4, 1985, under Liberian law, with its headquarters and center of main interests located in Greece, where it maintains offices at 118 Kolokotroni Street, Piraeus. Holdings operates pursuant to Holdings' existing Articles of Incorporation, dated December 4, 1985, Restated Articles of Incorporation, dated June 29, 2007 (the "Restated AOI"), and Articles of Amendment, dated June 29, 2018, and as amended, modified, supplemented or restated from time to time, and filed and recognized in Liberia (the "Existing Articles of Incorporation"). **Article V, Section 5 of the Restated Articles of Incorporation,** provides that "<u>any</u> purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)

Attached hereto and marked as Respondent's **Exhibit R/ 2 in bulk** are copies of the Articles of Incorporation of the Respondent, Restated Articles of Incorporation of the Respondent, and Articles of Amendment of the Articles of Incorporation of the Respondent.

2.2     On October 22, 2013, the Respondent and Blackstone Tactical Opportunities ("**Blackstone**"), an alternative investments fund, founded a new company, Eletson Gas LLC ("**Eletson Gas**"), a limited liability company (LLC) established under the laws of the Marshall Islands. Pursuant to the Limited Liability Company Agreement signed Blackstone was the preferred shareholder of the Company, while the Respondent here held the common shares/units. The preferred shares granted Blackstone priority in dividend distributions and, under certain conditions, decisive control over the company. Eletson Gas owned, directly or indirectly, 14 liquefied petroleum gas carriers.

2.3     In November 2021, a hedge fund, Murchison Ltd ("**Murchison**"), purchased Blackstone's units in Eletson Gas (for a price later revealed to be just USD 3 million) and thus became the preferred unit holder in Eletson Gas, replacing Blackstone. The acquisition of Blackstone's preferred units was made through a company affiliated with Murchison, Levona Holdings Ltd ("**Levona**"), a special purpose vehicle (SPV) established under the laws of the British Virgin Islands (BVI).

2.4     On February 22, 2022 a Binding Offer Letter("the BOL") was agreed between, amongst others, the Respondent and Eletson Gas from the one part and Levona from the other part pursuant to which Eletson Gas would either pay Levona USD 23 million or transfer ownership of two vessels of equivalent value (specifically, the shares of the bareboat charterers of the vessels SYMI II ENE and TELENDOS II ENE) and in exchange, Levona would transfer its preferred membership units in Eletson Gas to Eletson Gas or entities nominated by the latter. Attached hereto and marked as Respondent's **Exhibit R/3** is a copy of the Binding Offer Letter.

2.5     Whilst Eletson Gas transferred on 11 March 2022 to Levona the shares it held in the ship-owning companies (bareboat chartering companies) of MT SYMI and MT TELENDOS, valued at USD 23,000,000 and nominated the three Cypriot shipping companies Fentalon Limited, Apargo Limited, and Desimusco Trading Limited as its new preferred shareholders. Sometime later, Levona suddenly began to claim, around mid-July 2022, that it had not transferred its preferred shares in Eletson Gas. According to Levona, this was because, under the terms of the BOL, Eletson Gas was supposed to have followed certain formal procedures to exercise an option to acquire the preferred shares, which, according to Levona's claims, had not taken place. "Consequently, Levona began to assert that although both the two vessels (and more specifically the shares of the bareboat chartering companies of the vessels MT SYMI and MT TELENDOS) had been transferred to it, the preferred shares in Eletson Gas had not been properly transferred from Levona to Eletson Gas or its nominees. As a result, Levona asserted that it had both the two vessels and the preferred shares (units) in Eletson Gas and in mid-July 2022 it tried to sell the remaining twelve (12) vessels in Eletson Gas's fleet to Eletson Gas' main competitor, i.e. Unigas."

2.6     Specifically, on July 15, 2022, a Letter of Intent (LOI) was allegedly signed between Unigas and Eletson Gas, purportedly executed by a representative of Levona (who lacked the authority to sign on behalf of Eletson Gas). This LOI concerned the purported sale and transfer of the other twelve (12) vessels to Unigas, thus violating the terms of Limited Liability Company Agreement ("the LLCA"), as Levona was no longer a shareholder of Eletson Gas and had no right to negotiate or act on its behalf. Levona's actions caused damage not only to Eletson Gas but also to the New Preferred Shareholders, due to the conduct of Levona in bad faith, in breach of contractual terms, and contrary-to-good-faith and in breach of customary business practices. Attached hereto and marked as Respondent's **Exhibit R /4** is a copy of the Letter of Intent

2.7　Following Levona's anti-contractual and bad-faith behavior, the Respondent and its subsidiary Eletson Corporation initiated arbitration in New York against Levona on July 29, 2022, based on the arbitration clause contained in Article 12.14(a) of the LLCA. The purpose of the arbitration was to resolve the dispute between the parties regarding whether Levona had transferred to Eletson Gas or to companies nominated by it the preferred shares (units), which (units) Levona held in Eletson Gas, as well as related corporate disputes arising from the LLCA. Attached hereto and marked as Respondent's **Exhibit R/5** is a copy of the claim/complaint filed before the Judicial Arbitration and Mediation Services Inc (JAMS) by the Respondent.

2.8　During the arbitration, serious illegalities and violations of good faith and fair dealing by Levona/Murchison were revealed, which occurred before it even acquired Blackstone's shares (units) in Eletson Gas, after the acquisition, and during the arbitration itself. These included, among others, that Levona/Murchison maliciously: (a) Bribed the Chief Financial Officer of Eletson Corporation to act against the interests of Eletson Holdings, (b) Violated the confidentiality obligations of the LLCA, (c) Interfered with Eletson Gas's relationships with its creditors, leading to the seizure of Eletson Gas's ships, (d) Falsified evidence by creating alleged minutes of a board meeting from March 10, 2022, after the arbitration had begun, (e) Conspired with certain of Eletson Gas's lawyers against the interests of Eletson Gas. Attached hereto and marked as Respondent's **Exhibit R/ 6** is the relevant excerpts from the Arbitrator's ruling confirming these facts.

2.9　On September 29, 2023, the Arbitrator ruled in favor of the claims of the Respondent and Eletson Corporation. Specifically, it recognized the bad faith, breach of contract, and actions contrary to good faith and fair dealing by Murchison/Levona, finding that the latter violated the LLCA in several ways. The Arbitrator also determined that Levona had indeed transferred its preferred shares in Eletson Gas to the Cypriot companies Fentalon, Apargo, and Desimusco Trading Limited that had been nominated by the Eleston Gas. Furthermore, the Arbitral Award awarded (a) USD 43,455,12.21 as compensatory damages, (b) USD 43.455.122,21 as punitive damages, and (c) attorneys' fees, costs, expenses and additional interest. This award was confirmed on February 9, 2024, by an order of the US District Court for the Southern District of New York, except from certain provisions which were vacated without, however, altering the amounts awarded or their designated beneficiaries. Attached hereto and marked as Respondent's **Exhibit R/7** in bulk are the arbitral award/ruling and the US District Court for the Southern District of New York February 9, 2024, confirmation order.

2.10　Meanwhile, even before the above arbitration award was issued the Petitioner, along with two other creditors of the Respondent, i.e. VR Global Partners L.P., and Alpine Partners L.P., initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Respondent and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. The alleged debtors at the time filed motion to dismiss the involuntary bankruptcy proceedings. However, following extensive litigation that lasted approximately 6 months, and given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Respondent here to retain control over its assets, at least until the anticipated arbitral award was issued, on September 7, 2023, Respondent agreed to a stipulation with the Petitioner to convert the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) to a voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code).

2.11　It should be stressed that the Petitioner (i.e. Pach Shemen LLC) was not an original creditor of the Respondent. In fact, it did not even exist before the arbitration had commenced. It was established by Levona in order to acquire at an extremely low-price old bonds issued by the Respondent and it used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the petition for bankruptcy was not made due to true and genuine insolvency of the Respondent and for its restructuring for the equal and fair satisfaction of the creditors, but it was made a shield of protection of its alter ego Levona in case the arbitration award was issued against it. More specifically, as the Judicial Arbitration and Mediation Services Inc (JAMS) arbitrator found (emphasis added):

*"On or about January 4, 2023, Pach Shemen purchased $183,851,546 in bonds of Holdings for $2 million. Additionally, Mr. Spears, on behalf of the Levona-related entities, offered additional consideration to the bondholders contingent on the outcome of this arbitration stating that it would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the company." The Holdings bonds were purchased by Pach Shemen from Nomis Bay and BPY via private trades and then transferred to Pach Shemen.*
*[...]*
*On January 11, 2023, Pach Shemen then instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on these bonds ("Bondholder Litigation"). Then on March 7, 2023, Pach Shemen and two other creditors of Holdings, filed involuntary bankruptcy petitions against Holdings in the Southern District of New York. The involuntary bankruptcy petition and some of the documents included in the filing were signed by Mr. Lichtenstein and Mr. Spears. (The timing of this filing is notable—it was three days after I orally issued certain discovery rulings adverse to Levona, including that it had waived any claim of attorney-client privilege . . . and ordering the production of Levona/Murchinson's communications with Kanelos.*
*[...]*
*As discussed, supra, Pach Shemen is the alter ego of Levona. The separateness is in name only. Its representatives, including Spears and Lichtenstein, were bound by the Status Quo Injunction. Despite this, Pach Shemen a/k/a Levona II, entered into a trade to purchase the notes, offering as consideration value associated with the assets in dispute in this arbitration.*
*[...]*
*In other words, the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration. They believed, at the time—although mistakenly—that if I ruled that Eletson had exercised the option and bought out Levona's interests, the preferred interests would pass to Holdings. Thus, by purchasing the bonds, it became a controlling creditor of Holdings with the ability to put Holdings into bankruptcy. In the first instance, the filing of the bankruptcy led to Levona's insistence that it could not arbitrate these claims due to the automatic bankruptcy stay. This was certainly not "maintain[ing] the status quo." In the event the stay was to be lifted, and Levona lost in this arbitration, the Levona-related entities were then positioned to argue that, as creditor to Holdings, the value of the preferred shares passed to them."*

2.12    Subsequently, following the bad faith tactics of Levona and its affiliated companies Murchinson/Pach Shemen, on October 25, 2024, the Bankruptcy Court of New York, presided over by Judge John P. MASTANDO, approved Petitioner's September 19, 2024 plan and on November 4, 2024 , the court issued a confirmation order whose recognition is hereby sought, rejecting the objections of the Respondent and approving the reorganization plan proposed by the Creditors.


**III.    Reasons why the petition for enforcement of the judgment should be denied and dismissed because it is inequitable and works grave injustice against the Respondent**


3.1    Respondent says that the petition for recognition of this judgment should be denied and dismissed for the following reasons:

3.2    The judgment sought to be recognized and enforced is the subject of an appeal that has not been determined. Whilst this appeal may not have automatically under US law the effect of stay of execution or enforceability, it is obvious that if the petition is upheld and the Petitioner is allowed to apply the judgment within Liberia and change the corporate structure and governess of the Respondent, then the above appeal will be in practice totally neutralized, it will have no realistic purpose to be judicially determined. The fact that a judgment in a case that is on appeal is enforceable by the US court does not mean that it is enforceable in Liberia. The Supreme Court of Liberia emphatically held  in the case **Turner V. Burnette, 24 LLR 212 (1975**), that *"in the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable"*. This court is at liberty to determine whether to give effect to the judgement or not, and the standard set by the Supreme Court in making the discretionary determination is premised on the theory of what is regarded as naturally

just and equitable. The decision of whether to enforce or not to enforce is not limited to a two-prong inquiry of (a) whether the foreign court had jurisdiction (b) whether the Respondent appeared in court. Instead by the standard set in **Turner V. Burnette**, the inquiry extends to whether to enforce or not to enforce the foreign judgment would be just and equitable. Under Liberian law, the right of appeal is one that the constitution of Liberia upholds as inviolable.

3.3     The bankruptcy proceedings were initiated in bad faith, which constitutes a violation of natural justice and equity As mentioned above and as determined by the Arbitrator Ariel E. Belen in his final arbitral award dated September 29, 2023, the conduct of Levona, as well as the affiliated companies Murchinson and the Petitioner which, according to the Arbitrator, are described as "each being the alter ego of the other" — towards the Respondent is entirely illegal, in breach of contract, unethical, and utterly in bad faith. The Petitioner used a legal procedure for totally other purposes. The Respondent was not truly facing insolvency problems, and the Petitioner did not truly aim at serving a genuine claim. It misused the bankruptcy procedure to protect itself against a possible unfavorable arbitration award. The fact that compensation and damages were awarded to affiliated companies of the Respondent and not to the Respondent itself does not change the reality that the bankruptcy procedure was misused to neutralize the arbitration proceedings.

3.4     Specifically, the bankruptcy petition in the US was not filed with the intent of financially restructuring the Respondent but was aimed at securing a strategic advantage in the arbitration already pending between the Respondent and Eletson Corporation against Levona (an alter-ego of Murchinson and Pach Shemen LLC, i.e. the Petitioner). The Petitioner, by offering financial incentives and providing legal and financial support to other participants in the bankruptcy proceedings, created a network of control and influence that allowed it to dictate the course of the process solely to serve its own interests (i.e., the interests of Murchinson / Pach Shemen LLC / Levona).

3.5     As noted above, the Petitioner herein was not an original creditor of the Respondent, but it acquired at an extremely low price the bonds and used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the Chapter 7 petition for bankruptcy was not initiated for the restructuring of the Respondent, nor was it done for the equal and fair satisfaction of the creditors, but it was initiated in order to avoid the debts of its alter ego Levona by obstructing justice, all of which are contrary to the public policy of any country. Thus, the acquisition of the Bonds by the Petitioner was never intended to achieve potential financial returns on the investment. Instead, the shared goal of Murchinson/Levona/the Petitioner was to orchestrate the bankruptcy process for their benefit in the arbitration and to gain control over the Respondent and, through it, Eletson Gas. Moreover, Murchinson/Lenova/Pach Shemen/Petitioner attempted to use information obtained during the bankruptcy process before the U.S. Bankruptcy Court to their advantage in the arbitration.

3.6     It should be noted that the misuse of the bankruptcy procedure by the Petitioner was also confirmed in the Confirmation Order dated October 25, 2024 of the U.S. Bankruptcy Court which states: :

> *While the Arbitration was pending, Murchinson and Levona sought an alternative means by which they could obtain control of the Gas assets should the Arbitration result in an adverse outcome. As part of these efforts, Murchinson and Levona negotiated with certain holders of the New Notes regarding the potential purchase of a majority of the then-outstanding New Notes. (DX-096 (the "Note Purchase Emails") (email chain discussing New Note purchase terms)). Murchinson's plan was to purchase a majority of the New Notes in order to embark on a potential "bankruptcy strategy" to exert control over the Debtors and prevail in the Arbitration. (DX-199 (the "Bankruptcy Strategy Emails") (discussing the need to move quickly because Murchinson already had "the lawyers in motion on the bankruptcy strategy")). Murchinson ultimately negotiated the purchase of a majority of the New Notes, totaling $183,851,546. (Final Award at 60). As consideration for its purchase of the New Notes, Murchinson agreed to pay to the selling noteholders: (i) $2,000,000 up front; (ii) an additional $500,000 if the Arbitration ended to Murchinson's satisfaction; (iii) 10% of the value received by Levona for its Gas Preferred Shares (excluding certain expenses), up to $1,000,000; (iv) one third of the first $3,000,000 profit realized by the entity holding the New Notes on Murchinson's behalf (excluding expenses); and (v) thereafter 25% of any profit realized by the entity holding the New Notes on*

*Murchinson's behalf after $3,000,000 of profit is earned under (iv). Murchinson formed Pach Shemen—another special purpose vehicle—on December 12, 2022, to hold the New Notes, which were officially acquired on January 4, 2023. (Final Award at 60).*

*The arbitrator assessed nearly $87 million in damages against Levona, Pach Shemen, and Murchinson, because the arbitrator found that, inter alia, Murchinson and its proxies: (i) bribed an officer (the former CFO) of Eletson Corporation and Gas to act against Gas' interests; (ii) breached an NDA by communicating directly with Gas financiers and lenders; (iii) intentionally violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the Arbitration; and (v) refused to produce relevant documents in the Arbitration.*

*. The U.S Bankruptcy Court further found that "[Mark] Lichtenstein and [Adam] Spears are each affiliated in various ways with Murchinson, Pach Shemen, and Levona"*

3.7 Having made these findings concerning the bad faith actions of Murchinson and its affiliates, the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan, and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this court is not so constrained and should not accept to recognize in Liberia a bankruptcy judgment that was obtained by the misuse of laws and with such bad faith of the Petitioner. The court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was therefore unjust and inequitable, and hence, a judgment obtained by that means should not be enforced in Liberia.

3.8 Because the U.S. Bankruptcy Court did not consider whether (or to what extent) the overall bad faith conduct of Murchison and Pach Shemen in planning and carrying out the scheme to seize control of the Respondent (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing as the sole shareholder of Respondent, that issue has been left for the Liberian court to determine. Moreover, the U.S. Bankruptcy Court was never even given the opportunity to determine whether Pach Shemen's last-minute tactic to modify its proposed plan to avoid the requirements of Liberian corporate law by purporting to act under the existing bylaws violated natural justice and fundamental due process. In connection with both, the plan that Pach Shemen now tries to enforce in Liberia violates Liberian law because it was made and exists in bad faith, and naturally and fundamentally unjust and inequitable.

3.9 Even whilst the appeal is pending before the United States Bankruptcy Court for the Southern District of New York, and the Petitioners have filed before this court a petition for the recognition and enforcement of the foreign judgment, the Petitioner have nevertheless embarked upon the process of taking control of the Respondent, purporting to be shareholders and officers of the Respondent, and writing letters to lawyers representing the Respondent to threaten that to represent the Respondent in these proceedings without the Petitioner's consent is unauthorized. In effect, the Petitioners are to decide who represents the Petitioners, and they are also the Respondent, and they get to decide who represents the Respondent in these proceedings. In other words, the Petitioners are to be regarded as the Petitioners and the Respondent in these proceedings. If the Petitioner have reason to believe that it is also the Respondent or controls what Respondent does in these proceeding before this Liberian court, and that they can lawfully be the Petitioner and the Respondent in the enforcement proceedings before the Liberian court, they are at liberty to challenge the Respondent's legal representation before the Liberian court, and this court will make the appropriate determination under Liberian law. But to elect to threaten and bully Liberian lawyers, in a bid to prevent the Respondent from selecting counsel of their choice to represent their interest in the proceeding for the enforcement of judgment before the Liberian court, is further proof of the depraved conduct of the Petitioner. The **Liberian Constitution, Article 21(i),** provides: "the right to counsel and the rights of counsel shall be

inviolable. There shall be no interference with the lawyer client relationship"....."There shall be absolute immunity from any government sanctions or interference in the performance of legal services as a counsellor or advocate; lawyers offices and homes shall not be searched or papers examined or taken save pursuant to a search warrant and court order; and no lawyer shall be prevented from or punished for providing legal services, regard less of the charges against or the guilt of his client."

3.10    Petitioner has further sought to extend its improper exercise of control to Respondent's subsidiaries and affiliates, representing to employees, customers, financial institutions, and even outside counsel of those subsidiaries and affiliates that — even as it purports to seek this Court's recognition of the bankruptcy court's order — it in fact already controls those subsidiaries and affiliates. Respondent has threatened and purported to give instructions to those employees, customers, financial institutions and outside counsel. Attached hereto and marked as Respondent's **Exhibit R/8** is a copy of an email written to Lex Group Liberia's Senior Consulting Counsel, Cllr. Betty Lamin-Blamo by a Mr. Adam Spears, who purports to be the CEO of the Respondent, along with a certificate of incumbency, and extract of minutes of meeting of the board of directors of Respondent where it is resolved that Lex Group Liberia represents the Respondent/Eletson Holdings Inc in these proceedings. Lex Group Liberia's business registration certificate is also attached.

3.11    The bankruptcy court's approved Petitioner's September 19, 2024 Plan on October 25, 2024, and confirmed same on November 4, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e-amendment of its Articles of Incorporation, etc.. For example, the Petitioner had proposed amendments to the Articles of Incorporation of the Respondent to remove certain restrictions on the transferability of shares as a part of their plan. When the Petitioner realized that in order to do this it would require tthat the amendment be filed by the Address of Record who was appointed by the Respondent, the Petitioner sought to amend the plan to provide that it would become effective prior to any of these procedures occurring — and therefore without needing to await a Liberian court recognition and enforcement of the judgment. On November 19, 2024, Petitioner filed a supplemental plan after the opinion and confirmation order of the court was issued on November 4, 2024. The supplemental plan excluded the proposed Amendment to the Article of Incorporation, and instead inserted the current Restated Articles of Incorporation which contains restrictions on the transferability of the Respondent shares. Petitioner intent is to evade and is in fact attempting to evade its prior commitment to the bankruptcy court that it would proceed in accordance with Liberian law. Although the supplemental plan of November 19, 2024, has not been confirmed by the Bankruptcy court, Petitioner is attempting to take control of the Respondent *before* obtaining a judgment from a competent Liberian court approving the enforcement of the New York bankruptcy court's confirmation order issued on November 4, 2024. The bankruptcy court was never asked by the Petitioner to approve its November 19, 2024, supplemental plan and strategy to transfer the shares of the Respondent in violation of Respondent's Articles of incorporation.

3.12    The Petitioning Creditors' Plan and Disclosure Statement "contemplate the submission of certain documents (or forms thereof) and schedules" to effectuate the Plan (noting the Plan Supplements are "integral to and considered part of the Amended Plan").    Accordingly, on August 2, 2024, September 19, 2024, and November 12, 2024, the Petitioning Creditors filed Plan Supplements, that included, among other things, a Form of Amended By-Laws, Form of Amended Certificate of Incorporation, and Form of Shareholders Agreement (the "Prior Plan Supplements").    By submitting an Amended Certificate of Incorporation in each of the Prior Plan Supplements, the Petitioning Creditors recognized that they would be required to file an Amended Certificate of Incorporation with the Liberia authorities in order to implement the Plan and to effectuate a change in management and control of the Respondent including the appointment of directors, officers, and legal representatives of the company.

3.13    Instead of complying with Liberian law and acting in accordance with their Plan, on November 19, 2024, the Petitioning Creditors filed a *Notice of (I) The Occurrence of the Effective Date and (II) Final Deadlines for Filing Certain Claims* (the "Effective Date Notice"), providing notice "that all conditions precedent to the Effective Date set forth in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.2 of the Plan" and notice of the occurrence of the Effective Date on November 19, 2024. On the same day, the Petitioning Creditors filed the *Notice of Filing of Third Amended Plan Supplement to the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its*

*Affiliated Debtors* (the "Plan Supplement"). In the Plan Supplement, the Petitioner for the first time and without any notice to or approval of the Bankruptcy Court, abandoned their previously-stated intention to submit their own Amended Certificate of Incorporation, Articles of Incorporation, and By-Laws and instead represented that "Eletson Holdings Inc. will continue under its existing Restated Articles of Incorporation of Eletson Holdings Inc., as filed on June 29, 2007 with the Republic of Liberia, as amended by the Articles of Amendment filed on June 29, 2018 (and as amended, modified, supplemented, or restated from time to time)." *Id.* at 3 (emphasis added). Attached hereto and marked as Respondent's **Exhibit R/9** is a copy of the petitioner's supplemental plan of November 19, 2024.

3.14    Under Respondent's existing *Restated Articles of Incorporation* (Article V, Section 5) it prohibits the authorized transfer of shares and it provides : "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)

3.15    The Respondent's current Board of Directors have authorized Lex Group Liberia to file these returns challenging the recognition and enforcement of the judgment, because this court is at liberty to give or to refuse to give effect to the foreign judgment, which is sought to be enforced, if this court finds that to do so would be unjust and inequitable. The Supreme Court of Liberia in the case **Turner V. Burnette,    24 LLR  212  (1975),** held that *"The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied]*.

3.16    That as to count one (1) of the petition, Respondent says that it presents no traversable issue.

3.17    That as to count two (2) of the petition, it presents no issue that needs to be traversed.

3.18.    That as to count three (3) of the petition, Respondent denies that the bankruptcy proceedings were initially commenced by the Respondent as a voluntary Chapter 11 bankruptcy proceedings. Instead, the proceedings were initially commenced by the Petitioner against the Respondent as a Chapter 7 involuntary bankruptcy proceeding. Respondent says that to provide full disclosure, is a core tenet of judicial fairness and integrity. Courts rely on comprehensive and accurate information to deliver just and equitable decisions. The Petition's omissions undermine the Court's ability to consider the matter fully and fairly. The Petitioner failed to disclose to the Court that the bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York were not commenced as voluntary Chapter 11 bankruptcy proceedings, but as involuntary Chapter 7 bankruptcy proceedings. As mentioned above in paragraph  2.7 while the Respondent and Eletson Corporation had already initiated arbitration proceedings against Levona on July 29, 2022, on March 7, 2023, the Petitioner, along with two other creditors of the Respondent, initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Respondent and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. Given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Respondent to retain control over its assets, at least until the anticipated arbitral award was issued, on September 6, 2023, the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) were converted into voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code). The fact that the bankruptcy proceedings were initiated as involuntary Chapter 7 bankruptcy proceedings, and they were then converted into voluntary Chapter 11 bankruptcy proceedings is very important in this case and is not explicitly written in the Petition. This fact shows that the bankruptcy proceedings were not initiated voluntarily by the Respondent and that the Respondent was actually forced into bankruptcy by the filing of a bad-faith involuntary petition by the Petitioners.

3.19    That as to count four (4) of the Petition, Respondent says that it did  file a bankruptcy plan as a result of the proceedings that were initially commenced by the Petitioner against the Respondent as a Chapter 7 involuntary bankruptcy proceeding which later forced Respondent

because of the circumstances at the time, to stipulate with the Petitioner to convert the the Chapre 7 to a Chapter 11 proceedings.

3.20 That as to count five (5) and six(6) of the Petition, Respondent says that although the court did review the plans of the parties, the court did not consider whether (or to what extent) the overall bad faith conduct of Murchison/ Pach Shemen in planning and carrying out the scheme to seize control of the Respondent (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing and the Plan submitted by it. On October 25, 2025, the court approved the Petitioner's plan submitted on September 19, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e.-amendment of its Articles of Incorporation, etc. The court did not approve any supplemental plan thereafter.

3.21 That as to count seven (7) of the petition, Respondent says that it is a non-resident Liberian domestic corporation. However, it refutes that amendments to the Respondent's Articles of Incorporation must be filed and registered with the Liberian International Ship & Corporate Registry (LISCR). LISCR is the statutory registered agent for Liberian non-resident domestic corporations and Foreign Maritime Entities only. LISCR is responsible for receipt and service of process, and to ensure the keeping of the required information of directors, management, and ownership to enable accessibility and availability of that information to the relevant competent authorities. The Registrar - the Minister of Foreign Affairs-the US equivalent of Secretary of State or the Deputy Registrar, or an official of the Liberian Government designated by the Registrar are authorized under the Business Corporation Act to file and effect amendments to the Articles of Incorporation of Liberian corporations.

3.22 That as to count eight (8) of the petition, Respondent confirms and affirms count 3.21 above and says further that LISCR as the statutory registered agent of non-resident domestic corporation, it is authorized to adopt procedures and other mechanisms for the smooth operation of the Registry. Filings and submission of information relating to directors, management, and ownership of non-resident corporations (incumbency) can be made and accepted only from a pre-designated authorized representative of the non-resident domestic corporation and Foreign Maritime Entities known and referred to as the Address of Record ("AOR") as per the procedure established by LISCR, unless otherwise instructed by a competent Liberian court.

3.23 That as to count nine (9) of the petition, Respondent confirms that LISCR does not file Articles of Incorporation or Amendments to Articles of Incorporation of Liberian corporations. The Registrar or Deputy Registrar will not file or amend a Liberian corporation's Articles of Incorporation unless it is done upon the decision made by the corporation and not pursuant to the order of a foreign court that has not been recognized by the courts of Liberia by way of petition for the enforcement of judgment.

3.24 That as to count ten (10) and eleven (11) of the petition, Respondent says that a foreign judgment i.e. a confirmation order confirming a Chapter 11 plan confirmation judgment of the Southern District of New York Bankruptcy Court which purports to cancel and extinguish the common shares of a non-resident Liberian corporation and purports to issue new shares ("Reorganized Equity") is not considered conclusive as to any act(s) enumerated therein, and cannot be given automatic effect under Liberian law, but may be admitted as evidence and enforced by a Liberian court based on comity. The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied]. In the instant case, Respondent says that it would be unjust and inequitable to give effect to the foreign judgment sought to be enforced by the Petitioner for all of the reasons stated above. Even if the Respondent appeared in the foreign court, neither the Constitution of Liberia (1986), the statute or any case law has established that a foreign judgment is conclusive against a party, if the party appeared and the foreign court purportedly or actually had jurisdiction. The subject of foreign judgment is captured under **Chapter 25.12 of the Civil Procedure Law**, which deals with evidence. The foreign judgment is taken as evidence, but it is not considered conclusive and enforceable. The decision of what effect if any is to be given to the judgment as a piece of evidence, lies within the sound discretion of the court considering comity between and amongst states, and other factors such as justice and equity.

3.25   That as to count twelve (12) of the petition, Respondent says that it is without sufficient information to confirm or deny the averment.

3.26.   That as to count thirteen (13) of the Petition, a fundamental requirement for the enforcement of a foreign judgment in Liberia is that the judgment sought to be enforced must in the discretion of the court be considered just and equitable. The Petitioners have failed to show that the judgment sought to be enforced is just and equitable. The Petitioners have instead sought to only establish that the US court which rendered the judgment had jurisdiction to do so, and that the Respondent appeared in the proceedings. The Petitioners have also failed to show that this court (the sixth judicial circuit) has jurisdiction to hear the enforcement of judgment from a Bankruptcy Court of a foreign state/jurisdiction.

3.27   That as to the prayer of the Petitioner, Respondent says that judgment concludes against only persons that are parties to the case out of which the judgment grows. In the instant case, the Petitioner has failed to name and designate LISCR as a party to the suit even if they are considered nominal. Notwithstanding, Petitioner requests court to take actions against LISCR which impacts the rights of the Respondent, without designating LISCR as a Party. Respondent therefore request that the Petitioner's request for this court's order directed at LISCR should be disregarded.

3.28   Respondent denies all and singular the allegations of laws facts that were specifically traversed and reserves the right to interpose appropriate objections and defenses including objection to jurisdiction during the hearing or in any subsequent proceedings.

WHEREFORE, and in view of the foregoing, Respondent prays Your Honour to:

(i)     Issue an Interim Order prohibiting the Petitioner from continuing to hold itself as shareholders, director, and attempting to control the Respondent and its affiliates pending the conclusion of these proceedings.

(ii)    Deny and dismiss the petition

(iii)   Grant unto Respondent any and all such further relief deemed by Your Honour to be just, legal, and equitable as in keeping with law.

Respectfully Submitted:
The above-named Respondent,
Eletson Holdings Inc.
By and thru their Legal Counsels
Lex Group Liberia
Opposite Dominion Christian Fellowship Church
Congo Town, Monrovia, Liberia

J. Daku Mulbah
Counsellor-At-Law

Elizabeth Horace-Kwemi
Counsellor-At-Law

Dated this 16 day December A. D., 2024

EXHIBIT "5"



REPUBLIC OF LIBERIA)        IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY        CIRCUIT, MONTSERRADO COUNTY, SITTING
                          IN ITS DECEMBER TERM, A.D. 2024


BEFORE HIS HONOUR:  J. KENNEDY PEABODY… RESIDENT CIRCUIT JUDGE


Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its )
Registered Agent, The LISCR Trust Company, 80 Broad            )
Street, Monrovia, Liberia…………………………… Movant            )
                                                               )
                    VERSUS                                     )
                                                               )
Pach Shemen, LLC by and thru its Manager, Mark                 ) MOTION TO DISMISS
Lichtenstein………………… ………………...Respondent               )
                                                               )
                    VERSUS                                     )
                                                               )
Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its )
Registered Agent, The LISCR Trust Company, 80 Broad            )
Street, Monrovia, Liberia………………………… Respondent          )


GROWING OUT OF THE CASE:

Pach Shemen, LLC by and thru its Manager, Mark                 )
Lichtenstein……………………… …………………..…. ..Petitioner       )
                                                               )
                    VERSUS                                     ) PETITION FOR THE
                                                               ) ENFORCEMENT OF
                                                               FOREIGN )JUDGMENT
Eletson Holdings Inc., a nonresident Liberian Corporation, c/o its )
Registered Agent, The LISCR Trust Company, 80 Broad            )
Street, Monrovia, Liberia………………………… Respondent          )


## MOVANT'S MOTION

AND NOW COMES MOVANT in the above entitled cause of action most respectfully praying
Your Honour and this Honourable Court to grant Movant's Motion to dismiss for the following
legal and factual reason.

1. Movant says that **Chapter 11, § 2(a) of Title 1, Civil Procedure Law of Liberia**, provides:
   "Time; grounds; At the time of service of his responsive pleadings, a party may move for
   judgment dismissing one or more claims for relief asserted against him in a complaint or
   counterclaim on any of the following grounds: That the court has not jurisdiction of the
   subject matter of the action." It is the contention of the Movant, that the Civil Law Court
   does not have subject matter Jurisdiction over matters of Bankruptcy and Insolvency in
   Liberia, hence, the Petition has been filed before the wrong court and should therefore be
   dismissed consistent with the above quoted citation of law.

2. Movant avers that although the Insolvency and Restructuring Act grants the Commercial
   Court exclusive jurisdiction over all insolvency cases, it also provides that the Act does not
   apply to Domestic Non-Resident Corporations. However, when a foreign judgment, such as
   one emanating from the United States Bankruptcy Court for the Southern District of New

York, is sought to be enforced in Liberia as in the instant case, the Liberian court with exclusive jurisdiction over the subject matter should preside over such proceedings.

3. That Section 8.6 of Insolvency and Restructuring Act of Liberia gives the Commercial Court **exclusive jurisdiction over all insolvency cases** under this Act, regardless of the amount involved and notwithstanding any monetary limits or thresholds, and all matters relating to the administration of a Debtor's Property and Estate or the disposition thereof.

4. That in the interest of Justice and fair play relative to these proceedings, Movant prays Your Honor and this Honorable Court to dismiss Petitioner Petition for enforcement of Foreign Judgment because this Court lack subject matter Jurisdiction.

WHEREFORE AND IN VIEW OF THE FOREGOING, Movant prays Your Honor and this Honorable Court to deny and dismiss, Petitioner's Petition in its entirety, and grant unto Movant any other relief as deemed just and proper in the premises.

Respectfully Submitted:
The above-named Movant,
Eletson Holdings Inc.
By and thru their Legal Counsels
Lex Group Liberia
Opposite Dominion Christian Fellowship Church
Congo Town, Monrovia, Liberia

_____
J. Daku Mulbah
Counsellor-At-Law

_____
Elizabeth Horace-Kwemi
Attorney-At-Law

Dated this 18th day December A. D., 2024

REPUBLIC OF LIBERIA    )  IN THE OFFICES OF THE JUSTICE OF THE
MONTSERRADO COUNTY)  PEACE FOR MONTSERRADO, CITY OF
                    MONROVIA, LIBERIA


Eletson Holdings Inc., a nonresident  )
Liberian Corporation, c/o its Registered  )
Agent, the LISCR Trust Company, 80 Broad )
Street, Monrovia, Liberia…..……..Movant  )
                          )
       Versus          )    MOTION TO DISMISS
                          )
Pach Shemen LLC by and thru its    )
Manager, Mark Lichtenstein….. Respondent)
                          )
GROWING OUT OF THE CASE:    )
                          )
Pach Shemen LLC by and thru its    )
Manager, Mark Lichtenstein……. Petitioner )
                          )
       Versus          )    PETITION FOR THE
                          )    ENFORCEMENT OF
Eletson Holdings Inc., a nonresident  )    FOREIGN JUDGMENT
Liberian Corporation, c/o its Registered  )
Agent, the LISCR Trust Company, 80 Broad)
Street, Monrovia, Liberia…..….. Respondent)


## AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, the undersigned, a duly qualified and commissioned
Justice of the Peace for Montserrado County, at my office in the City of Monrovia, the Movant by
and thru one of its legal counsel, Counsellor J. Daku Mulbah, and made oath in keeping with law
that all and singular the averments as are set forth and contained in the attached Movant's Motion
to Dismiss are true and correct to the best of his knowledge and belief.


                    Sworn and subscribed to this _____ day of
                    December A.D. 2024.

                    _____
                    JUSTICE OF THE PEACE
                    Montserrado County, R.L.

_____
J. Daku Mulbah
Counsellor-At-Law/Affiant

$3.00 Revenue Stamp affixed to the Original.

EXHIBIT "6"

REPUBLIC OF LIBERIA)      IN THE CIVIL LAW COURT ANNEX, SIXTH JUDICIAL
MONTSERRADO COUNTY )   CIRCUIT, MONTSERRADO COUNTY, SITTING IN
                      ITS DECEMBER TERM, A.D., 2024

BEFORE HIS HONOR: SCHEAPLOR R. DUNBAR...................ASSIGNED JUDGE CIVIL
                                                       LAW COURT ANNEX


Pach Shemen LLC , by and thru its Manager, Mark.......................)
Lichentensein................................................................Petitioner )
                                                              ) PETITION TO ENFORCE
          Versus                                              ) A FOREIGN JUDGMENT
                                                              )
Eletson Holdings Inc., a Non-Resident Liberian corporation    )   *Filed: 23/12/2024*
C/o its Registered Agent, The LISCR Trust Company, 80 Broad    )
Street, Monrovia, Liberia.............................................Respondent)   *@ 2:18pm, Clerk*

        **NOTICE OF VOLUNTARY DISCONTINUANCE WITHOUT PREJUDICE**

The Clerk
Civil Law Court Annex
Temple of Justice
Monrovia

Mr. Clerk:

Please take judicial notice and have same spread of the record of this Court that the Petitioner's Petition to
Enforce a Foreign Judgment is hereby discontinued without prejudice pursuant to the provisions of Section
11.2 of the Civil Procedure Law.


                                        Respectfully submitted:
                                        The above named Petitioner,
                                        by and thru its counsel:
                                        Pierre, Tweh & Associates Inc.
                                        3RD Floor - Blue Plaza Building
                                        Benson Street
                                        Monrovia


                                        _____
                                        COUNSELLORS & ATTORNEYS-AT-LAW


Dated this 23rd day of
December, A.D., 2024


APPROVED

_____
His Honor Scheaplor R. Dunbar
Assigned Circuit Judge
Civil Law Court Annex

EXHIBIT "7"

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5

6  In the Matter of:

7  ELETSON HOLDINGS INC. AND REORGANIZED

8  ELETSON HOLDINGS INC.,                    Main Case No.

9          Debtors.                         23-10322-jpm

10

11  - - - - - - - - - - - - - - - - - - - -x

12

13                United States Bankruptcy Court

14                One Bowling Green

15                New York, New York

16

17                December 16, 2024

18                10:03 AM

19

20

21  B E F O R E:

22  HON. JOHN P. MASTANDO, III

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  MARIA

1

2 Notice of Adjournment of Hearing /(Adjourned Hearing Date:

3 12/16/2024 at 10:00 AM, Objections Due: 12/10/2024 at 2:00 PM,

4 Replies Due: 12/13/2024 at 12:00 PM) Notice of Adjournment of

5 Hearing on All Matters Scheduled to be Heard on December 9,

6 2024 at 10:00 AM (related document(s)1269, 1268)

7

8 Motion for Sanctions /Emergency Motion of Reorganized Eletson

9 Holdings Inc. for an Order Imposing Sanctions on Eletson

10 Holdings (A) Existing Person of Record and (B) Former

11 Shareholders, Officers, Directors, and Counsel, Including Reed

12 Smith LLP (Attachments: Ex. A: Proposed Order, Ex. B: Pierre

13 Declaration, Ex. C: Kotliar Declaration with Exs. 1-19)

14 (related document(s)1267)

15

16 Notice of Adjournment of Hearing /[Corrects and Replaces Docket

17 No. 1276] / (Adjourned Hearing Date: 12/16/2024 at 10:00 AM,

18 Objections Due: 12/10/2024 at 2:00 PM, Replies Due: 12/13/2024

19 at 12:00 PM) Notice of Adjournment of Hearing on All Matters

20 Scheduled to be Heard on December 9, 2024 at 10:00 AM (related

21 document(s)1269, 1268)

22

23 Motion to Authorize /Reorganized Holdings Motion for an Order

24 (I) Authorizing Adam Spears to Act as Foreign Representative of

25 Reorganized Holdings and (II) Granting Related Relief

1

2 (Attachments: Ex. A: Proposed Order, Ex. B: Nov. 12, 2024 Arb.

3 Action Hrg. Tr., Ex. C: Nov. 13, 2024 Chapter 11 Hrg Tr., Ex.

4 D: Nov. 19, 2024 Letter to Reed Smith, Ex. E: Nov. 20, 2024

5 Reed Smith Letter in Chapter 11 Trustee Appeal, Ex. F.: Nov.

6 21, 2024 Reed Smith Letter in Arb. Action) (related

7 document(s)1223, 1132)

8

9 Motion to Authorize /Reorganized Holdings Motion for an Order

10 (I) Authorizing Adam Spears to Act as Foreign Representative of

11 Reorganized Holdings and (II) Granting Related Relief

12 (Attachments: Ex. A: Proposed Order, Ex. B: Nov. 12, 2024 Arb.

13 Action Hrg. Tr., Ex. C: Nov. 13, 2024 Chapter 11 Hrg Tr., Ex.

14 D: Nov. 19, 2024 Letter to Reed Smith, Ex. E: Nov. 20, 2024

15 Reed Smith Letter in Chapter 11 Trustee Appeal, Ex. F.: Nov.

16 21, 2024 Reed Smith Letter in Arb. Action) (related

17 document(s)1223, 1132)

18

19

20 Motion for Sanctions /Emergency Motion of Reorganized Eletson

21 Holdings Inc. for an Order Imposing Sanctions on Eletson

22 Holdings (A) Existing Person of Record and (B) Former

23 Shareholders, Officers, Directors, and Counsel, Including Reed

24 Smith LLP (Attachments: Ex. A: Proposed Order, Ex. B: Pierre

25 Declaration, Ex. C: Kotliar Declaration with Exs. 1-19)

(related document(s)1267)

Amended Notice of Agenda /Hearing Date: 12/16/2024 at 10:00 AM
EST) Amended Notice of Agenda of Matters Scheduled for Hearing
on December 16, 2024 at 10:00 AM (EST) (related
document(s)1269, 1275, 1288, 1295, 1298, 1296, 1291, 1290,
1277, 1301, 1289, 1300, 1268, 1292, 1287, 1274, 1299, 1285,
1267, 1293)

Letter /Letter to the Honorable John P. Mastando III re:
Response to Reed Smith LLPs Letter to the Court in connection
with the December 16, 2024 Hearing. (related document(s)1295,
1268)

Response /Reorganized Holdings Omnibus Reply to the Objections
to Its Sanctions Motion and Foreign Representative Motion
(Attachment: Ex. A: Rebuttal Pierre Declaration) (related
document(s)1269, 1268, 1292, 1287, 1293)

Declaration /Declaration of Jared C. Borriello In Support of
Reorganized Holdings Omnibus Reply to the Objections to its
Sanctions Motion and Foreign Representative Motion
(Attachments: Exhibits. 1-11) (related document(s)1269, 1268,
1299)

Notice of Agenda /(Hearing Date: 12/16/2024 at 10:00 AM Via
Zoom) Notice of Agenda of Matters Scheduled for Hearing on
December 16, 2024 at 10:00 AM (EST) (related document(s)1269,
1275, 1288, 1295, 1298, 1296, 1291, 1290, 1277, 1289, 1300,
1268, 1292, 1287, 1274, 1299, 1285, 1267, 1293)

Transcribed by:  Joseph Burstein
eScribers, LLC
7227 North 16th Street, Suite #207
Phoenix, AZ 85020
(800) 257-0885
operations@escribers.net

1

2  A P P E A R A N C E S (All present by video or telephone):

3  REED SMITH LLP

4        Attorneys for Debtors

5        10 South Wacker Drive

6        40th Floor

7        Chicago, IL 60606

8

9  BY:   MICHAEL B. GALIBOIS, ESQ.

10

11

12  REED SMITH LLP

13        Attorneys for Debtors

14        1717 Arch Street

15        Suite 3100

16        Philadelphia, PA 19103

17

18  BY:   DEREK J. BAKER, ESQ.

19        DEREK M. OSEI-BONSU, ESQ.

20        JOSHUA M. PELES, ESQ.

21

22

23

24

25

1

2 REED SMITH LLP

3     Attorneys for Eletson Holdings Inc.

4     599 Lexington Avenue

5     New York, NY 10022

6

7 BY:   ANDREW L. BUCK, ESQ.

8     CHRISTOPHER M. LAUKAMG, ESQ.

9     LOUIS M. SOLOMON, ESQ.

10     RICHARD SOLOW, ESQ.

11

12

13 REED SMITH LLP

14     Attorneys for Eletson Holdings Inc.

15     1201 Market Street

16     Wilmington, DE 19801

17

18 BY:   KEVIN W. COCKERHAM, ESQ.

19

20

21

22

23

24

25

1
2  TOGUT, SEGAL & SEGAL LLP
3       Attorneys for Reorganized Holdings
4       One Penn Plaza
5       Suite 3335
6       New York, NY 10119
7
8  BY:   JARED C. BORRIELLO, ESQ.
9        LEILA EBRAHIMI, ESQ.
10       JOHN C. GALLEGO, ESQ.
11       AMANDA C. GLAUBACH, ESQ.
12       BRYAN M. KOTLIAR, ESQ.
13       JEFFREY LEFKOWITZ, ESQ.
14       MARTHA E. MARTIR, ESQ.
15       JOHN MCCLAIN, ESQ.
16       KYLE J. ORTIZ, ESQ.
17       BRIAN F. SHAUGHNESSY, ESQ.
18
19
20  PIERRE, TWEH & ASSOCIATES, INC.
21       Attorneys for Reorganized Holdings
22       PO Box 10-2536
23       Monrovia, NY 99999
24
25  BY:   JAMES A. PIERRE, ESQ.

```
 1
 2   DECHERT LLP
 3        Attorneys for Official Committee of Unsecured Creditors
 4        1095 Avenue of the Americas
 5        New York, NY 10036
 6
 7   BY:   OWEN HANEY, ESQ.
 8        DAVID A. HERMAN, ESQ.
 9        KARLI K. WADE, ESQ.
10        STEPHEN D. ZIDE, ESQ.
11
12
13   PERKINS COIE LLP
14        Attorneys for Wilmington Savings Fund Society, FSB
15        1155 Avenue of the Americas
16        22nd Floor
17        New York, NY 10036
18
19   BY:   TINA N. MOSS, ESQ.
20
21
22
23
24
25
```

1

2  SIDLEY AUSTIN LLP

3       Attorneys for Shareholders

4       787 Seventh Avenue

5       New York, NY 10019

6

7  BY:   WILLIAM E. CURTIN, ESQ.

8       MICHAEL A. SABINO, ESQ.

9

10

11  RIMON, P.C.

12       Attorneys for Daniolos Law Firm

13       100 Jericho Quadrangle

14       Suite 300

15       Jericho, NY 11753

16

17  BY:   ANTHONY C. ACAMPORA, ESQ.

18       BRIAN POWERS, ESQ.

19

20

21

22

23

24

25

1
2   RIMON, P.C.
3        Attorneys for Daniolos Law Firm
4        100 Park Avenue
5        16th Floor
6        New York, NY 10017
7
8   BY:   MICHAEL S. LAZAROFF, ESQ.
9
10
11  QUINN EMANUEL URQUHART & SULLIVAN, LLP
12        Attorneys for Levona Holdings Ltd.
13        295 5th Avenue
14        New York, NY 10016
15
16  BY:   DANIEL M. KELLY, ESQ.
17
18
19  QUINN EMANUEL URQUHART & SULLIVAN, LLP
20        Attorneys for Levona Holdings Ltd.
21        300 West 6th Street
22        Suite 2010
23        Austin, TX 78701
24
25  BY:   MATTHEW ROZNOVAK, ESQ.

1

2   UNITED STATES DEPARTMENT OF JUSTICE

3       Attorneys for Office of the United States Trustee

4       One Bowling Green

5       Suite 534

6       New York, NY 10707

7

8   BY:   DANIEL RUDEWICZ, ESQ.

9       PAUL K. SCHWARTZBERG, ESQ.

10

11

12  CHALOS & CO, P.C.

13      55 Hamilton Avenue

14      Oyster Bay, NY 11771

15

16  BY:   BRITON P. SPARKMAN, ESQ.

17

18

19

20

21

22

23

24

25

1

2 ALSO PRESENT:

3     RICK ARCHER, Media

4     ELENA EVANGELATOU, Aegean Baltic Bank

5     CLARA E. GEOGHEGAN, Media

6     UDAY GORREPATI, Media

7     MARK LICHTENSTEIN, ESQ., Pach Shemen

8     DAWN L. PERSON, Reorganized Holdings

9     ADAM SPEARS, Pach Shemen

10     BLANKA WOLFE, Media

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Good morning, everyone.  We're here on

3    case number 23-10322.

4          Can I have appearances for the record, please?

5          MR. ORTIZ:  Good morning, Your Honor.  Kyle Ortiz of

6    Togut, Segal & Segal for Reorganized Holdings.  Joined on the

7    line by my colleagues Brian Shaughnessy and Bryan Kotliar.

8          THE COURT:  Good morning.

9          MR. ORTIZ:  Good morning.

10         MR. HERMAN:  Good morning, Your Honor.  David Herman

11   for the official committee of unsecured creditors from Dechert.

12   With me is my partner Stephen Zide.

13         THE COURT:  Good morning.

14         MR. SOLOMON:  Your Honor, good morning.  It's Lou

15   Solomon from Reed Smith.  I am playing the part of Reed Smith

16   today.

17         THE COURT:  Good morning.

18         MR. CURTIN:  Good morning, Your Honor.  William

19   Curtin, Sidley Austin, for Lassia Investment Company, Glafkos

20   Trust Company, and Family Unit Trust company.

21         THE COURT:  Good morning.

22         MR. CURTIN:  Good morning, Your Honor.

23         MR. LAZAROFF:  Good morning, Your Honor.  Michael

24   Lazaroff from Rimon, P.C. on behalf of nonparty, the Daniolos

25   Law Firm.  And I believe I'm joined by my colleague Brian

1   Powers.

2            THE COURT:  Good morning.

3            MR. LAZAROFF:  Good morning.

4            MS. MOSS:  Good morning, Your Honor.  Tina Moss of

5   Perkins Coie on behalf of Wilmington Savings Fund Society, FSB,

6   as indenture trustee.

7            THE COURT:  Good morning.

8            MS. MOSS:  Good morning.

9            THE COURT:  Okay.  Who'd like to begin?

10           MR. ORTIZ:  Your Honor, Kyle Ortiz of Togut, Segal for

11  reorganized Holdings.  We did file an agenda and then an

12  amended agenda, which was at 1303.  Unless Your Honor has a

13  different preference, we can just jump into that agenda.

14           THE COURT:  Please.

15           MR. ORTIZ:  All right.  The first item on the agenda

16  is the motion for an order imposing sanctions on Eletson

17  Holdings existing personnel record, former shareholders,

18  officers, directors, and counsel.  That was filed at docket

19  1268.

20           Your Honor, I could simply say that on state orders of

21  this Court are binding on the parties and not optional or

22  discretionary and really leave it at that.  But unfortunately,

23  the violating parties want to throw just dozens of straw-man

24  arguments at the wall in an effort to kind of confuse and

25  distract from their volatile behavior.  So we are going to

1　address them.

2　　　　This case, Your Honor, is a little like the movie

3　Groundhog's Day in that we just, here we are kind of doing the

4　same thing.  Once again, we have one set of arguments that are

5　grounded in the clear, unambiguous language of the confirmed

6　plan, enforceable by an even more clear and unambiguous

7　statute, which binds the plan on the violating parties,

8　consistent with how Chapter 11 operates in every case.

9　　　　On the other side, Your Honor, once again we have make

10　believe, where when you don't like the clear result of a nearly

11　two-year process handed down in a hundred-plus-page decision,

12　you can just pretend the plan says things it doesn't, invent

13　promises, fabricate foreign laws, wish away the sections of the

14　Bankruptcy Code that require the plan's implementation,

15　relitigate confirmation after the confirmation order's entered,

16　the plan is effective, and ownership, although not all the

17　property, has changed hands, and claim orders in this Court's

18　very jurisdiction somehow doesn't reach the exact parties that

19　invoked that jurisdiction and just three months ago, Your

20　Honor, stood before you, loudly proclaiming that they were here

21　and not hiding in some other country.

22　　　　Frankly, they are openly mocking this Court, Your

23　Honor, telling you that they unilaterally get to decide your

24　authority over them.  Orders aren't optional.  If the effective

25　date was going to create some irreparable harm for these

1    parties, they should have sought a stay.  They didn't because

2    they could never satisfy that standard.  And even now, they're

3    just going to point to nothing concrete, a bunch of stuff that

4    they say they were informed of.

5           But at the end of the day, Your Honor, it's not

6    entirely shocking that the violating parties have chosen to

7    refuse to acknowledge the outcome of these proceedings.

8    Despite statements about maximizing the estate and concerns for

9    creditors at times, the violating parties actions throughout

10   the case made clear that, really, their only goal has ever been

11   to retain control for themselves, regardless of their

12   obligations to others.

13          And again, Your Honor, this isn't entirely shocking.

14   In fact, this exact situation was foreseen by Congress when it

15   made a confirmed plan binding on, among others, the debtor, all

16   creditors, all equity security holders, whether or not they

17   voted to accept the plan under 1141(a) of the Code.  It's why

18   Congress made the vesting of all property of the estate in the

19   debtor automatic upon confirmation of a plan under 1141(b) and

20   made clear that such vesting of assets is free and clear of all

21   claims of interest of creditors and equity holders under

22   1141(c) of the Bankruptcy Code.

23          Congress further recognized, Your Honor, that although

24   these things happen automatically in the eyes of the law, from

25   a practical perspective, there's still this issue of handing

1    over the proverbial keys.  Recognizing that debtors in

2    particular will often be reluctant to cooperate implementation

3    of a creditor plan confirmed over their objection, Section

4    1142(a) requires a debtor to carry out the plan and comply with

5    orders.

6            Then finally, Your Honor, if, like here, a debtor in

7    the face of this clear statutory mandate just refuses, Section

8    1142(b) empowers the Court to direct the debtor or any other

9    necessary party to perform whatever task for the consummation

10   of the plan.  Specifically, 1142(b) is worth reading.

11           "The Court may direct the debtor and any other

12           necessary party to execute or deliver or to join in

13           the execution or delivery of any instrument required

14           to effect a transfer of property dealt with by a

15           confirmed plan and to perform any other act that is

16           necessary for the consummation of the plan."

17           It's really quite elegant at times how this statute

18   comes together, which is why so frustrating when people pervert

19   it.  But note, Your Honor, the Bankruptcy Code does not require

20   any proof be provided to the debtor or its counsel before a

21   confirmed plan is binding.  It's binding on the effective date.

22   Once a court enters a confirmation order, its job is done with

23   regard to the plan going effective.  The Court has no

24   involvement in the declaration of an effective date beyond

25   confirming a plan.  They will not and cannot provide any

1 authority to the contrary.

2       Only two things are required for an effective date, an

3 unstayed confirmation order and a declaration of an effective

4 date. The violating parties have no say, and they will not and

5 cannot provide any authority stating that they have any say in

6 the occurrence of the effective date or the binding automatic

7 nature of the plan on that date. They will not and cannot

8 point to anything that says that the effectiveness of the plan

9 is contingent on them getting proof of anything.

10       The notice of the effective date is the proof, as it

11 is in all Chapter 11 cases, that a plan confirmed by the Court

12 has gone effective. On the occurrence of the effective date,

13 pursuant to paragraph 19 of the confirmation order, sections

14 10.1 and 12.9 of the plan, it is immediately and fully binding.

15 The authority is clear. They have no choice but to comply with

16 the terms of the confirmed plan and confirmation order.

17       This absurd notion, Your Honor, that they consulted

18 with Greek and Liberian counsel as to whether they had to

19 comply with an American confirmation order, has it entirely

20 backward. You consult with American counsel on the

21 consequences of an American order. American law is clear

22 thereabout. As Judge Wiles explained in his typical bluntness

23 in Voyager decision from just a year ago:

24       "The approval of a plan of reorganization does not

25       just give a debtor an option to proceed with the plan.

1              Indeed, Section 1142(a) of the Code states that the

2              debtor or any entity organized for the purpose of

3              carrying out the plan shall carry out the plan and

4              shall comply with any orders of the Court.  Section

5              1142 thereby imposes an affirmative statutory

6              obligation on the debtor's other entities and their

7              personnel to do what the plan contemplates."

8         With regard to what a plan requires, Judge Wiles said,

9    "Once I confirm the plan, the relevant parties will have no

10   choice but to do so."  The idea that a party can come to the

11   United States, invoke this court's jurisdiction and relief, but

12   then claim its orders do not apply to them is just -- again,

13   Your Honor, it's a complete and utter desecration of this

14   Court.  Never, ever, ever has there ever, ever been a need to

15   seek recognition to enforce on the debtor itself.  There is no

16   party more clearly subject to the jurisdiction of this Court

17   then the one who came to the Court.

18        If they thought there was a question of jurisdiction,

19   they would have argued that the motion to dismiss.  They will

20   not and cannot point to any authority saying otherwise.  They

21   are bound by the plan.  Something we will get into.  They

22   aren't actually denying.  And they are bound by all provisions

23   of the plan.  Plans aren't buffets.  You don't get to pick and

24   choose which provisions apply.

25        And let's look at what the plan, Your Honor, that they

1   are bound by provides for.  Automatically, without any notice

2   or further order of the Court on the effective date.  Section

3   5.4, Your Honor, provides that on the effective date, all

4   notes, stock where permitted by applicable law -- and I'll come

5   back to that, but nothing about that parenthetical implies that

6   cancellation of stock isn't permitted by applicable law --

7   shall be canceled in each case without further notice to or

8   order of the Bankruptcy Code, act or action under applicable

9   law, regulation, order, or rule, or any requirement or further

10  action, vote or approval or authorization by any person.

11          The violating parties are unquestionably covered by

12  any person.  So we don't need any vote, approval, or

13  authorization from them.  They are bound.  They have no option,

14  as Judge Wiles noted.  It does not say "after recognition".  It

15  does not say "only if the proof has been provided to the

16  violating parties".  It does not require any further vote or

17  action or authorization by any person, including the violating

18  parties.  It's simply the automatic effect of the plan and the

19  effective date.  That's how it works in every case.  It says on

20  the effective date, the stock shall be canceled.

21          Section 5.8 then provides, Your Honor, on the

22  effective date, Reorganized Holdings is authorized to issue or

23  cause to be issued the reorganized equity in accordance with

24  the terms of the plan, which Reorganized Holdings did.  It says

25  nothing about recognition or whether the filing parties agree.

1    It just happens.

2         Section 5.10(c) provides -- this one's important --

3    the members of the governing body of each debtor prior to the

4    effective date -- these are certain of the violating parties,

5    Your Honor -- in their capacities as such shall have no

6    continuing obligations to Reorganized Holdings or on or after

7    the effective date, and each such member -- again, these are

8    certain of the violating parties -- will be deemed to have

9    resigned and shall otherwise cease to be a director or manager

10   of the applicable debtor on the effective date.

11        This happens on the effective date.  It does not say

12   "after recognition".  It does not say "only if the violating

13   parties agree after consulting with Greek and Liberian

14   counsel".  It doesn't care if they are there provisionally or

15   otherwise.  They are deemed to cease being so without any

16   further action by anybody.

17        This provisional board Mr. Solomon will claim to have

18   been hired by does not exist under the law.  The process they

19   voluntarily subjected themselves to removed them automatically

20   on the effective date.  Them claiming capacity and authority to

21   create a dispute has no more weight than if Mr. Shaughnessy and

22   I claim to be the board of Coca-Cola.  This provisional board

23   charade is just abject evidence of their violation of the plan

24   and confirmation order that prohibited any action to hinder the

25   implementation of the plan or the taking of any action

1    inconsistent with the plan without the direction of the plan

2    proponents.

3           Section 5.2(c), Your Honor, provides that on the

4    effective date, all property in each estate, including all

5    retained causes of action -- which includes the appeal -- and

6    any property acquired by any of the debtors -- this is

7    important -- including interest held by the debtor in the

8    respective nondebtor direct and indirect subsidiaries and

9    affiliates shall vest in Reorganized Holdings free and clear.

10          So they can cry foul, Your Honor, about actions we are

11   taking with regard to certain subsidiaries, but section 5.2(c)

12   made abundantly and specifically clear that the interest in

13   their nondebtor direct and indirect subsidiaries and affiliates

14   vest in Reorganized Holdings on the effective date, not after

15   recognition or proof of the automatic is provided to counsel.

16          Nonetheless, Your Honor, in their typical

17   projection -- again, this is Groundhog's Day -- they will

18   complain about the damage being done to the company, as Mr.

19   Spears and other representatives of Reorganized Holdings reach

20   out to banks and counterparties and try to get the proverbial

21   keys because the violating parties refused to assist.  It's no

22   longer their company.  They are projecting their actions onto

23   us.

24          The plan provides all property to Reorganized

25   Holdings.  Nothing Mr. Spears or anyone else is doing is

1     interfering with anything of theirs.  Rather, this recalcitrant

2     squatting is interfering with Reorganized Holdings.  And again,

3     it's all covered by the plan.  Further down in that same

4     section 5.2(c), the plan, which is binding on the violating

5     parties, provides, "On and after the effective date, except as

6     otherwise provided in the plan, Reorganized Holdings may

7     operate its business and may use, acquire, or dispose of

8     property without supervision or approval by the Bankruptcy

9     Court and free of any restriction of the Bankruptcy Code or

10    Bankruptcy Rules."

11          This is also what 1141(b) and (c) provide

12    automatically.  There is no ambiguity.  The violating parties

13    just have no say in any of this and cannot and will not provide

14    any authority to the contrary.  They'll argue a whole bunch of

15    law and straw man issues that aren't in play in an attempt to

16    cloud this.  And you'll hear a lot of things about vague things

17    counsel's been informed of, but nothing concrete that actually

18    prohibits plan implementation.

19          So they can cry bloody murder that Adam Spears is

20    taking action at subsidiaries.  But the plan and the Code

21    provide that he has every right to and in fact enjoins the

22    vacating parties from interfering with his actions.  He is

23    fully authorized and empowered by the plan without any further

24    action.

25          Yet, counsel, Your Honor, one of the violating

1  parties, clearly before this Court, is filing letters in the

2  district court claiming that issues of authority still need to

3  be resolved because parties are bound by this Court, took

4  action in violation of this Court's orders for the sole purpose

5  of sewing manufactured confusion to create enough delay in an

6  attempt to get a different judgment in Greece.

7          The plan provides unambiguously that all such

8  authority and capacity vests with Reorganized Holdings through

9  the implementation provided for in article V of the plan, yet

10  they've refused to abide by this Court's confirmation order.

11  And when orders are insufficient to bring people in line, Your

12  Honor, courts are empowered to ramp up the pressure with

13  contempt and sanctions because the consequences of such

14  squatting and the refusal to hand over the keys, as this Court

15  directed, are drastic.  Indeed, they present an existential

16  threat.  The violating parties are willing to burn it all down

17  if they don't get their way.

18          Your Honor, it is very important to note that the plan

19  proponents were also bound by the confirmation order and plan

20  and have performed.  The plan proponents funded the full 53.5-

21  million rights offering.  And while they are now the legal

22  owners, the violating parties continue to unlawfully possess

23  and control the vast majority of the debtors' assets.  We

24  understand that while preventing access to bank accounts of

25  Reorganized Holdings' wholly-owned subsidiaries like Corp.,

1  they aren't paying Oaktree from those accounts, putting the

2  debtor's primary asset, the SMEs at risk.  We've heard from

3  lenders that they are trying to move the management of ships

4  from Corp. to other entities, while disputing who controls

5  Corp.  These are real-world consequences that affect what was

6  the payment to the creditor and being able to purchase the

7  equity rights offering.

8          And they aren't disputing the full force of the plan

9  and consequences of the effective date, Your Honor, when it

10 comes to things like paying off the debt and paying their

11 professional fees, we continue to honor this Court's orders,

12 including the recently entered interim comp order that

13 obligated us to make payments to estate professionals,

14 including Reed Smith, which we did immediately, even though we

15 don't really want to, because Your Honor, court orders aren't

16 optional.

17         So let's step back.  What is this about?  What do we

18 actually need them to do?  Something so minor.  So ministerial.

19 The main thing we've been asking their assistance with is for

20 them to take this ministerial step to either update the address

21 of record or to have the current address of record file the

22 Reorganized Holdings' preferred articles of incorporation with

23 the Liberian registry.  They won't even tell us who the AOR is,

24 so we can't identify who it is to direct to take this action

25 consistent with the plan.

1          So what is an AOR, Your Honor?  This thing that they

2     deceitfully claim could lead to criminal liability in a country

3     none of these people are in.  Well, as Mr. Pierre points out,

4     it's explained on LISCR website as follows.  And this is not

5     our expert.  This is a quote from the website.

6               "The AOR, often referred to as the billing address, is

7               the address to which the annual invoices and other

8               correspondence are mailed.  The AOR is the only

9               contact address retained in the records of the

10              registered agent.  The address is confidential and not

11              available to any third-party.  The registry's regional

12              office can only provide account information, accept

13              documents for filing, or accept a change of address

14              when submitted by the AOR, or" -- this is a big

15              "or" -- "under its written authorization."

16              Come on.  I mean, really?  People are going to go to

17     jail for updating a billing address, Your Honor?  They're going

18     to tell you this entire two-year process and the millions spent

19     and the judicial resources spent have no effect because they

20     won't submit or provide written authorization for us to submit

21     a document?  We asked for written authorization, Your Honor.

22     You saw that attached to one of our letters.  It's a page.

23     From the AOR to submit the new charter, which the LISCR website

24     makes clear is permitted.

25              This is farce.  They are openly mocking this Court in

1    the Bankruptcy Code.  We're talking about a billing address.

2    Somehow, Your Honor, the debtors' Intwasa (ph.) and Excel

3    Maritime, both Liberian holding companies related to Greek

4    shipping enterprises who filed in this district, accomplished

5    this without breaking any laws.  This is why we've been forced

6    to file a motion for sanctions and contempt.

7            But honestly, Your Honor, this isn't about contempt or

8    sanctions.  What this is really about is compliance.  We simply

9    want them to comply with the terms of the plan and the

10   Bankruptcy Code and perform this simple ministerial act that

11   they've been directed to do and they clearly are allowed to do.

12   The one act will go a long way towards implementation.  It's

13   the first domino in gaining control that the confirmed plan

14   entitles us to.

15           I can't promise Your Honor that we won't have to seek

16   this Court's relief again.  That's really up to them more than

17   us, and the track record there is not so impressive.  But it

18   will be a huge step in halting this charade that they've

19   invented and are now parading around the world about

20   uncertainty over control and authority.

21           Read the plan.  Article V on implementation leaves no

22   uncertainty.  They voluntarily converted and invoked this

23   court's jurisdiction, and they are bound by that outcome the

24   awesome judicial power of the United States is not something

25   you just get to try on and then give back if you don't like how

1    the outcome looks on you.  They can make press releases.  They

2    can write conflicting letters to banks, counterparties, and

3    courts.

4          But the plan leaves no doubt there's only a

5    Reorganized Holdings.  It does not matter if a bunch of

6    squatters want to call themselves a provisional board.  It does

7    not change the legal effect of the process they voluntarily

8    invoked.  Even if recognition were needed, Your Honor, it's

9    not.  That would not have any impact on the immediate binding

10   effect on those subject to the Court's jurisdiction.  They're

11   making up hurdles that have no support in law.

12         And their supposed concerns are baloney, Your Honor.

13   We even offered to indemnify them for the great risk of

14   updating a billing address, and they didn't respond to that,

15   which further demonstrates this is all an incredible farce,

16   motivated by delay and not some concern about violating a law,

17   which should have been raised at plan confirmation if it was a

18   real concern or in a motion for a stay they never brought.

19   Unstayed orders are enforceable.  Period.

20         Supreme Court said as much in Madison v. Meyers (ph.).

21   Without some further order, Your Honor, without some teeth from

22   the Court that they so openly mock, this charade will have no

23   end.  And the inconsequential nature of the one task we need

24   from them in Liberia highlights how completely disingenuous it

25   is to argue that our confirmed plan contemplated, let alone

1    promised, to seek recognition or is in any way inconsistent

2    with applicable law.

3           But let's venture into their land of make-believe for

4    a moment.  And like many times before, Your Honor, I'm a little

5    hesitant to do it because these arguments are fabricated straw

6    man arguments, and they really don't deserve our time.  They

7    consistently try to force us onto their make-believe playing

8    field, but I do think it's worth addressing them because it

9    demonstrates the lengths and the dishonesty that they will

10   continue to go to interfere with implementation of the plan,

11   which demonstrates why sanctions are needed.

12          All of their straw man arguments, Your Honor, grow out

13   of two related but completely false premises.  One, that the

14   plan requires anyone to do anything inconsistent with foreign

15   law to be implemented.  And two, that we therefore need and

16   promised to seek recognition.  Reed Smith is banking on

17   collective amnesia to make these arguments, to try and make it

18   seem like this was something anybody discussed until they

19   started raising it as a delay tactic on the literal eve of the

20   effective date.

21          Again, this is Groundhog Day all over again.  They

22   have the gall to say we're not complying with our own plan, the

23   confirmation order, and the Code to try to justify them doing

24   those exact things.  Like I've said before, Your Honor, if

25   you're curious about what they're doing, just look at what they

1  accuse us of.

2        But again, Your Honor, the plan isn't optional.  They

3  don't get to be judge, jury, and executioner to decide what we

4  need to do to implement our plan.  They will never point you to

5  any support for that.  They will point to legal advice in

6  Greece and Liberia.  What a surprise.  They sought advice and

7  it came back that they don't have to do anything.  But again,

8  if they sought American counsel, they'd be told they are bound.

9  Our laws and Your Honor's orders are not overridden by foreign

10  legal opinions.

11        Want to talk about comity?  Self-serving legal opinion

12  does not override the United States Bankruptcy Code.  They will

13  point to nothing tangible that binds this Court to support such

14  outrageous positions.  They don't get to decide what our plan

15  means.  They can point to nothing beyond boilerplate references

16  to applicable law in our plan.

17        And Your Honor, they can take them out of context.

18  They can bold and italicize them.  They can attempt to change

19  their meaning by adding their own color.  But they will not be

20  able to identify anywhere in the plan where there's any

21  specific law identified as problematic.

22        And I want to be clear, Your Honor, the word "Liberia"

23  appears in our plan exactly zero times.  The word "recognition"

24  appears in our plan exactly zero times.  Reed Smith claims we

25  expressly committed to seek recognition of the plan.  It's news

1 to me, and they know that.  It took them nearly the entire

2 fourteen-day stay period, during which they completely ignored

3 us and our efforts to coordinate on consummation of the plan,

4 to invent that lie.

5    The only thing they point to, Your Honor, is a risk

6 factor in the disclosure statement.  That identified a risk

7 present in every cross-border case that a party -- by the way,

8 a party that is in a foreign jurisdiction, not a party that's

9 here -- might try and argue that the plan does not apply to

10 them.  Them actively determining to be that party in defiance

11 of the order doesn't turn that risk factor into a preemptive

12 obligation that we promised to do something.

13    We listed it as a risk.  They took it as an invitation

14 and roadmap to disruption.  So let's dispense with the

15 nonsense.  We had no plans to seek recognition.  Recognition is

16 for things you need from parties who aren't here and weren't

17 bound by the confirmation order.  And even when you seek

18 recognition, that does not change the immediate binding effect

19 on parties before the Court.  Even prior to recognition, they

20 are here.  They are bound.

21    They make this immensely frustrating argument that our

22 now seeking recognition in Liberia is proof we always intended

23 to.  That is such disingenuous nonsense.  Their refusal to

24 comply with this Court's order and the Bankruptcy Code is why

25 we've been forced to take an unnecessary step that we're

 1 seeking sanctions to cover the cost of.  But again, we just

 2 want compliance.  If they updated the AOR, we'd withdraw the

 3 recognition tomorrow because we don't need it, Your Honor.

 4       They also point to a boilerplate condition precedent

 5 on having obtained all governmental and third-party approvals

 6 as somehow implying that there were approvals needed.  What

 7 government and third-party approvals are needed?  What

 8 government and third-party approvals did we ever identify for

 9 the Court in the plan, disclosure statement, or elsewhere?

10 There are none, Your Honor.  Although all conditions are

11 waivable, that isn't a condition we waive.  It's a condition we

12 satisfied because there were no approvals needed.

13       Conditions precedent, Your Honor, are not promises.

14 They are outs.  As I noted, Section 1141 and 1142 also binds

15 us.  We were bound to execute this plan.  And we, unlike the

16 debtors, had significant financial obligations under the plan.

17 The entire purpose of conditions precedent in this or any

18 contract is to protect the plan proponent because the plan is a

19 court-ordered contract that must be carried out.

20       Conditions precedent provide protection to the plan

21 proponent.  If we became aware of some third-party approval we

22 needed that we could not obtain, it gives us an out so we

23 aren't bound to spend 53.5 million on something that isn't what

24 we bargained for.  There is no promise in the disclosure

25 statement or the conditions precedent, and they can point to

1  absolutely nothing that we ever indicated so.

2          With regard to that risk factor, Your Honor, I've used

3  that exact language in multiple cases where no recognition was

4  needed.  Pacific Drilling, for instance, in that case, unlike

5  under Liberian law, under Luxembourg law, you're not able to

6  extinguish shares without a seventy-five percent vote of

7  existing shareholders.  In that case, we got a majority

8  shareholder to agree to hold an extraordinary meeting of

9  shareholders and issue a sufficient amount of new shares to, as

10  I told Judge Wiles, dilute the old shareholders to oblivion.

11          Now, that risk factor never came into play in that

12  case because the shareholders in that case, consistent with

13  1141, 1142, took the steps we needed them to take to implement

14  the plan.  Had they refused, we may have needed to seek

15  recognition, or we might have relied on the preemptive effect

16  of 1142 or 1123(a)(5(I).  It never came up.

17          As the article I wrote noted, we try to avoid these

18  things when, unlike here, there is a restriction on

19  cancellation of shares by proactively addressing them well

20  before the planning stage.  We're only talking about any of

21  this in this case because the violating parties are violating

22  the plan.

23          They also point to a boilerplate parenthetical in

24  section 5.4 when talking about canceling stock where permitted

25  under applicable law.  It does not say, as they want Your Honor

1    to believe, that canceling stock is not permitted under

2    applicable law.  There is another -- this is just another

3    phrase I use in a lot of my cases.  Not to give away the secret

4    sauce, Your Honor, but we don't draft these plans from scratch.

5    For the most part, we just piece them together from earlier

6    plans we've done.

7            This exact language, to the T, exact words, appears in

8    a whole bunch of my cases, including cases that were entirely

9    domestic, like, for instance, the Benitago case that we did

10   from in front of Judge Lane from start to finish during the

11   debtor's initial exclusive period.  It's just boiler language

12   saying we don't do something if it isn't permitted by law.

13           That identical language, of where permitted by

14   applicable law, appears at what is also -- because again, we're

15   just using the same plans -- section 5.4 of the Benitago plan

16   at docket number 366 of that case, which again was a U.S.-based

17   debtor.  Inclusion of such a parenthetical does not imply that

18   canceling stock is not permitted or that recognition is needed.

19           That Benitago case, by the way, Your Honor, also had

20   the exact same condition precedent on government and regulatory

21   approvals.  It's at 9.1(e) in that plan.  We also used very

22   similar language -- again, 9.8(e) -- in the Vice Media plan we

23   confirmed in front of Your Honor.  It was 9.1(f) in my

24   Greensill plan in front of Judge Wiles.  In all of those cases,

25   Your Honor, just like here and in so many other cases, there

1  turned out not to be any government or regulatory approvals

2  needed.  It's just something you add to protect yourself.

3      All those cases, Your Honor, like this case also had a

4  9.2, allowing you to waive conditions.  And I think the

5  violating parties actually explain how waiver of conditions,

6  precedent and the mere formality of effective dates works in

7  their waiver section of their denied plan, which provided:

8          "The debtors may waive any of the conditions to

9          confirmation of the plan and/or to occurrence of the

10          effective date of the plan set forth in this article

11          XIII at any time, without notice, without leave or

12          order of the Bankruptcy Court, and without any formal

13          action other than proceeding to confirm and/or

14          consummate the plan."

15      That's how it works.  They got it right.  Good job.

16  Reed Smith is masterful at taking innocuous boiler, perverting

17  its meaning, and pulling it to the forefront.  It is a false

18  premise to say we promised anything or you're asking anyone to

19  do anything inconsistent with law.

20      This is also why Reed Smith's outlandish position that

21  Section 1142 does not apply to the violating parties is totally

22  irrelevant and a pure straw man argument.  Nobody is trying to

23  preempt any law, although your order could, if we needed it to.

24  It's also just totally wrong.

25      But some really telling stuff in their effort to

1   create this straw man, where they have to twist into these

2   complex knots to claim Section 1142 does not apply to them.

3   Why do they do that?  Because Congress' inclusion of it in the

4   statute is so obviously and completely fatal to all of their

5   arguments.

6          The violating parties, Your Honor, do not deny that

7   the effective date occurred, not that they could or would have

8   any right to.  And they don't even deny that it's binding on

9   them under Section 1141.  All these things are in the plan, so

10  how they could say they don't but acknowledge that, but they

11  do.  They acknowledge that at paragraph 45 of the Reed Smith

12  reply.  But they then make the fantastical argument that the

13  entirety of Section 1142 is simply inapplicable.  In their land

14  of make-believe, it's no longer up to Congress what Sections of

15  the Code apply to them.  They could just pick and choose.

16         But it's worth stepping back again to note Section

17  1141 not only bound the debtor, it also bound the plan

18  proponents and Reorganized Holdings.  And 1142 also obligates

19  us to carry out the plan.  Thus, despite all of their

20  obstruction, Reorganized Holdings has continued to do what it's

21  obligated to do.

22         The violating parties, again, they want to have parts

23  of it, but not all of it.  They have no issue with the plan

24  when it involves paying off the DIP or paying their former

25  professionals.  The wire, Your Honor, for the third interim fee

1  application of Reed Smith was sent this past Friday,

2  immediately after the order was entered Thursday.  You know,

3  promptly.

4      Reed Smith takes this to an exceptional level of

5  mendaciousness in claiming that Section 1142 does not apply

6  because it's a preemption statute.  This is entirely

7  fabricated.  There's no authority for that statement.  It is

8  inconsistent with the plain language of Section 1142 of the

9  Code, which is entitled, "Implementation of the plan".  It is

10  not limited to preemption.

11      While 1142, Your Honor, does allow for preemption in

12  certain circumstances where applicable, but Reed Smith's

13  reading of 1142 would require 1142 only to apply when

14  implementation of a plan requires preemption.  This would give

15  no force to Section 1142, whereas here, steps needed to

16  implement the plan are entirely consistent with applicable law.

17  That is an irrational reading.

18      Similarly, their argument that 1142 only applies to

19  state law is inaccurate.  They just cited a bunch of cases

20  where a state law was preempted, and they make the negative

21  inference that it means it does not apply to foreign law, which

22  again, we aren't even asking them to do anything that violates

23  any law.  They are intentionally starting from a false premise.

24      Section 1142(a) has an introductory phrase providing

25  that, "Notwithstanding any other applicable law" -- and I'll

 1    just pause to note, Your Honor, that Congress knows how to

 2    write the words "state law" in the Code when it wants to --

 3    "rule, or regulation relating to financial condition" -- but

 4    that phrase is parenthetical and is not essential to the rest

 5    of the sentence, which goes on, "the debtor and any entity

 6    organized or to be organized for the purpose of carrying out

 7    the plan shall carry out the plan and shall comply with any

 8    orders of the court."

 9            Basic rules of grammar dictate that this Section

10    provides that the debtor and any entity organized or to be

11    organized for the purpose of carrying out the plan shall carry

12    out the plan and shall comply with any orders of the court.

13    And the introductory phrase is just providing that that's true,

14    notwithstanding any otherwise applicable nonbankruptcy law.

15            But they doubled down on this absurdity by then

16    claiming 1142(b) is only in furtherance of 1142(a), claiming

17    1142(b)'s power is limited to Section 1142(a)'s domestic scope,

18    and voila.  According to them, the court's power to direct them

19    has evaporated and they arrive with a straight face at this

20    conclusion, Your Honor, that the Code's provision on

21    implementing the plan simply does not apply to them.  That is

22    fantasy land.  1142(b) again says, "The court may direct the

23    debtor and any other necessary party to execute or deliver or

24    to join in the execution or delivery of any instrument required

25    to effect or transfer property dealt with by a confirmed plan

1  and to perform any other act that is necessary for the

2  confirmation of the plan."

3       1142(b), Your Honor unquestionably gives you the

4  authority to order them to perform the act of updating the AOR

5  and take all other steps directed to them to implement the

6  confirmed plan.  But again, Groundhog's Day, because they've

7  somehow taken us so far afield into this land of straw man to

8  try to create confusion.  None of this matters.  Nobody's being

9  asked to do anything that violates any law.  Your order binds.

10  It's not optional.  End of story.  So much concern with Greek

11  and Liberian law, but no apparent concern with blatant

12  violation of the U.S. law.

13       Even if any of those arguments were real or applied,

14  Your Honor, it wouldn't matter, because they're all, in

15  essence, objections to feasibility of the plan, and that ship

16  sailed long ago.  The case law is very clear that a plan has

17  res judicata effect and that you don't get confirmation do-

18  overs post-effective date.  It has been held again and again in

19  this district and elsewhere that res judicata principles bar

20  relitigation of issues raised or that could have been raised in

21  the confirmation proceedings.  As the Sixth Circuit noted in

22  Chattanooga Wholesale, "Without this rule, there would be no

23  finality to confirmed plans."

24       There must always be an end, even in Groundhog's Day,

25  Your Honor.  Bill Murray did eventually, finally, wake up on

```
 1    February 3rd.  Despite efforts to revisit or introduce new
 2    confirmation arguments.  Confirmation happened three months
 3    ago.  These parties had no issue taking up this Court's time
 4    and resources then, Your Honor.  They made no arguments that
 5    your order will have no force.  There were no arguments about
 6    recognition or promises to seek recognition.  There were no
 7    arguments that cancellation of shares would violate any laws.
 8    There were no feasibility objections based on inability to
 9    implement the plan.  Indeed, Your Honor, all three plans
10    provided for the cancellation of current shares and issuance of
11    new shares.
12         As the JB Haldeman case both parties cite to says,
13    "The confirmation process forces parties to speak now or
14    forever hold their peace because confirmation bars them from
15    bringing new claims or raising issues that could have been
16    entertained prior to confirmation."  Had they won, Your Honor,
17    something tells me the AOR would have had no concern filing
18    their amended articles.  They would have seen no need for
19    recognition in Liberia or Greece or Canada or Timbuktu.
20    Indeed, in their effort to claim their plan was feasible, they
21    repeatedly said it could be implemented immediately.
22         After this Court entered its decision and the
23    confirmation order, no efforts were made to stay its
24    effectiveness, and thus the confirmation order and the plan
25    became binding on them.  If they could make an actual showing
```

1 that the plan would violate laws or cause some incurable harm

2 to them, they would have sought a stay.

3      Likewise, there's no question, Your Honor, that the

4 violating parties not only submitted to this jurisdiction, but

5 themselves invoked the Court's jurisdiction when they

6 voluntarily converted. As the Madoff case in this district

7 that we cited in our reply found, participating in a bankruptcy

8 case and attending hearings is sufficient to create personal

9 jurisdiction.

10      There are jurisdictional arguments, Your Honor, are

11 just more of this Groundhog's Day. Here they are again,

12 changing their tune, just like when they said they will respect

13 and live with the outcome of creditor votes, only to argue that

14 the vote should be disregarded when they didn't come out in

15 their favor. Here, they've gone from trumpeting during

16 confirmation that we're here, present in this Court, not hiding

17 in another country, to trying to avoid a binding plan by hiding

18 in another country.

19      In any event, Your Honor, the Supreme Court held in

20 Travelers v. Bailey, concerning parties seeking to challenge

21 jurisdiction in resisting enforcement of bankruptcy court

22 orders, that, "So long as respondents or those in privity with

23 them were parties to the bankruptcy proceeding and were given a

24 fair chance to challenge the bankruptcy court's subject matter

25 jurisdiction, they cannot challenge it now by resisting

1    enforcement of the orders."

2         Reed Smith claims, Your Honor, at paragraph 36 of the

3    response, that Reed Smith recognizes the plan and confirmation

4    order and remains ready, willing, and able to act as counsel to

5    assist once the petitioning creditors obtain for recognition

6    and comply with other aspects of the plan and this Court's

7    order.  That is not how it works.  None of that's in the plan.

8    And as Judge Wiles said, there is no discretion in complying

9    with orders.

10        The plan and confirmation order are immediately and

11   fully binding on Reed Smith, and that would be true even if

12   recognition were needed because again, recognition is only for

13   parties that are not here.  Orders are not optional.  You will

14   hear nothing from them, Your Honor, but vague allusions,

15   inaccurate characterizations, and spin of our plan.  Nothing

16   concrete.  Out-of-context snippets in an effort to make-believe

17   about what our plan and the Code provide.

18        So much of what they say in response to their clear

19   and admitted violation of this Court's order is just an

20   alternative universe.  None of it is supported by any law or

21   statute.  For instance, Your Honor claims that we somehow are

22   abusing the bankruptcy process -- again, that is just amazing

23   projection -- by purporting to extend the reach of the plan and

24   confirmation order to Holdings' nondebtor affiliates ignores

25   all that equity in such affiliates was vested in Reorganized

1    Holdings at section 5.2(c) of the plan automatically.  It does

2    extend to those entities because the interests in those

3    entities is what Holdings owns.

4         They're going to bring up comity in Chapter 15.

5    They're totally irrelevant to a Chapter 11 and efforts to

6    enforce on a party subject to the jurisdiction of this Court.

7    They're straw man arguments, Your Honor.

8         Similar arguments about the center of main interest

9    just aren't relevant.  I've done plenty of cases, Your Honor,

10   where the center of main interest is elsewhere and no

11   recognition is sought because again, you don't need recognition

12   to enforce in a debtor.  The JPA case I did two years ago in

13   front of Judge Jones comes to mind.  Also, not to get into it

14   because I don't get too far afield into their world, but the

15   case law provides that comity shifts to where a restructuring

16   proceeding took place when the debtor is a holding company.

17   There's cases like Wuxi Suntech that say that.

18        Reed Smith claims that petitioning creditors need to

19   comply with applicable non-U.S. law for the plan to be

20   implemented.  That is just gobbledygook.  Like, what non-U.S.

21   law?  We don't have any.  Point us to something that we needed

22   to do.  We need an AOR to be updated.

23        They say that confirmation orders aren't enforceable

24   on debtors unless recognition is obtained first.  That is just

25   totally false.  Even if we needed recognition, it's fully

1  binding on all the parties here.  You can go get recognition
2  later and then make it binding on parties who aren't here, but
3  it's fully binding on them.  The only party we need to act is
4  the violating parties.  You get recognition when you have a
5  situation, like a fuel supplier is refusing to supply fuel
6  because it said its debt wasn't discharged in Chapter 11
7  because it wasn't there, and you go get recognition.  Things
8  like that.

9        Reed Smith's claims that we made some great bait-and-
10  switch on creditors who voted on the plan.  And this is kind of
11  rich.  They say, and opted in to the rights offering based on
12  our express undertaking to seek recognition.  Your Honor, we're
13  the only party that opted into the rights offering.  So I'm
14  glad he's looking out for us, but we were the only party
15  impacted by needing to use the existing articles of
16  incorporation instead of our preferred charter, which was only
17  required because of their obstreperous conduct.

18        And likewise, Your Honor, the argument in the Reed
19  Smith reply and -- I'm sorry, I always mess up his name -- the
20  Hadjieleftheriadis declaration that it was somehow improper.
21  After they refused to file our amended articles, to use the
22  existing articles is totally off base.

23        He points to prohibitions in the existing charter on
24  transfer of shares.  The shares weren't transferred, Your
25  Honor.  They were canceled and new shares issued.  In any

1    event, Section 1123(a)(5)(I) specifically provides the plan may

2    provide for the amendment of the debtor's charter, something

3    they might be aware of if they were consulting with U.S.

4    lawyers, as opposed to Greek and Liberian lawyers, about a U.S.

5    plan.  We could have used our amended charter, but that could

6    have created confusion due to the refusal to update the

7    registry with it.  So we chose to work with theirs until we can

8    update it through the AOR.  The Code and the plan permit this.

9           They make a big deal about our seeking to make Mr.

10   Spears the new AOR even before the effective date.  Apparently,

11   they missed the part of the email where we were very clear and

12   we informed them we would hold the new AOR in escrow until the

13   effective date, upon which date he is the CEO.  This concept

14   that certain of the violating parties saw Greek and legal

15   advice and will be subject to criminal exposure for complying

16   with the plan and confirmation order is a farce and an insult

17   to your intelligence.  The confirmation order and the

18   Bankruptcy Code bind them.  They don't get to get around that

19   with legal opinions.

20          We had a week-long trial.  You approved the plan.

21   They never raised concerns the plan was impossible to implement

22   without breaking law.  They have demonstrated none of this.

23   They didn't seek a stay pointing to such illusions.  Orders

24   aren't optional.

25          And this, Your Honor, is not the first Chapter 11

1  involving Greek and/or Liberian companies that has been

2  confirmed and enforceable without needing Greek and Liberian

3  registration recognition.  The Toisa case my firm did involve

4  Greek and Liberian entities and did not need recognition in

5  those jurisdictions.  We did, in that case, need recognition in

6  certain other jurisdictions, some of which we got before the

7  effective date, some of which we got long after the effective

8  date, to enforce on parties that weren't present during the

9  Chapter 11.

10      The Excel Maritime case that Skadden did in this

11  district was a Liberian holding company run by a Greek shipping

12  family.  No recognition needed, and nobody violated any laws

13  implementing either of those cases.  In Excel, confirmation

14  order was entered on January 27th, 2014, and the effective date

15  was declared without some great pause to seek recognition as

16  soon as the fourteen-day stay expired on February 14th, 2014.

17      What is amazing, Your Honor, is that Reed Smith goes

18  to great lengths to detail the efforts that certain violating

19  parties took to avoid implementation of the plan.  This

20  highlights their contempt.  The shenanigans with this

21  provisional board mean nothing because all board members were

22  deemed to resign on the effective date.  This is a blatant

23  collateral attack on the confirmation order and this Court's

24  jurisdiction.

25      And I'm almost done, Your Honor.  But I do have to

1  mention that Greek application.  They attached a translation

2  that just happened to leave out over twenty pages of them

3  relitigating issues Your Honor has already decided.  But the

4  same parties who omitted key parts of that translation and

5  couldn't find the Azure plan stipulation and were willing to

6  say votes shouldn't count and had the district court determine

7  they lied to this Court about documents withheld in the

8  arbitration, they want you to believe what they are telling you

9  some counsel told them and have that override your unstayed

10  binding order.  That precedent would just eviscerate the power

11  of this Court.

12        They are also saying we need to get recognition, but

13  also telegraphing they will contest recognition.  The

14  translation of the Greek application says as much.  And Mr.

15  Solomon wrote a letter to the Court last week saying that the

16  Liberian rep is planning to respond to the Liberian

17  recognition.  Under whose authority?  There is no Eletson

18  Holdings besides Reorganized Holdings.  So his letter this

19  morning, I don't understand what it's getting at.  There is

20  only Reorganized Holdings.  There is no other Holdings out

21  there somewhere in some fictional world.  How is that not

22  possibly interfering with implementation of the plan?

23        The majority of the major cases that still file in

24  this district, Your Honor, are-cross border cases.  If the rule

25  is those debtors don't have to abide by this Court's orders

1  unless foreign lawyers tell them they have to, it would turn

2  this Court into a banana court.  All these arguments evidence

3  one thing, one crystal clear thing, the violating parties have

4  no interest in complying with the confirmation order.  They

5  will invent new excuses and obstacles until the end of time.

6         So Your Honor, you have to create consequences, Your

7  Honor, or the last two years will have just been a very

8  expensive theater production.  This is why Congress made a

9  confirmed plan binding on them, required them to implement, and

10  gave this court the power to enter whatever order is needed.

11  We need an order directing the AOR be updated or the current

12  AOR file our preferred charter and for the violating parties to

13  act as directed in furtherance of the implementation of the

14  plan.  If they refuse to commit to that today, you need to levy

15  sanctions that will create significant incentive for them.

16         And it is clear we may have to go to other places to

17  get recognition of a sanctions order, but an order helps no

18  less.  Reed Smith, who is spinning this outrageous tale, is

19  unquestionably here and appears to have designed this whole

20  charade.  They can be sanctioned easily.  The Court has

21  jurisdiction over their professional fees in this case, for

22  instance.

23         This is all an elaborate, unethical ruse to prevent

24  the implementation of this Court's order.  If there are actual

25  harms that would result from implementation, they should have

1   sought a stay and demonstrated those harms before this became a

2   binding, enforceable order.  Clearly, there are no real harms,

3   so they could not meet that standard.  So they resort to this

4   nonsense in a back door.

5           And why are they doing this, Your Honor?  They're

6   trying to move assets, which we've seen.  And they're trying to

7   obtain, through what you see in that translation, a conflicting

8   judgment in Greece to create further confusion and prevent this

9   from being implemented.  The appeal no longer has relevance

10  because on the effective date, all causes of action went to

11  Reorganized Holdings free and clear, including the appeal.

12  They didn't try to stay that.

13          They didn't have the shareholders join in.  And not

14  surprisingly, Reorganized Holdings has no interest in that

15  appeal.  This is all binding on them.  They don't get to choose

16  if they comply with the court order.  Why have courts if their

17  orders are optional?

18          So we urge Your Honor to enforce the confirmation

19  order, protect the sanctity of this Court, order them to comply

20  fully with the confirmation order and Bankruptcy Code, and take

21  the actions directed to be taken in furtherance of the plan and

22  sanctioned them harshly for every day they do not.  Unless Your

23  Honor has any questions, that's all I have.  Thank you, Your

24  Honor.

25          THE COURT:  Thank you, Counsel.

1          Does anyone else wish to be heard on support of the
2    motion before I turn it to those opposing?
3          MR. HERMAN:  Your Honor, David Herman for the official
4    committee of unsecured creditors.  May I be heard?
5          THE COURT:  Please.
6          MR. HERMAN:  Thank you, Your Honor.  And Mr. Ortiz
7    covered everything very well, so I will try to be brief.  But I
8    do want to put a fine point on just a couple of points.
9          This has been a long case, and the Court has addressed
10   many complicated issues, including in the 102-page opinion that
11   Your Honor issued on confirmation.  This issue is not
12   complicated.  The plan has been confirmed, and now the parties
13   need to carry out the plan.  As Mr. Ortiz mentioned, under
14   Section 1142(a), the debtor "shall carry out the plan and shall
15   comply with any orders of the court".
16         Likewise, under the confirmation order under section
17   5, Romanette (i), the debtors and the petitioning creditors and
18   each of their respective related parties, which includes all of
19   their officers and directors and principals and equity holders,
20   are directed to cooperate in good faith to implement and
21   consummate the plan.  So the debtors and their related parties
22   must consummate the plan, but they're not doing that.
23         The former debtors are refusing to exercise the
24   corporate authority that they possess to effectuate the
25   transfer of ownership that's contemplated by the plan.  They

1   are purporting to make their own corporate governance changes

2   that are inconsistent with the plan.  They are, as Mr. Ortiz

3   explained, actively seeking orders of other courts in an effort

4   to mount a collateral attack on the plan in those courts.  And

5   they're doing so without the consent or involvement of the

6   company's new owners and without even contemporaneous notice to

7   them.

8           This is all a concerted effort.  Over a month ago, Mr.

9   Solomon announced in the district court that the effective date

10  of the plan would be contested.  And he was right.  This Court

11  is empowered to force the former debtors and their former

12  owners and directors and officers to carry out the plan.  The

13  Bankruptcy Code contemplates that this may happen, particularly

14  in circumstances like this one, where a creditor plan is

15  confirmed over the objection of the debtor.  In our papers, we

16  cited the Krypton case, which is from 1995, in which the Court

17  explained this very well over about thirty years ago.  It

18  stated:

19          "Owners and directors of Chapter 11 debtors are often

20          reluctant to cooperate in implementing a creditor plan

21          confirmed over their objection.  Thus, plan proponents

22          may request provisions in a confirmation order

23          pursuant to Section 1142 of the Code, requiring these

24          unwilling parties to take those actions necessary to

25          implement a confirmed plan."

 1         And that is what Section 1142(b) provides.  It

 2   provides that the court may direct the debtor and any other

 3   necessary party to execute or deliver or join in the execution

 4   or delivery of any instrument required to effect a transfer of

 5   property dealt with by a confirmed plan.  Now, the Court has

 6   already ordered this to occur.  As I noted before, the Court

 7   made these orders under 1142 in the confirmation order,

 8   providing that the debtors and the petitioning creditors and

 9   each of their respective related parties are directed to

10   cooperate in good faith and to implement and consummate the

11   plan.

12         So what should the court do when the former debtors

13   and their related parties do not comply?  And the answer, which

14   is set forth amply in the papers, and I won't repeat it all, is

15   to hold those parties in contempt and impose sanctions to

16   coerce compliance.  We cited a number of examples in our

17   papers, and the reorganized debtors cite more.

18         But the Krypton case is particularly instructive

19   because there, like here, the former owner, following

20   confirmation of the plan, started making filings in other

21   places -- in that case, it was regulatory filings -- trying to

22   interfere with the consummation of the plan.  And what the

23   court did was to provide that the owner would be held in

24   contempt and given five days to purge that contempt, including

25   by withdrawing the regulatory filings, or be fined for each day

1　that those filings are not withdrawn.  And that is what's going

2　to have to happen here if the former debtors and their owners,

3　the former owners and principals, do not comply.

4　　　　Now, I want to address the foreign law issue because a

5　lot of ink is spilled on that.  And really, all of these

6　foreign law issues are beside the point and are just an effort

7　to intentionally confuse the issues.  The opinions that have

8　been presented are answering the wrong question.  The question

9　they're answering is how one might use a U.S. court order to

10　change the address of record or to effectuate a change in

11　ownership.  So as the former debtor's Liberian lawyer describes

12　it, how you would "change the address of record and/or amend

13　the articles of incorporation to effect a change of ownership

14　of a Liberian company upon the order of a foreign court".

15　　　　Similarly, on page 5 of that lawyer's declaration, it

16　addresses whether the petitioning creditors as the plan

17　proponent, on the mere face of the S.D.N.Y. confirmation order,

18　can submit new constitutional documents.  Similarly, on page 6,

19　it addresses any effort to change the address of record in

20　reliance on a foreign judgment.  But nobody is seeking to do

21　that.  Nobody is trying to update the Liberian registry on the

22　mere face of the S.D.N.Y. confirmation order or change the

23　address of record in reliance on a foreign judgment or change

24　the address of record by virtue of the New York court's

25　judgment.

1          Instead, what needs to happen is that the individuals

2    at the company or at the former shareholders who have the

3    requisite corporate authority need to carry out the plan.  And

4    the former debtors' Liberian law declaration specifies that

5    this can happen, that filings with the Liberian registry can be

6    made and accepted from a predesignated authorized

7    representative, that amendments to the articles of

8    incorporation can be accomplished in accordance with procedures

9    established by the Liberian Business Corporation Act and the

10   corporation's organizational documents, and that the address of

11   record can be "changed through the appropriate procedures by

12   the existing shareholders".

13          That's all that needs to happen here, and all the

14   relevant individuals are here and subject to Your Honor's

15   jurisdiction.  The former debtors voluntarily availed

16   themselves of the jurisdiction of this Court.  The shareholders

17   are also subject to Your Honor's jurisdiction.  The majority

18   shareholders are represented by Mr. Curtin, who I see in the

19   top left of my screen.  The minority shareholders cast votes at

20   plan confirmation.  They are subject to Your Honor's

21   jurisdiction.  All of them simply need to be ordered to use

22   their regular corporate authority to carry out the plan.

23          Now, the reason that the committee is here addressing

24   these issues is that the conduct of the former debtor's former

25   owners is putting creditor distributions at risk and frankly

1  putting this entire case at risk.  The plan proponents have

2  funded the distributions and as Mr. Ortiz said, 53.5-million

3  dollars.  But because of the uncertainty that's been created by

4  the former owner's conduct, the notes trustee, understandably,

5  is unable to calculate the amount of a reserve that must be

6  maintained to make initial distributions to noteholders.

7       So creditors who have been waiting for years to be

8  paid and who voted on a plan and had the plan confirmed may not

9  get their distributions until this is worked out.  And it

10  appears that if the former debtors and their former owners have

11  it their way, we're looking at lengthy proceedings in other

12  countries and significant uncertainty before the plan can be

13  carried out.

14       So we urge Your Honor to enforce the plan, enforce the

15  confirmation order as to parties that are here and require them

16  to do those things that they have the authority to do to

17  effectuate the transfer of ownership under the plan.

18       THE COURT:  Thank you.

19       MR. HERMAN:  Thank you.

20       THE COURT:  Does anyone else wish to be heard in

21  support of the motion?

22       MS. MOSS:  Good morning, Your Honor.  Tina Moss,

23  Perkins Coie, on behalf of Wilmington Savings Fund Society, as

24  indenture trustee.

25       Just briefly, Your Honor, I would just confirm Mr.

1   Herman's remarks regarding distributions to holders.  Your

2   Honor, the trustee is not in a position to determine what the

3   outcome of these proceedings are going to be going forward,

4   given all of the uncertainty regarding the positions taken by

5   the former owners, debtors, principals.  And so we are still in

6   the process of trying to calculate distributions and determine

7   what can be done with respect to that.  Your Honor, this

8   creates uncertainty for the holders and also delay, continued

9   delay, in this case.

10      So I just wanted to confirm Mr. Herman's remarks

11  regarding that and urge the Court to rule with respect to this

12  matters in favor of the petitioning creditors' motion.  Thank

13  you, Your Honor.

14      THE COURT:  Thank you.

15      Would anyone like to be heard in opposition to the

16  motion?

17      MR. SOLOMON:  Your Honor, if I could go first.  And

18  thank you for your extraordinary amount of time that you have

19  given to this.  Reed Smith is here and welcomes the opportunity

20  to respond to the contempt and sanctions motion made against

21  it.  Very few things were said about it.  Mr. Ortiz can't but

22  help himself from all of the name calling and all of the

23  repetitious name calling.  And I'm going to go first because

24  although Mr. Curtin is here representing some of the

25  shareholders, and nothing was said about him and his clients in

1　the sanctions motion at all.  So there's a sloppiness to all of

2　this.  And I don't think Your Honor can act in the kind of

3　sloppy way that they're asking you to do.

4　　　　Who's actually here?  Well, Reed Smith is here, and

5　several shareholders are here.  Nobody else is here on this

6　motion.  By the way, Holdings, Your Honor, wasn't even a

7　respondent on the motion.  Yet, sort of draconian responses

8　like sanctions and throw-the-book-at-him and all of that kind

9　of get thrown about without actually addressing with care.  And

10　no, he shouldn't do it in reply because he didn't do it in

11　their papers.

12　　　　Who actually is here before Your Honor?  There is no

13　proof that these individuals -- and we don't even know who the

14　individuals are.  It's a little bit like Star Chamber in that

15　their request for sanctions is a bunch of -- against a whole

16　bunch of unnamed people, unnamed entities.  This Court can't

17　act like that, although they think if they kind of just

18　complain enough and call enough names and repeat themselves

19　enough that Your Honor is going to overlook it.  And of course,

20　Your Honor can't.

21　　　　Reed Smith has done everything it can to comply with

22　the orders of this Court.  Reed Smith has also been advised of

23　an order and directive by a Greek court.  We are doing our best

24　to comply with both.  At this point, there's nothing

25　inconsistent in those.  And that is what Reed Smith has done.

1  Reed Smith has produced all of the documents that it has.

2  This is covered in my declaration, paragraph 15 and

3  16, 19 and 25, and a number of other places.  Requests were

4  made of Reed Smith, which we passed on to our clients.  That's

5  dealt with in paragraphs 13, 16, 19, 25 of my affidavit

6  unrebutted.  The answers that we got, we conveyed immediately.

7  The answers that we couldn't get, we conveyed as well.  Even

8  after this motion, we continue to cooperate.  I talk about that

9  in my affidavit in as much detail as I can.

10  Indeed, we called defects in the service of this

11  motion to their attention.  They took no steps to correct it.

12  So not only does it appear that Your Honor lacks jurisdiction

13  over the vast majority of unnamed Star Chamber-like people --

14  entities that they want sanctions against, but they actually

15  haven't even served them with process as required by the

16  Bankruptcy Rules and the federal rules.  We even called that to

17  their attention.  And indeed, we even offered to broker a

18  stipulation that would get this AOR filed as soon as they

19  carried out what they promised to do in their plan.

20  Your Honor heard that fundamental aspects of this plan

21  are boilerplate.  And Your Honor heard that as many times as

22  they promised in their plan to comply with foreign law, so

23  that's about fifteen times.  And I appreciate that the due

24  process clause is not in the Constitution.  And it's actually

25  stuck in, like, the fourteenth -- I mean, you have to go all

1  the way down to fourteen, and it's just a few words.

2  Boilerplate is not what you would call it.

3       You have before you a non-U.S. entity, Holdings.  All

4  of its assets are not in the U.S.  All of the corporations that

5  it has any interest in are not in the U.S.  That's been like

6  that since the beginning.  Everyone has known that.  This has

7  been an international matter.

8       And from the beginning, six different ways from

9  Sunday, and then twice each, what the creditors said is that,

10  to this Court, not to worry, and to the creditors, other

11  creditors, and to the debtor, not to worry, we will comply with

12  non-U.S. law.  If there's a foreign law issue, we will comply.

13       Now, Mr. Ortiz had told you, I think I counted six

14  times, that no one is being asked to violate foreign law.

15  Well, I think that the one person you don't want to count on to

16  answer that question is me.  But I have good company on this

17  one.  And the company is Mr. Ortiz.  He doesn't know what he's

18  talking about.  He has no benefit of knowing what foreign law

19  is.  That is why we went to foreign law people, and foreign law

20  experts, and got Your Honor the information about whether, as

21  he says, we are being asked to violate foreign law.  We are

22  being asked.  The company, and the AOR, and its directors, and

23  its officers are being asked to violate foreign law.  We

24  advised them of that.

25       Now, that's not inconsistent with the plan.  The plan

1   promised that they would comply.  And so we assumed that they

2   will simply comply with foreign law.  But then poor Mr. Ortiz

3   has a client who is a thug, and you only need to read a letter

4   that Mr. Spears wrote to Ms. Lenin (ph.) -- Beilin?

5           UNIDENTIFIED SPEAKER:  Blaimo (ph.).

6           MR. SOLOMON:  -- Blaimo, who I happened to be on the

7   phone with yesterday.  So concerned was she that she couldn't

8   carry out her duties as a lawyer because she was threatened by

9   Mr. Spears, as he has threatened Reed Smith, as he has

10  threatened LCIA counsel, as he had -- for Gas, as he has

11  threatened BVI counsel, for Gas and for Corp., threatened.

12  Okay?

13          One, he says, who's paying your fees?  Right?  We're

14  going to block your fees; you're not going to get paid.  That's

15  always a good way to introduce yourself to a lawyer.  Second,

16  you're notified and directed that you have no authority to make

17  any filings on behalf of Holdings, and you shall not make any

18  filings on behalf of Holdings without a prior written

19  authorization or approval.

20          So what actually is happening here is that they filed,

21  in Liberia, an application for the recognition of the Court's

22  plan.  And the respondent is Holdings.  So in Holdings, the

23  respondent went and got a lawyer.  And that respondent's lawyer

24  is going to then try to represent its client zealously.  They

25  get a letter of threat, just as we got several letters of

1  threat, just as all the other lawyers have gotten letters of

2  threat, just as Mr. Daniolos has gotten letters of threat.

3       And I ask Your Honor to consider whether that makes a

4  lot of sense in a bankruptcy that everybody knew was foreign,

5  everybody knew it had to be recognized overseas.  And now the

6  question is, who is distorting the plan for their own good

7  right now?  And Mr. Ortiz says it's us.  Okay?  He's wrong.

8  It's him.  And when his client learned that they were going to

9  have to go and get this recognized, as they said twelve times

10  in their plan, he said, well, "F" that; we're not doing that.

11  All right?  Fix it.  Change it.

12       And one of the ways they changed it is, at the last

13  minute, without telling Your Honor, slipped in the wrong

14  articles of incorporation.  There were articles of

15  incorporation that were in the plan, and in the supplement to

16  the plan, and were said this is what we're going to use.  But

17  it was perfectly obvious that, in the new articles of

18  incorporation, they would have to go get those recognized.

19  That's what Ms. Blaimo says.

20       Mr. Pierre doesn't disagree with that.  All he says is

21  that if there was -- if it was done consensually, then they

22  wouldn't need to get it recognized.  But of course, it's not

23  being done consensually, because they have to go and get the

24  shares canceled.  And they said in their plan that, in order to

25  get the shares canceled, it needs to be done consistently with

1    foreign law.  And they knew that they were going to have to go

2    do that.

3          And so Mr. Spears says to Mr. Ortiz, well, "F" that;

4    you ain't doing that.  So at the last minute, they bait and

5    switch, and they put a different articles of incorporation in,

6    our old articles of incorporation, without ever telling Your

7    Honor, without ever seeing what effect that would have on plan

8    implementation.

9          And so they now have the old articles of

10   incorporation, which of course, don't allow transfer and void

11   any transfer that's not by the current -- current shareholders.

12   And rather than fixing all of that, Mr. Spears then said, well,

13   you know what?  I mean, I understand this was just Holdings.

14   And I understand that Judge Mastando made it very clear.  You

15   made it very clear, Your Honor.  Everybody has understood that

16   taking over Holdings was not sufficient to control Gas.

17   Everybody knows that.

18         Gas has preferred shareholders.  Your Honor talked

19   about it at length in the decision on the trustee motion.

20   Everybody has known that.  It hasn't stopped Mr. Spears,

21   however, from writing to Gas' banks and locking up Gas' money.

22   It hasn't stopped Mr. Spears from trying to bribe and fire the

23   court employees.  It hasn't stopped him from getting in the way

24   of the people who are loaning Gas money.

25         So there are, in fact, three major respects in which

1  the creditors are not complying with Your Honor's plan, with

2  the plan that Your Honor ordered.  First, they said,

3  repeatedly, that if there was a foreign law problem, they would

4  fix it.  They would not require anybody from Holdings to

5  violate foreign law.

6          They said, in very great detail -- and I'm going to

7  show Your Honor the very great detail, in every particular that

8  matters, the stock, the cancellation of the stock, the changing

9  of the articles of incorporation, everything that has to do

10  with the corporate structure has to be done in compliance with

11  non-U.S. law.  And that's what they promised.  And they're

12  walking away from that.

13          Second, they knew that, in order to fix the -- to

14  change control, they would need a new articles of

15  incorporation.  They swapped that out without ever telling Your

16  Honor and without ever figuring out what that would have to --

17  what effect that would have on implementation of this plan

18  since it's completely illegal.  Now they're operating under an

19  old articles of incorporation, which doesn't allow them to

20  transfer any of the stock that they have.

21          And then the third thing is, I do believe it's a

22  massive abuse of this Court's process to extend this bankruptcy

23  beyond Holdings.

24          Now, Reed Smith has done everything that it can, and

25  Reed Smith is here, and you will hear from the shareholders.

1　But I want the Court to under -- the Court does understand that

2　what they're complaining about here, against the people who are

3　actually here before Your Honor, doesn't remotely come close to

4　the burden of showing what they need to show.  Okay?

5　　　　The order has to be clear and unambiguous.  We're

6　going to talk about how clear and unambiguous it is.  I believe

7　it is clear and unambiguous that they need to go comply.  The

8　proof has to be clear and convincing.  And they have to prove

9　that we have not been diligent in trying to comply.  They can

10　carry none of those burdens.

11　　　　There are two different paradigms, and I think the

12　petitioning creditors are confusing all of them.  One is you

13　have a U.S. entity, and you have U.S. assets, and you have

14　U.S. -- the assets and whatever else the Court can look at, and

15　that, in fact, the Court has authority over that.  And to the

16　extent that Reed Smith is here -- and we are, all right -- and

17　we have documents that they wanted and asked for, we gave them

18　the documents.  That's what we had here.  Okay?

19　　　　The second paradigm is when you're dealing with a

20　wholly foreign entity -- and the question before Your Honor is

21　not whether we've acted in contempt.  I think that is a

22　sanctionable motion, in and of itself, and Your Honor should

23　just swiftly deny it.  But there may be a question whether,

24　given all of their representations, and even without their

25　representations, given the restatement and the international

 1  nature of this bankruptcy, whether Your Honor has the

 2  authority, and then whether it should exercise the authority,

 3  to order a non-U.S. person, in a non-U.S. jurisdiction, to

 4  violate non-U.S. law.  That's what's going on here.

 5          And instead of all of this screaming and shouting and

 6  calling us names, there shouldn't have been a contempt motion.

 7  It's frivolous.  And in fact, they should address that issue.

 8  Can they now -- having done what they did in their plan, can

 9  they now change this and put Your Honor in a position where

10  Your Honor can order a non-U.S. person, in a non-U.S.

11  jurisdiction, to violate non-U.S. law?  I don't believe, Your

12  Honor --

13          THE COURT:  Well, as a part of that, aren't they

14  saying that the people are here, they're before this Court, at

15  least as to the first part of your statement?  I mean,

16  they're --

17          MR. SOLOMON:  There is no evidence that the AOR is

18  before this Court at all, Your Honor.

19          THE COURT:  That's not what I mean.  I mean, in terms

20  of directing people to do things.

21          MR. SOLOMON:  No, I believe, Your Honor --

22          THE COURT:  Holdings is here.

23          MR. SOLOMON:  -- that Holdings is here.  Holdings is

24  clearly here.

25          THE COURT:  Okay.

1          MR. SOLOMON:  But there's no proof that -- there's no

2    proof that the foreign -- these are former directors now.

3    There's no proof that they are before this Court, and there's

4    no evidence.  And they are not, with respect, before this

5    Court.

6          The AOR, whom they're trying to force to violate

7    Liberian law -- and Your Honor has before you; it's an

8    unrebutted affidavit, because Mr. Pierre doesn't disagree that

9    they're being asked -- a non-U.S. person is being asked to

10   violate Liberian law, because they're trying to force him to

11   change the AOR without first changing who are the shareholders

12   of the company, who are the -- who is the board of the company,

13   who can actually direct this AOR?

14         So I do believe that -- I do believe that I'm

15   describing it correctly.  And I don't know -- I don't really

16   know all of the cases that Mr. Ortiz is in, and I don't really

17   go and look them up.  And I confess I'm not in as many.  But I

18   know how to read, and I know how to read his article in the

19   American Bankruptcy Institute Journal.  I know how to read

20   that, okay?  And it's April 2021, 40-4, ABI G14.  I know how to

21   read that.

22         And I know that, in detail, he says exactly what they

23   promised the creditors in this case that they would do.  He

24   says that a foreign debtor may have to navigate the challenge

25   of compliance with both its own law.  And in that case, he was

1    talking about the absolute priority rule and a couple of other

2    rules which I will get to.  Okay?

3        "A plan that fails to comply with applicable foreign

4    law would likely face significant challenges in satisfying

5    other confirmation requirements."  He says that on page 2 of

6    his article.  "Although bankruptcy court approval might satisfy

7    or obviate similar requirements of an American company, a

8    confirmation order is unlikely to act as a substitute for

9    applicable foreign legal requirements, particularly when

10   adjudicated by foreign courts."

11       Footnote 7, "Similar conflicts could arise from a

12   debtor's attempt to consummate any number of corporate

13   transactions."  And that's what they are asking, Your Honor, to

14   hold these parties in contempt for not doing.  They're asking

15   Your Honor to violate -- to direct them to violate corporate

16   law, both in Greece and in Liberia.  And there's nothing

17   speculative about that.  Okay?

18       They are the ones who put in no proof.  All they have

19   is bluster.  We actually gave Your Honor the proof.  And to be

20   very precise, it's the proof that we had when we answered their

21   questions.  And so with respect to Reed Smith, who is actually

22   the respondent here, okay, the information that we had, it

23   seems to me, is a complete defense to their suggestion now that

24   no, somehow it was okay for us to tell our clients to violate

25   non-U.S. law, and by not doing so, we are in contempt of this

1  Court's order.

2       I don't believe that.  I don't believe that, both

3  because of what Mr. Ortiz says is inherent in the bankruptcy

4  process, and what they said twelve different times in their

5  plan.  "If a foreign debtor attempts to consummate a plan

6  without complying with applicable foreign, corporate, and/or

7  securities laws", says Mr. Ortiz, "it likely will face

8  significant risk, including civil and criminal claims."  That's

9  what he says.  And that's right.  And that's what happens.

10      And so the suggestion that he makes is, well, Holdings

11  is here -- by the way, Holdings is not here, Your Honor.

12  Holdings is not a respondent on this motion.  But his idea that

13  Holdings is here, so they can be ordered to do anything they

14  want, is completely inconsistent with the statutes.  It's

15  completely inconsistent with what he says.

16      THE COURT:  But you're drawing a distinction between

17  Holdings and reorganized Holdings?

18      MR. SOLOMON:  No, reorganized -- no, they're not --

19      THE COURT:  Well, when you say they're not here, what

20  do you mean, because didn't they --

21      MR. SOLOMON:  I mean that no Holdings entity is

22  involved --

23      THE COURT:  Didn't they file the motion?

24      MR. SOLOMON:  No party being asked to be held in

25  contempt is a Holdings entity.  That's what I meant, Your

1     Honor.  It's the people they're trying to hold in contempt --

2            THE COURT:  Well, its Holdings' former -- existing

3     person of record, former shareholders, officers, directors, et

4     cetera.

5            MR. SOLOMON:  That's right, Your Honor.  And the point

6     I'm trying to make is that it is clear that, as Mr. Ortiz

7     would -- before he was set upon by his current client, who told

8     him to change everything in their plan, what he said was, even

9     a foreign debtor is going to have these problems, so you need

10    to make provision for it.

11           As he says, "At the board and management level, there

12    might be reluctance to take or pursue actions where the debtor

13    lacks real or even apparent authority to engage in such

14    transactions, leaving aside the personal risk and exposure that

15    may come with violating local laws."

16           That is what he said.  And that is correct.  And that

17    is why there is no contempt here, because the board and

18    management level were very reluctant to take conduct that

19    violated foreign law.

20           And he then says, "Potentially more significantly", on

21    page 3, "a bankruptcy court-approved plan that fails to comply

22    with foreign law might not be implementable without significant

23    and perhaps existential risk to the actual ability to

24    consummate the restructuring."

25           He then says, in footnote 11, "Some might argue that a

1  foreign debtor's election to file for Chapter 11 should be seen

2  as some kind of waiver of its domestic laws, to the extent

3  inconsistent with Bankruptcy Code."  And he says that's wrong.

4  "Such an argument" -- I'm quoting -- "would ignore that,

5  generally speaking, shareholders' rights vest in the

6  shareholders themselves.  It is difficult to imagine stripping

7  those rights from shareholders as a result of the debtor's

8  actions, particularly where shareholders themselves did not

9  authorize the Chapter 11 filing."

10        No shareholder here authorized the Chapter 11 filing.

11  And the point that we are making, Your Honor, is that, until

12  they decided to change their mind and do this, taking illegal

13  shortcuts, everybody understood, including Mr. Ortiz, that they

14  needed to comply -- that they needed to have a plan, given this

15  non-U.S. debtor, that was going to be compliant with foreign

16  law.

17        That does not mean that there's not an important role

18  for this plan.  It is.  They just need to go and get it

19  recognized.  They don't have to do it all over again.  Ms.

20  Blaimo identified what they have to show.  Okay?  The more

21  illegal conduct they are engaging in, I think, it's going to be

22  harder for them to show it.  I'm not counsel over there.  But

23  they have to go and get this plan recognized.

24        And when the plan gets recognized, then they can

25  cancel the shares, they can swap out the board, they can do

1    various things, which is what led us to say, why don't you just

2    go file for recognition?  And when you have the proper

3    recognition in Liberia and Greece, and it's all -- we'll file

4    this new AOR.  That's what we said to them.  I'm not sure that

5    you can -- I think it would be wrong to hold Reed Smith in

6    contempt, or in any dereliction of its duty, for having made

7    that proposal.  What he says, in summing up his point is, he

8    said, "ultimately, solutions and compromises will have to be

9    crafted".

10        So he says, well, you should have told me this at the

11    confirmation hearing.  We had nothing to say at the

12    confirmation hearing.  They promised us, six ways from Sunday,

13    that they were going to comply, that their actions would not

14    force violation of foreign law.  That, they did.  Now they've

15    changed their mind on that.

16        But it's not a matter that we didn't raise an issue.

17    All of the things that -- that it's res judicata.  The plan

18    should be res judicata, the plan that includes the boilerplate,

19    the most significant boilerplate that a foreign entity would

20    ever want to see.  He says, well, there's a waiver.  He says,

21    you can't make new confirmation arguments.  We're not doing any

22    of that, Judge.  We're asking them to comply with the plan that

23    Your Honor ordered.  And it is all over that plan.

24        THE COURT:  Can I just ask, counsel referenced the

25    effective date.  And so what is your view, to the extent you

1  have one, of the effective date?

2      MR. SOLOMON:  Yeah, I don't know what he was quoting,

3  but he certainly misquoted me.  I don't know what he was

4  quoting, but he put some words in my mouth on the effective

5  date.  I believe the effective date -- it doesn't terminate the

6  appeal, because that has to be substantial compliance and

7  consummation for that to happen.

8      But the plan identifies what happens on the effective

9  date.  Reed Smith was fired as counsel.  And when we stopped

10  acting as counsel, the provisional board then did go and get an

11  order, and asked Reed Smith to protect its rights for so long

12  as it was needed for Your Honor and the Greek court to figure

13  out whether they are doing it right.  I believe they are doing

14  it wrong.  But the effective date had that effect.  The plan

15  identified --

16      THE COURT:  But so you're not challenging the

17  effective date?

18      MR. SOLOMON:  The effective date occurred.  So far as

19  we know, Your Honor, the effective date occurred.

20      THE COURT:  I thought there was some reference to the

21  effective date being challenged.  Okay.

22      And who is controlling reorganized Holdings?

23      MR. SOLOMON:  I think, until such time as they comply

24  with the plan, okay, there is a board, a provisional board,

25  that was appointed by the Greek court, that is supposed to

1  maintain the status quo until they go and do what they're

2  supposed to do to implement this plan. I'm not sure -- does

3  that answer Your Honor's question?

4  　　　　THE COURT: Well, I think. It depends if that's the

5  answer. I mean, my question was just who is controlling

6  Holdings on a day-to-day basis? It's the provisional board,

7  you're saying.

8  　　　　MR. SOLOMON: The provisional board was given very

9  narrow -- very narrow authority. And there's not much for

10  Holdings to do. It's a holding company. But I read -- and

11  there was no intent to -- we submitted to the Court what we

12  received, okay, in terms of a translation, which, by the way,

13  this isn't even -- it's not a certified translation, but

14  parties are doing the best that they can. We got a Greek

15  lawyer to translate that. And we submitted what we had. This

16  provisional board has been directed to, essentially, maintain

17  the status quo, to not allow Holdings' rights to be violated.

18  　　　　In the clearest possible way, I want to disagree with

19  the suggestion that what they are allowed to do now is to drop

20  the appeal, and vacate the arbitral award, and drop our

21  confirmation proceeding. I don't believe they have the right

22  to do any of that until they properly take over Holdings. And

23  they can properly take over Holdings by doing what they said

24  they would do in the plan and in Your Honor's order.

25  　　　　Your Honor's order also said that I want -- this is

1    going to happen assuming compliance with applicable law.  And

2    when they say that they will make every effort to ensure -- by

3    the way, the disclosure statement does talk about Liberia.  It

4    says the debtors are incorporated in Liberia.  So the

5    suggestion that it doesn't say that is wrong.  This is Roman

6    VIII(a)(3).  And they expressly undertook to make every effort

7    to ensure that any confirmation order entered by the bankruptcy

8    court, and the steps taken pursuant to the confirmation order

9    to implement the plan, are recognized and are effective in all

10   applicable jurisdictions.

11         Now, the gimmick that they're playing with this AOR is

12   to avoid recognition.  And that's why we went and asked a

13   Liberian law expert whether that was okay.  And she said no.

14   Their expert says nothing inconsistent with that, Your Honor.

15   His opening declaration says that, yes, you can change the AOR

16   in the event that there's, like, a merger or a consolidation,

17   not in the event that you have to get your plan recognized.  So

18   he says nothing inconsistent with it.

19         Then they put in a reply declaration, on Friday, which

20   we haven't had a chance to be able to rebut.  The only thing I

21   will say, Your Honor, is if Your Honor will look at the actual

22   statutes that he claims to be citing, of Liberian law, the

23   preamble to that is talking about a case where you have a

24   Liberian corporation, with Liberian shareholders, and a

25   Liberian board, and vote -- excuse me -- the shareholders and

1  board that are recognized by Liberian law.  And they can then

2  take the following action.

3        But Spears and Co., Murchinson and Co. is not

4  recognized by Liberian law.  That's the very proceeding that

5  they tried to threaten our lawyer, or the lawyer, from having

6  anything to do with.  And so I don't think -- I don't think

7  there's a debate about Liberian law.

8        But Your Honor, even if there were, that is not a

9  grounds to hold Reed Smith in contempt.  That is not a ground

10  to hold shareholders in contempt.  And I believe those are the

11  only parties who are before you.  What I'm saying is, when you

12  make a promise to this Court, and to the creditors, to go and

13  get your plan recognized, that's a promise.  You can't walk

14  away from that.

15        And we cited the cases in our papers that says, just

16  because it's in an offering, right, and it's not in the plan

17  itself, doesn't mean it's not binding.  It is to be read

18  consistently with this plan.

19        And in this plan, I ask Your Honor just to look at, of

20  the twelve places where they promise compliance, Your Honor

21  should please look at 5.2(b) of the plan because it says, "take

22  such action as permitted by applicable law", and then it

23  lists -- it lists the conduct that has to be as permitted by

24  applicable law, "the execution and delivery of appropriate

25  agreements of formation, merger, amalgamation, restructuring,

1   conversion, the cancelling of anything having to do with

2   shares, the filing of appropriate certificates of articles of

3   incorporation, the requisite regulatory approvals to effectuate

4   the plan, the issuance of reorganized equity, all other

5   actions"  -- all other actions -- "that the applicable entities

6   determine to be necessary, including making filings or

7   recordings that may be required by applicable law in connection

8   with this plan".  Okay?

9           And then they say all other things are deemed to not

10  require further action "other than any requisite filings

11  required under the applicable state, provincial, federal, and

12  foreign law".  And so 5.2(b) covers everything.  There are, as

13  I say, ten or twelve other places that also say the same thing.

14          And I think the question to Your Honor is, can they

15  now walk away from that?  And we believe not, that even were

16  Your Honor to decide that they can walk away from that, that's

17  not a -- this is not the subject of a sanctions motion.  Your

18  Honor should have to -- I think Your Honor should look

19  carefully at what foreign law does require, because, as I say,

20  I don't believe that Your Honor has jurisdiction, or will

21  exercise jurisdiction, to force non-U.S. parties to violate

22  non-U.S. law in this non-U.S. bankruptcy.

23          If Your Honor feels differently, then Your Honor will

24  clarify.  And the argument that the parties will then have is

25  twofold.  One is that this is an international bankruptcy, and

1   the restatement does apply.  It doesn't matter how many times

2   Mr. Ortiz says it's a fabrication.  It's not a fabrication.

3        And as between U.S. law and non-U.S. law, Your Honor

4   will have to balance those.  They ignore that completely in

5   their reply.  And we have tried to lay out for Your Honor why

6   non-U.S. law should be complied with, because of the civil and

7   criminal penalties that flow from it.  And I'm not fabricating

8   that, as Mr. Ortiz says.  That's in the affidavit and in the

9   letter of non-U.S. law, under both Greek and Liberian law.  And

10  he then -- and so I ask Your Honor to take 5.2 into account.

11       5.4, Mr. Ortiz said several times that all equity in

12  the former directors were extinguished, and they were done

13  automatically, and there's not a darn thing that anybody can do

14  about it, except that that's not what 5.4 says.  It says that

15  they will be extinguished where permitted by applicable law.

16       I'm quoting Section 5.4.  "Stock can be canceled where

17  permitted by applicable law."  And Ms. Blaimo not only put in

18  her affidavit, but cited Your Honor to the provision of

19  Liberian law that says the existence of -- it's 5.14.  "The

20  site is ownership of shares."  Okay?  "It shall be Liberia."

21  They have to go to Liberia before they're going to be able to

22  cancel.

23       Now, this is not anything that we did and not anything

24  that I believe should take very long.  But I have to do it.

25  And they cannot then say, oh, well, 1142 allows Your Honor to

1  run roughshod over the rights that these parties have and
2  obligations that these parties have under foreign law.

3         They don't cite a single case where a single court has
4  applied 1142 in a foreign bankruptcy.  I think that's telling
5  you something.  We haven't found a case.  They don't cite a
6  case.  And the dozens of times that they say that we're
7  supposed to comply with it, not once do they actually cite a
8  case that applies it extraterritorially, because you're not
9  going to impose that, not without going through the proper
10  analysis that the restatement on international law restatement
11  requires this Court to do.

12         Now, they drop a footnote in the reply brief.  It's a
13  footnote in the reply brief that seems to cite a United States
14  Supreme Court decision.  So you kind of wonder, if it was
15  important enough, why they didn't put it in their opening brief
16  or why they didn't put it in the text.  It's Patterson v.
17  Shumate, which they claim says that it's okay to have 1142 not
18  preempt state law.  But of course, that wasn't the wasn't non-
19  U.S. -- that wasn't foreign law either.  That was ERISA.  So
20  there's no case.  And Your Honor, just in case Your Honor goes
21  and reads that case, the preemption scope there was 541(c)(2);
22  it wasn't 1142.

23         And so we've read that statute.  We've read all the
24  cases under that statute.  And we've read the cases that say
25  that 1142 is applicable to a debtor's financial condition.  And

1   what we're talking about here is the reorganization of Holdings

2   and other corporate laws.  And I don't believe 1142 applies at

3   all.

4           Your Honor, the confirmation order says, to the

5   greatest extent permitted under applicable laws --

6   permissible  -- I misquote -- "to the greatest extent

7   permissible under applicable law", in paragraph 5.  That's

8   right.  That's what we were all about before they decided to

9   change their mind.

10          So we're are not saying that Your Honor doesn't have

11  jurisdiction over Holdings.  We do think that there's been both

12  a failure of jurisdiction and a failure of service on the

13  individuals.  But we're not certainly -- Reed Smith is not

14  taking the position that Your Honor doesn't have jurisdiction

15  over it.  And we don't believe that the former debtor is taking

16  the position that Your Honor doesn't.  But as to what?  And the

17  things that the plan said need to be complied with foreign law,

18  they need to comply with foreign law.

19          In the reply declaration, which we have not had an

20  opportunity to respond to, and frankly, shouldn't be looked at

21  by Your Honor -- it's all substantive and should have done in

22  their opening papers.  But in any event, I do want to call Your

23  Honor's attention to paragraph 15, where Mr. Pierre purports to

24  say that, under the Liberian law, a nonresident Liberian

25  corporation's ability to cancel existing shares is subject to

1    the corporation's articles of incorporation.  That's correct.

2            And the articles of incorporation that are binding now

3    are the ones that they switched out right at the last minute.

4    So it's the articles of incorporation of Eletson Holdings that

5    have been in force since 2007.  And they do not permit the

6    transfer of these.  That is the whole point.

7            And unless and until they go and get their plan

8    recognized, they will not have a lawful basis to switch out the

9    shares.  They will therefore not have a lawful basis to take

10   over the board.  They will not have a lawful basis then to be

11   Holdings.  And that is what they need to do.  Even when they

12   are Holdings, they will not be able to masquerade as Gas.  They

13   still won't be able to do that, notwithstanding --

14   notwithstanding the Murchinson conduct.

15           Mr. Pierre says that the BCA (ph.) states that "a

16   person claiming to be the owner of such shares", and I'm

17   quoting him.  But that's a misstatement.  There's nothing in

18   the statute that says that at all.  It's a serious

19   misstatement.  That was written, obviously, by the Togut firm.

20   It never says anybody claiming to be the owner.  Section 5.18,

21   which is what he cites, is talking about the owner as

22   recognized by Liberia.  That owner is not Murchinson.  That

23   owner is not Pach Shemen.

24           I apologize, Your Honor.  I will not take the time to

25   go through the detail in my affidavit that I believe shows in

1  every particular of what Reed Smith did, and when it did it,

2  and why it did it.  There is no basis to suggest that Reed

3  Smith -- that there was any clear order that Reed Smith

4  violated.  None has been identified -- none has been identified

5  to the extent of clear and convincing evidence.  And I believe

6  that we have shown that we have acted diligently to comply with

7  this Court's orders.

8       I just want to look through my comments, and I think I

9  am done.  I'm happy to answer any questions if you'd like.

10      THE COURT:  There was a reference to the district

11  court proceeding.  What's the status of the district court

12  proceeding?

13      MR. SOLOMON:  So in the arbitration confirmation

14  proceeding, Your Honor, the district court has stayed that

15  until -- it has stayed virtually everything in that case until

16  January 10, when the parties are to be back before him.  So all

17  of the stuff that Mr. Ortiz was telling you about what's

18  happening, and what they've claimed in that proceeding, it has

19  been stayed.

20      It has been stayed because they claim that they can

21  now enter that case and make it go away, because they want to

22  be on both sides of the V.  I believe they cannot do that.

23      We have also told Judge Liman that we have been

24  advised that the shareholders, the preferred nominees, and Gas

25  wish to intervene in that case.  And he initially granted them

1    the right to make their motion, but then he stayed that also

2    until January 10th.

3         THE COURT:  Thank you.

4         MR. CURTIN:  Good morning, Your Honor.  William Curtin

5    of Sidley Austin.  Just a few points.

6         MR. SOLOMON:  Thank you, Your Honor.

7         MR. CURTIN:  Sorry.

8         THE COURT:  Yes.  Thank you, Counsel.

9         MR. CURTIN:  Thank you, Your Honor.  Again, good

10   morning.  Your Honor, I don't think this is an incredibly

11   complicated motion.  I think what you see here is the movants

12   attempting to take a shortcut.  They know what they're required

13   to do.  In fact, they're actually doing it.

14        Mr. Ortiz, of all people, knows the process.  He knows

15   what the next step is.  And they have, again, started that

16   process.  And the other motion that's before Your Honor this

17   morning is related to that process as well.

18        What we have here, Your Honor, is, of course, a

19   confirmed U.S. bankruptcy confirmation order.  And that's it.

20   That's what we have, right?  There's a next step here.  And

21   everybody knows that there's a next step here.  And the next

22   step is proceeding.  And as Mr. Solomon alluded to, I don't

23   think there's been any showing that the next step is going to

24   take some inordinate amount of time.  But there is a next step

25   that we have to go through.  And we need to go through that

1  step.

2       And the answer here is not to continue what has become

3  a trend in this case, which is when Murchinson doesn't get what

4  it wants, it attempts to intimidate.  It attempts to do things

5  like file a sanctions motion and intimidate attorneys from

6  doing their jobs.  That's not the right answer, and it wasn't

7  the right answer with the trustee motion earlier in the case,

8  and it's not the right answer now.

9       Instead of simply proceeding under the law in the

10  correct jurisdiction, which again, they are -- it's not like

11  they're saying, no, we don't have to do that or we're not going

12  to do that; they are doing it -- they bring this motion in an

13  attempt, at best, to effectuate a shortcut, and at worst, to

14  bully and intimidate folks to do what they want.

15       I think the key here, Your Honor -- you heard, I mean,

16  an hour or more of argument from Mr. Ortiz and Mr. Herman

17  talking about 1142.  But Mr. Solomon's point that there are no

18  cases applying 1142 to this fact pattern, to this foreign

19  jurisdiction situation.  And there's a reason for that, Your

20  Honor.  We heard all the quotes from Voyager, from Judge Wiles

21  had nothing to do -- there was no -- there was no foreign

22  jurisdiction issue there.  It was not at all what he was

23  talking about.

24       So I think, Your Honor, that the answer here is pretty

25  simple.  There's no basis -- well, first of all, as to my

1    particular clients, there's no specificity as to what my

2    clients have done or haven't done.  But just as a general

3    overarching matter for the entire motion, let the process play

4    itself out.  All these arguments about what is and isn't in the

5    plan, yes, it is in the plan that they have to comply with

6    applicable foreign jurisdiction law.  But it doesn't really

7    matter.  They still had to, even if it didn't say that in the

8    plan.

9         So I think there's a lot of noise being made, on the

10   Murchinson side here, and a lot of bluster.  But at the end of

11   the day, they're doing what they need to do in the foreign

12   jurisdiction.  And that will play itself out however it plays

13   itself out.  And again, there's no indication that it's going

14   to take any inordinate amount of time.  But it's going to take

15   however long it takes.

16        THE COURT:  What is the status of that proceeding, to

17   the extent you know?

18        MR. CURTIN:  I don't know any specifics other than

19   it's been brought.  And what I've been told by others -- and I

20   have no knowledge of this -- is that it's a couple of months'

21   proceeding and not a couple of years' proceeding.  But again, I

22   don't proclaim to be anywhere near an expert in Liberian law,

23   but that's simply what I'm told.

24        THE COURT:  No, understood.

25        MR. CURTIN:  So Your Honor, I mean, I do have to kind

1   of address one point, and this is going to be the only one, of

2   the comments that were made.  I mean, to make the arguments

3   that my clients came to this court voluntarily, I just think is

4   incredibly disingenuous and distorts the facts.

5           Yes, they consented to conversion.  That is correct.

6   But to imply that anyone other than Murchinson chose to bring

7   this matter before Your Honor, chose to bring this matter in

8   the United States, is just -- again, it's just not reality.  So

9   they chose to come here -- "they" being Murchinson -- and here

10  we are.  They got their confirmation order.  But there are

11  ramifications of coming here.  And that means there are things

12  that have to be accomplished in other jurisdictions.

13          And I understand they don't want to do that.  It's

14  going to take more time.  It's going to cost more money.  I

15  understand they don't want to do that, but that's what the law

16  requires.  And Your Honor shouldn't allow them to use your

17  court as essentially a means to either, A, again, take a

18  shortcut, or to bully other parties into doing what they want.

19  And that's all I have to say on this motion, Your Honor.

20          THE COURT:  Thank you, Counsel.

21          Did anyone else wish to be heard before I turn it back

22  to the movant?

23          MR. LAZAROFF:  Your Honor, Michael Lazaroff here on

24  behalf of the nonparty, Daniolos Law Firm.

25          We are here, respectfully, solely for the purpose of

1    contesting that this Court has jurisdiction over the Daniolos

2    Law Firm, which is a Greek law firm.  And our contesting of the

3    jurisdiction includes that it has not been served properly,

4    pursuant to the Hague Convention, on service, as would be

5    required by Bankruptcy Rule 7004.

6         We filed an opposition solely for this purpose, not

7    waiving any defenses, including of jurisdiction or service.

8    The petitioning party, in its response, its omnibus response,

9    specifically did not respond to our client's papers.

10         It states, on page 1, it's submitting an omnibus reply

11    to objections to the sanctions motions filed by Reed Smith and

12    the majority shareholders, and the objections to the foreign

13    representative's motions filed by the majority shareholders, as

14    joined by the provisional board, represented by Reed Smith.

15         It does not respond in its reply, at all, to our

16    papers.  And as far as I can tell from reading them, it does

17    not address our arguments.  Thus, to that extent, it appears

18    that they are conceding the point.  However, the point as we

19    detail in our papers, is pretty straightforward.  This is, at

20    the very least, a contested matter.

21         They filed under Bankruptcy Rule 9020, which

22    incorporates Rule 9014, which requires service through

23    Bankruptcy Rule 7004, pursuant to the Federal Rules of Civil

24    Procedure, which makes mandatory compliance with the Hague

25    Convention, when it's applicable.  It would be applicable in

1  the Daniolos Law Firm and any other Greek residents or citizens
2  because both Greece and the United States are signatories to
3  the Hague Convention.

4      Greece has opted out of mail service.  And most of the
5  decisions in the Southern District of New York find that, when
6  you opt out of mail service, that also applies to email
7  service.  That's the Smart Study (ph.) case that we cited.  As
8  such, there's no claim made that service was made on the
9  Daniolos Law Firm, or as far as I can tell, any other Greek
10  citizen, pursuant to the Hague Convention.  So there was no
11  service and there is no jurisdiction because of that.

12      Additionally, if one looks through the petition, one
13  fails to see the type of minimum contacts that would be
14  necessary, either general or specific.  The Daniolos Law Firm
15  is a Greek law firm.  The only action which appears to be
16  specified or hinted at in the papers is that it provided Greek
17  legal advice to Greek citizens and residents.

18      It has not appeared in these proceedings.  It
19  represents no one with regard to these proceedings.  It did not
20  provide advice with regard to United States law at all.  And on
21  that basis, there would be no minimum contacts, and it would be
22  fairly unreasonable for this Court to assert jurisdiction.

23      Thus, whatever else the Court does -- and we've
24  listened to a lot of argument -- whatever else it does with
25  regard to anyone else, it seems fairly straightforward, and we

1    respectfully request that the Court dismiss this motion for

2    contempt and sanctions with regard to the Daniolos Law Firm

3    because of a lack of service or jurisdiction.  We explain

4    everything else in our papers.  And I'm happy to answer any

5    questions the Court may have.

6              THE COURT:  Thank you, Counsel.

7              Anyone else wish to be heard?

8              Okay.  Did the movants wish to be heard again?

9              MR. ORTIZ:  Please, Your Honor.  Good morning again,

10   Your Honor.  Kyle Ortiz, of Togut, Segal & Segal, for

11   reorganized Holdings.

12             Again, when I talked about Groundhog's Day, that

13   really -- the amount of things that were said that were just

14   kind of pure subterfuge, pure trying to distract from very

15   clear authority.  That entire presentation, Your Honor, was an

16   admission that they are violating the plan.

17             And I think you hit on this point.  How could Holdings

18   be a respondent?  The only Holdings that exists today is

19   reorganized Holdings.  I don't know how they can possibly

20   thread this needle that the effective date happened but didn't

21   fully happen.

22             Even if you believed that some other recognition was

23   needed, it's still binding on these parties.  And I think it's

24   12.4 of the plan that says it's substantially consummated on

25   the effective date, "shall be deemed substantially

1  consummated".  It doesn't have a time line in it, Your Honor.

2  They don't get to pick and choose which parts of it apply on

3  which dates.  They're perfectly happy to accept millions of

4  dollars from these people, as counsel to the former Holdings.

5          And as I went through in my opening presentation, the

6  plan is super clear.  There is no ambiguity about the fact that

7  the old directors and officers are removed, deemed to resign,

8  or otherwise removed on the effective date.  They can't still

9  exist and be this provisional board.  You can't have it where

10  the parts of the plan that says Reed Smith is fired is there,

11  but the other parts aren't.

12          And the plan says, over and over, and the confirmation

13  order says, over and over, that they have to do as directed to

14  aid in implementation.  There's no part of the plan, there's no

15  part of the law that says you get to choose which parts apply

16  to you.

17          And I find it remarkable, just remarkable, that

18  they're going to say they don't know who the address of record

19  is, and that that person isn't here, because they didn't

20  identify that person.  As case law says, it is axiomatic that

21  attorneys must comply with court orders and have a

22  responsibility to oversee their client's compliance.

23          And if you want to see the ridiculousness and just the

24  lying of what they do, he then said that they have a proposal

25  where, if we do recognition first, they'll get the AOR to do

1  it.  Now we can file this AOR?  There was no promise in this

2  plan.  Pointing to a risk factor, and pointing to the fact

3  that, as responsible people, we say if there's applicable law

4  that we're going to comply with, it doesn't magically make

5  interfering applicable law.

6          And the most amazing thing about all of this, Your

7  Honor, is even if they believed what they were saying, any of

8  it, then they, bound by this plan, which they admit has gone

9  effective, should be doing, as the plan says, everything they

10  can to assist.  So if they really thought there was

11  recognition, they should be helping us get it and showing up

12  and saying we're not opposing it so that it happens on the two

13  weeks it could happen.

14          Instead, they have somebody that they have hired, as

15  an entity that no longer exists, to oppose it.  In the parts of

16  the Greek translation that they omitted --

17          THE COURT:  Who is opposing it, and on what basis?

18          MR. ORTIZ:  Great question.  It's a great question,

19  Your Honor.

20          THE COURT:  Oh, I thought you just said someone was

21  doing it.

22          MR. ORTIZ:  Well, we heard -- we saw in this letter,

23  that Mr. Solomon filed, that the expert, that they have as

24  their Liberian expert, is going to represent Holdings, and that

25  she couldn't be here today because she needs to prepare to

1    represent Holdings in that proceeding.  Except she doesn't

2    represent Holdings, because reorganized Holdings is the only

3    Holdings.  And Adam Spears is the CEO of that company.

4              There is no provisional board.  This is a fiction.

5    You can't have a plan happen, have all of the things that occur

6    under it happen, but then decide that certain parts of it don't

7    apply to you.  And I just -- there is no law.  I want to,

8    again, come back to the simplicity of what we're talking about.

9    And you don't need anybody's Liberian expert.  You just need to

10   read the words on the website that say that an AOR can file it,

11   or it can -- somebody else can under the AOR's written

12   authorization.  That's all we've asked for, Your Honor.

13             And again, they did not point to -- there does not

14   exist some foreign law.  We aren't trying to get around any

15   obligations to comply with foreign law.  There's no foreign law

16   that we're asking anyone to do anything in violation of.

17             And all we need is this AOR.  We've told them that we

18   would indemnify them.  That's how plans typically work, because

19   even in the United States, these things can come up.  Instead

20   of just yelling Murchinson, Murchinson, Murchinson, at the

21   confirmation hearing, they could have actually negotiated to be

22   included in the exculpation provision for things that we asked

23   them to carry out.

24             And by the way, Your Honor, if that's what they need,

25   if they're concerned about something, we're more than happy to

1 have this order saying, provide an AOR in two days and that

2 you're indemnified for taking those actions. That's perfectly

3 fine to be indemnified for things that we are asking them to do

4 in furtherance of the plan.

5 But they don't -- there's nothing in this plan,

6 there's nothing in the law that says you get to decide, no, I

7 don't have to do it. That's not how the law works. And Mr.

8 Solomon certainly has not read every case on 1142. And just

9 because most people actually comply with it, and he couldn't

10 come up -- we didn't put an example in our plan, it doesn't

11 mean that 1142 doesn't apply. Again, we went through this in

12 the opening.

13 THE COURT: Well, they're saying what's an example of

14 it applying in a foreign bankruptcy.

15 MR. ORTIZ: This isn't a -- they filed here, Your

16 Honor.

17 THE COURT: Well, I think he means a foreign entity.

18 But I understand your point.

19 MR. ORTIZ: But Your Honor, you can't say that the

20 Code only applies in certain aspects to foreign -- the entire

21 Code implies to the debtors. What they're trying to say is

22 that there's this preemption piece and that it doesn't preempt

23 foreign law. But again, that is starting from a false premise

24 that we're actually asking them to do anything that isn't in

25 compliance with foreign law.

1          THE COURT:  Well, that's a separate question.  Yeah,
2     that's a separate question.
3          MR. ORTIZ:  But Your Honor, it can't possibly be that
4     foreign debtors can come to this Court, seek this jurisdiction,
5     take U.S. taxpayer dollars, to have Your Honor be here, and
6     your staff be here, and just have certain provisions not apply
7     to them that.  Of course there's no cases on it, because it's
8     such a ridiculous notion, that you could just say, I'm a
9     foreign debtor, so I'm not supposed to implement law unless you
10    come back and seek it.  I mean, literally, that would
11    eviscerate the Southern District of New York.  That's why
12    people come here, is because foreign debtors get to use these
13    powers.  And you can't just take them and then --
14         THE COURT:  But if there was an agreement, though,
15    that there was something that was going to violate foreign law,
16    is there --
17         MR. ORTIZ:  Well --
18         THE COURT:  Is there case law saying -- ordering
19    someone to do that anyway?
20         MR. ORTIZ:  Is there case law saying order someone to
21    do that?  Well, so --
22         THE COURT:  Is there a bankruptcy case saying, in this
23    context, with a foreign debtor, everyone agrees that there's
24    some act that needs to happen that will violate foreign law,
25    but I'm going to order someone to do it anyway?

1      MR. ORTIZ: So not that I can come up with off the top

2 of my head, Your Honor. But I will note that this is the issue

3 that that article talks about, is that it's not been tested,

4 because generally --

5      THE COURT: No, I understand. And I understand you

6 don't think it is a violation of foreign law.

7      MR. ORTIZ: Right. Right. And those things come up

8 if it is. And if you thought it was -- and again, he's

9 pointing to the fact that I do this all the time, and that I

10 kind of look at these issues and know how to deal with them

11 when they come up.

12      So the concept is, if you know that it's going to be

13 an issue, you try to address that ahead of confirmation,

14 because you're worried that somebody can show up to

15 confirmation and argue that your plan isn't feasible because

16 you can't do certain things. And again, they didn't do that.

17 They're now doing this afterwards.

18      Your Honor, I want to talk about things that there's

19 no law for. There's never, ever been a case where we talk

20 about these things after the effective date. And again, I've

21 had cases where you have to go get recognition because somebody

22 isn't doing something four months after the effective date,

23 because somebody is refusing to do something.

24      But again, those are people who aren't here. They

25 came to this Court. They're subject to the jurisdiction of

1  this Court, Your Honor.  They can't now say your order

2  doesn't --

3          THE COURT:  I think there's also some disagreement as

4  to who the "they" is, right?

5          MR. ORTIZ:  Okay.  I understand that.  So I think the

6  "they" -- look, Reed Smith is here.  I don't think there's any

7  question that the former officers and directors of Holdings are

8  here.  I mean, there's the case law that we cite, Wilson v.

9  U.S., that says, if you bind something on a corporation,

10 obviously, corporations are a legal fiction.  You have to have

11 the people do it.

12         And I think you can clearly say that Mr. Kertsikoff,

13 Mr. Hadjieleftheriadis, and Ms. Karastamati have come to this

14 Court.  They've appeared as witnesses in your courtroom.  They

15 have told you, as Mr. Curtin said at that hearing, we're here;

16 we're not hiding in another country.  The shareholders are

17 clearly here.  They proposed a plan.

18         So those are parties right there, just those parties,

19 that could easily be ordered, identify an AOR, and have that

20 AOR give written authorization, as the website by the Liberian

21 registry clearly says you can, and we will indemnify that

22 person for any risk that they could possibly have, although I

23 don't think anybody that's being remotely honest thinks there's

24 a risk to something that, as the Liberian registry points out,

25 is a business address, Your Honor.  It's updating a business

1    address.  This is such a farce.

2         So I think, when you look at what we're actually

3    asking for, so that that shows this authority -- and again, if

4    they thought we needed recognition, the plan then requires them

5    to do everything they can to help us get it as fast as we can.

6    They can't just disappear when they didn't like the outcome.

7    That just would eviscerate any authority of this Court.

8         So I think you have Mr. Hadjieleftheriadis, Mr.

9    Kertsikoff, Ms. Karastamati, the shareholders, Reed Smith.

10   These other parties -- and I don't know who they are -- I

11   wouldn't be shocked, based on the track record, that the AOR is

12   one of those three people.  But they can, at very least,

13   identify, and as officers, and as the former shareholders,

14   direct that person to just -- it was literally a -- I had it

15   here a second ago, but a one-page form to say this is the new

16   person.

17        And they made a big stink about, oh, it was Adam

18   Spears.  But we always said we were going to hold that until

19   the effective date because that's what responsible parties do.

20   The things that they're saying, they just -- it's just

21   subterfuge.  I mean, you can't not be here.  You can't say that

22   the order and the confirmation, and all of the things that are

23   in it, apply only if you've been given proof.  The plan says

24   it's binding.  The Code says it's binding.  They admit that,

25   Your Honor, by the way, that 1141 says the plan is binding.

1        And even separate from 1142, all the same things that
2   are in 1142 are in the plan or in the confirmation order.
3   They're in your order, saying that they need to do the things
4   that take the steps to help with implementation.

5        I mean, and let's just be clear.  If you look at that
6   Greek translation, the reason that they want delay is so that
7   they can go to another court and get a contrary ruling and
8   create mass confusion.  But they aren't Holdings.  The plan did
9   what it did on the effective date.

10        And this stuff about the articles of incorporation,
11   you'll notice they keep saying it doesn't allow for the
12   transfer of shares.  We read these things.  He acts like we
13   don't read things and think about things.  Of course we did.
14   And it doesn't say anything about canceling, and it doesn't say
15   anything about issuing new shares.  And we had to go to that
16   great length because they wouldn't do an extraordinarily simple
17   act of updating an address of record.  I mean, this is just
18   comical.  And again, on the effective date, 12.4 provides the
19   plan shall be substantially consummated.  It's not partially
20   consummated.

21        Yeah, so foreign jurisdiction, I think, again, there's
22   this false premise that we're asking them to do anything that's
23   illegal.  They made that up.  That's insulting, Your Honor, and
24   it's just entirely irrelevant.  1142 clearly binds a debtor.
25   You don't get to pick and choose which pieces of the Bankruptcy

1 Code apply to you.  It binds them to take acts directed in

2 furtherance of consummation of the plan.  We do not need to

3 worry about the introductory phrase that says, even if it's

4 inconsistent with applicable law, because we aren't asking

5 anyone to do anything inconsistent with applicable law.  And

6 again, they're looking to contest all of these things.  V.H.

7 put in a declaration in connection with this; they're clearly

8 here.

9 And Your Honor, the subterfuge and the noise and the

10 silliness, all we are asking for is the most ministerial of

11 acts.  They can say that there's nothing in that declaration

12 that Ms. Blaimo put in that says that that -- the AOR itself

13 doing exactly what is said in the website, to either submit the

14 document or provide written authorization -- is not permitted

15 by law.

16 And again, I think it's just super important we're

17 having these arguments, Your Honor, three months after

18 confirmation.  If there was a flaw in our plan that made it so

19 that it couldn't be confirmed, that would have been a great

20 thing for them to raise at that time.  This is stuff that they

21 came up with in the two and a half weeks between, and we had

22 this debate, Your Honor.  There was your confirmation decision

23 that said, so ordered, but then we got a confirmation order

24 entered.  We decided to wait from fourteen days from the

25 confirmation order to be safe.  But in that time, they refused

1    to speak to us at all.  They did nothing except sit in a room

2    and come up with ideas to delay this.  And the only times they

3    did talk to us is when they said, we're going to get stays

4    elsewhere by doing other things.  This is the kind of people

5    that we're up against.  We went through this entire process.

6          There is a finality to a confirmed plan and an

7    effective date.  There is no case law that they can point to or

8    anybody is going to point to where -- we keep talking about

9    every step and every provision of the confirmed order and only

10   when former debtor's counsel has proof do things become active.

11   The entire plan became effective, became substantially

12   consummated, on the effective date.  There are things that need

13   to happen so that the people who became the new owners can

14   actually get the things that they own from the squatters.  You

15   can call yourself a provisional board.  Doesn't matter.  And

16   the things that we need are remarkably simple.

17         And look, we're back in front of Your Honor on

18   Wednesday for the Azure claim objection, which will we

19   resolved.  And between now and then, I don't understand how

20   they could possibly say that the parties you have in front of

21   you, the former shareholders, the three principals who've been

22   to this court and sat in your courtroom multiple times, and

23   Reed Smith can't figure out who this address of record -- which

24   they said they'd be able to figure out if we went and did these

25   things that we didn't need to do that create delay, that they

1  can't get that done, even if they're -- even with an

2  indemnification from us.  That's absurd, and it just shows that

3  they are doing everything they can to stop and obstruct what

4  Your Honor spent two years -- wrote 170 pages between the two

5  things -- doing.  It's just outrageous.  I'm a little just

6  offended that they're willing to make these arguments and come

7  up with these things.  It's not complicated.

8          Orders entered by a U.S. court are binding on those

9  parties.  If they're not stayed, Supreme Court case law says

10 they become binding, not optional, not what counsel wants to

11 do.  They're binding.  And if they had something that they

12 thought, Your Honor, was prohibited and they couldn't do it or

13 it would create some issue, they should have sought a stay;

14 they did not.  They came up with this specific design to create

15 fictional stays, to give time, to get a bigger thing in Greece,

16 to create serious confusion.  There needs to be an end to this.

17 We can start with something so simple, just this AOR.  And if

18 they're not complying with that, you don't have to impose

19 sanctions today or contempt today.  You can just say, do this

20 one thing.  And then the rest of it can roll off of that.

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Counsel.

23          Anyone else wish to be heard?

24          MR. KOTLIAR:  Your Honor, for the record, Bryan

25 Kotliar of Togut, Segal & Segal, counsel for the reorganized

1    Holdings.

2           I want to comment on something Mr. Solomon said about

3    the arbitration proceeding.

4           But at great risk to myself for upsetting Mr. Ortiz, I

5    do want to make one comment on the motion, which is Reed Smith

6    says that lots of people who used to be here aren't here

7    anymore.  But they're playing games.  He claims to represent

8    the provisional board, and he's here.  He filed an opposition

9    to the foreign representative motion -- that's next on the

10   agenda -- for the provisional board.  But that provisional

11   board didn't respond to this motion.  So they're not here, but

12   where are they?  This is a case, and they're nowhere to be

13   found.  They're not filing monthly operating reports.  They're

14   not paying professional fees in accordance with the

15   requirements of Your Honor's orders.  He says the provisional

16   board runs the show for a limited purpose.

17          Reed Smith emailed us immediately after the orders

18   were entered and the time periods ran for payment of their

19   professional fees.  The orders refer to reorganized Holdings

20   will pay, but we, Togut, are the people that they emailed as

21   reorganized Holdings.  But then he says, oh, we're not

22   Holdings, and Adam Spears, the CEO, the board member from the

23   plan and Your Honor's confirmation order, he's not holdings,

24   either.  He says over and over that Reed Smith is the target

25   and Reed Smith is here, but those other people aren't here.

1   But then he says "we", "us", and "our" throughout his
2   presentation.  All these foreign law issues that he says, none
3   of them affect Reed Smith, but then he says "we", "us", and
4   "our" in making the arguments for other people.  So who is it
5   that he's speaking for?  Is it the provisional board?  Is it
6   some quasi-holdings that he's making up?  I don't even think he
7   can tell you.

8        What's their opposition to Liberian recognition, the
9   Greek recognition?  I think their opposition is that Your Honor
10  wasted your time for two years.  They argue in their papers
11  that this was a bad-faith, involuntary filing, it was bad for
12  the company, and it was illegal, and it was a Murchinson
13  conspiracy.  Those are all the things that Your Honor wrote 200
14  pages rejecting.  But you wouldn't know that from looking at
15  their filings because they deleted twenty-eight pages from that
16  filing that made these arguments.

17       That filing was a Hadjieleftheriadis declaration.
18  It's unbelievable that people can't say that name still because
19  he filed a hundred declarations in this case for the debtors.
20  He was an officer and director of the debtors.  He filed the
21  declaration in support of Reed Smith's opposition to the
22  motion.  But he didn't appear for the provisional board or for
23  the debtors or the fake debtors with respect to this motion.
24  He's here for that, but he's not here for this.  It's whack-a-
25  mole, and Your Honor should put an end to this.

1        On the arbitration proceeding, Mr. Solomon said one

2   thing that's not true.  He says that we appeared in the case

3   for Holdings because we wanted it to go away; that's not true.

4   Only the independent director for Holdings has the authority

5   with respect to the arbitration for Holdings.  The independent

6   director has his own counsel.  He needs time to evaluate and

7   make his own decisions.  Togut is not doing that.  Togut and no

8   one else said that they appeared in order to make the

9   arbitration proceeding go away.  We, Togut, and separate

10  counsel for Holdings did file a notice of a stipulation of

11  withdrawal of the appeal of Your Honor's confirmation order,

12  obviously, since Holdings and the petitioning creditor can seek

13  a dismissal withdrawal of that appeal.

14        And lastly, I would just say we've heard two-hours-

15  plus of presentations.  We've been asking for a month, who is

16  the AOR.  Mr. Solomon said "he".  I think he knows.  Somebody

17  must know who the AOR is.  We haven't been told.  Thank you.

18        THE COURT:  Thank you.

19        MR. HERMAN:  Your Honor, David Herman for the

20  committee.  I have just a minute.

21        THE COURT:  Please.

22        MR. HERMAN:  Thank you.  The most interesting thing

23  that I heard Mr. Solomon say -- and I don't have a transcript,

24  obviously, yet.  But it was words to the effect of, if this was

25  being done consensually, they wouldn't need to get it

1  recognized, but it's not being done consensually.  And that's

2  exactly the point.  The question is, how do they contend

3  ownership would be transferred as a corporate matter?  Because

4  when he says, if this were being done consensually, it wouldn't

5  need to get recognized, the point is that there are people with

6  the debtor or its prior owners who have the corporate authority

7  to make the transfer happen.

8      Now, reorganized Holdings is saying that all that

9  needs to happen is updating the register.  And despite two

10  hours of argument, we haven't heard from the former debtors or

11  Reed Smith or the shareholders any sort of alternative.  Is

12  there a document that they contend needs to be written in Greek

13  that says the shares are hereby canceled?  Do we have to have a

14  family meeting?  If so, Section 1142(b) empowers the Court to

15  require all of those things.

16      In terms of who should be ordered to do this and found

17  in contempt, it's the three majority shareholders who are here.

18  They're represented by Mr. Curtin, who's now in the top-right

19  of my screen.  The principals of those three shareholders who

20  also run the company, according to two years of testimony that

21  we have, that's Mr. Hadjieleftheriadis, Mr. Kertsikoff, and Ms.

22  Karastamati.  The two minority shareholders and the principles

23  of those shareholders, those shareholders voted at

24  confirmation, so they're subject to Your Honor's jurisdiction.

25  And apparently, they have instituted Greek proceedings in

1  contravention of the plan without the consent or cooperation of

2  the new owners of the company.  So those are the parties that,

3  in our view, need to be ordered to comply and effectuate the

4  plan.

5      THE COURT:  Thank you.

6      MR. HERMAN:  Thank you.

7      MR. SOLOMON:  Your Honor, Lou Solomon.  I'd like two

8  minutes, please.

9      THE COURT:  Please.

10     MR. SOLOMON:  Reed Smith is here acting on behalf of

11 Reed Smith.  No one did anything wrong here, no one.  We're

12 trying to comply with the actual order.  And since no one did

13 anything wrong, Reed Smith didn't do anything wrong.  But I'm

14 also here on behalf of Reed Smith because Reed Smith didn't do

15 anything wrong.  All of the entities, the people that were here

16 talking about, are related parties.  The obligation is to

17 cooperate.  I do not believe that the requirement of

18 cooperation means violating foreign law.

19     We, for the first time, hear about Mr. Kertsikoff and

20 Ms. Karastamati.  They are not identified in the motion.  They

21 have not been served properly.  None of these individuals has

22 been served properly.  I understand that there's an

23 informality, but we're talking about contempt here.  We object.

24 They have to be served properly.  They would not even -- and

25 nobody's even tried to serve them properly.  The idea that

1   people vote on confirmation and therefore subject themselves to

2   the jurisdiction of this court on a contempt motion is not only

3   absurd, but something on which there has been absolutely no law

4   given to Your Honor.  It doesn't exist, and I don't think that

5   Your Honor can do that.

6           With respect to these minority shareholders, whom we

7   don't control and the provisional board doesn't control, nobody

8   controls, they are not here.  We did not file those papers.

9           I do use "we" a lot, Mr. Kotliar.

10          But the "they" that they keep accusing us of, the

11  "they", okay, these individual shareholders, these minority

12  shareholders, I don't know what the world would have been like

13  had they, had the petitioning creditors, actually honored the

14  promises that they made to Your Honor in the plan and honored

15  the order and went and got recognition, okay.  None of this

16  likely would need to have happened.

17          And Mr. Herman asks rhetorically, we haven't told him

18  what needs to be done.  We've told you exactly what needs to be

19  done in words of one syllable.  The Liberian expert in

20  paragraph 14 says the judicial recognition in Liberia of the

21  Southern District of New York Bankruptcy Court judgment is

22  required to change the address of record of Eletson Holdings.

23  She then goes on and explains that.  So this is not a case

24  where Mr. Ortiz can kind of make pretend that there's no

25  conflict.  They're asking Your Honor to order people to violate

1   Liberian law.

2         The alternative is simple:  do what -- as Mr. Curtin

3   says they are doing, go seek recognition.  But when you seek

4   recognition and you sue Holdings -- I don't know Liberian law.

5   But my guess is it is as absurd in Liberia as it is here in the

6   United States that you sue somebody and they cannot defend

7   themselves.  So my suspicion is that Holdings will be

8   responding, and I believe that that is due today.  That is why

9   the expert couldn't be here, Your Honor.  I just wanted to

10  answer the question that Your Honor asked Mr. Curtin.

11        THE COURT:  You're saying that's a response to the

12  recognition petition?

13        MR. SOLOMON:  Correct, Your Honor.  That's happening

14  today.  The respondent in that is Holdings.  The idea that it's

15  only a -- it's only a Murchinson, it's only a Mr. Spears who

16  could send a threatening email that says, we're going to hold

17  you in contempt if you actually defend the party we have sued,

18  okay.  That's lawless.  That's not the stuff of contempt.  In

19  fact, it seems to me that the lawyers perhaps should be lauded

20  for representing clients in a case like this until these issues

21  get clarified.  Okay, maybe you're not going to laud it.  It is

22  not contempt, and it is very simple.

23        THE COURT:  Who are the parties on the different sides

24  of that proceeding?

25        MR. SOLOMON:  Pach Shemen sought recognition, and they

1  have sued Eletson Holdings.

2        THE COURT:  Okay.

3        MR. SOLOMON:  Eletson Holdings will defend itself,

4  just like here, Your Honor.  Companies that are defunct still

5  are entitled to legal representation.  Companies that are in

6  runoff are entitled to legal representation.  Companies that

7  don't exist any longer are entitled to legal representation.

8  It's a matter of state law, and New York is very clear on that.

9  And here, it's also very clear that -- I understand what they

10  want.  They want to file a recognition proceeding and have

11  nobody defend, nobody resist, okay.  And what I'm saying is, if

12  they would actually follow what Your Honor has ordered them to

13  do in the plan and stop the bait-and-switch and go through the

14  recognition process, then I think this would all be done a lot

15  more quickly.

16        The fact is, however, that with all of those other

17  people who are not here and haven't even been served, who is

18  here is Reed Smith.  And other than this sort of scurrilous,

19  sort of silly, oh, yeah, Reed Smith is the mastermind behind

20  this -- absolutely no proof of that.  It's utterly false, okay.

21  We have set out in detail what we have done.  It is not

22  sanctionable.  It's completely cooperative to the extent that

23  we have been able to.  And there are no other parties here who

24  should be -- who should be called before this court.

25        One moment.

1      One little piece of paper, what's the big deal?  The

2  big deal is that it violates Liberian law.  And it is the

3  expedient that they are using to avoid recognition in Liberia.

4  And the one thing that's very clear is that they told Your

5  Honor over and over again -- they told him once, Your Honor,

6  clearly, expressly Liberia, that they were going to make every

7  effort to go get recognition in Liberia.  And then the other

8  twelve times, they said they're going to comply with Liberian

9  law.

10      And Your Honor has in front of you an expert

11  affidavit, not rebutted.  It is not rebutted by Mr. Pierre.  He

12  goes off, and he's not talking about a case where you do not

13  know who the proper parties are who are controlling the

14  company.  So there's nobody disagreeing with that.

15      And with that, the only other thing I will say is the

16  idea that they will indemnify parties who are not here, who

17  they can't even name, for criminal liability, okay, is -- I

18  don't think it's a serious point.  Although Mr. Ortiz has said

19  it four times, we disagree that that's at all effective.  What

20  they should be asked to do and ordered to do is what they

21  promised to do, and this motion should be denied.  Thank you.

22      THE COURT:  Thank you, Counsel.

23      Did anyone else wish to be heard in opposition to the

24  motion?  Okay.

25      The Court will take the emergency motion found at

1  Docket No. 1268 under advisement.

2  Counsel, would you like to turn to the second motion?

3  MR. ORTIZ: Happy to, Your Honor. Kyle Ortiz of

4  Togut, Segal & Segal for the reorganized Holdings.

5  The next matter on the docket is Docket 1269, which is

6  our motion authorizing Adam Spears to act as foreign

7  representative of reorganized Holdings. I don't think there's

8  a whole lot of opposition to this motion. I think there's an

9  interesting little wrinkle that they're trying to make that we

10  should only be able to be a foreign representative for purposes

11  of seeking recognition. That's simply not what the statute

12  says. 1505 says that you can be a foreign representative for

13  anything that's needed, and it is only limited by the laws of

14  whatever country you need to go to.

15  I would note, just for Your Honor, that this is a

16  completely -- the reason that we are bringing this motion is

17  because of the actions that they're taking to resist. I think

18  it's very interesting that he just said they're going to oppose

19  recognition, so go get recognition, but oppose it.

20  But in any event, you don't actually need a foreign

21  rep for Liberia. But there are certain countries where the

22  concept of a company being the foreign representative is just

23  confusing to them. Because they're used to worlds where you

24  have, like, a liquidator or you have a specific entity. So the

25  statute, the model law, says you have a foreign representative.

1 We're trying to appoint Adam Spears to that so that we can go

2 to these places that we're going to need to go to enforce the

3 confirmation order as parties continue to ignore it.

4 And to the extent Your Honor enters the sanctions

5 motion or does other things in furtherance of the plan at

6 different times that we may need to come back for, this would

7 also allow us to go seek recognition of that, which I think is

8 the issue with what they're asking for. It can't be just

9 narrowly only to get recognition because there are going to be

10 other things, depending on the actions that they take, that we

11 may need to have Mr. Spears as the foreign representative and

12 go seek recognition of various orders of this court.

13 But I don't think the overall concept is contested. I

14 think they just want to limit it to something that is more

15 limiting than what the Code provides.

16 THE COURT: Thank you, Counsel.

17 Did anyone else wish to be heard in support of the

18 motion? Okay.

19 Would anyone like to be heard in opposition or

20 response to the motion?

21 MR. CURTIN: Yes, Your Honor. William Curtin, Sidley

22 Austin. If you don't mind, I'll take this one first.

23 THE COURT: Yes, Mr. Curtin.

24 MR. CURTIN: So Mr. Ortiz is correct. We filed a

25 response, a limited objection, on this. You heard my arguments

1   on the previous motion.  We understand the need for them to

2   seek recognition.  So we're not opposing this order, which

3   would allow them to have Mr. Spears as their foreign

4   representative for that purpose.

5        What we are opposing, Your Honor, is anything more

6   than that.  And you heard just a second ago from Mr. Ortiz,

7   well, there may be more things that they need -- that they need

8   a recognition order on.  And that's fine; there may be.  But

9   they should come back to Your Honor, and they should seek an

10  additional order for those additional matters.  And why, Your

11  Honor?  Because you just heard two hours of argument -- or I

12  guess some of that was Mr. Solomon, and I would call it an hour

13  and a half of argument -- about what we contend is the other

14  side's willingness to not abide by foreign law.

15       So we don't think that it is the -- it would be a

16  prudent move for Your Honor at this point to simply say, okay,

17  don't -- we're recognizing unless it's not permitted by

18  applicable foreign law.  Because you've just heard that there's

19  a strong disagreement, to put it lightly, about what is

20  required under foreign law.

21       So the way that Your Honor, I would submit, should

22  handle this is in stages.  They need to seek the recognition.

23  Now, we've all -- we all agree on that, I think, so that's what

24  they should be authorized to do.  That's what Mr. Spears should

25  be authorized to do under this order.  If there's additional

1   things that need to happen, they can come back to Your Honor.

2   There's certainly nothing stopping them.  They're very well

3   aware how to do that.  This is not at all inconsistent with the

4   statute.  It's simply the best course of action under the facts

5   of this case.  Thank you, Your Honor.

6           THE COURT:  Thank you, Counsel.

7           Would anyone else like to be heard?  Okay.

8           The Court has -- sorry, was someone trying to speak?

9           MR. ORTIZ:  I was going to respond very briefly, but

10  if you'd rather I don't --

11          THE COURT:  No, go ahead.

12          MR. ORTIZ:  First of all, I think the objection

13  actually is inconsistent with the plan, which, again, says to

14  help us.  But I'm only going to do one thing, Your Honor.  I'm

15  just going to read the statute, 1505, authority to act in a

16  foreign country.  "A trustee or another entity, including an

17  examiner, may be authorized by the court to act in a foreign

18  country on behalf of an estate created under section 541.  An

19  entity authorized to act under this section may act in any way

20  permitted by the applicable foreign law."

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Counsel.  Okay.

23          The Court has considered the motion for an order

24  authorizing Mr. Spears to act as the foreign representative of

25  reorganized Holdings, which is found at Docket 1269, as well as

1  the majority shareholders' response to the motion, which is

2  found at Docket 1292, and the provisional holdings joinder to

3  the majority shareholders response, which was founded Docket

4  1293.

5        At this time, the Court will grant the motion to allow

6  Mr. Spears to act as a foreign representative in Liberia and

7  Greece to pursue recognition and enforcement of the

8  confirmation order.  And the Court will take under advisement

9  any broader authority at this time.  And if any broader

10 authority is needed, it can be raised with the Court.  But at

11 the at the moment, I will grant the motion with respect to

12 recognition and enforcement of the confirmation order in

13 Liberia and Greece.

14       If Counsel could submit an order consistent with that,

15 that would be great.

16       MR. ORTIZ:  Happy to do so Your Honor.

17       THE COURT:  Thank you, Counsel.

18       MR. CURTIN:  And excuse me, Your Honor.  Can I just

19 have an opportunity to review that order before it's submitted?

20       THE COURT:  Absolutely.  Everyone should review it

21 before it's submitted to the Court and let me know if it's

22 agreed upon or if there's any dispute.

23       MR. CURTIN:  Thank you, Your Honor.

24       MR. ORTIZ:  I'm sorry.  I appreciate Mr. Curtin's

25 statement, but of course, I think that's implied.  Of course,

1    we will be more than happy to do so.

2         THE COURT:  Thank you.  Counsel, you mentioned earlier

3    the Wednesday hearing and there being no objection, I believe.

4    Is there still a need for the hearing?

5         MR. ORTIZ:  Kyle Ortiz of Togut Segal for reorganized

6    Holdings.  I was hoping that there would be a need for that

7    because we would do something today on the AOR and be seeking

8    compliance by that date.  But if that's not happening and we're

9    not having any further discussion of this, I think you can just

10   enter that order and we don't need to be here.

11        THE COURT:  Yeah.  Does anyone else see a need for the

12   hearing on Wednesday for the matters that are scheduled for

13   Wednesday?

14        MR. SOLOMON:  I apologize, Your Honor.  Could somebody

15   tell me what (indiscernible)?

16        MR. ORTIZ:  I'm happy to, Your Honor.

17        So the Azure claimants had claims.  We objected to

18   their claims, Mr. Solomon.  And we've reached an agreement that

19   reduces their claims.  I'm rounding because I can't remember at

20   the moment, but like, fifteen million dollars.

21        THE COURT:  And I know you filed something along those

22   lines, and it didn't seem to me like there had been anything

23   filed.

24        MR. ORTIZ:  Right, and the objection deadlines on that

25   have long since passed.

1          THE COURT:  That was my understanding, as well, that

2    the objection deadline had passed.

3          Counsel, does anyone see the need for the hearing?

4          MR. SOLOMON:  Not for Reed Smith, Your Honor.

5          THE COURT:  Okay.  Thank you.  Okay.

6          We'll cancel that hearing.  And you can submit an

7    order -- well, I know you did already, but submit an order in

8    word form if you haven't already, and we'll address that.

9          MR. ORTIZ:  We'll do so, Your Honor.

10          THE COURT:  Okay.  Anything else for today?

11          MR. ORTIZ:  No, Your Honor, other than, if we're not

12    going to see you again before the holidays, just wish you a

13    happy holidays.

14          THE COURT:  Thank you.  Happy holidays to everyone.

15          UNIDENTIFIED SPEAKER:  You, as well, Your Honor.

16    Thank you.

17          UNIDENTIFIED SPEAKER 2:  Thank you, Your Honor.

18          THE COURT:  Thank you.  We're adjourned.  Thank you.

19    Have a great day.

20          (Whereupon these proceedings were concluded at 12:30 PM)

21

22

23

24

25

1

2                         I N D E X

3    RULINGS:                                    PAGE   LINE

4    Motion to allow Adam Spears to act as       115     15

5    foreign representative in Liberia and

6    Greece granted

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3   I, Joseph Burstein, certify that the foregoing transcript is a

4   true and accurate record of the proceedings.

5

6

7

8   _____

9   Joseph Burstein (CDLT-189)

10  TTA-Certified Digital Legal Transcriber

11

12  eScribers

13  7227 North 16th Street, Suite #207

14  Phoenix, AZ 85020

15

16  Date:  December 17, 2024

17

18

19

20

21

22

23

24

25

# #

**#207 (1)**
5:22

# /

**/Declaration (1)**
4:21
**/Emergency (1)**
3:20
**/Hearing (2)**
4:4;5:3
**/Letter (1)**
4:11
**/Reorganized (2)**
3:9;4:16

# A

**ABI (1)**
67:20
**abide (3)**
25:10;48:25;113:14
**ability (2)**
70:23;80:25
**abject (1)**
22:23
**able (11)**
26:6;31:20;34:5;
43:4;75:20;78:21;
81:12,13;100:24;
109:23;111:10
**absolute (1)**
68:1
**absolutely (4)**
34:1;107:3;109:20;
115:20
**absurd (4)**
19:17;101:2;107:3;
108:5
**absurdity (1)**
39:15
**abundantly (1)**
23:12
**abuse (1)**
64:22
**abusing (1)**
43:22
**ACAMPORA (1)**
10:17
**accept (4)**
17:17;27:12,13;
90:3
**accepted (1)**
55:6
**access (1)**
25:24
**accomplished (3)**
28:4;55:8;86:12
**accordance (3)**
21:23;55:8;102:14

**According (2)**
39:18;105:20
**account (2)**
27:12;78:10
**accounts (2)**
25:24;26:1
**accuse (1)**
31:1
**accusing (1)**
107:10
**acknowledge (3)**
17:7;37:10,11
**acquire (1)**
24:7
**acquired (1)**
23:6
**Act (23)**
3:10;18:15;21:8;
28:10,12;40:1,4;43:4;
45:3;49:13;55:9;58:2,
17;68:8;94:24;98:17;
111:6;114:15,17,19,
19,24;115:6
**acted (2)**
65:21;82:6
**acting (2)**
73:10;106:10
**Action (22)**
3:3,6,13,16;21:8,10,
17;22:16,24,25;23:5;
24:20,24;25:4;26:24;
36:13;50:10;76:2,22;
77:10;88:15;114:4
**actions (14)**
17:9;23:10,22;
24:22;50:21;52:24;
70:12;71:8;72:13;
77:5,5;93:2;111:17;
112:10
**active (1)**
100:10
**actively (2)**
32:10;52:3
**acts (3)**
98:12;99:1,11
**actual (5)**
41:25;49:24;70:23;
75:21;106:12
**actually (26)**
20:22;24:17;26:18;
36:5;58:4,9,12;59:14,
24;61:20;65:3;67:13;
68:19,21;79:7;83:13;
92:21;93:9,24;97:2;
100:14;107:13;
108:17;109:12;
111:20;114:13
**Adam (8)**
3:10;13:9;24:19;
92:3;97:17;102:22;
111:6;112:1
**add (1)**
36:2

**adding (1)**
31:19
**additional (3)**
113:10,10,25
**Additionally (1)**
88:12
**address (29)**
16:1;26:20,21;27:6,
7,9,10,13,17;28:1;
29:14;54:4,10,12,19,
23,24;55:10;66:7;
86:1;87:17;90:18;
95:13;96:25;97:1;
98:17;100:23;107:22;
117:8
**addressed (1)**
51:9
**addresses (2)**
54:16,19
**addressing (4)**
30:8;34:19;55:23;
58:9
**adjourned (1)**
117:18
**adjudicated (1)**
68:10
**admission (1)**
89:16
**admit (2)**
91:8;97:24
**admitted (1)**
43:19
**advice (5)**
31:5,6;46:15;88:17,
20
**advised (3)**
58:22;60:24;82:24
**advisement (2)**
111:1;115:8
**Aegean (1)**
13:4
**affect (2)**
26:5;103:3
**affidavit (7)**
59:5,9;67:8;78:8,
18;81:25;110:11
**affiliates (4)**
23:9,13;43:24,25
**affirmative (1)**
20:5
**afield (2)**
40:7;44:14
**afterwards (1)**
95:17
**again (54)**
16:4,9;17:13;20:12;
22:7;23:17;24:2;
28:16;30:21,21;31:2,
7;33:1;35:14,16,22;
37:16,22;38:22;
39:22;40:6,18,18;
42:11;43:12,22;
44:11;71:19;83:9,15;

84:10;85:13,21;86:8,
17;89:8,9,12;92:8,13;
93:11,23;95:8,16,20,
24;97:3;98:18,21;
99:6,16;110:5;
114:13;117:12
**against (5)**
57:20;58:15;59:14;
65:2;100:5
**Agenda (9)**
4:4,5;5:3,4;15:11,
12,13,15;102:10
**agent (1)**
27:10
**ago (9)**
16:19;19:23;40:16;
41:3;44:12;52:8,17;
97:15;113:6
**agree (4)**
21:25;22:13;34:8;
113:23
**agreed (1)**
115:22
**agreement (2)**
94:14;116:18
**agreements (1)**
76:25
**agrees (1)**
94:23
**ahead (2)**
95:13;114:11
**aid (1)**
90:14
**ain't (1)**
63:4
**allow (9)**
38:11;63:10;64:19;
74:17;86:16;98:11;
112:7;113:3;115:5
**allowed (2)**
28:11;74:19
**allowing (1)**
36:4
**allows (1)**
78:25
**alluded (1)**
83:22
**allusions (1)**
43:14
**almost (1)**
47:25
**alone (1)**
29:25
**along (1)**
116:21
**alternative (3)**
43:20;105:11;108:2
**although (9)**
16:16;17:23;33:10;
36:23;57:24;58:17;
68:6;96:22;110:18
**always (5)**
32:22;40:24;45:19;

61:15;97:18
**amalgamation (1)**
76:25
**AMANDA (1)**
8:11
**amazing (3)**
43:22;47:17;91:6
**ambiguity (2)**
24:12;90:6
**amend (1)**
54:12
**Amended (6)**
4:4,5;15:12;41:18;
45:21;46:5
**amendment (1)**
46:2
**amendments (1)**
55:7
**American (7)**
19:19,20,21,21;
31:8;67:19;68:7
**Americas (2)**
9:4,15
**amnesia (1)**
30:17
**among (1)**
17:15
**amount (6)**
34:9;56:5;57:18;
83:24;85:14;89:13
**amply (1)**
53:14
**analysis (1)**
79:10
**and/or (5)**
36:9,13;47:1;54:12;
69:6
**ANDREW (1)**
7:7
**announced (1)**
52:9
**annual (1)**
27:7
**answered (1)**
68:20
**ANTHONY (1)**
10:17
**anymore (1)**
102:7
**AOR (37)**
26:23;27:1,6,8,14,
23;33:2;40:4;41:17;
44:22;46:8,10,12;
49:11,12;59:18;
60:22;66:17;67:6,11,
13;72:4;75:11,15;
90:25;91:1;92:10,17;
93:1;96:19,20;97:11;
99:12;101:17;104:16,
17;116:7
**AOR's (1)**
92:11
**apologize (2)**

81:24;116:14
**apparent (2)**
40:11;70:13
**Apparently (2)**
46:10;105:25
**Appeal (10)**
3:5,15;23:5;50:9,
11,15;73:6;74:20;
104:11,13
**appear (2)**
59:12;103:22
**appearances (1)**
14:4
**appeared (4)**
88:18;96:14;104:2,
8
**appears (8)**
31:23,24;35:7,14;
49:19;56:10;87:17;
88:15
**applicable (38)**
21:4,6,8;22:10;
30:2;31:16;34:25;
35:2,14;38:12,16,25;
39:14;44:19;68:3,9;
69:6;75:1,10;76:22,
24;77:5,7,11;78:15,
17;79:25;80:5,7;85:6;
87:25,25;91:3,5;99:4,
5;113:18;114:20
**application (4)**
38:1;48:1,14;61:21
**applied (2)**
40:13;79:4
**applies (5)**
38:18;79:8;80:2;
88:6;93:20
**apply (18)**
20:12,24;32:9;
36:21;37:2,15;38:5,
13,21;39:21;78:1;
90:2,15;92:7;93:11;
94:6;97:23;99:1
**applying (2)**
84:18;93:14
**appoint (1)**
112:1
**appointed (1)**
73:25
**appreciate (2)**
59:23;115:24
**appropriate (3)**
55:11;76:24;77:2
**approval (7)**
19:24;21:10,12;
24:8;33:21;61:19;
68:6
**approvals (8)**
33:5,6,7,8,12;
35:21;36:1;77:3
**approved (1)**
46:20
**April (1)**

67:20
**Arb (4)**
3:2,6,12,16
**arbitral (1)**
74:20
**arbitration (6)**
48:8;82:13;102:3;
104:1,5,9
**ARCHER (1)**
13:3
**are-cross (1)**
48:24
**argue (7)**
24:14;29:25;32:9;
42:13;70:25;95:15;
103:10
**argued (1)**
20:19
**argument (12)**
32:21;36:22;37:12;
38:18;45:18;71:4;
77:24;84:16;88:24;
105:10;113:11,13
**arguments (25)**
15:24;16:4;30:5,6,
12,17;37:5;40:13;
41:2,4,5,7;42:10;44:7,
8;49:2;72:21;85:4;
86:2;87:17;99:17;
101:6;103:4,16;
112:25
**arise (1)**
68:11
**around (3)**
28:19;46:18;92:14
**arrive (1)**
39:19
**article (7)**
25:9;28:21;34:17;
36:10;67:18;68:6;
95:3
**articles (21)**
26:22;41:18;45:15,
21,22;54:13;55:7;
62:14,14,17;63:5,6,9;
64:9,14,19;77:2;81:1,
2,4;98:10
**aside (1)**
70:14
**aspects (3)**
43:6;59:20;93:20
**assert (1)**
88:22
**asset (1)**
26:2
**assets (6)**
17:20;25:23;50:6;
60:4;65:13,14
**assist (3)**
23:21;43:5;91:10
**assistance (1)**
26:19
**ASSOCIATES (1)**

8:20
**assumed (1)**
61:1
**assuming (1)**
75:1
**attached (2)**
27:22;48:1
**Attachment (1)**
4:18
**Attachments (4)**
3:2,12,24;4:24
**attack (2)**
47:23;52:4
**attempt (5)**
24:15;25:6;31:18;
68:12;84:13
**attempting (1)**
83:12
**attempts (3)**
69:5;84:4,4
**attending (1)**
42:8
**attention (3)**
59:11,17;80:23
**Attorneys (14)**
7:3,14;8:3,21;9:3,
14;10:3,12;11:3,12,
20;12:3;84:5;90:21
**AUSTIN (5)**
10:2;11:23;14:19;
83:5;112:22
**authority (31)**
16:24;19:1,5,15;
20:20;22:20;24:14;
25:2,8;28:20;38:7;
40:4;48:17;51:24;
55:3,22;56:16;61:16;
65:15;66:2,2;70:13;
74:9;89:15;97:3,7;
104:4;105:6;114:15;
115:9,10
**authorization (10)**
21:10,13,17;27:15,
20,21;61:19;92:12;
96:20;99:14
**Authorize (2)**
3:9;71:9
**authorized (8)**
21:22;24:23;55:6;
71:10;113:24,25;
114:17,19
**Authorizing (3)**
3:10;111:6;114:24
**automatic (4)**
17:19;19:6;21:18;
23:15
**automatically (6)**
17:24;21:1;22:19;
24:12;44:1;78:13
**available (1)**
27:11
**availed (1)**
55:15

**Avenue (7)**
7:4;9:4,15;10:4;
11:4,13;12:13
**avoid (5)**
34:17;42:17;47:19;
75:12;110:3
**award (1)**
74:20
**aware (3)**
33:21;46:3;114:3
**away (9)**
16:13;35:3;64:12;
76:14;77:15,16;
82:21;104:3,9
**awesome (1)**
28:24
**axiomatic (1)**
90:20
**AZ (1)**
5:23
**Azure (3)**
48:5;100:18;116:17

## B

**back (14)**
21:5;26:17;28:25;
31:7;37:16;50:4;
82:16;86:21;92:8;
94:10;100:17;112:6;
113:9;114:1
**backward (1)**
19:20
**bad (1)**
103:11
**bad-faith (1)**
103:11
**Bailey (1)**
42:20
**bait (1)**
63:4
**bait-and- (1)**
45:9
**bait-and-switch (1)**
109:13
**balance (1)**
78:4
**baloney (1)**
29:12
**Baltic (1)**
13:4
**banana (1)**
49:2
**Bank (2)**
13:4;25:24
**banking (1)**
30:16
**Bankruptcy (41)**
16:14;17:22;18:19;
21:8;24:8,9,10;28:1,
10;31:12;32:24;
36:12;42:7,21,23,24;
43:22;46:18;50:20;

52:13;59:16;62:4;
64:22;66:1;67:19;
68:6;69:3;70:21;71:3;
75:7;77:22,25;79:4;
83:19;87:5,21,23;
93:14;94:22;98:25;
107:21
**banks (3)**
23:20;29:2;63:21
**bar (1)**
40:19
**bargained (1)**
33:24
**bars (1)**
41:14
**base (1)**
45:22
**based (3)**
41:8;45:11;97:11
**Basic (1)**
39:9
**basis (8)**
74:6;81:8,9,10;
82:2;84:25;88:21;
91:17
**Bay (1)**
12:14
**BCA (1)**
81:15
**became (6)**
33:21;41:25;50:1;
100:11,11,13
**become (3)**
84:2;100:10;101:10
**begin (1)**
15:9
**beginning (2)**
60:6,8
**behalf (9)**
14:24;15:5;56:23;
61:17,18;86:24;
106:10,14;114:18
**behavior (1)**
15:25
**behind (1)**
109:19
**Beilin (1)**
61:4
**benefit (1)**
60:18
**Benitago (3)**
35:9,15,19
**beside (1)**
54:6
**besides (1)**
48:18
**best (4)**
58:23;74:14;84:13;
114:4
**beyond (3)**
18:24;31:15;64:23
**big (5)**
27:14;46:9;97:17;

110:1,2
**bigger (1)**
101:15
**Bill (1)**
40:25
**billing (4)**
27:6,17;28:1;29:14
**bind (2)**
46:18;96:9
**binding (29)**
15:21;17:15;18:21,
21;19:6,14;24:4;29:9;
32:18;37:8;41:25;
42:17;43:11;45:1,2,3;
48:10;49:9;50:2,15;
76:17;81:2;89:23;
97:24,24,25;101:8,10,
11
**binds (6)**
16:7;31:13;33:14;
40:9;98:24;99:1
**bit (1)**
58:14
**Blaimo (6)**
61:5,6;62:19;71:20;
78:17;99:12
**BLANKA (1)**
13:10
**blatant (2)**
40:11;47:22
**block (1)**
61:14
**bloody (1)**
24:19
**bluntness (1)**
19:22
**bluster (2)**
68:19;85:10
**board (31)**
22:17,22,22;29:6;
47:21,21;67:12;
70:11,17;71:25;
73:10,24,24;74:6,8,
16;75:25;76:1;81:10;
87:14;90:9;92:4;
100:15;102:8,10,11,
16,22;103:5,22;107:7
**body (1)**
22:3
**boiler (2)**
35:11;36:16
**boilerplate (7)**
31:15;33:4;34:23;
59:21;60:2;72:18,19
**bold (1)**
31:18
**border (1)**
48:24
**Borriello (2)**
4:21;8:8
**both (10)**
28:3;41:12;58:24;
67:25;68:16;69:2;

78:9;80:11;82:22;
88:2
**bound (15)**
20:21,22;21:1,13;
25:3,19;28:23;31:8;
32:17,20;33:15,23;
37:17,17;91:8
**Bowling (1)**
12:4
**Box (1)**
8:22
**breaking (2)**
28:5;46:22
**BRIAN (4)**
8:17;10:18;14:7,25
**bribe (1)**
63:22
**brief (4)**
51:7;79:12,13,15
**briefly (2)**
56:25;114:9
**bring (5)**
25:11;44:4;84:12;
86:6,7
**bringing (2)**
41:15;111:16
**BRITON (1)**
12:16
**broader (2)**
115:9,9
**broker (1)**
59:17
**brought (2)**
29:18;85:19
**BRYAN (3)**
8:12;14:7;101:24
**BUCK (1)**
7:7
**buffets (1)**
20:23
**bully (2)**
84:14;86:18
**bunch (7)**
17:3;24:14;29:5;
35:8;38:19;58:15,16
**burden (1)**
65:4
**burdens (1)**
65:10
**burn (1)**
25:16
**Burstein (1)**
5:20
**business (4)**
24:7;55:9;96:25,25
**BVI (1)**
61:11

**C**

**calculate (2)**
56:5;57:6
**call (6)**

29:6;58:18;60:2;
80:22;100:15;113:12
**called (3)**
59:10,16;109:24
**calling (3)**
57:22,23;66:6
**came (8)**
20:17;31:7;34:11,
16;86:3;95:25;99:21;
101:14
**Can (86)**
14:4;15:13;16:12;
20:10;23:10;24:19;
27:12;29:1,2;31:15,
17,18,18;33:25;45:1;
46:7;49:20;54:18;
55:5,5,8,11;56:12;
57:7;58:2,21;59:9;
64:24;65:9,14;66:8,8,
10;67:13;69:13;
71:24,25,25;72:5,24;
74:14,23;75:15;76:1;
77:14,16;78:13,16;
82:20;87:16;88:9;
89:19;91:1,10;92:10,
11,11,19;94:4;95:1,
14;96:12,21;97:5,5,
12;98:7;99:11;100:7,
13,15;101:3,17,19,20;
103:7;104:12;107:5,
24;111:12;112:1;
114:1;115:10,18;
116:9;117:6
**Canada (1)**
41:19
**cancel (4)**
71:25;78:22;80:25;
117:6
**canceled (7)**
21:7,20;45:25;
62:24,25;78:16;
105:13
**canceling (4)**
34:24;35:1,18;
98:14
**cancellation (5)**
21:6;34:19;41:7,10;
64:8
**cancelling (1)**
77:1
**capacities (1)**
22:5
**capacity (2)**
22:20;25:8
**care (2)**
22:14;58:9
**carefully (1)**
77:19
**carried (3)**
33:19;56:13;59:19
**carry (13)**
18:4;20:3;37:19;
39:7,11;51:13,14;

52:12;55:3,22;61:8;
65:10;92:23
**carrying (3)**
20:3;39:6,11
**case (64)**
14:3;16:2,8;17:10;
21:7,19;32:7;34:4,7,
12,12,21;35:9,16,19;
36:3;40:16;41:12;
42:6,8;44:12,15;47:3,
5,10;49:21;51:9;
52:16;53:18,21;56:1;
57:9;67:23,25;75:23;
79:3,5,6,8,20,20,21;
82:15,21,25;84:3,7;
88:7;90:20;93:8;
94:18,20,22;95:19;
96:8;100:7;101:9;
102:12;103:19;104:2;
107:23;108:20;
110:12;114:5
**cases (21)**
19:11;34:3;35:3,8,
8,24,25;36:3;38:19;
44:9;17;47:13;48:23,
24;67:16;76:15;
79:24,24;84:18;94:7;
95:21
**cast (1)**
55:19
**cause (2)**
21:23;42:1
**causes (2)**
23:5;50:10
**cease (2)**
22:9,15
**center (2)**
44:8,10
**CEO (7)**
46:13;92:3;102:22
**certain (12)**
22:4,8;23:11;38:12;
46:14;47:6,18;92:6;
93:20;94:6;95:16;
111:21
**certainly (4)**
73:3;80:13;93:8;
114:2
**certificates (1)**
77:2
**certified (1)**
74:13
**cetera (1)**
70:4
**challenge (4)**
42:20,24,25;67:24
**challenged (1)**
73:21
**challenges (1)**
68:4
**challenging (1)**
73:16
**CHALOS (1)**

52:12;55:3,22;61:8;
65:10;92:23
12:12
**Chamber (1)**
58:14
**Chamber-like (1)**
59:13
**chance (2)**
42:24;75:20
**change (20)**
27:13;29:7;31:18;
32:18;54:10,10,12,13,
19,22,23;62:11;
64:14;66:9;67:11;
70:8;71:12;75:15;
80:9;107:22
**changed (4)**
16:17;55:11;62:12;
72:15
**changes (1)**
52:1
**changing (3)**
42:12;64:8;67:11
**Chapter (15)**
3:3,5,13,15;16:8;
19:11;44:4,5;45:6;
46:25;47:9;52:19;
71:1,9,10
**characterizations (1)**
43:15
**charade (4)**
22:23;28:18;29:22;
49:20
**charter (6)**
27:23;45:16,23;
46:2,5;49:12
**Chattanooga (1)**
40:22
**choice (2)**
19:15;20:10
**choose (6)**
20:24;37:15;50:15;
90:2,15;98:25
**chose (4)**
46:7;86:6,7,9
**chosen (1)**
17:6
**CHRISTOPHER (1)**
7:8
**Circuit (1)**
40:21
**circumstances (2)**
38:12;52:14
**cite (7)**
41:12;53:17;79:3,5,
7,13;96:8
**cited (7)**
38:19;42:7;52:16;
53:16;76:15;78:18;
88:7
**cites (1)**
81:21
**citing (1)**
75:22
**citizen (1)**

88:10
**citizens (2)**
88:1,17
**civil (3)**
69:8;78:6;87:23
**claim (11)**
16:17;20:12;22:17,
22;27:2;37:2;41:20;
79:17;82:20;88:8;
100:18
**claimants (1)**
116:17
**claimed (1)**
82:18
**claiming (7)**
22:20;25:2;38:5;
39:16,16;81:16,20
**claims (13)**
17:21;31:24;41:15;
43:2,21;44:18;45:9;
69:8;75:22;102:7;
116:17,18,19
**CLARA (1)**
13:5
**clarified (1)**
108:21
**clarify (1)**
77:24
**clause (1)**
59:24
**clear (34)**
16:5,6,10;17:10,20,
20;18:7;19:15,21;
23:9,12;27:24;31:22;
40:16;43:18;46:11;
49:3,16;50:11;63:14,
15;65:5,6,7,8;70:6;
82:3,5;89:15;90:6;
98:5;109:8,9;110:4
**clearest (1)**
74:18
**clearly (11)**
20:16;25:1;28:11;
50:2;66:24;96:12,17,
21;98:24;99:7;110:6
**client (4)**
61:3,24;62:8;70:7
**clients (7)**
57:25;59:4;68:24;
85:1,2;86:3;108:20
**client's (2)**
87:9;90:22
**close (1)**
65:3
**cloud (1)**
24:16
**CO (3)**
12:12;76:3,3
**Coca-Cola (1)**
22:22
**COCKERHAM (1)**
7:18
**Code (28)**

16:14;17:17,22;
18:19;20:1;21:8;24:9,
20;28:1,10;30:23;
31:12;32:24;37:15;
38:9;39:2;43:17;46:8,
18;50:20;52:13,23;
71:3;93:20,21;97:24;
99:1;112:15
**Code's (1)**
39:20
**coerce (1)**
53:16
**COIE (3)**
9:13;15:5;56:23
**collateral (2)**
47:23;52:4
**colleague (1)**
14:25
**colleagues (1)**
14:7
**collective (1)**
30:17
**color (1)**
31:19
**comical (1)**
98:18
**coming (1)**
86:11
**comity (3)**
31:11;44:4,15
**comment (2)**
102:2,5
**comments (2)**
82:8;86:2
**commit (1)**
49:14
**committed (1)**
31:25
**Committee (5)**
9:3;14:11;51:4;
55:23;104:20
**comp (1)**
26:12
**companies (5)**
28:3;47:1;109:4,5,6
**Company (22)**
14:19,20,20;23:18,
22;44:16;47:11;
54:14;55:2;60:16,17,
22;67:12,12;68:7;
74:10;92:3;103:12;
105:20;106:2;110:14;
111:22
**company's (1)**
52:6
**complain (2)**
23:18;58:18
**complaining (1)**
65:2
**complete (2)**
20:13;68:23
**completely (10)**
29:24;30:13;32:2;

37:4;64:18;69:14,15;
78:4;109:22;111:16
**complex (1)**
37:2
**compliance (12)**
28:8;33:2;53:16;
64:10;67:25;73:6;
75:1;76:20;87:24;
90:22;93:25;116:8
**compliant (1)**
71:15
**complicated (4)**
51:10,12;83:11;
101:7
**complied (2)**
78:6;80:17
**comply (41)**
18:4;19:15,19;20:4;
28:9;32:24;39:7,12;
43:6;44:19;50:16,19;
51:15;53:13;54:3;
58:21,24;59:22;
60:11,12;61:1,2;65:7,
9;68:3;70:21;71:14;
72:13,22;73:23;79:7;
80:18;82:6;85:5;
90:21;91:4;92:15;
93:9;106:3,12;110:8
**complying (7)**
30:22;43:8;46:15;
49:4;64:1;69:6;
101:18
**compromises (1)**
72:8
**conceding (1)**
87:18
**concept (4)**
46:13;95:12;
111:22;112:13
**concern (5)**
29:16,18;40:10,11;
41:17
**concerned (2)**
61:7;92:25
**concerning (1)**
42:20
**concerns (3)**
17:8;29:12;46:21
**concerted (1)**
52:8
**concluded (1)**
117:20
**conclusion (1)**
39:20
**concrete (3)**
17:3;24:17;43:16
**condition (6)**
33:4,11,11;35:20;
39:3;79:25
**conditions (8)**
33:10,13,17,20,25;
36:4,5,8
**conduct (7)**

45:17;55:24;56:4;
70:18;71:21;76:23;
81:14
**confess (1)**
67:17
**confidential (1)**
27:10
**confirm (4)**
20:9;36:13;56:25;
57:10
**confirmation (75)**
16:15,15;17:19;
18:22;19:3,13,16,19;
22:24;25:10,19;
29:17;30:23;32:17;
36:9;40:2,17,21;41:2,
2,13,14,16,23,24;
42:16;43:3,10,24;
44:23;46:16,17;
47:13,23;49:4;50:18,
20;51:11,16;52:22;
53:7,20;54:17,22;
55:20;56:15;68:5,8;
72:11,12,21;74:21;
75:7,8;80:4;82:13;
83:19;86:10;90:12;
92:21;95:13,15;
97:22;98:2;99:18,22,
23,25;102:23;104:11;
105:24;107:1;112:3;
115:8,12
**confirmed (25)**
16:5;17:15;18:3,15,
21;19:11,16;28:13;
29:25;35:23;39:25;
40:6,23;47:2;49:9;
51:12;52:15,21,25;
53:5;56:8;83:19;
99:19;100:6,9
**confirming (1)**
18:25
**conflict (1)**
107:25
**conflicting (2)**
29:2;50:7
**conflicts (1)**
68:11
**confuse (2)**
15:24;54:7
**confusing (2)**
65:12;111:23
**confusion (6)**
25:5;40:8;46:6;
50:8;98:8;101:16
**Congress (6)**
17:14,18,23;37:14;
39:1;49:8
**Congress' (1)**
37:3
**connection (3)**
4:12;77:7;99:7
**consensually (5)**
62:21,23;104:25;

105:1,4
**consent (2)**
52:5;106:1
**consented (1)**
86:5
**consequences (5)**
19:21;25:13;26:5,9;
49:6
**consider (1)**
62:3
**considered (1)**
114:23
**consistent (5)**
16:8;26:25;34:12;
38:16;115:14
**consistently (3)**
30:7;62:25;76:18
**consolidation (1)**
75:16
**conspiracy (1)**
103:13
**Constitution (1)**
59:24
**constitutional (1)**
54:18
**consult (1)**
19:20
**consulted (1)**
19:17
**consulting (2)**
22:13;46:3
**consummate (7)**
36:14;51:21,22;
53:10;68:12;69:5;
70:24
**consummated (5)**
89:24;90:1;98:19,
20;100:12
**consummation (6)**
18:9,16;32:3;53:22;
73:7;99:2
**contact (1)**
27:9
**contacts (2)**
88:13,21
**contemplated (1)**
29:25;51:25
**contemplates (2)**
20:7;52:13
**contemporaneous (1)**
52:6
**contempt (26)**
25:13;28:6,7;47:20;
53:15,24,24;57:20;
65:21;66:6;68:14,25;
69:25;70:1,17;72:6;
76:9,10;89:2;101:19;
105:17;106:23;107:2;
108:17,18,22
**contend (3)**
105:2,12;113:13
**contest (1)**
48:13;99:6

**contested (3)**
52:10;87:20;112:13
**contesting (2)**
87:1,2
**context (2)**
31:17;94:23
**contingent (1)**
19:9
**continue (6)**
25:22;26:11;30:10;
59:8;84:2;112:3
**continued (2)**
37:20;57:8
**continuing (1)**
22:6
**contract (2)**
33:18,19
**contrary (3)**
19:1;24:14;98:7
**contravention (1)**
106:1
**control (8)**
17:11;25:23;28:13,
20;63:16;64:14;
107:7,7
**controlling (3)**
73:22;74:5;110:13
**controls (2)**
26:4;107:8
**Convention (4)**
87:4,25;88:3,10
**conversion (2)**
77:1;86:5
**converted (2)**
28:22;42:6
**conveyed (2)**
59:6,7
**convincing (2)**
65:8;82:5
**cooperate (6)**
18:2;51:20;52:20;
53:10;59:8;106:17
**cooperation (2)**
106:1,18
**cooperative (1)**
109:22
**coordinate (1)**
32:3
**Corp (4)**
25:25;26:4,5;61:11
**corporate (11)**
51:24;52:1;55:3,22;
64:10;68:12,15;69:6;
80:2;105:3,6
**Corporation (3)**
55:9;75:24;96:9
**corporations (2)**
60:4;96:10
**corporation's (3)**
55:10;80:25;81:1
**correctly (1)**
67:15
**correspondence (1)**

27:8
**cost (2)**
33:1;86:14
**Counsel (37)**
3:23;15:18;18:20;
19:18,20;22:14;
23:15;24:25;31:8;
43:4;48:9;50:25;
61:10,11;71:22;
72:24;73:9,10;83:8;
86:20;89:6;90:4;
100:10;101:10,22,25;
104:6,10;110:22;
111:2;112:16;114:6,
22;115:14,17;116:2;
117:3
**counsel's (1)**
24:17
**count (2)**
48:6;60:15
**counted (1)**
60:13
**counterparties (2)**
23:20;29:2
**countries (2)**
56:12;111:21
**country (8)**
16:21;27:2;42:17,
18;96:16;111:14;
114:16,18
**couple (4)**
51:8;68:1;85:20,21
**course (10)**
58:19;62:22;63:10;
79:18;83:18;94:7;
98:13;114:4;115:25,
25
**Court (180)**
4:12;14:2,8,13,17,
21;15:2,7,9,14,21;
16:22;18:8,11,22,23;
19:11;20:4,14,16,17;
21:2;24:9;25:1,2,3,
14;26:15;27:25;
29:20,22;31:13;
32:19;33:9;36:12;
39:8,12,22;41:22;
42:16,19,21;44:6;
48:6,7,11,15;49:2,2,
10,20;50:16,19,25;
51:5,9,15;52:9,10,16;
53:2,5,6,12,23;54:9,
14;55:16;56:18,20;
57:11,14;58:16,22,23;
60:10;63:23;65:1,1,
14,15;66:13,14,18,19,
22,25;67:3,5;68:6;
69:16,19,23;70:2;
72:24;73:12,16,20,25;
74:4,11;75:8;76:12;
79:3,11,14;82:10,11,
11,14;83:3,8;85:16,
24;86:3,17,20;87:1;

88:22,23;89:1,5,6;
90:21;91:17,20;
93:13,17;94:1,4,14,
18,22;95:5,25;96:1,3,
14;97:7;98:7;100:22;
101:8,9,22;104:18,21;
105:14;106:5,9;
107:2,21;108:11,23;
109:2,24;110:22,25;
112:12,16,23;114:6,8,
11,17,22,23;115:5,8,
10,17,20,21;116:2,11,
21;117:1,5,10,14,18
**court-approved (1)**
70:21
**court-ordered (1)**
33:19
**courtroom (2)**
96:14;100:22
**courts (6)**
25:12;29:3;50:16;
52:3,4;68:10
**Court's (23)**
16:17;20:11;25:4,
10;26:11;28:16,23;
29:10;32:24;39:18;
41:3;42:5,24;43:6,19;
47:23;48:25;49:24;
54:24;61:21;64:22;
69:1;82:7
**cover (1)**
33:1
**covered (4)**
21:11;24:3;51:7;
59:2
**covers (1)**
77:12
**crafted (1)**
72:9
**create (14)**
16:25;22:21;25:5;
37:1;40:8;42:8;49:6,
15;50:8;98:8;100:25;
101:13,14,16
**created (3)**
46:6;56:3;114:18
**creates (1)**
57:8
**creditor (7)**
18:3;26:6;42:13;
52:14,20;55:25;
104:12
**Creditors (21)**
9:3;14:11;17:9,16,
21;43:5;44:18;45:10;
51:4,17;53:8;54:16;
56:7;60:9,10,11;64:1;
65:12;67:23;76:12;
107:13
**creditors' (1)**
57:12
**criminal (5)**
27:2;46:15;69:8;

78:7;110:17
**cross-border (1)**
32:7
**cry (2)**
23:10;24:19
**crystal (1)**
49:3
**curious (1)**
30:25
**current (6)**
26:21;41:10;49:11;
63:11,11;70:7
**CURTIN (22)**
10:7;14:18,19,22;
55:18;57:24;83:4,4,7,
9;85:18,25;96:15;
105:18;108:2,10;
112:21,21,23,24;
115:18,23
**Curtin's (1)**
115:24

## D

**damage (1)**
23:18
**DANIEL (2)**
11:16;12:8
**Daniolos (10)**
10:12;11:3;14:24;
62:2;86:24;87:1;88:1,
9,14;89:2
**darn (1)**
78:13
**Date (59)**
4:4;5:3;16:25;
18:21,24;19:2,4,6,7,
10,12;21:2,3,19,20,
22;22:4,7,10,11,20;
23:4,14;24:5;26:9;
30:20;36:10;37:7;
40:18;46:10,13,13;
47:7,8,14,22;50:10;
52:9;72:25;73:1,5,5,9,
14,17,18,19,21;89:20,
25;90:8;95:20,22;
97:19;98:9,18;100:7,
12;116:8
**dates (2)**
36:6;90:3
**DAVID (4)**
9:8;14:10;51:3;
104:19
**DAWN (1)**
13:8
**Day (12)**
16:3;17:5;23:17;
30:21;40:6,24;42:11;
50:22;53:25;85:11;
89:12;117:19
**days (3)**
53:24;93:1;99:24
**day-to-day (1)**

74:6
**DE (1)**
7:16
**deadline (1)**
117:2
**deadlines (1)**
116:24
**deal (4)**
46:9;95:10;110:1,2
**dealing (1)**
65:19
**dealt (4)**
18:14;39:25;53:5;
59:5
**debate (2)**
76:7;99:22
**debt (2)**
26:10;45:6
**debtor (34)**
17:15,19;18:4,6,8,
11,20;19:25;20:2,15;
22:3,10;23:7;35:17;
37:17;39:5,10,23;
44:12,16;51:14;
52:15;53:2;60:11;
67:24;69:5;70:9,12;
71:15;80:15;94:9,23;
98:24;105:6
**debtors (27)**
18:1;23:6;33:16;
36:8;44:24;48:25;
51:17,21,23;52:11,19;
53:8,12,17;54:2;
55:15;56:10;57:5;
75:4;93:21;94:4,12;
103:19,20,23,23;
105:10
**debtors' (3)**
25:23;28:2;55:4
**debtor's (11)**
20:6;26:2;35:11;
46:2;54:11;55:24;
68:12;71:1,7;79:25;
100:10
**deceitfully (1)**
27:2
**December (3)**
4:6,13;5:5
**DECHERT (2)**
9:2;14:11
**decide (6)**
16:23;31:3,14;
77:16;92:6;93:6
**decided (4)**
48:3;71:12;80:8;
99:24
**decision (6)**
16:11;19:23;41:22;
63:19;79:14;99:22
**decisions (2)**
88:5;104:7
**Declaration (17)**
3:25,25;4:18,21;

18:24;19:3;45:20;
54:15;55:4;59:2;
75:15,19;80:19;99:7,
11;103:17,21
**declarations (1)**
103:19
**declared (1)**
47:15
**deemed (6)**
22:8,15;47:22;77:9;
89:25;90:7
**defects (1)**
59:10
**defend (4)**
108:6,17;109:3,11
**defense (1)**
68:23
**defenses (1)**
87:7
**defiance (1)**
32:10
**defunct (1)**
109:4
**delay (8)**
25:5;29:16;30:19;
57:8,9;98:6;100:2,25
**deleted (1)**
103:15
**deliver (3)**
18:12;39:23;53:3
**delivery (4)**
18:13;39:24;53:4;
76:24
**demonstrated (2)**
46:22;50:1
**demonstrates (3)**
29:15;30:9,11
**denied (2)**
36:7;110:21
**deny (3)**
37:6,8;65:23
**denying (1)**
20:22
**DEPARTMENT (1)**
12:2
**depending (1)**
112:10
**depends (1)**
74:4
**dereliction (1)**
72:6
**describes (1)**
54:11
**describing (1)**
67:15
**desecration (1)**
20:13
**deserve (1)**
30:6
**design (1)**
101:14
**designed (1)**
49:19

**Despite (4)**
17:8;37:19;41:1;
105:9
**detail (8)**
47:18;59:9;64:6,7;
67:22;81:25;87:19;
109:21
**determine (4)**
48:6;57:2,6;77:6
**determining (1)**
32:10
**dictate (1)**
39:9
**different (8)**
15:13;25:6;60:8;
63:5;65:11;69:4;
108:23;112:6
**differently (1)**
77:23
**difficult (1)**
71:6
**diligent (1)**
65:9
**diligently (1)**
82:6
**dilute (1)**
34:10
**DIP (1)**
37:24
**direct (11)**
18:8,11;23:8,13;
26:24;39:18,22;53:2;
67:13;68:15;97:14
**directed (11)**
25:15;28:11;40:5;
49:13;50:21;51:20;
53:9;61:16;74:16;
90:13;99:1
**directing (2)**
49:11;66:20
**direction (1)**
23:1
**directive (1)**
58:23
**director (4)**
22:9;103:20;104:4,
6
**Directors (11)**
3:23;15:18;51:19;
52:12,19;60:22;67:2;
70:3;78:12;90:7;96:7
**disagree (4)**
62:20;67:8;74:18;
110:19
**disagreeing (1)**
110:14
**disagreement (2)**
96:3;113:19
**disappear (1)**
97:6
**discharged (1)**
45:6
**disclosure (4)**

32:6;33:9,24;75:3
**discretion (1)**
43:8
**discretionary (1)**
15:22
**discussed (1)**
30:18
**discussion (1)**
116:9
**dishonesty (1)**
30:9
**disingenuous (3)**
29:24;32:23;86:4
**dismiss (2)**
20:19;89:1
**dismissal (1)**
104:13
**dispense (1)**
32:14
**dispose (1)**
24:7
**dispute (2)**
22:21;115:22
**disputing (2)**
26:4,8
**disregarded (1)**
42:14
**disruption (1)**
32:14
**distinction (1)**
69:16
**distorting (1)**
62:6
**distorts (1)**
86:4
**distract (2)**
15:25;89:14
**distributions (6)**
55:25;56:2,6,9;
57:1,6
**district (14)**
25:2;28:4;40:19;
42:6;47:11;48:6,24;
52:9;82:10,11,14;
88:5;94:11;107:21
**do- (1)**
40:17
**docket (8)**
15:18;35:16;111:1,
5,5;114:25;115:2,3
**document (3)**
27:21;99:14;105:12
**documents (7)**
27:13;48:7;54:18;
55:10;59:1;65:17,18
**documents1223 (2)**
3:7,17
**documents1267 (1)**
4:2
**documents1269 (4)**
4:7,19,24;5:5
**documents1295 (1)**
4:13

**dollars (4)**
56:3;90:4;94:5;
116:20
**domestic (3)**
35:9;39:17;71:2
**domino (1)**
28:13
**done (27)**
18:22;23:18;35:6;
44:9;47:25;57:7;
58:21,25;62:21,23,25;
64:10,24;66:8;78:12;
80:21;82:9;85:2,2;
101:1;104:25;105:1,
4;107:18,19;109:14,
21
**door (1)**
50:4
**doubled (1)**
39:15
**doubt (1)**
29:4
**down (5)**
16:11;24:3;25:16;
39:15;60:1
**dozens (2)**
15:23;79:6
**draconian (1)**
58:7
**draft (1)**
35:4
**drastic (1)**
25:15
**drawing (1)**
69:16
**Drilling (1)**
34:4
**drop (3)**
74:19,20;79:12
**due (3)**
46:6;59:23;108:8
**during (4)**
32:2;35:10;42:15;
47:8
**duties (1)**
61:8
**duty (1)**
72:6

**E**

**earlier (3)**
35:5;84:7;116:2
**easily (2)**
49:20;96:19
**EBRAHIMI (1)**
8:9
**effect (15)**
18:14;21:18;27:19;
29:7,10;32:18;34:15;
39:25;40:17;53:4;
54:13;63:7;64:17;
73:14;104:24

**effective (61)**
16:16,24;18:21,23,
24;19:2,3,6,10,12,12;
21:2,3,19,20,22;22:4,
7,10,11,20,22;50:10;
52:9;72:25;73:1,4,5,8,
14,17,18,19,21;75:9;
89:20,25;90:8;91:9;
95:20,22;97:19;98:9,
18;100:7,11,12;
110:19
**effectiveness (2)**
19:8;41:24
**effectuate (6)**
51:24;54:10;56:17;
77:3;84:13;106:3
**effort (11)**
15:24;36:25;41:20;
43:16;52:3,8;54:6,19;
75:2,6;110:7
**efforts (5)**
32:3;41:1,23;44:5;
47:18
**either (7)**
26:20;47:13;79:19;
86:17;88:14;99:13;
102:24
**elaborate (1)**
49:23
**election (1)**
71:1
**elegant (1)**
18:17
**ELENA (1)**
13:4
**Eletson (10)**
3:20,21;7:3,14;
15:16;48:17;81:4;
107:22;109:1,3
**else (19)**
23:25;51:1;56:20;
58:5;65:14;86:21;
88:23,24,25;89:4,7;
92:11;101:23;104:8;
110:23;112:17;114:7;
116:11;117:10
**elsewhere (4)**
33:9;40:19;44:10;
100:4
**email (3)**
46:11;88:6;108:16
**emailed (2)**
102:17,20
**EMANUEL (2)**
11:11,19
**emergency (1)**
110:25
**employees (1)**
63:23
**empowered (3)**

24:23;25:12;52:11
**empowers (2)**
18:8;105:14
**end (8)**
17:5;29:23;40:10,
24;49:5;85:10;
101:16;103:25
**enforce (8)**
20:15;44:6,12;47:8;
50:18;56:14,14;112:2
**enforceable (5)**
16:6;29:19;44:23;
47:2;50:2
**enforcement (4)**
42:21;43:1;115:7,
12
**engage (1)**
70:13
**engaging (1)**
71:21
**enjoins (1)**
24:21
**enough (5)**
25:5;58:18,18,19;
79:15
**ensure (2)**
75:2,7
**enter (3)**
49:10;82:21;116:10
**entered (9)**
16:15;26:12;38:2;
41:22;47:14;75:7;
99:24;101:8;102:18
**enterprises (1)**
28:4
**enters (2)**
18:22;112:4
**entertained (1)**
41:16
**entire (9)**
27:18;32:1;33:17;
56:1;85:3;89:15;
93:20;100:5,11
**entirely (7)**
17:6,13;19:19;35:8;
38:6,16;98:24
**entirety (1)**
37:13
**entities (9)**
20:6;26:4;44:2,3;
47:4;58:16;59:14;
77:5;106:15
**entitled (4)**
38:9;109:5,6,7
**entitles (1)**
28:14
**entity (14)**
20:2;39:5,10;60:3;
65:13,20;69:21,25;
72:19;91:15;93:17;
111:24;114:16,19
**equity (8)**
17:16,21;21:23;

26:7;43:25;51:19;
77:4;78:11
**ERISA (1)**
79:19
**eScribers (1)**
5:21
**escrow (1)**
46:12
**ESQ (32)**
7:7,8,9,10,18;8:8,9,
10,11,12,13,14,15,16,
17,25;9:7,8,9,10,19;
10:7,8,17,18;11:8,16,
25;12:8,9,16;13:7
**essence (1)**
40:15
**essential (1)**
39:4
**essentially (2)**
74:16;86:17
**EST (3)**
4:5,6;5:5
**established (1)**
55:9
**estate (5)**
17:8,18;23:4;26:13;
114:18
**et (1)**
70:3
**evaluate (1)**
104:6
**EVANGELATOU (1)**
13:4
**evaporated (1)**
39:19
**eve (1)**
30:19
**even (42)**
16:6;17:2;26:14,23;
29:8,13;32:17,19;
37:8;38:22;40:13,24;
43:11;44:25;46:10;
52:6;58:6,13;59:7,15,
16,17;65:24;70:8,13;
74:13;76:8;77:15;
81:11;85:7;89:22;
91:7;92:19;98:1;99:3;
101:1,1;103:6;
106:24,25;109:17;
110:17
**event (6)**
42:19;46:1;75:16,
17;80:22;111:20
**eventually (1)**
40:25
**everybody (7)**
62:4,5;63:15,17,20;
71:13;83:21
**everyone (5)**
14:2;60:6;94:23;
115:20;117:14
**evidence (5)**
22:23;49:2;66:17;

67:4;82:5
**eviscerate (3)**
48:10;94:11;97:7
**Ex (16)**
3:2,2,3,3,4,5,12,12,
13,13,14,15,24,24,25;
4:18
**exact (7)**
16:18;17:14;30:24;
34:3;35:7,7,20
**exactly (6)**
31:23,24;67:22;
99:13;105:2;107:18
**examiner (1)**
114:17
**example (2)**
93:10,13
**examples (1)**
53:16
**Excel (3)**
28:2;47:10,13
**except (4)**
24:5;78:14;92:1;
100:1
**exceptional (1)**
38:4
**exclusive (1)**
35:11
**exculpation (1)**
92:22
**excuse (2)**
75:25;115:18
**excuses (1)**
49:5
**execute (4)**
18:12;33:15;39:23;
53:3
**execution (2)**
18:13;39:24;53:3;
76:24
**executioner (1)**
31:3
**exercise (3)**
51:23;66:2;77:21
**Exhibits (1)**
4:24
**exist (5)**
22:18;90:9;92:14;
107:4;109:7
**existence (1)**
78:19
**existential (2)**
25:15;70:23
**Existing (9)**
3:22;15:17;34:7;
45:15,22,23;55:12;
70:2;80:25
**exists (2)**
89:18;91:15
**expedient (1)**
110:3
**expensive (1)**
49:8

**expert (10)**
27:5;75:13,14;
85:22;91:23,24;92:9;
107:19;108:9;110:10
**experts (1)**
60:20
**expired (1)**
47:16
**explain (2)**
36:5;89:3
**explained (4)**
19:22;27:4;52:3,17
**explains (1)**
107:23
**exposure (2)**
46:15;70:14
**express (1)**
45:12
**expressly (3)**
31:25;75:6;110:6
**Exs (1)**
3:25
**extend (3)**
43:23;44:2;64:22
**extent (10)**
65:16;71:2;72:25;
80:5,6;82:5;85:17;
87:17;109:22;112:4
**extinguish (1)**
34:6
**extinguished (2)**
78:12,15
**extraordinarily (1)**
98:16
**extraordinary (2)**
34:8;57:18
**extraterritorially (1)**
79:8
**eyes (1)**
17:24

**F**

**fabricate (1)**
16:13
**fabricated (2)**
30:5;38:7
**fabricating (1)**
78:7
**fabrication (2)**
78:2,2
**face (6)**
18:7;39:19;54:17,
22;68:4;69:7
**fact (12)**
17:14;24:21;63:25;
65:15;66:7;83:13;
84:18;90:6;91:2;95:9;
108:19;109:16
**factor (5)**
32:6,11;34:2,11;
91:2
**facts (2)**

86:4;114:4
**fails (3)**
68:3;70:21;88:13
**failure (2)**
80:12,12
**fair (1)**
42:24
**fairly (2)**
88:22,25
**faith (2)**
51:20;53:10
**fake (1)**
103:23
**false (7)**
30:13;36:17;38:23;
44:25;93:23;98:22;
109:20
**Family (3)**
14:20;47:12;105:14
**fantastical (1)**
37:12
**fantasy (1)**
39:22
**far (5)**
40:7;44:14;73:18;
87:16;88:9
**farce (4)**
27:25;29:15;46:16;
97:1
**fast (1)**
97:5
**fatal (1)**
37:4
**favor (2)**
42:15;57:12
**feasibility (2)**
40:15;41:8
**feasible (2)**
41:20;95:15
**February (2)**
41:1;47:16
**federal (3)**
59:16;77:11;87:23
**fee (1)**
37:25
**feels (1)**
77:23
**fees (6)**
26:11;49:21;61:13,
14;102:14,19
**few (3)**
57:21;60:1;83:5
**fiction (2)**
92:4;96:10
**fictional (2)**
48:21;101:15
**field (1)**
30:8
**fifteen (2)**
59:23;116:20
**figure (3)**
73:12;100:23,24
**figuring (1)**

64:16
**file (16)**
15:11;26:21;28:6;
45:21;48:23;49:12;
69:23;71:1;72:2,3;
84:5;91:1;92:10;
104:10;107:8;109:10
**filed (16)**
15:18;28:4;59:18;
61:20;87:6,11,13,21;
91:23;93:15;102:8;
103:19,20;112:24;
116:21,23
**filing (11)**
21:25;25:1;27:13;
41:17;71:9,10;77:2;
102:13;103:11,16,17
**filings (10)**
53:20,21,25;54:1;
55:5;61:17,18;77:6,
10;103:15
**finality (2)**
40:23;100:6
**finally (2)**
18:6;40:25
**financial (3)**
33:16;39:3;79:25
**find (3)**
48:5;88:5;90:17
**fine (3)**
51:8;93:3;113:8
**fined (1)**
53:25
**finish (1)**
35:10
**fire (1)**
63:22
**fired (2)**
73:9;90:10
**Firm (13)**
10:12;11:3;14:25;
47:3;81:19;86:24;
87:2,2;88:1,9,14,15;
89:2
**first (14)**
15:15;28:13;44:24;
46:25;57:17,23;64:2;
66:15;67:11;84:25;
90:25;106:19;112:22;
114:12
**five (1)**
53:24
**Fix (3)**
62:11;64:4,13
**fixing (1)**
63:12
**flaw (1)**
99:18
**Floor (2)**
9:16;11:5
**flow (1)**
78:7
**folks (1)**

84:14
**follow (1)**
109:12
**following (2)**
53:19;76:2
**follows (1)**
27:4
**Footnote (1)**
68:11;70:25;79:12,
13
**force (10)**
26:8;30:7;38:15;
41:5;52:11;67:6,10;
72:14;77:21;81:5
**forced (2)**
28:5;32:25
**forces (1)**
41:13
**forefront (1)**
36:17
**Foreign (89)**
3:10;4:17,23;16:13;
30:14;31:9;32:8;
38:21;49:1;54:4,6,14,
20,23;59:22;60:12,14,
18,19,19,21,23;61:2;
62:4;63:1;64:3,5;
65:20;67:2,24;68:3,9,
10;69:5,6;70:9,19,22;
71:1,15;72:14,19;
77:12,19;79:2,4,19;
80:17,18;84:18,21;
85:6,11;87:12;92:14,
15,15;93:14,17,20,23,
25;94:4,9,12,15,23,
24;95:6;98:21;102:9;
103:2;106:18;111:6,
10,12,20,22,25;
112:11;113:3,14,18,
20;114:16,17,20,24;
115:6
**foreseen (1)**
17:14
**forever (1)**
41:14
**form (2)**
97:15;117:8
**formal (1)**
36:12
**formality (1)**
36:6
**formation (1)**
76:25
**Former (31)**
3:22;15:17;37:24;
51:23;52:11,11;
53:12,19;54:2,3,11;
55:2,4,15,24,24;56:4,
10,10;57:5;67:2;70:2,
3;78:12;80:15;90:4;
96:7;97:13;100:10,
21;105:10
**forth (2)**

36:10;53:14
**forward (1)**
57:3
**foul (1)**
23:10
**found (7)**
42:7;79:5;102:13;
105:16;110:25;
114:25;115:2
**founded (1)**
115:3
**four (2)**
95:22;110:19
**fourteen (2)**
60:1;99:24
**fourteen-day (2)**
32:2;47:16
**fourteenth (1)**
59:25
**Frankly (3)**
16:22;55:25;80:20
**free (4)**
17:20;23:9;24:9;
50:11
**Friday (2)**
38:1;75:19
**frivolous (1)**
66:7
**front (7)**
35:10,23,24;44:13;
100:17,20;110:10
**frustrating (2)**
18:18;32:21
**FSB (2)**
9:14;15:5
**fuel (2)**
45:5,5
**full (2)**
25:20;26:8
**fully (7)**
19:14;24:23;43:11;
44:25;45:3;50:20;
89:21
**Fund (3)**
9:14;15:5;56:23
**fundamental (1)**
59:20
**funded (2)**
25:20;56:2
**further (13)**
17:23;21:2,7,9,16;
22:16;24:3,23;29:15,
21;50:8;77:10;116:9
**furtherance (6)**
39:16;49:13;50:21;
93:4;99:2;112:5

**G**

**G14 (1)**
67:20
**gaining (1)**
28:13

**gall (1)**
30:22
**GALLEGO (1)**
8:10
**games (1)**
102:7
**Gas (7)**
61:10,11;63:16,18,
24;81:12;82:24
**Gas' (2)**
63:21,21
**gave (3)**
49:10;65:17;68:19
**general (2)**
85:2;88:14
**generally (2)**
71:5;95:4
**GEOGHEGAN (1)**
13:5
**gets (1)**
71:24
**gimmick (1)**
75:11
**given (10)**
42:23;53:24;57:4,
19;65:24,25;71:14;
74:8;97:23;107:4
**gives (2)**
33:22;40:3
**glad (1)**
45:14
**Glafkos (1)**
14:19
**GLAUBACH (1)**
8:11
**goal (1)**
17:10
**gobbledygook (1)**
44:20
**goes (5)**
39:5;47:17;79:20;
107:23;110:12
**Good (27)**
14:2,5,8,9,10,13,14,
17,18,21,22,23;15:2,
3,4,7,8;36:15;51:20;
53:10;56:22;60:16;
61:15;62:6;83:4,9;
89:9
**GORREPATI (1)**
13:6
**governance (1)**
52:1
**governing (1)**
22:3
**government (4)**
33:7,8;35:20;36:1
**governmental (1)**
33:5
**grammar (1)**
39:9
**grant (2)**
115:5,11

**granted (1)**
82:25
**Granting (1)**
3:11
**great (13)**
29:13;45:9;47:15,
18;64:6,7;91:18,18;
98:16;99:19;102:4;
115:15;117:19
**greatest (2)**
80:5,6
**Greece (11)**
25:6;31:6;41:19;
50:8;68:16;72:3;88:2,
4;101:15;115:7,13
**Greek (28)**
19:18;22:13;28:3;
40:10;46:4,14;47:1,2,
4,11;48:1,14;58:23;
73:12,25;74:14;78:9;
87:2;88:1,9,15,16,17;
91:16;98:6;103:9;
105:12,25
**Green (1)**
12:4
**Greensill (1)**
35:24
**ground (1)**
76:9
**grounded (1)**
16:5
**Groundhog (1)**
30:21
**Groundhog's (6)**
16:3;23:17;40:6,24;
42:11;89:12
**grounds (1)**
76:9
**grow (1)**
30:12
**guess (2)**
108:5;113:12

**H**

**Hadjieleftheriadis (5)**
45:20;96:13;97:8;
103:17;105:21
**Hague (4)**
87:4,24;88:3,10
**Haldeman (1)**
41:12
**half (2)**
99:21;113:13
**halting (1)**
28:18
**Hamilton (1)**
12:13
**hand (1)**
25:14
**handed (1)**
16:11
**handing (1)**

17:25
**handle (1)**
113:22
**hands (1)**
16:17
**HANEY (1)**
9:7
**happen (17)**
17:24;52:13;54:2;
55:1,5,13;73:7;75:1;
89:21;91:13;92:5,6;
94:24;100:13;105:7,
9;114:1
**happened (5)**
41:2;48:2;61:6;
89:20;107:16
**happening (4)**
61:20;82:18;
108:13;116:8
**happens (5)**
22:1,11;69:9;73:8;
91:12
**happy (10)**
82:9;89:4;90:3;
92:25;111:3;115:16;
116:1,16;117:13,14
**harder (1)**
71:22
**harm (2)**
16:25;42:1
**harms (3)**
49:25;50:1,2
**harshly (1)**
50:22
**head (1)**
95:2
**hear (4)**
24:16;43:14;64:25;
106:19
**heard (25)**
26:2;51:1,4;56:20;
57:15;59:20,21;
84:15,20;86:21;89:7,
8;91:22;101:23;
104:14,23;105:10;
110:23;112:17,19,25;
113:6,11,18;114:7
**Hearing (12)**
4:5,13;5:4;72:11,
12;92:21;96:15;
116:3,4,12;117:3,6
**hearings (1)**
42:8
**held (5)**
23:7;40:18;42:19;
53:23;69:24
**help (4)**
57:22;97:5;98:4;
114:14
**helping (1)**
91:11
**helps (1)**
49:17

**hereby (1)**
105:13
**HERMAN (13)**
9:8;14:10,10;51:3,
3,6;56:19;84:16;
104:19,19,22;106:6;
107:17
**Herman's (2)**
57:1,10
**hesitant (1)**
30:5
**hiding (4)**
16:21;42:16,17;
96:16
**highlights (2)**
29:24;47:20
**himself (1)**
57:22
**hinder (1)**
22:24
**hinted (1)**
88:16
**hired (2)**
22:18;91:14
**hit (1)**
89:17
**hold (11)**
34:8;41:14;46:12;
53:15;68:14;70:1;
72:5;76:9,10;97:18;
108:16
**holders (5)**
17:16,21;51:19;
57:1,8
**holding (4)**
28:3;44:16;47:11;
74:10
**Holdings (102)**
3:9,11,21,22;4:16,
22;7:3,14;8:3,21;
11:12,20;13:8;14:6;
15:11,17;21:22,24;
22:6;23:9,14,19,25;
24:2,6;25:8;29:5;
37:18,20;44:1,3;
48:18,18,20,20;50:11,
14;58:6;60:3;61:17,
18,22,22;63:13,16;
64:4,23;66:22,23,23;
69:10,11,12,13,17,17,
21,25;73:22;74:6,10,
22,23;80:1,11;81:4,
11,12;89:11,17,18,19;
90:4;91:24;92:1,2,2,
3;96:7;98:8;102:1,19,
21,22,23;104:3,4,5,
10,12;105:8;107:22;
108:4,7,14;109:1,3;
111:4,7;114:25;
115:2;116:6
**Holdings' (5)**
25:25;26:22;43:24;
70:2;74:17

**holidays (3)**
117:12,13,14
**honest (1)**
96:23
**honestly (1)**
28:7
**Honor (247)**
14:5,10,14,18,22,
23;15:4,10,12,20;
16:2,9,20,23;17:5,13,
23;18:6,19;19:17;
20:13,25;21:3,21;
22:5;23:3,10,16;
24:25;25:12,18;26:9,
11,15;27:1,17,21;
28:2,7,15;29:8,12,21;
30:4,12,24;31:2,17,
22;32:5;33:3,10,13;
34:2,25;35:4,19,23,
25;36:3;37:6,25;
38:11;39:1,20;40:3,
14,25;41:4,9,16;42:3,
10,19;43:2,14,21;
44:7,9;45:12,18,25;
46:25;47:17,25;48:3,
24;49:6,7;50:5,18,23,
24;51:3,6,11;56:14,
22,25;57:2,7,13,17;
58:2,6,12,19,20;
59:12,20,21;60:20;
62:3,13;63:7,15,18;
64:2,7,16;65:3,20,22;
66:1,9,10,12,18,21;
67:7;68:13,15,19;
69:11;70:1,5;71:11;
72:23;73:12,19;
75:14,21,21;76:8,19,
20;77:14,16,18,18,20,
23,23;78:3,5,10,18,
25;79:20,20;80:4,10,
14,16,21;81:24;
82:14;83:4,6,9,10,16,
18;84:15,20,24;
85:25;86:7,16,19,23;
89:9,10,15;90:1;91:7,
19;92:12,24;93:16,
19;94:3,5;95:2,18;
96:1,25;97:25;98:23;
99:9,17,22;100:17;
101:4,12,21,24;103:9,
13,25;104:19;106:7;
107:4,5,14,25;108:9,
10,13;109:4,12;110:5,
5,10;111:3,15;112:4,
21;113:5,9,11,16,21;
114:1,5,14,21;115:16,
18,23;116:14,16;
117:4,9,11,15,17
**Honorable (1)**
4:11
**honored (2)**
107:13,14
**Honor's (13)**

31:9;55:14,17,20;
64:1;74:3,24,25;
80:23;102:15,23;
104:11;105:24
**hoping (1)**
116:6
**hour (2)**
84:16;113:12
**hours (2)**
105:10;113:11
**Hrg (4)**
3:3,3,13,13
**huge (1)**
28:18
**hundred (1)**
103:19
**hundred-plus-page (1)**
16:11
**hurdles (1)**
29:11

# I

**idea (5)**
20:10;69:12;
106:25;108:14;
110:16
**ideas (1)**
100:2
**identical (1)**
35:13
**identified (7)**
31:21;32:6;71:20;
73:15;82:4,4;106:20
**identifies (1)**
73:8
**identify (6)**
26:24;31:20;33:8;
90:20;96:19;97:13
**ignore (3)**
71:4;78:4;112:3
**ignored (1)**
32:2
**ignores (1)**
43:24
**II (1)**
3:11
**III (1)**
4:11
**illegal (5)**
64:18;71:12,21;
98:23;103:12
**illusions (1)**
46:23
**imagine (1)**
71:6
**immediate (2)**
29:9;32:18
**immediately (7)**
19:14;26:14;38:2;
41:21;43:10;59:6;
102:17
**immensely (1)**

32:21
**impact (1)**
29:9
**impacted (1)**
45:15
**implement (13)**
31:4;34:13;38:16;
40:5;41:9;46:21;49:9;
51:20;52:25;53:10;
74:2;75:9;94:9
**implementable (1)**
70:22
**implementation (19)**
16:14;18:2;22:25;
24:18;25:9;28:12,21;
30:10;38:9,14;47:19;
48:22;49:13,24,25;
63:8;64:17;90:14;
98:4
**implemented (4)**
30:15;41:21;44:20;
50:9
**implementing (3)**
39:21;47:13;52:20
**implied (1)**
115:25
**implies (2)**
21:5;93:21
**imply (2)**
35:17;86:6
**implying (1)**
33:6
**important (6)**
22:2;23:7;25:18;
71:17;79:15;99:16
**impose (3)**
53:15;79:9;101:18
**imposes (1)**
20:5
**Imposing (2)**
3:21;15:16
**impossible (1)**
46:21
**impressive (1)**
28:17
**improper (1)**
45:20
**inability (1)**
41:8
**inaccurate (2)**
38:19;43:15
**inapplicable (1)**
37:13
**Inc (4)**
3:21;7:3,14;8:20
**incentive (1)**
49:15
**included (1)**
92:22
**includes (4)**
23:5;51:18;72:18;
87:3
**Including (15)**

3:23;21:17;23:4,7;
26:12,14;35:8;50:11;
51:10;53:24;69:8;
71:13;77:6;87:7;
114:16
**Inclusion (2)**
35:17;37:3
**inconsequential (1)**
29:23
**inconsistent (17)**
23:1;30:1,14;36:19;
38:8;52:2;58:25;
60:25;69:14,15;71:3;
75:14,18;99:4,5;
114:3,13
**incorporated (1)**
75:4
**incorporates (1)**
87:22
**incorporation (18)**
26:22;45:16;54:13;
55:8;62:14,15,18;
63:5,6,10;64:9,15,19;
77:3;81:1,2,4;98:10
**incredible (1)**
29:15
**incredibly (2)**
83:10;86:4
**incurable (1)**
42:1
**Indeed (6)**
20:1;25:15;41:9,20;
59:10,17
**indemnification (1)**
101:2
**indemnified (2)**
93:2,3
**indemnify (4)**
29:13;92:18;96:21;
110:16
**indenture (2)**
15:6;56:24
**independent (2)**
104:4,5
**indicated (1)**
34:1
**indication (1)**
85:13
**indirect (2)**
23:8,13
**indiscernible (1)**
116:15
**individual (1)**
107:11
**individuals (6)**
55:1,14;58:13,14;
80:13;106:21
**inference (1)**
38:21
**informality (1)**
106:23
**information (3)**
27:12;60:20;68:22

**informed (3)**
17:4;24:17;46:12
**inherent (1)**
69:3
**initial (2)**
35:11;56:6
**initially (1)**
82:25
**ink (1)**
54:5
**innocuous (1)**
36:16
**inordinate (2)**
83:24;85:14
**instance (4)**
34:4;35:9;43:21;
49:22
**instead (6)**
45:16;55:1;66:5;
84:9;91:14;92:19
**Institute (1)**
67:19
**instituted (1)**
105:25
**instructive (1)**
53:18
**instrument (3)**
18:13;39:24;53:4
**insufficient (1)**
25:11
**insult (1)**
46:16
**insulting (1)**
98:23
**intelligence (1)**
46:17
**intended (1)**
32:22
**intent (1)**
74:11
**intentionally (2)**
38:23;54:7
**interest (8)**
17:21;23:7,12;44:8,
10;49:4;50:14;60:5
**interesting (3)**
104:22;111:9,18
**interests (1)**
44:2
**interfere (2)**
30:10;53:22
**interfering (5)**
24:1,2,22;48:22;
91:5
**interim (2)**
26:12;37:25
**international (4)**
60:7;65:25;77:25;
79:10
**intervene (1)**
82:25
**intimidate (3)**
84:4,5,14

**into (13)**
15:13;20:21;30:3;
32:11;34:11;37:1;
40:7;44:13,14;45:13;
49:2;78:10;86:18
**introduce (2)**
41:1;61:15
**introductory (3)**
38:24;39:13;99:3
**Intwasa (1)**
28:2
**invent (3)**
16:12;32:4;49:5
**invented (1)**
28:19
**Investment (1)**
14:19
**invitation (1)**
32:13
**invoices (1)**
27:7
**invoke (1)**
20:11
**invoked (4)**
16:19;28:22;29:8;
42:5
**involuntary (1)**
103:11
**involve (1)**
47:3
**involved (1)**
69:22
**involvement (2)**
18:24;52:5
**involves (1)**
37:24
**involving (1)**
47:1
**irrational (1)**
38:17
**irrelevant (1)**
36:22;44:5;98:24
**irreparable (1)**
16:25
**issuance (2)**
41:10;77:4
**issue (15)**
17:25;21:22;34:9;
37:23;41:3;51:11;
54:4;60:12;66:7;
72:16;84:22;95:2,13;
101:13;112:8
**issued (3)**
21:23;45:25;51:11
**issues (12)**
24:15;25:2;40:20;
41:15;48:3;51:10;
54:6,7;55:24;95:10;
103:2;108:20
**issuing (1)**
98:15
**italicize (1)**
31:18

**item (1)**
15:15

**J**

**jail (1)**
27:17
**JAMES (1)**
8:25
**January (3)**
47:14;82:16;83:2
**Jared (2)**
4:21;8:8
**JB (1)**
41:12
**JEFFREY (1)**
8:13
**Jericho (2)**
10:13,15
**job (2)**
18:22;36:15
**jobs (1)**
84:6
**John (3)**
4:11;8:10,15
**join (4)**
18:12;39:24;50:13;
53:3
**joinder (1)**
115:2
**Joined (3)**
14:6,25;87:14
**Jones (1)**
44:13
**Joseph (1)**
5:20
**Journal (1)**
67:19
**JPA (1)**
44:12
**Judge (13)**
19:22;20:8;21:14;
31:3;34:10;35:10,24;
43:8;44:13;63:14;
72:22;82:23;84:20
**judgment (6)**
25:6;50:8;54:20,23,
25;107:21
**judicata (4)**
40:17,19;72:17,18
**judicial (3)**
27:19;28:24;107:20
**jump (1)**
15:13
**jurisdiction (44)**
16:18,19;20:11,16,
18;28:23;29:10;32:8;
42:4,5,9,21,25;44:6;
47:24;49:21;55:15,
16,17,21;59:12;66:3,
11;77:20,21;80:11,12,
14;84:10,19,22;85:6,
12;87:1,3,7;88:11,22;

89:3;94:4;95:25;
98:21;105:24;107:2
**jurisdictional (1)**
42:10
**jurisdictions (4)**
47:5,6;75:10;86:12
**jury (1)**
31:3
**JUSTICE (1)**
12:2
**justify (1)**
30:23

**K**

**Karastamati (4)**
96:13;97:9;105:22;
106:20
**KARLI (1)**
9:9
**keep (3)**
98:11;100:8;107:10
**KELLY (1)**
11:16
**Kertsikoff (4)**
96:12;97:9;105:21;
106:19
**KEVIN (1)**
7:18
**key (2)**
48:4;84:15
**keys (3)**
18:1;23:21;25:14
**kind (13)**
15:24;16:3;45:10;
58:2,8,17;71:2;79:14;
85:25;89:14;95:10;
100:4;107:24
**knew (3)**
62:4,5;63:1;64:13
**knots (1)**
37:2
**knowing (1)**
60:18
**knowledge (1)**
85:20
**known (2)**
60:6;63:20
**knows (3)**
39:1;63:17;83:14,
14,21;104:16
**Kotliar (6)**
3:25;8:12;14:7;
101:24,25;107:9
**Krypton (2)**
52:16;53:18
**KYLE (6)**
8:16;14:5;15:10;
89:10;111:3;116:5

**L**

**lack (1)**

89:3
**lacks (2)**
59:12;70:13
**land (4)**
30:3;37:13;39:22;
40:7
**Lane (1)**
35:10
**language (7)**
16:5;34:3;35:7,11,
13,22;38:8
**Lassia (1)**
14:19
**last (5)**
48:15;49:7;62:12;
63:4;81:3
**lastly (1)**
104:14
**later (1)**
45:2
**laud (1)**
108:21
**lauded (1)**
108:19
**LAUKAMG (1)**
7:8
**Law (149)**
10:12;11:3;14:25;
17:24;19:21;21:4,6,9;
22:18;24:15;29:11,
16;30:2,15;31:16,21;
34:5,5,25;35:2,12,14;
36:19,23;38:16,19,20,
21,23,25;39:2,14;
40:9,11,12,16;43:20;
44:15,19,21;46:22;
54:4,6;55:4;59:22;
60:12,12,14,18,19,19,
21,23;61:2;63:1;64:3,
5,11;66:4,11;67:7,10,
25;68:4,16,25;70:19,
22;71:16;72:14;75:1,
13,22;76:1,4,7,22,24;
77:7,12,19,22;78:3,3,
6,9,9,15,17,19;79:2,
10,18,19;80:7,17,18,
24;84:9;85:6,22;
86:15,24;87:2,2;88:1,
9,14,15,20;89:2;
90:15,20;91:3,5;92:7,
14,15,15;93:6,7,23,
25;94:9,15,18,20,24;
95:6,19;96:8;99:4,5,
15;100:7;101:9;
103:2;106:18;107:3;
108:1,4;109:10,12,
9;111:25;113:14,18,
20;114:20
**lawful (3)**
81:8,9,10
**lawless (1)**
108:18
**laws (12)**

16:13;28:5;31:9;
41:7;42:1;47:12;69:7;
70:15;71:2;80:2,5;
111:13
**lawyer (8)**
54:11;61:8,15,23,
23;74:15;76:5,5
**lawyers (5)**
46:4,4;49:1;62:1;
108:19
**lawyer's (1)**
54:15
**lay (1)**
78:5
**LAZAROFF (6)**
11:8;14:23,24;15:3;
86:23,23
**LCIA (1)**
61:10
**lead (1)**
27:2
**learned (1)**
62:8
**least (3)**
66:15;87:20;97:12
**leave (3)**
15:22;36:11;48:2
**leaves (2)**
28:21;29:4
**leaving (1)**
70:14
**led (1)**
72:1
**LEFKOWITZ (1)**
8:13
**left (1)**
55:19
**legal (13)**
25:21;29:7;31:5,10,
11;46:14,19;68:9;
88:17;96:10;109:5,6,
7
**LEILA (1)**
8:9
**lenders (1)**
26:3
**length (2)**
63:19;98:16
**lengths (2)**
30:9;47:18
**lengthy (1)**
56:11
**Lenin (1)**
61:4
**less (1)**
49:18
**Letter (14)**
3:4,5,6,14,15,16;
4:11,12;48:15,18;
61:3,25;78:9;91:22
**letters (6)**
25:1;27:22;29:2;
61:25;62:1,2

**level (3)**
38:4;70:11,18
**Levona (2)**
11:12,20
**levy (1)**
49:14
**Lexington (1)**
7:4
**liability (2)**
27:2;110:17
**Liberia (7)**
29:24;31:6,22;
32:22;41:19;61:21;
68:16;72:3;75:3,4;
78:20,21;81:22;
107:20;108:5;110:3,
6,7;111:21;115:6,13
**Liberian (44)**
19:18;22:13;26:23;
28:3;34:5;40:11;46:4;
47:1,2,4,11;48:16,16;
54:11,14,21;55:4,5,9;
67:7,10;75:13,22,24,
24,25;76:1,4,7;78:9,
19;80:24,24;85:22;
91:24;92:9;96:20,24;
103:8;107:19;108:1,
4;110:2,8
**LICHTENSTEIN (1)**
13:7
**lie (1)**
32:4
**lied (1)**
48:7
**lightly (1)**
113:19
**likely (3)**
68:4;69:7;107:16
**Likewise (3)**
42:3;45:18;51:16
**Liman (1)**
82:23
**limit (1)**
112:14
**limited (5)**
38:10;39:17;
102:16;111:13;
112:25
**limiting (1)**
112:15
**line (3)**
14:7;25:11;90:1
**lines (1)**
116:22
**liquidator (1)**
111:24
**LISCR (2)**
27:4,23
**listed (1)**
32:13
**listened (1)**
88:24
**lists (2)**

76:23,23
**literal (1)**
30:19
**literally (2)**
94:10;97:14
**little (6)**
16:2;30:4;58:14;
101:5;110:1;111:9
**live (1)**
42:13
**LLC (1)**
5:21
**LLP (9)**
3:24;7:2,13;8:2;9:2,
13;10:2;11:11,19
**LLPs (1)**
4:12
**loaning (1)**
63:24
**local (1)**
70:15
**locking (1)**
63:21
**long (9)**
28:12;40:16;42:22;
47:7;51:9;73:11;
78:24;85:15;116:25
**longer (5)**
23:22;37:14;50:9;
91:15;109:7
**look (9)**
20:25;30:25;65:14;
67:17;75:21;76:19,
21;77:18;82:8;95:10;
96:6;97:2;98:5;
100:17
**looked (1)**
80:20
**looking (4)**
45:14;56:11;99:6;
103:14
**looks (2)**
29:1;88:12
**lot (10)**
24:16;35:3;54:5;
62:4;85:9,10;88:24;
107:9;109:14;111:8
**lots (1)**
102:6
**Lou (2)**
14:14;106:7
**loudly (1)**
16:20
**LOUIS (1)**
7:9
**Ltd (2)**
11:12,20
**Luxembourg (1)**
34:5
**lying (1)**
90:24

**M**

**Madison (1)**
29:20
**Madoff (1)**
42:6
**magically (1)**
91:4
**mail (2)**
88:4,6
**mailed (1)**
27:8
**main (3)**
26:19;44:8,10
**maintain (2)**
74:1,16
**maintained (1)**
56:6
**major (2)**
48:23;63:25
**majority (10)**
25:23;34:7;48:23;
55:17;59:13;87:12,
13;105:17;115:1,3
**make-believe (4)**
30:3,7;37:14;43:16
**makes (4)**
27:24;62:3;69:10;
87:24
**making (6)**
29:11;53:20;71:11;
77:6;103:4,6
**man (7)**
24:15;30:6,12;
36:22;37:1;40:7;44:7
**management (3)**
26:3;70:11,18
**manager (1)**
22:9
**mandate (1)**
18:7
**mandatory (1)**
87:24
**manufactured (1)**
25:5
**many (6)**
30:4;35:25;51:10;
59:21;67:17;78:1
**Maritime (1)**
28:3;47:10
**MARK (1)**
13:7
**Market (1)**
7:15
**MARTHA (1)**
8:14
**MARTIR (1)**
8:14
**masquerade (1)**
81:12
**mass (1)**
98:8

**massive (1)**
64:22
**Mastando (2)**
4:11;63:14
**masterful (1)**
36:16
**mastermind (1)**
109:19
**matter (15)**
29:5;40:14;42:24;
60:7;72:16;78:1;85:3,
7;86:7,7;87:20;
100:15;105:3;109:8;
111:5
**Matters (7)**
4:5;5:4;40:8;57:12;
64:8;113:10;116:12
**MATTHEW (1)**
11:25
**maximizing (1)**
17:8
**may (24)**
18:11;24:6,7;34:14;
36:8;39:22;46:1;
49:16;51:4;52:13,22;
53:2;56:8;65:23;
67:24;70:15;77:7;
89:5;112:6,11;113:7,
8;114:17,19
**maybe (1)**
108:21
**MCCLAIN (1)**
8:15
**mean (21)**
27:16;47:21;59:25;
63:13;66:15,19,19;
69:20,21;71:17;74:5;
76:17;84:15;85:25;
86:2;93:11;94:10;
96:8;97:21;98:5,17
**meaning (2)**
31:19;36:17
**means (6)**
31:15;38:21;86:11,
17;93:17;106:18
**meant (1)**
69:25
**Media (5)**
13:3,5,6,10;35:22
**meet (1)**
50:3
**meeting (2)**
34:8;105:14
**member (2)**
22:7;102:22
**members (2)**
22:3;47:21
**mendaciousness (1)**
38:5
**mention (1)**
48:1
**mentioned (2)**
51:13;116:2

**mere (3)**
36:6;54:17,22
**merger (2)**
75:16;76:25
**mess (1)**
45:19
**Meyers (1)**
29:20
**MICHAEL (4)**
10:8;11:8;14:23;
86:23
**might (8)**
32:9;34:15;46:3;
54:9;68:6;70:12,22,
25
**million (3)**
25:21;33:23;116:20
**millions (2)**
27:18;90:3
**mind (5)**
44:13;71:12;72:15;
80:9;112:22
**minimum (2)**
88:13,21
**ministerial (4)**
26:18,20;28:10;
99:10
**minor (1)**
26:18
**minority (4)**
55:19;105:22;
107:6,11
**minute (4)**
62:13;63:4;81:3;
104:20
**minutes (1)**
106:8
**misquote (1)**
80:6
**misquoted (1)**
73:3
**missed (1)**
46:11
**misstatement (2)**
81:17,19
**mock (1)**
29:22
**mocking (2)**
16:22;27:25
**model (1)**
111:25
**mole (1)**
103:25
**moment (4)**
30:4;109:25;
115:11;116:20
**money (3)**
63:21,24;86:14
**Monrovia (1)**
8:23
**month (2)**
52:8;104:15
**monthly (1)**

102:13
**months (4)**
16:19;41:2;95:22;
99:17
**months' (1)**
85:20
**more (17)**
16:6;20:16;22:21;
28:16;42:11;53:17;
70:20;71:20;84:16;
86:14,14;92:25;
109:15;112:14;113:5,
7;116:1
**morning (23)**
14:2,5,8,9,10,13,14,
17,18,21,22,23;15:2,
3,4,7,8;48:19;56:22;
83:4,10,17;89:9
**MOSS (6)**
9:19;15:4,4,8;
56:22,22
**most (7)**
35:5;72:19;88:4;
91:6;93:9;99:10;
104:22
**Motion (59)**
3:9,9,20,20;4:17,17,
23,23;15:16;20:19;
28:6;29:18;51:2;
56:21;57:12,16,20;
58:1,6,7;59:8,11;
63:19;65:22;66:6;
69:12,23;77:17;83:1,
11,16;84:5,7,12;85:3;
86:19;89:1;102:5,9,
11;103:22,23;106:20;
107:2;110:21,24,25;
111:2,6,8,16;112:5,
18,20;113:1;114:23;
115:1,5,11
**motions (2)**
87:11,13
**motivated (1)**
29:16
**mount (1)**
52:4
**mouth (1)**
73:4
**movant (1)**
86:22
**movants (2)**
83:11;89:8
**move (3)**
26:3;50:6;113:16
**movie (1)**
16:2
**much (6)**
29:20;40:10;43:18;
48:14;59:9;74:9
**multiple (2)**
34:3;100:22
**Murchinson (12)**
76:3;81:14,22;84:3;

85:10;86:6,9;92:20,
20,20;103:12;108:15
**murder (1)**
24:19
**Murray (1)**
40:25
**must (6)**
33:19;40:24;51:22;
56:5;90:21;104:17
**myself (1)**
102:4

# N

**name (5)**
45:19;57:22,23;
103:18;110:17
**names (2)**
58:18;66:6
**narrow (2)**
74:9,9
**narrowly (1)**
112:9
**nature (3)**
19:7;29:23;66:1
**navigate (1)**
67:24
**near (1)**
85:22
**nearly (2)**
16:10;32:1
**necessary (9)**
18:9,12,16;39:23;
40:1;52:24;53:3;77:6;
88:14
**need (62)**
20:14;21:12;25:2;
26:18;29:23;30:15;
31:4;32:16;33:3;
41:18;44:11,18,22;
45:3;47:4,5;48:12;
49:11,14;51:13;55:3,
21;61:3;62:22;64:14;
65:4,7;70:9;71:18;
80:17,18;81:11;
83:25;85:11;92:9,9,
17,24;98:3;99:2;
100:12,16,25;104:25;
105:5;106:3;107:16;
111:14,20;112:2,6,11;
113:1,7,7,22;114:1;
116:4,6,10,11;117:3
**needed (25)**
29:8;30:11;33:6,7,
12,22;34:4,13,14;
35:18;36:2,23;38:15;
43:12;44:21,25;
47:12;49:10;71:14,
14;73:12;89:23;97:4;
111:13;115:10
**needing (2)**
45:15;47:2
**needle (1)**

89:20
**needs (11)**
55:1,13;62:25;
91:25;94:24;101:16;
104:6;105:9,12;
107:18,18
**negative (1)**
38:20
**negotiated (1)**
92:21
**New (32)**
7:5;8:6;9:5,17;
10:5;11:6,14;12:6;
27:23;34:9;41:1,11,
15;45:25;46:10,12;
49:5;52:6;54:18,24;
62:17;64:14;72:4,21;
88:5;94:11;97:15;
98:15;100:13;106:2;
107:21;109:8
**news (1)**
31:25
**next (8)**
83:15,20,21,21,23,
24;102:9;111:5
**Nobody (9)**
36:22;47:12;54:20,
21;58:5;107:7;
109:11,11;110:14
**Nobody's (2)**
40:8;106:25
**noise (2)**
85:9;99:9
**nominees (1)**
82:24
**non- (1)**
79:18
**nonbankruptcy (1)**
39:14
**nondebtor (3)**
23:8,13;43:24
**none (12)**
27:3;33:10;40:8;
43:7;20;46:22;65:10;
82:4,4;103:2;106:21;
107:15
**Nonetheless (1)**
23:16
**nonparty (2)**
14:24;86:24
**nonresident (1)**
80:24
**nonsense (3)**
32:15,23;50:4
**non-US (20)**
44:19,20;60:3,12;
64:11;66:3,3,4,10,10,
11;67:9;68:25;71:15;
77:21,22,22;78:3,6,9
**North (1)**
5:22
**note (6)**
18:19;25:18;37:16;

39:1;95:2;111:15

**noted (5)**
21:14;33:14;34:17;
40:21;53:6

**noteholders (1)**
56:6

**notes (5)**
21:4;56:4

**Notice (11)**
4:4,5;5:3,4;19:10;
21:1,7;36:11;52:6;
98:11;104:10

**notified (1)**
61:16

**notion (2)**
19:17;94:8

**Notwithstanding (4)**
38:25;39:14;81:13,
14

**Nov (10)**
3:2,3,4,4,5,12,13,
14,14,15

**nowhere (1)**
102:12

**number (5)**
14:3;35:16;53:16;
59:3;68:12

**NY (11)**
7:5;8:6,23;9:5,17;
10:5,15;11:6,14;12:6,
14

**O**

**Oaktree (1)**
26:1

**object (1)**
106:23

**objected (1)**
116:17

**objection (9)**
18:3;52:15,21;
100:18;112:25;
114:12;116:3,24;
117:2

**Objections (6)**
4:16,22;40:15;41:8;
87:11,12

**obligated (2)**
26:13;37:21

**obligates (1)**
37:18

**obligation (3)**
20:6;32:12;106:16

**obligations (5)**
17:12;22:6;33:16;
79:2;92:15

**oblivion (1)**
34:10

**obstacles (1)**
49:5

**obstreperous (1)**
45:17

**obstruct (1)**
101:3

**obstruction (1)**
37:20

**obtain (3)**
33:22;43:5;50:7

**obtained (2)**
33:5;44:24

**obviate (1)**
68:7

**obvious (1)**
62:17

**obviously (5)**
37:4;81:19;96:10;
104:12,24

**occur (2)**
53:6;92:5

**occurred (1)**
37:7;73:18,19

**occurrence (3)**
19:6,12;36:9

**off (6)**
26:10;37:24;45:22;
95:1;101:20;110:12

**offended (1)**
101:6

**offered (2)**
29:13;59:17

**offering (5)**
25:21;26:7;45:11,
13;76:16

**Office (2)**
12:3;27:12

**officer (1)**
103:20

**Officers (9)**
3:23;15:18;51:19;
52:12;60:23;70:3;
90:7;96:7;97:13

**Official (3)**
9:3;14:11;51:3

**often (3)**
18:2;27:6;52:19

**old (5)**
34:10;63:6,9;64:19;
90:7

**omitted (2)**
48:4;91:16

**Omnibus (4)**
4:16,22;87:8,10

**Once (7)**
16:4;9:18:22;20:9;
43:5;79:7;110:5

**One (40)**
8:4;12:4;16:4;
20:17;24:25;27:22;
28:12;29:23;30:13;
49:3,3;52:14;54:9;
60:14,15,17;61:13;
62:12;65:12;73:1;
77:25;86:1,1;88:12,
12,19;97:12;101:20;
102:5;104:1,8;

106:11,11,12;107:19;
109:25;110:1,4;
112:22;114:14

**one-page (1)**
97:15

**ones (2)**
68:18;81:3

**one's (1)**
22:2

**only (44)**
17:10;19:2;21:15;
22:12;27:8,12;29:4;
32:5;34:20;37:17;
38:13,18;39:16;42:4,
13;43:12;45:3,13,14,
16;48:20;59:12;61:3;
75:20;76:11;78:17;
86:1;88:15;89:18;
92:2;93:20;97:23;
100:2,9;104:4;107:2;
108:15,15,15;110:15;
111:10,13;112:9;
114:14

**onto (2)**
23:22;30:7

**opening (5)**
75:15;79:15;80:22;
90:5;93:12

**openly (3)**
16:22;27:25;29:22

**operate (1)**
24:7

**operates (1)**
16:8

**operating (2)**
64:18;102:13

**operations@escribersnet (1)**
5:25

**opinion (2)**
31:11;51:10

**opinions (3)**
31:10;46:19;54:7

**opportunity (3)**
57:19;80:20;115:19

**oppose (3)**
91:15;111:18,19

**opposed (1)**
46:4

**opposing (5)**
51:2;91:12,17;
113:2,5

**opposition (9)**
57:15;87:6;102:8;
103:8,9,21;110:23;
111:8;112:19

**opt (1)**
88:6

**opted (3)**
45:11,13;88:4

**option (2)**
19:25;21:13

**optional (9)**
15:21;16:24;26:16;

31:2;40:10;43:13;
46:24;50:17;101:10

**Order (108)**
3:2,9,12,21,24;
15:16;18:22;19:3,13,
16,19,21;21:2,8,9;
22:24;25:10,19;
26:12;29:21;30:23;
32:11,17,24;36:12,23;
38:2;40:4,9;41:5,23,
24;43:4,7,10,19,24;
46:16,17;47:14,23;
48:10;49:4,10,11,17,
17,24;50:2,16,19,19,
20;51:16;52:22;53:7;
54:9,14,17,22;56:15;
58:23;62:24;64:13;
65:5;66:3,10;68:8;
69:1;73:11;74:24,25;
75:7,8;80:4;82:3;
83:19;86:10;90:13;
93:1;94:20,25;96:1;
97:22;98:2,3;99:23,
25;100:9;102:23;
104:8,11;106:12;
107:15,25;112:3;
113:2,8,10,25;114:23;
115:8,12,14,19;
116:10;117:7,7

**ordered (11)**
53:6;55:21;64:2;
69:13;72:23;96:19;
99:23;105:16;106:3;
109:12;110:20

**ordering (1)**
94:18

**orders (33)**
15:20;16:17,24;
18:5;20:4,12;25:4,11;
26:11,15;29:19;31:9;
39:8,12;42:22;43:1,9,
13;44:23;46:23;
48:25;50:17;51:15;
52:3;53:7;58:22;82:7;
90:21;101:8;102:15,
17,19;112:12

**order's (1)**
16:15

**organizational (1)**
55:10

**organized (5)**
20:2;39:6,6,10,11

**ORTIZ (57)**
8:16;14:5,5,9;
15:10,10,15;51:6,13;
52:2;56:2;57:21;
60:13,17;61:2;62:7;
63:3;67:16;69:3,7;
70:6;71:13;78:2,8,11;
82:17;83:14;84:16;
89:9,10;91:18,22;
93:15,19;94:3,17,20;
95:1,7;96:5;102:4;

107:24;110:18;111:3,
3;112:24;113:6;
114:9,12;115:16,24;
116:5,5,16,24;117:9,
11

**others (5)**
17:12,15;85:19

**otherwise (5)**
20:20;22:9,15;24:6;
39:14;90:8

**out (35)**
18:4;20:3,3,23:20;
27:3;30:12;31:17;
33:19,22;36:1;37:19;
39:6,7,11,12;42:14;
45:14;48:2,20;51:13,
14;52:12;55:3,22;
56:9,13;59:19;61:8;
64:15,16;71:25;
73:13;78:5;81:3,8;
85:4,12,13;88:4,6;
92:23;96:24;100:23,
24;109:21

**outcome (6)**
17:7;28:23;29:1;
42:13;57:3;97:6

**outlandish (1)**
36:20

**Out-of-context (1)**
43:16

**outrageous (3)**
31:14;49:18;101:5

**outs (1)**
33:14

**over (33)**
16:24;18:1,3;25:14;
28:20;30:21;48:2;
49:21;52:8,15,17,21;
59:13;63:16;65:15;
71:19,22;72:23;
74:22,23;79:1;82:11,
15;81:10;87:1;90:12,
12,13,13;102:24,24;
110:5,5

**overall (1)**
112:13

**overarching (1)**
85:3

**overlook (1)**
58:19

**overridden (1)**
31:9

**override (2)**
31:12;48:9

**overs (1)**
40:18

**overseas (1)**
62:5

**oversee (1)**
90:22

**OWEN (1)**
9:7

**own (8)**

30:22;31:19;52:1;
62:6;67:25;100:14;
104:6,7
**owner (7)**
53:19,23;81:16,20,
21,22,23
**owners (12)**
25:22;52:6,12,19;
54:2,3;55:25;56:10;
57:5;100:13;105:6;
106:2
**owner's (1)**
56:4
**ownership (7)**
16:16;51:25;54:11,
13;56:17;78:20;105:3
**owns (1)**
44:3
**Oyster (1)**
12:14

**P**

**Pach (4)**
13:7,9;81:23;
108:25
**Pacific (1)**
34:4
**page (6)**
27:22;54:15,18;
68:5;70:21;87:10
**pages (4)**
48:2;101:4;103:14,
15
**paid (2)**
56:8;61:14
**paper (1)**
110:1
**papers (13)**
52:15;53:14,17;
58:11;76:15;80:22;
87:9,16,19;88:16;
89:4;103:10;107:8
**paradigm (1)**
65:19
**paradigms (1)**
65:11
**parading (1)**
28:19
**paragraph (7)**
19:13;37:11;43:2;
59:2;80:7,23;107:20
**paragraphs (1)**
59:5
**parenthetical (4)**
21:5;34:23;35:17;
39:4
**Park (1)**
11:4
**part (7)**
14:15;35:5;46:11;
66:13,15;90:14,15
**partially (1)**

98:19
**participating (1)**
42:7
**particular (4)**
18:2;64:7;82:1;
85:1
**particularly (4)**
52:13;53:18;68:9;
71:8
**parties (78)**
15:21,23;16:7,18;
17:1,6,9;19:4;20:9;
21:11,16,18,25;22:4,
8,13;23:21;24:5,12,
22;25:1,3,16,22;
32:16,19;34:21;36:5,
21;37:6,22;41:3,12,
13;42:4,20,23;43:13;
45:1,2,4;46:14;47:8,
19;48:4;49:3,12;
51:12,18,21;52:24;
53:9,13,15;56:15;
68:14;74:14;76:11;
77:21,24;79:1,2;
82:16;86:18;89:23;
96:18,18;97:10,19;
100:20;101:9;106:2,
16;108:23;109:23;
110:13,16;112:3
**partner (1)**
14:12
**parts (8)**
37:22;48:4;90:2,10,
11,15;91:15;92:6
**party (17)**
18:9,12;20:10,16;
32:7,8,8,10;39:23;
44:6;45:3,13,14;53:3;
69:24;87:8;108:17
**passed (3)**
59:4;116:25;117:2
**past (1)**
38:1
**pattern (1)**
84:18
**Patterson (1)**
79:16
**PAUL (1)**
12:9
**pause (2)**
39:1;47:15
**pay (1)**
102:20
**paying (7)**
26:1,10,10;37:24,
24;61:13;102:14
**payment (2)**
26:6;102:18
**payments (1)**
26:13
**PC (4)**
10:11;11:2;12:12;
14:24

**peace (1)**
41:14
**penalties (1)**
78:7
**Penn (1)**
8:4
**people (32)**
18:18;25:11;27:3,
16;58:16;59:13;
60:19;63:24;65:2;
66:14,20;70:1;83:14;
90:4;91:3;93:9;94:12;
95:24;96:11;97:12;
100:4,13;102:6,20,25;
103:4,18;105:5;
106:15;107:1,25;
109:17
**percent (1)**
34:6
**perfectly (3)**
62:17;90:3;93:2
**perform (5)**
18:9,15;28:10;40:1,
4
**performed (1)**
25:20
**perhaps (2)**
70:23;108:19
**Period (3)**
29:19;32:2;35:11
**periods (1)**
102:18
**PERKINS (3)**
9:13;15:5;56:23
**permissible (2)**
80:6,7
**permit (2)**
46:8;81:5
**permitted (16)**
21:4,6;27:24;34:24;
35:1,12,13,18;76:22,
23;78:15,17;80:5;
99:14;113:17;114:20
**Person (16)**
3:22;13:8;21:10,12,
17;60:15;66:3,10;
67:9;70:3;81:16;
90:19,20;96:22;
97:14,16
**personal (2)**
42:8;70:14
**personnel (2)**
15:17;20:7
**perspective (1)**
17:25
**pervert (1)**
18:18
**perverting (1)**
36:16
**petition (2)**
88:12;108:12
**petitioning (10)**
43:5;44:18;51:17;

53:8;54:16;57:12;
65:12;87:8;104:12;
107:13
**ph (6)**
28:2;29:20;61:4,5;
81:15;88:7
**Phoenix (1)**
5:23
**phone (1)**
61:7
**phrase (5)**
35:3;38:24;39:4,13;
99:3
**pick (4)**
20:23;37:15;90:2;
98:25
**piece (3)**
35:5;93:22;110:1
**pieces (1)**
98:25
**Pierre (10)**
3:24;4:18;8:20,25;
27:3;62:20;67:8;
80:23;81:15;110:11
**place (1)**
44:16
**places (6)**
49:16;53:21;59:3;
76:20;77:13;112:2
**plain (1)**
38:8
**plan (237)**
16:6,7,12,16;17:15,
17,19;18:3,4,10,15,
16,21,23,25;19:7,8,
11,14,16,24,25;20:3,
3,7,8,9,21,23,25;
21:18,24;22:23,25;
23:1,1,24;24:3,4,6,18,
20,23,25;25:7,9,18,19,
20;26:8,25;28:9,13,
21;29:4,17,25;30:10,
14,22;31:2,4,14,16,
20,23,24,25;32:3,9;
33:9,15,16,18,18,20;
34:14,22;35:15,21,22,
24;36:7,9,10,14;37:9,
17,19,23;38:9,14,16;
39:7,7,11,12,21,25;
40:2,6,15,16;41:9,20,
24;42:1,17;43:3,6,7,
10,15,17,23;44:1,19;
45:10;46:1,5,8,16,20,
21;47:19;48:5,22;
49:9,14;50:21;51:12,
13,14,21,22,25;52:2,
4,10,12,14,20,21,25;
53:5,11,20,22;54:16;
55:3,20,22;56:1,8,8,
12,14,17;59:19,20,22;
60:25,25;61:22;62:6,
10,15,16,24;63:7;
64:1,2,17;66:8;68:3;

69:5,5;70:8,21;71:14,
18,23,24;72:17,18,22,
23;73:8,14,24;74:2,
24;75:9,17;76:13,16,
18,19,21;77:4,8;
80:17;81:7;85:5,5,8;
89:16,24;90:6,10,12,
14;91:2,8,9;92:5;
93:4,5,10;95:15;
96:17;97:4,23,25;
98:2,8,19;99:2,18;
100:6,11;102:23;
106:1,4;107:14;
109:13;112:5;114:13
**planning (2)**
34:20;48:16
**Plans (8)**
20:23;32:15;35:4,6,
15;40:23;41:9;92:18
**plan's (1)**
16:14
**play (4)**
24:15;34:11;85:3,
12
**playing (4)**
14:15;30:7;75:11;
102:7
**plays (1)**
85:12
**Plaza (1)**
8:4
**please (8)**
14:4;15:14;51:5;
76:21;89:9;104:21;
106:8,9
**plenty (1)**
44:9
**plus (1)**
104:15
**PM (1)**
117:20
**PO (1)**
8:22
**point (32)**
17:3;19:8;20:20;
31:4,5,13,15;32:5;
33:4,25;34:23;44:21;
51:8;54:6;58:24;70:5;
71:11;72:7;81:6;
84:17;86:1;87:18,18;
89:17;92:13;93:18;
100:7,8;105:2,5;
110:18;113:16
**pointing (4)**
46:23;91:2,2;95:9
**points (5)**
27:3;45:23;51:8;
83:5;96:24
**poor (1)**
61:2
**position (5)**
36:20;57:2;66:9;
80:14,16

**positions (2)**
31:14;57:4
**possess (2)**
25:22;51:24
**possible (1)**
74:18
**possibly (5)**
48:22;89:19;94:3;
96:22;100:20
**post-effective (1)**
40:18
**Potentially (1)**
70:20
**power (5)**
28:24;39:17,18;
48:10;49:10
**POWERS (3)**
10:18;15:1;94:13
**practical (1)**
17:25
**preamble (1)**
75:23
**precedent (8)**
33:4,13,17,20,25;
35:20;36:6;48:10
**precise (1)**
68:20
**predesignated (1)**
55:6
**preempt (3)**
36:23;79:18;93:22
**preempted (1)**
38:20
**preemption (6)**
38:6,10,11,14;
79:21;93:22
**preemptive (2)**
32:11;34:15
**preference (1)**
15:13
**preferred (5)**
26:22;45:16;49:12;
63:18;82:24
**premise (4)**
36:18;38:23;93:23;
98:22
**premises (1)**
30:13
**prepare (1)**
91:25
**PRESENT (5)**
13:2;25:15;32:7;
42:16;47:8
**presentation (3)**
89:15;90:5;103:2
**presentations (1)**
104:15
**presented (1)**
54:8
**press (1)**
29:1
**pressure (1)**
25:12

**pretend (2)**
16:12;107:24
**pretty (2)**
84:24;87:19
**prevent (2)**
49:23;50:8
**preventing (1)**
25:24
**previous (1)**
113:1
**primary (1)**
26:2
**principals (5)**
51:19;54:3;57:5;
100:21;105:19
**principles (2)**
40:19;105:22
**prior (5)**
22:3;32:19;41:16;
61:18;105:6
**priority (1)**
68:1
**privity (1)**
42:22
**proactively (1)**
34:19
**problem (1)**
64:3
**problematic (1)**
31:21
**problems (1)**
70:9
**Procedure (1)**
87:24
**procedures (2)**
55:8,11
**proceed (1)**
19:25
**proceeding (20)**
36:13;42:23;44:16;
74:21;76:4;82:11,12,
14,18;83:22;84:9;
85:16,21,21;92:1;
102:3;104:1,9;
108:24;109:10
**proceedings (8)**
17:7;40:21;56:11;
57:3;88:18,19;
105:25;117:20
**process (17)**
16:11;22:18;27:18;
29:7;41:13;43:22;
57:6;59:15,24;64:22;
69:4;83:14,16,17;
85:3;100:5;109:14
**proclaim (1)**
85:22
**proclaiming (1)**
16:20
**produced (1)**
59:1
**production (1)**
49:8

**professional (4)**
26:11;49:21;
102:14,19
**professionals (2)**
26:13;37:25
**prohibited (2)**
22:24;101:12
**prohibitions (1)**
45:23
**prohibits (1)**
24:18
**projecting (1)**
23:22
**projection (2)**
23:17;43:23
**promise (5)**
28:15;33:24;76:12,
13,20;91:1
**promised (11)**
30:1,16;32:12;
36:18;59:19,22;61:1;
64:11;67:23;72:12;
110:21
**promises (4)**
16:13;33:13;41:6;
107:14
**promptly (1)**
38:3
**proof (17)**
18:20;19:9,10;
21:15;23:15;32:22;
58:13;65:8;67:1,2,3;
68:18,19,20;97:23;
100:10;109:20
**proper (3)**
72:2;79:9;110:13
**properly (7)**
74:22,23;87:3;
106:21,22,24,25
**property (9)**
16:17;17:18;18:14;
23:4,6,24;24:8;39:25;
53:5
**proponent (3)**
33:18,21;54:17
**proponents (6)**
23:2;25:19,20;
37:18;52:21;56:1
**proposal (2)**
72:7;90:24
**Proposed (4)**
3:2,12,24;96:17
**protect (4)**
33:18;36:2;50:19;
73:11
**protection (1)**
33:20
**prove (1)**
65:8
**proverbial (2)**
18:1;23:20
**provide (14)**
18:25;19:5;24:11,

13,21;27:12,20;
33:20;43:17;46:2;
53:23;88:20;93:1;
99:14
**provided (8)**
18:20;21:15;23:15;
24:6;25:9;36:7;41:10;
88:16
**provides (15)**
21:1,3,21;22:2;
23:3,24;24:5;25:7;
39:10;44:15;46:1;
53:1,2;98:18;112:15
**providing (3)**
38:24;39:13;53:8
**provincial (1)**
77:11
**provision (5)**
39:20;70:10;78:18;
92:22;100:9
**provisional (21)**
22:17,22;29:6;
47:21;73:10,24;74:6,
8,16;87:14;90:9;92:4;
100:15;102:8,10,10,
15;103:5,22;107:7;
115:2
**provisionally (1)**
22:14
**provisions (4)**
20:22,24;52:22;
94:6
**prudent (1)**
113:16
**pulling (1)**
36:17
**purchase (1)**
26:6
**pure (3)**
36:22;89:14,14
**purge (1)**
53:24
**purporting (2)**
43:23;52:1
**purports (1)**
80:23
**purpose (9)**
20:2;25:4;43:17;
39:6,11;86:25;87:6;
102:16;113:4
**purposes (1)**
111:10
**pursuant (6)**
19:13;52:23;75:8;
87:4,23;88:10
**pursue (2)**
70:12;115:7
**put (14)**
51:8;63:5;66:9;
68:18;73:4;75:19;
78:17;79:15,16;
93:10;99:7,12;
103:25;113:19

**putting (3)**
26:1;55:25;56:1

## Q

**Quadrangle (1)**
10:13
**quasi-holdings (1)**
103:6
**quickly (1)**
109:15
**QUINN (2)**
11:11,19
**quite (1)**
18:17
**quo (2)**
74:1,17
**quote (1)**
27:5
**quotes (1)**
84:20
**quoting (5)**
71:4;73:2,4;78:16;
81:17

## R

**raise (2)**
72:16;99:20
**raised (5)**
29:17;40:20,20;
46:21;115:10
**raising (2)**
30:19;41:15
**ramifications (1)**
86:11
**ramp (1)**
25:12
**ran (1)**
102:18
**Rather (3)**
24:1;63:12;114:10
**re (1)**
4:11
**reach (3)**
16:18;23:19;43:23
**reached (1)**
116:18
**Read (16)**
28:21;61:3;67:18,
18,19,21;74:10;
76:17;79:23,23,24;
92:10;93:8;98:12,13;
114:15
**reading (4)**
18:10;38:13,17;
87:16
**reads (1)**
79:21
**ready (1)**
43:4
**real (4)**
29:18;40:13;50:2;

70:13
**reality (1)**
86:8
**really (15)**
15:22;17:10;18:17;
26:15;27:16;28:8,16;
30:6;36:25;54:5;
67:15,16;85:6;89:13;
91:10
**real-world (1)**
26:5
**reason (4)**
55:23;84:19;98:6;
111:16
**rebut (1)**
75:20
**Rebuttal (1)**
4:18
**rebutted (2)**
110:11,11
**recalcitrant (1)**
24:1
**received (1)**
74:12
**recently (1)**
26:12
**recognition (74)**
20:15;21:14,25;
22:12;23:15;29:8;
30:1,16;31:23,25;
32:15,15,18,19,22;
33:3;34:3,15;35:18;
41:6,6,19;43:5,12,12;
44:11,11,24,25;45:1,
4,7,12;47:3,4,5,12,15;
48:12,13,17;49:17;
61:21;72:2,3;75:12;
89:22;90:25;91:11;
95:21;97:4;103:8,9;
107:15,20;108:3,4,12,
25;109:10,14;110:3,
7;111:11,19,19;112:7,
9,12;113:2,8,22;
115:7,12
**recognized (17)**
17:23;62:5,9,18,22;
71:19,23,24;75:9,17;
76:1,4,13;81:8,22;
105:1,5
**recognizes (1)**
43:3
**Recognizing (2)**
18:1;113:17
**Record (19)**
3:22;14:4;15:17;
26:21,21;28:17;
54:10,12,19,23,24;
55:11;70:3;90:18;
97:11;98:17;100:23;
101:24;107:22
**recordings (1)**
77:7
**records (1)**

27:9
**reduces (1)**
116:19
**Reed (70)**
3:4,5,6,14,15,16,23;
4:12;7:2,13;14:15,15;
26:14;30:16;31:24;
36:16,20;37:11;38:1,
4,12;43:2,3,11;44:18;
45:9,18;47:17;49:18;
57:19;58:4,21,22,25;
59:1,4;61:9;64:24,25;
65:16;68:21;72:5;
73:9,11;76:9;80:13;
82:1,2,3;87:11,14;
90:10;96:6;97:9;
100:23;102:5,17,24,
25;103:3,21;105:11;
106:10,11,13,14,14;
109:18,19;117:4
**refer (1)**
102:19
**reference (2)**
73:20;82:10
**referenced (1)**
72:24
**references (1)**
31:15
**referred (1)**
27:6
**refusal (3)**
25:14;32:23;46:6
**refuse (2)**
17:7;49:14
**refused (5)**
23:21;25:10;34:14;
45:21;99:25
**refuses (1)**
18:7
**refusing (3)**
45:5;51:23;95:23
**regard (8)**
18:23;20:8;23:11;
34:2;88:19,20,25;
89:2
**regarding (3)**
57:1,4,11
**regardless (1)**
17:11
**regional (1)**
27:11
**register (1)**
105:9
**registered (1)**
27:10
**registration (1)**
47:3
**registry (6)**
26:23;46:7;54:21;
55:5;96:21,24
**registry's (1)**
27:11
**regular (1)**

55:22
**regulation (2)**
21:9;39:3
**regulatory (5)**
35:20;36:1;53:21,
25;77:3
**rejecting (1)**
103:14
**related (17)**
3:6,11,16;4:2,6,13,
18,24;5:5;28:3;30:13;
51:18,21;53:9,13;
83:17;106:16
**relating (1)**
39:3
**releases (1)**
29:1
**relevance (1)**
50:9
**relevant (3)**
20:9;44:9;55:14
**reliance (2)**
54:20,23
**relied (1)**
34:15
**Relief (3)**
3:11;20:11;28:16
**relitigate (1)**
16:15
**relitigating (1)**
48:3
**relitigation (1)**
40:20
**reluctance (1)**
70:12
**reluctant (3)**
18:2;52:20;70:18
**remains (1)**
43:4
**remarkable (2)**
90:17,17
**remarkably (1)**
100:16
**remarks (2)**
57:1,10
**remember (1)**
116:19
**remotely (2)**
65:3;96:23
**removed (3)**
22:19;90:7,8
**reorganization (2)**
19:24;80:1
**Reorganized (45)**
3:11,20;4:22;8:3,
21;13:8;14:6;15:11;
21:22,23,24;22:6;
23:9,14,19,24;24:2,6;
25:8,25;26:22;29:5;
37:18,20;43:25;
48:18,20;50:11,14;
53:17;69:17,18;
73:22;77:4;89:11,19;

92:2;101:25;102:19,
21;105:8;111:4,7;
114:25;116:5
**rep (2)**
48:16;111:21
**repeat (2)**
53:14;58:18
**repeatedly (2)**
41:21;64:3
**repetitious (1)**
57:23
**Reply (13)**
4:16,22;37:12;42:7;
45:19;58:10;75:19;
78:5;79:12,13;80:19;
87:10,15
**reports (1)**
102:13
**represent (5)**
61:24;91:24;92:1,2;
102:7
**representation (3)**
109:5,6,7
**representations (2)**
65:24,25
**Representative (14)**
3:10;4:17,23;55:7;
102:9;111:7,10,12,22,
25;112:11;113:4;
114:24;115:6
**representatives (1)**
23:19
**representative's (1)**
87:13
**represented (3)**
55:18;87:14;105:18
**representing (2)**
57:24;108:20
**represents (1)**
88:19
**request (3)**
52:22;58:15;89:1
**Requests (1)**
59:3
**require (9)**
16:14;18:19;21:16;
38:13;56:15;64:4;
77:10,19;105:15
**required (13)**
18:13;19:2;39:24;
45:17;49:9;53:4;
59:15;77:7,11;83:12;
87:5;107:22;113:20
**requirement (2)**
21:9;106:17
**requirements (4)**
68:5,7,9;102:15
**requires (8)**
18:4;20:8;30:14;
38:14;79:11;86:16;
87:22;97:4
**requiring (1)**
52:23

**requisite (3)**
55:3;77:3,10
**res (4)**
40:17,19;72:17,18
**reserve (1)**
56:5
**residents (2)**
88:1,17
**resign (2)**
47:22;90:7
**resigned (1)**
22:9
**resist (2)**
109:11;111:17
**resisting (2)**
42:21,25
**resolved (2)**
25:3;100:19
**resort (1)**
50:3
**resources (2)**
27:19;41:4
**respect (9)**
42:12;57:7,11;67:4;
68:21;103:23;104:5;
107:6;115:11
**respectfully (2)**
86:25;89:1
**respective (3)**
23:8;51:18;53:9
**respects (1)**
63:25
**respond (9)**
29:14;48:16;57:20;
80:20;87:9,15;
102:11;114:9
**respondent (7)**
58:7;61:22,23;
68:22;69:12;89:18;
108:14
**respondents (1)**
42:22
**respondent's (1)**
61:23
**responding (1)**
108:8
**Response (11)**
4:12,16;43:3,18;
87:8,8;108:11;
112:20,25;115:1,3
**responses (1)**
58:7
**responsibility (1)**
90:22
**responsible (2)**
91:3;97:19
**rest (2)**
39:4;101:20
**restatement (4)**
65:25;78:1;79:10,
10
**restriction (2)**
24:9;34:18

**restructuring (3)**
44:15;70:24;76:25
**result (3)**
16:10;49:25;71:7
**retain (1)**
17:11
**retained (2)**
23:5;27:9
**review (2)**
115:19,20
**revisit (1)**
41:1
**rhetorically (1)**
107:17
**rich (1)**
45:11
**RICHARD (1)**
7:10
**RICK (1)**
13:3
**ridiculous (1)**
94:8
**ridiculousness (1)**
90:23
**right (26)**
15:15;24:21;36:15;
37:8;52:10;61:13;
62:7,11;65:16;69:9;
70:5;73:13;74:21;
76:16;80:8;81:3;83:1,
20;84:6,7,8;95:7,7;
96:4,18;116:24
**rights (9)**
25:21;26:7;45:11,
13;71:5,7;73:11;
74:17;79:1
**RIMON (3)**
10:11;11:2;14:24
**risk (17)**
26:2;29:13;32:5,6,
11,13;34:2,11;55:25;
56:1;69:8;70:14,23;
91:2;96:22,24;102:4
**roadmap (1)**
32:14
**role (1)**
71:17
**roll (1)**
101:20
**Roman (1)**
75:5
**Romanette (1)**
51:17
**room (1)**
100:1
**roughshod (1)**
79:1
**rounding (1)**
116:19
**ROZNOVAK (1)**
11:25
**RUDEWICZ (1)**
12:8

**rule (10)**
21:9;39:3;40:22;
48:24;57:11;68:1;
87:5,21,22,23
**Rules (6)**
24:10;39:9;59:16,
16;68:2;87:23
**ruling (1)**
98:7
**run (3)**
47:11;79:1;105:20
**runoff (1)**
109:6
**runs (1)**
102:16
**ruse (1)**
49:23

**S**

**SABINO (1)**
10:8
**safe (1)**
99:25
**sailed (1)**
40:16
**same (7)**
16:4;24:3;35:15,20;
48:4;77:13;98:1
**sanctionable (2)**
65:22;109:22
**sanctioned (2)**
49:20;50:22
**Sanctions (24)**
3:20,21;4:17,23;
15:16;25:13;28:6,8;
30:11;33:1;49:15,17;
53:15;57:20;58:1,8,
15;59:14;77:17;84:5;
87:11;89:2;101:19;
112:4
**sanctity (1)**
50:19
**sat (1)**
100:22
**satisfied (1)**
33:12
**satisfy (2)**
17:2;68:6
**satisfying (1)**
68:4
**sauce (1)**
35:4
**Savings (3)**
9:14;15:5;56:23
**saw (3)**
27:22;46:14;91:22
**saying (22)**
20:20;35:12;48:12,
15;66:14;74:7;76:11;
80:10;84:11;91:7,12;
93:1,13;94:18,20,22;
97:20;98:3,11;105:8;

108:11;109:11
**Scheduled (3)**
4:5;5:4;116:12
**SCHWARTZBERG (1)**
12:9
**scope (2)**
39:17;79:21
**scratch (1)**
35:4
**screaming (1)**
66:5
**screen (2)**
55:19;105:19
**scurrilous (1)**
109:18
**SDNY (2)**
54:17,22
**Second (6)**
61:15;64:13;65:19;
97:15;111:2;113:6
**secret (1)**
35:3
**Section (36)**
18:3,7;20:1,4;21:2,
21;22:2;23:3,11;24:4;
33:14;34:24;35:15;
36:7,21;37:2,9,13,16;
38:5,8,15,24;39:9,17;
44:1;46:1;51:14,16;
52:23;53:1;78:16;
81:20;105:14;114:18,
19
**sections (3)**
16:13;19:13;37:14
**securities (1)**
69:7
**security (1)**
17:16
**seeing (1)**
63:7
**seek (22)**
20:15;28:15;30:1,
16;31:25;32:15,17;
34:14;41:6;45:12;
46:23;47:15;94:4,10;
104:12;108:3,3;
112:7,12;113:2,9,22
**seeking (8)**
32:22;33:1;42:20;
46:9;52:3;54:20;
111:11;116:7
**seem (2)**
30:18;116:22
**seems (4)**
68:23;79:13;88:25;
108:19
**SEGAL (12)**
8:2,2;14:6,6;15:10;
89:10,10;101:25,25;
111:4,4;116:5
**Self-serving (1)**
31:11
**send (1)**

108:16
**sense (1)**
62:4
**sent (1)**
38:1
**sentence (1)**
39:5
**separate (4)**
94:1,2;98:1;104:9
**serious (3)**
81:18;101:16;
110:18
**serve (1)**
106:25
**served (6)**
59:15;87:3;106:21,
22,24;109:17
**service (11)**
59:10;80:12;87:4,7,
22;88:4,6,7,8,11;89:3
**set (5)**
16:4;36:10;53:14;
70:7;109:21
**Seventh (1)**
10:4
**seventy-five (1)**
34:6
**several (3)**
58:5;61:25;78:11
**sewing (1)**
25:5
**shall (17)**
20:3,4;21:7,20;
22:5,9;23:9;39:7,7,11,
12;51:14,14;61:17;
78:20;89:25;98:19
**shareholder (2)**
34:8;71:10
**Shareholders (43)**
3:23;10:3;15:17;
34:7,9,10,12;50:13;
55:2,12,16,18,19;
57:25;58:5;63:11,18;
64:25;67:11;70:3;
71:6,7,8;75:24,25;
76:10;82:24;87:12,
13;96:16;97:9,13;
100:21;105:11,17,19,
22,23,23;107:6,11,12;
115:3
**shareholders' (2)**
71:5;115:1
**shares (20)**
34:6,9,19;41:7,10,
11;45:24,24,25;62:24,
25;71:25;77:2;78:20;
80:25;81:9,16;98:12,
15;105:13
**SHAUGHNESSY (3)**
8:17;14:7;22:21
**Shemen (3)**
13:7,9;81:23;
108:25

**shenanigans (1)**
47:20
**shifts (1)**
44:15
**ship (1)**
40:15
**shipping (2)**
28:4;47:11
**ships (1)**
26:3
**shocked (1)**
97:11
**shocking (2)**
17:6,13
**shortcut (3)**
83:12;84:13;86:18
**shortcuts (1)**
71:13
**shouting (1)**
66:5
**show (6)**
64:7;65:4;71:20,22;
95:14;102:16
**showing (4)**
41:25;65:4;83:23;
91:11
**shown (1)**
82:6
**shows (3)**
81:25;97:3;101:2
**Shumate (1)**
79:17
**side (2)**
16:9;85:10
**sides (2)**
82:22;108:23
**side's (1)**
113:14
**SIDLEY (4)**
10:2;14:19;83:5;
112:21
**signatories (1)**
88:2
**significant (7)**
33:16;49:15;56:12;
68:4;69:8;70:22;
72:19
**significantly (1)**
70:20
**silliness (1)**
99:10
**silly (1)**
109:19
**similar (4)**
35:22;44:8;68:7,11
**Similarly (3)**
38:18;54:15,18
**simple (7)**
28:10;84:25;98:16;
100:16;101:17;108:2,
22
**simplicity (1)**
92:8

simply (12)
15:20;21:18;28:8;
37:13;39:21;55:21;
61:2;84:9;85:23;
111:11;113:16;114:4

single (2)
79:3,3

sit (1)
100:1

site (1)
78:20

situation (3)
17:14;45:5;84:19

six (3)
60:8,13;72:12

Sixth (1)
40:21

Skadden (1)
47:10

slipped (1)
62:13

sloppiness (1)
58:1

sloppy (1)
58:3

Smart (1)
88:7

SMEs (1)
26:2

Smith (66)
3:4,5,6,14,15,16,24;
4:12;7:2,13;14:15,15;
26:14;30:16;31:24;
36:16;37:11;38:1,4;
43:2,3,11;44:18;
45:19;47:17;49:18;
57:19;58:4,21,22,25;
59:1,4;61:9;64:24,25;
65:16;68:21;72:5;
73:9,11;76:9;80:13;
82:1,3,3;87:11,14;
90:10;96:6;97:9;
100:23;102:5,17,24,
25;103:3;105:11;
106:10,11,13,14,14;
109:18,19;117:4

Smith's (4)
36:20;38:12;45:9;
103:21

snippets (1)
43:16

Society (3)
9:14;15:5;56:23

sole (1)
25:4

solely (2)
86:25;87:6

SOLOMON (39)
7:9;14:14,15;22:17;
48:15;52:9;57:17;
61:6;66:17,21,23;
67:1;69:18,21,24;
70:5;73:2,18,23;74:8;

82:13;83:6,22;91:23;
93:8;102:2;104:1,16,
23;106:7,7,10;108:13,
25;109:3;113:12;
116:14,18;117:4

Solomon's (1)
84:17

SOLOW (1)
7:10

solutions (1)
72:8

somebody (8)
91:14;92:11;95:14,
21,23;104:16;108:6;
116:14

somehow (7)
16:18;28:2;33:6;
40:7;43:21;45:20;
68:24

someone (5)
91:20;94:19,20,25;
114:8

somewhere (1)
48:21

soon (2)
47:16;59:18

sorry (4)
45:19;83:7;114:8;
115:24

sort (4)
58:7;105:11;
109:18,19

sought (8)
17:1;31:6,8;42:2;
44:11;50:1;101:13;
108:25

Southern (3)
88:5;94:11;107:21

SPARKMAN (1)
12:16

speak (3)
41:13;100:1;114:8

SPEAKER (3)
61:5;117:15,17

speaking (2)
71:5;103:5

Spears (24)
3:10;13:9;23:19,25;
24:19;46:10;61:4,9;
63:3,12,20,22;76:3;
92:3;97:18;102:22;
108:15;111:6;112:1,
11;113:3,24;114:24;
115:6

specific (4)
31:21;88:14;
101:14;111:24

Specifically (4)
18:10;23:12;46:1;
87:9

specificity (1)
85:1

specifics (1)

85:18

specified (1)
88:16

specifies (1)
55:4

speculative (1)
68:17

spend (1)
33:23

spent (3)
27:18,19;101:4

spilled (1)
54:5

spin (1)
43:15

spinning (1)
49:18

squatters (2)
29:6;100:14

squatting (2)
24:2;25:14

staff (1)
94:6

stage (1)
34:20

stages (1)
113:22

standard (2)
17:2;50:3

Star (2)
58:14;59:13

start (2)
35:10;101:17

started (3)
30:19;53:20;83:15

starting (2)
38:23;93:23

state (7)
15:20;38:19,20;
39:2;77:11;79:18;
109:8

stated (1)
52:18

statement (7)
32:6;33:9,25;38:7;
66:15;75:3;115:25

statements (1)
17:8

STATES (14)
12:2,3;20:1,11;
28:24;31:12;79:13;
81:15;86:8;87:10;
88:2,20;92:19;108:6

stating (1)
19:5

status (4)
74:1,17;82:11;
85:16

statute (12)
16:7;18:17;37:4;
38:6;43:21;79:23,24;
81:18;111:11,25;
114:4,15

statutes (2)
69:14;75:22

statutory (2)
18:7;20:5

stay (10)
17:1;29:18;32:2;
41:23;42:2;46:23;
47:16;50:1,12;101:13

stayed (6)
82:14,15,19,20;
83:1;101:9

stays (2)
100:3;101:15

step (12)
26:17,20;28:18;
32:25;83:15,20,21,22,
23,24;84:1;100:9

STEPHEN (2)
9:10;14:12

stepping (1)
37:16

steps (6)
34:13;38:15;40:5;
59:11;75:8;98:4

still (11)
17:25;25:2;48:23;
57:5;81:13;85:7;
89:23;90:8;103:18;
109:4;116:4

stink (1)
97:17

stipulation (3)
48:5;59:18;104:10

stock (10)
21:4,6,20;34:24;
35:1,18;64:8,8,20;
78:16

stood (1)
16:20

stop (2)
101:3;109:13

stopped (4)
63:20,22,23;73:9

stopping (1)
114:2

story (1)
40:10

straight (1)
39:19

straightforward (2)
87:19;88:25

straw (7)
24:15;30:5,12;
36:22;37:1;40:7;44:7

straw-man (1)
15:23

Street (3)
5:22;7:15;11:21

stripping (1)
71:6

strong (1)
113:19

structure (1)

64:10

stuck (1)
59:25

Study (1)
88:7

stuff (6)
17:3;36:25;82:17;
90:18;99:20;108:18

subject (13)
20:16;29:10;42:24;
44:6;46:15;55:14,17,
20;77:17;80:25;
95:25;105:24;107:1

subjected (1)
22:19

submit (9)
27:20,20,23;54:18;
99:13;113:21;115:14;
117:6,7

submitted (6)
27:14;42:4;74:11,
15;115:19,21

submitting (1)
87:10

subsidiaries (5)
23:8,11,13;24:20;
25:25

substantial (1)
73:6

substantially (4)
89:24,25;98:19;
100:11

substantive (1)
80:21

substitute (1)
68:8

subterfuge (3)
89:14;97:21;99:9

sue (2)
108:4,6

sued (2)
108:17;109:1

sufficient (3)
34:9;42:8;63:16

suggest (1)
82:2

suggestion (4)
68:23;69:10;74:19;
75:5

Suite (5)
5:22;8:5;10:14;
11:22;12:5

SULLIVAN (2)
11:11,19

summing (1)
72:7

Sunday (2)
60:9;72:12

Suntech (1)
44:17

super (2)
90:6;99:16

supervision (1)

24:8
**supplement (1)**
62:15
**supplier (1)**
45:5
**supply (1)**
45:5
**Support (8)**
4:21;29:11;31:5,13;
51:1;56:21;103:21;
112:17
**supported (1)**
43:20
**supposed (5)**
29:12;73:25;74:2;
79:7;94:9
**Supreme (4)**
29:20;42:19;79:14;
101:9
**sure (2)**
72:4;74:2
**surprise (1)**
31:6
**surprisingly (1)**
50:14
**suspicion (1)**
108:7
**swap (1)**
71:25
**swapped (1)**
64:15
**swiftly (1)**
65:23
**switch (3)**
45:10;63:5;81:8
**switched (1)**
81:3
**syllable (1)**
107:19

**T**

**tactic (1)**
30:19
**tale (1)**
49:18
**talk (7)**
31:11;59:8;65:6;
75:3;95:18,19;100:3
**talked (2)**
63:18;89:12
**talking (15)**
28:1;34:20,24;
60:18;68:1;75:23;
80:1;81:21;84:17,23;
92:8;100:8;106:16,
23;110:12
**talks (1)**
95:3
**tangible (1)**
31:13
**target (1)**
102:24

**task (2)**
18:9;29:23
**taxpayer (1)**
94:5
**teeth (1)**
29:21
**telegraphing (1)**
48:13
**telling (8)**
16:23;36:25;48:8;
62:13;63:6;64:15;
79:4;82:17
**tells (1)**
41:17
**ten (1)**
77:13
**terminate (1)**
73:5
**terms (6)**
19:16;21:24;28:9;
66:19;74:12;105:16
**tested (1)**
95:3
**testimony (1)**
105:20
**theater (1)**
49:8
**theirs (2)**
24:1;46:7
**thereabout (1)**
19:22
**thereby (1)**
20:5
**therefore (3)**
30:15;81:9;107:1
**third (2)**
37:25;64:21
**third-party (5)**
27:11;33:5,7,8,21
**thirty (1)**
52:17
**though (2)**
26:14;94:14
**thought (7)**
20:18;73:20;91:10,
20;95:8;97:4;101:12
**thread (1)**
89:20
**threat (5)**
25:16;61:25;62:1,2,
2
**threaten (1)**
76:5
**threatened (5)**
61:8,9,10,11,11
**threatening (1)**
108:16
**three (9)**
16:19;41:2,9;63:25;
97:12;99:17;100:21;
105:17,19
**throughout (2)**
17:9;103:1

**throw (1)**
15:23
**thrown (1)**
58:9
**throw-the-book-at-him (1)**
58:8
**thug (1)**
61:3
**Thursday (1)**
38:2
**Thus (5)**
37:19;41:24;52:21;
87:17;88:23
**Timbuktu (1)**
41:19
**times (18)**
17:9;18:17;30:4;
31:23,24;59:21,23;
60:14;62:9;69:4;78:1,
11;79:6;100:2,22;
110:8,19;112:6
**TINA (3)**
9:19;15:4;56:22
**today (10)**
14:16;49:14;89:18;
91:25;101:19,19;
108:8,14;116:7;
117:10
**together (2)**
18:18;35:5
**TOGUT (12)**
8:2;14:6;15:10;
81:19;89:10;101:25;
102:20;104:7,7,9;
111:4;116:5
**Toisa (1)**
47:3
**told (16)**
31:8;34:10;48:9;
60:13;70:7;72:10;
82:23;85:19,23;
92:17;96:15;104:17;
107:17,18;110:4,5
**tomorrow (1)**
33:3
**took (7)**
25:3;32:1,13;34:13;
44:16;47:19;59:11
**top (2)**
55:19;95:1
**top-right (1)**
105:18
**totally (5)**
36:21,24;44:5,25;
45:22
**towards (1)**
28:12
**Tr (4)**
3:3,3,13,13
**track (2)**
28:17;97:11
**transactions (2)**
68:13;70:14

**Transcribed (1)**
5:20
**transcript (1)**
104:23
**transfer (12)**
18:14;39:25;45:24;
51:25;53:4;56:17;
63:10,11;64:20;81:6;
98:12;105:7
**transferred (2)**
45:24;105:3
**translate (1)**
74:15
**translation (8)**
48:1,4,14;50:7;
74:12,13;91:16;98:6
**Travelers (1)**
42:20
**trend (1)**
84:3
**trial (1)**
46:20
**tried (3)**
76:5;78:5;106:25
**true (4)**
39:13;43:11;104:2,
3
**trumpeting (1)**
42:15
**Trust (2)**
14:20,20
**Trustee (10)**
3:5,15;12:3;15:6;
56:4,24;57:2;63:19;
84:7;114:16
**try (12)**
23:20;28:25;30:7,
17,23;32:9;34:17;
40:8;50:12;51:7;
61:24;95:13
**trying (21)**
26:3;36:22;42:17;
50:6,6;53:21;54:21;
57:6;63:22;65:9;67:6,
10;70:1,6;89:14;
92:14;93:21;106:12;
111:9;112:1;114:8
**tune (1)**
42:12
**turn (5)**
32:11;49:1;51:2;
86:21;111:2
**turned (1)**
36:1
**TWEH (1)**
8:20
**twelve (5)**
62:9;69:4;76:20;
77:13;110:8
**twenty (1)**
48:2
**twenty-eight (1)**
103:15

**twice (1)**
60:9
**twist (1)**
37:1
**two (17)**
19:2;30:13,15;
44:12;49:7;65:11;
91:12;93:19;99:2;
101:4,4;103:10;
105:9,20,22;106:7;
113:11
**twofold (1)**
77:25
**two-hours- (1)**
104:14
**two-year (2)**
16:11;27:18
**TX (1)**
11:23
**type (1)**
88:13
**typical (2)**
19:22;23:16
**typically (1)**
92:18

**U**

**UDAY (1)**
13:6
**ultimately (1)**
72:8
**unable (1)**
56:5
**unambiguous (5)**
16:5,6;65:5,6,7
**unambiguously (1)**
25:7
**unbelievable (1)**
103:18
**uncertainty (6)**
28:20,22;56:3,12;
57:4,8
**under (38)**
17:17,19,21;21:8;
22:18;27:15;33:16;
34:5,5,25;35:1;37:9;
48:17;51:13,16,16;
53:7;56:17;64:18;
65:1;77:11;78:9;79:2,
24;80:5,7,24;84:9;
87:21;92:6,11;111:1;
113:20,25;114:4,18,
19;115:8
**understandably (1)**
56:4
**understood (3)**
63:15;71:13;85:24
**undertaking (1)**
45:12
**undertook (1)**
75:6
**unethical (1)**

49:23
**unfortunately (1)**
15:22
**UNIDENTIFIED (3)**
61:5;117:15,17
**unilaterally (1)**
16:23
**Unit (1)**
14:20
**UNITED (11)**
12:2,3;20:11;28:24;
31:12;79:13;86:8;
88:2,20;92:19;108:6
**universe (1)**
43:20
**unlawfully (1)**
25:22
**Unless (7)**
15:12;44:24;49:1;
50:22;81:7;94:9;
113:17
**unlike (3)**
33:15;34:4,18
**unlikely (1)**
68:8
**unnamed (3)**
58:16,16;59:13
**unnecessary (1)**
32:25
**unquestionably (3)**
21:11;40:3;49:19
**unreasonable (1)**
88:22
**unrebutted (2)**
59:6;67:8
**Unsecured (3)**
9:3;14:11;51:4
**unstayed (3)**
19:3;29:19;48:9
**unwilling (1)**
52:24
**up (26)**
25:12;28:16;29:11;
34:16;37:14;40:25;
41:3;44:4;45:19;
63:21;67:17;72:7;
91:11;92:19;93:10;
95:1,7,11,14;98:23;
99:21;100:2,5;101:7,
14;103:6
**update (4)**
26:20;46:6,8;54:21
**updated (3)**
33:2;44:22;49:11
**updating (6)**
27:17;29:14;40:4;
96:25;98:17;105:9
**upon (5)**
17:19;46:13;54:14;
70:7;115:22
**upsetting (1)**
102:4
**urge (3)**

50:18;56:14;57:11
**URQUHART (2)**
11:11,19
**US-based (1)**
35:16
**use (10)**
24:7;35:3;45:15,21;
54:9;55:21;62:16;
86:16;94:12;107:9
**used (5)**
34:2;35:21;46:5;
102:6;111:23
**using (2)**
35:15;110:3
**utter (1)**
20:13
**utterly (1)**
109:20

**V**

**vacate (1)**
74:20
**vacating (1)**
24:22
**vague (2)**
24:16;43:14
**various (2)**
72:1;112:12
**vast (2)**
25:23;59:13
**venture (1)**
30:3
**vest (3)**
23:9,14;71:5
**vested (1)**
43:25
**vesting (2)**
17:18,20
**vests (1)**
25:8
**VH (1)**
99:6
**Via (1)**
5:3
**Vice (1)**
35:22
**view (2)**
72:25;106:3
**VIIIa3 (1)**
75:6
**violate (17)**
41:7;42:1;60:14,21,
23;64:5;66:4,11;67:6,
10;68:15,15,24;
77:21;94:15,24;
107:25
**violated (4)**
47:12;70:19;74:17;
82:4
**violates (3)**
38:22;40:9;110:2
**violating (33)**

15:23;16:7;17:6,9;
19:4;21:11,16,17;
22:4,8,12;23:21;24:4,
12,25;25:16,22;
29:16;34:21,21;36:5,
21;37:6,22;42:4;45:4;
46:14;47:18;49:3,12;
70:15;89:16;106:18
**violation (7)**
22:23;25:4;40:12;
43:19;72:14;92:16;
95:6
**virtually (1)**
82:15
**virtue (1)**
54:24
**void (1)**
63:10
**voila (1)**
39:18
**volatile (1)**
15:25
**voluntarily (6)**
22:19;28:22;29:7;
42:6;55:15;86:3
**vote (7)**
21:10,12,16;34:6;
42:14;75:25;107:1
**voted (4)**
17:17;45:10;56:8;
105:23
**votes (3)**
42:13;48:6;55:19
**Voyager (2)**
19:23;84:20

**W**

**WADE (1)**
9:9
**wait (1)**
99:24
**waiting (1)**
56:7
**waivable (1)**
33:11
**waive (3)**
33:11;36:4,8
**waiver (7)**
36:5,7;71:2;72:20
**waiving (1)**
87:7
**wake (1)**
40:25
**walk (3)**
76:13;77:15,16
**walking (1)**
64:12
**wall (1)**
15:24
**wants (3)**
39:2;84:4;101:10
**wasted (1)**

103:10
**way (19)**
25:17;28:12;30:1;
32:7;35:19;56:11;
58:3,6;60:1;61:15;
63:23;69:11;74:12,
18;75:3;92:24;97:25;
113:21;114:19
**ways (3)**
60:8;62:12;72:12
**website (6)**
27:4,5,23;92:10;
96:20;99:13
**Wednesday (4)**
100:18;116:3,12,13
**week (1)**
48:15
**week-long (1)**
46:20
**weeks (2)**
91:13;99:21
**weight (1)**
22:21
**welcomes (1)**
57:19
**weren't (3)**
32:16;45:24;47:8
**West (1)**
11:21
**whack-a- (1)**
103:24
**what's (7)**
54:1;66:4;82:11,17;
93:13;103:8;110:1
**whereas (1)**
38:15
**Whereupon (1)**
117:20
**Who'd (1)**
15:9
**whole (6)**
24:14;35:8;49:19;
58:15;81:6;111:8
**Wholesale (1)**
40:22
**wholly (1)**
65:20
**wholly-owned (1)**
25:25
**Who's (3)**
58:4;61:13;105:18
**whose (1)**
48:17
**who've (1)**
100:21
**Wiles (7)**
19:22;20:8;21:14;
34:10;35:24;43:8;
84:20
**WILLIAM (4)**
10:7;14:18;83:4;
112:21
**willing (4)**

25:16;43:4;48:5;
101:6
**willingness (1)**
113:14
**Wilmington (4)**
7:16;9:14;15:5;
56:23
**Wilson (1)**
96:8
**wire (1)**
37:25
**wish (11)**
16:13;51:1;56:20;
82:25;86:21;89:7,8;
101:23;110:23;
112:17;117:12
**withdraw (1)**
33:2
**withdrawal (2)**
104:11,13
**withdrawing (1)**
53:25
**withdrawn (1)**
54:1
**withheld (1)**
48:7
**without (32)**
21:1,7;22:15;23:1;
24:8,23;28:5;29:21,
21;34:6;36:11,11,12;
40:22;46:22;47:2,15;
52:5,6;58:9;61:18;
62:13;63:6,7;64:15,
16;65:24;67:11;69:6;
70:22;79:9;106:1
**witnesses (1)**
96:14
**WOLFE (1)**
13:10
**won (1)**
41:16
**wonder (1)**
79:14
**word (3)**
31:22,23;117:8
**words (7)**
35:7;39:2;60:1;
73:4;92:10;104:24;
107:19
**work (2)**
46:7;92:18
**worked (1)**
56:9
**works (5)**
21:19;36:6,15;43:7;
93:7
**world (4)**
28:19;44:14;48:21;
107:12
**worlds (1)**
111:23
**worried (1)**
95:14

**worry (3)**
60:10,11;99:3
**worst (1)**
84:13
**worth (3)**
18:10;30:8;37:16
**wrinkle (1)**
111:9
**write (2)**
29:2;39:2
**writing (1)**
63:21
**written (9)**
27:15,20,21;61:18;
81:19;92:11;96:20;
99:14;105:12
**wrong (12)**
36:24;54:8;62:7,13;
71:3;72:5;73:14;75:5;
106:11,13,13,15
**wrote (5)**
34:17;48:15;61:4;
101:4;103:13
**Wuxi (1)**
44:17

## X

**XIII (1)**
36:11

## Y

**year (1)**
19:23
**years (7)**
44:12;49:7;52:17;
56:7;101:4;103:10;
105:20
**years' (1)**
85:21
**yelling (1)**
92:20
**yesterday (1)**
61:7
**York (13)**
7:5;8:6;9:5,17;
10:5;11:6,14;12:6;
54:24;88:5;94:11;
107:21;109:8

## Z

**zealously (1)**
61:24
**zero (2)**
31:23,24
**ZIDE (2)**
9:10;14:12
**Zoom (1)**
5:4

## 1

**1 (1)**
87:10
**10 (1)**
82:16
**10.1 (1)**
19:14
**10:00 (4)**
4:4,6;5:3,5
**100 (2)**
10:13;11:4
**10016 (1)**
11:14
**10017 (1)**
11:6
**10019 (1)**
10:5
**10022 (1)**
7:5
**10036 (2)**
9:5,17
**10119 (1)**
8:6
**10-2536 (1)**
8:22
**102-page (1)**
51:10
**10707 (1)**
12:6
**1095 (1)**
9:4
**10th (1)**
83:2
**11 (15)**
3:3,5,13,15;16:8;
19:11;44:5;45:6;
46:25;47:9;52:19;
70:25;71:1,9,10
**1-11 (1)**
4:24
**1123a5I (2)**
34:16;46:1
**1132 (2)**
3:7,17
**1141 (5)**
33:14;34:13;37:9,
17;97:25
**1141a (1)**
17:17
**1141b (2)**
17:19;24:11
**1141c (1)**
17:22
**1142 (30)**
20:5;33:14;34:13,
16;36:21;37:2,13,18;
38:5,8,11,13,13,15,
18;52:23;53:7;78:25;
79:4,17,22,25;80:2;
84:17,18;93:8,11;
98:1,2,24

**1142a (5)**
18:4;20:1;38:24;
39:16;51:14
**1142a's (1)**
39:17
**1142b (7)**
18:8,10;39:16,22;
40:3;53:1;105:14
**1142b's (1)**
39:17
**1155 (1)**
9:15
**11753 (1)**
10:15
**11771 (1)**
12:14
**1-19 (1)**
3:25
**12 (2)**
3:2,12
**12.4 (2)**
89:24;98:18
**12.9 (1)**
19:14
**12/16/2024 (2)**
4:4;5:3
**12:30 (1)**
117:20
**1201 (1)**
7:15
**1267 (2)**
4:9;5:7
**1268 (7)**
4:8,14,19,24;5:7;
15:19;111:1
**1269 (2)**
111:5;114:25
**1274 (2)**
4:8;5:7
**1275 (2)**
4:7;5:6
**1277 (2)**
4:8;5:6
**1285 (2)**
4:8;5:7
**1287 (3)**
4:8,19;5:7
**1288 (2)**
4:7;5:6
**1289 (2)**
4:8;5:6
**1290 (2)**
4:7;5:6
**1291 (2)**
4:7;5:6
**1292 (4)**
4:8,19;5:7;115:2
**1293 (4)**
4:9,19;5:7;115:4
**1295 (2)**
4:7;5:6
**1296 (2)**
4:7;5:6

**1298 (2)**
4:7;5:6
**1299 (3)**
4:8,25;5:7
**13 (3)**
3:3,13;59:5
**1300 (2)**
4:8;5:6
**1301 (1)**
4:8
**1303 (1)**
15:12
**14 (1)**
107:20
**14th (1)**
47:16
**15 (3)**
44:4;59:2;80:23
**1505 (2)**
111:12;114:15
**16 (5)**
4:6,13;5:5;59:3,5
**16th (2)**
5:22;11:5
**170 (1)**
101:4
**19 (5)**
3:4,14;19:13;59:3,5
**19801 (1)**
7:16
**1995 (1)**
52:16

## 2

**2 (2)**
68:5;117:17
**20 (2)**
3:4,14
**200 (1)**
103:13
**2007 (1)**
81:5
**2010 (1)**
11:22
**2014 (2)**
47:14,16
**2021 (1)**
67:20
**2024 (13)**
3:2,3,4,4,6,12,13,
14,14,16;4:6,13;5:5
**21 (2)**
3:6,16
**22nd (1)**
9:16
**23-10322 (1)**
14:3
**25 (2)**
59:3,5
**257-0885 (1)**
5:24
**27th (1)**

**47:14
295 (1)**
11:13

## 3

**3 (1)**
70:21
**300 (2)**
10:14;11:21
**3335 (1)**
8:5
**36 (1)**
43:2
**366 (1)**
35:16
**3rd (1)**
41:1

## 4

**40-4 (1)**
67:20
**45 (1)**
37:11

## 5

**5 (3)**
51:17;54:15;80:7
**5.10c (1)**
22:2
**5.14 (1)**
78:19
**5.18 (1)**
81:20
**5.2 (1)**
78:10
**5.2b (2)**
76:21;77:12
**5.2c (2)**
23:3,11;24:4;44:1
**5.4 (6)**
21:3;34:24;35:15;
78:11,14,16
**5.8 (1)**
21:21
**53.5 (1)**
33:23
**53.5- (1)**
25:20
**53.5-million (1)**
56:2
**534 (1)**
12:5
**541 (1)**
114:18
**541c2 (1)**
79:21
**55 (1)**
12:13
**599 (1)**
7:4

**5th (1)**
  11:13

## 6

**6 (1)**
  54:18
**6th (1)**
  11:21

## 7

**7 (1)**
  68:11
**7004 (2)**
  87:5,23
**7227 (1)**
  5:22
**787 (1)**
  10:4
**78701 (1)**
  11:23

## 8

**800 (1)**
  5:24
**85020 (1)**
  5:23

## 9

**9.1e (1)**
  35:21
**9.1f (1)**
  35:23
**9.2 (1)**
  36:4
**9.8e (1)**
  35:22
**9014 (1)**
  87:22
**9020 (1)**
  87:21
**99999 (1)**
  8:23

EXHIBIT "8"

**From:** **Leila Ebrahimi** lebrahimi@teamtogut.com 
**Subject:** In re Eletson Holdings Inc. - Case No. 23-10322 (JPM) - Proposed Foreign Rep Order Related Docket No. 1269
**Date:** December 18, 2024 at 4:10 PM
**To:** JPM.orders@nysb.uscourts.gov
**Cc:** Kyle Ortiz kortiz@teamtogut.com, Bryan Kotliar bkotliar@teamtogut.com, Brian Shaughnessy bshaughnessy@teamtogut.com, Louis M. Solomon lsolomon@reedsmith.com, Baker, Derek J. dbaker@reedsmith.com, William E. Curtin wcurtin@sidley.com



Dear Chambers,

We respectfully submit a copy of the proposed order (the "Revised Proposed Order") on *Reorganized Holdings' Motion for an Order (I) Authorizing Adam Spears to Act as Foreign Representative of Reorganized Holdings and (II) Granting Related Relief* [Docket No. 1269] (the "Motion").  A copy of the order is attached in Word and PDF formats as well as a redline against the proposed form of order attached to the Motion.

We have shared the Revised Proposed Order with Counsel to the former Majority Shareholders at Sidley Austin and Reed Smith, both copied on this email and both parties have agreed to the attached Revised Proposed Order.

Time is of the essence.  As set forth in the letter we filed this morning [Docket No. 1316], counsel purporting to represent Eletson Holdings Inc. that was not authorized by Eletson Holdings Inc. has made very concerning filings in the Liberian recognition proceeding.  They have done so even though the Court appointed Adam Spears as the foreign representative for Eletson Holdings Inc. for purposes of the Liberian recognition proceeding at the December 16 Hearing.  We understand from Liberian counsel that responses to these filings are due by December 26 — however, due to the Christmas holiday, we are aiming to have our pleadings filed on or before December 23.

Thus, we respectfully request that the Court enter the Revised Proposed Order in the form attached to this email as soon as possible.

I am available on my cell phone 201-961-3262 or by email if the Court has any questions.

Respectfully submitted,

Leila Ebrahimi

—
**Leila Ebrahimi**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: **+1 212 201 5583** | Mobile: **+1 201 961 3262**
lebrahimi@teamtogut.com | togutlawfirm.com

| | |
|---|---|
| **redline - Foreign Rep Order.pdf** <br>172 KB | **Eletson - Order Authorizing Foreign Rep. (Sidley Draft …**<br>164 KB |

| |
|---|
| **Eletson - Order Authorizing Foreign Rep. (Sidley Draft …**<br>33 KB |

EXHIBIT "9"

REPUBLIC OF LIBERIA) IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY) CIRCUIT, MONTSERRADO COUNTY, SITTING IN
ITS DECEMBER TERM, A.D. 2024

HIS HONOUR J. KENNEDY PEABODY . . . . . . RESIDENT CIRCUIT JUDGE

Pach Shemen LLC, by and thru its Manager, )
Mark Lichtenstein................Petitioner)
                                          )
              Versus                      )
                                          )  PETITION TO ENFORCE
Eletson Holdings Inc., represented by Adam)  A FOREIGN JUDGMENT
Spears, its Foreign Representative in      )
Liberia, by and thru his Attorney-in-Fact,)
Counsellor Kunkunyo W. Teh, of the City of)
Monrovia..................................Respondent)

## PETITION

The above-named Petitioner submits this Petition
respectfully requesting Your Honour to enforce the judgment duly
entered into by the United States Bankruptcy Court for the
Southern District of New York, for the following legal and
factual reasons, to wit:

1. The Petitioner is a limited liability company validly
organized and existing under the laws of the State of Delaware,
U.S.A. Attached hereto and marked **Exhibit "P/1"** is a copy of the
Petitioner's Certificate of Incorporation.

2. The Petitioner has authorized Pierre, Tweh, & Associates
Inc., a Liberian law firm in good standing, to institute these
proceedings on behalf of the Petitioner. Attached hereto and
marked **Exhibit "P/2"** in bulk are copies of the Resolution of the
Petitioner's Manager authorizing the institution of these
proceedings and the current Business Registration Certificate of
Pierre Tweh & Associates Inc.

3. Petitioner says as a result of the Respondent's
insolvency, the Respondent commenced Voluntary Chapter 11
Bankruptcy Proceedings under the jurisdiction of the United
States Bankruptcy Court for the Southern District of New York.
Attached hereto and marked **Exhibit "P/3" in bulk** are copies of
the Respondent's September 6, 2023 Stipulation for the
commencement of the Voluntary Chapter 11 Bankruptcy Proceedings
and the corresponding September 25, 2023 written order from the
Bankruptcy Court. The Respondent's Bankruptcy Case is identified
as **In re: Eletson Holdings Inc., et al., Case No. 23-10322**.

4. As part of the Respondent's bankruptcy proceedings, the
Petitioner jointly with the Respondent's other creditors, filed
two (2) separate bankruptcy plans. The Respondent also filed a
separate bankruptcy plan with the Bankruptcy Court. The two (2)
creditors' plans detailed their respective strategies for the
reorganization and restructuring of the Respondent and certain
of the Respondent's affiliated entities. The Respondent's
bankruptcy plan independently also detailed the Respondent's
proposed reorganization and restructuring plan.

5. Further to Count 4 above, the Petitioner says after
reviewing and assessing the merits of the competing bankruptcy
plans that had been submitted to the Bankruptcy Court for the
reorganization and restructuring of the Respondent, on October
25, 2024, Honorable John P. Mastando III, the United States
Bankruptcy Court Judge, accepted and confirmed one of the
bankruptcy plans that the Petitioner had jointly with the other
creditors and denied both the creditors' alternative plan as
well as the Respondent's plan. Attached hereto are copies of the
following:

i). The Petitioner's September 19, 2024 bankruptcy plan (the "Plan), approved by the Bankruptcy Court on October 25, 2024, hereto attached and marked **Exhibit "P/4"**;

ii). Judge Mastando's Confirmation Opinion (the "Opinion"), hereto attached and marked **Exhibit "P/5"**; and,

iii). The Bankruptcy Court's November 4, 2024 Confirmation Order (the "Bankruptcy Order"), hereto attached and marked **Exhibit "P/6"**.

6. The Petitioner says the Plan calls for the complete reorganization and restructuring of the Respondent, including subjecting the Respondent to new governance documents by the amendment of the Respondent's Articles of Incorporation. For reference: See Article V of the Plan - **Exhibit "P/4"**.

7. Petitioner says the Respondent is a non-resident Liberian corporation and amendments to the Respondent's Articles of Incorporation must be filed and registered with LISCR LLC, the exclusive agent appointed by the Liberian Government to administer the Liberian Corporate Program and to act as the Registered Agent of all non-resident Liberian corporations. Therefore all non-resident Liberian corporations are required to file their Articles of Incorporations and any amendments thereto with LISCR LLC.

8. Still further to the said Counts 6 and 7 above, Petitioner says after filing the Articles of Incorporation with LISCR, LLC, a non-resident Liberian corporation is required to provide LISCR LLC with an official Address of Record "(AOR"). The AOR is the only person or entity with whom LISCR LLC will interact and receive notifications and instructions pertaining to the registration and status of the company unless otherwise ordered in keeping with law. Therefore LISCR LLC will record amendments to a non-resident Liberian corporation's Articles of Incorporation on instructions from the Respondent's current AOR or pursuant to a valid court order.

9. Further to Counts 6 through 8 above, although the Plan has been approved by the Bankruptcy Court for immediate implementation, Petitioner however submits that LISCR LLC will not accept the amendment of the Respondent's Articles of Incorporation for filing without instructions from the Respondent's current AOR or a valid court order.

10. Further to Count 9 above, the Petitioner says to ensure that the Plan is implemented in a December 20, 2024 Order Judge Mastando, the United States Bankruptcy Court Judge, authorized Adam Spears to act as the Respondent's sole Foreign Representative in Liberia for the purpose of seeking (or supporting any applications seeking) judicial recognition and enforcement in Liberia of the Bankruptcy Court's November 4, 2024 Confirmation Order. The aforesaid December 20, 2024 Order appointing Adam Spears as the Respondent's Foreign Representative in Liberia is attached hereto and marked **Exhibit "P/7"**.

11. Further to Count 10 above, Petitioner says the appointment of Adam Spears as the Respondent's sole Foreign Representative in Liberia was based on a motion by the Petitioner's counsel to the Bankruptcy Court for the appointment of Adam Spears to be the Petitioner's Foreign Representative in Liberia. Petitioner says no objections were interposed by the opposing parties to the Bankruptcy Court's appointment of Adam Spears as the Respondent's Foreign Representative in Liberia. Attached and marked **Exhibit "P/8" in bulk is** the motion requesting Adam Spears' appointment and the no objection responses to the motion submitted by the opposing parties.

**12.** Section 25.12 of the Liberian Civil Procedure Law provides that a foreign judgment is admissible against a party if any person appeared in the foreign court on behalf of such party. Petitioner submits that the record of the bankruptcy proceedings confirm that the Respondent was represented by the Reed Smith LLP Law Firm who appeared and participated in the proceedings on behalf of the Respondent. For reliance: See Page 2 of the Opinion - **Exhibit "P/5"**. The Respondent's participation in the proceedings is further evidenced by the Respondent's Stipulation to commence voluntary Chapter 11 bankruptcy proceedings which was entered on the records of the Bankruptcy Court and the Respondent's filing of its bankruptcy plan. For reliance: See **Exhibit "P/3"** and Section III(H) and Section (I) of the Opinion - **Exhibit "P/5"**.

**13.** Section 25.13 of the Civil Procedure Law additionally requires the foreign court to have valid legal jurisdiction to render the decision that is sought to be enforced in Liberia. Section II of the Opinion - **Exhibit "P/5"** - confirms that the United States Bankruptcy Court for the Southern District of New York has the requisite legal subject matter jurisdiction under the provisions of Title 28, Section 157 of the United States Code.

Section 157(a) provides that:

"*Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district*").

Section 157(b)(1) provides that:

"*Bankruptcy judges may hear and determine all cases under Title 11 and all core proceedings arising under Title 11, or arising in a case under Title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments*".

Section 157(b)(2)(L) provides that:

"*Core proceedings include, but are not limited to … confirmations of plans.*"

**14.** The Petitioner says the jurisdiction of the Bankruptcy Court is also supported by the Amended Standing Order of Reference, dated January 31, 2012, issued by the Chief Judge of the United States District Court for the Southern Jurisdiction of New York which provides as follows:

"*Pursuant to 28 U.S.C. Section 157(a) any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 are referred to the bankruptcy judges for this district.*".

Attached hereto and marked **Exhibit "P/9" in bulk** are the respective sections of the United States Code cited above and the Amended Standing Order.

**15.** In *Turner v. Burnette*, 24 LLR 212 (1975), the Supreme Court of Liberia held that: "*Generally, greater force and dignity will be given to the judgments of foreign courts when parties have had their day in a court of competent jurisdiction, after due service of process or after entry of appearance, and have had a full and impartial hearing upon the merits of their case; unless it can be shown that the proceedings were tainted with fraud.*"

*competent jurisdiction after due service of process or
after entry of appearance, and have had a full and
impartial hearing upon the merits of their case; unless it
can be shown that the proceedings were tainted with fraud."*

16. Further to Counts 12 through 15 above, the following
facts confirm that the Petitioner's Petition complied with all
of the required legal requirements for the granting of the
Petitioner's Petition for the enforcement in Liberia of the
judgment issued by the United States Bankruptcy Court for the
Southern District of New York:

(i) The Respondent appeared in the foreign proceedings and
was represented by competent counsel throughout the proceedings;

(ii) The Bankruptcy Court had valid subject matter
jurisdiction;

(iii) The judgment is based on a full hearing on the merits
of the case; and,

(iv) No allegations of fraud or any other impropriety have
been raised by opposing counsel in respect of any aspect of the
proceedings.

WHEREFORE, and in view of the foregoing, the Petitioner most
respectfully prays Your Honour as follows:

a. Confirm that Adam Spears has been duly appointed the
Respondent's Foreign Representative in Liberia with the
authority to seek the recognition and enforcement of the
Bankruptcy Order in Liberia.

b. Order that the Opinion and Bankruptcy Order and Plan be
enforced in Liberia.

c. Order instructing LISCR LLC to change Respondent's Address
of Record to a person or entity designated by the Petitioner.

d. Instruct LISCR LLC to henceforth accept instructions and
filings pertaining to the Respondent only from the Address of
Record designated by the Petitioner.

e. Order LISCR LLC to accept from the Petitioner's designated
Address of Record the amendments to the Respondent's governing
documents as required by the Plan, namely the Amended Articles
of Incorporation, the Amended By-Laws and any other applicable
material governance and/or organizational documents of
Respondent that need to be filed in order to fully implement
the Plan.

f. Order LISCR LLC to prohibit complying with any instructions
from the Respondent's currently registered Address of Record.

g. Grant unto the Petitioner any and all such further relief
deemed by Your Honour to be just, legal, and equitable as in
keeping with law.

> Respectfully submitted:
> The above named Petitioner,
> By and thru its legal counsel
> Pierre, Tweh, & Associates Inc.,
> 3rd Floor - Blue Plaza Building
> Benson Street
> Monrovia, Liberia

> James E. Pierre
> COUNSELLOR-AT-LAW

Dated this 7th day
of January 2025

REPUBLIC OF LIBERIA) IN THE OFFICE OF THE JUSTICE OF THE PEACE
MONTSERRADO COUNTY) FOR AND IN MONTSERRADO COUNTY

```
Fach Shemen, LLC, by and thru its Manager          )
Mark Lichtenstein.........................................................     )
. . . . . . . . . . . . . ......... Petitioner             )
                                                   ) PETITION TO
                    Versus                         ) ENFORCE A
                                                   )  FOREIGN
Eletson Holdings Inc., represented Adam Spears     )  JUDGMENT
its Foreign Representative in Liberia, by and      )
thru his Attorney-in-Fact, Counsellor Kunkunyon    )
W. Teh, of the City of Monrovia...........................................     )
.........................................................................................Respondent     )
```

## AFFIDAVIT

PERSONALLY appeared before me at my Office in the City of
Monrovia, James E. Pierre, Counsellor-at-Law and one of counsel
for Petitioner in the above entitled cause of action, and made
Oath according to Law that all and singular the allegations of
law and facts as are set forth and contained in the annexed and
foregoing PETITION are true to the best of his knowledge and
belief; and as to those matters of information received, he
verily believes them to be true.

SWORN and SUBSCRIBED to before me
this 7th day of January, A.D.
2025.

_____
JUSTICE OF THE PEACE – MONTSERRADO
COUNTY

_____
COUNSELLOR JAMES E. PIERRE
ONE OF COUNSEL FOR PETITIONER

EXHIBIT "10"

REPUBLIC OF LIBERIA)     IN THE CIVIL LAW COURT, SIXTH JUDICIAL CIRCUIT
MONTSERRADO COUNTY)   MONTSERRADO COUNTY, SITTING IN ITS DECEMBER
                   TERM, A.D., 2024

HIS HONOUR J. KENNEDY PEABODY . . . . . . . . . . . . . . . RESIDENT CIRCUIT JUDGE

Pach Shemen LLC, by and thru its Manager,)
Mark Lichtenstein......................Petitioner  )
                              )
           Versus           )
                              ) PETITION TO ENFORCE
Eletson Holdings Inc., represented by Adam ) A FOREIGN JUDGMENT
Spears, its Foreign Representative in       )
Liberia, by and thru his Attorney-in-Fact,     )
Counsellor Kunkunyon W. Teh, of the City of)
Monrovia............................Respondent)

### RESPONDENT'S RETURNS

1. Counts 1 and 2 of the Petition for Enforcement of Judgment (the "Petition") present no material issue of facts or law to be traversed.

2. As to Count 3 of the Petition, Respondent says the record of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") confirms that the Respondent commenced Voluntary Chapter 11 Bankruptcy Proceedings under the jurisdiction of the Bankruptcy Court and that the Bankruptcy Court granted the Respondent's application and issued a written order.

3. As to Counts 4, 5 and 6 of the Petition, without further or additional inquiry in respect of the authenticity or validity of the attached exhibits, Respondent says they confirm that Judge John P. Mastando, the Judge of the Bankruptcy Court, accepted one of the Bankruptcy Plans that the Petitioner had jointly submitted with the Respondent's other creditors for the reorganization and restructuring of the Respondent.

4. As to Counts 7, 8 and 9 of the Petition, Respondent says it is unable to traverse the said counts because it is without sufficient knowledge or information to confirm the assertions contained in the said counts.

5. Traversing Counts 10 and 11 of the Petition, Respondent says the record of the proceedings confirms that Adam Spears was appointed by the Bankruptcy Court and authorized to act as the Respondent's sole Foreign Representative in Liberia without any objections from any of the opposing parties for the purpose of seeking judicial recognition and thus the enforcement of the Judgments or Orders of the Bankruptcy Court.

6. Counts 12, 13, 14 and 15 of the Petition, being mere recitals of the relevant statutes and/or legal principles that are applicable to the case at bar, therefore do not present any issues to be traversed.

7. As to Count 16 of the Petition, Respondent concedes that Petitioner's Petition has complied with the legal requirements for the granting of the Petition for the enforcement in Liberia of the Bankruptcy Court's judgment and therefore interposes no objections to the granting of the Petition as prayed for.

     **WHEREFORE,** and in view of the foregoing facts and circumstances, and the law controlling, Respondent concedes to the legal soundness of the Petitioner's Petition and therefore interposes no objections to the granting of the Petition as prayed for. Respondent respectfully also prays Your Honour to waive all costs in these proceedings.

                               Respectfully submitted:
                               The Respondent
                               By and thru its Counsel
                               Counselor Kunkunyon Wleh Teh, Sr.
                               Mamba Point
                               Monrovia, Liberia

                               COUNSELOR-AT-LAW

Dated this 9th day
of January, 2025

REPUBLIC OF LIBERIA      )      IN THE OFFICE OF THE JUSTICE OF PEACE
MONTSERRADO COUNTY)             TEMPLE OF JUSTICE FOR MONTSERRADO
                                COUNTY


Pach Shemen LLC, by and thru its Manager, )
Mark Lichtenstein......................Petitioner   )
                                    )
              Versus                )
                                    ) PETITION TO ENFORCE
Eletson Holdings Inc., represented by Adam ) A FOREIGN JUDGMENT
Spears, its Foreign Representative in       )
Liberia, by and thru his Attorney-in-Fact,  )
Counsellor Kunkunyo W. Teh, of the City of)
Monrovia...........................Respondent)

## RESPONDENT'S AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified justice of the Peace for and
in Montserrado County at my Office in the City of Monrovia, Kunkunyon Wleh Teh,
Sr.,Counselor-At-Law, Counsel for Respondent in the foregoing cause and made Oath according
to law that all and singular the allegations of both law and facts as are set forth and contained in
the annexed and foregoing Respondent's Returns are true and correct to the best of his
knowledge and belief and as to those matters of information he verily believes them to be true
and correct.

SWORN AND SUBSCRIBED TO, BEFORE ME
THIS ____ DAY OF January 2025

_____
JUSTICE OF THE PEACE – MONTSERRADO
COUNTY

_____
Kunkunyon Wleh Teh, Sr.
Counsel for Respondent/Deponent

EXHIBIT "11"

REPUBLIC OF LIBERIA    )        IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERADDO COUNTY)       CIRCUIT, MONTSERADDO COUNTY, SITTING
                                          IN ITS DECEMBER TERM, A.D. 2014

**BEFORE HIS HONOUR: J. KENNEDY PEABODY....... RESIDENT CIRCUIT JUDGE**

Pach Shemen LLC by and thru its Manager, Mark Lichtenstein    )
....................................................................Petitioner    )
                                                                                          )
                    Versus                                             ) PETITION FOR THE
                                                                                          ) ENFORCEMENT OF
Eletson Holdings Inc., represented by Adam Spears its Foreign    ) JUDGEMENT
Representative in Liberia, by and Thru his Attorney-In Fact    )
Counsellor Kunkunyon W. Teh, of the City of Monrovia    )
....................................................................... Respondent    )

## INTERVENORS' RETURNS

Intervenors in the above-entitled cause of action pray Your Honour and this Honourable Court to
deny and dismiss Petitioner's Petition and for following legal and factual reasons.

I.    **Legal Premise**

1.1    That as to the entire Petition, Intervenors says that it should be denied and dismissed
because the judgment sought to be enforced was  appealed by the Co-Intervenor/Eletson
Holdings but that "Reorganized Holdings" who did not file the appeal, was allowed to withdraw
and dismiss Co/Intervenor's appeal before the United States Bankruptcy Court for the Southern
District of New. The Supreme Court of Liberia held in the case **Turner V. Burnette**, that it
cannot give effect to a foreign decree when to do so would prejudice the rights of a Liberian
citizen, or when its enforcement would contravene the positive laws of Liberia. Intervenors say,
under Liberian law, another party-i.e.- "Reorganized Holdings" would not be allowed to
withdraw the appeal of another party(-i.e.- the Co-Intervenors/Eletson Holding Inc. Intervenors
submit, that to give effect to the judgment will certainly prejudice the right of a Liberian person-
Eletson Holdings Inc, in that Eletson Holdings Inc's right of appeal was taken away without
Eletson Holding been granted the opportunity to present its case on appeal. The very judgment
and plan that empowered the so called "Reorganized Holdings" to withdraw and dismiss Co-
Intervenor/Eletson Holdings's  appeal in the United States Bankruptcy Court for for the Southern
District of New, is the very judgment that is now sought to be recognized and enforced in Liberia.
In the absence of the recognition and enforcement of the Bankruptcy Court's initial judgment and
order of November 4, 2024. which brought forth the creature "Reorganized Holdings", the said
"Reorganized Holdings" would not and does not have the authority under Liberian Law to
withdrew Co-Intervenor's/Eletson Holdings Inc's appeal. Attached hereto and marked as
Intervenors's **Exhibit I/1**in bulk is the Notice of Appeal (docket 1233) and the Statement of
Grounds of Appeal (docket 1264) both before the United States Bankruptcy Court for the
Southern District of New York, evidencing that Eletson Holding's did appeal the judgment.

1.2.    That the Intervenors's current Board of Directors have authorized Justice Advocates and
Partners and the J. Johnny Momoh & Associates Law Chambers to file these returns interposing
the appropriate legal defense to  the enforcement of the judgment against Co-Intervenor/Eleston
Holdings Inc, because this court is at liberty to give or to refuse to give effect to the foreign
judgment, which is sought to be enforced, if this court finds that to do so would be unjust and
inequitable. The Supreme Court of Liberia in the case **Turner V. Burnette, 24 LLR 212 (1975),**
held that "The Liberian Constitution has no such provision, and there is no statute or treaty with
respect to the effect to be given a foreign judgment. In the absence of a special compact, no
sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals
of another country; and it is at liberty to give or refuse effect to it as may be found just and
equitable". The court further held that it cannot give effect to a foreign decree when to do so
would prejudice the rights of a Liberian citizen, or when its enforcement would contravene the
positive laws of Liberia . In the instant case, Intervenors says that it would be unjust and
inequitable to give effect to the foreign judgment sought to be enforced and its enforcement

1

would contravene the positive laws of Liberia , for the following factual and legal reasons. Attached hereto and marked as Intervenors **Exhibit I/2** are copies of Resolutions from the Board of Directors of the Intervenors appointing Justice Advocates & Partners and J. Johnny Momoh & Associates Law Chambers to represent their legal interest in these proceedings. The firms' current business registration certificates are attached.

1.3     That having made findings concerning the bad faith actions of Murchinson and its affiliates, the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan, and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded by law from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this court is not so constrained and should refuse the enforcement  of the bankruptcy judgment  in Liberia, because it  was obtained by the misuse of laws and with such bad faith on the part of the Petitioner. This court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was unjust and inequitable, and hence, a judgment obtained by such means should not be enforced in Liberia.

## II.     Factual background

2.1     The Co-Intervenor/Eleston Holding Inc is a corporation, which was incorporated on December 4, 1985, under Liberian law, with its headquarters and center of main interests located in Greece, where it maintains offices at 118 Kolokotroni Street, Piraeus. Co-Intervenor/Eleston Holdings Inc operates pursuant to its existing Articles of Incorporation, dated December 4, 1985, Restated Articles of Incorporation, dated June 29, 2007 (the "Restated AOI"), and Articles of Amendment, dated June 29, 2018, and as amended, modified, supplemented or restated from time to time, and filed and recognized in Liberia (the "Existing Articles of Incorporation"). **Article V, Section 5 of the Restated Articles of Incorporation,** provides that "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)

Attached hereto and marked as Intervenors's **Exhibit I/ 3 in bulk** are copies of the Articles of Incorporation of the Co-Intervenor/Eleston Holdings Inc, its Restated Articles of Incorporation, and its Articles of Amendment of the Articles of Incorporation

2.2     On October 22, 2013, the Co-Intervenor/Eletson Holdings and Blackstone Tactical Opportunities ("**Blackstone**"), an alternative investments fund, founded a new company, Eletson Gas LLC ("**Eletson Gas**"), a limited liability company (LLC) established under the laws of the Marshall Islands. Pursuant to the Limited Liability Company Agreement signed Blackstone was the preferred shareholder of the Company, while the Co-Intervenor/Eletson Holdings here held the common shares/units. The preferred shares granted Blackstone priority in dividend distributions and, under certain conditions, decisive control over the company. Eletson Gas owned, directly or indirectly, 14 liquefied petroleum gas carriers.

2.3     In November 2021, a hedge fund, Murchison Ltd ("**Murchison**"), purchased Blackstone's units in Eletson Gas (for a price later revealed to be just USD 3 million) and thus became the preferred unit holder in Eletson Gas, replacing Blackstone. The acquisition of Blackstone's preferred units was made through a company affiliated with Murchison, Levona Holdings Ltd ("**Levona**"), a special purpose vehicle (SPV) established under the laws of the British Virgin Islands (BVI).

2.4     On February 22, 2022 a Binding Offer Letter("the BOL") was agreed between, amongst others, the Intervenors and Eletson Gas from the one part and Levona from the other part pursuant to which Eletson Gas would either pay Levona USD 23 million or transfer ownership of two vessels of equivalent value (specifically, the shares of the bareboat charterers of the vessels SYMI II ENE and TELENDOS II ENE) and in exchange, Levona would transfer its preferred membership units in Eletson Gas to Eletson Gas or entities nominated by the latter. Attached hereto and marked as Intervenors's **Exhibit I/4** is a copy of the Binding Offer Letter.

2.5     Whilst Eletson Gas transferred on 11 March 2022 to Levona the shares it held in the ship-owning companies (bareboat chartering companies) of MT SYMI and MT TELENDOS, valued at USD 23,000,000 and nominated the three Cypriot shipping companies Fentalon Limited, Apargo Limited, and Desimusco Trading Limited as its new preferred shareholders. Sometime later, Levona suddenly began to claim, around mid-July 2022, that it had not transferred its preferred shares in Eletson Gas. According to Levona, this was because, under the terms of the BOL, Eletson Gas was supposed to have followed certain formal procedures to exercise an option to acquire the preferred shares, which, according to Levona's claims, had not taken place. "Consequently, Levona began to assert that although both the two vessels (and more specifically the shares of the bareboat chartering companies of the vessels MT SYMI and MT TELENDOS) had been transferred to it, the preferred shares in Eletson Gas had not been properly transferred from Levona to Eletson Gas or its nominees. As a result, Levona asserted that it had both the two vessels and the preferred shares (units) in Eletson Gas and in mid-July 2022 it tried to sell the remaining twelve (12) vessels in Eletson Gas's fleet to Eletson Gas' main competitor, i.e. Unigas."

2.6     Specifically, on July 15, 2022, a Letter of Intent (LOI) was allegedly signed between Unigas and Eletson Gas, purportedly executed by a representative of Levona (who lacked the authority to sign on behalf of Eletson Gas). This LOI concerned the purported sale and transfer of the other twelve (12) vessels to Unigas, thus violating the terms of Limited Liability Company Agreement ("the LLCA"), as Levona was no longer a shareholder of Eletson Gas and had no right to negotiate or act on its behalf. Levona's actions caused damage not only to Eletson Gas but also to the New Preferred Shareholders, due to the conduct of Levona in bad faith, in breach of contractual terms, and contrary-to-good-faith and in breach of customary business practices. Attached hereto and marked as Intervenors's **Exhibit I /5** is a copy of the Letter of Intent.

2.7     Following Levona's anti-contractual and bad-faith behavior, the Intervenors and its subsidiary Eletson Corporation initiated arbitration in New York against Levona on July 29, 2022, based on the arbitration clause contained in Article 12.14(a) of the LLCA. The purpose of the arbitration was to resolve the dispute between the parties regarding whether Levona had transferred to Eletson Gas or to companies nominated by it the preferred shares (units), which (units) Levona held in Eletson Gas, as well as related corporate disputes arising from the LLCA. Attached hereto and marked as Intervenors's **Exhibit I/6** is a copy of the claim/complaint filed before the Judicial Arbitration and Mediation Services Inc (JAMS) by the Co-Intervenor/Eleston Holdings.

2.8     During the arbitration, serious illegalities and violations of good faith and fair dealing by Levona/Murchison were revealed, which occurred before it even acquired Blackstone's shares (units) in Eletson Gas, after the acquisition, and during the arbitration itself. These included, among others, that Levona/Murchison maliciously: (a) Bribed the Chief Financial Officer of Eletson Corporation to act against the interests of Eletson Holdings, (b) Violated the confidentiality obligations of the LLCA, (c) Interfered with Eletson Gas's relationships with its creditors, leading to the seizure of Eletson Gas's ships, (d) Falsified evidence by creating alleged minutes of a board meeting from March 10, 2022, after the arbitration had begun, (e) Conspired with certain of Eletson Gas's lawyers against the interests of Eletson Gas. Attached hereto and marked as Intervenors's **Exhibit I/ 7** is the relevant excerpts from the Arbitrator's ruling confirming these facts.

2.9     On September 29, 2023, the Arbitrator ruled in favor of the claims of the Co-Intervenor/Eletson Holdings and Eletson Corporation. Specifically, it recognized the bad faith, breach of contract, and actions contrary to good faith and fair dealing by Murchison/Levona, finding that the latter violated the LLCA in several ways. The Arbitrator also determined that Levona had indeed transferred its preferred shares in Eletson Gas to the Cypriot companies Fentalon, Apargo, and Desimusco Trading Limited that had been nominated by the Eleston Gas. Furthermore, the Arbitral Award awarded (a) USD 43,455,12.21 as compensatory damages, (b) USD 43.455.122,21 as punitive damages, and (c) attorneys' fees, costs, expenses and additional interest. This award was confirmed on February 9, 2024, by an order of the US District Court for the Southern District of New York, except from certain provisions which were vacated without, however, altering the amounts awarded or their designated beneficiaries. Attached hereto and marked as Intervenors's **Exhibit I/8** in bulk are the arbitral award/ruling and the US District Court for the Southern District of New York February 9, 2024, confirmation order.

2.10    Meanwhile, even before the above arbitration award was issued the Petitioner, along with two other creditors of the Co-Intervenor/Eletson Holdings, i.e. VR Global Partners L.P., and Alpine Partners L.P., initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Co-Intervenor/Eletson Holdings and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. The alleged debtors at the time filed motion to dismiss the involuntary bankruptcy proceedings. However, following extensive litigation that lasted approximately 6 months, and given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Intervenors here to retain control over its assets, at least until the anticipated arbitral award was issued, on September 7, 2023, Co-Intervenor/Eletson Holdings agreed to a stipulation with the Petitioner to convert the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) to a voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code).

2.11    It should be stressed that the Petitioner (i.e. Pach Shemen LLC) was not an original creditor of the Co-Intervenor/Eletson Holdings. In fact, it did not even exist before the arbitration had commenced. It was established by Levona in order to acquire at an extremely low-price old bonds issued by the Intervenors and it used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the petition for bankruptcy was not made due to true and genuine insolvency of the Intervenors and for its restructuring for the equal and fair satisfaction of the creditors, but it was made a shield of protection of its alter ego Levona in case the arbitration award was issued against it. More specifically, as the Judicial Arbitration and Mediation Services Inc (JAMS) arbitrator found (emphasis added):

> "On or about January 4, 2023, Pach Shemen purchased $183,851,546 in bonds of Holdings for $2 million. Additionally, Mr. Spears, on behalf of the Levona-related entities, offered additional consideration to the bondholders contingent on the outcome of this arbitration stating that it would pay an additional "$500k if the arbitration ends to our satisfaction on Eletson Gas and we can exercise our rights to act as Preferred to sell Eletson Gas vessels and/or the company." The Holdings bonds were purchased by Pach Shemen from Nomis Bay and BPY via private trades and then transferred to Pach Shemen.
> [...]
> On January 11, 2023, Pach Shemen then instructed the bond trustee, Wilmington Savings Fund Society, to sue Holdings to collect the debt due on these bonds ("Bondholder Litigation"). Then on March 7, 2023, Pach Shemen and two other creditors of Holdings, filed involuntary bankruptcy petitions against Holdings in the Southern District of New York. The involuntary bankruptcy petition and some of the documents included in the filing were signed by Mr. Lichtenstein and Mr. Spears. The timing of this filing is notable—it was three days after I orally issued certain discovery rulings adverse to Levona, including that it had waived any claim of attorney-client privilege . . . and ordering the production of Levona/Murchinson's communications with Kanelos.
> [...]
> As discussed, supra, Pach Shemen is the alter ego of Levona. The separateness is in name only. Its representatives, including Spears and Lichtenstein, were bound by the Status Quo Injunction. Despite this, Pach Shemen a/k/a Levona II, entered into a trade to purchase the notes, offering as consideration value associated with the assets in dispute in this arbitration.
> [...]
> In other words, the Levona-related entities were looking to either strip this arbitration of its jurisdiction or hedge against a potential loss in this arbitration. They believed, at the time—although mistakenly—that if I ruled that Eletson had exercised the option and bought out Levona's interests, the preferred interests would pass to Holdings. Thus, by purchasing the bonds, it became a controlling creditor of Holdings with the ability to put Holdings into bankruptcy. In the first instance, the filing of the bankruptcy led to Levona's insistence that it could not arbitrate these claims due to the automatic bankruptcy stay. This was certainly not "maintain[ing] the status quo." In the event the stay was to be lifted, and Levona lost in this arbitration, the Levona-related entities were then positioned to argue that, as creditor to Holdings, the value of the preferred shares passed to them."

2.12    Subsequently, following the bad faith tactics of Levona and its affiliated companies Murchinson/Pach Shemen, on October 25, 2024, the Bankruptcy Court of New York, presided over by Judge John P. MASTANDO, approved Petitioner's September 19, 2024 plan and on

November 4, 2024 , the court issued a confirmation order whose recognition is hereby sought, rejecting the objections of the Co-Intervenor/Eletson Holding and approving the reorganization plan proposed by the Creditors.

### III. Reasons why the petition for enforcement of the judgment should be denied and dismissed because it is inequitable and works grave injustice against the Intervenors

3.1     Intervenors say that the petition for recognition of this judgment should be denied and dismissed for the following reasons:

3.2     The judgment sought to be enforced was appealed by the Co-Intervenor/Eletson Holdings but that "Reorganized Holdings" who did not file the appeal, was allowed to withdraw and dismiss Co/Intervenor's appeal before the United States Bankruptcy Court for the Southern District of New. The Supreme Court of Liberia held in the case **Turner V. Burnette**, that it cannot give effect to a foreign decree when to do so would prejudice the rights of a Liberian citizen, or when its enforcement would contravene the positive laws of Liberia. Intervenors say, under Liberian law, another party-i.e.- "Reorganized Holdings" would not be allowed to withdraw the appeal of another party(-i.e.- the Co-Intervenors/Eletson Holding Inc. Intervenors submit, that to give effect to the judgment will certainly prejudice the right of a Liberian person-Eletson Holdings Inc, in that Eletson Holdings Inc's right of appeal was taken away without Eletson Holdings Inc. been granted the opportunity to present its case on appeal. The very judgment and plan that empowered the so called "Reorganized Holdings" to withdraw and dismiss Co-Intervenor/Eletson Holdings's appeal in the United States Bankruotcy Court for the Southern District of New York, is the very judgment that is now sought to be recognized and enforced in Liberia. In the absence of the recognition and enforcement of the Bankruptcy Court's initial judgment and order of November 4, 2024, which brought forth the creature "Reorganized Holdings", the said "Reorganized Holdings" would not have the authority under Liberian Law to withdraw Co-Intervenor's/Eletson Holdings Inc's appeal. The Supreme Court of Liberia emphatically held in the case **Turner V. Burnette, 24 LLR 212 (1975)**, that "*in the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and it is at liberty to give or refuse effect to it as may be found just and equitable*". This court is at liberty to determine whether to give effect to the judgement or not, and the standard set by the Supreme Court in making the discretionary determination is premised on the theory of what is regarded as naturally just and equitable. The decision of whether to enforce or not to enforce is not limited to a two-prong inquiry of (a) whether the foreign court had jurisdiction (b) whether the Intervenors appeared in court. Instead by the standard set in **Turner V. Burnette**, the inquiry extends to whether to enforce or not to enforce the foreign judgment would be just and equitable. Under Liberian law, the right of appeal is one that the constitution of Liberia upholds as inviolable.

3.3     The bankruptcy proceedings were initiated in bad faith, which constitutes a violation of natural justice and equity As mentioned above and as determined by the Arbitrator Ariel E. Belen in his final arbitral award dated September 29, 2023, the conduct of Levona, as well as the affiliated companies Murchinson and the Petitioner which, according to the Arbitrator, are described as "each being the alter ego of the other" — towards the Co-Intervenor/Eletson Holdings is entirely illegal, in breach of contract, unethical, and utterly in bad faith. The Petitioner used a legal procedure for totally other purposes. The Co-Intervenor/Eletson Holdings was not truly facing insolvency problems, and the Petitioner did not truly aim at serving a genuine claim. It misused the bankruptcy procedure to protect itself against a possible unfavorable arbitration award. The fact that compensation and damages were awarded to affiliated companies of the Intervenors and not to the Intervenors itself does not change the reality that the bankruptcy procedure was misused to neutralize the arbitration proceedings.

3.4     Specifically, the bankruptcy petition in the US was not filed with the intent of financially restructuring the Co-Intervenor/Eletson Holdings, but was aimed at securing a strategic advantage in the arbitration already pending between the Co-Intervenor/Eleston Holdings and Eletson Corporation against Levona (an alter-ego of Murchinson and Pach Shemen LLC, i.e. the Petitioner). The Petitioner, by offering financial incentives and providing legal and financial support to other participants in the bankruptcy proceedings, created a network of control and influence that allowed it to dictate the course of the process solely to serve its own interests (i.e., the interests of Murchinson / Pach Shemen LLC / Levona).

3.5    As noted above, the Petitioner herein was not an original creditor of the Co-Intervenor/Eletson Holdings, but it acquired at an extremely low price the bonds and used them as a means to open (involuntary) bankruptcy proceedings in order to obstruct justice by stay of the arbitration proceedings. Consequently, the Chapter 7 petition for bankruptcy was not initiated for the restructuring of the Intervenors, nor was it done for the equal and fair satisfaction of the creditors, but it was initiated in order to avoid the debts of its alter ego Levona by obstructing justice, all of which are contrary to the public policy of any country. Thus, the acquisition of the Bonds by the Petitioner was never intended to achieve potential financial returns on the investment. Instead, the shared goal of Murchinson/Levona/the Petitioner was to orchestrate the bankruptcy process for their benefit in the arbitration and to gain control over the Intervenors and, through it, Eletson Gas. Moreover, Murchinson/Lenova/Pach Shemen/Petitioner attempted to use information obtained during the bankruptcy process before the U.S. Bankruptcy Court to their advantage in the arbitration.

3.6    It should be noted that the misuse of the bankruptcy procedure by the Petitioner was also confirmed in the Confirmation Order dated October 25, 2024 of the U.S. Bankruptcy Court which states: :

> *While the Arbitration was pending, Murchinson and Levona sought an alternative means by which they could obtain control of the Gas assets should the Arbitration result in an adverse outcome. As part of these efforts, Murchinson and Levona negotiated with certain holders of the New Notes regarding the potential purchase of a majority of the then-outstanding New Notes. (DX-096 (the "Note Purchase Emails") (email chain discussing New Note purchase terms)). Murchinson's plan was to purchase a majority of the New Notes in order to embark on a potential "bankruptcy strategy" to exert control over the Debtors and prevail in the Arbitration. (DX-199 (the "Bankruptcy Strategy Emails") (discussing the need to move quickly because Murchinson already had "the lawyers in motion on the bankruptcy strategy")). Murchinson ultimately negotiated the purchase of a majority of the New Notes, totaling $183,851,546. (Final Award at 60). As consideration for its purchase of the New Notes, Murchinson agreed to pay to the selling noteholders: (i) $2,000,000 up front; (ii) an additional $500,000 if the Arbitration ended to Murchinson's satisfaction; (iii) 10% of the value received by Levona for its Gas Preferred Shares (excluding certain expenses), up to $1,000,000; (iv) one third of the first $3,000,000 profit realized by the entity holding the New Notes on Murchinson's behalf (excluding expenses); and (v) thereafter 25% of any profit realized by the entity holding the New Notes on Murchinson's behalf after $3,000,000 of profit is earned under (iv). Murchinson formed Pach Shemen—another special purpose vehicle—on December 12, 2022, to hold the New Notes, which were officially acquired on January 4, 2023.*

> *The arbitrator assessed nearly $87 million in damages against Levona, Pach Shemen, and Murchinson, because the arbitrator found that, inter alia, Murchinson and its proxies: (i) bribed an officer (the former CFO) of Eletson Corporation and Gas to act against Gas' interests; (ii) breached an NDA by communicating directly with Gas financiers and lenders; (iii) intentionally violated injunctions entered in the Arbitration; (iv) manipulated the evidentiary record in the Arbitration; and (v) refused to produce relevant documents in the Arbitration.*

> *. The U.S Bankruptcy Court further found that "[Mark] Lichtenstein and [Adam] Spears are each affiliated in various ways with Murchinson, Pach Shemen, and Levona" Your Honour is requested to take judicial notice of the relevant protion the Bankruotcy's court ruling .*

3.7    Having made these findings concerning the bad faith actions of Murchinson and its affiliates, the U.S. Bankruptcy Court nevertheless concluded that this conduct was not relevant to the issue of whether the Petitioning Creditors' Plan should be confirmed. The Bankruptcy Court found that its mandate under U.S. Bankruptcy Code Section 303 was limited to considering whether the Petitioning Creditors had engaged in bad faith in connection with proposing the Petitioning Creditors' Plan, and accordingly did not consider fully the substantial evidence establishing Pach Shemen's bad faith conduct prior to and during the pendency of the bankruptcy proceedings. While the Bankruptcy Court appears to have believed that it was precluded from looking at Pach Shemen's bad faith outside the very narrow issue of the proposal of the plan, this

court is not so constrained and should not accept to recognize in Liberia a bankruptcy judgment that was obtained by the misuse of laws and with such bad faith of the Petitioner. The court is at liberty to decide whether the Petitioner's conduct as a whole prior to and during the pendency of the bankruptcy proceedings was done in bad faith, was therefore unjust and inequitable, and hence, a judgment obtained by that means should not be enforced in Liberia.

3.8     **Because the U.S. Bankruptcy Court did not consider whether (or to what extent) the overall bad faith** conduct of Murchison and Pach Shemen in planning and carrying out the scheme to seize control of the Intervenors (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing as the sole shareholder of Intervenors, that issue has been left for the Liberian court to determine. Moreover, the U.S. Bankruptcy Court was never even given the opportunity to determine whether Pach Shemen's last-minute tactic to modify its proposed plan to avoid the requirements of Liberian corporate law by purporting to act under the existing bylaws violated natural justice and fundamental due process. In connection with both, the plan that Pach Shemen now tries to enforce in Liberia violates Liberian law because it was made and exists in bad faith, and naturally and fundamentally unjust and inequitable, and Adam Spears whom the Banruotcy found was "affiliated in various ways  with Murchinson, Pach Shemen, and Lenova is the very individual that is attempting to appear before this court to represent the interest of the Co-Intervenor/Eleston Holdings Inc.

3.9     Even whilst the appeal is pending  before the United States Bankruptcy Court for the Southern District of New York,  and the Petitioner havs filed before this court a petition for the recognition and enforcement of the foreign judgment, the Petitioner has nevertheless embarked upon the process of taking control of the Co-Intervenor/Eletson Holding, purporting to be shareholders and officers of the corporation, and writing letters to lawyers  representing the Co-Intervenor to threaten that to represent the Co-Intervenor in  proceedings before this court without the Petitioner's consent is unauthorized. In effect, the Petitioners are to decide who represents the Petitioner, and they are also the Co-Intervenor, and they get to decide who represents the Co-Intervenor/Eletson Holdings. In other words, the Petitioners are to be regarded as the Petitioners and the Respondent in these proceedings. If the Petitioner have reason to believe that it is  also the Respondent/Co-Intervnor/Eletson Holdings or controls what Respondent/Co-Intervenor/Eleston Holdings  does in these proceeding before  the Liberian courts, and that they can lawfully be the Petitioner and the Co-Intervenor in the enforcement proceedings before the Liberian court, they are at liberty to challenge the Intervenors's legal representation before the Liberian court, and this court will make the appropriate determination under Liberian law. But to elect to threaten and bully Liberian lawyers, in a bid to prevent the Intervenors from selecting counsel of their choice to represent their interest in the proceeding for the enforcement of judgment before the Liberian court, is further proof of the depraved conduct of the Petitioner. The **Liberian Constitution, Article 21(i),** provides: "the right to counsel and the rights of counsel shall be inviolable. There shall be no interference with the lawyer client relationship"…..."There shall be absolute immunity from any government sanctions or interference in the performance of legal services as a counsellor or advocate; lawyers offices and homes shall not be searched or papers examined or taken save pursuant to a search warrant and court order; and no lawyer shall be  prevented from or punished for providing legal services, regard less of the charges against or the guilt of his client."

3.10    Petitioner has further sought to extend its improper exercise of control to Co-Intervenor/Eletson Holdings's subsidiaries and affiliates, representing to employees, customers, financial institutions, and even outside counsel of those subsidiaries and affiliates that — even as it purports to seek this Court's recognition of the bankruptcy court's order — it in fact already controls those subsidiaries and affiliates. Mr Adams Spears  has threatened and purported to give instructions to those employees, customers, financial institutions and outside counsel. Attached hereto and marked as Intervenors' **Exhibit I/9** is a copy of an email written to Lex Group Liberia's Senior Consulting Counsel, Cllr. Betty Lamin-Blamo by Mr. Adam Spears, who purports to be the CEO of the Co-Intervenor/Eletson Holdings.

3.11    The bankruptcy court's approved Petitioner's September 19, 2024 Plan on October 25, 2024, and confirmed same on November 4, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e-amendment of its Articles of Incorporation, etc.. For example, the Petitioner had proposed amendments to the Articles of Incorporation of the Intervenors to remove certain restrictions on the transferability of shares as a part of their plan. When the Petitioner realized that in order to do this it would require tthat the amendment be filed by the Address of Record

who was appointed by the Intervenors, the Petitioner sought to amend the plan to provide that it would become effective prior to any of these procedures occurring — and therefore without needing to await a Liberian court recognition and enforcement of the judgment. On November 19, 2024, Petitioner filed a supplemental plan after the opinion and confirmation order of the court was issued on November 4, 2024. The supplemental plan excluded the proposed Amendment to the Article of Incorporation, and instead inserted the current Restated Articles of Incorporation which contains restrictions on the transferability of the Intervenors shares. Petitioner intent is to evade and is in fact attempting to evade its prior commitment to the bankruptcy court that it would proceed in accordance with Liberian law. Although the supplemental plan of November 19, 2024, has not been confirmed by the Bankruptcy court, Petitioner is attempting to take control of the Co- Intervenor/Eletson Holdings *before* obtaining a judgment from a competent Liberian court approving the enforcement of the New York bankruptcy court's confirmation order issued on November 4, 2024. The bankruptcy court was never asked by the Petitioner to approve its November 19, 2024, supplemental plan and strategy to transfer the shares of the Co-Intervenors in violation of corpration's Articles of incorporation.

3.12    The Petitioning Creditors' Plan and Disclosure Statement "contemplate the submission of certain documents (or forms thereof) and schedules" to effectuate the Plan (noting the Plan Supplements are "integral to and considered part of the Amended Plan"). Accordingly, on August 2, 2024, September 19, 2024, and November 12, 2024, the Petitioning Creditors filed Plan Supplements, that included, among other things, a Form of Amended By-Laws, Form of Amended Certificate of Incorporation, and Form of Shareholders Agreement (the "Prior Plan Supplements"). By submitting an Amended Certificate of Incorporation in each of the Prior Plan Supplements, the Petitioning Creditors recognized that they would be required to file an Amended Certificate of Incorporation with the Liberia authorities in order to implement the Plan and to effectuate a change in management and control of the Intervenors including the appointment of directors, officers, and legal representatives of the company.


3.13    Instead of complying with Liberian law and acting in accordance with their Plan, on November 19, 2024, the Petitioning Creditors filed a *Notice of (I) The Occurrence of the Effective Date and (II) Final Deadlines for Filing Certain Claims* (the "Effective Date Notice"), providing notice "that all conditions precedent to the Effective Date set forth in Section 9.1 of the Plan have been satisfied or waived pursuant to Section 9.2 of the Plan" and notice of the occurrence of the Effective Date on November 19, 2024. On the same day, the Petitioning Creditors filed the *Notice of Filing of Third Amended Plan Supplement to the Petitioning Creditors' Amended Joint Chapter 11 Plan of Reorganization of Eletson Holdings Inc. and its Affiliated Debtors* (the "Plan Supplement"). In the Plan Supplement, the Petitioner for the first time and without any notice to or approval of the Bankruptcy Court, abandoned their previously-stated intention to submit their own Amended Certificate of Incorporation, Articles of Incorporation, and By-Laws and instead represented that "Eletson Holdings Inc. will continue under its existing Restated Articles of Incorporation of Eletson Holdings Inc., as filed on June 29, 2007 with the Republic of Liberia, as amended by the Articles of Amendment filed on June 29, 2018 (and as amended, modified, supplemented, or restated from time to time)." *Id.* at 3 (emphasis added). Attached hereto and marked as Intervenors's **Exhibit I/10** is a copy of the petitioner's supplemental plan of November 19, 2024.


3.14    Under Co-Intervenor/Eleston's existing *Restated Articles of Incorporation* (Article V, Section 5) it prohibits the authorized transfer of shares and it provides : "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI)


3.15    That as to count one (1) of the petition, Intervenors say that it presents no traversable issue.

3.16    That as to count two (2) of the petition, it presents no issue that needs to be traversed.


3.17.    That as to count three (3) of the petition, Intervenors deny that the bankruptcy proceedings were initially commenced by the Intervenors as a voluntary Chapter 11 bankruptcy proceedings. Instead, the proceedings were initially commenced by the Petitioner against the Co-Intervenor/Eletson Holdings Inc as a Chapter 7 involuntary bankruptcy proceeding. Co-

Intervenor/Eletson Holdings says that to provide full disclosure, is a core tenet of judicial fairness and integrity. Courts rely on comprehensive and accurate information to deliver just and equitable decisions. The Petition's omissions undermine the Court's ability to consider the matter fully and fairly. The Petitioner failed to disclose to the Court that the bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of New York were not commenced as voluntary Chapter 11 bankruptcy proceedings, but as involuntary Chapter 7 bankruptcy proceedings. As mentioned above in paragraph 2.7 while the Intervenors and Eletson Corporation had already initiated arbitration proceedings against Levona on July 29, 2022, on March 7, 2023, the Petitioner, along with two other creditors of the Co-Intervenor/Eletson Holding, initiated involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) against the Co-Intervenor and two other alleged debtors, before the Bankruptcy Court for the Southern District of New York. Given the prevailing circumstances at the time, the continuous pressures from the opposing party (Levona), which was using constant tactics to hinder the progress of the arbitration, and in order for the Intervenors to retain control over its assets, at least until the anticipated arbitral award was issued, on September 6, 2023, the involuntary bankruptcy proceedings (under Chapter 7 of the US Bankruptcy Code) were converted into voluntary bankruptcy proceedings (under Chapter 11 of the US Bankruptcy Code). The fact that the bankruptcy proceedings were initiated as involuntary Chapter 7 bankruptcy proceedings, and they were then converted into voluntary Chapter 11 bankruptcy proceedings is very important in this case and is not explicitly written in the Petition. This fact shows that the bankruptcy proceedings were not initiated voluntarily by the Intervenors and that the Co-Intervenor/Eletson Holdings Inc was actually forced into bankruptcy by the filing of a bad-faith involuntary petition by the Petitioners.

3.18    That as to count four (4) of the Petition, Co-Intervenor/Eletson Holdings Inc says that it did file a bankruptcy plan as a result of the proceedings that were initially commenced by the Petitioner against the Intervenors as a Chapter 7 involuntary bankruptcy proceeding which later forced Intervenors because of the circumstances at the time, to stipulate with the Petitioner to convert the Chapter 7 to a Chapter 11 proceedings.

3.19    That as to count five (5) and six (6) of the Petition, Intervenors say that although the court did review the plans of the parties, the court did not consider whether (or to what extent) the overall bad faith conduct of Murchison/ Pach Shemen in planning and carrying out the scheme to seize control of the Intervenors (and through it, Eletson Gas) by means of a multi-year conspiracy was egregious enough to warrant rejecting the entire campaign and denying Pach Shemen standing and the Plan submitted by it. On October 25, 2025, the court approved the Petitioner's plan submitted on September 19, 2024, which provided that certain corporate procedures would take place pursuant to applicable Liberian law as part of the plan becoming effective-i.e.-amendment of its Articles of Incorporation, etc. The court did not approve any supplemental plan thereafter.

3.20    That as to count seven (7) of the petition, Intervenors say that it is a non-resident Liberian domestic corporation. However, it refutes that amendments to the Intervenors' Articles of Incorporation must be filed and registered with the Liberian International Ship & Corporate Registry (LISCR). LISCR is the statutory registered agent for Liberian non-resident domestic corporations and Foreign Maritime Entities only. LISCR is responsible for receipt and service of process, and to ensure the keeping of the required information of directors, management, and ownership to enable accessibility and availability of that information to the relevant competent authorities. The Registrar - the Minister of Foreign Affairs-the US equivalent of Secretary of State or the Deputy Registrar, or an official of the Liberian Government designated by the Registrar are authorized under the Business Corporation Act to file and effect amendments to the Articles of Incorporation of Liberian corporations.

3.21    That as to count eight (8) of the petition, Intervenors confirm and affirm count 3.21 above and says further that LISCR as the statutory registered agent of non-resident domestic corporation, it is authorized to adopt procedures and other mechanisms for the smooth operation of the Registry. Filings and submission of information relating to directors, management, and ownership of non-resident corporations (incumbency) can be made and accepted only from a pre-designated authorized representative of the non-resident domestic corporation and Foreign Maritime Entities known and referred to as the Address of Record ("AOR") as per the procedure established by LISCR, unless otherwise instructed by a competent Liberian court.

3.22    That as to count nine (9) of the petition, Intervenors confirm that LISCR does not file Articles of Incorporation or Amendments to Articles of Incorporation of Liberian corporations.

The Registrar or Deputy Registrar will not file or amend a Liberian corporation's Articles of Incorporation unless it is done upon the decision made by the corporation and not pursuant to the order of a foreign court that has not been recognized by the courts of Liberia by way of petition for the enforcement of judgment.

3.23    That as to count ten (10) and eleven (11) of the petition, Intervenors say that the December 20, 2024 Order by Judge Mastando was not for Adam Spear to act as foreign representative of the Co-Intervenor /Eletson Holding Inc's in Liberia because Eletson Holdings does have LISCR as its registered agent in Liberia. Rather, it was for Adam Spear to be the sole foreign Representative of the "Reorganized Eletson Holding Inc". It is a misrepresentation of the December 20, 2024, Order of the United States Bankruptcy Court for the Southern District of New York by the Petitioner, the designation of Adam Spear as the sole Foreign Representative of Intervenor/Eletson Holding Inc for the purpose of seeking or supporting any applications for judicial recognition and enforcement in Liberia of the Bankruptcy Court's November 4, 2024 Confirmation order. That assuming without admitting that the Order was for Adam Spear to be the sole foreign representative of Intervenor/Eletson Holding Holding Inc which is not the case, a foreign judgment i.e. a order of this nature is not considered conclusive as to any act(s) enumerated therein, and cannot be given automatic effect under Liberian law, but may be admitted as evidence    and enforced by a Liberian court based on comity. The Liberian Constitution has no such provision, and there is no statute or treaty with respect to the effect to be given a foreign judgment. In the absence of a special compact, no sovereign state is bound to give effect within its territory to a judgment rendered by the tribunals of another country; and <u>it is at liberty to give or refuse effect to it as may be found just and equitable" [Emphasis supplied].</u> In the instant case, Intervenors say that it would be unjust and inequitable to give effect to the foreign judgment sought to be enforced by the Petitioner for all of the reasons stated above. Even if the Intervenors appeared in the foreign court, neither the Constitution of Liberia (1986), the statute  or any case law has established that a foreign judgment is conclusive  against a party, if the party appeared and the foreign court purportedly or actually had jurisdiction. The subject of foreign judgment is captured under **Chapter 25.12 of the Civil Procedure Law**, which deals with evidence. The foreign judgment is taken as evidence, but it is not considered conclusive and enforceable. The decision of what effect if any is to be given to the judgment as a piece of evidence, lies within the sound discretion of the court considering comity between and amongst states, and other factors such as justice and equity. The New York Court's order cannot replace LISCR as Intervenor's registered agent in Liberia upon whom all process must be served without the Lberian court given recognition to that judgment. In reliance upon the Ne York Court's judgment, the Petitioner did not serve LISCR any process, instead it instituted the action and served the writ of summns and the Petition on the "Foreign Representative" who hs not been recognized. Your Honour is requested to take judicially notice of paragraph (a) of the Peitioner's prayer which requests Your Honour to: "Confirm that Adam Spears has been duly appointed Respondent's Foreign Representative in Liberia with authority to seek recgnition." This is an admission by the Petitioner that within the territory of Liberia , Adam Spears is not recognized and has no such authority until a competent Liberian authority grants and confirms his authority. Attached hereto and marked as Intervenors **Exhibit I/11** is a copy of the New York court's December 20, 2024, order.

3.24    That as to counts twelve (12) thirteen (13), fourteen(14) and fifteen (15) of the petition, Intervenors say that a fundamental requirement for the enforcement of a foreign judgment in Liberia is that the judgment sought to be enforced must in the discretion of the court be considered just and equitable and that it does not contravene the positive laws of Lberia. The Petitioner has failed to show that the judgment sought to be enforced is just and equitable. The Petitioners has instead sought to only establish that the US court which rendered the judgment had jurisdiction to do so, and that the Intervenors appeared in the proceedings. Those two factors under Section 25.12 and 25.13 of the Civil Procedure law, and Turner V. Burnette,  speak to the issue of admissibility of the judgment and not the conclusive effect to be given the judgment. The Petitioner has also failed to show that this court (the sixth judicial circuit) has jurisdiction to hear the enforcement of judgment from a Bankruptcy Court of a foreign state/jurisdiction.

3.25    That as to Count (16), Intervenors say that the fact that Co-Intervenor appeared before the court, and that the court had jurisdiction, or that there was no allegation of fraud alleged are not the only factors to be considered as conclusive to the grant of a petition for enforcemnt of judgement. In the case before the Bankruotcy court, although the Co-Inervenor pointed out that the Petitioner had been engaged in lots of bad faith conduct, the court ruled that it could not consider it by law. But under Liberian law, this court does not have to and cannot enforce a

judgment unless it is deemed just and equitable and unless the enforcement of the judgment would not contravene Liberian law.

3.27 Intervenors say to implement the plan which anticipates canceling and extinguishing the shares and interest of all of the shareholders in the Co-Intervenor/Eleston Holdings would work grave injustice against them.

3.28 That as to the prayer of the Petitioner, Intervenors says that judgment concludes against only persons that are parties to the case out of which the judgment grows. In the instant case, the Petitioner has failed to name and designate LISCR as a party to the suit even if they are considered nominal. Notwithstanding, Petitioner requests court to take actions against LISCR which impacts the rights of the Intervenors, without designating LISCR as a Party. Intervenors therefore request that the Petitioners request for this court's order directed at LISCR should be disregarded.

3.29 Intervenors denies all and singular the allegations of laws facts that were specifically traversed and reserves the right to interpose appropriate objections and defenses during the hearing or in any subsequent proceedings

WHEREFORE, and in view of the foregoing, Intervenors prays Your Honour to:

(i)     Issue an Interim Order prohibiting the Petitioner from continuing to hold itself as shareholders, director, and attempting to control the Intervenors and its affiliates pending the conclusion of these proceedings and also prohibiting Adam Spears from acting as Foreign Representative and President or exerting any form of authority on behalf of and in the name of the Co-Intervenor/Eletson Holdings pending the final determination of this case.

(ii)    Deny and dismiss the petition.

(iii)   Grant unto Intervenors any and all such further relief deemed by Your Honour to be just, legal, and equitable as in keeping with law.

Respectfully Submitted:
The above-named Intervenors,
Eletson Holdings Inc. and Keros Shipping Corporation,
Elafonissos Shipping Corporation, Lassia Investment Corporation,
Glafkos Trust Corporation, Family Trust Unity Corporation (Shareholders)
By and thru their Legal Counsels


Justice Advocates and Partners
18th Street, Sinkor
Monrovia, Liberia


G. Moses Paegar
Counsellor-At-Law


J. Johnny Momoh & Associates Law Chambers
8th Street, Sinkor
Monrovia, Liberia


J. Johnny Momoh
Counsellor-At-Law

Dated this 9th day January A. D., 2025

EXHIBIT "12"

REPUBLIC OF  LIBERIA)          IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY          CIRCUIT, MONTSERRADO COUNTY, SITTING
                                           IN ITS DECEMBER TERM, A.D. 2024

BEFORE HIS HONOUR: J. KENNEDY PEABODY.............. RESIDENT CIRCUIT JUDGE

Eletson Holdings Inc., 80 Broad Street, by and thru its              )
Board of Directors and President, and Keros Shipping Corporation, 80 )
Broad Street by and thru its President, Vasileios Chatzieleftheriadis, )
Elafonissos Shipping Corporation, 80 Broad Street by and thru          )
its President, Ioannis Zilakos, Lassia Investment Corporation 80
Broad Street by and thru its President, AdrianosPsomadakis-          )
Karastamatis, Glafkos Trust Corporation 80 Broad Street by and       )
thru its President, Vasileios Chatzieleftheriadis, Family Unity Trust, )
Corporation 80 Broad Street, by and thru its President,             )
Stavriani Kertsikof, In their capacity as shareholders              )          MOTION TO
of Eletson Holdings Inc) respectively...................................MOVANTS )          DISMISS
                                                                     )
                                                                     )
                         VERSUS                                      )
                                                                     )
Pach Shemen, LLC by and thru its Manager, Mark                       )
Lichtenstein.................................................1ST RESPONDENT)
                         AND
Eletson Holdings Inc., represented by Adam Spears its               )
Foreign Representative in Liberia, by and Thru his                  )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the               )
City of Monrovia............................................. 2ND RESPONDENT)

GROWING OUT OF THE CASE:

Pach Shemen, LLC by and thru its Manager, Mark                       )
Lichtenstein........................... .............. Petitioner      )
                                                                     ) PETITION TO
                                                                     )ENFORCE A
                                                                     )FOREIGN
                                                                     ) JUDGMENT
                         VERSUS                                      )
Eletson Holdings Inc., represented by Adam Spears its               )
Foreign Representative in Liberia, by and Thru his                  )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the               )
City of Monrovia.............................. Respondent           )

MOVANTS' MOTION

AND NOW COMES MOVANTS in the above entitled cause of action most respectfully praying
Your Honour and this Honourable Court to refuse jurisdiction and dismiss 1st Respondent's
Petition for Enforcement of a Foreign Judgment for the following legal and factual reasons, as
showeth, to wit:

1.  Movants say that **Chapter 11, § 2(a) of Title 1, Civil Procedure Law of Liberia**, provides:
    "Time; grounds; At the time of service of his responsive pleadings, a party may move for
    judgment dismissing one or more claims for relief asserted against him in a complaint or
    counterclaim on any of the following grounds: "That the court has no jurisdiction of the subject
    matter of the action." It is the contention of the Movants, that the Civil Law Court does not
    have subject matter Jurisdiction over matters of Bankruptcy and Insolvency and matters
    growing therefrom in Liberia. Hence, the Petition to Enforcement of a Foreign Judgment growing
    out of a Bankruptcy and Insolvency Proceedings in the United States of America is not
    cognizable before the Civil Law Court, Sixth Judicial Circuit for Montserrado County.

2.  Movants aver that although the Insolvency and Restructuring Act grants the Commercial Court
    exclusive jurisdiction over all insolvency cases, it also provides that the Act does not apply to

1

Domestic Non-Resident Corporations. However, when a foreign judgment, such as the one emanating from the United States Bankruptcy Court for the Southern District of New York, is sought to be enforced in the courts of Liberia as in the instant case, the Liberian court with exclusive jurisdiction over the subject matter is the proper forum before which such enforcement proceedings should be filed; that is to say the Commercial Court of Liberia.

3. That Section 8.6 of Insolvency and Restructuring Act of Liberia gives the Commercial Court **exclusive jurisdiction over all insolvency cases.** Under this Act, regardless of the amount involved and notwithstanding any monetary limits or thresholds, and all matters relating to the administration of a Debtor's Property and Estate or the disposition thereof are cognizable before the Commercial Court of Liberia.

4. That based on the averments contained in count one (1) through three (3) above, the Civil Law Court, Sixth Judicial Circuit for Montserrado County lacks subject matter jurisdiction over the instant enforcement proceedings.

WHEREFORE AND IN VIEW OF THE FOREGOING, Movants pray Your Honor and this Honorable Court to refuse jurisdiction, deny and dismiss, Petitioner's Petition in its entirety, and grant unto Movants any other relief as deemed just and proper in the premises.

Respectfully Submitted:
The above-named Movant,
Eletson Holdings Inc. and Keros Shipping Corporation,
Elafonissos Shipping Corporation, Lassia Investment Corporation,
Glafkos Trust Corporation, Family Trust Unity Corporation (Shareholders)
By and thru their Legal Counsels


Justice Advocates and Partners
18th Street, Sinkor
Monrovia, Liberia


Cllr. Moses G. Paegar
Counsellor-At-Law


J. Johnny Momoh & Associates Law Chambers
8th Street, Sinkor
Monrovia, Liberia


Cllr. J. Johnny Momoh
Counsellor-At-Law

Dated this 9th day January A. D., 2025

REPUBLIC OF LIBERIA ) IN THE OFFICE OF THE JUSTICE OF THE
MONTSERRADO COUNTY) PEACE FOR AND IN MONTSERRADO COUNTY

Eletson Holdings Inc., 80 Broad Street, by and thru its )
Board of Directors and President, and Keros Shipping Corporation, 80 )
Broad Street by and thru its President, Vasileios Chatzieleftheriadis, )
Elafonissos Shipping Corporation, 80 Broad Street by and thru )
its President, Ioannis Zilakos, Lassia Investment Corporation 80
Broad Street by and thru its President, AdrianosPsomadakis- )
Karastamatis, Glafkos Trust Corporation 80 Broad Street by and )
thru its President, Vasileios Chatzieleftheriadis, Family Unity Trust, )
Corporation 80 Broad Street, by and thru its President, )
Stavriani Kertsikof, In their capacity as shareholders )          MOTION TO
of Eletson Holdings Inc) respectively...................................MOVANTS)      DISMISS
                                                              )
                              VERSUS                          )
                                                              )
Pach Shemen, LLC by and thru its Manager, Mark               )
Lichtenstein.................................................................1ST RESPONDENT)
                              AND
Eletson Holdings Inc., represented by Adam Spears its         )
Foreign Representative in Liberia, by and Thru his           )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the        )
City of Monrovia........................................... 2ND RESPONDENT)

**GROWING OUT OF THE CASE:**

Pach Shemen, LLC by and thru its Manager, Mark               )
Lichtenstein........................ ............... Petitioner      )
                                                              ) PETITION TO
                                                              )ENFORCE A
                                                              )FOREIGN
                                                              ) JUDGMENT
                              VERSUS                          )
Eletson Holdings Inc., represented by Adam Spears its         )
Foreign Representative in Liberia, by and Thru his           )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the        )
City of Monrovia............................... Respondent         )

**AFFIDAVIT**

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in
Montserrado County, Republic of Liberia at my office in the City of Monrovia, Movants by and
thru its counsel, Cllr. G. Moses Paegar and made oath according to law that all and singular the
allegation as set forth and contained in the foregoing Movants' Motion are true and correct to the
best of his knowledge and belief, and as to those matters of information received, he verily believes
them to be true and correct.

SWORN AND SUBSCRIBED TO BEFORE ME,
this day of January A.D. 2025.

_____
JUSTICE OF THE PEACE, MONT. CO. R. L.

G. Moses Paegar
Counsellor-At-Law/Affiant

$5.00 Revenue Stamp affixed to the Original.

3

EXHIBIT "13"

REPUBLIC OF LIBERIA)       IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY         CIRCUIT, MONTSERRADO COUNTY, SITTING
                           IN ITS DECEMBER TERM, A.D. 2024

BEFORE HIS HONOUR: J. KENNEDY PEABODY.......... RESIDENT CIRCUIT JUDGE

| | |
|---|---|
| Eletson Holdings Inc., 80 Broad Street, by and thru its ) <br> Board of Directors and President, and Keros Shipping Corporation, 80 ) <br> Broad Street by and thru its President, Vasileios Chatzieleftheriadis, ) <br> Elafonissos Shipping Corporation, 80 Broad Street by and thru ) <br> its President, Ioannis Zilakos, Lassia Investment Corporation 80 <br> Broad Street by and thru its President, AdrianosPsomadakis- ) <br> Karastamatis, Glafkos Trust Corporation 80 Broad Street by and ) <br> thru its President, Vasileios Chatzieleftheriadis, Family Unity Trust, ) <br> Corporation 80 Broad Street, by and thru its President, ) <br> Stavriani Kertsikof, In their capacity as shareholders ) <br> of Eletson Holdings Inc) respectively.......................................Movants ) <br> ) <br> ) <br> **VERSUS** ) <br> ) <br> Pach Shemen, LLC by and thru its Manager, Mark ) <br> Lichtenstein.....................................................1st Respondent ) <br> AND <br> Eletson Holdings Inc., represented by Adam Spears its ) <br> Foreign Representative in Liberia, by and Thru his ) <br> Attorney-In Fact Counsellor Kunkunyon W. Teh, of the ) <br> City of Monrovia................................................ 2nd Respondent ) | MOTION TO <br> INTERVENE |

**GROWING OUT OF THE CASE:**

| | |
|---|---|
| Pach Shemen, LLC by and thru its Manager, Mark ) <br> Lichtenstein.......................... ................ Petitioner ) <br> ) <br> ) PETITION TO <br> )ENFORCE A <br> )FOREIGN <br> ) JUDGMENT <br> **VERSUS** ) <br> Eletson Holdings Inc., represented by Adam Spears its ) <br> Foreign Representative in Liberia, by and Thru his ) <br> Attorney-In Fact Counsellor Kunkunyon W. Teh, of the ) <br> City of Monrovia................................ Respondent ) | |

## MOVANT'S MOTION

AND NOW COME MOVANTS in the above-entitled cause of action most respectfully praying Your Honour and this Honourable Court to grant Movant's Motion to Intervene for the following legal and factual reasons.

1.  The Co- Movant/ Eleston Holdings Inc. is a non-resident Liberian corporation, which was incorporated on December 4, 1985, under Liberian law, with its headquarters and center of main interests located in Greece, where it maintains offices at 118 Kolokotroni Street, Piraeus. The Co-Movant operates pursuant to its existing Articles of Incorporation, dated December 4, 1985, Restated Articles of Incorporation, dated June 29, 2007 (the "Restated AOI"), and Articles of Amendment, dated June 29, 2018, and as amended, modified, supplemented or restated from time to time, and filed and recognized in Liberia (the "Existing Articles of Incorporation"). **Article V, Section 5 of the Restated Articles of Incorporation,** provides that "any purported transfer of shares of common stock not permitted hereunder shall be void and of no effect, and the purported transferee shall have no rights as a stockholder of the corporation and no other rights against or with respect to the corporation" (Restated AOI).Attached hereto and marked as Movants' **Exhibit**

1

**M/ 1 in bulk** are copies of the Articles of Incorporation of the Co-Movant/Eletson Holdings Inc, Restated Articles of Incorporation of the Co-Movant, and Articles of Amendment of the Articles of Incorporation of the Co-Movant.

2.     The Co-Movants, Keros Shipping Corporation, Elafonissos Shipping Corporation, Lassia Investment Corporation, Glafkos Trust Corporation, and Family Trust Unity Corporation are all non-resident Liberian corporations, under the laws of Liberia incorporated on May 9, 1997, October 7, 1981, December 6, 1991, and January 20, 1992, respectively. Attached hereto and marked as Movants' **Exhibit M/ 2 in bulk** are copies of the Articles of Incorporation of the Co-Movants and Certificates of Good standing.

3.     The Movants have authorized Justice Advocates & Partners, and the J. Johnny Momoh & Associate Law Chambers, who are reputable Liberian law firms to represent their legal interest in these proceedings. Attached hereto and marked as Movants' **Exhibit M/3 in bulk** are copies of resolutions of the Board of Directors of the Movants authorizing Justice Advocates & Partners, and J. Johnny Momoh & Associate Law Chambers to act on their behalf, the Certificate of Incumbency of the Co-Movant/Eletson Holding Inc, and the current business registration certificates of the firms are attached.

4.     It is the law, that "upon timely application, any person shall be allowed to intervene in an action:

(a)     When a statute of the Republic of Liberia confers an unconditional right to intervene; or

(b)     When the representation of the applicant's interests by existing parties is or may be inadequate and the applicant is or may be bound by a judgment in the action; or

(c)     When the applicant is so situated as to be adversely affected by a distribution or other disposition of property in the custody or subject to the control or disposition of the court or of an officer thereof." **Chapter 5, Section 5.6(1), Title 1, Civil Procedure Law of Liberia**

5.     Movants say that neither the board of the Co-Movant corporation/Eletson Holdings Inc, nor the shareholders have at any time appointed or designated Mr. Adams Spears to act as its "foreign representative in Liberia" nor has he obtained such authorization from any other competent authority. The designation of Adam Spears as the representative of the 2ⁿᵈ Respondent corporation, and his appointment of an Attorney-In Fact Counsellor Kunkunyon W. Teh to act on behalf of the corporation without the knowledge and consent of the Board of Directors and shareholders of the corporation is done in bad faith, and is intended to deprive the corporation of its day in court, and the opportunity to file its returns to the petition filed by the Petitioner for the enforcement of judgment against the corporation.

6.     Movant says that Eletson Holding Inc. is a non-resident Liberian corporation with its center of main interests and its head office at 118 Kolokotroni Street, Piraeus Greece, and its registered agent for the receipt of process is LISCR, which the Petitioner is very much aware. On November 26, 2024, the 1ˢᵗ Respondent/Petitioner herein commenced proceedings for the enforcement of the very judgment sought to be enforced and named Movant as the Respondent therein. The writ of summons along with the petition was served on Respondent's registered agent LISCR, but the proceedings was subsequently discontinued by the 1ˢᵗ Respondent/Petitioner on December 3, 2024. Thereafter, the 1ˢᵗ Respondent/Petitioner commenced yet another proceedings for the enforcement of the same judgment on December 5, 2024, (the second time), and also named Movant as the Respondent. Again, the Petitioner served the Movant through its registered agent, LISCR. On December 16, 2024, Co-Movant/Eleston Holdings Inc filed its returns to the Petition. Thereafter, and for the second time, 1ˢᵗ Respondent/Petitioner discontinued the proceedings on December 23, 2024. However, upon the commencement of the proceedings for the third time on January 7, 2025, unlike the others, 1ˢᵗ Respondent/Petitioner has intentionally declined to serve the corporation's registered agent because it intends to deprive the corporation and its shareholders of the benefit of having their day in court and interposing adequate and appropriate response to the petition. Attached hereto and marked as Movants' **Exhibit M/4** in bulk are copies of previous petitions filed, notices of discontinuance, and the Sheriff's returns evidencing service of process on LISCR as the registered agent of Co-Movant/Eletson Holdings Inc. The sheriff's returns in this matter is

also attached evidencing that this petition unlike the others, was never served on the corporation's registered agent, but instead, it was served on Kukuyon Teh who is not known to the Co-Movant/Eletson Holdings Inc.,- a clear attempt to ensure that the Movant corporation never gets its day in court. The 1st Respondent/Petitioner should have served the Petition on Eletson Holdings Inc's registered agent LISCR, for onward transmission to the corporation's head office at its address in Piraeus, Greece.

7.     Movants say that on November 25, 2024, "Reorganized Holdings" applied to the Bankruptcy Court for the Southern District of New York for the entry of an order appointing Adam Spears as the "Foreign Representative" of the "Reorganized Holdings". "Reorganized Holdings" is a creature of the Bankruptcy Court's judgment which declared the Co-Movant/Eletson Holdings Inc. reorganized. The judgment of the Bankruptcy court ordering the reorganization of the Co-Movant/Eletson Holdings Inc. has not been recognized in Liberia or ordered enforced by any competent court in Liberia. In fact, it is the very judgment that the 1st Respondent/Petitioner now seeks to be recognized and enforced in Liberia. On December 20, 2024, the United States Bankruptcy Court for the Southern District of New York court pursuant to Section 1505 of the United States Bankruptcy Code, ruled appointing Adam Spears as "the sole "foreign representative" solely on behalf of "Reorganized Holdings" in Liberia and Greece for the purpose of seeking (or supporting any application seeking) recognition of the Confirmation Order entered in the Chapter 11 case in Liberia and Greece".

8.     The Bankruptcy court in its ruling recognizing the universal right to due process of all the parties, held that "nothing in this order implies or shall be argued to indicate that **any** party is barred or limited in any way from responding to any proceedings seeking recognition of this court's orders in Liberia or Greece". Attached hereto and marked as Movants' **Exhibit M/5** is a copy of the December 20, 2024, order of the Bankruptcy Court.

9.     Movant says that Co-Movant/Eleston Holdings Inc. the debtor in the US Bankruptcy Court has the right to represent itself in these proceedings filed against it in Liberia, for the enforcement of the Bankruptcy court's judgment against it. Eleston Holdings Inc. is not considered "Reorganized Holdings" and is not deemed recognized in Liberia, until the Bankruptcy court's judgment which ordered its reorganization and confirmed the 1st Respondent/Petitioner's Plan, is recognized and ordered enforced by a competent court in Liberia. Hence, the very reason why the 1st Respondent/Petitioner has filed this action. Notwithstanding, what the 1st Respondent/Petitioner is tacitly seeking to do is to pretend that it is seeking recognition and enforcement of the Bankruptcy Court's judgment, and at the same time appear and exert before the very court before whom it is seeking recognition and enforcement of its authority as "Reorganized Holdings" through Adams Spears, an individual whom they sought to have the Bankruptcy court appoint in their capacity as "Reorganized Holdings" prior to this court recognizing Mr. Spears as such. The net effect of the bad faith conducts of the 1st Respondent/Petitioner by serving the Petition on Adam Spears through his designated Attorney -In-Fact is technically to ensure that Co-Movant/Eletson Holding Inc. does not have a whim of the proceedings and is not allowed to appear and represent itself.

10.     Movants say that the representation of the Co-Movant/Eletson Holdings Inc's interests by Counsellor Kunkunyon W. Teh is unauthorized, and is without doubt inadequate, and not in the best interest of the Movants; and ultimately, the Movants may be bound by a judgment in an action in which they were not given the opportunity to be heard.

11.     The Supreme Court of Liberia held in the case **Cooper Heirs et al v Swope et al, 39 LLR 220 (1998),** that a motion to intervene is a matter of right granted by statute, and that once a Movant has shown that it has protectible rights and interests, the trial court is without discretion to deny the motion to intervene. Movants say that the corporation and its shareholders do have protectible rights and interest that must be safeguarded and hence their intervention is absolutely necessary.

12.     Movants say that they have filed along with this Motion to Intervene, their Intervenors' Returns to the 1st Respondent/Petitioner's Petition, in keeping with Chapter 5, Section 5.63, Title 1, Civil Procedure Law, and prays Your Honor to take judicial notice thereof.

WHEREFORE AND IN VIEW OF THE FOREGOING, Movant prays Your Honor and this Honorable Court to grant Movant's Motions to Intervene in order give the Movants an opportunity to be heard and to preserve the sanctity of our laws, and grant unto Movant any other relief as Your Honour deems just and proper in the premises.

Respectfully Submitted:
The above-named Movants,
Eletson Holdings Inc., and Keros Shipping Corporation,
Elafonissos Shipping Corporation, Lassia Investment Corporation,
Glafkos Trust Corporation, Family Trust Unity Corporation (Shareholders)
By and thru their Legal Counsels:

Justice Advocates and Partners
18th Street, Sinkor
Monrovia, Liberia

Cllr. Moses G. Paegar
Counsellor-At-Law

J. Johnny Momoh & Associates Law Chambers
8th Street, Sinkor
Monrovia, Liberia

Cllr. J. Johnny Momoh
Counsellor-At-Law

Dated this 9th day January A. D., 2025

4

EXHIBIT "14"

REPUBLIC OF LIBERIA)          IN THE CIVIL LAW COURT, SIXTH JUDICIAL
MONTSERRADO COUNTY          CIRCUIT, MONTSERRADO COUNTY, SITTING
                           IN ITS DECEMBER TERM, A.D. 2024

<u>BEFORE HIS HONOUR: J. KENNEDY PEABODY</u>.......... RESIDENT CIRCUIT JUDGE

Eletson Holdings Inc., 80 Broad Street, by and thru its            )
Board of Directors and President, and Keros Shipping Corporation, 80  )
Broad Street by and thru its President, Vasileios Chatzieleftheriadis,  )
Elafonissos Shipping Corporation, 80 Broad Street by and thru      )
its President, Ioannis Zilakos, Lassia Investment Corporation 80
Broad Street by and thru its President, AdrianosPsomadakis-        )
Karastamatis, Glafkos Trust Corporation 80 Broad Street by and     )
thru its President, Vasileios Chatzieleftheriadis, Family Unity Trust,  )
Corporation 80 Broad Street, by and thru its President,            )
Stavriani Kertsikof, In their capacity as shareholders             )      MOTION TO
of Eletson Holdings Inc) respectively.....................................MOVANTS )      STRIKE
                                                                   )
                                                                   )
                    VERSUS                                         )
                                                                   )
Pach Shemen, LLC by and thru its Manager, Mark                     )
Lichtenstein.....................................................1ST RESPONDENT)
                    AND
Eletson Holdings Inc., represented by Adam Spears its              )
Foreign Representative in Liberia, by and Thru his                 )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the              )
City of Monrovia.......................................... 2ND RESPONDENT)

<u>GROWING OUT OF THE CASE:</u>

Pach Shemen, LLC by and thru its Manager, Mark                     )
Lichtenstein.......................... ............... Petitioner         )
                                                                   ) PETITION TO
                                                                   )ENFORCE A
                                                                   )FOREIGN
                                                                   ) JUDGMENT
                    VERSUS                                         )
Eletson Holdings Inc., represented by Adam Spears its              )
Foreign Representative in Liberia, by and Thru his                 )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the              )
City of Monrovia............................... Respondent         )

## MOVANTS' MOTION

AND NOW COME MOVANTS in the above-entitled cause of action most respectfully
praying Your Honour and this Honourable Court to strike the Returns filed by Cllr. Kunkunyon
W. Teh on behalf of Eletson Holdings, Inc., in the Petition to Enforce a Foreign Judgment out
of which this Motion and for legal and factual reasons, showeth the following to wit:

1.    The Co- Movant/ Eleston Holdings Inc. is a non-resident Liberian corporation,
      which was incorporated on December 4, 1985, under Liberian law, with its
      headquarters and center of main interests located in Greece, where it maintains
      offices at 118 Kolokotroni Street, Piraeus. The Co-Movant operates pursuant to its
      existing Articles of Incorporation, dated December 4, 1985, Restated Articles of
      Incorporation, dated June 29, 2007 (the "Restated AOI"), and Articles of
      Amendment, dated June 29, 2018, and as amended, modified, supplemented or
      restated from time to time, and filed and recognized in Liberia (the "Existing
      Articles of Incorporation"). **Article V, Section 5 of the Restated Articles of
      Incorporation,** provides that "any purported transfer of shares of common stock
      not permitted hereunder shall be void and of no effect, and the purported transferee
      shall have no rights as a stockholder of the corporation and no other rights against

1

or with respect to the corporation" (Restated AOI). Your Honor is requested to take judicial notice of Movants' **Exhibit M/ 1 in bulk** attached to the Motion to Intervene in substantiation of the averment contained herein.

2. The Co-Movants, Keros Shipping Corporation, Elafonissos Shipping Corporation, Lassia Investment Corporation, Glafkos Trust Corporation, and Family Trust Unity Corporation are all non-resident Liberian corporations, under the laws of Liberia incorporated on on May 9, 1997, October 7, 1981, December 6, 1991, and January 20, 1992, respectively. Your Honor is requested to take judicial notice of Movants' **Exhibit M/ 2 in bulk** attached to the Motion to Intervene in substantiation of the averment contained herein.

3. Movants say that neither the board of the Co-Movant corporation/Eletson Holdings Inc, nor the shareholders have at any time appointed or designated Mr. Adams Spears to act as its "foreign representative in Liberia" nor has he obtained such authorization from any other competent authority. The designation of Adam Spears as the representative of the 2nd Respondent corporation,  and his appointment of an Attorney-In-Fact Counsellor Kunkunyon W. Teh to act on behalf of the corporation without the knowledge and consent of the Board of Directors  and shareholders of the corporation is done in bad faith, and is intended to deprive the Co-Movant Eletson Holdings, Inc., of its day in court, and the opportunity to file its returns to the petition filed by the Petitioner for the enforcement of judgment against Co-Movant Eletson Holdings, Inc.

4. Movants say that on November 25, 2024, "Reorganized Holdings" applied to the Bankruptcy Court for the Southern District of New York for the entry of an order appointing Adam Spears as the "Foreign Representative" of the "Reorganized Holdings". "Reorganized Holdings" is a creature of the Bankruptcy Court's judgment which declared the Co-Movant/Eletson Holdings Inc. reorganized. The judgment of the Bankruptcy court ordering the reorganization of the Co-Movant/Eletson Holdings Inc. has not been recognized in Liberia or ordered enforced by any competent court in Liberia. In fact, it is the very judgment that the 1st Respondent/Petitioner now seeks to be recognized and enforced in Liberia. On December 20, 2024, the United States Bankruptcy Court for the Southern District of New York court pursuant to Section 1505 of the United States Bankruptcy Code, ruled appointing Adam Spears as "the sole "foreign representative" solely on behalf of "Reorganized Holdings" in Liberia and Greece for the purpose of seeking (or supporting any application seeking) recognition of the Confirmation Order entered in the Chapter 11 case in Liberia and Greece".

5. The Bankruptcy court in its ruling recognizing the universal right to due process of all the parties, held that "nothing in this order implies or shall be argued to indicate that **any** party is barred or limited in any way from responding to any proceedings seeking recognition of this court's orders in Liberia or Greece". Your Honor is requested to take judicial notice of Movants' **Exhibit M/5** attached to the Motion to Intervene in substantiation of the averment contained herein.

6. Movants say that based on the averments contained in count one (1) through six (6) above and the Supreme Court's Opinion in the case: **United Commodities, Inc., versus ECOWAS Bank for Investment and Development (EBID), decided on August 28, 2024,** in which the Court held that before a Liberian Lawyer can file or represent a non-domiciliary corporation he must do so pursuant to a board resolution of the non-domiciliary foreign corporation. Accordingly, Adam Spears and Cllr. Kunkunyon W. Teh lack the legal capacity and standing to represent Co-Movant/Eletson Holdings, Inc.

WHEREFORE AND IN VIEW OF THE FOREGOING, Movants pray Your Honor and this Honorable Court to strike, deny and dismiss the Returns filed by Adam Spears and Cllr. Kunkunyon W. The as Attorney-In-Fact for the said Adam Spears, and grant unto Movants any other relief as Your Honour deems just and proper in the premises.

Respectfully Submitted:
The above-named Movants,
Eletson Holdings Inc., and Keros Shipping Corporation,
Elafonissos Shipping Corporation, Lassia Investment Corporation,
Glafkos Trust Corporation, Family Trust Unity Corporation (Shareholders)
By and thru their Legal Counsels:


Justice Advocates and Partners
18th Street, Sinkor
Monrovia, Liberia


_____
Cllr. Moses G. Paegar
Counsellor-At-Law


J. Johnny Momoh & Associates Law Chambers
8th Street, Sinkor
Monrovia, Liberia


_____
Cllr. J. Johnny Momoh
Counsellor-At-Law


Dated this 9th day of January A. D., 2025

REPUBLIC OF LIBERIA ) IN THE OFFICE OF THE JUSTICE OF THE
MONTSERRADO COUNTY) PEACE FOR AND IN MONTSERRADO COUNTY

Eletson Holdings Inc., 80 Broad Street, by and thru its )
Board of Directors and President, and Keros Shipping Corporation, 80 )
Broad Street by and thru its President, Vasileios Chatzieleftheriadis, )
Elafonissos Shipping Corporation, 80 Broad Street by and thru )
its President, Ioannis Zilakos, Lassia Investment Corporation 80
Broad Street by and thru its President, AdrianosPsomadakis- )
Karastamatis, Glafkos Trust Corporation 80 Broad Street by and )
thru its President, Vasileios Chatzieleftheriadis, Family Unity Trust, )
Corporation 80 Broad Street, by and thru its President, )
Stavriani Kertsikof, In their capacity as shareholders )        MOTION TO
of Eletson Holdings Inc) respectively..............................MOVANTS)      STRIKE
                                                                )
                    VERSUS            •                         )
                                                                )
Pach Shemen, LLC by and thru its Manager, Mark                  )
Lichtenstein.............................................................1ST RESPONDENT)
                    AND
Eletson Holdings Inc., represented by Adam Spears its           )
Foreign Representative in Liberia, by and Thru his              )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the           )
City of Monrovia............................................ 2ND RESPONDENT)

GROWING OUT OF THE CASE:

Pach Shemen, LLC by and thru its Manager, Mark                  )
Lichtenstein.......................... ............... Petitioner      )
                                                                ) PETITION TO
                                                                )ENFORCE A
                                                                )FOREIGN
                                                                ) JUDGMENT
                    VERSUS                                      )
Eletson Holdings Inc., represented by Adam Spears its           )
Foreign Representative in Liberia, by and Thru his              )
Attorney-In Fact Counsellor Kunkunyon W. Teh, of the           )
City of Monrovia............................... Respondent      )

AFFIDAVIT

PERSONALLY APPEARED BEFORE ME, a duly qualified Justice of the Peace for and in
Montserrado County, Republic of Liberia at my office in the City of Monrovia, Movants by and
thru its counsel, Cllr. G. Moses Paegar and made oath according to law that all and singular the
allegation as set forth and contained in the foregoing Movants' Motion are true and correct to the
best of his knowledge and belief, and as to those matters of information received, he verily believes
them to be true and correct.

SWORN AND SUBSCRIBED TO BEFORE ME,
this 9th day of January A.D. 2025.

JUSTICE OF THE PEACE, MONT. CO. R. L.

G. Moses Paegar
Counsellor-At-Law/Affiant

$5.00 Revenue Stamp affixed to the Original.

4

EXHIBIT "15"

**From:** **Bryan Kotliar** bkotliar@teamtogut.com 
**Subject:** Re: Eletson Holdings Inc.
**Date:** January 10, 2025 at 4:53 PM
**To:** Curtin, William E. wcurtin@sidley.com
**Cc:** Kyle Ortiz kortiz@teamtogut.com

Bill,

The Majority Shareholders that you represent are co-movants along with the Minority Shareholders and persons purporting to represent Eletson Holdings on the three attached pleadings filed in Liberia opposing recognition of the Court's Confirmation Order.

All three pleadings violate the Plan and Confirmation Order for reasons that we have previously briefed extensively in the Sanctions Motion and related filings. In particular, paragraph 12 of the Court's Confirmation Order enjoins "all Holders of Claims *or Interests* and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates . . . *from taking any actions to interference with implementation or consummation of the Plan* or interfering with any distributions or payments contemplated by the Plan." (Emphasis added).

Incredibly, in Section 3 of the Motion to Strike, the Majority Shareholders argue that Mr. Spears has not been authorized to act as the "the foreign representative in Liberia" from "any . . . competent authority." You and your clients consented to the entry of the Bankruptcy Court's order appointing Adam Spears as Eletson Holdings' foreign representative for seeking the very recognition that your clients now dispute.

You have claimed that the Majority Shareholders are cooperating in good faith in implementing and consummating the Plan. In these pleadings, they are doing the direct opposite.

The Majority Shareholders are directed to withdraw these pleadings immediately and cease all other efforts to interfere with implementation or consummation of the Plan.

Best regards,

Bryan



**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
**Direct:** +1 212 201 5582 | **Mobile:** +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

TOGUT SEGAL & SEGAL LLP

On Jan 3, 2025, at 8:07 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Bill - following up on the below.

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
**Direct:** +1 212 201 5582 | **Mobile:** +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Dec 30, 2024, at 12:52 PM, Curtin, William E. <wcurtin@sidley.com> wrote:

Bryan,

I hope you are having a nice holiday. I've forwarded your request to my clients and I understand that they are conferring with Greek and Liberian counsel.

Thanks,
Bill

**WILLIAM E. CURTIN**

**SIDLEY AUSTIN LLP**
+212 839 6745
wcurtin@sidley.com

*************************************************************************************************
This e-mail is sent by a law firm and may contain information that is privileged or confidential.
If you are not the intended recipient, please delete the e-mail and any attachments and notify us
immediately.
*************************************************************************************************

**From:** Bryan Kotliar <bkotliar@teamtogut.com>
**Sent:** Thursday, December 26, 2024 7:30 AM
**To:** Curtin, William E. <wcurtin@sidley.com>
**Cc:** Kyle Ortiz <kortiz@teamtogut.com>
**Subject:** Re: Eletson Holdings Inc.

Good morning Bill - following up on the below.

─────

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<image001.png>

> On Dec 22, 2024, at 11:45 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Hi Bill - happy Sunday. Following up again on the below.
>
> ─────
>
> **Bryan M. Kotliar** | **Partner**
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335 | New York, NY 10119
> Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
> bkotliar@teamtogut.com | togutlawfirm.com
>
> <597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Dec 21, 2024, at 10:11 AM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:

Good morning Bill,

If you got any snow over night, hope you're enjoying the day and staying safe and warm.

Following up again on my emails below.  When can we expect your responses?

Best regards,

Bryan

――――

**Bryan M. Kotliar | Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

> On Dec 20, 2024, at 4:02 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
>
> Bill - following up again on the below. What is your response?
>
> ――――
>
> **Bryan M. Kotliar | Partner**
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335 | New York, NY 10119
> Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
> bkotliar@teamtogut.com | togutlawfirm.com
>
> <597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>
>
> > On Dec 19, 2024, at 2:27 PM, Bryan Kotliar <bkotliar@teamtogut.com> wrote:
> >
> > Bill - following up on my two emails below.  When can we expect your response?

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York,
NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516
410 1361
bkotliar@teamtogut.com |
togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

> On Dec 18, 2024,
> at 4:39 PM, Bryan
> Kotliar
> <bkotliar@teamtog
> ut.com> wrote:
>
> Bill,
>
> Following up on
> the below.  In
> connection with
> item (2), attached
> is a form of letter
> for your clients to
> submit in the
> Liberian
> recognition
> proceeding.  As
> you and your
> clients have been
> ordered to
> cooperate with us
> in good faith to
> implement the
> Plan, to the extent
> you have any
> issues with this
> letter or the other
> requests, we
> expect that you will
> let us know what
> they are so we can
> work through them
> with you in good
> faith.
>
> Given the
> upcoming
> deadlines in the
> Liberian

Liberian recognition proceeding, we'd appreciate your response by 9:00 a.m. (ET) on Friday, December 20. Again, if there are issues or if you need more time, please let us know so we can work through them.

Best regards,

Bryan

<[FORM] Former Majority Shareholders Liberian Letter - Draft.docx>

———

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

On Dec 17, 2024, at 9:25 PM, Bryan Kotliar

<[bkotliar@teamtogut.com](mailto:bkotliar@teamtogut.com)> wrote:

Bill,

As you know, the Confirmation Order provides, among other things, that "[t]he Debtors and the Petitioning Creditors and each of their respective Related Parties are hereby directed to cooperate in good faith to implement and consummate the Plan." Confir

mation Order ¶ 5(i). The former Majority Shareholders that you represent are included in the definition of Related Parties as former shareholders of the Debtors. Plan § 1.124. In addition, the Confirmation Order provides that "[u]pon entry of this Confirmation Order, all Holders of Claims or Interests and other parties in

"" interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan or interfering with any distributions and payments

contemplated by the Plan." Confirmation Order ¶ 12.

To fulfill your obligations to cooperate in good faith, we are asking you and the former Majority Shareholders do the following:

- (1) Send Ms. Blamo (and any other lawyers/firms purporting to represent Eletson Holdings Inc. in Liberia

, including Lex Group Liberia) a letter that the former Majority Shareholders agree with Reorganized Eletson Holdings Inc. that Ms. Blamo and Lex Group Liberia cannot represent Eletson Holdings Inc. (or a anyone purporting to be or to be acting on behalf of Eletson Holdings Inc. other than

than Adam Spears) or the shareholders in the Liberian recognition proceeding.

- (2) File a pleading in the Liberian recognition proceeding that the former Majority Shareholders consent to recognition of the Court's confirmation order.

- (3) File any pleadings necessary to withdraw or

terminate the pending Greek action in the Piraeus Court and, to the extent that such action is not withdrawn or terminated, file any pleadings necessary to support Eletson Holdings Inc.'s enforcement and recognition of the Confirmation Order in Greece.

We look forward to hearing from you.

you.

Best regards,

Bryan

---

**Bryan M. Kotliar** | **Partner**
Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335 | New York, NY 10119
Direct: +1 212 201 5582 | Mobile: +1 516 410 1361
bkotliar@teamtogut.com | togutlawfirm.com

<597CF39D-802E-4454-B1AD-DA0D1DE7FE3A.png>

EXHIBIT "16"


**Before the Athens Multi-Member Court of First Instance**

[*Intentional Jurisdiction Proceedings*]

### APPLICATION

Of the reorganized foreign company under the name: **"ELETSON HOLDINGS INC."** which, according to its articles of association, is based in Liberia, however, it's true seat, and beyond that, the center of its main interests, is located in the State of New York, (One Pennsylvania Plaza Suite 3335, New York, NY 10119, United States, USA), legally represented by Mr. *Adam Spears*, pursuant to the Order dated 12/20/2024 of the Bankruptcy Court of the Southern District of New York.

### FOR RECOGNIZING, IN GREECE,

### AS THE MAIN INSOLVENCY PROCEEDINGS

1. Order No. Doc. 1212/10.25.2024 of the Bankruptcy Court of the Southern District of New York in Case No. 23-10322 (JPM), under heading: "MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE",

2. Of the Order dated on the 4th OF NOVEMBER 2024 of the U.S. Bankruptcy Court - Southern District of New York (Case No: 23-10322 (JPM)), under heading: "FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS".

---

**A. Introductory** - **Scope of the Proceedings**

1. Our company, **"ELETSON HOLDINGS INC."**, both prior to and after its reorganization, is based, according to its articles of association, in Liberia. However, its true seat and the center of its main interests are located in New York, USA. As far as Greece is concerned, and in particular Piraeus (117 Kolokotroni Street), our company does not maintain its seat there, its board of directors does not meet there, no decisions are taken there regarding the pursuit of its objective, does not maintain personnel, infrastructure, property, and does not maintain bank accounts there. None of its creditors is located in Greece.



**2.** The need for recognition, in Greece, as primary insolvency proceedings: **(a.)** of Order number Doc. 1212/10.25.2024 of the Bankruptcy Court of the Southern District of New York in Case No. 23-10322 (JPM), under heading: "MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE", and **(b.)** of the Order of the Bankruptcy Court of the USA - Southern District of New York dated on the 4th of November 2024 (Case No: 23-10322 (JPM)), under heading: **"FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS"** hereinafter the "Order", was created by the filing, by currently <u>former</u> shareholders of our company **"ELETSON HOLDINGS INC.",** before the Single-Member Court of First Instance of Piraeus, of the application dated 11/11/2024 with filing No. 16655/7823/2024 on the appointment of provisionary management of our company **"ELETSON HOLDINGS INC.",** which is discussed on 02/04/2025, upon granting, in that regard, a temporary order appointing temporary management thereof, until the discussion of the application and under the condition of its discussion.

**3.** With this manipulation of the former shareholders, they are attempting by recourse to the jurisdiction of the Greek courts, to inhibit the completion of the reorganization of our company **"ELETSON HOLDINGS INC."** The above are discussed in detail below in the application.

4. The objective of this application and proceedings is, therefore, to recognize, in Greece, the foreign insolvency proceedings as the **main proceedings,** that is, the aforementioned Order. The main legal basis by which recognition is sought. is Law 3858/2010, on the adaptation of Greek law to the standard law of 1997 on "Cross-Border Bankruptcy" of the United Nations Commission on International Trade (UNCITRAL) 1997.

## B. Background

*I. The financing of "ELETSON HOLDINGS INC." via a bond loan drafted in the USA.*

5. The sole activity of **"ELETSON HOLDINGS INC.",** which was and remains a holding company, was search for financing, which it channeled to its subsidiaries. **Financing was always sought in the U.S.A.** Thus, in 2003, it received financing of $103 in the U.S.A. It is the inability of **"ELETSON HOLDINGS INC."** to serve another financing of $300 million, which led to its insolvency proceedings.

6. On this last financing, which goes back to the year 2013, the following are noted: In its relevant announcement dated 12/19/2013, **"ELETSON HOLDINGS INC.",** declaring that it is an international enterprise, *which maintains offices in Connecticut U.S.A.,* has asked for capital financing of $300 million by issuing bonds (bond loan), secured by a first class mortgage on the ships (the old bonds). Following the issuance of the bonds, Deutsche Bank in the U.S.A. was appointed as their trustee. It is noted that in the relevant contract dated 12/19/2013 (Indenture) between **"ELETSON HOLDINGS INC."** and Deutsche Bank, applicable law is set forth as the laws of the State of New York.

7. This financing agreement had three supplements, the first one was drafted on 01/31/2014, the second one on 03/20/2014 and the third one on 04/01/2014. New York law was maintained as the applicable law by express terms of said contracts.


[stamp:]
*HELLENIC
REPUBLIC*
[emblem:]

8.  Due to the financial inability of **"ELETSON HOLDINGS INC."** to adhere to the financing terms, i.e. its inability to pay interest, it proposed, in May 2018, to exchange the old bonds for new ones, also issued by it, similarly secured by a first-class mortgage on ships. As evidenced by Order No. Doc. 1212/10.25.2024 of the American Bankruptcy Court, an approximate percentage of 98%, of the bondholders-lenders of the old bonds participated in the exchange of bonds. This exchange was completed by "**ELETSON HOLDINGS INC."** in July 2018. The new bonds amounted to $314,068,360 in principal, maturing in the year 2022.

9.  On July 2, 2018, by contract drawn in New York between **"ELETSON HOLDINGS INC."** and the trustee of the old bonds, Deutsche Bank of the U.S.A., the latter ceased to be the trustee.

10. On the same day, a contract was drawn (Indenture), similarly governed by the laws of the State of New York, between **"ELETSON HOLDINGS INC."** and the company **Wilmington Savings Fund FSB,** by which the second was appointed trustee and administrator of the new bonds. Under this contract, Wilmington was authorized to act on behalf of the bondholders-lenders and to exercise their rights in the event that **"ELETSON HOLDINGS INC."** defaulted on the terms of the bond loan.

11. In order to secure the claims of the bondholders-lenders, **"ELETSON HOLDINGS INC."** was contracted with Wilmington on 07/02/2018, the latter in its capacity as representative of the bondholders-lenders, and pledged its holdings in other companies. The relevant pledge contract was drawn in New York and is governed by the laws of that State (term No. 13 thereof).


***II.***     ***The default of "ELETSON HOLDINGS INC.", and the two bond loan restructuring agreements***

**12.** Despite the exchange of bonds, on January 15, 2019, *"ELETSON HOLDINGS INC."* went into default, because it failed to make an expected payment to the bondholders-lenders on time.

**13.** On June 24, 2019, *"ELETSON HOLDINGS INC."* and some of its shareholders, on the one hand, and a certain group of bondholders-lenders, on the other hand, entered into a support agreement in New York for the restructuring (**Restructuring Support Agreement - RSA)** of the debt of *"***ELETSON HOLDINGS INC."*** , that is, *the* debt from the bond loan, based on the exchanging of old bonds with new ones that took place. This agreement is governed by the laws of the State of New York as well. The contracting parties expressly and unconditionally submit themselves to the exclusive jurisdiction of the courts of New York. In fact, under clause 23 of this contract, it is expressly provided that, in the event that the debtors, that is, in this case, ***"ELETSON HOLDINGS INC.",*** files Chapter 11 proceedings, it will take place in the bankruptcy court of the State of New York.

**14.** On October 29, 2019, *"ELETSON HOLDINGS INC."* and some of its shareholders, on one hand, and bondholders–lenders representing over 80% of the new bonds, on the other hand, entered into a second support agreement in New York to restructure the debt. This agreement is governed by the laws of the State of New York as well. The contracting parties expressly and unconditionally submit themselves to the exclusive jurisdiction of the courts of New York. In fact, under clause 23 of this contract, it is expressly provided that, in the event that the debtors, that is, in this case, "***ELETSON HOLDINGS INC.***", files Chapter 11 proceedings, it will take place in the bankruptcy court of the State of New York.


[stamp:]
∗HELLENIC
REPUBLIC∗
[emblem:]
[illegible]

**15.** Nevertheless, *"ELETSON HOLDINGS INC."* defaulted in fulfilling the second RSA.

***III.***      ***The insolvency proceedings before the New York Bankruptcy Court (South District)***

**16.** The companies Pach Shemen LLC, VR Global Partners and Alpine Partners, which, meanwhile, had lawfully acquired, as ruled by the Bankruptcy Court, the new bonds, filed against *"ELETSON HOLDINGS INC."* before the Bankruptcy Court of the Southern District of New York, a petition for its involuntary bankruptcy under Chapter 7 of the U.S. Bankruptcy Law.

**17.** On 6th of September 2023, **upon motion of *"ELETSON HOLDINGS ING",*** the Chapter 7 involuntary bankruptcy proceedings was converted into **Chapter 11 voluntary bankruptcy proceedings.** This is an internal insolvency reorganization procedure, which, after repealing the reorganization plan which was provided for in articles 107 et seq. 3588/2007 (Bankruptcy Code), before it was amended by Law 4446/2016 and before it was repealed by Law 4738/2020, now befits the reorganization procedure of articles 31 et seq. of Law 4738/2020, which is the only reorganization procedure provided for in the new bankruptcy law which was enacted by Law 4738/2020, repealing the Bankruptcy Code.

**18.** The advantage of these proceedings (Chapter 11) is that the debtor remains over the administration of his property. No bankruptcy expropriation occurs, so no administrator is appointed. This debtor is called Debtor in Possession. Therefore, the position of the administrator is maintained by the debtor himself. In this context, Pach Shemen, upon permission of the aforementioned bankruptcy court, granted to the Debtor in Possession, *"ELETSON HOLDINGS INC.",* financing of $10 million at an annual interest rate of 0.5%.

**19.** Three (3) reorganization plans were filed before the Bankruptcy Court of the Southern District of New York. The first by *"ELETSON HOLDINGS INC.",* the second by the Creditors, which was based on the plan of *"ELETSON HOLDINGS INC."*, and the third, the independent plan of the petitioning Creditors, which was finally approved by the Bankruptcy Court.

[stamp:]
∗**HELLENIC
REPUBLIC**∗
[emblem:]
[illegible]

**20.** In accordance with the approved reorganization plan:

    **i.** the shareholders of *"ELETSON HOLDINGS INC."* are ranked in the 9th class (Class 9) of the creditors. In accordance with paragraph 3.3. case (i) [= letter i], (ii) relating to the treatment of shareholders, it is explicitly provided that by and with the entry into force of the plan of reorganization, the existing shares are canceled, without distribution of money to shareholders.

    **ii.** Furthermore, in accordance with paragraph 5.8 of the reorganization plan, by and with its entry into force, the reorganized *"ELETSON HOLDINGS ING"* shall issue new shares.

    **iii.** Also, in accordance with paragraph 5.10(c) of the reorganization plan, by and with its entry into force, the directors of *"ELETSON HOLDINGS ING"* are deemed to have resigned and at any rate they may be revoked.

    **iv.** Finally, in accordance with paragraph 10.6. of the reorganization plan, by and with its entry into force, every professional employed by the debtor is not considered to be employed by the reorganized holding company, unless a contract is drawn after the date it is entered into force.

**21.** As said, on November 4, 2024, the Order of the U.S. Bankruptcy Court - Southern District of New York was issued [FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS]. This order confirms the Decision of the subsumption of *"ELETSON HOLDINGS INC."* under Chapter 11 of the U.S. Bankruptcy Code dated 10/25/2024, and the amended reorganization plan of the Creditors [MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE].


[stamp:]
*HELLENIC
REPUBLIC*
[emblem:]
[illegible]

**22.** Critical, in this case, elements of this Order, are the following:

    **i.**    Under item B., the validation of the reorganization plan is a **core** insolvency procedure.

    **ii.**    Under item L., *"ELETSON HOLDINGS INC."* **is a Debtor in Possession.**

    **iii.**    Under item T., the petitioning creditors have disclosed the persons of directors and representatives who are consistent with their best interests and public policy.

    **iv.**    According to item Y, it is found that it is lawful to modify the rights of the ninth class of Creditors (old shareholders).

    **v.**    According to item DD., it is found that the petitioning Creditors acted in good faith for the purpose of reorganizing and increasing the value of the property of *"ELETSON HOLDINGS INC."*

**23.** Furthermore, critical, according to the operative part of the Order, are the following:

    **i.**    With point No. 1. of its operative part, the reorganization plan is confirmed.

    **ii.**    Point 5.i. of its operative part authorizes the debtors, the reorganized *"ELETSON HOLDINGS INC."* and the petitioning Creditors to do whatever is necessary for the implementation of the reorganization plan.

    **iii.**    With point 14. of its operative part, the Bankruptcy Court shall retain its international jurisdiction in respect of any matter relating to Chapter 11, namely the reorganization proceedings.

    **iv.**    With point no. 19 of its operative part, subject to the occurrence of the effective date of the reorganization plan, the reorganization plan and the Order are immediately in force and enforceable. And they bind petitioning Creditors, the Debtors and all claim lenders and the holders of interests, and indeed regardless of whether the claims or interests were affected by the reorganization plan or not.

**v.** With No. 25. point of its operative part, it is set forth that the Order is final and the deadline for filing an appeal starts from the publication of said Order.

**IV.** *Illegal forum shopping, during the period from the issuance of the Order (11/04/2024) until the effective date of the reorganization plan (11/19/2024)*

**24.** Until November 18, 2024, that is, the date preceding the effective date of the reorganization plan, shareholders of *"ELETSON HOLDINGS INC."* were the following:

    **i.** The company "Lassia Investment Company" (of the Laskarina Karastamatis family), holder of 3,072 shares, representing 30.72% of its share capital.

    **ii.** The company "family Unity Trust Company" (of the family of Vasilis Kertsikoff) holder of 3,072 shares, representing 30.72% of its share capital.

    **iii.** The company "Glafkos Trust Company" (of the family of Vasileios Hatzieleftheriadis) holder of 3,072 shares, representing 30.72% of its share capital.

    **iv.** The company "Elafonissos Shipping Corporation" (of the family of Nikos Zilakos), holder of 392 shares representing 3.92% of its share capital. and

    **v.** The company "Keros Shipping Corporation" (of the family of Vasiliki Andreoulakis), holder of 392 shares representing 3.92% of its share capital.

**25.** The board of directors of *"ELETSON HOLDINGS INC."* consisted, prior to its reorganization, of the following:

    **i.** Laskarina Karastamatis, as Chairman of the Board.


[stamp:]
●HELLENIC
REPUBLIC●
[emblem:]
[illegible]

    **ii.**    Vasileios Hatzieleftheriadis, as Vice President and Treasurer of the Board.

   **iii.**    Vasileios Kertsikoff, as Vice President of the Board.

   **iv.**    Konstantinos Hatzieleftheriadis, Board Member.

    **v.**    Ioannis Zilakos, Board Member.

   **vi.**    Eleni Karastamatis, Board Member.

  **vii.**    Panagiotis Konstantaras, Board Member.

 **viii.**    Emmanuel Andreoulakis, Board Member.

**26.** *"ELETSON HOLDINGS INC.",* represented by the aforementioned management which was under a deadline, expiring over a few days, filed an appeal against the aforementioned Order on November 7, 2024. However, knowing that until the discussion of said Appeal, the reorganization plan would have come into effect, resulting in the automatic cessation of its board of directors, according to the above, but also the automatic loss of the shareholding capacity of its shareholders, proceeded to the manipulation, which is set out below.

**27.** The next day, November 8, 2024, four of the eight members of the Board of Directors, namely Laskarina Karastamatis, Vasileios Kertsikoff, Eleni Karastamatis and Panagiotis Konstantaras, resigned (why?), attempting inappropriately to cause, in this way, an artificial lack of management.

**28.** Instead, as they had an obligation, according to 5.i. point of the operative part of the Order, doing what was necessary for the implementation of the reorganization, the top four members of the Board did the opposite. They resigned to make it more difficult (!!!).

**29.** Subsequently, two shareholders, whose shareholding capacity in *"ELETSON HOLDINGS INC.",* was, as was the case of its Board of Directors, under a deadline, expiring a few days later, that is, the companies "Elafonissos Shipping Corporation" and "Keros Shipping Corporation", filed before the Single-Member Court of First Instance of Piraeus on 11/11/2024 with filing No. 16655/7823/2024, an application for voluntary jurisdiction proceedings. With it, alleging that, due to the aforementioned resignations, there was a lack of management, they are requesting the appointment of provisionary management of **"ELETSON HOLDINGS INC."** As stated, the application will be discussed on 02/04/2025. On **November 12, 2024**, a temporary order of the Judge of the Single Member Court of First Instance of Piraeus was granted. With it, the following were appointed as members of the provisionary management: a) Vasileios Chatzieleftheriadis, (b) Konstantinos Chatzieleftheriadis, c) Ioannis Zilakos, d) Emmanuel Andreoulakis, e) Andrianos Psomadakis - Karastamatis, f) Panos Paxinos, g) Eleni Giannakopoulou and h) Niki, spouse of Nikolaos Zilakos.

[stamp:]
∗HELLENIC
REPUBLIC∗
[emblem:]

30. Among the powers granted to the above provisionary management is to represent **"ELETSON HOLDINGS INC."**, during the discussion of its aforementioned Appeal against the Order of the Bankruptcy Court of the Southern District of New York, as well as to oppose the recognition of the above Order in Greece, but also in Liberia.

31. In order to achieve the above purpose, applicants, currently former shareholders, have asserted, as a result, the following: That the Center of the Main Interests of **"ELETSON HOLDINGS INC."** was not Liberia, where its statutory seat is, which is of course true, but Greece, and in particular Piraeus, where its real seat is allegedly located (117 Kolokotroni St.). This is completely untrue, as explained below.

32. Only the following are displayed from the present position: During the Chapter 11 insolvency proceedings before the Bankruptcy Court of the Southern District of New York, <u>both **"ELETSON HOLDINGS INC."** under its then management, but also its then shareholders, never raised a concern that the Center of Main Interests of **"ELETSON HOLDINGS INC."** was not the USA, but instead Greece</u>. And not just that. As evidenced by a document named Doc. 941 of the Chapter 11 case, under Case No. 23-10322 (JPM), <u>all shareholders of **"ELETSON HOLDINGS INC." voted**</u> for the selection of the reorganization plan. And they chose the reorganization plan of **"ELETSON HOLDINGS INC."** which was, however, dismissed by the Bankruptcy Court.

[stamp:]
∗HELLENIC
REPUBLIC∗
[emblem:]

**33.** The thing, therefore, is clear. The **Center of Main Interests** of **"ELETSON HOLDINGS INC."** was, at the time the insolvency proceedings initiated, and remains to this day, the U.S.A. Its alleged detection in Greece, in the late opinion of the above petitioning shareholders, but also of the board of directors which was appointed by temporary order, is a late myth of them, which is in fact unfounded in reality. The only reason they allege the above is the following: **Because the Bankruptcy Court did not uphold the reorganization plan they desired.**

*V. The entry into force of the reorganization plan (Effective Date) and the legal consequences thereof*

**34.** In execution of item no. 19. element of the operative part of the Order, on November 19, 2024, the petitioning creditors, with their document named Doc 1258/11.19.24 of the Chapter 11 cases, under Case No. 23-10322 (JPM), which was filed with the Bankruptcy Court on 11/19/2024, announced the arrival of the effective date (Notice of (I) the occurrence of the effective date) of the reorganization plan. This date was **11/19/2024.**

**35.** According to the above, by and with the entry into force of the reorganization plan, the old shareholders automatically ceased to be shareholders of (the reorganized) **"ELETSON HOLDINGS INC."** and the members of the Board of (the reorganized) **"ELETSON HOLDINGS INC."** automatically lose their capacities as Board members.

**36. On the same date, 11/19/2024, the new shareholders of the reorganized "ELETSON HOLDINGS INC." with their minutes,** as they state that the effective date of the reorganization plan has occurred, that is, 11/19/2024, that, in accordance with paragraph 3.3 (j) [= letter j] of the reorganization plan, the shares of the shareholders (9th class of creditors) are canceled and repealed; that, in accordance with paragraph 5.8 of the reorganization plan, the company issued new shares and that, in accordance with paragraph 5.10(c) of the reorganization plan, the Board members prior to the effective date of the reorganization plan (11/19/2024) shall automatically cease to be in that capacity, decided

[stamp:]
*HELLENIC
REPUBLIC*
[emblem:]

i.    to revoke all previous Board members of the company, including the persons who are specifically mentioned in their said decision and who form ***the provisionary board of directors which appointed with the aforementioned temporary order of the Presiding Judge of the Single-Member Court of First Instance of Piraeus and***

ii.    elect a new Board of Directors, consisting of: **(a.)** Adam Spears, **(b.)** Leonard J. Hoskinson, and **(c.)** Timothy B. Matthews.

**37.** As further evidenced by the affirmation of the Directors and Shareholders of the reorganized **"ELETSON HOLDINGS INC.",** dated 01/31/2025, its share capital amounts to 10,000 nominal Class A shares with no par value. Shareholders of the reorganized **"ELETSON HOLDINGS INC."** are the following:

**(a.)** The foreign company "Each Shemen LLC", holder of 935 shares, representing 9.35% of its share capital.

**(b.)** The foreign company "Mulberry Street Ltd", holder of 8,983 shares, representing 89.83% of its share capital.

**(c)** The foreign company "Waxcap Inc.", holder of 82 shares, representing 0.82% of its share capital.

Its board of directors consists of: **(a.)** Adam Spears, **(b.)** Leonard Jay Hoskinson, and **(c.)** Timothy B. Matthews.

**38.** **Conclusion:** From the effective date of the reorganization plan, the old shareholders ceased to have any shareholding relationship with the reorganized **"ELETSON HOLDINGS INC."** The same applies to the members of its Board of Directors. The reorganized **"ELETSON HOLDINGS INC."** is a legal entity that is completely foreign to them (shareholders and members of the board of directors).


*VI.*    *The fate of the Appeal against the Order dated 11/07/2024*

**39.** As evidenced by the decision of the District Court of the Southern District of New York dated December 30, 2024,

in the Case l:24-cv-08672-LJL, the appeal against the Order was **voluntarily** withdrawn by the plaintiff.

**40.** Therefore, the Order is not subject to any remedy as to its merits.

**C.**    **Recognition, in Greece, as the main proceedings of the foreign insolvency procedure of Chapter 11, (a.)** of

Order No. Doc. 1212/10.25.2024 of the Bankruptcy Court of the Southern District of New York in Case No. 23-10322

(JPM), under heading: **"MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING**

**CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS**

**INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND**

**DENYING MOTION IN LIMINE"** and **(b.)** of the Order of the U.S. Bankruptcy Court, Southern District of New York,

dated November 4, 2024 (Case No: 23-10322 (JPM)), under heading: **"FINDINGS OF FACTS, CONCLUSION OF**

**LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN**

**OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS"**

**41.** The recognition, in Greece, of foreign insolvency proceedings obeys different rules of law, depending on whether

they have been initiated in a Member State of the EU or in a third State. If the proceedings have been initiated in an

EU Member State, Regulation 2015/848 applies. If they have been initiated in a third State outside the EU, ratione

materiae is governed by the Standard Bankruptcy Law (BL) on Cross-Border Bankruptcy which was drawn in 1997

by the United Nations Commission on International Trade Law (Uncitral). The BL is applicable, provided that the

State in which recognition is sought has incorporated the BL into its national legal order**. This is what Greece did**

**with Law 3858/2010.**


[stamp:]
✳HELLENIC
REPUBLIC✳
[emblem:]

**42.** Law 3858/2010 forms an integral part of the law applicable in Greece for bankruptcies. Pursuant to article 2, point a of Law 3858/2010, foreign bankruptcy proceedings are defined as *"the collective judicial or administrative procedure in another State, including the temporary procedure related to bankruptcy, which assumes the insolvency of the debtor and entails the partial or total deprivation of the management of his property (bankruptcy expropriation) for the purpose of liquidation or reorganization"*. Therefore, Law 3858/2010 applies to foreign proceedings that meet the following four conditions: (a) collective nature of the proceedings, (b) its declaration by a judicial or administrative authority, (c) the debtor's insolvency as its initiating event, and (d) bankruptcy expropriation as a legal consequence of the declaration of the proceedings, i.e. deprivation of the powers of administration and disposition of the property, with a consequence of appointing another person, which is equipped with the exercise of those powers, and (e) for the purpose of liquidation and reorganization.

**43.** By way of deviation from the BL, Law 3858/2010 refers to an administrator. However, Debtor in Possession proceedings are not excluded. This is because, in the assessment of ad hoc inclusion, the wider wording of the BL and the legislative check on its uniform interpretation must be taken into account. This is explicitly reflected in article 8 of Law 3858/2010, according to which, in its interpretation, *its international origins, its pursuit of homogeneous application and its adherence to good faith* must be taken into account, as is, after all, legally accepted.

**44.** The proceedings of Chapter 11 of the American Bankruptcy Code (hereinafter Chapter 11) bears the following characteristics referred to in article 2, item a of Law 3858/2010: This is a collective process which is initiated, either at the request of the debtor or his creditors. During the proceedings, the debtor maintains the management of his property, debtor in possession, under the supervision of the court. With the permission of the court, he can also secure financing after the petition (post-petition finance). Consequently, Law 3858/2010 also governs the procedure of Chapter 11**. In essence, the Debtor in Possession is equated in terms of rights and obligations with the administrator.** This is, after all, expressly confirmed by the Uncitral Legislative Guide on Insolvency Law. Indeed, under the heading "expedited proceedings" the following are mentioned (number 75): *"An example of such a procedure can arise from cases where the reorganization plan has been approved and although the court has no ongoing jurisdiction in relation to its implementation, the procedure remain open or pending, and the court retains international jurisdiction until its implementation is completed."*



**45.** In the present case, the foreign **main** insolvency proceedings for which recognition is sought is, as mentioned above, one of Chapter 11. The debtor, **"ELETSON HOLDINGS INC."** is a Debtor in Possession, and as it was examined, they also received financing. Therefore, it falls within the scope of article 2 items a of Law 3858/2010 and its recognition in Greece is legally requested. It is noted that, with its Order dated 12/30/2024, the Bankruptcy Court of the Southern District of New York, in case Doc. 1326 of Chapter 11, Case No. 23-10322 (JPM), finds that the procedure of Chapter 11 falls within the meaning of "foreign proceedings" (foreign proceedings) of article 2, item a of the BL.

**46.** The recognition of the Order at issue herein requires: (a) an application for recognition must be submitted beforehand by the foreign administrator (article 15 par. 1 of Law 3858/2010), (b) the issuance of a decision of the court (article 17 par. 1 of Law 3858/2010), and (c) as a negative condition of the recognition, it must not be contrary to public order (article 6 of Law 3858/2010).

**47.** In the present case, it is I, that is, the reorganized **"ELETSON HOLDINGS INC."** who is submitting the recognition application. In the context of the Chapter 11 procedure, as mentioned above, the duties of the administrator are exercised by the debtor, in the present case, I, the applicant company being debtor in possession (see also Piraeus Multi-Member First Instance Court 1798/2020, Piraeus Appellate Court 429/2022, both in Legal Databank NOMOS). Therefore, I am entitled, per article 15 par. 1 of Law 3858/2010, to submit the application for recognition. I am legally represented for the submission of the legal application and the recognition of the foreign proceedings by Mr. Adam Spears. Because with the Order dated 12/20/2024, Doc 1326 (other) of the U.S. Bankruptcy Court of the Southern District of New York in Chapter 11, Case No. 23-10322 (JPM), under heading: "ORDER (I) AUTHORIZING ADAM SPEARS TO ACT AS FOREIGN REPRESENTATIVE OF REORGANIZED HOLDINGS AND (II) GRANTING RELATED RELIEF» Mr. Adam Spears was appointed as my exclusive "foreign representative", and in particular in Greece and Liberia, and exclusively for the purpose of requesting the recognition or supporting applications for the recognition of Chapter 11 proceedings in Greece and Liberia.

[stamp:]
*HELLENIC
REPUBLIC*
[emblem:]

**48.** In order to recognize the foreign proceedings, the application must be submitted to the bankruptcy court with local and substantial jurisdiction (article 17 par. 1 item d in combination with article 4 of Law 3858/2010). Pursuant to the provision of article 4 of Law 3858/2010, the competent court is the Multi-Member Court of First Instance in the region of which the debtor has his **Center of Main Interests** (hereinafter CMIs). However, Law 3858/2010 does not contain a provision by which the local jurisdiction is determined, when the debtor's CMIs, per article 78 par. 1 & 3 (Law 4738/2020), is not located in this country (Greece). There is, thus, an inadvertent gap of law that must be filled. In view of the fact that the applicant, reorganized **"ELETSON HOLDINGS INC.",** does not have any facilities in Greece, - indeed, is deprived of a place of business in the country, it does not carry out the slightest economic activity in which to utilize human resources and/or possess assets, and provided that, as set out below, there is a difference between an actual seat (considered as CMIs) and a statutory seat - the locally competent, with comparable, due to the exposed legal gap, application of article 905 par. 1 of the Code of Civil Procedure, is the multi-member court of first instance of the capital city, that is, your Court. Therefore, the application for recognition is exercised in the court of local and substantial jurisdiction and is entered according to the procedure of voluntary jurisdiction (articles 78 par. 4 and 130 par. 1 of Law 4738/2020).

[stamp:]
∗HELLENIC
REPUBLIC∗
[emblem:]

**49.** As it is concluded from article 17 of Law 3858/2010, the domestic court, assuming an application for the recognition of foreign proceedings, **is obliged** to immediately recognize it, provided that the conditions strictly stated in the law are met. The rule is that the domestic court shall not review, as to its substantive judgment, the foreign judge. This is the principle of the prohibition on retrying the case, which is the prohibition on the review of the legal and substantive correctness of the foreign decision. A limit to the above principle is introduced by the reservation of public order (article 6 of Law 3858/2010). In the present case, international public order is understood in the narrowest sense of Civil Code 33. In this regard, public order is the set of principles and concepts that are of primary, basic and fundamental importance which govern life at a certain place and time. In the context of international bankruptcy, such fundamental principles/rights would be the right to announce the claim and the procedural guarantees (right to be heard/defense). Such a case of infringement of the above fundamental principles does not apply in any way in the present case, as evidenced by all the documents of the proceedings that accompany the present application, but also by what we will produce on demand before your Court.

**50.** The foreign procedure is recognized as main, this is the request of the disputed order, if it is conducted in the State where the debtor has, at the time of the initiation of the foreign proceedings, his CMIs. Definition of CMIs is not found in Law 3858/2010. The interpretation fits based on the criteria of the legal order in which the recognition is sought. However, the requirement for a uniform and internationally oriented interpretation must be taken into account, which is, after all, mandated by article 8 of Law 3858/2010. In this regard, it is observed that the CMIs is a concept of Union authorship and origin [Regulation 848/2015, article 3 par. 1(b)] and was transplanted into the Uncitral regime. As a result, interpretive EU case law guidelines are critical for the domestic judge who receives an application for recognition.

**51.** The vague legal concept of the CMIs is broken down into three (3) individual composite elements: (a) the place of the main interests, so that it is possible that many places of interest can exist, but the main one is only one, (b) where their management (of main interests) is exercised, and (c) in a manner verifiable, not verified, by the third parties. "Management" is the same as central management and control of the business activity (head function). Therefore, it contradicts both the current management and daily operation (operational connection), as well as from the place where the company's assets are located (asset connection). This was confirmed by the decision of the EU Court in the case Interedil (C-396/09, par. 53), as well as by recital no. 30 of the preamble of Regulation 2015/848. In order for the CMIs to be identified, i.e. the central management core, actions that cannot inherently accept multiple management must be taken into account. Such are the strategic decision making, funding, oversight, approval of important contracts, financial policy making, and so on. The above delimited place of usual management must be verifiable as such by the third parties. Third parties are the potential or actual creditors of the debtor. This is also to create a legal guarantee as to the bankruptcy regime. The evaluation must fit on the part of the large and up-to-date creditors.

**52.** The applicant's CMIs was, at the time of the commencement of the foreign proceedings, in the USA. Of course, per article 16par. 3 of Law 3858/2010, "*...until proof to the contrary, the place of the debtor's statutory seat ... is presumed to be the center of the debtor's main interests*". The presumption is, of course, arguable. It applies, as long as the statutory sat of the legal entity coincides with its actual seat. In the event of a break-up, the place of its actual seat shall prevail by legislative choice. Due to the existence of the presumption, as long as the foreign proceedings are carried out in a place other than the statutory seat of the legal person, the applicant for the recognition bears the burden of invoking and proving the facts that reverse the presumption.

[stamp:]
⁕HELLENIC
REPUBLIC⁕
[emblem:]

**53.** In the present case, the following apply: **"ELETSON HOLDINGS INC."** has its statutory seat in Liberia. However, this is not where the ordinary management of its interests is exercised. This is only a "post office box", which does not constitute CMIs. This, after all, is also claimed by its former shareholders in their application for provisionary management. According to them, the actual seat, therefore the CMIs, is Greece and in particular Piraeus. This is completely inaccurate. The former member of its management, Mr. Vasileios Kertsikoff, examined on December 12, 2023, testifies in the context of the insolvency proceedings that **"ELETSON HOLDINGS INC.",** as a holding company, has no daily operations, has no personnel, has no bank accounts. Therefore, its central management is neither in Liberia nor in Greece. The CMIs of **"ELETSON HOLDINGS INC."** are found if one considers what its activities are. They were fundraising to fund its subsidiaries. It is noted that it is **"ELETSON HOLDINGS INC."** itself which states in the issuance of a bond loan, amounting to $300 million, that it has offices in Connecticut, in the town Stamford, Connecticut (USA), which, due to its location in the south-western Connecticut, falls under the Metropolitan District of the State of New York. It is also noted that in the past, they had issued another bond loan of $103 million. Therefore, the sole activity of **"ELETSON HOLDINGS INC."** was to seek and receive funding in the USA from American sources. It is, in fact, its inability to service said bond loan which led it to Chapter 11. In connection with this bond loan, it is noted that all contracts relating to it, by entering into, appointing a manager, exchanging old bonds with new ones, two assisted reorganization agreements, were drafted, as detailed, in **New York.** These were the only and most important contracts. **These most important decisions about the financing, which was its activity, were made in New York. New York is, therefore, the true seat of "ELETSON HOLDINGS INC." and, in any event, its CMIs, at the time of initiation of the bankruptcy proceedings.** This is why New York law is agreed as applicable and its courts are agreed as competent in all contracts. This is why in clause 23 of the two RSAs, **"ELETSON HOLDINGS INC."** agreed, if a Chapter 11 issue appears, at its request, as it was done, that it would take place in the New York Bankruptcy Court. **The New York CMIs is recognizable as such by its creditors.** Indeed, all of its creditors, as evidenced by the relevant documents, **with credits of more than $290 million,** are all legal entities based in the USA. In support of this, it is noted that **"ELETSON HOLDINGS INC.",** its shareholders at the time, but also its board of directors, **never challenged** the jurisdiction of the American Bankruptcy Court, on the argument that its CMIs are not there. It was this **"ELETSON HOLDINGS INC."** which, with **its application**, requested that its involuntary bankruptcy be converted into a Chapter 11 case. Therefore, based on the above, the presumption was debunked, the divergence between the statutory seat (Liberia) and the actual seat (New York - USA), in which the CMIs of **"ELETSON HOLDINGS INC."** are located, is proven. Hence, the foreign Chapter 11 proceedings were initiated and are conducted in the place where the CMIs of **"ELETSON HOLDINGS INC."** were located and are located, namely in New York.

54. Having regard to all legal requirements, the foreign insolvency proceedings under Chapter 11, namely the Bankruptcy Court Order dated November 4, 2024 (Case No: 23-10322) of the U.S. Southern District of New York, must be recognized by your Court as the main insolvency proceedings under the heading: "FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS".

**D. Documents submitted with the application**

55. Pursuant to article 15 par. 1 item a of Law 3858/2010, I co-submit, as attachments hereto, the following documents, which are all legally certified copies of the U.S. certified copies, all bearing the Hague Apostille and accompanied by the legally certified copies from their official translation into Greek:


[stamp:]
●HELLENIC
REPUBLIC●
[emblem:]

i.     The application for involuntary bankruptcy dated 07/03/2023 (Chapter 7) against the debtor: **"ELETSON HOLDINGS INC."**, addressed to the bankruptcy court of the Southern District of New York, with which the case was opened under number: 23-10322-ipm **[Attachment 1],**

ii.     Order No. Doc 215/09/25.2023 (other) of the Bankruptcy Court of the Southern District of New York in the case, Case No. 23-10322 (JPM), under heading: "ORDER CONVERTING THESE CASES TO CASES UNDER CHAPTER 11", by which, at the request of **"ELETSON HOLDINGS INC."** the involuntary bankruptcy proceedings (Chapter 7) were converted into such voluntary bankruptcy (Chapter 11) **[Attachment 2],**

iii.     Order No. Doc. 1212/10/25.2024 (other) of the Bankruptcy Court of the Southern District of New York in the case, Case No. 23-10322 (JPM), under heading: "MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE", by which the aforementioned court approved the reorganization plan **[Attachment 3].**

iv.     The Order dated November 4, 2024 (Case No: 23-10322 (JPM)) of the U.S. Bankruptcy Court of the Southern District of New York, under the heading: "FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS", which confirms the reorganization plan **[Attachment 4].**

v.  Document No. Doc. 1258/11.19.2024 of the Chapter 11 case, Case No. 23-10322 (JPM), under heading: "NOTICE OF (I) THE OCCURRENCE OF THE EFFECTIVE DATE AND (II) FINAL DEADLINES FOR FILING CERTAIN", by which the reorganization plan is effective as of 11.19.2024 **[Attachment 5].**

vi.  Order No. Doc 1326 (other) of the U.S. Bankruptcy Court of the Southern District of New York in the Chapter 11 Case No. 23-10322 (JPM), under heading: "ORDER (I) AUTHORIZING ADAM SPEARS TO ACT AS FOREIGN REPRESENTATIVE OF REORGANIZED HOLDINGS AND (II) GRANTING RELATED RELIEF" by which Adam Spears was appointed exclusive "foreign representative" exclusively on behalf of the reorganized **"ELETSON HOLDINGS INC."** in Greece and Liberia and exclusively for the purpose of requesting the recognition or supporting applications for the recognition of the Chapter 11 proceedings in Greece and Liberia **[Attachment 6];**

vii.  Document No. 20/12.30.2024 of the District Court of the Southern District of New York in Case l:24-cv-08672-LJL, under heading: "STIPULATION AND AGREEMENT TO DISMISS APPEAL UNDER RULE 8023 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE", by which it is proven that the Appeal dated 11/07/2024 of **"ELETSON HOLDINGS INC."** against the Order under iv. was voluntarily withdrawn **[Attachment 7].**

viii.  The Affidavit of my special legal representative dated January 28, 2025, certifying that there is no other foreign insolvency proceedings known to him in relation to me **[Attachment 8].**

---

*Whereas* **my application is lawful, substantiated and definitive.**



[stamp:]
∗**HELLENIC**
**REPUBLIC**∗
[emblem:]
[illegible]

*Whereas* it is filed with the Court of local and substantial jurisdiction.

*Whereas there is* manifest legitimate interest to recognize in Greece as the main insolvency proceedings, the foreign insolvency proceedings of Chapter 11 of the American Bankruptcy Code, namely: **(a.)** Order No. Doc. 1212/10.25.2024 of the Bankruptcy Court of the Southern District of New York in the case, Case No. 23-10322 (JPM), under heading: **"MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE"**, and **(b.)** the Order dated in November 4, 2024 of the U.S. Bankruptcy Court - Southern District of New York (Case No: 23-10322 (JPM)), under heading: **"FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS"**

Whereas, my former shareholders, namely the companies "Elafonissos Shipping Corporation" and "Keros Shipping Corporation" filed, as mentioned above, before the Single-Member Court of First Instance of Piraeus, on 11/11/2024 with filing No. 16655/7823/2024, a voluntary jurisdiction proceedings application. With it, they were alleging that, due to the aforementioned resignations, there was a lack of management, and they are requesting the appointment of provisionary management of **"ELETSON HOLDINGS INC."** As stated above, the application will be discussed on 02/04/2025.

On **November 12, 2024**, a temporary order of the Judge of the Single Member Court of First Instance of Piraeus was granted. With it, the following were appointed as members of the provisionary management: a) Vasileios Chatzieleftheriadis, (b) Konstantinos Chatzieleftheriadis, c) Ioannis Zilakos, d) Emmanuel Andreoulakis, e) Andrianos Psomadakis - Karastamatis, f) Panos Paxinos, g) Eleni Giannakopoulou and h) Niki, spouse of Nikolaos Zilakos. Therefore, at this time in Greece, there seems to be a management of mine, which, of course, as mentioned above [above, no. 36.i.] was revoked.

[stamp:]
∗HELLENIC
REPUBLIC∗
[emblem:]

Nevertheless, it did not stop acting, by apparent appropriation of authority, trying to block my reorganization. This conduct of my alleged management, which alleges that it represents and refers to me as "provisionary" Eletson Holdings Inc.", such a legal entity only exists in the imagination of my former shareholders and directors, and forced me, through my legal administration, to appeal before the Bankruptcy Court of the Southern District of New York, USA, and seek protection with my application.

My application was discussed on January 24, 2025 and was accepted on the same day. And with its Order dated 01/29/2025, which is immediately enforceable, the above Bankruptcy Court ordered my former shareholders and the above former members of the Board of Directors to do, and indeed within seven days from the service on them of the above Order, whatever is necessary for the implementation of the reorganization plan, subject to penalties, upon my new request, in case of their failure to comply.

*Whereas* the provision of article 19 par. 1 of Law 3858/2010 provides that from the filing of the application for recognition until the issuance of the decision, the court may, at the request of the foreign administrator, in the present case myself as debtor in possession, provide temporary protection, inter alia for the protection of the debtor or the interests of the creditors. The protection measures are, inter alia, what is provided for in case g of par. 1 of article 21 of Law 3858/2010, that is, "...*the provision of any power conferred by Greek law to the administrator, to the foreign administrator"*. And Greek law confers on the administrator the exclusive power to manage the bankruptcy property alone and to represent the debtor accordingly. Therefore, I, the applicant, as the debtor in possession, resemble, as set out, the administrator in full as well as his rights and similarly his obligations.

**Whereas there is an urgent case and an imminent risk that I will be given temporary protection, in the form of a temporary order, under article 781 of the Code of Civil Procedure, in conjunction with articles 19 and 21 of Law 3858/2010,**

EXHIBIT "17"


**BEFORE THE SINGLE-MEMBER FIRST-INSTANCE COURT OF PIRAEUS**

**PRIMARY INTERVENTION**

*(Voluntary Jurisdiction Proceedings)*

Of the reorganized foreign company under the name: **"ELETSON HOLDINGS INC."** which, according to its articles of association, is based in Liberia, but its registered seat and Center of Main Interests is located in the state of New York (USA), (One Pennsylvania Plaza Suite 3335, New York, NY 10119, United States, USA)., legally represented by Mr. *Adam Spears*, pursuant to the Order dated 12/20/2024 of the Bankruptcy Court of the Southern District of New York.

**VERSUS**

1. The foreign shipping company "**ELAFONISSOS SHIPPING CORPORATION**", which is based, per its statutory seat, in Liberia, in fact in Greece (per their own declaration), at 118 Kolokotroni Street in Piraeus, legally represented by its shareholder and representative **Ioannis ZILAKOS, son of Nikolaos**, resident of P. Psychiko of Attica, 13 Parnithos Street, with Tax Registration Number 065443172,

2. The foreign shipping company "**KEROS SHIPPING CORPORATION**", which is based, per its statutory seat, in Liberia, in fact in Greece, at 118 Kolokotroni St. in Piraeus, legally represented by its shareholder and representative **Stylianos ANDREOULAKIS, son of Emmanuel**, resident of Glyfada of Attica, 34 Tyrteou St., with Tax Registration Number 013241122.



1. During the hearing of February 4, 2025, the application with docket number 1, dated 11/11/2024, with General Filing Number 16655/7823/11-11-2024 is discussed before your Court, with which the applicants request the appointment of provisionary management at the foreign company "ELETSON HOLDINGS INC.", i.e. the intervener, in accordance with article 69 of the Civil Code, invoking that they are shareholders in "ELETSON HOLDINGS INC.", and that the latter is deprived of management and legal representation as of 11/08/2024, date on which four members resigned from its eight-member Board of Directors; without being able to replace them.

2. In particular, the applicants claim that an urgent case exists for the appointment of provisionary management consisting of the remaining four Members of the Board of the aforementioned company, and from the additional four members they propose, to whom the following powers and authorities should be conferred: *(a) to manage the Company to address current and urgent matters, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, (b) for the management of the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni and its other subsidiaries, which, due to their maritime nature, have lasting and urgent needs for making decisions and taking actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the funders of the above ships, funded through loan agreements with sale and lease back agreements, and (d) to render a decision to exercise, on behalf of the Company "ELETSON HOLDINGS INC.", all legal remedies and aids provided by law (Greek or foreign) in the name and on behalf of the above company, in order to safeguard its property and its interests,* **on the one hand** *by the Arbitration Award of the Arbitral Tribunal issued in New York on 09/29/2023, which tribunal consisted of* Judge-Arbitrator Ariel E. BELEN, **on the other hand**, to turn against the Voluntary Bankruptcy Decision of ELETSON HOLDINGS (Chapter 11) issued on 10/25/2024 in New York by the U.S. Bankruptcy Court - Southern District of New York comprising of John P. MASTANDO, as well as the Order of the same U.S. Bankruptcy Court - Southern District of New York dated 11/04/2024, which court consisted of Judge John P. MASTANDO, confirming the Decision of Voluntary Bankruptcy (Chapter 11), dated 10/25/2024, of ELETSON HOLDINGS and the other companies and the amended Creditors' reorganization plan and (c) to convene an extraordinary General Assembly for the election of a new Board of Directors.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

3. Additionally, they request the issuance of a temporary order appointing them temporarily until the discussion of this application, and subject to the discussion hereof at the appointed hearing, as members of the temporary management of the foreign shipping company "ELETSON HOLDINGS INC.", and with the authority *"to call for an extraordinary General Assembly for the election of a new Board of Directions, so that they administer the Company until then, in order to: (a) address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, (b) to manage the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, and its other subsidiaries, which, due to their maritime nature, have lasting and urgent needs for making decisions and proceeding to actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communications with the financiers of the above ships, which are financed through loan agreements with sale and lease back agreements, and (d) In order to make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies (Greek or foreign) and aids provided by law (Greek or foreign) in the name and on behalf of the aforementioned company, in order to safeguard its property and interests, and in particular for the Company:*

[stamp:]

[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST

To appear and be represented at the hearing (Status Conference) of 11/12/2024 before the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments brought by the Respondent Levona in the procedure to confirm the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.

*To represent itself and its subsidiary, ELETSON CORPORATION, and to request the acknowledgment of the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", with all the provisions of its operative part, as well as the declaration of its enforceability under the provisions of the New York Convention, in the territory of another State than the one issued, inter alia, in Greece, where Levona holds property.*

*Obtain judicial protection and on the one hand, to support the appeal against the above Bankruptcy Decision, which is already issued, of the U.S. Bankruptcy Court - Southern District of New York comprising of Judge John P. MASTANDO which confirms the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS and its other companies of interest, as well as the amended plan for the reorganization of the Creditors before the New York Bankruptcy Court, as the relevant deadline for its exercise (of the appeal) would expire, as per the immediately above stated, on 11/08/2024, on the other hand to appeal, with the respective statutory legal remedies and means, before the Greek Courts, in order to challenge the Decision of Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) in which it was filed by the U.S. Bankruptcy Court for reasons of lack of international jurisdiction of the latter in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council. Additionally, in the event that the Creditors apply for the acknowledgment and execution of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter to appear and be represented before the competent Greek Courts in order to oppose, otherwise and as an impediment to the recognition of the above Bankruptcy Decision in Greece, due to the inadequacy of the issuing party's international jurisdiction in the Bankruptcy Decision, that is, the foreign Bankruptcy Court of the U.S., and for their other claims in their favor.*

*To appoint proxy lawyers in Greece or abroad to be represented before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required, in order to protect their interests, by filing legal remedies, using legal means, oppositions, etc.*

4. The request for a temporary order was discussed on 11/12/2024 and a temporary order by the Judge of the Single-Member Court of First Instance of Piraeus was granted, , with which the following were appointed as members of the provisionary management: a) Vasileios Chatzieleftheriadis, (b) Konstantinos Chatzieleftheriadis, c) Ioannis Zilakos, d) Emmanuel Andreoulakis, e) Andrianos Psomadakis - Karastamatis, f) Panos Paxinos, g) Eleni Giannakopoulou and h) Niki, spouse of Nikolaos Zilakos. The above members of the provisional management were assigned the power to handle all urgent cases of the company and in particular to represent "ELETSON HOLDINGS INC." before the courts of New York USA for its pending cases, temporarily until the hearing of the application at the scheduled hearing and on the condition that said application is discussed during said hearing.

5. Against the alleged application submitted before your Court by the litigants "ELETSON HOLDINGS INC." herein the intervener, legally represented by Mr. Adam Spears, pursuant to the Order dated 12/20/2024 of the Bankruptcy Court of the Southern District of New York, as will be analyzed below, exercises this main intervention, having a legitimate interest, requesting the full dismissal of the application, which is inadmissibly brought before your Court, has been abusively filed and is completely unfounded. In summary, it is noted that a) Your Court lacks international jurisdiction, b) the reorganized "ELETSON HOLDINGS INC.", as detailed below, has a final Board of Directors consisting of (i) Adam Spears, (ii) Leonard J. Hoskinson, and (iii) Timothy B. Matthews, which was appointed on 11/19/2024, the date on which the results of its confirmed reorganization plan under chapter 11 of the American Bankruptcy Code occurred, **in the validation process of which the applicants herein participated,** who also lost, automatically, the capacity of shareholder on 11/19/2024, c) having a set management in "ELETSON HOLDINGS INC.", the condition of the lack of management per article 69 of the Civil Code for the appointment of a temporary Board of Directors is not met.



**II. Background**

**A. Identity and activity of the intervener "ELETSON HOLDINGS INC."**

6. "ELETSON HOLDINGS INC." (intervener) is a company which was incorporated in Liberia on 12/04/1985 as a domestic company, without residence (Non-resident domestic corporation) and is governed by the provisions of the Liberian Associations Law, which includes the Business Corporation Act, the laws of limited companies (Limited Liability Company Law) and the Private Foundation Law.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

7. According to par. 1.2. of Title 5 of the Liberian Union Law, a domestic company without residence (Non-resident domestic corporation) *means a domestic corporation not doing business in Liberia.* **And indeed, the business activity, in the present case, of "ELETSON HOLDINGS INC." was developed and is being developed in New York, USA, as it will be analyzed below.**

8. Under its articles of association, its objective is its engagement in any legal activity permitted for companies that operate under the Business Corporation Act. As it already appears from its name, "ELETSON HOLDINGS INC." is a holding company, that is, its main activity is the ownership of stock shares or share units in other companies, often in a majority percentage, without this always having to be the case. In particular, however, "ELETSON HOLDINGS INC." is engaged in the search for financing which it channels to its subsidiaries. Financing was always sought in the U.S.A. Thus, in 2003, it received financing of $103 million. In its relevant announcement dated 12/19/2013, "ELETSON HOLDINGS INC.", declaring that it is an international enterprise, which maintains offices in Connecticut U.S.A., has asked for capital financing of $300 million by issuing bonds (bond loan), secured by a first class mortgage on the ships (the old bonds). Following the issuance of the bonds, Deutsche Bank in the U.S.A. was appointed as their trustee. It is noted that in the relevant contract dated 12/19/2013 (Indenture) between "ELETSON HOLDINGS INC." and Deutsche Bank, applicable law is set forth as the laws of the State of New York.

9. As part of its activity as a holding company, "ELETSON HOLDINGS INC." owns 100% of the shares of the Special Maritime Enterprises (SME), under the names "KASTOS SPECIAL MARITIME ENTERPRISE", "KINAROS SPECIAL MARITIME ENTERPRISE", "KIMOLOS II SPECIAL MARITIME ENTERPRISE" and "FOURNI SPECIAL MARITIME ENTERPRISE", which lease the ships Kastos, Kinaros MT, Kimolos MT and Fourni MT, respectively, which are Greek-flagged tankers. **As the applicants themselves state, the above ships are the property of Oaktree Capital Management, under sale & lease back agreements** (see page 3 of the application).

[stamp:]
[emblem:]
HELLENIC REPUBLIC
HELLENIC COURT OF FIRST

10. "ELETSON HOLDINGS INC." also participates in 100% percentage in the Liberian company Eletson Corporation, which, as the applicants state, is the manager of the above ships, and has lawful establishment, in accordance with the provisions of article 25 of Law 27/1975 and Law 89/67, in Piraeus, at Kolokotroni St., no. 118. Further, "ELETSON HOLDINGS INC." participates in the company called Eletson Gas LLC, based in the Marshall Islands, and in particular owns 59.5% of its common shares. Levona Holdings Ltd, which owns 100% of its preferred shares and 40.5% of its common shares, participates in this company. Eletson Gas participates in Greek and foreign companies chartering ships managed by Eletson Corporation. As the applicants state in their application, the ships operated by Eletson Gas either directly or through its subsidiaries (charterers) belong to the lenders of Eletson Gas under sale & lease back agreements (see page 6 of the application).

11. Therefore, the sole asset of "ELETSON HOLDINGS INC." **is its holdings, while it does not have any other asset, let alone ships nor of course is it managing a ship itself. None of the above companies in which it participates is a ship-owner, as stipulated by the applicants themselves, according to the above.**

**B. The default of ELETSON HOLDINGS INC and the two restructuring agreements of its bond loan**

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

12. The above financing agreement under paragraph 8, was subject to three supplements, of which, the first was drawn on 01/31/2014, the second on 03/20/2014 and the third on 04/01/2014. New York law was maintained as the applicable law in all supplements by express terms of said contracts.

13. Due to the financial inability of "ELETSON HOLDINGS INC." to adhere to the financing terms, i.e. its inability to pay interest, it proposed, in May 2018, to exchange the old bonds for new ones, also issued by it, similarly secured by a first-class mortgage on ships. Approximately 98% of bondholders of the old bonds participated in the exchange of bonds. This exchange was completed by "ELETSON HOLDINGS INC." in July 2018. The new debentures were by capital of US$314,068,360 million, ending in 2022.

14. On July 2, 2018, by contract drawn in New York between "ELETSON HOLDINGS INC." and the trustee of the old bonds, Deutsche Bank of the U.S.A., the latter ceased to be the trustee.

15. On the same day, a contract was drawn (Indenture), similarly governed by the laws of the State of New York, between "ELETSON HOLDINGS INC." and the company Wilmington Savings Fund FSB, by which the second was appointed trustee and administrator of the new bonds. Under this contract, Wilmington was authorized to act on behalf of the bondholders-lenders and to exercise their rights in the event that "ELETSON HOLDINGS INC." defaulted on the terms of the bond loan.

16. In order to secure the claims of the bond-holder lenders, ELETSON HOLDINGS contracted with Wilmington on 07/02/2018, in its capacity as representative of the bondholder lenders, and pledged its holdings in other companies. The relevant pledge contract was drawn in New York as well and is governed by the laws of that State (term No. 13 thereof). As part of this

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INS...

17. Despite the exchange of bonds, on January 15, 2019, "ELETSON HOLDINGS INC." went into default, because it failed to make an expected payment to the bondholders-lenders on time.

18. On June 24, 2019, "ELETSON HOLDINGS INC." and some of its shareholders, on the one hand, and a certain group of bondholders-lenders, on the other hand, entered into a support agreement in New York for the restructuring (Restructuring Support Agreement - RSA) of the debt of "ELETSON HOLDINGS INC." , that is, the debt from the bond loan, based on the exchanging of old bonds with new ones that took place. This agreement is governed by the laws of the State of New York as well. The contracting parties expressly and unconditionally submit themselves to the exclusive jurisdiction of the courts of New York. **In fact, under clause 23 of this contract, it is expressly provided that, in the event that the debtors, that is, in this case, "ELETSON HOLDINGS INC.", files Chapter 11 proceedings, it will take place in the bankruptcy court of the State of New York.**

19. On October 29, 2019, "ELETSON HOLDINGS INC." and some of its shareholders, on one hand, and bondholders–lenders representing over 80% of the new bonds, on the other hand, entered into a second support agreement in New York to restructure the debt. **This agreement is governed by the laws of the State of New York as well. The contracting parties expressly and unconditionally submit themselves to the exclusive jurisdiction of the courts of New York. In fact, under clause 23 of this contract, it is expressly provided that, in the event that the debtors, that is, in this case, "ELETSON HOLDINGS INC.", files Chapter 11 proceedings, it will take place in the bankruptcy court of the State of New York.**

20. Nevertheless, "ELETSON HOLDINGS INC." defaulted in fulfilling the second RSA.

**C. The insolvency proceedings before the New York Bankruptcy Court (South District) and the approval of the *ELETSON HOLDINGS* reorganization plan**

21. The companies Pach Shemen LLC, VR Global Partners and Alpine Partners, which, meanwhile, had lawfully acquired[1] the new bonds, filed against "ELETSON HOLDINGS INC." before the Bankruptcy Court of the Southern District of New York, a petition for its involuntary bankruptcy under Chapter 7 of the U.S. Bankruptcy Law, due to its inability to fulfil its obligations from the bonds.

22. On September 6, 2023, upon motion of "ELETSON HOLDINGS ING", the Chapter 7 involuntary bankruptcy proceedings was converted into Chapter 11 voluntary bankruptcy proceedings. This is an internal insolvency reorganization procedure, which, after repealing the reorganization plan which was provided for in articles 107 et seq. 3588/2007 (Bankruptcy Code), before it was amended by Law 4446/2016 and before it was repealed by Law 4738/2020, now befits the reorganization procedure of articles 31 et seq. of Law 4738/2020, which is the only reorganization procedure provided for in the new bankruptcy law which was enacted by Law 4738/2020, repealing the Bankruptcy Code.

23. The advantage of these proceedings (Chapter 11) is that the debtor remains over the administration of his property. No bankruptcy expropriation occurs, so no administrator is appointed. This debtor is called Debtor in Possession. Therefore, the position of the administrator is maintained by the debtor himself. In this context, Pach Shemen, upon permission of the aforementioned bankruptcy court, granted to the Debtor in Possession, "ELETSON HOLDINGS INC.", financing in the amount of $10 million at an annual rate of 0.5%.

---

[1] As ruled by the Bankruptcy Court.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
HELLENIC COURT OF FIRST
INS...

24. Three (3) reorganization plans were filed before the Bankruptcy Court of the Southern District of New York. The first by "ELETSON HOLDINGS INC.", the second by the Creditors, which was based on the plan of "ELETSON HOLDINGS INC.", and the third, the independent plan of the petitioning Creditors, which was finally approved by the Bankruptcy Court with its Decision dated 10/25/2024 [MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE],

25. In accordance with the approved reorganization plan:

   **i.**  the shareholders of "ELETSON HOLDINGS INC." are ranked in the 9th class (Class 9) of the creditors. In accordance with paragraph 3.3. case (i) [= letter i], (ii) relating to the treatment of shareholders, it is explicitly provided that by and with the entry into force of the reorganization plain, the existing shares are canceled, without distribution of money to shareholders.

   **ii.**  Furthermore, in accordance with paragraph 5.8 of the reorganization plan, by and with its entry into force, the reorganized "ELETSON HOLDINGS ING" shall issue new shares.

   **iii.**  Also, in accordance with paragraph 5.10(c) of the reorganization plan, by and with its entry into force, the directors of "ELETSON HOLDINGS ING" are deemed to have resigned and at any rate they may be revoked.

   **iv.**  Finally, in accordance with paragraph 10.6. of the reorganization plan, by and with its entry into force, every professional employed by the debtor is not considered to be employed by the reorganized holding company, unless a contract is drawn after the date it is entered into force.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

26. On November 4, 2024, an Order of the U.S. Bankruptcy Court - Southern District of New York was issued to ratify the Confirmation Decision dated 10/25/2024 ["FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS"].

27. Critical, in this case, elements of this Order, are the following:

    **i.** Under item B., the validation of the reorganization plan is a **core** insolvency procedure.

    **ii.** Under item **L.,** *"ELETSON HOLDINGS INC."* **is a Debtor in Possession.**

    **iii.** Under item T., the petitioning creditors have disclosed the persons of directors and representatives who are consistent with their best interests and public policy.

    **iv.** According to item Y, it is found that it is lawful to modify the rights of the ninth class of Creditors (old shareholders).

    **v.** According to item DD., it is found that the petitioning Creditors acted in good faith for the purpose of reorganizing and increasing the value of the property of *"ELETSON HOLDINGS INC."*

28. Furthermore, critical, according to the operative part of the Order, are the following:

    **i.** With point No. 1. of its operative part, the reorganization plan is confirmed.

    **ii.** Point 5.i. of its operative part authorizes the debtors, the reorganized *"ELETSON HOLDINGS INC."* and the petitioning Creditors to do whatever is necessary for the implementation of the reorganization plan. In particular, it is provided in par. 5 (j), inter alia, that the Debtors and the Petitioning Creditors and each of their respective Relevant Parties are ordered to cooperate in good faith to implement and complete the Plan. All actions contemplated by the Plan, including those taken in anticipation of the Effective Date, are accepted and approved in all respects (subject to the provisions of the Plan and this Confirmation Order) *(The Debtors and the Petitioning Creditors and each of their respective Related Parties are hereby directed to cooperate in good faith to implement and consummate the Plan. All actions contemplated by the Plan, including actions taken in anticipation of the Effective Date, are hereby authorized and approved in all respects (subject to the provisions of the Plan and this Confirmation Order}].*

iii. With point 14. of its operative part, the Bankruptcy Court shall retain its international jurisdiction in respect of any matter relating to Chapter 11, namely the reorganization proceedings.

iv. With point no. 19 of its operative part, subject to the occurrence of the **effective date of the reorganization plan, the reorganization plan and the Order are immediately in force and enforceable.** And they bind petitioning Creditors, the Debtors and all claim lenders and the holders of interests, and indeed regardless of whether the claims or interests were affected by the reorganization plan or not.

v. With No. 25. point of its operative part, it is set forth that the Order is final and the deadline for filing an appeal starts from the publication of said Order.

29. The confirmation decision was appealed on 11/07/2024 by the then Board of Directors of "ELETSON HOLDINGS INC".

[stamp:]
[emblem:]
HELLENIC REPUBLIC
ΠΕΙΡΑΙΩΣ COURT OF FIRST
INSTANCE

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

30. As evidenced by the decision of the District Court of the Southern District of New York dated December 30, 2024, in Case l:24-cv-08672-LJL, the appeal against the Order was voluntarily withdrawn by the appellant and the appellees.

31. Therefore, the Order is not subject to any remedy as to its substance and has become final and is therefore recognized in Greece. It is noted that we have submitted before the Athens Multi-Member Court of First Instance the application for recognition in Greece dated 02/03/2025, pursuant to Law 3858/2010, as the main insolvency procedure, the foreign procedure of Chapter 11 of the American Bankruptcy Code of "ELETSON HOLDINGS INC".

**D. The entry into force of the reorganization plan (Effective Date) and its legal consequences**

32. In execution of item no. 19. element of the operative part of the Order, on November 19, 2024, the petitioning creditors, with their document named Doc 1258/11.19.24 of the Chapter 11 cases, under Case No. 23-10322 (JPM), which was submitted to the Bankruptcy Court on 11/19/2024, announced the arrival of the effective date (Notice of (I) the occurrence of the effective date) of the reorganization plan. This date was **11/19/2024.**

33. According to the above, by and with the entry into force of the reorganization plan, the old shareholders automatically ceased to be shareholders of (the reorganized) "ELETSON HOLDINGS INC." and the members of the Board of (the reorganized) "ELETSON HOLDINGS INC." automatically lose their capacities as Board members.

34. **On the same date, 11/19/2024, the new shareholders of the reorganized "ELETSON HOLDINGS INC." with their minutes**, as they state that the effective date of the reorganization plan has occurred, that is, 11/19/2024, that, in accordance with paragraph 3.3 (j) [= letter j] of the reorganization plan, the shares of the shareholders (9th class of creditors) are canceled and repealed; that, in accordance with paragraph 5.8 of the reorganization plan, the company issued new shares and that, in accordance with paragraph 5.10(c) of the reorganization plan, the Board members prior to the effective date of the reorganization plan (11/19/2024) shall automatically cease to be in that capacity, **decided:**

[stamp:]
[emblem:]
HELLENIC REPUBLIC
SINGLE-MEMBER COURT OF FIRST

i.    to revoke all previous Board members of the company, including the persons who are specifically mentioned in the aforementioned decision and who form the provisionary board of directors which was appointed with the aforementioned temporary order of the Presiding Judge of the Single-Member Court of First Instance of Piraeus and

ii.    to elect a new Board of Directors, consisting of: **(a.)**Adam Spears, **(b.)** Leonard Jay Hoskinson, and **(c.)** Timothy B. Matthews.

35. At the same time, the articles of association and the corporate documents of internal organization and operation (Bylaws) of "ELETSON HOLDINGS INC." were amended, in accordance with the provisions of its confirmed reorganization plan.

36. As further evidenced by the affirmation of the Directors and Shareholders of the reorganized "ELETSON HOLDINGS INC.", dated 01/31/2025, its share capital amounts to 10,000 nominal Class A shares with no par value.

37. Shareholders of the reorganized "ELETSON HOLDINGS INC." are the following:

(a.)The foreign company "Pach Shemen LLC", holder of 935 shares, representing 9.35% of its share capital.

(b.)The foreign company "Mulberry Street Ltd", holder of 8,983 shares, representing 89.83% of its share capital.

(c) The foreign company "Waxcap Inc.", holder of 82 shares, representing 0.82% of its share capital.

38. Its board of directors consists of: **(a.)**Adam Spears, **(b.)** Leonard J. Hoskinson, and **(c.)** Timothy B. Matthews.

39. Following the above, it is proven that from the entry into force of the reorganization plan, the old shareholders, including the absentees, ceased to have any shareholding relationship with the reorganized "ELETSON HOLDINGS INC.". The same applies to the members of its Board of Directors, which consists, since 11/19/2024 of the following: **(a.)** Adam Spears, **(b.)** Leonard Jay Hoskinson, and **(c.)** Timothy B. Matthews.

**E. The Order dated 01/29/2025 of the New York Bankruptcy Court (South District) for compliance with the confirmed reorganization plan**

40. Following the actions of the former shareholders and former Board members of "ELETSON HOLDINGS INC." who challenged Adam Spears' competence as the new authorized representative of the reorganized "ELETSON HOLDINGS INC." to submit, without prior recognition of the Confirmation Order in Liberia, the new statutory documents of the reorganized "ELETSON HOLDINGS INC." in the Liberian Register, the latter requested from the Bankruptcy Court of New York (South District) the issuance of an Order by which a) it would find that the former shareholders, officers and directors of "Reorganized Holdings Inc." as well as Reed Smith (appearing as proxy lawyers of former shareholders and officers), did not comply with the Confirmation Order, b) to oblige the former debtors and legal representatives to comply with the Confirmation Order and to implement the plan of Chapter 11, notifying the Liberian International Ships and Companies Register (LISCR) to reflect the Reorganized Eletson Holdings Inc. as the new owner of the reorganized debtor, c) to find that the former debtors and legal representatives failed to comply with the Confirmation Order and to impose penalties on them.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INSTA...

41. The above application was discussed on 01/24/2025 and was accepted, and with the Order dated 01/29/2025 of the New York Bankruptcy Court (South District) the following were order (our emphasis):

    i.    Pursuant to Article 1142 of the Bankruptcy Code, the Debtors and their Affiliates, including but not limited to the Ordered Parties, are authorized, **obliged and directed to comply with the Confirmation Order and the Reorganization Plan to contribute to the execution, implementation and completion of these terms.**

    ii.    The Debtors and their Affiliates, including, without limitation, the Ordered Parties, are authorized, obliged and directed to take all reasonable steps requested by Holdings to unconditionally support the execution, implementation and completion of the Plan; including, but not limited to, no later than seven (7) days from the date of service of the Order, in accordance with applicable law (the "Compliance Deadline"), taking all steps necessary to update or amend (a) Holdings' AOR to reflect that Adam Spears is the AOR (Authorized Representative) of Holdings and (b) Holdings' corporate governance documents filed with the LISCR as directed by Holdings.

    iii.    Holdings will serve a copy of the Order to all interested parties in accordance with applicable law.

    iv.    If the bound parties fail to perform the specific acts referred to in paragraph 2 within the Compliance Deadline or fail to take such actions (or not take any such actions) as set out in paragraph 2, Holdings may seek a hearing on short notice at a date and time to be determined by the Court, to determine whether the relevant parties have breached this Order, the Oral Decision, the Plan, the Confirmation Order and/or the Bankruptcy Code; as applicable, and consider another and further measure, including, without limitation, the imposition of compulsory and/or punitive monetary penalties.


     v.  The Order is issued without prejudice to Holdings' rights to seek compulsory and/or indemnified monetary penalties.

    vi.  The points of the Application for which the Court did not decide in its Oral Judgment are considered withdrawn without effect or dismissed without effect.

   vii.  **The Order is immediately effective and enforceable from the time it was issued.**

  viii.  The Court shall retain jurisdiction over all matters arising out of or relating to the application, interpretation or enforcement of the Order.

42. As concluded from the minutes of the discussion of the above application, for the issuance of its Order, the Bankruptcy Court, considered, among other things, the following: a) that on November 19, 2024, the reorganization plan has been put in place, b) that according to the plan, the Reorganized Eletson Holdings entity was created, and the previous Board of Directors was dissolved and abolished, c) that the representation of Eletson Holdings Inc. by Reed Smith was terminated (this is set out in the Chapter 11 2.5A plan) and the shares were paid to the new company, d) that, according to par. 3.1 and 3.2 of the plan, "on the effective date, each permitted existing share right will be released, canceled, liberated and abolished by any distributions to the holders", e) that the articles of association of the company were amended, reflecting the reorganized entity, f) that on the effective date, the share rights of the former debtors were abolished and all share rights in the reorganized company were issued to the new holders (see par. 5.4 and 5.8 of the plan), g) that the new members of the board of directors are Adam Spiers, Leonard Hoskinson and Timothy Matthias, h) that the appeal against the Confirmation Order dated 11/07/2024 was dismissed by the decision of Judge Liman.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INSTANCE

43. On the basis of the above findings, the Bankruptcy Court held, among other things (our emphasis), that **a)** as of the effective date and in accordance with the judgment of Judge Liman to dismiss the appeal, members of the Board of Directors of former debtors, some of which are now temporary board members, are automatically considered to be "resigned or otherwise terminated as directors or administrators of Eletson Holdings Inc.", **b)** the current directors, again in accordance with the judgment of Judge Liman, are the new board of directors appointed pursuant to the Confirmation Order; **c) the reorganized Eletson Holdings Inc.", the same corporate entity as the former debtor, Eletson Holdings, but with the new owners, the new board of directors and new management approved by the court in the confirmation decision, is the only Eletson Holdings Inc., d)** Judge Liman J found that the "decision of this Court recognizes the new Board of Directors of Eletson and gives the new Board of Directors of Eletson, pursuant to section 5.2 of the plan, the opportunity to act on behalf of Eletson, which is in accordance with sections 5.10 and 5.11 of the plan, and gives them power according to the plan." **e)** the confirmation decision and the Plan are binding on the counsel of the former debtors, as these parties actively appeared and participated in the bankruptcy case, **f)** Section 1141 of the Bankruptcy Code provides that, unless otherwise provided in subparagraphs (d)(2) and (d)(3) of this section, the provisions of a confirmed/validated plan

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, shareholder or general partner of the debtor, regardless of whether the claim or the interest of those creditors; shareholders or partners is restricted under the plan or not, and regardless of whether said creditor, shareholder or partner has accepted the plan or not, **d)** section 1149(c) states that, unless otherwise provided in paragraphs (d)(2) and (d)(3) of the section, and unless otherwise provided for in the plan or the decision to confirm the plan, after confirming a plan, the property administered by the plan is free from all claims and interests of creditors, of the debtor's shareholders and general partners, and (d) states that, unless otherwise provided for in the part of the plan or in the plan confirmation decision, confirming a plan terminates all rights and interests of shareholders and general partners as provided for by the plan, **h)** Section 1142 of the Bankruptcy Code states that, (A) notwithstanding any other applicable non-bankruptcy law, rule or regulation on the financial situation, the debtor and any entity organized for the purpose of implementing the plan must implement the plan and comply with the Court's orders, and (B), the Court may order the debtor and any other pledged party to sign or deliver or participate in the signing or delivery of any document required for the transfer of property which is managed by the confirmed plan, and to perform any other action necessary to complete the plan, **i)** section 1141 states that the confirmed plan binds the debtors and creditors to all the provisions of the plan, **j)** when a debtor refuses to comply with the terms of a confirmation decision, the Court may order the debtor to comply, **k)** the amendment of the AOR and the submission of the amended articles of association are also in accordance with the decision of Judge Liman in the appeal for the confirmation, which determined that the confirmation decision was final, as the former debtors and lawyers did not request annulment of the confirmation decision and the decision acknowledges a new Board of Directors of Eletson Holdings Inc. pursuant to articles 5.2, 5.10 and 5.11, among other things, of the plan, and the new Board of Directors may take any action they deem appropriate on behalf of Eletson.

44. Therefore, it is concluded from the above Order that the confirmation of the reorganization plan has become final.

**III. On the application of the litigants**

**A. The admissibility of the application of the litigants - lack of international jurisdiction. Lack of real registered seat in Greece**

45. Pursuant to articles 739, 740 § 1 and 786 § 1 of the Code of Civil Procedure, the appointment of provisionary management is made during the *procedure of voluntary jurisdiction (articles* 739 et seq. Code of Civil Procedure), by the *Single-Member Court of First Instance of the region where the legal person is based.*

46. According to article 10 of the Civil Code, the legal entity's capacity is regulated by the law of its registered seat. In the true sense of this order, as seat of the legal person by which, according to article 3 of the Code of Civil Procedure, the jurisdiction and the international jurisdiction of the court is determined, among other things, means the actual seat, that is, the place where its management is indeed exercised, that is, the decisions for the development of its activity are taken, and not any different place which is simply named as the seat in its articles of association (statutory seat). Therefore, a foreign company, whose management is exercised in Greece, where its actual headquarters are located, is competently sued before the Greek courts, the jurisdiction and the international jurisdiction of which is determined on the basis of the place of its actual seat (Supreme Court Plenary 2/1999, Supreme Court 2/2003, Supreme Court Plenary 2/1999, Supreme Court Plenary 461/1978).

47. The applicants bring the disputed application before your Court invoking that the actual registered seat of "ELETSON HOLDINGS INC." was not Liberia, where its statutory seat was, which is of course true, but of course Greece, and in particular Piraeus, where its real registered seat is allegedly located (117 Kolokotroni St.) and the place of exercise of its management. Indeed, the applicants, in their effort to persuade about the merits of their allegation, confuse the object of activity of "ELETSON HOLDINGS INC." with the activity of its subsidiaries, by characterizing "ELETSON HOLDINGS INC.", already from the beginning of the case file, as a foreign shipping company, and by identifying it, in fact, with the manager of the ships Eletson Corporation, invoking in particular that (p. 2) *"..it exercises it activity (meaning Eletson Holdings) in Piraeus through the 100% subsidiary of Eletson Corporation, which maintains, in Piraeus, a legally installed office according to the provisions of article 25 of Law 27/1975, where it employs approximately 50 employees, who are hired, insured and employed by Eletson Corporation, in accordance with the provisions of Greek law"*. That is to say, they display, fully in error, the installation of Eletson Corporation, as an installation of "ELETSON HOLDINGS INC." and its personnel as personnel of "ELETSON HOLDINGS INC.".

[stamp:]
[emblem:]
HELLENIC REPUBLIC
[...] COURT OF FIRST
INST[...]

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

48. Apart from the lack of foundation of their allegation of alleged real seat in Greece, the above allegations of the litigants, who do not contribute to your Court with regard to the activity of "ELETSON HOLDINGS INC." its own organization and operation as well, not only do they collide with the principle of a separate legal personality of its parent and subsidiaries, but expose the subsidiaries to risks of the reorganized (or worse of the non-reorganized, as alleged by the litigants) of the parent in its subsidiaries, through the identification attempted by the applicants. Indeed, the invocation of such allegations to establish the true registered seat of "ELETSON HOLDINGS INC." in Greece, not related to the same, but to its subsidiaries, shows exactly the inability of the litigants to establish its true registered seat in Greece and the manifest unsubstantiated nature of said allegation.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST

49. In any case, although the above is sufficient to dismiss the allegation of the litigants as completely unfounded, it was already presented in the Background that "ELETSON HOLDINGS INC." is not a shipping company in principle, as the applicants invoke for the purpose of confusing its activity and place of its development. Instead, it is a holding company clearly distinguished from the companies in which it participates and from the objective of their activity. More precisely, it is a company that receives funding it directs to its subsidiaries, as shown in the Background above. At no point in the application of the litigants is it specified which decisions of Eletson Holdings Inc as a holding company are made in Greece, it is rather attempted, as stated above, to identify it with its subsidiaries and their activity, for which specific incidents as to the place of their management decisions are not mentioned.

50. The statutory seat of "ELETSON HOLDINGS INC." is located in Liberia, however, this is not where the management of its interests is exercised, the intervener first of all falls under the domestic - without residence - Liberian companies. This is rather only a "post office box". In Greece, and in particular Piraeus (117 Kolokotroni Street), the company does not maintain registered seat there, its board of directors does not meet there, no decisions are taken there regarding the pursuit of its objective, does not maintain personnel, infrastructure, property, and does not maintain bank accounts there. This is, after all, stipulated indirectly by the litigants who present Eletson Corporation's personnel and offices as personnel and offices of "ELETSON HOLDINGS INC." *("..exercises all its activity (meaning of Eletson Holdings) in Piraeus through its 100% subsidiary Eletson Corporation, which maintains in Piraeus a lawfully installed office, according to the provisions of article 25 of Law 27/1975, where it employs approximately 50 employees, which are hired, insured and employed by Eletson Corporation, in accordance with the provisions of Greek law",* p. 2).

51. In support of the above, the former member of the management of "ELETSON HOLDINGS INC." Mr. Vasileios Kertsikoff, examined on December 12, 2023, testified in the context of the insolvency proceedings that "ELETSON HOLDINGS INC.", **as a holding company, has no daily operations, has no personnel, has no bank accounts. Therefore, its central management is exercised neither in Liberia nor in Greece.**

52. As to the more specific substantiation of the place of decision for the development of the intervener's business and the place where it develops, which is New York, USA, a more specific reference is made below under B. (II), where a more specific reference is included in the Center of its Main Interest which is identical to its actual registered seat.

**B. The lack of substantiation of the litigants' application**

**i.    The appointment of a final BoD to the reorganized "ELETSON HOLDINGS INC" based on its approved and final reorganization plan**

53. In accordance with the provision of article 69 of the Civil Code, as replaced by article 1 of Law 4055/2012 *"If the persons required for the management of the legal person are missing or, if their interests conflict with those of the legal person, the magistrate court shall appoint temporary management at the request of any person with a legitimate interest"*. Under this article, anyone who has a legitimate interest is entitled to cause the judicial appointment of a provisionary management of a legal person, if the persons required for management are missing or if their interests conflict with those of the legal person. A lack of a board of directors occurs when the members required for the assembly thereof are missing, and this lack is fictitious, when it is due to the dystropy or malevolence of the directors - members of the board, their denial or indifference for the exercise of the necessary management acts, and real in cases of death, severe illness, resignation, demotion or tenure expiration of the directors (Supreme Court 561/2008, Supreme Court 395/2002). The power of the provisionary management may be delimited by the court decision, which, if there is reason, may be reformed. If the decision does not stipulate the power of the provisionary management, then it has general power to administer and manage the affairs of the legal person, that is, all necessary powers for the regular management arising from the articles of association, limited only in time, until the time that the decision itself stipulates, or if it does not stipulate, until the election of the ordinary management. Therefore, a key competence of the provisionary management is the convening of the shareholders' assembly for the election of a new BoD. The court does not commit to the selection and appointment of appropriate persons as members of the provisionary management, neither by the persons proposed by the litigants, nor by any provision of the articles of association. While its relative judgment, being absolutely free and dominant, is not subject to annulment review.

54. In the present case, until November 18, 2024, that is, the previous date of the entry into force of its reorganization plan, shareholders of "ELETSON HOLDINGS INC." were the following:

[stamp:]
[emblem:]
HELLENIC REPUBLIC
US COURT OF FIRST
Inst.

    i.    i. The company "Lassia Investment Company" (of the Laskarina Karastamatis family), holder of 3,072 shares, representing 30.72% of its share capital.

    ii.    The company "family Unity Trust Company" (of the family of Vasilis Kertsikoff) holder of 3,072 shares, representing 30.72% of its share capital.

    iii.    The company "Glafkos Trust Company" (of the family of Vasileios Hatzieleftheriadis) holder of 3,072 shares, representing 30.72% of its share capital.

    iv.    The company "Elafonissos Shipping Corporation" (of the family of Nikos Zilakos), holder of 392 shares representing 3.92% of its share capital. And

    v.    The company "Keros Shipping Corporation" (of the family of Vasiliki Andreoulakis), holder of 392 shares representing 3.92% of its share capital.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

55. The board of directors of "ELETSON HOLDINGS INC." consisted, prior to its reorganization, of the following:

    **i.**    Laskarina Karastamatis, as Chairman of the Board.

    **ii.**    Vasileios Hatzieleftheriadis, as Vice President and Treasurer of the Board.

    **iii.**    Vasileios Kertsikoff, as Vice President of the Board.

    **iv.**    Konstantinos Hatzieleftheriadis, Board Member.

    **v.**    Ioannis Zilakos, Board Member.

    **vi.**    Eleni Karastamatis, Board Member.

    **vii.**    Panagiotis Konstantaras, Board Member.

    **viii.**    Emmanuel Andreoulakis, Board Member.

56. "ELETSON HOLDINGS INC.", represented by the aforementioned management which was under a deadline, expiring over a few days, filed an appeal against the aforementioned Order on November 7, 2024. However, knowing that until the discussion of said Appeal, the reorganization plan would have come into effect, resulting in the automatic cessation of its board of directors, according to the above, but also the automatic loss of the shareholding capacity of its shareholders, proceeded to the following manipulation in bad faith.

57. The next day, November 8, 2024, four of the eight members of the Board of Directors, namely Laskarina Karastamatis, Vasileios Kertsikoff, Eleni Karastamatis and Panagiotis Konstantaras, resigned (why?), attempting inappropriately to cause, in this way, an artificial lack of management.

58. Instead, as they had an obligation, according to 5.i. point of the operative part of the confirmation Order, doing what was necessary for the implementation of the reorganization, the top four members of the Board did the opposite. They resigned to make it more difficult (!!!).

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INS...

59. Subsequently, the applicants, whose shareholding capacity in "ELETSON HOLDINGS INC." was, as was the case of its Board of Directors, under a deadline, expiring a few days later, that is, the companies "Elafonissos Shipping Corporation" and "Keros Shipping Corporation", filed before your Court the application dated 11/11/2024 with filing No. 16655/7823/2024, for voluntary jurisdiction proceedings, alleging that due to the aforementioned resignations, a case of lack of management arose, and they received, **without the knowledge of the creditors and then new shareholders of the reorganized** "ELETSON HOLDINGS INC", the temporary order dated 11/12/2024.

60. It is clear that the former shareholders of "ELETSON HOLDINGS INC." acted abusively and in bad faith, and contrary to the absolutely binding decisions for them, in fact in the process of their issuance in which they participated. As mentioned, the involuntary petition for bankruptcy under article 7 of the U.S. Bankruptcy Code was converted on September 6, 2023, upon motion of "ELETSON HOLDINGS INC.", represented by its previous Board of Directors, in voluntary insolvency proceedings under Chapter 11 of the U.S. Bankruptcy Law. In the context of these proceedings, three reorganization plans were submitted, one of which was by "ELETSON HOLDINGS INC.", represented by its previous Board of Directors, which was not, however, accepted. As it is proven by the document Doc. 941 of the case of Chapter 11, under Case No. 23-10322 (JPM), all shareholders of "**ELETSON HOLDINGS INC.**", including the applicants herein, **voted** for the selection of the reorganization plan. And they chose the reorganization plan of **"ELETSON HOLDINGS INC."** which was, however, dismissed by the Bankruptcy Court. After this plan was not accepted, the then Board of Directors, four members of which, are identified with the members of the appointed, pursuant to the temporary order dated 11/12/2024, provisionary management, filed an appeal and immediately afterwards resigned, with manifest purpose, as it appears from the alleged application before you, to be released from the decisions of the U.S. bankruptcy court and to overturn the confirmed plan by proceeding to illegal forum shopping.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

61. **In addition to the abusiveness and bad faith of the opposing litigants, their application is unfounded, as the main condition of its acceptance per article 69 of the Civil Code, namely the lack of management, is unsubstantiated.**

62. In this regard, the applicants invoke in their application a lack of management because of the resignations of four of the eight Board Members. That is, they invoke a real lack of management.

63. However, as demonstrated above (par. 32 et seq.), the reorganized "ELETSON HOLDINGS INC." has a new Board of Directors, duly appointed pursuant to the final confirmation Order of its reorganization plan, as of 11/19/2024, consisting of: **(a.)** Adam Spears, **(b.)** Leonard Jay Hoskinson, and **(c·)** Timothy B. Matthews. The applicant companies, from this date, are not even shareholders of "ELETSON HOLDINGS INC."

64. The above is also ascertained by the most recent decision of the New York Bankruptcy Court dated 01/29/2025, excerpts of which were set out above, by which the debtor and any party linked to the debtor are ordered, that is, the applicants herein as former shareholders are also ordered, to comply with the terms of the confirmed and binding plan and to assist in its implementation. Indeed, said action of the absentees violates also the suspension of all kinds of judicial actions resulting from the subsumption to the Chapter 11 proceedings, to which suspension themselves refer in their application (p. 20). In view of this suspension, the purported application before your Court is inadmissible, otherwise unfounded.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST

65. In any case, as the applicants state in their application (p. 27, 28), based on its amended Articles of Association of 2018, the Board of Directors of "ELETSON HOLDINGS INC." consists of three members (directors) and makes decisions by a majority of its members, that is, with the agreement of two of its three members (see p. 29 of the application). The assigned directors are appointed by the Board itself, as the applicants also state (p. 30, 31 of the application). Therefore, even with the resignation of the four members of the pre-reorganization Board of Eletson Holdings Inc., the board would have lawfully existed (if in the meantime it had not been automatically terminated as a result of the reorganization plan confirmation) with 4 members who could have re-appointed between each other the assigned director. Therefore, the allegations of the absentees that the resigned members cannot be replenished and that the remaining members cannot appoint assigned directors are manifestly unfounded. Given that the BoD consists of at least three members, this would lawfully exist (if it had not been automatically terminated on 11/19/2024 according to the aforementioned) with its remaining four members.

66. It should also be noted that the powers for which the applicants request the appointment of provisionary management refer for the most part to the subsidiaries, which, however, as independent legal entities, have their own management. No urgent management action of those highlighted by the applicants is linked to the parent company Eletson Holdings Inc. itself. All subsidiaries and shipping companies are managed and represented by their own Boards of Directors and it is them the same who are dealing with third party suppliers and charterers, due to their capacity as ship owners, and not the parent company Eletson Holdings Inc, which is just a holding company, without even tax presence in Greece. Therefore, there is no reason for the appointment of provisionary management for the representation of subsidiaries and for the transactions of subsidiaries with third parties and with the State. The appeal, dated 11/07/2024, against the confirmation Order for the reorganization plan for the discussion of which they request the granting of relevant power by decision of your Court, has been withdrawn according to what was mentioned in the Background.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

67. The application of the litigants, therefore, is unfounded and in any case lacks an object, while the applicants lack any legitimate interest, given the loss of their shareholding capacity in the reorganized "ELETSON HOLDINGS INC.", as stated above.

**ii. On the applicants' allegations on the insolvency proceedings opened in the U.S.**

68. The applicants, while requesting the appointment of provisionary management due to an alleged lack of the number of directors provided for in the articles of association, as a result of the resignation of four out of eight, refer to events which have nothing to do with the subject of their application, a condition of which is only the lack, real or fictitious, of the management of the legal person, and are therefore raised ineffectively. They refer thus to Levona's dispute with "ELETSON HOLDINGS INC." and Eletson Corporation, and to the arbitration proceedings opened in connection with the matter of transfer or non-transfer, by Levona, of its shares in Eletson Gas. Subsequently they set against the bankruptcy proceedings opened in the USA, invoking manipulation, in bad faith, of the bankruptcy petition due to the lack of active legitimization of the creditors, who were allegedly not lawful creditors and their claims were allegedly disputed, while the purpose of the bankruptcy was allegedly to gain a competitive advantage in the arbitration proceedings. Besides that all these allegations are manifestly vague, they have nothing to do with the subject of the trial, which is the appointment of provisionary management due to the lack of such, according to the allegation of the litigants.

69. In the event that these allegations were considered to be made in order for the applicants to prevent the recognition of the validity of the "ELETSON HOLDINGS INC." reorganization plan confirming decision in Greece, taking, as a matter of fact, into account that, they allege, in combination, on the one hand that the true registered seat of "ELETSON HOLDINGS INC." is in Piraeus, and on the other hand that the U.S. Bankruptcy Court lacked international jurisdiction, these allegations, in addition to being manifestly vague, are completely unfounded.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INST...

70. First of all, the recognition, in Greece, of foreign insolvency proceedings obeys different rules of law, depending on whether they have been initiated in a Member State of the EU or in a third State. Only if the proceedings have been initiated in an EU Member State, Regulation 2015/848 applies. If they have been initiated in a third State outside the EU, such as in this case, ratione materiae is governed by the Standard Bankruptcy Law (BL) on Cross-Border Bankruptcy which was drawn in 1997 by the United Nations Commission on International Trade Law (Uncitral). The BL is applicable, provided that the State in which recognition is sought has incorporated the BL into its national legal order. **This is what Greece did with Law 3858/2010.**

71. As it appears from article 17 of Law 3858/2010, the domestic court, addressing an application for the recognition of foreign insolvency proceedings, is obliged to identify it immediately and in particular as main, if a) an application for recognition has been submitted by the foreign administrator, with its co-submitted documents according to article 15 par. 1 of Law 3858/2010, and (b) the conditions enumerated in article 17 are met, namely aa), it is a procedure within the meaning of case a of article 2, bb) the foreign administrator seeking recognition, is a person or a body within the meaning of case d of article 2, cc) the application referred to in article 4 has been submitted to the court, dd) the foreign proceedings are carried out in the State where the debtor has the center of his main interests.

72. In relation to the above conditions, the insolvency proceedings of chapter 11 of the U.S. Bankruptcy Code ("Chapter 11"), to which the intervener "ELETSON HOLDINGS INC." is subject, falls within the scope of article 2, item a of Law 3858/2010. It is noted that, with its Order dated 12/30/2024, the Bankruptcy Court of the Southern District of New York, Doc. 1326 of Chapter 11 Case No.23-10322 (JPM), finds that the procedure of "Chapter 11" falls within the meaning of "foreign proceedings" of article 2 item a of the BL.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

73. As part of the "Chapter 11" proceedings, the duties of the administrator are performed by the debtor, in this case, the intervener, who I am a debtor in possession (see also ad hoc Piraeus Multi-Member Court of First Instance 1798/2020, Piraeus Appellate Court 429/2022, NOMOS), who submitted my application dated 02/03/2025 before the Athens Multi-Member Court of First Instance (competent as the court of the capital city) for the recognition, in accordance with article 15 of Law 3858/2010, of the Confirmation Order of the reorganization plan with the confirmation decision. It is noted that in view of the fact that the reorganized **"ELETSON HOLDINGS INC.,"**, does not have any facilities in Greece, it is deprived of a place of business in the country, it does not carry out the slightest economic activity in which to utilize human resources and/or possess assets, and provided that there is a difference between an actual registered seat (considered as CMIs) and a statutory seat - the locally competent, with comparable, due to the exposed legal gap, application of article 905 par. 1 of the Code of Civil Procedure, is the Multi-Member Court of First Instance of the capital city, namely the Multi-Member Court of First Instance of Athens, where my application dated 02/03/2025 was submitted.

74. Furthermore, the rule is that the domestic court does not review, as to his substantive judgment, the foreign judge. **This is the principle of the prohibition on retrying the case, which is the prohibition on the review of the legal and substantive correctness of the foreign decision.** A limit to the above principle is introduced only by the reservation of public order (article 6 of Law 3858/2010). In the present case, international public order is understood in the narrowest sense of Civil Code 33. In this regard, public order is the set of principles and concepts that are of primary, basic and fundamental importance which govern life at a certain place and time. In the context of international bankruptcy, such fundamental principles/rights would be the right to announce the claim and the procedural guarantees (right to be heard/defense. **Such a case of infringement of the above fundamental principles does not exist in this case, nor do the applicants invoke something like this, who, as stated above, participated in the "chapter 11" proceedings, together with Eletson Holdings prior to its reorganization. Therefore, it does not fall under the jurisdiction of the domestic judge to review the substantive requirements of the foreign bankruptcy.**

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INST...

75. The foreign procedure is recognized as main, if it is conducted in the State where the debtor has, at the time of the initiation of the foreign proceedings, his Center of Main Interests (CMIs). Definition of CMIs is not found in Law 3858/2010. The interpretation fits based on the criteria of the legal order in which the recognition is sought. However, the requirement for a uniform and internationally oriented interpretation must be taken into account, which is, after all, mandated by article 8 of Law 3858/2010. In this regard, it is observed that the CMIs is a concept of EU authorship and origin [Regulation 848/2015, article 3 par. 1(b)] and was transplanted into the Uncitral regime. As a result, interpretive EU case law guidelines are critical for the domestic judge who receives an application for recognition.

76. The vague legal concept of the CMIs is broken down into three (3) individual composite elements: (a) the place of the main interests, so that it is possible that many places of interest can exist, but the main one is only one, (b) where their management (of the main interests) is exercised, and (c) in a manner verifiable, not verified, by the third parties. "Management" is the same as central management and control of the business activity (head function). Therefore, it contradicts both the current management and daily operation (operational connection), as well as from the place where the company's assets are located (asset connection). This was confirmed by the decision of the EU Court in the case Interedil (C-396/09, par. 53), as well as by recital no. 30 of the preamble of Regulation 2015/848. In order for the CMIs to be identified, i.e. the central management core, actions that cannot inherently accept multiple management must be taken into account. Such are the strategic decision making, funding, oversight, approval of important contracts, financial policy making, and so on. The above delimited place of usual management must be verifiable as such by the third parties. Third parties are the potential or actual creditors of the debtor. This is also to create a legal guarantee as to the bankruptcy regime. The evaluation must fit on the part of the large and up-to-date creditors.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

77. Of course, per article 16 par. 3 of Law 3858/2010, *"...until proof to the contrary, the place of the debtor's statutory seat ... is presumed to be the center of the debtor's main interests"*. The presumption is, of course, arguable. It applies, as long as the statutory seat of the legal entity coincides with its actual registered seat. In the event of a break-up, the place of its actual registered seat shall prevail by legislative choice. Due to the existence of the presumption, as long as the foreign proceedings are carried out in a place other than the statutory seat of the legal person, the applicant for the recognition bears the burden of invoking and proving the facts that reverse the presumption.

78. The actual registered seat and center of the main interests of "ELETSON HOLDINGS INC." which is considered, is found, if its activity is taken into account. This was and remains, as detailed in the Background, the acquisition of holdings in companies, which it finances by raising funds from investment funds. It is noted that it is "ELETSON HOLDINGS INC." itself which states in the issuance of a bond loan, amounting to $300 million, that it has offices in Connecticut, in the town Stamford, Connecticut (USA), which, due to its location in the south-western Connecticut, falls under the Metropolitan District of the State of New York. It is also noted that in the past, they had issued another bond loan of $103 million. Therefore, the sole activity of "ELETSON HOLDINGS INC." was to seek and receive funding in the USA from American sources. It is, in fact, its inability to service said bond loan which led it to "Chapter 11". In connection with this bond loan, it is noted that all contracts relating to it, by entering into, appointing a manager, exchanging old bonds with new ones, two assisted reorganization agreements, were drafted, as detailed in the Background, in New York. These were the only and most important contracts. **These major financing decisions were made in New York. New York is, therefore, the true registered seat of "ELETSON HOLDINGS INC." and, inherently, the center of its main interests.** This is why New York law is agreed as applicable and its courts are agreed as competent in all contracts. This is why in clause 23 of the two RSAs, "ELETSON HOLDINGS INC." agreed, if a "Chapter 11" issue appears, at its request, as it was done, that it would take place in the New York Bankruptcy Court. **New York is recognized by the creditors of ELETSON HOLDINGS INC as a center of its main interests and its real registered seat.** Indeed, all of its creditors, as evidenced by the relevant documents, **with credits of more than $290 million,** are all U.S.-based entities.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
COURT OF FIRST
INSTANCE

79. Furthermore, it is noted that "ELETSON HOLDINGS INC.", its then shareholders, including the absentees, but also its then board of directors, **never challenged** the jurisdiction of the American Bankruptcy Court, on the argument that the center of its main interests is not there. Instead, it was this **"ELETSON HOLDINGS INC.",** represented by the old BoD, whose members also form the provisionary administration set up in the temporary order of your Court, which requested by **its application** to convert its involuntary bankruptcy into a "Chapter 11" procedure.

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

80. During the Chapter 11 insolvency proceedings before the Bankruptcy Court of the Southern District of New York, both **"ELETSON HOLDINGS INC."** under its then-current management, including the absentees, but also its then shareholders, including the applicants, never raised a concern that the Center of Main Interests of **"ELETSON HOLDINGS INC."** was not the USA, but instead Greece. And not just that. As evidenced by a document named Doc. 941 of the Chapter 11 case, under Case No. 23-10322 (JPM), all the shareholders of **"ELETSON HOLDINGS INC.",** including the absent ones herein, **voted** for the selection of the reorganization plan. And they chose the reorganization plan of **"ELETSON HOLDINGS INC."** which was, however, dismissed by the Bankruptcy Court.

81. Following all of the above, therefore, the allegations of the absentees against the insolvency proceedings opened in the USA and the alleged lack of competence of the New York Bankruptcy Court, are totally unfounded, while your Court, as well as the Court of the recognition of the decision, cannot retry the case of the American Bankruptcy Code Chapter 11 reorganization proceedings to which ELETSON HOLDINGS INC. was subject. In particular it is clear that the **Center of Main Interests** of **"ELETSON HOLDINGS INC."** was, at the time the insolvency proceedings initiated, and remains to this day, the U.S.A. Its alleged detection in Greece, in the late opinion of the above petitioning shareholders, but also of the board of directors which was appointed by temporary order, is a late myth of them, which is in fact unfounded in reality. The only reason they allege the above is the following: **Because the Bankruptcy Court did not uphold the reorganization plan they desired.**

82. It is noted in any case that, as evidenced by the confirmation decision dated 10/25/2025 [MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE] the allegations of the applicants herein on manipulation, in bad faith, of the bankruptcy by Levona, as the alleged alter ego of creditor Pach Shemen, and the dispute with Levona regarding the transfer of Eletson Gas shares which was admitted to arbitration, and the alleged non-existence of the applicant creditors' claims, were examined by the bankruptcy judge and were dismissed. Among other things, Judge Mastando notes in the above decision that (p. 95 et seq.): *"Initially, as has been mentioned many times in this opinion, the Court has already reviewed and rejected the Debtors' allegations regarding the bad faith of the Applicant Creditors in the Opinion on the Opposition against Claims. (See Opinion on Opposition against Claims). To the extent that allegations remain, the Court expressly dismisses them. For these reasons, the Court finds that the Applicant Creditors have acted in good faith within the meaning of Article 1129(a)(3)."* In particular, it does not take into account the financing of US$10 million granted by the applicant creditors to Eletson Holdings Inc.

83. Especially as regards the dilatory references to the arbitration dispute with Levona, it was similarly brought to the attention of the bankruptcy judge, who found that the final Arbitration Award held that the Preferred Shares of Gas had been transferred to businesses affiliated with the Debtors' shareholders (the "Cyprus Nominees") since March 11, 2022, on which he awarded damages of US$87 million as compensation against Levona, Pach Shemen and Murchinson, noting indeed that, despite the fact that Holdings was part of the Arbitration, none of the damages awarded by the Final Arbitration Award were awarded to the Debtor Holdings. Instead, approximately half of the damages were awarded to Gas and the other half were awarded to the Cypriot Nominees, because the arbitrator found that they were the parties who were directly damaged by Levona's conduct. This dispute is therefore not perceived to relate to Eletson Holdings' reorganization plan and the allegations of alleged non-existence of creditors' claims. It should also be noted, as Judge Mastando points out in the above decision, that following the above decision, Holdings and Eletson Corp. filed an application with the United States District Court for the Southern District of New York (the "First Instance Court" and the "Confirmation Trial" pending in the Eletson Holdings case; Inc. v. Levona Holdings Ltd., 23-cv-07331-LJL (S.D.N.Y)) to confirm the Final Arbitration Award. (Confirmation trial in docket No. 1). Levona filed a counter-petition, asking for its disappearance. (Confirmation trial in docket No. 28-31). On February 15, 2024, the Federal Court of First Instance issued an Opinion and Order partially confirming the Final Arbitral Award (the "Confirmation Decision"), but eliminated certain parts of the compensation and certain findings of the arbitrator as to the liability for Levona, Pach Shemen and Murchinson under an alter ego theory. On July 3, 2024, Levona filed an application for permission to amend its application for disappearance, in order to reflect the possibility that the Debtors had not provided essential documents to the arbitrator, which purportedly dismantled the Debtors' position that the Debtors had exercised the call right for the Preferred Shares of Gas from Levona. On September 6, 2024, the Court of First Instance accepted Levona's application for amendment, stating that: the conclusions in favor of which Levona argued, the newly produced documents, struck down Eletson's suggestion that the documents would be insignificant. The documents were very significant for both the arbitration and for the previous trial before [the Court of First Instance]. They tend to show fraud during the arbitration proceedings. Further, the Court of First Instance stated that "Levona has provided evidence indicating that the [documents that were allegedly not provided] may only be the tip of the iceberg and that there may be other relevant documents supporting its allegations that extraordinary circumstances prevented them from filing them earlier and that fraud occurred in the arbitration proceedings." Thus, the Court of First Instance allowed Levona to conduct a preliminary investigation in order to determine whether the Final Arbitration Award was "issued by fraud or improper means."

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

84. All of the above are not reported by the applicants. It is stressed, however, that the vague and unfounded allegations above of the litigants on alleged bad faith and the opposition of the bankruptcy to morality due to the dispute with Levona, are not related at all to the subject matter of their application, have been dismissed by the U.S. bankruptcy court, do not negate the binding nature of the confirmed reorganization plan, nor do they, of course, relate to the recognition conditions of article 17 of Law 3858/2010.

**IV. On the legitimate interest of the intervener**

85. From the above, my legitimate interest in the exercise of this main intervention is easily proven. The application on behalf of the aforementioned former shareholders and the appointment of a temporary board of directors constitutes an appropriation of my representative power, a representation which may be exercised only by the new board of directors of the reorganized "ELETSON HOLDINGS INC", which legally exists as of 11/19/2024, consisting of (a.) Adam Spears, (b.) Leonard Jay Hoskinson, and (c.) Timothy B. Matthews. This appropriation risks, of course, my own interests, but also those of my creditors, since it illegally seeks the overturn of my pending reorganization. After all, as mentioned, the Bankruptcy Court of the Southern District of New York, USA, by its decision of January 29, 2025, ordered my former shareholders and former members of the Board of Directors to do everything necessary to implement the reorganization plan, with the reservation of penalizing them in case of non-compliance.

*Whereas* my application is lawful, substantiated and definitive.



*Whereas* I have a self-evident legitimate interest to exercise this intervention.

*Whereas* the purported application of the litigants before your Court is inadmissible due to the lack of international jurisdiction of your Court.

*Whereas* the purported application before your Court is completely unfounded, as there is no lack of management in the reorganized "ELETSON HOLDINGS INC." *Whereas* I will prove my allegations with documents and witnesses.

*Whereas* I paid the note number .................................................................................................................

for prepayment of my proxy attorney's fees.


**FOR THESE REASONS**

*AND WITH RESERVATION OF ALL MY LEGAL RIGHTS, I HEREBY REQUEST*

The acceptance of my current intervention.

The full dismissal of the opposing litigants' application dated 11/11/2024, with General Filing Number/Special Filing Number 16655/7823/11-11-2024, following the request for a temporary order.

Otherwise and in the alternative, to order the postponement, per article 249 of the Code of Civil Procedure, of the discussion of the above application following this intervention, until a decision is issued on my application dated 02/03/2025 before the Multi-Member Court of First Instance of Athens, pursuant to Law 3858/2010, for the recognition, in Greece, as the main insolvency proceedings of the foreign Chapter 11 procedure of the American Bankruptcy Code of the debtor "ELETSON HOLDINGS INC.", namely: (a.) Order No. Doc. 1212/10.25.2024 of the Bankruptcy Court of the Southern District of New York in Case No. 23-10322 (JPM), under heading: **"MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE",** and (b.) of the Order of the U.S. Bankruptcy Court - Southern District of New York, dated November 4, 2024 (Case No: 23-10322 (JPM)), under heading: **"FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS".**

[stamp:]
[emblem:]
HELLENIC REPUBLIC
PIRAEUS COURT OF FIRST
INSTANCE

To convict the litigants to my court costs and to the remuneration of my proxy attorney.

Athens, February 3, 2025

The proxy attorney

**[stamp:]**
MARIA E. ORPHANIDOU
ATTORNEY AT LAW OF ATHENS (Athens Bar
Association No. 39791) LL.M.
PARTNER IN THE LAW FIRM
"DIMITRIOS AVGITIDES AND ASSOCIATES"
[illegible]



**HELLENIC REPUBLIC**

PIRAEUS FIRST INSTANCE COURT

## LEGAL DOCUMENT FILING REPORT

Type of Legal Document: PRIMARY INTERVENTION

General Filing Number: 2641/2025

Special Filing Number: 726/2025

Exception Request Number: 0

Before the PIRAEUS FIRST INSTANCE COURT today, 02/03/2025, Monday at 12:04, the attorney at law MARIA ORPHANIDOU with Athens Bar Association Reg. No. 025791 and Tax Reg. No. 123490950 appeared before the Secretariat and filed the aforementioned legal document.

For this act, this report was drafted and lawfully signed.

Filed by                                                                     The Secretary


MARIA ORPHANIDOU                                                 GIZA OURANIA

## HEARING SCHEDULING ACT

Proceedings: VOLUNTARY, of the SINGLE MEMBER COURT

Docket: VOLUNTARY SINGLE-MEMBER MARITIME COURT

with Docket Number: 2

We hereby schedule the discussion on 04/01/2025, Tuesday at 09:00 at the COURT OF FIRST INSTANCE of PIRAEUS at 3-5 Skouze, Second Floor, Room 218

under the condition that said legal document be notified TWENTY (20) days prior to the trial. Service will be performed at the responsibility of the applicant.

PIRAEUS, 02/03/2025

Assessing Judge


DAFA EFSTATHIA

**TRUE COPY**

PIRAEUS, 02/08/2025

The Secretary


GIZA OURANIA

[blank page in source]

EXHIBIT "18"

Before the President of the Service of the Athens Court of First Instance

NOTE

Of Société Anonyme Eletson Holdings Inc., with statutory seat in Liberia and actual seat at 118 Kolokotroni Street, Piraeus, where the center of its main interests is, legally represented by the chairman of its board of directors Mr. Vasileios Chatzieleftheriadis.

On the application for a temporary order as a result of the application dated 02/03/2025 under General Filing Number 25252/2025 submitted to the Athens Court of First Instance in the name of Eletson Holdings Inc.

————————————————————

The application is inadmissible and actively illegitimate

1. Pursuant to article 15 of **Law** 3588/2007 (**exhibit 1** is produced), an application for the recognition of foreign proceedings is submitted by the "foreign litigant". Pursuant to article 2 par. (d) *"foreign administrator"* is a person or body which has jurisdiction in the context of the foreign proceedings, to manage or liquidate the bankruptcy property or to oversee the management of the debtor's affairs due to reorganization. Such an administrator cannot be the company under reorganization itself (ad hoc Piraeus Appellate Court 429/2022, which concerned a Liberian company which was reorganized under the procedure of Chapter 11 of the American bankruptcy law, <u>without an appointment of an administrator,</u> **<u>exhibit</u> 2).**

2. On par. vi. of p. 23 of the application at issue, it is stated that pursuant to a provision of the bankruptcy court of the Southern District of New York, Adam Spears was appointed *"the sole representative of* the company *for the purpose of seeking recognition of the Chapter 11 proceedings in Greece".*

3. Therefore, the application will be dismissed as actively illegitimate, since only the foreign administrator (which cannot be considered to be the bankrupt or reorganized company itself) may request the recognition. In this case, the application should have been submitted in the name of the purported aforementioned representative Adam Spears, provided that he satisfied all conditions of the *"foreign administrator"* of article 2(d) of Law 3588/2007.

<u>Opposition to power of attorney</u>

4. Our company is represented by a board of directors resulting from the certificate of the register of commercial companies of Liberia dated 01/03/2025, whose names are also listed on par. 29 p. 11 of the application at issue. This board of directors has not authorized the lawyer who signs the application at issue. Until the disputed bankruptcy decision is recognized by a court in Greece (but also in Liberia where the statutory seat of the company is located), it does not produce any legal effects and therefore the lawyer who appears to represent our company does not have any relevant mandate. For this reason, after all, the application for the recognition of foreign proceedings must be made only in the name of the foreign administrator and not in the name of the bankrupt/reorganized company itself (Piraeus Appellate Court 429/2022).

<u>The application is unfounded</u>

5. Central matter in the present case at issue is where the center of the company's main interests is located. The application at issue states that it was in the USA *"both prior to the reorganization of [the company] as well as after that".* The address One Pennsylvania Plaza Suite 3335 New York is also provided (see page 1 of the application). This address is only the registered seat of the law firm Togut Segal & Segal, which represents the creditors of our company (a printout of their website is provided, **exhibit 4).** It cannot therefore be construed as the place of our main interests.

6. Despite the fact that the disputed application states that the USA was the place of our main interests even prior to the initiation of the reorganization process of our company, it is stipulated on page 9 that until November 18, 2024, the companies listed there were the companies of the families of Laskarina Karastamatis, Vasileios Kertsikoff, Vasileios Chatzieleftheriadis, Nikos Zilakos and Vasiliki Androulakis. It is also stipulated that until then the board members were the Greek citizens referred to on pages 9 and 10 of the application. Therefore, both the shareholders and the Board members were Greek and were meeting to handle the company's affairs in Greece. Indicatively, we produce the minutes of the meeting of the members of the Board of Directors and the shareholders of the company, dated 09/15/2011, which took place at 118 Kolokotroni Street in Piraeus (exhibit 5). Accordingly, according to article 10 of the Civil Code, our company was established and is still actually based in Greece.

7. That the center of our main interests was in Greece prior to the initiation of the foreign proceedings is concluded by the following documents:

   a. The bankruptcy order itself, issued by the New York Court on 11/04/2024, which states in footnote 1 of the first page *"The debtors in these cases are Eletson Holdings Inc... The address of the debtors' corporate seat is 118 Kolokotroni St. in Piraeus."* It is included in the application at issue, but we produced it for convenience **(exhibit 6).**

   b. The announcement of 12/19/2013 on the issuance of a bond loan (which is referred to in page 2 (par. 6) of the disputed application) states on page vi that Eletson Holdings Inc. has principal executive offices located in Greece, **(exhibit 7).**

8. Consequently, the allegation that our center of interests is located in the USA is false and therefore, according to article 2 par. (b) of Law 3858/2007, the reorganization proceedings followed in the USA cannot be recognized in Greece, since it is not a *"foreign main procedure"* as it was not conducted in a State where the debtor has the center of his main interests.

Athens 02/04/2025

The proxy attorney

[stamp:]
[signature]
**IOANNIS D. MARKIANOS-DANIOLOS**
**ATTORNEY AT LAW (Athens Bar Association Reg. No. 15849)**
**DANIOLOS LAW FIRM (Piraeus Bar Association No. 30028)**
2nd MERARCHIAS No. 13 - PIRAEUS, P.C. 185 35
Tax Reg. No.: 997406286 = First Public Tax Service of Piraeus
TEL. 210 8226 601 - FAX: 210 8217 869
Email: j.markianes@danieles.gr

[blank page in source]

EXHIBIT "19"

[stamp:]

K. F. CALAVROS LAW FIRM
CH. P. FILIOS TH. KLOUKINAS, 19

VRANA - ATHENS 115 25 TEL.

2103698700 F. 2103698750

THEMISTOCLES TH. KLOUKINAS,
ATTORNEY AT LAW
E: kloukinas@calavros.gr

**BEFORE THE MULTI-MEMBER FIRST INSTANCE COURT OF ATHENS**

*(Voluntary Jurisdiction Proceedings)*


**PRIMARY INTERVENTION**


**1.** The foreign shipping company called "**ELETSON HOLDINGS INC**. ", which is based per its statutory seat in Liberia, in fact in Greece, at 118 Kolokotroni Street in Piraeus, as legally represented by its provisionary management pursuant to the **temporary order granted on 11/12/2024** of the President of the Service of the Single-Member Court of First Instance of Piraeus, Antonia MENGUAi, in conjunction with the **Minutes of Election** of the Members of the Board of Directors dated 11/12/2024 and its representation (already entered in the Company's record on 11/19/2024 in the Register of Companies of the Republic of Liberia in Greece), without a Tax Registration Number,


**2.** The foreign shipping company with name "ELAFONISSOS SHIPPING CORPORATION, which is based, per its statutory seat, in Liberia, in fact in Greece, at 118 Kolokotroni Street in Piraeus, legally represented and without a Tax Registration Number,


**3.** The foreign shipping company "**KEROS SHIPPING CORPORATION**", which is based, per its statutory seat, in Liberia, in fact in Greece, at 118 Kolokotroni St. in Piraeus, legally represented by its shareholder and representative **Stylianos ANDREOULAKIS, son of Emmanuel**, resident of Glyfada of Attica, 34 Tyrteou St., with Tax Registration Number 013241122.

| | | | |
|---|---|---|---|
| K. F. CALAVROS | Ch. FL FILIOS | M. Ch. ASIMINAKI | 1. G.. DOLAPSI, LL.M. |
| UNIVERSITY PROFESSOR | UNIVERSITY PROFESSOR | X. N. DIAMANTI, M.A. | A. N. PAPASTATHOPOULOS, LL.M |
| | | E. H. ZIAKAS, Ph.D. | A. K. ROUSSAKI, LL.M. |
| M. K. CALAVROU D.E.A. | 1. N. BEVERGETI, LL.M. | K. SP. IGLEZIS | N. A. TSEMPERA, LL.M. |
| Ch. K. CALAVROU, LL.M. | H. A. KIOUSI, LL.M. | P. N. KALODIKIS | B. G. TSOURA, LL.M. |
| Th. Th. KLOUKINAS | | A. A. KELESIDOU, LL.M. | K. G. FILIPPOUPOLITIS, LL.M. |
| L. G. KARALKAS | | E. Th. KLOUKINA, LL.M. | M. P. HAHAMI |
| A. G. TSILIGA | | | |

| | | | |
|---|---|---|---|
| 19 VRANA | 5 PAVLOU MELA | 65 DONATOU DIMOULITSA | |
| 115 25 ATHENS | 546 21 THESSALONIKI | 491 00 CORFU | |
| 210 3698700 | 2310 500770 | 26610 49736 | |
| **CALAVROS@CALAVROS.GR** | THESSALONIKI@CALAVROS.GR | CORFU@CALAVROS.GR | WWW.CALAVROS.GR |

**VERSUS**

The **allegedly** foreign company under Restructuring with name "ELETSON HOLDINGS INC", which, according to its articles of association, is based in Liberia, and has its **alleged** seat, as the center of its main interests, in New York, **allegedly represented** by Adam Spears, pursuant to the Order of the Bankruptcy Court of the Southern District of New York dated 12/20/2024.

--------------------

The respondent company, as they are allegedly represented in this regard, filed, before the Multi-Member Court of First Instance of Athens (Voluntary Jurisdiction Proceedings), its application dated 02/03/2025 (General Filing Number/Special Filing Number 25046/2025/43/2025), with which it the recognition, in Greece, pursuant to Law 3858/2010, of the Voluntary Bankruptcy Decision (Chapter 11) issued in New York on 10/25/2024 concerning ELETSON HOLDINGS INC. (of the U.S. Bankruptcy Court - Southern District of New York consisting of Judge John R. MASTANDO), as well as the Order dated 11/04/2024 of the same as above Bankruptcy Court confirming the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) and the Amended Restructuring Plan of the Creditors.

Said application should be dismissed as inadmissible, otherwise as legally unfounded, otherwise as a substantially unfounded for the following reasons:

## I.  OPPOSITIONS

1.  <u>**Lack of jurisdiction of the U.S. Bankruptcy Court - Southern District of New York**</u>, comprising of Judge John R. MASTANDO, both in respect of the judgment of the voluntary bankruptcy of Eletson Holdings and the other companies issued in New York on 10/25/2024, (Chapter 11), as well as the Order dated 11/04/2024 of the same as above bankruptcy court confirming the decision of voluntary bankruptcy dated 10/25/2024 (Chapter 11) of Eletson Holdings and the other companies and the amended Creditors' Restructuring Plan, as discussed in chapter B.1. herein.

It is noted, <u>that the alleged address in the case file of the disputed application</u> purporting to be the center of its main interests in the State of New York (One Pennsylvania Plaza Suite 333, New York, NY 10119, United States) is the offices of the law firm Togut, Segal & Segal LLP, which represents he litigants in the United States in the judicial dispute, as detailed below in Chapter A herein.


2.  **Inadmissibility of the disputed application.**

The disputed application was not filed by the administrator, as it should under the law, in accordance with article 15 of Law 3858/2010 (in this case by Adam Spears), but by the company itself alleged to be under Restructuring (see Three-Member Piraeus Appellate Court 429/2022, Legal Databank NOMOS).

3.  **Lack of functional competence of the Athens Multi-Member Court of First Instance.**

All disputes that have a direct or indirect relationship with ships (as in this case) are maritime disputes and fall under the maritime departments of the Piraeus Court of First Instance, which have exclusive functional (substantial) competence, regardless of the legal basis and the procedure (including the voluntary jurisdiction and recognition of a foreign decision), where the substantive living relationship is linked to ships and the court may need to deal with maritime issues (article 51 of Law 2172/1993) (see also Opinion of A. Antapasis in Commercial Law Review 2025, page 233.

**II.**

**A.  Procedural History**

**A.1.     The multifamily shipping company "ELETSON". - Its parent company "ELETSON HOLDINGS INC." and its subsidiary, "ELETSON CORPORATION".**

ELETSON HOLDINGS INC. (hereinafter referred to as *"the Company or Company" or "ELETSON HOLDINGS")* is the "parent" company of the maritime multi-family enterprise known in maritime events on a global scale as "ELETSON". The latter was founded in Piraeus in 1966, by Vasilis Hatzieleftheriadis, a common ancestor of the members of the Board of Directors of ELETSON HOLDINGS and their grandparents, who, with his sons, daughters and sons-in-law as partners, founded ELETSON and afterwards achieved, both himself and his descendants, to draw a highly successful maritime course that spans over 50 years.

The company is a Societe Anonyme (corporation), which is, as mentioned above, the "parent" company of the Eletson Family House, was established as early as 12/04/1985 under the laws of Liberia, having its **real seat in Greece where it maintains offices, at the address 118 Kolokotroni in Piraeus**, given that it was managed and is managed (details on this below **under A.8**) by an eight-member board of directors, that meets at its aforementioned facilities, all members of which are Greeks and residents of Greece, all decisions for its business activities and the fulfillment of its statutory objective are taken at its offices which it maintains at the above address, given that the Company is a holding company of shipping companies, performs all its activities in Piraeus through **its 100% subsidiary Eletson Corporation**, which maintains, in Piraeus, a legally established office in accordance with the provisions of article 25 of Law 27/1975, where it employs approximately 50 employees, that is paid, is insured and employed by Eletson Corporation, in accordance with the provisions of Greek law.

As mentioned above, the Company is a holding company and, among other things, owns in full the shares of four Greek Special Maritime Enterprises (**SMEs**), which control the ships MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, under the Greek Flag, which are tankers and in particular **of the Greek companies** "KASTOS SPECIAL MARITIME ENTERPRISE", "KIMAROS SPECIAL MARITIME ENTERPRISE", KIMOLOS II SPECIAL MARITIME ENTERPRISE" AND "FOURNOI SPECIAL MARITIME ENTERPRISE", respectively.

The ships are financed through loan agreements with reverse leasing (sale and lease back agreements). This means that the ships, which belonged to the above plaintiff SMEs, were sold to companies which are subsidiaries or affiliated with the funder, and then re-leased under bareboat charterparty to the previous owners. The amount of funding is the purchase price as the case may be. The former shipowner companies (i.e. the SMEs), which are currently charterers of each ship by bareboat charterparty, pay the rent and through the rent they have been repaying financing and interest. When the loan is repaid (or leasing reaches its maturity), each ship is returned to the respective SME (through the exercise of an option by the first shipowner SME for the repurchase of the ship – purchase option).

The owners of the above ships (who are currently registered as owners in the Registry) are subsidiaries and/or affiliates of Oaktree Capital Management ("Oaktree") which is the funding company. The SMEs are the charterers by bareboat charterparty which own the ships, the crews of which, as well as the captain, are appointed by said companies. The ships are then chartered by time-charterparties to third-party charterers, usually with long-term contracts.

The above ships are managed by the Liberian company Eletson Corporation (***hereinafter: "ELETSON CORPORATION"***), which is also a 100% subsidiary of ELETSON HOLDINGS, as mentioned above, and maintains a lawful establishment, in accordance with the provisions of Article 25 of Law 27/1975 and Law 89/67, in Greece, specifically in Piraeus, at 118 Kolokotroni Street, Piraeus, with Tax Registration Number, 098035979/ Public Tax Service of Ships of Piraeus.

**A.2.** **ELETSON HOLDINGS share capital structure.**

According to the recent Statement of the Directors, Nominated Employees and Shareholders of the company ELETSON HOLDINGS, dated 11/22/2024, the share capital amounts to 10,000 class A nominal shares, with no par value.

**Shareholders** of **ELETSON HOLDINGS** are the following foreign shipping companies, which belong to Greek families, namely:

a. The foreign shipping company "**LASSIA INVESTMENT COMPANY**" of the family of Laskarina Karastamati ("Karastamati"), holder of 3,072 shares, representing **30.72% of the** share capital of the Company;

5

**b.** The foreign shipping company "**FAMILY UNITY TRUST COMPANY**" of the family of Vasilis Kertsikoff ("Kertsikoff"), holder of 3,072 shares, representing **30.72% of the** share capital of the Company;

**c.** The foreign shipping company "**GLAFKOS TRUST COMPANY**" of the family of Vasilis Hatzieleftheriadis ("Hatzieleftheriadis") holder of 3,072 shares, which represent **30.72% of the** share capital of the Company;

**d.** The company "**ELAFONISSOS SHIPPING CORPORATION" of the family of Nikos Zilakos ("Zilakos"),** applicant herein, holder of 392 shares representing **3.92% of the** share capital of the Company, and finally,

e. The foreign shipping company **"KEROS SHIPPING CORPORATION" of the family of Vasiliki Androulaki ("Androulaki")**, holder of 392 shares, which represent **3.92%** of the share capital of the Company.

**ELETSON HOLDINGS,** therefore, belongs to foreign companies also belonging to Greek ultimate beneficiaries, which has been incorporated under the laws of Liberia and has **the center of its main interests in Greece, specifically in Piraeus of Attica, at 118 Kolokotroni Street**.

**A.3.     Eletson Gas LLC, a company incorporated by ELETSON HOLDINGS and Blackstone Tactical Opportunities.**

In early 2013, **ELETSON HOLDINGS** entered into a commercial arrangement with the foreign investment fund **Blackstone Tactical Opportunities** *(hereinafter Blackstone)*, which manages alternative investments to establish a joint venture, focusing on the purchase of **LPG ships**.

Indeed, in fulfilling the above objective, the new company Eletson Gas LLC (***hereinafter referred to as "Eletson Gas"***) was established by Eletson Holdings and by Blackstone's investment fund, which was incorporated as a limited liability company (LLC) under the laws of the Marshall Islands, which provide for the establishment of a limited liability company (LLC) by **an agreement to establish a limited liability company (LLC Agreement** dated April 12th 2013, which was amended and codified on August 16, 2019 - Amended and Restated LLC Agreement - to which subsequent amendments have also been made). Shareholders of Eletson Gas were, ***on the one hand***, ELETSON HOLDINGS, holding the common shares/units, and in particular 13,000,000 common shares which were and are the sum (100%) of the common shares, ***and on the other hand*** the investment fund Blackstone, holder of the preferred shares/units, i.e. having priority over the distribution of dividends and, under conditions, decisive power over the company, in particular 8,811,080 preferred shares which were the sum (100%) of the preferred shares. ELETSON CORPORATION also became a shareholder in Eletson Gas, being the managing company of the ships, by issuing to them certain "special membership units".[1]

---

[1] In fact, Blackstone participated in Eletson Gas LLC through its controlled legal entities, namely: (i) Blackstone Family Tactical Opportunities Investment Partnership (CAYMAN) ESC L.P., (ii) Blackstone Tactical Opportunities Investment Partnership (CAYMAN) SMD L.P. and (iii) BTO Eletson Holdings L.P.

At Eletson Gas, **ELETSON HOLDINGS** contributed in-kind **five (5) new pre-existing LPG ships**, all under Greek flag, and in particular the ships ANAFI, NISYROS, TILOS, TELENDOS and SYMI, and held all common shares (stock shares), and Blackstone contributed significant capital to build/purchase **another nine (9) state-of-the-art liquid gas ships, with the capacity to carry ethylene products as well**, and held **all preferred shares** which, however, in accordance with the "LLC Agreement" (***hereinafter: "LLCA"***) had increased rights and **controlled Eletson Gas LLC**, that is, they could make important corporate decisions and appointed the majority of the BoD members.

Accordingly, in early 2022, **Eletson Gas** owned, directly or indirectly, **fourteen (14) liquefied gas transport vessels**, thereby making its fleet the second largest on the market - the first largest is Unigas' fleet, a major and direct competitor of ELETSON. **Eletson Gas'** revenues derive primarily from the exploitation of said ships. **ELETSON CORPORATION** (a subsidiary of ELETSON HOLDINGS) together with **EMC GAS Corporation** (as mentioned below) are responsible for providing management services to ships directly or indirectly owned by **Eletson Gas'** subsidiaries. For the management services, **ELETSON CORPORATION** receives management fees from its own subsidiary ship-owning companies. **Management fees are an asset of ELETSON CORPORATION and an obligation for Eletson Gas or their respective subsidiaries incurring the relevant cost.** Throughout Eletson's corporate relationship with Blackstone, ELETSON (HOLDINGS and CORPORATION) was managing said vessels. In particular, the co-management of the above Eletson Gas' fleet was undertaken, *on the one hand*, by **ELETSON CORPORATION** (technical management), and on the other hand (commercial representation – monitoring-financial management) by **EMC GAS Corporation** which was established as a subsidiary of Eletson Gas, with statutory registered offices in the Marshall Islands, and was established as a shipping company under the legal framework of article 25 of Law 27/1975 and Law 89/67 (as a subsidiary of the above non-registered Eletson Gas).

Today, of these original fourteen (14) liquefied gas transport vessels, **Eletson Gas now controls and operates twelve (12)** (i.e. the original ships, except the "SYMI" and "TELNDOS" ships). These vessels are operated either directly by Eletson Gas or through subsidiary companies of the same, charterers of these bare ships. These Eletson Gas subsidiaries are not owners of the aforementioned ships only formally, since these ships have been transferred to Eletson Gas' lenders under the obtained loan by sale and lease-back financing as it was described above (see **paragraph A.1**). In fact, they act as owners in everything, and after the repayment of the loan received and interest through the payment of rents, according to the bareboat charterparties of said ships, they will also become formal owners of the ships.

**A.4.     The purchase of Blackstone's share by Levona, and Levona's agreement to withdraw (by transferring its (Levona's) shares in Eietson Gas or to companies it  would recommend).**

In November 2021, another investment fund (hedge fund), **Murchison Ltd** *(hereafter Murchison)* **- seventh defendant**, purchased its share from Blackstone (for a consideration later revealed to be just US$3 million), thereby becoming a partner (shareholder) in Eietson Gas, in the place of Blackstone. The purchase was made through an affiliate of Murchinson, which was a special purpose vehicle, Levona Holdings Ltd *(hereinafter "Levona")* **- fifth defendant herein**, incorporated under the laws of the British Virgin Islands.

**Murchinson and Levona** immediately stated from the outset that they did not intend to be long-term investors but wanted to withdraw soon with a significant profit above their investment. That's why negotiations started, which took place mainly in January and February 2022 and resulted in the conclusion of a Binding Offer Letter (*hereinafter "BOL"*) between **Eletson Holdings, Eletson Corporation, Eletson Gas** and **Levona**, dated **February 22, 2022**, according to which **Eletson Gas** would pay **Levona** twenty-three million US$ ($23,000,000) (or give Levona two ships of equivalent value, and in fact the stocks of the bareboat charterers, that is, SYMI II SME and TELENDOS II SME) and in return Levona would transfer the shares (preferential shares) it held to **Eletson Gas**, or to entities that the latter would indicate. Meanwhile, under the same agreement, Levona would initially make a US$10 million loan, which was increased to US$14 million (of which US$12.8 million was ultimately used) so that Eletson Gas would pay its short-term obligations to lenders. This loan would be repaid in one lump sum in two (2) years.

More specifically:

Term **2.1 of the BOL** provided that:

> *"Subject to and in exchange for the Transfer which takes place and on the terms set out in Terms 2.2. and 2.3, Levona hereby grants Eletson Gas the preemptive right upon written notice to Levona by the two companies (a "Preemptive Right Notice"), according to which Eletson Gas or another company nominated by it is entitled to purchase all of the shares held by Levona in Eletson Gas (the "Option Company Shares") in exchange for a consideration equal to the Call Option Exchange payable in cash* **at the conclusion of the transfer of the Company Shares into** *an account which Levona may indicate in writing. (J-06 § 2.1)."*

**Term 2.2. of the BOL** provided that Notice of the Exercise of the Option Right may only be served after:

(**a**) the Loan, that is, the Intra-Group Loan, pursuant to which Levona provided to "ELETSON GAS" a loan of up to US$10 million for a period of up to two (2) years and which was amended in April of the same year, allowing ELETSON GAS the capacity to raise an additional US$4 million and any interest accrued thereon has been fully repaid; or

(**b**) an adequate guarantee and/or security is provided for the Loan (the adequacy of such security is at Levona's discretion).

Pursuant to **Term 2.3 of the BOL**, Eletson Gas was required to exercise the option by sending the Option Exercise Update **within thirty days of the BOL's (signing) date**, unless the period was extended under Terms 2.4 or 2.5 of the BOL.

"**Call Option Exchange**" was defined as *"amount equal to USD **1 plus an amount equal to USD 23,000,000** minus the Net Value. If the Net Value equals US$23,000,000, the Call Option Exchange will be US$1. If the Net Value exceeds US$23,000,000, the amount owed on the Loan will be reduced by the amount of the balance."*

Indeed, after the BOL was signed and according to its definitions, on **March 11, 2022**, the parties entered into a series of contracts, including **(a) Eletson Gas** transferred to Levona the shares it held in the ship-owning companies MT SYMI and MT TELENDOS **worth S23,000,000 in consideration of the acquisition of Levona's preferred shares; and (b) Eletson Corporation** assigned to Levona all of its claims in respect of its management fees and liquidity provision due to it by Eletson Gas; or its subsidiaries, thereby providing Levona with sufficient collateral for the Loan.

In particular, the following "Transactional Documents" were signed between the parties:

**(i)** the Intra-group Loan, pursuant to which Levona provided Eletson Gas with a loan of up to US$10 million for a period of up to two years;

**(ii)** the Share Transfer Agreement pursuant to which Eletson Gas transferred to Levona 100% of its shares in SYMI and TELENDOS;

**(iii)** the Assignment of Claims, pursuant to which Eletson Corporation assigned to Levona all its claims in respect of management fees and the provision of liquidity owed to it by Eletson Gas or its subsidiaries;

**(iv)** (iv) the act of Waiver and Release; and

**(v)** (v) the Letter of Fundamental Acts.

Following the above, Levona (now **fifth of the defendants**) under the terms of the BOL and as judged under the New York Arbitration Award dated 09/29/2023 (JAMS arbitration award), as we will set out directly below **under par. A.6.** was no longer a shareholder of Eletson Gas - **fourth defendant herein**, while the latter indicated, according to the agreement in the BOL, and made its preferred shareholders the **foreign Cypriot shipping companies Fentalon Limited, Apargo Limited and Desimusco Trading Limited ("New *Preferred Shareholders")* on 03/11/2022**, which **ELETSON GAS** indicated, as above.

In fact, Eletson Holdings and in particular Eletson Corporation, without having a legal obligation to do so, offered to assist Levona in further reselling these ships (SYMI and TELENDOS) to third parties, i.e. liquidating them, obtaining the relevant benefit. In this way, Levona's investment of three million US dollars ($3,000,000) in November 2021 had an extra-multiplying return, that is, an amount of twenty three million USD ($23,000,000) just a few months later.

**A.5.**     **The allegations of Levona that it had not transferred the shares of Eletson Gas.** - The unconventional behavior, in bad faith and contrary to good faith and good transactional morals of Levona. - The violation of the terms of the LLC Agreement by Levona.

While the communication and procedures between Eletson and Levona (now **fifth of the defendants**) continued for the change of flag of the above two (2) ships and their resale to third parties, Levona (in about mid-July 2022) suddenly started claiming that while indeed the shares of SMEs SYMI and TELENDOS had been transferred to it as early as March 2022, it allegedly had not transferred to Eletson Gas its preferred shares in Eletson Gas, and this because according to the BOL [see above under **par. A.4.,** Eletson Gas should have followed some formal procedures for exercising an option to acquire such preferred shares, which, according to Levona's allegations, had not occurred. Therefore, Levona began claiming at that point that **BOTH** of its ships had been transferred **AND** it had not transferred the preferred shares it owned in Eletson Gas, and therefore it continued, currently the fifth defendant company, to be the preferred shareholder of Eletson Gas. In fact, Levona's conduct, in bad faith, unconventional and criminally punishable had become apparent when they attempted to sell the other twelve (12) ships of the Eletson Gas management fleet to Eletson's major competitor, the company Unigas. In particular, by a Letter of Intent (**LOI**) purportedly signed on **July 15, 2022**, between the company Unigas (which is a key competitor of Eletson Gas, as already mentioned) and Eletson Gas, which was allegedly signed by a representative of Levona (who, however, was not entitled to sign in the name and on behalf of Eletson Gas) it is assumed that the sale and transfer of the other twelve (12) ships to Unigas had been agreed, and in this way **Levona violated the LLCA terms** (see above **under par. A.3. since Levona ceased to be a shareholder of Eletson Gas, had no right under the LLCA to draft the Unigas LOI or to otherwise act on its behalf**, while at the same time causing, with its bad faith, unconventionally and contrary to the rules of good faith and trading morals, **damages to both Eletson Gas and the New Preferred Shareholders.**

Levona's wholly unconventional, in bad faith and contrary to good faith and morality behavior, had basically an underlying cause: The fact that the **values of the 12 LPG ships that remained under the control of Eletson Gas had begun to rise significantly** between the time the BOL was signed (that is, February 22, 2022) until Levona dramatically changed its stance (mid July 2022). The reason for the increase was the (particularly critical for the gas market) geopolitical **event of Russia's invasion of Ukrainian territories** (which completely incidentally began in late February 2022, and escalated in the months that followed). The Western world's effort to find alternatives to mining and primarily liquid gas transport (i.e. not through Russian pipelines, but through ships) **dramatically increased demand for LPG transport vessels, resulting in the skyrocketing commercial value of these types of ships**. Thus, Levona, as a hedge fund with the sole pursuit of high profits, rather than simply satisfying the already increasing value of SYMI and TELENDOS it controlled since March 11, 2022, **illegally attempted to reap benefits from the rest of the Eletson Gas fleet (i.e. the remaining, as mentioned above, 12 ships) as well**. In other words, it was not enough for Levona to have just invested US$3 million and would have generated on the basis of the contractual documents at least US$23 million (!) from both ships, but upon discovering the new market prospects, they tried to multiply their profits (by tens of additional millions) claiming that they still owned the preferential shares and therefore had "to gain" as a preferential shareholder from the attempt to sell the remaining 12 ships as well (!!!).

**A.6.     The initiated arbitration in New York. - The Arbitration Award issued in New York dated 09/29/2023 by the Arbitral Tribunal, consisting of Judge-Arbitrator Ariel E. BELEN** *(hereinafter referred to as "the arbitration award dated 09/29/2023").*

After the above unconventional and in all bad faith conduct of Levona (now the fifth of the defendants); which, as immediately mentioned above on **July 15, 2022**, was attempted to transfer the twelve (12) ships of Eletson Gas to its competitor Unigas, both the shareholder of Eletson Gas and first intervener herein, **Eletson Holdings**, as well as its subsidiary **Eletson Corporation**, responsible for the provision of management services to ships owned by Eletson Gas through its subsidiaries (the management fees are property of **Eletson Corporation** and an obligation to Eletson Gas or their respective incurring subsidiaries) **resorted to arbitration in** New York pursuant to their written recourse dated **07/29/2022** to **Levona** - currently fifth of the defendants; on the basis of the arbitration clause contained in the attached "LLC Agreement" [**article 12.14(a) at p. 69** of the "Third Amendment and Rewording of a Limited Liability Company Corporate Agreement for Eletson Gas LLC" dated **August 16, 2019 (LLC Agreement**)], in order to resolve the dispute between them and **"Levona"** as to whether they had been transferred to Eletson Gas or to companies that it would have indicated (and had already indicated) the shares/share units and in particular its preferred shares (shares/units) held by Levona in Eletson Gas as well as related corporate disputes resulting from the "LLC Agreement" (LLCA).

More specifically, with their recourse above, the applicants (ELETSON HOLDINGS and ELETSON CORPORATION) requested that it be recognized that Levona **had breached the terms of the LLCA**, as well as the **rules of good faith and morality of transactions,** since **the respondent, Levona, had ceased to be a shareholder of Eletson Gas**, following Eletson's exercise of the Option to Acquire the Preferred Shares of the respondent (Levona) in Eletson Gas, in accordance with the terms of the attached BOL and in particular following the transfer, to Levona, of the shares held by **Eletson Gas** in the ship-owning companies of MT SYMI and MT TELENDOS worth US$23,000,000, by virtue of which (transfer) it acquired the preferred shares of Levona and, at the direction of Eletson Gas, became New Preferred Shareholders of said foreign shipping companies, Fentalon Limited, Apargo Limited and Desimusco Trading Limited.

**Therefore, based on this data, the above applicant companies** (ELETSON HOLDINGS and ELETSON CORPORATION) **argued that Levona** had no right under the LLCA to draft the Unigas LOI or to act in any other way on behalf of Eletson Gas, and further that the actions taken by it resulted in property damage of Eletson Gas itself, as well as its New Preferred Shareholders, Fentalon Limited, Apargo Limited, and Desimusco Trading Limited, the remedy of which they (damage) requested through their aforementioned recourse.

Said Arbitral Tribunal, consisting of Judge-sole Arbitrator, Mr. Ariel E. Belen, after investigating the case, following the principle of equality and hearing both sides, invited the parties to attend the hearing, and after having taken into account the evidence produced and heard the attorneys of both sides, as well as the witness statements given during the discussion, which took place on the 15th, 16, 18, 19, 22, 23 and 24 May 2023, issued his final decision dated 09/29/2023, published in New York, United States of America (USA), that is, at the place that was agreed as the seat of the arbitration.

In accordance with that decision, the Arbitral Tribunal decided *on the one hand* that **Eletson exercised the option under the terms of the BOL;** *on the other hand,* **adjudicated** on the claims of the above applicants, and that indeed Levona **had breached the terms of the LLCA, and that the same and its affiliates, "Pach Shemen" and "Murchinson"** – herein **first** and **seventh** of the defendants, respectively, had violated **the rules of good faith and transactional morals,** causing quantifiable damage to Eletson Gas and its New Preferred Shareholders.


**A.6.1.   The rationale for the Arbitration Award dated 09/29/2023. - The evidence of the bad faith, unconventional and contrary to morality conduct by the side of Levona, Murchinson and Pach Shemen, that is, the current fifth, seventh and first of the defendants, respectively.**

During the arbitration as aforementioned which was initiated in New York, **serious illegal acts and violations of morality by Levona/Murchinson were revealed**, which occurred before Levona had even acquired the shares (units) of Blackstone in Eletson Gas, **after** the acquisition and **during** the course of the arbitration, such as, among other things, that Levona/Murchinson fraudulently: **a)** bribed a high-ranking official of Eletson (the Chief Financial Officer) to act against the interests of the latter, **b)** breached the confidentiality obligations of the LLCA, **c)** interfered with the relationships of Eletson Gas with its lenders, causing the seizure of ships of Eletson Gas, **d)** falsified evidence by creating purported meeting minutes of the Board of Directors dated March 10, 2022, after the commencement of the arbitration, **e)** conspired with the lawyers of Eletson Gas (Watson Farley & Williams, hereinafter "WFW") against the interests of the latter.

In fact, the disclosure, during the Arbitration, that Peter Kanelos, a senior officer of Eletson and Financial Director of Eletson Corporation, had been bribed by Murchinson/Levona, led Eletson Holdings and Eletson Corporation to **file a complaint** against Peter Kanelos before the **Piraeus Misdemeanor Prosecutor. Following** this, a <u>**criminal prosecution was brought against Peter Kanelos (i.e. the former Eletson finance director) in July 2024 for the offenses of: a) repetitive breach of trust with induced damages. B) the breach of professional confidentiality repeatedly, and c) receiving gifts in the private sector repeatedly. The criminal proceedings are still in progress and Peter Kanelos has already been referred to trial before the court.**</u>

In particular, as discussed in **CHAPTER** "*V. ANALYSIS AND DECISION ON THE SUBSTANCE OF THE CLAIMS AND OF THE COUNTERCLAIMS OF THE PARTIES*" of the Arbitration Award dated 09/29/2023, Judge-Arbitrator Ariel E. BELEN ruled that the following were proven:

> "***A. Eletson exercised the option under the terms of the BOL.***
>
> *[...] As a result, after weighing the evidence, I find that the conditions for the acquisition are more likely to have been met.* Therefore, according to the BOL, Levona's rights should have been transferred to Eletson Gas or its designee. As mentioned above, Eletson has demonstrated that Eletson Gas transferred these rights to the Preferred Shareholders. Thus, as of March 11, 2022, Levona was no longer the Preferred Shareholder and ceased to have any ownership in the Company.
>
> *It follows, therefore, that Levona had no power to enter into the Unigas LOI, to direct the Company's business or otherwise to exercise control over the Company's assets.*

**_B.   Eletson's Claims prior to the BOL._**

_[…]_

**_iii.   Claims after the acquisition/prior to BOL_**

_As to the allegations regarding claims after the acquisition/before the BOL, the evidence provided during the discussion demonstrates that **Murchinson bribed an** Eletson executive and Company representative, **violated the NDA with Blackstone, and disclosed confidential Company information.** These actions, which were never disclosed to Eletson after Levona became a party to the LLCA, violated the LLCA and/or the good faith and morals clause._

**_(a) Kanelos' Bribery_**

_As stated above, the evidence shows that Murchinson bribed Kanelos to act against the interests of the Company. **The secret relationship began before November 2, 2021, but continued after Levona/Murchinson became the Preferred Shareholder.** Indeed, the illegal "Services Agreement" was drafted between Levona/Murchinson and Kanelos in December 2021, and according to that Murchinson paid Kanelos US$100,000. (C-1699, C-1700, C-1701)._

_Kanelos was apparently a director of Eletson Corporation and, according to Levona, of Eletson Gas. The LLCA provides that "Each director has the duty of trust to the Affiliates as they apply to a director to a company incorporated under the laws of Delaware." (J-0 § 6.1(d)). Pursuant to Schedule VII (m) (fundamental acts) Levona could not "enter into, amend or waive any term of agreement between the Company and any director or member of the senior management". (J-01 Annex VII (m)). The so-called Service Agreement caused the breach of these duties of trust and was a breach of the good faith and morals of trade."_

**_(b) Breach of confidentiality obligations and involvement in the Company's agreements with its banks and financiers._**
_The evidence also demonstrates that **Murchinson breached the NDA** with Blackstone by directly contacting the Company's financiers and lenders._

*[…]*

**(c) Breach of the LLCA through efforts to terminate management agreements**

**Levona also breached the LLCA immediately upon entering the Company**, *attempting to terminate the management contracts and replace the directors of the Company's subsidiaries. (C-818, C-837, C-838, C-1964 ¶¶ 20, 115-121.)*

*[…]*

## C. Eletson's Allegations Regarding the Injunction[2]

**Eletson makes numerous allegations against the (legal) entities affiliated with Levona, for violations of the Injunction Decision.** *Some of these allegations, even if they are true, and while they are harassing and threatening, did not cause quantifiable damage to the Company. For example, Levona's early termination of the loan sent on October 25, 2022 and Levona's convening board meetings. (C-404, C-405, C-086).*

*Therefore, I will only specifically refer to the claims regarding violations that caused quantifiable damage (to the Company).* **The three actions are all relevant: the purchase, by Pach Shemen ,of a majority stake in outstanding bonds issued by Holdings, the instruction by Pach Shemen to the bond manager to initiate a trial against Holdings, and the instruction by Pach Shemen to file an application for involuntary bankruptcy against Holdings.**

*On about January 4, 2023,* **Pach Shemen purchased Holdings bonds valued at US$183,851,546 for US$2 million**. *(C-746, May 22, 2023 Minutes p. 332:16-20). In addition,* **Mr. Spears, on behalf of the (legal) entities affiliated with Levona, offered additional consideration to the bondholders depending on the outcome of this arbitration**, *stating that he would pay in addition "$500K if the arbitration is awarded in our favor in connection with Eletson Gas and we are able to exercise our rights - to act as the Preferred Shareholders for the sale of the Eletson Gas ships and/or the company". (C- 746.0008). Holdings bonds were purchased for* **Pach Shemen** *from Nomis Bay and BPY via private transactions and then were transferred to Pach Shemen. (C-746). Mr. Spears testified that he purchased the bonds from four previously held investment funds called Beachpoint, Caspian, Redwood and Knighthead. (May 23, 2023 Minutes p. Tr. 326:20- 327:2).*

---

[2] It is noted in this case that Judge-Arbitrator Mr. BELEN issued temporary orders and injunctive relief in the course of the JAMS arbitration, prohibiting, for as long as the arbitration lasted, the legal and actual change of the disputed assets of the companies involved.

On **January 11, 2023, Pach Shemen then instructed the bond manager, Wilmington Savings Fund Society, to sue Holdings to collect the overdue debts attributable to those bonds ("Bondholder Complaint").**[3] *Subsequently, on March 7, 2023, Pach Shemen and two other Holdings creditors filed petitions for involuntary bankruptcy against Holdings in the Southern District of New York. The petition for involuntary bankruptcy and some of the documents included in the application were signed by Mr. Lichtenstein and Mr. Spears. (C-749- C-75I- C-746). The time during which this application was filed is remarkable – it was three days after some decisions were issued verbally regarding the discovery process which was unfavorable to Levona, including that they had waived allegations of attorneys' secrecy with the WFW, which was when I ordered that Levona/Murchinson's communications with Kanelos be produced.*

*Levona alleges that none of Pach Shemen's actions constitutes a violation of the Injunction, because Pach Shemen is not bound by such decisions, and in respect of the administrator's trial and bankruptcy, Pach Shemen is not the only creditor to direct such trials.*

*As mentioned above,* **Pach Shemen is Levona's alter ego. The indistinguishably of the two is by name only. Its representatives, including Spears and Lichtenstein, were bound by the Injunction decision.** *Despite this, Pach Shemen otherwise Levona II, (C-746.0008), proceeded to a transaction for the purchase of the bonds, offering in exchange value related to the assets that are the subject of the dispute in this arbitration. TRO[4] and the clarification of November 2022 expressly ordered the parties to "maintain the existing status quo" and prohibited the "transfer or sale, or attempting to sell or transfer in any way, any of the assets ... of Gas ...", and the Injunction issued in January 2023, further extended the prohibition to include "or assets subject to the dispute in this arbitration." (C-1816- C-1887- C- 1838). While* **Pach Shemen technically did not transfer assets of Gas or assets that are the subject of the dispute in this arbitration, the overall strategy was to disrupt the status quo and find another avenue for acquiring the "assets of Gas ... or assets that are the subject of the dispute in this arbitration.**

---

[3] *Eletson alleges that Pach Shemen's purchase of those bonds and the mandate to the administrator to file a complaint violated Eletson's agreement to suspend payments with the original owners of the bonds. This allegation, although probably true, lies outside my jurisdiction.*

[4] It is noted that in this case the TRO (Temporary Restraining Order) is the equivalent of the "Temporary Order" in the Greek proceedings.

*In other words, the (legal) entities affiliated with Levona have sought either to deprive this arbitration of its jurisdiction or to secure themselves against a potential defeat in the context of this arbitration. They believed, at that time – even though wrongly – that if I ruled that Eletson had exercised the option and acquired Levona's shares, the preferred shares would pass on to Holdings. And that in this way, with the purchase of bonds, it became Holdings' primary creditor with the potential to bring about Holdings' bankruptcy. In the first instance, the filing of the bankruptcy petition led to Levona's insistence that such claims could not be adjudicated by the arbitral tribunal because of the automatic stay of bankruptcy. This certainly wasn't a preservation of the status quo.* In the event that the stay was lifted and Levona lost in the context of this arbitration, the (legal) entities affiliated with Levona would then be able to argue that, as a creditor of Holdings, the value of the preferred shares passed on to them.

*Unfortunately for Levona, this strategy was incorrect because the BOL expressly provided that in the event of a successful exercise of the option, the shares would be transferred to "Eletson Gas or its designee" (J-06 § 2.1), and as discussed above, Eletson Gas had transferred the rights to the Preferred Shareholders. Although Pach Shemen's actions may have been futile, its actions were intentional and (constitute) direct violations of the Injunction decision."*

**A.6.2.    The operative part of the Arbitration Award dated 09/29/2023. - The judgment of full passive liability of Levona, Murehinson and Pach Shemen in compensation to Eletson Gas, currently the fourth defendant herein, and its New Preferred Shareholders Fentalon Limited, Apargo Limited and Desimusco Trading Limited.**

Subsequently, according to the operative part of said decision, the Arbitral Tribunal ruled positively on the recourse of **ELETSON HOLDINGS** and **ELETSON CORPORATION**[5] and after dismissing Levona's allegations and requests, but also the claims of Levona (currently fifth of the defendants) in the Arbitration Counterclaim filed by them, decided the following *(emphasis added)*:

*«VIII. CONCLUSION AND FINAL ARBITRATION AWARD"*

*This Final Arbitration Award resolves all issues submitted for judgment in this arbitration. The undersigned examined and decided on all issues and arguments raised regarding the merits of the claims and counter-claims, requests regarding the amount of the Plaintiffs' solicitors' fees, costs, expenses and default interest, including those not expressly set forth herein. Any argument not contemplated in this Interim Decision was found to be unacceptable, unfounded, meaningless or unnecessary to be examined.*

*This Final Arbitral Award shall determine and stipulate the following:*

1.    *The Plaintiffs have demonstrated the breach of the LLCA and the rule of good faith and transactional morals, and have proven that Eletson exercised the call option pursuant to the BOL, and is therefore entitled to the issuance of an acknowledging decision for direct damages, punitive damages, default interest and attorneys' fees, as set out below.*

---

[5] It is noted that in the Arbitration Award dated 09/29/2023, where **"ELETSON" or "Plaintiffs"** is mentioned, it means **"ELETSON HOLDINGS"** and **"ELETSON CORPORATION"**, *a subsidiary of the first, and where* "**Company**" is mentioned, it means "**Eletson Gas**".

2.     *The* Defendant *did not prove any of its claims, which (thus) are dismissed.*

*Defendant is not entitled to claim anything from the Plaintiffs.*

**"A. *Acknowledging decision***

*The following are hereby acknowledged:*

*1.  Eletson effectively exercised the redemption option granted through the BOL dated February 22, 2022 on March 11, 2022, and any purported condition for exercising that right was either satisfied or waived.*

*2.  **As of March 11, 2022, Defendant Levona had no right of participation in the company Eletson Gas.***

*3.  The Company exercised its rights under the BOL to appoint three entities – Fentalon, Apargo and Desimusco (the Preferential Shareholders) – associated with the principals of the Plaintiffs as the parties who would receive the preferred shares of the Company which were previously held by Levona.*

*4.  The preferred shares in the Company were transferred to the Preferred Shareholders, effective as of March 11, 2022, and the Preferred Shareholders are permitted assignees under the LLCA. They have agreed to be bound by this award and by each award issued thereon.*

*5.  Eletson Holdings and Eletson Corporation never owned any of the company's preferred shares.*

*6.  **The shares of the subsidiaries controlling the ships Symi and Telendos were transferred to Levona on March 11, 2022, as consideration for the Call Option in relation to the BOL.** As of Mach 11, 2022, Levona reserves all rights relating to the ownership of the subsidiaries of those ships,*

*7.  The Injunction Decision shall remain in effect until a final judgment is issued on any Arbitral Award or any other award of said arbitrator.*

*8.  **Levona, Murchinson and Pach Shemen, are each alter ego of the other with respect to each event proven in the present case, and any kind of compensation granted hereunder. Any reference to Levona herein therefore concerns all alter egos, and for the avoidance of doubt, any decisions against Levona also concern any alter ego thereof.***

9.  ***Levona breached the LLCA and its related obligations***, *including, without limitation, common law obligations and contractual obligations to Plaintiffs and the Company*, **in at least the following ways**:

    ***i.***  *By bribing an employee of Eletson Corporation and a representative of the Company, Peter Kanelos, so that he would disclose confidential information of the Company;*

    ***ii.***  *By breaching confidentiality obligations by disclosing confidential Company information to third parties, while failing to take steps to retrieve such information, and then deceiving the Plaintiffs and the Company about said breaches after becoming a shareholder in the Company;*

    ***iii.***  *By actively engaging in illegal conduct, which led the Company's funders to turn against the Company and the Plaintiffs, including but not limited to, by causing the seizure of five ships of the Company and not disclosing such infringing conduct to Eletson or the Company after becoming a shareholder in the Company;*

    ***iv.***  *By not recognizing that Eletson has fully complied with the terms of the BOL Call Option and by not acting in good faith, silencing its purported belief that the Company could or may not meet the terms of the BOL;*

    ***v.***  *By claiming to act on the Company's behalf in its business dealings with third parties, including, among other things, by attempting to sell the Company's assets to its main competitor, Unigas, and concealing such breach from the Plaintiffs;*

    ***vi.***  *By unfairly threatening Eletson and its associated officers and directors, including, among other things, by suing them;*

    ***vii.***  *By improperly claiming to have taken control of the board of directors of the Company after March 11, 2022;*

    ***viii.*** *By improperly asserted that they were directing the Company's day-to-day operations after March 11, 2022;*

*ix.* *By improperly claiming that they are pursuing control of the Company's assets after March 11, 2022;*

*x.* *By improperly alleging that they convened and held meetings of the Company's Board of Directors without following appropriate procedures, and for unlawful and improper purposes of approving illegal and improper conduct after March 11, 2022;*

*xi.* *By breaching their obligations under the LLCA, including without limitation, by claiming to terminate the management agreements Eletson Corporation has with the Company's subsidiaries, that they are modifying the management of the Company's subsidiaries,* **excluding Eletson Corporation from communications with the Company's funders (violations) that Levona knew were anti–contractual and violated the LLCA,** *and*

10. *By breaching the decision for Injunction in this arbitration;*

*i.* *By declaring the Company improperly in default of the loan by Levona and unfairly terminating the loan;*

*ii.* *By trying to sell ships, including Symi and Telendos, while the Injunction decision was in effect; and*

*iii.* *By leading and/or causing Levona's subsidiaries to purchase a majority stake in Eletson Holdings securities in January 2023 to commence and then bring proceedings against Eletson Holdings and file an application for involuntary bankruptcy against Eletson Holdings.*

**Subsequently, the same Arbitration Award dated 09/29/2023 as above, of Judge-Arbitrator Ariel E. BELEN acknowledged the obligation of Levona, Pach Shemen and Murchinson to pay, jointly and severally, to the aforementioned companies, the amounts referred to therein as: a) compensation for direct damages, and b) punitive damages, plus c) attorneys' fees, costs, expenses and additional interest, and specifically recognized that:**

**_"B. Compensation for direct damages_**

**_Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, will pay US$43,455,122.21 in compensation as follows:_**

_1._ US$21,777,378.50 to be paid to Eletson Gas as compensation for direct damages for improper seizure of the Eletson Gas' ships, which includes default interest at 10% from the date of the seizures (or the approximate date the costs incurred) up to January 2023;

_2._ US$19,677,743.71 which must be paid to the Preferred Shareholders, which consist of lost profits (EBITDA) due to Levona's unjust enrichment arising from the exploitation of the Symi and Telendos ships from March 11, 2022, without the concurrent transfer of the preferred shares, which include pre-trial interest until January 2023;

_3._ US$2,000,000 to be paid to Eletson Gas as compensation for direct damages arising from the other breaches of the contract by Levona, with a preliminary interest of 10% from the date of this Interim Arbitration Award until the repayment of the compensation awarded by this award or the confirmation of this award by a competent court, depending on which day is earliest.

_4._ _The entities referred to above under B.1 and B.2 respectively are also awarded default interest on the principal amount of the compensation referred to in paragraph B.1. above (compensation for unlawful seizures) and paragraph B.2. above (compensation for lost profits due to unjust enrichment of Levona) at a rate of 10% from 30 January 2023 until the earlier of either the payment of the compensation or the confirmation of the (present) award by a competent court._

_C._ **_Punitive damages_**

**_Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, are liable to pay punitive damages in the total amount of US$43,455,122.21, as follows:_**

_1._ _US$23,777,378.50 to be paid to Eletson Gas; and_

2.   *US$19,677,743.71 to be paid to the Preferred Shareholders.*

Δ   ***Attorneys' Fees, Costs, Expenses and Additional Interest***

*Levona, Murchinson and Pach Shemen, as alter-egos, jointly and severally, will pay:*

1.   *Solicitors' fees, costs and expenses incurred to date in connection with this arbitration, the Bondholders' Complaint and the Bankruptcy pursuant to Article 12.14(8) of the LLCA and Rule 24(5) of the JAMS, as follows:*

   i.   *Attorneys' fees, costs and expenses due in connection with this arbitration amounting to US$9,590,222.99.*

   ii.  *An additional amount of US$22,366.10, which represents additional costs of JAMS incurred in connection with this arbitration from the time Eletson filed the Initial Acknowledgment, and with respect of which Eletson paid both the share corresponding to them too the same as well as the share corresponding to the Defendant.*

   iii. *Attorneys' fees, costs and expenses due in connection with the Bankruptcy and the Bondholders' Claims of US$3,007,266.20;*

2.   *Additional default interest on the principal amount of the compensation as awarded by the Corrected Interim Arbitration Award by 31 August 2023, amounting to US$2,496,081.88, which shall be paid as follows:*

   i.   *To Eletson Gas: US$1,319,163.14.*

   ii.  *To the Preferred Shareholders: US$1,176,918.74.*

3.   *Additional default interest on the principal amount of the compensation from August 31, 2023 until the date of payment of the amount due or the date of confirmation of this Final Arbitration Award, as enforceable by a court of competent jurisdiction, whichever date is earlier, and calculated using the formula set forth above in this Final Arbitration Award; and*

4.   *Additional default interest on fees, costs and expenses awarded by this Final Arbitration Award; from the time of publication of this Final Arbitration Award until the date of payment of the amounts due or the date of confirmation of this Final Arbitration Award as enforceable by a competent court, whichever date is earlier, and calculated using the formula set out above in this Final Arbitration Award."*

Furthermore, it is noted that on **July 23, 2023**, the same Arbitral Tribunal, consisting of Judge-Arbitrator Ariel E, Belen, issued an **Interim Arbitration Award** in the context of the aforementioned open arbitration, which was corrected by the same Arbitrator on **August 15, 2023** under a **Corrected Interim Arbitration Award**, by which he clarified that in Section VII. B4 of the arbitration *award "The entities referred to in paragraphs B.1 and B.2, respectively, are also awarded default interest on the main amount of the indemnification of paragraph B.1."*

The **Final Arbitral Award dated 09/29/2023** adopts, incorporates and republishes the **Corrected Interim Arbitral Award in its entirety, amending the Corrected Interim Arbitration Award** only to the extent necessary to make certain notional and stylistic changes, and to incorporate the subsequent decisions of the undersigned arbitrator in relation to the Plaintiffs' request for award of costs and attorneys' fees. Section VII of the Corrected Interim Arbitration Award titled *"Conclusion and Interim Arbitration Award" is not* reproduced within the critical **Final Arbitration Decision dated 09/29/2023** for the sake of brevity and clarity, although the findings and legal conclusions of that section are adopted in their entirety in **Section VIII of the Final Arbitration Award dated 09/29/2023 titled *"Conclusion and Final Arbitration Award"*.**

**A.6.3.  The internal confirmation procedure of the Arbitration Award dated 09/29/2023 under the federal arbitration law governing the interpretation and execution of said arbitration procedure in New York.**

**For the sake of completeness of the background alone**, we mention that on 10/19/2023 **ELETSON HOLDINGS and ELETSON CORPORATION**, appealed to the U.S. District Court - Southern District of New York, requesting **confirmation of the above Arbitration Award dated 09/29/2023, in order to be executed in the USA, in accordance with their domestic laws and in particular the federal arbitration law governing the interpretation and performance of such arbitration proceedings in New York, as provided in article 207 of the Federal Arbitration Act codified as 9 U.S.C. §§ 1-16.**

It is noted that this confirmation process is purely domestic, concerning the USA only, and does not affect the recognition of the arbitration award in other countries according to the New York Convention on the recognition and enforcement of foreign arbitration awards dated 06/10/1958, ratified by Greece with Law 4220/1961.

The above article 207 of 9 U.S.C. §§ 1-16 specifically states the following:

*"§207. Award of arbitrators; confirmation; jurisdiction; proceeding*

*Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention» and faithfully translated:*

*"§207. arbitration awards" validation "jurisdiction" progress "*

*Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter* **for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."**

Thereafter, on **02/09/2024**, Judge LIMAN issued a judgment, pursuant to which the Arbitration Award of the Arbitral Tribunal, consisting of Honorable Judge - Arbitrator Ariel E. BELEN, was confirmed in its entirety, as set forth in said judgment dated 09/29/2023.

In particular, Judge LIMAN upheld, inter alia, the following:

(a) That Eletson effectively exercised the redemption option granted through the BOL dated February 22, 2022 on March 11, 2022, and any purported condition for exercising that right was either satisfied or waived.

**(b)** That as of March 11, 2022, Defendant Levona had no right of participation in the company Eletson Gas.

**(c)** That the preferred shares in Eletson Gas were transferred to the Preferred Shareholders, effective March 11, 2022.

**(d)** The sum of US$43,455,122.21 awarded by the Arbitrator to Eletson Gas and to the Preferential Shareholders as compensation for consequential damages.

**(e)** The sum of US$43,455,122.21 awarded by the Arbitrator to Eletson Gas and the Preferred Shareholders as punitive damages.

**(f)** The amounts awarded by the Arbitrator for attorneys' fees, costs and expenses, with the only exception of the attorneys' fees awarded, costs and expenses related to the involuntary bankruptcy petition and the bondholder trial, in the amount of US$3,007,266.20.

Also, although Judge Liman did not uphold the provisions of the arbitration award concerning Murchinson and Pach Shemen, judging that the Arbitrator *"exceeded his powers by extending his award against both Murchinson and Pach Shemen because they were neither signatories to the LLCA Agreement nor parties to the arbitration,"* Judge Liman accepted that this *"does not relieve Levona of responsibility for her role in the actions of these entities."*

Finally, the Judge did not confirm the relevant provisions of the arbitration award and the compensation awarded, based on breaches of the order to uphold the status quo, which prohibited the parties from changing the current status quo, which prohibited the filing of a petition for involuntary bankruptcy of Eletson Holdings. However, as mentioned immediately below, this non-confirmation did not affect in any way the amounts finally awarded by the aforementioned Arbitrator as compensation for consequential damages (i.e. the amount of US$43,455,122.21) and as punitive damages (i.e. the amount of US$43,455,122.21), as well as their beneficiaries (i.e. Eletson Gas and the Preferred Shareholders).

At the same time, Judge LIMAN asked the parties to file a proposed form of judgment (**Proposed Judgment**). In view of the fact that Judge LIMAN in his judgment dated February 9, 2024 did not confirm all "*compensation, including punitive damages, based on Status Quo Injunction violations,*" Levona filed a proposed judgment and suggested that all the amount awarded as punitive damages be voided (i.e., the amount of US$43,455,122.21), while on the contrary, the side of Eletson (HOLDINGS and CORPORATION) claimed that the punitive damages should remain in their entirety, because Judge-Arbitrator Ariel E. BELEN had numerous other reasons to award this amount of punitive damages, and in any case the issue of the percentage of punitive damages that should be confirmed was an issue that only the Arbitrator himself had the power to adjudicate.

Following this, Judge LIMAN issued a decision on **April 19, 2024**, by which he referred to Judge-Arbitrator Ariel E. BELEN the relevant matter, requesting clarification as to whether part of the amount awarded as punitive damages concerns the violations of Status Quo Injunction, and in the event of a positive response, what amount corresponds to these violations.

On **August 9, 2024**, a clarification ruling was issued by **Judge-Arbitrator Ariel E. BELEN** with regard to the matter of referral, in which **he accepted that the entire amount of the punitive damages (US$43,455,122.21) must be confirmed**, as he held that no part of the amount that had been awarded as punitive damages corresponded to violations of Status Quo Injunction, and this is because there were many other factors that had led him to determine that he had to award such high punitive damages against Levona (currently fifth of the defendants).

Meanwhile, Levona, relying on allegations of alleged fraud by Eletson, filed an application on 3 July 2024 before Judge LIMAN to amend its opposition to Eletson's application (ie ELETSON HOLDINGS and ELETSON CORPORATION) for confirmation of the arbitration award and the counter-application for annulment of the arbitration award. Levona supported its allegations of the alleged commission of fraud by invoking that certain documents allegedly had to have been given to the arbitration in the context of document production (discovery) and were not given.

Following this, Judge LIMAN issued a judgment on September 6, 2024, allowing Levona to amend its opposition to the application for arbitral award confirmation and permitted the production of documents (discovery) in connection with the alleged fraud issue in the context of the Arbitration.

A case management plan was then set up, which determined what actions they would take and within which deadlines.

On **October 25, 2024**, two **final judgments were issued by** the U.S. Bankruptcy Court - the Southern District of New York on the proceedings opened at the expense of the Company and first plaintiff herein (see details immediately below **under par. A.7.)** by which the debtors' oppositions against the claims of certain purported creditors were dismissed and **the amended Restructuring plan that the Creditors had proposed (hereinafter the "Amended Creditor Restructuring Plan") was approved in relation to the Bankruptcy** of the first plaintiff herein **ELETSON HOLDINGS.**

**In view of these two awards of the Bankruptcy Court, and given that the <u>management of ELETSON HOLDINGS, as well as its subsidiary, ELETSON CORPORATION,</u> of the two companies, that is, that were part of the Arbitration and the arbitration award confirmation process, <u>was expected to pass to the Creditors (i.e. basically to Pach Shemen, Levona, Murchinson - currently first, fifth and seventh defendants, respectively),</u> if these (awards) are recognized - implemented in Liberia and Greece, Levona submitted a letter before Liman <u>requesting the stay of the confirmation procedure of the Arbitration Award dated 09/29/2023.</u>**

Although Eletson's side responded to the above letter with convincing arguments, on October 30, 2024, Judge LIMAN issued a decision on **October 31, 2024 <u>staying the arbitration award confirmation process until November 12, 2024</u>**.

On November 25, 2024, Judge Liman ordered the full stay of proceedings, including filing requests for intervention, the production of documents (discovery), and all pending requests and applications concerning the production of documents.

On 12/20/2024, Levona requested by letter sent to Judge Liman to conduct a status conference in order to lift the stay that had been granted on 11/25/2024.

On 12/23/2024, a status conference took place before Judge Liman and in his decision dated 12/30/2024, Judge Liman ordered the lifting of the stay of the arbitration award confirmation proceedings on all issues, except the issue of production of documents (discovery) in respect of Levona's application to annul the arbitration award due to fraud. The issue of the production of documents (discovery) remains stayed until a newer Order of the Court.

This domestic, as already mentioned, concerning the USA, confirmation procedure of the **Arbitration Award dated 09/29/2023 under the federal arbitration law governing the interpretation and execution of said arbitration proceedings in New York, is still pending before Judge LIMAN.**

**It is noted, that both "ELETSON GAS" and its New Preferred Shareholders, foreign Cypriot shipping companies, Fentalon Limited, Apargo Limited and Desimusco Trading Limited, filed before the Single-Member Court of First Instance of Piraeus** on 11/27/2024 with General Filing Number 18551/2024 and Special Filing Number 8368/2024 their application against the respondents to the arbitration award, "Levona Holdings Ltd.", "Pach Shemen LLC" and "Murchinson Ltd", requesting the recognition of said arbitration award dated 09/29/2023 and its declaration as enforceable in Greece. Hearing of the above application dated 11/27/2024 was scheduled for 06/03/2025.

**A.7.      The manipulation of the bankruptcy petition of ELETSON HOLDINGS, in bad faith, by its opposing party to the Arbitration, company Levona, and its other affiliated companies.**

Murchinson and Levona, currently seventh and fifth of the defendants, respectively (consisting of one and the same), when they realized that the possibility of defeat in the above arbitration was increasing, which happened with the Arbitration Award dated 09/29/2023, put in place a plan to prevent, first of all, the **issuance** of the above Arbitration Award by filing an application for declaring ELETSON HOLDINGS under **involuntary bankruptcy**. In particular, Levona, acting through another special purpose affiliated company (of precisely the same interests) (special purpose vehicle), that is, the first defendant herein **Pach Shemen LLC** (which in some correspondence that arose from discovery, they were calling it Levona II), purchased old bonds issued by ELETSON HOLDINGS that had been repaid in large part by selling all the ships securing these bonds and then the first defendant herein, **Pach Shemen LLC, filed,** on 03/07/2023, **a petition for involuntary bankruptcy of ELETSON HOLDINGS (pursuant to chapter 7 of the American Bankruptcy Code).** Given that a prerequisite for filing **an involuntary bankruptcy petition** before the American Bankruptcy Court is for it to be filed by three creditors; co-applicants with the first defendant herein **Pach Shemen** were two other companies, namely the second defendant herein **VR Global** and the third defendant herein **Alpine Partners**, who had also purchased bonds issued by ELETSON HOLDINGS. It is notable that Pach Shemen appeared as an ELETSON HOLDINGS creditor-bondholder by making an illegal agreement to purchase from the old bondholders bonds of an approximate nominal value of US$183 million for the embarrassing price of approximately US$2 million (plus some additional returns were if it were to emerge winner of the Arbitration). **That is, Levona, through the alter ego of Pach Shemen LLC, spent just US$2 million but sought repayment of US$183 million and filed for bankruptcy against its opposing party in the then pending ELETSON HOLDINGS Arbitration (!).**

The filing of said petition, results, under US (federal) bankruptcy law, in the automatic stay of all proceedings and arbitrations (individual prosecutions), and that is why **the aforementioned arbitration which had been initiated at that time, was stopped. However, following** the intense reaction of ELETSON HOLDINGS, which sought to continue the arbitration, the Pach Shemen /Levona /Murchinson side was forced to come to an agreement that was converted into a court order (stipulation & order), and thus the U.S. Bankruptcy Court issued a decision on 04/17/2023 and allowed said arbitration to continue. The Arbitration proceedings lasted for about two weeks in May 2023, by examining a series of witnesses on both sides, and then the Arbitration Award dated 09/29/2023 \was issued in New York by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN, as detailed above **under A.6.1.**

In more detail:

### A.7.1.    The Judgment of Voluntary Bankruptcy / Restructuring (Chapter 11) of ELETSON HOLDINGS and the other companies of the U.S. Bankruptcy Court - South District of New York, consisting of Judge John P. MASTANDO.

While ELETSON HOLDINGS and ELETSON CORPORATION had already sought recourse, as of **07/29/2022** to arbitration against Levona (**see above under par. A.6.1.**), on **March 7, 2023,** petitions of involuntary (forced) bankruptcy (chapter 7 of the US Bankruptcy Code) were filed before the Bankruptcy Court of the Southern District of New York (hereinafter the "***Bankruptcy Court***") by three purported creditors of them, and in particular **from the first up to the third defendant,** Pach Shemen LLC, VR Global Partners and L.P., Alpine Partners L.P. (hereinafter the "***Creditors***") against ELETSON HOLDINGS, as well as against its co-debtors Agathonisos Finance LLC and Eletson Finance (US) LLC (***hereinafter the "purported Debtors"***)

On **March 8, 2023**, Levona sent a letter to Judge-Arbitrator Ariel E. BELEN, informing him of the filing of involuntary bankruptcy petitions against ELETSON HOLDINGS which have resulted, under U.S. bankruptcy law, in all proceedings concerning Eletson Holdings and its subsidiaries (such as Eletson Corporation) being automatically stayed. Indeed, on **March 10, 2023**, Judge-Arbitrator Ariel E. BELEN stayed the aforementioned arbitration pending further judgment or notice by the Bankruptcy Court.

On **April 17, 2023**, upon agreement of the parties confirmed by the Bankruptcy Court, the latter lifted the automatic suspension for the limited purpose of continuing arbitration under the terms of the related agreement (stipulation) between the parties.

In the meantime, on **April 14, 2023**, the purported Debtors filed an application for dismissal of the above involuntary bankruptcy petitions.

Finally, the arbitration continued, as mentioned above, with extensive hearings, and on July 29, 2023, the Interim Arbitration Award (**Interim Award**) was issued by Judge - Arbitrator Ariel E. BELEN, and on August 15, 2023, the Corrected Interim Arbitration Award (**Corrected Interim Award**) was issued, by which certain non-substantial corrections were made to the Interim Award.

At the same time, however, the above involuntary bankruptcy proceedings of "ELETSON HOLDINGS" and the remaining two (2) companies of its interests, Agathonisos Finance LLC and Eletson Finance (US) LLC, continued before the Bankruptcy Court. Given the then conditions, the ongoing pressures they received from the opposing side (Levona), which by continuous tricks hindered the progress of the Arbitration and in order for ELETSON HOLDINGS to have control of its property, at least until the issuance of the expected arbitration award, on September 9, 2023, upon agreement of the parties confirmed by the Bankruptcy Court, the involuntary bankruptcy proceedings (based on chapter 7 of the American Bankruptcy Code) were amended to voluntary bankruptcy (Restructuring) proceedings (based on chapter 11 of the American Bankruptcy Code). That is, the filing of the voluntary Restructuring (chapter 11) in this case was done in necessity and due to the prevailing conditions, that is, essentially compulsory and not voluntary.

Subsequently, and upon manipulations, in bad faith, of Levona and its affiliated companies, Murchinson/Pach Shemen, two decisions were issued on **10/25/2024** by the Bankruptcy Court of New York, consisting of John P. MASTANDO J, with which the oppositions of the alleged debtors were dismissed (ELETSON HOLDINGS, Agathonisos Finance LLC and Eletson Finance (US) LLC) against the claims of certain creditors (by Pach Shemen LLC; VR Global Partners L.P., Alpine Partners L.P.) and the Amended Restructuring Plan of the Creditors was approved.

Judge Mastando details the Amended Creditor Restructuring Plan on pages 39-45 of his Decision dated 10/25/2024. In brief, the result of the Creditors' Restructuring Plan (provided that it is recognized and implemented in Liberia and Greece in accordance with applicable law) is that the control, management and ownership of ELETSON HOLDINGS shares will be transferred to Pach Shemen LLC (the new purported "majority shareholder", that is the first defendant) and DuPont Capita! Management (the new alleged "minority shareholder", that is, the fourth defendant herein). In particular, the Amended Creditor Restructuring Plan provides for cancellation ("disappearance") of the existing shares belonging to the five Greek families who, for approximately 50 years, established and controlled ELETSON HOLDINGS and in replacement provides for the issuance of new shares in the name of Pach Shemen LLC and Dupont Capital Management. A number of drastic corporate changes are also planned to take place, such as changes of articles of association, boards of directors, etc.

It is notable that in the **disclosure statement** filed with the Bankruptcy Court in support of the Creditors' Restructuring Plan, it is stated that ***"[illegible] Debtors | i.e. ELETSON HOLDINGS) have been incorporated in Liberia and some of their interests are governed by the laws of foreign jurisdictions outside the United States."*** Also in the same document it is stated that *"**The Plan Supporters** [**i.e. the alleged Creditors-currently first to third of the defendants herein) make every effort to ensure that any Confirmation Decision issued by the Bankruptcy Court and the steps to be taken in accordance with the Confirmation Decision for the implementation of the Plan will be recognized and applied to all applicable legal classes."*

In addition, **Section V.5.2(b) of the Creditor Restructuring Plan** (that is, the first three defendants) **acknowledges the need to comply with applicable state, provincial, federal or foreign laws to implement the Creditor Restructuring Plan and a change of control, namely:**

*"The Debtors* [i.e. ELETSON HOLDINGS], *with the prior written consent of the Plan Supporters or the Restructured* [ELETSON HOLDINGS], *if applicable, and Restructuring Plan Supporters, can, in their judgment, take any action **permitted by applicable law,** including those that the Restructured* [ELETSON HOLDINGS] *considers reasonable, necessary or appropriate to implement the Plan, such as: (j) the signing and delivery of any appropriate agreements or other creation documents; merger, merger by absorption, Restructuring, conversion, divestiture, transfer, arrangement, continuation, dissolution, selling, purchase or liquidation which contain terms consistent with the terms of this Plan and which **meet the requirements of applicable and enforceable law** and any other terms to which the parties may agree;[...] (III) the filing of appropriate certificates or constitutional documents, reconstitution documents, merger, consolidation, conversion, merger by absorption, arrangement, continuation or dissolution in accordance with applicable State or local law-[...](iii) all such actions as the interested parties deem necessary to obtain the required regulatory approvals to implement this Plan[...](ix) the issuance of the Restructured Equity Fund-and (x) all other actions the interested parties deem necessary, including making deposits or entries that may be **required by applicable law** in connection with this Plan, and such actions and documents are deemed not to require any further action or approvals (beyond the necessary deposits **required by the applicable government, local and federal** or foreign laws or the rights of consent or consultation as set out in the Plan)"!.* (emphasis added)

In addition, **section V.5.4 of the same Creditors Restructuring Plan** expressly states that:

*"all ... shares **(where permitted by applicable law)** ... will be canceled."* (emphasis added).

**A.7.2.    The Order of the Bankruptcy Court of the U.S. - Southern District of New York, comprised of Judge John P. MASTANDO, which was issued in New York on 11/04/2024 confirming the Voluntary Bankruptcy Decision (Chapter 11) dated 10/25/2024 for ELETSON HOLDINGS and the other companies and the amended Creditors' Restructuring Plan**.

On **11/04/2024**, the **Order** of the New York Bankruptcy Court, consisting of Judge John P. MASTANDO, was issued, confirming the above voluntary bankruptcy decision (Restructuring) (Chapter 11) of ELETSON HOLDINGS and the other companies (Agathonisos Finance LLC and Eletson Finance (US) LLC) and the amended Creditors' Restructuring Plan (FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS).

**Paragraph 25** of the above Order explicitly states:

**"Final Order.** *This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon entry of the Confirmation Decision.»* and in precise translation into Greek:

*"Final order. This Confirmation Order is a final order **and the period in which an appeal must be filed shall commence upon entry of the Confirmation Decision.»***

That is, in accordance with the provisions of the U.S. Bankruptcy Code, the deadline for ELETSON HOLDINGS and the other debtor companies to file appeal is **14 days from the issuance of the decision and begins from the issuance of the decision (article 8002 Federal Rules of Bankruptcy Procedure**), and therefore it had to be filed by **11/08/2024**, since the above decision of the Bankruptcy Court was issued on 10/25/2024, and was made, after the relevant introductory appeal application was filed before the competent Court for the Western District of New York, with Judge LIMAN as presiding judge on 11/07/2024.

However, in a fully abusive and dilatory manner, a few days after the appeal was filed by the only truly legalized lawyers of ELETSON HOLDINGS (Reed Smith), a new law firm (name Goulston & Storrs) appeared, alleging (with pride) that they represented the *Restructured* ELETSON HOLDINGS, filed a purported agreement with the purported Creditors to Dismiss Appeal under Rule 8023 of the Federal Rules of Bankruptcy Procedure ("stipulation and agreement to Dismiss Appeal Under Rule 8023 of the Federal Rules of Bankruptcy Procedure"). In other words, the allegedly Restructured ELETSON HOLDINGS (along with other lawyers) requested that Judge LIMAN dismissed the appeal that had been brought by the truly legalized lawyers of EMETSON HOLDINGS.

On 12/23/2024, a conference call (status conference) took place before Judge LIMAN  on the issue of the above alleged Agreement to Dismiss the Appeal pending. A critical issue in this discussion was whether the Restructuring of ELETSON HOLDINGS had actually occurred on 11/19/2024 and whether the representation of the allegedly restructured ELETSON HOLDINGS by the new lawyers Goulston&Storrs was valid. Judge Liman (without giving the right to the truly legalized lawyers of ELETSON HOLDINGS (Reed Smith) to respond in writing, in a short meeting and in summary he accepted that the Restructuring of ELETSON HOLDINGS had indeed taken place on 11/19/2024 and that the representation of the restructured ELETSON HOLDINGS by the new lawyers Goulson & Storrs was valid and therefore accepted the Agreement to Dismiss the Appeal, disregarding the valid arguments of ELETSON HOLDINGS's truly legitimized lawyer, Reed Smith to the contrary.

**A.7.3.  Conclusions. - Levona/Murchinson/Pach Shemen's bad faith conduct in the manipulation of the bankruptcy of ELETSON HOLDINGS. - The reasons for this.**

From a number of documents, and as already adjudicated by Judge-Arbitrator Ariel! E. BELEN in his final arbitration decision award dated 09/29/2023, the conduct of Levona, as well as its affiliates Murchinson and Pach Shemen, for which, indeed, the aforementioned Arbitrator mentions characteristically that "**each is an alter ego of the other", against ELETSON HOLDINGS, is entirely illegal, unconventional, unethical and totally in bad faith** [see in detail above **under A.6.**].

Their bad faith conduct led to the bankruptcy of ELETSON HOLDINGS, fully manipulated by them, which, although it was vindicated in the Arbitration Award dated 29.09.2023, was brought to a state of purportedly voluntary bankruptcy (restructuring) by actions of Levona/Murchinson/Pach Shemen, litigants herein, and the other companies of its interests.

The manipulation, in bad faith, of the bankruptcy of the Company, first plaintiff herein, by Levona/Murchinson/Pach Shemen is proven by the following:

**a. Lack of active legalization to file an involuntary bankruptcy application.**

Creditors, of the litigants Pach Shemen LLC, VR Global Partners L.P., Alpine Partners L.P. (first to third defendants herein) failed to investigate whether they themselves were eligible for active legalization to file a petition for involuntary bankruptcy of the Company under the American bankruptcy code.

In particular, Murchinson/Pach Shemen and Alpine Partners, the two of the three companies that jointly filed a petition for involuntary bankruptcy, were aware, at the time they filed their petitions for the involuntary bankruptcy of ELETSON HOLDINGS, of the existence of the Second **Restructuring Support Agreement (the "Second RSA")** [6]and its contents. This agreement was intended to maintain Eletson Holdings' stability and orderly operation and for this reason it included important binding clauses, such as clauses prohibiting the manipulation of insolvency proceedings and clauses restricting the transfer of bonds.

---

[6] **Note:**The Second RSA is an agreement signed on October 29, 2019, between the Debtors, certain shareholders of Eletson Holdings and certain shareholders of more than 80% of New Bondholders ("Consenting Bondholders"); The Second RSA included restrictions on the transfer of bonds; indicating that none of the Bondholders can sell, transfers, assign, mortgage, pledge, assign rights of participation or otherwise make their interests available to the New Bonds, without the transferee having signed a Second RSA subsumption at least three days prior to the transfer, otherwise the transfer will be considered invalid and without any force or effect. In addition, the Second RSA contained an enforcement clause, which granted a right to a non-infringing party to demand "specific execution and interference or other equitable relief as remedy for any such breach, including, but not limited to, an order by the Bankruptcy Court or other competent court requiring each party to immediately comply" with any of their obligations under the Second RSA.

Also, prior to the Second RSA, the First Restructuring Support Agreement (the "First RSA") was signed on June 24, 2019, between the Debtors, certain of the Debtors' shareholders and guarantors, and an *ad hoc* group of bondholders, which defined the terms for the Restructuring of the Debtors' obligations under the New Bonds and which was terminated on August 9, 2019, by the *ad hoc* group of bondholders.

Furthermore, the third of the companies jointly seeking the involuntary bankruptcy of ELETSON HOLDINGS, VR Global (second defendant herein), as a signatory to the OCM Agreement (**the "OCM Stipulation Agreement"[7]),** was also aware of additional restrictions which prohibited the transfer of bonds to parties that had not signed accession to the OCM Agreement itself.

Therefore, the filing of a petition for the involuntary bankruptcy of ELETSON HOLDINGS by the purported Creditors (currently first to seventh defendants) without investigation and without ascertaining the legality of their claims, constitutes a fundamental contradiction to morality.

### Bankruptcy manipulation scheme to gain advantage in a pending Arbitration.

Furthermore, another reason that makes the bankruptcy of the Company, and first plaintiff, manipulated and contrary to morality are the true causes and purpose for which involuntary bankruptcy petitions were filed.

In particular, the above involuntary bankruptcy petitions were not filed for the purpose of financially Restructuring Eletson Holdings, **but were intended to gain a strategic advantage in the arbitration proceedings that had already been commenced between Eletson Holdings and Eletson Corporation on the one hand as plaintiffs/appellants, and Levona (a fully linked, if not identify with Murchinston affiliate of Murchinson), on the other hand as respondent/defendant.**

---

[7] **Note:** The OCM Agreement is an agreement by which the Debtors obtained the consent of the majority of Bondholders, which consent was required by the Second RSA for the refinancing of the ships' charterparties. With this consent they then proceeded to refinance certain ship charterparties in cooperation with OCM Maritime Thames LLC, OCM Maritime Autumn LLC, OCM Maritime Rhine LLC and OCM Maritime Yukon LLC.
OCM companies are affiliated companies with the investment fund Oaktree Capital Management.
In addition, the OCM Agreement: (i) includes a preamble stating that "Ellison Parties and Holders are parties to the particular Restructuring Support Agreement dated October 29, 2019," (ii) prohibits bondholders from selling, assigning, transferring, mortgaging or otherwise disposing of their New Bonds unless, "as a condition of any such transaction, the recipient" signs their inclusion in the OCM Agreement; and (iii) provides that any disposition of New Bonds, as mentioned above, is void from the outset if no enrollment is signed.

During all stages of the bankruptcy proceedings, from negotiating with the previous holders of the bonds issued by Eletson Holdings and the filing of petitions for involuntary bankruptcy, through the issuance of the final judgment of the Bankruptcy Court in the context of the voluntary bankruptcy proceedings (under chapter 11 of the American Bankruptcy Code), Pach Shemen (i.e. still an affiliate of Murchinson and first defendant herein) played a pivotal role. Pach Shemen, by offering financial incentives and providing legal and financial support to the rest of the participants in the bankruptcy process, created a matrix of control and influence that allowed them to control the progress of the process, with the sole purpose of serving their own interests (i.e., the interests of Murchinson). For example, Murchinson/Pach Shemen, during the negotiation stage with bondholders, informed the latter that Murchinson (through its affiliate, Levona) was "*already in a dispute with Eletson*" and "*searched for any potential pressure point to improve the situation in the Gas arm*". In fact, the final agreement that arose between Murchinson/Pach Shemen and the bond sellers provided that "*an additional US$500,000 would be paid to bond sellers if the arbitration were terminated in our interest in respect of Eletson Gas and we would be able to exercise our rights as Preferred Shareholders to sell the Eletson Gas and/or the company (Eletson Gas) ships without legal intervention.*"

Therefore, the acquisition of the Bonds never involved possible financial returns of that investment. Rather, Murchinson/Levona/Pach Shemen's common goal was to manipulate the bankruptcy proceedings for their benefit in arbitration and gain control of Eletson Holdings and through them, the control of Eletson Gas. In fact, Murchinson/Pach Shemen/Levona attempted to use information obtained through the bankruptcy proceedings before the U.S. Bankruptcy Court for their benefit in Arbitration.

**c. Initiation of bankruptcy proceedings based on disputed claims.**

Finally, another reason that makes the bankruptcy of ELETSON HOLDINGS one in bad faith and manipulated, is that it was caused on the basis of disputed claims.

The filing of an involuntary bankruptcy petition of an obligor before a U.S. Bankruptcy Court must be based on **actual and undisputed claims.**

However, in this case, the defendants - purported as Creditors (and in particular the first to the third of defendants) **were aware, at the time of filing the involuntary bankruptcy petitions, of the validly contested nature of their claims.**

In fact, said defendant Creditors included in their proposals, in support of their petitions on involuntary bankruptcy of the Company, unfounded defamatory allegations about the purported Debtors, in order to humiliate the latter, disrupt their business relationships, and damage their reputation. Among other things, the defendant Creditors (first to third defendants) unfoundedly argued that the alleged Debtors engaged in intra-group transactions and in acts contrary to morality and good faith. These allegations remained unproven throughout the bankruptcy proceedings, as expected, since they lacked even an ounce of truth.

In view of the above, the knowledge of the purported Creditors of the totally questionable nature of their claims, in combination with the unfounded defamatory allegations against the purported debtors, demonstrates their conduct in bad faith and the undeniably and unambiguously manipulated bankruptcy procedure of ELETSON HOLDINGS, instigated on behalf of Levona/Murchinson/Pach Shemen.

**d. The negative recognition complaint already filed regarding the validity of the above decisions of the American Bankruptcy Court, before the only one having jurisdiction for this, namely the Multi-Member Court of First Instance of Piraeus.**

As has already been mentioned, **ELETSON HOLDINGS Inc**. is a Societe Anonyme (corporation), which has been established since 12/04/1985 under the laws of Liberia, having its **real seat of business in Greece where it maintains offices, at 118 Kolokotroni in Piraeus,** as it is governed by an eight-member board of directors, which has been meeting at its aforementioned facility **for forty (40) years** without interruption since its establishment and to this day all the BoD members are Greeks and residents of Greece, all decisions for its business activities and the fulfillment of its statutory objective are received at its offices, which it maintains at the above address, since the company is a holding company (of maritime companies) its entire activity in Piraeus through its 100% subsidiary Eletson Corporation, which maintains in Piraeus a lawfully established office in accordance with the provisions of article 25 of Law 27/1975, where it employs approximately 50 people **on land**, paid and insured in Greece, in accordance with the provisions of Greek law. It is also noted for completeness that multiple times more of this personnel are employed **at sea** and consists of **Greek seamen** as well, as Eletson is among the traditional companies that historically prefer even today the Greek flag for its ships.

Following the above and taking into account the fact that for more than forty years, the place where indeed the management of the interests of the Company is exercised, s Greece and Piraeus, in particular, **where the Company has offices, at 118 Kolokotroni St,, it follows that the exclusive jurisdiction for the initiation of the insolvency proceedings lies exclusively with the courts of Greece and in particular according to Greek law (Code of Civil Procedure, in conjunction with article 78 of Law 4738/2020 and article 51 of Law 2172/1993) the courts of Piraeus.**

Therefore, the Voluntary Bankruptcy Decision issued in New York on 10/25/2024 for ELETSON HOLDINGS and the other companies by the U.S. Bankruptcy Court - Southern District of New York, comprising of Judge John R. MASTANDO, as well as the Order dated 11/04/2024 of the same as above Bankruptcy Court confirming the 10/25/2024 decision of voluntary bankruptcy (Chapter 11) of ELETSON HOLDINGS and the other companies, and the Amended Creditors Restructuring Plan does **not have any consequence as to the Company in the Greek legal order, nor does it bind, while the Company has not been declared under the above decisions in bankruptcy and/or in any form of Restructuring, since the above U.S. Bankruptcy Court lacks jurisdiction, taking into account, that the Company's registered seat is in Greece.**

In any event, these judgments of the U.S. Bankruptcy Court have not been recognized in Greece—nor would they have been able to be recognized per the aforesaid - therefore, no legal effect has been produced in Greece. To acknowledge this fact, with the power of res judicata, as in recognition of the fact that the Company has in no way been declared under the above decisions, under a bankruptcy regime, and/or is placed in any form of Restructuring/Restructuring, the Company, currently first intervener, as well as the companies "ELETSON CORPORATION", "ELETSON GAS LLC", "KASTOS SPECIAL MARITIME ENTERPRISE", KINAROS SPECIAL MARITIME ENTERPRISE", "KIMOLOS II SPECIAL MARITIME ENTERPRISE" and "FOURNOI SPECIAL MARITIME ENTERPRISE" filed a complaint before the Multi-Member Court of First Instance of Piraeus [Ordinary Procedure - Department of Maritime Disputes] on 01/17/2025 with General Filing Number 1260/2025 and Special Filing Number 344/2025 against: 1. The foreign special purpose company "Pach Shemen LLC", 2. The foreign special purpose company "VR Global Partners, L.P." 3. The foreign special purpose company "Alpine Partners (BV1), L.P." 4. The foreign fund management company with the trade name "DuPont Capital Management", 5. The foreign special purpose company with company name "Levona Holdings Ltd.", 6. The foreign company with the trade name "Mulberry Street Ltd", 7. The foreign special purpose company with the trade name "Murchinson Ltd", 8. Adam Spears, 9. Leonard Hoskinson, 10. Mark Lichtenstein, 11. Marc Bistricer, 12. The company "BRASCHEL A. GREECE SINGLE-MEMBER LTD", 13. The company "BRASCHEL A. GREECE SINGLE-MEMBER LTD", 13. The company "BRASCHEL C GREECE SINGLE-MEMBER IKE" and 15. Ionas Varouxakis, that is, against the respondent to the appeal/defendant company "Levona" in the arbitration appeal filed on 07/29/2022 by Eletson Holdings and its subsidiary, Eletson Corporation, as well as against companies and/or natural persons linked with them.

**A.8.**     **The resignation of the Company's Directors. - The recourse to Greek Justice in order to safeguard the interests of the Corporation. ELETSON HOLDINGS. - The legalization of ELETSON HOLDINGS.**

As mentioned above **(see par. A.1. herein)**, "**ELETSON HOLDINGS INC**." is a Societe Anonyme (corporation) and has been incorporated under the laws of Liberia, as of 12/04/1985.

Pursuant to **Article III, Section 11. Powers** of the Company's Bylaws, the Company is governed by a Board of Directors, consisting of eight (8) members, in accordance with **Article III, Section 2**. Section 2. Eligibility of the above Bylaws of the Company and at any rate not less than three (3) in accordance with **article 1**. Members of the same Bylaws *(Section 1. Number of BY-LAWS)* Pursuant to **article 5.**

**Directors [VI. DIRECTORS] of the Amended and Codified Articles of Association of the Company** dated **06/29/2018**, which is registered with company's registration number C-40191 with the Ministry of Foreign Affairs of the Republic of Liberia, the Company is governed by a Board of Directors, consisting of **three (3) members**.

Until recently (i.e. until 11/08/2024) the Company was governed by an **eight-member Board of Directors**, as it appears from the **resolution, dated 12/11/2023**, of the Joint Assembly of the Members of the Board of Directors as well as the Shareholders of ELETSON HOLDINGS, and consisted of the following members:

a) Laskarina Karastamati, Chair and BoD Member,

b) Vasileios Hatzieleftheriadis, Vice President, Treasurer and BoD Member,

c) Vasileios Kertsikoff, Vice President and BoD Member,

d) Konstantinos Hatzieleftheriadis, BoD Member,

e) Ioannis Zilakos, BoD Member,

f) Eleni Karastamati, BoD Member,

g) Panagiotis Konstantaras, BoD Member.

h) Emmanuel Androulakis, as Secretary and BoD member,

While Eleni Vandorou was appointed as Assistant Secretary.

In the above Minutes, there is no provision for the Company's commitment, however, its Bylaws in **Article III, Section 5. Quorum (Section 5. Quorum of BY LAWS) provide that in order for there to be a legal formation and quorum at the meetings of the Company's Board of Directors, a majority is required, namely:**

*" Article III*

*BOARD OF DIRECTORS*

*Section 5. Quorum.*

*At any Meeting of the Board of Directors a **majority** of the Directors shall constitute a **quorum** for the transaction of business, but if at any Meeting of the Board there shall be less than a quorum present, a majority of those present may adjourn the Meeting from time to time until a quorum shall have been obtained."*

And in faithful translation:

*"Article III"*

**Board of Directors**

### Section 5 - Quorum

*At any Meeting of the Board of Directors a **majority** of the Directors shall constitute a **quorum** for the transaction of business, but if at any Meeting of the Board there shall be less than a quorum present, a majority of those present may adjourn the Meeting from time to time until a quorum shall have been obtained."*

In addition, pursuant to the Statement of Directors dated 09/26/2024, Officers and Shareholders of the Company (entered in the registration of the Company with number C-40191 with the Ministry of Foreign Affairs of the Republic of Liberia), the above Directors were published, while three (3) of them were appointed first, that is, **(a)** Laskarina Karastamati, as President, **(b)** Vasileios Hatzieleftheriadis, as Vice President and Treasurer, and **(c)** Vasileios Kertsikoff as Vice President, as d**esignated employees/managing officers of the Company,** to whom the power of attorney has been granted to sign on behalf of and to bind the Company.

The Designated **Officers** of the Company shall be **elected by the Board of Directors,** shall have an annual term of office, unless removed by the Board of Directors, as expressly provided in the Bylaws of ELETSON HOLNDINGS in Article IV, Section 1. Designated Employees and Representatives (**Section 1. Officers and Agents)** and Section 2. Term of Office In addition, in the same Article IV, Section 3. Powers and Duties **(Section 3. Powers and Duties), it is explicitly provided that the Designated Officers of the Company are subject to the control of the Board of Directors, that is:**

*" **Article IV***

**OFFICERS**

**Section** *I. **Officers and Agents.***

*[...] The Board of Directors may also appoint from time to time one or more Vice Presidents, Assistant Secretaries , Assistant Treasurers and other agents, officers, representatives and employees as may be deemed necessary. [...]"*

And in faithful translation into Greek:

*«Article IV,*

*Designated Officers*

*Section 1 - Officers and Agents*

The Board of Directors may also appoint from time to time one or more Vice Presidents, Assistant Secretaries , Assistant Treasurers and other agents, officers, representatives and employees as may be deemed necessary."

*Section 2.  Term of Office.*

*The term of office of all officers shall be one year or until their respective successors are chosen and qualify; Provided however that any officer elected or appointed by the Board of Directors may be removed, with or without cause, at any time by the affirmative vote of a majority of the members of the Board then in office.*

And in faithful translation into Greek:

*"Section 2. Term of Office.*

*The term of office of all officers shall be one year or until their respective successors are chosen and qualify;* Provided however that **any officer elected or appointed by the Board of Directors may be removed, with or without cause**, at any time by the affirmative vote of a majority of the members of the Board then in office.

*Section 3.  Powers and Duties.*

*The officers, agents, representatives and employees of the Corporation shall each have such powers and duties in the management of the property and affairs of the Corporation, subject to the control of the Board of Directors and approval of the Shareholders entitled to vote thereon, as generally pertain to their respective offices, as well as such powers and duties as from time to time may be prescribed by the Board of Directors and the Shareholders entitled to vote thereon. The Board of Directors may require any such officer, agent, representative or employee to give security for the faithful performance of his duties.*

*And in faithful translation into Greek:*

*Section 3. Powers and Duties.*

The officers, agents, representatives and employees of the Corporation shall each have such powers and duties in the management of the property and affairs of the Corporation, subject to the control of the Board of Directors and approval of the Shareholders entitled to vote thereon, as generally pertain to their respective offices, as well as such powers and duties as from time to time may be prescribed by the Board of Directors and the Shareholders entitled to vote thereon. The Board of Directors may require any such officer, agent, representative or employee to give security for the faithful performance of his duties."

**On 11/08/2024, by written letter to the Board of Directors of the Company the following persons, namely :**

a. Laskarina Karastamati, President and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

b. Vasileios Kertsikoff, Vice President and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

c. Eleni Karastamati, Board Member and

d. Panagiotis Konstantaras, Board Member.

**resigned** from the then eight-member ELETSON HOLDINGS' Board of Directors and the above capacities they held therein, while it was not possible to replace them, given that the Articles of Association of the Company did not provide for this and therefore no substitute members had been elected.

Following the above resignations, the **eight-member** Board of Directors of the Company has now been converted into a **four-member** Board, consisting of:

a) Vasileios Hatzieleftheriadis, Vice President, Treasurer and Board Member (and Designated Officer through the Declaration dated 09/26/2024)

b) Konstantinos Hatzieleftheriadis, Board Member,

c) Ioannis Zilakos, Board Member,

d) Emmanuel Androulakis, Secretary and Board member.

In addition to the total of three (3) designated employees/management officers of the Company, only one (1) Mr Vasileios Hatzieleftheriadis, remained.

Given, however, as immediately mentioned above, that a quorum at the meetings of the Company's directors is required, in accordance with the statutory provision pursuant to article III, Section 5 – A quorum (Section 5. Quorum of the Bylaws) <u>a majority,</u> in combination with the fact that until recently the Company was governed by an **eight-member Board of Directors**, as shown by the resolution dated 12/11/2023 of the Joint Meeting of the Members of the Board of Directors and the Shareholders of ELETSON HOLDINGS, the latter, as of today, 11/08/2024, is deprived of management, unable to convene a General Assembly of Shareholders and to make decisions, and to represent and bind the Company.

In addition, due to the absence of the Board of Directors, no designated employees/management officers of the Company could be appointed, while the one who remained, Mr. Vasileios Hatzieleftheriadis, similarly cannot make decisions, represent and bind the Company, since there is no Board of Directors to review and approve his decisions, in accordance with Section 3, of article IV above. Power and Duties **(Section 3. Powers and Duties of the Bylaws).**

So, given that, based on the immediately above, the Company was deprived of its management and legal representation since 11/08/2024, unable to take any action in order to defend its interests and/or defend against its actions, as detailed above herein, two (2) of its shareholders, namely the foreign shipping companies ELAFONISSOS SHIPPING CORPORATION as well as the company KEROS SHIPPING CORPORATION, which, as mentioned above **(under A.2.)** are holders of 392 shares (shareholders) each, which represent a percentage of 3,92% each of the shares of the Company; appealed to Greek Justice, by submitting application with General/Special Filing Number 16655/7823/11.11.2024, per article 69 of the Civil Code before the Single-Member Court of First Instance of Piraeus[8] [Voluntary Jurisdiction], in order **to appoint** a provisionary management of the Company, per the injunction process, to protect the rights of the Company, namely in order to **manage** the Company and to **convene an extraordinary General Assembly for the election of a new Board of Directors, per the particular mentioned therein, while the hearing of the above application was scheduled for 02/04/2025.**

---

[8] As already mentioned, the Company has established itself under the laws of Liberia, however, the center of its main interests and its actual registered office is in Piraeus, at 118 Kolokotroni street, therefore the appointment of its provisionary management, pursuant to article 786 *par.* 1 of the Code of Civil Procedure, under the procedure of voluntary jurisdiction, by the Single-Member Court of First Instance of the region where it is headquartered.

Due to the occurrence of an urgent case, the above application included a request for temporary order, until the discussion of the above application, and under the condition of its discussion before the above Court during the appointed hearing, by which the following were **appointed** as members of the temporary management of the foreign shipping company **"ELETSON HOLDINGS INC."**:

i. Vasileios Hatzieleftheriadis, son of Apostolos,

ii. Konstantinos Hatzieleftheriadis, son of Apostolos,

iii. Ioannis Zilakos, daughter of Nikolaos,

iv. Emmanuel Andreoulakis, son of Stylianos,

v. Andrianos Psomadakis - Karastamatis, son of Michael,

vi. Panos Paxinos, son of Ioannis,

vii. Eleni Giannakopoulou, daughter of Konstantinos, and

viii. Niki, spouse of Nikolaos Zilakos.

*with the power to administer the Company: (a) to address current and urgent issues, such as transactions for the management of the property of ELETSON HOLDINGS and transactions of any nature with financial institutions, charterers, suppliers, other traders and public bodies in Greece and abroad, and (b) to manage the four Special Maritime Enterprises that control the tankers MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, and its other subsidiaries; which, due to their maritime nature, have lasting and urgent needs for making decisions and proceeding to actions, (c) for the representation of their maritime subsidiaries and to maintain smooth and continuous communication with the sponsors of the above ships, funded through loan agreements with sale and lease back agreements, and (d) In order to make a decision to exercise on behalf of the Company "ELETSON HOLDINGS INC." all legal remedies (Greek or foreign) and aids provided by law (Greek or foreign) in the name and on behalf of the aforementioned company, in order to safeguard its property and interests, and in particular for the Company:*

- *To appear and be represented at the hearing (Status Conference) of 11/12/.2024 before the U.S. District Court - Southern District of New York, consisting of Judge Lewis J. LIMAN, in order to oppose the objections, allegations and impediments brought by the Respondent Levona in the procedure to confirm the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of* **Judge-Arbitrator Ariel E. BELEN and hereinafter, to request the declaration of its enforceability in order to turn against Levona.**

- *To represent itself and its subsidiary, ELETSON CORPORATION, and to request the acknowledgment of the Arbitration Award issued in New York on 09/29/2023 by the Arbitral Tribunal consisting of Judge-Arbitrator Ariel E. BELEN and the compliance of the respondent, "Levona", with all the provisions of its operative part, as well as the declaration of its enforceability under the provisions of the New York Convention, in the territory of another State than the one issued, inter alia, in Greece, where Levona holds property.*

- *Obtain judicial protection and on the one hand, to support the appeal against the above Bankruptcy Decision, which is already issued, of the U.S. Bankruptcy Court - Southern District of New York comprising of Judge John P. MASTANDO which confirms the Voluntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS and its other companies of interest, as well as the amended plan for the Restructuring of the Creditors <u>before the New York Bankruptcy Court</u>, as the relevant deadline for its exercise (of the appeal) would expire, as per the immediately above stated, on 11/08/2024, on the other hand to appeal, with the respective statutory legal remedies and means, <u>before the Greek Courts</u>, in order to challenge the Decision of Voluntary Bankruptcy dated 10/25/2024 (Chapter 11) in which it was filed by the U.S. Bankruptcy Court for reasons of lack of international jurisdiction of the latter in accordance with the provisions of Regulation 2015/848 of the European Parliament and of the Council.*

- *In addition, in the event that the Creditors apply for the acknowledgment and execution of the above voluntary bankruptcy decision in Greece, where ELETSON HOLDINGS is based in fact, the latter to appear and be represented before the competent Greek Courts in order to oppose, otherwise and as an impediment to the recognition of the above Bankruptcy Decision in Greece, due to the inadequacy of the issuing party's international jurisdiction in the Bankruptcy Decision, that is, the foreign Bankruptcy Court of the U.S., and for their other claims in their favor.*)

- ***To appoint proxy lawyers in Greece or abroad to be represented before domestic or foreign Courts, Arbitrators, Investigators and any other Authority required, in order to protect their interests, by filing legal remedies, using legal means, oppositions, etc.***
- ***To convene an extraordinary General Assembly for the election of a new Board of Directors.***

The discussion of the above request for temporary order took place before Mrs. President of the Service of the Piraeus Court of First Instance on 11/12/2024, when it was accepted, and a temporary order was granted with the following content:

> ***" -Accepts request for temporary order.***
>
> *-* ***Appoints temporary management of the maritime company "ELETSON HOLDINGS INC" consisting of the following persons: 1) Vasileios Hatzieleftheriadis, son of Apostolos, 2) Konstantinos Hatzieleftheriadis, son of Apostolos, 3) Ioannis Zelakos, son of Nikolaos, 4) Emmanuel Andreoulakis, son of Stylianos, 5) Andrianos Psomadakis - Karastamates, son of Michael, , 6) Panos Paxinos, son of Ioannis, 7) Eleni Giannakopoulou, daughter of Konstantinos, 8) Niki, spouse of Nikolaos Zilakos****, in order to address* **all the urgent cases of said company** *and in particular to ensure its legal representation (appointment of lawyers) before the Courts of New York USA for the pending cases, temporarily until the hearing of the application at the scheduled hearing and on the condition that it is discussed at said hearing."*

Following a relevant entry of the aforementioned provisionary management in the Company's record with number C-40191 with the Ministry of Foreign Affairs of the Republic of Liberia, the corresponding Certificate of the latter, dated 11/19/2024 was issued, by virtue of which the Directors of the Company were published and as set out above by virtue of the temporary order of Mrs. President of the Service of the Court of First Instance of Piraeus dated 11/12/2024, and **(a)** Vasileios Hatzieleftheriadis was appointed as President and Treasurer and **(b)** Emmanuel Andreoulakis, as Secretary, as **designated employees/managers of the Company (Officers),** to whom power of attorney has been granted as they sign on behalf of and bind the Company.

**Lack of jurisdiction of the U.S. Bankruptcy Court - Southern District of New York, comprising of Judge John R. MASTANDO, both in respect of the judgment of the voluntary bankruptcy of Eletson Holdings and the other companies issued in New York on 10/25/2024, (Chapter 11), as well as the Order dated 11/04/2024 of the same as above bankruptcy court confirming the decision of voluntary bankruptcy dated 10/25/2024 (Chapter 11) of Eletson Holdings and the other companies and the amended Creditors' Restructuring Plan.**

Bankruptcy and the insolvency process in general exist as a potential risk in any financial activity. Considering the fact of globalization of the economy and through the action of commercial companies internationally, the question arises: the main purposes of bankruptcy law, that is, those of equal treatment of the lenders, the protection of lenders, of liquidation, or business salvage and job retention, it is possible to achieve excerpts in individual legal classes or only by a specific legal order, and it will be extended to the entire property of the debtor, wherever she is located around the world? The answer to this question, has been given internationally through the dominant principle of the module, which engages with the principle of universality in a single system, that only the courts of the debtor's residence have jurisdiction to proceed, either in the declaration of bankruptcy or in the insolvency proceedings, which will have immediate effect as court orders in the other countries where the debtor operates and will seize all his property wherever it is located. Through the aforementioned option, shopping forum is also hindered, i.e. the extrusion of the interested parties in the transfer of assets or legal disputes from State to State in order to improve their legal position.

The "international jurisdiction" therefore belongs to the courts of the State where the **debtor's main interests are located (and in the internationally recognized terminology** *"center of main interests")*. Thus, the declaration of the insolvency proceedings being initiated by courts having jurisdiction is recognized in the other States as soon as it starts to produce effects in the State of insolvency.

If the debtor is a natural person, the center of his or her main interests is easy to find after it is generally coinciding with his or her place of residence or with the place of his or her habitual residence. For companies, the center of their main interests is, in principle, identified with the place of their statutory seat, but ultimately it depends on the place where the debtor company's interests are actually managed in an organized, permanent and enduring manner. This makes this place objectively identifiable by third parties. It is the place where the Board of Directors of a company meets and its decisions are made, and in general the decisions of the legal entity's professional and financial activities are made, using the human factor - its human resources and assets, decisions on contracting for the financial utilization of its assets in another state, etc.

Besides, it is no coincidence that the above have been fully adopted, even if it is not applicable in this regard, and by the **EU Regulation 2015/848 of the European Parliament "on insolvency proceedings".** Moreover, the above have been fully adopted with **articles 15-17 of Law 3858/2010, by virtue of which Greek law was adapted to the United Nations Commission on International Trade (UNCITRAL) Standard Law of 1997 on "Cross Border Bankruptcy".**

The concept of the center of main interests, after all, has been adopting, since **2007, Greek law (article 4 of Bankruptcy Code, already article 78 of Law 4738/2020), as the international jurisdiction of the Greek courts is provided for the declaration of bankruptcy of legal persons having the center of their main interests in Greece.**

In this case, as mentioned already, ELETSON HOLDINGS INC. is the "parent" company of the maritime multi-family business, known in maritime events on a global scale by the name "ELETSON". The latter was founded in Piraeus in 1966, by Vasilis Hatzieleftheriadis, a common ancestor of the members of the Board of Directors of ELETSON HOLDINGS and their grandparents, who, with his sons, daughters and sons-in-law as partners, founded ELETSON and afterwards achieved, both himself and his descendants, to draw a highly successful maritime course that spans over 50 years.

The first plaintiff company herein, "Eletson Holdings Inc" is a Societe Anonyme (corporation), which happens to be, as aforementioned, the parent company of the Eletson Family Business, was established in 12/04/1985 under the laws of Liberia, having its **real seat of business in Greece where it maintains offices, at 118 Kolokotroni in Piraeus,** as it is governed by an eight-member board of directors, which has been meeting at its aforementioned facility **for forty (40) years** without interruption since its establishment and to this day all the BoD members are Greeks and residents of Greece, all decisions for its business activities and the fulfillment of its statutory objective are received at its offices, which it maintains at the above address, since the company is a holding company (of maritime companies) its entire activity in Piraeus through its 100% subsidiary Eletson Corporation, which maintains in Piraeus a lawfully established office in accordance with the provisions of article 25 of Law 27/1975, where it employs approximately 50 people **on land**, paid and insured in Greece, in accordance with the provisions of Greek law. It is also noted for completeness that multiple times more of this personnel are employed **at sea** and consists of **Greek seamen** as well, as Eletson is among the traditional companies that historically prefer even today the Greek flag for its ships.

As mentioned above, the Company is a holding company and fully owns the shares of four Greek Special Maritime Enterprises (**SMEs**), which control the ships MT Kastos, MT Kinaros, MT Kimolos and MT Fourni, which are tankers and in particular the Greek companies "KASTOS SPECIAL MARITIME ENTERPRISE", "KINAROS SPECIAL MARITIME EXTERPRISE", "KIMOLOS II SPECIAL MARITIME EXTERPRISE" and "FOURNi SPECIAL maritime enterprise", respectively.

The ships are financed through loan agreements with reverse leasing (sale and lease back agreements). This means that the ships, which belonged to the above "Special Maritime Enterprises" (**SMEs**), were sold to companies which are subsidiaries or affiliated with the funder, and then re-leased under bareboat charterparty to the previous owners. The amount of funding is the purchase price as the case may be. The former owners which are currently charterers of each ship by bareboat charterparty, pay the rent and through the rent they have been repaying financing and interest. When the loan is repaid, each ship is returned to the respective SME.

The owners of the above ships (who are currently registered as owners in the Registry) are **four** subsidiaries and/or affiliates of Oaktree Capital Management ("Oaktree") which is the funding company. The SMEs are the charterers by bareboat charterparty which own the ships, the crews of which, as well as the captain, are appointed by said companies. The ships are then chartered by time-charterparties to third-party charterers, usually with long-term contracts.

The above ships are managed by the **third plaintiff herein** Liberian company **Eletson Corporation** (hereinafter: "ELETSON CORPORATION"), <u>which is also a 100% subsidiary of ELETSON HOLDINGS,</u> as mentioned above, and maintains a lawful establishment, in accordance with the provisions of Article 25 of Law 27/1975 and Law 89/67, in Greece at 118 Kolokotroni Street, Piraeus, with Tax Registration Number, 098035979/ Public Tax Service of Ships of Piraeus.

Following the above and taking into account the fact that for more than forty years, the place where indeed the management of the interests of the Company is exercised, s Greece and Piraeus, in particular, **where the Company has offices, at 118 Kolokotroni St,, it follows that the exclusive jurisdiction for the initiation of the insolvency proceedings lies exclusively with the courts of Greece and in particular according to Greek law (Code of Civil Procedure, in conjunction with article 78 of Law 4738/2020 and article 51 of Law 2172/1993) the courts of Piraeus.**

Consequently, the Involuntary Bankruptcy Decision dated 10/25/2024 (Chapter 11) of ELETSON HOLDINGS (currently first plaintiff) and the other companies of the U.S. Bankruptcy Court - Southern District of New York issued in New York dated 10/25/2024, consisting of Judge John R. MASTANDO, as well as the Order dated 11/04/2024 of the same above Bankruptcy Court confirming the 10/25/2024 Decision of Voluntary Bankruptcy (Chapter 11) of ELETSON HOLDINGS (currently the first plaintiff) and the other companies and the Amended Creditors' Restructuring Plan does **<u>not have any consequence as to the first intervening company in the Greek legal order, nor is it binding, and that the first intervening company herein has not been declared under the above decisions under a bankruptcy regime and/or is placed in any form of Restructuring, since the above U.S. Bankruptcy Court lacks jurisdiction, taking into account, that the Company's registered sat is in Greece.</u>**

<u>In any event, these judgments of the U.S. Bankruptcy Court have not been recognized in Greece—nor would they have been able to be recognized per the aforesaid - therefore, no legal effect has been produced in Greece.</u>

**A.l. The legitimate interest of "ELETSON HOLDINGS".**

*In this case*, **the first intervener** faced, in the context of the open, first involuntary, bankruptcy proceedings, claims of its opposing litigants, which, although disputed, guided it in a very difficult position. The only reason that these proceedings were initiated against them was, as mentioned above, the desire of Levona and the other related companies to stay the arbitration proceedings opened by the first plaintiff, so that the respondents would not be awarded claims against them in the relevant (arbitral) appeal **(under par. A.6. as above).**

In particular, as mentioned above **(under A.7.3.)** by a number of documents and as it has already been ruled by Judge-Arbitrator Ariel E. BELEN in his final arbitration decision award dated 09/29/2023, the conduct of Levona, as well as its affiliates Murchinson and Pach Shemen, for which, indeed, the aforementioned Arbitrator mentions characteristically that *"each is an alter ego of the other"*, **against ELETSON HOLDINGS, is entirely illegal, unconventional, unethical and totally in bad faith [see in detail above under A.6.**].

Their bad faith conduct led to the bankruptcy of ELETSON HOLDINGS, fully manipulated by them, which, although it was v**indicated in the Arbitration Award dated 09/29/2023**, was brought to a state of purportedly voluntary bankruptcy by actions of Levona/Murchinson/Pach Shemen and the other companies of its interests.

The manipulation, in bad faith, of the bankruptcy of the Company on behalf of Levona/Murchinson/Pach Shemen is proven, without any doubt, from the following, as they were explained in detail above (see paragraph **under A.7.1.**) and are summarized herein:

**a. Lack of active legalization to file an involuntary bankruptcy application.**

The purported as Creditors Pach Shemen LLC, VR global Partners L.P., Alpine Partners L.P., present first and third of the defendants, failed to inquire whether they themselves met the requirements for active legalization to file an application for involuntary bankruptcy of the Company under the American Bankruptcy Code, an action fundamentally contrary to morality;

**b. Bankruptcy manipulation scheme of the Company to gain advantage in a pending Arbitration.**

As detailed above **(under par. A.7.3.B.).** the true causes and purpose for which the involuntary bankruptcy petitions were filed against the current first plaintiff was not the financial Restructuring of the first claimant company, **but the petitioners of said petition in question against the current first plaintiff aimed to gain a strategic advantage in the arbitration proceedings that had already been opened between Eletson Holdings and Eletson Corporation, on the one hand as plaintiffs, and Levona (an affiliate of Murchinson), on the other hand as a defendant**. In terms of Greek law, we would talk about an **abusive petition for bankruptcy**, since it seeks purposes foreign to bankruptcy (Bankruptcy Code No. 80 of Law 4738/2020).

Therefore, the objective of Murchinson/Levona/Pach Shemen through the acquisition of the Bonds has never been possible financial returns of that investment; but, instead, their common goal was to manipulate the bankruptcy proceedings for their benefit in the arbitration and gain control over and through Eletson Gas; using information obtained through the bankruptcy proceedings before the American Bankruptcy Court for this purpose, for their own benefit in the Arbitration.

**c. Initiation of bankruptcy proceedings based on disputed claims.**

Finally, another reason that renders the bankruptcy of ELETSON HOLDINGS in bad faith and manipulated is that, while the filing of an involuntary bankruptcy petition of an obligor before the American Bankruptcy Court must be based on **actual and uncontroversial claims,** in this case, the aforementioned purported **Creditors of the first plaintiff knew, upon filing the involuntary bankruptcy petitions, the validly questionable nature of their claims.**

Thus, considering that the first intervener, despite the lack of debt to its purported Creditors, pursuant to a procedure directed against it, was put into a state of insolvency by the Court, which lacked this jurisdiction and therefore risked permanently losing the possibility of the management of its property and its general corporate affairs, has an obvious direct legitimate interest to be recognized with the power of res judicata that, both the Voluntary Bankruptcy Decision issued in New York on 10/25/2024 (Chapter 11) for ELETSON HOLDINGS (currently first plaintiff) and the other companies of the U.S. Bankruptcy Court - Southern District of New York issued in New York dated 25.10.2024, consisting of Judge John R. MASTANDO, as well as the Order dated 11/04/2024 of the same above Bankruptcy Court confirming the Decision of Voluntary Bankruptcy (Chapter 11) of ELETSON HOLDINGS dated 10/25/2024 (currently the first plaintiff) and the other companies, and the Amended Creditors Restructuring Plan, **does not have any consequence as to the first intervener company in the Greek legal order, nor is it binding, and that the first intervener company has not been declared by the above decisions under bankruptcy and/or is placed in any form of Restructuring/Restructuring.**

**Whereas** the first intervener has an self-evident legitimate interest in the exercise of the present intervention.

**Whereas,** further, the 2nd and 3rd intervener companies have a direct and legitimate interest in the exercise herein, as shareholders of the first intervener company, given that their financial interests are directly and inextricably linked to the autonomous operation of the first, ELETSON HOLDINGS Inc, and these interests are directly affected by the proceedings that were initiated against the above company, as the Amended Restructuring Plan provides for the annulment ("destruction") of the shares held by these companies for 40 consecutive years in ELETSON HOLDINGS.

**Whereas,** further, the 2nd and 3rd intervener companies have a direct and legitimate interest in the exercise herein, as shareholders of the first intervener company, given that their financial interests are directly and inextricably linked to the autonomous operation of the first, ELETSON HOLDINGS Inc, and these interests are directly affected by the proceedings that were initiated against the above company, as the Amended Restructuring Plan provides for the annulment ("destruction") of the shares held by these companies for 40 consecutive years in ELETSON HOLDINGS.

**Whereas** our intervention is admissible, valid in law and merit.

**Whereas** we will prove all our allegations with witnesses and documents.

**Whereas**, we hereby produce Fee Receipts for the Athens Bar Associations Nos. [hw:] *95553472*/2025 and........../2025 of article 61 of Law 4194/2013, for our signatory attorneys.

**FOR THESE REASONS**

**And with the explicit reservation of all our rights**


**WE HEREBY REQUEST**

- The acceptance of our current main intervention.

- That the application of the opposing party dated 02/03/2025 (General/Special Filing Number 25046/2025/43/2025), as well as the request to grant a temporary order (General/Special Filing Number 25252/20/2025).

- To convict the opposing litigant in our court expense.

**Athens, February 4, 2025**

**The Proxy Attorney**

[stamp:]
[signature]
K. F. CALAVROS LAW FIRM Chr.
PRILIOS - [illegible] Th.
KLOUKINAS  19A VRENA,
ATHENS 115-25 T.
21696037/002103698750
THEMISTOKLIS Th. KLOUKINAS,
ATTORNEY AT LAW, E:
koukinas@calavros.gr

[stamp:]
[illegible]

[stamp:]
[illegible]

[stamp:]
[illegible]

[emblem:]

**HELLENIC REPUBLIC**

COURT OF FIRST INSTANCE OF ATHENS

## LEGAL DOCUMENT FILING REPORT

Type of Legal Document: PRIMARY INTERVENTION

General Filing Number: 26019/2025

Special Filing Number: 46/2025

At the ATHENS FIRST INSTANCE COURT today, 02/04/2025 Tuesday, at 09:50 a.m., ELENI KLOUKINA with Athens Bar Association Number 041020 and Tax Registration Number 131698225, appeared before the Secretariat and filed the above legal document.

For this act, this report was drafted and lawfully signed.

Filed by                                                                                      The Secretary

ELENI KLOUKINA                                                        GEORGIOS IAKOVOU

## HEARING SCHEDULING ACT

Proceedings: MULTI-MEMBER-INSOLVENCY

Docket: P1

with Docket Number: 5

We hereby set as a discussion time on 03/19/2025, day Wednesday at 09:00 a.m. at the

ATHENS FIRST INSTANCE COURT, Building 6, Room 12

under the condition that said legal document be notified THREE (3) days prior to the trial.

ATHENS, 02/04/2025

Assessing Judge

DOVAS NIKOLAOS

**TRUE COPY**

ATHENS, 02/04/2025

The Secretary

*GEORGIOS [illegible]*

[stamp:]
[illegible]

[stamp:]
[signature]
K. F. [illegible] , [illegible] FIRM
K. F. CALAVROS LAW FIRM   CH. P.
FILIOS - Th. Th. KLOUKINAS   19
VRANA - ATHENS - 115 25   T.:
2103698700 - F: 2103698750
THEMOSTOKLIS TH. KLOUKINAS,
ATTORNEY AT LAW   E:
koukinas@calavros.gr

Without prejudice to any of my rights, competent bailiff to legally serve the present contract to Maria Orfanidou (Reg. No. 25791 [illegible] in her capacity as attorney of the purported restructured foreign company under the name "ELETSON HOLDINGS INC", which, per its articles of association, is based in Liberia, and **as a purported** registered office, has the center of its main interests in New York, **allegedly represented** by Adam Spears, pursuant to the Order dated 12/20/2024 of the Bankruptcy Court of the Southern District of the State of New York, for their information and for the legal consequences, at the same time being asked to attend the discussion, where and when specified above.

**Athens, February 4, 2025**

The proxy attorney

[stamp:]
[signature]
K. K. F. CALAVROS LAW FIRM   CH. P.
FILIOS - Th. Th. KLOUKINAS   19
VRANA - ATHENS - 115 25   T.:
2103698700 - F: 2103698750
THEMOSTOKLIS TH. KLOUKINAS,
ATTORNEY AT LAW
E: kletinas@calavros.gr

[blank page in source]

EXHIBIT "20"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/14/2025
```

-----------------------------------------------------------------------X
                    :

ELETSON HOLDINGS, INC. and ELETSON    :
CORPORATION,                         :
                    :

            Petitioners,       :          23-cv-7331 (LJL)
                    :

     -v-                  :           ORDER
                    :

LEVONA HOLDINGS LTD.,         :
                    :

            Respondent.     :
                    X
-----------------------------------------------------------------------

LEWIS J. LIMAN, United States District Judge:

For the reasons stated on the record during the hearing on February 14, 2025, the Court

GRANTS IN PART the motion of Petitioners Eletson Holdings Inc. and Eletson Corp. at Dkt.

No. 242. The request to displace Reed Smith LLP as counsel of record in this matter is granted.

Reed Smith is ordered to turn over to Petitioners' counsel of record Reed Smith's Eletson client

file as described in the oral ruling, on the schedule set forth on the record at the hearing. Any

motion to stay the Court's order shall be filed by February 24, 2025. Any opposition to a stay is

due March 3, 2025, and any reply by March 5, 2025.

The Clerk of Court is respectfully directed to close Dkt. No. 242.


SO ORDERED.

Dated: February 14, 2025
      New York, New York

                                 LEWIS J. LIMAN
                                 United States District Judge

EXHIBIT "21"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ELETSON HOLDINGS INC. and
ELETSON CORPORATION,

                    Petitioners,

            v.                          23 CV 7331 (LJL)

LEVONA HOLDINGS LTD.,

                    Respondent          Oral Argument

------------------------------x

IN RE:  ELETSON HOLDINGS INC.


                                        24 CV 8672 (LJL)

------------------------------x


                                        New York, N.Y.
                                        February 14, 2025
                                        10:05 a.m.

Before:

                    HON. LEWIS J. LIMAN,

                                        District Judge

1                          APPEARANCES

2   GOULSTON & STORRS PC
         Attorneys for Petitioner Eletson Holdings Inc. and Eletson
3        Corporation (23 CV 7331) and Appellant Eletson Holdings
         Inc. (24 CV 8672)
4   BY:  NATHANIEL R.B. KOSLOF
         JENNIFER FUREY
5
6   TOGUT, SEGAL & SEGAL LLP
         Attorneys for Petitioner Eletson Holdings Inc. (23 CV
7        7331) and Debtor Eletson Holdings and Appellees
         (24 CV 8672)
8   BY:  KYLE J. ORTIZ
9   DECHERT LLP
         Attorneys for Official Committee of Unsecured Creditors
10  BY:  DAVID A. HERMAN
11  QUINN EMANUEL URQUHART & SULLIVAN, LLP
         Attorneys for Respondent Levona Holdings Ltd. (23 CV 7331)
12  BY:  WILLIAM B. ADAMS
         ALEX VAN DYKE
13
14  REED SMITH LLP
         Attorneys for Petitioner Eletson Holdings Inc. and Eletson
15       Corporation (23 CV 7331) and Appellant Eletson Holdings
         Inc. (24 CV 8672)
16  BY:  LOUIS M. SOLOMON
         JOSHUA M. PELES
17       COLIN A. UNDERWOOD

18  RIMON, P.C.
         Attorneys for Debtor Eletson Holdings Inc. (24 CV 8672)
19  BY:  MICHAEL S. LAZAROFF

20

21

22

23

24

25

 1                    (Case called)

 2                    THE COURT:  Make the appearances for Eletson Holdings

 3      and then for the entity or the lawyers who say that they are

 4      representing Provisional Eletson Holdings, the board that was

 5      recognized by the Greek court.

 6                    Let me hear from Eletson Holdings' lawyers.

 7                    MS. FUREY:  Jennifer Furey, your Honor, good morning,

 8      from Goulston & Storrs, representing Eletson Holdings.

 9                    MR. KOSLOF:  Nate Koslof, also from Goulston & Storrs.

10                    MR. ORTIZ:  Good morning, your Honor, Kyle Ortiz of

11      Togut, Segal & Segal.  I represent the petitioning creditors in

12      the bankruptcy and then Eletson Holdings since the effective

13      date.

14                    THE COURT:  Do I have other lawyers at the front?

15                    MR. HERMAN:  Your Honor, David Herman from Dechert on

16      behalf of the Official Committee of Unsecured Creditors.

17                    MR. ADAMS:  Good morning, your Honor, William Adams

18      from Quinn Emanuel on behalf of Levona.  With me is my

19      colleague, Alex Van Dyke.

20                    THE COURT:  At the back table.

21                    MR. SOLOMON:  Good morning, your Honor, Lou Solomon

22      from Reed Smith.

23                    MR. PELES:  Good morning, your Honor, Josh Peles from

24      Reed Smith.

25                    MR. LAZAROFF:  Good morning, your Honor, Michael

1   Lazaroff from Rimon, P.C.

2            MR. UNDERWOOD:  Good morning.  Colin Underwood from

3   Reed Smith.

4            THE COURT:  Good morning.

5            I'll hear first from the lawyers at the front table.

6            I have given each side 45 minutes.  The lawyers at the

7   front table can reserve as much time as they want, and then

8   I'll hear from the lawyers at the back table.

9            MS. FUREY:  Thank you, your Honor.

10           THE COURT:  Ms. Furey, how much time do you want for

11  rebuttal?

12           MS. FUREY:  I would like to save 15 minutes for

13  rebuttal, your Honor.

14           THE COURT:  Do you want a warning when you come close

15  to the half-hour mark?

16           MS. FUREY:  That would be great, if you don't mind,

17  your Honor.

18           THE COURT:  At what point?

19           MS. FUREY:  Twenty-five minutes in.

20           THE COURT:  You may proceed.

21           MS. FUREY:  Your Honor, I represent Eletson Holdings

22  Inc.

23           I would like to start with the joint motion filed by

24  Eletson Holdings, the appellees and the creditors committee, to

25  strike the notices of appearance and the notice of appeals

1    filed by Rimon and Reed Smith, and that's at docket 27.

2           The Court should grant the joint motion to strike the

3    notices of appearance of attorneys Charles Acampora and Michael

4    Lazaroff because neither one of them has been retained by

5    Eletson Holdings Inc., as set forth in the declaration of Adam

6    Spears.  That's docket 29.

7           The Court should also grant the joint motion to strike

8    the notice of appeal because those attorneys were not

9    authorized to file the appeal on behalf of Eletson Holdings or

10   the dissolved entities, Eletson Finance, or Agathonissos

11   Finance LLC.

12          This is very straightforward.  Reed Smith and Rimon

13   admit that they do not currently represent Eletson Holdings

14   Inc.  As a result, the notice of appeal, which is at docket

15   number 24, in which these attorneys file on behalf of Eletson

16   Holdings Inc., is improper.

17          THE COURT:  Can you help me, Ms. Furey, with one

18   thing.

19          One of the arguments that I've heard has to do with

20   the frustration of the ability to challenge the plan of

21   confirmation.  There were, as I understand it, three plans

22   before the bankruptcy court:  Two of them were presented by the

23   petitioning creditors, one was presented by the debtors.  The

24   petitioning creditors' plan was confirmed by the bankruptcy

25   court.

1              Is that all correct so far?

2              MS. FUREY:  That is absolutely correct, your Honor.

3              THE COURT:  If there was to be a challenge to the plan

4    that was confirmed by the bankruptcy court, who could have

5    brought that challenge to this court and then, presumably, up

6    to the Second Circuit?

7              MS. FUREY:  The former directors, officers, and

8    shareholders could have lodged a notice of appeal, your Honor,

9    and did not.  They also could have sought a stay pending

10   appeal, and they did not.

11             THE COURT:  That would have been in their capacity as

12   debtors in the bankruptcy court?

13             MS. FUREY:  Correct, your Honor.

14             And by not doing so, in essence, as of the effective

15   date, on November 19, 2024, Eletson Holdings Inc. is the same

16   entity as before, but with new management and new owners.

17             At that point Eletson Holdings Inc. is not losing any

18   appellate rights.  It has appellate rights.  It's just those

19   appellate rights are controlled by new management and new

20   ownership, and that new management and new ownership has made a

21   decision, as it has every right to do, to not pursue that

22   appeal.

23             If the former shareholders, former officers, former

24   directors wanted to appeal from the confirmation order, they

25   could have.  If they wanted to move to stay, they could have.

1   If they wanted to seek to intervene in this court, they could

2   have.  They have done none of that.

3          So what we are left off, your Honor, is a situation

4   where it is undoubtedly true that there is only one Eletson

5   Holdings.  Your Honor has said that, Judge Mastando has said

6   that as recently as his January 24 oral ruling.  That's

7   consistent with the plan.  It's consistent with the

8   confirmation order.  It's consistent with the bankruptcy code.

9   There is only one Eletson Holdings.

10         So when an appeal is lodged, your Honor, by attorneys

11  that don't represent Eletson Holdings --

12         THE COURT:  Doesn't that presume -- one of the

13  questions in front of me, as I understand it, the Greek court

14  has appointed a provisional board with respect to Eletson

15  Holdings.  What's your answer to the notion that that

16  provisional board appointed Mr. Solomon and, therefore, they

17  are competing boards of Eletson Holdings?

18         MS. FUREY:  The provisional board was appointed on an

19  *ex parte* basis and its legitimacy has not been confirmed, and

20  that will be dealt with later in Greece.

21         Even putting that aside, we are not in Greece, your

22  Honor.  We are in the United States.  And there is, under

23  straight bankruptcy law, under the orders of both the

24  bankruptcy court, through Judge Mastando, and your Honor, there

25  is just but one Eletson Holdings, and that is the entity that

1   was reorganized that submitted itself voluntarily through a

2   Chapter 11 bankruptcy, and was reorganized as such.

3          Now, it's our position this provisional board doesn't

4   exist, and we plan to pursue such in Greece.  But, also, this

5   so-called provisional board hasn't submitted itself to the

6   jurisdiction of this court.  If this is somehow a separate

7   entity, then -- it hasn't sought to intervene.  It hasn't filed

8   its own notice of appeal.

9          THE COURT:  The Greek order has not been recognized by

10  this Court.  Is there a mechanism by which that order could be

11  recognized by the U.S. court?

12         MS. FUREY:  I might have to -- perhaps, your Honor.  I

13  actually don't know the answer to that.  Maybe Mr. Ortiz, who

14  is going to be speaking after me, from Togut --

15         THE COURT:  Mr. Ortiz will explain why Mr. Solomon has

16  misquoted Mr. Ortiz's article.

17         MS. FUREY:  I am definitely --

18         THE COURT:  I don't know whether Mr. Solomon has or

19  not, but we do have the author in front of us.

20         MS. FUREY:  I feel like the author is in a much better

21  position to explain that than myself.

22         I will have to say that they have not sought any sort

23  of recognition of this Greek order.  And the important part is,

24  this Court's -- what we are seeking is to enforce -- and this

25  is both in the bankruptcy court and in front of your Honor --

1    we are seeking to enforce orders within the United States -- in

2    United States courts over parties who are within the

3    jurisdiction of the United States Court.

4           So we are not asking this court, nor were we asking

5    the bankruptcy court, to control behavior abroad.  We are

6    controlling behavior in the United States for individuals who

7    are within the jurisdiction of this Court.

8           THE COURT:  I've got one more question, which may go

9    to you, may go to Mr. Ortiz, but there are various arguments

10   that are being made in front of me about the need for the Greek

11   court and for the court in Liberia to take certain action in

12   order for Eletson Holdings to function, the reorganized Eletson

13   Holdings to function.

14          Those arguments, at least as I read Mr. Ortiz's

15   article, go to the feasibility, and I'm wondering whether any

16   of those arguments that are now being made about the Greek

17   court and the Liberian court were made in the bankruptcy court

18   in challenging the feasibility of the petitioning creditors'

19   plan.

20          Is that a question for you or for Mr. Ortiz?

21          MS. FUREY:  It can be for both.

22          I can tell your Honor, I can answer that.  The answer

23   is no.  That is, nowhere in the plan, nowhere in the

24   confirmation order does it state that the plan needed to be --

25   needed foreign recognition for Liberia and Greece, and in a

1   whole week-long bankruptcy trial not once was it raised.

2          Judge Mastando just actually rules, in his oral ruling

3   in the transcript that's attached to my declaration, your

4   Honor, he ruled -- he rejected this notion of foreign

5   recognition and/or that it was contemplated by the plan.  He

6   said -- this is on page 36 of the transcript.  Judge Mastando

7   rules:  The Court agrees with Reorganized Holdings, that just

8   because the plan references compliance with applicable law does

9   not mean that there is applicable law that needs to be applied

10  here or that it's not being followed.

11         The essence, and Mr. Ortiz certainly will speak to

12  this more, but the essence of his ruling was that he was

13  ordering -- in a sanction setting he was ordering conduct by

14  individuals and entities that had submitted to his court

15  voluntarily, and that he had -- this wasn't a comity issue at

16  all or even a question of extraterritorial reach.  This is a

17  question of the ability of the court to order compliance with

18  the bankruptcy plan, enjoin interference with that plan, and

19  order actions to be taken, and it did.  Judge Mastando ordered

20  these parties, over objections that they were violating Liberia

21  and Greek law, ordered them to take actions to implement the

22  plan in Liberia through the AOR.

23         THE COURT:  What's the status of that?  Have those

24  actions been taken?

25         MS. FUREY:  No, your Honor.  And there was a motion

1  that was filed in the bankruptcy court recently for violating

2  that second court order, the January 24 order, because not only

3  have no actions been taken to cooperate, but there is actually

4  active activity to thwart the implementation of the plan.

5          Even after Judge Mastando's January 24 order, there

6  have been filings to opposing recognition and opposing the

7  recognition of Adam Spears, for example, the CEO of Eletson

8  Holdings, as a foreign representative.

9          Not only has there not been cooperation, but there has

10 been outright refusal and outright interference with that

11 foreign recognition.

12         In fact, arguments have been made that go so far as

13 arguing in Liberia and Greece that the bankruptcy court didn't

14 have jurisdiction ever.

15         THE COURT:  It is quite an argument when somebody

16 submits themselves voluntarily to the jurisdiction of a United

17 States court.

18         Go ahead.

19         MS. FUREY:  Not only that, your Honor, but in the

20 marketplace as well.

21         This is why Eletson Holdings is so in need of closure

22 and clarity.  Not only are they filing, actively filing abroad,

23 oppositions and motions to try to redo and undo the plan, but

24 they are filing -- they are submitting press releases, and this

25 is attached to the Furey declaration at -- it's docket 60-3.

1          THE COURT:  I really don't need to get into those

2    issues as to whether the provisional board is frustrating or

3    the lawyers appointed by the provisional board are frustrating

4    the ability of Eletson Holdings to operate.  That's an issue

5    for the owners now of Eletson Holdings, the creditors of

6    Eletson Holdings, to raise.

7          One other question for you, though.  It has to do with

8    the plan as confirmed.  Can you refresh me as to how it's

9    funded, who the creditors are besides Pach Shemen, and how the

10   plan is being funded.  Whose interests are we talking about?

11         MS. FUREY:  I am going to defer to Mr. Ortiz on that

12   question, your Honor.  I have a general understanding, but his

13   understanding is far more deep on that.

14         Your Honor, as far as the motion to strike, this Court

15   has inherent authority to strike an unauthorized notice of

16   appeal, and it should do so.

17         First I'd like to just address the Court's authority

18   and how it can do so, and that is -- again, it has an inherent

19   right to do so.  This is well established.

20         It is also well established in the Second Circuit that

21   a notice of appeal isn't a complete divestiture of this Court's

22   jurisdiction and ability to act on the notice of appeal, that

23   there are exceptions that exist, and the exceptions that exist

24   are if the appeal is deficient or frivolous.  This appeal is

25   both deficient and frivolous.

1          In fact, Reed Smith admits in its own motion to

2     strike, which is docket 46 on page 14, that a district court

3     may strike an appeal if the appeal flies in the face of

4     controlling law.

5          It is controlling law, your Honor, that an attorney

6     may not file a notice of appeal for a client he or she does not

7     represent.  In *U.S. v. Rodgers*, the Second Circuit made clear

8     that the rule of jurisdictional divestiture upon filing of a

9     notice of appeal is not absolute.  If the appeal is improper or

10    unauthorized, the district court maintains jurisdiction.

11         And In *United States of America For the Use and*

12    *Benefit of Browne & Bryan Lumber Company v. Massachusetts*

13    *Bonding and Insurance Company*, 303 F.2d, 823, the Second

14    Circuit stated that the district court had the authority to

15    strike a notice of appeal that was filed by an attorney who was

16    not authorized to file the appeal.  In *Twelve John Does v.*

17    *District of Columbia*, 117 F.3d 571, that's D.C. Circuit 1997,

18    and this is relied upon by the *Patel v. Wooten* case which is in

19    footnote 7 of our reply brief, the district court properly

20    struck a notice of appeal filed by a nonparty.

21         Your Honor may also rely --

22         THE COURT:  Give me that case again.

23         MS. FUREY:  It's *Twelve John Does v. District of*

24    *Columbia*, 117 F.3d 571.

25         THE COURT:  In that case it did strike the notice of

1    appeal filed by one of the parties, but it actually didn't have

2    the effect of divesting the circuit court entirely of its

3    jurisdiction because there was a coappellant, correct?

4            MS. FUREY:  I believe there were multiple appellants

5    in there, and I believe that they struck -- they struck because

6    they found one of the appellants to be a nonparty, they struck

7    on that basis.

8            THE COURT:  But the proposition you're arguing under

9    *Rodgers* would have the effect of saying to a district court

10   that even after the notice of appeal is docketed, the district

11   court has the authority to divest the circuit court of its

12   jurisdiction, and I had thought -- leave aside what I thought.

13   Mr. Solomon has argued that the docketing of the appeal is what

14   vests the Court of Appeals with jurisdiction.

15           MS. FUREY:  Right.  In the Second Circuit, unlike a

16   lot of the cases cited by Reed Smith are outside the Second

17   Circuit, and in the Second Circuit it's clear that that rule is

18   not absolute and that there are exceptions for when the notice

19   of appeal is unauthorized or otherwise frivolous, even as Reed

20   Smith notes, when it is contrary to controlling law, which this

21   is.

22           Here, of course, your Honor may also rely on the

23   January 23 order from the Second Circuit where Honorable Gerard

24   Lynch issued an order staying the purported appeal and noting

25   that your Honor will consider the stipulation of dismissal and

1    Eletson's motion to strike.

2            THE COURT:  And he asked the parties to report on the

3    status.  What do you take of that language?  How do you

4    interpret that language?

5            MS. FUREY:  I interpret that as if your Honor was to

6    go ahead and strike that motion that we would report back on

7    that status.

8            I also note how that order was transmitted to this

9    court in the ECF docket entry was as a mandate.  It's entitled:

10   Transition of U.S.C. 8 mandate/order to the district court.

11   That's on the docket entry.

12           And, notably, Reed Smith admits that this Court

13   retains jurisdiction when a mandate is transmitted to it.

14   That's at Reed Smith opposition at 10.

15           Of course, at the very least, your Honor could offer

16   an indicative ruling, under Rule 62.1, stating that the notice

17   of appeal was unauthorized and recommending dismissal of the

18   appeal.

19           Your Honor should exercise your authority, both under

20   your inherent powers and as dictated by the recent Second

21   Circuit mandate.

22           As I just stated --

23           THE COURT:  I do want to make sure that you address

24   the turnover of the files, if that is of interest to you.

25           MS. FUREY:  Yes.

1          Let me just say this on this point.  The notice of

2    appeal is not only facially deficient, because the attorneys

3    filing it on its behalf don't represent the parties on the

4    notice of appeal, and/or their clients, whether it be

5    Provisional Holdings or the former officers, directors, are not

6    party to the notice of appeal, nor could it be.  It's facially

7    deficient.  Also because they didn't appeal the confirmation

8    order, they don't have standing, your Honor.

9          But also it actually goes further than that.  By

10    taking the position they are taking, which is that there is

11    more than one Eletson Holdings, that they have authority to

12    represent this so-called entity, and that Goulston & Storrs, on

13    behalf of Eletson Holdings, doesn't have authority, all of that

14    violates the bankruptcy plan, Judge Mastando's order, and this

15    Court's December order.  It's facially deficient.  It's also

16    sanctionable.  And for that reason we believe that this Court

17    can address it.

18          Your Honor, I'll turn now to the turnover.  Eletson

19    Holdings --

20          THE COURT:  Let me just highlight for you a couple of

21    questions I have on the turnover.

22          One has to do with the retaining lien over the

23    documents.  There is an argument made that Reed Smith was doing

24    work for Corp. as well as Holdings Corp. was not a debtor in

25    the bankruptcy, and it's asserted a lien over the documents.

1    I'd like to hear your response to that argument.

2              MS. FUREY:  Sure, your Honor.

3              There is no lien over the documents.  The plan is

4    clear that all liens have been discharged, not just for Eletson

5    Holdings, but for all of its subsidiaries as well, including

6    Eletson Corp., which is a wholly owned subsidiary of Eletson

7    Holdings.

8              THE COURT:  Do you want to tell me where in the plan

9    it says that.

10             MS. FUREY:  Yes.  I believe it's Section 5.13 of the

11   plan, which is that any lien was discharged as of the effective

12   date of the plan.

13             THE COURT:  How is it clear that that applies not just

14   to Holdings but to its wholly owned subsidiary?

15             MS. FUREY:  There is language in the plan that all

16   property and debts of the estate include all of its wholly

17   owned subsidiaries.  I don't have the cite right now.  I know

18   it's in our brief, your Honor.

19             I am looking at Mr. Ortiz as backup.  If not, I can

20   get it when Mr. Ortiz is speaking and get it for you, your

21   Honor.

22             Also, and this is important --

23             THE COURT:  You also ask for documents regarding the

24   monetization of the award.  Tell me what specifically you're

25   looking for in terms of monetization and why, if I were to

1    order a turnover, it would apply to the monetization.

2          MS. FUREY:  I believe that means through potential

3    confirmation proceedings and activities that -- the activities

4    that's been done by Reed Smith on behalf of its clients to try

5    to thwart the plan, to be honest with your Honor, using the

6    arbitration award to do what they have been doing abroad, which

7    is causing --

8          THE COURT:  Certainly as of the moment that Reed Smith

9    was terminated by the new management, I wouldn't think that you

10   have any rights to the records.  You would be arguing out of

11   both sides of your mouth on that.

12         MS. FUREY:  That's very fair, your Honor.  We are

13   seeking records through the effective date, which is

14   November 19.

15         THE COURT:  What about the date on which they were

16   appointed by the provisional board, which is a couple of days

17   before that?

18         MS. FUREY:  We don't believe that is meaningful, your

19   Honor.  To go to --

20         THE COURT:  If there is an entity that's recognized by

21   foreign law that signs an engagement letter with a set of U.S.

22   lawyers, one would think -- there, as a matter of comity, I

23   would respect the decision of that foreign court to recognize

24   the provisional board and allow it to have lawyers.  That seems

25   to me to be hard to argue against.

1              MS. FUREY:  I would say that the date upon which Reed

2     Smith admitted to termination of Eletson Holdings, which is, I

3     believe they had said November 19 would control, but at the

4     same time two days earlier is fine as well, as long as it's not

5     any sort of admission on our part that there is any legal

6     impact of that provisional order, because it's a provisional

7     order.

8              Just on the fees and the lien question, I just wanted

9     to make one more point, your Honor, which is, Reed Smith did

10    submit its fee application to the bankruptcy court for services

11    rendered to both Corp. and to Eletson Holdings in line with the

12    plain language that I just quoted to you, and they were paid.

13    And so I think --

14             THE COURT:  I'm sorry.  They were paid?

15             MS. FUREY:  They were paid.

16             THE COURT:  In full?

17             MS. FUREY:  Every application that they have submitted

18    has been paid.  I believe, and, again, Mr. Ortiz can speak to

19    this more clearly, I think there were three different tranches.

20    The first two have been paid.  The third is pending, I believe.

21    But they have been paid a substantial amount of money under

22    this bankruptcy plan that they claim is ineffective until

23    foreign recognition occurs.

24             Again, they submitted not just bills for their

25    services for Eletson Corp. -- Eletson Holdings, but also

1    Eletson Corp., your Honor.

2               THE DEPUTY CLERK:  Five minutes.

3               THE COURT:  You want to give Mr. Ortiz time?

4               MS. FUREY:  Thank you, your Honor.

5               THE COURT:  Mr. Ortiz, why don't you quickly answer

6    the questions that I raised that have not been answered, and

7    then tell me anything else you want to tell me.

8               MR. ORTIZ:  Good morning, your Honor, Kyle Ortiz of

9    Togut, Segal & Segal.

10              I'm happy to do that.  I was trying to work them into

11   what I was going to say, but I can try to hit them off the bat

12   in the first instance.

13              With regard to the question on the fees, there are

14   interim fee applications as you go.  You typically get paid 80

15   percent and there is a 20 percent holdback, so there is a

16   holdback.  I believe they have been paid roughly $10 million

17   during the case, but there are substantial amounts still

18   outstanding.

19              And I will be fully transparent with your Honor.  We

20   do have a motion to attempt to disgorge all of those fees, as

21   we believe they have been representing the former shareholders

22   and former directors, as opposed to the estate, in the entire

23   case.

24              With regard to your question on planned funding, the

25   plan was funded through an equity rights offering of $53.5

1    million.  That was funded by an affiliate of Pach Shemen.

2    Those funds were then used to pay the distributions to all of

3    the various creditors.  Those funds did leave our hands and are

4    now in the hands of a distributing agent to distribute those

5    funds to the creditors, and part of those funds were in fact to

6    do things such as pay the professional fees of certain

7    professionals in the case, including Reed Smith, that were then

8    due as of the effective date, and to repay the

9    debtor-in-possession loan.

10            Your Honor, if there are other specific questions that

11   you think are still pending before I get into the remarks --

12            THE COURT:  Two things.

13            One is, the definition of the estate as covering the

14   subsidiaries and, second, the citation of your article with

15   Messrs. Cooper and *et al.*

16            MR. ORTIZ:  Yes, your Honor.

17            Section 5.2(c) of the plan, which I believe I actually

18   read to your Honor the last time I was here, at least on the

19   phone, says that Reorganized Holdings on the effective date --

20   except otherwise provided in this plan, Reorganized Holdings

21   may operate its business --

22            THE COURT:  I see that.

23            Just to be more precise, the question in my mind is,

24   the lien against Holdings was released by the plan.  Mr.

25   Solomon has argued that there is a separate lien against Corp,

1    that Holdings and Corp., as I understand his argument, are

2    jointly and severally liable.  If Holdings hasn't satisfied the

3    bill, then Corp. has to satisfy the bill.  He says he therefore

4    has a lien.

5           You have argued that lien has been discharged.  What

6    is it in the plan that discharges the obligations of Corp. to

7    pay Reed Smith?

8           MR. ORTIZ:  Your Honor, I don't believe that those

9    have been discharged under the plan.  Under the plan we become

10   the owners of Corp.

11          There is now an open dispute about whether they truly

12   represented Corp. or Holdings at any point or if they were

13   representing the former officers and directors, but I don't

14   think it would be correct to say that the plan itself removed

15   those liens.  The plan itself removed all the liens with

16   regards to Holdings and then also provided to Holdings the

17   ownership of the corporate entities below it.  But I don't

18   think it would be -- it's an entirely accurate statement to say

19   that the plan itself discharges those liens, your Honor.

20          THE COURT:  Ms. Furey, when she gets up on rebuttal,

21   will tell me why there isn't an attorney lien that prevents the

22   turnover of the documents to Eletson.

23          Tell me what else you want me to know.

24          MR. ORTIZ:  Your Honor, to address the article is

25   really kind of the substance of what I wanted to talk to you

1   about.

2          I think Ms. Furey did a good job of talking about the

3   simplicity of what we are talking about, and what the former

4   officers' and directors' counsel is going to do is try to dress

5   up lofty sounding concepts that are just absolutely irrelevant

6   to this issue.  Those include preemption, comity, and

7   recognition.

8          And the reason that is, your Honor, is because we

9   aren't asking any foreign government, any foreign regulatory

10  body, or any foreign court to do anything.  I think Judge

11  Mastando did a great job in his decision from two Fridays ago

12  of explaining what we are really doing, and the only party that

13  we need anything from is a party that was right here in the

14  jurisdiction of this court.

15         I would turn your Honor to the transcript from the

16  hearing on two Fridays ago.  Does your Honor have that in front

17  of you?

18              THE COURT:  I have that.

19              MR. ORTIZ:  Page 34, line 3 of that transcript.  Judge

20  Mastando, in discussing preemption, says:  This argument misses

21  the point because this Court is not seeking to displace foreign

22  laws here with this Court's order but to enforce the

23  confirmation order, which may involve implementing corporate

24  acts in a foreign jurisdiction.  That, your Honor, is the key.

25              THE COURT:  Am I correct, Mr. Ortiz, in understanding

1   that the import of your article is that the foreign recognition

2   and the challenges with the foreign recognition may have two

3   impacts.  One is, it may go to the feasibility of any plan if

4   the U.S. debtor has substantial operations abroad and would

5   need recognition to engage in those activities.  If recognition

6   is at issue, that may go to feasibility, number one.

7          And, number two, postconfirmation it may make it

8   difficult for the reorganized entity to operate and to pay off

9   the creditors and do everything that a reorganized entity

10  should do.

11         MR. ORTIZ:  Essentially, your Honor.

12         What the article really gets to, and I think the

13  distinction is, the article notes that there are certain

14  foreign regimes where there are restrictions on the transfer of

15  stock or the ability to raise additional capital without giving

16  a essentially right of first refusal to certain shareholders.

17  Liberia is not one of those jurisdictions, which is why we

18  didn't go through that.

19         And the issue that we raised is, this is something

20  that if it is an issue, you need to be thinking about because

21  somebody could raise a very feasibility argument and say, this

22  plan is impossible to do.

23         Of course, we had a confirmation hearing and nobody

24  raised any feasibility concerns because the party that we

25  needed to do something was present in this jurisdiction, and I

1   think that gets, your Honor -- and I probably don't need to

2   explain this to you -- the entire purpose of recognition.

3          Recognition is when you have somebody who is not

4   present in this jurisdiction that you need to enforce the order

5   on, but you can't do anything with that order because they are

6   not here.  They are only in another jurisdiction.

7          The big difference here is that the party that we need

8   to do something isn't a foreign body.  It isn't contrary to

9   foreign law.  We went through that with Judge Mastando two

10  weeks ago.

11         The party that we need to do something not only is

12  present in this jurisdiction, as your Honor pointed out, they

13  are the very party that evoked the jurisdiction of this Court.

14         I think it just would completely obliterate concepts

15  of comity if you could seek the relief of our courts, go

16  through a year-and-a-half-long process, and then, only when you

17  lose, claim you are not bound by it until there is recognition

18  in other places.

19         That's why, your Honor, our plan -- at no point in our

20  plan or the confirmation order do the words recognition,

21  Liberia, or Greece appear, because the issues that come up in

22  this article weren't present here because we had the parties we

23  need, subject to Judge Mastando's jurisdiction.

24         And honestly, your Honor, the point of the article is,

25  you need to deal with these issues if you're in a jurisdiction

1   where these issues exist, because I'm not even sure, if the

2   issues exist, that recognition would be sufficient.

3          But in this case we aren't dealing with a jurisdiction

4   where you can't cancel the shares.  That's something that we

5   talked about during a trial that we had that Judge Mastando

6   ruled on just recently.

7          I just want to note, again, the way Judge Mastando

8   talked about this I thought was really -- brings home the

9   point, which is, despite -- your Honor, this is page 39,

10  starting at line 24.

11         THE COURT:  Mr. Ortiz, your time is up.  I'll give you

12  30 seconds.

13         MR. ORTIZ:  I just want to note, your Honor, that

14  there is a timeline here that's very important.  The things

15  that are happening in Greece that they want to point to, those

16  were instigated post entry of the confirmation order, when they

17  were enjoined from taking such actions.  So what they are

18  really wanting this Court and the bankruptcy court to allow

19  them to do is to get multiple bites to collaterally attack an

20  order and a process that they fully partook in.

21         THE COURT:  Thank you.

22         Whatever you didn't cover you can cover in your 15

23  minutes of rebuttal.

24         Mr. Solomon.

25         MR. ORTIZ:  Thank you, your Honor.

1            MR. SOLOMON:  Thank you, your Honor.

2            I think Mr. Lazaroff is going to address the

3    jurisdictional issue, and then I would like to be heard.

4            THE COURT:  Do you want, Mr. Solomon, a notice at five

5    minutes?

6            MR. SOLOMON:  That would be great.  I have my own

7    timekeeper, but that would be great.

8            MR. LAZAROFF:  Your Honor, Michael Lazaroff from Rimon

9    P.C. on behalf of the entity that you're calling here

10   Provisional Eletson Holdings.

11           THE COURT:  Who do you represent?

12           MR. LAZAROFF:  We represent Eletson Holdings Inc., a

13   corporation that is incorporated in Liberia with the principal

14   main center of interest in Greece and exists under Greek and

15   Liberian law.  There have been two declarations -- more than

16   two, but from two declarants -- of both Greek and Liberian law

17   presented to this Court that explain to this Court --

18           THE COURT:  I have read them.  They don't quite say

19   what you say that they say.  They do talk about the recognition

20   of those entities abroad.  Neither of them actually say that

21   the provisional board is recognized in the United States or

22   that the Reorganized Holdings is unable to act in the United

23   States.

24           Is it your proposition that if Reorganized Holdings

25   wants to hire somebody to do janitorial work that your client

1   is the one in the United States that has to hire them?

2          MR. LAZAROFF:  I am going to defer to Mr. Solomon.

3          My main issue is jurisdiction.  However, I just want

4   to note that I believe -- certainly Mr. Daniolos did say that

5   the entity exists in Greece.

6          THE COURT:  He does say that.

7          MR. LAZAROFF:  Therefore, we can represent an entity

8   that exists under Greek and Liberian law.

9          THE COURT:  He does say what you have just said.  It

10  existed in Greece.  It doesn't say that it exists in the United

11  States.

12         MR. LAZAROFF:  That's, in fact, I believe, the issue

13  that is under appeal at the moment, but as I said, I am going

14  to defer to my cocounsel, Mr. Solomon, to discuss that at

15  greater length.

16         Here, though, I am going to discuss the jurisdictional

17  issue.  If this Court were to grant either the motion to strike

18  the notice of appeal or so-order the so-called voluntary

19  stipulation of withdrawal of appeal after a notice of appeal

20  had been filed and after the appeal had been docketed in the

21  Second Circuit, I believe, from what I have seen, it would be

22  the first case that, at least anyone in this court sitting here

23  today, has cited where that happened in a manner that would

24  completely get rid of the appeal, as your Honor noted earlier.

25         THE COURT:  Does the Second Circuit have the

1    authority, once a case has been docketed, to remand it to the

2    district court to consider a stipulation of dismissal?  Does it

3    have that power within it if it doesn't want to do it itself?

4         MR. LAZAROFF:  If it issued the mandate to come back

5    to the Court, as it says in *United States v. Rivera*, the way

6    that a mandate is returned to the district court is -- and I'll

7    quote from the case.  In either case, the clerk of the court

8    signs her name on a copy of the judgment to order that is

9    stamped mandate.  And I'm just adding now.  It's in all caps in

10   the case at the top of the first page, a true copy at the

11   bottom of the last page.  In this case --

12        THE COURT:  What's the case?

13        MR. LAZAROFF:  *U.S v. Rivera*, 844 F.2d 916, 920 (2d

14   Cir. 1988).  It is cited in our reply brief.

15        If one looks at the order staying the appeal from the

16   Second Circuit, you will not see the word mandate in large

17   letters on it, so I don't believe that the mandate has been

18   returned to this court.  As we argued in our reply brief --

19        THE COURT:  How do you read the entry that they put in

20   the docket saying mandate?

21        MR. LAZAROFF:  I believe, from my experience, that

22   whenever they are transmitting an order back to the Court, even

23   when it's not transmitting the mandate back to the court,

24   that's what they just do.  I don't have a cite for that.  I

25   just noticed that on dockets in the past.

1          THE COURT:  Your argument is that the circuit has the

2    authority to return it to me to consider a stipulation of

3    dismissal, but that they would have to do that by issuing the

4    mandate, and they have not issued the mandate.

5          Am I understanding your argument correctly?

6          MR. LAZAROFF:  That is correct, your Honor.  I think

7    there are other procedural things that would need to be done in

8    addition -- I believe one when the mandate comes back, I think

9    everything comes back.  I am not sure if they can do it

10   piecemeal in the way your Honor is suggesting, but had they

11   done so, then they would have done so.  However, even the

12   language of the stay order itself doesn't say anything about

13   granting your Honor leave to consider the motion.  It said that

14   your Honor indicated an interest in doing so, and they are

15   staying the appeal, and they want a report.  And as we --

16         THE COURT:  Yes.  But they want a report on the

17   status.  The word that they used was status.  What do you make

18   of that word?  Status isn't asking for my reasoning.  Status

19   tends to connote, is the appeal active or is it not active?

20   Isn't that what status refers to?

21         MR. LAZAROFF:  It could, your Honor.

22         I believe that if one looks again at the language of

23   the stay order, the Second Circuit noted that your Honor had

24   indicated an interest in considering the underlying stipulation

25   that is itself on appeal, meaning they seemed to have thought,

1  and I don't know for sure, I'm not a mind reader but I'm

2  looking at the language in that order, they seem to have

3  thought that your Honor was going to reconsider the question of

4  the order, which is ECF 20, which itself was so-ordering a

5  nearly identical stipulation of voluntary withdrawal.

6          However, even if we say that isn't their intention, I

7  think their words certainly strongly indicate that, even if it

8  wasn't their intention.

9          There was no briefing in front of the Second Circuit.

10  I believe the Second Circuit saw that there was a question

11  being brought to your Honor, maybe they understood it the way I

12  just said, maybe they didn't.  In order to let the record be

13  complete, they simply said, we are going to stay the appeal,

14  and we want a report on the status of the appeal thereafter.

15  If your Honor to were to say, your Honor has -- as I believe

16  your Honor should, that you don't have jurisdiction to rule,

17  then the appeal will go forward.  I believe, either way, we are

18  going to argue to the Second Circuit the appeal should go

19  forward.

20          The reason that you don't find cases where a district

21  court grants a motion to strike a notice of appeal or so order

22  a stipulation of voluntary withdrawal is because of the

23  well-established case law that says that once -- first step,

24  once a notice of appeal is filed, the district court is

25  divested of jurisdiction over everything that deals with all

1   aspects of the appeal.  That's *United States v. White*.  That

2   would include the question of whether the appeal goes forward.

3          If your Honor could sit here now and strike the notice

4   of appeal or your Honor could so order another withdrawal, then

5   your Honor's initial order would essentially be nonappealable,

6   and I don't think the United States jurisprudence recognizes

7   any such thing, and that's why you have so many cases where

8   that doesn't happen.

9          Now, it is true, as our opponents have indicated, that

10  there are exceptions to the concept of divestiture.  But in

11  none of those cases, not one of them that they cited, was --

12  certainly not in the Southern District of New York and the

13  Second Circuit, and the one case from the District of Columbia,

14  your Honor correctly noted, did not get rid of the appeal.

15         But in all of those cases what's happening is, the

16  district court will weigh in as to whether a particular appeal,

17  in their opinion, is unfounded, it is frivolous, it is

18  defective in order to allow the district court to not have to

19  delay in dealing with other aspects of the case.  Maybe it's to

20  go to trial.  Maybe it's to consider sanctions.  Maybe it's to

21  deal with an errata sheet.

22         THE COURT:  Your proposition is that a total impostor

23  could come into any of the courtrooms in this building, observe

24  what's happening, file a notice of appeal as a pretender, and

25  stop the Court in its tracks.

1            MR. LAZAROFF:  No, your Honor, I didn't say that.

2            First of all, that's not what's happening here.  But

3    assuming that to be a hypothetical, I don't believe so because

4    it would not stop what's happening here in its tracks, but your

5    Honor would not be able to dismiss the appeal.  The Second

6    Circuit would have to dismiss the appeal, which I assume would

7    happen relatively quickly, because there would be a motion to

8    the Second Circuit to dismiss the appeal, because who are these

9    people, they have no relationship to anything, and the complete

10   impostor wouldn't be able to justify their presence to the

11   Second Circuit.

12           THE COURT:  If the notice of appeal said, we are

13   appealing everything, then, under your argument, as I

14   understand it, there would be nothing collateral, nothing

15   remaining in the district court, and, therefore, the impostor

16   could halt all proceedings.

17           MR. LAZAROFF:  There are two possibilities, I think.

18   One is an interlocutory appeal before there is a final

19   decision, in which case a motion would be made to this Court to

20   recognize those exceptions, and this Court would be able to do

21   everything other than get rid of the appeal.  They could go

22   forward, if there was a trial to be had.  They could issue

23   sanctions.  They could issue costs.  They could do all the

24   normal things they would do, and that's exactly what the Second

25   Circuit is talking about.

1        In every case they are talking about not having the

2   district court be stopped from dealing with aspects of the case

3   while the Second Circuit goes through the motions of eventually

4   dismissing the appeal, which is what happens in, I think,

5   almost all of the cases cited.  It's the Second Circuit that

6   dismisses the appeal, not the district court.

7        The district court weighs in to say, OK, it's

8   unfounded or it's frivolous, in the district court's opinion,

9   but solely in order for the district court to do something

10  else, not for the district court to dismiss the appeal.

11       As I said, I believe the only case that was cited was

12  this *Twelve Does* case.  As your Honor noted, that didn't

13  actually stop the appeal.  It was just one group of appellants.

14  So the appeal was going forward, just that that group wasn't

15  going to be included.

16       Then there is a narrow exception under Federal Rule of

17  Appellate Procedure 42(a), but that's clearly only until the

18  appeal is docketed, and that moment passed on January 23.

19       Respectfully, whatever your Honor thinks about the

20  underlying issue, which you already issued the first order --

21       THE COURT:  Let me press you sort of on the collateral

22  matters.  We know that there are certain things that a court

23  can do, even after final judgment is entered.  For example,

24  there are things like fee applications.  If a notice of appeal

25  is filed, I take it, with respect to fee applications, the

 1  district court still can act.

 2          MR. LAZAROFF:  I believe that's correct, your Honor,

 3  but I think it's not quite as settled and as simple as your

 4  Honor is saying.  I think they probably could act, even without

 5  fitting into the exceptions, meaning even without an unfounded

 6  or a frivolous appeal, because it doesn't go to the central

 7  aspect of does the appeal exist.

 8          THE COURT:  What about a motion to strike notices of

 9  appearance?  Why wouldn't that also be collateral?  It doesn't

10  divest the circuit court of its authority, but it does have the

11  impact of making sure that people who are impostors, in my

12  hypothetical, don't use a court document to pretend that they

13  are somebody other than who those people are.

14          MR. LAZAROFF:  I believe in your hypothetical, again,

15  which we don't believe is the case here.

16          THE COURT:  I'm posing this as a hypothetical.  I

17  understand that's the argument raised by the other side.

18          MR. LAZAROFF:  Somebody completely unrelated to the

19  case, who has never been related to the case, comes in and

20  files a notice of appeal, I believe by striking the notice of

21  appearance of the attorneys who filed the notice of appeal,

22  that would have the same effect.  Who is going to continue to

23  pursue the appeal if the attorneys are no longer there.

24          THE COURT:  That's not correct.  I can grant a motion

25  for somebody to withdraw as counsel in the district court

1    without divesting the circuit court of its power, as long as

2    the appearance is made in the circuit court that's sufficient.

3    If I grant the motion here to strike Rimon and to strike Reed

4    Smith from the other case, that doesn't divest the circuit

5    court of its authority, does it?

6              MR. LAZAROFF:  I am not sure -- I don't believe it

7    divests the Second Circuit of its authority.  I don't think

8    that your Honor can divest the Second Circuit of its authority

9    even if you were to rule on the issues I don't believe your

10   Honor has authority to rule on.  But I believe that when you go

11   to the heart of an appeal, an appellant who is bringing an

12   appeal needs attorneys to represent it.  Striking all of the

13   attorneys that are purportedly representing it would in fact

14   kill the appeal.  Who is going to pursue the appeal in the

15   Second Circuit?

16             THE COURT:  I wouldn't necessarily be saying that --

17   are you from the Rimon firm?

18             MR. LAZAROFF:  I am.

19             THE COURT:  -- that the Rimon and Reed Smith doesn't,

20   in some theoretical matter, represent Eletson Holdings.  All it

21   would say is that your two firms have no authority to speak in

22   my court on behalf of Eletson Holdings.  That's what a notice

23   of appearance does.  It gives a party the authority to speak in

24   that court.

25             MR. LAZAROFF:  Respectfully, your Honor, I believe

1   that you would be limited from doing that also by the same

2   provision.  Anything that's going to the heart of the appeal

3   that would undermine -- I appreciate your Honor's distinction,

4   but I am not sure it -- first, I haven't seen that case, just

5   by the way.  Frank disclosure, I haven't seen the case.

6          But applying the principles that I have seen in the

7   cases, I think anything that is going -- the issue that is

8   being appealed, whether it is directly or indirectly, that

9   would have the effect of essentially stopping the appeal, that

10  is out of the jurisdiction of your Honor, first, when the

11  notice of appeal is filed and, second, if there is -- those

12  narrow cases under Federal Rule of Appellate Procedure 42(a),

13  once the appeal is docketed.

14          Any further questions, your Honor?

15          THE COURT:  No, thank you.

16          MR. LAZAROFF:  I am going to cede to my cocounsel.

17          THE COURT:  Very helpful.

18          Mr. Solomon.

19          MR. SOLOMON:  Thank you, your Honor.  Lou Solomon.

20          We are doing what we can as counsel to represent both

21  the integrity of this Court and our profession.  It is very

22  difficult every time we stand up that we are accused of

23  violating an order.  I do not believe that is well taken at

24  all.  I am going to go through quickly some of what counsel

25  said, and then I think I should have a little bit of time left.

1          It is not helpful to this Court to continue the

2     confusion about who is Eletson Holdings.  Counsel said, we

3     admit, we, Reed Smith, admit that they don't represent Eletson

4     Holdings Inc.  We do not admit that.  There is one Eletson

5     Holdings.  That's what she said.  There is only one Eletson

6     Holdings.  That is true.

7          THE COURT:  Mr. Solomon.  It would help me if you

8     decrease the volume of your voice.

9          MR. SOLOMON:  I'm sorry.  Of course.

10         Eletson Holdings does exist.  There is one Eletson

11    Holdings.  It is a Liberian corporation.  There is no

12    Reorganized Holdings Incorporated in Liberia.  Eletson Holdings

13    is incorporated in Liberia.  And we represent that entity, and

14    we represent that entity notwithstanding the disagreements that

15    we have with your Honor and, in part, with Judge Mastando.

16         THE COURT:  Maybe you can tell me, if I or the circuit

17    court determine that Reed Smith does not have the authority to

18    prosecute an appeal in this court, what provision of that

19    Liberian order would I be violating, and how does a Liberian

20    court have the authority to tell me who can speak in my court?

21    I don't think I can tell the Liberian court who can speak for

22    Eletson Holdings in Liberia.  I would not purport to do that.

23         How does the Liberian court *ex parte* tell me who can

24    speak here?  That's a judgment I make, not this judge in

25    Liberia.

1          MR. SOLOMON:  Your Honor, I do not believe that any of

2     the courts thus far or any of the counsel have suggested that a

3     Liberian court can control anything in this court, and we are

4     not --

5          THE COURT:  Or in the circuit court, correct?

6          MR. SOLOMON:  Or in the circuit court.  And we are not

7     taking that position.  There are, however, four fundamental

8     reasons why the law of Liberia and the law of Greece should

9     inform what your Honor does here.

10          THE COURT:  Did you make any of these arguments in the

11     bankruptcy court on feasibility?

12          MR. SOLOMON:  So I wanted to correct just one thing,

13     and then I am going to answer your Honor's question.

14          Both counsel have suggested that we don't represent

15     Eletson Holdings Inc.

16          THE COURT:  Just answer my question.  Did the debtors

17     make the argument that the plan presented by the petitioning

18     creditors for which they put in a lot of money was not feasible

19     because it would require approval by Liberia and Greece, which

20     would not be forthcoming?

21          MR. SOLOMON:  We did not make that argument, your

22     Honor, and the reason we did not make that argument was because

23     the plan, in about 12 places, said that --

24          THE COURT:  I understand that argument.  I disagree

25     with it because I think you're misreading it.  Go ahead.  Try

1  and convince me.

2         MR. SOLOMON:  In Section 5.2 of the plan it says that

3  they can take such action as permitted by applicable law.  In

4  5.4 they say they can cancel the stock, and Mr. Ortiz said that

5  Liberia isn't interested in stock.  Liberia has a statute, we

6  have cited it to your Honor, that says --

7         THE COURT:  Regardless of what happens with the stock,

8  the prior directors are divested of authority on the effective

9  date, and there is new directors that come in as of the

10  effective date, and your client -- your firm is terminated as

11  of the effective date.  None of that is contingent upon the

12  stock.

13        MR. SOLOMON:  Everything, your Honor, is contingent

14  upon the ownership of the stock.

15        THE COURT:  Tell me where in the plan it says that the

16  stock has to be transferred.  Because I don't read the plan the

17  way you do.

18        MR. SOLOMON:  Section 5.4 says that the stock is going

19  to be then cancelled where permitted by applicable law.  So

20  when it's not permitted by applicable law, there is no new

21  shareholder.  When there is no new shareholder, there cannot be

22  a new board.

23        THE COURT:  Why not?  Because the bankruptcy court has

24  the power to say who the board is, and the bankruptcy court

25  said it.  It confirmed this plan.

1           MR. SOLOMON:  It confirmed a plan that said that, to

2    the greatest extent permissible, under applicable law, that is

3    in page 21, paragraph 4 of the confirmation order, it said

4    that, if permitted by applicable law, in the disclosure

5    statement, which I understand that your Honor disagrees, we

6    believe it is binding, the cases that we have cited say that it

7    is binding, and when Mr. Ortiz told your Honor --

8           THE COURT:  It says that they will try to get

9    recognition, which makes sense because you would want to have

10   the entity recognized abroad because the entity does business

11   abroad.

12          But it can't be the proposition that a company goes

13   into a U.S. court, asks a U.S. court to spend a lot of time

14   reorganizing itself, does it because it says, listen, we've got

15   debts that we owe, we have got debts we owe to people like Pach

16   Shemen, a lot of money we owe to them.  We want to be

17   reorganized so we can pay them back.  And then that entity,

18   which goes to the U.S. court, asks the U.S. court to spend a

19   lot of time on it, can then say, well, no, Judge, we really

20   don't want to pay Pach Shemen back.  And we really, having

21   lost, we are now going to get -- ask for a second shot.  That's

22   not right.

23          MR. SOLOMON:  I appreciate that that is what the other

24   side is arguing.  Those are not the facts here.

25          THE COURT:  Isn't it what you're arguing?

1          MR. SOLOMON:  No, your Honor.  I would like a minute

2     to try to explain why it is not what we are arguing.  We are

3     not arguing that because this entire plan understood that it

4     was a foreign entity.

5          In all of the cases where there is comity and no

6     extraterritoriality there is a party before the Court and there

7     is jurisdiction here.  A party has come in and found itself

8     here; yet, in all of those cases the courts are respectful of,

9     if you have a corporation that is incorporated someplace

10    else -- and as your Honor knows from your Honor's own ruling in

11    this case, foreign law controls that issue, and the plan

12    understood that.  The plan understood that, and so when they

13    said that we ensure -- we will ensure, not something that they

14    can decide about.  They said, that because we are incorporated

15    in Liberia, and some of the interests are governed by the laws

16    of foreign jurisdiction . . ., they will make every effort to

17    ensure that any confirmation order entered --

18         THE COURT:  What do you make of the words every effort

19    in that sentence?

20         MR. SOLOMON:  That we expected that they would make an

21    effort, your Honor, and not try to circumvent it.  And what

22    happened was, there was --

23         THE COURT:  How is any of that relevant to what I'm

24    doing here?

25         MR. SOLOMON:  I believe it's dispositive, your Honor,

1  because when they say that we are incorporated in Liberia, Mr.

2  Ortiz said there is no reference to Liberia.  That was

3  incorrect.  When they say that they will make every effort to

4  ensure that the plan is recognized and is effective in those

5  jurisdictions, that's the word it has used.  It's not talking

6  about feasibility.

7          THE COURT:  Of course.  When you've got an entity that

8  does business internationally, you are going to want to make

9  sure that the plan -- that the plan is recognized in those

10 other countries.  But that doesn't mean that every country

11 where a multinational corporation does business has a veto

12 right over a U.S. plan.  A U.S. judge has said that this

13 corporation has a new board.  It said the prior directors, as

14 of the effective date, are deemed to have resigned, correct?

15         MR. SOLOMON:  Yes.

16         THE COURT:  Does that provision that says deemed to

17 have resigned, is it conditional?  Is it conditional upon the

18 effective date?  The effective date is conditional upon a

19 number of conditions precedent that can be waived by the

20 reorganized entity.

21         MR. SOLOMON:  The point I was making, your Honor, is

22 that the plan was set up properly and exactly in accordance

23 with what Mr. Ortiz's article is talking about.  They were

24 going to do it right.

25         Then at the last minute they decided that they were

1    going to circumvent the promises that they made, and they

2    waived the conditions that they set out.  They said that they

3    would get all governmental and third-party approvals that were

4    necessary.  They said that they would file all of the papers in

5    foreign countries that were necessary.  They decided to waive

6    that.  That doesn't detract -- that doesn't take away the

7    rights.

8              THE COURT:  Let me ask you, hypothetically, who is it

9    who is supposed to take all of those actions?  If I take your

10   proposition, right, then the lawyers who are in front of me and

11   the lawyers who are appearing in Liberia don't even have any

12   authority to seek all of those permissions.  You're arguing at

13   one point that there is no new board, the new board has no

14   authority, it can't appoint lawyers, and then you're arguing at

15   the same time, well, it hasn't taken the necessary action.

16             Which one is it?

17             MR. SOLOMON:  I'm not arguing anything of the sort,

18   your Honor.

19             THE COURT:  Isn't that the impact of what you're

20   arguing?

21             MR. SOLOMON:  It is not.  And let me try to be clear.

22             THE COURT:  Why can't the new board appoint lawyers?

23   Can the new board appoint lawyers?  Answer my question.

24             MR. SOLOMON:  There is no new board in the United

25   States.  Judge Mastando, whose order is on appeal, because I

1    think he ignored --

2              THE COURT:  Just answer my question.  Who has the

3    authority in the United States to appoint lawyers for Eletson

4    Holdings?

5              MR. SOLOMON:  The United States should be --

6              THE COURT:  Who has the authority in the United States

7    to appoint lawyers for Eletson Holdings?  Answer my question.

8              MR. SOLOMON:  The current provisional board of Eletson

9    Holdings is the only proper authority.

10             THE COURT:  If that is right, you're saying that that

11   provisional board is the only people who can hire lawyers for

12   Eletson Holdings?

13             MR. SOLOMON:  For Eletson Holdings.

14             THE COURT:  Sir, if that's right, just answer my

15   questions.  What has your firm done to make sure that the

16   proper procedures are followed in Liberia and in Greece?

17             MR. SOLOMON:  We do not represent the company in

18   Liberia or in Greece, your Honor.

19             THE COURT:  What has the provisional board done to

20   make sure that the plan as confirmed by a U.S. court is

21   recognized in those entities?

22             MR. SOLOMON:  There are recognition proceedings going

23   on in both Liberia and in Greece.

24             THE COURT:  Are you representing to me that the

25   provisional board has done everything within its power, has

1    used its best efforts to ensure that the plan is recognized in

2    those countries?  Is that your representation on behalf of the

3    provisional board?

4              MR. SOLOMON:  To the best of my knowledge, your Honor,

5    the provisional board has complied with Judge Mastando's order.

6              THE COURT:  No.  Answer my question, Mr. Solomon.

7    It's a yes-or-no question.  Has your client exercised its best

8    efforts to ensure that the shares are transferred in Liberia?

9              MR. SOLOMON:  In accordance with Liberian law.

10             THE COURT:  It has done that.

11             MR. SOLOMON:  In accordance with Liberian law.

12             THE COURT:  Sir, does Judge Mastando and me, do we

13   have the authority, therefore, to sanction the provisional

14   board if we find that it has not used its best efforts to

15   ensure the transfer?  Do I have that power?  Does Judge

16   Mastando have that power?

17             MR. SOLOMON:  I told --

18             THE COURT:  Yes or no.

19             MR. SOLOMON:  I told -- insofar as --

20             THE COURT:  Yes or no.

21             MR. SOLOMON:  -- is here, then they are before your

22   Honor, and they are before your Honor for purposes of

23   sanctions, including everything else.  I believe they are here.

24             THE COURT:  Mr. Solomon, is the answer to my question

25   that if Judge Mastando has found that they have not used their

1   best efforts to ensure the share transfer in Liberia that Judge

2   Mastando has the authority to sanction the provisional board,

3   yes or no?

4          MR. SOLOMON:  No.  For the reason that the motion that

5   has been made to Judge Mastando doesn't include the board, does

6   not include Provisional Holdings.

7          THE COURT:  If it did, Mr. Solomon, your view is that

8   Judge Mastando could sanction them, correct?

9          MR. SOLOMON:  Yes.  I acknowledge that we are here.

10         THE COURT:  Mr. Solomon, just answer my questions.  If

11  they amend their sanctions motion to include the provisional

12  board for doing exactly the things that you say haven't been

13  done, using their best efforts to ensure the share transfer,

14  the provisional board can be sanctioned.

15         MR. SOLOMON:  No, your Honor.  I believe, under -- I

16  believe that we have a case here where we have a U.S. court who

17  believes that it can control what a foreign entity does in a

18  foreign nation.  We respectfully disagree.

19         THE COURT:  You're saying that you represent the

20  entity that voluntarily came into the U.S. court, correct?

21         MR. SOLOMON:  Yes, your Honor.

22         THE COURT:  And that because it voluntarily entered

23  the U.S. court, the U.S. court therefore has -- under Second

24  Circuit authority, the bankruptcy court has the ability to hold

25  that entity in contempt, correct?

1              MR. SOLOMON:  I think it has to comply with the plan.

2              THE COURT:  Correct?  Just answer my question.

3              MR. SOLOMON:  I think it has to apply the law, and we

4    have a right to appeal.

5              THE COURT:  I know.  But just answer my question,

6    because it does go to whether there are two Eletsons.  You're

7    arguing now there aren't two Eletsons, there is only one, and

8    you represent it.

9              MR. SOLOMON:  There is also a provision --

10             THE COURT:  But if you represent it, then you are

11   subject to sanctions for not complying with the plan.

12             MR. SOLOMON:  There is a reorganized holdings that has

13   filed applications for recognition in Greece and in Liberia.

14   That is the correct thing for them to do.

15             THE COURT:  Aren't you they?

16             MR. SOLOMON:  No, your Honor.  They filed them.  They

17   filed them and that was correct.  They, Pach Shemen, who

18   owns --

19             THE COURT:  Forget about Pach Shemen.  Pach Shemen is

20   not a party here.

21             MR. SOLOMON:  It's 99 percent of Reorganized Holdings.

22   It's 99 percent.  Your Honor wasn't given that information

23   before.  Your Honor asked, and I was trying to answer your

24   Honor's question.

25             99 percent is owned by Pach Shemen, is controlled by

1    the same party, and that's why there is no jurisdiction here,

2    if your Honor does -- we briefed that.  We can rest on our

3    papers if your Honor doesn't want to hear it.

4         I'm busy trying to explain why -- I am trying to

5    answer your Honor's questions, but what I believe has happened

6    here, I believe, with respect, that the courts here have not

7    paid sufficient due notice to the fact that they are requiring

8    a foreign entity to violate foreign law.  I do not have to show

9    that they have to violate foreign law --

10        THE COURT:  A foreign entity, by not taking an appeal,

11   is not violating foreign law, is it?  If Eletson Holdings

12   chooses not to take an appeal, that does not violate the law of

13   Liberia, does it?

14        MR. SOLOMON:  I do not know the law of Liberia.

15        THE COURT:  You said that they are trying to compel a

16   foreign entity to violate foreign law.  I want to be precise

17   about your statement.  Is it your contention that it would

18   violate foreign law for Eletson Holdings not to prosecute an

19   appeal in the United States, yes or no?

20        MR. SOLOMON:  I do not know the answer to the

21   foreign-law question.  I do know that we have been engaged and

22   instructed to take an appeal.

23        THE COURT:  You said they were asking to violate

24   foreign law.  Does it violate the law of Liberia if Eletson

25   Holdings does not take an appeal to the Second Circuit?  Does

1    Liberia get to control whether appeals are taken?

2            MR. SOLOMON:  I do not know Liberian law and it would

3    surprise me if Liberian law did that.  I grant your Honor that.

4    But that's not the question here.  That's not the question.

5            A party who is in existence, at least someplace in the

6    world, I understand your Honor doesn't feel that it is here,

7    has a right to take an appeal.

8            THE COURT:  Why didn't it intervene?  Why didn't the

9    provisional board intervene here?

10           MR. SOLOMON:  The provisional board is here.

11           THE COURT:  It didn't intervene.

12           MR. SOLOMON:  It's here, your Honor, as Eletson

13   Holdings.  It took the appeal from the bankruptcy court.

14           THE COURT:  There is certain directors.  Is the

15   provisional board filing an appearance here?  Can the

16   provisional board be sanctioned?

17           MR. SOLOMON:  Not the directors.  I think both counsel

18   want to make us counsel for the directors.  I don't represent

19   the directors.  I represent an entity.

20           THE COURT:  You're saying I can order that entity, the

21   Liberian-created provisional board, to do certain things.  Is

22   that right?  Can I order the provisional board to transfer --

23   to take every effort to transfer the securities?

24           MR. SOLOMON:  No, your Honor.

25           THE COURT:  Why not?

1          MR. SOLOMON:  The reason is, after your Honor's ruling

2     and after Judge Mastando's ruling and after all of the

3     accusations and improper threats against Reed Smith, we filed,

4     in the bankruptcy court, a limited appearance that listed the

5     matters on which we are representing Eletson --

6          THE COURT:  The provisional board.

7          MR. SOLOMON:  Not the board.  Provisional Holdings.

8     We identified those.  And insofar as we are talking about

9     those, and I am here to talk about them, one of them is the

10    appeal.

11         THE COURT:  I'm familiar with entering a limited

12    appearance to challenge jurisdiction.  I am not actually

13    familiar with the notion that you can enter an appearance on

14    behalf of the Provisional Eletson for -- to make certain

15    arguments but not subject yourself to jurisdiction more

16    generally.

17         MR. SOLOMON:  We are happy to cite the local rule too,

18    your Honor, and that's what we invoked when we did it before

19    Judge Mastando, and we are happy to send that to your Honor.

20         My point here is that when you're asking the question

21    whether a U.S. Bankruptcy Court can instruct someone to cancel

22    shares --

23         THE COURT:  I'm not asking that question.

24         MR. SOLOMON:  Part of our argument here is that

25    extraterritoriality has not been -- 1141 and 1142 have never

1    been applied extraterritorially.

2              THE COURT:  This has nothing to do with

3    extraterritoriality, Mr. Solomon.

4              MR. SOLOMON:  Our appeal does have everything to do

5    with that, your Honor.  It has to do with comity.

6              THE COURT:  But I'm not offending any law of any

7    foreign country by concluding that you don't have the authority

8    to speak in this court or that the only people who have the

9    authority to take an appeal on behalf of Eletson Holdings, as

10   opposed to, for example, the debtors, would be the people who

11   the bankruptcy court, in an order that has not been stayed,

12   acts on behalf of Eletson Holdings.

13             MR. SOLOMON:  As we said in our papers, I believe the

14   stay issue is not dispositive of anything.  We had a plan to

15   rely on that they were going to comply with foreign law.  Your

16   Honor wants to ignore that.

17             THE COURT:  No, I don't want to ignore that.  I am

18   paying attention to that.

19             MR. SOLOMON:  Your Honor disagrees with my

20   interpretation of that, and I completely respect that.

21             We want to go to the Second Circuit to see whether

22   even if this Court does not offend foreign law, whether comity

23   requires that you take into account that a three-judge court in

24   Greece, answering the very same questions that has been posed

25   to your Honor, the exact same question --

1           THE COURT:  Mr. Solomon, it would help me if you

2     actually are accurate, I'll use that word, rather than a more

3     pejorative word, in the way in which you describe things.  They

4     were not asked the identical question.  Why don't you

5     describe -- if you want to represent what they were told.

6           MR. SOLOMON:  No intention to not be accurate.  I

7     think I am, your Honor.  Let me rephrase.

8           We have put before your Honor the same statements that

9     Reorganized Holdings made to the Greek court, the same

10    arguments that they are making here.  The arguments that they

11    are making is that Mr. Spears has the right to control Eletson

12    Holdings.  That was rejected by the three-judge Greek court.

13    There are other proceedings that are going to go forward.

14    There is a proceeding in Liberia that is happening on Monday.

15    Yesterday the BVI court also rejected, but set it down for a

16    hearing in April -- I want to try to be as accurate as I can --

17    the same argument that is being made here, that Provisional

18    Holdings has no right to have lawyers arguing on its behalf,

19    and that new Eletson or reorganized Eletson, Reorganized

20    Holdings, has the only right to appear.  That has been rejected

21    by those courts, and I believe that comity does require that

22    someone in the United States, a judge or the circuit --

23          THE COURT:  Do I have the authority to say that you

24    don't have -- that the provisional board does not have

25    authority to speak on behalf of Eletson Holdings in Liberia?

1          MR. SOLOMON:  I think phrased that way, I would doubt

2     it, your Honor, but I think that is a question of Liberian law,

3     but I do not know.

4          The point that we are making here is that, I do

5     appreciate that the United States courts feel that we have a

6     party before it and then want to take care of it.  Our argument

7     is both based on facts that have never been distinguished, on

8     promises that were made as part of the plan, in the order

9     itself, that the courts of the United States will defer to the

10    laws of other jurisdictions, and what we are asking is that

11    that issue be addressed, and it was not addressed,

12    respectfully, by your Honor, we would like the Second Circuit

13    to address it, and it has not -- I think it needs to be

14    addressed before your Honor --

15         THE COURT:  Don't you find something a little bit odd

16    with Eletson Holdings taking the position that Eletson Holdings

17    hasn't done something.

18         MR. SOLOMON:  No, your Honor.  Because these are just

19    semantics.

20         THE COURT:  It's actually not semantics.  It's

21    actually the core issue in front of me.  You're arguing on

22    behalf of Eletson Holdings that Eletson Holdings hasn't done

23    something that Eletson Holdings should do.  That seems to me to

24    say, all right, you have now confessed.

25         MR. SOLOMON:  No, your Honor.  Reorganized Holdings,

1    that's what we are calling them --

2              THE COURT:  No.  They are Eletson Holdings.

3              MR. SOLOMON:  Your Honor is calling them Eletson

4    Holdings, so for that purpose I will call them Eletson

5    Holdings.  Eletson Holdings made promises as part of the

6    bankruptcy.  It needs to carry those out --

7              THE COURT:  Let me use your language.  You have asked

8    me to refer to you as Eletson Holdings.  That's who you said

9    you represent.  If in fact you represent Eletson Holdings,

10   haven't you just confessed to your own wrongdoing?

11             MR. SOLOMON:  No, your Honor.  We believe that without

12   making any collateral attack on the bankruptcy court order, and

13   so far as I have read, in Liberia and in Greece no collateral

14   attack has been made.  What the entity that still exists is

15   trying to do is --

16             THE COURT:  According to your argument, you are that

17   entity.

18             MR. SOLOMON:  That entity is coming here and trying to

19   take an appeal and trying to protect its privileged documents.

20   It believes it still has the right to do that.  That is

21   correct, your Honor.  Until such time --

22             THE COURT:  It's that very entity that also has the

23   obligations to do everything that the plan requires it to do.

24   In other words, you are saying, on behalf of, quote,

25   Provisional Holdings, that Provisional Holdings is obligated to

1   do everything that, under the plan, Eletson Holdings is

2   obligated to do, correct?  Is that how I should understand your

3   argument?  Otherwise, I don't get it.

4           MR. SOLOMON:  I think because of the confusion, the

5   creditors made promises.  The creditors now --

6           THE COURT:  The creditors aren't in front of me.

7   Actually, they are, through Mr. Togut, but it's actually

8   Eletson Holdings that's in front of me.  Petition creditors

9   want a plan of confirmation overwhelmingly.

10          MR. SOLOMON:  Yes, subject to compliance with foreign

11  law in critical respects, and that has not been complied with,

12  and all we are saying is until such time as that is complied

13  with, then this entity exists, and we should very promptly go

14  and get the recognition or have those courts rule on the

15  recognition.  I don't believe that the United States bankruptcy

16  laws sought to put out of business the laws of Liberia where

17  the company was incorporated.

18          THE COURT:  We all agree on that.  I think the

19  question that you and I are going back and forth on is whether,

20  under your argument, your client is the one as Eletson

21  Holdings, you say it is, is obligated to do all of those things

22  and, therefore, should be sanctioned for failing to do it, or

23  whether there is -- it has certain powers but not -- but the

24  guys at the front table are the ones who -- although they were

25  not hired by anybody who has authority to hire them --

1           MR. SOLOMON:  They are hired by the creditors.  They

2    are being paid by the creditors.

3           THE COURT:  No.  It's not really who is paying them.

4    It's merely who they are authorized to speak for.  They can

5    only speak for Eletson Holdings if they were retained by new

6    management.  New management can only retain them if in fact the

7    plan is effective.  And if they speak for Eletson Holdings,

8    then they can make the decision whether to take the appeal.  If

9    they don't speak for Eletson Holdings, then it seems to me that

10   your client would be the one who is subject to being sanctioned

11   for not taking the actions that, under your view, should be

12   taken.

13          MR. SOLOMON:  I understand your Honor.  With respect,

14   we disagree.  That is why we would like to take an appeal.

15   That is why we believe we have the right to take an appeal.

16          THE COURT:  Is there a reason why the debtors didn't

17   take the appeal?

18          MR. SOLOMON:  They did take the appeal, your Honor.

19   Eletson Holdings took the appeal before the effective date.  It

20   was the only entity.  Directors and officers couldn't take

21   that, we were told.  I think counsel misspoke.  Eletson

22   Holdings, before the effective date, took the appeal to this

23   court.  That is what happened after the effective date.  What

24   we are calling Provisional Holdings, in our judgment, in the

25   judgment of the Greek courts and Liberian courts, still exists,

1    and directed us to prosecute that appeal.  That is what your

2    Honor dismissed, and that is what we would like to appeal.

3            THE COURT:  In your view, did the debtors have the

4    authority to take an appeal?

5            MR. SOLOMON:  The debtors did have an authority to

6    take an appeal.

7            THE COURT:  In their capacity -- let me ask the

8    question more precisely.

9            Did the proponents of the debtor's plan have the

10   authority to take an appeal other than in the name of Eletson

11   Holdings?

12           MR. SOLOMON:  I believe the only parties who could

13   take that appeal -- I don't want to claim to be an expert on

14   appellate practice between the bankruptcy court and this court.

15   I believe the only parties who could take that appeal were the

16   debtors, and they did take it.

17           THE COURT:  That, actually, is an important question

18   to me, whether -- maybe the folks at the front can tell me

19   whether the -- the proponents of a losing plan can take the

20   appeal.  I would be surprised, very surprised, if they could

21   not take an appeal because, after all, you've got a number of

22   different people who are saying that they want to have a plan

23   approved and orders don't have to be stayed.  This has to come

24   up all the time where a proponent of a plan who has lost wants

25   to take an appeal.

1          MR. SOLOMON:  Proponent of the plan, so far as I

2   understand, your Honor, were the debtors.  They were the

3   proponents of their plan, and they took the appeal before the

4   effective date.  There was no question about that.

5          THE COURT:  If, in fact, the effective date -- why

6   didn't they take -- seek a stay?  I guess you're saying that

7   the effective date is conditional upon the approval of

8   Liberia -- the transfer of shares in Liberia?

9          MR. SOLOMON:  With compliance with applicable law,

10   including, before you cancel the shares you have to get

11   approval of the Liberian court, recognizing the bankruptcy

12   court.  They don't redo the entire bankruptcy.  They have a law

13   akin to chapter 15.  But there are standards.  And I believe

14   that Eletson Holdings has a right to defend itself in that

15   court and has a right to ask this Court to be sufficiently

16   respectful of it, to wait before it decides who actually

17   controls the former debtor.

18          THE COURT:  Didn't you actually just put your finger

19   on it when you said Eletson Holdings has the right to defend

20   itself in that court when in fact the Eletson Holdings that is

21   recognized by this court is not the proponent of a plan that

22   lost?

23          MR. SOLOMON:  I do think that one of the important

24   questions is whether Eletson Holdings is divested of its right

25   to have the Second Circuit review your Honor's ruling in that

1    regard.  That is true.

2              Should your Honor, however, determine that --

3              THE COURT:  No.  You said in that court.  I thought

4    you were referring to in Liberia.

5              MR. SOLOMON:  The Liberian proceeding is to recognize

6    the bankruptcy plan in Liberia.  That is a proper proceeding in

7    Liberia.

8              THE COURT:  Maybe I misheard you.  I thought you said

9    that Eletson Holdings has the right to defend itself in

10   Liberia.

11             MR. SOLOMON:  Under the statute in Liberia, just as in

12   Greece, it had the right to go into court and say that

13   Mr. Spears is not the manager of the company.  Until the plan

14   is recognized in those countries, these entities exist.  And

15   because those entities exist, we believe that they have a right

16   to be here in this court.  Forgive all of my confusion about

17   naming, but that entity has a right to be here.  And if your

18   Honor disagrees, we have a right to file an appeal.

19             THE COURT:  Didn't the debtors say to the U.S. court,

20   listen, U.S. court, we are giving you all of our assets, and

21   you decide how we should be reorganized to pay off the

22   creditors.  We recognize, U.S. court, that one possible outcome

23   of this is that there will be new management and new owners of

24   the equity because, obviously, equity enjoys the lowest

25   priority.  So we recognize that the impact of this may be, we

1   lose everything.  That's what happens in bankruptcy.  And we

2   are going to -- we, debtors, are going to satisfy that.  We had

3   a right to challenge the bankruptcy.  It was initiated as an

4   involuntary bankruptcy.  We could have continued that

5   challenge.  We could have, under your view, filed in Liberia or

6   in some other country to ask for reorganization, but we choose

7   the U.S. forum.  We want the U.S. forum, recognizing that one

8   possible outcome -- one maybe likely outcome is that our equity

9   is going to be effectively cancelled and our control rights

10  lost.

11          MR. SOLOMON:  Yes, your Honor, I completely agree with

12  that, when it's done in accordance with the plan and when it's

13  done in accordance with law.

14          THE COURT:  Having said that to the U.S. court, we

15  recognize people who own the equity that one possible thing

16  that you, Judge, are going to tell us is that our equity is

17  worthless, and we have no management rights.

18          Is it your proposition then that those very same

19  people can then go into a foreign court and say to the foreign

20  court, no, we think it's a problem that the creditors own this,

21  and we are not going to do everything that the U.S. court wants

22  us to do, even though we asked the U.S. judge to spend a whole

23  lot of time on this reorganization?

24          MR. SOLOMON:  What I will say, your Honor, is that

25  this is not the first bankruptcy case that the courts of the

1   Southern District, and specifically the Second Circuit, have

2   applied comity to the law of a foreign jurisdiction and had the

3   law of a foreign jurisdiction apply in two of the bankrupt

4   entities.  That what we are saying should have happened here.

5          THE COURT:  I understand that qua directors, qua maybe

6   creditors to some extent, maybe in their capacity as

7   shareholders, the individuals who comprise the, quote,

8   provisional board, as recognized *ex parte* by the Greek court,

9   would have authority to go into some foreign court.  It's not

10  an issue in front of me.  I don't have to conclude on that.

11         But it does strike me as odd that those same

12  individuals who asked the U.S. court to reorganize their entity

13  could then purport to represent the reorganized entity, the

14  entity that they said U.S. court would reorganize, and then,

15  purporting to represent them, take a position opposite to the

16  plan.

17         MR. SOLOMON:  By the way, the proceeding in Greece

18  last week, your Honor, was not *ex parte*.

19         THE COURT:  I understand that.  The proceeding in

20  Greece basically said -- the Athens court said, we are going to

21  have a further hearing, but we are not going to do anything to

22  disturb what the Piraeus court did, and I understand that a

23  bit.

24         MR. SOLOMON:  Your Honor, what I believe the law --

25  what we argue the law is is that, yes, the debtor did come to

1   the United States and will be bound, provided that the

2   bankruptcy plan is recognized in the proper jurisdictions.  And

3   I believe there are two of them.  One is Greece and one is

4   Liberia.

5          And my argument to support that is not -- includes the

6   fact that the plan itself here and the order confirming the

7   plan itself here recognized that that needed to be done.  I

8   also believe that the law supports that.

9          So when you're changing articles of incorporation and

10  you're changing management, you're changing corporate

11  governance, the foreign law governs and that law needs to be

12  looked at.  Under comity and under extraterritoriality, our

13  view is the same.

14         With your permission, may I just answer a couple of

15  other questions?

16         THE COURT:  Answer a couple of other questions and

17  then go to the question of the documents.

18         I realize I have taken you over the time.  I'll give

19  you 10 more minutes.

20         MR. SOLOMON:  I do apologize, your Honor, for not

21  answering quickly enough.

22         I think I will move to the issue -- one moment,

23  please, your Honor.

24         *Gucci* and *Maxwell* were the two Second Circuit cases

25  that I could not remember just a moment ago.  In both cases

1  they defer to foreign law in a bankrupt context, which is the

2  kind of comity that we are asking to be considered here and it

3  has not been considered.

4          With respect to the turnover motion, I do believe that

5  should your Honor conclude that -- there is only Eletson

6  Holdings, and they are sitting at the front table, that there

7  is no longer any jurisdiction for your Honor to address

8  anything in the confirmation proceeding.  I do not believe the

9  turnover motion is appropriate in the confirmation proceeding.

10         THE COURT:  The turnover motion is in the other case.

11  It's in the arbitration case.

12         MR. SOLOMON:  I'm sorry.  Confirmation was unclear on

13  my part, and let me clarify.

14         The petitioners here, when we used to sit at the front

15  table, sought to confirm the arbitration award, and in that

16  proceeding an argument has been made that Provisional Holdings

17  doesn't exist, that only new Eletson Reorganized Holdings

18  exist.  Reorganized Holdings and Levona are the same.

19         There is no daylight between those entities.  We put

20  in our proof on that, at least *prima facie* proof.  They didn't

21  disagree.  In the papers that were filed both by Levona and,

22  quote, Reorganized holdings, nobody disagreed with that proof.

23  They are one in the same entity.  Because of that --

24         THE COURT:  They actually did disagree.  You may think

25  their disagreement was not sufficient, but they pointed out

1    that there is an independent director of Eletson Holdings, that

2    they have got -- that their capital base is not identical, and

3    that they each have responsibilities to their respective

4    constituents.  You have taken issue with that, but they do

5    disagree.

6            MR. SOLOMON:  What I meant is that the facts on which

7    we base our argument, that Levona and Pach Shemen are

8    controlled by the same entity, has not been questioned.

9            With respect to the independent director, I would like

10   to point out to your Honor that that independent director

11   reports and can be removed by the minority shareholder.  And

12   Pach Shemen, at docket 202 in this court, told your Honor that

13   the independent director owes fiduciary duties to the new

14   shareholders, i.e., Pach Shemen.

15           THE COURT:  Let me ask you this question.  If the

16   folks at the front table, assume I reject your argument on

17   whether they represent Eletson Holdings or not, and let's just

18   get to the turnover issues.

19           Let's assume that they were solely interested in going

20   after the preferred nominees for their recovery, taking the

21   position that that money belongs to Eletson, Eletson Holdings,

22   and did not dispute at all the arbitration.  They agreed that I

23   should confirm the arbitration award.  They stood up here today

24   and said, Judge, confirm the arbitration award, but we want to

25   sue the preferred nominees.

1          On that hypothetical, why wouldn't your firm have the

2     obligation to turn over to them the documents so that they

3     could sue the preferred nominees?

4          MR. SOLOMON:  Our answer is that I do not believe

5     that, even if they took that position, given the control that

6     is common to both, a position taken today might be changed

7     tomorrow, and I believe your Honor lacks jurisdiction.

8          I also believe -- my second point is that even if your

9     Honor has jurisdiction, and I think there were -- and it's not

10    a prudential issue at all.  There is no Article III

11    jurisdiction.

12         THE COURT:  The preferred nominees, in your view, are

13    entirely separate from Eletson, right?

14         MR. SOLOMON:  Correct.

15         THE COURT:  So there would be no -- whether it's in

16    the form of Eletson Holdings -- Eletson Holdings, as I

17    understand your plan of bankruptcy, would have an interest at

18    going after the preferred nominees, at least for some amounts

19    of the recovery of the reward.  That was part of the debtor's

20    plan.  Now that the Eletson Holdings is controlled by new

21    management, they should still have the same interest in going

22    after the preferred nominees.

23         MR. SOLOMON:  I may be mistaken, your Honor, but I

24    know no fact that supports that the debtor's plan had in mind

25    going after the preferred nominees.  It was only going after

1  Levona.

2          THE COURT:  Part of the funding I think was going to

3  be -- otherwise, Eletson Holdings doesn't have any money.

4  Except for the attorneys' -- some amount of the attorneys'

5  fees, the award was going to bankruptcy remote entities.  In

6  order for that money to come back into the estate to fund the

7  plan, they needed to get some of that from the preferred

8  nominees.

9          MR. SOLOMON:  That wouldn't require -- that doesn't

10  require litigation.  That was part of the plan.

11          THE COURT:  So the preferred nominees were just

12  going -- even though they were independent, they were just

13  going to give up their award?

14          MR. SOLOMON:  As part of the plan.  They went to the

15  preferred nominees.

16          THE COURT:  Let's assume now that the preferred

17  nominees didn't agree to compromise the award.  The preferred

18  nominees said, listen, we have got rights in this award.  Don't

19  they -- aren't they entitled to your files in order to go after

20  the preferred nominees?

21          MR. SOLOMON:  They are not entitled to our files and

22  not just because there is no jurisdiction in this Court.  This

23  Court cannot act.  But even could it act, I do not believe that

24  that turnover proceeding would have anything to do with the

25  arbitration confirmation matter that is before your Honor,

1   under statute and under the treaty, to be a streamlined

2   proceeding and an accelerated proceeding, and I don't believe a

3   turnover -- I have not seen any case that allows turnover under

4   those circumstances.

5          Third, the preferred nominees are not here, and so I

6   don't believe there is jurisdiction over them.  They can

7   voluntarily come in.

8          THE COURT:  Your firm is here.

9          Under *Tekni-Plex*, there would be no obstacle to the

10  turnover.

11         MR. SOLOMON:  I do believe that there would be,

12  absolutely there would be, and I wanted to get there.  I still

13  don't think that our privileged documents can go to anybody

14  other than our client.  That's not just *Tekni-Plex*.

15         THE COURT:  Your client owes a lot of money to the

16  debt holders.  Whether it gets them through suing the preferred

17  nominees or the preferred nominees giving the money, to the

18  extent that your client is Eletson Holdings, your client owes a

19  ton of money to the creditors, which it should get from the

20  preferred nominees.

21         MR. SOLOMON:  There are two parties in this case, your

22  Honor:  Levona and Eletson Holdings.  Eletson Corp. is also

23  here.  It's another reason why I don't think the turnover

24  proceeding matters.

25         With your Honor's permission, I would like to digress

1    just for a moment.

2          So your Honor understands, what happened in the

3    bankruptcy court is the Court was never -- the U.S. trustee

4    wanted the corp. fees to be looked at and the corp. fees were

5    looked at.  Judge Mastando approved those fees.

6          Now, counsel had it wrong.  Mr. Ortiz got it a little

7    more accurate.  They are seeking all of those fees back.  With

8    respect to $2 million of fees that Judge Mastando has already

9    approved, so there is no extinguishment in the bankruptcy.

10   It's not a lean that's been extinguished.  He already approved

11   those fees.  Corp. has not paid those fees.  In part, they have

12   not paid though fees because they have blocked the payments of

13   those fees.  But that is a $2 million lien that exists quite

14   apart from the other several million dollars that we are -- I

15   think that Reed Smith is entitled to have, and they are now

16   seeking to get it back.  So there is plenty of adversity, but I

17   just wanted to make sure that your Honor understood what the

18   facts were.

19         THE COURT:  I'll give you on two more minutes.

20         But just focus on the issue that I was focused on

21   about whether corp. has a lien.  I have read all of your other

22   arguments.  As I indicated in my order, this has been

23   extensively briefed.

24         MR. SOLOMON:  Of course, your Honor.

25         With your Honor's permission, insofar as there is

1   adversarialness, it doesn't matter who you put on the other

2   side of that.  Now, the Provisional Holdings.

3           THE COURT:  I'm giving you two minutes.  Use it how

4   you want.  If you don't want to go into the lien issue, I have

5   read all of the papers.

6           MR. SOLOMON:  I was trying to answer your Honor's

7   hypothetical concerning the preferred nominees because -- so

8   long as your Honor is assuming adversarialness, then *Tekni-Plex*

9   and the other cases, the Second Circuit department case and the

10  Magistrate Judge Francis case, they are on all fours, and I

11  think adversarialness is the key.  So that would apply even

12  with respect to the preferred nominees.

13          The retaining lien exists -- the retaining lien exists

14  not just because there is money that's owed.  Corp.'s

15  obligations were not discharged, your Honor.  They were never

16  discharged.  5.13 of the plan discharges liens of the estates

17  and the estates are defined as the debtors and Corp. is not one

18  of the debtors.

19          And that we're owed this money is found in Exhibit 8

20  of Ms. Furey's affidavit, which sets out -- which attaches only

21  part of the fourth interim-fee application.

22          But if your Honor will look at the ECF in the

23  bankruptcy court, your Honor will see that in footnotes 8 and 9

24  and 10 we calculate, we show how much -- I think it's about $2

25  million.  It's owed to Corp.  There is no discharge because

1     those amounts have been approved by the bankruptcy court and

2     they weren't discharged anyway because the subsidiary is not --

3     the subsidiary's liens are not discharged.

4          THE COURT:  Mr. Solomon, I just was checking.

5          The plan defines the estate as the estate, lower case,

6     of any of the debtors and, collectively, the estates of all of

7     the debtors created under Section 541.

8          My question is whether the estate of holdings, under

9     Section 541, would include all of the assets -- includes the

10    subsidiaries, the wholly owned subsidiaries.

11         MR. SOLOMON:  It does not, your Honor.  Mr. Ortiz

12    admitted that when he was up.

13         THE COURT:  They are going to get back up, so I just

14    want to make sure that I've got your answer.

15         Is there authority for that proposition, that the

16    estate wouldn't include -- it includes, surely, all of the

17    equity that is held by Holdings in Corp., and, therefore, it

18    would seem to me to include all of corp.'s property.

19         MR. SOLOMON:  Your Honor, I'm not competent any

20    further to answer the question.  I do know that Judge Mastando

21    has repeatedly said -- I do not believe that liens at the Corp.

22    level were ever directed or ever listed or ever discharged

23    under the bankruptcy plan.  But I'm happy to get better law on

24    that, your Honor, if your Honor wishes.

25         That is all I have to say on the liens, so let me sit

1    down if your Honor has nothing else.

2              THE COURT:  Thank you Mr. Solomon.

3              While you and I sparred, I have found the argument to

4    be very helpful, so I appreciate it and appreciate your

5    thoughts.

6              We will take a five-minute break, and then I will hear

7    from the folks at the front table for 15 minutes.

8              (Recess)

9              THE COURT:  Let me hear from the folks at the front

10   table.

11             MS. FUREY:  Thank you.  Jennifer Furey on behalf of

12   Eletson Holdings Inc.

13             Your Honor, I just wanted to quickly address the lien

14   issue that I raised before, and then Mr. Ortiz is going to

15   address some of the other rebuttal points.

16             On the lien issue, your Honor, there was a release of

17   lien that did include Eletson Corp.; under the plan, Section

18   5.13.

19             THE COURT:  I am going to go there.  Hold on.  I'm

20   there.

21             MS. FUREY:  Entitled release of liens.  It includes,

22   and this is halfway through, all mortgages, deeds of trust,

23   liens, pledges or other security interests against any property

24   of the estates shall be fully released and discharged, and any

25   and all right, title, and interest of any holder of such

1    mortgages, deeds of trust, liens, pledges, or other security

2    interests shall revert to Reorganized Holdings.

3            Then if you turn, your Honor, to Section 5.2(c) of the

4    plan, this section deals with the property of the estate and it

5    says:  Except as otherwise provided in this plan or any

6    agreement, instrument and so forth, on the effective date, all

7    property in each estate, including all retained causes of

8    action and any property acquired by any of the debtors,

9    including interest held by the debtors and their respective

10   nondebtor, direct and indirect subsidiaries and affiliates,

11   shall vest in reorganized holdings free and clear of all liens,

12   claims, charges, or other encumbrances, except for the liens

13   and claims established under this plan.

14           Following this, Reed Smith submitted its fee

15   application, and that's at bankruptcy docket number 1325,

16   paragraph 15, where Reed Smith submits the fee application for

17   actual, unnecessary professional services performed by counsel

18   for both Eletson Holdings and Eletson Corp.

19           Your Honor, I should have had those provisions handy

20   in the first one and not deferred or put Mr. Ortiz on the spot

21   to that, because this issue had not come up in the bankruptcy

22   court before.  My fault for any confusion on that.

23           Your Honor, even without a lien, your Honor, the file

24   may be turned over for a discharge for cause, and Reed Smith

25   admits as much in its opposition, with or without a lien, a

1   turnover can occur with cause.  I actually cannot think of any

2   greater cause than an attorney continuing to claim to represent

3   the client over the objection of the client and then working

4   against that client's interests.

5           I would say that they were terminated as of the

6   effective date, but since thereafter we have continuously sent

7   letters of termination based, in part, on their continued

8   refusal and, we would say, conduct and acting against our

9   interest, that constitutes cause.  A lien doesn't need to be

10  considered with regard to that.

11          Unless you have any other questions.

12          THE COURT:  No.  Let me hear from Mr. Ortiz.

13          MR. ORTIZ:  Good afternoon, again, your Honor, Tyler

14  Ortiz of Togut, Segal & Segal.  Hopefully, we are not losing

15  time for the chair dance, your Honor.

16          THE COURT:  I missed what you said.

17          MR. ORTIZ:  I hope we weren't being penalized for the

18  amount of time for the chair dance.

19          I just want to respond to a few points that Mr.

20  Solomon went through.

21          In the first instance, your Honor, the competing plan

22  of the debtors was a shareholder-sponsored plan.  Shareholders

23  were represented by Sidley Austin.  They heavily participated.

24  They filed documents in support of their plan.  They filed

25  documents opposing our plan.  Those entities certainly could

1   have appealed.  I would note that the more recent appeal that

2   they have taken, the shareholders did join that one.

3             THE COURT:  It's denominated the debtor's plan.

4   That's how Judge Mastando referred to it.  But what you're

5   telling me is that the proponents were the shareholders, and

6   those would be the parties who appeared and who could have

7   taken the appeal?

8             MR. ORTIZ:  Correct, your Honor.

9             Just like my former client was the party funding the

10  petitioner's creditor plan, the party that was actually going

11  to be putting in the funds and be the new owner coming out were

12  the shareholder entities under the debtor's plan.

13            Your Honor, when we talk about international comity, I

14  again want to emphasize that all the actions that they talk

15  about with comity are actions that they have taken in violation

16  of the injunctive provisions of the plan.

17            Again, the confirmation order was entered on

18  November 4, and then they went to the Piraeus first-instance

19  court.

20            I think it's worth noting, your Honor, the authority

21  that the provisional board got when they went for that *ex parte*

22  order -- and if you look at Ms. Furey's declaration that she

23  filed at docket 60, way down at page 389, and I will give you a

24  second, if you need to --

25            THE COURT:  Just tell me what it says.

1          MR. ORTIZ:  This provides the mandate for this

2     provisional board.  It includes:  To act before the Greek

3     courts in order to challenge the decision of voluntary

4     bankruptcy, dated 10/25/2024, Chapter 11, in which it was filed

5     by the U.S. Bankruptcy Court for reasons of lack of

6     international jurisdiction of the latter in accordance with

7     provisions of regulation 2015 of the European parliament and

8     council.

9          In addition, in the event the creditors apply for the

10     acknowledgement and execution of the above voluntary bankruptcy

11     decision in Greece, where Eletson Holdings is based in fact,

12     the latter to appear and be represented before the competent

13     Greek courts in order to oppose otherwise as an impediment to

14     the recognition of the above bankruptcy decision in Greece due

15     to the inadequacy of the issuing parties' international

16     jurisdiction in the bankruptcy decision.

17          Your Honor, that was their mandate.

18          When they talk about comity, comity is usually two

19     things that are happening at the same time and not trying to

20     interfere.  We had a process that completed, a confirmation

21     order that was entered that they are bound by, and they went

22     and then started a proceeding that was a collateral attack.  So

23     comity is a false premise here, your Honor.  What this is about

24     is getting second bites at the apple using foreign

25     jurisdictions.

1          I would note, your Honor, you were discussing

2   cancellation of shares with Mr. Solomon.  That was at no point

3   discussed during the confirmation, but it was heavily discussed

4   in the more recent trial, and Judge Mastando found that there

5   is no law prohibiting the cancellation of shares in Liberia,

6   that the ability to cancel shares is governed by the articles

7   of group incorporation, and the articles of incorporation,

8   although they restrict transfers, do not restrict the

9   cancellation of shares, and that is what ultimately happened

10  under the plan.

11         I think it's really important, your Honor, just to

12  quickly --

13         THE COURT:  Say that again.  So the shares have been

14  cancelled, is that correct, without a need for approval by

15  Liberia under Judge Mastando's ruling?

16         MR. ORTIZ:  Correct, your Honor.

17         THE COURT:  But it's the transfer of shares that has

18  not yet taken place.

19         MR. ORTIZ:  There is no transfer of shares that ever

20  needs to take place, your Honor.  Under 5.4, there is a

21  cancellation of shares, which doesn't require any foreign law,

22  anything to happen, and then, under 5.8, the new shares were

23  issued to the current shareholders.  So 5.4 of the plan

24  cancels.  5.8 issues the new shares.

25         I just want to read for you from Judge Mastando's

1  decision.  This was where I was trying to go when we ran out of

2  time before.

3          At page 39 of a decision from the 24th, page 39,

4  starting at line 24:  Despite the confirmation order in Judge

5  Liman's ruling, the former debtors and counsel have refused --

6  your Honor, this is the key, this the root of all of this -- to

7  exercise their corporate authority to effectuate the transfer

8  of ownership the plan requires.

9          Reed Smith's arguments that international comity

10  applies is mistaken, as Reorganized Holdings has not asked the

11  former debtors, nor related parties, to do anything that

12  requires Liberian government or court enforcement.  Rather,

13  Reorganized Holdings is asking this Court to enforce the

14  confirmation order against the parties that are already bound

15  by it.

16          It goes on, your Honor, at page 41, line 8.  This

17  Court need not force foreign officials to implement the plan in

18  reliance on the confirmation order.  Rather, the plan and the

19  confirmation order require the former debtors and their former

20  officers and directors, who have the requisite corporate

21  authority and who are all subject to this Court's jurisdiction,

22  to undertake any corporation actions necessary --

23          THE COURT:  Where are you reading from in Judge

24  Mastando's ruling?

25          MR. ORTIZ:  Judge Mastando's ruling from two Fridays

1   ago, your Honor.

2            THE COURT:  At what pages?

3            MR. ORTIZ:  The part what I was just reading was page

4   41 at line 8, and the part I read before that, your Honor, was

5   starting at page 39, line 24, going into page 40.

6            Your Honor, I think you really kind of hit it on the

7   head when you asked him the question, can the bankruptcy court

8   or this court sanction them for interfering with the plan.

9            As Judge Mastando emphasized here, the parties that

10  were asking to do something are subject to the jurisdiction of

11  this Court.  As we have discussed, they are the ones who

12  invoked the jurisdiction of this Court.

13           When they are saying that there are things that need

14  to happen in other places, we have only had to go to those

15  other places because the one party who isn't doing things is

16  the former debtors, the former shareholders, and the former

17  officers.

18           And as I just read, and there is similar language you

19  will see in the declaration in Liberia, where they are not

20  assisting, as they are required to under the plan; they are

21  contesting recognition.  They are using the recognition

22  proceedings as do-overs and additional attempts to overturn the

23  confirmation order, which they are bound to assist us in

24  implementing and enjoined.

25           This Court and the bankruptcy court can force them not

1    to do those things because they came to this Court, and they

2    are subject to the jurisdiction of this Court, and that's what

3    Judge Mastando went through in the lines I just read.  It's not

4    asking anybody in a foreign jurisdiction.

5           It's asking the party that came here and asked for

6    this Court's relief, took up a year and a half of this Court's

7    time, is telling them, you are enjoined from interfering, and

8    you're bound to help implement, and they are going to these

9    foreign jurisdictions, creating the need for these proceedings,

10   and then showing up and contesting them, your Honor.  It is

11   just making a mockery of the U.S. Courts and the international

12   system.

13          So you can dress it up in words like comity, you can

14   dress it up in preemption, but what it really is is a

15   collateral attack on a final order attempting to get the stay,

16   an extra judicial stay, so that they can use those other courts

17   as appeals courts, which is wildly improper, your Honor.

18          I just want to note, I don't understand how this

19   fiction that Mr. Solomon is pursuing would work.  He admits

20   that there was an effective date, that that removed Reed Smith,

21   the same effective date that removed the board members that he

22   is saying two days later hired him, so that he can advocate

23   against his former client.

24          And I don't understand how -- the consequence of the

25   bankruptcy was the discharge of a half billion dollars of debt,

1    your Honor.  Are they saying they don't have a half billion

2    dollars, that we can go pursue that in Greece and Liberia

3    still?  You can't make sense of how this argument would work.

4    This entity can't have it in two, an entity in the U.S. and an

5    entity in Liberia own the same things, but just in different

6    countries.

7            I think Judge Mastando, in his most recent ruling,

8    went very carefully through all of the things --

9            THE COURT:  It was a discharge of half a billion in

10   debt.  Is that what you said?

11           MR. ORTIZ:  Correct.

12           THE COURT:  In exchange for that, the creditors

13   received what?

14           MR. ORTIZ:  Certain creditors received shares under

15   the plan.  There is also, outside of being a creditor, the

16   equity rights offering, the $53.5 million equity rights

17   offering.  That's new value being put in.  That was for roughly

18   75 percent of the company.  Certain creditors also elected to

19   take shares.  That was 25 percent of the company.  And then the

20   remainder of the creditors got cashed out using some of the

21   proceeds from the 53.5 million.

22           THE COURT:  They got either equity or they were cashed

23   out.

24           MR. ORTIZ:  Correct, your Honor.

25           But, in the United States, the Reorganized Holdings

1     that does exist is free of that debt.

2            The issue we have, your Honor, is that the old owners

3     have refused to hand over the proverbial keys.  And it could be

4     true that you both own something but don't possess it.  But the

5     fact that they are refusing to hand it over doesn't mean that

6     they still own it.  It means that they are in contempt of Judge

7     Mastando's orders.  That's really the crux of what they are

8     doing.

9            And they are asking you, your Honor, and they are

10    asking Judge Mastando to give them the opportunity to go to

11    these other places and collaterally attack, and one of the

12    arguments they make in those places is that there is continuing

13    to be a pending appeal in front of this court.

14           I just want to note real quick, your Honor -- I know

15    that my time is probably up or nearly up, but they point to

16    things saying, we are stuck between a rock and a hard place.

17    We might be subject to criminal sanctions if we do these

18    things.

19           But I want to remind your Honor again that, on

20    November 4, a confirmation order was entered, and they went to

21    the Piraeus first-instance court after that, in violation of

22    that order, to create that very situation.  So it's very hard

23    to complain about being between a rock and a hard place when

24    you rolled the rock in on yourself, your Honor.

25           We have a very simple issue here.  There is one

 1  Eletson Holdings.  It had appellate rights.  It still has

 2  appellate rights.  But its owners have changed.

 3          Unless your Honor has any further questions.

 4          THE COURT:  I think that takes care of it.

 5          MR. ORTIZ:  Thank you, your Honor.

 6          I am going to take a five-minute recess, and then I'll

 7  be back on the bench, and I'll be able to give you a ruling

 8  with respect to at least some of this.  Thank you.

 9          (Recess)

10          THE COURT:  I am prepared to rule.

11          Several motions are before the Court.  In 24 CV 8672,

12  the appeal from the bankruptcy court, the court has before it:

13  (1) the joint motion at docket number 27 of Eletson Holdings

14  and the appellees to strike filings by Rimon P.C. and Reed

15  Smith LLP at docket numbers 22, 23, and 24, which include two

16  notices of appearance purportedly filed on behalf of Eletson

17  Holdings and the notice of appeal filed on behalf of Eletson

18  Holdings, Eletson Finance (US) LLC, otherwise known as Eletson

19  Finance, and Agathonissos Finance LLC, referred to as Eletson

20  MI, seeking to dismiss the purported appeal of this Court's

21  order of dismissal pursuant to stipulation filed on

22  December 30, 2024, and ordering the displacement of the lawyers

23  from those firms as counsel and (2) a motion at docket number

24  43 filed by Rimon P.C. and Reed Smith LLP to strike the

25  stipulation and agreement to dismiss the appeal under FRAP 42

1    filed by Eletson Holdings, the Official Committee of Unsecured

2    Creditors, and the appellees at docket number 31.

3         The Court has the following filings before it on the

4    motion at docket number 27:  (1) Eletson Holdings' memorandum

5    of law in support of the motion to strike docket numbers 22,

6    23, and 24, and the declaration of Adam Spears in support of

7    that motion at docket numbers 28 and 29; (2) a memorandum of

8    law filed by Rimon and Reed Smith in opposition to the motion

9    along with declarations by Louis Solomon, John

10   Markianos-Daniolos, and Gerald Padmore, at docket numbers

11   48-51; (3) a reply memorandum of Eletson Holdings and a

12   declaration in further support of that motion at docket numbers

13   59-60 and (4) a reply memorandum of law filed by Mr. Solomon,

14   docket numbers 61-63.

15        The Court has the following filings before it on the

16   motion at docket number 43:  A memorandum of law filed by Rimon

17   and Reed Smith, and the declarations of Markianos-Daniolos,

18   Solomon, and Padmore at docket numbers 44-47; the joint

19   memorandum of law in opposition to the motion filed by Eletson

20   Holdings and the appellees, along with the declaration of

21   Jennifer Furey at docket numbers 55-56, and a joinder filed by

22   the Official Committee of Unsecured Creditors and the

23   declaration of David Herman at docket numbers 57-58.

24        In 23 CV 7331, the arbitration confirmation action,

25   the Court has before it a motion to compel Reed Smith to

produce its client files for Eletson Holdings, docket number

242.  Eletson Holdings and its subsidiary, Eletson Corp., seek

an order displacing Reed Smith as counsel of record in the

matter and compelling Reed Smith to turn over the client file

to counsel from Goulston & Storrs.  The following papers are

before the Court on that motion:  (1) Eletson Holdings'

memorandum of law in support of the motion and the declarations

of Adam Spears, Jennifer Furey, and Timothy B. Mathews, docket

numbers 243-246; (2) the memorandum of law in opposition filed

by Reed Smith and the declaration of Louis Solomon, docket

numbers 251-52; and (3) the reply memorandum of law of Eletson

Holdings in support of the motion to compel, docket number 257;

(4) a reply memorandum of law by Levona in support of motion to

compel, docket number 258; and (5) a response by Reed Smith and

a declaration of Markianos-Daniolos, docket number 264-65.

         The Court also takes notice of the prior proceedings

in this matter.  The Court assumes familiarity with those prior

proceedings.  The Court recites only those facts which are

necessary for an understanding of the Court's rulings and its

reasoning.  Eletson Holdings is a company that, through its

subsidiaries and affiliates, is engaged in the shipment of

liquefied petroleum gas.  It is organized and exists under the

laws of Liberia and, until recently, it had management in

Greece, where it has business interests.  It holds the shares

of Eletson Corp., which provides management services.  It also

1  held the common shares of Eletson Gas, a limited liability

2  company that specializes in liquefied petroleum gas shipping.

3  At one time, the shares of Eletson Holdings were held by

4  members of a Greek shipping family.  At the times relevant

5  here, Eletson was in a distressed financial condition.  Eletson

6  Gas was operated as a joint venture, a company named Levona

7  Holdings, Ltd., whose shares were held by hedge funds managed

8  by Murchinson, Ltd., acquired the preferred shares of Eletson

9  Gas and an option to purchase the common shares of Eletson Gas

10 under certain circumstances in exchange for financing of up to

11 $14 million.

12         On July 29, 2022, Holdings and Eletson Corp., under

13 the previous management and ownership, initiated an arbitration

14 against Levona which turned on, among other issues, whether

15 Levona properly exercised its option to acquire the common

16 shares of Eletson Gas.  That arbitration ultimately concluded

17 with a ruling in favor of Holdings and Eletson Corp.  In

18 opinions and order, dated February 9, 2024 and April 19, 2024,

19 I rejected Levona's arguments that the award was in manifest

20 disregard of the law, but I concluded that the arbitrator

21 exceeded his authority in certain respects in his award of

22 damages.  Later, and prior to my entering any judgment

23 confirming the award, and before any amount of relief was

24 settled, I granted Levona's motion to amend its answer and its

25 motion to vacate the award, finding that there was evidence of

1    fraud in the arbitration proceeding.  That is the matter before

2    me at 23 CV 7331.

3         While the arbitration was proceeding, an affiliate of

4    Levona, which had purchased bonds of Holdings, filed with two

5    other creditors an involuntary petition for relief, under the

6    Bankruptcy Code, commencing involuntary Chapter 7 proceedings

7    against Holdings and two of its affiliates in the bankruptcy

8    court for the Southern District of New York.  Ultimately,

9    holdings and the other debtors agreed to convert the bankruptcy

10   case to a voluntary Chapter 11 case, thereby voluntarily

11   submitting themselves to the jurisdiction of the bankruptcy

12   court.  Bankruptcy docket 204, 215.  The case was assigned to

13   Bankruptcy Judge John Mastando.

14        After the award was entered and while proceedings to

15   confirm or to vacate the award were pending before me, the

16   parties litigated in bankruptcy court over a plan of

17   confirmation.  Three competing plans of reorganization were

18   submitted:  One by debtors, really, the shareholders, and two

19   by a group of holders of a portion of more than $300 million of

20   notes issued by debtor, which noteholders have never received a

21   payment thereunder.  They are the petitioning creditors.

22   Docket number 1-1, which is Judge Mastando's ruling on appeal

23   here.  The debtors objected to the plans of the petitioning

24   creditors.  The petitioning creditors objected to the debtors'

25   plans.  I refer here interchangeably to debtors and to

1   shareholders.  The Committee of Unsecured Creditors objected to

2   the debtors' plan.  The Court held an evidentiary hearing over

3   five days in September 2024.  It also received posttrial briefs

4   and expert reports.  The plan of the petitioning creditors

5   received an overwhelming majority of votes from the impaired

6   classes of claims.

7           On November 4, 2024, the bankruptcy court entered the

8   confirmation order approving the plan of the petitioning

9   creditors.  The confirmed plan is binding.  11 U.S.C. Section

10  1141.  The bankruptcy court concluded that the shareholders'

11  plan was not confirmable, *id.* at 52-79, and not feasible, *id.*

12  at 79-85.  It was not confirmable because the shareholders did

13  not contribute new value or value that was substantial and,

14  thus, it violated the absolute priority rule.  It was not

15  feasible because the shareholders failed to establish that the

16  new value contribution provided sufficient funding to make all

17  required day-one payments under the plan and because the

18  litigation trust was underfunded.  The Court also noted as an

19  addition problem with the plan that it presumed equitable

20  subordination of the petitioning creditors on the grounds that

21  they had acted in bad faith, but the Court concluded that the

22  petitioning creditors did not act in bad faith.

23          The bankruptcy court concluded, on the other hand,

24  that the plan of the petitioning creditors was proposed in good

25  faith and was confirmable*, id.* at 93-99, and that it was

1    feasible, *id.* at 99-101.  Parenthetically, the Cooper, Ortiz,

2    and Kessler article cited by Rimon and Reed Smith is not on

3    point because it primarily involves feasibility, which the

4    bankruptcy court already resolved, and management distraction,

5    which presumes that new management is in place.

6            Several provisions of the plan, as confirmed and

7    ordered by Judge Mastando, are relevant here.  The plan is at

8    23 CV 7331, docket number 202-3 and bankruptcy docket 1132.  On

9    the effective date, Eletson Finance and Agathonissos Finance

10   LLC or Eletson MI are deemed dissolved without further action

11   under applicable law, regulation, order, or rule.  That's *id.*,

12   Section 12.11.  Also on the effective date, the members of the

13   governing board of each debtor prior to the effective date were

14   "deemed to have resigned or otherwise ceased to be a director

15   or manager of the applicable debtor on the effective date." *Id.*

16   Section 5.10(c).  Eletson Holdings was deemed to be reorganized

17   holdings as of the effective date, and the equity of the old

18   Eletson Holdings was vested in its new owners*, id.* Sections

19   1.125-1.126, commencing on the effective date the reorganized

20   holdings was to be managed by a new board which would consist

21   of three directors:  One director selected by the plan

22   proponents, one selected by the plan proponents but subject to

23   the consent of the Creditors Committee, and an independent

24   director selected by the Creditors Committee.  *Id.* Section

25   5.10(a), (c).  The board of the reorganized Eletson Holdings

 1   has broad authority to act on behalf of Eletson.  The

 2   independent director had the right to make decisions related to

 3   claims and causes of action with Levona Holdings subject to a

 4   limited exception.  *Id.* Section 5.10(b).  Under the plan, as

 5   confirmed, any professionals retained by the debtors would not

 6   be considered employed by the reorganized entity absent

 7   execution of a new engagement letter for services rendered

 8   after that date.  *Id.* Section 10.6.  The effective date is

 9   defined to be the business day on which (a) no stay of the

10   confirmation order is in effect; (b) all conditions precedent

11   in the plan have become satisfied or waived in accordance with

12   the plan; and (c) the plan is declared effective.  Section

13   1.62.  As a result of the plan confirmation, a half billion

14   dollars of debt was cancelled, and the creditors received

15   either equity or cash.

16        On November 14, 2024, a notice of appeal of Judge

17   Mastando's order confirming the plan of confirmation was filed

18   purportedly on behalf of Eletson Holdings, Eletson Finance, and

19   Eletson MI.  That is the matter before me at 24 CV 8672.

20        Eletson Holdings waived conditions precedent on

21   November 19, 2024, and the plan was declared effective on that

22   date.  Bankruptcy docket number 1258.  No stay of the order was

23   sought or obtained.

24        On November 22, 2024, the law firm of Goulston &

25   Storrs filed a notice of appearance on behalf of Eletson

 1   Holdings Inc.  Docket number 7.  On November 25, 2024, a

 2   stipulation of voluntary dismissal was filed on behalf of

 3   Eletson Holdings and the other debtors, the Committee of

 4   Unsecured Creditors, and the appellees, dismissing the appeal

 5   pursuant to Rule 8023 of the Federal Rules of Bankruptcy

 6   Procedure.  That rule is framed in mandatory terms and requires

 7   dismissal of an appeal if the parties file a signed dismissal

 8   agreement specifying how costs are to be paid and pay any fees

 9   that are due.  Federal Rule of Bankruptcy Procedure 8023.  On

10   December 30, 2023, after a conference held on December 23,

11   2024, I signed the stipulation of dismissal.  Docket number 20.

12   Thereafter, on January 16, 2025, notices of appearance were

13   filed by the two lawyers from Rimon, one of whom is a former

14   partner of Reed Smith, purporting to represent "provisional"

15   Eletson Holdings, and Rimon and Reed Smith together filed what

16   purports to be a notice of appeal on behalf of Eletson

17   Holdings.  Docket number 24.  As I will explain in more detail,

18   the lawyers who purport to represent what they term Provisional

19   Eletson Holdings were retained by a provisional board made up

20   of Eletson Holdings original owner family members who were

21   appointed by a Greek court on November 12, 2024.  Docket number

22   50, paragraph 1.

23           On January 21, 2025, Eletson Holdings, through

24   Goulston & Storrs, the Committee of Unsecured Creditors,

25   through Dechert LLP, and appellees, through Togut Segal LLP,

1  filed a stipulation of dismissal of the purported appeal

2  pursuant to Federal Rule of Appellate Procedure 42(a)., docket

3  number 31.

4          The appeal was docketed on January 23, 2025.  On

5  January 23, 2025, the Second Circuit, per Judge Lynch, issued

6  an order staying the appeal after stating that this Court would

7  be considering the stipulation of dismissal and the motion to

8  strike the notice of appeal and directing each of the parties

9  (counsel for Eletson Holdings and counsel from Rimon and Reed

10  Smith) to advise the Court "regarding the status" of the appeal

11  within 14 days of the Court's action.  Docket number 34.  The

12  circuit, accordingly, transmitted the mandate to this court.

13  The docket reflects that the circuit, accordingly, transmitted

14  the mandate to this court.

15          The motions before me seek several forms of relief:

16  From reorganized Eletson Holdings (a) an order displacing the

17  Rimon lawyers, the Court already have ruled that Reed Smith

18  does not represent Eletson Holdings; and (b) an order striking

19  the notice of appeal; and from Reed Smith and Rimon (c) an

20  order striking the stipulation of dismissal of the appeal, or,

21  put otherwise, declaring that the stipulation of dismissal was

22  not authorized.  The Court grants the motion to strike the two

23  notices of appearance.  It denies the motion to strike the

24  stipulation of dismissal.  With respect to the notice of

25  appeal, the Court grants the motion to strike the notice of

appeal, but also it issues an indicative ruling that such

notice of appeal was not authorized and that the appeal should

be dismissed in the alternative.

As a preliminary matter, the Court addresses its

jurisdiction. Rimon and Reed Smith assert that the Court has

no jurisdiction to entertain the motion to strike of Eletson

Holdings and appellees. The argument is an odd one coming from

Rimon and Reed Smith who themselves have filed a motion asking

the Court to take action and to strike the stipulation of

dismissal of the appeal. That motion appears to presume that

the Court has jurisdiction. In any event, I conclude that the

argument is substantially without merit. While the docketing

of an appeal ordinarily divests the district court of

jurisdiction, that rule is not ironclad. It does not permit a

party "to halt district court proceedings arbitrarily by filing

a plainly unauthorized notice of appeal." *United States v.*

*Rodgers*, 101 F.3d 237, 251 (2d Cir. 1996). Thus, the filing of

a notice of appeal, when it is improper or unauthorized, does

not deprive this Court of all power to act. If, for example,

lawyers appear as impostors for a client, when they do not have

the authority to act or speak for that client, the Court is not

powerless to take action.

Rimon and Reed Smith raise a legitimate question

whether that authority is sufficient to permit this Court to

divest the Second Circuit of its jurisdiction by striking a

 1    notice of appeal or dismissing it once an appeal has been

 2    docketed and if it is not remanded.  The cases cited by Eletson

 3    Holdings, with one exception, do not involve the district court

 4    dismissing an appeal after it has been docketed, and that one

 5    exception involved a case where the effect of the striking of

 6    the notice was not to divest the circuit of jurisdiction.  More

 7    importantly, however, the Court of Appeals has mandated this

 8    Court to consider the underlying stipulation of dismissal that

 9    is challenged in the notice of appeal and the pending motion to

10    strike the stipulation of dismissal.  Importantly, the Court of

11    Appeals has mandated this Court to consider the stipulation of

12    dismissal of the appeal and the pending motion to strike the

13    stipulation of dismissal.  The docket reflects that the mandate

14    was transmitted from the circuit to this court.  As Reed Smith

15    and Rimon recognize, jurisdiction follows the mandate.  *United*

16    *States v. Rivera*, 844 F.2d 916, 921 (2d Cir. 1988).  The Second

17    Circuit stated that the parties were to report on the "status"

18    of the appeal, suggesting that it is not just asking for an

19    indicative ruling.  Reed Smith and Rimon argue that by asking

20    for a report, the circuit retained jurisdiction and thereby

21    deprived the Court of jurisdiction.  The Court does not read

22    the Second Circuit's order that way.  By asking for the status

23    of the appeal, the circuit appears to have presumed that the

24    status of the appeal might change as a result of this Court's

25    action.  It might either remain pending or be dismissed.  The

1    circuit did not ask for a report on the conclusions of this

2    court.  But to the extent that there is ambiguity, and there is

3    some ambiguity, and the Court of Appeals did not intend to vest

4    this Court with jurisdiction to decide whether the notice of

5    appeal should be stricken and the appeal dismissed, the Court

6    issues this indicative ruling under Federal Rule of Civil

7    Procedure 62.1(a) and Federal Rule of Appellate Procedure 12.1.

8              The Court concludes that the notice of appeal should

9    be stricken and the appeal should be dismissed.  The notice of

10   appeal was filed by Eletson Holdings, through Reed Smith and

11   Rimon.  But as of the date that the plan was confirmed, the

12   retention of Reed Smith was terminated.  The only professionals

13   permitted to act on behalf of Eletson Holdings after the

14   effective date, November 19, 2024, were those who were engaged

15   by Eletson Holdings after that date.  And after that date,

16   Eletson Holdings could act only through its new board.  It is

17   undisputed that Eletson Holdings has not retained the attorneys

18   from Rimon, no longer retains Reed Smith, and has not

19   authorized them to file a notice of appeal on behalf of Eletson

20   Holdings or its affiliates.  Spears declaration, docket number

21   29, paragraphs 4-8.  Thus, the notice of appeal was plainly

22   unauthorized.  Moreover, the stipulation of dismissal, which is

23   signed by authorized representatives of the appellant, Eletson

24   Holdings, as well as the appellee, and which conforms in all

25   other respects to Federal Rule of Appellate Procedure 42, is

1    effective.

2         The argument of Rimon and Reed Smith depends upon the

3    notions either (1) that the reorganized Eletson Holdings does

4    not exist; or (2) that there exists two Eletson Holdings, one

5    that is the reorganized Eletson Holdings and one that we can

6    call the un-reorganized Eletson Holdings.  But that is a plain

7    misreading of the plan of confirmation.  The whole purpose of

8    the Chapter 11 bankruptcy proceeding, to which the prior owners

9    of Eletson Holdings voluntarily subjected themselves, was to

10   reorganize Eletson Holdings.  It was reorganized successfully

11   and no stay of that reorganization was filed.  The shareholders

12   in the bankruptcy proceeding, whose plan was rejected, could

13   have appealed and sought a stay, but they did not.  They cannot

14   achieve the same result through the expedient of arguing in

15   this court that the reorganized Eletson Holdings is not Eletson

16   Holdings.

17        As of the effective date and by order of the

18   bankruptcy court, Eletson Holdings is now the reorganized

19   Eletson Holdings.  Thus, as Judge Mastando recently ruled,

20   there are not two separate Eletson Holdings.  He stated:

21   "Essentially, reorganized Eletson Holdings is the only Eletson

22   Holdings Inc."  Transcript of the January 24, 2025 bankruptcy

23   hearing, docket number 257-1 at 27.  He ruled:  "Upon the

24   effective date, equity interest of the former debtors were

25   extinguished, and all equity interest in reorganized holdings

1   were issued to the new holdings. . . . The board members of the

2   former debtor, certain of whom are now members of the

3   provisional board, were automatically deemed to have resigned

4   or otherwise ceased to be a director or manager of Eletson

5   Holdings Inc."

6           The Court has independently reviewed the plan of

7   confirmation of the petitioning creditors that was confirmed by

8   the bankruptcy court and it agrees.  The effective date has

9   passed.  All conditions precedent were waived and there was no

10  stay.  As of the effective date, the authority of the prior

11  managers of Eletson Holdings ended.  The other two debtors no

12  longer exist.  The authority to manage Eletson Holdings is

13  vested in the new board.  Prior counsel for Eletson Holdings

14  and those were not retained with the approval of the new board

15  cannot act on behalf of Eletson Holdings.  Counsel who were

16  retained by the new board may act on behalf of Eletson

17  Holdings.  It is Eletson Holdings, as managed by the new board,

18  which has the authority under the bankruptcy court order and

19  pursuant to the plan to take actions abroad to ensure that the

20  plan is recognized abroad, and that same Eletson Holdings, as

21  managed by the new board, which has the authority to decide

22  whether an appeal should be taken here in its name or not.

23          The losing shareholders had remedies available to

24  them.  They had every ability to challenge the confirmation

25  order.  They could have asked for a stay of the bankruptcy

court's ruling. The previous shareholders, as proponents of

the "debtor's plan" could have sought to appeal themselves, and

they did not. For whatever reason, they chose not to do so.

It is even possible that the previous board could have sought

to have its authority recognized by the bankrupt court which

approved the plan, or by this Court, invoking principles

regarding recognition of a foreign order. Alternatively, the

individual directors of the provisional board could have sought

to intervene in this action. They have not done so. They seek

now to get not only the benefit of a stay, but what they might

have received had the bankruptcy court order first been stayed

and then reversed and vacated.

Rimon and Reed Smith argue that there are "good faith

and legitimate questions concerning the authority and capacity"

of the reorganized Eletson Holdings to act. Docket number 48

at 2. They do not identify any good faith and legitimate

questions under the plan. Their only argument under the plan

was that not all of the conditions precedent were satisfied,

but those conditions precedent existed for the benefit of the

holders of the new Eletson who contributed value to that

entity, and they were willingly waived.

Rimon and Reed Smith argue that in order for Eletson

Holdings to act through the counsel that its reorganized board

has selected, in essence, the confirmation order must be

recognized and enforced in Liberia, where its shares are

registered, and in Greece, where it operates.  Docket number 48

at 21.  Before going through the technical reasons why that

argument is faulty, it is worth pausing on its inherent

absurdity.  In essence, Rimon and Reed Smith appear to be

arguing that in order for the reorganized Eletson Holdings to

be recognized anywhere, it must be recognized everywhere, or at

least in each of the countries where it does business or its

shares are registered.  But it was Eletson Holdings who itself

asked the Court in the United States to reorganize it, and the

bankruptcy court did so.  That order is now in effect, and it

is the order that is recognized by this Court as effective with

respect to proceedings in the United States.  Tellingly, none

of the arguments that Rimon and Reed Smith now make regarding

the ability of Eletson Holdings to act and the notion that it

cannot act without the approval of Liberia or Greece were made

when the debtors were challenging the feasibility of the

petitioning creditors plan.  Eletson Holdings, qua Eletson

Holdings, has an interest in making all efforts to ensure that

the order is recognized everywhere in order to return value to

its creditors.

        Rimon and Reed Smith's arguments with respect to each

of Greece and Liberia are defective.  Rimon and Reed Smith

rely, in part, on an order of a single-member court of first

instance in Greece, on November 12, 2024, obtained *ex parte* on

the application of the former shareholders of Eletson Holdings,

1   which appointed an interim board on a provisional basis

2   comprised of members of the family that formerly held Eletson

3   Holdings, authorized, among other things, to appoint attorneys

4   to act on behalf of Eletson Holdings to challenge the

5   confirmation order of the bankruptcy court.  Docket number

6   49-2.  Rimon and Reed Smith offer expert testimony that (1) the

7   confirmation order and plan are not automatically recognized in

8   Greece and not currently recognized and effective in Greece;

9   (2) the Greek order is still valid and effective in Greece; (3)

10  the provisional board members appointed by the Greek court are

11  recognized in Greece as the current board members of Eletson

12  Holdings; (4) an entity referred to as Provisional Eletson

13  Holdings exists in Greece; and (5) the provisional directors

14  are not permitted to effectuate the confirmation order and plan

15  in Greece prior to their recognition by a Greek court.  The

16  Greek court order has never been recognized in the United

17  States.  It's at docket number 50, paragraph 11.

18          That argument does not support the authority of

19  lawyers who were not engaged by the reorganized Eletson

20  Holdings to act for Eletson Holdings in the United States.  It

21  may be, as Rimon and Reed Smith argue, that the actions of the

22  reorganized Eletson Holdings will not be honored in Greece.

23  That is what the expert appears to say.  It is also what Rimon

24  and Reed Smith state.  "The confirmation order requires

25  recognition before it is binding in foreign jurisdictions."

 1   Docket number 61 at 11.  That proposition appears to be

 2   unexceptional.  The Court need not resolve that matter to

 3   decide the issues before it.  But the expert does not purport

 4   to say that the confirmation order must be recognized in Greece

 5   before it is recognized in the United States, or that the Greek

 6   court has the authority to decide who appears for Eletson

 7   Holdings in the United States when a United States court has

 8   decided, again in an order whose effect has not been stayed,

 9   that only the new board of Eletson Holdings can decide who

10   speaks for that entity.  If the persons who were appointed by

11   the Greek court were to protect the interests of the former

12   owners of Eletson Holdings, they had to have found a way other

13   than to countermand the order of a United States court to do so

14   and to purport to represent Eletson Holdings in the United

15   States.

16           Rimon and Reed Smith also rely upon a declaration of

17   an expert on Liberian law, stating (1) that a foreign court

18   order that purports to cancel or extinguish the common shares

19   of holdings and purports to issue new shares cannot be given

20   effect under Liberian law if inconsistent with the BCA or

21   governing documents of the company until it has been recognized

22   by the Liberian courts, and (2) that there are steps required

23   under Liberian law to amend the articles of incorporation and

24   for the new shareholders to be recognized as shareholders.

25   Docket number 51, paragraphs 6-7.  There is a declaration that

1    states that the plan and confirmation order will not be

2    automatically recognized in Liberia.  Docket number 51-1,

3    paragraph 8.  From that declaration, Rimon and Reed Smith argue

4    that the reorganized holdings does not yet exist because it has

5    not complied with "all applicable law, including the

6    requirement that the Liberian corporate authority extinguish

7    the existing shares and issue new shares as set forth in the

8    plan."  It asserts that the reorganized holdings has no power

9    to select counsel or to act in this court.  Docket number 48 at

10   3-4.

11              The conclusion does not follow from the premise.  The

12   authority of the new board of Eletson Holdings is not derived

13   from the vote of the shareholders.  It is based on a court

14   order, that of the United States Bankruptcy Court.  The plan,

15   as confirmed, dictates that Eletson Holdings will have three

16   directors, one chosen by the plan proponents, one chosen by the

17   plan proponents subject to the consent of the creditors

18   committee and one who is independent.  It thus is irrelevant

19   for purposes of this motion who holds the common shares of

20   Eletson Holdings.  Whoever holds those shares, power is vested

21   in the new board.  The former directors of Eletson Holdings did

22   not lose their power because of a shareholder vote.  They lost

23   it because of a court order.  And the professionals previously

24   retained by Eletson Holdings also did not lose their authority

25   because of a shareholder vote.  They lost it by virtue of the

plan, as confirmed.

          Rimon and Reed Smith argue "Provisional Holdings, at
least as recognized extraterritorially, including in Liberia
and Greece, remains a distinct entity until Liberia and Greece
recognize and accept the effects of the confirmation order."
Docket number 48 at 16.  That may well be true in Liberia and
in Greece.  It may be correct that the new board and new
shareholders will not be recognized in those countries until
there is a recognition proceeding.  I don't need to address
that.  But that does not mean that Eletson Holdings, as
reorganized by the United States Bankruptcy Court, is not
recognized in the United States.  Rimon and Reed Smith cite no
authority for that proposition.

          This ruling does not offend principles of
extraterritoriality or comity.  The Court is not applying the
ruling of the bankruptcy court extraterritorially.  It is
applying it to a proceeding in the United States relating to an
entity that voluntarily invoked the powers of the United States
court, and that is properly here.  Principles of comity apply
when the conduct of a United States court "will infringe on
sovereign interests of a foreign state." *Next Investors LLC v.
Bank of China*, 12 F.4th 119, 131.  A United States court must
pause before, for example, it restrains assets abroad.  But
here the United States court is not taking action that would
require a party to infringe some sovereign interest of a

foreign state.  To the contrary, it is Rimon and Reed Smith who

argue that a foreign court has the authority to take action

that would infringe on the rights of another state.  They would

have each of Greece and Liberia, and not a United States court,

dictate who has the authority to prosecute the case in the

United States on behalf of an entity recognized under United

States law.

As Judge Mastando ruled, and I agree, the plan does

not require Eletson Holdings to take any action that would

violate the law of Liberia.  There is no law that requires

Liberian approval for the cancellation of shares under Section

5.4 of the plan.  There also is no law that prevents Eletson

Holdings from issuing new shares pursuant to Section 5.8.

Finally, Rimon and Reed Smith also argue that the

disclosure statement for the plan states in the risk factors

that the petitioning creditors would "make every effort to

ensure that any confirmation order. . . and the steps taken

pursuant to the confirmation order to implement the plan are

recognized and are effective in all applicable jurisdictions."

Docket number 49-1, Section VIII A.3.  It states that "a

foreign court may refuse to recognize the effect of the

confirmation order."

Rimon and Reed Smith argue that Eletson Holdings

promised that it would obtain recognition of the bankruptcy

court's order and the plan in Liberia and Greece.  However,

under the plan, the resignation of the old board and the

appointment of the new board and the termination of counsel was

not contingent upon the recognition of the order in Greece and

Liberia.  Accepting the testimony of the experts arguendo,

without necessarily adopting it, recognition was necessary for

the acts of the board to be recognized in Liberia and Greece.

The bankruptcy court's order does not have to be recognized

everywhere again in order to be recognized anywhere and, in

particular, in the United States.

        The Court also strikes the notices of appearance filed

by the attorneys from Rimon on January 16.  Local Rule 1.4(b)

provides, in pertinent part, "Except where an attorney has

filed a notice of limited-scope appearance, an attorney who has

appeared for a party may be relieved or displaced only by court

order."  Local Rule 1.4(b).  The plan thus plainly contemplates

not only voluntary withdrawal, but nonvoluntary displacement.

The rule makes sense.  One who is plainly an interloper has no

right to speak in court or to ask a court to take action by the

mere expedient of filing a notice of appearance.  The Court

retains the authority to protect its docket by permitting only

those who are authorized to speak for a party to address the

Court and to request or oppose relief.  *See Chambers v. NASCO*,

501 U.S. 32, 43 (1991).

        The Court exercises that authority here.  Under the

plan confirmed by the bankruptcy court, Eletson Holdings' new

1    board can choose its lawyers.  The evidence is undisputed that

2    it did not hire the Rimon lawyers.  They do not have the

3    authority to speak on behalf of Eletson Holdings, and the

4    entity for whom they purport to act, Provisional Eletson

5    Holdings, is not a party before the Court.  The only party

6    before the Court as appellant is the entity that converted the

7    proceeding in the bankruptcy court to a voluntary petition,

8    Eletson Holdings, which, as the confirmed plan indicates, is

9    run by a new board.

10            The Court also grants the motion in 23 CV 7331 to

11   displace Reed Smith as counsel for Eletson Holdings.  What I

12   have said so far supports the motion to displace Reed Smith as

13   counsel for Eletson Holdings.  Eletson Holdings did not

14   continue Reed Smith's representation of it after Eletson

15   Holdings was reorganized.  It terminated Reed Smith's

16   representation on all Eletson matters effective November 19,

17   2024, and on November 27, 2024, it demanded that Reed Smith

18   cease and desist from taking any action ostensibly on behalf of

19   Eletson or holding itself out as counsel to Eletson.  Docket

20   numbers 245-1, 245-2.  It retained new counsel.  Reed Smith has

21   no authority to speak on behalf of Eletson Holdings.  Under

22   Rule 1.16(b)(2) of the New York Rules of Professional Conduct,

23   a lawyer must withdraw from a representation if the lawyer is

24   discharged.

25            The motion to compel also is granted.  Eletson

1    Holdings seeks (1) the entire file maintained by Reed Smith in

2    any matter wherein it represented Eletson Corp. or Eletson

3    Holdings in relation to the arbitration award, the enforcement

4    thereof or the monetization of it and the disputes underlying

5    the award; (2) all communications between Eletson Corp.,

6    Eletson Holdings, and/or any agents thereof, including Reed

7    Smith, and any third party relating to the arbitration; and (3)

8    unredacted time sheets through the current date relating to the

9    arbitration.  Docket number 243 at 9.  The Court assumes that

10   the request does not apply to documents created on or after

11   November 19, 2024.  The request also should not be read and the

12   Court does not apply it to files created in connection with the

13   representation by Reed Smith of the provisional board created

14   by the Greek court order starting on or after November 12,

15   2024.  To be clear, however, it is not limited to the file in

16   connection with this action.  It applies to the files in

17   connection with the arbitration proceeding and award, this

18   enforcement action to confirm or, alternatively, vacate the

19   award, and efforts to monetize it.  Reed Smith is ordered to

20   produce the requested documents, subject to the exception that

21   it may maintain documents it created while providing copies of

22   the same and is ordered to produce a log in the event that it

23   withholds any documents from the Eletson client file.

24            Under the New York Court of Appeals' decision in *Sage*

25   *Realty Corp. v. Proskauer Rose*, 91 N.Y.2d 30 (1997), the client

1  has presumptive access to the attorney's entire file on the

2  matter and is entitled to the file absent a substantial showing

3  by the attorneys of good cause and subject to the client paying

4  for assemblage and delivery of the document to the client.

5  That includes communications with the client and draft legal

6  memoranda and notes.  The exceptions are that the law firm is

7  not required to disclose documents which might violate a duty

8  of nondisclosure owed to a third party or otherwise imposed by

9  law, or to disclose documents intended for internal law office

10 review and use.  *Id.* at 37.

11        *Sage Realty* applies here.  By virtue of the

12 bankruptcy, there exists new owners of Eletson Holdings and new

13 management.  They are the owners of the privilege and of the

14 privileged documents.  That there has been a change in

15 management postbankruptcy does not alter this rule.  *See CFTC*

16 *v. Weintraub*, 471 U.S. 343, 358 (1985).  The privilege belongs

17 to the corporation and not to the persons who happened to

18 manage or own the corporation at the time the privileged

19 communications took place.  *Id.* at 349.  The request, moreover,

20 is limited to documents created or received or sent by Reed

21 Smith in its capacity as counsel for Eletson Holdings and

22 Eletson Corp.  The exception recognized in Tekni-Plex*, Inc. v.*

23 *Meyner & Landis*, 89 N.Y.2d 123 (1996) is not applicable.

24 First, Tekni-Plex does not apply to a bankruptcy proceeding in

25 federal court.  *See In Re Hechinger Investment Company of*

1    *Delaware*, 285 B.R. 601, 611 (D. Del. 2002).  Second, by its

2    materials, Tekni-Plex is limited to a merger context in which

3    the claims of the acquiring company did not derive from its

4    ownership of the acquired company, but from rights it retained.

5    Tekni-Plex, 89 N.Y.2d at 138.  The new owners here do not seek

6    documents relating to a transaction as to which they were

7    adverse to Eletson.  In their capacity as the owners of Eletson

8    Corp., they seek documents relating to a matter as to which

9    they were and still are adverse to Levona.

10          Reed Smith makes several arguments in response.  None

11   is persuasive.

12          First, Reed Smith argues that the Court lacks Article

13   III jurisdiction on the theory that there is no case in

14   controversy because, according to Levona, Pach Shemen and its

15   designee own 99 percent of the equity of Eletson Holdings, and

16   Pach Shemen and Levona are under common ownership and control.

17   Docket number 252 at 2, 13.

18          The Supreme Court has declined to hear a case where

19   "both litigants desire precisely the same result." *Moore v.*

20   *Charlotte Mecklenburg Board of Education*, 402 U.S. 47, 48

21   (1971).  In *United States v. Johnson*, the Court declined to

22   resolve an appeal when the plaintiff filed his lawsuit under a

23   fictitious name at the request of the defendant who sought a

24   friendly lawsuit and where the plaintiff did not employ or even

25   meet his attorney, did not pay any legal expenses, did not read

1    the complaint filed in his name, and had no knowledge of the

2    relief being sought.  319 U.S. 302 (1943).  The argument is

3    without merit here.  It is largely answered by Levona's reply

4    memorandum, with which the Court agrees.  The Court has before

5    it the motion of Levona to vacate the arbitral award and its

6    defenses to that award.  The award has "real meaning" for

7    Levona.  *See United States v. Windsor*, 570 U.S. 744, 758

8    (2013); *INS v. Chada*, 462 U.S. 919, 939 (1983).  As a result of

9    that award, Levona has a contractual obligation to pay millions

10   of dollars, including to third-party nominees designated by the

11   Eletson Holdings who are three Cypriot entities.  Levona seeks

12   to free itself of that obligation.  It also seeks to free

13   itself of the obligation to pay attorneys' fees to Eletson

14   Holdings.

15          All three elements of Article III jurisdiction are

16   established.  First, Levona has suffered an injury in fact.  It

17   currently has an obligation, not vacated, to pay millions to

18   the nominees, Gas and Eletson Holdings.  Second, the injury is

19   actual and imminent.  None of the parties have relieved Levona

20   of its obligation to pay.  Third, there is a causal connection

21   between the injury and the conduct complained of.  Levona's

22   payment obligation resulted from the alleged fraud of Eletson

23   Holdings during the arbitration if the allegations are to be

24   believed.  And, finally, the injury can be redressed by a

25   favorable decision.  If the Court vacates the award, Levona

1  will be relieved of that obligation.  *See Lujan v. Defenders of*

2  *Wildlife*, 504 US, 555, 560 (1992).

3         The fact that Eletson Holdings now shares some common

4  owners with Levona does not mean that the lawsuit is collusive

5  or that Levona is not currently suffering some real injury for

6  which an order would provide real relief.  Levona currently has

7  a huge liability on its books.  That liability is to a number

8  of different parties.  In fact, as things stand, Eletson Gas

9  and the Cypriot nominees are attempting to enforce the award.

10  Docket number 248-1 at 21-24.  Vacating the award would

11  eliminate that liability.

12         It is also not clear that there is a lack of adversity

13  between Levona and Eletson.  First, Reed Smith's argument

14  presumes what it contends is very much at issue in the

15  bankruptcy case, that the new management of Eletson Holdings in

16  fact has the authority to manage Eletson Holdings and that the

17  shares had been issued to Pach Shemen.  Reed Smith is

18  attempting to appeal the confirmation order.

19         Even under the confirmed plan, however, Eletson

20  Holdings and Levona are separate corporations.  There are

21  investors in Eletson Holdings who are not in Levona.  There are

22  creditors of Eletson Holdings who are not creditors of Levona.

23  EHI, Eletson Holdings, has board members who have no duties to

24  or any role in Levona, Murchinson, or Pach Shemen.  Spears'

25  declaration, docket number 244, paragraph 5.  But any lack of

adversity goes only to prudential concerns and not to whether

the Court has Article III jurisdiction.  *Chadha*, 462 U.S. at

940.  And here the prudential concerns argue in favor of the

exercise of jurisdiction.  There exists an award with real-life

consequences for Levona.  The lack of adversity will not result

in a collusive judgment.  First, there is a real possibility

that the third parties who are beneficiaries of the award will

seek to intervene.  Counsel has indicated in the past that they

will do so, and they have every interest to do so.  Docket

number 204 at 2.  And even if did not intervene, that does not

mean that the Court will vacate the award.  Levona will have to

convince the Court that there is a sufficient evidence to

support a conclusion that there was fraud in the arbitration.

*See D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 109 (2d Cir.

2006); *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d

241, 244 (2d Cir. 2004).

In any event, the Court has continuing jurisdiction,

even after the case has concluded, to require attorneys to turn

over their case files to their clients.  *See Kleiman v.

O'Neill*, 2008 WL 5582453 at *4 (E.D.N.Y. Dec. 30, 2008.)

Second, Reed Smith argues that, under Tekni-Plex, it

should not be required to turn over its client files because

they relate to an adversarial proceeding and are not general

business communications.  Docket number 252 at 17-19.  But as I

noted, Reed Smith misreads Tekni-Plex.  The case, even if it

1    were applicable, does not stand for the proposition that a

2    lawyer is obligated to turn over only general business

3    communications.  It carves out a limited exception to *Sage*

4    *Realty*, where the lawyer provided advice to the acquired

5    corporation in a merger as to which it was adverse to the

6    acquiring corporation, and then the acquiring corporation,

7    after the merger was consummated, seeks to obtain the

8    communications to use against the lawyer's then client.

9            In this case, however, the new management and board of

10   Eletson Holdings do not seek the attorney files to sue Eletson

11   Holdings.  It seeks materials to evaluate a litigation that it

12   is in with Levona, a corporation Reed Smith decidedly did not

13   represent.

14           Reed Smith also argues that the request is overbroad

15   because it is not limited to files in connection with this

16   action, but applies more generally to the award and the

17   arbitration proceedings that gave rise to these proceedings.

18           But the arbitration proceedings are inextricably

19   intertwined with these proceedings.  Reed Smith instituted the

20   action to confirm the award and therefore brought the entire

21   proceeding before the Court.  The documents are essential to

22   this litigation in which claims have been made against Eletson

23   Holdings.  Eletson Holdings is entitled to know whether and how

24   to pursue the motion to vacate the award, which is based on the

25   conduct in the arbitration, and its responses to the defenses

1    to the application to confirm the award.

2           As to the question whether Eletson Holdings can share

3    the documents with Levona or other third parties, *Weintraub*

4    answers that question.  It is up to the board and management of

5    Eletson Holdings, and not up to Reed Smith, whether Eletson

6    Holdings seeks to share the documents or not.

7           Third, Reed Smith argues that it holds an attorneys'

8    lien against Eletson Corp.  Docket number 252 at 2.  Under the

9    plan, all applications for allowance and payment of

10   professional fee claims by professionals for services rendered

11   and reimbursement of expenses incurred prior to the effective

12   date were to be filed on or before the professional fee claims

13   bar date.  If they were not filed, they were deemed to have

14   been waived.  Plan Section 2.4(b).  Under Section 5.13, all

15   liens against any property of the estates were fully released

16   and discharged as of the effective date of the plan.  *Id.*

17   Section 5.13.  Property of the estates includes the estate of

18   each of the debtors, and debtors would include wholly owned

19   subsidiaries.  Under 5.2(c) of the plan, on the effective date,

20   "all property in each estate, including all retained causes of

21   action, and any property acquired by any of the debtors,

22   including interests held by the debtors in their respective

23   nondebtor direct and indirect subsidiaries and affiliates,

24   shall vest in reorganized holdings, free and clear of all

25   liens."  Therefore, as of the effective date, any liens against

1   subsidiaries, including Corp., were extinguished.  Reed Smith

2   in fact submitted a claim for $17.7 million in legal fees, and

3   $597,000 in expenses.  That fee application included fees for

4   services provided to Eletson Holdings and to Corp.  Bankruptcy

5   docket number 1325.

6           In short, an attorneys' lien cannot now obstruct

7   Eletson Holdings from acquiring its own client file from Reed

8   Smith.

9           Finally, *sua sponte*, the Court amends the second

10  sentence of its opinion and order of April 19, 2024, at docket

11  number 123.  As originally ordered, the second sentence now

12  began:  "The Court confirms the order." It is amended to add

13  the conditional language:  "Subject to the resolution of

14  Levona's pending motion to vacate the award and its defense

15  based on fraud in the arbitration," so that the second sentence

16  will now begin:  "Subject to the resolution of Levona's pending

17  motion to vacate the award and its defense based on fraud in

18  the arbitration, the Court confirms the award. . ."  The

19  amendment should clarify what should already have been clear

20  from the record, which is that the Court only ruled on the

21  issues that were then in front of it, that there is a question

22  whether the award will be vacated, that until that issue is

23  resolved the Court cannot finally confirm the award, and that

24  when and if the confirmation/vacatur proceedings go to the

25  Second Circuit, they should go in a single package.

1              That's the ruling of the court.

2              I think with respect to the turnover of the files, it

3    should be in the next two weeks.

4              Mr. Solomon, do you have a view on that?

5              MR. SOLOMON:  Yes, your Honor.  We are going to need

6    to get other counsel involved.  I think two weeks is completely

7    impossible even to go through and starting to log those -- I

8    believe we are going to consider with other counsel an appeal.

9    We can't just hand over -- I don't believe that, under the

10   rules of professional responsibility, we just hand over the

11   documents.  We understand exactly what your Honor has ordered.

12             And so, first of all, we are going to need to get back

13   to your Honor.  If your Honor wishes us to make a stay

14   application now, we will.  I would rather have --

15             THE COURT:  I am not going to require you to make a

16   stay application now.  That's one reason why I'm asking about

17   how much time is -- I will hear from the other side, but you

18   don't need to make a stay application right now.  My deadline

19   for your turnover will permit you to make a motion for a stay.

20             MR. SOLOMON:  OK, your Honor.

21             THE COURT:  But tell me how much time you're asking

22   for.  Then I am going to ask the other side.

23             MR. SOLOMON:  Your Honor, we would like 30 days.  We

24   have retained counsel because of everything that has been going

25   on, but I am not sure that that is the counsel that will take

1    the appeal.  So I would like 30 days.

2           We are going to need to get some guidance on

3    *Tekni-Plex*.  I don't think we have the authority to hand over

4    those documents.  But it is possible that there are -- there

5    may be some documents that don't relate to anything.  We are

6    going to have to just go through the files.  We have not done

7    that.  I would like 30 days to do that and, within that time

8    period, make an application for a stay, if counsel intend to

9    make one.

10          THE COURT:  Let me ask the other side.

11          First of all, with respect to *Tekni-Plex*, I don't know

12   what guidance you're looking for, but I have ruled on

13   *Tekni-Plex*.  Let me ask the other side whether there is any

14   particular urgency for the documents.

15          MS. FUREY:  Well, there is, your Honor, and I think

16   this can be done on perhaps a rolling basis.

17          For example, all the documents that Eletson Holdings

18   provided to Reed Smith that were discovery in the case are

19   sitting in Reed Smith's discovery database.  I understand they

20   have their own proprietary database, but it would be like

21   equivalent to relativity or something like that.  Those are a

22   click of the button to produce.  Also all correspondence --

23          THE COURT:  With respect to that, you're talking about

24   the documents that were turned over to Levona in the

25   arbitration?

1          MS. FUREY:  The documents that weren't turned over to

2    Levona and the documents that were turned over to Levona, so

3    all of them.  So both the documents that were produced and the

4    documents that weren't produced, all of those are clearly

5    Eletson Holdings' property.  Also correspondence between

6    Eletson Holdings and Reed Smith and correspondence between Reed

7    Smith, Eletson Holdings and third parties.

8          Obviously, none of that raises any kind of log issues,

9    or anything like that.  I understand it may take them a little

10   longer on their internal correspondence and emails to go

11   through, but it seems like we could do this on a rolling basis.

12         It was unclear when he said 30 days.  Was counsel

13   inferring 30 days to seek a stay or 30 days on the ultimate --

14         THE COURT:  I don't know what he was referring to, but

15   my question to you is, what is the urgency to you getting the

16   documents earlier than 30 days from today?  I have not heard

17   any urgency from you.

18         MS. FUREY:  The one set of documents, frankly, that

19   are far more time sensitive are the corporate documents that

20   relate to like the corporate day-to-day operations of Eletson

21   Holdings that Reed Smith may have that relate -- that would

22   help us in the implementation of the plan.

23         So for those, if there are any such documents, we want

24   them sooner rather than later.  As far as the documents that

25   truly relate to this proceeding against Levona, 30 days'

1    production date is probably fine, your Honor.

2            THE COURT:  I am prepared to set a date of March 17,

3    which I think is your 30 days, Mr. Solomon, to produce the

4    documents and then to set a date for you to move for a stay say

5    seven days from now, with the other side having to respond

6    seven days from now, or if you wanted until the Monday, then

7    you can make it on the Monday with a response seven days after

8    that.

9            MR. SOLOMON:  Your Honor, given that other counsel is

10   going to have to do this, I would like two weeks to make the

11   motion to stay, but I want to be very candid with your Honor.

12   I can't conceive that even by March we will be able to make

13   production.

14           Your Honor, there is an appeal pending on who we are

15   supposed to be reporting to, and your Honor has suggested that

16   that appeal be dismissed, but that itself is going to have to

17   be the subject of discussion with the Second Circuit.  We are

18   all going to be writing to the Second Circuit about that.  So I

19   don't want to be overpromising anything, your Honor.  I am just

20   trying to be candid with the Court.

21           THE COURT:  What I am going to do is set a deadline of

22   March 17 for -- Ms. Furey, how did you put the priority

23   documents?  It was all documents conveyed by Eletson Corp. and

24   Eletson Holdings to counsel in connection with the arbitration

25   and all correspondence between Eletson Holdings and Eletson

1   Corp. and Reed Smith regarding the arbitration?

2            MS. FUREY:  And all correspondence with third parties.

3            THE COURT:  Those documents will be due on March 17

4   absent a stay.  Any remaining documents will be due on

5   March 31.  I am going to set a date for the application for me

6   to stay that order or, in the alternative, to extend it to

7   February 24, and I will receive opposition papers on March 3,

8   reply papers on March 5.

9            In the papers that you submit for a stay or for an

10  extension, Mr. Solomon, you can raise with me all of the issues

11  that identify whether there is a substantial legal issue that

12  justifies a stay, identify for me whatever you want me to know

13  in terms of an appeal, and why the order should be stayed

14  pending an appeal or the appeal that you have got in the

15  bankruptcy confirmation matter.

16           All of those arguments I am not prejudging except to

17  the extent that I have issued a ruling now.  But I am setting a

18  schedule to make sure that they come before the Court so I can

19  rule on a timely basis.

20           MR. SOLOMON:  Thank you, your Honor.

21           The only question I now have is, I don't understand

22  what we are not being required to do by March 17.  Could we

23  have that list again because it sounded like -- first, I heard

24  counsel talk about corporate documents for running of the

25  business.  We know how to look for those documents at least.

1    We were litigation counsel.  We will have those or we won't

2    have those.

3         But the rest, which sounded like every document in

4    connection with three years of litigation that's going on, I

5    think that is every document.  At least I know it's not in the

6    three categories, so I would like a little clarity on that.

7         THE COURT:  The clarity I am going to give you is that

8    I am not going to require you to produce internal firm

9    documents on that date.  I don't know the scope of what would

10   fall within other communications that you may have had in

11   connection with the arbitration or the monetization of the

12   arbitration.  One thing that it surely does not apply to is,

13   for example, draft memoranda that your firm did, any stuff

14   that's internal.

15        With respect to the rest, if there are disputes with

16   respect to the scope of my ruling or what you have or what they

17   are asking for, bring them in front of me.  I have no doubt

18   that unless my order is vacated or you convince me to stay it

19   for a long period of time, that there will be issues that will

20   arise.

21        I should also make it clear that with respect to the

22   privilege log, the privilege log will be due on the later of

23   the two dates.  I am not sure that there would be anything that

24   would fall in the logged category with respect to the earlier

25   production, but if there is something, that would be on the

1  later of the same two dates.  That should eliminate some

2  ambiguity.

3          MR. SOLOMON:  It does, your Honor, with final one

4  clarification requested because that is clear.  Thank you.

5          I did not think your order even applied to the

6  internal documents.  I thought your Honor had excluded those in

7  your opinion.  If we are supposed to have to log those internal

8  documents, that cannot -- I don't believe that can be done in

9  the six weeks that your Honor has given us.

10          THE COURT:  You will raise that with me in your

11  papers.

12          MR. SOLOMON:  Thank you, Judge.

13          THE COURT:  Have a good weekend, everybody.  Thank

14  you.

15          (Adjourned)

16

17

18

19

20

21

22

23

24

25

EXHIBIT "22"

1

2 UNITED STATES BANKRUPTCY COURT

3 SOUTHERN DISTRICT OF NEW YORK

4 - - - - - - - - - - - - - - - - - - - - -x

5

6 In the Matter of:

7 ELETSON HOLDINGS INC. AND REORGANIZED     Main Case No.

8 ELETSON HOLDINGS INC.,                    23-10322-jpm

9        Debtor.

10

11 - - - - - - - - - - - - - - - - - - - - -x

12

13               United States Bankruptcy Court

14               One Bowling Green

15               New York, New York

16

17               January 24, 2025

18               9:02 AM

19

20

21 B E F O R E:

22 HON. JOHN P. MASTANDO, III

23 U.S. BANKRUPTCY JUDGE

24

25 ECRO:  MARIA



1

2   Case Status Conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   Transcribed by:  Michael Drake

21   eScribers, LLC

22   7227 North 16th Street, Suite #207

23   Phoenix, AZ 85020

24   (800) 257-0885

25   operations@escribers.net



www.escribers.net | 800-257-0885

1

2   A P P E A R A N C E S (All present by video or telephone):

3   TOGUT, SEGAL & SEGAL LLP

4          Attorneys for Debtor

5          One Penn Plaza

6          Suite 3335

7          New York, NY 10119

8

9   BY:   JARED C. BORRIELLO, ESQ.

10         LEILA EBRAHIMI, ESQ.

11         JOHN GALLEGO, ESQ.

12         AMANDA C. GLAUBACH, ESQ.

13         BRYAN KOTLIAR, ESQ.

14         JEFFREY LEFKOWITZ, ESQ.

15         MARTHA MARTIR, ESQ.

16         JOHN MCCLAIN, ESQ.

17         KYLE J. ORTIZ, ESQ.

18         DAWN PERSON, ESQ.

19         BRIAN F. SHAUGHNESSY, ESQ.

20

21

22

23

24

25



1

2      REED SMITH LLP

3              Attorneys for Debtor

4              599 Lexington Avenue

5              New York, NY 10022

6

7      BY:    ANDREW BUCK, ESQ.

8              CHRISTOPHER M. LAUKAMG, ESQ.

9              LOUIS M. SOLOMON, ESQ.

10             RICHARD SOLOW, ESQ.

11

12

13     REED SMITH LLP

14             Attorneys for Debtor

15             1717 Arch Street

16             Three Logan Square

17             Suite 3100

18             Philadelphia, PA 19103

19

20     BY:    DEREK J. BAKER, ESQ.

21             DEREK MICHAEL OSEI-BONSU, ESQ.

22             JOSHUA M. PELES, ESQ.

23

24

25



1

2    REED SMITH LLP

3          Attorneys for Debtor

4          1201 Market Street

5          Wilmington, DE 19801

6

7    BY:   KEVIN W. COCKERHAM, ESQ.

8

9

10   REED SMITH LLP

11         Attorneys for Debtor

12         10 South Wacker Drive

13         40th Floor

14         Chicago, IL 60606

15

16   BY:   MICHAEL B. GALIBOIS, ESQ.

17

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20         Office of the United States Trustee

21         1 Bowling Green

22         New York, NY 10707

23

24   BY:   DANIEL RUDEWICZ, ESQ.

25



```
 1

 2    DECHERT LLP

 3          Attorneys for Official Committee of Unsecured Creditors

 4          1095 Avenue of the Americas

 5          New York, NY 10036

 6

 7    BY:   OWEN HANEY, ESQ.

 8          DAVID A. HERMAN, ESQ.

 9          KARLI WADE, ESQ.

10          STEPHEN ZIDE, ESQ.

11

12

13    SIDLEY AUSTIN LLP

14          Attorneys for Shareholders

15          787 Seventh Avenue

16          New York, NY 10019

17

18    BY:   WILLIAM E. CURTIN, ESQ.

19          MICHAEL SABINO, ESQ.

20          ROBERT S. VELEVIS, ESQ.

21

22

23

24

25
```



1

2  PERKINS COIE LLP

3      Attorneys for Wilmington Savings Fund Society, FSB

4      1155 Avenue of the Americas

5      22nd Floor

6      New York, NY 10036

7

8  BY:   TINA N. MOSS, ESQ.

9

10

11  QUINN EMANUEL URQUHART & SULLIVAN LLP

12      Attorneys for Levona Holdings Ltd.

13      295 5th Avenue

14      New York, NY 10016

15

16  BY:   ISAAC NESSER, ESQ.

17

18

19  ALSO PRESENT:

20      ELENA EVANGELATOU, Aegean Baltic Bank

21      MARK LICHTENSTEIN, Eletson Holdings

22      ADAM SPEARS, Eletson Holdings

23

24

25



ELETSON HOLDINGS INC.

1          P R O C E E D I N G S

2          THE COURT:  Good morning everyone.  We're here on Case

3    Number 23-10322.  Can I have appearances for the record,

4    please?

5          MR. ORTIZ:  Good morning, Your Honor.  Kyle Ortiz of

6    Togut, Segal & Segal for Eletson Holdings.

7          THE COURT:  Good morning.

8          MR. HERMAN:  Good morning, Your Honor.  David Herman

9    from Dechert, on behalf of the Official Committee of Unsecured

10   Creditors.

11         THE COURT:  Good morning.

12         MR. HERMAN:  Good morning.

13         MR. RUDEWICZ:  Good morning, Your Honor.  Daniel

14   Rudewicz on behalf of the United States Trustee.

15         THE COURT:  Good morning.

16         MR. CURTIN:  Good morning, Your Honor.  William

17   Curtin, Sidley Austin, for Lassia Investment Co., Glafkos

18   Holding, Inc.  and Family Unity Trust.  Your Honor, I'm joined

19   this morning by my partner, Robert Velevis.

20         As Your Honor knows, this hearing was scheduled last

21   night.  Unfortunately, I have a nonmovable conflict at 9:30.

22   So with Your Honor's permission, I'll drop at 9:30, and Mr.

23   Velevis will remain on to the extent the conference is still

24   going.

25         THE COURT:  Of course.  Good morning.



1          MR. CURTIN:  Thank you, Your Honor.

2          MR. SOLOMON:  Good morning, Your Honor.  Lou Solomon

3    and Josh Pellis for Reed Smith.

4          THE COURT:  Good morning.

5          MR. NESTOR:  Good morning, Your Honor.  It's Isaac

6    Nesser at Quinn Emanuel for Levona.

7          THE COURT:  Good morning.

8          MS. MOSS:  Tina Moss of Perkins Coie on behalf of

9    Wilmington Savings Fund Society, FSB as indenture trustee.

10          THE COURT:  Good morning.

11          Anyone else wishing to appear?  Okay.

12          There are two matters I'd like to cover today.  First

13    is reorganized Eletson Holdings' motion for an order imposing

14    sanctions on Eletson Holdings existing person of record and

15    former shareholders, officers, directors, and counsel,

16    including Reed Smith LLP.  The motion is found at docket number

17    1268.

18          The motion is supported by the declaration of James

19    Pierre and the declaration of Bryan Kotliar.  The motion states

20    that the former debtor's parents, owners, subsidiaries, and

21    affiliates, and their personnel, including officers, directors,

22    and principals, attorneys, and other professionals, and all of

23    the foregoing nominees -- we'll refer to them as former debtors

24    and counsel -- have attempted to subvert the confirmation

25    order, which is found at docket number 1223 by inter alia,



1    arguing that Reorganized Holdings Inc. cannot act in Liberia or

2    Greece without undertaking formal recognition proceedings.

3    That's in the motion at paragraph 37.

4         Reorganized Eletson Holdings Inc. seeks an order, 1,

5    finding that Reorganized Holdings Inc.'s former shareholders,

6    officers, and directors, and Reed Smith have failed to with the

7    confirmation order; 2, compelling the former debtors and

8    counsel to comply with the confirmation order and effectuate

9    the Chapter 11 plan by updating the Liberian International Ship

10   and Corporate Registry, which we'll refer to as LISCR, to

11   reflect Reorganized Eletson Holdings Inc. as the new owner of

12   the reorganized debtor; and 3, finding that former debtors and

13   counsel are in contempt for failing to comply with the

14   confirmation order and should be sanctioned.  That's Id. at

15   pages 15 through 28.

16        The Pierre declaration states that for the reorganized

17   Eletson Holdings Inc.'s amended articles of incorporation to

18   have legal effect in Liberia.  The amended corporate governance

19   documents need to be filed with LISCR.  That's the Pierre

20   declaration at paragraph 7.

21        For reorganized Eletson Holdings Inc. to be recognized

22   in Liberia the address of record, an individual which we'll

23   refer to as the AOR, needs to be amended by "the existing AOR".

24   That's from the declaration on paragraphs 10 through 12.

25        To update the AOR, the corporation's existing AOR can



1    effectuate the change or a Liberian Court can order the LISCR

2    to make the change.  That's Id. at paragraphs 12 through 13.

3         Pierre asserts that the former is the most expeditious

4    option.  That's Id. at paragraph 12.

5         The Official Committee of Unsecured Creditors filed a

6    statement in support of the motion, which we refer to as the

7    committee statement in support.  That's found at docket number

8    1301.  The committee reiterates many of the same points as

9    reorganized Eletson Holdings Inc.

10        Reed Smith filed an opposition to emergency motion of

11   Reorganized Eletson Holdings for an order imposing sanctions.

12   That objection is found in docket 1287.  Reed Smith appears as

13   a respondent to the motion and has also appeared on behalf of

14   the provisional board appointed by a Greek Court, as we will

15   discuss further in a bit, to object to the motion to appoint

16   the foreign representative in that capacity.  That motion was

17   found at docket 1269.

18        The objection filed by Reed Smith is supported by the

19   declaration of Louis Solomon and the declaration of Betty Lamin

20   Blamo and the declaration of Vassilis Hadjieleftheriadis.

21        In the objection, Reed Smith asserts that, 1, they did

22   not violate the confirmation order or the Chapter 11 plan

23   terms, and regardless, compliance with Sections 1141 and 1142

24   of the Bankruptcy Code is not applicable in a foreign

25   jurisdiction; that, 2, complying with the confirmation order



1    entails complying with foreign law because the confirmation

2    order cannot preempt foreign law; that 3, there is no basis for

3    a contempt finding because Reed Smith and other parties were

4    asked to update LISCR and take other actions that directly

5    contradict Liberian law, which requires a recognition

6    proceeding to the confirmation order; that 4, sanctions are

7    inappropriate where Reorganized Holdings Inc. is asking that

8    foreign law be violated in order to implement the plan and

9    enforce the confirmation order; that 5, contempt is not

10   appropriate because Reed Smith complied with efforts to

11   implement the Chapter 11 plan and other document requests; that

12   6, Reed Smith and other parties did not fail to cooperate nor

13   obstruct enforcement of the confirmation order but were asked

14   to violate foreign law; and 7, Reed Smith acknowledges that the

15   representation of reorganized Eletson Holdings Inc. terminated

16   upon the occurrence of the effective date, that's in the

17   Chapter 11 plan at docket 1132, and that they only represent

18   the provisional board of Eletson Holdings Inc., Eletson Corp.,

19   and Eletson Gas, LLC.  That's from the objection, pages 16

20   through 30.

21        The Solomon declaration asserts that upon advice of

22   Liberian counsel, the confirmation order must be recognized in

23   both Greece and Liberia before Reorganized Eletson Holdings

24   Inc. can take any corporate actions, including amending

25   documents with LISCR.  That's from the Solomon declaration,

1    paragraph 40.

2         The Liberian Law Expert witness, Ms. Lamin Blamo,

3    states that Reorganized Eletson Holdings Inc. cannot have the

4    existing AOR amend the AOR with LISCR without first having the

5    confirmation order recognized by a Liberian court because the

6    new shareholders' rights were created in a foreign

7    jurisdiction.  And that's the Lamin Blamo declaration,

8    paragraphs 12 through 14.

9         Lamin Blamo proceeds to state that Reorganized Eletson

10   Holdings Inc. cannot rely on the confirmation order to amend

11   the articles of a Liberian company without recognition.  That's

12   Id. at paragraph 13.

13        Lamin Blamo also states that if this Court attempts to

14   compel the change of the AOR, then this will be a violation of

15   Liberian law and will be recognized by the Liberian court as an

16   attempt to circumvent the applicable laws of Liberia.  That's

17   Id. at paragraph 15.

18        Also in opposition to the motion is the opposition of

19   nonparty Daniolos Law Firm, alleging that as a Greek law firm,

20   they were not served appropriately and that this Court has no

21   jurisdiction over the firm.  That's at docket number 1285.

22   Daniolos Law Firm claims that it represents individuals on the

23   provisional board appointed by the Greek Court.  That's from

24   the Daniolos objection, paragraph 8.

25        Further, the majority shareholders filed an objection



1    to the motion for sanctions.  The shareholders' objection is at

2    docket 1291.  The majority shareholders argue that Section 1142

3    of the Bankruptcy Code cannot negate foreign law and is

4    therefore inapplicable to preempt foreign law.  That's from the

5    objection at paragraphs 12 through 13.

6         And they argue that the AOR cannot be amended by

7    Reorganized Eletson Holdings Inc. until the confirmation order

8    is recognized in Liberia.  That's from the shareholders'

9    objection at 16 through 18.

10        Shareholders concede that the Chapter 11 plan cancels

11   all equity interests in the debtors but asserts that it has no

12   effect under Liberian law.  That's Id. at paragraph 20.  The

13   shareholders cite to section 54 of the confirmation order,

14   alleging that this provision requires that foreign law be

15   complied with to enforce the Chapter 11 plan.  That's Id. at

16   paragraph 25.

17        Reorganized Eletson Holdings Inc. filed an omnibus

18   reply to the objections to its sanctions motion.  The reply is

19   found at docket 1299.  In support of the reply are the rebuttal

20   declaration of James Pierre, we will refer to that as the

21   Pierre rebuttal declaration, and the declaration of Jared

22   Borriello.

23        Pierre asserts that nothing in Liberian law would

24   preclude the current AOR from providing their contact

25   information and from filing amendments to Holdings corporate



1    governance documents.  That's the Pierre rebuttal at paragraph

2    3.

3         He also clarifies that Liberian law does not require

4    recognition of a confirmation order prior to amending the AOR.

5    That's Id. at paragraph 4.

6         Pierre further states that Lamin Blamo's assertion

7    that a non-Liberian Court does not have jurisdiction to enforce

8    orders related to corporate shares in a Liberian company is

9    false because the Business Corporation Act of Liberia, which

10   establishes when a matter is under exclusive jurisdiction of

11   Liberia, states that a court of competent jurisdiction can

12   determine the issuance of shares.  That's Id. at paragraph 5 --

13   paragraphs 5 through 6.

14        Moreover, Pierre explains that the Insolvency and

15   Restructuring Act of Liberia specifically states that it does

16   not apply to non-Liberian corporations, and thus, this Court

17   can enforce the implementation of the plan without recognition

18   in Liberia.

19        Also in connection with the motion, Reed Smith filed a

20   letter on December 17th, 2024 alleging that Reorganized

21   Elletson Holdings Inc. was attempting to subvert the

22   recognition proceeding by having Adam Spears prevent Holdings

23   from responding in the Liberian recognition proceeding.  The

24   December 17th letter is found at docket number 1313.

25        Reed Smith asserts that the issue to be decided in



1    Liberia is whether the foreign court will accord Reorganize

2    Elletson Holdings Inc. all the rights of Holdings.  Attached to

3    that letter is an email from the foreign representative, Mr.

4    Spears, to Ms. Lamin Blamo stating that Ms. Lamin Blamo cannot

5    represent Eletson Holdings Inc. in Liberian proceedings without

6    prior written authorization.

7         In response to the December 17th letter, Reorganized

8    Eletson Holdings Inc. questioned who Reed Smith was purporting

9    to represent and asserted that the firm is effectively

10   preventing the effectuation of the Chapter 11 plan in

11   contravention of the confirmation order.  That is at docket

12   number 1314.

13        Reorganized Eletson Holdings asserts that there is

14   only one Eletson Holdings Inc., which is the Reorganized

15   Eletson Holdings Inc.

16        Further, they assert that former management of

17   Reorganized Eletson Holdings Inc. has hired counsel to oppose

18   Reorganized Eletson Holdings Inc.'s actions in the recognition

19   proceedings.

20        The letter also alleges that Reed Smith is in

21   violation of the Rules of Professional Conduct for representing

22   Eletson Holdings in Liberia because it admits it no longer

23   represents its former client in the bankruptcy proceeding.

24        Reorganized Eletson Holdings filed a letter on

25   December 18th detailing developments in Liberia.  The December



1    18th letter is found at docket number 1316.  That includes

2    details about the recognition proceeding that was then pending

3    in Liberia.  Reorganized Eletson Holdings Inc. asserts that the

4    former debtors are opposing the recognition proceeding and that

5    these actions collaterally attack the confirmation order.

6        Reed Smith responded to the December 18th letter,

7    stating that they are appearing in a joint capacity as a

8    respondent to the sanctions motion and as counsel to the

9    provisional board of Eletson Holdings Inc. in foreign court.

10   That's at docket number 1317.

11       On October -- I'm sorry.  On December 27th, 2024,

12   Reorganized Holdings filed a revised proposed order found at

13   docket 1330, narrowing the relief sought to compel parties to

14   comply with the confirmation order and plan.  Further on

15   December 31st, 2024, Reed Smith filed a limited opposition to

16   the revised proposed order, stating that since they do not

17   represent Eletson Holdings Inc., they cannot direct corporate

18   action of the former debtors and personnel and therefore should

19   not be sanctioned.  That's at docket 1338, paragraph 7.

20       On January 2nd, 2025, Reorganized Eletson Holdings

21   Inc. filed a letter in response to Reed Smith's opposition to

22   the revised proposed order, which is found at docket 1339.

23   Reorganized Eletson Holdings, Inc. explains that it is seeking

24   sanctions only to the extent that the parties failed to comply

25   with the revised proposed order as opposed to seeking sanctions



1    for prior conduct.

2        On January 6th, 2025, the Court held an evidentiary

3    hearing.  Reorganized Eletson Holdings Inc. presented their

4    Liberian law expert, Mr. James Pierre.  And Reed Smith

5    presented their Liberian law expert, Ms. Lamin Blamo.  The

6    parties withdrew their fact witnesses in connection with the

7    motion.  See the hearing transcript at pages 7, 13 through 14,

8    and 17, lines 5 through 15.

9        At the evidentiary hearing, Reorganized Eletson

10   Holdings, again, explained it was narrowing the relief sought

11   in the motion, seeking to have this Court enter an order

12   directing compliance with the confirmation order.  That's from

13   the evidentiary hearing, page 9, line 21 through 10, line 6.

14       Based on this Court's direction, at the conclusion of

15   the evidentiary hearing, parties were directed to submit

16   findings of fact and conclusions of law and post-evidentiary

17   trial briefs.

18       On January 13th, 2025, Reed Smith filed its findings

19   of fact and conclusions of law found at docket number 1356.

20   And on the same date, Reorganized Eletson Holdings filed its

21   proposed findings of fact and conclusions of law, approving

22   pending motion for contempt and other relief.  And that

23   Reorganized findings of fact is found at docket 1355.

24       On January 17th, 2025, Reorganized Eletson Holdings

25   filed its post-trial brief concerning the sanctions motion.



1 Reorganized post-trial brief is found at docket 1371. And also

2 on January 17th, Reed Smith filed its post-hearing brief in

3 opposition to emergency motion. Reed Smith's post-trial brief

4 is found at docket 1372.

5 Based on the above and considering the evidence

6 submitted in support and opposition of the motion, the Court

7 finds as follows.

8 On October 25th, 2024, the Court issued its memorandum

9 opinion and order confirming petitioner's -- confirming

10 petitioning creditors' amended Joint Chapter 11 plan, the

11 reorganization of Eletson Holdings Inc. and its affiliated

12 debtors, sustaining objections to completing plan and denying

13 motion in limine. That memorandum opinion and order is found

14 at docket 1212.

15 The Chapter 11 plan contains, among other provisions,

16 the following. Section 5.2(c) states that, "On the effective

17 date, all property in each estate, including all retained

18 causes of action and any property acquired by any of the

19 debtors, including interests held by the debtors in their

20 respective non-debtor direct and indirect subsidiaries and

21 affiliates, shall vest in Reorganized Holdings, free and clear

22 of all liens, claims, charges or other encumbrances."

23 Section 5.4 states that, "On the effective date, all

24 notes, stock were permitted by applicable law. Instruments,

25 certificates, agreements, side letters, fee letters, and other



ELETSON HOLDINGS INC.

1    documents evidencing or giving rise to claims against an

2    interest in the debtors shall be canceled and the obligations

3    of the debtors thereunder, or in any way related thereto, shall

4    be fully released, terminated, extinguished, and discharged."

5         Section 5.8 states that, "On the effective date,

6    Reorganized Holdings is authorized to issue or cause to be

7    issued the reorganized equity in accordance with the terms of

8    this plan."

9         And Section 5.10(c) states that, "The members of the

10    governing body of each debtor prior to the effective date, in

11    their capacities as such, shall have no continuing obligations

12    to Reorganize Holdings on or after the effective date, and each

13    such member will be deemed to have resigned or shall otherwise

14    cease to be a director or manager of the applicable debtor on

15    the effective date."

16         And Section 5.11 of the plan states that, "The

17    appropriate officers of the debtors for Reorganized Holdings as

18    applicable shall be authorized and, as applicable, directed to

19    issue, execute, and deliver the agreements, documents,

20    securities, and instruments contemplated by this plan or

21    necessary or desirable to effectuate any transaction hereunder

22    in the name of and on behalf of the debtors or Reorganized

23    Holdings as applicable, including the rights, offering

24    procedures, the shareholders agreement, the backstop agreement,

25    and any and all other agreements, documents, securities, and



ELETSON HOLDINGS INC.

1    instruments relating to the foregoing to the extent not

2    previously authorized by the Bankruptcy Court."

3            On November 4th, 2024, the Court entered the findings

4    of fact, conclusions of law, and order confirming petitioner's

5    amended joint Chapter 11 plan of Eletson Holdings and its

6    affiliated debtors.  That's the confirmation order, which is

7    found at docket 1223.

8            The confirmation order in relevant part states that,

9    "The debtors are hereby authorized and directed to take or not

10   take any and all actions as instructed by the petitioning

11   creditors and shall not take any actions inconsistent with the

12   plan or this confirmation order."  That's from the confirmation

13   order, paragraph 5(3).

14           Also, "On and after the effective date, except as

15   otherwise provided in the plan, Reorganized Holdings may

16   operate its business and may use, acquire, or dispose of

17   property and maintain, prosecute, abandon, comprise, or settle

18   any claims, interests, or causes of action."  That's Id. at

19   paragraph 7.

20           Confirmation order also enjoins former holders of

21   interest and their personnel from taking actions to interfere

22   with the implementation or consummation of the plan.  That's

23   Id. at paragraph 12.

24           No stay of the confirmation order was sought or

25   obtained, see e.g. judge -- the hearing before Judge Liman,



1    that transcript at paragraphs -- at page 25, lines 11 through

2    13.

3            On November 7th, 2024, Reed Smith, "On behalf of

4    Eletson Holdings Inc., Eletson Finance US, LLC, and

5    Agathonissos LLC, filed a notice of appeal with the U.S.

6    District Court for the Southern District of New York, appealing

7    the memorandum opinion and confirmation order."  That's at

8    docket number 1233.

9            During the Chapter 11 cases, the board of directors

10   consisted of the following:  Vassilis Hadjieleftheriadis,

11   Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Emmanuel

12   Andreoulakis, Vassilis Kertsikoff, Eleni Giannakopoulou,

13   Panagiotis Konstantaras, and Laskarina Karastamati.  That is

14   the previous board.  See Trial Exhibit 31.

15           On November 12th, 2024, the First Instance Court of

16   Piraeus in Greece, which I'll refer to as the Greek Court,

17   appointed a provisional board to oversee Eletson Holdings Inc.

18   See Trial Exhibit 81.

19           The provisional board was appointed because after

20   certain members of the previous board resigned, those members

21   being Laskarina Karastamati, Vassilis Kertsikoff, Eleni

22   Karastamati, and Panagiotis Konstantaras, those members

23   resigned on November 8th, 2024.  And then Elafonissos Shipping

24   Corp and Keros Shipping Corp, the former minority shareholders,

25   they sought relief from the Greek Court to appoint a temporary



1    board to manage the company while the confirmation order is

2    being appealed.  That's at Trial Exhibit 31.

3         The provisional board includes certain of the previous

4    board members.  The provisional board is Vassilis

5    Hadjieleftheriadis, Ioannis Zilakos, Niki Zilakos, Adrianos

6    Psomadakis-Karastamatis, Eleni Giannakopoulou, Panos Paxinos,

7    and Emmanuel Andreulaks.  That's from Trial Exhibit 104.

8         No recognition of the Greek Court order has been

9    sought in the U.S. or Liberia based on the evidence presented

10   at trial.  See Reorganized findings of fact paragraph 116 and

11   Trial Exhibit 104.

12        Also, prior to the effective date, the shareholders

13   included the minority shareholders who were just identified and

14   Lassia Investment Company, Family Unity Trust Company, and

15   Glafkos Trust Company, which are the majority shareholders.

16   See Trial Exhibit 31.

17        On November 19th, 2024, the Chapter 11 plan became

18   effective.  See ECF docket number 1258.

19        Pursuant to the plan, the Reorganized Eletson Holdings

20   entity was created, and the former board was dissolved and

21   terminated.  That's the plan, Sections 5.10C and 10.6.

22        Reed Smith's representation of Eletson Holdings Inc.

23   was terminated.  That's the Chapter 11 plan 2.5A.  And the

24   shares became vested in the new corporation.  That's section

25   5.8.  See also Trial Exhibits 25, 26, and 101.



ELETSON HOLDINGS INC.

1            Additionally, pursuant to sections 3.1 and 3.2, "on

2       the effective date, each allowed existing equity interest shall

3       be discharged, canceled, released, and extinguished with any

4       distributions to holders."  See Reorganized findings of fact,

5       paragraph 34, and the Chapter 11 plan, sections 3.1 through 2.

6            Further, the articles of incorporation were amended,

7       reflecting the reorganized entity.  See Trial Exhibits 25, 26,

8       and 101.

9            Thus, upon the effective date, equity interest of the

10      former debtors were extinguished, and all equity interest in

11      Reorganized Holdings were issued to the new holders.  See the

12      plan sections 5.4 and 5.8 and Reorganized findings of fact,

13      paragraph 21.

14           The new members of the board of directors were Adam

15      Spears, Leonard Hoskinson, and Timothy Matthews.  That's in the

16      plan, Sections 5.10A, and Trial Exhibit 101.

17           On November 25th, 2024, Reorganized Holdings filed the

18      stipulation and agreement to dismiss appeal under Rule 8023 of

19      the Federal Rules of Bankruptcy Procedure to dismiss the

20      confirmation appeal.  That's Case Number 24-cv-08672, docket

21      number 9.

22           Reed Smith filed a letter on November 26th, 2024

23      opposing dismissal, stating that the dismissal "raises the same

24      issue of who actually has the capacity and authority to act for

25      Holdings, including by retaining counsel that we have raised in



1    the confirmation action."  That's Id. at docket number 10.

2        Reed Smith asked the Court to refrain from ruling

3    until the "capacity issue was resolved."

4        When asked by Judge Liman at the hearing on the

5    confirmation appeal on behalf of whom Reed Smith was appearing,

6    counsel responded, "We are representing Eletson Holdings.

7    Eletson Holdings continues to exist.  We call it provisional

8    just so that we don't get confused."  That's from the

9    transcript before Judge Liman, page 16, line 22 through 25;

10   page 17, line 1 through 3.

11       Reed Smith relied in part on sections 5.2B and 5.4 to

12   argue that the shares were not canceled by applicable law and

13   therefore there still exists Eletson Holdings Inc.

14       Considering the arguments made at the hearing on

15   December 23rd, 2024, Judge Liman dismissed the confirmation

16   appeal at that hearing based in part on section 5.2.  Judge

17   Liman stated in relevant part at the hearing, "Because, number

18   1, there is an order of the Court, the Bankruptcy Court, that

19   has become final that I am to honor.  And that order recognizes

20   the new board of Eletson, gives the new board of Eletson under

21   5.2 of the plan the ability to act on behalf of Eletson, that's

22   under 5.10 and 5.11 of the plan, and gives them under the Plan

23   of confirmation authority with respect to this appeal.  If the

24   former owners of Eletson, the former directors of Eletson want

25   relief from those provisions of the plan, go to what is or



1    would have been the Bankruptcy Court and not to me."  That's

2    Trial Exhibit 40, the Judge Liman hearing transcript, page 31,

3    lines 13 through 23, and some bracketed words were inserted in

4    that quote just for context.

5        The Court finds that as of the effective date, and

6    consistent with Judge Liman's ruling dismissing the

7    confirmation appeal, the board members of the former debtor,

8    certain of whom are now members of the provisional board, were

9    automatically "deemed to have resigned or otherwise ceased to

10   be a director or manager of Eletson Holdings Inc."  That's from

11   the plan at section 5.10C.

12       Thus, the current board members, again, consistent

13   with Judge Liman's ruling, are the new board of directors

14   appointed pursuant to the confirmation order and plan to also

15   reorganize findings of fact, paragraph 169.

16       Essentially, Reorganized Eletson Holdings --

17   "Reorganized Eletson Holdings Inc., the same corporate entity

18   as the former debtor, Eletson Holdings, but with the new

19   owners, board, and management approved by this court in the

20   confirmation order", is the only Eletson Holdings Inc.  That is

21   a quote from reorganized post-trial brief, paragraph 3.

22       Further, as stated above, Judge Liman found that this

23   Court's "order recognizes the new board of Eletson and gives

24   the new board of Eletson under section 5.2 of the plan the

25   ability to act on behalf of Eletson, which is under sections



1   5.10 and 5.11 of the plan and gives them under the plan

2   authority."  Again, that's Trial Exhibit 40, Judge Liman's

3   hearing transcript, page 31, lines 15 through 17, with certain

4   words inserted in brackets for context.  And see also the

5   Chapter 11 plan, Sections 5.2, 5.4, and 5.10.

6       Thus, pursuant to the plan, the equity interest in the

7   former debtors were extinguished, and the equity interest in

8   reorganized Eletson Holdings Inc. were issued to the new

9   holders.  See e.g. Reorganized findings of fact, paragraph 21,

10  the PA rebuttal declaration at paragraph 15, and the January

11  6th hearing transcript, page 155, lines 12 through 156, line 2,

12  and also page 86, page 87, line 6 through 25.

13      Further, the confirmation order and Chapter 11 plan

14  are binding on the former debtor's counsel as these parties

15  actively appeared and participated in the bankruptcy case.  See

16  docket number 515 and 930 for example.  These parties availed

17  themselves of the Bankruptcy Court and are subject to enforcing

18  the confirmation order and Chapter 11 plan.  Reed Smith's

19  objection does not challenge that the confirmation order is

20  binding on these parties.

21      Turning to the Bankruptcy Code, Section 1141 of the

22  Code provides that, A, except as provided in subsections (d)(2)

23  and (d)(3) of this section, the provisions of a confirmed plan

24  bind the debtor, any entity issuing securities under the plan,

25  any entity acquiring property under the plan, and any creditor,



1   equity security holder, or general partner in the debtor,

2   whether or not the claim or interest of such creditor, equity,

3   security holder, or general partner is impaired under the plan,

4   and whether or not such creditor, equity security holder, or

5   general partner has accepted the plan.

6        1141(c) provides, except as provided in subsections

7   (d)(2) and (d)(3) of the section, and except as otherwise

8   provided in the plan or in the order confirming the plan, after

9   confirmation of a plan, the property dealt with by the plan is

10  free and clear of all claims and interest of creditors, equity

11  security holders, and of general partners in the debtor, and

12  (d) provides, except as otherwise provided in the subsection in

13  the plan or in the order confirming the plan, the confirmation

14  of a plan terminates all rights and interests of equity

15  security holders and general partners provided for by the plan.

16       Section 1142 of the Bankruptcy Code provides that, A,

17  notwithstanding any otherwise applicable nonbankruptcy law,

18  rule, or regulation relating to financial condition, the debtor

19  and any entity organized for the purpose of carrying out the

20  plan shall carry out the plan and shall comply with any orders

21  of the Court.  And B, the Court may direct the debtor and any

22  other necessary party to execute or deliver or to join in the

23  execution or delivery of any instrument required to effect a

24  transfer of property dealt with by a confirmed plan and to

25  perform any other act that is necessary for the consummation of



1    the plan.  And there are ellipses within both of those

2    paragraphs A and B.  That's section 1142.

3          Section 1141 states that the confirmation plan binds

4    debtors and creditors to all the plan's provisions.  See Shore

5    Snap Corp v. State Street Bank and Trust, 948 F.2d 869, 873.

6    That's Second Circuit, 1991.

7          And Section 1142 generally concerns implementation of

8    the plan.  See In re Voyager Digital Holdings Inc., 649 B.R.

9    111, 134 (Bankr. S.D.N.Y. 2023).

10         The Court agrees with reorganized Eletson Holdings

11    Inc. and the unsecured creditors' committee that section

12    1142(b) empowers the Court to enforce implementation of the

13    plan terms that are not complied with.  See In re Worldcom,

14    2009 WL at 2959457 at *7 (Bankr. S.D.N.Y. May 2009).  "Section

15    1142(b) empowers the Bankruptcy Court to enforce the

16    unperformed terms of a confirmed plan."

17         For instance, in In re Ray Krypton, the Court

18    sanctioned the debtor for failing to comply with the terms of

19    the confirmation order, which included a settlement agreement

20    to transfer certain licenses.  See In re Krypton, 181 B.R. 657,

21    661 (Bankr. S.D. Fla. 1995).  The court there held that "plan

22    proponents may request provisions in a confirmation order

23    pursuant to 1142 of the Code, requiring these unwilling parties

24    to take those actions necessary to implement a confirmed plan."

25    That's Id. at 666.



ELETSON HOLDINGS INC.

1    Where a debtor refuses to comply with terms of a

2  confirmation order, the Court may direct the debtor to comply.

3  See In re Riverside Nursing Home, 137 B.R. 134, 138 (Bankr.

4  S.D.N.Y. 1992).  "Subsection B of 1142 expressly authorizes the

5  Court to direct a recalcitrant debtor or any other party to

6  perform acts necessary to consummate the plan."

7    While the purpose of section 1142(b) of the Code is to

8  "enforce the unperformed terms of a confirmed plan", 1142(b)

9  "does not confer any substantive rights on a party apart from

10  what is provided for in the plan."  See In re Lehman Brothers

11  Holdings, 591 B.R. 153, 159 (Bankr. S.D.N.Y. 2018).

12    The confirmation order in the Chapter 11 plan here

13  reflect what Section 1142 dictates by inter alia providing for

14  compliance with the terms of the Chapter 11 plan.  See the

15  Chapter 11 plan at paragraph 5.2B and see the confirmation

16  order at paragraph 5.

17    Indeed, as stated in the committee statement in

18  support of the motion, the confirmation order provides that

19  "the debtors and the petitioning creditors and each of their

20  respective related parties are hereby directed to cooperate in

21  good faith to implement and consummate the plan."  That's the

22  That's the committee's statement in support at page 4.  See

23  also the confirmation order, paragraph 5.1.

24    Related parties, that term is defined in the Chapter

25  11 plan as "the debtor's predecessors, successors and assigns,



ELETSON HOLDINGS INC.

1    the debtor's parents, owners, subsidiaries, and affiliates,

2    current and former officers, directors, principals, direct and

3    indirect equity holders, fiduciaries, employees, agents,

4    attorneys, managers, representatives, and other professionals,

5    and all of the foregoing's respective heirs, servants, and

6    nominees."  That's from the plan, paragraph 1.124.  The

7    confirmation order and Chapter 11 plan instruct these related

8    parties to comply.

9         Section 5.2B of the plan states that "the debtors with

10   the prior written consent of Reorganized Holdings may, in their

11   discretion, take such action as permitted by applicable law,

12   including those Reorganized Holdings determine are reasonable,

13   necessary, or appropriate to effectuate the plan."  That's from

14   5.2B and certain ellipses within the quote.

15        And as stated, paragraph 5.1 of the confirmation order

16   states that the debtors and related parties "shall be and are

17   hereby authorized and empowered to execute, deliver, file, or

18   record such instruments" -- I'm sorry -- "such contracts,

19   instruments, releases, and other agreements or documents, and

20   take such actions as are necessary or appropriate to consummate

21   the plan, including the issuance of any equity interests in

22   connection with the plan."  That's from the confirmation order,

23   paragraph 5.1.

24        And paragraph 12 of the confirmation order states "all

25   parties in interest, along with their respective present or



1    former employees, agents, officers, directors, principals, and

2    affiliates shall be enjoined from taking any actions to

3    interfere with interfere with the implementation or

4    consummation of the plan."  That's from the confirmation order,

5    paragraph 12.

6            From the case law perspective, reorganized Eletson

7    Holdings Inc. cites to In re Navigator Gas Transport PLC, a

8    case in which the court sanctioned the debtors for failing to

9    implement the plan.  See Navigator Gas, Case Number 03-10471,

10   docket number 319, which is the sanctions order.  And see also

11   In re Navigator Gas, 358 B.R. 80, 83 (Bankr. S.D.N.Y. 2006).

12           In that case, Navigator Gas Transport and Isle of Man

13   Corporation that owned and operated ships outside of the United

14   States filed for Chapter 11 in 2003.  That's 358 B.R. at 82 to

15   83.

16           The court confirmed the unsecured creditors' Chapter

17   11 plan, which ordered the transfer of the company's shares to

18   the debtor's creditors.  That's Navigator Gas at 358 B.R. at 83

19   to 84.

20           The largest shareholder, whose board was controlled by

21   the debtor's directors, filed a petition in a foreign court "to

22   obstruct consummation of the plan."  That's from Navigator Gas

23   at docket number 303.  See also 358 B.R. at 82 to 83.

24           Subsequently, the plan proponents filed a motion

25   pursuant to 11 U.S.C. Sections 105(a) and 1142(b), seeking to



1    have the parties comply with the confirmation order and to find

2    the parties in contempt.  That's from the Navigator docket at

3    303.

4         Reed Smith argues that this case is not informative

5    because the sanctions order there did not address section 1142,

6    and the cooperation clause was different from the current

7    confirmation order.  See the Reed Smith post-trial brief at

8    paragraphs 34 and 35.

9         However, the Court finds that this case is instructive

10   because it highlights that the Court is empowered by section

11   1142 to implement the terms of a confirmation order on Chapter

12   11 plan even where such plan contemplates a reorganization of

13   the corporate entity which may operate in a foreign

14   jurisdiction.  Both the sanctions order in Navigator and the

15   confirmation order in this case direct former debtors and their

16   personnel to cooperate to implement the terms of the Chapter 11

17   plan.

18        Reed Smith further argues that asking this Court to

19   exercise its "powers under Sections 1141 and 1142 of the

20   Bankruptcy Code to order Holdings to comply with the

21   implementation of the plan, regardless of foreign law", is

22   impermissible.  That's the Reed Smith findings of facts at

23   paragraph 148.

24        Reed Smith asserts that "no case has ever interpreted

25   1142 to preempt foreign law."  That's Reed Smith's post-trial



1    brief at paragraph 33.

2         While Reed Smith argues that Section 1142 of the

3    Bankruptcy Code applies to just state preemption, this argument

4    misses the point because the Court is not seeking to displace

5    foreign law here with this Court's order but to enforce the

6    confirmation order, which may involve implementing corporate

7    acts in a foreign jurisdiction.  The cases cited in support by

8    Reed Smith are distinguishable for this reason.  See, for

9    instance, PG&E v. Cal Department of Toxic Substances, 350 F.3d

10   942 (9th Cir. 2003).

11        In PG&E, the issue before the court was an issue of

12   state law preemption.  That's Id. at 934.

13        Specifically, the Ninth Circuit held that "under

14   section 1142(a), nonbankruptcy law is expressly preempted by a

15   reorganization plan only to the extent that such law 'relates

16   to financial condition.'"  That's Id. at 937.

17        However, Reed Smith's argument that foreign preemption

18   effect of Section 1142 is inapplicable is moot because, again,

19   the Court is addressing reliance on Section 1142 to enforce

20   compliance with the confirmation order and plan, which are both

21   before this Court.  Section 1142 "imposes an affirmative

22   statutory obligation on the debtor's other entities and their

23   personnel to do what the plan contemplates."  See In re Voyager

24   Digital, 649 B.R. at 134.

25        Reed Smith asserts that Section 1142 cannot "serve as



1    a basis to sidestep otherwise applicable foreign law."  That's

2    from the objection in paragraph 51.  But again, that is not the

3    case here.

4         Reed Smith cites to In re HBLS in their post-trial

5    brief to support the argument that this Court need not "inject

6    itself into proceedings" that can be handled in Liberia.

7    That's from the post-trial brief at paragraph 46.

8         However, In re HBLS, L.P., that case involved a debtor

9    who sought to reopen a bankruptcy case to relitigate issues

10   already determined in the Bankruptcy Court.  That's at 468 B.R.

11   at 639.

12        The court determined that the foreign court gave

13   effect to the bankruptcy mediator's determinations there.  So

14   reopening the case to relitigate the issues would be

15   "meaningless".  That's Id. at page 640.  Here the Court is not

16   addressing determinations by a Liberian court.  The Court is

17   ruling on the Chapter 11 plan and confirmation order in this

18   Court.

19        Reed Smith argues that Liberian law does not permit

20   cancellation of stock without recognition.  They assert that

21   since Holdings is a Liberian corporation, Holdings has not

22   undergone a change in ownership because the confirmation order

23   and Chapter 11 plan have not complied with applicable foreign

24   law through recognition in Liberia.  That's the post-trial

25   brief, paragraphs 18 through 19.



1       Reed Smith also argues that Reorganized Holdings must

2   not preempt foreign law by changing the AOR and amending the

3   corporate governance documents with LISCR.  That's Id. at

4   paragraph 27.

5       They assert that international comity dictates

6   rejecting reorganized efforts to change the AOR.  That's Id. at

7   paragraph 39.

8       The Court disagrees for the following reasons.  The

9   Court agrees with Reorganized Holdings Inc. that just because

10  the plan references compliance with applicable law, that does

11  not mean that there is applicable law that needs to be applied

12  here or that is not being followed for the purposes of this

13  motion.  The evidence at trial provided in support of and in

14  opposition to the motion focused on whether Liberian law

15  "prohibits a party from unilaterally updating the AOR or

16  updating it pursuant to an American court order."  That's from

17  Reorganized post-trial brief, paragraph 1.

18      First, Reorganize Eletson Holding Inc.'s witness,

19  James Pierre, explain that the "corporate governance documents

20  required to be filed with LISCR can only be filed from the

21  nonresident Liberian corporation's existing address of record."

22  That's the AOR as we previously identified.  See Trial exhibit

23  21.  See also the Pierre declaration in paragraph 10.

24      The AOR is the "authorized representative of the

25  corporation" who is appointed by the shareholders of the



1    company to communicate with LISCR.  That's the Lamin Blamo

2    testimony, page 130, lines 22 through 25.

3        The appointment of an AOR must be consistent with the

4    company's articles and bylaws, which informs "how decisions are

5    made by the board."  That's from Lamin Blamo testimony, page

6    131, line 7 through 13.

7        Since the AOR is not public information, the existing

8    AOR after a merger or restructuring "will make the necessary

9    filings with LISCR, which usually includes the existing AOR,

10   notifying LISCR of an or change."  That's the Pierre

11   declaration, paragraph 13.

12       The record indicates that changing the AOR is an

13   administrative task as "Liberian law is silent regarding an

14   address of record, and the AOR is a concept created by and

15   rooted in LISCR's own internal policies."  That's from

16   Reorganized post-trial brief, paragraph 12, citing the Pierre

17   hearing transcript testimony at 73, lines 5 through 16.

18       Even Reed Smith's Liberian expert witness stated that

19   in the ordinary course, the shareholders can inform the AOR to

20   instruct LISCR to accept amended articles of incorporation as

21   "the authority is derived from the shareholders as per the

22   PCA."  That's from Ms. Lamin Blamo's testimony, page 141, line

23   19 through page 150, line 1.

24       Thus, if the existing shareholders, whether

25   Reorganized Eletson Holdings Inc.'s shareholders or the prior



ELETSON HOLDINGS INC.

1   shareholders, instruct the current AOR to change the AOR, they

2   can do so without violating Liberian law.  See again the

3   hearing transcript testimony of Ms. Lamin Blamo, page 150,

4   lines 22 through 23.

5        Second, to the extent foreign law is applicable, it

6   informs parties of the procedural process to file the

7   corporation's amended corporate governance documents such as

8   the amended articles.  Contrary to what Ms. Lamin Blamo states,

9   this Court is not directing the "Liberian government to take

10  any action pursuant" to the confirmation order.  That's

11  Liberian -- I'm sorry, Ms. Lamin Blamo's testimony at page 127,

12  lines 2 through 7.

13       Ms. Lamin Blamo stated that LISCR would not accept the

14  amended articles of incorporation because "it's being done

15  pursuant to a foreign court order."  That's from the hearing

16  transcript, page 178, lines 18 to 25.  But this is incorrect.

17  Rather, the Court is directing compliance with the confirmation

18  order which states that the former debtors and counsel must

19  help effectuate the terms of the plan, which includes updating

20  the corporation's existing AOR on file with LISCR or directing

21  the AOR to file the amended corporate governance documents for

22  the corporation, which includes the articles with LISCR.

23  That's the Pierre declaration, paragraph 12, Reorganized post-

24  trial brief, paragraph 12, and Ms. Lamin Blamo's trial

25  testimony, page 153, line 20 through 154, line 4.



1          Therefore, Reorganized Eletson Holdings Inc. may

2     direct the current AOR to "change the AOR to a representative

3     within Reorganized Holdings' new owner's control" and submit

4     the amended corporate governance documents to LISCR pursuant to

5     current shareholder direction, regardless of who those current

6     shareholders are.  See the Reorganized post-trial brief,

7     paragraph 10.  This is consistent with the confirmation order,

8     which directs the former debtors and their counsel to execute

9     or file documents to implement the plan.

10          Amending the AOR and filing the amended articles of

11     incorporation is also consistent with Judge Liman's

12     determination in the confirmation appeal that the confirmation

13     order is final as the former debtors and counsel did not seek a

14     stay of the confirmation order and the order directs -- the

15     order recognizes a new board of Eletson Holdings Inc. pursuant

16     to Sections 5.2, 5.10, and 5.11, among others of the plan, and

17     the new board of directors can take whatever actions it deems

18     appropriate on behalf of Eletson.  See Trial Exhibit 40, the

19     Judge Liman hearing transcript, page 31, line 10 through 23.

20          As Judge Liman stated and I previously quoted, the

21     order "recognizes the new board of Eletson, gives the new board

22     under Section 5.2 the ability to act on behalf of Eletson.

23     That's under Sections 5.10 and 5.11 of the plan."

24          Despite the confirmation order and Judge Liman's

25     ruling, the former debtors and counsel have refused "to



ELETSON HOLDINGS INC.

1   exercise their corporate authority to effectuate the transfer

2   of ownership the plan requires."  That's from the committee's

3   statement in support at paragraph 8.

4        Reed Smith's arguments that international comity

5   applies is mistaken as "Reorganized Holdings has not asked the

6   former debtors nor related parties to do anything that requires

7   Liberian government or court enforcement.  Rather, Reorganized

8   Holdings is asking this Court to enforce the confirmation order

9   against the parties that are already bound by it."  That's

10  Reorganized post-trial brief, paragraph 14.

11       Cases Reed Smith cites in support miss the point

12  because they address regulating foreign law.  For instance, In

13  re Vitamin C Antitrust Litigation, they cite in support of

14  their argument that statutes such as the Bankruptcy Code should

15  not be interpreted to regulate foreign persons "if that

16  regulation would conflict with principles of international

17  comity."  That's from Reed Smith's post-trial brief, paragraph

18  39.  See also the In re Vitamin Antitrust Litigation case, 8

19  F.4th 136, 143, note 8 (2d Cir. 2021).

20       This case and others cited address international

21  comity where U.S. law contradicts foreign law.  In In re

22  Vitamin C Antitrust Litigation, the parties were disputing

23  whether "Chinese law required defendants to engage in

24  anticompetitive conduct that violated U.S. antitrust laws such

25  that a true conflict exists."  That's In re vitamin C



1    Antitrust, 8 F.4th at 143.

2          Here, the issue is whether this Court can compel

3    compliance with the confirmation order and plan so that

4    Reorganized Eletson Holdings Inc. may take the lawful actions

5    they deem necessary.  That's Reorganized Holdings brief --

6    post-trial brief, paragraph 14.

7          As stated by the Unsecured Creditors' Committee, "this

8    Court need not force foreign officials to implement the plan in

9    reliance on the confirmation order.  Rather, the plan and

10   confirmation order require the former debtors and their former

11   officers and directors who have the requisite corporate

12   authority and who are all subject to this Court's jurisdiction,

13   to undertake any corporate actions necessary to effectuate the

14   transfer of ownership."  That's the committee's statement in

15   support, paragraphs 4 and 8.

16         Third, while it may not be clear whether LISCR will

17   choose to accept the actions of the AOR, that's Ms. Lamin

18   Blamo's trial testimony at page 169, line 21 to 25, this Court

19   reiterates that the evidence in the record "demonstrates that

20   there are no legal roadblocks in Liberia to prevent the former

21   debtors and related parties from changing the AOR as they were

22   directed to help implement the plan."  Again, that's the

23   Reorganized post-trial brief, paragraph 16, certain language

24   inserted in brackets.

25         Even Ms. Lamin Blamo has affirmed that a corporation



ELETSON HOLDINGS INC.

1    is permitted to amend its articles pursuant to its own bylaws.

2    That was the hearing transcript testimony, page 131, line 7

3    through 13.

4        Finally, despite Ms. Lamin Blamo's statements that

5    recognition must be attained to amend the board pursuant to a

6    foreign court order, on January 3rd, 2025, Mr.

7    Hadjieleftheriadis filed a certificate of election and

8    incumbency of Eletson Holdings, the provisional board's

9    Liberian Certificate with LISCR, which states that in addition

10   to naming the other board members from the previous board that

11   would serve on the provisional board, Mr. Hadjieleftheriadis is

12   the "acting president, treasurer, director of Eletson Holdings,

13   Inc."  That's Trial Exhibit 104.

14       Ms. Lamin Blamo stated that, "if a foreign Court

15   appointed a board and that appointment has not been recognized,

16   it is my opinion that the actions of the board would not be

17   recognized by a competent Liberian authority."  That's from Ms.

18   Lamin Blamo's testimony, page 165, lines 19 through 24.

19       However, "there is no evidence that the Greek order

20   was recognized by the Liberian Court," Reorganized findings of

21   fact, paragraph 116, nor has it been sought to be recognized in

22   this Court.

23       In summary, Reed Smith did not present evidence

24   establishing that compelling the former directors and counsel

25   to comply with the confirmation order and Chapter 11 plan to



ELETSON HOLDINGS INC.

1   assist Reorganized Eletson Holdings in amending the current AOR

2   and filing the requisite corporate governance documents for the

3   corporation with LISCR would be a violation of foreign law.

4   See again, e.g. the Pierre declaration in paragraph 10 and

5   Pierre rebuttal, paragraph 4.  Reorganized Eletson Holdings

6   Inc.'s former shareholders, directors, counsel, nominees, and

7   other personnel must therefore comply with the terms of the

8   plan and the confirmation order.

9        Thus, it is ordered that one, since no stay of the

10  confirmation order was sought and consistent with Judge Liman's

11  ruling in dismissing the confirmation appeal, the confirmation

12  order and Chapter 11 plan are binding on Reorganized Eletson

13  Holdings Inc.'s former shareholders, officers, directors,

14  counsel, nominees and others defined in section 1.124 of the

15  plan pursuant to Section 1141 and 1142 of the Bankruptcy Code.

16       Pursuant to section 1142 of the Bankruptcy Code,

17  Reorganized Eletson Holdings Inc.'s former shareholders,

18  officers, directors, counsel, and others, as defined in section

19  1.124 of the plan, are directed to comply with the plan and the

20  confirmation order to assist in effectuating the Chapter 11

21  plan.  And they are ordered to take all steps reasonably

22  necessary as requested by the board of Reorganized Eletson

23  Holdings Inc. or its agent to assist in amending the AOR and

24  updating the corporate governance documents, including the

25  amended articles of incorporation with LISCR, within seven days



1    of the date of the order to be issued following this ruling.

2    That order shall be served upon relevant parties in accordance

3    with applicable law.

4         If the parties do not comply with the order, the Court

5    will set a hearing on short notice to determine whether any

6    actions were taken to interfere with implementation and

7    consummation of the order to come out of this, the confirmation

8    order, and the Chapter 11 plan.

9         Any other relief sought in this motion and not

10   addressed herein is deemed either withdrawn without prejudice

11   or denied without prejudice and counsel shall submit an order

12   consistent with this ruling.

13        Okay.  That's on the sanctions motion, which is at

14   docket 1268.

15        The second issue before the Court are the letters that

16   the Court has received from counsel regarding Levona's motion

17   to authorize and enforce the stipulated stay relief order.

18   That motion is found at docket number 1367.

19        The Court has considered the letters from counsel Reed

20   Smith on January 22nd, 2025.  Quinn Emanuel sent a letter on

21   January 22nd.  And then Reed Smith sent a letter on January

22   23rd.

23        And what the Court is going to do is the Court is

24   going to adjourn the hearing on that motion to February 25th at

25   9:30 a.m.  And any responses to the motion shall be due on



ELETSON HOLDINGS INC.

1    February 11th by 4 p.m.  And any replies shall be due by

2    February 18th at 4 p.m. in connection with docket number 1367,

3    the Levona motion.

4        Okay.  Those are the two items that the Court had on

5    the agenda.

6        UNIDENTIFIED SPEAKER:  Thank you,  Your Honor.

7        MR. ORTIZ:  Your Honor, if I may.  Just a quick

8    question on implementation.  It's Kyle Ortiz of Togut, Segal

9    for Eletson Holdings.

10       THE COURT:  Okay.

11       MR. ORTIZ:  So we'll prepare an order consistent with

12    your ruling.  And then it's seven days from the entry of that

13    order, correct?

14       THE COURT:  Correct.

15       MR. ORTIZ:  Thank you, Your Honor.  We will prepare

16    that and submit it shortly.

17       THE COURT:  Okay.  Anything else for today?  Okay.

18    Thank you, everyone.  We're adjourned.  Have a great day.

19    Thank you.

20    (Whereupon these proceedings were concluded at 10:00 AM)

21

22

23

24

25



1

2                    C E R T I F I C A T I O N

3

4    I, Michael Drake, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8    

9    _____

10   Michael Drake (CER-513, CET-513)

11   AAERT Certified Electronic Transcriber

12

13   eScribers

14   7227 North 16th Street, Suite #207

15   Phoenix, AZ 85020

16

17   Date:  January 24, 2025

18

19

20

21

22

23

24

25

\*

**\*7 (1)**
29:14

**A**

**abandon (1)**
21:17
**ability (3)**
25:21;26:25;39:22
**above (2)**
19:5;26:22
**accept (3)**
37:20;38:13;41:17
**accepted (1)**
28:5
**accord (1)**
16:1
**accordance (2)**
20:7;44:2
**Ace148 (1)**
7:22
**acknowledges (1)**
12:14
**acquire (1)**
21:16
**acquired (1)**
19:18
**acquiring (1)**
27:25
**act (8)**
10:1;15:9,15;24:24;
25:21;26:25;28:25;
39:22
**acting (1)**
42:12
**action (6)**
17:18;19:18;21:18;
25:1;31:11;38:10
**actions (16)**
12:4,24;16:18;17:5;
21:10,11,21;29:24;
31:20;32:2;39:17;
41:4,13,17;42:16;
44:6
**actively (1)**
27:15
**acts (2)**
30:6;34:7
**actually (1)**
24:24
**ADAM (3)**
7:22;15:22;24:14
**addition (1)**
42:9
**Additionally (1)**
24:1
**address (6)**
10:22;33:5;36:21;
37:14;40:12,20
**addressed (1)**

44:10
**addressing (2)**
34:19;35:16
**adjourn (1)**
44:24
**adjourned (1)**
45:18
**administrative (1)**
37:13
**admits (1)**
16:22
**Adrianos (1)**
23:5
**advice (1)**
12:21
**Aegean (1)**
7:20
**affiliated (2)**
19:11;21:6
**affiliates (4)**
9:21;19:21;31:1;
32:2
**affirmative (1)**
34:21
**affirmed (1)**
41:25
**again (8)**
18:10;26:12;27:2;
34:18;35:2;38:2;
41:22;43:4
**against (2)**
20:1;40:9
**Agathonissos (1)**
22:5
**agenda (1)**
45:5
**agent (1)**
43:23
**agents (2)**
31:3;32:1
**agreement (4)**
20:24,24;24:18;
29:19
**agreements (4)**
19:25;20:19,25;
31:19
**agrees (2)**
29:10;36:9
**alia (2)**
9:25;30:13
**alleges (1)**
16:20
**alleging (3)**
13:19;14:14;15:20
**allowed (1)**
24:2
**along (1)**
31:25
**amend (4)**
13:4,10;42:1,5
**amended (15)**
10:17,18,23;14:6;
19:10;21:5;24:6;

37:20;38:7,8,14,21;
39:4,10;43:25
**amending (6)**
12:24;15:4;36:2;
39:10;43:1,23
**amendments (1)**
14:25
**American (1)**
36:16
**Americas (2)**
6:4;7:4
**among (2)**
19:15;39:16
**Andreoulakis (1)**
22:12
**Andreulaks (1)**
23:7
**ANDREW (1)**
4:7
**anticompetitive (1)**
40:24
**Antitrust (5)**
40:13,18,22,24;
41:1
**AOR (33)**
10:23,23,25,25;
13:4,4,14;14:6,24;
15:4;36:2,6,15,22,24;
37:3,7,8,9,12,14,19;
38:1,1,20,21;39:2,2,
10;41:17,21;43:1,23
**apart (1)**
30:9
**appeal (9)**
22:5;24:18,20;25:5,
16,23;26:7;39:12;
43:11
**appealed (1)**
23:2
**appealing (1)**
22:6
**appear (1)**
9:11
**appearances (1)**
8:3
**appeared (2)**
11:13;27:15
**appearing (2)**
17:7;25:5
**appears (1)**
11:12
**applicable (16)**
11:24;13:16;19:24;
20:14,18,18,23;25:12;
28:17;31:11;35:1,23;
36:10,11;38:5;44:3
**applied (1)**
36:11
**applies (2)**
34:3;40:5
**apply (1)**
15:16
**appoint (2)**

11:15;22:25
**appointed (7)**
11:14;13:23;22:17,
19;26:14;36:25;42:15
**appointment (2)**
37:3;42:15
**appropriate (5)**
12:10;20:17;31:13,
20;39:18
**appropriately (1)**
13:20
**approved (1)**
26:19
**approving (1)**
18:21
**Arch (1)**
4:15
**argue (3)**
14:2,6;25:12
**argues (5)**
33:4,18;34:2;35:19;
36:1
**arguing (1)**
10:1
**argument (4)**
34:3,17;35:5;40:14
**arguments (2)**
25:14;40:4
**articles (11)**
10:17;13:11;24:6;
37:4,20;38:8,14,22;
39:10;42:1;43:25
**assert (3)**
16:16;35:20;36:5
**asserted (1)**
16:9
**assertion (1)**
15:6
**asserts (10)**
11:3,21;12:21;
14:11,23;15:25;
16:13;17:3;33:24;
34:25
**assigns (1)**
30:25
**assist (3)**
43:1,20,23
**Attached (1)**
16:2
**attack (1)**
17:5
**attained (1)**
42:5
**attempt (1)**
13:16
**attempted (1)**
9:24
**attempting (1)**
15:21
**attempts (1)**
13:13
**Attorneys (10)**
4:3,14;5:3,11;6:3,

14;7:3,12;9:22;31:4
**AUSTIN (2)**
6:13;8:17
**authority (7)**
24:24;25:23;27:2;
37:21;40:1;41:12;
42:17
**authorization (1)**
16:6
**authorize (1)**
44:17
**authorized (6)**
20:6,18;21:2,9;
31:17;36:24
**authorizes (1)**
30:4
**automatically (1)**
26:9
**availed (1)**
27:16
**Avenue (5)**
4:4;6:4,15;7:4,13

**B**

**backstop (1)**
20:24
**BAKER (1)**
4:20
**Baltic (1)**
7:20
**Bank (2)**
7:20;29:5
**Bankr (6)**
29:9,14,21;30:3,11;
32:11
**Bankruptcy (20)**
11:24;14:3;16:23;
21:2;24:19;25:18;
26:1;27:15,17,21;
28:16;29:15;33:20;
34:3;35:9,10,13;
40:14;43:15,16
**Based (4)**
18:14;19:5;23:9;
25:16
**basis (2)**
12:2;35:1
**became (2)**
23:17,24
**become (1)**
25:19
**behalf (11)**
8:9,14;9:8;11:13;
20:22;22:3;25:5,21;
26:25;39:18,22
**Betty (1)**
11:19
**bind (1)**
27:24
**binding (3)**
27:14,20;43:12
**binds (1)**

29:3
**bit (1)**
11:15
**Blamo (15)**
11:20;13:2,7,9,13;
16:4,4;18:5;37:1,5;
38:3,8,13;41:25;
42:14
**Blamo's (7)**
15:6;37:22;38:11,
24;41:18;42:4,18
**board (37)**
11:14;12:18;13:23;
17:9;22:9,14,17,19,
20;23:1,3,4,4,20;
24:14;25:20,20;26:7,
8,12,13,19,23,24;
32:20;37:5;39:15,17,
21,21;42:5,10,10,11,
15,16;43:22
**board's (1)**
42:8
**body (1)**
20:10
**Borriello (1)**
14:22
**both (4)**
12:23;29:1;33:14;
34:20
**bound (1)**
40:9
**Bowling (1)**
5:21
**BR (10)**
29:8,20;30:3,11;
32:11,14,18,23;34:24;
35:10
**bracketed (1)**
26:3
**brackets (2)**
27:4;41:24
**brief (19)**
18:25;19:1,2,3;
26:21;33:7;34:1;35:5,
7,25;36:17;37:16;
38:24;39:6;40:10,17;
41:5,6,23
**briefs (1)**
18:17
**Brothers (1)**
30:10
**Bryan (1)**
9:19
**BUCK (1)**
4:7
**Business (2)**
15:9;21:16
**bylaws (2)**
37:4;42:1

**C**

**Cal (1)**

34:9
**call (1)**
25:7
**Can (12)**
8:3;10:25;11:1;
12:24;15:11,17;35:6;
36:20;37:19;38:2;
39:17;41:2
**canceled (3)**
20:2;24:3;25:12
**cancellation (1)**
35:20
**cancels (1)**
14:10
**capacities (1)**
20:11
**capacity (4)**
11:16;17:7;24:24;
25:3
**carry (1)**
28:20
**carrying (1)**
28:19
**Case (17)**
8:2;24:20;27:15;
32:6,8,9,12;33:4,9,15,
24;35:3,8,9,14;40:18,
20
**cases (3)**
22:9;34:7;40:11
**cause (1)**
20:6
**causes (2)**
19:18;21:18
**cease (1)**
20:14
**ceased (1)**
26:9
**certain (7)**
22:20;23:3;26:8;
27:3;29:20;31:14;
41:23
**certificate (2)**
42:7,9
**certificates (1)**
19:25
**challenge (1)**
27:19
**change (8)**
11:1,2;13:14;35:22;
36:6;37:10;38:1;39:2
**changing (3)**
36:2;37:12;41:21
**Chapter (32)**
10:9;11:22;12:11,
17;14:10,15;16:10;
19:10,15;21:5;22:9;
23:17,23;24:5;27:5,
13,18;30:12,14,15,24;
31:7;32:14,16;33:11,
16;35:17,23;42:25;
43:12,20;44:8
**charges (1)**

19:22
**Chicago (1)**
5:14
**Chinese (1)**
40:23
**choose (1)**
41:17
**CHRISTOPHER (1)**
4:8
**Cir (2)**
34:10;40:19
**Circuit (2)**
29:6;34:13
**circumvent (1)**
13:16
**cite (2)**
14:13;40:13
**cited (2)**
34:7;40:20
**cites (3)**
32:7;35:4;40:11
**citing (1)**
37:16
**claim (1)**
28:2
**claims (5)**
13:22;19:22;20:1;
21:18;28:10
**clarifies (1)**
15:3
**clause (1)**
33:6
**clear (3)**
19:21;28:10;41:16
**client (1)**
16:23
**Co (1)**
8:17
**COCKERHAM (1)**
5:7
**Code (12)**
11:24;14:3;27:21,
22;28:16;29:23;30:7;
33:20;34:3;40:14;
43:15,16
**COIE (2)**
7:2;9:8
**collaterally (1)**
17:5
**comity (4)**
36:5;40:4,17,21
**Committee (8)**
6:3;8:9;11:5,7,8;
29:11;30:17;41:7
**committee's (3)**
30:22;40:2;41:14
**communicate (1)**
37:1
**company (7)**
13:11;15:8;23:1,14,
14,15;37:1
**company's (2)**
32:17;37:4

**compel (3)**
13:14;17:13;41:2
**compelling (2)**
10:7;42:24
**competent (2)**
15:11;42:17
**completing (1)**
19:12
**compliance (7)**
11:23;18:12;30:14;
34:20;36:10;38:17;
41:3
**complied (4)**
12:10;14:15;29:13;
35:23
**comply (15)**
10:8,13;17:14,24;
28:20;29:18;30:1,2;
31:8;33:1,20;42:25;
43:7,19;44:4
**complying (2)**
11:25;12:1
**comprise (1)**
21:17
**concede (1)**
14:10
**concept (1)**
37:14
**concerning (1)**
18:25
**concerns (1)**
29:7
**concluded (1)**
45:20
**conclusion (1)**
18:14
**conclusions (4)**
18:16,19,21;21:4
**condition (1)**
28:18
**condition' (1)**
34:16
**Conduct (3)**
16:21;18:1;40:24
**confer (1)**
30:9
**conference (1)**
8:23
**confirmation (80)**
9:24;10:7,8,14;
11:22,25;12:1,6,9,13,
22;13:5,10;14:7,13;
15:4;16:11;17:5,14;
18:12;21:6,8,12,12,
20,24;22:7;23:1;
24:20;25:1,5,15,23;
26:7,14,20;27:13,18,
19;28:9,13;29:3,19,
22;30:2,12,15,18,23;
31:7,15,22,24;32:4;
33:1,7,11,15;34:6,20;
35:17,22;38:10,17;
39:7,12,12,14,24;

40:8;41:3,9,10;42:25;
43:8,10,11,11,20;44:7
**confirmed (6)**
27:23;28:24;29:16,
24;30:8;32:16
**confirming (5)**
19:9,9;21:4;28:8,13
**conflict (2)**
8:21;40:16,25
**confused (1)**
25:8
**connection (4)**
15:19;18:6;31:22;
45:2
**consent (1)**
31:10
**considered (1)**
44:19
**considering (2)**
19:5;25:14
**consisted (1)**
22:10
**consistent (8)**
26:6,12;37:3;39:7,
11;43:10;44:12;45:11
**consummate (3)**
30:6,21;31:20
**consummation (5)**
21:22;28:25;32:4,
22;44:7
**contact (1)**
14:24
**contains (1)**
19:15
**contemplated (1)**
20:20
**contemplates (2)**
33:12;34:23
**contempt (5)**
10:13;12:3,9;18:22;
33:2
**context (2)**
26:4;27:4
**continues (1)**
25:7
**continuing (1)**
20:11
**contracts (1)**
31:18
**contradict (1)**
12:5
**contradicts (1)**
40:21
**Contrary (1)**
38:8
**contravention (1)**
16:11
**control (1)**
39:3
**controlled (1)**
32:20
**cooperate (3)**
12:12;30:20;33:16

cooperation (1)
33:6
Corp (4)
12:18;22:24,24;
29:5
Corporate (19)
10:10,18;12:24;
14:25;15:8;17:17;
26:17;33:13;34:6;
36:3,19;38:7,21;39:4;
40:1;41:11,13;43:2,
24
Corporation (8)
15:9;23:24;32:13;
35:21;36:25;38:22;
41:25;43:3
corporations (1)
15:16
corporation's (4)
10:25;36:21;38:7,
20
counsel (21)
9:15,24;10:8,13;
12:22;16:17;17:8;
24:25;25:6;27:14;
38:18;39:8,13,25;
42:24;43:6,14,18;
44:11,16,19
course (2)
8:25;37:19
COURT (90)
8:2,7,11,15,25;9:4,
7,10;11:1,14;13:5,13,
15,20,23;15:7,11,16;
16:1;17:9;18:2,11;
19:6,8;21:2,3;22:6,15,
16,25;23:8;25:2,18,
18;26:1,5,19;27:17;
28:21,21;29:10,12,15,
17,21;30:2,5;32:8,16,
21;33:9,10,18;34:4,
11,19,21;35:5,10,12,
12,15,16,16,18;36:8,
9,16;38:9,15,17;40:7,
8;41:2,8,18;42:6,14,
20,22;44:4,15,16,19,
23,23;45:4,10,14,17
Court's (4)
18:14;26:23;34:5;
41:12
cover (1)
9:12
created (3)
13:6;23:20;37:14
creditor (3)
27:25;28:2,4
Creditors (8)
6:3;8:10;11:5;
21:11;28:10;29:4;
30:19;32:18
creditors' (4)
19:10;29:11;32:16;
41:7

current (9)
14:24;26:12;31:2;
33:6;38:1;39:2,5,5;
43:1
CURTIN (4)
6:18;8:16,17;9:1

## D

d2 (2)
27:22;28:7
d3 (2)
27:23;28:7
DANIEL (2)
5:24;8:13
Daniolos (3)
13:19,22,24
date (14)
12:16;18:20;19:17,
23;20:5,10,12,15;
21:14;23:12;24:2,9;
26:5;44:1
DAVID (2)
6:8;8:8
day (1)
45:18
days (2)
43:25;45:12
DE (1)
5:5
dealt (2)
28:9,24
Debtor (19)
4:3,14;5:3,11;
10:12;20:10,14;26:7,
18;27:24;28:1,11,18,
21;29:18;30:1,2,5;
35:8
debtors (30)
9:23;10:7,12;14:11;
17:4,18;19:12,19,19;
20:2,3,17,22;21:6,9;
24:10;27:7;29:4;
30:19;31:9,16;32:8;
33:15;38:18;39:8,13,
25;40:6;41:10,21
debtor's (7)
9:20;27:14;30:25;
31:1;32:18,21;34:22
December (9)
15:20,24;16:7,25,
25;17:6,11,15;25:15
DECHERT (2)
6:2;8:9
decided (1)
15:25
decisions (1)
37:4
declaration (19)
9:18,19;10:16,20,
24;11:19,19,20;12:21,
25;13:7;14:20,21,21;
27:10;36:23;37:11;

38:23;43:4
deem (1)
41:5
deemed (3)
20:13;26:9;44:10
deems (1)
39:17
defendants (1)
40:23
defined (3)
30:24;43:14,18
deliver (3)
20:19;28:22;31:17
delivery (1)
28:23
demonstrates (1)
41:19
denied (1)
44:11
denying (1)
19:12
DEPARTMENT (2)
5:19;34:9
DEREK (2)
4:20,21
derived (1)
37:21
desirable (1)
20:21
Despite (2)
39:24;42:4
detailing (1)
16:25
details (1)
17:2
determination (1)
39:12
determinations (2)
35:13,16
determine (3)
15:12;31:12;44:5
determined (2)
35:10,12
developments (1)
16:25
dictates (2)
30:13;36:5
different (1)
33:6
Digital (2)
29:8;34:24
direct (8)
17:17;19:20;28:21;
30:2,5;31:2;33:15;
39:2
directed (6)
18:15;20:18;21:9;
30:20;41:22;43:19
directing (4)
18:12;38:9,17,20
direction (2)
18:14;39:5
directly (1)

12:4
director (3)
20:14;26:10;42:12
directors (16)
9:15,21;10:6;22:9;
24:14;25:24;26:13;
31:2;32:1,21;39:17;
41:11;42:24;43:6,13,
18
directs (2)
39:8,14
disagrees (1)
36:8
discharged (2)
20:4;24:3
discretion (1)
31:11
discuss (1)
11:15
dismiss (2)
24:18,19
dismissal (2)
24:23,23
dismissed (1)
25:15
dismissing (2)
26:6;43:11
displace (1)
34:4
dispose (1)
21:16
disputing (1)
40:22
dissolved (1)
23:20
distinguishable (1)
34:8
distributions (1)
24:4
District (2)
22:6,6
docket (33)
9:16,25;11:7,12,17;
12:17;13:21;14:2,19;
15:24;16:11;17:1,10,
13,19,22;18:19,23;
19:1,4,14;21:7;22:8;
23:18;24:20;25:1;
27:16;32:10,23;33:2;
44:14,18;45:2
document (1)
12:11
documents (15)
10:19;12:25;15:1;
20:1,19,25;31:19;
36:3,19;38:7,21;39:4,
9;43:2,24
done (1)
38:14
Drive (1)
5:12
drop (1)
8:22

due (2)
44:25;45:1
During (1)
22:9

## E

ECF (1)
23:18
effect (5)
10:18;14:12;28:23;
34:18;35:13
effective (13)
12:16;19:16,23;
20:5,10,12,15;21:14;
23:12,18;24:2,9;26:5
effectively (1)
16:9
effectuate (7)
10:8;11:1;20:21;
31:13;38:19;40:1;
41:13
effectuating (1)
43:20
effectuation (1)
16:10
efforts (2)
12:10;36:6
eg (3)
21:25;27:9;43:4
either (1)
44:10
Elafonissos (1)
22:23
election (1)
42:7
ELENA (1)
7:20
Eleni (3)
22:12,21;23:6
Eletson (78)
8:6;9:13,14;10:4,
11,17,21;11:9,11;
12:15,18,18,19,23;
13:3,9;14:7,17;16:5,8,
13,14,15,17,18,22,24;
17:3,9,17,20,23;18:3,
9,20,24;19:11;21:5;
22:4,4,17;23:19,22;
25:6,7,13,20,20,21,24,
24;26:10,16,17,18,20,
23,24,25;27:8;29:10;
32:6;36:18;37:25;
39:1,15,18,21,22;
41:4;42:8,12;43:1,5,
14;44:9,12,12;45:9
Elletson (2)
15:21;16:2
ellipses (2)
29:1;31:14
else (2)
9:11;45:17
email (1)

16:3
**EMANUEL (3)**
7:11;9:6;44:20
**emergency (2)**
11:10;19:3
**Emmanuel (2)**
22:11;23:7
**employees (2)**
31:3;32:1
**empowered (2)**
31:17;33:10
**empowers (2)**
29:12,15
**encumbrances (1)**
19:22
**enforce (11)**
12:9;14:15;15:7,17;
29:12,15;30:8;34:5,
19;40:8;44:17
**enforcement (2)**
12:13;40:7
**enforcing (1)**
27:17
**engage (1)**
40:23
**enjoined (1)**
32:2
**enjoins (1)**
21:20
**entails (1)**
12:1
**enter (1)**
18:11
**entered (1)**
21:3
**entities (1)**
34:22
**entity (7)**
23:20;24:7;26:17;
27:24,25;28:19;33:13
**entry (1)**
45:12
**equity (14)**
14:11;20:7;24:2,9,
10;27:6,7;28:1,2,4,10,
14;31:3,21
**ESQ (19)**
4:7,8,9,10,20,21,22;
5:7,16,24;6:7,8,9,10,
18,19,20;7:8,16
**Essentially (1)**
26:16
**establishes (1)**
15:10
**establishing (1)**
42:24
**estate (1)**
19:17
**EVANGELATOU (1)**
7:20
**even (3)**
33:12;37:18;41:25
**everyone (2)**

8:2;45:18
**evidence (6)**
19:5;23:9;36:13;
41:19;42:19,23
**evidencing (1)**
20:1
**evidentiary (4)**
18:2,9,13,15
**example (1)**
27:16
**except (5)**
21:14;27:22;28:6,7,
12
**exclusive (1)**
15:10
**execute (4)**
20:19;28:22;31:17;
39:8
**execution (1)**
28:23
**exercise (2)**
33:19;40:1
**Exhibit (12)**
22:14,18;23:2,7,11,
16;24:16;26:2;27:2;
36:22;39:18;42:13
**Exhibits (2)**
23:25;24:7
**exist (1)**
25:7
**existing (10)**
9:14;10:23,25;13:4;
24:2;36:21;37:7,9,24;
38:20
**exists (2)**
25:13;40:25
**expeditious (1)**
11:3
**Expert (4)**
13:2;18:4,5;37:18
**explain (1)**
36:19
**explained (1)**
18:10
**explains (2)**
15:14;17:23
**expressly (1)**
30:4;34:14
**extent (5)**
8:23;17:24;21:1;
34:15;38:5
**extinguished (4)**
20:4;24:3,10;27:7

**F**

**F2d (1)**
29:5
**F3d (1)**
34:9
**F4th (2)**
40:19;41:1
**fact (12)**

18:6,16,19,21,23;
21:4;23:10;24:4,12;
26:15;27:9;42:21
**facts (1)**
33:22
**fail (1)**
12:12
**failed (2)**
10:6;17:24
**failing (3)**
10:13;29:18;32:8
**faith (1)**
30:21
**false (1)**
15:9
**Family (2)**
8:18;23:14
**February (3)**
44:24;45:1,2
**Federal (1)**
24:19
**fee (1)**
19:25
**fiduciaries (1)**
31:3
**file (5)**
31:17;38:6,20,21;
39:9
**filed (24)**
10:19;11:5,10,18;
13:25;14:17;15:19;
16:24;17:12,15,21;
18:18,20,25;19:2;
22:5;24:17,22;32:14,
21,24;36:20,20;42:7
**filing (3)**
14:25;39:10;43:2
**filings (1)**
37:9
**final (2)**
25:19;39:13
**Finally (1)**
42:4
**Finance (1)**
22:4
**financial (2)**
28:18;34:16
**find (1)**
33:1
**finding (3)**
10:5,12;12:3
**findings (12)**
18:16,18,21,23;
21:3;23:10;24:4,12;
26:15;27:9;33:22;
42:20
**finds (3)**
19:7;26:5;33:9
**firm (5)**
13:19,19,21,22;
16:9
**First (4)**
9:12;13:4;22:15;

36:18
**Fla (1)**
29:21
**Floor (2)**
5:13;7:5
**focused (1)**
36:14
**followed (1)**
36:12
**following (4)**
19:16;22:10;36:8;
44:1
**follows (1)**
19:7
**force (1)**
41:8
**foregoing (2)**
9:23;21:1
**foregoing's (1)**
31:5
**foreign (33)**
11:16,24;12:1,2,8,
14;13:6;14:3,4,14;
16:1,3;17:9;32:21;
33:13,21,25;34:5,7,
17;35:1,12,23;36:2;
38:5,15;40:12,15,21;
41:8;42:6,14;43:3
**formal (1)**
10:2
**former (36)**
9:15,20,23;10:5,7,
12;11:3;16:16,23;
17:4,18;21:20;22:24;
23:20;24:10;25:24,
24;26:7,18;27:7,14;
31:2;32:1;33:15;
38:18;39:8,13,25;
40:6;41:10,10,20;
42:24;43:6,13,17
**found (18)**
9:16,25;11:7,12,17;
14:19;15:24;17:1,12,
22;18:19,23;19:1,4,
13;21:7;26:22;44:18
**free (2)**
19:21;28:10
**FSB (2)**
7:3;9:9
**fully (1)**
20:4
**Fund (2)**
7:3;9:9
**further (9)**
11:15;13:25;15:6;
16:16;17:14;24:6;
26:22;27:13;33:18

**G**

**GALIBOIS (1)**
5:16
**Gas (7)**

12:19;32:7,9,11,12,
18,22
**gave (1)**
35:12
**general (5)**
28:1,3,5,11,15
**generally (1)**
29:7
**Giannakopoulou (2)**
22:12;23:6
**gives (3)**
25:20,22;26:23;
27:1;39:21
**giving (1)**
20:1
**Glafkos (2)**
8:17;23:15
**Good (7)**
8:2,5,7,8,11,12,13,
15,16,25;9:2,4,5,7,10;
30:21
**governance (9)**
10:18;15:1;36:3,19;
38:7,21;39:4;43:2,24
**governing (1)**
20:10
**government (2)**
38:9;40:7
**great (1)**
45:18
**Greece (3)**
10:2;12:23;22:16
**Greek (7)**
11:14;13:19,23;
22:16,25;23:8;42:19
**Green (1)**
5:21

**H**

**Hadjieleftheriadis (6)**
11:10;22:10,11;
23:5;42:7,11
**handled (1)**
35:6
**HANEY (1)**
6:7
**HBLS (2)**
35:4,8
**hearing (21)**
8:20;18:3,7,9,13,
15;21:25;25:4,14,16,
17;26:2;27:3,11;
37:17;38:3,15;39:19;
42:2;44:5,24
**heirs (1)**
31:5
**held (4)**
18:2;19:19;29:21;
34:13
**help (2)**
38:19;41:22
**hereby (3)**

21:9;30:20;31:17
**herein (1)**
44:10
**hereunder (1)**
20:21
**HERMAN (4)**
6:8;8:8,8,12
**highlights (1)**
33:10
**hired (1)**
16:17
**holder (3)**
28:1,3,4
**holders (7)**
21:20;24:4,11;27:9;
28:11,15;31:3
**Holding (2)**
8:18;36:18
**Holdings (93)**
7:12;8:6;9:14;10:1,
4,5,11,17,21;11:9,11;
12:7,15,18,23;13:3,
10;14:7,17,25;15:21,
22;16:2,2,5,8,13,14,
15,17,18,22,24;17:3,
9,12,17,20,23;18:3,
10,20,24;19:11,21;
20:6,12,17,23;21:5,
15;22:4,17,23;19,22;
24:11,17,25;25:6,7,
13,26:10,16,17,18,20;
27:8;29:8,10;30:11;
31:10,12;32:7;33:20;
35:21,21;36:1,9;
37:25;39:1,15;40:5,8;
41:4,5;42:8,12;43:1,5,
13,17,23;45:9
**Holdings' (2)**
9:13;39:3
**Home (1)**
30:3
**Honor (13)**
8:5,8,13,16,18,20;
9:1,2,5;25:19;45:6,7,
15
**Honor's (1)**
8:22
**Hoskinson (1)**
24:15

**I**

**Id (18)**
10:14;11:2,4;13:12,
17;14:12,15;15:5,12;
21:18,23;25:1;29:25;
34:12,16;35:15;36:3,
6
**identified (2)**
23:13;36:22
**IL (1)**
5:14
**impaired (1)**

28:3
**impermissible (1)**
33:22
**implement (10)**
12:8,11;29:24;
30:21;32:9;33:11,16;
39:9;41:8,22
**implementation (8)**
15:17;21:22;29:7,
12;32:3;33:21;44:6;
45:8
**implementing (1)**
34:6
**imposes (1)**
34:21
**imposing (2)**
9:13;11:11
**inapplicable (2)**
14:4;34:18
**inappropriate (1)**
12:7
**Inc (45)**
8:18;10:1,4,11,21;
11:9;12:7,15,18,24;
13:3,10;14:7,17;
15:21;16:2,5,8,14,15,
17;17:3,9,17,21,23;
18:3;19:11;22:4,17;
23:22;25:13;26:10,
17,20;27:8;29:8,11;
32:7;36:9;39:1,15;
41:4;42:13;43:23
**included (2)**
23:13;29:19
**includes (5)**
17:1;23:3;37:9;
38:19,22
**including (10)**
9:16,21;12:24;
19:17,19;20:23;
24:25;31:12,21;43:24
**inconsistent (1)**
21:11
**incorporation (6)**
10:17;24:6;37:20;
38:14;39:11;43:25
**incorrect (1)**
38:16
**Inc's (8)**
10:5,17;16:18;
36:18;37:25;43:6,13,
17
**incumbency (1)**
42:8
**Indeed (1)**
30:17
**indenture (1)**
9:9
**indicates (1)**
37:12
**indirect (2)**
19:20;31:3
**individual (1)**

10:22
**individuals (1)**
13:22
**inform (1)**
37:19
**information (2)**
14:25;37:7
**informative (1)**
33:4
**informs (2)**
37:4;38:6
**inject (1)**
35:5
**inserted (3)**
26:3;27:4;41:24
**Insolvency (1)**
15:14
**Instance (4)**
22:15;29:17;34:9;
40:12
**instruct (3)**
31:7;37:20;38:1
**instructed (1)**
21:10
**instructive (1)**
33:9
**instrument (1)**
28:23
**Instruments (5)**
19:24;20:20;20:1;
31:18,19
**inter (2)**
9:25;30:13
**interest (10)**
20:2;21:21;24:2,9,
10;27:6,7;28:2,10;
31:25
**interests (5)**
14:11;19:19;21:18;
28:14;31:21
**interfere (4)**
21:21;32:3,3;44:6
**internal (1)**
37:15
**International (5)**
10:9;36:5;40:4,16,
20
**interpreted (2)**
33:24;40:15
**into (1)**
35:6
**Investment (2)**
8:17;23:14
**involve (1)**
34:6
**involved (1)**
35:8
**Ioannis (2)**
22:11;23:5
**ISAAC (2)**
7:16;9:5
**Isle (1)**
32:12

**issuance (2)**
15:12;31:21
**issue (9)**
15:25;20:6,19;
24:24;25:3;34:11,11;
41:2;44:15
**issued (5)**
19:8;20:7;24:11;
27:8;44:1
**issues (2)**
35:9,14
**issuing (1)**
27:24
**items (1)**
45:4

**J**

**James (4)**
9:18;14:20;18:4;
36:19
**January (10)**
17:20;18:2,18,24;
19:2;27:10;42:6;
44:20,21,21
**Jared (1)**
14:21
**join (1)**
28:22
**joined (1)**
8:18
**joint (3)**
17:7;19:10;21:5
**Josh (1)**
9:3
**JOSHUA (1)**
4:22
**Judge (16)**
21:25,25;25:4,9,15,
16;26:2,6,13,22;27:2;
39:11,19,20,24;43:10
**jurisdiction (9)**
11:25;13:7,21;15:7,
10,11;33:14;34:7;
41:12
**JUSTICE (1)**
5:19

**K**

**Karastamati (3)**
22:13,21,22
**KARLI (1)**
6:9
**Keros (1)**
22:24
**Kertsikoff (2)**
22:12,21
**KEVIN (1)**
5:7
**knows (1)**
8:20
**Konstantaras (2)**

22:13,22
**Konstantinos (1)**
22:11
**Kotliar (1)**
9:19
**Krypton (2)**
29:17,20
**Kyle (2)**
8:5;45:8

**L**

**Lamin (22)**
11:19;13:2,7,9,13;
15:6;16:4,4;18:5;
37:1,5,22;38:3,8,11,
13,24;41:17,25;42:4,
14,18
**language (1)**
41:23
**largest (1)**
32:20
**Laskarina (2)**
22:13,21
**Lassia (2)**
8:17;23:14
**last (1)**
8:20
**LAUKAMG (1)**
4:8
**law (49)**
12:1,2,5,8,14;13:2,
15,19,19,22;14:3,4,
12,14,23;15:3;18:4,5,
16,19,21;19:24;21:4;
25:12;28:17;31:11;
32:6;33:21,25;34:5,
12,14,15;35:1,19,24;
36:2,10,11,14;37:13;
38:2,5;40:12,21,21,
23;43:3;44:3
**lawful (1)**
41:4
**laws (2)**
13:16;40:24
**legal (2)**
10:18;41:20
**Lehman (1)**
30:10
**Leonard (1)**
24:15
**letter (12)**
15:20,24;16:3,7,20,
24;17:1,6,21;24:22;
44:20,21
**letters (4)**
19:25,25;44:15,19
**Levona (3)**
7:12;9:6;45:3
**Levona's (1)**
44:16
**Lexington (1)**
4:4

**Liberia (18)**
10:1,18,22;12:23;
13:16;14:8;15:9,11,
15,18;16:1,22,25;
17:3;23:9;35:6,24;
41:20
**Liberian (31)**
10:9;11:1;12:5,22;
13:2,5,11,15,15;
14:12,23;15:3,8,23;
16:5;18:4,5;35:16,19,
21;36:14,21;37:13,
18;38:2,9,11;40:7;
42:9,17,20
**licenses (1)**
29:20
**LICHTENSTEIN (1)**
7:21
**liens (1)**
19:22
**Liman (9)**
21:25;25:4,9,15,17;
26:2,22;39:19,20
**Liman's (6)**
26:6,13;27:2;39:11,
24;43:10
**limine (1)**
19:13
**limited (1)**
17:15
**line (14)**
18:13,13;25:9,10;
27:11,12;37:6,22,23;
38:25,25;39:19;
41:18;42:2
**lines (11)**
18:8;22:1;26:3;
27:3,11;37:2,17;38:4,
12,16;42:18
**LISCR (20)**
10:10,19;11:1;12:4,
25;13:4;36:3,20;37:1,
9,10,20;38:13,20,22;
39:4;41:16;42:9;43:3,
25
**LISCR's (1)**
37:15
**Litigation (3)**
40:13,18,22
**LLC (3)**
12:19;22:4,5
**LLP (9)**
4:2,13;5:2,10;6:2,
13;7:2,11;9:16
**Logan (1)**
4:16
**longer (1)**
16:22
**Lou (1)**
9:2
**LOUIS (2)**
4:9;11:19
**LP (1)**

35:8
**Ltd (2)**
7:12,21

**M**

**maintain (1)**
21:17
**majority (3)**
13:25;14:2;23:15
**Man (1)**
32:12
**manage (1)**
23:1
**management (2)**
16:16;26:19
**manager (2)**
20:14;26:10
**managers (1)**
31:4
**many (1)**
11:8
**MARK (1)**
7:21
**Market (1)**
5:4
**matter (1)**
15:10
**matters (1)**
9:12
**Matthews (1)**
24:15
**may (13)**
21:15,16;28:21;
29:14,22;30:2;31:10;
33:13;34:6;39:1;41:4,
16;45:7
**mean (1)**
36:11
**meaningless (1)**
35:15
**mediator's (1)**
35:13
**member (1)**
20:13
**members (10)**
20:9;22:20,20,22;
23:4;24:14;26:7,8,12;
42:10
**memorandum (3)**
19:8,13;22:7
**merger (1)**
37:8
**MICHAEL (3)**
4:21;5:16;6:19
**minority (2)**
22:24;23:13
**miss (1)**
40:11
**misses (1)**
34:4
**mistaken (1)**
40:5

**moot (1)**
34:18
**Moreover (1)**
15:14
**morning (16)**
8:2,5,7,8,11,12,13,
15,16,19,25;9:2,4,5,7,
10
**MOSS (3)**
7:8;9:8,8
**most (1)**
11:3
**motion (33)**
9:13,16,18,19;10:3;
11:6,10,13,15,16;
13:18;14:1,18;15:19;
17:8;18:7,11,22,25;
19:3,6,13;30:18;
32:24;36:13,14;44:9,
13,16,18,24,25;45:3
**Murchinson (1)**
7:21
**must (6)**
12:22;36:1;37:3;
38:18;42:5;43:7

**N**

**name (1)**
20:22
**naming (1)**
42:10
**narrowing (2)**
17:13;18:10
**Navigator (8)**
32:7,9,11,12,18,22;
33:2,14
**necessary (11)**
20:21;28:22,25;
29:24;30:6;31:13,20;
37:8;41:5,13;43:22
**need (3)**
10:19;35:5;41:8
**needs (2)**
10:23;36:11
**negate (1)**
14:3
**NESSER (2)**
7:16;9:6
**NESTOR (1)**
9:5
**New (24)**
4:5;5:22;6:5,16;7:6,
14;10:11;13:6;22:6;
23:24;24:11,14;
25:20,20;26:13,18,23,
24;27:8;39:3,15,17,
21,21
**night (1)**
8:21
**Niki (1)**
23:5
**Ninth (1)**

34:13
**nominees (4)**
9:23;31:6;43:6,14
**nonbankruptcy (2)**
28:17;34:14
**non-debtor (1)**
19:20
**non-Liberian (2)**
15:7,16
**nonmovable (1)**
8:21
**nonparty (1)**
13:19
**nonresident (1)**
36:21
**nor (2)**
12:12;40:6;42:21
**note (1)**
40:19
**notes (1)**
19:24
**notice (2)**
22:5;44:5
**notifying (1)**
37:10
**notwithstanding (1)**
28:17
**November (7)**
21:3;22:3,15,23;
23:17;24:17,22
**Number (22)**
8:3;9:16,25;11:7;
13:21;15:24;16:12;
17:1,10;18:19;22:8;
23:18;24:20,21;25:1,
17;27:16;32:9,10,23;
44:18;45:2
**Nursing (1)**
30:3
**NY (6)**
4:5;5:22;6:5,16;7:6,
14

**O**

**object (1)**
11:15
**objection (11)**
11:12,18,21;12:19;
13:24,25;14:1,5,9;
27:19;35:2
**objections (2)**
14:18;19:12
**obligation (1)**
34:22
**obligations (2)**
20:2,11
**obstruct (2)**
12:13;32:22
**obtained (1)**
21:25
**occurrence (1)**
12:16

**October (2)**
17:11;19:8
**offering (1)**
20:23
**Office (1)**
5:20
**officers (9)**
9:15,21;10:6;20:17;
31:2;32:1;41:11;
43:13,18
**Official (3)**
6:3;8:9;11:5
**officials (1)**
41:8
**omnibus (1)**
14:17
**one (2)**
16:14;43:9
**only (6)**
12:17;16:14;17:24;
26:20;34:15;36:20
**operate (2)**
21:16;33:13
**operated (1)**
32:13
**opinion (4)**
19:9,13;22:7;42:16
**oppose (1)**
16:17
**opposed (1)**
17:25
**opposing (2)**
17:4;24:23
**opposition (8)**
11:10;13:18,18;
17:15,21;19:3,6;
36:14
**option (1)**
11:4
**order (108)**
9:13,25;10:4,7,8,
14;11:1,11,22,25;
12:2,6,8,9,13,22;13:5,
10;14:7,13;15:4;
16:11;17:5,12,14,16,
22,25;18:11,12;19:9,
13;21:4,6,8,12,13,20,
24;22:7;23:1,8;25:18,
19;26:14,20,23;27:13,
18,19;28:8,13;29:19,
22;30:2,12,16,18,23;
31:7,15,22,24;32:4,
10;33:1,5,7,11,14,15,
20;34:5,6,20;35:17,
22;36:16;38:10,15,
18;39:7,13,14,14,15,
21,24;40:8;41:3,9,10;
42:6,19,25;43:8,10,
12,20;44:1,2,4,7,8,11,
17;45:11,13
**ordered (2)**
32:17;43:9,21
**orders (2)**

15:8;28:20
**ordinary (1)**
37:19
**organized (1)**
28:19
**Ortiz (5)**
8:5,5;45:7,8,11
**OSEI-BONSU (1)**
4:21
**others (4)**
39:16;40:20;43:14,
18
**otherwise (7)**
20:13;21:15;26:9;
28:7,12,17;35:1
**out (3)**
28:19,20;44:7
**outside (1)**
32:13
**over (1)**
13:21
**oversee (1)**
22:17
**OWEN (1)**
6:7
**own (2)**
37:15;42:1
**owned (1)**
32:13
**owner (1)**
10:11
**owners (4)**
9:20;25:24;26:19;
31:1
**owner's (1)**
39:3
**ownership (3)**
35:22;40:2;41:14

**P**

**PA (2)**
4:18;27:10
**page (23)**
18:13;22:1;25:9,10;
26:2;27:3,11,12,12;
30:22;35:15;37:2,5,
22,23;38:3,11,16,25;
39:19;41:18;42:2,18
**pages (3)**
10:15;12:19;18:7
**Panagiotis (2)**
22:13,22
**Panos (1)**
23:6
**paragraph (52)**
10:3,20;11:4;13:1,
12,17,24;14:12,16;
15:1,5,12;17:19;
21:13,19,23;23:10;
24:5,13;26:15,21;
27:9,10;30:15,16,23;
31:6,15,23,24;32:5;

33:23;34:1;35:2,7;
36:4,7,17,23;37:11,
16;38:23,24;39:7;
40:3,10,17;41:6,23;
42:21;43:4,5
**paragraphs (10)**
10:24;11:2;13:8;
14:5;15:13;22:1;29:2;
33:8;35:25;41:15
**parents (2)**
9:20;31:1
**part (4)**
21:8;25:11,16,17
**participated (1)**
27:15
**parties (24)**
12:3,12;17:13,24;
18:6,15;27:14,16,20;
29:23;30:20,24;31:8,
16,25;33:1,2;38:6;
40:6,9,22;41:21;44:2,
4
**partner (4)**
8:19;28:1,3,5
**partners (2)**
28:11,15
**party (4)**
28:22;30:5,9;36:15
**Paxinos (1)**
23:6
**PCA (1)**
37:22
**PELES (1)**
4:22
**Pellis (1)**
9:3
**pending (2)**
17:2;18:22
**per (1)**
37:21
**perform (2)**
28:25;30:6
**PERKINS (2)**
7:2;9:8
**permission (1)**
8:22
**permit (1)**
35:19
**permitted (3)**
19:24;31:11;42:1
**person (1)**
9:14
**personnel (6)**
9:21;17:18;21:21;
33:16;34:23;43:7
**persons (1)**
40:15
**perspective (1)**
32:6
**petition (1)**
32:21
**petitioner's (2)**
19:9;21:4

**petitioning (3)**
19:10;21:10;30:19
**PG&E (2)**
34:9,11
**Philadelphia (1)**
4:18
**Pierre (18)**
9:19;10:16,19;11:3;
14:20,21,23;15:1,6,
14;18:4;36:19,23;
37:10,16;38:23;43:4,
5
**Piraeus (1)**
22:16
**plan (109)**
10:9;11:22;12:8,11,
17;14:10,15;15:17;
16:10;17:14;19:10,
12,15;20:8,16,20;
21:5,12,15,22;23:17,
19,21,23;24:5,12,16;
25:21,22,22,25;26:11,
14,24;27:1,1,5,6,13,
18,23,24,25;28:3,5,8,
8,9,9,13,13,14,15,20,
20,24;29:1,3,8,13,16,
21,24;30:6,8,10,12,
14,15,21,25;31:6,7,9,
13,21,22;32:4,9,17,
22,24;33:12,12,17,21;
34:15,20,23;35:17,23;
36:10;38:19;39:9,16,
23;40:2;41:3,8,9,22;
42:25;43:8,12,15,19,
19,21;44:8
**plan's (1)**
29:4
**PLC (1)**
32:7
**please (1)**
8:4
**pm (2)**
45:1,2
**point (2)**
34:4;40:11
**points (1)**
11:8
**policies (1)**
37:15
**post- (1)**
38:23
**post-evidentiary (1)**
18:16
**post-hearing (1)**
19:2
**post-trial (16)**
18:25;19:1,3;26:21;
33:7,25;35:4,7,24;
36:17;37:16;39:6;
40:10,17;41:6,23
**powers (1)**
33:19
**preclude (1)**

14:24
**predecessors (1)**
30:25
**preempt (4)**
12:2;14:4;33:25;
36:2
**preempted (1)**
34:14
**preemption (3)**
34:3,12,17
**prejudice (2)**
44:10,11
**prepare (2)**
45:11,15
**PRESENT (3)**
7:19;31:25;42:23
**presented (3)**
18:3,5;23:9
**president (1)**
42:12
**prevent (2)**
15:22;41:20
**preventing (1)**
16:10
**previous (4)**
22:14,20;23:3;
42:10
**previously (3)**
21:2;36:22;39:20
**principals (3)**
9:22;31:2;32:1
**principles (1)**
40:16
**prior (7)**
15:4;16:6;18:1;
20:10;23:12;31:10;
37:25
**procedural (1)**
38:6
**Procedure (1)**
24:19
**procedures (1)**
20:24
**proceeding (6)**
12:6;15:22,23;
16:23;17:2,4
**proceedings (5)**
10:2;16:5,19;35:6;
45:20
**proceeds (1)**
13:9
**process (1)**
38:6
**Professional (1)**
16:21
**professionals (2)**
9:22;31:4
**prohibits (1)**
36:15
**property (6)**
19:17,18;21:17;
27:25;28:9,24
**proponents (2)**

29:22;32:24
**proposed (5)**
17:12,16,22,25;
18:21
**prosecute (1)**
21:17
**provided (8)**
21:15;27:22;28:6,8,
12,15;30:10;36:13
**provides (5)**
27:22;28:6,12,16;
30:18
**providing (2)**
14:24;30:13
**provision (1)**
14:14
**provisional (12)**
11:14;12:18;13:23;
17:9;22:17,19;23:3,4;
25:7;26:8;42:8,11
**provisions (5)**
19:15;25:25;27:23;
29:4,22
**Psomadakis-Karastamatis (1)**
23:6
**public (1)**
37:7
**purporting (1)**
16:8
**purpose (2)**
28:19;30:7
**purposes (1)**
36:12
**Pursuant (15)**
23:19;24:1;26:14;
27:6;29:23;32:25;
36:16;38:10,15;39:4,
15;42:1,5;43:15,16

**Q**

**quick (1)**
45:7
**QUINN (3)**
7:11;9:6;44:20
**quote (3)**
26:4,21;31:14
**quoted (1)**
39:20

**R**

**raised (1)**
24:25
**raises (1)**
24:23
**Rather (3)**
38:17;40:7;41:9
**Ray (1)**
29:17
**re (3)**
29:8,13,17,20;30:3,
10;32:7,11;34:23;

35:4,8;40:13,18,21,25
**reason (1)**
34:8
**reasonable (1)**
31:12
**reasonably (1)**
43:21
**reasons (1)**
36:8
**rebuttal (5)**
14:19,21;15:1;
27:10;43:5
**recalcitrant (1)**
30:5
**received (1)**
44:16
**recognition (14)**
10:2;12:5;13:11;
15:4,17,22,23;16:18;
17:2,4;23:8;35:20,24;
42:5
**recognized (9)**
10:21;12:22;13:5,
15;14:8;42:15,17,20,
21
**recognizes (4)**
25:19;26:23;39:15,
21
**record (8)**
8:3;9:14;10:22;
31:18;36:21;37:12,
14;41:19
**REED (53)**
4:2,13;5:2,10;9:3,
16;10:6;11:10,12,18,
21;12:3,10,12,14;
15:19,25;16:8,20;
17:6,15,21;18:4,18;
19:2,3;22:3;23:22;
24:22;25:2,5,11;
27:18;33:4,7,18,22,
24,25;34:2,8,17,25;
35:4,19;36:1;37:18;
40:4,11,17;42:23;
44:19,21
**refer (6)**
9:23;10:10,23;11:6;
14:20;22:16
**references (1)**
36:10
**reflect (2)**
10:11;30:13
**reflecting (1)**
24:7
**refrain (1)**
25:2
**refused (1)**
39:25
**refuses (1)**
30:1
**regarding (2)**
37:13;44:16
**regardless (3)**

11:23;33:21;39:5
**Registry (1)**
10:10
**regulate (1)**
40:15
**regulating (1)**
40:12
**regulation (2)**
28:18;40:16
**reiterates (2)**
11:8;41:19
**rejecting (1)**
36:6
**related (8)**
15:8;20:3;30:20,24;
31:7,16;40:6;41:21
**relates (1)**
34:15
**relating (2)**
21:1;28:18
**released (2)**
20:4;24:3
**releases (1)**
31:19
**relevant (3)**
21:8;25:17;44:2
**reliance (2)**
34:19;41:9
**relied (1)**
25:11
**relief (7)**
17:13;18:10,22;
22:25;25:25;44:9,17
**relitigate (2)**
35:9,14
**rely (1)**
13:10
**remain (1)**
8:23
**reopen (1)**
35:9
**reopening (1)**
35:14
**reorganization (3)**
19:11;33:12;34:15
**Reorganize (4)**
16:1;20:12;26:15;
36:18
**reorganized (78)**
9:13;10:1,4,5,11,12,
16,21;11:9,11;12:7,
15,23;13:3,9;14:7,17;
15:20;16:7,13,14,17,
18,24;17:3,12,20,23;
18:3,9,20,23,24;19:1,
21;20:6,7,17,22;
21:15;23:10,19;24:4,
7,11,12,17;26:16,17,
21;27:8,9;29:10;
31:10,12;32:6;36:1,6,
9,17;37:16,25;38:23;
39:1,3,6;40:5,7,10;
41:4,5,23;42:20;43:1,

5,12,17,22
**replies (1)**
45:1
**reply (3)**
14:18,18,19
**represent (4)**
12:17;16:5,9;17:17
**representation (2)**
12:15;23:22
**representative (4)**
11:16;16:3;36:24;
39:2
**representatives (1)**
31:4
**representing (2)**
16:21;25:6
**represents (2)**
13:22;16:23
**request (1)**
29:22
**requested (1)**
43:22
**requests (1)**
12:11
**require (2)**
15:3;41:10
**required (3)**
28:23;36:20;40:23
**requires (4)**
12:5;14:14;40:2,6
**requiring (1)**
29:23
**requisite (2)**
41:11;43:2
**resigned (4)**
20:13;22:20,23;
26:9
**resolved (1)**
25:3
**respect (1)**
25:23
**respective (4)**
19:20;30:20;31:5,
25
**responded (2)**
17:6;25:6
**respondent (2)**
11:13;17:8
**responding (1)**
15:23
**response (2)**
16:7;17:21
**responses (1)**
44:25
**Restructuring (2)**
15:15;37:8
**retained (1)**
19:17
**retaining (1)**
24:25
**revised (4)**
17:12,16,22,25
**RICHARD (1)**

4:10
**rights (5)**
13:6;16:2;20:23;
28:14;30:9
**rise (1)**
20:1
**Riverside (1)**
30:3
**roadblocks (1)**
41:20
**ROBERT (2)**
6:20;8:19
**rooted (1)**
37:15
**RUDEWICZ (4)**
5:24;8:13,14;45:15
**Rule (2)**
24:18;28:18
**Rules (2)**
16:21;24:19
**ruling (9)**
25:2;26:6,13;35:17;
39:25;43:11;44:1,12;
45:12

## S

**SABINO (1)**
6:19
**same (4)**
11:8;18:20;24:23;
26:17
**sanctioned (4)**
10:14;17:19;29:18;
32:8
**sanctions (13)**
9:14;11:11;12:6;
14:1,18;17:8,24,25;
18:25;32:10;33:5,14;
44:13
**Savings (2)**
7:3;9:9
**scheduled (1)**
8:20
**SD (1)**
29:21
**SDNY (5)**
29:9,14;30:4,11;
32:11
**Second (3)**
29:6;38:5;44:15
**Section (36)**
14:2,13;19:16,23;
20:5,9,16;23:24;
25:16;26:11,24;
27:21,23;28:7,16;
29:2,3,7,11,14;30:7,
13;31:9;33:5,10;34:2,
14,18,19,21,25;39:22;
43:14,15,16,18
**Sections (13)**
11:23;23:21;24:1,5,
12,16;25:11;26:25;

27:5;32:25;33:19;
39:16,23
**securities (3)**
20:20,25;27:24
**security (5)**
28:1,3,4,11,15
**seek (1)**
39:13
**seeking (5)**
17:23,25;18:11;
32:25;34:4
**seeks (1)**
10:4
**Segal (3)**
8:6,6,6;45:8
**sent (2)**
44:20,21
**servants (1)**
31:5
**serve (2)**
34:25;42:11
**served (2)**
13:20;44:2
**set (1)**
44:5
**settle (1)**
21:17
**settlement (1)**
29:19
**seven (2)**
43:25;45:12
**Seventh (1)**
6:15
**shall (16)**
19:21;20:2,3,11,13,
18;21:11;24:2;28:20,
20;31:16;32:2;44:2,
11,25;45:1
**shareholder (2)**
32:20;39:5
**Shareholders (22)**
6:14;9:15;10:5;
13:25;14:2,10,13;
20:24;22:24;23:12,
13,15;36:25;37:19,21,
24,25;38:1;39:6;43:6,
13,17
**shareholders' (3)**
13:6;14:1,8
**shares (5)**
15:8,12;23:24;
25:12;32:17
**Ship (1)**
10:9
**Shipping (2)**
22:23,24
**ships (1)**
32:13
**Shore (1)**
29:4
**short (1)**
44:5
**shortly (1)**

45:16
side (1)
19:25
sidestep (1)
35:1
SIDLEY (2)
6:13;8:17
silent (1)
37:13
SMITH (44)
4:2,13;5:2,10;9:3,
16;10:6;11:10,12,18,
21;12:3,10,12,14;
15:19,25;16:8,20;
17:6,15;18:4,18;19:2;
22:3;24:22;25:2,5,11;
33:4,7,18,22,24;34:2,
8,25;35:4,19;36:1;
40:11;42:23;44:20,21
Smith's (9)
17:21;19:3;23:22;
27:18;33:25;34:17;
37:18;40:4,17
Snap (1)
29:5
Society (2)
7:3;9:9
SOLOMON (6)
4:9;9:2,2;11:19;
12:21,25
SOLOW (1)
4:10
sorry (3)
17:11;31:18;38:11
sought (9)
17:13;18:10;21:24;
22:25;23:9;35:9;
42:21;43:10;44:9
South (1)
5:12
Southern (1)
22:6
SPEAKER (1)
45:6
SPEARS (4)
7:22;15:22;16:4;
24:15
specifically (2)
15:15;34:13
Square (1)
4:16
state (4)
13:9;29:5;34:3,12
stated (9)
25:17;26:22;30:17;
31:15;37:18;38:13;
39:20;41:7;42:14
statement (6)
11:6,7;30:17,22;
40:3;41:14
statements (1)
42:4
STATES (24)

5:19,20;8:14;9:19;
10:16;13:3,13;15:6,
11,15;19:16,23;20:5,
9,16;21:8;29:3;31:9,
16,24;32:14;38:8,18;
42:9
stating (4)
16:4;17:7,16;24:23
statutes (1)
40:14
statutory (1)
34:22
stay (4)
21:24;39:14;43:9;
44:17
STEPHEN (1)
6:10
steps (1)
43:21
still (2)
8:23;25:13
stipulated (1)
44:17
stipulation (1)
24:18
stock (2)
19:24;35:20
Street (3)
4:15;5:4;29:5
subject (2)
27:17;41:12
submit (4)
18:15;39:3;44:11;
45:16
submitted (1)
19:6
subsection (2)
28:12;30:4
subsections (2)
27:22;28:6
Subsequently (1)
32:24
subsidiaries (3)
9:20;19:20;31:1
Substances (1)
34:9
substantive (1)
30:9
subvert (2)
9:24;15:21
successors (1)
30:25
Suite (1)
4:17
SULLIVAN (1)
7:11
summary (1)
42:23
support (13)
11:6,7;14:19;19:6;
30:18,22;34:7;35:5;
36:13;40:3,11,13;
41:15

supported (2)
9:18;11:18
sustaining (1)
19:12

**T**

task (1)
37:13
temporary (1)
22:25
term (1)
30:24
terminated (4)
12:15;20:4;23:21,
23
terminates (1)
28:14
terms (12)
11:23;20:7;29:13,
16,18;30:1,8,14;
33:11,16;38:19;43:7
testimony (10)
37:2,5,17,22;38:3,
11,25;41:18;42:2,18
therefore (5)
14:4;17:18;25:13;
39:1;43:7
thereto (1)
20:3
thereunder (1)
20:3
Third (1)
41:16
Three (1)
4:16
thus (6)
15:16;24:9;26:12;
27:6;37:24;43:9
Timothy (1)
24:15
TINA (2)
7:8;9:8
today (2)
9:12;45:17
Togut (2)
8:6;45:8
Toxic (1)
34:9
transaction (1)
20:21
transcript (11)
18:7;22:1;25:9;
26:2;27:3,11;37:17;
38:3,16;39:19;42:2
transfer (5)
28:24;29:20;32:17;
40:1;41:14
Transport (2)
32:7,12
treasurer (1)
42:12
trial (20)

18:17;22:14,18;
23:2,7,10,11,16,25;
24:7,16,26:2;27:2;
36:13,22;38:24,24;
39:18;41:18;42:13
true (1)
40:25
Trust (4)
8:18;23:14,15;29:5
Trustee (3)
5:20;8:14;9:9
Turning (1)
27:21
two (2)
9:12;45:4

**U**

under (16)
14:12;15:10;24:18;
25:20,22,22;26:24,25;
27:1,24,25;28:3;
33:19;34:13;39:22,23
undergone (1)
35:22
undertake (1)
41:13
undertaking (1)
10:2
Unfortunately (1)
8:21
UNIDENTIFIED (1)
45:6
unilaterally (1)
36:15
UNITED (4)
5:19,20;8:14;32:13
Unity (2)
8:18;23:14
unperformed (2)
29:16;30:8
Unsecured (6)
6:3;8:9;11:5;29:11;
32:16;41:7
unwilling (1)
29:23
update (2)
10:25;12:4
updating (5)
10:9;36:15,16;
38:19;43:24
upon (4)
12:16,21;24:9;44:2
URQUHART (1)
7:11
USC (1)
32:25
use (1)
21:16
usually (1)
37:9

**V**

Vassilis (5)
11:20;22:10,12,21;
23:4
VELEVIS (3)
6:20;8:19,23
vest (1)
19:21
vested (1)
23:24
violate (2)
11:22;12:14
violated (2)
12:8;40:24
violating (1)
38:2
violation (3)
13:14;16:21;43:3
Vitamin (4)
40:13,18,22,25
Voyager (2)
29:8;34:23

**W**

Wacker (1)
5:12
WADE (1)
6:9
way (1)
20:3
Whereupon (1)
45:20
whose (1)
32:20
WILLIAM (2)
6:18;8:16
Wilmington (1)
5:5;7:3;9:9
wishing (1)
9:11
withdrawn (1)
44:10
withdrew (1)
18:6
within (4)
29:1;31:14;39:3;
43:25
without (9)
10:2;13:4,11;15:17;
16:5;35:20;38:2;
44:10,11
witness (3)
13:2;36:18;37:18
witnesses (1)
18:6
WL (1)
29:14
words (2)
26:3;27:4
Worldcom (1)

29:13
**written (2)**
16:6;31:10

## Y

**York (7)**
4:5;5:22;6:5,16;7:6,
14;22:6

## Z

**ZIDE (1)**
6:10
**Zilakos (3)**
22:11;23:5,5

## 0

**03-10471 (1)**
32:9

## 1

**1 (7)**
5:21;10:4;11:21;
25:10,18;36:17;37:23
**1.124 (3)**
31:6;43:14,19
**10 (8)**
5:12;10:24;18:13;
25:1;36:23;39:7,19;
43:4
**10.6 (1)**
23:21
**10:00 (1)**
45:20
**10016 (1)**
7:14
**10019 (1)**
6:16
**10022 (1)**
4:5
**10036 (2)**
6:5;7:6
**101 (3)**
23:25;24:8,16
**104 (3)**
23:7,11;42:13
**105a (1)**
32:25
**10707 (1)**
5:22
**1095 (1)**
6:4
**11 (34)**
10:9;11:22;12:11,
17;14:10,15;16:10;
19:10,15;21:5;22:1,9;
23:17,23;24:5;27:5,
13,18;30:12,14,15,25;
31:7;32:14,17,25;
33:12,16;35:17,23;

42:25;43:12,20;44:8
**111 (1)**
29:9
**1132 (1)**
12:17
**1141 (5)**
11:23;27:21;29:3;
33:19;43:15
**1142 (19)**
11:23;14:2;28:16;
29:2,7,23;30:4,13;
33:5,11,19,25;34:2,
18,19,21,25;43:15,16
**1142a (1)**
34:14
**1142b (5)**
29:12,15;30:7,8;
32:25
**1149c (1)**
28:6
**1155 (1)**
7:4
**116 (2)**
23:10;42:21
**11th (1)**
45:1
**12 (12)**
10:24;11:2,4;13:8;
14:5;21:23;27:11;
31:24;32:5;37:16;
38:23,24
**1201 (1)**
5:4
**1212 (1)**
19:14
**1223 (2)**
9:25;21:7
**1233 (1)**
22:8
**1258 (1)**
23:18
**1268 (2)**
9:17;44:14
**1269 (1)**
11:17
**127 (1)**
38:11
**1285 (1)**
13:21
**1287 (1)**
11:12
**1291 (1)**
14:2
**1299 (1)**
14:19
**12th (1)**
22:15
**13 (9)**
11:2;13:12;14:5;
18:7;22:2;26:3;37:6,
11;42:3
**130 (1)**
37:2

**1301 (1)**
11:8
**131 (2)**
37:6;42:2
**1313 (1)**
15:24
**1314 (1)**
16:12
**1316 (1)**
17:1
**1317 (1)**
17:10
**1330 (1)**
17:13
**1338 (1)**
17:19
**1339 (1)**
17:22
**134 (3)**
29:9;30:3;34:24
**1355 (1)**
18:23
**1356 (1)**
18:19
**136 (1)**
40:19
**1367 (2)**
44:18;45:2
**137 (1)**
30:3
**1371 (1)**
19:1
**1372 (1)**
19:4
**138 (1)**
30:3
**13th (1)**
18:18
**14 (4)**
13:8;18:7;40:10;
41:6
**141 (1)**
37:22
**143 (2)**
40:19;41:1
**148 (1)**
33:23
**15 (5)**
10:15;13:17;18:8;
27:3,10
**150 (2)**
37:23;38:3
**153 (2)**
30:11;38:25
**154 (1)**
38:25
**155 (1)**
27:11
**156 (1)**
27:11
**159 (1)**
30:11
**16 (5)**

12:19;14:9;25:9;
37:17;41:23
**165 (1)**
42:18
**169 (2)**
26:15;41:18
**17 (3)**
18:8;25:10;27:3
**1717 (1)**
4:15
**178 (1)**
38:16
**17th (5)**
15:20,24;16:7;
18:24;19:2
**18 (3)**
14:9;35:25;38:16
**181 (1)**
29:20
**18th (4)**
16:25;17:1,6;45:2
**19 (3)**
35:25;37:23;42:18
**19103 (1)**
4:18
**19801 (1)**
5:5
**1991 (1)**
29:6
**1992 (1)**
30:4
**1995 (1)**
29:21
**19th (1)**
23:17

## 2

**2 (5)**
10:7;11:25;24:5;
27:11;38:12
**2.5A (1)**
23:23
**20 (2)**
14:12;38:25
**2003 (2)**
32:14;34:10
**2006 (1)**
32:11
**2009 (2)**
29:14,14
**2018 (1)**
30:11
**2021 (1)**
40:19
**2023 (1)**
29:9
**2024 (12)**
15:20;17:11,15;
19:8;21:3;22:3,15,23;
23:17;24:17,22;25:15
**2025 (6)**
17:20;18:2,18,24;

42:6;44:20
**21 (5)**
18:13;24:13;27:9;
36:23;41:18
**22 (3)**
25:9;37:2;38:4
**22nd (3)**
7:5;44:20,21
**23 (3)**
26:3;38:4;39:19
**23-10322 (1)**
8:3
**23rd (2)**
25:15;44:22
**24 (1)**
42:18
**24-cv-08672 (1)**
24:20
**25 (9)**
14:16;22:1;23:25;
24:7;25:9;27:12;37:2;
38:16;41:18
**25th (3)**
19:8;24:17;44:24
**26 (2)**
23:25;24:7
**26th (1)**
24:22
**27 (1)**
36:4
**27th (1)**
17:11
**28 (1)**
10:15
**295 (1)**
7:13
**2959457 (1)**
29:14
**2d (1)**
40:19
**2nd (1)**
17:20

## 3

**3 (5)**
10:12;12:2;15:2;
25:10;26:21
**3.1 (2)**
24:1,5
**3.2 (1)**
24:1
**30 (1)**
12:20
**303 (2)**
32:23;33:3
**31 (6)**
22:14;23:2,16;26:2;
27:3;39:19
**3100 (1)**
4:17
**319 (1)**
32:10

**31st (1)**
　17:15
**33 (1)**
　34:1
**34 (2)**
　24:5;33:8
**35 (1)**
　33:8
**350 (1)**
　34:9
**358 (4)**
　32:11,14,18,23
**37 (1)**
　10:3
**39 (2)**
　36:7;40:18
**3rd (1)**
　42:6

19:23;24:12;25:11;
　27:5
**5.8 (3)**
　20:5;23:25;24:12
**51 (1)**
　35:2
**515 (1)**
　27:16
**53 (1)**
　21:13
**54 (1)**
　14:13
**591 (1)**
　30:11
**599 (1)**
　4:4
**5th (1)**
　7:13

**81 (1)**
　22:18
**82 (2)**
　32:14,23
**83 (4)**
　32:11,15,18,23
**84 (1)**
　32:19
**86 (1)**
　27:12
**869 (1)**
　29:5
**87 (1)**
　27:12
**873 (1)**
　29:5
**8th (1)**
　22:23

## 4

**4 (8)**
　12:6;15:5;30:22;
　38:25;41:15;43:5;
　45:1,2
**40 (4)**
　13:1;26:2;27:2;
　39:18
**40th (1)**
　5:13
**46 (1)**
　35:7
**468 (1)**
　35:10
**4th (1)**
　21:3

## 5

**5 (6)**
　12:9;15:12,13;18:8;
　30:16;37:17
**5.1 (3)**
　30:23;31:15,23
**5.10 (5)**
　25:22;27:1,5;39:16,
　23
**5.10A (1)**
　24:16
**5.10c (3)**
　20:9;23:21;26:11
**5.11 (5)**
　20:16;25:22;27:1;
　39:16,23
**5.2 (6)**
　25:16,21;26:24;
　27:5;39:16,22
**5.2B (4)**
　25:11;30:15;31:9,
　14
**5.2c (1)**
　19:16
**5.4 (4)**

## 6

**6 (4)**
　12:12;15:13;18:13;
　27:12
**60606 (1)**
　5:14
**639 (1)**
　35:11
**640 (1)**
　35:15
**649 (2)**
　29:8;34:24
**657 (1)**
　29:20
**661 (1)**
　29:21
**666 (1)**
　29:25
**6th (2)**
　18:2;27:11

## 7

**7 (8)**
　10:20;12:14;17:19;
　18:7;21:19;37:6;
　38:12;42:2
**73 (1)**
　37:17
**787 (1)**
　6:15
**7th (1)**
　22:3

## 8

**8 (6)**
　13:24;40:3,18,19;
　41:1,15
**80 (1)**
　32:11
**8023 (1)**
　24:18

## 9

**9 (2)**
　18:13;24:21
**9:30 (3)**
　8:21,22;44:25
**930 (1)**
　27:16
**934 (1)**
　34:12
**937 (1)**
　34:16
**942 (1)**
　34:10
**948 (1)**
　29:5
**9th (1)**
　34:10