HERBERT SMITH FREEHILLS KRAMER (US) LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
Kyle J. Ortiz
Brian F. Shaughnessy
David E. Blabey Jr.

*Counsel for Plaintiffs as Against Defendants Other Than
Law Firm and Lawyer Defendants*

GOULSTON & STORRS PC
One Post Office Square
Boston, MA 02109
(617) 574-3575
Jennifer B. Furey (*pro hac vice* to come)
Nathaniel R.B. Koslof (*pro hac vice* to come)
Jaclyn Grodin

*Counsel for Plaintiffs as Against All Defendants*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: ELETSON HOLDINGS INC., *et al.*, | : | Chapter 11 |
| | : | Case No. 23-10322 (JPM) |
| Debtors.[1] | : | Jointly Administered |

------------------------------------------------------------------------x

| | |
|---|---|
| ELETSON HOLDINGS INC.; ELETSON | : |
| CORPORATION; ELETSON CHARTERING INC.; | : |
| EMC INVESTMENT CORPORATION; | : |
| KASTOS SPECIAL MARITIME ENTERPRISE; | : |
| FOURNI SPECIAL MARITIME ENTERPRISE; | : |
| KINAROS SPECIAL MARITIME ENTERPRISE; and | : |
| KIMOLOS II SPECIAL MARITIME ENTERPRISE, | : |
| | : Adv. Pro. No. _____ |
| Plaintiffs, | : |
| v. | : |
| | : |
| VASSILIS KERTSIKOFF; VASILIS | : |

---

[1] The Debtors in these Chapter 11 Cases were: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC (collectively, the "Debtors"). References to the "Debtors" with respect to conduct that occurred prior to the Effective Date of the Plan (described below) are to the pre-effective date Debtors. References to the "Debtors" with respect to conduct that occurred following the Effective Date of the Plan are to the post-effective date Debtors.

HADJIELEFTHERIADIS; LASCARINA : 
KARASTAMATI; KONSTANTINOS : 
HADJIELEFTHERIADIS; IOANNIS ZILAKOS; : 
EMMANUEL ANDREOULAKIS; ADRIANOS : 
PSOMADAKIS; PANOS PAXINOS; ELENI : 
GIANNAKOPOULOU; NIKI ZILAKOU; : 
LASSIA INVESTMENT COMPANY; GLAFKOS : 
TRUST COMPANY; FAMILY UNITY TRUST : 
COMPANY; ELAFONISSOS SHIPPING : 
CORPORATION; KEROS SHIPPING : 
CORPORATION; REED SMITH LLP; LEX GROUP : 
LIBERIA LLC; DANIOLOS LAW FIRM; : 
JOHN MARKIANOS-DANIOLOS; and RIMON P.C., : 
 : 
                        Defendants. : 
------------------------------------------------------------------------x

## COMPLAINT

Plaintiffs Eletson Holdings Inc. ("Holdings"), Eletson Corporation ("Corp."), Eletson Chartering Inc. ("Chartering"), EMC Investment Corporation ("EMC"), Kastos Special Maritime Enterprise ("Kastos"), Fourni Special Maritime Enterprise ("Fourni"), Kinaros Special Maritime Enterprise ("Kinaros"), and Kimolos II Special Maritime Enterprise ("Kimolos" and, collectively with Kastos, Fourni, and Kinaros, the "SMEs" and each an "SME Party") hereby file this Complaint (the "Complaint") against: (1) Defendants Vassilis Kertsikoff, Vasilis Hadjieleftheriadis, Lascarina Karastamati, Konstantinos Hadjieleftheriadis, Ioannis Zilakos, Emmanuel Andreoulakis, Adrianos Psomadakis, Panos Paxinos, Eleni Giannakopoulou, and Niki Zilakou (collectively, the "Former D&Os"); (2) Defendants Lassia Investment Company ("Lassia"), Glafkos Trust Company ("Glafkos"), Family Unity Trust Company ("Family Unity"), Elafonissos Shipping Corporation ("Elafonissos"), and Keros Shipping Corporation ("Keros") (collectively, the "Former Shareholders"); and (3) Defendants Reed Smith LLP ("Reed Smith"), Lex Group Liberia LLC ("Lex Group"), Daniolos Law Firm ("Daniolos Firm"), John Markianos-

Daniolos ("Daniolos"), and Rimon P.C. ("Rimon") (collectively, the "Fake EHI Attorneys"). In support of the Complaint, the Plaintiffs respectfully allege as follows:

## SUMMARY OF THE ACTION

1.      This Complaint asserts claims for conversion and breach of contract (among others) against the former owners, directors, officers, and counsel of the above-captioned Debtors, who have engaged in a months-long campaign to resist and obstruct the implementation of the confirmed chapter 11 plan. The conversion claims are straightforward: the Defendants have diverted funds owed under Eletson's charterparty contracts from their rightful recipients into accounts controlled by the former owners. They have used those funds to enrich themselves and to fund their assault against the plan, making payments to lawyers who should and do know better. At the same time, the Defendants have refused to turn over critical business records required to be transferred to new ownership under the plan. The breaches of contract are equally clear: this Court has held on at least four occasions that the Defendants are in ongoing breach of the chapter 11 plan—a binding contract. For these and other reasons set forth below, the Defendants have caused extensive damage to the Plaintiffs, which this Complaint seeks to rectify.

## JURISDICTION AND VENUE

2.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference, M*-431, dated January 31, 2012, of the United States District Court for the Southern District of New York (the "Southern District of New York") referring to this Court all proceedings arising under title 11 of the United States Code (the "Bankruptcy Code") or arising in or related to a case under title 11.

3.     This adversary proceeding is commenced pursuant to section 105(a) of the United States Bankruptcy Code (the "Bankruptcy Code") and Rule 7001(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.     This adversary proceeding is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A) and (E) such that this Court has jurisdiction to hear and to determine this proceeding and to enter final orders and judgments in it.  If this Court or any other appropriate court finds any part of this adversary proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this proceeding under 28 U.S.C. § 1334 because this proceeding arises in and relates to the Debtors' chapter 11 cases (the "Chapter 11 Cases").  Plaintiffs consent to the entry of final orders and judgments by this Court in this adversary proceeding pursuant to Bankruptcy Rule 7008.

5.     This Court has personal jurisdiction over each of the Defendants pursuant to Rule 7004 of the Bankruptcy Rules.  Each of the Defendants has maintained minimum contacts with the United States in connection with the claims asserted herein, including by the Debtors' voluntary commencement of the Chapter 11 Cases (as authorized by their controlling parties), the Debtors' participation in the Chapter 11 Cases, and the Defendants' individual participation in the Chapter 11 Cases.

6.     Venue in the Southern District of New York is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and is related to the Chapter 11 Cases commenced under the Bankruptcy Code and pending in this Court.

## PARTIES

### A.     Plaintiffs

7.     Plaintiff Holdings is a corporation formed under the laws of the Marshall Islands, and is the ultimate parent of the Eletson family of companies (collectively, "Eletson").  Eletson is an international gas shipping company which owns and operates a fleet of medium and long-range

gas tanker ships that carry a wide range of refined petroleum products, including crude oil. Eletson operates its fleet through wholly owned subsidiaries of Holdings, which subsidiaries own or charter the ships. Holdings was one of the Debtors in the above-captioned Chapter 11 Cases. Holdings was previously owned by Lassia, Glafkos, and Family Unity (collectively, the "Former Majority Shareholders"), each of which previously held approximately 30.7% of the equity in Holdings, and by Elafonissos and Keros (collectively, the "Former Minority Shareholders"), each of which previously held 3.92% of the equity in Holdings. As described below, pursuant to the Court's order (the "Confirmation Order") confirming a chapter 11 plan for the Debtors (the "Plan"), and the Plan itself, on the Plan's effective date (the "Effective Date"): (1) all notes, stock, and other documents giving rise to claims against and interests in the former Debtors (including the interests of the Former Majority and Former Minority Shareholders) were automatically cancelled; (2) ownership and control of the Debtors was vested in the creditors, and (3) the directors and officers of each Debtor prior to the effective date were deemed to have resigned.

8.      Plaintiff Corp. is a corporation organized under the laws of Delaware, and is a wholly owned subsidiary of Holdings. Corp. manages Eletson's fleet of ships in exchange for a management fee.

9.      Plaintiff Chartering is a corporation organized under the laws of the Marshall Islands, and is a wholly owned subsidiary of Holdings. Chartering acts as the sub-charterer for certain of the vessels operated by the SMEs.

10.      Plaintiff EMC is a corporation organized under the laws of the Marshall Islands, and is a wholly owned subsidiary of Holdings. EMC performs certain corporate treasury functions for Holdings and its subsidiaries.

11.     Plaintiff Kastos is a special maritime enterprise organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kastos is a party to a sale-leaseback transaction concerning the vessel "Kastos" with OCM Maritime Thames LLC ("Thames"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that is affiliated with Oaktree Capital Management, Inc., an American investment firm ("Oaktree").  Under the terms of this transaction: (1) Thames purchased the vessel "Kastos" from Kastos for $15,075,000; and (2) Kastos leased the "Kastos" from Thames pursuant to the bareboat charterparty dated June 24, 2020 (the "Kastos-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Kastos" out to charter parties.  As described below, since approximately January 12, 2023, Kastos has been a party to the Kastos Charterparty contract with Novum (both defined below) providing for Novum's hire of the "Kastos" for $24,400 daily.

12.     Plaintiff Fourni is a special maritime enterprise organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Fourni is a party to a sale-leaseback financing transaction concerning the vessel "Fourni" with OCM Maritime Autumn LLC ("Autumn"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that is affiliated with Oaktree.  Under the terms of this transaction: (1) Autumn purchased the vessel "Fourni" from Fourni for $15,075,000; and (2) Fourni leased the "Fourni" from Autumn pursuant to the bareboat charterparty dated June 24, 2020 (the "Fourni-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Fourni" out to charter parties.  As described below, since approximately January 12, 2023, Fourni has been a party to the Fourni Charterparty contract with Novum (both defined below) providing for Novum's hire of the "Fourni" for $24,400 daily.

13.     Plaintiff Kinaros is a special maritime enterprise organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kinaros is a party to a sale-leaseback financing transaction concerning the vessel "Kinaros" with OCM Maritime Rhine LLC ("Rhine"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that is affiliated with Oaktree.  Under the terms of this transaction: (1) Rhine purchased the vessel "Kinaros" from Kinaros for $14,275,000; and (2) Kinaros leased the "Kinaros" from Rhine pursuant to the bareboat charterparty dated June 24, 2020 (the "Kinaros-Oaktree Charterparty") and undertook to pay the lease with funds earned from hiring the "Kinaros" out to charter parties. Upon information and belief, since the Effective Date, Kinaros has leased the vessel "Kinaros" to one or more third parties pursuant to a charterparty contract at a rate of not less than $31,500 per day.

14.     Plaintiff Kimolos is a special maritime enterprise organized under the laws of Greece, and is a wholly owned subsidiary of Holdings.  Kimolos is a party to a sale-leaseback financing transaction concerning the vessel "Kimolos" with OCM Maritime Yukon LLC ("Yukon," and, together with Thames, Autumn, and Rhine, the "Oaktree Parties"), a limited-liability company organized under the laws of the Republic of the Marshall Islands that is affiliated with Oaktree.  Under the terms of this transaction: (1) Yukon purchased the vessel "Kimolos" from Kimolos for $15,075,000; and (2) Kimolos leased the "Kimolos" from Yukon pursuant to the bareboat charterparty dated June 24, 2020 (the "Kimolos-Oaktree Charterparty," and, together with the Kastos-Oaktree Charterparty, the Fourni-Oaktree Charterparty, and the Kinaros-Oaktree Charterparty, the "Oaktree Charterparties") and undertook to pay the lease with funds earned from hiring the "Kimolos" out to charter parties.  Upon information and belief, since the Effective Date,

Kimolos has leased the vessel "Kimolos" to one or more third parties pursuant to a charterparty contract at a rate of not less than $33,500 per day.

