

**Kyle J. Ortiz**
Partner
+1 212 715 9132
+1 212 715 8000
kyle.ortiz@hsfkramer.com

1177 Avenue of the Americas
New York, NY 10036
**T** 212.715.9100
**F** 212.715.8000

September 23, 2025

**<u>VIA ECF AND EMAIL</u>**

The Honorable John P. Mastando III
United States Bankruptcy Court
Southern District of New York
One Bowling Green
New York, NY 10004

Re:  *<u>In re Eletson Holdings, Inc., et al., Case No. 23-10322 (JPM)</u>*

Dear Judge Mastando,

We write on behalf of Eletson Holdings Inc. ("<u>Holdings</u>") in connection with *Eletson Holdings Inc.'s Motion for Entry of an Order Compelling Reed Smith to Implement the Plan and Imposing Sanctions* [Docket No. 1607] (the "<u>Motion</u>"), which has been fully briefed and was argued before Your Honor on May 15, 2025.

Since mid-May, there have been subsequent events further warranting the relief sought in the Motion such that we respectfully request a ruling as soon as possible to remove Reed Smith's interloping, disruptive, and unwarranted presence in these proceedings.

There are two primary reasons why ruling now is appropriate.  <u>First</u>, the fictional entity, "Provisional Holdings," and the board that purported to direct it, that Reed Smith claims to have a mandate to represent, has dispositively been determined not to exist.  <u>Second</u>, the events outlined below have made clear that Reed Smith's primary motivation in continuing to appear before this Court is not to protect the interests of "Provisional Holdings," but to protect Reed Smith's own interests in preventing a revelation of the full extent of its participation in a potential fraud on the Arbitrator, and in turn, on this Court.

**<u>There is No "Provisional Holdings"</u>**

As Reed Smith admits, its representation of Holdings was terminated on the Effective Date, after which "the provisional board members, acting under the authority vested in them by the Greek Order, retained Reed Smith for limited purposes."  *In re Eletson Holdings Inc.*, et al., No. 24-cv-08672-LJL (S.D.N.Y. Jan. 31, 2025) (Docket No. 46).  And, as Judge Liman recently observed, "Provisional Holdings' putative legal existence rested upon the order of a single-member Court of First Instance of Piraeus in Greece . . . which appointed an interim board on a provisional basis comprised of members of the families that formerly held Holdings."  *Eletson Holdings Inc. v. Levona Holdings Ltd.*, 2025 WL 2452351, at *3 (S.D.N.Y. Aug. 26, 2025) (the "<u>August 26 Decision</u>").



HERBERT SMITH
FREEHILLS
KRAMER

That purported Provisional Board was created pursuant to an ex parte order that this Court held was obtained in violation of the Confirmation Order. *See* July 2, 2025 Hr'g Tr. at 22:7-18. And its specific mandate was to "turn against" the Plan. Docket No. 1459 at Ex. 1, at 35, 38, 41-42, 46.

On June 6, 2025, the same Greek court that had appointed the so-called Provisional Board dismissed the very petition that had led to its formation. *See* Docket No. 1687 at Ex. B (the "June 6, 2025 Greek Decision"). The Greek court stated: "The claim that the voluntary bankruptcy of the US Bankruptcy Court – Southern District of New York on October 25, 2024, and the court order of November 4, 2024, confirming the same . . . have no legal effect in Greece, is unfounded." June 6, 2025 Greek Decision, at 3. The Greek Court continued:

> This is because the above decision and order have in any case produced legal effects in Liberia, in accordance with the law and, by extension, the administrative-management acts governing the internal relations of the above legal entity (interma corporis), which include, in particular, the composition, election, establishment, convening, and meeting of the corporate bodies . . . Consequently, the petition under consideration must be dismissed as inadmissible due to lack of jurisdiction . . . [.]

*Id*.

Following the June 6, 2025 Greek Decision, Judge Liman ruled that "there is no legal entity called 'Provisional Holdings' or 'Holdings (Greece),' and thus it has no standing to appear in federal court." August 26 Decision at *3. If Provisional Holdings has no existence and no standing, its purported counsel clearly has no right to appear in this case.[1]

Reed Smith is now attempting to walk back its prior, repeated admissions that the Effective Date occurred, so it can claim before the Second Circuit that it still represents Holdings in this case.[2] Such a position only makes disqualification more urgent, as explained below.

**Reed Smith's Self-Interested Motivations**

Despite being terminated on the Effective Date, Reed Smith attended every subsequent hearing before this Court at times on behalf of itself, and other times also on behalf of the "Provisional Board," "Provisional Holdings," the Former Majority Shareholders, as well as the

---

[1] Such a ruling would not be inconsistent with the Court's well-reasoned decision denying Reed Smith's application to withdraw because that ruling was based, in part, on the premise that to the extent "Provisional Holdings" exists, it must have counsel so it could be served. *See* Docket No. 1655 ("Thus, withdrawal is not appropriate here given that Reed Smith's client – purported Provisional Eletson Holdings – is subject to the Sanctions Orders and has attempted to argue that it is not subject to service."). With subsequent rulings clarifying that no such entity exists, the Court's concerns about service are moot.

[2] *See Provisional Eletson Holdings Inc. v. Reorganized Eletson Holdings Inc.*, No. 1:25-cv-05753-LJL (S.D.N.Y. Sept. 2, 2025) (Docket No. 10 at 14) ("[T]he Second Circuit will consider . . . whether the Plan and Confirmation Order must be recognized under foreign law in order to become effective[.]"); *see also* Docket No. 1344, Dec. 16, 2024 Hr'g Tr. at 73:16-18 ("THE COURT: But so you're not challenging the effective date? MR. SOLOMON: The effective date occurred."); *see also* Docket No. 1416 at 28 (letter from Reed Smith noting its "representation of Eletson Holdings, Inc. terminated upon the Effective Date").



former management of Holdings (despite Reed Smith's protestations to the contrary).  Reed Smith is clearly motivated in part by a desire to receive payment from their true clients (the former owners in their various forms) (*see* Ex. A) and continues to work for and serve the former owners, including by, for example, acting as an escrow agent for EMC Gas Corporation ("EMC Gas"), Laskarina Karastamati, and Vassilis Kertsikoff in connection with the "SYMI" vessel, without the authority of Holdings or EMC Gas.  *See* Ex. B.  Indeed, pursuant to the underlying escrow agreement, dated August 19, 2025 (Ex. C), Reed Smith "shall be providing legal services to [EMC Gas], **Laskarina Karastamati, and Vassilis Kertsikoff**."  Ex. C ¶ K.  If there ever was any doubt in the past about Reed Smith's improper, post-Effective Date relationship with the former management of Holdings (there was not), it has now been memorialized in writing.

But Reed Smith's primary motivation, much like its continued efforts to appear before Judge Liman, is to conceal the extent of its involvement in a potential fraud that Eletson's former management perpetrated on the Arbitrator and this Court.  The alleged fraud has been explained in detail by Judge Liman multiple times, including just last week.  *See Eletson Holdings, Inc. and Eletson Corp. v. Levona Holdings Ltd.*, No. 1:23-cv-07331-LJL (S.D.N.Y. Sept. 19, 2025) (Docket No. 606) (the "September 19 Order").  "Levona alleges that Eletson committed a fraud upon the arbitrator by improperly withholding documents that would have demonstrated that it did not exercise the option and that Levona retained ownership of the Preferred Shares," and "by asserting that the Intervenors had been nominated to receive the Preferred Shares."  *Id.* at 2.  "The Court previously held that 'Levona has submitted substantial evidence that a fraud was committed by Eletson . . . including by withholding the Withheld Documents and critical evidence on a pivotal issue and by presenting perjured testimony.' . . . The Court reaffirms and reiterates those findings here."  *Id.* at 4.

The length Reed Smith has gone to conceal those documents from this and other courts in various proceedings, is well documented.  *Eletson Holdings, Inc. and Eletson Corp. v. Levona Holdings Ltd.*, No. 1:23-cv-07331-LJL (S.D.N.Y. Sept. 6, 2024) (Docket No. 162 at 46) (noting that when represented by Reed Smith, Eletson "frustrated Levona's ability to bring this motion earlier through its persistent and aggressive arguments in the Bankruptcy Court, which ultimately were rejected, including an argument that the Court finds to be incredible that the documents were not relevant to the arbitration proceedings."); *see also Eletson Holdings Inc., Eletson Corp. v. Levona Holdings Ltd., v. Reed Smith LLP*, Nos. 25-445, 25-176 (2d Cir.) (Docket Nos. 20, 74, 86).

The reasoning for Reed Smith's desperation was laid bare when Judge Liman determined to compel production of certain purportedly privileged Reed Smith documents under the crime-fraud exception.  In doing so, Judge Liman found "probable cause that a fraud was committed on the arbitrator," as well as on this Court:

> There also is evidence that provides probable cause to believe that Eletson, under its prior management, contrived an after-the-fact and false story that the Intervenors [meaning the Cypriots] had been nominated to receive Preferred Shares of Eletson Gas in order to keep those shares remote from involuntary bankruptcy proceedings that had been commenced against Eletson.



September 19 Order at 4.

Judge Liman detailed the types of activities that gave rise to probable cause:

> These documents include communications regarding the drafting of an affidavit alleged to be false and misleading, responses to document production that were intended to be fraudulent and to conceal fraudulent conduct, a conversation among lawyers and client where testimony to be given and that is alleged to be false was discussed, communication regarding the recitation of facts alleged to be false, and documents concerning the concealment of fraudulent conduct after the conclusion of arbitration.

*Id*. at 4-5.

Judge Liman also noted that it is Reed Smith leading the charge in trying to spin a story to downplay the import of these documents:

> Finally, Reed Smith (but not its clients) attempts to put its own positive spin on the Withheld Documents.  There is ample reason to question Reed Smith's interpretation.  That interpretation is not supported by any evidentiary submission and in some instances appears implausible on its face.

*Id*. at 6.

