UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- x

In re:               :        Chapter 11

ELETSON HOLDINGS INC., et al.,   :        Case No. 23-10322 (JPM)

             Debtor.[1]    :

--------------------------------------------------------------- x

### DECLARATION OF JENNIFER SHARRET IN SUPPORT OF ELETSON HOLDINGS INC.'S MOTION FOR AN ORDER IMPOSING AND INCREASING SANCTIONS AGAINST THE VIOLATING PARTIES

I, Jennifer Sharret, under penalty of perjury hereby declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.     I am a counsel at the law firm of Herbert Smith Freehills Kramer (US) LLP ("HSF Kramer"), counsel to Eletson Holdings Inc. ("Holdings") in the above captioned chapter 11 cases.

2.     I respectfully submit this declaration (this "Declaration") in support of *Eletson Holdings Inc.'s Motion for an Order Imposing and Increasing Sanctions Against the Violating Parties* (the "Motion"),[2] filed contemporaneously herewith.

3.     Attached are true and correct copies of the following documents, each translated by the Greek law firm of D.K. Avgitidis & Associates (the "Avgitidis Firm"):

| Exhibit | Description |
|---------|-------------|
| A. | A motion filed by the Avgitidis Firm before the Piraeus Greek Court on August 6, 2025 seeking information from the former board members of Eletson Corp. (the Initial Avgitidis Motion) |

---

[1]   Prior to November 19, 2024, the Debtors in these cases were: Eletson Holdings Inc., Eletson Finance (US) LLC, and Agathonissos Finance LLC.  On March 5, 2025, the Court entered a final decree and order closing the chapter 11 cases of Eletson Finance (US) LLC and Agathonissos Finance LLC.  Commencing on March 5, 2025, all motions, notices, and other pleadings relating to any of the Debtors shall be filed in the chapter 11 case of Eletson Holdings Inc.  The Debtor's mailing address is c/o Herbert Smith Freehills Kramer (US) LLP, 1177 Avenue of the Americas, New York, New York 10036.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Motion.

| B. | A memorandum filed by the Avgitidis Firm on September 22, 2025 that summarizes what occurred at a hearing held before the Piraeus Greek Court on September 19, 2025 (the Subsequent Avgitidis Memorandum) |
| C. | A memorandum filed on September 19, 2025 by Emmanuel Andreoulakis, as counsel to Vassilis Kertsikoff, Laskarina Karastamati, and Vassilis Chatzieleftheriadis before the Piraeus Greek Court (the Andreoulakis Memorandum) |

Dated:   October 1, 2025
     New York, New York

*/s/ Jennifer Sharret*
Jennifer Sharret

# EXHIBIT A

**Before the Single-Member Court of First Instance of Piraeus**

**PETITION**

[*proceedings for interim measures*]

The foreign shipping company, under the name: "**ELETSON CORPORATION**", based in the USA, in the state of Delaware (Cogency Global Inc. 850, New Burton Road, Suite 201, Dover, Delaware USA 19904), and legally represented by Mr. Leonard Hoskinson, with registered office in Piraeus, at 118 Kolokotroni Street, in accordance with Article 25 of Law 27/1975 and Law 89/67, with Tax Identification Number 098035979/Piraeus Ship Tax Office.

**AGAINST**

1. **Λασκαρίνα Καρασταμάτη (Laskarina Karastamati)**, resident of Piraeus, 118 Kolokotroni Street.

2. **Βασίλειος Χατζηελευθεριάδης (Vasileios Hatzieleftheriadis)**, resident **of** Piraeus, 118 Kolokotroni Street.

3. **Βασίλειος Κέρτσικωφ (Vasileios Kertzikov)**, resident of Piraeus, Kolokotroni Street, no. 118, all in their capacity as former members of our Board of Directors.

—————————————————

## A. Introduction

1. The petition under consideration is being brought ***in the context of our bankruptcy petition pending before the Piraeus Multi-Member Court of First Instance***. Specifically, the anonymous banking company under the name: "**AEGEAN BALTIC BANK ANONYMOUS BANKING** COMPANY" filed an application before the above Court on April 1, 2025, with filing number 7937/2025 and specific number 2174/2025, requesting that I be declared bankrupt on the grounds that I have allegedly fallen into a state of cease of payment. The hearing for the discussion of this application was set for May13, 2025.

2. During this hearing, the following events took place, which demonstrate, both individually and in combination with other facts set out below, the immediate and imminent danger. My legal entity appeared before the Piraeus Multi-Member Court of First Instance, but with different legal representatives. My former board of directors, the respondents, as of

March 19, 2025, appointed a lawyer to represent me, who appeared in court. My current management also appointed a lawyer, the undersigned, Μαρία Ορφανίδου (Maria Orfanidou), who also appeared.

3. It is worth noting that the attorney-at-law, appointed by the former administration at a time when he had already lost that status, and therefore invalidly appointed, had no objection to the discussion of my bankruptcy petition, which is, to say the least, paradox. This is because no company, when the conditions for declaring bankruptcy are not met, wishes to expedite the discussion of the application. This is all the more so when, at the time of filing the bankruptcy petition and its discussion, we do not have our center of main interests in Greece, with the result that the Greek courts lack jurisdiction.

4. Finally, following legal proceedings by my attorney-in-fact and the attorneys-in-fact of my parent company, under the name "Eletson Holdings Inc.," which owns all (100%) of my shares and joined the proceedings in order to intervene on behalf of the company, the above bankruptcy petition was postponed until September[23,] 2025.

5. The facts of the case are set out in detail below, with particular emphasis on the unlawful and culpable refusal of the defendants, former members of our management, to hand over critical documents that are necessary for our defense against the bankruptcy petition.

## B. **Identity of the parties**

### *I. Eletson Corporation*

6. Our company, ELETSON CORPORATION (hereinafter referred to as the "Company"), is a foreign shipping company, mainly engaged in the management of chartered ships. It was established on October 2, 1979, under the laws of Liberia, and on March 20, 2025, it relocated to the Marshall Islands, with registration number 130810, with Mr. Leonard Hoskinson as its sole legal representative, who was registered as President, Treasurer, and Secretary of the Company in the Liberian Companies Registry (LISCR) on 19.3.2025. According to the Certificate of Incumbency dated 24 March 2025 from the Marshall Islands registry, Leonard J. Hoskinson remained President, Treasurer, and Secretary of the Company. Subsequently, as of May 2, 2025, the Company has relocated again to the United States, to the state of Delaware (Cogency Global Inc. 850, New

Burton Road, Suite 201, Dover, Delaware USA 19904), with Mr. Leonard Hoskinson remaining as President, Treasurer, and Secretary.

7. Our company had a secondary, non-primary, facility, in accordance with the provisions of Article 25 of Law 27/1975 and Law 89/67, in Piraeus, at 118 Kolokotroni Street.

8. The sole shareholder of the Company, with a 100% stake, is the holding company "ELETSON HOLDINGS INC." (hereinafter referred to as "the parent company"), for which the following is noted to your honorable Court, which sheds light on the background of the dispute.

9. ELETSON HOLDINGS INC. was established in Liberia on December 4, 1985, as a non-resident domestic corporation governed by the provisions of the Liberian Associations Law. According to its articles of incorporation as a domestic non-resident corporation, its purpose was to engage in any lawful activity permitted for companies operating under the Liberian Business Corporation Act.

10. As a holding company, ELETSON HOLDINGS INC. owns 100% of the Company and 100% of the shares of Special Maritime Enterprises (ENE), under the names "KASTOS SPECIAL MARITIME ENTERPRISE", "KINAROS SPECIAL MARITIME ENTERPRISE," "KIMOLOS II SPECIAL MARITIME ENTERPRISE," and "FOURNI SPECIAL MARITIME ENTERPRISE," which lease the ships MT Kastos, MT Kinaros, MT Kimolos, and MT Fourni, respectively, which fly the Greek flag and are tankers. The above ships are owned by Oaktree Capital Management under sale and lease back agreements.

11. However, the exact activity of "ELETSON HOLDINGS INC." was to seek financing, which it channeled to the companies in which it participated. This financing was organised exclusively in the USA, where, since 1993, it had been issuing bonds to raise capital. Thus, in 1993, it had received financing of US$103 million in the United States, with the issuance in New York of bonds maturing in 2003, governed by US law. Subsequently, in December 2013, it issued, also in New York, a new bond loan, , with a principal amount of US$300 million, also governed by US law.

12. As a result of its inability to meet its obligations to its creditors under the above bond loan, which it attempted to restructure out of court twice in 2019 but failed,  Pach Shemen LLC, VR Global Partners and Alpine Partners filed a petition for its involuntary bankruptcy in 2023 before the

Bankruptcy Court for the Southern District of New York, pursuant to Chapter 7 of the US Bankruptcy Code. On 6 September 2023, following a motion by ELETSON HOLDINGS INC. itself, represented, among others, by the defendants, the involuntary Chapter 7 insolvency proceedings were converted into voluntary Chapter 11 insolvency proceedings. This is an in-bankruptcy reorganization procedure, which aims to rescue the debtor's business in order to avoid liquidation, which would result in involuntary bankruptcy.

13. On November 4, 2024, the U.S. Bankruptcy Court for the Southern District of New York issued its Findings of Facts, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS]. This confirmed the decision of 25 October 2024 to place "ELETSON HOLDINGS INC." under Chapter 11 of the US Bankruptcy Code and the amended creditors' reorganization plan [MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE].

14. With the above decision of 25.10.2024 and the Order of the New York Bankruptcy Court of 4.11.2024, the creditors' proposed plan for the reorganization of the parent company was ratified, while the reorganization plan proposed by the debtor parent company itself was rejected, represented by the board at that time of directors, which consisted of the defendants, as well as Konstantinos Hatzieleftheriadis, Ioannis Zilakos, Eleni Karastamati, Panagiotis Konstantaras, and Emmanouil Andreoulakis. It should be noted that the defendants controlled the majority shareholders of the parent company, namely Lassia Investment Company (owned by the Laskarina's Karastamati family), Family Unity Trust Company (owned by the Vasilios's Kertzikov family) and Glafkos Trust Company (owned by the Vasilios's Hatzieleftheriadis family).

15. The certified creditors' reorganization plan came into effect on November 19, 2024, providing, among other things, that as of its entry into force, the former shareholders automatically cease to be shareholders of "ELETSON HOLDINGS INC." and automatically its members lose their status as members of the Board of Directors of "ELETSON HOLDINGS

INC." . On the same date, 19.11.2024, the new shareholders of "ELETSON HOLDINGS INC." , by way of a resolution, after stating that the date of entry into force of the reorganization plan, i.e. 19.11.2024, has arrived, that, in accordance with paragraph 3.3 (i) [= letter i] of the reorganization plan, the shares of the shareholders (9th class of creditors) are cancelled and abolished, that, in accordance with paragraph 5.8 of the reorganization plan, the company issued new shares and that, in accordance with paragraph 5.10(c) of the reorganization plan, the members of the Board of Directors prior to the date of entry into force of the reorganization plan (19.11.2024) automatically cease to hold that position, they decided, in a completely lawful manner:

i.      to dismiss all previous members of the company's Board of Directors,
ii.     to elect a new Board of Directors, consisting of:  Adam Spears, (b.) Leonard J. Hoskinson, and (c.) Timothy B. Matthews.

16. In the context of the 13 March 2025 Order of the New York Bankruptcy Court for further compliance with the confirmed plan and its implementation, which followed previous decisions by the same Court to implement the plan due to actions by former shareholders and former members of the Board of Directors against the implementation of the plan, the AOR (Address of Record) of "ELETSON HOLDINGS INC." in Liberia was amended, the above new board of directors was registered on 14.3.2025 in the Liberian Companies Registry (LISCR), and subsequently relocated (on 14.3.2025) to the Marshall Islands, where it continues to exist as a Marshall Islands company, under the same name and with the same purpose, represented by the above board of directors.  According to the Certificate of Incumbency of the Marshall Islands dated 24.3.2025, the directors of "ELETSON HOLDINGS INC.", a company incorporated on December 4, 1985, under the laws of Liberia and relocated to the Marshall Islands on March 14, 2025, with registration number 130683, are Adam Spears, Leonard J. Hoskinson, and Timothy B. Matthews, with Adam Spears serving as President, Chief Executive Officer, Secretary, and Treasurer. **Moreover, the above was accepted by decision No. 2572/2025 of your Court, issued at the request of two former minority shareholders of "ELETSON HOLDINGS INC." for the appointment of a provisional administration to the said company,**

**which application was rejected.** According to this decision*, "In particular, as early as March 14, 2025, i.e., prior to the discussion of the application under consideration, the members of the Board of Directors of ELETSON Holdings Inc. are Adam Spears (Adam Spears), resident of Toronto, Canada, who holds the positions of Chairman, Treasurer, and Secretary, Leonard J. Hoskinson, resident of Florida, USA, and Timothy B. Matthews , resident of Tennessee, USA, as evidenced by the certificate of election and appointment dated 14 March 2025 issued by the Liberian International Ship and Company Registry (The LISCR Trust Company).*

17. According to clause 5.2.c of the approved reorganization plan, it is expressly provided that the parent company shall continue its activities and acquire its holdings, i.e. its holding in the applicant. Moreover, even if this clause did not exist, the parent company's activity is precisely that of managing its holdings and, through them, appointing their management and  determining their overall strategy and business policy. It was in this context that the election of a new management team took place in the applicant company with the appointment of Mr. Hoskinson as the sole representative of the Company, which was registered in the Liberian Companies Register on March 19, 2025, followed by the relocation of the Company to the Marshall Islands and then to Delaware, as explained above, with Mr. Hoskinson as the sole representative of the Company.

## II. The identity of the defendants

18. The defendants were, until 19 March 2025, when Mr Hoskinson was registered in the Liberian's (LISCR) as the new management of the applicant, members of its board of director's. The same persons also participated in the parent company's board of directors until 19 November 2024, when the parent company's reorganization plan came into effect, providing for the dismissal of its board members and the appointment of a new board, while they also controlled the majority shareholders of the parent company, as explained above.

19. However, the defendants, although they were the same persons, as former members of the parent company's board of directors, they requested that it be included in the reorganization process in the United States, during which they themselves submitted their own reorganization plan, on behalf of the debtor parent company, which was rejected, after the parent company's creditors' reorganization plan was ratified, they took a number

of actions, both in Greece and abroad, in order to overturn the decision of the US bankruptcy court, refusing to hand over the management of the parent company and all of its subsidiaries, including the applicant here, appearing to this day as alleged representatives of the parent company, which they refer to in the New York courts as "provisional Holdings," but also of the applicant. In this context of abuse of power by the defendants, the appointment of a lawyer on behalf of the applicant to appear before the Piraeus Multi-Member Court of First Instance on May 13,2025 during the hearing of AB Bank's bankruptcy petition and their previous refusal to provide us with access to the Company's documents and records.

20. Indicatively, we note that the former board of directors of the parent company, including the defendants, after failing to obtain approval of their proposed reorganization plan from the US bankruptcy court, rushed, on the last day of the deadline for appealing against the ratification decision, and filed an appeal on 7 November 2024 (which was subsequently withdrawn), immediately afterwards, on 8 November 2024, i.e. a few days before the reorganization plan came into force (November 19, 2024) and the new board of directors of the parent company was appointed, pursuant to the ratified plan, four of the eight members of the parent company's board of directors resigned. Immediately after their resignation, the former minority shareholders, Elafissos Shipping Corporation and Keros Shipping, representing the interests of the Zilakos and Andreoulakis families, who were also members of the previous Board of Directors of the parent company, filed their application (GAK / EKA) for the appointment of a provisional Board of Directors pursuant to Article 69 of the Civil Code to the parent company "Eletson Holdings Inc", allegedly citing a lack of management, thus resorting to a completely illegal forum shopping procedure in order to release themselves from their obligation to implement the ratified reorganization plan, precisely because it was the creditors' reorganization plan, the ratification and implementation of which meant they lost control of the parent company and, consequently, its subsidiaries. In complete ignorance of all those involved in the reorganization process in the United States, and especially the parent company's creditors, they caused, by virtue of the above application, the issuance of a temporary order dated 12.11.2024, appointing a provisional board of directors, of which the second of the defendants was a member. However, as mentioned

above, this application was rejected by decision No. 2572/2025 of your Court, which recognized the new management of the parent company, and thus terminated the validity of the provisional order dated 12.11.2025 and, consequently, any authority of the provisional Board of Directors.

21. Subsequently, the former minority shareholders of the parent company, together with the applicant here and the subsidiaries of ENE, clearly guided by the natural persons members of the families that controlled the parent company (prior to its reorganization), including the defendants, proceeded to a) file their lawsuit on January 17, 2025, before the Piraeus Multi-Member Court of First Instance (ordinary proceedings) requesting that the certified reorganization plan be recognized as having no effect in Greece and cannot be recognized in Greece (the case file of which has not yet been closed so as to be given a hearing date), b) in the application filed on February 19, 2025 for interim measures, also directed against the current representative of the Company, Leonard Hoskinson, requesting that the new management of the parent company cease to exercise powers of representation and take decisions as a shareholder of its subsidiaries, which was rejected, as mentioned below, c) in the intervention of right on 4.2.2025 against the application dated 3.2.2025 for recognition of the decisions of the New York bankruptcy court, which the new management of the parent company was forced to file before the Athens Multi-Member Court of First Instance (which was discussed on 19.3.2025 and a decision is pending).

22. In addition to the above actions challenging the certified reorganization plan and its binding nature, they also took action to challenge the change of AOR in Liberia, both for the parent company and for the applicant here, which were rejected (!!!), confirming once again that the sole management of the parent company and of the applicant here, its subsidiary, is that designated in the certified reorganization plan.

23. It should be noted that due to the above actions of the former shareholders and members of the Board of Directors of the parent company and its subsidiaries, such as the applicant herein, allegedly represented by the defendants, the New York bankruptcy court issued orders for their compliance with the plan and its implementation, as well as sanctions against the former shareholders and members of the parent company's board of directors, including the respondents, as well as the members of

the provisional board of directors from 12.11.2024 (which ceased on 6.6.2025, as explained).

## C. **The conduct of the defendants – Imminent danger and urgent circumstances**

24. As already apparent from the brief background above, the defendants, as former controlling shareholders of the parent company and, consequently, of its subsidiaries, are doing everything possible to maintain control of Eletson Holdings Inc. and, through it, control of the applicant (Eletson Corporation), which is a wholly owned subsidiary.

25. In addition to the above legal actions, which are clearly aimed at obstructing the exercise of the new management's authority, from the very moment that the new management of the parent company and the applicant sought to communicate with the former executives and staff of the companies, requesting access to all their documents and records in order to exercise their management, not only refused such access, but also, through the applicant and the ENEs, filed their application before your Court on February 19, 2025, requesting the dismissal of the new administrators, including the applicant's representative, Leonard Hoskinson, from appearing as representatives of the parent company and its subsidiaries and from performing administrative acts. This application was discussed on May 23, 2025, and rejected by decision No. 665/2025 of Your Court ( ) as vague due to contradictions, with the contradiction lying, in the Court's opinion, in the recourse of the parent company "ELETSON HOLDINGS INC" itself in the voluntary reorganization procedure under Chapter 11 of the US Bankruptcy Code.

26. In the midst of the above actions by the respondents contesting the new management and refusing to hand over to us the records and documents of both the parent company and its subsidiaries, including the applicant, the domestic bank "**AEGEAN BALTIC BANK S.A.**", **recognizing our new management,** informed us by email dated 08.04.2025, **addressed to Mr. Honskinson, as the newly appointed Chairman and Managing Director of our company, a petition for bankruptcy against Eletson**

**Corporation, which was to be discussed on 13.5.2025.**

27. **Our company, under its new management,** understands the risk to its existence posed by the bankruptcy petition, but also its pretextual nature for reasons that we will explain below, **requested from the respondents essential evidentiary documents in support of its defense.** In other words, despite the fact that they are no longer my managers, they are withholding and not handing over to the new management the evidence that is absolutely necessary to rebute the bankruptcy petition, even though this evidence exists and is in their possession. In simple terms, they continue to behave as my administrators, even though they ceased to be so on 19.03.2025.

28. Due to this behavior, we notified them on May 6, 2025, Formal Extrajudicial Notice – Demand for Document Production – Reservation of Legal Rights, as evidenced by No. 5805I/09.05.2025 (to the 1st of the defendants, Ms. Laskarina Karastamati), 5806I/09.05.2025 (to the 2nd of the respondents, Mr. Vasileios Hatzieleftheriadis) and 5808I/09.05.2025 (to the 3rd of the defendants, Mr. Vasileios Kertikof) reports of service by the Bailiff of the Court of Appeal of Athens, Mr. Nikolaos Mademtzis. The said extrajudicial document reads as follows:

"*BEFORE ANY COMPETENT COURT AND AUTHORITY*

*Extrajudicial protest – demand for disclosure of documents –*
*reservation of legal rights*

*By the foreign shipping company named "**ELETSON CORPORATION**," based in the Marshall Islands (Trust Company Complex, Ajeltake Road, Majuro, Marshall Islands MH 96960), represented by Mr. Leonard Hoskinson, with registered office in Greece, in Piraeus, at 118 Kolokotroni Street, with Tax Identification Number 098035979 of the Piraeus Tax Office for Ships.*

*TO*

1. *Laskarina Karastamati (Λασκαρίνα Καρασταμάτη), resident of Piraeus, 118 Kolokotroni Street.*
2. *Vasileios Hatzieleftheriadis (Βασίλειος Χατζηελευθεριάδης), resident of Piraeus, 118 Kolokotroni Street.*

**[10]**

3.  Vasileios Kertzikov (Βασίλειος Κερτσίκωφ), resident of Piraeus, Kolokotroni Street, no. 118, all in their capacity as former members of our Board of Directors.

———————————————

1.  As you are well aware, our company is now managed by Mr. Leonard Hoskinson. As you are also well aware, despite your removal from the company's Board of Directors, you continue to act as alleged members of the Board of Directors and do not hand over to the new management, as you are required to do, the company books and other company documents in general, despite the efforts of the new management.

2.  Your lack of cooperation with the new management assumes significant importance and leads to an aggravation of your liability as former members of our administration, particularly due to the following fact:

3.  The anonymous banking company, under the name: "Aegean Baltic Bank Anonymous Banking Company" filed before the Multi-Member Court of First Instance of Piraeus on April 1, 2025, with general filing number: 7937/2025 and special: 2174/2025, for the declaration of Eletson Corporation in bankruptcy pursuant to Article 78 et seq. of Law 4738/2020, the hearing of which was set for May 13May 2025 and serial number: 1. The applicant notified Mr. Leonard Hoskinson, in his capacity as the new legal representative, of this application by email, , thereby clearly acknowledging our new management and the transfer of the company's registered office.

4.  You understand that the duty of our new management is to protect the interests of the company and its sole shareholder, Eletson Holdings Inc. Our prudent management is obliged to contest the above bankruptcy petition on its merits. To this end, it must be aware of the company's financial data, which, as stated, you have not brought to our attention.