**B.      Defendants**

15.      Defendant Vassilis Kertsikoff (also known as Vasileios Kertsikof) was previously (1) an officer and director of Holdings, (2) an officer and director of Corp., (3) an officer and director of EMC, and (4) a director, officer, owner, and/or beneficiary of Family Unity, a Former Majority Shareholder.  To facilitate the so-called "Provisional Board" scheme (described below), Kertsikoff resigned from Holdings' board of directors and officer position on November 8, 2024. Upon information and belief, Kertsikoff resigned as a director and/or officer of Family Unity sometime after the Confirmation Order was entered.  All of Kertsikoff's other roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Confirmation Order, the Plan, and a written consent executed by Holdings in its capacity as sole shareholder and controlling shareholder, as applicable, of Holding's subsidiaries (the "Omnibus Parent Consent").  Upon information and belief, Kertsikoff continues to assert that he controls Holdings and/or its subsidiaries to third parties.  Upon information and belief, Kertsikoff maintains a residence in Piraeus, Greece and conducts or conducted business in or directed at New York.

16.      Defendant Vasilis Hadjieleftheriadis (also known as Vasileios Chatzieleftheriadis) was previously (1) an officer and director of Holdings, (2) an officer and director of Corp., (3) an officer and director of EMC, and (4) an officer and director of the SMEs.  Hadjieleftheriadis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024.  Hadjieleftheriadis is currently and has been a director, officer, owner and/or beneficiary of Glafkos, a Former Majority Shareholder.  As of February 24, 2025, Hadjieleftheriadis became an officer, owner and/or beneficiary of Lassia, a Former Majority Shareholder.  All of Hadjieleftheriadis's roles at Eletson were terminated

following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and a separate consent by the stockholders of Holdings (the "Holdings Stockholder Consent"). Hadjieleftheriadis has the authority to transfer funds to and from the historical bank accounts of Eletson Corporation, Chartering, EMC, and, on information and belief, all other subsidiaries. Hadjieleftheriadis is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order (defined below). Upon information and belief, Hadjieleftheriadis maintains a residence in Piraeus, Greece and conducts or conducted business in or directed at New York.

17.     Defendant Lascarina Karastamati (also known as Laskarina Karastamati) was previously (1) an officer and director of Holdings, (2) an officer and director of Corp., (3) an officer and director of the SMEs, (4) an officer and director of EMC, and (5) an officer, owner, and/or beneficiary of Lassia, a Former Majority Shareholder. Karastamati resigned from Holdings' board of directors and officer position on November 8, 2024. All of Karastamati's other roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, and the Omnibus Parent Consent. On or around February 24, 2025, Karastamati transferred her shares of Lassia to Vasilis Hadjieleftheriadis and no longer owns or manages Lassia. Karastamati has the authority to transfer funds to and from the historical bank accounts of Eletson Corporation, Chartering, EMC, and, on information and belief, all other subsidiaries. Upon information and belief, Karastamati maintains a residence in Piraeus, Greece and conducts or conducted business in or directed at New York.

18.     Defendant Konstantinos Hadjieleftheriadis (also known as Konstantinos Chatzieleftheriadis) was previously a director of Holdings, and is an owner and/or beneficiary of Glafkos. Konstantinos Hadjieleftheriadis was purportedly appointed a provisional director of

Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. Konstantinos Hadjieleftheriadis and Vasilis Hadjieleftheriadis are brothers. All of Konstantinos Hadjieleftheriadis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Hadjieleftheriadis is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

19. Defendant Ioannis Zilakos was previously a director of Holdings, and is currently an officer, director, and owner of Elafonissos, a Former Minority Shareholder. Zilakos was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. All of Zilakos's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Zilakos is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

20. Defendant Emmanuel Andreoulakis (also known as Emmanouil Andreoulakis) was previously (1) the AOR (defined below) for and a director of Holdings, (2) in-house counsel to Eletson Corp., and (3) an officer and director of the SMEs, and is currently an officer, director, agent, and/or owner of Keros, a Former Minority Shareholder. Andreoulakis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. All of Andreoulakis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member

of the Provisional Board, Andreoulakis is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

21. Defendant Adrianos Psomadakis (also known as Adrianos Psomadakis-Karastamatis) was previously a director of Holdings and an owner, officer, and director of Lassia. Psomadakis was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024. All of Psomodakis's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Psomadakis is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

22. Defendant Panos Paxinos was previously a director of Holdings. Paxinos was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024, and is an officer and/or owner Elafonissos. Paxinos is the son of Defendant Ioannis Zilakos. All of Paxinos's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Paxinos is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

23. Defendant Eleni Giannakopoulou (also known as Eleni Yannakopoulou) was previously a director of Holdings. Giannakopoulou was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024, and is an owner and/or beneficiary of Glafkos. Giannakopoulou is the daughter of Defendant Konstantinos Hadjieleftheriadis and niece of Defendant Vasilis

Hadjieleftheriadis. All of Giannakopoulou's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Giannakopoulou is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

24. Defendant Niki Zilakou (also known as Niki Zilakos) was previously a director of Holdings. Zilakou was purportedly appointed a provisional director of Holdings by a Greek court upon the application of the Former Minority Shareholders on November 11, 2024, and is an officer and/or owner of Elafonissos. Zilakou is the mother of Ioannis Zilakos and the aunt of Andreoulakis, the Hadjieleftheriadis brothers, and the Karastamati sisters. All of Zilakou's roles at Eletson were terminated following the Effective Date pursuant to, as applicable, the Court's Confirmation Order, the Plan, the Omnibus Parent Consent, and the Holdings Stockholder Consent. As a member of the Provisional Board, Zilakou is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

25. Upon information and belief, Defendant Lassia is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Lassia previously held approximately 30.7% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to the Court's Confirmation Order and the Plan. Lassia is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

26. Upon information and belief, Defendant Glafkos is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Glafkos previously held approximately 30.7% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the

Effective Date pursuant to the Court's Confirmation Order and the Plan. Glafkos is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

27. Upon information and belief, Defendant Family Unity is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Family Unity previously held approximately 30.7% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to the Court's Confirmation Order and the Plan. Family Unity is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

28. Upon information and belief, Defendant Elafonissos is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Elafonissos previously held 3.92% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to, as applicable, the Court's Confirmation Order and the Plan. Elafonissos is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

29. Upon information and belief, Defendant Keros is a Liberian entity with its registered address at 80 Broad Street, Monrovia, Liberia. Keros previously held 3.92% of the equity in Holdings, but its equity interests in Holdings were extinguished as of the Effective Date pursuant to, as applicable, the Court's Confirmation Order and the Plan. Keros is in contempt of the Consummation Order, the February Sanctions Order, the Third Sanctions Order, and the Fourth Sanctions Order.

30. Defendant Reed Smith is a global law firm with 33 offices throughout the United States, Europe, the Middle East, and Asia, including in New York.

31.     Defendant Lex Group is a law firm based in Monrovia, Liberia.  The Lex Group has submitted testimony in the Chapter 11 Cases on behalf of the Provisional Board (defined below).

32.     Defendant Daniolos Firm is a law firm based in Piraeus, Greece.  Defendant John Markianos-Daniolos is a partner of the Daniolos Firm.  Daniolos Firm and Daniolos have appeared in the Chapter 11 Cases on behalf of their purported clients, including submitting multiple declarations in support of arguments advanced by the Provisional Board, purporting to act as Holdings, and Reed Smith, and have advocated for the same clients in the appeal of the Confirmation Order.

33.     Defendant Rimon is a global law firm with 50 offices throughout North America, Europe, the Middle East, Latin America, Asia, and the Pacific, including in New York.

## ALLEGATIONS

**A.      General Background**

**1.      The Principal Families**

34.     Historically, Eletson was closely held, controlled, and managed by three families: the Kertsikoff, Hadjieleftheriadis, and Karastamati families (the "<u>Principal Families</u>").  Each of those families beneficially held approximately 30.7% of the equity in Holdings through their ownership of Liberian trust companies, *i.e.*, the Former Majority Shareholders: (1) Family Unity, owned by the Kertsikoff family; (2) Glafkos, owned by the Hadjieleftheriadis family; and (3) Lassia, owned by the Karastamati family.  Holdings' remaining equity was beneficially held by two other families: the Zilakos and Andreoulakis families (the "<u>Minority Families</u>") through the ownership of other Liberian trust companies, *i.e.*, the Former Minority Shareholders (1) Elafonissos and (2) Keros.   The three Principal Families and two Minority Families (collectively, the "<u>Families</u>") are all related to each other.

35. As described above, members of the Families were also directors and officers of Holdings and of its various subsidiaries, including Corp., Chartering, EMC, Gas, and the SMEs.

### 2. Events Leading to the Chapter 11 Cases

36. Leading up to the Chapter 11 Cases, the Debtors were deeply insolvent and owed their creditors at least $450 million, including more than $320 million on account of First Preferred Ship Mortgage Notes due January 15, 2022 (the "Notes"). The Debtors never made a single cash payment over the life of the Notes and failed to repay the Notes at maturity.

37. Therefore, on March 7, 2023, certain creditors filed involuntary petitions against the Debtors under Chapter 7 of the Bankruptcy Code (the "Petitions") in the United States Bankruptcy Court of the Southern District of New York. They were later joined by 10 additional creditors (collectively, the "Petitioning Creditors"). The Petitioning Creditors included institutions as well as individual retail investors who collectively were owed hundreds of millions of dollars, largely on account of the Notes that had remained in default and unpaid for years.

38. On April 14, 2023, the Debtors moved to dismiss the Petitions, and months of litigation between the Debtors and their creditors ensued. On the eve of trial, the Debtors agreed to convert the Chapter 7 involuntary cases to voluntary cases under Chapter 11. As the District Court recently observed, under the "stewardship" of Defendants Vassilis Kertsikoff, Laskarina Karastamati, and Vasilis Hadjieleftheriadis, "Holdings voluntarily sought the protection and assistance of the United States Bankruptcy Court for the Southern District of New York."

### 3. The Voluntary Chapter 11 Cases

39. On September 25, 2023, the Court entered an order converting the cases to Chapter 11 initiating the above-captioned Chapter 11 Cases.

40. Following the conversion, disagreements ensued between the legacy owners of Holdings, on the one hand, and its creditors, on the other, concerning the future direction and

ownership of the company. Those disagreements played out, among other things, in the filing of competing chapter 11 plans. The Petitioning Creditors proposed two plans, and the Debtors, supported by the Former Majority Shareholders, filed a third one

41. The Debtors' plan was to be funded through a contribution from the Former Majority Shareholders. The Former Majority Shareholders submitted a commitment letter to this Court purporting to commit them to provide a $30 million "new value" contribution to the plan. The letter was signed by Laskarina Karastamati, Vasileios Chatzieleftheriadis, and Vasileios Kertsikof on behalf of the Former Majority Shareholders, and by Laskarina Karastamati on behalf of each of the three Debtors.

42. From September 10, 2024 through September 13, 2024, the Court held a hearing (the "Confirmation Hearing") to consider confirmation of the competing plans. Defendants Vassilis Kertsikoff and Vasilis Hadjieleftheriadis testified at the confirmation hearing on behalf of the Debtor.