This Court should not continue to be a forum for Reed Smith to make deliberately false and implausible arguments to protect its own interests.  Although there has not been a final ruling on the fraud issue, the pendency of that issue only reinforces Reed Smith's disqualifying conflict of interest (not to mention that Reed Smith has been arguing against the interests of its former client for more than 10 months now).  All that aside, Reed Smith's position (no matter how implausible) that it is still counsel to the actual Debtor in this case, alone, is disqualifying.[3]  *See In re Black and White Stripes, LLC*, 623 B.R. 34, 50 (Bankr. S.D.N.Y. 2020) ("[D]isqualification is appropriate 'if it is plausible that the representation of another interest may cause the debtor's attorneys to act differently than they would without that other representation."); *see also In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994); *In re Codesco*, 18 B.R. 997, 999 (Bankr. S.D.N.Y. 1992) ("[T]he purpose of the incorporation of the disinterest requirement in [section] 327 was to prevent even the appearance of a conflict irrespective of the integrity of the person or firm under consideration . . . . [A] 'disinterested' person should be divested of any

---

[3] Reed Smith's ongoing representation of the principals in other courts is also disqualifying (and contrary to declarations made under penalty of perjury (*see* Docket No. 1290) if they want to claim they are still counsel to the Debtor in this case.  *See Rome*, 19 F.3d at 60.  Further, if the former owners of Holdings (and Reed Smith, as their counsel) truly believed that the Plan had *not* gone effective:  Reed Smith would have filed its so-called "final" fee application in the bankruptcy case, which it did [*see* Docket No. 1325]; Reed Smith would have opposed the closure of the bankruptcy cases of Holdings' two debtor affiliates, which were closed without objection [*see* Docket No. 1515] (closing the cases as "fully administered"); the former owners of Holdings would have continued to comply with the duties of a debtor in bankruptcy (including the payment of statutory fees to the United States Trustee and the filing of monthly operating reports), which they have not; and the former owners would not have stood by while the reorganized company settled and paid the debts incurred by Holdings before its bankruptcy—unless they sought to accept the benefits of the Plan, while disclaiming its burdens [*see, e.g.*, Docket No. 1808].



scintilla of personal interest which might be reflected in his decision concerning estate matters."); *Rome v. Braunstein*, 19 F.3d 54, 60 (1st Cir. 1994) ("[S]ince section 327(a) is designed to limit even appearances of impropriety to the extent reasonably practicable, doubt as to whether a particular set of facts gives rise to a disqualifying conflict of interest normally should be resolved in favor of disqualification."); *In re Angelika Films 57th, Inc.*, 227 B.R. 29, 38-39 (Bankr. S.D.N.Y. 1998) (citing *Rome*, 19 F.3d at 58) ("[T]he test is neither subjective, nor significantly influenced by the court-appointed professionals' 'protestations of good faith,' . . . but contemplates an objective screening for even the 'appearance of impropriety.'").

In short, Reed Smith either represents a fictional entity and has no standing, or it claims to represent the Debtor and has a disabling conflict. Under either scenario, Reed Smith has no business appearing before this Court and should be disqualified.

Respectfully submitted,


/s/ Kyle J. Ortiz_____


Kyle J. Ortiz
Partner

# EXHIBIT A

| | |
|---|---|
| **From:** | Solomon, Louis M. |
| **Sent:** | Friday, June 6, 2025 3:52 PM EDT |
| **To:** | Vasilis A. Hadjieleftheriadis |
| **CC:** | j.markianos@daniolos.gr; Manolis S. Andreoulakis; Weller, Charles G.; Peles, Joshua M.; Underwood, Colin A. |
| **Subject:** | RE: instructions  ** MSG#:<3442129> |

Vasilis:  We have received your instructions.

At the same time, you changed the payment confirmation that I included in my draft.  As you know, we have personal commitments as well as entity commitments.

We are under intense pressure right now to prepare papers on your behalf.  I therefore need your confirmation that the payment for the new instructions is and shall be the same **as it was -- at least as broad as you articulated it**.  We can sort out any failure of recollection by you or me later.  If this is acceptable, please confirm asap.  I need this confirmation to continue to work on your behalf.

Thank you.

**Louis M. Solomon** (bio)
E-Mail: Lsolomon@reedsmith.com
Direct Tel.: +1.212.549.0400
Mobile:  +1.917.292.2484
Reed Smith LLP
599 Lexington Avenue
New York, New York 10022

---

**From:** V. Hadjieleftheriadis <vasilis.hadjieleftheriadis@eletson.com>
**Sent:** Friday, June 6, 2025 3:42 PM
**To:** Solomon, Louis M. <LSolomon@reedsmith.com>; Underwood, Colin A. <CUnderwood@reedsmith.com>; Peles, Joshua M. <JPeles@reedsmith.com>
**Cc:** j.markianos@daniolos.gr; manolis.andreoulakis@eletson.com
**Subject:** instructions ** MSG#:<3442129>

**External E-Mail - FROM vasilis.hadjieleftheriadis@eletson.com <vasilis.hadjieleftheriadis@eletson.com>**

---

**Message Number:** 3442129

**From:** vasilis.hadjieleftheriadis@eletson.com
**To:** LSolomon@reedsmith.com, CUnderwood@reedsmith.com, JPeles@reedsmith.com
**Cc:** j.markianos@daniolos.gr, manolis.andreoulakis@eletson.com

**Sent:** Friday, Jun 6, 2025 22:41 (UTC +03:00)
**Subject:** instructions

To Reed Smith, LLP:

This is to confirm the instructions we have provided to you.  I act with authority on behalf of Eletson Holdings, Inc. and Eletson Corporation.  My authority to act on behalf of Eletson Holdings, Inc. is derived under Greek law and the failure, to date, of purported Reorganized Eletson Holdings, Inc. to obtain recognition and enforcement of the Confirmation Order in Greece.  My authority to act on behalf of Eletson Corporation is derived under Greek law and the failure, to date, by purported Reorganized Eletson Holdings, Inc. to obtain recognition and enforcement of the Confirmation Order in Greece. Besides I am recorded in the registry of maritime companies of the Ministry of Maritime Affairs as legally representing Eletson Corporation in Greece.

I advised you through counsel that a Greek court today issued a nonfinal decision, which is subject to an appeal we intend to take promptly, that affects the Provisional Board of Holdings. As we have advised you, under Greek law, the order does not affect Eletson Holdings or Eletson Corporation.

As a result, we continue the instructions that we have provided to you to protect the interest of Eletson Holdings, Inc., which is the entity that has not been reorganized in Greece, and its wholly owned subsidiary, Eletson Corporation in connection with all proceedings in which either entity has rights, including without limitation the turnover proceeding and other matters in the Second Circuit and any matters in the Southern District of New York, including in the Bankruptcy Court.  Payment obligations remain the same – Eletson Gas and its shareholders remain fully responsible for your fees, expenses, and any other costs or loss Reed Smith incurs in connection with or arising out of your adherence to these instructions.

Very truly yours,

*********************************************************************
The information contained in this message is intended only for the recipient, is privileged and confidential and protected from disclosure. If you are not an intended recipient, please notify the sender and delete all copies. We implement technical and organizational measures aiming at the protection of personal data on the basis of requirements and standards set by applicable data protection laws, including the GDPR. The content and attachments of the message are checked by anti-virus programs. Please consider the environment before printing this e-mail!

This message has been scanned for malware by Forcepoint. www.forcepoint.com

# EXHIBIT B

Claim No. CL-2025-000359

IN THE HIGH COURT OF JUSTICE
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
COMMERCIAL COURT (KBD)

B E T W E E N

OCM Maritime Yangtze LLC

Claimant

-and-

(1) Symi II Special Maritime Enterprise
(2) Eletson Gas LLC

Defendants

PARTICULARS OF CLAIM

1. The Claimant ("Owners") is the owner of the gas carrier MV "SYMI" ("the Vessel"). By a charterparty in the amended "BARECON 2001" form dated Athens 13 January 2020 (a copy of which is attached as Appendix A) ("the Charter") Owners agreed to let and the 1st Defendant ("Charterers") agreed to hire the Vessel for a Charter Period of 5 years on the terms and conditions provided for therein.

2. The Claimant is the Beneficiary under a Guarantee dated 13 January 2020 ("the Guarantee") (a copy of which is attached as Appendix B) by which the 2nd Defendant ("the Guarantor") unconditionally and irrevocably agreed, as principal and independent debtor, among other things, due payment of all amounts payable by the Charterer under the Charter.

3. Appendices C and D hereto set out respectively extracts of terms of the Charter and the Guarantee referred to herein.

4. Words defined in the Charter and/or the Guarantee are used with the same meaning herein unless it appears otherwise from the context.

5. The Claimant will refer to and rely on the Charter and the Guarantee for their full terms, true meaning and legal effect.

1

**Charter Period**

6. The Vessel was delivered to the Charterers under the Charter on 16 January 2020.

7. The Charter Period provided for in clause 2 and Box 21 of the Charter is 5 years.

8. In the premises the Charter Period expired on 16 January 2025.

**Charter Hire**

9. Wrongfully and/or in breach of clauses 11(a) and/or 17(a) and/or 34(a) and/or 35(d) and/or 38(a) of the Charter, the Charterers have failed and/or refused to pay Charter Hire and other sums (comprising default interest and insurance costs) due and owing to the Claimant in the total sum of US$ 1,161,142.89, of which US$ 384,103.37 became due on 16 October 2024, US$373,251.98 became due on 16 November 2024 and US$403,787.04 became due on 16 December 2024, as particularised in invoices dated 10 October 2024, 11 November 2024 and 2 December 2024 ("the Hire Invoices") respectively.

10. In the premises there is due and owing to the Claimant the sum of US$1,161,142.89 and/or the Claimant has suffered loss and damage in a like sum due to the Charterers' breach of the Charter provisions aforesaid.

**Arrest and failure to redeliver**

11. The Claimant will refer to and rely on clauses 15 and/or 17 and/or 29 and/or 36(h) and/or 45 and/or 49 of the Charter.

12. Wrongfully and in breach of clauses 15 and/or 49 of the Charter, the Charterers failed on the expiration of the Charter Period (16 January 2025) to redeliver the Vessel to Owners at a safe and ice-free port or place as indicated in Box 16 and in the same or as good structure, state, condition and class as that in which she was delivered, fair wear and tear not affecting class excepted, as provided for in clause 15, and/or in the

2

condition on redelivery provided for in clause 49(a), and have failed to redeliver the Vessel at all.