5.  Without prejudice to any of our rights, we request that you provide us with copies of the following documents in your possession within one day of receiving this letter:

i.  *For the closed fiscal year from 01.01.2024 to 31.12.2024, general ledger of fourth-level accounts and trial balance of closing and pre-closing fourth-level accounts.*

ii.  *For the period from 01.01.2025 to 30.04.2025, the trial balance of fourth-level accounts and VAT returns.*

iii.  *Deed of payment of the purchase price for the property located at 118 Kolokotroni Street, which was executed by public notary Maria Kolovou of Piraeus under no. 25.798/08.11.2024.*

iv.  *Bank balances, indicating any amounts already due and payable.*

v.  *Any debt settlements with creditors in general, including, indicatively, the State and social security institutions.*

vi.  *Detailed statement of the company's assets, real estate, and movable property.*

vii.  *Detailed list of real or other security interests over all types of assets (e.g., mortgages, pledges, other security rights).*

viii.  *Personnel register including salary details.*

ix.  *Any legal actions against the company and the company against third parties.*

x.  *Payments to creditors and for operating expenses during the last quarter before filing for bankruptcy.*

xi.  *Statement of results for the previous financial year and the first four months of the current financial year.*

xii.  *List of the company's monthly operating expenses.*

xiii.  *List of receivables.*

xiv.  *The company's pending and executed contracts of all kinds, including in particular management contracts.*

**6.**  *Otherwise, we hereby declare that we will take legal action against you in order to obtain copies of the above documents, without prejudice to any other documents that may be requested in court.*

*We appoint as our representative only for the receipt of the above documents the lawyer and resident of Athens, Maria Orfanidou, A.M. D.S.A.: 25791, 17 Al. Soutsou Street, tel. 2103631879, 6972679737.*

*Without prejudice to any of our rights in general, the competent ξθδιψαλ bailiff is ordered to legally serve this document to those to whom it is addressed, namely:*

1. *Laskarina Karastamati (Λασκαρίνα Καραστάμάτη), resident of Piraeus, 118 Kolokotroni Street.*

2. *Vasileios Hatzieleftheriadis (Βασίλειος Χατζηελευθεριάδης), resident of Piraeus, Kolokotroni Street, no. 118.*

3. *Vasileios Kertzikov (Βασίλειος Κέρτσικωφ), resident of Piraeus, Kolokotroni Street, no. 118.*

*to take note of the legal consequences, copying this document as it stands in the relevant service report.*

*Athens, May 6, 2025*

*The attorney-at-law"*

29. **Our extrajudicial letter was met with complete indifference by the respondents.** In fact, the respondents not only ignored us, but also illegally authorized a lawyer to appear before the Piraeus Multi-Member Court of First Instance on May 13, 2025, to discuss AB Bank's bankruptcy petition against our Company, as stated.

30. As can easily be understood, without the necessary documents showing the financial situation of our Company, it is impossible for us to defend ourselves, since we do not know, for example, the balance of our bank accounts, our receivables and liabilities, from which the financial situation of the Company emerges, which is obviously crucial for refuting the claim that we are in a state of cease of payments, as claimed by the applicant.

31. There is therefore an urgent case and imminent danger that the former members of the Company's management, who have so far refused to hand over the management of the Company together with all its books and records, to provide us with copies of the following requested information in order to refute the bankruptcy petition, the hearing of which has been postponed and is now scheduled for [23]September 2025, i.e. very soon. Without these documents, it is objectively impossible to oppose the petition. Consequently, the imminent danger and urgency, lying in the loss of our ability to defend ourselves, are obvious.

32. Therefore, the respondents must be required to provide us with copies of the following documents, which exist and are in their possession, namely:

    i.   Balance sheets or statements of financial position for the last five years.

**[13]**

ii.    Revenue/expense ledger.

iii.   Income statements for the last five years.

iv.    Statements of Changes in Equity for the last five financial years.

v.     Cash flow statements for the last five years.

vi.    Appendix to the Financial Statements for the last five years.

vii.   Certified Auditors' Reports for the last five years.

viii.  General ledger and balance sheet for the current fiscal year.

ix.    For the period from 01.01.2025 to 31.07.2025, balance sheet of fourth-degree and VAT returns.

x.     Deed of payment of the purchase price for the property located at 118 Kolokotroni Street, property no. 118, which was carried out by notary public Maria Kolovou of Piraeus, under no. 25.798/08.11.2024.

xi.    Copies of all bank accounts held for the period from 31.07.2024 to 31.07.2025, showing the balances owed to the banks and any amounts already due and payable to them.

xii.   Detailed statement of loan and other credit agreements, indicating the name of the bank/financial institution, contract/account number, and balance.

xiii.  Statement of personal guarantees and collateral, or other collateral on assets of any kind, indicating the creditor in whose favor the security is provided, the type of security, and the claim to be secured.

xiv.   Statement of current and past due obligations to the State and social security institutions.

xv.    Debt settlements with creditors in general, including, indicatively, the State and social security institutions.

xvi.   Detailed statement of the company's assets, real estate, and movable property.

xvii.  Detailed register of the company's fixed assets.

xviii. Clearance Notes, Income Tax Returns for Legal Entities, VAT Returns, ENFIA Returns, and ENFIA Returns for the last five years.

xix.   Lease agreements for movable or immovable property.

xx.    Licenses and rights of use (e.g., operating licenses, trademarks).

xxi.   Company staff list with payroll data.

xxii.  Legal actions against the company and the company against third parties.

xxiii.   Detailed list of suppliers and creditors.

xxiv.   Payments to creditors and to cover the company's operating expenses during the last quarter before filing for bankruptcy.

xxv.   Statement of the company's monthly operating expenses.

xxvi.   List of receivables for the period from 31.07.2024 to 31.07.2025.

xxvii.   The list of the company's pending and executed contracts of all kinds, including in particular ship management contracts.

xxviii.   The agreement with AEGEAN BALTIC BANK S.A. on the settlement and partial repayment of the debt to in accordance with decision no. 1280/2024 of the Piraeus Multi-Member Court of First Instance.

## D. <u>Legal part</u>

33. The obligation of the holder to produce a document derives directly from the provision of Article 902 of the Civil Code, i.e. it is a legal obligation (A.P 626/2014). A basic procedural principle is that no one is obliged to provide their opponent with information that could be used against them. However, in certain cases provided for in the provisions of Articles 901-903 of the Civil Code and 450 et seq. of the Code of Civil Procedure, **both** the litigant **and the third party, which is the case here,** are obliged to produce documents in their possession, because the proper administration of justice may depend on them (I. Κατράς, Β. Επίδειξη εγγράφου ειδικά, σε : Αγωγές Αιτήσεις και Ενστάσεις Ενοχικού Δικαίου Αστικού Κώδικα, 2018, σ.1187, Εκδόσεις Σάκκουλας).

34. The disclosure of documents is a special judicial request, as it may be sought during pending proceedings in accordance with the provisions of Articles 450 to 452 of the Code of Civil Procedure. If there is no pending trial, the provisions of Articles 901 to 903 of the Civil Code apply. In particular, according to Article 902 of the Civil Code, it is provided that "*anyone who has a legitimate interest in being informed of the content of a document in the possession of another person has the right to demand that it be shown or copied, if the document was drawn up in the interest of the person requesting it or certifies a legal relationship that also concerns him [...]*". The conditions for creating a claim for the disclosure of a document and/or for the provision of a copy thereof under the aforementioned article

are, on the one hand, the existence of a legal interest on the part of the person requesting the disclosure , and, on the other hand, the possession of the document by the person against whom the relevant claim is directed (Ζέπος ΕνοχΔ, II σελ. 679, Ράμμος ΕρμΑΚ άρθρ. 902 αρ. 5).

35. Among the cases of legal interest listed exhaustively in the provision of Article 902 AK, which are required for the establishment of a claim for the disclosure of a document or the granting of a copy, is that in which the document certifies a legal relationship that also concerns the applicant. Furthermore, from the combination of the provisions of Articles 450 of the Code of Civil Procedure, 902 of the Civil Code, and that of Article 3(3) of Presidential Decree 226/1992, it follows that, in order for the court to order the disclosure of commercial books, they must constitute evidence in a specific trial and the legal conditions for their inspection or production must be met, as regulated in the above provisions (Ι. Κατράς, Β. Επίδειξη εγγράφου ειδικά, σε : Αγωγές Αιτήσεις και Ενστάσεις Ενοχικού Δικαίου Αστικού Κώδικα, 2018, σ.1189, Εκδόσεις Σάκκουλας).

36. The disclosure of documents under Articles 901 to 903 of the Civil Code may be requested by means of a claim or a counterclaim. However, according to prevailing theory and case law, the disclosure of documents or the provision of copies may also be sought by means of interim measures in cases of urgency or imminent danger (ΑΠ 1613/2000 ΕλλΔνη 42.680, ΜΠρΘεσ. 23434/2001 Αρμ. 2002.1186, ΜΠρΑθ. 10575/85 ΕλλΔνη 26.1418, Τζίφρα, Ασφαλιστικά Μέτρα[4], σελ. 344επ., Χαμηλοθώρη, Ασφαλιστικά Μέτρα, εκδ. 2010, σελ. 328, Κρουσταλάκης, Δίκη 21.651). This view is supported by the provision of Article 731 of the Code of Civil Procedure, which stipulates that the court is entitled to order as a protective measure the action, omission, or tolerance of a certain act by the person against whom the application is directed (ΜΠρΡοδ. 2048/2009, ΜΠρΑθ. 8430/2009, ΜΠρΤρ. 98/2008, ΜΠρΑθ. 2077/2008, ΜΠρΘ 42696/2007, ΜΠρΣπ. 906/2005, άπασες σε ΤΝΠ ΝΟΜΟΣ).

37. It should be noted that, in the context of the procedure for interim measures, provisional settlement of the above dispute is not prevented by the provision of Article 692 § 4 of the Code of Civil Procedure, since the right for which security is sought is not that of disclosure, which in itself usually has no value, but the substantive right, and the demonstration

merely prepares the evidence thereof. In the claim or petition for the demonstration of a document, the holder thereof is passively legitimized, even if there is no claim against him relating to the document, who (the holder) may also be a third party, while no provision provides for notification of the application to the person against whom the claim is made (ΜΠρΘεσ. 18952/2003, ΤΝΠ Νόμος.)

38. According to case law (ΕφΑθ. 2456/2002, ΤΝΠ Νόμος), in order for the claim/petition for the disclosure of documents to be specific, it must refer specifically to the documents whose disclosure is requested. The identification of the document to be produced as above is necessary because in this way a) the legitimacy of the applicant's request is verified, b) the defendant/respondent is given the opportunity to state the reasons for his refusal, and c) it is possible to specify the document in the operative part of the decision, which is necessary for its possible enforcement. In other words, for the specific nature of the relevant claim/petition, it is sufficient to personalize the document, without it being necessary to specify its content in more detail, because otherwise the exercise of the relevant claim is made excessively difficult in certain cases (ΑΠ 508/1999 ΕλλΔνη 35.1299, ΕφΑθ. 5720/1996 ΕλλΔνη 38.692, 1741/1994 ΕλλΔνη 38.1261, ΜΠρΘεσ. 9211/2016, ΤΝΠ ΝΟΜΟΣ).

39. According to the relevant case law, an urgent case for the issuance of a copy of a document under Article 902 of the Civil Code is the need to prepare and draft or file the relevant lawsuit, both in terms of exercising the claim in a certain way and in terms of proving it (ΜΠΠειρ. 3411/2021 ΤΝΠ ΝΟΜΟΣ, ΜΠρΛαμ. 57/2018 NoB 2018.1467).

---

**WHEREAS** it follows from the combination of the provisions of Articles 902 of the Civil Code and 450(1) of the Code of Civil Procedure that anyone may request **a third party** to disclose any document in their possession that may serve as evidence of their claims, even as circumstantial evidence.

**WHEREAS** in urgent cases or to avert danger, such production may also be ordered by the Single-Member Court of First Instance through the procedure of interim measures.

**WHEREAS**, in addition to the ordered disclosure of a document, the granting

of a copy to the applicant at his expense may be ordered.

**WHEREAS** in this case, third parties, in the above sense, are the defendants, and the disclosure of the above documents is necessary for our preparation to defend against the bankruptcy petition against us.

**WHEREAS** the respondents did not provide our new management, as they were obliged to do in their capacity as former members of our management, despite our requests, the above requested documents, which are in their possession.

**WHEREAS** there is an urgent case and imminent danger, within the meaning of Article 688 of the Code of Civil Procedure for the provision of the requested documents, since otherwise it is impossible for us to defend ourselves against the bankruptcy petition filed by , which will be heard on 23ʰ .09.2025, i.e. very soon, so that if they are not granted to us through the procedure of interim measures, our defense will be frustrated.

**WHEREAS** our allegations and claims are lawful, well-founded, and true, and are proven by witnesses and documents.

**WHEREAS** your Court has both subject matter an territorial jurisdiction.

**FOR THESE REASONS**

**and with the express reservation of all our legal rights**

**WE REQUEST**

1. **That each of the defendants be ordered** to provide us with copies of the following documents, which are in their possession:

   **i.** Balance sheets or statements of financial position for the last five years.

   ii. Revenue/expense ledger.

   iii. Income statements for the last five years.

   iv. Statements of Changes in Equity for the last five financial years.

   v. Cash flow statements for the last five years.

   vi. Appendix to the Financial Statements for the last five years.

   vii. Certified Auditors' Reports for the last five years.

   viii.        General ledger and balance sheet for the current fiscal year.

   ix. For the period from 01.01.2025 to 31.07.2025, balance sheet of fourth-degree and VAT returns.

   x. Deed of payment of the purchase price for the property located at 118 Kolokotroni Street, property no. 118, which was carried out by notary public Maria Kolovou of Piraeus, under no. 25.798/08.11.2024.

xi. Copies of all bank accounts held for the period from 31.07.2024 to 31.07.2025, showing the balances owed to the banks and any amounts already due and payable to them.

xii. Detailed statement of loan and other credit agreements, indicating the name of the bank/financial institution, contract/account number, and balance.

xiii. Statement of personal guarantees and collateral, or other collateral on assets of any kind, indicating the creditor in whose favor the security is provided, the type of security, and the claim to be secured.

xiv. Statement of current and past due obligations to the State and social security institutions.

xv. Debt settlements with creditors in general, including, indicatively, the State and social security institutions.

xvi. Detailed statement of the company's assets, real estate, and movable property.

xvii. Detailed register of the company's fixed assets.

xviii. Clearance Notes, Income Tax Returns for Legal Entities, VAT Returns, ENFIA Returns, and ENFIA Returns for the last five years.

xix. Lease agreements for movable or immovable property.

xx. Licenses and rights of use (e.g., operating licenses, trademarks).

xxi. Company staff list with payroll data.

xxii. Legal actions against the company and the company against third parties.

xxiii. Detailed list of suppliers and creditors.

xxiv. Payments to creditors and to cover the company's operating expenses during the last quarter before filing for bankruptcy.

xxv. Statement of the company's monthly operating expenses.

xxvi. List of receivables for the period from 31.07.2024 to 31.07.2025.

xxvii. The list of the company's pending and executed contracts of all kinds, including in particular ship management contracts.

xxviii. The agreement with AEGEAN BALTIC BANK S.A. on the settlement and partial repayment of the debt to in accordance with decision no. 1280/2024 of the Piraeus Multi-Member Court of First Instance.

2. **To be endangered** , in the event of non-compliance with the application, with the operative part of your court decision, a financial penalty of

€5,000.00 against each of the respondents for each day of delay in providing the above documents, as well as their personal detention. And

3. The respondents **shall be ordered to pay** the general legal costs and our lawyer's fees.

**Athens, August 5, 2025**
**The attorney**

# EXHIBIT B

**Before the Single-Member Court of First Instance of Piraeus**

**MEMORANDUM**

[*proceedings for interim measures*]

The foreign shipping company, under the name: **"ELETSON CORPORATION"**, in the USA, in the state of Delaware (Cogency Global Inc. 850, New Burton Road, suite 201, Dover, Delaware USA 19904), and legally represented by Mr. Leonard Hoskinson, maintains an establishment pursuant to Article 25 of Law 27/1975 and Legislative Decree 89/67 in Piraeus, at 118 Kolokotroni Street, with Tax Identification Number 098035979/Piraeus Port Tax Office.

**AGAINST**

1. **Laskarina Karastamati**, resident of Piraeus, 118 Kolokotroni Street.
2. **Vasileios Chatzieleftheriadis**, resident of Piraeus, 118 Kolokotroni Street.
3. **Vasileios Kertzikoff**, resident of Piraeus, Kolokotroni Street, no. 118, all in their capacity as former members of our Board of Directors.

———————————————

## I. Introduction

1. Discussed before your Court at the hearing on September 19, 2025, the application for interim measures filed by our company "ELETSON CORPORATION" (hereinafter referred to as the Company) (**Exhibit I),** legally represented by Mr. Leonard Hoskinson, which was duly and timely served on the respondents, as evidenced by reports of service with numbers 6703I/10-09-2025 and 6704I/10-09-2025 by the bailiff of the Athens Court of Appeal, Ioannis Mademtzis (to the 1st and 2nd of the respondents) and report no. 400IA'/10-09-2025 of the bailiff of the Athens Court of Appeal, Sotirios Roumeliotis (to the 3o of the respondents), both members of the Civil Society of Bailiffs "ROUMELIOTIS S.- MANOLAKOU S.-MADEMTZIS I. AEDE" **(Exhibit IIa to IIc).**
2. The Company was legally represented in court by the following persons, acting on its behalf, Maria Orfanidou and Georgios Babetas lawyers of Athens, as evidenced by the Company's power of attorney documents submitted with the appeal (**Exhibit IIIa to IIIc**), duly signed by its legal representative, Mr. Hoskinson, as detailed below in II.

**3.** During the hearing of the case, attorney Mr. Sofos appeared and stated that he was representing "ELETSON CORPORATION", i.e. the applicant, having (allegedly) received authorization from the second respondent, Mr. Chatzieleftheriadis, who is (allegedly) the sole legal representative of "ELETSON CORPORATION", according to a document dated April 2025 from the Piraeus shipping companies' registry, which he invoked. And having proceeded to the inadmissible appearance, as we shall demonstrate below, he then declared, wholly inadmissibly, a withdrawal from this filed petition by Mr. Hoskinson on behalf of "ELETSON CORPORATION". As we demonstrate below in II, by invoking our supporting documents, the only legal representative of the Company is Mr. Hoskinson, and it is therefore noted that the above representation by Mr. Sofos and the consequent waiver of the petition are completely unacceptable.

**4.** Subsequently, the respondents stated that they were represented by Mr. Andreoulakis. The respondents represented by the abovementioned attorney similarly stated that Mr. Hoskinson had no power of representation, that our petition was allegedly being exercised abusively because we allegedly had all the documents we were requesting at our disposal due to the previous reorganization of the parent company "Eletson Holdings Inc" in the USA, which documents, he then stated, do not exist because they are not maintained (!!!) and which in any case are not in the possession of the respondents. In other words, contradictory and mutually exclusive allegations. It is noteworthy that, towards the end of the discussion, he briefly mentioned that the parent company Eletson Holdings had recently reached some sort of settlement of the Company's debt to AB Bank, which, as we mention in our petition, has filed for bankruptcy against the Company. He used the word "stipulation." **Indeed, on 8.9.2025, the New York bankruptcy court ratified the document dated 20-6-2025 entitled "Stipulation and Order by and Between Eletson Holdings Inc and Aegean Baltic Bank SA Resolving Proof of Claim", i.e. an agreement on the payment of the bank's claim against the parent company as guarantor for the Company's debts, as set out in the certified reorganization plan (Exhibit 35)**. This agreement provides that within ten working days at the latest from its entry into force, i.e. from 8-9-2025 when it was ratified by the Court, the parent company Eletson Holdings Inc. will make an initial distribution of $166,155.24. This

statement by the attorney confirms our repeated claim in all court cases with the respondents regarding their abusive behavior, as in order to rid themselves of the parent company's unmanageable debts, which were written off as part of its reorganization (see exhibit 10, which includes the entire history of the reorganization and the decisions of the New York Court), the parent company is represented by its new board of directors as appointed under the reorganization plan, which has been successful. However, when the parent company, under its new management, exercises its rights as a shareholder in its subsidiaries, such as the applicant, the ratified reorganization plan has not taken effect, according to the opposing parties who deny the legal representation of the parent company. This contradiction was also noted in your Court's decision No. 665/2025 (Exhibit 20), to which we refer below and which rejected the respondents' application for interim measures against the new management.

5.  In response to the unacceptable and unfounded claims of the opposing parties, we submit the following true and well-founded arguments in full support of our claims and the validity of our application.


**II. Regarding the legal representation of the Company by Mr. Hoskinson and the lawful appearance of her duly authorized attorneys-at-law**

6.  As stated in our application, the Company is a **foreign** company, mainly active in the management of chartered ships. It was established on October 2, 1979, under the laws of Liberia, and on March 20, 2025, it relocated to the Marshall Islands **(Exhibit 1),** with registration number 130810, with Mr. Leonard Hoskinson as its sole legal representative, who was registered as President, Treasurer, and Secretary of the Company in the Liberian Companies Registry (LISCR) on March 19, 2025 (**Exhibit 2 and 2a**). According to the Certificate of Incumbency dated 24.3.2025 from the Marshall Islands registry, Leonard J. Hoskinson remained President and CEO of the Company (**Exhibit 3, 3a**). Subsequently, **as of May 2, 2025, the Company has relocated again to the United States, to the state of Delaware** (Cogency Global Inc. 850,  New Burton Road, Suite 201, Dover, Delaware USA 19904), with Mr. Leonard Hoskinson remaining as President, CEO, and legal representative (**Exhibit 4a to 4d**).

7.  As mentioned in our petition, the above changes to the Company's Board

of Directors took place after the change in the Board of Directors of its sole parent company, "ELETSON HOLDINGS INC." (hereinafter referred to as the "parent company"), which took place in the context of its (the parent company's) reorganization in the USA, which we refer to briefly in our petition and we shall reiterate, with reference to the pertinent documents, for the fuller enlightenment of this Honourable Court. However, we note already by way of introduction that the issue of who represents the present applicant – that is, who constitutes its Board of Directors – does not depend on whether the reorganization proceedings of the parent company (and not of the present applicant, its subsidiary) have been recognized in Greece, but is determined exclusively on the basis of the law of the company's registered seat, that is, initially Liberia, subsequently the Marshall Islands, and currently the State of Delaware, where all changes to the corporate bodies of the company have taken place, as evidenced by the certificates we have submitted above. The respondents, of course, have produced no equivalent certificates, but merely a certificate issued by a department of the Ministry of Shipping, dated April (thus not even recent), in which the second of the respondents appears as the representative of the branch office established in Piraeus. We shall refer below to this purported capacity.