### 4. Confirmation of the Plan

43. On October 25, 2024, after the nearly week-long trial, the Court issued a decision (the "Confirmation Decision") confirming the chapter 11 Plan proposed by the Petitioning Creditors and rejecting the Debtors' proposed plan.

44. On November 4, 2024, the Court entered the Confirmation Order confirming the Plan. The Confirmation Order, among other things, (1) required all relevant parties to cooperate in good faith to implement and consummate the Plan; (2) directed the Debtors to "take or not take any and all actions as instructed by the Petitioning Creditors" and to not "take any actions inconsistent with the Plan or th[e] Confirmation Order"; and (3) determined that "all property of each of the Debtors' Estates, including. . . . interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and Affiliates, shall vest in Reorganized Holdings free and

clear of all claims, Liens, encumbrances, charges, and other interests, except as may be provided pursuant to the Plan or this Confirmation Order."

45.     On November 19, 2024, the Effective Date, the Plan went effective upon the Petitioning Creditors' filing of the notice of Effective Date, which confirmed that all conditions precedent to the Effective Date set forth in Section 9.1 of the Plan were satisfied or waived.  Reed Smith and its clients did not dispute that the Effective Date occurred.  *See* Tr. of Hr'g (Dec. 16, 2024) at 73:16-19 (Reed Smith admitting that "[t]he [E]ffective [D]ate occurred").

### 5.     The Effect of Confirmation

46.     The confirmation and effectiveness of the Plan had several key consequences.

47.     *First*, the Plan became binding as against (among others) the Debtors, their equity security holders, and Related Parties (defined below).  *See* 11 U.S.C. § 1141(a).

48.     *Second*, the Plan displaced the Debtors' existing ownership, vesting new ownership in the creditors eligible to receive new equity on account of their claims under the Plan.

49.     *Third*, the Plan displaced the Debtors' existing management and governance structure.  In keeping with these provisions, the articles of incorporation of Holdings were amended to reflect the reorganized entity, and a new board of directors was constituted (the "New Board"), comprising Adam Spears, Leonard Hoskinson, and Timothy Matthews.

50.     *Fourth*, the Plan terminated the retention of the Debtors' prior counsel and professionals.  Holdings retained its current counsel as of the Effective Date.

51.     *Fifth*, the Plan and Confirmation Order imposed various ongoing duties of compliance, and vested the reorganized company and its new ownership with various rights of enforcement.  Among other things: (i) paragraph 5(i) of the Confirmation Order authorized the Debtors to "carry out and implement all provisions of the Plan," and required the Debtors and each of their "Related Parties" to "cooperate in good faith to implement and consummate the Plan," and

(ii) paragraph 12 of the Confirmation Order enjoined all parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, from taking any actions to interfere with the implementation or consummation of the Plan.[2]

52.     In short, following the Effective Date of the Plan, both ownership and management of Holdings changed hands and became vested in the individuals and entities specified in the Plan—i.e., Holdings' creditors—who were given the right to enforce the Plan.

53.     On and after the Effective Date, Holdings took several steps to take control of the Debtors' subsidiaries, including Corp. and the SMEs, the equity interests of which automatically vested in reorganized Holdings free and clear of any other interest.  In its capacity as the 100% equity holder of Corp. and the SMEs, Holdings (among other things) directed: (1) the removal of the then-existing directors and officers of Corp. and the appointment of new directors and officers, who were authorized to act on behalf of Corp.; (2) the removal of the then-existing directors of each of the SMEs and the appointment of new directors authorized to act on behalf of each of the SMEs; and (3) the removal and revocation of all directors and officers of each of the Holdings' wholly owned or controlled companies and each such company's subsidiaries.

54.     In the wake of these changes, and as this Court recognized in a January 24, 2025 oral ruling: (1) the New Board is now the operative board of Holdings, with authority to act on behalf of Eletson, (2) on the Effective Date, the former board members ceased to be directors or managers of Holdings; (3) Holdings (as reorganized) is the only Eletson Holdings Inc.; and (4) the

---

[2]   Under Section 1.124 of the Plan, the Debtors' Related Parties include its "predecessors, predecessors in interest, successors and assigns, parents, owners, subsidiaries, [and] affiliates," as well as its "current and former officers, directors, principals, equity holders . . ., members, partners, employees, agents, sub-agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, managers, investment managers, investment bankers, consultants, representatives, management companies, fund advisors and other professionals."

Confirmation Order is binding on, among others, the Former Majority Shareholders, Former Minority Shareholders, Former D&Os, and Holdings' former counsel.

**6.     The Confirmation Appeal and Its Dismissal**

55.     On November 7, 2024, the Debtors filed a notice of appeal from the Confirmation Decision (the "Plan Confirmation Appeal"). The Debtors neither sought nor obtained a stay pending appeal of the Plan Confirmation Appeal.

56.     On November 25, 2024, Holdings, the Petitioning Creditors, and the Creditors' Committee filed a stipulation with the Honorable Lewis J. Liman of the Southern District of New York (the "District Court") seeking to dismiss the Plan Confirmation Appeal with prejudice (the "Appeal Dismissal Stipulation").

57.     On December 23, 2024, the District Court held a hearing to consider the Appeal Dismissal Stipulation. During that hearing, Judge Liman ruled as follows:

> I'm going to grant the stipulation of dismissal. Because, number one, there is an order of the Court, the bankruptcy court, that has become final that I am to honor. And that order recognizes the new board of Eletson, gives the new board of Eletson, under [section 5.2 of the Plan], the ability to act on behalf of Eletson. That's under [sections 5.10 and 5.11 of the Plan], and gives them under the plan of confirmation, authority with respect to this appeal. If the former owners of Eletson, the former directors of Eletson, want relief from those provisions of the plan, go to what is or would have been the bankruptcy court and not to me.

Tr. of Hr'g (December 23, 2024) at 31:10-23.

58.     On December 30, 2024, the District Court so-ordered the Appeal Dismissal Stipulation (the "Appeal Dismissal Stipulation Order").

59.     On January 16, 2025, Reed Smith and Rimon filed a Notice of Appeal of the Appeal Dismissal Stipulation Order purportedly on behalf of Holdings, Eletson Finance (US) LLC, and Agathonissos Finance LLC. Holdings did not retain Reed Smith or Rimon and did not authorize either Reed Smith or Rimon to file a Notice of Appeal on Holdings' behalf.

60.    The District Court struck the Notice of Appeal.  In its extensive bench ruling on February 14, 2025, the District Court (1) pointed out the "inherent absurdity" of the Provisional Board's (defined below) arguments that foreign recognition of the Confirmation Order is necessary before the Confirmation Order is effective; (2) held that the Provisional Board and Reed Smith are not entitled to speak for Holdings before the Court, and that post-Effective Date actions purportedly taken by the Provisional Board's counsel on behalf of Holdings were "plainly unauthorized," likening counsel to "interloper[s]" and striking the notices of appearance and notices of appeal that the Provisional Board's counsel purported to file on Holdings' behalf; and (3) issued an indicative ruling that Holdings' decision to dismiss the Confirmation Appeal should be recognized and that the Second Circuit should dismiss the Confirmation Appeal.[3]

61.    The District Court also emphasized during argument that former management and ownership's failure to do everything they reasonably could to help implement the Plan, was itself a violation of the Confirmation Order.  As the District Court observed:  "it does strike me as odd that those same individuals who asked the U.S. court to reorganize their entity could then purport to represent the reorganized entity, the entity that they said U.S. court would reorganize, and then, purporting to represent them, take a position opposite to the plan."  The District Court also observed, in colloquy with Reed Smith, that: "You're arguing on behalf of Eletson Holdings that Eletson Holdings hasn't [sought recognition] that Eletson Holdings should do. . . . haven't you just confessed to your own wrongdoing?"

**B.    The Defendants' Efforts To Undermine and Obstruct the Plan**

62.    Despite the clear mandates of the Plan and Confirmation Order to "cooperate in good faith" and assist with implementation of the Plan, the Defendants have refused to cooperate

---

[3] The District Court's dismissal of the Confirmation Appeal is on appeal before the Second Circuit.

with efforts to consummate the Plan, and have in fact obstructed it. These persistent and improper efforts began before the Effective Date and have continued to the present day.

### 1. Reed Smith and Others Immediately Begin Scheming to Obstruct the Plan

63. Upon the Plan's confirmation, the Petitioning Creditors contacted Reed Smith to begin closing discussions and requested standard diligence information such as copies of corporate constituent documents, loan agreements, employment agreements, and an employee roster, among other things. On October 30, 2024, counsel for the Petitioning Creditors also requested that Reed Smith put the Petitioning Creditors in touch with key personnel to begin discussions regarding the Employee Incentive Plan under the Plan. Two weeks later, the Petitioning Creditors explicitly directed the former Debtors to provide the requested information pursuant to paragraph 5(iii) of the Confirmation Order. Still, Reed Smith and the other Defendants continued their refusal to cooperate and did not join a single closing call until the final closing call on the Effective Date (during which they raised on objection to the closing of the Plan transactions and the declaration of the Effective Date).

64. Moreover, despite being bound by the Confirmation Order and the Bankruptcy Code to implement the Plan, Reed Smith and the former Debtors openly expounded on their intention to obstruct implementation of the Plan. For example, on November 12, 2024, Reed Smith informed Judge Liman that the former Debtors intended to contest the Plan's effectiveness, stating:

> We know that the plan says that shares of Holdings, old Holdings, might be extinguished, but even that is explicitly subject to applicable law, and that applicable law is not U.S. law, it's Liberian law. I'm not suggesting anything that I know; the only thing I know to represent to your Honor is that we asked the same Liberian counsel whom your Honor knows from the last time whether a U.S. bankruptcy order is automatically enforceable in Liberia. It is not.

Tr. of Hr'g (Nov. 12, 2024) at 7:13-21. In a letter to this Court filed later that day, Reed Smith argued that "a recognition proceeding is needed in both Liberia and Greece to ensure the

Confirmation Order's enforceability." Reed Smith advanced this position even though (1) the Confirmation Order and Plan provide that the Court-ordered ownership change would take place automatically upon the Effective Date; (2) Reed Smith has never identified any party in Liberia against whom the Confirmation Order needs to be enforced; and (3) the position advanced by Reed Smith was against the interests of Holdings, its former client.

        **2.**      **The Minority Shareholders Petition For Appointment of a Provisional Board**

65.     On November 8, 2024, four of Holdings' officers and board members purportedly resigned those positions. A few days later, in violation of the binding Confirmation Order, Minority Shareholders Keros and Elafonissos filed a petition on an *ex parte* basis with the First Instance Court of Piraeus in Greece (the "Piraeus Court") seeking appointment of a provisional board of directors of Holdings to "turn against" the Confirmation Decision and "to oppose" the Confirmation Order. Defendant Zilakos submitted a declaration in connection with the petition. Keros was represented in the Greek Court by its shareholder and representative Stylianos Andreoulakis, the son of Defendant Emmanuel Andreoulakis.

66.     On November 11, 2024, the Piraeus Court issued an order appointing four individuals to replace the resigning directors and a provisional board (the "Provisional Board") for "temporary management" of Holdings. The eight-member Provisional Board consisted of: Vasilis Hadjieleftheriadis; his brother, Konstantinos; Ioannis Zilakos; Emmanuel Andreoulakis; Adrianos Psomadakis; Panos Paxinos; Eleni Giannakopoulou; and Niki Zilakou.

67.     The Piraeus Court scheduled a subsequent hearing for February 4, 2025 to consider reconstituting the board.[4]

68.     The Former Minority Shareholders sought this February 2025 hearing even though (1) Holdings' board was set to be reconstituted automatically upon the occurrence of the Effective Date pursuant to the terms of the Plan; (2) the Debtors were not seeking to stay the Confirmation Order; and (3) the Debtors and their former directors and officers were enjoined from taking "any actions inconsistent with the Plan or [the] Confirmation Order without the prior written consent of the Petitioning Creditors or further order of the Court."