13. The Vessel was arrested pursuant to an order of the High Court of Gujarat at Ahmedabad on or about 21 November 2024 at the port of Deendayal or Kandla, India ("the Arrest") on the application of EMC Gas Corporation ("EMC Gas"). It was claimed by EMC Gas in the arrest application that it had entered into a Financial Management Agreement dated 16 January 2020 with the 1st Defendant and had disbursed expenses on behalf of the Vessel but had not been reimbursed. The order pursuant to which the arrest took place provided among other things that "*in the event of the Defendant ... depositing in this Court for securing pending Arbitration and/or satisfying the Plaintiff's claim for the principal amount ... plus ... for costs aggregating to USD 1,256,569.27 with further interest ...the said Warrant of Arrest would not be executed ...*"

14. In breach of clauses 17 and/or 45(p) and/or 45(y) of the Charter, the Charterers failed at their own expense or at all to take all reasonable or any steps to secure that within 45 days or a reasonable (or any) time the Vessel was released from the Arrest and/or failed to provide bail. Further or alternatively, the occurrence of the Arrest was itself a breach of clauses 45(h) and/or 45(n) and/or 45(o) and/or 45(p) and/or 45(y) of the Charter (as further particularised below).

15. Further or in the further alternative, wrongfully and in breach of clause 36(h) of the Charter the Charterers:

   a. failed promptly (or at all) to discharge any alleged liabilities (which are not admitted) which gave or may have given rise to the alleged claims (which are not admitted) relied on in the Gujarat arrest proceedings referred to above ("the Arrest Proceedings"); and/or

   b. failed immediately and forthwith upon receiving notice of the Arrest in exercise or purported exercise of any claim alleged against the Vessel (which is not admitted) or at any time to procure the release of the Vessel by providing bail or otherwise securing its release as the circumstances required.

3

16. In the yet further alternative, if (which is denied) the Charter did not expire in accordance with its terms on 16 January 2025, the Charter has terminated or been terminated in accordance with its applicable provisions and, wrongfully and in breach of clause 29 of the Charter, the Charterers have hindered or interfered with the repossession of the Vessel by Owners and/or failed to prevent such hindrance or interference by suffering the Vessel to be arrested or by failing to procure its release from the Arrest. As pleaded below, Owners' primary case on termination is that the Charter has been terminated at common law due to the Charterers' repudiatory breach and/or renunciation thereof, but Owners rely in the alternative on termination in accordance with the applicable provisions of the Charter.

**Release from the Arrest**

17. As a result of the above breaches and/or failures, Owners were left with no option but to take steps to bring about the lifting of the Arrest, which involved them agreeing to pay substantial sums to EMC Gas in order to secure its agreement to lift the Arrest. The agreement reached between Owners and EMC Gas in this regard is referred to in an Escrow Agreement dated 19 August 2025 (a copy of which is attached as Appendix F) between the Claimant, EMC Gas, Vassilis Kertsikoff, Laskarina Karastamati and Reed Smith LLP (the latter as escrow agent). The Escrow Agreement states (among other things):

a. That the Claimant would pay into an escrow account held by Reed Smith London the total sum of US$3,887,129.98 (the "Escrow Fund") (clause 3). That sum was the amount that EMC Gas told Owners it was owed in respect of expenses and unpaid management fees connected with the Vessel (Recital H), which included the sums in respect of which the Vessel was arrested and sums purportedly incurred after the Arrest;

b. The Escrow Fund would be released to EMC Gas in 2 tranches: (i) US$2,600,000.00 within 2 business days of receipt by Owners of written confirmation from EMC Gas providing certain undertakings set out in clause 27 of the Escrow Agreement and Owners acknowledging receipt of the undertakings (clause 6(a)) and (ii) the remainder upon receipt by the escrow agent of written confirmation from the Greek

4

Registry of change of the Vessel's technical manager to IMC Ship Management and from Owners that a crew change has been performed OPL Fujairah and that they have received the declaration set out at clause 4 of the Escrow Agreement;

c.  EMC Gas will take all necessary steps to release the Arrest, order the Vessel to sail to Fujairah OPL and, upon its arrival there, relinquish control of the Vessel to Owners and IMC's management and permit a crew change to be performed;

d.  EMC Gas would provide the undertakings to Owners set out in clause 27, including not at any time after the date of the Escrow Agreement to arrest or cause the arrest of the Vessel in any jurisdiction;

e.  "*The Owners' position is that they are not liable to pay the Manager any sums whatsoever in respect of the Vessel. Notwithstanding and strictly without prejudice to that, the parties agreed on 10 August 2025 to secure the release of the Vessel from arrest and change its management in accordance with the escrow terms set out below which involve payment by Owners of sums to the Manager to reflect the Outstanding Amount as represented by the Manager. Owners' agreement to pay and payment of those sums is not intended to alter the substantive rights of the Parties, or any of them, as they existed immediately prior to entering into this Escrow Agreement and is strictly without prejudice to their rights to claim those sums as a debt and/or as damages from the Manager, Symi II, Eletson Gas LLC and/or Eletson Corporation and/or any other entity under the ... BBC, the Corporate Guarantee (as defined in the BBC) dated 16 January 2020 …*" (recital I).

18. In connection with the agreement referred to at paragraph 17 above:

a.  Owners paid the Escrow Fund into escrow on or around 20 August 2025;

b.  EMC Gas obtained an order for the release of the Vessel from the Arrest dated 11 August 2025;

c.  On or around 22 August 2025, in accordance with Clause 6(a) of the Escrow Agreement, the Claimant confirmed to Reed Smith that US$2,600,000 of the Escrow Fund could be distributed to EMC Gas;

d.  The Vessel reached Fujairah OPL on or about 22 August 2025.

19. Upon arrival OPL Fujairah, a survey and an underwater inspection were performed on or around 26 August 2025. Further inspections have subsequently been performed. The underwater inspection identified indentations of the Vessel's hull that require inspections of Class, which are yet to take place. The surveys identified a significant amount of damage, which is listed at Appendix G.

20. The Vessel has not been redelivered to Owners and Owners have not been able take control of the Vessel. The crew currently onboard the Vessel are neither employed nor controlled by Owners. The Vessel is not currently trading and has not done so since the Arrest.

**Loss and Damage**

21. As a result of the Charterers' breach of clauses 15 and/or 17 and/or 29 and/or 36(h) and/or 45 and/or 49 aforesaid and/or as a result of Charterers' repudiation and/or renunciation of the Charter particularised below, Owners have suffered (in addition to the loss and damage suffered by Owners due to the non-payment of the Hire Invoices) the following loss and/or damage.

PARTICULARS OF LOSS AND DAMAGE DUE TO THE ARREST AND/OR FAILURE TO PROCURE RELEASE OR REDELIVER

a.  Loss of hire and/or freight available in the market at a rate of US$28,779 per day from the date of expiry of the Charter (16 January 2025) to date (being in total the sum of US$7,079,634) and continuing;

b.  Alternatively loss of hire at the rate of hire provided for in clause 15 up to the date of future redelivery of the Vessel and/or return of the Vessel to the structure, state and condition on redelivery required under clauses 15 and/or 49 alternatively up to

the date of any termination of the Charter (being the total sum of US$708,678.95 up to 13 March 2025); and/or

c. The cost of facilitating the release of the Vessel from the Arrest including the sum of US$3,887,129.98 paid to EMC Gas and legal fees and other costs (particulars of which will be provided);

d. The cost to Owners (particulars of which will be provided) of surveying and/or returning the Vessel to the structure, state and condition on redelivery required under clauses 15 and/or 49 including but not limited to the cost of rectifying the damage to the Vessel's underwater hull and the damage listed at Appendix G such costs to date having reached US$633,667.94; and/or

e. Loss of the capital value (particulars of which will be provided) of the Vessel due to the inability of Owners to trade or sell or maintain the Vessel due to the Charterers' breaches pleaded above; and/or

f. The Losses itemised in Appendix E against which Owners claim to be indemnified by the Charterers; and/or

g. The future Losses against which Owners claim below to be indemnified by the Charterers.

**Termination at common law for repudiatory breach or renunciation**

22. Owners, by a letter dated 13 March 2025 ("the 13 March 2025 Letter") headed "TERMINATION NOTICE", among other things:

a. Reminded the Charterers that the Charter Period had expired and that in breach of the Charter the Vessel had not been redelivered and that the Charterers had no right to possession of the Vessel;

b. Called upon the Charterers immediately to redeliver the Vessel to Owners in accordance with the terms of the Charter;

7

c. Gave the Charterers notice of termination of the Charter and that Owners were repossessing the Vessel with immediate effect and were entitled to do so under the terms of the Charter;

d. Asked the Charterers to give urgent confirmation of the return of the legal and physical possession of the Vessel to Owners and practical arrangements related to the redelivery.

23. If (which is denied) the Charter remained in force after 16 January 2025, as at 13 March 2025 the Charterers had repudiated and/or renounced the Charter by their breaches thereof and/or by evincing an intention not to be bound thereby and/or as a result of the occurrence of the Events of Default particularised below. Owners will refer to and rely on the following facts and/or matters as constituting and or demonstrating individually and/or collectively such repudiation and/or renunciation:

PARTICULARS OF REPUDIATION AND/OR RENUNICATION AS AT 13 MARCH 2025

a. Persistent failure and/or refusal by the Charterers to pay hire and other sums owing for approximately 5 months as particularised in the Hire Invoices and thereafter; and/or

b. Failure by the Charterers to redeliver the Vessel on expiry of the Charter Period or at all; and/or

c. Allowing and/or causing the Vessel to be arrested and/or failure by the Charterers to procure its release from the Arrest; and/or

d. Continuing to make claims and/or purporting to exercise alleged rights in correspondence (written or purportedly written on the Charterers' behalf) which were inconsistent with Owners' rights and the Charterers' obligations under the Charter, including the letter dated 10 January 2025:

    i. claiming that the Charterers' "*rights have been frustrated and interfered with respect to the Vessel, its management and the economic value of its operation*", when the Charterers' obligations under the Charter were

8

independent of and undiminished by the alleged frustration and interference (which are denied); and/or

ii. purporting to exercise the option to purchase the Vessel provided for in clause 48 of the Charter ("the Purchase Option"), in circumstances where that Purchase Option did not exist or had expired by reason (among other things) of the Charterers' failure to exercise it within the time period allowed under clause 48, i.e. the Purchase Option could not be exercised later than 16 December 2024 because clause 48 provided (among other things):