8. Clear proof of our above claims, which we refer to in more detail below, is provided by **decision no. 2572/2025 of your Court (Exhibit 5), issued at the request of two former minority shareholders of "ELETSON HOLDINGS INC." (representing the interests of the same families that controlled the parent company) (Exhibit 6), for the appointment of a provisional Board of Directors to the said company pursuant to Article 69 of the Civil Code, which petition was rejected by the above decision (thus terminating the provisional Board of Directors that had been appointed pursuant to the provisional order of 12.11.2024, which the opposing parties had obtained on their own, without the knowledge of all those involved in the reorganization process and the new Board of Directors appointed on 19.11.2024 pursuant to the ratified reorganization plan, Exhibit 6(a).**

9. The above decision rejected the petition under Article 69 on the following grounds: "*However, with this content and request, the petition under consideration is inadmissible due to lack of international jurisdiction and is*

*therefore rejected, given that a review of the case file documents showed that the actual headquarters of ELETSON Holdings Inc. was not located in Greece at the time the petition in question was heard. In particular, as early as March 14, 2025, i.e., prior to the hearing of the petition under consideration, the members of the Board of Directors of ELETSON Holdings Inc. are Adam Spears, resident of Toronto, Canada, who holds the positions of Chairman, Treasurer, and Secretary, Leonard J. Hoskinson, resident of Florida, USA, and Timothy B. Matthews, resident of Tennessee, USA, as evidenced by the certificate of election and exercise of duties of the Liberian International Ship and Company Registry (The LISCR Trust Company) dated 14.3.2025. Consequently, the residence of the persons who constitute the bodies that mobilize the company's organization is no longer in Greece. Furthermore, the postal address of the above legal entity is now "c/o Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, NY 10119", i.e. New York, USA. Consequently, the company now has a substantial presence and a point of contact in the United States. The above proves that the actual headquarters of the above legal entity has already been transferred since March 14, 2025, to North America, where its administrative headquarters and strategic management are now located. The applicants' claim that the voluntary bankruptcy decision of October 25, 2024, of the US Bankruptcy Court - Southern District of New York and the November 4, 2024, by virtue of which the shareholding structure of the above company was changed and the above Board of Directors was appointed, have no legal effect in Greece, is unfounded. This is because the above decision and order have in any case had legal consequences in Liberia, in accordance with the law and, by extension, the administrative acts governing the internal relations of the above legal entity (interna corporis), which include, in particular, the composition, election, formation, convening, and meeting of corporate bodies (see MonEpiPei 405/2024, published on the EfPei website).*

**10.**     As can be seen from the above reasoning of the decision, the Court accepted that the effects of the voluntary bankruptcy (i.e., reorganization) decision of October 25, 2024, of the Bankruptcy Court of the Southern District of New York - Southern District of New York, and the Order of November 4, 2024 confirming the same by the above Court, pursuant to which both the shareholding structure and the Board of Directors of the parent company "Eletson Holdings Inc." were changed, resulting in the

latter lacking jurisdiction to hear the application before it. In other words, the Court referred you, functionally, to the binding nature of the US reorganization decision, as already recognized and producing legal effects in Liberia, in order to reach its conclusion on the lack of international jurisdiction. It should be noted that on the issue of its international jurisdiction, the Court of Piraeus was required to examine only (as it did) the representation and actual seat of the company (a concept different from that of the Center of Main Interests, as detailed in our petition) at the time of the hearing of the application before the Court, i.e. on 1.4.2025, so that in Liberia the corporate consequences of the decisions of the New York court had taken effect, as Your Honourable Court itself clearly acknowledges.

11.    In its above ruling, Your Honourable Court concluded with the submission by the parent company, which had filed an intervention of right against the application (Exhibit 13), including the following documents, which we submit by reference and with this Note: a) the certificate of representation of the parent company dated 14.3.2025, registered with the LISCR of Liberia, b) notification to the LISCR of the change of the parent company's AOR, c) the petition dated 14.3.2025 for the relocation of the parent company to the Marshall Islands with the attached supporting documents, d) the certificate of relocation and registration in the Marshall Islands registry dated 14.3.2025, together with the new articles of association of the company, e) the rejection dated 28.3.2025 of the respondents' request for suspension of the relocation and restoration of the previous situation in Liberia, f) the certificate of representation dated 24 March 2025 from the competent registry of the Marshall Islands, with an apostille, according to which the members of the Company's Board of Directors continue to be those registered on March 14, 2025, in the Liberian registry, namely Spears, Hoskinson, Mattheus (**Exhibit 7 to 9).**

12.    The above decision was issued pending the issuance of a decision on the parent company's petition dated 3.2.2025 for the recognition of the reorganization decisions in Greece (**Exhibit 10**), and while the opposing parties had already raised all their arguments (see the opposing parties' pleadings dated 1-4-2025, **Exhibit 12**), which they will also raise before Your Honorable Court regarding the alleged non-occurrence of the effects of the change in the Board of Directors and the shareholding structure of

the parent company because the decisions of the New York court have not been recognized in Greece.

***13.*** Absolutely correctly, according to your Honorable Court's decision No. 2572/2025, the non-recognition in Greece of the decisions of the foreign court could not affect its judgment on matters of internal operation of the legal entity — such as the shareholding structure, the election, the formation, the convening and meeting of corporate bodies — which are governed by the law of the registered office of the foreign company, in accordance with Article 1, last paragraph of Law 791/1978 and the established case law on its application, referred to in the main grounds of the above decision of your Court. Specifically, this article, which also applies to the applicant Eletson Corporation, stipulates that '1. *Maritime companies which have been incorporated under the laws of foreign states, provided that they are or have in the past been shipowning or ship-managing companies, shipbroking companies, bareboat charterers, or ship lessees under financial leasing arrangements, whether under the Greek or a foreign flag, or are established or will be established in Greece pursuant to the provisions of Article 25 of Law 27/1975 or of Legislative Decrees 89/1967 and 378/1968, shall be governed, as regards their incorporation and legal capacity, by the law of the state of their registered seat, irrespective of the place from which their affairs are or were managed, in whole or in part. The provisions of the preceding paragraph shall also apply to holding companies of the above-mentioned companies."*

**14.** According to established case law interpreting and applying the above provision[1] — which was also taken into account and referred to in the above decision of the Court — the law of the registered office regulates, by way of exception, the establishment, legal personality, and legal capacity of the foreign legal entity. Consequently, it also governs its internal affairs (*interna corporis)*, while the law of the actual (or effective) seat is limited to governing its external relations (*externa corporis).* Matters pertaining to the internal corporate functioning include, in particular, the composition, election, constitution, convocation and meetings of the corporate bodies,

---

[1] See MEPeir 405/2024, published on the website of the Court of Appeal of Piraeus. See also, OlAP 2/2003, AP 803/2010 and AP 812/2008, EfPei 151/2016 and EfPei 618/2004,MEPeir 58/2020, all published in the NOMOS legal database, AP 186/2008, EfPeir 401/2010, op. cit., and EfPeir 345/2021.

their competences and decision-making procedures, the acquisition and loss of the capacity of a member of the Board of Directors[2], as well as shareholding status, shareholders' rights, minority rights, and the rights and obligations arising from the shares[3]. By contrast, matters concerning the external functioning of the legal entity include, inter alia, the legal capacity of the company to undertake specific obligations or acquire specific rights, the acquisition of commercial status by members of the Board of Directors and/or shareholders, the liability of the corporate bodies towards third parties, the personal liability of shareholders towards third parties, the conditions for the lifting of the corporate veil[4], and the liability of the company arising from the acquisition of an aggregate of assets[5].

15.   According to the above decision No. 2572/2025 of your Court, the parent company "Eletson Holdings Inc" falls under the last paragraph of Article 1 of Law 791/1978 and, based on the above established case law, the internal affairs (*interna corporis)* of that company — such as its shareholding structure and management — are governed by the law of its registered office, according to which its Board of Directors has been changed, as provided for in the certified reorganization plan, which came into force in Liberia, given that the Company's AOR was changed and the amendments to the relevant documents were registered with the LISCR. Therefore, the Court, based on the Certificates of Incumbency issued in Liberia on March 14, 2025, ruled that the Board of Directors of the parent company consists of Adam Spears, Leonard Hoskinson, and Timothy Mattweus.

16.   The above is not invalidated by decision no. 272/2025 of the Athens Court of First Instance, which was exclusively invoked by the opposing parties during the hearing without specific reference to decision 2572/2025 of the Court of First Instance of Piraeus, which they recalled after our intervention. Decision No. 272/2025 rejected the petition for recognition of the reorganization of the parent company in Greece **(Exhibit**

---

[2] See MEP 405/2024, op. cit., see EFP 345/2021.
[3] See MEfPeir 405/2024, op. cit., see AP 419/2020, NoB 2001, p. 626, see Pambouki, Private International Law, Legal Library, 2020, para. 679.
[4] See EfPei 462/2018, 586/2012, 1000/2006; EfAth/2009; MEPei 238/2014, all published in NOMOS.
[5] See L. Athanasiou, The treatment of foreign shipping companies in case law, Lex & Forum 1/2022, p. 45.

**11)** as inadmissible. First of all, the two courts dealt with different legal issues, without one being bound by the decision of the other. This is further evidenced by the fact that the Court of First Instance of Piraeus issued its decision while fully aware of the pending decision on the petition for recognition, as already mentioned, rejecting, in fact, the ancillary request of the intervening of right parent company (**Exhibit 13)** to postpone the decision until the Court of First Instance of Athens had ruled.

17. Furthermore, with regard to the subject matter of the case before the Court of First Instance of Piraeus — namely, whether, following its reorganization, the parent company is represented by its new Board of Directors, an issue which was examined in order to determine its jurisdiction, the Court correctly relied on Article 1 of Law 791/1978, as interpreted and applied by the established case law referred to above. These provisions apply regardless of whether the reorganization plan has been recognized in Greece, given that the parent company is a foreign legal entity falling within the scope of Article 1 of Law 791/1978, as does its subsidiary, the applicant here, and, therefore, all matters relating to its shareholding structure and legal representation are governed by the law of its registered office, as explained above. According to the documents originally issued in the Liberia and subsequently in the Marshall Islands, the Board of Directors is the one appointed under the parent company's reorganization plan.

18. Moreover, from a review of the decision of the Court of First Instance of Athens, it appears that it accepts that Adam Spears is the representative of the parent company and that the parent company does not have its center of main interests (and therefore its actual seat) in Piraeus, since: (a) it rejected the objection of the opposing party, which intervened against the petition for recognition (**Exhibit 22)** on the grounds of lack of international jurisdiction of the Court of Athens— which was based on the claim that the center of the company's main interests was in Piraeus — thus confirming the jurisdiction of the Athens Court, b) ruled that the petition for recognition was not submitted by a bankruptcy trustee, as Adam Spears was appointed as a legal representative and not as a trustee (syndic).

19. The above decision of the Athens Court of First Instance is subject to appeal, given that both grounds for rejection, namely: a) that the petition

is rejected as inadmissible on formal grounds because it was not submitted by a bankruptcy trustee/syndic, since Adam Spears has been appointed by your Court as legal representative (and not as trustee/syndic), and b) that the Court considers that the recognition procedure concerns a group of companies and specifically the parent company, while Greek public policy does not recognize the bankruptcy of groups of companies, are completely incorrect. This is because a) the parent company did not go bankrupt but was reorganized under Chapter 11 of the US Bankruptcy Code, a procedure in which no trustee is appointed but the debtor retains control of its assets (debtor in possession) (a procedure similar to the consolidation procedure in Greece) and therefore the petition for recognition is submitted by the debtor itself as legally represented, i.e. by Adam Spears, as was submitted in this case, and b) the parent company did not go bankrupt but was reorganized, and the reorganization under Chapter 11 concerns only the parent company, as is indisputably apparent from the relevant documents attached to the application for recognition, Decision No. 272/2025 manifestly erred in considering that the insolvency of the parent company constituted a group insolvency, whereas, as has already been noted, this was not a case of insolvency at all but of reorganization.

20.     The reasoning of Decision No. 2572/2025 of your Court also applies to the applicant subsidiary Eletson Corporation, which, as a foreign ship-management operating vessels under the Greek flag ("KASTOS SPECIAL MARITIME ENTERPRISE," "KINAROS SPECIAL MARITIME ENTERPRISE," "KIMOLOS II SPECIAL MARITIME ENTERPRISE" and "FOURNI SPECIAL MARITIME ENTERPRISE"), as the opposing parties have agreed in the context of our disputes (see, for example, the petition under Article 69 and their proposals dated 1-4-2025, **Exhibit 6 and 12 respectively**) but also having its registered office in Piraeus pursuant to the provisions of Article 25 of Law 27/1975, falls under Article 1 of Law 791/1978. **Therefore, its representation will be judged exclusively on the basis of foreign law and the documents issued on that basis, i.e. those we refer to above and submit.**

21.     Specifically, with regard to the alleged representative of the Piraeus-based office of Mr. Chatzieleftheriadis, the following should be noted:

**22.**    The applicant is a foreign company and has obtained a license to establish itself in Piraeus pursuant to Article 25 of Law 27/1975, as the opposing parties also accept. Pursuant to Article 25 of Law 27/1975, Ministerial Decision 312/2013 was issued, entitled " *Regulation of details concerning the required documentation and procedure for the establishment in Greece of offices or branches of foreign shipping enterprises and the submission of domestic shipping enterprises to the provisions of Article 25 of Law 27/1975."* Among the documents required under Article 1 for the granting of an establishment license is the resolution of the Board of Directors of the foreign company for the opening of the establishment and for the appointment of a representative at such office. Accordingly, the representative of the said office in Greece is appointed by the Board of Directors of the foreign company. On the basis of the law of sociétés anonymes, which applies to foreign companies with respect to the external relations of the foreign legal entity (since otherwise it would be deemed a de facto general partnership), such representative constitutes a substitute organ of the Board of Directors, appointed and revoked by the Board freely. The registration of such appointment with the Shipping Companies Department of the Ministry of Shipping has no constitutive effect whatsoever, but only declaratory.

**23.**    The above is confirmed by the same Ministry Department in its response dated 21 August 2025 to our request dated 7 August 2025 (exhibit no. 2229) for the revocation of Mr. Chatzieleftheriadis, both of which we submit by way of reference (**Exhibit 14, 14(a)**. In our above request, we asked for the revocation of Mr. Chatzieleftheriadis, submitting the minutes of the company's Board of Directors meeting dated 24-7-2025 (**Exhibit 15)**, signed by Mr. Hoskinson as President and Secretary. In this regard, the competent authority responded as follows (our emphasis): "i. *With regard to the dismissal of the representative of the company's office in Greece, it should be noted that the supporting documents submitted do not indicate the appointment of a new representative of the company's office in Greece (the minutes of the Board of Directors meeting of July 24, 2025 mention only the Chairman of the Board of Directors and the Proxies for the purpose of implementing the decision to recall the representative of the company's office in Greece). In accordance with the legislation in force and the individualised permit for the establishment of a company office in Greece*

*(Article 25 of Law 27/75, as currently in force), the minutes of the company's Board of Directors meeting must be submitted, appointing a representative and including a relevant solemn declaration by the representative, in accordance with the provisions of Article 1, paragraph 1(c) and (e) of (b) of the relevant Joint Ministerial Decision.* **It is clarified that the revocation of the representative is effected by resolution of the competent collective body of the company and not by decision of our Service. The relevant supporting documents are submitted to our Service and the corresponding certificates are issued, while the publicity of such information is declaratory and not constitutive**.

24.     In other words, the competent authority did not update the company's details because no other representative was appointed at the same time as the decision to revoke the representative was taken, **while it also confirms that the revocation of the representative** is **carried out solely by decision of the competent collective body, and that the publicity of the service is indicative and not constitutive.** There is, therefore, a clear distinction made also by the competent authority between the collective body of the Board of Directors of the foreign company and its representative at the office in Greece, who is revoked immediately by resolution of that body without any need for registration with the said authority. Moreover, as appears from the above document, the Company has already submitted an application for the change of its nationality, which is in the process of completion (see Exhibit 14b). It is further noted that the resolution appointing a new representative at the Piraeus office, namely Mr. Kilian Papadimitriou, has already been adopted and is in the process of obtaining an apostille in order to be filed with the Ministry, as was requested by it **(Exhibit 36)**.

25.     It should further be noted that this is not a register but rather a service where the relevant documents of foreign companies are filed for the establishment of their office in Greece (it is not, that is, the Shipping Companies Register where Shipping Companies Limited by Shares (E.N.E.) and maritime companies are recorded, where, in any event, the publicity is likewise declaratory[6] ).

---

[6] According to Law 959/1979, which regulates shipping companies and the Shipping Companies Register, constitutive publicity concerns acts relating to the company itself, such as its incorporation, as provided in Article 2(2), pursuant to which a Shipping

26.   **Therefore, as of July 24, 2025, Mr. Chatzieleftheriadis has been dismissed from his position as representative of the Company's office in Piraeus, without any need to register this decision anywhere**. The document of the authority which the respondents will submit was issued in April, and they of course invoked no Board resolution, nor do we expect them to produce one, since any such resolution would be manifestly null and misleading for this Honourable Court. Nor will they produce a recent certificate of representation from the LISCR of Liberia or from anywhere else, as they would in fact be obliged to do in order to substantiate their allegations that the respondents allegedly continue even today to constitute the Company's Board of Directors. As is also evident from the document of the competent department of the Ministry of Shipping, the Board of Directors is superior to the representative of the office in Greece, is not bound by that representative, but on the contrary, the representative is bound by the resolutions of the Board, from which he may be revoked at any time, the revocation taking effect from the adoption of the resolution by the Board, without any registration whatsoever.

27.   **It should be noted that the actions of the opposing parties in Liberia against the change of AOR and the relocation of the Company were rejected by decision of the competent court there (Exhibit 8**).

28.   **In view of the above, it is clear that the sole legal representative of the applicant Company is Mr. Hoskinson, who granted power of**

---

Company acquires legal personality upon its registration. Declaratory publicity concerns all other acts referred to in Article 52(3) of Law 959/1979, including the appointment and revocation of members of the Board of Directors (see P. Selekos, The Register of Shipping Companies as a (Special) Commercial Register, 1996, pp. 44, 48; L. Georgakopoulos, Maritime Law, 2006, p. 90; Kalantzis, Shipping Company, Commentary by Article of Law 959/1979, 1990, p. 123). The foregoing is consistent with the framework of the General Commercial Register (G.E.MI.), and specifically Articles 18 and 19 thereof, which apply to all forms of capital companies, such as the Société Anonyme. Within this framework as well, a similar distinction is made between acts of constitutive and declaratory nature. Registration has constitutive effect only for the acts enumerated exhaustively in Article 18, which does not include the appointment or revocation of members of the Board of Directors (see also **Areios Pagos 1273/2006**, NOMOS, according to which "the act of appointment of the members is completed by the adoption of the relevant resolution of the general meeting and the acceptance of the appointment by the member, and may even be informal, since its publication does not have constitutive but declaratory character; therefore, its non-publication has the effect that the société anonyme cannot invoke anything relating to the appointment of such members against third parties." See also Ververos, in DAE, 2024, Art. 84, no. 12).

**attorney to the attending lawyers to file the application before you and to represent the Company during its discussion at the hearing on September[19].**

29.    **Furthermore, AEGEAN BALTIC BANK S.A., recognizing our new management**, informed us in an email dated 08.04.2025 **(Exhibit 31)**, addressed to Mr. Honskinson, as the newly appointed President and CEO of our company, a petition for bankruptcy against Eletson Corporation, to which we refer below and against which we have filed the appeal under consideration.

30.    **It is further proven that Mr. Sofos, who stated that he represents the applicant and that he waives the pleadings of the petition under review, had no valid power of attorney and no authority to represent the company, given that Mr. Chatzieleftheriadis has no authority to represent the company.**

31.    **The following contradiction should also be emphasized in this regard: Mr. Sofos disputed that Mr. Hoskinson is the legal representative of the Company and that the only representative is Mr. Chatzieleftheriadis, who has not granted power of attorney to file the petition under consideration. However, by withdrawing from the petition, he acknowledges that it was validly and lawfully filed. Therefore, both Mr. Sofos' representation and the withdrawal from the petition filed by us are completely unacceptable.**


### III. On the validity of our application and the imminent danger

32.    As stated in our application, the case in question is being heard in the context of our bankruptcy petition pending before the Piraeus Multi-Member Court of First Instance. Specifically, the anonymous banking company under the name "**AEGEAN BALTIC BANK ANONYMOUS BANKING COMPANY**" filed before the above Court on April[1], 2025, with filing number general: 7937/2025 and specific: 2174/2025, requesting that I be declared bankrupt on the grounds that I have allegedly fallen into a cessation of payments (**Exhibit 16)**. The hearing for the discussion of this application was set for May 13, 2025.

33.    As I mentioned in my petition, and as agreed by the representative of

the respondents, at the above hearing, the representative lawyer of the respondents appeared, stating that he represented the Company, having been instructed by the second of the respondents. In other words, He thus raised the same arguments concerning the alleged lack of representation by Mr. Hoskinson that were presented before you, which we refuted above. Finally, following legal action by my attorney and the attorneys of my parent company, under the name "Eletson Holdings Inc.," which owns all (100%) of my shares and joined the proceedings in order to intervene on behalf of the company (and did not intervene as the opposing parties incorrectly and inaccurately stated in court), the above bankruptcy petition was postponed until the hearing on September 23, 2025 (**Exhibit 17)**.

34.     The above was agreed by the opposing parties, who even stated through their representative, Mr. Andreoulakis, that they would also appear at the postponed hearing on September 23, 2025, to discuss the bankruptcy petition because, according to their claims, the Company is legally represented by the opposing parties and Mr. Chatzieleftheriadis, which we have proven to be untrue.

35.     We refer in our petition to the refusal of the respondents to accept the change in the shareholding structure and the Board of Directors of the parent company as a result of its reorganization, and the subsequent change in the Board of Directors of the Company, as a 100% subsidiary of the reorganized parent company. This refusal, moreover, was also stated before you in court, with the renewed challenge of the change in the management of both the parent company and the subsidiary of Eletson Corporation.

36.     The dispute with the respondents is known to your Court, initially in the context of the provisional Board of Directors that they attempted to appoint to the parent company by application of Article 69 of the Civil Code, an attempt that was initially successful when, on their own, without summoning any of those involved in the parent company's reorganization plan and even though they knew that on 19.11.2024 the ratified plan would come into force and the new board of directors of the parent company would be appointed, they hastened to obtain the provisional order on the 12.11.2024, which lapsed upon the dismissal of their application by virtue of Your Honourable Court's Decision No. 2572/2025,

as noted above for the appointment of a provisional Board of Directors (see **Exhibit 6a**), which was terminated with the rejection of their application pursuant to Decision No. 2572/2025 of your Court, as mentioned above.