69.     The Provisional Board has taken the position that its "members are the only parties authorized to represent and/or bind Holdings."   Upon information and belief, the Provisional Board, by unanimous consent of the members, retained Reed Smith purportedly to represent Holdings "and directed Reed Smith to refuse all requests" contained in certain letters from the new (and legitimate) board of reorganized Holdings.   Upon information and belief, the Provisional Board, by unanimous consent of the members, directed Reed Smith "to object to or pursue other legal remedies disputing the authority of Togut [i.e., Holdings' new counsel] or any other counsel that was not appointed by the Provisional Board, and to file any document requested to support the Appeal [of the Confirmation Order]."

70.     The Provisional Board also retained the Daniolos Firm and the Lex Group.   Mr. Daniolos submitted testimony to this Court disputing the authority of reorganized Holdings to take

---

[4]   The Piraeus Court's order constituting the Provisional Board was a temporary one, and contemplated a further hearing at a future date.  When the court subsequently considered the matter on a more complete record, it issued a June 6, 2025 Decision dismissing the *ex parte* petition that had led to the formation of the so-called Provisional Board.  In that June 6 Decision, the Piraeus Court wrote that "[t]he claim that the voluntary bankruptcy of the US Bankruptcy Court-Southern District of New York on October 25, 2024, and the court order of November 4, 2024, confirming the same . . . have no legal effect in Greece, is unfounded."

various actions in Greece.  He also appeared in court in Greece on behalf of the Provisional Board, taking positions against the interests and objectives of reorganized Holdings.  Ms. Lamin-Blanco of the Lex Group similarly offered written and live testimony to this Court disputing the authority of reorganized Holdings to take various actions in Liberia.  Ms. Lamin-Blanco and the Lex Group also appeared in court in Liberia on behalf of the Provisional Board, taking positions against the interests and objectives of reorganized Holdings.

### 3. Reed Smith and Others Refuse to Update or Assist in Updating LISCR

71.     Reed Smith and the other Defendants also refused to update or assist in updating LISCR, LLC—the Liberian International Ship & Corporate Registry ("LISCR")—to reflect the change of ownership that occurred on the Plan's Effective Date.

72.     On November 12, 2024, counsel for the Petitioning Creditors emailed Reed Smith requesting (1) that Reed Smith and the Debtors identify the designated individual at Holdings' existing address of record ("AOR") on file with LISCR; and (2) that the existing AOR complete a form of letter, to be held in escrow and submitted on the Effective Date, instructing LISCR to update its AOR for Holdings to reflect Holdings' new AOR and authorized personnel (the "LISCR Letter").  Reed Smith did not respond to these requests, and instead at a hearing on November 13, 2024 claimed that they were advised that providing the requested LISCR Letter would violate Liberian criminal law.

73.     On November 17, 2024, Reed Smith sent an email to the Petitioning Creditors confirming that they would not update LISCR.  Reed Smith separately submitted a Declaration stating that "Liberian counsel [i.e., Lex Group] had advised the directors of Holdings to refrain from taking any action regarding the change to the Address of record."

74. Defendants' obstruction with changing the AOR and updating LISCR continued for months, requiring a flurry of otherwise-unnecessary motion practice that resulted in contempt findings and sanctions.

75. On November 25, 2024, Holdings filed its first sanctions motion [Docket No. 1268] (the "First Sanctions Motion"). Among other things, Holdings asserted in the First Sanctions Motion that Defendants Reed Smith, the Daniolos Firm, and the Former Majority Shareholders "ha[d] refused to take steps" requested by Holdings to implement the Plan, including properly updating LISCR "to reflect the change in ownership that occurred on the Plan's Effective Date . . . as required under Section 5.4 of the Plan." Holdings further asserted that Defendants had been asked to "file a change of the AOR (address of record) or file [Holdings'] new corporate documents with LISCR" but that "[t]he [Defendants] have refused to even identify the current AOR or who is currently authorized to make filings with LISCR." Several of the Defendants objected to the First Sanctions Motion on December 10, 2024.

76. On January 24, 2025, the Court issued an oral decision granting the First Sanctions Motion (the "Consummation Decision"), which was followed on January 29, 2025 by an accompanying order (the "Consummation Order").

77. In the Consummation Decision, the Court ordered the "former shareholders, officers, directors, [and] counsel" of Holdings to "assist in amending the AOR and updating the corporate governance documents, including the amended articles of incorporation with LISCR."

78. In the Consummation Order, the Court ordered the same things *already* required by the Confirmation Order, *i.e.*, the Court required Defendants to work in good faith to facilitate the Plan's consummation in full.

79. Defendants did not comply with the Consummation Decision or Order.

80. On February 6, 2025, Holdings filed a second sanctions motion related to Defendants' continued refusal to update the AOR in violation of the Consummation Order (the "Second Sanctions Motion").

81. At a hearing on February 20, 2025, the Court granted the Second Sanctions Motion, in part, finding that its earlier orders had not been complied with (the "February Sanctions Opinion"). Despite this finding, however, the Court determined to "provide the parties one final opportunity for compliance," and directed various of the Defendants (the "Ordered Parties") to take a series of specific actions directed at identifying and updating the AOR, including a directive to submit under seal to the Court the identity of the AOR.

82. Despite the Court's crystal-clear instructions, the Ordered Parties did not comply with the February Sanctions Opinion.

83. Each of the Former Majority Shareholders submitted a certification that helped to illustrate their non-compliance with the February Sanctions Opinion (the "Certifications"). Lassia, in a document signed by Laskarina Karastamati, certified to the Court that it had "no knowledge" of the identity of the AOR, no power to direct the AOR, and had thus "requested from Mr. Vasilis Hadjieleftheriadis in his capacity as President of the provisional Board of Directors of EHI . . . to instruct the current AOR." Family Unity, in a document signed by Stavriana Kertsikoff, made a substantively identical certification. Glafkos, in a document signed by Vasilis Hadjieleftheriadis, referred to a separate certification submitted by Mr. Hadjieleftheriadis himself, in which he disclaimed prior knowledge of the AOR, expressed that he was "hesitant to instruct the . . . AOR to act," and therefore would confirm only that he "advised the current AOR of the order of the New York Bankruptcy Court."

84.     Defendants Eleni Giannakopoulou, Panos Paxinos, and Adrianos Psomadakis-Karastamatis, members of the Provisional Board, also submitted certifications that disclaimed knowledge of Holdings' AOR and/or authority to instruct the AOR. Each of the Provisional Board members submitted such certifications notwithstanding the fact (which was later revealed) that the AOR was actually Defendant Emmanuel Andreoulakis, *a member of the Provisional Board*, who, along with his cousin Ioannis Zilakos, declined to submit a certification regarding the identity of the AOR despite being directed to do so in the February Sanctions Opinion.

85.     The identity of the AOR was not submitted under seal to the Court.

86.     On February 27, 2025, as a result of the parties' noncompliance, the Court entered an order (the "February Sanctions Order"), which sanctioned "the purported Provisional Board," Mr. Hadjieleftheriadis, the Former Majority Shareholders, and the AOR $1,000 per day until the parties complied with various requirements, including updating the AOR with the LISCR and submitting the identity of the AOR to the Court.

87.     On March 13, 2025, through Holdings' own efforts, LISCR updated Holdings' AOR, and Holdings was subsequently redomiciled in the Republic of the Marshall Islands.

88.     The change to Holdings' AOR was not accomplished with the assistance of any Defendant, each of whom—rather than helping update LISCR as required— did not cooperate or facilitate the AOR change at all.

89.     On March 19, 2025, also through Holdings' own efforts, LISCR updated Eletson Corp.'s AOR, and Eletson Corp. was also subsequently redomiciled in the Marshall Islands.

**4.      The Defendants Oppose Recognition of the Plan in Liberia**

90.     In the face of the Defendants' obstructionist tactics, Pach Shemen LLC ("Pach Shemen"), a Petitioning Creditor and a shareholder of Holdings, determined to commence a proceeding in a Liberian court on January 7, 2025 (the "Liberian Proceeding") seeking recognition

and enforceability of the Confirmation Decision and Confirmation Order in Liberia and an order instructing the LISCR to change the AOR.

91.     On January 9, 2025 the Provisional Board, purporting to act as Holdings, and the Former Majority Shareholders, with the assistance of Lex Group, filed papers in opposition to the relief sought in the Liberian Proceeding.  Among other things, the Provisional Board and the Former Majority Shareholders asserted—falsely—that Mr. Spears had not been authorized to act as the foreign representative in Liberia by "any . . . competent authority," despite Mr. Spears having been recognized as the Foreign Representative for Holdings in Liberia pursuant to a consensual order of this Court.  Counsel to the reorganized Holdings demanded that the Appellant withdraw its opposition papers, but Appellant did not comply.[5]

### 5.     The Defendants Oppose Recognition of the Plan in Greece

92.     Likewise facing opposition to the Plan in Greece, on February 3, 2025, reorganized Holdings filed an application in the Court of First Instance of Athens (the "<u>Athens Court</u>") seeking recognition of the Confirmation Order (the "<u>Greek Recognition Petition</u>").

93.     On February 4, 2025, the Daniolos Law Firm moved to dismiss the Greek Recognition Petition, arguing, among other things, that Greek judicial recognition of the Confirmation Order is a prerequisite to the Confirmation Order having legal effect anywhere, without qualification.  Also on February 4, 2025, the Provisional Board, again purporting to act as Holdings, and the Former Minority Shareholders sought to intervene in (and oppose) the Greek Recognition Petition (the "<u>Greek Intervention Application</u>").

---

[5]  Pach Shemen ultimately dismissed the Liberian Proceeding on March 14, 2025 after Holdings changed its domicile to the Republic of the Marshall Islands.

94. The Greek Recognition Petition was heard before the Athens Court on March 19, 2025, and it remains pending. At the March 19 hearing, Ms. Karastamati appeared and testified against recognition of the Confirmation Order. The Greek Intervention Application opposing recognition filed by the Provisional Board has not been withdrawn.

95. Ms. Karastamati also testified at an April 1, 2025 hearing before the Piraeus Single-Member Court of First Instance in support of the Former Minority Shareholders' petition for the appointment of a temporary board of directors of Holdings. At the hearing, Ms. Karastamati testified, among other things, that (a) the Petitioning Creditors were bogus (hoax) creditors, (b) Holdings was coerced to commence its chapter 11 case, (c) the Petitioning Creditors acted in bad faith by commencing a bankruptcy plan against Holdings, and (d) Holdings has not elected the board of directors, despite the fact that the members of the board are listed in the certificate of incumbency issued by the LISCR. Each of these arguments was previously considered and rejected by this Court in its October 25, 2024, decision allowing the Petitioning Creditors' proofs of claims and overruling the Debtors' objections thereto.

96. On February 27, 2025, reorganized Holdings received an email from the Sofos & Partners Law Firm purporting to serve a copy of a notice of the filing of an unauthorized motion for injunctive relief (the "Improper Greek Motion") filed on February 19, 2025, in the Member First Instance Court of Piraeus. The Improper Greek Motion names certain of Holdings' new officers and directors (Adam Spears and Leonard Hoskinson), one of its new shareholders (Pach Shemen LLC), and others as defendants-respondents. The Improper Greek Motion was filed by the Kalavros Law Firm, which improperly claims to act on behalf of plaintiffs-applicants Holdings and certain of Holdings' subsidiaries (Eletson Corp., Eletson Gas, and the four SMEs), as well as Holdings' Former Minority Shareholder Elafonissos.