> " …
>
> *If the Charterers wish to exercise their Purchase Option ..., the Charterers shall give the Owners written notice thereof not less than one ... month before the expected date of completion of the purchase. The date of completion of the Purchase shall in such a case ... in no circumstances be later than the last day of the Charter Period.*
>
> *...*
>
> *The Owners have not granted the Charterers any option other than the Purchase Option set out above ... if the Purchase Option is not exercised within 30 days before the Final Option Date* [the 5th anniversary of the Delivery Date]*, the Owners have the right to enter into contracts or other agreements to sell or charter the Vessel ...*" and/or

e. purporting to exercise the Purchase Option in circumstances where:

i. due to the occurrence and continuation at all material times of an "Applicable Insolvency Default" within the meaning of clause 48 of the Charter, the Charterers in any event had no entitlement to exercise the Purchase Option or to the delivery of the Vessel or to the transfer of title in the Vessel; and/or

ii. due to the continuation at the end of the Charter Period of Events of Default under clauses 45(f) and/or (h) (particularised below) the Claimant considered, acting reasonably having regard to the Charterers'

9

financial condition at that time, it would reasonably be expected that the sale of the Vessel to the Charterers and payment of the purchase price could be ordered by a court, administrator or receiver or other relevant person to be set aside, reversed or repaid; and/or

iii. claiming that there was "*force majeure*" with respect of the rights and dates set forth in clause 48, when the Charter does not provide for "*force majeure*" with respect to such rights or dates or at all; and/or

iv. claiming that the amount alleged to be payable under the Purchase Option would become due and would be paid on the discharge of a worldwide freezing order alleged to have been obtained by the Guarantor and/or the Approved Manager against Levona Holdings Ltd ("Levona") (which was alleged to be the Charterers' sole shareholder), when the Purchase Option had not been exercised and was not or was no longer capable of being exercised and in any event did not allow for any postponement in the payment of the Purchase Option Price whether on the grounds of a freezing order obtained against Levona by the Guarantor or the Approved Manager or at all; and/or

v. failing in accordance with the requirements of clause 48 by the Completion Date or at all to pay the Purchase Option Price or the Purchase Obligation Price (if the 1st Defendant was entitled to purchase the Vessel, which is denied) or the Indemnity Sum or outstanding Charter Hire or outstanding interest on unpaid sums owing under the Charter (including the sums particularised in the Hire Invoices).

24. The Charterers' repudiation and/or renunciation aforesaid was accepted (without prejudice to the prior expiry of the Charter Period on 16 January 2025 and/or Owners' right to rely on such expiry) by Owners in the 13 March 2025 Letter as terminating the Charter and/or the termination of the Charter in the 13 March 2025 Letter was valid and/or effective at common law by reason of such repudiation and/or renunciation.

25. Alternatively, if, contrary to Owners' alternative case, the Charter was not terminated by the 13 March 2025 Letter, it was terminated by the acceptance in the Claim Form

herein and/or in Owners' solicitors' letter of 10 August 2025 of the Charterers' repudiatory breach and/or renunciation aforementioned.

**Termination under Clause 45(y) due to repudiatory breach**

26. Further or in the yet further alternative, if (which is denied) the Charter remained in force after 16 January 2025:

    a. Under clause 45(y) of the Charter the occurrence of an Event of Default in the Charter Period was treated, while it was at any time continuing, as a repudiation of the Charter by the Charterers which Owners were entitled to accept as terminating the Charter;

    b. Numerous Events of Default (which are particularised below) had occurred in the Charter Period and were continuing when Owners terminated the Charter by the 13 March 2025 Letter (and/or subsequently);

    c. The 13 March 2025 Letter and/or the Claim Form herein and/or Owners' solicitors' letter of 10 August 2025 were or are to be treated as a valid and effective acceptance of such repudiation, thereby terminating the Charter.

*Events of Default*

27. The following Events of Default occurred during the Charter Period and were at all material times continuing and are relied on as repudiatory breaches of the Charter entitling Owners to terminate the Charter and/or justifying such termination:

    a. **Clause 45(a) Non-payment**: A Transaction Obligor (Charterers) did not pay on the due date(s) amounts payable pursuant to a Relevant Document to which they were party (the Charter) and, to the extent relevant, such non-payment was not remedied within 5 banking days or at all, i.e. the unpaid sums particularised in the Hire Invoices;

    b. **Clause 45(f) Insolvency**:

11

  i. a Transaction Obligor (Charterers) was unable to pay its debts as they fell due or suspended making payment of its debts and/or the value of its assets was less than its liabilities (which is to be inferred from the non-payment of the Hire Invoices above and/or the contents of the letter of 10 January 2025 aforesaid);

  ii. A Transaction Obligor (the Guarantor) was unable to pay its debts as they fell due and/or suspended making payment of its debts and/or the value of its assets was less than its liabilities (which is to be inferred from, amongst other things, the non-payment by the Guarantor of the sums demanded on 5 August 2025 and/or the Claim Form and/or herein and/or (ii) the proceedings referred to in the judgment of HHJ Pelling KC referred to at sub-paragraph (f)(ii) below and/or (iii) the Greek proceedings referred to at sub-paragraph (f)(ii) below; and/or (iv) the freezing order against Levona (which claims to be the owner of the preferred shares in the Guarantor) referred to in the letter purportedly from the Charterers of 10 January 2025 ("the WFO"), which was not discharged until an order of the BVI court dated 13 March 2025 entered on 25 March 2025.

c. **Clause 45(h) Creditors' process**: There had occurred prior to the expiry of the Charter Period attachment, distress or an analogous process (namely the Arrest and/or the Arrest proceedings and/or the WFO) affecting assets of a Transaction Obligor (the 1st and/or 2nd Defendants), such assets being the Vessel or the Charterers' (former) rights in respect of the Vessel under the Charter, and/or the 2nd Defendant's assets, which were not discharged within 60 days (or in the case of the Arrest at all);

d. **Clause 45(m) Repudiation and rescission of agreements**: A Transaction Obligor (Charterers) had during the Charter Period repudiated or purported to repudiate a Relevant Document (namely the Charter) or evidenced an intention to do so;

e.  **Clause 45(n) Litigation**: Litigation, proceedings or disputes were commenced (i.e. the Arrest Proceedings and/or the WFO) in relation to a Relevant Document (the Charter and/or the Guarantee) and/or against a Transaction Obligor (the 1st and/or 2nd Defendants) and/or their assets which was reasonably likely to have a Material Adverse Effect, i.e. in the reasonable opinion of the Claimant the litigation would have a material adverse effect on the business, operations, property and/or condition of the 1st and/or 2nd Defendants which would affect their ability to perform their obligations under a Relevant Document (the Charter and/or the Guarantee);

f.  **Clause 45(o) Material Adverse Effect:** Events or circumstances had occurred in the Charter Period which in the reasonable opinion of the Claimant had or were reasonably likely to have a material adverse effect on: (i) the business, operations, property, condition or prospect of the Charterers which would affect the ability of any Transaction Obligor (the Charterers and/or the Guarantor) to perform their obligations under a Relevant Document (the Charterparty and/or the Guarantee); and/or (ii) the ability of the Charterers and/or the Guarantor to perform their obligations under Relevant Documents (the Charterparty and/or the Guarantee), such events and/or circumstances being:

(i)  the Arrest proceedings and/or

(ii)  proceedings and/or disputes in the United States and Greece which concern and/or affect the ownership and/or control of the 2nd Defendant and/or its owners, including Eletson Holdings, Inc. (which owns the common shares in the 2nd Defendant), and/or its directors and/or assets and/or its solvency including those referred to in the judgment HHJ Pelling KC in *Eletson Gas LLC et al. v. A Limited et al.* [2025] EWHC 1855 (Comm) at paragraphs 16, 24, 26 and 29 and/or a petition filed in the Court of First Instance of Piraeus on 11 November 2024 by the minority shareholders of Eletson Holdings requesting the Court to appoint a provisional board of directors and/or proceedings before the Athens First Instance Court in which Eletson Holdings applied for an order recognising the Eletson Holdings Chapter 11 Plan in Greece under Greek legislation enacting the UNCITRAL Model Law on Cross-Border Insolvency; and/or

13

(iii)   the WFO;

g.  **Clause 45(p) Arrest of Vessel:** The Arrest, which was not attributable to the sole (or any) fault of Owners or their affiliate or agent, and the Charterers' failure to procure the release of the Vessel within 45 days (or at all);

h.  **Clause 45(s) Change of Control:** There has been a change or purported change of control of the 2nd Defendant from that existing at the date of the Charter without the prior (or any) written consent of Owners, which change or purported change in the owning structure or control is not permitted as per Clause 43(o), i.e.by virtue of the Eletson Holdings Chapter 11 Plan as referred to in the judgment of HHJ Pelling KC in *Eletson Gas LLC et al. v. A Limited et al*. [2025] EWHC 1855 (Comm) at paragraphs 26 to 28 and/or by virtue of the disputed change in ownership and/or control of the preferred shares in the 2nd Defendant in the proceedings referred to at sub-paragraph 27(f)(ii) above.

**Termination under clause 28**

28. If, contrary to Owners' case, the Charter had not expired in accordance with its terms on 16 January 2025 and had not been terminated due to the repudiatory breach and/or renunciation of the Charter by the 1st Defendant and Owners' acceptance thereof pleaded above, Owners terminated the Charter in its solicitors' letter dated 10 August 2025 under clause 28 thereof by reason of non-payment of the hire owing reflected in the Hire Invoices.

**Indemnity**

29. The Claimant will refer to and rely on clauses 17 and 38(a)(i), (ii), (iii), (vii) and (viii) and 38(e) and 38(f) of the Charter and/or such other parts of clause 38 as may be pertinent to any future Losses (as defined in clause 59) suffered by the Claimant in connection with the Charter.

30. The Losses incurred by the Claimant to date, amounting in aggregate to $13,167,617.76, £59,025.55 and €23,317.52 in respect of which or against which it claims and demands and is entitled to be indemnified are listed in Appendix E.