37.     And they did so even though, as we mention in our petition, they themselves, as former members of the parent company's board of directors, requested that it be included in the reorganization process in the United States, during which they themselves submitted, on behalf of the debtor parent company, its own reorganization plan, which was, however, rejected. In this regard, we invoke and submit the petition dated 13.09.2023 to convert the parent company's initial bankruptcy petition into a Chapter 11 petition (**Exhibit 18**) of US bankruptcy law, as well as the decision of 25.10.2024 of the Bankruptcy Court of the Southern District of New York (see attachment in **Exhibit 10**), approving the creditors' reorganization plan following the Order of the same Court dated 4.11.2024 (see attachment to **Exhibit 10**) which ratifies it, as well as the document dated 19.11.2024, entitled: "NOTICE OF (I) THE OCCURRENCE OF THE EFFECTIVE DATE AND (II) FINAL DEADLINES FOR FILING CERTAIN", which brings the reorganization plan into effect on 19.11.2024 (see attachment to **Exhibit 10**), with its effects, such as the change in the parent company's management, the certified reorganization plan. The above documents prove precisely  that, on the one hand, the respondents voluntarily requested the parent company's  inclusion in the reorganization process in the US and, on the other hand, that immediately after the ratification of the creditors' reorganization plan, which provided for a change in thethe composition of creditors and the board of directors of the parent company (**Exhibit 19**), they hastened to their first wholly bad-faith and contradictory act, namely to resign from the parent company's Board of Directors and then to hasten before Your Honourable Court to procure, on their own, a provisional order appointing a provisional Board of Directors, in order to obstruct the implementation of the reorganization plan.

38.     This contradictory behavior was noted by your Court in its decision no. 665/2025 (**Exhibit 20**) issued on 19.2.2025 in response to the request for interim measures filed by the opposing parties (**Exhibit 21)**, also directed against the current representative of the Company, Leonard Hoskinson, requesting that the new management of the parent company cease to

exercise powers of representation and take decisions as a shareholder of its subsidiaries . This request was discussed on May 23, 2025, and rejected by decision No. 665/2025 of your Court **as vague due to inconsistency, with the inconsistency lying, in the Court's opinion, in the appeal by the parent company "ELETSON HOLDINGS INC" itself in the voluntary reorganization procedure under Chapter 11 of the US Bankruptcy Code.**

39.    At the same time, former minority shareholders of the parent company, together with the applicant here and the subsidiaries of ENE, clearly guided by the natural persons, members of the families that controlled the parent company and its subsidiaries, including the three respondents, proceeded to a) file an intervention of right on 4.2.2025 (**Exhibit 22)** against the petition dated 3.2.2025 petition for recognition of the decisions of the New York bankruptcy court, which the new management of the parent company was forced to file before the Athens Multi-Member Court of First Instance precisely because of the bad faith conduct of the opposing parties, b) in the exercise of their action before the Piraeus Multi-Member Court of First Instance (ordinary procedure) on 17.1.2025, requesting that the ratified reorganization plan be recognized as having no effect in Greece and cannot be recognized in Greece (the file for which has not yet been closed so that a date for hearing can be set) (**Exhibit 23)**, in the context of which they filed an application for interim measures on 19.2.2025, which was rejected by decision No. 665/2025 of your Court, and most recently in the filing of dated 19.6.2025 against your Court's decision no. 2572/2025, which is to be heard in February 2026 (**Exhibit 24**). Of course, the appeal does not suspend the validity and enforcement of the above decision of your Court, and in any case it is unfounded, as the Court's judgment is well-reasoned, in accordance with what was mentioned above under II.

40.    In addition to the above actions challenging the ratified reorganization plan and its binding nature, they also took action to challenge the change of AOR in Liberia, both for the parent company and for the applicant here, which were rejected (!!!) (see **Exhibit 8),** confirming once again that the sole management of the parent company and the applicant, its subsidiary, is that appointed under the certified reorganization plan.

41.    It should be noted that due to the above actions of the former

shareholders and members of the Board of Directors of the parent company and its subsidiaries, such as the applicant here, represented by the respondents, the New York bankruptcy court issued orders for their compliance with the plan and its implementation, as well as sanctions against the former shareholders and members of the Company's Board of Directors, including the respondents,  as well as the members of the provisional board of directors of 12.11.2024 (which ceased on 6.6.2025, as stated). By way of example, we refer to the Order of the New York Bankruptcy Court dated 27.02.2025 (**Exhibit 25) imposing sanctions** (a fine of USD $1,000) on the former majority shareholders of Eletson Holdings Inc, namely "Lassia Investment Company" (whose shareholder is the first of the respondents), "Family Unity Trust Company" (with the third of the respondents as shareholder) and "Glafkos Trust Company" (with the second of the respondents as shareholder), as well as the so-called provisional board of directors of the parent company and Mr. Chatzieleftheriadis, and the former AOR (address of record) in Liberia itself, for each day of non-compliance from 29.01.2025 Order of the for compliance with the reorganization plan and in particular for not changing the company's AOR so that the new management could be registered in the Liberian registry **(Exhibit 25, 26).** Finally, in the context of the 13.3.2025 Order of the New York Bankruptcy Court for further compliance with the certified plan and its implementation (**Exhibit 27),** the AOR (Address of Record) of the parent company "ELETSON HOLDINGS INC." in Liberia was amended, the above was registered on 14.3.2025 in the Liberian Companies Registry (LISCR), its new board of directors, and then relocated (on 14.3.2025) to the Marshall Islands, where it continues to exist as a Marshall Islands company, under the same name and with the same purpose, represented by the above board of directors, as already mentioned above and as confirmed by decision no. 2572/2025 of your Court.

**42.**    As already apparent from the above brief review of the history of the actions of the respondents as ultimate shareholders of the former shareholders of the parent company (i.e., Lassia Investment Company (with the first respondent as shareholder), Family Unity Trust Company (with the third of the respondents as shareholder) and Glafkos Trust Company (with the second of the respondents as shareholder) ) and its

subsidiaries and former members of the board of directors of the parent company and its subsidiaries, the respondents, through the companies, former shareholders of Eletson Holdings Inc.and its subsidiaries, including the applicant herein, are doing everything possible to maintain control of Eletson Holdings Inc. and, through it, control of the applicant (Eletson Corporation), which is a wholly owned subsidiary. This was also agreed before your Court during the hearing, while continuing to dispute the authority of the parent company and its subsidiaries to be represented by the new management appointed to them as described above.

43. In addition to the above legal actions, which clearly aim to obstruct the exercise of the new management's authority, from the very moment that the new management of the parent company and the applicant sought to communicate with the former executives and staff of the companies, requesting access to all their documents and records in order to exercise their management, not only refused such access, but also, through the applicant and the ENEs, filed their application before your Court on February 19, 2025, requesting that the new administrators, including the applicant's representative, Leonard Hoskinson, from appearing as representatives of the parent company and its subsidiaries and from exercising administrative functions, which was rejected as previously stated.  In this petition, the respondents themselves refer to the messages sent by the new management to the parent company, the applicant here, and the respondents, in which they inform them of the change in management and request information and access to data. In addition to the above petition by the respondents themselves, I invoke and submit a) the emails dated 20.11.2024 from the new management to various departments and employees of Eletson Corporation **(Exhibit 28)**, b) the message dated 4.12.2024  to Ms. Karastamati and Mr. Chatzieleftheriadis, as well as the message dated 27.12.2024   to Mr. Chatzieleftheriadis (**Exhibit 29, 29a)**, c) the message dated 28.11.2024 to  employees of Eletson   Corporation Inc (**Exhibit 30)**.

44. In light of the above actions by those contesting the new management and their refusal to hand over the files and documents of both the parent company and its subsidiaries, including the applicant, the domestic bank "**AEGEAN BALTIC BANK S.A.**", **recognizing our new management,**

notified us by email dated 08.04.2025 (**Exhibit 31), addressed to Mr. Honskinson, as the newly appointed Chairman and Managing Director of our company, a petition for bankruptcy against Eletson Corporation, which was to be discussed on 13.5.2025.**

45.    **Our company, under its new management,** understands the risk to its existence posed by the bankruptcy petition, but also its pretextual nature for reasons that we will explain below, **it sought crucial documentary evidence from the parties concerned in order to defend itself.** In other words, despite the fact that they are no longer my managers, they are withholding and not handing over to the new management the evidence that is absolutely necessary to refute the bankruptcy petition, even though this evidence exists and is in their possession. In simple terms, they continue to behave as my administrators, even though they ceased to be so on 19.03.2025. They claimed before you that they allegedly do not have any documents in their possession. But how can they claim to remain the company's management while at the same time stating that they do not have any documents in their possession? Moreover, the second of the respondents, who appears to be the representative of the company's office in Greece, obviously has access to all the information concerning the subsidiary.

46.    As we mention in our petition, due to their behavior, we notified the respondents on May 6, 2025, of an extrajudicial protest May 2025 Extrajudicial protest – invitation to produce documents – reservation of our rights, as evidenced by No. 5805I/09.05.2025 (to the 1st of the respondents, Ms. Laskarina Karastamati), 5806I/09.05.2025 (to the 2nd of the respondents, Mr. Vasileios Chatzieleftheriadis) and 5808I/09.05.2025 (to the 3rdof the respondents, Mr. Vasileios Kertikoff) reports of service by the Bailiff of the Court of Appeal of Athens, Mr. Ioannis Mademtzis (**Exhibit *32ᵃ ,32b,32c*** ).

47.    **Our said extrajudicial notice was met with the respondents' complete indifference. If, as they alleged before Your Honourable Court, we supposedly had access to the requested documents, which they themselves allegedly do not possess, why did they not respond accordingly to our aforementioned extrajudicial letter, but instead disregarded it? Clearly, the entirety of the conduct and actions of the**

**opposing parties set out above readily demonstrates that they deliberately refuse to grant us access to anything concerning the Company, while claiming that they alone are the lawful representatives of the Company. Therefore, all their assertions that they allegedly do not have documents of the Company are manifestly pretextual as well as contradictory.** In fact, the respondents not only ignored us, but also provided, improperly authorized a lawyer to appear before the Piraeus Multi-Member Court of First Instance on May 13, 2025, to discuss AB Bank's bankruptcy petition against our Company, as explained before you.

48.    As is easily understood, without the necessary documents showing the financial situation of our Company, it is impossible for us to defend ourselves, since we are unaware, for example, the balance of our bank accounts, our receivables and liabilities, which show the financial situation of the Company, which is obviously crucial to refuting the claim that we are in a state of insolvency, as claimed by the applicant.

49.    There is therefore an urgent case and imminent danger that the former members of the Company's management, who have so far refused to hand over the management of the Company together with all its books and records, to provide us with copies of the following requested information in order to refute the bankruptcy petition, the hearing of which has been postponed and is now scheduled for September 23, 2025, i.e. very soon. Without these documents, it is objectively impossible to oppose the petition. Consequently, the imminent danger and urgency, lying in the loss of our ability to defend ourselves, are obvious.

50.    It should be noted that, as the bank also states in the bankruptcy petition, the multi-storey property located at 118 Kolokotroni Street, owned by Eletson Corporation, was sold and transferred for a consideration, namely a credit price of € 4.8 million, while it was and remains encumbered for loans of Piraeus Bank (!!!). Following our search in the land registry, we located notarial deed no. 25,789/08.11.2024 of the Piraeus notary, Ms. Maria Kolovou, (Exh. 33) from which it indeed appears that the aforementioned property was transferred to the Cypriot company Esposa Ltd (of whose interests, one wonders?) on 8.11.2024, that is, just 4 days after the order ratifying the reorganization plan of the parent

company and on the day when half of the members of the Board of Directors of the parent resigned, the sole asset of Eletson Corporation (!!!). Coincidence perhaps? Moreover, Esposa Ltd was founded on 28.9.2024 (Exh. 34), i.e. shortly before the sale and while the reorganization plan was being discussed in America. Indeed, the said company is reported to have capital of only a few thousand euros and bought a property for € 4.8 million !!!!It appears that the opposing parties, who are supposedly interested in the proper management of the Company and the protection of its interests, have embarked on a process of "unfair" liquidation of Eletson Corporation, stripping it of all its assets so that the new management will find no assets to manage.

51.    It is proven that the opponents, who allegedly care about the proper management of the Company and the safeguarding of its interests, have engaged in a process of "covert" liquidation of Eletson Corporation, stripping it of every asset, so that the new management will not find any property to manage.

52.    It is therefore self-evident that there is an imminent risk to the protection of the Company's interests, our full access to the Company's records, such as, among others, the documents of sale and collection of the consideration of the above property.

53.    As to the allegation of the opponents that our application is supposedly legally unfounded because there is no identity of parties with the bankruptcy trial, this is utterly wrong, as it follows from the provision of article 902 of the Civil Code, which we also invoke in our application.

54.    Specifically, as we also mention in our application, the obligation of the holder to proceed to the production of a document derives directly from the provision of article 902 of the Civil Code, that is, it is an obligation arising by law (Supreme Court 626/2014). The inspection of documents constitutes a peculiar judicial request, since it may be pursued during a pending trial according to the provisions of articles 450 to 452 of the Code of Civil Procedure. If there is no pending trial, the provisions of articles 901 to 903 of the Civil Code apply. Specifically, according to article 902 of the Civil Code, it is provided that "whoever has a legitimate interest to be informed of the content of a document that is in the possession of another

has the right to demand its production or a copy thereof, if the document was drawn up for the benefit of the one requesting it or certifies a legal relationship that concerns him [...]" . The conditions for the creation of a claim for the production of a document and/or for the granting of a copy thereof under the aforementioned article are, on the one hand, the existence of a legitimate interest of the applicant requesting the production, and on the other hand, the possession of the document by the one against whom the relevant claim is directed (Zepos, Law of Obligations, II, p. 679, Rammos, Commentary on Civil Code, article 902, no. 5).

**55.**     Among the cases of legitimate interest listed restrictively in the provision of article 902 of the Civil Code, which are required for the establishment of a claim for the production of a document or the granting of a copy, is also that in which the document certifies a legal relationship that also concerns the applicant. Furthermore, from the combination of the provisions of article 450 of the Code of Civil Procedure, article 902 of the Civil Code, and article 3 par. 3 of Presidential Decree 226/1992, it follows that, for the court to order the appearance of commercial books, these must constitute means of proof in a specific trial and the legal conditions for their inspection or production must be met, as regulated in the aforementioned provisions (I. Katras, B. Production of a document in particular, in: Claims Applications and Objections of the Law of Obligations of the Civil Code, 2018, p. 1189, Sakkoulas Publications).

**56.**     The production of documents under articles 901 to 903 of the Civil Code may be requested by action or by counterclaim. However, according to the prevailing view in theory and case law, the production of documents or the granting of copies may also be pursued by interim measures if there is an urgent case or imminent danger (Supreme Court 1613/2000 Hellenic Law Review 42.680, Thessaloniki Court of First Instance 23434/2001 Arm. 2002.1186, Athens Court of First Instance 10575/85 Hellenic Law Review 26.1418, Tzifras, Interim Measures[4], p. 344 ff., Chamilothoris, Interim Measures, ed. 2010, p. 328, Kroustalakis, Trial 21.651). This view is based on the provision of article 731 of the Code of Civil Procedure, which provides that the court is entitled to order, as an interim measure, the performance, omission, or tolerance of a specific act by the one against whom the application is directed (Rhodes Court of First Instance

2048/2009, Athens Court of First Instance 8430/2009, Trikala Court of First Instance 98/2008, Athens Court of First Instance 2077/2008, Thessaloniki Court of First Instance 42696/2007, Sparta Court of First Instance 906/2005, all in NOMOS legal database).

57.   It is noted that, in the procedure of Interim Measures, the temporary regulation of the above dispute is not prevented by the provision of article 692 § 4 of the Code of Civil Procedure, since the right whose securing is sought is not that of display, which by itself usually has no value, but the substantive one, and the display merely prepares the proof of it. In the action or the application for the display of a document, the holder thereof is passively legitimized, even if there is no claim against him relating to the document, and such holder may even be a third party, while no provision requires the service of the application on the person against whom the claim is directed (Thessaloniki Court of First Instance 18952/2003, NOMOS database).

58.   According to case law (Athens Court of Appeal 2456/2002, NOMOS database) in order for the action/application for the display of documents to be sufficiently specific, the documents whose display is requested must be specifically mentioned therein. The specification of the document to be displayed as above is necessary because in this way (a) the legality of the request of the plaintiff/applicant is checked, (b) the possibility is given to the defendant/respondent to set out the reasons for his refusal, and (c) the identification of the document in the operative part of the decision becomes feasible, which is necessary for its possible enforcement. That is, for the definiteness of the relevant action/application, it is sufficient that the document is individualized, without it being necessary also to specify in detail its content, because otherwise the exercise of the relevant claim is excessively hindered in certain cases (Supreme Court 508/1999 Hellenic Law Review 35.1299, Athens Court of Appeal 5720/1996 Hellenic Law Review 38.692, 1741/1994 Hellenic Law Review 38.1261, Thessaloniki Court of First Instance 9211/2016, NOMOS database).

59.   According also to relevant case law, an urgent case for the granting of a copy of a document under article 902 of the Civil Code is also the need for the preparation and drafting or filing of the relevant action, both from the point of view of exercising the claim in a specific manner and for its

proof (Piraeus Court of First Instance 3411/2021 NOMOS database, Lamia Court of First Instance 57/2018 NoB 2018.1467).

**60.**    Therefore, from the above it follows that the present application has been submitted pursuant to article 902 of the Civil Code, which does not require any identity of parties, but may even be submitted by a third party with a legitimate interest, which in this case is readily proven on the basis of the foregoing. The imminent danger to the protection of the Company's interests is therefore self-evident, as is our full access to the Company's data, including, among other things, the documents relating to the sale and collection of the consideration for the above property.

---

**WHEREAS** from the combination of the provisions of articles 902 of the Civil Code and 450 par. 1 of the Code of Civil Procedure it follows that anyone may request from a third party the display of any document which the latter holds and which may serve to prove his allegations, even as evidence by presumption.

**WHEREAS** in urgent cases or to avert danger, such display may also be ordered by the Single-Member Court of First Instance under the procedure of interim measures.

**WHEREAS**, in addition to the ordered production of a document, the granting of a copy to the applicant at his expense may also be ordered.

**WHEREAS** in this case, third parties, in the above sense, are the respondents, and the production of the above documents is necessary for our preparation to oppose the bankruptcy petition against us.

**WHEREAS** the respondents did not provide to our new management, as they were obliged to, in their capacity as former members of our management, despite our notices, the above requested documents which are in their hands.

**WHEREAS** there exists an urgent case and imminent danger, in the sense of article 688 of the Code of Civil Procedure, for the granting of the requested documents, since otherwise it is impossible for us to defend ourselves against the bankruptcy petition, the hearing of which will take place on 23.09.2025, that is, very soon, so that if they are not granted to us through the procedure of interim measures, our defense will be thwarted.

**WHEREAS** Your Court has subject-matter and territorial jurisdiction.

**WHEREAS** in order to prove my allegations in my application of 05.08.2025 with General/Specific Filing No. 20576/71126/2025, I invoke and submit the following documents:

1. The application of 05.08.2025 with General/Specific Filing No. 20576/71126/2025 for the taking of interim measures before the Single-Member Court of First Instance of Piraeus **(Exhibit I),**

2. The service reports no. 6703I/10-09-2025 and 6704I/10-09-2025 of the judicial bailiff of the Athens Court of Appeal, Ioannis Mademtzis, and the service report no. 400IA'/10-09-2025 of the judicial bailiff of the Athens Court of Appeal, Sotirios Roumeliotis, both members of the Civil Company of Judicial Bailiffs "ROUMELIOTIS S. – MANOLAKOU S. – MADEMTZIS I. A.E.D.E.", from which it follows the lawful and timely service of my application **(Exhibits IIa to IIc),**

3. The powers of attorney to the appearing and undersigned proxy lawyers for the representation of "ELETSON CORPORATION" in the trial of the present application for interim measures, bearing the Apostille, duly translated **(Exhibits IIIa to IIIc),**

4. The certificate of 20.3.2025 for the transfer of the Company's registered office from Liberia to the Marshall Islands and its registration in the registry of the Marshall Islands, bearing the Apostille **(Exhibit 1),** duly translated,

5. The certificate of 19.3.2025 of election and exercise of duties of "ELETSON CORPORATION" (certificate of Incumbency) issued by LISCR Trust Company of Liberia, bearing the Apostille, according to which Mr. Leonard Hoskinson is President, Treasurer, and Secretary of the Company **(Exhibit 2),** with the authenticity of the document certified by the Liberian lawyer James Pierre II, duly translated,

6. The certificate of 24.03.2025 of representation (certificate of Incumbency) of the Trust Company of the Marshall Islands, according to which Leonard J. Hoskinson remained President, Treasurer, and Secretary of the Company, bearing the Apostille **(Exhibit 3),** duly translated,

7. The certificate of 14.04.2025 of directors and shareholders (certificate of Directors and Shareholding) of "ELETSON CORPORATION", bearing the Apostille **(Exhibit 3a),** duly translated,

8. The certificate of 02.05.2025 of transfer of the Company's registered office issued by the registry of the Marshall Islands, pursuant to which it is proven that the Company has taken all the required actions for the transfer of its registered office from the Marshall Islands to the State of Delaware, bearing the Apostille **(Exhibit 4a),** duly translated,

9. The certificate of 02.05.2025 of conversion of "ELETSON CORPORATION" from a non-Delaware company to a Delaware company and the articles of association of the Company, both bearing the Apostille **(Exhibits 4b, 4c),** duly translated,

10. The certificate of 10.09.2025 of good standing of the Secretary of State of Delaware, bearing the Apostille **(Exhibit 4d),** duly translated,

11. The decision no. 2572/2025 of the Single-Member Court of First Instance of Piraeus, pursuant to which the application of 11.11.2024 of two former minority shareholders (Elafonissos Shipping and Keros Shipping) of "ELETSON HOLDINGS INC." for the appointment of a temporary management to the said company was rejected **(Exhibit 5),**

12. The application of 11.11.2024 with General/Specific Filing No. 16655/7823/2024 of the above former minority shareholders of "ELETSON HOLDINGS INC." requesting the appointment of a temporary management before the Single-Member Court of First Instance of Piraeus **(Exhibit 6),** with attached at its foot the temporary order of 12.11.2024 issued upon the above application, which ceased to be valid upon the issuance of the rejecting decision on the application no. 2572/2025 of the Single-Member Court of First Instance of Piraeus,

13. The certificate of 14.3.2025 of election and exercise of duties of Eletson Holdings Inc (certificate of Incumbency), according to which the Board of Directors of the Company consists of Adam Spears, Leonard Hoskinson, and Timothy Matthews, issued by the LISCR Trust Company of Liberia, according to the certification of Liberian lawyer James Pierre II, which is also submitted in official translation, accompanied by the said certification and by the application of 14.3.2025 for the relocation of the Company to the Marshall Islands (with its attached supporting documents), the certificate of relocation of 14.3.2025 and the resignation of 14.3.2025 of LISCR TRUST COMPANY as registered agent for the Company, all bearing the Apostille, duly translated **(Exhibit 7),**