97.     The Improper Greek Motion challenges the Court's jurisdiction and seeks unlawful relief in direct contravention of the Court's and the District Court's findings and orders, including (a) an injunction preventing Holdings' new (Court-approved) officers, directors, and shareholders from exercising even the most fundamental management and ownership rights vested in them by the Plan and Confirmation Order, including, (i) claiming to represent Holdings or its subsidiaries, (ii) performing any acts of administration or management of Holdings or its subsidiaries, (iii) claiming that the boards of directors of Holdings and its subsidiaries have been changed, and (iv) attempting to register any changes with any authority, including LISCR; and (b) the imposition of a monetary fine of €5,000, at least three months incarceration, and fees and other costs.

98.     A hearing on the Improper Greek Motion took place in Greece on April 1, 2025. At the April 1 hearing, Defendant Lascarina Karastamati appeared and testified in support of the permanent appointment of the Provisional Board.

### 6.     The Defendants Take Others Actions Around the Globe to Obstruct the Plan

#### a.     The Improper LISCR Actions

99.     As noted above, on March 13, 2025, through the efforts of Holdings and with no assistance from the Defendants, LISCR updated Holdings' AOR to Adam Spears.  Thereafter, on March 18, 2025, certain of the Defendants—including Elafonissos and the Former Majority Shareholders—commenced a new action in the Supreme Court of Liberia (the "Liberian Court") against LISCR challenging the change in Holdings AOR (the "First LISCR Action").  These parties filed the First LISCR Action in Holdings' name, even though this was not authorized by Holdings and Holdings was no longer a Liberian company.

100.    Shortly after, the Liberian Court issued a temporary stay of any further LISCR actions related to subsidiaries of Holdings (the "Temporary Stay").  The Temporary Stay initially

interfered with Holdings' efforts to re-domicile Eletson Corp. and EMC and change the AORs of its remaining Liberian subsidiaries.

101.    On March 28, 2025, the Liberian Court issued an order rejecting the First LISCR Action and lifting the Temporary Stay. Holdings was then able to successfully update the AOR for its remaining Liberian subsidiaries, and all of Holdings' Liberian subsidiaries, including Eletson Corp. and EMC, were re-domiciled in the Marshall Islands.

102.    On April 8, 2025, Holdings was informed that persons purporting to act on behalf of Eletson Corp. and EMC filed a substantially similar petition in the Liberian Court against LISCR (the "Second LISCR Action" and, together with the First LISCR Action, the "LISCR Actions"), again challenging the change in Holdings' AOR and arguing, among other things, that LISCR was not authorized to change the AOR.

103.    On April 13, 2025, Mr. Andreoulakis, through his counsel, sent a letter to LISCR alleging that LISCR's updating of the AOR of each of the former Liberian companies was improper.

### b.    The Improper Marshall Islands Proceeding

104.    On April 23, 2025, Defendants Emmanuel Andreoulakis, Glafkos, Lassia, and Family Unity filed a complaint in the High Court of the Republic of the Marshall Islands against Eletson Holdings Inc., Eletson Corporation, and other affiliated entities, seeking to reveal the administrative agent and address of record of each defendant and/or to remove and replace the current applicable administrative agent and address of record for each defendant.

### c.    The Improper German Petition

105.    On April 9, 2025, Joh. Berenberg, Gossler & Co. Bank ("Berenberg")—a financial institution that provides banking services to Holdings' subsidiaries, including Eletson Corp. and

EMC—finally released account statements relating to certain corporate accounts. Berenberg's production followed months of obstruction by the former owners, particularly Mr. Hadjieleftheriadis, who repeatedly challenged Holdings' authority to access these accounts. Access was only provided after Holdings provided a certificate of incumbency and other materials to Berenberg. The very next day, on April 10, 2025, Berenberg informed Holdings that Holdings' former officers and directors had initiated an action in Hamburg, Germany (the "Improper German Petition") seeking injunctive relief against Berenberg.

106. Holdings had been working with Berenberg following the Effective Date to effectuate a change in the authorized representatives for bank accounts held in the name of Eletson Corp. and EMC (the "Accounts"). Through working with Berenberg, the company obtained bank statements showing potentially millions of dollars in funds available at Eletson Corp. and EMC, to which the new owners of Holdings have no access yet. The Improper German Petition further evidences attempts by the Ordered Parties, and others, to interfere with implementation of the Plan.

d. The Efforts to Sow Doubt Concerning Ownership and Control

107. Finally, Defendants have used the limbo their improper obstruction has created in order to sow doubt in the market about whether the New Board comprised of Adam Spears, Leonard Hoskinson, and Timothy Matthews actually controls Eletson.

108. For example, shortly after the Effective Date, the Former D&Os made a public proclamation that they will not comply with the Plan or the Confirmation Order. As detailed in a November 21, 2024 article in *TradeWinds*, a market-leading media outlet for the global shipping industry:

> The 'incumbent [former] officers [of Holdings]' said in a statement sent to TradeWinds that any attempt by the 'purported new equity owners' of [Reorganized Holdings] to appoint management or directors at the Liberian company was

'premature and ineffective.' This is due to a lack of recognition of their capacity
and authority in the courts of Liberia and Greece, where the business is located[.]

Mr. Hadjieleftheriadis, former president of Holdings who falsely and fraudulently claimed to still hold that title, was quoted as saying: "While we respect the US bankruptcy process, the recent decision is under appeal and we must also respect international law."

109.    On January 2, 2025, Mr. Hadjieleftheriadis executed a *Certificate of Election and Incumbency of Eletson Holdings Inc.*, which, on January 3, 2025, was filed with LISCR (the "Certificate of Incumbency"). The Certificate of Incumbency states that the duly elected, qualified, and acting directors of Eletson Holdings Inc. are the members of the purported Provisional Board appointed by the Greek court, and that Mr. Hadjieleftheriadis is the president and treasurer and Andreoulakis is the secretary of Eletson Holdings Inc. While there is no evidence that the Greek Order was recognized by a Liberian court, and the Certificate of Incumbency was filed with LISCR by the AOR without first seeking recognition of the Greek Order in a Liberian proceeding, the Certificate of Incumbency was used by Defendants in violation of the Confirmation Order to frustrate implementation of the Plan.

110.    Unfortunately, as described below, Defendants' efforts to sow doubt in the market regarding whether the Plan is effective and the Confirmation Order is enforceable have allowed Defendants to tortiously and wrongfully usurp Plaintiffs' property

**C.    The Sanctions Opinions and Orders**

111.    In the face of the Defendants' obstructionist tactics, reorganized Holdings has been compelled to file a series of sanctions motions seeking to compel compliance with the Plan. These motions have resulted in repeated rulings from the Court finding, as fact, that various of the Defendants are acting in continued violation of the Plan and Confirmation Order.

112. In January 2025, as noted above, the Court issued the Consummation Decision and Consummation Order, directing the AOR, the Former Majority Shareholders, the Former Minority Shareholders, Reed Smith, and the Daniolos Firm to comply with the Plan.

113. In February 2025, as noted above, the Court issued the February Sanctions Order, which found that the purported Provisional Board, Vasilis Hadjieleftheriadis, and the Former Majority Shareholders had violated the Plan and Confirmation Order.

114. On March 13, 2025, in response to yet another sanctions motion, the Court issued a third sanctions Order (the "Third Sanctions Order"), in which it found that the purported Provisional Board, Vasilis Hadjieleftheriadis, the Former Majority Shareholders, and the Former Minority Shareholders were in ongoing violation of the Confirmation Order.

115. Most recently, in a fourth sanctions Order dated July 8, 2025 (the "Fourth Sanctions Order"), the Court found that the purported Provisional Board, Vasilis Hadjieleftheriadis, Laskarina Karastamati, the Former Majority Shareholders, and the Former Minority Shareholders were in ongoing violation of the Confirmation Order.

**D. Defendants' Conversion**

116. After the Confirmation Order was entered, and continuing through the date of this Complaint, the Defendants engaged in a scheme to convert Plaintiffs' assets for the Former D&Os' benefit in violation of the Plan and Confirmation Order. This scheme involved refusing to turn over property of the estate to reorganized Holdings, and changing bank instructions for payments due under certain charterparties, so as to divert those payments from reorganized Holdings to the Former D&Os.

**1. Defendants Refuse to Turn Over Property of Reorganized Holdings**

117. Shortly after the Court entered the Confirmation Order, counsel for reorganized Holdings (then, counsel for the Petitioning Creditors) requested various documents and

information from Reed Smith in an attempt to satisfy the waivable condition precedent to the Effective Date that "the Debtors' assets, including . . the Debtors' books and records, shall have been transferred to Reorganized Holdings." Whether or not these assets were transferred prior to the effective date, under paragraph 7 of the Confirmation Order, section 5.2(c) of the Plan, and sections 1141(b) and (c) of the Bankruptcy Code, all such assets, "including interests held by the Debtors in their respective non-Debtor direct and indirect subsidiaries and Affiliates" and, by extension, the assets of such affiliates to the extent the affiliates were wholly owned by one of the Debtors, vested in reorganized Holdings as of the Effective Date.

118. In response to counsel's information requests, Reed Smith declined to provide any of the information and documents that are critical to reorganized Holdings' ability to operate the Debtors and their subsidiaries post-Effective Date, stating "there is no provision in the Plan or the Confirmation Order allowing the Plan Proponents to 'direct' the Debtor prior to the Effective Date." Reed Smith further asserted that it could not provide documents under the control of non-Debtor subsidiaries because it did not represent those subsidiaries. These requests for documents and information included the following:

- "Provide an employee roster for all Subsidiaries, identify key personnel, and facilitate and schedule / coordinate discussions with the Petitioning Creditors' representatives and employees; identify payroll provider and personnel involved in coordinating payroll";

- "Provide copies of all employment-related agreements with Subsidiaries, including, without limitation, any agreements regarding employment, services, separation, retention, severance, incentive, bonus, consulting, contractor or related agreements or arrangements";

- "Provide copies of any employee benefit plans and retirement plans at the Subsidiaries";

- "Provide copies of (or otherwise access to) all books and records of the Debtors and the Subsidiaries, including all

charters, certificates of incorporation, by laws, and similar corporate constituent documents for all Subsidiaries";

- "Provide copies of loan agreements, liens, indemnification agreements, and agreements for indebtedness for all Subsidiaries; if any of the foregoing does not exist in a written agreement, provide a description of all such agreements";

- "Provide a list of all members of the board (or other similar governing body) and officers for all Subsidiaries, including contact information and KYC/AML information for each; identify whether any counsel (in house or otherwise) representing any officers or directors in any legal actions";

- "Provide a list of all legal, financial, and other professionals retained/employed by the Debtors and all Subsidiaries, outstanding amounts due to each, and points of contact";

- "Provide a list (or other description) of all pending, outstanding, and/or threatened or otherwise potentially known litigations (threatened, actual, or otherwise) against or instituted by the Debtors and all Subsidiaries";

- "Provide copies of all insurance policies, including, without limitation, D&O insurance (including any tail coverage) to which Eletson Holdings is listed as an additional insured and information related to any insurance benefits, including claims, rights, and proceeds, arising therefrom";

- "Provide a list of material contracts and material suppliers for all Subsidiaries";

- Provide a list of all bank accounts and authorized signatories for all Subsidiaries, along with approved users, account information, and points of contact at each bank";

- "Identify personnel responsible for IT and related services and provide access to Eletson's email platform and website";

- "Identify employee(s) responsible for assisting the Petitioning Creditors and their counsel with consummating the Plan and transitioning the ownership and management of the company, including providing available days and times this week to discuss closing matters."