31. Further or alternatively, the Claimant is entitled to and claims an indemnity:

   a. Under clause 17 against all Losses suffered or incurred or which may in the future be suffered or incurred by the Claimant arising out of or in relation to the operation of the Vessel by the Charterers and/or the Arrest (which arose out of an event occurring during the Charter Period, namely the matters, which are not admitted, on which the plaintiff in the Arrest proceedings relies) including but not limited to the sums itemised in Appendix E; and/or

   b. Under clause 38(a)(ii) against all Losses suffered or incurred or which may in the future be suffered or incurred by the Claimant arising directly or indirectly in connection with the Vessel and/or the chartering of the Vessel to the 1st Defendant and/or the operation of the Vessel including but not limited to the sums itemised in Appendix E;

   c. Under clause 38(a)(iii) against all Losses suffered or incurred by the Claimant to secure the release of the Vessel from the Arrest and/or to prevent or attempt to prevent the future arrest of the Vessel including but not limited to the sums itemised in Appendix E;

   d. Under clause 38(a)(vii) against all Losses incurred or suffered by the Claimant or which may in the future be suffered or incurred by the Claimant as a result of or in connection with the Events of Default particularised above including but not limited to the sums itemised in Appendix E;

   e. Under clause 38(a)(viii) against all Losses of whatsoever kind or nature imposed on, incurred or suffered by, or asserted against the Claimant or which may in the future be imposed on, incurred or suffered by or asserted against the Claimant in any way relating to or arising out of the insurances over the Vessel or to incidents covered by such insurances including but not limited to the sums itemised in Appendix E;

15

   f.  Under clause 38(e) against all Losses of whatsoever kind and nature which have been or which may in the future be imposed on, incurred or suffered by or asserted against the Claimant in any way in relation to or arising in connection with the termination of the chartering of the Vessel to the 1st Defendant including without limitation recovering possession of the Vessel and the other matters referred to in clause 38(e), including but not limited to the sums itemised in Appendix E.

**Declaration**

32. Further or alternatively, by reason of the facts and/or matters aforesaid, the Claimant is entitled to and claims declarations that:

   a.  the Charter Period under the Charter expired on 16 January 2025 and thereupon the Claimant became entitled and remains entitled to immediate redelivery of the Vessel and/or to take possession thereof without hindrance or interference and/or to enjoy the use and benefit of the Vessel and/or to trade and/or to sell the Vessel, if so desired; and/or

   b.  in any event, for the reasons set out in (c) to (i) below, or any of them, the Claimant is entitled to immediate redelivery of the Vessel and/or to take possession thereof without hindrance or interference and/or to enjoy the use and benefit of the Vessel and/or to trade and/or to sell the Vessel, if so desired; and/or

   c.  the Purchase Option under clause 48 of the Charter has not been exercised or has not been validly exercised and/or has expired and/or is no longer of any force or effect and, therefore, the 1st Defendant was not and is not entitled to purchase the Vessel; and/or

   d.  the Purchase Obligation provided for in clause 48 of the Charter does not and did not at any time give the 1st Defendant any right under the Charter to purchase the Vessel; and/or

   e.  in any event, the 1st Defendant, having failed by the Final Option Date and/or the final day of the Charter Period or at all to make payment of the Purchase Option

Price or the Purchase Obligation Price or the Indemnity Sum or Charter Hire owing, has no rights or no continuing rights to purchase the Vessel under either the Purchase Option or the Purchase Obligation and the Claimant is not obliged to transfer title to the Vessel under clause 48 or at all and/or the Claimant is entitled to sell the Vessel pursuant to clauses 40(a) and/or 48 or in any event; and/or

f.  the 1st Defendant has repudiated and/or renounced the Charter and any alleged contract (which is denied) for the purchase of the Vessel or which may be alleged to have entitled the 1st Defendant to purchase the Vessel; and/or

g.  the Claimant has by the 13 March 2025 Letter accepted the 1st Defendant's repudiatory and/or renunciatory breaches as terminating the Charter and any alleged contract with the 1st Defendant for the purchase by it of the Vessel or entitling the 1st Defendant to purchase the Vessel (which are denied); and/or

h.  if the Charter and/or any such alleged contract (which is denied) with the Defendant for the purchase by it of the Vessel or entitling the 1st Defendant to purchase the Vessel were not terminated by the 13 March 2025 Letter, they were terminated by the acceptance in the Claim Form and/or in the Claimant's solicitor's letter dated 10 August 2025 of the 1st Defendant's repudiatory and/or renunciatory breaches; and/or

i.  if the Charter was not terminated by reason of the 1st Defendant's repudiatory or renunciatory breach thereof, the Charter has been terminated under clause 28 by the aforesaid Claimant's solicitor's letter; and/or

j.  the indemnities provided for in the Charter have survived the termination and/or other ending of the Charter and the repudiatory and/or renunciatory breaches by the Charterers pleaded herein and the Claimant is entitled on demand and/or under clause 17 and/or clause 38 to be indemnified against all and any Losses (as defined in clause 59 of the Charter) which it has suffered or may in the future suffer falling within the scope of the indemnities provided for in the Charter including but not limited to the Losses itemised in Appendix E and/or referred to in paragraph 30 above.

**Injunction**

33. By reason of the facts and matters pleaded above, the Claimant is entitled to and claims an injunction (interim and/or final) requiring the 1st Defendant:

    a.   To redeliver the Vessel to the Claimant in the condition and in all other respects in accordance with the requirements provided for by the Charter; and/or

    b.   To deliver up possession of the Vessel to the Claimant; and/or

    c.   To procure redelivery to and possession of the Vessel by the Claimant; and/or

    d.   Not to hinder or interfere with the redelivery to and/or repossession and/or retaking of the Vessel by the Claimant or to cause such hindrance or interference;

    e.   Not to take any steps to arrest, seize or otherwise detain the Vessel or otherwise disrupt its lawful operation.

**Interest**

34. The Claimant is entitled to and claims interest under clauses 11(f) and/or 11(g) and/or 35(d) and/or 35(e) of the Charter in the sum of \$348,330.09 to date as set out in Appendix F and continuing or in such other sum as the court may determine or at such other daily rate as the court may determine until actual payment or for such period as the court thinks fit and/or interest pursuant to Section 35A of the Senior Courts Act 1981 on damages and/or indemnity at such rate and for such period as the court thinks fit.

**Guarantee**

35. By a letter dated 5 August 2025, the Claimant demanded payment under the Guarantee of:

    a.  US\$1,161,142.39 being an amount payable under the Charter and unpaid in respect of Charter Hire and other sums as particularised in the Hire Invoices; and

b.   US$94,398.63, being the amount of interest owing and unpaid by the 1st Defendant as at 5 August 2025 on the sum of US$1,161,142.39 aforesaid under clause 35(d) of the Charter; and

c.   US$5,788,479, being a liability of the Charterers and/or the amount of an obligation incurred by the Charterers in respect of damages for the breaches of the Charter particularised above (representing loss of earnings and/or loss of use of the Vessel from 17 January 2025 (the day after the expiry of the Charter Period) to 5 August at US$28,779 per day, which was the daily time charter equivalent rate which the Vessel could have achieved in the market in that period); and

d.   The following amounts, being Losses suffered or incurred by the Claimant arising directly or indirectly out of the chartering of the Vessel or otherwise in connection with the Vessel within the meaning of clause 38(a)(ii) of the Charter and in respect of which the Claimant is entitled to an indemnity under the Charter and which are amounts payable by the 1st Defendant under or in connection with the Charter:

   i.   GBP59,025.55 and EUR23,317.52 in respect of legal fees invoiced or notified to Owners at that date;

   ii.   US$400,000 in respect the fees of Burlington Management Limited for advice and support in relation to termination of the Charter and repossession of the Vessel evidenced by an invoice dated 18 September 2025.

36. In the premises the Claimant is entitled to and claims under clauses 2.1 and/or 2.3 and/or 3.1 and/or 4.1 and/or 7 of the Guarantee the sums of US$13,167,617.76, £59,025.55 and €23,317.52, alternatively damages in that amount.

37. Further or alternatively, the Claimant is entitled to and claims a declaration that:

a.   It is entitled under clause 2.1 to be paid by the 2nd Defendant under the Guarantee, on demand, in addition to the amounts particularised above, any other amounts

19

which are not paid by the Charterers when due and payable (whether they have
already become due and payable or become due and payable in the future); and

b.  It is entitled under clause 2.2 to make further demands under the Guarantee; and

c.  The 2nd Defendant is unconditionally and irrevocably obliged under clause 2.3 of
the Guarantee to discharge all such obligations and liabilities of the 1st Defendant
whatsoever, whensoever and howsoever arising as were at the date of the Guarantee
or may thereafter have been or may in the future become incurred by the 1st
Defendant under or in connection with the Charter and every other Relevant
Document, in addition to the obligations and liabilities referred to above; and

d.  It is entitled under clause 4.1 to be paid by the 2nd Defendant on demand the amount
of all documented expenses which have been or may in the future be incurred by
the Claimant in connection with any matter arising out of the Guarantee including
the Claimant's costs of the present proceedings against the 1st and/or 2nd Defendants;
and

38. The Claimant is entitled to and claims interest under the clause 7 of the Guarantee in
the amount claimed and/or awarded herein against the Charterers and/or interest
pursuant to Section 35A of the Senior Courts Act 1981 at such rate and for such period
as the court thinks fit.

AND the Claimant claims:

A.  Against the 1st Defendant;

(1)  The sums of US$13,167,617.76, £59,025.55 and €23,317.52; and/or

(2)  Damages; and/or

(3)  An indemnity in the sum of  US$13,167,617.76, £59,025.55 and €23,317.52; and/or

(4)  A declaration in the term set out at paragraph 32 above; and/or

(5)    An injunction in the terms set out at paragraph 33; and/or

(6)    Interest pursuant to the Charter in the sum of $348,330.09 and continuing or in such other amounts and/or at such other rate as the Court determines and/or under s. 35A of the Senior Courts Act 1981; and/or

(7)    Costs.

B.    Against the 2nd Defendant:

(1)    The sums of  US$13,167,617.76, £59,025.55 and €23,317.52;

(2)    A declaration in the terms set out at paragraph 32 above;

(3)    Interest in the amount thereof awarded against the 1st Defendant under the Charter and/or in sum of US$13,167,617.76, £59,025.55 and €23,317.52 and continuing or in such other amounts and/or at such other rate as the Court determines and/or under s. 35A of the Senior Courts Act 1981;

(4)    Costs (including an indemnity against the costs of these proceedings).

**Statement of Truth**

The Claimant believes that the facts stated in these Particulars of Claim are true. The Claimant understands that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised by the Claimant to sign this Statement.