14. The rejection of 28.03.2025 of the opponents' appeal against the relocation of "ELETSON HOLDINGS INC." with the lifting of the temporary order, and the rejection of 24.04.2025 of the appeal against the relocation of "ELETSON CORPORATION", as proven by the certificate of 05.05.2025 of the Secretary of the Supreme Court of Liberia, bearing the Apostille **(Exhibit 8),** duly translated,

15. The certificate of 24.3.2025 of representation (certificate of Incumbency) of the Trust Company of the Marshall Islands, according to which the Board of Directors of Eletson Holdings Inc continues to consist of Adam Spears, Leonard Hoskinson, and Timothy Matthews, with Adam Spears being the legal representative **(Exhibit 9),** bearing the Apostille, duly translated,

16. The application of 3.2.2025 with General/Specific Filing No. 25046/43/2025 of the parent company Eletson Holdings **(Exhibit 10),** represented by Adam Spears, by which it requested that in Greece be recognized the pending foreign insolvency proceeding as the main insolvency proceeding, and specifically:

    a. The Order no. Doc. 1212/25.10.2024 of the Bankruptcy Court of the Southern District of New York in the case Case No. 23-10322 (JPM), under the title: "MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE", and

    b. The Order of 4th November 2024 of the U.S. Bankruptcy Court – Southern District of New York (Case No. 23-10322 (JPM)), under the title: "FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS",

It is noted that to the above application are attached as co-submitted documents (duly certified copies, from the certified copies in the U.S.A., all bearing the Apostille and accompanied by the duly certified copies

with an official translation into the Greek language) the following documents:

i. The application of 03.07.2023 of involuntary bankruptcy (Chapter 7) against the debtor: "**ELETSON HOLDINGS INC**.", addressed to the Bankruptcy Court of the Southern District of New York, by which the case was opened under reference: 23-10322.

ii. The Order no. Doc 215/25.09.2023 (another) of the Bankruptcy Court of the Southern District of New York in the case Case No. 23-10322 (JPM), under the title: "ORDER CONVERTING THESE CASES TO CASES UNDER CHAPTER 11", by which, following the request of "**ELETSON HOLDINGS INC.**," the procedure of involuntary bankruptcy (Chapter 7) was converted into a voluntary bankruptcy proceeding (Chapter 11).

iii. The Order no. Doc. 1212/25.10.2024 (another) of the Bankruptcy Court of the Southern District of New York in the case Case No. 23-10322 (JPM), under the title: "MEMORANDUM OPINION AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS, SUSTAINING OBJECTIONS TO COMPETING PLANS, AND DENYING MOTION IN LIMINE", by which the said court approved the reorganization plan.

iv. The Order of 4 November 2024 of the U.S. Bankruptcy Court – Southern District of New York (Case No. 23-10322 (JPM)), under the title: "FINDINGS OF FACTS, CONCLUSION OF LAWS, AND ORDER CONFIRMING PETITIONING CREDITORS' AMENDED JOINT CHAPTER 11 PLAN OF ELETSON HOLDINGS INC. AND ITS AFFILIATED DEBTORS", by which the reorganization plan is confirmed.

v. The document no. Doc. 1258/19.11.2024 of the case Chapter 11, Case No. 23-10322 (JPM), under the title: "NOTICE OF (I) THE OCCURRENCE OF THE EFFECTIVE DATE AND (II) FINAL DEADLINES FOR FILING CERTAIN", by which the reorganization plan came into force on 19.11.2024.

vi. The Order no. Doc 1326 (another) of the U.S. Bankruptcy Court of the Southern District of New York in the case Chapter 11, Case No. 23-10322

(JPM), under the title: "ORDER (I) AUTHORIZING ADAM SPEARS TO ACT AS FOREIGN REPRESENTATIVE OF REORGANIZED HOLDINGS AND (II) GRANTING RELATED RELIEF", by which Mr. Adam Spears was appointed sole "foreign representative" exclusively on behalf of the reorganized "**ELETSON HOLDINGS INC**." in Greece and Liberia, and exclusively for the purpose of requesting recognition or supporting applications for recognition of the Chapter 11 proceeding in Greece and Liberia.

vii. The document no. Doc. 20/30.12.2024 of the District Court of the Southern District of New York in the case Case 1:24-cv-08672-LJL, under the title: "STIPULATION AND AGREEMENT TO DISMISS APPEAL UNDER RULE 8023 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE", from which it is proven that the appeal of 07.11.2024 of "ELETSON HOLDINGS INC." against the under (iv) Order was voluntarily withdrawn.

viii. The Affidavit of 28 January 2025 of the special legal representative of "ELETSON HOLDINGS INC.", by which he certifies that there exists no other foreign insolvency proceeding known to him related to the former.

17. The decision no. 272/2025 of the Court of First Instance of Athens, by which the application for recognition was rejected **(Exhibit 11),**

18. The submissions of 01-04-2025 of the opponents on the application of 11.11.2024 of the companies "ELAFONISSOS SHIPPING CORPORATION" and "KEROS SHIPPING CORPORATION" before the Single-Member Court of First Instance of Piraeus **(Exhibit 12),**

19. The intervention of 03.02.2025 of "ELETSON HOLDINGS INC." against the application of 11.11.2024 of the companies "ELAFONISSOS SHIPPING CORPORATION" and "KEROS SHIPPING CORPORATION" before the Single-Member Court of First Instance of Piraeus **(Exhibit 13),**

20. The application with protocol no. 2229/07-08-2025 of the Company to the Ministry of Shipping, by which we request the revocation of Vasileios Chatzieleftheriadis (also the 2nd of the respondents) from the position of representative of the Company's establishment in Greece **(Exhibit 14),**

21. The reply with protocol no. 2212.2-1/1709/60407/2025 of the Ministry of Shipping to the application with protocol no. 2229/07-08-

2025 of "ELETSON CORPORATION" regarding the revocation of the representative of the Company's establishment in Greece **(Exhibit 14a),**

22. The reply with protocol no. 2212.2-1/1709/49803/2025 of the Ministry of Shipping and Island Policy regarding the transfer of the Company's seat from Liberia to the Marshall Islands and from the Marshall Islands to Delaware **(Exhibit 14b),**

23. The minutes of 24-7-2025 of the Board of Directors of "ELETSON CORPORATION" regarding the revocation of the 2nd of the respondents, signed by Mr. Hoskinson as President and Secretary **(Exhibit 15),**

24. The application of 31.03.2025 and with GAK/EAK 7937/2174/2025 of the banking company under the name "AEGEAN BALTIC BANK SOCIETE ANONYME BANKING COMPANY" for the declaration of our bankruptcy before the Multi-Member Court of First Instance of Piraeus **(Exhibit 16),**

25. Exact copy from the original list of cases of the hearing of 13.05.2025 of the Multi-Member Court of First Instance of Piraeus, Voluntary Jurisdiction Procedure **(Exhibit 17),**

26. The application of 13.09.2023 for the conversion by the parent company itself of the initially submitted bankruptcy petition into a petition for submission under Chapter 11 **(Exhibit 18),**

27. The reorganization plan (Plan) of "ELETSON HOLDINGS INC." approved by the decision of 25.10.2024 of the Bankruptcy Court and confirmed by the Order of 4.11.2024 of the same Court **(Exhibit 19),** duly translated,

28. The decision no. 665/2025 of the Single-Member Court of First Instance of Piraeus (Provisional Measures Procedure), by which the application of 19.02.2025 of the opponents through the applicant and ENE was rejected as vague due to contradiction **(Exhibit 20),**

29. The application of 10.02.2025 for provisional measures of the opponents directed also against the current representative of the Company Leonard Hoskinson, by which they requested that the new management of the parent company cease to exercise powers of representation and to make decisions as shareholder of its subsidiaries **(Exhibit 21),**

30. The intervention of 04.02.2025 of the opponents against the application of 3.2.2025 for recognition of the parent company "ELETSON HOLDINGS INC." (**Exhibit 22),**

31. The lawsuit of 17.1.2025 of the opponents before the Multi-Member Court of First Instance of Piraeus (ordinary procedure) with the request that it be recognized that the confirmed reorganization plan produces no effect in Greece and cannot be recognized in Greece **(Exhibit 23),**

32. The appeal of 19-06-2025 of the opponents against the decision no. 2572/2025 of Your Court **(Exhibit 24),**

33. The Order of 27.02.2025 of the Bankruptcy Court of New York by which sanctions (monetary penalty of USD 1,000) were imposed on the former majority shareholders of Eletson Holdings Inc., namely on "Lassia Investment Company", "Family Unity Trust Company" and "Glafkos Trust Company", but also on the so-called provisional board of directors of the first plaintiff and on Mr. Chatzieleftheriadis as well as on AOR himself, for each day of non-compliance with its Order of 29.01.2025 for compliance with the reorganization plan **(Exhibit 25),**

34. The Order of 29.01.2025 of the U.S. Bankruptcy Court under the title "ORDER IN SUPPORT OF CONFIRMATION AND CONSUMMATION OF THE COURT-APPROVED PLAN OF REORGANIZATION" by which compliance with the confirmed plan is ordered **(Exhibit 26),**

35. The supplementary order of 13.03.2025 of the Bankruptcy Court of New York for the further support, confirmation, and consummation of the approved reorganization plan **(Exhibit 27),**

36. The e-mail messages of 20.11.2024 of the new management to various departments and employees of "ELETSON CORPORATION" **(Exhibit 28),**

37. The message of 4.12.2024 addressed to Ms. Karastamati and Vasilis Chatzieleftheriadis as well as the message of 27.12.2024 of the first of us to Mr. Chatzieleftheriadis **(Exhibits 29, 29a,**

38. The message of 28.11.2024 to employees of "ELETSON CORPORATION" Inc **(Exhibit 30),**

39. The e-mail correspondence of 8.4.2025 with an employee of AB BANK by which the bankruptcy petition against the latter was communicated to Mr. Hoskinson as appointed President and Chief Executive Officer of "ELETSON CORPORATION" **(Exhibit 31),**

40. The extrajudicial protest – request for production of documents – reservation of rights of 06-05-2025, as evidenced by the service reports no. 5805I/09.05.2025 (to the 1st of the respondents, Ms. Laskarína Karastamati), no. 5806I/09.05.2025 (to the 2nd of the respondents, Mr. Vasileios Chatzieleftheriadis) and no. 5808I/09.05.2025 (to the 3rd of the respondents, Mr. Vasileios Kertikoſ), drawn up by the Court Bailiff at the Athens Court of Appeal, Mr. Ioannis Mademtzis **(Exhibits 32a, 32b, 32c),**

41. The deed no. 25.798/08.11.2024 of the Notary Public of Piraeus, Ms. Maria Kolovou, by which the multi-storey property of "ELETSON CORPORATION" at 118 Kolokotroni Street was transferred, encumbered and against a credit price, to the Cypriot company Esposa **(Exhibit 33),**

42. Data concerning Esposa Limited **(Exhibit 34).**

43. The document of 8-9-2025 entitled "STIPULATION AND ORDER BY AND BETWEEN ELETSON HOLDINGS INC. AND AEGEAN BALTIC BANK S.A. RESOLVING PROOF OF CLAIM NO. 4", which was referred to in the hearing by the attorney of the respondents **(Exhibit 35).**

44. The decision of 21.9.2025 of the Company's Board of Directors for the appointment of Kilian Papadimitriou as representative of the Company's office in Piraeus (**Exhibit 36).**

### FOR THESE REASONS

### and expressly reserving all our lawful rights,

### WE REQUEST

1. **That the present application and this memorandum be accepted.**

2. **That it be ordered that each of the respondents** grant us copies of the following documents, which exist and are in their possession:

   i. Balance Sheets or Statements of Financial Position for the last five fiscal years.

   ii. Book of revenues/expenses.

   iii. Statements of Results for the last five fiscal years.

   iv. Statements of Changes in Equity for the last five fiscal years.

   v. Cash Flow Statements for the last five fiscal years.

vi. Notes to the Financial Statements for the last five fiscal years.

vii. Auditors' Reports for the last five fiscal years.

viii. General ledger and trial balance of the current fiscal year.

ix. For the period from 01.01.2025 to 31.07.2025, trial balance of fourth-degree accounts and VAT returns.

x. The deed of payment of the credited price of the sale of the property at 118 Kolokotroni Street, effected under deed no. 25.798/08.11.2024 of the Notary Public of Piraeus, Ms. Maria Kolovou.

xi. Copies of all maintained bank accounts for the period from 31.07.2024 to 31.07.2025, showing the balances against the banks and any overdue and payable debit amount owed to them.

xii. Detailed list of loan and other credit agreements, indicating bank/financial institution, contract/account number, balance.

xiii. List of personal guarantees and security interests, or other securities over any type of assets, indicating the secured creditor, the type of security, and the secured claim.

xiv. List of current and overdue obligations to the State and Social Security Institutions.

xv. Debt settlement arrangements with creditors in general, including, indicatively, with the State and social security institutions.

xvi. Detailed list of the company's assets, immovable and movable.

xvii. Detailed Fixed Assets Register of the company.

xviii. Tax assessment notes, Corporate Income Tax Returns, VAT Returns, ENFIA Returns and Declarations for the last five fiscal years.

xix. Lease agreements of movable or immovable property.

xx. Licenses and rights of use (e.g. operating licenses, trademarks).

xxi. Company's personnel table with their salaries.

xxii. Judicial actions against the company and by the company against third parties.

xxiii. Detailed list of suppliers and creditors.

xxiv. Payments to creditors and for covering the company's operating expenses during the last three months prior to the filing of the bankruptcy petition.

xxv. Statement of the company's monthly operating expenses.

xxvi. List of receivables for the period from 31.07.2024 to 31.07.2025.

xxvii. List of the company's pending and executed contracts of any

kind, including in particular ship management contracts.

xxviii. The agreement with "AEGEAN BALTIC BANK SOCIETE ANONYME BANKING COMPANY" on settlement and installment repayment of the debt under decision no. 1280/2024 of the Multi-Member Court of First Instance of Piraeus.

3. That, in case of non-compliance by the respondents with the operative part of Your Court's decision, a monetary penalty of EUR 5,000.00 **be threatened** against each of the respondents for each day of delay in granting the above documents, as well as their personal detention.

4. That the respondents **be condemned** to the overall court expenses and the fee of our attorney-at-law.

5. **That the allegations of the opponents be rejected.**


**Athens, September 22, 2025**
**The attorneys**

# EXHIBIT C

**Before the Single-Member Court of First Instance of Piraeus**
**MEMORANDUM**
**(Procedure of Interim Measures)**

**Vasileios Kertsikof of Errikos-Iosif-Alvertou and Stavrianis**, who was born in Athens on 07/03/1966, T.I.N. 038082958 Tax Office of Psychiko, resident of Filothei, Attica (49 Eleftheriou Venizelou Street), private employee, holder of police identity card no. A0162971 issued by the Police Department of Filothei-Psychiko on 14/05/2020.

**Laskarina Karastamati of Ioannis and Erato**, who was born in Athens, Attica on 18/06/1963, T.I.N. 044627470 Tax Office of Glyfada, resident of Voula, Attica (5 Zymis Street), retired lawyer-administrative advisor, holder of police identity card no. X531876 issued by the Police Department of A' Glyfada on 30/10/2003.

**Vasileios Chatzieleftheriadis of Apostolos and Argiro**, who was born in Paleo Faliro, Attica on 30/04/1972, T.I.N. 052767454 Tax Office of Glyfada, resident of Voula, Attica (8 Tynou Street), private employee, holder of police identity card no. A0632965 issued by the Police Department of Vari Voula Vouliagmeni on 29/07/2021.

**AGAINST**

The fictitious company with the allegedly declared registered office Cogency Global Inc. 850, New burton Road, suite 201, Dover, Delaware USA 19904 (which unlawfully uses the name of the historic Greek shipping management company of ocean-going merchant vessels ELETSON CORPORATION) and against the alleged representative of this fictitious company.

It was discussed on 19.09.2025, under filing number GAK 20576/2025 EAK 1126/06-08-2025, the application for interim measures of the opposing party against us, which we deny as legally and substantively unfounded.

The prepayment of the attorney's fee was made, as evidenced by the receipt submitted herewith.

**<u>LACK OF LEGITIMATE INTEREST</u>**

The objection is essentially based on two main grounds:

1. The requested documents, insofar as they exist, are not issued in the name of the shipping company managing oceangoing vessels, that is, they are not issued in the name of the actual ELETSON CORPORATION, but are issued in an economically and

1

technically consolidated manner in the name of the holding company ELETSON HOLDINGS INC. (which was established precisely to allow for the issuance of such information in an economically and technically consolidated manner).

2. The requested documents, even if they existed in the name of the actual ELETSON CORPORATION, are neither necessary nor sufficient to refute the bankruptcy petition of the Bank. From the catalog of documents requested, it appears that what is being sought here is not the submission of documents but in reality the lifting of the actual company ELETSON CORPORATION in execution of a foreign decision on the reorganization of ELETSON HOLDINGS INC. In other words, it is essentially the use of a security measures procedure in order to satisfy a claim that is not legitimate (the illegitimacy of the claim stems from the fact that the foreign decision on the reorganization of ELETSON HOLDINGS INC.—by virtue of which the applicant signing the petition acts—has not been recognized in Greece). (appended with reference to decision of the Multi-Member Court of First Instance of Athens 272/06-08-2025).

3. None of the documents requested are necessary in order for the applicant to defend against the bankruptcy petition of AB Bank (e.g., the relationship may involve a personnel report [document xxi], the detailed register of fixed assets [xvii], monthly operating expenses report [xxv], etc.) with the claim of AB Bank for which the bankruptcy petition has been filed. The only document that should be requested is the cause of the claim, namely the loan agreement with the bank. This document and this information, however, is already known since the Bank had been involved in the reorganization in New York. Moreover, the persons who fraudulently violated the foreign bankruptcy law (see below) and caused the (non-recognition) reorganization of the holding company ELETSON HOLDINGS INC., which is the guarantor of the loan of the bank Aegean Baltic Bank to ELETSON CORPORATION, very recently, on 8 September 2025, consented to the issuance of an order by the foreign Bankruptcy Court (Stipulation and Order) (appended with reference) regarding the claim of Aegean Baltic Bank against the holding company ELETSON HOLDINGS INC., as guarantor of the loan received by the debtor ELETSON CORPORATION from the Bank. The Bank therefore knew everything and it is proven that what is being used here is in essence the process of serving documents in order to "pierce" Eletson Corporation and impose/enforce the foreign reorganization decision of ELETSON HOLDINGS INC. which has not been recognized in Greece.

**GROSSLY ABUSIVE APPLICATION**

The legal application, even if it were momentarily accepted that the persons hiding behind the applicant had the right to hold the requested documents, is grossly abusive for two main reasons:

2

1. In the context of the lengthy and painstaking (even if invalid under the domestic legal order) reorganization procedure of the holding company ELETSON HOLDINGS INC. conducted before the foreign Bankruptcy Court, there took place an extensive presentation of documents, and thus the opponents already hold all the documents and information available (it is well known in legal circles that in proceedings before the U.S. Federal Courts there is exhaustive display of documents). As already shown, the legal application is entirely pretextual, firstly to introduce a new, second, contradictory and unlawful request for postponement of the (pending) bankruptcy petition of Aegean Baltic Bank against the actual ELETSON CORPORATION, and secondly, to exert undue pressure against the defendants as natural persons.

2. As we have already noted, the persons who fraudulently circumvented the foreign bankruptcy law (see below) and caused the (non-recognition) reorganization of the holding company ELETSON HOLDINGS INC., which is guarantor of the loan of Aegean Baltic Bank to ELETSON CORPORATION, very recently, on 8 September 2025, consented to the issuance of an order by the foreign Bankruptcy Court (Stipulation and Order) regarding the claim of Aegean Baltic Bank against the holding company ELETSON HOLDINGS INC., as guarantor of the loan received by the debtor ELETSON CORPORATION from the Bank. By this consensual order, the supposedly reorganized holding company ELETSON HOLDINGS INC. and Aegean Baltic Bank agreed that the Bank would be paid, not for the amount of its claim, which is said to exceed USD 4 million, but for the much smaller amount of USD 166,155.24, while at the same time providing that no increase in the Bank's claims against the debtor ELETSON CORPORATION would be sought. It becomes evident, to any reasonable observer, that if the supposedly reorganized holding company ELETSON HOLDINGS INC. genuinely protected the interests of the debtor ELETSON CORPORATION, it would not have been so indulgent towards the Bank, and it could not, according to common logic, have achieved the dismissal and rejection of the Bank's bankruptcy petition against ELETSON CORPORATION, with the result that the continuation of the proceedings is prolonged and, indeed, while the debtor is deprived of liquidity and faces enormous pressure from the Bank.

## INADMISSIBILITY OF THE APPLICATION DUE TO VAGUENESS

The application of the opposing party, (hereinafter "ELETSON Delaware"), a shell company, without organizational structure and operation at its declared alleged registered office in Delaware, suffers from fundamental contradiction and is not subject to judicial assessment as follows: if indeed it concerns ELETSON CORPORATION and if indeed it is legally represented by the aforementioned foreign party, and if indeed it has an establishment pursuant to article 25 of Law 27/75 in Piraeus, at 118

Kolokotroni Street, which is its own, then how is it possible not to possess or not to know itself the elements it requests from us?

For the admissibility of the application, a clear specification of the documents must be made (Varvakokilis, commentary on article 450). In this case, document titles are listed without any further specification, date, etc. These titles are so general that it becomes evident that what is being sought is the display of documents that the signing attorney of the application merely presumes exist, without knowing that they actually exist and without specifying them. Particularly regarding commercial books, Varvakokilis states in case law that it is the position that in the application there must be specified, in addition to other details, the page on which the entries concerning the disputed case exist (Supreme Court 282/1971, etc.).

**<u>INADMISSIBILITY OF THE APPLICATION DUE TO SATISFACTION OF A RIGHT</u>**
It is firmly established in case law that the display of documents is inadmissibly sought in security measures, because, if the application is accepted, it leads to impermissible satisfaction of a potential right under articles 901 et seq. of the Civil Code.
The display of documents in security measures is permitted only when there is a pending trial and such documents are useful in that pending proceeding. From the fact that the bankruptcy petition filed by AB Bank shows that there is no pending proceeding, it is clear that the documents requested cannot be useful in a pending proceeding.