119. Reorganized Holdings outlined Reed Smith's, the Former D&Os', and the Former Shareholders' refusal to comply with their obligations under the Plan to provide the documents and information responsive to these requests (all such documents and information, the "Converted Personal Property") in the First Sanctions Motion, and the Court ultimately entered the Consummation Order, which found that each of the Defendants had received notice of the First Sanctions Motion and "required" and "directed" various parties, including all of the Defendants, "to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof." Despite multiple demands, the Defendants have not turned over the Converted Personal Property, which is property of reorganized Holdings. Upon information and belief, Defendant Vasilis Hadjieleftheriadis is in possession of the Converted Personal Property, which are located in "on-site files" at his office in Piraeus, Greece.

### 2. The Former D&Os Change Eletson's Contracts To Convert Plaintiffs' Property

#### a. The December 2024 Invoices

120. As noted above, on or about January 12, 2023, Novum Energy Trading Corp. ("Novum") entered into charterparty contracts with Plaintiff Chartering providing for Novum's hires of the vessels "Kastos" and "Fourni" for a period of 3 years at a rate of $24,400 per day per vessel pro-rata, commencing from the date of delivery of the "Kastos" and "Fourni" on January 12 and January 15, 2023, respectively (the "Kastos Charterparty" and "Fourni Charterparty" and, collectively, the "Novum Charterparties").

121. Less than one week after the Novum Charterparties were executed, the parties amended each agreement by addendum (the "Kastos Charterparty Addendum #1" and "Fourni Charterparty Addendum #1," respectively and, collectively, the "First Charterparty Addenda") to change the EMC bank account into which Novum would remit payments due under the Novum

Charterparties (the "Charterparty Payments") to EMC's bank account at Berenberg (the "EMC Berenberg Account").

122. On November 14, 2024—five days prior to the Effective Date—an agent of the Former D&Os emailed Novum and Gulfstream Tanker Chartering LLC ("GTC Brokers"): (1) an invoice bearing debit note no. 26228 in connection with a Charterparty Payment for December 2024 in the amount of $746,945.00 under the Kastos Charterparty; and (2) an invoice bearing debit note no. 26227 in connection with a Charterparty Payment for December 2024 in the amount of $746,945.00 under the Fourni Charterparty.

123. On November 22, 2024—three days after the Effective Date—an agent of the Former D&Os purporting to act on behalf of Corp., emailed an employee of Berenberg, requesting a status update in connection with a pending wire transfer from the Berenberg Account to an account in the name of Corp. authorized by the Former D&Os or their agents.

124. The Berenberg employee responded that same day, attaching the Confirmation Order and stating:

> Please note that we are not allowed anymore to accept any instructions from your end in line with the attached order.
>
> During the day we will cancel all your bank mandates, eBanking instructions. The only person that until further notice authorized to instruct payments is Mr Mark Lichtenstein whose bank mandates will be implemented in the coming days.
>
> Only if Mr Lichtenstein confirms by return mail that we are allowed to release the intra-group payment by order of EMC Investment Corp. amounting to USD 57,000.00 in favour of Eletson Corp. can we proceed.
>
> As you may understand this overall situation is also very sensitive for the bank.

125. On November 26, 2024, an agent of the Former D&Os sent emails to Novum and GTC Brokers attaching (1) a revised invoice bearing debit note no. 26233 in connection with a charterhire payment due from Novum for December 2024 in the amount of $746,945.00 under the

Kastos Charterparty (the "Revised December Kastos Invoice"); (2) a revised invoice bearing debit note no. 26234 in connection with a charterhire payment due from Novum for December 2024 in the amount of $746,945.00 under the Fourni Charterparty (the "Revised December Fourni Invoice" and, together with the Revised December Kastos Invoice, the "December 2024 Invoices"). Both emails had "NEW BANK DETAILS" in the subject line and included instructions to make payments on the December 2024 Invoices to EMC's bank account at ABN AMRO Bank (the "ABN AMRO Account"), which remained under the control of the Former D&Os, rather than the Berenberg Account, which reorganized Holdings was in the process of working with Berenberg to obtain control over.

126. None of the Plaintiffs or their post-Effective Date representatives authorized the issuance of the December 2024 Invoices.

127. None of the Plaintiffs or their post-Effective Date representatives were notified by any of the Defendants of the issuance of the December 2024 Invoices.

128. The Former D&Os' issuance of the December 2024 Invoices violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

129. Later on November 26, 2024, a Novum employee sent an email to agents of the Former D&Os under the subject line "EMC Investment Corporation BI Confirmation." The Novum employee stated, among other things, that:

> Our Treasury Team is trying to setup payment for DEBIT NOTE: 26233, however the banking details are different than those verified previously.

> In this regard, we would greatly appreciate if you could update your banking details for your [ABN AMRO Account], via our KOMGO Portal.

130. On November 27, 2024, an agent of the Former D&Os responded to Novum, stating: "Kindly note that four **revised** invoices were issued yesterday with different bank details

tha[n] those verified previously." (emphasis in original). Two of the four revised invoices mentioned in this email were the December 2024 Invoices.

131.    Later on November 27, 2024, a Novum employee responded to the agent of the Former D&Os, stating: "Thank you for your time this evening and taking my call. The banking instructions have been verbally verified."

132.    None of the Plaintiffs or their post-Effective Date representatives authorized the agent of the Former D&Os to provide banking instructions to Novum that differed from those set forth in the First Charterparty Addenda.

133.    None of the Plaintiffs or their post-Effective Date representatives were notified by any of the Defendants regarding the provision of banking instructions to Novum that differed from those set forth in the First Charterparty Addenda.

134.    By directing the agent of the Former D&Os to provide banking instructions to Novum that differed from those set forth in the First Charterparty Addenda, the Former D&Os violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

135.    On December 4, 2024, an employee of GTC Brokers sent emails to Novum and agents of the Former D&Os memorializing addendums to the Novum Charterparties that purported to change the banking details under those agreements to require payment into the ABN Amro Account controlled by the Former D&Os (the "Kastos Charterparty Addendum #2" and "Fourni Charterparty Addendum #2," respectively and, collectively, the "Second Charterparty Addenda"). On December 5, 2024, an agent of the Former D&Os responded via email to GTC Brokers confirming their agreement to the Second Charterparty Addenda.

136.    None of the Plaintiffs or their post-Effective Date representatives authorized the execution of the Second Charterparty Addenda.

137.    None of the Plaintiffs or their post-Effective Date representatives were notified by any of the Defendants of the Second Charterparty Addenda.

138.    Execution of the Second Charterparty Addenda by agents of the Former D&Os on behalf of Kastos and Fourni violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

139.    From December 2 to December 9, 2024, an agent of the Former D&Os sent a series of emails to Novum employees and agents demanding that payment be made on account of the December 2024 Invoices to the ABN AMRO Account.

140.    Notwithstanding these wrongful instructions, on or about December 10, 2024, Novum remitted payments on account of the December 2024 Invoices to the Berenberg Account.

141.    On December 10, 2024, an agent of the Former D&Os, emailed Novum demanding that Novum "RECALL the two [Charterparty Payments] from [the Berenberg Account] and EFFECT THE PAYMENTS to the [the ABN AMRO Account] as per addendum."  This email further stated that "[a]ttached hereto we resent the invoices with the CORRECT bank details, as well as the exchanges with our Charters that these bank details have been uploaded in their system since 27/11."  The agent of the Former D&Os sent a follow up email on the same day to Novum again demanding payment to the ABN AMRO Account.

142.    On December 11, 2024, two Novum employees separately responded to the agent of the Former D&Os.  The first email from Novum stated, among other things, that "[p]ayments for both the Fourni and Kastos were made on 12/9/2024 to the account listed on both invoices and that were verbally verified by our onboarding team . . . .  We will make best efforts to recall the

funds, however, we also suggest that upon receipt to [the Berenberg Account], that you reject as well." The second email stated, among other things, "if Eletson needed payment to another account, they would have to list the new account on the invoice, and we would have had to confirm the new banking instructions verbally with Eletson . . . . Since payment was remitted on Monday, I think it's past the time we can recall it, and also believe it is past the time you are able to have your bank DK the funds."

143. That same day, the agent of the Former D&Os emailed the Novum employees stating, among other things, that "[s]ince 26 Nov. we have sent invoices with the new bank details and on 27 Nov. we verified the details . . . . These details were uploaded in yr system by my goodself the same day . . . . Pls recall the payments and pay as agreed." (emphasis in original). The agent sent another follow-up email to Novum on December 11, 2024 again demanding that payment of the December 2024 Invoices be made to the ABN AMRO Account.

b. The January 2025 Invoices

144. On December 13, 2024, an agent of the Former D&Os sent emails to Novum and GTC Brokers attaching (1) an invoice for a Charterparty Payment for January 2025 in the amount of $746,945.00 under the Kastos Charterparty (the "January Kastos Invoice"); and (2) an invoice in connection with a Charterparty Payment for January 2025 in the amount of $746,945.00 under the Fourni Charterparty (the "January Fourni Invoice," together with the January Kastos Invoice, the "January 2025 Invoices," and the January 2025 Invoices together with the December 2024 Invoices, the "Improper Novum Invoices"). Both emails had "NEW BANK DETAILS" in the subject line, and the January 2025 Invoices directed Novum to make payment to the ABN AMRO Account.

145.    On December 23, 2024, the same agent of the Former D&Os emailed Novum seeking payment on account of the January 2025 Invoices, demanding that payment be made "**in the ABN bank acct**, as per the relevant addendum." (emphasis in original).

146.    On December 30, 2024 and January 2, 2025, an agent of the Former D&Os sent emails to Novum again seeking payment on account of the January 2025 Invoices.

147.    None of the Plaintiffs or their post-Effective Date representatives authorized the issuance of the January 2025 Invoices.

148.    None of the Plaintiffs or their post-Effective Date representatives were notified by any of the Defendants regarding the issuance of the January 2025 Invoices.

149.    The issuances of the January 2025 Invoices violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

c.    Defendants Declare Defaults by Novum

150.    On January 2, 2025, Novum's general counsel, emailed an agent of the Former D&Os, stating: "Please be advised that in light of the recent U.S. Bankruptcy and District court rulings regarding Eletson Holdings Inc. which are impacting the SMEs . . . we have placed the payments on a treasury hold pending further documentary substantiation." (the "Novum January 2 Email").

151.    On January 7, 2025, Defendant Emmanuel Andreoulakis, an agent of the Former D&Os, emailed Novum's general counsel and other Novum personnel declaring a default by Novum under the Kastos Charterparty for failure to pay the Revised December Kastos Invoice and the January Kastos Invoice.  Among other things, Mr. Andreoulakis wrote:

We refer to the C/P for the LPGC "Kastos" between Kastos Special Maritime Enterprise (Owners)[6] and Novum Energy Trading Corp dated 12 January 2023, and to the Addendum thereto dated 4 December 2024 (together, the "Charterparty").

Pursuant to clause 9 of the Charterparty, payment of hire shall be made in immediately available funds per calendar month in advance, by telegraphic transfer to Owners' nominated account at ABN Amro Bank.

However, the December Hire and the January Hire (or any of it) has not been paid. In the circumstances, pursuant to clause 9 of the Charterparty, Charterers are in default of their obligation to make proper and timely payment of the December Hire and the January Hire.

Without prejudice to all of their other rights, the purpose of this email is to notify the Charterers that they are in default of their obligation to pay the December Hire and the January Hire, and unless the Charters pay the December Hire and the January Hire within seven days of receipt of this notice, including interest calculated in accordance with clause 9, Owners shall withdraw the Vessel from service of Charterers without prejudice to any other rights Owners may have under the Charterparty or otherwise.