*Vanessa Tattersall*

Vanessa Claire Tattersall

Holman Fenwick Willan LLP

19th September 2025

# EXHIBIT C

## ESCROW AGREEMENT

**THIS AGREEMENT** is made this ___19___ day of August 2025

**BETWEEN**

(1)  OCM Maritime Yangtze LLC of Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96690

(2)  EMC Gas Corporation of Ajeltake Road, Ajeltake Island, 96960 Majuro, Marshall Islands

(3)  Vassilis E. Kertsikoff of 118 Kolokotroni Street, Piraeus, Greece

(4)  Laskarina Karastamati of 118 Kolokotroni Street, Piraeus, Greece

(hereinafter the **"Parties"**)

- and -

(5)  Reed Smith LLP of 1 Blossom Yard, London, E1 6RS, UK (hereafter referred to as the **"Escrow Holder"**).

**WHEREAS:**

A.  EMC Gas Corporation (**"Manager"**) entered into a Financial Management Agreement dated 16 January 2020 (**"FMA"**) with Symi II Special Maritime Enterprise (**"Symi II"**) in respect of the provision of various management services to the LPG/C "SYMI" (**"Vessel"**). The FMA was entered into pursuant to Symi II's rights in respect of the Vessel under a bareboat charterparty dated 13 January 2020 (the **"BBC"**).

B.  On 16 January 2020, the Manager provided OCM Maritime Yangtze LLC (**"Owners"**) with a Manager's Undertaking pursuant to which they (amongst other things) agreed

not to, without the prior written consent of Owners, take any action or institute any proceedings or make or assert any claim on or in respect of the Vessel.

C. The Charter Period under the BBC expired on or around 16 January 2025. The Vessel was not, however, and has not been redelivered to Owners on or after that date in breach of the terms of the BBC. The Manager continued to provide certain management services to the Vessel after 16 January 2025. Owners cannot comment on the scope of or basis for those services. Owners did and do not agree that the Manager could have or should have continued to provide management services after 16 January 2025.

D. The Manager's position is that it was established practice between the Manager and Symi II prior to expiry of the BBC Charter Period for the Manager to submit monthly detailed reports to Symi II, outlining anticipated revenue from the Vessel's employment and previous month's expenses incurred. The Manager would reimburse itself for these expenses from a designated bank account where revenue from the Vessel's employment was collected. Owners cannot comment on that purported practice.

E. In the week commencing 22 April 2024 interests purporting to act on behalf of Symi II (and/or its purported 100% shareholder company, Levona Holdings Ltd.), restricted and/or blocked the Manager's access to an account into which the hire in respect of the Vessel was remitted, thereby (it is claimed) preventing the Manager from reimbursing itself for expenses incurred on behalf of the Vessel.

F. In circumstances where the Manager states that it had not been reimbursed in respect of a significant amount of expenses which the Manager incurred and/or paid, which continued to accrue, the Manager brought an admiralty suit in rem against the Vessel in the High Court of Gujarat at Ahmbedabad (Admiralty Suit No. 46 of 2024) on 21 November 2024, seeking the arrest of the Vessel, until the satisfaction of the Manager's

unpaid claim of US$ 1,256,569.27 in respect of unpaid Vessel expenses incurred between 30 May 2024 and 4 October 2024 (the "**Admiralty Suit**"). Owners did not give consent to the Manager to bring such suit and in Owners' view the arrest was and is in breach of the undertaking(s) provided to Owners in the Manager's Undertaking. The Manager's claim in respect of unpaid Vessel expenses is also the subject of a counterclaim in an arbitration under the London Maritime Arbitrators Association (LMAA) Rules in London against Symi II (the "**London Arbitration**"). Owners do not have knowledge of and are not involved in the London Arbitration.

G. Following the issuance of the Admiralty Suit, the Honourable Court of Gujarat passed the order for the arrest of the Vessel on the same day, and directed the port and customs authorities at Deendayal port, Kandla, to take the Vessel under arrest until further orders (the "**Arrest Order**").

H. Since the filing of the Admiralty Suit and the passing of the Arrest Order, the Vessel has incurred further expenses. The Manager has represented to Owners that the total outstanding amount in respect of Vessel expenses and unpaid management fees is therefore US$3,887,129.98 (the "**Outstanding Amount**"). The Manager acknowledges that Owners have relied on that representation in entering into the agreement on 10 August 2025 referred to at Recital I below and this Escrow Agreement.

I. The Owners' position is that they are not liable to pay the Manager any sums whatsoever in respect of the Vessel. Notwithstanding and strictly without prejudice to that, the parties agreed on 10 August 2025 to secure the release of the Vessel from arrest and change its management in accordance with the escrow terms set out below which involve payment by Owners of sums to the Manager to reflect the Outstanding Amount as represented by the Manager. Owners' agreement to pay and payment of those sums

3

is not intended to alter the substantive rights of the Parties, or any of them, as they existed immediately prior to entering into this Escrow Agreement and is strictly without prejudice to their rights to claim those sums as a debt and/or as damages from the Manager, Symi II, Eletson Gas LLC and/or Eletson Corporation and/or any other entity under the Manager's Undertaking, the BBC, the Corporate Guarantee (as defined in the BBC) dated 16 January 2020 and/or the manager's undertaking provided by Eletson Corporation as technical manager of the Vessel and/or any other contract. Owners fully reserve those rights.

J. Pursuant to the agreement reached by the Parties on 10 August 2025 and in anticipation of the Parties' execution of this Escrow Agreement, the Manager has taken all necessary steps to release the Vessel from arrest (including the filing of an admiralty suit in the High Court of Gujarat at Ahmbedabad seeking an order for the release of the Vessel). The Manager further provided instructions to the Vessel's master to sail to OPL Kandla, India (which the Vessel has now passed).

K. The Escrow Holder shall be providing legal services to the Manager, Laskarina Karastamati and Vassilis Kertsikoff and the Escrow Holder is willing to enter into this Escrow Agreement.

L. It has been agreed that the Escrow Holder shall hold money to be paid by or on behalf of Owners in accordance with the terms of this Escrow Agreement (being the sum described in Clause 4), less any deductions which may be made from time to time in accordance with the terms of this Escrow Agreement (the "**Escrow Funds**") into the Escrow Holder's client account (as more particularly described in Clause 3 below) (the "**Escrow Account**") pursuant to the terms of this Escrow Agreement and shall be a party to this Escrow Agreement for the purposes of so doing only.

4

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

*Appointment of Reed Smith as Escrow Holder*

1.    The Parties jointly and severally hereby appoint Reed Smith to hold the Escrow Funds under the terms of this Escrow Agreement.

2.    The Escrow Holder hereby accepts such appointment and agrees to perform only such acts and to undertake only such obligations as are ascribed to the Escrow Holder in accordance with the terms of this Escrow Agreement.  The Parties acknowledge and agree that the duties, responsibilities and obligations of the Escrow Holder shall be limited to those expressly set out in this Escrow Agreement, each of which is administrative in nature, and no duties, responsibilities or obligations shall be inferred or implied.

*Payment into Escrow*

3.    Owners shall within three business days of the date of this Escrow Agreement pay the Outstanding Amount, free of bank charges to the following client account of the Escrow Holder:

| | |
|---|---|
| Account Name: | Reed Smith LLP Client USD Account |
| Currency: | $US |
| Bank: | Barclays Bank Plc |
| Address: | 1 Churchill Place, London, E14 5HP |
| Account No: | 83207500 |
| Sort Code: | 20-00-00 |

5

IBAN:            GB08 BARC 2000 0083 2075 00

SWIFT:           BARCGB22

The Escrow Funds shall be held by the Escrow Holder for the benefit of the Parties and subject to the terms set out herein subject always to Recital I above which is legally binding on the Parties. The Parties shall promptly provide the Escrow Holder with such documentation and assistance reasonably required to hold the Escrow Funds.

4.     Following receipt of the Escrow Funds in full in accordance with the terms of this Escrow Agreement, the Escrow Holder shall release the sum of US$2,600,000 from the Escrow Account to the Manager, or such company or bank account as the Manager may nominate in writing, as per Clause 6(a) below. Following release of that sum to the Manager, the Vessel will sail OPL Fujairah under the Manager's crew, control and orders, with Owners being responsible for all the costs and expenses incurred in the performance of the subject voyage. Upon arrival at OPL Fujairah, the Manager shall immediately and unconditionally (save for the terms of this Escrow Agreement) relinquish control of the Vessel to Owners and their chosen technical manager, IMC Ship Management ("IMC"), and a crew change will be performed. Owners undertake to facilitate such crew change. Upon performance of the crew change, the Manager shall provide a written declaration to Owners in a form acceptable to Owners that it does not have any interest in, rights in respect of or possession, or control of the Vessel including any rights or interests in connection with the management of the Vessel and that it cannot and does not object at any time to the Owners changing the Vessel's Flag. Following confirmation from Owners of their receipt of such confirmation and otherwise in accordance with Clause 6(b) below the Escrow Holder shall release the sum of US$1,287,129.98 to the Manager, or such company or bank account as the

Manager may nominate in writing. Owners shall pay the costs and expenses directly incurred in (a) the performance of the crew change, including but not limited to the costs of crew repatriation, and (b) IMC's registration as technical managers. Owners shall not be responsible for any other costs or expenses whatsoever.

5.    The Escrow Holder need not invest the Escrow Funds in any particular way or obtain any particular rate of interest on them (save that the Escrow Account must be interest bearing provided such an account is reasonably available). Interest shall be credited or debited from the Escrow Funds in accordance with the bank's usual procedures for crediting or debiting interest. Any interest which accrues on the Escrow Funds whilst held in the Escrow Account will be added to the Escrow Funds and for the purposes of this Escrow Agreement shall be dealt with in the same way as the Escrow Funds. The Escrow Holder shall be entitled to deduct from any interest or other accrued income on the Escrow Funds any withholding, tax or other deduction required by law, and to pay any amount so deducted to the relevant authority. Owners shall not be liable for any such deduction and any such deduction shall not be deemed to reduce the amount paid by Owners into the Escrow Account. Owners shall be deemed to have paid the Escrow Funds upon receipt by the Escrow Holder of those Funds in full into the Escrow Account.