**<u>The application is inadmissible because the procedure of interim measures is not permitted</u>**

As appears from the relief sought in the pending application, the opposing party requests by way of the interim measures procedure the display of documents/items. Such a request may be submitted under the interim measures procedure (article 450 CCP) only when there is a pending trial. In particular, as is consistently accepted (Court of First Instance of Drama 47/2015, Court of First Instance of Athens 4572/2014):
"The provisions of articles 450 et seq. CCP regulate the obligation of the parties or third parties to display documents *during the pendency of a trial*, when the document requested is to be used as evidence, in deviation from those of articles 902–903 of the Civil Code, which apply when there is no pending trial in which the document could be used as evidence, and therefore in the case where the necessity of producing documents arises *during the pendency of a trial*, exclusively applicable are the provisions of article 450 et seq. CCP (Court of Appeals of Thessaloniki 1150/2001 Hellenic Justice 44, 524, Court of Appeals of Thessaloniki 1939/1998 Hellenic Justice 40, 382). Furthermore, according to the aforementioned provision of article 902 CC, the legitimate interest pursued through the display of documents is restricted to the

three limited and exclusive cases provided by that article, namely it arises on the basis of the provision that such legitimate interest exists only when: a) the document was drafted for the purpose of providing evidence, or is necessary to preserve the rights of the requester, a fact judged by the purpose for which it was drafted at the time of its preparation, so that even from its content there exists no doubt that the document was prepared exclusively for the benefit of the requesting holder, b) when it certifies or proves a legal relationship concerning the requester, or c) when it relates to negotiations conducted for the conclusion of a legal transaction and concerns the requester, provided that such negotiations did not culminate in the final contract" (Court of Appeals of Athens 10090/1980 et al., Court of Appeals of Athens 10381/1988 NoB 37, 747, Court of Appeals of Athens 1090/1981 Armen. 1981, 749).

Similarly, it was ruled by Thessaloniki Court of Appeals 1150/2021 that:

"...the provision of article 902 CC applies when there is no pending trial in which the requested document could be used specifically as evidence, whereas the provisions of articles 450 et seq. CCP exclusively regulate the obligation of the parties or third parties to produce documents during the pendency of a trial, in which the document requested is to be used as evidence (Supreme Court 1264/1983 15.400, Court of Appeals of Thessaloniki 1939/1998 Hellenic Justice 40.382, Court of Appeals of Thessaloniki 1783/1993 Arm. MH 590, Court of Appeals of Athens 16072/1988 Hellenic Justice 34.1366, Court of Appeals of Athens 10381/1988 NoB 37.747). Moreover, pursuant to article 902 CC, whoever has a legitimate interest to be informed of the content of a document in the possession of another has the right to request its display or a copy thereof, if the document was drafted for the benefit of the person requesting it, or certifies a legal relationship concerning him, or relates to negotiations conducted regarding such legal relationship either directly by him or for his benefit through intermediaries. From this provision it follows that the prerequisite for the creation of a claim for the display of a document is the existence of such legitimate interest of the person requesting its display. The cases of the existence of legitimate interest for the display of a document or the granting of a copy are limited to those set out in article 902 CC and are referred to exhaustively (Georgiadis, General Principles of Civil Law, vol. IV, p. 553, II. Balis, Civil Law 22.154, Court of Appeals of Athens 10381/1988 NoB 37.747, Court of Appeals of Athens 1090/1981 Arm. 1981.479, Court of Appeals of Piraeus 102/1964 NoB 14.1089)."

Therefore, since there is no pending trial, and no such legitimate interest is cited, it follows that the pending application is inadmissible because it has been filed by way of the interim measures procedure, whereas it should have been filed as an action under article 901 et seq. CC.

**LACK OF ACTIVE LEGITIMACY**

The applicant is a shell company with a declared alleged registered office in Delaware, USA (a well-known tax haven) and cannot be recognized in Greece either as a valid or as a null legal entity. In the Greek legal order it is absolutely inadmissible, for the reasons extensively developed in the decision of the Multi-Member Court of First Instance of Athens 272/06-08-2025. But the only reason for the applicant's transfer from its initial registered office (Monrovia, Liberia), first to the Marshall Islands, and then to the tax haven State of Delaware, USA, was opportunistic. Especially the second transfer decision appears to have been taken so that, in the (less likely) event of acceptance, by the competent Court of Piraeus, of the (pending) bankruptcy petition of Aegean Baltic Bank against the actual ELETSON CORPORATION, then such a decision of Piraeus would face difficulties in recognition in the USA.

## LACK OF PASSIVE LEGITIMACY

If it is assumed that there are two companies, one being the new (shell) ELETSON Delaware, and one being the historic (actual) ELETSON CORPORATION, then according to what is stated in the opposing party's application, why should it be directed against ELETSON CORPORATION, which is actually based in Piraeus?

The answer is obvious.

The legal application is entirely pretextual, intended to exert undue pressure against us, the defendants as natural persons, but also to introduce a new, second, contradictory and unlawful request for postponement of the (pending) bankruptcy petition of Aegean Baltic Bank against the actual ELETSON CORPORATION.

## THE APPLICATION IS SUBSTANTIVELY UNFOUNDED

Furthermore, it is admitted in the application that the "documents" requested are not in the personal possession of each defendant, but are in the possession of the company (see para. 27, last line where it is written literally that the documents exist and are **in its** possession, i.e., of the company).

Since it is mentioned that the defendants are no longer members of the applicant's Board of Directors, it is evident that they cannot possibly hold at home all those corporate documents and books which, to the extent they exist, are evidently located at Kolokotroni 118. The opposing parties are therefore first called upon to achieve recognition of the foreign reorganization procedure, that has been distorted into a forcible takeover of the corporate Group, and indeed without the contribution of any body ensuring even the slightest objectivity or impartiality, such as a trustee.

6

**COMPLETE ABSENCE OF DANGER AND URGENCY**

The bankruptcy petition of the Bank was filed on 1 April 2025, but the present application for the display of documents under the urgent procedure of interim measures bears the date 5 August 2025. It was served only on 10 September 2025. This not only fails to prove any urgent and imminent risk but instead demonstrates the entirely pretextual nature of the present application.

Moreover, as the actual ELETSON CORPORATION based in Piraeus, represented by its sole legal representative Mr. Vasileios Chatzeleftheriadis, has demonstrated, it is entirely possible to defend against the Bank's bankruptcy petition without any need for intervention in the allegedly pending reorganization procedure in Delaware, USA. Neither the possible repayment (or not) nor the outcome of the case there concerns the present case.

Specifically:

It is stated in para. 26 that the Bank sent an email to Hoskinson on 8 April informing him of a pending bankruptcy petition to be heard on 13 May. First of all, this message does not constitute recognition that Hoskinson is a representative. The bankruptcy petition was served at Kolokotroni (not to Hoskinson in the Marshall Islands or in Delaware). For 4 months the opponents remained inactive, without filing an application for display of documents immediately, even though they now claim to have ignored the ex parte judgment mentioned as issued on 6 May. Does this not prove that the application for display of documents has nothing to do with the Bank's bankruptcy petition, but constitutes an abuse of procedural provisions aimed at circumventing insolvency law? Moreover, the Bank's bankruptcy petition will be heard on 23 September, so it is more than obvious that the opponents are using the Bank's bankruptcy petition as a pretext. Procedural provisions are being abused for the further postponement of the hearing of the bankruptcy petition, which, if it proceeds, will clearly clash with the foreign proceedings of an impermissible supposedly group reorganization of the parent ELETSON HOLDINGS INC. It should be noted that the hearing of the Bank's bankruptcy petition had already been postponed once, from 13 May 2025 (i.e., since it was already known that the hearing would take place on 23 September). Therefore, if there had truly been urgent grounds for requesting the documents, a relevant application should have been filed immediately after the adjournment on 13 May.

**OBJECTION OF AUTHORITY**

The application states in the first 22 paragraphs that the power of attorney of the Lawyer who signed it was given by the "new" management appointed by the

shareholder of the applicant and indeed by the reorganized ELETSON HOLDINGS INC. In para. 21 it is even admitted that an application for recognition of the foreign insolvency proceedings was filed "and the issuance of a decision is awaited." On 6 August, when the present application for interim measures was filed, it is likely that the Lawyer who signed it was not yet aware of the decision of the Athens Multi-Member Court of First Instance 272/2025, which rejected the recognition application. In any case, since the application for recognition of the foreign insolvency proceedings was rejected, this has the self-evident consequence that the foreign proceedings produce no legal effect whatsoever in Greece and are therefore not recognized in Greece, neither the new Board of Directors of ELETSON HOLDINGS INC. nor the decision of ELETSON HOLDINGS INC. to appoint a new Board of Directors of ELETSON CORPORATION.

Moreover, based on the certificate dated 11.4.2025 from the competent Services of the Ministry of Shipping, the lawful representative in Greece, where the only establishment and organizational structure exist, of ELETSON CORPORATION is Vasileios Chatzeleftheriadis. It is noted that the date of transfer 19.3.2025 mentioned in para. 2 of the present application regarding the change of the applicant's Board of Directors was rejected. Therefore, based on all the above, the foreign insolvency proceedings have no legal consequences in Greece and no act carried out under the non-recognized foreign insolvency proceedings is recognized in Greece (i.e., neither a new Board of Directors, nor an instruction to a Lawyer regarding the present application, nor transfers in the Marshall Islands or in the State of Delaware).

Regardless of the above, the Piraeus Single-Member Court of First Instance has in the past ruled that the actual seat of ELETSON CORPORATION is in Piraeus (see line 8 of the front side of the 21st page of the submitted decision 1957/2023). Moreover, the actual seat of ELETSON CORPORATION is also acknowledged in the pending application, since it is recognized that the three (3) members (Greek citizens, permanent residents of Greece) were, until the alleged change in March 2025, members of the Board of Directors and naturally met and deliberated in Greece for the legal entity. Consequently, all references to the relocation of the company's registered office to tax havens around the globe are not only irrelevant but, ultimately, also prove the crucial issue that the declared registered office of the applicant in an opportunistic location such as the State of Delaware, USA, is fictitious. The issue of authority is judged according to the law of the actual seat, where the foreign reorganization procedure of ELETSON HOLDINGS INC. does NOT apply.

Finally, regarding the 19.2.2025 application for interim measures (in the name of ELETSON CORPORATION, inter alia, referred to in para. 21 of the present application) which was heard on 23.5.2025 (also referred to in para. 25 of the present application),

it was alleged that representation of ELETSON CORPORATION by another lawyer and the resignation of the lawyer of the application had been pursued. However, the court proceeded to hear the case and ultimately rejected the application as vague, something also admitted in para. 25 of the present application. This constitutes clear judicial precedent that the representation of ELETSON CORPORATION cannot be accepted by the natural person called Hoskinson.

## 1. INTRODUCTION – IDENTITY OF THE APPLICANT AND OF US, THE DEFENDANTS Kertsikof, Karastamati, Chatzeleftheriadis

The interests behind the present application are absolutely identified with the aggressive alternative fund Murchinson and its subsidiary company Levona P.O. Box (without organizational structure and activity).

I explain in detail below.

I, Vasileios Kertsikof (Kertsikof), am the lawful representative, in Greece, acting jointly or separately with the other lawful representative, Lascarina Karastamati (who is also my first cousin), of the foreign-based shipping company EMC GAS CORPORATION (TIN 997370790, Tax Office of Piraeus).

I, Lascarina Karastamati (Karastamati), am the lawful representative, in Greece, acting jointly or separately with the other lawful representative, Vasileios Kertsikof (who is also my first cousin), of the same foreign-based shipping company EMC GAS CORPORATION (hereinafter, for reasons of simplification and brevity, referred to as "internal representative" or "EM G I GAS CORPORATION" or "EMC GAS" or "EMC Gas Corporation"). This company has been established under the law of the Marshall Islands and has a permanent establishment in Greece (118 Kolokotroni, Piraeus) according to the relevant provisions of the Greek tax legislation as well as the provisions of mandatory corporate law which allow a foreign company managing ocean-going ships to establish a branch in Greece, with legal personality and representation in court and out of court, as amended and currently in force, Law 89/67, 378/68 and art. 25 L. 27/75.

I, Vasileios Chatzeleftheriadis (Chatzeleftheriadis), am the lawful representative, in Greece, of the foreign-based shipping companies ELETSON CORPORATION (TIN 098035979/Tax Office of Piraeus) and EMC INVESTMENT CORPORATION (TIN 098059836/Tax Office of Piraeus). Vasileios Kertsikof and Lascarina Karastamati are my first cousins.

These companies, ELETSON CORPORATION (hereinafter, for reasons of simplification and brevity, also referred to as "technical manager" or "management company" or "ELETSON CORPORATION" or "Eletson Corporation" or "EC"), and EMC INVESTMENT CORPORATION (hereinafter, for reasons of simplification and brevity, also referred to as "commercial counterpart" or "financial counterpart" or "EMC" or "EMC Investment Corporation"), have been incorporated under Liberian law and have established themselves in Greece (118 Kolokotroni Street, Piraeus), each as a shipping office engaged in the co-management of oceangoing oil product tankers under the legal framework, as amended and currently in force, of Laws 89/67, 378/68 and art. 25 of Law 27/75.

## 2. NECESSARY HISTORICAL BACKGROUND

**2.1** The shipping enterprise founded in Piraeus in 1966 by our common ancestor (i.e., our grandfather Vasileios Chatzeleftheriadis, originating from Sinasos, Cappadocia), with the cooperation of his sons, daughters and sons-in-law, today continues to be a multi-family shipping house known under the name Eletson (ELETSON or "ELETSON"). (We avoid the term "Group" because it is an economic-technical term that does not accurately reflect the present reality).

ELETSON, with an exceptionally successful history of over 50 years, has in recent years faced financial difficulties, due to, among other reasons (such as, indicatively, the withdrawal of traditional Banks from financing shipping, the fall in the supply of experienced seafarers, the influx of newer vessels from China), mainly, however, due to problems arising from the coronavirus and the simultaneous global crisis in the tanker market. This shipping house consists of ELETSON HOLDINGS INC., (hereinafter, for reasons of simplification and brevity, referred to as "holding company" or "the holding" or "ELETSON HOLDINGS INC." or "the HOLDING" or "EHI"), which is both the shareholder company (holding company – paper company with no shipping or management activity). Its subsidiary is the actual company Eletson Corporation, the shipping company managing the oceangoing vessels of Eletson Holdings Inc., as well as other affiliated companies.

2.2 In October 2013, Eletson Holdings Inc. entered into a very significant commercial agreement with the investment fund Blackstone, which happens to be a company managing alternative investments, for the establishment of a joint venture focusing on the liquefied gas carrier market. Specifically, in 2013 the company ELETSON GAS LLC (LLC) was established (hereinafter referred to as Eletson Gas LLC, "EG," "GAS" or "ELETSON GAS LLC"), the shareholders of which were on the one hand Eletson Holdings Inc. (holding the common shares/units, 13,000 common units being and remaining the entirety (100%) of the common units), and on the other hand the

investment fund (commonly known in private equity language as "private equity") Blackstone Tactical Opportunities (hereinafter Blackstone, "BX"), which held the preferred shares/units, having priority in the distribution of dividends and, under conditions, decisive authority over the company, amounting to 8,811,080 preferred units, being the entirety (100%) of the preferred units.

More specifically, indeed, in order to fulfill the above objective, a new company–joint venture ELETSON GAS LLC ("EG") was established by the parent holding company ELETSON HOLDINGS INC. (with an approximate equity share of 60%) and by the investment fund Blackstone (with an approximate equity share of 40%). Into this new company–joint venture ELETSON GAS LLC ("EG"), the parent holding company ELETSON HOLDINGS INC. contributed five newly built LPG carriers, and specifically, ELETSON HOLDINGS INC. contributed the newly built modern LPG carriers, all of Greek names, namely ANAFI, NISYROS, TINOS, TELENDOS and SYMI, with a collectively estimated clean market value (i.e., after deducting then-existing loans and other liabilities) of approximately USD 135–140 million, while Blackstone contributed (and gradually contributed over time) cash, ultimately amounting to approximately USD 136 million. Thus, by that time, a fleet of nine (9) ultramodern LPG carriers, capable of transporting gas and petroleum products, was acquired.

The co-management of the above fleet of EG had been undertaken, on the one hand, by ELETSON CORPORATION (technical management), and on the other hand (commercial representation – supervision – financial management), by the company EMC GAS Corporation, which was established as a subsidiary of EG, with registered office in the Marshall Islands and established as a shipping office under the legal framework of article 25 of Law 27/1975 and of Law 89/67 (as its subsidiary, with EG as its parent company established in Greece).

From the certificate dated 4 July 2019, Protocol Number 2212.2-1/4680/51154/2019 of the Department of Shipping Companies, Directorate of Ocean-Going Shipping, Ministry of Shipping and Island Policy, Hellenic Coast Guard, Directorate B' (NAYTILIAS), it followed that the vessels then under co-management numbered 15. (15 vessels are listed. The vessel MATHRAKI had been sold shortly after the establishment of Eletson Gas LLC, sold in August 2019, leaving 14 vessels).

Consequently, EG ultimately reached, in 2019, the control of 14 LPG carriers (the 5 contributed by the Eletson company existing since 2013 plus 9 newly built ships after 2013 with new equity contributed by Blackstone and of course with additional borrowing).

Since then, as will be further analyzed, after March 2022, EG controls 12 of these through 12 subsidiary companies, shipowning companies of bareboat-chartered vessels or time charterers of said vessels. These subsidiaries of EG are not merely the nominal owners of the aforementioned vessels, because the vessels had been transferred to EG's lenders in the context of financing with reverse leaseback arrangements (sale and leaseback financing), an unusual but by all means customary form of financing in shipping.

More specifically, EG, in early 2022, had 14 subsidiaries, each of which was the shipowner of one vessel. Already from 2020, and also in 2022, due to the need for financing to repay loans, some of these shipowning companies entered into reverse leaseback arrangements (Sale and Lease Back) with the investment fund Oaktree Capital Management (hereinafter "Oaktree"). In this context, the former shipowning companies proceeded to a formal sale and transfer of ownership of the vessels to Oaktree's subsidiary companies (i.e., companies controlled by Oaktree). The amount they received was financing which they needed in order to repay and refinance existing loans. At the same time, the former shipowning companies chartered the vessels (through leasing or bareboat charters) from Oaktree companies and thus the former shipowners became charterers/operators, exploiting the vessels which now belonged to Oaktree companies.

**2.3.** In November 2021, Blackstone, discouraged by the volatility of the shipping economy and despite the fact that during the early years of its partnership with Eletson it had gained significant profits, sold (or rather "liquidated" unconditionally and withdrew) its preferred shares (stake) in the until then completely unknown company Levona Holdings Inc. Levona, as set out in greater detail below, had taken care to undermine the image of Eletson Gas LLC and, indeed, by applying unscrupulous methods (described below) that were contrary to every notion of fair practice, encouraged the lending Banks of Eletson Gas LLC to seize the vessels through forced seizures and auctions. This, with the aim of acquiring as much as possible of Eletson Gas LLC in order for Blackstone to liquidate its stake to Levona, as indeed happened. Levona and its associates had reached such a point of industrial-scale espionage that they monitored the positions of the vessels of Eletson Gas LLC to assess whether each port was favorable or not, in legal terms, for forced seizure and auction of the vessel, so that Levona could then urge the lending Banks to proceed against Eletson Gas LLC with continuous and self-destructive massive seizures, in order for the investment giant —and former partner of Eletson— Blackstone, to liquidate unconditionally, and "at any cost," its stake to Levona and abandon, in reality, shipping altogether, i.e., the inherently highly volatile industry. It is no coincidence that on the very days when Levona carried out the raid on Eletson Gas LLC, the lending Banks proceeded to forced seizures, with "bulky" enforcement of judicial decisions, one after the other, of six vessels of Eletson Gas LLC, namely: DELOS (in the USA),KYTHNOS (in

12

Singapore),ASTYPALAIA (in Singapore),OTHONOI (in the Netherlands), PAROS (in the Netherlands), and KYTHERA (in France). Eletson Gas LLC, as a result, collapsed.

More specifically, in November 2021, Blackstone appeared to have transferred its stake (a mixed percentage of approximately 40%) in EG to the hedge fund named Murchinson Ltd., based in Canada, which, under the established Anglo-Saxon terminology, could be considered to belong to the category of *"vulture funds"*, i.e., "vulture capital," specializing in aggressive buyouts and liquidations of troubled companies and this fund, as will be further analyzed below, with the purpose of dissolving and/or liquidating the aforementioned company EG, used the offshore company (registered in the British Virgin Islands) Levona Holdings Ltd. as a vehicle to acquire Blackstone's stake.

Thus, a new shareholding structure of EG was formed (to which the 14 former shipowning companies of the vessels, now bareboat chartering companies, belonged). This now consisted on the one hand of Eletson Holdings Inc., and on the other of the previously unknown and f completely obscure origin and identity company "Levona," which had taken over from Blackstone. Levona, which is in fact a shell company functioning as a postal address, lacking any office organization or operational substance, aimed for a quick profit, i.e., a rapid exit from EG with significant gains. For this reason, discussions on the manner of Levona's withdrawal and replacement by a more long-term investor began almost immediately after the purchase of Blackstone's shares.

It is worth noting that in November 2021, within 1–2 days, immediately following what may well be described as a "raid" by the vulture fund Murchinson Ltd. on Eletson Gas LLC, the people of Murchinson-Levona, without any right and certainly without the slightest lawful basis, made illegal and malicious accusations regarding the technical and commercial management agreements between the reputable companies of the Eletson group (Eletson Corporation, EMC Gas Corporation, EMC Investment Corporation) and the vessels of Eletson Gas LLC. In other words, it was a continuous, unlawful targeting by the people of Murchinson-Levona, with abusive themes and unscrupulous methods, aimed at discrediting the sound management services of the Eletson group.

The aforementioned transfer of shares from Blackstone in EG had thus been carried out without any general agreement or consent and, in fact, with dubious methods of management information to the companies Murchinson and Levona by an executive of ELETSON CORPORATION, Peter Kanellos. Regarding this unfortunate but pivotal aspect of the entire case, there is an ongoing criminal investigation under file number A.B.M. E22-1465.

For completeness of information, in the Transfer Agreement dated 02.11.2021, through which Murchinson/Levona purchased Blackstone's shares in EG,

Murchinson/Levona acquired those shares at a price (which, according to complex calculations we shall not elaborate on here) of **$3,000,000** (with the possibility of increasing by up to $4,000,000 under certain conditions).

Specifically, under the above-mentioned Transfer Agreement of 02.11.2021, the companies BLACKSTONE FAMILY TACTICAL OPPORTUNITIES INVESTMENT PARTNERSHIP (CAYMAN) SMD L.P., BLACKSTONE FAMILY TACTICAL OPPORTUNITIES INVESTMENT PARTNERSHIP (CAYMAN) ESC L.P., and BTO ELETSON HOLDINGS L.P, on the one hand (as seller) and on the other hand LEVONA HOLDINGS LTD (as Purchaser ) agreed on the following:

**(a) As the object of the sale:**

**"2 AGREEMENT FOR THE SALE"**

**2.1 Sale and transfer of shares**

Taking into account the other terms of this Agreement, each of the Sellers shall sell and transfer the Shares to the Purchaser [...]

"As 'Shares' are meant all the shares in the Company, which are owned by the Sellers and shall be sold to the Purchaser under this Agreement, and specifically:"

(a) 8,580,000 Preferred Shares Class A, 83,570 Preferred Shares Class B-1, and 59,400 Preferred Shares Class B-2, which are owned by BTO Eletson Holdings L.P.,

(β) 39,222 Preferred Shares Class A, 382 Preferred Shares Class B-1, and 272 Preferred Shares Class B-2, which are owned by Blackstone Family Tactical Opportunities Investment Partnership (Cayman) ESC L.P., and

(γ) 47,444 Preferred Shares Class A, 462 Preferred Shares Class B-1, and 328 Preferred Shares Class B-2, which are owned by Blackstone Family Tactical Opportunities Investment Partnership (Cayman) SMD L.P**.**

"As 'Company' is meant Eletson Gas LLC [...]"