152.    None of the Plaintiffs or their post-Effective Date representatives authorized Mr. Andreoulakis to declare a default by Novum under the Kastos Charterparty.

153.    None of the Plaintiffs or their post-Effective Date representatives were notified by the Defendants that a default by Novum under the Kastos Charterparty would be declared.

154.    Mr. Andreoulakis's email declaring a default by Novum under the Kastos Charterparty violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

155.    Upon information and belief, one or more of the Former D&Os or their agent(s) declared a default under the Fourni Charterparty on the basis that Novum allegedly failed to pay the Revised December Fourni Invoice and the January Fourni Invoice.

---

[6] This is an error, as Plaintiff Chartering is the party designated as the "Owner" under the Kastos Charterparty. Kastos Special Maritime Enterprise is not mentioned in the Kastos Charterparty.

156.    None of the Plaintiffs or their post-Effective Date representatives authorized anyone to declare a default by Novum under the Fourni Charterparty.

157.    None of the Plaintiffs or their post-Effective Date representatives were notified by the Defendants that a default by Novum under the Fourni Charterparty would be declared.

158.    The declaration of a default by Novum under the Fourni Charterparty violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the charterparty funds.

#### d. Continued Improper Communications with Novum and Oaktree

159.    On January 8, 2025, Defendant Vasilis Hadjieleftheriadis emailed Novum's general counsel and other Novum personnel, stating:

> You will have seen the Owners' default notices given in response to Novum's failure to pay the December and January hires for the "Kastos" and the "Fourni". We are extremely disappointed that it had to come to this, but you will appreciate that Eletson cannot operate the ships for you without being paid hire, and there is simply no lawful basis for you not to pay.

Referencing the January 2 Novum Email, Mr. Hadjieleftheriadis further stated:

> Without prejudice to all the Owners' rights, and merely for completeness, we note that on 3 January[7] Novum vaguely referred to " . . . recent U.S. Bankruptcy and District court rulings regarding Eletson Holdings Inc. which are impacting the SMEs and our understanding that new management has been installed for the vessel owning companies along with a change in vessel management (as well as new maritime counsel engaged), we have placed the payments on a treasury hold pending further documentary substantiation."  We do not know who is feeding Novum incorrect information, nor why Novum believes that the matters to which it refers could possibly excuse their obligation to pay hire.  Suffice to say that the issues in the NY BK and SDNY proceedings concerning Eletson Holdings are numerous and complicated, but what is important is that they are of no concern to Charterers and certainly do not impact on the Owners' or Charterers' performance of the charters in any way, as is clearly evident to the Charterers from the Vessels' continued compliance with their employment orders.  Furthermore, there has been no new management nor change of Owners' counsel.  Again strictly without

---

[7] Given the seven hour time difference between New York and Greece, agents of the Former D&Os located in Greece would have received the January 2 Novum Email on January 3, 2025.

prejudice to all the Owners' rights, which continue to be reserved, Charterers are called upon to immediately cure their default by making payment in accordance with the clause 9 notices which they have duly received.

160.    None of the Plaintiffs or their post-Effective Date representatives authorized Mr. Hadjieleftheriadis to send the January 8, 2025 email to Novum.

161.    Mr. Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives regarding the January 8, 2025 email to Novum.

162.    Mr. Hadjieleftheriadis's January 8, 2025 email to Novum violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

163.    Later that day, counsel for Novum responded to Mr. Hadjieleftheriadis's email stating, among other things:

> As you probably know, in light of the bankruptcy proceedings in the U.S., Novum has been given different instructions from the new management of Fourni Special Maritime Enterprise and Kastos Special Maritime Enterprise ("the SME's") for hire payment.  Novum has also received new payment instructions from the OCM Maritime Autumn and OCM Maritime Thames ("the OCM entities").  Thus, including your team's instructions to pay into a new account, Novum has three different new accounts for which it has been directed to pay charter hire.
>
> Novum is ready and willing to pay, but cannot pay more than once. Let us know if your team is open to the possibility of Novum paying hire into an escrow account pursuant to a three-way agreement among your team, the OCM entities and the new management.  Alternatively, Novum is also considering paying the hire into the U.S. Court's registry.  We have copied counsel to the OCM entities as well as counsel to the new management of the SME's on this message for easy reference and coordination.

164.    On January 10, 2025, Autumn, an Oaktree Party and the registered owner of the "Fourni" vessel, sent a letter to Fourni and Holdings to the attention of Peter Kanelos, the former CFO of Eletson and an agent of the Former D&Os, demanding that Fourni direct Novum to make Charterparty Payments directly to Autumn's bank account at Berenberg (the "Autumn Berenberg Account").  The same day, Thames, another Oaktree Party and the registered owner of the "Kastos"

vessel, sent a letter to Kastos and Holdings to the attention of Mr. Kanelos demanding that Kastos direct Novum to make Charterparty Payments to the Autumn Berenberg Account. On January 14, Mr. Hadjieleftheriadis, purporting to act as director, president, and treasurer of Fourni and Kastos, countersigned both letters (as executed, the "Fourni-Autumn Letter" and the "Kastos-Thames Letter," respectively and collectively, the "Oaktree Letter Agreements").

165.    None of the Plaintiffs or their post-Effective Date representatives authorized Mr. Hadjieleftheriadis to execute the Oaktree Letter Agreements.

166.    Mr. Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives that he would execute the Oaktree Letter Agreements.

167.    Mr. Hadjieleftheriadis's execution of the Oaktree Letter Agreements violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

168.    On January 14, 2025, Mr. Hadjieleftheriadis sent an email to Novum instructing Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account pursuant to the Oaktree Letter Agreements.

169.    Neither of the Plaintiffs nor their post-Effective Date representatives authorized Mr. Hadjieleftheriadis to instruct Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account.

170.    Mr. Hadjieleftheriadis did not notify any of the Plaintiffs or their post-Effective Date representatives that he had instructed Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account.

171. Mr. Hadjieleftheriadis's instructions to Novum to make payments due and payable under the Novum Charterparties to the Autumn Berenberg Account violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the charterparty funds.

### 3. Defendants' Illegal Maneuvering Stymied Plaintiffs' Efforts to Receive the Charterhire Payments Due to Them

172. While Defendants were improperly seeking to redirect the Charterparty Payments due under the Novum Charterparties to accounts controlled by Defendants, counsel for Novum communicated with Holdings and Oaktree to resolve the confusion surrounding the conflicting payment instructions referenced in counsel for Novum's January 8, 2025 email to Mr. Hadjieleftheriadis.

173. On January 7, 2025, maritime counsel for reorganized Holdings emailed counsel for Novum, stating, among other things, that Oaktree had communicated that it was "fine with the bankruptcy process and as we understand, [Oaktree is] satisfied that our client is now in control of the Eletson group as per the ordered bankruptcy plan." The email further stated that "[w]e have also come to an agreement with Oaktree that Novum's ongoing charter payments can be paid to" Holdings' bank account at Bank of America (the "Holdings BOA Account").

174. Later that day, counsel for Novum responded, advising that Novum had received the notices of default from Mr. Andreoulakis, and stating:

> Novum has received conflicting instructions with regards to payment of charter hire and has been engaged in due diligence in light of the pending bankruptcy proceedings. We appreciate all of you sending documentation. Novum is ready and willing to pay charter hire. However, in light of the conflicting instructions and need for due diligence, Novum has been holding the charter hire pending resolution of these issues.

175. On January 9, 2025, counsel for Novum emailed counsel for reorganized Holdings noting that the banking instructions under the original Novum Charterparties provided for payment to an account with DNB Bank ASA in the name of Plaintiff EMC and asking if DNB was

"recognizing new management of EMC . . . or is this account also frozen?" In a follow up email the next day, counsel for Novum noted that counsel for reorganized Holdings "mentioned that the Berenberg Account is frozen" and asked if "payment [would] be accepted" if Novum made a Charterparty Payment to that account. The email also noted that "Reed Smith introduced a document on Monday showing that the court in Pireaus [sic.], Greece appointed a temporary board pending further court action in February" and requested corroborating documents.

176. On January 13, 2025, counsel for Reorganized Holdings responded, attaching Berenberg's November 22, 2024 email to the Former D&Os wherein Berenberg described its cancellation of the Former D&Os' bank mandates with respect to the Berenberg Account in light of the Confirmation Order. *See supra* ¶ 124. The email also advised Novum's counsel that the Berenberg Account was not frozen, but that Berenberg was undergoing its own due-diligence process to resolve the conflicting banking instructions.

177. On January 13, 2025, Novum's counsel advised maritime counsel for reorganized Holdings via telephone that, notwithstanding the Former D&Os efforts to the contrary, Novum had made payments on account of the Improper Novum Invoices to the Berenberg Account consistent with the First Charterparty Addenda. Novum's counsel further reported to counsel for reorganized Holdings that Novum had agreed to the Second Charterparty Addenda without knowledge of the Confirmation Order or the changes in ownership and control of the Plaintiffs thereunder.

178. Defendants' failures to inform Novum regarding the Confirmation Order in any post-Confirmation Order dealings with Novum, which Defendants improperly engaged in on behalf of one or more of the Plaintiffs, violated the Confirmation Order, frustrated implementation of the Plan, and facilitated conversion of the Charterparty Payments.

179. Later on January 13, 2025, Novum's general counsel emailed Mr. Hadjieleftheriadis, copying (1) counsel for reorganized Holdings, (2) outside counsel for Novum, and (3) counsel to the Oaktree Parties. The email stated, among other things, that "attempts at payment [of the Improper Novum Invoices] were made but certain payments were rejected by the receiving bank and/or there were delays in payment due to the competing claims for payment," that Novum had now paid the outstanding sums due under the Improper Novum Invoices plus interest "in accordance with the relevant invoices" and the Second Charterparty Addenda—i.e., to the ABN AMRO Account controlled by the Former D&Os. Novum's counsel noted that the interest payments were being made "under protest" and subject to clawback and/or setoff. Novum's counsel also noted that "third parties and/or parties purporting to represent Owners propose that payments be made into bank accounts not provided for in the charterparties or addenda,"—i.e., the Holdings BOA Account.

180. Upon information and belief, Novum has continued to make monthly Charterparty Payments due under the Novum Charterparties to the ABN AMRO Account controlled by the Former D&O's.

181. As will be proven at trial, Defendants' unlawful conversion has caused and is causing millions of dollars of damages to Plaintiffs every month, including, without limitation, lost SME revenues and the otherwise-unnecessary incurrence of legal fees to rectify Defendants' tortious actions.

#### 4. Defendants Frustrate Plaintiffs' Efforts to Recover Other Charterparty Payments Due to Them

182. Plaintiffs have asked Defendants for information regarding Kinaros and Kimolos, including amounts due to those SMEs in connection with the use of the vessels "Kinaros" and

"Kimolos" by third parties, but as of the date of this Complaint, Defendants have refused and/or failed to provide any information to Plaintiffs in that regard.

183. Upon information and belief, and in view of the alleged non-payments to Oaktree (described below), Defendants are also improperly converting the funds due to Kinaros and Kimolos and causing Plaintiffs damages in amounts to be proven at trial..

**5. Defendants Sow Confusion With the Oaktree Parties**

184. On June 15, 2025, the SMEs each served on the applicable Oaktree Party a notice (collectively, the "Purchase Option Notices") that each SME Party intended to exercise its option pursuant to clause 48 of the applicable Oaktree Charterparty to purchase the vessel leased pursuant to that Oaktree Charterparty.