6.    The Escrow Funds shall be held by the Escrow Holder and shall not be distributed other than as follows:

    a.  US$2,600,000 of the Escrow Funds shall be distributed to the Manager, or to a company or account nominated by the Manager in writing, by the Escrow Holder within 2 business days of receipt of written confirmation from:

7

(i)     the Manager providing (i) the undertakings set out at Clause 27 below and (ii) a list of the outstanding payables for the Vessel being provided to Owners; and

(ii)     Owners acknowledging to the Escrow Holder in writing receipt of (i) the undertakings set out at Clause 27 below and (ii) the list of the outstanding payables for the Vessel. Owners undertake to provide such acknowledgement promptly upon receipt of those documents; and

b.  the remainder of the Escrow Funds (US$1,287,129.98, together with any interest accrued thereon), shall be distributed to the Manager by the Escrow Holder upon receipt by the Escrow Holder of both written confirmation from (i) the Greek Registry of the change of the Vessel's technical manager to IMC and (ii) written confirmation from Owners that a crew change has been performed OPL Fujairah, that the Manager's crew have disembarked the Vessel and that they have received the declaration set out in Clause 4 above. Owners undertake to provide such acknowledgment promptly and to co-operate with the Manager and the Greek Registry regarding the change in technical manager; or

c.  any amount or amounts up to the sum of the Escrow Funds pursuant to joint instructions from the Manager, Laskarina Karastamati, Vassilis Kertsikoff and Owners ("Release Notice") and signed by or on behalf of each of the Manager, Vassilis Kertsikoff, Laskarina Karastamati and Owners, whose name and specimen signatures are set out at Schedule 1 below;

d.  as ordered by a court or any legal or regulatory authority of competent jurisdiction or to reimburse the Escrow Holder for money spent by it in accordance with the terms of this Escrow Agreement or owed to it under any

indemnity provided in this Escrow Agreement or on termination of this Agreement; or

e.  on the sixth anniversary of the date of this Escrow Agreement in the event that there are Escrow Funds in the Escrow Account in which case the Escrow Holder shall release any balance remaining to the Owners.

7.  Upon the receipt by the Escrow Holder of a written notification from the parties that the events described at Clause 6 above have occurred, the Escrow Holder will make the payments to the Manager promptly. The Escrow Holder may act in reliance, without any further enquiry, on such written notification on behalf of the Parties, and may assume the validity and accuracy of any statement or assertion contained in any other notice, instrument or instruction received pursuant to this Escrow Agreement and may assume that any person purporting to give any writing, notice, advice or instruction in connection with the provisions of this Escrow Agreement has been duly authorised to do so.

8.  The Escrow Holder shall not be under an obligation to make a payment:

a.  to the extent that such payment exceeds the Escrow Funds held;

b.  pursuant to a notification which, in the Escrow Holder's reasonable opinion is incomplete, unclear, contains a manifest error or is not otherwise in accordance with the provisions of this Escrow Agreement, without prejudice to Clause 6 or 7 above; or

c.  where the Escrow Holder is prevented from doing so by law or by the order of a court or any other legal or regulatory authority of competent jurisdiction or due to the risk that such instruction may cause the Escrow Holder to breach a

9

law, regulation or sanction of any country affecting the Escrow Holder (or any entity related to it) or put it at risk of any breach of its bank's terms and conditions for the holding and operation of accounts (in each case there being a risk in the opinion of the Escrow Holder). The Escrow Holder shall promptly notify the Parties in writing in the event that it declines to instruct the bank holding the Escrow Funds to make a payment in accordance with this paragraph, setting out the reasons for doing so if and to the extent permitted by law or regulation.

9.      The Parties agree that the authorisation and designation of the Escrow Holder under this Escrow Agreement shall be irrevocable by them and shall be binding upon their successors and assigns.

10.     The Escrow Holder shall hold, transfer, disburse and pay the Escrow Funds in accordance with this Escrow Agreement. The Escrow Holder is authorised to take any and all actions indicated in this Escrow Agreement to be taken by the Escrow Holder and all such further actions consistent with the terms of this Escrow Agreement as it shall deem necessary or desirable to implement the provisions of this Escrow Agreement. The Escrow Holder shall not be required to use its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Escrow Holder's sole and absolute judgement, could involve it in expense or liability. If any action taken by the Escrow Holder requires by law payment to any third party, the Escrow Holder is entitled to deduct such sum from the Escrow Funds. If any action to be taken by the Escrow Holder requires it to obtain legal advice, the Escrow Holder is entitled to retain outside counsel, or utilise its own lawyers and charge the Parties at its standard hourly

rates, and to deduct from the Escrow Funds the sum due for such legal services, and in the event there are insufficient funds to pay for the legal services the Parties shall be jointly and severally liable for such amount. The responsibilities of the Escrow Holder for any such legal advice shall be as set out in an engagement letter between the Escrow Holder and the Parties and are outside the scope of the appointment set out in this Escrow Agreement.

11.    In the event the Escrow Holder receives conflicting instructions from the Parties under the terms of this Escrow Agreement, the Escrow Holder shall be fully protected in refraining from acting until such conflict is resolved to the satisfaction of the Escrow Holder. In the event of any conflicting instructions or any other dispute concerning the terms of this Escrow Agreement or effectiveness of any Release Notice, the Escrow Holder is entitled (but not obliged) to apply to the High Court of England for directions as to the operation of this Escrow Agreement, use of the Escrow Funds and its obligations, at the cost of the Parties (including for the time spent by the Escrow Holder on its own legal representation) which may be deducted from the Escrow Funds, and in the event there are insufficient funds to meet the costs the Parties shall be jointly and severally liable.

12.    The Escrow Holder shall not be liable to the Parties for any mistake of fact, error of judgement, delay or act or omission of any kind unless caused by its fraud or reckless disregard of its obligations under the terms of this Escrow Agreement. The Escrow Holder shall not be liable for any indirect, incidental, consequential, punitive or special losses or damages, regardless of the form of action and whether or not any such losses or damages were foreseeable or contemplated. Any liability of the Escrow Holder to the Parties under or related to this Escrow Agreement shall not exceed in the aggregate

11

the sum of £3 million or the minimum sum to which the Escrow Holder is permitted by law or professional regulation to limit its liability to each of the Parties, if higher than £3 million in the aggregate. This provision and any other exclusions or limitations in this Escrow Agreement are not intended to exclude any liability of the Escrow Holder which it is not permitted by law to exclude.

13.    Any fees, costs or charges levied by a bank arising out of or in connection with holding the Escrow Funds (including any charges of a bank to recover a negative rate of interest) may when due be deducted and paid from the Escrow Funds by either the Escrow Holder or the bank. The Escrow Holder shall be under no obligation to make up any shortfall in the Escrow Funds due to such deductions.

14.    The Parties jointly and severally agree to indemnify the Escrow Holder (and any partners, members, employees, representatives, or agents of the Escrow Holder or any entity associated with the Escrow Holder and its shareholders, directors, partners, members, employees or agents (together the "**Indemnified Parties**") against any and all losses, liabilities, claims, demands, deductions,  fees or expenses whatsoever (including, without limitation, charges incurred in holding the Escrow Funds or otherwise operating the Escrow Account) incurred as a result of actions taken or omitted pursuant to this Escrow Agreement or otherwise arising out of or in relation to this Escrow Agreement, except for liabilities incurred by the Escrow Holder resulting from its, fraud or reckless disregard of its obligations under the terms of this Escrow Agreement. The Escrow Holder shall have a first lien over the Escrow Account to secure the obligations of the Parties under this clause or otherwise to the Escrow Holder under this Escrow Agreement. The Indemnified Parties shall be entitled to enforce the

terms of this clause. The terms of this clause shall survive termination of this Escrow Agreement.

15. It is acknowledged by the Parties that the Escrow Holder acts for each of the Manager, Laskarina Karastamati and Vassilis Kertsikoff. In relation to this Escrow Agreement, each of the Manager, Laskarina Karastamati and Vassilis Kertsikoff acknowledge that the Escrow Holder's duties to the Parties are as set out in this Escrow Agreement and that the Escrow Holder shall not be under any duty to advise or act in the interests of the Manager, Laskarina Karastamati and Vassilis Kertsikoff in any way which shall or may conflict with its duties under this Escrow Agreement and that in so performing such duties the Escrow Holder may act in a way which is not in the best interests of the Manager, Laskarina Karastamati and/or Vassilis Kertsikoff. Owners agree that the Escrow Holder providing the services as set out in this Escrow Agreement shall not limit or prevent the Escrow Holder from advising the Manager, Laskarina Karastamati and/or Vassilis Kertsikoff on matters related to the lifting of the arrest of the Vessel, the Admiralty Suit, the London Arbitration, the Outstanding Amount or otherwise related to or connected to this Escrow Agreement or the Vessel.

16. The Escrow Holder shall not be in breach of its obligations or otherwise be liable to the Parties, or any other party, as a result of any act, omission, failure, fraud, delay, negligence, insolvency or default of any bank, financial institution, clearing or payments system, or regulatory, governmental or supra-national body or authority or any of their directors, officers, partners, employees, agents or representatives. In the event that Clause 8 (c) applies then the Escrow Holder shall not be liable for refusing to give any such instruction.

13

17.    This Escrow Agreement does not take effect until the Escrow Holder receives the Escrow Funds.

18.    This Escrow Agreement shall terminate (1) by the Escrow Holder terminating the account in accordance with clause 19 below, or (2) upon release of the Escrow Funds together with interest (if any) accrued thereon in accordance with the provisions of clause 6 above or (3) if the Escrow Funds held in the Escrow Account, have a zero balance: Subject in all cases to the survival of obligations specifically contemplated in this Escrow Agreement to so survive. On termination, the Escrow Holder may close any separate designated Escrow Account.

19.    The Escrow Holder may resign as the escrow agent at its discretion by giving notice in writing of such resignation to the Parties, which notice shall specify a date upon which such resignation shall take effect (such date being no less than thirty (30) days from the date of the notice of resignation). The Parties shall, within thirty (30) days of the date of the foregoing notice from the Escrow Holder, designate a substitute escrow agent (the "**Substitute Escrow Holder**"), which the Substitute Escrow Holder shall, upon its designation and undertaking in full the obligations of the Escrow Holder under this Escrow Agreement, succeed to all of the rights, duties and obligations of the Escrow Holder under this Escrow Agreement. In the event the Parties shall not have delivered to the Escrow Holder a written designation of Substitute Escrow Holder within the thirty (30) day period, together with the consent to such designation by the Substitute Escrow Holder, the Escrow Holder may appoint a Substitute Escrow Holder or apply to a court of competent jurisdiction for directions which may include an application for the appointment of a Substitute Escrow Holder, and the Parties shall be jointly and severally liable for the costs of such appointment by the Escrow Holder or court

14

proceedings and the obtaining of such appointment which shall be payable from the Escrow Funds, and in the event that there are insufficient funds in the Escrow Account, payable by the Parties (jointly and severally) to the Escrow Holder. Where resignation has occurred as above the terms of this Escrow Agreement shall continue to apply until the acceptance of the Substitute Escrow Holder of the terms of this Escrow Agreement or as otherwise accepted and agreed or as ordered by a court of competent jurisdiction.