**(b) As to the purchase price of the sale:**

**"3 PRICE**

(a) The purchase price to be paid by the Purchaser shall be the sum of:

(i) the Fixed Price, which shall be paid upon completion of the agreement as set forth in Clause 4, and

(ii) the Conditional Price, which shall be paid pursuant to Clause 9.

[...]

The term 'Fixed Price' shall mean the amount of $3,000,000**.**

14

**"9 CONDITIONAL PRICE"**

**9.1** Within fifteen (15) Business Days of each Triggering Event of the Conditional Price, the Purchaser shall pay the Conditional Price into the Sellers' bank account, provided that in no case shall the Conditional Price exceed, in addition to any amounts already paid in relation to the Conditional Price, the maximum amount of $4,000,000 payable to the Sellers under this Clause 9 as the Conditional Price.

The term 'Conditional Price' shall mean the amount of $4,000,000.

**2.4.** Finally, the parties—namely on the one hand Levona and on the other Eletson Gas LLC, Eletson Corporation, and Eletson Holdings Inc.—signed on 22 February 2022 a Binding Offer Letter (BOL), according to which, by March 2022, Levona would withdraw from EG and transfer its preferred shares either back to EG itself or to third parties designated by EG (nominees).In summary, the agreement provided:a) That EG would transfer the shares of two shipowning companies to Levona, and specifically the companies SYMHI II ENE (which was the shipowning-bareboat chartering company of the LPG carrier *SYMHI*) and TELENDOS II ENE (which was the shipowning-bareboat chartering company of the vessel *TELENDOS*), with a net value exceeding USD 23,000,000. This meant that Levona, in a period of about 4 months, would make a profit of more than 750% on its initial investment (USD 3 million).In exchange, Levona would transfer its shares (stake) either back to EG itself or to companies designated by EG as nominees.b) In addition, Levona would grant EG a loan of USD 10 million to cover immediate needs and, in particular, the repayment of loans from other financiers that were becoming due. To secure this obligation of Levona from the loan (which was repayable over two years), "adequate security and/or collateral" would be provided—meaning, generally, "sufficient security" and specifically, property/assets as a guarantee. This security would be released once the loan had been repaid or another security arrangement had been provided.

It is, however, worth noting that in March 2022, and for several months thereafter, both sides were working toward the sale of the two vessels SYMHI and TELENDOS to another Greek-controlled shipping group, so that Murchinson and Levona could collect the lucrative proceeds of the sale. All parties involved at that time —including even the prospective buyers of the vessels—wished for Eletson to maintain the commercial representation of the vessels, precisely because of its unique expertise in their technical management.But there was another significant reason: all those involved then wanted Eletson to retain the commercial representation of the vessels SYMHI and TELENDOS, while Murchinson and Levona would not appear at all as representatives of the vessels. This was because, in the end, only Greek interests (i.e., natural persons of Greek nationality) could control at least 50.01% (majority) of a shipping company under the special category of ENE (Greek Law on Maritime Enterprises) (see the

relevant notarial deeds of registration of ocean-going commercial vessels under the Greek Flag).

2.5. Subsequently, and as a conclusion of the above-mentioned agreement, it was agreed on 11 March 2022 that EG would transfer to Levona the shares of the two companies owning the vessels SYMHI and TELENDOS, and, conversely, an agreement was made to transfer Levona's shares (thus ceasing to be a shareholder in EG) to nominees of EG. At the same time, the loan agreement was signed, along with the security agreement securing the loan.

2.6. It then turned out, however, that Levona was not satisfied with the enormous agreed profit (i.e., acquiring the vessels with a net value of USD 23 million against the USD 3 million it had originally invested), within just four months, from November 2021 to March 2022 but then she (Levona) began to backtrack and deny that she had transferred her stake to EG, claiming instead that since she still held the preferred shares, she could sell them to third parties, and that the nine Liquefied Ethylene carriers could also be sold.On 15 July 2022, Eletson received from Levona a Letter of Intent (LoI) signed with Unigas (Eletson's main competitor) for the sale of the nine vessels, and indeed at a price below market value.The major geopolitical event that influenced Levona's change of course was the Ukraine crisis. Due to instability in the gas supply routes from the East to Western Europe, the prices of LNG carriers surged, and along with them, all LPG carriers.For this reason, EC and Eletson Holdings (which were corporate members under EG's Articles of Association) were forced, on 29 July 2022, to commence arbitration proceedings in New York against Levona, as provided in EG's founding agreement, its Articles of Association.

2.7. Until an arbitrator was appointed and protective measures could be sought (on 10 October 2022 a Temporary Restraining Order was issued within the framework of this arbitration—later, on 12 January 2023, an Arbitration Injunction was issued to preserve the status quo), Levona and its associates not only continued to exert suffocating pressure on the Greek directors (members of the Board) of EG (Kertsikof and Karastamati), but, still holding the formal majority of EG's Board members (as the sole shareholder of the shipowning companies), they could at any given time proceed with actions to transfer the shipowning companies (and thereby the actual ownership of the vessels).

The Temporary Restraining Order was issued on 10 October 2022 by the Honorable Ariel E. Belen, retired civil court judge of New York, who serves as arbitrator at JAMS (Judicial Arbitration Mediation Services) in New York—the agreed body, venue, and seat for dispute resolution under the arbitration clause contained in the Articles of Association of Eletson Gas LLC.The Order specifically provided the following:

**AND having granted all parties the opportunity to be heard, and having taken into account the arguments of all parties, both in the written submissions filed and during**

the procedural hearing of 7 October 2022, and having considered the matter and given both parties the opportunity to submit proposed Temporary Restraining Orders, the undersigned Arbitrator hereby confirms the oral Order he issued during the procedural hearing of 7 October 2022, namely that the issuance of a Temporary Restraining Order is justified in the present case so as to preserve the status quo pending the court's ruling on the opposing requests for preliminary relief, which is scheduled to be heard on 22 November 2022, or on another date to be determined by                              the                              Arbitrator."
AND IT IS FURTHER ORDERED that for as long as this Temporary Restraining Order remains in effect, the parties shall maintain the *status quo* and, among other things, shall refrain from the following actions:(1) They shall refrain from transferring or selling any asset of Eletson Gas LLC (the "Company") without the joint written consent of the parties, which must be submitted to the undersigned Arbitrator, or (2) They shall refrain from calling or conducting any meetings of the board of directors for the purpose of making proposals or decisions regarding the transfer or sale of any asset of the Company.

As emerges from a careful reading of the Order—as later clarified by the Arbitrator himself—the true meaning of the Order was to preserve the situation as it stood at that time.

On 12 January 2023, the Arbitrator issued his decision on the opposing applications for preliminary relief. He accepted the application filed by Eletson, while rejecting the one filed by Levona. There, the Arbitrator reiterated the above with the following specific clarification (emphasis added):

"the parties shall maintain the *status quo* and, among other things, shall refrain from the following actions: (1) They shall refrain from transferring or selling, or attempting to sell or otherwise transfer, any asset of Eletson Gas LLC (the 'Company'), or any asset that is the subject of dispute in this arbitration, without the joint written consent of the parties, which must be submitted to the undersigned Arbitrator, or (2) They shall refrain from calling or conducting any meetings of the board of directors for the purpose of making proposals or decisions regarding the transfer or sale of any asset of the Company that is the subject of dispute in this arbitration."

In the arbitration decision, a series of illegal acts by Levona are described, including bribery of the Chief Financial Officer of ELETSON CORPORATION in its attempt to secure profit.

Most importantly, however: in order to obstruct the progress of the New York arbitration, which was not developing favorably for them, the people of Murchinson Levona, within 2023 and as part of their malicious schemes, filed a petition for the dissolution and liquidation of the Eletson business group, on grounds of alleged insolvency.Specifically, Murchinson/Levona (through another proxy company, as even

the Arbitration Decision accepts, its subsidiary) purchased an old dormant affiliate of Eletson Holdings Inc. and, based on that, filed for voluntary bankruptcy of Eletson Holdings Inc. under Chapter 7 of the U.S. Bankruptcy Code.As a result, Eletson Holdings was forced to submit itself to a procedure of debt restructuring under Chapter 11 of the U.S. Bankruptcy Code.All this was provoked by Murchinson/Levona, who exploited information supplied to them by the CFO. Thus, as we have already stated, the petition for dissolution and liquidation was confirmed through a procedure of so-called voluntary reorganization of the Eletson group.

More specifically, as is known, reorganization proceedings, as an outgrowth of collective enforcement, may entail some form of stay or suspension of individual judicial measures. At this point, since Murchinson/Levona were also parties to the arbitration proceedings, the U.S. Bankruptcy Court for the Southern District of New York issued a suspension order, and it was unclear whether this suspension also included the arbitration claim of the Eletson group against Levona.The parties agreed that the suspension did not include Eletson's arbitration claim against Levona, and the Bankruptcy Court confirmed this agreement by its Order of 17 April 2023, titled:"STIPULATION AND ORDER GRANTING ALLEGED DEBTOR'S MOTION FOR RELIEF FROM STAY TO PROCEED WITH, OR TO CONFIRM THE INAPPLICABILITY OF, THE AUTOMATIC STAY TO PREPETITION ARBITRATION PROCEEDINGS."

This Order, in paragraph 4, is consistent with the interim measures in the arbitration (which, as we said, was later confirmed by an Arbitration Injunction to preserve the *status quo*). Let's see precisely the relevant provision of the parties' agreement, which was ratified by the Bankruptcy Court through the Judge's Order (emphasis added).

**"For the avoidance of doubt, no Arbitration Party shall transfer, dispose of, <u>transact in</u>, hypothecate, encumber, impair <u>or</u> <u>otherwise use</u> any such Arbitration Award <u>or any asset or property related thereto</u> absent a further order of this Court."**

It should be noted that the Arbitration Award in New York was issued after a lengthy process, involving exchange of documents, expert reports, written submissions, oral testimony of witnesses, and hearings held on 15, 16, 18, 19, 22, 23, and 24 May 2023.The Arbitrator issued on 18 August 2023 an **(**amended) Interim Arbitration Award, which was finalized on 29 September 2023, when the Arbitrator issued the Final Arbitration Award, which also included a decision on attorneys' fees.In this decision, the Arbitrator (Judge Belen) included extensive findings on Levona's conduct.It is noteworthy that Judge Lewis J. Liman of the U.S. District Court, before whom confirmation of the Final Arbitration Award is pending, also took a position on this matter. Specifically, Levona filed a motion with the Court to keep certain information confidential (i.e., redacted/hidden for a long time) until the Court issues its ruling on whether to confirm the arbitration award.Levona sought to conceal the names of certain individuals, considered third parties and innocent, as well as certain

actions that allegedly demonstrated particularly unlawful behavior.Judge Liman rejected Levona's motion to keep the names secret, reasoning that the public's right of access is neither diminished nor negated by Levona's arguments.

The above Arbitration Award, after considering all the evidence and weighing everything, accepted that the crime of bribery/corruption had indeed been committed, making extensive findings and references to Levona's conduct.

The arbitral tribunal in New York ruled that Levona's attempted, forceful efforts to change the boards of directors of its subsidiaries Eletson Gas, and then for these new boards—or ELETSON GAS  itself directly—to terminate the ship management agreements, all constituted serious violations of the Articles of Association of Eletson Gas.

It is telling that these subversive and unlawful efforts by Levona began immediately after it launched its "night raid" on Eletson Gas, and indeed, as was revealed, even in contradiction to legal advice Levona had received concerning the collision of these initiatives with the Articles of Association.

The Arbitrator concluded that Levona violated the Articles of Association of Eletson Gas (referred to as the LLCA, meaning Limited Liability Company Agreement), among other reasons because it unlawfully attempted to replace the members of the boards of directors of Eletson Gas's subsidiaries, and because it unlawfully attempted to terminate the management agreements.The Judge held the following with reference to Article 3.2 of the Articles of Association and its Schedule VII (it is worth quoting the text first in English since these are the Judge's own words, and also because, in order for the so-called "understandings" to be clear, the translation must be free):

"Levona also breached the LLCA immediately upon joining [EG] by attempting to terminate management contracts and replace the directors of [EG's] subsidiaries. [Justice Belen referred to Section 3.2 of, and Schedule VII to, the LLCA] The provisions in Schedule VII prohibited Levona from taking unilateral action concerning Eletson's Management Agreements, including without limitation, terminating them directly or indirectly. Murchinson's counsel specifically advised it of this …. Nevertheless, on November 5, 2021, Levona, through Bistricer, authorized WFW to terminate [EG's] management agreements with [EC] and replace the board of directors of [EG's] subsidiaries with Levona representatives. WFW, on Levona's behalf, issued a Notice of Replacement and Appointment of Directors purporting to replace Eletson's Directors and to appoint Lichtenstein, Spears, Fenttiman, and Hassett as the directors of [EG's] subsidiaries …. Levona also issued a notice terminating [EG's] affiliates' Management Agreements with [EC]. …

Levona then attempted to use these termination notices to cut [EC] off from any communication with SEB [one of EG's lenders]. …

Thus, the record overwhelmingly demonstrates that Levona's attempted termination of the management agreements was a willful and intentional breach of the LLCA."

But also the regular U.S. District Court for the Southern District of New York ("SDNY"), which has been tasked with converting the arbitration award into a court judgment, has recorded the following:

"And, the arbitrator found that Levona violated the Articles of Association by attempting to terminate the management agreement [with Eletson Corporation] and by attempting to replace the boards of directors of the subsidiaries [of Eletson Gas] with representatives preferred by Levona." (p. 33)

The involvement of the Levona–our CFO "collaboration" is crucial for the proper assessment of the special application for protective measures.

As revealed by documents, in December 2021 Levona bribed and used the above-mentioned financial executive, and he agreed and accepted bribes to breach his duties toward us, his employers, in order to confer unlawful benefit on Levona. He even signed a related agreement (to "legitimize" the bribe amounts in a formal contract), under which he received an advance payment of USD 100,000, and it was further agreed that he would receive 10% of Levona's profits as a kickback. The advance of USD 100,000, received on 21/12/2021, would later be deducted from that 10% profit share.

Consequently, apart from the crimes of breach of trust and professional misconduct, the complete and true substance of the offense under Article 396 of the Penal Code (bribery of an employee) is established, committed by Levona and fully confirmed by the Arbitration Award, which evaluated all the evidence proving its occurrence.

The justification put forward, which Levona apparently fabricated, that our executive supposedly had an obligation to inform Blackstone (as the holder of 40% of Eletson Gas), is utterly flimsy, since he did all of this in complete secrecy from the three of us, who were the natural representatives of his employer Eletson Corporation, and clearly to the detriment of our interests.Specifically, on this point we refer to an excerpt from the Arbitration Award, which directly addressed these exact arguments raised there by Levona:

"In an attempt to defend its secret communications with Kanellos, both before and after the acquisition of Blackstone's shares, Levona insisted that Kanellos was the Company's Chief Financial Officer, not only of Eletson Corporation, and that its communications with him as a preferred shareholder of the Company were absolutely proper. On closer examination, however, this argument collapses quickly and only reinforces Eletson's assertions that it is inadmissible. Even if he was the Chief Financial Officer of the Company, he was also the Chief Financial Officer of Eletson Corporation—he owed duties to Eletson, and the secret incentive agreement with

Murchinson was clearly a conflict of interest caused by Murchinson and concealed from everyone at Eletson. Moreover, the nature of the correspondence, prior to 2 November 2021—before Murchinson/Levona acquired any controlling interest in the Company—shows that Kanellos was acting against the Company's interests and was aligned with Murchinson.Therefore, even if Kanellos was the Company's CFO, this does not exonerate Murchinson."

(Final Arbitration Award – **Relevant Document, p. 21**)

It should be noted that in the Arbitration Award, Eletson Gas is mentioned as follows:

"There is no evidence that Murchinson ever received Blackstone's written consent to communicate with anyone, especially with the Company's lenders**."** (Final Arbitration Award – **Relevant Document, p. 42**)

The argument that he supposedly acted this way because he was at EG's headquarters in Piraeus and did everything from Piraeus (thus admitting that the place where the offenses were committed was Piraeus) and that for this reason he provided information—because he allegedly had physical access to EG's data—constitutes a mere pretext for his collusion and private provision of information to Levona, in exchange for the bribes/corruption payments he received.

His bribery and corruption, which has been proven, shows that Levona–Murchinson are responsible for causing catastrophic damage to the Eletson group.

According to the Final Arbitration Award issued on 29 September 2023, the arbitrator recognized the bad faith and commercially unethical conduct of Murchinson/Levona and, on their part, the ultimate breach of the Articles of Association of Eletson Gas LLC in various ways.Specifically, the arbitrator ruled, among other things, as follows:

**1.** The right of repurchase granted through the BOL (Binding Offer Letter) dated 22 February 2022 and up to 11 March 2022 was substantively exercised, and every assumed condition for the exercise of this right was either satisfied or waived.

**2.** Levona violated the Articles of Association of Eletson Gas LLC and its related obligations, including, without limitation, obligations under common law and contractual obligations toward the claimants in the arbitration and EG, at least in the following ways:

**i)** Bribed an employee of Eletson Corporation and representative of EG, thereby causing him to disclose EG's confidential information.

**ii)** Breached its fiduciary obligations by disclosing EG's confidential information to third parties, failing to take measures to recover that information, and subsequently exploiting those disclosures against the claimants in the arbitration and against EG itself, even though it had become a shareholder of EG.

21

**iii)** Actively participated in unlawful conduct, which caused EG's lenders to turn against EG, including, without limitation, provoking the seizure of five of EG's vessels and failing to disclose this wrongful conduct to EG, despite being a shareholder of EG.

**iv)** Failed to recognize that there had been full compliance with the purchase right terms of the BOL (Binding Offer Letter) and did not act in good faith, instead withholding the supposed belief that the BOL terms had not been satisfied.

**v)** Claimed to act on behalf of EG in its business dealings with third parties, including attempting to sell EG's assets to its main competitor, Unigas, while concealing this breach from us.

**vi)** Directly threatened us, the undersigned officers and directors Kertsikof and Karastamatis, among other things by initiating legal proceedings against us.

According to the Final Arbitration Award, Murchinson/Levona secretly communicated with the said Chief Financial Officer and used him to obtain confidential information of EG, which information they intended to disclose to EG's lenders, thereby violating the fiduciary duties that the Chief Financial Officer owed to Eletson Corporation, his then-employer.

More specifically, according to the Final Arbitration Award:

"Peter Kanellos was the Chief Financial Officer of Eletson Corporation and representative of the Company [i.e., here meaning Eletson Gas LLC]. The parties dispute whether he was also the Chief Financial Officer of the Company. The evidentiary record shows that before acquiring the preferred shares from Blackstone, **Murchinson communicated secretly with Kanellos about strategies regarding (a) reducing the purchase price for the acquisition of Blackstone's shares and** (b) what to do with the Company's assets once Levona became a preferred shareholder. ( C-1599, C-1600, C-1615, C-1616, C-1617, C-1618, C-1623, C-1625, C-1635, C-1638, C-1640, C-1641, C-1642, C-1647, C-1648, C-1649, C-1664, C-1960, C-2018). **Murchinson used Kanellos to obtain confidential information of the Company and to disclose this information to the Company's lenders along with Murchinson's proposals for refinancing the Company.**( Watch, for example C-463-C-1600-C-1615-C-1616-C-1618-C-1623-C-1640-C-1641-C-1642-C-1647-C-1648-C-1649-C-1664)

**It is unbelievable that Kanellos, a long-time employee and trusted person of the heads of the (legal) Eletson entities, received promises of compensation aligned with the final strategy that Murchinson would implement**.For example, in an email dated 1 October 2021, Bistricer wrote to Kanellos: *"You will receive 10% of whatever profits we make from this transaction, provided it goes through. The 10% will be paid as soon as we get our capital back, minus a reasonable return on capital."* (C-1678).

*It is indisputable that Kanelos acted in breach of his duties as a director or representative of Eletson and the Company, and that he and Murchinson actively concealed their communications.* Throughout <u>all the aforementioned correspondence, Kanelos deliberately used his personal Gmail account rather than the Eletson email address</u>. In an email dated 31 October 2021, **Kanelos admitted that he was working on behalf of Murchinson's interests: *"After securing the agreement for Murchinson, I worked very hard for a year towards your group's interest*** (and I will continue to do so even if the plan is ultimately to liquidate the company. Although I am glad that I align my interests with those of Murchinson...)" (C-1679, emphasis added).

Both <u>Murchinson and Kanelos took active measures to conceal their secret communications</u>. For example, **on <u>1 November 2021, Lichtenstein sent Kanelos a "Confidential Summary of Terms" concerning the compensation that would be paid to Kanelos (C1680–C1681)</u>**. Subsequently, a few days later, on 5 November 2021, the day Levona became the holder of the preferred shares, Lichtenstein sent Kanelos an email to his Eletson address, attaching Blackstone's director replacement announcements, <u>**acting as if he had never known Kanelos. Addressing him formally, Lichtenstein wrote:** *"Dear Mr. Kanelos, Pleased to meet you. I found the contact information on the Eletson website and I hope you may be able to assist me"*</u> (LEV025 p. 6). There is also evidence showing that Kanelos <u>instructed his email correspondents not to disclose his communications or any ongoing negotiations with Eletson.</u> (See, e.g., C-1704). For instance, on 5 May 2021, Kanelos sent an email from his Gmail account, on behalf of Murchinson, in which he stated: *"<u>[G]iven the sensitivity of this agreement, use ONLY my Gmail</u> for our communication (not my Eletson account)"* (C-567).

After Levona became the preferred shareholder, Murchinson formalized the compensation agreement with Kanelos in a Services Agreement, dated 19 December 2021 (C-1698 – C-1699). <u>Levona/Murchinson complied with its terms by depositing USD 100,000 to Kanelos on 21 December 2021 (C-1700 – C-1701).</u>

In an attempt to defend its secret communications with Kanelos both before and after the acquisition of Blackstone's shares, Levona insisted that Kanelos was the Chief Financial Officer of the Company, not only of Eletson Corporation, and that his communications as preferred shareholder of the Company with them were entirely proper. On closer inspection, however, <u>this argument quickly collapses and only strengthens Eletson's claims of inadmissibility</u>. Even if he were the Company's CFO, he was also the CFO of Eletson Corporation — <u>he owed duties to Eletson, and the secret incentive agreement with Murchinson was clearly a conflict of interest, concealed from and never disclosed to anyone at Eletson.</u> Furthermore, the nature of the correspondence prior to 2 November 2021 — before Murchinson/Levona acquired any preferred interest in the Company — makes it clear that <u>Kanelos was acting for Murchinson's benefit against the Company's interests and was aligned with</u>

*Murchinson's interests. Therefore, even if Kanelos was the Company's CFO, this did not
absolve him from his duties to Eletson or from his alignment with Murchinson.*

*In reality, Levona's insistence that Kanelos was the Company's representative serves
only the untenable argument that he acted as a "double agent" between Murchinson
and WFW."*

(Final Arbitral Award – Relevant Document, pp. 19–21)

As set out above, the result of the actions of our CFO (acting as Levona's agent) was to
transfer from EG to Levona all the shares of the latter in two companies, the
shipowning companies of the vessels "SYMI" and "TELENDOS", under a financial
leasing scheme. A few months after this transfer, Levona asked for our assistance in
registering the Greek flag on the vessels TELENDOS and SYMI (exploiting Eletson's
name, while Levona was ostensibly undergoing an EG withdrawal procedure). It then
entrusted the management of the (by then Liberian-flagged) vessel "Telendos" to
another management company, Columbia. Indeed, Levona caused the detention of
the vessel TELENDOS in an Indian port, while we were attempting to transfer it from
Eletson to Columbia for management.