185. On June 23, 2025, counsel for the Oaktree Parties sent a collective response (the "Purchase Option Response") to the Purchase Option Notices by email stating that "there may be continuing Applicable Insolvency Defaults for all of the Vessels/[Oaktree Charterparties]" that would prevent "the Purchase Options [from] . . . being exercised," pointing to alleged nonpayment and insolvency defaults under certain related charterparties. Further, the Purchase Option Response claims that "the difficulties for [the Oaktree Parties] created by the management/ownership dispute in respect of the Vessels . . . which are such that [the Oaktree Parties] cannot even be sure that the notices to which they are responding are in fact properly authorized on behalf of the [SMEs]" have "ma[de] it impossible for [the Oaktree Parties] to perform the Purchase Options as intended by Clause 48 without their actions giving rise to a risk of litigation against [the Oaktree Parties] and/or the Vessels[.]"

186. On June 19, 2025, counsel for the Oaktree Parties sent copies of four notices of events of default (the "Notices of Default") under the Oaktree Charterparties to Mark Lichtenstein and Adam Spears of reorganized Holdings by email. The Notices of Default were sent by mail to

Eletson Gas Inc. and the applicable SME Party at their respective offices in Greece, which are still under the control of the Former D&Os and/or their agents in both instances to the attention of Mr. Kanelos, Eletson's former CFO. Additionally, the Notices of Default were sent by email to an Eletson email address that is controlled by the Former D&Os and/or their agents. The Notices of Default claim that purported events of default have occurred under the applicable Oaktree Charterparty's non-payment and insolvency provisions, and other related provisions, and attach various allegedly unpaid invoices from May and June of 2025 relating to each Oaktree Charterparty.

187. On June 25, 2025, counsel for the Oaktree Parties sent copies of demand letters (the "Guaranty Demands") related to the guarantees dated June 24, 2020 between Holdings and each SME Party for each applicable Oaktree Charterparty (the "SME Guarantees") to Mark Lichtenstein and Adam Spears by email. Each Guaranty Demand is addressed by mail to Holdings at its former office in Greece, which is still under the control of the Former D&Os and/or their agents, to the attention of Peter Kanelos and by email to the same address as the Notices of Default. Each Guaranty Demand makes certain requests for documents and information and claims that Holdings is in default under the applicable SME Guarantee for (i) failing to provide details related to ongoing litigation in the United States concerning ownership and/or control of Holdings, (ii) failing to notify the Oaktree Parties of the events of default listed on the Notices of Default, (iii) and failing to obtain the Oaktree Parties' prior written consent to the change in the ownership structure of Holdings.

188. The purported defaults alleged by the Oaktree Parties in the Purchase Option Response, the Notices of Default, and the Guaranty Demands are a direct result of the Defendants'

conversion of the Converted Funds and continued efforts to obstruct implementation of the confirmed Plan.

### E. The Fake EHI Attorneys Aided and Abetted the Conversion

189. The above-described conversion of Plaintiffs' property has been substantially assisted by the Fake EHI Attorneys, who have acted in violation of the Plan and Confirmation Order, among other orders, in order to sow doubt as to whether Eletson is under the New Board's control and facilitate the conversion.

190. On or about November 29, 2024, the Provisional Board purported to authorize the appointment of Lex Group to purportedly represent Holdings in Liberian courts.

191. At least as of December 10, 2024, the Provisional Board purportedly directed Reed Smith to protect the purported interests of Holdings pending recognition of the Confirmation Order in Liberia and Greece.

192. At least as of February 4, 2025, the Provisional Board retained the Daniolos Firm, purportedly on behalf of Holdings, to protect the purported interests of Holdings in Greece.

193. The Fake EHI Attorneys are aware of the Court's Confirmation Order and that it requires the Former D&Os and their agents and Related Parties (among others) to "cooperate in good faith to implement and consummate the Plan."

194. The Fake EHI Attorneys are also aware that they (and their clients) are "Related Parties" under the Plan and, therefore, that the Confirmation Order "enjoins" them (and the Former D&Os and Former Shareholders, among others) from "taking any actions to interfere with the implementation or consummation of the Plan."

195. Most importantly, the Confirmation Order specifically provides that the pre-Effective Date Debtors were "authorized and directed to take or not take any and all actions as instructed by the Petitioning Creditors and shall not take any actions inconsistent with the Plan and

53

th[e] Confirmation Order or further order of the Court" in connection with the "actions required by the Plan and th[e] Confirmation Order."

196. Similarly, the Consummation Order "authorized, required, and directed" Defendants "to comply with the Confirmation Order and the Plan to assist in effectuating, implementing, and consummating the terms thereof."

197. Despite their awareness of the Confirmation Order and the obligations that it places upon them and their clients, the Fake EHI Attorneys have each made various filings and arguments seeking to overturn the Confirmation Order and/or obstruct implementation of the Plan.

198. Upon information and belief, the Fake EHI Attorneys, who claim to represent Holdings, have also been knowingly paid with the converted funds. Indeed, to the extent the Fake EHI Attorneys' purported client has any funds at all to pay for the substantial legal assistance it has obtained over the past eight months since the Effective Date, those funds are rightfully the property of reorganized Holdings itself, which this Court and the District Court have recognized as the only legitimate version of Eletson Holdings Inc.

199. The Fake EHI Attorneys are also aware that the Former D&Os have unlawfully converted Holdings' property and have refused to turn the Converted Funds and/or the Converted Personal Property over to Holdings' true owners. Through their efforts to help the Former D&Os in their quest to avoid the Confirmation Order's requirements and to obstruct implementation of the Plan, the Fake EHI Attorneys have substantially assisted Former D&Os' conversion of Holdings' property.

# CAUSES OF ACTION

## COUNT 1: CONVERSION
### (against all Defendants)

200.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

201.    Since the Confirmation Order was entered, the Former D&Os and the Former Shareholders have taken affirmative and unauthorized actions in violation of the Confirmation Order intended to ensure that (i) Plaintiffs' post-Effective Date property, including Charterparty Payments due under the Novum Charterparties, was improperly diverted into bank accounts under the dominion and control of one or more of the Former D&Os and not into accounts under the dominion and control of any of the Plaintiffs; and (ii) the Converted Personal Property, which is critical to Plaintiffs' ability to operate their businesses, was not turned over to the Plaintiffs.

202.    Since the Effective Date, more than half a year's worth of revenue (the "Converted Funds") has been paid by Novum under the Kastos Charterparty and the Fourni Charterparty to bank accounts under the control of one or more Defendants and not into accounts under the control of any of the Plaintiffs, as a result of the Former D&Os' and the Former Shareholders' improper and unauthorized actions. Plaintiffs believe that the same is true for payments made by third parties under charterparty agreements for hire of the "Kimolos" and "Kinaros" vessels due to Kimolos and Kinaros.

203.    The Former D&Os and the Former Shareholders have exercised dominion over the Converted Funds and the Converted Personal Property, and have treated the Converted Funds and the Converted Personal Property as if they were the owners of the Converted Funds and the Converted Personal Property. The Defendants have not complied with demands for the turnover or return of the converted property.

55

204. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to themselves and their insiders.

205. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to the Fake EHI Attorneys.

206. Upon information and belief, the Former D&Os and the Former Shareholders have paid some of the Converted Funds to Eletson employees in inflated amounts in attempts to curry the employees' favor to further their obstruction of the Confirmation Order and its effects.

207. Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million.

## COUNT 2:
## AIDING AND ABETTING CONVERSION
### (against all Defendants)

208. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

209. As described above, the Former D&Os and the Former Shareholders have improperly converted the Converted Funds and the Converted Personal Property, causing Plaintiffs damages.

210. At all relevant times, each of the Defendants, including the Fake EHI Attorneys, have had actual knowledge of the Former D&Os' and the Former Shareholders' efforts to convert the Converted Funds and the Converted Personal Property, specifically including (i) the Former D&Os' and the Former Shareholders' efforts to divert Charterparty Payments into bank accounts under the dominion and control of one or more of the Former D&Os and not into accounts under the dominion and control of any of the Plaintiffs, and (ii) the Former D&Os' and the Former Shareholders' refusal to turn over the Converted Personal Property to reorganized Holdings.

211. The other Defendants, including the Fake EHI Attorneys, have substantially assisted in the conversion of the Converted Funds and the Converted Personal Property by

providing the appearance of legality and legitimacy to the rogue and unauthorized actions of the Former D&Os and the Former Shareholders. In addition, by filing the various legal challenges to the legitimacy of existing ownership and management of Holdings, the Fake EHI Attorneys have substantially assisted in the conversion of the Converted Funds and the Converted Personal Property by proximately causing such conversion.

**COUNT 3:**
**BREACH OF CONTRACT**
**(against all Defendants)**

212.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

213.     As described above, on November 4, 2024, the Court entered an order confirming the Plan. The Plan is a contract, which is binding on all parties in interest in the Chapter 11 Cases, including, specifically, the so-called "Related Parties" under the plan. The "Related Parties" include the Debtors and their current and former officers, directors, principals, direct and indirect equity holders, representatives, and other professionals (including, for the avoidance of doubt, each of the Defendants).

214.     As described above, the Plan required certain performance from all Related Parties, including, among other things, to cooperate in good faith to implement and consummate the Plan and to not take any actions inconsistent with the Plan or the Confirmation Order.

215.     Through their above-described intentional conduct, and as this Court has repeatedly held in connection with the above-described sanctions opinions and orders, Defendants have not fulfilled their obligations under the Plan, which constitutes a breach. On the other hand, Plaintiffs have fulfilled their obligations under the Plan.

216.     Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million from the breach of contract.

## COUNT 4:
## TORTIOUS INTERFERENCE WITH CONTRACT
### (against all Defendants)

217.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218.     As described above, Plaintiffs' subsidiaries, Kastos and Fourni, have valid ongoing contracts—the Novum Charterparties and their amendments and addenda—with Novum. Specifically, Novum agreed to make Charterparty Payments to the Berenberg Account under the First Charterparty Addenda.

219.     At all relevant times, Defendants have had actual knowledge of the existence of those contracts and had actual knowledge of the specific terms relating to the banking instructions.

220.     Defendants, through their wrongful conduct as described above, have intentionally procured Novum's breaches of the contracts without justification by engaging in a wrongful scheme to have Novum change the banking instructions to remit Charterparty Payments to accounts controlled by the Former D&Os.  Indeed, the Novum Charterparties were breached when Novum agreed to change the banking instructions to accounts controlled by the Former D&Os. Further, it was Defendants' objective, through their intentional conduct with Novum, to procure such a breach in order to have control over the Converted Funds.

221.     Had Defendants not acted wrongfully in committing the above-referenced tortious acts of interference, the contracts would not have been breached.

222.     Because of the foregoing, Plaintiffs have suffered damages of at least $63.5 million from the tortious interference.

## PRAYER FOR RELIEF

**WHEREFORE**, for the above-stated reasons, Plaintiffs respectfully request that the Court enter judgment against each of the Defendants in an amount not less than $63.5 million, and grant such other relief as the Court deems just and proper.

DATED:  July 30, 2025
              New York, New York

HERBERT SMITH FREEHILLS
KRAMER (US) LLP
By:

*Kyle J. Ortiz*
Kyle J. Ortiz
Brian F. Shaughnessy
David E. Blabey Jr.
New York, New York 10036
(212) 715-9100

*Counsel for Plaintiffs as Against Defendants Other Than Law Firm and Lawyer Defendants*

GOULSTON & STORRS PC
By:

*Jaclyn Grodin*
Jaclyn Grodin
Jennifer B. Furey (*pro hac vice* to come)
Nathaniel R.B. Koslof (*pro hac vice* to come)
Boston, MA 02109
(617) 574-3575

*Counsel for Plaintiffs as Against All Defendants*