20.    No amendment to this Escrow Agreement shall be effective unless in writing and agreed by each of the Parties and the Escrow Holder.

21.    If any provision of this Escrow Agreement shall be held to be illegal, void, invalid or unenforceable under the laws of any jurisdiction, the legality, validity and enforceability of the remainder of this Escrow Agreement in that jurisdiction shall not be affected, and the legality, validity and enforceability of the whole of this Escrow Agreement in any other jurisdiction shall not be affected.

22.    Other than the Indemnified Parties, a person who is not a party to this Escrow Agreement shall have no right to enforce any term of this Escrow Agreement under the Contracts (Rights of Third Parties) Act 1999.

23.    This Escrow Agreement may be executed in any number of counterparts, and by each party to it on separate counterparts. Each counterpart is an original, but all counterparts shall together constitute one and the same instrument.

24.    Delivery of an executed counterpart signature page of this Escrow Agreement by e-mail (PDF) shall be as effective as delivery of a manually executed counterpart of this Escrow Agreement. In relation to each counterpart, upon confirmation by or on behalf

15

of the signatory that the signatory authorises the attachment of such counterpart signature page to the final text of this Escrow Agreement, such counterpart signature page shall take effect together with such final text as a complete authoritative counterpart.

25.    This Escrow Agreement is governed by and shall be construed in accordance with English law and any disputes (whether contractual or otherwise) arising hereunder or arising in connection herewith shall be referred to exclusive jurisdiction of the courts of England and Wales.

(a)    The Escrow Holder, the Manager, Mr. Vassilis Kertsikoff and Ms. Laskarina Karastamati hereby irrevocably and unconditionally appoint Reed Smith LLP as their agent for service of process in relation to any proceedings before the English courts in connection with this Escrow Agreement at the address of its London office wherever located at the time of service (currently 1 Blossom Yard, London E1 6RS).

(b)    Owners hereby unconditionally and irrevocably appoint Holman Fenwick Willan LLP to accept service of any claim or proceedings under or in connection with this Escrow Agreement at the address of its London office wherever located at the time of service (currently 8 Bishopsgate, London EC2N 4BQ).

26.    Without prejudice to the provisions of clause 6, any written notification to be given in connection with this Escrow Agreement shall be sent for the attention of the contact, to the address and include the reference specified below or to such other address, or person as the party concerned may notify to others in accordance with the provisions of this clause and shall be delivered by hand, by fax, by email, or sent by pre-paid first

class post, recorded delivery or special delivery. The contacts, addresses, and references for service of notices or instructions are:

| | |
|---|---|
| Manager: | Address- 118 Kolokotroni Street, Piraeus, Greece |
| | Email address – cweller@reedsmith.com; gtang@reedsmith.com; epilaviou@reedsmith.com |
| Vassilis Kertsikoff: | Address -118 Kolokotroni Street, Piraeus, Greece |
| | Email address – cweller@reedsmith.com; gtang@reedsmith.com; epilaviou@reedsmith.com |
| Laskarina Karastamati: | Address - 118 Kolokotroni Street, Piraeus, Greece |
| | Email address – cweller@reedsmith.com; gtang@reedsmith.com; epilaviou@reedsmith.com |
| Owners: | Address – Holman Fenwick Willan LLP, 8 Bishopsgate, London EC2N 4BQ |
| | Email address – vanessa.tattersall@hfw.com / camilla.hobart-smith@hfw.com |

27.  Prior to the Escrow Holder releasing funds to the Manager pursuant to Clause 6(a) above, the Manager shall warrant, undertake and represent the following to Owners in a document signed by the Manager:

a.  That it remains unreimbursed in respect of the full Outstanding Amount by Symi II or any other entity, that it has invoices for the full Outstanding Amount and that it shall provide a breakdown of the invoices of the total Outstanding Amount, including any invoices and amounts not yet paid, within two business days of this undertaking.

b.  That it shall pay, in full:

i)  the Outstanding Amount; and

ii) any and all other invoices, costs and expenses in respect of the Vessel and services provided to or in connection with it whilst under the Manager's management and incurred prior to change of the technical management as set out in this Escrow Agreement, invoiced or incurred prior to or after the Vessel's departure from Kandla save for expenses and costs that Owners have agreed to pay under Clause 4 of this Escrow Agreement.

If such invoices, costs and expenses are paid after the Vessel's departure from Kandla, the Manager shall pay them promptly from funds received from the Escrow Account established under this Agreement. Owners shall not be required to pay additional sums whatsoever over and above the Escrow Fund / the Outstanding Amount other than those that they have expressly agreed to pay under Clause 4 of this Escrow Agreement.

c. That no sums are due or owing by Owners to the Manager in respect of the Vessel and that the Manager will not bring or assert any claim against Owners or the Vessel for any such sums.

d. That it shall not, at any time after the date of this Agreement, arrest or cause the arrest of the Vessel in any jurisdiction going forwards and warrants that it has not prior to the date of this Escrow Agreement taken any steps to obtain the arrest of or to arrest the Vessel other than the current arrest in India.

e. That it shall not, at any time after the date of this Agreement, arrest or cause the arrest of any vessel in the same or associated ownership, management or control as the Vessel in connection with any unpaid invoices, costs or expenses relating to the Vessel and services provided to it whilst under the Manager's management and prior to change of the management as envisaged in this Escrow Agreement.

f.  That, if the Vessel or any vessel in the same or associated ownership, management or control as the Vessel is arrested in any jurisdiction as a result of unpaid invoices, costs and expenses relating to or connected with the Vessel and services provided to it whilst under the Manager's management and prior to change of the technical management as envisaged in this Escrow Agreement addressed to the Manager and/or relating to the period prior to the change of the Vessel's technical manager, the Manager shall immediately pay such invoices so as to lift the arrest and shall pay any costs and losses incurred by Owners as a result of the arrest, provided always that:

i.  Owners shall notify the Manager promptly upon becoming aware of such arrest and provide copies of any related invoices within Owners' possession;

ii.  Owners shall co-operate fully with the Manager to minimise costs provided that Owners will not incur additional cost and expense in doing so.

**Schedule 1: Signatories and Release Notice**

Escrow Holder – Address: Reed Smith LLP, 1 Blossom Yard, E1 6RS, FAO: Charles Weller, Giyan Tang, Eleni Pilaviou; Ref No: 738583.00041

Owners - Address: Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96690 C/O  Holman Fenwick Willan LLP, Piraeus Tower, 4 Akti Posidonos Street 185 31 Piraeus, Greece; FAO: Robin Parry, Stavroula Mylona; Reference: VCT/CHS/24008-29

The Manager – Address: Ajeltake Road, Ajeltake Island, 96960 Majuro, Marshall Islands FAO: Vassilis Kertsikoff;  Reference: Symi/738583.00041

Laskarina Karastamati – Address: 118 Kolokotroni Street, Piraeus, Greece FAO: Laskarina Karastamati; Reference: Symi/738583.00041

Vassilis Kertsikoff - Address: 118 Kolokotroni Street, Piraeus, Greece FAO: Vassilis Kertsikoff; Reference: Symi/738583.00041

Any notice or instruction given in connection with this Escrow Agreement shall be deemed to have been given only on actual receipt.

20

SIGNED:                                              DATE: 19-08-2025

ROBIN PARRY

**For and on behalf of Owners**

SIGNED:                                              DATE: 19 | 8 | 2025.

**For and on behalf of the Manager**

SIGNED:                                              DATE: 19 | 8 | 25

**For and on behalf of Vassilis E. Kertsikoff**

SIGNED:                                              DATE: 19 | 8 | 2025.

**For and on behalf of Laskarina Karastamati**

SIGNED:                                              DATE: 19.08.2025

**For and on behalf of Reed Smith LLP**

21

**Draft Release Notice**

Dear Sirs,

We refer to:

1.1.    The agreement (    **Agreement**) for [        ]  made between the Manager, Laskarina Karastamati, Vassilis Kertsikoff and Owners dated [    ] August 2025;

1.2.    The Escrow Funds held in the Escrow Account  in accordance with  the Escrow Agreement dated [    ] August 2025 (**Escrow Agreement**).

This is a Release Notice as referred to in the Escrow Agreement.

Unless the context otherwise requires, words and expressions defined in the Escrow Agreement have the same meaning in this notice.

We hereby irrevocably instruct to make the following payments from the Escrow Funds :

(a)    to [    ] the sum of £[        ] [(together with any  accrued interest on such sum)] by electronic transfer to the following account:

| Bank name: | |
|---|---|
| Bank address: | |
| Account No.: | |
| Sort Code: | |
| Name on account: | |

(b)    This Release Notice may be executed in any number of counterparts, each of which when executed shall constitute a duplicate original, but all the counterparts shall together constitute one instrument.

This Release Notice and any dispute or claim arising out of or in connection with it or its subject matter (including non-contractual disputes and claims) shall be governed by and construed in accordance with the law of England and Wales.  The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim arising out of or in connection with this Release Notice or its subject matter (including non-contractual disputes and claims).

Yours faithfully

| Signed on behalf of the Manager | |
|---|---|
| | ................................................. |

22

| By    [*NAME    OF    AUTHORISED SIGNATORY*] | |
|---|---|
| | Authorised Signatory |

| Signed on behalf of Laskarina Karastamati<br><br>By    [*NAME    OF    AUTHORISED SIGNATORY*] | ................................................. |
|---|---|
| | Authorised Signatory |

| Signed on behalf of Vassilis Kertsikoff<br><br>By    [*NAME    OF    AUTHORISED SIGNATORY*] | ................................................. |
|---|---|
| | Authorised Signatory |

| Signed on behalf of Owners<br><br>By    [*NAME    OF    AUTHORISED SIGNATORY*] | ................................................. |
|---|---|
| | Authorised Signatory |

23