In reality, it is Eletson — and only Eletson — that has suffered damage, and indeed
enormous damage, not the other side.

Specifically, the Final Arbitral Award found that the damage to EG was caused by the
following actions of Murchinson/Levona:

*"i. **By bribing** an employee of Eletson Corporation and representative of the Company,*
***Mr. Peter Kanelos, thereby causing him to disclose confidential Company
information**.*

*ii. By violating confidentiality obligations, **disclosing the Company's confidential
information to third parties,** failing to take measures to recover that information, and
then misleading the Lenders and the Company in relation to those violations, while
being a shareholder of the Company.*

*iii. By actively participating in unlawful conduct, **namely in giving the Company's
lenders the impression that they were acting against the Company and the Lenders,
on behalf of others, thereby causing the foreclosure of five of the Company's vessels,
without limitation**, and failing to inform Eletson or the Company of this wrongful
conduct while a shareholder of the Company.*

*iv. By failing to acknowledge that Eletson had fully complied with the terms of the
Purchase Agreements under the BOL, and instead misrepresenting that Eletson might
or could fail to perform under the BOL.*

*v. By claiming to act on behalf of the Company in business transactions with third parties, including selling Company assets to its main competitor, Unigas, and concealing this violation from the Lenders.*

*vi. By unlawfully calling shareholder meetings of Eletson and its affiliated entities, and appointing new directors and officers, among others acting against them.*

*vii. By unlawfully taking control of the Company's board of directors after 11 March 2022.*

*viii. By unlawfully dismissing Company directors and officers after 11 March 2022.*

*ix. By unlawfully attempting to seize control of the Company after 11 March 2022.*

*x. By unlawfully claiming to have convened and actually holding meetings of the Company's Board of Directors without following the appropriate procedures, and for the unlawful and improper purpose of approving unlawful and improper conduct after 11 March 2022.*

*xi. By breaching its obligations under the Articles of Association, including, without limitation, by claiming that it was terminating the management agreements that Eletson Corporation had with the Company's subsidiaries, altering the management of the Company's subsidiaries, excluding Eletson Corporation from communications with the Company's lenders, (breaches) of which Levona was aware, which were contrary to contract and in violation of the Articles of Association and pending arbitration."*

*10. By violating the Provisional Measures Order of the arbitral tribunal:*

*i. By unlawfully hiding from the Company its inability to pay the loan from Levona and unlawfully declaring the loan in default.*

*ii. By attempting to sell vessels, including the vessels SYMI and TELENDOS, while the Provisional Measures Order was still in force.*

*iii. By defining and/or causing the purchase of shares in the Company's subsidiaries by Levona through an auction of shares of Eletson Holdings in January 2023, <u>in order to initiate and subsequently cause proceedings against Eletson Holdings, which resulted in the filing of an involuntary bankruptcy petition against Eletson Holdings.</u>"*

(Final Arbitral Award – **Relevant Document**, pp. 78–79)

For the above damages to EG, the Arbitrator held that Murchinson/Levona must pay compensation to EG, which is calculated as follows:

*"1. <u>**USD 21,777,378.50**</u>, which must be paid to <u>**Eletson Gas as compensation for actual damages arising from the unlawful foreclosures of Eletson Gas's vessels**</u>, which includes interest at the rate of 10% from the dates of foreclosure (or the approximate*

*date of the expenses incurred) until January 2023, […]*

*3. **USD 2,000,000**, which must be paid to **Eletson Gas as compensation for actual damages arising from other breaches of the agreement by Levona**, with default interest of 10% from the date of this Interim Arbitral Award until final satisfaction of the present award, whether through communication of the present award or any judicial enforcement, depending on which date occurs first."*

(Final Arbitral Award – **Relevant Document**, p. 80)

According to the Final Arbitral Award, in fact our CFO was bribed by Murchinson/Levona in order to act against EG's interests and to disclose valuable confidential business information. More specifically, the decision held as follows:

*"As mentioned above, the evidence shows that Murchinson bribed Kanelos to act against the Company's interests. The secret relationship began before 2 November 2021 but continued after Levona/Murchinson became the Preferred Shareholder. Indeed, the unlawful 'Services Agreement' was drawn up between Levona/Murchinson and Kanelos in December 2021, under which Murchinson paid Kanelos USD 100,000 (C-1699, C-1700, C-1701).*

*Kanelos was obviously a director of Eletson Corporation and, according to Levona, of Eletson Gas. The Articles provide that 'Each director owes a fiduciary duty to the Affiliated Companies, as those are applicable to a director towards a company incorporated under the laws of Delaware' (J-0 § 6.1(f)). According to Schedule VII (u) (Permitted Actions), Levona could not 'enter into, amend or terminate any agreement between the Company and any director or member of senior management'. (J-01 Schedule VII (u)). The alleged Services Agreement caused a breach of the above fiduciary duties and constituted a breach of the covenant of good faith and fair dealing."*

(Final Arbitral Award – **Relevant Document**, pp. 41–42)

*"Every one of Murchinson's witnesses admitted under oath that the bribery of Kanelos from the Company was concealed, without shame."*

(Final Arbitral Award – **Relevant Document**, p. 56)

It is indeed beyond any comment that there exists an agreement signed in December 2021 between Levona and our CFO, which the Arbitrator took into account with respect to the issue of bribery, and in which their contractual relationship is described. Specifically, this agreement provided for the following:

*"2. Conditional Profit Participation Amount. With respect to the rights of the Company² (and its affiliates with this company) and their profits from Eletson […] the*

*Company (or any affiliate of this company) shall pay the Conditional Profit Participation Amount to the Counterparty, in accordance with the conditions set forth in this Clause.*

*[...]*

***2.1.2.*** *Once the Company and the shareholders of its affiliates (collectively) receive the Basic Investment Return, the Counterparty shall be entitled to receive the Conditional Profit Participation Amount, equal to 10% of the profits that the Company or its affiliates with this company have received in excess of the Basic Investment Return, after deducting Capital Expenditure amounts, until the Counterparty has received the Minimum Profit Participation Amount.*

*In effect, [...]*

***2.1.3.*** *Once the Counterparty has received the Minimum Counterparty Profit, the Counterparty shall be entitled to receive the Conditional Profit Participation Amount equal to ten percent (10%) of any profits from the Preferred Shares, and an additional five percent (5%) of any profits resulting from Capital Expenditure Savings, after deduction of the value of the Preferred Shares and the related capital investment, for amounts exceeding the Minimum Profit Threshold.*

*[...]*

***3. Advance Payment.*** *Irrespective of the provisions of Clause 2.1, within 5 business days of this Agreement, the Company shall pay the Counterparty __an advance payment of USD 100,000,__ [...] which shall be deducted from the Conditional Profit Participation Amount."*

Consequently, our CFO agreed with Levona to provide these services, in exchange for a share of Levona's profits from the dissolution and liquidation of the Eletson group in the amount of 10% (that is, as a first step, for the profit of USD 1,000,000, from which he agreed to receive the amount of USD 100,000 as an advance payment). This agreement is not only cynical, nor merely brazen, but demonstrates shameless immorality, lack of ethics, audacity, and corruption. Drafted in the English language, it presents interpretational difficulties. The central idea is that our CFO would receive 10% of Murchinson Levona's net profits from the liquidation of Eletson Gas LLC. When Levona's net profits—Murchinson Levona (excluding the substantial return of capital it had advanced to Murchinson Levona to buy out Blackstone or for legal fees) would exceed USD 10,000,000 (where our CFO would be "entitled" to USD 1,000,000), then his share would amount to 5%. Let us see how this translates in the case of SYMI and TELENDOS: total net value after loans, at least USD 23 million. If we assume that Murchinson Levona spent about USD 4 million to buy out Blackstone (estimated at USD 3 million) and legal fees to English lawyers (price unknown but let us assume USD 1 million together with lost interest for such an investment—opportunity cost), then from 23–3–1 = USD 19 million net profit, the "entitlement" of our CFO would be USD

1 million (i.e., 10% of the first USD 10 million) and USD 450,000 (i.e., 5% of the additional USD 9 million), making a total of USD 1.45 million net profit. And then with the dissolution of the remaining fleet of Eletson Gas LLC, even under "fire sale" conditions, it is apparent that our CFO's "mind was blown," as total "profits" exceeded USD 5 million, at least, from the gradual liquidation or immediate dissolution of Eletson Gas LLC.

On 21.12.2021, there was confirmation of payment, whereby Murchinson's representative paid the amount of USD 100,000, which was taken into account by the Arbitrator concerning the issue of bribery of our CFO.

Therefore, the services provided by our Chief Financial Officer to Murchinson/Levona were nothing other than the leakage of confidential business and commercial information of the Eletson group and EG, and his assistance in enabling them, on the one hand, to acquire EG's shares at an extremely low price, and on the other, to liquidate EG's fleet, transfer its management to another company, and profit at EG's expense. And his profit from this agreement with Murchinson/Levona was a share of Murchinson/Levona's profits, for which he has already demonstrably received an advance payment of USD 100,000.

We would like to avoid burdening the pleadings with a multitude of documents, beyond the submission and invocation of the attached Arbitral Award.

For the sake of completeness, however, this Memorandum, even if briefly, proceeds with commentary on the above stormy facts, through submission, invocation, and reference to the arbitral award.

It is crucial that the JAMS New York Arbitral Award has adjudicated against the real Eletson Corporation in Piraeus, in favor of Lenova, the sum of ten (10) million U.S. dollars as compensation and/or as a penalty clause. The fictitious, opposite "Eletson Corporation" of Delaware, in cooperation with Lenova and the supposedly restructured parent "Eletson Holdings Inc.," filed before a Court with a consensual stipulation, which was approved by the United States District Court for the Southern District of New York, a petition (of the real Eletson Corporation in Piraeus) for recognition of the JAMS New York Arbitral Award (under the U.S. Federal Arbitration Act which follows the spirit of the New York Convention for the Recognition and Enforcement of Foreign Arbitral Awards).

Therefore, any observer in good-faith would wonder: how is it ever possible that the opposing, fictitious "Eletson Corporation" (Delaware), having zealously stripped away the most significant asset of the real Eletson Corporation (Piraeus), could be the proper legal entity to appear in defense against the bankruptcy petition of AB Bank against the real Eletson Corporation (Piraeus)?

Thus, the interests hidden behind the petition — and which are indeed responsible for the attempted weakening and disintegration in Greece, by exploiting the guise of public order, under the pretense of a so-called restructuring of the historic Greek shipping group of companies under Eletson Holdings Inc. — do not hesitate to trample upon the descendants of the founders of Eletson Holdings Inc., personally serving indefinite legal documents, in order to appear in Piraeus in support of AB Bank's bankruptcy petition against Eletson Corporation, a subsidiary of Eletson Holdings Inc., all while pretending that the very same interests, with unlawful methods and schemes, are working with zeal for the economic annihilation of Eletson Corporation.

**FULL AND COMPLETE DISCHARGE OF THE CLAIM THROUGH SETTLEMENT BETWEEN THE APPLICANT AND THE GUARANTOR SHELL COMPANY ELETSON HOLDINGS INC. – ABUSIVE CONDUCT**

As we have already noted, Eletson Holdings Inc., which acted as guarantor of the loan granted by the applicant Aegean Baltic Bank to Eletson Corporation, proceeded on 8 September 2025 with the consensual issuance of an order by a foreign bankruptcy court (Stipulation and Order) regarding the claim of Aegean Baltic Bank against the shell company Eletson Holdings Inc., in its capacity as guarantor of the loan granted by the Bank to the debtor Eletson Corporation. The consensual stipulation and order of the Bankruptcy Court for the Southern District of New York contains the following outrageous provision, whereby, in essence, the applicant Bank and the supposedly restructured parent shell company Eletson Holdings Inc. "agreed" to release the debtor subsidiary management company Eletson Corporation.

***The present Consensual Stipulation and Order neither affects nor extinguishes in any way the claims of AB Bank against Eletson Corp. (including claims arising from the Subordination Agreement).***

The bankruptcy procedure of the Bankruptcy Court for the Southern District of New York has not been recognized in Greece, with respect to any capital or source of capital, because the Athens Court of First Instance has ruled in open session that such recognition would contravene Greek public policy, violating fundamental principles of our legal culture, our constitutional framework, and our socio-economic system of values, such as human dignity, justice, equality, the rule of law, and above all the protection of private property. These are principles of overriding mandatory law, which under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards prohibit recognition of foreign bankruptcy orders in Greece where they conflict with public policy.

The consensual stipulation and order of the Bankruptcy Court for the Southern District of New York (Stipulation and Order) no longer constitutes a real situation; rather, it

reinforces the strong impression of gross abuse of law and misuse that now hints at the deliberate weakening in Greece of the shipowning management company, while the said consensual stipulation is presented almost as an independent subject for evaluation.

The consensual stipulation and order of the Bankruptcy Court for the Southern District of New York has been translated as follows:

### *CONSENSUAL STIPULATION AND ORDER BETWEEN ELETSON HOLDINGS INC.*

### *AND AEGEAN BALTIC BANK S.A. RESOLVING PROVEN CLAIM NO. 4*

*This agreement and order (the "Agreement and Order") is entered into as of the date hereof, between Eletson Holdings Inc. (the "Debtor" or the "Holdings") and Aegean Baltic Bank S.A. ("AB Bank" and, together with the Debtor, the "Parties"), through their respective undersigned attorneys, concerning Proven Claim No. 4 (the "Claim").*

### *RECITALS*

*A. On 7 March 2023, certain creditors of Holdings filed petitions for relief under Chapter 7 of the U.S. Bankruptcy Code against Holdings and certain of its subsidiaries (collectively, the "Debtors").*

*B. On 25 September 2023, the Debtors, including Holdings, converted the above Chapter 7 cases to cases under Chapter 11 (the "Chapter 11 Cases").*

*C. On 9 November 2023, the Court entered the Order for Relief under Chapter 11, thereby commencing the Chapter 11 Cases in the form prescribed by the Bankruptcy Code (the "Order for Relief"). On 18 December 2023, at 4:00 p.m., AB Bank filed its proof of claim [number] (in U.S. dollars) against Holdings and certain subsidiaries, asserting that its claim was secured by certain assets.*

*D. Prior to the Effective Date, AB Bank filed the Claim against Holdings in the amount of USD 6,335,665 concerning the specific Guarantee dated 9 October 2014, between Holdings (as guarantor) and AB Bank (the "Guarantee"), which was entered into on condition of payment or agreement to pay any capital amounts advanced by AB Bank under the Subordination Agreement of the Lender in an Open Current Account no. XXXX-0022 (the "Subordination Agreement"), between AB Bank and Eletson Corporation ("Eletson Corp.").*

*E. On 25 October 2024, the Court issued an order [Docket No. 1212], among other things, confirming a reorganization plan under Chapter 11 for the Debtors [Docket No. 1132, Exhibit 1] (the "Plan"), and on 4 November 2024, the Court entered an order confirming the Plan [Docket No. 1223] (the "Confirmation Order").*

30

*F. On 19 November 2024, the Plan substantially became effective and the "Effective Date" (as defined in the Plan) occurred. See Docket No. 1258 (Notice of Occurrence of Effective Date).*

*G. Following the Effective Date, the Parties engaged in good faith negotiations and discussions concerning full satisfaction and settlement of the Claim. In order to achieve full satisfaction and resolution of the Claim, the Parties have agreed that all claims of AB Bank against Eletson Corp. (including those arising under the Subordination Agreement) shall be fully satisfied and extinguished as set forth herein, and that the Parties wish to resolve any disputes relating thereto, under the terms and conditions set forth in this Agreement and Order.*

### *AGREEMENT AND ORDER REGARDING FULL SATISFACTION OF CLAIM*

1.  *The foregoing recitals are incorporated herein in their entirety.*

2.  *This Consensual Stipulation and Order shall be effective and immediately enforceable as of the date of entry of the Bankruptcy Court's order approving this stipulation and order (the "Effective Date of the Settlement").*

3.  *As of the Effective Date of the Settlement, in full and final satisfaction of the Claim, AB Bank shall have an allowed general unsecured claim against Holdings in the amount set forth immediately below (the "Allowed Claim"), which shall be treated in accordance with and receive distributions under the Plan as a Class 3 General Unsecured Claim. The Allowed Claim shall be deemed "allowed" for all purposes under the Chapter 11 Cases and shall not be subject to any objection, reclassification, offset, avoidance, subordination, or any other challenge by any party in interest. All other amounts of the Claim beyond the Allowed Claim shall be deemed disallowed and expunged from the claims register.*

| Claim No. | Debtor | Allowed Amount | Claim Category |
|---|---|---|---|
| 4 | Eletson Holdings Inc. | USD 5,775,000 | Class 3 – General Unsecured |

4.  *No later than ten (10) business days after the Effective Date of the Settlement, Holdings shall make an initial distribution of USD 166,155.24 to AB Bank on account of the Allowed Claim pursuant to the Plan. Holdings shall make additional distributions, if any, to AB Bank on account of the Allowed Claim as provided for and in accordance with the Plan.*

5.  *As of the Effective Date of the Settlement, any claims against the Debtor asserted by AB Bank shall be disallowed and expunged from the claims register to the extent satisfied in accordance with the terms of the Plan.*

6. *This Consensual Stipulation and Order shall not affect or impair in any way the claims of AB Bank against Eletson Corp. (including claims arising under the Subordination Agreement).*

7. *This Settlement Agreement and Order is binding and enforceable upon the Debtor, the Debtor's estate, and AB Bank, as well as their respective heirs, representatives, predecessors, affiliated companies, successors, and assigns, and upon any third parties affected thereby.*

8. *Nothing in this Consensual Stipulation and Order shall be construed as or deemed to be evidence of or an admission of, or construed as creating or recognizing, any claim, right, or remedy of any kind by any of the Parties to this Agreement and Order against any other person or entity, except to the extent expressly set forth herein.*

9. *This Agreement and Order constitutes the entire agreement between the Parties regarding the subject matter hereof and may only be amended in writing signed by the Parties or their duly authorized representatives (including Adam Spears, whom Holdings authorizes as its exclusive representative).*

10. *Each of the undersigned attorneys represents and warrants that he/she is duly authorized to execute this Agreement and Order on behalf of his/her respective client.*

11. *Each of the Parties to this Agreement and Order represents and warrants that it has been duly authorized to execute this Agreement and Order, that it understands and agrees to the terms of this Agreement and Order, and that it intends to be bound hereby.*

12. *To avoid doubt, the execution of this Agreement and Order does not constitute the assumption of any executory contract or unexpired lease by the Parties.*

13. *This Agreement and Order may be executed in counterparts and delivered by facsimile or email in PDF format, each of which shall be deemed an original. A complete set of executed counterparts shall be deemed collectively one original agreement.*

14. *The Debtor and the Clerk of the Court are authorized to amend the official claims register and the electronic docket of the Chapter 11 Cases in accordance with the terms of this Agreement and Order and to take all necessary and appropriate measures to effectuate the relief granted herein.*

15. *The Court retains exclusive jurisdiction over any issues, claims, rights, or disputes arising out of or relating to this Agreement and Order and any actions necessary to enforce, interpret, or implement the terms and provisions of this Agreement and Order.*

*[The remainder of this page has been left intentionally blank.]*

*23-10322-jpm Document 1808 Filed on 09/08/25 Entered on 09/08/25 16:33:14 Main Document*

*Page 6 of 6*

*New York, New York*

*Dated: June 20, 2025*

**HERBERT SMITH FREEHILLS KRAMER (USA) LLP**

*/s/ Kyle Ortiz*

*Kyle J. Ortiz, Esq.*

*Brian F. Shaughnessy, Esq.*

*1177 Avenue of the Americas*

*New York, NY 10036*

*Tel: (212) 715-9100*

*Fax: (212) 715-8000*

*Emails: kyle.ortiz@hsfkramer.com*

*brian.shaughnessy@hsfkramer.com*

*Attorneys for Eletson Holdings Inc.*


**AEGEAN BALTIC BANK, S.A.**

*/s/ Phil Abelson*

*Phil Abelson*

*Kim Havlin*

*Jade Yoo*

*WHITE & CASE LLP*

*1221 Avenue of the Americas*

*New York, New York 10020*

*Tel: (212) 819-8200*

*Fax: (212) 354-8113*

*Attorneys for Aegean Baltic Bank, S.A.*

*Dated: New York, New York*

*8 September 2025*

By this consensual stipulation, the allegedly reorganized shell company Eletson Holdings Inc. and Aegean Baltic Bank agreed that the Bank would be paid, in lieu of its claim which exceeded USD 4 million, the infinitesimal amount of USD 166,155.24, without however providing that the Bank's claim against the debtor Eletson Corporation would thereby be satisfied. It is worth noting that Aegean Baltic Bank had been selected by the U.S. Trustee, as one of the three members of the Unsecured Creditors' Committee, in the purported reorganization of the shell company Eletson Holdings Inc. before the U.S. Bankruptcy Court for the Southern District of New York. This designation was recognized as a privilege granted abroad, while in New York the Bank was treated as a lending institution holding claims, whereas in Greece it was both the lender and the guarantor of the loan.

There is no doubt that, through its participation in the Unsecured Creditors' Committee, the Bank acquired access to inside information regarding the other creditors and, in practice, abused this privileged position by turning against the true management company Eletson Corporation. Such conduct is not only contradictory, but also a blatant violation of fairness, equity, and public policy.

Furthermore, it is abundantly clear that if the allegedly reorganized shell company Eletson Holdings Inc., ostensibly protecting the interests of the debtor Eletson Corporation, were truly acting in good faith towards the Bank, it could, as a matter of common sense, have succeeded in extinguishing and dismissing AB Bank's bankruptcy petition against Eletson Corporation, instead of allowing the continuation of this vexatious proceeding.

From all of the above it follows that there is no justification for the imposition of service of documents against us.

34

**FOR THESE REASONS**

**Subject to all reservations of our rights,**

**WE REQUEST**

That the application for interim measures of the opposing party be dismissed as unfounded and that it be ordered to bear the costs of these proceedings.

Piraeus 19.09.2025

The Attorney at Law

Emmanuel Andreoulakis

Signature/ stamp

35